AKIN GUMP STRAUSS HAUER & FELD LLP
Ira S. Dizengoff
Arik Preis
Mitchell Hurley
Joseph L. Sorkin
Sara L. Brauner
One Bryant Park
New York, New York 10036
Telephone: (212) 872-1000
Facsimile: (212) 872-1002

*Counsel to the Official Committee of Unsecured*
*Creditors of Purdue Pharma L.P.,* et al.

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

|  |  |  |
|---|---|---|
| In re: | ) | Chapter 11 |
|  | ) |  |
| PURDUE PHARMA L.P., *et al.*,[1] | ) | Case No. 19-23649 (RDD) |
|  | ) |  |
| Debtors. | ) | (Jointly Administered) |
|  | ) |  |

## DECLARATION OF MITCHELL HURLEY
### DATED SEPTEMBER 29, 2020

---

[1] The Debtors in these cases, along with the last four digits of each Debtor's registration number in the applicable jurisdiction, are as follows: Purdue Pharma L.P. (7484), Purdue Pharma Inc. (7486), Purdue Transdermal Technologies L.P. (1868), Purdue Pharma Manufacturing L.P. (3821), Purdue Pharmaceuticals L.P. (0034), Imbrium Therapeutics L.P. (8810), Adlon Therapeutics L.P. (6745), Greenfield BioVentures L.P. (6150), Seven Seas Hill Corp. (4591), Ophir Green Corp. (4594), Purdue Pharma of Puerto Rico (3925), Avrio Health L.P. (4140), Purdue Pharmaceutical Products L.P. (3902), Purdue Neuroscience Company (4712), Nayatt Cove Lifescience Inc. (7805), Button Land L.P. (7502), Rhodes Associates L.P. (N/A), Paul Land Inc. (7425), Quidnick Land L.P. (7584), Rhodes Pharmaceuticals L.P. (6166), Rhodes Technologies (7143), UDF L.P. (0495), SVC Pharma L.P. (5717) and SVC Pharma Inc. (4014). The Debtors' corporate headquarters is located at One Stamford Forum, 201 Tresser Boulevard, Stamford, CT 06901.

PUBLICLY FILED PER STIPULATION [ECF 2140]

Under 28 U.S.C. § 1746, I, Mitchell Hurley, declare under the penalty of perjury that the following is true and correct to the best of my knowledge, information, and belief:

1.      This declaration ("**Declaration**") is submitted in support of the Official Committee of Unsecured Creditors (the "**UCC**") of Purdue Pharma, L.P. et al.'s two motions filed contemporaneously with this Declaration entitled (1) Official Committee of Unsecured Creditors' Motion to Compel Production of Purportedly Privileged Documents, or for In Camera Review, Based on Good Cause, Crime Fraud, and At Issue Exceptions to Privilege (the "**Exceptions Motion**"); and (2) Official Committee of Unsecured Creditors' Motion to Compel Production of Purportedly Privileged Documents, or for In Camera Review, Based on Failure of the Sacklers and the Debtors to Demonstrate Documents Identified on Logs Are Privileged (the "**General Challenges Motion,**" and, together with the Exceptions Motion, the "**Motions**").[2]

2.      I am an attorney in good standing admitted to practice in the State of New York, and I am a partner at the law firm of Akin Gump Strauss Hauer & Feld LLP ("**Akin Gump**").  I make this Declaration based on my own personal knowledge and belief, and upon documents and information available to me as counsel to the UCC.

3.      The UCC has met and conferred with counsel for the Sacklers and the Debtors (collectively, the "**Withholding Parties**") in a good faith effort to resolve by agreement the issues raised by the Motions without the intervention of the Court.  The UCC has conferred and corresponded with the Sacklers' and the Debtors' counsel on numerous occasions in an attempt to resolve the UCC's concerns regarding the propriety of the documents withheld or redacted as indicated on the Privilege Logs, as well as the issues regarding the Good Cause, Crime Fraud, and At Issue exceptions to privilege.  A selection of the written correspondence most relevant to the

---

[2] Capitalized terms used but not defined herein shall have the meanings ascribed to them in the Motions.

PUBLICLY FILED PER STIPULATION [ECF 2140]

issues before the Court is described below and attached to this Declaration.  While the parties

informally resolved some of the UCC's challenges, they could not resolve the issues set forth in

the Motions.  The UCC, therefore, has filed the Motions in accordance with the briefing schedule

provided in the *Amended Stipulation and Agreed Order Regarding Discovery Deadlines and

Briefing Scheduling in the Chapter 11 Cases* executed by the Debtors, the Sacklers, the NCSG,

the AHC, and the UCC, which was filed and so ordered by the Court on September 28, 2020 [ECF

No. 1734].

4.      Further, the UCC is filing the correspondence with the Withholding Parties in

redacted form in an abundance of caution in order to accommodate certain Withholding Parties'

prior positions concerning the confidentiality of email address and other information that may be

contained therein.  By filing in this way, the UCC does not intend to suggest that it agrees the

information is or ought to be confidential.

5.      In addition to the correspondence between the UCC and the Withholding Parties,

this Declaration describes the documents and testimony attached to this Declaration that support

the UCC's position in both Motions.

6.      Certain exhibits attached hereto have been designated as Confidential, Highly

Confidential, or Professional's Eyes Only by one or more parties to this proceeding and are filed

under seal pursuant to the *Second Amended Protective Order* entered in these proceedings [ECF

No. 1540].

7.      Attached hereto as **Exhibit A** is a true and correct copy of an excel workbook

containing the entries on Side A's privilege log that the UCC is challenging in the General

Challenges Motion and the Exceptions Motion, separated by category based on the tabbed

worksheets in the excel workbook.  For the Exceptions Motion, the privilege entries are a non-

PUBLICLY FILED PER STIPULATION [ECF 2140]

exhaustive, illustrative list of the Challenged Documents that the UCC believes may fit within the categories of privileged documents of which, by the Exceptions Motion, the UCC is seeking to compel production.

8.      Attached hereto as **Exhibit B** is a true and correct copy of an excel workbook containing the entries on Side B's privilege log that the UCC is challenging in the General Challenges Motion and the Exceptions Motion, separated by category based on the tabbed worksheets in the excel workbook.  For the Exceptions Motion, the privilege entries are a non-exhaustive, illustrative list of the Challenged Documents that the UCC believes may fit within the categories of privileged documents of which, by the Exceptions Motion, the UCC is seeking to compel production.

9.      Attached hereto as **Exhibit C** is a true and correct copy of an excel workbook containing the entries on Debtors' privilege log that the UCC is challenging in the General Challenges Motion and the Exceptions Motion, separated by category based on the tabbed worksheets in the excel workbook.  For the Exceptions Motion, the privilege entries are a non-exhaustive, illustrative list of the Challenged Documents that the UCC believes may fit within the categories of privileged documents of which, by the Exceptions Motion, the UCC is seeking to compel production.

10.     Attached hereto as **Exhibit 1** is a true and correct copy of an email from J. McClammy to K. Porter, dated May 22, 2020.

11.     Attached hereto as **Exhibit 2** is a true and correct copy of a letter from M. Hurley to J. Ball, A. Lees, and G. Joseph, dated July 25, 2020.

12.     Attached hereto as **Exhibit 3** is a true and correct copy of a letter from A. Lees to M. Hurley, dated July 28, 2020.

PUBLICLY FILED PER STIPULATION [ECF 2140]

13.     Attached hereto as **Exhibit 4** is a true and correct copy of a letter from A. Lees to M. Hurley, dated July 31, 2020.

14.     Attached hereto as **Exhibit 5** is a true and correct copy of a letter from M. Hurley to J. Ball, A. Lees, and G. Joseph, dated August 5, 2020.

15.     Attached hereto as **Exhibit 6** is a true and correct copy of a letter from A. Lees to M. Hurley, dated August 7, 2020.

16.     Attached hereto as **Exhibit 7** is a true and correct copy of a letter from J. Ball to Akin Gump counsel, dated August 10, 2020.

17.     Attached hereto as **Exhibit 8** is a true and correct copy of a letter from M. Hurley to J. Ball and A. Lees, dated August 12, 2020.

18.     Attached hereto as **Exhibit 9** is a true and correct copy of a letter from J. Ball to M. Hurley, dated August 16, 2020.

19.     Attached hereto as **Exhibit 10** is a true and correct copy of a letter from A. Lees to M. Hurley, dated August 16, 2020.

20.     Attached hereto as **Exhibit 11** is a true and correct copy of a letter from J. Ball, A. Lees, J. Dougherty, and M. Hirschfield to M. Hurley, dated August 17, 2020.

21.     Attached hereto as **Exhibit 12** is a true and correct copy of a letter from M. Hurley to J. Ball, dated August 18, 2020.

22.     Attached hereto as **Exhibit 13** is a true and correct copy of a letter from M. Hurley to A. Lees, dated August 20, 2020.

23.     Attached hereto as **Exhibit 14** is a true and correct copy of a letter from A. Lees to M. Hurley, dated August 22, 2020.

5

PUBLICLY FILED PER STIPULATION [ECF 2140]

24.    Attached hereto as **Exhibit 15** is a true and correct copy of a letter from J. Ball to M. Hurley, dated August 23, 2020.

25.    Attached hereto as **Exhibit 16** is a true and correct copy of a second letter from J. Ball to M. Hurley, dated August 23, 2020.

26.    Attached hereto as **Exhibit 17** is a true and correct copy of a letter from M. Hurley to B. Kaminetzky, C. Duggan, J. McClammy, M. Clarens, dated August 30, 2020.

27.    Attached hereto as **Exhibit 18** is a true and correct copy of a letter from M. Hurley to J. Ball, dated August 30, 2020.

28.    Attached hereto as **Exhibit 19** is a true and correct copy of a letter from M. Hurley to A. Lees, dated August 30, 2020.

29.    Attached hereto as **Exhibit 20** is a true and correct copy of a letter from A. Lees to M. Hurley, dated September 2, 2020.

30.    Attached hereto as **Exhibit 21** is a true and correct copy of a letter from J. McClammy to M. Hurley, dated September 8, 2020.

31.    Attached hereto as **Exhibit 22** is a true and correct copy of a letter from J. Ball to M. Hurley, dated September 8, 2020.

32.    Attached hereto as **Exhibit 23** is a true and correct copy of a letter from M. Hurley to A. Lees, dated September 12, 2020.

33.    Attached hereto as **Exhibit 24** is a true and correct copy of a letter from M. Hurley to J. Ball, dated September 12, 2020.

34.    Attached hereto as **Exhibit 25** is a true and correct copy of a letter from M. Hurley to J. McClammy, dated September 13, 2020.

PUBLICLY FILED PER STIPULATION [ECF 2140]

35.     Attached hereto as **Exhibit 26** is a true and correct copy of a letter from J. Ball to Akin Gump counsel, dated September 17, 2020.

36.     Attached hereto as **Exhibit 27** is a true and correct copy of a letter from A. Lees to M. Hurley, dated September 17, 2020.

37.     Attached hereto as **Exhibit 28** is a true and correct copy of a letter from M. Hurley to A. Lees, dated September 19, 2020.

38.     Attached hereto as **Exhibit 29** is a true and correct copy of a letter from M. Hurley to J. McClammy, dated September 21, 2020.

39.     Attached hereto as **Exhibit 30** is a true and correct copy of a letter from M. Hurley to A. Lees, dated September 22, 2020.

40.     Attached hereto as **Exhibit 31** is a true and correct copy of a letter from J. Ball to Akin Gump counsel, dated September 22, 2020.

41.     Attached hereto as **Exhibit 32** is a true and correct copy of a letter from M. Hurley and A. Troop to J. McClammy and P. Fitzgerald, dated September 23, 2020.

42.     Attached hereto as **Exhibit 33** is a true and correct copy of a letter from M. Hurley to J. McClammy, dated September 24, 2020.

43.     Attached hereto as **Exhibit 34** is a true and correct copy of a letter from A. Lees to M. Hurley, dated September 24, 2020.

44.     Attached hereto as **Exhibit 35** is a true and correct copy of a letter from M. Hurley to J. Ball, dated September 24, 2020.

45.     Attached hereto as **Exhibit 36** is a true and correct copy of a letter from M. Hurley to A. Lees, dated September 25, 2020.

PUBLICLY FILED PER STIPULATION [ECF 2140]

46.     Attached hereto as **Exhibit 37** is a true and correct copy of a letter from M. Grier to M. Huebner, M. Hurley, R. Ringer, and A. Troop, dated September 26, 2020.

47.     Attached hereto as **Exhibit 38** is a true and correct copy of a letter from A. Lees to M. Hurley, dated September 28, 2020.

48.     Attached hereto as **Exhibit 39** is a true and correct copy of an email from J. McClammy to G. Feiner, dated May 11, 2020.

49.     Attached hereto as **Exhibit 40** is a true and correct copy of a letter from J. McLaughlin to K. Porter, dated April 9, 2020.

50.     Attached hereto as **Exhibit 41** is a true and correct copy of a letter from M. Hirschfield to A. Vinson Crawford, dated September 16, 2020.

51.     Attached hereto as **Exhibit 42** is a true and correct copy of a letter from M. Leventhal to J. McClammy, C. Duggan, and C. Oluwole, dated September 26, 2020.

52.     Attached hereto as **Exhibit 43** is a true and correct copy of an excerpt from the transcript of the deposition of David Sackler: 66:13-18; 86:20-87:10; 156:5-157:21; 190:6-15; 211:9-224:1; 225:6-232:17; 379:6-380:3; dated August 28, 2020.

53.     Attached hereto as **Exhibit 44** is a true and correct copy of an excerpt from the transcript of the deposition of Marianna Sackler: 4:19-22; 302:14-25; dated September 2, 2020.

54.     Attached hereto as **Exhibit 45** is a true and correct copy of an excerpt from the transcript of the deposition of Stephen Ives: 5:4-6; 31:23-37:21; 309:19-310:14; dated September 22, 2020.

55.     Attached hereto as **Exhibit 46** is a true and correct copy of excerpts from the transcript of the deposition of Ilene Sackler Lefcourt: 78:7-12; 91:18-92:7; dated September 18, 2020.

PUBLICLY FILED PER STIPULATION [ECF 2140]

56.     Attached hereto as **Exhibit 47** is a true and correct copy of an excerpt from the transcript of the deposition of Dame Theresa Sackler: 50:18-52:6; 63:25-65:16; 452:21-453:12; dated September 23-24, 2020.

57.     Attached hereto as **Exhibit 48** is a true and correct copy of a Memorandum of Understanding Regarding Joint Defense and Common Interest dated May 15, 2018, as sent by E. Lilburn to M. Hurley on July 31, 2020.

58.     Attached hereto as **Exhibit 49** is a true and correct copy of an email dated March 31, 2015 with an attached document entitled "Report of SDB Activities and Responsibilities," which was produced to the UCC under the Bates numbers PPLPUCC000336422 and PPLPUCC000336423, respectively.

59.     Attached hereto as **Exhibit 50** is a true and correct copy of a document entitled "Purdue Pharma Inc. Board of Directors," which was produced to the UCC under the Bates number PPLPUCC500140094.

60.     Attached hereto as **Exhibit 51** is a true and correct copy of Mortimer-Side Informational Presentation, Nov. 22, 2019.

61.     Attached hereto as **Exhibit 52** is a true and correct copy of an email chain dated August 28, 2013 among Jonathan Sackler and Dame Theresa Sackler, which was produced to the UCC under the Bates number MDSF00019408.

62.     Attached hereto as **Exhibit 53** is a true and correct copy of an email dated May 3, 2010, which was produced to the UCC under the Bates number MSF00077969.

63.     Attached hereto as **Exhibit 54** is a true and correct copy of a "Family Council Meeting" agenda for a meeting dated November 5, 2012, which was produced to the UCC under the Bates number PPLPUCC000620611.

PUBLICLY FILED PER STIPULATION [ECF 2140]

64.     Attached hereto as **Exhibit 55** is a true and correct copy of an email chain dated September 22, 2017, which was produced to the UCC under the Bates number MSF00591611.

65.     Attached hereto as **Exhibit 56** is a true and correct copy of an email chain among Jonathan White and Dame Theresa Sackler from June 19, 2015, which was produced to the UCC under the Bates number MSF90010331.

66.     Attached hereto as **Exhibit 57** is a true and correct copy of an email chain dated June 12, 2015, which was produced to the UCC by Beth Cohen under the Bates numbers BCOH0000049.

67.     Attached hereto as **Exhibit 58** is a true and correct copy of excerpts from a December 6, 2019 presentation by Joseph Hage Aaronson LLC, on behalf of the Raymond-side Sacklers entitled "*In Re: Purdue Pharma L.P., et al.*: Presentation of Defenses: Pursuant to November 5, 2019 Amended Stipulation ¶ 17(b) (ECF No. 431)."

68.     Attached hereto as **Exhibit 59** is a true and correct copy of an email chain dated March 3, 2010, which was produced to the UCC under the Bates numbers PPLPC012000259875.

69.     Attached hereto as **Exhibit 60** is a true and correct copy of a native file containing a presentation entitled "Purdue Pharma L.P. and Independent Associated Companies:  Insurance Update" dated September 2012, which was produced to the UCC under the Bates number PWG004469106.

70.     Attached hereto as **Exhibit 61** is a true and correct copy of an email chain dated April 13, 2012 attaching a presentation produced in native format entitled "OxyContin Market Events:   4/12/12 - FINAL," which was produced to the UCC under the Bates numbers PPLPC012000372436.

PUBLICLY FILED PER STIPULATION [ECF 2140]

71.      Attached hereto as **Exhibit 62** is a true and correct copy of an email chain dated November 20, 2006, which was produced to the UCC under the Bates numbers PPLPC057000003694.

72.      Attached hereto as **Exhibit 63** is a true and correct copy of an email chain dated May 15, 2007, which was produced to the UCC under the Bates numbers PWG004474511.

73.      Attached hereto as **Exhibit 64** is a true and correct copy of an email chain dated May 17, 2007, which was produced to the UCC under the Bates numbers PPLPUCC002683256.

74.      Attached hereto as **Exhibit 65** is a true and correct copy of an email chain dated February 27, 2007, which was produced to the UCC under the Bates numbers PPLPUCC000555709.

75.      Attached hereto as **Exhibit 66** is a true and correct copy of an email chain dated June 25, 2007, which was produced to the UCC under the Bates number PPLPUCC000886987.

76.      Attached hereto as **Exhibit 67** is a true and correct copy of an email chain dated February 13, 2008, which was produced to the UCC under the Bates numbers PPLPUCC000177443.

77.      Attached hereto as **Exhibit 68** is a true and correct copy of an email chain dated June 22, 2007, which was produced to the UCC under the Bates numbers PWG004473999.

78.      Attached hereto as **Exhibit 69** is a true and correct copy of an email chain dated July 26, 2007 attaching a document entitled "Confidential Memorandum to Jon Sackler," which was produced to the UCC under the Bates numbers PPLPUCC9000491386.

79.      Attached hereto as **Exhibit 70** is a true and correct copy of a document entitled "Memorandum to Dr. Richard Sackler.  From:  F. Peter Boer" dated April 12, 2008, which was produced to the UCC under the Bates numbers PDD9316314303.

PUBLICLY FILED PER STIPULATION [ECF 2140]

80.    Attached hereto as **Exhibit 71** is a true and correct copy of an email chain dated February 22, 2008, which was produced to the UCC the Debtors under the Bates numbers PPLPC042000011911.

81.    Attached hereto as **Exhibit 72** is a true and correct copy of excerpts from a December 6, 2019 presentation by Debevoise & Plimpton, on behalf of the Mortimer-side Sacklers entitled "Presentation of Defenses ('Side A'): Pursuant to November 5, 2019 Amended Stipulation ¶ 17(b) (ECF No. 431)."

82.    Attached hereto as **Exhibit 73** is a true and correct copy of a WhatsApp conversation from October 2017, which was produced to the UCC under the Bates number MSF00023231.

83.    Attached hereto as **Exhibit 74** is a true and correct copy of a WhatsApp conversation from 2017 to 2019, which was produced to the UCC under the Bates number MSF00022423.

84.    Attached hereto as **Exhibit 75** is a true and correct copy of an email chain dated December 21, 2011, which was produced to the Senate Finance Committee by Purdue prior to Purdue's bankruptcy filings under the Bates number SFC00007403.

85.    Attached hereto as **Exhibit 76** is a true and correct copy of an email chain dated March 6, 2015, which was produced to the UCC under the Bates number PNY000485015.

86.    Attached hereto as **Exhibit 77** is a true and correct copy of an email chain dated October 20, 2017, which was produced to the UCC under the Bates number MDSF00019747.

87.    Attached hereto as **Exhibit 78** is a true and correct copy of a document entitled "Purdue Quarterly Report to the Board April 15, 2008," which was produced to the UCC under the Bates numbers PWG004497873.

PUBLICLY FILED PER STIPULATION [ECF 2140]

88.    Attached hereto as **Exhibit 79** is a true and correct copy of an email chain dated December 8, 2011, which was produced to the UCC under the Bates numbers PWG004463776.

89.    Attached hereto as **Exhibit 80** is a true and correct copy of a presentation entitled "Risk Identification and Mitigation:  Selected Risks," dated September 30, 2013, which was produced to the UCC by the Debtors under the Bates numbers PPLPC031001489270.

90.    Attached hereto as **Exhibit 81** is a true and correct copy of a presentation entitled "Risk Identification and Mitigation:  Selected Risks," dated December 1, 2014, which was produced in native format to the UCC by the Debtors under the Bates number PPLPC032000394439.

91.    Attached hereto as **Exhibit 82** is a true and correct copy of a Purdue Board Meeting Agenda and materials, dated September 13, 2018.

92.    Attached hereto as **Exhibit 83** is a true and correct copy of an email dated May 15, 2012 attaching a letter from the United States Senate Committee on Finance to John H. Stewart, dated May 8, 2012, which was produced to the UCC under the Bates numbers RSF00679318.

93.    Attached hereto as **Exhibit 84** is a true and correct copy of a presentation entitled "4Q12 Compliance Report to the Board of Directors," dated January 2013, which was produced in native format to the UCC under the Bates number PPLPUCC001456442.

94.    Attached hereto as **Exhibit 85** is a true and correct copy of an excerpt of a Board presentation dated May 15, 2014, which was produced to the UCC under the Bates numbers PPLP004411166.

95.    Attached hereto as **Exhibit 86** is a true and correct copy of an excerpt of a Board presentation dated April 21, 2015, which was produced to the UCC under the Bates numbers PPLP004412071.

PUBLICLY FILED PER STIPULATION [ECF 2140]

96.     Attached hereto as **Exhibit 87** is a true and correct copy of a Distribution Agreement dated October 24, 1991, which was produced to the UCC under the Bates numbers MSF00026491.

97.     Attached hereto as **Exhibit 88** is a true and correct copy of excerpts of Board decisions dated January 15, 2013, which was produced to the UCC under the Bates numbers PPLP004417308.

98.     Attached hereto as **Exhibit 89** is a true and correct copy of an email chain dated July 24, 2015, which was produced to the UCC under the Bates number PPLPUCC9002715623.

99.     Attached hereto as **Exhibit 90** is a true and correct copy of an email chain dated September 9, 2014, which was produced to the UCC under the Bates numbers MDSF00018083.

100.     Attached hereto as **Exhibit 91** is a true and correct copy of email correspondence from September 5, 2020 to September 25, 2020 between M. Hirschfield and A. Vinson Crawford, among others.

101.     Attached hereto as **Exhibit 92** is a true and correct copy of excerpts of Plaintiffs' Memorandum of Law in Support of Motion for Partial Summary Adjudication in the case *In re National Prescription Opiate Litigation*, Case No. 17-md-2804, United States District Court for the Northern District of Ohio, dated July 19, 2019, Doc. No. 1910-1.

102.     Attached hereto as **Exhibit 93** is a true and correct copy of excerpts of Plaintiffs' Consolidated Reply Memorandum in Further Support of Plaintiffs' Motions for Partial Summary Adjudication in the case *In re National Prescription Opiate Litigation*, Case No. 17-md-2804, United States District Court for the Northern District of Ohio, dated August 26, 2019, Doc. No. 2545.

PUBLICLY FILED PER STIPULATION [ECF 2140]

103.     Attached hereto as **Exhibit 94** is a true and correct copy of "An Analysis of Distributor and Manufacturer Regulatory Compliance to Maintain Effective Controls for the Prevention of Diversion of Controlled Substances" filed in the case *In re National Prescription Opiate Litigation*, Case No. 17-md-2804, United States District Court for the Northern District of Ohio, dated January 31, 2020, Doc. No. 3124-14.

104.     Attached hereto as **Exhibit 95** is a true and correct copy of an excerpt of a United States Department of Justice Civil Proof of Claim Form in these cases dated July 30, 2020.

105.     Attached hereto as **Exhibit 96** is a true and correct copy of an excerpt of a United States Department of Justice Criminal Proof of Claim Form Addendum in these cases dated July 30, 2020.

106.     Attached hereto as **Exhibit 97** is a true and correct copy of a letter from J. Sorkin to K. Marino, dated July dated September 15, 2020.

107.     Attached hereto as **Exhibit 98** is a true and correct copy of an email from K. Marino to J. Sorkin, dated September 28, 2020.

108.     Attached hereto as **Exhibit 99** is a true and correct copy of the April 14, 2009 Decision regarding "Funding – Rhodes Pharmaceuticals L.P.," which was produced to the UCC under the Bates number PPLPUCC000619871.

109.     Attached hereto as **Exhibit 100** is a true and correct copy of April 1, 2010 Decision regarding "Purdue Pharma L.P. – 2Q 2010 Distribution," which was produced to the UCC under the Bates number PPLPUCC000440913.

110.     Attached hereto as **Exhibit 101** is a document describing the categories of privileged documents (namely, the Fiduciary Documents, the Crime Fraud Documents, and the At Issue Documents) that the UCC is seeking to compel as set forth in the Motions.

PUBLICLY FILED PER STIPULATION [ECF 2140]

111.    Attached hereto as **Exhibit 102** is a document entitled "Dr. Craig Landau Appointed President and CEO Purdue Pharma L.P.," dated August 28, 2018, was produced to the UCC by the Debtors under the Bates number PPLPUCC000013176.

112.    Attached hereto as **Exhibit 103** is true and correct copy of a letter from Mara Leventhal (Joseph Hage Aaronson) to James I. McClammy (Davis Polk) et al. dated September 26, 2020.

113.    Attached hereto as **Exhibit 104** is a true and correct copy of the April 16, 2013 Beacon Company SEC Form 4.

114.    Attached hereto as **Exhibit 105** is a true and correct copy of the April 16, 2013 Rosebay Medical Company L.P. SEC Form 4.

115.    Attached hereto as **Exhibit 106** is a true and correct copy of the March 4, 2003 Shareholders' Agreement (Purdue Pharma Inc.), which was produced to the UCC under the Bates number MSF00026639.

116.    Attached hereto as **Exhibit 107** is a true and correct copy of the Minutes of a March 4, 2003 Meeting of the Board of Directors of Purdue Pharma Inc., which was produced to the UCC under the Bates number PPLPUCC500647319.

117.    Attached hereto as **Exhibit 108** is a true and correct copy of the December 4, 2015 email from Kathe Sackler, which was produced to the UCC under the Bates number MSF00806366.

118.    Attached hereto as **Exhibit 109** is a true and correct copy of a document entitled "MNP Consulting Limited - List of Directors," sent as an attachment to a July 14, 2020 email from J. Upin to A. V. Crawford RE: IAC custodians follow up.

PUBLICLY FILED PER STIPULATION [ECF 2140]

Executed on: September 29, 2020

/s/ Mitchell Hurley
Mitchell Hurley

PUBLICLY FILED PER STIPULATION [ECF 2140]

# EXHIBIT 1

PUBLICLY FILED PER STIPULATION [ECF 2140]

| | |
|---|---|
| **From:** | McClammy, James I. <james.mcclammy@davispolk.com> |
| **Sent:** | Friday, May 22, 2020 7:52 PM |
| **To:** | Porter, Katherine |
| **Cc:** | Oluwole, Chautney M.; Preis, Arik; Hurley, Mitchell; Sorkin, Joseph L.; Brauner, Sara; zz-Murphy, Jack; Butler, Paul; Richards, Jillie |
| **Subject:** | Fwd: Purdue: Official Committee Request for DOJ Documents |
| **Attachments:** | June 2019 Letter Agreement.pdf; ATT00001.htm; March 2020 Letter Agreement.pdf; ATT00002.htm |

**EXTERNAL Email**

Katherine/Akin Team

This follows up on our prior communications and your email below.  After you review, we can set up a time to finalize a path forward.

For context, we have been diligently working with the Committee to address its requests, all the while mindful of the need to minimize costs – monetary, time and distraction, and potential delay – associated with responding to those requests.  We have asked that requests be tailored so that the review process can be focused on reviewing and producing documents pertinent to this proceeding.  Accordingly, we have agreed to the review for production of approximately 284,832 documents from 40 custodians and are in discussions with you that could result in the review of upwards of approximately 877,569 more documents on the estate terms alone.

With respect to documents produced to the DOJ, in calls DPW and Skadden, we shared Debtors' position that we would not withhold any document responsive to your requests solely on the grounds that it had been produced to the DOJ, but it was not proper to request, or for us to respond to a request, for the DOJ productions.  We understand the Committee disagrees and is maintaining its request for all documents produced to the DOJ.

As discussed, there are essentially three categories of documents that are subject to your request for documents produced to the DOJ:  (i) documents produced before the first non-waiver agreement was put in place in June 2019; (ii) documents produced after the non-waiver agreement was put in place in June 2019; and (iii) presentations and white papers prepared in response to DOJ inquiries or otherwise provided to the DOJ.  As discussed, just because the first two categories of documents were produced to the DOJ does not mean that they bear any relationship to matters that may be at issue in these cases.  Indeed, the DOJ productions are likely significantly over-broad in that they covered a substantial number of custodians and very

broad and numerous search terms and the documents were produced, in the interest of time, without conducting a responsiveness review at the insistence of the DOJ with whom we have actively been pursuing a resolution.  Turning over again large numbers of documents that are likely to include a meaningful amount of irrelevant material as well as privileged material to be reviewed by parties that are, or perhaps will be, paid by the Debtors' estates is not the best use of estate resources.

As noted, we believe our proposal strikes the right balance to provide the Committee with information to which it may be entitled without overburdening the estates or risking an improper intrusion upon the DOJ investigatory process.  I provide below some additional information on that proposal.

With respect to Category 1, documents produced before the first non-waiver agreement was in place, there were approximately 319,000 documents produced to the DOJ.  Of that total, the Committee already has access to approximately 219,000 of those documents as they were also produced in other civil litigation proceedings.  To resolve the issue with respect to the request for documents produced to the DOJ, we propose producing the remaining approximately 100,000 documents to the committee, initially on a Professionals' Eyes Only – Highly Confidential basis.  As mentioned, these documents were produced to the DOJ with a single FOIA confidential treatment requested designation.  We would need to conduct a confidentiality review to properly designate these documents in accordance with the terms of the Amended Protective Order that is in place in the bankruptcy.

With respect to Category 2, documents produced after the non-waiver agreement was in place, there are approximately 1,940,000 documents in this category.  As stated, these documents were not reviewed for responsiveness and an additional privilege review of these documents would need to be conducted before they could be produced.  Debtors would need to conduct an additional privilege review since per the non-waiver agreement, the documents were not previously reviewed with the privilege standard appropriate for production in these cases.  A review of this size is, we believe, clearly unwarranted where we have already produced to the UCC 6.7 million documents from the MDL and civil litigations and are in the process of reviewing potentially 1,162,401 more documents for production to the UCC, some of which overlaps with what has been produced to the DOJ.  In addition to the burden on the Debtors of conducting a confidentiality and privilege review of these documents, having Debtors pay for counsel to review this large number of documents would be significant and is not a reasonable expense when there is likely a significant percentage of documents in that population that are irrelevant.

Regarding the issue of privilege, we have attached versions of the relevant non-waiver agreements in a form that will assist further discussion of this issue.  We can arrange a time to further discuss.

Lastly, with respect to Category 3, we reiterate our concern that your request for presentations and whitepapers provided to the DOJ improperly interferes with the DOJ's investigation and confidential settlement and plea discussions, and is contrary to the protections given to confidential settlement and plea discussions, including Federal Rules of Evidence 408 and/or 410. In light of the hundreds of thousands of additional documents Debtors have already agreed to review and produce, together with the Category 1 documents we are agreeing to produce here, we are hopeful that the Committee will stand down from this request. Our hope is the Committee will seriously consider our expressions of concern that producing such materials would be counterproductive and not risk an intrusion on confidential investigation and settlement/plea agreement processes. We believe that sharing these materials would impede our ability to seek a fair and just resolution as efficiently as possible, which would have a seriously detrimental effect on the estate.

Best,

J.I.M.

---

**From:** McClammy, James I. <james.mcclammy@davispolk.com>
**Sent:** Thursday, May 21, 2020 10:23 AM
**To:** 'Porter, Katherine' <kporter@akingump.com>; Oluwole, Chautney M. <chautney.oluwole@davispolk.com>
**Cc:** apreis@akingump.com; Hurley, Mitchell <mhurley@AkinGump.com>; Sorkin, Joseph L. <jsorkin@AkinGUMP.com>; Brauner, Sara <sbrauner@akingump.com>; Murphy, Jack <jmurphy@AKINGUMP.com>; Butler, Paul <pbutler@akingump.com>; Richards, Jillie <richardsj@akingump.com>
**Subject:** RE: Purdue: Official Committee Request for DOJ Documents

Katherine –

Acknowledging receipt of the below and confirming that we are working on your requests and will revert. We will also respond on the substance of some of the points presented below.

J.I.M.

**James I. McClammy**

**Davis Polk & Wardwell** LLP

PUBLICLY FILED PER STIPULATION [ECF 2140]

450 Lexington Avenue  |  New York, NY 10017

+1 212 450 4584 tel  |

james.mcclammy@davispolk.com

---

Confidentiality Note: This email is intended only for the person or entity to which it is addressed and may contain information that is privileged, confidential or otherwise protected from disclosure. Unauthorized use, dissemination, distribution or copying of this email or the information herein or taking any action in reliance on the contents of this email or the information herein, by anyone other than the intended recipient, or an employee or agent responsible for delivering the message to the intended recipient, is strictly prohibited. If you have received this email in error, please notify the sender immediately and destroy the original message, any attachments thereto and all copies. Please refer to the firm's Privacy Notice for important information on how we process personal data. Our website is at www.davispolk.com.

**From:** Porter, Katherine <kporter@akingump.com>
**Sent:** Wednesday, May 20, 2020 8:31 PM
**To:** McClammy, James I. <james.mcclammy@davispolk.com>; Oluwole, Chautney M. <chautney.oluwole@davispolk.com>
**Cc:** apreis@akingump.com; Hurley, Mitchell <mhurley@AkinGump.com>; Sorkin, Joseph L. <jsorkin@AkinGump.com>; Brauner, Sara <sbrauner@akingump.com>; Murphy, Jack <jmurphy@AKINGUMP.com>; Butler, Paul <pbutler@akingump.com>; Richards, Jillie <richardsj@akingump.com>
**Subject:** Purdue: Official Committee Request for DOJ Documents

Jim,

Below is a summary of our call yesterday, May 19, regarding documents produced by the Debtors to the DOJ.  Please get back to us on the items we have noted, and let us know if your recollection differs regarding any of the points below.

You advised there are three categories of documents that the Debtors have provided to the DOJ in connection with its investigation of Purdue's role in the opioid crisis: (1) productions made to the DOJ before the execution of the so-called non-waiver agreement between the Debtors and DOJ ("NWA"); which you said you thought had been executed in or around June of 2019; (2) productions made to the DOJ after the execution of the NWA; and (3) the Debtors' presentations and white papers.  You then offered a proposal regarding which of these categories the Debtors were willing to produce.  Although the non-consenting states ("NCSG") were not on the call, you said you would be making the same proposal to them in a separate call.  Please confirm that you have spoken to the NCSG and provide us any details of that conversation.

**Category 1 – Productions made to the DOJ before the execution of the NWA.**

You conceded that the Debtors do not claim the documents in Category 1 are subject to any Debtor-privilege. You offered to produce those documents, but claimed doing so still would involve a significant burden because the Debtors would have to review them for "confidentiality" to ensure they are properly designated under the existing protective order. As a preliminary note, we do not believe documents that already have been produced to a third party without any non-disclosure agreement with that third party could still be considered confidential within the definitions provided in the bankruptcy protective order. Nevertheless, we asked whether the burden you described in connection with confidentiality review would be eliminated if the receiving parties agreed to let you produce all of them on an OPEO basis (subject of course to the receiving parties right to challenge that designation once received), and you agreed that it would.

You advised that these documents number in the six-figure range, and that they can be produced relatively quickly. We asked you to give us a more precise figure for the volume of documents in this category. We hope you will get back to us with this information promptly.

**Category 2 – Productions made to the DOJ after the execution of the NWA.**

The Debtors will not agree to produce the documents in Category 2. But, if documents that were produced to the DOJ in this timeframe are also independently picked up by the Official Committee's existing search criteria, the Debtors will not withhold them from production on that basis. You identified two reasons for withholding documents in Category 2. First, you advised that they were not subject to any review for relevance before their production to the DOJ, and therefore many of these documents may not be relevant to the Official Committee's investigation. If so, this could result in some additional burden to the Official Committee, but not to the Debtors, who have already gathered the documents and can send them to us at the push of a button. Nevertheless, to help us consider your concern, please advise with more specificity and as soon as possible the types of documents that were part of this production that you claim likely would or could be irrelevant to the Official Committee's investigation in these cases.

You also argued (as you did on our call last Friday May 15) that some documents in Category 2 were privileged, and that those documents would remain privileged despite their disclosure by the Debtors to the DOJ because of the existence of the NWA. As a result, you contend it would be burdensome to produce to the Official Committee the documents in Category 2 because that would require a privilege review. As you know, we asked you on May 15 to give us a copy of the NWA so we can better assess your claim, but so far you have failed to do so. When we spoke again yesterday, you told us the Debtors have denied our request for a copy of the NWA. You claim this is because the NWA could somehow reveal aspects of the DOJ's investigation, though you freely admit that the DOJ itself has never asserted any claim of "investigatory privilege" with respect to any of these materials, including the NWA and including the Category 2 documents. You also were unable to tell us how many documents are in Category 2.

## Category 3 – The Debtors' presentations and white papers.

The Debtors also will not agree to produce the documents in Category 3.  You advised that the Debtors are not claiming that these documents are subject to attorney-client privilege.  Rather, you identified two reasons for withholding them.  First, you argued that some of these documents are protected from disclosure because they are subject to Federal Rules of Evidence 408 and 410.  We do not agree that either of these rules is a basis for withholding documents from production in discovery, and you cited no authorities to suggest that they are.  Second, you argued that disclosure may interfere with the grand jury process or with the DOJ's ongoing investigation.  Once again, however, you acknowledged that the government has not attempted to assert any grand jury or investigative privilege itself, and that the concern you identified is purely speculative.

If you do not address our requests above by Friday, May 22, we are prepared to bring this matter to the court's attention. Thank you.

Regards,

**Katherine Porter**

**AKIN GUMP STRAUSS HAUER & FELD** LLP

One Bryant Park  |  New York, NY 10036-6745  |  USA  |  Direct: +1 212.872.7467  |  Internal: 37467
Fax: +1 212.872.1002  |  kporter@akingump.com  |  akingump.com  |  Bio

The information contained in this e-mail message is intended only for the personal and confidential use of the recipient(s) named above. If you have received this communication in error, please notify us immediately by e-mail, and delete the original message.

# EXHIBIT 2



**MITCHELL P. HURLEY**
+1 212.872.1011/fax: +1 212.872.1002
mhurley@akingump.com

July 25, 2020

**VIA E-MAIL**

Jasmine Ball
**Debevoise & Plimpton LLP**
919 Third Avenue
New York, NY 10022
*Counsel to Sackler Family Side A*
*(Mortimer) ICSPs, ACSPs, and Entities*

Alex Lees
**Milbank LLP**
55 Hudson Yards
New York, NY 10001
*Counsel to Sackler Family Side B*
*(Raymond) ICSPs, ACSPs, and Entities*

Gregory P. Joseph
**Joseph Hage Aaronson LLC**
485 Lexington Avenue, 30th Floor
New York, NY 10017
*Counsel to Sackler Family Side B*
*(Raymond) ICSPs, ACSPs, and Entities*

Re:   *In re: Purdue Pharma L.P. et al.*, No. 19-23649 (Bankr. S.D.N.Y.) – Request for
Meet and Confer

Dear Counsel:

We write to schedule a meet and confer call with you concerning discovery from your clients early next week, ideally Monday or Tuesday if you are available on those days. Please let us know about your availability at your earliest convenience. The topics we wish to discuss with you are previewed in this letter and relate primarily to your clients' non-ESI discovery, *i.e.*, the production of documents to be gathered outside of the negotiated ESI search terms and custodians, and a small number of other issues that have recently arisen. Of course, during our meet and confer and otherwise, we may identify other issues for discussion beyond those listed below, but we have attempted to preview major areas for discussion in advance in order to help you prepare for the call and ensure a productive discussion.



**Akin Gump**

STRAUSS HAUER & FELD LLP

July 25, 2020
Page 2

**Mortimer D. Sackler Emails**

Pursuant to our agreed stipulation, Side A was required to determine whether ESI could be collected from the Mortimer D. Sackler account by June 25, 2020. Stipulation [ECF 1295] ¶ 4. It is now one month later and we still do not have an answer. Please be prepared to provide the following information:

- ■ Which vendor is Side A using to restore back up tapes, and where is that vendor located?

- ■ Has Mundipharma delivered the physical back up tapes to the vendor yet? If not, why not? If yes, when?

- ■ Has the vendor (or anyone else) provided any estimate of how long it will take to restore the tapes?

- ■ Please provide more detail concerning what steps need to be taken to restore the tapes.

- ■ Has Side A been able to determine anything regarding the contents of the tapes? For example, the period of time of the data contained on the tapes, and the volume of Mortimer's emails contained on the tapes?

- ■ Please provide an estimate of when Mortimer's emails responsive to the Official Committee's requests in the March 31 subpoena ("Subpoena") will be produced.

**Privilege Logs**

As you know, we just received each Side's initial privilege logs, which are extensive. Our review is underway, but preliminarily we already have identified a number of entries that appear to be problematic.

For example, it appears from your privilege logs, as well as Side B's July 17, 2020 claw back letter, that responsive documents are being withheld as subject to the marital privilege, despite being normal, everyday communications between spouses (including communications about trips to Paris, second homes, Sackler trusts, insurance, transfers, taxes, working out, flowers, and art exhibitions, among others). We do not believe that every email between spouses is subject to a colorable claim of the marital privilege.



July 25, 2020
Page 3

In addition, both Sides have logged as attorney-client privileged communications with Davis Polk lawyers, a firm that we understand has never represented the Sacklers, and Side A logged communications between Mortimer D.A. Sackler and Gheri Sackler as marital privileged, though we understand Gheri is his mother, not his wife.  Please be prepared to explain these entries on our call.  We will continue to raise other questions concerning your logs as our review proceeds.

**Beneficiary Meeting Materials**

Please confirm that you have gathered or will gather and produce all extant presentations and other materials distributed in connection with family meetings concerning Purdue, including any so-called "beneficiary meetings."  We believe these materials require independent searching of hard copy and electronic files, and should not rely solely on the ESI search terms.

**Trust Materials**

In response to Request 5, both Sides have refused to provide trust accountings.  We believe these are easy to obtain through non-ESI searches, and ask that you reconsider and produce those materials.

In response to Request 5(f), regarding loan agreements, we understand that Side B will only produce "loan agreements governing loans to or from Raymond Side Initial Covered Sackler Person Trusts, as to which a Covered Party is the counterparty."  We can accept this limitation *on the understanding* that the relevant information concerning other loans will be captured in the so-called sources and uses document discussed further below.  Side A, on the other hand, has refused to produce any loan agreements, or to provide a clear explanation about what sort of report it will provide concerning the disposition of assets from ICSP trusts.  Please advise whether loans will be included in Side A's report concerning ICSP trusts; if they will not, the Official Committee requires Side A's loan agreements responsive to this request, which should be easy to gather through non-ESI searches.

Regarding transfers among the Covered Sackler Persons and trusts, both Sides have agreed to provide certain bank and other financial documents that we understand will show cash transfers in and out of ICSP trusts.  We are concerned, however, that the documents you will provide will not convey information regarding transfers of *non-cash* assets (such as real estate, art, equity interests, jewelry, etc), and we have reason to believe that significant value may have been held in non-cash assets .  As with the loan agreements, we expect that Side B's so-called sources and uses document will capture this information, and so we are not requesting any



**Akin Gump**

STRAUSS HAUER & FELD LLP

July 25, 2020
Page 4

additional primary source documents concerning this request from Side B at this time.  Please advise, however, if we are mistaken.  Side A, however, has provided no detail regarding its forthcoming report, and we have no confidence that it will fill this gap in information.  Accordingly, we request Side A's production of documents sufficient to show non-cash transfers, which we understand should be straightforward to gather through non-ESI searches.

Finally, regarding distributions, what both Side A and B have offered to provide for Request 5(g) does not capture *the reasons to give or refuse* requested distributions, unless otherwise captured by our ESI search terms.  We believe these materials should be readily attainable with the ICSP trusts' files through non-ESI searching and ask that you please provide these documents.

**Professionals who Advised Any Covered Sackler Persons or Trusts**

In response to Request 8, seeking professionals who advised any of the Covered Sackler Persons or trusts, Side A offered to provide "a stipulation containing this information to avoid the need to undertake an unduly burdensome search for and production of documents."  When do you plan to provide the stipulation?  Side B refused this request.  We ask again that you produce this information as requested in the Subpoena, or in the same manner Side A proposed.  It is critical that the Official Committee learn the identities of all professional firms that gave your clients advice about estate planning and transfers, including without limitation accounting and wealth management firms.

**Asset Protection and Estate Planning**

In response to Request 9, seeking certain asset protection and estate planning information, both Sides stated that they will only produce documents concerning "asset protection structures" that were actually implemented.  You previously assured us that neither Side intends the term "implemented" to narrow or otherwise affect any production decisions, and we expect and confirmed that responsive documents concerning, for example, documents concerning asset protection and estate planning measures that may have been proposed or discussed will not be withheld from production merely because they were not ultimately implemented.



**Akin Gump**

STRAUSS HAUER & FELD LLP

July 25, 2020
Page 5

## Tax Liability on Distributions

In response to Request 10, both Sides have stated that they will produce tax filings of Initial Covered Sackler Persons and documents relating to transfers.[1]  We would like tax work papers showing calculations for distributions, records or payments of tax liability, and records of any tax distributions or deductions and/or withholdings.  Each of these should be discrete, and easy to locate without use of ESI searching.

## Transfers from IACs to Covered Sackler Persons or Trusts

In response to Request 14, both Sides have agreed to produce tax returns, audited financial statements, and bank records for Initial Covered Sackler Persons.  Please confirm that these documents will be sufficient to identify all transfers from IACs to Covered Sackler Persons or trusts.

## Financial Status of the Covered Sackler Persons

In response to Request 19, both Sides have reserved the right to provide an updated financial presentation that takes into account current events relating to the impact of Covid-19.  Do you intend to do so?

## Discovery Materials from Other Actions or Investigations

In response to Request 22, Side A said it will only produce expert reports, requests for admission, and interrogatory responses in "pending civil and administrative actions."  The Official Committee would like these documents from non-pending and non-civil actions as well, if they exist.

## Government Investigations

In response to Requests 32 and 62, both Sides agreed to provide the documents actually produced in investigations.  However, you refused to produce documents "concerning" those

---

[1] While both Sides sought to narrow the definition of "Transfer" in their Responses and Objections, we understand, based on our agreement concerning responsiveness for the ESI review, that any documents concerning transfers as defined in the Subpoena would be produced as part of the ESI review and production, including but not limited to transfers from owners of the Debtors, or II-Way Entities, and transfers to IACs and trusts.  *See* May 25 Hurley Ltr. (all documents returned by the agreed upon search criteria and that are responsive to the Subpoenas are to be produced with only two identified exceptions).



July 25, 2020
Page 6

investigations that were not produced.  We have raised these materials before, and most recently
have received your July 22, 2020 emails similarly refusing to produce your presentations and
other exchanges with the DOJ and third parties concerning DOJ investigations of your clients in
connection with the opioid crisis.  We would be happy to discuss with you during our call why
we believe these materials readily meet the requisite threshold for "relevance" to be subject to
production under Rule 2004.  We ask that you please be prepared during our call to explain why
you believe providing this information to the Official Committee would be burdensome, and
whether there are any items from this category that you believe could be produced without undue
burden.

**Electronic Medical Record Systems or Providers**

In response to Request 34, Side B asserted in its Responses and Objections that it was
limiting its production to documents concerning Practice Fusion.  This is not an acceptable
limitation.  Nevertheless, we understand that no documents were withheld from ESI searches and
production based on this supposed limitation, if such documents were returned by our agreed
search terms and custodians.  *See* May 25 Hurley Ltr.  To the extent that Side B custodians are in
possession of non-ESI documents responsive to this request, please confirm that they will
provide agreements with electronic medical record systems other than Practice Fusion, if any.

**Anti-Money Laundering Documents**

In response to Request 55, both Sides have agreed to produce "bank records and financial
statements" but not documents submitted *to* banks concerning anti-money laundering
requirements.  We ask that you please reconsider, as these documents should be easy to locate
through non-ESI searches.[2]

**Document Preservation Notices**

In response to Request 75, seeking document hold notices, both Sides refuse to produce
this information entirely.  We ask that you please reconsider.  It is not burdensome to gather
these notices, which can easily be located through non-ESI searching.  Moreover, these

---

[2] To the extent any documents submitted to banks were captured by the agreed-upon ESI searches, we
understand that you have produced these documents, given our agreement on responsiveness.  *See* May 25 Hurley
Ltr.  Please advise immediately if that is incorrect.



Akin Gump
STRAUSS HAUER & FELD LLP

July 25, 2020
Page 7

documents are highly relevant to questions concerning litigation, which are central to key claims in these cases.

**Sackler-Owned Pharmaceutical Companies**

In response to Request 86 for documents sufficient to identify all pharmaceutical companies owned by any Covered Sackler Person, both Sides have said they will identify those in which Sacklers have a "material interest." Please clarify your definition of material, whether measured by the value of the interest, the percentage, or otherwise.

**Engagement Agreements and Legal Invoices**

Both Sides said they will only produce the quarterly reports required under the case stipulation. We ask that you please provide copies of all engagement agreements and all invoices involving Stuart Baker, Norton Rose, or Chadbourne & Parke in your possession, custody, or control, from 2006 through the Petition Date.

**Sackler Entities**

While the Official Committee has worked with Royer Cooper and Haug to identify IACs and II-Way Entities, we still lack sufficient clarity on certain entities. Your Responses and Objections to the Subpoenas purported to draw artificial limitations on the definitions of I-Way Entities, II-Way Entities, and IACs. In time, your proposed definitions have proven unworkable and leave many entities associated with the Covered Sackler Persons without designation, thereby, it seems, potentially removing them from the scope of the Subpoenas. With respect to the ESI review, our disagreement with your purported limitations on these definitions became moot given our agreement that the ICSPs would produce all documents returned by the agreed search criteria that were responsive to the Subpoenas with only two exceptions for privilege/forbidden by law, and a good faith determination that the document could not be subject to a good faith claim of relevance to any issue in these cases by the Official Committee or any other party. *See* May 25 Hurley Ltr.; *see also* May 29 Lees Ltr.

As you turn to non-ESI review, however, we want to ensure that you will, at a minimum, include in your definitions for IACs and II-Way Entities all entities identified and/or represented by Royer Cooper and Haug, respectively, as current or former IACs and II-Way Entities (including, with respect to Royer Cooper, all former, liquidated IACs that it has acknowledged as such).



July 25, 2020
Page 8

Likewise, we believe that Side A and Side B must identify all entities owned by the Covered Sackler Persons, regardless of classification, and their respective counsel. We hope you will be willing to discuss this issue with us during the meet and confer.

Please let us know if each Side is responsible for gathering any responsive materials from the I-Way Entities on its respective side. If that is not the case, we will ask that each Side identify the counsel for those I-Way Entities.

Relatedly, Royer Cooper has identified many entities that, it claims, are represented by Milbank.[3] We ask Side B to confirm its representation of these entities and commitment to produce documents responsive to the Subpoenas that may be held by these entities. We expect that these are documents to be obtained through targeted reviews, and not a negotiation of search terms and custodians.

Finally, we request Side A and Side B to advise regarding who is representing and producing documents on behalf of the Sacklers' joint ventures, as Royer Cooper has informed the Official Committee that it does not represent these entities.

**Charities, Foundations, or Institutes**

The Official Committee has identified many entities that appear to be charities, foundations, or institutes affiliated with Covered Sackler Persons.[4] Please be ready to confirm whether these entities are managed, directed, controlled, or majority funded by Covered Sackler Persons, and if so, confirm their representation and commitment to produce documents responsive to the Subpoenas.

With respect to one such entity, The Acorn Foundation, it appears that Stuart D. Baker, Jonathan White, and multiple Sacklers, including Kathe, Mortimer, and Ilene, all had email

---

[3] For example, B.L. Carrolton Limited (Bermuda); G.H. Carrell Limited (Bermuda); Mallard Limited (Bermuda); Triangle Industries Limited (Bermuda); Nerula S.ar.l. (Luxembourg); Millsaw Realty L.P.

[4] For example, The Acorn Foundation for the Arts and Sciences, Inc., (Delaware); The Aesculapius Foundation Limited (Bermuda); The Bouncer Foundation, Inc. (Delaware); The Dr. Mortimer and Theresa Sackler Charitable GmbH (Germany); The Mortimer D. Sackler Foundation, Inc. (New York); The Raymond and Beverly Sackler Foundation (Canada); The Raymond and Beverly Sackler Foundation, Inc. (New York); The Raymond and Beverly Sackler Fund for the Arts and Sciences, Inc. (Delaware); The Research Foundation Limited (Bermuda); The Richard Sackler Family Foundation, Inc. (Delaware); The Sackler Foundation (Canada); The Sackler Foundation (Switzerland); The Sackler Trust (United Kingdom); Verto Institute LLC; Napp Educational Foundation (United Kingdom).

UNREDACTED - CONTAINS OUTSIDE PROFESSIONALS' EYES ONLY INFORMATION
TREAT SUBJECT TO PROTECTIVE ORDER



Akin Gump

STRAUSS HAUER & FELD LLP

July 25, 2020
Page 9

addresses with The Acorn Foundation.  Do you have possession, custody, or control of these emails?

**Sources and Uses Reports (Or Similar Reports)**

We ask Side B to please provide an update on the timing of your clients' report concerning transfers from ICSP trusts, which we have referred to between the parties as a "sources and uses" report.  As indicated above, our understanding that this report would be provided dictated our willingness to compromise on several of our requests for underlying documents.

We understand that Side A is not providing a so-called "sources and uses" report, but does intend to provide a report "listing the trusts that received subsequent distributions out of funds received by a Side A Covered Sackler Person through a distribution from Purdue."  *See* May 21, 2020 H. Williford email.  We ask Side A to please provide an update on timing, and also more clarity and detail about *what* information it is willing to provide and in what form.  As with Side B, our discovery positions have been shaped in part by your longstanding promise to provide this report.

**Norton Rose Documents**

As requested in the Official Committee's July 22, 2020 letter, the Official Committee seeks your support in collecting documents responsive to the Subpoenas that may be in the possession, custody, or control of Norton Rose Fulbright and other professional service providers.  As discussed further therein, these documents are critical to many issues addressed in the Subpoenas.  Please be prepared to discuss whether your clients are willing to cooperate as requested in the July 22 letter.

Nothing herein constitutes a waiver of any of the Official Committee's claims, defenses, rights or remedies, all of which are reserved.  Further, nothing herein shall be construed as limiting the scope of any requests issued in the Subpoenas.

Sincerely,

*/s/ Mitchell Hurley*
Mitchell P. Hurley

# EXHIBIT 3

UNREDACTED    CONTAINS OUTSIDE PROFESSIONALS' EYES ONLY INFORMATION
TREAT SUBJECT TO PROTECTIVE ORDER



# Milbank

**ALEXANDER B. LEES**

*Partner*

55 Hudson Yards | New York, NY 10001-2163
T: 212.530.5161
alees@milbank.com | milbank.com

July 28, 2020

***PROFESSIONALS' EYES ONLY/HIGHLY CONFIDENTIAL***
***SUBJECT TO PROTECTIVE ORDER***

**VIA EMAIL**

Mitchell P. Hurley
One Bryant Park
Bank of America Tower
New York, NY 10036

   Re:  In re Purdue Pharma L.P. et al., No. 19-23649 (Bankr. S.D.N.Y.)

Dear Mitch:

   I write in response to your letter of July 25, 2020, on behalf of the Raymond-side Initial Covered Sackler Persons and Additional Covered Sackler Persons we represent.

<u>Privilege Logs</u>

   Please explain why you do not believe emails between spouses are privileged, especially where they are presumed to be confidential. If you have authority to support your position that the privilege does not attach to "everyday communications" that are transmitted in confidence, please provide it.

   With respect to communications that include our clients and Davis Polk, which represents the Debtors, there are multiple reasons why a privilege would apply. Jonathan, Richard, and David Sackler were directors of the Debtors (as were various members of the Mortimer Sackler family). In addition, our clients (including those who were not directors) were named in several prepetition lawsuits based on the Debtors' own conduct and liabilities and premised on the same factual and legal theories as claims against the Debtors. Likewise, our clients and the Debtors jointly are supporting a plan of reorganization centered on the proposed settlement framework. So where our clients are included on communications with Davis Polk, where legal advice or attorney work product was solicited or conveyed, there would be no waiver of attorney-client

MILBANK LLP

NEW YORK | LOS ANGELES | WASHINGTON, D.C. | SÃO PAULO | FRANKFURT
LONDON | MUNICH | BEIJING | HONG KONG | SEOUL | SINGAPORE | TOKYO

PUBLICLY FILED PER STIPULATION [ECF 2140]

Mitchell P. Hurley
July 28, 2020                                                                                                 Page 2

privilege or work-product protection because our clients were acting as directors of the Debtors, shared a common legal interest with the Debtors, or both.

<u>Beneficiary Meeting Materials</u>

We have previously advised you that the Additional Custodians conducted a search for handwritten notes or other non-ESI materials from beneficiaries' meetings and found none, which is one of the reasons why we have undertaken extensive collections of their ESI and agreed to apply your proposed search parameters. You proposed a search string for the Additional Custodians directly aimed at identifying these materials, which we have told you returns over 1,400 documents for review (nearly 2,800 with families). Finally, we remind you that beneficiary meeting materials were prepared and disseminated by the Debtors and so should be obtained from their files, where they are more likely to be organized and accessible. We have previously told you that at least some of these materials are available in the Debtors' document database, and we offered to provide you relevant Bates numbers of which we are aware. *See, e.g.,* the following presentations of which we are aware: PPLPC037000098187, PPLPC034000597805, PPLP004409088, PPLPC051000193984, PPLPC051000273481, PPLPC051000273480, and PPLPC051000273479.

<u>Trusts Materials</u>

We confirm, as we have told you before, that information about loans and non-cash transfers with respect to trusts that received distributions originating from Purdue will be addressed in our sources-and-uses presentation. We also believe that your request for "trust accountings" will be obviated by that presentation.

With respect to your request for documents evidencing reasons for giving or refusing requested distributions, we are unaware of any "readily obtainable" file, as you describe in your letter, that contains this information. Non-privileged communications about trust distributions, if they are picked up by your search parameters, will be produced as part of our ESI process.

<u>Professionals</u>

Request No. 8 of the UCC's subpoena is too broad to provide a complete and accurate response in a reasonable timeframe, inasmuch as it asks us to identify any person or entity engaged to provide "professional services of any kind at any time," for dozens of individuals, trusts, and entities dating back a quarter century. We appreciate that your letter focuses the request on obtaining the identities of professional firms "that gave advice about estate planning and transfers." With that clarification, we provide here a list of the principal professional firms retained by the Raymond Sackler family to provide advice on trusts and estates, wealth management, and accounting:

- Chadbourne & Parke LLP/Norton Rose Fulbright (US) LLP (legal)

Mitchell P. Hurley
July 28, 2020                                                                                    Page 3

- Milbank LLP (legal)

- Joseph Hage Aaronson LLC (legal)

- Latham & Watkins, LLP (legal)

- Gilbride, Tusa, Last & Spellane LLC (legal)

- Long Reimer Winegar LLP (legal)

- North Bay Associates (accounting and wealth management)

- Ernst & Young LLP (accounting and auditing)

- Summer Road LLC (wealth management)

- Kokino LLC (wealth management)

- Willow Street Group, LLC (trust-related services)

- Peak Trust Company (Alaska) (trust-related services)

This list was compiled in good faith, based on information readily available to the family office and the knowledge of advisors who regularly interact with the relevant professionals; we reserve the right to update or amend this list if new information becomes available to us.

<u>Asset Protection and Estate Planning</u>

We confirm the approach we are taking with respect to responsiveness of ESI, as set forth in our letter of May 29, 2020.

<u>Tax Liability on Distributions</u>

A request for production of tax workpapers for all R-ICSPs is not proportional to the needs of these cases, particularly considering that the UCC is already receiving 12 years' worth of tax returns, audit materials, bank records, and financial statements for the R-ICSPs. All tax work papers related to all tax filings for every R-ICSP from 2008 forward will equate to an enormous volume of materials that would have to be collected and reviewed, and any incremental value that these work papers could provide is significantly outweighed by the burden. This is especially problematic given that our responses and objections to the subpoena were served more than three months ago, on April 21, where we told you which tax materials we would produce, and the issue of tax workpapers has not been raised since.

Mitchell P. Hurley
July 28, 2020                                                                 Page 4

In the spirit of compromise, however, we agree to produce the tax work papers related to the tax filings from 2008 to the first quarter of 2020 for Rosebay Inc. and the 74A trust. These entities are the two tax-paying entities in the chain of ownership of Purdue on the Raymond side.

Transfers from IACs to Covered Sackler Persons or Trusts

We anticipate producing in the first week of August voluminous tax, audit, banking, and other financial materials for the R-ICSPs dating back to 2008. When you receive the materials, please review them and let us know if they do not answer your questions about transfers from the IACs.

Financial Status of the Covered Sackler Persons

We plan to provide an update to the Raymond-side Net Assets Report that reflects information as of May 31, 2020. Given the timing of when the relevant data becomes available and how long it takes to consolidate that data into a report, we are targeting the middle of September for delivery of the updated presentation. We will keep you informed if this timeline changes.

Government Investigations

Please see my email of July 22, 2020 for our response to this request, which includes an explanation of our position on relevance and burden. Especially given the vast information the UCC already has received or will receive, including all documents produced to government agencies in respect of opioid marketing, we do not intend to undertake another extensive project – beyond the searches to which we have already agreed – of reviewing documents "relating to" those investigations (including communications with the Debtors), many of which will be privileged, and producing another privilege log. As to communications with government agencies, to the extent the information is not already available to the UCC because such governments are among the UCC's constituents, we do not believe it is appropriate for the UCC's discovery demands to interfere with ongoing confidential discussions or investigations, which will be the necessary result if a government agency – specifically, the Department of Justice – learns that its communications are being revealed to a third party. We will hear you out on your explanations of relevance and proportionality when we have our call, although we are skeptical that we will be persuaded.

Electronic Medical Record Systems or Providers

We confirm the approach we are taking with respect to responsiveness of ESI, as set forth in our letter of May 29, 2020.

Mitchell P. Hurley
July 28, 2020                                                                                      Page 5

Anti-Money Laundering Documents

     We do not understand the relevance of documents submitted to banks concerning anti-money laundering requirements. Please be prepared to explain on our call. We also direct you to Request No. 1(m) of the subpoenas served by the Non-Consenting States on 11 financial institutions as part of a Rule 2004 investigation that the UCC joined, which seeks all letters sent to the banks by the account holders. We understand that all but one of the subpoenaed financial institutions have already provided documents. You therefore should have, or should soon be receiving, the documents you are seeking, if there are any, directly from those institutions.

Document Preservation Notices

     Document preservation notices contain information subject to the attorney-client privilege. We do not agree to produce these materials. As a compromise, we agree instead to provide the UCC with a log of any such document preservation notice sent to our clients by their individual counsel in connection with potential liability related to Purdue's sale and marketing of opioids in connection with the current wave of litigation that contains the date sent, sender, recipients, and a non-privileged description of the contents.

Sackler-Owned Pharmaceutical Companies

     Please refer to our document production of March 13, 2020, which lists Raymond-side pharmaceutical companies. Our reference to materiality in our responses and objections to the subpoena was intended to exclude pharmaceutical companies in which our clients hold an interest of less than 5%.

Engagement Agreements and Legal Invoices

     With respect to engagement agreements involving Stuart Baker, Norton Rose or Chadbourne & Parke, our clients have conducted a search for these materials and advise that they do not have them. Norton Rose has confirmed to us that there are no written engagement letters between any of our clients and Chadbourne & Parke or Norton Rose. We will ask Stuart Baker's counsel if he has any written engagement letters with our clients.

     With respect to your request for more than two decades of legal invoices, we fail to see how these are relevant, or why producing them would be proportional to the needs of the case, especially if they require review for privilege. Please articulate a basis for this request.

Sackler Entities

     Please explain what you mean when you ask if we will "include in []our definitions for IACs and II-Way Entities all entities identified and/or represented by Royer Cooper and Haug, respectively." Discussing definitions in the abstract, untethered to a particular response to a

Mitchell P. Hurley
July 28, 2020                                                                                                    Page 6

document request, is not meaningful. To make this concrete, we ask that you please explain if there is a specific response to the subpoena that you believe should be modified in some way.

We agree to provide a list of entities in which the R-ICSPs or R-ACSPs own a controlling interest. We do not know what you mean when you ask if "each Side is responsible for gathering any responsive materials from the I-Way Entities on its respective side." Please clarify, for example, if you are asking whether our firms represent these entities and have authority to respond to document requests on their behalf. In any event, however, we believe it is exceedingly unlikely that any of these entities have relevant documents or, if they do, that such documents will have significant marginal value on top of the materials that have already been or will be produced by the numerous other individuals, entities, and trusts that have been subjected to the UCC's investigation. We would therefore view any requests for materials from these entities as not proportional to the needs of these cases.

We confirm that we represent the entities listed in footnote 3 of your letter, except we advise you that Millsaw Realty L.P. has dissolved. For those entities that remain in existence, we will consider and respond in good faith to any requests you make for collecting documents that can be "obtained through targeted reviews, and not a negotiation of search terms and custodians."

As to your request about joint ventures, please identify which joint ventures you are inquiring about specifically and we will endeavor to answer your questions about representation.

Charities, Foundations or Institutes

The following entities identified in footnote 4 of your letter are associated with the Raymond side:

- The Bouncer Foundation, Inc.

- The Raymond and Beverly Sackler Foundation, Inc.

- The Raymond and Beverly Fund for Arts & Sciences, Inc.

- The Richard Sackler Family Foundation, Inc.

- Raymond and Beverly Sackler Foundation (Canada)

- The Research Foundation, Ltd.

- Verto Institute LLC

PROFESSIONALS' EYES ONLY/HIGHLY CONFIDENTIAL    PUBLICLY FILED PER STIPULATION [ECF 2140]
SUBJECT TO PROTECTIVE ORDER

Mitchell P. Hurley
July 28, 2020                                                                                   Page 7

You asked us to be prepared to discuss representation for these entities and their "commitment to produce documents responsive to the Subpoenas." Please tell us what documents you intend to seek from these entities.

<u>Sources and Uses Report</u>

We anticipate being able to provide the sources-and-uses report in the first or second week of August. We will follow up with more detailed scheduling information shortly.

<u>Norton Rose</u>

We have told Norton Rose and counsel to Mr. Baker that they are both authorized to produce to the UCC non-privileged materials that are responsive to the UCC's requests on behalf of our clients. We are still in the process of reviewing the questions at the end of your July 22 letter, which require answers on behalf of numerous clients. This information necessarily requires coordination with Norton Rose, and it will take some time to gather. We reserve all rights with respect to these inquiries.

Very truly yours,

*/s/ Alexander B. Lees*

Alexander B. Lees

# EXHIBIT 4



# Milbank

## ALEXANDER B. LEES

*Partner*

55 Hudson Yards | New York, NY 10001-2163
T: 212.530.5161
alees@milbank.com | milbank.com

July 31, 2020

***PROFESSIONALS' EYES ONLY/HIGHLY CONFIDENTIAL
SUBJECT TO PROTECTIVE ORDER***

**VIA EMAIL**

Mitchell P. Hurley
Akin Gump Strauss Hauer & Feld LLP
One Bryant Park
Bank of America Tower
New York, NY 10036

   Re: In re Purdue Pharma L.P., et al., No. 19-23649 (Bankr. S.D.N.Y.)

Dear Mitch:

   I write to follow up on topics discussed in our call of July 29, 2020, and in recent discovery correspondence.

<u>Professionals</u>

   You asked us during the call to provide additional information regarding the professionals identified in our July 28 letter. The following is information about the services those advisors provided to the R-ICSPs and R-ACSPs whom Milbank and JHA represent:

- Chadbourne/Norton Rose has been providing services since before January 1, 1996. The principal contact is Leslie J. Schreyer. We are continuing to work with Norton Rose to gather information responsive to your letter of July 22.

- Milbank began providing services in July 2018. We have previously advised you of Milbank's Raymond-side clients and refer to those earlier correspondences. We believe you are aware of the nature of Milbank's services. The principal contact is Gerard Uzzi.

MILBANK LLP

NEW YORK | LOS ANGELES | WASHINGTON, D.C. | SÃO PAULO | FRANKFURT
LONDON | MUNICH | BEIJING | HONG KONG | SEOUL | SINGAPORE | TOKYO

UNREDACTED - CONTAINS OUTSIDE PROFESSIONALS' EYES ONLY INFORMATION
TREAT SUBJECT TO PROTECTIVE ORDER

Mitchell P. Hurley
July 31, 2020                                                                                                                    Page 2

- JHA began providing services in or around November 2016. We have previously advised you of JHA's Raymond-side clients and refer to those earlier correspondences. For a period of time, JHA advised members of both sides of the family. We believe you are aware of the nature of JHA's services. The principal contact is Gregory P. Joseph.

- Latham began providing services in February 2015. It has advised various trusts that are R-ICSPs and R-ACSPs. Latham's services involved general review of trust structure, advice regarding private trust companies, and advice regarding planning for future generations. The principal contact is Michael A. Pucker.

- Gilbride currently represents the estates of Raymond, Beverly, and Jonathan Sackler. Gilbride began representing the Raymond Sackler family and various R-ICSP and R-ACSP trusts in approximately late 2001. Its services include Connecticut-law advice on trust issues, probate of wills and settlement of estates, and trust divisions. The principal contacts are Dorothy Freeburg and Theodore Sandler.

- Long Reimer Winegar was engaged by Chadbourne & Parke LLP and later by Norton Rose Fulbright (US) to form Wyoming private trust companies for the family's trusts and to advise on Wyoming trust and corporate law questions. It began providing services in approximately July 2011. The principal contact is Christopher M. Reimer.

- North Bay has been providing services to the late Raymond Sackler, the late Beverly Sackler, Richard Sackler, the late Jonathan Sackler, Richard and Jonathan Sackler's respective children and their families, and trusts and entities associated with these individuals, since before January 1, 1996. The principal contact is Stephen A. Ives.

- Ernst & Young began providing services to various trusts that are R-ICSPs and R-ACSPs in approximately 2008. The principal contact is Mark Mote.

- Summer Road began providing services to Beverly Sackler, Richard Sackler, Richard Sackler's children and their families, and trusts and entities associated with these individuals, in approximately 2012. The principal contact is David Sackler.

- Kokino began providing services to Jonathan Sackler's family (including Beverly Sackler) and associated trusts and entities in approximately 2013. The principal contact was Jonathan Sackler; Kokino currently is in a state of transition, following Jonathan Sackler's death.

UNREDACTED - CONTAINS OUTSIDE PROFESSIONALS' EYES ONLY INFORMATION
TREAT SUBJECT TO PROTECTIVE ORDER

Mitchell P. Hurley
July 31, 2020                                                                                      Page 3

- Willow Street began providing services to MCM Cliff Fiduciary Management
  LLC and Crystal Fiduciary Company LLC starting in approximately 2017.
  Willow Street provides similar services to other R-ICSP and R-ACSP Wyoming
  private trust companies formed after 2017 (*e.g.*, Cornice Fiduciary Management
  LLC, Cedar Cliff Fiduciary Management Inc. and Data LLC). The principal
  contact is Betty Andrikopoulos.

- Peak has been providing services to the 1974 Irrevocable Trust A, 1974
  Irrevocable Trust B, and Akutan Bay LLC since approximately early 2001. Its
  services pertain to administration relating to certain life insurance policies owned
  by Akutan Bay LLC. The principal contact is Brandon Cintula.

We further understand that Weil Gotshal & Manges represented members of both sides of
the family who served as Purdue directors, for a period beginning in late 2016, providing legal
advice in connection with their roles as directors. Weil ceased representing members of the
Raymond Sackler family in September 2017. The primary contact was Joe Smolinsky.

As with the information provided in our July 28 letter, this information was compiled in
good faith, based on information readily available to the family office and the knowledge of
advisors who regularly interact with the relevant professionals; we reserve the right to update or
amend this list if new information becomes available to us.

Not-for-Profit Organizations

In response to an inquiry you made on our call, we have confirmed that our clients do not
have email accounts associated with the extant not-for-profit entities referenced in our letter of
July 28; nor do we believe that those institutions have any email accounts associated with them
at all. We are still looking into whether there were any email accounts associated with Verto
(which, as we told you, has not been operational since the beginning of 2015), and we will
update you. In addition, to the best of our knowledge, the not-for-profit organizations referenced
in our July 28 letter were not involved in opioid-related work or causes.

Privilege Claw Back Letters

During our July 29 call, the UCC reiterated its view that the documents referenced in our
letter of July 17 are not protected from disclosure by the spousal privilege. The UCC agreed to
provide us with authority supporting its argument, but we have not yet received it. As we noted
during the call, we believe this privilege issue is governed by federal common law, which does
not recognize an exception to the spousal privilege for "everyday communications" that are
transmitted in confidence. Please provide authority to support your position; alternatively, please
confirm that the documents have been destroyed consistent with the protective order.

Mitchell P. Hurley
July 31, 2020                                                                                      Page 4

    In response to our letter of July 26, you stated in an email of July 28, without articulating the basis, that you do not believe the documents are privileged. Upon further review of these documents, we agree to change some of our privilege positions and remove redactions accordingly. We will provide replacement images next week for the documents from which we agree to remove the redactions.

Government Investigations

    In our email of July 22 responding to the UCC's newly revived request for communications concerning government investigations, we cited authority holding that a litigant is not entitled to this kind of discovery when the documents provided to the government also have been produced to the litigant. During our call, you represented that there is authority to the contrary and that you would provide it to us. If you still intend to seek communications concerning government investigations, please provide authority for your position so we can consider it.

Common Interest Agreement

    During our July 29 call, you requested any written common interest agreements between our clients and the Debtors. Please find enclosed the written agreement we referenced during our call, along with signature pages of which we are aware (it is possible there are others). These materials have been Bates stamped RSF00484625 through RSF00484673. The agreement and signature pages have been marked Professionals' Eyes Only under the protective order. No party has withdrawn from the agreement.

Raymond-side Entities

    In response to your letter of July 28, we will provide you in an upcoming production with a list of entities in which an R-ICSP or R-ACSP we represent holds a controlling interest, as a supplement to our production of March 13, 2020.

Sources and Uses Presentation

    We intend to give our sources-and-uses presentation on August 13, at 2:00pm (eastern). We expect that it will take approximately 1.5 to 2 hours. We will arrange for a Zoom meeting and will send out scheduling information soon. This presentation will be highly technical and may be of interest only to advisors. Nevertheless, please tell your constituents, colleagues, and other parties whom you believe should attend, subject to the understanding that the presentation will be designated Professionals' Eyes Only under the protective order and that attendance should be limited accordingly.

Mitchell P. Hurley

July 31, 2020                                                                                                    Page 5

<u>Depositions</u>

      In response to your letter to us of July 29, we confirm, as we have told you before, that we do not represent Stuart Baker. Please contact Mr. Baker's counsel at Simpson Thacher regarding his deposition.

      We represent Leslie Schreyer in his capacity as trustee of Raymond-side trusts, but Mr. Schreyer also is represented in other capacities by other counsel (for example, as trustee for Mortimer-side trusts). If you plan to depose Mr. Schreyer in multiple capacities, we believe he should appear for a single deposition where he can be examined in his different capacities in one sitting, with all appropriate counsel present. We will help facilitate his deposition to the extent we can, subject to our need to coordinate with other counsel.

      The remaining individual deponents listed in your letter to us (Stephen Ives, David Sackler, Marianna Sackler, and Richard Sackler) are our clients, and we will arrange for their testimony. Jared Giddens, with whom you have corresponded before, also represents Mr. Ives and will need to be involved in coordinating Mr. Ives's deposition. We have advised each of these individuals of your letter. We will be prepared to begin depositions in late August or early September, and we are working with the witnesses to determine availability and scheduling.

      We believe now is the appropriate time to begin discussing a protocol for deposition testimony. For each deponent identified in your letter, please tell us how long you expect the deposition to last and whether the UCC intends to examine the witnesses on behalf of all parties authorized to take Rule 2004 discovery, or whether the UCC intends to share the examination with other authorized parties. If multiple parties intend to examine a witness, then our position is that they must allocate the agreed time among themselves and questioning must be non-duplicative. We will not produce witnesses for multiple depositions conducted by different parties or subject them to repetitive examinations on the same subjects.

      We are cognizant of the Court's comments at the July 23 hearing concerning conducting depositions before document discovery concludes. If a witness must be re-called because relevant documents are produced after his or her deposition begins, any supplemental questioning must be limited to documents that were produced after the first examination (and subject matter specifically related to such documents).

      As for your allusion to Rule 30(b)(6) witnesses, please advise immediately which entities you plan to depose. If any individually named witness in your July 29 letter also is designated as a corporate representative for an entity, we believe the witness should appear for a single deposition and be examined in both corporate and individual capacities in one sitting, to the maximum extent feasible.

      All depositions will have to be conducted remotely in light of the ongoing pandemic. If you have a preferred medium or service for remote depositions, please let us know so we can

Mitchell P. Hurley
July 31, 2020                                                                        Page 6

coordinate any technological issues. Please also forward your proposed protocol for conducting remote depositions.

Finally, Marianna Sackler lives in Australia and is expected to be there at the time of any deposition in these cases. Please advise whether you have identified any legal impediment to conducting a deposition of a witness situated in Australia.

Very truly yours,

*/s/* Alexander B. Lees

Alexander B. Lees

# EXHIBIT 5



**MITCHELL P. HURLEY**
+1 212.872.1011/fax: +1 212.872.1002
mhurley@akingump.com

August 5, 2020

**VIA E-MAIL**

Jasmine Ball
**Debevoise & Plimpton LLP**
919 Third Avenue
New York, NY 10022
*Counsel to Sackler Family Side A*
*(Mortimer) ICSPs, ACSPs, and Entities*

Alex Lees
**Milbank LLP**
55 Hudson Yards
New York, NY 10001
*Counsel to Sackler Family Side B*
*(Raymond) ICSPs, ACSPs, and Entities*

Gregory P. Joseph
**Joseph Hage Aaronson LLC**
485 Lexington Avenue, 30th Floor
New York, NY 10017
*Counsel to Sackler Family Side B*
*(Raymond) ICSPs, ACSPs, and Entities*

Re:    *In re: Purdue Pharma L.P. et al.*, No. 19-23649 (Bankr. S.D.N.Y.)

Dear Counsel:

We write to follow up on several recent communications, as well as our meet and confer calls from July 29, 2020 and July 31, 2020, and Side B's letter from July 31, 2020. Many of the items below require Side A and/or Side B to provide us with responses, materials, documents, and other information. In that regard, we would remind all of you of Judge Drain's comments on the record during the July 23, 2020 hearing and encourage you to provide the requested information promptly.



August 5, 2020
Page 2

### Government Investigations

As discussed during our call, your clients have identified no satisfactory explanation for refusing to produce communications concerning DOJ or other government investigations, including such communications directly with the government entity or other third parties. Per your request, we direct you to *Alaska Electrical Pension Fund v. Bank of America Corp.*, No. 14-CV-7126 (JMF), 2017 WL 280816 (S.D.N.Y. Jan. 20, 2017) for an example of a case recognizing that such materials are subject to disclosure in civil litigation. We also ask that you identify any witnesses that have been interviewed by any such agency in connection with the opioid investigations. As you know, the Official Committee has sought this information for many months.

### Reliance by Your Clients on the Common Interest Doctrine

None of the logs produced by your clients on July 21, 2020 and July 31, 2020 (Side A) and July 22, 2020 and July 26, 2020 (Side B) identifies the common interest doctrine as a basis for withholding any of the documents listed on the logs. During our meet and confer call on July 29, 2020, however, you advised that both Sides of the Sackler family in fact intend to rely, apparently extensively, on the common interest doctrine to shield from production to the Official Committee documents that were shared with third parties or otherwise do not on their face meet the elements necessary to sustain an assertion of privilege. We asked you during that call to immediately revise your document-by-document logs to identify the entries subject to your claims of common interest. During our call, you offered no justification for having omitted this information in the first place, but said only that you would consider our request.

On August 3, 2020, Milbank wrote (speaking for both Sides of the family) to advise that the Sacklers would not amend their logs to identify entries with respect to which they claim the common interest doctrine applies. None of the excuses offered for the Sacklers' refusal in your August 3 email are satisfactory. First, you suggest it would be an unfair burden to require the Sacklers to "re-do" their "document-by-document" logs to identify entries with respect to which the Sacklers claim they can invoke the common interest doctrine. Of course, if the Sacklers had prepared their logs in accordance with the rules in the first instance, they would have to redo nothing. While you argue that parties have the right to rely on category logs if they choose, in this case your clients elected to prepare document-by-document logs. In so doing, your clients asserted the attorney-client privilege and/or the work product doctrine and/or spousal privilege on a document-by-document basis. Your suggestion that the Sacklers somehow would have faced an undue burden taking exactly the same approach with respect to claims of common



Akin Gump
STRAUSS HAUER & FELD LLP

August 5, 2020
Page 3

interest is frankly nonsensical.  Indeed, the Official Committee finds the Sacklers' choice to single out this one doctrine for different treatment on their logs curious, to put it mildly.

Next, you argue that the Sacklers were permitted to omit information from their logs because "common interest" is "not a privilege, but a doctrine we can rely upon in appropriate circumstances in the event you assert waiver."  As a preliminary matter, we note that the work product doctrine also is "not a privilege, but a doctrine," and yet the Sacklers cited that doctrine thousands of times on their logs.  In any event, you appear to misapprehend your clients' burden.  The Sacklers in the first instance are required to prove that the documents they have withheld are immune from disclosure, including by demonstrating that logged communications were made in confidence with their attorneys.  Absent a valid assertion of common interest, the entries on your log that include third parties (among others) are facially deficient, as they do not show confidential attorney work product or communications between your clients and their lawyers.[1]

Finally, you say in your email that "as soon as it is ready," you will provide information concerning "applicable bases for non-waiver, like the common interest doctrine, on a category basis."  Again, you offer no explanation for having identified every other supposed immunity from disclosure on your log on a document-by-document basis, nor do you provide any specifics as to the "explanation" you will provide, nor do you agree to any deadline by which any information concerning the common interest claims will be supplied.   The Official Committee reserves all of its rights concerning the Sacklers' recalcitrance concerning their logs, including the Official Committee's right to contend that the Sacklers have waived any claim to the common interest doctrine as a result.  In the past, your clients have refused reasonable demands by the Official Committee during the meet and confer process, only to reverse their position(s) after the Official Committee has moved to compel.  The Official Committee believes this pattern

---

[1] To the extent you assert the Official Committee somehow agreed that the Sacklers could rely on the common interest doctrine as a basis for avoiding disclosure without identifying the documents subject to the doctrine, that assertion is false.  You also mischaracterize the relevant course of events.  Before the Sacklers ever served their logs they knew (or should have known) that they were obliged to identify all bases for withholding documents from discovery, including any purported claims of common interest.  During our meet and confer call on July 29, the first topic we addressed was the Official Committee's demand that the Sacklers revise their logs to identify any entries allegedly subject to the common interest doctrine.   In short, your suggestion that the Official Committee somehow is to blame for the Sacklers' deficient logs is meritless.



August 5, 2020
Page 4

constitutes an abuse of the discovery process, and will seek sanctions if your clients repeat it again with respect to this issue.

### Spousal Privilege

We explained our position that the spousal privilege does not apply to all communications between spouses, but only those that are actually made in confidence based on the marital relationship. *See G-Fours, Inc. v. Miele*, 496 F.2d 809 (2d Cir. 1974) (ordinary business conversations not protected). The privilege "must be strictly construed and accepted 'only to the very limited extent that permitting a refusal to testify or excluding relevant evidence has a public good transcending the normally predominant principle of utilizing all rational means for ascertaining truth.'" *In re Reserve Fund Sec. & Derivative Litig.*, 275 F.R.D. 154 (S.D.N.Y. 2011) (citations omitted). "Although communications between spouses are presumed to be confidential, 'wherever a communication, because of its nature or the circumstances under which it was made, was obviously not intended to be confidential, it is not a privileged communication." *Id.* (internal citations omitted).

Side B asserted that federal law governed and that, under federal law, any communication made solely between spouses is covered by the spousal privilege, even those that are intended to be (but have not yet been) conveyed to a third party. We asked you to provide any authority you had for your assertion that federal law applies to this privilege, and that federal law protects <u>all</u> communications (on whatever topic) made solely between spouses. You have not yet provided those authorities. If they exist, please provide them without further delay.

With respect to this issue, Side B also demanded in its July 31, 2020 letter that we confirm that certain clawback documents purportedly subject to the spousal privilege "have been destroyed consistent with the protective order." The Protective Order does not require such destruction. It requires that we "return, *sequester*, or destroy all copies of the" the clawed back documents. As previously confirmed in writing, the relevant materials have been sequestered.

We understand that you are removing some redactions and providing replacements for the documents identified in your July 26, 2020 clawback letter (to which we provided notice on July 28, 2020 that we believe the privilege assertions were unfounded). We will wait to discuss these privilege assertions with you further until you provide replacement images. ECF No. 1540 ¶¶ 68, 69. As stated in our email dated July 19, 2020, we have sequestered these documents as well.



August 5, 2020
Page 5

**Public Relations Communications**

We are continuing to review the voluminous logs provided to date by both Side A and Side B and note that thousands of entries appear to be to, from, or copying various public relations firms—including numerous entries that do not include legal counsel. We have concerns about the Sacklers withholding these documents as they do not appear to be privileged from the details provided in the logs, and they concern issues core to the Official Committee's investigation. As you likely know, ordinary public relations work—such as assisting counsel in "assessing the probable public reaction" to a litigation strategy or responding to requests by the media—is not sufficient to implicate the attorney-client privilege. *Calvin Klein Trademark Trust v. Wachner*, 198 F.R.D. 53, 55 (S.D.N.Y. 2000). Furthermore, even if these communications had been privileged to begin with, the attorney-client privilege was waived by their disclosure to public relations firms. *See id.* at 54–55. Although our review is currently ongoing, so far we have identified the following public relations consultants on logs for both Side A and Side B: Edelman, Sabd Verbinnen & Co., Goldin, and Teneo. Please produce all withheld documents that include personnel from any public relations firms, including but not limited to those we identify here.

**Depositions**

Side B responded regarding the need to move forward with scheduling depositions in its letter dated July 31, 2020.[2] The Official Committee plans to take some, but not all, depositions starting in late August or early September in order to meet the case schedule contemplated by the Court, and will work with you and other parties in an effort to arrive upon a schedule acceptable to all. Be advised that the Official Committee intends to take each deposition for as long as is necessary and appropriate. For present purposes, all parties should expect the portion of each deposition that occurs in the initial phase of depositions beginning in late August or early September ("Phase 1") to last at least the full seven hours, although additional time may be sought or required. In light of the limited document review that will be able to be accomplished prior to Phase 1 depositions, the Official Committee does not accept Side B's proposed limitation on the scope of any depositions that the Official Committee takes after document review is completed ("Phase 2"), though the Official Committee will of course seek to avoid unnecessary duplication. If Side B continues to object to this approach, which we believe is consistent with the Court's direction on July 23, you should surface your objection with the

---

[2] Side A, we are still waiting for your answer.



August 5, 2020
Page 6

Court immediately. We have contacted a vendor about logistics for remote video depositions. Please feel free to share any thoughts you may have in this regard.

**Trust Materials**

Regarding documents concerning reasons for approving or denying requested distributions from trusts, we asked you to locate any formal or informal written record the trustee made documenting the decision to make or withhold distributions available through non-ESI sources, including but not limited to board committee meeting minutes reflecting decisions to approve or deny distribution requests. To the extent no such records are readily available, we requested an explanation. For example, did the trustee observe any protocol for vetting distributions, or were distributions made whenever a beneficiary requested them as a matter of course? Both Side A and Side B agreed to ask the trustees of their respective trusts whether they have any record-keeping process or protocol for approving or denying distribution requests, and to provide us with the answer and any documents obtainable through non-ESI sources.

**Engagement Agreements and Legal Invoices**

In its July 28, 2020 letter, Milbank represented that its clients did not possess any engagement agreements involving Stuart Baker, Norton Rose, and Chadbourne & Parke (collectively "NRF"), and that Norton Rose confirmed that such agreements did not exist with NRF. On the July 29 call, we requested that both Sides check whether any such agreements exist or existed between affiliates of your clients and NRF or Stuart Baker. We also reiterated that in the absence of such agreements, you produce all invoices involving Stuart Baker or NRF in your possession, custody, or control, from 2006 through the Petition Date. We noted that the Official Committee may be willing to modify its request for such materials if the Sacklers provide robust disclosures in narrative form concerning the relationship(s) between NRF on the one hand and the Sacklers and their affiliates on the other, as set forth in more detail in my letter dated July 22, 2020.

**Questions Outstanding to Side A**

We posed several questions to both Sides of the Sackler families by letter dated July 25, 2020 and during our meet and confer on July 29, 2020. Side B provided certain responses by letters dated July 28 and July 31, 2020. We still await information from Side A regarding the following:



August 5, 2020
Page 7

- Identities of estate planning, wealth management and accounting firms, information as to the periods of time in which these firms were engaged by members of the Sackler family as well as the principal contacts at these firms.

- Information concerning entities, charities, foundations, or institutes affiliated with Side A, including whether any Sackler family members or Debtor executives had email accounts at these entities, whether such email accounts have been collected for production in these cases, and whether such entities performed any work related to opioids, treatment for conditions arising from exposure to opioids, or treatment of opioid addiction. Side A will specifically confirm these questions with respect to The Acorn Foundation.

- Any common interest agreements entered into by Side A that were not among the agreements provided by Side B on July 31, 2020.

- Side A I-Way Entities, including those in which Side A holds a controlling interest.

- Description of the contents of Side A's forthcoming sources and uses (or similar) report, and deadline for production.

- Response regarding upcoming depositions for Side A individuals, and timing and logistics for the same.

- We requested that Side A, like Side B, agree to provide the tax work papers related to the tax filings from 2008 to the first quarter of 2020 for the initial tax-paying entities and/or trusts in the chain of ownership of Purdue on the Mortimer side.[3]

- A deadline by when Side A will collect and produce ESI from the Mortimer D. Sackler account. We understand that Side A asserts that the reason it is so extremely past its original promises concerning this account is because, among other things, the contact person at Mundipharma IT went on vacation.

---

[3] *See* Side B July 28, 2020 letter agreeing to produce the tax work papers related to the tax filings from 2008 to the first quarter of 2020 for Rosebay Inc. and the 74A trust.

UNREDACTED  CONTAINS OUTSIDE PROFESSIONALS' EYES ONLY INFORMATION
TREAT SUBJECT TO PROTECTIVE ORDER



**Akin Gump**
STRAUSS HAUER & FELD LLP

August 5, 2020
Page 8

- A deadline by when Side A will provide an updated Mortimer-side Net Assets Report to reflect changed financial circumstances.

Please feel free to contact us if you have any questions or wish to discuss any of the foregoing. The foregoing is not intended to be a comprehensive catalogue of all of the Official Committee's concerns relating to the Sacklers' privilege logs and other positions taken in discovery these cases, which the Official Committee continues to review. Nothing herein constitutes a waiver or relinquishment of any of the Official Committee's claims, defenses, rights or remedies. Further, this letter speaks only for the Official Committee; other groups in these cases, while coordinating discovery with the Official Committee, reserve their independent rights, including with respect to taking depositions.

Sincerely,

*/s/ Mitchell Hurley*
Mitchell P. Hurley

cc:    Marshall Huebner (Davis Polk & Wardwell LLP)
        Ben Kaminetzky (Davis Polk & Wardwell LLP)
        Charles Duggan (Davis Polk & Wardwell LLP)
        James McClammy (Davis Polk & Wardwell LLP)
        Margarita Clarens (Davis Polk & Wardwell LLP)
        Chautney M. Oluwole (Davis Polk & Wardwell LLP)
        Andrew Troop (Pillsbury Winthrop Shaw Pittman LLP)
        Andrew Alfano (Pillsbury Winthrop Shaw Pittman LLP)
        Jason Sharp (Pillsbury Winthrop Shaw Pittman LLP)
        Kenneth H. Eckstein (Kramer Levin Naftalis & Frankel LLP)
        Rachael Ringer (Kramer Levin Naftalis & Frankel LLP)

# EXHIBIT 6



# Milbank

**ALEXANDER B. LEES**

*Partner*

55 Hudson Yards  |  New York, NY 10001-2163

T: 212.530.5161

alees@milbank.com  |  milbank.com

August 07, 2020

**VIA EMAIL**

Mitchell P. Hurley
Akin Gump Strauss Hauer & Feld LLP
One Bryant Park
Bank of America Tower
New York, NY 10036

      Re:     In re: Purdue Pharma L.P., No 19-23649 (Bankr. S.D.N.Y.)

Dear Mitch:

We write in response to your letter of August 5.

<u>Government Investigations</u>

We have already agreed to produce to the UCC all documents produced by our clients in connection with any government investigations relating to Purdue's sale of opioids. The UCC has the same documents that government investigators have. There is no legitimate need for more.

With respect to communications concerning government investigations, your cited case cuts against your position. Your request, as we understand it, is for *all* communications *concerning* DOJ or other government investigations. In the case you cite, *Alaska Electrical Pension Fund v. Bank of America Corp.*, 2017 WL 280816 (S.D.N.Y. Jan. 20, 2017), Judge Furman held that this is inappropriate. *See id.* at *1 ("A few months ago, Plaintiffs moved to compel production of documents relating to various regulatory investigations of Defendants' conduct with respect to ISDAfix. In an Opinion and Order entered on November 16, 2016, the Court concluded that Plaintiffs' requests were overbroad and encompassed materials that were plainly irrelevant." (citing *Alaska Electrical Pension Fund v. Bank of America Corp.,* 2016 WL 6779901, at *3 (S.D.N.Y. Nov. 16, 2016) (rejecting motion to compel production of communications with government regulators))). Judge Furman granted a renewed motion to compel only after the plaintiffs revised and narrowed their requests "to a targeted subset of

MILBANK LLP

NEW YORK | LOS ANGELES | WASHINGTON, D.C. | SÃO PAULO | FRANKFURT
LONDON | MUNICH | BEIJING | HONG KONG | SEOUL | SINGAPORE | TOKYO

Mitchell P. Hurley
August 07, 2020                                                                                    Page 2

regulatory materials, including white papers, presentations, written memoranda, or briefs shown or provided" to regulators. *Id.* at *1. On our call of July 29, you were very explicit that you did not intend to limit your request in any way. Your request is thus exactly the kind that was rejected in *Alaska Electrical*.

Even as to communications with or presentations to regulators, we also cited to you *In re WorldCom, Inc. Securities Litigation*, 2003 WL 22953645 (S.D.N.Y. Dec. 16, 2003), which found no legal authority that would give a private litigant "a right of access to ongoing government investigations or entitle them to the work of criminal and regulatory investigators." *Id.* at *7. Just as in *WorldCom*, as the history of these cases shows quite clearly, the UCC and its capable counsel "can fashion their own document requests without relying upon the government subpoenas." Nor is there any reason to believe that our clients' production of any communications with regulators will add anything to the mountains of data and information the UCC is already receiving through discovery – not to mention all the information about investigations the UCC can collect from its own constituents in the unsecured class, who collectively include every state, countless governmental subdivisions, and even the United States government itself. The minimal (or non-existent) marginal value of our clients' production of communications with the government must be balanced against the harm that could be caused by interfering with an ongoing government investigation, including by the DOJ. We therefore decline your request to produce these materials. If you intend to press your position, we believe the matter must be resolved by the Court.

Common Interest on Privilege Logs

The portion of your letter concerning privilege logs is riddled with mischaracterizations of the record, and we reject it entirely. On our call, and in follow-up correspondence, we did explain why our privilege log does not identify, on a document-by-document basis, entries subject to claims of common interest: we do not believe the rules or our existing agreement about a form of log required this. The rules required us to identify "the nature of the privilege (including work product) which is being claimed." Local Civil Rule 26.2(a)(1); *see also* Local Bankruptcy Rule 7034-1(a) ("the nature of the privilege being claimed"). The common interest doctrine is not the privilege being claimed, but rather is a defense to an assertion of waiver – an assertion you have never made, let alone with any specificity. Your argument that "the work product doctrine also 'is not a privilege, but a doctrine,'" therefore misses the point. Work product is an affirmative basis to withhold, not a response to an assertion that confidentiality has been broken by the presence of a third party. Work product also is expressly identified as a "privilege" under the Local Civil Rules. Local Civil Rule 26.2(a)(1); *see also* Fed. R. Civ. P. 26(b)(5)(A) (contemplating that parties will withhold documents that are "privileged or subject to protection as trial-preparation material"). Work product protection is thus required to be asserted on privilege logs; the common interest exception is not. The fact that both work product and common interest are frequently described as "doctrines" reflects nothing more than the expansive meaning of "doctrine: A principle, esp. a legal principle, that is widely adhered to." BLACK'S LAW DICTIONARY 606 (11th ed. 2019).

PUBLICLY FILED PER STIPULATION [ECF 2140]

Mitchell P. Hurley
August 07, 2020                                                                                      Page 3

Our obligation was to describe documents so as to "enable other parties *to assess* the claim" of privilege. Fed. R. Civ. P. 26(b)(5)(A) (emphasis added). We have provided you with the information you need to assess the claim: namely, the sender and recipients of communications identified our log, along with descriptions of the documents. We also have agreed to provide you with the email addresses on the documents, the subject lines of emails, other metadata, an identification of the individuals and organizations on the log, and a description by category of common-interest and similar assertions. This is more than sufficient. We were not required to anticipate and answer, in the first instance on our privilege log, every question or objection you might conceive of during your assessment of the privilege claims. If you have follow-up questions, or challenges, you can raise them in due course. But lodging unparticularized objections to every document with a third party on it, simply because the words "common interest" were not inserted in the description field, is unwarranted and unhelpful.

Spousal Privilege

We continue to believe that your position on federal spousal privilege is misguided, including insofar as you believe that the *topic* of the conversation matters. It does not.

As the case you cite in your letter observed, there are three prerequisites to the marital privilege: (1) there must be a "valid marriage"; (2) there must be "utterances or expressions intended by one spouse to convey a message to the other;" and (3) "the communication must have been made in confidence, which is presumed." *In re Reserve Fund Sec. & Derivative Litig.*, 275 F.R.D. 154, 157 (S.D.N.Y. 2011) (quotation marks omitted). There is no limitation on the topic. The privilege applies to all "utterances or expressions intended by one spouse to convey a message to the other" that are made in confidence, regardless of topic.

What matters is whether the communication was made privately. *See, e.g.*, *United States v. Rakes*, 136 F.3d 1, 3 (1st Cir. 1998) ("The government suggests that some general rule deprives spousal conversations of the privilege if they relate to financial matters; needless to say, it does not make this claim in respect to the attorney-client privilege. The marital communications privilege contains no such limitation: the cases say, at most, that a discussion of financial matters between husband and wife may not be intended to be confidential."); *see also, e.g.*, *Flatworld Interactives v. Apple Inc.*, 2013 WL 11319071, at *2 (N.D. Cal. Dec. 24, 2013) ("Although the email chain is most likely a business communication that is not protected by the attorney-client privilege, it is protected by the spousal privilege as described above."); *accord In re Witness Before Grand Jury*, 791 F.2d 234, 237 (2d Cir. 1986) ("The confidential communications privilege, by contrast, provides assurance that *all* private statements between spouses . . . will be forever free from public exposure." (emphasis added)). The UCC's burden in trying to overcome the privilege, therefore, is not satisfied by identifying a particular subject matter that it believes is beyond protection. Rather, the UCC must show that the communication, despite being made privately, was nevertheless intended or expected to be revealed to a non-spouse. You have not made, and cannot make, this showing.

Mitchell P. Hurley
August 07, 2020                                                                Page 4

        The Second Circuit case you cite does not persuade us that the analysis should be any
different. For one thing, it was decided under state law, which does not govern this federal
bankruptcy case. For another, the "ordinary business matters" exception alluded to by some state
courts at most indicates that spousal conversations about business may not be privileged where
they evince an intent or expectation that they will be shared with another person. *See Rakes*, 136
F.3d at 3. We do not believe this exception to the marital privilege, even assuming it were
cognizable in this federal bankruptcy case, would make the documents at issue discoverable. We
do not see how the documents constitute discussions about business affairs, nor do we see any
indication, in any event, that the parties to the communications intended or expected that their
conversations would be shared with third parties.

Public Relations Communications

        We will not produce "all withheld documents that include personnel from any public
relations firms," as your letter requests. Courts recognize that the engagement of a public relation
firm is sometimes necessary for attorneys "to perform some of their most fundamental client
functions." *In re Grand Jury Subpoenas Dated Mar. 24, 2003*, 265 F. Supp. 2d 321, 330
(S.D.N.Y. 2003). Where a public relations consultant is "hired by the lawyers to assist them in
dealing with the media," as they were in this case, and where the communications "are made for
the purpose of giving or receiving advice . . . directed at handling the client's legal problems,"
the presence of public relations firm personnel on a privileged communication does not break
privilege. *Id.* at 331; *see also Stardock Sys., Inc. v. Reiche*, No. 417CV07025SBAKAW, 2018
WL 6259536, at *3 (N.D. Cal. Nov. 30, 2018). Moreover, the *In re Grand Jury* court recognized
that hiring of a public relations firm to assist lawyers may be necessary in "high profile
matter[s]," like this one, that are the subject "intense press interest and extensive coverage" for
extended periods of time because "the media, prosecutors, and law enforcement
personnel . . . engage in activities that color public opinion, certainly to the detriment of the
subject's general reputation but also, in the most extreme cases, to the detriment of his or her
ability to obtain a fair trial" by tainting potential jurors and fact finders about the merits at issue
in the litigation. *In re Grand Jury*, 265 F. Supp. 2d at 323, 330. In the pre-bankruptcy litigation
against our clients, many of the plaintiffs' attorneys frequently spoke to the media about the
claims and selectively shared their court filings (sometimes in violation of protective orders)
with the press in an open attempt to shape public perceptions before anticipated jury trials.
Similarly, the State Attorneys General also gave frequent press conferences and interacted with
the media about their cases against our clients.

        Additionally, materials prepared by a non-lawyer may be protected by the work product
doctrine. "At its core, the work-product doctrine shelters the mental processes of the attorney . . .
But the doctrine is an intensely practical one, grounded in the realities of litigation in our
adversary system. One of those realities is that attorneys often must rely on the assistance of
investigators and other agents in the compilation of materials in preparation for trial. It is
therefore necessary that the doctrine protect material prepared by agents for the attorney as well
as those prepared by the attorney himself." *United States v. Nobles*, 422 U.S. 225, 238–39

Mitchell P. Hurley

August 07, 2020                                                                    Page 5

(1975); *cf. Stardock*, 2018 WL 6259536 at *3 ("In the context of Rule 26, PR firms may fall within the category of an attorney's consultant or at the very least their agent.").

Your letter states that you are continuing to evaluate the entries on our privilege log that involve public relations firms. When you have completed your assessment, we are happy to respond to any reasoned and specific challenges to our assertions of privilege or work product, which should take into account the UCC's knowledge of the facts in these cases and the applicable law. But we once again reject the UCC's attempt to issue blanket challenges to numerous entries on the privilege log before it has conducted an evaluation of the claim of privilege with any degree of particularity.

Depositions

As we understand your position on depositions, you do not believe you are bound by the time limits of Civil Rule 30(d)(1), as made applicable by Bankruptcy Rules 7030 and 9014. You also apparently believe that in conducting depositions in two phases, you are entitled to revisit topics in the second phase that were already covered in the first, even if those topics are not implicated by any of the documents produced after the first phase. We disagree, and we do not believe this is consistent with the Court's statements at the July 23 hearing. The UCC's position, in essence, is that it is entitled to depose each witness twice, for as long as it likes, including by starting over anew the second time, notwithstanding the presumption of Rule 30(a) that a witness should be deposed a single time. The Court's guidance, however, was that the UCC could *continue* a deposition after supplemental document productions are made; it did not give blanket leave from all of the limitations of Rule 30. We are willing to discuss reasonable exceptions to the 7-hour limit on a witness-by-witness basis, but you have not yet advised us which witnesses you think will require more time nor how much time you desire. We reiterate our request that you make a proposal on timing for each witness so that we can have a productive discussion.

We posed several additional questions to you about depositions in our letter of July 31, as to which we still are awaiting answers. Please provide them as soon as possible. Meanwhile, we will revert to you shortly with the names of witnesses whose schedules will permit depositions in late August and early September, and the specific dates on which they are available.

Trust Materials

After inquiring into the matter, we are unaware of "readily available" records reflecting decisions to approve or deny trust distribution requests. We understand that you are in discussions with Simpson Thacher about searches of Norton Rose files; if any documents of the kind you hypothesize exist (and they may not), we expect they will have to be found through that process.

Mitchell P. Hurley
August 07, 2020                                                                    Page 6

Engagement Agreements and Legal Invoices

We are preparing a narrative description of the relationships between Norton Rose and our clients, as well as lists of individuals and entities, as requested in your letters of July 22 and 25, and will send as soon as it is ready.

\*        \*        \*

Your assertion that our clients have "refused reasonable demands by the Official Committee during the meet and confer process, only to reverse their position(s) after the Official Committee has moved to compel" is manifestly false. There are countless examples of our offering information to you voluntarily, acceding to your demands without debate, and reaching resolution of disputes with you despite having bona fide objections to your approach to discovery. The record speaks for itself on this subject.

Furthermore, the last time the UCC sought judicial relief in respect of discovery, we were in the middle of negotiating virtually every issue that you raised with the Court – including issues as to which *we* had made compromise offers in an effort to streamline the UCC's extraordinarily overbroad and disproportionate discovery frolic, but to which the UCC never even bothered to respond before submitting a letter to the Court (in flagrant violation of Local Bankruptcy Rule 7007-1). Judge Drain rightly put aside your purported grievances and ordered you to continue meeting and conferring, after which we eventually reached agreement. We did not "reverse" any position in response to your letter; we urged you to continue having a productive dialogue, and the process that the UCC sought to cut short ultimately led to a resolution. Your alleged grievance is thus wholly misconceived. The purpose of the meet-and-confer process is to come to resolution. That does not change when you attempt to short-circuit that process with precipitous and disingenuous letters to the Court.

Very truly yours,

*/s/ Alexander B. Lees*

Alexander B. Lees

# EXHIBIT 7

**Debevoise
& Plimpton**

Debevoise & Plimpton LLP
919 Third Avenue
New York, NY 10022
+1 212 909 6000

August 10, 2020

**VIA EMAIL**

Re:    *In re: Purdue Pharma L.P. et al., No. 19-23649 (Bankr. S.D.N.Y.)*

Counsel:

We write on behalf of the Mortimer Sackler Initial Covered Sackler Persons ("Mortimer Sackler ICSPs")
with regard to the Request for Production of Documents of the Official Committee of Unsecured Creditors
to Initial Covered Sackler Persons, dated March 31, 2020 (the "Requests"), the meet-and-confer call
between the parties on July 29, 2020, and certain correspondence between the parties on August 3,
2020 concerning the common interest doctrine.  As noted in our correspondence on August 3, 2020, the
Mortimer Sackler ICSPs agreed to supplement entries on their privilege log (the "Privilege Log"),
previously produced on July 21, 2020 and July 31, 2020 pursuant to Paragraph 7(c) of the Stipulation
and Agreed Order Among the Official Committee and the Mortimer Side Covered Parties Regarding
Discovery Deadlines in the Chapter 11 Cases [Dkt. No. 1347]. Specifically, the Mortimer Sackler ICSPs
agreed to note on their privilege log where the common interest doctrine applies to communications to
which attorneys from Davis Polk & Wardwell LLP ("Davis Polk") are parties and to provide additional
information concerning the nature of the common interest.  This agreement to supplement certain entries
on the Privilege Log was not and shall not be construed as an agreement that the Privilege Log produced
on July 31, 2020 was in any way insufficient or that any other entry on the Privilege Log should be
revised, amended, or supplemented based on the additional information being provided herewith
concerning communications with Davis Polk.  For your convenience, we have also attached a separate
privilege log rider that includes only those entries related to Davis Polk.

Additionally, there are five documents that were previously withheld from production and have since been
determined to contain non-privileged material responsive to one or more Requests that will be produced
this week.  Control numbers 16188, 23226, 23233, 23291 and 23293 have been deleted from the
privilege log.  In the event that any information subject to the attorney-client privilege, the work product
doctrine, or any other applicable privilege doctrine has been inadvertently excluded from the Privilege
Log, the Mortimer Sackler ICSPs do not waive or intend to waive any privilege, and reserve all rights with
regard to the Privilege Log, including the right to amend privilege designations and supplement the
Privilege Log.

The Mortimer Sackler ICSPs preserve and do not waive all defenses, including, but not limited to,
defenses based on lack of personal jurisdiction.

Best regards,


Jasmine Ball

# EXHIBIT 8

PUBLICLY FILED PER STIPULATION [ECF 2140]



**MITCHELL P. HURLEY**
+1 212.872.1011/fax: +1 212.872.1002
mhurley@akingump.com

August 12, 2020

**VIA E-MAIL**

Jasmine Ball
**Debevoise & Plimpton LLP**
919 Third Avenue
New York, NY 10022
*Counsel to Sackler Family Side A*
*(Mortimer) ICSPs, ACSPs, and Entities*

Alex Lees
**Milbank LLP**
55 Hudson Yards
New York, NY 10001
*Counsel to Sackler Family Side B*
*(Raymond) ICSPs, ACSPs, and Entities*

     Re:    *In re: Purdue Pharma L.P. et al.*, No. 19-23649 (Bankr. S.D.N.Y.)

Dear Alex and Jasmine:

     We write in response to Alex's August 7, 2020 letter, in which we understand that Alex spoke for both Side A and Side B in material respects, and the two letters Alex sent to us on August 10, 2020.

     <u>**Depositions and Deposition Scheduling**</u>

     Side B has written with a variety of proposals concerning scheduling depositions for David Sackler, Marianna Sackler, and Stephen Ives. Side A has not identified any proposed dates for its witnesses.

     As a preliminary matter, we hope that Mr. Sackler is feeling as well as can be under the circumstances, that his surgery is successful, and that he has a swift recovery. Regarding a schedule for his deposition, the Official Committee will agree to proceed on August 28 as you propose, provided Mr. Sackler makes himself available to resume his deposition following the

PUBLICLY FILED PER STIPULATION [ECF 2140]



**Akin Gump**
STRAUSS HAUER & FELD LLP

August 12, 2020
Page 2

completion of document discovery.[1]  As you know, the Debtors and Side B currently do not plan
to complete productions that may include thousands of David Sackler emails prior to September
1, 2020.  Moreover, Side B's current production obligations—not including productions from the
IACs or Norton Rose Fulbright (with its merger partner, Chadbourne & Parke, "NRF")—may
not be complete until late October or after.  Even if you were able to finish the production of Mr.
Sackler's emails hosted at Moab on August 24—and you appear uncertain whether you in fact
are capable of doing so—potentially thousands of other emails still would be outstanding, and
the Official Committee would not have a fair opportunity to fully review and digest even the
August 24 production prior to the deposition.

        Significantly, Mr. Sackler was a long-time board member at Purdue and the IACs, and
likely will be an important witness with respect to many issues and documents to be produced in
the future by other Sackler family affiliates and counsel as well.  The Official Committee also
anticipates that the Debtors and the Sacklers will be compelled to produce a substantial number
of documents that they may initially withhold as privileged, and those documents too will likely
concern matters with which Mr. Sackler was closely involved.  Those productions necessarily
will follow the proposed initial date for Mr. Sackler's deposition, including because Side B is not
even scheduled to serve its final privilege log until October 22, 2020 (and any documents that
were withheld or redacted and determined not to be privileged to be provided on or before
October 26, 2020).[2]  Please advise if, given these circumstances, Mr. Sackler would prefer to
begin on August 28 as you proposed, or instead agree to appear for the first time after substantial
completion of document production.

        Regarding Mariana Sackler, you proposed proceeding with her deposition on September
3, 2020.  Because Ms. Sackler apparently lives in Australia, you offered to make her available
beginning at 6:00 p.m. New York time.  Your proposal will be quite inconvenient for the court
reporters, office services personnel and legal professionals involved, and only is practical if Ms.
Sackler appears for more than one session given the time difference.  The Official Committee
nevertheless is willing to begin Ms. Sackler's deposition at 6:00 p.m. New York time as you
propose, provided she is flexible in scheduling additional date(s) for concluding her deposition,
including to the extent the creditors decide to wait to finish her deposition until other documents

---

        [1] You should assume that the Non-Consenting States will participate in any scheduled
depositions.

        [2] The Official Committee does not plan to wait until the final log is produced to raise all
of its privilege challenges, but as a result of the timing of Side B's logs, the disclosure of many
documents almost certainly will be delayed until the end of October at the earliest.



# Akin Gump

STRAUSS HAUER & FELD LLP

August 12, 2020
Page 3

are produced and reviewed by the Official Committee, such as Ms. Sackler's personal emails, which are not scheduled to be produced until September 15, 2020.

Regarding Mr. Ives, on August 10, 2020, you wrote that Mr. Ives would be available "during the week of September 14," and demanded that we select a day that week on which to take Mr. Ives deposition. The next day you wrote again, however, and advised that Mr. Ives actually is not available the week of September 14, and demanded that we proceed with his deposition either on September 22 or 23. The Official Committee believes it is generally more productive for parties to negotiate dates for depositions convenient for all, rather than making unilateral demands of this kind. Nevertheless, in an effort to accommodate you and Mr. Ives, the Official Committee will agree to begin Mr. Ives's deposition on September 22, 2020 but reserves its right to resume his testimony after document discovery has been concluded. *See* July 23 Tr. at 69.

We ask that Side B please propose dates in mid to late September on which the Official Committee can begin Richard Sackler's deposition. We also ask that Side A identify dates in late September and October to begin examinations of the witnesses identified in the Official Committee's letter to Side A dated July 29, 2020.

A final note on depositions. We do not believe, as Alex suggests in his August 7 letter, that the Official Committee is "entitled to depose each witness twice, for as long as it likes, including by starting over anew the second time." *See* Aug. 7, 2020 A. Lees Ltr. at 5. Rather, because the Official Committee is beginning depositions before an enormous amount of discovery is scheduled to be finished, the Official Committee must reserve its right to resume depositions to the extent appropriate when additional documents are produced, as the Court itself recognized during the July 23 hearing. This is not a function of simply "require[ing] more time" with the witnesses, *see id.*, though to be sure, more than the seven hours you suggest may be required to fairly examine certain witnesses. But the Official Committee may also need to resume depositions so it can confront at least some witnesses with documents that were not produced in time to be reviewed and used by the Official Committee as a practical matter when the deposition was initiated, or whose significance emerges or is clarified based on later disclosures. The Official Committee will seek in good faith to avoid imposing any undue burden on the Sacklers and their affiliates in taking depositions, and hopes to work with you cooperatively in scheduling and ensuring that examinations continue for periods of time that the parties find acceptable under the circumstances.



August 12, 2020
Page 4

### <u>Revisions to Privilege Logs[3]</u>

As you know, both sides of the Sackler family chose to prepare and produce document-by-document logs in these cases.  While both sides apparently plan to rely extensively on the "common interest doctrine" and "joint defense" privilege, neither side identified which entries on their logs supposedly are subject to either protection.  Side A's log omitted these concepts entirely, while Side B noted only that "claims of attorney-client privilege and work product protection include reliance on common interest, joint defense, and similar doctrines of non-waiver, and all rights with respect to such doctrines are reserved."[4]  The Official Committee has now asked the Sacklers repeatedly to revise their logs to provide additional required information, including by specifically identifying which documents on the log supposedly are "common interest" or "joint defense," but the Sacklers have refused.

The Sacklers approach is unacceptable.  The standard for testing the adequacy of a privilege log is whether, as to each document, it sets forth specific facts that, if credited, would suffice to establish each element of the privilege that is claimed.  *E.g.*, *In re Methyl Tertiary Butyl Ether ("MTBE") Prods. Liab. Litig.*, 274 F.R.D. 106, 112 (S.D.N.Y. 2011); *Orbit One Commc'ns, Inc. v. Numerex Corp*., 255 F.R.D. 98, 109 (S.D.N.Y. 2008).  Numerous entries on the Sacklers' logs fail this test, because on their face they were shared with persons who were neither the Sacklers nor their attorneys.  The associated documents therefore are not "confidential," an element required to sustain a claim of privilege and/or work product unless the

---

[3] With respect to the various privilege challenges that have been raised, we assume both Side A and Side B contend federal common law applies, as you have not identified any applicable state law with respect to any of the entries we are challenging, as is required under Local Rule 26.2(a)(1).  Please let us know if that is not the case, and if so, which state's law you believe applies and to which issues.

[4] We assume Side B's reference to "joint defense" refers to or at least includes claims that Side B constituents retained certain counsel on a joint basis with other parties to the same document or communications, but please correct us if we are mistaken.  Despite Side B's unfortunate choice of words, the Official Committee assumes Side B does not actually purport to claim "common interest" and "joint defense" with respect to every single document on its logs that it also claims is subject to the attorney client privilege and/or work product doctrine.  Side B undoubtedly knows that fewer than all of the entries on its log are in fact subject to a colorable claim of protection under the joint defense privilege or common interest doctrine, and contending otherwise would be bad faith.



August 12, 2020
Page 5

proponent of the privilege also identifies, and can support, facts that justify withholding the document notwithstanding the absence of a key element of the privilege.

To the extent the Sacklers contend that they have a common interest, joint defense or other relationship with the third-parties to these entries, they were required to so allege in their logs. This is not a close call, as the Sacklers well know. Indeed, in the MDL, the Sacklers also produced privilege logs, and in those logs they specifically identified each entry that they claimed was subject to withholding in whole or in part based on a claim of "common interest," just as the rules require. The rules also specifically require the Sacklers to specify "where not apparent, the relationship of the author, addressees, and recipients to each other" that supports the claim of immunity from disclosure. The Sacklers supplied none of this information, and their logs accordingly are manifestly inadequate.

On August 7 and August 10, 2020, Side A and Side B produced revised logs or addenda that added "common interest" as a basis for nondisclosure solely with respect to communications to which attorneys from Davis Polk & Wardwell LLP are parties. The additional information falls far short of what the Official Committee requested, and does not satisfy the Sacklers' obligations under applicable rules.

First, we have consistently asked you to identify any specific entries that you contend are immune from disclosure at least in part because you claim the common interest doctrine is operative. *See* Aug. 1, 2020 K. Porter Email; Aug. 3, 2020 K. Porter Email; Aug. 5, 2020 M. Hurley Ltr. We did not, and have not, limited this request to communications with Davis Polk. We need to know all of the specific entries that your clients assert are protected at least in part because you claim they are subject to a common interest. Second, we have consistently asked you to provide an explanation of any purported basis for common interest, including who the interest is shared with and what the interest is. We have provided case law indicating that this is required. To date, you have not provided this explanation. Please confirm by close of business tomorrow, August 13, 2020, that you will provide the necessary information by Monday, August 17, 2020.

Lastly, Jasmine, please answer our question about whether you have any written common interest agreements not provided by Side B.

As we have explained, these issues are extremely important to the Official Committee, and we will seek the Court's assistance if you continue to refuse to provide the required information.



August 12, 2020
Page 6

### Government Investigations

You note pointedly that the Official Committee has not offered to limit its request solely to the Sacklers' presentations to and other communications with investigating government agencies ("Agency Communications"), but instead also seeks the Sacklers' communications with third parties concerning those investigations. Are the Sacklers offering to produce the Agency Communications if the Official Committee drops its demand for the Sacklers' third party communications? Please advise. You also reference what you describe as "the harm that could be caused by interfering with an ongoing investigation." We do not believe the so-called investigatory privilege could block the Official Committee's request even if properly invoked, and of course your clients do not have standing to do so. Is it your contention that the DOJ or other agency has sought to assert this privilege? If so, please provide us with any documents or information that you claim memorialize that attempted invocation.

### Public Relations Communications

In support of your refusal to produce public relations communications in response to our request, you cite a single case from the governing jurisdiction (*In re Grand Jury Subpoenas Dated Mar. 24, 2003*, 265 F. Supp. 2d 321 (S.D.N.Y.)) and support it with an unpublished opinion from the Northern District of California (*Stardock Sys., Inc. v. Reiche*, 2018 WL 6259536 (N.D. Cal. Nov. 30, 2018)). However, the Southern District of New York case you cite is an outlier with a very precise and narrow holding. *See, e.g., Universal Standard Inc. v. Target Corp.*, 331 F.R.D. 80, 91-92 (S.D.N.Y. 2019); *Egiazaryan v. Zalmayev*, 290 F.R.D. 421, 432 (S.D.N.Y. 2013). As courts in the Southern District of New York have repeatedly recognized, *In re Grand Jury Subpoenas* may only be used to support privilege where a public relations firm is hired to achieve a specific litigation goal (such as influencing the decision whether or not to indict by prosecutors and regulators). *Bloomingburg Jewish Educ. Ctr. v. Vill. of Bloombingburg*, 171 F. Supp. 3d 136, 146 (S.D.N.Y. 2016); *Universal Standard*, 331 F.R.D. at 92. And even then, the public relations consultant's performance of standard public relations services outside of this specific goal, such as preparing a press release at the time of filing, participating in strategy sessions with counsel and the party, reviewing materials sent by the party for impact on litigation strategy, advising counsel as to possible public reactions, and handling media communications, is not protected by attorney-client privilege. *Bloomingburg*, 171 F. Supp. at 145 (summarizing *Haugh v. Schroder Inv. Mgmt. N.A. Inc.*, 2003 WL 21998674, at *1 (S.D.N.Y. Aug. 25, 2003)).

Indeed, even if *In re Grand Jury Subpoenas* reflected the general rule on public relations communications in the Southern District of New York, and it does not, it does not support a



August 12, 2020
Page 7

claim of privilege with respect to the entries on your logs, which do not indicate an effort to achieve a particular litigation goal, but rather, frequently, if not always, reflect public relations firms conducting standard public relations services like preparing a press release  (Ctrl. Nos. 19761, 19890, and 21301 from Side A, and RSNY12199536 and RSNY12204690 from Side B); participating in strategy sessions  (Ctrl. Nos. 17395, 19566, and 31297 from Side A and DSF0040060 from Side B); reviewing materials sent by the party for impact on litigation strategy  (Ctrl. Nos. 23612 and 24377 from Side A, and PS-01157987, PS-01160647 and DSF0021048 from Side B); advising counsel as to possible public reactions  (the documents identified as pertaining to impact on ligation strategy, as well as Ctrl. Nos. 22997/MSF00877578 and 26298 from Side A); and handling media communications  (Ctrl. Nos. 14670, 18497, and 22601 from Side A, and PS-00101495, PS-01167042, and DSF0064978 from Side B). Even under *In re Grand Jury Subpoenas*, these types of communications are not entitled to protection.

Accordingly, as stated before, please produce all withheld documents that include personnel from any public relations firms, including but not limited those previously identified. Please also identify all public relations firms included on the logs and provide all engagement letters with these firms, including the dates and subject matter of the engagements.  Even under the limited case law you cite, this information is necessary to assess whether privilege has properly been invoked.

### **Marital Privilege**

We also disagree with your characterization of the law around marital communications, and reserve the right to raise with the Court any dispute regarding any entries you assert as privileged on this basis.  In any event, we have identified at least two entries in Side A's August 10 updated July 31 log where the marital privilege has been improperly claimed or appears to have other issues.  MSF00932093 consists of a communication from Mortimer D.A. Sackler to Gheri Sackler, who is his mother, not his wife.  Even though we pointed out this to you, it still invokes the "marital communications privilege."  It also purports to assert the attorney-client privilege over this communication as "Requesting and providing legal advice from Eric Rothman re: investment/business transactions" even though Eric Rothman is not identified in the To, From, or CC lines.  This seems improper on both counts.  Please advise.  Likewise, Row 1647 consists of a communication from Theresa Sackler to Mortimer Sackler dated Mar. 13, 2007 and purports to invoke the marital communications privilege based on the marriage of Mortimer D.A. Sacker and Jacqueline, as the privilege is explained as "[d]iscussing legal advice, providing legal advice, and reflecting a request for legal advice re: trusts and estates; Mortimer D.A. Sackler and



**Akin Gump**

STRAUSS HAUER & FELD LLP

August 12, 2020
Page 8

Jacqueline Sackler."  This communication also lacks any attorney and the assertions concerning legal advice appear misplaced.

### Beneficiary Meeting Materials

We appreciate that some of the Official Committee's searches may return materials used at meetings among family members concerning the affairs of Purdue and/or the disposition of the wealth generated at least in part by Purdue's sales of OxyContin.  Given the potential significance of these materials, however, we reiterate our request that you also ask family members, advisors and affiliates who may be able to help locate copies of these materials to do so.  This should include not just inquiries you say you made to "Additional Custodians," but also the Initial Covered Sackler Parties, and, we suspect, advisors like Mr. Olsen of Kokino, outside counsel, and Stephen Ives.  You are of course in a better position than we to determine who to ask for materials of this kind, and we ask again that you do so.

### Engagement Agreement and Legal Invoices

Alex, please advise when we can expect the narrative description you indicate Side B will provide on page six of your letter.  Jasmine, please advise whether Side A will do the same, and if so, when we can expect to receive that information.

### Confirmation Concerning Emails Collected

As a reminder, our requests for email ESI searching covered all non-Debtor emails of the relevant ICSP and ACSP custodians, wherever located.

Alex, we understand that you are confirming that any emails from the Verto Institute were collected.  We believe you otherwise have confirmed that you have gathered for review and production to us all emails of the Side B ICSP and ACSP custodians (other than Beth Cohen, whose ESI is being separately produced by Schulte).

Jasmine, we do not believe we have received your confirmation.  Among other things, we have specifically asked you about emails hosted by the Acorn Foundation.  It appears that Mortimer Sackler had an email account with the Acorn Foundation, although that was not listed among Mortimer Jr.'s emails that you disclosed to us, and you have asserted that Mortimer Sr. only had the Mundipharma account discussed below.  Likewise, we have discovered that other members of the Sackler family, as well as Stuart Baker and Jonathan White had email accounts with Acorn.  Please respond concerning the collection of Acorn emails, tell us who has



**Akin Gump**

STRAUSS HAUER & FELD LLP

August 12, 2020
Page 9

possession of those emails, and confirm they will be collected.  Please also confirm that *all* non-Debtor emails of the relevant ICSP and ACSP custodians were collected, wherever located.

### Other Questions Unanswered by Side A

Jasmine, we are still awaiting answers from you in response to numerous questions, including but not limited to questions posed in our letter dated July 25, 2020 and during our meet and confer on July 29, 2020, which we highlighted for you again in our letter dated August 5, 2020.  Side A's continuing pattern of neglect regarding the Official Committee's requests, including with respect to requests for basic information that have been outstanding for months, must end.

In the case of Mortimer Sackler's Mundipharma email, you were obligated under the so-ordered stipulation to use best efforts to gather the emails and also to provide information respecting that *by June 25, 2020* and to meet and confer with us thereafter on a production schedule for those documents.  [ECF No. 1347] ¶ 4.  The fact that you still have not collected the ESI, and we are still chasing you even for answers regarding your process, frankly does not satisfy your obligations under the stipulations.

Please advise regarding our outstanding questions by close of business tomorrow.

\* \* \*

Alex, your August 7 letter concludes with a series of baseless accusations and mischaracterizations concerning your own conduct and that of your clients in discovery in these cases.  We do not think it would be productive to engage with you in the same manner, and note only that we disagree with your assertions in material part, and that we urge both Sides of the Sackler family to take a more constructive approach to the meet and confer process and discovery in the future.

Please feel free to contact us if you have any questions or wish to discuss any of the foregoing. The foregoing is not intended to be a comprehensive catalogue of all of the Official Committee's concerns relating to the Sacklers' privilege logs and other positions taken in discovery these cases, which the Official Committee continues to review. Nothing herein constitutes a waiver or relinquishment of any of the Official Committee's claims, defenses, rights or remedies.

UNREDACTED. CONTAINS OUTSIDE PROFESSIONALS' EYES ONLY INFORMATION
TREAT SUBJECT TO PROTECTIVE ORDER



August 12, 2020
Page 10

Sincerely,

*/s/ Mitchell Hurley*
Mitchell P. Hurley

cc:    Gregory P. Joseph (Joseph Hage Aaronson LLC)
       Marshall Huebner (Davis Polk & Wardwell LLP)
       Ben Kaminetzky (Davis Polk & Wardwell LLP)
       Charles Duggan (Davis Polk & Wardwell LLP)
       James McClammy (Davis Polk & Wardwell LLP)
       Margarita Clarens (Davis Polk & Wardwell LLP)
       Chautney M. Oluwole (Davis Polk & Wardwell LLP)
       Andrew Troop (Pillsbury Winthrop Shaw Pittman LLP)
       Andrew Alfano (Pillsbury Winthrop Shaw Pittman LLP)
       Jason Sharp (Pillsbury Winthrop Shaw Pittman LLP)
       Kenneth H. Eckstein (Kramer Levin Naftalis & Frankel LLP)
       Rachael Ringer (Kramer Levin Naftalis & Frankel LLP)

# EXHIBIT 9

**Debevoise
& Plimpton**

**Debevoise & Plimpton LLP**
919 Third Avenue
New York, NY 10022
+1 212 909 6000

August 16, 2020

<u>BY EMAIL</u>

Mitchell Hurley
Katherine Porter
Akin Gump Strauss Hauer & Feld LLP
One Bryant Park
New York, New York 10036
mhurley@akingump.com
kporter@akingump.com

**In re: Purdue Pharma L.P. et al, No. 19-23649 (Bankr. S.D.N.Y.)**

Dear Counsel:

We write with regard to certain contentions advanced in correspondence from the
Official Committee of Unsecured Creditors (the "UCC") dated July 25, 2020, and
August 5, 2020, concerning Side A's assertion of one or more forms of privilege over
certain documents redacted in or withheld from its document productions to the
parties authorized to conduct Rule 2004 discovery in these chapter 11 cases.[1]

**Confidential Government Investigations**

Side A agreed to provide the UCC with all documents produced in prior actions
related to opioids, including confidential government investigations, while reserving
the right to maintain the confidentiality of any such investigations.  Side A fulfilled
that agreement by producing these documents months ago.  The UCC nevertheless
continues to demand that Side A produce communications with government agencies
and officials in the course of any such confidential investigations.  As Side A
explained on July 22, 2020, the production of such communications is unnecessary
and inappropriate because (*i*) any such investigations remain confidential, (*ii*) the
types of communications sought by the UCC would reveal confidential government
information, including the nature, substance, and potential theories of the

---

[1]     The Mortimer Sackler ICSPs preserve and do not waive all defenses,
including, but not limited to, defenses based on lack of personal jurisdiction.

PUBLICLY FILED PER STIPULATION [ECF 2140]

investigations, as well as confidential settlement communications, and (*iii*) through the disclosure of that confidential information, jeopardize potential resolution of any such investigations, which is a prerequisite to a global settlement and plan of reorganization in these chapter 11 cases.

The UCC has advanced no substantive reason supporting the disclosure of these communications other than a general claim that they are relevant and discoverable. *See, e.g.*, Letter dated August 5, 2020. Any confidential communications with government agencies, such as presentations by counsel, however, are attorney work product and settlement communications that are not probative of and could not be relied on in proving any private creditor's claim. They are therefore not relevant to the UCC's diligence of the proposed settlement with regard to the claims of its members or other creditor constituencies

## Spousal Privilege

We note that the UCC and Side B currently dispute the applicable law concerning the analysis of the assertion of privilege over confidential communications between spouses. Side A is in agreement with Side B that federal common law provides the legal framework for spousal privilege in these chapter 11 cases. Aside from one email between individuals who are not spouses that was inadvertently designated as subject to spousal privilege on Side A's privilege log for which we already agreed to remove the inadvertent designation, the UCC has not identified any specific documents for which it disputes Side A's assertion of spousal privilege. We therefore do not understand that there is any live dispute with regard to Side A's assertion of spousal privilege.

## Common Interest Privilege

Side A rejects the UCC's characterization of its privilege log as "deficient" simply because Side A did not include specific references to the "common interest" doctrine. As explained in Side B's August 7, 2020 letter, there is no requirement that the common interest doctrine be noted on a privilege log. Side A provided the UCC with an appendix as part of its privilege log identifying counsel and relationships with third parties, which Side A understood to be sufficient information to enable the UCC to evaluate assertions of privilege regarding communications to which third parties were privy. Pursuant to the UCC's request during the parties' July 29, 2020 meet-and-confer, we provided supplemental information regarding certain entries on Side A's privilege log to which attorneys at Davis Polk & Wardwell LLP were party. We further agreed to provide supplemental information on the appendix to the privilege log to further assist the UCC in evaluating specific claims of privilege. We will be available to meet-and-confer regarding claims of privilege following provision of the supplemented appendix to the UCC. We are unaware of any challenge by the UCC to Side A's claim of privilege over a specific document implicating the common interest doctrine.

Mitchell Hurley                                    3                            August 16, 2020


**Privileged Communications with Public Relations Firms Retained by Counsel**

For the reasons stated in counsel for Side B's August 7, 2020 letter, we reject the
UCC's assertion that any communications to which personnel from a public relations
firm are party are categorically not privileged.  Side A has already produced
communications from or including public relations firms that it deemed not
privileged.  To the extent that the UCC identifies additional documents involving
public relations firms on Side A's privilege log that the UCC contends are not
privileged, Side A is available to meet-and-confer concerning those specific claims.

Best regards,

*/s/Jasmine Ball*
Jasmine Ball

# EXHIBIT 10

UNREDACTED - CONTAINS OUTSIDE PROFESSIONALS' EYES ONLY INFORMATION
TREAT SUBJECT TO PROTECTIVE ORDER



# Milbank

**ALEXANDER B. LEES**

*Partner*

55 Hudson Yards  |  New York, NY 10001-2163
T: 212.530.5161
alees@milbank.com  |  milbank.com

August 16, 2020

**VIA EMAIL**

Mitchell P. Hurley
Akin Gump Strauss Hauer & Feld LLP
Bank of America Tower
New York, NY 10036

  Re: In re Purdue Pharma L.P., No. 19-23649 (Bankr. S.D.N.Y.)

Dear Mitch:

  I write in response to your letters of August 12 and 13, and to Ms. Porter's emails of August 13 and 14. My letter of August 13 addresses the subject of David Sackler's deposition, and we continue to reserve all rights with respect to that subject. This letter addresses the remainder of the issues you raised in recent correspondence.

<u>Depositions</u>

  You state in a footnote in your August 12 letter that we should "assume that the Non-Consenting States will participate in any scheduled deposition." Please clarify what you mean by this: specifically, whether we should expect multiple parties to examine the witnesses. As stated in our letter of August 7, if multiple parties authorized to conduct a Rule 2004 examination intend to question the witnesses, they must allocate the agreed or mandated time for each witness among themselves.

  Thank you for offering to provide a draft deposition protocol. We believe it is appropriate to address, at a minimum, the following:

1. Which service or platform you intend to use.

2. Precautions you or the platform provider will take to ensure the security of the deposition and any confidential information or documents referenced.

3. That you will record video and audio in addition to having a stenographic transcript.

MILBANK LLP

NEW YORK | LOS ANGELES | WASHINGTON, D.C. | SÃO PAULO | FRANKFURT
LONDON | MUNICH | BEIJING | HONG KONG | SEOUL | SINGAPORE | TOKYO

PUBLICLY FILED PER STIPULATION [ECF 2140]

Mitchell P. Hurley
August 16, 2020                                                                                      Page 2

4. How you intend to show documents to the witness and provide the witness with the opportunity to review each document in full (for example, whether you will furnish copies of documents to the witness in advance).

5. Who will be able to participate in the deposition, and how you will exclude a participant, if necessary, if you use documents or elicit information that the participant is not entitled to receive under the protective order.

6. How you intend to introduce exhibits at the deposition, for example by document-sharing technology, by using the screensharing technology within the videoconferencing platform, or by sending the exhibit to the deponent and all individuals on the record by email.

7. That the service provider will have a breakout room function and that the breakout rooms shall be established by the service provider prior to the deposition and controlled by the service provider.

8. Whether you intend to do technological troubleshooting in advance of each deposition.

In addition, we would expect any deposition protocol to provide that:

1. The parties agree (a) that remote depositions may be used at a trial or hearing to the same extent that an in-person deposition may be used at trial or hearing (b) not to object to the use of any of these depositions on the basis that the deposition was taken remotely.

2. Each person attending a remote deposition shall be visible to all other participants, their statements shall be audible to all participants, and they should each strive to ensure their environment is free from noise and distractions.

3. Conversations in the breakout rooms shall be confidential and shall not be recorded.

4. The parties agree (a) not to challenge the validity of any oath administered by the court reporter, even if the court reporter is not a notary public in the location in which the deponent resides and (b) that the court reporter shall be permitted to administer the oath to the witness via the videoconference.

5. The parties agree that the court reporter is an "Officer" as defined by Federal Rule of Civil Procedure 28(a)(2) and shall be permitted to administer the oath to the witness via the videoconference.

Mitchell P. Hurley
August 16, 2020                                                                                     Page 3

6.  The party that noticed the deposition shall be responsible for procuring a written transcript and video record of the remote deposition.

7.  The parties shall bear their own costs in obtaining a transcript and/or video record of the deposition.

8.  At the beginning of each deposition, consistent with Rule 30(b)(5)(A) of the Federal Rules of Civil Procedure, the service provider responsible for video-recording the deposition shall "begin the deposition with an on-the-record statement that includes: (i) the officer's name and company affiliation; (ii) the date, time, and place of the deposition; (iii) the deponent's name; (iv) the officer's administration of the oath or affirmation to the deponent; and (v) the identity of all persons present."

We would be pleased to consider other issues relating to a deposition protocol that you suggest. If, upon further reflection, we believe other items should be addressed in the protocol, we will bring them to your attention or add them to the draft you circulate.

Marianna Sackler will be available for deposition at 6:00pm (eastern) on September 2, which will be 8:00am on September 3 on her local time. We do not agree that Ms. Sackler should sit for another deposition later given the status of document discovery. It is inaccurate for you to say that her documents will not be produced until September 15. We stated explicitly in our letter of August 10 that to accommodate your request to depose Ms. Sackler, and to begin depositions in late August and early September, we would expedite production of Ms. Sackler's documents and substantially complete those productions during the week of August 24. We currently anticipate that we will substantially complete production even earlier, by approximately August 21. There should be no need to re-depose this witness, whose knowledge of relevant facts is limited in any event.

Considering the time difference between the US and Australia, we are amenable to scheduling Ms. Sackler's deposition on September 2 for less than the allowable 7 hours, and permitting the UCC to reserve the remaining time for a continued examination in the event the UCC identifies specific facts that it learned after September 2 that justify continuing the examination of this witness who is unlikely to have knowledge of pertinent facts. If the UCC does not agree in this respect, Ms. Sackler will be prepared to sit for her entire 7-hour deposition on September 2-3.

As to potential legal impediments to deposing a witness in Australia, we are not currently aware of any; the purpose of our inquiry was to ensure that the UCC had thought through the issue, given that some foreign jurisdictions limit the ability of attorneys to conduct depositions in US proceedings on their soil. We will assume that you have done your diligence in this regard.

Steve Ives will be available for deposition on September 22 from 9am to 5:30pm Eastern time. Production of Mr. Ives's documents has been substantially complete since August 7. As a

Mitchell P. Hurley
August 16, 2020                                                                                                    Page 4

result, there is no reason why you should need to depose Mr. Ives a second time "after document discovery has concluded." That, however, is an issue on which we can each reserve our rights until such time, if any, that you come to believe additional testimony from Mr. Ives may be warranted.

We are conferring with Richard Sackler on his availability for deposition.

<u>Privilege Logs</u>

We have been extraordinarily accommodating to the UCC with respect to privilege logs. Based on the UCC's expressed preference, we agreed to produce document-by-document privilege logs, which is far more detail than the UCC is entitled to receive under applicable rules. *See* Local 26.2(c) ("[I]t is presumptively proper to provide the information required by this rule by group or category."). At the UCC's insistence, we further agreed to produce privilege logs on a rolling basis, committing to produce at least four privilege logs in as many months, while simultaneously reviewing approximately one million documents in the same period and preparing for the depositions that you requested begin as early as August.

Our July 22 privilege log contains extensive information to assist the UCC in assessing our claims of privilege, including the date; sender, recipient, and author information; email addresses; email subject lines; file names; the privilege relied upon; and a description of the document. In response to feedback that the relationships among various parties on our privilege log were not sufficiently apparent to you, we further agreed to provide a list of individuals and entities appearing on the privilege log, any organizational association of those individuals or entities, and a narrative description of the relationships. We anticipate providing this list by tomorrow, August 17 (and we will update it as necessary to account for additional privilege logs).

When you further professed ignorance as to any conceivable common legal interest between our clients and any third party on the privilege log (even those that were co-defendants in litigation), we agreed to provide a categorical list of common legal interests (and similar principles of non-waiver) that our clients share with such parties. Although we do not believe this information is required, we are providing it to you as yet another accommodation. We are in the process of preparing this list and will provide it to you as soon as practicable.

Despite the extensive information we have provided or agreed to provide, you continue to insist that we revise our 15,000-plus entry privilege log in substantial part, based on an assertion that our initial privilege log is deficient on its face. This demand is neither reasonable nor supported by applicable law or rules.[1] Local Civil Rule 26.2 requires that we provide "(i) the

---

[1] The cases you cite are inapposite. In *In re MTBE*, the privilege log contained virtually no description of the withheld documents or the asserted privilege. 274 F.R.D. 106, 112 n. 28 (S.D.N.Y. 2011). That is a far cry from what we have provided here. In *Orbit One*, the court ordered the use of categorical logs to lessen the extensive "burden posed by reviewing and recording a large quantity of protected communication," and required that the

Mitchell P. Hurley
August 16, 2020                                                                                                          Page 5

type of document . . . ; (ii) the general subject matter of the document; (iii) the date of the
document; and (iv) the author of the document, the addressees of the document, and any other
recipients, and, where not apparent, the relationship of the author, addressees, and recipients to
each other." We have agreed to provide this information and more.

It is one thing to contend that we must support our claims of privilege in court in
response to a motion to compel or similar challenge – a proposition we do not dispute – but it is
quite another to assert that we are required to brief our position on all conceivable challenges to
our privilege assertions in the first instance on face of the privilege log. Such a contention is not
supported by any authority of which we are aware. To the contrary, it is antithetical to modern
discovery rules, which recognize the extraordinary expense and unnecessary burden associated
with the approach to privilege logs demanded by the UCC, particularly for the volume of
documents involved here. *See* Fed. R. Civ. P. 26(b)(5) advisory committee's note to 1993
amendment ("Details concerning time, persons, general subject matter, etc., may be appropriate
if only a few items are withheld, but may be unduly burdensome when voluminous documents
are claimed to be privileged or protected . . . ."); Local Civil Rule 26.2 committee's note to 2011
amendment (encouraging the development of "efficient ways to communicate the information
required") (citing The Sedona Cooperation Proclamation (Nov. 2011),
www.thesedonaconference.org (recognizing that "especially with ESI, privilege logs can be
voluminous, a major source of satellite litigation, and a substantial drain on judicial resources"
and recommending judicial management techniques, including "presumptively privileged"
agreements and additional time to create privilege logs for "voluminous ESI"))).

We are willing to provide additional detail regarding entries on our privilege log – even
beyond what we have agreed to give already – in response to reasonable further inquiries you
may have. But we expect the UCC, in making such inquiries, to identify *with particularity* the
entries (or a discrete category of entries) that it questions, after making a good faith assessment
of our claim of privilege based on all of the information available to it (including the information
that the UCC already knows from its extensive experience with these cases). We further expect
the UCC to cabin its inquiries by date and subject matter where appropriate, to ensure that we are
expending our resources debating entries that actually matter to the case. We have already
demonstrated our willingness to cooperate in this respect by providing a more detailed
explanation of a targeted number of entries involving Davis Polk. We believe this approach is
efficient, consistent with applicable law and rules, and will have the effect of streamlining
privilege disputes, if any, that we are required to raise with the Court.

With respect to the question about asterisks in our privilege log, we direct you to the
correspondence from Dan White to Katherine Porter of June 15. We agreed that any attorney
who appears on the privilege log would have an asterisk next to his or her name.

---

categories listed give enough information for the adverse party to "assess any potential objections to the assertion of
attorney-client privilege." 255 F.R.D. 98, 109 (S.D.N.Y.).

Mitchell P. Hurley
August 16, 2020                                                                                    Page 6

Government Investigations

My email of July 22 and letters of July 28 and August 7 explain that we do not believe any portion of the UCC's request regarding government investigations into opioid marketing is appropriate. That includes its request for communications with government investigative agencies, as well as communications with other parties concerning the investigations.

Public Relations Communications

It is well-recognized that a consultant who provides expert services necessary for the provision of legal advice is within the scope of attorney-client privilege through the agent exception to waiver. *See, e.g.*, *U.S. v. Kovel*, 296 F.2d 918, 922 (2d Cir. 1961) (accountant within the scope of privilege); *In re Int'l Oil Trading Co., LLC*, 548 B.R. 825, 834 (Bankr. S.D. Fla. 2016) (holding that a broad interpretation of the agency exception is "more consistent with the purpose for the exception" and finding a litigation funder within the scope of the attorney-client privilege). This is particularly clear where the consultant is engaged directly through counsel.[2] *See In re Grand Jury Subpoenas Dated Mar. 24, 2003 Directed to (A) Grand Jury Witness Firm & (B) Grand Jury Witness,* 265 F. Supp. 2d 321, 331 (S.D.N.Y. 2003); *Montesa v. Schwartz*, No. 12CIV6057CSJCM, 2016 WL 3476431, at *7 (S.D.N.Y. June 20, 2016) (investigator retained through counsel within the scope of privilege).[3]

Goldin Solutions and Dezenhall Resources are public relations firms that appear on our privilege log. These firms were engaged by JHA to provide services necessary to the provision of legal advice to our clients in these cases.[4] The engagement letters for these firms, which are Bates stamped RSF00666457 through RSF00666470, are being provided herewith. We expect that this will resolve any outstanding questions regarding the scope of privilege extending to these agents of counsel.

Although we are continuing to review the privilege log in response to your inquiries, we are not aware of other public relations firms on our privilege log that were engaged by or on

---

[2] The cases you cite are inapposite for a variety of reasons, including because none involved retention of a public relations firm through counsel specifically for the purpose of assisting with litigation. *Egiazaryan v. Zalmayev*, 290 F.R.D. 421, 425 (S.D.N.Y. 2013) (plaintiff hired the public relations firm); *Universal Standard Inc. v. Target Corp.*, 331 F.R.D. 80, 89 (S.D.N.Y. 2019) (same). Moreover, the degree of media attention and potential effect on the jury pool is directly analogous to the situation described in *In re Grand Jury Subpoenas* and not to the situation presented in either of the cases you cite. During the July 23 court conference, Judge Drain recognized that well-known media outlets with exceedingly high readership have published (and continue to publish) misleading stories about our clients and these cases. The rampant media misinformation about our clients seriously jeopardizes our clients' ability to receive a fair hearing and was the motivation for counsel's retaining public relations firm assistance, as reflected the engagement letters we are providing to you herewith.

[3] Additionally, as we previously indicated, the sharing of work product with a public relations firm will not waive the protections applicable to that work product. *See* August 7 A. Lees letter to M. Hurley at 4-5.

[4] "While not required, courts have looked to contemporaneous documentary proof, such as retainer agreements and billing statements, or the absence thereof, in determining the nature of the third party's engagement with counsel." *Montesa*, 2016 WL 3476431, at *5 (citing *United States v. Adlman*, 68 F.3d 1495, 1500 n.1 (2d Cir. 1995)).

Mitchell P. Hurley
August 16, 2020                                                                                  Page 7

behalf of our clients. We understand that other public relations firms on our privilege log were
retained by or on behalf of others who shared a common legal interest with our clients. We
believe that questions regarding such firms may be better answered by those who retained them.
Some of your questions regarding these firms may be answered by reviewing the forthcoming
description of individuals and entities and categorical description of common interest (and
similar) relationships on our privilege log. To the extent that you continue to have questions
regarding privilege log entries involving public relations firms after considering all the
information provided by us and other parties to these cases in respect of this issue, we reiterate
our request that you provide us with particularized inquiries regarding specific privilege log
entries, which we will of course consider and address in good faith.

Engagement Agreements and Legal Invoices

        We anticipate providing a narrative description of NRF's services by early next week.
Our goal is to provide a joint response from both Sackler families, the IACs represented by
Royer Cooper Cohen Braunfeld LLC, and the II-Way entities represented by Haug Partners. This
requires some coordination, and therefore some time, but it should provide you with the
information you requested in a single response.

Emails Collected

        Our previous correspondence describes the email collections we have conducted. We are
continuing to investigate your inquiry about the Verto Institute (which has not been operational
for over five years) and any email accounts associated with it (over which we do not have
possession, custody or control). We expect to have an answer for you this week.

        Ms. Porter's email of August 14 inquired about several email accounts that you believe
are associated with David Sackler. As we informed you in May, messages associated with
███████████ are maintained by Moab Capital Partners. *See* May 22 K. Goldberg email
to M. Hurley. This account was collected and reviewed; any responsive messages will be
provided with the Moab production, which we anticipate will occur next week.

        We do not recognize the accounts ███████████ or ███████████ To the extent
you are referring to ███████ and ███████, we collected and reviewed these
accounts and have substantially completed production of any responsive messages.

        Perry Capital and OSS Capital are hedge funds where Mr. Sackler worked during the
time period of approximately 2001 through 2005 or 2006. We understand that at least Perry
Capital no longer exists. Mr. Sackler does not have possession, custody or control of these email
accounts, to the extent they still exist.

        ███████████ was Mr. Sackler's email address while attending Princeton
University as an undergraduate. Mr. Sackler does not have access to this email address and it is
his understanding that the inbox no longer exists. Princeton University provided Mr. Sackler

Mitchell P. Hurley
August 16, 2020                                                                    Page 8

with the ███████████████████ email account after graduation. Mr. Sackler does not
use this account, no longer recalls his log-in credentials for it, and efforts to reset his password
have been unsuccessful. Emails to this account are forwarded to ██████████

        We are looking into your inquiries regarding ████████████████████
█████████████████, and █████████████████████████ Preliminarily,
we believe that the ██████████████ email addresses may be mobile device aliases of Mr. Sackler's
██████████████ email address, and that the ██████████████ address may
be a Purdue-hosted account (and thus in the custody of Debtors, to the extent it exists).

<u>Beneficiary Meetings</u>

        We have further confirmed with the family office, including with Steve Ives and with a
representative of Kokino, that the family office and the R-ICSPs do not have a readily accessible
file that contains beneficiary meeting materials. We again urge you to ask the debtors for these
items, as we understand the materials you seek were prepared by Purdue personnel.

                                Very truly yours,

                                */s/ Alexander B. Lees*
                                Alexander B. Lees

cc:     Marshall Huebner (Davis Polk & Wardwell LLP)
        Andrew Troop (Pillsbury Winthrop Shaw Pittman LLP)
        Kenneth H. Eckstein (Kramer Levin Naftalis & Frankel LLP)

# EXHIBIT 11

UNREDACTED - CONTAINS OUTSIDE PROFESSIONALS' EYES ONLY INFORMATION
TREAT SUBJECT TO PROTECTIVE ORDER

| **JASMINE BALL** | **ALEXANDER B. LEES** |
|---|---|
| **DEBEVOISE & PLIMPTON LLP** | **MILBANK LLP** |
| **JOHN DOUGHERTY** | **MARC HIRSCHFIELD** |
| **HAUG PARTNERS LLP** | **ROYER COOPER COHEN** |
| | **BRAUNFELD LLC** |

August 17, 2020

*OUTSIDE PROFESSIONALS' EYES ONLY/HIGHLY CONFIDENTIAL*
*SUBJECT TO PROTECTIVE ORDER*

**VIA ELECTRONIC MAIL**

Mitchell P. Hurley
One Bryant Park
Bank of America Tower
New York, NY 10036

Re:    *In re: Purdue Pharma L.P. et al.*, No. 19-23649 (Bankr. S.D.N.Y.)

Dear Mitch:

On behalf of our respective clients, we write in response to inquiries you have posed about the history of the representation by Norton Rose Fulbright (together with its predecessors, "**NRF**") of members of the Sackler family, trusts for their benefit, and companies or entities and entities owned directly or indirectly, in whole or in part by, or associated with members of the Sackler family, including in your July 22, 2020 letter addressed to Ms. Ball and Messrs. Joseph and Lees.

We received the following description from NRF regarding that historic relationship:

> In about the late 1960's, Doctors Arthur, Mortimer and Raymond Sackler and their families and entities became clients of Chadbourne (then Chadbourne, Parke, Whiteside & Wolff).  Arthur ceased to be a client around the late 1970's or early 1980's.

> Chadbourne represented Mortimer, Raymond and their families, family trusts and trustees and entities owned by them and by their families and trusts since the late 1960's or early 1970's.  As family members increased and new trusts and entities were formed, they too became clients.  They ceased to be clients upon death (individuals), termination/dissolution (trusts and entities), disposition to third parties (entities) or divorce out of the family.

PUBLICLY FILED PER STIPULATION [ECF 2140]

UNREDACTED - CONTAINS OUTSIDE PROFESSIONALS' EYES ONLY INFORMATION
TREAT SUBJECT TO PROTECTIVE ORDER

*OUTSIDE PROFESSIONALS' EYES ONLY/HIGHLY CONFIDENTIAL*
*SUBJECT TO PROTECTIVE ORDER*

Upon the combination of Chadbourne and NRF on July 1, 2017, all the then-current Sackler clients (individuals, entities, trusts and trustees) became clients of NRF.

NRF's relationship with the Chapter 11 debtors ended upon or shortly prior to the Chapter 11 filing.

Attached to this letter are lists prepared by NRF of clients that NRF has represented as part of that historic relationship. Those lists identify individuals, entities and trusts by categories listed below, together with our understanding of what each of those categories includes:

1. **MDS Family Individuals**: Mortimer D. Sackler, his descendants, and his descendants' relatives, including spouses.

2. **RRS Family Individuals**: Raymond R. Sackler, his descendants, and his descendants' relatives, including spouses.

3. **Debtor Entities**: Entities named as debtors in *In re Purdue*.

4. **US Jointly Owned Entities**: US entities, other than the Debtor Entities, that were jointly owned (directly or indirectly), half by MDS Family Individuals, or entities or trusts associated with them, and half by RRS Family Individuals, or entities or trusts associated with them.

5. **Non-US Jointly Owned Entities**: Non-US entities that were jointly owned (directly or indirectly), half by MDS Family Individuals, or entities or trusts associated with them, and half by RRS Family Individuals, or entities or trusts associated with them.

6. **Joint Venture Entities**: entities (1) in which MDS Family Individuals, or entities and trusts associated with them, and RRS Family Individuals, and/or entities or trusts associated with them, have a (direct or direct) ownership interest, but (2) which do not fall under the definition of US Jointly Owned Entities or Non-US Jointly Owned Entities.

7. **MDS Family Entities (US & Non-US)**: (1) entities in which MDS Family Individuals (directly or indirectly) own a controlling interest, or (2) charitable or non-profit entities established by either MDS Family Individuals or entities or trusts associated with MDS Family Individuals.

8. **RRS Family Entities (US & Nom-US)**: (1) entities in which RRS Family Individuals (directly or indirectly) own a controlling interest, or (2) charitable or non-profit entities established by either RRS Family Individuals or entities or trusts associated with MDS Family Individuals.

9. **MDS Family Trusts**: trusts established by and/or for the benefit of MDS Family Individuals.

10. **RRS Family Trusts**: trusts established by and/or for the benefit of RRS Family Individuals

PUBLICLY FILED PER STIPULATION [ECF 2140]

*OUTSIDE PROFESSIONALS' EYES ONLY/HIGHLY CONFIDENTIAL*
*SUBJECT TO PROTECTIVE ORDER*

NRF advised us that these lists were compiled fairly quickly and thus are subject to further correction and/or supplementation. They may not be completely comprehensive, particularly in regard to terminated entities and trusts. If NRF informs us of any revisions or corrections to these lists, we will pass them on to you. NRF also advised us that the lists do not include any shelf companies that may have been created for members of the Sackler family, but which were never activated and for which NRF never provided legal services.

NRF also provided the following additional information regarding the relationship:

> We are unaware of the initial reason for the relationship with the Sacklers when it was first formed. Since at least 1990, the relationships and subject matters have been very extensive, including corporate and partnership, transactional work, licensing, tax matters, wills, trusts and estate matters, real estate, litigation, employment matters, etc.

> The principal Chadbourne/NRF partners involved in the representation of the Sackler clients since the 1980's include: John Wilcox – Tax (deceased), Peter M. Ward – Trusts and Estates (deceased), Stuart D. Baker (General, Corporate, Real Estate), Leslie J. Schreyer (General, Tax, Trusts and Estates), George E. Zeitlin – Tax (deceased), Barry Dinaburg (Tax), Lauren D. Kelly (Tax), Jeffrey A. Robins (Tax, Trusts and Estates), Anthony M. Roncalli (Corporate), Frank S. Vellucci (Corporate), Ian M. McClatchey (Corporate), Donald I Strauber (Litigation), Sumantha Sedor (Corporate), Karina Haum Siegel (Tax), William G. Cavanagh (Tax), Amy D'Agostino (Corporate), Jay Henneberry (Litigation), Mary Yelenick (Litigation), Phoebe Wilkinson (Litigation), H. Hedley Stothers (Real Estate), Deborah Guider (Corporate). Leslie J. Schreyer has been the relationship partner for the Sackler clients since Stuart D. Baker first took a position with Purdue.

We trust that this has provided you with the relevant background information about the NRF relationship. The information in this letter is being provided in response to your request for information to assess the attorney client relationship between NRF and certain of our respective clients and is not intended to, and does not, waive any such privilege.

The lists compiled by NRF also respond to your request for information about "Affiliated Entities" in your July 28, 2020 letter to Messrs. Duggan, McClammey, Hirschfield, Lees, Dougherty, and Joseph and Ms. Ball. All of the entities that each of the undersigned is aware of on behalf of our respective clients that would constitute "Affiliated Entities" as you use the term in your July 28, 2020, are identified in one or more of the exhibit to this letter, the Affiliated Entity List, the Royer Cooper List, the Haug List, appended to your July 28, 2020 letter, and the organizational charts provided by Milbank on March 12, 2020.

PUBLICLY FILED PER STIPULATION [ECF 2140]

*OUTSIDE PROFESSIONALS' EYES ONLY/HIGHLY CONFIDENTIAL*
*SUBJECT TO PROTECTIVE ORDER*

Regards,

/s/ Alexander B. Lees
Alexander B. Lees
**MILBANK LLP**
55 Hudson Yards
New York, NY 10001
Telephone: (212) 530-5000

/s/ Jasmine Ball
Jasmine Ball
**DEBEVOISE & PLIMPTON LLP**
919 Third Avenue
New York, NY 10022
Telephone: (212) 909-6000

/s/ John C. Dougherty
John C. Dougherty
**HAUG PARTNERS LLP**
One Post Office Square
Boston, Massachusetts 02109

/s/ Marc E. Hirschfield
Marc E. Hirschfield
**ROYER COOPER COHEN
BRAUNFELD LLC**
1120 Avenue of the Americas; 4th Floor
New York, New York 10036

Attachment
Cc (with attachment):
    James McClammey (Davis Polk & Wardwell LLP)
    Charles Duggan (Davis Polk & Wardwell LLP)
    Andrew Troop (Pillsbury Winthrop Shaw Pittman LLP)
    Andrew Alfano (Pillsbury Winthrop Shaw Pittman LLP)
    Jason Sharp (Pillsbury Winthrop Shaw Pittman LLP)
    Kenneth H. Eckstein (Kramer Levin Naftalis & Frankel LLP)
    Rachael Ringer (Kramer Levin Naftalis & Frankel LLP)
    Joe M. McLaughlin (Simpson Thacher & Bartlett LLP)

# ATTACHMENT

PUBLICLY FILED PER STIPULATION [ECF 2140]

**MDS Family Individuals**

1. Mortimer D. Sackler, M.D. (deceased)
2. Theresa E. Sackler
3. Marissa T. Sackler
4. ███████████████
5. ███████████████
6. Sophia D.S. Dalrymple
7. Jamie W.M. Dalrymple
8. ███████████████
9. ███████████████
10. Michael D. Sackler
11. Lucero Inhara O. Toledo
12. ███████████████
13. Ilene Sackler Lefcourt
14. Jeffrey M. Lefcourt
15. Heather Lefcourt
16. ███████████████
17. ███████████████
18. ███████████████
19. Karen Lefcourt-Taylor
20. ███████████████
21. ███████████████
22. Kathe A. Sackler, M.D.
23. Susan Shack Sackler, M.D.
24. Benjamin J. Shack Sackler
25. Julia H. Shack Sackler
26. Samantha S. Hunt
27. John Hunt
28. Tara Hunt
29. Jasper Hunt
30. Dylan Hunt
31. ███████████████
32. Mortimer D.A. Sackler
33. Jacqueline Sackler
34. ███████████████
35. ███████████████
36. ███████████████

1

*OUTSIDE PROFESSIONALS' EYES ONLY/HIGHLY CONFIDENTIAL*
*SUBJECT TO PROTECTIVE ORDER*

### RRS Family Individuals

1. Raymond R. Sackler, M.D. (deceased)
2. Beverly Sackler (deceased)
3. Richard S. Sackler, M.D.
4. Beth B. Sackler (divorced 2013 – not a current client)
5. David A. Sackler
6. Jaseleen Ruggles
7. ██████████████████
8. ██████████████████
9. ██████████████████
10. Marianna Sackler Frame
11. ████████████
12. ████████████
13. ████████████
14. Rebecca Sackler
15. ██████████
16. Jonathan D. Sackler (deceased)
17. Mary Corson
18. Madeleine Sackler
19. Clare E. Sackler
20. ██████████████████
21. ██████████████████
22. Miles R.C. Sackler
23. ████████████

PUBLICLY FILED PER STIPULATION [ECF 2140]

*OUTSIDE PROFESSIONALS' EYES ONLY/HIGHLY CONFIDENTIAL*
*SUBJECT TO PROTECTIVE ORDER*

## Debtor Entities

1.  Purdue Pharma L.P. (DE)
2.  Purdue Pharma Inc. (NY)
3.  Purdue Transdermal Technologies L.P. (DE)
4.  Purdue Pharma Manufacturing L.P. (DE)
5.  Purdue Pharmaceuticals L.P. (DE)
6.  Imbrium Therapeutics L.P. (DE)
7.  Adlon Therapeutics L.P. (DE)
8.  Greenfield BioVentures L.P. (DE)
9.  Seven Seas Hill Corp. (British Virgin Islands)
10. Ophir Green Corp. (British Virgin Islands)
11. Purdue Pharma of Puerto Rico (DE)
12. Avrio Health L.P. (DE)
13. Purdue Pharmaceutical Products L.P. (DE)
14. Purdue Neuroscience Company (DE)
15. Nayatt Cove Lifescience Inc. (DE)
16. Button Land L.P. (DE)
17. Paul Land Inc. (NY)
18. Quidnick Land L.P. (DE)
19. Rhodes Associates L.P. (DE)
20. Rhodes Pharmaceuticals L.P. (DE)
21. Rhodes Technologies (DE)
22. UDF LP (DE)
23. SVC Pharma LP (DE)
24. SVC Pharma Inc.(DE)

3

OUTSIDE PROFESSIONALS' EYES ONLY/HIGHLY CONFIDENTIAL
SUBJECT TO PROTECTIVE ORDER

**US Jointly Owned Entities**

1. AB GENERICS L.P. (DE) (Dissolved April 8, 2004)
2. AB GENERICS L.P. (NY) (Cancelled August 24, 2018)
3. ABG LABORATORIES, INC. (NJ) (Merged into The P.F. Laboratories, Inc. May 10, 2004)
4. AVRIO HEALTH INC. (NY) (Formerly Purdue Products Inc.; name change effective December 28, 2017)
5. BARTLETT TRADING CORP. (NY) (Dissolved April 21, 2004)
6. BAZAAR ILLUSTRATIONS, INC. (NY)
7. BLAIR LABORATORIES, INC. (NY) (Merged into The Purdue Frederick Company May 6, 2004)
8. BR HOLDINGS ASSOCIATES INC. (NY)
9. BR HOLDINGS ASSOCIATES L.P. (DE)
10. BRIDGEWELL COMPANY (NY) (terminated September 21, 2011)
11. CAAS LEASING, INC. (DE)
12. CALYPTE BIOMEDICAL CORPORATION (CA) (Merged out)
13. CALYPTE, INC. (DE)
14. CBC DIAGNOSTICS, INC. (DE) (Dissolved 2/28/00)
15. CONNECTICUT AVENUE REALTY CO., INC. (CT)
16. COVENTRY TECHNOLOGIES L.P. (DE) (Formerly Coventry Technologies LLC, conversion to limited partnership effective July 8, 2004)
17. DT PARTNERS L.P. (DE) (formerly Delphian Technology L.P., name change effective July 17, 2002) (Cancelled 12/18/15)
18. EDLA LABORATORIES, INC. (NJ) (Merged into The P.F. Laboratories, Inc. May 10, 2004)
19. E.R.G. REALTY, INC. (NY)
20. ESSENTIAL RAW MATERIALS LLC (DE) (cancelled May 31, 2019)
21. GRAY PHARMACEUTICAL CO., INC. (NY) (Dissolved April 14, 2004)
22. GRAY PHARMACEUTICAL CO. (NY) (Terminated May 5, 2004)
23. HOSPICE PROVIDENT LLC (DE) (Cancelled September 12, 2016)
24. HOSPITAL PROMOTION SERVICE, INC. (NY) (Merged into Pharmaceutical Research Associates, Inc. May 7, 2004)
25. HS HOLDINGS INC. (DE)
26. HYPEROL SALES CORPORATION (NY) (Merged into Pharmaceutical Research Associates, Inc. May 7, 2004)
27. ██████████████████
28. IKUWA HOLDINGS INC. (NY) (formerly Bard Pharmaceuticals Inc., name change to Laureate Pharma Inc. effective May 14, 2002; current name change effective December 6, 2004) (Dissolved August 9, 2017)
29. IKUWA HOLDINGS L.P. (DE) (formerly Bard BioPharma L.P., name change to Laureate Pharma L.P. effective May 14, 2002; current name change effective December 6, 2004) (Cancelled 12/18/15)

PUBLICLY FILED PER STIPULATION [ECF 2140]

*OUTSIDE PROFESSIONALS' EYES ONLY/HIGHLY CONFIDENTIAL*
*SUBJECT TO PROTECTIVE ORDER*

30. LABORATORIOS BLAIR, S.A., INC. (NY) (Dissolved by Proclamation December 15, 1973)
31. MARKET TRACK RESEARCH LLC (DE limited liability company) (Dissolved April 8, 2004)
32. MIDVALE CHEMICAL COMPANY (NJ)
33. MILLSAW REALTY INC. (NY) (Dissolved December 21, 2016)
34. MILLSAW REALTY L.P. (DE) (Cancelled 12/18/15)
35. MNP CONSULTING LIMITED (DE)
36. MUNDIPHARMA, INC. (NY)
37. MUNDIPHARMA BIOLOGICS INC. (NY)
38. MUNDIPHARMA BIOLOGICS L.P. (DE)
39. MUNDIPHARMA HEALTHCARE CORPORATION (DE)
40. MUNDIPHARMA HEALTHCARE LLC (WA)
41. MUNDIPHARMA INTERNATIONAL LIMITED (DE)
42. MUNDIPHARMA INTERNATIONAL TECHNICAL OPERATIONS LIMITED (DE)
43. MUNDIPHARMA IT SERVICES INC. (DE)
44. MUNDIPHARMA LLC (DE) (Cancelled August 20, 2018)
45. MUNDIPHARMA LTD. (DE)
46. MUNDIPHARMA PHARMACEUTICALS INC. (NY)
47. NAPPWOOD LAND CORPORATION (NJ)
48. NEPPERHAN DISTRIBUTORS, INC. (NY) (Dissolved May 6, 1980)
49. NEW SUFFOLK HOLDINGS LLP (DE)
50. NORWALK REALTY DEVELOPMENT LLC (DE) (Dissolved April 8, 2004)
51. ███████████████████████████████
52. NOX CORPORATION (DE) (Dissolved November 12, 1998)
53. ONE STAMFORD LAND INC. (NY) (formerly known as Purdue Land Inc., name change effective November 1, 2002)
54. ONE STAMFORD HOLDINGS L.P. (DE limited partnership) (formerly known as Purdue Land Holdings L.P., name change effective November 1, 2002) (Dissolved April 8, 2004)
55. ONE STAMFORD REALTY L.P. (DE limited partnership) (formerly known as Purdue Realty L.P., name change effective November 1, 2002)
56. ONEAC HOLDING CORP. (DE) (Voided in DE March 1, 2001 for failure to file annual reports)
57. PHARMA ASSOCIATES INC. (NY) (Formerly Purdue Associates Inc., name change effective February 19, 2002)
58. PHARMA ASSOCIATES L.P. (DE) (Formerly Purdue Associates L.P., name change effective February 15, 2002)
59. PHARMA2PHARMA L.P. (DE)
60. PHARMA TECHNOLOGIES INC. (NY) (formerly Napp Chemicals, Inc.)
61. PHARMACEUTICAL RESEARCH ASSOCIATES, INC. (DE)
62. PHARMACEUTICAL RESEARCH ASSOCIATES, INC. (NY)
63. PHARMACEUTICAL RESEARCH ASSOCIATES L.P. (DE) (Formerly Purdue Holdings L.P.; name change July 24, 2018)

5

*OUTSIDE PROFESSIONALS' EYES ONLY/HIGHLY CONFIDENTIAL*
*SUBJECT TO PROTECTIVE ORDER*

64. PHARMIT INC. (NY) (Dissolved June 24, 2019)
65. PHARMIT L.P. (DE) (Cancelled August 20, 2018)
66. PLP ASSOCIATES HOLDINGS INC. (NY) (Formerly Purdue Holdings Inc., name change effective July 16, 2002)
67. PLP ASSOCIATES HOLDINGS L.P. (DE) ( formerly Purdue Pharma LLC, a DE limited liability company converted to DE limited partnership December 7, 1998) (Name changed from Purdue Holdings L.P., effective July 16, 2002)
68. PRA HOLDINGS, INC. (NY)
69. PURDUE ACQUISITION CORPORATION (DE) (merged into CoCensys, Inc. on September 28, 1999)
70. PURDUE AO PHAMACEUTICALS INC. (NY) (Dissolved June 19, 2019)
71. PURDUE AO PHAMACEUTICALS L.P. (DE) (Cancelled August 20, 2018)
72. PURDUE BIOLOGICS, INC. (DE) (Formerly Immuno-Diagnostics, Inc.) (Merged into Pharmaceutical Research Associates, Inc. May 7, 2004)
73. PURDUE BIOPHARMA INC. (NY)
74. PURDUE BIOPHARMA L.P. (DE) (Formed November 6, 2014)
75. PURDUE BIOPHARMA L.P. (DE) (Dissolved April 8, 2004)
76. PURDUE HEALTHCARE TECHNOLOGIES INC. (NY)
77. PURDUE HEALTHCARE TECHNOLOGIES L.P. (DE)
78. PURDUE NEUROSCIENCE CORPORATION (NY) (Dissolved October 1, 2004)
79. PURDUE NEUROSCIENCE INC. (DE) (Dissolved April 8, 2004)
80. PURDUE NEUROSCIENCE L.P. (DE) (Dissolved April 8, 2004)
81. PURDUE PHARMA LTD. (DE) (formerly CoCensys Inc.; name change January 17, 2001) (Dissolved April 8, 2004)
82. PURDUE PHARMA MANUFACTURING INC. (NY) (Dissolved June 17, 2019)
83. PURDUE PHARMA PRODUCTS L.P. (DE) (Formed August 4, 2005)
84. PURDUE PHARMA TECHNOLOGIES INC. (DE) (formerly Napp Technologies, Inc., name change effective October 7, 2002) (Name changed to Purdue Services Inc. effective April 10, 2002 through October 6, 2002)
85. PURDUE PHARMACEUTICAL PRODUCTS INC. (NY)
86. PURDUE RESEARCH INSTITUTE L.P. (DE) (Cancelled August 20, 2018)
87. RHODES PHARMACEUTICALS INC. (NY)
88. RHODES TECHNOLOGIES INC. (formerly Napp Coventry Inc.)
89. ROBIN LAND LIMITED (NY) (Liquidated December 1993)
90. ROBIN REALTY COMPANY L.P. (DE) (Liquidated December 1993)
91. RSJ COMPANY L.P. (DE) (Formerly RSJ Company LLC, conversion to limited partnership effective July 17, 2007)
92. SACKLER SCHOOL OF MEDICINE
93. SAWWOOD LAND CORPORATION (NY)
94. SCIENCE MEDIA COMMUNICATIONS, INC. (CT) (Dissolved April 12, 2004)
95. SCIENCE MEDIA , INC. (NY) (Formerly known as Science Media Productions, Inc.)
96. SENOKOT PHARMACEUTICAL PRODUCTS CORP. (NY) (Merged into Pharmaceutical Research Associates, Inc. May 7, 2004)

*OUTSIDE PROFESSIONALS' EYES ONLY/HIGHLY CONFIDENTIAL*
*SUBJECT TO PROTECTIVE ORDER*

97. SENOKOT SALES CORPORATION (NY) (Dissolved by Proclamation December 15, 1973)

98. SHIELD LABORATORIES, INC. (NY) (Formerly known as Save Business Consultants, Inc.) (dissolved April 27, 1999)

99. SWIFT MAILERS, INC. (NY) (dissolved April 27, 1999)

100. SYNERGISTICS (NY) (terminated 2000)

101. THE G.F. HARVEY CO., INC. (NY) (Merged into Pharmaceutical Research Associates, Inc. May 7, 2004)

102. THE MARWEST COMPANY (NY)(Terminated September 21, 2011)

103. THE P.F. BETADINE PRODUCTS CO., INC. (NY)

104. THE P.F. LABORATORIES, INC. (NJ)

105. THE PURDUE PHARMA COMPANY (DE) (name changed from The PP Company, effective September 1, 1997) (Terminated September 30, 2004)

106. THE PURDUE FREDERICK COMPANY INC. (NY) (d/b/a The Purdue Frederick Company)

107. THE PURDUE FREDERICK COMPANY INTERNATIONAL, INC. (NY) (Merged into The Purdue Frederick Company May 6, 2004)

108. THE SACKLER FOUNDATION, INC. (Dissolved August 27, 2010)

109. THE SEVEN HUNDRED REALTY CORPORATION (NJ)

110. THE TERRAMAR FOUNDATION, INC. (DE)

111. TXP SERVICES INC. (DE)

112. VITAMERICAN CHEMICALS, INC. (NJ)

113. VITAMERICAN CORPORATION (DE)

PUBLICLY FILED PER STIPULATION [ECF 2140]

*OUTSIDE PROFESSIONALS' EYES ONLY/HIGHLY CONFIDENTIAL*
*SUBJECT TO PROTECTIVE ORDER*

## Non-US Jointly Owned Entities

### ARGENTINA

MUNDIPHARMA PHARMACEUTICALS ARGENTINA S.R.L.(formerly 024 S.R.L.; name change July 21, 2016)

MUNDIPHARMA (ARGENTINA) S.R.L.

PURDUE PHARMA DE ARGENTINA S.R.L. (liquidated February 12, 2007)

### AUSTRALIA

MUNDIPHARMA PTY. LIMITED

MUNDIPHARMA ANZ LIMITED (Formerly Purdue Pharma Pty. Ltd.; name change effective March 11, 2019)

MUNDIPHARMA HEALTHCARE PTY. LTD. (Formerly Specialized Therapeutics Pty. Ltd.; name change effective March 21, 2017)  (Acquired March 23, 2017)

MUNDIPHARMA ONCOLOGY PTY. LTD. (Formerly Tolmar Australia Pty. Ltd.; name change effective February 16, 2018)  (Acquired February 16, 2018)

### AUSTRIA

MUNDIPHARMA GesmbH

MUNDIPHARMA MEDICAL CEE GMBH (Merged into Mundipharma GesmbH September 2018)

### BELGIUM

MUNDIPHARMA BV (formerly Mundipharma Comm. VA; name change June/July 2020)

MUNDIPHARMA PHARMACEUTICALS BELGIUM BV (formerly Mundipharma Pharmaceuticals BVBA; name change June/July 2020; previously known as Mundipharma BVBA)

### BERMUDA

BERMAG LIMITED

CENTRAG LIMITED (Liquidated December 1992)

LEYCOL INTERNATIONAL LIMITED (Liquidated 1991)

L.P. CLOVER LIMITED

MN CONSULTING LLC

MUNDIPHARMA COMPANY

MUNDIPHARMA INTERNATIONAL CORPORATION LIMITED (Formerly a British Virgin Islands company, domesticated to Bermuda effective June 23, 2006)

MUNDIPHARMA INTERNATIONAL LIMITED (Formerly Maxell Limited)

MUNDIPHARMA INTERNATIONAL HOLDINGS LIMITED

MUNDIPHARMA LABORATORIES LIMITED (Formerly Mundipharma International Limited, name change effective September 12, 1996)

MUNDIPHARMA LIMITED

MUNDIPHARMA MEDICAL COMPANY (formerly Patterson Company)

MUNDIPHARMA OPHTHALMOLOGY CORPORATION LIMITED

8

*OUTSIDE PROFESSIONALS' EYES ONLY/HIGHLY CONFIDENTIAL*
*SUBJECT TO PROTECTIVE ORDER*

MUNDIPHARMA OPHTHALMOLOGY PRODUCTS LIMITED

MUNDIPHARMA PHARMACEUTICAL COMPANY

MUNDIPHARMA RESEARCH COMPANY LIMITED

SICO LTD.

STRESA LIMITED (dissolved February 26, 2001)

## BRAZIL

MUNDIPHARMA PRODUCTOS FARMACEUTICOS LTD. (liquidated)

MUNDIPHARMA BRASIL PARTICIPAÇÕES LIMITADA (Merged into Mundipharma Brasil Produtos Médicos e Farmacêuticos Ltda. effective December 6, 2012)

MUNDIPHARMA BRASIL PRODUTOS MÉDICOS E FARMACÊUTICOS LTDA. (formerly Etiker Produtos Médicos e Farmacêuticos Ltda.; acquired on July 26, 2012)

## BRITISH VIRGIN ISLANDS

BOETTI CORPORATION

BOLDINI CORPORATION

CLOVIO CORPORATION

EVENING STAR SERVICES LTD.

HAYEZ CORPORATION



LAKE CLAIRE INVESTMENTS LTD.

MALTUS CORPORATION

MEXCUS CORPORATION

MUNDIPHARMA INTERNATIONAL CORPORATION (Domesticated to Bermuda June 23, 2006)

## BULGARIA

MUNDIPHARMA MEDICAL S.àr.l. (Sofia branch)

## CANADA

BARD PHARMACEUTICALS (1990) INC.

BLAIR PHARMACEUTICALS, LTD.

ELVIUM LIFE SCIENCES GP INC.

ELVIUM LIFE SCIENCES LIMITED PARTNERSHIP

ELVIUM ULC

GRAY PHARMACEUTICALS CO. (CANADA) LTD.

PURDUE FREDERICK INC.

PURDUE PHARMA (Formerly known as Purdue Frederick)

PURDUE PHARMA INC. (formerly 171590 Canada Inc. and formerly P.F. Pharmaceuticals Inc.)

PURDUE PHARMA ULC (Dissolved June 17, 2020)

9

PUBLICLY FILED PER STIPULATION [ECF 2140]

*OUTSIDE PROFESSIONALS' EYES ONLY/HIGHLY CONFIDENTIAL*
*SUBJECT TO PROTECTIVE ORDER*

## CAYMAN ISLANDS

ONEAC INC. (liquidated 1998)

## CHILE

MUNDIPHARMA PHARMACEUTICALS (CHILE) LIMITADA

## CHINA

MUNDIPHARMA (CHINA) PHARMACEUTICAL COMPANY LIMITED (Formerly Beijing Mundipharma Pharmaceutical Company Limited; name change effective May 11, 2010)

MUNDIPHARMA (SHANGHAI) INTERNATIONAL TRADE COMPANY LIMITED

## COLOMBIA

MUNDIPHARMA (COLOMBIA) S.A.S.

## CZECH REPUBLIC

MUNDIPHARMA GESMBH (Prague branch)

## DENMARK

NORPHARMA OF 9 DECEMBER 1994 A/S (Liquidated March 27, 1995)

MUNDIPHARMA A/S (Formerly Norpharma A/S; name change effective May 15, 2017)

NORPHARMA LABORATORIES APS (Liquidated April 26, 1995)

## DUBAI

MUNDIPHARMA FZ-LLC

MUNDIPHARMA MIDDLE EAST FZ-LLC

## EGYPT

MUNDIPHARMA EGYPT LLC

MUNDIPHARMA SCIENTIFIC OFFICE OF MUNDIPHARMA MEA GMBH (Registered Scientific Office)

## FINLAND

MUNDIPHARMA OY

MUNDIPHARMA FINLAND OY (formerly Mundipharma AY) (merged into Mundipharma OY April 15, 2001)

## FRANCE

LABORATORIES BELAMONT SAS  (merged into Mundipharma SAS effective August 31, 2003)

MUNDI-INTER SARL  (liquidated)

MUNDIPHARMA MANAGEMENT SARL (Formerly HS Management S.ar.l.)

MUNDIPHARMA INTERNATIONAL SARL  (liquidated)

MUNDIPHARMA SAS (Formerly Mundipharma Sarl)

PUBLICLY FILED PER STIPULATION [ECF 2140]

*OUTSIDE PROFESSIONALS' EYES ONLY/HIGHLY CONFIDENTIAL*
*SUBJECT TO PROTECTIVE ORDER*

## GERMANY

MUNDIPHARMA BIOLOGICS GMBH (Formerly Cinfa Biotech GmbH; name change May 2019) (Acquired July 31, 2018)

DELA PHARMAZEUTISCHE VERWALTUNG GmbH (liquidated) (formerly Mundipharma Proter GmbH; formerly Dr. Med. Hans Voigt GmbH)

KRUGMANN GmbH

MUNDICHEMIE GmbH

MUNDICHEMIE GmbH & Co. KG (Liquidated 12/31/94)

MUNDIPHARMA GmbH

MUNDIPHARMA IT SERVICES GMBH & CO. KG (Dissolved March 31, 2019)

MUNDIPHARMA IT SERVICES VERWALTUNGS GmbH (Dissolved March 31, 2019)

MUNDIPHARMA MEDICAL GmbH

MUNDIPHARMA RESEARCH GMBH & CO. KG

MUNDIPHARMA RESEARCH VERWALTUNGS GMBH

MUNDIPHARMA DEUTSCHLAND GmbH & Co. KG (Formerly known as Mundipharma Vertriebsgesellschaft mbH & Co. KG; name change effective September 23, 2014)

MUNDIPHARMA VERWALTUNGSGESELLSCHAFT mbH

ONEAC GmbH (liquidated 2000; struck off Commercial Register February 22, 2001)

ONEAC GmbH & Co. KG (not in existence)

TFC PHARMA GMBH  (Dissolved March 31, 2019)

## HONG KONG

MUNDIPHARMA (HONG KONG) LIMITED

## HUNGARY

MUNDIPHARMA MEDICAL GMBH (Budapest branch)

## INDONESIA

MUNDIPHARMA LABORATORIES GmbH (Representative office)
        100.0%        Mundipharma Laboratories GmbH (Switzerland)

PT. MUNDIPHARMA HEALTHCARE INDONESIA (Formed May 8, 2015)

## IRELAND

MUNDIPHARMA CORPORATION (IRELAND) LIMITED

MUNDIPHARMA MEDICAL COMPANY (Irish Branch) (Transferred to Mundipharma Pharmaceuticals Limited effective June 1, 2007)

MUNDIPHARMA PHARMACEUTICALS LIMITED

## ITALY

MUNDIPHARMA PROTER Srl (liquidated) (formerly St. Edmund Srl)

MUNDIPHARMA S.r.L (Liquidated October 14, 2005)

PUBLICLY FILED PER STIPULATION [ECF 2140]

*OUTSIDE PROFESSIONALS' EYES ONLY/HIGHLY CONFIDENTIAL*
*SUBJECT TO PROTECTIVE ORDER*

MUNDIPHARMA PHARMACEUTICALS S.r.L.

## JAPAN

JAPANESE SILENT PARTNERSHIP (referred to as TK or Tokumei kumiai)

MUNDIPHARMA KABUSHIKI KAISHE

MUNDIPHARMA PHARMACEUTICALS GMBH (Switzerland) (Japan Branch) (Liquidated)

SPECTRUM PHARMACEUTICALS GK (Acquired November 16, 2015; merged into Mundipharma K.K.)

## JERSEY, CHANNEL ISLANDS

ONEAC LIMITED (Dissolved October 10, 2003)

## KAZAKHSTAN

MUNDIPHARMA MEDICAL CEE GMBH (Representative Office)

## KOREA

MUNDIPHARMA DISTRIBUTION LTD.

MUNDIPHARMA KOREA LTD. (Formerly Mundipharma YH; name change February 14, 2011)

## LUXEMBOURG

ACCARDI S.àr.l.

BULLA S.àr.l.

EURO-CELTIQUE S.A.

FILTI S.àr.l.

FLIRA S.àr.l.

HOKOL S.àr.l. (liquidated 12/23/15)

IND S.àr.l.

IREY S.àr.l.

LUCIEN HOLDINGS S.àr.l.

LYMIT HOLDINGS S.àr.l.

MUNDIPHARMA INTERNATIONAL SERVICES S.àr.l.

MUNDIPHARMA IT SERVICES S.àr.l. (Liquidated May 3, 2018)

NITID S.àr.l.

NONTAG S.àr.l.

PORTHOS S.àr.l.

SOFY S.àr.l.

SONGOL S.àr.l.

SONTI S.àr.l.

## MALAYSIA

PUBLICLY FILED PER STIPULATION [ECF 2140]

*OUTSIDE PROFESSIONALS' EYES ONLY/HIGHLY CONFIDENTIAL*
*SUBJECT TO PROTECTIVE ORDER*

MUNDIPHARMA PHARMACEUTICALS SDN. BHD. (formerly Mundipharma Sendirian Berhad; name change effective December 6, 2004)

## MAURITIUS

MUNDIPHARMA LTD.

CUTCHOGUE HOLDINGS CORPORATION

## MEXICO

MUNDIPHARMA DE MEXICO, S. de R.L. de C.V.

PURDUE PHARMA DE MEXICO S. DE R.L. (liquidated 2003)

## MOROCCO

MUNDIPHARMA MAROC

## MYANMAR

MUNDIPHARMA (MYANMAR) CO., LTD.

## NETHERLANDS

ACCARDI B.V.

ALFA GENERICS B.V. (formerly ABC Pharma B.V.; name change effective April 12, 2012)

ARSAGO B.V.

BRADENTON PRODUCTS B.V.

LADENBURG B.V.

MUNDIPHARMA B.V.

MUNDIPHARMA BRADENTON B.V.

MUNDIPHARMA DC B.V.

MUNDIPHARMA PHARMACEUTICALS B.V.

TACCA B.V.

TENNA B.V.

VACCARO B.V.

VENUSTI B.V.

## NEW ZEALAND

MUNDIPHARMA NEW ZEALAND LIMITED

## NORWAY

MUNDIPHARMA A.S.

## PANAMA

PENTAN CORPORATION (dissolved August 22, 2008)

PUBLICLY FILED PER STIPULATION [ECF 2140]

*OUTSIDE PROFESSIONALS' EYES ONLY/HIGHLY CONFIDENTIAL*
*SUBJECT TO PROTECTIVE ORDER*

**PHILIPPINES**

MUNDIPHARMA DISTRIBUTION GMBH (Philippines branch)

**POLAND**

MUNDIPHARMA MEDICAL GMBH (Warsaw branch) (de-registered October 20, 2008)

MUNDIPHARMA POLSKA SP. Z O.O.

**PORTUGAL**

MUNDIPHARMA FARMACEUTICA LDA.

**ROMANIA**

MUNDIPHARMA MEDICAL GMBH (Romanian branch) (de-registered March 1, 2017)

**RUSSIA**

MUNDIPHARMA GESMBH (Representative office)

**SAUDI ARABIA**

TECHNICAL SCIENTIFIC OFFICE OF MUNDIPHARMA NEAR EAST GMBH

**SINGAPORE**

LADENBURG INVESTMENTS LIMITED PTE

MARNINE HOLDINGS PTE. LIMITED

MARTONE HOLDINGS PTE. LIMITED

MUNDIPHARMA DEVELOPMENT PTE. LIMITED

MUNDIPHARMA HEALTHCARE PTE LIMITED

MUNDIPHARMA IT SERVICES PTE. LTD.

MUNDIPHARMA MANUFACTURING PTE LIMITED

MUNDIPHARMA PHARMACEUTICALS PRIVATE LIMITED

MUNDIPHARMA PTE LIMITED

MUNDIPHARMA SINGAPORE HOLDING PTE LIMITED

**SLOVAK REPUBLIC**

MUNDIPHARMA GESMBH (Bratislava branch)

**SLOVENIA**

MEDIS

**SOUTH AFRICA**

MUNDIPHARMA (PROPRIETARY) LIMITED

**SPAIN**

14

UNREDACTED  CONTAINS OUTSIDE PROFESSIONALS' EYES ONLY INFORMATION
TREAT SUBJECT TO PROTECTIVE ORDER

*OUTSIDE PROFESSIONALS' EYES ONLY/HIGHLY CONFIDENTIAL*
*SUBJECT TO PROTECTIVE ORDER*

MUNDIPHARMA BIOLOGICS S.L. (Formerly Cinfa Biotech S.L.; name change effective May 2019) (Acquired July 31, 2018)

MUNDIPHARMA PHARMACEUTICALS S.L.

MUNDIPHARMA SERVICES SL  (Liquidated December 23, 2014)

## SWEDEN

MUNDIPHARMA AB

## SWITZERLAND

DR. WEIBEL AG (liquidated)

MEDIMATCH AG (formerly Hyper AG) (Liquidated; March 12, 2014)

MONDIAL PRODUITS PHARMACEUTIQUES S.A. (liquidated)

MUNDI-INTER SA (liquidated)

MUNDIPHARMA AG

MUNDIPHARMA DISTRIBUTION GmbH

MUNDIPHARMA EDO GmbH

MUNDIPHARMA HOLDING AG

MUNDIPHARMA INTERNATIONAL SERVICES GmbH

MUNDIPHARMA IT GmbH (Formed January 7, 2011)

MUNDIPHARMA IT SERVICES GmbH

MUNDIPHARMA LABORATORIES GmbH

MUNDIPHARMA LATAM GmbH (Formed June 10, 2015)

MUNDIPHARMA MEA GmbH

MUNDIPHARMA MEDICAL GmbH

MUNDIPHARMA MEDICAL COMPANY (Swiss branch)

MUNDIPHARMA NEAR EAST GmbH

MUNDIPHARMA PHARMACEUTICALS GmbH (Japan branch) (liquidated)

MUNDIPHARMA PHARMAZEUTIKA (Basel branch of Bard Pharmaceuticals Limited (UK))

PURDUE PHARMA GmbH (formerly Mundipharma Products GmbH) (liquidated)

## TAIWAN

TAIWAN MUNDIPHARMA PHARMACEUTICALS LTD. (formerly Taiwan Mundipharma Ltd.; name change effective November 15, 2012)

## THAILAND

MUNDIPHARMA (THAILAND) LIMITED

## TURKEY

MUNDIPHARMA INTERNATIONAL CONSULTING SERVICES INC. (Mundipharma International Danışmanlık Hizmetleri Anonim Şirketi) (liquidated)

PUBLICLY FILED PER STIPULATION [ECF 2140]

*OUTSIDE PROFESSIONALS' EYES ONLY/HIGHLY CONFIDENTIAL*
*SUBJECT TO PROTECTIVE ORDER*

MUNDIPHARMA PHARMACEUTICALS INDUSTRY AND TRADE LIMITED (Mundipharma Ecza Urunleri Sanayi Ve Ticaret Limited Şirketi)

## UNITED KINGDOM

BARD PHARMACEUTICALS LIMITED

BETADINE AND PRODUCTS LIMITED (formerly Priory Laboratories Limited) (Dissolved)

CLINICAL DESIGNS LIMITED

COATES & COOPER LIMITED (Dissolved)

CODELLA LIMITED (Dissolved)

IRC 1446 WITHHOLDING PARTNERSHIP L.P. (Dissolved December 31, 2008)

MOORE CHEMICALS LIMITED (Fine Chemical Sales) (Dissolved)

MOORE MEDICINAL PRODUCTS LIMITED (Dissolved)

MUNDIBIOPHARMA LIMITED

MUNDIPHARMA CORPORATION LIMITED

MUNDIPHARMA INTERNATIONAL LIMITED

MUNDIPHARMA INTERNATIONAL SERVICES LIMITED

MUNDIPHARMA INTERNATIONAL TECHNICAL OPERATIONS LIMITED

MUNDIPHARMA IT SERVICES LIMITED

MUNDIPHARMA LIMITED (Formerly known as Dagrapharm Limited; name change effective September 30, 1991)

MUNDIPHARMA MEDICAL COMPANY LIMITED

MUNDIPHARMA RESEARCH LIMITED (Formerly known as Napp Pharmaceuticals Research Limited; name change effective August 23, 2006)

NAPP LABORATORIES LIMITED

NAPP PENSION TRUSTEES LIMITED

NAPP PHARMACEUTICAL GROUP LIMITED

NAPP PHARMACEUTICAL HOLDINGS LTD. (formerly Napp Pharmaceuticals Ltd.)

NAPP PHARMACEUTICALS LIMITED

NAPP RESEARCH CENTRE LTD. (Research)

PAINEUROPE LIMITED (Formerly Palliative Care Limited, name change effective July 9, 2003)

QDEM PHARMACEUTICALS LIMITED

TENAC LIMITED (formerly Darejudge Limited and formerly Oneac Limited) (liquidated 1998)

THE NAPP EDUCATIONAL FOUNDATION

## VIETNAM

THE REPRESENTATIVE OFFICE OF MUNDIPHARMA PHARMACEUTICALS PTE. LTD. IN HO CHI MINH CITY (Representative office) (Name in Vietnamese - Văn Phòng Đại Diện Mundipharma Pharmaceuticals Pte. Ltd. Tại Thành Phố Hồ Chí Minh)

PUBLICLY FILED PER STIPULATION [ECF 2140]

*OUTSIDE PROFESSIONALS' EYES ONLY/HIGHLY CONFIDENTIAL*
*SUBJECT TO PROTECTIVE ORDER*

## Joint Venture Entities

## BANGLADESH

MUNDIPHARMA BANGLADESH PRIVATE LIMITED (Bangladesh manufacturing facility)

MUNDIPHARMA TRADING BANGLADESH PRIVATE LIMITED (Incorporated May 24, 2015)

BANGLADESH BEAUTY PRODUCTS PRIVATE LIMITED (formerly Revlon Trading Bangladesh Private Limited; effective October 14, 2016)

## BERMUDA

JSC COMPANY (Cancelled September 15, 2008)

MNB COMPANY

NC PHARMACEUTICAL COMPANY (Dissolved April 28, 2004)

NICE COSMETICS AND TOILETRIES COMPANY (Cancelled September 16, 2016)

PAR-LA-VILLE PROPERTIES LTD.

TRANSWORLD PHARMA LIMITED

## BRITISH VIRGIN ISLANDS

FREYA HOLDINGS LIMITED (Liquidated February 16, 2017)

## CYPRUS

MUNDIPHARMA LIMITED (formerly P&M Central Pharmacies Limited) (Merged into Mundipharma Pharmaceuticals Limited (Cyprus) December 13, 2010)

MUNDIPHARMA PHARMACEUTICALS LIMITED (formerly P&M Pharmaceuticals Limited)

## INDIA

KAMAKHYA COSMETICS AND PHARMACEUTICALS PRIVATE LTD. (Merged into Modi-Revlon Private Limited effective February 19, 2013)

MODI-MUNDIPHARMA HEALTHCARE PRIVATE LIMITED (Formerly Modi-Omega Pharma (India) Private Limited; name change effective April 13, 2015)

MODI-MUNDIPHARMA PRIVATE LIMITED

MODI-MUNDIPHARMA BEAUTY PRODUCTS PRIVATE LIMITED (formerly: Modi-Revlon Private Limited; name change effective July 21, 2016)

WIN-HEALTHCARE PRIVATE LIMITED

WIN-MEDICARE PRIVATE LIMITED

## ISRAEL

ARA

HILLEL

MONBAZ ECONOMIC AND ADMINISTRATIVE CONSULTING LTD. (liquidated)

RAFA LABORATORIES LIMITED

TYRELLE

17

PUBLICLY FILED PER STIPULATION [ECF 2140]

*OUTSIDE PROFESSIONALS' EYES ONLY/HIGHLY CONFIDENTIAL*
*SUBJECT TO PROTECTIVE ORDER*

## PAKISTAN

REVLON PAKISTAN PRIVATE LIMITED (Liquidated)

## SRI LANKA

BEAUTY PRODUCTS LANKA (PRIVATE) LIMITED (formerly Revlon Lanka (Private) Limited; name change effective November 23, 2016)

## UNITED STATES

SIGNUTRA INC. (DE)

PUBLICLY FILED PER STIPULATION [ECF 2140]

*OUTSIDE PROFESSIONALS' EYES ONLY/HIGHLY CONFIDENTIAL*
*SUBJECT TO PROTECTIVE ORDER*

### MDS Family Entities (US & Non-US)

## BERMUDA

AEROLAB LIMITED  (Dissolved December 10, 2019)

BETAL LIMITED

CENTRALAB LIMITED

CONTOR LIMITED (Dissolved October 18, 2000)

DRYDEN LIMITED (Dissolved December 10, 2019)

EARLS COURT FARM LIMITED (formerly Viga Investments Limited; formerly Earls Court Investments Limited)

EBURY INVESTMENTS LIMITED

GREAT PARK INVESTMENTS LIMITED (Dissolved July 10, 2013)

J.E.M. LIMITED (Dissolved December 23, 2019)

KELLY PHARMACEUTICALS LIMITED

MERGANSER LIMITED (dissolved July 21, 2010)

NORTHDALE LIMITED

ROOKSNEST ESTATE LIMITED (formerly Capella Limited) (Liquidated)

SEALAB LIMITED  (Liquidated)

THE AESCULAPIUS FOUNDATION LTD.

TK INTERNATIONAL LIMITED

TOM PHARMACEUTICALS LIMITED (dissolved July 21, 2010)

## BRITISH VIRGIN ISLANDS

ALDAN CORPORATION (Liquidated May 20, 2016)

APPLEBRIDGE CORPORATION



ARIZONA GOLD CORP.

BANELA CORPORATION

BENGAL MOON CORPORATION

CAHOKIA CORPORATION (Dissolved May 21, 2020)

CEDAR ROCK INVESTMENT CORPORATION

CHILGROVE HOLDINGS LIMITED (Liquidated December 28, 2017)

PUBLICLY FILED PER STIPULATION [ECF 2140]

*OUTSIDE PROFESSIONALS' EYES ONLY/HIGHLY CONFIDENTIAL*
*SUBJECT TO PROTECTIVE ORDER*

CINNAMON BAY CORP. (Liquidated January 17, 2014)

CRESTFLOWER CORPORATION (Dissolved January 28, 2015)

CYPRESS DRIVE INC.

DEARBORN LIGHTHOUSE LTD.

DESMOND COMPANY, INC. (Dissolved November 27, 1992)

DIAMOND VALLEY LTD.

DIAGONAL BLUE CORP.

DUNCTON HOLDINGS LIMITED

EASTMAIN VENTURES CORPORATION (liquidated)

ELSTED INVESTMENTS LIMITED

ECHO LAKE HOLDINGS CORP. (liquidated July 26, 2013)

FIDINC LIMITED (Liquidated October 3, 2013))

FIRST NEW CASTLE INC.  (dissolved April 5, 2013)

FISHBOURNE HOLDINGS LIMITED

FOREST GLEN VENTURES CORP. (liquidated January 11, 2005)

GOLDEN WING CORP.

HABIN INVESTMENTS LIMITED

HAMPTON BAY VENTURES LTD. (Dissolved June 12, 2015)

HARMAL ACQUISTION LTD.

HERCULES LIMITED

HEYSHOTT HOLDINGS LIMITED

HIGHBROOK HOLDINGS LIMITED Liquidated December 28, 2017)

HIGHLAND COURT INC.

HOOVER TRAILS LTD.

K.A. SACKLER, M.D., LIMITED (Dissolved April 1, 1998)

KINGSFORD VENTURES LTD.

LYMINSTER HOLDINGS LIMITED

LOMBARDY CORPORATION

MAPLEHURST HOLDINGS LIMITED

MAY INVESTMENTS HOLDINGS CORP.

MEDICHEM LIMITED (Dissolved November 15, 2013)

MEMPHIS PHARMA LIMITED

MILHOLD LIMITED (dissolved September 6, 2013)

MINSTED INVESTMENTS LIMITED

MORTIMER D. SACKLER S.A.

MOUNT UNION CORP.

NWP GOLF HOLDINGS LTD.

20

*OUTSIDE PROFESSIONALS' EYES ONLY/HIGHLY CONFIDENTIAL*
*SUBJECT TO PROTECTIVE ORDER*

PACIFIC MOON CORP.

PARKERWEST INTERNATIONAL CORPORATION

PATCHAM INVESTMENTS LIMITED

PICKERING PHARMACEUTICALS CORPORATION

PICKHOLD LIMITED

PORT HARDY CORP.

RACKHAM INVESTMENTS LIMITED

RAINBOW GATE CORPORATION

RAVINE INVESTMENTS LIMITED (Dissolved March 15, 2000)

ROMAS GLOBAL INVESTMENTS LIMITED  (Dissolved July 11, 2002)

SALTY TAFFY CORP.

SEA RESORT INVESTMENTS LIMITED

SELHAM HOLDINGS LIMITED

SHELTER ROCK CORP.      (Dissolved)

SILLY CAY HOLDINGS LIMITED  (Liquidated January 17, 2014)

SILVER MEADOW CORP.

SILVER STAR CAPITAL INC.

STANHOPE GATE CORP.

STARGLOW VENTURES INC

STONE PERFECT INC.

STREAM VALLEY CORP. (Dissolved November 12, 2019)

SULLINGTON INVESTMENTS LIMITED

SUMMER BOUNCE INC.

TECHWOOD CORPORATION (MDAS)  (dissolved March 6, 2013)

TILGATE INVESTMENTS LIMITED \

TRIANGULAR GREEN CORP.  (dissolved March 6, 2013)

UPSTREAM VALLEY CORP.   (Dissolved December 2, 2019)

VELVET MOON CORP.

WHEATON VENTURES CORP. (liquidated January 11, 2005)

WILCREST CORPORATION

WINDMILL MANOR LTD. (Dissolved)

WINEHAM INVESTMENTS LIMITED

## CANADA

THE SACKLER FOUNDATION

## CAYMAN ISLANDS

SFP, L.P.

PUBLICLY FILED PER STIPULATION [ECF 2140]

*OUTSIDE PROFESSIONALS' EYES ONLY/HIGHLY CONFIDENTIAL*
*SUBJECT TO PROTECTIVE ORDER*

## GERMANY

DR. MORTIMER AND THERESA SACKLER CHARITABLE GMBH (Liquidated October 2, 2015)

## ISLE OF MAN

GINOLA LIMITED (transfer of domicile to Jersey, Channel Islands effective November 27, 2013)

JIMMA LIMITED (liquidated)

LADY LUCK LP

LADY LUCK LIMITED

## JERSEY, CHANNEL ISLANDS

AMALIE HOLDINGS LIMITED

ASTERELLE LIMITED (Dissolved)

BEACON TRUST COMPANY LTD. (formerly Reigo Trustee Limited)

BOWLAND COMPANY LIMITED

CAVESTOK LIMITED (Liquidated)

CHELSEA TRUST COMPANY LTD.

DOLDER INVESTMENTS LIMITED (liquidated)

INTERTRUST TRUSTEE 2 (JERSEY) LIMITED Formerly Elian Trustee (Jersey) Limited; name change effective December 9, 2016; formerly Ogier Trustee Limited; name change effective September 26, 2014)

GINOLA LIMITED (Originally incorporated in Isle of Man; transfer of domicile to Jersey, CI effective November 27, 2013)

GRANDIFLORA LIMITED

HAGEN TRUST COMPANY LIMITED

HAZELL HOLDINGS LIMITED

HEATHERIDGE TRUST COMPANY LIMITED

HEATHMOOR LIMITED

HILLSIDE TRUST COMPANY LIMITED

INPENDRA LIMITED

KINGSFORD VENTURES LP (MDS)

KIMUS INVESTMENTS LIMITED

LA DIGUE LIMITED

MARLSFORD LIMITED (Liquidated April 3, 2013)

MAYDEAN TRUST COMPANY LIMITED

MEDICHEM CONSULTANTS (INTERCONTINENTAL) LIMITED

MILLBORNE TRUST COMPANY LIMITED

MONDAI HOLDINGS LIMITED

MOPWELL 13 LIMITED (Liquidated)

MORDAS TRUST COMPANY LIMITED

MORVETTA INVESTMENTS LIMITED

22

UNREDACTED - CONTAINS OUTSIDE PROFESSIONALS' EYES ONLY INFORMATION
TREAT SUBJECT TO PROTECTIVE ORDER

*OUTSIDE PROFESSIONALS' EYES ONLY/HIGHLY CONFIDENTIAL
SUBJECT TO PROTECTIVE ORDER*

PHARMACEUTICAL AND CHEMICAL INVESTMENTS LIMITED (Dissolved July 16, 1998)

RACINE INVESTMENTS LIMITED (Liquidated)

ROMAS INVESTMENTS LIMITED (Dissolved December 30, 1996)

ROOKSNEST ESTATE LIMITED

RUSHLEIGH LIMITED

SAMWELL 12 LIMITED

SANDIWAY TRUST COMPANY LIMITED

SAUBER INVESTMENTS LIMITED

SAUMUR TRUST CO. LTD.

SOPWELL 12 LIMITED (Liquidated)

SOPWELL 14 LIMITED (Liquidated)

SPRINGFIELD HOLDINGS LIMITED

TAHINI INVESTMENTS LIMITED

TAYLEIGH TRUST COMPANY LIMITED

TENZIN TRUST COMPANY LIMITED

THEMAR TRUST COMPANY LIMITED

VARUS INVESTMENTS LIMITED

## LIECHTENSTEIN

GERAFINA ANSTALT (liquidated)

## LUXEMBOURG

BAHA HOLDINGS S.àr.l.

CEDAR ROCK HOLDINGS S.àr.l. (Liquidated December 1, 2014)

DIAGONAL BLUE S.àr.l.

HALM S.àr.l. (Formerly Halm B.V., a Netherlands company, migrated to Luxembourg 12/15/2005)

HALM HOLDINGS S.àr.l. (Formerly Halm Holdings N.V., a Netherlands Antilles company, converted to Halm Holdings S.àr.l., a Luxembourg company effective December 30, 2003)

NORROY S.àr.l.

## MALTA

CEDAR ROCK CORPORATION LTD.

BETAL MALTA LIMITED

## MAURITIUS

CALVERTON HOLDINGS CORPORATION

## NETHERLANDS

HAMBERT B.V.

PUBLICLY FILED PER STIPULATION [ECF 2140]

**UNREDACTED - CONTAINS OUTSIDE PROFESSIONALS' EYES ONLY INFORMATION**
**TREAT SUBJECT TO PROTECTIVE ORDER**

*OUTSIDE PROFESSIONALS' EYES ONLY/HIGHLY CONFIDENTIAL*
*SUBJECT TO PROTECTIVE ORDER*

## PANAMA

THE CALEDONIAN COMPANY (Dissolved)

FIDEUROP INC.

MORTIMER D. SACKLER, M.D., S.A. (Dissolved November 21, 2003)

## SWITZERLAND

COROC AG (Dissolved)

KAFIMEX AG (Dissolved)

MORTIMER D. SACKLER GmbH (liquidated)

SACKLER FOUNDATION
UHU IMMOBILIEN A.G.

## TURKS AND CAICOS ISLANDS



BLUE HILLS ESTATES LTD.

CAICOS GP LTD.



HARMAL ACQUISITION LTD. (Struck of register)

M2 LTD.

M3 LTD.

NIXIE LTD. (Dissolved August 19, 2009)

NORTHWEST POINT GOLF ESTATES LTD.

S$^3$ LTD.

S.E. ASSOCIATES LTD.

SEA RESORTS L.P.

SEA RESORTS GP LTD.

SEA RESORTS LP LTD.

24

PUBLICLY FILED PER STIPULATION [ECF 2140]

*OUTSIDE PROFESSIONALS' EYES ONLY/HIGHLY CONFIDENTIAL*
*SUBJECT TO PROTECTIVE ORDER*

SILLY CAY LIIMITED (Liquidated)

STILLWATER HOLDINGS LTD.

TCI GOLF L.P.

TCI AVIATION HOLDINGS LIMITED

YARA REALTY LIMITED

YARA TRADING (TCI) LTD.

## UNITED KINGDOM

CAP PRODUCTS LIMITED (Dissolved)

CIPHER CORP HOLDING LTD. (formerly Cipher Corp. Ltd.; incorporated February 6, 2016; name change effective July 25, 2016)

CIPHER CORP. MANAGEMENT LTD. (formerly SSHQUK Ltd.; name change effective July 25, 2016)

GLH VENTURES LIMITED

HI FLY NEST LIMITED (Dissolved)

I.P. LIMITED

THE DR. MORTIMER AND THERESA SACKLER FOUNDATION

THE DR. MORTIMER AND THERESA SACKLER FOUNDATION

THE SACKLER TRUST

## UNITED STATES



ALTUS FAMILY FOUNDATION INC. (DE)

BCN HOLDINGS L.P. (DE) (Formerly BCN Holdings LLC, converted from LLC to L.P., effective July 17, 2014)

BEACON COMPANY (DE) (formerly Reigo Company)

BEAVER POND FARMS, INC. (NY) (liquidated)

BEAVER POND FARMS PARTNERSHIP (NY) (Terminated December 11, 1996)

25

PUBLICLY FILED PER STIPULATION [ECF 2140]

UNREDACTED - CONTAINS OUTSIDE PROFESSIONALS' EYES ONLY INFORMATION
19-23649-rdd    Doc 2161-1    Filed 12/18/20    Entered 12/18/20 18:15:36    Hurley
TREAT SUBJECT TO PROTECTIVE ORDER
Declaration and Exhibits 1-16    Pg 123 of 217
*OUTSIDE PROFESSIONALS' EYES ONLY/HIGHLY CONFIDENTIAL*
*SUBJECT TO PROTECTIVE ORDER*

BEAVER POND FARM LLC (NY)

BENGAL MOON (DELAWARE) LLC (DE) Formerly Bengal Moon (Delaware) Corp.; converted to LLC effective December 14, 2017)

███████████████

BLUE IGUANA GP LLC (DE) (Cancelled December 26, 2016)

BLUE IGUANA LP LLC (DE) (Cancelled December 26, 2016)

BRIDGEWAY HOLDINGS LLC (NY)

CANDY JAR LLC (NY)

CENTRAL EIGHT REALTY LLC (DE)

CHARITABLE-E (NY)

CHERRY TREE HOLDINGS, LLC (NY)

CIPHER US MANAGEMENT CORP. (DE) (Formerly Spyscape NY Corp., name change effective July 18, 2016)

COLTURAE, INC. (DE)

COLTURAE PRODUCTS INTERNATIONAL (NY)

COOKIE DOUGH LLC (NY)

███████████████████

CTR INVESTMENTS LLC (DE)

CTRI HOSPITALITY LLC

CTR IP LLC

DOWITCHER REALTY LLC (NY)

DUNLIN PROPERTIES LLC (NY)

ETHOS PRODUCTIONS LLC (DE)

FAR WELLS LLC (NY)

FARMINGTON (TEXAS) LLC (DE) (Cancelled September 29, 2003)

FEATHER LLC (dissolved April 16, 2001)

FAMILY CONFERENCE CENTER, INC. (Liquidated)

FIDINC CORP. (DE) (Dissolved June 18, 2013)

FINISTERRE CORPORATION (DE)

FIREFLY SERVICES LLC (DE)

FIRST NEW CASTLE CORP. (DE) (Dissolved December 15, 2011)

FISKIM PROPERTIES LLC (NY)

FIVE THREE WARREN LLC (NY)

FLAT CREEK FIDUCIARY MANAGEMENT LLC (WY) ( formerly Flat Creek Fiduciary Management Inc., converted to LLC effective April 3, 2012)

FORRESTLAND LLC (NY)

███████████████

GANSETTE HOLDINGS LLC (NY)

26

PUBLICLY FILED PER STIPULATION [ECF 2140]

*OUTSIDE PROFESSIONALS' EYES ONLY/HIGHLY CONFIDENTIAL*
*SUBJECT TO PROTECTIVE ORDER*

GUMMY BEAR LLC (DE) (Cancelled February 10, 2009)

HEARTH HOLDINGS LLC (NY)

███████████████████████

HUNTINGTON (TEXAS) LLC (DE) (Cancelled September 29, 2003)

INDIAN SPRINGS PROPERTY LLC (NY)

JEFFREY LEFCOURT INVESTMENTS LLC (DE)

JELLYBEAN LLC (DE) (Cancelled November 5, 2008)

KASSETS HOLDINGS LLC (DE)

KASMITH 2 LLC (DE)

KASMITH 3 LLC (DE)

KASMITH 4 LLC (DE)

KASMITH 5 LLC (DE)

KASMITH 6 & 7 LLC (DE)

KASUE ASSETS LLC (DE)

KOUSA REALTY LLC (DE)

KOUSA REALTY LLC (NY)

LAZBRIDGE FOUNDATION (DE)

LEMURES LLC (DE) (Formerly Lemures Corporation; converted from corporation to LLC effective December 15, 2017)

█████████████████

LIMULUS PROPERTIES LLC (DE)

LIONLIGHT LLC (DE)

LOLLIPOPI LLC (DE)

MAGIC PROPERTY HOLDINGS LLC (NY)

M.D. FOODIE LLC (DE)

ME.NET LLC (NY) (Formerly 1-800-Reach Me LLC.  Name changed 14 July 1999) (merged into Me.Net Network Inc. May 1, 2000)

ME.NET NETWORK INC. (DE)

MEADOWLARK FAMILY FOUNDATION INC. (DE)

MEADOWLARK INK LLC (DE)

MEDICHEM CORP. (DE)  (Dissolved June 18, 2013)

MILLENNIUM SECURITIES LLC (DE)

MILTON (DELAWARE) CORP. (Dissolved June 18, 2013)

MORVETTA LLC (NY)

MTS 2013 FALCON LLC (DE)

NAPEAGUE BEACH HOUSE LLC (NY)

NIXIE LLC (NY)

27

*OUTSIDE PROFESSIONALS' EYES ONLY/HIGHLY CONFIDENTIAL*
*SUBJECT TO PROTECTIVE ORDER*

NWP GOLF LLC (DE)

OSHA INVESTMENTS LLC (DE)

OTAVITE HOLDINGS LLC (DE)

PERSONA PRODUCTIONS LLC (DE)

PHEASANT HILL REALTY LLC (DE)

PICKERING (DELAWARE) LLC (Formerly Pickering (Delaware) Corp.; converted to LLC December 15, 2017)

PIGEON REALTY LLC (NY)

PROFIT THE WORLD FOUNDATION (DE)

PROMETHEAN ENTERPRISES INC. (NY) (Dissolved November 8, 2001)

QUATRO SERVICES LLC (DE) (Formerly Limulus Properties LLC; name change effective January 17, 2012)

SANDLOT LLC (DE)

SEA RESORTS LLC (DE)

SILLY CAY CORPORATION (DE) (Dissolved November 27, 2013)

SOFT RIVER FIDUCIARY MANAGEMENT LLC (WY) (formerly Soft River Fiduciary Management Inc.; converted to LLC effective April 3, 2012))

SPARTAN GEAR LLC (DE)

STANHOPE GATE INC. (DE) (Dissolved effective January 3, 2003)

STILLWATER LLC (DE)

STILLWATER AVIATION LLC (DE)

STILLWATER ▮▮▮▮▮▮▮▮

STILLWATER CORPORATION (DE) (C Corp)

STILLWATER DESIGN LLC (DE)

STILLWATER ▮▮▮▮▮▮▮▮

STILLWATER HOLDINGS LLC (DE) (Formerly Stillwater LLC; name change effective August 30, 2011)

STILLWATER ▮▮▮▮▮▮▮▮

STILLWATER ▮▮▮▮▮▮▮▮

STILLWATER ▮▮▮▮▮▮▮▮
2019)

STILLWATER TRUST LLC (DE)

STILLWATER TRUST AC-GP LLC (DE)

STILLWATER TRUST H-GP LLC (DE)

STONY WELLS LLC (NY)

STRING LAKE FIDUCIARY MANAGEMENT INC. (WY) (dissolved February 15, 2011)

TADDEO LLC (DE)

TADDEO FIDUCIARY MANAGEMENT INC. (WY)

28

*OUTSIDE PROFESSIONALS' EYES ONLY/HIGHLY CONFIDENTIAL*
*SUBJECT TO PROTECTIVE ORDER*

TAHINI LAND COMPANY, INC. (NY) (dissolved November 4, 1997)

TAHINI LAND COMPANY LLC (NY)

TANAGER REALTY LLC (DE)

TATEN CORPORATION (DE) (Dissolved March 29, 2004)

TECHALPHA LLC (DE) (Dissolved August 31, 2004)

THE ABACUS FOUNDATION FOR THE ARTS & SCIENCES, INC. (DE)

THE ACORN FOUNDATION FOR THE ARTS AND SCIENCES, INC. (DE)

THE CORNELIA STREET COMPANY (NY)

THE MORTIMER AND JACQUELINE SACKLER FOUNDATION (DE)

THE MORTIMER D. SACKLER FOUNDATION, INC. (NY)

THE SACKLER LEFCOURT CENTER FOR CHILD DEVELOPMENT, INC.

THE SERENDIPIA FOUNDATION (DE) (Formerly Sackler Hunt Foundation; name change March 9, 2018)

THE SHACK SACKLER FOUNDATION (DE)

TOOT SWEET LLC (DE) (Cancelled November 4, 2009)

TRIANGULAR HOLDINGS CORPORATION (DE)  (Dissolved October 23, 2012)

TRIO SERVICES LLC (DE)



VEERY ASSOCIATES, INC. (NY)

VIRGINIANA REALTY LLC (DE)

WASHINGTON LLC (DE) (Cancelled December 29, 2016)

29

PUBLICLY FILED PER STIPULATION [ECF 2140]

UNREDACTED - CONTAINS OUTSIDE PROFESSIONALS' EYES ONLY INFORMATION

TREAT SUBJECT TO PROTECTIVE ORDER

*OUTSIDE PROFESSIONALS' EYES ONLY/HIGHLY CONFIDENTIAL*
*SUBJECT TO PROTECTIVE ORDER*

## RRS Family Entities (US & Non-US)

### BERMUDA

ATLANTIC LABORATORIES LIMITED

B.L. CARROLTON LIMITED

G.H. CARRELL LIMITED

LAYSAN LIMITED

MALLARD LIMITED

SHELDRAKE LIMITED (Dissolved April 14, 2020)

TEAL LIMITED (Dissolved 1998)

THE RESEARCH FOUNDATION LTD.

TRIANGLE INDUSTRIES LTD.

### BRITISH VIRGIN ISLANDS

BEVERLY SACKLER, INC. (Dissolved February 23, 1996)

EAST HUDSON INC.

EAST RIVER PARTNERS LTD.

HOBART CORPORATION

J.D. SACKLER, INC. (Dissolved February 23, 1996)

MAUNA KEA LIMITED

MENLO PARK INVESTORS INC.

███████████████████

RAYMOND R. SACKLER, M.D., INC. (Dissolved February 23, 1996)

RICHARD S. SACKLER, M.D., LTD. (Dissolved February 23, 1996)

SILK CREST CORP.

WESTAGE CORPORATION (Dissolved November 27, 1992)

### CANADA

CHEYENNE CANADA LIMITED PARTNERSHIP

CPC CANADA CORPORATION

THE RAYMOND AND BEVERLY SACKLER FOUNDATION (La Fondation Raymond et Beverly Sackler)

### CAYMAN ISLANDS

ONEAC INC. (Dissolved 1998)

### JERSEY, CHANNEL ISLANDS

ONEAC LIMITED (Dissolved October 10, 2003)

### LUXEMBOURG

PUBLICLY FILED PER STIPULATION [ECF 2140]

*OUTSIDE PROFESSIONALS' EYES ONLY/HIGHLY CONFIDENTIAL*
*SUBJECT TO PROTECTIVE ORDER*

 

      BOILING BAY S.àr.l.

      NEJI S.àr.l.

      NERULA S.àr.l.

## MAURITIUS

      AQUEBOGUE HOLDINGS CORPORATION

## NETHERLANDS

      BOILING BAY CORPORATION B.V.

## UNITED KINGDOM

      THE RAYMOND AND BEVERLY SACKLER FOUNDATION

      THE RAYMOND AND BEVERLY SACKLER 1988 FOUNDATION (Formerly known as The Raymond and Beverly Sackler Foundation; name changed July 2010)

## UNITED STATES

      1JM LLC (DE)

      2JM LLC (DE)

      3JM LLC (DE)

      95 PERCENT LLC (NY)

      1987 FUND LLC (DE)

      █████████████

      AIM HIGH PRODUCTIONS LLC (DE)

      AJ MANAGED HOLDINGS LLC (DE)

      AKUTAN BAY LLC (AK)

      ALASKA COMPANY LLC (DE) (Dissolved)



      ANNALEX CAPITAL MANAGEMENT LLC (NY)

      ALEXANDER ROAD CAPITAL LLC (NY) (Dissolved 2018)

      ANKERSEA LIMITED LIABILITY COMPANY (DE)

      ANTLER LLC (DE)

      AZURITE HOLDINGS LLC (DE)

      BAPRICOT LLC (NY)

      BASIC RESEARCH PHARMACEUTICALS COMPANY (CT) (terminated 1998)

      BERYL HOLDINGS LLC (DE)

      ████████████

31

PUBLICLY FILED PER STIPULATION [ECF 2140]

UNREDACTED - CONTAINS OUTSIDE PROFESSIONALS' EYES ONLY INFORMATION
TREAT SUBJECT TO PROTECTIVE ORDER
*OUTSIDE PROFESSIONALS' EYES ONLY/HIGHLY CONFIDENTIAL*
*SUBJECT TO PROTECTIVE ORDER*

██████████

BOILING BAY CORPORATION (DE)

BOWFORD COMPANY (NY) (terminated September 21, 2011)

████████████████████

BRIJ BAY COMPANY (DE)

BRJ FIDUCIARY MANAGEMENT LLC (WY) (Formed July 14, 2011; formerly BRJ Fiduciary Management Inc., converted to LLC March 28, 2012)

BROOK HOLDINGS (NY)

CALHOUN ADVISORS LLC (DE)

██████████████████

CAP 1 LLC (DE)

CAP 2 LLC (DE)

███████████████

CEDAR CLIFF FIDUCIARY MANAGEMENT INC. (WY)

██████████

CHEVIOT LLC (DE)

███████████████

CHEYENNE ENERGY SERVICES LLC (OK)

CHEYENNE INTERNATIONAL CORPORATION (OK)

CHEYENNE PETROLEUM COMPANY (NY)

CHEYENNE PETROLEUM COMPANY 1981 LTD. (NY) (terminated February 28, 2001)

CHINA SEA COMPANY, INC. (DE)

CHINA SEA COMPANY L.P. (DE)

CONNECTICUT COALITION FOR ACHIEVEMENT NOW (CT)

CORNICE FIDUCIARY MANAGEMENT LLC (WY)

CPC 2001 LLC (DE)

CRISSAIRE CORPORATION (DE)

CRYSTAL FIDUCIARY COMPANY LLC (WY)

███████████████████████████

DABB LLC (DE)

DATA LLC (WY)

DECKSTONE INTERNATIONAL COMPANY (CT)

██████████████████

DRAVITE HOLDINGS LLC (DE)

32

*OUTSIDE PROFESSIONALS' EYES ONLY/HIGHLY CONFIDENTIAL*
*SUBJECT TO PROTECTIVE ORDER*

ELBANITE HOLDINGS LLC (DE)

EXMOOR HORN LLC (DE)

FINNEST PHARMA LLC (DE) (Cancelled December 5, 2000)

G3D LLC (DE)

G3A LLC (DE)

G3R LLC (DE)

███████████████████████

GGM COMPANY (DE)

GREAT CURVE FILMS, LLC (DE)

████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████

HERA COMPANY (NY) (terminated 1998)

HPR PARTNERS (NY) (Terminated August 23, 2016)

HUDSON RIVER (DELAWARE) INC. (DE)

HUDSON RIVER PARTNERS (NY)

INACTIVE HOLDINGS LLC (DE)

INTERROGATION 2008 LLC (NY)

INTREPIDUS HOLDINGS LLC (DE) (Terminated March 5, 2018)

JGT ONE LLC (DE)

JGT THREE LLC (DE)

JGT TWO LLC (DE)

JIBWIND COMPANY (NY)

JR LEARNING LLC (DE)

JWA HOLDINGS LLC (DE)



KERNITE HOLDINGS LLC (DE)

KOKINO CORPORATION (DE)

KOKINO LLC (DE)

████████████████████████████

PUBLICLY FILED PER STIPULATION [ECF 2140]

*OUTSIDE PROFESSIONALS' EYES ONLY/HIGHLY CONFIDENTIAL*
*SUBJECT TO PROTECTIVE ORDER*

KRA ASSOCIATES, LTD. (CT)

KRA ASSOCIATES, LTD. (DE) (Formerly Syzygy International, Inc.)

LANDINGS FINANCIAL LIMITED LIABILITY COMPANY (DE)

LARAMIDE LLC (DE)

LARES CORPORATION (DE) (Liquidated December 22, 1995)

LBV NON-PROFIT, INC. (DE) (Formerly Les Bouledogues Vigneronnes, Inc.; name change effective November 15, 2017)

LBV INC. (DE) (Formerly Les Bouledogues Vigneronnes, Inc.; name change August 10, 2018)

LEVEL 4 FILMS, LLC (NY)

LIGHTSHIP COMPANY (NY)

LINARITE HOLDINGS LLC (DE)

LITTLE MENLO LLC (DE)

███████████████████████

LODESTONE LIMITED LIABILITY COMPANY (DE)

M3C HOLDINGS LLC (DE)

MADBROOK DEVELOPMENT LLC (NY) (Dissolved April 16, 2019)

MADBROOK FILMS LLC (NY) (Dissolved April 16, 2019)

MCM FIDUCIARY MANAGEMENT LLC (WY)

MD60 LLC (DE)

███████████████████████████████

MILL SHOALS LLC (DE)

MINIMALIST PROJECT LLC (NY)

███████████████████████████████████

MONTROSE FINANCIAL CORPORATION (DE) (Dissolved September 2, 2011)

MOONSTONE HOLDINGS LLC (DE)

███████████████████████████████████████████████████████████████

NORTH BAY ASSOCIATES (DE general partnership)

NORTH BAY EAGLE LLC (DE)

NORTH BAY TRUST COMPANY INC. (OK)

OG PICTURE, INC. (NY)

OG FILM, LLC (NY)

ONEAC HOLDING CORP. (DE) (Voided in DE March 1, 2001)

ORCHIDS LLC (DE)

████████████████████████

34

UNREDACTED - CONTAINS OUTSIDE PROFESSIONALS' EYES ONLY INFORMATION
TREAT SUBJECT TO PROTECTIVE ORDER

*OUTSIDE PROFESSIONALS' EYES ONLY/HIGHLY CONFIDENTIAL*
*SUBJECT TO PROTECTIVE ORDER*

OTAVITE HOLDINGS LLC (DE)

PACIFIC PARTNERS COMPANY (NY) (formerly Lightning Associates)

PALOMA PARTNERS L.P. (DE)

PARK VIEW PROPERTIES L.L.C. (DE)

█████████████████████████████

PBC - ABS (NY)

PBC - ABSJS (DE)

PBC-ALF (NY)

PBC - ALTERNATIVE INVESTMENTS (NY)

PBC - ATTICUS EUROPEAN FUND (NY)

PBC - BEAR STEARNS HEALTHCARE VALUE PARTNERS (NY)

PBC - BROOK HOLDINGS (NY)

PBC-BSM (NY)

PBC-CENTAUR (NY)

PBC - CONTRARIAN EQUITY FUND (NY)

PBC - GLENHILL CAPITAL (NY)

PBC - GCLP (NY)

PBC - HAWKEYE CAPITAL (NY)

PBC - HAYGROUND COVE INSTITUTIONAL PARTNERS (NY)

PBC-KPP (NY)



PBC - MARATHON FUND (NY)

PBC - MARATHON SPECIAL OPPORTUNITY FUND (NY)

PBC - MARATHON STRUCTURED FINANCE FUND (NY)

PBC - PASSPORT II (NY)



PBC-RLCP (NY)

PBC - SENECA CAPITAL (NY)

PBC - SILVER POINT CAPITAL FUND (NY)

PBC - SWIFTCURRENT PARTNERS (NY)

PBC - THE LUCERNE CAPITAL FUND (NY)

PBC - VISIUM BALANCED FUND (NY)

PBC - WCQP (NY)

35

UNREDACTED - CONTAINS OUTSIDE PROFESSIONALS' EYES ONLY INFORMATION
TREAT SUBJECT TO PROTECTIVE ORDER
19-23649-rdd    Doc 2161-1    Filed 12/18/20    Entered 12/18/20 18:15:36    Hurley
Declaration Exhibits 1-16    Pg 133 of 217

*OUTSIDE PROFESSIONALS' EYES ONLY/HIGHLY CONFIDENTIAL*
*SUBJECT TO PROTECTIVE ORDER*

PBC - ZLP OPPORTUNITY FUND (NY)

PEACOCK FILMS LLC (NY) (Dissolved April 16, 2019)

PERTHLITE HOLDINGS LLC (DE)

PITON CAPITAL PARTNERS LLC (DE)

PITON CAPITAL MANAGEMENT LLC (DE)



R NAPP HOLDINGS LLC (DE)

RADSTOCK CORPORATION (DE)

RAYMOND AND BEVERLY SACKLER FOUNDATION, INC. (NY)

RAYMOND AND BEVERLY SACKLER FUND FOR THE ARTS AND SCIENCES (DE)

RBMC HOLDINGS LLC (DE)

RBS INSTITUTE LLC (DE)

RECUMEN LLC (NY) (Formerly Security Intelligence and Threat Evaluation Analytics; name change 11/3/2012) (Terminated December 22, 2017)

REES HOLDINGS LLC (NY)

RGT ONE LLC (DE)

RGT THREE LLC (DE)

RGT TWO LLC (DE)

RICHARD SACKLER FAMILY FOUNDATION, INC. (DE) (Formerly Richard and Beth Sackler Foundation, Inc.; name change March 16, 2018)

RIVERSIDE SEVEN LLC (DE)

ROCKPOINT SCIENTIFIC ASSOCIATES (NY) (terminated December 31, 1995)

ROSEBAY MEDICAL COMPANY, INC. (DE)

ROSEBAY MEDICAL COMPANY LLC (DE)

ROSEBAY MEDICAL COMPANY L.P. (DE)

ROSELITE HOLDINGS LLC (DE)

PUBLICLY FILED PER STIPULATION [ECF 2140]

*OUTSIDE PROFESSIONALS' EYES ONLY/HIGHLY CONFIDENTIAL*
*SUBJECT TO PROTECTIVE ORDER*

RUNHAM CORPORATION (DE)

RWA HOLDINGS LLC (DE)

SARBONNE LLC (DE)



SEADOG PARTNERS (DE)

SEASPRAY COMPANY L.P. (DE) (terminated 1/1/99)

SEGELFISH COMPANY, INC. (DE) (liquidated 1999)

SFP HOLDINGS LLC (DE)

SHIPSHAPE ASSOCIATES

SOUND LAND LLC (DE) (Shelf)



SPRUCE HILL LLC (DE) (Cancelled March 19, 2018)

STANDARD PHARMACEUTICALS CORPORATION (DE)

STARLING REALTY LIMITED (DE) (liquidated 1999)

STARLING REALTY COMPANY L.P. (DE) (terminated 1999)

STIBNITE HOLDINGS LLC (DE)

ST. LAWRENCE ASSOCIATES (NY) (formerly Thunder Associates Partnership)

SUMMER ROAD LLC (DE)

SUNRIVER CAPITAL MANAGEMENT LLC (DE) (Cancelled January 31, 2018)

SUNRIVER CAPITAL PARTNERS LLC (DE) (Cancelled January 31, 2018)

SUPERIOR POINT PRODUCTIONS LLC (NY) (Cancelled June 20, 2018)



TDQ 1 LLC LLC (DE)

TDQ 2 LLC (DE)

TEMAGAMI LLC (DE)

THE BOUNCER FOUNDATION, INC. (DE)

THE LOTTERY, LLC (DE)

37

PUBLICLY FILED PER STIPULATION [ECF 2140]

*OUTSIDE PROFESSIONALS' EYES ONLY/HIGHLY CONFIDENTIAL*
*SUBJECT TO PROTECTIVE ORDER*

THE NEW ACADEMIES LLC (DE) ( formerly Schola Nova LLC; name change effective December 14, 2011) (Cancelled April 21, 2015)

███████████████████

TRADEWIND COMPANY (NY)

TREMOLITE HOLDINGS LLC (DE)

TRIANGLE HOLDING LLC (DE)

TRQ ANALYTICS LLC (DE)

TRYSAIL COMPANY (NY) (Terminated August 29, 2003)

TWIN SPRINGS HOLDINGS (NY)

UNCH CORP. (DE)

UNSTABLE ELEMENTS LLC (DE)

VALDIVIA FILMS (DE)

VERTO INSTITUTE LLC (DE)

VLS LLC (DE)

WA CANADA L.P. (DE)

WASATCH LLC (DE)

WESSER COMPANY, INC. (DE) (liquidated 1999)

WESSER COMPANY L.P. (DE) (terminated 1/1/99)

WESTWARD HOME LLC (DE)

WHILTON CORPORATION (DE)

WP LEASING LLC (DE)

████████████████████████

38

## MDS Family Trusts

|  | Name of Trust | Creation Date | Also referred to as*<br><br>* Not necessarily a comprehensive list of names each trust has been known as | Status | Termination Date |
|---|---|---|---|---|---|
|  | **Existing Trusts** |  |  |  |  |
| 1 | Gorey Trust | 4-Apr-96 |  | Existing Client | -- |
| 2 | La Coupe Trust | 4-Apr-96 |  | Existing Client | -- |
| 3 | Canadian Partnership Trust | 8-Jun-90 |  | Existing Client | -- |
| 4 | Beacon Trust | 31-Dec-93 |  | Existing Client | -- |
| 5 | Clover Trust | 4-Apr-96 |  | Existing Client | -- |
| 6 | MIL Trust | 4-Apr-96 |  | Existing Client | -- |
| 7 | Pickering Trust | 28-Feb-97 |  | Existing Client | -- |
| 8 | Fidinc Trust | 19-Jun-97 |  | Existing Client | -- |
| 9 | Medichem Trust | 19-Jun-97 |  | Existing Client | -- |
| 10 | Milton Trust | 16-Mar-98 |  | Existing Client | -- |
| 11 | Hercules Trust | 2-Mar-99 |  | Existing Client | -- |

1

UNREDACTED - CONTAINS OUTSIDE PROFESSIONALS' EYES ONLY INFORMATION
TREAT SUBJECT TO PROTECTIVE ORDER

*OUTSIDE PROFESSIONALS' EYES ONLY/HIGHLY CONFIDENTIAL*
*SUBJECT TO PROTECTIVE ORDER*

| | Name of Trust | Creation Date | Also referred to as* <br><br> * Not necessarily a comprehensive list of names each trust has been known as | Status | Termination Date |
|---|---|---|---|---|---|
| 12 | Halm Trust | 2-Mar-99 | | Existing Client | -- |
| 13 | Tom & Kelly Trust | 2-Mar-99 | | Existing Client | -- |
| 14 | Memphis Pharma Trust | 2-Mar-99 | | Existing Client | -- |
| 15 | Mundi Lab Trust | 2-Mar-99 | | Existing Client | -- |
| 16 | Varus Trust | 25-Jun-99 | | Existing Client | -- |
| 17 | Silver Trust | 28-Jul-99 | | Existing Client | -- |
| 18 | Mondai Trust | 12-Jun-01 | | Existing Client | -- |
| 19 | Angonoka Trust | 19-Jun-98 | | Existing Client | -- |
| 20 | Meerkat Trust | 26-Jun-98 | | Existing Client | -- |
| 21 | Lune River Trust | 7-Sep-10 | | Existing Client | -- |
| 22 | Jackson River Trust | 19-Jul-10 | | Existing Client | -- |
| 23 | PALP Trust | 26-Dec-96 | | Existing Client | -- |
| 24 | Cobo Bay Trust | 16-Dec-11 | | Existing Client | -- |

PUBLICLY FILED PER STIPULATION [ECF 2140]

UNREDACTED - CONTAINS OUTSIDE PROFESSIONALS' EYES ONLY INFORMATION TREAT SUBJECT TO PROTECTIVE ORDER

*OUTSIDE PROFESSIONALS' EYES ONLY/HIGHLY CONFIDENTIAL*
*SUBJECT TO PROTECTIVE ORDER*

| | Name of Trust | Creation Date | Also referred to as* <br><br> * Not necessarily a comprehensive list of names each trust has been known as | Status | Termination Date |
|---|---|---|---|---|---|
| 25 | Diagonal Blue Trust | 11-Dec-12 | | Existing Client | -- |
| 26 | Taddeo Trust | 19-Mar-12 | | Existing Client | -- |
| 27 | Reserve Trust | 26-Nov-01 | | Existing Client | -- |
| 28 | ISL 88 Trust | 14-Oct-88 | Ilene Sackler Lefcourt Trust; ISL 1988 Trust | Existing Client | -- |
| 29 | ISL 96 Trust | 22-Mar-96 | Ilene Sackler Lefcourt Trust; ISL 1996 Trust | Existing Client | -- |
| 30 | ISL 2010 Family Trust | 23-Apr-10 | | Existing Client | -- |
| 31 | ISL 2011 Family Trust | 25-Mar-11 | | Existing Client | -- |
| 32 | BSS Trust | 14-Sep-98 | Benjamin Shack Sackler Trust | Existing Client | -- |
| 33 | BJSS 2010 Trust | 27-Dec-10 | | Existing Client | -- |
| 34 | BJSS 2013 Trust | 30-Dec-13 | | Existing Client | -- |
| 35 | JSS Trust | 16-Sep-98 | Julia Shack Sackler Trust | Existing Client | -- |
| 36 | JHSS 2010 Trust | 27-Dec-10 | | Existing Client | -- |
| 37 | JHSS 2013 Trust | 30-Dec-13 | | Existing Client | -- |

3

UNREDACTED - CONTAINS OUTSIDE PROFESSIONALS' EYES ONLY INFORMATION
TREAT SUBJECT TO PROTECTIVE ORDER

*OUTSIDE PROFESSIONALS' EYES ONLY/HIGHLY CONFIDENTIAL*
*SUBJECT TO PROTECTIVE ORDER*

| | Name of Trust | Creation Date | Also referred to as*<br><br>* Not necessarily a comprehensive list of names each trust has been known as | Status | Termination Date |
|---|---|---|---|---|---|
| 38 | KAS 88 Trust | 14-Oct-88 | Kathe A. Sackler Trust; KAS 1988 Trust | Existing Client | -- |
| 39 | KAS 96 Trust | 22-Mar-96 | Kathe A. Sackler Trust; KAS 1996 Trust | Existing Client | -- |
| 40 | Kathe A. Sackler 2001 Trust | 17-Dec-01 | KAS 2001 Trust | Existing Client | -- |
| 41 | KAS 2010 Family Trust | 16-Apr-10 | | Existing Client | -- |
| 42 | Morvetta Trust | 4-Jun-82 | | Existing Client | -- |
| 43 | KAS 2011 Family Trust | 31-Dec-11 | | Existing Client | -- |
| 44 | SASS 2010 Trust | 27-Dec-10 | | Existing Client | -- |
| 45 | SASS 2013 Trust | 30-Dec-13 | | Existing Client | -- |
| 46 | MDAS 1996 Trust | 22-Mar-96 | Mortimer DA Sackler Trust | Existing Client | -- |
| 47 | MDAS 2002 Trust | 21-Mar-02 | Mortimer DA Sackler Trust | Existing Client | -- |
| 48 | MDAS 2010 Family Trust | 26-Mar-10 | | Existing Client | -- |
| 49 | MDAS 2011 Family Trust | 25-Mar-11 | | Existing Client | -- |
| 50 | Theresa E. Sackler 1988 Trust | 26-Feb-88 | TES 1988 Trust | Existing Client | -- |

4

OUTSIDE PROFESSIONALS' EYES ONLY/HIGHLY CONFIDENTIAL
SUBJECT TO PROTECTIVE ORDER

| | Name of Trust | Creation Date | Also referred to as*<br><br>* Not necessarily a comprehensive list of names each trust has been known as | Status | Termination Date |
|---|---|---|---|---|---|
| 51 | Theresa E. Sackler 2008 Trust | 22-Dec-08 | TES 2008 Trust | Existing Client | -- |
| 52 | TES Beacon 2012 Trust | 20-Apr-12 | | Existing Client | -- |
| 53 | TES Beacon 2013 Trust | 25-Feb-13 | | Existing Client | -- |
| 54 | TES Beacon 2014 Trust | 2-May-14 | | Existing Client | -- |
| 55 | TES Bare Trust | 5-Sep-16 | | Existing Client | -- |
| 56 | Perelle Bay Trust | 21-Jun-06 | | Existing Client | -- |
| 57 | Racine Trust | 13-Feb-87 | | Existing Client | -- |
| 58 | Millennium Trust | 15-Dec-98 | | Existing Client | -- |
| 59 | Flat Creek Purpose Trust | 29-Mar-12 | | Existing Client | -- |
| 60 | Mordas Consolidated Purpose Trust | 22-Dec-00 | | Existing Client | -- |
| 61 | Trust Under Declaration of Trust No. 1 dated November 25, 1996 | 25-Nov-96 | Beaver Pond Trust 1; Pawling Property Trust 1 | Existing Client | -- |
| 62 | Trust Under Declaration of Trust No. 2 dated November 25, 1996 | 25-Nov-96 | Beaver Pond Trust 2; Pawling Property Trust 2 | Existing Client | -- |

5

PUBLICLY FILED PER STIPULATION [ECF 2140]

UNREDACTED - CONTAINS OUTSIDE PROFESSIONALS' EYES ONLY INFORMATION
TREAT SUBJECT TO PROTECTIVE ORDER

*OUTSIDE PROFESSIONALS' EYES ONLY/HIGHLY CONFIDENTIAL*
*SUBJECT TO PROTECTIVE ORDER*

| | Name of Trust | Creation Date | Also referred to as*<br><br>* Not necessarily a comprehensive list of names each trust has been known as | Status | Termination Date |
|---|---|---|---|---|---|
| 63 | Ilene Sackler Lefcourt Revocable Trust | 10-Oct-13 | | Existing Client | -- |
| 64 | JML Pour-Over Trust | 10-Oct-13 | | Existing Client | -- |
| 65 | KLT Pour-Over Trust | 10-Oct-13 | | Existing Client | -- |
| 66 | MDAS Investment Trust | 15-Jun-10 | | Existing Client | -- |
| 67 | Soft River Purpose Trust | 29-Mar-12 | | Existing Client | -- |
| 68 | SS Tanager Trust | 6-Oct-09 | | Existing Client | -- |
| 69 | Themar Consolidated Purpose Trust | 21-Dec-00 | | Existing Client | -- |
| 70 | Trust under Agreement dated the 13th day of March 2009 | 13-Mar-09 | KAS Pourover Trust; Kathe A. Sackler Pourover Trust | Existing Client | -- |
| 71 | Trust under Agreement dated the 11th day of May 2005 | 11-May-05 | MDAS Revocable Trust; Mortimer DA Sackler Revocable Trust | Existing Client | -- |
| 72 | MTS 2002 Trust | 21-Mar-02 | Marissa T. Sackler Trust | Existing Client | -- |
| 73 | MTS 2006 Trust | 8-Aug-06 | Marissa T. Sackler Trust | Existing Client | -- |
| 74 | SDS 2002 Trust | 21-Mar-02 | Sophia D. Sackler Trust | Existing Client | -- |

6

PUBLICLY FILED PER STIPULATION [ECF 2140]

*OUTSIDE PROFESSIONALS' EYES ONLY/HIGHLY CONFIDENTIAL*
*SUBJECT TO PROTECTIVE ORDER*

| | Name of Trust | Creation Date | Also referred to as* <br><br> * Not necessarily a comprehensive list of names each trust has been known as | Status | Termination Date |
|---|---|---|---|---|---|
| 75 | SDS 2006 Trust | 8-Aug-06 | Sophia D. Sackler Trust | Existing Client | -- |
| 76 | MDS 2002 Trust | 21-Mar-02 | Michael D. Sackler Trust | Existing Client | -- |
| 77 | MDS 2006 Trust | 8-Aug-06 | Michael D. Sackler Trust | Existing Client | -- |
| 78 | 533 Canal Trust | 27-Dec-13 | | Existing Client | -- |
| 79 | BJSS and JHSS 2012 K Trust | 24-Dec-12 | | Existing Client | -- |
| 80 | Inholmes Trust | 5-Sep-13 | | Existing Client | -- |
| 81 | ISL JML OSHA Trust | 31-Dec-12 | | Existing Client | -- |
| 82 | ISL LT Children's Trust | 31-Dec-12 | | Existing Client | -- |
| 83 | JML 2010 Family Trust | 23-Apr-10 | | Existing Client | -- |
| 84 | JML 2011 Family Trust | 25-Mar-11 | | Existing Client | -- |
| 85 | JML Investment Trust | 31-Jan-12 | | Existing Client | -- |
| 86 | JML OSHA Trust | 31-Dec-12 | | Existing Client | -- |
| 87 | Karen Lefcourt Trust | 19-Dec-00 | | Existing Client | -- |

7

PUBLICLY FILED PER STIPULATION [ECF 2140]

*OUTSIDE PROFESSIONALS' EYES ONLY/HIGHLY CONFIDENTIAL*
*SUBJECT TO PROTECTIVE ORDER*

| | Name of Trust | Creation Date | Also referred to as* <br><br> * Not necessarily a comprehensive list of names each trust has been known as | Status | Termination Date |
|---|---|---|---|---|---|
| 88 | KLT 2010 Family Trust | 23-Apr-10 | | Existing Client | -- |
| 89 | KLT 2011 Family Trust | 25-Mar-11 | | Existing Client | -- |
| 90 | LSRR Family Trust | 27-Dec-13 | | Existing Client | -- |
| 91 | May Trust | 21-May-99 | | Existing Client | -- |
| 92 | MDAS 2012 Children's Trust | 20-Dec-12 | | Existing Client | -- |
| 93 | MDS 1992 Trust | 26-Mar-92 | | Existing Client | -- |
| 94 | MDS Beacon 2010 Trust | 15-Sep-10 | | Existing Client | -- |
| 95 | MDS Beacon 2011 Trust | 14-Apr-11 | | Existing Client | -- |
| 96 | MDS Beacon 2012 Trust | 20-Apr-12 | | Existing Client | -- |
| 97 | MDS Beacon 2013 Trust | 25-Feb-13 | | Existing Client | -- |
| 98 | MDS Family Trust | 6-Oct-10 | MDS 2010 Family Trust | Existing Client | -- |
| 99 | MTS 2013 Family Trust | 27-Dec-13 | | Existing Client | -- |
| 100 | MTS 2016 Trust | 23-Dec-16 | | Existing Client | -- |

PUBLICLY FILED PER STIPULATION [ECF 2140]

UNREDACTED - CONTAINS OUTSIDE PROFESSIONALS' EYES ONLY INFORMATION
TREAT SUBJECT TO PROTECTIVE ORDER

*OUTSIDE PROFESSIONALS' EYES ONLY/HIGHLY CONFIDENTIAL*
*SUBJECT TO PROTECTIVE ORDER*

| | Name of Trust | Creation Date | Also referred to as* <br><br> * Not necessarily a comprehensive list of names each trust has been known as | Status | Termination Date |
|---|---|---|---|---|---|
| 101 | MTS Bare Trust | 25-Oct-11 | | Existing Client | -- |
| 102 | MTS Beacon 2013 Trust | 27-Dec-13 | | Existing Client | -- |
| 103 | MTS Beacon 2014 Trust | 2-May-14 | | Existing Client | -- |
| 104 | MTS Beacon 2015 Trust | 22-Oct-15 | | Existing Client | -- |
| 105 | MTS Beacon 2010 Trust | 15-Sep-10 | | Existing Client | -- |
| 106 | MTS Beacon 2011 Trust | 14-Apr-11 | | Existing Client | -- |
| 107 | MTS Beacon 2012 Trust | 20-Apr-12 | | Existing Client | -- |
| 108 | MTS 2010 Family Trust | 6-Oct-10 | | Existing Client | -- |
| 109 | MTS Trust 2006 | | | Existing Client | -- |
| 110 | Nixie Trust | 5-Nov-12 | | Existing Client | -- |
| 111 | Romas Trust 2002 | 3/2/2002 | | Existing Client | -- |
| 112 | SDS 1992 Trust | 26-Mar-92 | | Existing Client | -- |
| 113 | SDS Bare Trust | 23-Jun-16 | | Existing Client | -- |

PUBLICLY FILED PER STIPULATION [ECF 2140]

*OUTSIDE PROFESSIONALS' EYES ONLY/HIGHLY CONFIDENTIAL
SUBJECT TO PROTECTIVE ORDER*

| | Name of Trust | Creation Date | Also referred to as*<br><br>* Not necessarily a comprehensive list of names each trust has been known as | Status | Termination Date |
|---|---|---|---|---|---|
| 114 | SDS Beacon 2011 Trust | 18-Apr-11 | | Existing Client | -- |
| 115 | SDS Beacon 2012 Trust | 20-Apr-12 | | Existing Client | -- |
| 116 | SDS Beacon 2014 Trust | 2-May-14 | | Existing Client | -- |
| 117 | SDS Family Trust | 22-Sep-10 | SDS 2010 Family Trust | Existing Client | -- |
| 118 | Sheffield Trust | 14-Nov-90 | Sheffield Terrace Trust; Samantha S. Sackler Trust; Samantha S. Sackler 1990 Trust | Existing Client | -- |
| 119 | SSH 2013 Family Trust | 30-Dec-13 | Samantha Sackler Hunt 2013 Family Trust | Existing Client | -- |
| 120 | SSSH Beacon 2013 Trust | 30-Dec-13 | Samantha S Sackler Hunt 2013 Family Trust | Existing Client | -- |
| 121 | SSSH 1996 Trust | 22-Mar-96 | Samantha Sackler Trust; Samantha S. Sackler Trust; Samantha Sackler 1996 Trust; Samantha S Sackler Hunt 1996 Trust | Existing Client | -- |
| 122 | SSSH 2002 Trust | 21-Mar-02 | Samantha Sackler Trust; Samantha S. Sackler Trust; Samantha Sackler 2002 Trust; Samantha S Sackler Hunt 2002 Trust | Existing Client | -- |

PUBLICLY FILED PER STIPULATION [ECF 2140]

*OUTSIDE PROFESSIONALS' EYES ONLY/HIGHLY CONFIDENTIAL*
*SUBJECT TO PROTECTIVE ORDER*

|  | Name of Trust | Creation Date | Also referred to as*<br><br>* Not necessarily a comprehensive list of names each trust has been known as | Status | Termination Date |
|---|---|---|---|---|---|
| 123 | Taddeo Purpose Trust | 27-Jan-12 |  | Existing Client | -- |
| 124 | Pugh Family Trust | 23-Mar-17 |  | Existing Client | -- |
| 125 | David F. Pugh Trust | 12-Mar-14 |  | Existing Client | -- |
| 126 | Highland Court Trust | 16-Dec-10 |  | Existing Client | -- |
| 127 | Trust under Declaration Dated April 11, 2002 | 11-Apr-02 | Fairfield Beach House Trust; Fairfield Beach Trust | Existing Client | -- |
| 128 | Indian Wells Trust | 26-Dec-16 |  | Existing Client | -- |
|  | **Terminated Trusts** |  |  |  |  |
| 129 | Archimedia Trust | 1-Nov-11 |  | Terminated Trust |  |
| 130 | MDS Beacon 2014 Trust | 2-May-14 |  | Terminated Trust | 25-Nov-16 |
| 131 | MDS Beacon 2015 Trust | 18-Sep-15 |  | Terminated Trust |  |
| 132 | Chelsea Trust | 8-Sep-11 |  | Terminated Trust | 20-Sep-13 |
| 133 | Gheri 1998 Trust | 13-Jul-98 | Gheri Sackler Trust | Terminated Trust | 18-Dec-15 |
| 134 | Glebe Trust | 8-Sep-11 |  | Terminated Trust | 17-Dec-14 |

PUBLICLY FILED PER STIPULATION [ECF 2140]

*OUTSIDE PROFESSIONALS' EYES ONLY/HIGHLY CONFIDENTIAL*
*SUBJECT TO PROTECTIVE ORDER*

| | Name of Trust | Creation Date | Also referred to as*<br><br>* Not necessarily a comprehensive list of names each trust has been known as | Status | Termination Date |
|---|---|---|---|---|---|
| 135 | Ifield Trust | 8-Sep-11 | | Terminated Trust | 11-Apr-17 |
| 136 | ISL 2002 Trust | 21-Mar-02 | | Terminated Trust | 30-Jul-12 |
| 137 | Jeffrey Lefcourt 1995 Trust | 29-Dec-95 | | Terminated Trust | 29-Feb-16 |
| 138 | Jeffrey Lefcourt 1997 Trust | 22-Aug-97 | | Terminated Trust | 29-Feb-16 |
| 139 | Karen Lefcourt 1995 Trust | 29-Dec-95 | | Terminated Trust | |
| 140 | Lemur Trust | 22-Jun-98 | | Terminated Trust | 2-May-12 |
| 141 | Macaque Trust | 29-Jun-98 | | Terminated Trust | 27-Feb-12 |
| 142 | Marissa Sackler Trust (1997) | 15-May-97 | | Terminated Trust | 4-Mar-13 |
| 143 | MDAS 1989 Trust | 20-Feb-89 | | Terminated Trust | 23-Feb-16 |
| 144 | MDS Insurance Trust | 25-Jan-90 | | Terminated Trust | 3-Apr-12 |
| 145 | Michael D. Sackler Trust (1997) | 15-May-97 | | Terminated Trust | 30-Nov-17 |
| 146 | Muriel Trust | 14-Sep-98 | Muriel 1998 Trust; Muriel Sackler Trust | Terminated Trust | 20-Jul-16 |
| 147 | Newcastle Trust | 15-Sep-99 | | Terminated Trust | 27-Feb-12 |

PUBLICLY FILED PER STIPULATION [ECF 2140]

UNREDACTED - CONTAINS OUTSIDE PROFESSIONALS' EYES ONLY INFORMATION
TREAT SUBJECT TO PROTECTIVE ORDER

*OUTSIDE PROFESSIONALS' EYES ONLY/HIGHLY CONFIDENTIAL*
*SUBJECT TO PROTECTIVE ORDER*

| | Name of Trust | Creation Date | Also referred to as*<br><br>* Not necessarily a comprehensive list of names each trust has been known as | Status | Termination Date |
|---|---|---|---|---|---|
| 148 | Rozel Trust | 4-Apr-96 | | Terminated Trust | 12-Mar-12 |
| 149 | Sauber Trust | 3-Jun-82 | | Terminated Trust | 24-Apr-13 |
| 150 | SDS Beacon 2010 Trust | 15-Sep-10 | | Terminated Trust | 5-Jan-17 |
| 151 | SDS Beacon 2013 Trust | 25-Feb-13 | | Terminated Trust | 2-Feb-17 |
| 152 | Sophia D. Sackler Trust (1997) | 15-May-97 | | Terminated Trust | 30-Nov-17 |
| 153 | SSSH Beacon 2010 Trust | 15-Sep-10 | | Terminated Trust | 15-Jul-14 |
| 154 | SSSH 2010 Family Trust | 22-Sep-10 | | Terminated Trust | 7-Jul-14 |
| 155 | Stillwater Trust | 12-Jul-07 | | Terminated Trust | 13-Jul-12 |
| 156 | Stillwater 2011 Trust | 20-Dec-11 | | Terminated Trust | 13-Jul-12 |
| 157 | KAS Mortgage Trust | 27-Oct-03 | | Terminated Trust | |
| 158 | Tamarin Trust | 24-Jun-98 | | Terminated Trust | 27-Feb-12 |
| 159 | TES Beacon 2010 Trust | 15-Sep-10 | | Terminated Trust | 12-Jan-17 |
| 160 | TES Beacon 2011 Trust | 14-Apr-11 | | Terminated Trust | 3-Jul-12 |

13

UNREDACTED - CONTAINS OUTSIDE PROFESSIONALS' EYES ONLY INFORMATION
TREAT SUBJECT TO PROTECTIVE ORDER

*OUTSIDE PROFESSIONALS' EYES ONLY/HIGHLY CONFIDENTIAL*
*SUBJECT TO PROTECTIVE ORDER*

| | Name of Trust | Creation Date | Also referred to as*<br><br>* Not necessarily a comprehensive list of names each trust has been known as | Status | Termination Date |
|---|---|---|---|---|---|
| 161 | Theresa E. Sackler Insurance Trust | 18-Nov-96 | TES Insurance Trust | Terminated Trust | 28-Feb-12 |
| 162 | Theresa E. Sackler Trust (2008) | 22-Dec-08 | TES 2008 Trust | Terminated Trust | |
| 163 | String Lake Inc. Purpose Trust | 13-May-10 | | Terminated Trust | Nov-10 |
| 164 | Castle Cornet Trust | 28-Dec-00 | | Terminated Trust | 23-Apr-13 |
| 165 | Rainbow Trust | 22-Mar-02 | | Terminated Trust | 13-Jul-12 |
| 166 | Rooksnest Trust | 22-Mar-02 | | Terminated Trust | 27-Feb-12 |
| 167 | TES Family Trust | 15-Sep-10 | | Terminated Trust | 3-Jul-12 |
| 168 | SDS Beacon 2015 Trust | 18-Sep-15 | | Terminated Trust | 12-Dec-16 |
| 169 | TES Beacon 2015 Trust | 15-Sep-10 | | Terminated Trust | 12-Jan-17 |
| 170 | MTS 1992 Trust | 26-Mar-92 | | Terminated Trust | 13-Jul-17 |
| 171 | Velvet Moon Trust | 17-Jun-98 | | Terminated Trust | |
| 172 | Vazon Bay Trust | 28-Dec-00 | | Terminated Trust | 27-Feb-12 |
| 173 | TES & Children's Trust | 27-Jan-00 | | Terminated Trust | |

PUBLICLY FILED PER STIPULATION [ECF 2140]

*OUTSIDE PROFESSIONALS' EYES ONLY/HIGHLY CONFIDENTIAL*
*SUBJECT TO PROTECTIVE ORDER*

| | Name of Trust | Creation Date | Also referred to as*  *Not necessarily a comprehensive list of names each trust has been known as | Status | Termination Date |
|---|---|---|---|---|---|
| 174 | Trust f/b/o TES under Codicil of Guernsey Channel Islands Will | | | Terminated Trust | |

15

*OUTSIDE PROFESSIONALS' EYES ONLY/HIGHLY CONFIDENTIAL*
*SUBJECT TO PROTECTIVE ORDER*

## RRS Family Trusts

| | Name | Date Created | Sometimes referred to as | Status |
|---|---|---|---|---|
| 1 | Trust U/A 11/5/74 fbo Beverly Sackler | 11/5/1974 | 1974 Irrevocable Trust; 1974 Irrevocable Trust A; 1974 Trust A; 74 Trust A; 74A Trust; 1974 Irrevocable Trust A; 74 Irrevocable Trust A | Existing Client |
| 2 | Trust B U/A 11/5/74 fbo Beverly Sackler | 2/1/2002 | 1974 Irrevocable Trust B; 1974 Trust B; 74 Trust B; 74B Trust; 1974 Irrevocable Trust B; 74 Irrevocable Trust B | Existing Client |
| 3 | The 1974 Irrevocable Investment Trust | 4/1/2004 | 74 Irrevocable Investment Trust; 1974 Investment Trust; 74 Investment Trust | Existing Client |
| 4 | 1974 Irrevocable Trust fbo BS and RSS | 5/1/2015 | 74AR Trust; 1974 AR Trust | Existing Client |
| 5 | 1974 Irrevocable Trust fbo BS and JDS | 5/1/2015 | 74AJ Trust; 1974 AJ Trust | Existing Client |
| 6 | AR Irrevocable Trust | 7/2/2019 | | Existing Client |
| 7 | AJ Irrevocable Trust | 5/31/2019 | | Existing Client |

PUBLICLY FILED PER STIPULATION [ECF 2140]

*OUTSIDE PROFESSIONALS' EYES ONLY/HIGHLY CONFIDENTIAL*
*SUBJECT TO PROTECTIVE ORDER*

| | Name | Date Created | Sometimes referred to as | Status |
|---|---|---|---|---|
| 8 | Raymond R. Sackler Trust 1 dtd 12/23/89 | 12/23/1989 | RSS Captain Trust; RSS Captain Trust A; RSS 1989 Captain Trust; RSS 1989 Captain Trust A; 1989 RSS Issue Trust | Existing Client |
| 9 | Raymond R. Sackler Trust 1B dtd 12/23/89 | 12/23/1989 | RSS Captain Trust B; RSS 1989 Captain Trust B | Existing Client |
| 10 | Raymond R. Sackler Trust 2 dtd 12/23/89 | 12/23/1989 | JDS Captain Trust; JDS Captain Trust A; JDS 1989 Captain Trust; JDS 1989 Captain Trust A; JDS 1992 Issue Trust | Existing Client |
| 11 | Raymond R. Sackler Trust 2B dtd 12/23/89 | 12/23/1989 | JDS Captain Trust B; JDS 1989 Captain Trust B | Existing Client |
| 12 | Irrevocable Trust under Declaration dated as of September 19, 1995 f/b/o Issue of Jonathan D. Sackler | 9/19/1995 | JDS 1995 Captain Trust: JDS Landings Trust | Existing Client |
| 13 | Irrevocable Trust under Declaration dated as of September 19, 1995 f/b/o Issue of Richard S. Sackler | 9/19/1995 | RSS 1995 Captain Trust: RSS Landings Trust | Existing Client |
| 14 | Beverly Sackler Trust 1 f/b/o David Alex Sackler 12/20/1989 | 12/20/1989 | David Gallo 1 Trust | Existing Client |

17

*OUTSIDE PROFESSIONALS' EYES ONLY/HIGHLY CONFIDENTIAL*
*SUBJECT TO PROTECTIVE ORDER*

| | Name | Date Created | Sometimes referred to as | Status |
|---|---|---|---|---|
| 15 | Beverly Sackler Trust 1 f/b/o Marianna Rose Sackler 12/21/1989 | 12/21/1989 | Marianna Gallo 1 Trust ; Annie Gallo 1 Trust | Existing Client |
| 16 | Beverly Sackler Trust 1 f/b/o Rebecca Kate Sackler 12/22/1989 | 12/22/1989 | Rebecca Gallo 1 Trust; Becky Gallo 1 Trust | Existing Client |
| 17 | Beverly Sackler Trust 2 f/b/o David Alex Sackler 12/20/1989 | 12/20/1989 | David Gallo 2 Trust | Existing Client |
| 18 | Beverly Sackler Trust 2 f/b/o Marianna Rose Sackler 12/21/1989 | 12/21/1989 | Marianna Gallo 2 Trust; Annie Gallo 2 Trust | Existing Client |
| 19 | Beverly Sackler Trust 2 f/b/o Rebecca Kate Sackler 12/22/1989 | 12/22/1989 | Rebecca Gallo 2 Trust; Becky Gallo 2 Trust | Existing Client |
| 20 | Beverly Sackler Trust 3 f/b/o David Alex Sackler 12/20/1989 | 12/20/1989 | David 3 Gallo Trust | Existing Client |
| 21 | Beverly Sackler Trust 3 f/b/o Marianna Rose Sackler 12/21/1989 | 12/21/1989 | Marianna Gallo 3 Trust 3; Annie Gallo 3 Trust | Existing Client |
| 22 | Beverly Sackler Trust 3 f/b/o Rebecca Kate Sackler 12/22/1989 | 12/22/1989 | Rebecca Gallo 3 Trust; Becky Gallo 3 Trust | Existing Client |
| 23 | Beverly Sackler Trust 1 f/b/o Madeleine Sackler 12/26/1989 | 12/26/1989 | Madeleine Gallo 1 Trust | Existing Client |

PUBLICLY FILED PER STIPULATION [ECF 2140]

*OUTSIDE PROFESSIONALS' EYES ONLY/HIGHLY CONFIDENTIAL*
*SUBJECT TO PROTECTIVE ORDER*

| | Name | Date Created | Sometimes referred to as | Status |
|---|------|--------------|--------------------------|--------|
| 24 | Beverly Sackler Trust 1 f/b/o Clare Elizabeth Sackler 12/27/1989 | 12/27/1989 | Clare Gallo 1 Trust | Existing Client |
| 25 | Beverly Sackler Trust 1 f/b/o Miles Raymond Sackler 12/29/1989 | 12/29/1989 | Miles Gallo 1 Trust; Miles Non-Gallo Trust 1 | Existing Client |
| 26 | Beverly Sackler Trust 2 f/b/o Madeleine Sackler 12/26/1989 | 12/26/1989 | Madeleine Gallo 2 Trust | Existing Client |
| 27 | Beverly Sackler Trust 2 f/b/o Clare Elizabeth Sackler 12/27/1989 | 12/27/1989 | Clare Gallo 2 Trust | Existing Client |
| 28 | Beverly Sackler Trust 2 f/b/o Miles Raymond Sackler 12/30/1989 | 12/30/1989 | Miles Gallo 2 Trust; Miles Non-Gallo Trust 2 | Existing Client |
| 29 | Beverly Sackler Trust 3 f/b/o Madeleine Sackler 12/26/1989 | 12/26/1989 | Madeleine Gallo 3 Trust | Existing Client |
| 30 | Beverly Sackler Trust 3 f/b/o Clare Elizabeth Sackler 12/27/1989 | 12/27/1989 | Clare Gallo 3 Trust | Existing Client |
| 31 | Beverly Sackler Trust 3 f/b/o Miles Raymond Sackler 12/28/1989 | 12/28/1989 | Miles Gallo 3 Trust 2; Miles Non-Gallo Trust 3 | Existing Client |
| 32 | David A. Sackler 2012 Trust | 1/27/2012 | David Anniversary Trust | Existing Client |
| 33 | Marianna R. Sackler 2012 Trust | 1/27/2012 | Marianna Anniversary Trust; Annie Anniversary Trust | Existing Client |

PUBLICLY FILED PER STIPULATION [ECF 2140]

*OUTSIDE PROFESSIONALS' EYES ONLY/HIGHLY CONFIDENTIAL*
*SUBJECT TO PROTECTIVE ORDER*

| | **Name** | **Date Created** | **Sometimes referred to as** | **Status** |
|---|---|---|---|---|
| 34 | Rebecca K. Sackler 2012 Trust | 1/27/2012 | Rebecca Anniversary Trust; Becky Anniversary Trust | Existing Client |
| 35 | Madeleine Sackler 2012 Trust | 1/27/2012 | Madeleine Anniversary Trust | Existing Client |
| 36 | Clare E. Sackler 2012 Trust | 1/27/2012 | Clare Anniversary Trust | Existing Client |
| 37 | Miles R.C. Sackler 2012 Trust | 1/27/2012 | Miles Anniversary Trust | Existing Client |
| 38 | Irrevocable Trust under Declaration dated as of April 25, 1991 | 4/25/1991 | 2-Life Insurance Trust; 4/25/91 Trust | Existing Client |
| 39 | Trust under Declaration of Trust dated August 23, 1988 f/b/o Richard S. Sackler and Issue of Richard S. Sackler | 8/23/1988 | ███████████ | Existing Client |
| 40 | Trust under Declaration of Trust dated December 17, 1991 f/b/o Richard S. Sackler and Issue of Richard S. Sackler | 12/17/1991 | ███████████ | Existing Client |
| 41 | Trust under Declaration of Trust dated August 23, 1988 f/b/o Jonathan D. Sackler and Issue of Jonathan D. Sackler | 8/23/1988 | ███████████ | Existing Client |

PUBLICLY FILED PER STIPULATION [ECF 2140]

*OUTSIDE PROFESSIONALS' EYES ONLY/HIGHLY CONFIDENTIAL*
*SUBJECT TO PROTECTIVE ORDER*

| | Name | Date Created | Sometimes referred to as | Status |
|---|---|---|---|---|
| 42 | Trust under Declaration of Trust dated December 17, 1991 f/b/o Jonathan D. Sackler and Issue of Jonathan D. Sackler | 12/17/1991 | ██████████████ | Existing Client |
| 43 | Trust under agreement dated December 3, 1979 f/b/o Richard S. Sackler | 12/3/1979 | BRP Trust; RSS BRP Trust; BRP Trust A | Existing Client |
| 44 | Trust under agreement dated December 3, 1979 f/b/o Jonathan D. Sackler | 12/3/1979 | BRP Trust; JDS BRP Trust; BRP Trust B | Existing Client |
| 45 | Trust under agreement dated June 16, 1980 f/b/o Richard S. Sackler | 6/16/1980 | FPC Trust; RSS FPC Trust; FPC Trust A | Existing Client |
| 46 | Trust under agreement dated June 16, 1980 f/b/o Jonathan D. Sackler | 6/16/1980 | FPC Trust; JDS FPC Trust; FPC Trust B | Existing Client |
| 47 | Trust under agreement dated December 23, 1980 f/b/o Richard S. Sackler | 12/23/1980 | XPC Trust; RSS XPC Trust; XPC Trust A | Existing Client |
| 48 | Trust under agreement dated December 23, 1980 f/b/o Jonathan D. Sackler | 12/23/1980 | XPC Trust; JDS XPC Trust; XPC Trust B | Existing Client |

21

PUBLICLY FILED PER STIPULATION [ECF 2140]

*OUTSIDE PROFESSIONALS' EYES ONLY/HIGHLY CONFIDENTIAL*
*SUBJECT TO PROTECTIVE ORDER*

| | Name | Date Created | Sometimes referred to as | Status |
|---|---|---|---|---|
| 49 | Beth B. Sackler Trust | 12/27/2001 | | Ceased to be a client circa 12/2010 |
| 50 | Mary Corson Trust | 1/15/2004 | | Existing Client |
| 51 | Trust Agreement dated August 29, 2003 f/b/o Issue of Richard S. Sackler | 8/29/2003 | PRAH Trust; RSS PRAH Trust; Beth PRAH Trust | Existing Client |
| 52 | Trust Agreement dated August 29, 2003 f/b/o Mary Corson and Issue of Jonathan D. Sackler | 8/29/2003 | PRAH Trust; JDS PRAH Trust; Mary PRAH Trust | Existing Client |
| 53 | Irrevocable Trust under Declaration dated as of August 25, 1992 | 8/25/1992 | RSS 1992 Captain Trust; RSS 1992 Grantor Trust | Existing Client |
| 54 | Irrevocable Trust under Declaration dated as of December 29, 1992 | 12/29/1992 | JDS 1992 Captain Trust; JDS 1992 Grantor Trust | Existing Client |
| 55 | Richard S. Sackler Life Insurance Trust | 7/27/2002 | | Existing Client |
| 56 | Jonathan D. Sackler Life Insurance Trust | 7/27/2002 | | Existing Client |
| 57 | Richard S. Sackler Trust U/A 9/30/04 | 9/30/2004 | RSS North Bay Trust | Existing Client |

PUBLICLY FILED PER STIPULATION [ECF 2140]

*OUTSIDE PROFESSIONALS' EYES ONLY/HIGHLY CONFIDENTIAL*
*SUBJECT TO PROTECTIVE ORDER*

| | Name | Date Created | Sometimes referred to as | Status |
|---|---|---|---|---|
| 58 | Jonathan D. Sackler Trust U/A 9/30/04 | 9/30/2004 | JDS North Bay Trust | Existing Client |
| 59 | Hudson Trust | 9/4/2019 | | Existing Client |
| 60 | Richard S. Sackler Trust f/b/o David A. Sackler 3/8/90 | 3/8/1990 | David Minority Trust | Existing Client |
| 61 | Richard S. Sackler Trust f/b/o Marianna R. Sackler 3/8/90 | 3/8/1990 | Marianna Minority Trust; Annie Minority Trust | Existing Client |
| 62 | Richard S. Sackler Trust f/b/o Rebecca K. Sackler 3/8/90 | 3/8/1990 | Rebecca Minority Trust; Becky Minority Trust | Existing Client |
| 63 | Jonathan D. Sackler Trust f/b/o Clare Elizabeth Sackler 4/11/90 | 4/11/1990 | Clare Minority Trust | Existing Client |
| 64 | Jonathan D. Sackler Trust f/b/o Madeleine Sackler 4/11/90 | 4/11/1990 | Madeleine Minority Trust | Existing Client |
| 65 | Jonathan D. Sackler Trust f/b/o Miles Raymond Corson Sackler, 4/11/90 | 8/2/1990 | Miles Minority Trust | Existing Client |
| 66 | The RSS 2012 Family Trust | 12/31/2012 | | Existing Client |

PUBLICLY FILED PER STIPULATION [ECF 2140]

UNREDACTED - CONTAINS OUTSIDE PROFESSIONALS' EYES ONLY INFORMATION
TREAT SUBJECT TO PROTECTIVE ORDER

*OUTSIDE PROFESSIONALS' EYES ONLY/HIGHLY CONFIDENTIAL*
*SUBJECT TO PROTECTIVE ORDER*

| | Name | Date Created | Sometimes referred to as | Status |
|---|---|---|---|---|
| 67 | Marianna R. Sackler Captain Trust | 3/14/2012 | Annie Captain Trust; Marianna Captain Trust | Existing Client |
| 68 | Rebecca K. Sackler Captain Trust | 3/14/2012 | Becky Captain Trust; Rebecca Captain Trust | Existing Client |
| 69 | RSS Fiduciary Management Trust | 8/4/2011 | | Existing Client |
| 70 | JDS Fiduciary Management Trust | 8/4/2011 | | Existing Client |
| 71 | Crystal Trust | 9/25/2017 | | Existing Client |
| 72 | MCM Fiduciary Management Trust | 9/12/2017 | | Existing Client |
| 73 | Data Trust | 11/20/2018 | | Existing Client |
| 74 | Cornice Trust | 11/20/2018 | | Existing Client |
| 75 | DABB Trust | 7/24/2019 | | Existing Client |
| 76 | Raymond R. Sackler Credit Shelter Trust u/a 3/29/2012* | 3/29/2012 | | Existing Client |
| 77 | Raymond R. Sackler GST Exempt Marital Trust u/a 3/29/2012* | 3/29/2012 | | Existing Client |
| 78 | Raymond R. Sackler Marital Trust u/a 3/29/2012* | 3/29/2012 | | Existing Client |

24

PUBLICLY FILED PER STIPULATION [ECF 2140]

UNREDACTED - CONTAINS OUTSIDE PROFESSIONALS' EYES ONLY INFORMATION
TREAT SUBJECT TO PROTECTIVE ORDER

*OUTSIDE PROFESSIONALS' EYES ONLY/HIGHLY CONFIDENTIAL*
*SUBJECT TO PROTECTIVE ORDER*

|   | Name | Date Created | Sometimes referred to as | Status |
|---|------|--------------|--------------------------|--------|
| 79 | Beverly Sackler 2012 Revocable Pourover Trust | 3/29/2012 | | Existing Client |
| 80 | RSS Revocable Pourover Trust | 10/26/2018 | | Existing Client |
| 81 | JDS Revocable Pourover Trust | 8/15/2019 | | Existing Client |
| 82 | Cedar Cliff Trust | 12/31/2019 | | Existing Client |
| 83 | 1959 Irrevocable Trust | 10/1/1959 | | Terminated Trust |
| 84 | 1969 Irrevocable Trust | 5/1/1969 | | Terminated Trust |
| 85 | FTA Trust | 1/24/1983 | | Terminated Trust |
| 86 | 1974 Revocable Trust | 10/31/1974 | 10/31/74 Revocable Trust; RRS Revocable Trust | Terminated Trust (terminated circa 2012) |
| 87 | RSS Pourover Trust | 11/15/1990 | | Terminated Trust |

25

PUBLICLY FILED PER STIPULATION [ECF 2140]

*OUTSIDE PROFESSIONALS' EYES ONLY/HIGHLY CONFIDENTIAL*
*SUBJECT TO PROTECTIVE ORDER*

| | **Name** | **Date Created** | **Sometimes referred to as** | **Status** |
|---|---|---|---|---|
| 88 | JDS Pourover Trust | 11/26/1990 | | Terminated Trust |
| 89 | RSS 2/2/98 Trust | 11/26/1990 | RSS Captain Trust IV | Terminated Trust |
| 90 | JDS 2/2/98 Trust | 11/26/1990 | JDS Captain Trust IV | Terminated Trust |
| 91 | RSS 1992 Insurance Trust | 3/13/1992 | | Terminated Trust |
| 92 | JDS 1992 Insurance Trust | 10/27/1992 | | Terminated Trust |
| 93 | The Richard S. Sackler Revocable Pourover Trust | 2/1/2013 | | Terminated Trust |
| 94 | The Jonathan D. Sackler Revocable Pourover Trust | 12/12/2010 | | Terminated Trust |
| 95 | The Jonathan D. Sackler Revocable Pourover Trust | 9/30/2004 | | Terminated Trust |

26

# EXHIBIT 12



**MITCHELL P. HURLEY**
+1 212.872.1011/fax: +1 212.872.1002
mhurley@akingump.com

August 18, 2020

**VIA E-MAIL**

Jasmine Ball
**Debevoise & Plimpton LLP**
919 Third Avenue
New York, NY 10022
*Counsel to Sackler Family Side A*
*(Mortimer) ICSPs, ACSPs, and Entities*

　　　　Re:　　*In re: Purdue Pharma L.P. et al.*, No. 19-23649 (Bankr. S.D.N.Y.)

Dear Jasmine:

　　　　We write regarding additional issues we have identified with respect to Side A's August 10, 2020 revised privilege log (the "Log").  As detailed below, there are thousands of entries on the Log that are invalid on their face, including because they involve third parties and do not appear to be confidential communications for the purpose of obtaining legal advice.

　　　　As you know, none of the entries on Side A's Log identifies "common interest," "joint defense" or "joint engagement" as a basis for withholding (other than a comparative handful of entries with Davis Polk listed as a sender or recipient that you added in a supplement to Side A's original log).  And even with regard to this group of entries, you have failed to supply information sufficient to demonstrate that they are immune from disclosure to the Official Committee despite the presence of third parties on those documents and communications, and despite the Official Committee's repeated requests.  Below we address certain categories of withheld documents that involve third parties, and ask that you please produce all documents within those categories or provide the information necessary to sustain Side A's privilege claims no later than **5 p.m. on August 20, 2020**, so that we may promptly raise any unresolved issues with Judge Drain.[1]

---

[1] We will not address again in detail here Side A's improper withholding of thousands of documents that it shared with public relations firms, and instead incorporate by reference our prior correspondence concerning those materials.  *See* Aug. 5 and 12, 2020 M. Hurley Ltrs.  You are mistaken that the Official Committee somehow is required to challenge your privilege claims on an "entry by entry" basis.  We have identified categories of entries on your logs, including the "PR firm" documents and those discussed herein, where Side A's claim of privilege is fatally defective based on the contents of the Log produced.  We demand production of all of those documents immediately.  To the extent Side A has information that it claims immunizes particular documents within these categories from



August 18, 2020
Page 2

### Accountants[2]

Several thousand entries on the Log include accountants and accounting firm personnel, whose communications generally are not shielded by privilege. *See United States v. Arthur Young & Co.*, 465 U.S. 805, 817 (1984) ("no confidential accountant-client privilege exists under federal law, and no state-created privilege has been recognized in federal cases"). Indeed, it is well-settled that where the communication at issue "is not legal advice but only accounting service, or if the advice sought is the accountant's rather than the lawyer's, no privilege exists." *United States v. Kovel*, 296 F.2d 918, 922 (2d Cir. 1961). While many of the Log entries with accountants/accounting firm personnel also copy counsel, that does not cause privilege to attach. *See Summit Ltd. v. Levy*, 111 F.R.D. 40, 42 (S.D.N.Y. 1986). Rather, absent information demonstrating that the accountant served a function similar to that of a translator by providing essential analysis to assist counsel in the rendition of legal services, *Kovel*, 296 F.2d at 922; *Universal Std. Inc. v. Target Corp.*, 331 F.R.D. 80, 87-88 (S.D.N.Y. 2019), any claim of privilege is vitiated by the presence of the accountant on the document.

Although our review is currently ongoing, so far we have identified the following accounting firms on the Log: Grant Thornton, RSM, Management Revisions, Berdon, and Revinova. Please produce all withheld documents that include accountants and accounting firm personnel, including but not limited to those we have identified here. Alternatively, the Official Committee requests that you amend the Log or otherwise provide detail sufficient to establish why each such communication is privileged despite the presence of the accountant, such as affidavits or other evidence—not mere conclusory assertions—that the accountant was providing information necessary to render legal advice but that counsel could not have understood without the accountant's specialized analysis. Please also provide the Official Committee with copies of all engagement letters or agreements with these firms, including the dates and subject matter of the engagements. Provision of such agreements is necessary (but not sufficient alone) for your clients to carry their burden of invoking privilege with respect to any of these documents.

---

disclosure despite the fact that they were disclosed already to third parties, Side A has the burden of coming forward with that information now. If you do not agree to do so, we will raise these issues with the Court.

[2] With respect to the various privilege challenges that have been raised, we assume you contend federal common law applies, as you have not identified any applicable state law with respect to any of the entries in your log, as is required under Local Rule 26.2(a)(1). Please let us know if that is not the case, and if so, which state's law you believe applies and to which issues.



August 18, 2020
Page 3

## Insurance Brokers and Adjusters

Side A's Log includes over 70 documents with insurers, insurance adjusters or brokers, or insurers' counsel.  Importantly, of the insurance-related entries the Official Committee has identified, none of the corresponding privilege descriptions indicates that the insurer is participating in the communication pursuant to a near-identical shared litigation interest as is typically required to preserve privilege.  *See, e.g.*, *N. River Ins. Co. v. Columbia Cas. Co.*, No. 90 Civ. 2518, 1995 WL 5792, at \*4 (S.D.N.Y. Jan. 5, 1995) (compiling federal cases for the principle that "[t]he insurer may have the same 'desire' as the insured that the insured not be found liable for damages in an underlying action, but this does not qualify as an identical legal interest" necessary to maintain privilege).

To the contrary, the Log descriptions suggest that these insurance entities are almost always included on communications concerning generic "investment/business transactions."  No basis appears on the Log or other information you have supplied that would establish communications with these non-lawyers somehow are privileged.  *Cf. Am. Ins. Co. v. Elgot Sales Corp.*, No. 97 CIV. 1327, 1998 WL 647206, at \*2 (S.D.N.Y. Sept. 21, 1998) (holding documents prepared in ordinary course of insurance adjuster's business not privileged, even where prospect of litigation loomed).

The Official Committee therefore requests that you produce all communications involving purported insurers, insurance brokers, and insurance adjusters, including those associated with Cooper Gray, DeWitt Stern Group, Gauntlet, J.S. Johnson, Procor Solutions, SBJ Group, Swiss Re, and Technical Adjusters.  Alternatively, the Official Committee requests that you amend the Log or otherwise provide detail sufficient to establish why each such communication is privileged despite the presence of these non-lawyer professionals, such as affidavits or other evidence—not mere conclusory assertions—including specific support for any claim that they share a sufficiently identical legal interest with the Side A clients in pending litigation or otherwise.

## Financial or Investment Advisors

Additionally, the Log includes hundreds of documents featuring persons identified as financial analysts, financial advisors, and investment advisors.  The generic privilege descriptions for these documents (primarily "providing information for," "discussing," or "reflecting" legal advice regarding "business transactions," "trusts and estates," "taxes," and "opioids") do not enable the Official Committee to determine whether such documents are privileged.



August 18, 2020
Page 4

As with any third party, communications with financial or investment advisors generally prevents valid assertion of privilege. *See, e.g.*, *United States v. Ackert*, 169 F.3d 136, 139-40 (2d Cir. 1999) (rejecting privilege claim over communications with investment banker, noting "the attorney-client privilege generally applies only to communications between the attorney and the client"). Exceptions to this general rule have been narrowly cabined to financial or investment advisors providing information *essential* to an attorney's provision of legal advice. It is immaterial that the advisor's expertise was important, or even if it was formative to counsel's ultimate opinion. *See, e.g.*, *Ackert*, 169 F.3d at 139 ("[A] communication between an attorney and a third party does not become shielded by the attorney-client privilege solely because the communication proves important to the attorney's ability to represent the client."); *Export-Import Bank of the U.S. v. Asia Pulp & Paper Co., Ltd.*, 232 F.R.D. 103, 113 (S.D.N.Y. 2005) (counsel's communications with financial consultant plainly not privileged without explanation of why they were essential to attorney's legal advice).

None of the related entries provides information sufficient to carry your clients' burden of showing that these communications were properly withheld. Accordingly, the Official Committee requests that you produce all communications involving third-party financial and investment advisors, including Christopher Stone and Nancy Everett (in their personal capacities), as well as those affiliated with Adam Gold, Appomattox, Atlas Capital Group, Deltec, Skytop Capital Management LLC, and Soditic Ltd. Alternatively, we request that Side A amend the Log or otherwise provide detail sufficient to establish why each such communication is privileged despite the presence of these non-lawyer professionals, such as affidavits or other evidence—not mere conclusory assertions. Please also provide the Official Committee with copies of all engagement letters or agreements with these individuals and companies, including the dates and subject matter of the engagements. Provision of such agreements is necessary (but not sufficient alone) for your clients to carry their burden of invoking privilege with respect to any of these documents.

**Other Consultants and Advisors**

Additionally, the Log includes thousands of entries involving communications with general third-party "consultants," "advisors," "project managers," and/or "management companies" (collectively, the "Consultants").[3] As with other advisors (e.g., financial/investment

---

[3] The Consultants are identified as having roles with Akoya Hospitality, Alix Partners, Dezenhall Resources, Ltd., Eastdil Secured, Ernst & Young, Freestream, Goldin Solutions, Gran Clos, Kathryn McCarthy Consultants, Kitchen Table Partners, Leading Edge Aviation Services, Manaco S.A, Management Revisions, Pillbox Ventures, LLC, Pollack+Partners, Presidential Aviation, Purple Strategies, Steven Hall & Partners, StonehageÂ, Stu Loeser & Co., Teneo, Fitzsimons, and Tuana.



August 18, 2020
Page 5

advisors discussed above), these Consultants break privilege unless they provide *specialized* services that are *essential* to the attorney's provision of legal advice. *See, e.g.*, *Scott v. Chipotle Mexican Grill, Inc.*, 94 F. Supp. 3d 585, 591-92 (S.D.N.Y. 2015) (report prepared by consultant allegedly referenced by attorneys was not privileged because it offered no specialized knowledge); *Asia Pulp & Paper*, 232 F.R.D. at 113 (counsel's communications with consultant not privileged without explanation of why they were essential to legal advice).

The descriptions provided on the Log do not suggest any such essential services provided by the Consultants. Instead, the entries involving the Consultants generally refer to discussion, provision, reflection, or requesting of legal advice regarding "investment/business transactions," "taxes," "opioid products," and "charitable contributions." The Official Committee therefore requests that you amend the Log or otherwise provide detail sufficient to establish why each such communication is privileged despite the presence of these non-lawyers, such as affidavits or other evidence—not mere conclusory assertions. Please also provide the Official Committee with copies of all engagement letters or agreements with these companies, including the dates and subject matter of the engagements. Provision of such agreements is necessary (but not sufficient alone) for your clients to carry their burden of invoking privilege with respect to any of these documents.

## Private and Investment Bankers

Similarly, the Official Committee has identified a number of communications on the Log involving third-party bankers, including "private" and "investment" bankers from Coutts, Credit Suisse, Eagle Capital Management, First Republic, JPM Chase, and Scotia Bank. The Second Circuit in *U.S. v. Ackert* decisively established that communications between counsel and a third-party banker, even if the conversations "significantly assisted the attorney in giving his client legal advice about its tax situation," are not privileged. 169 F.3d at 139-40 ("[W]e reject the magistrate judge's broad ruling that the entire examination of [the banker] on his communications with [counsel] is protected by [client's] privilege."). Furthermore, counsel merely seeking information from the banker that the client did not have regarding a proposed transaction does not confer attorney-client privilege. *Id.*

The communications withheld by Side A appear to concern taxes and both business and personal transactions. There is no indication from the information on the Log that the bankers on these communications contributed any more than the investment banker in *Ackert*. The Official Committee therefore requests that you produce all communications involving private or investment bankers. Alternatively, the Official Committee requests that you amend the Log or otherwise provide detail sufficient to establish why each such communication is privileged despite the presence of these non-lawyer professionals, such as affidavits or other evidence—not mere



August 18, 2020
Page 6

conclusory assertions—like the accountant in *Kovel*, who "play[ed] a role analogous to an interpreter" necessary for the attorney to provide legal advice. *See id.* at 139.

### Real Estate Brokers and Developers

Side A has categorized communications with real estate brokers and developers as privileged. However, communications with real estate brokers and developers are not privileged, and the presence of such third parties on communications typically breaks the privilege even where an attorney is a party. *See In re Rock & Republic Enterprises, Inc.*, No. 10-11728, 2010 WL 4137572 (S.D.N.Y. Bankr. Oct. 19, 2010) (finding that burden had not been met for establishing that communications with real estate brokers on which an attorney was one of only many recipients were privileged). Moreover, for communications regarding real estate issues to which an attorney is a party, the burden is on the party asserting privilege to supply "sufficient information to demonstrate that the documents are confidential communications that contain information relating specifically to a legal opinion formed and the advice given by the lawyer in the course of that relationship." *Id.* at *4 (internal quotations and citation omitted). That burden has not been met here. The Official Committee therefore requests that you produce all communications involving real estate brokers or developers, including those involving Aristo Developers, Brown Harris Tevens, Corcoran, Dolphin Capital, Douglas Elliman, Hamptons International, Houlihan Lawrence, Jones Lang LaSalle IP, Inc., Prime Purchase, Private Property Search, Savills, Sotheby's, Aman or Aman Resorts, and Strutt and Parker. Alternatively, the Official Committee requests that you amend the Log or otherwise provide detail sufficient to establish why each such communication is privileged despite the presence of these non-lawyer professionals, such as affidavits or other evidence—not mere conclusory assertions.

### Co-Investors or Counterparties

Many entries on the Log contain co-investors/counterparties and their counsel in connection with various transactions involving the Sackler parties and their related companies. These third parties and their counsel do not share a privilege with the Sackler parties. *See Obeid v. Mack*, No. 14 Civ. 6498 (LTS) (HBP), 2016 WL 7176653, at *8-9 (S.D.N.Y. Dec. 9, 2016) (finding that communications containing an equity investor waived the attorney-client privilege because although plaintiff and the investor shared a financial interest they had not formed a coordinated legal strategy and the communications were not for the purpose of developing a common legal strategy); *JM Vidal, Inc. v. Texdis, USA, Inc.*, No. 08 Civ. 6398(CM)(KNF), 2010 WL 86134, at *2 (S.D.N.Y. Jan. 8, 2010) (finding that a communication between a paralegal working for plaintiff's counsel, plaintiff, and a third-party investor that was not made for the purpose of obtaining legal advice was not protected by attorney-client privilege). Accordingly,



## Akin Gump
STRAUSS HAUER & FELD LLP

August 18, 2020
Page 7

please produce all withheld communications that include co-investors/counterparties and their counsel. If you contend that any of these communications are subject to a joint defense or common interest privilege, please produce the relevant joint defense agreements and explain specifically how the withheld communications are in connection with a coordinated legal strategy rather than merely a shared financial interest.

### Other Third-Party Participants

In addition to the categories addressed above, Side A's Log claims attorney-client privilege and/or work product protection with respect to communications copying various other third-party participants, including individuals identified as follows on the Appendix to the Log:

| Name | Role |
|---|---|
| | Art consultant retained by MDAS |
| | Art consultant retained by MDAS |
| | Colleague of Ilene Sackler Lefcourt |
| | Colleague of Ilene Sackler Lefcourt |
| | Friend |
| | Friend |
| | Friend |
| | Friend |
| | Friend |
| | Charity Assistant |
| | Charity Director |
| | Salesman |
| | Physician[4] |
| | Owner's Representative |
| | Notary |
| | Notary |
| | Notary |

---

[4] Only attorney-client—and not physician-patient—privilege is listed as a basis for withhold this document.



**Akin Gump**
STRAUSS HAUER & FELD LLP

August 18, 2020
Page 8

| Toni | Notary |
|---|---|
| ██████████ | Assistant |
| | Partner |
| ██████████ | Assistant |
| ██████████ | Assistant |
| ██████████ | Personal Assistant |
| ██████████ | Employee of Family Member |
| ██████████ | Personal Assistant |
| ██████████████ | Planning advisor |
| | Property manager |
| | Managing agent |
| | Asset manager |
| | Asset manager |
| | Asset manager |
| | Designer |
| | Architect and Designer |
| | Architect |
| | Architect |
| | Architect |
| | Contractor |
| | Contractor for Caicos Resorts Limited |
| | Contractor |
| | Contractor |
| | Contractor |
| | Contractor |
| | Contractor |
| | Contractor |
| | Architect and Designer |
| | Contractor |



August 18, 2020
Page 9

| | |
|---|---|
| | Contractor |
| | Contractor |
| | Contractor |
| | Contractor |
| | Contractor |
| | Architect Advisor |
| | Contractor |
| | Employee of Lazilands Farms |
| | Unknown role at Sypscape |
| | Investor at Profounder Capital |
| | "Employee" of unknown company |

As discussed with respect to the categories of third-party documents above, the attorney-client privilege and work product doctrine require confidentiality, among other things, and ordinarily cannot be asserted with respect to documents to which non-clients are party, or that are disclosed to such third parties. *Crawford v. Franklin Credit Mgmt. Corp.*, 261 F.R.D. 34, 43 (S.D.N.Y. 2009) (quoting *Schanfield v. Sojitz Corp. of Am.*, 258 F.R.D. 211, 214-15 (S.D.N.Y. 2009)). Despite our repeated requests, you have provided nothing but insufficient, generic and conclusory assertions regarding the myriad documents on the Side A Log that involve third parties in an effort to show that these documents somehow are shielded from disclosure. All such documents therefore should be produced without further delay.

### Communications Without Counsel

Referencing the Appendix you have included with the Log, as well as numerous known law firms not listed in the Appendix, the Official Committee has identified nearly five thousand emails on the Log without any attorneys in the "to," "from," or "cc" fields. ***This figure represents nearly one-fifth of all email communications listed on the Log***. Roughly half of the non-attorney emails listed on the Log have been withheld entirely on the basis of attorney-client privilege (over two thousand of which include attorney-client privilege as the *only* basis for withholding).

"[T]he attorney-client privilege generally applies only to communications between the attorney and the client . . . ." *Ackert*, 169 F.3d at 139. While it is possible that attorney-client privilege and/or work product protection may protect certain communications despite counsel's absence, the sheer number of such communications withheld by Side A raises red flags. The



**Akin Gump**
STRAUSS HAUER & FELD LLP

August 18, 2020
Page 10

Official Committee requests that you ensure all non-attorney communications are properly being withheld from production.

To that end, the Official Committee notes that in over 150 of the non-attorney "Privilege Withhold" entries, Side A's explanation for the privilege includes an assertion that the communications are "[r]eflecting *an intent* to seek legal advice." (emphasis added). This is not a valid basis for withholding, and all such documents must be produced immediately. *See Duttle v. Bandler & Kass*, 127 F.R.D. 46, 52 (S.D.N.Y. 1989) ("[D]iscussions that anticipate a privileged communication are not themselves privileged. To hold otherwise would expand the attorney-client privilege without limit, since countless communications within an organization could be considered preparatory to seeking legal advice.").

### Communications with the Special Committee

There are a few hundred entries on Side A's Log containing the four current At-Large Directors of PPI's Board—Robert S. "Steve" Miller, Kenneth Buckfire, John S. Dubel, and Michael Cola—who, as you know, also constitute the Special Committee of the Board in connection with restructuring and litigation matters. All of these communications are dated in 2019, *after the Sacklers resigned from the Board*, and your clients therefore cannot claim these documents are subject to the Debtors' privilege, as Alex Lees admitted during our meet and confer call on July 29, 2020. In addition, we understand that the Special Committee was engaged at the time in investigating estate claims *against your clients* relating to the opioid crisis. Consequently, we do not believe your clients and the Special Committee could have shared a "common interest," and we ask that you please produce these documents immediately. If you nevertheless plan to argue that any of these communications are subject to a joint defense or common interest privilege, please immediately identify, in detail, the nature of the supposedly identical legal interest shared by Side A and the Special Committee.

### Crime-Fraud/At Issue

As we previously have advised, the Official Committee is investigating the extent to which the crime-fraud exception applies to documents withheld by the Sacklers as privileged, including by Side A. *See, e.g.*, *In re Grand Jury Subpoena Duces Tecum Dated Sept. 15, 1983*, 731 F.2d 1032, 1039 (2d Cir. 1984) ("[T]here need only be presented a reasonable basis for believing that the objective was fraudulent."); *Amusement Indus. v. Stern*, 293 F.R.D. 420, 427 (S.D.N.Y. 2013) ("the probable cause necessary to sustain the exception is not an overly demanding standard"). The Official Committee has been particularly focused on suspicious transfers out of the Debtors to the ultimate benefit of Sackler family members, including your clients. *See generally* Alix



August 18, 2020
Page 11

Partners's Cash Transfers of Value Analysis [ECF No. 654]; AlixPartners Intercompany and Non-Cash Transfers Analysis (May 28, 2020) [ECF No. 1194]. As the Department of Justice has observed in its July 30 proof of claim, many of these transfers appear to have been made "with the intent to hinder a recovery by creditors or without receiving reasonably equivalent value for these transfers." As such, the Official Committee does not believe any communications with attorneys discussing or effecting such transfers can be withheld on privilege or work product grounds. *Cf. Cendant Corp. v. Shelton*, 246 F.R.D. 401, 405-06 (D. Conn. 2007) (circumstantial evidence established applicability of crime-fraud exception for suspected fraudulent transfers).

The Official Committee is continuing its investigation; however, from its review to date, it believes communications within at least the following categories are subject to production pursuant to the crime-fraud exception.

1.  Transfers made by the Debtors that may be subject to avoidance actions, including but not limited to the transfers identified in the Alix Partners's Cash Transfers of Value Analysis [ECF No. 654] and Intercompany and Non-Cash Transfers Analysis [ECF No. 1194];

2.  Debtors' solvency or insolvency since at least January 1, 2007;

3.  Debtors' attempts to obtain insurance since at least January 1, 2001; and

4.  Calculation of distributions, including tax distributions, since at least January 1, 2001.

The Official Committee reserves its right to add to these categories as its investigation continues, but asks in the meantime that you please advise whether your clients will reconsider their privilege assertions over the categories of documents identified above.

The Official Committee is also entitled to otherwise privileged communications that your clients have put at issue in these proceedings. On December 6, 2019, you provided the Official Committee and others with a "Presentation of Defenses" pursuant to the parties' agreement that your clients would provide a "thorough explanation and analysis of the defenses" that they "intend to make with regard to any and all causes of action that have been or may be . . . brought against them." *See* ECF No. 431-1 ¶ 17(b). In the December 6 presentation, you put Side A's communications with counsel directly at issue both implicitly and explicitly, including by claiming that Side A relied on counsel's advice concerning the legality of their actions.

The Official Committee is entitled to fully evaluate the truth of such statements, including



**Akin Gump**

STRAUSS HAUER & FELD LLP

August 18, 2020
Page 12

any reliance on advice of counsel, by reviewing the underlying attorney communications put at issue by Side A. Accordingly, the Official Committee requests that you produce any such documents. *See, e.g.*, *In re Grand Jury Proceedings*, 219 F.3d 175, 182-83 (2d Cir. 2000) (advice-of-counsel defense is "quintessential example" of at-issue waiver); *United States v. Bilzerian*, 926 F.2d 1285, 1292 (2d Cir. 1991) (defendant implicitly waived privilege when he testified that he thought his actions were legal, putting his knowledge of the law and the basis for his understanding of the law at issue); *Pereira v. United Jersey Bank*, Nos. 94 Civ. 1565, 94 Civ. 1844, 1997 WL 773716, at *4 (S.D.N.Y. Dec. 11, 1997) (privilege may be waived if the holder "makes factual assertions the truth of which can only be assessed by examination of the privileged communication").

If there are no such documents evidencing your clients' supposed reliance on advice of counsel, please confirm that fact to the Official Committee as soon as possible.

**Stuart Baker and Jonathan White**

Side A has withheld or redacted thousands of entries on the Log based on the fact that Stuart Baker (or other lawyers at his firm, Norton Rose) or Jonathan White sent, received, or was copied on the communications. While we understand that each of these individuals is a lawyer, that does not automatically confer privilege status for every item on which he appears. In addition to legal roles with Purdue Pharma Inc., the Board, and Purdue affiliates, Mr. Baker has held many business roles at literally hundreds of Purdue and affiliated entities as well as non-legal positions at numerous Sackler family trusts and Sackler family entities. Similarly, Mr. White is a past member of Purdue Pharma Inc.'s Board, and has served on the Boards of MNP and other Purdue-related and Sackler family trusts, and as a trustee of Sackler trusts. The attorney-client privilege protects legal advice, but not business advice. *In re Grand Jury Subpoena Duces Tecum*, 731 F.2d 1032, 1037 (2d Cir. 1984) ("[T]he privilege is triggered only by a client's request for legal, as contrasted with business, advice.").

The Log entries containing Stuart Baker and Jonathan White do not delineate when they are participating in a communication in their business or legal capacities. The following is only a sample of generic privilege descriptions that have been applied to large numbers of emails including either Mr. Baker or Mr. White:

| Privilege Explanation | Entries with Baker | Entries with White |
|---|---|---|
| Discussing legal advice re: investment/business transactions | Appearing across to/from/cc lines in 46 emails ranging from Mar. 2006 through Mar. 2019 | Appearing across to/from/cc lines in 131 emails ranging from Mar. 2008 through July 2018 |



August 18, 2020
Page 13

| Providing information for purpose of legal advice re: investment/business transactions | Appearing across to/from/cc lines in 53 emails ranging from Nov. 2004 through Jan. 2019 | Appearing across to/from/cc lines in 72 emails ranging from Nov. 2004 through March 2019 |
|---|---|---|
| Requesting legal advice re: investment/business transactions | Appearing across to/from/cc lines in 69 emails ranging from Aug. 2003 through Sept. 2019 | Appearing across to/from/cc lines in 45 emails ranging from Aug. 2003 through July 2019 |
| Requesting and providing legal advice re: investment/business transactions | Appearing across to/from/cc lines in 134 emails ranging from Dec. 2003 through Jan. 2019 | Appearing across to/from/cc lines in 184 emails ranging from July 2006 through July 2019 |
| Providing legal advice re: investment/business transactions | Appearing across to/from/cc lines in 166 emails ranging from June 2004 through Oct. 2017 | Appearing across to/from/cc lines in 141 emails ranging from July 2004 through July 2019 |

These are far from the only examples of generic entries including either Mr. Baker or Mr. White; but as the breadth of these examples illustrate, the Log does not allow the Official Committee to delineate in what capacity Mr. Baker or Mr. White were serving from one entry to the next. At a minimum, the Official Committee requests that you supplement the Log to indicate whether Messrs. Baker and White are participating in communications based on their business or legal capacities for the above generic descriptions. Please note that the Official Committee's review of the Log is ongoing, and the Official Committee continues to reserve its right to challenge specific entries including Messrs. Baker or White.

* * *

Please feel free to contact us if you have any questions or wish to discuss any of the foregoing. As noted above, we ask that you provide the information or documents requested herein no later than **5 p.m. on August 20, 2020**. As you know, we first asked you to amend your log to provide information sufficient to sustain your claims with respect to documents shared with third parties during the parties' initial meet and confer on the logs on July 29, 2020. By now you already should have supplied the additional information requested here, or produced the associated documents if you are unable to supply that information. Moreover, expedited consideration is necessary so that we may raise any unresolved issues with Judge Drain in accordance with the Court's July 23, 2020 admonition that the Official Committee raise "important privilege issues" promptly.



August 18, 2020
Page 14

       The foregoing is not intended to be a comprehensive catalogue of all of the Official Committee's concerns relating to Side A's Log and other positions taken in discovery in these cases, which the Official Committee continues to review.  Nothing herein constitutes a waiver or relinquishment of any of the Official Committee's claims, defenses, rights, or remedies.

                Sincerely,

                */s/ Mitchell Hurley*
                Mitchell P. Hurley


cc:    Marshall Huebner (Davis Polk & Wardwell LLP)
       Ben Kaminetzky (Davis Polk & Wardwell LLP)
       Charles Duggan (Davis Polk & Wardwell LLP)
       James McClammy (Davis Polk & Wardwell LLP)
       Margarita Clarens (Davis Polk & Wardwell LLP)
       Chautney M. Oluwole (Davis Polk & Wardwell LLP)
       Andrew Troop (Pillsbury Winthrop Shaw Pittman LLP)
       Andrew Alfano (Pillsbury Winthrop Shaw Pittman LLP)
       Jason Sharp (Pillsbury Winthrop Shaw Pittman LLP)
       Kenneth H. Eckstein (Kramer Levin Naftalis & Frankel LLP)
       Rachael Ringer (Kramer Levin Naftalis & Frankel LLP)

# EXHIBIT 13



**MITCHELL P. HURLEY**
+1 212.872.1011/fax: +1 212.872.1002
mhurley@akingump.com

August 20, 2020

**VIA E-MAIL**

Alex Lees
Milbank LLP
55 Hudson Yards
New York, NY 10001
Counsel to Sackler Family Side B
(Raymond) ICSPs, ACSPs, and Entities

> Re:   *In re: Purdue Pharma L.P. et al.*, No. 19-23649 (Bankr. S.D.N.Y.)

Dear Alex:

We write concerning additional issues we have identified with respect to Side B's August 5, 2020 revised privilege log and August 7, 2020 privilege log addendum (collectively, the "Logs"). As detailed below, the Logs contain thousands of entries that are invalid on their face, including because they involve third parties and do not appear to be confidential communications for the purpose of obtaining legal advice.

As you know, none of the entries on Side B's Logs identifies "common interest," "joint defense," or "joint engagement" as a basis for withholding other than a comparative handful of entries where individuals affiliated with Davis Polk & Wardwell LLP ("Davis Polk") are listed as a sender or recipient that you added in an addendum to Side B's original log. Instead, the Logs contain a general "note"—which is not tied to any particular entry—that "Claims of attorney-client privilege and work product protection include reliance on common interest, joint defense, and similar doctrines of non-waiver, and all rights with respect to such doctrines are reserved." This blanket assertion of "common interest" is insufficient. Nor does the joint defense agreement you produced on July 31, 2020 or the assertion of categorical common interest in your August 17, 2020 letter suffice to meet your burden of demonstrating specific entries on the Logs as subject to protection under the "common interest" doctrine. And even with regard to the Davis Polk entries, you have failed to supply information sufficient to demonstrate that they are immune from disclosure to the Official Committee despite the presence of third parties on those documents and communications, and despite the Official Committee's repeated requests.

Below we address certain categories of withheld documents that involve third parties or otherwise are not privileged on the face of the Logs, and ask that you please produce all documents within those categories or provide the information necessary to sustain Side B's privilege claims,



August 20, 2020
Page 2

including but not limited to the basis for the assertion of the common interest doctrine with respect to each category, no later than **5 p.m. on August 22, 2020**, so that we may promptly raise any unresolved issues with Judge Drain.[1]

**Accountants**[2]

Over one hundred entries on the Logs include accountants and accounting firm personnel, whose communications generally are not shielded by privilege. *See United States v. Arthur Young & Co.*, 465 U.S. 805, 817 (1984) ("no confidential accountant-client privilege exists under federal law, and no state-created privilege has been recognized in federal cases"). Indeed, it is well settled that where the communication at issue "is not legal advice but only accounting service, or if the advice sought is the accountant's rather than the lawyer's, no privilege exists." *United States v. Kovel*, 296 F.2d 918, 922 (2d Cir. 1961). While many of the communications on the Logs involving accountants/accounting firm personnel also copy counsel, that does not cause privilege to attach. *See Summit Ltd. v. Levy*, 111 F.R.D. 40, 42 (S.D.N.Y. 1986). Rather, absent information demonstrating that the accountant served a function similar to that of a translator by providing essential analysis to assist counsel in the rendition of legal services, *Kovel*, 296 F.2d at 922; *Universal Std. Inc. v. Target Corp.*, 331 F.R.D. 80, 87-88 (S.D.N.Y. 2019), any claim of privilege is vitiated by the presence of the accountant on the document.

Although our review is currently ongoing, so far we have identified the following accounting firms on the Logs: Management Revisions Ltd. and Revinova Treuhand AG. Additionally, Joerg Fischer is identified as an "accountant to [the] Mortimer Sackler Family." Please produce all withheld documents that include accountants and accounting firm personnel, including but not limited to those we have identified here. Alternatively, the Official Committee

---

[1] We will not address again in detail here Side B's improper withholding of thousands of documents that it shared with public relations firms, and instead incorporate by reference our prior correspondence concerning those materials. *See* Aug. 5 and 12, 2020 M. Hurley Ltrs. You are mistaken that the Official Committee somehow is required to challenge your privilege claims on an "entry by entry" basis. We have identified categories of entries on your logs, including the "PR firm" documents and those discussed herein, where Side B's claim of privilege is fatally defective based on the contents of the Logs produced. We demand production of all of those documents immediately. To the extent Side B has information that it claims immunizes particular documents within these categories from disclosure despite the fact that they were disclosed already to third parties, Side B has the burden of coming forward with that information now. If you do not agree to do so, we will raise these issues with the Court.

[2] With respect to the various privilege challenges that have been raised, we assume you contend federal common law applies, as you have not identified any applicable state law with respect to any of the entries in your log, as is required under Local Rule 26.2(a)(1). Please let us know if that is not the case, and if so, which state's law you believe applies and to which issues.



August 20, 2020
Page 3

requests that you amend the Logs or otherwise provide detail sufficient to establish why each such communication is privileged despite the presence of the accountant, such as affidavits or other evidence—not mere conclusory assertions—that the accountant was providing information necessary to render legal advice but that counsel could not have understood without the accountant's specialized analysis. Please also provide the Official Committee with copies of all engagement letters or agreements with these firms, including the dates and subject matter of the engagements. Provision of such agreements is necessary (but not sufficient alone) for your clients to carry their burden of invoking privilege with respect to any of these documents.

### Investment Advisors

Additionally, the Logs include several documents featuring persons or firms identified as investment advisors, including Alex Troy, ▮▮▮▮▮▮▮▮▮▮, Evercore Group L.L.C., ▮▮▮▮▮, and Lori Sackler. The generic privilege descriptions for these documents, including the confusing omnibus "requesting and reflecting request for and provision of legal advice" regarding "legal developments," "the family estate," "potential transactions," and "Purdue structure," do not enable the Official Committee to determine whether such documents are privileged.

As with any third party, communications with investment advisors generally prevents a valid assertion of privilege. *See, e.g.*, *United States v. Ackert*, 169 F.3d 136, 139-40 (2d Cir. 1999) (rejecting privilege claim over communications with investment banker, noting "the attorney-client privilege generally applies only to communications between the attorney and the client"). Exceptions to this general rule have been narrowly cabined to financial or investment advisors providing information *essential* to an attorney's provision of legal advice. It is immaterial that the advisor's expertise was important, or even if it was formative to counsel's ultimate opinion. *See, e.g.*, *Ackert*, 169 F.3d at 139 ("[A] communication between an attorney and a third party does not become shielded by the attorney-client privilege solely because the communication proves important to the attorney's ability to represent the client."); *Export-Import Bank of the U.S. v. Asia Pulp & Paper Co., Ltd.*, 232 F.R.D. 103, 113 (S.D.N.Y. 2005) (counsel's communications with financial consultant plainly not privileged without explanation of why they were essential to attorney's legal advice).

None of the related entries provides information sufficient to carry your clients' burden of showing that these communications were properly withheld. Accordingly, the Official Committee requests that you produce all communications involving third-party investment advisors, including those identified above. Alternatively, we request that Side B amend the Logs or otherwise provide detail sufficient to establish why each such communication is privileged despite the presence of



August 20, 2020
Page 4

these non-lawyer professionals, such as affidavits or other evidence—not mere conclusory assertions. Please also provide the Official Committee with copies of all engagement letters or agreements with these individuals and companies, including the dates and subject matter of the engagements. Provision of such agreements is necessary (but not sufficient alone) for your clients to carry their burden of invoking privilege with respect to any of these documents.

### Other Consultants

The Logs further include dozens of entries involving communications with general third-party "consultants," "consulting firms," a "consulting expert," and a non-lawyer advisor providing "trust and tax counsel to Richard Sackler" (collectively, "Consultants").[3] As with other advisors (e.g., investment advisors discussed above), these Consultants break privilege unless they provide *specialized* services that are *essential* to the attorney's provision of legal advice. *See, e.g., Scott v. Chipotle Mexican Grill, Inc.*, 94 F. Supp. 3d 585, 591-92 (S.D.N.Y. 2015) (report prepared by consultant allegedly referenced by attorneys was not privileged because it offered no specialized knowledge); *Asia Pulp & Paper*, 232 F.R.D. at 113 (counsel's communications with consultant not privileged without explanation of why they were essential to legal advice).

The descriptions Side B has provided on the Logs do not suggest any such essential services provided by the Consultants. Instead, the entries involving the Consultants generally refer to "requesting and reflecting" legal advice regarding "Purdue business structure," "family estate," "litigation strategy," and "settlement of liability." The Official Committee therefore requests that you amend the Logs or otherwise provide detail sufficient to establish why each such document is privileged despite the presence of these non-lawyers, such as affidavits or other evidence—not mere conclusory assertions. Please also provide the Official Committee with copies of all engagement letters or agreements with these Consultants, including the dates and subject matter of the engagements. Provision of such agreements is necessary (but not sufficient alone) for your clients to carry their burden of invoking privilege with respect to any of these documents.

### Co-Investors or Partners

Many entries on the Logs contain persons described as co-investors or partners in connection with various transactions involving the Sackler parties and their related companies. These third parties do not share a privilege with the Sackler parties. *See Obeid v. Mack*, No. 14

---

[3] The Logs identify the Consultants as having roles with Huron Consulting Group, Lake Partners, Purple Strategies, and Ernst & Young. Joseph Valentino is also identified as providing "trust and tax counsel to Richard Sackler."



**Akin Gump**
STRAUSS HAUER & FELD LLP

August 20, 2020
Page 5

Civ. 6498 (LTS) (HBP), 2016 WL 7176653, at *8-9 (S.D.N.Y. Dec. 9, 2016) (finding that
communications containing an equity investor waived the attorney-client privilege because
although plaintiff and the investor shared a financial interest, they had not formed a coordinated
legal strategy and the communications were not for the purpose of developing a common legal
strategy); *JM Vidal, Inc. v. Texdis, USA, Inc.*, No. 08 Civ. 6398(CM)(KNF), 2010 WL 86134, at
*2 (S.D.N.Y. Jan. 8, 2010) (finding that a communication between a paralegal working for
plaintiff's counsel, plaintiff, and a third-party investor that was not made for the purpose of
obtaining legal advice was not protected by attorney-client privilege).  Accordingly, please
produce all withheld communications that include co-investors and partners, including Joseph
Madri, MG Mobiles India PVT Ltd., and Michael Kassen.  If you contend that any of these
communications are subject to a joint defense or common interest privilege, please produce the
relevant joint defense agreements and explain specifically how the withheld communications are
in connection with a coordinated legal strategy rather than merely a shared financial interest.

**Other Third-Party Participants**

In addition to the categories addressed above, Side B's Logs claim attorney-client privilege
and/or work product protection with respect to communications copying various other third-party
participants, including the following:

| Name | Role |
| --- | --- |
| ███████████ | Personal assistant to Michael Sackler |
| | Peter Boer's administrative assistant |
| | Administrative assistant to Jacques Theurillat |
| | Personal assistant to certain M-ACSPs |
| ███████████ | Mortimer Sackler Jr.'s personal administrative assistant |
| Foote & Associates LLP | Counsel to certain R-ICSP investment managers |
| Simpson Thacher & Bartlett LLP | Counsel to PJT Partners LP in bankruptcy; counsel to the Product Liability Advisory Counsel, Inc., in underlying opioid litigation; counsel to Stuart Baker in underlying opioid litigation and bankruptcy |
| Jason Krellman[4] | Personal doctor to Richard Sackler |

---

[4] Only attorney-client—and not physician-patient—privilege is listed as a basis for withhold this document.

PUBLICLY FILED PER STIPULATION [ECF 2140]

UNREDACTED - CONTAINS OUTSIDE PROFESSIONALS' EYES ONLY INFORMATION
TREAT SUBJECT TO PROTECTIVE ORDER



August 20, 2020
Page 6

| Jerry Gliklich[5] | Personal doctor to Richard Sackler |

As discussed with respect to the categories of third-party documents above, the attorney-client privilege and work product doctrine require confidentiality, among other things, and ordinarily cannot be asserted with respect to documents to which non-clients are party, or that are disclosed to such third parties. *Crawford v. Franklin Credit Mgmt. Corp.*, 261 F.R.D. 34, 43 (S.D.N.Y. 2009) (quoting *Schanfield v. Sojitz Corp. of Am.*, 258 F.R.D. 211, 214-15 (S.D.N.Y. 2009)). Despite our repeated requests, you have provided nothing but insufficient, generic and conclusory assertions regarding the myriad documents on the Side B Logs that involve third parties in an effort to show that these documents somehow are shielded from disclosure. All such documents therefore should be produced without further delay.

**Communications Without Counsel**

The Official Committee has identified over 500 entries on the Logs without any attorneys in the "to," "from," or "cc" fields. Over 150 of the non-attorney emails listed on the Logs have been withheld entirely on the sole basis of attorney-client privilege.

"[T]he attorney-client privilege generally applies only to communications between the attorney and the client . . . ." *Ackert*, 169 F.3d at 139. While it is possible that attorney-client privilege and/or work product protection may protect certain communications despite counsel's absence, the numerous entries without attorneys on Side B's log that are described as merely "reflecting" requests and/or provision of legal advice raises red flags. The Official Committee requests that you ensure all non-attorney communications are properly being withheld from production.

**Kathe Sackler Improperly Denoted as a Lawyer**

The Logs contain several entries where Kathe Sackler is using a Debevoise email address, i.e.,                              and you have denoted that email address with an asterisk, purportedly indicating that it belongs to a lawyer. As we understand that Ms. Sackler is not a lawyer and was never employed by Debevoise, please explain why you have denoted that Debevoise email address with an asterisk on the Logs and the basis for withholding these

---

[5] Only attorney-client—and not physician-patient—privilege is listed as a basis for withhold this document.



August 20, 2020
Page 7

communications.

### Communications with the Special Committee

There are a few hundred entries on Side B's Logs containing two of the current At-Large Directors of PPI's Board—Robert S. "Steve" Miller and Kenneth Buckfire—who, as you know, also constitute members the Special Committee of the Board in connection with restructuring and litigation matters. Most of these communications are dated in 2019,[6] *after the Sacklers resigned from the Board*, and your clients therefore cannot claim these documents are subject to the Debtors' privilege, as you admitted during our meet and confer call on July 29, 2020. In addition, we understand that the Special Committee was engaged at the time in investigating estate claims *against your clients* relating to the opioid crisis. Consequently, we do not believe your clients and the Special Committee could have shared a "common interest," and we ask that you please produce these documents immediately. If you nevertheless plan to argue that any of these communications are subject to a joint defense or common interest privilege, please immediately identify, in detail, the nature of the supposedly identical legal interest shared by Side B and the Special Committee.

### Crime-Fraud/At Issue

As we previously have advised, the Official Committee is investigating the extent to which the crime-fraud exception applies to documents withheld by the Sacklers as privileged, including by Side B. *See, e.g.*, *In re Grand Jury Subpoena Duces Tecum Dated Sept. 15, 1983*, 731 F.2d 1032, 1039 (2d Cir. 1984) ("[T]here need only be presented a reasonable basis for believing that the objective was fraudulent."); *Amusement Indus. v. Stern*, 293 F.R.D. 420, 427 (S.D.N.Y. 2013) ("the probable cause necessary to sustain the exception is not an overly demanding standard"). The Official Committee has been particularly focused on suspicious transfers out of the Debtors to the ultimate benefit of Sackler family members, including your clients. *See generally* Alix Partners's Cash Transfers of Value Analysis [ECF No. 654]; AlixPartners Intercompany and Non-Cash Transfers Analysis (May 28, 2020) [ECF No. 1194]. As the Department of Justice has observed in its July 30 proof of claim, many of these transfers appear to have been made "with the intent to hinder a recovery by creditors or without receiving reasonably equivalent value for these transfers." As such, the Official Committee does not believe any communications with attorneys discussing or effecting such transfers can be withheld on privilege or work product grounds. *Cf. Cendant Corp. v. Shelton*, 246 F.R.D. 401, 405-06 (D. Conn. 2007) (circumstantial evidence

---

[6] The entries with an OLK indication, which you have stated do not have reliable metadata, also appear to be from 2019 given the subject matter of the communications.



August 20, 2020
Page 8

established applicability of crime-fraud exception for suspected fraudulent transfers).

The Official Committee is continuing its investigation; however, from its review to date, it believes communications within at least the following categories are subject to production pursuant to the crime-fraud exception.

1. Transfers made by the Debtors that may be subject to avoidance actions, including but not limited to the transfers identified in the Alix Partners's Cash Transfers of Value Analysis [ECF No. 654] and Intercompany and Non-Cash Transfers Analysis [ECF No. 1194];

2. Debtors' solvency or insolvency since at least January 1, 2007;

3. Debtors' attempts to obtain insurance since at least January 1, 2001; and

4. Calculation of distributions, including tax distributions, since at least January 1, 2001.

The Official Committee reserves its right to add to these categories as its investigation continues, but asks in the meantime that you please advise whether your clients will reconsider their privilege assertions over the categories of documents identified above.

The Official Committee is also entitled to otherwise privileged communications that your clients have put at issue in these proceedings. On December 6, 2019, you provided the Official Committee and others with a "Presentation of Defenses" pursuant to the parties' agreement that your clients would provide a "thorough explanation and analysis of the defenses" that they "intend to make with regard to any and all causes of action that have been or may be . . . brought against them." *See* ECF No. 431-1 ¶ 17(b). In the December 6 presentation, you put Side B's communications with counsel directly at issue both implicitly and explicitly, including by claiming that Side B relied on counsel's advice concerning the legality of their actions. You even followed up with a request to make Side B's December 6 presentation public, noting that the presentation reflected the positions Side B intended to take in the face of any adverse claims. See ECF No. 682, 685. While we understand the request to make public was subsequently withdrawn, we do not have any reason to believe Side B's position has changed with respect to its asserted defenses.

The Official Committee is entitled to fully evaluate the truth of such statements, including any reliance on advice of counsel, by reviewing the underlying attorney communications put at issue by Side B. Accordingly, the Official Committee requests that you produce any such documents. *See, e.g.*, *In re Grand Jury Proceedings*, 219 F.3d 175, 182-83 (2d Cir. 2000) (advice-



**Akin Gump**

STRAUSS HAUER & FELD LLP

August 20, 2020
Page 9

of-counsel defense is "quintessential example" of at-issue waiver); *United States v. Bilzerian*, 926 F.2d 1285, 1292 (2d Cir. 1991) (defendant implicitly waived privilege when he testified that he thought his actions were legal, putting his knowledge of the law and the basis for his understanding of the law at issue); *Pereira v. United Jersey Bank*, Nos. 94 Civ. 1565, 94 Civ. 1844, 1997 WL 773716, at \*4 (S.D.N.Y. Dec. 11, 1997) (privilege may be waived if the holder "makes factual assertions the truth of which can only be assessed by examination of the privileged communication").

If there are no such documents evidencing your clients' supposed reliance on advice of counsel, please confirm that fact to the Official Committee as soon as possible.

**Stuart Baker and Jonathan White**

Side B has withheld or redacted thousands of entries on the Logs based on the fact that Stuart Baker or Jonathan White sent, received, or was copied on the communications. While we understand that each of these individuals is a lawyer, that does not automatically confer privilege status for every item on which he appears. In addition to legal roles with Purdue Pharma Inc., the Board, and Purdue affiliates, Mr. Baker has held many business roles at literally hundreds of Purdue and affiliated entities as well as non-legal positions at numerous Sackler family trusts and Sackler family entities. Similarly, Mr. White is a past member of Purdue Pharma Inc.'s Board, and has served on the Boards of MNP and other Purdue-related and Sackler family trusts, and as a trustee of Sackler trusts. The attorney-client privilege protects legal advice, but not business advice. *In re Grand Jury Subpoena Duces Tecum*, 731 F.2d 1032, 1037 (2d Cir. 1984) ("[T]he privilege is triggered only by a client's request for legal, as contrasted with business, advice.").

The Logs entries containing Stuart Baker and Jonathan White do not delineate when they are participating in a communication in their business or legal capacities. The following is only a sample of generic privilege descriptions that have been applied to large numbers of emails including either Mr. Baker or Mr. White:

| Privilege Explanation | Entries with Baker |
| --- | --- |
| Confidential communication requesting and reflecting request for and provision of legal advice regarding litigation strategy. | 305 |
| Confidential communication requesting and reflecting provision of legal advice regarding Purdue business structure. | 189 |
| Confidential communication requesting and reflecting request for and provision of legal advice regarding Purdue business structure. | 158 |



August 20, 2020
Page 10

| Privilege Explanation | Entries with White |
| --- | --- |
| Confidential communication requesting and reflecting request for and provision of legal advice regarding litigation strategy. | 43 |

These are far from the only examples of generic entries including either Mr. Baker or Mr. White; but as the breadth of these examples illustrate, the Logs do not allow the Official Committee to delineate in what capacity Mr. Baker or Mr. White was serving from one entry to the next. Indeed, even where Mr. Baker or Mr. White was serving as an attorney, the Official Committee cannot discern from the Logs whether Messrs. Baker or White were serving as attorneys to Side B or Side A (in which case the communications could only avoid waiver under common interest or work product doctrine).

At a minimum, the Official Committee requests that you supplement the Logs to indicate whether Messrs. Baker and White are participating in communications based on their business or legal capacities for the above generic descriptions, and if serving in a legal capacity, whether they are representing Side B or Side A Sacklers. Please note that the Official Committee's review of the Logs is ongoing, and the Official Committee continues to reserve its right to challenge specific entries including Messrs. Baker or White.

\* \* \*

Please contact us if you have any questions or want to discuss any of the foregoing. As noted above, we ask that you provide the information or documents requested herein no later than **5 p.m. on August 22, 2020**. As you know, we first asked you to amend your log to provide information sufficient to sustain your claims with respect to documents shared with third parties during the parties' initial meet and confer on the logs on July 29, 2020. By now you already should have supplied the additional information requested here, or produced the associated documents if you are unable to supply that information. Moreover, expedited consideration is necessary so that we may raise any unresolved issues with Judge Drain in accordance with the Court's July 23, 2020 admonition that the Official Committee raise "important privilege issues" promptly.

The foregoing is not intended to be a comprehensive catalogue of all of the Official Committee's concerns relating to Side B's Logs and other positions taken in discovery in these cases, which the Official Committee continues to review. Nothing herein constitutes a waiver or relinquishment of any of the Official Committee's claims, defenses, rights, or remedies.



August 20, 2020
Page 11

Sincerely,

*/s/ Mitchell Hurley*
Mitchell P. Hurley

cc:    Marshall Huebner (Davis Polk & Wardwell LLP)
       Ben Kaminetzky (Davis Polk & Wardwell LLP)
       Charles Duggan (Davis Polk & Wardwell LLP)
       James McClammy (Davis Polk & Wardwell LLP)
       Margarita Clarens (Davis Polk & Wardwell LLP)
       Chautney M. Oluwole (Davis Polk & Wardwell LLP)
       Andrew Troop (Pillsbury Winthrop Shaw Pittman LLP)
       Andrew Alfano (Pillsbury Winthrop Shaw Pittman LLP)
       Jason Sharp (Pillsbury Winthrop Shaw Pittman LLP)
       Kenneth H. Eckstein (Kramer Levin Naftalis & Frankel LLP)
       Rachael Ringer (Kramer Levin Naftalis & Frankel LLP)

# EXHIBIT 14



# Milbank

**ALEXANDER B. LEES**
*Partner*
55 Hudson Yards | New York, NY 10001-2163
T: 212.530.5161
alees@milbank.com | milbank.com

August 22, 2020

**VIA EMAIL**

Mitchell P. Hurley
Akin Gump Strauss Hauer & Feld LLP
One Bryant Park
New York, NY 10036

Re:     In re Purdue Pharma L.P., No. 19-23649 (Bankr. S.D.N.Y.)

Dear Mitch:

I write in response to your letter of August 21 (misdated August 20) regarding the Raymond-side privilege log.

Your complaints about the privilege log to date, with only a few exceptions (*e.g.*, communications involving Davis Polk), have been general and abstract, without reference to specific documents or discrete categories of documents. We have had to ask you on multiple occasions to take a more targeted, particularized approach. We continue to disagree with your sweeping, inaccurate, and unnecessary statements regarding the adequacy of the privilege log as a whole; but we appreciate that the UCC has now decided to engage more productively by raising narrower categories of issues so that we can have more meaningful and concrete dialogue. Since the categories of concerns in your August 21 letter relate to relatively few entries on our privilege log (albeit still without identifying specific documents and control numbers), we are endeavoring in this letter to provide responses with respect to specific documents wherever possible. We expect that this letter, and the additional information we are agreeing to give you, will resolve many of your concerns. Should any issues regarding the privilege log have to be raised with the Court, however, we expect that you will follow the procedure agreed-upon and so-ordered in our discovery stipulation.

Accountants

We disagree with the portion of your letter regarding accountants. As the cases you cite acknowledge, an accountant may be within the scope of attorney-client privilege where the accountant is necessary to the provision of legal advice. *See, e.g.*, *United States v. Kovel*, 296 F.2d 918 (2d Cir. 1961). Moreover, as we have noted in earlier correspondence, including a non-

MILBANK LLP

NEW YORK | LOS ANGELES | WASHINGTON, D.C. | SÃO PAULO | FRANKFURT
LONDON | MUNICH | BEIJING | HONG KONG | SEOUL | SINGAPORE | TOKYO

PUBLICLY FILED PER STIPULATION [ECF 2140]

Mitchell P. Hurley
August 22, 2020                                                                                                    **Page 2**

lawyer on a communication exempt from disclosure under the work-product doctrine does not vitiate the protection. *See* August 7 Letter at 4-5 (citing *United States v. Nobles,* 422 U.S. 225, 238–39 (1975)). The question for purposes of waiver is whether disclosure to the non-lawyer increased the likelihood that the disclosing party's adversary would gain access to the work product. *N.Y. Times Co. v. United States DOJ,* 939 F.3d 479, 494 (2d Cir. 2019). Where, as here, the answer is *no*, there is no waiver. Each of the descriptions in the log entries reflecting the presence of accountant parties you identify states that the communication involved the request for, or provision of, legal advice or work product. We are not required to further describe – or "prove" via extrinsic evidence, as you demand – the specific role of the accountants with respect to these communications. And nowhere in your letter do you provide any basis for disputing that these accountants were necessary to facilitate the provision of legal advice. The entire basis for your demand appears to be that it is theoretically possible that the accountants you identified could break confidentiality. That is not sufficient.

Nevertheless, as a show of good faith, we will conduct another review of the communications on our privilege log to which Management Revisions Ltd. was a party. We will produce any of these documents that we conclude are not privileged.

As disclosed in the "List of Individuals and Entities Appearing on July 22, 2020 Privilege Log" (the "Description of Individuals/Entities"),[1] the other two accountants identified in your letter – Revinova Treuhand AG and Joerg Fischer – are associated with Side A, the IACs and II-way entities, with whom our clients have common interests. We further note that all of the entries on our privilege log with an @revinova.ch email handle are associated with Joerg Fischer, who is an IAC director. *See* Description of Individuals/Entities. We have re-reviewed the documents at issue, and in all instances Mr. Fisher appears to be copied on these communications in his role as a director rather than as an accountant, and it is our understanding that the presence of Mr. Fischer on the documents does not break the privilege. As a show of good faith, we will promptly provide the documents on our privilege log involving Mr. Fischer to counsel for the IACs to confirm this understanding. To the extent that counsel for the IACs informs us that these communications are not privileged as a result of Mr. Fischer's inclusion, we will produce them. Otherwise, please direct further questions regarding privilege issues as it relates to Revinova and Mr. Fischer to counsel for the IACs.

<u>Investment Advisors</u>

The cases you cite in your letter regarding investment advisors are fact-specific applications of privilege principles and do not support your sweeping assertion that "communications with investment advisors generally prevents a valid assertion of privilege." *See U.S. v. Ackert,* 169 F.3d 136 (2d Cir. 1999) (recognizing *Kovel* but finding it had "no application to this case"); *Export-Import Bank of the U.S. v. Asia Pulp & Paper Co., Ltd.,* 232 F.R.D. 103,

---

[1] *See* Attach. to August 17 email from D. White.

Mitchell P. Hurley
August 22, 2020                                                                Page 3

113 (S.D.N.Y. 2005) (rejecting application of *Kovel* based on company's own description of financial advisor; stating that the "functional equivalent" doctrine presented a "closer question" and considering the details of the engagement). On the contrary, "[m]any courts have recognized than, in today's market place, attorneys need to be able to have confidential communications with investment bankers to render adequate legal advice." *Stafford Trading, Inc. v. Lovely*, 2007 U.S. Dist. LEXIS 13062, at \*19-20 (N.D. Ill. Feb. 22, 2007); *accord Crane Sec. Techs., Inc. v. Rolling Optics, AB*, 230 F. Supp. 3d 10, 24 (D. Mass 2017) (attorney communications with investment banker privileged); *Calvin Klein Trademark Trust v. Wachner*, 124 F. Supp. 2d 207, 209 (S.D.N.Y. 2000) (Rakoff, J.), (attorney communications with banker privileged because banker, functioning as an expert, advised attorney regarding whether certain information was "material" in legal sense, and so was serving "an interpretive function" for attorney). Moreover, the exception to the waiver doctrine with respect to investment advisors is not as narrow as you assert. Aug. 21 Hurley Let. at 3 (stating without citation that an investment advisor must be "*essential*" to an attorney's provisions of legal advice). The presence of third parties does not "negate[] eligibility for protection from disclosure" where the communication is with a financial advisor and intended to "*facilitate* the provision of legal service by the attorney to the client." *In re FiberMark, Inc.*, 330 B.R. 480, 499 (Bankr. D. Vt. 2005) (emphasis added) (finding communications "between Akin Gump and the Committee includ[ing] the Committee's financial advisor" to be privileged where it was "demonstrated that the communication was intended to facilitate the provision of legal service by the attorney to the client"). Moreover, many of the documents on our privilege log involving investment advisors were withheld under the work product doctrine, and therefore inclusion of an investment advisor would not waive the protection. *See supra.*

We have reviewed the communications on our privilege log involving Alex Troy, ███████████████ Evercore Group L.L.C., ██████████████ and Lori Sackler. While we disagree with your sweeping assertions regarding privilege as applied to communications with investment advisors, we have determined that PS-00024728, PS-00700128, PS-00696254, and RS0852774 are not privileged for other reasons. We will produce these documents with our next production.

We have re-reviewed the remaining documents on our privilege log involving Alex Troy, ███████████████████████████ and Michael Kassen, and we continue to believe that these documents are protected from disclosure. ██████████████████████████ is a trustee to Raymond-side trusts and was acting in that capacity in communications reflected on our privilege log that we have determined not to produce. We will provide a revised Description of Individuals/Entities that includes this fact. Entries involving Michael Kassen similarly reflect communications where Mr. Kassen acted in his role as an officer of MCM Fiduciary Management LLC, a trustee for Raymond-side trusts.

Other investment advisor documents on our privilege log involve complex financial transactions to which ████████ as well as Alex Troy and ████████ provided advice

Mitchell P. Hurley
August 22, 2020                                                                 Page 4

alongside legal counsel. Alex Troy in particular has worked closely for years with the family
entity Kokino LLC in relation to the Sackler family's financial and investment transactions. In
the documents at issue, his inclusion on the communications facilitated the provision of legal
advice.

        The other investment advisor identified in your letter, Evercore Group LLC, is an
advisory firm engaged by IACs. It is our understanding that Evercore provides litigation support
and expert services, and therefore its presence on the withheld documents does not break
confidentiality. We will promptly provide the documents involving Evercore on our privilege log
to counsel for the IACs to confirm this understanding. To the extent that counsel for the IACs
informs us that these communications are not privileged as a result of Evercore's inclusion, we
will produce these documents promptly. Otherwise, please direct further questions regarding
privilege issues as they relate to Evercore to counsel for the IACs.

Other Consultants

        Your letter takes issue with "dozens" of entries – out of nearly 15,000 – reflecting
communications involving Huron Consulting Group, Lake Partners, Purple Strategies, Ernst &
Young, and Joseph Valentino. We disagree with your assertions that these parties necessarily
break privilege. After review, however, we believe the documents to which Ernst & Young is a
party are not privileged for other reasons. We will produce these documents with our next
production.[2]

        We continue to assert that the documents involving Huron and Lake Partners are
privileged. Huron and Lake Partners are experts and litigation consultants engaged by counsel
for the Raymond side that are necessary to the provision of legal advice, and thus are within the
scope of attorney-client privilege and work product doctrine. (Huron also provides similar
services to the Mortimer Sackler family, with which our clients share a common interest). The
UCC is quite familiar with Huron's role through our various presentations, including those
provided on January 15 and August 13. The Raymond-side engagement letters for Huron and
Lake Partners, which are Bates stamped RSF00745233 through RSF00745241, are being
provided herewith. We expect that this will resolve any outstanding questions regarding
communications with these firms.

        In your letter, you also identify Joseph Valentino as a "non-lawyer advisor providing
'trust and tax counsel to Richard Sackler.'" But as our privilege log denotes, Mr. Valentino is a
lawyer. Your assertion that Mr. Valentino's presence on communications could somehow waive
privilege is therefore incorrect.

        The other consultant identified in your letter, Purple Strategies, is a consulting firm

---

[2] PS-01163388, PS-01163441, PS-01163386, and PS-01163446.

Mitchell P. Hurley
August 22, 2020                                                                    Page 5

engaged by the Debtors. It is our understanding that the presence of Purple Strategies on the documents we withheld as privileged does not break confidentiality. We will promptly provide the documents involving Purple Strategies on our privilege log to counsel for the Debtors to confirm this understanding. To the extent that counsel for the Debtors informs us that these communications are not privileged as a result of the inclusion of Purple Strategies, we will produce these documents. Otherwise, please direct further questions regarding privilege issues at it relates to Purple Strategies to counsel for the Debtors.

<u>Co-Investors or Partners</u>

The cases that you cite on the subject of co-investors or partners again are fact-specific applications of privilege principles and do not stand for the sweeping proposition that such parties can never share a privilege or common legal interest with a client. You have no basis, therefore, to seek production, without limitation, of "all withheld communications that include co-investors and partners."

With respect to communications involving Joseph Madri and Michael Kassen, we have re-reviewed the documents involving these individuals and confirmed that most of these documents were properly withheld. Joseph Madri and Mundipharma shared a common interest with respect to a proposed transaction between Madri and Mundipharma, on one hand, and Yale University, on the other. As referenced above, the communications on our privilege log involving Michael Kassen are in his capacity as a trustee to Raymond-side trusts, not as a co-investor, and we have confirmed that these communications are privileged with the exception of PS-00142096, which we have determined is not privileged for other reasons. We will produce this document with our next production.

The single document on our privilege log involving MG Mobiles India PVT Ltd. is a three-page email that was produced with three lines of text redacted. After further reflection, we have determined that the redacted portion is not privileged. We will produce an unredacted version of this document with our next production.

<u>Other Third-Party Participants</u>

Your letter demands that we produce "without delay" communications involving five administrative assistants, two doctors, and two law firms, based on nothing more than your characterization of these individuals and entities as "third parties." We reject your demand.

The five administrative assistants serve members of the Sackler family or directors of the Debtors or MNP Consulting Limited. It is well recognized that an administrative assistant does not waive privilege with respect to communications intended for the individual he or she is assisting. *See, e.g.*, *In re Adelphia Commc'ns Corp.*, 2005 WL 425498 at *8 (S.D.N.Y. Feb.16, 2005) (receipt of privileged email by secretary for purpose of passing it along to intended

Mitchell P. Hurley
August 22, 2020

Page 6

recipient did not waive privilege); *Abbott Labs. v. Airco, Inc.*, 1985 WL 3596 at *4 (N.D. Ill. Nov.4, 1985) ("A recognized exception to the rule that the communication must be directly between the client and attorney is for ministerial agents of the attorney (such as clerks, secretaries and stenographers) or of the client who facilitate transmission of the communication."). The presence of administrative assistants on the communications you identify does not waive any privilege.

Jason Krellman and Jerry Gliklich are Richard Sackler's personal physicians. They appear on one document on our privilege log, dated February 12, 2019, which was withheld on the basis of attorney-client privilege. As our privilege log indicates, a Paul Weiss attorney (counsel to Richard Sackler and others) was also a recipient of this document. The document facilitated communication between counsel and these doctors to assist Richard Sackler's attorneys in the course of their legal representation. Specifically, this was a communication in advance of Richard Sackler's March 7 and 8, 2019, deposition in the Multi-District Litigation; it was necessary for Dr. Sackler's attorneys to consult with his doctors in order to understand his medical condition and the implications it might have for his testimony. *See* Transcript of March 7, 2019 Deposition of Richard Sackler at 19:7-9 (statement by counsel for Richard Sackler).[3] The presence of Jason Krellman and Jerry Gliklich on the withheld document therefore does not break confidentiality. We also will be revising our privilege log to reflect that the document is being withheld under the work product doctrine, as well as the attorney-client privilege.

Simpson Thacher is counsel to Stuart Baker in underlying opioid litigation and this bankruptcy. Stuart Baker, as you know, was longtime counsel to the Sackler families, Debtors, IACs, and II-Ways, among others. Simpson Thacher is also counsel to PJT Partners LP in this bankruptcy. All seven of the documents on our privilege log to which Simpson Thacher is a party are from 2019 and concern the joint defense of parties sued in connection with opioid litigation. The presence of Simpson Thacher does not waive the privileged nature of these documents.

Finally, Foote & Associates LLP represented Jonathan Sackler and Pocobay in connection with a loan, and each of the withheld documents on which it appears concerned legal advice in connection with that transaction. These documents were appropriately withheld.

Communications without Counsel

Your letter states that you have "identified over 500 entries on the Logs without any attorneys in the 'to,' 'from,' or 'cc' fields" and that "150 of the non-attorney emails listed on the Logs have been withheld entirely on the sole basis of attorney-client privilege." Although you acknowledge that it is "possible that attorney-client privilege and/or work product protection

---

[3] Available at RSF00169537.

Mitchell P. Hurley
August 22, 2020                                                                              Page 7

may protect certain communications despite counsel's absence," you assert without any basis or explanation that these documents "raise[] red flags." We disagree.

We have searched the population of documents referenced by the UCC and have identified approximately 536 such documents. The majority of these documents – nearly 300 – bear a production number, indicating that they were produced with redactions. Most of them are email chains that reflect redacted communications involving attorneys or consultants engaged by attorneys to assist with the legal representation of the Sackler family. Approximately 154 of the 536 documents do not have any production bates numbers (and therefore were fully withheld) and are designated as "AC Privileged." But the descriptions associated with 150 of these documents denote the name of the specific attorneys giving rise to our claim of privilege over each document. *See, e.g.*, Privilege ID No. RS0878500 ("Confidential communication requesting and reflecting provision of legal advice of Mara Leventhal* regarding litigation strategy."). You therefore have enough information about these documents to know that a specific lawyer's legal advice was implicated, and that the documents were properly withheld. We have re-reviewed the other 4 documents. We will be producing one of these documents (PS-01003509). The other three documents involve attorney-client communications or work product prepared specifically for review by an attorney. We will revise the entries pertaining to these other three documents to further explain our basis for withholding them. This should be sufficient to dispel any "red flags" you think are raised.

<u>Kathe Sackler</u>

Because of the inclusion of "Debevoise" in an email handle for Kathe Sackler, we erroneously added an asterisk to her name on the privilege log. We agree that Kathe Sackler is not an attorney, and we confirm that we did not rely on an assumption that she was an attorney in making our privilege assertions. When we produce an amended privilege log reflecting the other changes reflected in this letter, we will correct this administrative error and remove the asterisk from Ms. Sackler's name.

<u>Communications with Special Committee</u>

Your assertion about privilege log entries with Steve Miller and Kenneth Buckfire is misplaced. Messrs. Miller and Buckfire, as you acknowledge, are members of the PPI board. It should be obvious, therefore, that they serve PPI in various matters that are separate from the Special Committee, which represents just a subset of their board duties. There is also abundant case law holding that a common interest can exist between parties on some subjects, even when those parties do not share a common interest on other subjects. Thus, the common interest doctrine "applies where the interests of the parties are not identical, and it applies even where the parties' interests are adverse in substantial respects. The privilege applies even where a lawsuit is foreseeable in the future between co-defendants." *In re Tribune Co.*, 2011 WL 386827, at *4 (Bankr. D. Del. Feb. 3, 2011) (quoting *In re Mortg. & Realty Tr.*, 212 B.R. 649, 653 (Bankr.

Mitchell P. Hurley
August 22, 2020                                                                    Page 8

C.D. Cal. 1997)). "When the interests of the parties diverge to some extent the common interest doctrine applies only insofar as their interests are in fact identical; communications relating to matters as to which they hold opposing interests lose any privilege." *Id.* (quoting *In re Rivastigmine Patent Litig.*, 2005 WL 2319005, at *4 (S.D.N.Y. Sept. 22, 2005) (alterations and quotation marks omitted)).

Had communications occurred between our clients and Messrs. Miller and Buckfire concerning matters as to which Purdue and our clients were adverse, we would not have withheld them. The documents we did withhold, however, concerned matters as to which Purdue and our clients *did* hold a common interest – most notably, opioid litigation in which Purdue and our clients were sued jointly on the same facts and legal theories, and in which they coordinated on a joint defense.[4] Our claims of privilege in this regard are proper.

Crime-Fraud

We do not intend to withdraw privilege assertions with respect to documents on our log, if any, addressing the topics listed on page 8 of your letter. Your assertion that Purdue's distributions "may be subject to avoidance actions" is pure speculation. You have come forward with no evidence whatsoever to support any avoidance theory, nor is there any. The only thing you cite in your letter is a proof of claim submitted by the U.S. government in Purdue's bankruptcy case. A proof of claim, of course, is just a pleading. It contains no evidence, but merely recites a series of allegations – in this case, bare, unproven, and conclusory ones. This does not satisfy your burden. *In re Caesars Entm't Operating Co., Inc.*, 2016 WL 7477566, at *2 (Bankr. N.D. Ill. Sept. 21, 2016) (rejecting invocation of crime-fraud exception where official committee relied on adversary proceeding complaint: "A complaint is in any event simply a set of allegations; it establishes no facts."). For the *facts* on this subject, we direct you to our presentation of December 6, 2019, in which we laid out in meticulous detail (over the course of dozens of slides) why there is no evidentiary basis for avoidance claims here.

Not only have you failed to come forward with any evidence that Purdue engaged in voidable transfers, but you also have not satisfied your burden of showing that any legal advice reflected on our privilege log was given for the specific purpose of "concealing or facilitating" a fraud on Purdue's creditors, which is necessary to trigger application of the crime-fraud exception. *E.g.*, *In re Fin. Oversight & Mgmt. Bd. for Puerto Rico*, 392 F. Supp. 3d 244, 257–58 (D.P.R. 2019) (quoting *In re Grand Jury Proceedings*, 417 F.3d 18, 22 (1st Cir. 2005)). We likewise fail to see what several of the topics on page 8 of your letter – including legal advice about insurance coverage and the calculation of taxes – have to do with any purported application of the crime-fraud exception.

---

[4] The sole exception is a privileged communication during which Richard, Jonathan, and David Sackler were still members of the PPI board. *See* PS-00079748.

Mitchell P. Hurley
August 22, 2020

Page 9

Furthermore, and in any event, we do not agree that any legal communication concerning a transfer, even assuming it were subject to avoidance, must be produced because it was necessarily tainted by "fraud." As the Official Commentary to the Uniform Voidable Transfers Act (the most up-to-date model statute on the subject of avoidance law) makes clear, referring to voidable transfers as "fraudulent," although "sanctioned by historical usage" is "misleading." UVTA § 15, cmt. 1. This is because "[f]raud is not a necessary element of a claim for relief," even when the claim is based on the debtor's "actual intent" to "hinder, delay, or defraud." UVTA § 4, cmt. 8. Rather, the phrase "'[h]inder, delay, or defraud' is best considered to be a single term of art describing a transaction that unacceptably contravenes norms of creditors' rights. Such a transaction need not bear any resemblance to common-law fraud." *Id.*; *see also Caesars*, 2016 WL 7477566, at *3 ("'[F]raudulent transfer' is an umbrella term for a variety of claims, some of which involve fraud in the usual sense and some of which do not."). So where an avoidance claim is premised on something other than a debtor's intent to commit a fraud in the common-law sense of "deception," the crime-fraud exception does not apply. *See Caesars*, 2016 WL 7477566, at *3 (official committee failed to establish *prima facie* application of crime-fraud exception where avoidance claims were based on allegations of an intent to "hinder" or "delay" creditors); *Puerto Rico*, 392 F. Supp. 3d at 258 (crime-fraud exception did not apply in the context of alleged fraudulent transfers where there had been no "prima face showing of criminal or deceptive activity"). Once again, you have come forward with no facts suggesting that any of Purdue's transfers were made with an intent to deceive or conceal. That you have failed to reference even a single supportive fact in your letter, after months of discovery, which involved the production of millions of documents, speaks volumes.

<u>At-Issue Waiver</u>

We likewise reject your contention that our presentation of December 6 effectuated an at-issue waiver of privilege. Contrary to the assertions on page 8 of your letter, the presentation nowhere "claim[ed] that Side B relied on counsel's advice concerning the legality of their actions." The presentation explicitly quoted, displayed, and cited non-privileged documents that had previously been produced by Purdue in the MDL and other litigations.

"The key to a finding of implied waiver is some showing by the party arguing for a waiver that the opposing party relies on the privileged communication as a claim or defense or as an element of a claim or defense." *In re Cty. of Erie*, 546 F.3d 222, 228 (2d Cir. 2008). The *Erie* Court held that "a party must *rely* on privileged advice from his counsel to make his claim or defense." *Id.* at 229 (emphasis in original). The court reasoned that a party's mere assertion of lawful behavior on its part does not place underlying advice of counsel as to lawfulness at issue. ("They [the defendants] maintain only that their actions were lawful. . . . [A]ny legal advice rendered by the County Attorney's Office is irrelevant to any defense so far raised by Petitioners.").

Mitchell P. Hurley
August 22, 2020                                                                                    Page 10

     This emphatically demonstrates that there was no waiver here. The December 6 presentation showed that the PPI board members were repeatedly advised – in countless non-privileged documents previously produced by the Debtors – that Purdue was in compliance with its legal obligations. The presentation documented the basis for all its statements with voluminous quotations to and citations of non-privileged documents that had been produced in discovery. For example, the December 6 presentation proved that:

- PPI's board received detailed quarterly reports from Purdue's Compliance Department confirming that Purdue's operations were in compliance with law from 2007 through 2018, when the last Side B director left the board. *See* Slides 35, 36 (and cited documents). Compliance Department communications are not privileged. *See, e.g.*, *Adams v. Teck Cominco Alaska, Inc.*, 232 F.R.D. 341, 344 (D. Alaska 2005) (report regarding regulatory compliance and non-compliance not privileged because the report was not prepared "for the purpose of obtaining legal advice").

- PPI's board received for five years certifications by the Office of Inspector General of Health and Human Services that Purdue was operating in compliance with the Corporate Integrity Agreement (*see* Slide 33 (and cited documents)), which required compliance with law.

- PPI's board knew that Purdue implemented multiple compliance tools to ensure accurate marketing. *See* Slide 37 (and cited documents).

- PPI's board understood that Purdue had operating procedures to ensure that all written marketing materials were reviewed by the Legal, Medical Services, and Regulatory Affairs Departments. *See* Slide 37-38 (and cited document).

- PPI's board understood that the salesforce was not allowed to deviate from approved materials. *See* Slide 39 (and cited document).

- PPI's board was informed that employees were extensively trained on compliance. *See* Slide 40 (and cited document).

- PPI's board was informed that Purdue audited potential areas of legal risk. *See* Slide 41 (and cited document).

- PPI's board was informed that that all compliance issues were reported and remediated, including by termination if the violation was significant. *See* Slides 42, 44 (and cited documents).

- PPI's board was informed that most compliance violations were minor. *See* Slide 43 (and cited documents).

Mitchell P. Hurley
August 22, 2020                                                                    Page 11

- PPI's board was informed that Purdue regularly updated its compliance procedures to meet regulatory requirements. *See* Slides 45, 46 (and cited documents).

- PPI's board was informed that Purdue constantly monitored for violations. *See* Slide 47 (and cited document).

- PPI's board was informed that the Speaker Program was carefully monitored to avoid violations. *See* Slides 48-49 (and cited document).

- PPI's board was informed that an audit showed that prescribing was not influenced by consulting payments to prescribers. *See* Slide 50 (and cited document).

- PPI's board knew that Purdue submitted all promotional material to the FDA, which had not issued a letter to Purdue taking issue with any of its promotional material since 2003. *See* Slides 54-57 (and cited documentation).

- PPI's board was informed that Purdue had in place robust anti-diversion efforts, which were reviewed by many governmental entities. *See* Slides 105-108 (and cited documents).

- PPI's board was repeatedly informed that Purdue focused on preventing diversion. *See* Slides 114, 116 (and cited documents).

- PPI's board was informed that Purdue's anti-diversion efforts met DEA requirements. *See* Slide 119 (and cited document).

- PPI's board was informed that Purdue audited its Abuse and Diversion Detection ("ADD") Program. *See* Slides 115 (and cited document).

- PPI's board was informed that an auditor approved by the New York Attorney General (a former federal prosecutor) investigated the ADD Program and endorsed Purdue's implementation of it. *See* Slide 130 (and cited document).

- PPI's board was advised that Purdue's Compliance Council reviewed the ADD Program. *See* Slide 117 (and cited document).

- PPI's board was informed that Purdue annually certified compliance with ADD Program reporting requirements to consent judgment states for three years. *See* Slides at 109-111 (and cited documents). *See generally* December 6 Presentation at Slides 52 and 98.

The purpose of the compliance communications that the board received was to inform the directors regarding the operations of Purdue and the company's satisfaction of regulatory requirements, not to convey legal advice. Our citation to those non-privileged documents, **which the Debtors had produced in litigation**, did not put at issue any privileged communications.

Mitchell P. Hurley
August 22, 2020                                                                                    Page 12

You can evaluate the non-privileged documents cited in our presentation by looking at them –
and at the many other non-privileged communications sent to the board confirming that Purdue
was operating in compliance with law.

Your assertion that the presentation "impliedly" put privileged communications at issue
is baseless. Explicit reliance on non-privileged materials does not "impliedly" put privileged
communications at issue. Under Second Circuit law, simply because privileged information may
be relevant to a claim or defense does not give rise to an implied waiver. Rather, to waive
privilege, "the party must rely on privileged advice from his counsel to make his claim or
defense." *Erie*, 546 F.3d at 229. That did not happen on December 6.

Moreover, to the extent you contend there was some kind of waiver because of the
materials cited and displayed in the December 6 presentation, your arguments should be directed
to the Debtors. The PPI's directors' defense as articulated on December 6 was that the directors
were repeatedly informed that Purdue was operating in compliance with law, and it was
exclusively based on non-privileged documents that Purdue had produced in litigation without
asserting any claim of privilege. Debtors' counsel was present at the December 6 presentation
and, appropriately, expressed no concern about privilege being breached. It was not. And our
clients never asserted a defense of reliance on advice of counsel in any of the pre-petition
litigations – and have asserted no such defense to date in these chapter 11 cases.

Stuart Baker

Your letter asks us to supplement our privilege log to indicate whether Mr. Baker is
"participating in communications based on [his] business or legal capacit[y]" with respect to
approximately 650 entries. This request is neither consistent with rules governing privilege logs,
nor would performing this exercise shed any additional light on whether communications
involving Mr. Baker are privileged.

We agree that communications where Mr. Baker is providing business, rather than legal
advice (and no other attorney's legal advice implicated) are not privileged. We remind you that
we have produced *over 35,000* non-privileged documents involving Mr. Baker, which
demonstrates our good faith efforts to parse communications where Mr. Baker was participating
in a business role from communications where he was providing or being asked to provide legal
advice.

Moreover, entries on our privilege log in which Mr. Baker was participating in a business
capacity may still be privileged for other reasons. As you note, Mr. Baker held business roles
with the Debtors and affiliated entities, and non-legal roles with Sackler family trusts and
entities. If a communication reflects the provision of legal advice to any of these entities (or an
individual or entity with a common legal interest) by another lawyer, Mr. Baker's inclusion on
the communication in his business capacity would not break the privilege. In addition, Mr. Baker

Mitchell P. Hurley
August 22, 2020                                                                 Page 13

shares a common interest with our clients with respect to a number of issues because he was
named as a co-defendant in a number of cases in the underlying litigation based on the same
allegations that gave rise to the claims against our clients. Thus, your burdensome request that
we clarify Mr. Baker's role on every entry involving him on our privilege log would not help you
assess our claim of privilege, and so we do not agree to it.

<u>Jonathan White</u>

        Jonathan White is an advisor to the Mortimer Sackler family. *See* Description of
Individuals/Entities. Although we understand Mr. White is an attorney, none of our privilege
claims rely on Mr. White as the attorney creating the privilege and all appear to be
communications in which Mr. White was acting in his capacity as Trustee Director. It is our
understanding that the presence of Mr. White on the documents we withheld as privileged does
not break the privilege. We will promptly provide the documents involving Mr. White to counsel
for the Mortimer Sackler family to confirm this understanding. To the extent that counsel
informs us that these communications are not privileged as a result of Mr. White's inclusion, we
will produce these documents. Otherwise, please direct further questions regarding privilege
issues at it relates to Jonathan White to Debevoise.


                                Very truly yours,


                                */s/ Alexander B. Lees*
                                Alexander B. Lees



cc:    Marshall Huebner (Davis Polk & Wardwell LLP)
       Andrew Troop (Pillsbury Winthrop Shaw Pittman LLP)
       Kenneth H. Eckstein (Kramer Levin Naftalis & Frankel LLP)

# EXHIBIT 15

**Debevoise
& Plimpton**

**Debevoise & Plimpton LLP**
919 Third Avenue
New York, NY 10022
+1 212 909 6000

August 23, 2020

<u>BY EMAIL</u>

Mitchell Hurley
Katherine Porter
Akin Gump Strauss Hauer & Feld LLP
One Bryant Park
New York, New York 10036
mhurley@akingump.com
kporter@akingump.com

*In re: Purdue Pharma L.P. et al*, No. 19-23649 (Bankr. S.D.N.Y.)

Dear Counsel:

We write with regard to certain contentions advanced in correspondence from the
Official Committee of Unsecured Creditors (the "UCC") dated July 25, 2020, August
5, 2020, August 12, 2020, and August 18, 2020 concerning Side A's assertion of one
or more forms of privilege over certain communications involving personnel at
certain public relations firms, which were redacted in or withheld from its document
productions to the parties authorized to conduct Rule 2004 discovery in these chapter
11 cases.[1]  We also write to provide clarification with regard to an issue raised in
your August 12, 2020 letter concerning the assertion of spousal privilege.

**<u>Privileged Communications with Public Relations Firms Retained by Counsel</u>**

For the reasons stated in counsel for Side B's August 7, 2020 letter, we reject the
UCC's categorical assertion that any communication involving a public relations
firm is per se not privileged.  Side A has already produced communications from or
including public relations firms that it deemed not privileged.  We have reviewed the
documents referenced in your August 12, 2020 letter and disagree with your assertion
that these documents are not privileged.

---

[1]    The Mortimer Sackler ICSPs preserve and do not waive all defenses,
including, but not limited to, defenses based on lack of personal jurisdiction.

PUBLICLY FILED PER STIPULATION [ECF 2140]

Mitchell Hurley                    2                    August 23, 2020

As you are doubtless aware, the civil litigation that preceded these chapter 11 cases
was regularly covered by the news media, talk shows, and others.  Parties on the
plaintiffs' side interacted with the media and sought news coverage.  The first
litigation to name former Side A directors was announced at a press conference by
the Massachusetts Attorney General and media coverage of the Sackler families was
cited in the complaint.  Massachusetts and other state attorneys general have
routinely issued press releases announcing filing of complaints and developments in
litigation, as well as raising the profile of the opioid litigation on Twitter and other
social media.  Under such circumstances in which plaintiffs' litigation and media
strategy are inextricably intertwined, retention of public relations personnel to advise
counsel is essential to counsel's provision of legal advice.  *See In re Grand Jury
Subpoenas Dated Mar. 24, 2003 Directed to (A) Grand Jury Witness Firm & (B)
Grand Jury Witness*, 265 F. Supp. 2d 321, 330 (S.D.N.Y. 2003) ("Finally, dealing
with the media in a high profile case probably is not a matter for amateurs.  Target
and her lawyers cannot be faulted for concluding that professional public relations
advice was needed."); *see also Stardock Sys., Inc. v. Reiche*, No.
417CV07025SBAKAW, 2018 WL 6259536, at *6 (N.D. Cal. Nov. 30, 2018)
("Because Defendants' counsel (and not Defendants themselves) hired the PR firm of
Singer to provide PR counseling specifically for the purposes of litigation strategy in
the current action, just like the services the PR firm in the *In re Grand Jury
Subpoenas* case rendered, the attorney-client privilege extends to the withheld
communications between Singer and Defendants' counsel").

Each of the documents you discussed in you August 12, 2020 letter falls squarely
within the ambit of *In re Grand Jury Subpoenas*, and not "standard public relations
services":

- For Ctrl. Nos. 19761, 19890, and 21301, your August 12 letter describes the
documents as pertaining to "preparing a press release."  No. 19761 reflects a
communication from counsel to client concerning a press release that was
about ongoing litigation.  No. 19890 contains further correspondence
concerning client and counsel's views of public relations strategy.  No. 21301
contains counsel's analysis of a press release about litigation.  Including
public relations professionals in these communications is necessary for legal
representation of the client and does not waive the attorney-client privilege.
*See In re Grand Jury Subpoenas*, 265 F. Supp. 2d at 330 ("For example,
lawyers may need skilled advice as to whether and how possible statements to
the press—ranging from 'no comment' to detailed factual presentations—
likely would be reported in order to advise a client as to whether the making
of particular statements would be in the client's legal interest.").

- Similarly, your suggestion that public relations professionals' participation in
strategic discussions with counsel concerning pending high-profile
litigation—as reflected in Ctrl Nos. 17395, 19890, and 31297—cannot be
privileged is meritless.  *In re Grand Jury Subpoenas* clearly recognized the

need for coordination and discussion between counsel and public relations professionals on many strategic considerations at the intersection of public relations and legal analysis. *See* 265 F. Supp. 2d at 330 ("Questions such as whether the client should speak to the media at all, whether to do so directly or through representatives, whether and to what extent to comment on specific allegations, and a host of others can be decided without careful legal input only at the client's extreme peril.").

- Your description of Ctrl. Nos. 23612 and 24377 as reflecting review of materials "for impact on litigation strategy" itself refutes your contention that the documents would not be privileged. However, we have reviewed the documents and verified that they reflect privileged communications, such as confidential requests for information and input from counsel (Ctrl. No. 23612) and comments from counsel on work product affecting litigation (Ctrl. No. 24377). *See In re Grand Jury Subpoenas*, 265 F. Supp. 2d at 330-31 ("[T]here simply is no practical way for such discussions to occur with the public relations consultants if the lawyers were not able to inform the consultants of at least some non-public facts, as well as the lawyers' defense strategies and tactics, free of the fear that the consultants could be forced to disclose those discussions.").

- Your description of Ctrl. Nos. 22997 and 26298 as containing communications "advising counsel as to possible public reactions" similarly undermines your contention that these documents are not privileged communications as the very reason counsel would retain public relations professionals would be to understand public reactions as part of litigation strategy. As explained above, public relations issues have been intertwined with litigation strategy for the period encompassing the documents you cited. *See In re Grand Jury Subpoenas*, 265 F. Supp. 2d at 330 ("For example, lawyers may need skilled advice as to whether and how possible statements to the press—ranging from 'no comment' to detailed factual presentations—likely would be reported in order to advise a client as to whether the making of particular statements would be in the client's legal interest.").

- Your claim that the privilege does not extend to public relations professionals' "handling media communications," as reflected on Ctrl. Nos. 14670, 18497, and 22601, is also unfounded as *In re Grand Jury Subpoenas* recognized that this is one of the functions for which counsel may find it necessary to retain public relations professionals to act on their behalf in representing their clients. *See In re Grand Jury Subpoenas*, 265 F. Supp. 2d at 330 ("Finally, dealing with the media in a high profile case probably is not a matter for amateurs. Target and her lawyers cannot be faulted for concluding that professional public relations advice was needed."). For example, as the metadata for Ctrl. No. 22601 indicates, the document contains

communications between counsel, clients, and public relations personnel
concerning direct communications with a media outlet.

Therefore, each of these documents reflects attorney-client communications and is
privileged. We will not remove the privilege designations and we reject your
argument that these provide any basis for the categorical de-designation that you
request.

We disagree with your description of *In re Grand Jury Subpoenas* as an "outlier" and
dispute that federal common law provides a basis for the categorical argument about
several thousand documents. *See, e.g.*, *Bloomingburg Jewish Educ. Ctr. v. Vill. of
Bloomingburg, New York*, 171 F. Supp. 3d 136, 141 (S.D.N.Y. 2016) ("Applying the
above principles, courts have—based on the particular facts and circumstances
presented to them—reached varying conclusions as to whether to extend the privilege
to communications with public relations consultants." (emphasis added)). The cases
on which your August 12, 2020 letter relies are all easily distinguishable from the
current litigation and *In re Grand Jury Subpoenas*. Several of these cases concern
public relations personnel retained for business purposes whereas here the public
relations personnel have been providing advice concerning high-profile litigation
against the clients. *See, e.g.*, *Universal Standard Inc. v. Target Corp.*, 331 F.R.D. 80,
92 (S.D.N.Y. 2019) ("The public relations consultant here was hired not by the
attorney but by Universal Standard and was hired for business purposes.");
*Egiazaryan v. Zalmayev*, 290 F.R.D. 421, 432 (S.D.N.Y. 2013) ("Egiazaryan has not
shown that the activities BGR was performing were part of FZWZ's efforts to
conduct 'public advocacy on behalf of' Egiazaryan in relation to this lawsuit . . . .
Rather, it was involved in a wide variety of public relations activities aimed at
burnishing Egiazaryan's image.").[2] The retention of public relations professionals to
advise on the public relations dimensions of nationwide litigation in which numerous
parties were seeking media coverage to advance their cases is similarly unlike the
minor and inessential role played by the public relations consultant in *Bloomingburg*,
171 F. Supp. 3d at 146–47 ("Mr. Holland's declaration asserts that he used West End
to distill complex facts into digestible pieces and conduct records research that
facilitated municipal officials' ability to accurately explain the *Lamm* case to the
public.").

We appreciate that the UCC is reviewing the discovery materials and privilege log in
detail and we are available to continue to meet and confer regarding entries on the
privilege log. We urge the UCC to prioritize requests that relate to documents
relevant to the UCC's diligence as to underlying claims against Purdue and the
Former Directors and evaluation of the fairness of the settlement. Ex post

---

[2]    Further, *Egiazaryan* was applying New York law in a diversity case and
noted that New York law is narrower than federal common law on the scope
of privileged communications with public relations personnel.

Mitchell Hurley                              5                      August 23, 2020

discussions of public relations strategy in response to publicity campaigns by plaintiffs' counsel have little, if any, relevance to the UCC's core diligence.

**Spousal Privilege**

We previously explained that MSF00932093 was inadvertently marked Marital Communications but was also correctly marked as Attorney-Client Communication. With regard to Ctrl. No. 1647, we have reviewed the document and concluded that it was properly withheld for both Marital Communications and Attorney-Client Privilege.  The marital privilege is between Theresa Sackler and Dr. Mortimer D. Sackler, and the email chain includes an email from Jonathan White in his capacity as an attorney.  The privilege log description will be updated as follows: "Discussing legal advice, providing legal advice, and reflecting a request for legal advice from Jonathan White re: trusts and estates; Theresa Sackler and Mortimer D. Sackler." We are available to meet-and-confer regarding questions about additional documents subject to the marital communications privilege.

Best regards,

*/s/Jasmine Ball*
Jasmine Ball

# EXHIBIT 16

**Debevoise & Plimpton**

Debevoise & Plimpton LLP
919 Third Avenue
New York, NY 10022
+1 212 909 6000

CONFIDENTIAL / SUBJECT TO PROTECTIVE ORDER

August 23, 2020

<u>BY EMAIL</u>

Mitchell Hurley
Katherine Porter
Akin Gump Strauss Hauer & Feld LLP
One Bryant Park
New York, New York 10036
mhurley@akingump.com
kporter@akingump.com

***In re: Purdue Pharma L.P. et al.*, No. 19-23649 (Bankr. S.D.N.Y.)**

Counsel,

We write with regard to certain contentions advanced in correspondence from the
Official Committee of Unsecured Creditors (the "UCC") dated August 18, 2020
concerning Side A's privilege log.[1]

As set forth below, we disagree with the UCC's apparent assertion that the inclusion
of certain third parties categorically means that any communication at issue is not
privileged.  Instead, as courts have repeatedly recognized, the determination of
whether a communication involving a non-counsel third party depends on the
relevant circumstances.  As you are aware, the relevant time period for the Requests
was defined as January 1, 1996, to September 15, 2019 for the Initial Covered
Sackler Persons and January 1, 2006 to September 15, 2019 for the Additional
Covered Sackler Persons.  The Requests encompassed a broad range of topics and
the UCC's request that the ICSPs not stand on relevance objections with regard to
electronic documents that hit on one or more of the UCC's search terms resulted in a
production that covers diverse events, transactions, disputes, and other affairs over
the course of twenty-four years, as well as numerous third parties with potential
common interests with one or more of the ESI custodians.  The privilege log
represents counsel's good faith efforts to identify privileged documents in the wide-
ranging production universe.  In this context, we simply cannot agree to any

---

[1]    The Mortimer Sackler ICSPs preserve and do not waive all defenses,
including, but not limited to, defenses based on lack of personal jurisdiction.

PUBLICLY FILED PER STIPULATION [ECF 2140]

Mitchell Hurley                         2                         August 23, 2020

CONFIDENTIAL / SUBJECT TO PROTECTIVE ORDER

categorical requests to de-designate documents without further review of the
documents in light of the UCC's correspondence nor do we think it appropriate for
the UCC to make such a demand, much less on the unreasonably accelerated
timeframe your correspondence seeks to impose on this process.

To that end, we recently began a re-review of Privilege Log entries involving third
parties.  As a result of that process, we have already identified 16 individuals or
entities (listed in the Appendix to this letter) for whom we agree that all
communications previously logged are not privileged and are continuing our review
of other individuals and communications.  We will begin producing de-designated
documents on a rolling basis.  Where appropriate, we will also be revising our
privilege log entries to provide additional information.  In the meanwhile, we are
prepared to meet and confer regarding the concerns that you have raised.  As the
privilege log is more than 30,000 entries long, it is in everyone's interest for the UCC
to identify to us during the meet and confer process the entries that are of greatest
priority to the UCC's diligence efforts.

## Attorney-Client Privilege May Attach to Communications with Third Parties

Your core contention that certain entries on the Privilege Log are necessarily "invalid
on their face" because they involve third parties is unfounded.  The Second Circuit
recently rejected a categorical approach to privilege, once again affirming that
communications involving third-party advisors may be protected by the attorney-
client privilege:

> When a communication is "made in confidence for the
> purpose of obtaining legal advice from the lawyer," the
> inclusion of a third party on that communication does not
> necessarily destroy the attorney-client privilege, so long as
> the inclusion "is necessary, or at least highly useful, for the
> effective consultation between the client and the lawyer."
> "[C]ommunications by the client to his counsel and a third-
> party reasonably related to [the] purpose of having the
> third-party interpret [the communications] so that the
> lawyer may better give legal advice" remain protected.

*Sampedro v. Silver Point Capital, L.P.*, No. 19-4339-CV, 2020 WL 2988693, at *3
(2d Cir. June 4, 2020), as amended (June 5, 2020) (citation omitted) (quoting *United
States v. Kovel*, 296 F.2d 918, 922 (2d Cir. 1961)) (communications involving third-
party consultant did not break privilege because consultant was essential for
analyzing data relevant to legal analysis).  Another court reached a similar
conclusion:

> Analysis of attorney-client privilege claims requires then a
> discerning analysis, not merely a demonstration that a
> financial analyst or consultant may have been a recipient of

UNREDACTED - CONTAINS OUTSIDE PROFESSIONALS' EYES ONLY INFORMATION
TREAT SUBJECT TO DECLARATION AND EXHIBITS

Mitchell Hurley                              3                        August 23, 2020

CONFIDENTIAL / SUBJECT TO PROTECTIVE ORDER

> a questioned document. . . . Determining the application of
> the attorney-client privilege requires a careful analysis, not
> the invocation of a rule of easy and automatic application.

*BankDirect Capital Fin., LLC v. Capital Premium Fin., Inc.*, 326 F.R.D. 176, 183
(N.D. Ill. 2018) (documents containing "comments, suggestions, and/or questions
between financial advisor and attorneys pertaining to the drafting of the agreements"
were privileged).

Numerous cases show that communications involving the categories of third parties
listed in your letter can be privileged:

- Accountants:  *See, e.g.*, *Indianapolis Airport Auth. v. Travelers Prop. Cas.
  Co. of Am.*, No. 1:13-CV-01316-JMS, 2015 WL 4715202, at *7 (S.D. Ind.
  Aug. 7, 2015) ("As agents of IAA, communications containing legal
  advice between IAA's accountants at BKD and IAA's counsel are
  privileged. . . . IAA's privilege log includes communications between
  BKD accountants outside the presence of IAA's counsel.  These
  communications are also protected because BKD's accountants expressly
  discuss counsel's legal advice.").

- Insurance brokers and adjusters:  *See, e.g.*, *Lectrolarm Custom Sys., Inc. v.
  Pelco Sales, Inc.*, 212 F.R.D. 567, 571 (E.D. Cal. 2002) ("Where an
  insurer has agreed that it has a duty to defend and to indemnify its insured,
  they are both clients of the lawyer.  The lawyer is retained to defend both
  in the underlying action and the attorney client privilege applies to protect
  communications between the lawyer and the insurer.").

- Financial/Investment Advisors:  *See, e.g.*, *In re Fibermark, Inc.*, 330 B.R.
  480 (D. Vt. Bankr. Ct. 2005) ("The Court has found several
  communications involving third parties that do meet the criteria for
  protection, for example (a) where the communication between Akin Gump
  and the Committee included the Committee's financial advisor or Akin
  Gump was communicating solely and directly to the Committee's financial
  advisor, and (b) AIG (the party asserting the privilege) has demonstrated
  that the communication was intended to facilitate the provision of legal
  service by the attorney to the client.").

- Private/Investment Bankers:  *See, e.g.*, *Calvin Klein Trademark Trust v.
  Wachner*, 124 F. Supp. 2d 207, 209 (S.D.N.Y. 2000) (inclusion of
  investment banking firm in communications with counsel concerning
  plaintiff company's possible sale did not waive privilege, where the
  investment banking firm's role in helping to draft documents was
  necessary for responsible counsel to render legal advice).

CONFIDENTIAL / SUBJECT TO PROTECTIVE ORDER

- <u>Real Estate Brokers/Developers</u>:  *In re Rock & Republic Enterprises, Inc.*, No. 10-11728AJG, 2010 WL 4137572, at *6 (Bankr. S.D.N.Y. Oct. 19, 2010) (reserving judgment on certain documents relating to real estate brokers that reflected communications drafted by counsel).

- <u>Co-investors/counterparties</u>:  *Schaeffler v. United States*, 806 F.3d 34, 42-43 (2d Cir. 2015) (finding common interest among lending consortium and investor noting that "[t]he fact that eleven-billion Euros of sunken investment and any additional sums advanced in the refinancing were at stake does not render those legal issues 'commercial,' and sharing communications relating to those legal issues is not a waiver of the privilege.") *see also HSH Nordbank AG New York Branch v. Swerdlow*, 259 F.R.D. 64, 72 (S.D.N.Y. 2009) (Lynch, J.) ("Defendants; suggestion that it would be improper to apply the common interest doctrine because Nordbank's common interest with the non-party lenders is a business interest, rather than a legal interest, also fails.  While the lenders' business interests may coincide or overlap with their legal interests, the obligations they seek to enforce are grounded in contract and, by definition, involve the pursuit of legal rights and remedies.  This is underscored by the fact that the very subject of the communications was what legal strategy would best serve the interests of Nordbank and the non-party lenders.").

The foregoing cases are not intended to represent the exclusive grounds on which Side A can assert privilege over documents involving third parties.  These cases, as well as cases cited in your correspondence, make it clear, however, that there is no bright-line rule concerning waiver of privilege based on the identity of such third parties.  Accordingly, we are undertaking a review of the entries on the privilege log related to the issues noted in your letter and will revise the privilege designations or privilege log entries as necessary.

**<u>Communications without Counsel Can Be Privileged</u>**

Your August 18, 2020 letter challenges the assertion of privilege over communications between clients without counsel copied.  As you recognize, communications between parties who share a common interest discussing privileged advice may remain privileged even outside the presence of counsel.  *See Gucci Am., Inc. v. Gucci*, No. 07CIV.6820RMBJCF, 2008 WL 5251989, at *1 (S.D.N.Y. Dec. 15, 2008) ("If information that is otherwise privileged is shared between parties that have a common legal interest, the privilege is not forfeited even though no attorney either creates or receives that communication.  For example, if an attorney provides legal advice to a client-recommending that a defendant move for summary judgment, say-the client can repeat that advice to a co-defendant outside the presence of any attorney without causing the privilege to be waived."); *see also Crane Sec. Techs., Inc. v. Rolling Optics, AB*, 230 F. Supp. 3d 10, 21-22 (D. Mass. 2017) ("The fact that communications are between non-lawyers does not per se waive the privilege.  In *In*

Mitchell Hurley                          5                          August 23, 2020

CONFIDENTIAL / SUBJECT TO PROTECTIVE ORDER

*re Prograf Antitrust Litigation*, 2013 WL 1868227, at *3, (D. Mass. May 3, 2013), the idea that non-lawyers could discuss or relay legal advice without copying an attorney was so uncontroversial that Judge Zobel, incorporating it into her ruling, did not even discuss it."). Your letter simply claims that the amount of communications in this category on Side A's privilege log "raises red flags" and you therefore request that we review several thousand entries. We are available to discuss any particularized concerns the UCC may have, but we note that a high volume of such communications should be unsurprising given the nature of the client group: a large family, including married couples, with common interests in many issues over the last two decades.

**Communications with Special Committee Members Can Be Privileged**

The UCC's assumption that there cannot be a common interest between the A-side and certain members of the Special Committee is simply incorrect. Side A has a common interest with the Purdue's board with respect to two core issues: (*i*) opposition to allegations that Purdue and its Former Directors engaged in supposedly unlawful marketing practices and (*ii*) negotiating a global settlement to the prescription opioid litigation. The possibility that members of the Special Committee and Side A may have adverse positions on certain other issues is of no moment. It is widely recognized that parties may share common interests with respect to certain issues and be adverse as to others:

> Relationships between clients are often more ambiguous than the extremes of united in interest and completely adverse. Sometimes it will occur that clients share a mutual interest as to one issue (such as discrediting a witness) but are adversarial as to many or all other issues. Most courts have held that the common interest privilege can apply even if the clients are in conflict on some or most points, *so long as the communication itself deals with a matter on which the parties have agreed to work toward a mutually beneficial goal*. (emphasis added)

*SEC v. Wyly*, No. 10 Civ. 5760 (SAS), 2011 WL 2732245 (S.D.N.Y. July 5, 2011) (quoting Saltzburg, Martin and Capra, Federal Rules of Evidence Manual at 501–29, 30 (9th ed.)).

Here, as we have previously explained, even after the Side A Former Directors stepped down as directors of Purdue, they maintained significant common interests with Debtors, including the Special Committee, with regard to pending civil litigation. Discussions between counsel and Board members took place with the shared understanding that such communications would be protected by a common interest/attorney client privilege. Indeed, in some cases, Side A may need to consult with counsel for the Special Committee prior to de-designating documents. Pursuant

Mitchell Hurley                          6                          August 23, 2020

CONFIDENTIAL / SUBJECT TO PROTECTIVE ORDER

to the UCC's request, however, we are reviewing assertions of privilege over communications involving the Special Committee and have already determined that the following documents are not privileged: Ctrl. Nos. 23209, 23210, 23216, 23221, 23223, 23351, 23352, 23366, and 23367.  These documents will be removed from the privilege log and produced to the UCC.

**Communications with Stuart Baker and Jonathan White**

We recognize that Jonathan White and Stuart Baker are lawyers who acted in both legal and non-legal capacities.  For this reason, Side A has already produced documents reflecting communications from or to one of these individuals.  We are willing to review entries on the privilege log and to provide more information.  We believe it is appropriate to focus on entries where Messrs. White or Baker are the only counsel on the communication.  To the extent necessary, we will de-designate documents that are not privileged and revise the privilege log accordingly.  If you would like us to prioritize our review of certain documents meeting these criteria, please provide us with that information.

**Crime/Fraud Exception**

We understand from your letter that the UCC is considering challenging Side A's assertion of privilege over one or more documents based on the "crime-fraud" exception.  However, your letter does not note any specific communications that you believe to be subject to that exception.  Rather, you request that Side A preemptively waive privilege assertions over four categories of documents based on nothing more than the UCC's speculation.  Side A will, of course, take the UCC's request under advisement, but notes that the request is both highly premature and vague, so we have little confidence that it is productive to discuss this issue at this time.

**At-Issue Exception to Privilege**

Your August 18, 2020 letter requests disclosure of unspecified communications from unspecified counsel based on an unsupported assertion that Side A's December 6, 2019 presentation put privileged communications in issue.  We note that you are in receipt of both a copy of Side A's deck and a transcript of Ms. Monaghan's presentation.  Please refer us to the specific portions of the presentation that you claim put privileged communications at issue.  Please also identify any entries on Side A's privilege log you claim were put "in issue" by the December 6, 2019 presentation.

* * *

Side A can be available to meet and confer regarding any of the foregoing issues and to discuss prioritization of any specific questions with the UCC.  We appreciate that the UCC is reviewing the privilege log in detail and that the log is extensive.  We note, however, that our understanding of the discovery process in these chapter 11

UNREDACTED – CONTAINS OUTSIDE PROFESSIONALS' EYES ONLY INFORMATION
TREAT SUBJECT TO PROTECTIVE ORDER

Mitchell Hurley                                7                        August 23, 2020

CONFIDENTIAL / SUBJECT TO PROTECTIVE ORDER

cases was that the UCC would seek to narrow the issues following the production of all potentially responsive ESI, recognizing that the breadth of the discovery would encompass many irrelevant issues.  The same is correspondingly true of Side A's privilege log.  We do not believe it will ultimately be a productive use of the UCC's time to litigate privilege issues the resolution of which do not advance these chapter 11 cases.  As we review the issues raised in your August 18, 2020 letter, we will make a good faith effort to provide the UCC with non-privileged information to assist the parties in narrowing the issues.

Best regards,

*/s/ Jasmine Ball*
Jasmine Ball

Mitchell Hurley                          8                          August 23, 2020

CONFIDENTIAL / SUBJECT TO PROTECTIVE ORDER

### Appendix of Individuals/Entities To Be Removed from Side A Privilege Log

1. ██████████████

2. ████████████████

3. ██████████████

4. █████████████

5. ████████████

6. ██████████████

7. ██████████

8. ███████████

9. ██████████████████

10. ████████████████████████

11. █████████████

12. ███████████

13. ██████████████

14. ████████████████████

15. ██████████████

16. ████████████