# EXHIBIT 49

| From: | Snyderman, Ralph |
|---|---|
| | |
| Sent: | 3/31/2015 6:09:20 PM |
| To: | |
| | |
| Subject: | FW: Activities and Responsibilities |
| Attachments: | SDB Activities 2014.DOC |

**From:** Baker, Stuart D.
**Sent:** Tuesday, March 31, 2015 6:09:00 PM (UTC-05:00) Eastern Time (US & Canada)
**To:** Sackler, Dr Raymond R; Sackler, Beverly; Sackler, Dame Theresa; Sackler, Dr Richard; Sackler Lefcourt, Ilene; Sackler, Dr Kathe; Sackler, Jonathan; Sackler Hunt, Samantha; Sackler, Mortimer D.A.; Sackler, David A.; Boer, Peter; Boer, Peter; Pickett, Cecil; Costa, Paulo; Paulo Costa; Snyderman, Ralph
**Cc:** Wikström, Åke; 'Christopher B. MITCHELL (Christopher.Mitchell@cbmitchell.co.uk)'; Roncalli, Anthony
**Subject:** Activities and Responsibilities

Dear All,

Please find attached my report to you of Activities and Responsibilities, dated March 31, 2015. Please let me know if you have any comments or questions.

Regards,
Stuart

This e-mail, and any attachments thereto, is intended only for use by the addressee(s) named herein and may contain legally privileged and/or confidential information. If you are not the intended recipient of this e-mail, you are hereby notified that any dissemination, distribution or copying of this e-mail, and any attachments thereto, is strictly prohibited. If you have received this e-mail in error, please notify me by replying to this message and permanently delete the original and any copy of this e-mail and any printout thereof.

For additional information about Chadbourne & Parke LLP and Chadbourne & Parke, a multinational partnership, including a list of attorneys, please see our website at http://www.chadbourne.com

PUBLICLY FILED PER STIPULATION [ECF 2140]

 PPLPUCC000336422

Report of SDB Activities and Responsibilities

March 31, 2015

1) Boards of Directors

a) Provides legal advice regarding the responsibilities and duties of the Directors and officers of the worldwide independent associated companies including regular attention to various issues raised by Directors and Executives. Provides continuing advice, support and consideration of corporate governance matters to ensure that the Directors fulfill their respective fiduciary duties and responsibilities and limit their potential liability exposure.

b) Conducts and chairs Meetings of the Boards of Directors of the worldwide independent associated companies.

c) On an almost daily basis in conversations with various Directors, discusses various aspects of the businesses of the independent associated companies.

d) Works with Executives, Directors and the Agenda Committee to prepare and deliver Agendas for the Meetings of the Boards of Directors of the worldwide independent associated companies.

e) Reports to the Boards of Directors and to members of the Sackler Family.

f) Circulates draft Decisions of the Boards of Directors of the US, and UK independent associated companies and recommendations of the Board of Directors of MNP Consulting Limited to Directors for comment.

g) Circulates Proposed Decisions of the Boards of Directors between regularly scheduled meetings to deal with various matters that arise between scheduled meetings. Provides necessary information in connection with the consideration of Proposed Decisions by the Boards of Directors.

h) Handles follow-up with Directors regarding draft Decisions (including Proposed Decisions) including responding to Directors' questions and providing direction related to questions posed and issues raised by Executives.

i) Provides final Decisions to Executives for implementation of action items.

PROFESSIONALS' EYES ONLY/HIGHLY CONFIDENTIAL—SUBJECT TO PROTECTIVE ORDER    PPLPUCC000336423

j)   Reviews formal resolutions of the Minutes of the Meetings of the Boards of
Directors and the execution of same as Secretary (or equivalent office) of the
relevant independent associated companies.

k)   Assists the Boards of Directors in developing and implementing improvements to
the organization of the Boards of Directors.

2)   Committees of the Board of Directors

a)   Assists Chairpersons in the management and scheduling of various Committees of
the Board of Directors of MNP Consulting.

b)   Coordinates requests by management for Committee review.

c)   Provides and coordinates necessary information to the Committees in connection
with the activities of each Committee.

3)   Purdue U.S. Matters

a)   Holds the position of Executive Vice President, Counsel to the Board.

b)   Serves as a member of the Purdue Executive Committee.

c)   Reviews, comments on, and advises on significant commercial transactions and
strategic alliances and attends meetings and conference calls regarding same.

d)   Participates in the defense of the various litigation matters involving the U.S.
independent associated companies.  This involves review of various relevant
documents and participation in meetings and conference calls regarding same.

e)   Serves as a member of the Pension Investment Committee which oversees the
Purdue 401(k) and the Purdue Pension Plan.

f)   Available to act as lead counsel responsible for the coordination and completion
of commercial transactions; e.g., Infinity.

g)   Provides guidance and support to lawyers handling legal work related to (but not
limited to) commercial transactions, corporate governance, financing transactions,
real estate transactions and other U.S. legal matters handled for the independent
associated companies and/or the Sackler family.

PROFESSIONALS' EYES ONLY/HIGHLY CONFIDENTIAL—SUBJECT TO PROTECTIVE ORDER          PPLPUCC000336424

4) Directorships

    a) SDB is a Director and/or an officer of approximately 75 Sackler companies including companies located in Australia, Austria, Belgium, Bermuda, Brazil, British Virgin Islands, Canada, Chile, China, Colombia, Cyprus, Denmark, Dubai, Finland, France, Germany, Hong Kong, India, Ireland, Israel, Italy, Japan, Korea, Luxembourg, Malaysia, Mexico, Netherlands, New Zealand, Norway, Philippines, Poland, Portugal, Singapore, South Africa, Spain, Sweden, Switzerland, Taiwan, Thailand, Turkey, the United Kingdom, the United States, Venezuela and Vietnam.

    b) With respect to the non-U.S. independent associated companies, in many cases, SDB and CBM are the sole Directors. Other than for Purdue Pharma Inc. in the U.S., SDB and Phil Strassburger are the Directors except where SDB is the sole Director of some U.S. independent associated companies. With respect to the operating independent associated companies, family members act as Directors of a number of companies, including, but not limited, to Purdue Pharma Inc., Mundipharma GesmbH (Austria), Purdue Pharma Inc. (Canada), Purdue Frederick Inc. (Canada), Napp Pharmaceutical Holdings Limited, Napp Pharmaceutical Group Limited and MNP Consulting Limited.

    c) SDB serves as a trustee and trustee director of various Sackler family trusts.

5) Responsibility for Rhodes Legal Affairs

    a) Provides advice and legal services to the Management and Directors of Rhodes Technologies and Rhodes Pharmaceuticals L.P.

    b) Supervise James Doyle, in-house counsel for the Rhodes companies.

