# EXHIBIT 58

# *In Re: Purdue Pharma L.P., et al.*

## Presentation of Defenses

Pursuant to November 5, 2019 Amended Stipulation ¶17(b) (ECF No. 431)

Joseph Hage Aaronson LLC

Counsel to Raymond Sackler Family ("Side B")

THIS PRESENTATION CONTAINS CONFIDENTIAL / HIGHLY CONFIDENTIAL MATERIAL SUBJECT TO PROTECTIVE ORDER AND FEDERAL RULE OF EVIDENCE 408

1

# *Good Faith And Reasonableness*

THIS PRESENTATION CONTAINS CONFIDENTIAL / HIGHLY CONFIDENTIAL MATERIAL SUBJECT TO PROTECTIVE ORDER AND FEDERAL RULE OF EVIDENCE 408

PUBLICLY FILED PER STIPULATION [ECF 2140]

# Board Knew There Was Federal Oversight Of Purdue Marketing From 2007 To December 31, 2012

- Purdue operated under Corporate Integrity Agreement ("CIA") and reported to the Office of the Inspector General ("OIG")

**CORPORATE INTEGRITY AGREEMENT**
**BETWEEN THE**
**OFFICE OF INSPECTOR GENERAL**
**OF THE**
**DEPARTMENT OF HEALTH AND HUMAN SERVICES**
**AND**
**PURDUE PHARMA L.P.**

CORPORATE INTEGRITY AGREEMENT
BETWEEN THE
OFFICE OF INSPECTOR GENERAL
OF THE
DEPARTMENT OF HEALTH AND HUMAN SERVICES
AND
PURDUE PHARMA L.P.

I. PREAMBLE

Purdue Pharma L.P. (Purdue) hereby enters into this Corporate Integrity Agreement (CIA) with the Office of Inspector General (OIG) of the United States Department of Health and Human Services (HHS) to promote compliance with the statutes, regulations, and written directives of Medicare, Medicaid, and all other Federal health care programs (as defined in 42 U.S.C. § 1320a-7b(f)) (Federal health care program requirements) and with the statutes, regulations, and written directives of the Food and Drug Administration (FDA requirements). Contemporaneously with this CIA, Purdue is entering into a Settlement Agreement with the United States.

Prior to the Effective Date (as defined below), Purdue established a voluntary compliance program (Corporate Compliance Program), which includes a corporate Compliance Officer and Corporate Compliance Council, a Code of Business Conduct for all employees, written policies and procedures, educational and training initiatives, review and disciplinary procedures, a confidential disclosure program, and internal review procedures designed, as represented by Purdue, to promote compliance with applicable laws and the promotion of high ethical standards.

II. TERM AND SCOPE OF THE CIA

A. The period of the compliance obligations assumed by Purdue under this CIA shall be five years from the effective date of this CIA, unless otherwise specified. The effective date shall be the date on which Purdue becomes obligated to make payment to the United States of the Settlement Amount established pursuant to the Settlement Agreement between the United States and Purdue, signed on or about the date of signature of this CIA (Effective Date). Each one-year period, beginning with the one-year period following the Effective Date, shall be referred to as a "Reporting Period."

Corporate Integrity Agreement
Purdue Pharma L.P.

1

*Attachment E to Plea Agreement*
*United States v. The Purdue Frederick Company, Inc.*

Case 1:07-cr-00029-JPJ Document 5-5 Filed 05/10/07 Page 1 of 40 Pageid#: 126

2007 Corporate Integrity Agreement

PUBLICLY FILED PER STIPULATION [ECF 2140]

# Board Understood Independent Monitor Assured Compliance With CIA

CIA required an independent reviewer to monitor and certify annually "compliance with all requirements of this CIA."

a. *Engagement of Independent Reviewers*. ==Within 120 days after the Effective Date, Purdue shall engage an entity (or entities), such as an accounting, auditing, or consulting firm (hereinafter "Independent Review Organization" or "IRO"), to perform a Promotional and Product Services Engagement.== Each IRO engaged by Purdue shall have expertise in Federal health care program and FDA requirements. Each IRO shall assess, along with Purdue, whether it can perform the IRO review in a professionally independent and objective fashion, as appropriate to the nature of the engagement, taking into account any other business relationships or other engagements that may exist.

CORPORATE INTEGRITY AGREEMENT
BETWEEN THE
OFFICE OF INSPECTOR GENERAL
OF THE
DEPARTMENT OF HEALTH AND HUMAN SERVICES
AND
PURDUE PHARMA L.P.

I.    PREAMBLE

Case 1:07-cr-00029-JPJ   Document 5-5   Filed 05/10/07   Page 1 of 40   PageID#: 126

2007 Corporate Integrity Agreement, p. 29

31

THIS PRESENTATION CONTAINS CONFIDENTIAL / HIGHLY CONFIDENTIAL MATERIAL SUBJECT TO PROTECTIVE ORDER AND FEDERAL RULE OF EVIDENCE 408

PUBLICLY FILED PER STIPULATION [ECF 2140]

# Board Knew The CIA Heightened Purdue's Compliance Requirements

- Establish a Code of Conduct to ensure compliance
- Establish Policies and Procedures regarding the operation of Purdue's compliance programs
- Train all "Covered Persons"
- Establish an Ethics and Compliance Hotline
- Notify the OIG of any "Reportable Events"
- Submit annual reports to the OIG

CORPORATE INTEGRITY AGREEMENT
BETWEEN THE
OFFICE OF INSPECTOR GENERAL
OF THE
DEPARTMENT OF HEALTH AND HUMAN SERVICES
AND
PURDUE PHARMA L.P.

I. PREAMBLE

Purdue Pharma L.P. (Purdue) hereby enters into this Corporate Integrity Agreement (CIA) with the Office of Inspector General (OIG) of the United States Department of Health and Human Services (HHS) to promote compliance with the statutes, regulations, and written directives of Medicare, Medicaid, and all other Federal health care programs (as defined in 42 U.S.C. § 1320a-7b(f)) (Federal health care program requirements) and with the statutes, regulations, and written directives of the Food and Drug Administration (FDA requirements). Contemporaneously with this CIA, Purdue is entering into a Settlement Agreement with the United States.

Prior to the Effective Date (as defined below), Purdue established a voluntary compliance program (Corporate Compliance Program), which includes a corporate Compliance Officer and Corporate Compliance Council, a Code of Business Conduct for all employees, written policies and procedures, educational and training initiatives, review and disciplinary procedures, a confidential disclosure program, and internal review procedures designed, as represented by Purdue, to promote compliance with applicable laws and the promotion of high ethical standards.

II. TERM AND SCOPE OF THE CIA

A. The period of the compliance obligations assumed by Purdue under this CIA shall be five years from the effective date of this CIA, unless otherwise specified. The effective date shall be the date on which Purdue becomes obligated to make payment to the United States of the Settlement Amount established pursuant to the Settlement Agreement between the United States and Purdue, signed on or about the date of signature of this CIA (Effective Date). Each one-year period, beginning with the one-year period following the Effective Date, shall be referred to as a "Reporting Period."

Corporate Integrity Agreement
Purdue Pharma L.P.

