# EXHIBIT 68

PUBLICLY FILED PER STIPULATION [ECF 2140]

Message

**From:** Sackler, Jonathan [redacted]

**Sent:** 6/22/2007 12:28:26 PM

**To:** David Sackler Sackler, Mortimer JR [redacted] Sackler, Dr Richard [redacted] Sackler, Dr Kathe [redacted]

**BCC:** [redacted]

**Subject:** RE: SEPR

I agree that we need an IB process to surface the opportunities and give us exposure to the best possible deal.

I think that we should not exclude a stock-for-stock deal with a mid-sized company.

I don't agree that every meaningful R&D pipeline opportunity has been snatched up by the majors. R&D is a dynamic process – prospects change over time. Information availability is limited – companies aren't making all the details public. Most companies are trying to build, not sell themselves on a daily basis to the highest bidder.

In any stock-for-stock deal, we will have to evaluate the pipeline, irrespective of the risks associated with that evaluation.

Jon Sackler

---

One Stamford Forum | 201 Tresser Boulevard | Stamford, CT 06901

Assistant: [redacted]

---

**From:** David Sackler [mailto[redacted]
**Sent:** Friday, June 22, 2007 11:10 AM
**To:** Sackler, Jonathan; Sackler, Mortimer JR; Sackler, Dr Richard; Sackler, Dr Kathe
**Subject:** RE: SEPR

First of all, SEPR is far more expensive than I had anticipated. I'm crunching the numbers. You will all have them in your in box this afternoon I hope.

Produced by Purdue Pharma L.P., pursuant to Multistate Work Group Requests
Subject to the Confidentiality Agreement dated February 16, 2017
PUBLICLY FILED PER STIPULATION [ECF 2140]
Confidential Treatment Requested

PWG004473999

I think the problem isn't doing that transaction, it's picking the right company as our partner. SEPR is a far more volatile beast than PFE. Getting shares in one is not the same as getting shares in another. SEPR is down 25% in 6 months. I would be very upset to see the value of our exit diminished by 12.5% based on factors outside our control. I assume the drop would have been half the SEPR alone decline as Purdue would have dampened the volatility materially.

I don't believe we have the ability to analyze what will and won't make it through the FDA, so I don't want to bet billions of our dollars as we merge with something based on the value of their pipeline. If that pipeline were so great AND that company was already on the block why hasn't big pharma already picked it up? They've been doing M&A searching for pipeline drugs for 5 years now. Why are we going to pick off something they've missed.

Another risk I've thought of doing this exercise is that we have absolutely no idea how our negative publicity will play with investors. It may be that we're tainted and the negative press around Oxy will decimate a smaller company's stock price. If we sell to Pfizer, even the most bearish statements about the company will as a public entity will be mitigated by their size. If we merge with a company like SEPR the analysts could very well start saying crazy things about future liabilities and we could see the value of our investment seriously diminished. I can't tell you how it will go and neither can anyone else. It may not be material or it may cost us 25% of our money day 1. Who can say for sure?

I'll say it again: We absolutely have to run a process. Our company will be marketed on the basis of adjusted EBITDA, so we will already be given the benefit of cost savings in our sale price. If at the end of that process SEPR is the best offer by enough to compensate us for the risks I've outlines (and they are all material), then let's merge with them. If not, why would we take a lower price and higher risk for our equity in our business? I really don't understand the logic. To me this is an absolute non-starter. We have the cart before the horse. Let's hire a banker and keep SEPR in the process and get the most for what we have.

You will all have the numbers. I have no idea why SEPR is better than Cephalon, UCB, Shire, or any of the other smaller specialty pharma stocks. Jon is right, the NOL is very difficult to transfer.

---

**From:** Sackler, Jonathan [
**Sent:** Friday, June 22, 2007 10:53 AM
**To:** David Sackler      Sackler, Mortimer JR; Sackler, Dr Richard; Sackler, Dr Kathe
**Subject:** RE: SEPR

Why not consider a merger of some or all pharma cos into SEPR, or some similar public company? Let's assume for the sake of discussion that SEPR has a decent business (no obvious gaping holes) and some pipeline. What's wrong with taking stock in a public company? If we ended up with a 40 or 50% interest in SEPR (and that can be dialed back by retaining some assets), that might give us a nice position. Over time, we develop the synergies; greater mass to pursue new opportunities; our EU business is preserved intact (I assume SEPR doesn't have much of an operation in the EU). Ultimately, the business either grows, or we help engineer a sale to a larger company. In the meantime, we work out some liquidity arrangements to get some cash out of the share position, either through block sales or derivative transactions.

By the way, I believe there are some real problems utilizing NOLs after a "change in control".

Jon Sackler

---

One Stamford Forum | 201 Tresser Boulevard | Stamford, CT 06901

Produced by Purdue Pharma L.P., pursuant to Multistate Work Group Requests
Subject to the Confidentiality Agreement dated February 6, 2018 TIPULATION [ECF 2140]
Confidential Treatment Requested

PWG004474000

PWG004473999

Assistant: ████████████████████████████████████████

---

**From:** David Sackler [mailto:█████████████
**Sent:** Thursday, June 21, 2007 6:35 PM
**To:** Sackler, Mortimer JR; Sackler, Dr Richard; jds; Sackler, Dr Kathe; mds
**Subject:** RE: SEPR

I apologize that I was given incomplete information here. I still feel very similarly. I don't think we're capable of determining if paying more than 11x adjusted EBITDA for SEPR is good value. (I break down my adjustments below.) Unfortunately I don't think we have talent for evaluating pipelines. We really don't have much positive to say about our drug development since OxyContin and I really don't think we're in a position to know what will or will not make it through the FDA. We just cannot compete against big pharma in this regard. We need to admit that Sepracor is not an unknown entity in the pharma world and companies like Pfizer would also love to reap cost savings, amortize goodwill, and utilize NOL's to shield taxes the same way we do. Pfizer has more resources than we do and a better track record at doing pipeline acquisitions and SEPR remains a public entity trading at 20x EBITDA. My view is we need to leave this alone. If we can shield our taxes in another less risky way I'm all for it. If we cannot, then we may need to pay them. SEPR seems too expensive to entertain buying with our track record in drug development.

