FILED IN LESS REDACTED FORM PURSUANT TO THE STIPULATION AND AGREED
ORDER REGARDING MEDIA INTERVENORS' MOTION TO UNSEAL MATERIALS FILED IN
CONNECTION WITH UCC PRIVILEGES MOTIONS [ECF No. 2140]

19-23649-shl    Doc 2163    Filed 12/18/20    Entered 12/18/20 18:30:09    Main Document
Pg 1 of 38

AKIN GUMP STRAUSS HAUER & FELD LLP
Ira S. Dizengoff
Arik Preis
Mitchell Hurley
Joseph L. Sorkin
Elizabeth Scott (*admitted pro hac vice*)
Sara L. Brauner
One Bryant Park
New York, New York 10036
Telephone: (212) 872-1000
Facsimile: (212) 872-1002

*Counsel to the Official Committee of Unsecured
Creditors of Purdue Pharma L.P.,* et al.

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| PURDUE PHARMA L.P., *et al.*,[1] | ) | Case No. 19-23649 (RDD) |
| | ) | |
| Debtors. | ) | (Jointly Administered) |
| | ) | |

**OFFICIAL COMMITTEE OF UNSECURED CREDITORS' REPLY IN SUPPORT OF
MOTION TO COMPEL PRODUCTION OF PURPORTEDLY PRIVILEGED
DOCUMENTS, OR FOR IN CAMERA REVIEW, BASED ON FAILURE
OF THE SACKLERS TO DEMONSTRATE
DOCUMENTS IDENTIFIED ON LOGS ARE PRIVILEGED**

---

[1] The Debtors in these cases, along with the last four digits of each Debtor's registration number in the applicable jurisdiction, are as follows: Purdue Pharma L.P. (7484), Purdue Pharma Inc. (7486), Purdue Transdermal Technologies L.P. (1868), Purdue Pharma Manufacturing L.P. (3821), Purdue Pharmaceuticals L.P. (0034), Imbrium Therapeutics L.P. (8810), Adlon Therapeutics L.P. (6745), Greenfield BioVentures L.P. (6150), Seven Seas Hill Corp. (4591), Ophir Green Corp. (4594), Purdue Pharma of Puerto Rico (3925), Avrio Health L.P. (4140), Purdue Pharmaceutical Products L.P. (3902), Purdue Neuroscience Company (4712), Nayatt Cove Lifescience Inc. (7805), Button Land L.P. (7502), Rhodes Associates L.P. (N/A), Paul Land Inc. (7425), Quidnick Land L.P. (7584), Rhodes Pharmaceuticals L.P. (6166), Rhodes Technologies (7143), UDF L.P. (0495), SVC Pharma L.P. (5717) and SVC Pharma Inc. (4014). The Debtors' corporate headquarters is located at One Stamford Forum, 201 Tresser Boulevard, Stamford, CT 06901.

FILED IN LESS REDACTED FORM PURSUANT TO THE STIPULATION AND AGREED
ORDER REGARDING MEDIA INTERVENORS' MOTION TO UNSEAL MATERIALS FILED IN
CONNECTION WITH UCC PRIVILEGES MOTIONS [ECF No. 2140]

## <u>TABLE OF CONTENTS</u>

PRELIMINARY STATEMENT.................................................................................................. 1

ARGUMENT ......................................................................................................................... 5

    A.    The Sacklers Have Failed to Demonstrate That the Withheld Documents
Involve Baker and White Acting in Their Legal, Rather Than Business,
Capacity......................................................................................................11

    B.    The Sacklers Have Not Established That Stephen Ives Was Acting as an
Agent Necessary to Facilitate the Provision of Legal Advice. .............................17

    C.    The Sacklers Have Not Met Their Burden of Proving Privilege as to
Communications Among Special Committee Members and the Sacklers
(and/or Their Board Designees)........................................................................21

    D.    The Sacklers Have Not Shown That Communications Including Other
Third Parties and Communications Without Lawyers That Purport to
Reflect an Intent to Seek Legal Advice are Privileged. .......................................27

CONCLUSION.................................................................................................................... 31

## **TABLE OF AUTHORITIES**

**Federal Cases**

*866 E. 164th St., LLC v. Union Mut. Fire Ins. Co.*,
    No. 16-CV-03678(SN), 2016 WL 6901321 (S.D.N.Y. Nov. 23, 2016) ................................... 30

*Alpex Computer Corp. v. Nintendo Co., Ltd.*,
    No. 86 Civ. 1749(KMW), 1988 WL 87511 (S.D.N.Y. Aug. 16, 1988) ................................ 16

*Bank of Am., N.A. v. Terra Nova Ins. Co.*,
    212 F.R.D. 166 (S.D.N.Y. 2002) ................................................................................. 6, 1, 23

*Bloomingburg Jewish Educ. Ctr. v. Vill. of Bloomingburg*,
    171 F. Supp. 3d 136 (S.D.N.Y. 2016) ............................................................................... 28

*Bowne of New York City, Inc. v. AmBase Corp.*,
    150 F.R.D. 465 (S.D.N.Y. 1993) ............................................................................... *passim*

*Brown v. Barnes and Noble, Inc.*,
    No. 1:16-cv-07333(RA)(KHP), 2019 WL 7168146 (S.D.N.Y. Dec. 23, 2019) ..................... 17

*In re C.W. Mining Co.*,
    442 B.R. 44 (Bankr. D. Utah 2010) .................................................................................... 9

*Calvin Klein Trademark Tr. v. Wachner*,
    198 F.R.D. 53 (S.D.N.Y. 2000) ........................................................................................ 28

*City of Almaty, Kazakhstan v. Ablyazov*,
    No. 15-CV-05345(AJN)(KHP), 2019 WL 2865102 (S.D.N.Y. July 3, 2019) ....................... 30

*In re Cnty. of Erie*,
    473 F.3d 413 (2d Cir. 2007) ............................................................................................... 13

*Curto v. Med. World Commc'ns, Inc.*,
    783 F. Supp. 2d 373 (E.D.N.Y. 2011) ................................................................................. 6

*Duttle v. Bandler & Kass*,
    127 F.R.D. 46 (S.D.N.Y. 1989) ........................................................................................ 28

*Export-Import Bank of the U.S. v. Asia Pulp & Paper Co., Ltd.*,
    232 F.R.D. 103 (S.D.N.Y. 2005) ...................................................................................... 29

*Fifty-Six Hope Rd. Music Ltd. v. UMG Recordings, Inc.*,
    No. 08 CIV. 6143(DLC), 2010 WL 343490 (S.D.N.Y. Feb. 1, 2010) ............................. 6, 30

*Fleisher v. Phoenix Life Ins. Co.*,
    No. 11 CIV. 8405(CM)(JCF), 2013 WL 42374 (S.D.N.Y. Jan. 3, 2013) ............................... 6

*Global Fleet Sales, LLC v. Delunas*,
  No. 12-15471, 2016 WL 3365763 (E.D. Mich. June 17, 2016) .............................................29

*In re Grand Jury Proceedings*,
  219 F.3d 175 (2d Cir. 2000)...............................................................................................30

*In re Grand Jury Subpoena Dated July 6, 2005*,
  510 F.3d 180 (2d Cir. 2007)..................................................................................................6

*In re Grand Jury Subpoenas Dated March 24, 2003*,
  265 F. Supp. 2d 321 (S.D.N.Y. 2003)..................................................................................28

*Granite Partners v. Bear, Stearns & Co.*,
  184 F.R.D. 49 (S.D.N.Y. 1999) .............................................................................................6

*Gulf Islands Leasing, Inc. v. Bombardier Capital, Inc.*,
  25 F.R.D. 466 (S.D.N.Y. 2003) ...........................................................................................22

*Haugh v. Schroder Inv. Mgmt. N. Am. Inc.*,
  No. 02 Civ. 7955 DLC, 2003 WL 21998674 (S.D.N.Y. Aug. 25, 2003) ...............................28

*In re Modell*,
  171 B.R. 510 (Bankr. S.D.N.Y. 1994) ...........................................................................7, 8, 14

*Music Sales Corp. v. Morris*,
  No. 98 Civ. 9002(SAS)(FM), 1999 WL 974025 (S.D.N.Y. Oct. 26, 1999)...........................30

*Nat'l Day Laborer Org. Network v. USCIS*,
  No. 16 CIV. 387(PAE), 2020 WL 5518114 (S.D.N.Y. Sept. 14, 2020)..................................13

*In re North Plaza, LLC*,
  395 B.R. 113 (S.D. Cal. July 25, 2008) ...............................................................................30

*Middlesex Ret. Sys. v. Quest Software, Inc.*,
  No. CV 06-6863-DOC(RNBx), 2009 WL 10673943 (C.D. Cal. July 8, 2009) ......................24

*Obeid v. Mack*,
  No. 14 Civ. 6498(LTS)(HBP), 2016 WL 7176653 (S.D.N.Y. Dec. 9, 2016) ........................30

*In re Rivastigmine Patent Litig.*,
  No. 05-MD-1661(HB/JCF), 2005 WL 2319005 (S.D.N.Y. Sept. 22, 2005)....................22, 24

*Rackers v. Siegfried*,
  54 F.R.D. 24 (W.D. Mo. 1971)..............................................................................................9

*Ryan v. Gifford*,
  No. CIV. A. 2213-CC, 2007 WL 4259557 (Del. Ch. Nov. 30, 2007)....................................23

*SEC v. Roberts*,
    254 F.R.D. 371 (N.D. Cal. 2008) ........................................................................25

*SEC v. Wyly*,
    No. 10 Civ. 5760(SAS), 2011 WL 3366491 (S.D.N.Y. July 27, 2011) .............................19, 20

*In re Steinhardt Partners, L.P.*,
    9 F.3d 230, 235 (2d Cir. 1993) ........................................................................23

*Strougo v. BEA Assocs.*,
    199 F.R.D. 515 (S.D.N.Y. 2001) ......................................................................21

*TVT Records v. Island Def Jam Music Group*,
    214 F.R.D. 143 (S.D.N.Y. 2003) ......................................................................12

*United States v. Ackert*,
    169 F.3d 136 (2d Cir. 1999) ........................................................................29, 30

*United States v. Arthur Young & Co.*,
    465 U.S. 805 (1984) ................................................................................29

*United States v. Constr. Prods. Research, Inc.*,
    73 F.3d 464 (2d Cir. 1996) ........................................................................7, 8, 14, 16

*United States v. DeFonte*,
    441 F.3d 92 (2d Cir. 2006) ..........................................................................28

*United States v. Int'l Broth. of Teamsters, Chauffeurs, Warehousemen & Helpers
of Am., AFL-CIO*,
    119 F.3d 210 (2d Cir. 1997) ..........................................................................23

