# EXHIBIT 57-1

## Analysis of UCC 30(b)(6) Deposition Topics

**I.**     **Topics Potentially Not Covered:**

Topics 9, 13, 21, 22, 25, 29, 33

**II.**     **Topics Already Covered in Litigation**

The below references to testimony are meant as examples only and do not reflect the

totality of the discovery taken on any of the identified topics.

**A.**     **Litigation Liability:  Topics 1-3**

In *State of Rhode Island v. Purdue Pharma L.P.,* C.A. No. PC-18-4555 (Sup. Ct.), Jon

Lowne, Purdue's Executive Vice President, Chief Financial Officer, was deposed as a 30(b)(6)

witness called to offer testimony on, among other topics:  "[Purdue's] current and historical

opioid litigation liabilities, including all government liabilities, civil liabilities, criminal

liabilities, and amounts previously paid or currently agreed to be paid, or any balance sheet

reserves related to liabilities."  Relevant testimony can be found, for example, in Lowne Tr. at

35:19-44:2 covering historical litigation, including amounts for years 2004-2007, accounting

processes for liabilities, and liability estimates.  More recent litigation was covered at 45:15-

51:1, as were settlements at 51:3-54:7.  Ed Mahony, Purdue's former CFO, provided additional

testimony on this topic in the Rhode Island litigation.  *See, e.g.*, Mahony Tr. at 245:13-46:14.

**B.**     **Financial/Corporate:  Topics 4-8; 27-28; 30-31**

In addition to the two depositions in Rhode Island of Purdue's current and former CFOs,

Lowne and Mahony which also covered financial/corporate topics, the corporate witness

deposition of Keith Darragh, Purdue's former Controller, was taken in *State of Oklahoma v.*

*Purdue Pharma L.P.,* C.A. No. CJ-2017-816 (Cleveland Cnty. Dist. Ct.).

In Rhode Island, Plaintiffs asked Lowne to testify regarding:

1

- The past and present corporate relationship between You and the entities listed in Attachment A of the May 10, 2007 Plea Agreement in *United States v. The Purdue Frederick Co., Inc.*, No.07-CR_00029 (W.D. Va.) and all other wholly owned and/or independent affiliated companies ("Attachment A Entities"). In the event any of the Attachment A Entities are or were owned by a trust or trusts, the identity of such trust(s), the beneficiaries of such trust(s), the reason for any change of ownership between private persons and trust(s), and the amounts of monies paid or held in trust for each beneficiary by year from 1995 to date;

- All disbursements, distributions, loans, or dividends paid to any shareholder, Board Member, or owner of You or any Attachment A entity . . . ;

- All transfers or conveyances involving You, any Attachment A Entity, and any Board member, shareholder, or owner of You or any Attached A Entity . . . ;

- Your current, historical (from 2007 to 2017), and projected financial condition and valuation including financial statements; balance sheets; valuation of current and historical assets, including intangible assets; current and historical liabilities, including any short or long assets, including intangible assets; current and historical liabilities, including any short or long term debt; deferred tax liability; other liabilities; current and historical revenues, costs and expenses, net income, and EBITDA; accounts payable and receivable; current strategic plans, plans of operations, and goals including any financial budget, projection or forecast for 2018, 2019, and beyond; current projected EBITDA for 2018, 2019, and beyond; projected unleveraged free cash flows for 2018, 2019, and beyond; and any appraisals, analyses, opinions, reviews, or plans of future business operations prepared by any financial advisor (including any investment bankers, investment advisors, or any internal or external auditor) or provided to any bank, investment bank, underwriter, financial institution, or other third party in connection with (i) any potential sale or (ii) an extension of credit and/or securing any loan or line of credit and/or issuing any stock, bond, note or other security to any potential lender or investor;

- Any proposed or planned restructuring or change to the corporate relationship between You and the Attachment A Entities, including but not limited to transfers for the purpose of avoiding potential liabilities or enforcement of obligations or potential obligations to any law enforcement agency or private plaintiff; and

- Any proposed or planned transactions involving change of control of You or any Attachment A Entity . . . .

