UNREDACTED - CONTAINS PROFESSIONALS' EYES ONLY INFORMATION AND PRIVILEGED COMMUNICATIONS - TREAT SUBJECT TO PROTECTIVE ORDER

# EXHIBIT 66

**In the Matter Of:**

*Purdue Pharma Bankruptcy*

---

*MARIANNA SACKLER*

*September 02, 2020*

---



1

1

2    UNITED STATES BANKRUPTCY COURT

3    SOUTHERN DISTRICT OF NEW YORK

4    -------------------------------------

5    In Re:                    Chapter 11

6

7    PURDUE PHARMA L.P.,        Case No.

8    et al.,                    19-23649 (RDD)

9          Debtors    (Jointly Administered)

10   -------------------------------------

11

12

13        ** HIGHLY CONFIDENTIAL **

14           PROFESSIONALS' EYES ONLY

15

16     REMOTE VIDEOTAPED DEPOSITION OF

17             MARIANNA SACKLER

18

19        Wednesday, September 2, 2020

20             6:00 p.m. (EST)

21

22

23   Reported by:

24   Joan Ferrara, RMR, FCRR

25   Job No. 2020-89752

Highly ConfidentialMarianna Sackler - September 02, 2020

2

1

2    REMOTE APPEARANCES:

3    Counsel for the Raymond Side Covered Parties

4    and The Witness Marianna Sackler:

5

6    MINTERELLISON

7            MICHAEL HUGHES

8

9    JOSEPH HAGE AARONSON, LLC

10           MARA LEVENTHAL

11           BENJAMIN TAYLOR

12           PETER R. JERDEE

13

14   PAUL WEISS

15           ROBERTO FINZI

16           BENJAMIN WEINTRAUB

17

18   MILBANK LLP

19           GERARD UZZI

20           ALEXANDER B. LEES

21           KATHERINE FELL

22

23

24                   (Continued)

25

UNREDACTED - SUBJECT TO DOCUMENT 166-5 FILED 12/18/20 OBJECTION 12/18/20 18:47:42 MAIN EXHIBITS PRIVILEGED
COMMUNICATIONS - TREND SUBJECT TO PROTECTIVE ORDER
Pg 5 of 102

Highly ConfidentialMarianna Sackler - September 02, 2020

3

REMOTE APPEARANCES: (Continued)

Counsel to the Official Committee of

Unsecured Creditors of Purdue

Pharma L.P., et al:

AKIN GUMP STRAUSS HAUER & FELD, LLP

    MITCHELL HURLEY

    KATHERINE PORTER

    ARIK PREIS

    JOSEPH L. SORKIN

    ASHLEY CRAWFORD

    ELIZABETH HARRIS

    SARA BRAUNER

    JAMES SALWEN

    ANTHONY SIERRA

    McKENZIE MILLER

    JILLIE RICHARDS


Counsel to Walter Lee Salmons-UCC Member:

    WILL KOVALCHIK


THOMPSON BARNEY LAW FIRM

    KEVIN THOMPSON


        (Continued)

4

1

2  REMOTE APPEARANCES: (Continued)

3  Financial Advisor to the Official Committee:

4  PROVINCE FIRM

5          MICHAEL ATKINSON

6

7  Counsel to the Ad Hoc Group of Creditors:

8  KRAMER LEVIN

9          ELISE FUNKE

10          RACHAEL RINGER

11          SETH SCHINFELD

12

13  Counsel to the Ad Hoc Group of Non-Consenting

14  States:

15  PILLSBURY WINTHROP SHAW PITTMAN

16          ANDREW M. TROOP

17          JASON SHARP

18

19  Counsel for The United States of America via

20  Department of Justice:

21          ALICIA BENTLEY

22          BERT MAYER

23

24                      (Continued)

25

```
                                                           5

 1

 2   REMOTE APPEARANCES: (Continued)

 3

 4   Counsel for Certain Non-Sackler Directors:

 5   PAUL HASTINGS

 6            MATT HERRINGTON

 7

 8   Counsel to the Mortimer Side Covered Parties:

 9   DEBEVOISE & PLIMPTON LLP:

10            JASMINE BALL

11            JACOB STAHL

12

13   Counsel to the Stipulating IACs:

14   ROYER COOPER COHEN BRAUNFELD, LLC

15            MARC SKAPOF

16

17   Counsel for the Debtors:

18   DAVIS POLK

19            CHARLES DUGGAN

20            BENJAMIN KAMINETZKY

21            JAMES McCLAMMY

22

23

24                         (Continued)

25
```

UNREDACTED 19-23649-shl Doc 2166-5 Filed 12/18/20 Entered 12/18/20 18:47:42 Exhibit 60 PRIVILEGED
COMMUNICATIONS - TREATED PURSUANT TO PROTECTIVE ORDER
Pg 8 of 102

Highly Confidential Marianna Sackler - September 02, 2020

6

1

2  A P P E A R A N C E S:  (Continued)

3

4  ATTORNEY GENERAL FOR THE STATE OF NEW YORK:

5         M. UMAIR KHAN

6         KATHRYN BLAKE

7

8  ATTORNEY GENERAL FOR THE STATE OF

9  MASSACHUSETTS:

10        GILLIAN FEINER

11        SYDENHAM B. ALEXANDER, III

12

13  ATTORNEY GENERAL FOR THE STATE OF

14  CONNECTICUT:

15        KIMBERLY MASSICOTTE

16        ELEANOR MULLEN

17

18  ATTORNEY GENERAL FOR THE STATE OF

19  CALIFORNIA:

20        TIMOTHY LUNDGREN

21        MICHELLE BURKART

22        LAUREL CARNES

23        STEPHANIE YU

24

25                        (Continued)

7

1

2    REMOTE APPEARANCES: (Continued)

3

4    ATTORNEY GENERAL FOR THE COMMONWEALTH OF

5    PENNSYLVANIA:

6            MELISSA L. VAN ECK

7

8    ATTORNEY GENERAL FOR THE STATE OF COLORADO:

9            MEGAN PARIS RUNDLET

10

11   HAUG PARTNERS

12           KATHERINE GALLE

13

14   ALSO PRESENT:

15           AYDALINE GARCIA, Videographer

16           JUAN TORRES, Tech Monitor

17           SHANNON McGOVERN

18           RYAN HAMPTON

19           KARA TRAINOR

20

21

22

23

24

25

29

```
 1        M. SACKLER - HIGHLY CONFIDENTIAL
 2              DOCUMENT TECHNICIAN:  Okay, no
 3         problem.  One second.
 4    BY MR. HURLEY:
 5        Q.    Ms. Sackler, David Sackler 3 is a
 6    document that was produced to us in
 7    discovery in this case and includes
 8    information -- sorry, let me back up.
 9              This is a Professionals' Eyes
10    Only, Highly Confidential.
11              David Sackler 3 is a chart that
12    has three columns titled "Name," "Position"
13    and "Date In Position."
14              Do you see that, Ms. Sackler?
15        A.    Yes.
16        Q.    And if you go, I guess it's nine
17    rows up from the bottom, you'll see
18    Marianna Sackler Frame listed there.
19              Tell me when you're there.
20        A.    Yes, I can see that.
21        Q.    Okay.
22              And under the column "Position,"
23    it has the words or it has "Consultant E."
24              Do you see that?
25        A.    Yes, I do see that.
```

Highly ConfidentialMarianna Sackler - September 02, 2020

30

```
1        M. SACKLER - HIGHLY CONFIDENTIAL
2        Q.    What is a consultant E?
3        A.    I don't know.
4        Q.    Were you a consultant for Purdue
5    in the time period identified, which is
6    June 1, 2005 to December 31, 2018?
7        A.    I do not know.
8        Q.    Do you know whether you had any
9    role or title at Purdue during that period
10    of time?
11        A.    Yes.
12        Q.    And what role or roles did you
13    have during that period of time?
14        A.    There was a four-month period of
15    time in about two thousand -- I believe it
16    was 2009-2010 where I worked in the
17    research and development department at
18    Purdue.
19        Q.    Did you have any other roles or
20    titles at Purdue during the period of time
21    identified on the chart?
22        A.    Not to my knowledge.
23        Q.    Are you party to any -- withdraw
24    that.
25             Have you ever been party to a
```

31

```
 1      M. SACKLER - HIGHLY CONFIDENTIAL

 2   written agreement with Purdue, to your

 3   knowledge?

 4      A.    I'm sorry, could you be more

 5   specific?

 6      Q.    Sure.

 7            Have you been party -- are you or

 8   have you ever been party to a written

 9   employment agreement with Purdue?

10      A.    Yes.

11      Q.    Okay.  When?

12      A.    It would have pertained to that

13   time period I referenced, around four

14   months when I worked in the medical

15   research and development department.

16      Q.    Okay.

17            What was the term of the

18   agreement that you are identifying?

19      A.    What was the term of the

20   agreement?

21      Q.    The effective dates.

22      A.    I don't remember.

23      Q.    Did they coincide with the period

24   of time that you were working in the

25   research and development department?
```

32

1      M. SACKLER - HIGHLY CONFIDENTIAL

2          A.    I believe so.

3          Q.    Okay.

4              Other than that agreement, have

5      you ever been party to any other agreement

6      with Purdue?

7          A.    I don't know.

8          Q.    What did you do during the

9      four-month period of time that you were

10     working in the research and development

11     group?

12         A.    As I remember, I was working on

13     the reformulation project for OxyContin.

14     Part of that, I believe, also had to do

15     with the study protocol for that

16     reformulation and a part of it had to do,

17     as I recall, with preparations for a

18     meeting with the FDA.

19         Q.    And how did you get that job?

20         A.    As I recall, I spoke with, I

21     believe I spoke with John Stewart about an

22     interest in working at the company for a

23     period of time, and he, I guess,

24     established that the research and

25     development department would be an

33

```
 1      M. SACKLER - HIGHLY CONFIDENTIAL

 2   interesting space for me at that particular

 3   time.

 4      Q.    John Stewart was then the CEO of

 5   Purdue?

 6      A.    I don't recall what his exact

 7   title was, but he had some very senior

 8   position at the company, yes.

 9      Q.    And you reached out directly to

10   him about this?

11      A.    As my recollection serves, yes.

12      Q.    Is he the person that you

13   negotiated your contract with?

14      A.    I don't think so.

15      Q.    Who did you negotiate that

16   agreement with?

17      A.    I don't remember.

18      Q.    Do you remember who countersigned

19   it?

20      A.    I don't remember.

21      Q.    Did you sign it?

22      A.    I don't remember.

23      Q.    Do you remember any of the terms

24   of the agreement?

25      A.    No.
```

Highly ConfidentialMarianna Sackler - September 02, 2020

34

```
1        M. SACKLER - HIGHLY CONFIDENTIAL
2              MR. HURLEY:  Lexitas, let's go to
3        Document No. 3.  I'm going to mark
4        that as MS Exhibit 1.
5              (MS Exhibit 1, Cash transfers of
6        value analysis, remotely introduced
7        and provided electronically to the
8        reporter.)
9              MS. LEVENTHAL:  Would you please
10       state the confidentiality designation
11       and Bates number?
12             MR. HURLEY:  Yes.  It's no
13       confidentiality.  It's the cash
14       transfers of value analysis, and no
15       Bates number.  This is a document that
16       was filed on the docket.
17  BY MR. HURLEY:
18       Q.    So I want to bring you to page
19  324 of this document first.  So please let
20  me know when you're there, Ms. Sackler.
21       A.    I'm sorry, I don't have a page
22  324.  My document seems to only go to slide
23  8.
24       Q.    The document is excerpted.  So
25  while there are only eight pages in the
```

50

M. SACKLER - HIGHLY CONFIDENTIAL

Q.     What does she do there?

A.     I believe she's an accountant there.

Q.     And what about ████ ?

A.     ████████ was my dad's assistant.

Q.     Is she no longer your dad's assistant?

A.     She is no longer my dad's assistant.

Q.     Does your dad have an assistant currently?

A.     Yes.

Q.     What is that person's name?

A.     ███████████

Q.     ██████████

A.     Yes.

Q.     The last e-mail on the chain is from you.  It's dated Thursday, February 16, 2006, got a timestamp of 8:26 a.m. Looks like it's to your dad and it says "Subject wire."

