**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re: | Chapter 11 |
| PURDUE PHARMA L.P., *et al.*, | Case No. 19-23649 (RDD) |
| Debtors.[1] | Jointly Administered |

## DECLARATION OF DAVIDSON GOLDIN

I, Davidson Goldin, declare:

1. I am the founder of Goldin Solutions, Inc. ("**Goldin**"), a public relations firm based in New York, New York.

2. Goldin was engaged by Joseph Hage Aaronson LLC ("**JHA**") in or about early November 2018 to assist in the defense of Richard Sacker, Jonathan Sackler and David Sackler (the "**Clients**") in connection with national opiate litigation (the "**Litigation**"). A true and correct copy of the November 12, 2018 engagement letter between JHA and Goldin (RSF00666465) (the "**Engagement Letter**") is attached hereto as **Exhibit A**.

3. Goldin undertook this assignment on the understanding, as set forth in the Engagement Letter, that JHA was "concerned that numerous unbalanced and inaccurate media reports about the Clients have appeared and will continue to appear, that this will have an

---

[1] The Debtors in these cases, along with the last four digits of each Debtor's registration number in the applicable jurisdiction, are as follows: Purdue Pharma L.P. (7484), Purdue Pharma Inc. (7486), Purdue Transdermal Technologies L.P. (1868), Purdue Pharma Manufacturing L.P. (3821), Purdue Pharmaceuticals L.P. (0034), Imbrium Therapeutics L.P. (8810), Adlon Therapeutics L.P. (6745), Greenfield BioVentures L.P. (6150), Seven Seas Hill Corp. (4591), Ophir Green Corp. (4594), Purdue Pharma of Puerto Rico (3925), Avrio Health L.P. (4140), Purdue Pharmaceutical Products L.P. (3902), Purdue Neuroscience Company (4712), Nayatt Cove Lifescience Inc. (7805), Button Land L.P. (7502), Rhodes Associates L.P. (N/A), Paul Land Inc. (7425), Quidnick Land L.P. (7584), Rhodes Pharmaceuticals L.P. (6166), Rhodes Technologies (7143), UDF LP (0495), SVC Pharma LP (5717) and SVC Pharma Inc. (4014). The Debtors' corporate headquarters is located at One Stamford Forum, 201 Tresser Boulevard, Stamford, CT 06901.

adverse impact on the Clients in, and in connection with, the Litigation, and that this poses a clear risk and present danger of having a severe and adverse impact on the Clients due to the tainting influence on potential jurors and any other fact-finders concerning the merits of the Litigation." Ex. A, ¶ 2.

4.      Goldin accepted this engagement on the understanding that its role was to assist counsel by working to remediate inaccurate, unfair, and misleading press coverage of the Clients to avoid its having a tainting influence on the legal process.  The Engagement Letter provides that services that JHA retained Goldin to provide include "Goldin's expertise in assessing media coverage regarding the Litigation and seeking accurate news coverage because such coverage may affect decision-makers in the Litigation and protect the Client's legal interests."  *Id*.

5.      The Engagement Letter further specified that "JHA is not retaining Goldin to provide ordinary public relations advice unrelated to the Clients' legal interests in, and in connection with, the Litigation."  *Id*.

6.      Since Goldin was first engaged by JHA, under the supervision of JHA and other counsel for the Clients ("**Counsel**"), Goldin has continually monitored and assessed media coverage regarding the Litigation and the Clients to help identify and correct inaccurate, unfair, and misleading reporting.

7.      Goldin's effort has identified an enormous amount of media that, since November 2018 contains inaccurate, unfair and misleading content about facts and issues that bear directly on the Litigation.  Goldin has also identified incendiary statements, including anti-Semitic attacks and related death threats aimed at members of the Sackler family, that have been disseminated globally on various social media platforms.   Goldin has succeeded in getting dozens of inflammatory social media posts taken down.

8.    The following are only some examples of the many errors that Goldin identified and, together with Counsel, helped correct:

a.    The New York Times corrected its false statement—based on a "filing in a Massachusetts lawsuit"—in a January 15, 2019 article that the "*Sacklers Directed Efforts to Mislead Public About OxyContin,* **New Documents Indicate***,"* to eliminate *"New Documents Indicate"* and instead say "**Court Filing Claims**."  A true and correct copy of the text of the original article is attached at **Exhibit B**, and the corrected article is available at https://www.nytimes.com/2019/01/15/health/sacklers-purdue-oxycontin-opioids.html.

b.    ABC News corrected its January 16, 2019 article about the Massachusetts litigation, which was originally titled, "*Family behind OxyContin knowingly deceived public about safety of the opioid drugs,* **court documents say***,"* to say instead "*Family behind OxyContin knowingly deceived public about safety of the opioid drugs,* **court documents allege**."  A true and correct copy of the text of the original article is attached at **Exhibit C**, and the corrected article is available at https://abcnews.go.com/US/Health/family-oxycontin-knowingly-deceived-public-safety-opioid-drugs/story?id=60428693.

c.    NBC corrected its accusation in a December 29, 2019 editorial, *Opioids, pot and criminal justice report helped undermine this decade's War on Drugs*, that the Sacklers "tried to hide ill-gotten billions overseas" to reflect that this assertion was "[a]ccording to the New York state attorney general," and the "Sacklers have disputed the AG's findings."  A true and correct copy of the text of the original

article is attached at __**Exhibit D**__, and the corrected article is available at

https://www.nbcnews.com/think/opinion/opioids-pot-criminal-justice-reform-

helped-undermine-decade-s-war-ncna1108231.

d.     The New York Times corrected misstatements in a July 22, 2020 op-ed, *The*

*Sacklers Could Get Away With It* (original material stricken; new language in bold

and underscored)*:* "So far, the bankruptcy court has granted injunctions stopping

proceedings in several hundred lawsuits charging that Sackler family members

directed the aggressive marketing campaign ~~**that led to**~~ **for OxyContin; it and**

**other opioids have been implicated in the addictions of** millions of ~~addicted~~

patients and the deaths of several hundred thousand."  The correction added that

"**it is unclear what proportion**" of addiction and opioid deaths "**OxyContin is**

**responsible for**."  A true and correct copy of the text of the original article is

attached at __**Exhibit E**__, and the corrected article is available at

https://www.nytimes.com/2020/07/22/opinion/sacklers-opioid-

epidemic.html?action= click&module=Opinion&pgtype=Homepage.

