UNREDACTED – CONTAINS OUTSIDE PROFESSIONALS' EYES ONLY INFORMATION.
TREAT SUBJECT TO PROTECTIVE ORDER

FILED IN LESS REDACTED FORM PURSUANT TO THE STIPULATION AND AGREED ORDER REGARDING MEDIA
INTERVENORS' MOTION TO UNSEAL MATERIALS FILED IN CONNECTION WITH UCC PRIVILEGES MOTIONS
[ECF No. 2140]

Jasmine Ball
M. Natasha Labovitz
Maura Kathleen Monaghan
Jeffrey J. Rosen
DEBEVOISE & PLIMPTON LLP
919 Third Avenue
New York, New York 10022
Telephone:  (212) 909-6000
Facsimile:  (212) 909-6836

*Attorneys for Beacon Company*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| **In re:** | **Chapter 11** |
| **PURDUE PHARMA L.P.,** *et al.*, | **Case No. 19-23649 (RDD)** |
| **Debtors.**[1] | **(Jointly Administered)** |

**OBJECTION OF MORTIMER SACKLER INITIAL COVERED SACKLER PERSONS TO THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS' MOTION TO COMPEL PRODUCTION OF PURPORTEDLY PRIVILEGED DOCUMENTS, OR FOR *IN CAMERA* REVIEW, BASED ON GOOD CAUSE, CRIME FRAUD, AND AT ISSUE EXCEPTIONS TO CLAIMS OF PRIVILEGE**

---

[1]    The Debtors in these cases, along with the last four digits of each Debtor's registration number in the applicable jurisdiction, are as follows: Purdue Pharma L.P. (7484), Purdue Pharma Inc. (7486), Purdue Transdermal Technologies L.P. (1868), Purdue Pharma Manufacturing L.P. (3821), Purdue Pharmaceuticals L.P. (0034), Imbrium Therapeutics L.P. (8810), Adlon Therapeutics L.P. (6745), Greenfield BioVentures L.P. (6150), Seven Seas Hill Corp. (4591), Ophir Green Corp. (4594), Purdue Pharma of Puerto Rico (3925), Avrio Health L.P. (4140), Purdue Pharmaceutical Products L.P. (3902), Purdue Neuroscience Company (4712), Nayatt Cove Lifescience Inc. (7805), Button Land L.P. (7502), Rhodes Associates L.P. (N/A), Paul Land Inc. (7425), Quidnick Land L.P. (7584), Rhodes Pharmaceuticals L.P. (6166), Rhodes Technologies (7143), UDF LP (0495), SVC Pharma LP (5717) and SVC Pharma Inc. (4014). The Debtors' corporate headquarters is located at One Stamford Forum, 201 Tresser Boulevard, Stamford, CT 06901.

UNREDACTED – CONTAINS OUTSIDE PROFESSIONALS' EYES ONLY INFORMATION.
TREAT SUBJECT TO PROTECTIVE ORDER

## TABLE OF CONTENTS

PRELIMINARY STATEMENT ............................................................................................... 6

STATEMENT OF FACTS ................................................................................................. 10

I.      The UCC Does Not and Cannot Come Forward with Facts Supporting Its "Crime
        Fraud" Claims Vis-a-vis the Mortimer Sackler ICSPs ................................................... 10

        A.      The UCC's Few "Crime Fraud" Documents Do Not Show Anyone
                Intentionally or Constructively Rendered Purdue Insolvent ................................ 11

                1.      The UCC's Claim that Purdue Was Insolvent when It Made
                        Distributions Is Contrary to the Clear Historical Record ......................... 11

                2.      The UCC Does Not Have a Shred of Evidence that Mortimer
                        Sackler ICSP—or Purdue's Board—Acted with the Intent to
                        Hinder Creditors ......................................................................................... 18

        B.      The UCC Offers No Evidence to Suggest that Counsel Facilitated Any
                Supposedly Fraudulent Transfers ....................................................................... 21

II.     The UCC's "At Issue" Allegations Are Predicated on Two Slides in a Settlement
        Presentation that Do Not Mention Legal Advice ........................................................... 22

ARGUMENT .................................................................................................................... 22

I.      The UCC Does Not and Cannot Demonstrate Any Basis to Apply the "Crime
        Fraud" Exception ............................................................................................................ 22

        A.      The UCC Has Not Identified Any Particular Communications Involving
                Counsel that Furthered the Alleged Fraud ......................................................... 23

        B.      The UCC Has Not Met Its Burden of Providing a Factual Basis to Support
                its Fraudulent Conveyance Claims ...................................................................... 25

        C.      The UCC Has Offered No Basis for an In Camera Review ................................ 33

II.     The UCC Does Not Identify Any Basis to Apply the "At Issue" Exception ................... 34

CONCLUSION ................................................................................................................. 35

UNREDACTED – CONTAINS OUTSIDE PROFESSIONALS' EYES ONLY INFORMATION.
TREAT SUBJECT TO PROTECTIVE ORDER

## <u>TABLE OF AUTHORITIES</u>

<small>**CASES**</small>

*Aiossa v. Bank of Am.*,
  N.A., No. CV 10-01275(JS)(ETB), 2011 WL 4026902 (E.D.N.Y. Sept. 12, 2011) ..............34

*Arista Records LLC v. Lime Grp. LLC*, No. 06 CV 5936, 2011 WL 1642434 (S.D.N.Y.
  Apr. 20, 2011) ........................................................................................................................35

*Blackrock Allocation Target Shares: Series S. Portfolio v. Wells Fargo Bank, N.A.*, Nos.
  14 Civ. 9371 (KPF) (SN), 14 Civ. 9764 (KPF) (SN), 14 Civ. 10067 (KPF) (SN), 14
  Civ. 10102 (KPF) (SN), 15 Civ. 10033 (KPF) (SN), 2018 WL 3863447 (S.D.N.Y.
  Aug. 13, 2018) ........................................................................................................................35

*Bodie v. Purdue Pharma Co.*, 236 F. App'x 511 (11th Cir. June 1, 2007) ..................................15

*Boysaw v. Purdue Pharma*, No. 1:07-cv-00079, 2008 WL 4452650 (W.D. Va. Sept. 30,
  2008) ......................................................................................................................................15

*Kim v. Yoo*, 776 F. App'x 16 (2d Cir. 2019).................................................................................28

*Cendant Corp. v. Shelton*, 246 F.R.D. 401 (D. Conn. 2007) ........................................................31

*Chapin Home for the Aging v. McKimm*, No. 11-CV-0667 (FB) (RER), 2014 WL
  12883697 (E.D.N.Y. Aug. 7, 2014) .......................................................................................28

*City of Chicago v. Purdue Pharma, L.P., et al.*, No. 14 C 4361 (N.D. Ill.) .................................18

*City of New Haven v. Purdue Pharma, L.P.*, No. X07HHD CV 17-6086134 (Conn.
  Super. Ct. Jan. 8, 2019)..........................................................................................................18

*Coan v. Dunne*, 2019 WL 1513462 (D. Conn. Apr. 8, 2019).......................................................26

*Danisco A/S v. Novozymes A/S*, 427 F. Supp. 2d 443 (S.D.N.Y. 2006) .......................................27

*Foister v. Purdue Pharma L.P.*, 295 F. Supp. 2d 693 (E.D. Ky. 2003).......................................15

*Freedman v. Weatherford Int'l Ltd.*, No. 12 Civ. 2121(LAK)(JCF), 2014 WL 3767034
  (S.D.N.Y. July 25, 2014) ..................................................................................................24, 26

*FSP, Inc. v. Societe Generale*, No. 02CV4786GBD, 2005 WL 475986 (S.D.N.Y. 2005)...........33

*In re 650 Fifth Ave.*, No. 08 Civ. 10934 (KBF), 2013 WL 3863866 (S.D.N.Y. July 25,
  2013) ......................................................................................................................................34

*In Caesars Entm't Operating Co., Inc.*, No. 15 B 1145, 2016 WL 7477566, at *4 (Bankr.
  N.D. Ill. Sept. 21, 2016)......................................................................................................27, 28

UNREDACTED – CONTAINS OUTSIDE PROFESSIONALS' EYES ONLY INFORMATION.
TREAT SUBJECT TO PROTECTIVE ORDER

*In re Cty. of Erie*, 546 F.3d 222 (2d Cir. 2008) .........................................................35

*In re Direct Access Partners, LLC*, 602 B.R. 495 (Bankr. S.D.N.Y. 2019) .................................31

*In re Fresh Del Monte Pineapple Antitrust Litig.*, No. 04 MD 1628 (RMB), 2007 WL
    64189 (S.D.N.Y. Jan. 4, 2007)..................................................................................27

*In re Gen. Motors LLC*, No. 14-MC-2543 (JMF), 2015 WL 7574460 (S.D.N.Y. Nov. 25,
    2015) ............................................................................................................25, 26, 27

*In re Iridium Operating LLC*, 373 B.R. 283 (Bankr. S.D.N.Y. 2007)..........................................28

*In re Lyondell Chem. Co.*, 567 B.R. 55 (Bankr. S.D.N.Y. 2017) ...............................................31

*In re Omnicom Group Inc., Sec. Litig.*, 233 F.R.D. 400 (S.D.N.Y. 2006) ...................................26

*In re Purdue Pharma L.P.*, Case No. 07-C-00740 (Ky. Cir. Ct. May 8, 2007)............................14

*In re Richard Roe, Inc.* 168 F.3d 69 (2d Cir. 1999).........................................................23, 25, 27

