UNREDACTED – CONTAINS OUTSIDE PROFESSIONAL'S EYES ONLY INFORMATION
SUBJECT TO PROTECTIVE ORDER

FILED IN LESS REDACTED FORM PURSUANT TO THE STIPULATION AND AGREED ORDER REGARDING MEDIA INTERVENORS' MOTION TO UNSEAL MATERIALS FILED IN CONNECTION WITH UCC PRIVILEGES MOTIONS [ECF No. 2140]

Jasmine Ball
M. Natasha Labovitz
Maura Kathleen Monaghan
Jeffrey J. Rosen
DEBEVOISE & PLIMPTON LLP
919 Third Avenue
New York, New York 10022
Telephone:  (212) 909-6000
Facsimile:  (212) 909-6836

*Attorneys for Beacon Company*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| **In re:** | **Chapter 11** |
| **PURDUE PHARMA L.P.,** *et al.*, | **Case No. 19-23649 (RDD)** |
| **Debtors.**[1] | **(Jointly Administered)** |

**OBJECTION OF MORTIMER SACKLER INITIAL COVERED SACKLER PERSONS TO THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS' MOTION TO COMPEL PRODUCTION OF PURPORTEDLY PRIVILEGED DOCUMENTS OR FOR *IN CAMERA* REVIEW, BASED ON FAILURE OF THE SACKLERS AND THE DEBTORS TO DEMONSTRATE DOCUMENTS IDENTIFIED ON LOGS ARE PRIVILEGED**

---

[1]   The Debtors in these cases, along with the last four digits of each Debtor's registration number in the applicable jurisdiction, are as follows: Purdue Pharma L.P. (7484), Purdue Pharma Inc. (7486), Purdue Transdermal Technologies L.P. (1868), Purdue Pharma Manufacturing L.P. (3821), Purdue Pharmaceuticals L.P. (0034), Imbrium Therapeutics L.P. (8810), Adlon Therapeutics L.P. (6745), Greenfield BioVentures L.P. (6150), Seven Seas Hill Corp. (4591), Ophir Green Corp. (4594), Purdue Pharma of Puerto Rico (3925), Avrio Health L.P. (4140), Purdue Pharmaceutical Products L.P. (3902), Purdue Neuroscience Company (4712), Nayatt Cove Lifescience Inc. (7805), Button Land L.P. (7502), Rhodes Associates L.P. (N/A), Paul Land Inc. (7425), Quidnick Land L.P. (7584), Rhodes Pharmaceuticals L.P. (6166), Rhodes Technologies (7143), UDF LP (0495), SVC Pharma LP (5717) and SVC Pharma Inc. (4014). The Debtors' corporate headquarters is located at One Stamford Forum, 201 Tresser Boulevard, Stamford, CT 06901.

UNREDACTED – CONTAINS OUTSIDE PROFESSIONAL'S EYES ONLY INFORMATION
SUBJECT TO PROTECTIVE ORDER

## TABLE OF CONTENTS

PRELIMINARY STATEMENT ............................................................................................. 1

BACKGROUND ................................................................................................................. 4

ARGUMENT ...................................................................................................................... 6

I.    The Court Should Not Compel Production of Irrelevant and Sensitive
      Confidential Settlement Communications with the Department of Justice ...................... 6

II.   The UCC Has Shown No Basis to Intrude on the Common Interest Shared by Side
      A and Debtors Concerning the Mass Tort Litigation in Which Both Purdue and Its
      Former Directors Were Named as Co-Defendants ............................................................ 9

III.  The UCC Cannot Disturb the Attorney-Client Privilege Over Communications
      Between Counsel and Communication Advisors With Respect to Litigation
      Strategy ........................................................................................................................... 12

IV.   The UCC's Attack on Privileged Communications Because They Include Other
      Advisors Is Baseless ....................................................................................................... 15

V.    There Is No Basis for *in Camera* Review of Privileged Communications from an
      Advisor Who Had Both Legal and Non-Legal Roles Because the Law Is Clear
      that Predominantly Legal Communications Are Nonetheless Privileged ........................ 21

VI.   There Is No Basis for the UCC to Bog Down the Chapter 11 Cases with an
      Exceptionally Burdensome *in Camera* Review ............................................................. 23

CONCLUSION .................................................................................................................. 24

UNREDACTED – CONTAINS OUTSIDE PROFESSIONAL'S EYES ONLY INFORMATION
SUBJECT TO PROTECTIVE ORDER

## TABLE OF AUTHORITIES

CASES

*Alpex Computer Corp. v. Nintendo Co.*,
  No. 86 Civ. 1749 (KMW),
  1988 WL 87511 (S.D.N.Y. Aug. 16, 1988) ........................................................................11

*Apple Inc. v. Corellium, LLC*,
  No. 19-81160-CV,
  2020 WL 1986942 (S.D. Fla. Apr. 27, 2020) ................................................................11, 23

*BankDirect Capital Fin., LLC v. Capital Premium Fin., Inc.*,
  326 F.R.D. 176 (N.D. Ill. 2018) ......................................................................................16

*Bloomingburg Jewish Educ. Ctr. v. Vill. of Bloomingburg, New York*,
  171 F. Supp. 3d 136 (S.D.N.Y. 2016) ..............................................................................16

*E.E.O.C. v. Gear Petroleum, Inc.*,
  948 F.2d 1542 (10th Cir. 1991) .........................................................................................8

*E.E.O.C. v. Karenkim, Inc.*,
  No. 5:08-CV-1019(NAM/DEP),
  2011 WL 13352967 (N.D.N.Y. Jan. 10, 2011) ....................................................................8

*ESPN, Inc. v. Office of Comm'r of Baseball*,
  76 F. Supp. 2d 383 (S.D.N.Y. 1999) ..................................................................................8

*Gabaldoni v. Washington Cnty. Hosp. Ass'n*,
  250 F.3d 255 (4th Cir. 2001) ...........................................................................................20

*Gabana Gulf Distribution v. Gap Int'l Sales, Inc.*,
  No. C-06-02584 CRB (EDL),
  2007 WL 2729863 (N.D. Cal. Sept. 19, 2007) ..................................................................19

*Haugh v. Schroder Inv. Mgmt. N. Am. Inc.*,
  No. 02 CIV.7955 DLC,
  2003 WL 21998674 (S.D.N.Y. Aug. 25, 2003) ..................................................................14

*Highland Capital Mgmt., L.P. v. Schneider*,
  551 F. Supp. 2d 173 (S.D.N.Y. 2008) ................................................................................8

*In re Cnty. of Erie*,
  473 F.3d 413 (2d Cir. 2007) .........................................................................................22, 21

*In re Grand Jury Subpoenas Dated Mr. 24, 2003 Directed to (A) Grand Jury Witness
  Firm & (B) Grand Jury Wintess*,
  265 F. Supp. 2d 321 (S.D.N.Y. 2003) ....................................................................13, 14, 15

UNREDACTED – CONTAINS OUTSIDE PROFESSIONAL'S EYES ONLY INFORMATION
SUBJECT TO PROTECTIVE ORDER

*In re Omnicom Grp., Inc. Sec. Litig.*,
   233 F.R.D. 400 (S.D.N.Y. 2006) ..................................................................23

*In re Restasis (Cyclosporine Ophthalmic Emulsion) Antitrust Litig.*,
   352 F. Supp. 3d 207 (E.D.N.Y. 2019) ..........................................................14

*In re Sept. 11 Litig.*,
   621 F. Supp. 2d 131 (S.D.N.Y. 2009)..............................................................9

