# Exhibit 27

# Corporate Compliance Quarterly Report to Board of Directors 4Q10

## February 3, 2011
## Bert Weinstein
## Vice President, Corporate Compliance



U.S. - 16

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

PPLP004405709

# Summary

- Purdue's Corporate Integrity Agreement (CIA)
  - OIG Site Visit
  - Public Citizen Freedom of Information Act Request
  - Monitoring Results
  - Hotline Calls and Other Inquiries
- Federal Pharma Enforcement Summary for 2010
- Evolving CIAs
- Corporate Compliance 2011 Objectives



2



U.S. - 17

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

PPLP004405710

# Corporate Integrity Agreement

- CIA Year #3 closed 7/30/10, with 100% completion of all requirements – awaiting OIG's close out letter

- OIG Site Visit - December 3rd letter from OIG Monitor Keshia Thompson summarizes highlights of the two day site visit to Stamford (October 13-14th)
  - The letter summarizes the meetings and materials covered during the visit
  - Also sets forth the Monitor's recommendations for compliance practices in connection with Purdue's new speaker programs
  - Copy attached
- 3-1/2 years of 5 year CIA completed !



3



U.S. - 18

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

PPLP004405711

# Public Citizen Freedom of Information Act Request

- Recall, OIG March 9th letter notified of Public Citizen request under FOIA for copies of Purdue's CIA Annual Reports. We reached agreement with OIG on very limited production of heavily redacted material – information already in the public domain (July 14th).

- Public Citizen study issued December 16th presented a database of major criminal and civil settlements between federal and state governments and pharmaceutical companies.

- Purdue not highlighted, although public information about settlement referenced

- Citing danger to public safety and "more robust response than the government's current practices."

- Copy of Executive Summary pages attached

 **PURDUE** ®

4

U.S. - 19

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

PPLP004405712

# CIA- Sales Promotion Monitoring – 4Q10

Purdue's CIA requires Corporate Compliance to review Field Contact Reports (FCRs) with a compliance category rating of "1," indicating less than 100% compliance with Sales SOPs

- 672 FCRs were prepared during  4Q10

  - 41 FCRs had a Compliance Rating of "1" – 8 required Compliance investigation; 5 resulted in discipline
    - 2 representatives recorded call note(s) that: contained language which was unclear about indication or proper use of Ryzolt; did not clearly show they corrected a Health Care Provider's misconception about Ryzolt's Indication; or contained a concerning "Next Call Objective"
    - 1 representative received discipline for multiple violations

    - 4 representatives received discipline for making comparative claims during promotion



5



U.S. - 20

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY                                        PPLP004405713

# CIA Medical Services Monitoring – 4Q10

Purdue's CIA requires review of certain HCP inquiries to Medical Services regarding sales representative referrals (reflects OIG's general concern for off-label or improper promotion)

- During 4Q10 there were a total of 20696* Inquiries received by Medical Services concerning *all products*

  - 17504 of these inquiries pertained to OxyContin and Ryzolt, the "Covered Products" during CIA year 4
    - 14866 for Reformulated OxyContin
    - 2521 for discontinued formulation of OxyContin
  - 1351 of the inquiries fell into the CIA specified categories/topics
    - 38 of these inquiries are being reviewed



\* More than all of 2009

6



U.S. - 21

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

PPLP004405714

# Hotline Calls and Other Inquiries
# 4Q10



7



U.S. - 22

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

# Hotline and Other Inquiries 4Q10

Compliance had 200 matters in 4Q10, including:

- 91 Sales and Marketing matters relating to promotion, marketing materials, gifts, meals, CIA compliance, and grants ( 51 requests from sales representatives seeking review of Institutional Policies)

- Many OxyContin patient inquiries regarding reformulation

- There are a small number of open sales investigations into representative call notes concerning potential improper promotion and violations of Sales Department SOPs – not deemed to rise to the level of CIA Reportable Events



