# Exhibit 41

# 1 Q 2012
# Compliance Report to Board of Directors
# Purdue Pharma L.P.

Bert Weinstein
April 27, 2012

## Summary

- Corporate Integrity Agreement – no significant issues in 1Q12; CIA "ends" July 30th
- Post-CIA Compliance Program – modest adjustments: less focused on formal CIA requirements, more focused on overall risks and substance
- OIG Roundtable on Pharmaceutical Industry CIAs – largely positive OIG report published on February meeting with "CIA" Compliance Officers
- Fair Market Value Compensation of Health Care Professionals – bringing Purdue compensation of HCPs in line with best practices
- New Sales force Call Note Review Process – greater effectiveness / cost-saving
- Intermezzo Sales Force Compliance Training – positive impression/successful

**Corporate Integrity Agreement**

U.S. - 186

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY    PPLP004407950

The fifth and final year of Purdue's CIA comes to an end July 30th. There have been no Reportable Events in the first quarter of 2012 or in CIA year five, and no unfavorable communications with the Office of Inspector General. We fully expect to complete the fifth year, and full term, of the CIA with a favorable review and close – out, although formal closing of the CIA by the OIG may be expected to take up to six months past July 30th.

**Post-CIA Compliance Program**

The high level 'charter" of the Compliance group is to prevent and detect violations of law, regulations and company policies.

Purdue employees understand the importance of a compliance program, especially given the experience leading up to imposition of the CIA, and the continuing announcement of new CIAs in our industry (interestingly, when new-hires are asked, most confirm they have come from companies that had CIAs). The employee expectation is that a strong compliance program is necessary and will continue at Purdue.

There have been, in a sense, two compliance programs at Purdue since the advent of the CIA: one program to ensure compliance with our CIA, and another program focused on all other compliance risks. The broad direction we propose for the future is to eliminate little of *substance* from the "CIA compliance program," but to eliminate obvious OIG reporting and other formalities that do not provide value in terms of the prevention and detection of violations. This will free up resources for a more comprehensive focus on all compliance risks in aggregate.

A discussion of the details of the proposed plan will be the focus for the next live Compliance report to the Board.

**OIG Report on Pharmaceutical Compliance Roundtable Meeting**

On March 26th, the OIG released its public report from the February 23rd Pharmaceutical Compliance Roundtable. The Roundtable was similar to other such events the OIG has hosted with other healthcare sectors, although because this one involved only pharmaceutical companies

U.S. - 187

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY                                    PPLP004407951

with CIAs, it was deemed sensitive by participants given the high visibility and industry criticism.

The meeting consisted of a full day meeting with some 40 industry participants and senior OIG officials, including the Inspector General, Chief Counsel, and our CIA Monitors. The industry group was divided into five, for discussion of five topics at separate tables throughout the day: (1) Challenges in Implementing CIAs; (2) Compliance Program Structure and Oversight; (3) Risk Assessment and Monitoring Activities; (4) Policies, Procedures, and Training Activities; and (5) Compliance Post-CIA.

The report is generally favorable with respect to its discussion of the challenges and concerns raised by the industry participants and the general state of compliance in the pharmaceutical industry. On this latter point, the OIG report approvingly states: "We hope this report will be useful to providers outside the pharmaceutical industry as they seek to enhance their own compliance programs."

**Compensation of Health Care Professionals at "Fair Market Value"**

Compliance has implemented an updated process with respect to compensation of Healthcare Professionals (HCPs), to ensure Purdue's practices continue to remain in accord with governmental regulations.

As you know, we must compensate HCPs only at "fair market value (FMV)" levels, or risk implicating Anti-Kickback Statute liability. As part of the need for good methodology, we retained a FMV expert to assist with research and benchmarking of relevant wage data, by Medical Specialty (e.g., pain and sleep specialties). For each Specialty, a wage range was developed. A list of current Purdue HCP consultants was compiled and profiled, to include detailed information regarding the academic, clinical and "leadership" qualifications possessed which could be evaluated against a set of established criteria in order to qualify each Consultant and assign them to "Tiers." From this information, a compensation schedule was produced, with medical specialties grouped into hourly ranges of activities, in turn divided into three tiers of qualification. An exception management process was also developed to address unique circumstances where the strategic expertise or capability of a HCP could justify a payment above the established FMV range or a promotion to a higher tier. This process permits some flexibility within our objective framework.

U.S. - 188

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY    PPLP004407952

**New Sales Force Call Note Review Process**

Purdue has been reviewing Sales Force (and other) call notes against key search words. All call notes with "hits" on key words have been reviewed in the past by up to six paralegals within Law. In November, this process was transferred to the Compliance Group, and has since been substantially re-engineered, including an evaluation of the productivity of reviewing call notes containing the key words having been factored into the review process. Given the fact that many of the compliance issues found in call notes have not had to do with the key words, a new random sample selection process has been added. The net result is that two Analyst level employees in Compliance complete the reviews in less than half of their working time, leaving time for other work, and have eliminated a multi-month backlog in call notes waiting for review. The review of a random selection of call notes also means that we will be looking at call notes for every representative each month. This will result in a total of some 7200 call notes reviewed each month for the Analgesic Sales Force. Initially, there will be no key word search for the Intermezzo Sales Force – call notes will be reviewed for every representative on a random basis, until experience suggests appropriate key words. Net-net, we will be reviewing approximately 12,000 call notes each month, about 10% of the total call notes.

I believe the Board's takeaway from this new process should be that Purdue is doing an even better more thorough job of monitoring field activity through these improvements.

**Preparations for Intermezzo Launch**

In addition to the on-line compliance training modules required of all Purdue colleagues, Compliance fully participated in the live Home Office and launch meeting compliance training of the Quintiles Intermezzo representatives. Key points of emphasis, beyond our normal level of compliance training included a focus on communicating Purdue's culture and our "CIA experience" to these new representatives. The consensus of the Compliance group is that these new representatives have a solid understanding of Purdue culture and the importance of compliance.

U.S. - 189

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY                                    PPLP004407953