PARTIALLY REDACTED CONTAINS CONFIDENTIAL PROFESSIONALS' EYES ONLY INFORMATION TREAT SUBJECT TO PROTECTIVE ORDER

# EXHIBIT 19

PUBLICLY FILED PER STIPULATION [ECF 2140]

PARTIAL DE-DESIGNATION: CONTAINS SUBJECT PROFESSIONALS' EYES ONLY INFORMATION
TREAT SUBJECT TO PROTECTIVE ORDER

# Park Jensen Bennett LLP

**To:** Lisa Landau, Esq.
Chief, Health Care Bureau
Office of the Attorney General of the State of New York

Marc Kesselman, Esq.
Senior Vice President, General Counsel
Purdue Pharma L.P.

Danielle Gentin Stock, Esq.
Head of Government Litigation and Investigations
Purdue Pharma L.P.

**From:** Douglas R. Jensen
Tami Stark

**Subject:** Auditor's Third and Final Report on Purdue Pharma's ADD Program

**Date:** October 19, 2018

---

On October 20, 2017, the Auditor, Douglas R. Jensen, submitted his second report (the "Second Report") under the Assurance of Discontinuance agreement executed on August 19, 2015 by Purdue Pharma L.P. ("Purdue") and the Office of the Attorney General of the State of New York ("OAG") (the "AOD"). That Second Report covered the period from June 23, 2016 through June 30, 2017 (the "Second Review Period").[1]

This constitutes the third and final report of the Auditor pursuant to paragraph 41.c. of the AOD (the "Third Report") and covers the period from July 1, 2017 through March 31, 2018 (the

---

[1] The Auditor submitted his first report on October 7, 2016 (the "Initial Report"), which covered the period from the effective date of the AOD through the date of June 22, 2016 (the "First Review Period").

PUBLICLY FILED PER STIPULATION [ECF 2140]

CONFIDENTIAL                                                    PPLP004473738

PARTIAL DOCUMENT CONTAINS CLIENT PROFESSIONALS' EYES ONLY INFORMATION TREAT SUBJECT TO PROTECTIVE ORDER

"Third Review Period"). The Report is divided into four parts: (I) summary of findings; (II) description of the scope of the Auditor's activities to date; (III) the Auditor's findings with respect to Purdue's compliance with Section IV.A. of the AOD and the reasonableness of its determinations whether to continue marketing opioid products to health care providers ("HCPs") who were the subject of Abuse Diversion and Detection ("ADD") Reports; and (IV) conclusion.

### I. Summary of Findings

Pursuant to paragraph 41.b. of the AOD, the Auditor is required to provide a written report each year for three years. Because the Second Review Period ended on June 30, 2017, the Third Review Period was originally contemplated to run through June 30, 2018. In early February 2018, however, Purdue announced that as of February 12, 2018 its sales representatives would no longer promote opioids to prescribers. This decision effectively rendered the ADD Program superfluous, since the sales representatives required to file ADD reports based on their sales calls to HCPs would no longer be making such calls.[2]

Because of the above, the Third Review Period was curtailed, and the OAG staff agreed that the Auditor should complete its evaluation through the date that Purdue stopped marketing opioids through its sales representatives, on or about February 12, 2018. Even after that date, however, due to ADD Reports that had been filed prior to February 12, the Company continued to add HCPs to its No-Call List through at least March 31, 2018. Thus, the Third Review Period ran from the day after the Second Review Period ended, July 1, 2017, through March 31, 2018.

---

[2] Purdue employed around 600 sales representatives in 2018, but that number dropped to approximately 300 by in or about April 2018.

PUBLICLY FILED PER STIPULATION [ECF 2140]

CONFIDENTIAL

PPLP004473739

PARTIAL DE-DESIGNATION — CONTAINS PROFESSIONALS' EYES ONLY INFORMATION TREAT SUBJECT TO PROTECTIVE ORDER

During the Third Review Period, the Auditor's work continued to focus on two broad questions: first, whether Purdue managed its ADD Program in compliance with Section IV.A. of the AOD; and second, whether Purdue's determinations whether to continue marketing to HCPs who had been the subject of ADD Reports were reasonable.

