UNREDACTED – CONTAINS PROFESSIONALS' EYES ONLY INFORMATION
SUBJECT TO PROTECTIVE ORDER

Jasmine Ball
Maura Kathleen Monaghan
Jeffrey J. Rosen
DEBEVOISE & PLIMPTON LLP
919 Third Avenue
New York, New York 10022
Telephone:  (212) 909-6000
Facsimile:  (212) 909-6836

*Attorneys for Beacon Company*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

|  |  |
|---|---|
| **In re:** | **Chapter 11** |
| **PURDUE PHARMA L.P.,** *et al.*, | **Case No. 19-23649 (RDD)** |
| **Debtors.**[1] | **(Jointly Administered)** |

**SUR-REPLY MEMORANDUM OF OBJECTION OF MORTIMER SACKLER INITIAL COVERED SACKLER PERSONS TO THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS' MOTION TO COMPEL PRODUCTION OF PURPORTEDLY PRIVILEGED DOCUMENTS, OR FOR *IN CAMERA* REVIEW, BASED ON GOOD CAUSE, CRIME FRAUD, AND AT ISSUE EXCEPTIONS TO CLAIMS OF PRIVILEGE**

---

[1]  The Debtors in these cases, along with the last four digits of each Debtor's registration number in the applicable jurisdiction, are as follows: Purdue Pharma L.P. (7484), Purdue Pharma Inc. (7486), Purdue Transdermal Technologies L.P. (1868), Purdue Pharma Manufacturing L.P. (3821), Purdue Pharmaceuticals L.P. (0034), Imbrium Therapeutics L.P. (8810), Adlon Therapeutics L.P. (6745), Greenfield BioVentures L.P. (6150), Seven Seas Hill Corp. (4591), Ophir Green Corp. (4594), Purdue Pharma of Puerto Rico (3925), Avrio Health L.P. (4140), Purdue Pharmaceutical Products L.P. (3902), Purdue Neuroscience Company (4712), Nayatt Cove Lifescience Inc. (7805), Button Land L.P. (7502), Rhodes Associates L.P. (N/A), Paul Land Inc. (7425), Quidnick Land L.P. (7584), Rhodes Pharmaceuticals L.P. (6166), Rhodes Technologies (7143), UDF LP (0495), SVC Pharma LP (5717) and SVC Pharma Inc. (4014). The Debtors' corporate headquarters is located at One Stamford Forum, 201 Tresser Boulevard, Stamford, CT 06901.

UNREDACTED – CONTAINS PROFESSIONALS' EYES ONLY INFORMATION
SUBJECT TO PROTECTIVE ORDER

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................................... iii

STATEMENT OF FACTS ...................................................................................... 5

I.    The UCC's Reply Does Not Show Probable Cause with Respect to the Elements
      of the "Crime Fraud" Exception ................................................................... 5

      A.    The UCC's Intentional Fraudulent Transfer Allegations Still Do Not Show
            Any Side A ICSP Acting to Interfere, Hinder, or Delay Creditors ...................... 5

            1.    The UCC Reply Does Not Come Forward With Evidence Showing
                  Probable Cause That Each, Let Alone All, Side A ICSPs
                  Participated in Fraudulent Transfers ......................................... 6

            2.    An Extensive Record Disproves the UCC's Claim that Any Side A
                  ICSP Knew that Purdue Faced a "Massive" Litigation Threat and
                  "Vast Liability" ......................................................................... 9

            3.    The UCC Has No Answer to Cash Management Practices That
                  Ensured That Purdue's Needs Were Met Before Distributions
                  Were Approved ......................................................................... 11

            4.    Side A Distributions Were Transferred to Trusts for Conventional
                  Wealth Management Purpose—Not to Hide It from Creditors ............... 13

      B.    The UCC's Fiduciary Duty Allegations Do Not Show Any Side A ICSP
            Engaging in a Crime or Fraud ................................................................. 14

            1.    No Side A ICSP Engaged in Management Functions ............................. 15

            2.    No Side A ICSP Engaged in Crimes or Frauds ................................... 16

      C.    The UCC Reply Does Not Contain Any Allegations About the Role of
            Counsel in Facilitating Any Supposed Crime or Fraud ...................................... 21

II.   The NCSG Memorandum Does Not Show Probable Cause with Respect to the
      Elements of the "Crime Fraud" Exception ..................................................... 22

ARGUMENT ...................................................................................................... 27

I.    The UCC and the NCSG Have Not Come Forward with Evidence of Probable
      Cause That Any Side A ICSP Engaged in a Crime or Fraud ................................. 27

      A.    The UCC and the NCSG's Intentional Fraudulent Transfer Allegations Do
            Not Show Any Side A ICSP Engaging in a Crime or Fraud ................................. 27

UNREDACTED – CONTAINS PROFESSIONALS' EYES ONLY INFORMATION
SUBJECT TO PROTECTIVE ORDER

B.      The UCC's Fiduciary Duty Allegations Do Not Show Any ICSP Engaging
        in a Crime or Fraud ................................................................................... 30

C.      The NCSG's Allegations Do Not Show Any ICSP Engaging in a Crime or
        Fraud ........................................................................................................... 33

II.     The UCC and the NCSG Have Not Shown Probable Cause That Side A ICSP
        Communications with Counsel Facilitated Any Alleged Crime or Fraud ...................... 34

III.    The Court Should Not Order an *In Camera* Review Because the UCC and the
        NCSG Have Offered No Basis to Conclude That the "Crime Fraud" Exception
        Applies ................................................................................................................... 37

CONCLUSION ................................................................................................................. 38

UNREDACTED – CONTAINS PROFESSIONAL EYES ONLY INFORMATION
SUBJECT TO PROTECTIVE ORDER

# TABLE OF AUTHORITIES

**CASES**

*Amusement Indus.Inc. v. Stern*, 293 F.R.D. 420 (S.D.N.Y. 2013)................................................36

*Bialek v. Racal-Milgo, Inc.*, 545 F. Supp. 25 (S.D.N.Y. 1982) ..........................................26

*Cendant Corp. v. Shelton*, 246 F.R.D. 401 (D. Conn. 2007)........................................28

*Coquina Invs. v. Rothstein,* No. 10-60786-Civ-COOKE/BANDSTRA, 2011 WL
    13096509 (S.D. Fla. Oct. 19, 2011)........................................32

*Cotton v. City of Eureka*, No. C-08-04386 SBA (EDL), 2010 WL 2889498 (N.D. Cal.
    July 22, 2010) ........................................32

*Drummond Company, Inc. v. Conrad & Scherer, LLP*, 885 F. 3d 1324 (11th Cir. 2018) ......35, 36

*Emerson v. Wembley USA Inc.*, 433 F. Supp. 2d 1200 (D. Colo. 2006)........................................32

*Galaxy CSI, LLC v. Galaxy Comp. Servs., Inc.*, No. 1:04-CV-00007-LMB, 2004 WL
    3661433 (E.D. Va. Mar. 31, 2004) ........................................30, 31

*In re AHT Corp.*, 292 B.R. 734 (S.D.N.Y. 2003) ........................................26

*In re N.Y.C. Asbestos Litig.*, 109 A.D.3d 7 (N.Y. App. Div. 2013) (UCC Reply ¶ 20) ...............30

*In re Old CarCo LLC*, 435 B.R. 169 (Bankr. S.D.N.Y. 2010) ........................................29, 30

*In re Platinum and Palladium Commodities Litigation*, 828 F. Supp. 2d 588 (S.D.N.Y.
    2011) ........................................17

*In re Richard Roe, Inc.*, 168 F.3d 69 (2d. Cir. 1999) ("*Roe II*")................................27, 30, 34, 35

*In re Richard Roe Inc.*, 68 F.3d 38 (2d Cir. 1995)........................................27

*Kertesz v. Gen. Video Corp.*, No. 09-cv-1648 (GBD), 2010 WL 11506390 (S.D.N.Y.
    2010) ........................................10

*LiButti v. United States*, 107 F.3d 110 (2d Cir. 1997) ........................................31, 32, 33

*Lipsky v. Commonwealth United Corp.*, 551 F.2d 887 (2d Cir. 1976) ........................................17

*Loughrin v. United States*, 573 U.S. 351 (2014)........................................3

*MacNamara v. City of New York*, No. 04 Civ. 9216(RJS)(JCF), 2008 WL 186181
    (S.D.N.Y. Jan. 18, 2008)........................................3, 34

*Pence v. Gee Grp., Inc.*, 236 F. Supp. 3d 843, 846–48 (S.D.N.Y. 2017) ........................................10

UNREDACTED – CONTAINS PROFESSIONALS' EYES ONLY INFORMATION
SUBJECT TO PROTECTIVE ORDER

*Progressive Cas. Ins. Co. v. Monaco*, No. 16-cv-823 (VAB), 2017 WL 2873051 (D.
     Conn. July 5, 2017) ....................................................................................................32

*Rosebud Sioux Tribe v. A & P Steel, Inc.*, 733 F.2d 509 (8th Cir. 1984) ....................................33

*S.E.C. v. Citigroup Global Markets, Inc.*, 827 F. Supp. 2d 328 (S.D.N.Y. 2011), *vacated* ..........17

*Sackler v. Utah Div. of Consumer Protection,* No. 190905862 (Utah Dist. Ct. Oct. 10,
     2019) ...................................................................................................................... 27

*Securities Investor Protection Corp. v. Bernard Madoff Investment Securities LLC*, 319
     F.R.D. 100 (S.D.N.Y. 2017) .....................................................................................28

*United States v. Jacobs*, 117 F.3d 82 (2d Cir. 1997) ....................................................................3

*United States v. Zolin*, 491 U.S. 554 (1989) ...............................................................................37

STATUTES

N.Y. Bus. Corp. Law § 717 .....................................................................................................31

UNREDACTED – CONTAINS PROFESSIONALS' EYES ONLY INFORMATION
SUBJECT TO PROTECTIVE ORDER

Pursuant to the *Notice of Agreement between Debtors and UCC re: Privilege Motions and Adjournment of Hearing with Respect to Remaining Privilege Disputes as to the Sacklers*: [Dkt. No. 1908], the Side A ICSPs[2] submit this sur-reply memorandum in further opposition to the UCC's Exceptions Motion and the Ad Hoc Group of Non-Consenting States' memorandum submitted on November 18, 2020 [Dkt. No. 2012] (the "NCSG Reply").

1.       The UCC's reply memorandum in support of its Exceptions Motion (the "UCC Reply") and the NCSG Memorandum only confirm that the Court should not invoke the extraordinary remedy of requiring the Side A ICSPs to produce privileged documents.  As set forth below, none of the UCC or the NCSG allegations come remotely close to meeting the burden necessary to justify this extraordinary remedy for two separate and independent reasons.  <u>First</u>, neither the UCC nor the NCSG comes forward with any evidence that any Side A ICSP, much less all of them, engaged in a crime or fraud.  <u>Second</u>, neither the UCC nor the NCSG makes any attempt to satisfy a core prerequisite of the application:  coming forward with **<u>evidence</u>** that the communications with counsel they seek facilitated any of the crimes or frauds that they allege.  The Department of Justice ("DOJ") allegations upon which the UCC and NCSG largely rely were expressly denied by the members of the Sackler families that are parties to the DOJ civil settlement (the "Named Sacklers")—something the DOJ frequently does not permit defendants to do—and the full record demonstrates that the Side A ICSPs acted entirely lawfully. The Motion should therefore be denied.

