REDACTED

AKIN GUMP STRAUSS HAUER & FELD LLP
Ira S. Dizengoff
Arik Preis
Mitchell Hurley
Joseph L. Sorkin
Sara L. Brauner
One Bryant Park
New York, New York 10036
Telephone: (212) 872-1000
Facsimile: (212) 872-1002

*Counsel to the Official Committee of Unsecured
Creditors of Purdue Pharma L.P.,* et al.

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| PURDUE PHARMA L.P., *et al.*,[1] | ) | Case No. 19-23649 (RDD) |
| | ) | |
| Debtors. | ) | (Jointly Administered) |
| | ) | |

## DECLARATION OF ARIK PREIS DATED NOVEMBER 18, 2020

---

[1] The Debtors in these cases, along with the last four digits of each Debtor's registration number in the applicable jurisdiction, are as follows: Purdue Pharma L.P. (7484), Purdue Pharma Inc. (7486), Purdue Transdermal Technologies L.P. (1868), Purdue Pharma Manufacturing L.P. (3821), Purdue Pharmaceuticals L.P. (0034), Imbrium Therapeutics L.P. (8810), Adlon Therapeutics L.P. (6745), Greenfield BioVentures L.P. (6150), Seven Seas Hill Corp. (4591), Ophir Green Corp. (4594), Purdue Pharma of Puerto Rico (3925), Avrio Health L.P. (4140), Purdue Pharmaceutical Products L.P. (3902), Purdue Neuroscience Company (4712), Nayatt Cove Lifescience Inc. (7805), Button Land L.P. (7502), Rhodes Associates L.P. (N/A), Paul Land Inc. (7425), Quidnick Land L.P. (7584), Rhodes Pharmaceuticals L.P. (6166), Rhodes Technologies (7143), UDF L.P. (0495), SVC Pharma L.P. (5717) and SVC Pharma Inc. (4014).  The Debtors' corporate headquarters is located at One Stamford Forum, 201 Tresser Boulevard, Stamford, CT 06901.

PUBLICLY FILED PER STIPULATION [ECF 2140]

REDACTED

Under 28 U.S.C. § 1746, I, Arik Preis,[2] declare under the penalty of perjury that the following is true and correct to the best of my knowledge, information, and belief:

1.  This declaration ("**Declaration**") is submitted in support of the Official Committee of Unsecured Creditors of Purdue Pharma, L.P. et al.'s Motions (defined below) and two reply briefs filed contemporaneously with this Declaration entitled (1) Official Committee of Unsecured Creditors' Reply in Support of Its Motion to Compel Production of Purportedly Privileged Documents, or for *In Camera* Review, Based on Good Cause, Crime Fraud, and At Issue Exceptions to Claims of Privilege (the "**Exceptions Reply**")[3]; and (2) Official Committee of Unsecured Creditors' Reply in Support of Motion to Compel Production of Purportedly Privileged Documents, or for *In Camera* Review, Based on Failure of the Sacklers to Demonstrate Documents Identified on Logs are Privileged (the "**General Challenges Reply,**"[4] and, together with the Exceptions Reply, the "**Replies**").[5]

2.  I am an attorney in good standing admitted to practice in the State of New York, and I am a partner at the law firm of Akin Gump Strauss Hauer & Feld LLP ("**Akin Gump**").  I was admitted to the New York State Bar in 2001 and have been practicing law in the area of bankruptcy and financial restructuring since that time.  I make this Declaration based on my own personal knowledge and belief, and upon documents and information available to me as counsel to the Official Committee of Unsecured Creditors of Purdue Pharma, L.P. et al (the "**UCC**").

---

[2] My legal name is Erik Preis but for my entire life I have utilized the name Arik and not Erik.

[3] For the sake of clarity, the Exceptions Reply is submitted in support of the UCC's *Motion to Compel Production of Purportedly Privileged Documents, or for* In Camera *Review, Based on Good Cause, Crime Fraud, and At Issue Exceptions to Claims of Privilege* [ECF No. 1753] (the "**Exceptions Motion**").

[4] For the sake of clarity, the Challenges Reply is submitted in support of the UCC's *Motion to Compel Production of Purportedly Privileged Documents, or for In Camera Review, Based on Failure of the Sacklers and the Debtors to Demonstrate Documents Identified on Logs are Privileged* [ECF No. 1752] (the "**General Challenges Motion**").  The Exceptions Motion and General Challenges Motion are collectively referred to herein as the "**Motions**."

[5] Capitalized terms used but not defined herein shall have the meanings ascribed to them in the Replies, which the UCC has endeavored to use consistently with definitions used in the Motions.

PUBLICLY FILED PER STIPULATION [ECF 2140]

REDACTED

3.      The UCC files its Replies in accordance with the briefing schedule provided in the

*Stipulation and Agreed Order Regarding Amended Briefing Schedule in the Chapter 11 Cases*,

executed by the Debtors, the Sacklers, the NCSG, the AHC, and the UCC, which was filed and so

ordered by the Court on October 26, 2020 [ECF No. 1848].  After filing its Motions, the UCC has

continued to meet and confer with counsel for the Side A and Side B Sacklers (collectively, the

"**Sacklers**") and the Debtors (collectively with the Sacklers, the "**Withholding Parties**") in a good

faith effort to resolve by agreement the issues raised by the Motions without the intervention of

the Court.  While the parties informally resolved some of the UCC's challenges, they could not

resolve all the issues as described in the Replies.

4.      This Declaration attaches and describes documents and testimony relied upon in

the Replies.  Certain exhibits attached hereto have been designated as Confidential, Highly

Confidential, Professional's Eyes Only, or Outside Professional's Eyes Only, by one or more

parties to this proceeding and are redacted pursuant to the *Third Amended Protective Order* entered

in these proceedings [ECF No. 1935].  The UCC also files certain correspondence with the

Withholding Parties under seal in an abundance of caution in order to accommodate certain

Withholding Parties' prior positions concerning the confidentiality of email address and other

information that may be contained therein.  By filing in this way, the UCC does not intend to

suggest that it agrees the information is or ought to be confidential.

5.      Attached hereto as **Exhibit A** is a true and correct copy of an excel workbook

containing the entries on Side A's privilege log that the UCC is challenging in the Motions and

Replies, separated by category based on the tabbed worksheets in the excel workbook.  For the

Exceptions Motion and Reply, the privilege entries are a non-exhaustive, illustrative list of the

Challenged Documents (as defined in the Exceptions Motion) that the UCC believes fit within the

PUBLICLY FILED PER STIPULATION [ECF 2140]

REDACTED

categories of privileged documents the UCC seeks to compel.  This Exhibit A is intended to supersede the Exhibit A attached to the Declaration of Mitchell Hurley Dated September 29, 2020, originally filed in support of the Motions.

6.      Attached hereto as **Exhibit B** is a true and correct copy of an excel workbook containing the entries on Side B's privilege log that the UCC is challenging in the Motions and Replies, separated by category based on the tabbed worksheets in the excel workbook.  For the Exceptions Motion and Reply, the privilege entries are a non-exhaustive, illustrative list of the Challenged Documents (as defined in the Exceptions Motion) that the UCC believes fit within the categories of privileged documents the UCC seeks to compel.  This Exhibit B is intended to supersede the Exhibit B attached to the Declaration of Mitchell Hurley Dated September 29, 2020, originally filed in support of the Motions.

7.      Attached hereto as **Exhibit C** is a list of document control numbers corresponding to certain Privilege Log entries for which the UCC requests *in camera* review.  The list is organized categorically and by Withholding Party.  The document control numbers in Exhibit C are presented as a limited sampling of materials that the UCC believes would enable the Court to make a reasoned determination whether further *in camera* review or other relief is appropriate respecting categories of documents identified in the General Challenges Reply.

8.      Attached hereto as **Exhibit 110** is a true and correct copy of a letter from Mitchell Hurley to Alexander Lees, dated September 25, 2020.

9.      Attached hereto as **Exhibit 111** is a true and correct copy of a letter from Mitchell Hurley to Alexander Lees, dated October 12, 2020.

10.     Attached hereto as **Exhibit 112** is a true and correct copy of a letter from Mitchell Hurley to Jasmine Ball, dated October 14, 2020.

PUBLICLY FILED PER STIPULATION [ECF 2140]

REDACTED

11.     Attached hereto as **Exhibit 113** is a true and correct copy of an email from Elizabeth Scott to Jasmine Ball, dated October 20, 2020.

12.     Attached hereto as **Exhibit 114** is a true and correct copy of an email from Elizabeth Scott to Jasmine Ball, dated October 23, 2020.

13.     Attached hereto as **Exhibit 115** is a true and correct copy of an email from Elizabeth Scott to Jasmine Ball, dated October 29, 2020.

14.     Attached hereto as **Exhibit 116** is a true and correct copy of a letter from Alexander Lees to Mitchell Hurley, dated September 28, 2020.

15.     Attached hereto as **Exhibit 117** is a true and correct copy of a letter from Alexander Lees to Mitchell Hurley, dated October 19, 2020.

16.     **Exhibit 118** to this Declaration has been intentionally omitted.

17.     **Exhibit 119** to this Declaration has been intentionally omitted.

18.     **Exhibit 120** to this Declaration has been intentionally omitted.

19.     **Exhibit 121** to this Declaration has been intentionally omitted.

20.     Attached hereto as **Exhibit 122** is a true and correct copy of an email from Stuart Baker dated November 1, 2018, which was produced to the UCC under the Bates number MSF00470861.

21.     Attached hereto as **Exhibit 123** is a true and correct copy of an email exchange between Mortimer Sackler and Antony Mattessich, dated April 24, 2017, which was produced to the UCC under the Bates number MSF00575712.

22.     Attached hereto as **Exhibit 124** is a true and correct copy of an email from Stuart Baker to Richard Sackler, dated November 22, 2013, which was produced to the UCC under the Bates number RSF_OLK00070002.

PUBLICLY FILED PER STIPULATION [ECF 2140]

REDACTED

23.    Attached hereto as **Exhibit 125** is a true and correct copy of a July 27, 2011 email from Cecil Pickett forwarding a Stuart Baker email with attachment titled "Proposed 2012 Calendar of Meetings and Board Calls," which was produced to the UCC under the Bates numbers PPLPUCC9002657293-94.

24.    Attached hereto as **Exhibit 126** is a true and correct copy of an email chain dated June 21, 2019, which was produced to the UCC under the Bates number MSF00997606.

25.    Attached hereto as **Exhibit 127** is a true and correct copy of an excel spreadsheet containing text messages including Dame Theresa Sackler and others, which was produced to the UCC under the Bates number MSF90089695.

26.    Attached hereto as **Exhibit 128** is a true and correct copy of an email from Paul Gallagher, Senior Managing Director at Teneo, dated May 20, 2019, which was produced to the UCC under the Bates number PPLPUCC002663187.

27.    Attached hereto as **Exhibit 129** is a true and correct copy of an email from Paul Gallagher, Senior Managing Director at Teneo, dated May 20, 2019, which was produced to the UCC under the Bates number PPLPUCC002664919.

28.    Attached hereto as **Exhibit 130** is a true and correct copy of an email from Mortimer Sackler dated May 21, 2019, which was produced to the UCC under the Bates number PPLPUCC002662986.

29.    **Exhibit 131** to this Declaration has been intentionally omitted.

30.    Attached hereto as **Exhibit 132** is a true and correct copy of an email from David Lundie to John Donovan, dated February 8, 2012, which was produced to the UCC under the Bates number PPLPC036000177151.

PUBLICLY FILED PER STIPULATION [ECF 2140]

REDACTED

31.     Attached hereto as **Exhibit 133** is a true and correct copy of a September 2010 email chain which was produced to the UCC under the Bates number PPLPUCC002449097.

32.     Attached hereto as **Exhibit 134** is a true and correct copy of an email from Michael Friedman dated March 5, 2006, which was produced to the UCC under the Bates number PPLPUCC002603602.

33.     Attached hereto as **Exhibit 135** is a true and correct copy of a February 15, 2011 email from Jonathan Sackler attaching Purdue board and management discussion materials, which was produced to the UCC under the Bates number PPLPUCC9003800123.

34.     Attached hereto as **Exhibit 136** is a true and correct copy of excerpts from the minutes of a March 4, 2003 meeting of the board of directors of Purdue Pharma Inc., which was produced to the UCC under the Bates number PPLPUCC500647319.

35.     Attached hereto as **Exhibit 137** is a true and correct copy of a May 5, 2017 email from Craig Landau attaching a Purdue diagnostic and forward plan, which was produced to the UCC under the Bates number PWG004670879.

36.     Attached hereto as **Exhibit 138** is a true and correct copy of a February 2007 email chain which was produced to the UCC under the Bates number PPLPC061000013858.

37.     Attached hereto as **Exhibit 139** is a true and correct copy of a March 2008 email chain which was produced to the UCC under the Bates number PPLPC012000174476.

38.     Attached hereto as **Exhibit 140** is a true and correct copy of an February 2012 email chain which was produced to the UCC under the Bates number PPLPUCC9002981007.

39.     Attached hereto as **Exhibit 141** is a true and correct copy of a November 2013 email chain which was produced to the UCC under the Bates number SideA00429689.

PUBLICLY FILED PER STIPULATION [ECF 2140]

REDACTED

40.    Attached hereto as **Exhibit 142** is a true and correct copy of a June 2015 email chain which was produced to the UCC under the Bates number PPLPUCC9004448656.

41.    Attached hereto as **Exhibit 143** is a true and correct copy of excerpts from a February 11, 2010 letter from Amy D'Agostino to Cecil Pickett attaching executed Director Agreements, which was produced to the UCC under the Bates number CP0000001.

42.    Attached hereto as **Exhibit 144** is a true and correct copy of Executive Committee Meeting Notes & Actions, dated September 21, 2011, which was produced to the UCC under the Bates number RSF_OLK00035017.

43.    Attached hereto as **Exhibit 145** is a true and correct copy of an April 2012 email chain, which was produced to the UCC under the Bates number PPLPC012000372585.

44.    Attached hereto as **Exhibit 146** is a true and correct copy of a September 11, 2013 memorandum from McKinsey to John Stewart and Russ Gasdia, which was produced to the UCC under the Bates number PPLPC012000441614.

