UNREDACTED - CONTAINS OUTSIDE PROFESSIONALS EYES ONLY INFORMATION
TREAT SUBJECT TO PROTECTIVE ORDER

# EXHIBIT 180

PUBLICLY FILED PER STIPULATION [ECF 2140]

UNREDACTED - CONTAINS OUTSIDE PROFESSIONALS EYES ONLY INFORMATION
TREAT SUBJECT TO PROTECTIVE ORDER

**Produced Natively**

CONFIDENTIAL

PUBLICLY FILED PER STIPULATION [ECF 2140]

PPLPC012000372437
PPLPC012000372437

UNREDACTED - CONTAINS OUTSIDE PROFESSIONALS EYES ONLY INFORMATION
TREAT SUBJECT TO PROTECTIVE ORDER

# OxyContin Market Events

## 4/12/12 - <u>FINAL</u>

**FAMR**



PUBLICLY FILED PER STIPULATION [ECF 2140]

UNREDACTED - CONTAINS OUTSIDE PROFESSIONALS EYES ONLY INFORMATION
TREAT SUBJECT TO PROTECTIVE ORDER

# OxyContin Market Events

| | | |
|---|---|---|
| 1. | January 1995 | Faulding Pharmaceuticals licenses rights to market Kadian to BMS |
| **2.** | **December 1995** | **OxyContin was launched by Purdue Pharma with 256 sales reps** |
| 3. | August 1996 | Kadian was launched by Zeneca for Faulding Pharmaceuticals |
| 4. | Q1 1997 | Purdue sales force expands to 323 sales reps |
| 5. | Q1 1998 | Purdue sales force expands to 422 sales reps |
| 6. | Q1 1999 | Purdue sales force expands to 532 sales reps |
| 7. | Q1 2000 | Purdue sales force expands to 674 sales reps |
| 8. | January 2000 | Time Magazine runs an article about OxyContin abuse & diversion |
| 9. | 2000 | Purdue sales force expends to 770 sales reps and creates the Hospital Specialty Division (HSD) |
| 10. | Q1 2001 | Newsweek and other publications run articles about OxyContin abuse & diversion |
| 11. | March 2001 | Barry Meier's first article on OxyContin published in The New York Times |
| 12. | March 2001 | New strengths of Kadian launched by Faulding Pharmaceuticals (30 & 60 mg) |
| 13. | April 2001 | First OxyContin product liability lawsuit filed |
| 14. | December 2001 | Alpharma acquires Faulding, including Kadian |
| 15. | June 2002 | Avinza was launched by Ligand |
| 16. | December 2002 | First WDVA subpoena |
| **17.** | **October 2003** | **Spectracef was launched by Purdue Pharma** |
| 18. | January 2004 | First antitrust lawsuits filed |
| 19. | January 2004 | 1st OxyContin patent decision – Endo wins in district court |
| 20. | April 2004 | Teva launches generic OxyContin (80 mg) |
| 21. | June 2004 | Purdue sales force contracts to 550 sales reps |

**FAMR**

11/13/2020

For Internal Use Only. Not for Use in Promotion. Purdue does not promote off-label use.

2



PUBLICLY FILED PER STIPULATION [ECF 2140]

UNREDACTED - CONTAINS OUTSIDE PROFESSIONALS EYES ONLY INFORMATION
TREAT SUBJECT TO PROTECTIVE ORDER

# OxyContin Market Events

| | | |
|---|---|---|
| 22. | January 2005 | Duragesic goes generic |
| **23.** | **February 2005** | **Palladone was launched by Purdue Pharma** |
| 24. | June 2005 | Ivax and Endo launch generic OER (all strengths) |
| 25. | June 2005 | Purdue sales force contracts to 250 sales reps |
| 26. | November 2005 | Watson launches (authorized) generic OER (all strengths) |
| 27. | December 2005 | Teva and Dava/Impax launch generic OER (all strengths) |
| 28. | January 2006 | OxyContin placed on most Medicare Part D plans |
| **29.** | **February 2006** | **Purdue wins Patent appeal** |
| 30. | July 2006 | Opana ER launched by Endo |
| 31. | July 2006 | Settlement of product liability insurance coverage litigation |
| 32. | August 2006 | Licensing agreement with Endo & Teva regarding OxyContin patent infringement |
| 33. | October 2006 | Agreement in principle to settle WDVA investigation |
| 34. | November 2006 | New strengths of Kadian launched by Alpharma (80 mg) |
| 35. | December 2006 | First mass settlement of product liability claims |
| 36. | February 2007 | Watson (authorized) generic OER ceases production |
| 37. | February 2007 | Avinza sold to King Pharmaceuticals from Ligand |
| 38. | April 2007 | New strengths of Kadian launched by Alpharma (200 mg) |
| 39. | April 2007 | Settlement agreement with Impax |
| 40. | May 2007 | Multistate attorney general settlement |
| 41. | May 2007 | Announcement of WDVA plea and settlement |
| 42. | July 2007 | Court approval of WDVA plea and settlement |
| 43. | August 2007 | Filing of next wave of civil litigation (eventually including third party payers, Kentucky Attorney General, class actions, mass actions, individual actions) |
| 44. | September 2007 | New strengths of Kadian launched by Alpharma (10 mg) |

**FAMR**



PUBLICLY FILED PER STIPULATION [ECF 2140]

UNREDACTED - CONTAINS OUTSIDE PROFESSIONALS EYES ONLY INFORMATION
TREAT SUBJECT TO PROTECTIVE ORDER

# OxyContin Market Events

| | | |
|---|---|---|
| **45.** | **February 2008** | **OxyContin launches three new strengths (15, 30 & 60 mg)** |
| 46. | April 2008 | New strengths of Opana ER launched by Endo (7.5, 15 & 30 mg) |
| 47. | September 2008 | Licensing agreement with Mallinckrodt regarding OxyContin patent infringement |
| 48. | December 2008 | Actavis acquires Kadian from Alpharma |
| 49. | December 2008 | FDA rejects Remoxy NDA from  King Pharmaceuticals |
| 50. | December 2008 | OxyContin removed from Humana |
| 51. | Q1 2009 | Purdue sales force expends to 350 sales reps |
| 52. | January 2009 | OxyContin removed from Humana Medicare Part D |
| 53. | February 2009 | New strengths of Avinza launched by King Pharmaceuticals (45 & 75 mg) |
| **54.** | **May 2009** | **Ryzolt was launched by Purdue Pharma** |
| 55. | May 2009 | First settlements of next wave of civil litigation |
| 56. | June 2009 | Licensing agreement with KV Pharmaceutical regarding OxyContin patent infringement |
| 57. | September 2009 | Embeda was launched by King Pharmaceuticals |
| 58. | October 2009 | Licensing agreement with Actavis regarding OxyContin patent infringement |
| 59. | 2010 | Settlement of antirust cases |
| 60. | Q1 2010 | Purdue sales force expends to 400 sales reps |
| 61. | March 2010 | OxyContin low ABUK patent suit filed |
| 62. | April 2010 | Approval of OxyContin Reformulation |
| 63. | April 2010 | Exalgo was launched by Covidien |
| 64. | April 2010 | Kadian patent expired |
| **65.** | **August 2010** | **OxyContin Reformulation launched by Purdue Pharma** |
| 66. | November 2010 | Pfizer to acquire King Pharmaceuticals |
| 67. | November 2010 | FDA requests withdrawal of all propoxyphene products (Darvon, Darvocet, and generics containing propoxyphene) due to serious potential heart risks |

**FAMR**

For Internal Use Only. Not for Use in Promotion. Purdue does not promote off-label use.



PUBLICLY FILED PER STIPULATION [ECF 2140]

UNREDACTED - CONTAINS OUTSIDE PROFESSIONALS EYES ONLY INFORMATION
TREAT SUBJECT TO PROTECTIVE ORDER

# OxyContin Market Events

| | | |
|---|---|---|
| 68. | Q1 2011 | Purdue sales force expends to 525 sales reps |
| **69.** | **January 2011** | **Butrans was launched by Purdue Pharma** |
| 70. | January 2011 | OxyContin removed from Caremark (Silverscript) Medicare Part D |
| 71. | January 2011 | OxyContin removed from Aetna Medicare Part D |
| 72. | January 2011 | OxyContin removed from Wellpoint Medicare Part D |
| 73. | March 2011 | Embeda was voluntarily recalled by King Pharmaceuticals because a pre-specified stability requirement was not met during routine testing. |
| 74. | March 2011 | 1st OxyContin patent suit filed on reformulation |
| 75. | June 2011 | FDA rejects Remoxy NDA from Pfizer & King Pharmaceuticals |
| 76. | July 2011 | Florida law goes into effect that bars most physicians from dispensing controlled substances from their offices |
| 77. | September 2011 | Florida starts state monitoring database that tracks retail sales of controlled substances |
| 78. | September 2011 | Nucynta ER was launched by Janssen |
| 79. | November 2011 | Kadian generics are available |
| 80. | November 2011 | OxyContin added back to Caremark (Silverscript) Medicare Part D |
| 81. | January 2012 | Endo Pharmaceuticals temporarily suspends production of several products due to errors in the packaging of the tablets.  Products include: Opana (Endo), Opana ER (Endo), Percodan, Endocet, Oxymorphone (Endo), Percocet, Zydone, Endodan, Morphine |

**FAMR**

For Internal Use Only. Not for Use in Promotion. Purdue does not promote off-label use.



PUBLICLY FILED PER STIPULATION [ECF 2140]

UNREDACTED - CONTAINS OUTSIDE PROFESSIONALS EYES ONLY INFORMATION
TREAT SUBJECT TO PROTECTIVE ORDER



# Monthly OER Prescriptions Since Launch
### January 1996 - February 2012

For Internal Use Only. Not for Use in Promotion. Purdue does not
promote off-label use.



6

PUBLICLY FILED PER STIPULATION [ECF 2140]

FAMR

UNREDACTED - CONTAINS OUTSIDE PROFESSIONALS EYES ONLY INFORMATION
TREAT SUBJECT TO PROTECTIVE ORDER



**Monthly OER Kg Dispensed Since Launch**
January 1996 - February 2012

For Internal Use Only. Not for Use in Promotion. Purdue does not promote off-label use.



PUBLICLY FILED PER STIPULATION [ECF 2140]

UNREDACTED - CONTAINS OUTSIDE PROFESSIONALS' EYES ONLY INFORMATION
TREAT SUBJECT TO PROTECTIVE ORDER



**Monthly OER TRxs versus 20mg Equivalents**
January 1996 - February 2012

FAMR

For Internal Use Only. Not for Use in Promotion. Purdue does not promote off-label use.



8

PUBLICLY FILED PER STIPULATION [ECF 2140]

UNREDACTED - CONTAINS OUTSIDE PROFESSIONALS EYES ONLY INFORMATION
TREAT SUBJECT TO PROTECTIVE ORDER

# EXHIBIT 181

PUBLICLY FILED PER STIPULATION [ECF 2140]

UNREDACTED - CONTAINS OUTSIDE PROFESSIONALS EYES ONLY INFORMATION
TREAT SUBJECT TO PROTECTIVE ORDER

# DISCUSSION MATERIALS

**August 13, 2014**

STRICTLY PRIVATE AND CONFIDENTIAL



J.P.Morgan

PUBLICLY FILED PER STIPULATION [ECF 2140]

PROFESSIONALS' EYES ONLY/HIGHLY CONFIDENTIAL—SUBJECT TO PROTECTIVE ORDER

PPLPUCC000281516

UNREDACTED — CONTAINS OUTSIDE PROFESSIONALS' EYES ONLY INFORMATION
TREAT SUBJECT TO PROTECTIVE ORDER

# Executive summary

- **The J.P. Morgan global healthcare and financing teams have worked with the Purdue / Mundipharma Group over the last 6+ weeks to prepare a comprehensive valuation and debt capacity analysis**
  - Number of discussions with Regional Directors across the businesses to understand current portfolio of assets and pipeline

- **The Company provided J.P. Morgan with a 10 year financial forecast for each of the businesses**
  - Company provided 2 separate cases for U.S. OxyContin
    - Base case: Assumes OxyContin Loss of Exclusivity ("LoE") in 2021
    - OxyContin U.S. early LoE case: Assumes OxyContin LoE in 2016

- **Management has included pipeline assets in the forecast which they believe have a greater than 50% probability of success**

- **Mundipharma Ex-U.S. Group has incorporated R&D and S&P costs savings over the projection period that allow for additional capital available for investments**
  - R&D savings of $45mm in 2015 increasing to $237mm in 2024 (accounting for ~74% of total Ex-U.S. R&D)
  - S&P savings of $29mm in 2016 increasing to $228mm in 2024 (accounting for ~22% of total Ex-U.S. S&P)

- **Valuation excludes any upside from operating synergies to a strategic buyer and is shown from a corporate buyer's tax point of view**
  - U.S. tax rate of 35% and Ex-U.S. rate of 20%

- **In addition to looking at valuation from a corporate buyers perspective, for tax purposes, J.P. Morgan reviewed the value to an acquirer of the existing partnership structure**
  - For tax purposes, in a transaction where assets or partnership rights are transferred to an acquirer, the acquirer has the ability to "step-up" the value of the assets received to fair value, and to amortize that fair value over 15 years

- **Preliminary sum-of-the-parts analysis values the Purdue / Mundipharma Group at:**

## SOTP valuation

| Business | Base case ($mm) | | OxyContin U.S. early LoE case ($mm) |
|---|---|---|---|
| Purdue U.S. | $1,855—$2,170 | | $1,160—$1,440 |
| Coventry | | $1,005—$1,370 | |
| Mundipharma Ex-U.S. Group | | $3,255—$4,500 | |
| Cost savings available for investments[1] | | $2,435—$3,025 | |
| Global Purdue / Mundipharma Group | $8,550—$11,065 | | $7,855—$10,335 |
| Present value of asset step-up (midpoint) | $1,500 | | $1,345 |
| Total value[2] | $11,095 | | $10,230 |

Source: Management projections; values rounded to nearest $5mm
[1] Cost savings available for investments for Mundipharma Ex-U.S. Group; [2] Calculated based off midpoint

PUBLICLY FILED PER STIPULATION [ECF 2140]

J.P.Morgan

EXECUTIVE SUMMARY

PROFESSIONALS' EYES ONLY/HIGHLY CONFIDENTIAL—SUBJECT TO PROTECTIVE ORDER

PPLPUCC000281524

UNREDACTED - CONTAINS OUTSIDE PROFESSIONALS' EYES ONLY INFORMATION
TREAT SUBJECT TO PROTECTIVE ORDER

# Executive summary (cont'd)

- **Valuation of the global Purdue / Mundipharma Group is highly sensitive to:**
  - OxyContin exclusivity in the U.S.
  - Coventry pipeline and growth profile
  - Mundipharma emerging markets / Asia growth profile and launching ~362 products from 2014– 2018

- **J.P. Morgan recommends that the Board consider options to diversify the business given OxyContin's contribution to the overall financial profile of the Purdue / Mundipharma Group**

- **A number of options are available to the Company in its "tool box" to provide the funding to diversify and grow the global business**

| | |
|---|---|
| **Redeploying cash / resources Status – Ongoing** | ■ Mundipharma Ex-U.S. Group has incorporated R&D and S&P costs savings over the projection period that allow for additional capital available for investments<br>■ Total 2014 operating expenses (excluding cost of sales and royalty expense) of $2.3bn vs. $2.0bn in 2018<br>■ EBTIDA margin of 23% in 2014 vs. 34% in 2018 demonstrates margins improve to levels where additional savings become more difficult |
| **Divesting non-core assets Status – near term** | ■ <u>OxyContin U.S.:</u> Limited buyer universe given potential for near term loss of exclusivity and growth trajectory. Buyers would look but aren't likely to pay upfront value above worst case IP outcome. Success in U.S. key to Global success and return on R&D investment<br>■ <u>Global Oncology:</u> Number of buyers would be interested. Consider impact to Mundipharma given overlap with existing sales force call point<br>■ <u>Global OTC:</u> Number of buyers would be interested. Small capital raise given size<br>■ <u>Global Betadine:</u> Given management expectations around growth trajectory, consider upside from retaining the asset vs. value received from buyers today |
| **New capital raise Status – medium term** | ■ J.P. Morgan has completed a preliminary review of the Purdue Mundipharma Group debt capacity and believes the Company can raise ~$1-$1.5bn on a standalone basis and $1-$3bn in context of an acquisition<br>■ Could potentially limit near-term dividends depending on size of the acquisition |
| **Other Status – near to medium term** | ■ JV or collaborations with an external equity partner where Purdue /Mundipharma Group would contribute assets |

Source: Management projections

EXECUTIVE SUMMARY

8

J.P.Morgan

PUBLICLY FILED PER STIPULATION [ECF 2140]

PROFESSIONALS' EYES ONLY/HIGHLY CONFIDENTIAL—SUBJECT TO PROTECTIVE ORDER

PPLPUCC000281525

UNREDACTED - CONTAINS OUTSIDE PROFESSIONALS EYES ONLY INFORMATION
TREAT SUBJECT TO PROTECTIVE ORDER

# EXHIBIT 185

PUBLICLY FILED PER STIPULATION [ECF 2140]

