AKIN GUMP STRAUSS HAUER & FELD LLP
Ira S. Dizengoff
Arik Preis
Mitchell Hurley
Joseph L. Sorkin
Elizabeth Scott (*admitted pro hac vice*)
Sara L. Brauner
One Bryant Park
New York, New York 10036
Telephone: (212) 872-1000
Facsimile: (212) 872-1002

*Counsel to the Official Committee of Unsecured
Creditors of Purdue Pharma L.P.,* et al.

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| PURDUE PHARMA L.P., *et al.*,[1] | ) | Case No. 19-23649 (RDD) |
| | ) | |
| Debtors. | ) | (Jointly Administered) |
| | ) | |

**OFFICIAL COMMITTEE OF UNSECURED CREDITORS' REPLY IN SUPPORT OF
ITS MOTION TO COMPEL PRODUCTION OF PURPORTEDLY PRIVILEGED
DOCUMENTS, OR FOR *IN CAMERA* REVIEW, BASED ON GOOD CAUSE, CRIME
FRAUD, AND AT ISSUE EXCEPTIONS TO CLAIMS OF PRIVILEGE**

---

[1] The Debtors in these cases, along with the last four digits of each Debtor's registration number in the applicable jurisdiction, are as follows: Purdue Pharma L.P. (7484), Purdue Pharma Inc. (7486), Purdue Transdermal Technologies L.P. (1868), Purdue Pharma Manufacturing L.P. (3821), Purdue Pharmaceuticals L.P. (0034), Imbrium Therapeutics L.P. (8810), Adlon Therapeutics L.P. (6745), Greenfield BioVentures L.P. (6150), Seven Seas Hill Corp. (4591), Ophir Green Corp. (4594), Purdue Pharma of Puerto Rico (3925), Avrio Health L.P. (4140), Purdue Pharmaceutical Products L.P. (3902), Purdue Neuroscience Company (4712), Nayatt Cove Lifescience Inc. (7805), Button Land L.P. (7502), Rhodes Associates L.P. (N/A), Paul Land Inc. (7425), Quidnick Land L.P. (7584), Rhodes Pharmaceuticals L.P. (6166), Rhodes Technologies (7143), UDF L.P. (0495), SVC Pharma L.P. (5717) and SVC Pharma Inc. (4014). The Debtors' corporate headquarters is located at One Stamford Forum, 201 Tresser Boulevard, Stamford, CT 06901.

## **TABLE OF CONTENTS**

TABLE OF AUTHORITIES ................................................................................. ii

PRELIMINARY STATEMENT ............................................................................ 1

DISCOVERY STATUS ........................................................................................ 5

ARGUMENT ........................................................................................................ 9

I.     THE CRIME FRAUD EXCEPTION JUSTIFIES FURTHER DISCLOSURE ...... 9

    A.    Breach of Fiduciary Duty:  Substantial Reason Exists to Believe the
          Sacklers and Other Purdue Board Members Breached Their Fiduciary
          Duties ................................................................................................ 10

          1.    The Sacklers' close involvement in the details of Purdue's affairs
                supports an inference that they breached their fiduciary duties ..... 12

          2.    The Sacklers were directly involved or implicated in conduct
                Purdue has admitted was criminal or that allegedly underpins DOJ
                claims. ........................................................................................ 18

    C.    Intentional Fraudulent Transfer:  Probable Cause Exists to Believe that the
          Sacklers, in Control of Purdue, Sought to Hinder or Delay Creditors ....... 24

          1.    The Sacklers' own words and actions reveal their motivations ..... 25

          2.    Purdue faced massive actual or threatened litigation and vast
                liability at all relevant times—and the Sacklers knew it ............... 27

          3.    The Sacklers continually failed to get products (hazard) insurance. 34

          4.    Trust distributions massively outpaced reinvestment. ................... 35

          5.    Other Sackler contentions are equally unpersuasive. ................... 37

    D.    The Crime-Fraud Documents Should Be Produced or Reviewed *In
          Camera* ............................................................................................. 41

II.    THE AT ISSUE EXCEPTION JUSTIFIES FURTHER DISCLOSURE ............. 44

CONCLUSION .................................................................................................. 47

SUPPLEMENTAL FILING IN SUPPORT OF MEMORANDUM OF LAW IN OPPOSITION
AND AGREED ORDER REGARDING MEDIA INTERVENORS' MOTION TO UNSEAL
MATERIALS FILED IN CONNECTION WITH UCC PRIVILEGES MOTIONS [ECF No. 2140]

## **TABLE OF AUTHORITIES**

### **Federal Cases**

*Amusement Indus., Inc. v. Stern*,
    293 F.R.D. 420 (S.D.N.Y. 2013) ...............................................................9, 10, 40, 43

*Arista Records LLC v. Lime Grp. LLC*,
    No. 06 CV 5936(KMW), 2011 WL 1642434 (S.D.N.Y. Apr. 20, 2011) ........44, 45, 46

*In re Brocade Commc'ns Sys., Inc. Derivative Litig.*,
    615 F. Supp. 2d 1018 (N.D. Cal. 2009) ....................................................................12

*Brown v. Barnes and Noble, Inc.*,
    No. 1:16-cv-07333(RA)(KHP), 2019 WL 7168146 (S.D.N.Y. Dec. 12, 2019).........45

*Cendant Corp. v. Shelton*,
    246 F.R.D. 401 (D. Conn. 2007)..........................................................................24, 41

*In re Cnty. of Erie*,
    546 F.3d 222 (2d Cir. 2008)................................................................................44, 46

*Drummond Company, Inc. v. Conrad & Scherer, LLP*,
    885 F.3d 1324 (11th Cir. 2018) .................................................................................43

*Fabrikant v. French*,
    691 F.3d 193 (2d Cir. 2012)......................................................................................40

*Galaxy CSI, LLC v. Galaxy Comp. Servs., Inc.*,
    No. 1:04-CV-00007-LMB, 2004 WL 3661433 (E.D. Va. Mar. 31, 2004)...................9

*In re Grand Jury Subpoena Duces Tecum Dated Sept. 15, 1983*,
    731 F.2d 1032 (2d Cir. 1984).....................................................................................9

*Irving Trust Company v. Gomez*,
    100 F.R.D. 273 (S.D.N.Y. 1983) ..............................................................................10

*LiButti v. United States*,
    107 F.3d 110 (2d Cir. 1997)......................................................................................17

*Moore v. Bay*,
    284 U.S. 4 (1931)......................................................................................................38

*In re Oxycotin Antitrust Litig.*,
    No. 1:06-cv-13095-SHS (S.D.N.Y. Jan. 7, 2008).....................................................33

*In re Richard Roe, Inc.*,
    168 F.3d 69 (2d Cir. 1999).......................................................................................42

*Rosebud Sioux Tribe v. A & P Steel, Inc.*,
    733 F.2d 509 (8th Cir. 1984) ....................................................................17

*Scott v. Chipotle Mexican Grill, Inc.*,
    67 F. Supp. 3d 607 (S.D.N.Y. 2014)..........................................................45

*Sec. Inv'r Prot. Corp. v. Bernard L. Madoff Inv. Sec., LLC*,
    319 F.R.D. 100 (Bankr. S.D.N.Y. 2017) ...............................................9, 24

*In re Tronox, Inc.*,
    503 B.R. 239 (Bankr. S.D.N.Y. 2013)....................................38, 39, 40, 41

*United States v. Travisano*,
    724 F.2d 341 (2d Cir. 1983).......................................................................10

*United States v. Zolin*,
    491 U.S. 554 (1989)...................................................................................43

*In re W.R. Grace & Co.*,
    281 B.R. 852 (Bankr. D. Del. 2002) ........................................................40

**State Cases**

*Stone ex rel. AmSouth Bancorporation v. Ritter*,
    911 A.2d 362 (Del. 2006) .........................................................................12

*Dohmen v. Goodman*,
    234 A.3d 1161 (Del. 2020) .......................................................................12

*Jones v. Mackey Price Thompson & Ostler*,
    469 P.3d 879 (Utah 2020) .........................................................................40

*Lebanon Cnty. Employees' Ret. Fund v. AmerisourceBergen Corp.*,
    No. 2019-0527-JTL, 2020 WL 132752 (Del. Ch. Jan. 13, 2020)...................11, 12, 23

*N.J. Dep't of Env't Prot. v. Caldeira*,
    794 A.2d 156 (N.J. 2002).........................................................................39

*In re N.Y.C. Asbestos Litig.*,
    109 A.D.3d 7 (N.Y. App. Div. 2013) .........................................................9

*Pritchard v. Pritchard*,
    No. FA950319316S, 2004 WL 1052680 (Conn. Super. Ct. Apr. 26, 2004) ..............39

*Purdue Pharma L.P. v. Hon. Steven D. Combs*,
    No. 2013-CA-001941-OA (Ky. Ct. App. dated Feb. 4, 2014) ....................................30

*State v. Lombardo Bros. Mason Contractors, Inc.*,
    54 A.3d 1005 (Conn. 2012) ......................................................................39

JOINDER IN UCC'S REPLY IN FURTHER SUPPORT OF STIPULATION
AND AGREED ORDER REGARDING MEDIA INTERVENORS' MOTION TO UNSEAL
MATERIALS FILED IN CONNECTION WITH UCC PRIVILEGES MOTIONS [ECF No. 2140]

**Federal Statutes**

11 U.S.C. § 544(b) ...................................................................................................38

**State Statutes**

Haw. Rev. Stat. § 657-1.5 ........................................................................................39

N.J.S.A. 2A:14-1.2(a) ...............................................................................................39

**Rules**

Bankruptcy Rule 9031 ..........................................................................................1, 43

**Constitutional Provisions**

Fifth Amendment ...........................................................................................5, 17, 23

## PRELIMINARY STATEMENT

1.      If ever there were circumstances justifying application of the crime-fraud and at issue doctrines—two vital, universally recognized exceptions to the attorney-client privilege— they are present here.  The extensive record marshalled by the UCC[2] provides ample "probable cause" to believe the Sacklers engaged in widespread breaches of fiduciary duty and fraudulently transferred billions of dollars out of Purdue to their putative spendthrift trusts and foreign affiliates with the intention of hindering and depriving creditors.  This is precisely the kind of wrongdoing that justifies application of the crime fraud exception.[3]

2.      Purdue has now confessed to being a serial federal offender, admitting to crimes committed over a period totaling at least 15 years, and spanning three decades, all while under the exclusive ownership and control of the Sacklers.  Purdue admits that its most recent period of law breaking began *the same month*—May 2007—that Purdue previously confessed to marketing and selling opioids in violation of federal law, and that Purdue engaged in a sustained program to defraud the United States government.  Based on those crimes, and on related civil wrongdoing, Purdue soon will have paid close to $1 billion in damages, fines, penalties and forfeitures to the federal government, and will have admitted to liability of approximately $8 billion.

3.      Until recently, the Sacklers dominated and controlled Purdue and all of its affairs, with a particularly keen focus on the sale and marketing of OxyContin, the drug responsible for

---

[2] Capitalized terms used and not otherwise defined herein shall have the meanings ascribed to such terms in the Motion. The UCC withdraws its alternative request for appointment of a special master in light of Bankruptcy Rule 9031. Evidence supporting the Motion and cited below was attached to the Declaration of Mitchell Hurley dated September 29, 2020 [ECF 1754] (the "**Hurley Decl.**"), concluding with exhibit number 109.  The UCC has identified substantial additional evidence in support of the Motion since it filed its opening papers.  For ease of reference, such new evidence will be attached to the Declaration of Arik Preis dated November 18, 2020 (the "**Preis Decl.**") beginning with exhibit number 110.

[3] For the avoidance of doubt, and as set forth in the *Stipulation of Settlement and Agreed Order Regarding Official Committee's Motion to Compel and Debtors' Motion for a Protective Order* [ECF No. 1955], the UCC and the Debtors have resolved the portions of the Motion pertaining to documents withheld by the Debtors; and, as such, the UCC seeks no further relief from the Debtors in respect of the Motion.

most of the Sacklers' extravagant wealth.  At all relevant times, members of the family comprised

a majority of Purdue's Board, with outside directors who were appointed and "dominated by" the

Sacklers, and viewed as "soldiers" who could be "march[ed] … into a meeting" and relied on to

"follow the lead of the family member in the room."

4.    But the Sacklers were far more than just dominating directors.  In the words of one

of their closest advisors, the Sacklers were "executives, management, board and shareholders all-

in-one," and had their fingerprints on all material company activities.  When it came to increasing

opioid sales through aggressive marketing tactics—the conduct underpinning Purdue's recent plea

and settlement with the DOJ—the Sacklers were at their micromanaging worst, going on sales

calls to physician offices, engaging with junior marketing personnel over the objection of

management, contravening or countermanding executive directions, and giving "trivial" and even

"insulting" orders to junior personnel.  At every turn, the Sacklers commanded Purdue's personnel

to market OxyContin aggressively, including by targeting "high value" prescribers based not on

their specialty or practice—which did not factor into the sales plan—but solely on the fact that

those prescribers wrote exponentially more OxyContin prescriptions than others.  That approach,

which the Sacklers specifically and enthusiastically endorsed, is at the heart of the conduct Purdue

now admits was criminal.

5.    Directors breach their fiduciary duties when they knowingly permit the company

to engage in conduct that violates the law.  In these cases, the evidence of the Sacklers' complete

dominion over Purdue's affairs, and meticulous attention to and control over the details of Purdue's

marketing, is overwhelming.  That evidence permits—indeed, all but requires—an inference that

if Purdue was continuously engaged in criminal conduct in the marketing and sale of OxyContin

for at least ten years (on top of the five years of crimes Purdue admitted to in 2007), the Sacklers

had to know about it.  And even if the Sacklers' conduct with respect to Purdue's crimes somehow could be described merely as negligent, they still would be liable for breaches of fiduciary duty, since Purdue did not purport to eliminate the Board's fiduciary duty of care until 2018.

6.      Probable cause also exists to believe that the Sacklers transferred billions of dollars out of Purdue in a deliberate attempt to hinder or delay opioid creditors, another basis for applying the crime-fraud exception.  The Sacklers claim that the massive value transfers Purdue made to their trusts in the wake of the 2007 plea could not have been intended to evade Purdue creditors, because prior to 2017 no one could have predicted that Purdue would face "meaningful litigation." But dozens of contemporaneous emails, memos and other documents demonstrate just the opposite.  Key members of the Sackler family unmistakably were shaken by Purdue's 2007 guilty plea, and deeply concerned that opioid-related litigation and its threat to the family's wealth would persist and grow.

