**REDACTED**

AKIN GUMP STRAUSS HAUER & FELD LLP
Ira S. Dizengoff
Arik Preis
Mitchell Hurley
Joseph L. Sorkin
Sara L. Brauner
One Bryant Park
New York, New York 10036
Telephone: (212) 872-1000
Facsimile: (212) 872-1002

*Counsel to the Official Committee of Unsecured
Creditors of Purdue Pharma L.P.,* et al.

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| PURDUE PHARMA L.P., *et al.*,[1] | ) | Case No. 19-23649 (RDD) |
| | ) | |
| Debtors. | ) | (Jointly Administered) |
| | ) | |

**DECLARATION OF ARIK PREIS DATED NOVEMBER 18, 2020**

---

[1] The Debtors in these cases, along with the last four digits of each Debtor's registration number in the applicable jurisdiction, are as follows: Purdue Pharma L.P. (7484), Purdue Pharma Inc. (7486), Purdue Transdermal Technologies L.P. (1868), Purdue Pharma Manufacturing L.P. (3821), Purdue Pharmaceuticals L.P. (0034), Imbrium Therapeutics L.P. (8810), Adlon Therapeutics L.P. (6745), Greenfield BioVentures L.P. (6150), Seven Seas Hill Corp. (4591), Ophir Green Corp. (4594), Purdue Pharma of Puerto Rico (3925), Avrio Health L.P. (4140), Purdue Pharmaceutical Products L.P. (3902), Purdue Neuroscience Company (4712), Nayatt Cove Lifescience Inc. (7805), Button Land L.P. (7502), Rhodes Associates L.P. (N/A), Paul Land Inc. (7425), Quidnick Land L.P. (7584), Rhodes Pharmaceuticals L.P. (6166), Rhodes Technologies (7143), UDF L.P. (0495), SVC Pharma L.P. (5717) and SVC Pharma Inc. (4014). The Debtors' corporate headquarters is located at One Stamford Forum, 201 Tresser Boulevard, Stamford, CT 06901.

PUBLICLY FILED PER STIPULATION [ECF 2140]

REDACTED

Under 28 U.S.C. § 1746, I, Arik Preis,[2] declare under the penalty of perjury that the following is true and correct to the best of my knowledge, information, and belief:

1.      This declaration ("**Declaration**") is submitted in support of the Official Committee of Unsecured Creditors of Purdue Pharma, L.P. et al.'s Motions (defined below) and two reply briefs filed contemporaneously with this Declaration entitled (1) Official Committee of Unsecured Creditors' Reply in Support of Its Motion to Compel Production of Purportedly Privileged Documents, or for *In Camera* Review, Based on Good Cause, Crime Fraud, and At Issue Exceptions to Claims of Privilege (the "**Exceptions Reply**")[3]; and (2) Official Committee of Unsecured Creditors' Reply in Support of Motion to Compel Production of Purportedly Privileged Documents, or for *In Camera* Review, Based on Failure of the Sacklers to Demonstrate Documents Identified on Logs are Privileged (the "**General Challenges Reply,**"[4] and, together with the Exceptions Reply, the "**Replies**").[5]

2.      I am an attorney in good standing admitted to practice in the State of New York, and I am a partner at the law firm of Akin Gump Strauss Hauer & Feld LLP ("**Akin Gump**").  I was admitted to the New York State Bar in 2001 and have been practicing law in the area of bankruptcy and financial restructuring since that time.  I make this Declaration based on my own personal knowledge and belief, and upon documents and information available to me as counsel to the Official Committee of Unsecured Creditors of Purdue Pharma, L.P. et al (the "**UCC**").

---

[2] My legal name is Erik Preis but for my entire life I have utilized the name Arik and not Erik.

[3] For the sake of clarity, the Exceptions Reply is submitted in support of the UCC's *Motion to Compel Production of Purportedly Privileged Documents, or for* In Camera *Review, Based on Good Cause, Crime Fraud, and At Issue Exceptions to Claims of Privilege* [ECF No. 1753] (the "**Exceptions Motion**").

[4] For the sake of clarity, the Challenges Reply is submitted in support of the UCC's *Motion to Compel Production of Purportedly Privileged Documents, or for In Camera Review, Based on Failure of the Sacklers and the Debtors to Demonstrate Documents Identified on Logs are Privileged* [ECF No. 1752] (the "**General Challenges Motion**").  The Exceptions Motion and General Challenges Motion are collectively referred to herein as the "**Motions**."

[5] Capitalized terms used but not defined herein shall have the meanings ascribed to them in the Replies, which the UCC has endeavored to use consistently with definitions used in the Motions.

2

PUBLICLY FILED PER STIPULATION [ECF 2140]

REDACTED

3.      The UCC files its Replies in accordance with the briefing schedule provided in the

*Stipulation and Agreed Order Regarding Amended Briefing Schedule in the Chapter 11 Cases*,

executed by the Debtors, the Sacklers, the NCSG, the AHC, and the UCC, which was filed and so

ordered by the Court on October 26, 2020 [ECF No. 1848].  After filing its Motions, the UCC has

continued to meet and confer with counsel for the Side A and Side B Sacklers (collectively, the

"**Sacklers**") and the Debtors (collectively with the Sacklers, the "**Withholding Parties**") in a good

faith effort to resolve by agreement the issues raised by the Motions without the intervention of

the Court.  While the parties informally resolved some of the UCC's challenges, they could not

resolve all the issues as described in the Replies.

4.      This Declaration attaches and describes documents and testimony relied upon in

the Replies.  Certain exhibits attached hereto have been designated as Confidential, Highly

Confidential, Professional's Eyes Only, or Outside Professional's Eyes Only, by one or more

parties to this proceeding and are redacted pursuant to the *Third Amended Protective Order* entered

in these proceedings [ECF No. 1935].  The UCC also files certain correspondence with the

Withholding Parties under seal in an abundance of caution in order to accommodate certain

Withholding Parties' prior positions concerning the confidentiality of email address and other

information that may be contained therein.  By filing in this way, the UCC does not intend to

suggest that it agrees the information is or ought to be confidential.

5.      Attached hereto as **Exhibit A** is a true and correct copy of an excel workbook

containing the entries on Side A's privilege log that the UCC is challenging in the Motions and

Replies, separated by category based on the tabbed worksheets in the excel workbook.  For the

Exceptions Motion and Reply, the privilege entries are a non-exhaustive, illustrative list of the

Challenged Documents (as defined in the Exceptions Motion) that the UCC believes fit within the

3

PUBLICLY FILED PER STIPULATION [ECF 2140]

REDACTED

categories of privileged documents the UCC seeks to compel. This Exhibit A is intended to supersede the Exhibit A attached to the Declaration of Mitchell Hurley Dated September 29, 2020, originally filed in support of the Motions.

6.      Attached hereto as **Exhibit B** is a true and correct copy of an excel workbook containing the entries on Side B's privilege log that the UCC is challenging in the Motions and Replies, separated by category based on the tabbed worksheets in the excel workbook. For the Exceptions Motion and Reply, the privilege entries are a non-exhaustive, illustrative list of the Challenged Documents (as defined in the Exceptions Motion) that the UCC believes fit within the categories of privileged documents the UCC seeks to compel. This Exhibit B is intended to supersede the Exhibit B attached to the Declaration of Mitchell Hurley Dated September 29, 2020, originally filed in support of the Motions.

7.      Attached hereto as **Exhibit C** is a list of document control numbers corresponding to certain Privilege Log entries for which the UCC requests *in camera* review. The list is organized categorically and by Withholding Party. The document control numbers in Exhibit C are presented as a limited sampling of materials that the UCC believes would enable the Court to make a reasoned determination whether further *in camera* review or other relief is appropriate respecting categories of documents identified in the General Challenges Reply.

8.      Attached hereto as **Exhibit 110** is a true and correct copy of a letter from Mitchell Hurley to Alexander Lees, dated September 25, 2020.

9.      Attached hereto as **Exhibit 111** is a true and correct copy of a letter from Mitchell Hurley to Alexander Lees, dated October 12, 2020.

10.     Attached hereto as **Exhibit 112** is a true and correct copy of a letter from Mitchell Hurley to Jasmine Ball, dated October 14, 2020.

PUBLICLY FILED PER STIPULATION [ECF 2140]

REDACTED

11.     Attached hereto as **Exhibit 113** is a true and correct copy of an email from Elizabeth Scott to Jasmine Ball, dated October 20, 2020.

12.     Attached hereto as **Exhibit 114** is a true and correct copy of an email from Elizabeth Scott to Jasmine Ball, dated October 23, 2020.

13.     Attached hereto as **Exhibit 115** is a true and correct copy of an email from Elizabeth Scott to Jasmine Ball, dated October 29, 2020.

14.     Attached hereto as **Exhibit 116** is a true and correct copy of a letter from Alexander Lees to Mitchell Hurley, dated September 28, 2020.

15.     Attached hereto as **Exhibit 117** is a true and correct copy of a letter from Alexander Lees to Mitchell Hurley, dated October 19, 2020.

16.     **Exhibit 118** to this Declaration has been intentionally omitted.

17.     **Exhibit 119** to this Declaration has been intentionally omitted.

18.     **Exhibit 120** to this Declaration has been intentionally omitted.

19.     **Exhibit 121** to this Declaration has been intentionally omitted.

20.     Attached hereto as **Exhibit 122** is a true and correct copy of an email from Stuart Baker dated November 1, 2018, which was produced to the UCC under the Bates number MSF00470861.

21.     Attached hereto as **Exhibit 123** is a true and correct copy of an email exchange between Mortimer Sackler and Antony Mattessich, dated April 24, 2017, which was produced to the UCC under the Bates number MSF00575712.

22.     Attached hereto as **Exhibit 124** is a true and correct copy of an email from Stuart Baker to Richard Sackler, dated November 22, 2013, which was produced to the UCC under the Bates number RSF_OLK00070002.

PUBLICLY FILED PER STIPULATION [ECF 2140]

REDACTED

23.     Attached hereto as **Exhibit 125** is a true and correct copy of a July 27, 2011 email from Cecil Pickett forwarding a Stuart Baker email with attachment titled "Proposed 2012 Calendar of Meetings and Board Calls," which was produced to the UCC under the Bates numbers PPLPUCC9002657293-94.

24.     Attached hereto as **Exhibit 126** is a true and correct copy of an email chain dated June 21, 2019, which was produced to the UCC under the Bates number MSF00997606.

25.     Attached hereto as **Exhibit 127** is a true and correct copy of an excel spreadsheet containing text messages including Dame Theresa Sackler and others, which was produced to the UCC under the Bates number MSF90089695.

26.     Attached hereto as **Exhibit 128** is a true and correct copy of an email from Paul Gallagher, Senior Managing Director at Teneo, dated May 20, 2019, which was produced to the UCC under the Bates number PPLPUCC002663187.

27.     Attached hereto as **Exhibit 129** is a true and correct copy of an email from Paul Gallagher, Senior Managing Director at Teneo, dated May 20, 2019, which was produced to the UCC under the Bates number PPLPUCC002664919.

28.     Attached hereto as **Exhibit 130** is a true and correct copy of an email from Mortimer Sackler dated May 21, 2019, which was produced to the UCC under the Bates number PPLPUCC002662986.

29.     **Exhibit 131** to this Declaration has been intentionally omitted.

30.     Attached hereto as **Exhibit 132** is a true and correct copy of an email from David Lundie to John Donovan, dated February 8, 2012, which was produced to the UCC under the Bates number PPLPC036000177151.

PUBLICLY FILED PER STIPULATION [ECF 2140]

REDACTED

31.     Attached hereto as **Exhibit 133** is a true and correct copy of a September 2010 email chain which was produced to the UCC under the Bates number PPLPUCC002449097.

32.     Attached hereto as **Exhibit 134** is a true and correct copy of an email from Michael Friedman dated March 5, 2006, which was produced to the UCC under the Bates number PPLPUCC002603602.

33.     Attached hereto as **Exhibit 135** is a true and correct copy of a February 15, 2011 email from Jonathan Sackler attaching Purdue board and management discussion materials, which was produced to the UCC under the Bates number PPLPUCC9003800123.

34.     Attached hereto as **Exhibit 136** is a true and correct copy of excerpts from the minutes of a March 4, 2003 meeting of the board of directors of Purdue Pharma Inc., which was produced to the UCC under the Bates number PPLPUCC500647319.

35.     Attached hereto as **Exhibit 137** is a true and correct copy of a May 5, 2017 email from Craig Landau attaching a Purdue diagnostic and forward plan, which was produced to the UCC under the Bates number PWG004670879.

36.     Attached hereto as **Exhibit 138** is a true and correct copy of a February 2007 email chain which was produced to the UCC under the Bates number PPLPC061000013858.

37.     Attached hereto as **Exhibit 139** is a true and correct copy of a March 2008 email chain which was produced to the UCC under the Bates number PPLPC012000174476.

