George R. Calhoun V (*pro hac vice*)
IFRAH PLLC
1717 Pennsylvania Avenue NW
Suite 650
Washington, DC 20006-2004
(202) 524-4140 – Tel.
(202) 524-4141 – Fax
george@ifrahlaw.com

Counsel for Ironshore Specialty Insurance Company,
formerly known as TIG Specialty Insurance Company

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In Re:<br><br>PURDUE PHARMA L.P., *et al.*,[1]<br><br>               Debtors. | Chapter 11<br><br>**Case No. 19-23649-rdd**<br>**(Jointly Administered)** |

**IRONSHORE SPECIALTY INSURANCE COMPANY'S, FORMERLY KNOWN AS TIG SPECIALTY INSURANCE COMPANY, OBJECTION TO DEBTORS' MOTION FOR AN ORDER APPROVING STIPULATION**

Ironshore Specialty Insurance Company, formerly known as TIG Specialty Insurance

Company, ("TIG") respectfully submits its objection to Debtors' Motion for an Order Approving

---

[1] The Debtors in these Chapter 11 cases, along with the last four digits of each Debtor's registration number in the applicable jurisdiction, are as follows: Purdue Pharma L.P. (7484), Purdue Pharma Inc. (7486), Purdue Transdermal Technologies L.P. (1868), Purdue Pharma Manufacturing L.P. (3821), Purdue Pharmaceuticals L.P. (0034), Imbrium Therapeutics L.P. (8810), Adlon Therapeutics L.P. (6745), Greenfield BioVentures L.P. (6150), Seven Seas Hill Corp. (4591), Ophir Green Corp. (4594), Purdue Pharma of Puerto Rico (3925), Avrio Health L.P. (4140), Purdue Pharmaceutical Products L.P. (3902), Purdue Neuroscience Company (4712), Nayatt Cove Lifescience Inc. (7805), Button Land L.P. (7502), Rhodes Associates L.P. (N/A), Paul Land Inc. (7425), Quidnic Land L.P. (7584), Rhodes Pharmaceuticals L.P. (6166), Rhodes Technologies (7143), UDF LP (0495), SVC Pharma LP (5717) and SVC Pharma Inc. (4014). The Debtors' corporate headquarters is located at One Stamford Forum, 201 Tresser Boulevard, Stamford, CT 06901.

Stipulation (the "Motion"). Dkt. 2227. The above-captioned debtors and debtors in possession in these proceedings (collectively, the "Debtors) recently filed a motion seeking to grant the Official Committee of Unsecured Creditors (the "Official Committee") and the Ad Hoc Committee of Governmental and Other Contingent Litigation Claimants ("Ad Hoc Committee") (collectively, the "Committees") standing to pursue insurance actions. TIG objects to this relief because, under New York insurance law and Delaware corporate law, only the insured has standing to pursue an insurance claim against its insurer. Neither of the Committees is an insured under the implicated TIG policy (the "Policy"). The Committees represent governmental entities that have no interest in TIG's policies, even as claimants. Further, TIG objects to that part of Debtors' proposed relief that prevents Debtors from settling an insurance action without the Official Committee's and/or the Ad Hoc Committee's consent. While Debtors may wish to seek the Committees' consent as a practical matter, an order precluding Debtors from settling under any circumstances is neither needed nor appropriate. Rather than grant the Debtor's motion, the Court should grant TIG's still-pending motion for relief from stay (Dkt. 712) to permit TIG's arbitration, filed pre-bankruptcy, to move forward.

## BACKGROUND

1.    TIG, The Purdue Frederick Company, Inc. ("Purdue Frederick") and Debtors Purdue Pharma L.P., Purdue Pharma Inc., and Purdue Pharmaceuticals L.P. (collectively with Purdue Frederick, "Purdue") currently are parties to a confidential arbitration proceeding pending in London in connection with the parties' respective rights and obligations under the Policy. TIG initiated that arbitration by serving a Notice to Arbitrate on October 8, 2018. After the panel was established, TIG served its Statement of Claim on February 28, 2019. Purdue served its Statement of Defense on May 15, 2019. TIG served its Reply Submission on June 26, 2019. Subsequently,

the parties met with the Tribunal for a Case Management Conference regarding entry of a case management schedule.

