<span style="color:red">REDACTED</span>

AKIN GUMP STRAUSS HAUER & FELD LLP
Ira S. Dizengoff
Arik Preis
Mitchell Hurley
Joseph L. Sorkin
Sara L. Brauner
One Bryant Park
New York, New York 10036
Telephone: (212) 872-1000
Facsimile: (212) 872-1002

*Counsel to the Official Committee of Unsecured*
*Creditors of Purdue Pharma L.P.,* et al.

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| PURDUE PHARMA L.P., *et al.*,[1] | ) | Case No. 19-23649 (RDD) |
| | ) | |
| Debtors. | ) | (Jointly Administered) |
| | ) | |

## DECLARATION OF ARIK PREIS DATED NOVEMBER 18, 2020

---

[1] The Debtors in these cases, along with the last four digits of each Debtor's registration number in the applicable jurisdiction, are as follows: Purdue Pharma L.P. (7484), Purdue Pharma Inc. (7486), Purdue Transdermal Technologies L.P. (1868), Purdue Pharma Manufacturing L.P. (3821), Purdue Pharmaceuticals L.P. (0034), Imbrium Therapeutics L.P. (8810), Adlon Therapeutics L.P. (6745), Greenfield BioVentures L.P. (6150), Seven Seas Hill Corp. (4591), Ophir Green Corp. (4594), Purdue Pharma of Puerto Rico (3925), Avrio Health L.P. (4140), Purdue Pharmaceutical Products L.P. (3902), Purdue Neuroscience Company (4712), Nayatt Cove Lifescience Inc. (7805), Button Land L.P. (7502), Rhodes Associates L.P. (N/A), Paul Land Inc. (7425), Quidnick Land L.P. (7584), Rhodes Pharmaceuticals L.P. (6166), Rhodes Technologies (7143), UDF L.P. (0495), SVC Pharma L.P. (5717) and SVC Pharma Inc. (4014). The Debtors' corporate headquarters is located at One Stamford Forum, 201 Tresser Boulevard, Stamford, CT 06901.

<span style="color:red">PUBLICLY FILED PER STIPULATION [ECF 2140]</span>

<span style="color:red">REDACTED</span>

Under 28 U.S.C. § 1746, I, Arik Preis,[2] declare under the penalty of perjury that the following is true and correct to the best of my knowledge, information, and belief:

1.      This declaration ("**Declaration**") is submitted in support of the Official Committee of Unsecured Creditors of Purdue Pharma, L.P. et al.'s Motions (defined below) and two reply briefs filed contemporaneously with this Declaration entitled (1) Official Committee of Unsecured Creditors' Reply in Support of Its Motion to Compel Production of Purportedly Privileged Documents, or for *In Camera* Review, Based on Good Cause, Crime Fraud, and At Issue Exceptions to Claims of Privilege (the "**Exceptions Reply**")[3]; and (2) Official Committee of Unsecured Creditors' Reply in Support of Motion to Compel Production of Purportedly Privileged Documents, or for *In Camera* Review, Based on Failure of the Sacklers to Demonstrate Documents Identified on Logs are Privileged (the "**General Challenges Reply,**"[4] and, together with the Exceptions Reply, the "**Replies**").[5]

2.      I am an attorney in good standing admitted to practice in the State of New York, and I am a partner at the law firm of Akin Gump Strauss Hauer & Feld LLP ("**Akin Gump**").  I was admitted to the New York State Bar in 2001 and have been practicing law in the area of bankruptcy and financial restructuring since that time.  I make this Declaration based on my own personal knowledge and belief, and upon documents and information available to me as counsel to the Official Committee of Unsecured Creditors of Purdue Pharma, L.P. et al (the "**UCC**").

---

[2] My legal name is Erik Preis but for my entire life I have utilized the name Arik and not Erik.

[3] For the sake of clarity, the Exceptions Reply is submitted in support of the UCC's *Motion to Compel Production of Purportedly Privileged Documents, or for* In Camera *Review, Based on Good Cause, Crime Fraud, and At Issue Exceptions to Claims of Privilege* [ECF No. 1753] (the "**Exceptions Motion**").

[4] For the sake of clarity, the Challenges Reply is submitted in support of the UCC's *Motion to Compel Production of Purportedly Privileged Documents, or for In Camera Review, Based on Failure of the Sacklers and the Debtors to Demonstrate Documents Identified on Logs are Privileged* [ECF No. 1752] (the "**General Challenges Motion**").  The Exceptions Motion and General Challenges Motion are collectively referred to herein as the "**Motions**."

[5] Capitalized terms used but not defined herein shall have the meanings ascribed to them in the Replies, which the UCC has endeavored to use consistently with definitions used in the Motions.

<span style="color:red">PUBLICLY FILED PER STIPULATION [ECF 2140]</span>

REDACTED

3.      The UCC files its Replies in accordance with the briefing schedule provided in the

*Stipulation and Agreed Order Regarding Amended Briefing Schedule in the Chapter 11 Cases*,

executed by the Debtors, the Sacklers, the NCSG, the AHC, and the UCC, which was filed and so

ordered by the Court on October 26, 2020 [ECF No. 1848].  After filing its Motions, the UCC has

continued to meet and confer with counsel for the Side A and Side B Sacklers (collectively, the

"**Sacklers**") and the Debtors (collectively with the Sacklers, the "**Withholding Parties**") in a good

faith effort to resolve by agreement the issues raised by the Motions without the intervention of

the Court.  While the parties informally resolved some of the UCC's challenges, they could not

resolve all the issues as described in the Replies.

4.      This Declaration attaches and describes documents and testimony relied upon in

the Replies.  Certain exhibits attached hereto have been designated as Confidential, Highly

Confidential, Professional's Eyes Only, or Outside Professional's Eyes Only, by one or more

parties to this proceeding and are redacted pursuant to the *Third Amended Protective Order* entered

in these proceedings [ECF No. 1935].  The UCC also files certain correspondence with the

Withholding Parties under seal in an abundance of caution in order to accommodate certain

Withholding Parties' prior positions concerning the confidentiality of email address and other

information that may be contained therein.  By filing in this way, the UCC does not intend to

suggest that it agrees the information is or ought to be confidential.

5.      Attached hereto as **Exhibit A** is a true and correct copy of an excel workbook

containing the entries on Side A's privilege log that the UCC is challenging in the Motions and

Replies, separated by category based on the tabbed worksheets in the excel workbook.  For the

Exceptions Motion and Reply, the privilege entries are a non-exhaustive, illustrative list of the

Challenged Documents (as defined in the Exceptions Motion) that the UCC believes fit within the

3

REDACTED

categories of privileged documents the UCC seeks to compel.  This Exhibit A is intended to supersede the Exhibit A attached to the Declaration of Mitchell Hurley Dated September 29, 2020, originally filed in support of the Motions.

6.      Attached hereto as **Exhibit B** is a true and correct copy of an excel workbook containing the entries on Side B's privilege log that the UCC is challenging in the Motions and Replies, separated by category based on the tabbed worksheets in the excel workbook.  For the Exceptions Motion and Reply, the privilege entries are a non-exhaustive, illustrative list of the Challenged Documents (as defined in the Exceptions Motion) that the UCC believes fit within the categories of privileged documents the UCC seeks to compel.  This Exhibit B is intended to supersede the Exhibit B attached to the Declaration of Mitchell Hurley Dated September 29, 2020, originally filed in support of the Motions.

