Gerard Uzzi
Alexander B. Lees
**MILBANK LLP**
55 Hudson Yards
New York, New York 10001
Telephone:    (212) 530-5000
Facsimile:    (212) 530-5219

Gregory P. Joseph
Mara Leventhal
**JOSEPH HAGE AARONSON LLC**
485 Lexington Avenue, 30th Floor
New York, New York 10017
Telephone:    (212) 407-1200
Facsimile:    (212) 407-1280

*Counsel for the Raymond Sackler Family*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re: | Chapter 11 |
| PURDUE PHARMA L.P., *et al.*, | Case No. 19-23649 (RDD) |
| Debtors.[1] | Jointly Administered |

# DECLARATION OF GARRETT LYNAM

I, GARRETT LYNAM, pursuant to 28 U.S.C. § 1746, declare as follows:

1.    I am General Counsel at Kokino LLC ("Kokino"), where I have been employed

---

[1] The Debtors in these cases, along with the last four digits of each Debtor's registration number in the applicable jurisdiction, are as follows: Purdue Pharma L.P. (7484), Purdue Pharma Inc. (7486), Purdue Transdermal Technologies L.P. (1868), Purdue Pharma Manufacturing L.P. (3821), Purdue Pharmaceuticals L.P. (0034), Imbrium Therapeutics L.P. (8810), Adlon Therapeutics L.P. (6745), Greenfield BioVentures L.P. (6150), Seven Seas Hill Corp. (4591), Ophir Green Corp. (4594), Purdue Pharma of Puerto Rico (3925), Avrio Health L.P. (4140), Purdue Pharmaceutical Products L.P. (3902), Purdue Neuroscience Company (4712), Nayatt Cove Lifescience Inc. (7805), Button Land L.P. (7502), Rhodes Associates L.P. (N/A), Paul Land Inc. (7425), Quidnick Land L.P. (7584), Rhodes Pharmaceuticals L.P. (6166), Rhodes Technologies (7143), UDF LP (0495), SVC Pharma LP (5717) and SVC Pharma Inc. (4014). The Debtors' corporate headquarters is located at One Stamford Forum, 201 Tresser Boulevard, Stamford, CT 06901.

- 1 -

since 2015. Kokino is a single-family office owned by the Jonathan Sackler family that provides investment management and other services to their family and other associated family clients.[2] As General Counsel of Kokino, I manage the legal affairs of Kokino and regularly advise the Jonathan Sackler family on legal matters. I am also the executor of the Estate of Jonathan Sackler.

2.     I submit this declaration in support of the Limited Objection of the Raymond Sackler Family to the First and Second Motions to Unseal Judicial Records by Media Intervenors Dow Jones & Company, Inc., Boston Globe Media Partners, LLC, and Reuters News & Media (the "Limited Objection"). I make this declaration based on my personal knowledge and based on my review of Kokino's books and records, as well as discussions that I have had with other Kokino employees. This declaration is intended to provide the Court with background information concerning the economic harm that has previously resulted from the disclosure of the Jonathan Sackler family's commercial counterparties.

3.     I understand that certain documents related to the bankruptcy proceedings are currently under seal but may become publicly available in response to requests from certain media organizations, and that those documents contain the names of certain hedge funds, banks, brokerages, private equity firms, venture capital firms, financial advisors, etc., with which Kokino and members of the Jonathan Sackler family have ongoing investments or other business relationships.

4.     A primary purpose of Kokino, like all family offices, is to increase the value of its family clients' investment assets. For Kokino, a significant portion of the Jonathan Sackler family's investments are made through third-party investment managers (e.g., hedge funds and

---

[2]    The Jonathan Sackler family is part of the Raymond Sackler family.

private equity funds) and facilitated by financial intermediaries (e.g., banks and broker dealers). Maintaining access to investment managers and financial intermediaries is critical to serving Kokino's commercial purpose. As detailed below, disclosure (and concerns about disclosure) of the identity of business counterparties has precipitated the termination of the relationships by certain counterparties in circumstances that are detrimental to Kokino's business objectives, including by causing an inability for the family to deploy capital into attractive investments, forcing the Jonathan Sackler family to exit positions or close accounts at less than desirable times, and causing the family to forgo profitable opportunities. Accordingly, Kokino regards the identity of the Jonathan Sackler family's investment managers and financial counterparties as highly sensitive, confidential commercial information.

