Jasmine Ball
Maura Kathleen Monaghan
Jeffrey J. Rosen
DEBEVOISE & PLIMPTON LLP
919 Third Avenue
New York, New York 10022
Telephone: (212) 909-6000
Facsimile: (212) 909-6836

*Attorneys for Beacon Company*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| **In re:** | **Chapter 11** |
| **PURDUE PHARMA L.P., *et al.*,** | **Case No. 19-23649 (RDD)** |
| **Debtors.**[1] | **(Jointly Administered)** |

**MORTIMER D. SACKLER ICSP'S LIMITED OBJECTION TO THE MEDIA INTERVENORS' MOTION TO INTERVENE AND UNSEAL JUDICIAL RECORDS**

1 The Debtors in these cases, along with the last four digits of each Debtor's registration number in the applicable jurisdiction, are as follows: Purdue Pharma L.P. (7484), Purdue Pharma Inc. (7486), Purdue Transdermal Technologies L.P. (1868), Purdue Pharma Manufacturing L.P. (3821), Purdue Pharmaceuticals L.P. (0034), Imbrium Therapeutics L.P. (8810), Adlon Therapeutics L.P. (6745), Greenfield BioVentures L.P. (6150), Seven Seas Hill Corp. (4591), Ophir Green Corp. (4594), Purdue Pharma of Puerto Rico (3925), Avrio Health L.P. (4140), Purdue Pharmaceutical Products L.P. (3902), Purdue Neuroscience Company (4712), Nayatt Cove Lifescience Inc. (7805), Button Land L.P. (7502), Rhodes Associates L.P. (N/A), Paul Land Inc. (7425), Quidnick Land L.P. (7584), Rhodes Pharmaceuticals L.P. (6166), Rhodes Technologies (7143), UDF LP (0495), SVC Pharma LP (5717) and SVC Pharma Inc. (4014). The Debtors' corporate headquarters is located at One Stamford Forum, 201 Tresser Boulevard, Stamford, CT 06901.

The Mortimer Sackler Initial Covered Sackler Persons[2] ("**Side A ICSPs**"), by and through their undersigned counsel, respectfully submit this limited objection ("**Objection**") to the *Motion to Intervene and Unseal Judicial Records by Dow Jones & Company, Inc., Boston Globe Media Partners, LLC, and Reuters New & Media, Inc.* [Dkt. No. 2022] and the *Second Motion to Unseal Judicial Records by Media Intervenors Dow Jones & Co., Inc., Boston Globe Media Partners LLP, and Reuters News & Media Inc.* [Dkt. No. 2188] (the "**Motions**" by, collectively, the "**Media Intervenors**"). In support of the Limited Objection, the Side A ICSPs respectfully state as follows:[3]

1. The Side A ICSPs share the commitment to transparency expressed by the Debtors, the Raymond Sackler Family, other parties in these chapter 11 cases, and the Media Intervenors. The Side A ICSPs participated in the meet-and-confer process to resolve the issues raised by the Motions to Unseal which resulted in the filing of over 500 documents on the public docket (with certain limited redactions that have not been contested). Only one issue remains: the Media Intervenors' request in their Reply that the Court order the unsealing of the Privilege Log Materials that were attached as exhibits to the UCC's Motions to Compel. *See Reply in Supp. of Mots. to Unseal Judicial Rs. by Dow Jones & Co., Boston Globe Media Partners, LLC, and Reuters News & Media, Inc.*

---

[2] The Mortimer Sackler ICSPs include Ilene Sackler Lefcourt, Kathe Sackler, Mortimer D.A. Sackler, and Theresa Sackler as well as trusts for their benefit and the trustees of those trusts. *See Amended and Restated Case Stipulation Among the Debtors, the Official Committee of Unsecured Creditors and Certain Related Parties dated Nov. 20, 2019*, ¶ 1 [Dkt. No. 518].

[3] The Side A ICSPs preserve, and do not waive, all defenses, including without limitation defenses based on lack of personal jurisdiction.

[Dkt. No. 2288] ("Reply") at 6-7. The Side A ICSPs do not object to the unsealing of significant portions of the privilege log.[4] The Side A ICSPs seek the Court's intervention with respect to only certain categories of information on the privilege log, as disclosure of such information on the public docket could result in precisely the types of harms specified in Section 107 that warrant documents remaining under seal.

