# EISENBERG & BAUM, LLP

February 8, 2021

VIA EMAIL & ELECTRONIC COURT FILING

Office of the United States Trustee
William K. Harrington, *United States Trustee*
U.S. Federal Office Building
201 Varick Street, Suite 1006
New York, NY 10014

Re: *In re: Purdue Pharma L.P. et al., No. 19-23649 (Bankr. S.D.N.Y.)(RDD)*

Dear Mr. Harrington:

I write in my capacity as counsel to the Ad Hoc Committee on Accountability. As you know, the Committee on Accountability includes the leaders of organizations which advocate on behalf of thousands of victims and survivors of the opioid crisis, and who are deeply concerned about transparency and accountability in the above-captioned chapter 11 cases. In the interest of transparency, I am copying the Court.

The Committee on Accountability has begun to review documents recently released pursuant to the *Stipulation of Settlement and Agreed Order Regarding Media Intervenors' Motion to Unseal Materials Filed in Connection with UCC Privileges Motions* [ECF No. 2140]. We have reviewed a May 15, 2018 *Joint Defense and Common Interest Agreement* among counsel for Purdue Pharma L.P., et al. ("Purdue" or the "Debtors") and counsel for members of the Sackler family ("Joint Defense Agreement" or "JDA"), and wanted to bring to your attention certain issues which it may raise.[1] I attach a copy of the JDA to this letter as **Exhibit A**.

*The Joint Defense Agreement*

It appears that the JDA was "entered into by and between the undersigned counsel on behalf of" various Sackler entities and the Debtors. It was not signed by the Debtors or by any of the Purdue entities; only by their counsel. It established, among other things, that Skadden and the other signatories would mount a "common defense" strategy based on the "mutuality of interest" of Purdue and the Sacklers. More particularly, the JDA provides in pertinent part as follows:

> the undersigned believe and anticipate that, on the basis of currently available information, the nature of the Actions and the relationship among the undersigned will present various common legal and factual issues and *a mutuality of interest* in a joint defense in connection

---

[1] *See* Official Committee of Unsecured Creditors' Notice of Filing of First Set of Unredacted or Partially Redacted Exhibits to the Declaration of Mitchell Hurley Dated September 29, 2020 [ECF No. 1754], Dec. 18, 2020, filed as ECF 2161-5, at 10.

    with the Actions, or any other claims, proceedings or investigations that may arise *in relation to the Actions*;[2] [and]

    any and all Defense Materials obtained by any of the undersigned from each other are being provided solely for internal use of the undersigned and their counsel and *shall remain confidential and shall be protected from disclosure to any third party* by the joint-defense privilege, the clients' attorney-client privilege, the attorneys' work product doctrine and other applicable privileges and immunities. All Defense Materials shall be used solely in connection with the Actions. . . . *Neither the undersigned nor their counsel shall disclose Defense Materials or the contents thereof to anyone not a signatory to this MOU (except the undersigned counsels' firms, employees or agents) without first obtaining the written consent of all counsel for all the Parties who have signed this MOU*.[3]

Patrick Fitzgerald of Skadden Arps executed the JDA by and on behalf of Purdue. Mary Jo White of Debevoise & Plimpton signed by and on behalf of the Mortimer Sackler family (Side A).[4] It appears (based on a review of publicly-filed Skadden time records) that Paul Weiss, the firm that represents the Raymond Sackler family (Side B), also joined the common defense arrangement.[5]

---

[2] JDA, p. 1 (*emphasis added*). Defined terms used in quotations from the JDA have the meanings ascribed to them in the JDA.

[3] JDA p. 2, ¶ 1 & 2 (*emphasis added*).

[4] Special Counsel to the Debtor, Reginald Brown of Wilmer Cutler Pickering Hale (now of Kirkland & Ellis) also entered into the JDA. [ECF No. 428]. Some of our concerns about Skadden may also apply to WilmerHale. In addition, we note that the JDA contains a signature block for Purdue's strategic legal consultant, Alabama's former Acting U.S. Senator Luther Strange. Strange was appointed to serve as the United States Senator from Alabama from February 2017 to January 3, 2018, after the position was vacated by Senator Jeff Sessions upon Session's confirmation as U.S. Attorney General. Sessions served at the United States Attorney General from February 9, 2017 to November 7, 2018 during the period when Purdue and the Sacklers may have been negotiating with the Department of Justice.