6) Financial Matters

    a) Coordinates (with Raymond Smith, Steve Jamieson and Douglas Docherty) the implementation of financial matters outside of the United States (e.g., answering numerous questions, providing advice, making various decisions and executing documents).

    b) Responsible, with Ed Mahony, for the preparation for a potential financing to support acquisition of investments by Purdue Pharma L.P. and other independent associated companies which will require funding which exceeds internal resources. In this connection, this matter requires regular interaction with J.P. Morgan.

PROFESSIONALS' EYES ONLY/HIGHLY CONFIDENTIAL—SUBJECT TO PROTECTIVE ORDER    PPLPUCC000336425

c) Responsible for overseeing the preparation of the worldwide consolidated financial statements. This includes execution of the representation letter to E&Y for all companies included in the worldwide consolidated financial statements.

d) Currently working on revisions to financial performance reporting to improve how the Boards of Directors evaluates management to reflect the changing nature of the businesses; including, but not limited to, the recruitment of the Chief Financial Advisor to the Board.

e) Works closely in the United States with Ed Mahony regarding various financial matters.

f) Member of U.S. Executive Audit Committee which meets quarterly.

g) Organizes and supervises audit committees in Canada, Europe, Australia, Asia, Latin America and Middle East.

h) Works with Steve Ives regarding audits of various trusts.

i) Works with Dr. Kathe, Les Schreyer and Jeffrey Lefcourt on the Executive Committee of The Acorn Foundation for the Arts and Sciences, Inc.

7) Budget Meetings

a) Organizes Mid-Year Budget Meetings and Year-End Budget Meetings. Responsibility includes preparation, revisions and distribution of the Rules of the Road (in collaboration with Steve Jamieson).

b) Provides Decisions for consideration by the Boards of Directors related to the approved Budgets and handles inquiries regarding the same.

8) Recruitment of Senior Executives and Directors

a) Assists in the recruitment of certain Senior Executives and Directors.

b) Over the last years, successful recruitments include Raman Singh, the Regional Manager for the Asia Pacific, Latin America, Middle East and North Africa, Australia and New Zealand regions, Antony Mattessich, the Regional Manager for Europe, Paulo Costa and Ralph Snyderman as additional B Directors, Jane Orr, the new General Manager of Mundipharma Australia and Mark Timney as the President and CEO of Purdue Pharma L.P.

PROFESSIONALS' EYES ONLY/HIGHLY CONFIDENTIAL—SUBJECT TO PROTECTIVE ORDER    PPLPUCC000336426

c) Currently assisting in the recruitment of one or two directors to replace Judy Lewent and the Chief Financial Advisor to the Board.

9) Compliance

    a) Responsible for Compliance of non-U.S.independent associated companies.

    b) Supervises the investigation and resolution of compliance issues for the non-U.S. independent associated companies.

    c) Oversees Compliance Committee meetings in Canada, Europe, Australia, Asia, Latin America and Middle East including the participation of approximately 40 legal and compliance officers.

    d) Monitors each Compliance Committee of the non-U.S. independent associated companies to ensure they are functioning on a regular and consistent basis.

    e) Obtains compliance certifications from certain General Managers/Regional Directors of the non-U.S. independent associated companies stating that the executive knows that all compliance matters are being handled properly.

    f) With the assistance of in-house counsel and aided by outside counsel and KPMG, works to make certain that the requested compliance practices are understood and exercised by the employees of each of the non-U.S. independent associated companies.

    g) Sees to the preparation of a Comprehensive Compliance Report to all the non-U.S. independent associated companies for distribution to the Board of Directors of MNP Consulting Limited.

    h) Supervises the investigation and resolution of serious compliance breaches regarding the non-U.S. independent associated companies.

10) International Legal Matters

    a) Supervises legal and compliance matters outside of the United States.  Supervises and trains Jacqueline Le Saux, Bryan Lea and Patrik Maurer.

    b) Has regular involvement with and gives advice and direction to Jacqueline, Bryan and Patrik and their respective legal staffs, consisting of approximately 40 lawyers and compliance officers, regarding the matters they handle for the non-U.S. independent associated companies.

PROFESSIONALS' EYES ONLY/HIGHLY CONFIDENTIAL—SUBJECT TO PROTECTIVE ORDER          PPLPUCC000336427

UNREDACTED - CONTAINS OUTSIDE PROFESSIONALS' EYES ONLY INFORMATION;
TREAT SUBJECT TO PROTECTIVE ORDER

   c) Works with Bryan Lea in the recruitment and training of head of compliance for Europe and South Africa and of in-house counsel and compliance officers for the United Kingdom, France, Italy, Spain, Germany, Austria (including the CEE), Nordics and Benelux.

   d) Works with Patrik Maurer in the recruitment and training of head of compliance for Asia, Latin America, Middle East and North Africa and of in-house counsel and compliance officers for Australia, Switzerland, Brazil, China, Japan, Korea and the Philippines.

   e) Conducts twice yearly Legal Review Meetings concerning international legal matters with Jacqueline, Bryan and Patrik and many of their respective reports.

   f) Oversees and reviews quarterly reports (prepared by Jacqueline, Bryan and Patrik) regarding international legal matters and distributes those quarterly reports to the Boards of Directors.

   g) Available to act as lead counsel responsible for the coordination of and completion of commercial transactions.

   h) Provides guidance and support to lawyers handling legal work related to (but not limited to) commercial transactions, corporate governance, financing transactions, regulatory matters, real estate transactions and other legal matters handled for the non-U.S. independent associated companies.

11) International Patent Matters

   a) Phil Strassburger who reports to SDB with regard to patent matters outside the U.S., leads the independent associated companies in the effort to develop and protect the patents outside the U.S., as well, of course, in the U.S.

   b) In addition, Phil assists in the effort to strengthen the independent associated companies' regulatory position with regard to OxyContin® and other marketed products.

   c) In addition, Richard Inz (in the United States who reports to Phil), Kevin Bill (in Cambridge who reports to Bryan Lea) and Oliver Knapp (in Basel who reports to Patrik Maurer) assist with various international patent matters.

   d) SDB supports the work of these lawyers on a regular basis.