1

*Attachment E to Plea Agreement*
*United States v. The Purdue Frederick Company, Inc*

Case 1:07-cr-00029-JPJ Document 5-5 Filed 05/10/07 Page 1 of 40 Pageid#: 126

2007 Corporate Integrity Agreement

THIS PRESENTATION CONTAINS CONFIDENTIAL / HIGHLY CONFIDENTIAL MATERIAL SUBJECT TO PROTECTIVE ORDER AND FEDERAL RULE OF EVIDENCE 408

PUBLICLY FILED PER STIPULATION [ECF 2140]

# Board Was Informed That OIG Annually Certified Compliance With CIA (2007, 2008, 2009, 2010, 2011, 2012)



Reporting that the OIG Monitor "confirmed" that "Purdue was **in compliance**" with" the CIA

Quarterly Report to the Board, April 2010, p. 12 (PPLP004317547)

Reporting that year 3 of the CIA closed "with **all requirements met** for this period"

Quarterly Report to the Board, July 2010, p. 16 (PPLP004367018)

"**All requirements under the CIA have been met** in Reporting Period 4"

Quarterly Report to the Board, August 2011, p. 28 (PPLP004366913)

"**All requirements under the CIA have been met** in Reporting Year 4"

Quarterly Report to the Board, November 2011, p. 25 (PPLP004366871)

"the Company **continues to maintain a state of effective compliance**, with all components on the Annual Compliance Scorecard **above the established standards**"

Quarterly Report to the Board, November 2012, p. 46 (PPLP004366816)

"the Company **continues to maintain a state of effective compliance**, with all components on the Annual Compliance Scorecard **above the established standards**"

Quarterly Report to the Board, July 2013, p. 46 (PPLPC012000433388)

THIS PRESENTATION CONTAINS CONFIDENTIAL / HIGHLY CONFIDENTIAL MATERIAL SUBJECT TO PROTECTIVE ORDER AND FEDERAL RULE OF EVIDENCE 408

33

PUBLICLY FILED PER STIPULATION [ECF 2140]

# Board Understood That Compliance Was Equally Strict After CIA Ended

## Purdue's Compliance Program



***Post-CIA there will be little change in Purdue's compliance program***

- We will continue to address compliance risks company-wide
- We will continue to do nearly all CIA-required compliance activities
- We will drop a small percentage of total workload that was OIG-centric (e.g., reporting to OIG), but expand other valuable activities

Efforts already underway to communicate to employees about Purdue's compliance program post-CIA



HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY                    U.S. - 56                    PPLP004408048

## Report to Board of Directors:

### Post-CIA Compliance Program

Corporate Compliance Department
July 19, 2012

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY                    U.S. - 54                    PPLP004408046

Quarterly Compliance Report 2Q 2012 (PPLP004408046)

34

THIS PRESENTATION CONTAINS CONFIDENTIAL / HIGHLY CONFIDENTIAL MATERIAL SUBJECT TO PROTECTIVE ORDER AND FEDERAL RULE OF EVIDENCE 408

# From 2007 On, Board Received Quarterly Reports Confirming That Marketing Was In Compliance With Law

| Year | Qtr | Reference | ✓ |
|------|-----|-----------|---|
| 2007 | Q3 | PPLPC019000172297 | ✓ |
| 2007 | Q4 | PPLPC019000195607 | ✓ |
| 2008 | Q1 | PPLP004401169 | ✓ |
| 2008 | Q2 | PPLP004401342 | ✓ |
| 2008 | Q3 | PPLP004402032 | ✓ |
| 2008 | Q4 | PPLP004402205 | ✓ |
| 2009 | Q1 | PPLP004402651 | ✓ |
| 2009 | Q2 | PPLPC012000236639 | ✓ |
| 2009 | Q3 | PPLP004402982 | ✓ |
| 2009 | Q4 | PPLP004403707 | ✓ |
| 2010 | Q1 | PPLP004404102 | ✓ |
| 2010 | Q2 | PPLP004404551 | ✓ |

| Year | Qtr | Reference | ✓ |
|------|-----|-----------|---|
| 2010 | Q3 | PPLP004405460 | ✓ |
| 2010 | Q4 | PPLP004405709 | ✓ |
| 2011 | Q1 | PPLP004406032 | ✓ |
| 2011 | Q2 | PPLP004406466 | ✓ |
| 2011 | Q3 | PPLP004406790 | ✓ |
| 2011 | Q4 | PPLP004407554 | ✓ |
| 2012 | Q1 | PPLP004407950 | ✓ |
| 2012 | Q2 | PPLP004408046 | ✓ |
| 2012 | Q3 | PPLP004408439 | ✓ |
| 2012 | Q4 | PPLP004409357 | ✓ |
| 2013 | Q1 | PPLP004409694 | ✓ |

| Year | Qtr | Reference | ✓ |
|------|-----|-----------|---|
| 2013 | Q2 | Q2 Compliance | ✓ |
| 2013 | Q3 | PPLP004410506 | ✓ |
| 2013 | Q4 | PPLP004410797 | ✓ |
| 2014 | Q1 | PPLP004411696 | ✓ |
| 2014 | Q2 | PPLP004411277 | ✓ |
| 2014 | Q3 | Q3 Compliance | ✓ |
| 2014 | Q4 | PPLP004411811 | ✓ |
| 2015 | Q1 | PPLP004412071 | ✓ |
| 2015 | Q2 | PPLP004412152 | ✓ |
| 2015 | Q3 | PPLP004412546 | ✓ |
| 2015 | Q4 | PPLP004412818 | ✓ |

THIS PRESENTATION CONTAINS CONFIDENTIAL / HIGHLY CONFIDENTIAL MATERIAL SUBJECT TO PROTECTIVE ORDER AND FEDERAL RULE OF EVIDENCE 408

PUBLICLY FILED PER STIPULATION [ECF 2140]

# Board Was Repeatedly Advised Purdue Marketing Was Fully Compliant With Law



### Investigation – DM Requirements

- Bottom Line
  - Investigation revealed that a few District Managers have fallen short of expectations
    - Reviews of call notes
    - Time spent in field doing ride-alongs with representatives
    - Routine administrative activities
    - Accurate and complete documentation (calendars, FCRs, etc.)
  - One CIA-related obligation (completion of FCRs) is deficient
  - Review of call notes and other monitoring has uncovered
    - No Improper Promotion
    - No Inappropriate discussion of abuse, diversion, tolerance, withdrawal
    - No violations of Law

PURDUE    4

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY    PPLP004402654

**Corporate Compliance
Quarterly Report to
Board of Directors
1Q09**

May 8, 2009
Bert Weinstein
Vice President, Corporate Compliance

PURDUE

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY    PPLP004402651

Quarterly Compliance Report 1Q 2009 (PPLP004402651)

THIS PRESENTATION CONTAINS CONFIDENTIAL / HIGHLY CONFIDENTIAL MATERIAL SUBJECT TO PROTECTIVE ORDER AND FEDERAL RULE OF EVIDENCE 408

36

# Board Knew That Purdue Implemented Multiple Marketing Compliance Tools To Ensure Accurate Marketing

- **Marketing and Advertising Materials** – Required review and unanimous approval from Medical Services, Regulatory Affairs, and Legal.

- **Guidelines on Product Promotion** – Prohibited sales representatives from using promotional materials not approved.

- **Promotion Monitoring Program** – Required District Managers to observe and record interactions between sales reps and HCPs. Compliance notified of any potentially improper statements.

- **Sales Call Monitoring** – Legal or Compliance reviewed sales force call notes.

- **Audits** – Compliance conducted audits and monitored key risk activities.

Sources: PPLP004432089, PPLP004431206, PPLP004430145

THIS PRESENTATION CONTAINS CONFIDENTIAL / HIGHLY CONFIDENTIAL MATERIAL SUBJECT TO PROTECTIVE ORDER AND FEDERAL RULE OF EVIDENCE 408

37

# Board Understood That All Marketing Material Was Approved By Medical Services, Regulatory Affairs And Counsel

## Material Review Process SOP:

**General Counsel Review** – (Required) A lawyer in the Office of General Counsel is responsible for reviewing and approving Material to ensure that the Material and relevant supporting documents meet all current requirements including copyright, trademark and patent information including copyright, trademark and patent information requirements.

**Medical Services Review** – (Required) A member of Medical Services is responsible for reviewing and approving Material and relevant supporting documentation to ensure: [1] **Material is consistent with product labeling**, [2] the data cited within the Material is referenced appropriately and correctly, [3] content is written in accordance with current medical practice standards, [4] the Material is medically appropriate for the intended audience, and [5] the Material complies with internal medical review standards.

**Regulatory Affairs Review** – (Required) A member of Regulatory Affairs is responsible for reviewing and approving Material and relevant supporting documentation to ensure that all applicable regulations by the FDA, FTC and other relevant regulatory bodies are met. Regulatory Affairs responsibilities include, but are not limited to: [1] filing the material with the FDA, as required, [2] **confirming approved labeling supports all Material**, [3] ensuring fair balance is achieved for all claims, [4] ensuring there is adequate prominence of required statements, and [5] confirming that any previous commitments to FDA are fulfilled.