Mortimer, I remember when you proposed buying SEPR years ago for a fraction of the price we're talking about today. It was a great buy back then and I've not forgotten that you nailed it. Unfortunately we can't undo our missteps of years ago and need to evaluate SEPR at 11x EBITDA. To me that's way too much to pay considering our track record of picking winners at the FDA. Even if we factor in shielding $400mm of taxes, that's a one time pickup and then we're left having paid what will likely be $5.5-6B for SEPR. Maybe that's the right price, but who are we to say? It also leaves us more exposed as our resources will definitely be extremely stretched from paying such a hefty price for SEPR.

In SEPR's last quarter I calculate adjusted EBITDA of $53.883mm removing their litigation settlement cost. If we further adjust it to say we can cut their sales and marketing by 30% and their G&A by 50% I get to EBITDA of $121mm. Annualized we're talking $484mm of EBITDA for which we would pay an EV of at least $5.5B to give enough of a bounce of the 52 week low to guarantee we got it the company. That's 11.3x adjusted EBIDA. I believe it will take us 2 years to cut costs sufficiently to get to the full adjusted number and to me paying 11.3x adjusted is too much. You could argue that my 30% cut to sales and marketing is too low and we can do better and I can't refute you, but I would be very cautious as we're also not proven integrators. We might be great at it, but we don't have any way to know. I think all of us would rather be sellers at 11x adjusted EBITDA than buyers so SEPR is a pass to me.

I'm happy to do these quick and dirty adjustments for you guys rather than consuming the bankers with it. Any modeling you want done I'm happy to do as well. I'd rather keep the bankers focused on the other stuff we've talked about with them and take these little modeling assignments on myself.

If we're really looking to shield taxes by purchasing NOLs, I can propose other ways. There are public cash rich shells out there we can snap up and utilize their NOL's. I'm in one called KDUS that's small, but other friends have other ones that are larger. Most of them have NOL's of approximately 100% of the cash balance. We can snap them up for cash+15-50% and save 50-85% on our taxes by using their NOLs. I can get you a list tomorrow if you guys think the tax structures can work. (It's the same thing as using SEPR's NOL's and we're paying a significant discount to us.) I don't think the NOL's can be captured in that way though. As it's been explained to me by the Wall Street tax guys, the shell (or SEPR) would have to buy 49% of Purdue in order for the NOL's to transfer. They don't think we can buy something public to private and have the NOLs transfer. If I'm wrong I apologize. It's just what I've been told. I'm definitely not a tax person. If you want the list I'll get it for you tomorrow.

Do you guys want me to whip up a quick SEPR model tomorrow so we can play with cost savings or was this little diatribe enough?

---

**From:** Sackler, Mortimer JR █████████████████
**Sent:** Thursday, June 21, 2007 5:27 PM
**To:** Sackler, Dr Richard: ids; Sackler, Dr Kathe; mds
**Cc:** David Sackler
**Subject:** RE: SEPR

Produced by Purdue Pharma L.P., pursuant to Multistate Work Group Requests
Subject to the Confidentiality Agreement dated February 6, 2018 PURSUANT TO PROTECTIVE STIPULATION [ECF 2140]
Confidential Treatment Requested

PWG004474001

PWG004473999

UNREDACTED - CONTAINS OUTSIDE PROFESSIONALS' EYES ONLY INFORMATION.

Richard,

This was not my idea. You changed it to be that SEPR purchase us, which I would not be in favor of at all. My idea was simply to explore whether it made sense for us to purchase SEPR to:

1.      take advantage of their loss carry forwards to shield our current and future tax liability
2.      take advantage of significant synergies between the two businesses resulting in the combined business being much more profitable and diversified (less dependant on one product).
3.      Explore whether the combined business would yield us a much higher sale price for us from a large pharma buyer

Between the first two features, I thought it made sense to explore whether there was enough sustainable value in SEPR to justify what I pointed out was a very high current EV. The combined entities could be a much more attractive acquisition for a large pharma or may not be.

Regards,

Mortimer

---

**From:** Sackler, Dr Richard
**Sent:** Thursday, June 21, 2007 1:29 PM
**To:** mdas; jds; Sackler, Dr Kathe; mds
**Cc:**
**Subject:** FW: SEPR

I really think that David has demolished Mortimer's notion (which sounded interesting to me in my ignorance) that a merger with Sepracor might make sense. Even if we can win effective control of events without destroying the loss carry forward, there is probably more negatives that overwhelm the benefits. Evan $1B in loss carry forward would only be $400M in tax savings, not enough to justify the risks that David outlines.