*United States v. Kovel*,
    296 F.2d 918 (2d Cir. 1961) ........................................................................19. 29

*United States v. Schwimmer*,
    892 F.2d 237 (2d Cir. 1989) ..........................................................................22

*Urban Box Office Network, Inc. v. Interfase Managers, L.P.*,
    No. 01 CIV. 8854(LTS)(THK), 2006 WL 1004472 (S.D.N.Y. Apr. 18, 2006) .....................16

*von Bulow v. von Bulow*,
    811 F.2d 136 (2d Cir. 1987) ........................................................................6, 22

*Wash. Bancorporation v. Said*,
    145 F.R.D. 274 (D.D.C. 1992) ......................................................................10

*Wultz v. Bank of China Ltd.*,
    304 F.R.D. 384 (S.D.N.Y. 2015) ......................................................................6

**State Cases**

*In re Lululemon Athletica Inc.*, *220 Litig.*,
    No. 9039-VCP, 2015 WL 1957196 (Del. Ch. Apr. 30, 2015) .................................................19

**Rules**

Bankruptcy Rule 9031 ...........................................................................................................1

Federal Rule of Evidence 503 ..............................................................................................19

**Constitutional Provisions**

Fifth Amendment ..........................................................................................................2, 9. 10

**Other Authorities**

Wigmore on Evidence § 2301 (2019 Supp.)...........................................................................19

**FILED IN LESS REDACTED FORM PURSUANT TO THE STIPULATION AND AGREED ORDER REGARDING MEDIA INTERVENORS' MOTION TO UNSEAL MATERIALS FILED IN CONNECTION WITH UCC PRIVILEGES MOTIONS [ECF No. 2140]**

The Official Committee of Unsecured Creditors (the "UCC") of Purdue Pharma, L.P. and its affiliated debtors and debtors-in-possession (collectively, the "Debtors") respectfully submits this reply memorandum (the "Reply") in support of its *Motion to Compel Production of Purportedly Privileged Documents, or for In Camera Review, Based on Failure of the Sacklers to and the Debtors Demonstrate Documents Identified on Logs are Privileged* [ECF No. 1752] (the "Motion")[2] seeking an order requiring the CSPs[3] to produce to the UCC, or provide for review *in camera* by the Court,[4] the Withheld Documents. For the avoidance of doubt, and as set forth in the *Stipulation of Settlement and Agreed Order Regarding Official Committee's Motion to Compel and Debtors' Motion for a Protective Order* [ECF No. 1955], the UCC and the Debtors have resolved the portions of the Motion pertaining to documents withheld by the Debtors; and, as such, the UCC seeks no further relief from the Debtors in respect of the Motion. The Ad Hoc Group of Non-Consenting States ("NCSG") affirmatively supports the relief requested in the Motion and this Reply.

## PRELIMINARY STATEMENT

1.      As the only creditor fiduciary in these cases, the UCC has worked tirelessly in discovery to evaluate the Settlement Framework, including the valuable estate and third-party causes of action from which the Sacklers seek to be released. Emails and other contemporaneous written communications have provided the best—and in many cases the only—source of

---

[2] Capitalized terms used and not otherwise defined herein shall have the meanings ascribed to such terms in the Motion. Evidence supporting the Motion and cited below was attached to the Declaration of Mitchell Hurley dated September 29, 2020 [ECF 1754] (the "Hurley Decl."), concluding with exhibit number 109. The UCC has identified substantial additional evidence in support of the Motion since it filed its opening papers. For ease of reference, such new evidence will be attached to the Declaration of Arik Preis dated November 18, 2020 (the "Preis Decl.") beginning with exhibit number 110. In the Motion and this Reply, the privilege logs subject to the UCC's challenges are described as the "Side A Logs" and the "Side B Logs." The Side A Logs and Side B Logs are sometimes collectively referred to as the "Sackler Logs" or the "Privilege Logs."

[3] As defined in the Scheduling Stipulation, the CSPs include the Raymond Side (or "Side B") Initial Covered Sackler Persons and Additional Custodians and the Mortimer Side (or "Side A") Covered Parties. The CSPs are sometimes referred to collectively herein as the "Sacklers" or, as applicable, the "Side A Sacklers" and the "Side B Sacklers."

[4] The UCC withdraws its alternative request for appointment of a special master in light of Bankruptcy Rule 9031.

information regarding the transactions and events at issue, particularly given (i) the passage of time, (ii) the death or incapacity of potentially key witnesses,[5] (iii) the claimed inability of surviving members of the Sackler family and their trusted advisors to recall circumstances surrounding the transactions and events that are the focus of the UCC's investigation, and (iv) the assertion of the Fifth Amendment by former CEOs of Purdue. As such, it is particularly critical to the UCC's ongoing investigation to ensure that any documents that the Sacklers have improperly withheld from disclosure based on an unsupported claim of privilege are produced.

2.    Mindful of the Court's admonition to move these cases forward and in an effort to lessen the burden on the parties and the Court, the UCC has reduced the number of purportedly privileged documents withheld or redacted by the Sacklers that the UCC is challenging by nearly 90%.[6] This reduction (i) zeroes in on documents most important to the claims at issue,[7] and (ii) takes into account the nearly 8,600 documents that the Sacklers previously withheld and/or redacted as privileged and have now agreed to produce in full or with fewer redactions as the result

---

[5] Raymond, Mortimer Sr., Beverly, and Jonathan Sackler no longer are living. On November 16, 2020, long-time Purdue Board member Peter Boer ▅▅▅▅▅▅▅▅ get through only about 45 minutes of his deposition. Today, the UCC was informed by Mr. Boer's lawyer that Mr. Boer ▅▅▅▅▅▅▅▅.

[6] In its Motion, the UCC challenged a total of 23,686 entries on the Sacklers' Privilege Logs. The UCC is now challenging just 2,673 entries. The updated lists of challenged entries, as they appear on the Privilege Logs, are included on Exhibits A and B to the Preis Declaration. The UCC respectfully requests that the Court refer to these updated Exhibits when entering any order granting the UCC's requested relief.

[7] In an effort to address the Sacklers' claim that documents identified on their Privilege Logs are not relevant to the UCC's investigation, the UCC agreed to consider dropping its challenges to documents that the Sackler family identified as falling outside the three document categories (the "Categories") identified in the Exceptions Motion, as set forth in Exhibit 101 to the Hurley Declaration filed concurrently therewith. *See* Preis Decl., Ex. 110 (Sept. 25, 2020 letter from M. Hurley to A. Lees); *id.* Ex. 111 (Oct. 12, 2020 letter from M. Hurley to Side B); *id.* Ex. 112 (Oct. 14, 2020 letter from M. Hurley to Side A); *id.* Ex. 113 (Oct. 20, 2020 email from E. Scott to Side A); *id.* Ex. 114 (Oct. 23, 2020 email from E. Scott to Side A); *id.* Ex. 115 (Oct. 29, 2020 email from E. Scott to Side A). Side B has taken the UCC up on its offer and identified 2,231 documents purportedly outside the Categories, and the UCC has agreed to withdraw its challenge to approximately 2,000 of those documents. *See* Preis Decl., Ex. 116 (Sept. 28, 2020 letter from Side B); *id.* Ex. 117 (Oct. 19, 2020 letter from Side B). Despite four separate requests, Side A has ignored the UCC's offer, and has not identified documents on the Side A Logs that are outside the Categories. Nevertheless and despite the fact that it is without access to the underlying documents at issue, the UCC has done its best to limit its challenges to documents within the Categories.

of the UCC's challenges.[8]   Side A produced one such document just days before the UCC's

deadline to file this Reply.   In the January 2018 email among Ilene Sackler Lefcourt, Theresa

Sackler, Mortimer Sackler Jr., and Stuart Baker, Ilene writes that "[i]t seems to me, based on

several things presented today, that promoting any opioids, in any way, in any country should be

stopped immediately."[9]   The previously withheld email response from Stuart Baker is a terse

instruction, "[p]lease do not respond to this email," and further reveals the Sacklers' strategy to

ensure that important communications either included counsel or were not put in writing at all.[10]

3.    Notwithstanding the productions the Sacklers have made and continue to make,

they continue to assert privilege over the following categories of documents that are of paramount

importance to the UCC's investigation into the value of the estate causes of action and direct third-

party claims:

- **Stuart Baker and Jonathan White Communications**: Communications with
Stuart Baker and/or Jonathan White—two individuals who act in both legal and
business capacities for the Sacklers and the Debtors—should be produced because
it is not apparent from the face of the Privilege Logs that the predominant purpose
of these communications contemplated Messrs. Baker and White acting in their
legal, rather than business, capacity, and the Sacklers have submitted no evidence
to support their privilege claims over these communications.  This issue is critical
given, among other things, Messrs. Baker's and White's significant business roles,
including Mr. Baker's position as the "*de facto*" chairman of Purdue, and in more
than 150 other executive, director, and other business roles for the Sacklers, their
trusts, Purdue, and other entities.  Finally, it is worth noting that Mr. Baker was
excluded from the released Trusts, Trustees, and Protector parties in the proposed
settlement between the DOJ and the Sacklers to resolve all civil, but not criminal,

---

[8] Side A has agreed to produce in full or reduce the number of redactions on approximately 5,535 documents
previously withheld or redacted on privilege grounds, concluding that its privilege assertions were wrong as to over
15% of its 34,726 total logged documents.  Side B has already produced approximately 3,158 documents previously
withheld or redacted on privilege grounds, representing approximately 14% of its 22,100 total logged documents.
Before the Debtors settled the privilege dispute with the UCC, the Debtors produced approximately 3,376 documents
previously withheld or redacted on privilege grounds, representing approximately 3% of the approximately 128,000
documents on their post-petition logs.

[9] *See* Preis Decl., Ex. 122 [OPEO].

[10] *See id.*

claims asserted against them by the DOJ.[11]  Indeed, the DOJ determined to release more than 250 Trusts, Trustees, and Protectors (in certain limited capacities) from all future liability, but declined to do so with respect to Mr. Baker.  *See id.*

- **Stephen Ives Communications**: Communications copying Side B accountant and alleged "agent" of Side B's family office, Stephen Ives, as well as accounting personnel assisting him, should be produced because the Sacklers have failed to meet their burden of proving that Mr. Ives's presence on communications does not vitiate privilege.  These documents are critical to the UCC's investigation given Mr. Ives's substantial role in Side B financial and accounting matters, including tax structuring and distributions to Sackler trusts.