In Oklahoma, Darragh's corporate witness topics included:

- The Purdue Defendants' past and present ownership structure; financial status and financial health, including but not limited to information contained in any pro forma financial statements, such as gross revenue, liabilities, profits, and cash flow, for the past five years; distributions of any revenue and/or profits to owners in the past five years; and

17489875.1.LITIGATION

past and present formal and informal policies and procedures related to the distribution of any revenue and/or profits to owners.

Testimony and information on these issues can be found, for example, in Lowne Tr. at 54:8-64:7 and Exhs. 7-8 (revenue); 75:19-86:17, 94:1-100:25, 103:21-130:1; 157:17-159:6, and Exhs. 9-14, 22 (transfers); 288:13-295:1 (valuations of Purdue); 131:16-135:9, 147:19-157:2, 159:7-162:4, 168:3-176:17, 277:9-288:11, 295:3- 316:15, 332:3-336:25, 345:5-350:19 and Exhibits 15, 18, 19, 21, 22, 31 (Purdue's wholly owned subsidiaries and IACs); Darragh Tr. at 34:1-36:15 (revenue); 89:6-20 (structure of PPI and PHLP); 97:1-98:6 (Sackler trusts); 106:23-108:22 (transfers); Mahony Tr. at 170:14-171:22, 174:10-175:16, 228:2-236:19, 260:12-288:25, 294:4-299:10, 305:11-306:17, 307:20-309:17, and Exh. 17 (transfers); 247:22-249:11, 251:12-252:22; 266:12-267:25 (company liquidity); 314:3-334:11 (relationship with Rhodes and IP).

### C.    Board of Directors:  Topics 10-11

Purdue has produced Board minutes and related materials up through October 11, 2019. Testimony on these topics can be found in the Lowne transcript and the MDL deposition of Richard Sackler.  *See, e.g.*, R. Sackler Tr. at 83:23-85:12, 87:9-124:16; Lowne Tr. 32:20-34:8; 114:3-131:15; 209:1-214:19 and Lowne Exhs 10-14.

### D.    Regulatory/Government:  Topics 12, 25

In the MDL, Richard Fanelli, Purdue's Head of Regulatory Affairs, was deposed as a 30(b)(6) witness and he offered the company's testimony on these issues.  *See, e.g.*, Fanelli Tr. at 82:15-87:6; 352:23-363:3 (government investigations); 168:16-201:11 (policies and procedures for interacting with governmental agencies); 206:4-235:7 (warning letters and other regulatory correspondence); 450:15-463:11 (FDA's regulatory authority).

### E. Poppy Farms: Topic 14

In Oklahoma, Donogh McGuire, currently Vice President, Technical Operations, was deposed as a corporate witness on the sole topic of the source of ingredients for Purdue's opioid products, including poppies. *See* McGuire (OK) Tr. 12:1-14:1; 30:5-32:25; 65:1-70:4; 80:25-82:12. Plaintiffs propounded interrogatories coming out of that deposition to which Purdue provided written responses which will be provided.

### F. Suspicious Order Monitoring: Topic 15

Many witnesses were deposed on compliance issues, such as Purdue's suspicious order monitoring efforts and programs, including: Margaret Feltz, Vice President, Chief Compliance Officer; Mark Geraci, Vic President, Chief Security Officer; and former employees Lisa Miller, Head of Corporate Social Responsibility; Alexis Stroud, Compliance; Stephen Seid, Sales Account Manager; Eric Brantley, Suspicious Order Monitoring; Jack Crowley, SOM Compliance; and Robin Hogen, Vice President, Public Affairs.