       Do you see that?

A.     Yes.

51

```
1        M. SACKLER - HIGHLY CONFIDENTIAL

2              MS. LEVENTHAL:  I would just

3         correct that it's the first e-mail in

4         the chain.

5         Q.    Yeah, in time it's the first

6    e-mail and on the page it's the last.

7    That's what I meant by the last.

8              But you see what I'm looking at,

9    right?

10        A.    Yes.

11        Q.    The 8:26 a.m. e-mail?

12        A.    Yes.

13        Q.    There is a signature block and it

14   says "Marianna Sackler, Mundipharma Italy

15   SRL."

16              Do you see that?

17        A.    Yes.

18        Q.    Is this the Italian company that

19   you were referring to before that you

20   worked at for a period of time?

21        A.    Yes.

22        Q.    And how long did you work there?

23        A.    I think about 18 months.

24        Q.    What was your role at this

25   entity?
```

52

```
 1        M. SACKLER - HIGHLY CONFIDENTIAL
 2        A.    I was an assistant in the PR
 3   department.
 4        Q.    And how long -- sorry.
 5              What period of time did you work
 6   at Mundipharma Italy?
 7        A.    I believe all of 2006 and roughly
 8   half of 2007.
 9        Q.    Were you based in Italy?
10        A.    Yes.
11        Q.    Where in Italy?
12        A.    Milan.
13        Q.    And is Mundipharma Italy SRL an
14   IAC?
15        A.    I don't know if that's the
16   terminology that is used to describe it.  I
17   had not heard it described as such.
18             MR. HURLEY:  So we're going to go
19        to Document 7, which is highly
20        confidential, RSF 738258 is the Bates
21        number on the first page of the
22        document, and please mark this MS 3.
23             (MS Exhibit 3, E-mail string,
24        Bates stamped RSF 738258, remotely
25        introduced and provided electronically
```

53

```
 1        M. SACKLER - HIGHLY CONFIDENTIAL
 2         to the reporter.)
 3    BY MR. HURLEY:
 4        Q.    I'd like to direct you to the
 5    second page of this e-mail when you're
 6    ready, Ms. Sackler.
 7        A.    Okay.
 8        Q.    So I want to direct you to the
 9    second page.  It's a continuation of an
10    e-mail that begins on the first page that
11    looks like you sent September 25, 2007 at
12    1:58 p.m. to somebody named Valerie McCall.
13             And you write at top of the
14    second page, "I believe I was being paid by
15    an oil company in the U.S., but I am not
16    positive as Mundipharma Italy couldn't
17    officially bring me onboard in any legal
18    capacity in the time allotted."
19             Do you see that?
20        A.    Yes.
21        Q.    What was the oil company in the
22    U.S. that paid your salary?
23        A.    I don't know.
24        Q.    Does your family own an oil
25    company located in the U.S., to your
```

UNREDACTED - Subject to Further Confidentiality Review 19-23649-shl Doc 2166-5 Filed 12/18/20 Entered 12/18/20 18:47:42 Main Document Exhibit 56 PRIVILEGED COMMUNICATIONS - TRIP SUBJECT TO PROTECTIVE ORDER Pg 20 of 102

Highly ConfidentialMarianna Sackler - September 02, 2020

60

```
 1      M. SACKLER - HIGHLY CONFIDENTIAL

 2    scientific articles in Italy that were

 3    coming out around topics of pain and pain

 4    treatment.  We collected them for austerity

 5    for the company.  We also supported sales

 6    staff when they required information

 7    documentation on actual product materials

 8    and information in the news that was

 9    relevant.

10            So if a doctor had read something

11    and met with a sales associate and the

12    sales associate hadn't read that article,

13    they would reach out to us for us to find

14    it and provide it to them.  And then

15    finally my work was also as last eyes on

16    any documents that were written in English

17    for assurance that anything written in

18    English was done correctly.

19      Q.    And what were you paid to do this

20    work?

21      A.    I don't remember.

22      Q.    Do you remember if you had a

23    salary?

24      A.    I do remember being paid, yes.

25      Q.    Do you remember if it was hourly
```

61

1      M. SACKLER - HIGHLY CONFIDENTIAL

2    or like an annual salary?

3      A.    I remember being paid monthly.

4      Q.    Do you remember even

5    approximately how much you were paid

6    monthly?

7      A.    I can't be sure, no.

8      Q.    Do you have a reasonable estimate

9    that you can give us?

10     A.    My estimate would be around 1350

11   to 1500 euro a month.

12     Q.    Have you had any roles working

13   for any other non -- any other family-owned

14   entities besides Purdue and Mundipharma

15   Italy?

16     A.    No.

17     Q.    And again, approximately when did

18   your employment at Mundipharma Italy end?

19     A.    Sometime in Q2 of 2007.

20          MR. HURLEY:  So I want to pull up

21       Document No. 8, which is marked

22       Confidential and has the Bates number

23       on the first page PPLPC 022000109859.

24          MS. LEVENTHAL:  What are we

25       marking this as?

M. SACKLER - HIGHLY CONFIDENTIAL

          MR. HURLEY:  MS 4.

          (MS Exhibit 4, E-mail, Bates

     stamped PPLPC 022000109859, remotely

     introduced and provided electronically

     to the reporter.)

BY MR. HURLEY:

     Q.    I want you to look at the e-mail

that looks like you sent to someone named

Mike Innaurato, July 27, 2006, and the

timestamp is 4:41:47 a.m., re OxyContin

market data.

          Tell me when you're there,

please.

          Who is Mike Innaurato?

     A.    I don't know.

     Q.    Do you recognize the name?

     A.    I recognize the name, yes.

     Q.    What do you recognize it from?

     A.    I guess overhearing it in

conversation.  I don't know.

     Q.    He's got a ███████████████████

███████

          Do you see that?

     A.    Yes.

108

```
 1        M. SACKLER - HIGHLY CONFIDENTIAL
 2        Q.    Yeah, I'm sorry, it's a reference
 3   to $4.4 million distribution in 2010 it
 4   looks like from the 1A Trust.
 5             Do you see that?
 6        A.    Right, yes.
 7        Q.    Does this refer to the 4. -- is
 8   this the same distribution as was
 9   identified as being $4.367 million in
10   Exhibit 7 we were looking at a moment ago,
11   the Stephen Ives document?
12        A.    I don't know.
13        Q.    Is it possible that you received
14   two distributions of approximately $4.4
15   million in or around this time period?
16        A.    I don't know.
17        Q.    Do you think you'd remember that,
18   if you had received almost $9 million in
19   cash in a single year?
20        A.    I do think I would remember that.
21        Q.    Do you think you would remember
22   if you received $4 and a half million in
23   cash in a single year?
24        A.    Yes.
25        Q.    Does the fact that you don't
```

UNREDACTED - SUBJECT TO PROTECTIVE ORDER - CONTAINS PRIVILEGED
COMMUNICATIONS - TRIBUTARY TO PROTECTIVE ORDER

109

```
 1      M. SACKLER - HIGHLY CONFIDENTIAL
 2    remember it suggest to you that you didn't
 3    actually get the distribution?
 4           MS. LEVENTHAL:  Objection.
 5      A.    No.
 6      Q.    So I guess you think it is
 7    possible that you got the $4.4 million
 8    distribution in 2010, but you just don't
 9    remember getting it, is that right?
10      A.    Yes.
11      Q.    The report also indicates that in
12    2009 the 1A Trust -- sorry, withdraw that.
13           MR. HUGHES:  Why don't we
14       actually take a short break, five
15       minutes.
16           MS. LEVENTHAL:  Okay.
17           THE VIDEOGRAPHER:  The time is
18       8:10 and we're going off the record.
19           (Recess taken from 8:10 p.m. to
20       8:19 p.m.)
21           THE VIDEOGRAPHER:  The time is
22       8:19 and we are back on the record.
23    BY MR. HURLEY:
24      Q.    So Ms. Sackler, you support your
25    lifestyle using the wealth of your family,
```

110

```
1        M. SACKLER - HIGHLY CONFIDENTIAL
2    right?
3        A.    Yes.
4        Q.    And the wealth of your family
5    primarily comes from Purdue's activities.
6    Are you aware of that?
7        A.    No.
8        Q.    Okay.
9              Are you aware that a substantial
10   amount of your family's wealth comes from
11   the activities of Purdue Pharma?
12       A.    Yes.
13       Q.    And are you aware that a
14   substantial amount of the revenue that
15   Purdue Pharma has earned in the last 10 to
16   15 years has come from the sale of
17   OxyContin?
18       A.    Yes.
19       Q.    And are you aware that those
20   sales are alleged to have caused great
21   misery in this country?
22             MS. LEVENTHAL:  Objection.
23       A.    I'm aware that they have alleged
24   to have caused, yes.  I don't agree, but
25   I'm aware.
```

UNREDACTED - CONTAINS ODUC 21 66-5 FILED 12/18/20 OR ENTERED 12/18/20 18:47:42 IN EXHIBITS 66 PRIVILEGED
COMMUNICATIONS - TRIP 26 TO 102 TO PROTECTIVE ORDER

```
 1        M. SACKLER - HIGHLY CONFIDENTIAL

 2        Q.    Do you have any, experience any

 3   guilt from living off the proceeds, at

 4   least in part, of the sale of OxyContin?

 5        A.    No.

 6        Q.    Do you believe that Purdue bears

 7   any responsibility for the opioid crisis in

 8   this country?

 9        A.    No.

10        Q.    Do you believe that your family

11   has any responsibility for the misery

12   created by the opioid crisis in this

13   country?

14              MS. LEVENTHAL:  Objection.

15        A.    No.

16        Q.    Your family from time to time has

17   what are called beneficiary meetings,

18   right?

19        A.    Yes.

20        Q.    And what's the purpose of the

21   beneficiary meetings?

22        A.    To review the status of the

23   business.

24        Q.    What business?

25        A.    I don't know.
```

112

```
 1        M. SACKLER - HIGHLY CONFIDENTIAL

 2        Q.    Does it include Purdue?

 3        A.    Yes.

 4        Q.    Does it include any other

 5   businesses in addition to Purdue?

 6        A.    I don't know.

 7        Q.    Does your family have any

 8   businesses in addition to Purdue?

 9        A.    Yes.

10        Q.    What businesses?

11        A.    The pharmaceutical companies that

12   are abroad.

13        Q.    Sometimes referred to as IACs?

14        A.    I don't know.

15            MR. HURLEY:  I'd like to pull up

16        Document No. 32, please.  It's marked

17        Highly Confidential and the first page

18        has the Bates number PPLPUCC

19        9002650902.

20            Let's please mark this MS Exhibit

21        9.

22            (MS Exhibit 9, E-mail with

23        attachment, beginning Bates stamp

24        PPLPUCC 9002650902, remotely

25        introduced and provided electronically
```

Highly ConfidentialMarianna Sackler - September 02, 2020

194

1    M. SACKLER - HIGHLY CONFIDENTIAL

2         DOCUMENT TECHNICIAN:  Yes.

3         MR. LUNDGREN:  Thank you.

4         Lexitas, can we bring up Document

5    M, please.

6         DOCUMENT TECHNICIAN:  M, as in

7    Mary?

8         MR. LUNDGREN:  Yes.

9         This is Bates stamped PPLPUCC

10   900404597.  It's an e-mail dated

11   October 23, 2008 from Marianna Sackler

12   to John Stewart.

13         (MS Exhibit 29, E-mail string,

14   Bates stamped PPLPUCC 900404597,

15   remotely introduced and provided

16   electronically to the reporter.)

17 BY MR. LUNDGREN:

18   Q.    Do you recognize this e-mail

19 chain, Ms. Sackler?

20   A.    If you give me a moment, I'll

21 refresh my memory.

22   Q.    Sure.  Should we go off the

23 record?

24   A.    Sure.  It shouldn't take me too

25 long.