e.     Fox News corrected misstatements in a February 24, 2020 article, *OxyContin*

*maker Purdue Pharma launches campaign for opioid victims to file claims*

(original material stricken): "Purdue Pharma, the drug company that makes

OxyContin ~~— which has killed 430,000 people in the U.S. over the past two~~

~~decades —~~ launched a $23.8 million ad campaign on Monday alerting victims

where to file claims if they have been affected or harmed by the opioid."  A true

and correct copy of the text of the original article is attached at __**Exhibit F**__, and the

corrected article is available at https://www.foxnews.com/health/oxycontin-

maker-purdue-pharma-opioid-victims-file-claims.

f.    Legal Reader corrected misstatements in an October 18, 2019 article, *Sackler's
are Not Giving Up Enough, Some Say* (new language in bold and underscored):
"All the way back in 2001, for example, after 59 deaths from OxyContin were
reported in one state alone, Richard Sackler responded in an email, 'This is not
too bad.  It could have been far worse.' **[Editor's note: A representative for the
family stated that Dr. Sackler was referring to the totality of a New York
Times article in which the deaths were reported, not the deaths themselves.
In fact, the copy of Dr. Sackler's email does not mention death.]**"  A true and
correct copy of the text of the original article is attached at **Exhibit G**, and the
corrected article is available at https://www.legalreader.com/sacklers-are-not-
giving-up-enough-some-say/.

9.    Under the supervision of JHA and other Counsel, Goldin has helped identify and
obtain corrections in media coverage relating to Litigation against members of the Raymond
Sackler family or Purdue, including, from more than fifty major media outlets, including ABC
News, CBS News, CNN, Fox News, MSNBC, NBC News, The New York Times, NPR, The
Wall Street Journal, and The Washington Post.

10.    These corrections related to allegations against the Raymond Sackler family or
Purdue, including, but not limited to, errors concerning: (1) the roles that certain Raymond
Sackler family members had at Purdue; (2) Purdue's role in the opioid crisis; (3) distributions
from Purdue; and (4) assets held by certain Raymond Sackler family members; and (5)
OxyContin, and opioids generally.

11.     Goldin and Counsel have notified media outlets that they had quoted certain physicians who publicly denigrated Purdue or the Sackler family before those physicians disclosed that they were paid consultants to opioid litigation plaintiffs.  The physicians were Dr. Andrew Kolodny, Dr. Jane Ballantyne, and Dr. Anna Lembke, each of whom disclosed in 2019 that their previously published articles on opioids were tainted by conflicts of interest.  *See:*

a.     Dr. Andrew Kolodny Disclosure Announcement (September 4, 2019), JAMA, *Clarification of Reporting of Potential Conflicts of Interest in JAMA Articles*, "I received compensation for work as an expert in malpractice litigation involving opioid prescribing," https://jamanetwork.com/journals/jama/article-abstract/2749614:

b.     Dr. Jane Ballantyne Disclosure Announcement (September 10, 2019), International Committee of Medical Journal Editors: "*Dr. Ballantyne reports personal fees from Motley Rice LLP, DC, outside the submitted work*," https://static1.squarespace.com/static/54d50ceee4b05797b34869cf/t/5dcaf0593c5 9a1289b55759b/1573580890392/_authors_conflictFormServlet_M19-1488_ICMJE_M19-1488-Conflicts.pdf;

c.     Dr. Anna Lembke Disclosure Announcement (September 16, 2019), International Committee of Medical Journal Editors: "*Dr. Lembke reports that she has been retained as an expert witness on the plaintiff side in federal and state litigation*," https://static1.squarespace.com/static/ 54d50ceee4b05797b34869cf/t/5dcaf0593c59a1289b55759b/1573580890392/_aut hors_conflictFormServlet_M19-1488_ICMJE_M19-1488-Conflicts.pdf.

12.    After Goldin and Counsel notified media outlets that Drs. Kolodny, Ballantyne

and Lembke were paid consultants to opioid litigation plaintiffs, several of those news

organizations published disclaimers regarding quotations from those doctors about the Sacklers

or Purdue.  For example:

a.    Inside Philanthropy, which quoted Dr. Kolodny describing the Sacklers as "in

their own category, similar to a drug cartel," subsequently disclosed that

"Kolodny has been a paid expert witness in opioid lawsuits."  *See* Inside

Philanthropy, *Opinion | Historic But Halfhearted: Behind a University's Fraught

Efforts to Rid Itself of Toxic Donations* (May 5, 2020),

https://www.insidephilanthropy.com/ home/2020/5/5/historic-but-halfhearted-

behind-a-universitys-fraught-efforts-to-rid-itself-of-toxic-donations.

b.    After quoting Dr. Lembke as stating, in an article about the MDL litigation,

"[t]his is a stunning about-face by Purdue, which has long contended that it has

not influenced physician education with its drug reps," The New York Times

disclosed it had given "an incomplete description of Dr. Anna Lembke's role at a

court session in Cleveland. Dr. Lembke was giving testimony as an expert witness

in support of plaintiffs in the opioid cases; she was not speaking solely as an

addiction specialist."  *See* New York Times (March 5, 2018), *Can This Judge

Solve the Opioid Crisis?* https://www.nytimes.com/2018/03/05/health/opioid-

crisis-judge-lawsuits.html.

13.    I declare under penalty of perjury that the foregoing is true and correct.

Executed on ___10/13/20___

Davidson Goldin

831074

# EXHIBIT A

JOSEPH HAGE AARONSON LLC

485 LEXINGTON AVENUE

NEW YORK, NEW YORK 10017

(212) 407-1200

WWW.JHA.COM

GREGORY P. JOSEPH
DIRECT DIAL: (212) 407-1210
DIRECT FAX: (212) 407-1280
EMAIL: gjoseph@jha.com

November 12, 2018

**By Email**
Mr. Davidson Goldin
Goldin Solutions
928 Broadway
Suite 900
New York, NY  10010

Re:  **Opiate Litigation against Richard, Jonathan, David Sackler**

Dear David:

Pursuant to our discussions, we agree to the following engagement of Goldin Solutions and you to assist us in the defense of Richard, Jonathan and David Sackler (the "**Clients**") in connection with the national opiate litigation which, as of this writing, includes in excess of 1,000 lawsuits filed in various venues in the United States (the "**Litigation**"):

1. **Retention**. This letter constitutes a retainer agreement between Joseph Hage Aaronson LLC (the "**Firm**" or "**JHA**") and Goldin Solutions and you personally (collectively, "**Goldin**" or "**you**"), pursuant to which this Firm is retaining Goldin to provide strategic public relations advice and other services (the "**Litigation Services**") to JHA, legal counsel to the Clients, in connection with pending and anticipated Litigation and involving the Clients (as parties or witnesses) and allegations against them in the Litigation so that JHA and its co-counsel to the Clients, including but not limited to Norton Rose Fulbright US LLP ("**NRF**"), may render appropriate legal advice the client and coordinate with counsel for other parties who share a common interest in the Litigation, including but not limited to Purdue Pharma L.P., a Delaware limited partnership ("**PPLP**").