*In re Tribune Co. Fraudulent Conveyance Litig.*, No. 11-md-2296 (RJS), 2017 WL
    82391 (S.D.N.Y. Jan. 6, 2017).................................................................................31

*In re W.R. Grace & Co.,* 281 B.R. 852 (Bankr. D. Del. 2002).................................................30

*Irving Tr. v. Gomez*, 100 F.R.D. 273 (S.D.N.Y. 1983) .........................................................32

*Kentucky v. Purdue Pharma L.P.*, No. 07-CI-01303 (Ky. Cir. Ct. Dec. 22, 2015) .......................17

*Labzda v. Purdue Pharma L.P.*, 292 F.Supp.2d 1346 (S.D. Fla. 2003) .....................................14

*Lazare Kaplan Int'l, Inc. v. KBC Bank N.V.*, No. 1:11-CV-09490 (ALC), 2016 WL
    4154274 (S.D.N.Y. July 22, 2016) .............................................................................24

*Lippe v. Bairnco Corp.*, 249 F. Supp. 2d 357 (S.D.N.Y. 2003), aff'd, 99 F. App'x 274 (2d
    Cir. 2004)...................................................................................................28, 30, 31

*MacNamara v. City of N.Y.*, No. 04 Civ. 9216 (RJS), 2008 WL 186181 (S.D.N.Y. Jan.
    17, 2008) ........................................................................................................25

*Matter of Xonics Photochemical, Inc.*, 841 F.2d 198 (7th Cir. 1988) ...........................................29

*McCauley v. Purdue Pharma L.P.*, 331 F.Supp.2d 449 (W.D. Va. 2004)....................................15

*Official Comm. Of Asbestos Claimants of G-1 Holding, Inc. v. Heyman*, 342 B.R. 416
    (S.D.N.Y. 2006)...............................................................................................24

*Ord. Granting Mot. to Dismiss, State of North Dakota v. Purdue Pharma L.P.*, No. 08-
    2018-CV-01300 (N.D. Dist. Ct. May 10, 2019) ..........................................................18

UNREDACTED – CONTAINS OUTSIDE PROFESSIONALS' EYES ONLY INFORMATION.
TREAT SUBJECT TO PROTECTIVE ORDER

*People of the State of Cal. v. Purdue Pharma L.P., et al.*, 30-2014-00725287-CU-BT-CXC (Cal. Super. Ct. Orange County) ...................................................................18

*Price v. Purdue Pharma Co.*, 920 So. 2d 479 (Miss. 2006) .........................................15

*Sackler v. Utah Div. of Consumer Protection*, No. 190905862 (Utah Dist. Ct. Oct. 10, 2019) .........................................................................................................................18

*Securities Investor Protection Corp. v. Bernard Madoff Investment Securities LLC*, 319 F.R.D 100 (S.D.N.Y. 2017) .......................................................................................32

*Shakima O. v. Westchester Cty.*, No. 12 CV 9468(VB), 2014 WL 521608 (S.D.N.Y. Feb. 10, 2014) .......................................................................................................................26

*United States* v. *The Purdue Frederick Co.*, 1:07-cr-0029 (W.D. Va. May 10, 2007).................14

*United States v. Purdue Frederick Co., Inc.*, 495 F. Supp.2d 569 (W.D. Va. 2007).....................14

*United States v. Zolin*, 491 U.S. 554 (1989) .........................................................23, 34

OTHER AUTHORITIES

30 N.Y. Jur. 2d, Creditors' Rights and Remedies § 325 ................................................33

Fed. R. Evid. 408 ...........................................................................................................23

UNREDACTED – CONTAINS OUTSIDE PROFESSIONALS' EYES ONLY INFORMATION.
TREAT SUBJECT TO PROTECTIVE ORDER

1.      The Mortimer Sackler Initial Covered Sackler Persons ("Mortimer Sackler ICSPs") respectfully submit this objection to the Official Committee of Unsecured Creditors' ("UCC") Motion to Compel Production of Purportedly Privileged Documents, or for *In Camera* Review, Based on Good Cause, Crime Fraud, and at Issue Exceptions to Claims of Privilege (the "Exceptions Motion").[2]

## PRELIMINARY STATEMENT

2.      The Mortimer Sackler ICSPs have produced more than one million pages of documents and text messages to date.  Notwithstanding this immense production, which comes on top of tens of millions of pages of documents produced by Purdue, IACs, Two-Way Entities and Side B in pre and post petition discovery, the UCC claims in this Exceptions Motion that its ability to conduct diligence has been somehow hindered by the Mortimer Sackler ICSPs' determination that certain documents are protected by attorney-client privilege.  The UCC's motion should be denied because the UCC has not met and cannot meet its burden of coming forward with evidence to substantiate its claims and justify the extraordinary remedy of Court-ordered production of attorney-client communications under either the "crime fraud" or "at issue" exceptions.

3.      **First, the UCC provides no basis to apply the "crime fraud" exception.**  The "crime fraud" exception does not apply because the UCC has not demonstrated and cannot demonstrate a crime, a fraud, or communications with counsel in furtherance of this non-existent conduct.

---

[2]     The Mortimer Sackler ICSPs respond only to the UCC's allegations regarding it and does not address the UCC's allegations regarding "Good Cause" which are directed solely at the Debtor.  The Mortimer Sackler ICSPs preserve, and do not waive, all defenses, including without limitation defenses based on lack of personal jurisdiction.

UNREDACTED – CONTAINS OUTSIDE PROFESSIONALS' EYES ONLY INFORMATION.
TREAT SUBJECT TO PROTECTIVE ORDER

4.      The "crime fraud" exception is narrow and applies only where there are communications with counsel that facilitate a crime or fraud.  The UCC both does not demonstrate any "crime" or "fraud"—failing to substantiate its core allegation that Purdue's authorization of distributions from 2008 to 2016 defrauded unknown, unnamed litigation creditors—and has not even attempted to meet the iron-clad requirement of identifying how particular communications furthered this supposed fraud.  In support of its extraordinary claim that the Mortimer Sackler ICSPs engaged in communications with counsel in furtherance of the claimed fraud, the UCC offers only two paltry, vague explanations that fall far short of what the law requires.  First, it attaches a list of <u>categories</u> of documents which are merely restatements of the UCC's allegations, *e.g.*, "[t]he Sacklers' asset protection and estate planning measures to transfer funds to trusts and other assets with 'limited transparency,'" Hurley Decl. at 21, without making the required showing that a single such communication between a Mortimer Sackler ICSP and counsel even exists.  Second, the UCC provides a list of privilege log entries, many of which on their face could not possibly show communications in furtherance of the supposed fraud, *e.g.*, a communication from 2017—well after the challenged distributions ceased—relating to the establishment of a trust for the family of a spouse of a Mortimer Sackler ISCP and a communication from 2018 relating to "Draft Wills, Revocable Trusts and Related" for the spouse of a child of a Mortimer Sackler ICSP.  Such communications about ordinary financial and estate planning plainly could not have facilitated an alleged fraud that transpired as much as a decade earlier.  The Court should reject the UCC's application to apply the "crime fraud" exception for this reason alone without even needing to address the UCC's underlying fraudulent transfer allegations.

UNREDACTED – CONTAINS OUTSIDE PROFESSIONAL EYES ONLY INFORMATION.
TREAT SUBJECT TO PROTECTIVE ORDER

5.      The UCC's underlying fraudulent conveyance allegations fare no better.[3]  To start, the UCC does not even have standing to bring fraudulent conveyance claims, as these claims are property of the Debtor Estate.  And the UCC's argument puts the proverbial cart before the horse.  The UCC's fraudulent conveyance theory is predicated on the <u>assumption</u> that Purdue has massive liabilities that it cannot afford to pay.  But the UCC does not even attempt to come forward with evidence that its claims will be meritorious.

6.      The UCC's argument is also predicated on revisionist history.  It rests on the fiction that the current wave of unmanageable mass tort litigation against Purdue began over a decade ago and that Purdue's transfers dating back to 2008 were therefore fraudulent.  But there were a very small number of lawsuits targeting Purdue before 2017 and Purdue's Board did not authorize any non-tax distributions after **2016**.  While the UCC attempts to argue that these suits were inevitable with the benefit of hindsight, the law requires that solvency be determined **<u>at the time of the transfer</u>**, and the Exceptions Motion ignores the overwhelming evidence that Purdue was, and reasonably believed to be, solvent when distributions were made from 2008-2016.  During this time period, Purdue—like any company—faced occasional litigation risks, but Purdue had more than enough cash to resolve the matters it then faced.  The risk of the immense wave of litigation that began later—by plaintiffs who had not yet even identified themselves— was simply unfathomable.

---

[3]    This memorandum does not include a full briefing on the underlying fraudulent conveyance claims as these claims are brought up only in the context of a discovery dispute; the Mortimer Sackler ICSPs reserve their rights to provide full briefing on fraudulent conveyance allegations should they ever be presented to, or are to be ruled on, by the Court.

UNREDACTED – CONTAINS OUTSIDE PROFESSIONALS' EYES ONLY INFORMATION.
TREAT SUBJECT TO PROTECTIVE ORDER

7.      As the UCC itself admits, the "lion's share of the cash distributions" it is challenging took place from 2008 through 2012.[4]  Exceptions Mot. ¶ 29.  This period corresponds precisely with the time when Purdue's prescription opioid activities were subject to extensive scrutiny from the Department of Health and Human Service Office of Inspector General ("OIG") and an outside independent review organization ("IRO") as a result of the Corporate Integrity Agreement ("CIA") entered by Purdue in 2007.  Quarter after quarter, Purdue's management kept the Board apprised of the oversight by OIG and IRO and informed the Board that Purdue was in material compliance with all of its CIA obligations.  The CIA was successfully closed out in 2013.  Purdue plainly was not at risk of being rendered insolvent by virtually non-existent litigation regarding those same marketing practices during a period of intense outside scrutiny.