*In re Smith & Nephew Birmingham Hip Resurfacing Hip Implant Prod. Liab. Litig*,
   No. 1:17-MD-2775,
   2019 WL 2330863 (D. Md. May 31, 2019)...................................................20

*In re SunEdison, Inc.*,
   572 B.R. 482 (Bankr. S.D.N.Y. 2017)...........................................................6, 9

*Local 3, Int'l Bhd of Elec. Workers v. N.L.R.B.*,
   845 F.2d 1177 (2d Cir 1988).........................................................................21

*Ravenell v. Avis Budget Grp., Inc.*,
   No. 08-CV-2113 SLT,
   2012 WL 1150450 (E.D.N.Y. Apr. 5, 2012) .................................................14

*S.E.C. v. Wyly*,
   No. 10 Civ. 5760 SAS,
   2011 WL 3366491 (S.D.N.Y. July 27, 2011) ................................................17

*Sampedro v. Silver Point Capital, L.P.*,
   818 Fed. App'x 14 (2d Cir. 2020).................................................................16

*Schaeffler v. United States*,
   806 F.3d 34 (2d Cir. 2015)..............................................................................9

*Stardock Sys., Inc. v. Reiche*,
   No.417CV07025SBAKAW,
   2018 WL 6259536 (N.D. Cal. Nov. 30, 2018) ..............................................16

*The Sols. Team, Inc. v. Oak St. Health, MSO, LLC*,
   No. 17 cv 1879,
   2020 WL 30602 (N.D. Ill. Jan. 2, 2020) ......................................................19

*United States v. Kovel*,
   296 F.2d 918 (2d Cir 1961)......................................................................13, 16

*United States v. Krug*,
   868 F.3d 82 (2d Cir. 2017)..............................................................................9

UNREDACTED – CONTAINS OUTSIDE PROFESSIONAL'S EYES ONLY INFORMATION
SUBJECT TO PROTECTIVE ORDER

*United States v. Schwimmer*,
  892 F.2d 237 (2d Cir. 1989)......................................................................................9

*Universal Standard Inc. v. Target Corp.*,
  331 F.R.D. 80 (S.D.N.Y. 2019) ...............................................................................16

## STATUTES

Fed. R. Bankr. P. 2004........................................................................................6, 7, 8, 9

Fed. R. Evid. 408 .........................................................................................2, 6, 7, 8, 9

Fed. R. Evid. 801 ......................................................................................................9

UNREDACTED – CONTAINS OUTSIDE PROFESSIONAL'S EYES ONLY INFORMATION
SUBJECT TO PROTECTIVE ORDER

The Mortimer Sackler Initial Covered Sackler Persons ("Mortimer Sackler ICSPs")[2]

respectfully submit this Objection to the Official Committee of Unsecured Creditors' ("UCC")

Motion to Compel Production of Purportedly Privileged Documents or for *In Camera* Review

Based On Failure Of The Sacklers and The Debtors to Demonstrate Documents Identified on

Logs are Privileged (the "General Challenges Motion" or "Br.").  For the reasons set out below,

the UCC's motion should be denied in its entirety.[3]

## PRELIMINARY STATEMENT

1.      The General Challenges Motion is a baseless attempt to deprive twelve Side A

custodians of the protection of the attorney-client privilege over entire categories of

communications.  The General Challenges Motion offers scant rationale to justify the sought-

after intrusion on the attorney-client relationships and challenges the privilege of myriad

documents with little, if any, relevance to the UCC's diligence of the proposed settlement.

2.      As this Court has made clear, the parties "have rights including basic rights in

respect to privilege and the like and I don't require them to waive privilege."  Sept. 30, 2020

Hr'g Tr at 82:18–20.  The UCC's document requests are incredibly broad and go back decades,

requiring the production of more than a million pages of documents from Side A custodians

alone on topics like their "financial status" and encompass legal issues like tax planning, estate

planning, and ordinary course business disputes having nothing to do with Purdue.  Given the

sheer breadth of the UCC's Subpoena, it is hardly surprising that thousands of documents

---

[2]     The Mortimer Sackler ICSPs include Theresa Sackler, Ilene Sackler Lefcourt, Kathe Sackler, and Mortimer
D.A. Sackler, as well as trusts for their benefit and the trustees of those trusts**.** Amended and Restated Case
Stipulation Among the Debtors, the Official Committee of Unsecured Creditors and Certain Related Parties
dated Nov. 20, 2019,¶ 1 [D.N. 518]

[3]     The Mortimer Sackler ICSPs preserve, and do not waive, all defenses, including without limitation defenses
based on lack of personal jurisdiction.

1

UNREDACTED – CONTAINS OUTSIDE PROFESSIONAL'S EYES ONLY INFORMATION
SUBJECT TO PROTECTIVE ORDER

concerning a broad variety of privileged communications from many different attorneys would need to be withheld or redacted.

3.       The UCC mounts a blunderbuss attack on five categories of documents properly withheld as privileged or confidential.  All of these documents were appropriately designated in keeping with well-established law and this indiscriminate effort by the UCC should be rejected.

4.       *First*, the UCC seeks to compel production of presentations and correspondence between Side A and the Department of Justice (the "DOJ") relating to settlement efforts.  These confidential materials should be protected against disclosure in light of the strong public interest in promoting settlement of complex claims.  Parties need to be free to have candid discussions with the DOJ without worrying about a later litigant demanding confidential settlement discussions.  Indeed, these materials would not even be admissible under Federal Rule of Evidence 408.  The UCC's half-baked guess that they "might" constitute impeachment materials or admissions (they don't) demonstrates their misunderstanding of the purpose of this bankruptcy discovery:  it is not to prepare for a trial at which witnesses will be impeached.  *See* Aug. 26, 2020 Hr'g Tr. 25:17-21 ("And I just think it's important for the bankruptcy lawyers to keep an eye on the litigators and make sure that they understand the difference between doing due diligence and an examination and taking discovery for purposes of a trial.").  Moreover, the materials would be redundant because the UCC has already received all materials produced to the DOJ and can draw their own conclusions from the actual documents.

5.       *Second*, the UCC asks the Court to reject on a wholesale basis the existence of a common interest that permits co-defendants to share privileged and confidential material without waiver of privilege.  Here, Purdue and the Former Directors are co-defendants in hundreds of lawsuits.  Indeed, as this Court recognized in granting the Section 105(a) injunction, the lawsuits

2

UNREDACTED – CONTAINS OUTSIDE PROFESSIONAL'S EYES ONLY INFORMATION
SUBJECT TO PROTECTIVE ORDER

against the Former Directors are derivative of and closely related to the claims against Purdue.
Oct. 11, 2019 Hr'g Tr. 261:10-22.  That is a classic circumstance in which the common interest
is well accepted.  The Second Circuit, the Southern District of New York and this Bankruptcy
Court have all recognized the value of permitting parties to share joint defense materials without
invalidating privilege.

6.      *Third*, the UCC asserts that all communications involving communications
advisors are not privileged.  Not so.  Courts recognize that when communications, or public
relations, advisors are retained by law firms in order to assist with litigation strategy, they are
within the privileged circle.  That is exactly the circumstance here.

7.      *Fourth*, the UCC broadens its attack to argue that any time any sort of third-party
advisor is included on a communication, that communication loses its privileged status.  That is
simply not the law.  The UCC's contention that only communications with counsel and not
communications among parties about seeking legal advice are entitled to privilege similarly
reflects an insupportably cramped interpretation of attorney-client privilege.