8



U.S. - 23

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

# Inquiries by Quarter  (1Q05 – 4Q10)





9

U.S. - 24

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

# 4Q10 Compliance Inquiries



U.S. - 25

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

# Inquiry Response Time



### Days to Close Inquiries 4Q10 as of 1/14/11)



11

U.S. - 26

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

PPLP004405719

# Summary of Federal Enforcement in 2010

- Enforcement activity continues to increase -- 17 major DOJ cases against corporations in 12 months -- a record
- Strong focus on criminal actions (corporate, individuals)
- Major Settlements, by sector:
  - Pharmaceutical Sector -- 15
  - Device Sector -- 6
- Nearly $4 BILLION in settlements paid in 2010
- 9 of the 21 settlements involve criminal charges
  - 2 felony cases involved smaller companies (Norian, KV)
  - Large-dollars frequently – but not always – involve off-label promotion
- A summary of major settlements is attached



12



U.S. - 27

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

PPLP004405720

# Evolution of CIAs: "Old" CIA Provisions

CIAs Typically Required Companies to have:

- Compliance Officer and Compliance Committee
- Written Standards – Code of Conduct
- Compliance Training
- Independent Review Organization
- Hotline
- Exclusion Screening
- Notifications to OIG of Reportable Events
- Auditing and Monitoring Commitments

 PURDUE

13



U.S. - 28

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

# Major Developments

- Board accountability
- Management accountability
- Compliance officer certifications
- Expansion into medical affairs and R&D
- Monitoring
- Transparency
- Sale of business or unit
- Expanded use of exclusion authority
- Criminalization of Individuals



14



U.S. - 29

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY                                    PPLP004405722

# "New" CIA Provisions

- Independence of CCO
- Needs Assessments: consulting services and Publications
- Board Oversight
- Senior Manager Certification
- Notification to HCPs
- Website Postings: payments to HCPs
- Website Postings: Research/Clinical Studies
- Monitoring-Promotion

- Monitoring-Promotion
- Post-marketing Commitments
- Consultant / Speaker Monitoring
- Needs Assessment: Publications
- Grants Monitoring
- Compliance Expert
- Website Posting: Med Ed Grants
- Disclosures for Formulary Committee Members



15



U.S. - 30

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

PPLP004405723

# 2011 Corporate Compliance Goals

1. Compliance with Purdue's CIA and Multistate (AG) Agreement
2. Lead Departmental Compliance Committees and Activities
3. Drive  Ethical Organizational Culture
4. Compliance risks within Sales and Marketing
5. Compliance risks within R&D
6. Compliance risks within Manufacturing and Quality
7. Compliance risks within Administration areas
8. Healthcare and Non-Healthcare Grants
9. Inquiries and Investigations
10. Compliance Auditing and Monitoring
11. HCP Fee For Service Arrangements / Speaker Programs
12. Aggregate Spend – Federal Sunshine Act & State Reporting
13. Maximize External Compliance Leadership Roles





16

U.S. - 31

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

PPLP004405724

# Appended Documents

1. Summary of Significant 2010 Industry Settlements
2. December 3, 2011 OIG Site Visit Letter
3. Executive Summary – Public Citizen 12/16/10 Report



17

U.S. - 32

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

PPLP004405725

# Blue Sheet

CPAM: 381979.3

**U.S. - 33**

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

PPLP004405726

# Significant 2010 Industry Settlements

| Company | Date | Product(s) | Outcome | Allegations |
|---|---|---|---|---|
| **Kos Pharma** | Dec. 2010 | Niaspan, Advicor | • Deferred prosecution agreement<br>• $41M civil settlement | Unlawful inducements, off-label promotion |
| **Roxanne Labs.** | Dec. 2010 | 4 products and/or classes | • $280M civil settlement | Marketing the spread |
| **Abbott** | Dec. 2010 | 9 products | • $126M civil settlement | Marketing the spread |
| **B. Braun** | Dec. 2010 | 49 products | • $15M civil settlement | Marketing the spread |