As to the first question, the evidence reviewed by the Auditor and the Auditor's interactions with its Law Department indicate that the Company continued to operate the ADD Program in compliance with Section IV.A. The Initial Report included a paragraph-by-paragraph description of the requirements posed by Section IV.A. and the Company's compliance with those requirements. Rather than repeat the paragraph-by-paragraph analysis of the Initial Report, this Report, like the Second Report, will touch on some of the ongoing Section IV.A. obligations and concludes that those components of the Program are consistent with the requirements of the AOD.

As to the second question, with one exception discussed below (see section III.B.2.) the Auditor concludes that the Company's determinations whether to continue marketing were reasonable. During the Third Review Period, the Company evaluated 547 HCPs from across the nation through its ADD Program, with 26 of those located in New York. Of those 547 IICPs, Purdue's Ethics and Compliance Department ("Compliance Department") automatically placed 415 HCPs on the No-Call List, including the 26 HCPs located in New York, without any input

3

PUBLICLY FILED PER STIPULATION [ECF 2140]

CONFIDENTIAL                                                                                             PPLP004473740

from the Law Department. The remaining 132 HCPs required Law Department review.[3] Of those 132 HCPs, the Law Department determined to cease calling 86 and to continue calling 46.

The Auditor again focused most of its attention on those HCPs placed in the continue calling category, and with one exception discussed below found the Law Department's determinations reasonable. As before, the Auditor's evaluations, as well as the Company's determinations, constitute judgment calls that took different forms. In all cases, based on our interactions with the Law Department, it has approached these determinations conscientiously.

## II. Scope of Activities

Following the submission of the Second Report on October 20, 2017, the Auditor continued to receive documentation from the Company, including: revisions to Purdue's Abuse & Diversion Detection Standard Operating Procedure 1.7.1 ("ADD SOP"); Purdue's monthly updates to the OAG; revisions to Purdue's Sales Training Presentation and Quiz for the ADD Program; spreadsheets listing new hires who completed trainings and quizzes; Incentive Compensation Guides for the third and fourth quarters of 2017 and the first quarter of 2018; and a spreadsheet of No-Call notifications listing instances in which calls were made on No-Call HCPs.

---

[3] For the 132 HCPs the Law Department reviewed, Purdue sent the Auditor electronic folders of the documents it analyzed as part of the Law Department review. The Second Report referred to these electronic folders as "ADD Files" and stated that the Company sent the auditor ADD Files for every evaluation that originated from an ADD Report. In the Third Review Period, the Company began to automatically place certain HCPs on the No-Call List without Law Department review even when an ADD Report had been submitted. For such placements (51 during the Third Review Period), the Company did not send the Auditor electronic folders, and only provided such folders for the 132 cases that required Law Department review.

4

PUBLICLY FILED PER STIPULATION [ECF 2140]

CONFIDENTIAL                                                    PPLP004473741

The Auditor also had interactions with the lawyers at Purdue having primary responsibility for the ADD Program: Maria A. Barton, Senior Vice President and General Counsel during the Third Review Period[4]; Danielle Gentin Stock, Head of Government Litigation and Investigations; Stephanie DiFazio, Senior Counsel, Regulatory; and ███, Legal Analyst. The Auditor had conference calls and exchanged emails with one or more of them to discuss issues raised by the Auditor's review of the documents.

A principle focus of the Auditor's efforts, of course, was to evaluate the reasonableness of Purdue's decisions whether to continue promoting opioid products to the HCPs at issue in each ADD Report. With respect to that effort, as noted above, Purdue provided the Auditor with spreadsheets listing the 547 HCPs it evaluated during the Third Review Period ("ADD Evaluations") and electronic folders for the 132 HCPs the Law Department reviewed ("ADD Files"). ADD Evaluations originated from the following: (a) the filing of an ADD Report by a sales representative (154); (b) the filing of an ADD Report by a sales representative around the same time as a media report raising issues about that HCP (28); (c) the filing of an ADD Report around the same time as another report (1);[5] (d) the filing of a request to resume calling on an HCP (1); (e) a media report raising issues about an HCP (349); or other circumstances (14).[6] Of

---

[4]  On or about July 24, 2018, Maria Barton was replaced in those positions by Marc Kesselman.

[5]  Purdue received an ADD Report from the sales force that Dr. Louis Spagnoletti was closing his practice around the same time that Purdue's Medical Information Department received a phone call from a patient stating that this HCP was losing his license.