2.       This Court has already recognized that the parties should now have "sufficient information" to reach a negotiated settlement.  Hr'g Tr. November 17, 2020 at 251:2–3 [Dkt. No.

---

[2]       All terms used herein shall have the same meaning as set forth in the Side A ICSPs' Objection to the UCC's Exceptions Motion (the "Side A Obj.") [Dkt. No. 1804].  The Side A ICSPs preserve, and do not waive, all defenses, including without limitation defenses based on lack of personal jurisdiction.

UNREDACTED – CONTAINS PROFESSIONALS' EYES ONLY INFORMATION
SUBJECT TO PROTECTIVE ORDER

2073].  Indeed, the UCC already has over 90 million pages of documents from the Debtors, Side

A, and Side B, and has taken more than a dozen depositions.  The UCC has so many documents

that they conceded that even billing at a rate of several million dollars per month, they cannot

cast human eyes over all of them.  UCC Reply ¶ 13.  The UCC nonetheless claims it should

receive even more documents.  Not only does the UCC have no basis to apply the "crime fraud"

exception, but its proposal to either (i) have someone sort through documents to determine which

ones fit within its seven general categories or (ii) have this Court conduct an *in camera* review

would only further distract the parties from reaching a settlement.

* * *

3.      The UCC concedes that it is not pursuing a constructive fraudulent conveyance

theory and that its "crime-fraud arguments are based on the Sacklers' intentionally fraudulent

transfers and breaches of fiduciary duties."  UCC Reply ¶ 73 [Dkt. No. 2014].  The NCSG makes

allegations about a disjointed set of crime or fraud allegations.  Neither the UCC nor the NCSG

meets the burden of coming forward with evidence to support a finding of probable cause that

would justify the Court ordering the production of privileged communications.

4.      **Intentional fraudulent conveyance**:  Notwithstanding its new allegations, the

UCC has not come forward with a shred of actual evidence—much less probable cause—that

any Side A ICSP authorized any transfer with the intent of hindering, interfering with or delaying

any creditor.  Indeed, there are no specific intentional fraudulent conveyance allegations for

virtually all of the Side A ICSPs.  In any event, the UCC does not identify a single document

showing that any Side A ICSP was concerned that litigation threatened Purdue's solvency, much

less than any Side A ICSP sought to move assets to avoid hypothetical creditors.  Instead, the

few Side A documents cited by the UCC demonstrate that Side A believed Purdue's financial

2

UNREDACTED – CONTAINS PROFESSIONALS' EYES ONLY INFORMATION
SUBJECT TO PROTECTIVE ORDER

position was strong, particularly in light of reclaiming the OxyContin patent after a long legal

battle.  Side A nonetheless wanted to consider potential strategic transactions in light of the

possibility of OxyContin facing a "patent cliff" and other business reasons.  To state the obvious,

wishing to sell or merge a business is no indication of fraud.  Indeed, in this year alone,

notwithstanding the pandemic, there have been at least nine strategic transactions involving

healthcare companies with a value of more than $1 billion.[3]

5.        The UCC also fails to meet its burden of evidence that **"each of the particular**

**attorney-client communications at issue was used 'in furtherance of [a] crime or fraud'**

**. . . ."** *MacNamara v. City of New York*, No. 04 Civ. 9216(RJS)(JCF), 2008 WL 186181, at *4

(S.D.N.Y. Jan. 18, 2008) (alterations in original) (quoting *United States v. Jacobs*, 117 F.3d 82,

87 (2d Cir. 1997), abrogated on other grounds by *Loughrin v. United States*, 573 U.S. 351

(2014)).  In fact, the UCC makes few isolated allegations about any communications with

counsel, none of which involve Side A ICSPs.  The UCC does not allege that any of those

communications with counsel—or any others—facilitated any supposed intentional fraudulent

conveyance by any Side A ICSP.

6.        The UCC Reply doubles down on the UCC's meritless position that it can satisfy

that burden through its use of seven highly generalized categories of documents that simply

rephrase its allegations, *e.g.*, "Whether, and/or how, opioid litigants could collect, or be

prevented from collecting, a potential judgment against the Sacklers, their trusts and other

affiliates and assets (even if the Sacklers' motive to obscure assets was unbeknownst to the

lawyer providing the advice)."  Hurley Decl., Ex. 101, at 2 [Dkt. No. 1754].  These categories

---

[3]     Michael Gibney, *Largest Healthcare Deals of 2020 Break Through COVID-19 M&A Drought*, S&P GLOBAL (Aug. 18, 2020),
        https://www.spglobal.com/marketintelligence/en/news-insights/latest-news-headlines/largest-healthcare-deals-of-2020-break-through-covid-19-m-a-drought-59894540.

UNREDACTED – CONTAINS PROFESSIONALS' EYES ONLY INFORMATION
SUBJECT TO PROTECTIVE ORDER

provide no objective indicia regarding (i) what counsel is rendering the advice; (ii) the

circumstances under which such advice is rendered; and (iii) how such advice facilitated an

alleged crime or fraud.

7.      The UCC is similarly incorrect that its chart of privilege log entries identifies

communications with counsel that facilitated any alleged Side A ICSPs' intentional fraudulent

transfers.  Many of the entries appear to have been selected simply because they contained the

word "trust."  The UCC, however, has not come forward with any evidence showing that legal

advice regarding trusts was in furtherance of efforts by Side A ICSPs to defraud creditors.  To

the contrary, Jonathan White, a longtime director of trustee companies acting as trustees for

trusts for the benefit of Side A members, testified that he had "always shied away from advising

clients to set up trusts for asset protection purposes" because under Jersey law, "anyone who sets

up a trust with that expressly in mind is at risk of having the trust set aside;" and he was "<u>never

privy to any discussion . . . that suggested asset protection was any part of the planning that was

done for Dr. Mortimer and his family</u>."  Suppl. Ball Decl., Ex. 1 (emphasis added) at 24:20–25:2,

26:14–18.

8.      **Fiduciary duty**:  The UCC's fiduciary duty claims do not give rise to application

of the "crime fraud" exception for multiple reasons.

9.      <u>First</u>, none of the UCC's fiduciary duty allegations show any Side A ICSP

engaging in a crime or fraud.  Instead, the UCC's claims are either predicated on conduct by

Purdue's management or unproven allegations borrowed from the DOJ that are disproven by the

record.  The UCC, for example, parrots the DOJ's allegations that the Named Sacklers approved

a management initiative called E2E that supposedly resulted in medically unnecessary

prescriptions being written.  UCC Reply ¶¶ 44–45.   In reality, Kathe Sackler and a Side A

UNREDACTED – CONTAINS PROFESSIONAL EYES ONLY INFORMATION
SUBJECT TO PROTECTIVE ORDER

outside director delivered the opposite message to management, stating during a Board meeting in response to a management presentation about E2E that "the salesforce (and indeed the entire organization) should be driven to be of high value to patients and physicians . . . and not simply to increase prescriptions for Purdue products."  Suppl. Ball Decl., Ex. 2 at PPLPC01200045392; *id.*, Ex. 3 at PPLPC012000449538.

10.     Second, the UCC's allegations of breach of fiduciary duty could not possibly justify an order stripping documents of privilege.  The UCC makes no attempt to show how communications between Side A ICSPs and counsel facilitated any of the supposed conduct associated with alleged fiduciary duty breaches related to Purdue marketing activities.

11.     **NCSG allegations**:  The NCSG does not show any Side A ICSP engaged in any crime or fraud, relying either on DOJ allegations that are inadequate for the reasons described above or allegations of conduct that do not involve Side A ICSPs.  And the NCSG does not even bother to try to show that any alleged conduct was facilitated by communications with counsel.

## STATEMENT OF FACTS

I.     **The UCC's Reply Does Not Show Probable Cause with Respect to the Elements of the "Crime Fraud" Exception**

   A.     **The UCC's Intentional Fraudulent Transfer Allegations Still Do Not Show Any Side A ICSP Acting to Interfere, Hinder, or Delay Creditors**

12.     Despite extensive discovery, including access to far more documents than any earlier plaintiffs (including the state of Oklahoma and two Ohio municipalities, all three of whom were ready to go to trial), the UCC has introduced no evidence that any Side A ICSP was "worried about Purdue['s] litigation risk," UCC Reply ¶ 59, or approved any transfer of funds to evade litigation creditors.  Indeed, the UCC cannot deny the irrefutable evidence to the contrary: at the same time that the alleged project to defraud creditors was supposedly in full swing,

UNREDACTED – CONTAINS PROFESSIONALS' EYES ONLY INFORMATION
SUBJECT TO PROTECTIVE ORDER

Purdue was implementing a cash management strategy approved by the Board that resulted in Purdue building up a huge stockpile of cash.

> 1.    The UCC Reply Does Not Come Forward With Evidence Showing Probable Cause That Each, Let Alone All, Side A ICSPs Participated in Fraudulent Transfers

13.    The UCC Reply makes many allegations regarding "the Sacklers" that have nothing to do with any Side A ICSP,[4] and the UCC does <u>not</u> make any specific intentional fraudulent conveyance allegations with respect to virtually all of the Side A former directors.

14.    The UCC makes no intentional fraudulent conveyance allegations regarding Ilene Sackler Lefcourt.

15.    The UCC makes no intentional fraudulent conveyance allegations regarding Kathe Sackler, but the UCC notes that she occasionally *received* a small number of news summaries that included stories about opioid diversion and abuse.  *Id.* ¶ 57.

16.    The UCC makes no intentional fraudulent conveyance allegations regarding Theresa Sackler, but the UCC notes that she occasionally *received* a small number of news summaries that included stories about opioid diversion and abuse.  *Id.*

17.    The UCC makes no intentional fraudulent conveyance allegations regarding the Side A outside directors.

18.    The UCC cites a few documents involving Mortimer D.A. Sackler, but not a single one of the underlying documents that the UCC cites contains a statement by Mortimer that he was concerned about litigation threatening Purdue's solvency, much less show that he was seeking to evade any hypothetical creditors.  These emails simply show that Side A was

---

[4]    Allegations concerning members of the Raymond Sackler family are rebutted in their Opposition to the Exceptions Motion and their sur-reply.

UNREDACTED – CONTAINS PROFESSIONALS' EYES ONLY INFORMATION
SUBJECT TO PROTECTIVE ORDER

interested in the possibility of a strategic transaction because they wanted to optimize the value of the family's assets.

19.     The UCC selectively highlights certain words from an email exchange in February 2008 that on its face is about the ultimate expiration of the OxyContin patent and Side A's desire to consider strategic transactions as a result.  The UCC asserts that Mortimer's reference in an email sent on February 13, 2008 to "horrible risks" and his family's desire to "exit the great risks we have and continue to take to secure our families' current and future financial security" were references to risk of litigation that could threaten Purdue's solvency. Hurley Decl., Ex. 67; Suppl. Ball Decl., Ex. 4.  However, the email says nothing about litigation, much less litigation threatening Purdue's solvency.  To the contrary, it emphasizes that Purdue's prospects had improved because its patent rights had been restored.  Side A simply wanted to maximize that value through a strategic transaction. *See* Hurley Decl., Ex. 67.