45.    Attached hereto as **Exhibit 147** is a true and correct copy of an August 15, 2013 email from Richard Sackler, which was produced to the UCC under the Bates number PPLPUCC9002391802.

46.    Attached hereto as **Exhibit 148** is a true and correct copy of an email from Stuart Baker dated August 21, 2013, which was produced to the UCC under the Bates number PPLPC045000016165.

47.    Attached hereto as **Exhibit 149** is a true and correct copy of an April 6, 2014 email from Edward Mahony, which was produced to the UCC under the Bates number PPLPC012000471641.

PUBLICLY FILED PER STIPULATION [ECF 2140]

REDACTED

48.    Attached hereto as **Exhibit 150** is a true and correct copy of excerpts from a presentation titled: Changes in prescriptions of OxyContin and OPANA ER after introduction of tamper resistant formulations among potentially problematic and comparator prescribers, which was produced to the UCC under the Bates number PPLPC019000826509.

49.    Attached hereto as **Exhibit 151** is a true and correct copy of a May 21, 2007 email and attached May 2007 calendar printout, which was produced to the UCC under the Bates numbers PPLPUCC001531749-50.

50.    Attached hereto as **Exhibit 152** is a true and correct copy of excerpts from an August 2013 email from Donna Condon attaching an August 8, 2013 memorandum from McKinsey to John Stewart and Russ Gasdia, which was produced to the UCC under the Bates number MDSF00986947.

51.    Attached hereto as **Exhibit 153** is a true and correct copy of a June 2014 email chain, which was produced to the UCC under the Bates number PPLPC045000017003.

52.    Attached hereto as **Exhibit 154** is a true and correct copy of excerpts from a Purdue OxyContin Annual Marketing Plan, dated October 6, 2013, which was produced to the UCC under the Bates number PAK000062549.

53.    Attached hereto as **Exhibit 155** is a true and correct copy of excerpts from an August 15, 2013 Purdue board meeting agenda and attached August 8, 2013 memorandum from McKinsey which was produced to the UCC under the Bates number PPLP004409890.

54.    Attached hereto as **Exhibit 156** is a true and correct copy of an October 8, 2011 Google news alert, which was produced to the UCC under the Bates number RSF00683542.

55.    Attached hereto as **Exhibit 157** is a true and correct copy of a November 1, 2013 Google news alert, which was produced to the UCC under the Bates number RSF_OLK00008429.

PUBLICLY FILED PER STIPULATION [ECF 2140]

REDACTED

56.    Attached hereto as **Exhibit 158** is a true and correct copy of an April 18, 2015 Google news alert, which was produced to the UCC under the Bates number MDSF00514742.

57.    Attached hereto as **Exhibit 159** is a true and correct copy of a July 2016 email chain, which was produced to the UCC under the Bates number PWG004484978.

58.    Attached hereto as **Exhibit 160** is a true and correct copy of a January-February 2008 email chain, which was produced to the UCC under the Bates number SideA00391976.

59.    Attached hereto as **Exhibit 161** is a true and correct copy of a February 2008 email chain, which was produced to the UCC under the Bates number PPLPC042000011810.

60.    Attached hereto as **Exhibit 162** is a true and correct copy of an October 2014 email chain, which was produced to the UCC under the Bates number PPLPUCC000335135.

61.    Attached hereto as **Exhibit 163** is a true and correct copy of document titled "CEO Considerations," which was produced to the UCC under the Bates number PPLPUCC001662356.

62.    Attached hereto as **Exhibit 164** is a true and correct copy of excerpts from a Dec. 6, 2019 "Presentation of Defenses ('Side A')," which was provided to the UCC by counsel for Side A.

63.    Attached hereto as **Exhibit 165** is a true and correct copy of excerpts from an October 8, 2010 Purdue news summary, which was produced to the UCC under the Bates number PPLPC061000060749.

64.    Attached hereto as **Exhibit 166** is a true and correct copy of an April 2012 email chain, which was produced to the UCC under the Bates number MARSH-PURDUE-001112.

65.    Attached hereto as **Exhibit 167** is a true and correct copy of a May 11, 2012 email and attached presentation and timeline, which was produced to the UCC under the Bates number MARSH-PURDUE-001768.

PUBLICLY FILED PER STIPULATION [ECF 2140]

REDACTED

66.     Attached hereto as **Exhibit 168** is a true and correct copy of a May 2012 email chain, which was produced to the UCC under the Bates number MARSH-PURDUE-001777.

67.     Attached hereto as **Exhibit 169** is a true and correct copy of a July 2015 email chain, which was produced to the UCC under the Bates number MDSF00450185.

68.     Attached hereto as **Exhibit 170** is a true and correct copy of a June 2016 email chain, which was produced to the UCC under the Bates number MDSF00010697.

69.     Attached hereto as **Exhibit 171** is a true and correct copy of excerpts from a February 29, 2012 Purdue news summary, which was produced to the UCC under the Bates number IACS_ESI_0000490680.

70.     Attached hereto as **Exhibit 172** is a true and correct copy of an March 30, 2016 letter from Moody's Investor Services, which was produced to the UCC under the Bates number PPLPUCC003938943.

71.     Attached hereto as **Exhibit 173** is a true and correct copy of an April 7, 2016 letter from Standard & Poor's Ratings Services, which was produced to the UCC under the Bates number PPLPUCC500143127.

72.     Attached hereto as **Exhibit 174** is a true and correct copy of a document titled "Proposal Regarding Board Practices," which was produced to the UCC under the Bates number MSF00144650.

73.     Attached hereto as **Exhibit 175** is a true and correct copy of a July 16, 2017 email from Mortimer Sackler which was produced to the UCC under the Bates number SideA00229177.

74.     Attached hereto as **Exhibit 176** is a true and correct copy of a March 10, 2008 email from Richard Sackler which was produced to the UCC under the Bates number PPLPC023000164605.

11

REDACTED

75.     Attached hereto as **Exhibit 177** is a true and correct copy of an April-May 2011 email chain which was produced to the UCC under the Bates number PPLPUCC9000363533.

76.     Attached hereto as **Exhibit 178** is a true and correct copy of *Purdue's Written Responses to 30(b)(6) Topics*, served in connection with *In re: National Prescription Opiate Litigation*, MDL No. 2804, in the United States District Court, Northern District of Ohio, which was produced to the UCC under the Bates number POK003735973.

77.     Attached hereto as **Exhibit 179** is a true and correct copy of a June 18, 2014 Purdue news summary, which was produced to the UCC under the Bates number POK003746339.

78.     Attached hereto as **Exhibit 180** is a true and correct copy of an April 12, 2012 OxyContin Market Events presentation, which was produced to the UCC under the Bates number PPLPC012000372437.

79.     Attached hereto as **Exhibit 181** is a true and correct copy of excerpts from an August 13, 2014 presentation from JP Morgan, which was produced to the UCC under the Bates number PPLPUCC000281516.

80.     Attached hereto as **Exhibit 182** is a true and correct copy of the Purdue plea agreement with the United States dated October 20, 2020 and filed in these proceedings at EFC No. 1828-2.

81.     Attached hereto as **Exhibit 183** is a true and correct copy of excerpts from a notification of patent decision in *In re Oxycotin Antitrust Litig.*, No. 1:06-cv-13095-SHS (S.D.N.Y. Jan. 7, 2008), which was produced to the UCC under the Bates number PURCHI-000834581.

82.     Attached hereto as **Exhibit 184** is a true and correct copy of an August 17, 2020 letter to Mitchell Hurley.

PUBLICLY FILED PER STIPULATION [ECF 2140]

REDACTED

83.     Attached hereto as **Exhibit 185** is a true and correct copy of excerpts from the audited combined financial statements of Purdue for years ended December 31, 2007 and 2006, which was produced to the UCC under the Bates number PPLPUCC500056846.

84.     Attached hereto as **Exhibit 186** is a true and correct copy of a May 1999 email chain, which was produced to the UCC under the Bates number PPLPUCC000004987.

85.     Attached hereto as **Exhibit 187** is a true and correct copy of a March 2007 email chain, which was produced to the UCC under the Bates number PPLPUCC004057767.

86.     Attached hereto as **Exhibit 188a** is a true and correct copy of privilege slip sheet, which was produced to the UCC under the Bates number PPLPC051000035807, and is identified in metadata as the parent document of PPLPC051000035808 (Ex. 188b to this Declaration).

87.     Attached hereto as **Exhibit 188b** is a true and correct copy of a 2006 Comment published in Northwestern University Law Review titled: "West Virginia's Painful Settlement: How the OxyContin Phenomenon and Unconventional Theories of Tort Liability May Make Pharmaceutical Companies Liable for Black Markets," which was produced to the UCC under the Bates number PPLPC051000035808.

88.     Attached hereto as **Exhibit 189** is a true and correct copy of a Purdue News Summary circulated on June 20, 2014, which was produced to the UCC under the Bates number PAZ000115626.

89.     Attached hereto as **Exhibit 190** is a true and correct copy of a June 2014 email chain, which was produced to the UCC under the Bates number PPLPC045000017003.

90.     Attached hereto as **Exhibit 191** is a true and correct copy of excerpts from the audited combined financial statements of Purdue for years ended December 31, 2008 and 2007, which was produced to the UCC under the Bates number PPLPUCC500056885.

PUBLICLY FILED PER STIPULATION [ECF 2140]

REDACTED

91.     Attached hereto as **Exhibit 192** is a true and correct copy of a May 2012 email chain, which was produced to the UCC under the Bates number MARSH-PURDUE-001863.

92.     Attached hereto as **Exhibit 193** is a true and correct copy of a April 2012 email chain, which was produced to the UCC under the Bates number MARSH-PURDUE-001114.

93.     Attached hereto as **Exhibit 194** is a true and correct copy of a May 2012 email chain, which was produced to the UCC under the Bates number MARSH-PURDUE-001804.

94.     Attached hereto as **Exhibit 195** is a true and correct copy of excerpts from a privilege log dated March 5, 2019, produced by the Debtors in connection with MDL litigation, and provided to the UCC in connection with these proceedings.

95.     Attached hereto as **Exhibit 196** is a true and correct copy of a November 2020 email chain between counsel for Norton Rose Fulbright, the UCC, and the Debtors, among others.

96.     Attached hereto as **Exhibit 197** is a true and correct copy of a November 8, 2020 email from Katherine Porter to counsel for the Debtors concerning deposition scheduling.

97.     Attached hereto as **Exhibit 198** is a true and correct copy of a November 15, 2020 email from Katherine Porter attaching the current deposition schedule in these proceedings.

98.     Attached hereto as **Exhibit 199** of  State Settlement Agreement and Release dated July 17, 2007, and entered into by the State of Washington and The Purdue Frederick Company, Inc. and Purdue Pharma L.P., which was produced to the UCC under the Bates number PPLPC030000403213.

99.     Attached hereto as **Exhibit 200** is a true and correct copy of the online curriculum vitae of Norton Rose Fulbright attorney Donald Strauber, which was obtained on November 17, 2020, at https://www.nortonrosefulbright.com/en-us/people/1016474.

PUBLICLY FILED PER STIPULATION [ECF 2140]

REDACTED

100.    Attached hereto as **Exhibit 201** is a true and correct copy of the affidavit of Edward B. Mahony, dated February 4, 2014, and submitted in connection with the lawsuit styled *Purdue Pharma L.P. v. Combs*, Case No. 2013-CA-001941, in the Commonwealth of Kentucky Court of Appeals.

101.    Attached hereto as **Exhibit 202** is a true and correct copy of the following journal article: Ryan N. Hansen, et al., Economic Costs of Nonmedical Use of Prescription Opioids, 27 CLINICAL J. OF PAIN 194 (2011).

102.    Attached hereto as **Exhibit 203** is a true and correct copy of excerpts from the audited combined financial statements of Purdue for years ended December 31, 2009 and 2008, which was produced to the UCC under the Bates number PPLPUCC500056924.

103.    Attached hereto as **Exhibit 204** is a true and correct copy of a December 24, 2010 email to Richard Sackler titled "What's new for 'oxycontin' in PubMed," which was produced to the UCC under the Bates number RSF_OLK00055037.

104.    Attached hereto as **Exhibit 205** is a true and correct copy of excerpts from the audited combined financial statements of Purdue for years ended December 31, 2010 and 2009, which was produced to the UCC under the Bates number PPLPUCC500056963.

105.    Attached hereto as **Exhibit 206** is a true and correct copy of an October 2014 email chain, which was produced to the UCC under the Bates number PPLPC045000017072.

106.    Attached hereto as **Exhibit 207** is a true and correct copy of an email from Howard Udel forwarding a March 10, 2008 article titled: "Anatomy Of A Patent Dispute: Purdue Pharma's OxyContin Battle," which was produced to the UCC under the Bates number MSF01116645.

107.    Attached hereto as **Exhibit 208** is a true and correct copy of an excerpt from a distributions summary spreadsheet provided by Side A to the UCC.

15

REDACTED

108.    Attached hereto as **Exhibit 209** is a true and correct copy of a March 2007 email chain, which was produced to the UCC under the Bates number PPLPUCC9004824942.

109.    Attached hereto as **Exhibit 210** is a true and correct copy of an annual report review letter to Purdue from the Office of Inspector General, U.S. Department of Health & Human Services, dated May 6, 2009, which was produced to the UCC under the Bates number PNY000127987.

110.    Attached hereto as **Exhibit 211** is a true and correct copy of an annual report review letter to Purdue from the Office of Inspector General, U.S. Department of Health & Human Services, dated April 1, 2010, which was produced to the UCC under the Bates number PPLP004250164.

111.    Attached hereto as **Exhibit 212** is a true and correct copy of an annual report review letter to Purdue from the Office of Inspector General, U.S. Department of Health & Human Services to Purdue, dated January 28, 2011, which was produced to the UCC under the Bates number PPLPUCC001877705.

112.    Attached hereto as **Exhibit 213** is a true and correct copy of an annual report review letter to Purdue from the Office of Inspector General, U.S. Department of Health & Human Services to Purdue, dated March 8, 2012, which was produced to the UCC under the Bates number PPLPUCC001884369.