OUTSIDE PROFESSIONALS EYES ONLY INFORMATION
TREAT SUBJECT TO PROTECTIVE ORDER

AUDITED COMBINED FINANCIAL STATEMENTS
Purdue Pharma L.P. and Associated Companies, PRA Holdings, Inc.
and Subsidiaries, Purdue Pharma Inc., Pharma Associates Inc.,
Pharma Associates L.P., IKUWA Holdings Inc., Purdue Products L.P.,
Purdue Products Inc., Purdue Pharmaceutical Products L.P. and Associated
Company, Purdue Pharmaceutical Products Inc., Purdue Neuroscience Company,
Millsaw Realty Inc., One Stamford Realty L.P. and Norwell Land Company
Referred to Herein as The "Companies"
Years ended December 31, 2007 and 2006

PUBLICLY FILED PER STIPULATION [ECF 2140]

REDACTED THIS CONTAINS PROFESSIONALS EYES ONLY INFORMATION
TREAT SUBJECT TO PROTECTIVE ORDER

Audited Combined Financial Statements

Purdue Pharma L.P. and Associated Companies,
PRA Holdings, Inc. and Subsidiaries,
Purdue Pharma Inc., Pharma Associates Inc.,
Pharma Associates L.P., IKUWA Holdings Inc.,
Purdue Products L.P., Purdue Products Inc.,
Purdue Pharmaceutical Products L.P. and Associated Company,
Purdue Pharmaceutical Products Inc., Purdue Neuroscience Company,
Millsaw Realty Inc., One Stamford Realty L.P. and Norwell Land Company
Referred to Herein as The "Companies"

*Years ended December 31, 2007 and 2006*
*with Report of Independent Auditors*

# Contents

Report of Independent Auditors ................................................................................................ 1

The Companies' Audited Combined Financial Statements

Combined Balance Sheet ........................................................................................................... 2
Combined Statement of Operations ......................................................................................... 3
Combined Statement of Equity ................................................................................................. 4
Combined Statement of Cash Flows ........................................................................................ 5
Notes to Combined Financial Statements ................................................................................ 6

PUBLICLY FILED PER STIPULATION [ECF 2140]

The Companies' Notes to Combined Financial Statements

December 31, 2007

## 19. Commitments and Contingencies (continued)

### Legal Proceedings

The Companies record accruals for contingencies to the extent that the occurrence of the contingency is probable and the amount of liability is reasonably estimable. If the reasonable estimate of liability is within a range of amounts and some amount within the range appears to be a better estimate than any other, then the Companies record that amount as an accrual. If no amount within the range is a reasonable estimate, then the Companies record the lowest amount as an accrual. Such assessments involve a series of complex judgments and rely heavily on estimates and assumptions regarding future events that management has deemed reasonable. Excessive outcomes can occur, and it is possible that the Companies could incur judgments or enter into settlements in excess of the amounts accrued, which could have a material adverse effect on the results of operations.

The Companies accounting policy with respect to defense costs is to expense all costs as incurred and to record recoveries from insurance when collection is assured. The Companies record accruals for other non defense cost insurance recoveries based on existing deductibles and coverage limits, to the extent that the recovery is probable and the amount of recovery is reasonably estimable.

### OxyContin Tablets Litigation

Various lawsuits, claims and proceedings are pending or threatened against certain of the Companies related to OxyContin® Tablets ("OxyContin"). The most significant are described below. The Companies recorded $5 million in 2007, $579 million in 2006, $100 million in 2005 and $10 million in 2004 with respect to these matters. Of these amounts (i) $652 million has been paid as of March 31, 2008, (ii) $35 million will be paid on May 9, 2008, (iii) approximately $5 million will be paid to cover costs associated with Purdue Pharma L.P.'s ("PPLP") implementation of the Corporate Integrity Agreement (see *OxyContin Tablets Litigation - Regulatory, Law Enforcement and Governmental Matters,* below) and as of March 31, 2008, approximately $1 million of the $5 million has been paid, and (iv) the balance of $3 million has been classified as a current liability. The deferred $35 million payment is secured by liens on certain of the Companies manufacturing facilities.

PUBLICLY FILED PER STIPULATION [ECF 2140]
PROFESSIONALS' EYES ONLY/HIGHLY CONFIDENTIAL—SUBJECT TO PROTECTIVE ORDER    PPLPUCC500056873

Confidential – For Professional Eyes Only

THIS ITEM CONTAINS PROFESSIONALS EYES ONLY INFORMATION
TREAT SUBJECT TO PROTECTIVE ORDER

The Companies' Notes to Combined Financial Statements

December 31, 2007

## 19. Commitments and Contingencies (continued)

*OxyContin Tablets Litigation - Civil Product Liability Lawsuits*

Numerous individuals have made product liability claims related to OxyContin against certain of the Companies. Most of those claimants have alleged that (1) they suffered bodily injury from the use of OxyContin, including addiction, (2) the defendant Companies failed to adequately warn them about the risks of addiction and (3) the defendant Companies "over-promoted" and aggressively and/or fraudulently marketed OxyContin. The claimants sought various forms of relief, including compensatory and punitive damages, interest and costs, and attorneys' fees. As of March 31, 2008, the defendant Companies have settled or otherwise disposed of substantially all of those claims.

To the extent that product liability claims remain after the settlements, including claimants that elect to opt out of the settlement offers, the defendant Companies are confident that they will prevail on the merits of those individual claims. Since the announcement of the resolution of the Western District of Virginia investigation (see *OxyContin Tablets Litigation - Regulatory, Law Enforcement and Governmental Matters* below), approximately 77 additional individual personal injury actions have been filed against certain of the Companies, and certain of the Companies have been named as defendants in four putative class actions pending in Canada. The defendant Companies in such actions anticipate that they will have meritorious defenses against such claims and will vigorously defend them.

As of March 31, 2008, 102 OxyContin product liability lawsuits, including the 77 noted above, are pending against the defendant Companies.

*OxyContin Tablets Litigation – Consumer Protection Claims*

Since the announcement of the resolution of the Western District of Virginia investigation (see *OxyContin Tablets Litigation - Regulatory, Law Enforcement and Governmental Matters* below), two consumer protection claims have been filed against certain of the Companies. On May 14, 2007, three health and welfare funds filed a putative class action against certain of the Companies in the U.S. District Court for the Eastern District of Pennsylvania claiming such Companies' alleged improper promotion of OxyContin caused them to pay for unnecessary and excessive usage of OxyContin. The plaintiff funds assert a class on behalf of third-party payors located in Pennsylvania or who paid for prescriptions on behalf of patients within Pennsylvania. The plaintiff funds assert violations of Pennsylvania consumer protection laws and related common laws. This action had been transferred to the U.S. District Court for the Southern District of New York (the "Southern District"). On or around August 1, 2007, a health and welfare fund filed a putative class action against certain of the Companies in the Southern District claiming such Companies' alleged improper promotion of OxyContin caused it to pay for unnecessary and excessive usage of OxyContin. The plaintiff fund asserts violations of the Racketeer Influenced Corrupt Organizations Act, numerous state consumer protections laws and related common law. The plaintiff fund asserts a nationwide class on behalf of third-party payors. The defendant Companies in each of these actions believe that they have meritorious defenses with respect to these claims and will vigorously defend them.

28

PUBLICLY FILED PER STIPULATION [ECF 2140]

Confidential – For Professional Eyes Only

TREAT SUBJECT TO PROTECTIVE ORDER

The Companies' Notes to Combined Financial Statements

December 31, 2007

## 19. Commitments and Contingencies (continued)

*OxyContin Tablets Litigation - Regulatory, Law Enforcement and Governmental Matters*

In May 2007, certain of the Companies reached agreement to settle the investigation pending in U.S Attorney's Office for the Western District of Virginia. The settlement was presented to the Court in the Western District of Virginia on May 10, 2007, and was approved by the Court on July 20, 2007. As part of this resolution, The Purdue Frederick Company Inc. pled guilty to a single felony count of misbranding based upon misstatements made in the promotion of OxyContin to healthcare professionals that occurred prior to July 2001. As part of the agreement with the government and based upon their senior positions with such Companies, one executive and two former executives, also pled guilty to a single "strict liability" misdemeanor for misbranding based upon the misconduct of other employees while the executives held their positions of responsibility. The terms of the agreement also provided that PPLP enter into a Corporate Integrity Agreement as part of which it is maintaining a compliance program and has engaged an Independent Review Organization with respect to the sale and marketing of its products for 60-month period. The Corporate Integrity Agreement became effective on July 31, 2007.

In May 2007, in connection with investigations involving activities related to the certain of the Companies and their promotion of OxyContin, such Companies signed consent judgments to settle investigations with twenty-seven State Attorneys General. In addition, such Companies settled separately with the Attorneys General for State of Mississippi and the State of Florida.

On October 4, 2007, the Attorney General of the Commonwealth of Kentucky and Pike County, Kentucky filed a claim against certain of the Companies in state court alleging such Companies' improper promotion of OxyContin caused the plaintiff's to pay for excessive costs related to the usage of OxyContin as well as the costs arising from misuse and addiction. The plaintiffs asserted various causes of action for their claim under Kentucky law, including the Kentucky Medicaid Fraud Statute. The action was removed to the U.S. District Court for the Eastern District of Kentucky on October 29, 2007. The defendant Companies in this action believe they have meritorious defenses with respect to these claims and will vigorously defend them.

In 2004, the defendant Companies settled claims raised by the West Virginia Attorney General, based mostly on consumer protection assertions.

*Patent Litigations*

The continued development of generic competition for OxyContin could have a materially adverse impact on the Companies' financial position, operations and cash flows.

29

PUBLICLY FILED PER STIPULATION [ECF 2140]

CONTAINS PROFESSIONALS' EYES ONLY INFORMATION
TREAT SUBJECT TO PROTECTIVE ORDER

The Companies' Notes to Combined Financial Statements

December 31, 2007

**19. Commitments and Contingencies (continued)**

*U.S. Patent Litigations*

1.    Boehringer/Roxane Litigation

In 1999, certain of the Companies commenced a legal action in the Southern District alleging that Boehringer Ingelheim GmbH, Boehringer Ingelheim Pharmaceuticals, Inc. and Roxane Laboratories, Inc. (collectively, "Roxane") had undertaken substantial activities, specifically seeking Food and Drug Administration ("FDA") approval and preparing to sell a product formerly known as Roxicodone SR, and more recently as Extain, which allegedly infringed certain patent claims of certain of the Companies' OxyContin patents. In February 2000, the FDA stayed the approval of the New Drug Application ("NDA") for Roxane's product. In December 2006, Roxane informed the Southern District that it has no plans to introduce Extain on the market. On August 29, 2007, the Southern District entered a Consent Judgment which had been submitted by the parties terminating the litigation pursuant to a settlement agreement. Pursuant to the Consent Judgment, (1) Roxane agreed that its Extain product would infringe the OxyContin patents and admitted that those patents are valid and enforceable and (2) Roxane's counterclaims were dismissed with prejudice.

2.    Endo Litigations

During 2000 and 2001, certain of the Companies commenced three legal actions in the Southern District against Endo Pharmaceuticals Holdings Inc. and Endo Pharmaceuticals, Inc. (collectively, "Endo") in response to Endo's filings with the FDA for approval to sell generic 10mg, 20mg, 40mg and 80mg controlled-release oxycodone products prior to the expiration of certain patent claims of the plaintiff Companies' OxyContin patents. Endo responded by alleging non-infringement, invalidity and unenforceability and asserting certain antitrust counterclaims. On January 5, 2004, following a bench trial, the Southern District issued its Opinion and Order, concluding that Endo's proposed generic 10mg, 20mg, 40mg and 80mg controlled-release oxycodone products infringe the plaintiff Companies' OxyContin patents, but that those patents are unenforceable due to the plaintiff Companies' inequitable conduct, and the Southern District enjoined the plaintiff Companies from enforcing those patents (the "*Endo* decision"). On June 7, 2005, the United States Court of Appeals for the Federal Circuit (the "Court of Appeals") issued its Opinion affirming the Southern District's finding that the Companies' OxyContin patents were unenforceable due to inequitable conduct. On June 21, 2005, the plaintiff Companies filed "Plaintiff-Appellants' Combined Petition for Panel Rehearing and Rehearing En Banc."

On February 1, 2006, the Court of Appeals issued an Order granting the plaintiff Companies' petition for rehearing by the panel, withdrew its June 7, 2005 Opinion, and issued a new Opinion (the "*Endo II* Decision"). The *Endo II* Decision vacated the *Endo* decision on the issue of inequitable conduct, affirmed the Southern District's judgment of infringement, and remanded the case to the Southern District for further proceedings consistent with the *Endo II* Decision.

30

PROFESSIONALS' EYES ONLY/HIGHLY CONFIDENTIAL—SUBJECT TO PROTECTIVE ORDER    PPLPUCC500056876

The Companies' Notes to Combined Financial Statements

December 31, 2007

## 19. Commitments and Contingencies (continued)

On September 1, 2006, the parties informed the Southern District that they had settled the litigation. On October 5, 2006, the Court entered the Consent Judgment, terminating the litigation, in which (1) Endo agreed that its generic controlled-release oxycodone products infringe the plaintiff Companies' OxyContin patents, and that it would not dispute the validity or enforceability of those patents, and (2) Endo's counterclaims were dismissed with prejudice. As part of the settlement, Endo agreed to terminate its sales of generic controlled-release oxycodone products by December 31, 2006 and the plaintiff Companies agreed to waive certain claims for damages against Endo arising from past infringing sales of its generic controlled-release oxycodone products.

3.    Teva Litigations

Certain of the Companies commenced legal actions in the Southern District against Teva Pharmaceuticals USA, Inc. ("Teva") in response to Teva's filings with the FDA for approval to market generic 10mg, 20mg, 40mg and 80mg controlled-release oxycodone products prior to the expiration of certain patent claims of the plaintiff Companies' OxyContin patents. The plaintiff Companies sought a judgment that Teva had infringed certain of the plaintiff Companies' OxyContin patents, as well as injunctive relief, attorneys' fees, and costs. Teva asserted counterclaims seeking, among other things, declarations of non-infringement, patent invalidity, and patent unenforceability and alleging certain antitrust violations. On October 12, 2006, the Southern District entered a Consent Judgment, which had been submitted by the parties, terminating the litigation, in which (1) the Southern District's June 25, 2004 Memorandum Order granting Teva's motion for summary judgment based on collateral estoppel was vacated, (2) Teva agreed that its generic controlled-release oxycodone products infringe the plaintiff Companies' OxyContin patents, and admitted that those patents are valid and enforceable, and (3) Teva's counterclaims were dismissed with prejudice. Teva had a license to sell generic controlled-release oxycodone products which expired at the end of January 2008. The plaintiff Companies agreed to waive all claims certain for damages against Teva and Teva's customers, distributors and suppliers arising from infringing sales of Teva's generic controlled-release oxycodone products.

4.    Impax Litigations

During 2002, certain of the Companies commenced legal actions in the Southern District against Impax Laboratories, Inc. ("Impax") in response to Impax's filings with the FDA for approval to sell generic forms of OxyContin prior to the expiration of the Companies' OxyContin patents. The plaintiff Companies sought a judgment that Impax infringed certain of the Companies' OxyContin patents and injunctive relief.

31

PUBLICLY FILED PER STIPULATION [ECF 2140]

TREAT SUBJECT TO PROTECTIVE ORDER

The Companies' Notes to Combined Financial Statements

December 31, 2007

**19. Commitments and Contingencies (continued)**

On March 30, 2007, the parties informed the Southern District that they had reached agreement to settle the litigation, and would be submitting a proposed form of Consent Judgment, following submission of the settlement papers to the Federal Trade Commission and the Antitrust Division of the Department of Justice. On May 25, 2007, the Southern District entered the Consent Judgment pursuant to which, *inter alia*, (1) Impax agreed that its generic controlled-release oxycodone products infringe the OxyContin patents, and admitted that those patents are valid and enforceable, and (2) Impax's counterclaims were dismissed with prejudice. Impax had a license to sell its generic controlled-release oxycodone products through July 2007. Impax had a supplemental license to sell its generic controlled-release oxycodone products commencing November 27, 2007 through January 2008. The plaintiff Companies agreed to waive certain claims for damages against Impax arising from past infringing sales of its generic controlled-release oxycodone products.

5.      Rite Aid and Safeway Litigations

On December 19 and 20, 2006, respectively, Rite Aid Corporation ("Rite Aid") and Safeway Inc. ("Safeway") sued certain of the Companies for declaratory judgments of patent invalidity, unenforceability and noninfringement of certain of the OxyContin patents. On February 16, 2007, the defendant Companies moved to dismiss the actions or, in the alternative, to stay them. On August 22, 2007, the Southern District entered judgments dismissing the complaints without prejudice. Rite Aid and Safeway appealed to the Court of Appeals. After defendant Companies submitted their brief in opposition to Rite Aid's and Safeway's appeals, Rite Aid and Safeway offered to dismiss their appeals. On February 7, 2008, the Court of Appeals endorsed a Stipulation Of Dismissal submitted by the parties terminating these actions.