7.      Peter Boer, a close family advisor and current Purdue director, advised the Sacklers in July 2007 to "take defensive measures" against Purdue's "uncapped liabilities," including by sending assets overseas.  Boer counseled the Sacklers to deprive litigants of a "deep pocket" from which to recover damages inflicted by Purdue.  The transfers upon which the Sacklers then embarked were unprecedented, both in absolute terms and as a percentage of Purdue's net sales, resulting in at least $12 billion in cash and property moving offshore and to family trusts from 2008 and after.  These facts are sufficient for a "reasonably prudent person" to conclude that the Sacklers may have engaged in fraudulent transfers and to apply the crime fraud exception.

8.      The Sacklers also put "at issue" their good faith, and their alleged belief that litigation was not a serious threat at the time of the transfers, both in their defense presentations and again in opposition to the Motion.  The mere fact that estate claims have not yet been

3

commenced against the Sacklers should not prevent application of the at issue doctrine, as the Sacklers contend. To more accurately evaluate and bolster the strength of estate claims, creditors should be given access to the same information that would be available to them if they reject the Settlement Framework and proceed to litigation with the Sacklers, including documents that could contradict (or support) the central arguments the Sacklers intend to make in defense of such claims.

9. The Sacklers argue the Motion should be denied because the UCC seeks disclosure of documents by category. But substantial precedent exists for granting exceptions motions based on documents identified by group, and the categories selected by the UCC here are reasonably calculated to include documents likely to be in furtherance of or closely related to the Sacklers breaches of duty and the claims of good faith. And, the UCC had no choice but to proceed as it did. Given the sheer size of the Sacklers' logs, and the generic document descriptions they feature, neither the UCC nor anyone other than the Sacklers themselves can say with confidence which of the specific documents they withheld come within the applicable categories. To the extent the Court elects to review any documents *in camera*, the UCC submits that a reasonable and less burdensome starting point would be with a small sample of documents within each of the categories, and suggests below a sampling of approximately 71 such documents.

10. The UCC will continue to engage in good faith in the current mediation process with the mediators, the Sacklers, the NCSG, the AHC, the Debtors, and others in an effort to reach resolution of the claims against the Sacklers. Indeed, the UCC is hopeful that discovery it already has marshalled, and that is underway, will be enough to elicit reasonable settlement terms from the Sacklers, perhaps even before the scheduled hearing date (December 15, 2020). Barring a settlement, however, disclosure of the material subject to the Motion will remain critical. Notably, (i) key witnesses, including Purdue's CEOs from 2007 to 2017 (John Stewart and Mark Timney)

have refused to answer the UCC's questions on Fifth Amendment grounds, (ii) several years or more have elapsed since many of the transfers and other events at issue occurred, (iii) witness memories appear to have faded, and (iv) a number of important witnesses are not available at all.[4] Contemporaneous documents therefore have been and will remain critical to developing the facts that support the estates' claims, and absent settlement by December 15, the Motion should be granted.

## DISCOVERY STATUS

11.     Parties to these cases, including in opposition to the Motions, have criticized the manner in which the UCC has conducted discovery in these cases. The UCC believes these attacks are unfair, and provides a brief update on the status of discovery and reminder of how we arrived here.

12.     First, the UCC has not engaged in "relentless" or "ever expanding" discovery demands in these cases, as has been suggested. On the contrary, the UCC last served a new document request on the Sacklers on March 31, 2020, and on the Debtors on May 1, 2020. Nearly all of the documents produced in response to those requests were the subject of so-ordered stipulations entered into by the parties last summer, were identified using agreed ESI search criteria that the parties' negotiated over periods of many weeks, and expressly were based on "hit reports" disclosing the number of documents that would be subject to review before the parties executed the stipulations.[5] The stipulations also required rolling privilege logs, and the current Motions

---

[4] Raymond, Mortimer Sr., Jonathan, and Beverly Sackler are no longer living. Peter Boer, author of the July 2007 memo recommending the Sacklers take "defensive measures," provided about 45 minutes of deposition testimony on November 16, 2020 but did not return from the morning break. Mr. Boer will not be made available to complete his examination, apparently based on a medical condition.

[5] *Stipulation and Agreed Order Among the Official Committee, the Non-Consenting States Group and the Debtors Regarding Discovery in the Chapter 11 Cases* [ECF No. 1623]; *Stipulation and Agreed Order Among the Official Committee and the Raymond Side Covered Parties Regarding Discovery Deadlines in the Chapter 11 Cases* [ECF No. 1348]; *Stipulation and Agreed Order Among the Official Committee and the Mortimer Side Covered Parties Regarding Discovery Deadlines in the Chapter 11 Cases* [ECF No. 1347].

were the subject of a later stipulation with the Debtors dated August 25, 2020, that was amended

and joined in part by the Sacklers on September 28, 2020. In other words, discovery has proceeded

as the disclosing parties agreed.

13.    The UCC also was provided with documents produced by the Debtors and others

pre-petition in the MDL. While vast, these productions already had been gathered in response to

requests made by other parties, and producing them to the UCC did not impose a material

additional burden on the Debtors or other disclosing parties. For its part, the UCC never intended

to review every one of these documents, and did not to do so. Rather, the UCC employed search

terms, machine-learning, and predictive coding to identify much smaller, targeted groups of

documents for review, a process that has unearthed much information of critical relevance to these

cases, but without the cost of a document-by-document review.

14.    Criticism leveled at the UCC for using Cole Schotz lawyers, including partners, in

connection with document review also is misguided. The average billing rate for a Cole Schotz

partner, or "member," is less than that of a first-year associate at a large, New York-based firm.

*Compare* [ECF No. 1924] at Ex. A (disclosing average Cole Schotz partner member rate of $619),

*with* [ECF No. 1864] at Ex. B (identifying Davis Polk & Wardwell first year associate rate of

$690.00). In document review, these experienced Cole Schotz lawyers play a crucial role,

receiving documents from contract attorneys after "first level" review, and helping identify those

of greater potential significance and then distributing them to team members for use in depositions,

pleadings and otherwise. This is precisely the kind of task that Cole Schotz was retained to carry

out, at rates lower than any appropriate alternative.[6]  Nor has Akin Gump overstaffed these cases

---

[6] *See also* Preis Decl., Ex. 217 (Nov. 19, 2019 Hr'g Tr. at 23:12-16 (J. Drain: "I actually welcome the notion that the committee decided to hire [Cole Schotz] not as a conflicts counsel, but as an efficiency counsel, which is, I think, a nice way of saying a less expensive counsel for matters that are appropriate.")).

at a senior level or otherwise. Most partner and senior counsel hours through August have been billed by just six Akin Gump lawyers, while other subject-matter experts have been utilized periodically as necessary and appropriate, and have billed comparatively few hours.[7]

15.     The document discovery phase of the UCC's investigation is nearing completion. The UCC understands that the Sacklers and the Debtors have finished producing documents pursuant to last summer's stipulations, except for documents subject to the Motions. The Debtors, the Sacklers, and related current and former clients ("**NRF Clients**") of Norton Rose Fulbright ("**NRF**" or "**Norton Rose**") have committed to completing by the end of November their production of ESI responsive to the UCC's requests previously served on the NRF Clients that are in NRF's immediate possession. Preis Decl., Ex. 196 (November 9, 2020 Simpson Thacher email). The so-called IACs also are engaged in producing documents pursuant to separate stipulations, which the UCC hopes will be completed without further Court intervention.

16.     The UCC has taken far fewer depositions than the opposition suggests, and soon will be finished. On July 23, 2020, the Court instructed the UCC to start depositions before the conclusion of document discovery.[8] The UCC promptly sent letters to the Debtors and to the Sacklers asking that they provide notice to identified witnesses that the UCC was considering deposing. The UCC made clear repeatedly that it had no intention of deposing all of the witnesses

---

[7] For instance, in July, a white-collar partner billed 16.2 hours, an appellate partner billed 9.4 hours, and an insurance partner billed 15.7 hours. In addition, although Akin Gump believes the fees it has incurred are appropriate and compensable, it routinely writes off substantial sums in recognition of the great expense of these cases generally and with the expectation that any estate savings will benefit victims of the opioid crisis. *See, e.g.*, Eleventh *Monthly Fee Statement of Akin Gump Strauss Hauer & Feld LLP for the Period of August 1, 2020 through August 31, 2020* [ECF No. 1870] at 2 n.2 (reflecting a voluntary fee reduction of more than $2 million); *see also Twelfth Monthly Fee Statement* [ECF No. 1923] at 2 n.2 ($911,767.00 reduction); *Tenth Monthly Fee Statement* [ECF No. 1696] at 2 n.2 ($612,473.50 reduction); *Ninth Monthly Fee Statement* [ECF No. 1559] at 2 n.2 ($310,958.00 reduction); *Eighth Monthly Fee Statement* [ECF No. 1382] at 3 n.3 ($375,945 reduction); *Seventh Monthly Fee Statement* [ECF No. 1276] at 2 n.2 ($242,846.00 reduction).

[8] Document productions remain underway, and the UCC reserves its right to bring to the Court's attention in connection with the Motions information not cited here or in its opening brief to the extent identified by the UCC's ongoing review in advance of the hearing.

identified in its letters, and merely sought to ensure their availability on the schedule preferred by the Court. In an August 25, 2020 letter, the UCC advised the Court that it and the NCSG together planned to take approximately 25 depositions, not 40 as suggested by some.[9] To date, the UCC has scheduled a total of 21 witnesses, and sought diligently to complete all of those examinations by the end of November. Due to witness schedules and/or preferences, the UCC has scheduled 5 depositions in early December.[10]

17. Certain parties have suggested that it was unnecessary or imprudent for the UCC to take discovery in these cases because Purdue provided substantial disclosures pre-petition in the opioid MDL. But none of the pre-petition discovery was directed at claims for fraudulent transfer, breach of fiduciary duty or any of the other claims that belong to the estates. Moreover, critical custodians escaped discovery entirely in the MDL, including most members of the Sackler family and all non-Sackler members of Purdue's Board of Directors. And as its submissions on these Motions demonstrate, the UCC's discovery has greatly strengthened and increased the value of the estates' claims against the Sacklers.

18. The Motions themselves also have been productive. In exchange for the UCC's agreement to withdraw its challenges, the Debtors will provide (and have already provided) thousands of privileged documents to the UCC on a common interest basis concerning distributions, communications with the Sacklers, and probative documents identified by the Debtors' own investigation. The UCC is aware of no other debtor agreeing to supply privileged documents to its creditors, certainly not on this scale. In addition, after the UCC challenged the disclosing parties' Privilege Logs, they agreed to produce previously withheld information from

---

[9] *Mitchell Hurley Letter to the Court*, dated August 25, 2020 [ECF No. 1613].
[10] Preis Decl., Ex. 197 (November 8, 2020 K. Porter email); *see also id*. Ex. 198 (November 15, 2020 K. Porter email attaching current deposition schedule).

more than 12,000 documents, including 5,535 by Side A (15% of the total originally logged) and

3,158 by Side B (14% of the total originally logged).

## ARGUMENT

19.     More than sufficient "probable cause" exists to believe that the Sacklers breached

their fiduciary duties and made intentional fraudulent transfers, and to justify application of the

crime-fraud exception.  The Sacklers also have put "at issue" their claims of good faith, and that

they had no idea before 2017 that Purdue might face meaningful opioid-related litigation.

## I.     THE CRIME FRAUD EXCEPTION JUSTIFIES FURTHER DISCLOSURE

20.     Communications and "advice in furtherance of a fraudulent or unlawful goal" are

not privileged.  *In re Grand Jury Subpoena Duces Tecum Dated Sept. 15, 1983*, 731 F.2d 1032,

1038 (2d Cir. 1984).  The claims to which the exception applies include intentional fraudulent

transfer and breach of fiduciary duty, among others.  *See id*. at 1041 (applying crime-fraud

exception to communications in furtherance of transfers to hinder or delay creditor); *In re N.Y.C.

Asbestos Litig.*, 109 A.D.3d 7, 10 (N.Y. App. Div. 2013) ("The crime-fraud exception

encompasses a fraudulent scheme, an alleged breach of fiduciary duty, or an accusation of some

other wrongful conduct."); *Galaxy CSI, LLC v. Galaxy Comp. Servs., Inc.*, No. 1:04-CV-00007-

LMB, 2004 WL 3661433, at *2 (E.D. Va. Mar. 31, 2004) (noting crime/fraud exception has been

applied to "fraudulent transfers in the bankruptcy context and breaches of fiduciary duty") (citation

omitted).

21.     Courts in this Circuit do not, as the Sacklers contend, require moving parties to

"establish fraud in the traditional sense of deceit or trickery."  *See* Side B Amended Exceptions

Objections [ECF No. 1815] (hereinafter "**BXO**") at 34 (citing a Northern District of Illinois

decision).  Rather, evidence of "intentional actions to hinder, delay or defraud" is sufficient.  *Sec.

Inv'r Prot. Corp. v. Bernard L. Madoff Inv. Sec., LLC*, 319 F.R.D. 100, 109 (Bankr. S.D.N.Y.

2017); *see Amusement Indus., Inc. v. Stern*, 293 F.R.D. 420, 425 (S.D.N.Y. 2013) (exception reaches "conduct beyond the technical definitions of crimes or frauds to include other wrongful conduct"). The Sacklers argue *Irving Trust Company v. Gomez*, 100 F.R.D. 273 (S.D.N.Y. 1983), requires a showing of "actual fraud" to invoke the exception, but that case says just the opposite: "unlawful conduct" suffices "regardless of whether such conduct constitutes a fraud or any other intentional tort." *Id.* at 277; *compare* BXO at 37-38. In any event, Purdue admittedly defrauded the U.S. government while under the Sacklers' control.