38.     Attached hereto as **Exhibit 140** is a true and correct copy of an February 2012 email chain which was produced to the UCC under the Bates number PPLPUCC9002981007.

39.     Attached hereto as **Exhibit 141** is a true and correct copy of a November 2013 email chain which was produced to the UCC under the Bates number SideA00429689.

PUBLICLY FILED PER STIPULATION [ECF 2140]

REDACTED

40.     Attached hereto as **Exhibit 142** is a true and correct copy of a June 2015 email chain which was produced to the UCC under the Bates number PPLPUCC9004448656.

41.     Attached hereto as **Exhibit 143** is a true and correct copy of excerpts from a February 11, 2010 letter from Amy D'Agostino to Cecil Pickett attaching executed Director Agreements, which was produced to the UCC under the Bates number CP0000001.

42.     Attached hereto as **Exhibit 144** is a true and correct copy of Executive Committee Meeting Notes & Actions, dated September 21, 2011, which was produced to the UCC under the Bates number RSF_OLK00035017.

43.     Attached hereto as **Exhibit 145** is a true and correct copy of an April 2012 email chain, which was produced to the UCC under the Bates number PPLPC012000372585.

44.     Attached hereto as **Exhibit 146** is a true and correct copy of a September 11, 2013 memorandum from McKinsey to John Stewart and Russ Gasdia, which was produced to the UCC under the Bates number PPLPC012000441614.

45.     Attached hereto as **Exhibit 147** is a true and correct copy of an August 15, 2013 email from Richard Sackler, which was produced to the UCC under the Bates number PPLPUCC9002391802.

46.     Attached hereto as **Exhibit 148** is a true and correct copy of an email from Stuart Baker dated August 21, 2013, which was produced to the UCC under the Bates number PPLPC045000016165.

47.     Attached hereto as **Exhibit 149** is a true and correct copy of an April 6, 2014 email from Edward Mahony, which was produced to the UCC under the Bates number PPLPC012000471641.

PUBLICLY FILED PER STIPULATION [ECF 2140]

REDACTED

48.     Attached hereto as **Exhibit 150** is a true and correct copy of excerpts from a presentation titled: Changes in prescriptions of OxyContin and OPANA ER after introduction of tamper resistant formulations among potentially problematic and comparator prescribers, which was produced to the UCC under the Bates number PPLPC019000826509.

49.     Attached hereto as **Exhibit 151** is a true and correct copy of a May 21, 2007 email and attached May 2007 calendar printout, which was produced to the UCC under the Bates numbers PPLPUCC001531749-50.

50.     Attached hereto as **Exhibit 152** is a true and correct copy of excerpts from an August 2013 email from Donna Condon attaching an August 8, 2013 memorandum from McKinsey to John Stewart and Russ Gasdia, which was produced to the UCC under the Bates number MDSF00986947.

51.     Attached hereto as **Exhibit 153** is a true and correct copy of a June 2014 email chain, which was produced to the UCC under the Bates number PPLPC045000017003.

52.     Attached hereto as **Exhibit 154** is a true and correct copy of excerpts from a Purdue OxyContin Annual Marketing Plan, dated October 6, 2013, which was produced to the UCC under the Bates number PAK000062549.

53.     Attached hereto as **Exhibit 155** is a true and correct copy of excerpts from an August 15, 2013 Purdue board meeting agenda and attached August 8, 2013 memorandum from McKinsey which was produced to the UCC under the Bates number PPLP004409890.

54.     Attached hereto as **Exhibit 156** is a true and correct copy of an October 8, 2011 Google news alert, which was produced to the UCC under the Bates number RSF00683542.

55.     Attached hereto as **Exhibit 157** is a true and correct copy of a November 1, 2013 Google news alert, which was produced to the UCC under the Bates number RSF_OLK00008429.

PUBLICLY FILED PER STIPULATION [ECF 2140]

REDACTED

56.     Attached hereto as **Exhibit 158** is a true and correct copy of an April 18, 2015 Google news alert, which was produced to the UCC under the Bates number MDSF00514742.

57.     Attached hereto as **Exhibit 159** is a true and correct copy of a July 2016 email chain, which was produced to the UCC under the Bates number PWG004484978.

58.     Attached hereto as **Exhibit 160** is a true and correct copy of a January-February 2008 email chain, which was produced to the UCC under the Bates number SideA00391976.

59.     Attached hereto as **Exhibit 161** is a true and correct copy of a February 2008 email chain, which was produced to the UCC under the Bates number PPLPC042000011810.

60.     Attached hereto as **Exhibit 162** is a true and correct copy of an October 2014 email chain, which was produced to the UCC under the Bates number PPLPUCC000335135.

61.     Attached hereto as **Exhibit 163** is a true and correct copy of document titled "CEO Considerations," which was produced to the UCC under the Bates number PPLPUCC001662356.

62.     Attached hereto as **Exhibit 164** is a true and correct copy of excerpts from a Dec. 6, 2019 "Presentation of Defenses ('Side A')," which was provided to the UCC by counsel for Side A.

63.     Attached hereto as **Exhibit 165** is a true and correct copy of excerpts from an October 8, 2010 Purdue news summary, which was produced to the UCC under the Bates number PPLPC061000060749.

64.     Attached hereto as **Exhibit 166** is a true and correct copy of an April 2012 email chain, which was produced to the UCC under the Bates number MARSH-PURDUE-001112.

65.     Attached hereto as **Exhibit 167** is a true and correct copy of a May 11, 2012 email and attached presentation and timeline, which was produced to the UCC under the Bates number MARSH-PURDUE-001768.

PUBLICLY FILED PER STIPULATION [ECF 2140]

REDACTED

66.     Attached hereto as **Exhibit 168** is a true and correct copy of a May 2012 email chain, which was produced to the UCC under the Bates number MARSH-PURDUE-001777.

67.     Attached hereto as **Exhibit 169** is a true and correct copy of a July 2015 email chain, which was produced to the UCC under the Bates number MDSF00450185.

68.     Attached hereto as **Exhibit 170** is a true and correct copy of a June 2016 email chain, which was produced to the UCC under the Bates number MDSF00010697.

69.     Attached hereto as **Exhibit 171** is a true and correct copy of excerpts from a February 29, 2012 Purdue news summary, which was produced to the UCC under the Bates number IACS_ESI_0000490680.

70.     Attached hereto as **Exhibit 172** is a true and correct copy of an March 30, 2016 letter from Moody's Investor Services, which was produced to the UCC under the Bates number PPLPUCC003938943.

71.     Attached hereto as **Exhibit 173** is a true and correct copy of an April 7, 2016 letter from Standard & Poor's Ratings Services, which was produced to the UCC under the Bates number PPLPUCC500143127.

72.     Attached hereto as **Exhibit 174** is a true and correct copy of a document titled "Proposal Regarding Board Practices," which was produced to the UCC under the Bates number MSF00144650.

73.     Attached hereto as **Exhibit 175** is a true and correct copy of a July 16, 2017 email from Mortimer Sackler which was produced to the UCC under the Bates number SideA00229177.

74.     Attached hereto as **Exhibit 176** is a true and correct copy of a March 10, 2008 email from Richard Sackler which was produced to the UCC under the Bates number PPLPC023000164605.

PUBLICLY FILED PER STIPULATION [ECF 2140]

REDACTED

75.     Attached hereto as **Exhibit 177** is a true and correct copy of an April-May 2011 email chain which was produced to the UCC under the Bates number PPLPUCC9000363533.

76.     Attached hereto as **Exhibit 178** is a true and correct copy of *Purdue's Written Responses to 30(b)(6) Topics*, served in connection with *In re: National Prescription Opiate Litigation*, MDL No. 2804, in the United States District Court, Northern District of Ohio, which was produced to the UCC under the Bates number POK003735973.

77.     Attached hereto as **Exhibit 179** is a true and correct copy of a June 18, 2014 Purdue news summary, which was produced to the UCC under the Bates number POK003746339.

78.     Attached hereto as **Exhibit 180** is a true and correct copy of an April 12, 2012 OxyContin Market Events presentation, which was produced to the UCC under the Bates number PPLPC012000372437.

79.     Attached hereto as **Exhibit 181** is a true and correct copy of excerpts from an August 13, 2014 presentation from JP Morgan, which was produced to the UCC under the Bates number PPLPUCC000281516.

80.     Attached hereto as **Exhibit 182** is a true and correct copy of the Purdue plea agreement with the United States dated October 20, 2020 and filed in these proceedings at EFC No. 1828-2.

81.     Attached hereto as **Exhibit 183** is a true and correct copy of excerpts from a notification of patent decision in *In re Oxycotin Antitrust Litig.*, No. 1:06-cv-13095-SHS (S.D.N.Y. Jan. 7, 2008), which was produced to the UCC under the Bates number PURCHI-000834581.

82.     Attached hereto as **Exhibit 184** is a true and correct copy of an August 17, 2020 letter to Mitchell Hurley.

PUBLICLY FILED PER STIPULATION [ECF 2140]

REDACTED

83.     Attached hereto as **Exhibit 185** is a true and correct copy of excerpts from the audited combined financial statements of Purdue for years ended December 31, 2007 and 2006, which was produced to the UCC under the Bates number PPLPUCC500056846.

84.     Attached hereto as **Exhibit 186** is a true and correct copy of a May 1999 email chain, which was produced to the UCC under the Bates number PPLPUCC000004987.

85.     Attached hereto as **Exhibit 187** is a true and correct copy of a March 2007 email chain, which was produced to the UCC under the Bates number PPLPUCC004057767.

86.     Attached hereto as **Exhibit 188a** is a true and correct copy of privilege slip sheet, which was produced to the UCC under the Bates number PPLPC051000035807, and is identified in metadata as the parent document of PPLPC051000035808 (Ex. 188b to this Declaration).

87.     Attached hereto as **Exhibit 188b** is a true and correct copy of a 2006 Comment published in Northwestern University Law Review titled: "West Virginia's Painful Settlement: How the OxyContin Phenomenon and Unconventional Theories of Tort Liability May Make Pharmaceutical Companies Liable for Black Markets," which was produced to the UCC under the Bates number PPLPC051000035808.

88.     Attached hereto as **Exhibit 189** is a true and correct copy of a Purdue News Summary circulated on June 20, 2014, which was produced to the UCC under the Bates number PAZ000115626.

89.     Attached hereto as **Exhibit 190** is a true and correct copy of a June 2014 email chain, which was produced to the UCC under the Bates number PPLPC045000017003.

90.     Attached hereto as **Exhibit 191** is a true and correct copy of excerpts from the audited combined financial statements of Purdue for years ended December 31, 2008 and 2007, which was produced to the UCC under the Bates number PPLPUCC500056885.

PUBLICLY FILED PER STIPULATION [ECF 2140]

REDACTED

91.     Attached hereto as **Exhibit 192** is a true and correct copy of a May 2012 email chain, which was produced to the UCC under the Bates number MARSH-PURDUE-001863.

92.     Attached hereto as **Exhibit 193** is a true and correct copy of a April 2012 email chain, which was produced to the UCC under the Bates number MARSH-PURDUE-001114.

93.     Attached hereto as **Exhibit 194** is a true and correct copy of a May 2012 email chain, which was produced to the UCC under the Bates number MARSH-PURDUE-001804.

94.     Attached hereto as **Exhibit 195** is a true and correct copy of excerpts from a privilege log dated March 5, 2019, produced by the Debtors in connection with MDL litigation, and provided to the UCC in connection with these proceedings.

95.     Attached hereto as **Exhibit 196** is a true and correct copy of a November 2020 email chain between counsel for Norton Rose Fulbright, the UCC, and the Debtors, among others.

96.     Attached hereto as **Exhibit 197** is a true and correct copy of a November 8, 2020 email from Katherine Porter to counsel for the Debtors concerning deposition scheduling.

97.     Attached hereto as **Exhibit 198** is a true and correct copy of a November 15, 2020 email from Katherine Porter attaching the current deposition schedule in these proceedings.

98.     Attached hereto as **Exhibit 199** of  State Settlement Agreement and Release dated July 17, 2007, and entered into by the State of Washington and The Purdue Frederick Company, Inc. and Purdue Pharma L.P., which was produced to the UCC under the Bates number PPLPC030000403213.

99.     Attached hereto as **Exhibit 200** is a true and correct copy of the online curriculum vitae of Norton Rose Fulbright attorney Donald Strauber, which was obtained on November 17, 2020, at https://www.nortonrosefulbright.com/en-us/people/1016474.

PUBLICLY FILED PER STIPULATION [ECF 2140]

REDACTED

100.    Attached hereto as **Exhibit 201** is a true and correct copy of the affidavit of Edward B. Mahony, dated February 4, 2014, and submitted in connection with the lawsuit styled *Purdue Pharma L.P. v. Combs*, Case No. 2013-CA-001941, in the Commonwealth of Kentucky Court of Appeals.