2.     Purdue thereafter filed for bankruptcy protection on September 15, 2019.

3.     On September 26, 2019, the Office of the United States Trustee for Region 2 appointed the Official Committee pursuant to Section 1102(a) of the Bankruptcy Code to act as a fiduciary for and represent the interests of all unsecured creditors in the Chapter 11 Cases. Dkt. 131. The Ad Hoc Committee was formed by voluntary association in September 2019 and its professionals are being paid by the estate pursuant to this Court's order entered on December 2, 2019. Dkt. 553.

4.     On December 30, 2019, TIG filed its Motion for Relief from Automatic Stay, arguing among other things that the parties' disputes as to their rights and obligations under the Policy are non-core matters that are subject to mandatory arbitration. Dkt. 712.

5.     On January 17, 2020, Debtors and the Committees filed objections to TIG's Motion for Relief from Automatic Stay. Dkts. 753, 756, 757. Among other things, the objectors stated that they did not want arbitration to interfere with the parties' negotiations. Dkt. 753 at 15–16; Dkt. 756 ¶ 16; Dkt. 757 ¶ 10. As represented in their Motion, those negotiations are now completed or nearly so.

6.     TIG filed its Reply in Support of its Motion for Relief from Automatic Stay on January 22, 2020. Dkt. 765. The Court heard argument on TIG's motion on January 24, 2020.  The Court carried TIG's Motion for Relief from Automatic Stay, which remains pending.

7.     On January 6, 2021, Debtors filed their Motion. Dkt. 2227. In the Motion, Debtors state that they and the Committees have agreed on a process for pursuit of the Debtors' insurance assets. Specifically, the Debtors have purportedly agreed to grant joint standing to the Committees

to assert and litigate, as co-plaintiffs and co-parties with the Debtors, claims and causes of action related to the Debtors' insurance assets, subject to the terms of an agreed-upon stipulation.

8.      Debtors seek an Order from this Court that would, among other things, authorize the Committees to litigate matters on behalf of Debtors' estates and that would require approval from either the Official Committee or the Ad Hoc Committee of any settlement Debtors seek to enter.

**ARGUMENT**

**I.      The Committees do not have Standing to Pursue Insurance Assets.**

The requested relief is inappropriate because: (1) under applicable Delaware and New York law, the Committees do not have standing to pursue insurance claims, (2) derivative standing is not in the interests of the estate, and (3) proceedings are not core proceedings.

**A.      Derivative Standing is Inappropriate for Insurance Actions.**

Nothing in the Bankruptcy Code authorizes the grant of derivative standing to an official—much less unofficial—committee. Section 1109 of the Bankruptcy Code provides that any "party in interest," including the debtor, the trustee, a committee of creditors or equity interest holders, a creditor, or an indenture trustee, "may appear and may be heard on any issue" in a Chapter 11 "case." This general right to participate, however, does not confer standing upon every party in interest to engage in litigation contemplated by other provisions of the statute, such as lien and transfer avoidance. Standing to prosecute estate claims is expressly given by statute to a bankruptcy trustee (or debtor in possession, by operation of Section 1107(a) of the Bankruptcy Code).

Although the Bankruptcy Code does not expressly authorize anyone other than a trustee or DIP to prosecute claims belonging to the estate, courts sometimes allow committees or individual

creditors to commence litigation on behalf of the estate under narrowly defined circumstances. The Second Circuit Court of Appeals authorized such relief in *In re STN Enterprises*, 779 F. 2d 901, 904 (2d Cir. 1985), in which it found "a qualified right for creditors' committees to initiate suit with the approval of the bankruptcy court" when the trustee or debtor-in-possession has unjustifiably failed to bring suit or abused its discretion in not suing to avoid a preferential transfer. The Second Circuit later refined the doctrine of "derivative standing" in *In re Commodore International Ltd.*, which involved litigation brought by a creditors' committee against various officers and directors for fraud, waste, and mismanagement. *Commodore Int'l Ltd. v. Gould (In re Commodore Int'l Ltd.),* 262 F.3d 96, 100 (2d Cir. 2001). Unlike in *STN Enterprises*, the debtor in *Commodore* had not unreasonably refused to bring suit but agreed to permit the committee to litigate the claims on behalf of the estate. The Second Circuit ruled that a committee may bring suit even if the debtor does not unjustifiably refuse to do so as long as: (i) the trustee or debtor consents; and (ii) the court finds that the litigation is (a) in the best interests of the estate and (b) necessary and beneficial to the fair and efficient resolution of the bankruptcy proceedings. *Id.* at 100. Without bankruptcy court approval granted on one of the bases set forth above, a creditors' committee does not have standing to commence litigation that otherwise belongs solely to the debtor, including even bankruptcy causes of action. *See Official Comm. of Unsecured Creditors v. Halifax Fund, L.P. (In re Applied Theory Corp.)*, 493 F.3d 82 (2d Cir. 2007).