7.      Attached hereto as **Exhibit C** is a list of document control numbers corresponding to certain Privilege Log entries for which the UCC requests *in camera* review.  The list is organized categorically and by Withholding Party.  The document control numbers in Exhibit C are presented as a limited sampling of materials that the UCC believes would enable the Court to make a reasoned determination whether further *in camera* review or other relief is appropriate respecting categories of documents identified in the General Challenges Reply.

8.      Attached hereto as **Exhibit 110** is a true and correct copy of a letter from Mitchell Hurley to Alexander Lees, dated September 25, 2020.

9.      Attached hereto as **Exhibit 111** is a true and correct copy of a letter from Mitchell Hurley to Alexander Lees, dated October 12, 2020.

10.     Attached hereto as **Exhibit 112** is a true and correct copy of a letter from Mitchell Hurley to Jasmine Ball, dated October 14, 2020.

PUBLICLY FILED PER STIPULATION [ECF 2140]

REDACTED

11.     Attached hereto as **Exhibit 113** is a true and correct copy of an email from Elizabeth Scott to Jasmine Ball, dated October 20, 2020.

12.     Attached hereto as **Exhibit 114** is a true and correct copy of an email from Elizabeth Scott to Jasmine Ball, dated October 23, 2020.

13.     Attached hereto as **Exhibit 115** is a true and correct copy of an email from Elizabeth Scott to Jasmine Ball, dated October 29, 2020.

14.     Attached hereto as **Exhibit 116** is a true and correct copy of a letter from Alexander Lees to Mitchell Hurley, dated September 28, 2020.

15.     Attached hereto as **Exhibit 117** is a true and correct copy of a letter from Alexander Lees to Mitchell Hurley, dated October 19, 2020.

16.     **Exhibit 118** to this Declaration has been intentionally omitted.

17.     **Exhibit 119** to this Declaration has been intentionally omitted.

18.     **Exhibit 120** to this Declaration has been intentionally omitted.

19.     **Exhibit 121** to this Declaration has been intentionally omitted.

20.     Attached hereto as **Exhibit 122** is a true and correct copy of an email from Stuart Baker dated November 1, 2018, which was produced to the UCC under the Bates number MSF00470861.

21.     Attached hereto as **Exhibit 123** is a true and correct copy of an email exchange between Mortimer Sackler and Antony Mattessich, dated April 24, 2017, which was produced to the UCC under the Bates number MSF00575712.

22.     Attached hereto as **Exhibit 124** is a true and correct copy of an email from Stuart Baker to Richard Sackler, dated November 22, 2013, which was produced to the UCC under the Bates number RSF_OLK00070002.

5

PUBLICLY FILED PER STIPULATION [ECF 2140]

REDACTED

23.     Attached hereto as **Exhibit 125** is a true and correct copy of a July 27, 2011 email from Cecil Pickett forwarding a Stuart Baker email with attachment titled "Proposed 2012 Calendar of Meetings and Board Calls," which was produced to the UCC under the Bates numbers PPLPUCC9002657293-94.

24.     Attached hereto as **Exhibit 126** is a true and correct copy of an email chain dated June 21, 2019, which was produced to the UCC under the Bates number MSF00997606.

25.     Attached hereto as **Exhibit 127** is a true and correct copy of an excel spreadsheet containing text messages including Dame Theresa Sackler and others, which was produced to the UCC under the Bates number MSF90089695.

26.     Attached hereto as **Exhibit 128** is a true and correct copy of an email from Paul Gallagher, Senior Managing Director at Teneo, dated May 20, 2019, which was produced to the UCC under the Bates number PPLPUCC002663187.

27.     Attached hereto as **Exhibit 129** is a true and correct copy of an email from Paul Gallagher, Senior Managing Director at Teneo, dated May 20, 2019, which was produced to the UCC under the Bates number PPLPUCC002664919.

28.     Attached hereto as **Exhibit 130** is a true and correct copy of an email from Mortimer Sackler dated May 21, 2019, which was produced to the UCC under the Bates number PPLPUCC002662986.

29.     **Exhibit 131** to this Declaration has been intentionally omitted.

30.     Attached hereto as **Exhibit 132** is a true and correct copy of an email from David Lundie to John Donovan, dated February 8, 2012, which was produced to the UCC under the Bates number PPLPC036000177151.

6

REDACTED

31.    Attached hereto as **Exhibit 133** is a true and correct copy of a September 2010 email chain which was produced to the UCC under the Bates number PPLPUCC002449097.

32.    Attached hereto as **Exhibit 134** is a true and correct copy of an email from Michael Friedman dated March 5, 2006, which was produced to the UCC under the Bates number PPLPUCC002603602.

33.    Attached hereto as **Exhibit 135** is a true and correct copy of a February 15, 2011 email from Jonathan Sackler attaching Purdue board and management discussion materials, which was produced to the UCC under the Bates number PPLPUCC9003800123.

34.    Attached hereto as **Exhibit 136** is a true and correct copy of excerpts from the minutes of a March 4, 2003 meeting of the board of directors of Purdue Pharma Inc., which was produced to the UCC under the Bates number PPLPUCC500647319.

35.    Attached hereto as **Exhibit 137** is a true and correct copy of a May 5, 2017 email from Craig Landau attaching a Purdue diagnostic and forward plan, which was produced to the UCC under the Bates number PWG004670879.

36.    Attached hereto as **Exhibit 138** is a true and correct copy of a February 2007 email chain which was produced to the UCC under the Bates number PPLPC061000013858.

37.    Attached hereto as **Exhibit 139** is a true and correct copy of a March 2008 email chain which was produced to the UCC under the Bates number PPLPC012000174476.

38.    Attached hereto as **Exhibit 140** is a true and correct copy of an February 2012 email chain which was produced to the UCC under the Bates number PPLPUCC9002981007.

39.    Attached hereto as **Exhibit 141** is a true and correct copy of a November 2013 email chain which was produced to the UCC under the Bates number SideA00429689.

PUBLICLY FILED PER STIPULATION [ECF 2140]

REDACTED

40.     Attached hereto as **Exhibit 142** is a true and correct copy of a June 2015 email chain which was produced to the UCC under the Bates number PPLPUCC9004448656.

41.     Attached hereto as **Exhibit 143** is a true and correct copy of excerpts from a February 11, 2010 letter from Amy D'Agostino to Cecil Pickett attaching executed Director Agreements, which was produced to the UCC under the Bates number CP0000001.

42.     Attached hereto as **Exhibit 144** is a true and correct copy of Executive Committee Meeting Notes & Actions, dated September 21, 2011, which was produced to the UCC under the Bates number RSF_OLK00035017.

43.     Attached hereto as **Exhibit 145** is a true and correct copy of an April 2012 email chain, which was produced to the UCC under the Bates number PPLPC012000372585.