5. Hildene Capital Management, LLC ("Hildene") forced both the Jonathan Sackler and Richard Sackler families out of Hildene-managed hedge funds in late 2018. An unknown source leaked news of the Hildene redemption to The Wall Street Journal in early 2019. *See* Juliet Chung, Sara Randazzo, and Gregory Zuckerman, *Hedge Fund Tosses Family That Controls Maker of OxyContin*, THE WALL STREET Journal (Mar. 7, 2019), https://www.wsj.com/articles/hedge-fund-tosses-family-that-controls-maker-of-oxycontin-11551985100?st=be56yxlg1w94zft&reflink=desktopwebshare_permalink (the "March 2019 WSJ Article"). The March 2019 WSJ Article outlined how reputational concerns drove Hildene's redemption decision. *Id*.

6. The March 2019 WSJ Article mentioned another confidential Jonathan Sackler family investment counterparty, DeepCurrents Investment Group, LLC ("DeepCurrents"). In early March 2019, DeepCurrents informed Kokino that DeepCurrents was redeeming the Jonathan Sackler family from its hedge fund. Kokino understood this decision was directly

related to the March 2019 WSJ Article and DeepCurrents' concern that maintaining a commercial relationship with the Jonathan Sackler family in light of the public disclosure would be detrimental to DeepCurrents' business.

7.  Three unreported investment managers identified similar concerns to Kokino as the reason for wanting to end their business relationships with the Jonathan Sackler family. One hedge fund manager informed Kokino on or around October 3, 2019 that it would redeem the Jonathan Sackler family's investment in its hedge fund. Additionally, two investment advisers informed Kokino on or around July 14, 2020 and September 30, 2020, respectively, that they wished to end their business relationships with the family. I understand these investment managers indicated to Kokino that they based their decisions on their concerns that an ongoing association with the Sackler family that became publicly known would have a deleterious effect on their businesses.

8.  On December 16, 2019, The New York Times reported on distributions that Purdue Pharma L.P. made to the Sackler family. *See* Jan Hoffman and Danny Hakim, *Purdue Pharma Payments to Sackler Family Soared Amid Opioid Crisis*, N.Y. TIMES (Dec. 16, 2019), https://www.nytimes.com/2019/12/16/health/sacklers-purdue-payments-opioids-.html?searchResultPosition=2. The article reported that the attorney general of New York publicly stated that "we must see detailed financial records showing how much the Sacklers profited" and that "[w]e need full transparency into their total assets." Two days later, on December 18, 2019, an investment counterparty notified Kokino that it would terminate its business relationship with the Jonathan Sackler family in 2020 due to the perceived impact on their business if their relationship with the Jonathan Sackler family became publicly known. This termination led to Kokino halting a proprietary investment strategy that depended on the

investment counterparty. Kokino estimates that this single termination caused economic losses to the Jonathan Sackler family of more than $20 million in the form of forgone investment profits in 2020 alone.

9. Additionally, I am aware of or have been informed of at least 6 other financial institutions that: (i) terminated their banking or broker-dealer relationships with the Jonathan Sackler family (and associated business entities or private foundations); or (ii) decided to avoid or limit business with the Jonathan Sackler family. These events occurred between May 2019 and late 2020.

10. These examples illustrate how disclosure of counterparty information can frustrate the ability of the Sackler family to deploy capital into attractive investments, force the family to exit investments at less than desirable times and generally cause the family to forgo profitable opportunities. Therefore, these examples show how disclosure of current non-public commercial relationships result in economic harm to the Sackler family, particularly with respect to investments that are intended to help fund their family's share of any settlement in the chapter 11 cases.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on February 7, 2021

_____
Garrett Lynam