2. First, the Side A ICSPs join the Raymond Sackler Family's Limited Objection seeking to maintain as confidential the identities of current investment counterparties. *Limited Obj. of the Raymond Sackler Family to the First and Second Mots. To Unseal Judicial Rs. By Media Intervenors Dow Jones & Company, Inc., Boston Globe Media Partners, LLC, and Reuters News & Media, Inc.* [Dkt. No. 2360]. The disclosure of such information could result in the disruption of relationships between the Side A ICSPs and investment counterparties and could adversely impact Side A's finances at a time when they will be required to make the large financial contribution contemplated by the proposed global settlement.

3. Second, the Side A ICSPs seek to redact the identification of one narrow category of investments because of the unique risk of focusing public attention on their connection to the family: the subset of information in the privilege log that would identify public-facing entities that are ultimately owned in whole or significant part by Side A

4 Per agreement with the Media Intervenors, the Side A ICSPs are replacing the names of administrative assistants, personal assistants, executive assistants, technical support personnel, paralegals, nannies, gardeners, and housekeepers with their titles. Consistent with prior practice, the Side A ICSPs will also be making redactions for the limited purposes of protecting Personal Identifying Information.

ICSPs. As set forth below, this information should remain under seal pursuant to 11 U.S.C. § 107(c) because there is undue risk that highlighting and publicizing such information on the public docket could result not only in financial damage to such entities, but also in vandalism or violent attacks against the property of such entities or their employees.

4. Members of the Sackler families have been subject to vitriolic attacks, frequently of an anti-Semitic nature, in online fora. Certain of these attacks include entreaties to violence. Providing a link between these public-facing businesses and the Sackler family on the public docket could engender more calls for violent reprisals. The Side A ICSPs respectfully request the Court's intervention to ensure that this risk does not become a reality.[5]

## I. The Information Regarding Public-Facing Entities Is Appropriately Shielded Under Section 107(c) Because Disclosure Would Create an Undue Risk of Unlawful Injury to Individuals and Property

5. In light of the threats made against members of the Sackler families, information regarding public-facing entities with which they are affiliated falls squarely within the type of information that Section 107(c) is designed to protect. Section 107(c) provides:

> The bankruptcy court, for cause, may protect an individual, with respect to the following types of information to the extent the court finds that disclosure of such information would create undue risk of identity theft or other unlawful injury to the individual or the individual's property.

[5] The Side A ICSP's will provide the Court separately with the Privilege Log Materials containing proposed redactions.

11 U.S.C. § 107(c). Notably, the "assessment of risk is **forward-looking**" and "the standard does not require evidence of injury having occurred in the past or under similar circumstances." *In re: Motions Seeking Access to 2019 Statements*, 585 B.R. 733, 751 (D. Del. 2018) (emphasis added), *aff'd* 775 F. App'x 78 (3d Cir. 2019).

6. The public-facing entities and their employees face an undue risk of violence due to the dangerous hate speech and threats targeted at members of the Sackler families. A full litany of the threats risks encouraging copycats, but a selection of just some of the online rhetoric should suffice to validate the concern:

- "Sacrifice their dark souls in a public square in DC. Alow (sic) free public parking with a circus atmosphere. Bring back public hangings NOW. Every member of the Sackler family should be hung one by one. And don't forget the infants!" *Decl. of Jasmine Ball dated February 7, 2021*, Ex. 1.
- "So let's find their addresses and burn their fucking homes down." *Id.*, Ex. 2.
- "If anything the death penalty needs to be more widely enforced. On the Sackler family for instance. . . . I just don't get why the German high command could be tried for 'crimes against humanity' by a tribunal . . . yet a jewish family killed 230,000 of the people of the country that held that tribunal and got away with it." *Id.*, Ex. 3.
- "We should each just grab a Sackler's limb and pull." *Id.*, Ex. 4.
- "[T]he entire Sackler family… public stoning . . . ." *Id.*, Ex. 5.

7. Media coverage has the potential to further inflame this mob mentality. For example, a New Yorker writer tweeted with respect to a colleague's forthcoming book, "can't wait for Patrick to BURY the SACKLERS."[6] *Id.*, Ex. 6. The Side A ICSPs

[6] She then added in a separate tweet a few minutes later, "metaphorically speaking." *Id.*, Ex. 6. The "metaphorical" distinction may escape the perception of the authors of the threats described in the previous paragraph.

are concerned that any focus on these public-facing businesses, especially if it uses language like that used by the New Yorker writer, may further encourage the online posters to believe that violence is justified and present them with targets against which to direct it.

8. The risk posed by such online vitriol turning into violence or vandalism is all too real:

> White-supremacist groups use social media as a tool to distribute their message, where they can incubate their hate online and allow it to spread. But when their rhetoric reaches certain people, the online messages can turn into real-life violence.[7]

New reporting on the connection between members of the Sackler families and these public-facing entities could spur people who are making or have read the types of online posts described above to attack such entities.