[5] Skadden billing records indicate on-going joint defense strategy discussions between Skadden, as special counsel for the Debtors, and counsel for the Sacklers:

    4/07/20: CONFER WITH DEBEVOISE AND PAUL WEISS RE: DOJ STRATEGY (0.5); CORRESPOND WITH DOJ RE: FACTUAL QUESTIONS (0.3).

    4/14/20 PARTICIPATE IN CALL WITH SKADDEN TEAM RE: DOJ RESOLUTION ISSUES, STRATEGY, AND NEXT STEPS (0.9); CONFER WITH CLIENT, DEBEVOISE, PAUL WEISS, AND SKADDEN TEAM RE: DOJ STRATEGY (1.0);

    5/03/20: PARTICIPATE IN CALL WITH COMMON DEFENSE COUNSEL AND P. FITZGERALD RE: DOJ ISSUES (0.7);

    5/13/20: CONFER WITH PAUL WEISS RE: STRATEGY (0.7);

    5/15/20: CALL WITH DEBEVOISE AND PAUL WEISS RE: FACTUAL ISSUES IDENTIFIED IN DOJ INVESTIGATION (1.5);

    5/19/20: CONFER WITH PAUL WEISS AND DEBEVOISE RE: DOJ STRATEGY (1.1); ANALYZE DOCUMENTS RE: RESOLUTION ISSUES (0.3);

    5/22/20: PARTICIPATE IN CONFERENCE CALL WITH SKADDEN AND PAUL WEISS RE: DOJ RESOLUTION MATERIALS (1.0); REVIEW NOTES FROM CALL WITH PAUL WEISS (0.2); and

2

*Questions about the JDA*

We have three sets of questions about the JDA:

*First*, was Skadden bound by the JDA when it was retained in the Debtors' chapter 11 cases, and has it remained so bound since then? The JDA creates a mechanism by which a party may withdraw from it.[6] Did the Debtors withdraw (or seek to cause Skadden to withdraw) at any point? If so, when? Did the Debtors or its counsel enter into subsequent joint defense (or similar) agreements with the Sacklers or entities owned or controlled by them?

*Second*, assuming Skadden and the Debtors did not withdraw from the JDA, was it disclosed in the application to retain Skadden as Special Counsel or otherwise? Federal Rule of Bankruptcy Procedure 2014(a) provides that any application to retain Skadden as special counsel had to be accompanied by a "verified statement of the person to be employed setting forth the person's connections with the debtor, creditors, [and] any other party in interest." Fed. R. Bankr. P. 2014(a).

We have reviewed the Debtor's November 6, 2019 application to retain Skadden, as well as the verified statement of Patrick Fitzgerald in support thereof ("Fitzgerald Declaration") [ECF No. 438-1]. Although the Fitzgerald Declaration discloses the fact that Skadden represented Purdue in connection with certain compliance matters prior to bankruptcy, it says nothing about the JDA.

It would appear that caselaw requires special counsel to disclose a "connection" such as the JDA. *KLG Gates LLP. Brown*, 506 B.R. 177, 192-93 (E.D.N.Y. 2014). Bankruptcy Rule 2014(a) requires that a verified statement disclose the connections between the professionals and the universe of parties in interest in the case. *See In re The Leslie Fay Cos., Inc.*, 175 B.R. 525, 533 (Bankr. S.D.N.Y. 1994). "All facts that may have any bearing on the disinterestedness of a professional must be disclosed." *Id.* Courts have emphasized "the importance of making thorough disclosures of any connections as required by Rule 2014 when seeking to employ counsel pursuant to Section 327." *KLG Gates LLP v. Brown*, 506 B.R. 177, 193 (E.D.N.Y. 2014) (citing *In re Leslie Fay*, 175 B.R. 525, 533 (Bankr.S.D.N.Y.1994); *In re Biddle*, 2012 WL 6093926, at *3–5

---

5/26/20: CONFER WITH P. FITZGERALD RE: STRATEGY FOR CALL WITH DEBEVOISE (0.3); REVIEW DOCUMENTS FROM DOJ RE: RESOLUTION ISSUES (1.7); CONFER WITH DEBEVOISE RE: RESOLUTION ISSUES (1.0); CONFER WITH SKADDEN, PAUL WEISS, DEBEVOISE, AND CLIENT RE: DOJ STRATEGY (1.0).