PROFESSIONALS' EYES ONLY/HIGHLY CONFIDENTIAL—SUBJECT TO PROTECTIVE ORDER        PPLPUCC000336428

12) Agreement/Document Review and Execution

   a) Executes (approximately 2,500 in 2014) documents on behalf of the worldwide independent associated companies including, but not limited to, agreements relating to governance, financing transactions, regulatory filings, licensing and business development transactions, strategic alliances, corporate organization and reorganization and other transactions. The documents executed also include tax returns, annual reports, banking documents, investment paperwork, state qualifications and other necessary documentation related to corporate maintenance.

   b) SDB reviews each document signed (a number of which are under oath) or ensures that a competent lawyer has reviewed the document and approved such document for execution.

   c) In addition to the documents executed by SDB, SDB reviews and comments upon hundreds of additional documents and agreements each year sent to him for comment and often approval prior to being executed.

13) Ownership - Tax Planning - Distributions

   a) Oversees the development of tax planning ideas based on suggestions from various family members, other advisors and SDB.

   b) Reviews and supervises the implementation of approved tax plans and programs.

   c) Considers and provides advice regarding the ownership and organizational structures of the worldwide independent associated companies including reviewing and commenting upon organizational documentation related to corporate and tax planning.

   d) Works with advisors to recommend and handle Distributions from various companies.

14) Bermuda

   a) Handles matters related to various cross-border transactions involving the Bermuda companies.

   b) Attention to licensing structures involving the Bermuda companies.

PUBLICLY FILED PER STIPULATION [ECF 2140]

PROFESSIONALS' EYES ONLY/HIGHLY CONFIDENTIAL—SUBJECT TO PROTECTIVE ORDER          PPLPUCC000336429

    c) As a practical matter, Douglas Docherty reports to SDB and looks to SDB for guidance and recommendations.

15) Internal Audit

    a) Responsible for Internal Audit for the worldwide independent associated companies.

    b) Responsible for reviewing and commenting on all internal audit reports. In 2014 there were 40 such reports.

    c) Distributes summary emails of internal audit reports and sees to the circulation of those reports to Directors of relevant companies and handles related inquires.

    d) Supervises the investigation and resolution of compliance issues raised by internal audits for the worldwide independent associated companies.

16) International Legal Fees

    a) Responsible for oversight and approval of legal fees to outside lawyers working outside the United States.

17) New Product Introduction

    a) Supervises the completion of Short Form Medical Due Diligence Questionnaires by approved medical officers before a new product is launched outside the United States.

PUBLICLY FILED PER STIPULATION [ECF 2140]

PROFESSIONALS' EYES ONLY/HIGHLY CONFIDENTIAL—SUBJECT TO PROTECTIVE ORDER          PPLPUCC000336430

# EXHIBIT 52

PUBLICLY FILED PER STIPULATION [ECF 2140]

Message
_____

**From:**       Sackler, Dame Theresa
**Sent:**       28/08/2013 21:18:25
**To:**         Sackler, Mortimer D.A                                   ; Ilene Sackler Lefcourt [ **Redacted For GDPR** ] Sackler, Dr Kathe

**Subject:**    FW: Governance
_____


Will try to  speak to you all  re Jon's ideas for an outside director to be a "lead director" or "board
chair"  after the holiday weekend .
Thanks ,T

-----Original Message-----
From: Sackler, Jonathan
Sent: 28 August 2013 21:06
To: Sackler, Dame Theresa
Subject: RE: Governance

Theresa,

I completed my survey of the B Directors and Stuart.

Paulo recognizes the need for a chairperson with a business background.  He thinks it will be a difficult
job given the personalities on the board, but a worthwhile undertaking.  He believes that shepherding our
board is a 3-day-a-week job and he is not in a position to do it.  He said that he is sitting on 4
boards, one of which will require more time than at present.  As a consequence, he believes that he will
have to resign from one (not ours).  I asked him who he would favor, and he said that Ralph has the
knowledge, demeanor and credibility and would be his first choice.  He thinks that Ake could also be
effective.

Ralph's remarks were virtually the same as Paulo's (I wonder if they've had this discussion before):
leading our board will be very difficult but worth trying.  Ralph has noted that we have "very bright,
highly opinionated" family members who sometimes approach an established strategy "at a 90 degree angle"
to existing policy.  He thinks this is a problem because it robs the board and management of the
"quietude" needed to execute effectively.  Ralph thinks this job will take someone half-time.  He
suggested that Paulo would be the best person for it.  I asked him if he would be willing, and he said
that it would be a "wrenching" change for him given his other commitments, and he would have to resign
from everything else except his work with Duke, but he would consider it.  I asked him if he thinks Ake
would do a good job, and he said that he believes he would.

I also discussed this with Stuart.  Stuart likes the current arrangement, he said that being the de facto
chairman helps him in his work.  He said that if he is given the freedom and the mandate to limit
discussion on board items and to limit individual directors to 3 minutes each on each topic, he would do
that and he thinks it would make our meetings more productive.  He also suggested that business issues
get referred to the appropriate committee:  for example, if a director has concerns about our investment
in China, those concerns should be referred to the Corporate Development Committee (is that the current
name?) for consideration.

In summary, all of the B Directors agree with the concept of appointing a chairperson.  They all cited
Paulo as the obvious choice, but Paulo is unwilling to do it.  Ralph may be willing, and given his
background in medicine, pharmaceutical research, management and pharma board experience, he would seem to
be a viable candidate (Ralph would be Paulo's first choice).  Peter is willing to do it, but his
effectiveness would be limited by his relative lack of pharma experience.  Everyone (except possibly
Raymond) agrees that Ake could do a good job, and Ake was Richard's first choice (Richard likes the idea
of a non-voting chairperson.)

If the A Directors are similarly inclined, I think we could pursue further discussions with Ralph and Ake
and try to settle on a clear job description and compensation.

All the best,

Jon Sackler

201 Tresser Boulevard
Stamford, CT 06901

PUBLICLY FILED PER STIPULATION [ECF 2140]

PROFESSIONALS' EYES ONLY/CONFIDENTIAL-SUBJECT TO PROTECTIVE ORDER

-----Original Message-----
From: Sackler, Jonathan
Sent: Monday, August 26, 2013 12:14 PM
To: Sackler, Dame Theresa
Subject: FW: Governance


Theresa, a quick update:

I spoke with my father, Richard and Peter about the idea of selecting someone to serve as board chair (or "lead director", if we prefer that title).  They all agree that it would be helpful.  In terms of who, my father leans toward Paulo or Cecil, Richard toward Ake or Paulo, and Peter toward Paulo (sees benefit to his being local) and also said he is interested in doing it if we felt he's the best choice (see his note below).  I have yet to speak with Paulo, Ralph and Stuart, but I'll try to do that today or tomorrow.