PPLP004368480

11/07 Material Review Process SOP (PPLP004368480)

THIS PRESENTATION CONTAINS CONFIDENTIAL / HIGHLY CONFIDENTIAL MATERIAL SUBJECT TO PROTECTIVE ORDER AND FEDERAL RULE OF EVIDENCE 408

38

# Board Understood Sales Force Not Allowed To Deviate From Approved Materials

**2008 Sales Force SOP Manual:**

**Policy Statement**

All Materials that include product information must be approved by the home office in accordance with Purdue's *Material Review and Approval Process* SOP, a copy of which is available on the Policies and Standards page of the Purdue intranet. All product claims made verbally by Sales Force Personnel must be consistent with the product labeling and Company approved Materials.

**Correspondence with HCPs**

Sales Force Personnel generally are not permitted to draft and/or send correspondence to any Health Care Practitioner (HCP) that has not previously gone through the internal Material Review Process and received written approval for distribution except as provided below.

7/30/08 Revised SOPs (PPLP003342665)

THIS PRESENTATION CONTAINS CONFIDENTIAL / HIGHLY CONFIDENTIAL MATERIAL SUBJECT TO PROTECTIVE ORDER AND FEDERAL RULE OF EVIDENCE 408

39

# Board Was Informed That Employees Were Extensively Trained On Compliance

## #3 - Compliance Training

- All Employees receive training on Purdue's Code and on our Healthcare Law Compliance (HCLC) Policies, as noted above
- Sales and Marketing staff also participate in extensive live training sessions on HCLC Policies, including both didactic and scenario-based training, on the laws and regulations of the FDA, CMS, and other regulatory agencies.
- Purdue formally adopted the PhRMA Code on Interactions with Healthcare Professionals, and trains employees on the PhRMA Code
- All Purdue employees are also trained on Purdue's CIA
- All Purdue employees complete training on Adverse Event and Product Complaint Reporting.



**PURDUE** ® Confidential - FOIA EXEMPT                    11

U.S. - 44

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY                    PPLP004405470



**Corporate Compliance Quarterly Report to Board of Directors 3Q10**

November 3, 2010
Bert Weinstein
Vice President, Corporate Compliance

**PURDUE** ®                    1

U.S. - 34

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY                    PPLP004405460

Quarterly Compliance Report 3Q 2010 (PPLP004405460)

40

THIS PRESENTATION CONTAINS CONFIDENTIAL / HIGHLY CONFIDENTIAL MATERIAL SUBJECT TO PROTECTIVE ORDER AND FEDERAL RULE OF EVIDENCE 408

PUBLICLY FILED PER STIPULATION [ECF 2140]

# Board Understood Purdue Audited Potential Areas Of Risk

## 4Q13 Compliance Audits



### Topper's Audit
- To assess the potential that the Annual Topper's Contest might incentivize the Sales Force to inappropriately promote products
- No negative findings – no correlation

### Medical Information Requests
- To provide a level of assurance that inquires received by Medical Services were not solicited and/or confirm whether or not improper promotion may have occurred by Sales Representatives
- No negative findings – no correlation



U.S. - 116

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

PPLP004410807

---

## Quarterly Compliance Report to the Board of Directors for 4Q2013

Bert Weinstein
Vice President, Corporate Compliance
January 16, 2014

U.S. - 106

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

PPLP004410797

Quarterly Compliance Report 4Q 2013 (PPLP004410797)

THIS PRESENTATION CONTAINS CONFIDENTIAL / HIGHLY CONFIDENTIAL MATERIAL SUBJECT TO PROTECTIVE ORDER AND FEDERAL RULE OF EVIDENCE 408

41

# Board Was Informed That All Compliance Issues Were Reported And Remediated

## OIG Communications

Two outstanding matters closed by OIG with "no action"

1) Field Contact Report Matter

Recap: Investigation revealed that a few District Managers had fallen short of expectations for: reviews of call notes; time spent in field doing ride-alongs with representatives; routine administrative activities; accurate and complete documentation (calendars, FCRs, etc.)

OIG's November 24, 2009 email notes:

- "Purdue promptly notified OIG of its discovery" of the issue
- "promptly conducted a nationwide investigation"
- "took remedial action" in consultation with OIG
- "re-trained personnel"
- "commitments made…had been accomplished"
- *"At this time we have no further questions about this matter."*

PURDUE 4

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY PPLP004403710

## OIG Communications

2) OxyContin Savings Card Investigation

Recap: In March, 2009 Purdue discovered and reported to OIG the existence of representative call notes with references to savings cards and federal healthcare programs. Use of the savings cards with such programs is unlawful, and explicitly prohibited by the terms of the cards themselves. Thoroughly investigated by outside counsel, with no evidence of any improper use, OIG remained concerned with risk.

OIG's November 24, 2009 email notes:

"Purdue has met its reporting obligation,' with no further action to be taken by OIG."

*Purdue is nevertheless implementing two new safeguards – a new card activation process (like a credit card), and a new pharmacist verification process when prescriptions are filled*

PURDUE 5

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY PPLP004403711

Corporate Compliance Quarterly Report to Board of Directors 4Q09

February 4, 2010
Bert Weinstein
Vice President, Corporate Compliance

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY PPLP004403707

Quarterly Compliance Report 4Q 2009 (PPLP004403707)

PUBLICLY FILED PER STIPULATION [ECF 2140]

# Board Was Informed That Most Compliance Issues Were Minor



Annual Report was submitted to the Office of Inspector General on September 23rd. The Independent Review Organization's Report on its Transaction and Systems Reviews contained a limited number of **minor observations** and recommendations, to which the company responded as part of the Annual Report. This will be reported in more detail during the quarterly report to the Board.

Quarterly Report to the Board, November 2011, p. 25 (PPLP004366871)



The Final Independent Review Organization (IRO) Report under Purdue's CIA was successfully concluded. . . . **All findings and observations are minor**, but highlight the continued importance of adherence to departmental SOPs, which we continue to address.

Quarterly Report to the Board, November 2012, p. 45 (PPLP004366816)



there have been **no *significant* compliance matters** to report

Quarterly Report to the Board, July 2013, p. 49 (PPLPC012000433388)

THIS PRESENTATION CONTAINS CONFIDENTIAL / HIGHLY CONFIDENTIAL MATERIAL SUBJECT TO PROTECTIVE ORDER AND FEDERAL RULE OF EVIDENCE 408

43

# Board Was Informed That Serious Violations Resulted In Termination

## Other Significant Matters

These additional matters involved violations of SOPs and policies, but are not "Reportable Events"

- District Manager determined representative (long term employee and multi-time Toppers winner) had falsified call records and expense reports. Representative terminated 12/08/08.

- On 12/12/08, sales representative who had previously been investigated for call note inconsistencies self-reported that she had improperly recorded call notes on at least two physicians. Further investigation disclosed representative not following call note reporting SOP. Representative terminated 01/12/09.

- Corporate Compliance received anonymous Hotline that a representative had been arrested for attempting to use a forged prescription for OxyContin. Representative terminated 01/15/09.



8

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY                    PPLP004402212

**Corporate Compliance Quarterly Report to Board of Directors 4Q08**

February 5, 2009
Bert Weinstein
Vice President, Corporate Compliance

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY                    PPLP004402205

Quarterly Compliance Report 4Q 2008 (PPLP004402205)

44

THIS PRESENTATION CONTAINS CONFIDENTIAL / HIGHLY CONFIDENTIAL MATERIAL SUBJECT TO PROTECTIVE ORDER AND FEDERAL RULE OF EVIDENCE 408

# Board Understood Purdue Regularly Updated Compliance Procedures To Meet Regulatory Requirements

## Our Views

- Purdue's compliance program is regularly updated to account for regulatory guidance, including the Sentencing Guidelines, OIG's Compliance Guidance, and CIAs. Our quarterly reports speak to the evolving compliance environment, and seek to keep the Board well-informed of the status of compliance at Purdue, including any significant developments.