*Richard S. Sackler, MD*

reply and forward

---

**From:** David Sackler [mailto:
**Sent:** Thursday, June 21, 2007 12:56 PM
**To:** Sackler, Dr Richard
**Subject:** RE: SEPR

I think SEPR stock is a horribly risky bet. Why do we need to sell to SEPR and pool our assets? If they want to sell the current SEPR assets and we think they can get a good price, let's buy stock directly. Merging with them is a very bad idea in my opinion. I think SEPR is already expensive despite being at a 52 week low.

I really don't understand how this is in any way to our advantage. We're adding multiple layers of risk into our deal:

Risk 1) Do we actually get a price we're happy with from SEPR to begin with? Maybe maybe not, but having a buyer in mind before we go to market is almost never the way to get the best deal. If we want the most money for what we have

Produced by Purdue Pharma L.P., pursuant to Multistate Work Group Requests
Subject to the Confidentiality Agreement dated February 6, 2015

PUBLICLY FILED PER STIPULATION [ECF 2140]

Confidential Treatment Requested

PWG004474002

PWG004473999

we need to keep our options open. THOUGHT HERE. INCLUDE SEPRACOR WHEN WE GO TO MARKET JUST IN CASE

Risk 2) SEPR is a $4.8B EV company, which means that to get the price we want they may have to lever up further, giving us levered stock and cash to get us our price.

Risk 3) SEPR stock will be illiquid and has been exceedingly volatile this year. It's not like getting PFE stock and structuring an exit. We could very well agree on a price and see the value of Purdue in the deal drop 25% between signing and closing. (SEPR is down 25% since Feb 1.) Even if we structure a collar and take a slightly lower price, we will be holding this stock at least a year and a half to get another transaction complete. It's down 25% in 6 months and still trades at over 20x EBITDA. Do we really want to be in something that risky? I sure don't.

Risk 4) We would have to take on the technology risk at SEPR. The worst possible scenario is that we sell to them for worthless paper. If their technology doesn't work, and their stock chart tells me they've had some material problems this year, we have just given our asset away for a worthless stock and our diluted equity is the entire value of the company. (Plus there will likely be leverage on it, so the pain may be more acute to the stock price.) How do we have the expertise to evaluate what SEPR has? I don't believe that Purdue has that expertise, and in this deal we would have to evaluate SEPR's pipeline without the help of Purdue people. I think our ability to spot winning drug development candidates has been terrible for the past decade, so I would be very nervous about making any deal that requires us to take on material technology risk. We are simply unable to evaluate the risks inherent in our acquirer's pipeline and that pipeline is the ONLY reason to even consider them as a legitimate bidder.

Risk 5) After making the deal we then need to market the combined company. I'm just assuming that would be a prerequisite for doing the deal, but it's unlikely they will allow us to wrestle control away from current SEPR management. If they wanted to sell themselves why do they need us to do it alongside them? I assume they don't want to sell today. Assuming we can force them to do it, we would then take on a second set of banking fees and we would have to hope that the combined is worth more than that parts. Each deal could take 1.5 years to complete, so we're also taking a risk that the stock market doesn't crap out and destroy the value of our equity.

Ultimately we need to run a process and test the value of what we own. If SEPR is the highest bidder and beats big pharma or private equity by enough to compensate us for the risks above, then let's merge with them. If not, what's the point of this discussion? I can virtually guarantee a higher price running a process than calling up SEPR as the only bidder. Ultimately these risks above make me feel that SEPR needs to be willing to pay $750-1B more than the next legitimate bidder (big pharma or PE.) I really have no interest in owning their stock. Let's leave our stock speculation to our respective personal accounts and hedge funds and get the best mix of return and liquidity for our business.

---

**From:** Sackler, Dr Richard [
**Sent:** Thursday, June 21, 2007 12:08 PM
**To:** David Sackler
**Subject:** FW: SEPR

**What do you think about Sepracor buying out the Purdue US business and giving us stock and then trying to sell on to anther buyer?**

Richard S. Sackler, M.D.



---

**From:** Sackler, Mortimer D.A. [mailto:
**Sent:** Thursday, June 21, 2007 11:54 AM
**To:** Sackler, Dr Richard
**Cc:** Sackler, Mortimer JR
**Subject:** SEPR

Produced by Purdue Pharma L.P., pursuant to Multistate Work Group Requests
Subject to the Confidentiality Agreement dated February 6, 2013 STIPULATION [ECF 2140]
Confidential Treatment Requested

PWG004474003

PWG004473999

FYI

Produced by Purdue Pharma L.P., pursuant to Multistate Work Group Requests
Subject to the Confidentiality Agreement dated February 16, 2015 STIPULATION [ECF 2140]
Confidential Treatment Requested

PWG004474004

PWG004473999

# EXHIBIT 69

PUBLICLY FILED PER STIPULATION [ECF 2140]

Message
_____

**From:**      F. Peter Boer ▮▮▮▮▮▮▮▮▮
**Sent:**      7/26/2007 2:08:46 PM
**To:**        Sackler, Jonathan ▮▮▮▮▮▮▮▮▮▮▮▮
**Subject:**   Electronic Copy of my Memorandum
**Attachments:** Confidential Memorandum to Jon Sackler.doc; ATT07931.txt


I took the liberty of attaching Richard's copy.



HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

PPLPUCC9000491386
PPLPUCC9000491386

## Confidential Memorandum to Jon Sackler

From: Peter Boer

Tuesday, July 24, 2007

Re: Sale of Pharmaceutical Interests

Yesterday you confided that the Sackler family had begun a dialogue with two investment banks regarding a potential sale of its pharmaceutical assets. During our brief conversation, you asked me if I had any insight into such processes, and I responded with some of my views on the important considerations. Since then, I have been thinking further on the subject, and thought it would be useful to organize my preliminary thoughts in a brief memorandum. I can readily understand the family's desire to separate themselves from the unpleasantness and unfairness of the past few years.