- **Special Committee Communications**:  Communications among members of the Special Committee to the Board of Directors of Purdue Pharma L.P. (the "Special Committee") and various Sackler family members (and/or their Board designees)— whom the Special Committee is investigating—dated after the Special Committee's formation and long after the last Sackler left the Board should be produced because the common interest doctrine does not protect communications among parties with adversarial interests of this kind.  Moreover, there could be no expectation of confidentiality, and therefore no privilege, for any communications between the Sacklers and/or their Board designees on the one hand, and members of the Special Committee on the other hand, in connection with liability arising out of the opioid crisis and attendant litigation—given the Special Committee's duty to investigate potential estate claims ***against*** the Sacklers, and Purdue's insolvency arising from, these very issues.

4.    These Baker, White, Ives, and Special Committee documents are particularly important to the UCC's investigation.  Regarding certain other categories of Withheld Documents, the UCC has substantially narrowed its challenges, and addresses those categories briefly at the conclusion of the Argument section below.[12]

5.    To the extent the Court determines to review documents *in camera* in connection with considering the Motion, the UCC submits that review by the Court of a ***limited sampling*** of materials in the identified categories would enable the Court to make a reasoned determination

---

[11] *See Notice by the Sackler Families of Settlement with the United States Department of Justice and Motion to Confirm that Payment by the Sackler Families Under Settlement with the United States Department of Justice Is Not Prohibited by this Court*, Exhibit A [ECF No. 1833] (the "DOJ/Sackler Settlement Agreement"), Addendum B.

[12] Updated lists of Privilege Log entries still subject to the UCC's challenge are attached as Exhibits A and B to the Preis Declaration.  While the UCC continues to believe that the written presentations and communications the Sacklers shared with the DOJ are relevant and subject to production, the UCC has withdrawn its challenges to those documents as well.

FILED IN LESS REDACTED FORM PURSUANT TO THE STIPULATION AND AGREED
ORDER REGARDING MEDIA INTERVENORS' MOTION TO UNSEAL MATERIALS FILED IN
CONNECTION WITH UCC PRIVILEGES MOTIONS [ECF No. 2140]

19-23649-shl    Doc 2163    Filed 12/18/20    Entered 12/18/20 18:30:09    Main Document
Pg 11 of 38

whether further *in camera* review or other relief is appropriate respecting the identified categories. Given the burdens on the Court's time and the urgency of these issues, the UCC has identified a set of 87 documents (approximately 3% of the overall total number of challenged entries sought herein) for *in camera* review, including a selection of documents from each category noted. While the UCC obviously does not have the benefit of viewing the actual documents, it believes this sample of 87 documents would be an appropriate place to begin based on the limited information available in the Privilege Logs.[13]

6.       The UCC will continue to work diligently and in good faith with the mediators and other parties in interest in mediation in an effort to reach a consensual resolution with the Sacklers, including with respect to the estate claims. Indeed, the UCC is hopeful that the evidence it has unearthed to date will be sufficient to elicit reasonable settlement terms from the Sacklers, perhaps even before December 15, 2020, when the Motion is scheduled to be heard. The UCC respectfully submits, however, that the further disclosure and/or *in camera* review it requests will be critical if the parties are unable to reach a consensual resolution by that time, and, if necessary, will substantially aid the UCC and other parties in interest as they prepare to prosecute the estates' valuable claims.

## ARGUMENT

7.       The Sacklers' Objections to the Motion largely hinge on the false premise that it is the ***UCC's burden*** to show that the Withheld Documents are not subject to the attorney-client privilege or work product protection.[14] *See, e.g.*, Side A General Challenges Obj. ¶¶ 21, 23, 31;

---

[13] The control numbers of the Privilege Log entries submitted for *in camera* review are listed in Exhibit C to the Preis Declaration. These entries, as they appear on the Privilege Logs, are also highlighted in yellow on Exhibits A and B of the Preis Declaration.

[14] The UCC uses the term "privilege" in the Motion as shorthand to refer to all alleged immunities from disclosure, and should not be construed to limit the UCC's challenges to attorney-client privilege alone, and instead also encompasses work product and all other doctrines upon which the Sacklers rely to protect the Withheld Documents from disclosure. As the Sacklers well know through the numerous meet and confer letters exchanged and the Motion

Side B General Challenges Obj. at 14, 18, 23, 30, 31.  But that is not the law in this Circuit.  Indeed, contrary to their contentions, it is the *Sacklers* who bear the "heavy burden" of establishing (1) all of the elements of the attorney-client or work product privilege with respect to any information withheld from disclosure, and (2) that the applicable privilege has not been waived.  *Fifty-Six Hope Rd. Music Ltd. v. UMG Recordings, Inc.*, No. 08 CIV. 6143(DLC), 2010 WL 343490, at *3 (S.D.N.Y. Feb. 1, 2010) ("Like the attorney client privilege, the party invoking the [work product] privilege bears 'the heavy burden' of establishing its applicability.") (citing *In re Grand Jury Subpoena Dated July 6, 2005*, 510 F.3d 180, 183 (2d Cir. 2007)); *Granite Partners v. Bear, Stearns & Co.*, 184 F.R.D. 49, 52 (S.D.N.Y. 1999) ("The party seeking to assert a claim of privilege has the burden of demonstrating both that the privilege exists and that it has not been waived.") (citations omitted); *see also Fleisher v. Phoenix Life Ins. Co.*, No. 11 CIV. 8405(CM)(JCF), 2013 WL 42374, at *3 (S.D.N.Y. Jan. 3, 2013) (similar); *Bank of Am., N.A. v. Terra Nova Ins. Co.*, 212 F.R.D. 166, 169 (S.D.N.Y. 2002) (similar) (collecting cases).[15]

8.     Not only do the Sacklers bear the burden of establishing the elements of the attorney-client and work product privileges and the non-waiver of these privileges, that burden only "can be met [] by an evidentiary showing" by the Sacklers "based on competent evidence . . . and cannot be 'discharged by mere conclusory or *ipse dixit* assertions.'"  *Bowne of New York City,*

---

itself, the UCC has consistently challenged their refusal to produce the Withheld Documents on all bases, including attorney-client privilege, work product protection, common interest, and any other ground the Sacklers have asserted. Side B's suggestion that the UCC has not challenged the Sacklers' work product assertions is baseless.  *See* Side B General Challenges Obj. at 30, 32.

[15] While Side B cites Third Circuit cases for the proposition that the burden of showing work product waiver is on the moving party, *see* Side B General Challenges Obj. at 18-19 & n.36, courts in the Second Circuit clearly place the burden of showing non-waiver on the withholding party.  *See Wultz v. Bank of China Ltd.*, 304 F.R.D. 384, 396 (S.D.N.Y. 2015) (determining that the "[non-moving party] has not met its burden of showing that the materials are protectable as work product," and noting that the "[moving parties] bear no burden of proof"); *Curto v. Med. World Commc'ns, Inc.*, 783 F. Supp. 2d 373, 380 (E.D.N.Y. 2011) ("'The party asserting the protection afforded by the work product doctrine has the burden of showing both that the protection exists and that it has not been waived.'") (quoting *Bank of Am., N.A.*, 212 F.R.D. at 169 (collecting cases)).

*Inc. v. AmBase Corp.*, 150 F.R.D. 465, 470 (S.D.N.Y. 1993) (quoting *von Bulow v. von Bulow*, 811 F.2d 136, 144, 146 (2d Cir. 1987) (internal citations omitted)).  Thus, the Sacklers must provide a sufficient factual basis for the attorney-client and work product privilege claims for ***each challenged document*** on their Privilege Logs, supported by evidence such as affidavits or declarations.  *Id*. at 473 ("In requiring a party to prove the factual basis for its claims of privilege, the courts generally look to a showing based on affidavits or equivalent statements that address each document at issue.") (collecting cases); *In re Modell*, 171 B.R. 510, 514 (Bankr. S.D.N.Y. 1994) (purported privilege holder generally carries burden of demonstrating privilege "by way of affidavits or equivalent statements discussing the applicability of the attorney-client privilege to each document at issue").

9.      Simply put, the Sacklers have not met their evidentiary burden to show that each of the Withheld Documents the UCC has challenged is privileged.  Side A has submitted no affidavits or declarations supporting their privilege claims.  And Side B offered only the declaration of a public relations firm to support withholding public relations documents and deposition testimony in connection with Stephen Ives, which are insufficient for the reasons explained *infra*.

10.      The Sacklers' conclusory allegations in their Objections and reliance on their sparse Privilege Logs are not enough to meet their burden of demonstrating privilege and non-waiver. Indeed, a privilege log, standing alone, cannot support privilege claims where, as here with respect to the presence of non-privileged third parties, there are factual gaps as to the applicability of privilege.  *See, e.g.*, *United States v. Constr. Prods. Research, Inc.*, 73 F.3d 464, 473 (2d Cir. 1996) ("To facilitate its determination of privilege, a court may require an adequately detailed privilege log in conjunction with evidentiary submissions to fill in any factual gaps." (internal quotation marks and citation omitted)); *Bowne*, 150 F.R.D. at 470 (similar).  In *Construction Products*

*Research*, the Second Circuit determined that cursory privilege log entries did "not provide enough information to support the privilege claim," "particularly in the glaring absence of any supporting affidavits or other documentation." *Constr. Prods. Research, Inc*., 73 F.3d at 474. While the entries on the Privilege Logs here provide certain information as to the Withheld Documents such as date, author, recipient, cc's, subject, and description, the Privilege Logs alone do not provide adequate information to establish that the challenged entries copying outside third parties deserve protection. Therefore, the Sacklers must provide declarations or other evidence to support their privilege allegations as to each challenged document. *See Constr. Prods. Research, Inc.*, 73 F.3d at 473; *Bowne*, 150 F.R.D. at 470; *In re Modell*, 171 B.R. at 514. Nor do the Sacklers' conclusory allegations as to privilege in their Objections replace the required evidentiary support to fill in the factual gaps on the Privilege Logs. *See Bowne*, 150 F.R.D. at 470.

11.     To be clear, the UCC is not requesting a "categorical de-designation" of all documents on the Privilege Logs that include third parties or members of the Special Committee after the Special Committee was formed, as the Sacklers claim in their Objections. *See* Side A General Challenges Obj. ¶ 32. Rather, as Side A acknowledges, whether a document can be withheld as privileged must be "considered on a document-by-document basis." *See id.* ¶ 31. And here, the Sacklers have not met their burden on a document-by-document basis by competent evidence to prove that each of the Withheld Documents is subject to the attorney-client privilege or work product protection.