In the MDL, the following were 30(b)(6) topics:

- The custom and practice of using the following OMS information and data sources as a component of the OMS Committee's duties and responsibilities: The data supplied by the wholesaler concerning sales of Purdue products. This includes FFS data that was loaded monthly onto the OMS database; IMS outlet/prescriber data; Sales operations outlier analyses; Savings Card data including outlet redemptions and prescriber utilization; Sales Force Reports of Concern; ADD Program information; Data from governmental agencies and law enforcement including state licensing boards, legislative contacts, criminal and/or civil trials, and DEA; Media reports; CSA Compliance to include collaboration with Authorized Distributors to share information. (Geraci)

- The policies and procedures for and identity of persons responsible for monitoring suspicious orders or potential diversion of Purdue's opioid medications. (Seid)

*See, e.g.*, Feltz Tr. at 60:11-61:3 (corporate compliance council), 71:18-74:1 (legal review of call notes), 90:6-96:5 (compliance officer ride-alongs with sales reps), 96:6-96:23 (compliance role with third party speakers), 100:3-106:12 (compliance role in ADD and investigations), 115:17-

121:21 (ADD reporting), 125:4-129:4 (Purdue drug safety hotline), 149:17-151:8 (compliance reports to the Board); Brantley Tr. at 65:8-23; 87:9-88:21 (SOM program); Crowley (MDL) Tr. at 67:21-68:18, 237:16-264:20 (SOM program); Geraci Tr. at 39:15-49:9, 63:20-70:9, 110:7-113:24, 130:6-133:24 (Purdue's SOM programs); 134:18-139:8 (Region Zero); 37:2-39:8, 61:23-64:25, 91:3-94:15, 162:17-207:18 (development of Purdue's Order Monitoring System); Seid Tr. at 23:7-51:17 (structure of the SOP committee, DEA requirements, structure of SOM database and policies and procedures for SOM); Exh. 3 (folder containing a collection of documents related to SOM policies, including the SOM SOPs, examples of the database, a walkthrough of the SOM process from start to finish, and SOM background documents); 51:18-55:9 (ADD reports); Stroud Tr. (SC AG) at 26:16-56:2 (function of all Purdue compliance committees in relation to consent judgment); 55-57 (Reportable Events Committee); 97-102 (sales SOPs instituted to ensure compliance); 107-09 (call note review and sale compliance review committee process); 174-75 (training); 193-97 (internal investigations). In addition, Purdue produced data and documents relations to its OMS program at PPLP004435316 through PPLP004435616, PPLP004436567 through PPLP004473666, PPLP004474164 through PPLP004474495, and PPLP004474496 through PPLP004474522. Purdue produced data and documents from its Suspicious Order Monitoring Program ("SOM Program") at PPLP004396704 through PPLP004397411.

### G. Abuse/Diversion and Efforts to Combat: Topics 16-18, 32

These topics were covered by multiple witnesses, including: Donald Kyle, currently Vice President, Head of Strategic Science & Academic Outreach; Robert Kaiko, Purdue Consultant and former Purdue officer; Paul Coplan, Epidemiology; LeeAnn Storey, Director of Product Monitoring; Curtis Wright, Medical Director; Pamela Bennett, Director Patient and Professional Relations; Lisa Miller, Burt Rosen, former Director of Federal Government Affairs; and David Haddox.

For example, one topic for Lisa Miller's Oklahoma deposition was:

- All actions and efforts previously taken, currently under way, and actions planned and expected to take place in the future which seek to address, fight or abate the opioid crisis.

And in the MDL, Kyle's corporate witness topics included:

- Knowledge regarding potential risks of abuse, misuse, dependence, or addiction with use of MS Contin prior to Purdue's launch of OxyContin;

- Knowledge regarding potential risks of abuse, misuse, dependence, or addiction with use of OxyContin prior to 2001 Congressional testimony by Michael Friedman and Howard Udell;

- Information supporting statements Purdue made to FDA, medical professionals, patients, or the public concerning, with respect to OxyContin, Butrans, and Hysingla: risk of addiction or abuse; efficacy; safety for long-term use; screening of patients; monitoring of patients; or comparisons to non-opioid analgesics; and

- Steps taken by Purdue since 2011 to abate the opioid crisis.