195

```
 1        M. SACKLER - HIGHLY CONFIDENTIAL
 2              MR. LUNDGREN:  Let's go off the
 3        record.
 4              THE VIDEOGRAPHER:  The time is
 5        10:52 and we're going off the record.
 6              (Recess taken from 10:52 p.m. to
 7        10:53 p.m.)
 8              THE VIDEOGRAPHER:  The time is
 9        10:53 and we are going back on the
10        record.
11   BY MR. LUNDGREN:
12        Q.    I direct your attention to the
13   lower e-mail.  It's dated October 23rd.
14   It's from John H. Stewart.  It says, "Hi,
15   Annie.  Your father called and let me know
16   that you are interested in helping with
17   some of our OxyContin-related activities.
18   So given your background with our products
19   and operations via the assignment with
20   Mundipharma and your energetic attitude, I,
21   of course, said yes."
22              Do you see where I'm reading?
23        A.    Yes.
24        Q.    Is the assignment with
25   Mundipharma, is that the time you spent in
```

196

1      M. SACKLER - HIGHLY CONFIDENTIAL

2    Italy?

3         A.    I believe so.

4         Q.    Let me direct your attention to

5    the next paragraph.  It reads, "With

6    respect to the feedback we recently

7    received from the FDA on our OxyContin-TR

8    NDA and also their notification that we

9    need to establish a REMS (risk evaluation

10   and management strategy) for the current

11   OxyContin formulation, three distinct

12   working groups have been established.  Two

13   of these are led by Craig Landau, and I

14   spoke with him about your serving in a

15   project coordinator capacity in which your

16   role would be to help organize the WG

17   meetings and sub meetings, generate and

18   issue the minutes and follow-up on specific

19   action items."

20            Do you see where I'm reading?

21        A.    Yes.

22        Q.    Do you know what the FDA stands

23   for?

24        A.    Food and Drug Administration.

25        Q.    Do you know what OxyContin-TR

Highly Confidential Marianna Sackler - September 02, 2020

197

1    M. SACKLER - HIGHLY CONFIDENTIAL

2  stands for?

3    A.    I believe that's OxyContin tamper

4  resistant.

5    Q.    You think OTR might be an

6  abbreviation for that?

7    A.    That's possible.

8    Q.    Do you know what NDA is an

9  abbreviation for?

10    A.    I do not.

11    Q.    Did you at one time?

12    A.    Possibly.

13    Q.    Do you understand what REMS

14  stands for?

15    A.    Yes.

16    Q.    Because it's written right there

17  or did you know before the parenthetical

18  explanation?

19    A.    At the time or now?

20    Q.    Let's start with at the time.

21    A.    I would not have known what it

22  stood for at the time.

23    Q.    How about moments ago?

24    A.    In reviewing this document, the

25  parenthetical information helped to refresh

198

```
1        M. SACKLER - HIGHLY CONFIDENTIAL

2   my memory.

3        Q.    Would you have been familiar with

4   it shortly after the period in which this

5   e-mail was written, say later in 2008?

6        A.    Maybe.  I don't know.

7        Q.    The description of working groups

8   here, does that match your recollection of

9   the work that you did during that time?

10       A.    It seems to.

11       Q.    Did you accept this role?

12       A.    I believe I did.

13       Q.    Do you recall Craig Landau

14  forwarding you weekly briefing memos to

15  keep you up to speed on the project?

16       A.    I don't remember.

17       Q.    Do you think it's possible that

18  he did?

19       A.    I think it's possible that he

20  did, but I don't remember.

21            MR. LUNDGREN:  I think we marked

22       that 28.  So I think this would be

23       Exhibit 29.

24            Lexitas, can you please bring up

25       Document DD.  Exhibit 30.  Document
```

199

M. SACKLER - HIGHLY CONFIDENTIAL

DD.  That will be Bates stamp PDD

8901704660.  It's dated October 26,

2008.

        (MS Exhibit 30, E-mail, Bates

stamped PDD 8901704660, remotely

introduced and provided electronically

to the reporter.)

BY MR. LUNDGREN:

Q.    This is an e-mail dated October

26, 2008.  It is from Craig Landau to --

that's your e-mail address,

████████████████████ correct?

A.    Yes.

Q.    Okay.

        Do you see the first line, it

says, "Weekly update memos to John

Stewart"?

A.    I see that.

Q.    I direct your attention to the

attachment, it should be page 4, Bates

stamped PDD 8901704663.

A.    Yes.

Q.    Does this appear to you to be one

of the weekly update memos?

200

```
 1      M. SACKLER - HIGHLY CONFIDENTIAL

 2      A.    May I have a few moments to

 3   review it?

 4      Q.    Sure.  I'm going to be asking

 5   about the bullets on the first page -- but

 6   yeah, we're happy to go off the record and

 7   you can take some time.

 8      A.    Okay, just give me a moment to

 9   review it so I can review it appropriately.

10           MR. LUNDGREN:  Let's go off the

11      record.

12           THE VIDEOGRAPHER:  The time is

13      10:59.  We're going off the record.

14           (Recess taken from 10:59 p.m. to

15      11:00 p.m.)

16           THE VIDEOGRAPHER:  The time is 11

17      p.m. and we are going back on the

18      record.

19   BY MR. LUNDGREN:

20      Q.    This is a memorandum from Craig

21   Landau to John Stewart, is that correct?

22      A.    It appears to be, yes.

23      Q.    Dated October 8, 2008.  The re

24   line says "FDA notification concerning NDA

25   20-553 OxyContin."
```

201

```
 1        M. SACKLER - HIGHLY CONFIDENTIAL

 2               Right underneath, it says,

 3     "Notification from the FDA concerning NDA

 4     20-553, OxyContin, OxyCodone hydrochloride

 5     extended-release tablets was received on

 6     Friday, October 3, 2008.  A brief summary

 7     of the key messages are as follows."

 8               Do you see where I'm reading

 9     there?

10        A.    Yes.

11        Q.    That first bullet says, "New

12     safety information based on post-marketing

13     reports of overdose, abuse, addiction

14     triggered required REMS under FDA AA."

15               The next bullet reads, "REMS

16     requirement to ensure benefits of the drug

17     outweigh the risks of 1, use of dosages 60

18     milligrams and above in non-opioid tolerant

19     individuals; 2, abuse; 3, overdose, both

20     accidental and intentional."

21               Do you see where I'm reading?

22        A.    Yes.

23        Q.    Did that relate to your role as

24     the crisis project coordinator?

25        A.    I don't know.
```

Highly ConfidentialMarianna Sackler - September 02, 2020

202

1      M. SACKLER - HIGHLY CONFIDENTIAL

2      Q.    He was forwarding this memo to

3   you on October 26th, is that right?

4      A.    Let me go back and confirm that

5   that's the date that's on there.  Yes.

6      Q.    Do you have reason to believe

7   that he would be sending you information on

8   something other than your role as crisis

9   project coordinator?

10     A.    I don't know what his -- what he

11  would send and what he wouldn't.  I believe

12  he was trying to send me background

13  information on the projects at large.

14     Q.    You said "projects at large,"

15  plural, multiple projects?

16     A.    They were the two working groups

17  that were described above.  So one was as

18  I've stated earlier in my testimony, one

19  was regarding the response to the FDA, and

20  the other was regarding the testing of the

21  new formulation.

22     Q.    You became a core team member

23  working on these projects, is that right?

24     A.    I don't know if that was what the

25  term was that was used to describe me.  I

203

```
 1      M. SACKLER - HIGHLY CONFIDENTIAL

 2   don't recall that being used, but I'm not

 3   denying that that may be the case.

 4      Q.   Okay.

 5           MR. LUNDGREN:  Lexitas, can we

 6      pull up Document N, please?  It should

 7      be marked as Exhibit 31.  This is

 8      Highly Confidential.  PPLPUCC

 9      9003890841.

10           (MS Exhibit 31, E-mail, Bates

11      stamped PPLPUCC 9003890841, remotely

12      introduced and provided electronically

13      to the reporter.)

14   BY MR. LUNDGREN:

15      Q.   This is an e-mail from Craig

16   Landau to Marianna Sackler, among others.

17   It was sent on October 30, 2008.

18           I direct your attention to the

19   second page.  Do you see where it says,

20   "Here's the deck for today's meeting.

21   Today's meeting should focus on:  1,

22   introduction of Marianna, a new member of

23   our core team."

24           Do you see that?

25      A.   Yes.
```

UNREDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED - CERTAIN PRIVILEGED COMMUNICATIONS - TRIPP SUBJECT TO PROTECTIVE ORDER

204

```
 1        M. SACKLER - HIGHLY CONFIDENTIAL
 2        Q.    Do you have any reason to believe
 3   that you were not a member of the core
 4   team?
 5        A.    I do not.
 6        Q.    So to be clear, you think it's
 7   likely that you were a core team member?
 8             MS. LEVENTHAL:  Objection.
 9        A.    I don't recall being referred to
10   as a core team member.
11        Q.    Do you remember there being a
12   core team?
13        A.    I don't remember there being a
14   team that was referred to as the core team,
15   no.
16        Q.    Do you see that Core Team
17   capitalized?
18        A.    I do see that, yes.
19             MR. LUNDGREN:  Lexitas, can we
20        bring up Document CC, please?
21             This will be Exhibit 32.
22             This is marked PPLPC
23        004000176622.  It's Confidential.
24        It's from Russel Gasdia to Windell,
25        Fisher.  It's dated Saturday, October
```

205

```
 1        M. SACKLER - HIGHLY CONFIDENTIAL
 2        4, 2008.
 3              (MS Exhibit 32, E-mail, Bates
 4        stamped PPLPC 004000176622, remotely
 5        introduced and provided electronically
 6        to the reporter.)
 7   BY MR. LUNDGREN:
 8        Q.    Do you know who Russel Gasdia is?
 9        A.    I do not.
10        Q.    Do you know who Windell Fisher
11   is?
12        A.    I do not.
13        Q.    Do you see the e-mail text
14   underneath, it says, "The attached
15   documents were received late Friday night.
16   They are not favorable responses from FDA.
17   One documents regards the OTR (new
18   formulation), the other is in regards to
19   current formulation and the need for
20   significant risk management initiative."
21              Do you see where I'm reading?
22        A.    I do.
23        Q.    I direct your attention to the
24   next paragraph where the final sentence
25   says, "While this news is concerning and
```

206

```
 1      M. SACKLER - HIGHLY CONFIDENTIAL
 2   disappointing, we need to let the dust
 3   settle and determine steps forward."
 4           Do you see where I'm reading?
 5      A.    Yes.
 6      Q.    Do you see that there are two
 7   letters attached to this e-mail?
 8      A.    Yes.
 9      Q.    I direct your attention to the
10   second letter on page 8, which is PPLPC
11   00400017 and it ends 6629.  I'm going to be
12   directing you to a specific passage, but if
13   you want to take time to read the entire
14   thing, we can go off the record.  I'm going
15   to draw your attention to the third
16   sentence.
17      A.    Let's go off the record just so I
18   can review it.
19           MR. LUNDGREN:  Sure.
20           THE VIDEOGRAPHER:  The time is
21      11:08.  We're going off the record.
22           (Recess taken from 11:08 p.m. to
23      11:11 p.m.)
24           THE VIDEOGRAPHER:  The time is
25      11:12 and we are back on the record.
```

Highly ConfidentialMarianna Sackler - September 02, 2020

207

1      M. SACKLER - HIGHLY CONFIDENTIAL

2    BY MR. LUNDGREN:

3      Q.    Do you see the third paragraph of

4    this letter, it says, "This supplemental

5    new drug application proposes a risk

6    management plan for OxyContin.  We have

7    completed the review of the application as

8    amended and have determined that we cannot

9    approve this application in its present

10   form.  It will be necessary for you to

11   submit a proposed risk evaluation and

12   mitigation strategy REMS for the reasons

13   described below in place of the risk

14   management plan."

15           Do you see that?

16      A.    Yes.

17      Q.    And I want to direct your

18   attention to the last paragraph on that

19   page.  It says, "Since OxyContin was

20   approved on December 12, 1995 for the

21   management of moderate to severe pain in

22   patients where use of an opioid analgesic

23   is indicated for more than a few days, we

24   have become aware of postmarketing reports

25   of overdose, abuse, and addiction

208

1     M. SACKLER - HIGHLY CONFIDENTIAL

2   associated with OxyContin."

3          And I'd like to direct your

4   attention to the following paragraph that

5   comes right after, the top of the next

6   page.  It says, "Based on this new safety

7   information and in accordance with Section

8   505(f)(1) of the FDCA, we've determined

9   that a REMS is necessary for OxyContin to

10  ensure that the benefits of the drug

11  outweigh the risks of, 1, use of dosages 60

12  milligrams and above in non-opioid tolerant

13  individuals; 2, abuse; and 3, overdose both

14  accidental and intentional."