2. **Scope of Litigation Services**. JHA is concerned that numerous unbalanced and inaccurate media reports about the Clients have appeared and will continue to appear, that this will have an adverse impact on the Clients in, and in connection with, the Litigation, and that this poses a clear risk and present danger of having a severe and adverse impact on the Clients due to its tainting influence on potential jurors and any other fact-finders concerning the merits of the Litigation. The Litigation Services that JHA is retaining

RSF00666465

JOSEPH HAGE AARONSON LLC
Mr. Davidson Goldin
November 12, 2018
Page 2

Goldin to provide includes Goldin's expertise in assessing media coverage regarding the Litigation and seeking accurate news coverage because such coverage may affect decision-makers in the Litigation and protect the Clients' legal interests. JHA is not retaining Goldin to provide ordinary public relations advice unrelated to the Clients' legal interests in, and in connection with, the Litigation.

3.   **Privilege and Confidentiality; Injunctive Relief**.

a.    During the period of this agreement, Goldin will take instructions from JHA on behalf of the Clients. All communications by Goldin in connection with the Litigation Services hereunder shall be addressed to JHA or, as directed by JHA, to co-counsel for the Clients or to General Counsel to PPLP, in connection with common interest communications, or to or with the Clients, who are a critical source of essential factual information necessary for the Litigation Services to be effectively provided.

b.    In order for Goldin to carry out its responsibilities hereunder, it may be necessary for JHA or others, including NRF, PPLP and the Clients, to disclose to Goldin legal theories developed for the defense of the Litigation and related privileged information, lawyers' work product and other Confidential Information. As used in this agreement, the term "**Confidential Information**" means (i) all information that Goldin receives from or on behalf of JHA, the Clients, NRF or PPLP, or which Goldin derives therefrom, whether furnished before, on or after the date of this agreement, whether tangible or intangible, in whatever form or medium provided, as well as all information generated by Goldin or that contains, reflects or is derived from the Confidential Information, and (ii) Goldin's retention by JHA on behalf of the Clients.

c.    It is agreed that, except as provided herein, Goldin shall keep the Confidential Information confidential and Goldin shall not disclose any Confidential Information in any manner whatsoever, in whole or in part, and shall not use any Confidential Information other than in connection with the provision of the Litigation Services without prior authorization from JHA. Goldin agrees to transmit Confidential Information only to such of its officers, directors or employees who need to know the Confidential Information for the sole purpose of assisting JHA in connection with Goldin's providing the Litigation Services and who are informed of the confidentiality requirements under this agreement.

d.    Unless otherwise directed by JHA, all documents or other materials generated or prepared by you in connection with your activities hereunder shall be marked: "Privileged" or "Privileged and Confidential" or "Prepared In Anticipation of Litigation Pursuant To Counsel's Direction And In Order To Assist Counsel To Provide Legal Advice." All such documents shall remain or become the property of JHA and shall be segregated and maintained in secure and separate files.

RSF00666466

JOSEPH HAGE AARONSON LLC
Mr. Davidson Goldin
November 12, 2018
Page 3

  e. It is further understood that, if JHA authorizes Goldin to disclose any Confidential Information, that authorization shall be limited to specific Confidential Information that JHA expressly identifies and, further provided, that Goldin understands, agrees and acknowledges that the Clients intend to keep privileged and confidential all Confidential Information as to which such express authorization is <u>not</u> provided.

  f. Goldin acknowledges and agrees that any breach of obligations and restrictions set forth in this Section 3 may cause irreparable and immediate harmed to the Clients, who could not be made whole by monetary damages and have no adequate remedy at law. Accordingly, Goldin agrees that, in addition to any other remedy to which they may be entitled in law or in equity, JHA will be entitled to injunctive relief (without the posting of any bond and without proof of actual damages) to prevent breaches or threatened breaches of this agreement and/or to compel specific performance of Goldin's confidentiality and other obligations under this agreement, and Goldin will not oppose the granting of such relief. Goldin also agrees to reimburse all costs and expenses, including attorneys' fees, incurred by JHA or Pharmaceutical Research Associates L.P. or the Clients in attempting to enforce the obligations of Goldin under this Section 3.

  g. The provisions of this Section 3 shall survive the termination of this agreement.

 4. **Duration, Fees and Expenses**. It is agreed that Goldin shall be entitled to compensation of ▇▇▇▇ per month for an initial period of six months ("**Initial Period**"), after which time this agreement will renew automatically on a month-to-month basis unless cancelled by either JHA or Goldin on not less than thirty (30) days written notice ("**Monthly Renewal Period**"). The responsibilities of the parties under this agreement shall continue during such notice period. At the end of the Initial Period, and at the end of every three Monthly Renewal Periods thereafter, Goldin's monthly compensation may be adjusted by agreement of the parties. Goldin shall also receive reimbursement for necessary expenses incurred. Pharmaceutical Research Associates L.P. will make payment to Goldin directly of all sums due Goldin under this agreement. No other entity, including JHA, NRF or PPLP, nor the Clients, shall have any liability for any fees or expenses associated with this agreement.

 5. **Billing**. Goldin will bill JHA on a monthly basis. Early in each month, Goldin will send a statement containing fees payable for, and expenses incurred during, the prior month. Each statement, which will be payable upon receipt, will include an itemization of out-of-pocket expenses incurred.