8.      Purdue had more than enough resources to withstand litigation and regulatory inquiries it was facing, or was likely to face.  By 2014, it had amassed more than $1 billion in free cash, far more than Purdue paid to resolve the investigation by the Department of Justice ("DOJ") in 2007, which was by the far the largest legal liability that Purdue had ever faced.  In 2015, Purdue resolved an investigation by the New York Attorney General relating to its prescription opioid marketing practices for $75,000.  Purdue resolved an opioid marketing case brought by Kentucky for $24 million over eight years, even though it faced a procedural bar that could have prevented it from contesting liability.  Purdue had ample cash to resolve many such

---

[4]     The UCC misleadingly conflates distributions that benefitted Purdue's limited partners (non-tax distributions and distributions to the IACs) with tax distributions.  As Purdue is a limited partnership, it does not pay taxes; instead, taxes are paid by its limited partners.  Purdue's management calculated tax distributions.  Then, for Side A, tax distributions were transferred to a U.S.-based holding company and then were paid to federal and state taxing authorities.  The UCC does not and cannot explain why distributions made for the purpose of paying taxes should even be considered in a fraudulent conveyance analysis.

UNREDACTED – CONTAINS OUTSIDE PROFESSIONALS' EYES ONLY INFORMATION.
TREAT SUBJECT TO PROTECTIVE ORDER

suits at these valuations, and the Exceptions Motion provides no basis to conclude that that the Board nonetheless could or should have anticipated the unprecedented current flood of litigation years before it materialized.

9.      Recognizing the weakness of its claims that Purdue was insolvent when distributions were made, the UCC also concocts a theory that Purdue's Board underlinedintentionally acted to defraud creditors.  But the Exceptions Motion fails to identify a shred of evidence showing that a single distribution was made with intent to hinder or delay a single creditor, much less that every distribution was made for that purpose.

10.     **The UCC's "at issue" waiver claim is frivolous.**  The UCC's "at issue" claim—that the Sacklers waived privilege by putting legal advice "at issue" in the bankruptcy proceeding—fails as to the Mortimer Sackler ICSPs because it is based almost entirely on statements made by Side B in settlement presentations, save for two slides from a Side A settlement presentation made pursuant to Federal Rule of Evidence ("FRE") 408.  The UCC's use of a confidential settlement communication to further its agenda is plainly inappropriate. Regardless, Side A did not say anything in that presentation that put privileged legal advice "at issue," and there was no waiver.

## STATEMENT OF FACTS

**I.      The UCC Does Not and Cannot Come Forward with Facts Supporting Its "Crime Fraud" Claims Vis-a-vis the Mortimer Sackler ICSPs**

11.     The UCC's attempt to apply the "crime-fraud" exception fails because the Exceptions Motion falls far short of demonstrating probable cause of the existence of fraudulent transfers, much less identifying communications in furtherance of such alleged conduct.  To the contrary, the Exceptions Motion omits extensive evidence that forecloses the UCC's arguments.

UNREDACTED – CONTAINS OUTSIDE PROFESSIONALS' EYES ONLY INFORMATION.
TREAT SUBJECT TO PROTECTIVE ORDER

### A.    The UCC's Few "Crime Fraud" Documents Do Not Show Anyone Intentionally or Constructively Rendered Purdue Insolvent

12.    The UCC's "crime fraud" argument is based on its self-serving and inaccurate account of the circumstances under which Purdue made distributions and the flow of those funds to Purdue's ultimate shareholders.  The UCC ignores the overwhelming evidence of Purdue's solvency when distributions were calculated and approved, including Purdue's successful operation under and completion of the CIA, Purdue's success in resolving then-existing litigation for relatively small amounts, and Purdue's large cash stockpile.

#### 1.    The UCC's Claim that Purdue Was Insolvent when It Made Distributions Is Contrary to the Clear Historical Record

13.    The UCC's assertion that Board-authorized distributions rendered Purdue insolvent is premised on a gross distortion of the events during the period from 2008 to 2016 when Purdue's Board authorized the non-tax distributions that the UCC is now challenging. During those years, Purdue was indisputably solvent, as Purdue was subject to a small number of prescription opioid marketing lawsuits, which it historically defended very successfully, and Purdue had more than enough cash to resolve them.

14.    ***Purdue had stable finances and ample cash on hand during the time that the Board authorized non-tax distributions.***  In 2016, the last year the Board authorized non-tax distributions, the two leading ratings agencies, S&P and Moody's assessed Purdue and determined ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮.  *See* Ball Decl., Ex. 1 (▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮); *id.*, Ex. 2 at PPLPBN-00002644.  These ratings agencies were fully aware of the media reporting referenced in the UCC's Motion about harms caused by opioid abuse (*See* Exceptions Mot. ¶ 33.), but that did not stop them from concluding ▮▮▮▮▮▮▮▮▮▮▮▮ Indeed, Purdue's management conveyed precisely that point to the Board:

UNREDACTED – CONTAINS OUTSIDE PROFESSIONALS' EYES ONLY INFORMATION.
TREAT SUBJECT TO PROTECTIVE ORDER

> In addition to these Purdue-specific updates, there has been a significant amount of mostly negative legal and regulatory press related to the Pharma industry and specifically opioids. Despite these challenges, we were able to secure ████████████████████ ███████████████████ and maintain strong interest from several investors. — S&P confirmed their BB rating. — Moody's confirmed their previous rating of Ba3…

*Id.*, Ex. 2 at PPLPBN-00002644.

15.    S&P and Moody's determination that ██████████████████ was the outcome of processes that Purdue consistently had employed to ensure that it had sufficient cash on hand. Purdue's management determined the funds necessary for operations and working capital, including anticipated legal expenses. *See id.*, Ex. 3. Distributions were made only from cash that was left over after those needs were fully funded, and only after they were approved by Purdue's full board. *See id.*, Exs. 4-5 (Board decision and notes reflecting approval of distributions in Dec. 2, 2010 decision by Peter Boer, Judy Lewent, Cecil Pickett, and others); *id.*, Exs. 6-7 (Board decision and notes reflecting approval of distributions in June 24, 2011 decision by Peter Boer, Judy Lewent, Cecil Pickett, and others). Purdue's board was not limited to members of the Sackler family but also included outside directors with impeccable credentials, including the former CFO of a large pharmaceutical company, an eminent pharmaceutical development specialist, and the dean of a prominent medical school. Consistent with these cash management practices, as of 2014, Purdue had built up a cash cushion of over $1 billion. *Id.*, Ex. 8 at PPLPUCC900266 8962. By the time of Purdue's chapter 11 filing, it had more than $1.3 billion in available cash and no funded debt. *Corporate Monthly Operating Report*, ECF No. 520 at 3-4. In other words, from the year in which the very first three municipal lawsuits regarding Purdue's prescription opioid marketing practices were filed (2014) to the moment of the chapter 11 filing (2019), Purdue <u>increased</u> its already enormous cash on hand by over 30%. This is the polar opposite of a fraudulent conveyance strategy.

UNREDACTED – CONTAINS OUTSIDE PROFESSIONALS' EYES ONLY INFORMATION.
TREAT SUBJECT TO PROTECTIVE ORDER

16.      ***Purdue's pre-2017 litigation experience confirmed that Purdue had sufficient resources to resolve the litigation it faced***.  In 2007, Purdue resolved the DOJ investigation for $634 million and the investigation by 27 state attorneys general for $19 million.[5]  These payments did not threaten Purdue's solvency and Purdue always had at least hundreds of millions in dollars in cash on hand after that time.

17.      The UCC's contentions also ignore that lawsuits against Purdue routinely failed.  Court after court held that Purdue's marketing practices simply did not cause opioid injuries.  Purdue had numerous wins and low-value settlements with individual plaintiffs because those plaintiffs could not show that Purdue's marketing caused their alleged harm—and in fact evidence typically proved to the contrary.  *See, e.g.*, *United States v. Purdue Frederick Co., Inc.*, 495 F. Supp.2d 569, 575 (W.D. Va. 2007) ("As to any individuals injured by the use of OxyContin, the difficulties of establishing causation are demonstrated by the numerous civil suits that have been filed by such persons against Purdue, including two before this court. **Courts have consistently found that despite extensive discovery, plaintiffs were unable to show that Purdue's misbranding proximately caused their injuries.**").  The following are just some of the cases that Purdue won because plaintiffs could not prove causation:

- *Labzda v. Purdue Pharma L.P.*, 292 F.Supp.2d 1346 (S.D. Fla. 2003):  Plaintiff failed to prove causation where before obtaining OxyContin, plaintiff  abused OxyContin, marijuana, ecstasy, and alcohol, and lied about his condition to obtain a prescription.  On the date of death, plaintiff consumed large quantities of alcohol and marijuana and crushed/snorted OxyContin.