8.      *Fifth*, the UCC argues that communications between clients and counsel who may
also provide business advice are automatically not subject to privilege.  The law, however, is
clear:  a communication with a lawyer who is predominantly providing legal advice is privileged,
even if that lawyer in the same communication or on other communications also provides
business advice.  Side A recognized the need to distinguish between business and legal advice,
disclosing communications in whole where the communication was about business advice,
redacting privileged portions of mixed communications and withholding documents where the
predominant purpose of the communication was seeking or receiving legal advice.

UNREDACTED – CONTAINS OUTSIDE PROFESSIONAL'S EYES ONLY INFORMATION
SUBJECT TO PROTECTIVE ORDER

9.      In an implicit acknowledgement that its efforts to compel the wholesale disclosure

of privileged materials will fail, the UCC falls back on an argument that the documents should be

subject to *in camera* review instead.  But there is no need for *in camera review* of thousands of

documents here and the process would bog down this already staggeringly expensive discovery

process at a time when both the Debtors and the Court have urged that the cases should be

moving quickly toward the development and confirmation of a Plan of Reorganization.

## **BACKGROUND**

10.     On March 31st, 2020, the UCC served its Requests seeking 88 categories of

documents.  The relevant time period for the UCC Requests was defined as January 1, 1996, to

September 15, 2019 for the Initial Covered Sackler Persons and January 1, 2006 to September 15,

2019 for the Additional Covered Sackler Persons.  The Requests sought documents relating to a

wide variety of topics, many of which were untethered to the Debtors, much less the substance of

the litigation claims that led to the chapter 11 filing.  *See, e.g.*, Request No. 9 ("All Documents

Concerning or constituting asset planning or estate planning or asset protection advice made or

provided to the Covered Sackler Persons or the Trusts . . . ."); Request No. 13 ("All Documents

and Communications Concerning . . . any subsequent Transfers or reinvestment of [any funds

transferred from Purdue] . . . ."[4]); Request No. 19 ("All Documents and Communications

Concerning the financial status of the Covered Sackler Persons . . . ."); Request No. 82 ("All

Documents and Communications Concerning tax strategies to avoid or reduce tax liability.");

Request No. 84 ("Documents sufficient to Identify all charitable donations, gifts or contributions

---

[4]      The scope of Request No. 13was immense because the UCC defined "Transfer" as "each mode, direct or
indirect, absolute or conditional, voluntary or involuntary, of disposing of or parting with property, or an
interest in property" without any materiality threshold.  As written, the Request included, for example, any
document that hit on one of the UCC's search terms that reflected any payment any Mortimer Sackler ICSP
made between 1996 and 2019 and any document concerning any past or present investment relationship by any
ICSP that included, in part, funds potentially traceable to Purdue.

UNREDACTED – CONTAINS OUTSIDE PROFESSIONAL'S EYES ONLY INFORMATION
SUBJECT TO PROTECTIVE ORDER

by or on behalf of any Covered Sackler Persons from 2007 to the present."). The Subpoena also included numerous requests on topics that clearly concern legal advice. *See, e.g.*, Request No. 25 ("All Documents and Communications related to the proposed settlement framework and Summary Term Sheet or any other proposed or potential compromise of claims related to these cases . . . ."); Request No. 26 ("[A]ll Documents and Communications Concerning all opioid-related litigation"); Request No. 28 ("All Documents Concerning any Communications to which any Covered Sackler Person was a party Concerning actual or potential Claims against or liability of Purdue or any of its owners or other affiliates arising out of or relating to the sale or marketing of opioids.").

11.     The Mortimer Sackler ICSPs served comprehensive responses and objections, which included agreement to produce large swaths of relevant documents and objections to plainly irrelevant aspects of the document requests. During the meet-and-confer process, the UCC requested that the Mortimer Sackler and Raymond Sackler ICSPs defer their relevance and burden objections to the extent that electronic documents had hit on one or more of the UCC's search terms, and both agreed to do so to expedite discovery in this matter. As a result, the Mortimer Sackler ICSPs alone have produced approximately 207,800 documents from their review of approximately 663,600 documents. The Privilege Log included less than 15% of the documents deemed responsive in the course of the Mortimer Sackler ICSPs' review and contained 34,594 documents. Of these documents, 26,261 were withheld in full and 8,294 were produced with redactions. This number of privileged documents is clearly proportional to the scale of the document production, particularly in light of the fact that the UCC's Subpoena included many requests that focus on legal issues, equally related to underlying mass tort litigation.

UNREDACTED – CONTAINS OUTSIDE PROFESSIONAL'S EYES ONLY INFORMATION
SUBJECT TO PROTECTIVE ORDER

12.    Following the production of the Privilege Log, the Mortimer Sackler ICSPs

agreed, at the UCC's request, to re-review and potentially de-designate entries on the Privilege

Log.  This process has been successful in resolving numerous privilege disputes.  The Mortimer

Sackler ICSPs have also identified several thousand documents (still only a fraction of the

extensive Privilege Log) that they determined should not have been included in the Privilege Log,

which is hardly surprising given the scale and pace of the discovery in these cases, that are being

de-designated.  Further, and notwithstanding the UCC's aggressive motion, the Mortimer Sackler

ICSPs' review of Privilege Log entries, based on correspondence with the UCC remains ongoing

and we anticipate that we will continue to resolve additional privilege disputes in good faith.

## ARGUMENT

### I.    The Court Should Not Compel Production of Irrelevant and Sensitive Confidential Settlement Communications with the Department of Justice

13.    The UCC's request for production of settlement communications with the DOJ

should be rejected because the communications at issue are confidential settlement discussions

made under Federal Rule of Evidence 408.  These documents are highly sensitive and do not

bear on the UCC's diligence.  The UCC already has access to all of the documents produced to

the DOJ (and many millions of pages more from the underlying mass tort litigation and Rule

2004 discovery in the chapter 11 cases) and is now in the process of deposing numerous

witnesses.

14.    The UCC has not identified any particular need or appropriate purpose for the

disclosure of confidential communications with the DOJ made pursuant to Federal Rule of

Evidence 408.  As the court in *In re SunEdison* explained:  "Relevance . . . is not enough; the

[requesting party] must show that they need the discovery for some appropriate purpose, or that

the failure to get the discovery will result in hardship or injustice."  *In re SunEdison, Inc.*, 572

B.R. 482, 490 (Bankr. S.D.N.Y. 2017).  The UCC's conclusory statements that communications

with the DOJ relate to a common set of underlying events are not enough.  The UCC has already

received **all documents the parties have produced to the DOJ**, and its mandate has nothing to

do with the DOJ's separate regulatory process.  Instead, the UCC has been tasked with

conducting diligence on the resolution of claims belonging to other creditors.  The UCC has

received millions of pages of additional documentary discovery through the Rule 2004 process,

as well as all the documents and deposition transcripts from litigation that predated this

bankruptcy proceeding.  Rule 408 communications with the DOJ, however, relate to settlement

of claims that only the DOJ has the authority to bring and settle, and that are far beyond the

UCC's remit in these chapter 11 cases.

15.     The UCC's request for disclosure of confidential communications with the DOJ is

a sideshow that would shed no light on the value of their constituent creditors' claims.  The court

in *Alaska Electrical Pension Fund v. Bank of Am. Corp.* declined to require production of

communications with regulators based on the contention that the documents would "'shed light

on the investigations themselves,' helping [private plaintiffs] to better understand the regulators'

process" because "the investigatory processes of the CFTC and Defendants' other regulators

have little to no bearing on the merits of Plaintiffs' antitrust or state law claims."  No. 14-CV-

7126 (JMF), 2016 WL 6779901, at *3 (S.D.N.Y. Nov. 16, 2016).[5]  The same is true here.