18



U.S. - 34

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

# Significant 2010 Industry Settlements

| Company | Date | Product(s) | Outcome | Allegations |
|---------|------|-----------|---------|-------------|
| **SB Pharmaco Puerto Rico, Inc. (GSK subsidiary)** | Oct. 2010 | Kytril, Bactroban, Paxil CR, Avandamet | • Criminal plea (felony)<br>• Total of $750M ($150M criminal fine and forfeiture and $600M civil settlement)<br>• 5-year CIA | GMP violations; manufacture and distribution of adulterated drugs |
| **Synthes, Inc.**<br><br>**Norian Corp.** | Oct. 2010 | Norian XR (bone filler) | • Synthes – Criminal plea (one misdemeanor count); criminal penalty and fines of $670K<br>• Norian – Criminal plea (one felony count and 110 misdemeanor counts); criminal penalty and fines of $23M<br>• 5-year CIA; Synthes must sell all Norian assets; Norian excluded | Synthes – shipping adulterated and misbranded product<br><br>Norian – making false statements and shipping adulterated and misbranded product |
| **Novartis Pharma. Corp.** | Sept. 2010 | Trileptal (plus civil allegations related to five other drugs) | • Criminal plea (misdemeanor)<br>• Total of $422.5M ($185M criminal fine and $237.5M civil settlement)<br>• 5-year CIA | Off-label promotion |

*PURD*



19

U.S. - 35

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

PPLP004405728

# Significant 2010 Industry Settlements

| Company | Date | Product(s) | Outcome | Allegations |
|---|---|---|---|---|
| Forest Pharmaceuticals Inc. | Sept. 2010 | Levothroid, Celexa, Lexapro | • Criminal plea (felony and misdemeanor)<br>• Total of $313M ($164M criminal fines and penalties, $149M civil settlement)<br>• 5-year CIA | Obstruction of justice; distribution of unapproved drug; off-label promotion |
| Allergan Inc. | Sept. 2010 | Botox | • Criminal plea (misdemeanor)<br>• Total of $600M ($375 criminal fine and $225 civil settlement)<br>• 5-year CIA | Off-label promotion |
| St. Jude Medical Inc. | June 2010 | Heart devices | • $3.725M civil settlement | False claims based on kickbacks |
| Novartis Vaccines & Diagnostics | May 2010 | TOBI (cystic fibrosis drug) | • $72.5M civil settlement | False claims |

**PURDUE**

20



U.S. - 36

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

PPLP004405729

# Significant 2010 Industry Settlements

| Company | Date | Product(s) | Outcome | Allegations |
|---|---|---|---|---|
| **AstraZeneca Pharma. LP** | April 2010 | Seroquel | • $520M civil settlement<br>• 5-year CIA | Off-label promotion, kickbacks |
| **Ortho-McNeil Jansen Pharm. Inc. (J&J subsidiary)** | April 2010 | Topamax | • Criminal plea (misdemeanor)<br>• Total of about $82M ($6.14M in criminal fines; $75.37M civil settlement)<br>• 5-year CIA | Misbranding, off-label promotion |
| **Schwarz Pharma Inc.** | April 2010 | Deponit, Hyoscyamine Sulfate ER | • $22M civil settlement | False claims regarding eligibility for coverage |
| **Alpharma Inc.** | March 2010 | Kadian | • $42.5M civil settlement | Kickbacks, misrepresentation of safety and efficacy |
| **KV Pharma. Comp.; Ethex Corp.** | March 2010 | Propafenone, dextroamphetamine sulfate | • Criminal plea by subsidiary Ethex Corporation (felony)<br>• $27M in fines and penalties<br>• CEO excluded | GMP violations (oversized drug tablets, failure to notify the FDA) |