[6]  This category may include, among other things, the following: "Reports of Concern" (which are specific alleged occurrences of diversion of a Purdue opioid product as opposed to a

5

PUBLICLY FILED PER STIPULATION [ECF 2140]

CONFIDENTIAL                                                                                         PPLP004473742

these 547 ADD Evaluations, 26 concerned HCPs located in New York (all of whom were placed on the No-Call List by Purdue's Compliance Department), and 521 concerned HCPs located in other states.

As with its Initial and Second Reports, the Auditor again determined to focus its efforts on those instances in which the Law Department decided to continue calling on the HCP. The Auditor typically reviewed: the ADD Report or Request to Resume Calling; a DEA license screenshot; a state medical board license screenshot; a summary licensing screenshot; opioid prescription statistics; and Call Notes written by the sales representatives after any visits to the HCP. In addition, some folders contain copies of news articles or additional state medical board licensing documents concerning the HCP. Further, as described in the Initial Report, for each HCP Purdue determined to continue to call, Purdue provided the Auditor with factual summaries. These summaries describe the source of the report, summarize the Law Department or outside counsel's conversations with the sales representatives and the status of the HCP's medical licenses, prescription history and other relevant facts.

### III.  Findings

#### A. *Purdue's Maintenance of the ADD Program*

To evaluate the Company's compliance with Section IV.A., the Initial Report included a paragraph-by-paragraph discussion of that Section. The Second Report discussed how Purdue

---

suspect situation which would be reported through the ADD Program); HCPs who were re-reviewed by the law department due to the Auditor's requests; and reports by Purdue employees who are not sales representatives.

6

had maintained the ADD program since the Initial Report and discussed some of the continuing obligations under Section IV.A. This Third Report does the same.

### 1. *Purdue's Maintenance of the ADD Program*

Purdue did not make any personnel changes to the Law department's ADD Program in the Third Review Period. Maria Barton continued in the General Counsel role and Danielle Gentin Stock, Head of Government Litigation and Investigations, remained in charge of the Law Department's ADD Program responsibilities. Stephanie DiFazio, Senior Counsel, Regulatory, and ███████, Legal Analyst, assisted with these responsibilities.

The Law Department also continued to retain an outside law firm, Spears Manning LLC, to conduct the first stage of the ADD investigations. After reviewing the ADD Reports and conducting a follow-up investigation, Mr. Spears would make a privileged recommendation to the Law Department to: 1) cease calling; 2) cease calling and refer to law enforcement;[7] 3) continue calling; or 4) continue calling and investigate again in six to twelve months. Ms. Stock reviewed these privileged recommendations and made the final decision. Sometimes, Ms. Barton also reviewed the recommendations.

If a determination was made to continue calling the HCP, the Law Department would send the Auditor a factual summary reflecting the facts gathered during these investigations. A contract attorney, Ms. DiFazio and/or ███████ created the factual summaries based on the

---

[7] While the Law Department previously referred to law enforcement HCPs whose conduct was particularly egregious, during the Third Review Period the Law Department formalized this process with Spears Manning. After this formalization, Purdue referred 16 HCPs to law enforcement, although none of the 16 were from New York. Referrals were made to the DEA and the pertinent state medical boards.

7

PUBLICLY FILED PER STIPULATION [ECF 2140]

CONFIDENTIAL

PPLP004473744

PARTIAL DEPOSITION CONTAINS SUBJECT PROFESSIONALS' IDENTIFYING INFORMATION
TREAT SUBJECT TO PROTECTIVE ORDER

privileged memoranda drafted by Spears Manning, and Ms. DiFazio and ▇▇▇▇ reviewed them before sending to the Auditor.

Purdue also continued to use an automated system called Vinyl, which scanned news, state and DEA licensing databases and other online media for the names of the HCPs in Purdue's Phoenix system. If Vinyl found a match, the Compliance Department was automatically notified. Accordingly, ADD Files could originate from Vinyl, the sales force, or other sources.

Purdue also continued to provide and track training with respect to the ADD program. Purdue provided the Auditor with spreadsheets listing every new hire who completed the training and quiz during the Third Review Period.

### 2. *Continuing Obligations under the AOD*

During the Third Review Period, the Auditor followed up with Purdue on certain specific questions identified and discussed in the Second Report. Those issues are discussed below.

*Paragraph 29* of Section IV.A. requires that ADD Reports be filed when ADD Covered Persons observe or learn "(b) facts suggesting that an HCP's patients are seeking opioids for misuse, including for example an HCP who has failed to comply with NY's I-STOP Program." During the First and Second Review Periods, while Purdue had included this requirement in its ADD SOP, it had not seen any examples of ADD Reports filed because an HCP had failed to comply with NY's I-STOP program. During the Third Review Period, Purdue again found no examples of ADD Reports that were based on a failure to comply with I-STOP.