20.     Starting in 2004, Purdue's revenue declined dramatically after it lost OxyContin patent exclusivity as a result of litigation with generic competitors.  As the UCC itself recognizes, shortly before February 2008, Purdue had experienced a "victory in the patent dispute that restored its exclusive right to sell OxyContin."  UCC Reply ¶ 60 n.34.  It was for that reason and others that Mortimer expressed confidence that "the organization (relationships, people, etc.), pipeline, non-U.S. businesses have tremendous value as well" and stated that "our prospects have improved dramatically" in light of the OxyContin patent being restored.  Hurley Decl., Ex. 67.  Further, Mortimer wrote that "[y]ou will very likely be asked to join the Board of the company that acquires us which I think would be a very exciting prospect." *Id.*  If Side A intended to hide from creditors, it would make no sense to advocate for involvement in a post-transaction entity.

UNREDACTED – CONTAINS PROFESSIONALS' EYES ONLY INFORMATION
SUBJECT TO PROTECTIVE ORDER

21.     An earlier email in this chain confirmed that Side A's concern was that an

approaching patent cliff was eroding the value of Purdue.  Mortimer wrote that "the longer we

wait the lower the price will be as the remaining 5 years of [OxyContin] patent life (and the

multiple we will get on that) ticks away."  Suppl. Ball Decl., Ex. 4 at PPLPUCC9004448360.

This email concerns economic risks relating to the timing of potential strategic transactions.  *Id.*[5]

22.     Mortimer reiterated his confidence in Purdue's business prospects just days later:

"the very large cash flow the U.S. Company should produce in the coming years [that] will

'move the needle' for even the largest pharmaceutical companies."  Preis Decl., Ex. 161.  He

supported exploring a sale because of various business considerations, including that (i) Purdue's

value was slowly diminishing as a potential OxyContin patent cliff approached; (ii) Purdue's

ultimate owners were paying 40% income tax instead of 15% capital gains tax on a sale; and (iii)

"[t]he pharmaceutical industry"—not just Purdue—"has been far too volatile and risky for a

family to hold 95% of its wealth in."[6]  *Id.*

23.     Finally, the UCC's claim that "Side A appears to have wanted 100% of Purdue's

net income paid out in the form of distributions," UCC Reply ¶ 61 (emphasis added), arises from

a misunderstanding of the document upon which it is based.  The UCC relies on an email David

---

[5]     The UCC claims that there were "questionable" redactions on this email, but the UCC has
        the version of this email that the Side A ICSPs attach here, with nearly all the redactions
        removed.

[6]     Side A did not demand to "cash out" as the UCC's claims, but rather Mortimer stated, "the
        size of the transaction is likely to make us the largest equity holder in the company."
        *Compare* UCC Reply ¶ 61 *with* Pries Decl., Ex. 161 at PPLPC042000011810.  Holding a
        large equity stake in an acquiring company is fundamentally inconsistent with the UCC's
        theory that Side A believed that Purdue faced significant litigation risks.  In this context,
        Mortimer's statement that "[w]hile things are looking better again now, I would not count
        out the possibility that times will get much more difficult again in the future and probably
        much sooner than we expect," Pries Decl., Ex. 161 at PPLPC042000011810, similarly
        reflects his concern about the risks of the pharmaceutical industry and the possibility of a
        patent cliff.

UNREDACTED – CONTAINS PROFESSIONALS' EYES ONLY INFORMATION
SUBJECT TO PROTECTIVE ORDER

Sackler sent to Jonathan Sackler in which David characterized Side A's supposed opening

position in a negotiation: "Can we get them down from a 50/50 split of net income? I'm sure we

can, but do we want to even engage with that as the starting point?" Preis Decl., Ex. 162 at

PPLPUCC000335136. This "50/50 split" referenced half of Purdue's net income staying with

Purdue and half being made available for distributions. Indeed, Purdue's cash reserve was

growing both before and after 2014 precisely because a significant percentage of Purdue's net

income stayed with the company. Further, David's email makes clear that even a 50/50 split was

an opening position in negotiations. *Id.*

> 2.    An Extensive Record Disproves the UCC's Claim that Any Side A ICSP
>        Knew that Purdue Faced a "Massive" Litigation Threat and "Vast
>        Liability"

24.    The UCC's claim that "the Sacklers" knew that Purdue faced a supposedly

massive litigation risk is disproven by Purdue's lengthy history—which the UCC ignores—of

prevailing in individual product liability suits or settling them for relatively modest amounts.[7]

25.    The UCC speculates that "the Sacklers" knew about Purdue's supposed litigation

exposure based on a small number of lawsuits, articles theorizing about future litigation, and the

identity of a lawyer retained by Purdue—but none of this shows that any Side A ICSP knew or

believed that Purdue faced litigation liability that Purdue could not afford to resolve:

---

[7]    That history is further confirmed by the Purdue financial statements that the UCC cites,
which demonstrate that Purdue's litigation expenditures were a small fraction of Purdue's
annual revenues, which significantly exceeded $1 billion. *Compare* Preis Decl., Exs. 185,
191, 203, 205, *with* Ball Decl., Ex. 8 at PPLPUCC9002668962 [Dkt. No. 1805]. The 2009
and 2010 audit report cited by the UCC, for example, states that Purdue's "recorded expense
for settlements [was] $17 million in 2010, $40 million in 2009, [and] $45 million in 2008,"
with a current liability of $55 million. Preis Decl., Ex. 205 at PPLPUCC00056995. This
statement also noted that a number of class actions against Purdue had been settled. This
trend continued: Purdue recorded $41.8 million in settlement expenses for 2013 and $5.5
million in 2014, with a balance of $65.5 million that was classified as a current liability.
Suppl. Ball Decl., Ex. 6 at PPLPUCC9002450734. Purdue had more than enough resources
to handle litigation of the magnitude it was facing.

UNREDACTED – CONTAINS PROFESSIONALS' EYES ONLY INFORMATION
SUBJECT TO PROTECTIVE ORDER

- A comment in a 2006 law review article—which the UCC concedes was circulated only to members of management and not Side A ICSPs—speculated that Purdue's 2004 settlement with West Virginia could result in more litigation. UCC Reply ¶ 54. This settlement, however, was only for $10 million. Preis Decl., Ex. 188b at PPLPC051000035809.

- Purdue was sued by Kentucky in 2007, but the suit was resolved in 2015 for $24 million over eight years, an amount that was inflated by Purdue facing a procedural bar that could have prevented it from contesting liability. Side A. Obj. ¶ 23. The UCC's claim that this case "still implied Purdue liability of at least [$1.6 billion] (sic) on a morphine milligram basis," UCC Reply ¶ 56 n.32, rests solely on the UCC's speculation and certainly does not reflect the state of mind of any Side A ICSP.

- Mortimer D.A. Sackler and Richard Sackler discussed a possible $50 million suspense account that could be accessed if a Sackler family member was sued and Purdue did not indemnify him or her. *Id.* ¶ 59. Mortimer, however, wrote that "[a]s you say this is <u>unlikely to ever get triggered but this would give you the same protection as currently under the SA</u>," thereby making crystal clear that he regarded the possibility of this account being accessed as remote.[8] Preis Decl., Ex. 160 at SideA00391976. Moreover, $50 million was not in any way an amount that threatened Purdue's solvency. The suspense account also indicates a view that the possible impact of litigation was modest.

- Purdue was sued by several municipalities in 2014, and there was speculation in the media about additional litigation. UCC Reply ¶ 56. By this time, Purdue had more than $1 billion in cash that could be used to resolve litigation claims, and the UCC identified no evidence that any Side A ICSP believed the cost of resolving these suits would exceed Purdue's cash on hand. Side A Obj. ¶ 15.

- Purdue was represented in connection with the 2007 plea and other OxyContin litigation by Don Strauber, an attorney who previously had defended the tobacco industry. UCC Reply ¶ 55. The UCC provides no evidence that any Side A ICSP was aware of this fact. Regardless, any suggestion that any Side A ICSP must have known that Purdue faced litigation risk that threatened its solvency because of the resume of a Purdue outside lawyer is farcical.

- Articles at various times discussed the harm allegedly caused by OxyContin and other prescription opioids and Purdue's supposed damages. *Id.* ¶¶ 56–57. When individual

---

[8]    In any event, the UCC's allegation regarding this document rests on the mistaken assumption that the only reason Purdue would not indemnify a director is insolvency— there are numerous cases involving solvent companies that declined to satisfy their indemnification obligations. *See, e.g., Pence v. Gee Grp., Inc.*, 236 F. Supp. 3d 843, 846–48 (S.D.N.Y. 2017) (apparently solvent company refused to indemnify former director, despite acknowledging obligation to do so); *Kertesz v. Gen. Video Corp.*, No. 09-cv-1648 (GBD), 2010 WL 11506390 (S.D.N.Y. 2010) (former officer and director raised disputed issues of fact as to whether company complied with its indemnification obligations).

UNREDACTED – CONTAINS PROFESSIONALS' EYES ONLY INFORMATION
SUBJECT TO PROTECTIVE ORDER

claims were litigated in court—not in the press—the result was invariably that Purdue prevailed or settled the cases for relatively modest amounts.  Side A Obj. ¶¶ 17–18.

- Several documents showed that Purdue's Board and certain executives believed that obtaining product liability insurance was a priority.  UCC ¶¶ 62–63.  These documents, however, provide no answer to the core problems with the UCC's theory outlined in the Side A Objection—namely that insurers did not want to cover any Schedule II opioid (not just Purdue products) and that the documents reflected a desire for insurance for risk management purposes, not concern about litigation threatening Purdue's solvency.  Side A Obj. ¶ 32.  Indeed, one of the UCC's documents shows that Purdue's goal was "to build a $150mm-$200 million catastrophic tower at less than $3 million."  Preis Decl., Ex. 193 at MARSH-PURDUE-001115.  Thus, the maximum amount of coverage that Purdue sought was a small fraction of its free cash ($748 million in 2012), Suppl. Ball Decl., Ex. 5 at PPLPC030000761745, meaning that Purdue had more than adequate reserves to cover this amount itself.

       3.     The UCC Has No Answer to Cash Management Practices That Ensured That Purdue's Needs Were Met Before Distributions Were Approved

26.    The UCC does not dispute that Purdue had a process that was designed to ensure that Purdue's cash needs were satisfied:  distribution levels were set only after (i) Purdue's management determined that Purdue had enough cash for operations (including anticipated legal expenses) and working capital, as discussed in the Side A Objection, Side A Obj. ¶ 15, and (ii) distributions were approved by Purdue's full board, including the outside directors.  Indeed, Purdue's non-tax distributions steadily dropped after 2011 and stopped altogether after 2016.  AlixPartners Cash Transfers of Value Analysis at 25 [Dkt. No. 654-1].