113.    Attached hereto as **Exhibit 214** is a true and correct copy of an annual report review letter to Purdue from the Office of Inspector General, U.S. Department of Health & Human Services to Purdue, dated January 24, 2013, which was produced to the UCC under the Bates number PPLP004427723.

PUBLICLY FILED PER STIPULATION [ECF 2140]

REDACTED

114.   Attached hereto as **Exhibit 215** is a true and correct copy of an August 2014 email chain, which was produced to the UCC under the Bates number PPLPUCC9004797180.

115.   Attached hereto as **Exhibit 216** is a true and correct copy of the September 3, 2019 Amendment to the Shareholders' Agreement executed between Purdue Pharma Inc. and certain PPI Shareholders, which was provided to the UCC by the Debtors.

116.   Attached hereto as **Exhibit 217** is a true and correct copy of hearing transcript excerpts from the Nov. 19, 2019 hearing in this matter.

117.   Attached hereto as **Exhibit 218** is a true and correct copy of deposition transcript excerpts from the October 30, 2020 deposition of Cecil Pickett, Ph.D.

118.   Attached hereto as **Exhibit 219** is a true and correct copy of deposition transcript excerpts from the November 4, 2020 deposition of Stuart Baker.

119.   Attached hereto as **Exhibit 220** is a true and correct copy of deposition transcript excerpts from the September 22, 2020 deposition of Stephen Ives.

120.   Attached hereto as **Exhibit 221** is a true and correct copy of deposition transcript excerpts from the August 28, 2020 deposition of David Sackler.

121.   Attached hereto as **Exhibit 222** is a true and correct copy of deposition transcript excerpts from the September 2, 2020 deposition of Marianna Sackler.

122.   Attached hereto as **Exhibit 223** is a true and correct copy of deposition transcript excerpts from the November 5, 2020 deposition of Kathe Sackler.

123.   Attached hereto as **Exhibit 224** is a true and correct copy of deposition transcript excerpts from the October 27, 2020 deposition of John Stewart.

124.   Attached hereto as **Exhibit 225** is a true and correct copy of deposition transcript excerpts from the October 30, 2020 deposition of Mark Timney.

PUBLICLY FILED PER STIPULATION [ECF 2140]

REDACTED

125.    Attached hereto as **Exhibit 226** is a true and correct copy of deposition transcript excerpts from the November 10, 2020 deposition of Mortimer D.A. Sackler.

126.    Attached hereto as **Exhibit 227** is a true and correct copy of deposition transcript excerpts from the September 24, 2020 deposition of Theresa Sackler.

127.    Attached hereto as **Exhibit 228** is a true and correct copy of deposition transcript excerpts from the November 16, 2020 deposition of Peter Boer.


Executed on: November 18, 2020


*/s/ Arik Preis*
Arik Preis

PUBLICLY FILED PER STIPULATION [ECF 2140]

UNREDACTED - CONTAINS OUTSIDE PROFESSIONALS EYES ONLY INFORMATION
SUBJECT TO PROTECTIVE ORDER

# EXHIBIT 136

UNREDACTED - CONTAINS OUTSIDE PROFESSIONALS' EYES ONLY INFORMATION

# PURDUE PHARMA INC.

---

### Minutes of a Meeting of
### the Board of Directors

---

### March 4, 2003

A meeting of the Board of Directors of Purdue Pharma Inc., a New York corporation (the "Corporation"), and the general partner of Purdue Pharma L.P., a Delaware limited partnership (the "Partnership"), was held on March 4, 2003 in New York City (the "Meeting"). A quorum of the Board of Directors was present and at the request of those Directors present, Stuart D. Baker acted as Secretary of the Meeting.

The first order of business was a discussion of the proposed amendment and restatement of the Certificate of Incorporation of the Corporation and the amendment of the By-Laws of the Corporation. After discussion, and on motion duly made and seconded, it was decided by a majority of the Class A Directors of the Corporation present with one Class A Director abstaining and by all of the Class B Directors of the Corporation as follows:

RESOLVED, that it is in the best interests of the Corporation to amend and restate its Certificate of Incorporation as set forth in Article SIXTH of the Certificate of Amendment and Restatement of the Certificate of Incorporation of the Corporation in the form attached hereto as Schedule 1 (the "Certificate of Amendment and Restatement"), and that in accordance therewith, the proposed amended and restated Certificate of Incorporation of the Corporation, as set forth in Article SIXTH of the Certificate of Amendment and Restatement be submitted to the shareholders of the Corporation for their consideration at a special meeting of the shareholders to be held immediately following the conclusion of the Meeting; and further

RESOLVED, that contingent upon receiving approval from the shareholders of the Corporation to amend and restate the Certificate of Incorporation of the Corporation, that the proper officers of the Corporation be and each of them hereby is authorized and directed to execute and file the Certificate of Amendment and Restatement, with such changes, additions

PUBLICLY FILED PER STIPULATION [ECF 2140]

PROFESSIONALS' EYES ONLY/HIGHLY CONFIDENTIAL—SUBJECT TO PROTECTIVE ORDER        PPLPUCC500647319

UNREDACTED - CONTAINS OUTSIDE PROFESSIONALS' EYES ONLY INFORMATION

and modifications thereto, as the officers so acting shall approve, such approval to be conclusively evidenced by the execution and delivery thereof; and further

        RESOLVED, that contingent upon receiving approval from the shareholders of the Corporation, the proposed amendments to the By-Laws of the Corporation in the form attached hereto as Schedule 2, be and the same hereby are adopted and approved as amendments to the By-Laws of the Corporation, and that in accordance therewith, the proposed amendments to the By-Laws of the Corporation in the form attached hereto as Schedule 2 be submitted to the shareholders of the Corporation for their consideration at a special meeting of the shareholders to be held immediately following the conclusion of the Meeting.

        The next order of business was a discussion of the election of officers of the Corporation and the Partnership and an announcement of the reorganization of the Partnership. After discussion, and in each instance contingent upon receiving approval from the shareholders of the Corporation (i) to amend and restate the Certificate of Incorporation of the Corporation, as set forth in article SIXTH of the Certificate of Amendment and Restatement, and (ii) of the proposed amendments to the By-Laws of the Corporation in the form attached hereto as Schedule 2, and on motion duly made and seconded, it was decided by a majority of the Class A Directors of the Corporation present with one Class A Director abstaining and by all of the Class B Directors of the Corporation as follows:

        RESOLVED, that Mortimer D. Sackler, M.D. be and he hereby is elected the Class A Co-Chairman of the Corporation and the Partnership, to serve as the Class A Co-Chairman for a term of three years commencing March 4, 2003 or until the earlier of his death, incapacity, retirement, resignation or removal as a Class A Director of the Corporation; and further

        RESOLVED, that Richard S. Sackler, M.D. be and he hereby is elected the Class B Co-Chairman of the Corporation and the Partnership, to serve as the Class B Co-Chairman for a term of three years commencing March 4, 2003 or until the earlier of his death, incapacity, retirement, resignation or removal as a Class B Director of the Corporation; and further

        RESOLVED, the following persons be and they hereby are elected to the offices of the Corporation and the Partnership set forth opposite their respective names, to hold office until their respective successors are elected and qualified:

2

PUBLICLY FILED PER STIPULATION [ECF 2140]

PROFESSIONALS' EYES ONLY/HIGHLY CONFIDENTIAL—SUBJECT TO PROTECTIVE ORDER    PPLPUCC500647320

| Name | Title |
|------|-------|
| Michael Friedman | President and Chief Executive Officer |
| Edward W. Albright | Executive Vice President, Manufacturing |
| Stuart D. Baker | Executive Vice President, Counsel to the Board |
| Paul D. Goldenheim | Executive Vice President, Worldwide Research & Development |
| Edward B. Mahony | Executive Vice President, Chief Financial Officer |
| Howard R. Udell | Executive Vice President, General Counsel |

; and further

RESOLVED, that Howard R. Udell ("HRU"), will report to the President and Chief Executive Officer and will be responsible for managing all aspects of the Partnership's legal affairs and matters pertaining to the crisis associated with media reports of abuse and diversion of OxyContin™ tablets. HRU will have responsibility for appointing law firms to work for the Partnership and managing their activities. Reporting to HRU will be: Public Affairs, Federal Government Affairs, State Government Affairs, all litigation attorneys, Intellectual Property Law, FDA and DEA Law, DEA Compliance and Health Policy. HRU will also report to Mortimer D. Sackler, M.D. and Raymond R. Sackler, M.D. and the Board of Directors of the Corporation in regard to litigation, and only to Mortimer D. Sackler, M.D., Raymond R. Sackler, M.D. and the Board of Directors of the Corporation in regard to international matters; and further

RESOLVED, that effective as of April 4, 2003, HRU's title will change to Executive Vice President, Chief Legal Officer of the Corporation and the Partnership; and further

RESOLVED, that routine corporate legal matters will be assigned to a new General Counsel reporting to HRU; and further

RESOLVED, that the Corporation for itself and on behalf of the Partnership be and it hereby is authorized and directed to hire a new executive responsible for DEA Compliance reporting to the Executive Vice President, General Counsel; and further

RESOLVED, that Stuart D. Baker ("SDB"), as the Executive Vice President, Counsel to the Board will report to the President and Chief Executive Officer in regard to matters for the Corporation and the Partnership except for matters related to the shareholders, the Board of Directors of the Corporation or its committees. Tax planning and legal-finance matters will continue to be the responsibility of SDB; and further

NY2 - 358817.01

PUBLICLY FILED PER STIPULATION [ECF 2140]

PROFESSIONALS' EYES ONLY/HIGHLY CONFIDENTIAL—SUBJECT TO PROTECTIVE ORDER        PPLPUCC500647321

UNREDACTED — CONTAINS OUTSIDE PROFESSIONALS EYES ONLY INFORMATION
PROFESSIONALS' EYES ONLY/HIGHLY CONFIDENTIAL—SUBJECT TO PROTECTIVE ORDER

RESOLVED, that Theresa Muchnick, as the Vice President, Quality Assurance of the Corporation and the Partnership, be and she hereby is authorized and directed to report to the President and Chief Executive Officer; and further

RESOLVED, that the Corporation for itself and on behalf of the Partnership be and it hereby is authorized and directed to create a new position of Chief Compliance Officer reporting to the President and Chief Executive Officer of the Corporation and the Partnership. The President and Chief Executive Officer is hereby directed to find senior level executive candidates to be considered by the Board of Directors of the Corporation as soon as possible for this position of Chief Compliance Officer of the Corporation and the Partnership; and further

RESOLVED, that although no public announcement of the reorganization of the Partnership shall be made, the Corporation and the Partnership be and they hereby are authorized and directed to release on March 6, 2003 to employees the announcement in the form attached hereto as Schedule 3.

There being no further business to come before the Meeting, the same was, upon motion, adjourned.

_____
Stuart D. Baker

NY2 - 358817.01

PUBLICLY FILED PER STIPULATION [ECF 2140]

PROFESSIONALS' EYES ONLY/HIGHLY CONFIDENTIAL—SUBJECT TO PROTECTIVE ORDER    PPLPUCC500647322

REDACTED - CONTAINS OUTSIDE PROFESSIONALS' EYES ONLY INFORMATION

HIGHLY SENSITIVE MATERIAL - SUBJECT TO PROTECTIVE ORDER

<u>SCHEDULE 3</u>

FOR RELEASE AFTER DINNER MARCH 6, 2003, FOLLOWING VERBAL
NOTIFICATIONS TO SELECTED INDIVIDUALS AND ALL VICE PRESIDENTS


Dear Colleagues,

We are pleased to be writing to you today to inform you of the following organizational
changes that will take effect immediately:

Dr. Richard S. Sackler has been appointed and will serve with Dr. Mortimer D. Sackler
as Co-Chairmen of the Board of Directors of Purdue Pharma Inc., the general partner
of Purdue Pharma L.P. (PPLP).  Drs. Mortimer D. Sackler and Raymond R. Sackler
will serve as Co-Chairmen of the Board of Directors of The Purdue Frederick Company
(PF).

Mr. Michael Friedman has been appointed President and Chief Executive Officer of
PPLP and PF, reporting to the Co-Chairmen, and to the respective Boards of Directors
of these companies.

Michael will direct and guide all company operations, including: Sales and Marketing;
Licensing and Business Development; Research and Development, including
Regulatory Affairs; Human Resources; Law; Security; Corporate Affairs; Finance;
Production; and Quality Assurance and Control.

Michael is eminently qualified to lead the company at this time in its development.  He
has been associated with the owners of the company for close to twenty years and with
Purdue for the last eighteen years.  Most important, Michael shares our absolute
commitment to patients and physicians.

The Boards of Directors will establish fundamental business policies, participate in all
major decisions and continue to guide the management on an ongoing basis. We expect
that these changes will enable us to continue to enhance Purdue's commitment to
patients and physicians.

The Boards of Directors

PUBLICLY FILED PER STIPULATION [ECF 2140]

PROFESSIONALS' EYES ONLY/HIGHLY CONFIDENTIAL—SUBJECT TO PROTECTIVE ORDER    PPLPUCC500647349

UNREDACTED - CONTAINS OUTSIDE PROFESSIONALS' EYES ONLY INFORMATION
REDACTED SUBJECT TO PROTECTIVE ORDER

# EXHIBIT 144

**Executive Committee Meeting**
**Notes & Actions**

**Wednesday, September 21st, 2011**
**9:00am – 12:00 Noon**
**Board Room**

Present:    Robin Abrams    (RA)        Ed Mahony        (EM)
            Stuart Baker    (SDB)       Alan Must        (AM)
            Russ Gasdia     (RG)        Richard  Silbert (RS)
            David Haddox    (DJH)       John H. Stewart  (JHS)
            David Long      (DL)        Gary Stiles      (GLS)
            David Lundie    (DRL)       Phil Strassburger (PS)
            Bill Mallin     (WM)        Bert Weinstein   (BW)

---

## 1.  Introduction - J. Stewart

John Stewart opened the meeting, noted that prescriptions for OxyContin no longer appear to be in a state of decline, and that 2011 sales of the product should be at about the same level as in 2010. He added that the new formulation certainly appears to be helping reduce abuse, as evidenced by reports from law enforcement and preliminary data from Purdue's own epidemiology studies.  It is hoped that as awareness of the new formulation's impact on abuse becomes more widespread, there will be an associated positive impact on willingness to use the product in appropriate patients with chronic, non-malignant pain.  He added that he would be speaking on the subject of pain, prescription drug abuse and Purdue's anti-abuse activities at Sacred Heart University the following week.