PUBLICLY FILED PER STIPULATION [ECF 2140]

PROFESSIONALS' EYES ONLY/HIGHLY CONFIDENTIAL—SUBJECT TO PROTECTIVE ORDER    PPLPUCC500056878

The Companies' Notes to Combined Financial Statements

December 31, 2007

## 19. Commitments and Contingencies (continued)

6.    KV and Actavis Litigations

On January 16, 2007, certain of the Companies sued KV Pharmaceutical Company ("KV") and Actavis Totowa LLC ("Actavis") in response to KV's and Actavis' filings with the FDA for approval to sell generic forms of 10mg, 20mg, 40mg and 80mg generic controlled-release oxycodone products prior to the expiration of the plaintiff Companies' OxyContin patents.    KV responded by alleging non-infringement, invalidity and unenforceability and asserting certain antitrust counterclaims.    Actavis responded by alleging invalidity and unenforceability (but not non-infringement) and asserting certain antitrust counterclaims.    On February 12, 2007, certain of the Companies sued KV in a second suit in response to KV's second filing with the FDA for approval to sell generic forms of 30mg and 60mg generic controlled-release oxycodone products prior to the expiration of the OxyContin patents. These cases were transferred from the District Court for the District of Delaware (the "Delaware Court") to the Southern District.    On June 6, 2007, certain of the Companies sued KV in a third suit, commenced in the Southern District, in response to KV's third filing with the FDA for approval to sell generic forms of the 15 mg generic controlled-release oxycodone product prior to the expiration of the plaintiff Companies' OxyContin patents.    Since the plaintiff Companies filed suit against KV and Actavis within 45 days of receipt of notice of KV's and Actavis' respective filings with the FDA, the plaintiff Companies, under the Hatch-Waxman Act, are entitled to an automatic statutory stay which effectively prevents KV and Actavis from launching their generic controlled-release oxycodone products from the date of receipt of their respective notices until the earlier of: (i) 30 months or (ii) a court decision finding the OxyContin patents invalid, unenforceable, or in the case of KV, not infringed.    The parties  briefed on the issue of inequitable conduct.    Following an oral argument, on January 7, 2008, the Southern District issued an Opinion concluding that KV and Actavis had not established inequitable conduct and that the OxyContin patents are enforceable.    On March 14, 2008, Actavis filed a motion to lift the stay previously entered by the Southern District regarding the remaining issues to be tried.

7.    Mallinckrodt Litigation

In or about September 2005, Mallinckrodt Inc. ("Mallinckrodt") submitted an Abbreviated New Drug Application ("ANDA") with the FDA seeking approval to market its 10mg, 20mg, 40mg and 80mg generic controlled-release oxycodone products prior to the expiration of certain of the Companies' OxyContin patents.    On November 9, 2006, certain of the Companies filed legal action against Mallinckrodt alleging infringement of the plaintiff Companies' OxyContin patents by virtue of Mallinckrodt's ANDA submission.    Since the legal action was not commenced within the 45-day statutory period, the plaintiff Companies were unable to obtain a 30-month stay of FDA approval of the ANDA under the Hatch Waxman Act.    On January 19, 2007 the plaintiff Companies filed a First Amended Complaint adding Count II which alleges patent infringement by Mallinckrodt by virtue of its sale of bulk oxycodone hydrochloride, the active pharmaceutical ingredient in OxyContin, to third party generic pharmaceutical companies who have been found to infringe the OxyContin patents.    Mallinckrodt filed its Answer to the First Amended Complaint on June 14, 2007 alleging non-infringement, invalidity and unenforceability with regard to the plaintiff Companies' OxyContin patents.    The parties briefed the issue of inequitable conduct. Following oral argument, on January 7, 2008, the Southern District issued an Opinion concluding that Mallinckrodt had not established inequitable conduct and that the OxyContin patents are enforceable.

33

PUBLICLY FILED PER STIPULATION [ECF 2140]

PROFESSIONALS' EYES ONLY/HIGHLY CONFIDENTIAL—SUBJECT TO PROTECTIVE ORDER        PPLPUCC500056879

TREAT SUBJECT TO PROTECTIVE ORDER

The Companies' Notes to Combined Financial Statements

December 31, 2007

## 19. Commitments and Contingencies (continued)

8.    Apotex Litigation

On September 12, 2007, certain of the Companies filed a complaint for patent infringement against Apotex Inc. and Apotex Corp. (collectively, "Apotex") in the Southern District and in the Delaware Court in response to Apotex's filing with the FDA for approval to sell generic forms of 10mg, 20mg, 40mg and 80mg generic controlled-release oxycodone products prior to the expiration of the plaintiff Companies OxyContin patents. Since the plantiff Companies filed suit against Apotex within 45 days of receipt of notice of Apotex's filing with the FDA, the plaintiff Companies, under the Hatch-Waxman Act, are entitled to an automatic statutory stay which effectively prevents Apotex from launching its generic controlled-release oxycodone products from the date of receipt of such notice until the earlier of: (i) 30 months or (ii) a court decision finding the OxyContin patents invalid, unenforceable or not infringed.  On October 2 2007, the Southern District consolidated the Apotex litigation with the other antitrust litigations.  On November 2, 2007, Apotex responded by alleging non-infringement, invalidity and unenforceability and asserting certain patent and antitrust counterclaims.  On November 19, 2007, the Delaware Court dismissed the case without prejudice pursuant to a stipulation by the parties. On November 26, 2007, the plaintiff Companies filed their reply to Apotex's counterclaims in the Southern District.

9.    Par Litigation

On May 9, 2007, certain of the Companies filed a complaint for patent infringement against Par Pharmaceutical, Inc. and Par Pharmaceutical Companies, Inc. (collectively, "Par") in the Delaware Court in response to Par's filing with the FDA for approval to sell a generic form of 200mg tramadol hydrochloride extended-release tablets prior to the expiration of the plaintiff Companies applicable patents.  On June 28, 2007, certain of the Companies filed a second complaint for patent infringement against Par in the Delaware Court in response to Par's filing of a second letter with the FDA for approval to sell generic forms of 100mg and 200mg tramadol hydrochloride extended-release tablets prior to expiration of the plaintiff Companies applicable patents.  On October 24, 2007, certain of the Companies filed a third complaint for patent infringement against Par in the Delaware Court in response to Par's filing of a third letter with the FDA for approval to sell a generic form of 300mg tramadol hydrochloride extended-release tablets prior to the expiration of the plaintiff Companies applicable patents.  Since all three of the lawsuits were filed by the plaintiff Companies against Par within 45 days of receipt of notice of Par's respective filings with the FDA, the plaintiff Companies, under the Hatch-Waxman Act, are entitled to an automatic statutory stay which effectively prevents Par from launching its generic extended-release tramadol hydrochloride products from the date of receipt of the respective notices until the earlier of: (i) 30 months or (ii) a court decision finding the tramadol patent invalid, unenforceable or not infringed.   On October 10, 2007, the Delaware Court entered an Order pursuant to which the three litigations were consolidated into one action and a litigation schedule was established to enable a trial commencing on November 10, 2008. On March 20, 2008, Par moved to amend its Answer And Counterclaim, in order to add an allegation of inequitable conduct in the procurement of the patent in suit, which the plaintiff Companies did not oppose. On March 21, 2008, the plaintiff Companies moved to add a claim for a declaratory judgment for threatened infringement of U.S. Patent 7,074,430, which Par did not oppose.

34

PUBLICLY FILED PER STIPULATION [ECF 2140]

PROFESSIONALS' EYES ONLY/HIGHLY CONFIDENTIAL—SUBJECT TO PROTECTIVE ORDER        PPLPUCC500056880

The Companies' Notes to Combined Financial Statements

December 31, 2007

## 19. Commitments and Contingencies (continued)

*Non-U.S. Patent Litigations*

Certain of the Companies' European associated companies have patent litigation pending in Germany, Switzerland, the Netherlands and the United Kingdom, and generic oxycodone controlled release-products have already launched in Germany.  The Companies recorded OxyContin royalties from their European associated companies of $31.0 million and $33.2 million in the years ended December 31, 2007 and 2006, respectively.  If the European associated companies do not prevail in these litigations, the Companies could experience a decrease in royalty income in the future.

On October 19, 2007, Purdue Pharma (Canada) commenced proceedings against Pharmascience Inc. ("Pharmascience") in Federal Court (Canada) to prevent approval by the Minister of Health of Pharmascience's request for approval to market generic controlled-release oxycodone hydrochloride tablets.  On January 31, 2008, Purdue Pharma (Canada) commenced proceedings against Apotex Inc. in Federal Court (Canada) to prevent approval by the Minister of Health of Apotex Inc.'s request for approval to market generic controlled-release oxycodone hydrochloride tablets.  The Companies recorded OxyContin royalties from Purdue Pharma (Canada) of $20.7 million and $16.0 million in the years ended December 31, 2007 and 2006, respectively.  If Purdue Pharma (Canada) does not prevail in this litigation, the Companies could experience a decrease in royalty income in the future.

*Antitrust Litigations*

Following the *Endo* decision, certain of the Companies were sued in 70 antitrust lawsuits.   The substantial majority of these antitrust lawsuits are asserted as class actions on behalf of various classes of consumers, health plans, insurance companies, retail chains and direct purchasers.  The plaintiffs in these antitrust lawsuits contend that the OxyContin patents were fraudulently obtained and that the Endo patent litigation was a "sham" lacking any objective basis and brought subjectively in bad faith, in violation of the antitrust laws.  Many of the complaints assert comparable theories under state tort law and unfair competition statutes.  Plaintiffs seek various relief, including injunctions, damages, treble damages, disgorgement of profits, a constructive trust and attorneys' fees.

As of March 31, 2008, 68 of these antitrust lawsuits which have been consolidated in the Southern District, and two others have been dismissed. Subsequent to the *Endo II* Decision, the defendant Companies moved for a stay of all antitrust claims pending the outcome of the patent infringement action against Endo.  On March 30, 2006, the Southern District granted that motion staying the 68 antitrust claims until further order.  Consistent with the stay, in a July 27, 2007 Order, the Southern District stayed antitrust counterclaims of the KV, Actavis and Mallinkrodt litigations described above.

Also following the *Endo* decision, certain State Attorneys General began contemplating or conducting investigations of certain of the Companies' alleged inequitable conduct.  In a Tolling Agreement effective May 12, 2004, certain of the Companies and the Attorneys General for 41 states plus the District of Columbia agreed to toll any statute of limitations, doctrine of laches or other time-related defense to any claims arising from such investigations.  No Attorney General has commenced suit as a result of any such investigation.

35

Confidential – For Professional Eyes Only

HIGHLY CONFIDENTIAL – OUTSIDE PROFESSIONALS EYES ONLY INFORMATION
TREAT SUBJECT TO PROTECTIVE ORDER

The Companies' Notes to Combined Financial Statements

December 31, 2007

## 19. Commitments and Contingencies (continued)

The defendant Companies in the antitrust lawsuits believe that they have meritorious defenses with respect to, and will continue to vigorously defend, the antitrust lawsuits. The Companies further believe that they would have meritorious defenses with respect to any suits that may be commenced by the State Attorneys General. If the defendant Companies were not to prevail in final, non-appealable determinations of the antitrust lawsuits, the impact could be materially adverse to the Companies' financial position, operations and cash flows.

*Insurance Coverage Litigations*

1.    OxyContin Lawsuits and Claims

The Companies have a $1 billion tower of product liability insurance covering certain years when plaintiffs allege certain damages related to OxyContin. The Companies had been involved in ongoing litigation with American International Specialty Lines Ins. Co. ("AISLIC"), Gulf Underwriters Insurance Company ("Gulf"), and Steadfast Insurance Company ("Steadfast"). In 2006, the Companies entered into settlement agreements with AISLIC, Gulf, and Steadfast. The Companies recorded insurance proceeds of $26.9 million, $144.7 million and $90 million for the years ended December 31, 2007, 2006 and 2005, under these settlement agreements.

The Companies have now exhausted approximately $131.6 million of available insurance under the $1 billion tower. Further recoveries from this insurance tower are not assured.

2.    Antitrust Lawsuits

The Companies have been involved in lawsuits against Steadfast, National Union and Gulf in the New York State Court with respect to their obligation to defend or indemnify the Companies for those claims asserted in the antitrust litigation. The Gulf settlement referred to in paragraph 1 above, resolved the defendant Companies' claims against Gulf. The Companies claims against Steadfast and National Union were dismissed on July 12, 2005 by the trial court and on May 8, 2007 by the appellate court.

*Average Wholesale Price Litigation*

As of March 31, 2008, PPLP, together with dozens of other pharmaceutical manufacturers, is a defendant in approximately 50 Average Wholesale Price ("AWP") lawsuits. Some of the lawsuits also name certain of the other Companies (collectively with PPLP referred to herein as the "AWP Companies").

The allegations against the AWP Companies in these lawsuits are that the AWP Companies inflated their AWPs and other reported prices knowing that the Medicaid agencies of these plaintiffs reimbursed pharmacies for Medicaid beneficiary prescriptions based on AWP and otherwise relied on other prices reported by the AWP Companies. The AWP's at issue include OxyContin and, in some instances, other PPLP products. Some of the lawsuits do not identify any particular product.

36

PROFESSIONALS' EYES ONLY/HIGHLY CONFIDENTIAL—SUBJECT TO PROTECTIVE ORDER          PPLPUCC500056882

THIS DOCUMENT IS OUTSIDE PROFESSIONALS EYES ONLY INFORMATION
TREAT SUBJECT TO PROTECTIVE ORDER

The Companies' Notes to Combined Financial Statements

December 31, 2007

## 19. Commitments and Contingencies (continued)

The lawsuits against PPLP were brought by Attorneys General in Alabama, New York, Iowa and Utah and various New York Counties.  At present, all lawsuits against Purdue are consolidated before the U.S. District Court in Boston, Massachusetts (the "Boston District Court"), except the cases on behalf of Alabama and Schenectady, Oswego and Erie counties in New York, which are pending in various state courts. The Attorney General action in Utah was consolidated before the Boston District Court, but the Attorney General is seeking to remand the action to state court in Utah.   Motions to dismiss have been filed and are pending in all such actions except for the Alabama action and the action in Erie County, New York, where PPLP's motion to dismiss was granted, but the Erie County was also granted with leave to amend.  None of the actions currently have any trial date set.

Although it is not possible to predict the outcome of any litigation, the Companies believe that the final disposition of the AWP lawsuits will not have a materially adverse impact on the Companies' financial position, operations and cash flows.

*Regulatory, Law Enforcement and Governmental Matters*

The Companies' and their facilities are regularly inspected by, and the Companies are subject to inquiries from, various regulatory agencies, including the FDA, FTC and the Drug Enforcement Administration.