22.     Nor is the UCC required to "demonstrate" that the estates will prevail on their claims. *E.g.*, BXO at 32; *see also* Side A Exceptions Objections [ECF No. 1804] ¶ 57 (hereinafter "**AXO**"). "Obviously, there need not be a 'definitive[]' showing" of wrongful conduct to invoke the crime-fraud exception; "rather, 'there need only be presented a reasonable basis for believing' that conduct triggering the exception has occurred. *Amusement Indus., Inc.*, 293 F.R.D. at 426 ("The probable cause standard cannot imply 'more probable than not.'") (quoting *United States v. Travisano*, 724 F.2d 341, 346 (2d Cir. 1983)). The relevant threshold sometimes is called a "probable cause" or "substantial reason" standard, but however labeled, "is 'not an overly demanding standard.'" *Sec. Inv. Prot. Corp.*, 319 F.R.D. at 107 (quoting *Amusement Indus.*, 293 F.R.D. at 427). That standard is readily met here, particularly in light of Purdue's recent admission that it committed federal crimes for at least a ten-year period under the stewardship of the Sacklers.

A.     **Breach of Fiduciary Duty:  Substantial Reason Exists to Believe the Sacklers and Other Purdue Board Members Breached Their Fiduciary Duties**

23.     Directors who knowingly fail to prevent violations of positive law breach their fiduciary duty of loyalty. *Lebanon Cnty. Employees' Ret. Fund v. AmerisourceBergen Corp.*, No. 2019-0527-JTL, 2020 WL 132752, at *21 (Del. Ch. Jan. 13, 2020).[11]  On May 10, 2007, Purdue

---

[11] *See* October 20, 2020 plea agreement (the "**Plea Agreement**," or "**2020 Plea Agreement**") Preis Decl., Ex. 182.

admitted to federal crimes in connection with its sale and marketing of opioids between 1996 and

2001, and agreed to pay a $600 million fine. Purdue now admits that it embarked on further

criminal conduct that very same month—May of 2007—this time lasting through at least 2017.

Purdue also has conceded liability for fines, penalties and damages amounting to about $8 billion.

24.     According to the Sacklers, the "record proves the reasonableness, good faith and

conscientiousness" of the Sackler Board members. BXO at 27. But it does nothing of the sort. In

their October 15 opposition, the Sacklers tout "federal oversight of PPLP's marketing and its

compliance with federal health care law" as a basis for believing that Purdue's conduct under their

watch was above board. *Id.* at 27. The Sacklers claim that during the period of the CIA, "each

year" the Office of Inspector General of HHS confirmed that PPLP was "in compliance with

federal law." *Id.* In fact, the OIG's annual communications clearly provided that the OIG was not

"affirm[ing] that Purdue has implemented an effective compliance program," and that "Purdue is

in the best position to determine the effectiveness of its compliance efforts."[12] And just days after

the Sacklers filed their oppositions, Purdue admitted it "knowingly and intentionally conspired and

agreed with others to defraud" the federal government. *Compare* BXO at 27 *with* Preis Decl., Ex.

182 (2020 Plea Agreement) at 16.

25.     Remarkably, it appears that the Sacklers plan to argue that they simply did not know

that the company they owned and "micromanage[d]" was committing crimes over a period

spanning three decades. *See* Preis Decl., Ex. 132 at PPLPC036000177151 [C] (Purdue marketing

personnel accusing Mortimer Sackler of "micromanagement beyond belief"). But discovery has

revealed the Sacklers' fingerprints on all important Purdue decisions, especially decisions

---

[12] Preis Decl., Ex. 210 [C] (May 6, 2009 OIG review letter); *id.* Ex. 211 [C] (Apr. 1, 2010 OIG review letter); *id.* Ex.
212 [C] (Jan. 28, 2011 OIG review letter); *id.* Ex. 213 [C] (Mar. 8, 2012 OIG review letter); *id.* Ex. 214 [C] (Jan. 24,
2013 OIG review letter).

concerning sales, marketing and other practices impacting OxyContin revenues, and including much of the conduct forming the predicate for Purdue's recent guilty plea.

26.     That evidence more than justifies a "reasonable belief" that the Sacklers actually knew about Purdue's criminal conduct, or at least failed adequately to monitor that conduct, and thus violated their fiduciary duties of good faith and loyalty.  *See AmerisourceBergen Corp.*, 2020 WL 132752, at *22 (observing that board members and officers "breach[] their fiduciary duty of loyalty by," among other things, "consciously permitting the company to violate positive law," or "consciously failing to monitor … regulatory risk").  Certainly, the evidence provides probable cause to conclude that the Board may have violated its duty of care, a negligence standard that Purdue's partnership agreement did not purport to eliminate until 2018.[13]  *See In re Brocade Commc'ns Sys., Inc. Derivative Litig.*, 615 F. Supp. 2d 1018, 1046 (N.D. Cal. 2009) ("To plead a violation of the duty of care [under Delaware law], a plaintiff need not allege that a defendant knowingly breached or even consciously disregarded his fiduciary duty to the company; gross negligence is sufficient.") (citation omitted).

>     ***1.***     ***The Sacklers' close involvement in the details of Purdue's affairs supports an inference that they breached their fiduciary duties.***

27.     The Sacklers argue that as mere Board members, they reasonably relied on management reports that Purdue was in compliance with applicable laws and regulations, and have no responsibility for the fact that Purdue actually was carrying out multiple felonies over a period of many years.  *E.g.*, BXO at 26-28.  But directors only can take refuge in statutory safe harbors if they act in good faith, and then only for breaches of the duty of care, not claims, like some included

---

[13] Absent such contractual exculpation, "a general partner's duties to limited partners and the partnership parallel those exercised by directors of Delaware corporations," who "owe duties of care and loyalty" to the enterprise.  *Dohmen v. Goodman*, 234 A.3d 1161, 1167-68 (Del. 2020).  Most of the identified breaches of duty occurred before the 2018 amendment to the PPLP partnership agreement, and that amendment may be avoidable in any case.  *See* Exceptions Motion n.21.

here, that are based on disloyalty and bad faith. *See Stone ex rel. AmSouth Bancorporation v. Ritter*, 911 A.2d 362, 367 (Del. 2006) (observing that a statutory safe harbor "can exculpate directors from monetary liability for a breach of the duty of care, but not for conduct that is not in good faith or a breach of the duty of loyalty"). The Sacklers' knowledge of Purdue's criminal misconduct can be inferred from their hands-on management of Purdue—especially its efforts to drive sales of OxyContin—and vitiates any claim that they acted negligently, but in good faith.

28.     Indeed, and by design, Purdue's Board—and thus the Sacklers—expressly retained control over all major decisions, and "guided" management. In 2003, for example, the Board penned an internal release concerning an "organizational change." Richard and Mortimer would be appointed "Co-Chairman of the Board," and Michael Friedman—who just four years later would plead guilty to federal crimes in the marketing and sale of opioids at Purdue—was named President and CEO. In its 2003 announcement, however, the Sacklers made clear that the Board they dominated would "participate in all major decisions and continue to guide the management on an ongoing basis." Preis Decl., Ex. 136 at PPLPUCC500647349 [PEO/HC].

29.     In fact, not only did the Sacklers "guide the management on an ongoing basis," they provided substantive direction even to management underlings. *See generally* Preis Decl., Ex. 134 [PEO/HC]. For example, in a 2006 email, Friedman complained:

> During the past few months I have repeatedly asked Board members to refrain from giving direction to my subordinates. Nevertheless, Board members continue to engage my subordinates in lengthy conversations and chains of correspondence (see emails below) that amount to substantial direction. … [T]here are times that these directions differ from those that I would provide … and I am unaware because I don't hear about the Board member's directions. … [S]ome of these directions have been trivial and insulting ….

*Id.* at PPLPUCC002603603. Richard described Friedman's email as a "public[] rebuk[e]," and asked that it be withdrawn. *Id.* Friedman replied "[a]s I told you the other day, you are all over me and my staff … you obviously are not willing to change …. I would prefer not to discuss this

13

further on email." *Id.* at PPLPUCC002603602.

30.     And the Sacklers' roles as *de facto* executives did not change, even after May 2007,
when they resigned certain executive titles in the wake of Purdue's guilty plea. *E.g.,* Preis Decl.,
Ex. 137 [C].  In 2010, for example, Stuart Baker explained that Board meetings were always
"loaded with lots of agenda items" because the Sacklers wanted to be "deeply involved in the
business and [are] unwilling to delegate authority over many matters that would be left to
management of a public company." He went on, "[t]his of course is nothing new as this is the way
Mortimer and Raymond ran the business and made it what it is today." Preis Decl., Ex. 133 at
PPLPUCC002449097 [PEO/HC].  In 2011, Jonathan, Richard and current Purdue director Peter
Boer discussed the same issue, observing that "the role of the board and that of the management
[at Purdue] is blurred compared with the distinctions made by other major corporations," and
ascribing the lack of a "conventional division between board and management roles" in part to
"the majority of family Board Members." Preis Decl., Ex. 135 at PPLPUCC9003800125 [HC].

31.     At various times, the Sacklers discussed limiting their involvement in management,
but their domination of Purdue's affairs remained unaltered until they began to resign from the
Board in 2018.  In 2015, the Board actually drafted a resolution that would have limited contact
with managers in an effort to stop family members from "bombarding execs with [] ideas and
trying to influence them." Preis Decl., Ex. 142 at PPLPUCC9004448656 [HC].  Board member
Cecil Pickett acknowledged that Board members continued inappropriately to "get in the weeds"
of Purdue's affairs, with Richard in particular getting "very granular on" Purdue's "sales and
marketing." Preis Decl., Ex. 218 (Pickett Dep. 144:19-145:20; 150:25-151:17).  In 2017, Craig
Landau sent Mortimer Jr. a memo identifying as the first "issue[] facing our business" that "the
Board of Directors serve[s] as the 'de facto' CEO." Preis Decl., Ex. 137 at PWG004670879-80

14

[C]. And Kathe Sackler admitted at her deposition that Mark Timney resigned as CEO in 2017 in part because of continuing director "micromanagement." Preis Decl., Ex. 223 (Kathe Sackler Dep. 272:3-10).

32.     Because they acted as de facto executives rather than merely as directors, the Sacklers and other Board members spent far more time on Purdue's affairs than is typical for a corporate board. Purdue directors were contractually required to devote approximately 70 to 100 days per year to Board duties, including attending meetings, which would typically each take a full day. *See* Preis Decl., Ex. 218 (Pickett Dep. 88:16-91:2); Preis Decl., Ex. 143 (CP0000015 [C]). Most Purdue directors also served on the Board of MNP, and the two boards *each* met at least once a month. Pries Decl., Ex. 218 (Pickett Dep. 91:8-92:3). Cecil Pickett, a director since April, 2008, noted that "obviously" 70 to 100 days "is a lot of days compared to what I served on public company boards." *Id*. at 92:7-10. Pickett went on to explain that an attempt to reform Board practices in 2011 was driven by directors with public company experience: "We just felt that there simply were too many—too many board meetings …." *Id*. at 140:18-22. Even that "reform" would have required outside directors to attend as many as 15 Board meetings, 13 executive committee meetings, and 14 meetings for other committees,[14] a marginal improvement from the "present level of approximately 50 meetings per annum."[15] For Sackler Board members there were 44 meetings and 14 "Update Calls" scheduled for 2012 alone.[16]

33.     Like their respective fathers—Purdue's founders—Richard and Mortimer in particular acted as "executives, management, board and, shareholders all-in-one." Preis Decl., Ex. 135 at PPLPUCC9003800125 n.1 [HC]. Mortimer described his "Purdue involvement" as a

---

[14] *See* Preis Decl., Ex. 174 at MSF00144656-58 [OPEO].

[15] *See id.* at MSF00144650 [OPEO].

[16] *See* Preis Decl., Ex. 125 (2011 email from Stuart Baker with attachment PPLPUCC9002657294 [HC] titled "Proposed 2012 Calendar of Meetings and Board Calls.").

director as often rising to the level of a "full time" commitment," and complained that his $2.5

million compensation should therefore be doubled to $5 million per year.[17]  Mortimer Jr. was

particularly focused on driving increased revenue, and was accused by lower level sales managers

of "micromanagement beyond belief."  *See* Preis Decl., Ex. 132 at PPLPC036000177151 [C].  For

his part, Richard described his extraordinary devotion to Purdue's most important product as far

back as 1999:  "You won't believe how committed I am to make OxyContin a huge success.  It is

almost that I dedicated my live [sic] to it."  Preis Decl., Ex. 186 at PPLPUCC0004987 [HC].

34.     The ardor of Richard and Mortimer Jr. for growing OxyContin sales never wavered,

nor did their interventions with Purdue's nominal executive team to drive increased sales:

- In February, 2007, after reviewing a stocking report, Richard asked his marketing team "[w]hat does this mean to our model?"  He then apparently met with a relatively junior marketing manager so he could make his "own study of the [sales] forecast" and "understand[] the critical issues that we face."  Preis Decl., Ex. 138 at PPLPC061000013859-64 [C].

- That same day, Purdue's then-CEO Mr. Friedman emailed Richard to tell him that "your involvement at this level of detail and calling [the less senior employee] to your office for a review … is wrong."  When Richard pushed back, Friedman threw up his hands:  "I have no reason to expend any energy on getting you to act properly because I don't believe you will change."[18]

- Nor did he change.  For example, Richard engaged with the sales team in painstaking detail on March 9, 2008, apparently in an effort to prove that the team's sales forecast was too low.  Richard instructed the team to revise their spreadsheets, remarked that "this looks very different and much more encouraging, doesn't it?," and expressed his "excite[ment] to dig into the data." After removing Richard from the chain, one of the marketing managers advised his underlings on how to "defend[] the forecast" if "you wind up talking to Dr. Richard today without me."  Preis Decl., Ex. 139 at PPLPC012000174476-77 [C].

- But Richard preferred his own views to that of his marketing team.  In a report to the Board the next day, Richard wrote that after a deep dive  into "the preliminary sales forecast for 2008," he could "happily report that the 2008 forecast and sales plan [prepared by management] is almost certainly overly conservative, by which I mean it

---

[17] *See* Preis Decl., Ex. 175 at SideA00229177-78 [PEO/C] (email from Mortimer D.A. Sackler to Kerry Sulkowicz where he complains "[t]here have been a number of times that I have had to step up my Purdue involvement almost to full time, which is to the detriment of the other work I am doing").

[18] Preis Decl., Ex. 138 at PPLPC061000013858-59 [C].

significantly understates what we may reasonably expect to be achieved in 2008." Preis Decl., Ex. 176 at PPLPC023000164605 [C].