101.    Attached hereto as **Exhibit 202** is a true and correct copy of the following journal article: Ryan N. Hansen, et al., Economic Costs of Nonmedical Use of Prescription Opioids, 27 CLINICAL J. OF PAIN 194 (2011).

102.    Attached hereto as **Exhibit 203** is a true and correct copy of excerpts from the audited combined financial statements of Purdue for years ended December 31, 2009 and 2008, which was produced to the UCC under the Bates number PPLPUCC500056924.

103.    Attached hereto as **Exhibit 204** is a true and correct copy of a December 24, 2010 email to Richard Sackler titled "What's new for 'oxycontin' in PubMed," which was produced to the UCC under the Bates number RSF_OLK00055037.

104.    Attached hereto as **Exhibit 205** is a true and correct copy of excerpts from the audited combined financial statements of Purdue for years ended December 31, 2010 and 2009, which was produced to the UCC under the Bates number PPLPUCC500056963.

105.    Attached hereto as **Exhibit 206** is a true and correct copy of an October 2014 email chain, which was produced to the UCC under the Bates number PPLPC045000017072.

106.    Attached hereto as **Exhibit 207** is a true and correct copy of an email from Howard Udel forwarding a March 10, 2008 article titled: "Anatomy Of A Patent Dispute: Purdue Pharma's OxyContin Battle," which was produced to the UCC under the Bates number MSF01116645.

107.    Attached hereto as **Exhibit 208** is a true and correct copy of an excerpt from a distributions summary spreadsheet provided by Side A to the UCC.

PUBLICLY FILED PER STIPULATION [ECF 2140]

REDACTED

108.    Attached hereto as **Exhibit 209** is a true and correct copy of a March 2007 email chain, which was produced to the UCC under the Bates number PPLPUCC9004824942.

109.    Attached hereto as **Exhibit 210** is a true and correct copy of an annual report review letter to Purdue from the Office of Inspector General, U.S. Department of Health & Human Services, dated May 6, 2009, which was produced to the UCC under the Bates number PNY000127987.

110.    Attached hereto as **Exhibit 211** is a true and correct copy of an annual report review letter to Purdue from the Office of Inspector General, U.S. Department of Health & Human Services, dated April 1, 2010, which was produced to the UCC under the Bates number PPLP004250164.

111.    Attached hereto as **Exhibit 212** is a true and correct copy of an annual report review letter to Purdue from the Office of Inspector General, U.S. Department of Health & Human Services to Purdue, dated January 28, 2011, which was produced to the UCC under the Bates number PPLPUCC001877705.

112.    Attached hereto as **Exhibit 213** is a true and correct copy of an annual report review letter to Purdue from the Office of Inspector General, U.S. Department of Health & Human Services to Purdue, dated March 8, 2012, which was produced to the UCC under the Bates number PPLPUCC001884369.

113.    Attached hereto as **Exhibit 214** is a true and correct copy of an annual report review letter to Purdue from the Office of Inspector General, U.S. Department of Health & Human Services to Purdue, dated January 24, 2013, which was produced to the UCC under the Bates number PPLP004427723.

PUBLICLY FILED PER STIPULATION [ECF 2140]

REDACTED

114.    Attached hereto as **Exhibit 215** is a true and correct copy of an August 2014 email chain, which was produced to the UCC under the Bates number PPLPUCC9004797180.

115.    Attached hereto as **Exhibit 216** is a true and correct copy of the September 3, 2019 Amendment to the Shareholders' Agreement executed between Purdue Pharma Inc. and certain PPI Shareholders, which was provided to the UCC by the Debtors.

116.    Attached hereto as **Exhibit 217** is a true and correct copy of hearing transcript excerpts from the Nov. 19, 2019 hearing in this matter.

117.    Attached hereto as **Exhibit 218** is a true and correct copy of deposition transcript excerpts from the October 30, 2020 deposition of Cecil Pickett, Ph.D.

118.    Attached hereto as **Exhibit 219** is a true and correct copy of deposition transcript excerpts from the November 4, 2020 deposition of Stuart Baker.

119.    Attached hereto as **Exhibit 220** is a true and correct copy of deposition transcript excerpts from the September 22, 2020 deposition of Stephen Ives.

120.    Attached hereto as **Exhibit 221** is a true and correct copy of deposition transcript excerpts from the August 28, 2020 deposition of David Sackler.

121.    Attached hereto as **Exhibit 222** is a true and correct copy of deposition transcript excerpts from the September 2, 2020 deposition of Marianna Sackler.

122.    Attached hereto as **Exhibit 223** is a true and correct copy of deposition transcript excerpts from the November 5, 2020 deposition of Kathe Sackler.

123.    Attached hereto as **Exhibit 224** is a true and correct copy of deposition transcript excerpts from the October 27, 2020 deposition of John Stewart.

124.    Attached hereto as **Exhibit 225** is a true and correct copy of deposition transcript excerpts from the October 30, 2020 deposition of Mark Timney.

PUBLICLY FILED PER STIPULATION [ECF 2140]

REDACTED

125.    Attached hereto as **Exhibit 226** is a true and correct copy of deposition transcript excerpts from the November 10, 2020 deposition of Mortimer D.A. Sackler.

126.    Attached hereto as **Exhibit 227** is a true and correct copy of deposition transcript excerpts from the September 24, 2020 deposition of Theresa Sackler.

127.    Attached hereto as **Exhibit 228** is a true and correct copy of deposition transcript excerpts from the November 16, 2020 deposition of Peter Boer.

Executed on: November 18, 2020

*/s/ Arik Preis*
Arik Preis

PUBLICLY FILED PER STIPULATION [ECF 2140]

UNREDACTED - CONTAINS OUTSIDE PROFESSIONALS' EYES ONLY INFORMATION
SUBJECT TO PROTECTIVE ORDER

# EXHIBIT 132

PUBLICLY FILED PER STIPULATION [ECF 2140]

**To:** Lundie, David[

**Cc:** Mallin, William

**From:** John J. Donovan

**Sent:** Wed 2/8/2012 10:56:39 AM

**Subject:** Re: Butrans Weekly Report for the week ending January 27, 2012 - FYI

David, Bill,

I think this is a good idea--I would have Bill and David Long work on this with John--
again, if we can get John to agree to the changes then David and Bill can facilitate the
change process---sub team work!!

The field force only views this all as micromanagement beyond belief and, I suspect,
has low morale as a result.  Russ is in a tough position and we need to position this in a
way that he feels supported.

kindly,
John

**John J. Donovan**
**donovanassociates.net**

-----Original Message-----
From: Lundie, David <
To: John J. Donovan <
Cc: Mallin, William <W
Sent: Wed, Feb 8, 2012 10:46 am
Subject: FW: Butrans Weekly Report for the week ending January 27, 2012 - FYI

```
John

Bill and I are seeing a number of emails coming in from BOD members

This is what I call in 'snow' terms an avalanche! .............And Russ is at
the bottom of the slope

Russ is not going to win this argument..............

I did speak to Long ( and Ed) on this topic yesterday.....all reacting to ECO
and in other words the Exec team see this as not going well

Wonder should we encourage JHS to work with Long on redesign Russ's organization
using the #5 template as his guide to Long?
JHS can't do all this himself and has to empower his Exec team
I would offer to intervene but (a) I am not HR and (b) I go in to hospital
tomorrow and will be out of pocket for a few days

-----Original Message-----
From: Sackler, Mortimer D.A.
Sent: Wednesday, February 08, 2012 9:46 AM
To: Gasdia, Russell
```

PUBLICLY FILED PER STIPULATION [ECF 2140]

UNREDACTED - CONTAINS OUTSIDE PROFESSIONALS' EYES' ONLY INFORMATION
SUBJECT TO PROTECTIVE ORDER

Cc: Sackler, Dr Richard; Sackler, Dr Raymond R; Sackler, Dr Kathe; Sackler,
Jonathan; Sackler, Theresa; Pickett, Cecil; Boer, Peter; Lewent, Judy; Baker,
Stuart D.; Stewart, John H. (US); Abrams, Robin; Dolan, James; Landau, Dr.
Craig; Long, David; Lundie, David; Mahony, Edward; Mallin, William; Silbert,
Richard W; Stiles, Gary; Strassburger, Philip; Weinstein, Bert
Subject: Re: Butrans Weekly Report for the week ending January 27, 2012 - FYI

How long does it take a rep to go and see all (or the top 80%) of their assigned
doctors?

I would suggest holding the meeting the beginning of Feb or at the earliest the
last week of January. That way reps have at least three full weeks back at work
and can get to visit all their doctors while they are still fresh from the
winter break. One week back doesn't give them enough time and will not be
productive for them.

I would imagine that doctors are most open and receptive to new ideas, products,
etc after coming back from a nice break than they are after having been back for
a month.  Have we ever tried to measure/study that?  Has anyone done any
research on that?

Regards,

Mortimer

On Feb 8, 2012, at 9:38 AM, "Gasdia, Russell" ███████████████████ wrote:

Mortimer

We have considered this. I fact, Windell Fisher and I discussed this just last
week. Our meeting is set for next January, but we are considering moving into
mid to late January in order to do what you say and also allow some added tome
to prepare for the meeting.

Most companies have kick-off meetings at the start of the year. Not sure about
"Big Pharma" where they are too big to conduct in a national setting.

The balance is waiting too long after the end of a year to gather the sales
force together, gain a new focus, introduce new promotional campaigns and
provide training geared towards addressing issue faced in the previous year and
anticipated in the new year.

Russ

-----Original Message-----
From: Sackler, Mortimer D.A.
Sent: Tuesday, February 07, 2012 6:35 PM
To: Gasdia, Russell
Cc: Sackler, Dr Richard; Sackler, Dr Raymond R; Sackler, Dr Kathe; Sackler,
Jonathan; Sackler, Theresa; Pickett, Cecil; Boer, Peter; Lewent, Judy; Baker,
Stuart D.; Stewart, John H. (US); Abrams, Robin; Dolan, James; Landau, Dr.
Craig; Long, David; Lundie, David; Mahony, Edward; Mallin, William; Silbert,
Richard W; Stiles, Gary; Strassburger, Philip; Weinstein, Bert
Subject: Re: Butrans Weekly Report for the week ending January 27, 2012 - FYI

Russ,

Do you feel based on these results that in future years we should not plan the
national sales meeting so close following the winter break as it extends the
period of time since the doctor last saw our rep?  Wouldn't it be better to have
the reps get back to work for January and back in front of doctors who enter the
new year refreshed and ready to take on new information and challenges and hold
the sales meeting the beginning of Feb?  At least then the doctors will have
have gotten at least one reminder visit from our reps in the last month whereas
now they might go two months without seeing one of our reps??

What do other companies do?

Regards,

Mortimer

On Feb 7, 2012, at 5:55 PM, "Gasdia, Russell" ███████████████████ wrote:

·        Prescriptions for the final week of January 2012 are now available

PUBLICLY FILED PER STIPULATION [ECF 2140]

UNREDACTED - CONTAINS OUTSIDE PROFESSIONALS' EYES ONLY INFORMATION
EXHIBITS 134 TO 137 ARE PROTECTIVE ORDER

·    We experienced a 2.3% increase over the previous week in TRx growth
and an increase in share from 1.48% to 1.59%. This is the third highest share
since launch.

o    This occurred while the entire extended-release opioid market experienced a
-4.9% decrease in TRxs

·    While the prescription trends have decreased since mid-December, the
past four weeks are showing a slight rebound

·    Call activity appears to be a major driver of these trends, as
evidenced below

o    The graph below depicts primary presentations per week in blue. You will
note that primary presentations dropped during December due to vacations as well
as the company holiday week. Also we lose a full week in January due to the
National Sales Meeting.

o    The red line represents TRxs and you can see the relationship/trend with
calls and results.
[cid:image015.png@01CCE5C1.AAA3C490]


We are also tracking the Butrans Patient Savings Program. Results for this
program are a week ahead of the TRx data.

·    We had a record week for redemptions with data the week ending
February 4th

o    On a weekly basis, we have been averaging 40% of all TRxs including a
redemption of a savings card or eVoucher. Based on this, we should see an
increase in TRxs next week.

·    We also see redemptions for a new version of the savings program which
offers a $0 co-pay on the first RX (for patients receiving their first RX of
Butrans) and we cover up to $75 of the co-pay.

·    The blue bar represents the eVoucher savings (which is savings at the
retail pharmacy cash register/computer). This is the bulk of our redemptions and
the most recent eek was the strongest week to date.

·    This Patient Savings Program is designed to provide a reduction in a
patient's out-of-pocket costs while we continue to negotiate with Managed Care
Organizations for improved formulary status.