Unlike the estate avoidance and similar actions considered by the Second Circuit in the cases cited above, the Debtors and Committees seek derivative standing to pursue state law insurance claims. With respect to such claims, however, applicable Delaware and New York law precludes the grant of standing to any party other than the insured.

In a factually similar case, the court narrowly construed Rule 24(a)(1) in analyzing a committee's right to intervene in an insurance coverage adversary proceeding. *See, e.g.*, *Catholic Bishop of Northern Alaska v. Continental Ins. Co., et al. (In re Catholic Bishop of Northern Alaska)*, Case No. F08-00110-DMD, Adversary No. F08-90019-DMD, Doc. 583 ("while 1109(b) appeared to create such a right when viewed in isolation, it had to be viewed in the context of Rule 24(a)(1)").  The court there focused on the fact that even if the committee—which represented the plaintiffs in the underlying sexual abuse claims in that case—had an interest in whether there was coverage for their claims, state law proscribed the plaintiffs from maintaining a direct action against the insurers. *In re Catholic Bishop of Northern Alaska*, Case No. F08-00110-DMD, Adversary No. F08-90019-DMD, Doc. 58 at pg. 6.

The same is true here under both Delaware corporate law and New York insurance law.

### 1.    Delaware Corporate Law Precludes Derivative Standing

Each of the Debtors is a Delaware entity as to which Delaware corporate law applies. That law specifically precludes derivative standing. For example, in *HH Liquidation, LLC*, 590 B.R. 221, 282-285 (Bankr. D. Del. 2018), the Delaware bankruptcy court considered whether an official committee of unsecured creditors had standing to pursue derivative claims on behalf of a Delaware LLC. The bankruptcy court ruled that the LLC Act is "clear and unambiguous about who can bring a derivative action: the plaintiff 'must be a member or an assignee.'" *Id*. at 284 (citing 6 Del. C. § 18-1002). *See also In re PennySaver USA Publishing, LLC*, 587 B.R. 445, 467 (Bankr. D. Del 2018) (Delaware bankruptcy court dismissed a Chapter 7 trustee's derivative claims for breach of fiduciary duties owed to creditors of an LLC because the creditors were neither assignees nor members of the LLC). The same rule applies to Delaware limited partnerships; *In re Citadel Watford City Disposal Partners,* 603 BR 897 (Bankr. D. Del. 2019).

6

Given this background, the Bankruptcy Court for the District of Delaware recently held that the state law on derivative standing must be considered in any decision to grant standing to a third party. Specifically, that court, in *In re Dura Automotive Systems*, No. 19-12378 (Bankr. D. Del. June 9, 2020), held that granting the official committee of unsecured creditors derivative standing on behalf of the debtors – a Delaware limited liability company – was precluded by the Delaware Limited Liability Company Act (the "LLC Act"). Here, each of the Debtor entities is organized under Delaware law and thus derivative standing is precluded by statute.

### 2. The Committees Cannot Pursue Insurance Claims Under New York Law.

Derivative standing also is precluded by New York insurance law.[2] Under New York Insurance Law § 3420, an injured party cannot maintain a direct action against a tortfeasor's insurer until he/she has *first* obtained a judgment against the tortfeasor/insured, served the insurance company with a copy of the judgment, and awaited payment for thirty days. N.Y. Ins. Law § 3420(a)(2) and (b)(1). *See also Lang v. Hanover Ins. Co.*, 3 N.Y.3d 350, 354–55 (2004) ("Insurance Law § 3420 therefore grants an injured party a right to sue the tortfeasor's insurer, but only under limited circumstances . . .. Compliance with these requirements is a condition precedent to a direct action against the insurance company . . .." (internal citation omitted)).[3]

New York courts have specifically held that claimants lack standing to pursue claims that have not resulted in an unsatisfied judgment. *See, e.g.*, *Nick's Garage, Inc. v. Liberty Mut. Fire Ins. Co.*, 991 N.Y.S.2d 695 (4th Dep't. 2014); *Jimenez v. New York Cent. Mut. Fire Ins. Co.*, 897

---

[2] The TIG Policy is expressly governed by the law of New York.