44.     Attached hereto as **Exhibit 146** is a true and correct copy of a September 11, 2013 memorandum from McKinsey to John Stewart and Russ Gasdia, which was produced to the UCC under the Bates number PPLPC012000441614.

45.     Attached hereto as **Exhibit 147** is a true and correct copy of an August 15, 2013 email from Richard Sackler, which was produced to the UCC under the Bates number PPLPUCC9002391802.

46.     Attached hereto as **Exhibit 148** is a true and correct copy of an email from Stuart Baker dated August 21, 2013, which was produced to the UCC under the Bates number PPLPC045000016165.

47.     Attached hereto as **Exhibit 149** is a true and correct copy of an April 6, 2014 email from Edward Mahony, which was produced to the UCC under the Bates number PPLPC012000471641.

PUBLICLY FILED PER STIPULATION [ECF 2140]

REDACTED

48.     Attached hereto as **Exhibit 150** is a true and correct copy of excerpts from a presentation titled: Changes in prescriptions of OxyContin and OPANA ER after introduction of tamper resistant formulations among potentially problematic and comparator prescribers, which was produced to the UCC under the Bates number PPLPC019000826509.

49.     Attached hereto as **Exhibit 151** is a true and correct copy of a May 21, 2007 email and attached May 2007 calendar printout, which was produced to the UCC under the Bates numbers PPLPUCC001531749-50.

50.     Attached hereto as **Exhibit 152** is a true and correct copy of excerpts from an August 2013 email from Donna Condon attaching an August 8, 2013 memorandum from McKinsey to John Stewart and Russ Gasdia, which was produced to the UCC under the Bates number MDSF00986947.

51.     Attached hereto as **Exhibit 153** is a true and correct copy of a June 2014 email chain, which was produced to the UCC under the Bates number PPLPC045000017003.

52.     Attached hereto as **Exhibit 154** is a true and correct copy of excerpts from a Purdue OxyContin Annual Marketing Plan, dated October 6, 2013, which was produced to the UCC under the Bates number PAK000062549.

53.     Attached hereto as **Exhibit 155** is a true and correct copy of excerpts from an August 15, 2013 Purdue board meeting agenda and attached August 8, 2013 memorandum from McKinsey which was produced to the UCC under the Bates number PPLP004409890.

54.     Attached hereto as **Exhibit 156** is a true and correct copy of an October 8, 2011 Google news alert, which was produced to the UCC under the Bates number RSF00683542.

55.     Attached hereto as **Exhibit 157** is a true and correct copy of a November 1, 2013 Google news alert, which was produced to the UCC under the Bates number RSF_OLK00008429.

PUBLICLY FILED PER STIPULATION [ECF 2140]

REDACTED

56.    Attached hereto as **Exhibit 158** is a true and correct copy of an April 18, 2015 Google news alert, which was produced to the UCC under the Bates number MDSF00514742.

57.    Attached hereto as **Exhibit 159** is a true and correct copy of a July 2016 email chain, which was produced to the UCC under the Bates number PWG004484978.

58.    Attached hereto as **Exhibit 160** is a true and correct copy of a January-February 2008 email chain, which was produced to the UCC under the Bates number SideA00391976.

59.    Attached hereto as **Exhibit 161** is a true and correct copy of a February 2008 email chain, which was produced to the UCC under the Bates number PPLPC042000011810.

60.    Attached hereto as **Exhibit 162** is a true and correct copy of an October 2014 email chain, which was produced to the UCC under the Bates number PPLPUCC000335135.

61.    Attached hereto as **Exhibit 163** is a true and correct copy of document titled "CEO Considerations," which was produced to the UCC under the Bates number PPLPUCC001662356.

62.    Attached hereto as **Exhibit 164** is a true and correct copy of excerpts from a Dec. 6, 2019 "Presentation of Defenses ('Side A')," which was provided to the UCC by counsel for Side A.

63.    Attached hereto as **Exhibit 165** is a true and correct copy of excerpts from an October 8, 2010 Purdue news summary, which was produced to the UCC under the Bates number PPLPC061000060749.

64.    Attached hereto as **Exhibit 166** is a true and correct copy of an April 2012 email chain, which was produced to the UCC under the Bates number MARSH-PURDUE-001112.

65.    Attached hereto as **Exhibit 167** is a true and correct copy of a May 11, 2012 email and attached presentation and timeline, which was produced to the UCC under the Bates number MARSH-PURDUE-001768.

PUBLICLY FILED PER STIPULATION [ECF 2140]

REDACTED

66.     Attached hereto as **Exhibit 168** is a true and correct copy of a May 2012 email chain, which was produced to the UCC under the Bates number MARSH-PURDUE-001777.

67.     Attached hereto as **Exhibit 169** is a true and correct copy of a July 2015 email chain, which was produced to the UCC under the Bates number MDSF00450185.

68.     Attached hereto as **Exhibit 170** is a true and correct copy of a June 2016 email chain, which was produced to the UCC under the Bates number MDSF00010697.

69.     Attached hereto as **Exhibit 171** is a true and correct copy of excerpts from a February 29, 2012 Purdue news summary, which was produced to the UCC under the Bates number IACS_ESI_0000490680.

70.     Attached hereto as **Exhibit 172** is a true and correct copy of an March 30, 2016 letter from Moody's Investor Services, which was produced to the UCC under the Bates number PPLPUCC003938943.

71.     Attached hereto as **Exhibit 173** is a true and correct copy of an April 7, 2016 letter from Standard & Poor's Ratings Services, which was produced to the UCC under the Bates number PPLPUCC500143127.

72.     Attached hereto as **Exhibit 174** is a true and correct copy of a document titled "Proposal Regarding Board Practices," which was produced to the UCC under the Bates number MSF00144650.

73.     Attached hereto as **Exhibit 175** is a true and correct copy of a July 16, 2017 email from Mortimer Sackler which was produced to the UCC under the Bates number SideA00229177.

74.     Attached hereto as **Exhibit 176** is a true and correct copy of a March 10, 2008 email from Richard Sackler which was produced to the UCC under the Bates number PPLPC023000164605.

PUBLICLY FILED PER STIPULATION [ECF 2140]

REDACTED

75.     Attached hereto as **Exhibit 177** is a true and correct copy of an April-May 2011 email chain which was produced to the UCC under the Bates number PPLPUCC9000363533.

76.     Attached hereto as **Exhibit 178** is a true and correct copy of *Purdue's Written Responses to 30(b)(6) Topics*, served in connection with *In re: National Prescription Opiate Litigation*, MDL No. 2804, in the United States District Court, Northern District of Ohio, which was produced to the UCC under the Bates number POK003735973.

77.     Attached hereto as **Exhibit 179** is a true and correct copy of a June 18, 2014 Purdue news summary, which was produced to the UCC under the Bates number POK003746339.

78.     Attached hereto as **Exhibit 180** is a true and correct copy of an April 12, 2012 OxyContin Market Events presentation, which was produced to the UCC under the Bates number PPLPC012000372437.

79.     Attached hereto as **Exhibit 181** is a true and correct copy of excerpts from an August 13, 2014 presentation from JP Morgan, which was produced to the UCC under the Bates number PPLPUCC000281516.