9. Application of the common-law balancing test, which is properly considered as part of a Section 107(c) analysis, confirms that disclosure of information

---

[7] Rachel Hatzipanagos, *How Online Hate Turns Into Real-Life Violence*, WASH. POST (Nov. 30, 2018, 2:31 AM), https://www.washingtonpost.com/nation/2018/11/30/how-online-hate-speech-is-fueling-real-life-violence/. *See also, e.g.*, Cardiff University, *Increase in Online Hate Speech Leads to More Crimes Against Minorities*, Phys.org (Oct. 15, 2019), https://phys.org/news/2019-10-online-speech-crimes-minorities.html ("An increase in hate speech on social media leads to more crimes against minorities in the physical world, a study shows. . . . [A]s the number of 'hate tweets'—those deemed to be antagonistic in terms of race, ethnicity or religion—made from one location increased, so did the number of racially and religiously aggravated crimes—which included violence, harassment and criminal damage."); NYU, *Hate Speech on Twitter Predicts Frequency of Real-Life Hate Crimes* (June 24, 2019), https://www.nyu.edu/about/news-publications/news/2019/june/hate-speech-on-twitter-predicts-frequency-of-real-life-hate-crim.html ("According to a first-of-its-kind study, cities with a higher incidence of a certain kind of racist tweets reported more actual hate crimes related to race, ethnicity and national origin.").

related to public-facing entities here should not be required. *See In re: Motions Seeking Access to 2019 Statements*, 585 B.R. at 757 ("That this Court or the Bankruptcy Court may refer to longstanding common law principles in exercising discretion under § 107(c) is not erroneous, as § 107 codifies the common law right of access."). The risk of potential injury to persons or property greatly outweighs any supposed public interests in Privilege Log Materials here because they were submitted by the UCC in connection with discovery motions that have not even been scheduled for argument, much less decided by the Court. As the Second Circuit has recognized, "the presumption of public access in filings submitted in connection with discovery disputes or motions *in limine* is generally somewhat lower than" trial evidence or summary judgment briefs. *Brown v. Maxwell*, 929 F.3d 41, 50 (2d Cir. 2019).

10. The application of this lower presumption of public access is particularly warranted under the present circumstances and strongly argues in favor of keeping information about public-facing investments under seal. The only reason that the Side A privilege log was included in a court filing is because the UCC decided to challenge approximately 13,000 entries. Many of the privilege log entries describe ordinary-course communications with counsel regarding these public-facing entities that have *nothing to do with* the Debtors, the pharmaceutical industry or distributions made from the Debtors. The UCC, however, has now *abandoned* its challenge to many of those entries, including entries concerning certain third parties *unrelated* to the Debtors. *See Official Committee of Unsecured Creditor's Reply in Supp. Mot. to Compel Production of Purportedly Privileged Docs., or for In Camera Review, Based on Failure of the Sacklers to*

*Demonstrate Docs. Identified on Logs Are Privileged*, ¶ 42 & n.59 [Dkt. No. 2013] ("[T]he UCC withdraws its challenges to these documents [involving certain service providers and third parties] in the interest of narrowing this dispute only to documents of paramount importance to the UCC's investigation.").

11. In sum, when the Court is asked to balance between (i) a lower public interest in a lawyer-generated document filed in a discovery dispute that has not been heard, and for which many of the challenged entries are abandoned and (ii) the meaningful, unquantifiable risk that posting information about the public-facing entities on the public docket could lead to hateful and violent rhetoric being translated into actual violence or vandalism, the Court should avoid risks to people and property and permit the Side A ICSPs to redact information about the public-facing entities.

**CONCLUSION**

12. For the foregoing reasons, this Court should (i) grant the Limited Objection filed by the Raymond Sackler family regarding investor counterparties for the reasons set forth in their brief and (ii) grant the Limited Objection filed by the Side A

ICSPs and permit the redaction of information related to public-facing entities, as disclosure of such information on the public docket in the current threat environment created an undue risk of violent attacks against people and property.

Dated: February 7, 2021
New York, New York

By: */s/ Jasmine Ball*________________
Jasmine Ball
Maura Kathleen Monaghan
Jeffrey J. Rosen
DEBEVOISE & PLIMPTON LLP
919 Third Avenue
New York, New York 10022
Telephone: (212) 909-6000
Facsimile: (212) 909-6836
Email: jball@debevoise.com
mkmonaghan@debevoise.com
jrosen@debevoise.com

*Attorneys for Beacon Company*