*See* Notice of Seventh Monthly Statement of Skadden, Arps, Slate, Meagher & Flom LLP for Compensation For Services Rendered and Reimbursement of Expenses Incurred As Special Counsel to the Debtors For the Period from April 1, 2020 Through April 30, 2020, June 5, 2020 [ECF No. 1235]; and Notice of Eighth Monthly Statement of Skadden, Arps, Slate, Meagher & Flom LLP for Compensation For Services Rendered and Reimbursement of Expenses Incurred As Special Counsel to the Debtors For the Period from May 1, 2020 Through May 31, 2020, June 5, 2020 [ECF No. 1352].

[6] The JDA provides that:

*Should any Party* choose to withdraw from this MOU or *determine that* he, she, or it *no longer has, or no longer will have, a mutuality of interest in a joint defense*, he or she or it *shall provide prior written notice*, in which case this MOU shall no longer be operative as to the withdrawing Party, but shall continue to protect all Defense Materials disclosed to the withdrawing Party prior to such withdrawal [p. 5, para 8]

3

(Bankr.D.S.C. Dec. 6, 2012)). In the *Molten Metals* case, Judge Kenner wrote:

> I need not determine whether joint defense agreements are *always* disqualifying, though in many cases they will prove formidable obstacles. But *agreements of this sort need at least to be disclosed in all relevant detail in the application to employ counsel and in the supporting verified statement.* As in this case, their nondisclosure can only thicken the suspicion of conflict and betrayal of interest under which counsel will finally seek compensation. *In re Molten Metal Tech., Inc.,* 289 B.R. 505, 514 n. 20 (Bankr. D. Mass. 2003)(emphasis added).

Our question is therefore: was the JDA disclosed in a verified statement as required by Federal Rule of Bankruptcy Procedure 2014(a)? If so, when and how? If not, why not? We know that disclosure pursuant to Rule 2014 is an important issue for the Office of the United States Trustee; your office may share our concerns about the JDA.[7]

*Third*, what effect has the JDA had on Skadden Arps' capacity to represent the Debtors' estates? The JDA provided that "Defense Materials" "shall remain confidential and shall be protected from disclosure to any third party." It appears that significant amounts of time, money and energy have been devoted in this case to discovery disputes between the Sacklers and various creditor groups (and the Debtors). The Committee on Accountability is concerned that Skadden's obligations to keep information confidential would have conflicted with its duties to the Debtors' estates, thereby needlessly increasing costs.

More importantly, we understand that Skadden played a key role in negotiations with the Department of Justice which led to settlements between the Sacklers and DOJ and between Purdue and DOJ, both of which were presented to the Bankruptcy Court and which were in certain respects approved by the Bankruptcy Court.[8]

Objectors noted at the time that these settlements appeared to place greater liability for the alleged misconduct on Purdue than on the Sacklers.[9] Purdue, but not the Sacklers, agreed to plead guilty to three crimes. Purdue agreed to pay about thirty-five times more than the Sacklers pursuant to these settlements. These disparities were notable because the supporting materials recognized—and Purdue did not dispute—that the Sacklers were the Debtors' "*de-facto CEO*" during the relevant period.[10]

An inference created by the JDA and the seemingly lopsided nature of the DOJ Settlements may be that Skadden held or represented an interest adverse to the estate that was not disclosed

---

[7] *See* Letter from Stephen E. Boyd, Assistant United States Attorney General to Representative Andy Biggs dated October 30, 2020 (attaching memorandum from Clifford White of U.S. Trustee program regarding 2014 policy and providing data on formal and informal enforcement). We attach this letter as **Exhibit B.**

[8] *See* Order Pursuant to 11 U.S.C. § 105 and Fed. R. Bankr. P. 9019 Authorizing and Approving Settlements between the Debtors and the United States, Nov. 18, 2020 [ECF No. 2004] (the "Purdue Settlement"); Order Confirming that Payment by the Sackler Families Under Settlement with the United States Department of Justice is not Prohibited by this Court's Preliminary Injunction, Nov. 18, 2020 [ECF 2003] (the "Sackler Settlement"). Collectively, we refer to the Purdue Settlement and the Sackler Settlement as the "DOJ Settlements."

[9] *See i.e.* Brief of Bankruptcy Professors As *Amici Curiae* in Opposition to the Proposed Settlement Between The United States And the Debtors, Nov. 10, 2020 [ECF No. 1913-1], at 16.

[10] *See* Sackler Settlement, Addendum at 4, ¶12; Purdue Settlement, Addendum at 4, ¶ 14.