An issue seems to be brewing with David Lundie -- this is a bit of a rumor, but plausible.  David is somewhat unhappy, and the issues that have been shared with me concern some dissatisfaction at the slow pace of change that John Stewart is leading (I've also heard from Stuart Baker that other members of the Exec Committee are chafing, particularly Russ Gasdia); being micro-managed by John; and David's own compensation.  I spoke with Stuart about it on Saturday and he's going to try to collect more information and will let David know that one of the board members will want to visit with him when we're together next week.

This brings up the question of which board member is most appropriate, which raised in my mind the issue of dividing Compensation from Talent in our committee structure.  I think that's a mistake and we should combine those committees since comp is such an important factor in retaining and attracting talent.  Also, given our 2 Committee membership limit, dividing those two functions creates an additional challenge in staffing.

Finally, I'm attaching a note from Peter Boer with an attachment that I think is a good refresher.

I'll be back to you after I speak with the remaining B Directors.

All the best,

Jon Sackler

One Stamford Forum   |   201 Tresser Boulevard   |   Stamford, CT 06901

-----Original Message-----
From: F. Peter Boer [mail
Sent: Saturday, August 24, 2013 12:24 PM
To: Sackler, Jonathan
Subject: Governance


Just to refresh memories, I found a memorandum I wrote with Judy dated April 2011 on how to move forward on corporate governance.  It is still a good blueprint and we have accomplished a lot of this, but there are a few gaps, and we have not yet become more efficient.  I chalk it up to the transition, but the progress we have made is not to be sneezed at.

In our call this morning we talked about a chairman's role.  As you know, I try to be careful about such matters and did not want to give you an off-the-top answer regarding my own willingness to serve.  In fact there are a number of issues to be addressed. However, I can say that given the full support of the Board, I would be willing to do the job, and think I can add significant value.  I also think that I could work in a complementary manner with Stuart Baker so we take full advantage of our respective styles and skill sets.

PUBLICLY FILED PER STIPULATION [ECF 2140]

UNREDACTED - CONTAINS OUTSIDE PROFESSIONALS' EYES ONLY INFORMATION -
TREAT SUBJECT TO PROTECTIVE ORDER

# EXHIBIT 53

| From: | White, Jonathan (Ogier.com) |
| --- | --- |
| To: | Sackler, Theresa; Ilene Sackler Lefcourt; Sackler, Dr Kathe (af); ▮▮▮▮ |
| | Sackler, Mortimer D.A.; ▮▮▮▮▮▮▮▮    Sophie Sackler; Michael Sackler |
| | ▮▮▮▮▮▮▮▮    Karen Lefcourt Taylor |
| CC: | Ward, Peter M.; Hermance B M Schaepman (contact@avocat-schaepman.com); Rogers, Lois |
| | J.; ▮▮▮▮▮▮▮▮    Lubar, Charles; Fischer, Joerg; Schreyer, Leslie J.; |
| | Baker, Stuart D. |
| Sent: | 5/3/2010 7:30:18 PM |
| Subject: | Family Meeting |
| Attachments: | MDS Family Charter (1 Oct 2003).PDF |

Dear All,

This is to confirm that the Family meeting will take place at **11.00am tomorrow at 62nd Street**. Kathe has kindly agreed to the meeting starting at that time even though she will be travelling into Manhattan at that time (we will join her in by telephone). The meeting will continue to 5.00pm or thereabouts. In the event that we do not finish our business tomorrow, we will continue on Thursday at 11.00am. On that occasion Ilene has a prior commitment but has also kindly agreed to the earlier start. She will join us at midday.

The Agenda will be as follows:

1. Trustee/Protector presentation to include
   - Summary and overview of Mortimer's wills and testamentary gifts
   - Guidance as to the Trustees/Protectors future approach
   - Report on salaries/consultancy fees paid to certain Family members

2. Presentation on the work that is being done following Mortimer's death with a particular emphasis on the fiscal implications of this and the work that is being done to address these.

3. A discussion as to the Family Charter (a further copy of which is attached). The intention is **not** to get into a detailed analysis of the terms of this document but rather have a discussion as to how best to bring it up to date and when this could happen.

4. E62nd Street.

5. Philanthropy. There is a separate detailed agenda covering this which I will leave Christopher to circulate.

I look forward to seeing you all tomorrow.

Kind Regards,

Jonathan

Jonathan White

Consultant

Ogier
Whiteley Chambers
Don Street
St Helier
Jersey
JE4 9WG
British Isles

Tel: +44 (0)1534 504472
Fax: +44 (0)1534 887379
www.ogier.com

PUBLICLY FILED PER STIPULATION [ECF 2140]

OUTSIDE PROFESSIONALS' EYES ONLY-SUBJECT TO PROTECTIVE ORDER    MSF00077969

Excellence Ogier
Bahrain   British Virgin Islands   Cayman Islands   Guernsey
Hong Kong   Ireland   Jersey   London   Tokyo

P please consider the environment before printing this email

--------------------------------------------------------------------------------------------------------------

This e-mail is confidential and may also be privileged.
If you are not the intended recipient, please notify the sender immediately.
You should not copy it or disclose its contents to any other person.

Internet communications cannot be guaranteed to be secure or error free as information could be intercepted,
corrupted, lost, arrive late or contain viruses.
The sender does not accept liability for any errors or omissions in the context of this message which arise as a
result of internet transmission.
If we receive a request from you via e-mail we will treat that as authority to reply by e-mail.

Information on the Ogier Group, its law practices and companies including their registered offices and where
relevant, details of their local regulators can
be accessed via the Ogier Group website:-

www.ogier.com/pages/legalnotice.aspx

OUTSIDE PROFESSIONALS' EYES ONLY-SUBJECT TO PROTECTIVE ORDER                    MSF00077970

UNREDACTED - CONTAINS OUTSIDE PROFESSIONALS' EYES ONLY INFORMATION -
TREAT SUBJECT TO PROTECTIVE ORDER

# EXHIBIT 54

# FAMILY COUNCIL MEETING
### 15 East 62nd Street
### Monday 5th November 2012 - 10 am to 5 pm

| **Attendees:** | Dame Theresa E Sackler | Ilene Sackler Lefcourt |
| --- | --- | --- |
| | Kathe A Sackler MD | Samantha Sackler Hunt |
| | Mortimer D A Sackler | Marissa T Sackler |
| | Sophia D Sackler Dalrymple | Michael D Sackler |
| | Jeffrey Lefcourt | Karen Lefcourt Taylor |

| **In Attendance**: | Stuart D Baker | Jörg Fischer |
| --- | --- | --- |
| | Charles G Lubar | Christopher B Mitchell |
| | Leslie J Schreyer | Jonathan G White |
| | Hermance B M Schaepman | Peter M Ward |