- We have a robust risk assessment process that is owned by the business units, updated quarterly, and reviewed by Purdue's senior executive-level compliance council to ensure collaboration, and includes robust auditing and monitoring of key compliance risks.

- The Purdue organization is well trained, sensitive to good compliance practices, and comfortable communicating with the Compliance department.

- We believe have no recommendations for altering practices as a result of this Guidance, will keep you informed of any developments, and will welcome any inquiries from you.



U.S. - 41

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY                PPLP004412163

## Quarterly Compliance Report to Board of Directors for 2Q2015

Bert Weinstein
Vice President, Corporate Compliance
August 20, 2015

U.S. - 30

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY                PPLP004412152

Quarterly Compliance Report 2Q 2015 (PPLP004412152)

THIS PRESENTATION CONTAINS CONFIDENTIAL / HIGHLY CONFIDENTIAL MATERIAL SUBJECT TO PROTECTIVE ORDER AND FEDERAL RULE OF EVIDENCE 408

45

# Board Understood Purdue Regularly Updated Compliance Procedures To Meet Regulatory Requirements

**Compensation of Health Care Professionals at "Fair Market Value"**

Compliance has implemented an updated process with respect to compensation of Healthcare Professionals (HCPs), to ensure Purdue's practices continue to remain in accord with governmental regulations.

1 Q 2012
Compliance Report to Board of Directors
Purdue Pharma L.P.

Bert Weinstein
April 27, 2012

Summary

- Integrity Agreement – no significant issues in 1Q12; CIA "ends" July 30th
- Compliance Program – modest adjustments: less focused on formal CIA elements, more focused on overall risks and substance
- Available on Pharmaceutical Industry CIAs – largely positive OIG report
- on February meeting with "CIA" Compliance Officers
- Fair Market Value Compensation of Health Care Professionals – bringing Purdue compensation of HCPs in line with best practices
- New Sales force Call Note Review Process – greater effectiveness / cost-saving
- Intermezzo Sales Force Compliance Training – positive impression/successful

Corporate Integrity Agreement

U.S. - 186

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY          PPLP004407950

Quarterly Compliance Report 1Q 2012 (PPLP004407950)

46

THIS PRESENTATION CONTAINS CONFIDENTIAL / HIGHLY CONFIDENTIAL MATERIAL SUBJECT TO PROTECTIVE ORDER AND FEDERAL RULE OF EVIDENCE 408

PUBLICLY FILED PER STIPULATION [ECF 2140]

# Board Understood Purdue Constantly Monitored For Violations

## 3Q13  Field Sales Call Note Reviews



Call notes are reviewed for key words and by randomized selection, within 30 days of each month's-end

| Total Calls From Field | Reviewed by Compliance | % of Calls Reviewed | Minor, or No Findings | Major Findings | % Reviewed w/ Major Findings |
|---|---|---|---|---|---|
| 246,449 | 29,180 | 11.82% | 253 | 10 | 0.03% |

Call note reviews are a cornerstone of our overall sales oversight, with a total of 698 total matters evaluated at weekly Sales Discipline Committee meetings during the 3rd quarter

| Remediation | # / % Total |
|---|---|
| DM Coaching | 513 / 73% |
| No follow up needed | 81 / 12% |
| Warning Letter | 56 / 8% |
| Coaching Letter | 41 / 5% |
| Probation Letter | 7 / 1% |

| Top 5 Issues Found | # / % Total |
|---|---|
| Product Indication Errors | 174 / 25% |
| #Products Discussed vs Reported | 103 / 15% |
| Reformulation Messaging | 94 / 13% |
| Poorly Written Call Note | 82/ 12% |
| Potential Comparative Claim | 45 / 6% |

*PURDUE* ®

U.S. - 7

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

PPLP004410510

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

PPLP004410510

## Quarterly Compliance Report to the Board of Directors 3Q2013

Bert Weinstein

Vice President, Corporate Compliance
October 28, 2013

*PURDUE*

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

U.S. - 3

PPLP004410506

Quarterly Compliance Report 3Q 2013 (PPLP004410506)

47

THIS PRESENTATION CONTAINS CONFIDENTIAL / HIGHLY CONFIDENTIAL MATERIAL SUBJECT TO PROTECTIVE ORDER AND FEDERAL RULE OF EVIDENCE 408

# Board Understood Speaker Program Was Carefully Monitored

## Speaker Program Update

- Speaker programs are a relatively high risk activity, in view of the potential for off-label or other improper promotional conduct by third parties during such activities.
- FDA recently issued a warning letter on another company's program
- Purdue has a live monitoring process
  - All programs monitored and reported on by Purdue attendees
  - 8.5% of all speaker programs have had an independent monitor in attendance (exceeds recent CIA standards)
  - To date no substantive concerns have been identified, and minor issues appropriately addressed



U.S. - 22

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY                    PPLP004407563

**Corporate Compliance Quarterly Report to Board of Directors 4Q2011**

January 19, 2012

Bert Weinstein
Vice President, Corporate Compliance

U.S. - 13

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY                    PPLP004407554

Quarterly Compliance Report 4Q 2011 (PPLP004407554)

48

THIS PRESENTATION CONTAINS CONFIDENTIAL / HIGHLY CONFIDENTIAL MATERIAL SUBJECT TO PROTECTIVE ORDER AND FEDERAL RULE OF EVIDENCE 408

PUBLICLY FILED PER STIPULATION [ECF 2140]

# Board Informed Purdue Monitoring Of Speaker Program Kept Risk Low

## 4Q13 Speaker Program Monitoring



**Speaker Programs are in government crosshairs**

- Each Purdue program is reviewed by Field Sales monitoring form
- Independent monitors attend ~5% of programs, with selection based on speaker frequency or for cause
- Most common compliance issues by speakers: did not stay strictly on label and/or follow approved slide deck. Remediated through letters to attendees, corrective speaker training, and dismissal of speakers for repeated lapses. Level of risk is low given our remedial and oversight actions.

| Year | Total Programs | Programs with Compliance Issues | % of Programs with Compliance Issues |
|------|----------------|---------------------------------|--------------------------------------|
| 2011 | 968 | 6 | 0.62% |
| 2012 | 1290 | 12 | 0.93% |
| 2013 | 732 | 3 | 0.41% |



U.S. - 113

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

PPLP004410804

## Quarterly Compliance Report to the Board of Directors for 4Q2013

Bert Weinstein

Vice President, Corporate Compliance

January 16, 2014

U.S. - 106

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

PPLP004410797

Quarterly Compliance Report 4Q 2013 (PPLP004410797)

THIS PRESENTATION CONTAINS CONFIDENTIAL / HIGHLY CONFIDENTIAL MATERIAL SUBJECT TO PROTECTIVE ORDER AND FEDERAL RULE OF EVIDENCE 408

49

# Board Advised That Audit Showed Prescribing Was Not Influenced By Consulting Payments

## Compliance Audit

During Q2, an audit was conducted to explore whether HCP prescribing might have been influenced by consulting payments or other value received from Purdue

- Reviewed 100 highest *prescribers* of Butrans, 100 highest prescribers of OxyContin, and 100 highest Purdue-*compensated* HCPs in 2014
- Results – *There was no correlation found between Purdue's financial relationships with HCPs and their prescribing of Purdue products*
- For the 10 out of 200 "overlapping" HCPs that were both among the highest prescribers <u>and</u> the highest recipients of Purdue compensation, a deeper review indicated that their prescribing of Purdue products was consistent with their prescribing of other long-acting opioids, eliminating concerns that Purdue compensation improperly affected prescribing



U.S. - 33

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY          PPLP004412155

## Quarterly Compliance Report to Board of Directors for 2Q2015

Bert Weinstein
Vice President, Corporate Compliance
August 20, 2015

U.S. - 30

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY          PPLP004412152

Quarterly Compliance Report 2Q 2015 (PPLP004412152)

THIS PRESENTATION CONTAINS CONFIDENTIAL / HIGHLY CONFIDENTIAL MATERIAL SUBJECT TO PROTECTIVE ORDER AND FEDERAL RULE OF EVIDENCE 408

50

# Four Insurmountable Problems

- Purdue **does not have underlying liability**.