My experience goes back over twenty years and includes at least two dozen cases, ranging from the purchase or sale of individual product lines or businesses to bids for the sale of multibillion dollar publicly-traded companies. Most of these cases involved W.R. Grace and NOVA Chemicals, but one was as a consultant for a private equity firm and another was the sale of our Laureate property. As you can appreciate my role was usually indirect, as an executive or company director with a key role in determining strategies and valuations, but not in directly managing the legal and investment banking teams. Your case has many unique aspects, but I will attempt to summarize what I have learned that may have bearing.

**The process.** It will be relatively easy to engage competent investment bankers, who will be pleased to be retained and get a piece of any action. They will be highly motivated, but remember that to a large extent they don't work for you, but work *on behalf of the deal.* You have a big advantage over publicly traded companies in that there is little risk of a "bear hug," where directors must seriously consider offers that are too low because of the risk of shareholder suits. You can walk away if the shareholders agree the deal is not right.

The process is disruptive. Potential bidders will probably want access to an electronic "data room," containing sensitive financial data and key legal documents. Since most strategic buyers are competitors you may risk giving out competitively valuable information. You can track activity in this room to get a feeling about the level of analysis being performed by each qualified party. You are in principle protected by CDA's, but dissemination of such key information is irreversible. Secondly, many key employees are needed to assemble this information. This poses two other problems. These employees will be distracted from the task of managing the company, at a time where circumstances are changing quickly and there are gaps in management. Secondly, these employees may make projections about their future that will give them an incentive to leave. Recruiting new employees will be more difficult. "Stay bonuses" can give you

1

HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

some protection against the latter threat, but not the former. The image of a steadfast commitment of the Sackler family to Purdue and its affiliates is valuable.

In brief, entering the process is not free.

The process does not guarantee bids. At Grace, a takeover or merger was for some time welcomed by management, first because it offered some shelter from the asbestos liability, and secondly because it would trigger golden parachutes. But it never happened, because the asbestos liability could not then be accurately estimated or capped. Faced with reality, management disassembled the company by selling two of its three crown jewels, and all other business units but two, one of which was the source of the asbestos liability. Significantly, litigants pursued the two companies buying crown jewels and recovered money from them. In perspective this strategy was productive for Grace shareholders and probably a surprise for the buyers. The learning is that even though the liability may be assumed to reside with one party, the courts may rule otherwise. The implications for Purdue shareholders may be parallel.

More recently, NOVA has held discussions with possible acquirers, mediated by investment bankers. Considerable effort went into this process, but in the end *no formal bids were received*. Unlike Grace, NOVA has no serious legal liabilities. My personal opinion is that strategic buyers and investors had different views of the future of petrochemicals in the Middle East, and a deal was not timely.

The relevance to Purdue is twofold. Uncapped liabilities can significantly reduce buyer interest, reducing the probability of any bid more than affecting valuation. Secondly, a negative forecast for the future of pharmaceuticals (talk of a broken innovation model, and a likely hostile Democratic administration) creates timing issues that are unfavorable. In the longer run, global demographics make pain management an excellent business.

**Valuation.** There are three key components to the valuation of the pharmaceutical properties: cash flow from existing business, the value of the pipeline, and estimated legal liabilities. As you know, I have written three books on the subject of technology valuation, relevant to the second component.

1. **Cash flow.** The value of cash flow is determined by expected cash flow over the forecast period, discounted by the cost of capital. The logical forecast period is to 2013, when core U.S. oxycontin patents expire. These projections presumably exist for all the international business units, and provide the foundation of the valuation exercise. I do not have this information. A key issue, though, is how to treat the years after 2013, or to define the terminal value. Should one assume the U.S. oxycontin business continues at a significantly reduced level? Or should one assume that it would continue after 2013 based on proprietary technology such as abuse resistance or low ABUK? In markets less vulnerable to patent discontinuity, it may be reasonable to assume that growth occurs "in perpetuity" at some assumed rate.

2

PUBLICLY FILED PER STIPULATION [ECF 2140]

PPLPUCC9000491388
PPLPUCC9000491386

2. **Pipeline.** The value of the pipeline is a very significant uncertainty. From a valuation viewpoint it can be assessed in one of two ways. One is to calculate the value of each important project, based on revenue projections, projected manufacturing costs, and then discount for cost of capital, development cost, and risk of abandonment. Purdue has data on the first two items, and the pharmaceutical industry has published data on average abandonment rates by phase or stage (Purdue experience may differ). I sense that the Purdue pipeline may be a significant valuation question, and will require independent experts. The second method is to factor the value of pipeline technology into the future revenue model, and in particular the very important assumption about long-term growth.