12.     Further, even if the Sacklers had met their burden to establish work product protection for some of the documents at issue, the UCC has clearly established a "substantial need" for the documents. First, the Withheld Documents not only are relevant to this case, but they are also critical to diligence regarding the Settlement Framework and valuable estate and third-party

causes of action, the release of which are contemplated by the proposed Settlement Framework and must be evaluated by the Debtors' creditors. *See In re C.W. Mining Co.*, 442 B.R. 44, 48-49 (Bankr. D. Utah 2010) (determining that withheld documents were necessary to assist the Trustee with administration of the estate and pending litigation). Such diligence—including access to improperly withheld documents—is necessary to ensure that value is maximized for creditors and that any release of the Sacklers and related parties from liability in these cases is appropriate, an issue of paramount importance not only to the Debtors' creditors, but to the public at large.[16]

13.     Additionally, the UCC has a substantial need for the Withheld Documents given the informational asymmetry in these cases—the Debtors and the Sacklers have both benefited from viewing the claimed work product and can consider those materials in their settlement analysis, while the UCC cannot unless the materials are disclosed. *See, e.g.*, *Rackers v. Siegfried*, 54 F.R.D. 24, 26 (W.D. Mo. 1971) (finding that "[i]f one party were to have knowledge of [information pertinent to claims at issue] and the other party were to be without such knowledge, a distinct trial advantage would accrue to the former party . . . [t]herefore, plaintiff has shown a substantial need for the discovery of the documents within the meaning of the applicable rule"). And under the unique circumstances of these proceedings—where multiple key witnesses are deceased, profess to lack memory of even the most basic aspects of Purdue's business, have invoked privilege to avoid answering questions on numerous topics, and/or have invoked the Fifth Amendment, refusing to testify about any matters concerning the Debtors whatsoever—no effective alternative

---

[16] As noted earlier, the UCC will continue to work diligently and in good faith with the mediators and other parties in interest in mediation in an effort to reach a consensual resolution with the Sacklers, including with respect to the estate claims. Indeed, the UCC is hopeful that the evidence it has unearthed to date will be sufficient to elicit reasonable settlement terms from the Sacklers, perhaps even before December 15, 2020, when the Motion is scheduled to be heard. The UCC respectfully submits, however, that the further disclosure and/or *in camera* review it requests will be critical if the parties are unable to reach a consensual resolution by that time, and, if necessary, will substantially aid the UCC and other parties in interest as they prepare to prosecute the estates' valuable claims.

means exists for discovering the information.[17]  Further, where, as here, turning over work product

will lead to cost savings and conservation of estate resources, disclosure is favored.  *See Wash.*

*Bancorporation v. Said*, 145 F.R.D. 274, 279 (D.D.C. 1992) (finding that "[p]roduction of [work

product] will save defendants [] time and money . . ., and in a case as large and complex as this

one, that time and money constitutes substantial need" (internal quotation marks omitted)).

14.    That the Sacklers have produced many logged documents during the meet and

confer process and continue to review their Privilege Logs and de-designate documents also shows

why the Sacklers' privilege claims cannot be proven based on the Privilege Logs and conclusory

allegations alone.  *See, e.g.*, Side A General Challenges Obj. ¶ 12 (explaining that Side A has

"identified several thousand documents . . . that they determined should not have been included in

the Privilege Log"); Side B General Challenges Obj. at 26 & n.46 (explaining that the Side B Logs

contain several hundred entries with "unreliable metadata" that do not reflect accurate dates).

While mistakes in privilege logs are understandable, the ability of moving parties to probe

privilege allegations and put the withholding party "to its proof" is fundamental to a full and fair

discovery process.

15.    The UCC has repeatedly requested that the Sacklers meet their burden of proving

their privilege claims, and was forced to seek relief from this Court when they refused.  As set

forth below, the Sacklers' continued refusal to prove their privilege claims in response to the

---

[17] *See, e.g.*, Preis Decl., Ex. 226 (Mortimer D.A. Sackler Dep. 22:3-7 [HC]) (failing to recall for which Purdue entities
he served as a Board member); *id.* Ex. 223 (Kathe Sackler Dep. 260:7-261:7 [HC]) (stating that she was "confused"
about whether the Governance Committee ever worked with international companies); *id.* Ex. 227 (Theresa Sackler
Dep. 298:19-25 [HC]) (failing to recall "any of the dates" McKinsey worked with Purdue); *id.* Ex. 219 (Baker Dep.
169:18-170:13, 78:11-80:10 [HC]) (declining to answer questions on privilege grounds regarding why trusts were
situated in Jersey and how the Sackler family business was organized to avoid liabilities); *id.* Ex. 224 (Stewart Dep.
151:4-12, 144:3-145:7, 145:8-146:11, 146:23-149:7 [HC]) (refusing to answer questions on Fifth Amendment grounds
regarding Sackler management of Purdue, diversion of Purdue products, and sales strategies); *id.* Ex. 225 (Timney
Dep. 42:3-8, 52:18-53:14, 107:2-108:5, 41:10-42:2 [HC]) (refusing to answer questions on Fifth Amendment grounds
regarding Sackler management of Purdue and sales strategies).

UCC's Motion warrants an order compelling production of the Withheld Documents and/or *in camera* review of a sampling of the Withheld Documents in each of the following categories: (a) Stuart Baker and Jonathan White communications for which the predominant purpose was business, rather than legal, advice; (b) communications copying Stephen Ives in which his presence was not necessary for the rendition of legal advice; (c) communications among members of the Special Committee and the Sacklers (and/or their Board designees) dated after the Special Committee formation in which the interests of the Special Committee are adverse to the targets of their investigation; and (d) other non-privileged third-party communications.

### A. The Sacklers Have Failed to Demonstrate That the Withheld Documents Involve Baker and White Acting in Their Legal, Rather Than Business, Capacity.

16.     The Sacklers concede that Messrs. Baker and White held non-legal roles at Purdue and for the Sacklers, and thus that communications with them may not be privileged. *See* Side A General Challenges Obj. ¶ 40 ("[Side A has] produced many communications with Mr. White that are not privileged"); Side B General Challenges Obj. at 24 (noting it is true Mr. Baker had legal and non-legal roles and that Side B has produced documents involving Mr. Baker subject to no claim of privilege).  To be sure, Messrs. Baker's and White's non-legal roles are numerous and comprehensive.  *See* Motion ¶¶ 28-31 (detailing Messrs. Baker's and White's non-legal roles, including as executives and board members of Purdue and the IACs, as trustees for the Sacklers' trusts, and Mr. Baker's role as the "*de facto*" chairman of Purdue).[18]  As such, there can be no dispute that Messrs. Baker and White are not typical "outside" counsel due to the dizzying variety

---

[18] Indeed, as the "*de facto*" chairman of Purdue, Mr. Baker frequently took on routine, business-side actions, such as working directly with the business to communicate and implement board directives throughout Purdue and the IACs. *See, e.g.*, Preis Decl., Ex. 123 [OPEO] (April 24, 2017 email exchange between Mortimer Sackler Jr. and Antony Mattessich regarding Mr. Baker's actions); *see also id.* Ex. 218 (Pickett Dep. 59:5-22 [HC]) (Dr. Pickett, a Purdue Pharma Inc. board member since 2010, testifying that Mr. Baker was "someone that shepherded the agendas through the board meetings," and without reference to Mr. Baker ever providing legal advice).

and volume of their non-legal roles and therefore merit careful scrutiny before their communications may be properly withheld as privileged. *See TVT Records v. Island Def Jam Music Group*, 214 F.R.D. 143, 145 (S.D.N.Y. 2003) (noting that counsel's communications in capacity as business executives were not privileged and that assertion of a "blanket privilege for large portions of the communications" by counsel who were also business executives was "overly broad"). When Mortimer Sackler Jr. was asked at his deposition to identify Mr. White's role on behalf of his family and their controlled entities, he mentioned only that Mr. White acted as a director and trustee, and did not even mention the fact that White also is trained as a lawyer.[19] And both sides admit that Baker played many non-legal roles on their behalf.[20]

17.     The need for such scrutiny has become even more apparent since the UCC filed its Motion. On October 21, 2020, the DOJ and certain members of the Sackler family announced that they had reached a civil settlement regarding allegations "that the Sacklers knowingly caused false and/or fraudulent claims for OxyContin to be submitted to the Federal Healthcare Programs."[21] As part of that settlement, if consummated, Mr. White will receive a civil release from the DOJ in his limited capacity as a trustee and protector of the Sackler family trusts—proof positive of his heavy involvement with the Sacklers on a non-legal basis and the importance of his communications to the UCC's investigation.[22] More significantly, the DOJ has chosen ***not*** to provide even a limited release to Mr. Baker, who is and has been, by any measure, Purdue's and

---

[19] Preis Decl., Ex. 226 (Mortimer D.A. Sackler Dep. 370:10-372:5 [HC]).

[20] *See, e.g.*, Side B General Challenges Obj. at 24; Preis Decl., Ex. 223 (Kathe Sackler Dep. 211:6-22 [HC]) (stating that Baker worked as an administrator for MNP, scheduling meetings and creating agendas); Hurley Decl., Ex. 52 (Jonathan Sackler stating that Mr. Baker is considered "the de facto chairman" of the Purdue board); *id.* Ex. 49 (Report of SDB Activities and Responsibilities March 31, 2015, where Baker identified various non-legal roles); *id.* Ex. 40 (April 9, 2020 J. McLaughlin Ltr. showing that Baker was a director or officer of more than 120 IACs and 30 other affiliated entities).

[21] DOJ/Sackler Settlement Agreement [ECF No. 1833, Ex. A] ¶ F.

[22] DOJ/Sackler Settlement Agreement [ECF 1833, Ex. A] Addendum B (Released Family Members and Trust Parties).

the Sacklers' most trusted business and legal advisor and has been since the late 1960s.[23] As such,

Mr. Baker's importance to the UCC's investigation cannot be overstated.

18.     Mr. Baker has also recently admitted that it was not his practice to enter engagement

letters when he provided legal advice to Purdue, the Sacklers, or their entities,[24] making it all the

more difficult to distinguish when he was acting in a business or legal capacity.  When questioned

about this lack of a distinction between his business and legal advice over his more than fifty-year

career advising the Sacklers and their entities, Mr. Baker testified he would sometimes, but not

always, distinguish legal advice from business advice by indicating to his audience that "we're

now in an attorney-client privilege session."[25]  Mr. Baker's *ad hoc* approach to legal engagements

and assertions of the attorney-client privilege further justifies the conclusion that a deeper inquiry

into the challenged Baker documents is appropriate.

19.     The entries on the Privilege Logs alone are insufficient to carry the Sacklers' burden

to prove that the predominant purpose of each of the challenged Baker and White documents was

legal rather than business.[26]   *See Nat'l Day Laborer Org. Network v. USCIS*, No. 16 CIV.

387(PAE), 2020 WL 5518114, at *8 (S.D.N.Y. Sept. 14, 2020) (holding that where a

communication contains both legal and business advice, it will be privileged only if its

"predominant purpose" was to render or solicit legal advice) (citing *In re Cnty. of Erie*, 473 F.3d

413, 420 (2d Cir. 2007)).  The Sacklers offer little more than the unremarkable fact that they have

produced other documents involving Messrs. Baker and White.[27]  But the fact that the Sacklers

---

[23] *See generally id.*

[24] *See* Preis Decl., Ex. 219 (Baker Dep. 313:8-314:13 [HC]).