*See, e.g.*, Kyle Tr. at 24:13-21, 53:7-54:3, 61:70-64:8, 125 (Purdue's knowledge of reports of opioid abuse); 107:5-110:14 (abuse warnings); 64:19-73:20 (abuse abatement efforts); Miller Tr. at 363:16-413:7 and Exhibit 20 (abatement efforts); Rosen (MDL) Tr. at 129:14-143:1, 241:12-277:12 (public policies, laws, and regulations that restricted opioid use and law that granted patients greater access); Kaiko Tr. at 88:2-16 (early understanding of abuse potential), 281:2-287:15 (need for reformulated Oxy, abuse deterrents); Storey Tr. at 356:5-260:3 (early discussion of abuse potential), 375:5-377:10 (reports of concern) Wright Tr. at 44:20-48:12; 191:12-192:12 (Purdue remediation efforts); Bennett Tr. at 441:15-442:7; 444:23-446:5 (drug abuse); Coplan Tr. at 61:1-75:19 (Reformulated OxyContin); 354:4-356:11 (RADARS detection system). In addition, Purdue's response to Interrogatory No. 29 in the MDL, served on March 4, 2019, identifies studies concerning the risk of addiction, abuse, misuse, or diversion of opioids.

### H.     Influence of Dose Mix:  Topic 19

Russ Gasdia, formerly Vice President Sales and Marketing; and Phil Cramer, currently Head of Sales; were questioned regarding the sales and marketing of dosages of OxyContin. *See, e.g.*, Gasdia Tr. (11/28/18) at 273:10-274:20 (flagging prescribers using higher doses); Gasdia Tr. (1/15/19) at 78:19-83:4 (dose monitoring); Cramer (OK) Tr. at 362:4-365:1, 413:2-427:5 and Exhibit 55 (dosages and titration methods, including promotion of upward titration).

### I.     McKinsey: Topic 20

In addition to Purdue's production of documents showing the work done by McKinsey, McKinsey responded to a subpoena producing documents as well.  Phil Cramer's Oklahoma corporate witness deposition covers this topic.  *See, e.g.*, Cramer (OK) Tr. at 587:6-6:13:20, Exhibits 71, 72, 73, 76 (McKinsey memos and presentations concerning advice provided to Purdue about sales and marketing).

### J.     Payments to Prescribers as Advisors/Speakers:  Topic 23

Information related to Purdue's speaker programs can be found in documents Purdue has produced, including at PPLP004366643 to PPLP004366644 and PPLP00436839 to PPLP004368427.  Statements of work entered into with healthcare providers, which includes compensation information, can be found at PPLP003477189 through PPLP003491628. Additional payment information can be found in documents produced at PPLP004473757 through PPLP004473760 and PPLP004473761 through PPLP004473769.   In addition, *see* Cramer (OK) Tr. at 74:11-80:15; 232:1-233:40, 290:15-291:10; 327:20-331:6 (Purdue's use of physician speakers and its speaker's bureau).

**K.    Consent Decree: Topic 24**

Testimony regarding this topic can be found in the depositions of Richard Sackler, Burt Rosen, and Alexis Stroud.  *See, e.g.*, R. Sackler Tr. at 375:2-378:22 (guilty plea and fines imposed); Rosen (MDL) Tr. at 148:13-155:18 (discipline and termination of persons guilty of misconduct); and the testimony of Stroud noted above regarding compliance matters. *See* Stroud Tr. (SC AG) at 26:16-56:2 (function of all Purdue compliance committees in relation to consent judgment**).**

**L.    Insurance: Topic 26**

Both Darragh and Mahony were asked about Purdue's insurance.  *See, e.g.*, Darragh Tr. at 29:18-30:25; Mahony Tr. at 287:12-288:25.

17489875.1.LITIGATION