15         Do you see that?

16    A.    Yes.

17    Q.    And right underneath, it says,

18  "Your proposed REMS must contain the

19  following."  I'm not going to have us go

20  through all of these, but I'll just read

21  the first sentence of these numbers.

22         So you can see there's the bold

23  where it says, "Elements to assure safe

24  use" and then number 1 says, "A plan to

25  ensure that OxyContin will only be

209

1    M. SACKLER - HIGHLY CONFIDENTIAL

2    prescribed by prescribers who are

3    especially certified under 505-1(F)(3)(A)

4    through the certification process described

5    below."

6         And I'd like to direct you to the

7    next page where it says number 2, "A plan

8    to ensure that OxyContin is only dispensed

9    by pharmacies, practitioners, or healthcare

10   settings who are especially certified under

11   505-1(f)(3)(B) by requiring that" -- and

12   then there's some more specific

13   requirements.

14         Then underneath it for number 3,

15   "A plan to ensure the drug is dispensed to

16   patients with documentation of the

17   following safe use conditions under

18   505-1(f)(3)(D)."

19         Do you understand those

20   statements to mean that the FDA was

21   requiring a REMS proposal from the -- from

22   Purdue Pharma - --

23       A.    Yes.

24         MS. LEVENTHAL:  Mr. Lundgren,

25     before we go back in, I just wanted to

Highly ConfidentialMarianna Sackler - September 02, 2020

210

```
 1      M. SACKLER - HIGHLY CONFIDENTIAL
 2        alert the tech team that some of our
 3        team has gotten kicked off of Zoom and
 4        they're trying to get back in.  I sent
 5        a chat to Aydaline.  If you could
 6        please let them back in.
 7              THE VIDEOGRAPHER:  Will do.
 8              MR. LUNDGREN:  Do we need to go
 9        off the record?  I'm happy to go off
10        the record.
11              MS. LEVENTHAL:  Yeah, if that's
12        necessary to let them back in, please
13        do.
14              MR. LUNDGREN:  Okay.  Let's go
15        off the record.
16              THE VIDEOGRAPHER:  Okay.  The
17        time is 11:16 and we're going off the
18        record.
19              (Recess taken from 11:16 p.m. to
20        11:17 p.m.)
21              THE VIDEOGRAPHER:  The time is
22        11:17, we're going back on the record.
23      BY MR. LUNDGREN:
24        Q.    Do you have any understanding as
25      we sit here today as to whether a proposed
```

211

1      M. SACKLER - HIGHLY CONFIDENTIAL

2    REMS would have affected Purdue's bottom

3    line?

4         A.    I don't know.

5         Q.    You said that one of the outside

6    consultants that you were communicating

7    with at this time was McKinsey, is that

8    right, the McKinsey firm?

9         A.    Yes.

10        Q.    Did you say you worked closely

11   with during this time?

12        A.    I worked closely with some of the

13   consultants at McKinsey at that time, yes.

14             MR. LUNDGREN:  Lexitas, can you

15         please bring up Document HH.  This is

16         a document produced to the state under

17         state statute as being used at this

18         deposition with the consent of the

19         producing party.  It's been Bates

20         stamped MCK-MAAG-0119358.  It's dated

21         October 15, 2008.

22             MS. LEVENTHAL:  What's the

23         Exhibit number?

24             MR. LUNDGREN:  33.

25             (MS Exhibit 33, E-mail, Bates

UNREDACTED — Subject to Further Confidentiality Review Pg 46 of 102

19-23649-shl   Doc 2166-5   Filed 12/18/20   Entered 12/18/20 18:47:42   Exhibit 66

UNREDACTED - SUBJECT TO MEET AND CONFER PROCESS AND CONTAINS PRIVILEGED
COMMUNICATIONS - TRIAL SUBJECT TO PROTECTIVE ORDER

Highly Confidential Marianna Sackler - September 02, 2020

212

```
 1      M. SACKLER - HIGHLY CONFIDENTIAL

 2        stamped MCK-MAAG-0119358, remotely

 3        introduced and provided electronically

 4        to the reporter.)

 5            MS. LEVENTHAL:  Okay, thank you.

 6   BY MR. LUNDGREN:

 7      Q.    There is an e-mail from a Loren

 8   Griffit at McKinsey, sent October 15, 2018

 9   -- sorry, 2008 to several McKinsey

10   individuals.  The subject is, "Simplified

11   strategic options for Purdue."

12            Do you see I'm reading from the

13   first and only paragraph, it says, "Based

14   on a discussion with Maria and Craig Landau

15   this afternoon, I've simplified the few

16   pages on potential outcomes and strategic

17   options for Purdue.  Maria had a chat with

18   John Stewart later and discussed much of

19   this with him.  We may want to share pages

20   like these in any case."

21            Do you see where I'm reading

22   that?

23      A.    Yes.

24      Q.    Let me direct your attention to

25   the slides that follow.  I'm going to walk
```

213

1    M. SACKLER - HIGHLY CONFIDENTIAL

2    through them, but if you want to take a

3    moment to read them, we can go off the

4    record?

5        A.    How many slides are there?  It

6    shouldn't take me more than a moment to go

7    through these to review.  You're more than

8    welcome to go off the record if that's

9    helpful.

10            MR. LUNDGREN:  Okay, let's go off

11       the record.

12            THE VIDEOGRAPHER:  The time is

13       11:21.  We're going off the record.

14            (Recess taken from 11:21 p.m. to

15       11:22 p.m.)

16            THE VIDEOGRAPHER:  The time is

17       11:22 and we are back on the record.

18    BY MR. LUNDGREN:

19       Q.    So, Ms. Sackler, do you see

20    across the top it say, "Outcomes for

21    OxyContin range from business as usual to

22    withdrawal"?

23       A.    Yes.

24       Q.    And there's an arrow on the left

25    side that says "greater impact on

UNREDACTED19-23649-shl Doc 21669-5 Filed 12/18/20 Entered 12/18/20 18:47:42 Exhibit 66 PRIVILEGED COMMUNICATIONS - TRIPG 48 JECT TO PROTECTIVE ORDER

Highly ConfidentialMarianna Sackler - September 02, 2020

214

```
1        M. SACKLER - HIGHLY CONFIDENTIAL

2    profitability"?

3        A.    Yes.

4        Q.    The top box says "Business as

5    usual," and right beside that it says "REMS

6    approved for OxyContin."

7              Then "OxyContin OTR approved and

8    successful in holding market share against

9    King's Remoxy or Remoxy denied approval."

10             And then there is an arrow.

11             And then on the right side it

12   says "Maintenance of current OxyContin

13   revenues over a three-to-four-year

14   timeframe."

15             Do you see where I'm reading?

16       A.    Yes.

17       Q.    There is a second box that says

18   "intermediate outcome."  And right next to

19   that, it says "OxyContin restricted, a

20   result of voluntary or FDA-required

21   action."

22             And there are sub bullets there

23   that say "withdrawal of high-dose

24   formulations," "sales/marketing

25   restrictions," "tablet tagging,"
```

215

```
1        M. SACKLER - HIGHLY CONFIDENTIAL

2    "distribution limited to certain doctors,

3    pharmacies or geographies."

4            And do you see the arrow points

5    to the right and it says "significant, but

6    not devastating loss of OxyContin revenues

7    over a one-to-two-year timeframe"?

8        A.    I see that.

9        Q.    And then there is a third box at

10   the bottom that says "withdrawal from

11   market" and it says, right beside that, it

12   says "FDA pulls OxyContin from market

13   following rejection of REMS, approval of

14   Remoxy coupled with FDA perception that it

15   is safer than OxyContin."

16           And to the right it's described

17   as "devastating loss of OxyContin revenues

18   over one-to-two-year timeframe."

19           Do you see that?

20       A.    Yes.

21       Q.    Now, if we turn to the next page,

22   there are Purdue's strategic options laid

23   out.  The top one says "play, which is seek

24   FDA approval for the REMS."  And the

25   approach as indicated to the side says
```

216

1    M. SACKLER - HIGHLY CONFIDENTIAL

2    "definitely a thorough REMS, prepare to

3    effectively implement and monitor the

4    REMS."

5              And then to the right it says

6    "what you would have to believe to pursue

7    this course," and it says "Purdue can

8    produce a high quality REMS that the FDA

9    will approve."

10             Do you see that?

11   A.    Yes.

12   Q.    Do you see there's a delay box

13   underneath the play box?

14   A.    I see that.

15   Q.    Okay.

16             And then do you see that the

17   third box says "preempt" and that option

18   says "voluntarily curtail OxyContin to

19   obviate the need for a REMS."

20             Do you see that?

21   A.    Yes.

22   Q.    And beside it, the approach says

23   "assess what the FDA is most concerned

24   about and what Purdue can do to address it,

25   IG, take high dose versions off the market,

UNREDACTED 19-23649-shl Doc 21665-5 Filed 12/18/20 Entered 12/18/20 18:47:42 Exhibit 66 PRIVILEGED
COMMUNICATIONS - TRIBUTO PROTECTIVE ORDER
Pg 51 of 102

Highly ConfidentialMarianna Sackler - September 02, 2020

217

```
 1      M. SACKLER - HIGHLY CONFIDENTIAL

 2   and therefore persuade the FDA to withdraw

 3   its demand for a REMS."

 4           And then to the right of that, it

 5   says, underneath the column what you would

 6   have to believe to pursue this course, "FDA

 7   is concerned about particular aspects of

 8   OxyContin and can be persuaded not to take

 9   action if Purdue voluntarily addresses

10   these aspects."

11           Do you see where I was reading

12   there?

13      A.   Yes.

14      Q.   I want to turn your attention to

15   the next page.  "Recommendations on actions

16   to take immediately."

17           The top box says "REMS, place

18   Craig Landau in charge of overseeing REMS

19   development.  Engage Pinney Associates to

20   provide focused expertise on specified

21   technical aspects."

22           Are you familiar with Pinney

23   Associates?

24      A.   I don't remember.

25      Q.   The bottom box says "Strategic
```

218

```
1        M. SACKLER - HIGHLY CONFIDENTIAL

2    integration, decide how to ensure Purdue

3    pursues a coherent overall strategy and

4    successfully pulls together REMS

5    components.  The CEO to read with McKinsey.

6    Other handpicked team members TBD."

7             Do you see that?

8        A.    Yes.

9        Q.    Okay.  I want to draw your

10   attention to a new document.

11            MR. LUNDGREN:  This is going to

12       be Document II, please, Lexitas.  This

13       is another document that was produced

14       under the same condition that I said

15       for the previous document.

16            This is Bates labeled

17       MCK-MAAG-0119358.  This is dated

18       10/16, 2008.  October 16th, which is

19       just one day after that e-mail that we

20       just discussed.

21            This e-mail is from a Loren

22       Griffith, again at McKinsey --

23            MS. LEVENTHAL:  The Exhibit

24       number, please?

25            MR. LUNDGREN:  That's my fault,
```

219

```
 1        M. SACKLER - HIGHLY CONFIDENTIAL

 2        I'm sorry.  The Exhibit number would

 3        be 34.

 4             (MS Exhibit 34, E-mail, Bates

 5        stamped MCK-MAAG-0119358, remotely

 6        introduced and provided electronically

 7        to the reporter.)

 8   BY MR. LUNDGREN:

 9        Q.    I direct your attention to really

10   what's the only non-redacted portion of

11   this e-mail.  It says, "As per our

12   discussion this morning, updated to include

13   a new option 'band together' with other

14   pharmacos doing C-II opioids to jointly

15   strategize how to deal with the FDA."

16             So I want to draw your attention

17   to the slides that are following here.  If

18   you want to take a moment to look at them,

19   you can, I'm going to be drawing your

20   attention to the second slide -- not the

21   one that directly comes after the e-mail,

22   but the one after that.  If you want to

23   take a look here, we can go off the record.

24        A.    That would only take me a minute,

25   but sure, let's go off the record.
```

220

```
1        M. SACKLER - HIGHLY CONFIDENTIAL

2              MR. LUNDGREN:  Okay.  Let's go

3        off the record.

4              THE VIDEOGRAPHER:  The time is

5        11:30.  We're going off the record.

6              (Recess taken at 11:30 p.m.)

7              THE VIDEOGRAPHER:  The time is

8        11:30 and we are back on the record.

9    BY MR. LUNDGREN:

10       Q.    Okay.

11             Do you see the difference, what

12       the additional box is on this page?

13       A.    Yes.

14       Q.    Do you see where it says "band

15       together, work with others facing potential

16       FDA action"?

17       A.    Yes.

18       Q.    And do you see right beside it,

19       it says "jointly develop FDA response

20       strategy with other pharmacos, marketing or

21       developing Class 2 opioid analgesics"?

22       A.    Yes.

23       Q.    For example, Cephalon's Fentoria.

24       And then the two bullets underneath it say,

25       "As appropriate, share abuse mitigation
```

221

1      M. SACKLER - HIGHLY CONFIDENTIAL

2    strategies; and formulate arguments to

3    defend against strict treatment by the

4    FDA."

5            Do you see that?

6      A.    Yes.

7      Q.    Were you aware of this

8    band-together strategy?