 6. **Discovery Requests; Subpoenas**. Notwithstanding any provision herein to the contrary, if Goldin is required or requested to disclose any Confidential Information to a court, governmental or regulatory agency, stock exchange or similar body, or as otherwise required by law, Goldin shall give prompt notice to JHA upon receipt of any

RSF00666467

JOSEPH HAGE AARONSON LLC
Mr. Davidson Goldin
November 12, 2018
Page 4

such disclosure demand or request prior to any such disclosure so that JHA and the Clients shall have a reasonable opportunity, should they determine to do so, at no cost or expense to Goldin, to seek an appropriate protective order or other remedy, and Goldin agrees to cooperate with any such efforts to seek such protective order or other remedy. If, in the absence of a protective order or other remedy, Goldin is nonetheless, in the written opinion of its counsel (whose reasonable fees will be paid directly by Pharmaceutical Research Associates L.P.), legally compelled to disclose the Confidential Information, Goldin may, on ten (10) days' written notice to JHA and without liability hereunder, disclose that portion—and only that portion—of the Confidential Information that its counsel advises it is legally required to disclose, provided that Goldin, exercises its reasonable efforts to preserve the confidentiality of the Confidential Information. Notwithstanding the foregoing, if JHA or the Clients promptly notify Goldin in writing that attorney-client or common-interest privilege or attorney work product protection is being asserted with respect to all or any portion of the information subject to disclosure, Goldin shall not disclose any portion of the information as to which such privilege or protection is asserted unless and until it is judicially determined that such information is not protected by such privilege or protection. The provisions of this Section 6 shall survive the termination of this agreement.

7. **Termination; Document Retention**. Goldin must preserve any written materials, including emails, generated or received by Goldin in connection with this engagement, as such materials are potentially discoverable in litigation. It is agreed that, except to the extent that JHA agrees in writing, upon the termination or expiration of this agreement Goldin shall deliver to JHA all documents and other materials, including all copies thereof, that:

    (a)    have been provided to Goldin in connection with Goldin's work pursuant to this agreement;

    (b)    embody or disclose in any way theories, opinions, facts, data, information, documents, or other materials disclosed or provided to Goldin in connection with Goldin's work pursuant to this agreement; or

    (c)    have been, or are in the process of being, or shall in the future be, prepared by or for Goldin pursuant to this agreement; or

    (d)    are derived from any of the foregoing.

8. **Conflicts**. Goldin agrees not to, in the future, consult for or otherwise represent any other person or entity known to have an interest adverse to the Clients' interests in or concerning the Litigation, or the events or occurrences out of which the Litigation arises, if such services are substantially related to the Litigation Services provided hereunder or relate in any way to the Litigation or would require Goldin to deal with any facts, issues, theories or strategies related to the subject matter of this agreement.

RSF00666468

**JOSEPH HAGE AARONSON LLC**
Mr. Davidson Goldin
November 12, 2018
Page 5

9.    **Accountability; Standards of Performance**.  Goldin agrees to devote its best efforts to achieving the goals of this engagement and carrying out the instructions given by JHA.  Goldin agrees to provide all Litigation Services in strict accordance with this agreement and with a high degree of care, skill, diligence, professional knowledge, judgment, and expertise according to sound work practices and accepted professional and industry standards.

10.    **Compliance with Laws; Regulations; Codes**.  Goldin represents and covenants that Goldin is, and during the term of this agreement will remain, in compliance with all applicable federal, state and local laws, regulations and orders.

11.    **Entire Agreement**.  This agreement constitutes the entire agreement between the parties and there are no representations, understandings, or agreements relative hereto which are not fully expressed herein and that no party to the agreement is relying on any fact or matter not expressly set forth herein.

12.    **Governing Law**.  This agreement and performance thereunder is governed by the laws of the State of New York.  The parties agree to submit to the jurisdiction of the state or federal courts in the City, County and the State of New York for all disputes arising out of this agreement.

If the foregoing terms are acceptable, please sign the copy of this letter in the space provided below and return it to us.  We look forward to working with you.

Very truly yours,

JOSEPH HAGE AARONSON LLC

By:    _____
Gregory P. Joseph

ACCEPTED AND AGREED:
GOLDIN SOLUTIONS

By:    _____
Davidson Goldin

Date:  _Nov 13, 2018_

RSF00666469

JOSEPH HAGE AARONSON LLC

Mr. Davidson Goldin
November 12, 2018
Page 6

ACCEPTED AND AGREED AS TO PAYMENT PROVISIONS:
PHARMACEUTICAL RESEARCH ASSOCIATES L.P.

By: _____
Edward B. Mahony
Vice President, Finance

Date: ___11/14/19___

803574

RSF00666470

# EXHIBIT B

# The New York Times

## Sacklers Directed Efforts to Mislead Public About OxyContin, New Documents Indicate
By Barry Meier

*A filing in a Massachusetts lawsuit contains dozens of internal Purdue Pharma documents suggesting the family was far more involved than the company has long contended.*

Members of the Sackler family, which owns the company that makes OxyContin, directed years of efforts to mislead doctors and patients about the dangers of the powerful opioid painkiller, a court filing citing previously undisclosed documents contends.

When evidence of growing abuse of the drug became clear in the early 2000s, one of them, Richard Sackler, advised pushing blame onto people who had become addicted.

"We have to hammer on abusers in every way possible," Mr. Sackler wrote in an email in 2001, when he was president of the company, Purdue Pharma. "They are the culprits and the problem. They are reckless criminals."

That email and other internal Purdue communications are cited by the attorney general of Massachusetts in a new court filing against the company, released on Tuesday. They represent the first evidence that appears to tie the Sacklers to specific decisions made by the company about the marketing of OxyContin. The aggressive promotion of the drug helped ignite the opioid epidemic.

The filing contends that Mr. Sackler, a son of a Purdue Pharma founder, urged that sales representatives advise doctors to prescribe the highest dosage of the powerful opioid painkiller because it was the most profitable.

Since OxyContin came on the market in 1996, more than 200,000 people have died in the United States from overdoses involving prescription opioids, and Purdue Pharma has been the target of numerous lawsuits.

For years, Purdue Pharma has sought to depict the Sackler family as removed from the day-to-day operations of the company. The Sacklers, whose name adorns museums and medical schools around the world, are one of the richest families in the United States, with much of their wealth derived from sales of OxyContin. Disclosure of the documents is likely to renew calls for institutions to decline their philanthropic gifts.