- *Foister v. Purdue Pharma L.P.*, 295 F. Supp. 2d 693 (E.D. Ky. 2003):  Each of [eight] named plaintiffs either had a preexisting drug abuse history before obtaining a

---

[5]    *See* Plea Agreement, *United States* v. *The Purdue Frederick Co.*, 1:07-cr-0029 (W.D. Va. May 10, 2007) (ECF No. 6); Information, Attachment D (Civil Settlement Agreement), *United States* v. *The Purdue Frederick Co.*, 1:07-cr-0029 (W.D. Va. May 10, 2007) (ECF No. 5-4); Consent Judgment at ¶ 25, *In re Purdue Pharma L.P.*, Case No. 07-C-00740 (Ky. Cir. Ct. May 8, 2007).

UNREDACTED – CONTAINS OUTSIDE PROFESSIONALS' EYES ONLY INFORMATION.
TREAT SUBJECT TO PROTECTIVE ORDER

prescription and/or failed to follow OxyContin PI, *e.g.*, a plaintiff who had history of abusing marijuana, Percocet, Percodan, Roxanol, cocaine and methamphetamines before he ever received an OxyContin prescription.

- *McCauley v. Purdue Pharma L.P.*, 331 F.Supp.2d 449 (W.D. Va. 2004): Each plaintiff was taking other opioid products, such as Percocet and Lortab, while also taking OxyContin. One plaintiff was receiving other opioid prescriptions from multiple doctors while taking OxyContin and lying to his physicians about his overlapping prescriptions

- *Price v. Purdue Pharma Co.*, 920 So. 2d 479 (Miss. 2006): Plaintiff was treated by, and obtained OxyContin from, ten different physicians from ten different clinics in two cities, and had used seven different pharmacies in three cities.

- *Bodie v. Purdue Pharma Co.*, 236 F. App'x 511 (11th Cir. June 1, 2007): Plaintiff's physician testified that he was aware that OxyContin posed a risk of addiction and that his decision to prescribe OxyContin to plaintiff was independent of any marketing materials Purdue provided.

- *Boysaw v. Purdue Pharma*, No. 1:07-cv-00079, 2008 WL 4452650 (W.D. Va. Sept. 30, 2008) : Plaintiff's physician prescribed a variety of opioid medications to treat plaintiff's pain, including OxyContin, OxyIR, Methadone, and Kadian. Plaintiff then sought an opioid prescription from a different physician, who stopped treating plaintiff after learning he had tested positive for cocaine use.

18.     Additionally, in early 2007, Purdue settled 1374 individual claims for $75 million and the tolled claims of several thousand additional claimants were also settled.  As described in an article sent to the Board at that time, this settlement "effectively shuts down nearly all existing products-liability litigation against the company."  *See* Ball Decl., Ex. 11.

19.     By the UCC's own description, the "lion's share" of the distributions at issue were authorized from 2008 to 2012.  *See* Exceptions Mot. ¶ 29.  During this time period, Purdue's prescription opioid marketing activity was under extensive government oversight as a result of the CIA entered into with the DOJ in 2007.  This included detailed audits of its opioid marketing and sales practices by the IRO, which were submitted to OIG.

20.     Purdue's management repeatedly notified the Board that Purdue was in material compliance with all CIA requirements in every one of those years and that any minor issues were being promptly remediated.  For example:

UNREDACTED – CONTAINS OUTSIDE PROFESSIONALS' EYES ONLY INFORMATION.
TREAT SUBJECT TO PROTECTIVE ORDER

- The July 2008 report stated: "we received confirmation that the OIG was satisfied with Purdue's Implementation Report" and OIG "confirmed . . . 'that Purdue has successfully implemented the initial requirements of its [CIA].'"  Ball Decl., Ex. 10 at PPLP004367324.

- The October 2009 report stated: "all requirements fully met for CIA year 2." *Id.*, Ex. 11 at PPLP004402984.

- The April 2010 report stated:  "Purdue's OIG monitor confirmed that … Purdue was in compliance with the terms of the CIA." *Id.* Ex. 12 at PPLPC012000269488.

- The August 2011 report stated:  "All requirements under the CIA have been met in Reporting Period 4." *Id.*, Ex. 13 at PPLP00436940.

- The July 2012 report stated: "There have been no Reportable Events in year five, and no unfavorable communications with the Office of Inspector General. We expect to complete the full term of the CIA with a favorable review." *Id.*, Ex. 14 at PPLPC012000387512.

- The April 2013 report contained a section of the OIG's letter from January 24, 2013, stating: "it appears that Purdue was in compliance with the terms of the [CIA] . . . during the fifth annual reporting period" and "that the term of the Purdue CIA has now concluded." *Id.* Ex. 15 at PPLP004409695.

21.    Purdue successfully concluded the CIA in early 2013.  Prior to the termination of the CIA, Purdue's management told the Board it was committed to continuing the compliance practices adopted during the CIA period.  *See id.*, Ex. 16 at PPLP004408048 (noting that Purdue "will continue to do nearly all CIA-required compliance activities" and that "we will drop a small percentage of total workload that was OIG-centric (e.g., reporting to OIG), but expand other valuable activities."  It is illogical to suggest that Purdue and its Board should have foreseen the risk of a flood of litigation regarding its marketing that could render it insolvent at the same time that the exact marketing practices were under considerable scrutiny by governmental authorities and found to be fully compliant.

22.    Two settlements in 2015 again confirmed that Purdue could afford to resolve litigation related to its prescription opioid marketing activities.  Purdue resolved an investigation by the New York Attorney General into its prescription opioid marketing practices with an

UNREDACTED – CONTAINS OUTSIDE PROFESSIONALS' EYES ONLY INFORMATION.
TREAT SUBJECT TO PROTECTIVE ORDER

Assurance of Discontinuance ("AOD") that included a payment of **$75,000.** As part of this settlement, Purdue agreed to a variety of steps to enhance its marketing compliance practices going forward. The AOD stated that Purdue's Abuse and Diversion Detection Program ("ADD") "can be an effective tool in identifying potential abuse and illegal diversion of opioids, these findings demonstrate opportunities for improvement in Purdue's implementation of the program" and required Purdue to (i) make several enhancements to that program, including providing the State with the names of healthcare providers in the State on the "no call list" due to suspected improper activities (ii) impose limitations on total compensation for sales personnel that could be attributed to OxyContin sales.[6] Pursuant to the AOD, the New York Attorney General appointed a monitor who reviewed Purdue's ADD decisions nationwide and subsequently concluded that these decisions reflected the outcome of a process undertaken "conscientiously" and "in good faith," and were "reasonable."[7]

23. In 2015, Purdue also resolved a suit by the Kentucky Attorney General regarding prescription opioid marketing practices with a payment of $24 million over eight years. Agreed Judgment and Stipulation of Dismissal with Prejudice, *Kentucky v. Purdue Pharma L.P.*, No. 07-CI-01303 ¶ 13 (Ky. Cir. Ct. Dec. 22, 2015). That amount was inflated because Purdue had committed a procedural error in the course of the litigation which put it at risk that a court would conclude that it had admitted liability by default. Both of these settlements confirmed that Purdue had more than enough reserves to resolve any prescription opioid marketing suits.

---

[6]    Assurance of Discontinuance, In re Purdue Pharma L.P. (Aug. 19, 2015), http://ag.ny.gov/pdfs/Purdue-AOD-Executed.pdf.

[7]    Oct. 7, 2016, Douglas R. Jensen, Auditor's First Report on Purdue Pharma's ADD Program, Ball Decl., Ex. 17 at PPLP004473668-3669; Oct. 20, 2017, Douglas R. Jensen, Auditor's Second Report on Purdue Pharma's ADD Program, Ball Decl., Ex. 18 at PPLP004473711-3712; Oct. 19, 2018, Douglas R. Jensen, Auditor's Third and Final Report on Purdue Pharma's ADD Program, Ball Decl., Ex. 19 at PPLP004473740-3741.

UNREDACTED – CONTAINS OUTSIDE PROFESSIONALS' EYES ONLY INFORMATION.
TREAT SUBJECT TO PROTECTIVE ORDER

24.     In 2016, a presentation by Purdue's management to the Board included a slide entitled "Major Potential Risks to the current cash flow outlook" stated: "Purdue * Litigations (low)," again confirming that Purdue's management did not believe that litigation threatened its solvency.  *See* Ball Decl., Ex. 20 at PPLP004412631.

25.     The litigation wave against Purdue did not become significant until 2017.  Purdue was sued by three municipalities in 2014[8]—but the number of such suits remained small until 2017 when Purdue was subject to several hundred suits.  The first lawsuit naming the Side A Former Directors of Purdue's board was not filed until June 2018.

26.     But even in the period after distributions ceased, key litigation developments contradict the UCC's theories.  The only two cases against Purdue during this period that reached final dispositions resulted in dismissal.  *See Ord. Granting Mot. to Dismiss, State of North Dakota v. Purdue Pharma L.P.*, No. 08-2018-CV-01300 (N.D. Dist. Ct. May 10, 2019); *City of New Haven v. Purdue Pharma, L.P.*, No. X07HHD CV 17-6086134 (Conn. Super. Ct. Jan. 8, 2019).  And in Utah, the District Court issued an extraordinary writ dismissing a case brought by the Division of Consumer Protection against Side A Former Director Kathe Sackler.  *See Sackler v. Utah Div. of Consumer Protection*, No. 190905862 (Utah Dist. Ct. Oct. 10, 2019).

27.     As Purdue explained in its first day brief, "not one of the Pending Actions has resulted in any finding of liability against the Defendant Debtors or Related Parties." Debtors' Informational Brief, ECF No. 17 at 42.  And no member of the Sackler family has ever been adjudged liable.