16.     The UCC's unsubstantiated speculation that the requested material could include

"important admissions and impeachment material" (Br. ¶ 19.) is both incorrect and directly

---

[5]     The UCC relies on a subsequent opinion in *Alaska Electrical Pension Fund*.  Despite some initial similarities,
this opinion is inapposite.  The discovery dispute concerned class action litigation.  *See* No. 14-CV-7126 (JMF),
2017 WL 280816 (S.D.N.Y. Jan. 20, 2017).  By contrast, the parties here are engaged in sensitive negotiations
with a variety of governmental actors and private parties aimed at achieving a global resolution.  The stark
differences between the context of the discovery dispute in *Alaska Electrical Pension Fund* and the current
efforts to achieve a global settlement lead to a different outcome here.

UNREDACTED – CONTAINS OUTSIDE PROFESSIONAL'S EYES ONLY INFORMATION
SUBJECT TO PROTECTIVE ORDER

contradicts this Court's admonition that the parties should be mindful that Rule 2004 discovery

should not be conducted as trial preparation. *See* Aug. 26 Tr. ("And I just think it's important for

the bankruptcy lawyers to keep an eye on the litigators and make sure that they understand the

difference between doing due diligence and an examination and taking discovery for purposes of

a trial.").

17.    Even putting that aside, under Rule 408, any statements made to the DOJ would

be inadmissible to prove any of the litigation creditors' allegations in any potential civil litigation

of those claims anyway.  And, the strictures of Rule 408 often bar the admission of settlement

communications for impeachment purposes. See *E.E.O.C. v. Gear Petroleum, Inc.*, 948 F.2d

1542, 1546 (10th Cir. 1991) ("[T]he risks of prejudice and confusion entailed in receiving

settlement evidence are such that often the underlying policy of Rule 408 require exclusion even

when a permissible purpose can be discerned.") (internal quotations omitted).  Thus, courts are

entitled to "exercise [their] broad discretion in admitting" settlement communications under Rule

408 and weigh the risk of potential prejudice against a tenuous argument that the communication

might support an attempt to impeach a witness. *E.E.O.C. v. Karenkim, Inc.*, No. 5:08-CV-

1019(NAM/DEP), 2011 WL 13352967, at *3 (N.D.N.Y. Jan. 10, 2011).  *ESPN, Inc. v. Office of*

*Comm'r of Baseball*, 76 F. Supp. 2d 383, 411-12 (S.D.N.Y. 1999) ("the almost unavoidable

impact of disclosure about compromises is that the jury will consider the evidence as a

concession of liability."); *see Highland Capital Mgmt., L.P. v. Schneider*, 551 F. Supp. 2d 173,

1997 (S.D.N.Y. 2008) (no admission where "[t]here is no showing that the settlement agreement

or any related evidence are relevant to th[e] case").  Given the risk of prejudice and "the public

policy favoring the compromise and settlement of disputes that would otherwise be discouraged

with the admission of such evidence," (*see* Fed. R. Evid. 408 advisory committee's note) it is

UNREDACTED – CONTAINS OUTSIDE PROFESSIONAL'S EYES ONLY INFORMATION
SUBJECT TO PROTECTIVE ORDER

highly unlikely that the settlement communications authored by counsel would ever be admitted

to impeach a fact witness.  Similarly, it is highly speculative to suggest that a trial court would

exercise its discretion to admit counsel's advocacy in confidential settlement negotiations as a

party admission under Federal Rule 801(d)(2).  *See, e.g.*, *In re Sept. 11 Litig.*, 621 F. Supp. 2d

131, 164 (S.D.N.Y. 2009) (declining to admit evidence under 801(d)(2) because the court would

not admit the "statements made during settlement discussions" under Rule 408).

19. Unable to provide substantive justification for its demand, the UCC falls back to

the general principle that the scope of Rule 2004 discovery is "broad."  But, as *SunEdison*

underscores, "broad" does not mean limitless.  Here, the UCC's request should be rejected as

beyond the limits of what is necessary or appropriate to conduct its diligence of the proposed

settlement.

**II.   The UCC Has Shown No Basis to Intrude on the Common Interest Shared by Side
A and Debtors Concerning the Mass Tort Litigation in Which Both Purdue and Its
Former Directors Were Named as Co-Defendants**

19. Nor is the UCC entitled to communications reflecting privileged advice to

members of Side A, Side B, and the Debtors where they were co-defendants in mass tort

litigation based on similar and overlapping allegations.  Protection of communications between

parties regarding litigation in which they are co-defendants is the core of the common interest

doctrine.  *See United States v. Krug*, 868 F.3d 82, 86 (2d Cir. 2017) (the joint defense privilege

"serves to protect the confidentiality of communications passing from one party to the attorney

for another party where a joint defense effort or strategy" has been undertaken); *Schaeffler v.*

*United States*, 806 F.3d 34, 40 (2d Cir. 2015) ("[P]rivilege is not waived by disclosure of

communications to a party that is engaged in a 'common legal enterprise' with the holder of the

privilege."); *United States v. Schwimmer*, 892 F.2d 237, 243 (2d Cir. 1989) (the common interest

rule is "an extension of the attorney client privilege" that serves the "need to protect the free flow

of information from client to attorney . . . whenever multiple clients share a common interest

about a legal matter"). Here, the Former Directors and the Debtors were named as co-defendants

in hundreds of cases in 2018 and 2019. This litigation was the subject of the settlement

negotiations that preceded and led to these chapter 11 cases. As document discovery included

the time period during which this litigation was pending, it is unsurprising that Side A's Privilege

Log contains entries reflecting privileged communications pursuant to that common interest.

  20. Contrary to the UCC's speculation about adverse interests, the Court has already

recognized that held that the mass tort litigation against the former directors was closely related

to the litigation against Purdue. *See* Oct. 11. 2019 Tr. at 261:10-22 (holding that extension of

injunction to litigation against third parties was appropriate in light of the "identity of factual

interest" with litigation against the Debtors). The claims against the former directors cannot

succeed unless those plaintiffs first prove wrongful conduct by the Debtors. The factual and

legal overlap of these claims required the ICSPs and the Debtors to have a common legal

strategy during the mass tort litigation. Attorney-client communications concerning that

common legal strategy, including members of the Special Committee in their capacity as

directors of a co-defendant, are indisputably privileged.

  21. The UCC fails to explain how any specific communication on the Privilege Log is

not subject to a common interest. Instead, the UCC relies on an attached list with a vague

description that these documents relate to "topics" on which the UCC would "expect" the parties

to have adverse interests. (Br. ¶42). In light of the obvious common interest the Former

Directors and Debtors share with regard to the mass tort litigation, it is not enough for the UCC

to assert *ipse dixit* that it "is troubled" by the Debtors' assertion of common interest (¶ 41),

"question" whether communications with the Special Committee can be withheld (¶ 42), and

UNREDACTED – CONTAINS OUTSIDE PROFESSIONAL'S EYES ONLY INFORMATION
SUBJECT TO PROTECTIVE ORDER

suggest that other claims of privilege pertaining to communications with the plenary board are "dubious" (¶ 42). None of these vague complaints justifies wholesale de-designation or *in camera* review of documents shared among co-defendants regarding shared litigation. *See, e.g.*, *Apple Inc. v. Corellium, LLC*, No. 19-81160-CV, 2020 WL 1986942, at *3–4 (S.D. Fla. Apr. 27, 2020) ("Absent probative direct or circumstantial evidence supporting claims that opposing counsel are improperly withholding documents or engaging in other discovery misconduct, the Court will not rely on counsel's suspicions."); *Alpex Computer Corp. v. Nintendo Co.*, No. 86 Civ. 1749 (KMW), 1988 WL 87511, at *3 (S.D.N.Y. Aug. 16, 1988) ("[S]uspicions of counsel are not a basis for shifting the responsibility for discovery from counsel to the court.").