*PURDUE* ®

21

**U.S. - 37**

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

# Significant 2010 Industry Settlements

| Company | Date | Product(s) | Outcome | Allegations |
|---------|------|-----------|---------|-------------|
| **Eon Labs Inc. (subsidiary of Novartis AG)** | Feb 2010 | Nitroglycerin SR | • $3.5M civil settlement | False claims; "less than effective" drugs shipped to the government |
| **Guidant LLC (subsidiary of Boston Scientific Corp.)** | Feb 2010 | Implantable defibrillators | • Criminal plea (misdemeanors) • $296M in fines and penalties | Device quality/safety problems, concealed from FDA |
| **Atricure Inc.** | Feb 2010 | Surgical ablation devices | • $3.76M civil settlement | Off-label promotion, False claims based on kickbacks |
| **Spectranetics Corp.** | Dec 2009 | Medical lasers, peripheral devices for those lasers | • $4.9M in civil damages plus a $100,000 forfeiture • Non-prosecution agreement • 5-year CIA | Importation and distribution of unapproved medical devices; False claims |
| **Guidant Corp.** | Dec 2009 | Pacemakers, defibrillators | • $22M civil settlement • 5-year CIA | False claims based on kickbacks to HCPs |

 **PURDUE**

22



## U.S. - 38

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

PPLP004405731

# Blue Sheet

CPAM: 381979.3

**U.S. - 39**

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

PPLP004405732



**DEPARTMENT OF HEALTH & HUMAN SERVICES**

Office of Inspector General
Office of Counsel to the Inspector General

Keshia B. Thompson
Senior Counsel, Administrative and Civil Remedies Branch
Telephone: (202) 205-9573
Facsimile: (202) 205-0604

Cohen Building - Room 5527
330 Independence Ave., S.W.
Washington, D.C. 20201
Email: Keshia.Thompson@oig.hhs.gov

December 3, 2010

**VIA ELECTRONIC MAIL AND REGULAR MAIL**

Bert Weinstein,
Vice President, Corporate Compliance
Purdue Pharma L.P.
One Stamford Forum
Stamford, CT  06901

> Re:   Office of Inspector General On-Site Visit

Dear Bert:

The purpose of this letter is to follow-up the Office of Inspector General's (OIG's)
site visit to Purdue Pharma L.P. (Purdue) that took place on October 13 - 14, 2010.

1.   Brief Summary of Site Visit.

A.   Introductions/Overview of Purdue's Business Operations and Compliance
Program.  We met with a number of Purdue representatives during the site visit.  Upon
arrival, we met with the following individuals who presented an overview of the
evolution of Purdue's compliance program and Purdue's implementation of CIA
requirements:  (1) the Purdue Chief Executive Officer (CEO); (2) the Vice President,
Corporate Compliance (Purdue's Compliance Officer, Bert Weinstein); (3) the Director
of Corporate Compliance; (4) the Executive Director Healthcare Education & Liaison
Programs; (5) the Senior Financial Analyst Financial Planning and Analysis; (6) the
Executive Director, Sales Force; (7) the Vice President Sales and Marketing; (8) the
Senior Manager Corporate Compliance; (9) the Assistant Director Corporate
Compliance; (10) the Senior Manager, Corporate Compliance; and (11) the Executive
Vice President, Chief Financial Officer.  These Purdue representatives also incorporated
into their presentation an overview of the history of the company, the organization of the
company, and the geographic dispersal of Purdue employees and operations.

**U.S. - 40**

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

Page 2– Mr. Bert Weinstein

Bert Weinstein has been Purdue's Compliance Officer since 2004. Bert has prompted structural and related compliance changes and initiatives during his tenure. From December 2006 to 2010, Purdue's Compliance Department increased in size, from a staff of four people to a staff of nine people. Purdue emphasized that compliance is promoted at the highest levels of the company, that the Compliance Department is independent, that the Compliance Officer reports to the President and CEO and Purdue's Board of Directors, that the Compliance Officer is a member of Purdue's Compliance Committee, and that Purdue requires its business units to incorporate compliance into their operations.