*Paragraph 31.a.* of Section IV.A. requires in part that to the extent a sales representative "promotes a Purdue opioid product on a planned call to an HCP on the No-Call List," such sales representative shall be subject to potential discipline. As noted in the Initial Report, if a sales

8

PUBLICLY FILED PER STIPULATION [ECF 2140]

CONFIDENTIAL

PPLP004473745

representative were to have contact with an HCP on the No-Call List and enter such contact in the Call Notes, the Phoenix system would generate a notification of that fact to the Law Department. In such instance, the Ethics & Compliance Department would investigate to determine the reason for the contact and pursue appropriate follow-up. Pursuant to our request, the Law Department provided a spreadsheet reflecting the reasons for these notifications and their disposition by the Ethics & Compliance Department. That spreadsheet covered the period of July 1, 2017 through February 12, 2018, during which the Law Department received notifications of 9 such instances.[8]

As with the First and Second Review Periods, the Auditor found that the reasons for such contact varied, but found no instances in which a sales representative intentionally visited a No-Call HCP for the purpose of marketing to that HCP. In some instances, a sales representative inadvertently encountered a No-Call HCP during a visit to another (unrestricted) HCP practicing in the same medical office, and consistent with ADD procedure the sales representative noted the encounter in her Call Notes after the fact. In one case, a sales representative missed the email sent the day before stating that the HCP had been placed on the No-Call List. This sales representative was reminded of the policy and coached on the requirements of the ADD program.

*Paragraph 31.f.* of Section IV.A. requires that if a sales representative fails to file an ADD report when appropriate, that "person shall be subject to disciplinary action by Purdue,

---

[8] During the Initial Review Period, Purdue reported 24 such instances and during the Second Review Period reported 50.

9

PUBLICLY FILED PER STIPULATION [ECF 2140]

CONFIDENTIAL

PPLP004473746

PARTIAL DOCUMENT CONTAINS PRIVILEGED PROFESSIONALS' EYES ONLY INFORMATION TREAT SUBJECT TO PROTECTIVE ORDER

including but not limited to censure, probation and termination." During the Third Review Period, Purdue reported that 6 out of their approximately 600 sales representatives received discipline.[9] All 6 sales people received warning letters emphasizing the importance of the ADD policies, were required to complete online ADD Program training and to review the ADD SOP with the Ethics & Compliance Department. As one example, a sales representative was informed by a pharmacist that the pharmacist was refusing to fill prescriptions from a particular prescriber. The sales representative decided to no longer call on this prescriber, but never filed an ADD report. The prescriber was placed on the No-Call List after his medical license was suspended. The sales person received the discipline described above. In another example, two sales representatives noticed red flags -- a large volume of patients in the office, a large volume of workers' compensation patients, no exam table in an examination room in the physician's office, some patient visits lasting 4-5 minutes -- but did not file an ADD Report. The representatives received the discipline described above.

*Paragraph 32* of Section IV.A. has two components. First, the paragraph requires that "ADD Covered Persons in New York shall enter detailed call notes regarding sales calls to HCPs in which compliance or potential abuse issues are raised." Second, the Company's Compliance Department "shall, on a quarterly basis, audit and review a sample of such call notes to, inter alia, evaluate compliance with the ADD Program and determine whether ADD Reports need to be filed regarding particular HCPs." Since the Second Report, the Law Department informed the Auditor that the Compliance Department initially flagged three call notes as raising

---

[9] During the Initial Review Period, Purdue reported there had been no instances of discipline and during the Second Review Period there had been one.

PUBLICLY FILED PER STIPULATION [ECF 2140]

CONFIDENTIAL

PPLP004473747

possible ADD concerns: two of the call notes contained statements that the doctors had discontinued prescribing opioids and one of the call notes indicated that the HCP's office had been shut down. After conducting follow-up, the Law Department determined that none of these call notes raised ADD concerns.