27.    The UCC's claim that outside directors blindly followed instructions from members of the Sackler families, UCC Reply ¶¶ 67–68,  is refuted by the testimony of Cecil Pickett, who stated that:  "when it came to voting, the voting — **my voting was based upon voting my own mind and what I thought was the best course**."  Suppl. Ball Decl., Ex. 7 at 259:13–16.[9]

---

[9]    The email sent from David Sackler to Jonathan Sackler—which included no one from Side A—also does not call the outside directors' decision making into question.  David recognized that Jonathan "belie[ved] in the independence of directors."  Pries Decl., Ex. 162

UNREDACTED – CONTAINS PROFESSIONALS' EYES ONLY INFORMATION
SUBJECT TO PROTECTIVE ORDER

28.     Mr. Pickett's testimony also confirms that the outside directors voted to approve

distributions because they understood that distribution amounts were calculated only after

Purdue's cash needs were satisfied.  *See id.* at 176:24–177:11 ("[T]he budget meetings would . . .

take place and there was a sense of what kind of support the activities needed with regard to

funding, and then I think the <u>distribution discussions came up after that</u>.  And so I think it was

put into context of what was—what was needed for funding of ongoing activities—or a

request—or request from management." (emphasis added)).[10]  It is for this reason that Mortimer

wrote that "the outside directors have CONSISTENTLY said . . . that [distribution] is a

shareholder issue and not one they have or are comfortable expressing a view on."[11]  Preis Decl.,

Ex. 169 at MDSF00450185.  Outside directors therefore deferred to shareholders on what should

be done with excess funds, after all of Purdue's needs, including litigation expenses have been

fully funded.  The Board, including outside directors, was not approving distributions to evade

creditors; it did not believe the small number of litigation claims that Purdue faced came

anywhere close to threatening its solvency.  Indeed, as late as January 2016, a management

---

at PPLPUCC000335137.  David's supposed belief to the contrary rested on nothing more
than that he was "more cynical than that."  *Id.*

[10]    Mortimer D.A. Sackler offered a similar explanation of the distribution approval process:
"[W]hat the Board considered was first and foremost that the company had the resources it
required and the money it needed for reinvestment and for working capital as well as for any
investments in R&D and corporate development that it had identified or gotten approved by
the Board. So all of its needs … would be set aside first, including any contingency
needs. . . . There was always, you know, the business had, got what it needed first.  And then
beyond that, the Board was discussing really what excess cash should be left in the
businesses and what excess cash should come out of the business, right."  Suppl. Ball Decl.,
Ex. 8 at 269:23–271:3 [MDAS Depo Tr.].

[11]    The UCC's reliance on Mortimer's statement that "we won't delegate that decision
[regarding distributions] to non-family members as it is currently our only option for getting
a return and liquidity from the businesses" is equally misplaced because the subject of the
email was the "MNP Board," not the Purdue board.  Preis Decl., Ex. 170 at
MDSF00010697.

UNREDACTED – CONTAINS PROFESSIONALS' EYES ONLY INFORMATION
SUBJECT TO PROTECTIVE ORDER

presentation to the Board included a slide entitled "Major Potential Risks to the current cash flow

outlook," which stated that the Purdue litigation risk was "low."  Leventhal Decl., Ex. 72 at

PPLP004412631 [Dkt. No. 1812].

> 4.      Side A Distributions Were Transferred to Trusts for Conventional Wealth
> Management Purpose—Not to Hide It from Creditors

29.      The UCC's suggestion that there was something inherently improper about Side

A's distributions being transferred to Jersey trusts disregards the history of these trusts and

conventional wealth management practices.  The Beacon Trust held Side A's Purdue shares and

received Purdue distributions.  It was settled in 1993, several years before OxyContin was even

FDA approved.  It was settled in Jersey because the settlor, Mortimer D. Sackler, and much of

his family lived in Europe.

30.      As Jonathan White, a longtime director of trust companies acting as trustees of

trusts for the benefit of certain Side A family members, explained, trusts play an important role

in wealth management and planning inter-generational transfers of assets:

> [P]reservation of wealth and, is a very common [reason for establishing Jersey trusts],
> particularly for people who own businesses, forced heirship in certain circumstances can
> be helpful for people who come from countries who have, who are constrained by forced
> heirship provisions with assets in many, many different countries. · The trust regime can
> be helpful there. · And especially succession planning in my experience where wealthy
> families want to provide vehicles to look after their wealth and ensure that wealth is held
> for the benefit of future generations. ·

Suppl. Ball Decl., Ex. 1 at 25:15–26:6.

31.      Mr. White also emphasized that evading creditors was <u>not</u> a proper purpose for a

Jersey trust and that he was unaware of anyone from Side A trying to hide assets:

> **I have always shied away from advising clients to set up trusts for asset protection
> purposes.  I think there is, as a matter of law, anyone who sets up a trust with that
> expressly in mind is at risk of having the trust set aside.**

* * *

UNREDACTED – CONTAINS PROFESSIONALS' EYES ONLY INFORMATION
SUBJECT TO PROTECTIVE ORDER

> **I was never privy to any discussion . . . that suggested asset protection was any part of the planning that was done for Dr. Mortimer and his family.**

*Id.* at 24:21–26:18.

**B.    The UCC's Fiduciary Duty Allegations Do Not Show Any Side A ICSP Engaging in a Crime or Fraud**

32.    The UCC's claim that the "crime fraud" exception should be applied because Side A ICSPs supposedly breached their fiduciary duties largely rests on allegations regarding Purdue's management.  The UCC seeks to connect that alleged conduct to "the Sacklers" through a combination of (i) certain documents that reflect generalized annoyance with certain members of Purdue's Board, UCC Reply ¶¶ 25, 29, 31, 34; and (ii) a small number of documents regarding information received by Purdue's Board and the summary of a meeting prepared by an outside consultant that made <u>no reference</u> to any Side A ICSP, *id.* ¶¶ 38–44.  None of these documents shows any Side A ICSPs overstepping their bounds as directors or engaging in criminal or fraudulent conduct.

33.    Purdue's directors were not its management.  When asked whether there were "disagreements at board meetings about operations of [Purdue] that you viewed were really operational issues that should be left to management," Cecil Pickett testified:

> I think some members of the board got a little more granular than other members when certain issues or certain management presentations came up.  I didn't view that as necessarily unusual because I had seen it at other boards.  You know, some board members want to know all the nuts and bolts of things.  I probably could have been accused of that myself in terms of some of the R&D programs, about maybe getting a little too granular.  <u>So I didn't — I didn't see it in terms of overseeing or being … part of management.</u>

Suppl. Ball Decl., Ex. 7 at 143:19–144:14 (emphasis added).

34.    Finally, the UCC argues that Board participation in management activities can be inferred by the frequency with which the Board met, UCC Reply ¶ 32—but frequency of meetings does not turn directors into managers.  To the contrary, Mr. Pickett testified that the

UNREDACTED – CONTAINS PROFESSIONALS' EYES ONLY INFORMATION
SUBJECT TO PROTECTIVE ORDER

frequency of meetings resulted from the fact that "some of the discussions at the board meetings were not very efficient discussions and sometimes there were differences between the family members, which I think . . . made it a bit awkward at the board level . . . ."  Suppl. Ball Decl., Ex. 7 at 140:22–141:4.

> 1.   No Side A ICSP Engaged in Management Functions

35.   The UCC does not point to a single instance of any Side A ICSP participating in Purdue's prescription opioid marketing activities or other management functions.

36.   The UCC makes <u>no</u> specific allegations about Ilene Sackler Lefcourt being involved in management activities.

37.   The UCC makes <u>no</u> specific allegations about Kathe Sackler being involved in management activities.

38.   The UCC makes <u>no</u> specific allegations about Theresa Sackler being involved in management activities.

39.   The UCC includes a few allegations about Mortimer D.A. Sackler, disregarding Mr. Pickett's testimony that he did not have any "granular" involvement in Purdue's affairs. Moreover, each of the documents upon which the UCC relies contravenes the UCC's claim he was "micromanaging" or engaging in management functions:

- Mortimer wrote in a 2017 email that there were an unspecified "number of times" that he "had to step up [his] Purdue involvement to almost full time."  Mortimer, however, was spending his Purdue time on classic board functions:  "pushing a time intensive process to build the pharma board, recruit the Chairman, deal with Executive management changes, and most importantly find [a] path to a sale/liquidity event for the family." Preis Decl., Ex. 175; *see also, e.g.*, David A. Katz, *Advice for Boards in CEO Selection and Succession Planning*, HARVARD LAW SCHOOL FORUM ON CORPORATE GOVERNANCE (JUNE 11, 2012) ("Selecting the chief executive officer and planning for CEO succession are among the most important responsibilities of a company's board of directors."), at https://corpgov.law.harvard.edu/2012/06/11/advice-for-boards-in-ceo-selection-and-succession-planning/; Richard Summerfield, *The Role of the Board in M&A*, FINANCIER WORLDWIDE (June 2019) ("[I]t is essential that board members play their part and provide input on whether an acquisition is in the best interests of the company and its

UNREDACTED – CONTAINS PROFESSIONAL EYES ONLY INFORMATION
SUBJECT TO PROTECTIVE ORDER

shareholders . . . Whether to pursue a deal is one of the more momentous–and scrutinized–decisions a board will make, particularly if it is deciding whether to sell the company which may crystalise the value of the stockholders' investment."), at https://www.financierworldwide.com/the-role-of-the-board-in-ma.

- Mortimer did not "micromanage beyond belief." The UCC resorts to quoting an off-hand comment by a third-party consultant, who made a comment about how unspecified actions by the Board might be perceived by the sales force ("[t]he field force only views this as micromanagement beyond belief and, I suspect has low morale as a result." Preis Decl., Ex. 132 at PPLPC036000177151). This email was sent to a response to an email from a Purdue executive stating that he was "seeing a number of emails coming in from BOD members" without further elaboration; the executive attached an email in which Mortimer made a suggestion regarding the timing of the national salesforce meeting. *Id.* at PPLPC036000177151–152.

- The memorandum from Craig Landau did not state that that "the Board of Directors serve[s] as the 'de facto' CEO'" of Purdue. Preis Decl., Ex. 137. Instead, Landau wrote: "Three distinct business types (branded Rx/Biosimilars, consumer/OTC, generics) are being run through four separate regions (five if Rhodes is included), with the Board of Directors serving as the 'de-facto' CEO." *Id.* at PWG004670880. This email plainly referred to the international pharmaceutical businesses (known as Mundipharma), not Purdue. At the time this memorandum was written, Purdue had a CEO (Mark Timney), but the Mundipharma association did not.

        2.        No Side A ICSP Engaged in Crimes or Frauds

40.     Purdue's 2020 plea, upon which the UCC relies, makes <u>zero</u> reference to Purdue's Board or members of the Sackler families.[12] Preis Decl., Ex. 182. It contains not a single reference suggesting any of them had any role in the crimes at issue. The UCC nevertheless claims that the Board is responsible for medically unnecessary prescriptions because it supposedly endorsed management's E2E initiative. However, E2E is <u>not</u> mentioned in Purdue's plea at all. It is merely referenced in a denied allegation in Purdue's civil DOJ settlement. E2E is also referenced in the Named Sacklers' civil settlement agreement with the DOJ as a set of

---

[12]    The UCC attempts to connect Purdue's plea to Purdue's Board by making the bald assertion that Purdue's decision not to inform the Drug Enforcement Agency ("DEA") that "Region Zero" doctors (on a no-call list) were continuing to prescribe OxyContin was "a choice that was or should have been known to the Sacklers." UCC Reply ¶ 38. The UCC, however, provides no evidence that the Board had any knowledge about what prescriber data Purdue was or was not giving to the DEA.