With respect to Butrans, he said that prescriptions continue to increase, but at only about 50% of the rate that was originally forecast.  Nevertheless, the product does appear to be among the most successful new products launched in the past year – and that more information about new product launches should be forthcoming from IMS.

He said that Glen Oclassen of Transcept has been in close contact throughout their discussions with the FDA, and that it seems highly likely that approval of Intermezzo will follow the change in the recommended dose for women – from 3.5mg to 1.75mg.  Transcept's target for formally replying to the agency is sometime next week, and if they receive a 60 day review - the product will likely be approved in late November.

With respect to the Strategic Business Plan, J. Stewart said that the groups writing the implementation chapters,  assisted by John Donovan, have met several times – and that Bill Mallin will be developing a timeline showing due dates for draft reports, review meetings and final reports. He added that from the product perspective, agents for the treatment of neuropathic pain remain a

[ PAGE  \* MERGEFORMAT ]

PUBLICLY FILED PER STIPULATION [ECF 2140]

UNREDACTED - CONTAINS OUTSIDE PROFESSIONALS' EYES ONLY INFORMATION

key target – both via acquisition of existing marketed products as well as through developing new indications for existing Purdue products (e.g. Targin).

He mentioned that the Leadership Council had recently met with him, and that they had proposed to work more closely with the Executive Committee – in order to be able to increase the value they bring to the company.

**Post Meeting Note:**  a copy of an updated version of the Leadership Council's presentation/proposal is attached.

J. Stewart noted that development of the 2012 Budget is already well underway and reminded everyone that the original 2011 sales projections were more than $1 billion higher than the latest estimate, and that 2012 sales projections appear to be at about the same level as the company experienced in 2009 and 2010.  As such, for 2012, departments should look to reduce their expenditures where possible, and only bring forward recommendations for increased headcount where they are clearly associated with projects that will generate increased sales and profitability in the future (e.g. new product development, cost avoidance/reduction, etc.)

His final comment was in reference to Board Meetings, where there is an interest from both Board Members and Management that the agendas/discussions focus more on major issues of strategy or operations, and less on updates and minor decisions.  Toward that end, he asked all Executive Committee members to review the issues they had brought to the Board over the past 2 years – and to bring forward a list of those that they recommended somehow be handled outside of Board Meetings.

At the same time, Executive Committee Members should bring forward a list of actions/items that they felt the Board could undertake – so as to improve the efficiency of the company.

[ EMBED PowerPoint.Show.12  ]

2.  **Commercial Product Portfolio Committee - M. Innaurato/R. Gasdia/ B. Weingarten**

    2.1  **Intermezzo - J. Risco**

        B. Weingarten, J. Risco, M. Innaurato, and R. Gasdia provided an overview of the Intermezzo launch plans and preliminary budget. The update included label changes on dosage and administration, review of marketing materials based upon the changes, new market research plans to update the sales forecast, and the launch timeline - likely 2Q 2012. The 2011 budget and actual spend was reviewed, but there was no review of the 2012 budget as it is still under development.   Key actions arising out of the presentation were:

        i.    Hold follow up meeting with Jeff Zerillo, to finalize launch production timelines based on an end of November 2011 approval.

[ PAGE  \* MERGEFORMAT ]

PUBLICLY FILED PER STIPULATION [ECF 2140]

HIGHLY  CONFIDENTIAL—SUBJECT
TO PROTECTIVE ORDER

   ii.    Based on the launch production timeline, establish a launch meeting date and physician selling date.

   iii.   Work with BBU Members to finalize the budget recommendation for 2012.

   iv.   Initiate market research to determine any impact on the sales forecast of the new wording in the proposed FPI, and to provide additional assurance of the validity of the original sales forecast.

   v.    Finalize a sales forecast for 2012 and 2013.

Actions:  J. Risco/R. Gasdia

[ EMBED PowerPoint.Show.12 ]

## 3.   Business Development - J. Dolan

**3.1   Vulcan Status Report** – J. Dolan said that he would be meeting with the President of Vulcan Laboratories on October 5th and advising them that, given the recent public announcement on the outcome of the "301" pivotal study, that if we move forward, Purdue will essentially be re-starting the negotiation for this product "from scratch".  If we reach any agreement it would highly likely be on the terms of Purdue assuming responsibility for and control of the conduct of any additional efficacy/safety studies required for approval. If this is conceptually acceptable to Vulcan, it is possible that the product may still be commercially viable – if the studies can be completed and the product approved prior to 2015, and also with much more favorable (to Purdue) deal terms.

J. Dolan also provided an overview of the neuropathic pain product landscape, focusing on those products that are potentially available to development partners. This analysis indicates there are no products with novel mechanisms of action, including those in our pipeline, that are expected to launch prior to 2016. J. Dolan also updated the Executive Committee on late-stage opportunities, including milnacipran for fibromyalgia.

[ EMBED PowerPoint.Show.12 ]

## 4.   R&D Operating Committee        C. Landau/P. Coplan/H. Chilcoat

**4.1**   P. Coplan and H. Chilcoat provided and update on the OxyContin NAVIPRO study findings. The NAVIPRO study provides the first formal post-market epidemiology data on re-formulated OxyContin and has potential to impact on the product's safety data.  The outcomes of this study (see attached) include a reduction in rates of abuse, shifts in rates of abuse, especially away from injecting and snorting, and reductions in diversion.  This study has been accepted for publication in PAIN Week, and a poster was recently presented at a medical meeting in Las Vegas - to very positive review.

[ EMBED PowerPoint.Show.12 ]

**4.2   Findings from the "Region 0" Analysis -  H. Chilcoat/R. Abrams**

[ PAGE  \* MERGEFORMAT ]

PUBLICLY FILED PER STIPULATION [ECF 2140]

RSF_OLK00035019

UNREDACTED - CONTAINS OUTSIDE PROFESSIONALS' EYES ONLY INFORMATION
PREPARED AT THE REQUEST OF COUNSEL IN ANTICIPATION OF LITIGATION

H.  Chilcoat and R. Abrams updated the Executive Committee on Region 0 - those prescribers identified by Purdue as having peculiar patterns of prescribing. Through Purdue's Abuse and Diversion Detection Program, approximately 1900 such prescribers have been identified – and they make up Region 0. Using IMS Xponent data over a 2 year period and studying Region 0 active prescribers at the time of ORF introduction, the analysis showed much larger declines in the number of OxyContin scripts with Region 0 prescribers versus other prescribers – with the most significant decline being seen for the 80mg strength.  30% of all prescribers in Region 0 stopped writing scripts for OxyContin altogether, and there was a corresponding increase in oxycodone IR scripts.  The study, like the NAVIPRO data, provides objective data to both Purdue and the regulatory agencies to better understand the impact of the new formulation.

[ EMBED PowerPoint.Show.12  ]

## 5.  Departmental Issues/Other Business

### 5.1   Update on 2012 Budget Planning - E. Mahony

E. Mahony reported that preparations for the 2012 Budget are on schedule. A final draft agenda for the meetings will be sent out this week, along with a presentation template. All presentations need to be reviewed and completed in time for the October 25th review.

Action:  All

### 5.2   Strategy Implementation

#### 5.2.1  Update on Key Objectives Action Plan        B. Mallin/All

B.  Mallin gave an update on the six objectives (the "how and when" of implementing the strategy), including a comprehensive timeline for developing each of these objectives - with a target completion date of October 17th. The first three objectives, which are the key commercially driven objectives, were reviewed with the Executive Committee during the meeting. B.  Mallin also noted that the 2012 Budget would include some, but not all, of the investment proposals – including some limited headcount additions.

**Strategic Objective #1 –** Model to enhance the R&D pipeline - J. Dolan/G. Stiles/A. Downs/D. Kyle/C. Landau

i.    J. Dolan and C. Landau reviewed Objective #1 as part of strategic planning – New Models/Approaches to enhance the existing pipeline as follows:

ii.   Multiple work streams are ongoing in support of pipeline development, Purdue's pipeline interests and Purdue's overarching business strategy.

iii.  Activities involve groups/personnel within and outside of R&D.

[ PAGE  \* MERGEFORMAT ]

PUBLICLY FILED PER STIPULATION [ECF 2140]

UNREDACTED - CONTAINS OUTSIDE PROFESSIONALS' EYES ONLY INFORMATION
HIGHLY CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

    iv.    A key initiative is the creation and implementation of a new process and corresponding structure (R&D Innovation) to support identification, evaluation and pursuit of early stage (including pre-POC) drug and non-drug opportunities.

    v.    Non-drug opportunities include services, diagnostics, devices and development of new data sources to inform the practice of medicine (pain management) and support our vision of becoming a more comprehensive "pain management" company.

    vi.    BDC and R&D Innovation will work in concert, to identify, evaluate, and recommend opportunities to pursue.

    vii.    The R&D Innovation group will be led by a dedicated head (currently being recruited), and will create, implement and operationalize an R&D driven strategy for pursuit of early drug and non-drug opportunities that support Purdue's overall business strategy.

    viii.    The content of the innovation strategy will be driven and managed by the heads of the R&D disciplines such as Discovery Research, Pharmaceutics, Risk Management & Epidemiology, Clinical Research, etc.

    ix.    The opportunities under consideration and those recommended for pursuit will be vetted through the BDC.

    x.    All research agreements or "deals" will be managed by LBD, with appropriate support from relevant R&D and non-R&D disciplines.

[ EMBED PowerPoint.Show.12 ]

**Strategic Objective #2** – Develop success criteria for marketed products - G. Stiles/P. Coplan/T. Killian/J. Risco/R. Gasdia

G. Stiles updated the group on Strategic Objective #2, "Develop Success Criteria for Marketed Products" which is a three-phase plan to drive customers to Purdue Products, serve patient and public health needs, help manage healthcare costs, and provide increased commercial value. This plan will include demonstrating abuse-deterrence value, improving the practice of pain management, improving safety and side effect profiles, identifying diverse pain management options, and a greater focus on pharmaco-economic studies, health outcomes research and epidemiology data/risk management data.

**Strategic Objective #3** – Develop a suite of pain management support services -  R. Gasdia/M. Ronning/T. Richards/L. Miller/C. Landau

[ PAGE \* MERGEFORMAT ]

HIGHLY  CONFIDENTIAL—SUBJECT
TO PROTECTIVE ORDER

RSF_OLK00035021

UNREDACTED - CONTAINS OUTSIDE PROFESSIONALS' EYES ONLY INFORMATION
FILED UNDER SEAL PER PROTECTIVE ORDER

R. Gasdia reported that work on Strategic Objective #3, which is to develop a plan for a suite of support services to our customers, is underway - with early focus on the nurse educator program, development of a web portal for patient, Managed Care and health systems access, and other non branded efforts. This group plans to meet later this week to develop additional specific objectives.

B. Mallin reported that he and D. Long had met with the Leadership Council to review a communication plan for the strategy. The recommendations of the Leadership council were very well developed, and can serve as the starting point for a comprehensive communication plan. It was agreed to bring the communication plan to Executive Committee Members, and to anticipate the communications to begin post-budget.

5.3     Follow-Up Action Items from the July 20th, 2011 Executive Committee Meeting were originally planned, but were not covered due to time constraints.

   5.3.1  Organizational Development – identify areas of "best practice".

6.     Next meeting – New date is November 21st at 9am in the Board Room.  No dinner will be held the prior evening.

**Distribution**

Stuart Baker
Jim Dolan
Russ Gasdia
Mark Geraci
David Haddox
David Long
David Lundie
Ed Mahony
Bill Mallin
Alan Must
Burt Rosen
Gary Stiles
Phil Strassburger
Robin Abrams
Richard Silbert
Bert Weinstein

[ PAGE  \* MERGEFORMAT ]

PUBLICLY FILED PER STIPULATION [ECF 2140]

HIGHLY  CONFIDENTIAL—SUBJECT
TO PROTECTIVE ORDER

UNREDACTED - CONTAINS OUTSIDE PROFESSIONALS' EYES ONLY INFORMATION
TREATED AS HIGHLY CONFIDENTIAL - SENSITIVE



PUBLICLY FILED PER STIPULATION [ECF 2140]

HIGHLY  CONFIDENTIAL—SUBJECT
TO PROTECTIVE ORDER

RSF_OLK00035023

UNREDACTED - CONTAINS OUTSIDE PROFESSIONALS' EYES ONLY INFORMATION
TREATED SUBJECT TO PROTECTIVE ORDER

# EXHIBIT 146

UNREDACTED - CONTAINS OUTSIDE PROFESSIONALS' EYES ONLY INFORMATION
TREAT AS SUBJECT TO PROTECTIVE ORDER

CONFIDENTIAL

Memorandum to
John Stewart
Russ Gasdia

From
McKinsey & Company

September 11, 2013

# Identifying Granular Growth Opportunities for OxyContin: 20 Specific Recommendations

In June, Purdue engaged McKinsey to conduct a detailed assessment of the underlying drivers of current OxyContin performance, identify key opportunities to increase near-term OxyContin revenue and develop plans to capture priority opportunities.

We have now completed our work and the findings suggest that there is significant opportunity to improve OxyContin performance - despite strong trends that may be making the opioid marketplace challenging for the foreseeable future. .

OxyContin remains quite promotionally sensitive and this drives the significant scale of the opportunity for Purdue, in our estimate could be hundreds of millions in revenue on an annualized basis.   Our full diagnostic findings are detailed separately.

This memo provides a summary of our key recommendations spanning the seven areas that we explored most deeply.  We have 20 specific recommendations organized into the following seven areas:

- Turbocharging Purdue's Sales Engine
- Messaging
- Health Economics and Outcomes Activities
- Access and Availability
- Commercial Benchmarking and Resourcing
- Market Demand ForecastingMoving Forward

Given the April 16th FDA decision and OxyContin's updated labeling, we strongly urge Purdue to aggressively seize these opportunities and begin action immediately.

1

PUBLICLY FILED PER STIPULATION [ECF 2140]

## A. Turbocharging Purdue's Sales Engine

We recommend you take actions to 'Turbocharge Purdue's Sales Engine' and optimize across all elements of the sales model – from prescriber targeting to territory alignment to aligning incentive compensation.