## 20. Common Stock

|  | Year ended December 31, | |
|---|---|---|
|  | 2007 | 2006 |
|  | *(In thousands)* | |
| Common stock is comprised of the following: | | |
| Common stock, $1 par value – PRA Holdings, Inc. | | |
|   Authorized shares – 500 | | |
|   Issued and outstanding shares – 500 | $1 | $1 |
| Common stock, $1 par value – Purdue Pharma Inc. | | |
|   Authorized shares – 1,000 | | |
|   Issued and outstanding shares – 1,000 | 1 | 1 |
| Common stock, $1 par value – Pharma Associates Inc. | | |
|   Authorized shares – 1,000 | | |
|   Issued and outstanding shares – 1,000 | 1 | 1 |
| Common stock, $1 par value – IKUWA Holdings Inc. | | |
|   Authorized shares – 1,000 | | |
|   Issued and outstanding shares – 1,000 | 1 | 1 |
| Common stock, $1 par value – Purdue Products Inc. | | |
|   Authorized shares – 1,000 | | |
|   Issued and outstanding shares – 1,000 | 1 | 1 |
| Common stock, $1 par value – Purdue Pharmaceutical Products Inc. | | |
|   Authorized shares – 1,000 | | |
|   Issued and outstanding shares – 1,000 | 1 | 1 |
| Common stock, $1 par value – Millsaw Realty Inc. | | |
|   Authorized shares – 1,000 | | |
|   Issued and outstanding shares – 1,000 | 1 | 1 |
|  | $7 | $7 |

PUBLICLY FILED PER STIPULATION [ECF 2140]

PROFESSIONALS' EYES ONLY/HIGHLY CONFIDENTIAL—SUBJECT TO PROTECTIVE ORDER          PPLPUCC500056883

UNREDACTED - CONTAINS OUTSIDE PROFESSIONALS EYES ONLY INFORMATION
TREAT SUBJECT TO PROTECTIVE ORDER

# EXHIBIT 191

PUBLICLY FILED PER STIPULATION [ECF 2140]

Confidential – For Professional Eyes Only
CONTAINS PROFESSIONALS EYES ONLY INFORMATION
TREAT SUBJECT TO PROTECTIVE ORDER



AUDITED COMBINED FINANCIAL STATEMENTS
Purdue Pharma L.P. and Associated Companies, PRA
Holdings, Inc. and Subsidiaries, Purdue Pharma Inc.,
Pharma Associates Inc., Pharma Associates L.P.,
IKUWA Holdings Inc., Purdue Products L.P., Purdue
Products Inc., Purdue Pharmaceutical Products L.P. and
Associated Company, Purdue Pharmaceutical Products Inc.,
Purdue Neuroscience Company, Millsaw Realty Inc., and
Norwell Land Company
Referred to Herein as The "Companies"
Years ended December 31, 2008 and 2007

Ernst & Young LLP

*ERNST & YOUNG*

PUBLICLY FILED PER STIPULATION [ECF 2140]

Audited Combined Financial Statements

Purdue Pharma L.P. and Associated Companies,
PRA Holdings, Inc. and Subsidiaries,
Purdue Pharma Inc., Pharma Associates Inc.,
Pharma Associates L.P., IKUWA Holdings Inc.,
Purdue Products L.P., Purdue Products Inc.,
Purdue Pharmaceutical Products L.P. and Associated Company,
Purdue Pharmaceutical Products Inc., Purdue Neuroscience Company,
Millsaw Realty Inc., and Norwell Land Company
Referred to Herein as The "Companies"

*Years ended December 31, 2008 and 2007*
*with Report of Independent Auditors*

## Contents

Report of Independent Auditors.................................................................................................1

The Companies' Audited Combined Financial Statements

Combined Balance Sheet..........................................................................................................2
Combined Statement of Income................................................................................................3
Combined Statement of Equity.................................................................................................4
Combined Statement of Cash Flows .........................................................................................5
Notes to Combined Financial Statements..................................................................................6

PUBLICLY FILED PER STIPULATION [ECF 2140]

THIS CONTAINS PROFESSIONALS EYES ONLY INFORMATION
TREAT SUBJECT TO PROTECTIVE ORDER

The Companies' Notes to Combined Financial Statements

December 31, 2008

## 21. Commitments and Contingencies (continued)

### *Legal Proceedings*

The Companies record accruals for contingencies to the extent that the occurrence of the contingency is probable and the amount of liability is reasonably estimable. If the reasonable estimate of liability is within a range of amounts and some amount within the range appears to be a better estimate than any other, then the Companies record that amount as an accrual. If no amount within the range is a reasonable estimate, then the Companies record the lowest amount as an accrual. Such assessments involve a series of complex judgments and rely heavily on estimates and assumptions regarding future events that management has deemed reasonable. Excessive outcomes can occur, and it is possible that the Companies could incur judgments or enter into settlements in excess of the amounts accrued, which could have a material adverse effect on the results of operations.

The Companies' accounting policy with respect to defense costs is to expense all costs as incurred and to record recoveries from insurance when collection is assured. The Companies record accruals for other non-defense cost insurance recoveries based on existing deductibles and coverage limits, when collection is assured.

### *OxyContin® Tablets Litigation*

Various lawsuits, claims and proceedings are pending or threatened against certain of the Companies related to OxyContin® Tablets ("OxyContin"). The most significant are described below. The Companies recorded $45 million in 2008, $5 million in 2007, $579 million in 2006, $100 million in 2005 and $10 million in 2004 with respect to these matters. Of these amounts $718 million has been paid as of March 31, 2009. The balance of $21 million has been classified as current and long-term liabilities of $9 million and $12 million, respectively.

### *OxyContin® Tablets Litigation - Civil Product Liability Lawsuits*

Numerous individuals have made product liability claims related to OxyContin against certain of the Companies. Most of those claimants alleged that (1) they suffered bodily injury from the use of OxyContin, including addiction, (2) the defendant Companies failed to adequately warn them about the risks of addiction and (3) the defendant Companies "over-promoted" and aggressively and/or fraudulently marketed OxyContin. The claimants sought various forms of relief, including compensatory and punitive damages, interest and costs, and attorneys' fees. The defendant Companies settled or otherwise disposed of substantially all of those claims. To the extent that product liability claims remain after the settlements, including claimants that elect to opt out of the settlement offers, or have been brought after the settlements, the defendant Companies are confident that they will prevail on the merits of those individual claims.

As of March 27, 2009, 326 OxyContin product liability lawsuits are pending against the defendant Companies in the United States. In addition, there are 6 product liability putative class action lawsuits against the defendant Companies in Canada, collectively advancing claims on behalf of all Canadians who have been prescribed and/or used OxyContin. The defendant Companies have also maintained agreements to toll the statutes of limitations of potential claims on behalf of approximately 300 or more individuals not subject to the settlements. The defendant Companies believe they have meritorious defenses with respect to such claims and will vigorously defend them.

30

PUBLICLY FILED PER STIPULATION [ECF 2140]

CONTAINS PROFESSIONALS' EYES ONLY INFORMATION
TREAT SUBJECT TO PROTECTIVE ORDER

The Companies' Notes to Combined Financial Statements

December 31, 2008

**21. Commitments and Contingencies (continued)**

*OxyContin® Tablets Litigation – Consumer Protection Claims*

Two consumer protection claims have been filed against certain of the Companies by third party payors. On May 14, 2007, three health and welfare funds filed a putative class action against certain of the Companies in the U.S. District Court for the Eastern District of Pennsylvania claiming such Companies' alleged improper promotion of OxyContin caused them to pay for unnecessary and excessive usage of OxyContin. The plaintiff funds assert a class on behalf of third-party payors located in Pennsylvania or who paid for prescriptions on behalf of patients within Pennsylvania. The plaintiff funds assert violations of Pennsylvania consumer protection laws and related common laws. On or around August 1, 2007, a health and welfare fund filed a putative class action against certain of the Companies in U.S. District Court for the Southern District of New York (the "Southern District") claiming such Companies' alleged improper promotion of OxyContin caused it to pay for unnecessary and excessive usage of OxyContin. The plaintiff fund asserts violations of the Racketeer Influenced Corrupt Organizations Act, numerous state consumer protections laws and related common law. The plaintiff fund asserts a nationwide class on behalf of third-party payors. The Pennsylvania action was transferred to the Southern District, where the two actions have been consolidated.

Although defendant Companies in each of these actions contest the allegations and have raised meritorious defenses with respect to these claims, the parties have tentatively entered into a settlement disposing of both actions, which was preliminarily approved by the Southern District in December 2008. Class members have the right to either submit claims or opt-out of the settlement. A Fairness Hearing on the settlement is scheduled for May 15, 2009.

*OxyContin® Tablets Litigation - Regulatory, Law Enforcement and Governmental Matters*

On July 20, 2007 the U.S. District Court in the Western District of Virginia approved a settlement between certain of the Companies and the U.S. Attorney's Office for the Western District of Virginia to end a pending investigation. As part of this resolution, The Purdue Frederick Company Inc. pled guilty to a single felony count of misbranding based upon misstatements made in the promotion of OxyContin to healthcare professionals that occurred prior to July 2001. As part of the agreement with the government and based upon their senior positions with such Companies, one executive and two former executives also pled guilty to a single "strict liability" misdemeanor for misbranding based upon the misconduct of other employees while the executives held their positions of responsibility. The terms of the agreement also provided that PPLP enter into a Corporate Integrity Agreement as part of which it is maintaining a compliance program and has engaged an Independent Review Organization to perform reviews of specified promotional and product services during the term of such Corporate Integrity Agreement. The Corporate Integrity Agreement became effective on July 31, 2007.

In May 2007, in connection with investigations involving activities related to certain of the Companies and their promotion of OxyContin, such Companies signed consent judgments to settle investigations with twenty-seven State Attorneys General. In addition, such Companies settled separately with the Attorneys General for the State of Mississippi and the State of Florida.

31

PROFESSIONALS' EYES ONLY/HIGHLY CONFIDENTIAL—SUBJECT TO PROTECTIVE ORDER    PPLPUCC500056917

Confidential – For Professional Eyes Only

CONTAINS PROFESSIONALS' EYES ONLY INFORMATION
TREAT SUBJECT TO PROTECTIVE ORDER

The Companies' Notes to Combined Financial Statements

December 31, 2008

## 21. Commitments and Contingencies (continued)

On October 4, 2007, the Attorney General of the Commonwealth of Kentucky and Pike County, Kentucky filed a claim against certain of the Companies in state court alleging such Companies' improper promotion of OxyContin caused the plaintiffs to pay for excessive costs related to the usage of OxyContin, as well as the costs arising from misuse and addiction.  The plaintiffs asserted various causes of action for their claim under Kentucky law, including violation of state antitrust laws and the Kentucky Medicaid Fraud Statute.  The action was removed to the U.S. District Court for the Eastern District of Kentucky on October 29, 2007 and has subsequently been transferred to the Southern District where it has been coordinated with the antitrust lawsuits (see *Antitrust Litigations* below) and is subject to the stay ordered by the Southern District. The defendant Companies in this action believe they have meritorious defenses with respect to these claims and will vigorously defend them.

In 2004, certain of the Companies settled claims raised by the West Virginia Attorney General, based mostly on consumer protection assertions.

*Patent Litigations*

Certain of the Companies have been involved in various lawsuits involving claims that the OxyContin patents were not infringed, invalid or unenforceable.  If the Companies are unsuccessful in defending the OxyContin patents and generic forms of OxyContin are approved, this could have a materially adverse impact on the Companies' financial position, operations and cash flows.

*U.S. Patent Litigations - Settled*

Between 2006 and 2008, certain of the Companies entered into settlement agreements with (a) Boehringer Ingelheim GmbH, Boehringer Ingelheim, Roxane Laboratories, Inc. and Boehringer Ingelheim Corporation (collectively, "Roxane"), (b) Endo Pharmaceutical Holdings Inc. and Endo Pharmaceuticals, Inc. (collectively, "Endo"), (c) Teva Pharmaceuticals USA, Inc. ("Teva"), (d) Impax Laboratories, Inc. ("Impax") and (e) Mallinckrodt Inc. ("Mallinckrodt") terminating litigation regarding such Companies' OxyContin patents. Pursuant to such settlement agreements, each of Roxane, Endo, Teva, Impax and Mallinckrodt acknowledged the validity and enforceability of the OxyContin patents and acknowledged that sales of generic controlled release oxycodone products without a valid license would infringe the OxyContin patents.  In connection with the settlements of the Endo, Teva, Impax and Mallinckrodt litigations, each of Endo, Teva, Impax and Mallinckrodt were granted a short-term license to sell generic controlled-release oxycodone products.

32

PUBLICLY FILED PER STIPULATION [ECF 2140]

The Companies' Notes to Combined Financial Statements

December 31, 2008

## 21. Commitments and Contingencies (continued)

*U.S. Patent Litigations - Ongoing*

1.      OxyContin Patent Litigations

In 2007, KV Pharmaceutical Company ("KV"), Actavis Totowa LLC ("Actavis"), and Apotex Inc. and Apotex Corp. (collectively, "Apotex") filed various Abbreviated New Drug Applications with the FDA seeking approval to sell generic forms of certain of the Companies' controlled-release oxycodone products.  In response, certain of the Companies sued KV, Actavis and Apotex for patent infringement.  Since the plaintiff Companies filed suit against KV, Actavis and Apotex within 45 days of receipt of notice of respective filings with the FDA, the plaintiff Companies, under the Hatch-Waxman Act, are entitled to an automatic statutory stay which effectively prevents KV, Actavis and Apotex from launching their generic controlled-release oxycodone products from the date of receipt of their respective notices until the earlier of: (i) 30 months or (ii) a court decision finding the OxyContin patents invalid, unenforceable, or not infringed.

On January 7, 2008, the Southern District issued an Opinion concluding that KV and Actavis had not established inequitable conduct and that the OxyContin patents are enforceable.  The remaining issues of patent validity and whether the generic products infringe the OxyContin patents have yet to be tried.

In the Apotex action, the parties submitted (but the Southern District has not yet signed) a Stipulated Order To Accept Judgment, pursuant to which, if the Southern District enters a judgment (other than a consent or agreed judgment) in the KV or Actavis actions finding the OxyContin patents valid and enforceable, then Apotex agreed that it will be bound by that judgment, and further agreed that its generic product would infringe the OxyContin patents. The parties agreed to stay the Apotex action until the KV and Actavis actions are dismissed or otherwise finally resolved.

2.      Tramadol Patent Litigations

In March, May and September, 2007, Par Pharmaceutical Companies, Inc. and in July and September, 2008, Impax Laboratories, Inc. ("Impax"), each respectively provided notices that they are each seeking FDA approval of ANDAs to engage in the commercial manufacture, use or sale of tramadol hydrochloride extended release tablets, 100 mg, 200 mg and 300 mg, prior to the expiration of certain of the Companies' patents.

In May, June and October, 2007, Purdue Pharma Products L.P. ("Purdue Pharma Products") filed complaints for patent infringement against Par Pharmaceutical, Inc. and Par Pharmaceutical Companies, Inc. (collectively, "Par") in Delaware.  In August and November, 2008, Purdue Pharma Products filed complaints for patent infringement against Impax in Delaware.  Purdue Pharma Products sought judgments that Par and Impax have infringed its tramadol patent and an injunction against continued infringement.

PUBLICLY FILED PER STIPULATION [ECF 2140]
PROFESSIONALS' EYES ONLY/HIGHLY CONFIDENTIAL—SUBJECT TO PROTECTIVE ORDER          PPLPUCC500056919

PROFESSIONALS' EYES ONLY HIGHLY CONFIDENTIAL INFORMATION
TREAT SUBJECT TO PROTECTIVE ORDER

The Companies' Notes to Combined Financial Statements

December 31, 2008

## 21. Commitments and Contingencies (continued)

Since the plaintiff Companies filed suit against Par and Impax within 45 days of receipt of notice of respective filings with the FDA, the plaintiff Companies, under the Hatch-Waxman Act, are entitled to an automatic statutory stay which effectively prevents Par and Impax from launching their respective tramadol hydrochloride extended release tablets from the date of receipt of their respective notices until the earlier of: (i) 30 months or (ii) a court decision finding the tramadol patents invalid, unenforceable, or not infringed.

A five-day bench trial is scheduled to begin in the Par litigation on April 16, 2009.  A five-day bench trial is scheduled to begin on June 21, 2010 in the Impax litigation.

*Non-U.S. Patent Litigations*

Certain of the Companies' European associated companies and a Canadian associated company have patent litigation matters pending in Germany, the Netherlands, the United Kingdom, the Czech Republic, Norway, Finland and Canada, and generic oxycodone controlled-release products have already launched in Germany, the Netherlands, Finland and the Czech Republic.  On August 19, 2008, the court in Germany dismissed the plaintiff Companies' patent infringement claims.  On March 24, 2009, pursuant to a separate nullity action, one of the patents asserted in the infringement action in Germany was revoked by the German patent court.  This judgment will be appealed.  On December 16, 2008, the court in the United Kingdom found the OxyContin patents valid but not infringed.  On appeal, the court in the United Kingdom reversed the lower court's ruling on infringement and confirmed the validity of the patents in suit.  Further, the court ordered injunctions against the counterparties in the litigation prohibiting delivery of any infringing products in the United Kingdom.  On February 16, 2009, the court in the Czech Republic reinstated a preliminary injunction precluding sales of generic OxyContin, which had previously been granted and then revoked.  The Companies recorded OxyContin royalties from their European and Canadian associated companies of $53.8 million and $51.7 million in the years ended December 31, 2008 and 2007, respectively.  If the associated companies do not prevail in these litigations, the Companies could experience a decrease in royalty income in the future.

*Antitrust Litigations*

As of March 27, 2009, certain of the Companies are defendants in approximately 68 antitrust lawsuits.  The substantial majority of these antitrust lawsuits are asserted as class actions on behalf of various classes of consumers, health plans, insurance companies, retail chains and direct purchasers.  The plaintiffs in these antitrust lawsuits contend that the OxyContin patents were fraudulently obtained and that the Endo patent litigation was a "sham" lacking any objective basis and brought subjectively in bad faith, in violation of the antitrust laws.  Many of the complaints assert comparable theories under state tort law and unfair competition statutes.  Plaintiffs seek various relief, including injunctions, damages, treble damages, disgorgement of profits, a constructive trust and attorneys' fees.

On March 30, 2006, the Southern District granted a motion staying the 68 antitrust claims until further order.  Consistent with the stay, in a July 27, 2007 Order, the Southern District stayed antitrust counterclaims of the KV and Actavis litigations described above.