- Richard concluded by recommending that the Board "have Mortimer Jr. and I work with John Stewart to re-forecast the year and also the 5 year plan for OxyContin tablets," and the creation of "a new and higher sales plan." [19]

- In 2011, Richard even joined representatives on physician sales calls, a practice then CEO John Stewart encouraged, because it would help the Sacklers "get a sense of" what "impacts prescribing behavior" and gain "a more detailed analysis of 'where' the prescription uptake is great, and where it is poor," including "which district, which region, which types of prescribers, which types of practices etc."[20] As discussed below, Purdue's policy of targeting abnormally high volume OxyContin prescribers for intensive marketing—enthusiastically endorsed by the Sacklers—is at the heart of the DOJ allegations subject to the Purdue plea agreement and Sackler settlement.

- In February 2012, Mortimer Jr. intervened on the timing of the annual sales meeting, arguing that Purdue should "not plan the national sales meeting" after "the winter break as it extends the period of time since the doctor last saw our rep." Preis Decl., Ex. 140 at PPPLPUCC9002981008 [HC].

- In 2013, Stuart Baker reported that during "a recent conversation with Dr. Richard, he outlined what he would tell [incoming CEO] Mark [Timney] he had to do to do [sic] with the US business in the short run," despite Baker imploring Richard "to leave the new executive to consider and make recommendations to the board without prior direction." Preis Decl., Ex. 141 at SideA00429689 [PEO/C].

- As noted, by 2015, it had gotten so bad that a resolution was drafted to cabin director contact with executives, but the resolution failed.

35. The Court also would be within its discretion to draw adverse inferences against the Sacklers based on the refusal of Purdue's CEOs to answer questions at their depositions. *See, e.g., LiButti v. United States*, 107 F.3d 110, 123-24 (2d Cir. 1997) (adverse inference may be drawn against party based on non-party invocation of Fifth Amendment privilege); *Rosebud Sioux Tribe v. A & P Steel, Inc*., 733 F.2d 509, 523 (8th Cir. 1984) (reversing district court failure to permit plaintiff to call non-party witness to stand to invoke Fifth Amendment where non-party allegedly conspired with defendant). Among other things, the Court can infer that had the CEOs testified, they would have confirmed what the documents already strongly evidence: the Sacklers controlled

[19] Preis Decl., Ex. 176 at PPLPC023000164608-09 [C].
[20] *See, e.g.*, Preis Decl., Ex. 177 at PPLPUCC9000363533 [HC].

management and micromanaged Purdue.  *See, e.g.*, Preis Decl., Ex. 224 (Stewart Dep. 151:4-12);

*id.* Ex. 225 (Timney Dep. 42:3-5, 52:18-53:11, 107:2-108:5).

### 2.   *The Sacklers were directly involved or implicated in conduct Purdue has admitted was criminal or that allegedly underpins DOJ claims.*

36.   The evidence also connects the Sacklers to specific predicates underlying the

Purdue Plea Agreement and the Purdue and Sackler settlements with the DOJ.  Under the Purdue

Plea Agreement, Purdue admits to a three count felony information charging Purdue with (i) a dual

object conspiracy to defraud the United Sates and to violate the FDCA, including by continuing to

market opioids to health care providers ("**HCPs**") despite having information the HCPs were

prescribing opioids without a legitimate medical purpose, (ii) conspiracy to violate the Federal

Anti-Kickback Statute through improper payments to HCPs, and (iii) conspiracy to violate the

Federal Anti-Kickback Statute related to Purdue's payments to Practice Fusion, a cloud based

electronic health records organization ("**ERO**").[21]  Purdue stipulated to certain agreed facts in

Schedule A to the plea agreement spanning a period from May 2007 through 2017 (the "**Plea**

**SOF**").[22]  The Purdue Plea Agreement attaches as Exhibit C a civil settlement between Purdue and

the DOJ which in turn includes an Addendum A ("**AA**") detailing misconduct alleged by the DOJ,

but not agreed to by Purdue.[23]

37.   The criminal plea is predicated in part on Purdue's failure to inform the DEA that

so-called "Region Zero" doctors were responsible for over one million OxyContin prescriptions.

Under Purdue's Abuse Diversion and Detection ("**ADD**") program, sales representatives were

required to file reports concerning HCPs engaged in practices suggesting potential abuse or

---

[21] *Notice of Hearing on Motion of Debtors Pursuant to 11 U.S.C § 105 and Fed. R. Bankr. P. 9019 Authorizing and Approving Settlements Between the Debtors and The United States*, [ECF No. 1828] (hereinafter "**2020 Purdue-DOJ Settlement Agreement**") Ex. B at 2-3.

[22] *Id.*, Ex. B at Schedule A.

[23] *Id.* at Ex. C.  Addendum A begins on page 24.

diversion of opioids, such as "engaging in an atypical pattern of prescribing techniques." 2020 Purdue-DOJ Settlement Agreement, 2020 DOJ Settlement Agreement Ex. B at Schedule A at 16 (Plea SOF ¶ c). "Senior-level Purdue employees" would review the reports and determine whether to put the HCP on a do-not-call list that Purdue referred to as "Region Zero." *Id.* (Plea SOF ¶ d). While Purdue usually stopped "detailing"—calling on—Region Zero HCPs, Purdue and the Sacklers knew that Region Zero HCPs continued to drive revenue by disproportionally writing OxyContin prescriptions. *Id.* Ex. C at 53-54 (AA ¶¶ 27-32).

38.     The full Board, including the Sacklers, received reports that Purdue continued to earn substantial revenue from Region Zero prescriptions. *E.g.* Preis Decl., Ex. 150 at Slide 8 [C]. Indeed, "Purdue had detailed information (down to the number of prescriptions written, product, and dosage) of Purdue products prescribed by all prescribers, including Region Zero doctors, from which it could determine that Purdue had been making substantial profits from these prescriptions." *See id.* at 61 (AA ¶ 69). But Purdue did not disclose that information to the DEA, a choice that was or should have been known to the Sacklers, and that Purdue now admits was criminal. *See* 2020 Purdue-DOJ Settlement Agreement, Ex. B at Schedule A (Plea SOF ¶ e).

39.     Purdue also tracked average monthly prescriptions by HCPs, which it ranked by "deciles," with the HCPs who wrote the most OxyContin prescriptions in decile ten, and the HCPs who wrote the fewest such prescriptions in decile one. In 2010, Purdue introduced a new "tamper resistant" version of OxyContin that was more difficult to abuse by snorting or injection, though Purdue knew it remained subject to abuse by oral ingestion. *See* 2020 Purdue-DOJ Settlement Agreement, Ex. C (AA ¶ 66). Purdue swiftly saw a substantial and sustained drop in OxyContin

sales.[24]  On October 25, 2011, the Sacklers and other Board members were provided with executive committee meeting notes reporting on an "analysis [that] showed much larger declines in the number of OxyContin scripts with Region 0 prescribers versus other prescribers" and that "30% of all prescribers in Region 0 stopped writing scripts for OxyContin altogether" once OxyContin became more resistant to tampering.  Preis Decl., Ex. 144 at RSF_OLK00035020 [HC].

40.     Senior Purdue executives acknowledged that the decline was largely due "to reformulation"—suggesting that the lost sales were those that previously were being diverted for abuse.  Preis Decl., Ex. 145 at PPLPC012000372585 [C].  Indeed, Mortimer Sackler Jr. testified that "we were positive that was happening," and that at least some of the decline in sales was because people who wanted to abuse and divert OxyContin stopped buying OxyContin when the reformulation was introduced in 2010.  Preis Decl., Ex. 226 (Mortimer Sackler Dep. 310:16-25).  Despite their knowledge that much of the lost sales were illicit, Richard wrote to the head of sales in 2012 to ask "[w]hat are we doing to identify corrective actions" to address "the sudden decline in OC sales in the past year or two."  *Id.*

41.     While prescriptions written by Region Zero HCPs decreased dramatically in 2010, a steep drop also was observed among high prescribing HCPs that Purdue continued to detail.  A report supplied to the Sacklers and other Board members in August 2013, for example, indicated "[t]wo thirds of th[e] decline [in OxyContin sales] comes from prescribers in [the highest prescribing] deciles 5-10."  Preis Decl., Ex. 152 at MDSF00986949 [PEO].  Rather than investigate whether these high volume HCPs were engaged in diversion, and despite recognizing that OxyContin remained subject to abuse, the Sacklers specifically sought to "turbocharge" sales of

---

[24] OxyContin sales dropped from $2.31 billion in 2009 to $2.26 billion in 2010 (ADF OxyContin was launched mid-year in 2010), then to $2.1 billion in 2011, and continued to decline thereafter.  *See* Preis Decl. Ex. 178 at POK003735985 [C].

OxyContin by focusing marketing efforts on those very prescribers.  *Id.* at MDSF00986953.

42.     Purdue's decile data itself arguably revealed aberrant prescription patterns, indicating that high decile HCPs were writing far more OxyContin prescriptions even than Region Zero doctors.  The Board received a study in August 2013 reporting that, on average, Region Zero doctors wrote 61.1 OxyContin prescriptions per month, while a "comparator" group averaged just 9 scripts per month.  *See* Preis Decl., Ex. 150 at Slide 8 [C].  In October 2013, Purdue's Annual Marketing Plan included a chart revealing that HCPs in the top three deciles targeted for sale by Purdue wrote more prescriptions on average, with decile seven averaging 67.8 prescriptions, and decile ten prescribing a whopping 246.6 OxyContin scripts per month.  The same document reported that (i) the top decile—composed of just 358 prescribers—wrote as many OxyContin prescriptions as the bottom *99,825* HCPs and (ii) fully half of all OxyContin prescriptions were written by just 5.2% of HCPs—those in deciles 5-10.  Preis Decl., Ex. 154 at PAK000062565 [C].  The Board apparently made no effort to determine *why* "high value prescribers" were writing so many prescriptions.  Preis Decl., Ex. 226 (Mortimer Sackler Dep. 335:5-336:22, 338:3-16).  The Plan went on to recommend "more precisely prioritizing and targeting prescribers" including by "focus[ing] on high writers of NBRx" and more "precisely target prescribers by behavior[.]"  Preis Decl., Ex. 154 at PAK000062570 [C].

43.     The October 2013 recommendation is consistent with a plan to "turbocharge the sales engine" developed by Purdue consultant McKinsey with the enthusiastic support of the Sacklers.  Preis Decl., Ex. 146 at PPLPC012000441614 [C].  In a memorandum provided to the Board on August 15, 2013, McKinsey opined that "better targeting" of HCPs could result in greater than $100 million in sales "upside," noting that "the average prescriber in decile 5-10 writes 25 times as many OxyContin scripts as a prescriber in decile 0-4," and recommending "shif[ing] calls

to higher potential prescribers." Preis Decl., Ex. 155 at PPLP004409892-93 [C]. Purdue already
directed more attention to high volume HCPs, but McKinsey recommended doubling down,
including by removing discretion from sales representatives to ensure they did not unduly waste
time calling on ordinary prescribers.

44.     Later on August 15, 2013, Richard wrote to Mortimer Jr.: "The 'discoveries' of
McKinsey are astonishing." Preis Decl., Ex. 147 [HC]. Richard then "arranged a face to face
meeting with McKinsey on Friday, August 23, 2013 … to discuss the McKinsey Report." Preis
Decl., Ex. 148 [C]. According to emails available to the DOJ but not the UCC, at the August 23
meeting with McKinsey, "the room was filled with only family including … the elder statesman
Dr. Raymond [Sackler] … We went through exhibit by exhibit for about 2 hrs … they were
extremely supporting of the findings and our recommendations … and wanted to strongly endorse
getting going on our recommendations." 2020 Purdue-DOJ Settlement Agreement, Ex. C (AA ¶¶
103-104). Purdue proceeded to adopt the McKinsey plan, which it called "Evolve to Excellence"
(or "**E2E**"). *Id.* (AA ¶ 90).

45.     This Sackler-endorsed program, which "focused on intensifying marketing to the
very highest-volume prescribers in the country," underpins the DOJ's claim that Purdue
"knowingly caused [the submission of] false and or fraudulent claims," and may also have
contributed to a predicate for Purdue's guilty plea, including by aiding and abetting the dispensing
of medically unnecessary prescription drugs, and by continuing to detail HCPs "in situations in
which Purdue possessed sufficient information that a decision should have been made to cease
detailing." *Id.* (AA ¶ 108); *id.*, Ex. B at Schedule A (Plea SOF ¶ f) (failure to maintain effective
controls and thus defraud the DEA included detailing HCPs). As early as April 2014, Purdue's
CFO Ed Mahoney was able to report to the Board that "[t]he E2E effort has resulted in significant

22

improvement" in sales of opioids.  Preis Decl., Ex. 149 at PPLPC012000471642 [C].

46.     The Sacklers' direct involvement in conduct identified in, or related to, the Plea

Agreement and Civil Settlement with the DOJ, can also be inferred from the refusal of Purdue's

CEOs during the key period to answer the UCC's questions on Fifth Amendment grounds.  The

following is a sample of related questions the CEOs refused to answer:

- From at least 2010 to the end of your time as CEO of Purdue, did Purdue engage in strategies that resulted in prescriptions that were not medically indicated, were unsafe, ineffective and/or medically unnecessary[?] … Those prescriptions were then sometimes diverted for uses that lacked a legitimate medical purpose, correct?  Preis Decl., Ex. 224 (Stewart Dep. 144:3-145:7).

- A strategy that Purdue employed that furthered the opioid crisis included targeting prescribers most likely to prescribe opioids, correct[?] … The expected increase in sales from such targeting was over $100 million annually, correct? … And the Board of Directors of Purdue approved that targeting prescriber program, correct?  *Id.* Ex. 224 (Stewart Dep. 145:8-146:11).

- Yet another strategy that Purdue employed that furthered the opioid crisis included speaker programs where Purdue paid certain prescribers to speak to other prescribers about why they should prescribe OxyContin and other Purdue opioids, correct? … Purdue knew that speaker programs had a high risk of creating high risk of creating off-label abuse of opioids, correct? … The riskiness of such programs were reported to the board, including the Sackler members of the board correct?  *Id.* Ex. 224 (Stewart Dep. 146:23-149:7).

- You and the Board Members of Purdue knew that more prescriptions of ADF OxyContin translated into more abuse, correct? … [D]espite that knowledge, the company and the Board pushed to increase prescriptions, to increase profits, to increase distributions to the Sacklers, correct?  *Id.* Ex. 225 (Timney Dep. 69:15-70:5).