[cid:image016.png@01CCE5C1.AAA3C490]

The National Sales Meeting focused on improving the effectiveness of the sales
force. The entire meeting was geared on "best practices" of our top Butrans
sales representatives for 2011. We transferred their successful approaches to
the entire sales force via a series of workshops. We are confident that as we
progress into February primary presentations will increase. This, along with
improved skills of the sales reps and implementation of the new patient savings
card, should lead to increases in  TRxs in line with our objectives.

Russ


[cid:image001.jpg@01CCE03A.5FFE0630]

Weekly Prescriptions and Stocking Report for the Week Ending January 27, 2012

*Please note:

·    Prescriptions are inclusive of retail, long term care, and mail
service channels.

·    Stocking data is not  available for 2012 as Purdue no longer purchases
the weekly data .

·    The store count and patches ordered data reflect all channels of
trade.

·    The store count reflects the number of outlets that ordered products

PUBLICLY FILED PER STIPULATION [ECF 2140]

during the given time period.

·        Wal-Mart, Target and Kroger data are not included in the stocking
data.

1.    Weekly Rx Snapshot for Week 54 of Butrans Launch

·        The new Butrans Trial Offer $0 copay began the week ending January 27.

·        Butrans total prescriptions for week of January 27, accounted for
7,567 Rxs compared to last week's prescription count of 7,396.

·        Butrans share of ERO Rx segment was 1.59% this week, compared to 1.48%
last week.  1.59% of the ERO market is the highest share since Dec 16, 2011 and
the third highest share percent since launch.  The highest ERO market share was
1.62% for the week of November 18, 2011.

Key Metrics

Actual

Latest weekly  Butrans TRx volume

7,567

Latest weekly Butrans NRx volume

6,142

Year to date 2012 TRxs

29,497

Latest weekly Butrans growth rate

2.3%

Latest weekly distribution by Butrans dosage strength


TRxs

%

5mcg

2,115

28.0%

10mcg

3,441

45.5

20mcg

2,011

26.6

Total

7,567

100.0%

Latest weekly growth rate for Extended Release Opioids (EROs)

-4.9%

Latest weekly Butrans share of Extended Release Opioids (EROs)

PUBLICLY FILED PER STIPULATION [ECF 2140]

CONFIDENTIAL

1.59%

2.    Launch Comparison (Retail Only)

·        The following is a post launch comparison of Butrans versus other
extended release opioids and Butrans versus extended release Tramadol products.
At 54 weeks post-launch, Butrans retail Rxs (7,567) continued to outpace all
launched EROs with the exception of OxyContin.

·        At 21 weeks post-launch, Butrans outpaced all EROs, including
recently introduced Nucynta ER which is tracking similarly to Duragesic's
launch.

[cid:image002.png@01CCE59C.8402B2D0]

*Includes pre-launch prescriptions

[cid:image003.png@01CCE59C.8402B2D0]

3.    New vs. Refill Prescriptions

·        Latest weekly new and refill Rxs are shown as follows:
[cid:image004.png@01CCE59C.8402B2D0]

[cid:image005.png@01CCE59C.8402B2D0]

4.    Prescriptions by Dosage Strength

·        In order to meet the 2012 prescription target of 604,500 Rxs, Butrans
prescriptions must increase at an average of 190.5 Rxs each week, starting with
the Rx total for the week ending January 6th (6,770).  Butrans Rxs must also
achieve a year end distribution of 5mcg/hr at 30%, 10mcg/hr at 45% and 20mcg/hr
at 25% in order to meet demand forecast of $132mm.  Progress against the Rx
target is shown in the following figures:

    Week Prior

  Last Week

Current Week

YTD

Goal

5mcg

27.6%

28.2%

28.0%

27.9%

30.0%

10mcg

PUBLICLY FILED PER STIPULATION [ECF 2140]

46.2%

45.4%

45.5%

45.8%

45.0%

20mcg

26.1%

26.3%

26.6%

26.3%

25.0%

[cid:image006.png@01CCE59C.8402B2D0]

[cid:image007.png@01CCE59C.8402B2D0]

·       10mcg equivalents Rxs:

      [cid:image008.png@01CCE59C.8402B2D0]

5.    Prescriptions by Channel

·       Retail pharmacy scripts continue to dominate Butrans total Rxs by
channel, accounting for 95%, followed by 4% in LTC and 1% from Mail order.

[cid:image009.png@01CCE59C.8402B2D0]

[cid:image010.png@01CCE59C.8402B2D0]

6.    Prescriptions by Specialty

·       By specialty group, Primary Specialists continue to garner largest
share of Butrans Rxs, accounting for 39.7% this week, followed by PCPs with
39.6%, and NP/PAs with 15%.

·       Anesthesiology/pain medicine (19.7%), FP/GP (15.3%), Physical Medicine
(12.1% )  and Osteopathic Medicine (13.1%), were leading individual specialties
this week.
[cid:image012.png@01CCE59C.8402B2D0]

7.    Stocking Overview

·       Stocking data is not  available for 2012 as Purdue no longer purchases
the weekly data .

Stephen Wachter | Manager, Market Research | Purdue Pharma L.P.

PUBLICLY FILED PER STIPULATION [ECF 2140]

UNREDACTED - CONTAINS OUTSIDE PROFESSIONALS' EYES ONLY INFORMATION
THIS IS SUBJECT TO PROTECTIVE ORDER

<image001.jpg>
<Butrans Weekly Report 1-27-12.xlsm>
<image002.png>
<image003.png>
<image004.png>
<image005.png>
<image006.png>
<image007.png>
<image008.png>
<image009.png>
<image010.png>
<image012.png>
<image015.png>
<image016.png>

PUBLICLY FILED PER STIPULATION [ECF 2140]

UNREDACTED - CONTAINS OUTSIDE PROFESSIONALS' EYES ONLY INFORMATION
SUBJECT TO PROTECTIVE ORDER

# EXHIBIT 134

UNREDACTED - CONTAINS OUTSIDE PROFESSIONALS' EYES ONLY INFORMATION
SUBJECT TO PROTECTIVE ORDER

| | |
|---|---|
| **From:** | Friedman, Michael ████████████████████ |
| **Sent:** | 3/5/2006 5:14:57 PM |
| **To:** | hru [███████████ |
| **Subject:** | FW: Board Discussion |

FYI

Michael Friedman, D.P.S.
████████████

---

**From:** Sackler, Dr Richard
**Sent:** Sunday, March 05, 2006 12:12 PM
**To:** Friedman, Michael
**Subject:** RE: Board Discussion

OK, but I don't agree with your view.

# Richard

---

**From:** Friedman, Michael
**Sent:** Sunday, March 05, 2006 12:03 PM
**To:** Sackler, Dr Richard
**Subject:** RE: Board Discussion

Richard,

As I told you the other day, you are all over me and my staff. You are making my life very uncomfortable and creating a great deal of work for me and the staff. You obviously are not willing to change or do not see the issue here. You are doing to me what you said others did to you while you were President. I feel that I have an obligation to report to the rest of the Board that this is demotivating and interfering with the operation of the company.

I would prefer not to discuss this further on email.

Michael Friedman, D.P.S.
████████████

---

**From:** Sackler, Dr Richard
**Sent:** Sunday, March 05, 2006 11:56 AM
**To:** Friedman, Michael
**Subject:** RE: Board Discussion
**Importance:** High

1.    I don't understand this, Michael.
2.    I spoke with Ed before I spoke with Sussman. Sussman had called me, not Ed.
3.    I took what I thought was an honest position with Sussman.
4.    Sussman told me that he wanted Landis who is the GP of the RE to speak with me. I directed him to Ed, not to me.
5.    When I first learned that Ed wants to say things that contradict what I told Sussman, I was mortified. Had I been advised by you or Ed that we are "in the market" I wouldn't have said what I did to Sussman. I had no idea that we were

telling brokers that we are going to expand and will need space in Stamford. I had no knowledge of this even though I spoke with Ed first.

6.    I wrote to you and to Ed saying that we needed to reconcile what we are saying. This is a nice way of saying that I don't want to be embarrassed (may already be so) by the disconnect between the management and the board.

7.    I am surprised that you are publicly rebuking me for this, and I find it disconcerting.


I would ask that you withdraw your note by recalling it.

Thanks.


**Richard**


---

**From:** Friedman, Michael
**Sent:** Sunday, March 05, 2006 11:47 AM
**To:** Sackler, Beverly; Sackler, Dr Kathe; Sackler, Dr Mortimer; Sackler, Dr Raymond R; Sackler, Dr Richard; Sackler, Jonathan; Sackler, Mortimer JR; Sackler, Theresa
**Cc:** sdb; hru; Friedman, Michael
**Subject:** Board Discussion

**Highly Confidential**

During the past few months I have repeatedly asked Board members to refrain from giving direction to my subordinates. Nevertheless, Board members continue to engage my subordinates in lengthy conversations and chains of correspondence (see emails below) that amount to substantial direction. I have previously chosen to look aside in the interest of maintaining a collaborative and collegial environment, but the frequency of such instructions has increased in recent months. This creates a number of problems for me: First, there are times that these directions differ from those that I would provide, redirecting resources and executive time, and I am unaware because I don't always hear about the Board member's directions. Second, direction from one Board member may differ from the direction that the entire Board would provide, creating what could amount to an unfair preference for the Board member directing my subordinates. Third, some of these directions have been trivial and insulting to experienced and knowledgeable executives. And, finally, this pattern of behavior undermines my authority as the President and CEO, limiting my ability to implement a unified and integrated plan for the business. I have actually had subordinates ask me if the Board has lost confidence in me.

While I have committed to stay on and work with the Board through the crisis, I feel that I must let the Board know that this pattern of behavior is preventing me from getting the job done and I fear will adversely affect the company.

Sincerely,

Michael Friedman, D.P.S.
████████████████


---

**From:** Sackler, Dr Richard
**Sent:** Saturday, March 04, 2006 6:25 PM
**To:** Mahony, Edward; mxf
**Subject:** RE: Sussman

UNREDACTED - CONTAINS OUTSIDE PROFESSIONALS' EYES ONLY INFORMATION
SUBJECT TO PROTECTIVE ORDER

Ed,

I know that you have a lot of experience in doing these things, but I wonder if your approach and mine needs to be better reconciled.

May I suggest that we get together on Monday morning before you take Landis' call.

## Richard

---

**From:** Mahony, Edward
**Sent:** Saturday, March 04, 2006 6:21 PM
**To:** Sackler, Dr Richard; mxf
**Subject:** RE: Sussman

Dr Richard,

Per your phone call:

1.    you talked to Susman
2.    he was interested in Purdue becoming a tenant next door
3.    you told him that you were not sure if Purdue would grow staff and that Purdue might actually leave the state
4.    he told you that Landis would call me

I am planning what I might say to Landis.  I have to be very careful not to vary too much from what we are telling the rest of the real estate community.  So if Landis calls me I will tell him:
1.    Purdue has had an important legal victory
2.    Purdue will likely be adding staff and will likely be in the market for more space at some point but the scale of requirement will certainly depend on a lot of factors and I can't predict the level at this point
3.    Purdue is not looking for space now but could be looking in the next year of so
4.    We are aware of sub let opportunities next door but are not looking for space now
5.    If his group is selling the building at investor prices our principals would probably like us to look but only if he is selling AND I am not asking as a user.
6.    If he asks about MOVING OUT OF STATE I will tell him that Michael Friedman has told our employees and others many times that we will most likely stay in Stamford and there are no plans to look outside of Stamford.  (I would not want a rumor that Purdue is moving out of state.  It would hurt our relations with the City and our employees.)

Best Regards,
Ed Mahony
█████████

---

**From:** Sackler, Dr Richard
**Sent:** Thursday, March 02, 2006 5:32 PM
**To:** edm
**Cc:** mxf; Ives, Stephen A.; mxf
**Subject:** FW: Sussman

I'm traveling back from Japan and am leaving now.

Would you call Donald for me and tell him I'll give him a call this weekend about some things, but find out what is on his mind about the building.  You can do this tomorrow morning or tonight.

█████████

PROFESSIONALS' EYES ONLY/HIGHLY CONFIDENTIAL—SUBJECT TO PROTECTIVE ORDER
PUBLICLY FILED PER STIPULATION [ECF 2140]

UNREDACTED - CONTAINS OUTSIDE PROFESSIONALS' EYES ONLY INFORMATION
FILED SUBJECT TO PROTECTIVE ORDER

Richard S. Sackler, M.D.

---

**From:** Ives, Stephen A. [mailto ██████████
**Sent:** Thursday, March 02, 2006 3:19 PM
**To:** Sackler, Jonathan; Sackler, Dr Richard
**Subject:** Sussman

I had an interesting conversation with Donald Sussman today.

He had heard something about our recent good news and was wondering what we were now going to do with our leasing situation with UBS.  If you recall, he is (I think) a partner in an entity that owns the building next door.  I also believe that they were in negotiations with UBS at the same time that we were conducting negotiations regarding our space.  Jon, I think you were aware of his deal next door as I recall you mentioning it to me.