[3] Insurance Law § 3420(a)(6) permits an injured plaintiff to commence a prejudgment claim against a tortfeasor's insurer "if the insurer disclaims liability or denies coverage based upon the failure to provide timely notice," but same applies only to policies issued or renewed after January 17, 2009. TIG's Policy was allegedly in effect between July 1, 2000 to October 1, 2002 but was subsequently cancelled with effect from January 8, 2002.

N.Y.S.2d 143 (2d Dep't. 2010). *See also NAP, Inc. v. Shuttletex, Inc.*, 112 F. Supp. 2d 369, 376 (S.D.N.Y. 2000) ("Where an injured third party, prior to an adjudication of liability, institutes an action directly against an insurer which has disclaimed coverage and seeks to establish the insurer's obligation to defend and indemnify the insured, the actual controversy arises between the insurer and the insured. In this situation, a real possibility exists that any declaration of the rights and legal relations between the parties that the court renders may amount to an advisory opinion potentially grounded on standing that may not obtain or on a contingency that may not occur." (citations omitted)).

That the Debtors commenced a bankruptcy proceeding does not change the analysis. In fact, Insurance Law § 3420 was passed to provide injured parties with the ability to directly pursue satisfaction of a judgment obtained against a bankrupt or insolvent defendant from that defendant's insurance company, an ability which did not previously exist at common law. *See*, *Lang*, 3 N.Y.3d at 355–56 ("Far from supplying a reason for disregarding the statutory requirements, the bankruptcy or insolvency of an insured is precisely the situation Insurance Law § 3420 was intended to address.").

There is no dispute that neither the Committees nor the plaintiffs they represent have obtained any judgment(s) against Debtors that have been presented to TIG for payment. Thus, the Committees cannot satisfy the requirements of New York law for standing. Though the Committees may have a generalized interest with regard to insurance to cover the opioid claims, they do not have a "protectable interest" within the context of insurance claims against TIG because New York law does not permit a victim to maintain a direct action against the liability insurance company of the tortfeasor.

Any argument that the Committee has a greater interest in recovery than the Debtors is also not supported by New York Insurance Law. Even in the limited circumstances where it is permitted, an injured party's rights when taking direct action against an insurer are no greater than those of the tortfeasor/insured. *See, e.g.*, *West Street Properties, LLC v. American States Ins. Co.*, No. 545132012, 2014 WL 8335517, at *4 (N.Y. Sup. Ct. Oct. 03, 2014) ("It is well-settled that in taking direct action against an insurer, the injured party steps into the shoes of the insured and has only those rights that the insured would have under the insurance policy." (citing *D'Arata v. New York Cent. Mut. Fire Ins. Co.*, 76 N.Y.2d 659, 665 (1990))).  As such, New York law, like Delaware law, precludes the grant of standing to the Committees.

### B.        Derivative Standing is Not In The Best Interest of the Estate

Pursuit of the insurance recoveries by any party other than the insured would not be in the estate's interest. Among the issues involved in the pending arbitration is whether the injury, damage or liability for which coverage is sought were "expected or intended" within the meaning of the TIG Policy. If they were expected or intended, there is no "occurrence" under the TIG Policy that could give rise to a covered loss. *See, e.g.*, *Olin Corp. v. Ins. Co. of N. Am.*, 762 F. Supp. 548, 564 (S.D.N.Y. 1991), *aff'd*, 966 F.2d 718 (2d Cir. 1992) (in determining whether the corporation expected or intended the harm, one should consider "what [the policyholder's] executives knew, when they knew it, and what conclusion they drew from their knowledge."). The information TIG will seek from the Debtors to evaluate coverage in connection with the underlying claims likely will overlap with the information that could increase the Debtors' exposure to underlying claims. Indeed, one of the very reasons that policies such as the TIG Policy provide for the resolution of disputes through confidential arbitrations is so that the resolution of coverage disputes does not have a negative impact on underlying defense of claims. By inviting attorneys for the claimants

into the litigation, the court would undermine that principle without achieving any countervailing benefit for the estate.