80.     Attached hereto as **Exhibit 182** is a true and correct copy of the Purdue plea agreement with the United States dated October 20, 2020 and filed in these proceedings at EFC No. 1828-2.

81.     Attached hereto as **Exhibit 183** is a true and correct copy of excerpts from a notification of patent decision in *In re Oxycotin Antitrust Litig.*, No. 1:06-cv-13095-SHS (S.D.N.Y. Jan. 7, 2008), which was produced to the UCC under the Bates number PURCHI-000834581.

82.     Attached hereto as **Exhibit 184** is a true and correct copy of an August 17, 2020 letter to Mitchell Hurley.

PUBLICLY FILED PER STIPULATION [ECF 2140]

REDACTED

83.     Attached hereto as **Exhibit 185** is a true and correct copy of excerpts from the audited combined financial statements of Purdue for years ended December 31, 2007 and 2006, which was produced to the UCC under the Bates number PPLPUCC500056846.

84.     Attached hereto as **Exhibit 186** is a true and correct copy of a May 1999 email chain, which was produced to the UCC under the Bates number PPLPUCC000004987.

85.     Attached hereto as **Exhibit 187** is a true and correct copy of a March 2007 email chain, which was produced to the UCC under the Bates number PPLPUCC004057767.

86.     Attached hereto as **Exhibit 188a** is a true and correct copy of privilege slip sheet, which was produced to the UCC under the Bates number PPLPC051000035807, and is identified in metadata as the parent document of PPLPC051000035808 (Ex. 188b to this Declaration).

87.     Attached hereto as **Exhibit 188b** is a true and correct copy of a 2006 Comment published in Northwestern University Law Review titled: "West Virginia's Painful Settlement: How the OxyContin Phenomenon and Unconventional Theories of Tort Liability May Make Pharmaceutical Companies Liable for Black Markets," which was produced to the UCC under the Bates number PPLPC051000035808.

88.     Attached hereto as **Exhibit 189** is a true and correct copy of a Purdue News Summary circulated on June 20, 2014, which was produced to the UCC under the Bates number PAZ000115626.

89.     Attached hereto as **Exhibit 190** is a true and correct copy of a June 2014 email chain, which was produced to the UCC under the Bates number PPLPC045000017003.

90.     Attached hereto as **Exhibit 191** is a true and correct copy of excerpts from the audited combined financial statements of Purdue for years ended December 31, 2008 and 2007, which was produced to the UCC under the Bates number PPLPUCC500056885.

PUBLICLY FILED PER STIPULATION [ECF 2140]

REDACTED

91.     Attached hereto as **Exhibit 192** is a true and correct copy of a May 2012 email chain, which was produced to the UCC under the Bates number MARSH-PURDUE-001863.

92.     Attached hereto as **Exhibit 193** is a true and correct copy of a April 2012 email chain, which was produced to the UCC under the Bates number MARSH-PURDUE-001114.

93.     Attached hereto as **Exhibit 194** is a true and correct copy of a May 2012 email chain, which was produced to the UCC under the Bates number MARSH-PURDUE-001804.

94.     Attached hereto as **Exhibit 195** is a true and correct copy of excerpts from a privilege log dated March 5, 2019, produced by the Debtors in connection with MDL litigation, and provided to the UCC in connection with these proceedings.

95.     Attached hereto as **Exhibit 196** is a true and correct copy of a November 2020 email chain between counsel for Norton Rose Fulbright, the UCC, and the Debtors, among others.

96.     Attached hereto as **Exhibit 197** is a true and correct copy of a November 8, 2020 email from Katherine Porter to counsel for the Debtors concerning deposition scheduling.

97.     Attached hereto as **Exhibit 198** is a true and correct copy of a November 15, 2020 email from Katherine Porter attaching the current deposition schedule in these proceedings.

98.     Attached hereto as **Exhibit 199** of  State Settlement Agreement and Release dated July 17, 2007, and entered into by the State of Washington and The Purdue Frederick Company, Inc. and Purdue Pharma L.P., which was produced to the UCC under the Bates number PPLPC030000403213.

99.     Attached hereto as **Exhibit 200** is a true and correct copy of the online curriculum vitae of Norton Rose Fulbright attorney Donald Strauber, which was obtained on November 17, 2020, at https://www.nortonrosefulbright.com/en-us/people/1016474.

PUBLICLY FILED PER STIPULATION [ECF 2140]

REDACTED

100.    Attached hereto as **Exhibit 201** is a true and correct copy of the affidavit of Edward B. Mahony, dated February 4, 2014, and submitted in connection with the lawsuit styled *Purdue Pharma L.P. v. Combs*, Case No. 2013-CA-001941, in the Commonwealth of Kentucky Court of Appeals.

101.    Attached hereto as **Exhibit 202** is a true and correct copy of the following journal article: Ryan N. Hansen, et al., Economic Costs of Nonmedical Use of Prescription Opioids, 27 CLINICAL J. OF PAIN 194 (2011).

102.    Attached hereto as **Exhibit 203** is a true and correct copy of excerpts from the audited combined financial statements of Purdue for years ended December 31, 2009 and 2008, which was produced to the UCC under the Bates number PPLPUCC500056924.

103.    Attached hereto as **Exhibit 204** is a true and correct copy of a December 24, 2010 email to Richard Sackler titled "What's new for 'oxycontin' in PubMed," which was produced to the UCC under the Bates number RSF_OLK00055037.

104.    Attached hereto as **Exhibit 205** is a true and correct copy of excerpts from the audited combined financial statements of Purdue for years ended December 31, 2010 and 2009, which was produced to the UCC under the Bates number PPLPUCC500056963.

105.    Attached hereto as **Exhibit 206** is a true and correct copy of an October 2014 email chain, which was produced to the UCC under the Bates number PPLPC045000017072.

106.    Attached hereto as **Exhibit 207** is a true and correct copy of an email from Howard Udel forwarding a March 10, 2008 article titled: "Anatomy Of A Patent Dispute: Purdue Pharma's OxyContin Battle," which was produced to the UCC under the Bates number MSF01116645.

107.    Attached hereto as **Exhibit 208** is a true and correct copy of an excerpt from a distributions summary spreadsheet provided by Side A to the UCC.

PUBLICLY FILED PER STIPULATION [ECF 2140]

REDACTED

108.    Attached hereto as **Exhibit 209** is a true and correct copy of a March 2007 email chain, which was produced to the UCC under the Bates number PPLPUCC9004824942.

109.    Attached hereto as **Exhibit 210** is a true and correct copy of an annual report review letter to Purdue from the Office of Inspector General, U.S. Department of Health & Human Services, dated May 6, 2009, which was produced to the UCC under the Bates number PNY000127987.

110.    Attached hereto as **Exhibit 211** is a true and correct copy of an annual report review letter to Purdue from the Office of Inspector General, U.S. Department of Health & Human Services, dated April 1, 2010, which was produced to the UCC under the Bates number PPLP004250164.

111.    Attached hereto as **Exhibit 212** is a true and correct copy of an annual report review letter to Purdue from the Office of Inspector General, U.S. Department of Health & Human Services to Purdue, dated January 28, 2011, which was produced to the UCC under the Bates number PPLPUCC001877705.