4

when Skadden was retained.[11] We note that Skadden was initially retained by Purdue in 2010 when Purdue was under the active control of the Sackler family. While Skadden represented Purdue, and not the Sacklers, the Committee on Accountability is concerned about Skadden's independence.[12] If in fact Skadden was bound by the JDA and failed to disclose it, the Committee is concerned that it "created a blind spot: the firm could not report on at least some of what it saw and knew."[13] Here, it would appear that, by virtue of the JDA, Skadden may not have been able to report fully to key estate and creditor representatives (e.g., the "Special Committee" of the Debtors' board of directors; the Official Committee of Unsecured Creditors) regarding the Sacklers' liabilities, which are highly material to these chapter 11 cases.

---

[11] Section 327(e) of the Code requires that Skadden, as special counsel, "not represent or hold any interest adverse to the debtor or to the estate with respect to the matter on which such attorney is to be employed." An attorney holds an adverse interest to the estate if he or she "(1). . . would create either an actual or potential dispute in which the estate is a "rival claimant" or (2) possesses "a predisposition under circumstances that render such a bias against the estate. *Bank Brussels Lambert v. Coan (In re AroChem Corp.)*, 176 F.3d 610, 623 (2d Cir. 1999) (internal citation omitted). The requirements of Section 327 cannot be taken lightly, for they "serve the important policy of ensuring that all professionals appointed pursuant to [the section] tender undivided loyalty and provide untainted advice and assistance in furtherance of their fiduciary responsibilities." *Leslie Fay Cos.,* 175 B.R. at 531.

Counsel may respond that the DOJ Settlements produced more value to the estate than would have been possible without Skadden's representation, and thus the JDA had no effect on Skadden's capacity to discharge its fiduciary obligations to the estate and creditors. This may or may not be true, but would be irrelevant. The outcome of a deal has little to do with a professional's fiduciary obligations. As Justice Douglas noted in *Woods v. City Nat'l Bank & Trust Co.,* a lawyer cannot argue that "although he had conflicting interests, he served his several masters equally well or that his primary loyalty was not weakened by the pull of his secondary one." 312 U.S. 262, 269 (1941).

[12] We note that Skadden was retained as "compliance counsel" during periods for which Purdue pleaded guilty to crimes that appear to have involved failures of compliance. In 2016, Purdue retained Skadden "to conduct proactive legal and compliance reviews." Letter dated Feb. 29, 2016 from Jennifer L. Bragg, Skadden, Arps., et al. to Andrea B. Neuman, Purdue Pharma, L.P., Fitzgerald Dec., Ex. 1-B. Whether Skadden failed to discharge its duties as compliance counsel in ways that led to the criminal charges is yet another question raised by the JDA and the DOJ Settlements. The estate may, for example, have causes of action against Skadden if its "proactive legal and compliance reviews" should have, but failed to, detect the conduct that led to the criminal pleas in the Purdue Settlement.

[13] *In re Molten Metal Tech Inc.* at 512. As Rep. Katie Porter (CA), a nationally-recognized bankruptcy expert, explained to Purdue CEO Craig Landau at the December 17, 2020 House Oversight and Reform Committee Hearing on Purdue Pharma and The Opioid Epidemic:

> you are the statutory debtor in possession under [11 U.S.C. §.] 1107 and you have all the fiduciary duties of a trustee in bankruptcy at this time to recover every last dollar that can be recovered for the creditors in this case. The creditors in this case do not include the Sackler family.

      More importantly, the JDA may have had the effect of facilitating the Sacklers' apparent defense strategy. If a plan is confirmed on expected terms in these cases, the Sacklers will retain billions of dollars from the sale of OxyContin and escape any further scrutiny or accountability. We are therefore deeply concerned about the constraints that the JDA may have placed on Skadden and the fact that the JDA was not (to our knowledge) disclosed when Skadden was retained.

      We look forward to your answers to these questions.

      Respectfully,

      _____/s/_____

      Michael S. Quinn (mq-1640)
      mquinn@eandblaw.com

      *Counsel to the Ad Hoc Committee on Accountability*

Encs   [Exhibit A (JDA) & Exhibit B (Ass't Atty Letter)]

CC   Honorable Robert D. Drain
       U.S. Bankruptcy Court for the Southern District of New York
       300 Quarropas Street, Room 248
       White Plains, NY 10601