1. **FINANCIAL**

    1. Comparison of actual performance against Budget for Trusts for first 6 months of 2012 (JF)
    2. Projected distributions for remainder of 2012 (JF)

2. **BANKING AND INVESTMENTS**

    1. Investment Committee remit (JGW/MDAS)
    2. Investment update (MDAS)
    3. Report on banking, currencies and acquisition of Treasury Bills (SDB, JF, CGL, LJS, JGW)

3. **BUSINESS**

    1. Business issues not covered by Beneficiaries meeting (KAS/SDB)

4. **PHILANTHROPY**

    (See separate CBM Agenda)

5. **DATES, VENUE AND FREQUENCY OF 2013 MEETINGS**

6. **ANY OTHER BUSINESS**

PUBLICLY FILED PER STIPULATION [ECF 2140]

# EXHIBIT 55

| | |
|---|---|
| **From:** | Samantha Hunt |
| **To:** | Dame Theresa Sackler & Mr. Paul Deemer |
| **CC:** | Mortimer Sackler |
| **Sent:** | 9/22/2017 1:49:58 PM |
| **Subject:** | Re: Family Council Meeting Agenda - Business issues |

OK - will be free after about 6:30 - but will email you if free before. xx

On 22 Sep 2017, at 14:45, Sackler, Dame Theresa < ████████████████ > wrote:

Let's speak - can update u on my chat with Stuart etc ,
Just landing Italy / will phone at teatime xx

Sent from my iPhone

On 22 Sep 2017, at 13:41, Samantha Hunt ████████████ wrote:

Hi there
I think I should let you see the below - but am not yet forwarding to all ... let me know if you think I should.

I asked Jonathan last time we all met what Les thought of the direction the framework agreement was going in - and if Les had seen any part of the draft. He told me he hadn't seen it as yet - but that they were meeting to discuss it. This was before the summer and then I heard no more.

So when he sent out the email earlier this week re Jeff joining the meeting I asked him again. See below response.

I think this is really poor handling of the entire situation - why waste everyone's time energy and rack up huge fees if there is a fundamental flaw/issue with the way the re structuring is being approached.

Best

Sam

Sent from my iPhone

Begin forwarded message:

**From:** Jonathan White ████████████████
**Date:** 22 September 2017 at 12:06:07 BST
**To:** Samantha Hunt ████████████
**Cc:** Jonathan White ████████████████
**Subject: Re: Family Council Meeting Agenda - Business issues**

Hi Samantha,

Stuart in particular has reservations which is why I think we need to discuss with the whole Family. As I said in my email the whole advisor group discussed the matter recently and feels that we need to discuss a number of alternatives with you all (and not just the framework agreement).

PUBLICLY FILED PER STIPULATION [ECF 2140]

OUTSIDE PROFESSIONALS' EYES ONLY-SUBJECT TO PROTECTIVE ORDER

MSF00591611
MSF00591611

UNREDACTED - CONTAINS OUTSIDE PROFESSIONALS' EYES ONLY INFORMATION - TREAT SUBJECT TO PROTECTIVE ORDER

I looked forward to seeing you on the 3rd.

Kind Regards

Jonathan

Jonathan White



On 21 Sep 2017, at 16:18, Samantha Hunt                                                      > wrote:

Jonathan

Have you now also discussed the specifics of the Agreement with Les?

It would be good if we could understand how this agreement could change our current structure. For better/for worse.

Thanks

Samantha

Sent from my iPhone

On 21 Sep 2017, at 10:26, Jonathan White
<                                                      > wrote:

Dear All,

The Trustee/Protector Group recently met and, amongst other things, discussed the Framework Agreement.

We have certain reservations about the Framework Agreement and, in particular, are concerned about how any "supervisory" board might work. The first draft of the Framework Agreement contained reserved powers which were capable of being construed extensively and which potentially run the risk of allowing the supervisory body to act in an executive capacity. I talked to Jeff and Jen about this and said that, taking these factors into account and also factoring in our duties as trustees, we felt that these concerns should be canvassed with the Family.

We concluded that there should be a discussion of this matter at the forthcoming Family Council meeting where we should explain the reservations and discuss alternatives We, including Jeff and Jen, see the possible alternatives and approach to be adopted at the Family Council meeting as follows:


*  We should explain the process that has been conducted to date, what it is designed to achieve, the framework agreement itself and the risks attached to having a supervisory board if that body interferes in the executive functions and duties of the operating board.

PUBLICLY FILED PER STIPULATION [ECF 2140]
OUTSIDE PROFESSIONALS' EYES ONLY-SUBJECT TO PROTECTIVE ORDER                    MSF00591612
MSF00591611

*  We should discuss whether it is right to have family participation on boards and if the conclusion is that it is, we should decide how that participation should be achieved and in particular whether it should be on a full board or some form of supervisory shareholder body or both.

*  If the desire is to have some form of family representation on a shareholder body we should consider how that would work with trustee participation in order to preserve the integrity of the trusts and the legal decision-making powers of the trustees as owners; and

*  As part of the discussions we should also consider the current structure and whether the family members (including the A directors in particular) regard this as the currently fit for purpose (acknowledging that it has served the trustees and Family well over the years) and potentially something that can remain for the future

Jeff will, coincidently, be in London at that time and has a strong preference to participate in the meeting as he and Jen have been most closely involved in the drafting of and discussions relating to the Framework Agreement. We agree that it would be helpful to have Jeff present but believe that his participation should be limited only to the first item on the Agenda (business issues).

Please confirm that, as A Directors, you agree with the approach outlined above and, in particular, that you are happy for Jeff to attend the first item.

Kind regards,

Jonathan

Jonathan White

This e-mail message has been scanned for Viruses and Content and cleared by Mimecast. Plain text email is unsecure. This email is confidential and is subject to disclaimers. Details can be found at:
http://www.intertrustgroup.com/disclaimer.aspx

This e-mail message has been scanned for Viruses and Content and cleared by Mimecast. Plain text email is

PUBLICLY FILED PER STIPULATION [ECF 2140]
OUTSIDE PROFESSIONALS' EYES ONLY-SUBJECT TO PROTECTIVE ORDER

UNREDACTED - CONTAINS OUTSIDE PROFESSIONALS' EYES ONLY INFORMATION.
TREAT SUBJECT TO PROTECTIVE ORDER

unsecure.
This email is confidential and is subject to disclaimers. Details can be found at: http://www.intertrustgroup.com/disclaimer.aspx