- **No reasonable person would have believed** that Purdue would face a meaningful number of opioid-related lawsuits or judgments **before 2017**.

- Purdue's and other companies' experience with opioid litigation shows that **the company could not reasonably have anticipated liabilities beyond its ability to pay**.

- **In 2017, Purdue ceased distributions** once the magnitude of the current wave of litigation became apparent.

THIS PRESENTATION CONTAINS CONFIDENTIAL / HIGHLY CONFIDENTIAL MATERIAL SUBJECT TO PROTECTIVE ORDER AND FEDERAL RULE OF EVIDENCE 408

470

# The Analysis Must Focus On Whether Purdue
# Knew It Would Eventually Face Judgments It Could Not Pay

- Purdue did not face meaningful litigation until 2017.

- Previously, Purdue resolved investigations and lawsuits for manageable amounts.

- Once the "wave" of litigation began in 2017, Purdue ceased making distributions.

THIS PRESENTATION CONTAINS CONFIDENTIAL / HIGHLY CONFIDENTIAL MATERIAL SUBJECT TO PROTECTIVE ORDER AND FEDERAL RULE OF EVIDENCE 408

PUBLICLY FILED PER STIPULATION [ECF 2140]

# "Badges of Fraud" Do Not Evidence Actual Intent

The badges of fraud operate as **circumstantial evidence** of fraudulent intent.

**Direct evidence establishes that Purdue made the distributions in good faith** and without reason to believe it would face insurmountable opioid-related litigation.

The New York and Oregon complaints do not plead, and the facts do not reflect, the presence of most of the traditional badges of fraud.

> **In re Chin**, 492 B.R. 117, 132 (Bankr. E.D.N.Y. 2013)

*"The availability of badges of fraud as circumstantial evidence fulfills an important function, but the utility of a checklist can only go so far."*

> **In re Stanton**, 457 B.R. 80, 94 (Bankr. D. Nev. 2011)

*"Because they are only evidence of the likelihood of fraud, badges of fraud are not given equal weight; and sometimes the circumstances indicate they should be given no weight at all."*

PUBLICLY FILED PER STIPULATION [ECF 2140]

# EXHIBIT 59



**From:** Mahony, Edward
**Sent:** Wed 3/3/2010 1:33:01 AM
**Subject:** RE: FOLLOW UPS --- FROM FEBRUARY 4 BOARD MEETING

Dr Kathe,

1. The market research report was sent a moment ago in a separate email.
2. On insurance ... we think that we are in a best position to place insurance once we have the OTR label and REMS program agreed by the FDA. Until that happens we would be hard pressed to differentiate OTR from OxyContin in the eyes of insurers.

All the best,

Ed

---

**From:** Sackler, Dr Kathe
**Sent:** Tuesday, March 02, 2010 11:36 AM
**To:** Mahony, Edward; Sackler, Beverly; Sackler, Jonathan; Sackler, Dr Mortimer; Sackler, Dr Raymond R; Sackler, Dr Richard; Sackler, Theresa; Sackler Lefcourt, Ilene; Boer, Peter; Lewent, Judy; Pickett, Cecil
**Cc:** Stewart, John H. (US); Gasdia, Russell; Mallin, William; Long, David; Dolan, James; Innaurato, Mike; Sackler, Dr Kathe; Baker, Stuart D.
**Subject:** Re: FOLLOW UPS --- FROM FEBRUARY 4 BOARD MEETING

Dear Ed-

Thank you.
Please circulate the Market Research Summary Report on Intermezzo electronically.

Ed, I think it would be timely and worthwhile to include at the next Board Meeting an update on Insurance. Please consider also how you might be able to access our going forward insurance options sooner than what is outlined below, so that discussion and planning can begin, rather than first

PUBLICLY FILED PER STIPULATION [ECF 2140]

addressing this with a report to the Board three months after product approval.

(I have included SDB, above, as he was inadvertently omitted from the cc list.)

Best regards,
Kathe



K. A. Sackler, M.D.

Assistant:

---

**From:** Mahony, Edward
**To:** Sackler, Beverly; Sackler, Jonathan; Sackler, Dr Kathe; Sackler, Dr Mortimer; Sackler, Dr Raymond R; Sackler, Dr Richard; Sackler, Theresa; Sackler Lefcourt, Ilene; Boer, Peter; Lewent, Judy; Pickett, Cecil
**Cc:** Stewart, John H. (US); Gasdia, Russell; Mallin, William; Long, David; Dolan, James; Innaurato, Mike
**Sent:** Mon Mar 01 16:42:02 2010
**Subject:** FOLLOW UPS --- FROM FEBRUARY 4 BOARD MEETING

Colleagues – At John Stewart's request, the following are answers to certain questions raised at the February 4 Board meeting:

1.  **Q. How much has Purdue spent researching tamper resistant products?**

    A.  $303 million as follows:

| Project | $ million | Timeframe |
|---|---|---|
| Hydrocodone / Naltrexone / APAP | 73 | 2000 - 2004 |
| Oxycodone /Naltrexone | 66 | 2001 - 2005 |
| OxyContin New Formulation (OTR) | 71 | 2007 - 2009 |
| Fentanyl/Naltrexone (transdermal) | 39 | 2000 - 2003 |
| Hydrocodone/Naltrexone | 36 | 2001 - 2004 |
| Hydromorphone TR | 16 | 2007 - 2009 |
| Other | 2 | |

PUBLICLY FILED PER STIPULATION [ECF 2140]

PPLPC012000259876
PPLPC012000259875

UNREDACTED - CONTAINS OUTSIDE PROFESSIONALS' EYES ONLY INFORMATION - TREAT SUBJECT TO PROTECTIVE ORDER

2.   Q. Purdue is in the process of modifying the ▇▇▇▇▇▇▇▇ from ▇▇▇▇ to try to
     eliminate or delay the insurance obligation, which would likely require Purdue to post a
     ▇▇▇▇ million security deposit.  We proposed and ▇▇▇▇ has tentatively agreed to waive
     this insurance requirement, as long as Purdue's net worth is greater than ▇▇ million.
     Mortimer Jr. asked that, as part of the license modification, we try to limit access to
     Purdue's financial statements.

   A.   ▇▇▇▇ has tentatively agreed to accept an E&Y letter representing that Purdue's
        net worth is
        greater than ▇▇ million - instead of the previously discussed submission of full
        financial
        statements.

3.   Q. Jon Sackler asked that we explore buying true risk transfer product liability insurance.

   A.   We will explore the market immediately after the approval of the new formulation of
        OxyContin,
        and then report back to the Board within 90 days.

4.   Q. What is the daily cost of treatment of OxyContin compared to Lyrica and Cymbalta?

   A. The average daily cost of these and other relevant branded medicines are:

|           | Daily Cost at List Price |
|-----------|--------------------------|
| Cymbalta  | $5.58                    |
| Lyrica    | $5.39                    |
| OxyContin | $15.28                   |
| Kadian    | $16.10                   |
| Avinza    | $10.92                   |

Additional Comments:
   I.    The daily cost above is before pharmacy mark-up, manufacturer
         rebates and other manufacturer allowances.
   II.   Cymbalta and Lyrica per tablet price is relatively constant across all
         strengths.
   III.  Typically, branded opioid prices increase as the tablet strengths

CONFIDENTIAL

increase.

    IV.    The daily cost of Lyrica and Cymbalta overlap with OxyContin's daily cost at 10 to 40 mg BID.

**5.**  **Q. There were numerous questions during the Novelos presentation.**

    A.   Jim Dolan circulated a Novelos press release last week which described NOV-002's recent clinical results.

**6.**  **Q. Mortimer Jr asked for a "since-inception" Rhodes Technologies financial report.**

    A.  A report will be completed by the end of March.

**7.**  **Q. During the Intermezzo presentation, Jerry Risco and Mike Innaurato were asked for a summary of completed and planned market research.**

    A.  The summary report is complete, but since it is 10 pages long, it will be sent to those

     Directors who specifically request.