3. **Legal Liabilities.** I am not a lawyer, although you know I've lived with one for half of my life. Liabilities are a huge valuation question, whether viewed from a legal or a business perspective. Grace was invulnerable to takeovers while the asbestos wildfire raged. At its most pessimistic stage, Grace stock traded under $2/sh, well below previous market values of about $15. As legal settlements and decisions developed, the liabilities were capped and valuations moved upward to the $20-30 range. Grace strategy had been to consolidate the liabilities in a single unit, whose "deep pockets" were limited, and then settle with key plaintiffs. In the end, this strategy achieved a favorable outcome, but during the process I regarded it as a "crapshoot" dependent on the vagaries of the courts, and I was not personally interested in speculating on its success. Bob Beber, formerly Grace General Counsel knows this history intimately, and may be a useful advisor, but I would have to check his availability. In general, a key learning was that perceptions of deep pockets hugely affect litigants' strategy, and the prospects for a "final" settlement. For the family, it may be that overseas assets with limited transparency and jurisdictional shielding from U.S. judgments will be less attractive to litigants than domestic assets. Obviously, this factor depends on how the ownership is structured, and I presume the family has taken most of the appropriate defensive measures. My points are that the uncapped nature of the liabilities may affect the likelihood of getting bids that reflect fair value, and that converting the overseas assets to cash equivalents may be counter-productive until interest in litigation has died down.

Jon, many of these points deserve in-depth analysis and discussion, and I am pleased to be available to assist you and the family wherever I can.

3

HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

PPLPUCC9000491389
PPLPUCC9000491386

UNREDACTED - CONTAINS OUTSIDE PROFESSIONALS' EYES ONLY INFORMATION - TREAT SUBJECT TO PROTECTIVE ORDER

# EXHIBIT 71

Message
_____

**From:**     Sackler, Dr Richard

**Sent:**     2/22/2008 8:49:28 PM
**To:**       David Sackler
**Subject:**  RE: Argument to borrow money now V 4 rev accpt


No, I didn't mean to imply that. He wants to tell the execs and go ahead and whatever happens is ok with him.


Richard S. Sackler, M.D.



       O
       H
       C


-----Original Message-----
From: David Sackler
Sent: Friday, February 22, 2008 7:07 PM
To: Sackler, Dr Richard
Subject: RE: Argument to borrow money now V 4 rev accpt

Jon wants to sell without making a pitch book or telling the execs. Im not sure how that will work, but more power to him. Maybe he can explain that move along w buying something without cash. Everything jon says contradicts another thing jon says. He is not making sense these days

-----Original Message-----
From: Sackler, Dr Richard
Sent: Friday, February 22, 2008 6:50 PM
To:   David Sackler
Subject: RE: Argument to borrow money now V 4 rev accpt

Jon likes his plan which is Mortimer's plan to get on with selling the business. The cash is just a distraction. Sort of like "well, if you want to keep it, we need the cash in the business." To a point this is correct, of course.

In any event, I'm sure we'll take out $50M to $100M in quarter 2. So calm down. It is important to get to the goal and I'm arranging the meetings that bring the debt project forward. I think the arguments for doing it are so strong and the objections so weak that I'm confident we will go for the debt. Once that is settled, we'll be over the hump and the distributions will continue regardless.


Richard S. Sackler, M.D.



       O

       H

       C


_____

From: David Sackler
Sent: Friday, February 22, 2008 2:52 PM

PUBLICLY FILED PER STIPULATION [ECF 2140]

HIGHLY CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

To: Sackler, Dr Richard
Subject: RE: Argument to borrow money now V 4 rev accpt

This is just shocking. The only way to build the company involves debt.
$100mm isn't buying a $1.8B company. I have no idea what math Jon is
using, but on no planet does 100 = 1,800. So what is lost by taking the
cash back out? If we've paid the taxes nothing is lost since we're
going to need debt anyway. It's not as if our current R&D pipeline
could sustain another $50mm/year of investment. We don't have enough in
there to make use of the money. What is the possible argument behind
leaving cash on the balance sheet? We're not going to be able to buy
anything with it. We need debt. But he doesn't want to take down debt.
But he still wants to buy things. But without debt and without the cash
I don't really understand how he expects to pull that off. Magic?
Asking another company nicely to give us their business? How does it
work? If there's some M&A strategy that buys pharma companies for no
money I'd love to hear it.

I think you need to call Jon on this bullshit. He doesn't want more
money in the portfolio as he doesn't want to deal with the headaches
created by that. That is the only reason I can see for not taking money
out of the business. Jon's lack of interest in all things but school
reform is not something to bring up with Mortimer's family present.
It's something you need to handle with Jon. If he doesn't want to work
unless it's fighting the teacher's union, fine, but why is his desire to
be retired impacting our ability to plan our finances and manage Purdue?

From: Sackler, Dr Richard [ ███████████████████████████ ]
Sent: Friday, February 22, 2008 2:46 PM
To: ds@moabpartners.com
Subject: RE: Argument to borrow money now V 4 rev accpt

We didn't take it because I didn't present it. Jon said he thought we
should leave the money in the company and either build the company or
sell it. I didn't want to get into that issue at the last Board
meeting. Next week will present time enough to get on with this
subject.

Richard S. Sackler, M.D.



O

H

C

_____

PUBLICLY FILED PER STIPULATION [ECF 2140]

HIGHLY CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

PPLPC042000011912
PPLPC042000011911

From: David Sackler ███████████████
Sent: Friday, February 22, 2008 2:42 PM
To: Sackler, Dr Richard
Subject: RE: Argument to borrow money now V 4 rev accpt

Wait we didn't take that? What is his objection? I really don't
understand that.

From: Sackler, Dr Richard ████████████████████████████
Sent: Friday, February 22, 2008 2:43 PM
To:   David Sackler
Subject: FW: Argument to borrow money now V 4 rev accpt

Richard S. Sackler, M.D.