[25] *See* Preis Decl., Ex. 219 (Baker Dep. 321:18-322:9 [HC]).

[26] Due to a recently-discovered clerical error, a number of the UCC's challenges to the entries copying Mr. Baker on the Side B Logs were inadvertently omitted from Exhibit B to the Hurley Declaration that accompanied the Motion. This error has been corrected, and the amended Exhibit B submitted in support of this Reply contains the full set of challenged entries.  *See* Preis Decl., Ex. B (Excel Tab 1).

[27] The parties have produced or agreed to produce additional documents involving Messrs. Baker and White that they have determined are not privileged.  *See* Side A General Challenges Obj. ¶¶ 39, 40 & n.20; Side B General Challenges

have produced communications with Messrs. Baker and White acting in their business capacity does not mean the withheld communications are privileged, nor does this fact in any way assist the Sacklers in demonstrating the predominant purpose of the communications remaining on the Privilege Logs. *See Constr. Prods. Research, Inc.*, 73 F.3d at 474 (requiring evidentiary support to fill factual gaps where log entries did "not provide enough information to support the privilege claim").

20.    The Sacklers have otherwise failed to carry their burden to demonstrate that the Baker and White communications are privileged.  For example, Side A continues to withhold entries with the vague mix of legal and business descriptions such as "legal advice re: trusts and estates,"[28] and "[d]iscussing legal advice and providing information for purpose of legal advice re: media coverage concerning Purdue opioid products,"[29] and has failed to advance any evidence such as declarations from Mr. White or the recipients of the emails, to demonstrate the predominant purpose of Mr. White's advice was legal, or even to define the nature, timing and contours of the legal roles played by those persons via evidence, rather than by *ipse dixit* claims in legal memoranda.  Side A also relies on generic descriptions, and no evidence, to support claims of privilege regarding communications with Mr. Baker, including the description "[d]iscussing legal advice re: changes on the Board of Directors at Purdue; litigation concerning Purdue opioid products."[30]  Boilerplate language on privilege logs is not enough to sustain claims of privilege in the face of a motion to compel.  *Bowne*, 150 F.R.D. at 474; *In re Modell*, 171 B.R. at 514.

---

Obj. at 23.  The UCC therefore withdraws its challenges to these documents.  Side A has also provided additional detail concerning the subject matter of five of its entries involving Mr. White, and based on that information, the UCC agrees to withdraw its challenge as to those five entries.  *See* Side A General Challenges Obj. ¶ 41.

[28] Preis Decl., Ex. A (Excel Tab 1, at 13315) (entry describing email between Jonathan White and Kathe Sackler).

[29] Preis Decl., Ex. A (Excel Tab 1, at 14926) (entry describing email between Jonathan White and Ilene Sackler Lefcourt).

[30] Preis Decl., Ex. A (Excel Tab 1, at 16179) (entry describing email between Stuart Baker, Theresa Sackler, and Jonathan Sackler with the subject line "Re: Board constitution").

21.     Similarly, Side B relies on boilerplate Privilege Log descriptions alone to justify withholding communications that include Mr. Baker.  Side B argues that because the withheld communications are between Mr. Baker and PPI and IAC board members and executives, and the privilege descriptions include "requesting and reflecting provision of legal advice regarding Purdue business structure," that the entries are sufficient to ascertain Mr. Baker was acting as a lawyer.  *See* Side B General Challenges Obj. at 24.[31]  But communications involving the self-proclaimed "*de facto*" chairman of Purdue related to "legal advice regarding Purdue business structure" are, by the very words of the description, of a mixed legal and business nature.[32]  Side B has submitted no evidence to meet its burden to withhold these communications.[33]  And even more, Side B claims privilege regarding multiple documents referring to purported legal advice from Mr. Baker related to distributions and for which Mr. Baker is the only lawyer listed on the Privilege Logs, but Mr. Baker has testified that he did not provide legal advice regarding distributions from Purdue.[34]

22.     Notably, the authorities the Sacklers cite actually support the UCC's position that the Sacklers must provide evidence to establish their privilege claims as to the Baker and White communications, or at least submit to *in camera* review.  In *Scott v. Chipotle Mexican Grill, Inc.*,

---

[31] The UCC has included two entries with this generic description in its proposed set of entries for *in camera* review. *See* Preis Decl., Ex. B (Excel Tab 1, at RS0189895 and PS-01072058).

[32] For example, Side B recently produced a redacted email that illustrates the insufficiency of the descriptions on the Privilege Logs alone to demonstrate that the predominant purpose of the email was legal.  This November 22, 2013 email chain contains an email from then-Purdue President and CEO John Stewart stating "[h]ere are the final reports from McKinsey on the work they did to identify the factors leading to OxyContin's below budget sales performance, and their recommendations for action to be taken to stimulate the product's sales performance."  The content of the subsequent emails exchanged between Mr. Baker and Dr. Richard Sackler are largely redacted for privilege with no indication of a request or provision of legal advice, and the privilege description Side B offers for this entry is similarly generic and even concedes it is related to Purdue's business structure.  *See* Preis Decl., Ex. B (Excel Tab 1, at RS0291493) (described as "Confidential communication requesting and reflecting provision of legal advice regarding Purdue business structure"); *id.* Ex. 124 [HC].

[33] Side B's attempt to use the work product doctrine to withhold documents including Mr. Baker similarly fails because Side B has recited the wrong test for work product protection and has not offered any evidence to carry its burden to establish the applicability of work product protection.  *See* Paragraph 7 & n.15 *supra.*

[34] *See* Preis Decl., Ex. 219 (Baker Dep. 322:18-22, 323:13-18 [HC]); *see also generally id.* Ex. B (Excel Tab 1).

the court decided the privilege issues only *after* reviewing Chipotle's "amended privilege log, the exhibits *in camera*, and the supplemented deposition transcript excerpts." 94 F. Supp. 3d 585, 589-90 (S.D.N.Y. 2015). Nor is the UCC operating on mere "suspicions of counsel" as to their challenges, unlike in the authority the Sacklers cite. *See Alpex Computer Corp. v. Nintendo Co., Ltd.*, No. 86 Civ. 1749(KMW), 1988 WL 87511, at *3 (S.D.N.Y. Aug. 16, 1988). Instead, the UCC has identified specific Privilege Log entries and challenged them for the specific reason that the Sacklers have not established that the predominant purpose of the withheld communications was legal in nature.[35] The UCC is not required to prove the Baker and White communications are ***not*** privileged to prevail on this Motion; it need only show that the Sacklers have not proven that they are. *See Constr. Prods. Research, Inc.*, 73 F.3d at 474. Here, the Sacklers have refused to provide any such evidence or explanation to support their privilege claims, and instead have relied solely upon their inadequate and generic Privilege Log entries, which fall well short of their evidentiary burden.

23.    Because the Sacklers have failed to offer any actual ***evidence*** in support of their privilege claims regarding the Baker and White documents, the Sacklers have failed to carry their burden to assert attorney-client privilege or work product protection, and the Court would be within its discretion to order production of the 629 challenged Baker and White documents without more. At a minimum, the UCC respectfully submits that the Court should undertake an *in camera* review of a reasonable number of Baker and White documents in order to consider whether additional relief is appropriate on a basis informed by actually reviewing some of the information that has been withheld on alleged privilege grounds. *See Urban Box Office Network, Inc. v. Interfase Managers, L.P.*, No. 01 CIV. 8854(LTS)(THK), 2006 WL 1004472, at *1 (S.D.N.Y. Apr.

---

[35] Indeed, the UCC is not challenging more than 7,000 of the entries on the Sackler Logs that include Messrs. Baker or White.

18, 2006) (court conducted *in camera* review and ordered production of withheld documents

challenged on the basis of being business, as opposed to legal, communications).

24.     To ease the burden of the proposed review, the UCC has identified a sampling of

25 documents in the Baker and White category from the Privilege Logs and from that sampling

the Court may determine whether further *in camera* review or production is necessary.[36]   Courts

routinely examine a reasonable sampling of purportedly privileged documents *in camera* to inform

broader rulings regarding privilege issues and such a practice is appropriate here.  *See, e.g.*, *Brown*

*v. Barnes and Noble, Inc.*, No. 1:16-cv-07333(RA)(KHP), 2019 WL 7168146, at *8-9 (S.D.N.Y.

Dec. 23, 2019) (granting in part motion to compel privileged documents after *in camera* review of

50 documents and finding that "[t]he vast majority of the documents" were not "subject to the

attorney-client privilege because they do not seek or convey legal advice").

### B.     The Sacklers Have Not Established That Stephen Ives Was Acting as an Agent Necessary to Facilitate the Provision of Legal Advice.

25.     Stephen Ives is a non-lawyer who has provided accounting and investment advisory

services to the Side B Sacklers for decades.  *See, e.g.*, Preis Decl., Ex. 220 (Ives Dep. 46:2-47:6

[HC]) (explaining Mr. Ives's involvement for decades with North Bay Associates, which he

describes as a partnership used to perform accounting and tax compliance efforts for Side B

Sacklers and related entities and trusts); *id*. Ex. 221 (David Sackler Dep. 134:11-24, 136:13-19

[HC]) (explaining that Ives and his office prepared David Sackler's personal taxes for his entire

working life); *id*. Ex. 222 (Marianna Sackler Dep. 76:22-77:4 [HC]) (explaining that Ives acts as

an "accountant and financial advisor" to the Side B family and prepares Marianna Sackler's

personal taxes).  Side B argues that Mr. Ives served various other roles with respect to the Raymond

---

[36] *See* Preis Decl., Exs. A-B (Excel Tabs 1) for the full set of privilege entries for Baker and White communications
the UCC seeks and *see* Preis Decl., Ex. C for the narrowed sample of Baker and White communications for *in camera*
review.

Sackler family, is the "consummate representative and agent" of the family, and is therefore more

properly categorized as a client representative or agent who does not waive privilege.[37]  Side B

General Challenges Obj. at 20-22.  But such broad strokes arguments are insufficient to establish

privilege.

26.     Indeed, the many and varied roles Mr. Ives served for Side B during the precise

years in which the Sacklers transferred more than $10 billion, along with at least another $1 billion

in other property, out of Purdue and into domestic and international trusts—some of which Mr.

Ives managed—for the benefit of the Sacklers is precisely why discovery of non-privileged

documents involving Mr. Ives is critical to the UCC's investigation of potential estate claims.