9      A.    I remember hearing about

10   conversations as to whether or not Purdue

11   was aware of other Class 2 narcotic

12   prescription -- or narcotic-producing

13   companies, whether or not they had received

14   similar requests from the FDA.

15     Q.    And what did you hear?

16     A.    I don't remember.

17     Q.    Did you hear that phrase "band

18   together"?

19     A.    I don't remember.

20     Q.    But you think it's reasonable

21   that that strategy could have been pursued?

22           MS. LEVENTHAL:  Objection.

23     A.    I don't know.

24     Q.    I'm sorry, I didn't hear the

25   response.

222

1  M. SACKLER - HIGHLY CONFIDENTIAL

2  A.    I don't know.

3        MR. LUNDGREN:  Lexitas, can we

4  bring up Document JJ.  This is Bates

5  stamped -- the Exhibit number is 35.

6  It's Bates stamped PPLPUCC 9004040303.

7        This is an e-mail dated November

8  11, 2008 and this is an e-mail chain.

9  I'll be asking about the top three

10  e-mails, but if you want to have the

11  full context, I'm happy to go off the

12  record.

13        (MS Exhibit 35, E-mail, Bates

14  stamped PPLPUCC 9004040303, remotely

15  introduced and provided electronically

16  to the reporter.)

17        THE WITNESS:  Let's go off the

18  record, please.

19        THE VIDEOGRAPHER:  The time is

20  11:33.  We are going back off the

21  record.

22        (Recess taken from 11:33 p.m. to

23  11:35 p.m.)

24        THE VIDEOGRAPHER:  The time is

25  11:35 and we are back on the record.

Highly ConfidentialMarianna Sackler - September 02, 2020

223

```
1        M. SACKLER - HIGHLY CONFIDENTIAL

2    BY MR. LUNDGREN:

3        Q.    I'd like to direct your attention

4    to the third e-mail from the top from John

5    Stewart to Howard Udell, Mike Innaurato,

6    Russell Gasdia -- there are some ccs as

7    well, Craig Landau, Burt Rosen, LaDonna

8    Steiner, Richard Silbert.

9              Are those names familiar to you,

10   any of those names?

11       A.    Some of them.

12       Q.    Let's, I guess, go one by one.

13   Howard Udell?

14       A.    Howard Udell, yes.

15       Q.    How do you know him?

16       A.    He was an attorney and also a

17   family friend.

18       Q.    Was a family friend or is a

19   family friend?

20       A.    He's since passed away.

21       Q.    Next name we may have already

22   discussed, Mike Innaurato?

23       A.    I'm being more and more

24   familiarized by his name today, but I don't

25   remember knowing him personally.
```

224

```
1        M. SACKLER - HIGHLY CONFIDENTIAL

2        Q.    Burt Rosen?

3        A.    I don't recognize the name.

4        Q.    LaDonna Steiner?

5        A.    I don't recognize the name.

6        Q.    Richard Silbert?

7        A.    Yes.

8        Q.    Who is Richard Silbert?

9        A.    I believe he's counsel for

10   Purdue.

11       Q.    Okay.

12             I'm going to direct your

13   attention to the paragraph at the bottom.

14   It says, "Yes, I agree that it is

15   reasonable to work towards bringing the

16   pharma companies into a dialogue about how

17   a classic approach might work, depending on

18   the number of companies that agree to

19   participate in the initial meeting and the

20   number of individuals from each company who

21   will attend.  Even the initial meeting is

22   likely to be more productive if it is

23   facilitated and led by a third party.

24   Perhaps a consultant such as McKinsey who

25   did similar work in the industry and FDA on
```

225

```
 1      M. SACKLER - HIGHLY CONFIDENTIAL
 2   some aspects of clinical trials or a
 3   healthcare-related group that would be
 4   interested in playing an active role in the
 5   program's development and delivery would be
 6   a good choice."
 7           The last sentence says, "We
 8   should ask either the REMS WG or the
 9   OxyContin defense WG to take the lead on
10   this."
11           Do you see that?
12      A.    Yes.
13      Q.    Does WG stand for working group?
14      A.    I don't know.
15      Q.    We talked about some working
16   groups that you were involved in.  Were you
17   involved in either the REMS working group
18   or the OxyContin defense working group?
19      A.    I believe I was involved in
20   what's considered the REMS working group.
21      Q.    Okay.
22           So looking at the e-mail, the one
23   above this, it's from Craig Landau.  This
24   is the e-mail dated November 11th.  He
25   says, "I support moving this forward and
```

226

```
 1      M. SACKLER - HIGHLY CONFIDENTIAL
 2   recommend this be led by OxyContin defense
 3   WG."
 4           And then Howard Udell in the
 5   e-mail right above it says, "I'm happy to
 6   pick this up."
 7           Do you see that?
 8      A.   Yes.
 9      Q.   And you said you were involved in
10   the REMS working group, is that right?
11      A.   Yes.
12           MR. LUNDGREN:  Okay.  Lexitas, I
13      just sent an exhibit a moment ago.
14      Could you check to see if you have it?
15           DOCUMENT TECHNICIAN:  You sent it
16      to me directly?
17           MR. LUNDGREN:  Yes.  Is this
18      Mr. Torres?
19           DOCUMENT TECHNICIAN:  Yes.
20           MR. LUNDGREN:  Yes, I just sent
21      it to you.
22           DOCUMENT TECHNICIAN:  All right.
23      Give me one second.
24           Okay.  I have it.  It's in the
25      chat.
```

227

```
 1       M. SACKLER - HIGHLY CONFIDENTIAL
 2              MR. LUNDGREN:  Can we mark this
 3       Exhibit 36.
 4              (MS Exhibit 36, E-mail chain,
 5       remotely introduced and provided
 6       electronically to the reporter.)
 7   BY MR. LUNDGREN:
 8       Q.    The top e-mail is an e-mail from
 9   Craig Landau to John Stewart.  It's dated
10   November 25, 2008.  The subject is REMS
11   memo for the Board.  This is a longer
12   e-mail chain.  So if you wanted to have a
13   moment, we could go off the record?
14       A.    Yes, please.
15              MR. HURLEY:  Let's go off the
16       record.
17              THE VIDEOGRAPHER:  The time is
18       11:40.  We are going off the record.
19              (Recess taken from 11:40 p.m. to
20       11:46 p.m.)
21              THE VIDEOGRAPHER:  The time is
22       11:46 and we are back on the record.
23   BY MR. LUNDGREN:
24       Q.    I direct your attention to the
25   bottom e-mail, it's from Marianna Sackler
```

228

M. SACKLER - HIGHLY CONFIDENTIAL

to Craig Landau, Mike Innaurato, LaDonna

Steiner, I think those are names we saw a

moment ago.  It says, "Attached you will

find a text memo for the Board summarizing

the first blue ribbon panel.  As I would

like to get this out to the Board before

Thanksgiving so they will have time to read

the memo before reading any information

they will receive about the briefing

documents and REMS work we are doing, if

you would be so kind as to make your

comments and get them back to me by

tomorrow afternoon."

        Do you see that?

   A.    Yes.

   Q.    And do you see the e-mail right

above it, it's from Marianna Sackler to

Annie Sackler ████████████████████

        Do you see that?

   A.    Yes.

   Q.    It reads, the first paragraph

says, "Annie would like to send the Board a

high-level summary of the REMS blue ribbon

panel meeting she's prepared.  Since she

229

```
1        M. SACKLER - HIGHLY CONFIDENTIAL

2    joined us some weeks ago, Annie has spent

3    most of her time involved with REMS-related

4    activities, including taking notes during

5    the panel meeting, summarizing the meeting

6    for internal purposes was a deliverable we

7    had spoken about."

8            And continue to the next

9    paragraph, "Annie's done nice work for us

10   and has truly added value.  As such, I'm

11   supportive of her desire to send a

12   high-level summary to the Board."

13           Do you see that?

14       A.   Yes.

15       Q.   See the next sentence, "I'm also

16   fairly certain she's proud to be

17   meaningfully involved."

18           Do you see that?

19       A.   Yes.

20       Q.   "While the document could use

21   some attention, I don't believe the time

22   required for a thorough review/rewrite by

23   myself or any of the team members is

24   indicated in this case.  What are your

25   thoughts?"
```

230

```
 1        M. SACKLER - HIGHLY CONFIDENTIAL

 2            Do you see that?

 3     A.    Yes.

 4     Q.    Okay.

 5            And I'd like to draw your

 6   attention to the attachment, which says,

 7   "Draft for discussion November 17, 2008.

 8   Discussion summary, REMS blue ribbon panel,

 9   prepared by Marianna Sackler on behalf of

10   Purdue REMS core team."

11            Do you see that?

12     A.    Yes.

13     Q.    Does that shed any light as to

14   whether you were a part of the REMS core

15   team?

16     A.    As I said, I don't remember, but

17   if that's what I was referring to at the

18   time, then that would appear so.

19     Q.    We talked about the banding

20   together strategy a moment ago.  Do you

21   know if there was any resolution to the

22   banding together strategy?

23            MS. LEVENTHAL:  Object to form.

24            THE WITNESS:  Sorry.

25            MS. LEVENTHAL:  I'm sorry.  Just
```

Highly ConfidentialMarianna Sackler - September 02, 2020

231

```
 1      M. SACKLER - HIGHLY CONFIDENTIAL
 2       an objection.
 3       A.    I don't remember if there was or
 4   there was not.
 5             MR. LUNDGREN:  Lexitas, can you
 6       bring up Document LL, please.  This
 7       will be Exhibit 37.
 8             (MS Exhibit 37, E-mail string,
 9       Bates stamped PPLPC 06200002162,
10       remotely introduced and provided
11       electronically to the reporter.)
12             MS. LEVENTHAL:  After this
13       document, I think we will have been
14       going for about a little more than an
15       hour.  Then I would just ask that when
16       you're done with the next document we
17       could take a break.
18             MR. LUNDGREN:  Sure.  Happy to.
19       Like I said, any time.
20             MS. LEVENTHAL:  Great.
21   BY MR. LUNDGREN:
22       Q.    So this is Bates PPLPC
23   06200002162?
24       A.    Hold on.  I think I have the
25   wrong document.  Would you mind sending
```

232

```
 1      M. SACKLER - HIGHLY CONFIDENTIAL

 2    that through again, please?

 3            MS. LEVENTHAL:  Yes, Document II

 4       is in the chat and not Document LL.

 5            DOCUMENT TECHNICIAN:  Sure.  One

 6       second.  Sorry about that.

 7            THE WITNESS:  Not to worry.

 8       Thank you.

 9    BY MR. LUNDGREN:

10      Q.    So this is an e-mail chain again.

11    If you want to take a brief moment to

12    review it, I realize we have a break coming

13    in a moment, but I'm happy to go off the

14    record if you need a moment.

15            The top email is from Richard

16    Sackler, it's dated December 4, 2008 and

17    it's to a fair number of Sackler names,

18    also Peter Boer.  The subject reads "Urgent

19    FDA follow-up on OxyContin REMS."

20            Would you like a moment to review

21    the e-mail?

22      A.    Yeah, it shouldn't take too long.

23            MR. LUNDGREN:  Let's go off the

24       record.

25            THE VIDEOGRAPHER:  The time is
```

M. SACKLER - HIGHLY CONFIDENTIAL

11:52.  We're going off the record.