In a statement, Purdue Pharma, which is based in Stamford, Conn., rejected suggestions of wrongdoing by the company or members of the Sackler family, describing the court filing as "littered with biases and inaccurate characterizations." The statement said the company was working to curtail the use and misuse of prescription painkillers.

Asked for a response from Richard Sackler and other members of the Sackler family, a Purdue Pharma spokesman, Robert Josephson, said that the company had no additional comment.

In 2007, the company and three of its top executives pleaded guilty to federal criminal charges that Purdue had misrepresented the dangers of OxyContin, and they paid $634.5 million in fines. The Sacklers were not accused of any wrongdoing and have not faced personal legal consequences over the drug.

But last June, Maura Healey, the Massachusetts attorney general, sued eight members of the Sackler family, along with the company and numerous executives and directors, alleging that they had misled doctors and patients about OxyContin's risks. The suit also claimed that the company aggressively promoted the drug to doctors who were big prescribers of opioids, including physicians who later lost their licenses.

The court filing released on Tuesday also asserts that Sackler family members were aware that Purdue Pharma repeatedly failed to alert authorities to scores of reports the company had received that OxyContin was being abused and sold on the street. The company also used pharmacy discount cards to increase OxyContin's sales and Richard Sackler, who served as Purdue Pharma's president from 1999 to 2003, led a company strategy of blaming abuse of the drug on addicts, the suit claimed.

In 1995, when the Food and Drug Administration approved OxyContin, it allowed Purdue Pharma to claim that the opioid's long-acting formulation was "believed to reduce" its appeal to drug abusers compared with traditional painkillers such as Percocet and Vicodin.

At a gathering shortly afterward to celebrate the drug's launch, Mr. Sackler boasted that "the launch of OxyContin tablets will be followed by a blizzard of prescriptions that will bury the competition. The prescription blizzard will be so deep, dense, and white," according to a document cited in the legal complaint.

Company sales representatives told doctors that OxyContin couldn't be abused and were trained to say that the drug had an addiction risk for patients of "less than one percent," a claim that had no scientific backing. Within a few years, Purdue Pharma was selling more than $1 billion worth of OxyContin annually.

But abuse of the drug quickly grew as teenagers and others discovered that all they needed to do was to crush OxyContin to get access to large amounts of a pure narcotic, oxycodone, contained in the pills.

The court filing depicts Richard Sackler both as a principal force behind OxyContin's promotion and the company's efforts to dismiss growing reports about the drug's abuse in the early 2000s.

For instance, when a federal prosecutor reported in 2001 that there had been 59 overdose deaths involving OxyContin in his state alone, Mr. Sackler appeared to make light of the problem, a document cited in the court filing suggests.

"This is not too bad," he wrote to the company officials. "It could have been far worse.

As part of the 2007 settlement agreement, the board of Purdue Pharma, which included members of the Sackler family, signed a corporate integrity agreement with the federal government promising that the company would not violate the law in the future.

However, Ms. Healey asserted in her lawsuit filed last year that Purdue Pharma, with the knowledge of the Sacklers, continued to illegally market the drug, including promoting its use at levels that increased the drug's dangers.

Also, while Richard Sackler and other members of the family had resigned their operating posts either before or after the 2007 settlement of the Justice Department lawsuit, they still continued to control the company and its decisions, the lawsuit claims.

In a 2012 email, one Purdue Pharma sales official complained about Richard Sackler's micromanagement of the company's sales and marketing activities.

"Anything you could do to reduce the direct contact of Richard into the organization is appreciated," that official wrote.

In its statement, Purdue Pharma said that federal officials in 2013 had reviewed the company's performance under the five-year corporate integrity agreement and found it in complete compliance.

Purdue Pharma, first known as Purdue Frederick, was founded in 1952 by three brothers, Arthur, Mortimer and Raymond Sackler, all physicians who left medicine to pursue careers in the drug business.

When Arthur Sackler died in 1987, his two younger brothers, Mortimer and Raymond Sackler purchased his stake in the company. They both died more recently.

In 2016, Forbes magazine estimated the family's wealth at about $13 billion. However, the precise figure is unknown because Purdue Pharma is privately held.

A confidential 2006 Department of Justice memorandum prepared in connection with the federal government's case against Purdue Pharma concluded that the drug maker was aware of OxyContin's growing abuse soon after it came onto the market in 1996.

That document also cited internal Purdue Pharma documents and emails that indicated members of the Sackler family had received reports about the abuse of OxyContin and another long-acting narcotic painkiller, MS Contin, sold by Purdue Pharma. The memorandum, however did not suggest any wronging by members of the Sackler family.

https://www.nytimes.com/2019/01/15/health/sacklers-purdue-oxycontin-opioids.html

# EXHIBIT C



**Family behind OxyContin knowingly deceived public about safety of the opioid drugs, court documents say**
By Aaron Katersky & Anthony Rivas

*New documents allege the family's choices "caused much of the opioid epidemic."*

New court documents from the Massachusetts attorney general claims to offer proof that the family that owns the company that makes the powerful opioid drug OxyContin was behind years of efforts to deceive doctors and patients about the safety of the drug and increase profits.

The Sackler family, owners of Purdue Pharma, the company that makes OxyContin, "made the choices that caused much of the opioid epidemic," according to a court document filed by Massachusetts Attorney General Maura Healey.

The Sacklers "directed deceptive sales and marketing practices" at Purdue Pharma for more than a decade and "are responsible for addiction, overdose and death that damaged millions of lives," the documents say.

However, in a broader statement, it called the accusations "biased and inaccurate characterizations" of the company and its executives, and said that it would "aggressively defend against these misleading allegations."

"In a rush to vilify a single manufacturer whose medicines represent less than two percent of opioid pain prescriptions rather than doing the hard work of trying to solve a complex public health crisis, the complaint distorts critical facts and cynically conflates prescription opioid medications with illegal heroin and fentanyl," the company said.

More than 11,000 people in Massachusetts died from opioid-related overdoses in the past decade, and over 100,000 people survived overdoses that were not fatal, "but still devastating," the documents say, blaming Purdue and other drug companies. Nationally, opioid-related overdoses killed 72,000 people in 2017, according to the National Institute on Drug Abuse.

Several executives at Purdue Pharma pleaded guilty in 2007 to misrepresenting the dangers of OxyContin but the Healey's lawsuit directly implicates members of the Sackler family. The Sacklers weren't personally accused of any wrongdoing in that lawsuit.