---

[8]     *See City of Chicago v. Purdue Pharma, L.P., et al.*, No. 14 C 4361 (N.D. Ill.); *People of the State of Cal. v. Purdue Pharma L.P., et al.*, 30-2014-00725287-CU-BT-CXC (Cal. Super. Ct. Orange County)

UNREDACTED – CONTAINS OUTSIDE PROFESSIONALS' EYES ONLY INFORMATION.
TREAT SUBJECT TO PROTECTIVE ORDER

**2.     The UCC Does Not Have a Shred of Evidence that Mortimer Sackler ICSP—or Purdue's Board—Acted With the Intent to Hinder Creditors**

28.     Unable to overcome the overwhelming evidence that Purdue had more than enough cash to resolve then then-existent litigation, the UCC also alleges that Purdue's Board somehow acted with the intent to hinder or delay Purdue's judgment creditors.  But the UCC does not identify evidence that shows that any given transfer—much less every one of them— was made with the intent to defraud any creditor.

29.     The UCC's intentional fraudulent transfer argument rests on the demonstrably false assumption that the Mortimer Sackler ICSPs were somehow following a strategy laid out by Peter Boer in a July 2007 "Confidential Memorandum" to Jon Sackler in which he recommended transferring assets overseas. *See* Exceptions Mot. ¶ 23-24. This document is plainly irrelevant to the Mortimer Sackler ICSPs:  it was not sent to any of them or anyone else on Side A; Mr. Boer was not on Purdue's Board at that time; and Mr. Boer was later appointed to the Board by Side B.  Further, the Side A ownership structure, which was established long before this memo was written, could not possibly have been established to evade opioid lawsuits faced by Purdue in 2017 and thereafter.

30.     Side A's share of Purdue has been held by the Beacon Trust since it was settled in 1993—several years before the first OxyContin pill was ever sold.  Ball Decl., Ex. 21.  Beacon Trust was established as a Jersey Trust because the settlor, Mortimer D. Sackler, Sr. was European and had a European family:  Mortimer Sr. had been an Austrian citizen since the 1970s, his wife was a citizen of the United Kingdom and four of his children resided there as well.  This ownership trust had absolutely nothing to do with legal liability relating to OxyContin marketing litigation decades later.

UNREDACTED – CONTAINS OUTSIDE PROFESSIONALS' EYES ONLY INFORMATION.
TREAT SUBJECT TO PROTECTIVE ORDER

31.     The UCC cites a February 2008 email in which Mortimer D.A. Sackler wrote to
Richard Sackler—in the context of urging Side B to agree to a sale of Purdue—that
"[f]undamentally we don't want to stay in this business anymore (given the horrible risks,
outlooks, difficulties) and I think the majority of your family feels the same way."  Hurley Decl.,
Ex. 67.  The UCC ignores that he went on to say that Purdue's "**prospects have <u>improved</u>
<u>dramatically</u>**."  *Id.*  The suggestion that the email refers to future opioid litigation risks that
could render Purdue insolvent is created by the UCC out of whole cloth and contravened by the
omitted portion of Mr. Sackler's email.

32.     The UCC cites to various documents that discussed Purdue's difficulty obtaining
product liability insurance, including one request by a Mortimer Sackler ICSP for an update on
Purdue's efforts to obtain such insurance.  *Id.*, Ex. 59 at 9875-76.  The UCC fails to mention that
one of the very documents it cites confirm OxyContin was not uniquely situated:  this document
recites that product liability insurance was likely not available for any Schedule II medicine and
product liability insurance on "other products is expensive, restrictive, and not available at
adequate levels so is not recommended." *Id.*, Ex. 60 at 2.  Regardless, no document expressed
concern that Purdue could not afford to resolve product liability litigation.  To the contrary, as
explained above, Purdue had consistently <u>prevailed</u> in product liability suits.

33.     The UCC alleges that from 2012 to 2015, Purdue's chief compliance officer told
the Board in several presentations about federal government enforcement actions against
unrelated pharmaceutical companies.  *Id.*, Exs. 84-86.  These briefings, however, show that
Purdue's chief compliance officer acted responsibly in keeping the Board apprised of key
developments, including enforcement actions against companies unrelated to Purdue.  More
fundamentally, in these same presentations, the chief compliance officer told the Board that

UNREDACTED – CONTAINS OUTSIDE PROFESSIONALS' EYES ONLY INFORMATION.
TREAT SUBJECT TO PROTECTIVE ORDER

Purdue was complying fully with all applicable legal and regulatory requirements. *Id.,* Ex. 84 at 7 ("Throughout 4Q12, the Company continued to maintain a state of effective compliance, with all components of the Annual Compliance Scorecard above the established standards."); Ex. 85 at 1167 ("Purdue continues to have excellent systems and processes in place to prevent and detect violations, and to remediate issues before they become major. No significant compliance issues to date in 2014.") Ex. 86 at 2072 ("Purdue continues to have strong systems and processes in place to prevent and detect violations of law, regulations and Company policies…**There have been no significant compliance issues in the 1st quarter, 2015**.") (emphasis in original). Nothing about these briefings suggests Purdue might become insolvent; in fact the consistent assurances regarding compliance demonstrated just the opposite.[9]

34.     The UCC alleges that during the period of 2017-2019 certain Side A members expressed a preference for discussing sensitive issues relating to negative press coverage on WhatsApp or by telephone. *Id.*, Exs. 73-74. These documents could not possibly support the UCC's allegation because these documents were authored years after the challenged distributions. Moreover, these documents were <u>produced</u>, notwithstanding their sensitivity—demonstrating Side A's commitment to transparency.

---

[9]     The UCC also cites to an email from a Side A Former Director in 2015 providing instructions that communications about tax notices and audits and communications with tax agencies should be conducted orally. *See* Hurley Decl., Ex. 108. Again, this document is irrelevant as it was produced and has nothing do with Purdue's distributions or opioid litigation liability. Of course, many people do not want to have email communication about their taxes out of concern that sensitive information, including Social Security Numbers, may be stolen and used in identity theft. *See, e.g.,* New York State Dept. Tax and Finance, *Protect Yourself from Identity Theft During the Tax Season* (Feb. 25, 2020) https://www.tax.ny.gov/press/rel/2020/idtheft022520.htm ("Tax season isn't only a busy time for tax professionals, scammers also kick into high gear targeting taxpayers. It's critical for all New Yorkers to be vigilant in protecting their sensitive tax information from falling into the wrong hands.").

UNREDACTED – CONTAINS OUTSIDE PROFESSIONALS' EYES ONLY INFORMATION.
TREAT SUBJECT TO PROTECTIVE ORDER

**B.    The UCC Offers No Evidence to Suggest that Counsel Facilitated Any Supposedly Fraudulent Transfers**

35.    The UCC also fails to describe how privileged communications between Mortimer Sackler ICSPs (or other Side A members) and counsel somehow supposedly facilitated the alleged fraudulent conveyances.  The UCC instead identified two categories of information it claims are subject to the exception:

36.    First, the UCC included a laundry list of "<u>categories</u> of documents that the UCC <u>suspects</u> have been withheld" that do little more than restate the UCC's fraudulent conveyance allegations, *e.g.*, "The formation, governance and management of the Sacklers' trusts, including whether trusts were created or modified, or transfers made among trusts, for the purpose of delaying or hindering creditor…." and "[t]he appropriate amount, and mechanics for, distributions to the Sacklers to avoid tracing or liability (including fraudulent transfer liability." The UCC did not even attempt to connect any of these categories to specific Mortimer Sackler ICSP privilege log entries.  Exceptions Mot. ¶ 81; Hurley Decl., Ex. 101.

37.    Second, the UCC appended a list of Side A privilege log entries, nearly all of which appear to have been selected because they contain the word "trust" somewhere in the description.  Many of these communications were made <u>after</u> the final challenged distribution and relate to legal advice regarding estate planning.  *See e.g.*,Hurley Decl., Ex. A, Log Entries 13242, 32429, 32438, 32443.  Other communications identified for the pre-2017 period relate to similar topics.  *See, e.g.*, *id.*,Log Entries 31586, 31820, 31706, 31712, 31833.  The UCC has not specified what, if anything, it contends each and every such communication has to do with the challenged distributions or prescription opioid litigation.

UNREDACTED – CONTAINS OUTSIDE PROFESSIONALS' EYES ONLY INFORMATION.
TREAT SUBJECT TO PROTECTIVE ORDER

## II.   The UCC's "At Issue" Allegations Are Predicated on Two Slides in a Settlement Presentation that Do Not Mention Legal Advice

38.     With respect to Mortimer Sackler ICSPs, the UCC's claim that there is an "at issue" waiver is based on nothing more than two slides from a confidential <u>settlement presentation</u> by Side A counsel to counsel for the Debtors and Creditors pursuant to FRE 408. Exceptions Mot. ¶ 82.  These slides explained the reasons that any fraudulent conveyance allegations would fail—in substance the same arguments that are made below.  Notably, the presentation does not say anything about Side A relying on advice of counsel regarding distribution decisions and makes no express, or even implied, reference to a single communication with counsel, the privilege of which the UCC is challenging.