22.    The UCC also makes a generic challenge to common interest communications present on Side A's Privilege Log on the grounds that they are not specifically identified as such. Side A has already provided the UCC with a detailed Appendix to its Privilege Log describing the role of every individual who appears in one or more entries on the Privilege Log, including third parties who share a common interest with one or members of Side A. This information is sufficient to evaluate the privilege claims, particularly where the common interest arises out of matters irrelevant to the global settlement. Discovery in these chapter 11 cases has attained an extraordinary scale and, due to the breadth and timeframe of the discovery requests, has swept in numerous documents that, while technically responsive, are of little or no relevance to the core diligence issues. It would not be a worthwhile use of the parties' limited resources to annotate numerous privilege log entries simply to spell out where the common interest doctrine is plainly applicable based on the information already provided.

23.    The UCC's argument that claims of common interest must be "based on competent evidence" (Br. ¶ 40) puts the cart before the horse. The common interest doctrine is

UNREDACTED – CONTAINS OUTSIDE PROFESSIONAL'S EYES ONLY INFORMATION
SUBJECT TO PROTECTIVE ORDER

not an independent basis for withholding documents; it is a doctrine that protects the privilege

from waiver.  To the extent there are specific communications potentially relevant to the

diligence necessary to achieve a global resolution, Side A remains willing to meet-and-confer,

re-review prior privilege designations, and provide further information in response to specific

inquiries from the UCC.

### III.    The UCC Cannot Disturb the Attorney-Client Privilege Over Communications Between Counsel and Communication Advisors With Respect to Litigation Strategy

24.    The communication, and public relations, advisors who appear on the Privilege

Log conducted work that is inextricably intertwined with litigation strategy and therefore

protected under the law of this Circuit.[6]  As the Court is doubtless aware, the civil litigation that

preceded these Chapter 11 cases was heavily covered by the news media, talk shows, and others.

Indeed, Massachusetts and other state attorneys general have routinely issued press releases

announcing the filing of complaints and case developments and frequently called attention to

opioid litigation on Twitter and other social media platforms.[7]  Almost all of the documents

relating to public relations advisors on the privilege log are from 2017 to the present.[8]  (Br.

¶¶ 45-54.)

25.    As a threshold matter, this privilege dispute again reflects the UCC's failure to

focus discovery on diligence of the proposed settlement.  Exchanges between counsel and

---

[6]    Side A has already produced at least 1,150 of the public relations documents challenged by the UCC via Hurley Decl., Ex. A (Excel Tab D), and intends to make an additional disclosure of approximately 80 documents in short order.  These revisions to the Side A privilege log are based on the fact that the review process revealed a significant number of PR documents that were either ministerial in nature or were simply forwarding or referencing media reports without more.

[7]    *See, e.g.*, @MassAGO, Twitter (Oct. 4, 2019, 2:05 PM), https://twitter.com/MassAGO/status/1180198426895667200; @NewYorkStateAG,  Instagram (Aug. 5, 2019), https://www.instagram.com/p/B0ydD-NhIIK/?igshid=563a1uore3dv; @AGBecerra, Twitter (Oct. 3, 2019, 1:51 PM), https://twitter.com/AGBecerra/status/1179831379816677376; Attorney General Josh Shapiro, Facebook (May 16, 2019), https://www.facebook.com/PaAttorneyGen/videos/601256267027080/?vh=e&extid=0).

[8]    Only 66 documents of the documents the UCC has challenged pre-date 2017.

UNREDACTED – CONTAINS OUTSIDE PROFESSIONAL'S EYES ONLY INFORMATION
SUBJECT TO PROTECTIVE ORDER

communications advisors concerning the media aspects of litigation strategy are of little, if any,

relevance to the UCC's diligence because (*i*) there were no distributions to the Side A Family

Members after 2016, (*ii*) the allegations in litigation creditors' complaints primarily relate to

marketing many years prior to 2017, and (*iii*) Purdue stopped marketing altogether in early 2018.

Further attempts by the UCC to intrude on communications concerning media strategy during the

mass tort litigation will not meaningfully advance these chapter 11 cases.  The UCC's persistent

demands for these documents appears to be little more than an attempt to obtain counsel's

confidential strategy for the mass tort litigation at the expense of focusing on the evaluation of

the proposed settlement.

26.    The Second Circuit has long recognized that communications with third-party

advisors may be privileged.  *See United States v. Kovel,* 296 F.2d 918, 922 (2d Cir 1961).  In *In

re Grand Jury Subpoenas Dated Mar. 24, 2003 Directed to (A) Grand Jury Witness Firm & (B)

Grand Jury Witness*, Judge Kaplan explained how this principle specifically applies to the

retention of communications advisors: "(1) confidential communications (2) between lawyers

and public relations consultants (3) hired by the lawyers to assist them in dealing with the media

in cases such as this (4) that are made for the purpose of giving or receiving advice (5) directed

at handling the client's legal problems are protected by the attorney-client privilege."  265 F.

Supp. 2d 321, 331 (S.D.N.Y. 2003) (attorney-client privilege protected communications with

public relations advisor concerning high-profile grand jury investigation).

27.    The communications challenged by the UCC track all five of these elements.  In

highly publicized mass tort litigation where plaintiffs made regular use of the news media to

press their case, counsel for the Mortimer Sackler ICSPs found it necessary to engage

communications advisors (as identified on the Privilege Log) for assistance in dealing with the

UNREDACTED – CONTAINS OUTSIDE PROFESSIONAL'S EYES ONLY INFORMATION
SUBJECT TO PROTECTIVE ORDER

media, consistent with and in furtherance of overall legal strategy.  Contrary to the UCC's

mischaracterization of the August 23, 2020 letter from Jasmine Ball, the communications

advisors were not hired "to improve [Side A's] reputation with the public" but to support the

litigation strategy, of which media relations were one important part. (Hurley Decl. Ex. 16 (Aug.

23, 2020 J. Ball Ltr. at 2))

28.     The public relations documents on the privilege log confirm that counsel found it

necessary to rely on the expertise of public relations professionals.  For example:

- Entry No. 16,828: This document contains analysis of the Side A legal and
  communications advisors regarding whether it was appropriate to engage with
  certain media outlets during the ongoing litigation.  *In re Grand Jury Subpoenas*
  clearly recognized the need for coordination and discussion between counsel and
  communications advisors on many strategic considerations at the intersection of
  public relations and legal analysis.  *See* 265 F. Supp. 2d at 330 ("Questions such
  as whether the client should speak to the media at all, whether to do so directly or
  through representatives, whether and to what extent to comment on specific
  allegations, and a host of others can be decided without careful legal input only at
  the client's extreme peril.").

- Entry No. 24,089: This document reflects legal advice regarding press releases in
  the wake of additional state lawsuits filed in 2019.  Including communications
  advisors in these discussions is essential for counsel to effectively represent the
  clients' best interests in statements concerning pending litigation.  *See In re
  Grand Jury Subpoenas*, 265 F. Supp. 2d at 330 ("For example, lawyers may need
  skilled advice as to whether and how possible statements to the press—ranging
  from 'no comment' to detailed factual presentations—likely would be reported in
  order to advise a client as to whether the making of particular statements would be
  in the client's legal interest.").