Purdue indicated that its Board of Directors adopts a "Compliance Charter," a policy document that governs the compliance function and incorporates the "Seven Elements" of an effective compliance program under the Federal Sentencing Guidelines. Purdue also noted that it has used the OIG Compliance Program Guidance for Pharmaceutical Manufacturers as a resource when implementing its compliance program and CIA requirements. Purdue gave examples of its Board's involvement with compliance and explained the Board's use of a "Dashboard" and a "Scorecard" to navigate compliance issues and evaluate compliance implementation.

     B.    <u>Tour of Headquarters</u>. Bert Weinstein provided a tour of headquarters and during the tour, further explained the entity's organization and introduced us to a number of individuals who work in a variety of capacities within the organization. During the tour, we witnessed what Purdue described as an annual sales representative training that takes place for a week at headquarters. This week-long training includes compliance training.

     C.    <u>Review of Purdue CIA Implementation</u>. Purdue described its Code of Business Ethics (Code of Conduct) and an extensive system of department policies and procedures by which it implements compliance. Purdue told us that all employees of Purdue and associated United States companies receive a copy of the Code of Conduct as well as annual Code of Conduct and compliance training. Purdue also indicated that all employees must annually certify that they have received, read, understood and agree to abide by the Code. Purdue demonstrated and/or discussed with us a number of electronic systems that it uses in connection with its compliance program. During our discussions, Purdue responded to questions we posed about these systems.

Purdue uses Axentis Enterprise System to facilitate the following Purdue compliance related functions: (1) learning management; (2) incident management; and (3) risk and control management (auditing and monitoring activities). Purdue's "Online Workplace Learning" (OWL) website provides access to compliance policies and procedures,

**U.S. - 41**

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY                                     PPLP004405734

Page 3– Mr. Bert Weinstein

enables compliance complaint reporting, and is the company's electronic vehicle for disseminating compliance training to those who must be trained. Purdue provided a demonstration of Axentis and showed us a number of items, including the Disclosure Log and compliance training-related functions.

Purdue utilizes its Phoenix system to monitor and evaluate sales representatives' interactions with health care providers. Purdue provided a demonstration of Phoenix and described related processes and tasks performed by responsible personnel.

Purdue uses its "Aprimo" system to manage "Materials," which include, for example, printed communications regarding Purdue's products. Purdue previously handled Materials related processes manually. Such processes include, for example, approval, dissemination, and discontinuation of Materials. We discussed Aprimo with Purdue. During the discussion, Purdue noted that it is still getting acclimated to Aprimo and working through Aprimo-related issues and challenges.

Purdue utilizes an Information Request Management System (IRMS) to handle product inquiries posed to Medical Services. Purdue provided a demonstration of IRMS, and described related processes and tasks performed by responsible personnel.

     D.    <u>Arrangements with Health Care Providers</u>. Purdue reported that it engages a limited number of health care providers to serve in capacities such as speakers at product theatres, advisory board participants, and consultants. Purdue maintains a database wherein personnel scan certain information including the contract governing the arrangement. The database enables Purdue to identify certain other key information, including who is performing the service called for in the contract. A primary purpose of this database is to ensure that a contract exists before Purdue makes payment to a health care provider providing services on behalf of Purdue or to whom Purdue is otherwise obligated to make payment. Purdue reported, among other things, that there is no clear, formal process by which Purdue engages health care professionals in these capacities.

In the last several years, Purdue has not used many speakers for speaker programs. However, Purdue anticipates using more health care providers as speakers in the near future. Purdue has not historically performed a forward-looking needs assessment for services to be provided by health care providers pursuant to contractual arrangements with Purdue. Purdue noted that it has adopted the PhRMA Code on Interactions with Healthcare Professionals. Purdue does not permit gift giving, entertainment, or provision of pencils, pens, or similar items to health care providers. Purdue presently does not provide product samples.