*Paragraph 33* of Section IV.A. requires that, in Purdue's compensation structure for marketing employees, no more than 30% of an individual's total compensation (including bonus) may be based on the volume of OxyContin prescriptions. During the Third Review Period, based upon Purdue's Incentive Compensation Guides, the sales force received 70% of its compensation in a base salary and 30% in variable incentive compensation. During the last two quarters of 2017, the variable incentive compensation could be based on sales of Hysingla, Butrans, OxyContin, or Symproic and whether the sales representative supported responsible opioid prescribing or utilization. Sales of OxyContin did not account for more than 17.5% of the variable incentive compensation. During the first quarter of 2018 through February 12, 2018, the variable incentive compensation could be based on sales of Symproic, whether the sales representative supported responsible opioid prescribing or utilization, and whether the sales representative was calling on HCPs with the frequency that Purdue specifies for the sales representative's territory. To determine whether a sales representative supported responsible opioid prescribing or utilization, Purdue considered whether the sales representative discussed the following topics with the HCPs: 1) appropriate patient selection; 2) risk, including addiction, abuse and misuse; 3) resources to support *chronic pain management* and/or reduce addiction, abuse and misuse; and 4) the fact that abuse deterrent properties do not prevent or reduce the risk of addiction and that abuse is still possible by intravenous, intranasal and oral routes.

11

PUBLICLY FILED PER STIPULATION [ECF 2140]

CONFIDENTIAL

PPLP004473748

### B. *Purdue's Decisions Regarding Whether to Continue Marketing During the Third Review Period*

Pursuant to Paragraph 41.b. of the AOD, the Auditor obtained from Purdue each of the ADD Files closed by the Law Department during the Third Review Period. During the Third Review Period, the Law Department determined to cease calling 86 and to continue calling 46 of the 132 HCPs reviewed by the Law Department. As required by the AOD, the Auditor continued to evaluate the reasonableness of these 46 continue calling determinations. In doing so, the Auditor applied the guidelines outlined in the Initial Report. (*See* pages 25-27 of the Initial Report.)

While the Auditor applied the same guidelines as before, in one respect its interactions with the Company were different. As described in the Initial and Second Reports, in some instances the Auditor had concerns about a continue calling determination made by the Company, and after it expressed those concerns the Company reconsidered its position and decided to place the HCP on the No-Call List or subject the HCP to further review. In the Third Review Period, because Purdue stopped promoting opioids to prescribers altogether on February 12, 2018, such discussions did not take place. In one instance discussed below, the Auditor had concerns about the Company's determination to continue calling on Dr. Randall Brewer, and based upon prior experience the Auditor believes it likely the Company would have reconsidered its position. However, because of the Company's determination to cease promoting opioids altogether, no such process took place.

Set forth below is a discussion of representative determinations made by the Company in the Third Review Period. As in the Initial and Second Reports, this Report does not discuss

12

PUBLICLY FILED PER STIPULATION [ECF 2140]

CONFIDENTIAL

PPLP004473749

every determination made by the Company, but instead discusses those which we believe to be illustrative. Our evaluations of the 46 continue calling determinations fall into three categories: (a) instances in which the Auditor found the Company's determination to continue calling reasonable (44); (b) one instance, concerning Dr. Randall Brewer, in which the Auditor disagreed with the Company's continue calling determination; and (c) one instance in which the Auditor found the Company's determination to continue calling reasonable, but which was a closer call and raised issues of possibly broader application that the Auditor wished to bring to the OAG's attention.[10] Each of these categories is discussed below in turn.

1. *Continued-Calling Determinations Found Reasonable*

Selected examples of the Company's determinations to continue calling, and how the Company arrived at them, are described below.

*Dr. Oleg Gavrilyuk.* On or about February 15, 2017, a Purdue sales representative filed an ADD Report with respect to Dr. Oleg Gavrilyuk, a physician focused on pain management and located in San Diego, California. The Report was filed by the sales representative who called on Dr. Gavrilyuk. This sales representative said that a pharmacist told him that Dr. Gavrilyuk may have lost his medical license.

In response to the Report, Spears Manning spoke with the sales representative who made the Report and had been calling on Dr. Gavrilyuk for the previous four and a half years. He reported that the pharmacist had speculated that Dr. Gavrilyuk lost his license because he

---

[10] On October 5, 2017, the Auditor met with OAG staff to discuss, among other things, these closer calls and whether the OAG wished for the Auditor to address them differently. As no decision was made to address them differently in future reports, we continue to treat them as before.