UNREDACTED – CONTAINS PROFESSIONALS' EYES ONLY INFORMATION
SUBJECT TO PROTECTIVE ORDER

explicitly denied allegations.  Allegations that have been denied are of no evidentiary weight

whatsoever.  *See, e.g.*, *S.E.C. v. Citigroup Global Markets, Inc.*, 827 F. Supp. 2d 328, 333

(S.D.N.Y. 2011), *vacated and remanded on other grounds by* 752 F.3d 285 (2d Cir. 2014) ("As a

matter of law, an allegation that is neither admitted nor denied is simply that, an allegation.  It

has no evidentiary value."); *In re Platinum and Palladium Commodities Litigation*, 828 F. Supp.

2d 588, 593–94 (S.D.N.Y. 2011) (striking allegations based on an order enforcing a settlement

with the Commodities Futures Trading Commission because the order "was the product of a

settlement between the CFTC and the Respondents, not an adjudication of the underlying issues

in the CFTC proceeding," so the plaintiffs were "prohibited from relying on the [order] to plead

the 'underlying facts of liability.'").[13]  They are entirely inadequate to establish the stringent

showing necessary to apply the "crime fraud" exception to attorney-client privilege.  As

described below, these claims are refuted by an extensive record showing that the Board

understood that Purdue's marketing stressed the benefits of the abuse-deterrent properties of

reformulated OxyContin (the "ADF") and that certain Side A directors responded to E2E by

emphasizing the importance of serving physicians and patients — not generating prescriptions.[14]

41.    E2E was a routine <u>management</u> initiative that was implemented in the aftermath

of the FDA's decision in April 2013 to approve a change to the OxyContin label that, for the first

time since the FDA approved reformulated OxyContin, permitted Purdue to describe the product

---

[13]    *See also Lipsky v. Commonwealth United Corp.*, 551 F.2d 887, 893 (2d Cir. 1976) (holding
that "a consent judgment between a federal agency and a private corporation which is not
the result of an actual adjudication of any of the issues . . . can not be used as evidence in
subsequent litigation between that corporation and another party").

[14]    The following discussion of McKinsey and E2E applies with equal force to the NCSG's
allegations regarding these initiatives.

UNREDACTED – CONTAINS PROFESSIONALS' EYES ONLY INFORMATION
SUBJECT TO PROTECTIVE ORDER

features that deterred the dangerous practices of snorting and inhaling the product.[15]  Purdue's

Board was provided with extensive epidemiological evidence showing the benefits of the ADF,

including that drug diversion had declined by nearly 50% since the ADF launch in 2010 and that

the percentage of individuals abusing OxyContin by snorting or injecting the product had

dropped dramatically.  Suppl. Ball Decl., Ex. 9 at PPLP012000349954.  Indeed, as reflected by

the testimony of Mortimer D.A. Sackler that the UCC quoted only in part, the Board was

"positive that . . . less of the product was getting diverted and abused," something the Board

viewed as "a good thing."  Suppl. Ball Decl., Ex. 8 at 310:22-25.

42.     Approximately one month after the FDA approved the labeling change, Purdue's

management decided to retain McKinsey as part of the E2E initiative.  The Board was told about

the retention only after McKinsey's work was underway.  Suppl. Ball Decl., Ex. 10 at

PPLPC012000431263 ( July 5, 2013 email from Mortimer D.A. Sacker asking management why

McKinsey had been selected and how much this engagement would cost).

43.     Purdue's management first made a presentation to the Board on McKinsey at a

July 25, 2013 meeting.  Suppl. Ball Decl., Ex. 11.  The agenda item immediately before the

McKinsey presentation was a report to the Board that again confirmed that the ADF was having

a beneficial impact.  *Id.* at PPLP004409860.  A slide entitled "Positive Impact of AD

OxyContin" made the following points (among others):

- Meaningful Reduction in Abuse – Especially Parenteral;

- Fewer Pharmacy Thefts Reported by Law Enforcement; and

- Positive Reputation and Relationship with FDA and DEA.

---

[15]   *FDA Actions on OxyContin Products, 4/16/2013,* at
https://www.fda.gov/drugs/information-drug-class/fda-actions-oxycontin-products-
4162013#:~:text=FDA%20has%20determined%20that%20the,abuse%20via%20the%20intr
anasal%20route.

UNREDACTED – CONTAINS PROFESSIONALS EYES ONLY INFORMATION
SUBJECT TO PROTECTIVE ORDER

44.     Purdue's Board never adopted McKinsey's recommendations or told management to do so.  Purdue's Board, like all boards, acts through votes, and the UCC does not identify a single Board vote relating to McKinsey or E2E.  Further, the internal McKinsey email regarding the August 23, 2013 meeting with the Purdue Board makes no reference to any Side A ICSP being present, much less saying anything during the meeting.  To the contrary, the McKinsey email confirms that whatever directors were present at the meeting were <u>not</u> deeply engaged on McKinsey's work:  "**Board had not engaged on our work...Dr. Richard had not read our memo**."  NCSG Reply**,** Ex. O.

45.     When E2E was raised at a Board meeting in October 2013, Kathe Sackler and a Side A outside director responded with emphatic messaging to management about proper prescribing practices that is the polar opposite of what the UCC (and the DOJ) alleges:

> Must focus on sales force incentives (behaviors) **not just push to obtain scripts** – integrate this across the entire culture not just sales – language, attitude, etc – **do well by doing good**.
>
> * * *
>
> In regard to the E2E Project, the following comments/questions were raised:  i. In terms of incentives, the salesforce (and indeed the entire organization) should be driven to be of **high value to patients and physicians** (and the healthcare system), **not simply to increase prescriptions for Purdue products**.

Suppl. Ball Decl., Ex. 3  at PPLPC012000449538; *id.*, Ex. 2 at PPLPC012000452392.  These two documents make crystal clear that Side A ICSPs had no fraudulent intent whatsoever.

46.     The UCC also deliberately overlooks that the E2E program emphasized messaging about OxyContin's abuse deterrent properties.  According to one E2E presentation to the Board in October 2013:

> "Workload targeting" and the new label containing abuse deterrent languages creates an opportunity to [r]efresh messages regarding the new formulation."  Among the "[o]bjectives" were "Appropriate Patient Messaging" and  "Abuse Deterrence."

UNREDACTED – CONTAINS PROFESSIONALS' EYES ONLY INFORMATION
SUBJECT TO PROTECTIVE ORDER

Suppl. Ball Decl., Ex. 12 at PPLP004410029.

47.     Based on the epidemiological data presented to it, the Board believed that

converting patients from non-ADF opioid medicines, including immediate release products,

reduced — rather than increased — opportunities for abuse and diversion.  A presentation to the

Board from the following year emphasized that the abuse-deterrent properties create

opportunities to pursue legitimate sources of new demand.  The presentation noted that "68% of

[immediate release] conversions go to other [extended release opioid] models," which created an

"[o]pportunity to increase [immediate release] oxycodone to OxyContin conversion rate."

Suppl. Ball Decl., Ex. 13 at PPLP004411409.  The "Vision" therefore was to "[l]everage <u>ADF</u>

<u>leadership and Managed Care coverage</u> to strengthen first line [extended release opioid] from

[immediate release] oxycodone switches."  *Id.* at PPLP0044114012 (emphasis added).  In other

words, Purdue's plan was to encourage healthcare providers to switch their patients from

immediate-release opioids—which did not have abuse deterrent properties—to ADF OxyContin,

which had such properties.  And Purdue was focused on legitimate providers:  the managed care

plans identified in the E2E presentation typically are affiliated with healthcare providers that are

subject to significant oversight, including utilization reviews that are intended to ensure proper

prescribing practices.[16]

---

[16]   *See, e.g.*, *Just the Facts: Prescription Drug Utilization Management*, Am. Cancer Soc'y
(Feb. 25, 2014) ("Health plans often specify a limit on the total quantity of a given
prescription drug that can be dispensed at one time.  For example, plans may limit patients
to a 30-day supply of a particular medication per month. This type of limit is not usually a
significant barrier for patient access.  More <u>frequently, these limits are used to ensure that a
patient is not prescribed a quantity of medication that exceeds best practices or medical
guidelines</u>."), at https://www.fightcancer.org/policy-resources/just-facts-prescription-drug-
utilization-management; *Pharmacy Practice in Managed Care*, Academy of Managed Care
Pharmacy (Dec. 2015) (listing "cost containment strategies" including "[f]ormulary
management" and "[u]tilization management"), at

UNREDACTED – CONTAINS PROFESSIONALS' EYES ONLY INFORMATION
SUBJECT TO PROTECTIVE ORDER

48.    At its core, the UCC's claim that the Board believed Purdue was seeking to encourage medically unnecessary prescriptions through E2E is illogical:  it would have made no sense for Purdue to emphasize OxyContin's abuse-deterrent properties if the objective was to encourage sales from "pill mill" doctors whose "patients" sought to abuse OxyContin for non-medical purposes.  Indeed, it is difficult to understand why such "pill mills" would have had <u>any</u> interest in a high-priced, branded drug with abuse-deterrent features when lower cost generic products without such features were readily available.  In fact, the Board was explicitly advised that post-ADF, OxyContin was a <u>disfavored</u> drug by abusers.  Suppl. Ball Decl., Ex. 9 at PPLP012000349956.

## C.    The UCC Reply Does Not Contain Any Allegations About the Role of Counsel in Facilitating Any Supposed Crime or Fraud

49.    Although styled as a brief advocating for certain exceptions to the attorney-client privilege, the UCC Reply has very few allegations about the role of counsel.  Communications by or with attorneys are mentioned only a few times.  *See* ¶¶ 51, 54, 55, 59.[17]  The UCC does not even argue that any of these communications were in furtherance of a crime or fraud.

- In paragraph 51, the UCC discusses a meeting that reportedly took place in May 2007 between two members of the Raymond Sackler Family, Stuart Baker, and Joe Smolinsky, a restructuring attorney at Chadbourne & Parke.  UCC Reply ¶ 51.  The UCC does not allege that any Side A ICSP was at that meeting.  The UCC does not allege anything about what happened at the meeting or even whether advice was sought from the perspective of a potential debtor or creditor.  The UCC similarly does not specify what happened as a result of this meeting or how this meeting supposedly facilitated a crime or fraud.

---

https://www.amcp.org/sites/default/files/2019-03/Pharmacy%20Practice%20in%20Managed%20Care%20-%20Dec%202015-1.pptx.

[17]    The UCC Reply quotes an email from Stuart Baker in paragraph 30, but that communication did not pertain to legal advice.