The rationale for addressing Purdue's sales model holistically is strong. Our findings demonstrate the breadth of issues and how they are inter-related. For example, despite the significant value in improving Purdue's targeting, the value cannot be captured unless the field improves its level of adherence to the new call plan.

Therefore, we recommend a set of immediate actions:

1.  Create a senior team to lead this effort (no more than three executives within and outside Sales) and task them to develop a detailed workplan within 30 days.

2.  Establish an incremental revenue goal vs forecast (e.g., $150M annualized incremental stretch goal by July 2014) and set regular progress reviews with the appropriate groups

3.  Shift Purdue's sales targeting from decile to workload (industry norm that more precisely defines the value of physicians) incorporating measures beyond total ERO prescriptions.

4.  Increase field effort significantly for OxyContin through improved productivity (e.g. raise the number of OxyContin primary calls by ~60% above current 1H 2013 run-rate, from 37 to 59 primary details per month per rep ) and closely measuring changes in sales

5.  Take actions to drive field adherence with recommended call targets, including adjustment of the incentive compensation to reflect the greater field effort on OxyContin.

6.  Perform similar analyses for Butrans and the near term pipeline to align on a portfolio level field resourcing plans to ensure that the sales transformation builds a strategic platform for the future. (Butrans was not part of our project's scope)

7.  Explicitly consider the strategic addition of ~65-230 OxyContin reps and various options (e.g., a CSO overlay to get increased frequency). There are multiple factors to be considered including leadership perspectives on: 1) desire for a "belt and suspenders" lower risk approach to delivering the near term forecast 2) how much change the current organization can realistically deliver 3) required resources for Butrans and expected future pipeline. This is the kind of decision we would expect the senior team to vigorously debate.

Our experience with other pharmaceutical companies suggests that such a comprehensive sales transformation program takes nine months, although positive revenue impact will be seen within 2-3 months. It is critical that Purdue commits to addressing this sales transformation as an organizational journey, not an event. Success requires not only the analytic answer, but even more importantly winning the hearts and minds of the sales force and fundamentally changing

2

PUBLICLY FILED PER STIPULATION [ECF 2140]

UNREDACTED - CONTAINS OUTSIDE PROFESSIONALS' EYES ONLY INFORMATION
SUBJECT TO FRE 408 AND COMMON INTEREST PRIVILEGE

how the company operates including both the sales force and home office. New capabilities such as workload-based targeting and sales analytic capabilities will need to be learned and reinforced on a daily basis. The organizational mindset, behavior and culture will all need to evolve along the journey.

## B. Messaging

The new OxyContin label is a significant opportunity for differentiation that has not been fully leveraged. Many specialists, who fully understand the label appreciate the benefit, have reported changing their prescribing behavior. But many primary care prescribers are unaware of or misunderstand the label change. Increased prescriber education on Abuse Deterrence is clearly needed, not just on the product attributes but also on the characterization of the risk of abuse. Many prescribers have a misunderstanding about their own ability to predict the risk of abuse in individual patients. Given the nature of the Abuse Deterrence information needed, we believe the education should be led by Medical.

8. Significantly improve physician awareness and understanding of the new label, primarily through medical resources and training of the sales reps on ways to appropriately involve Medical.

9. In parallel, new prescriber segmentation should be developed in light of the new label. For example, prescribers can be targeted for messaging of the label based on awareness of the reformulation, or in geographic areas with high abuse rates.

## C. Health Economics and Outcomes Activities (HECON)

HECON is becoming increasingly important – from payors to corporatized providers to physicians. Today Purdue does not proactively engage payors on HECON issues and only responds to unsolicited requests. Therefore Purdue is not proactively sharing its new label and the supporting data to help inform formulary decisions. We are not aware of another pharmaceutical company in the US that takes this approach. Rather we see pharmaceutical companies increasing resources, in HECON and payor groups, and even growing numbers of institutional reps and key account managers empowered to engage in these types of economic discussions.

Purdue's strategy has led to an undersized and underutilized HECON team. We recognize that HECON to support OxyContin and other pain products is more challenging than in other therapeutic areas due to comparison to generics and general reliance on quality of life

3

PUBLICLY FILED PER STIPULATION [ECF 2140]

UNREDACTED - CONTAINS OUTSIDE PROFESSIONALS' EYES ONLY INFORMATION

measurements vs avoidance of costly alternative care. However your portfolio and the evolving landscape stress the importance of real effort in this area.

10. Urgently re-consider Purdue's practice of not pro-actively engaging with payors on data. If reversed, increase resourcing to strengthen Purdue's value propositions to payors, such as reduction in abuse rates for patients switched to AD or annual costs of opioid abusers.


## D. Access and Availability

Access to OxyContin for some patients has become quite challenging in specific locations. This is due to a combination of factors including: state-level laws and regulations, DEA initiatives, PROP activities, wholesaler initiatives, national pharmacy policies, and local pharmacist perceptions.

While the wholesaler issues are quite visible and real, we believe the decisions being made at pharmacies, while less publicly visible, are in fact creating far greater access issues.

Walgreens, in particular, is having material impact on patients – reducing its units purchased by 18% in just the last three months. This Walgreens reduction alone accounts for 50-70% of the total OxyContin decline in units in that period. In April, Walgreens rolled out national opioid dispensing guidelines. Separately, as part of their agreement with the DEA, Walgreens eliminated controlled substances from their bonus calculations for pharmacists. Thus individual pharmacists effectively lose money every time they accept the work of fulfilling an opioid prescription.

While Walgreens is currently having the most dramatic impact, there is reason to believe that many other chains either have implemented (e.g., CVS in 2012) or are considering similar policies. Thus the pharmacy access issue is both urgent and broad.

11. Significantly increase insight on pharmacy-level dynamics through purchasing of new data (e.g., CVS and Rite-Aid purchasing, pharmacy segmentation in OMS) and create a working team with responsibility for monitoring the situation on a monthly basis

12. Initiate direct executive committee level engagement with pharmacy leadership to show urgency and build a win-win partnership for patients.

13. In parallel, aggressively explore alternative distribution options (e.g., pharmacy direct mail order) via a senior level cross-functional team.

While Managed Care is an unlikely source of near term opportunity, we did uncover two findings that suggest there are some actions that can be taken quickly. First, Purdue has experienced significant drop offs in the commercial book of business related to decisions in Part D. Second, territories within the same states appear to have wide differences in pull through even with equivalent access.

4

PUBLICLY FILED PER STIPULATION [ECF 2140]

UNREDACTED - CONTAINS OUTSIDE PROFESSIONALS' EYES ONLY INFORMATION
HIGHLY CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

14. Develop a comprehensive Part D strategy that includes review of the rebate plan and local field surge to mitigate commercial plan spillover.

15. Incorporate differential local market access conditions into standard DM business planning.


## E. Commercial Benchmarking and Resourcing

In comparison to other mature products of similar size and prescriber mix (primary care and specialty), OxyContin resourcing appears consistently low.  From promotional spend per revenue dollars to the number of MSLs to field force and brand team size, OxyContin is consistently and substantially below benchmarks.

While this kind of analysis should only be used a directional guide, the consistency of the results points to an opportunity for profitable increased investment – particularly with the FDA decision and consistent with a more proactive mindset.

16. As part of the upcoming cycle, broadly consider increasing current resourcing levels for OxyContin, with clear business cases and ROIs.


## F. Market demand and forecasting

Forecasting is never perfectly accurate and will always be subject to error.  However, Purdue can take steps to increase its level of market insight and its accuracy.

17. Increase market research efforts particularly in quantifying emerging marketplace dynamics. This will require additional resources to purchase new data (e.g., corporatized providers, complete formulary status, CVS data) and additional capacity to analyze the data and recommend specific actions.

18. Shift to more 'local market analyses' to uncover the most relevant insights and opportunities that may not be noticed/incorporated at the national level.  For example, patient savings cards could be more focused in areas of lower income or higher Tier 3 managed care access (where copays are higher).  Or targeting could be focused on 'biggest losers' to quickly identify important prescribers.

19. Consider establishing a Sales Analytics function to 'own' and deliver improved tools and insights to the field, working in close partnership with the FAMR group.


## G. Moving Forward

5

PUBLICLY FILED PER STIPULATION [ECF 2140]

UNREDACTED - CONTAINS OUTSIDE PROFESSIONALS' EYES ONLY INFORMATION
SUBJECT TO PROTECTIVE ORDER

Purdue has had a remarkable history of success. We see significant opportunity to further drive performance and openness to the scale of change that is needed. Many of these recommendations will take significant effort by Purdue and come with real implementation risk.

20. While pursuing these near term opportunities, Purdue must take the time to develop an overall master plan and set timing expectations accordingly - making daily progress but also optimizing for sustainable impact.

6

PUBLICLY FILED PER STIPULATION [ECF 2140]

CONFIDENTIAL

UNREDACTED - CONTAINS OUTSIDE PROFESSIONALS' EYES ONLY INFORMATION
REDACTED SUBJECT TO PROTECTIVE ORDER

# EXHIBIT 150

UNREDACTED - CONTAINS OUTSIDE PROFESSIONALS' EYES ONLY INFORMATION
PREPARED UNDER FRE 408 AND PROTECTIVE ORDER

# Changes in prescriptions of OxyContin and OPANA ER after introduction of tamper resistant formulations among potentially problematic and comparator prescribers

Howard Chilcoat
Robin Abrams
Sayee Natarajan
Paul Coplan

Purdue Pharma, L.P.

PUBLICLY FILED PER STIPULATION [ECF 2140]

UNREDACTED - CONTAINS OUTSIDE PROFESSIONALS' EYES ONLY INFORMATION TREAT SUBJECT TO PROTECTIVE ORDER

# Distribution of number of OxyContin Rx per month pre-ORF for Region 0 and comparator prescribers



- Region 0 Prescribers (n=364)
  - Mean = 61.1/month
  - Median = 36.5/month
  - IQR = 15.0 – 77.5/month

  Account for 16% of oxycodone 30mg and 14% of OxyContin 80mg prescriptions nationwide

- Comparator Prescribers (n=19,703)
  - Mean = 14.4/month
  - Median = 9.0/month
  - IQR = 5.0 – 15.0/month

PUBLICLY FILED PER STIPULATION [ECF 2140]

8

UNREDACTED - CONTAINS OUTSIDE PROFESSIONALS' EYES ONLY INFORMATION
TREAT SUBJECT TO PROTECTIVE ORDER

# EXHIBIT 154

PUBLICLY FILED PER STIPULATION [ECF 2140]

UNREDACTED - CONTAINS OUTSIDE PROFESSIONALS' EYES ONLY INFORMATION
TREATED AS HIGHLY CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

# 2013

# OxyContin®

## (oxycodone HCL controlled-release) Tablets

# Annual Marketing Plan

Updated October 6, 2013

PUBLICLY FILED PER STIPULATION [ECF 2140]

CONFIDENTIAL                                                                    PAK000062549

UNREDACTED - CONTAINS OUTSIDE PROFESSIONALS' EYES ONLY INFORMATION
PREPARED AT THE DIRECTION OF COUNSEL - PRIVILEGED

# 2013 Annual Marketing Plan for OxyContin®

*Table of Contents*

1.  MARKET OVERVIEW / SITUATIONAL ANALYSIS ...................................... 4
    1.1  Market Definition ...................................................................... 4
    1.2  Market Performance and Competition ........................................ 5
        ▪ Dollar Volume ......................................................................... 5
        ▪ Prescription Volume ................................................................ 6
        ▪ Prescribers ............................................................................. 8
        ▪ Market Promotion .................................................................... 8
    1.3  Payer Environment ...................................................................... 9
    1.4  Issues / Challenges .................................................................. 11

2.  PRODUCT SUMMARY for OxyContin® ................................................ 14
        ▪ Indications and Usage ........................................................... 14
        ▪ Clinical Pharmacology ........................................................... 14
        ▪ How Supplied ........................................................................ 15
        ▪ Dosage and Administration .................................................... 15
    2.1  Positioning .............................................................................. 15
    2.2  Messaging ............................................................................... 15
    2.3  Target Audiences ..................................................................... 17
        ▪ Prescribers ........................................................................... 17
        ▪ Retail Pharmacies ................................................................. 17
        ▪ Managed Care Organizations ................................................ 17
    2.4  Sales Force Priorities ............................................................... 18
    2.5  Contracting / Rebating ............................................................. 19

3.  MARKETING PLAN RECOMMENDATIONS ........................................... 20
    3.1  Goal / Objective ....................................................................... 20
    3.2  Critical Success Factors ........................................................... 20
    3.3  Strategies, Tactics, and Key Initiatives ..................................... 20

4.  BUDGET and FINANCIALS .............................................................. 23
    4.1  Budget for 2013 ....................................................................... 23
    4.2  Forecast .................................................................................. 23
    4.3  P&L ........................................................................................ 24

5.  LIFE CYCLE MANAGEMENT .......................................................... 25

6.  PIPELINE COMPETITION .............................................................. 26
    6.1  Late-Stage Development .......................................................... 26

PUBLICLY FILED PER STIPULATION [ECF 2140]
CONFIDENTIAL                                                                          PAK000062550

UNREDACTED - CONTAINS OUTSIDE PROFESSIONALS' EYES ONLY INFORMATION
SUBJECT TO PROTECTIVE ORDER

7.    APPENDICES ............................................................................................................. 28

    7.1    Medical Services ............................................................................................. 28

    7.2    Marketing Education and Conventions ........................................................... 28

    7.3    Medical Research ............................................................................................ 28

    7.4    eMarketing....................................................................................................... 28

    7.5    Sales Operations ............................................................................................. 29

    7.6    Sales Training ................................................................................................. 29

    7.7    Medical Liaisons ............................................................................................ 31

    7.8    Market Research ............................................................................................. 31

    7.9    Public Affairs ................................................................................................. 31

    7.10    Sales Management ........................................................................................ 31

    7.11    Product Supply ............................................................................................. 31

    7.12    Early-Stage Development .............................................................................. 31

    7.13    List of Acronyms and Abbreviations............................................................ 31

    7.14    Sources .......................................................................................................... 34

PUBLICLY FILED PER STIPULATION [ECF 2140]

CONFIDENTIAL

PAK000062551

- **Prescribers**

In 2012: 209,066 healthcare providers (HCP) wrote at least one prescription for OxyContin. For the first 6 months of 2013: 165,137 HCPs wrote at least one prescription for OxyContin.