34

PUBLICLY FILED PER STIPULATION [ECF 2140]

PROFESSIONALS' EYES ONLY/HIGHLY CONFIDENTIAL—SUBJECT TO PROTECTIVE ORDER          PPLPUCC500056920

Confidential – For Professional Eyes Only
PROFESSIONALS' EYES ONLY/HIGHLY CONFIDENTIAL INFORMATION
TREAT SUBJECT TO PROTECTIVE ORDER

The Companies' Notes to Combined Financial Statements

December 31, 2008

**21. Commitments and Contingencies (continued)**

In 2004, certain State Attorneys General began contemplating or conducting investigations of certain of the Companies' alleged inequitable conduct following a decision in a patent litigation brought by certain of the Companies against Endo Pharmaceuticals Holdings Inc. and Endo Pharmaceuticals, Inc. that held that the OxyContin patents were unenforceable due to inequitable conduct. In a Tolling Agreement effective May 12, 2004, certain of the Companies and the Attorneys General for 41 states plus the District of Columbia agreed to toll any statute of limitations, doctrine of laches or other time-related defense to any claims arising from such investigations. No Attorney General has commenced suit as a result of any such investigation.

The defendant Companies in the antitrust lawsuits believe that they have meritorious defenses with respect to, and will continue to vigorously defend, the antitrust lawsuits. The Companies further believe that they would have meritorious defenses with respect to any suits that may be commenced by the State Attorneys General. If the defendant Companies were not to prevail in final, non-appealable determinations of the antitrust lawsuits, the impact could be materially adverse to the Companies' financial position, operations and cash flows.

*Insurance Coverage Litigations*

1.     OxyContin Lawsuits and Claims

The Companies have a $1 billion tower of product liability insurance covering certain years when plaintiffs allege certain damages related to OxyContin. Certain of the Companies had been involved in ongoing litigation with American International Specialty Lines Ins. Co. ("AISLIC"), Gulf Underwriters Insurance Company ("Gulf"), and Steadfast Insurance Company ("Steadfast"). In 2006, certain of the Companies entered into settlement agreements with AISLIC, Gulf, and Steadfast. The Companies recorded insurance proceeds of $5.2 million, $26.9 million, $144.7 million and $90 million for the years ended December 31, 2008, 2007, 2006 and 2005 under these settlement agreements.

The Companies have now exhausted approximately $156.2 million of available insurance under the $1 billion tower. The balance of the payments received from insurance companies did not reduce the limits of insurance. Further recoveries from this insurance tower are not assured.

2.     Antitrust Lawsuits

Certain of the Companies have been involved in lawsuits against Steadfast, National Union and Gulf in New York state court with respect to insurance companies' obligation to defend or indemnify the Companies for those claims asserted in the antitrust litigations. The Gulf settlement referred to in paragraph 1 above, resolved the Companies' claims against Gulf. The Companies' claims against Steadfast and National Union were dismissed on July 12, 2005 by the trial court and on May 8, 2007 by the appellate court.

PUBLICLY FILED PER STIPULATION [ECF 2140]

PROFESSIONALS' EYES ONLY/HIGHLY CONFIDENTIAL—SUBJECT TO PROTECTIVE ORDER          PPLPUCC500056921

TREAT SUBJECT TO PROTECTIVE ORDER

The Companies' Notes to Combined Financial Statements

December 31, 2008

## 21. Commitments and Contingencies (continued)

*Average Wholesale Price Litigation*

As of March 27, 2009, PPLP, together with dozens of other pharmaceutical manufacturers, is a defendant in approximately 50 Average Wholesale Price ("AWP") lawsuits. Some of the lawsuits also name certain of the other Companies (collectively with PPLP referred to herein as the "AWP Companies").

These lawsuits allege that the AWP Companies inflated their AWPs and other reported prices knowing that the Medicaid agencies reimbursed pharmacies for Medicaid beneficiary prescriptions based on AWP and otherwise relied on other prices reported by the AWP Companies. The AWPs at issue include OxyContin and, in some instances, other PPLP products. Some of the lawsuits do not identify any particular product.

Although it is not possible to predict the outcome of any litigation, the Companies believe that the final disposition of the AWP lawsuits will not have a materially adverse impact on the Companies' financial position, operations and cash flows.

*Regulatory, Law Enforcement and Governmental Matters*

The Companies' and their facilities are regularly inspected by, and the Companies are subject to inquiries from, various regulatory agencies, including the FDA, FTC and the Drug Enforcement Administration.

PPLP filed a Citizen Petition on June 23, 2008 (as further supplemented on October 15, 2008) requesting that the FDA require King Pharmaceuticals, Inc. and Pain Therapeutics, Inc. (collectively, "KPPT") to certify to the OxyContin patents for the Remoxy™ NDA filed by KPPT. Remoxy is a twice-a-day oxycodone formulation. On December 19, 2008, the FDA notified PPLP that the Citizen Petition was premature and made no comment on the substantive issues. If the FDA does not ultimately decide the substantive issues in PPLP's favor, the FDA may approve the KPPT NDA resulting in the subsequent launch of Remoxy by KPPT.

PUBLICLY FILED PER STIPULATION [ECF 2140]

PROFESSIONALS' EYES ONLY/HIGHLY CONFIDENTIAL—SUBJECT TO PROTECTIVE ORDER    PPLPUCC500056922

UNREDACTED - CONTAINS OUTSIDE PROFESSIONALS EYES ONLY INFORMATION
TREAT SUBJECT TO PROTECTIVE ORDER

# EXHIBIT 200

PUBLICLY FILED PER STIPULATION [ECF 2140]

UNREDACTED - CONTAINS OUTSIDE PROFESSIONALS' EYES ONLY INFORMATION
TREAT SUBJECT TO PROTECTIVE ORDER

# NORTON ROSE FULBRIGHT

## Donald Strauber

**Of Counsel**
Norton Rose Fulbright US LLP



don.strauber@nortonrosefulbright.com

**New York**
T: +1 212 408 5205

---

Donald Strauber has more than 50 years of experience in complex commercial litigation and heads up matters in courts throughout the United States. He has worked primarily in three areas: health-related litigation, federal securities litigation and large commercial disputes.  He is in charge of Jim Beam's defense of alcohol-health cases and litigation relating to the marketing of beverage alcohol. He was co-national counsel for the Purdue defendants in the OxyContin® litigation and advises Purdue on matters relating to OxyContin.

## Professional experience

Collapse all

### — Education

LL.B, *cum laude*, Harvard Law School, 1960
BA, University of Pennsylvania, 1957

### — Admissions

• New York State Bar

### — Representative experience

• Representing The Purdue companies in the defense of the OxyContin® litigation.

• Represented Jim Beam in connection with *Thorp v. Beam* relating to the issue of whether a distiller is responsible for a child's alleged "fetal alcohol syndrome." The successful defense of this case before a jury in Seattle resulted in the voluntary dismissal of similar cases around the country and put an end to the feared onslaught of litigation on that issue.

• Represented Jim Beam in purported class actions throughout the United States dealing with the labeling of products as "All Natural."

• Represented Rockwell Automation, Inc. (formerly Rockwell International Corporation) in connection with *Broad v. Rockwell*, a securities class action on behalf of holders of Collins convertible debentures, arising out of the Rockwell-Collins merger, which was successfully tried to a jury in Dallas and affirmed *en banc* by the Fifth Circuit Court of Appeals.

### — Rankings and recognitions

• Legal 500 Leading lawyer, Litigation - Product Liability and mass tort defense: Consumer products:  The Legal 500 has described him as "the dean of the US beverage alcohol product liability bar" (2010) -- "His signal quality is the maturity of his judgement and he has a record of outstanding success on product liability matters brought to verdict." (2009)  In 2017 he continued to be named as a "leading lawyer" in products liability and was named to the Legal 500 Hall of Fame which recognizes individuals designated by the Legal 500 as "elite lawyers" for at least six consecutive years.

• Acritas Star, *Acritas*, 2018-2020

PUBLICLY FILED PER STIPULATION [ECF 2140]

UNREDACTED. CONTAINS OUTSIDE PROFESSIONALS' EYES ONLY INFORMATION TREAT AS SUBJECT TO PROTECTIVE ORDER

- New York Metro Super Lawyer, *Thomson Reuters*, 2012

## — Publications

- "Products Liability," Chapter 77, *Successful Partnering Between Inside and Outside Counsel*, (Robert L. Haig), *Thomson Reuters/West*, 2012

## — Memberships and activities

- Member, Association of the Bar of the City of New York

- Member, American Bar Association

- Member, Board of Directors, Mobilization for Justice, New York City

UNREDACTED - CONTAINS OUTSIDE PROFESSIONALS EYES ONLY INFORMATION
TREAT SUBJECT TO PROTECTIVE ORDER

# EXHIBIT 203

PUBLICLY FILED PER STIPULATION [ECF 2140]

ENGLISH FILED DOCUMENTS - WITSIDE PROFESSIONALS EYES ONLY - CONFIDENTIAL INFORMATION
TREAT SUBJECT TO PROTECTIVE ORDER

AUDITED COMBINED FINANCIAL STATEMENTS
Purdue Pharma L.P. and Associated Companies, PRA
Holdings, Inc. and Subsidiaries, Purdue Pharma Inc.,
Pharma Associates Inc., Pharma Associates L.P.,
IKUWA Holdings Inc., Purdue Products Inc.,
Purdue Pharmaceutical Products Inc., Purdue
Neuroscience Company, Millsaw Realty Inc., and
Norwell Land Company
Referred to Herein as The "Companies"
Years ended December 31, 2009 and 2008

PUBLICLY FILED PER STIPULATION [ECF 2140]

Audited Combined Financial Statements

Purdue Pharma L.P. and Associated Companies,
PRA Holdings, Inc. and Subsidiaries,
Purdue Pharma Inc., Pharma Associates Inc.,
Pharma Associates L.P., IKUWA Holdings Inc.,
Purdue Products Inc., Purdue Pharmaceutical
Products Inc., Purdue Neuroscience Company,
Millsaw Realty Inc., and Norwell Land Company
Referred to Herein as The "Companies"

*Years ended December 31, 2009 and 2008*
*with Report of Independent Auditors*

# Contents

Report of Independent Auditors ............................................................................................... 1

The Companies' Audited Combined Financial Statements

Combined Balance Sheet ........................................................................................................... 2
Combined Statement of Income ................................................................................................ 3
Combined Statement of Equity ................................................................................................. 4
Combined Statement of Cash Flows ......................................................................................... 5
Notes to Combined Financial Statements ................................................................................. 6

PUBLICLY FILED PER STIPULATION [ECF 2140]

PROFESSIONALS' EYES ONLY/HIGHLY CONFIDENTIAL—SUBJECT TO PROTECTIVE ORDER          PPLPUCC500056925

The Companies' Notes to Combined Financial Statements

December 31, 2009

## 21. Commitments and Contingencies (continued)

### *Legal Proceedings*

The Companies record accruals for contingencies to the extent that the occurrence of the contingency is probable and the amount of liability is reasonably estimable. If the reasonable estimate of liability is within a range of amounts and some amount within the range appears to be a better estimate than any other, then the Companies record that amount as an accrual. If no amount within the range is a reasonable estimate, then the Companies record the lowest amount as an accrual. Such assessments involve a series of complex judgments and rely heavily on estimates and assumptions regarding future events that management has deemed reasonable. Excessive outcomes can occur, and it is possible that the Companies could incur judgments or enter into settlements in excess of the amounts accrued, which could have a material adverse effect on the Companies' financial position, operations and cash flows.

The Companies' accounting policy with respect to defense costs is to expense all costs as incurred and to record recoveries from insurance when collection is assured. The Companies record accruals for other non-defense cost insurance recoveries based on existing deductibles and coverage limits, when collection is assured.

Various lawsuits, claims and proceedings are pending or threatened against certain of the Companies. The most significant are described below. The Companies recorded expense for settlements of $40 million in 2009, $45 million in 2008, $5 million in 2007, $579 million in 2006, $100 million in 2005 and $10 million in 2004 with respect to these matters. Of these amounts $721 million has been paid as of December 31, 2009. The balance at December 31, 2009 of $58 million has been classified as current and long-term liabilities of $57 million and $1 million, respectively.

### *OxyContin® Tablets ("OxyContin") Litigation - Civil Product Liability Lawsuits*

Numerous individuals have made product liability claims related to OxyContin against certain of the Companies. Most of those claimants allege that (1) they suffered bodily injury from the use of OxyContin, including addiction, (2) the defendant Companies failed to adequately warn them about the risks of addiction and (3) the defendant Companies "over-promoted" and aggressively and/or fraudulently marketed OxyContin. The claimants seek various forms of relief, including compensatory and punitive damages, interest and costs, and attorneys' fees.

As of March 31, 2010, 476 OxyContin product liability lawsuits are either currently pending against the defendant Companies or the defendant Companies in the United States have been notified they will be pending. Previously, there were five putative class action suits that were filed in federal courts in Colorado, Michigan, Mississippi, Nevada and Washington against certain of the Companies asserting a class on behalf of individuals residing in these states, as well as any person in the United States who between the years 1995 and 2001 was prescribed and/or used OxyContin and claiming, among other things, injunctive relief and certain types of damages. On September 8, 2009, those five putative class actions were dismissed without prejudice.

PUBLICLY FILED PER STIPULATION [ECF 2140]

PROFESSIONALS' EYES ONLY/HIGHLY CONFIDENTIAL—SUBJECT TO PROTECTIVE ORDER    PPLPUCC500056955

PROFESSIONALS' EYES ONLY/HIGHLY CONFIDENTIAL INFORMATION
TREAT SUBJECT TO PROTECTIVE ORDER

The Companies' Notes to Combined Financial Statements

December 31, 2009

## 21. Commitments and Contingencies (continued)

In addition, there are nine product liability putative class action lawsuits against the defendant Companies in Canada, collectively advancing claims on behalf of all Canadians who have been prescribed and/or used OxyContin.

The defendant Companies have also maintained agreements to toll the statutes of limitations of potential claims on behalf of approximately 300 or more individuals not subject to the settlements.

The defendant Companies believe they have meritorious defenses with respect to such claims and will vigorously defend them.

*OxyContin® Tablets Litigation – Consumer Protection Claims*

In 2007, two consumer protection claims were filed against certain of the Companies by third party payors alleging improper promotion of OxyContin caused them to pay for unnecessary and excessive usage of OxyContin. Both actions were consolidated in the U.S. District Court for the Southern District of New York (the "Southern District").

The parties entered into a settlement disposing of both actions, which was approved by the Southern District at a Fairness Hearing on May 15, 2009. Pursuant to the terms of the settlement, the two actions were dismissed with prejudice.

*OxyContin® Tablets Litigation - Regulatory, Law Enforcement and Governmental Matters*

On July 20, 2007 the U.S. District Court for the Western District of Virginia (the "WDVA") approved a settlement between certain of the Companies and the U.S. Attorney's Office for the WDVA to end a pending investigation. As part of this resolution, The Purdue Frederick Company Inc. pled guilty to a single felony count of misbranding based upon misstatements made in the promotion of OxyContin to healthcare professionals that occurred prior to July 2001. As part of the agreement with the government and based upon their senior positions with such Companies, three former executives also pled guilty to a single "strict liability" misdemeanor for misbranding based upon the misconduct of other employees while the executives held their positions of responsibility. The terms of the agreement also provided that PPLP enter into a Corporate Integrity Agreement pursuant to which it is maintaining a compliance program and has engaged an Independent Review Organization to perform reviews of specified promotional and product services during the term of such Corporate Integrity Agreement. The Corporate Integrity Agreement became effective on July 31, 2007.

In May 2007, in connection with investigations involving activities related to certain of the Companies and their promotion of OxyContin, such Companies signed consent judgments to settle investigations with twenty-seven State Attorneys General. In addition, such Companies settled separately with the Attorneys General for the State of Florida and the State of Mississippi.

PUBLICLY FILED PER STIPULATION [ECF 2140]

PROFESSIONALS' EYES ONLY/HIGHLY CONFIDENTIAL—SUBJECT TO PROTECTIVE ORDER        PPLPUCC500056956

PROFESSIONALS' EYES ONLY/HIGHLY CONFIDENTIAL INFORMATION
TREAT SUBJECT TO PROTECTIVE ORDER

The Companies' Notes to Combined Financial Statements

December 31, 2009

### 21. Commitments and Contingencies (continued)

On October 4, 2007, the Attorney General of the Commonwealth of Kentucky and Pike County, Kentucky filed a claim against certain of the Companies in state court alleging such Companies' improper promotion of OxyContin caused the plaintiffs to pay for excessive costs related to the usage of OxyContin, as well as the costs arising from misuse and addiction. The plaintiffs asserted various causes of action for their claim under Kentucky law, including violation of state antitrust laws and the Kentucky Medicaid Fraud Statute. The action was removed to the U.S. District Court for the Eastern District of Kentucky on October 29, 2007 and has subsequently been transferred to the Southern District where it has been coordinated with the antitrust lawsuits (see *Antitrust Litigations* below) and is subject to the stay ordered by the Southern District. The defendant Companies in this action believe they have meritorious defenses with respect to these claims and will vigorously defend them.