- The Sacklers exercised substantial oversight and control over management's operations of Purdue, correct? … While you were CEO, the Sacklers received regular detailed reports from you and other members of management about sales trends, correct? … The Sacklers had direct communications with you and other Purdue executives, including sales and marketing executives concerning forecasts and marketing strategies and tactics, correct? … The Sacklers directed management to use sales tactics that would cause more higher dose opioid prescriptions to be written, correct?  *Id.* Ex. 225 (Timney Dep. 107:2-108:5).

In short, there is more than sufficient reason to believe that the Sacklers breached their fiduciary

duties to Purdue by "consciously permitting the company to violate positive law," failing

adequately to monitor Purdue or, with gross negligence, causing or allowing Purdue to engage in

criminal conduct.  *See AmerisourceBergen Corp.*, 2020 WL 132752, at *22.

> **C.**  **Intentional Fraudulent Transfer:  Probable Cause Exists to Believe that the Sacklers, in Control of Purdue, Sought to Hinder or Delay Creditors**

47.    Probable cause for application of the crime fraud exception may be found where a transferor is subject to, or has reason to fear, litigation or other unliquidated liabilities, and makes transfers to allegedly creditor-remote vehicles like trusts.  *See, e.g.*, *Cendant Corp.*, 246 F.R.D. at 405-06 (holding that the "most logical inference" from defendant's decision to transfer assets to trust while subject to litigation was that transferor sought to "hinder, delay or defraud" litigation creditors); *Sec. Inv'r Prot. Corp.*, 319 F.R.D. at 108 (noting that "temporal proximity" between transferor's decision to buy house solely in spouse's name and her knowledge that Ponzi scheme was about to unravel were relevant to probable cause for crime fraud exception).  Recognizing this issue, the Sacklers insist in their defense presentations that no one would have believed Purdue could "face meaningful litigation until 2017," and that the massive Purdue transfers they caused after the 2007 plea agreement could not have been motivated by a desire to hinder or delay creditors.  The Sacklers double down on that claim in opposition to the Motion.  *See* Hurley Decl. [ECF No. 1754], Ex. 58 at 488;[25] BXO at 15; AXO ¶¶ 54-55 (purporting to distinguish *Cendant*).  In fact, "meaningful litigation" not only could have been predicted dating back to 2007, the evidence shows that the Sacklers perceived and feared that threat when they made the challenged transfers.

---

[25] The UCC's citation to aspects of the Sacklers' defense presentations in these cases is entirely appropriate.  Side B actually tried to file its presentation publicly, and raises no objection to its use here.  Side A does object, but without any basis.  Side A's presentation expressly was prepared pursuant to the *Amended and Restated Case Stipulation Among the Debtors, the Official Committee of Unsecured Creditors and Certain Related Parties* [ECF No. 518], and presented to the UCC in part to induce it to forbear from taking its own discovery for the first several months of the cases.  After discovery began, Side A argued it should be limited because its presentation "preview[ed] for the UCC" defenses "that would have been developed through expert discovery in the civil litigation that is now stayed by this Court's injunction" and is "highly relevant to the UCC's weighing of the strengths and weaknesses of the litigation claims."  *Compare* AXO ¶ 58 *with Letter from J. Ball to Court*, dated April 29, 2020 [ECF No. 1113] at 3-4 n.6.  The Sacklers never intended to maintain as confidential the positions in their presentations; on the contrary, the Sacklers advised expressly that they would be the centerpieces of their defense if the claims do not settle.

### 1.   *The Sacklers' own words and actions reveal their motivations.*

48.    None of the Sacklers' attempts to explain away their contemporaneous expressions of concern about opioid related liability are remotely convincing.  For example, the Sacklers try to dismiss Jonathan's November 20, 2006 email complaining that the pharmaceutical industry had been "enshrined as a permanent whipping boy for the … bar" because it supposedly "<u>preced[ed]</u>" Purdue's 2007 settlement with the DOJ.  BXO at 19 (underscore in original, alteration added).  In fact, the terms of the DOJ agreement were "agreed in principle" in a writing signed by the U.S. Attorney's Office for the Western District of Virginia on October 25, 2006, more than one month *before* Jonathan's email.  Hurley Decl. [ECF No. 1754], Ex. 62.  In that same email, Jonathan frets that "contingent liabilities continue to hover over the business."  *Id.* at PPLPC057000003699.  In their Objections, the Sacklers argue that Jonathan was actually sanguine about those liabilities because he wrote "<u>we know the cost</u>."  BXO at 20 (underscore added by the Sacklers).  But what he actually wrote is "***we hope*** we know the cost."  Hurley Decl. [ECF No. 1754], Ex. 62 (emphasis added).

49.    It is clear that the Sacklers remained deeply concerned about future liabilities despite the DOJ agreement.  *Compare* BXO at 4 (claiming 2007 settlements "resolv[ed]" those risks").  In March 2007, Jonathan Sackler wrote that "as WDVA empties our coffers," "[t]here are a number of risks" that "we're not really braced for," including "[t]he emergence of numerous new lawsuits."  Preis Decl., Ex. 187 at PPLPUCC004057767 [PEO].  In the same month, Richard worried that replacing Purdue's outgoing CEO—who personally pled guilty in 2007—could be challenging because "internal candidates" might not "want to leave their present bearths [sic] for the risks of a future at Purdue."  Preis Decl., Ex. 209 at PPLPUCC9004824942 [HC].  Jonathan noted several "ongoing risks created by WDVA," including "if there's a future perception that Purdue has screwed up on compliance, we could get murdered" as well as "an uncertain contingent

liabilities picture" with "zero margin for error." *Id.*

50.     On May 17, 2007, ten days after the plea was publicly filed, David Sackler warned that the family may not be "rich" "for long" as a result of "what is going on in all of these courtrooms right now." Hurley Decl. [ECF No. 1754], Ex. 64 [HC]. To be sure, as the Sacklers note, David was not then on Purdue's Board, and was 27 years old. But Mortimer Jr. and Samantha both were younger when they joined Purdue's Board, Preis Decl., Ex. 226 (Mortimer D.A. Sackler Dep. 245:22-246:25), and Richard had been planning to add David as a director at least two months before David sent his May 17 email. Ultimately, Richard decided the time was not right based on advice from Stuart Baker, instead appointing David to the Board in July 2012, the month and year that the CIA expired. *See* Hurley Decl. [ECF No. 1754], Ex. 65 [PEO]. David also was running millions of dollars of the family's wealth in May 2007, and later would describe himself as the person who "manages the family fortune." Preis Decl., Ex. 221 (David Sackler Dep. 121:9-18); *see also* Hurley Decl., Ex. 57 [C]. The Sacklers also make much of Jonathan's response to David, including his attempt to reassure him that "the family" could not be sued, but ignore David's rejoinder:

> Well I hope you're right and under logical circumstances I'd agree with you, but we're living in America. … ***We will be sued***. … [A]sk yourself how long it will take these lawyers to figure out that we might settle with them if they can freeze our assets and threaten us.

Hurley Decl. [ECF No. 1754], Ex. 64 at PPLPUCC002683256 [HC].

51.     Since filing its Motion, the UCC has discovered that Stuart Baker arranged a May 22, 2007 meeting between Richard, Jonathan and Joe Smolinsky, then a bankruptcy partner at Mr. Baker's law firm. Preis Decl. Ex. 151 at PPLPUCC001531750 [HC/PEO]. As Mr. Baker acknowledged during his deposition, at the time Purdue either had very little or no funded debt, continued to generate substantial free cash from its sale of opioids, and had no plans to file for

SEALING FINDINGS OF FACT, CONCLUSIONS OF LAW, AND STIPULATION
AND AGREED ORDER REGARDING CERTAIN INTERVENORS' MOTION TO UNSEAL
MATERIALS FILED IN CONNECTION WITH UCC PRIVILEGES MOTIONS [ECF No. 2140]

bankruptcy.  Preis Decl., Ex. 219 (Baker Dep. 359:10-21).  Mr. Baker said that he could not remember "why Purdue or the Sacklers were seeking advice from … a bankruptcy lawyer" twelve days after Purdue's guilty plea, but that "if [he] knew at the time, it probably would be privileged." *Id.* at 359:22-360:6.

52.     Peter Boer's July 2007 memo to Jonathan and Richard also focused on litigation risk.  Boer warned of Purdue's "uncapped liabilities" and urged "the family" to take "defensive measures," including through "overseas assets with limited transparency and jurisdictional shielding from U.S. judgments," Hurley Decl. [ECF No. 1754], Ex. 69.[26]  The Sacklers note that Boer was not then on Purdue's Board, but that is beside the point because Boer was a director of Sackler-owned affiliate Rhodes Technologies, a board that he joined in 1999.  Boer also worked with Side A and Side B directors as a member of the search committee that resulted in John Stewart's appointment as Purdue CEO in September 2007.  Preis Decl, Ex. 228 (Boer Dep. 38:10-40:8 [HC]).  Notably, the Sacklers made Boer a director of Purdue just a few months *after* receiving his July memo.  The Sacklers claim that "the UCC does not point to any evidence that [the Sacklers] took any" of the recommended "'defensive measures,'" ignoring the billions they poured into offshore entities and putative spendthrift trusts in the following years and their own claims in these cases that they *succeeded* in placing assets beyond their creditors.  Preis Decl., Ex. 164 (Dec. 6, 2019 "Presentation of Defenses ('Side A')" from Debevoise & Plimpton LLP) [FRE 408/PEO] at 72.

### 2.     Purdue faced massive actual or threatened litigation and vast liability at all relevant times—and the Sacklers knew it.

---

[26] The Sacklers argue that by June 10, 2007 settlements with the DOJ and certain states had been entered **"resolving those risks**."  Side B Amd. Exceptions Obj. at 4 (bolding and italics in original).  But the states released only narrow categories of claims and, as Purdue later recognized, the "next wave" of civil litigation already had begun by August, 2007.  Preis Decl., Ex. 199 ¶¶ 2-3 (Washington State settlement and release); Hurley Decl. [ECF No.1754], Ex. 61 at PPLPC01200372436-37.  And the evidence leaves no room for doubt that the Sacklers believed they and Purdue remained at risk to opioid creditors.

53.      According to the Sacklers, (i) "from 2008-2016" Purdue only "faced occasional litigation risk" akin to that of "any company," (ii) Purdue had buttoned up all litigation by the spring of 2007, and (iii) an "immense wave" of litigation was "simply unfathomable."  AXO ¶ 6. The evidence tells a different story.  According to a deck prepared at the request of Richard Sackler in 2012, the "next wave of civil litigation" already had begun by August 2007, eventually including "class actions," "individual actions," and claims asserted by "third party payers" and one state attorney general (Kentucky).  Hurley Decl. [ECF No. 1754], Ex. 61 at slide 3.  Nor did Purdue face only "occasional litigation risk" akin to that of "any company."  By March of 2008 more than 100 OxyContin suits were pending against Purdue in the U.S., plus four class actions in Canada.[27] In 2009, the number had grown to more than 330,[28] and by 2010, included *nearly 500 pending actions*, plus a nationwide consumer class action filed in the Eastern District of California.[29]  The Sacklers argue that products liability actions were not an existential threat, and note that many began to settle in 2011 and 2012.  By that time, however, the Sacklers already had transferred close to $7 billion in cash to themselves or for their benefit.  *See Cash Transfers of Value Analysis*, dated December 16, 2019 [ECF No. 654] at slide 11. [30]

54.      Moreover, the Sacklers had no assurance in the 2008-2012 time period that litigation would be limited to products liability cases.  Kentucky already had initiated a *parens patriae* action, and additional state lawsuits were far from "unfathomable."  *Compare* AXO ¶ 6. In November 2006, a law journal article was passed among Stuart Baker, Howard Udell (Purdue's

---

[27] Preis Decl., Ex 185 at PPLPUCC500056874 [PEO].

[28] *Id.*, Ex. 191 at PPLPUCC500056916 [PEO].

[29] *Id.*, Ex. 203 at PPLPUCC500056955 [PEO]; *id.*, Ex. 205 at PPLPUCC500056996 [PEO/HC].

[30] The expense arising from private litigation was not immaterial.  By 2008, carriers already had reimbursed Purdue some $337 million in settlement and legal expense associated with OxyContin litigation.  *Declaration of Mara Leventhal dated October 14, 2020* [ECF No. 1812], Ex. 19 at PPLPUCC9002964495 [HC].  Notably, Purdue never even sought coverage for the 2007 DOJ agreement or any other public action, apparently seeking to conserve its $1 billion in limits for additional anticipated private-side liability.

then general counsel) and others. The article predicted that a 2004 settlement entered into by Purdue with West Virginia would only "increase the threat of future legal action against drug manufacturers." The article went on to warn that "*OxyContin opponents in some states are already urging their attorneys' general to consider pursuing similar claims*," *and that in the wake of the "now-notorious waves of tobacco and asbestos litigation, many plaintiffs' attorneys have been searching relentlessly for the "next big thing."* Preis Decl., Ex. 188b at PPLPC051000035809, PPLPC051000035818-19.[31]

55.     At the time, Mr. Baker was a partner at Chadbourne & Parke, long-time counsel to the Brown & Williamson tobacco company, one of four "original participating manufacturers" that settled with states attorneys' general in the late-1990s for more than $200 billion. Baker testified that a Chadbourne partner who represented Brown & Williamson in the tobacco lawsuits, Don Strauber, also represented Purdue in connection with the Western District of Virginia investigation and after the 2007 plea deal. Pries Decl., Ex 219 (Baker Dep. 365:6-18). Indeed, according to his web bio, Strauber continues to "represent[] The Purdue companies in the defense of the OxyContin litigation" to this day. Preis Decl., Ex. 200 (web bio). It would have bordered on malpractice for Strauber not to have shared with Purdue the fact that tobacco companies also fended off product liability cases for a period of time, but eventually were forced into one of the largest civil settlements in U.S. history.

56.     The Sacklers certainly were paying attention when, in 2014, the City of Chicago and two California counties filed separate actions against Purdue using tactics similar to those deployed against tobacco companies. On June 22, 2014, for example, Mortimer forwarded a

---

[31] A cover email forwarding this article that was withheld as privileged shows that the article was shared with Howard Udell, Purdue's then-General Counsel, among others. *See* Preis Decl., Ex. 188a; *id.* Ex. 195 (excerpt of Mar. 5, 2019 MDL privilege log [C]).