Bottom line from Donald is that he is wondering if there is anyway that we (his entity and us) could work together for our joint benefit.  He seems to be aware of our deal with UBS, although I can't confirm that.  He mentioned some 15 year plan that was supposed to be a provision of our lease.  I told him that I was really not at liberty to discuss the particulars.  However, I told him that I would pass this conversation along to you guys and if there was any interest in discussing this with Donald, then one of us would contact him.

I would suggest that one of you guys call him just to find out what is on his mind.  I will be happy to do it, but I think I should first be better briefed on our deal with UBS.  Let me know if and how you want me to proceed.

**Steve Ives**



---

PROFESSIONALS' EYES ONLY/HIGHLY CONFIDENTIAL—SUBJECT TO PROTECTIVE ORDER    PPLPUCC002603605
PUBLICLY FILED PER STIPULATION [ECF 2140]    PPLPUCC002603602

UNREDACTED - CONTAINS OUTSIDE PROFESSIONALS' EYES ONLY INFORMATION
SUBJECT TO PROTECTIVE ORDER

# EXHIBIT 137

UNREDACTED - CONTAINS OUTSIDE PROFESSIONALS' EYES ONLY INFORMATION
DESIGNATED SUBJECT TO PROTECTIVE ORDER

**Chu, Jennifer L.**

---

**Subject:**                    FW: Craig's diagnostic and forward plan for the Sackler Pharma Enterprise

Begin forwarded message:

**From:** Landau, Dr. Craig ███████████████████
**Date:** May 5, 2017 at 4:37:43 PM EDT
**To:** Mortimer Sackler ██████████████████
**Cc:** Landau, Dr. Craig █████████████████
**Subject: Craig's diagnostic and forward plan for the Sackler Pharma Enterprise**


Dear Mortimer,

Per your request, I've attached a document outlining my thoughts on the issues facing the global enterprise, and what should be done to address them.  I'm really pleased that you and Dr. Kathe reached out and are planning to put a proposal forward to the Board.  Not sure of your plan, but please feel free to share with other Board members and reach out to me with any questions or clarifications you may need.

A couple of important things to note:

- I drew on files / data I had available to me from previous board meetings as I didn't wish to involve or engage others on this effort with requests for additional data. For this reason, while everything is directionally correct, certain individual stats may need to be updated.
- Much of the information and perspective written into the document is highly sensitive, and if available to my peers or their subordinates, could be very damaging. I'm certain you understand this and will ensure the document stays at the board level (I'm just a bit nervous).
- Lastly, I didn't "sugar coat" anything. While I like to be diplomatic, this is no time to mince words or be anything but direct. Hope it doesn't offend you or anyone on the Board. I wrote the document, including the proposed solutions as if it were **my** business.

Happy to hear of any feedback you may have whenever you have time.

Regards and enjoy the weekend.

-Craig

1

Produced by Purdue Pharma L.P., pursuant to Multistate Work Group Requests
Subject to the Confidentiality Agreement dated February 16, 2017
Confidential Treatment Requested                    PUBLICLY FILED PER STIPULATION [ECF 2140]

UNREDACTED CONTAINS OUTSIDE PROFESSIONALS EYES ONLY INFORMATION
SUBJECT TO PROTECTIVE ORDER

CONFIDENTIAL DOCUMENT

# Sackler Pharma Enterprise

DIAGNOSTIC AND FORWARD PLAN

Craig Landau, MD

## I.   SITUATION

■ The global Sackler pharmaceutical enterprise is at an inflection point with significant challenges to its cash flow, stability, and future.

■ The U.S. Purdue organization, once a growth engine and primary funding source for the group is declining precipitously, faces intensifying headwinds and requires immediate stabilization.

■ The expectation is that the <u>current</u> revenue decline in the US business will be offset by significant <u>future</u> revenue growth from **LAM** (consumer /OTC) and **Rhodes** (generics) where profit margins are low, there is limited intellectual property and significant business risk and complexity.

■ Given the urgency of the issues laid out below, a fundamental reassessment of our operating model and strategy along with immediate change is needed in order to prevent further business decline and ensure a sustainable, growth-oriented business going forward.

■ Maintaining the status quo should be considered an active decision and in my view, will likely lead to further deterioration of the business from which recovery is uncertain.

## II.   THE ISSUES FACING OUR BUSINESS

■ **Our current global investment strategy does <u>NOT</u> serve the best interest of the global enterprise or the shareholders.**

– Three distinct business types (branded Rx/Biosimilars, consumer/OTC, generics) are being run through four separate regions (five if Rhodes is included), with the Board of Directors serving as the "de-facto" CEO.

– The resultant global product mix has produced lower gross margins, high operating costs to net sales (39% U.S., 36% EU, 82% LAM, 30% Canada) vs. benchmark (25%-30% for similar sized pharma), elevated complexity, inefficiency, lack of focus and alignment, and as a result, heightened business risk.

– The current business consists of over 70 different products across 49 different countries, with > 90% of profit for the global enterprise generated from only

1

Produced by Purdue Pharma L.P., pursuant to Multistate Work Group Requests
Subject to the Confidentiality Agreement dated February 16, 2017
Confidential Treatment Requested       PUBLICLY FILED PER STIPULATION [ECF 2140]

UNREDACTED - CONTAINS OUTSIDE PROFESSIONALS' EYES ONLY INFORMATION
HIGHLY CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

12 countries, with the remaining countries in loss positions or generating minimal profit.

- Investments (infrastructure, R&D and BD) remain mostly non-strategic, short-term oriented with long payback periods, and given funding limitations, carry significant opportunity costs. In addition, there is inconsistency in how financials are reviewed with some countries using 10 year NPVs, some 15 year NPVs, and others ascribing large terminal values.

- Collectively, the IACs are pursuing too many therapeutic areas, and with the exception of opioid analgesics, we lack the focus, scale and necessary depth and breadth of expertise to invest and compete effectively in many regions. Despite many efforts across all regions, we have failed to establish a meaningful presence (i.e. a #1-2 position) in any other TA beyond pain.

■ **The US business is in a state of decline and will soon be unable to fund either/both investments or distributions going forward**

- Despite 20 years of success, the US business remains heavily reliant on OxyContin, a declining brand; appropriate investments have not been made to diversify the business and ensure a sustainable future.

- In spite of significant efforts, the recent BD-driven approach to re-growing the US business has not delivered on its promise. Further, there's been a reluctance to pursue smaller, "digestible" on- or near-market opportunities.

2

Produced by Purdue Pharma L.P., pursuant to Multistate Work Group Requests
Subject to the Confidentiality Agreement dated February 16, 2017
Confidential Treatment Requested   PUBLICLY FILED PER STIPULATION [ECF 2140]

PWG004670881

UNREDACTED - CONTAINS OUTSIDE PROFESSIONALS EYES ONLY INFORMATION
SUBJECT TO PROTECTIVE ORDER





– With U.S. Purdue financing severely limited, the LAM region is using debt to purchase expensive on-market genericized products in attempts to leverage the investment in recently built infrastructure.  Utilizing debt to fund operating costs is a high stakes gamble, not sustainable and should be a source of concern (i.e. Valeant model).

– Over $1B US has been invested to date in emerging markets, with limited intellectual property, a high level of sovereign risk and increased business complexity.  Almost $6B in additional investments are required over the next 10-years to drive further growth in this region with only $2B in expected profit to be returned to the business.

– While growth in certain consumer products ████████ is being established, the expansion of product offerings is too diverse, the margins too low, and business complexity too high.

– The focus has been on expansion across countries with limited consideration for price, margins or infrastructure > leading to lack of profitability in many territories now and in the foreseeable future.

3

Produced by Purdue Pharma L.P., pursuant to Multistate Work Group Requests
Subject to the Confidentiality Agreement dated February 16, 2017
Confidential Treatment Requested    PUBLICLY FILED PER STIPULATION [ECF 2140]

PWG004670882



**SUMMARY**

In the face of significant market pressures, our current investment strategy, a weak organic innovation pipeline, limited success in BD and limited resources for external assets, <u>the global business as it stands is not sustainable</u>.

4

Produced by Purdue Pharma L.P., pursuant to Multistate Work Group Requests
Subject to the Confidentiality Agreement dated February 16, 2017
Confidential Treatment Requested    PUBLICLY FILED PER STIPULATION [ECF 2140]

UNREDACTED - CONTAINS OUTSIDE PROFESSIONALS EYES ONLY INFORMATION
SUBJECT TO PROTECTIVE ORDER

## III.   SOLUTIONS

## Guiding Principles and Strategic Overview

A true sense of urgency and a series of decisive actions are needed, and are outlined on the pages that follow.

One potential and significant change would be to appoint a global CEO and consolidate all regional businesses as one, multinational company. While doing so may in the long run provide substantial benefit, certain internal considerations may prevent this from occurring. Further, globalizing the business will introduce new challenges, complexities and risks that may be too great to endure at this critical time.

However, there is reason to be optimistic. The most significant issues negatively impacting the global enterprise (leadership, leadership incentives, investment strategy, lack of R&D, and heightened business complexity) can be addressed without full globalization, as the requisite understanding of the issues, necessary changes, and leadership already exist within the business.

The following principles **upon which the company was founded** should be followed on a global basis:

- Entrepreneurial, market-driven
- Delivery of innovative medicines that provide value to patients
- Restore a passion for the development of these innovative products
- Reliance on leadership with deep organizational experience and loyalty to the shareholders

We will adopt a strategy to re-trench, simplify the business and develop a pipeline and product portfolio that enables a sustainable future for the global enterprise. This strategy and the following steps (if taken immediately) are "no-regret moves" and will advance the business, regardless of potential future changes to regional or global structure:

- Stop the bleeding now (stop spending money on non-profitable products and territories)
- Drive immediate returns to the business (financial and qualitative)
- Install a focus on profitability, not top-line growth
- Implement leadership changes that leverage existing strengths, retain key talent and provide development opportunities and successors for the future
- Incur as little business disruption as possible

5

Produced by Purdue Pharma L.P., pursuant to Multistate Work Group Requests
Subject to the Confidentiality Agreement dated February 16, 2017
Confidential Treatment Requested   PUBLICLY FILED PER STIPULATION [ECF 2140]

PWG004670884

The plan to achieve the above strategy requires pursuit and/or changes to the following four (4) elements:

1) Retain regional commercial centers with strong leadership and a clear vision

2) Create a global portfolio mgmt function to drive intelligent BD/R&D investments

3) Re-boot & globalize R&D to improve focus, save money, and enhance yield of new innovative products

4) Expand the remit of global operations to simplify operations and reduce COGs

<table>
<tr><td>Retain Regional Commercial Centers</td><td>Create a Global Portfolio Management Function</td></tr>
<tr><td>Re-boot and Globalize R&D</td><td>Expand remit of Global Operations</td></tr>
</table>

## 1. Regional Commercial Centers

Re-focus the business towards Regional Commercial Centers with accountability directly to the Board with each leader (below) responsible for their full end-to-end commercial P&L, excluding R&D expenses. Regions will have responsibly for Sales & Marketing, Medical Affairs, Market Access, HR, Finance, Legal, Customer Service and some local presence for Regulatory, IT, Supply Chain and Distribution.

**Proposed leadership**:

Europe +/- Australia (Antony Mattessich)

U.S./Canada (Craig Landau)

LAM +/- Australia (Raman Singh)

6

Produced by Purdue Pharma L.P., pursuant to Multistate Work Group Requests
Subject to the Confidentiality Agreement dated February 16, 2017
Confidential Treatment Requested PUBLICLY FILED PER STIPULATION [ECF 2140]

PWG004670885

UNREDACTED - CONTAINS OUTSIDE PROFESSIONALS' EYES ONLY INFORMATION
SUBJECT TO PROTECTIVE ORDER

Through active management by each **Regional Commercial Center**, the
following actions should be taken in the immediate-, mid-, or long-term:

- <u>Implement structural / leadership changes at Executive and Director levels to
  stabilize each business</u> (**immediate**):
    - Ensure retention of critical personnel
    - Signal immediate change and revitalize organization with trusted
      leadership who has direct experience and credibility (internally and
      externally)
    - Lay out regional and global priorities and dedication to a "one-for-all"
      approach to the global enterprise and shareholders



7

Produced by Purdue Pharma L.P., pursuant to Multistate Work Group Requests            PWG004670886
Subject to the Confidentiality Agreement dated February 16, 2017
Confidential Treatment Requested    PUBLICLY FILED PER STIPULATION [ECF 2140]

UNREDACTED - CONTAINS OUTSIDE PROFESSIONALS' EYES ONLY INFORMATION
SUBJECT TO PROTECTIVE ORDER



– <u>Undertake a comprehensive portfolio rationalization exercise</u> to determine which additional products to divest or out-license in select territories.