The estate proposes to pay the cost of pursuing the litigation, so derivative standing also offers no financial benefit to the estate. Indeed, the Debtors are represented by highly regarded insurance coverage counsel from the Reed Smith firm in the pending TIG arbitration and with respect to insurance matters generally. *See* Dkt. 585. According to its court filings, the Debtors already have paid Reed Smith nearly $1 million over the course of the bankruptcy case. There is no reason to believe that the Gilbert firm will be able to obtain any better results than Reed Smith or that it will cost the estate any less. To the contrary, Gilbert's rates appear to be somewhat higher than those of Reed Smith. *Compare* Dkt 585 (average rate of $717 an hour for Reed Smith) *with* Dkt. 1989 (showing partner rates for Gilbert attorneys ranging from $675 to $1500 per hour). To the extent both firms would be involved, the cost undoubtedly would be greater, and no efficiencies would be obtained.

Nor does it benefit the estate to have the Ad Hoc Committee's counsel pursue a recovery from TIG. The TIG Policy covers only personal injury and property damage resulting from an occurrence, while expressly excluding damages such as "governmental or criminal fines or penalties." Dkt. 712-2, Ex. A at 5. Here, the Ad Hoc Committee represents only governmental entities that have no interest in TIG's policies and thus may have lower incentive to maximize the value of any remaining insurance.

The Debtors are, of course, free to consult with the Committees if the Debtors choose to bring a settlement forward for approval by the Court. The Committees have a right to object to any such settlement so obtaining their approval would streamline any settlement approval. The estate is not benefitted, however, by giving the Committees' veto right over any settlement. The proposed

order does just that. An order precluding the debtors from settling under any circumstances without the consent of one of the Committees is neither needed nor appropriate. Rather, the order attempts to constrain the Debtors' business judgment in advance of any decisions that might be made in the future.

### C.    Coverage Claims are not Core Proceedings.

Section 1109(b) of the Bankruptcy Code provides that "[a] party in interest, including the debtor, the trustee, a creditors' committee, an equity security holders' committee, a creditor, an equity security holder, or any indenture trustee, may raise and may appear and be heard on any issue in a case under this chapter [11 U.S.C. §§ 1101 *et seq.*]." Section 1109 did not, however, dispose of the need for a party to establish Article III standing. Here, as set forth above, the Committees do not have Article III standing to pursue state law claims against TIG. Moreover, any pursuit of insurance recoveries would be a non-core matter that does not arise in the bankruptcy such that Section 1109 might apply. With respect to TIG specifically, any resolution of insurance issues involving TIG must be resolved in the pending arbitration.

Although core proceedings are not statutorily defined, Section 157(b)(2) offers a nonexclusive list of such actions. A proceeding that involves rights created by bankruptcy law, or that could arise only in a bankruptcy, is a core proceeding. *MBNA Am. Bank, N.A. v. Hill*, 436 F.3d 104, 108–09 (2d Cir. 2006); *McCrory Corp. v. 99¢ Only Stores (In re McCrory Corp.)*, 160 B.R. 502, 506 (S.D.N.Y. 1993). A claim is non-core if it "does not depend on bankruptcy laws for its existence and . . . could proceed in a court that lacks federal bankruptcy jurisdiction." *N. Am. Energy Conservation, Inc. v. Interstate Energy Res., Inc.*, No. 00–40563(PCB), 00–2276, 00CIV4302, 2000 WL 1514614, at *2 (S.D.N.Y. Oct. 10, 2000).