112.    Attached hereto as **Exhibit 213** is a true and correct copy of an annual report review letter to Purdue from the Office of Inspector General, U.S. Department of Health & Human Services to Purdue, dated March 8, 2012, which was produced to the UCC under the Bates number PPLPUCC001884369.

113.    Attached hereto as **Exhibit 214** is a true and correct copy of an annual report review letter to Purdue from the Office of Inspector General, U.S. Department of Health & Human Services to Purdue, dated January 24, 2013, which was produced to the UCC under the Bates number PPLP004427723.

PUBLICLY FILED PER STIPULATION [ECF 2140]

REDACTED

114.    Attached hereto as **Exhibit 215** is a true and correct copy of an August 2014 email chain, which was produced to the UCC under the Bates number PPLPUCC9004797180.

115.    Attached hereto as **Exhibit 216** is a true and correct copy of the September 3, 2019 Amendment to the Shareholders' Agreement executed between Purdue Pharma Inc. and certain PPI Shareholders, which was provided to the UCC by the Debtors.

116.    Attached hereto as **Exhibit 217** is a true and correct copy of hearing transcript excerpts from the Nov. 19, 2019 hearing in this matter.

117.    Attached hereto as **Exhibit 218** is a true and correct copy of deposition transcript excerpts from the October 30, 2020 deposition of Cecil Pickett, Ph.D.

118.    Attached hereto as **Exhibit 219** is a true and correct copy of deposition transcript excerpts from the November 4, 2020 deposition of Stuart Baker.

119.    Attached hereto as **Exhibit 220** is a true and correct copy of deposition transcript excerpts from the September 22, 2020 deposition of Stephen Ives.

120.    Attached hereto as **Exhibit 221** is a true and correct copy of deposition transcript excerpts from the August 28, 2020 deposition of David Sackler.

121.    Attached hereto as **Exhibit 222** is a true and correct copy of deposition transcript excerpts from the September 2, 2020 deposition of Marianna Sackler.

122.    Attached hereto as **Exhibit 223** is a true and correct copy of deposition transcript excerpts from the November 5, 2020 deposition of Kathe Sackler.

123.    Attached hereto as **Exhibit 224** is a true and correct copy of deposition transcript excerpts from the October 27, 2020 deposition of John Stewart.

124.    Attached hereto as **Exhibit 225** is a true and correct copy of deposition transcript excerpts from the October 30, 2020 deposition of Mark Timney.

PUBLICLY FILED PER STIPULATION [ECF 2140]

<span style="color:red">REDACTED</span>

125.    Attached hereto as **Exhibit 226** is a true and correct copy of deposition transcript excerpts from the November 10, 2020 deposition of Mortimer D.A. Sackler.

126.    Attached hereto as **Exhibit 227** is a true and correct copy of deposition transcript excerpts from the September 24, 2020 deposition of Theresa Sackler.

127.    Attached hereto as **Exhibit 228** is a true and correct copy of deposition transcript excerpts from the November 16, 2020 deposition of Peter Boer.

Executed on: November 18, 2020

*/s/ Arik Preis*
Arik Preis

<span style="color:red">PUBLICLY FILED PER STIPULATION [ECF 2140]</span>

UNREDACTED - CONTAINS OUTSIDE PROFESSIONALS' EYES ONLY INFORMATION
TREAT SUBJECT TO PROTECTIVE ORDER

# EXHIBIT 172

UNREDACTED — CONTAINS OUTSIDE PROFESSIONALS' EYES ONLY INFORMATION
TREAT SUBJECT TO PROTECTIVE ORDER



7 World Trade Center
250 Greenwich Street
New York, NY 10007
www.moodys.com

30 March, 2016

For the attention of: Thomas Leggett

Re: Indicative Ratings

Dear Mr. Leggett,

At your request, Moody's Investors Service ("**Moody's**") has reviewed the business fundamentals and financial condition of Purdue Pharma L.P. *(*Purdue, or the Issuer), as well as the terms and conditions surrounding the Issuer's proposed financing, as described below with a view to assigning Indicative Ratings.

A Moody's Indicative Rating is an unmonitored, point-in-time opinion of the potential credit ratings of an issuer or a proposed debt issuance by an issuer contemplating such a debt issuance at some future date. Indicative Ratings are not equivalent to and do not represent traditional Moody's credit ratings. However, Indicative Ratings are expressed on Moody's traditional rating scale. Please refer to Moody's *Rating Symbols & Definitions*, which is available at www.moodys.com, for the meaning of Moody's ratings and other products/services.

Based on the documents and information provided to Moody's to date and particularly on key assumptions and considerations, including but not limited to those presented below, Moody's has assigned the Indicative Ratings detailed below. This letter and the Indicative Ratings contained within it are subject in all respects to the terms of your application for the Indicative Ratings.

## <u>Indicative Ratings</u>

Moody's has assigned the below Indicative Ratings:

Corporate Family Rating at Ba3
Probability of Default Rating at Ba3-PD
$100 million Senior Secured Revolving Credit Facility at Ba3 (LGD 3)
$400 million Senior Secured Term Loan at Ba3 (LGD 3)

Outlook: Stable

RATING RATIONALE

The Ba3 indicative Corporate Family Rating is supported by Purdue's low financial leverage, with debt/EBITDA of around 1.0x, and our expectation of conservative leverage tolerance going forward. The low funded debt contemplated results in very strong interest coverage ratios, cash flow to debt coverage ratios and cash to debt ratios. This will allow the company to absorb considerable operating or legal setbacks with minimal risk of debt impairment. The rating reflects our view that an event that

PUBLICLY FILED PER STIPULATION [ECF No. 2140]

UNREDACTED 2 CONTAINS OUTSIDE PROFESSIONALS' EYES ONLY INFORMATION
TREAT SUBJECT TO PROTECTIVE ORDER

leads to a very rapid decline in underlying OxyContin demand (such as an AB rated generic substitute) is unlikely in the next two to three years. The rating is also supported by Purdue's good scale and the company's strong competitive position in the opioid pain market.

The Ba3 is constrained by Purdue's very high concentration in OxyContin, which represents over 80% of total revenue. Further, the company is nearly entirely concentrated in the opioid pain market – a mature and declining market that is subject to a high level of government scrutiny and widespread efforts to reduce opioid abuse in the US. As a result of declining market demand, increased competition from new branded abuse-deterrent medications and authorized generic sales of OxyContin (as per Purdue's settlement agreement with generic drug companies), we anticipate steady erosion of OxyContin over the next several years. Given a limited internal pipeline of new products within the credit group to offset this decline, Purdue will likely need to pursue acquisitions which could lead to higher leverage. While acquisitions could be positive if they reduce Purdue's exposure to OxyContin, the company's acquisition strategy is somewhat unclear and targets are yet unidentified. The rating is further constrained by litigation risk and the likelihood that excess cash will not benefit creditors but will instead be distributed to entities outside of the credit group.

The term loan rating is the same as the CFR, as it represents the majority of liabilities in the capital structure. While the company has about $150 million of unsecured payables and pension liabilities, we do not believe it would provide material loss absorption in an event of default.