PUBLICLY FILED PER STIPULATION [ECF 2140]
OUTSIDE PROFESSIONALS' EYES ONLY-SUBJECT TO PROTECTIVE ORDER

MSF00591614
MSF00591611

# EXHIBIT 56

Message

---

**From:** Sackler, Dame Theresa
**Sent:** 19/06/2015 18:03:45
**To:** Jonathan White [
**CC:** Sackler Lefcourt, Ilene (AF)                                    Sackler, Mortimer D.A. (
                              Sackler, Dr Kathe (AF) [                              ]; Lubar, Charles
[clubar@morganlewis.com]
**Subject:** Re: Advisor Notice re Tax Distributions


Sorry for late reply ....I agree that the letter should now be sent in this form.
Thanks, Theresa

Sent from my iPad

> On 19 Jun 2015, at 12:19, Jonathan White <Jonathan.White@elian.com> wrote:
>
> Dear All,
>
> Are we  agreed that the second version can go. I sense that there is a consensus around that but wanted
to make quite sure.
>
> Kind Regards
>
> Jonathan White
> Consultant, Elian Private Wealth
> D  +44 1534 504472
> T  +44 1534 504000
> F +44 1534 887379
> elian.com
>
> ELIAN
> BAHRAIN | BRITISH VIRGIN ISLANDS | CAYMAN ISLANDS | DUBLIN |GUERNSEY
> HONG KONG | JERSEY | LONDON | LUXEMBOURG | NEW YORK | TOKYO
>
>
>
> -----Original Message-----
> From: Sackler-Lefcourt, Ilene (AF) [mailto
> Sent: 15 June 2015 15:51
> To: Jonathan White
> Cc: Sackler, Mortimer D.A. (Stillw); Sackler-Lefcourt, Ilene (AF); Sackler, Dr Kathe (af); Dame Theresa
Sackler; Lubar, Charles
> Subject: Re: Advisor Notice re Tax Distributions
>
> I agree with Jonathan's rewrite
>
>
>
>> On Jun 12, 2015, at 2:39 PM, Jonathan White <Jonathan.White@elian.com> wrote:
>>
>> Dear Mortimer,
>>
>> You asked me to rework the email to Stuart and the revised form follows. For the reasons expressed
previously, I do NOT favour sending a letter of this kind and below you will find an alternative email
which makes the same point in a different way. I would recommend that that be sent as it makes the point.
>>
>> The form which you have requested is as follows
>>
>> "Dear Stuart,
>>
>> I am writing to you as the single one way Director of the various Private Trust Companies which act as
Trustees for the Mortimer Family. In that capacity, I have consulted with Charles Lubar as well as the
"A" Directors who are, in turn, the representatives of the Mortimer Family and their Trustees on the
Boards of the two way businesses. This email relates to the concerns which we have concerning the
decision to allocate cash from the Bermuda entities for supporting various business initiatives with the
effect that, notwithstanding the fact that the Bermuda Companies had profits, they did not have cash
available to make "Tax" distributions in the normal manner. You are well aware of the detail of these
concerns. Whilst the A Directors acknowledge that they were of the aware of and agreed to the funding of
China, in particular, from Bermuda, they did so in the belief that Tax distributions would also be made.
>>

---

OUTSIDE PROFESSIONALS' EYES
ONLY – SUBJECT TO PROTECTIVE PUBLICLY FILED PER STIPULATION [ECF 2140]
ORDER

>> The A Directors ( I say the A Directors because it was the Boards which authorised the spend) believe
that those advisors who were charged with allocating spend across the various business knew that it was a
requirement of the Mortimer Family Trustees, the A Directors and of the Mortimer Family generally that no
allocation should be made to Bermuda unless the Bermuda companies continued to have free cashflow to make
Tax distributions. Contrary to the clear understanding that existed, the effect of the decisions at the
end of last year did not take that overriding requirement into account. Accordingly, you are hereby
requested to work immediately with those same individuals to remedy the situation in order to put the
Bermuda companies back into a position to pay Tax Distributions that were due in respect of prior years.
>>
>> Kindly confirm that this will be done"
>>
>> The alternative which I would suggest is as follows
>>
>> Dear Stuart,
>>
>> This email relates to the concerns which have been expressed concerning the decision to allocate cash
from the Bermuda entities for supporting various business initiatives with the effect that,
notwithstanding the fact that the Bermuda Companies had profits, they did not have cash available to make
Tax distributions in the normal manner. You are well aware of the detail of these concerns. Whilst the A
Directors acknowledge that they were of the aware of and agreed to the funding of China, in particular,
from Bermuda, they did so in the belief that Tax distributions would also be made.
>>
>> As you know, it was the expectation of the Mortimer Family Trustees, the A Directors and of the
Mortimer Family generally that no allocation would be made to Bermuda unless the Bermuda companies
continued to have free cashflow to make Tax distributions. The effect of the decisions at the end of last
year did not take that overriding expectation into account. We would not wish for something like this to
happen again and the purpose of this email is to ask you to impress upon the two way advisors the need to
ensure that (a) any agreement concerning distributions of any kind is always respected when funding
requirements are allocated across the businesses and (b) those advisors will always ensure that these
matters are taken fully into account before funds are allocated for other purposes.
>>
>> Kindly confirm that this will be done"
>>
>>
>>
>>
>> Kind Regards
>>
>> Jonathan
>>
>> Jonathan White
>>
>> --------------------------------------------------------------------
>> ------------------------
>>
>> PLEASE NOTE THAT WITH EFFECT FROM 29 SEPTEMBER 2014, OGIER FIDUCIARY SERVICES HAS RE-BRANDED AS ELIAN.
>>
>>
>> This e-mail is confidential and may also be privileged.
>> If you are not the intended recipient, please notify the sender immediately.
>> You should not copy it or disclose its contents to any other person.
>>
>> Internet communications cannot be guaranteed to be secure or error
>> free as information could be intercepted, corrupted, lost, arrive late or contain viruses.
>> The sender does not accept liability for any errors or omissions in
>> the context of this message which arise as a result of internet transmission.
>> If we receive a request from you via e-mail we will treat that as authority to reply by e-mail.
>>
>> Information on the Elian Group and its companies including their
>> registered offices and where relevant, details of their local
>> regulators can be accessed via the Elian website
>>
>> www.elian.com/legalnotice
>

OUTSIDE PROFESSIONALS' EYES
ONLY – SUBJECT TO PROTECTIVE
ORDER
PUBLICLY FILED PER STIPULATION [ECF 2140]

MSF90010332

MSF90010331

UNREDACTED - CONTAINS OUTSIDE PROFESSIONALS' EYES ONLY INFORMATION -
TREAT SUBJECT TO PROTECTIVE ORDER

# EXHIBIT 57

Message

**From**:          Beth Sackler
on behalf of    Beth Sackler
**Sent**:          6/12/2015 5:54:12 PM
**To**:            David Sackler
**CC**:            Richard Sackler ; J Ruggles-Sackler
**Subject**:       Re: Updates

Hi David,

I have read your email, and it is so very much to take in.  Please know that in the next few days, I'll think on it carefully and get back to you.
David, you have always held a very special place in my heart (being our firstborn), and I only want what is best for you.  Enjoy your time with Joss in Rome, and know I love you.