Ed

PUBLICLY FILED PER STIPULATION [ECF 2140]

CONFIDENTIAL

PPLPC012000259878
PPLPC012000259875

# EXHIBIT 61

PUBLICLY FILED PER STIPULATION [ECF 2140]

**To:**   Mahony, Edward
**Cc:**   Rosen, David (Marketing)[                              ]; Innaurato,
Mike[                              ]; Fisher, Windell
**From:**   Gasdia, Russell
**Sent:**   Fri 4/13/2012 9:36:39 AM
**Subject:**   FW: Final - OxyContin Market Events 4-12-12.pptx
Final - OxyContin Market Events 4-12-12.pptx

Ed

I thought you would be very interested in seeing this work done by David's group for Dr. Richard

Russ

**From:** Rosen, David (Marketing)
**Sent:** Thursday, April 12, 2012 9:03 PM
**To:** Sackler, Dr Richard
**Cc:** Gasdia, Russell; Stewart, John H. (US)
**Subject:** Final - OxyContin Market Events 4-12-12.pptx

Hi, Dr. Richard. I was able to wrap this up tonight. This includes both major product liability litigation
as well as patent litigation. Please let me know if you have any questions.

-David

PUBLICLY FILED PER STIPULATION [ECF 2140]

CONFIDENTIAL

**Produced Natively**

PUBLICLY FILED PER STIPULATION [ECF 2140]

PPLPC012000372437
PPLPC012000372437

# OxyContin Market Events

## 4/12/12 - <u>FINAL</u>

PUBLICLY FILED PER STIPULATION [ECF 2140]

FAMR



# OxyContin Market Events

| 1. | January 1995 | Faulding Pharmaceuticals licenses rights to market Kadian to BMS |
| 2. | **December 1995** | **OxyContin was launched by Purdue Pharma with 256 sales reps** |
| 3. | August 1996 | Kadian was launched by Zeneca for Faulding Pharmaceuticals |
| 4. | Q1 1997 | Purdue sales force expands to 323 sales reps |
| 5. | Q1 1998 | Purdue sales force expands to 422 sales reps |
| 6. | Q1 1999 | Purdue sales force expands to 532 sales reps |
| 7. | Q1 2000 | Purdue sales force expands to 674 sales reps |
| 8. | January 2000 | Time Magazine runs an article about OxyContin abuse & diversion |
| 9. | 2000 | Purdue sales force expends to 770 sales reps and creates the Hospital Specialty Division (HSD) |
| 10. | Q1 2001 | Newsweek and other publications run articles about OxyContin abuse & diversion |
| 11. | March 2001 | Barry Meier's first article on OxyContin published in The New York Times |
| 12. | March 2001 | New strengths of Kadian launched by Faulding Pharmaceuticals (30 & 60 mg) |
| 13. | April 2001 | First OxyContin product liability lawsuit filed |
| 14. | December 2001 | Alpharma acquires Faulding, including Kadian |
| 15. | June 2002 | Avinza was launched by Ligand |
| 16. | December 2002 | First WDVA subpoena |
| 17. | **October 2003** | **Spectracef was launched by Purdue Pharma** |
| 18. | January 2004 | First antitrust lawsuits filed |
| 19. | January 2004 | 1st OxyContin patent decision – Endo wins in district court |
| 20. | April 2004 | Teva launches generic OxyContin (80 mg) |
| 21. | June 2004 | Purdue sales force contracts to 550 sales reps |

FAMR

PUBLICLY FILED PER STIPULATION [ECF 2140]
For Internal Use Only. Not for Use in Promotion. Purdue does not promote off-label use.

2



# OxyContin Market Events

| | | |
|---|---|---|
| 22. | January 2005 | Duragesic goes generic |
| **23.** | **February 2005** | **Palladone was launched by Purdue Pharma** |
| 24. | June 2005 | Ivax and Endo launch generic OER (all strengths) |
| 25. | June 2005 | Purdue sales force contracts to 250 sales reps |
| 26. | November 2005 | Watson launches (authorized) generic OER (all strengths) |
| 27. | December 2005 | Teva and Dava/Impax launch generic OER (all strengths) |
| 28. | January 2006 | OxyContin placed on most Medicare Part D plans |
| **29.** | **February 2006** | **Purdue wins Patent appeal** |
| 30. | July 2006 | Opana ER launched by Endo |
| 31. | July 2006 | Settlement of product liability insurance coverage litigation |
| 32. | August 2006 | Licensing agreement with Endo & Teva regarding OxyContin patent infringement |
| 33. | October 2006 | Agreement in principle to settle WDVA investigation |
| 34. | November 2006 | New strengths of Kadian launched by Alpharma (80 mg) |
| 35. | December 2006 | First mass settlement of product liability claims |
| 36. | February 2007 | Watson (authorized) generic OER ceases production |
| 37. | February 2007 | Avinza sold to King Pharmaceuticals from Ligand |
| 38. | April 2007 | New strengths of Kadian launched by Alpharma (200 mg) |
| 39. | April 2007 | Settlement agreement with Impax |
| 40. | May 2007 | Multistate attorney general settlement |
| 41. | May 2007 | Announcement of WDVA plea and settlement |
| 42. | July 2007 | Court approval of WDVA plea and settlement |
| 43. | August 2007 | Filing of next wave of civil litigation (eventually including third party payers, Kentucky Attorney General, class actions, mass actions, individual actions) |
| 44. | September 2007 | New strengths of Kadian launched by Alpharma (10 mg) |

PUBLICLY FILED PER STIPULATION [ECF 2140]
For Internal Use Only. Not for Use in Promotion. Purdue does not promote off-label use.

3



# OxyContin Market Events

| | | |
|---|---|---|
| 45. | **February 2008** | **OxyContin launches three new strengths (15, 30 & 60 mg)** |
| 46. | April 2008 | New strengths of Opana ER launched by Endo (7.5, 15 & 30 mg) |
| 47. | September 2008 | Licensing agreement with Mallinckrodt regarding OxyContin patent infringement |
| 48. | December 2008 | Actavis acquires Kadian from Alpharma |
| 49. | December 2008 | FDA rejects Remoxy NDA from King Pharmaceuticals |
| 50. | December 2008 | OxyContin removed from Humana |
| 51. | Q1 2009 | Purdue sales force expends to 350 sales reps |
| 52. | January 2009 | OxyContin removed from Humana Medicare Part D |
| 53. | February 2009 | New strengths of Avinza launched by King Pharmaceuticals (45 & 75 mg) |
| 54. | **May 2009** | **Ryzolt was launched by Purdue Pharma** |
| 55. | May 2009 | First settlements of next wave of civil litigation |
| 56. | June 2009 | Licensing agreement with KV Pharmaceutical regarding OxyContin patent infringement |
| 57. | September 2009 | Embeda was launched by King Pharmaceuticals |
| 58. | October 2009 | Licensing agreement with Actavis regarding OxyContin patent infringement |
| 59. | 2010 | Settlement of antirust cases |
| 60. | Q1 2010 | Purdue sales force expends to 400 sales reps |
| 61. | March 2010 | OxyContin low ABUK patent suit filed |
| 62. | April 2010 | Approval of OxyContin Reformulation |
| 63. | April 2010 | Exalgo was launched by Covidien |
| 64. | April 2010 | Kadian patent expired |
| 65. | **August 2010** | **OxyContin Reformulation launched by Purdue Pharma** |
| 66. | November 2010 | Pfizer to acquire King Pharmaceuticals |
| 67. | November 2010 | FDA requests withdrawal of all propoxyphene products (Darvon, Darvocet, and generics containing propoxyphene) due to serious potential heart risks |

FAMR

PUBLICLY FILED PER STIPULATION [ECF 2140]
For Internal Use Only. Not for Use in Promotion. Purdue does not promote off-label use.