O

H

C

From: Sackler, Dr Richard
Sent: Friday, February 22, 2008 2:42 PM
To: Sackler, Dr Kathe; MDAS (████████████████ Mortimer Jr.
████████████
Subject: FW: Argument to borrow money now V 4 rev accpt

This may be why Jon nixed the 100M distribution last week. He didn't
want to encourage me.   :-)

Richard S. Sackler, M.D.



O

H

C

PUBLICLY FILED PER STIPULATION [ECF 2140]

HIGHLY CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

From: Sackler, Jonathan
Sent: Friday, February 22, 2008 2:11 PM
To:   David Sackler   Sackler, Dr Richard; 'F. Peter Boer'; Sackler,
Mortimer JR; kas; 'Robert Shapiro'; sdb; 'Robert Shapiro'
Subject: RE: Argument to borrow money now V 4 rev accpt


I think we can apply some leverage to acquire a good asset and diversify
the business. I've heard talk about taking a billion out as a
distribution and borrowing a billion -- not a good idea in my mind.


Jon Sackler

A note to my friends in Connecticut... Be heard! Sign the "Great Schools
for All" petition
<http://www.conncan.org/action_center/members/petition.asp>

One Stamford Forum | 201 Tresser Boulevard | Stamford, CT 06901

 | fax

From: David Sackler
Sent: Friday, February 22, 2008 1:27 PM
To: Sackler, Jonathan; Sackler, Dr Richard; 'F. Peter Boer'; Sackler,
Mortimer JR; kas; 'Robert Shapiro'; sdb; 'Robert Shapiro'
Subject: RE: Argument to borrow money now V 4 rev accpt

Jon,


So we're clear, I think you're misunderstanding what my dad is proposing
somewhat. The cash we're taking down in a debt deal will remain on the
balance sheet. The cash we take out of the business will be operating
cash flow. We will only use the debt financing to do an acquisition. I
know it sounds like a bizarre move, but it is designed to take money off
the table while keeping our flexibility to buy another business. By
keeping the money on the balance sheet unless it's used to diversify our
business we will materially lower our interest rate. That covenant is
unique and will take a huge amount of interest expense off our shoulders
as the lenders are sure that their money is protected and not as

PUBLICLY FILED PER STIPULATION [ECF 2140]
HIGHLY CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

PPLPC042000011914
PPLPC042000011911

vulnerable to Oxy's patent expiration.

If we are really unwilling or unable to lever up the business then we
may as well table acquisition discussions for the balance of the year at
least. We simply won't have enough cash on hand to execute any of the
proposed deals for at least 18 months. Why waste our time if we won't
lever the business?

From: Sackler, Jonathan
Sent: Friday, February 22, 2008 12:55 PM
To: Sackler, Dr Richard; F. Peter Boer; Sackler, Mortimer JR; kas;
Robert Shapiro; sdb; Robert Shapiro; **David Sackler**
Subject: RE: Argument to borrow money now V 4 rev accpt

So let's outline the assumptions here. It's a good list of things to
discuss.

1. The price we would obtain for the companies will probably grow
substantially over the next 6 (?) months. This is driven by: growing
US sales of OxyContin as the generics disappear from the market; a
recommendation by the FDA Advisory Panel that might translate into a
requirement for some sort of TR feature in future generics; and
improvement in credit markets that will support buyers' access to debt
and more aggressive bidding.

This assumes a number of things that we should discuss.

\*    First, that buyers will not credit the company's forecasts.
That surprises me, but I'd like to hear the view of more experienced
folks.
\*    Second, that the FDA Advisory Panel ruling is favorable to
Purdue. They could take a position that's problematic, for example, if
they advise that all CR opioids should have safety features that our TR
formulation lacks; or that TR features are unlikely to significantly
reduce accidental poisoning because of abuser behavior and should not be
considered essential to a product. In any event, we know that there are
a number of TR strategies in advanced development and our TR IP won't
block out the field (and itself might be challenged). Whatever happens
with the Advisory Panel, I think it's likely the prospects for direct CR
oxycodone competition will appear more immediate 6 months from now,
particularly if we haven't settled the Mallinckrodt case.
\*    Third, credit markets may improve or may worsen in 6 months.
Some analysts predict a long credit crunch that won't see bottom for
another year or two and won't be buoyant for years. In any event, I
think we're looking to do a deal with a cash-rich company or a
stock-for-stock transaction, not a PE firm.
\*    Finally, that things generally go our way and nothing bad blows
up.

2. The second big assumption is that we can borrow $1-2 billion on

PUBLICLY FILED PER STIPULATION [ECF 2140]

HIGHLY CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

PPLPC042000011915
PPLPC042000011911

UNREDACTED - CONTAINS OUTSIDE PROFESSIONALS' EYES ONLY INFORMATION -
TREAT SUBJECT TO PROTECTIVE ORDER

favorable terms, and that you have some purpose for that money.

\* The "credit crunch" is all about putting teeth into credit
agreements and shrinking leverage. Operating cashflow in each of our
markets is heavily dependent on one controversial product protected by a
contested patent in a market with some new competition in the wings.
That spells volatility. Unless it's being applied to an acquisition
that bolsters the lender's collateral position, I suspect that any loan
you're offered will be a loan you will reject.

\* I don't think it's wise to leverage up a volatile core holding
for the sake of putting some cash in your pocket. It's a "taint". If
things go well, you've paid the banks huge fees for nothing. If things
go badly, you've dramatically increased the risk of bankruptcy and made
yourself a fat target along the way. Frankly, given what we've gone
through in the last five years, I'm amazed that we're even having this
conversation. If Purdue had been carrying a billion dollars of debt,
either the family would have coughed it up or the lenders would have
foreclosed. It would have been a financial disaster.