Specifically, understanding the steps the Sacklers may have taken to move Purdue assets away

from litigation creditors and their rationale for doing so necessarily is critical to valuing the estate

causes of action.  *See, e.g.*, Preis Decl., Ex. 220 (Ives Dep. 53:7-25 [HC]) (describing his work for

the Side B Sacklers as "accounting records, tax compliance, tax planning, trust structure, helping

with the governance that Jon and Richard wanted for the families and their trust structures, banking

arrangements, oil and gas investments, reporting on family investment portfolios and any other

type of accounting or management reporting that they would request").

27.     The relevant question for privilege purposes is not whether Mr. Ives is more

appropriately categorized as an accountant/investment advisor or client representative/agent, but

rather whether his presence on the documents and communications for which protection is sought

---

[37] For its part, Side A makes no effort to defend the inclusion of Mr. Ives aside from pointing out that "[c]ommunications involving accountants who were necessary for the provision of legal advice were properly withheld as privileged," *see* Side A General Challenges Obj. ¶ 33, and that it is continuing to review the documents on the Side A Logs and "anticipates that it may produce additional documents involving third-party advisors," *id*. at 15-16 n.12.  But the UCC does not contest that communications including accountants may be privileged if the accountant was necessary for the provision of legal advice.  Rather, the UCC disputes that Side A has actually made such a showing as to the log entries including Mr. Ives or other accountants and financial advisors.  The UCC thus focuses for purposes of this Reply on the arguments set forth by Side B, which apply with equal force to Side A.

was necessary—not simply useful or convenient—to facilitate the effective communication of

legal—not financial or business—advice between attorney and client. This standard is essentially

the same whether analyzed through the accountant/investment advisor or client

representative/agent lens. *See, e.g.*, *United States v. Kovel*, 296 F.2d 918, 922 (2d Cir. 1961)

(accountant vitiates privilege unless "the presence of the accountant is necessary, or at least highly

useful, for the effective consultation between the client and the lawyer which the privilege is

designed to permit"); *SEC v. Wyly*, No. 10 Civ. 5760(SAS), 2011 WL 3366491, at *2 (S.D.N.Y.

July 27, 2011) ("The presence of these agents does not destroy the privilege if their presence was

needed to facilitate effective communication of legal advice between the attorney and the client.").

28.     Moreover, Side B mischaracterizes the law regarding agents or employees of family

offices. Neither proposed Federal Rule of Evidence 503 nor either of the cases Side B cites stands

for the proposition that an agent or employee of a family office—especially one that holds many

and varied roles for different individuals, entities, and organizations—is automatically entitled to

privilege protection with respect to each and every document or communication related to the

family whose office he serves. As recognized in both of the cases Side B cites, a fact-specific

inquiry is required with respect to the particular documents at issue to determine whether the

representative was acting as an agent necessary for the provision of legal advice at the time and in

the context of the communication. *See In re Lululemon Athletica Inc.*, *220 Litig.*, No. 9039-VCP,

2015 WL 1957196, at *8 (Del. Ch. Apr. 30, 2015) (applying Delaware[38] privilege law to conduct

---

[38] Though recognizing the need to conduct a fact-specific inquiry to determine whether third-party agents break privilege, *In re Lululemon Athletica Inc. 220 Litigation*, is otherwise inapposite as it relies on Delaware law and applies a less restrictive standard—that the agent "shares responsibility for the subject matter underlying the consultation," 2015 WL 1957196, at *9—than the Second Circuit's more exacting requirement that the third party be "necessary" for the effective communication of legal advice. *See, e.g.*, *Wyly*, 2011 WL 3366491, at *2. Under federal common law as interpreted by the Second Circuit, the necessity element requires that the third-party agent's involvement be indispensable in facilitating the attorney-client communication. *See, e.g.*, *Kovel*, 296 F.2d at 921; *Strougo v. BEA Assocs.*, 199 F.R.D. 515, 522 (S.D.N.Y. 2001) (for privilege to apply notwithstanding presence of third party, the

a detailed and fact-specific inquiry regarding a single email chain and ultimately concluding that the representative of the family office was acting as an agent with respect to the communication at issue because under an established trading plan, the family office representative was authorized to receive notices regarding trades and had responsibility over matters relating to that trade); *Wyly*, 2011 WL 3366491, at *2, 5 (conducting a detailed, entry-by-entry review of the circumstances of each challenged document to determine whether "at this time and with respect to the matter presented in the documents logged" individuals who "wore many hats" were operating "as a necessary agent" for purposes of facilitating legal advice). And "[t]he party invoking the privilege has the burden of showing that the agent was 'necessary to facilitate client communications' between the principal and the lawyer." *Wyly*, 2011 WL 3366491, at *2 (quoting *In re Application Pursuant to 28 U.S.C. § 1782*, 249 F.R.D. 96, 100-01 (S.D.N.Y. 2008)).

29.     The Sacklers have not met—or even attempted to meet—their burden to establish Mr. Ives was a necessary agent with respect to any of the communications at issue. For example, as to the family office role (and indeed every other role in which Mr. Ives served), Side B has failed to specify for which withheld communications Mr. Ives was purportedly acting in his capacity as a representative of the family office as opposed to a trustee or one of his many other roles; who engaged counsel—whether it was the family office itself or one or more of the individual family members; and why Mr. Ives was needed—and not merely convenient—for the communication. Side B's generic assertions that Mr. Ives held many roles related to the Sackler families and entities fall short of the standard, and thus, the documents and communications including Mr. Ives should be produced.[39]

---

third-party agent must be "crucial to the lawyer's assessment of his client's case"); Wigmore on Evidence § 2301 (2019 Supp.) (requiring the "assistance of [] agents" to be "indispensable" to attorney's work).

[39] This same analysis applies to the employees who worked for Mr. Ives for which Side B has made no effort to satisfy its burden. *See* Side B General Challenges Obj. at 20 n.39.

30.    For these same reasons, the Sacklers have not met their burden to show that any purported work product protection for the entries related to Mr. Ives exists and has not been waived.  *See, e.g.*, *Bank of Am., N.A.*, 212 F.R.D. at 169 ("The party asserting the protection afforded by the work product doctrine has the burden of showing both that the protection exists and that it has not been waived.").

31.    Because of the Sacklers' failure to meet their burden of proving that Mr. Ives (or accounting personnel assisting him) was necessary for the rendition of legal advice on each of the 1,184 communications the UCC has challenged or that these communications are subject to work product protection, the communications should be produced.  In the alternative, the UCC requests that the Court conduct an *in camera* review of a sampling of 14 of the Ives challenged documents and from that sampling determine whether further *in camera* review or production of the remaining challenged Ives documents is appropriate.[40]

### C.    The Sacklers Have Not Met Their Burden of Proving Privilege as to Communications Among Special Committee Members and the Sacklers (and/or Their Board Designees).

32.    The Sacklers claim that communications with members of the Special Committee after the Sacklers left the Board are privileged and subject to protection under the common interest doctrine because the Sacklers and the Debtors—including the members of the Special Committee in their capacity as Purdue Board members at-large—share a common interest in defending against the opioid litigation brought against Purdue and the Sacklers.  *See* Side A General Challenges Obj. ¶¶ 5, 19-21; Side B General Challenges Obj. at 3-4, 26-27.  But the Sacklers have submitted no evidence showing their interests (and/or the Sacklers' Board designees) and the Special Committee members' interests were or should have been aligned in any of the 93 challenged entries.  Indeed,

---

[40] *See* Preis Decl., Exs. A-B (Excel Tabs 2) for the full set of privilege entries for Ives communications the UCC seeks and *see* Preis Decl., Ex. C for the narrowed suggestion of sample Ives communications for *in camera* review.

the Special Committee has a duty to investigate potential estate claims *against* the Sacklers,

including by developing arguments that Purdue itself was insolvent since the Sacklers started

transferring billions of dollars out of Purdue to themselves, and based on its liability arising out of

the opioid crisis and attendant litigation.    Therefore, there could be no expectation of

confidentiality for communications between the Sacklers and/or their Board designees on the one

hand, and members of the Special Committee on the other hand, as to the defense of such claims.

33.    The common interest doctrine "protect[s] the confidentiality of communications

passing from one party to the attorney for another party where a joint defense effort or strategy has

been decided upon and undertaken by the parties and their respective counsel."    *United States v.*

*Schwimmer*, 892 F.2d 237, 243 (2d Cir. 1989) (citation omitted).    Importantly, the common interest

doctrine applies "only insofar as [the parties'] interests are in fact identical; communications

relating to matters as to which [the parties] [hold] opposing interests . . . lose any privilege."    *In re*

*Rivastigmine Patent Litig.*, No. 05-MD-1661(HB/JCF), 2005 WL 2319005, at *4 (S.D.N.Y. Sept.

22, 2005) (citation omitted).    The party claiming common interest has the burden to "establish its

existence" by "competent evidence, usually through the admission of affidavits, deposition

testimony or other admissible evidence."    *Gulf Islands Leasing, Inc. v. Bombardier Capital, Inc.*,

25 F.R.D. 466, 472 (S.D.N.Y. 2003) (citing *von Bulow*, 811 F.2d at 147; *Bowne*, 150 F.R.D. at

472).    "The burden cannot be met by 'mere conclusory or *ipse dixit* assertions' in unsworn motion

papers authored by attorneys."    *Id.* (quoting *von Bulow*, 811 F.2d at 146 (internal quotation marks

and citations omitted)).

34.    The Special Committee is charged with fully and fairly investigating estate causes

of action against the Sacklers and others, including investigating Purdue's insolvency as a result

of liability arising out of Purdue's and the Sacklers' role in the opioid crisis.[41]  Communications

that include members of the Special Committee that relate to the defense of opioid litigation

vitiates the requirement that attorney-client communications must be "confidential," as the

members of the Special Committee would be duty-bound to use information they learned in

communications with the Sacklers later against the Sacklers.  *See, e.g.*, *United States v. Int'l Broth.

of Teamsters, Chauffeurs, Warehousemen & Helpers of Am., AFL-CIO*, 119 F.3d 210, 214 (2d Cir.