(Recess taken at 11:52 p.m.)

THE VIDEOGRAPHER:  The time is

11:52 and we are back on the record.

BY MR. LUNDGREN:

Q.    I'd like to direct your attention to the second page.  The e-mail from Craig Landau on December 4, 2008 and there are several e-mail addresses.

Do you know who Karen Becker is?

A.    The name is familiar.  I don't remember who she is.

Q.    Do you know who Maria Gordian is?

A.    Yes.

Q.    Who is Maria Gordian?

A.    Maria Gordian is a consultant or was a consultant for McKinsey who was working on projects with Purdue.

Q.    And were you working with her?

A.    I did work with Maria.

Q.    Do you know who

████████████████████████

A.    I do not.

Q.    Anthony Santopolo?

234

1          M. SACKLER - HIGHLY CONFIDENTIAL

2          A.     I do not.

3          Q.     Nancy Camp-Font?

4          A.     I do not.

5          Q.     The e-mail from Craig Landau

6     says, "Colleagues, please see attached

7     letters received today from FDA.  In short,

8     we've been asked not to submit a REMS for

9     currently marketed OxyContin or our new

10    formulation until we hear back from FDA.

11    Apparently, the agency is in the process of

12    making some decisions on the content and

13    implementation for REMS on a class-wide

14    basis."

15               Do you see that?

16         A.     Yes.

17         Q.     And I would like to now draw your

18    attention to the first page.

19               Do you see the bottom e-mail from

20    Howard Udell that's just four very large

21    exclamation points?

22         A.     I see that.

23         Q.     And do you see the top e-mail

24    from your father Richard Sackler to a few

25    Sackler names there, and Peter Boer, dated

235

```
1       M. SACKLER - HIGHLY CONFIDENTIAL

2    December 4, 2008 and Richard Sackler says,

3    "This is very good news.  It appears that

4    we will be grouped with other opioids that

5    are potentially abusable and there will be

6    a class REMS."

7              Do you see that?

8       A.    I do.

9              MR. HURLEY:  Okay.  Now is a good

10          time for a break.  I'm happy to go off

11          the record.

12             THE VIDEOGRAPHER:  The time is

13          11:55 and we're going off the record.

14             (Recess taken from 11:55 p.m. to

15          12:04 a.m.)

16             THE VIDEOGRAPHER:  The time is

17          12:04 a.m. and we are back on the

18          record.

19             MR. LUNDGREN:  Lexitas, can you

20          please pull up the document that I

21          just sent to you?

22             This is an e-mail that is Bates

23          stamped PPLPC 04200016174.  This would

24          be Exhibit 38.

25             (MS Exhibit 38, E-mail string,
```

236

```
 1        M. SACKLER - HIGHLY CONFIDENTIAL

 2          Bates stamped PPLPC 04200016174,

 3          remotely introduced and provided

 4          electronically to the reporter.)

 5   BY MR. LUNDGREN:

 6        Q.   The top e-mail is from Marianna

 7   Sackler to Richard Sackler sent on November

 8   6, 2008.

 9             I realize there's a little bit of

10   text here, so if you want a chance to look

11   at it, we can go off the record very

12   briefly.

13             Do you want a moment to review?

14        A.   Why don't you direct me to the

15   section and if I need more time, I'll let

16   you know.

17        Q.   That's fair.

18             I'm going to be asking you about

19   the substance of it.  I'm not going to be

20   reading any portion of it.  I'm going to be

21   asking you which problem you were trying to

22   solve here.

23        A.   Okay, I'll take a minute to read.

24             THE VIDEOGRAPHER:  The time is

25          12:06 and we're going off the record.
```

237

M. SACKLER - HIGHLY CONFIDENTIAL

(Recess taken from 12:06 p.m. to
12:08 a.m.)

THE VIDEOGRAPHER:  The time is
12:08 and we are back on the record.

BY MR. LUNDGREN:

Q.    So if I direct your attention to
the bottom e-mail, which is from Marianna
Sackler to Kenneth Yoon at McKinsey.  Do you
know who Kenneth Yoon is?

A.    He was a consultant on one of the
projects.

Q.    Maria Gordian and Craig Landau.
Do you recognize ███████████

A.    That's one of my father's e-mail
addresses.

Q.    Is this e-mail your brainstorming
about some of the hang-ups in the
logistical planning of the REMS?

MS. LEVENTHAL:  Objection.

A.    Upon reading this e-mail, it
appears that these are thoughts that have
come out of conversations I've had more
specifically about one of the elements of
the REMS.

UNREDACTED - SUBJECT TO FESTERLING OBJECTION RE: PRIVILEGED COMMUNICATIONS - TRIP 72 of 102 TO PROTECTIVE ORDER

238

1    M. SACKLER - HIGHLY CONFIDENTIAL

2        Q.    And this was solutions that you

3    had come up with?

4        A.    I don't remember if these were

5    solutions that I came up with or if these

6    ideas were ideas that were raised when I

7    was speaking with, as it states above,

8    Joachim, Tony, or Jing, or perhaps anybody

9    else.  I don't know.

10       Q.    In your work as project crisis

11   coordinator, did you have to coordinate

12   with different parties in expectation of a

13   meeting with the FDA in January 2009?

14       A.    I'm sorry, to ask you, can you

15   just rephrase the question just a little

16   bit?  I want to make sure I understand you

17   clearly so that I'm answering correctly.

18       Q.    Did you coordinate with different

19   parties in connection with a meeting with

20   the FDA in January 2009?

21       A.    So I don't remember which parties

22   I might have coordinated with, but I was

23   involved in preparing for the meeting with

24   the FDA in 2009.

25       Q.    This was a meeting that Purdue

UNREDACTED - SUBJECT TO PROFESSIONALS' EYES ONLY AND CONTAINS CONFIDENTIAL AND PRIVILEGED
COMMUNICATIONS - TRIBAL SUBJECT TO PROTECTIVE ORDER

239

1    M. SACKLER - HIGHLY CONFIDENTIAL

2   had requested?

3        A.    I don't remember.

4        Q.    Was Purdue wanting to reach

5   agreement with the FDA on the content of

6   the resubmission of the reformulated

7   OxyContin controlled-release?

8        A.    I don't remember.

9        Q.    Was Purdue wanting to get

10  feedback and additional testing data in the

11  implementation process for the new

12  OxyContin?

13       A.    I don't remember.

14            MR. LUNDGREN:  Lexitas, can you

15       bring up Document Q, please?  This

16       will be Exhibit 39.

17            (MS Exhibit 39, E-mail, Bates

18       stamped PDD 9316100647, remotely

19       introduced and provided electronically

20       to the reporter.)

21            MS. LEVENTHAL:  Can you please

22       state the Bates and confidentiality

23       designation?

24            MR. LUNDGREN:  Highly

25       Confidential, PDD 9316100647.

UNREDACTED - SUBJECT TO FURTHER CONFIDENTIALITY REVIEW - CONTAINS PRIVILEGED COMMUNICATIONS - TREATED AS SUBJECT TO PROTECTIVE ORDER

19-23649-shl Doc 2166-5 Filed 12/18/20 Entered 12/18/20 18:47:42 Exhibits 66 Pg 74 of 102

240

M. SACKLER - HIGHLY CONFIDENTIAL

BY MR. LUNDGREN:

     Q.    This is an e-mail from Marianna
Sackler to several Sacklers,

     Peter Boer      sent January 15, 2009.
Subject is "Overview of mock FDA meeting of
January 14, 2009."

          I'm going to direct your
attention to the second page and the second
paragraph.  You say, "Lastly, per your own
reference, I've attached the finalized
briefing document submitted to FDA in
December, along with the two appendices for
your own reference."

          Right after that you say, "As I
hope you are all aware, there will be
another mock meeting held on Monday in
Stamford, in conference room 2F at 1600
Summer Street (of course, subject to
change), where we hope you can come and
participate."

          So this is an e-mail from you to
members of the Purdue Board, is that
correct?

     A.    To the Board inclusive of in the

241

1    M. SACKLER - HIGHLY CONFIDENTIAL

2    cc line John Stewart.

3        Q.    Did board members show up for the

4    meeting that you're proposing?

5        A.    I don't remember.

6        Q.    You were giving them briefing

7    documents in preparation for the FDA

8    meeting?

9        A.    I'm sorry, what was the question?

10   I couldn't hear you clearly.

11       Q.    You were giving them briefing

12   documents in preparation for the FDA

13   meeting?

14       A.    It appears that that is what I

15   referenced, yes.

16       Q.    I'm going to direct your

17   attention to, this will be the fourth page

18   of this document.  So it's page 2 of 15 and

19   the Bates is PDD 9316100654.  I want to

20   direct your attention under 5, where it

21   says "A, purpose of the meeting."

22           Do you see where I'm reading?

23       A.    Yes.

24       Q.    It says, "Purdue has requested

25   this meeting for two reasons."  There is a

242

```
 1      M. SACKLER - HIGHLY CONFIDENTIAL

 2    1 and a 2.

 3            1 says "To reach agreement with

 4    FDA on the content of our resubmission by

 5    understanding which new data should be

 6    provided to support approval of this new

 7    formulation of OxyContin controlled-release

 8    (new CCR).  In contrast to our proposed

 9    label submitted as part of NDA 22-272, we

10    no longer seek labeling or claims for

11    'tamper-resistance' or any express or

12    implied claim of reduced potential for

13    misuse, abuse or diversion attributable to

14    this new formulation."

15            Do you see that?

16      A.    Yes.

17      Q.    And underneath that under number

18    2, it says, "To gain specific feedback

19    and/or agreement on plans for additional

20    testing of the physical and chemical

21    properties of the new formulation; our plan

22    to submit new data for the 60 and 80

23    milligram strength tablets, so that all

24    tablet strengths from 10 to 80 for the new

25    OCR can be approved and replace all
```

243

1     M. SACKLER - HIGHLY CONFIDENTIAL

2    strengths of the existing formulation at

3    the soonest possible time; and our proposed

4    mechanism for replacing the currently

5    marketed formulation with the new

6    formulation."

7          Do you see where I'm reading?

8     A.    Yes.

9     Q.    And that's under the section, the

10   purpose of the meeting?

11    A.    Yes.

12    Q.    Do you recall how frequently you

13   were communicating with board members at

14   this time?

15    A.    I don't remember.

16          MR. LUNDGREN:  Lexitas, can we

17       bring up Document P, please?  This is

18       Exhibit 40.  This is PPLPC

19       019000254443.  This e-mail is from

20       Marianna Sackler on January 14, 2009

21       to Craig Landau, Brianne Weingarten,

22       with a cc to Pasha Sarraf.

23          (MS Exhibit 40, E-mail, Bates

24       stamped PPLPC 019000254443, remotely

25       introduced and provided electronically

244

```
 1      M. SACKLER - HIGHLY CONFIDENTIAL

 2       to the reporter.)

 3      A.    Yes.

 4      Q.    Do you know who Pasha Sarraf is?

 5      A.    Pasha Sarraf was another one of the

 6    McKinsey consultants who worked on this

 7    project.

 8      Q.    Did you work closely with Pasha

 9    Sarraf?

10      A.    Yes.

11      Q.    Okay.  I'm looking at the second

12    paragraph.  It says, "Pasha mentioned to me

13    the possibility of board involvement in the

14    meeting on Monday.  If indeed the Board is

15    to be invited to the meeting on Monday, I

16    have a few suggestions as to how we can

17    smoothly integrate them into the process

18    without causing unnecessary roadblocks."

19           Do you see that?

20      A.    Yes.

21      Q.    What were the unnecessary

22    roadblocks?

23      A.    As I'm sure many would

24    appreciate, the Board has multiple

25    different responsibilities, not to mention
```

Highly Confidential    Marianna Sackler - September 02, 2020

247

1     M. SACKLER - HIGHLY CONFIDENTIAL

2     Jon was particularly interested?

3         A.    Also because I'm quite close with

4     my uncle.  So he would have been curious to

5     know about my involvement.

6         Q.    Did your father provide comments

7     to you regarding aspects of the project

8     that you were working on?