The lawsuit was filed in June last year but the newly filed documents quote Richard Sackler — the son of the company's founder — boasting about a "blizzard of prescriptions" at an OxyContin launch party, despite warnings from a Food and Drug Administration official and the drug's inventor about the need for controls.

"The prescription blizzard will be so deep, dense and white," he said, according to the court documents.

Years later, evidence of the growing abuse of OxyContin began to surface, according to the lawsuit. A

sales representative for Purdue told a reporter that they were directed to lie about the drug. Another sales rep pleaded with Richard Sackler after attending a community meeting at a local high school in January 2001, where mothers spoke out about their children who had overdosed. And a month after that plea, the documents say, a federal prosecutor reported 59 deaths related to OxyContin in a single state.

In response to the mounting evidence, Richard Sackler advised blaming the addicts.

"We have to hammer on the abusers in every way possible," the lawsuit quoted Sackler as writing in an email. "They are the culprits and the problem. They are reckless criminals."

From 2007 to 2018, the Sacklers doubled down on pushing for increasing sales, according to the documents, directing sales reps to visit the most "prolific prescribers" and to encourage them to prescribe more of the highest doses of the drug to gain the most profit. They also allegedly studied "unlawful tactics to keep patients on opioids longer."

Richard Sackler even went into the field to promote the drug to doctors with sales reps, a level of micromanagement that led the vice president of sales and marketing to write to the CEO of Purdue.

"Anything you can do to reduce the direct contact of Richard into the organization is appreciated," they wrote, according to the documents.

The attached court filing represents the first evidence presented by the attorney general to tie the Sackler family to Purdue Pharma's campaign of deception. There is a hearing on Jan. 25 to eliminate the remaining redactions.

https://abcnews.go.com/US/Health/family-oxycontin-knowingly-deceived-public-safety-opioid-drugs/story?id=60428693

# EXHIBIT D

**Opinion | Opioids, pot and criminal justice reform helped undermine this decade's War on Drugs**
By Zachary Siegel

*With an extraordinary number of Americans suffering, the door has opened to understanding and treating the pain of drug use rather than apply brute force.*

This much we know: Americans like to do drugs. That might explain why a prescient headline in the satirical publication The Onion stands as one of the most enduring comments on American drug enforcement — "Drugs Win Drug War."

*There are ongoing arrests for cannabis and deep racial disparities among those detained, but the change in the trend line is profound.*

While that article was published in 1998, it was only during the past decade that its parody devolved into grim reality. In many ways, this reality has been an aching nadir, with more lives lost annually to overdoses than AIDS, gun violence and car crashes. But this past decade also brought its highs (pun intended): Recreational marijuana prohibitions started to fall in a domestic domino effect as one state after another accepted that it was pointless to criminalize the use of such a widely consumed drug. And at root, it is this shifting attitude on the role of the criminal justice system in prosecuting drug use that signifies the most fundamental change in our love-hate relationship with controlled substances.

Though far from over, the War on Drugs has felt more like a tug of war across this past decade rather than a righteous crusade, with reformers trying to fend off the country's prohibitionist impulse as it makes a last-gasp effort to ramp up arrests and enhance penalties. And the reformers have public opinion on their side — the decade comes to an end with a majority of Americans favoring a more compassionate approach than locking users up. The criminalization of drug use is both out of step with what people want and what the evidence shows to work; in fits and starts, policy, policing and the law are finally starting to catch up.

There's no single cause on which to pin this shift in opinion, but the highly visible white victims of the opioid crisis — from suburban teenagers to the non-college educated across the Midwest and Appalachia — surely played a role. A 2015 New York Times headline captured this development better than anywhere else: "In Heroin Crisis, White Families Seek Gentler War on Drugs."

The story went on to explain that "zero tolerance and stiff prison sentences" defined the Drug War back when the crack epidemic was its centerpiece and "poor, predominantly black urban areas" were its headquarters. In contrast, with almost 90 percent of first-time heroin users in the preceding decade

white, suburban and small-town families vocally pushed to soften the country's approach to drugs, "from altering the language around addiction to prodding government to treat it not as a crime, but as a disease," as the Times put it.

While the opioid crisis didn't begin in this decade, it did accelerate to unprecedented heights, with record-breaking death rates leading to a drop in life expectancy for three years in a row (2015-17), which hadn't happened in America since the Spanish flu coincided with World War I. Of course, the Drug War, too, didn't start in this decade, and its continuing legacy meant that white families didn't quite get their wish. This decade saw prosecutors unleash harsh penalties on friends, family members and loved ones of overdose victims, who are increasingly being charged with homicide and manslaughter simply for sharing drugs.

But the criminal justice system still evolved, with more jails and prisons beginning to treat opioid addiction with life-saving medications like methadone and buprenorphine,. Meanwhile, pressure from outside the system such as lawsuits, bad publicity and shame also moved the needle. The decade ended with the fall of the company, Purdue Pharma, that produced the blockbuster painkiller OxyContin, which caused the first wave of overdoses 20 years ago. And its owners, the Sackler family tried to hide their ill-gotten billions overseas before declaring bankruptcy to fend off more than 2,000 civil suits as public demonstrations pushed a medical school and a museum to drop their name.

If shame was a potent force in fighting against the company that oversold opioids, it was the shedding of stigmas that characterized the massive shift in public opinion toward marijuana in the past decade — which transformed more than that on just about any other policy across the American landscape. In 2000, 63 percent of Americans said the use of marijuana should be illegal, according to polling from Pew Research Center. By 2010, that number had dropped to 52 percent, and for the last 10 years it continued to plunge, shifting the balance in favor of marijuana. In 2019, a full two-thirds of Americans believed cannabis should be legal.

There is no way to characterize this but as a loss for the so-called War on Drugs. Marijuana not only continued to be consumed — with nearly 55 million people who indulge, it's one of the most widely used drugs — but now, thanks to the legalization drive, there's a chance to right wrongs of the past. For instance, once legalization goes into effect in Illinois on Jan 1, 2020, the city of Evanston will use tax revenue on cannabis to fund reparations for black residents.

Yes, there are ongoing arrests for cannabis and deep racial disparities among those detained, but the change in the trend line is profound. And with that change comes a repudiation of the founding principles of the erstwhile draconian approach: Nancy Reagan's advice to "just say no" is clearly not a successful way to get people to curtail their pot use; putting users in jail is not an effective use of the criminal justice system; and normalization means quality control, taxation and other constructive mechanisms can be implemented.