## ARGUMENT

## I.   The UCC Does Not and Cannot Demonstrate Any Basis to Apply the "Crime Fraud" Exception

39.     The attorney-client privilege is "the oldest of the privileges for confidential communications known to the common law," and serves the venerable purpose of "encourag[ing] full and frank communication between attorneys and their clients[,] . . . thereby promot[ing] broader public interests in the observance of law and administration of justice." *United States v. Zolin*, 491 U.S. 554, 562 (1989) (citations omitted).  Courts in this Circuit have emphasized that, given the "critical role" that the attorney-client privilege plays in our judicial system, the crime-fraud exception and other waiver rule must be applied narrowly to avoid "vitiat[ing] much of the protection they afford."  *See In re Richard Roe, Inc.* 168 F.3d 69, 71 (2d Cir. 1999) (reversing a decision applying the crime-fraud exception).  The UCC's motion should be denied because it does not come even close to the required two-part showing under the exception, failing to demonstrate any "**factual basis** for a showing of probable cause to believe that a fraud or crime has been committed and that the communications in question were in

UNREDACTED – CONTAINS OUTSIDE PROFESSIONALS' EYES ONLY INFORMATION.
TREAT SUBJECT TO PROTECTIVE ORDER

furtherance of the fraud or crime." *Lazare Kaplan Int'l, Inc. v. KBC Bank N.V.*, No. 1:11-CV-09490 (ALC), 2016 WL 4154274, at *3 (S.D.N.Y. July 22, 2016) (emphasis added).

40.     The UCC's Motion appears to be an inappropriate attempt to assert fraudulent conveyance claims that the UCC lacks standing to assert, disguised as a discovery dispute.  This Court previously declined to decide a "crime fraud" motion based on fraudulent transfer allegations in a similar posture, explaining that the "determinations necessary to establish probable cause, most of them factual, cannot be made in this context and on this record as it now stands," particularly because "[t]he issues . . . lie at the heart of the present controversy." *Official Comm. Of Asbestos Claimants of G-1 Holding, Inc. v. Heyman*, 342 B.R. 416, 427 (S.D.N.Y. 2006).  The logic of this argument applies with equal—indeed far greater—force in this matter.  Fraudulent conveyance claims are the property of the Debtor estate, not the UCC and this is not the time or place for such claims to be litigated.  In addition, the Court can decline to apply the "crime fraud" exception for the independent reason that the UCC does not even make a meaningful attempt to grapple with the requirement to identify particular communications that furthered the supposed fraud.

### A.     The UCC Has Not Identified Any Particular Communications Involving Counsel that Furthered the Alleged Fraud

41.     The UCC appears to assume that if it merely recites its fraudulent conveyance allegation, it follows that the Court must order a broad privilege waiver related to its allegations.  But that is not enough.  *See, e.g.*, *Freedman v. Weatherford Int'l Ltd.*, No. 12 Civ. 2121(LAK)(JCF), 2014 WL 3767034, at *7 (S.D.N.Y. July 25, 2014) ("[S]uch documents are not the type that facilitate or further fraudulent conduct; at most, they would potentially provide evidence of a fraud.  This is insufficient to trigger the crime-fraud waiver.").  The UCC must meet the applicable standard in the Second Circuit for <u>each</u> challenged communication:  "there

UNREDACTED – CONTAINS OUTSIDE PROFESSIONALS' EYES ONLY INFORMATION.
TREAT SUBJECT TO PROTECTIVE ORDER

[must] be (i) a determination that 'the client communication or attorney work product in question was itself in furtherance of the crime or fraud' and (ii) 'probable cause to believe that **the particular communication** with counsel or attorney work product was intended in some way to facilitate or to conceal the criminal activity.'" *In re Richard Roe LLC*, 168 F.3d at 71. *See also, e.g.*, *In re Gen. Motors LLC*, No. 14-MC-2543 (JMF), 2015 WL 7574460, at \*4 (S.D.N.Y. Nov. 25, 2015) ("[T]o subject privileged communications or attorney work product to disclosure, a party must show a purposeful nexus . . . that the communications were made with an intent to further the crime or fraud[.]")(internal citation and quotation marks omitted). The applicant must show that "**each of the particular attorney-client communications at issue was used in furtherance of a crime or fraud** and cannot rest merely upon the movant's presentation of a 'theory' regarding widespread fraud." *MacNamara v. City of N.Y.*, No. 04 Civ. 9216 (RJS), 2008 WL 186181, at \*4 (S.D.N.Y. Jan. 17, 2008) (internal citation and quotation marks omitted).

42.     The UCC has not come anywhere near making the required particularized showing. As discussed above, the UCC's attempt to transform its fraudulent conveyance theory into self-identified "Categories of Privilege Claims"—which do not specify a single communication on the Mortimer Sackler ICSP privilege log—could not possibly identify a "particular" communication in furtherance of a fraud.

43.     The "crime fraud" tab in the UCC's spreadsheet of Mortimer Sackler ICSP documents that it seeks to challenge fares no better. The UCC does not and cannot explain how a communication could further an alleged fraud relating to a distribution years after the allegedly fraudulent distributions stopped altogether (16% of the communications on the UCC's chart)— and dozens of additional documents reflecting communications that were made years after some, if not all, of the challenged distributions were made, *e.g.*, 60% of the communications on the

UNREDACTED – CONTAINS OUTSIDE PROFESSIONALS' EYES ONLY INFORMATION.
TREAT SUBJECT TO PROTECTIVE ORDER

UCC's chart took place after the 2008-2012 period in which the "lion's share" of the distributions were authorized.  The UCC similarly cannot explain how the subject matters of emails on the privilege log, such as "Draft Wills, Revocable Trusts, and Related"; or "Your Wills and Pourover Trust" have any type of nexus to the UCC's allegations about specific transfers being fraudulent or the magnitude of risk (or lack thereof) presented by opioid litigation.  Courts routinely decline to apply the "crime fraud" exception in such circumstances where the applicant cannot show how communications with counsel furthered an alleged crime of fraud.  *See, e.g.*, *Coan v. Dunne*, 2019 WL 1513462, at *4 (D. Conn. Apr. 8, 2019) ("The attorney-client and work-product privileges are entitled to careful protection, and the Trustee has not made the particularized showing to justify the crime/fraud exception for the vast range of otherwise privileged documents he seeks."); *In re: General Motors*, Nos. 14-MD-2543 (JMF), 14-MC-2543 (JMF), 2015 WL 7574460, at *6 (S.D.N.Y. Nov. 15, 2015) (declining to apply crime fraud exception where plaintiffs "d[id] not provide a factual basis for a good faith belief that the communications and work product they seek—let alone any *particular* communications or work product they seek—were made with the intent to further a crime or fraud." (emphasis in original)); *Freedman v. Weatherford Int'l Ltd.*, No. 12 Civ. 2121(LAK)(JCF), 2014 WL 3767034, at *7 (S.D.N.Y. July 25, 2014) (discussed above); *Shakima O. v. Westchester Cty.*, No. 12 CV 9468(VB), 2014 WL 521608, at *7 (S.D.N.Y. Feb. 10, 2014) (declining to apply crime fraud exception because plaintiffs had not "demonstrated the e-mail was sent in furtherance of any such fraud or crime").

   **B.**   **The UCC Has Not Met Its Burden of Providing a Factual Basis to Support its Fraudulent Conveyance Claims**

   44.   The UCC has utterly failed to meet its burden of providing a factual basis to substantiate its allegations of intentional or constructive fraudulent conveyances.  *See, e.g., In re*

UNREDACTED – CONTAINS OUTSIDE PROFESSIONALS' EYES ONLY INFORMATION.
TREAT SUBJECT TO PROTECTIVE ORDER

*Omnicom Group Inc., Sec. Litig.*, 233 F.R.D. 400, 404 (S.D.N.Y. 2006) ("According to the Second Circuit, to justify invocation of this exception to the privilege, the discovering party bears the burden to demonstrate that there is "probable cause to believe that a fraud or crime has been committed and that the communications in question were in furtherance of the crime or fraud"). As courts in this Circuit have made clear, "the privilege is not to be lightly cast aside based on speculative allegations," *Danisco A/S v. Novozymes A/S*, 427 F. Supp. 2d 443, 445 (S.D.N.Y. 2006), and a movant's burden is not satisfied by merely suggesting that material "<u>might</u> provide evidence of a crime or fraud." *In re Richard Roe LLC*, 168 F.3d at 71; *compare with* Exceptions Mot., ¶ 81 ("The UCC has identified the categories of documents that the UCC <u>suspects</u> have been withheld and are reasonably related to the fraudulent schemes.").

45.     Here, the Exceptions Motion offers little more than sweeping and inaccurate generalizations about dozens of transactions over the course of a decade and vague discussions of potential litigation liabilities, precisely the circumstances where the crime fraud exception cannot apply. *See, e.g.*, *In re Gen. Motors LLC*, No. 14-MC-2543 (JMF), 2015 WL 7574460, at *7 (S.D.N.Y. Nov. 25, 2015) (denying crime fraud exception where material was "candid legal advice regarding the company's potential liability on individual claims"); *In Caesars Entm't Operating Co., Inc.*, No. 15 B 1145, 2016 WL 7477566, at *4 (Bankr. N.D. Ill. Sept. 21, 2016) (denying crime fraud exception where plaintiffs relied on bare allegations from their complaint).

46.     **The UCC does not and cannot support its constructive fraudulent conveyance claim.**

47.     The UCC cannot base "crime fraud" allegations on a <u>constructive</u> fraudulent conveyance argument because the "crime fraud" exception applies only where there is fraudulent intent—an element necessarily lacking in a constructive fraud theory. *See, e.g.*, *In re Fresh Del*

UNREDACTED – CONTAINS OUTSIDE PROFESSIONALS' EYES ONLY INFORMATION.
TREAT SUBJECT TO PROTECTIVE ORDER

*Monte Pineapple Antitrust Litig.*, No. 04 MD 1628 (RMB), 2007 WL 64189, at *14 (S.D.N.Y.