29.     Contrary to the UCC's contention, no court has questioned the validity of Judge

Kaplan's decision in *In re Grand Jury Subpoenas* or limited the decision to its particular facts.[9]

---

[9]    Contrary to the parenthetical in the Motion, *Haugh* did not "suggest[] there is an open question whether *In re
Grand Jury 2003* was correctly decided"; the *Haugh* court simply stated: there was no need to address whether
the then-recent opinion was correctly decided because it did not assist the party invoking it.  *Haugh v. Schroder
Inv. Mgmt. N. Am. Inc.*, No. 02 CIV.7955 DLC, 2003 WL 21998674, at *3 (S.D.N.Y. Aug. 25, 2003).  The
validity of *In re Grand Jury Subpoenas* was also not at issue in *In re Restasis* or *Ravenell* because it did not
apply to the facts of those cases.  *See In re Restasis (Cyclosporine Ophthalmic Emulsion) Antitrust Litig.*, 352 F.
Supp. 3d 207, 212 (E.D.N.Y. 2019) ("In re Grand Jury does not apply to the situation here—the routine hiring
of consultants to help a company improve its regulatory position.");  *Ravenell v. Avis Budget Grp., Inc.*, No. 08-

UNREDACTED – CONTAINS OUTSIDE PROFESSIONAL'S EYES ONLY INFORMATION
SUBJECT TO PROTECTIVE ORDER

*See* Motion ¶ 49 (suggesting that attorney-client privilege only covers public relations documents

that "constitute or relate to efforts to influence prosecutors"). While the UCC identifies

decisions declining to apply *In re Grand Jury Subpoenas* based on the specific facts presented in

those cases,[10] courts have found discussions involving legal and communications advisors to be

protected where, as here, the communications advisors were hired specifically for the purposes

of litigation strategy and in an environment where plaintiffs are also litigating in the media such

that "attorney efforts to influence public opinion in order to advance the clients legal position[s]"

were necessary to "achieve a fair and just result" of the legal matter.[11]  *In re Grand Jury* at 326,

330.

### IV.   The UCC's Attack on Privileged Communications Because They Include Other Advisors Is Baseless

30.     The Court should reject the UCC's claim that numerous privileged

communications lose that status simply because other advisors to the attorney's client were privy

to the communication..[12]  (Br. ¶¶ 55-58).  The attorney-client privilege is simply not so narrow

---

CV-2113 SLT, 2012 WL 1150450, at *3 (E.D.N.Y. Apr. 5, 2012) ("Defendants in this case have failed to demonstrate that the involvement of OCI or its corporate successor was necessary for effective communication between counsel and client.").

[10]   These essential elements are missing from the cases the UCC cites to support its request for the categorical waiver of privilege.  For example, it is inappropriate to compare the minor and inessential role played by the public relations consultant in *Bloomingburg Jewish Educ. Ctr. v. Vill. of Bloomingburg, New York*, 171 F. Supp. 3d 136,146–47 ("Mr. Holland's declaration asserts that he used West End to distill complex facts into digestible pieces and conduct records research that facilitated municipal officials' ability to accurately explain the Lamm case to the public."). Further, the cases in which the UCC relies are all easily distinguishable.  Several of these cases concern public relations personnel retained for business purposes whereas here the public relations personnel have been providing advice concerning high-profile litigation against the clients.  *See, e.g., Universal Standard Inc. v. Target Corp.*, 331 F.R.D. 80, 92 (S.D.N.Y. 2019) ("The public relations consultant here was hired not by the attorney but by Universal Standard and was hired for business purposes.").

[11]   *Stardock Sys., Inc. v. Reiche*, No.417CV07025SBAKAW, 2018 WL 6259536, at *6 (N.D. Cal. Nov. 30, 2018) ("Because Defendants' counsel (and not Defendants themselves) hired the PR firm of Singer to provide PR counseling specifically for the purposes of litigation strategy in the current action, just like the services the PR firm in the In re Grand Jury Subpoenas case rendered, the attorney-client privilege extends to the withheld communications between Singer and Defendants' counsel").

[12]   At the request of the UCC, Debevoise has re-reviewed the privilege log and has already produced over 2000 documents involving third-party advisors that were originally withheld.  For most of these documents, it was

UNREDACTED – CONTAINS OUTSIDE PROFESSIONAL'S EYES ONLY INFORMATION
SUBJECT TO PROTECTIVE ORDER

that the attorney and client cannot even consult in confidence with the client's non-legal advisors.

The Second Circuit recently reaffirmed that communications involving third-party advisors may

be protected by the attorney client privilege:

> When a communication is "made in confidence for the purpose of
> obtaining legal advice from the lawyer," the inclusion of a third party on
> that communication does not necessarily destroy the attorney-client
> privilege, so long as the inclusion "is necessary, or at least highly useful,
> for the effective consultation between the client and the lawyer."
> "[C]ommunications by the client to his counsel and a third party
> reasonably related to [the] purpose of having the third-party interpret [the
> communications] so that the lawyer may better give legal advice" remain
> protected.

*Sampedro v. Silver Point Capital, L.P.*, 818 Fed. App'x 14, 19 (2d Cir. 2020), at *3 (2d Cir. June

4, 2020) (citation omitted), as amended (June 5, 2020) (quoting *United States v. Kovel*, 296 F.2d

918, 922 (2d Cir. 1961)) (holding that consultant was essential for analyzing data relevant to

legal analysis).  As the communications on the Privilege Log demonstrate, third-party advisors

may prove "highly useful" to the attorney's consultation of her client in diverse circumstances,

from insurance claims to landlord-tenant issues.

31.     To assert otherwise and seek a categorical waiver of privilege, as the UCC has

done, overlooks that "[a]nalysis of attorney-client privilege claims requires then a discerning

analysis, not merely a demonstration that a financial analyst or consultant may have been a

recipient of a questioned document. . . .  Determining the application of the attorney-client

privilege requires a careful analysis, not the invocation of a rule of easy and automatic

application."  *BankDirect Capital Fin., LLC v. Capital Premium Fin., Inc.*, 326 F.R.D. 176, 185

(N.D. Ill. 2018) (documents containing "comments, suggestions, and/or questions between

---

determined on review not that the third-party advisors broke privilege but rather that the legal advice did not
predominate over the investment advice.  As the review is ongoing, Side A anticipates that it may produce
additional documents involving third-party advisors.

UNREDACTED – CONTAINS OUTSIDE PROFESSIONAL'S EYES ONLY INFORMATION
SUBJECT TO PROTECTIVE ORDER

financial advisor and attorneys pertaining to the drafting of the agreements" were privileged).  In

other words, the fundamental principle of attorney-client privilege as it applies to

communications including advisors must be considered on a document-by-document basis.  The

UCC also ignores the fundamental common law principle that communications between a party's

agent or representative and counsel fall within the attorney-client communication.  *See, e.g.*,

*S.E.C. v. Wyly*, No. 10 Civ. 5760 SAS, 2011 WL 3366491, at *8 (S.D.N.Y. July 27, 2011) ("The

email and attachments are privileged because they are communications between a necessary

agent and a lawyer on a confidential legal matter."), *modified on reconsideration sub nom. S.E.C.,

Inc. v. Wyly*, No. 10 Civ. 5760 SAS, 2011 WL 3841591 (S.D.N.Y. Aug. 18, 2011), *and modified

on reconsideration sub nom. S.E.C., Inc. v. Wyly*, No. 10 Civ. 5760 SAS, 2011 WL 4055408

(S.D.N.Y. Aug. 19, 2011).

32.    As the following examples illustrate, the UCC's request for categorical

de-designation of documents including third parties is unfounded.