**U.S. - 42**

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY    PPLP004405735

Page 4– Mr. Bert Weinstein

Purdue noted that it has assigned a team responsible for development of software and implementation of the Patient Protection and Affordable Care Act (ACA) provisions that, in part, require reporting of payments or transfers of value to physicians (the "ACA Payment Reporting Requirements"). Purdue reported that this team's work is in progress.

E.   Training.  As previously noted, Purdue electronically administers and tracks compliance training.  A designated Purdue employee is tasked with identifying populations that require compliance training.  Training is disseminated and tracked electronically through OWL.  Failure to complete training can result in employee discipline up to and including termination.

F.   Employee Interviews.  We interviewed ten employees who work in sales, medical education, drug safety and pharmacovigilance, medical services, medical education, and other capacities for Purdue.  The employees recalled receiving a copy of the Purdue Code of Conduct, attending compliance training, and could recall some of the content of the training.  Employees were able to describe how compliance specifically relates to their job duties.  The employees could identify Purdue's Compliance Officer, individuals who work in the Compliance Department, and were aware of the compliance hotline.  Several of the employees mentioned "OWL" when discussing compliance and compliance training.  The employees indicated that they felt comfortable (or would be comfortable) reporting compliance issues at Purdue via the various reporting modes available at Purdue – the hotline, management, the Compliance Officer, and/or other compliance staff.

G.   Interview of Compliance Officer.  We met with Bert Weinstein prior to closing out our site visit.  We discussed a number of topics with Bert, including the evolution of the Purdue compliance program since the CIA became effective, Purdue's thinking about and approach to compliance risk assessment, and some of our observations during the site visit.

2.   Concluding Remarks.  We met briefly at the end of the site visit with Bert Weinstein and the individuals who were present during the opening meeting of the site visit to thank them for their cooperation and to briefly summarize certain of our observations.

We noted that the site visit illuminated that Purdue needs to create a clear process or processes for entry into arrangements with health care professionals.  Such process(es) should clearly delineate, among other things, the parameters and guidelines governing Purdue's speakers program and who may and may not select speakers.  Purdue's Compliance Department should play a central role in clarification, development,

**U.S. - 43**

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

Page 5– Mr. Bert Weinstein

refinement, and ongoing evaluation of these processes.  Purdue's Compliance
Department should also consider whether its processes and policies surrounding
arrangements with health care professionals are sufficient to enable it to comply with the
ACA Payment Reporting Requirements.  Coordination with Purdue's ACA Payment
Reporting Requirements implementation team will be necessary.  Relevant policies and
procedures should be amended and/or created.  Relevant Purdue personnel should receive
training with respect to the new and/or amended process(es).

Purdue mentioned that it expects to utilize more speakers in the near future.  Purdue
should consider whether its compliance risk assessment process has adequately taken into
account the anticipated uptick in such arrangements with health care providers, given
recent and/or impending drug launches.  The OIG's Compliance Program Guidance for
Pharmaceutical Manufacturers may offer helpful information as Purdue scrutinizes and
makes adjustments to its process(es) governing arrangements with health care providers.

We very much appreciate your cooperation and assistance during the visit.  The site
visit was very informative for us.  We hope it was helpful for Purdue, as Purdue
endeavors to fulfill its CIA obligations.

If you have any questions, please contact me at (202) 205-9573.