13

PUBLICLY FILED PER STIPULATION [ECF 2140]

CONFIDENTIAL

PPLP004473750

recently left a group practice to open his own practice. Every time the pharmacist checked the license, however, it appeared to be valid. The sales representative also reported that this doctor was highly educated and a professional physician with a high degree of knowledge and interest in pain medications, who takes his time with patients and is considered a low volume doctor.

In addition to contacting the sales representatives, Spears Manning reviewed the Call Notes, Dr. Gavrilyuk's medical license (which was active), his DEA registration (active), and his prescribing history (since June 2016, he wrote about 40 opioid prescriptions a month), and located no publicly available negative information. Based on all the above, the Law Department determined that it was appropriate to continue calling on Dr. Gavrilyuk.

After receiving this information, the Auditor asked Purdue to check Dr. Gavrilyuk's state and DEA licenses again. As of May 2018, his licenses were still active.

*Comprehensive Pain Management & Western Reserve Pain Management.* On or about November 9, 2017, a sales representative and his manager submitted an ADD Report stating that two large pain management practices in the Akron, Ohio area, Comprehensive Pain Management ("CPM") and Western Reserve Pain Management ("WRPM"), had decided to stop meeting with sales representatives from pharmaceutical companies because the Ohio Board of Pharmacy was monitoring the number of visits made by such representatives as a result of the "opioid epidemic."

In response to the Report, Spears Manning spoke with the sales representative who made the Report and two additional representatives who called on the practices. The representatives called on 8 doctors and nurse practitioners at WRPM, and 14 doctors and nurse practitioners at CPM. An administrator at CPM and a receptionist at WRPM informed the sales representative

14

PUBLICLY FILED PER STIPULATION [ECF 2140]

CONFIDENTIAL

PPLP004473751

who made the report and his manager that they would no longer allow office visits but did not state why. The sales representatives and their manager had separately heard, however, that the Board of Pharmacy was reviewing the number of visits they made to these practices. They believed that CPM and WRPM had voluntarily shut down visits, not that the Board of Pharmacy had required them to do so.

In addition to contacting the sales representatives, Spears Manning reviewed, for all the doctors and nurse practitioners they called on at CPM and WRPM: the Call Notes, medical licenses (which were active), DEA registrations (active), prescribing history (which showed nothing out of the ordinary), and located no publicly available negative information. Based on all the above, the Law Department determined that it was appropriate to continue calling on the doctors and nurse practitioners at CPM and WRPM.

*Nurse Practitioner, Tawnya Hoffman.* On or about September 13, 2017, a Key Account Manager filed an ADD Report with respect to Tawnya Hoffman, a Nurse Practitioner located in Brownsville, California. The Report was based upon the Key Account Manager's observation in the Integrated Delivery Network that Ms. Hoffman prescribed over $1 million of extended release oxycodone ("ERO").

In response to the Report, Spears Manning spoke with a different Purdue employee because the Key Account Manager who filed the ADD Report was no longer with Purdue. This employee explained that the health system that Ms. Hoffman works for had an ERO number of just over $1 million, not Ms. Hoffman personally. Ms. Hoffman prescribes an average of 103 opioids a month. Accordingly, it appeared that the Key Account Manager had confused the health system's totals for Ms. Hoffman's.

15

PUBLICLY FILED PER STIPULATION [ECF 2140]

CONFIDENTIAL

PPLP004473752

In addition to contacting this employee, Spears Manning reviewed the Call Notes, Ms. Hoffman's medical license (which was active), her DEA registration (active), her prescribing history (which showed between 50 and 160 opioid prescriptions per month) and located no publicly available negative information. Based on all the above, the Law Department determined that it was appropriate to continue calling on Ms. Hoffman.

### 2. *Instance in which the Auditor Disagreed with the Company's Continue Calling Determination*

As noted above, the Auditor disagreed with the Company's continue calling recommendation with respect to Dr. Randall Brewer. In September 2017, Purdue was notified that several public entities in Louisiana had filed a lawsuit against Purdue, various other drug makers, and doctors alleging misrepresentations regarding the safety of prescription painkillers. This lawsuit included Dr. Randall Brewer, a pain management specialist in Shreveport, Louisiana.