UNREDACTED – CONTAINS PROFESSIONALS' EYES ONLY INFORMATION
SUBJECT TO PROTECTIVE ORDER

- In paragraph 54, the UCC references a law review article emailed in 2006 between Stuart Baker, Howard Udell (then Purdue's general counsel), and other individuals (not including any members of the Sackler family) that discussed the possibility of future litigation by the plaintiff's bar. UCC Reply ¶ 54. The UCC does not allege that Mr. Baker or Mr. Udell provided any advice in connection with this article that furthered a crime or fraud.

- In paragraph 55, the UCC notes that Don Strauber, a partner at Chadbourne & Parke, has represented Purdue. UCC Reply ¶ 55. The UCC does not allege that Mr. Strauber provided any advice that furthered a crime or fraud. Instead, the UCC takes the extraordinary position that the Court should infer that Mr. Strauber advised Purdue that litigation might render it insolvent simply because Mr. Strauber represented tobacco companies in connection with the 1998 Tobacco Master Settlement Agreement. Not only is this argument nonsensical, but the proposition that the experience of an attorney's clients should be imputed to his other clients would make the practice of law unsustainable.

- In paragraph 59, the UCC quotes an email from Richard Sackler referencing a comment about a potential lawsuit by Richard Silbert, one of Purdue's in-house counsel. UCC Reply ¶ 59. The UCC does not allege that Mr. Silbert provided legal advice that furthered a crime or fraud.

- Finally, the NCSG Memorandum is wholly devoid of any contention that counsel played a role in any of its allegations.

50.    None of these allegations show any counsel facilitating any supposed intentional fraudulent transfer or facilitating any alleged breach of fiduciary duty related to Purdue's conduct.

## II.    The NCSG Memorandum Does Not Show Probable Cause with Respect to the Elements of the "Crime Fraud" Exception

51.    The disjointed allegations in the NCSG Memorandum similarly do not show any Side A ICSP engaging in criminal or fraudulent conduct. The NCSG does not even attempt to show that any alleged conduct was facilitated by advice of counsel.

52.    The NCSG claims that there was "a pattern of Sacklers" controlling the actions at Purdue, NCSG Reply ¶ 14, but not a single document that the NCSG cites in support of its allegations makes any specific reference to a Side A ICSP or was ever received by a Side A ICSP. These documents consist of nothing more than (i) several internal McKinsey emails

UNREDACTED – CONTAINS PROFESSIONALS' EYES ONLY INFORMATION
SUBJECT TO PROTECTIVE ORDER

which contained notes of meetings in which two Purdue executives reportedly expressed concern about Purdue's board at large, NCSG Reply, Exs. G, I; (ii) one email from a Purdue executive to McKinsey stating that the Board was dissatisfied with CEO John Stewart, *id.*, Ex. H; and (iii) a self-evaluation by a McKinsey employee in which she boasted, among other things, about her relationship with unspecified members of the Sackler Family, and efforts in "[t]ackling the challenges of malaria." *Id.*, Ex. J.  These emails do not show any Side A ICSP doing anything, much less committing a crime or fraud.

53.    The NCSG's allegation that Purdue improperly opposed the FDA's 2008 proposal that OxyContin should be prescribed only by doctors who completed certain training does not specify involvement by any Side A ICSP.  Regardless, the risk management procedures for OxyContin and other Schedule II opioids are set forth in a Risk Evaluation and Mitigation Strategies ("REMS") program for all opioids that the FDA adopted in 2012 and updated numerous times since then.[18]  The NCSG simply has no basis to second guess the policy choices made over a decade ago by the FDA, the nation's prescription drug regulator.  And even if they could, that second-guessing offers no basis for canceling the privilege over any Side A communications.

54.    The NCSG quotes the DOJ's allegation that "Purdue's Abuse Diversion Detection Program and Region Zero list, of which the Named Sacklers were aware, contains examples of high-volume prescribers during [the project] that Purdue's own employees suspected were writing medically unnecessary prescriptions."  NCSG Reply ¶ 19.  The UCC disregards what the Board knew, *i.e.*, that the "Region Zero list" consisted of names of healthcare providers who had

---

[18]    *Approved Risk Evaluation and Mitigation Strategy (REMS)*, U.S. Food & Drug Admin., last updated Nov. 14, 2019, at https://www.accessdata.fda.gov/scripts/cder/rems/index.cfm?event=RemsDetails.page&REMS=17

UNREDACTED – CONTAINS PROFESSIONALS' EYES ONLY INFORMATION
SUBJECT TO PROTECTIVE ORDER

been identified by management because they were potentially engaging in inappropriate

prescribing practices.  The Board understood from management that Region Zero was a "no call"

list, meaning that healthcare providers on this list were not being visited by Purdue's sales

representatives.  Suppl. Ball Decl., Ex. 14 at PPLPC012000283169. That was the whole purpose

of Region Zero: to stop promotional efforts directed to questionable prescribers.  There is simply

no way to take the Board's awareness that Purdue was not marketing to these prescribers and

turn it into a fraud.

55.     The DOJ allegation upon which the NCSG relies is based solely on one

spreadsheet containing a list of Region Zero prescribers that was sent to the Board for

informational purposes.  *Id*. at PPLPC012000283170.  This list was embedded in other Board

materials and no Board action was required with respect to these or other prescribers.  Moreover,

the Region Zero list was accompanied by a memorandum from management that described

robust efforts to identify healthcare providers engaging in potentially improper practices,

including:

- Increased rep training on the policy governing the ADD program;

- Increase in prescriber visibility due to the new data sets;

- New websites for looking up DEA license status;

- Google and other web alerts;

- Increase in the actual number of reps in the field the last few years;

- Increase in the # of prescribers researched by the Law Department; and

- Increase in data auditing by home office.

*Id*.  The Board thus reasonably believed that Purdue was taking responsible steps to combat

abuse and diversion.

UNREDACTED – CONTAINS PROFESSIONALS' EYES ONLY INFORMATION
SUBJECT TO PROTECTIVE ORDER

56.     The NCSG references a 2013 memorandum from a Purdue executive to Purdue's Board that explained that demand for OxyContin might be reduced because of a requirement imposed by Walgreens that its pharmacists review and evaluate the appropriateness of prescriptions for Schedule II medications.  The NCSG, however, does not and cannot specify anything—let alone anything unlawful—that any Side A ICSP did in response.

57.     The NCSG discusses statements made in certain slides that were provided by McKinsey to Purdue's management in 2017.  The NCSG does not cite to any document showing that these slides were ever shown to the Board.  To the contrary, the transmittal email from McKinsey makes clear that these slides reflected only a proposal:  "Here are a few summary pages **if helpful** for your Board Update."  As far as the Side A ICSPs are aware, this proposal was never provided to the Board**.**

58.     The NCSG makes just one intentional fraudulent transfer claim regarding a Side A ICSP—a brief reference in a footnote to a supposed statement by Mortimer D.A. Sackler about a "death spiral."  NCSG Reply ¶ 20 n.42.  But Mortimer never said he believed that Purdue was in a "death spiral," much less that it was caused by litigation exposure.  He instead reiterated the concerns similar to those he raised six years earlier, namely that Purdue's business practices had "resulted in a huge depreciation in our bottom line and more importantly shareholder value over the past 5+ years."  Suppl. Ball Decl., Ex. 15 at RSF00175887.  If the status quo continued, he worried that a Side B outside director would be correct that Purdue would "simply continue the current death spiral until it is too late (*i.e.* until the value of the business is a fraction of what we could get for it today)."   Mortimer emphasized that "[t]he goal of the businesses and the Board of Directors that oversee them (and have a fiduciary duty to ALL the shareholders) is to BUILD

UNREDACTED – CONTAINS PROFESSIONALS' EYES ONLY INFORMATION
SUBJECT TO PROTECTIVE ORDER

shareholder value." Mortimer was trying to build shareholder value, not hide money from creditors.

59.    Finally, grasping at straws for support, the NCSG relies on a decision of a Massachusetts trial court denying a motion to dismiss filed by Sackler Former Directors.  NCSG ¶ 7.  A denial of a motion to dismiss has no evidentiary value.  *See, e.g.*, *In re AHT Corp.*, 292 B.R. 734, 746 (S.D.N.Y. 2003) ("But a decision denying a motion to dismiss does not mean that a claim has merit and will ultimately succeed. If it did, we could simply enter judgment for the plaintiff at the same time we denied the motion to dismiss for failure to state a claim and spare ourselves a lot of unnecessary aggravation."); *Bialek v. Racal-Milgo, Inc.*, 545 F. Supp. 25, 36 (S.D.N.Y. 1982) (denial of 12(b)(2) motion to dismiss "does not, of course, alleviate plaintiff's burden of proving the requisite jurisdictional facts at trial by a preponderance of the evidence; nor does it prejudice defendant's right to move, at the conclusion either of plaintiff's case or of the presentation of all the evidence, for a Rule 12(b)(2) dismissal on the ground that the plaintiff failed to sustain this burden of proof").

60.    The NCSG also disregards the fact that the only decision regarding a Side A ICSP that was subject to appellate review resulted in a dismissal of the case.  In Utah, after an administrative tribunal found that Kathe Sackler (the only Side A ICSP named in the litigation) was subject to jurisdiction in Utah, a Utah District Court exercised its discretion to issue an extraordinary writ—a rare remedy used only to correct egregious errors, as its name applies— dismissing the claims against Kathe because she did not participate in Purdue's alleged activities in Utah.  Side A Obj. ¶ 26 (citing *Sackler v. Utah Div. of Consumer Protection,* No. 190905862 (Utah Dist. Ct. Oct. 10, 2019)).

UNREDACTED – CONTAINS PROFESSIONALS' EYES ONLY INFORMATION
SUBJECT TO PROTECTIVE ORDER

## ARGUMENT

61.     There is no dispute that according to the Second Circuit, the "crime fraud"
exception can only be applied in the narrow circumstance in which a "party seeking to invoke the
crime-fraud exception must at least demonstrate that there is probable cause to believe that a
crime or fraud has been attempted or committed <u>and</u> that the communications were in
furtherance thereof."  *In re Richard Roe, Inc.*, 168 F.3d 69, 70 (2d. Cir. 1999) ("*Roe II*").
Further, there must be "(i) a determination that 'the client communication or attorney work
product in question was *itself* in furtherance of the crime or fraud' and (ii) 'probable cause to
believe that **the particular communication** with counsel or attorney work product was *intended*
in some way to facilitate or to conceal the criminal activity.'"  *Id.* at 71 (quoting *In re Richard
Roe Inc.*, 68 F.3d 38, 40 (2d Cir. 1995)) (emphasis added only as to "the particular
communication"); UCC Reply ¶ 75.  The UCC and the NCSG have failed to come forward with
evidence to meet their burden with respect to either of these elements.  They have not shown that
any Side A ICSP engaged in a crime or fraud.  Equally fundamentally, they have not identified
"particular communications" with counsel that facilitated criminal or fraudulent activity.

**I.     The UCC and the NCSG Have Not Come Forward with Evidence of Probable Cause
That Any Side A ICSP Engaged in a Crime or Fraud**

**A.     The UCC and the NCSG's Intentional Fraudulent Transfer Allegations Do
Not Show Any Side A ICSP Engaging in a Crime or Fraud**

62.     The UCC and the NCSG's meager allegations against Side A ICSPs could not be
more different from the fact patterns in the cases they cite in which courts applied the "crime
fraud" exception.  The UCC cites *Securities Investor Protection Corp. v. Bernard Madoff
Investment Securities LLC*, 319 F.R.D. 100, 108 (S.D.N.Y. 2017), in which the court found a
"'temporal proximity' between transferor's decision to buy a house solely in spouse's name and
her knowledge <u>that Ponzi scheme was about to unravel</u>."  UCC Reply ¶ 47 (emphasis added).