### January – July 2013 Prescribers

| TRx Decile | # Physicians | % Physicians | # Rx | Mean Rx / Physician/Month |
|---|---|---|---|---|
| 10 | 358 | 0.2% | 617,887 | 246.6 |
| 9 | 778 | 0.5% | 617,624 | 113.4 |
| 8 | 1,300 | 0.8% | 617,149 | 67.8 |
| 7 | 2,182 | 1.4% | 617,248 | 40.4 |
| 6 | 3,613 | 2.3% | 617,056 | 24.4 |
| 5 | 5,668 | 3.5% | 617,075 | 15.6 |
| 4 | 8,668 | 5.4% | 617,056 | 10.2 |
| 3 | 13,636 | 8.5% | 617,048 | 6.5 |
| 2 | 24,399 | 15.2% | 617,331 | 3.6 |
| 1 | 99,825 | 62.2% | 620,667 | 0.9 |

- **Retail Pharmacies**

Approximately 35,000 retail pharmacies are stocked with OxyContin.

- **Managed Care Organizations**

The key Commercial accounts listed below represent 56% of OxyContin sales.

| Provider/Plan | Lives | Formulary Status | Market Share TRx | 1st Qtr 2013 Gross Sales | Rolling 12 months as of March 2013 TRx Trend lines |
|---|---|---|---|---|---|
| **Commercial** | | | 25.8% | $395,398,880 | |
| CVS/Caremark | 27,087,808 | Tier 2 | 27.3% | $72,543,505 | |
| Express Scripts | 12,249,248 | Tier 2 | 28.5% | $57,716,623 | |
| Medco Health | 14,674,244 | Tier 2 | 29.8% | $55,332,213 | |
| United HealthCare | 12,111,259 | Tier 2 QL | 26.4% | $20,908,620 | |
| Prime Therapeutics | 13,500,000* | Tier 2 | 27.7% | $15,767,177 | |

The key Medicare Part D accounts listed below represent 75% of OxyContin sales.

| Provider/Plan | Lives | Formulary Status | Market Share TRx | 1st Qtr 2013 Gross Sales | Rolling 12 months as of March 2013 TRx Trend lines |
|---|---|---|---|---|---|
| **Part D** | | | 19.6% | $200,070,376 | |
| AARP/UHC | 7,035,934 | Preferred | 24.5% | $61,780,501 | |
| Caremark L.L.C.(including Member Health) | 6,048,047 | Preferred | 24.5% | $52,069,570 | |
| Medco Health Solutions | 2,086,630 | Preferred | 24.0% | $14,755,810 | |
| CIGNA Healthcare - CGLIC | 753,549 | Preferred | 29.1% | $12,131,216 | |
| Express Scripts | 2,380,487 | Preferred | 28.5% | $8,985,101 | |

PUBLICLY FILED PER STIPULATION [ECF 2140]

CONFIDENTIAL
PAK000062565

UNREDACTED - CONTAINS OUTSIDE PROFESSIONALS' EYES ONLY INFORMATION
HIGHLY CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

 

C.  Leverage MC coverage in plans where OxyContin is under-indexed through nonpersonal channels to close the gap

D.  Partner with Tier 2 MC plans to reach aligned prescribers about plan coverage for OxyContin

**5.  Support NBRx and continuing Rx goals by more precisely prioritizing and targeting prescribers with tailored messages and channels** [ ACAM 14-Aug-12 Slide 46]

A.  Maintain a competitive share of voice (SOV) with Nucynta ER and Opana ER

B.  Optimize P1 target list to focus on high writers of NBRx brands, and ensure 90%+ of P1 OxyContin calls are delivered

C.  Leverage established relationship marketing (RM) infrastructure to more precisely target prescribers by behavior with the most relevant message

D.  Target NPs and PAs as prescribers who are higher users of digital resources and are actively seeking information

For details on tactics and key initiatives, refer to ACAM 2013 tactical plans and 2013 master budget for OxyContin.

PUBLICLY FILED PER STIPULATION [ECF 2140]

UNREDACTED - CONTAINS OUTSIDE PROFESSIONALS' EYES ONLY INFORMATION
TREATED AS HIGHLY CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

# EXHIBIT 155

PUBLICLY FILED PER STIPULATION [ECF 2140]

UNREDACTED - CONTAINS OUTSIDE PROFESSIONALS' EYES ONLY INFORMATION

**BOARDS OF DIRECTORS MEETINGS**
**(U.S. Companies)**

**Thursday, August 15, 2013**

**AGENDA**

1. Interim Decisions

   - None

2. Pending Decisions

   - None

3. Key Hires Update **(25 Minutes)**

4. R&D Report - Staffing Update **(15 Minutes)**

5. Abuse Deterrent Formulations - Pharmaco-Economic Studies **(20 Minutes)**

6. Targiniq® **(20 Minutes)**

7. McKinsey Report and Actions to be Taken **(30 Minutes)**

8. 2014 Budget Process **(10 Minutes)**

9. Other

CPAM: 5698362.1

**U.S. - 1**

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY                              PPLP004409890

PUBLICLY FILED PER STIPULATION [ECF 2140]

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER                              PPLP004409890

UNREDACTED - CONTAINS OUTSIDE PROFESSIONALS' EYES ONLY INFORMATION
REDACTED - FOR PUBLIC FILING - HIGHLY CONFIDENTIAL

# TAB 7

U.S. - 2

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

PPLP004409891

PUBLICLY FILED PER STIPULATION [ECF 2140]

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

PPLP004409891

UNREDACTED - CONTAINS OUTSIDE PROFESSIONALS' EYES ONLY INFORMATION
HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

CONFIDENTIAL

Memorandum to
John Stewart
Russ Gasdia

From
McKinsey & Company

August 8th, 2013

# Identifying granular growth opportunities for OxyContin: Addendum to July 18th and August 5th updates

This addendum highlights two additional findings since our July 18th and August 5th updates and specific actions we believe Purdue should take to begin to increase sales.

**1. Prescriber Targeting**

Our refined analyses confirm significant opportunity to improve sales through better targeting. We believe the upside is >$100 million in annual sales.

Today Purdue spends as much effort detailing the lesser value prescribers (decile 0-4) as it does on the higher value prescribers (decile 5-10). To put this in perspective, the average prescriber in decile 5-10 writes 25 times as many OxyContin scripts as a prescriber in decile 0-4. In Q1 2013 the majority (52%) of OxyContin primary calls were made to decile 0-4 prescribers. Including the secondary calls, 57% of the primary detail equivalents (PDEs) were made to decile 0-4 prescribers. Best practice in the industry is over 80% of effort on higher value prescribers. (Exhibit 1)

1

U.S. - 3

PUBLICLY FILED PER STIPULATION [ECF 2140]
CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER    PPLP004409892

UNREDACTED - CONTAINS OUTSIDE PROFESSIONALS' EYES ONLY INFORMATION
CONTAINS HIGHLY CONFIDENTIAL INFORMATION



Exhibit 1: OxyContin calls by market decile

Furthermore, 75% of the decline in OxyContin sales comes from prescribers that Purdue is not calling upon.  Two thirds of this decline is from prescribers in deciles 5-10.  (Exhibit 2)  In addition, the field sales force primary OxyContin calls are running at 65% of goal.

2

U.S. - 4

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY                PPLP004409893

PUBLICLY FILED PER STIPULATION [ECF 2140]

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER            PPLP004409893

**Exhibit 2: OxyContin TRx change at different levels of call activity**



Absolute Year over Year change in OxyContin TRx[1] by number of PDEs
Number of TRx

- **75% of the decline of OxyContin is concentrated in prescribers that Purdue does not call**

- The impact of calls is particularly strong in high-deciles: **two-thirds of the 96K decline among uncalled physicians occurs in deciles 5-10**

- Analysis also shows call sensitivity throughout range of PDEs

- This suggests that increased call activity may have a substantial impact on slowing the decline of OxyContin

**# OxyContin PDEs from April 2012-Mar 2013[2]**

|  | 0 | 0-4 | 4-8 | 8-12 | 12-16 | 16-24 | 24+ | OVERALL |
|---|---|---|---|---|---|---|---|---|
| Change | -95,700 | -37,700 | -14,900 | -900 | 1,100 | 8,600 | 10,000 | -127,000 |
| % decline in prescriber segment | -10% | -8% | -4% | 0% | 0% | 3% | 8% |  |
| # prescribers | 343K | 43K | 16K | 8K | 4K | 3K | 1K | 417K |

1 TRx change measured in absolute terms between 6 months ending in March 2012 and 6 months ending in March 2013
2 PDE (primary detail equivalent) calculated using 1.0 weight for a P1 and 0.5 for a P2

SOURCE: IMS, Purdue call data

McKinsey & Company | 1

Collectively these findings show significant opportunity to improve targeting and also emphasize the upside from improvement as OxyContin's responsiveness to calls appears significant.

## 2. Retail access

Access to OxyContin for some patients has become quite challenging in specific local markets. This is due to a combination of factors including: regulations, DEA initiatives, PROP, wholesaler initiatives and local pharmacist perceptions.

There is direct evidence of this reduced access through patient calls to Purdue's Medical Information line which have recorded a 300% increase in instances of patients reporting difficulty filling opioid prescriptions, often needing to travel to multiple pharmacies in an attempt to fill their prescription.

There are reports of wholesalers stopping shipments entirely to an increasing number of pharmacies, causing temporary supply disruptions. Although, it appears that pharmacies are able to secure alternative distributors.

3

U.S. - 5

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

PPLP004409894

PUBLICLY FILED PER STIPULATION [ECF 2140]

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

PPLP004409894

Many wholesalers are also imposing hard quantity limits on orders based on prior purchase levels. This restricts access for new and existing patients, especially in situations when an access challenge arises in a local pharmacy, the wholesaler quantity limits restrict the ability of other local pharmacies to pick up the displaced patients.

While the wholesaler issues are quite visible and real, we believe the daily decisions being made at local pharmacies, while less publicly visible, are in fact creating far greater access issues.

Walgreens, in particular, is having material impact on patients. In April, Walgreens rolled out national opioid dispensing guidelines. These guidelines are quite extensive and include 'flags' for new patients and dose limits which can clearly impact appropriate patient access. (Exhibit 3)

**Exhibit 3: Guidelines established by major pharmacy chains for opioid dispensing**



SOURCE: Purdue; Pharmacy expert interviews                    McKinsey & Company | 2

Separately, as part of their agreement with the DEA, Walgreens eliminated controlled substances from their bonus calculations for pharmacists. Thus individual pharmacists effectively lose money every time they accept the work of fulfilling an opiod prescription. Thus there is a strong dis-incentive for pharmacists to dedicate the extra time needed to maintain patient access to opiods, even independent of the chain's national guidelines on opioid dispensing.

4

**U.S. - 6**

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY                    PPLP004409895

PUBLICLY FILED PER STIPULATION [ECF 2140]

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER                    PPLP004409895

Deep examination of Purdue's available pharmacy purchasing data shows that Walgreens has reduced its units by 18% in just the last three months. In March – June, the Walgreens reduction alone can account for 50-70% of the total OxyContin decline in units. (Exhibit 4)

**Exhibit 4: OxyContin purchasing by pharmacy chain**   PRELIMINARY - IN VALIDATION



SOURCE: Market Visibility dataset; OMS

McKinsey & Company | 3

We have examined multiple zip codes where Walgreens is a major supplier, and the other local pharmacies have not seen offsetting increases in purchases – thus it appears that many of these patients are either going untreated or being forced to find alternatives.

Further, the Walgreens data also shows a significant impact on higher OxyContin dosages. Among Walgreen stores that stock OxyContin 20mg, in the last three months there has been a 21% reduction in the number of stores also purchasing the 80mg. It is also important to note that Walgreen's reduction in the 80mg far exceeds the national trend. Their share of national purchases of the 80mg has fallen by nearly 20%. Thus Walgreens is not simply reflecting lower demand, but apparently taking independent action to further reduce 80mg purchasing.

While Walgreens is currently having the most dramatic impact, there is reason to believe that many of the chains either have implemented (e.g., CVS in 2012) or are considering similar policies. Thus the pharmacy access issue is both urgent and broad.

The magnitude of today's patient access issues underscores the need to: (1) take immediate actions to address issues at pharmacies (e.g., ensure appropriate senior level dialogue with Walgreens, increase patient advocacy efforts); and (2) accelerate exploration of potential

5

**U.S. - 7**

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY                                   PPLP004409896

PUBLICLY FILED PER STIPULATION [ECF 2140]

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER                                   PPLP004409896

UNREDACTED - CONTAINS OUTSIDE PROFESSIONALS' EYES ONLY INFORMATION
PUBLICLY FILED PER STIPULATION [ECF 2140]

innovative alternatives such as direct-to-patient mail order which was described in our prior memo.

### 3. Specific actions to begin to increase Purdue's sales[1]

When combined with prior findings, the scale of change required in Purdue's sales force model is significant. Rather than addressing the pieces individually, we recommend you take actions to 'Turbocharge Purdue's Sales Engine' and optimize across all elements of the winning sales model – from targeting to territories to incentive compensation.

The rationale to for addressing Purdue's sales model holistically is strong. These findings demonstrate the breadth of issues and how they are inter-related. For example, despite the significant value in improving Purdue's targeting, the value cannot be captured unless the field achieves a higher level of adherence to Purdue's call plan.

While the behavioral and process changes described here are significant, and some incremental investments may be required (e.g., additional reps, Sales analytics capabilities), overall the financial investments are moderate relative to the upside sales potential.

Therefore, we recommend Purdue approve five actions immediately:

1. Create a senior leadership team to lead this effort (no more than three executives within and outside sales) and task them to develop a detailed workplan within 30 days.

2. Establish a revenue growth goal (e.g., $150M incremental stretch goal by July 2014) and set monthly progress reviews with CEO and Board.