*Patent Litigations*

Certain of the Companies have received notices indicating that Food and Drug Administration ("FDA") approval of an Abbreviated New Drug Application ("ANDA") is being sought to engage in the commercial manufacture, use or sale of oxycodone hydrochloride extended release tablets in 10 mg, 20 mg, 40 mg and 80 mg dosage strengths prior to the expiration of certain of the Companies' patents covering low-ABUK oxycodone. Such low-ABUK oxycodone patents were recently listed in the FDA's Approved Drug Products with Therapeutic Equivalence Evaluations (Orange Book) in connection with OxyContin. The Companies are currently considering a response to such notices. However, as noted in the "U.S. Patent Litigations – Settled" section below, all patent litigation directed towards the current patent covering OxyContin, which expires April 16, 2013, have been settled. Therefore, the Companies do not believe such notices concerning the low-ABUK patents will have a materially adverse impact on the Companies' financial position, operations and cash flows.

*U.S. Patent Litigations - Settled*

Certain of the Companies have been involved in various lawsuits involving claims that the OxyContin patents were not infringed, and/or were invalid or unenforceable. Between 2006 and 2009, certain of the Companies entered into settlement agreements with (a) Boehringer Ingelheim GmbH, Boehringer Ingelheim, Roxane Laboratories, Inc. and Boehringer Ingelheim Corporation (collectively, "Roxane"), (b) Endo Pharmaceutical Holdings Inc. and Endo Pharmaceuticals, Inc. (collectively, "Endo"), (c) Teva Pharmaceuticals USA, Inc. ("Teva"), (d) Impax Laboratories, Inc. ("Impax"), (e) Mallinckrodt Inc. ("Mallinckrodt"), (f) Actavis Totowa LLC ("Actavis"), (g) KV Pharmaceutical Company ("KV"), (h) Apotex Inc. and Apotex Corp. (collectively, "Apotex"), and (i) Ranbaxy Inc., Ranbaxy Pharmaceuticals Inc. and Ranbaxy Laboratories Limited (collectively, "Ranbaxy") (the entities defined in (a) through (i) collectively referred to as the "Settling Defendants") terminating litigation regarding such Companies' OxyContin patents. Pursuant to such settlement agreements, each of the Settling Defendants acknowledged or agreed not to challenge the validity and enforceability of the OxyContin patents and acknowledged that sales of generic controlled release oxycodone products without a valid license would infringe the OxyContin patents. In connection with the settlements of the Endo, Teva, Impax, Mallinckrodt, Actavis, KV, Apotex and Ranbaxy litigations, each of the respective Settling Defendants was granted a short-term license to sell generic controlled-release oxycodone products. In connection with the settlements of the Actavis, Apotex, KV and Ranbaxy litigations, the respective Settling Defendants have been appointed as authorized generic distributors of certain versions of OxyContin in lieu of the aforementioned short-term license.

PUBLICLY FILED PER STIPULATION [ECF 2140]

PROFESSIONALS' EYES ONLY/HIGHLY CONFIDENTIAL—SUBJECT TO PROTECTIVE ORDER          PPLPUCC500056957

TREAT SUBJECT TO PROTECTIVE ORDER

The Companies' Notes to Combined Financial Statements

December 31, 2009

### 21. Commitments and Contingencies (continued)

*U.S. Patent Litigations - Ongoing*

Tramadol Patent Litigations

Between March, 2007 and April 2010, Par Pharmaceutical Companies, Inc., Impax, Paddock Laboratories, Inc. ("Paddock"), Cipher Pharmaceuticals Inc. ("Cipher") and Sun Pharmaceutical Industries Ltd., Sun Pharmaceutical Industries, Inc., Sun Pharma Global FZE and Carco Pharmaceuitcal Laboratories, Ltd. (collectively, "Sun"), Handa Pharmaceuticals, LLC ("Handa"), Lupin Ltd. and Lupin Pharmaceuticals, Inc. ("Lupin"), and Anchen Pharmaceuticals Inc. ("Anchen") and Teva, each respectively provided notices that it is each seeking FDA approval of ANDAs or New Drug Applications ("NDAs") to engage in the commercial manufacture, use or sale of extended-release tramadol hydrochloride tablets in 100 mg, 200 mg and/or 300 mg dosage strengths, prior to the expiration of certain of the Companies' patents.

Between 2007 and 2010, Purdue Pharma Products L.P. ("Purdue Pharma Products") filed complaints for patent infringement against Par Pharmaceutical, Inc. and Par Pharmaceutical Companies, Inc. (collectively, "Par"), Impax, Paddock, Cipher, Sun, Handa, Lupin and Anchen. Purdue Pharma Products sought judgments that Par, Impax, Paddock, Cipher, Sun, Handa, Lupin and Anchen have infringed its tramadol patents and an injunction against continued infringement.

A five-day bench trial was held in the Par litigation in April, 2009. On August 14, 2009, the District Court issued its Findings of Fact and Conclusions of Law and Judgment Order finding that Par's generic tramadol products would infringe certain of the Companies' patents, and that inequitable conduct had not been committed during prosecution of those patents, but that the patents were invalid for obviousness. Purdue Pharma Products and Par have each filed a Notice of Appeal and have fully briefed the issues. An appeal date has been set for May 7, 2010.

The Impax action was stayed. The Cipher and Sun actions have collateral estoppel judgments entered. On February 12, 2010, the United States Judicial Panel on Multidistrict Litigation centralized the Paddock actions and the Impax action in Delaware (the "Tramadol MDL"). Subsequently, both Handa and Anchen have been added to the Tramadol MDL and the court has been informed that the Lupin action, already pending in Delaware, is related. The Companies recorded royalties and net sales from extended-release tramadol hydrochloride tablets of $10.5 million and $4.7 million in the years ended December 31, 2009 and 2008, respectively. If the Companies do not prevail in the Tramadol MDL patent litigations, the Companies could experience a decrease in royalties and net sales in the future.

PUBLICLY FILED PER STIPULATION [ECF 2140]
PROFESSIONALS' EYES ONLY/HIGHLY CONFIDENTIAL—SUBJECT TO PROTECTIVE ORDER    PPLPUCC500056958

SUBJECT TO PROFESSIONALS' EYES ONLY INFORMATION
TREAT SUBJECT TO PROTECTIVE ORDER

The Companies' Notes to Combined Financial Statements

December 31, 2009

### 21. Commitments and Contingencies (continued)

*Non-U.S. Patent Litigations*

Certain of the Companies' European independent, associated companies and a Canadian independent, associated company have patent litigation matters pending in Germany, the Netherlands, the United Kingdom, the Czech Republic, Norway, Finland, Switzerland, Austria, Sweden, Belgium, Korea and Canada, and generic oxycodone controlled-release products have already launched in Germany, the Netherlands, Finland, Norway, Sweden and the Czech Republic.   Generic oxycodone controlled-release products in the Czech Republic have since been enjoined.  A post-grant Opposition to one of the patents at issue is proceeding in the European Patent Office.  A claim in such patent has been upheld in amended form, and both sides appealed from that decision.  On August 19, 2008, the court in Germany dismissed the patent plaintiff Companies' infringement claims.  On March 24, 2009, pursuant to a separate nullity action, one of the patents asserted in the infringement action in Germany was revoked by the German patent court.  This judgment is being appealed.  On December 16, 2008, the court in the United Kingdom found the OxyContin patents valid but not infringed.  On appeal, the court in the United Kingdom reversed the lower court's ruling on infringement and confirmed the validity of the patents in suit.  Further, the court ordered injunctions against the counterparties in the litigation prohibiting delivery of any infringing products in the United Kingdom.  On April 1, 2009, the House of Lords declined to hear an appeal in the case, concluding those proceedings.  On January 30, 2009, the court in the Czech Republic reinstated a preliminary injunction precluding sales of generic OxyContin, which had previously been granted and then revoked.  On July 16, 2009, a court in Canada issued an Order precluding approval of a generic OxyContin product.   On September 30, 2009, the District Court in The Hague, The Netherlands found the patents in suit valid and infringed, and issued an injunction against continued infringement.  On October 15, 2009, the Oslo District Court in Norway found the patents in suit invalid and not infringed.  The Dutch and Norwegian decisions have been appealed.  On January 6, 2010, a new OxyContin patent issued, and additional infringement proceedings have been commenced.  On March 30, 2010, a patent court in Dusseldorf, Germany granted a preliminary injunction prohibiting a competitor from selling extended release generic oxycodone products based on this newly-issued patent.  PPLP has posted a 7.5 million Euro bond in connection with this ruling.  On April 6, 2010, the Finnish Patent Office revoked one of the patents as allegedly obvious.  On April 7, 2010, the District Court in The Hague, Netherlands granted a preliminary injunction prohibiting a competitor from selling extended release generic oxycodone products.

The Companies recorded aggregate OxyContin royalties from their European, Canadian and Korean associated companies of $58.3 million and $53.8 million in the years ended December 31, 2009 and 2008, respectively.   If such associated companies do not prevail in these litigations, the Companies could experience a decrease in royalty income in the future.

PUBLICLY FILED PER STIPULATION [ECF 2140]

PROFESSIONALS' EYES ONLY/HIGHLY CONFIDENTIAL—SUBJECT TO PROTECTIVE ORDER    PPLPUCC500056959

HIGHLY CONFIDENTIAL—SUBJECT TO PROFESSIONALS' EYES ONLY INFORMATION
TREAT SUBJECT TO PROTECTIVE ORDER

The Companies' Notes to Combined Financial Statements

December 31, 2009

### 21. Commitments and Contingencies (continued)

*Antitrust Litigations*

As of March 31, 2010, certain of the Companies are defendants in approximately 68 antitrust lawsuits.  The substantial majority of these antitrust lawsuits are asserted as class actions on behalf of various classes of consumers, health plans, insurance companies, retail chains and direct purchasers.  The plaintiffs in these antitrust lawsuits contend that the OxyContin patents were fraudulently obtained and that the Endo patent litigation was a "sham" lacking any objective basis and brought subjectively in bad faith, in violation of the antitrust laws.  Many of the complaints assert comparable theories under state tort law and unfair competition statutes.  Plaintiffs seek various relief, including injunctions, damages, treble damages, disgorgement of profits, a constructive trust and attorneys' fees.

On March 30, 2006, the Southern District granted a motion staying the 68 antitrust claims until further order, and following the Court's January 7, 2008 ruling on enforceability of the OxyContin patents, these actions remain stayed.

In 2004, certain State Attorneys General began contemplating or conducting investigations of certain of the Companies' alleged inequitable conduct following a decision in a patent litigation brought by certain of the Companies' against Endo that held that the OxyContin patents were unenforceable due to inequitable conduct.  In a Tolling Agreement effective May 12, 2004, certain of the Companies and the Attorneys General for 41 states plus the District of Columbia agreed to toll any statute of limitations, doctrine of laches or other time-related defense to any claims arising from such investigations.  No Attorney General has commenced suit as a result of any such investigation.

The antitrust lawsuits are currently comprised of three groups: (a) the proposed class of direct purchasers of OxyContin, (b) the indirect purchasers of OxyContin and (c) the "opt outs" (i.e., those who opted out of the proposed direct purchaser class).  The defendant Companies have settled or are in the process of settling the 56 pending indirect purchaser actions.  The parties expect to file with the Southern District a motion of certification of the direct purchaser class for the purposes of settlement and a motion for preliminary approval of a class-wide settlement.  The defendant Companies also anticipate a settlement with a group of direct purchasers who opted out of the class and filed separate law suits on their own behalf.

To the extent any antitrust lawsuits remain after the settlements, the defendant Companies believe that they have meritorious defenses with respect to, and will continue to vigorously defend, the antitrust lawsuits.  The Companies further believe that they would have meritorious defenses with respect to any suits that may be commenced by the State Attorneys General.  If the defendant Companies were not to prevail in final, non-appealable determinations of the antitrust lawsuits, the impact could be materially adverse to the Companies' financial position, operations and cash flows.

35

PUBLICLY FILED PER STIPULATION [ECF 2140]

PROFESSIONALS' EYES ONLY/HIGHLY CONFIDENTIAL INFORMATION
TREAT SUBJECT TO PROTECTIVE ORDER

The Companies' Notes to Combined Financial Statements

December 31, 2009

21. Commitments and Contingencies (continued)

*Insurance Coverage Litigations*

The Companies have a $1 billion tower of product liability insurance covering certain years when plaintiffs alleged certain damages related to OxyContin. Certain of the Companies had been involved in ongoing litigation with American International Specialty Lines Ins. Co. ("AISLIC"), Gulf Underwriters Insurance Company ("Gulf"), and Steadfast Insurance Company ("Steadfast"). In 2006, certain of the Companies entered into settlement agreements with AISLIC, Gulf, and Steadfast. The Companies recorded insurance proceeds of $7.1 million, $5.2 million, $26.9 million, $144.7 million and $90 million for the years ended December 31, 2009, 2008, 2007, 2006 and 2005, respectively, under the settlements referenced above and/or pertinent insurance policies.

The Companies have now exhausted approximately $174.8 million of available insurance under the $1 billion tower. The balance of the payments received from insurance companies did not reduce the limits of insurance. Further recoveries from this insurance tower are not assured.

*Average Wholesale Price Litigation*

As of March 31, 2010, PPLP, together with dozens of other pharmaceutical manufacturers, is a defendant in approximately 50 Average Wholesale Price ("AWP") lawsuits. Some of the lawsuits also name certain of the other Companies (collectively with PPLP referred to herein as the "AWP Companies").

These lawsuits allege that the AWP Companies inflated their AWPs and other reported prices knowing that the Medicaid agencies reimbursed pharmacies for Medicaid beneficiary prescriptions based on AWP and otherwise relied on other prices reported by the AWP Companies. The AWPs at issue include OxyContin and, in some instances, other PPLP products. Some of the lawsuits do not identify any particular product.

The AWP lawsuit brought by the State of Iowa has been settled.

Although it is not possible to predict the outcome of any litigation, the Companies believe that the final disposition of the AWP lawsuits will not have a materially adverse impact on the Companies' financial position, operations and cash flows.

*Regulatory, Law Enforcement and Governmental Matters*

The Companies' and their facilities are regularly inspected by, and the Companies are subject to inquiries from, various regulatory agencies, including the FDA, Federal Trade Commission and the Drug Enforcement Administration.

PPLP filed a Citizen Petition with the FDA on June 23, 2008 (as further supplemented on October 15, 2008) requesting that the FDA require King Pharmaceuticals, Inc. and Pain Therapeutics, Inc. (collectively, "KPPT") to certify to the OxyContin patents for the Remoxy™ NDA filed by KPPT. Remoxy is a twice-a-day oxycodone formulation. On December 19, 2008, the FDA notified PPLP that the Citizen Petition was premature and made no comment on the substantive issues. If the FDA does not ultimately decide the substantive issues in PPLP's favor, the FDA may approve the KPPT NDA resulting in the subsequent launch of Remoxy by KPPT.

PUBLICLY FILED PER STIPULATION [ECF 2140]

36

UNREDACTED - CONTAINS OUTSIDE PROFESSIONALS' EYES ONLY INFORMATION
TREAT SUBJECT TO PROTECTIVE ORDER

# EXHIBIT 205

PUBLICLY FILED PER STIPULATION [ECF 2140]

UNREDACTED - CONTAINS OUTSIDE PROFESSIONALS' EYES ONLY INFORMATION
TREAT SUBJECT TO PROTECTIVE ORDER

AUDITED COMBINED FINANCIAL STATEMENTS
Purdue Pharma L.P. and Associated Companies, PRA
Holdings, Inc. and Subsidiaries, Pharma Associates Inc.,
Pharma Associates L.P., IKUWA Holdings Inc.,
Purdue Products Inc., Purdue Pharmaceutical Products Inc.,
and Norwell Land Company
Referred to Herein as The "Companies"
Years ended December 31, 2010 and 2009

PUBLICLY FILED PER STIPULATION [ECF 2140]

UNREDACTED - CONTAINS OUTSIDE PROFESSIONALS' EYES ONLY INFORMATION
TREAT SUBJECT TO PROTECTIVE ORDER

Audited Combined Financial Statements

Purdue Pharma L.P. and Associated Companies,
PRA Holdings, Inc. and Subsidiaries,
Pharma Associates Inc.,
Pharma Associates L.P., IKUWA Holdings Inc.,
Purdue Products Inc., Purdue Pharmaceutical
Products Inc.,
and Norwell Land Company
Referred to Herein as The "Companies"

*Years ended December 31, 2010 and 2009*
*with Report of Independent Auditors*

# Contents

Report of Independent Auditors ................................................................................................ 1

The Companies' Audited Combined Financial Statements

Combined Balance Sheet ......................................................................................................... 2
Combined Statement of Income .............................................................................................. 3
Combined Statement of Equity ............................................................................................... 4
Combined Statement of Cash Flows ....................................................................................... 5
Notes to Combined Financial Statements ............................................................................... 6

PROFESSIONALS' EYES ONLY/HIGHLY CONFIDENTIAL—SUBJECT TO PROTECTIVE ORDER    PPLPUCC500056964

UNREDACTED - CONTAINS OUTSIDE PROFESSIONALS' EYES ONLY INFORMATION
TREAT SUBJECT TO PROTECTIVE ORDER

The Companies' Notes to Combined Financial Statements

December 31, 2010

### 19. Commitments and Contingencies (continued)

*Legal Proceedings*

The Companies record accruals for contingencies to the extent that the occurrence of the contingency is probable and the amount of liability is reasonably estimable. If the reasonable estimate of liability is within a range of amounts and some amount within the range appears to be a better estimate than any other, then the Companies record that amount as an accrual. If no amount within the range is a reasonable estimate, then the Companies record the lowest amount as an accrual. Such assessments involve a series of complex judgments and rely heavily on estimates and assumptions regarding future events that management has deemed reasonable. Excessive outcomes can occur, and it is possible that the Companies could incur judgments or enter into settlements in excess of the amounts accrued, which could have a material adverse effect on the Companies' financial position, operations and cash flows.