SPECIFIC FILINGS NECESSARY TO FORM A PROPOSED STIPULATION
AND AGREED ORDER REGARDING CERTAIN INTERVENORS' MOTION TO UNSEAL
MATERIALS FILED IN CONNECTION WITH UCC PRIVILEGES MOTIONS [ECF No. 2140]

*Businessweek* article to a group that included Richard Sackler and other PPLP directors titled *Rahm Emanuel's War on Drugs*. Preis Decl., Ex. 153 at PPLPC045000017006 [C]. The article referenced the "lawsuits filed in the past month by Chicago and California's Santa Clara and Orange Counties," and described their strategy as "akin to the multiple lawsuits against tobacco companies in the 1990s." Preis Decl., Ex. 189 at PAZ000115628-29. Rahm Emanuel, then Chicago's mayor, was quoted as saying that other "cities h[ad] reached out to him about filing similar actions." *Id.* at PAZ000115629. In his June 22 email forwarding the article to other Board members, Mortimer proposed meeting "with Rahm Emmanuel to educate him about the real issues," and suggested the family "arrange a meeting with Michael Bloomberg"—owner of *Businessweek*—to get him to "print a story with the balance to this story." Preis Decl., Ex. 190 at PPLPC045000017005 [C]. Less than two months later, the Purdue Board resolved to indemnify the trustees of the trusts that own Purdue against any "settlements, judgments, fines, liabilities or similar" in connection with "the City of Chicago litigation matter or in any" other civil or criminal proceeding "involving Purdue Pharma L.P. and/or any of the other U.S. independent associated companies."[32]

57.    Other news reminded the Sacklers daily of the havoc wreaked by OxyContin and other opioids. Stories concerning prescription opioid abuse and diversion were common throughout the relevant period, with articles or headlines supplied by Purdue to the Sacklers and other Board members regularly. *See, e.g.*, Preis Decl., Ex. 165 at PPLPC061000060750 [C]

---

[32] The Sacklers cite their settlement of the Kentucky action as evidence that Purdue had no reason to believe state-led opioid litigation could be a serious threat during the 2008 to 2017 time period. But the Kentucky settlement was not reached until December 18, 2015, and by that time (i) the Sacklers already had caused Purdue to make most of the transfers subject to challenge, and (ii) other public entities had commenced lawsuits of their own, including Chicago and the California counties. To be sure, at $24 million, the Kentucky settlement was smaller than the Oklahoma settlement that would follow, but still implied Purdue liability of at least [$1.6 billion] on a morphine milligram equivalent basis, and Purdue itself claimed that even $1 billion in opioid-related liabilities "would have an immediate, crippling, and irreparable effect on Purdue." Preis Decl., Ex. 201 (*Affidavit of Edward B. Mahony* ¶¶ 4, 6, *Purdue Pharma L.P. v. Hon. Steven D. Combs*, No. 2013-CA-001941-OA (Ky. Ct. App. dated Feb. 4, 2014)).

(October 8, 2010 Purdue News Summary to Kathe Sackler linking several articles concerning opioid-related investigations and arrests as well as "*Police: Painkiller Becoming Teen Drug of Choice*"); *id.* Ex. 156 at RSF00683542 [C] (October 8, 2011 Google Alert to David Sackler linking to an article about a man who became addicted to OxyContin, turned to heroin, and died of a heroin overdose); *id.* Ex. 171 at IACS_ESI_0000490681-82 [C] (February 29, 2012 Purdue News Summary to Theresa Sackler linking 29 articles concerning "Diversion and Abuse" such as "*Legal prescriptions for opioids can lead to addiction*" and "*Woman convicted of oxycodone trafficking*"); *id.* Ex. 157 at RSF_OLK00008429 [C] (November 1, 2013 Google Alert to Richard Sackler concerning a high school student who died of an OxyContin overdose); *id.* Ex. 179 at POK003746339 [C] (June 18, 2014 Purdue News Summary to Jonathan Sackler linking 57 articles concerning "Diversion and Abuse," including "*Prescription Pain Killer Deaths Outnumber Heroin, Cocaine Overdoses*"); *id.* Ex. 158 at MDSF00514742 [PEO/C] (April 18, 2015 Google Alert to Mortimer D.A. Sackler linking story "*Why Supposedly Abuse-Proof Pills Won't Stop Opioid Overdose Deaths,*" which mentioned Purdue); *id.* Ex. 159 at PWG004484978 [C] (July 10, 2016 email from Purdue VP Raul Damas to Sackler Board members linking an LA Times article about a fraudulent pain clinic that Purdue itself investigated, concluded was corrupt, but chose not to terminate its supply or contact government authorities).

58.     The scale of harm associated with the abuse and diversion of OxyContin and other opioids was also well known to Purdue. Purdue regularly tracked and reviewed reports and information concerning the economic consequences of the opioid crisis. In fact, Purdue commissioned a study of its own that was released in 2008. *See* Preis Decl., Ex. 202 (Ryan N. Hansen, et al., Economic Costs of Nonmedical Use of Prescription Opioids, 27 CLINICAL J. OF PAIN 194, 199 (2011)). According to its own study, in the year 2006 alone OxyContin caused

1,553 deaths and $7.2 billion in damages.  *Id*.  Richard Sackler received an email notice summarizing the conclusions of the Hansen study on December 24, 2010.  Preis Decl., Ex. 204 [C].  Purdue also calculated how much of its own revenue was derived from the abuse of OxyContin, concluding in 2006 that up to 18.1%—or $1.8 billion—of its sales for the prior 10 years were based on diversion and abuse.[33]

59.    Side A implies that while the UCC has identified substantial evidence that Side B was worried about Purdue's litigation risk, similar proof does not exist regarding Side A.  In fact, the record is clear that Side A wanted out of Purdue dating at least to the period following Purdue's last guilty plea in 2007, and was well aware of the "horrible risks" then facing Purdue.  Exceptions Motion ¶ 22.  In early 2008, for example, Side A's Mortimer Sackler exchanged emails with his cousin Richard in early 2008 concerning the creation of what they called a "suspense account" in case a family member is "sued as a consequence of his/her actions in the company or related to a company product."  Preis Decl., Ex. 160 at SideA00391976-77 [PEO/C].  Richard wrote:  "At this moment, no family member is being sued.  But I've been told by Silbert that I will be so and probably soon."  *Id.* at Side A00391978.  Mortimer replied, "makes sense to me," but emphasized that the account "should only be triggerable [sic] *if Purdue fails to meet its indemnification obligations*."  *Id.* (emphasis added).  In that event, Mortimer wrote in a later email, "any family member who has been sued directly … [but] no longer being covered by Purdue" could activate the suspense account "up to a maximum of $50 million …."  *Id.* at Side A00391976.  That $50

---

[33] The Sacklers argue they believed the risk of damages associated with their sale of opioids was small because Purdue "settled" with New York state in 2015 for just $75,000, referring to an Assurance of Discontinuance ("**AOD**") that Purdue entered into with the New York State Attorney General's Office ("**NYAG**").  AXO ¶ 22.  But the AOD was not a "settlement" in any material sense.  Among other things, the NYAG did not release any claims against Purdue in connection with the AOD.  If it had, New York would not now be suing Purdue for billions of dollars based on conduct dating back to 2007 and before.  Under the AOD, Purdue agreed to undertake additional obligations aimed at reducing abuse and diversion of OxyContin.  In other words, the AOD proves nothing except that Purdue managed to deceive the State of New York just as Purdue has now admitted to deceiving the federal government with respect to Purdue's abuse, diversion and deterrence efforts.

million would be on top of the depletion of Purdue's resources through litigation, since it "can't get triggered unless Purdue is unable to meet its obligations under its indemnification agreements." *Id.*

60.    In the same month, Mortimer Jr. wrote to Richard that "[f]undamentally we don't want to stay in this business anymore (given the horrible risks, outlooks, difficulties, etc [sic]) and I think the majority of your family feels the same way." Hurley Decl. [ECF No. 1754], Ex. 67 (PPLPUCC000177443). Side A notes that Mortimer went on that "our prospects have improved dramatically," but leaves out the rest of the sentence, in which Mortimer favors a sale because it would permit the family to "once and for all eliminate the great risks we have and continue to take and secure our families' current and future financial security."[34] *Id.* Notably, the same email chain features a number of questionable redactions, including a 12:53 a.m. exchange between only Mortimer Jr. and Richard—both non-lawyers—that immediately preceded their debate about whether to sell Purdue in view of its "horrible risks." *Id.* at PPLPUCC000177445.

61.    Also in February 2008, Mortimer Jr. advised his cousin Jonathan that, "I feel strongly that we should pursue" a merger option that Jonathan described as "essentially [] a cash-out." Preis Decl., Ex. 161 at PPLPC042000011810, PPLPC042000011812 [HC]. Mortimer Jr. cited "the future risks we are sure to face and the impact they will have on the shareholder value of the business and hence the family's wealth" as a reason for preferring the "cash-out" option. *Id.* at PPLPC042000011810. Mortimer referenced his desire to exit the business as far back as 2000,

---

[34] Mortimer's reference to improved prospects likely is based on Purdue's then-recent and dramatic sales increase following Purdue's victory in a patent dispute that restored its exclusive right to sell OxyContin. *See, e.g.*, Preis Decl., Ex. 180 at PPLPC012000372437 at slides 4, 6 [C] (PowerPoint entitled "OxyContin Market Events," dated April 12, 2012, and listing lawsuits, among other events, and including chart of "Monthly OER Prescriptions Since Launch" showing increase in OxyContin sales (and decrease in generic sales) at the beginning of 2008); *id.* Ex. 207 at MSF01116645 [OPEO]; *id.* Ex. 183 at PURCHI-000834581 [C] (notification of patent decision in *In re Oxycotin Antitrust Litig.*, No. 1:06-cv-13095-SHS (S.D.N.Y. Jan. 7, 2008). Despite this extraordinary sales growth, Mortimer made clear he wanted out.

and noted that the intervening period, which included hundreds of opioid related lawsuits against

Purdue, a federal guilty plea and payment of more than $600 million in fines and settlements, as

not "a pleasant experience." *Id.* He went on: "While things are looking better again now, I would

not count out the possibility that times will get much more difficult again the in the future, and

probably sooner than we expect." *Id.* Side A remained staunchly in favor of a Purdue sale as soon

as it could be achieved, and of maximizing distributions to the family in the meantime, even after

Side B claims it began to favor reinvestment in Purdue in 2014. For example, in 2014 Side A

appears to have wanted 100% of Purdue's net income paid out in the form of distributions, with

"a 50/50 split" between Side A and Side B. Preis Decl., Ex. 162 at PPLPUCC000335136

[PEO/HC] (see heading "Distributions").[35]

### 3. The Sacklers continually failed to get products (hazard) insurance.

62. Purdue and the Sackler-dominated Board also were acutely aware of Purdue's

inability to obtain products (hazard) insurance to cover OxyContin risk, and had to know that

meant Purdue's own assets were at risk to litigation creditors. The Board received annual reports

concerning Purdue's failure to obtain insurance as detailed in the UCC's opening brief. New

evidence shows the Board was directly involved in those efforts. For instance, a broker described

Purdue's April 2012 request to bid products insurance as "approved [by] and at the direction of

---

[35] The Sacklers boast in their opposition that there had not yet been any "finding of liability against the Defendant Debtors or Related Parties" despite a large number of "Pending Actions." AXO ¶ 27. Just days after writing those words, of course, the Sacklers announced that they plan to pay $225 million to settle civil claims alleged against the family by the DOJ, and the Debtors disclosed that they soon will plead guilty to multiple federal crimes for the second time since 2007. *See generally* Sackler-DOJ Settlement Agreement; *Notice by the Sackler Families of Settlement with the United States Department of Justice and Motion to Confirm that Payment by the Sackler Families Under Settlement with the United States Department of Justice Is Not Prohibited by This Court* [ECF No. 1833] (hereinafter the "**Sackler-DOJ Settlement Agreement**"). The Sacklers also fail to note Purdue's many litigation failures, including (a) denials of motions to dismiss claims against Debtors in at least fourteen cases (including in thirteen different states and in the federal MDL); (b) a settlement by Debtors for $270 million in Oklahoma to avoid trial; (c) Johnson & Johnson losing at trial in the same Oklahoma case Debtors settled with a judgment against it of over $400 million; (d) Debtors losing the only summary judgment motion that has been filed in the various cases against it, and (e) Debtors having now pled guilty to committing crimes over many years and agreeing to an $8.3 billion settlement.

Purdue's BOD." Preis Decl., Ex. 166 at MARSH-PURDUE-001113 [HC] (emails time stamped 10:13 and 11:36 a.m.). On May 11, 2012, Purdue asked a broker to provide comments on a timeline for the process promptly, since it "needs to be submitted to the Board on Monday 5/14/12." Preis Decl., Ex. 167 at MARSH-PURDUE-001768-70 [HC]. After speaking with Purdue's treasurer, who in turn had "briefed" Purdue's CFO, the broker advised his team that Purdue wished to "*go to market with 1 goal to include OxyContin*." Preis Decl., Ex. 168 at MARSH-PURDUE-001777 [HC] (emphasis added).

63.     In a later email, Marsh reemphasized that "this is a BOD directive," noting that Purdue was "currently self-insured since the major earlier oxycontin [sic] litigation." Preis Decl., Ex. 192 at MARSH-PURDUE-001863. Marsh continued, "[t]his will be a major high profile effort" and "Purdue's CFO, BOD and sr in-house counsel are all going to be closely connected to the placement process and evaluation." Preis Decl., Ex. 193 at MARSH-PURDUE-001114. On May 22, 2012, a Marsh Senior Vice President wrote: "The question the underwriter will ask is what is the likelihood of another wave of lawsuits. … [H]as Purdue done enough to defend themselves against future similar litigation?" Preis Decl., Ex. 194 at MARSH-PURDUE-001804 [HC]. After diligencing those questions, no underwriter was prepared to provide products (hazard) insurance to Purdue at any price.

### 4.     *Trust distributions massively outpaced reinvestment.*

64.     Side B contends that it began to oppose large additional distributions beginning in November 2014, which it claims is proof that it was not concerned about litigation risk to Purdue. BXO at 16-17; *see also id*. at 3 (claiming Purdue increased its cash reserve beginning in 2014). The Sacklers tacitly admit that from 2008 to 2013—the period when almost $8 billion of the challenged transfers were made—Side B was just as eager for distributions as Side A. And Side B could have *vetoed* distributions at any time if it wished, but continued to allow large transfers of

cash to be made to Sackler family trusts through 2017.