– <u>Drive growth by exploiting our position in opioids</u> to become the global leader in pain and adjacent therapies (**immediate**):

  ▫ Restore appropriate focus on the patient, patient access and the proper practice of pain management across the global organization.

8

Produced by Purdue Pharma L.P., pursuant to Multistate Work Group Requests
Subject to the Confidentiality Agreement dated February 16, 2017
Confidential Treatment Requested   PUBLICLY FILED PER STIPULATION [ECF 2140]                                    PWG004670887

UNREDACTED - CONTAINS OUTSIDE PROFESSIONALS' EYES ONLY INFORMATION
SUBJECT TO PROTECTIVE ORDER

- Deploy Purdue Canada's guidelines-based "Patient First" program in the U.S. and other regions as a <u>global commitment and standard-setting approach</u> for pharmaceutical companies in the opioid space.

- Curtail traditional opioid product detailing by sales representatives and leverage Medical Science Liaisons, physician support and e-detailing /technology approaches that are more appropriate given the nature of the external environment, and far less expensive.

- Pursue a multi-health authority (global) initiative to align on opioid benefit-risk and measures to ensure appropriate patient access, labelling and risk mitigation measures.

- In the U.S., revive epidemiology / ADF strategy and re-engage FDA with constructive data acquisition plan and steps to ensure appropriate prescribing and physician engagement.

- Pursue opioid consolidation strategy as other companies abandon the space, creating a company focused entirely on abuse deterrent opioid and non-opioid analgesic therapeutics.

- More aggressively pursue a broader non-opioid Pain franchise including related CNS and Addiction opportunities.



9

Produced by Purdue Pharma L.P., pursuant to Multistate Work Group Requests
Subject to the Confidentiality Agreement dated February 16, 2017
Confidential Treatment Requested    PUBLICLY FILED PER STIPULATION [ECF 2140]

PWG004670888

UNREDACTED - CONTAINS OUTSIDE PROFESSIONALS EYES ONLY INFORMATION
SUBJECT TO PROTECTIVE ORDER

## 2. Create a Global Portfolio Management Function

Absent a global CEO and unifying strategy, the **Global Portfolio Management** function would ensure that each region follow an appropriate and integrated BD/R&D investment strategy, where each investment is "worked up" with consistent standards, and is appropriately constructed to leverage our presence in multiple markets.  The function would be comprised of three core representatives from BD, Finance and R&D, plus an "acting" Global CMO to provide clinical perspective:



CORE MEMBERS

Business development (Paul Medeiros - EU)

Finance (Kelly Martin - Canada)

R&D (Julie Ducharme – U.S.)

-------------------------------------------------

(Acting) Global CMO (Craig Landau)

The Global Portfolio Management function would report to **Antony Mattessich**, to leverage his demonstrated commercial experience and strategic vision.

Through the active management of the **Global Portfolio Management** function, the following actions should be taken **immediately**:

– Lead the creation of an **Investment and Therapeutic Area Framework** to produce a focused, balanced and appropriate R&D pipeline and portfolio of marketed products.

  □ The framework will guide BD / R&D investments with a decided TA focus and provide clarity for "off-target" investments on a regional or multi-regional basis.

  □ At present, the TA focus for the Rx business should include pain, medical cannabis and other opportunities (e.g. better chemotherapy) that leverage our existing infrastructure and capabilities (commercial, R&D, market access).

  □ Ensure continued adherence to the framework within and across regions.

  □ The framework would also be instrumental in deciding on which non-core assets and franchises should be divested.

10

Produced by Purdue Pharma L.P., pursuant to Multistate Work Group Requests
Subject to the Confidentiality Agreement dated February 16, 2017
Confidential Treatment Requested    PUBLICLY FILED PER STIPULATION [ECF 2140]                    PWG004670889

UNREDACTED - CONTAINS OUTSIDE PROFESSIONALS EYES ONLY INFORMATION
SUBJECT TO PROTECTIVE ORDER

## 3. Re-Boot and Globalize R&D

Long-term, sustainable growth must be achieved through the development and commercialization of innovative, patent-protected medicines that bring recognized value and differentiation to patients and their physicians. Going forward, R&D and Clinical colleagues must have a more prominent voice in portfolio management as well as in determining overall business strategy for the IACs.

In addition, to be successful and cost effective, we must consolidate R&D under one leader with direct accountability to one of the Regional Commercial Leaders. All functions (e.g. pharmaceutics, analytics, virtual discovery, toxicology, clinical research and pharmacology, clinical trial operations, outsource management, pharmacovigilance, biostatistics, data management, regulatory affairs) will be integrated and managed more effectively and efficiently on a global basis.

Head of Global R&D to be **Julie Ducharme**, leveraging her excellent basic science experience, drug development, research network, administrative and clear communication skills.

Global R&D reports to **Craig Landau** to leverage his clinical experience and success and experience in drug development, regulatory strategy and health policy outcomes.

Through the active management of the **Global R&D** function, the following actions should be taken **immediately and in the mid-term**:

– Perform a thorough review and analysis of all existing R&D programs, regardless of source to decide whether to kill or continue with each project (**immediate**).
  - ▫ The review will be fearless and data-driven. Only pipeline projects with a clear and supportive business case will be funded. All others will be either divested, killed of shelved.
  - ▫ Programs that will be specifically challenged include ███████████
  ████████████████████████████████████

– Implement additional restructure within global R&D (**immediate)**
  - ▫ Adopt a more fully outsourced / variable pricing model with strategic partnerships with 2 or 3 global CROs and an appropriate number of boutique CROs offering repeated services within TAs of focus (e.g. pain, cannabis research, oncology, etc.)

11

Produced by Purdue Pharma L.P., pursuant to Multistate Work Group Requests
Subject to the Confidentiality Agreement dated February 16, 2017
Confidential Treatment Requested    PUBLICLY FILED PER STIPULATION [ECF 2140]

PWG004670890

UNREDACTED - CONTAINS OUTSIDE PROFESSIONALS EYES ONLY INFORMATION
SUBJECT TO PROTECTIVE ORDER

– <u>Pursue staged investments in multiple, external, early stage projects and technologies (academia, biotech)</u> (**mid-term**):

☐ Provide downstream access to known programs and potential later stage R&D assets for acquisition, in-licensing or with an established equity position, returns driven through out-licensing or sale of assets to third parties.



– <u>Consider installing an external development engine</u> (**mid-term**):

☐ Invest and/or partner with one or two select (i.e. appropriately focused) VCs to access promising development stage assets for long term, and potentially joint-value creation where Purdue/Mundipharma could be the commercial outlet for products developed through the partnership, or participate financially through sale or out-license to a 3rd party.

## 4. Expand Remit of Global Operations

Continue to consolidate all API production, manufacturing, quality and supply chain operations across the globe, leveraging select manufacturing plants to provide lower cost of goods, an objective already under pursuit by the current head (David Lundie).



Head of Global Operations (**David Lundie** – no change from present)

Reporting to (**Antony Mattessich**) – no change from present)

12

Produced by Purdue Pharma L.P., pursuant to Multistate Work Group Requests
Subject to the Confidentiality Agreement dated February 16, 2017
Confidential Treatment Requested    PUBLICLY FILED PER STIPULATION [ECF 2140]

PWG004670891

UNREDACTED - CONTAINS OUTSIDE PROFESSIONALS EYES ONLY INFORMATION
SUBJECT TO PROTECTIVE ORDER

# EXHIBIT 140

PUBLICLY FILED PER STIPULATION [ECF 2140]

UNREDACTED - CONTAINS OUTSIDE PROFESSIONALS' EYES ONLY INFORMATION
SUBJECT TO PROTECTIVE ORDER

Message



**From:** Sackler, Mortimer D.A.

**Sent:** 2/8/2012 9:46:22 AM
**To:** Gasdia, Russel
**CC:** Sackler, Dr Richard                                                    Sackler, Dr Raymond R

Sackler, Dr Kathe                                                    Sackler, Jonathan

Sackler, Theresa                    Pickett, Cecil
                                                    Boer, Peter

Lewent, Judy                    Baker, Stuart D.
                                        Stewart, John H. (US)
                                                    Abrams, Robin

Dolan, James                    Landau, Dr. Craig
                                                    Long, David
                Lundie, David
                                        Mahony, Edward

Mallin, William
                                        Silbert, Richard W

Stiles, Gary                    Strassburger, Philip
                                                    Weinstein, Bert

**BCC:** Stewart, John H. (US)
**Subject:** Re: Butrans Weekly Report for the week ending January 27, 2012 - FYI

How long does it take a rep to go and see all (or the top 80%) of their assigned doctors?

I would suggest holding the meeting the beginning of Feb or at the earliest the last week of January. That way reps have at least three full weeks back at work and can get to visit all their doctors while they are still fresh from the winter break. One week back doesn't give them enough time and will not be productive for them.

I would imagine that doctors are most open and receptive to new ideas, products, etc after coming back from a nice break than they are after having been back for a month.  Have we ever tried to measure/study that?  Has anyone done any research on that?

Regards,

Mortimer

On Feb 8, 2012, at 9:38 AM, "Gasdia, Russell"                    wrote:

Mortimer

We have considered this. I fact, Windell Fisher and I discussed this just last week. Our meeting is set for next January, but we are considering moving into mid to late January in order to do what you say and also allow some added tome to prepare for the meeting.

Most companies have kick-off meetings at the start of the year. Not sure about "Big Pharma" where they are too big to conduct in a national setting.

The balance is waiting too long after the end of a year to gather the sales force together, gain a new focus, introduce new promotional campaigns and provide training geared towards addressing issue faced in the previous year and anticipated in the new year.

Russ

PUBLICLY FILED PER STIPULATION [ECF 2140]

-----Original Message-----
From: Sackler, Mortimer D.A.
Sent: Tuesday, February 07, 2012 6:35 PM
To: Gasdia, Russell
Cc: Sackler, Dr Richard; Sackler, Dr Raymond R; Sackler, Dr Kathe; Sackler, Jonathan; Sackler, Theresa;
Pickett, Cecil; Boer, Peter; Lewent, Judy; Baker, Stuart D.; Stewart, John H. (US); Abrams, Robin; Dolan,
James; Landau, Dr. Craig; Long, David; Lundie, David; Mahony, Edward; Mallin, William; Silbert, Richard
W; Stiles, Gary; Strassburger, Philip; Weinstein, Bert
Subject: Re: Butrans Weekly Report for the week ending January 27, 2012 - FYI

Russ,

Do you feel based on these results that in future years we should not plan the national sales meeting so
close following the winter break as it extends the period of time since the doctor last saw our rep?
Wouldn't it be better to have the reps get back to work for January and back in front of doctors who
enter the new year refreshed and ready to take on new information and challenges and hold the sales
meeting the beginning of Feb?  At least then the doctors will have have gotten at least one reminder
visit from our reps in the last month whereas now they might go two months without seeing one of our
reps??

What do other companies do?

Regards,

Mortimer

On Feb 7, 2012, at 5:55 PM, "Gasdia, Russell" ████████████████████████ wrote:

·        Prescriptions for the final week of January 2012 are now available

·        We experienced a 2.3% increase over the previous week in TRx growth and an increase in share
from 1.48% to 1.59%. This is the third highest share since launch.

o   This occurred while the entire extended-release opioid market experienced a -4.9% decrease in TRxs

·        While the prescription trends have decreased since mid-December, the past four weeks are
showing a slight rebound

·        Call activity appears to be a major driver of these trends, as evidenced below

o   The graph below depicts primary presentations per week in blue. You will note that primary
presentations dropped during December due to vacations as well as the company holiday week. Also we lose
a full week in January due to the National Sales Meeting.

o   The red line represents TRxs and you can see the relationship/trend with calls and results.
[cid:image015.png@01CCE5C1.AAA3C490]


We are also tracking the Butrans Patient Savings Program. Results for this program are a week ahead of
the TRx data.

·        We had a record week for redemptions with data the week ending February 4th

o   On a weekly basis, we have been averaging 40% of all TRxs including a redemption of a savings card or
eVoucher. Based on this, we should see an increase in TRxs next week.

·        We also see redemptions for a new version of the savings program which offers a $0 co-pay on
the first RX (for patients receiving their first RX of Butrans) and we cover up to $75 of the co-pay.

·        The blue bar represents the eVoucher savings (which is savings at the retail pharmacy cash
register/computer). This is the bulk of our redemptions and the most recent eek was the strongest week to
date.

·        This Patient Savings Program is designed to provide a reduction in a patient's out-of-pocket
costs while we continue to negotiate with Managed Care Organizations for improved formulary status.