11

Here, the coverage issues present state law contract interpretation issues with respect to the scope and validity of insurance coverage. These types of claims have most often been found to be non-core proceedings in which bankruptcy courts cannot enter final orders or judgments and, as a result, bankruptcy courts presented with insurance coverage disputes routinely permit the dispute to be adjudicated in an appropriate non-bankruptcy forum. *See, e.g.*, *Orion Pictures Corp. v. Showtime Networks, Inc. (In re Orion Pictures Corp.)*, 4 F.3d 1095, 1101 (2d Cir. 1993) (insurance coverage action was non-core), *cert. denied*, 511 U.S. 1026 (1994); *In re MF Global Holdings, Ltd.*, 571 B.R. 80, 96 (2017) (coverage action was non-core despite potential impact on estate); *DeWitt Rehab. & Nursing Cntr, Inc. v. Columbia Gas Co.*, 464 B.R. 587, 591–92 (S.D.N.Y. 2012) (state law insurance coverage proceedings are non-core); *In re Burger Boys, Inc.*, 183 B.R. 682 (S.D.N.Y. 1994) (declaratory judgment action to resolve coverage disputes was non-core); *Lawrence Group, Inc. v. Hartford Cas. Ins. Co. (In re Lawrence Group, Inc.)*, 285 B.R. 784, 788 (Bankr. N.D.N.Y. 2002) ("[T]he resolution of this contractual dispute will have little to no bearing on the administration of the estate. . .. There is nothing in the record or elsewhere indicating how or why plaintiffs' contract claims will directly affect the bankruptcy court's core administrative function. The only relationship this action has to the bankruptcy proceedings is that 'determination of the action would affect the ultimate size of the estate.' Accordingly, this is a non-core matter.") (quoting *Resolution Trust Corp. v. Best Prods. Co. (In re Best Prods. Co.)*, 68 F.3d 26 (2d Cir. 1995))).

Moreover, where, as here, "the insurance proceeds would only augment the assets of the estate for general distribution, the effect on the administration of the estate [is] insufficient to render the proceedings core." *U.S. Lines* at 639 (citing *In re Orion Pictures Corp.*, 4 F.3d at 1102). Here, the Debtors and other movants concede that they are looking to maximize insurance

assets, but make no allegation that insurance is an asset upon which the bankruptcy hinges. *See*

Motion ¶¶ 16–17. As such, the coverage issues in this case are non-core and cannot be finally

determined in this Court. As such, the Committees may not rely upon Section 1109 to authorize

standing to pursue these state law, non-bankruptcy claims.

####    D.        TIG's Motion for Relief from Automatic Stay Should be Granted.

The Court previously deferred ruling on TIG's Motion for Relief from Stay. In the

intervening months, creditors filed their proofs of claim and the Debtors continued negotiations

towards a plan. The Debtors now represent to the Court that they are at a stage where they seek to

proceed to resolution of insurance issues. The Court should, therefore, revisit TIG's Motion for

Relief from Stay and grant TIG relief to proceed with the pending arbitration.

Section 362(d)(1) of the Bankruptcy Code provides that a court "shall grant relief from the

stay, . . . such as by terminating, annulling, modifying, or conditioning such stay . . . for cause,

including the lack of adequate protection of an interest in property of such party in interest . . .."

11 U.S.C. § 362(d)(1). Because the Code does not define "cause," courts must consider whether

cause exists on a case-by-case basis. *In re Sonnax Indus., Inc.*, 907 F.2d 1280, 1285 (2d Cir. 1990).

The movant bears the initial burden of making a showing of "cause" for relief from the stay, but

the ultimate burden of persuasion rests with the debtor to show an absence of "cause." *Mazzeo v.*

*Lenhart (In re Mazzeo)*, 167 F.3d 139, 142 (2d Cir. 1999); *see also In re Sonnax*, 907 F.2d at 1285

("The burden of proof on a motion to lift or modify the automatic stay is a shifting one. Section

362(d)(1) requires an initial showing of cause by the movant, while Section 362(g) places the

burden of proof on the debtor for all issues other than 'the debtor's equity in property.'").

Here, cause exists for relief from the automatic stay (i) because arbitration is mandatory,

and (ii) under application of the relevant *Sonnax* factors. On these points, TIG references and

13

incorporates herein its arguments asserted in its Memorandum in Support of its Motion for Relief from Automatic Stay (Dkt. 712-1]) and in its Reply in Support of its Motion for Relief from Automatic Stay (Dkt. 765). Moreover, the panel in the arbitration between TIG and Purdue is awaiting the lifting of the automatic stay so that it may continue with its duties.

## CONCLUSION

For all of the above reasons, the Court should deny Debtors' Motion and grant TIG's Motion for Relief from the Automatic Stay.

Dated:  January 15, 2021
          Washington, DC

                                  Respectfully submitted,

                                  /s/ George Calhoun
                                  George R. Calhoun V (*pro hac vice*)
                                  IFRAH PLLC
                                  1717 Pennsylvania Avenue NW
                                  Suite 650
                                  Washington, DC 20006-2004
                                  (202) 524-4140 – Tel.
                                  (202) 524-4141 – Fax
                                  george@ifrahlaw.com