The assignment of the indicative ratings is based on, but not limited to, several key assumptions including:

- **Composition of the capital structure:** No other debt incurred beyond the $500 million credit facility, which is to be comprised of a $100 million revolver and a $400 million term loan.

- **No significant debt outside of the credit group:** There is no material debt or liabilities outside the credit group that represents a potential cash call for Purdue.

- **Credit agreement will have sufficient protections to creditors:** The credit agreement will have several protections to prevent excessive cash leakage out of the credit group, including: a maximum leverage covenant, excess cash flow sweep requirements, and restricted payment terms.

## Disclaimers

The Indicative Ratings have been assigned on a "point-in-time" basis and will not be monitored going forward.

Credit ratings issued by Moody's are Moody's current opinions of the relative future credit risk of entities, credit commitments, or debt or debt-like securities and are not statements of current or historical fact. Moody's credit ratings address credit risk only and do not address any other risk, including but not limited to: liquidity risk, market value risk, or price volatility. Such other non-credit risks may have a significant effect on the yield to investors.

Neither Moody's Indicative Ratings nor its credit ratings are, and they do not provide, investment advice or recommendations to purchase, sell, or hold particular securities. Moody's issues its Indicative Ratings and credit ratings with the expectation and understanding that each investor will make its own evaluation of each security that is under consideration for purchase, holding, or sale.

PUBLICLY FILED PER STIPULATION [ECF No. 2140]

PROFESSIONALS' EYES ONLY/HIGHLY CONFIDENTIAL—SUBJECT TO PROTECTIVE ORDER          PPLPUCC003938944

UNREDACTED — CONTAINS OUTSIDE PROFESSIONALS' EYES ONLY INFORMATION
TREAT SUBJECT TO PROTECTIVE ORDER

Under no circumstances shall Moody's or any of its affiliates or any of their respective directors, officers or employees have any liability to any person or entity for (a) any loss or damage in whole or in part caused by, resulting from, or relating to, any action or error (negligent or otherwise) or other circumstance or contingency within or outside the control of Moody's or any of its or its affiliates' directors, officers, employees or agents in connection with the Indicative Ratings or the procurement, collection, compilation, analysis, interpretation, communication, publication or delivery of any information used in assigning the Indicative Ratings, or (b) any direct, indirect, special, consequential, compensatory or incidental damages whatsoever (including without limitation, lost profits), even if Moody's is advised in advance of the possibility of such damages, resulting from the Indicative Ratings or the use of, or inability to use, any information in connection with the Indicative Ratings. **ALL INFORMATION, INCLUDING THE INDICATIVE RATING OR ANY FEEDBACK OR OTHER COMMUNICATION RELATING THERETO, IS PROVIDED "AS IS" WITHOUT REPRESENTATION OR WARRANTY OF ANY KIND.   MOODY'S MAKES NO REPRESENTATION OR WARRANTY, EXPRESS OR IMPLIED, AS TO THE ACCURACY, TIMELINESS, COMPLETENESS, MERCHANTABILITY OR FITNESS FOR ANY PARTICULAR PURPOSE OF ANY SUCH INFORMATION.**

The assignment of an Indicative Rating or a credit rating does not create a fiduciary relationship between Moody's and you or between Moody's and other recipients of the Indicative Rating or credit rating.  Moody's has not consented to and will not consent to being named as an "expert" under the applicable securities laws, including, without limitation, Section 7 of the Securities Act of 1933.

We would like to draw your attention to the fact that while the information and assumptions conveyed to Moody's in connection with the Indicative Ratings may broadly describe the ultimately negotiated agreements and final terms of the actual financing, these final terms and agreements could deviate in many significant respects from the information provided to Moody's for purposes of assigning the Indicative Ratings. The final terms, contractual provisions and debt structure of the actual financing could be collectively stronger or weaker than those reviewed by Moody's to date and a change in even a single contractual provision, or any difference between the final terms of the actual financing and the information provided to us, could have the potential to impact the credit quality of the transaction. Accordingly, the definitive credit ratings assigned to an actual financing will reflect final terms and conditions and could conceivably be higher or lower than the assigned Indicative Ratings.

PUBLICLY FILED PER STIPULATION [ECF No. 2140]

UNREDACTED - CONTAINS OUTSIDE PROFESSIONALS' EYES ONLY INFORMATION
TREAT SUBJECT TO PROTECTIVE ORDER

**Confidentiality**

Please be aware that the contents of this letter are strictly confidential. The Indicative Ratings are only for the benefit of the Issuer and should not be disclosed to any other person except strictly in accordance with your application for the Indicative Ratings. Moody's reserves the right to publish or disclose the Indicative Rating in accordance with your application for the Indicative Rating, including, without limitation (i) as required by law, regulation, judicial or governmental order, subpoena or other legal process or as requested or required by any governmental or regulatory authority, or (ii) in the event that such Indicative Rating is disclosed (other than by Moody's or any affiliate of Moody's) to any third party other than as expressly permitted pursuant to the confidentiality provisions set forth in your application for the Indicative Ratings.

Sincerely,

Jessica Gladstone
Senior Vice President

*Moody's Investors Service*

Cc: JG, Global Middle Office, Peter H. Abdill

PUBLICLY FILED PER STIPULATION [ECF No. 2140]

UNREDACTED - CONTAINS OUTSIDE PROFESSIONALS' EYES ONLY INFORMATION
TREAT SUBJECT TO PROTECTIVE ORDER

# EXHIBIT 173

PUBLICLY FILED PER STIPULATION [ECF No. 2140]

UNREDACTED 2 CONTAINS OUTSIDE PROFESSIONALS' EYES ONLY INFORMATION
TREAT SUBJECT TO PROTECTIVE ORDER



Redacted
Director
55 Water Street
New York, NY 10041-003
Tel: 416-507-2561
Redacted @standardandpoors.com

April 7, 2016

Mr. Jean-Jacques Charhon
Executive Vice President and Chief Financial Officer
Purdue Pharma L.P.
One Stamford Forum
Stamford, CT 06901-3431

Dear Mr. Charhon:

Thank you for requesting that Standard & Poor's Ratings Services ("Ratings Services") provide you
with feedback through its Rating Evaluation Service (RES) on the indicative ratings impact for
Purdue Pharma ("Purdue"). The single scenario provided pertains to a potential issuance of a $400
senior secured term loan, with a $100 million revolver, to help fund future acquisitions in the
pharmaceutical space in order to diversify the current portfolio and drive future growth. Ratings
Services has reviewed the specific scenario you have provided, and with certain assumptions,
provide the following summary analysis reflecting our RES committee response.

**Scenarios Presented**

> ➢ **Scenario 1** – ($400 million of new debt) The acquisition financing will comprise:
> - o     $400 million of senior secured term loan debt.
> - o     $100 million senior secured revolver, undrawn at close of deal.

**Summary of Indicative Rating Conclusions***

|  | Current Ratings | Scenario 1 |
|---|---|---|
| Corporate Credit Rating | N/A | BB |
| Outlook | N/A | Stable |
| Senior Secured/Recovery | N/A | BBB-/1 |

*Assumes that the hypothetical scenario submitted to Ratings Services by you is implemented in
accordance with information and representations you have provided.