Mom

Sent from my iPhone

On Jun 12, 2015, at 3:48 PM, David Sackler            wrote:

Mom, Dad and Joss,

As we're leaving for Rome tonight, I thought I'd put this together to voice some thoughts.  I realize dad isn't great with e mail, so he may not read this, or may read it after it's already dated and events have changed the relevance of some of this.  But on the off chance he's not too busy over the coming week I thought I'd send it off.



PUBLICLY FILED PER STIPULATION [ECF 2140]

BCOH0000049
BCOH0000049

Apartment



Work

I'm not sure anyone appreciates the full extent of what I do and the stress involved.  For reference here are my jobs.

1)      <!--[if !supportLists]--><!--[endif]-->Manage the family fortune.  Beyond pushing myself to excel, I work for a boss (Dad) with little understanding of what I do.  He's incredibly risk averse, but sometimes this oscillates to wanting more returns or characterizing things without context as "terrible, bad, shitty, crappy, broken, in the doldrums" or any other derisive term you'd like to lob at me.

a.      <!--[if !supportLists]--><!--[endif]-->I field a barrage of random macro musings from Dad.  He admits these theories haven't come to fruition, but each new one needs to be vetted.  I also get unintentionally hostile e mails to me and my staff, and requests for massive projects thrown at us willy-nilly.  I'm not saying all of this is bad.  Some of the projects help us be better as far as internal management of the SR entity HR function.  I do them, and deliver them, but these things are often quite involved and stressful.

b.      <!--[if !supportLists]--><!--[endif]-->I have to handle all of that, which often includes managing dad into understanding his course may not be optimal, while making good returns and fighting to not trail benchmarks all the

PUBLICLY FILED PER STIPULATION [ECF 2140]

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

while focusing on risk. This may look easy to you. It's quite literally the hardest job in the world, and as such people who do it get paid very well. I want to say it again for emphasis. Compiling a track record the way I have, both at Moab, and at Summer Road, is literally the most difficult thing on earth to succeed at. I don't always succeed, but if I compared my track record against anyone in a comparable business I think it would stack up favorably. You may lack the context, but I'm awash in it. Summer Road is already something to be proud of, and it's turning into something unique. All it needs is time and attention.

c.  When I mentioned to Dad that had I stayed at Moab I would be making $6mm per year (math below), Dad's comment was "maybe it was a mistake to leave Moab." Talk about a spirit-killing response. How about, "Thank you so much for doing what I always asked you, building a staff and focusing on the family office side of things to benefit the family, not just Moab." I was excited to leave Moab for this, and I'm still happy with the choice to help the family. Everything I've done here has been to put my sisters' interests ahead of my own. It just hurts to hear that "maybe that was a bad choice."

i.  Moab has $&#9608;&#9608;&#9608;. There are more fees on the discounted assets, so there's more money, but it's not relevant right now. The combined fee is then &#9608;&#9608;&#9608; pays the staff and overheads and &#9608;&#9608; and I would take in &#9608;&#9608;&#9608;. &#9608;&#9608; has hired more senior staff to replace me and I own some equity, so he's not making &#9608;&#9608;&#9608;.

2)  Sit on the Purdue/Mundi boards

a.  This is far from enjoyable in any way. These boards are contentious, the pace is incredibly tedious most times, the boards are far too large, and the businesses aren't growing the way they once did.

b.  I think I contribute as much as any of our outside directors, but I'm not sure. When I chatted with Stuart a year ago about maybe stepping off the boards to focus more time on Summer Road, he told me he thought it would be a huge blow to management morale. I don't know how to evaluate my performance, as we don't rate board members, but I'd like to think I do a good job. I don't always have the patience to sit through the tedium, but I do the reading and contribute actively. Dad told me yesterday he thought I contributed at least as much as the outside directors, which is nice to hear.

3)  Manage money for whomever Dad throws my way. &#9608;&#9608; is just one example, but there are others. I get that it's dad being proud of the work I do, but it consumes time and puts another layer of pressure on me. That $28k probably means a ton to &#9608;&#9608; and I want to do a great job with it. I feel responsible for her. I realize dad never considered this, but I have to sit around and think about risk tolerance, returns, dividends etc based on each person. (Sometimes these "clients" refuse to answer questions about these issues, or in &#9608;&#9608; case they can't as she lacks the knowledge.) So I just take this on and do the best I can, but I worry about a stock blowing up on them. We can take it, but they may not be able to.

4)  Be Dad's right hand for everything. I get that Dad is getting older and gets little to no help from anyone else. But I'm pulled into what feels like every financial decision, real estate transaction, economic/stock market research project, extra Purdue research projects, and so on. It's flattering that I'm trusted so greatly, but it's real time I devote to this stuff. It can be stressful. The Utah &#9608;&#9608;&#9608; transaction is an example. We have a seller pushing us to get closed, and we delay so that Dad can maximize the tax efficiency of the purchase for estate tax purposes. (We're talking a few hundred thousand dollars spread over the rest of Dad's life if we screw it up and don't optimize it.) To me that's not worth delaying for and it's tension-provoking to have &#9608; beating on us about how his wife doubts we'll close. I don't want to lose the transaction over the estate tax side of things. That's just one example. I'm not trying to be critical of Dad at all. He's got his process and that's fine, but his process often creates stress on those around him.

### What's the point?

This is critical for me. If the point of all this money is to not touch it and be able to say we're incredibly frugal rich people, that's fine. Jon Sackler seems to want to do this. He's bragged to me about how little money he spends on things. (His kids all had their own bedrooms, and &#9608;&#9608;&#9608; is probably the best address in Greenwich, but I grant his wardrobe hasn't seen a dollar invested in it for a decade.) He's talked about giving all his money away when he

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

BCOH0000051
BCOH0000049

dies. All of that is great if that's the life he wants. Warren Buffet is a good example of someone similar. Jon has been trying to retire for 10 years or so. He's developed other interests outside investing and Purdue, and spends a ton of time on them. He's made an affirmative decision that he's got enough money, that's he's happy, his kids will be happy, and that it's enough. I would guess if asked he'd rank the fact he can't fully pull himself out of the boards and investing as the biggest regret in his life at the moment.