# OxyContin Market Events

| | | |
|---|---|---|
| 68. | Q1 2011 | Purdue sales force expends to 525 sales reps |
| **69.** | **January 2011** | **Butrans was launched by Purdue Pharma** |
| 70. | January 2011 | OxyContin removed from Caremark (Silverscript) Medicare Part D |
| 71. | January 2011 | OxyContin removed from Aetna Medicare Part D |
| 72. | January 2011 | OxyContin removed from Wellpoint Medicare Part D |
| 73. | March 2011 | Embeda was voluntarily recalled by King Pharmaceuticals because a pre-specified stability requirement was not met during routine testing. |
| 74. | March 2011 | 1st OxyContin patent suit filed on reformulation |
| 75. | June 2011 | FDA rejects Remoxy NDA from Pfizer & King Pharmaceuticals |
| 76. | July 2011 | Florida law goes into effect that bars most physicians from dispensing controlled substances from their offices |
| 77. | September 2011 | Florida starts state monitoring database that tracks retail sales of controlled substances |
| 78. | September 2011 | Nucynta ER was launched by Janssen |
| 79. | November 2011 | Kadian generics are available |
| 80. | November 2011 | OxyContin added back to Caremark (Silverscript) Medicare Part D |
| 81. | January 2012 | Endo Pharmaceuticals temporarily suspends production of several products due to errors in the packaging of the tablets.  Products include: Opana (Endo), Opana ER (Endo), Percodan, Endocet, Oxymorphone (Endo), Percocet, Zydone, Endodan, Morphine |

FAMR

PUBLICLY FILED PER STIPULATION [ECF 2140]
For Internal Use Only. Not for Use in Promotion. Purdue does not promote off-label use.

5



FAMR



PUBLICLY FILED PER STIPULATION [ECF 2140]

For Internal Use Only. Not for Use in Promotion. Purdue does not
promote off-label use.

6

PURDUE

FAMR

PUBLICLY FILED PER STIPULATION [ECF 2140]
For Internal Use Only. Not for Use in Promotion. Purdue does not
promote off-label use.

PURDUE

FAMR



PUBLICLY FILED PER STIPULATION [ECF 2140]
For Internal Use Only. Not for Use in Promotion. Purdue does not promote off-label use.

8



# EXHIBIT 62

Message

| | |
|---|---|
| **From:** | Sackler, Dr Richard |
| **Sent:** | 11/20/2006 3:26:52 PM |
| **To:** | jds |
| **Subject:** | Pharma issues 061119 |

Let me read this and get back to you. I have given it to Dad to read as well.

---

Rich,

I've been thinking about our pharma issues and want to share some ideas and observations with you. They are not the result of careful review – just a reaction to what we heard and discussed over the past few weeks. If you think it's useful, maybe we can flesh this out and focus on some items for more careful review and follow-up action.

The possible actions I listed below are meant for discussion – they're not proposals.

PLEASE KEEP THIS CONFIDENTIAL.

1. General conditions.

It seems that in every market, governments are implementing and plotting new ways to cut pharma revenue. And the industry is now enshrined as a permanent whipping boy for the politicians, regulators and trial bar. Against that headwind, valuable innovations are still generally well rewarded.

In our case, CR opioids are facing contradictory forces that make the future even harder to define. The concept is getting long in the tooth and more competitors are entering the market. Pricing is increasingly an issue. They're running low on patent life and suffering from attacks against patents by generic companies. Getting caught in the crossfire of the "war on drugs" is obviously a huge risk – we know the cost (at least, we hope we know the cost) in the US, we just don't have a way to evaluate the risk of a blow-up in Europe or Asia.

PUBLICLY FILED PER STIPULATION [ECF 2140]
HIGHLY CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

On the other hand, there's a big, dissatisfied, under-treated market to address. And we have an innovation in Targin that <u>might</u> prove to be important and relatively well protected – I'm not clear on the range of our IP.

Bottomline, all of the above drives a lot of volatility. As folks with a disproportionately large investment in a few companies in this industry, we have to ask ourselves if we have the stomach for that kind of volatility.

2. Europe.

Financial performance. I was surprised at how little money or free cash is coming out of these operations. Also, the high cost and long timelines to develop Targin are troubling. I'm not criticizing Ake/Karen – I am prepared to believe that this is a fact of life in our industry. But the bottomline for us is that we are very exposed to generic OxyContin (and with 5 rumored applicants, it seems inevitable that our exclusivity will be challenged within months and we will have to try our patents) and we have neither the cashflow cushion nor the new product opportunities to avoid significant cutbacks to the operations in the event of infringement. And that would leave us without the kind of cash required to generate new products like Targin.

OxyContin patents. As far as I can tell, we have an appropriate legal team addressing the patent issues. I have no thoughts on how to improve it or reduce risk.

Governance. I am impressed with Ake. I think he's a good businessman and, as far as I can tell, has an effective touch with the operations – challenging but reasonable. He has brought in some impressive people for the country manager positions, and is willing to change people out when needed (I would not have done what Dad did in that regard – I think Ake is right in sensing a weakness in one of his country managers). I continue to believe that the boards are weak, and in the long-term, that weakness will cost us.

European research. We agree, there's no sign of real innovation. I would add that our leadership displays a disturbing lack of background, sensitivity or even interest in science or medicine. The fact that Karen could come to the Forodosine meeting without any apparent understanding or interest in the diseases we hope to treat, the science we're trying to apply, the clinical setting, pitfalls, opportunities or competing approaches, tells me that we don't have a head of Research who can make carefully

PUBLICLY FILED PER STIPULATION [ECF 2140]

HIGHLY CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER                    PPLPC057000003695

PPLPC057000003694

reasoned judgements – we have, perhaps, a head of Development, depending on your evaluation on how well the Targin project's being handled – how effective, efficient and timely.

I was happy to see that most of the new projects involving naloxone were deferred.  None seems so compelling as to warrant piling in more resources in advance of the clinical insight that we should get from the Targin clinical program.  My sense is, if we want to create a strong pipeline we're going to have to make deals with other companies.  We should focus on strengthening our project selection team – and in my mind, that takes us back to the issue of injecting great science and sensitivity to medical practice into the process.

Possible actions:
- Launch a major cost-cutting initiative to protect against sudden shocks.  Ake needs to decide where to look for the savings and with what urgency in each case.  Aim to create significant free cashflow in the business ($100 mill pre-tax distribution) to support security and possible in-licensing or acquisitions.  This will negatively impact growth – we're going to have to cut some muscle to meet this requirement.
- Look for a company acquisition or merger.  Be prepared to put equity on the table to finance the right deal.
- Develop a plan to obtain substantial debt financing for the business, with appropriate covenants given the risk to our patents.
- Recruit several new board members and work to actively engage them.  Look for people who can help us to recruit great executives, particularly in R&D, or experts in cost-cutting, or people who can help the board develop and implement a strategy to maximize shareholder value and reduce risk.
- Start a process with an IB to evaluate possible transactions, including identifying prospective preferred partners (one possible strategy is to add a partner who can capitalize the business or add products to diversify the sales line and add profitability, help us drive value creation, and help us with a future liquidity event – IPO or sale).
- Identify a senior scientist to advise the company, or a series of individuals or panels to tackle specific areas of interest (pain, cancer, airways).  Or, recruit a head of R, or a head of R&D, with appropriate background.

3.  Asia.

PUBLICLY FILED PER STIPULATION [ECF 2140]

You and I have discussed Glarbo in the past. The only thing I would add is that the way he dealt with Japan suggests to me that he hated having Engen there because of Steve's relationship with you (I thought his complaint that Engen "trades on his relationship with the shareholders" was very revealing – I can tell you that Engen never reached out to me and has never in my hearing uttered a word of complaint or criticism about Glarbo), and he saw an opportunity to get rid of him in the Shionogi/OxyContin disappointment and a new focus on cost-cutting. On the other hand, it's possible that he correctly determined that Engen was not up to the job – though on what criteria remains unclear to me.

Japan is far and away the sweet spot in Asia, particularly for opioid analgesics that probably face enormous headwind in other markets. With the departure of Engen we will have to trust Glarbo's ability to manage the preservation and strengthening of the operation. Based on our experience in Singapore and Malaysia and the abortive attempt to promote our former head of R&D, combined with Glarbo's lack of experience in Japan and lack of experience in product development, and combined with the fact that the only person there with connections to the owners and connections to clinical people in the US has gotten the boot, I'd say the Japan project is in a very precarious position. And we might not know for 5 years that the thing is completely off the rails – I don't trust Glarbo to share any bad news that he can bury. The key will be assuring a flow of accurate and timely information so that corrective action can be taken quickly.