\* We should discuss the appetite for an acquisition, the role of
credit in completing one, and the timing of our discussions with lenders
and preparation of supporting materials.

3. When we meet I hope we can discuss all of the above and our
fundamental choices.

Jon Sackler

A note to my friends in Connecticut... Be heard! Sign the "Great Schools
for All" petition
<http://www.conncan.org/action_center/members/petition.asp>

_____

One Stamford Forum | 201 Tresser Boulevard | Stamford, CT 06901

_____

From: Sackler, Dr Richard
Sent: Friday, February 22, 2008 11:31 AM
To: F. Peter Boer; Sackler, Mortimer JR; Sackler, Jonathan; kas; Robert
Shapiro; sdb; Robert Shapiro;    David Sackler
Subject: Argument to borrow money now V 4 rev accpt

Please comment in the attached word file to the COMMENT DOCUMENT

_____

There has been a number of exchanges about the best way to go forward as

PUBLICLY FILED PER STIPULATION [ECF 2140]

HIGHLY CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER                    PPLPC042000011916
                                                                    PPLPC042000011911

a family in the business and whether we should just "get on with it" with all that will follow as if it is simple and without risk. I don't feel that it is simple and without risk, and I'm certain that even if this is our goal, we should not simply get on with it.

I've tried to get my thinking organized to make it easier to have a dialogue, so he it is.

At the end of this thread, Jon says: "As I said, I think a distribution and leveraged recap is the least desirable course. Any other ideas?"

I disagree and am surprised in Jon's hierarchy which places raising money at the bottom. Jon, I hope you agree that the loan on its own is the best course of action, although you didn't approach the question.

In my mind, the borrowing of $1B to 2B (perhaps more) is the very best alternative to the others because it maximizes our flexibility and allows us to know what we are likely to attain in price if we were to decide to sell the business. Whatever our direction, a successful loan effort will enhance every goal and simultaneously advance all of them at the same time.

The term loan allows us the flexibility to:

1.   Make an important acquisition for cash

    a.   Project Apple is beyond our current cash reserve and if we had the chance to do it now, we would need to raise debt anyway
    b.   We are far more likely to achieve a favorable transaction when we have the money in hand to complete it. Today, no one can be sure that he can raise debt prospectively until it has been done.

2.   Allows us to distribute substantial cash if we chose to do so
3.   As a prerequisite to a term loan of this magnitude, we will have to create a pitch book. This will be the equivalent of a US M&A pitch book which we can chose to use or not without suffering the disruption and risks of assembling a book. This has got to be a superior approach to any that involves announcing to the organization that we are exiting the business before we know that we are doing so.

The decision to sell the business is probably a course that will quickly become a one-way street. Good or bad, we will almost certainly complete a transaction even if at the end of the process, we are unhappy with the

PUBLICLY FILED PER STIPULATION [ECF 2140]
PPLPC042000011917
PPLPC042000011917

price and terms because managing through a busted sale would be risky
and difficult.

We don't know what sort of price we can obtain for the US especially.
Our internal guesses shared in this group have ranged from $2B to $10B;
this is a huge swing. Why such large differences? I think there are at
least four reasons:

1.   Our situation is so unusual that we are properly uncertain about
how much value we will receive for the hope that we will become a $2.2B
company in 2008 and a $3+B company in 2009. We learned in two
interviews of candidates that their first and overriding concern is
about our ability to achieve this unprecedented goal in an unprecedented
situation. Prospective buyers' will share the same uncertainty and will
heavily discount the hoped-for prospects. It is absolutely clear to me
that we will get a better price the closer we are to a running rate of
$3+B; we are far from that level now. We should wait until the US
business approaches $250M+ running rate.

2.   Deciding to run an auction before we have attained our optimal
run-rate may have severe consequences to our ability to achieve our
potential. Furthermore, it will make everything else harder, too. We
experienced how stress  on the organization in the past few years caused
lost opportunities and depleted the energies of the staff and Board. If
running an auction becomes the overarching goal for the organization
everything else will suffer. Lacking both sales level position (our
run-rate for sales last month was somewhat over $100M/month and not
$250M per month) and organization will make progress even harder. In
short, we have a lot of things to do in very few months to achieve our
purposes.

3.   The credit markets are extremely uncertain and how this will
affect both the selling process and ultimately the equity markets is
unknown

4.   Unconsidered in our estimates and the above these three factors
is the upcoming Advisory Panel in May. Success here could increase our
value by a lot, and there isn't a negative outcome here absent the very
improbable decision of the Panel to discourage the FDA from approving
TRO. This Advisory Panel is a great opportunity to greatly change the
basis of competition in the controlled release opioid business in our
favor and give OxyContin additional legs beyond our 2013 patent
expiration. GS has discussed this with me and have volunteered that if
this turns out well, it can give a huge boost to our value if it gives a
buyer a good reason to expect that OxyContin tablets is a valuable and
dynamic franchise that can live beyond the 2013 expiration.

But the overarching reason for not running an auction now is even more
compelling. We don't know what the future will bring and what we will
want to do later this year or next, but even if a sale is our ultimate
goal, there is a much better way to do it, and that is:

1.   Go through the private placement and raise money in the debt
market so we don't need to sell to execute a sale in order to have the
ability to take meaningful dollars out of our equity in Purdue, if that
is what we chose. It will make us appear far stronger in the eyes of
potential buyers as the family will have the freedom to take meaningful
dollars off the table.