1997) (communication must be "made in confidence" for privilege to attach); *cf. Ryan v. Gifford*,

No. CIV. A. 2213-CC, 2007 WL 4259557, at *3 (Del. Ch. Nov. 30, 2007) (finding that privilege

was waived as to communications related to a special committee's investigation that were

disclosed to directors under investigation given that "[t]he Special Committee was formed to

investigate wrongdoing and in response to litigation in which certain directors were named as

individual defendants"—a "relationship more akin to one adversarial in nature").  Therefore, no

expectation of confidentiality could attach, and there is no privilege as to communications among

members of the Special Committee and the targets of their investigation as to matters pertinent to

the investigation, such as Purdue's insolvency as a result of opioid litigation.  Additionally, the

"adversarial tension" among the parties to the communications waives any work product

protection that may have otherwise applied.  *Bank of Am., N.A.*, 212 F.R.D. at 170 ("[A] voluntary

disclosure of work product to an adversary waives the privilege as to other parties." (quoting *In re*

---

[41] *See* Preis Decl., Ex. 216 at 3-4 ("[T]he Special Committee [] will oversee . . . (z) the prosecution, defense or settlement of any claim or litigation between any of PPI, PPLP or any PPLP Subsidiary, on the on hand, and any Class A Shareholder, any Class B Shareholder, any Specified Person with respect to any Class A Shareholder or Class B Shareholder, any Affiliate of any of the foregoing (other than PPI, PPLP or any PPLP Subsidiary), or any current or former director or officer of PPI, PPLP or any PPLP Subsidiary on the other hand ('Affiliate Litigation'), and no such . . . Affiliate Litigation shall take place without the approval of the Special Committee."); *see also Debtors' Informational Brief*, dated September 16, 2019, at 16 [ECF No. 17] (the "Informational Brief") ("The Special Committee has been overseeing various investigations, including an exhaustive review by outside experts of distributions made by the Debtors to the Sackler Families and their affiliates, as well as any dealings between the Debtors and any member of the Sackler Families or any of their affiliates.").

*Steinhardt Partners, L.P.*, 9 F.3d 230, 235 (2d Cir. 1993)).

35.     In any event, the Sacklers have submitted no evidentiary support for their conclusory assertions in their unsworn Objections that the Special Committee members were "not acting in [their] capacity as a Special Committee member" in any of the communications the UCC has challenged. *See, e.g.*, Side B General Challenges Obj. at 4. The Privilege Logs do not explain for any of the challenged entries the capacity in which the Special Committee members were acting, and the Sacklers have not submitted declarations from members of the Special Committee or other parties copied on the communications attesting that in each of the challenged entries, the Special Committee members were acting in their capacity as at-large Purdue Board members in connection with opioid litigation—in a manner totally unrelated to the Special Committee's investigation—as the Sacklers baldly assert.

36.     These critical omissions undermine the Sacklers' efforts to shield their communications with the Special Committee communications from production. The Special Committee, which the UCC understands was formed in May 2019, has been charged with investigating estate claims, including potential claims against the Sacklers and legacy Board members such as long-serving Purdue Board members Cecil Pickett and Peter Boer (both Sackler appointees and confidantes), who are still on the Board.[42] Thus, as of the Special Committee's formation, the interests of its members and the subjects of its investigation are clearly adverse. Communications among parties with adverse interests lose any privilege that may have otherwise attached. *See In re Rivastigmine Patent Litig.*, 2005 WL 2319005, at *4; *see also Middlesex Ret. Sys. v. Quest Software, Inc.*, No. CV 06-6863-DOC(RNBx), 2009 WL 10673943, *at 4 & n.6 (C.D. Cal. July 8, 2009) (holding that special committee "did not have the requisite 'common interest'

---

[42] The Special Committee members are Steve Miller, Kenneth Buckfire, Mike Cola, and John Dubel. Informational Brief at 14.

with the persons it was investigating and with whom the privileged communications in question were shared"); *SEC v. Roberts*, 254 F.R.D. 371, 374 n.4 (N.D. Cal. 2008) (similar).

37.     The Privilege Logs themselves do not contain adequate information to show that for each logged entry containing Special Committee members and Sacklers (and/or their Board designees), the Special Committee members were acting in their capacity as at-large Board members in connection with opioid litigation (*i.e.*, the basis for the Sacklers' common interest claim) unrelated to the Special Committee's investigation, rather than in their capacity as members of the Special Committee.

38.     For example, five entries on the Side A Logs dated June 21-22, 2019—six months after the last Sackler left the Purdue Board—have the subject line "Appointment of Independent Directors"; copy various Sacklers, Jonathan White, and Special Committee members Steve Miller and Kenneth Buckfire; and are described as "Requesting and providing legal advice re: changes on the Board of Directors at Purdue" (for four of the entries) and "Providing information for purpose of legal advice and requesting legal advice re: changes on the Board of Directors at Purdue; and as litigation concerning Purdue opioid products" (for one entry).[43]  Interestingly, Side A removed from the Side A Logs and produced without redactions an email chain with the same dates and the same participants as the challenged entries as a result of the meet and confer process.[44]  In this previously redacted email, Mortimer Sackler Jr.—although no longer on the Purdue Board—was expressing his strong views on who should be appointed as an "independent"

---

[43] *See* Preis Decl., Ex. A (Excel Tab 3, at 25829, 25839, 25840, 25841).  Entry no. 25802 on the Side A Logs appears to concern a similar subject—it is likewise dated June 21, 2019, is from Buckfire to Miller, and copies Theresa Sackler, Jonathan White, Jeffrey Rosen of Debevoise, and Kerry Sulkowicz of Boswell Group.  *See id.* Ex. A (Excel Tab 3, at 25802).  The Side A Logs describe this email as "Reflecting an intent to seek legal advice re: changes on the Board of Directors at Purdue."  *Id.*

[44] *See* Preis Decl., Ex. 126 [OPEO].

director to the Purdue Board.[45]   Side A advisor Jonathan White and Theresa Sackler likewise expressed their views on the "independent" Board candidates (including eventual Special Committee member John Dubel).[46]   It is unclear why the Sacklers were inserting themselves into Purdue business **after** leaving the Board by discussing with the Special Committee members the choice of another at-large director, who would also become a member of the Special Committee, **to investigate the Sacklers**.   And it is also unclear how the interests of the Sacklers and the Special Committee members are not adverse with respect to such investigation.   Clearly, Side A does not view this June 2019 email exchange as common interest, given its decision to produce one iteration of the email chain, and the similar entries on the Side A Logs should also be produced.

39.     Moreover, the Sackler Logs contain numerous entries dated May 20-23, 2019—long after the Sacklers left the Purdue Board—copying members of the Special Committee and the Sacklers that appear to concern a Wall Street Journal op-ed by Special Committee member Steve Miller, which was heavily edited by David Sackler and Mortimer Sackler Jr.,[47] as demonstrated by related WhatsApp messages that have been produced.[48]   The fact that many such communications involving this op-ed and other media relations have been produced suggests that the Wall Street Journal op-ed emails (and other media-related emails) are not entitled to privilege protection and likewise should be produced.

40.     Accordingly, the UCC requests that the Court order the Sacklers to produce all of

---

[45] *Id*.

[46] *See id*.

[47] *See Objection of the Ad Hoc Group of Non-Consenting States to the Motion of Debtors Pursuant to 11 U.S.C. § 105 and Fed. R. Bankr. P. 9019 Authorizing and Approving Settlements Between the Debtors and the United States* [ECF 1914] at n.5 (discussing Miller's op-ed "written with Sackler input, review, and comment").

[48] *See* Preis Decl., Ex. A (Excel Tab 3, at 24466, 24470, 24476, 24478, 24482, 24490, 24493, 24568, 24575, 24578, 24579, 24600, 32804); *id.* Ex. B (Excel Tab 3, at PS-01157672, DSF0027111, PS-01149009, PS-01157592, PS-01157604, PS-01157645, PS-01157648, DSF0027075, DSF0027080, DSF0027095, PS-01157154, PS-01157155, PS-01891599, PS-01891600, PS-01891603, PS-01891554); *see* Preis Decl., Exs. 128-130 [C].

the 93 challenged Special Committee documents.[49]  In the alternative, the UCC requests that the

Court conduct *in camera* review of a sampling of 13 documents in the Special Committee category,

and from that sampling determine whether further *in camera* review or production of the remaining

challenged entries is appropriate.[50]

> ### D.    The Sacklers Have Not Shown That Communications Including Other Third Parties and Communications Without Lawyers That Purport to Reflect an Intent to Seek Legal Advice are Privileged.

41.    The Sacklers have made no evidentiary showing that the Withheld Documents

shared with third parties, including public relations firms, accountants/investment advisors, and

other third parties, are shielded by the attorney-client privilege and work product protection.  The

Sacklers' argument that the *UCC* has made no showing that sharing work product with these third

parties increased the likelihood that the material would come into the hands of a litigation

adversary improperly shifts the burden of proof.[51]  As explained above, the ***Sacklers*** have the

"heavy burden" of showing that (1) the documents are subject to the attorney-client privilege

and/or work product protection, and (2) those privileges were not waived.  Nor has Side A met its

burden to show that entries on the Side A Logs that do not copy lawyers but yet are described as

reflecting "an intent to seek legal advice" are privileged.

42.    The Objections offer explanations ***that are not present in or apparent from the***

***Privilege Logs*** for a handful of entries concerning third parties to justify the Sacklers' privilege

claims over these documents.  In a showing of good faith and to reduce the burden on the Court,

---

[49] In connection with the UCC's Motion, Side B manually reviewed 144 documents it previously represented contained dates that were undeterminable based on unreliable metadata.  *See* Side B General Challenges Obj. at 25-26.  Side B's Exhibit 121 to its Objection confirmed that 142 of these documents are dated before the Special Committee was formed.  *See id.*  Therefore, the UCC withdraws its challenges to these documents.

[50] *See* Preis Decl., Exs. A-B (Excel Tabs 3) for the full set of privilege entries for Special Committee communications the UCC seeks and *see* Preis Decl., Ex. C for the narrowed sample Special Committee communications for *in camera* review.

[51] The UCC has challenged the Sacklers' privilege assertions in connection with documents shared with third-party service providers and other third parties since their earliest meet and confer letters in August.  This includes all bases for withholding—including work product grounds.

the UCC hereby withdraws its challenges to the vast majority of these other third-party entries and
entries that do not copy lawyers but purport to seek legal advice, except as stated below. The UCC
has attempted to narrow its challenges based on relevancy and in accordance with the Sacklers'
explanations in their Objections, even though the Sacklers submitted no evidence to support these
privilege assertions.