9         A.    I imagine that he would have, but

10    I don't remember.

11            MR. LUNDGREN:  Lexitas, can we

12        have Document R, please.  This is

13        Exhibit --

14            DOCUMENT MODERATOR:  41.

15            MR. LUNDGREN:  Exhibit 41.

16            It's Bates stamped PDD

17        9316103060.

18            MS. LEVENTHAL:  What is the

19        confidentiality designation?

20            MR. LUNDGREN:  Highly

21        Confidential.

22            MS. LEVENTHAL:  Thank you.

23            (MS Exhibit 41, E-mail string,

24        Bates stamped PDD 9316103060, remotely

25        introduced and provided electronically

248

```
 1        M. SACKLER - HIGHLY CONFIDENTIAL
 2          to the reporter.)
 3    BY MR. LUNDGREN:
 4        Q.    The second e-mail here is from
 5    Richard Sackler to Marianna Sackler.  It
 6    begins, "Here are my thoughts about the FDA
 7    meeting next week and the planning for this
 8    meeting.  The preparation for the meeting
 9    at the agency is at a very high level of
10    sophistication."
11            Do you see that?
12        A.    Yes.
13        Q.    I'm directing your attention to
14    the Roman -- sorry, not Roman Numeral --
15    but number 4 and sub B.  It says, "We will
16    start shipping the OTR formulation in place
17    of the original formula as quickly as we
18    can."
19            Do you understand what OTR stands
20    for?
21        A.    It's my understanding that that
22    is the tamper-resistant formulation.
23        Q.    The top e-mail is from Marianna
24    Sackler to Laura Nelson Kearney at
25    McKinsey.  Do you know who Laura Nelson
```

Highly Confidential    Marianna Sackler - September 02, 2020

249

1        M. SACKLER - HIGHLY CONFIDENTIAL

2    Kearney is?

3        A.    She was one of the McKinsey

4    consultants working on this particular

5    project.

6        Q.    And there are a couple of letters

7    missing from the first -- from the margin

8    here, but it appears to say, "Dear All,

9    sorry for the delay in getting this to you.

10   As you can see, my father has some comments

11   about the preparation."

12           Do you see where I've read that?

13       A.    Yes.

14       Q.    Do you think that's a fair

15   reading?  I realize there was a letter

16   missing from each line, but does that seem

17   a fair reading of those sentences?

18       A.    It's the same fair reading that I

19   would have given it.

20       Q.    Would it be fair to say you were

21   in frequent contact with the McKinsey team

22   on this project?

23       A.    Yes.

24       Q.    And you were impressed with the

25   work that they did?

Highly ConfidentialMarianna Sackler - September 02, 2020

250

1     M. SACKLER - HIGHLY CONFIDENTIAL

2     A.    I was very impressed with the

3  work that they did.

4     Q.    Ultimately, the reformulation was

5  approved by the FDA, correct?

6     A.    That's my understanding.

7     Q.    But you don't know for sure?

8     A.    I believe it was.

9        MR. LUNDGREN:  Lexitas, can you

10       bring up Document MM, please.  I

11       believe this will be Exhibit 42.  This

12       is Bates labeled PPLPC 039000468372,

13       marked Confidential.

14          The top e-mail is from Marianna

15       Sackler to Craig Landau.  The subject

16       is regarding forward congratulations

17       deserved for a job well done.

18          (MS Exhibit 42, E-mail string,

19       Bates stamped PPLPC 039000468372,

20       remotely introduced and provided

21       electronically to the reporter.)

22  BY MR. LUNDGREN:

23     Q.    And this is a longer e-mail

24  chain, so if you want to take a minute to

25  review it, I'm happy to go off the record.

251

```
 1        M. SACKLER - HIGHLY CONFIDENTIAL

 2        A.    All right.  It shouldn't take me

 3   more than a minute.

 4             MR. LUNDGREN:  Off the record.

 5             THE VIDEOGRAPHER:  The time is

 6        12:27.  We're going off the record.

 7             (Recess taken from 12:27 a.m. to

 8        12:28 a.m.)

 9             THE VIDEOGRAPHER:  The time is

10        12:28 and we are back on the record.

11   BY MR. LUNDGREN:

12        Q.    So looking at the top e-mail, it

13   says "Craig, thank you so much for

14   following up.  Both my parents and I feel

15   that you have had the unique opportunity to

16   observe my professional strengths and work

17   style.  It would mean so much to me if you

18   would take the time to write a letter of

19   recommendation on my behalf for the three

20   business schools I will be applying to in

21   January.  As of now, I've submitted

22   application to Yale, Wharton, and by the

23   end of this week NYU.  However, I have

24   Harvard, Columbia and Georgetown ahead of

25   me."
```

263

1     M. SACKLER - HIGHLY CONFIDENTIAL

2  pharmacy is January through June 2006.

3         Do you see that?

4     A.    Yes.

5     Q.    Do you see there's a file right

6  after that that's total monthly dollar

7  sales for OxyContin and generics and other

8  products in the relevant opioid markets,

9  including single entity and combination

10 products and retail long-term care and

11 hospital channels from January 1996 to

12 December 2005.

13        Do you see that?

14    A.    Yes.

15    Q.    And after that, trends in

16 OxyContin use by pain condition, and that

17 is from year-end 1996 to 2005.

18        Do you see that?

19    A.    Yes.

20    Q.    And then she says she will follow

21 up with regard to the number of

22 prescribers.

23        You wrote that e-mail in, the

24 request in July 2006, is that right?

25    A.    Yes.

UNREDACTED - subject to further confidentiality review - CONTAINS PRIVILEGED
COMMUNICATIONS - TRIBUTED SUBJECT TO PROTECTIVE ORDER

264

```
 1        M. SACKLER - HIGHLY CONFIDENTIAL
 2        Q.    You were looking at the U.S. as
 3   an example of success in sales and
 4   marketing OxyContin, correct?
 5        A.    We were looking at the U.S. in
 6   terms of their sales and marketing as of
 7   foundation.  They had a lot more history in
 8   the product than Italy at the time.
 9        Q.    You wanted to follow in their
10   footsteps?
11        A.    That's what I say.  Don't know
12   what I meant at the time.
13        Q.    When you wrote that e-mail in
14   2006, were you aware of media reports of
15   widespread abuse and diversion of
16   OxyContin?
17        A.    I don't remember.
18        Q.    When you wrote that e-mail were
19   you aware of the risk of abuse that
20   OxyContin possessed?
21        A.    I don't know what I knew at the
22   time.
23        Q.    When you wrote that e-mail, did
24   you know that Purdue was under federal
25   investigation for committing crimes
```

265

```
 1      M. SACKLER - HIGHLY CONFIDENTIAL
 2   marketing OxyContin in the U.S.?
 3      A.    I don't remember.
 4      Q.    When you wrote that e-mail had
 5   you talked with your family about the
 6   investigation of Purdue in the U.S.?
 7      A.    I don't remember.
 8      Q.    Have you ever talked with your
 9   family about the investigation of Purdue in
10   the U.S.?
11      A.    At some point, I'm sure.
12      Q.    Sitting here right now, can you
13   think of a single conversation you had with
14   your family about the 2007 investigation of
15   Purdue?
16      A.    I can't remember right now, no.
17      Q.    Less than a year after you wrote
18   that e-mail, Purdue pled guilty to felony
19   misbranding of OxyContin, didn't it?
20      A.    I don't know.
21      Q.    You don't know whether that
22   happened?
23      A.    I don't know if it was less than
24   a year.
25      Q.    Are you aware that it happened?
```

266

```
 1        M. SACKLER - HIGHLY CONFIDENTIAL

 2        A.    I am aware that it happened.

 3        Q.    Are you aware that Purdue paid

 4   $600 million in criminal and civil

 5   penalties and fines to resolve the crimes?

 6            MS. LEVENTHAL:  Objection to

 7        form.

 8        A.    I'm aware that Purdue paid a

 9   penalty.

10        Q.    You don't know how much?

11        A.    I don't remember how much.

12        Q.    Do you know whether it was more

13   than $500 million?

14        A.    I don't remember.

15        Q.    Did you know that Purdue's

16   executives also pled guilty to misbranding?

17            MS. LEVENTHAL:  Objection to

18        form.

19        A.    I don't know.

20        Q.    You don't know if Purdue

21   executives pled guilty to misbranding?

22        A.    I know that Purdue executives

23   pled guilty.  I don't remember what it was

24   that they pled guilty to.

25        Q.    Do you think your father Richard
```

267

```
1        M. SACKLER - HIGHLY CONFIDENTIAL

2   Sackler was aware of the illegal promotion

3   that led to this indictment?

4           MS. LEVENTHAL:  Objection.

5       A.    I don't presume to know what my

6   father was or was not aware of, but I don't

7   believe that he was aware of any illegal

8   actions taking place.

9       Q.    Wasn't he the head of research

10  and development when OxyContin came to the

11  market?

12      A.    I don't know if he was the head

13  of research and marketing or research and

14  development at the time that OxyContin came

15  to market.

16      Q.    Do you know anything about his

17  job responsibilities when OxyContin came to

18  the market?

19      A.    I do not.

20      Q.    Do you know if he played any role

21  at all -- do you know if your father played

22  a role in bringing OxyContin to market?

23      A.    Apologies.  Do you need me to

24  answer that again?  I don't know.

25      Q.    Do you recall what your father's
```

268

```
 1      M. SACKLER - HIGHLY CONFIDENTIAL

 2   reaction was when you chose to work at

 3   Mundipharma Italy?

 4      A.    I don't remember, no.

 5           MR. LUNDGREN:  Lexitas, can we

 6      bring up Document H, please?  This is

 7      Exhibit 44.

 8           I believe 44 was PPLPC

 9      021001114014.  It was also Document E.

10      That's what my notes have, but I could

11      be wrong.

12           (MS Exhibit 44, E-mail chain,

13      Bates stamped PPLPC 021001114014,

14      remotely introduced and provided

15      electronically to the reporter.)

16           MS. LEVENTHAL:  So this is

17      Exhibit 45, correct?  Just so the

18      record is clear.

19           DOCUMENT TECHNICIAN:  That's what

20      I have.

21   BY MR. LUNDGREN:

22      Q.    This is an e-mail chain PPLPUCC

23   000657320.  It's marked Confidential from

24   Richard Sackler to Marianna Sackler.  I

25   direct your attention to the bottom e-mail
```

UNREDACTED - SUBJECT TO PROFESSIONAL EYES' ONLY AND IN PART TO PRIVILEGED
COMMUNICATIONS - TRIBUTE TO PROTECTIVE ORDER

275

```
 1      M. SACKLER - HIGHLY CONFIDENTIAL

 2  father about the criminal conviction?

 3      A.    I don't remember.

 4            MR. LUNDGREN:  Lexitas, can we

 5      bring up Document U, please?

 6            I believe this is Exhibit 47.

 7            (MS Exhibit 47, E-mail chain,

 8      remotely introduced and provided

 9      electronically to the reporter.)

10  BY MR. LUNDGREN:

11      Q.    This is an e-mail from Richard

12  Sackler to Marianna Sackler, the subject is

13  "A Huffington Post article."  There is a

14  little bit of an e-mail chain.  So if you

15  want a minute to look at it for context,

16  you can do that.

17            Let's go off the record if you'd

18  like to do that.

19      A.    Sure.

20            MR. HURLEY:  Let's go off the

21      record.

22            THE VIDEOGRAPHER:  The time is

23      1:06 a.m.  We're going off the record.

24            (Recess taken at 1:06 a.m.)

25            THE VIDEOGRAPHER:  The time is
```

UNREDACTED Version OF Document 2166-5 Filed 12/18/20 Entered 12/18/20 18:47:42 Main Document Exhibit 66 PRIVILEGED COMMUNICATIONS - TREATED UNDER SUBJECT TO PROTECTIVE ORDER
19-23649-shl    Doc 2166-5    Filed 12/18/20    Entered 12/18/20 18:47:42    Exhibit 66
Pg 91 of 102

Highly ConfidentialMarianna Sackler - September 02, 2020

276

```
1        M. SACKLER - HIGHLY CONFIDENTIAL

2          1:06 a.m. and we are back on the

3          record.

4    BY MR. LUNDGREN:

5        Q.    I'm looking at the second e-mail

6    in the chain and I'm looking at the last

7    full paragraph.  It says Marianna Sackler,

8    Richard Sackler.  It says, "If it's okay

9    with you, I would like to forward this to

10   Amanda and Adam, my two friends who called

11   me to make sure we were doing okay."

12           Forwarding "this," is that a

13   reference to the article that follows?

14       A.    That's my understanding of

15   reading this.

16       Q.    And I'd like to draw your

17   attention to the top e-mail from Richard

18   Sackler to Marianna Sackler.  He responds,

19   "Sure, and send them the facts, the

20   document that was submitted by both the

21   U.S. prosecutor and us to the federal judge

22   as the only statement of facts."  Facts is

23   italicized.  "This is the true facts."

24           Do you see that?

25       A.    Yes.
```

UNREDACTED 19-23649-shl Doc 2166-5 Filed 12/18/20 Entered 12/18/20 18:47:42 Main Exhibit 66 PRIVILEGED COMMUNICATIONS - TRPg 92 of 102 TO PROTECTIVE ORDER

Highly ConfidentialMarianna Sackler - September 02, 2020

277

1     M. SACKLER - HIGHLY CONFIDENTIAL

2       Q.    You subsequently sent the Agreed

3   Statement of Facts to your friends, is that

4   right?