So how did 80-year-old cannabis laws finally begin to crumble this past decade? Though very different in properties and ill effects, marijuana's image shifted for some of the same reasons that opioids changed the drug conversation in America: White people being criminalized, the medical industry

having a role in how to calibrate use of the drug, and a feeling among both liberals and conservatives that filling up jails with users was a waste of lives and money.

Cannabis laws didn't change all by themselves, and it's important to recognize the role that grass-roots advocacy played. "The remarkable progress of marijuana legalization over the past decade was driven not by for-profit interests but by people and organizations who care first and foremost about freedom, justice, compassion and human rights," said Ethan Nadelmann, the founder and former director of the Drug Policy Alliance, the nonprofit that helped get cannabis on the ballot in numerous states.

Another explanation for this seismic shift away from the brain-frying-in-a-pan attitude toward drugs is generational. Fewer millennials and zoomers have grown up on abstinence anti-drug education after groups such as DARE lost millions in funding after research consistently showed its '80s-style programming was ineffective (DARE has since rebranded and claims their "keepin' it REAL" campaign works this time).

Underpinning the evolution in how consumption of cannabis is treated is the fact that the criminal justice system has come to be viewed as outdated, expensive and overly punitive. In 2018, over 75 percent of Americans — Democrats, Republicans, independents and especially women among them — believed that the criminal justice system needed major improvements. Some specific drug-related policies, such as mandatory minimum sentences erasing judges' discretion to lower penalties for nonviolent offenders, are universally loathed.

Particularly significant has been the growing dissent from within the system over the past decade. From politicians to prosecutors to police chiefs, those who had formerly propped up the system were no longer defending it in the face of a mobilized electorate.

*It's too late to help the victims of these tragedies, but they could still galvanize us to band together to create a healthier society.*

While the Obama administration provided a sweeping number of pardons and commutations to nonviolent drug offenders in federal prison, influential conservatives also joined the effort to reduce incarceration. Notably, mega-GOP donors the Koch brothers backed 2018's First Step Act, which aims to reduce recidivism through a variety of new programs and sentencing guidelines, including reducing mandatory minimums. A year afterward, more than 3,000 people have been released. Newcomers to Congress are going even further, with politicians like New York Rep. Alexandria Ocasio-Cortez calling for the decriminalization of all drugs.

But much of the change was driven by local criminal justice systems. A politically strategic and well-disciplined movement of activists helped make the term "progressive prosecutor" trendy, while a wave of new district attorneys and prosecutors around the country refused to prosecute low-level drug offenses, preferring to deal with such cases outside the criminal system. Activists in Philadelphia scored a major legal victory over Safehouse, a nonprofit that hopes to open America's first ever overdose prevention site — a facility where people can use drugs under medical supervision.

Major legal reforms of the decade have also occurred outside of liberal hubs. Smart policy like syringe-exchanges that challenge America's quixotic quest for a drug-free society spread this past decade to states including Kentucky, North Carolina, West Virginia and Tennessee.

Since Richard Nixon declared drugs "public enemy No. 1" nearly 50 years ago, much of America's drug policy focused on eradicating the supply of drugs. Finally, the country is wrestling with our insatiable demand for drugs, and given the extraordinary number of Americans suffering, the door has opened to understand and treat this pain as opposed to stamping it out with brute force.

This decade gave rise to the term "deaths of despair" to describe the ills of our time: overdoses, alcohol and suicide. It's too late to help the victims of these tragedies, but they could still galvanize us to band together to create a healthier society.

https://www.nbcnews.com/think/opinion/opioids-pot-criminal-justice-reform-helped-undermine-decade-s-war-ncna1108231

# EXHIBIT E

# The New York Times

**Opinion | The Sacklers Could Get Away With It**
By Gerald Posner and Ralph Brubaker

*The family behind Purdue Pharma made a fortune on the opioid epidemic. Will they ever truly face justice?*

The billionaire Sacklers who own Purdue Pharma, maker of the OxyContin painkiller that helped fuel America's opioid epidemic, are among America's richest families. And if they have their way, the federal court handling Purdue's bankruptcy case will help them hold on to their wealth by releasing them from liability for the ravages caused by OxyContin.

The July 30 deadline for filing claims in Purdue's bankruptcy proceedings potentially implicates not just claims against Purdue, but also claims against the Sacklers. The Sacklers may yet again benefit from expansive powers that bankruptcy courts exercise in complex cases.

So far, the bankruptcy court has granted injunctions stopping proceedings in several hundred lawsuits charging that Sackler family members directed the aggressive marketing campaign that led to millions of addicted patients and the deaths of several hundred thousand.

The Sacklers have offered $3 billion in the hope that the bankruptcy court will impose a global settlement of OxyContin litigation. Under this settlement, all claims against the Sacklers, even by families who lost loved ones to opioids, would be forever extinguished.

The Sacklers would walk away with an estimated several billion of OxyContin profits while leaving unresolved a crucial question asked by victims and their families: Did the Sacklers create and coordinate fraudulent marketing that helped make their best-selling drug a deadly national scourge? With that question left unanswered, many of those injured by OxyContin would feel victimized again.

In a bankruptcy filing, debts are forgiven — "discharged," in legal terms — after debtors commit the full value of all of their assets (with the exception of certain types of property, like a primary home) to pay their creditors. That is not, however, what the Sacklers want, and indeed the members of the family have not filed for bankruptcy themselves.

What they propose instead is to be shielded from all OxyContin lawsuits, protecting their tremendous personal wealth from victims' claims against them. What's more, a full liability release would provide the Sacklers with more immunity than they could ever obtain in a personal bankruptcy filing, which would not protect them from legal action for fraud, willful and malicious personal injury, or from punitive damages.

Appallingly, legal experts expect the court to give the Sacklers what they want. The precedent is a 1985 case in which the A.H. Robins Company, the manufacturer of the Dalkon Shield contraceptive device, filed for bankruptcy protection. Plaintiffs charged that members of the Robins family and others had fraudulently concealed evidence of the Dalkon Shield's dangers. None had themselves filed for bankruptcy, but the court discharged all of them from liability. The releases even went so far as to prohibit injured women from suing their doctors for medical malpractice claims. Other bankruptcy courts have since embraced this concept of a shield from liability for those who have not filed bankruptcy.