Jan. 4, 2007) ("It seems clear that the intent element, so critical to the application of the crime-

fraud exception to the attorney client privilege, requires intent to induce detrimental reliance.");

*See In re Caesars Entm't Operating Co., Inc.*, 2016 WL 7477566, at *3 ("As CEC correctly

argues, however, 'fraudulent transfer' is an umbrella term for a variety of claims, some of which

involve fraud in the usual sense and some of which do not. Even so-called fraudulent transfer

claims based on actual as opposed to constructive fraud may not involve fraud, since those

claims can be premised on an intent to hinder or delay creditors.").

48.    The UCC does not and cannot come forward with facts that would show probable

cause that Purdue's Board authorized distributions that supposedly rendered it insolvent.  The

UCC's claim that Purdue was rendered insolvent by transfers from 2008 to 2016 because <u>in 2020</u>

"the value of *claims* asserted against the Debtors are historically vast" and measured in trillions

of dollars, *see* Exceptions Mot. ¶ 58, is facially unsustainable.  These claims are, of course,

unproven.  Solvency must be assessed at the time of the transfer, not informed by hindsight.  *See,

In re Iridium Operating LLC*, 373 B.R. 283, 345 (Bankr. S.D.N.Y. 2007) ("In determining

whether a company was adequately capitalized, courts examine not what ultimately happened to

the company, but whether the company's then-existing cash flow projections … were reasonable

and prudent when made."); *Chapin Home for the Aging v. McKimm*, No. 11-CV-0667 (FB)

(RER), 2014 WL 12883697, at *7 (E.D.N.Y. Aug. 7, 2014) ("If the debtor can establish at the

time of the transfer some figure of net worth, *i.e.* a positive value of assets in excess of its

probable liabilities, then insolvency is not established." (citing *Lippe v. Bairnco Corp.*, 249 F.

Supp. 2d 357, 360 (S.D.N.Y. 2003), aff'd, 99 F. App'x 274 (2d Cir. 2004), *disagreed with on

other grounds by Kim v. Yoo*, 776 F. App'x 16 (2d Cir. 2019) (summary order)).  As such,

UNREDACTED – CONTAINS OUTSIDE PROFESSIONALS' EYES ONLY INFORMATION.
TREAT SUBJECT TO PROTECTIVE ORDER

"remote contingencies, which do not seriously endanger the [defendant's] ability to pay its debts,

[are not] deemed to make an otherwise solvent firm bankrupt." *Matter of Xonics Photochemical,*

*Inc.*, 841 F.2d 198, 201 (7th Cir. 1988) (Posner, J).

49. Here, the UCC does not even attempt to explain how to assess and quantify—in

real time—liabilities that Purdue supposedly faced from 2008-2016 relating to lawsuits that were

not filed until years later. Nor can the UCC do so, because the evidence is overwhelmingly to

the contrary and demonstrates that Purdue had more than enough resources to resolve the

litigation it was then facing:

- **Early 2000s onwards:** Purdue consistently prevailed in suits brought by individuals who alleged that they suffered harm as a result of abusing OxyContin or resolved them for small amounts. Purdue had no reason to believe that the few suits brought by government entities pre-2017 would fare any better. Government claims are just a derivative aggregation of secondary response costs the government allegedly incurred responding to opioid-related harms suffered by residents whose direct claims did not succeed when they were brought on an individual basis.

- **2008-2012:** During this time period when the "lion's share" of Purdue's distributions were made, Purdue's marketing activities were under close scrutiny by OIG and the IRO. OIG notified Purdue each year that it was in compliance with its obligations under the CIA. And Purdue's management reported to the Board every quarter about its successful CIA compliance. Given this close outside scrutiny over its marketing practices, coupled with a finding of compliance, Purdue had no reason to believe that suits over those same practices could somehow jeopardize its solvency

- **2014 onwards:** Purdue had more $1 billion in available cash after all operational and working capital needs (including legal expenses) were met. That cash gave Purdue extensive resources to resolve litigation.

- **2015:** The New York Attorney General resolved its prescription opioid marketing investigation for just **$75,000** and minor enhancements to Purdue's ADD program. Purdue certainly had no reason to believe that the New York Attorney General would return several years later claiming that Purdue and members of the Sackler family owed many multiples of that amount because of its prescription opioid marketing practices.

- **2015:** The litigation brought by Kentucky regarding Purdue's prescription opioid marketing practices was settled for $24 million over eight years, a tiny fraction of Purdue's free cash. Moreover, as described above, that amount was inflated by Purdue's litigation error.

UNREDACTED – CONTAINS OUTSIDE PROFESSIONALS' EYES ONLY INFORMATION.
TREAT SUBJECT TO PROTECTIVE ORDER

- **2016:** The year before the litigation wave became significant, ratings agencies confirmed that Purdue's financial outlook was stable and Purdue's management told the Board that litigation risk was low.

- **2017 – present:** Since the litigation wave began, Purdue has prevailed in two cases, Kathe Sackler prevailed in one case and no creditor has successfully litigated a case to verdict. [*See supra* §I.A.1.]

50.     The decision in *Lippe v. Bairnco Corporation* illustrates why any constructive fraudulent conveyance theory must fail.  In *Lippe*, Keene Corporation, which had filed for bankruptcy after being sued in 100,000 asbestos cases, was the subject of a fraudulent conveyance action brought by a trustee which alleged that Keene had engaged in a scheme to hide assets from judgment creditors.  The court disagreed, explaining that "Keene could not predict the future, and it had no reason to know, at the time of the transfers, that years later it would be rendered insolvent by a flood of asbestos filings." *Lippe*, 249 F. Supp. 2d at 360.  Here too, Purdue's Board could not foresee the future and had no reason to know that it would be subject to "a flood of … filings."

51.     *In re W.R. Grace & Co.,* 281 B.R. 852, 869 (Bankr. D. Del. 2002), the case relied on by the UCC, *see* Exceptions Mot. ¶ 58, underscores the facts that are required for a constructive fraudulent conveyance claim—none of which are present here.  In that case, the court observed that "W.R. Grace knew it had a serous and open-ended asbestos liability problem for years before the transaction at issue here"; therefore, "it is not too much to expect that firms with well-established legacies of mass tort liability should realize that transfers for less than equivalent value may harm their tort claimant-creditors should prognostications of future claims be inaccurate." *In re W.R. Grace & Co.*, 281 B.R. at 868.  At the time when distributions were made, Purdue had the opposite of such a "serious and open-ended . . . liability problem."  Purdue had successfully put its pre-2007 liabilities behind it.  When it faced individual cases, Purdue invariably won or settled the cases for modest amounts.  And as late as 2016, Purdue had been

UNREDACTED – CONTAINS OUTSIDE PROFESSIONALS' EYES ONLY INFORMATION.
TREAT SUBJECT TO PROTECTIVE ORDER

sued only a small number of times by government entities and rating agencies concluded that its

outlook was stable.  The UCC's constructive fraudulent conveyance allegations therefore fail.

52.     **The UCC does not and cannot support its intentional fraudulent conveyance

claim.**  The UCC's intentional fraudulent transfer claim is devoid of any factual support and

legally unstainable.

53.     The standard for proving actual intent to defraud is not met by a mere showing

that harm to creditors was or should have been foreseeable; it may not be presumed, or

established based on "suspicion, conjecture, or doubtful inference."  *In re Tribune Co.

Fraudulent Conveyance Litig.*, No. 11-md-2296 (RJS), 2017 WL 82391, at *12 n.15 (S.D.N.Y.

Jan. 6, 2017) (quoting *Lippe*, 249 F. Supp. 2d at 375); *In re Direct Access Partners, LLC*, 602

B.R. 495, 542 (Bankr. S.D.N.Y. 2019) (rejecting intentional fraudulent transfer claim where

"[n]o evidence was offered that would support a finding that any executive or employee . . .

acted with an actual intent to hinder, delay or defraud creditors"); *In re Lyondell Chem. Co.*, 567

B.R. 55, 145 (Bankr. S.D.N.Y. 2017) (rejecting fraudulent transfer claim where the debtor's

"testimony at trial was credible and . . . he did not have an intent to hinder, defraud, or delay . . .

creditors.").

54.     Comparing the cases cited by the UCC in which courts held that debtors engaged

in intentional fraudulent conveyances with the facts of this case illustrates why the UCC's claim

fails.  The UCC cites cases where creditors came forward with factual evidence of debtors who

recognized a discrete liability related to misconduct and then took steps to avoid creditors.  In

*Cendant Corp. v. Shelton*, 246 F.R.D. 401, 405 (D. Conn. 2007), for example, the court found

that the "crime fraud" exception applied, relying on earlier findings that the plaintiff had

"probable cause to believe that it can prove by clear and convincing evidence" that a principal of

UNREDACTED – CONTAINS OUTSIDE PROFESSIONALS' EYES ONLY INFORMATION.
TREAT SUBJECT TO PROTECTIVE ORDER

the plaintiff created a trust and "transferred assets to it to shelter the assets from creditors who might make claims arising out of his fraudulent conduct" at the plaintiff's businesses.  Similarly, in *Securities Investor Protection Corp. v. Bernard Madoff Investment Securities LLC*, 319 F.R.D. 100, 1089 (S.D.N.Y. 2017), the trustee sought production of documents in connection with a transaction by the defendant, an employee of Bernard L. Madoff Investment Securities LLC who knew that the entity's "financial position was poor" and the employee's decision to purchase the house in her partner's name rather than jointly as initially planned,  "suggests that the desire to remove [the defendant] from the chain of title was an outgrowth of [the defendant's knowledge] that the Madoff Ponzi scheme was about to fall apart."[10]

55.      The UCC does not have any evidence that remotely resembles these cases.  The UCC, for example, does not have a shred of evidence that any Mortimer Sackler ICSP (or anyone else on Purdue's Board) recognized that Purdue faced a large litigation liability and took steps to render Purdue unable to pay such debts.  To the contrary, as described above, the Side A ownership structure was established several years before the OxyContin launch and approximately two decades <u>before</u> the challenged distributions.  Moreover, Purdue's Board had no reason to be concerned about the few litigation cases it faced during the time period that distributions were authorized because of Purdue's cash cushion and track record of resolving litigation and regulatory matters for amounts it could readily afford.