33.    ***Accountants:*** Communications involving accountants who were necessary for the

provision of legal advice were properly withheld as privileged.[13]  *See, e.g.*, *Indianapolis Airport

Auth. v. Travelers Prop*. Cas. Co. of Am., No. 1:13-CV-01316-JMS, 2015 WL 4715202, at *7

(S.D. Ind. Aug. 7, 2015) ("As agents of IAA, communications containing legal advice between

IAA's accountants at BKD and IAA's counsel are privileged.").  For example, the UCC

challenges Privilege Log Entry No. 12018, an email from Theresa Sackler to Leslie Schreyer (an

attorney at Chadbourne & Parke LLP) dated January 30, 2016 on which two Ernst & Young

accountants were copied.  The privilege log description includes the subject line of the email:

"Re: Authorization to settle with HMRC -- please reply."  Without waiving subject matter

---

[13]    The UCC's discussion of cases that do not recognize an accountant-client privilege are beside the point as Side
A did not withhold documents based on the accountant-client privilege.  *See* Br. ¶ 55.

UNREDACTED – CONTAINS OUTSIDE PROFESSIONAL'S EYES ONLY INFORMATION
SUBJECT TO PROTECTIVE ORDER

privilege, the communication relates to a dispute with the tax authorities of the United Kingdom

("HMRC" is an acronym for Her Majesty's Revenue and Customs) in which Chadbourne

required the accounting expertise of EY.

34.  **Insurance Brokers:** Similarly, communications including insurance brokers, as

an agent, may be party to a privileged communication and were properly withheld.[14]  For

example, the UCC challenges the presence of ███████████ of the insurance brokerage firm,

███████████████ on documents relating to an insurance claim, *see* Privilege Log Entry

No. 20833.  ███ was acting on behalf of its clients, Mortimer D.A. and Jackie Sackler, in an

effort ██████████████████████████████████████████████████████████

The attorney-client communication on which ███████ is copied discusses settlement strategy

concerning the nature and value of the insurance claim.[15]  Not only is this communication

privileged, it is also irrelevant to the diligence in this case.

35.  **Consultants:** Consultants can function as an agent within the circle of attorney-

client privilege for the same reasons.[16]  For example, the UCC challenges the privilege

designation of attorney-client communications that included ███████████ who provided owner

representative services in 2009-2010 to Mortimer D.A. Sackler in connection ████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

---

[14]  Of the 80 documents related to the presence of insurance brokers that the UCC has challenged, Side A has produced 49 documents, and will produce an additional tranche in short order.

[15]  Even if the presence of ███████ would vitiate a claim of attorney-client privilege (and it does not), the communications are also attorney work product created in anticipation of litigation.  ███████ presence is akin to that of an expert assisting the attorney in evaluating and settling the claim.

[16]  Of the 632 number of documents related to the presence of professional consultants that the UCC has challenged, Side A has produced 270 documents, and will produce approximately 220 in short order.

UNREDACTED – CONTAINS OUTSIDE PROFESSIONAL'S EYES ONLY INFORMATION
SUBJECT TO PROTECTIVE ORDER

██████████████████████████████████████████ The withheld documents are communications between either ██████ himself and the attorneys at Chadbourne, or between Mr. Sackler and his attorneys with ██████ copied (Log Entry 4065). Again, not only are these attorney-client communications including Mr. Sackler's agent privileged, but they are also in no way relevant to the resolution of the chapter 11 cases.

36.     The UCC's complaint that Side A has improperly withheld communications that do not include a lawyer and described on the privilege log as "reflecting an intent to seek legal advice" is similarly misplaced.[17]  (UCC Brief at paras. 43-44.)  First, contrary to the UCC's contention, this is a perfectly valid basis for the assertion of attorney-client privilege.  *See, e.g.*, *The Sols. Team, Inc. v. Oak St. Health, MSO, LLC*, No. 17 cv 1879, 2020 WL 30602, at *1 (N.D. Ill. Jan. 2, 2020) (certain documents that reflected communication for the purpose of receiving legal advice were considered privileged); *Gabana Gulf Distribution v. Gap Int'l Sales, Inc.*, No. C-06-02584 CRB (EDL), 2007 WL 2729863, at *1 (N.D. Cal. Sept. 19, 2007) ("[C]ommunications between non-lawyers regarding an intent to seek legal advice may be privileged.").  Many of the communications the UCC challenges on this ground concern content originating with or communicated to lawyers and, in fact, lawyers are the authors or recipients in a number of cases.

- Entry No. 18,354: This document is an email chain among Mortimer D. A. Sackler and certain executives at one of the IACs discussing the choice of a law firm to represent the IAC in potential litigation.  It specifically refers to advice from Stuart Baker in this regard, and thus both reveals attorney-client communications and is work product as the communications were made in the course of pending or anticipated litigation.  The document was produced in redacted form and included an email from the IAC's contractual partner. (Ball Decl. Exhibit 22)

---

[17]    Subsequent to the filing of the Motion, we have determined that 174 of the 276 documents at issue should not have been included on the Privilege Log.

UNREDACTED – CONTAINS OUTSIDE PROFESSIONAL'S EYES ONLY INFORMATION
SUBJECT TO PROTECTIVE ORDER

- Entry No 10,956: This document is the agenda for a Board of Directors meeting dating from 2015.  It was produced to the UCC with three lines of the agenda redacted.  The privilege log description explains that the redactions relate to opioid litigation.  *Gabaldoni v. Washington Cnty. Hosp. Ass'n*, 250 F.3d 255, 262 n.6 (4th Cir. 2001) (redactions for privilege appropriate in communications with Board of Directors); *See In re Smith & Nephew Birmingham Hip Resurfacing Hip Implant Prod. Liab. Litig*, No. 1:17-MD-2775, 2019 WL 2330863, at *3 (D. Md. May 31, 2019) (communications with the client's Board of Directors regarding matters of pending or anticipated litigation protected by both attorney-client privilege and work product privilege). (Ball Decl. Exhibit 23).

37.   A number of the other communications challenged here are from attorneys, and in fact, are retainer letters from local counsel retained by Side A Family Members to represent them in states where opioid-related litigation was brought against them, for example.[18]  These communications are both attorney-client communications and work product because they were made for the purpose of obtaining legal advice and during the course of ongoing litigation.[19]

38.   The General Challenges Motion's refrain that the Mortimer Sackler ICSPs have failed to provide sufficient information to justify their privilege designations accurately is unfounded.  Throughout the General Challenges Motion, the UCC often focuses on one field of the Privilege Log – a brief explanation of the privilege basis – and ignores the other information supporting the privilege designations, including the subject line of withheld communications, the context provided by unredacted content of partially redacted documents, and the Appendix providing supplemental information about every individual who appears on the Privilege Log. The Mortimer Sackler ICSPs stand ready to provide additional information on privileged communications that are potentially relevant to the dispute, as they have throughout the

---

[18] Privilege Log Entry No.'s  13221, 13223, 15046, 15047, 15071, 17399, 17403, 32476, 23266, 26100, 26273, 26274, 26808, 26810, 27573 and 27576.

[19]   Some of the documents at issue were incorrectly described on the log as "reflecting an intent to seek legal advice" when they were in fact redacted for spousal privilege.  For example, Privilege Log Entry No. 2503 was produced with only spousal communications redacted.  The privilege log description has been accordingly revised to reflect that this document is being produced in redacted form pursuant to the spousal privilege.

UNREDACTED – CONTAINS OUTSIDE PROFESSIONAL'S EYES ONLY INFORMATION
SUBJECT TO PROTECTIVE ORDER

discovery process.  However, it is neither a necessary nor reasonable use of the parties' resources

to revisit thousands of entries that have no relation to the substance of the settlement concerning

which the UCC is supposed to be conducting diligence.