Sincerely,

Keshia B. Thompson
Senior Counsel

cc:    Melissa Hart, Senior Counsel

U.S. - 44

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY                    PPLP004405737

# Blue Sheet

CPAM: 381979.3

**U.S. - 45**

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY                    PPLP004405738

# Rapidly Increasing Criminal and Civil Monetary Penalties
# Against the Pharmaceutical Industry: 1991 to 2010

### December 16, 2010

### Sammy Almashat, M.D., M.P.H, Charles Preston, M.D., M.P.H,

### Timothy Waterman, B.S., Sidney Wolfe, M.D.

### Public Citizen's Health Research Group

EXECUTIVE SUMMARY ................................................................................. 2

INTRODUCTION ............................................................................................ 4

METHODS AND DEFINITIONS ........................................................................ 4

RESULTS ....................................................................................................... 9

DISCUSSION ................................................................................................ 19

APPENDIX 1: METHODS AND DATA SOURCES ............................................... 23

APPENDIX 2: ADDITIONAL FIGURES.............................................................. 26

REFERENCES ............................................................................................... 32

U.S. - 46

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY                    PPLP004405739

## EXECUTIVE SUMMARY

### Background

U.S. spending on prescription drugs has increased from $40 billion in 1990 to $234 billion in 2008. In this era of rapidly rising drug costs, the illegal pharmaceutical company activities that have contributed to such inflated spending have garnered a significant amount of media attention. Recent billion-dollar settlements with two of the largest pharmaceutical companies in the world, Eli Lilly and Pfizer, provide evidence of the enormous scale of this wrongdoing. However, the total size, varied nature, and potential impact of these illegal and potentially dangerous activities have not been previously analyzed. This study examined trends from 1991 to the present in federal and state criminal and civil actions against pharmaceutical companies in order to address these questions.

### Analysis

The purpose of this study was to compile a comprehensive database of all major criminal and civil settlements between federal and state governments and pharmaceutical companies. Press releases from both federal and state governments, in addition to existing online databases, were used to identify all settlements of at least $1 million during the past 20 years.

### Main Findings

- Of the 165 settlements comprising $19.8 billion in penalties during this 20-year interval, 73 percent of the settlements (121) and 75 percent of the penalties ($14.8 billion) have occurred in just the past five years (2006-2010).

- Four companies (GlaxoSmithKline, Pfizer, Eli Lilly, and Schering-Plough) accounted for more than half (53 percent or $10.5 billion) of all financial penalties imposed over the past two decades. These leading violators were among the world's largest pharmaceutical companies.

- While the defense industry used to be the biggest defrauder of the federal government under the False Claims Act (FCA), a law enacted in 1863 to prevent defense contractor fraud, the pharmaceutical industry has greatly overtaken the defense industry in recent years. The pharmaceutical industry now tops not only the defense industry, but all other industries in the total amount of fraud payments for actions against the federal government under the False Claims Act.

- The practice of illegal off-label promotion of pharmaceuticals has been responsible for the largest amount of financial penalties levied by the

2

**U.S. - 47**

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

PPLP004405740

federal government over the past 20 years. This practice can be prosecuted as a criminal offense because of the potential for serious adverse health effects in patients from such activities.

- Deliberately overcharging state health programs, mainly Medicaid fraud, has been the most common violation against state governments and is responsible for the largest amount of financial penalties levied by these governments. This type of violation is also the main factor in the considerable increase in state settlements with pharmaceutical companies over time.

- Former pharmaceutical company employees and other "whistleblowers" have been instrumental in bringing to light the most egregious violations and have been responsible for initiating the largest number of federal settlements over the past 10 years. From 1991 through 2000, *qui tam* (whistleblower) cases made up only 9 percent of payouts to the government, but from 2001 through 2010, they comprised 67 percent of total payouts.

## Conclusion

Over the past two decades, especially during the past 10 years, there has been a marked increase in both the number of government settlements with pharmaceutical companies and the size of the accompanying financial penalties. The reasons for these increases are likely related to a combination of increased violations by companies and increased enforcement on the part of federal and state governments.

The danger to public safety and the loss of state and federal dollars that comes with these violations require a more robust response than the government's current practices. Given the relatively small size of current financial penalties when compared to the perpetrating companies' profits, both increased financial penalties and appropriate criminal prosecution of company leadership may provide a more effective deterrent to unlawful behavior by the pharmaceutical industry.

U.S. - 48

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY                    PPLP004405741