In response to the Report, Spears Manning spoke with a sales representative and a manager (DBM), who did not report any concerns about Dr. Brewer and were not aware of the lawsuit. They felt that he had a very conservative pain practice and was a thought leader in Northern Louisiana. They explained that he only allowed patients to take two short-acting opioids and if the patient required more, would convert them to a long acting opioid. They also said that he employed proper screening tools, including urine tests and prescription monitoring. In addition to contacting the sales representatives, Spears Manning reviewed the Call Notes, Dr. Brewer's medical license (which was active), his DEA registration (active), and his prescribing

PUBLICLY FILED PER STIPULATION [ECF 2140]

CONFIDENTIAL

PPLP004473753

history. Based on all the above, the Law Department determined that it was appropriate to continue calling on Dr. Brewer.

In reviewing the prescription history, the Auditor noticed that Dr. Brewer's monthly prescriptions ranged from around 1200 to 1800 a month. The Auditor had not previously observed monthly prescription numbers that high and conducted additional analysis. The Auditor found that from July 2015 to July 2017, 64.3% of these prescriptions were for short acting opioids and 35.7% were for long acting. The Auditor also asked for Dr. Brewer's 2018 prescription history and found that from January to May 2018, his monthly opioid prescriptions ranged from around 1300 to 1600. Based on this, the Auditor asked Purdue's Law Department if it had any additional information concerning Dr. Brewer's practice, and the Department said it did not. This inquiry, however, took place months after the Company had determined to cease promoting opioids altogether, and at that point was effectively moot. Had the question not been mooted, the Auditor would have recommended that Purdue revisit its continue calling determination and based on prior experience thinks it likely that the Company would have revisited its position.

### 3. *Determinations Found Reasonable, but Raising Issues for the OAG's Consideration.*

The Initial and Second Reports described several instances in which the Auditor found the Company's determination to continue calling reasonable, but the determination raised issues of more general application that the Auditor wished to bring to the OAG's attention. During the Third Review Period, the Auditor found one instance of this.

PUBLICLY FILED PER STIPULATION [ECF 2140]

CONFIDENTIAL

PPLP004473754

PARTIAL DE-DESIGNATION OF CONFIDENTIAL PROFESSIONALS' EYES ONLY INFORMATION TREAT SUBJECT TO PROTECTIVE ORDER

*Dr. Kristy King.* On or about July 17, 2017, a Purdue sales representative filed an ADD Report with respect to Dr. Kristy King, an internist in Little Rock, Arkansas. The sales representative reported that an office manager from another medical practice told her that a pharmacist told the office manager Dr. King was under investigation.

In response to the Report, Spears Manning spoke with the sales representative who filed the Report and another sales representative who has called on Dr. King for the last 15 years. The latter sales representative stated that for many years, Dr. King worked at a pain clinic, but then about three years ago took over an internal medicine practice. Within the last year, Dr. King has transitioned the practice to a wellness and weight-loss practice. Both sales representatives reported that they believed Dr. King took a conservative approach to prescribing opioid products and the patient base appears legitimate. Dr. King also followed prescription monitoring programs and performed drug screens. The sales representatives had no concerns about Dr. King.

Spears Manning also reviewed the Call Notes, Dr. King's medical license (which was active), her DEA registration (active), and her prescribing history (which was trending down since the beginning of 2016) and located no publicly available negative information. Based on this, the Law Department determined that it was appropriate to continue calling on Dr. King.

After reviewing this information, the Auditor requested the Arkansas Medical Board Orders relating to the discipline of Dr. King noted on her medical license screen shot. These orders showed that in 2013 the Arkansas State Medical Board alleged that Dr. King overprescribed Scheduled medications and did not maintain records justifying such prescriptions. Dr. King consented to an Order requiring her to complete continuing education courses on

18

PUBLICLY FILED PER STIPULATION [ECF 2140]

CONFIDENTIAL

PPLP004473755

prescribing Scheduled medications and prohibiting her from prescribing medications for any patients outside of the State of Arkansas.

Considering the above, as with its previous Reports, the Auditor flags this case for consideration by the OAG. Any time an HCP is disciplined for conduct relating to prescribing controlled substances, such discipline goes to the heart of the AOD and merits careful scrutiny. On the other hand, it does not in the Auditor's view represent an automatically disqualifying factor so long as the issues identified were addressed and controlled.

## IV. Conclusion

Under Paragraph 41.b. of the AOD, the Auditor was required to provide three annual Reports to the OAG and Purdue. Since this constitutes our third and final Report, the Auditor considers its role concluded. Of course, to the extent the OAG has questions or wishes to discuss the substance of this Report, the Auditor would be happy to do so.

PUBLICLY FILED PER STIPULATION [ECF 2140]

CONFIDENTIAL

PPLP004473756