UNREDACTED – CONTAINS PROFESSIONALS' EYES ONLY INFORMATION
SUBJECT TO PROTECTIVE ORDER

Similarly, in *Cendant Corp. v. Shelton*, 246 F.R.D. 401, 405 (D. Conn. 2007), the court found
that at the time the defendant created a trust, an accounting fraud had been uncovered and the
defendant "had been named as a defendant in shareholder actions in which the damages sought
exceeded the value of his assets." *See* UCC Reply ¶ 47.

63.     The UCC plainly cannot show probable cause with respect to each of the Side A
ICSPs for which it makes no substantive allegations.  Regardless, the UCC and the NCSG cannot
come forward with evidence that is comparable to the fact patterns in the cases they cite.  The
UCC and the NCSG failed to show that any Side A ICSP believed that Purdue faced a realistic
risk of litigation that could render it insolvent notwithstanding its large cash reserves.  And they
certainly do not show anyone acting to hide money from creditors.  Indeed, all available
evidence is to the contrary.

64.     Here, the trusts were created before the launch of OxyContin, and the trustee-
director's sworn testimony was that they were <u>not</u> created to protect assets from creditors.
Beacon Trust, which holds Side A's share of Purdue, was settled several years before the launch
of OxyContin and decades before the distributions that are the subject of the UCC's and the
NCSG's allegations.  *See supra* ¶ 29.  Further, as Mr. White explained, Jersey trusts are used for
conventional wealth management purposes, not for hiding assets from creditors. Suppl.  Ball
Decl., Ex. 1 at 25:11–26:6.  Critically, Mr. White "was never privy to any discussion … that
suggested asset protection was any part of the planning that was done for Dr. Mortimer and his
family." *Id.* at 26:14–18.

65.     Purdue's cash management practices are fundamentally inconsistent with the
course of conduct alleged by the UCC and the NCSG.  Purdue's Board authorized distributions
only after management determined that all of its cash needs were being satisfied.  Side A Obj. ¶¶

UNREDACTED – CONTAINS PROFESSIONALS' EYES ONLY INFORMATION
SUBJECT TO PROTECTIVE ORDER

13–15.  By the time the first municipal suits were filed in 2014, Purdue already had more than $1

billion in cash.  Side A Obj. ¶15.   While the UCC and the NCSG's allegations would suggest

that Purdue's Board would have responded to those lawsuits by increasing distributions so that

they would be inaccessible to supposed litigation creditors, the Board, including the Side A

ICSPs did the exact opposite:  non-tax distributions dropped further and Purdue's cash reserve

continued to grow.  And after 2016, in recognition of increasing litigation risks, Purdue's Board

stopped authorizing non-tax distributions entirely.  Side A Obj. ¶¶ 6, 13–14.

66.     Courts have rejected intentional fraudulent conveyance claims in cases that are

similar to the present matter.  In *In re Old CarCo LLC*, 435 B.R. 169 (Bankr. S.D.N.Y. 2010),

the court rejected intentional fraudulent conveyance claims that were "implausible" in light of

the defendant's conduct:  "Daimler's own actions do not support an inference of fraudulent

intent" as "[i]t is implausible that an affiliate of Daimler would make a $1.5 billion credit facility

available to CarCo or that Daimler would make a direct $920 million repayment to CarCo of

intercompany debt if Daimler were intentionally stripping assets from CarCo and expected

CarCo to fail." *Id.* at 194.  The UCC and the NCSG similarly cannot explain why Purdue's

Board, which supposedly was acting to defraud creditors, did just the opposite by allowing

Purdue to build a huge stockpile of cash that could be pursued by hypothetical litigation creditors

(should they ever materialize). *See also* Side A Obj. ¶¶ 15–27.

UNREDACTED – CONTAINS PROFESSIONALS' EYES ONLY INFORMATION
SUBJECT TO PROTECTIVE ORDER

### B.    The UCC's Fiduciary Duty Allegations Do Not Show Any ICSP Engaging in a Crime or Fraud[19]

67.    The UCC cannot circumvent its inability to show that any Side A ICSP engaged in a crime or fraud (as discussed in Section I.A., above) by arguing that an allegation of breach of fiduciary duty, without more, could be a sufficient basis to apply the "crime fraud" exception. That argument has been rejected by the Second Circuit, which expressly requires "probable cause to believe that a crime or fraud has been attempted or committed." *Roe II*, 168 F.3d at 70. Similarly, a case cited by the UCC, *In re N.Y.C. Asbestos Litig.*, 109 A.D.3d 7, 10 (N.Y. App. Div. 2013) (UCC Reply ¶ 20), mentions breaches of fiduciary duty but then goes on to state that a party seeking "to invoke the crime-fraud exception must demonstrate that there is a factual basis for a showing of probable cause to believe that a <u>fraud or crime has been committed</u> and that the communications in question were in furtherance of the fraud or crime" (emphasis added).[20]    Indeed, absent a requirement of proving a crime or fraud, dockets would be flooded with "crime fraud" motions accompanying every breach of fiduciary suit.

68.    The UCC cannot bolster its fiduciary duty allegations  by drawing adverse inferences against the Board members from the refusal of two ex-CEOs (John Stewart and Mark

---

[19]    The Side A ICSPs dispute that the UCC has any basis to bring fiduciary duty claims against them (including with respect to any insolvency arguments that the UCC is no longer asserting in connection with the Exceptions Motion).  The Side A ICSPs reserve the right to litigate such claims if the UCC ever asserts them.

[20]    While the court in *Galaxy CSI, LLC v. Galaxy Comp. Servs., Inc.*, No. 1:04-CV-00007-LMB, 2004 WL 3661433, at *2 (E.D. Va. Mar. 31, 2004), recognized that there might be unspecified circumstances in which a breach of fiduciary duty could give rise to an application of the "crime fraud" exception, it held that under the facts of the case there was extensive evidence of fraud:  "an extensively planned course of dealing to collude with a competitor and clandestinely transfer assets from the parent company, through transactions structured with the advice of counsel."  To the extent *Galaxy* or any of the UCC's other cases are read to allow application of the "crime fraud" exception without proof of a crime or fraud, any such case is contrary to binding Second Circuit authority.

UNREDACTED – CONTAINS PROFESSIONALS' EYES ONLY INFORMATION
SUBJECT TO PROTECTIVE ORDER

Timney) to testify.  The UCC's argument makes no sense because the UCC overlooks that the

Board is entitled to rely on reports from management.  *See* N.Y. Bus. Corp. Law § 717.  If the

adverse inference the UCC seeks to draw is that the ex-CEOs engaged in misconduct (*see* UCC

Reply ¶ 46), that could potentially mean that the CEOs were misleading the Board as well.  In

any event, the UCC offers no basis to infer that the Side A ICSPs had any reason to disbelieve

communications from the CEOs, much less other members of Purdue's management.  In

particular, the Side A ICSPs had no reason to doubt Mark Timney's report to the board that

Purdue had "a strong culture; very compliant[,] conservative—we are very, very, very

conservative," or quarterly presentations to the Board by the chief compliance officer that Purdue

was complying with its legal and regulatory obligations.  Side A Obj. ¶¶ 20-21; Suppl. Ball

Decl., Ex. 16 at PPLPBN-00001792.

69.    Regardless, the UCC's argument is refuted by Second Circuit case law that

provides that a non-party's refusal to testify can lead to adverse inferences drawn against a party

only in limited circumstances that are not applicable here.  In *LiButti v. United States*, 107 F.3d

110 (2d Cir. 1997), a case the UCC cites, the Second Circuit outlined four factors to consider in

evaluating whether adverse inferences should be drawn:  (1) the nature of the relevant

relationships (which will "invariably be the most significant circumstance"); (2) the degree of

control of the party over the nonparty witness; (3) the compatibility of the interests of the party

and non-party witness in the outcome of the litigation; and (4) the role of the non-party witness

in the litigation.  *Id.* at 123.  These factors point strongly against adverse inferences here:

- There is no relationship between any Side A ICSP and the former CEOs, as Mr. Stewart
  was fired by the Board in 2013 and Mr. Timney resigned due to differences of opinion
  with the Board in 2017.

- No Side A ICSP has any control over either former CEO.

UNREDACTED – CONTAINS PROFESSIONAL EYES ONLY INFORMATION
SUBJECT TO PROTECTIVE ORDER

- The interests of the Side A ICSPs and the former CEOs are not closely aligned because liability for management and the Board are assessed separately.  Side A ICSPs have repeatedly taken the position that they did not participate in, and are not responsible for, management's alleged conduct.

- The role of the former CEOs is relatively minor in this litigation.  The UCC has numerous other sources of information that it is using to conduct diligence, including tens of millions of pages of documents and testimony from more than a dozen witnesses including Purdue's current CEO.

70.    Courts have frequently declined to apply adverse inferences in analogous

circumstances where, among other things, the witness who refused to testify and the party

against which the inference was sought did not have a close relationship.  *See, e.g. Coquina Invs.*

*v. Rothstein,* No. 10-60786-Civ-COOKE/BANDSTRA, 2011 WL 13096509, at *1 (S.D. Fla.

Oct. 19, 2011) (declining to find adverse inference against TD Bank because a former employee

who declined to testify had been fired and TD Bank and the former employee "did not have a

close relationship," the former employee "had little, if any loyalty, to TD Bank," and TD Bank

did not exert control over the employee).[21]

71.    The two cases the UCC cites are inapposite.  In *LiButti*, the Second Circuit

remanded to the district court to determine whether adverse inferences should be drawn in a tax

---

[21]    *See also, e.g., Progressive Cas. Ins. Co. v. Monaco*, No. 16-cv-823 (VAB), 2017 WL 2873051, at *11 (D. Conn. July 5, 2017) (declining to apply adverse inference where defendant had reported the non-party witness for theft and where defendant did not have significant degree of control over non-party witness); *Cotton v. City of Eureka*, No. C-08-04386 SBA (EDL), 2010 WL 2889490, at *4 (N.D. Cal. July 22, 2010) (declining to apply adverse inference where there was "no evidence of any close or special relationship" between the party against whom the inference was sought and the non-party witness, and there was "no showing that [the party] ha[d] any degree of control over" the non-party witness); *Emerson v. Wembley USA Inc.*, 433 F. Supp. 2d 1200, 1213 (D. Colo. 2006) (declining to apply adverse inference where non-party witness was a "tangential figure," and "no longer work[ed] for or with" the defendants, and where the adverse inference sought was "massive in scope," and the non-party was not "the only source of the answer" with regard to several of the questions plaintiff posed).