3. Shift Purdue's sales targeting from decile to workload (industry norm that more precisely defines the value of physicians)

4. Re-balance field effort dramatically toward OxyContin by increasing field force activity where needed and closely measuring changes in sales

5. Mandate field compliance with targets and align the incentive program to match OxyContin prioritization


Our experience with other pharmaceutical companies suggests that such a comprehensive Sales transformation program takes nine months, although positive impact will be seen within 2-3 months. It is critical that Purdue commits to addressing sales as an organizational journey, not an event. Success requires not only the analytic answer, but even more importantly winning the hearts and minds of the sales force and permanently changing how the company operates, from

---

[1] Recommended actions to address "retail access" will be included in our final report

6

**U.S. - 8**

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

PUBLICLY FILED PER STIPULATION [ECF 2140]

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

UNREDACTED - CONTAINS OUTSIDE PROFESSIONALS' EYES ONLY INFORMATION
SUBJECT TO DISPUTE OVER HIGHLY SENSITIVE INFORMATION

HQ to the field. New capabilities will need to be learned and reinforced on a daily basis. The organizational mindset, behavior and culture will all need to evolve along with journey.

Purdue should start work immediately. Additional analytics are needed (e.g., workload and Champions need to be identified). As mentioned above, a detailed workplan needs to be developed within 30 days. While this effort would be focused on OxyContin, the approach and capabilities built would likely have positive spillover to Butrans and the rest of the portfolio.

While it is challenging to quantify the exact impact of such changes in a dynamic marketplace, we are confident that the value at stake is significant – hundreds of millions, not tens of millions. Analysis done during the prior sales force alignment and our own retrospective analysis both showed over $200M of potential opportunity in a single year, even more in cumulative terms. While this did not take into account the negative landscape drivers such as pharmacy access challenges, it also did not consider the positive drivers such as the recent label change. The substantial size of the opportunity is reassurance that the significant effort required will be well rewarded.

**Closing**

We emphasized this 'Sales Engine' recommendation because we believe it is fundamental to Purdue's near term and longer term success. We strongly believe that a comprehensive approach is the right answer. Success will require real commitment from Purdue leadership and also significant effort from the organization. This program requires substantial capability building at HQ and in the field. The program office described above will require support of an internal cross-functional working group, likely with executive committee engagement, possibly as co-chairs. Our experience is that these kinds of sales transformations are not easy and require real work but the end result is quite rewarding, both for individuals and for the organization.

Our experience makes clear that one fundamental 'must have' for execution success is strong leadership alignment upfront.

Therefore our recommendation is that Purdue makes a clear go-no go decision to 'Turbocharge the Sales Engine'.

**U.S. - 9**

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY                                    PPLP004409898

PUBLICLY FILED PER STIPULATION [ECF 2140]

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER                                    PPLP004409898

UNREDACTED - CONTAINS OUTSIDE PROFESSIONALS' EYES ONLY INFORMATION
REDACTED SUBJECT TO PROTECTIVE ORDER

# EXHIBIT 163

PUBLICLY FILED PER STIPULATION [ECF 2140]

UNREDACTED - CONTAINS OUTSIDE PROFESSIONALS EYES ONLY INFORMATION
PROFESSIONALS' EYES ONLY/HIGHLY CONFIDENTIAL—SUBJECT TO PROTECTIVE ORDER

# CEO Considerations

## *Background and Assumptions*

Let's begin by framing the situation.

Our central assumption is that Purdue must be managed for long-term success.  While it is very possible that the company can be recapitalized using debt, or sold to a strategic buyer, the perception of a sound long-term plan and effective management will translate into maximizing value for the present owners.  Conversely, a perception of a rush to the exits will unnecessarily diminish our bargaining position.

Secondly, there are two risks the owners cannot effectively control.  The first is the availability of a meaningful amount of debt on reasonable terms (rate and covenants).  The second is the entrance of strategic buyers both able to finance an acquisition and a conviction that Purdue is among the best investments currently available to them.  We and our advisers will have some control over buyers' perception of Purdue, but not over their competing investment opportunities or the strategies available to them. These risks again argue for operating the company for sustained value.

In the event that a favorable deal cannot be structured during 2008, the most certain way for the owners to diversify their risk is to distribute more free cash flow so they can purchase diversifying assets.  Top Purdue management must be aligned to this reality, which intrinsically competes with the use of free cash flow to maximize growth and diversification for Purdue itself.  In the end, the right targets will depend on a realistic assessment of the quality of the investment opportunities available to Purdue, which includes the competence of its management team to execute on these opportunities.

## *Special CEO Considerations (for Board discussion only)*

Purdue's situation is unique, particularly in its dangerous concentration of risk, and this circumstance of itself makes CEO performance considerations unique.

Possible investors in, or acquirers of, Purdue will view the top management team differently.  Passive investors will include the competence of this team and its long-term commitment to the Company as an element of value. On the other hand, most strategic buyers would require synergies and would intend to replace executives with their own people, systems, and culture. There are other options available that haven't yet been considered.  For example, management may seek to partner with a financial buyer or take the company public, while the owners may consider combining these options with other goals, such as donation to a foundation or other tax-advantaged approaches.

[PAGE  ]

UNREDACTED - CONTAINS OUTSIDE PROFESSIONALS EYES ONLY INFORMATION
REDACTED - SUBJECT TO PROTECTIVE ORDER

The Purdue CEO and his top team are thus in an interesting and potentially conflicted position.  Under some circumstances, such as merger with a public company, a private equity deal etc., they may gain exceptional opportunities to increase personal wealth through incentive packages.  On the other hand, they may at the end of the day gain only the one-time benefits specified in change-of-control or severance agreements. Their individual perceptions and preferences in these different outcomes will depend on whether they are contemplating retirement, or whether they feel they are well positioned to advance their careers elsewhere in the industry.

   *Defocusing the organization* – When and if it becomes known that the current owners are seeking to reposition the ownership of the business, there will be intense speculation by executives "in-the-know" on the probable outcome for the Company and consequent distraction from the business.  The elements that will minimize damage are many, but the most important will be the shortest possible time between announcement and finality.  Surely, we do not want to engage our executive team until we know precisely what we want to achieve and have a high degree of confidence that we will accomplish it.

   *Character* – as we recently discussed in NYC over dinner – becomes a paramount consideration under these circumstances.  People who will shift their loyalties rapidly under stress and temptation can become a liability from the owners' viewpoint. My opinion is that JHS is very (favorably) strong in this dimension but there are signs that  below him, personal considerations have already intruded and he will have to change this mindset.

[PAGE  ]

PUBLICLY FILED PER STIPULATION [ECF 2140]

UNREDACTED - CONTAINS OUTSIDE PROFESSIONALS' EYES ONLY INFORMATION
SUBJECT TO PROTECTIVE ORDER - HIGHLY CONFIDENTIAL - EXECUTIVE

_**Priority 1. Sustaining, protecting, and extending the cash flow afforded by
the OxyContin® tablets franchise**_

The primary metrics and source of value over the medium term is EBITDA
(complimented by other financial metrics) through our period of exclusivity,
currently estimated to be until November, 2013.[1] These must be protected and
extended through operational excellence and astute positioning versus potential
competitors.

There seem to be a few opportunities to extend the franchise to 2015 or beyond.
These include OTR patents and non-PEO technologies, low ABUK, intermediate
and extended strengths, and antagonist combinations, not to mention new
concepts.[2] Even if they are long shots, success with these projects are
**exceptionally valuable**. The work to date is promising and it appears that
more efforts could and should be launched.

Major risks must be avoided, especially non-compliance with the Corporate
Integrity Agreement, and employee loss of confidence in a period of turbulence.

_**Priority 2. Building an organization and business systems that will improve
efficiency and decision-making, while trimming redundant procedures and
staff**_

The revitalization and reorganization of the Company, including top executive
ranks, is an imperative. In particular, the absence of a Chief Scientific or Chief
Technical Officer to coordinate and prioritize R&D programs is a major gap, and
the question has been raised whether Business Development should be led by a
more seasoned executive if we are to accomplish meaningful results in the
available time frame. Manufacturing appears to be in excellent shape (excepting
the continuing Totowa financial drain and absent a cost-effective production
backup plan). The role and performance of other key functions such as Sales and
Marketing, Finance, Legal and Human Resources needs to be carefully assessed
and changes made as needed. In the view of some board members, succession
planning at the top levels has been long promised but never delivered. The
delivery of a succession planning process with fully developed succession plans
in place across the functions is a very important early priority.

The CEO must ensure cooperation, communication, and coordination among
departments, and work to eliminate silos and roadblocks to effective action. The

---

[1] It must be remembered that we need to start pediatric studies to earn the additional 6
months of patent life early enough to assuredly accomplish approval.
[2] There is one legal long shot that is the extension of the patent due to defective adjudication
and resulting losses to the business. To my knowledge no serious work has been done but the
aspartame experience has some relevance. Bob Shapiro may be able to refine this approach
working with HRU, SDB and JHS.

[PAGE ]

PUBLICLY FILED PER STIPULATION [ECF 2140]

PROFESSIONALS' EYES ONLY/HIGHLY CONFIDENTIAL—SUBJECT TO PROTECTIVE ORDER    PPLPUCC001662358

repair of systems and procedures, many of which are deficient and some altogether absent, is an important task, much of which must be delegated.

The CEO must define the management teams' goals, incentives, and metrics to implement both the annual and strategic plans.

### Priority 3. Working with the Board on Company strategy, including financing or recapitalizing the Company

There are several key strategic issues that deserve prompt attention:
1. The correct allocation of free cash flow between distributing profits to owners versus Purdue investment opportunities
2. The quality and size of external investment opportunities. Inadequate availability of sound external growth opportunities, and our ability to exploit them when they have been identified, might continue to lead to a misallocation of resources.
3. The allocation of internal R&D funds between medium term and long-term opportunities generating meaningful EBITDA before 2013. While some long-term efforts are necessary, the priority for owners is EBITDA impact before 2013.
4. The amount of cash on the balance sheet to ensure liquidity and respond to opportunity. This judgment will affect the rate of distribution, especially in the short term.

A flawed strategic plan or failed execution of sound plans are important risks.

### Priority 4. Investment in acquisitions and R&D programs that will create medium-term value.

A successful CEO will diversify sources of cash flow over the next five years to reduce the company's vulnerability to loss of exclusivity, and increase investor estimates of ongoing EBITDA beyond this timeframe. Some EBITDA can be "bought" through shrewd acquisitions and more can be created by successful new product development. Setting **achievable** targets is a key task that may have already been deferred too long.

While abundant cash flow for investment is available in principle, the key judgments are:
1. The number of opportunities that can be realized within the constraints of the external marketplace . The size and chances of success have to match available resources.
2. There is a constraint that major investments must be value creating before 2013.
3. Resource limitations, since such opportunities must be integrated, pursued, and realized within the modest personnel resources of a relatively small company.

[PAGE  ]

PUBLICLY FILED PER STIPULATION [ECF 2140]

UNREDACTED - CONTAINS OUTSIDE PROFESSIONALS' EYES ONLY INFORMATION
HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

4. The leverage available through associated businesses in Europe, Canada, Asia and Rhodes.[3] Some of Purdue's best opportunities already come, and will continue to come, from creative exploitation of the opportunities these units develop. The will to collaborate is there, but we seem to be missing opportunities owing to organizational weaknesses.

Managing the many projects and initiatives under priority 4 is critical because it typically involves complex situations, important people, and time-consuming meetings. The urgent and interesting can easily distract from the truly important. The CEO must provide leadership, guidance, and encouragement, but in the end this is not CEO work. Effective senior executives in R&D, Finance, and Business Development can help greatly.

**Personal Considerations**

The CEO's job is challenging. We have noted he must divide his time among four general priorities, and achieve results within the short time frame afforded by our exclusivity position.

1) Sustaining, protecting, and possibly extending the cash flow afforded by our oxycodone franchises.
2) Building an organization and business systems that will improve efficiency and decision-making, while trimming redundant procedures or staff.
3) Working with the Board on company strategy, including financing or recapitalizing the Company
4) Investing in acquisitions and R&D programs that will create medium-term value.

An immediate opportunity is to reduce the time committed to managing Canada by appointing a President/COO for this region, with JHS retaining the CEO position for the time being. The division of responsibility between Canadian CEO and COO will involve three elements: formulating Canada strategy (agreement on goals), delegation of authority, and structuring effective reporting relationships. It should be expected that the COO in Canada will join the ranks of possible successors to JHS, AW and HG. It will be important to firmly establish the amount of time JHS is expected to commit to the U.S. business.[4] This

---

3 Rationalizing world-wide supply and within-US supply is an unsolved problem. We could start trying to do this in the US and Canada where we face unreasonable operating costs (Totowa) and need for capital expansion (Canada).
4 The matter of Australia needs to be settled. JHS cannot continue as *de facto* CEO half-way around the world. Whether this responsibility falls to his Canadian COO successor or to regional management should be made when we have a COO in sight. The appointment of CH as President of Purdue Canada might make this an easier decision.

[PAGE ]

PUBLICLY FILED PER STIPULATION [ECF 2140]

PPLPUCC001662360

UNREDACTED - CONTAINS OUTSIDE PROFESSIONALS' EYES ONLY INFORMATION
PUBLICLY FILED PER STIPULATION [ECF 2140]

division of time should ideally be reflected in the structure of the pay package,[5]
i.e. US W-2 versus Canadian T-4, although the ultimate currency is irrelevant.

There is a group of issues particular to JHS including dual residence, tax, and
travel to Toronto, pension accruals, vacation entitlements, health insurance, and
other fringe benefits.  These details must be considered with a view to the
differences between U.S. and Canadian practice by human resource
professionals.

Until the situation changes, it may be sufficient to stipulate that JHS' long-term
compensation under current practice would vest in the event of his being
terminated without cause, or in the event of his retirement after age 62-63 years.

**Conclusion**

We  hope this summary of the key considerations in our decision to go
forward will be helpful to the Search Committee, and more importantly to setting
the stage for an effective transition and mutual understanding between CEO and
Board.  I'm sure you will get some other suggestions from Committee members
and we look forward to the discussion.