The Companies' accounting policy with respect to defense costs is to expense all costs as incurred and to record recoveries from insurance when collection is assured. The Companies record accruals for other non-defense cost insurance recoveries based on existing deductibles and coverage limits, when collection is assured.

Various lawsuits, claims and proceedings are pending or threatened against certain of the Companies. The most significant are described below. The Companies recorded expense for settlements of $17 million in 2010, $40 million in 2009, $45 million in 2008, $5 million in 2007, $581 million in 2006, $100 million in 2005 and $10 million in 2004 with respect to these matters. Of these amounts $743 million has been paid as of December 31, 2010. The balance at December 31, 2010 of $55 million has been classified as a current liability.

*OxyContin Litigation - Civil Product Liability Lawsuits*

Numerous individuals have made product liability claims related to OxyContin against certain of the Companies. Most of those claimants allege that (1) they suffered bodily injury from the use of OxyContin, including addiction, (2) the defendant Companies failed to adequately warn them about the risks of addiction, and (3) the defendant Companies "over-promoted" and aggressively and/or fraudulently marketed OxyContin. The claimants seek various forms of relief, including compensatory and punitive damages, interest and costs, and attorneys' fees.

As of April 13, 2011, approximately 299 OxyContin product liability lawsuits involving approximately 471 user plaintiffs are either currently pending against the defendant Companies or the defendant Companies in the United States have been notified they will be pending. Previously, there were five putative class action suits that were filed in federal courts in Colorado, Michigan, Mississippi, Nevada and Washington against certain of the Companies asserting a class on behalf of individuals residing in these states, as well as any person in the United States who between the years 1995 and 2001 was prescribed and/or used OxyContin and claiming, among other things, injunctive relief and certain types of damages. These class actions subsequently settled in March, 2010 and have been dismissed against the defendant Companies.

31

PUBLICLY FILED PER STIPULATION [ECF 2140]

PROFESSIONALS' EYES ONLY/HIGHLY CONFIDENTIAL—SUBJECT TO PROTECTIVE ORDER          PPLPUCC500056995

UNREDACTED-CONTAINS OUTSIDE PROFESSIONALS EYES ONLY INFORMATION
TREAT SUBJECT TO PROTECTIVE ORDER

The Companies' Notes to Combined Financial Statements

December 31, 2010

### 19. Commitments and Contingencies (continued)

The defendant Companies have reached an agreement to settle 274 OxyContin cases brought in Staten Island, New York by New York and non-New York residents. The law firm representing the plaintiffs in these matters, Sanders Viener, is in the process of obtaining from its clients approval of the settlement agreement. To the extent that the settlement does not receive the requisite approval or the conditions of the settlement are not otherwise met, 246 cases will be dismissed pursuant to the Appellate Division, Second Department's decision to grant on appeal the defendant Companies' motion to dismiss the cases brought by out-of-state residents on the grounds of forum non conveniens, which would leave 28 of the 274 cases pending in New York. Because dismissal on forum non conveniens grounds is without prejudice, the out-of-state plaintiffs in the 246 cases would have the opportunity to re-file in their home jurisdictions if a settlement is not reached. In a conference held with the trial court in March 2011, plaintiffs' counsel obtained permission to delay dismissal of the out-of-state actions pursuant to the Appellate Division's decision in order to provide additional time to obtain approval of the settlement.

In addition, there are nine product liability putative class action lawsuits against the defendant Companies in Canada, collectively advancing claims on behalf of all Canadians who have been prescribed and/or used OxyContin.

The defendant Companies have also maintained agreements to toll the statutes of limitations of potential claims on behalf of approximately several hundred individuals not subject to the settlements. On August 24, 2010, the defendant Companies signed a settlement agreement that will potentially resolve the claims of up to 155 of such claimants. As of April 13, 2011, nearly all of those claimants have agreed to participate in the settlement.

The defendant Companies believe they have meritorious defenses with respect to such claims and will vigorously defend them.

*OxyContin Tablets Litigation – Consumer Protection Claims*

In 2007, two consumer protection claims were filed against certain of the Companies by third party payors alleging improper promotion of OxyContin caused them to pay for unnecessary and excessive usage of OxyContin. Both actions were consolidated in the U.S. District Court for the Southern District of New York (the "Southern District"). The parties entered into a settlement disposing of both actions, which was approved by the Southern District at a Fairness Hearing on May 15, 2009. Pursuant to the terms of the settlement, the two actions were dismissed with prejudice.

On September 9, 2010, a putative nationwide consumer class action was filed against certain of the Companies by a California consumer alleging improper promotion of OxyContin caused consumers to pay an excessive price for the medication. The case is pending in the U.S. District Court for the Eastern District of California. The defendant Companies believe they have meritorious defenses and intend to vigorously defend the claims.

PUBLICLY FILED PER STIPULATION [ECF 2140]

PROFESSIONALS' EYES ONLY/HIGHLY CONFIDENTIAL—SUBJECT TO PROTECTIVE ORDER          PPLPUCC500056996

UNREDACTED - CONTAINS OUTSIDE PROFESSIONALS' EYES ONLY INFORMATION
TREAT SUBJECT TO PROTECTIVE ORDER

The Companies' Notes to Combined Financial Statements

December 31, 2010

**19. Commitments and Contingencies (continued)**

*OxyContin Tablets Litigation - Regulatory, Law Enforcement and Governmental Matters*

On July 20, 2007 the U.S. District Court for the Western District of Virginia (the "WDVA") approved a settlement between certain of the Companies and the U.S. Attorney's Office for the WDVA to end a pending investigation. As part of this resolution, The Purdue Frederick Company Inc. pled guilty to a single felony count of misbranding based upon misstatements made in the promotion of OxyContin to healthcare professionals that occurred prior to July 2001. As part of the agreement with the government and based upon their senior positions with such Companies, three former executives also pled guilty to a single "strict liability" misdemeanor for misbranding based upon the misconduct of other employees while the executives held their positions of responsibility. The terms of the agreement also provided that PPLP enter into a Corporate Integrity Agreement pursuant to which it is maintaining a compliance program and has engaged an Independent Review Organization to perform reviews of specified promotional and product services during the term of such Corporate Integrity Agreement. The Corporate Integrity Agreement became effective on July 31, 2007.

In May 2007, in connection with investigations involving activities related to certain of the Companies and their promotion of OxyContin, such Companies signed consent judgments to settle investigations with twenty-seven State Attorneys General. In addition, such Companies settled separately with the Attorneys General for the State of Florida and the State of Mississippi.

On October 4, 2007, the Attorney General of the Commonwealth of Kentucky and Pike County, Kentucky filed a claim against certain of the Companies in state court alleging such Companies' improper promotion of OxyContin caused the plaintiffs to pay for excessive costs related to the usage of OxyContin, as well as the costs arising from misuse and addiction. The plaintiffs asserted various causes of action for their claim under Kentucky law, including violation of state antitrust laws and the Kentucky Medicaid Fraud Statute. The action was removed to the U.S. District Court for the Eastern District of Kentucky on October 29, 2007 and has subsequently been transferred to the Southern District where it has been coordinated with the antitrust lawsuits (see *Antitrust Litigations* below) and is subject to the stay ordered by the Southern District. The defendant Companies in this action believe they have meritorious defenses with respect to these claims and will vigorously defend them.

*Patent Litigations*

Generic competition for OxyContin in the United States could have a materially adverse impact on the Companies' financial position, operations and cash flows.

33

PUBLICLY FILED PER STIPULATION [ECF 2140]

UNREDACTED - CONTAINS OUTSIDE PROFESSIONALS' EYES ONLY INFORMATION
TREAT SUBJECT TO PROTECTIVE ORDER

The Companies' Notes to Combined Financial Statements

December 31, 2010

**19. Commitments and Contingencies (continued)**

*U.S. Patent Litigations*

1.      OxyContin Patent Litigations (original formulation)

On or around June 28, 2010, certain of the Companies received a notice indicating that Food and Drug Administration ("FDA") approval of an Abbreviated New Drug Application ("ANDA") is being sought to engage in the commercial manufacture, use or sale of oxycodone hydrochloride extended release tablets prior to the expiration of certain of the Companies' (a) original patents related to OxyContin, which will expire on April 16, 2013, and (b) low-ABUK oxycodone patents, (see item 2 below for further information on the low-ABUK oxycodone patents).  On August 11, 2010, certain of the Companies commenced patent infringement litigation in the Southern District and the U.S. District Court for the Eastern District of Pennsylvania against Varam, Inc. ("Varam") and KVK-Tech, Inc. ("KVK").  Since the plaintiff Companies filed suit against Varam and KVK within 45 days of receipt of notice of their respective filings with the FDA, the plaintiff Companies, under the Hatch-Waxman Act, are entitled to an automatic statutory stay, which effectively prevents Varam and KVK from launching their generic controlled-release oxycodone products from the date of receipt of their respective notices until the earlier of: (i) 30 months or (ii) a court decision finding the patents in-suit invalid, unenforceable, or not infringed.

To the extent the plaintiff Companies do not prevail in the litigation and/or to the extent the FDA approves the proposed ANDAs, the Companies could experience generic competition for OxyContin.

2.      Low-ABUK Oxycodone Patent Litigations (original formulation)

On or around April 9, 2010, certain of the Companies received notices indicating that FDA approval of an ANDA is being sought to engage in the commercial manufacture, use or sale of oxycodone hydrochloride extended release tablets prior to the expiration of certain of the Companies' patents related to low-ABUK oxycodone which have been listed in the FDA's Approved Drug Products with Therapeutic Equivalence Evaluations (the "Orange Book") in connection with OxyContin.  On May 5, 2010, certain of the Companies commenced patent infringement litigation in the Southern District against Ranbaxy Inc., Ranbaxy Pharmaceuticals Inc. and Ranbaxy Laboratories Limited (collectively, "Ranbaxy"), Actavis Elizabeth LLC ("Actavis Elizabeth"), and Mylan Pharmaceuticals Inc. and Mylan Inc.  The Companies believe that the ANDAs for which the low-ABUK oxycodone notices were provided are not seeking FDA approval until after April 16, 2013, the date on which the last of the original patents related to OxyContin will expire.

To the extent the plaintiff Companies do not prevail in the litigation and/or to the extent the FDA approves the proposed ANDAs, the Companies could experience generic competition for OxyContin.

34

PUBLICLY FILED PER STIPULATION [ECF 2140]

PROFESSIONALS' EYES ONLY/HIGHLY CONFIDENTIAL—SUBJECT TO PROTECTIVE ORDER          PPLPUCC500056998

UNREDACTED – CONTAINS OUTSIDE PROFESSIONALS' EYES ONLY INFORMATION
TREAT SUBJECT TO PROTECTIVE ORDER

Exhibits

The Companies' Notes to Combined Financial Statements

December 31, 2010

## 19. Commitments and Contingencies (continued)

3.    OxyContin Patent Litigations (reformulation)

Certain of the Companies received notices indicating that FDA approval of an ANDA is being sought to engage in the commercial manufacture, use or sale of oxycodone hydrochloride extended release tablets in 10 mg, 15 mg, 20 mg, 30 mg, 40 mg, 60 mg and/or 80 mg dosage strengths prior to the expiration of certain of the Companies' patents related to low-ABUK oxycodone, and prior to the expiration of certain third party patents which PPLP licensed from such third parties.  All such patents have been listed in the Orange Book in connection with the reformulation of OxyContin.  On March 23 and 24, 2011, certain of the Companies commenced patent infringement litigation in (a) the Southern District against Watson Laboratories, Inc. – Florida ("Watson Florida"), Andrx Labs, LLC ("Andrx"), Teva Pharmaceuticals USA, Inc., and Actavis Elizabeth; (b) the Southern District of Florida against Watson Florida; and (c) Delaware against Andrx.  On April 8, 2011, certain of the Companies commenced patent infringement litigation in the Southern District against Ranbaxy and Impax Laboratories, Inc.  The Companies believe that the ANDAs for which the notices were provided are not seeking FDA approval until after April 16, 2013, the date on which the last of the original patents related to OxyContin will expire.  Since the plaintiff Companies filed suit within 45 days of receipt of notice of the defendant companies' respective filings with the FDA, the plaintiff Companies, under the Hatch-Waxman Act, are entitled to an automatic statutory stay, which effectively prevents defendants from launching their generic controlled-release oxycodone products from the date of receipt of their respective notices until the earlier of: (i) 30 months or (ii) a court decision finding the patents in-suit invalid, unenforceable, or not infringed.

To the extent the plaintiff Companies do not prevail in the litigation and/or to the extent the FDA approves the proposed ANDAs, the Companies could experience generic competition for OxyContin.

*Non-U.S. Patent Litigations*

Certain of the Companies' European associated companies have patent litigation matters pending in Germany, the Netherlands, the United Kingdom, the Czech Republic, Norway, Finland, Switzerland, Austria, Sweden, Belgium, Denmark, and Slovakia, and generic oxycodone controlled-release products have already launched in Germany, the Netherlands, Finland, Norway, Sweden, Denmark, Austria, and the Czech Republic.  Generic oxycodone controlled-release products in the Netherlands, Norway and the Czech Republic have since been enjoined.

The litigations in the various jurisdictions in Europe are at various stages.  On March 30, 2010, a patent court in Dusseldorf, Germany granted a preliminary injunction prohibiting a competitor from selling extended release generic oxycodone products based on a newly-issued patent.  The injunction was upheld on appeal.  Proceedings on the merits are going forward.  PPLP has posted a 7.5 million Euro (approximately $10.2 million) bond in connection with the ruling granting the preliminary injunction. If the injunction is upheld in the merits proceedings, the bond will be refunded.  If the injunction is vacated, the competitor is entitled to make a claim for its damages based on the improvident grant of the injunction.  Damages are not limited to the amount of the bond.  PPLP would be liable for any damages awarded greater than 7.5 million Euro (approximately $10.2 million), and would obtain a return of the balance of the bond to the extent the entire amount of the bond was not utilized.

35

PUBLICLY FILED PER STIPULATION [ECF 2140]

UNREDACTED - CONTAINS OUTSIDE PROFESSIONALS EYES ONLY INFORMATION
TREAT SUBJECT TO PROTECTIVE ORDER

The Companies' Notes to Combined Financial Statements

December 31, 2010

## 19. Commitments and Contingencies (continued)

A Canadian associated company had a patent litigation pending in Canada, which was settled on June 17, 2010. On or about February 23, 2011, a Canadian associated company received a notice of allegation from Ranbaxy Pharmaceuticals Canada Inc., which is seeking approval to engage in the commercial manufacture, use or sale of oxycodone hydrochloride extended release tablets prior to the expiration of the applicable patent. A complaint was filed on April 13, 2011. The parties will be filing a stay of the proceeding pursuant to the terms of a prior settlement agreement with Ranbaxy.

A Korean associated company has a patent litigation pending in Korea and generic oxycodone controlled-release products have already launched in Korea. On September 14, 2010, the Korean Patent Office Intellectual Property Tribunal held the Korean OxyContin patent valid, rejecting a generic company's revocation proceeding.

An Australian associated company has a patent litigation matter pending concerning an oxycodone controlled-release patent. No generic oxycodone controlled-release product has been launched in Australia.

The Companies recorded aggregate OxyContin royalties from their European, Canadian and Korean associated companies of $61.4 million and $57.9 million in the years ended December 31, 2010 and 2009, respectively. If such associated companies do not prevail in these litigations, the Companies could experience a decrease in royalty income in the future.

*Antitrust Litigations*

Following the 2004 decision by the Southern District in the Endo patent litigation holding that the OxyContin patents were unenforceable due to inequitable conduct, approximately 68 antitrust lawsuits were filed against certain of the Companies. The substantial majority of these antitrust lawsuits were asserted as class actions on behalf of various classes of consumers, health plans, insurance companies, retail chains and direct purchasers. They asserted antitrust claims under federal law or, in a number of cases, under state antitrust laws or unfair competition statutes. The plaintiffs in these antitrust lawsuits contended that the OxyContin patents were fraudulently obtained and that the Endo patent litigation was a "sham" lacking any objective basis and brought subjectively in bad faith, in violation of the antitrust laws. Plaintiffs sought various relief, including injunctions, damages, treble damages, disgorgement of profits, a constructive trust and attorneys' fees. These cases, which were filed in federal and state courts around the country, were consolidated into a multi-district litigation proceeding in the Southern District. On March 30, 2006, the Southern District granted a motion staying all of the antitrust lawsuits until further order. With the exception of one brief interval, the actions remained stayed since that time.