65.    The Sacklers claim they were intent on reinvesting in Purdue during this period, but the evidence demonstrates otherwise. *See, e.g.*, BXO at 41-42 (claiming that "at the time of the Distributions Side B wanted to keep money invested in Purdue"). As Richard Sackler and Peter Boer explained to the Board in their 2008 memo, distributing "more free cash flow" was the "most certain way for the owners to diversify their risk," but it also "intrinsically compete[d] with the use of free cash flow to maximize growth and diversification for Purdue itself." Preis Decl., Ex. 163 at PPLPUCC001662356 [PEO/HC]. In the ensuing years, the Sacklers chose to favor distributions to the family over any competing interest in growth for Purdue, as starkly illustrated in a report to the Board concerning Purdue's investment from 2009 to 2014:



Peers have invested heavily for growth

| | 2009-2014 Deal spend¹ in Billion USD | 2009-2014 Deals completed | Notable deals, $ Billion | 2008-2012 Revenue $ Billion |
|---|---|---|---|---|
| VALEANT | 16.9 | 33 | • Bausch & Lomb ($8.7)<br>• Medicis ($2.6) | 8.8 |
| endo | 7.1 | 12 | • Paladin ($1.5)<br>• Am. Medical Sys. ($2.9) | 10.2 |
| Shire | 5.7 | 10 | • Viropharma ($3.3)<br>• Advanced Biohealing ($0.8) | 18.3 |
| Forest Pharmaceuticals, Inc. | 5.3 | 12 | • Aptalis ($2.9)<br>• Clinical Data ($1.1) | 20.0 |
| ★ | 2.5 | 5 | • Otsuka Partnership ($1.4)<br>• Ovation ($0.9) | 12.8 |
| optimer | 2.2 | 5 | • Optimer ($0.8)<br>• Trius ($0.7) | N/A |
| Jazz Pharmaceuticals | 1.8 | 4 | • Gentium ($0.9)<br>• EUSA Pharma ($0.7) | 1.2 |
| The Medicines Company | 1.4 | 9 | • Rempex ($0.5)<br>• Incline Therapeutic ($0.4) | 2.2 |
| Mallinckrodt Pharmaceuticals | 1.4 (Does not include recent $5.6B deal for Questcor) | 3 | • Cadence ($1.2)<br>• CNS Therapeutics ($0.1) | N/A |
| ACORDA | 0.3 | 4 | • Neuronex ($0.1)<br>• Fampridine-SR ($0.1) | N/A |
| PURDUE | 0.1 (Average ~$4 Billion) | 2 | • ████████████<br>• Intermezzo ($55mm) | 11.3 |

1 Deals include stock purchases, partnerships, buyouts, and licensing.
SOURCE: Windhover deal data, Purdue financials

66.    Purdue's investment in research and development was similarly anemic. In a 2014 email, Jonathan described the approach as "more of a smart milking program than a growth program," and Purdue director Ralph Snyderman acknowledged in response that "our own R/D is minimal." Preis Decl., Ex. 206 at PPLPC045000017072-73 [C]. Also in 2014, Purdue sought to hire a new Vice President of Business Development, but he declined the offer based on "Board member comments re not doing deals, and 'milking' the Purdue business." Preis Decl., Ex. 215

at PPLPUCC9004797180 [HC]).  Far from demonstrating that the Sacklers realistically sought to

grow Purdue's business after the 2007 guilty plea, the actual evidence suggests the Sacklers

intended to treat Purdue as a cash cow and did so.

### 5. Other Sackler contentions are equally unpersuasive.

67.     Side A claims that Purdue had "outside directors" with "impeccable credentials,"

implying that they would have acted as a check on any fraudulent conduct regarding distributions.

AXO ¶ 15.  But a 2015 email from Mortimer himself makes clear that Side A's position on this

motion is simply false:  "As for distributions, the outside directors have CONSISTENTLY said,

and correctly so, that that is a shareholder issue and not one they have or are comfortable

expressing a view on."  Preis Decl., Ex. 169 at MDSF00450185 [C] (capitalization in original).

Nor do the Sacklers offer any evidence that any "outside director" was meaningfully independent

from the side of the family by which he or she was hand-picked.

68.     That is probably because the evidence demonstrates the exact opposite.  For

example, then-Board member David Sackler described the outside directors in 2014 as "family

member proxies," expressed skepticism as to their independence, and wrote that he saw "a

situation when [sic] each side is marching their soldiers into a meeting, and watching those soldiers

follow the lead of the family member in the room."  He noted that "distributions … will likely play

out this way."  Preis Decl., Ex. 162 at PPLPUCC000335137 (see heading "Governance").  In a

June 23, 2016 email, after noting the MNP Board would consist of "9 family members and (soon)

6 outside directors," Jonathan Sackler concluded "we will have 15 out of 16 board members at the

table, *dominated by family members*."  Preis Decl., Ex. 170 at MDSF00010698 [PEOC] (emphasis

added).[36]

69.    The Sacklers argue nonsensically that their transfers could not have related to the litigation fears because some of the transferee-trusts were created in the 1970s.  *E.g.*, BXO at 22; AXO ¶¶ 29-30.  But to the extent that the Sacklers transferred value out of Purdue at least in part based on fear of Purdue's "uncapped liabilities," it makes no difference whether the recipient of those transfers was a trust created in 2008, 2004 or 1974.[37]  Nor is it significant that Purdue was owned by trusts since before OxyContin was introduced.  It was the transfers of cash and other property out of Purdue to the trusts themselves (and to overseas affiliates) that were designed to frustrate creditors.

70.    Next, the Sacklers argue that transfers "preceding the bankruptcy by more than two years" cannot be avoided, apparently relying a time limitation provided in Section 548(a).  *See* BXO at 32.  Under Section 544, however, state or other non-bankruptcy law determines the limitations periods, if any, to which the estates' claims are subject, and an estate representative can avoid transfers on behalf of all creditors as long as at least one triggering creditor has a valid claim at the time of the transfer.  *See* 11 U.S.C. § 544(b); *Moore v. Bay*, 284 U.S. 4, 5 (1931) (holding entirety of a fraudulent transfer can be avoided by estate as long as at least one triggering creditor is present even if that creditor's claims make up a fraction of the amount avoided); *In re Tronox, Inc.*, 503 B.R. 239, 266 n.31 (Bankr. S.D.N.Y. 2013) ("[T]here is no question that the drafters of the Bankruptcy Code adopted the rule of *Moore v. Bay* …. and that a debtor such as Tronox can

---

[36] In the same email string, regarding how much the businesses should distribute to family members, Mortimer observed that the family would not "delegate that decision to non-family members as it is currently our only option for getting a return and liquidity from the businesses."  *Id.*

[37] For what it's worth, the Sacklers greatly expanded their web of trusts in later years.  On Side A alone, approximately 70 new trusts were created after 2007, and of those, at least 50 received distributions of Purdue-sourced funds directly from Beacon Trust (owner of Side A's interest in Purdue).  *See, e.g.*, Preis Decl., Ex. 184 (Aug. 17, 2020 Letter to M. Hurley); *id.* Ex. 208 [PEO] (Sept. 17, 2020 Distributions Chart prepared by Side A at "Beacon Flow" tab).

avoid the transaction on behalf of the estate and all of its creditors.").

71.     While the UCC need not prove that a triggering creditor exists to prevail on this Motion, there can be no serious doubt that such creditors are present here.  For example, the Pension Benefit Guaranty Corporation, a United States government agency, is afforded a six-year limitations period under the Fair Debt Collection Practices Act.  *See In re Tronox Inc.*, 503 B.R. at 273-75.[38]  The state of New Jersey is subject to a ten-year statute of limitations, N.J.S.A. 2A:14-1.2(a); *N.J. Dep't of Env't Prot. v. Caldeira*, 794 A.2d 156, 163-65 (N.J. 2002),[39] while the states of Hawaii[40] and Connecticut[41] are not subject to any statute of limitations for fraudulent conveyance claims.  In addition, much of the evidence of intentional fraud cited in connection with the Motion became available for the first time in discovery in these cases, and therefore the two-year period to bring intentional fraudulent conveyance claims under the so-called "discovery rule" has not yet even begun to run with respect to any of the challenged transfers.  Finally, the statutes of limitation applicable to the fraudulent transfer claims (or other claims) may be subject to equitable tolling, or extended pursuant to the discovery rule or the "continuing wrong" doctrine or on other grounds.

72.     The Sacklers point to the substantial evidence marshalled by the UCC that they

---

[38] *See* Proofs of Claim filed by the PBGC,  Claim Nos. 42481, 42497, 42499, 82985, 87644, and 91430 available at: https://restructuring.primeclerk.com/purduepharma/Home-ClaimInfo (last accessed Nov. 17, 2020).

[39] Specifically, New Jersey law provides that, "Except where a limitations provision expressly and specifically applies to actions commenced by the State or where a longer limitations period would otherwise apply, and subject to any statutory provisions or common law rules extending limitations periods, any civil action commenced by the State shall be commenced within ten years after the cause of action shall have accrued."  N.J.S.A. 2A:14-1.2(a).

[40] *See* Haw. Rev. Stat. § 657-1.5 ("No limitation of actions provided for under this or any other chapter shall apply to bar the institution or maintenance of any action by or on behalf of the State and its agencies, unless the State is specifically designated in such a statute as subject to the limitation period contained therein.  No defense to any action brought by the State or any of its agencies shall be predicated upon the lapse of time.").

[41] *State v. Lombardo Bros. Mason Contractors, Inc.*, 54 A.3d 1005, 1015 (Conn. 2012) (noting that "this and other courts of this state expressly have recognized [the rule of *nullum tempus*] as part of this state's common law since the second half of the nineteenth century," and holding that statutes of limitations or repose for tort actions, product liability actions, and negligence actions do not apply to the state itself); *see also Pritchard v. Pritchard*, No. FA950319316S, 2004 WL 1052680, at *2 (Conn. Super. Ct. Apr. 26, 2004).

were motivated by the litigation threat against Purdue to transfer Purdue's assets to trusts and overseas, and argue that it is possible to place an innocent gloss on the identified communications if looked at in the light most favorable to the Sacklers.  Even if such a reading were plausible— which the UCC disputes—it would not defeat the UCC's showing of probable cause.  As the Second Circuit has held, "the fact than an innocent explanation may be consistent with the facts alleged does not negate probable cause."  *Amusement Indus., Inc.*, 293 F.R.D. at 427 (quoting *Fabrikant v. French*, 691 F.3d 193, 216 (2d Cir. 2012)).  Moreover, as the UCC pointed out in its opening papers—and the Sacklers do not deny—fraud need not be the transferor's sole motivation; a transfer is intentionally fraudulent if "at least one of the [transferor's] motives was an impermissible one."  *Jones v. Mackey Price Thompson & Ostler*, 469 P.3d 879, 890 & n.8 (Utah 2020) (collecting cases); *In re Tronox Inc.*, 503 B.R. at 278-79 (same).

73.    The Sacklers contend that "allegations that PPLP engaged in constructive fraudulent transfers … do not suffice" to invoke the crime-fraud exception.  But the UCC's crime-fraud arguments are based on the Sacklers' intentionally fraudulent transfers and breaches of fiduciary duties.  To be sure, Purdue was insolvent dating back to the 2008 transfers, including based on massive-opioid-related claims that had accrued but not yet been filed.  *See, e.g., In re W.R. Grace & Co.*, 281 B.R. 852, 859-65 (Bankr. D. Del. 2002) (holding that un-asserted mass tort claims should be considered in solvency analysis even if unknown at the time of the challenged transactions).[42]  The UCC briefly discussed its constructive fraud claims in its opening papers in connection with the *Garner* argument directed to the Debtors.  *See* Exceptions Motion ¶¶ 57-58. Since that branch of its Motion has been settled, the UCC will not address insolvency in detail

---

[42] Peter Boer, a long time W.R. Grace executive and board member, testified that W.R. Grace's CEO was Jonathan Sackler's ▮▮▮▮▮ neighbor in ▮▮▮▮▮, and may have introduced Boer to Sackler.  Preis Decl., Ex. 228 (Boer Dep. 45:20-46:18 [HC]).

<span style="color:red">19-23649-shl FILING CROSS REFERENCE FORM FOR JOINT STIPULATION
AND AGREED ORDER REGARDING MEDIA INTERVENORS' MOTION TO UNSEAL
MATERIALS FILED IN CONNECTION WITH UCC PRIVILEGES MOTIONS [ECF No. 2140]</span>

here.[43]

74.    Finally, the Sacklers argue that the billions of dollars in transfers they made to their trusts and offshore affiliates in an attempt to hinder or delay creditors were made openly, and therefore cannot be considered fraudulent, because "*Forbes* reported them." BXO at 35.[44] But *Forbes* simply reported the family's wealth as the "combined value of [the Sacklers'] drug operations as well as accumulated dividends over the years."[45] *Forbes* gave no hint as to how much of that wealth remained in the company and how much had been secreted offshore in an attempt to defraud creditors. Nor did *Forbes* describe the unprecedented value transfer program the Sacklers launched after Purdue confessed to criminal conduct in 2007, nor cite evidence that the family was motivated at least in part out of fear of Purdue's "uncapped liabilities." Neither *Forbes* nor anyone else outside of Purdue could have known any of these facts until they were unearthed in connection with discovery, since Purdue was closely held and because, as *Forbes* put it, the Sacklers made a practice of "fl[ying] under the radar."[46]

### D.    The Crime-Fraud Documents Should Be Produced or Reviewed *In Camera*

75.    "Communications that otherwise would be protected by the attorney-client

---

[43] It is worth noting, however, that credit analyses undertaken by JPMorgan, Moody's and S&P between 2014 and 2016 do not support the Sacklers' claim that Purdue was then solvent. *Compare* BXO at 9. First, ratings were obtained in connection with potential secured debt, which would have been senior to all other company liabilities. Second each of those entities relied expressly on financial information and assumptions supplied to them by Purdue, which they made no attempt to verify. Preis Decl., Ex. 181 at PPLPUCC000281516, PPLPUCC000281524 [PEO-HC] (JP Morgan); *id.* Ex. 172 at PPLPUCC003938943 [PEO-HC] (Moody's); *id.* Ex. 173 at PPLPUCC500143127 [PEO-HC] (S&P). Third, even if any of them had tried to assess Purdue's opioid-related liability—and they did not—the standards applicable under GAAP fundamentally differ from the legal standards for determining the impact of potential tort liability in an insolvency analysis. *See, e.g., In re Tronox Inc.*, 503 B.R. at 302 (stressing that "GAAP itself only requires reporting a limited subclass of environmental and tort liabilities," and that "the way GAAP looks at [such liabilities] is different than the determination of a [fraudulent transfer] claim") (citations omitted).