[cid:image016.png@01CCE5C1.AAA3C490]

The National Sales Meeting focused on improving the effectiveness of the sales force. The entire meeting
was geared on "best practices" of our top Butrans sales representatives for 2011. We transferred their
successful approaches to the entire sales force via a series of workshops. We are confident that as we

PUBLICLY FILED PER STIPULATION [ECF 2140]

PPLPUCC9002981008

progress into February primary presentations will increase. This, along with improved skills of the sales reps and implementation of the new patient savings card, should lead to increases in TRxs in line with our objectives.

Russ


[cid:image001.jpg@01CCE03A.5FFE0630]

Weekly Prescriptions and Stocking Report for the Week Ending January 27, 2012

*Please note:

·        Prescriptions are inclusive of retail, long term care, and mail service channels.

·        Stocking data is not  available for 2012 as Purdue no longer purchases the weekly data .

·        The store count and patches ordered data reflect all channels of trade.

·        The store count reflects the number of outlets that ordered products during the given time period.

·        Wal-Mart, Target and Kroger data are not included in the stocking data.

1.    Weekly Rx Snapshot for Week 54 of Butrans Launch

·        The new Butrans Trial Offer $0 copay began the week ending January 27.

·        Butrans total prescriptions for week of January 27, accounted for 7,567 Rxs compared to last week's prescription count of 7,396.

·        Butrans share of ERO Rx segment was 1.59% this week, compared to 1.48% last week.  1.59% of the ERO market is the highest share since Dec 16, 2011 and the third highest share percent since launch.  The highest ERO market share was 1.62% for the week of November 18, 2011.


Key Metrics

Actual

Latest weekly  Butrans TRx volume

7,567

Latest weekly Butrans NRx volume

6,142

Year to date 2012 TRxs

29,497

Latest weekly Butrans growth rate

2.3%

Latest weekly distribution by Butrans dosage strength


TRxs

%

5mcg

2,115

28.0%

10mcg

PUBLICLY FILED PER STIPULATION [ECF 2140]

UNREDACTED - CONTAINS OUTSIDE PROFESSIONALS' EYES ONLY INFORMATION
FILED SUBJECT TO PROTECTIVE ORDER

3,441

45.5

20mcg

2,011

26.6

Total

7,567

100.0%

Latest weekly growth rate for Extended Release Opioids (EROs)

-4.9%

Latest weekly Butrans share of Extended Release Opioids (EROs)

1.59%


2.    Launch Comparison (Retail Only)

·        The following is a post launch comparison of Butrans versus other extended release opioids and Butrans versus extended release Tramadol products.  At 54 weeks post-launch, Butrans retail Rxs (7,567) continued to outpace all launched EROs with the exception of OxyContin.

·         At 21 weeks post-launch, Butrans outpaced all EROs, including recently introduced Nucynta ER which is tracking similarly to Duragesic's launch.


                [cid:image002.png@01CCE59C.8402B2D0]

*Includes pre-launch prescriptions


                [cid:image003.png@01CCE59C.8402B2D0]



3.    New vs. Refill Prescriptions

·        Latest weekly new and refill Rxs are shown as follows:
[cid:image004.png@01CCE59C.8402B2D0]


[cid:image005.png@01CCE59C.8402B2D0]



4.    Prescriptions by Dosage Strength

·        In order to meet the 2012 prescription target of 604,500 Rxs, Butrans prescriptions must increase at an average of 190.5 Rxs each week, starting with the Rx total for the week ending January 6th (6,770).  Butrans Rxs must also achieve a year end distribution of 5mcg/hr at 30%, 10mcg/hr at 45% and 20mcg/hr at 25% in order to meet demand forecast of $132mm.  Progress against the Rx target is shown in the following figures:


    Week Prior


PUBLICLY FILED PER STIPULATION [ECF 2140]

UNREDACTED - CONTAINS OUTSIDE PROFESSIONALS' EYES ONLY INFORMATION
DATA SUBJECT TO PROTECTIVE ORDER

Last Week

Current Week

YTD

Goal

5mcg

27.6%

28.2%

28.0%

27.9%

30.0%

10mcg

46.2%

45.4%

45.5%

45.8%

45.0%

20mcg

26.1%

26.3%

26.6%

26.3%

25.0%

[cid:image006.png@01CCE59C.8402B2D0]

[cid:image007.png@01CCE59C.8402B2D0]

·        10mcg equivalents Rxs:

        [cid:image008.png@01CCE59C.8402B2D0]

5.    Prescriptions by Channel

·        Retail pharmacy scripts continue to dominate Butrans total Rxs by channel, accounting for 95%,
followed by 4% in LTC and 1% from Mail order.

[cid:image009.png@01CCE59C.8402B2D0]

[cid:image010.png@01CCE59C.8402B2D0]

PUBLICLY FILED PER STIPULATION [ECF 2140]

UNREDACTED - CONTAINS OUTSIDE PROFESSIONALS' EYES ONLY INFORMATION
THIS IS SUBJECT TO PROTECTIVE ORDER

6.    Prescriptions by Specialty

·         By specialty group, Primary Specialists continue to garner largest share of Butrans Rxs,
accounting for 39.7% this week, followed by PCPs with 39.6%, and NP/PAs with 15%.

·         Anesthesiology/pain medicine (19.7%), FP/GP (15.3%), Physical Medicine (12.1% )  and
Osteopathic Medicine (13.1%), were leading individual specialties this week.
[cid:image012.png@01CCE59C.8402B2D0]


7.    Stocking Overview

·         Stocking data is not  available for 2012 as Purdue no longer purchases the weekly data .


Stephen Wachter | Manager, Market Research | Purdue Pharma L.P.




<image001.jpg>
<Butrans Weekly Report 1-27-12.xlsm>
<image002.png>
<image003.png>
<image004.png>
<image005.png>
<image006.png>
<image007.png>
<image008.png>
<image009.png>
<image010.png>
<image012.png>
<image015.png>
<image016.png>

PUBLICLY FILED PER STIPULATION [ECF 2140]

UNREDACTED - CONTAINS OUTSIDE PROFESSIONALS' EYES ONLY INFORMATION
THAT IS SUBJECT TO PROTECTIVE ORDER

# EXHIBIT 149

PUBLICLY FILED PER STIPULATION [ECF 2140]

UNREDACTED - CONTAINS OUTSIDE PROFESSIONALS' EYES ONLY INFORMATION
DATA SUBJECT TO PROTECTIVE ORDER



**To:** Boer, Peter[ ███ ]; Costa, Paulo[ ███ ]; Lewent, Judy[ ███ ] Boer, Peter[ ███ ]; Pickett, Cecil[ ███ ] Sackler Hunt, Samantha[ ███ ]; Sackler Lefcourt, Ilene[ ███ ]; Sackler, Beverly[ ███ ]; Sackler, Dame Theresa[ ███ ]; Sackler, David[ ███ ]; Sackler, Dr Kathe[ ███ ]; Sackler, Dr Raymond R[ ███ ]; Sackler, Dr Richard[ ███ ]; Sackler, Jonathan[ ███ ]; Sackler, Mortimer D.A.[ ███ ]; Snyderman, Ralph[ ███ ]; Sackler, David A.[ ███ ]

**Cc:** Timney, Mark[ ███ ]; Gasdia, Russell[ ███ ]; Long, David[ ███ ] Lundie, David[ ███ ]; Mallin, William[ ███ ]; sdb[ ███ ]; Strassburger, Philip[ ███ ] Weinstein, Bert[ ███ ]; Bostrup, Eric[ ███ ]; Danahy, Michael[ ███ ]; Davis, Neal[ ███ ] Lowne, Jon[ ███ ] Shum, Sam[ ███ ]; Baumgartner, Todd[ ███ ]; edm[ ███ ]

**From:** Mahony, Edward
**Sent:** Sun 4/6/2014 9:15:33 PM
**Subject:** Purdue == Year to Date 2014 Financial Flash Report
<u>March Sales Analysis Monthly Package V1.pdf</u>

Colleagues - The following flash financial report covers Purdue sales, cash-on-hand and material financial developments.   The report focuses on variances to the 2014 Budget.

Net Sales

Net Sales year-to-date March of $444.2 million are $10.8 million under budget. The underlying demand for OxyContin and Butrans are on or over budget.   The lower than budget factory sales is due to lower than budgeted trade inventory – which we believe is temporary.   For the full year we expect sales to be on budget.

OxyContin

OxyContin net sales year-to-date March of $393.3 million are $5.9 million under budget.   The variance to budget is due to higher than budget demand offset by a temporary reduction in trade inventory as follows.

OxyContin demand is running approximately $18 million higher than budget. Scripts of 1,362,000 year-to-date are higher than budget by 51,000 or 3.9%.  Also the script mix by strength and number of tablets per script are running slightly favorable to budget.

PUBLICLY FILED PER STIPULATION [ECF 2140]

UNREDACTED - CONTAINS OUTSIDE PROFESSIONALS' EYES ONLY INFORMATION
THIS IS SUBJECT TO PROTECTIVE ORDER

OxyContin trade inventory at the end of March is lower than the Budget by $23 million.  Trade inventory is sensitive to the timing of the weekly purchases by the big three wholesalers.  A change in timing of an order by one day from the big three wholesalers can result in a $20-30 million variance in month end inventory.  We believe that trade inventories will return to budget levels in the coming months.

OxyContin rebates are expected to run higher than budget due to an unanticipated contract re-negotiation initiated by United Health.

OPPORTUNITIES

The E2E effort has resulted in significant improvement and on or close to budget performance in number of sales calls vs. budget, primary sales call split on budget (OxyContin 60% and Butrans 40%) and calls on target HCP's.

RISKS

There are a number of risks specific to OxyContin.   Those risks include (i) continued pressure against higher doses of opioids, (ii) continued pressure against long term use of opioids and most recently (iii) a new class label for ER opioids that will likely include the following language "reserve OxyContin for use in patients for whom alternative treatment options (e.g., non-opioid analgesics or immediate-release opioids) are ineffective, not tolerated, or would be otherwise inadequate …".

Taking all the above into account we expect OxyContin 2013 sales to be on budget.


Butrans

Butrans net sales year-to-date March of $26.1 million are $7.1 million under budget due to the following:

Like OxyContin, the Butrans sales shortfall is due to trade inventory being $6.3

PUBLICLY FILED PER STIPULATION [ECF 2140]

UNREDACTED - CONTAINS OUTSIDE PROFESSIONALS' EYES ONLY INFORMATION
SUBJECT TO PROTECTIVE ORDER

million below budget.  As with OxyContin we expect Butrans inventory to return to budget levels in the coming months.

Also contributing is $1.7 million in backorders for the new 15 mcg patch.   The back orders should begin to clear starting mid-April.

The full year prospects for Butrans are encouraging (i) year-to-date prescriptions of 143,500 are in line with budget  (ii) Butrans share of EROs was 2.45% for the week ending 3/21/14 (a new record high) up from 2.12% at the start of the year and (iii) managed care coverage is improving and on track to meet (commercial) or significantly exceed (Med D) the budget targets.

OPPORTUNITES

The new 7.5 mcg patch is expected to launch later this year, the FDA recently approved a change in the Butrans label that would allow use of multiple patches (within the current 20 mcg upper limit) and impact of new managed care coverage should start to show up in the script data later this year --- all of these offer an opportunity to exceed the budget.    Importantly, there have been no Paragraph 4 challenges against Butrans to date.

RISKS

In spite of the improving managed care coverage prescribers perception is that Butrans has low managed care coverage – a perception that the brand team is working to correct.   Also --- Butrans' share of the sales calls has decreased vs. the last two years.   The sales budget took that decrease into consideration but the impact could be greater than anticipated.

Taking all the above into account we expect Butrans 2013 sales to be on budget.


Intermezzo

Intermezzo net sales for the three months ending March were $2.5 million.  The brand is breaking even and we are making good progress in settling the Hatch Waxman litigation.

PUBLICLY FILED PER STIPULATION [ECF 2140]

UNREDACTED - CONTAINS OUTSIDE PROFESSIONALS' EYES ONLY INFORMATION
THIS IS SUBJECT TO PROTECTIVE ORDER

Cash and Short Term Investments

At the end of March, unrestricted cash and short term investments totaled $1,002.0 million which is in-line with forecast.  Non-tax distributions of $90.5 million were made this week.

████████████

██████████████████████████████ is now reduced from $500 million to $350 million.

Audited Financial Statements

Ernst and Young are completing their field work this week and audited financial statements will be issued by Friday April 4th.   Operating results are consistent with the internal 2013 financials issued to the Board in January.

Q1 Financial Statements will be issued shortly.