PUBLICLY FILED PER STIPULATION [ECF No. 2140]

PROFESSIONALS' EYES ONLY/HIGHLY CONFIDENTIAL—SUBJECT TO PROTECTIVE ORDER          PPLPUCC500143127

UNREDACTED — CONTAINS OUTSIDE PROFESSIONALS' EYES ONLY INFORMATION
TREAT SUBJECT TO PROTECTIVE ORDER.

*Rating Evaluation Service – Abbott Laboratories*

**Indicative Ratings Score Snapshot**

|  | Current Ratings | Scenario 1 |
|---|---|---|
| **BUSINESS RISK** | N/A | Weak |
| *Country risk* | N/A | Very Low Risk |
| *Industry risk* | N/A | Low Risk |
| *Competitive position* | N/A | Weak |
| **FINANCIAL RISK** | N/A | Minimal |
| *Cash Flow/Leverage* | N/A | Minimal |
| **ANCHOR** | N/A | *bb+* |
| **MODIFIERS** |  |  |
| *Diversification/portfolio effect* | N/A | Neutral |
| *Capital structure* | N/A | Neutral |
| *Financial policy* | N/A | Neutral |
| *Liquidity* | N/A | Adequate |
| *Management/governance* | N/A | Fair |
| *Comparable ratings analysis* | N/A | Negative (-1 notch) |
| **Group or government influence** | N/A | BB |
| **ISSUER CREDIT RATING** | N/A | BB |
| **OUTLOOK** | N/A | Stable |

**Supporting Rationale**

Upon Purdue's announcement that it will issue the $400 million term loan B, Standard & Poor's Ratings Services would expect to respond with a public research update indicating the corporate credit rating as well as the issue-level and recovery ratings on the term loan B. The specificity of our comments regarding the ratings would depend on the availability of definitive information at the time. Assuming that Purdue had made a final decision regarding the proposed debt amount, and that plan was consistent with the scenario provided, we would indicate the rating conclusions as detailed below in our external communication.

**Scenario 1: ($400 million term loan B): BB/Stable:** Under this single scenario, issuing a $400 million term loan B, Ratings Services would assign a 'BB' corporate credit rating to Purdue; the outlook would be stable, provided that the scenario is implemented in accordance with information and representations provided by Purdue to Ratings Services.

The new secured bank facilities would likely be rated 'BBB-', two notches above the corporate credit rating with a Recovery Rating of '1', indicating Ratings Services' view that lenders can expect "very high" (90% to 100%) recovery in the event of payment default.

 ➢ The 'BB' corporate credit rating is underpinned by our belief that product and therapeutic concentration is offset by a conservative financial policy and strong credit metrics, including leverage below 1.5x, even after issuance of the prospective term loan.
 ➢ Product and therapeutic concentration coupled with the entrance of six authorized generic (AG) competitors to Oxycontin are the primary factors that support our "weak" business risk

PUBLICLY FILED PER STIPULATION [ECF No. 2140]

PROFESSIONALS' EYES ONLY/HIGHLY CONFIDENTIAL—SUBJECT TO PROTECTIVE ORDER          PPLPUCC500143128

*Rating Evaluation Service – Abbott Laboratories*

assessment. This is somewhat offset by a market-leading position with Oxycontin, scale in the manufacturing and supply (to AG competitors) of Oxycontin, and steadily growing diversity in its pharmaceutical portfolio from newer products, Butrans and Hysingla.

➢ A historically conservative financial policy (this is the first debt placement) and very low leverage metrics support our "minimal" financial risk assessment. Pro forma leverage will be about 1.3x in 2016, decreasing to 1.0x in 2017, and then decline to less than 1x thereafter.

➢

➢ Our anchor rating is 'bb+' but our belief that Purdue's credit quality – owing to product and therapeutic concentration – is similar to companies such as Jazz, contribute to the use of a comparable rating analysis modifier: the modifier lowers the anchor by one-notch, to arrive at a corporate credit rating of 'BB'.

➢ Ratings Services has placed significant reliance on management's commitment to credit quality and a conservative financial policy.

➢ Ratings Services would likely assign a stable outlook. The stable outlook would reflect our expectation that, despite revenue contraction in 2016 due to declines in Oxycontin, Purdue will generate more than $300 million of free cash flow and sustain leverage below 1x.

## Recovery Analysis

The term loan would likely be rated 'BBB-', two notches above Purdue's corporate credit rating, and would be assigned a '1' recovery rating, indicating Rating Services' view that lenders could expect "very high" (90% to 100%) recovery of principal in the event of payment default. The credit facilities are secured by substantially all of the assets of Purdue and its subsidiaries.

Ratings Services' default scenario contemplates the introduction of additional generic competitors to Oxycontin, and/or manufacturing problems that inhibit the company's ability to manufacture Purdue's key product, as the trigger point for a potential default or bankruptcy filing. Ratings Services believes that if the borrower were to default, there would continue to be a viable business model driver by the continued demand for Oxycontin, the strength of the company's franchise, and its other branded and generic products. Therefore, it is believed that lenders would achieve the greatest recovery amounts through reorganization of the company rather than liquidation.

Our recovery analysis assumes an enterprise value of approximately $452 million, based on a conservative 4.5x multiple of emergence EBITDA. After reducing the emergence enterprise value by administrative expenses, there is $438 million of remaining enterprise value. Under the simulated default scenario, there is adequate emergence enterprise value to fully cover the senior secured credit facilities (assuming the revolver is drawn to 85% of its maximum). Therefore, the credit facilities are assigned a recovery rating of '1', indicating Ratings' Services' view that lenders should expect "very high" recovery (90% to 100%) recovery of principal in the event of default.

## General Assumptions:

The ratings evaluation focused on Purdue's prospective operating and financial performance under the proposed scenario.

Key assumptions you have provided to us include:

PUBLICLY FILED PER STIPULATION [ECF No. 2140]

PROFESSIONALS' EYES ONLY/HIGHLY CONFIDENTIAL—SUBJECT TO PROTECTIVE ORDER        PPLPUCC500143129

UNREDACTED – CONTAINS OUTSIDE PROFESSIONALS' EYES ONLY: INFORMATION
TREAT SUBJECT TO PROTECTIVE ORDER

*Rating Evaluation Service – Abbott Laboratories*

> ➤ Term loan issuance of approximately $400 million.
> ➤ Actual operating results will be reasonably in-line with management prepared projections provided March 2016.
> ➤ Underwritten credit facilities will be used to fund potential acquisitions.
> ➤ The proposed bank facilities will be secured by Purdue's assets on a first priority basis.

Ratings Services' analytical judgements include:
> ➤ Our base case revenue and EBITDA projections, to which we made a modest haircut assumption from management prepared projections (provided in March 2016) due to the heavy reliance on Oxycontin.
> ➤ Recovery assumptions, including a somewhat more conservative EBITDA multiple given the reliance on Oxycontin and the expiration of AG contracts in the simulated default year (2020).

### Competitive position: Weak

Our business risk assessment is underpinned by significant product and therapeutic concentration, which are key factors in our assessment of branded pharmaceutical companies. Moreover, we estimate that Oxycontin will lose blockbuster status after AG entry erodes Oxycontin sales to less than a $1 billion in fiscal 2016; it also has a limited pipeline: Purdue has no new molecular entities in its late stage pipeline. Instead, their pipeline consists only of new formulations of three existing, marketed products.