I want to stress something important. Jon made that decision for himself, without it being forced on him. Had he wanted to spend a lot of money, that would be his choice too. No one yells at Dad for chartering a plane and says "That's a horrible thing to do. That's not how we live. Look at your brother." Jon didn't devote his career to making the family richer only to be told, "that's not how you should live Jon." He didn't ask his kids to work on behalf of the family. He told them to go out and be fulfilled. I think film production is something most parents would say, "Oh god how are you going to make a living?" Jon's response was, "If it makes you happy do it." There's no right or wrong answer here for how to raise kids, but I do think it's incredibly hurtful to lump all this stress on me, and ask me to carry the water for my sisters only to learn at age 35 that the plan is to live very frugally. Living where we want and in the apartment we want is the goal I've set for myself. It's really the only hard goal I have.

I don't want to give the wrong impression. I don't want to live like Mortimer Jr or his siblings. There's really one goal as I've said, and it's an apartment like the one we're discussing. I surely want to live well, but I feel that relative to the income generated on the investments, my definition of well doesn't come even remotely close to invading the principal each year. It doesn't even come close to consuming even 10% of the gross income generated by the investments in an average year. **My definition of well falls below the level of income we're talking about between Purdue and Summer Road.** I don't have life goals of a plane, yacht or anything crazy like that. I just want to get my family settled in a place where Joss and I can say, "This is it. We're going to get them off to college from this place." I know that somehow that doesn't compute for you two when your kids say it. I find that strange as you built your dream house and didn't sell it until you split up and no longer used it. You seem to say you don't understand the notion of being settled and the peace that comes from it, yet you lived exactly that.

I said this to dad, but it bears repeating. If using a low single digit percentage of the investment portfolio held in trust for my kids and I on an apartment is too extravagant, then I think the family has enough money for as many generations as I could care to count. There's no point being stressed out about the portfolio, Purdue, or anything else relating to family businesses. My kids, their kids, and so on will be covered in virtually every circumstance. I should be maximizing a different kind of utility, health, family, fun and stress reduction. That's where I come out. There's really nothing that's likely to change that viewpoint. The idea of patience was fine when we didn't have what we consider the prefect situation for our family and soon to be another kid or kids on the way. (I'm not sure what patience buys you really beyond stress and anxiety about where to house baby 3 and or 4 as well as stress about the market going up.) The other counter is that it's just a lot of money, which it certainly is, but relative to the size of the money in trust it's not. At asking, paying all the taxes etc, this represents just 3.8% of the investment portfolio held in trust for me and my kids. If the apartment one day were worth nothing, it would be a bad month for the book. So we've circled back to the notion of why I spend my working life making the family richer? Why do that if an investment less than 5% of the book that would give as much joy, and could be borrowed against so it ties up less capital, is too much?

Kids



PUBLICLY FILED PER STIPULATION [ECF 2140]

UNREDACTED - CONTAINS OUTSIDE PROFESSIONALS' EYES ONLY INFORMATION -
TREAT SUBJECT TO PROTECTIVE ORDER

## Income for me

Mom said something to Joss about "one thing at a time. Salary and then be patient for an apartment." Let's be clear, this compensation is deserved. It's not something being handed to me. Dad will be the first to say it should have been paid since the beginning, and he intends to catch me up on all past compensation as well. I don't think it's remotely fair to say that I'm "getting" something here. Annie's use of the trust to buy a house is getting something. (And something I supported.) This income stems from a huge amount of work, stress, and success.

## Manipulation

When my kids were born I made a promise to myself to break the cycle of manipulation that exists in our family. Poppi tried to control his kids with everything at his disposal. Dad more or less acquiesced from what I can see. Jon didn't and had to be lured back over time. For all the good Poppi has done for all of us, he started a pattern of behavior that is very hurtful. By holding money over people's heads while getting them to work for family enterprises, he was able to exert a huge amount of control. Dad has said numerous times that he hated it, and I remember how often he wanted to move us away from CT when I was growing up. (India, China, and I'm sure countless other destinations offered an escape.) Jon did run away for years and it took a lot to bring him back into the fold. Dad has committed to improving this cycle by paying me for my work. That's a great first step. I would urge you both not to use a larger apartment as a tool to coerce Joss and I in any way. I need to break this cycle, one way or the other, before ███████████ are walking and talking. I cannot subject them to it. I find it too destructive, and I know my sisters agree with me.

If you're introspective about it, the girls have chosen to break the cycle in their own ways. Annie has always run away. This is probably her most effective way of establishing some control over her own life. It's worked well. You've both accepted that she's got no career, and likely will never have one. Unless ████████████████████, they will use money from the trusts to support themselves and their kids. (I don't have a problem with this at all. As far as personal utility goes, Annie wins the prize amongst your kids.) Becky, has a driving need to succeed in a field far away from anything her family is doing. Her hatred of learning anything about money management or Purdue demonstrates to me that she's worried about being consumed by the forces that drive my life and being sucked into working for Dad. I'm like Dad, I stuck it out for the family and took the stress that comes with it. I accepted the manipulation to work towards my life goals and help the family. My sisters reacted differently. To go back to the "What's the point" section, if a single digit percentage of the investment portfolio held in trust for me and my kids is too much to spend on our primary home, we will accept that and spend less. But it's going to be hard for me to want to put up with the stresses I do as the aim of amassing wealth for many generations has been attained. Joss and I will look around as to what makes the most sense to live frugally, but to have the life for our kids we think they deserve. They are what counts, and if the life we can give them in NYC doesn't meet what we want for them, we'll go. I'm not trying to threaten either of you. I'm not emotional about this. These are all choices, and in many ways I'd find remaking our life somewhere away from New York, in a less stressful environment very liberating. I can run Summer Road remotely and fly in for board meetings (and join them by phone.) I'll certainly end up physically healthier and more present in my kids' lives.

## Conclusion

As I said, I'm sorry for the time pressure on this apartment. ██████████████████. I'm sorry for letting you down in any way really. As adults we all have issues to deal with, and I hope this note gives you something to think about. I'm not emotional as I write this. Not happy or sad. There's a great big wide world out there, and I want to be sure that my family is as happy as we can possibly be in it. We have the incredible good fortune to have a great deal of money to aid in things like a home. We also have the good fortune to have had me generate multiples of the wealth I want to spend on a home on behalf of the family. So in other words, it's not just good fortune; dad knows as well as I do there's a ton of hard work in it.

I'll look forward to your replies, we'll be heading to Italy this evening.

PUBLICLY FILED PER STIPULATION [ECF 2140]

<image001.png>

<C21 Sackler 061015 Study.pdf>

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

BCOH0000054
BCOH0000049