Possible actions:

• Find a way to create visibilty. Perhaps an international working group (modeled after the manufacturing committee) that reviews developments and opportunities in product development. To support the JPAP program and local marketing initiatives, perhaps a parallel group for S&M.

• You could try to develop a direct relationship with the key people in Japan. This is not to impose your management over Glarbo's – but to promote a clear line of communication. However, we should realize that, especially in Japan, it is highly unlikely that people will volunteer anything outside the scope of what Glarbo tells them to report.

• We could create a board of directors for the Japan business that would include one or two Japanese. Maybe Yoshi Hori could help us recruit someone.

China has finally succeeded in sucking in substantial capital from us. I think we put about $2 mill into the JV – now we're putting in another $25 mill. Our inability to find

PUBLICLY FILED PER STIPULATION [ECF 2140]

an alternative to building a new factory is a big disappointment, and in the back of my mind I wonder if it's simply a failure on the part of our management. And, at the risk of seeming to harp, I share the complaints about Glarbo creating unrealistic expectations around financing and project scope and sequence. Nevertheless, here we are. Preserving and building on our foothold in China feels like an important step for us, so I feel like we have no alternative but to shell out the cash.

On the positive side, Wang made a good impression. And based on his cv (let's hope it's accurate – I'm starting to question everything that comes out of Asia) he should have the skills necessary to avoid dumb mistakes. The sooner we get him going, the better.

Southeast Asia is not very critical. Here's a bet for you: over the next 5 years we'll do better with Modi's initiatives than with Glarbo's.

Korea – I don't feel like we have enough direct information to know much, but it appears to be stabilized. However, the difficulties in the market may mean that we will never make much money there, especially with our existing product line.

Australia is a great story, and you should be proud of what you got started there – whatever her shortcomings, Cornelia, who you spotted and recruited, has proven to be very effective at executing on the opioids program. I wonder if she really intends to return after her leave, or if she'll find a job in Europe. Do we have a successor in place?

India, in my opinion, is beginning to suffer from Umesh spreading himself so thin. We're growing at or a little below the rate of growth of the market in both pharma and cosmetics. We should do what we can to create more focus on new product introductions. In addition, I suspect that we could do more with the products we have. For example, I'm concerned that the Modi-Mundi Continus strategy has constrained our thinking and our messaging with the doctors. We're selling a technology, not a solution to a patient's problems. I mentioned my concern to Mike Lynch, who suggested re-engaging Paul Manners to see if he could drive a little more focus and creative thinking.

Possible actions:
• Formally authorize Modi to deal directly with Napp with respect to product dossiers.

PUBLICLY FILED PER STIPULATION [ECF 2140]
HIGHLY CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

- Give greater focus to new product opportunities by asking Modi to circulate a quarterly report specifically on this topic.

- Hire Paul Manners or a substitute (maybe a consulting company like McKinsey) to engage the local management in a strategy review. Let's identify the critical business drivers and support them.


U.S.

The financial results in the States will revolve around exclusivity. I think the rational course (which we've taken) is to plan around no return to exclusivity. In light of the failure over the past 30+ months of the Rebuild Plan to put any new products in the bag, and the absence of any realistic near-term prospects, it's just the prospect of a near-term return to exclusivity that argues against a restructuring to drive down expenses.

Cost-cutting will be hard work and could expose the company to additional risks. It seems sensible to set ourselves a notional deadline for dealing with both Impax and Mallinckrodt – I'd say that if we haven't made substantial progress by the end of December, we should begin a process that will address every category of cost.

What do we have? A small OTC business, a half-staffed and half-developed niche generics business, a possible formulation for TR oxy that might change the competitive environment, and 4 possible proprietary products that are 2009-2011 introductions (oad tramadol, Targin, Norspan, and possibly Palladone if we cut the right deal with J&J). In addition, contingent liabilities continue to hover over the business, and there's a great need to protect the company by maximizing free cash.

Possible actions:
- The same as for Europe.
- Define the attributes of the ideal CEO given the possible priority on cost-cutting.


PUBLICLY FILED PER STIPULATION [ECF 2140]

HIGHLY CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

UNREDACTED - CONTAINS OUTSIDE PROFESSIONALS' EYES ONLY INFORMATION -
TREAT SUBJECT TO PROTECTIVE ORDER

# EXHIBIT 63

Message
_____

**From:**    Sackler, Dr Richard

**Sent:**    5/15/2007 4:56:48 PM
**To:**      Elon Kohlberg
**Subject:**   RE: news coverage
_____

The good news is that things simmered down very quickly, and the story doesn't seem to have excited the masses. We've received a lot of support from the medical community, and so my fears seem to be for naught. I'm very much relieved, and now we are planning on how to handle the future for the business.

Richard S. Sackler, M.D.

●

●
_____

**From:** Elon Kohlberg
**Sent:** Tuesday, May 15, 2007 4:55 PM
**To:** Sackler, Dr Richard
**Subject:** RE: news coverage

I hope that all this does not take too great a toll on Beth and you. And that whatever evil forces are behind all this, in the end they will be exposed.

Rafi and I arrived in Rome today – we'll be traveling in Italy for a week. If we go to Florence we'll give Annie a call.

_____

**From:** Sackler, Dr Richard [mailto:
**Sent:** Sunday, May 13, 2007 6:33 PM
**To:** Elon Kohlberg
**Cc:** Udell
**Subject:** RE: news coverage

Thank you, Elon.
The equating of marketing OxyContin with "drug pushing" is very distressing and very threatening. I had not heard about the Rivera story. Frankly, I don't know what to do. I'm not confident that this is something that will blow over. My sense is that it may get a lot worse in the coming weeks. I hope I'm wrong.
I'm sorry that Digi-Block was blasted in Israel. This may have been done by a competitor. We have always thought that there is a evil subtext to the witch hunt, but we can't put our finger on it. Who? We have no idea. The motivation? Greed? Possibly. Envy? Possibly. Personal animus? Who knows.

Produced by Purdue Pharma L.P., pursuant to Multistate Work Group Requests
Subject to the Confidentiality Agreement dated February 16, 2018 STIPULATION [ECF 2140]
Confidential Treatment Requested

PWG004474511

PWG004474511

UNREDACTED – CONTAINS OUTSIDE PROFESSIONALS' EYES ONLY INFORMATION.
TREAT SUBJECT TO PROTECTIVE ORDER

But I'm very troubled, and very upset by this.

Thanks for your words of support.

---

**From:** Elon Kohlberg
**Sent:** Sunday, May 13, 2007 6:25 PM
**To:** Sackler, Dr Richard
**Subject:** news coverage

Dear Richard,

I read with great dismay the New York Times article on Oxycontin. It seems that someone (the Virginia DA?) was out to make a name for himself by whipping up public frenzy in the face of the great tragedy of substance abuse.

Then last night I watched Geraldo Rivera. It was appalling. Geraldo equated the marketing of Oxycontin with drug-pushing! When the doctor on the show tried to say that Oxycontin was a life-saver for cancer patients who would otherwise suffer unbearable pain, Geraldo dismissed him as irrelevant.

I know how scary it is when the media decides to portray you as a bad guy. I experienced this first-hand a couple of years ago when the Israeli State Comptroller, following an anonymous tip, decided to investigate an officer in the Ministry of Education for taking a bribe from Digi-Block. Never mind that the "bribe" consisted of a $1,000 airline ticket from Tel Aviv to Boston, and never mind that the trip received advance approval from the officer's supervisors at the Ministry. Once the issue was raised, the whole Digi-Block project in Israel, to which I had dedicated a huge amount of time and effort, was dead. Naively, and against the advice of my wiser friends, I agreed to be interviewed by the journalist who had made this his story. Needless to say, that was a disaster.

I hope that the Purdue story eventually will receive a fair hearing in the press and in the court of public opinion.

Best regards, Elon

Produced by Purdue Pharma L.P., pursuant to Multistate Work Group Requests                    PWG004474512
Subject to the Confidentiality Agreement dated February 19, 2013 STIPULATION [ECF 2140]
Confidential Treatment Requested

PWG004474511