PUBLICLY FILED PER STIPULATION [ECF 2140]

PPLPC042000011918
PPLPC042000011911

2.    Focus the organization on the future - first and foremost attaining our sales goals and having a successful Advisory Panel meeting. The debt allows us to keep meaningful caivate placement and raise money in the debt market so we don't need to sell to execute a sale in order to have the ability to take meaningful dollars out of our equity in Purdue, if that is what we chose. It will make us appear far stronger in the eyes of potential buyers as the family will have the freedom to take meaningful dollars off the table.

3.    Focus the organization on the future - first and foremost attaining our sales goals and having a successful Advisory Panel meeting. The debt allows us to keep meaningful cash on the balance sheet for future acquisitions and still allows us to take large distributions if that is what we chose at any time going forward.

Focus Management and the Board on the business to prove the promise of our position. Put all their energies of Management and the Board into realizing our near-term potentials and thus give us the best chance for a successful sale at the highest price.

The process of raising debt will allow GS to attain the requisite information to put together an M&A book should we choose to do it. Our executives will not have to be brought over the wall into a sale process as the work needed to raise a term loan is comparable to executing a sale, but with a far different goal.

I believe we would imperil achieving our potential and our goals by launching into an ill-timed sales effort. It is badly timed both from the marketplace and business perspective.

So, my view is that this is that the term-loan is the best option, not the worst, Jon.

Richard S. Sackler, M.D.



PUBLICLY FILED PER STIPULATION [ECF 2140]

HIGHLY CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

\* HYPERLINK ████████████████████

From: Sackler, Jonathan
Sent: Thursday, February 21, 2008 11:54 PM
To: Sackler, Mortimer JR; Sackler, Dr Richard; kas;   Peter Boer
Robert Shapiro; sdb; Robert Shapiro
Subject: RE: Long term planning

Mortimer, I don't see the tax issue the same way you do. I expect
buyers will project cashflow net of their anticipated tax costs and
discount it to arrive at a price, and unless it's a stock-for-stock
deal, we will pay some taxes on that price. On the other hand, the
buyer's cashflow forecast may benefit from projected synergies. Your
other points seem reasonable to me.

I am here next week and I have some times free. I am heading out on
vacation on Thurs the 28th and return March 16.

All the best,

Jon Sackler

A note to my friends in Connecticut... Be heard!   HYPERLINK
"http://www.conncan.org/action_center/members/petition.asp"   Sign the
"Great Schools for All" petition
_____

One Stamford Forum | 201 Tresser Boulevard | Stamford, CT 06901

█████████████████████   HYPERLINK

PUBLICLY FILED PER STIPULATION [ECF 2140]

HIGHLY CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

From: Sackler, Mortimer JR
Sent: Thursday, February 21, 2008 6:58 PM
To: Sackler, Jonathan; Sackler, Dr Richard; kas;   Peter Boer  Robert
Shapiro; sdb; Robert Shapiro
Subject: Re: Long term planning


I agree we should get together and discuss this. I feel strongly that
we should pursue the sale/merger with a major company and do so
prudently but also quickly. We are in a unique situation now where the
very large cash flow the U.S. Company should produce in the coming years
will "move the needle" for even the largest pharmaceutical companies and
would have great value for them. We should be able to achieve a very
large number for the businesses that will guarantee the family's
financial security for many generations. However, each passing month
costs us significant shareholder value as we get one month closer to the
expiration of the patent and hence reduce the value of the cash flow for
the acquirer by roughly 1/60th each month. Take that and multiply it by
the multiple that we will achieve in a sale and you can see that each
month delay costs us over $100 million. In addition, every month that
goes by has us paying 40% income tax on the earnings versus paying 15%
long term capital gains on the sale proceeds (or the cash portion
thereof and deferring the rest). That difference alone is a very large
number. Our projected taxes for Purdue alone this year is over $500
million and could be much higher.

The pharmaceutical industry has become far too volatile and risky for a
family to hold 95% of its wealth in. It simply is not prudent for us to
stay in the business given the future risks we are sure to face and the
impact they will have on the shareholder value of the business and hence
the family's wealth. The last time we discussed a sale was in 2000 and
we ended up trying to go the route of choice 1 below and it has not been
a pleasant experience (to say the least). While things are looking
better again now, I would not count out the possibility that times will
get much more difficult again in the future and probably much sooner
than we expect. Also, even if we sell out to a major pharma company,
the size of the transaction is likely to make us the largest equity
holder in the company (assuming we get a substantial portion of the
purchase price in equity instead of cash which would make sense and
allow us to differ the tax) so we will by no means be completely out of
the business and could, potentially and if we wanted to, secure Board
seats as part of the deal.

I get back to NY on Sunday and would make myself available anytime after
that to meet on this critically important subject. When can the rest of
you meet?

Regards,

PUBLICLY FILED PER STIPULATION [ECF 2140]

HIGHLY CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

Mortimer

On 2/21/08 4:12 PM, "Sackler, Jonathan"
wrote:

Folks,

I think it's time for another discussion on longterm planning. I
understand that there is interest in a major distribution and debt
financing. As I've told Richard, this seems unattractive to me, but I'm
happy to discuss it.

[The entire original message is not included]

PUBLICLY FILED PER STIPULATION [ECF 2140]

HIGHLY CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

PPLPC042000011922
PPLPC042000011911