- **Intent To Seek Legal Advice**: The UCC originally challenged 276 entries on the Side A Logs that indicate that no lawyers authored, sent, received, or were copied on the communications, yet are described as reflecting "an intent to seek legal advice," which is not a valid basis upon which to withhold documents. *See Duttle v. Bandler & Kass*, 127 F.R.D. 46, 52 (S.D.N.Y. 1989) ("To hold otherwise would expand the attorney-client privilege without limit, since countless communications within an organization could be considered preparatory to seeking legal advice."); *see also United States v. DeFonte*, 441 F.3d 92, 95-96 (2d Cir. 2006) (observing that notes made in preparation for communication with attorney are privileged only if in fact "the notes were communicated by the client to the attorney"). Side A has represented that it will produce 174 of the 276 documents in this category and that others should have been withheld on spousal privilege grounds, and the UCC has voluntarily withdrawn its challenges to other documents,[52] leaving just 5 entries in this category still subject to challenge and which the UCC suggests should be reviewed *in camera*.[53]

- **Public Relations**: Communications copying public relations firms generally are not privileged, even when their services relate to pending litigation. *See, e.g.*, *Haugh v. Schroder Inv. Mgmt. N. Am. Inc.*, No. 02 Civ. 7955 DLC, 2003 WL 21998674, at *3 (S.D.N.Y. Aug. 25, 2003) ("A media campaign is not a litigation strategy."); *Calvin Klein Trademark Tr. v. Wachner*, 198 F.R.D. 53, 55 (S.D.N.Y. 2000) ("It may be that the modern client comes to court as prepared to massage the media as to persuade the judge; but nothing in the client's communications for the former purpose constitutes the obtaining of legal advice or justifies a privileged status."). Disclosure of otherwise privileged materials to public relations firms thus typically waives privilege. *See Bloomingburg Jewish Educ. Ctr. v. Vill. of Bloomingburg*, 171 F. Supp. 3d 136, 146-47 (S.D.N.Y. 2016); *Calvin Klein Trademark Tr.*, 198 F.R.D. at 54-55; *Haugh*, 2003 WL 21998674, at *3. The Sacklers' attempts to invoke the narrow exception in *In re Grand Jury 2003*[54] fails for at least three reasons: (1) the facts in these proceedings do not fit within the extremely limited circumstances in that case (a high-profile grand jury

---

[52] *See* Side A General Challenges Obj. at nn.17, 19.

[53] *See* Preis Decl., Ex. A (Excel Tab 6) and Ex. C for the entries in this category the UCC challenges and seeks review of *in camera*. One such challenged entry describes over 90 text messages between Theresa Sackler and Mortimer Sackler Jr. from 2017 through 2019—none of which copy lawyers—that have been withheld in full or redacted because they purportedly reflect an "intent to seek legal advice." *See* Preis Decl., Ex. 127 [OPEO] and *id.*, Ex. A (Excel Tab 6, at 26175).

[54] *In re Grand Jury Subpoenas Dated March 24, 2003*, 265 F. Supp. 2d 321 (S.D.N.Y. 2003).

investigation); (2) if the Sacklers *could* invoke the exception, they have failed to present any evidence that the public relations firms on their Privilege Logs are like those in *In re Grand Jury 2003*; and (3) even assuming some public relations firms are like those in *In re Grand Jury 2003*, the Sacklers cannot seek a blanket ruling with respect to *all* documents involving those firms—the showing must be on a document by document basis.[55]  The UCC challenges 354[56] public relations entries dated before January 16, 2019, when the last Sackler left the Purdue Board, on the Privilege Logs that have been improperly withheld and submits 16 entries for *in camera* review.[57]

- **Accountants/Investment Advisors**: The Sacklers have submitted no evidence demonstrating that the communications with accounting personnel and investment advisors appearing on the challenged communications were essential to the provision of legal advice, which is necessary to meet their burden to withhold these communications. *See United States v. Arthur Young & Co.*, 465 U.S. 805, 817 (1984) ("[N]o confidential accountant-client privilege exists under federal law and no state-created privilege has been recognized in federal cases.") (internal quotation marks and citation omitted); *United States v. Ackert*, 169 F.3d 136, 139 (2d Cir. 1999) ("[A] communication between an attorney and a third party does not become shielded by the attorney-client privilege solely because the communication proves important to the attorney's ability to represent the client.") (citation omitted); *Kovel*, 296 F.2d at 922 (where the communication at issue "is not legal advice but only accounting service, or if the advice sought is the accountant's rather than the lawyer's, no privilege exists"); *Global Fleet Sales, LLC v. Delunas*, No. 12-15471, 2016 WL 3365763, at *3 (E.D. Mich. June 17, 2016) (communications not protected work product where there was "little evidence" that client retained the financial advisor "as a consulting expert for this litigation at the time" the client sent the relevant communications); *Export-Import Bank of the U.S. v. Asia Pulp & Paper Co., Ltd.*, 232 F.R.D. 103, 113 (S.D.N.Y. 2005) (communications with financial consultant not privileged without demonstration they were essential to attorney's legal advice); *see also* Part B *supra*.  The UCC challenges 408 accountants/investment advisors entries on the Privilege Logs (excluding Ives and personnel assisting him) dated between January 1, 2007 and December 31, 2016 that have been improperly withheld and submits 14 entries for *in camera* review.[58]

---

[55] The UCC withdraws its challenges to public relations entries containing Lake Partners, which Side B represents is a non-testifying expert in connection with litigation matters rather than a public relations firm.  *See* Side B General Challenges Obj. at 19.

[56] In a showing of good faith and to reduce the burden on the Court, the UCC hereby withdraws its challenges to documents including public relations firms retained by the Sacklers that constitute or contain attorney-generated work product created after February 21, 2018—the date Side B has identified as the first date the Sacklers were sued in connection with Purdue's marketing efforts—that was shared with a public relations firm.  For the avoidance of doubt, the UCC does not drop its challenges to documents that are withheld on the basis that they purportedly constitute or contain work product generated by public relations firms rather than counsel.  Because the UCC does not have access to the public relations documents at issue, it is not able to determine which challenged entries fall within these parameters.

[57] *See* Preis Decl., Exs. A-B (Excel Tabs 4) for the full set of privilege entries for public relations communications the UCC seeks and *see* Preis Decl., Ex. C for the narrowed sample public relations communications for *in camera* review.

[58] The UCC withdraws its challenges to the accountant/investment advisor documents that the Sacklers represent are not relevant to the estate claims investigation and documents that the UCC has determined should no longer be

FILED IN LESS REDACTED FORM PURSUANT TO THE STIPULATION AND AGREED
ORDER REGARDING MEDIA INTERVENORS' MOTION TO UNSEAL MATERIALS FILED IN
CONNECTION WITH UCC PRIVILEGES MOTIONS [ECF No. 2140]

19-23649-shl    Doc 2163    Filed 12/18/20    Entered 12/18/20 18:30:09    Main Document
Pg 36 of 38

- **Other Third-Parties—UCC Challenge Withdrawn**: The Sacklers have not met their burden of proving that logged documents and communications with other kinds of service providers and third parties have been properly withheld.[59] While circumstances can exist in which such documents and communications are protected from disclosure, the Sacklers have not made the evidentiary showing necessary to demonstrate that those circumstances exist as to each third-party entry on their Privilege Logs. *See Music Sales Corp. v. Morris,* No. 98 Civ. 9002(SAS)(FM), 1999 WL 974025, at *7 (S.D.N.Y. Oct. 26, 1999) ("The voluntary disclosure of privileged attorney-client communications to unrelated third parties typically constitutes a waiver of the privilege."); *Fifty-Six Hope Rd. Music Ltd.*, 2010 WL 343490, at *3 (stating that "disclosure of documents to a third-party may waive the work-product privilege") (citing *In re Grand Jury Proceedings*, 219 F.3d 175, 191 (2d Cir. 2000)); *see also Ackert*, 169 F.3d at 139-40 (investment banker); *City of Almaty, Kazakhstan v. Ablyazov*, No. 15-CV-05345(AJN)(KHP), 2019 WL 2865102, at *8 (S.D.N.Y. July 3, 2019) (consultant); *Obeid v. Mack*, No. 14 Civ. 6498(LTS)(HBP), 2016 WL 7176653, at *8-9 (S.D.N.Y. Dec. 9, 2016) (co-investor); *866 E. 164th St., LLC v. Union Mut. Fire Ins. Co.*, No. 16-CV-03678(SN), 2016 WL 6901321, at *1 (S.D.N.Y. Nov. 23, 2016) (insurer); *In re North Plaza, LLC*, 395 B.R. 113, 126 (S.D. Cal. July 25, 2008) (real estate broker). While the Sacklers have not met their burden of proof to withhold these documents as privileged, the UCC withdraws its challenges to these documents in the interest of narrowing this dispute only to documents of paramount importance to the UCC's investigation.

43.    The UCC has diligently worked with the Sacklers to narrow its challenges to documents relevant to the UCC's investigation, and the remaining documents indicated above (intent to seek legal advice (5 documents), public relations (354 documents), accountants/investment advisors (408 documents)) should be produced. In the alternative, the UCC requests that the Court conduct an *in camera* review of a sampling of 35 of the challenged documents from the above categories and from that sampling determine whether further *in camera* review or production of the remaining challenged documents is appropriate.

---

challenged, but stands by its challenges to the other remaining documents because the Sacklers have not met their burden of showing privilege or work product protection. *See* Preis Decl., Exs. A-B (Excel Tabs 5) for the full set of privilege entries for accountant/investment advisor communications the UCC seeks and Preis Decl., Ex. C for the narrowed sample accountant/investment advisor communications for *in camera* review.

[59] As stated in the UCC's Motion, for Side A, these other third parties include architects, building and construction contractors/managers, gardeners, farm and estate managers, personal "friends" of various Sacklers, a chef and other restaurant employees, charity directors, and art consultants, *see* Hurley Decl., Ex. A (Excel Tab F); insurance brokers, *id*. (Excel Tab G); bankers, *id*. (Excel Tab H); real estate brokers, *id*. (Excel Tab I); co-investors and/or counterparties to transactions, *id*. (Excel Tab J); and a variety of consultants, *id*. (Excel Tab K). Side B asserts privilege over its communications involving consultants, Hurley Decl., Ex. B (Excel Tab D); co-investors, *id*. (Excel Tab E); bankers, *id*. (Excel Tab F); real estate firms, *id*. (Excel Tab G); and other third parties, such as a recipient of a charitable donation and an individual who "assist[s] with identifying charitable opportunities," *id*. (Excel Tab H).

## CONCLUSION

44.    For all of the foregoing reasons and those stated in the Motion, the UCC

respectfully requests that the Court grant the Motion in its entirety (other than with regard to the

Debtors), and enter the proposed order submitted with the Reply requiring the Sacklers to (i)

produce the Withheld Documents or (ii) provide the Withheld Documents, or a subset thereof, to

the Court for review *in camera* and production to the UCC to the extent deemed appropriate.  The

NCSG supports the relief requested herein.

New York, New York               AKIN GUMP STRAUSS HAUER & FELD LLP

Dated: November 18, 2020

By: /s/ *Mitchell P. Hurley*          

    Ira S. Dizengoff
    Arik Preis
    Mitchell P. Hurley
    Joseph L. Sorkin
    Elizabeth Scott (*admitted pro hac vice*)
    Sara L. Brauner
    One Bryant Park
    New York, New York 10036
    Telephone: (212) 872-1000
    Facsimile: (212) 872-1002
    idizengoff@akingump.com
    apreis@akingump.com
    mhurley@akingump.com
    jsorkin@akingump.com
    edscott@akingump.com
    sbrauner@akingump.com

    *Counsel to the Official Committee of Unsecured
    Creditors of Purdue Pharma, L.P.,* et al.