5       A.    I don't remember.

6       Q.    Do you know if you've ever seen

7   the Agreed Statement of Facts that your

8   father was referring to?

9       A.    I don't know.

10           MR. LUNDGREN:  Lexitas, can we

11       have Exhibit B, please -- Document B,

12       sorry, which will be Exhibit 48.

13           (MS Exhibit 48, Agreed Statement

14       of Facts, remotely introduced and

15       provided electronically to the

16       reporter.)

17  BY MR. LUNDGREN:

18       Q.    This is the Agreed Statement of

19   Facts in the United States of America

20   versus Purdue Frederick Company, Inc.,

21   d/b/a The Purdue Frederick Company, Michael

22   Friedman, Howard Udell, Paul Goldenheim.

23       A.    I'm not sure that that's what

24   I've received.

25           MS. LEVENTHAL:  Yeah, I think you

Highly ConfidentialMarianna Sackler - September 02, 2020

278

```
 1      M. SACKLER - HIGHLY CONFIDENTIAL
 2       have the wrong document attached.
 3       Exhibit B is an e-mail.
 4            MR. LUNDGREN:  I'm sorry, Exhibit
 5       V as in victory.  Sorry about that.
 6            MS. LEVENTHAL:  Should this
 7       document be withdrawn and Exhibit 48
 8       remarked?
 9            MR. LUNDGREN:  Yes, let's do
10       that.
11            DOCUMENT TECHNICIAN:  No problem.
12       One second.
13            MR. LUNDGREN:  Sorry, do we have
14       Exhibit 48 now as Document V or are we
15       still in the process?
16            DOCUMENT TECHNICIAN:  We have
17       marked it as 48.  So we are all set.
18     BY MR. LUNDGREN:
19       Q.   As I said, this is the Agreed
20     Statement of Facts in the case of United
21     States of America versus the Purdue
22     Frederick Company, Inc., d/b/a the Purdue
23     Frederick Company, Michael Friedman, Howard
24     Udell, Paul Goldenheim.
25            Seeing this front page, does this
```

UNREDACTED shl Doc 2166-5 Filed 12/18/20 Entered 12/18/20 18:47:42 IN PART PRIVILEGED
COMMUNICATIONS - TRIPP SUBJECT TO PROTECTIVE ORDER

279

1      M. SACKLER - HIGHLY CONFIDENTIAL

2   refresh your recollection as to whether

3   you've seen the Agreed Statement of Facts?

4      A.    I have.

5      Q.    I'd like to direct your attention

6   to paragraph 29.

7      A.    Okay, I'm there.

8      Q.    It says, "In or about May 1997,

9   certain Purdue supervisors and employees

10  stated that while they were well aware of

11  the incorrect view held by many physicians

12  that OxyCodone is weaker than morphine,

13  they did not want to do anything to make

14  physicians think that OxyCodone was

15  stronger or equal to morphine or to take

16  any steps in the form of promotional

17  materials, symposia, clinicals,

18  publications, conventions or communications

19  with the field force and would affect the

20  unique position that OxyContin had in many

21  physicians' minds."

22          Do you see that?

23      A.    Yes.

24      Q.    Do you know who those certain

25  Purdue supervisors and employees were?

280

```
1        M. SACKLER - HIGHLY CONFIDENTIAL

2        A.    I do not.

3        Q.    Do you know why they weren't

4    identified?

5        A.    I do not.

6        Q.    Do you know if it was done to

7    protect the family?

8        A.    I do not.

9        Q.    Did you ever discuss this with

10   your father?

11       A.    I have not.

12       Q.    Did you ever ask him if he's one

13   of the people described in the statement of

14   facts?

15       A.    No, I have not.

16            MR. LUNDGREN:  Lexitas, can we

17       bring up Document W, which will be

18       Exhibit 49.  It's Bates stamped PDD

19       8801141848.

20            (MS Exhibit 49, E-mail string,

21       Bates stamped PDD 8801141848, remotely

22       introduced and provided electronically

23       to the reporter.)

24   BY MR. LUNDGREN:

25       Q.    The top e-mail is an e-mail from
```

281

1      M. SACKLER - HIGHLY CONFIDENTIAL

2    Dr. Richard Sackler -- sorry, from

3    Dr. Richard Sackler to Michael Friedman

4    sent Thursday, June 12, 1997, and your

5    father says, "I think that you have this

6    issue well in hand.  If there are any

7    developments, please let me know."

8          Do you see that?

9      A.    I see that.

10     Q.    The e-mail underneath it begins,

11   "In recent team meetings, we have been

12   discussing" -- sorry, let me start over.

13          "In recent team meetings, we have

14   discussed the issue that OxyContin is

15   perceived by some physicians, particularly

16   oncologists, as not being as strong as MS

17   Contin.  Although this perception has had

18   some effect with physicians switching to MS

19   Contin with more severe cancer pain

20   patients, it has actually had a positive

21   effect with physician's use in non-cancer

22   pain.  Since OxyCodone is perceived as

23   being a weaker opioid than morphine, it has

24   resulted in OxyContin being used much

25   earlier for non-cancer pain.  Physicians

282

```
 1      M. SACKLER - HIGHLY CONFIDENTIAL
 2   are positioning this product with Percocet,
 3   hydrocodone and Tylenol with Codeine have
 4   been traditionally used.  Since the
 5   non-cancer pain market is much greater than
 6   the cancer pain market, it is important
 7   that we allow this product to be positioned
 8   where it currently is in the physician's
 9   mind.  If we stress the power of OxyContin
10   versus morphine, it may help us in the
11   smaller cancer pain market, but hurt us in
12   the larger potential non-cancer pain
13   market.  Some physicians may start
14   positioning this product where morphine is
15   used and wait until pain is severe before
16   using it.  Marketing has decided that the
17   efforts of the Phase 4 team should be
18   predominantly focused on expanding
19   OxyContin use for non-cancer pain.  Our
20   approach to cancer pain will be to get
21   physicians to use it earlier instead of
22   products such as Percocet, Vicodin, Tylenol
23   #3.  The sales force can teach the
24   oncologists to properly dose and titrate
25   OxyContin to ensure that they stay with it
```

283

```
 1       M. SACKLER - HIGHLY CONFIDENTIAL
 2    as the pain increases.  By doing this, the
 3    oncologists will realize through
 4    experienced that OxyContin is effective.
 5            "It is important that we be
 6    careful not to change the perception of
 7    physicians for OxyCodone when developing
 8    promotional pieces, symposia, review
 9    articles, studies, et cetera.  We can
10    discuss this further at our next team
11    meeting."
12            Do you see that?
13       A.    Yes.
14       Q.    Does this change your opinion of
15    who the certain Purdue supervisors and
16    employees were?
17            MS. LEVENTHAL:  Objection.
18       A.    It does not.
19       Q.    Do you know the names of the
20    individuals that pled guilty in the 2007 US
21    DOJ case?
22       A.    I think I do.
23       Q.    Who are they?
24       A.    Paul Goldenheim, Howard Udell and
25    Michael Friedman.
```

284

```
 1        M. SACKLER - HIGHLY CONFIDENTIAL

 2        Q.    Do you consider your family to

 3   have been close with any of those

 4   individuals?

 5        A.    Yes.

 6        Q.    Do you consider your family to

 7   still be close to any of those individuals?

 8        A.    Unfortunately as I stated earlier

 9   Howard Udell has since passed.  We were

10   closed with him until he passed.  And my

11   father remains close with Michael Friedman,

12   and so the family does as well.

13        Q.    You consider yourself to be a

14   close friend of his?

15        A.    Yes.

16        Q.    Did it strain the relationship

17   with your family that an employee from your

18   company pled guilty to a crime?

19        A.    Not in my experience, but I can't

20   speak for others.

21             MR. LUNDGREN:  Lexitas, can we

22        bring up Document X, please.  It will

23        be Exhibit 50, Bates label PPLPUCC

24        000561368.  This is an e-mail from

25        Richard Sackler to Marianna Sackler,
```

UNREDACTED IN OPEN COURT SUBJECT TO PROFESSIONALS' EYES ONLY AND CONTAIN PRIVILEGED
COMMUNICATIONS - TRPR 1001 SUBJECT TO PROTECTIVE ORDER

Highly ConfidentialMarianna Sackler - September 02, 2020

285

```
 1        M. SACKLER - HIGHLY CONFIDENTIAL

 2        CC to Beth Sackler.  The subject is

 3        "List of Mundi/Purdue Pharma related

 4        folks for the wedding."

 5             (MS Exhibit 50, E-mail, Bates

 6        stamped PPLPUCC 000561368, remotely

 7        introduced and provided electronically

 8        to the reporter.)

 9   BY MR. LUNDGREN:

10        Q.    I'd like to direct your attention

11   to the e-mail below it, which is from

12   Marianna Sackler, Dr. Richard Sackler.  It

13   says, "Dad, below you'll see who has

14   already been included and those I'd like to

15   include, but obviously we want to be

16   sensitive to cost and appropriateness of

17   including them."

18             And Michael Friedman is listed as

19   invited, is that correct?

20        A.    Yes.

21        Q.    Did he attend your wedding?

22        A.    To my recollection, yes, but I

23   can't be sure.

24        Q.    Your father didn't object to

25   Michael Friedman attending the wedding?
```

286

```
 1      M. SACKLER - HIGHLY CONFIDENTIAL

 2      A.    No, he did not.

 3      Q.    Did Craig Landau attend the

 4  wedding?

 5      A.    He did not.

 6      Q.    Was he invited?

 7      A.    He was not.

 8      Q.    Did Stuart Baker attend the

 9  wedding?

10      A.    I believe he did.

11      Q.    Did Steve Ives?

12      A.    Steve did not.

13      Q.    Was he invited?

14      A.    He was.

15      Q.    Were you involved in picking

16  Craig Landau to be the CEO?

17      A.    I was not.

18      Q.    Did you have any conversations

19  with your father about Craig Landau being

20  chosen as CEO?

21      A.    I don't recall any conversation

22  prior to him being picked, no.

23      Q.    Do you from time to time share

24  news articles about Purdue with your

25  father?
```

287

M. SACKLER - HIGHLY CONFIDENTIAL

A.     I'm sure in the past I have.

Q.     When was the earliest you
remember sending him an article about
Purdue?

A.     I don't have any specific
recollection.

Q.     Do you send him articles about
the opioid crisis?

A.     I don't remember doing that.

       MR. LUNDGREN:  Lexitas, can we
    bring up Document Y, please.  This is
    Bates labeled PPLPC 045000004037.  It
    will be Exhibit 51.

       (MS Exhibit 51, E-mail, Bates
    stamped PPLPC 045000004037, remotely
    introduced and provided electronically
    to the reporter.)

BY MR. LUNDGREN:

Q.     February 8, 2001 is the date at
of the top e-mail.  I'd like to direct your
attention to the e-mail below it, it's from
████████████████  Is that an e-mail address
of yours?

A.     I don't think so.