The Constitution vests only Congress with the power to enact bankruptcy law, the essence of which is prescribing by statute how much wealth a debtor must surrender to creditors in order to obtain a discharge. But Congress has never given a green light for the courts to create a liability discharge process for those — like the Sacklers — who have not submitted all of their assets to the control of a bankruptcy court by filing bankruptcy.

This extraordinary practice presents serious obstacles for those injured by OxyContin. If granted, it will be nearly impossible to get a full and transparent assessment of the Sacklers' role in the opioid crisis without either the appointment of an independent examiner in the bankruptcy case or congressional investigations.

Allowing the bankruptcy court to impose a global OxyContin settlement may at first appear to be an efficient way to resolve litigation that could drag on for years. But the Sacklers will benefit from this expediency at the expense of victims.

At stake is whether there will ever be a fair assessment of responsibility for America's deadly prescription drug epidemic. Protection from all OxyContin liability for the Sackler family would be an end-run around the reckoning that justice requires.

Gerald Posner (@geraldposner) is the author of "Pharma: Greed, Lies and the Poisoning of America." Ralph Brubaker teaches bankruptcy law at the University of Illinois.

*The Times is committed to publishing a diversity of letters to the editor. We'd like to hear what you think about this or any of our articles. Here are some tips. And here's our email: letters@nytimes.com.*

*Follow The New York Times Opinion section on Facebook, Twitter (@NYTopinion) and Instagram.*

https://www.nytimes.com/2020/07/22/opinion/sacklers-opioid-epidemic.html?action=click&module=Opinion&pgtype=Homepage

# EXHIBIT F



**OxyContin maker Purdue Pharma launches campaign for opioid victims to file claims**
By Vandana Rambaran

Purdue Pharma, the drug company that makes OxyContin -- which has killed 430,000 people in the U.S. over the past two decades -- launched a $23.8 million ad campaign on Monday alerting victims where to file claims if they have been affected or harmed by the opioid.

The company filed for bankruptcy in September as part of a tentative settlement in the case central to the country's opioid crisis, and the ad campaign is part of a stipulation in similar cases that require the company to notify victims that they are able to file claims. In this case, the Stamford, Conn.-based company is looking at a proposed settlement that could be worth more than $10 billion over time, including the value of drugs it is producing. The settlement will also require the Sackler family, which owns the company, to give up control of the business while also contributing $3 billion over the next seven years and another $1.5 billion pending the sale of the family's global pharmaceutical business, Mundipharma.

The ad campaign -- which began online but is expected to appear in magazines, newspapers, TV and radio, billboards, movie theaters and other places -- is expected to reach 95 percent of adults in America. Victims have until the end of June to file claims.

Although suits against Purdue have mostly been filed by government entities alleging that the company promoted its drugs to doctors by misleading and downplaying risks and overstating benefits, the ads allow users of the drug who may not necessarily identify themselves as victims to come forward and seek damages.

It remains to be seen who exactly would qualify for settlement money or how much they would receive. In addition, distinctions between payouts to illicit drug users who abused OxyContin versus people who were prescribed the drug and became addicted are subject to negotiations.

"A lot of the victims don't know that they were victimized. They may think that they're addicts. They may think that they have a moral failing or a character failing," Ed Neiger, a lawyer representing a committee of individuals seeking a say in the Purdue bankruptcy, said. "There were people in a boardroom that caused them to become addicted to opioids."

https://www.foxnews.com/health/oxycontin-maker-purdue-pharma-opioid-victims-file-claims

# EXHIBIT G



**Sacklers are Not Giving Up Enough, Some Say**
By Sara E. Teller

*Many believe the Sackler family is getting off the hook in the opioid litigation.*

Even though the Sacklers will pay billions of dollars to settle the opioid litigation primarily focused on their role in Purdue's manufacturing of the powerful opioid OxyContin, experts say that when all is said and done, they will still be billionaires.

Purdue Pharma aggressively and deceptively marketed OxyContin beginning in 1996 and since its inception, the drug has been linked with more than 200,000 overdose fatalities. OxyContin has also been responsible for at least another 200,000 cases of addiction.

Despite settling, the family will still be worth between $1 billion and $2 billion, according to industry experts. And that number has been derived only from traceable money. The Sacklers have also allegedly been trying to hide their funds in overseas investments.

"If [the Sacklers] have the perception – and it's the correct perception – that 'people like us just don't go to jail, we just don't, so the worst that's going to happen is you take some reputational stings and you'll have to write a check,' that seems like a recipe for nurturing criminality," Keith Humphreys, a drug policy expert at Stanford University, said.

Some lawmakers have suggested the state or federal agencies should investigate the Sacklers personally and push for criminal charges beyond the litigation they already face. The current lawsuits all constitute civil matters. This is the second time lawmakers are asking to do so, too.

A federal investigation that took place in the mid-2000s called for the prosecution of members of the Sackler family due to their connection with deceptively marketing OxyContin. However, at the time, only three executives pleaded guilty in 2007 to charges related to "misbranding." They had to pay out big fines but did not go to prison. Many believe they should have and, now that the opportunity is once again presenting itself, it would be foolish to allow the family to go unscathed a second time around.

"You can go to prison for accidentally killing one person with your car.  That's the minimum standard," Rick Claypool, a research director at Public Citizen, said, adding, "The idea that you can run a company and cause societal-level devastation and walk away from that relatively unscathed is mind-boggling."

From the 1990s on, Purdue was run in large part by the descendants of Mortimer and Raymond Sackler, the brothers who founded the company.  And, these members have been blamed for contributing significantly to the opioid crisis.  The lawsuits against them include evidence pertaining to what the leaders knew and when they knew it.

All the way back in 2001, for example, after 59 deaths from OxyContin were reported in one state alone, Richard Sackler responded in an email, "This is not too bad.  It could have been far worse."  He also wrote that same month, "We have to hammer on the abusers in every way possible.  They are the culprits and the problem.  They are reckless criminals."  He purposely diverted the blame from the family to those who became addicted to the product they were selling.

David Sackler, who was on Purdue's board of directors, said in an interview this year, "Facts will show we didn't cause the crisis."  Well, it looks like that is simply not the case.

https://www.legalreader.com/sacklers-are-not-giving-up-enough-some-say/