---

[10]     *See also Irving Tr. v. Gomez*, 100 F.R.D. 273, 277 (S.D.N.Y. 1983) (Exceptions Motion ¶ 73) (factual evidence supported plaintiff's claim that "Chase, at the instigation and with the support of Irving Trust, deprived Bulos of the rightful use of his funds although it knew of no grounds to do so"); In re Galaxy Comp. Servs., Inc., 2004 WL 3661433, at *2-3 (Bankr. E.D. Va. Mar. 31, 2004) (Exceptions Motion ¶ 76) (specific and numerous factual allegations, supported by documents and deposition testimony, of "extensively planned course of dealing to collude with a competitor and clandestinely transfer assets from the parent company, through transactions structured with the advice of counsel").

UNREDACTED – CONTAINS OUTSIDE PROFESSIONALS EYES ONLY INFORMATION.
TREAT SUBJECT TO PROTECTIVE ORDER

56.     The UCC further confirms the weakness of its position by making the nonsensical argument that distributions were made years in advance of litigation in recognition of the "uncapped nature" of Purdue's potential opioid liability" and the desire to frustrate future litigation creditors.  Exceptions Mot. ¶ 59.  Lacking any evidence of intentional conduct, this argument is no different from the constructive fraudulent conveyance argument that fails for the reasons described above.  Further, under the UCC's reasoning, dozens of other corporations named as defendants in the opioid litigation have also been defrauding creditors and thousands of transactions would become the subject of litigation and potentially unwound.  The law of fraudulent transfers does not lead to such chaos, however, because there is nothing unlawful about authorizing a transfer when there is a hypothetical possibility of liability to an unknown creditor some day in the future.  *See* 30 N.Y. Jur. 2d, Creditors' Rights and Remedies § 325 (the mere potential of liability due to an alleged tort victim because of supposed tortious conduct "at the time of a transfer of property,… should not be considered in determining whether the transfer was a fraudulent conveyance during insolvency because such a debt is 'entirely speculative' at the time of transfer") (citation omitted); *FSP, Inc. v. Societe Generale*, No. 02CV4786GBD, 2005 WL 475986, at *15 (S.D.N.Y. 2005) (stating that "[t]he hypothetical existence of liabilities, from future tort claims against the partnership, is not considered for purposes of a fraudulent conveyance analysis" and holding that counterclaimant's fraudulent conveyance claim was "legally insufficient because it [wa]s premised on the partnership's lack of sufficient assets to pay its debtor creditors as a result of future potential tort claims of an unknown monetary amount").

* * *

UNREDACTED – CONTAINS OUTSIDE PROFESSIONALS' EYES ONLY INFORMATION.
TREAT SUBJECT TO PROTECTIVE ORDER

### C.    The UCC Has Offered No Basis for an In Camera Review

57.    As the UCC has not demonstrated the existence of a fraud, much less communications in furtherance of a supposed fraud, its *in camera* review request should be denied.  A party is entitled to an *in camera* review only where it makes "a showing of a factual basis adequate to support a good faith belief by a reasonable person that in camera review of the materials may reveal evidence to establish the claim that the crime-fraud exception applies." *Zolin,* 491 U.S. at 572 (1989) (internal citation omitted).  The threshold showing is intended to protect the policy of "open and legitimate disclosure between attorneys and clients," to prevent "groundless fishing expeditions," and to recognize "the burdens *in camera* review places upon the district courts, which may well be required to evaluate large evidentiary records without open adversarial guidance by the parties." *Id.* at 571.  The UCC's meritless motion is precisely this type of "groundless fishing expedition."  *See, e.g.*, *Aiossa v. Bank of Am*., N.A., No. CV 10-01275(JS)(ETB), 2011 WL 4026902, at *7 (E.D.N.Y. Sept. 12, 2011) (denying in camera review for crime fraud where "[Plaintiff's] evidence comprises a series of disparate occurrences which are undermined by other evidence and are susceptible of innocent explanations.  It therefore does not permit a reasonable suspicion of a crime, fraud, or other wrongful conduct.");  *In re 650 Fifth Ave.*, No. 08 Civ. 10934(KBF), 2013 WL 3863866, at *2 (S.D.N.Y. July 25, 2013) (denying in camera review for crime fraud where the government offered no evidence beyond "labeling the challenged communications with an unproven allegation from the VAC," and "merely assume the ultimate question").  Moreover, an *in camera* review of the countless documents the UCC has identified would be a waste of judicial resources and effort, to no good end, because only the Debtor Estate can bring a fraudulent conveyance claim and the UCC—given access to millions and millions of pages of documents—cannot come anywhere close to substantiating one.

UNREDACTED – CONTAINS OUTSIDE PROFESSIONALS' EYES ONLY INFORMATION.
TREAT SUBJECT TO PROTECTIVE ORDER

## II.    The UCC Does Not Identify Any Basis to Apply the "At Issue" Exception

58.     The UCC's "at issue" argument makes just one passing reference to a Side A

Document:  a two slide excerpt from a Slide A settlement presentation to creditors and debtors in

which Side A pointed out that a fraudulent transfer claim would be unsuccessful because the

allegation—which the UCC makes here as well—that "litigation threatened Purdue's solvency"

would fail because it is" based entirely on an unprecedented wave of litigation that no one could

reasonably have anticipated at the time the distributions were made."  Hurley Decl., Ex. 72 at 68.

It is completely inappropriate for the UCC to turn around and use this settlement presentation as

a basis to seek discovery.

59.     Regardless, there is no "at issue" waiver here.  As the case cited by the UCC

makes clear, this waiver applies only in situations in which "it would be unfair for a party

asserting contentions [of good faith] to then rely on its privileges to deprive its adversary of

access to material that might disprove or undermine the party's contentions."  *Arista Records*

*LLC v. Lime Grp. LLC*, No. 06 CV 5936, 2011 WL 1642434, at *3 (S.D.N.Y. Apr. 20, 2011)

(alterations in original) (internal citations omitted).  By contrast, as the Second Circuit has

recognized, "[a] mere indication of a claim or defense certainly is insufficient to place legal

advice at issue" even though "privileged information may be in some sense *relevant* in any

lawsuit."  *In re Cty. of Erie*, 546 F.3d 222, 229 (2d Cir. 2008) (emphasis in original); *see also*

*Blackrock Allocation Target Shares: Series S. Portfolio v. Wells Fargo Bank, N.A.*, Nos. 14 Civ.

9371 (KPF) (SN), 14 Civ. 9764 (KPF) (SN), 14 Civ. 10067 (KPF) (SN), 14 Civ. 10102 (KPF)

(SN), 15 Civ. 10033 (KPF) (SN), 2018 WL 3863447, at *5 (S.D.N.Y. Aug. 13, 2018) (declining

to apply "at issue" exception; explaining that "[h]ad Wells Fargo maintained that its lack of

knowledge was based on counsel's advice, it likely would have waived the privilege over any

evidence relevant to that advice, yet that is not Wells Fargo's position").

UNREDACTED – CONTAINS OUTSIDE PROFESSIONALS' EYES ONLY INFORMATION.
TREAT SUBJECT TO PROTECTIVE ORDER

60.     The Side A presentation falls nowhere near the circumstances where there is an

"at issue" waiver for two reasons:  First, the assertion was made in the context of confidential

arguments about the merits of a settlement agreement—not court proceeding.  Second, the Side

A presentation makes no reference, direct or implied, to legal advice rendered by counsel.

61.     Instead, the Side A presentation addresses the same facts discussed above—drawn

from produced documents and the public record—that demonstrate that Side A did not engage in

fraudulent conveyance, as Purdue was solvent when distributions were authorized and no one

acted to defraud litigation creditors that did not then exist.  No communications with counsel are

required to establish these irrefutable facts.

62.     The UCC's attempt to apply the "at issue" waiver therefore fails and the Court

should deny the UCC's request for an *in* camera review.

## CONCLUSION

63.     For the foregoing reasons, the Exceptions Motion with respect to the Mortimer

Sackler ICSPs should be denied.

Dated: October 14, 2020
New York, New York

<div style="margin-left: 40%;">

By:     */s/ Jasmine Ball*
          Jasmine Ball
          M. Natasha Labovitz
          Maura Kathleen Monaghan
          Jeffrey J. Rosen
          DEBEVOISE & PLIMPTON LLP
          919 Third Avenue
          New York, New York 10022
          Telephone:  (212) 909-6000
          Facsimile:  (212) 909-6836
          Email: jball@debevoise.com
                    nlabovitz@debevoise.com

</div>

UNREDACTED – CONTAINS OUTSIDE PROFESSIONALS' EYES ONLY INFORMATION.
TREAT SUBJECT TO PROTECTIVE ORDER

mkmonaghan@debevoise.com
jrosen@debevoise.com

*Attorneys for Beacon Company*