**V.   There Is No Basis for *in Camera* Review of Privileged Communications from an
Advisor Who Had Both Legal and Non-Legal Roles Because the Law Is Clear that
Predominantly Legal Communications Are Nonetheless Privileged**

39.     The UCC's request for *in camera* review of all communications for which Side

A's Privilege Log reflects that Jonathan White or Stuart Baker acted as counsel is both

unnecessary and unreasonable.  The documents relating to Stuart Baker challenged by the UCC

on this basis have already been removed from the privilege log or will be removed shortly, and

the UCC will receive any such documents.  The Court should not be burdened with an *in camera*

review of the entries where Mr. White provided legal advice simply because Mr. White acted as

a non-legal advisor at other times and therefore the UCC distrusts the privilege designations.  *See*

*Local 3, Int'l Bhd of Elec. Workers v. N.L.R.B.*, 845 F.2d 1177, 1180 (2d Cir 1988) ("*In camera*

review is considered the exception, not the rule" and acknowledging that the "inspection of

disputed documents places very burdensome demands on federal trial courts.").  It is common for

attorneys to act as business advisors and these determinations must be made on a document-by-

document basis.  *See County of Erie*, 473 F.3d at 420 ("[t]he predominant purpose of a

communication cannot be ascertained by quantification or classification of one passage or

another; it should be assessed dynamically and in light of the advice being sought or rendered, as

well as the relationship between advice that can be rendered only by consulting the legal

authorities and advice that can be given by a non-lawyer.").

40.     An attorney also acting as a business adviser is entirely common and does not—

without more—necessitate a burdensome *in camera* review; if this were the rule, courts would be

overwhelmed by requests that every communication regarding in-house counsel be reviewed *in*

UNREDACTED – CONTAINS OUTSIDE PROFESSIONAL'S EYES ONLY INFORMATION
SUBJECT TO PROTECTIVE ORDER

*camera*.  Instead, joint business and legal communications remain protected so long as the

"predominant purpose" of the communication was legal advice.  *See In re Cty. of Erie*, 473 F.3d

413, 420 (2d Cir. 2007) (holding that a communication containing both legal and business advice

is privileged where its "predominant purpose" was to render or solicit legal advice).  Where

Mr. White provided solely business advice, materials were produced.  Indeed, the Mortimer

Sackler ICSPs have produced many communications with Mr. White that are not privileged.

Based on review during the meet-and-confer process, the set of documents where privilege is

asserted based on Mr. White's role as counsel has been further narrowed.[20]

41.     As the following examples illustrate, the purpose of the withheld and redacted

communications from Mr. White was "predominantly" legal in nature (including many when he

worked at the law firm Ogier) and therefore protected by privilege:

- Entry No. 4998: This document is an email dated January 28, 2010 from Mr.
  White to Theresa Sackler, in response to a question from her concerning certain
  aspects of her estate after the passing of her husband, Dr. Mortimer D. Sackler.
  The email attaches memoranda of law from the law firm Farrer's and from the
  attorney Mathew Cain, both of which addressed Theresa Sackler's request for
  legal advice.  Nor is it clear why the UCC challenges this entry because
  Mr. White also provided non-legal advice as the description in the Privilege Log
  clearly indicates that two other attorneys, Leslie Schreyer and Matthew Cain,
  were copied on the communication.

- Entry No. 5002: This email relates to a discussion of legal advice regarding tax
  efficient legal structures of investments in the UK and Switzerland between Mr.
  White and Dame Theresa Sackler in late January, 2010.

- Entry No. 7408: This is an email dated September 28, 2011 with the subject line
  "Wills" from Mr. White to Theresa Sackler in which Mr. White provides legal
  advice regarding estate planning (her will, in fact).

- Entry No. 8089: This email (with the subject line "Swiss Agreements") is a
  summary by Mr. White of (*i*) investment structures, and ownership-agreements
  giving effect to the transfer of property made to various Side A Family Members

---

[20]    Of the 587 documents that the UCC challenged with respect to Mr. Baker and Mr. White, counsel has now
removed 231 from the privilege log and anticipates producing over 100 additional documents shortly.

UNREDACTED – CONTAINS OUTSIDE PROFESSIONAL'S EYES ONLY INFORMATION
SUBJECT TO PROTECTIVE ORDER

via a decedent's estate; and (*ii*) an explanation of various decisions made in order
to comply with Swiss Law.

- Entry No. 9086: This email from Jonathan White relates to a discussion
implementing legal advice in order to structure investments in the Inholmes Estate
efficiently and in advance of new laws and regulations in the United Kingdom
from September 2013.

42.     The UCC's blanket argument that all Mr. White's communications were for
business purposes is insufficient and untrue.  (*See* Br. ¶¶ 28-34.)**.**  The foregoing examples
demonstrate that Mr. White provided legal advice for purposes other than business, *e.g.*, estate
planning, while joint business and legal communications remain protected so long as the
"predominant purpose" of the communication was legal advice.  Further, it is clear from the
Privilege Log that the communications in question have nothing to do with the UCC's diligence
of the settlement and simply do not warrant *in camera* inspection by the Court.

**VI.     There Is No Basis for the UCC to Bog Down the Chapter 11 Cases with an
Exceptionally Burdensome *in Camera* Review**

43.     Throughout the General Objections Motion, the UCC requests *in camera* review
of <u>all</u> of the challenged documents to the extent not immediately produced.  The UCC does not
and cannot justify this request.  *See, e.g.*, *In re Omnicom Grp., Inc. Sec. Litig.*, 233 F.R.D. 400,
409 (S.D.N.Y. 2006) (denying *in camera* review despite detailed evidentiary submission that
nonetheless had not "demonstrated an adequate basis for setting aside the privilege").  The
UCC's proposal that these documents be provided for *in camera* review would also lead to an
unnecessary waste of resources.  *See Apple Inc.*, 2020 WL 1986942, at *3–4 ("*in camera* review
of Apple's withheld documents . . . would be a waste of scarce judicial resources.  This Court,
like all of society, is in the midst of dealing with the serious and far-reaching effects of the novel
coronavirus pandemic. . . .  The instant Motion, premised primarily upon the distrust and
suspicion of the good faith of opposing counsel, is not a motion that warrants *in camera* review

UNREDACTED – CONTAINS OUTSIDE PROFESSIONAL'S EYES ONLY INFORMATION
SUBJECT TO PROTECTIVE ORDER

or further consideration").  For example, Entry No. 4892, a partially redacted document

challenged by the UCC, contains – as is clear from the unredacted portions – ███████████

███████████████████████████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████ (Ball

Decl. Exhibit 24) ███████████████████████████████████████████████

███████████████████████████ The mere fact that this document was

deemed responsive to the UCC's broad subpoena does not mean that it merits further discussion,

much less analysis by the Court.

## **CONCLUSION**

44.    The Mortimer Sackler ICSPs respectfully request that the Court enter an Order

denying the UCC's motion to compel production of purportedly privileged documents, or for *in*

*camera* review.


Dated:    October 14, 2020
              New York, New York


By:    */s/ Jasmine Ball*_____
         Jasmine Ball
         M. Natasha Labovitz
         Maura Kathleen Monaghan
         Jeffrey J. Rosen
         DEBEVOISE & PLIMPTON LLP
         919 Third Avenue
         New York, New York 10022
         Telephone:  (212) 909-6000
         Facsimile:  (212) 909-6836
         Email: jball@debevoise.com
                     nlabovitz@debevoise.com
                     mkmonaghan@debevoise.com
                     jrosen@debevoise.com

         *Attorneys for Beacon Company*