UNREDACTED – CONTAINS PROFESSIONALS' EYES ONLY INFORMATION
SUBJECT TO PROTECTIVE ORDER

proceeding where the non-party taxpayer (a father) did not answer questions regarding whether
he owned or controlled a business or a horse purportedly owned by the party (his daughter)
because of the "strength of their relationship" and shared interest.  The relationship between the
Side A ICSPs and two long-departed CEOs are very different from a father and daughter.  In
*Rosebud Sioux Tribe v. A & P Steel, Inc.*, 733 F.2d 509, 514 (8th Cir. 1984), a non-party gave
deposition testimony that was harmful to the plaintiff and stated he would invoke the Fifth
Amendment if called to testify at trial.  The trial court determined that the witness was
unavailable and allowed the defendant to introduce the deposition testimony at trial.  *Id.*  The
Eighth Circuit reversed because the use of deposition testimony under these circumstances was
fundamentally unfair, holding that the trial court should have allowed plaintiff to call the non-
party as a witness.  *Id.* at 522.  This case is irrelevant because the Side A ICSPs do not plan to
use the deposition testimony of either former CEO.

### C.    The NCSG's Allegations Do Not Show Any ICSP Engaging in a Crime or Fraud

72.    The NCSG says barely anything at all about any Side A ICSP, much less that
shows any of them engaged in a crime or fraud.  The NCSG says nothing about Ilene Sackler
Lefcourt, Kathe Sackler, or Theresa Sackler (except to include their names in a list of directors).
Mortimer D.A. Sackler appears just once — in a footnote stating nothing more than:  "Mortimer:
Purdue in a 'death spiral.'"  NCSG Reply ¶ 20 n.42.  As discussed above, Mortimer did not say
that Purdue was in a death spiral, nor did he say anything about litigation risk.  *See supra* ¶ 58.
Instead, he advocated exploring strategic transactions that could build shareholder value.

73.    The NCSG's generalized allegations regarding Purdue's Board are no different.
The documents the NCSG cites at most show that certain Purdue executives were dissatisfied
with unspecified members of Purdue's Board.  And the NCSG's allegations regarding McKinsey

UNREDACTED – CONTAINS PROFESSIONALS' EYES ONLY INFORMATION
SUBJECT TO PROTECTIVE ORDER

and E2E are simply a rehash of the UCC's arguments, which do not show any Side A ICSP

engaging in criminal or fraudulent conduct for the reasons described above.

## II. The UCC and the NCSG Have Not Shown Probable Cause That Side A ICSP Communications with Counsel Facilitated Any Alleged Crime or Fraud

74. The UCC and the NCSG have failed to satisfy the iron-clad requirement that they

come forward with "probable cause to believe that **the particular communication** with counsel

or attorney work product was intended in some way to facilitate or to conceal the criminal

activity." *Roe II*, 168 F.3d at 70. Instead, they "rest merely upon the movant's presentation of a

'theory' regarding widespread fraud" — something they are not permitted to do. *MacNamara v.

City of N.Y.*, No. 04 Civ. 9216 (RJS), 2008 WL 186181, at *4 (S.D.N.Y. Jan. 17, 2008). Courts

routinely deny "crime fraud" motions for failure to satisfy these requirements. *See, e.g.*, *id.*; *Roe

II*, 168 F.3d 69.

75. <u>Intentional fraudulent conveyances</u>: The UCC neither specifies which counsel, if

any, facilitated intentional fraudulent conveyances by Side A ICSPs, nor the circumstances in

which counsel facilitated such conveyances. *See* Side A Obj. ¶¶ 35–37. The UCC instead seeks

to cover its inability to identify any link between actual communications with counsel and its

crime/fraud allegations by citing instead to (i) seven broad categories unrelated to any specific

communications with counsel, which do little more than restate the UCC's allegations, and (ii)

various entries selected from the Side A ICSP privilege log. *See* Hurley Decl., Ex. 101, at 2;

Hurley Decl., Ex. A. Neither enables the UCC to satisfy its burden.

76. The UCC's seven categories are facially insufficient to satisfy the Second

Circuit's requirement that a movant must come forward with "probable cause to believe that **the

particular communication** with counsel or attorney work product was intended in some way to

UNREDACTED – CONTAINS PROFESSIONALS' EYES ONLY INFORMATION
SUBJECT TO PROTECTIVE ORDER

facilitate or to conceal the criminal activity." *Roe II*, 168 F.3d at 70.  Categories such as the

following are at most restatements of the UCC's theories of the case:

- "The Sacklers' asset protection and estate planning measures to transfer funds to trusts and other assets with "limited transparency" and/or "jurisdictional shielding" from creditors relating to the Sacklers' and Purdue's liability;"

- "Whether, and/or how, opioid litigants could collect, or be prevented from collecting, a potential judgment against the Sacklers, their trusts and other affiliates and assets (even if the Sacklers' motive to obscure assets was unbeknownst to the lawyer providing the advice);" and

- "The appropriate amount, and mechanics for, distributions to the Sacklers to avoid tracing or liability (including fraudulent transfer liability)."

Hurley Decl., Ex. 101, at 2.  None of the UCC's categories contain objective criteria that could

be used to identify particular communications with counsel that facilitated any allegedly criminal

or fraudulent conduct.

77.    The two cases cited by the UCC illustrate exactly what the UCC is unable to do:

specify which counsel facilitated alleged frauds and the particular circumstances in which such

counsel did so.  In *Drummond Company, Inc. v. Conrad & Scherer, LLP*, 885 F. 3d 1324, 1333

(11th Cir. 2018), for example, the district court determined that there was an adequate showing

that <u>counsel</u> committed a fraud (fraud on the court and witness bribery) and found that specific

communications between that counsel about discrete topics were in furtherance of that

crime/fraud, *e.g.*, counsel's "withholding and redaction of documents produced to Drummond in

the defamation case showing payments to [two witnesses]," and counsel's email stating that two

witnesses "would receive ongoing monthly payments."[22]  Similarly, in *Amusement Indus.Inc. v.*

---

[22]    Contrary to the UCC's claim, the Eleventh Circuit did not "uph[o]ld a district court's decision to review documents within nine broad categories."  UCC Reply ¶ 77.  The court expressly explained that its opinion addressed only a "pure legal issue" of whether work product protection can be invoked in circumstances in which counsel, but not their clients, engaged in a crime or fraud.  *Drummond Co., Inc.*, 885 F. 3d at 1339.

UNREDACTED – CONTAINS PROFESSIONAL EYES ONLY INFORMATION
SUBJECT TO PROTECTIVE ORDER

*Stern*, 293 F.R.D. 420, 440–41 (S.D.N.Y. 2013), the court "found the transactions on which these attorneys worked to each constitute illegal schemes devised by" the defendant, and on that basis required the disclosure of communications between the defendant and "Buchanan Ingersoll & Rooney, P.C.; Herrick, Feinstein LLP; or Hoffinger Ste[rn] and Ross, LLP concerning (1) Ste[rn]'s efforts to obtain financing from J.P. Morgan; (2) Ste[rn]'s efforts to obtain financing from Citigroup; (3) Ste[rn]'s acquisition and use of Amusement's $13 million; or (4) Ste[rn]'s efforts to obtain financing from Petra at the time." The UCC's categories, by contrast, contain none of these types of specific and objective factual parameters.

78.     The UCC's list of privilege log entries is similarly insufficient because the UCC fails to connect any of the entries to any allegedly intentional fraudulent conveyance. The UCC does not explain how it compiled the list of entries related to its Exceptions Motion. Hundreds of entries on the UCC's chart seem to have been selected because they contain the word "trust." The UCC does not specify how any and all legal advice related to trusts facilitated intentional fraudulent transfers. Nor could it, as the use of trusts is an entirely appropriate means of inter-generational wealth planning and there is no evidence that any transfers to Side A trusts were made to defraud creditors.

79.     <u>Fiduciary duties</u>. The UCC does not even attempt to explain how (if at all) its fiduciary duty allegations regarding Side A ICSPs are related to communications with counsel. Under the rubric of "fiduciary duty" allegations, the UCC dwells at length on the alleged conduct of Purdue's management. The UCC does not and cannot explain how any communications between Side A and counsel that it is challenging facilitated any activities by management, much less conduct that was criminal or fraudulent.

UNREDACTED – CONTAINS PROFESSIONALS' EYES ONLY INFORMATION
SUBJECT TO PROTECTIVE ORDER

80.   The inability of the UCC to connect its fraudulent conveyance allegations to communications is further confirmed by the one UCC "category" that even mentions fiduciary duties:  "Purdue's potential liability, or the Sacklers' (or any of their advisors') potential liability, related to breaches of fiduciary duty and other misconduct, and any efforts to conceal such conduct or breaches of duty."  *See* Hurley Decl., Ex. 101, at 2.  This catalog of allegations leaves unanswered what conduct falls within it, much less which particular communications between Side A ICSPs and counsel facilitated it.

81.   <u>The NCSG's allegations</u>:  The NCSG brief says <u>nothing</u> about the role of counsel with respect to its allegations.

## III.   The Court Should Not Order an *In Camera* Review Because the UCC and the NCSG Have Offered No Basis to Conclude That the "Crime Fraud" Exception Applies

82.   Recognizing that its use of categories that merely restate its theories does not work, the UCC falls back on an *in camera* review of each communication as an alternative.  An *in camera* review is unwarranted here.  The UCC correctly recognizes that an *in camera* review is appropriate only where a party presents "a factual basis adequate to support a good faith belief by a reasonable person . . . that *in camera* review . . . may reveal evidence to establish that the crime-fraud exception applies."  UCC Reply ¶ 77 (quoting *United States v. Zolin*, 491 U.S. 554, 572 (1989)).  The UCC and the NCSG, however, have not made such a showing for the reasons described above.  Their attempt to use an *in camera* review as a court-sanctioned "fishing expedition" to determine <u>if</u> they may have a basis to apply the crime fraud exception puts the cart before the horse and has no basis in law.  An *in camera* review of an unknown number of documents would only further prolong this dispute and potentially pose even more burdensome demands on the parties at a time when their focus should be settlement negotiations.

UNREDACTED – CONTAINS PROFESSIONALS' EYES ONLY INFORMATION
SUBJECT TO PROTECTIVE ORDER

## CONCLUSION

83.     The UCC's and the NCSG's meritless efforts to convince the Court to order the production of privileged documents have already proven an unnecessary distraction from the Court's directive to pursue a global negotiated resolution that would put an end to wasteful litigation that is draining the Debtors' Estate by tens of millions of dollars each month and would allow significant abatement resources to begin flowing to hard-hit communities across the country.  The UCC and the NCSG already have access to a massive volume of documents, and they have not come close to meeting the burden of showing that they meet the narrow circumstances in which a Court should apply the extraordinary remedy of ordering the production of privileged documents.  The Court should deny the Exceptions Motion.

Dated:   December 9, 2020
         New York, New York

                                    By:     /s/ Jasmine Ball_____
                                            Jasmine Ball
                                            Maura Kathleen Monaghan
                                            Jeffrey J. Rosen
                                            DEBEVOISE & PLIMPTON LLP
                                            919 Third Avenue
                                            New York, New York 10022
                                            Telephone:  (212) 909-6000
                                            Facsimile:  (212) 909-6836
                                            Email: jball@debevoise.com
                                                   mkmonaghan@debevoise.com
                                                   jrosen@debevoise.com

                                            *Attorneys for Beacon Company*