Richard Sackler and Peter Boer

---

5 Compensation should be regulated 90% in US $'s.  By that it is intended that a
US$/Canadian$ shift is not the basis of a consideration of any pay increments, up or down.  If
JHS chooses to have his US pay in Can$'s, that is fine, but he will have to decide whether he
wants to protect the exchange rate going forward.  For those who aren't familiar with FX
issues, this is an essentially "costless" exercise using forward contracts.

[PAGE  ]

PROFESSIONALS' EYES ONLY/HIGHLY CONFIDENTIAL—SUBJECT TO PROTECTIVE ORDER    PPLPUCC001662361

UNREDACTED - CONTAINS OUTSIDE PROFESSIONALS' EYES ONLY INFORMATION
TREAT SUBJECT TO PROTECTIVE ORDER

# EXHIBIT 174

UNREDACTED - CONTAINS OUTSIDE PROFESSIONALS' EYES ONLY INFORMATION
PUBLICLY FILED PER STIPULATION [ECF 2140]

PROPOSAL REGARDING BOARD PRACTICES

Purpose:  This memorandum reviews whether there is a desire on the part of the

Family to restructure and/or make changes to the present organization and functioning of the

Boards of Directors.  An objective of this memorandum will be to discuss possible changes to

the current practices that would streamline the functionality of the Boards of Directors in order to

reduce the amount of time Directors spend on meetings of the Boards of Directors to

approximately 15-20 days per annum from the present level of approximately 50 meetings per

annum.*  Consideration will also be given to grouping meetings to facilitate director travel

schedules, and to maintain transparency for all directors.  These goals will necessarily require

important changes in board governance by delegating substantial responsibilities to committees

of the Board of Directors of MNP Consulting Limited and to Management.

Current Structure:  At present the following Boards of Directors have both

Class A Directors and Class B Directors:

1.    Purdue Pharma Inc., the general partner of Purdue Pharma L.P.;

2.    Napp Pharmaceutical Holdings Limited, an English limited company (and

        its sub-holding company, Napp Pharmaceutical Group Limited, an English

        limited company);

3.    Mundipharma Verwaltungsgesellschaft mbH, the general partner of

        Mundipharma Vertriebsgesellschaft mbH & Co. KG, a German company;

4.    MNP Consulting Limited, a Delaware corporation ("MNP"); and

---

\*    Total number of days Directors were involved in in-person meetings in 2010 was 52.

PUBLICLY FILED PER STIPULATION [ECF 2140]

OUTSIDE PROFESSIONALS' EYES ONLY-SUBJECT TO PROTECTIVE ORDER                MSF00144650

REDACTED - CONTAINS OUTSIDE PROFESSIONALS' EYES ONLY INFORMATION

FILED UNDER SEAL - HIGHLY SENSITIVE

5.   Mundipharma Pty. Limited, an Australian company.

In general the Boards of Directors (or equivalent governing authority) of the other Independent Associated Companies consist of Stuart D. Baker and Christopher B. Mitchell (with some variation depending upon local requirements and/or other matters). The Boards of Directors (or equivalent governing authority) of the Independent Associated Companies that do not have Class A Directors and Class B Directors receive recommendations from MNP.

Under the Distribution Agreement dated October 24, 1991 either Family may direct that any Board of Directors (or similar governing authority) will be conformed with Class A Directors and Class B Directors.

At present the following provisions apply regarding quorum and voting requirements with respect to Class A Directors and Class B Directors:

1.   A quorum of the Board of Directors must include (a) a majority of the Class A Directors, and (b) the presence of (i) if the Class B-1 Director is then in office, the Class B-1 Director[†] and at least one Class B-2 Director, or (ii) the majority of the Class B-2 Directors;

2.   All actions of the Board of Directors shall be approved by the vote of each class of Directors voting separately, as follows:

(i)   A majority of Class A Directors present at a meeting of the Board of Directors, and

---

[†] Dr. Raymond is the Class B-1 Director.

PUBLICLY FILED PER STIPULATION [ECF 2140]

OUTSIDE PROFESSIONALS' EYES ONLY-SUBJECT TO PROTECTIVE ORDER                  MSF00144651

(ii)      A majority of Class B Directors present at a meeting of the Board
of Directors.

Principles:  A cardinal principle will be clear separation of management and board
responsibilities.  The shareholders of the relevant companies will continue to elect the directors
of the relevant companies, and the committees that are proposed to be established will be
established by the Board of Directors of MNP; provided, however, that in each case a committee
must have Class A Director members and Class B Director members, and to the extent that any
Class A Director or Class B Director wishes to participate on a committee, he or she will be
permitted to become a member of such committee.  Committees will invite appropriate
executives and other persons that can assist the committees.  In addition, the Class A and Class B
quorum and voting requirements will also be applicable to each committee.  In other words for
any committee to constitute a quorum will require a majority of the Class A Director members
and a majority of the Class B Director members, and for any committee to take effective action it
will require the affirmative vote of a majority of the Class A Director members present and a
majority of the Class B Director members present.

The committees will provide reports to the Board of Directors of MNP of the
committees' recent proceedings, and will provide copies of any Decisions taken by such
committees as well as any Proposed Decisions for consideration by the Board of Directors of
MNP on those matters requiring action by the Board of Directors of MNP.  Management
participation in the committee reports will be at the discretion of any director member of such
committee.

For transparency, all members of the Board of Directors of MNP will be invited
to participate, in person or telephonically, in committee meetings.

3

PUBLICLY FILED PER STIPULATION [ECF 2140]

OUTSIDE PROFESSIONALS' EYES ONLY-SUBJECT TO PROTECTIVE ORDER                    MSF00144652

<u>Meeting Frequency</u>:  There will be six regular board meetings per annum, with dates set one to two years in advance.  These will be typically two-day meetings with committee meetings scheduled on the first day, and the Boards of Directors meetings on the second day.  The mid-year and year-end (budget) meetings and associated committee meetings will require two to three days each.  Special meetings may be called as needed.  By way of example, proposed 2012 schedules of meetings are attached.

<u>Executive Committee</u>:  As a priority in streamlining board processes, the Executive Committee will be provided authorities in the areas of headcount, capital spending, licensing, legal settlements and bank signatories as required to expedite urgent business above levels currently delegated to Management.  The Executive Committee will have responsibility for considering investments of commercial attractiveness, financial analysis, and strategy as appropriate.  The Executive Committee shall consider recommendations from the Technology Committee.  The Executive Committee will address matters outside the regular board cycle.  In addition, it will approve pro forma resolutions to save time on the regular board agenda for strategic matters.  It shall be constituted of no more than six directors, with at least two Class A and two Class B members.  The Executive Committee calendar will contemplate six meetings per year, but it is anticipated that some meetings may be cancelled in the absence of urgent business, and that the Executive Committee may have additional telephonic meetings as needed.  The charter and authorities of Executive Committee will be approved by the Board of Directors of MNP.

<u>Governance Committee</u>:  The Governance Committee will be responsible for board development.  One aspect of its charter will be recommending improved processes for effective board governance.  It will provide a forum for identifying the issues involved with

4

PUBLICLY FILED PER STIPULATION [ECF 2140]

OUTSIDE PROFESSIONALS' EYES ONLY-SUBJECT TO PROTECTIVE ORDER    MSF00144653

REDACTED - CONTAINS OUTSIDE PROFESSIONALS' EYES ONLY INFORMATION

proposed changes, and bring these issues and its recommendations to the full Board of Directors
of MNP for consideration.

The Governance Committee will recommend the balance of skills and experience
it deems relevant for an effective Board of Directors, and will advise on the desired profiles for
director candidates.

The Governance Committee will recommend to various committees the
authorities and scope of these committees' activities, and also make recommendations regarding
the delegation of authorities to Management.

When and if required, the Governance Committee will address any issues of
meeting structure. In doing so, it will consider best practices from the governance literature, and
models of effective governance from successful companies. It is anticipated that most of the
recommendations of the Governance Committee will come to the full Board of Directors of
MNP for discussion and approval.

Compensation and Leadership Committee: The Compensation and Leadership
Committee will review compensation on a global basis. It will also consider succession planning
and management practices that develop effective leadership. It is anticipated that most of the
routine work of this committee will be linked to the annual budget cycle, but that special
situations involving key employees will also be brought to the attention of this committee. In its
compensation role, the Compensation and Leadership Committee will need external resources
including management staff supporting external compensation consultants. In its leadership role,
it may need executive recruitment and other consulting expertise with global scope.

Technology Committee: The role of the Technology Committee will be to review
internal R&D programs in depth, review special projects of strategic importance, and to pre-

PUBLICLY FILED PER STIPULATION [ECF 2140]

OUTSIDE PROFESSIONALS' EYES ONLY-SUBJECT TO PROTECTIVE ORDER    MSF00144654

UNREDACTED - CONTAINS OUTSIDE PROFESSIONALS' EYES ONLY INFORMATION

REDACTED PURSUANT TO PROTECTIVE ORDER

screen and validate the technological components of licensing and M&A proposals. It will provide the Board of Directors of MNP an independent view of probabilities of success, risk elements, global coordination and the quality of the analysis. The technology aspects of the meetings now called Oversight Meetings would be included in the Technology Committee's scope. This committee can relieve the Board of Directors of MNP of very detailed discussions of science and intellectual property, while providing interested board members a forum for exploring technological opportunities in depth. However, the scope of this committee will not in general include assessment of commercial attractiveness, financial analysis or strategy.

<u>Audit and Compliance Committees</u>. There are audit committees in the United States, Canada, Europe and Asia which meet on a regular basis involving management, lawyers, accountants and internal audit staff. Each independent associated company with significant operations has compliance committees made up of the General Manager, Chief Financial Officer, Head of Marketing and Sales and In-house Counsel. There are overall compliance committees for the United States, Canada, Europe and Asia.

Cecil Pickett
Judy Lewent
Peter Boer
Stuart Baker

Date: June 3, 2011

6

OUTSIDE PROFESSIONALS' EYES ONLY-SUBJECT TO PROTECTIVE ORDER            MSF00144655

REDACTED - CONTAINS OUTSIDE PROFESSIONALS' EYES ONLY INFORMATION

## 2012 Calendar of Shareholder and Board Meetings

| Meetings | Dates |
|---|---|
| Shareholders and Board Meetings | Thursday, January 19, 2012 |
| Shareholders and Board Meetings | Thursday, March 15, 2012 |
| Legal Finance Meetin | Thursday, May 17, 2012 |
| Mid Year Budget Meetings | Wednesday, June 20, 2012 |
| Mid Year Budget Meetings | Thursday, June 21, 2012 |
| Shareholders and Board Meetings | Friday, June 22, 2012 |
| Shareholders and Board Meetings | Wednesday, September 12, 2012 |
| Legal Finance Report Meeting | Thursday, October 18, 2012 |
| U.S. Budget Meetings | Tuesday, October 30, 2012 |
| U.S. Budget Meetings | Wednesday, October 31, 2012 |
| Year End Budget Meetings | Tuesday, November 13, 2012 |
| Year End Budget Meetings | Wednesday, November 14, 2012 |
| U.S. Budget Meetings | Thursday, November 15, 2012 |
| Shareholders and Board Meetings | Friday, November 16, 2012 |
| Shareholders and Board Meetings | Friday, December 7, 2012 |

7

PUBLICLY FILED PER STIPULATION [ECF 2140]

OUTSIDE PROFESSIONALS' EYES ONLY-SUBJECT TO PROTECTIVE ORDER   MSF00144656

REDACTED - CONTAINS OUTSIDE PROFESSIONALS EYES ONLY INFORMATION PLEASE HANDLE CONFIDENTIALLY AND SENSITIVELY

## 2012 Calendar of Executive Committee Meetings

| Meetings | Dates |
|---|---|
| Executive Committee Meeting | Wednesday, January 18, 2012 |
| Executive Committee Meeting | Wednesday, February 22, 2012 |
| Executive Committee Meeting | Wednesday, March 14, 2012 |
| Executive Committee Meeting | Wednesday, April 18, 2012 |
| Executive Committee Meeting | Wednesday, May 16, 2012 |
| Mid Year Budget Meetings - Executive Committee | Monday, June 18, 2012 |
| Mid Year Budget Meetings - Executive Committee | Tuesday, June 19, 2012 |
| Executive Committee Meeting | Wednesday, July 11, 2012 |
| Executive Committee Meeting | Tuesday, September 11, 2012 |
| Executive Committee Meeting | Wednesday, October 24, 2012 |
| US Budget Meetings - Executive Committee | Monday, October 29, 2012 |
| Year End Budget Meetings - Executive Committee | Monday, November 12, 2012 |
| Executive Committee Meeting | Wednesday, December 6, 2012 |

8

PUBLICLY FILED PER STIPULATION [ECF 2140]

OUTSIDE PROFESSIONALS' EYES ONLY-SUBJECT TO PROTECTIVE ORDER

UNREDACTED - CONTAINS OUTSIDE PROFESSIONALS EYES ONLY INFORMATION
REDACTED - PROFESSIONALS' EYES ONLY

**2012 Calendar of Others Meetings**

| Meetings | Dates |
| --- | --- |
| Compensation Committee Meeting | Tuesday, January 17, 2012 |
| Other Committees Meeting | Wednesday, January 18, 2012 |
| Compensation Committee Meeting | Tuesday, March 13, 2011 |
| Other Committees Meeting | Wednesday, March 14, 2012 |
| Technology Committee - Oversight Group Meeting | Monday, May 14, 2012 |
| Technology Committee - Oversight Group Meeting | Tuesday, May 15, 2012 |
| Mid Year Budget Meetings - Other Committees | Monday, June 18, 2012 |
| Mid Year Budget Meetings - Other Committees | Tuesday, June 19, 2012 |
| Technology Committee - Oversight Group Meeting | Monday, October 15, 2012 |
| Technology Committee - Oversight Group Meeting | Tuesday, October 16, 2012 |
| Compensation Committee Meeting | Tuesday, October 23, 2012 |
| US Budget Meetings - Other Committees | Monday, October 29, 2012 |
| Year  End Budget Meetings - Other Committees | Monday, November 12, 2012 |
| Compensation Committee Meeting | Tuesday, November 20, 2012 |

PUBLICLY FILED PER STIPULATION [ECF 2140]

OUTSIDE PROFESSIONALS' EYES ONLY-SUBJECT TO PROTECTIVE ORDER          MSF00144658