Also in 2004 following the Southern District's decision in the Endo patent litigation, certain State Attorneys General began contemplating or conducting investigations of certain of the Companies' alleged inequitable conduct. In a Tolling Agreement effective May 12, 2004, certain of the Companies and the Attorneys General for 41 states plus the District of Columbia agreed to toll any statute of limitations, doctrine of laches or other time-related defense to any claims arising from such investigations. No Attorney General has commenced suit as a result of any such investigation.

36

PUBLICLY FILED PER STIPULATION [ECF 2140]

UNREDACTED—CONTAINS PROFESSIONALS EYES ONLY INFORMATION
TREAT SUBJECT TO PROTECTIVE ORDER

The Companies' Notes to Combined Financial Statements

December 31, 2010

### 19. Commitments and Contingencies (continued)

The antitrust lawsuits can be separated into three categories: (a) the proposed class of direct purchasers of OxyContin, (b) 56 complaints filed by indirect purchasers of OxyContin, many purporting to represent nationwide or statewide classes of indirect purchasers, and (c) 11 direct purchasers who opted out of the proposed direct purchaser class described in (a). As of April 13, 2011, the defendant Companies have settled all of the 56 indirect purchaser actions, entered into a settlement agreement with the direct purchaser class (which settlement was approved by the Southern District), and signed agreements settling the claims asserted by the 11 direct purchasers that opted out of the direct purchaser class. In summary, the defendant Companies have signed agreements to settle all filed claims and anticipate that all such claims (to the extent they have not yet been dismissed) will be dismissed in due course.

To the extent any antitrust lawsuits remain after the settlements, the defendant Companies believe that they have meritorious defenses with respect to the antitrust lawsuits, and will continue to vigorously defend them. The Companies further believe that they would have meritorious defenses with respect to any suits that may be commenced by the State Attorneys General. If the defendant Companies were not to prevail in final, non-appealable determinations of the antitrust lawsuits, the impact could be materially adverse to the Companies' financial position, operations and cash flows.

*Insurance Coverage Litigations*

The Companies have a $1 billion tower of product liability insurance covering certain years when plaintiffs alleged certain damages related to OxyContin. Certain of the Companies had been involved in ongoing litigation with American International Specialty Lines Ins. Co. ("AISLIC"), Gulf Underwriters Insurance Company ("Gulf"), and Steadfast Insurance Company ("Steadfast"). In 2006, certain of the Companies entered into settlement agreements with AISLIC, Gulf, and Steadfast. The Companies recorded insurance proceeds of $14.2 million, $7.1 million, $5.2 million, $26.9 million, $144.7 million and $90 million for the years ended December 31, 2010, 2009, 2008, 2007, 2006 and 2005, respectively, under the settlements referenced above and/or pertinent insurance policies.

The Companies have now exhausted approximately $201 million of available insurance under the $1 billion tower. The balance of the payments received from insurance companies did not reduce the limits of insurance. Further recoveries from this insurance tower are not assured.

*Average Wholesale Price Litigation*

As of April 13, 2011, PPLP, together with dozens of other pharmaceutical manufacturers, remains as a defendant in approximately four Average Wholesale Price ("AWP") lawsuits brought by the following states: Louisiana, Alabama, Utah and Kansas. Some of these lawsuits also name certain of the other Companies (collectively with PPLP referred to herein as the "AWP Companies").

37

PUBLICLY FILED PER STIPULATION [ECF 2140]

UNREDACTED—CONTAINS OUTSIDE PROFESSIONALS' EYES ONLY INFORMATION
TREAT SUBJECT TO PROTECTIVE ORDER

The Companies' Notes to Combined Financial Statements

December 31, 2010

**19. Commitments and Contingencies (continued)**

These lawsuits allege that the AWP Companies inflated their AWPs and other reported prices knowing that the Medicaid agencies reimbursed pharmacies for Medicaid beneficiary prescriptions based on AWP and otherwise relied on other prices reported by the AWP Companies. The AWPs at issue include OxyContin and, in some instances, other PPLP products. Some of the lawsuits do not identify any particular product.

The AWP lawsuit brought by the State of Iowa and the cases brought by various counties in the State of New York have been settled and the AWP Companies have been dismissed as defendants.

Although it is not possible to predict the outcome of any litigation, the Companies believe that the final disposition of the AWP lawsuits will not have a materially adverse impact on the Companies' financial position, operations and cash flows.

*Regulatory, Law Enforcement and Governmental Matters*

The Companies and their facilities are regularly inspected by, and the Companies are subject to inquiries from, various regulatory agencies, including the FDA, Federal Trade Commission and the Drug Enforcement Administration.

PPLP filed a Citizen Petition with the FDA on June 23, 2008 (as further supplemented on October 15, 2008) requesting that the FDA require King Pharmaceuticals, Inc. and Pain Therapeutics, Inc. (collectively, "KPPT") to certify to the OxyContin patents for the Remoxy™ NDA filed by KPPT. Remoxy is a twice-a-day oxycodone formulation. On December 19, 2008, the FDA notified PPLP that the Citizen Petition was premature and made no comment on the substantive issues. PPLP also filed a Citizens Petition with the FDA on January 14, 2011 again requesting that the FDA require KPPT to certify to the OxyContin patents for the Remoxy™ NDA filed by KPPT. If the FDA does not ultimately decide the substantive issues in these petitions in PPLP's favor, the FDA may approve the KPPT NDA resulting in the subsequent launch of Remoxy by KPPT.

The Companies are aware of two Citizen's Petitions that have been filed with the FDA on September 30, 2010 and October 8, 2010, respectively, each requesting that the FDA determine whether OxyContin sold pursuant to NDA No. 20-553 by PPLP has been voluntarily withdrawn from the market due to reasons other than safety and effectiveness. The Companies do not know at this time when the FDA will respond to such Citizen's Petitions or what the FDA's response will be to such Citizen's Petitions.

PUBLICLY FILED PER STIPULATION [ECF 2140]

PROFESSIONALS' EYES ONLY/HIGHLY CONFIDENTIAL—SUBJECT TO PROTECTIVE ORDER          PPLPUCC500057002

UNREDACTED - CONTAINS OUTSIDE PROFESSIONALS EYES ONLY INFORMATION
TREAT SUBJECT TO PROTECTIVE ORDER

# EXHIBIT 216

PUBLICLY FILED PER STIPULATION [ECF 2140]

UNREDACTED - CONTAINS OUTSIDE PROFESSIONALS' EYES ONLY INFORMATION
TREAT SUBJECT TO PROTECTIVE ORDER

Execution Version

AMENDMENT TO SHAREHOLDERS' AGREEMENT

This AMENDMENT TO SHAREHOLDERS' AGREEMENT (this "**Amendment**"), dated as of September 3, 2019 (the "**Effective Date**"), is entered into by and among Banela Corporation, a British Virgin Islands company ("**Banela**"), Linarite Holdings LLC, a Delaware limited liability company ("**Linarite**"), Perthlite Holdings LLC, a Delaware limited liability company ("**Perthlite**" and, together with Banela and Linarite, the "**PPI Shareholders**"), and Purdue Pharma Inc., a New York corporation ("**PPI**").  Capitalized terms used herein and not otherwise defined herein shall have the meanings given to such terms in the Amended and Restated Shareholders' Agreement (as defined below).

W I T N E S S E T H

WHEREAS, the PPI Shareholders and PPI are parties to that certain Amended and Restated Shareholders' Agreement of PPI effective as of May 14, 2019 (the "**Amended and Restated Shareholders' Agreement**"); and

WHEREAS, the PPI Shareholders and PPI desire to amend the Amended and Restated Shareholders' Agreement on the terms and conditions set forth herein.

NOW, THEREFORE, the parties hereto hereby agree as follows:

1.    <u>Amendments</u>.  (a)  Effective as of the Effective Date, the Amended and Restated Shareholders' Agreement is hereby amended to delete and replace in its entirety each instance of the words "Transaction Committee" therein with the following words: "Special Committee".

(b)    Effective as of the Effective Date, the last sentence of Section 2(a)(i)(5) of the Amended and Restated Shareholders' Agreement is hereby amended to insert before the period the following words and punctuation: "; provided that if any Director recuses him or herself from a given meeting or a given vote, such Director's position will be treated as if it were, for purposes of such meeting or vote, a vacancy."

(c)    Effective as of the Effective Date, Section 2(a)(viii) of the Amended and Restated Shareholders' Agreement is hereby deleted and replaced in its entirety with the following:

(viii)    <u>Quorum; Action by the Board.</u>  A quorum of the Board shall consist of a majority of the Directors In Office as of such time; provided that, if there is not present a majority of the Directors In Office disregarding the proviso to the definition of the term "Directors In Office," then a quorum shall consist of all of the Directors In Office including after taking into account the proviso to the definition of that

PUBLICLY FILED PER STIPULATION [ECF 2140]

UNREDACTED - CONTAINS OUTSIDE PROFESSIONALS' EYES ONLY INFORMATION
TREAT SUBJECT TO PROTECTIVE ORDER

term; provided further that, in no event will the number of Directors constituting a quorum be less than one-third of the Full Board.  All actions of the Board, other than those delegated to and properly approved by the Special Committee or, to the extent authority to act with respect thereto has been delegated to another committee of the Board, such other committee of the Board has properly approved such matter, will require either (a) the affirmative vote of at least a majority of the number of Directors In Office as of such vote if a quorum is present at such time; provided that (x) the approval of any Fundamental Matter described in clause (ii) of the definition thereof (or the delegation to a committee of the Board of the authority to act with respect to any such Fundamental Matter) shall also require the affirmative vote of each Director In Office in favor of such Fundamental Matter and (y) the approval of any Fundamental Matter described in clause (i) of the definition thereof (or the delegation to a committee of the Board of the authority to act with respect to any such Fundamental Matter) shall also require the affirmative vote of two-thirds of the Directors In Office in favor of such Fundamental Matter, or (b) the unanimous written consent of the Directors In Office disregarding the proviso to the definition of the term "Directors In Office".  No Board approval will be required with respect to (x) the following three matters with respect to which the Board has delegated authority to the Special Committee:  (1) all dividends by PPI to its Shareholders or any distribution by PPLP to its general and/or limited partners, (2) all Affiliate Transactions (as defined below) and (3) all Affiliate Litigation (as defined below), or (y) any other matter with respect to which the Board has delegated authority to act to a committee of the Board, provided that such matter is properly approved by such committee.

PUBLICLY FILED PER STIPULATION [ECF 2140]

UNREDACTED - CONTAINS OUTSIDE PROFESSIONALS' EYES ONLY INFORMATION
TREAT SUBJECT TO PROTECTIVE ORDER

     (e)     Effective as of the Effective Date, Section 2(a)(ix) of the Amended and Restated Shareholders' Agreement is hereby deleted and replaced in its entirety with the following:

     (ix)     <u>Special Committee</u>.  The Board shall have a

"**Special Committee**", which will oversee (x) all dividends by PPI to its Shareholders

and all distributions by PPLP to its general and/or limited partners, (y) all transactions

between PPI, PPLP or any PPLP Subsidiary, on the one hand, and any Class A

Shareholder, any Class B Shareholder, any Specified Person with respect to any Class A

Shareholder or Class B Shareholder, or any Affiliate of any of the foregoing (other than

PPI, PPLP or any PPLP Subsidiary), on the other hand (an "**Affiliate Transaction**"), and

(z) the prosecution, defense or settlement of any claim or litigation between any of PPI,

PPLP or any PPLP Subsidiary, on the one hand, and any Class A Shareholder, any Class

B Shareholder, any Specified Person with respect to any Class A Shareholder or Class B

Shareholder, any Affiliate of any of the foregoing (other than PPI, PPLP or any PPLP

Subsidiary), or any current or former director or officer of PPI, PPLP or any PPLP

Subsidiary, on the other hand ("**Affiliate Litigation**"), and no such dividend, distribution,

Affiliate Transaction or Affiliate Litigation shall take place without the approval of the

Special Committee.  Neither the term "Affiliate Transaction" nor the term "Affiliate

Litigation" shall include (a) any transaction solely between PPLP and any of its wholly

owned subsidiaries or a transaction solely between two or more wholly owned

subsidiaries of PPLP, (b) seeking protection under the federal bankruptcy code or any

analogous state law, (c) settling any litigation to which PPI, PPLP or any PPLP

Subsidiary is a party (other than any litigation between any of PPI, PPLP or any PPLP

Subsidiary, on the one hand, and any Class A Shareholder, any Class B Shareholder, any

Specified Person with respect to any Class A Shareholder or Class B Shareholder, any

3

UNREDACTED - CONTAINS OUTSIDE PROFESSIONALS' EYES ONLY INFORMATION
TREAT SUBJECT TO PROTECTIVE ORDER

Affiliate of any of the foregoing (other than PPI, PPLP or any PPLP Subsidiary) or any

current or former director or officer of PPI, PPLP or any PPLP Subsidiary, on the other

hand), (d) any transaction that would otherwise be an Affiliate Transaction but is below a

dollar threshold that has been established by the Board as not needing Special Committee

approval or (e) claims asserted against PPLP, PPI or any PPLP Subsidiary by any Person

that is not a Class A Shareholder, a Class B Shareholder, a Specified Person with respect

to any Class A Shareholder or Class B Shareholder, an Affiliate of any of the foregoing

(other than PPI, PPLP or any PPLP Subsidiary) or a current or former director or officer

of PPI, PPLP or any PPLP Subsidiary.

    (1)    The Special Committee shall be composed of: (A) the Chairman

and (B) such other Directors (none of whom shall be a member of the MDS Family or the

RRS Family, or any current or former spouse of a member of the MDS Family or the

RRS Family) as shall be determined by a majority of the Directors In Office.  The

Chairman of the Special Committee shall be an At Large Director or the Chairman, in

either case as selected by the Board.

    (2)    A quorum of the Special Committee shall consist of either (x) a

majority of the Special Committee or (y) all Disinterested Persons on the Special

Committee.

    (3)    All actions of the Special Committee will require either the

affirmative vote of at least a majority of its members or unanimous written consent;

provided that for any given matter to be acted on by the Special Committee at a meeting,

only those members of the Special Committee who are Disinterested Persons with respect

to such matter shall participate in such vote, and any members of the Special Committee

PUBLICLY FILED PER STIPULATION [ECF 2140]

UNREDACTED - CONTAINS OUTSIDE PROFESSIONALS' EYES ONLY INFORMATION
TREAT SUBJECT TO PROTECTIVE ORDER

who are not Disinterested Persons with respect to such matter shall be disregarded for

purposes of determining a majority approval with respect to such vote (i.e., as if such

members were not members of the Special Committee).

  2. <u>Miscellaneous</u>.  (a) Except as expressly provided in this Amendment, the Amended and Restated Shareholders' Agreement and all provisions thereof in effect as of the date hereof shall continue in full force and effect without any modification or amendment.

  (b) This Amendment may be amended, modified, supplemented or waived only by written agreement of the parties hereto.

  (c) This Amendment shall be governed by, and construed and enforced in accordance with, the laws of the State of New York.

  (d) This Amendment may be executed in counterparts, each of which when so executed and delivered shall constitute an original and all of which together shall constitute one and the same instrument.

[*Signature Pages Follow*]

5

UNREDACTED - CONTAINS OUTSIDE PROFESSIONALS' EYES ONLY INFORMATION
TREAT SUBJECT TO PRESERVE ORDER

IN WITNESS WHEREOF, the parties hereto have executed this Amendment effective as of the date first set forth above.

PURDUE PHARMA INC.

By _____

Name: MARK L. KESSELMAN

Title: Sr. VICE PRESIDENT, GENERAL COUNSEL

*[Signature Page to Amendment to Shareholder's Agreement]*

UNREDACTED - CONTAINS OUTSIDE PROFESSIONALS EYES ONLY INFORMATION
TREAT SUBJECT TO PROTECTIVE ORDER

BANELA CORPORATION

By _____
Name:  Jonathan G. White
Title:  Director

*[Signature Page to Amendment to Shareholder's Agreement]*

PUBLICLY FILED PER STIPULATION [ECF 2140]

LINARITE HOLDINGS LLC

By _____

Name: Leslie J. Schreyer
Title: Manager

*[Signature Page to Amendment to Shareholder's Agreement]*

PUBLICLY FILED PER STIPULATION [ECF 2140]

UNREDACTED, CONTAINS OUTSIDE PROFESSIONALS' EYES ONLY INFORMATION TREAT SUBJECT TO PROTECTIVE ORDER

PERTHLITE HOLDINGS LLC

By _____
Name: Leslie J. Schreyer
Title: Manager

*[Signature Page to Amendment to Shareholder's Agreement]*

PUBLICLY FILED PER STIPULATION [ECF 2140]