[44] Alex Morrell, The OxyContin Clan: The $14 Billion Newcomer to Forbes 2015 List of Richest U.S. Families, FORBES (July 1, 2015, 10:17 AM EDT), https://www.forbes.com/sites/alexmorrell/2015/07/01/the-oxycontin-clan-the-14-billion-newcomer-to-forbes-2015-list-of-richest-u-s-families/#13b2fa4475e0.

[45] *Id.*

[46] In any case, and as discussed elsewhere, evidence that the Sacklers transferred value from Purdue to themselves or for their benefit at least in part to hinder or delay creditors is sufficient to invoke the crime fraud exception, without also requiring evidence of fraud in the "sense of deceit or trickery."

privilege 'are not protected if they relate to client communications in furtherance of contemplated or ongoing criminal or fraudulent conduct,'" *see, e.g.*, *Cendant Corp. v. Shelton*, 246 F.R.D. 401, 405 (D. Conn. 2007) (quoting *In re Grand Jury*, 731 F.3d at 1038) or if "intended in some way to facilitate or conceal" such wrongful conduct.  *See* AXO ¶ 41 (citing *In re Richard Roe, Inc.*, 168 F.3d 69, 71 (2d Cir. 1999)).  The UCC has identified categories of withheld documents that it believes satisfy the crime fraud exception here, including documents concerning (i) the Sacklers' asset protection and estate planning measures relating to the transfer of funds to family trusts and away from Purdue's creditors, (ii) whether Purdue transfers were or could be deemed fraudulent transfers, (iii) how opioid plaintiffs might collect, or be prevented from collecting, on any judgments against Purdue, the Sacklers or any of the Sacklers' other affiliates, (iv) the amount and mechanics for distributions to and for the benefit of the Sacklers, (v) Purdue's potential liability as it relates to breaches of fiduciary duty or other misconduct, (vi) non-cash transfers to or for the benefit of the Sacklers, and (vii) concealment by the Sacklers of any misconduct.[47]

76.     The Sacklers argue that the UCC cannot rely on categories in support of its motion, and instead was required to identify "each of the particular attorney-client communications [that] was used in furtherance of a crime or fraud."  AXO ¶ 41.  But it would literally be impossible for the UCC to do as the Sacklers demand given the vague nature of the descriptions they employed on their Privilege Logs.  The UCC nevertheless did its best to decode the Privilege Logs by reference to significant date ranges, subject fields (though often sparse and cryptic) and other available information, attaching lists of log entries identified by control number that the UCC believes might be within the categories.[48]  Unfortunately, because only the Withholding Parties

---

[47] *See* Hurley Decl., Ex. 101 at 2.

[48] *See* Preis Decl., Ex. A (Excel Tab 7) and Ex. B (Excel Tab 6) for a sample list of Privilege Log entries the UCC believes might be within the crime-fraud and/or at-issue categories.  The UCC has further narrowed the list to 60 entries that the UCC suggests for *in camera* review.  The control numbers of the Privilege Log entries submitted for

have access to the contents of the documents, only they can confidently identify which come within

the categories and which do not.[49] *See, e.g.*, AXO ¶ 43 (arguing that certain documents withheld

by Side A do not come within the categories identified by the UCC).

77. Ample precedent supports a categorical approach to privilege-challenge motions,

including based on the crime-fraud exception. For example, the Eleventh Circuit upheld a district

court's decision to review documents within nine broad categories of documents for application

of the crime-fraud exception in furtherance of a crime or fraud "in lieu of a document-by-document

analysis." *Drummond Company, Inc. v. Conrad & Scherer, LLP*, 885 F.3d 1324, 1333 (11th Cir.

2018); *see also Amusement Indus., Inc.*, 293 F.R.D. at 440-41 (ordering production of categories

of communications between the defendant and the defendant's attorneys based on the crime-fraud

exception without reference to specific documents). The standard for triggering *in camera* review

requires only "a factual basis adequate to support a good faith belief by a reasonable person …

that *in camera* review … may reveal evidence to establish the claim that the crime-fraud exception

applies." *United States v. Zolin*, 491 U.S. 554, 572 (1989) (quotation omitted). The UCC

respectfully submits that it has established a more than adequate factual basis to justify *in camera*

review of documents in the identified categories.[50]

78. The burden associated with *in camera* review has been greatly reduced as a result

of the UCC's settlement with the Debtors. Nevertheless, the burden associated with the requested

---

*in camera* review are listed in Exhibit C to the Preis Declaration. These entries, as they appear on the Privilege Logs,
are also highlighted in yellow on Exhibits A-B of the Pries Declaration.

[49] In a September 25, 2020 letter to Side B, the UCC offered to drop its General Challenges Motion with respect to
entries not within any of the categories identified in connection with this Motion. *See* Preis Decl., Ex. 110 (Sept. 25,
2020 Letter from M. Hurley). On September 28, 2020 Side B agreed, and provided a list of control numbers that are
*not* within any of those categories. *See* Preis Decl., Ex. 116 (Sept. 28, 20209 Letter from A. Lees). The UCC made
the same offer to Side A on October 14, 2020, but has not received any response. *See* Preis Decl., Ex. 112 (Oct. 14,
2020 Letter from M. Hurley).

[50] As noted, the UCC withdraws its alternative request for appointment of a special master in light of Federal Rule of
Bankruptcy Procedure 9031.

*in camera* review remains substantial. In its discretion, the Court can certainly begin its review with a subset of the identified categories, or a fractional, random sample of some or all of the identified categories, or employ another method to limit the scale of the initial review and determine whether an examination of additional documents *in camera* is warranted. As an option, and in an effort to further reduce the burden on the Court, the UCC has selected a total of sixty entries, thirty from Side A and thirty from Side B, that it suggests for *in camera* review related to the "crime fraud" and "at issue" exceptions.[51] The UCC is available to provide any support the Court may request in connection with crafting a practical solution to the problem created by the extraordinary size of the Privilege Logs in these cases, and the correspondingly large number of challenges pursued by the UCC.[52]

## II.    THE AT ISSUE EXCEPTION JUSTIFIES FURTHER DISCLOSURE

79.    In their oppositions and defense presentations,[53] the Sacklers claim that in "good faith" (i) they believed Purdue's opioid sales and marketing practices were at all times compliant with applicable laws and regulations and (ii) prior to 2017, they believed that Purdue did not face significant litigation risk related to opioids. The Sacklers' decision to put their alleged good faith at issue justifies disclosure of attorney-client communications that "may well demonstrate the falsity of [their] claim[s]." *Arista Records LLC v. Lime Grp. LLC,* No. 06 CV 5936(KMW), 2011 WL 1642434, at *3 (S.D.N.Y. Apr. 20, 2011) (quotation omitted).

---

[51] *See* Preis Decl., Ex. C listing the control numbers for suggested *in camera* review for crime fraud and at issue categories. The UCC has also highlighted the privilege log entries for suggested *in camera* review for Side A and Side B in the crime fraud and at issue categories in Preis Decl. Ex. A (Excel Tab. 7) and Preis Decl. Ex. B (Excel Tab 6).

[52] The Sacklers argue that communications from 2013 to 2017 should be immune from the crime fraud exception because the "lion's share" of fraudulent distributions were made between 2008 and 2012. AXO ¶ 43. But the Sacklers' fraud continued after 2012, though the family "only" transferred about $2.4 billion in cash during the later years.[52] And communications that occurred after the Sacklers stopped secreting funds from Purdue in 2017 also may be subject to the crime fraud exception, which applies *both* to communications in furtherance of a crime or fraud *and* to communications relating to later attempts to conceal that the crime or fraud occurred.

[53] The UCC's citation to the Sacklers' presentations is appropriate and consistent with the parties' reasonable expectations. *See* n. 24 *supra.*

AND AGREED ORDER REGARDING AD HOC INTERVENORS' MOTION TO UNSEAL
MATERIALS FILED IN CONNECTION WITH UCC PRIVILEGES MOTIONS [ECF No. 2140]

80.     Fairness, the touchstone of the exception, comes into play when parties put their

state of mind at issue.  *See In re Cnty. of Erie*, 546 F.3d 222, 229 (2d Cir. 2008) ("Underlying any

determination that a privilege should be forfeited is the notion of unfairness."); *Brown v. Barnes

and Noble, Inc.*, No. 1:16-cv-07333(RA)(KHP), 2019 WL 7168146, at *7 (S.D.N.Y. Dec. 12,

2019) (at-issue waiver applies "where, for example, a party's state of mind, such as his good faith

belief in the lawfulness of his conduct, is relied upon in support of a claim or defense") (internal

quotation and citation omitted).  The doctrine applies regardless of whether the party expressly

relies on advice of counsel, as long as an examination of privileged communications is necessary

to fairly examine the claim of good faith.  *See Scott v. Chipotle Mexican Grill, Inc.*, 67 F. Supp.

3d 607, 614-16 (S.D.N.Y. 2014) (in case alleging that salaried apprentices were misclassified and

entitled to overtime pay, defendant claimed good faith defense of reliance on applicable

regulations; court recognized that legal advice might demonstrate falsity of good faith defense).

81.     In *Arista Records*, the court held that the at-issue waiver doctrine applied to

privileged communications where the client alleged certain transfers were not intended "to avoid

any potential legal exposure" and that "he did not believe that [his company] … would be sued"

at the time of the transfers—even though the client did not expressly invoke reliance on counsel.

No. 06 CV 5936(KMW), 2011 WL 1642434, at *1-3 (S.D.N.Y. Apr. 20, 2011).  The Sacklers

attempt to distinguish *Arista Records* because it involved testimony, but nothing in the decision

suggests the court would have arrived at a different conclusion if the privilege had instead been

asserted over documents.  *See* BXO at 45-46.  Indeed, the court in *Arista Records* rejected

defendants' argument that plaintiff's motion in limine was "a disguised and untimely motion to

compel," because the court did not view the distinction as material.  *See* 2011 WL 1642434, at *2

(discovering parties can seek relief in the form of a motion to compel or motion in limine, but "a

45

motion to compel is not a prerequisite to invoking the [at-issue] rule").[54]

82.     The Sacklers argue that at-issue waiver is inapplicable because the UCC currently asserts no "claims."   The Sacklers concede, however, that their presentations describe "the defenses that the Shareholder Parties intend to make" if there is no settlement and claims are litigated.  To gauge the value of those claims, the UCC must have access to the same documents that would be available to creditors were the Sacklers to invoke their good faith arguments in a litigation setting.  The fact that litigation is not actually pending now should not by itself bar the relief the UCC seeks, considering the nature of the exercise in which the parties are engaged.

83.     Nor is this case analogous to *John Doe Co. v. United States*, where the subject of a grand jury investigation shared its "good faith" defense solely in an effort to influence the decision making of its adversary—a prosecutor—who would not be prejudiced regardless of whether it accepted or rejected the contentions.  350 F.3d 299, 301, 306 (2d Cir. 2003).  Here, in contrast, the Sacklers hoped their presentations would influence many potential "decisionmakers" concerning the Settlement Framework they support, including the consenting and non-consenting states, the Debtors, a host of other creditor groups in addition to the UCC, and for Side B at least, the Court itself.  *See Motion to Allow/Motion to Make Publicly Available the Raymond Sackler Family's Presentation of Dec. 6, 2019* [ECF No. 685] (withdrawn); BXO at 8, 11, 27-29.

84.     Finally, the Sacklers argue that "if the UCC's argument were accepted … whenever someone asserts a claim of fraudulent conveyance, the defendant must either admit that they acted with an intent to defraud or waive the privilege."  BXO at 48.  But the Sacklers do not merely deny they acted with fraudulent intent.  They deny that prior to 2017 they could have had any reason to

---

[54] *Arista Records* is entirely consistent with the Second Circuit's decision in *Erie*, where application of the doctrine was rejected precisely because the "petitioners d[id] not claim a good faith or state of mind defense."  546 F.3d at 229; *compare* BXO at 43.

believe Purdue might face "meaningful litigation," and they do so specifically to undermine any inference that they transferred vast sums out of Purdue to and for the benefit of Sackler family trusts in order to evade litigation creditors. The Sacklers likewise claim they genuinely believed that Purdue was complying with all laws and regulations, despite the fact that Purdue has now pleaded guilty twice to engaging in criminal conduct in the sale of opioids over a period spanning three decades while controlled by the Sackler family. If privileged documents exist rebutting the Sacklers assertions of good faith, fairness demands they be supplied to Purdue's creditors as they consider whether to release valuable estate claims.

## <u>CONCLUSION</u>

85.    For the foregoing reasons the UCC respectfully asks the Court to grant the Motion in full, and enter the proposed order submitted with the Reply, requiring the Sacklers to (i) produce the Challenged Documents and/or (ii) provide the Challenged Documents to the Court for *in camera* review. The NCSG supports the relief requested herein.

STIPULATION AND AGREED ORDER REGARDING MDL PLAINTIFFS' AND NAS INTERVENORS' MOTION TO UNSEAL MATERIALS FILED IN CONNECTION WITH UCC PRIVILEGES MOTIONS [ECF No. 2140]

New York, New York                              AKIN GUMP STRAUSS HAUER & FELD LLP

Dated:  November 18, 2020


                                    By: /s/ *Mitchell P. Hurley*

                                        Ira S. Dizengoff
                                        Arik Preis
                                        Mitchell P. Hurley
                                        Joseph L. Sorkin
                                        Elizabeth Scott (*admitted pro hac vice*)
                                        Sara L. Brauner
                                        One Bryant Park
                                        New York, New York 10036
                                        Telephone: (212) 872-1000
                                        Facsimile: (212) 872-1002
                                        idizengoff@akingump.com
                                        apreis@akingump.com
                                        mhurley@akingump.com
                                        jsorkin@akingump.com
                                        edscott@akingump.com
                                        sbrauner@akingump.com

                                        *Counsel to the Official Committee of Unsecured*
                                        *Creditors of Purdue Pharma, L.P.*, et al.