CONFIDENTIAL

PPLPC012000471644
PPLPC012000471641

UNREDACTED - CONTAINS OUTSIDE PROFESSIONALS EYES ONLY INFORMATION
SUBJECT TO PROTECTIVE ORDER

# EXHIBIT 177

PUBLICLY FILED PER STIPULATION [ECF 2140]

UNREDACTED - CONTAINS OUTSIDE PROFESSIONALS EYES ONLY INFORMATION
SUBJECT TO PROTECTIVE ORDER

Message

**From**:    Stewart, John H. (US) ██████████████████████████████████████

**Sent**:    5/3/2011 10:55:26 AM
**To**:    Sackler, Dr Richard ████████████████████████████████████████████
**Subject**:    RE: Butrans Weekly Report for the week ending April 15th
**Attachments**:    image001.jpg; image002.png; image003.png; image004.png; image005.png; image006.png; image007.png;
image008.png; image009.png; image010.png; image011.png; image012.png; image013.png; image014.png;
image015.png; image016.png

Richard

This came up in a conversation with Jon and Raymond yesterday, and I agree that it is useful/insightful to travel with the
representatives to get a sense of physicians response to a product as well as ancillary issues (e.g. Package Insert
Statements, formulary coverage) that they say significantly impacts their prescribing behavior.  What is being worked-up
is a more detailed analysis of "where" the prescription uptake is great, and where it is poor – so that the work-withs can
be planned accordingly.  I would note that "where" includes such issues at which representative, which district, which
region, which types of prescribers, which types of practices etc.

Will show you the analyses as they come to me.

John

---

**From:** Sackler, Dr Richard
**Sent:** Thursday, April 28, 2011 11:06 PM
**To:** JHS (US)
**Subject:** FW: Butrans Weekly Report for the week ending April 15th

I believe that if you and I go to the field for a couple of days and follow good reps, we will get a better idea of
the prospects for this product.  We may even see ways of improving the trajectory.

Do you want to do it?

# Richard S. Sackler, MD



Office

-- Cell

-- Home

---

**From:** "Gasdia, Russell" ████████████████████████████
**Date:** Thu, 28 Apr 2011 11:33:28 -0400
**To:** "Dr. Richard S. Sackler" ███████████████ Mortimer Sackler ██████████████████ Raymond
Sackler ███████████████████ "Sackler, Dr Kathe" ██████████████████ "Sackler, Jonathan"
██████████████████, Theresa Sackler ████████████████████, John Stewart
██████████████ Stuart Baker ██████████████████ "F. Boer" ██████████████, Judy
Lewent ██████████████████████, Cecil internet ██████████████████████
**Cc:** "Mallin, William" ██████████████████████, James Dolan ██████████████ "Mallin, William"

PUBLICLY FILED PER STIPULATION [ECF 2140]

UNREDACTED – CONTAINS OUTSIDE PROFESSIONALS EYES ONLY INFORMATION
FILED SUBJECT TO PROTECTIVE ORDER

, "Landau, Dr. Craig" <​███████████████> David Long
, "Lundie, David" <​███████████████>, Bert Weinstein
"Silbert, Richard W" <​███████████████> Robin Abrams
Strassburger, Philip" <​███████████████>

**Subject:** Butrans Weekly Report for the week ending April 15th



# Weekly Prescriptions and Stocking Report for the Week Ending April 15, 2011

*\*Please note:*

· *Two-day district sales meetings were held during this week. As a result, sales calls were **40%** lower than normal. (see graph below)*



· *Prescriptions are inclusive of retail, long term care, and mail service channels.*

· *Stocking data reflects the week ending April 8th.*

· *The store count and patches ordered data reflect all channels of trade.*

· *The store count reflects the number of outlets that ordered products during the given time period.*

· *Wal-Mart, Target and Kroger data are not included in the stocking data.*

PUBLICLY FILED PER STIPULATION [ECF 2140]
HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

UNREDACTED – CONTAINS OUTSIDE PROFESSIONALS EYES ONLY INFORMATION
SUBJECT TO PROTECTIVE ORDER

## 1. *Weekly Rx Snapshot for Week 13 of Butrans Launch*

· Butrans total prescriptions were up 1.1% to 4,539 compared to 4,491 last week. *It was the only long acting opioid to experience gains this week.*

· *For the second week in a row, the 10mcg dosage strength was the leading strength*, representing 44% or 1,999 scripts.

· The two-day sales meetings could have affected the Rxs for the initial starting strength for most Butrans Rxs.  For the first time, the 5mcg strength (1,852) declined; it lost 58 Rxs compared to 1,910 last week.

· *The overall LAO market decreased to about 500,000 Rxs.*  This is a 3.4% drop from about 518,000 Rxs in the previous week.

| Key Metrics | | | Actual |
|---|---|---|---|
| Latest weekly  Butrans TRx volume | | | 4,539 |
| Latest weekly Butrans NRx volume | | | 4,225 |
| Year to date TRxs | | | 36,675 |
| Latest weekly Butrans growth rate | | | 1.1% |
| Latest weekly distribution by Butrans dosage strength | | Rxs | % |
| | 5mcg | 1,852 | 41% |
| | 10mcg | 1,999 | 44 |
| | 20mcg | 688 | 15 |
| | Total | 4,539 | 100% |
| Latest weekly growth rate for Long Acting Opioids | | | -3.4% |
| Latest weekly Butrans share of Long Acting Opioids | | | 0.91% |

## 2. *New vs. Refill Prescriptions*

· The gains in Butrans Rxs this week were all for new prescriptions (+51) which totaled 4,225 compared to 4,174 last week.  NRxs grew by 1.2%.

· All gains in NRxs this week were in the 10mcg (+3.0%) and 20mcg (+9.8%) dosage strengths.

· Refill Rxs were basically unchanged at 314 or 7% share. (This was third week in a row at 7% share).

· While total Rx's declined this week for the 5mcg strength, refill Rx's for this strength increased 2.2% over last week.

PUBLICLY FILED PER STIPULATION [ECF 2140]

UNREDACTED - CONTAINS OUTSIDE PROFESSIONALS' EYES ONLY INFORMATION
FILED SUBJECT TO PROTECTIVE ORDER





### 3. *Prescriptions by Dosage Strength*

·    The 10mcg (1,999) and 20mcg (688) dosage strengths grew by 2.9% and 7.8%, respectively, from 1,943 and 638, respectively.

·    The distribution of Butrans by dosage strength saw its highest levels for the 10mcg (44%) and 20mcg (15%) since the first week of promotion.

·    In order to meet the 2011 prescription target of 529,000 Rxs, Butrans prescriptions must increase at an average of 410 Rxs each week, starting with the Rx total for the week ending March [4th] (3,017). Butrans Rxs must also achieve a year end distribution of 5mcg/hr at 40%, 10mcg/hr at 40% and 20mcg/hr at 20% in order to meet demand forecast of $102mm. Progress against the Rx target is shown in the following figures:

|       | Week Prior | Last Week | Current Week | Goal |
|-------|------------|-----------|--------------|------|
| 5mcg  | 44.4%      | 42.5%     | 40.8%        | 40.0% |
| 10mcg | 41.4%      | 43.3%     | 44.0%        | 40.0% |

PUBLICLY FILED PER STIPULATION [ECF 2140]

UNREDACTED - CONTAINS OUTSIDE PROFESSIONALS' EYES ONLY INFORMATION
SUBJECT TO PROTECTIVE ORDER

| 20mcg | 14.2% | 14.2% | 15.2% | 20.0% |





· 10mcg equivalents were up by 3.0% to 4,301 compared to 4,174 in the previous week.

PUBLICLY FILED PER STIPULATION [ECF 2140]

UNREDACTED - CONTAINS OUTSIDE PROFESSIONALS EYES ONLY INFORMATION
EXHIBITS 132 SUBJECT TO PROTECTIVE ORDER



## 4. _Prescriptions by Channel_

·    The distribution of Rxs by channel continued to be driven by the retail pharmacy channel; however, LTC is steadily and modestly increasing in share.  LTC rose from 2.2% share last week to 2.4% share in the current week.



UNREDACTED - CONTAINS OUTSIDE PROFESSIONALS EYES ONLY INFORMATION
THIS IS SUBJECT TO PROTECTIVE ORDER



## 5. *Prescriptions by Specialty*

·    Anesthesiology/pain (21% or 968 Rx's), Osteopathic Medicine (15% or 694 Rx's), and FP/GPs (13% or 605 Rx's) were the leading specialties this week.

·    Prescriptions from Physical Medicine, decreased 13.4% or 88 less scripts from last week, which was largest decrease by any specialty. Decreases were also noted for Physician Assistants, -17.1% or -47 Rx's  and FP/GP's , which declined for second week in a row (-3.5% over last week).

·    Increases of note came from Nurse Practitioners, which grew 18.6% or 45 Rx's over last week and Internal Medicine, up 8.6% or 34 Rx's.

PUBLICLY FILED PER STIPULATION [ECF 2140]

UNREDACTED - CONTAINS OUTSIDE PROFESSIONALS EYES ONLY INFORMATION
REDACTED SUBJECT TO PROTECTIVE ORDER





PUBLICLY FILED PER STIPULATION [ECF 2140]

UNREDACTED - CONTAINS OUTSIDE PROFESSIONALS' EYES ONLY INFORMATION
SUBJECT TO PROTECTIVE ORDER

## 6. *Launch Comparison (Retail Only)*

·   The following is a post launch comparison of Butrans versus other long acting opioids and Butrans versus long acting Tramadol products.



HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER                                    PPLPUCC9000363541

UNREDACTED - CONTAINS OUTSIDE PROFESSIONALS EYES ONLY INFORMATION
SUBJECT TO PROTECTIVE ORDER



## 7. *Stocking Overview*

· The number of unique stores ordering Butrans reached its highest level since the week ending January 28th, but the number of patches ordered reached its lowest level since the week ending March 18th.

| Butrans Overview | 25-Mar-11 | 1-Apr-11 | 8-Apr-11 |
|---|---|---|---|
| **Total Prescriptions** | 3,844 | 4,291 | 4,491 |
| **Total Unique Store Count** | 2,609 | 2,651 | 2,666 |
| **Total Patches Ordered** | 13,576 | 13,164 | 12,100 |

## 8. *Unique Store Count*

· The number of stores ordering Butrans increased for both the 10mcg and 20mcg strengths, but similar to the prescriptions dispensed in the subsequent week, the 5mcg strength experienced a slight decline (- 5%).

| Butrans Unique Store Count | 25-Mar-11 | 1-Apr-11 | 8-Apr-11 |
|---|---|---|---|
| **5mcg** | 1,221 | 1,269 | 1,205 |
| **10mcg** | 1,243 | 1,232 | 1,277 |
| **20mcg** | 419 | 425 | 468 |
| **Total** | 2,609 | 2,651 | 2,666 |

| Butrans Unique Store Count %* | 25-Mar-11 | 1-Apr-11 | 8-Apr-11 |
|---|---|---|---|
| **5mcg** | 46.8% | 47.9% | 45.2% |
| **10mcg** | 47.6% | 46.5% | 47.9% |

PUBLICLY FILED PER STIPULATION [ECF 2140]

HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

UNREDACTED - CONTAINS OUTSIDE PROFESSIONALS' EYES ONLY INFORMATION
THIS IS SUBJECT TO PROTECTIVE ORDER

| | | | | |
|---|---|---|---|---|
| 20mcg | | 16.1% | 16.0% | 17.6% |

\* Percent is based on the total number of unique outlets that ordered Butrans



## 9. _Patches Ordered_

·    Almost half (44%) of Butrans patches ordered were for the 10mcg strength. The 10mcg and 20mcg strengths increased by 3.7% and 10.1%, respectively, but the 5mcg strength fell by 28.7%.

| Butrans Patches Ordered | 25-Mar-11 | 1-Apr-11 | 8-Apr-11 |
|---|---|---|---|
| 5mcg | 5,488 | 5,424 | 3,868 |
| 10mcg | 6,068 | 5,824 | 5,852 |
| 20mcg | 2,020 | 1,916 | 2,380 |
| Total | 13,576 | 13,164 | 12,100 |

| % of Butrans Patches Ordered | 25-Mar-11 | 1-Apr-11 | 8-Apr-11 |
|---|---|---|---|
| 5mcg | 40.4% | 41.2% | 32.0% |
| 10mcg | 44.7% | 44.2% | 48.4% |
| 20mcg | 14.9% | 14.6% | 19.7% |
| Total | 100.0% | 100.0% | 100.0% |

## 10.    _Prescriptions Dispensed versus Patches Ordered_

·    About three-quarters of Butrans patches ordered were for the higher dosage strengths, but only 57% of Rxs were filled for those strengths:

PUBLICLY FILED PER STIPULATION [ECF 2140]

UNREDACTED - CONTAINS OUTSIDE PROFESSIONALS' EYES ONLY INFORMATION
SUBJECT TO PROTECTIVE ORDER



Alicia Shepard • Manager, Analytics & Market Research • Purdue Pharma L.P. • 201 Tresser Blvd, Stamford, CT 06901 • 203-588-7368

PUBLICLY FILED PER STIPULATION [ECF 2140]
HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER                    PPLPUCC9000363544