Purdue has significant product and therapeutic concentration. The majority of its sales come from three key products, all of which focus on pain management. One of the products, Oxycontin, accounted for about 84% of 2015 revenues and we expect it will still account for about 65% of sales in 2017. While Purdue benefits from the being one of the leading players in the pain management market, and has some scale and market leadership in Oxycontin, the strength is limited by the small addressable market: the opioid market is less than $7 billion. Another limitation is generic challenges to Oxycontin that we expect will lead to sales declines in projected periods and the loss of blockbuster status for this product. Our base case is that Purdue will lose 56% of its sales from Oxycontin generic entry over the next 3 years (and about 14% of its volume through 2020). Although Purdue settled with the six companies that filed generic challenges to Oxycontin – somewhat mitigating the impact of generic entry over the near-term – those agreements have varied expirations in the 2019-2020 time frame. While Purdue could have exclusive access to the market after those expirations (unless another generic manufacturer comes along in the interim) it could also lose additional market share should any one of those six players receive approval to then commercialize their own generic version of Oxycontin. Purdue's business risk also reflects a weak research and development late stage pipeline: its pipeline consists only of new formulations of existing products and no new molecular entities that could eventually provide product and revenue diversity.

Over the next few years, additional (but albeit modest) diversity will come from growth of Purdue's generic business and will help to reduce concentration in Oxycontin. Presently, it is small and only accounts for 14% of revenues; by the end of 2017 we expect this contribution to increase to 25%. Although future business development transactions will likely bolster the generic business, we do

PUBLICLY FILED PER STIPULATION [ECF No. 2140]

PROFESSIONALS' EYES ONLY/HIGHLY CONFIDENTIAL—SUBJECT TO PROTECTIVE ORDER          PPLPUCC500143130

UNREDACTED 2318 CONTAINS OUTSIDE PROFESSIONALS' EYES ONLY INFORMATION
TREAT SUBJECT TO PROTECTIVE ORDER

not expect the scale of the generics business to increase over the next 1-2 years such that it will support a stronger business risk assessment.

### Cash flow/leverage: Minimal
The company is proposing to issue $400 million of debt. Despite our base case expectation that AG competition will pressure EBITDA, pro forma for this debt issuance leverage will be 1.3x in 2016 with FFO to total debt of about 71% - both indicative of minimal financial risk (defined as leverage of less than 1.5x and FFO/TD of more than 60%). Our selection of free operating cash flow to total debt, which we expect will be 45% in 2016, as a supplemental credit ratio, also supports this assessment. Although our base case expectation is that EBITDA will decline following the AG settlements, the strong levels of free operating cash flow to total debt support our belief that Purdue will generate at least $300 million of free cash flow in the projected years.

### Diversification/portfolio effect: Neutral

### Capital structure: Neutral

### Liquidity: Adequate

### Financial policy: Neutral
Purdue has demonstrated a conservative financial policy with no major debt issuances prior to the contemplated $400 million term loan B. Pro forma for that debt issuance, and our expectation of revenue and EBITDA pressure from Oxycontin AG competition, our base case expectation is that leverage will increase to a maximum of 1.3x and funds from operations (FFO) to total debt of 71%, both in fiscal 2016. At those levels, we believe the company has debt capacity – of about $1.0 billion – before the rating would be pressured. Therefore, we do not expect financial policy to be detrimental to the credit rating over the next 1-2 years.

### Management and governance: Fair

### Comparable rating analysis (CRA): Negative (-1 notch)
The -1 notch for the CRA modifier reflects our belief that, despite an anchor of 'bb+', Purdue's overall credit quality is more comparable to 'BB' rated peer Jazz Pharmaceuticals plc. Purdue and Jazz both have similar scale from a revenue perspective and both companies have product and revenue concentration; in our opinion, both companies will need to diversify to reduce concentration. Moreover, the lack of scale compared to larger companies such as 'BB+'-rated Service Corp. International, also impacted our decision to use this modifier.

*This ratings services evaluation is both preliminary and confidential. It is preliminary in that it is based on hypothetical information presented to us by you. You understand that Ratings Services will not review, modify or surveil this evaluation. Subsequent information or changes to the information previously provided could result in final conclusions that differ from the preliminary proposed conclusions. Please note the conclusions provided herein are based on assumptions you and your team have provided to us. To the extent that these assumptions, our criteria or other*

PUBLICLY FILED PER STIPULATION [ECF No. 2140]

PROFESSIONALS' EYES ONLY/HIGHLY CONFIDENTIAL—SUBJECT TO PROTECTIVE ORDER       PPLPUCC500143131

UNREDACTED 2 CONTAINS OUTSIDE PROFESSIONALS' EYES ONLY: INFORMATION
TREAT SUBJECT TO PROTECTIVE ORDER

*Rating Evaluation Service – Abbott Laboratories*

*factors change, the rating implications could also change. You understand and agree that we are not financial advisors to you and that in performing the RES, Ratings Services is providing indicative rating opinions on the scenarios presented; it is not endorsing or advocating any particular course of action. Nothing in this report is intended to create, or should be construed as creating, a fiduciary relationship between you and us and recipients of the indicative rating opinions. We have not consented to and will not consent to being named an "expert" under applicable securities laws. Neither Ratings Services' RES or any indicative rating set out herein is a credit rating, nor is it a recommendation to buy, hold or sell any financial obligation of an issuer. This letter is subject to the Terms and Conditions attached to the Engagement Letter applicable to the RES (the "applicable T&Cs").*

*Confidential Dissemination of the Evaluation. The rating services evaluation, including this letter, is provided by Ratings Services to you on a confidential basis. You may not disclose the evaluation (or for the avoidance of doubt, any indicative rating set out therein) or this letter, to third parties except: (i) as required by law or regulation, or for regulatory purposes, or (ii) to third parties that are bound by confidentiality obligations; and in each case, only in accordance with law and in its entirety without any changes (and provided a copy of the applicable T&Cs are attached thereto). If the evaluation is disclosed other than in accordance with the Engagement Letter, including the applicable T&Cs, Ratings Services reserves the right to publicly comment on the evaluation and/or publish this letter.*

PUBLICLY FILED PER STIPULATION [ECF No. 2140]

PROFESSIONALS' EYES ONLY/HIGHLY CONFIDENTIAL—SUBJECT TO PROTECTIVE ORDER         PPLPUCC500143132

UNREDACTED – CONTAINS OUTSIDE PROFESSIONALS' EYES ONLY INFORMATION
TREAT SUBJECT TO PROTECTIVE ORDER

*Rating Evaluation Service – Abbott Laboratories*

Should you have questions, please do not hesitate to contact me.

Sincerely,
Standard & Poor's Ratings Services

**Redacted**

**Redacted**
Director

PUBLICLY FILED PER STIPULATION [ECF No. 2140]

PROFESSIONALS' EYES ONLY/HIGHLY CONFIDENTIAL—SUBJECT TO PROTECTIVE ORDER                    PPLPUCC500143133