Page 1

1    UNITED STATES BANKRUPTCY COURT

2    SOUTHERN DISTRICT OF NEW YORK

3    Case No. 19-23649-rdd

4    - - - - - - - - - - - - - - - - - - - - - - - - - - - x

5    In the Matter of:

6

7    PURDUE PHARMA L.P.,

8

9         Debtor.

10   - - - - - - - - - - - - - - - - - - - - - - - - - - - x

11

12                  United States Bankruptcy Court

13                  300 Quarropas Street, Room 248

14                  White Plains, NY 10601

15

16                  December 15, 2020

17                  10:02 AM

18

19

20

21   B E F O R E :

22   HON ROBERT D. DRAIN

23   U.S. BANKRUPTCY JUDGE

24

25   ECRO:  ART

Page 2

1   HEARING re Motion to Extend Exclusivity Period for Filing a

2   Chapter 11 Plan and Disclosure Statement/ Motion of Debtors

3   for Entry of a Third Order Extending the Exclusive Periods

4   Within Which to File a Chapter 11 Plan and Solicit

5   Acceptances Thereto (ECF #2045)

6

7   HEARING re Letter re: Motion of Debtors for Entry of a Third

8   Order Extending the Exclusive Periods Within Which to File a

9   Chapter 11 Plan and Solicit Acceptances Thereto filed by

10  PROP, Executive Director, Mr. Kolodny (related

11  document(s)2045) Filed by Andrew Kolodny (ECF #2056)

12

13  HEARING re Statement in Support of Debtors' Motion to Extend

14  Exclusivity Periods (related document(s}2045} filed by Paul

15  A. Rachmuth on behalf of Ad Hoc Committee on Accountability

16  (ECF #2099)

17

18  HEARING re Letter re: Letter ie: Motion of Deb rs or Entry

19  of a Third Order Extending the Exclusive Periods Within

20  Which to File a Chapter 11 Plan and Solicit Acceptances

21  Thereto (related document(s}2056, 2045) (ECF #2106)

22

23

24

25

Page 3

1   HEARING re Letter re: Motion of Debtors for Entry of a Third

2   Order Extending the Exclusive Periods Within Which to File a

3   Chapter 11 Plan and Solicit Acceptances Thereto (related

4   document(s)2056, 2045) (ECF #2108)

5

6   HEARING re Third Interim Fee Application of KPMG LLP as Tax

7   Consultant to the Debtors and the Official Committee of

8   Unsecured Creditors for Allowance of Compensation for

9   Services Rendered and Reimbursement of Expenses for the

10  Period : 6/1/2020 to 9/30/2020, fee:$650638.50, expenses:

11  $0.00. filed by KPMG LLP (ECF #1921)

12

13  HEARING re Third Application for Interim Professional

14  Compensation for Arnold & Porter Kaye Scholer LLP, Debtor's

15  Attorney, period: 6/1/2020 to 9/30/2020, fee: $456,899.19,

16  expenses: $275.00. filed by Arnold & Porter Kaye Scholer

17  LLP. (ECF #1941)

18

19  HEARING re Third Interim Fee Application Of Skadden, Arps,

20  Slate, Meagher & Flom LLP For Compensation For Services

21  Rendered And Reimbursement Of Expenses As Special Counsel To

22  The Debtors For The Period: 6/1/2020 to 9/30/2020,

23  fee:$7,384,885.33, expenses: $2,974.45. filed by Skadden,

24  Arps, Slate, Meagher & Flom LLP. (ECF #1945)

25

Page 4

1    HEARING re Third Interim Fee Application of Dechert LLP, as

2    327(e) Special Counsel, for Compensation for Professional

3    Services Rendered and Reimbursement of Actual and Necessary

4    Expenses Incurred During the Period: 6/1/2020 to 9/30/2020,

5    fee:$3,706,616.10, expenses: $612,547.92. filed by Dechert

6    LLP. (ECF #1959)

7

8    HEARING re Third Interim Fee Application of King & Spalding

9    LLP for Compensation for Services Rendered and Reimbursement

10   of Expenses Incurred as Special Counsel to the Debtors and

11   Debtors in Possession for the Period: 6/1/2020 to 9/30/2020,

12   fee:$6,959,667.27, expenses: $133.1 0.(related

13   document(s)543) filed by KING & SPALDING LLP. (ECF #1965)

14

15   HEARING re Jones Day's Third Interim Application For

16   Allowance of Compensation For Services Rendered and

17   Reimbursement of Actual and Necessary Expenses Incurred

18   During Retention Period: 6/1/2020 to 9/30/2020,

19   fee:$640,809.81, expenses: $10,725.56 (ECF #30)

20

21   HEARING re Third Application for Interim Professional

22   Compensation for Wilmer Cutler Pickering Hale and Dorr LLP,

23   Debtor's Attorney, period:  6/1/2020 to 9/30/2020,

24   fee:$50,256.67, expenses: $244.56. filed by George W.

25   Shuster Jr. (ECF #1969)

1   HEARING re Third Interim Fee Application of PJT Partners LP

2   as Investment Banker to the Debtors and Debtors-In-

3   Possession for Allowance of Compensation for Services

4   Rendered and for the Reimbursement of All Actual and

5   Necessary Expenses Incurred for the Period:  6/1/2020 to

6   9/30/2020, fee:$900,000.00, expenses: $2,015.31 (ECF #1971)

7

8   HEARING re Third Interim Fee Application for the Period June

9   1, 2020 through September 30, 2020 for Allowance of

10  Compensation for Services Rendered and for Reimbursement of

11  Expenses Incurred as Financial Advisor to the Chapter 11

12  Debtors period: 6/1/2020 to 9/30/2020, fee:$3,969,661.00,

13  expenses: $659.36 (ECF #1977)

14

15  HEARING re Third Interim Fee Statement of Ernst & Young LLP

16  for Compensation and Reimbursement of Expenses Incurred as

17  Auditors and Providers for the Debtors for the Period:

18  6/1/2020 to 9/30/2020, fee:$93,500.00, expenses: $600.00

19  (ECF #1980)

20

21  HEARING re Second Interim Application of Cornerstone

22  Research for Compensation for Services Rendered and

23  Reimbursement of Expenses Incurred as Consultant to the

24  Debtors for the Period: 6/1/2020 to 9/30/2020,

25  fee:$1,474,818.00, expenses: $591.47 (ECF #1986)

1    HEARING re Third Interim Application of Davis Polk &

2    Wardwell LLP for Compensation for Services Rendered and

3    Reimbursement of Expenses Incurred as Counsel to the Debtors

4    and Debtors in Possession for the Period: 6/1/2020 to

5    9/30/2020, fee:$38,809,735.00, expenses: $153,971.26

6    (ECF #1994)

7

8    HEARING re Second Interim Fee Application of Bedell Cristin

9    Jersey Partnership as Special Foreign Counsel to the

10   Official Committee of Unsecured Creditors of Purdue Pharma

11   LP., et al., for Allowance of Compensation for Services

12   Rendered and Reimbursement for Expenses for the Period:

13   6/1/2020 to  9/30/2020, fee:$187,054.04, expenses: $1,340.70

14   (ECF #1976)

15

16   HEARING re Second Interim Fee Application of Cole Schotz

17   P.C. as Co-Counsel to the Official Committee of Unsecured

18   Creditors of Purdue Pharma LP., et al., for Allowance of

19   Compensation for Services Rendered and Reimbursement of

20   Expenses for the Period:  6/1/2020 to 9/30/2020,

21   fee:$7,763,784.50, expenses: $292.14 (ECF #1978)

22

23

24

25

1   HEARING re Third Interim Application of Jefferies LLC for

2   Allowance of Compensation for Services Rendered and

3   Reimbursement of Expenses Incurred as Investment Banker for

4   the Official Committee of Unsecured Creditors for the

5   Period: 6/1/2020 to 9/30/2020, fee:$900,000.00, expenses:

6   $34,850.00 (ECF #1979)

7

8   HEARING re Third Interim Fee Application of Kurtzman Carson

9   Consultants LLC as Information Agent to the Official

10  Committee of Unsecured Creditors for Allowance of

11  Compensation for Professional Services Rendered and for

12  Reimbursement of Actual and Necessary Expenses Incurred,

13  period: 6/1/2020 to 9/30/2020, fee: $245,204.44, expenses:

14  $23,155.05 (ECF #1981)

15

16  HEARING re Third Interim Application of Province, Inc.,

17  Financial Advisor to the Official Committee of Unsecured

18  Creditors of Purdue Pharma LP., et al., for Compensation and

19  Reimbursement of Expenses for the Interim Period: 6/1/2020

20  to 9/30/2020, fee:$5,797,712.00, expenses: $7,328.61

21  (ECF #1982)

22

23

24

25

Page 8

1    HEARING re Third Interim Fee Application of Akin Gump

2    Strauss Hauer & Feld LLP as Counsel to the Official

3    Committee of Unsecured Creditors of Purdue Pharma L.P., et

4    al, for Allowance of Compensation for Services Rendered and

5    Reimbursement of Expenses Incurred for the Period: 6/1/2020

6    to 9/30/2020, fee:$22,112,857.5, expenses: $1,358,212.79

7    (ECF #1983)

8

9    HEARING re Application for Final Professional Compensation I

10   Final Fee Application of Bayard, P.A. for Compensation for

11   Services Rendered and Reimbursement of Expenses as Co-

12   Counsel to the Official Committee of Unsecured Creditors for

13   the Period from September 29, 2019 Through and Including

14   July 15, 2020 for Bayard, P.A., Creditor Comm. Aty, period:

15   9/29/2019 to 7/15/2020, fee:$1, 182,574.50, expenses:

16   $8,304.38. filed by Bayard, P.A. (ECF #1984)

17

18   HEARING re Third Interim Fee Application of Brown Rudnick

19   LLP as Co-Counsel to the Ad Hoc Committee of Governmental

20   and Other Contingent Litigation Claimants for Services and

21   Reimbursement of Expenses Incurred for the Period: 6/1/2020

22   to 9/30/2020, fee:$568, 187.50, expenses: $19,156.20

23   (ECF #1973)

24

25

1    HEARING re Application of Otterbourg P.C. as Co-Counsel to

2    the Ad Hoc Committee of Governmental and Other Contingent

3    Claimants for Third Interim Allowance of Compensation for

4    Services Rendered and Reimbursement of Expenses Incurred

5    period: 6/1/2020 to 9/30/2020, fee:$682,293.50, expenses:

6    $2,091.13 (ECF #1990)

7

8    HEARING re Third Interim Fee Application of FTI Consulting,

9    Inc. for Compensation Earned and Expenses Incurred for the

10   Period f: 6/1/2020 to 9/30/2020, fee:$1,440,572.15,

11   expenses: $205.15 (ECF #1988)

12

13   HEARING re Third Interim Application of Gilbert LLP, for

14   Allowance of Compensation for Services Rendered and

15   Reimbursement of Expenses Incurred as Co-Counsel to the Ad

16   Hoc Committee of Governmental and Other Contingent

17   Litigation Claimants for the Period: 6/1/2020 to 9/30/2020,

18   fee:$1,062,892.00, expenses: $9,305.17 (ECF #1989)

19

20

21

22

23

24

25

1   HEARING re Third Interim Application of Kramer Levin

2   Naftalis & Frankel LLP, as Co-Counsel to the Ad Hoc

3   Committee of Governmental and Other Contingent Litigation

4   Claimants, for Allowance of Compensation for Professional

5   Services Rendered and for Reimbursement of Actual and

6   Necessary Expenses Incurred for the Period : 6/1/2020 to

7   9/30/2020, fee:$1,698,836.50, expenses: $69,971.34

8   (ECF #1996)

9

10  HEARING re First Interim Application of Houlihan Lokey

11  Capital Inc., Investment Banker and Co-Financial Advisor to

12  the Ad Hoc Committee, for Compensation and Reimbursement of

13  Expenses for the Period January 1, 2020 through May 31, 2020

14  (ECF #1778 and ECF #1991)

15

16  HEARING re Second Interim Application of Bielli & Klauder,

17  LLC for Compensation for Services Rendered and Reimbursement

18  of Expenses Incurred as Counsel to the Fee Examiner, David

19  M. Klauder, Esquire, for the Period: 6/1/2020 to 9/30/2020,

20  fee: $220,000.00, expenses:$ (ECF #1964)

21

22  HEARING re Motion to Authorize /Debtors Motion to Supplement

23  Order Authorizing the Debtors to Assume the Reimbursement

24  Agreement and Pay the Fees and Expenses of the Ad Hoc

25  Committees Professionals (ECF #2030)

1    HEARING re Ecke's Motion to Authorize Claim Payment

2    (ECF #2032)

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25    Transcribed by:  Sonya Ledanski Hyde

1    A P P E A R A N C E S :

2

3    DAVIS POLK & WARDWELL LLP

4         Attorneys for the Debtor

5         450 Lexington Avenue

6         New York, NY 10017

7

8    BY:  MARSHALL HUEBNER (TELEPHONICALLY)

9         JAMES MCCLAMMY (TELEPHONICALLY)

10

11   KRAMER LEVIN NAFTALIS & FRANKEL LLP

12        Attorneys for the Ad Hoc Committee

13        1177 Avenue of the Americas

14        New York, NY 10036

15

16   BY:  TIMOTHY KRAMER (TELEPHONICALLY)

17

18   MASOUD BAMDAD

19        Pro Se Plaintiff

20        17806 Ridgeway Road

21        Granada Hills, CA 91344

22

23

24

25

1   MARIA ECKE

2        Pro Se

3        8 Glenbrook Drive

4        West Simsbury, CT 06092

5

6   PILLSBURY WINTHROP SHAW PITTMAN LLP

7        Attorneys for Ad Hoc Non-Consenting States

8        31 West 52nd Street

9        New York, NY 10019

10

11  BY:  ANDREW TROOP (TELEPHONICALLY)

12

13  DEBEVOISE & PLIMPTON LLP

14        919 Third Avenue

15        New York, NY 10022

16

17  BY:  JEFFREY J. ROSEN (TELEPHONICALLY)

18

19

20

21

22

23

24

25

1              P R O C E E D I N G S

2           THE COURT:  Good morning.  This is Judge Drain.

3     We're here for the omnibus monthly calendar in Purdue

4     Pharma, LP.  This hearing is completely telephonic.

5           MAN 1:  Good morning

6           THE COURT:  -- addition to, announcing yourself

7     and your client the first time you speak, probably do so

8     again, at least announce yourself, that is, if you speak

9     later so that the court reporter can put together your voice

10    with your name.

11          There's one authorized recording of this hearing.

12    It's being taken by Court Solutions.  They provide a copy to

13    our clerk's office on a daily basis.  If you want a

14    transcript of today's hearing, you should contact our

15    clerk's office to arrange for the preparation of one.

16          Because today's calendar is completely telephonic,

17    you should keep your phone on mute unless you're speaking,

18    at which time, of course, you should unmute yourself.

19          So, with that introduction, I have the amended

20    agenda for today's hearing submitted by the Debtors'

21    counsel, and I'm happy to go down that agenda unless someone

22    wants to take something out of order or raise some other

23    issue or make a report at the beginning of the hearing.

24          MR. HUEBNER:  Sure, Your Honor.  Good morning. It

25    is Marshall Huebner of Davis, Polk, and Wardwell, LP, on

Page 15

1    behalf of the Debtors.  Can the Court hear me clearly?

2             THE COURT:  Yes, I can hear you fine.  Thanks.

3             MR. HUEBNER:  Terrific.  So, Your Honor, we really

4    don't have a kind of introductory remarks.  I think that I'm

5    actually prepared to just begin and march down the agenda.

6    I guess the only late-breaking development is that there was

7    one item originally on for today that was adjourned to the

8    22nd, which relates to an unsealing motion by an entity

9    representing the media.

10            I believe, watching emails flying around including

11   actually in the last four minutes, that that looks like it

12   is resolved and that the parties hopefully will be filing a

13   stipulation as early as alter today that provides for a

14   process under which I think the Debtors are going through

15   documents and putting them into the public domain or giving

16   them out to these parties, and then if there's disagreement

17   about things that we believe need to remain protected by the

18   protective order, it sets up a mechanic.

19            But I think that the motion itself is going to be

20   resolved by a stipulation, which I think is great news

21   taking another item off of next week's docket, and again,

22   hopefully again, making yet more documents available to the

23   public on a more accelerated basis.

24            So not on today's agenda, but we all can use a

25   little good news in these dark times, especially the Court,

Page 16

1    with a hearing that you graciously gave us three days before

2    the Christmas holiday or two days before Christmas Eve, so

3    that agenda looks like it is narrowing as well.

4              THE COURT:  Okay.  I was hoping the extra week

5    might lead to a resolution of that.

6              MR. HUEBNER:  Yep.  People have been working --

7    their emails have been flying by, really, at all hours for

8    days and days.  People, I think, have been working quite

9    hard on it and it looks like it has borne a hoped-for fruit.

10             With respect to exclusivity, Your Honor, I guess

11   let me just begin the march.  I really don't have a lot to

12   say on this, either, for reasons I think will be clear in a

13   minute.

14             Your Honor, as we set forth in the motion, we

15   could've asked for a longer period, and in fact, probably

16   many might have, because we do have until March 15th as a

17   matter of statute, but we chose, intentionally, not to do

18   that because we think that is not the right date and we

19   actually think that, as you have heard us say at hearing

20   after hearing, and as the Court, I think, has actually

21   echoed at several hearings, especially, most pointedly, at

22   the last two, time is really not anyone's friend here, for

23   the reasons I elaborated on before, and I'm not going to

24   elaborate on this morning.

25             With respect to the extension that we did,

Page 17

1   ultimately, ask for, February 15th for filing and May 17th

2   for completing solicitation, we did engage in our normal

3   collaborative process and we called around to the key

4   stakeholders and we explained our approach to everybody, the

5   fruit of that, yet again, is that we are here yet again at

6   an utterly uncontested omnibus hearing, which really

7   shouldn't be taken for granted in any case, and in this

8   case, probably more than almost any ever, I never take for

9   granted.

10          So, we think those dates are appropriate, Your

11   Honor, and let me explain, just for a minute, why.  March

12   15th is obviously just way, way too far away and the Debtors

13   are actually not willing to wait until March or, frankly,

14   even February, and not file a plan.  We have been at this.

15   Today is literally the 15-month anniversary of this case,

16   and the time is now.

17          I wish that we had a report today with regards to

18   phase two of mediation.  Your Honor obviously abjured all of

19   us in the strongest possible terms to do everything humanly

20   possible to be here on December 15th with a report as to the

21   conclusion of mediation.  We don't have such a report.  It

22   is still ongoing.  Parties are engaged in it, but we're not

23   there yet.

24          Typically, exclusivity hearings focus, at least in

25   part, on the accomplishments of the last 120 days or 180

Page 18

1   days.  I'm not going to do that.  It's in the papers and

2   candidly, I'm not so impressed or focused with all we've

3   accomplished in the last period, although it has been

4   monumental and critical.  I am relentlessly focused on what

5   lies ahead and what is left to be done, especially since I

6   now think that now gets measured in a number of weeks that

7   is for sure single digits and probably closer to mid-single

8   digits then ten.

9           When we asked for February 15th, I think it won't

10  be a surprise to the Court or to anybody that you always

11  leave yourself a little bit of slippage, and so that means

12  that our current expectation is to file a plan in this case,

13  one way or the other, in January before the expiration of

14  exclusivity.

15          As the Court will no doubt be surprised to hear,

16  and certainly none of the bankruptcy lawyers or any of the

17  parties would be surprised to hear, the professionals on the

18  estate side have been working very, very hard to that end.

19  This is an enormously complicated plan, by any measure.

20          The issues that remain, essentially, between the

21  Sacklers and some of the states and other parties, are huge

22  and measured in the billions, but in terms of the complexity

23  of the deal, they're actually one aspect of it, and there

24  are many other things, including the five private side deals

25  that were resolved in phase one of mediation in terms of

1    structuring and documenting and implementing and classifying

2    and voting that are actually also enormously complicated.

3            Moreover, we don't yet know what plan and

4    disclosure statement we will be filing at the end of

5    January.  Is there a deal?  Is there no deal?  You know, you

6    heard at the last hearing that people were not necessarily

7    willing to say that the private side deals would stick where

8    there were potential termination rights in the terms sheets,

9    absent either an acceptable DOJ resolution or a Sackler deal

10   as part of the deal.

11           And so, we actually also, back at the farm at

12   Davis Polk and PJT and Alix, find ourselves facing having to

13   draft for multiple alternatives because there are multiple

14   permutations of possible plans that need to be ready on

15   January 30th.

16           And so, we've been working kind of day and night

17   on the hundreds of pages of documents that are necessary for

18   things like that -- disclosure statements, plans, plan

19   supplements and the like, voting, ballots -- and we will

20   soon be inviting other core constituencies into this

21   documentation process.  There are, of course, central issues

22   still being negotiated among the key parties where we're not

23   one side or the other.  We're sort of a fiduciary in the

24   middle attempting to facilitate a deal, but we're neither

25   the payors, in the case of the Sacklers, nor really the

1    payees, in the case of the entities that are across the

2    Sacklers primarily in those mediations.

3            But there are many, many other things that are

4    involved, obviously, in the exit of a multi-billion dollar,

5    23-company enterprise from Chapter 11, that are very complex

6    and pen is being put to paper every day and many nights and

7    we trust that the other parties in the case will be

8    accepting our invitation to work collaboratively on these

9    documents.

10            Either way, we will timely get it done and we will

11    be filing a plan, as I said, I think -- not I think --

12    before the expiration of exclusivity, which is currently

13    February 15, and hopefully by a couple weeks before that, to

14    give a margin of error.

15            Your Honor, with respect to the filing on

16    exclusivity, there are no objections.  There are several

17    filings.  Unless the Court directs me otherwise, I'm

18    actually not going to engage in any sort of presentation or

19    colloquy on the content of those filings.  Frankly, none of

20    them is an objection.  In fact, one of them is actually

21    specifically in support.

22            The others express points of view on complex

23    topics.  They express points of view that in some cases

24    reflect a sophisticated understanding of things that I don't

25    know nearly as well as the writers.  In some cases, I think

Page 21

1    they reflect an understanding of what actually has happened

2    in this case so far and what we hope to achieve that I very,

3    very strongly disagree with, but it doesn't matter, because

4    the docket is not a referendum for issues that are not yet

5    before the Court or on issues of public policy generally.

6          I think I've made that point at, I think, seven

7    hearing so far in this case.  One files things to get a

8    Court to rule on motions, not to express general points of

9    view, at least in my experience, on issues of public policy.

10   And so, I actually would prefer not to get into my views on

11   any of the letters or the one actual response with respect

12   of parties' views on various forms of exit.

13         I think I'm not telling tales out of school to say

14   that I've also consulted with the other -- several other

15   governmental and fiduciary core parties in a case, and

16   that's very much a shared view, having today be a kind of

17   free-wheeling referendum on issues that are currently being

18   mediated, negotiated, discussed, and drafted would actually

19   not be helpful to the case.

20         And so again, obviously, always as an officer of

21   the Court, we'll answer any question that the Court puts to

22   me, unless it is unethical or unlawful to do so, but I would

23   prefer not to get into any of the substance with respect to

24   the complex social policy issues, structuring issues, plan

25   alternative issues, that are raised in the filings, because

Page 22

1    candidly, this is an uncontested motion and I think that it

2    is simple as, we ask that the Court enter the order, to

3    which none of the 614,000 creditors in this case have filed

4    an objection.

5            THE COURT:  Okay, that's fine.  Does anyone else

6    have anything to say on this motion?

7            MR. KRAMER:  I don't know what the motion means.

8    My name's Tim Kramer.  I got a few things I'd like to say.

9    First of all, the corrected notice of hearing --

10           THE COURT:  Excuse me, Mr. Kramer.  Who -- can you

11   just tell me, are you representing someone?  And if not,

12   what is your status in the case or what is your role in the

13   case?

14           MR. KRAMER:  My role is, my fiancée died and I

15   became the guardian of her daughter and I became the

16   representative of her estate and I got this letter in the

17   mail and it's the corrected notice of hearing is in correct.

18   It says to call CourtCall and so I called them and they said

19   no, call Court Solutions, so I -- it was a big fiasco to try

20   to get to this phone call today, that's number one.

21           Number two, I have not received any letters or

22   emails, what that other gentleman was just talking about

23   regarding this.  And number three, Purdue Sackler, I think

24   they owe my stepdaughter the money because they made the

25   drugs that killed my fiancée and I'm raising my stepdaughter

Page 23

1    now.

2              THE COURT:  Okay.  So, Mr. Kramer, the particular

3    matter that is on the calendar first today is a motion to

4    extend the Debtors' time, which they have exclusively, to

5    file a Chapter 11 plan.  It doesn't pertain directly to any

6    particular claim in the case.  I'm assuming that you or one

7    of your family members filed a claim in the case, and that

8    may be what you got some form of notice on.  If you had not

9    filed what's called a notice of appearance in the case,

10   i.e., a request for notice of all of the hearings and all of

11   the matters to be heard, then you would not have gotten

12   notice of this particular motion that I'm addressing now.

13             So, I guess I can understand your confusion,

14   particularly given that you're not a lawyer, but this motion

15   really doesn't directly relate to or address your or your

16   daughter-in-law's claim in this case.  Those claims will be

17   dealt with in a claim review and analysis process, and will

18   be paid in some form -- it's highly unlikely that they'll be

19   paid in full -- but they'll be paid in some form if they're

20   allowed, once a plan, a Chapter 11 plan in the case is

21   confirmed.

22             So that's really what this hearing is about is to,

23   in essence, determine what time the Debtors have exclusively

24   to file that type of plan and dealing with scheduling issues

25   related to the filing and confirmation of a plan.  It

Page 24

```
 1    doesn't really pertain to individual claims.

 2              MR. KRAMER:  Okay.

 3              THE COURT:  I hope that clears things up for you.

 4              MR. KRAMER:  Yeah, a little bit.  I'm still

 5    confused by the lawyer -- because I -- I've got a bunch of

 6    lawyers contact me and I'm kind of surprised that they're

 7    not the ones handling this hearing today.  I don't know

 8    anything about this kind of stuff, so --

 9              THE COURT:  Well, I don't know who's contacting

10    you, sir.  Really, I'm not sure.  I mean, it's the Debtors'

11    motion and the person speaking first is the Debtors' lawyer,

12    so he was the right person to be speaking about the motion.

13    But again, if lawyers have been contacting you about your

14    particular claim, which I doubt the Debtors' lawyers would

15    be, then you should just be dealing with them as you wish,

16    but this motion really doesn't relate to your specific

17    claim.

18              MR. KRAMER:  Okay.  Just so you know, it says the

19    -- "Please provide the following name, Eddie Andino,

20    divisional manager," and it's signed by Vito Genna, clerk of

21    the court.

22              THE COURT:  I --

23              MR. KRAMER:  November --

24              THE COURT:  Again, I don't -- it's some form of

25    notice that you received in respect of a claim or a claim to
```

Page 25

1    be filed, but it wouldn't pertain to this specific motion

2    that's before me today.

3            MR. KRAMER:  Oh.  Should I hang up then, or should

4    I stay on the line?

5            THE COURT:  You could -- either one.  Whatever you

6    want, sir.

7            MR. KRAMER:  Okay.  All right.

8            THE COURT:  You don't have to stay on the line.

9            MR. KRAMER:  Thank you.

10           THE COURT:  But if you want to --

11           MR. KRAMER:  I'll just listen to what you guys

12   have to say so I can -- kinds of makes a little sense to me.

13   I'll put on mute.

14           THE COURT:  Okay.  That's fine.  That's perfectly

15   fine.  All right.  Does anyone else have anything to say on

16   this motion?

17           MR. BAMDAD:  Yes, Your Honor.  My name is Massoud

18   Bamdad and I'm one of the claimants in this case.  I need to

19   know, am I going to get the -- am I going to receive a copy

20   of this, whatever they want to file on 15th of February?

21           THE COURT:  Well, if what you're referring to is,

22   will you be served with a copy of the plan and disclosure

23   statement?

24           MR. BAMDAD:  Yes, sir.

25           THE COURT:  Yeah.  Yes, under the Bankruptcy Code,

1    claimants -- and I'm assuming you filed a proof of claim in

2    this case -- are entitled to notice of a plan and disclosure

3    statement.  They're not entitled to notice of every pleading

4    filed in a bankruptcy case.  To get every pleading, you need

5    to file what's called a notice of appearance, asking to get

6    a copy of everything, but the Code has a special rule that

7    requires notice to those who file claims of certain really

8    important pleadings, like a plan and disclosure statement,

9    so I'm assuming you'll get notice of that.

10           MR. BAMDAD:  Thank you, sir.  And my last and

11    second question is, actually when I filed this lawsuit, I

12    brought name of some people that they involved in this

13    company.  I have this question that they -- is this

14    bankruptcy involve those people, too, or just for the

15    Purdue?

16           THE COURT:  Well, the bankruptcy case is for

17    Purdue Pharma and affiliate -- certain affiliated companies.

18           MR. BAMDAD:  But not individual?

19           THE COURT:  There's not an individual bankruptcy

20    case.  Now, I don't know who you named in your lawsuit.

21           MR. BAMDAD:  Like the CEOs and some member of the

22    Sackler family.

23           THE COURT:  Okay.  So, in addition to the

24    bankruptcy, however, you should know two things.  First,

25    there is an injunction in place in this case that goes into

Page 27

1    next year that prohibits the continued prosecution of

2    lawsuits against a number of third parties who are not

3    individual Debtors in the case.  They may include people

4    that you sued in your lawsuit.  That has been extended a

5    couple of times.

6           The reason for the injunction, in a nutshell, is

7    that those parties, the claim -- put it this way.  The

8    claims against those parties are very similar, sometimes

9    they're identical to the claims against the Debtors in the

10   bankruptcy case, and the continued litigation of those

11   claims would severely impact the ability of the bankrupt

12   Debtors to put together a plan to pay creditors out of their

13   assets.

14          And in addition, the major parties in this case

15   have been engaged in an investigation and analysis and are

16   now engaged in negotiation of a potential collective

17   resolution of claims against those third parties.

18          MR. BAMDAD:  Yes.

19          THE COURT:  And the injunction is intended to

20   facilitate that process.  That process isn't going to go on

21   forever and there'll --

22          MR. BAMDAD:  Yes.

23          THE COURT:  -- be some discussion about that later

24   in this hearing, but right now, you need to check to see

25   whether, if you're going to be pursing that lawsuit, that

1    those people are protected by the injunction that's in

2    place, because if that's the case, then you really can't

3    continue until that injunction ends.

4             MR. BAMDAD:  Yes.

5             THE COURT:  So that's about all I can tell you

6    without knowing more about your lawsuit.  And again, if you

7    filed a claim against the Debtor or the Debtors, you will

8    get notice of the Debtors' request for approval of the

9    disclosure statement and plan.

10            MR. BAMDAD:  Yes, sir.

11            THE COURT:  Okay.

12            MR. BAMDAD:  Thank you very much.

13            THE COURT:  Okay.

14            MR. HUEBNER:  And Your Honor, just to the extent

15   helpful, since there are obviously many parties involved in

16   this case who have both suffered loss and may not have

17   counsel and be familiar with the byzantine pathways of

18   Chapter 11, just if there are other people listening, we did

19   set up a free website at the beginning of the case where

20   everybody can access every single document in the case for

21   free with no passwords and no sign-up and not fees.  It's

22   Restructuring.primeclerk.com/PurduePharma.  Or if you really

23   just google PrimeClerk Purdue, it'll pop up as the first

24   hit, and every document in the case is on there, and today's

25   agenda letter does, I think very clearly, reflect Court

 1    Solutions.  When the Court switched service providers many

 2    months ago, we switched as well so apologies, Mr. Kramer, if

 3    -- you may have been looking at a pretty old document that

 4    still had CourtCall on there, but it is definitely Court

 5    Solutions, and again, our documents have said that for a

 6    while.  So hopefully, those two pieces of kind of public

 7    access information are helpful to people on the phone, and

 8    you can always check the docket to see what's going on, even

 9    if you don't want to do a notice of appearance and get the

10    many, many, many filings in the case.  There's always a way

11    to just go onto that website and you can see what's new

12    since the last time that you checked.

13            MR. BAMDAD:  Say --

14            MR. HUEBNER:  -- Your Honor --

15            MR. BAMDAD:  I'm sorry, interrupting you.  Could

16    you repeat that website or whatever you --

17            MR. HUEBNER:  Sure, absolutely.  It's

18    restructuring dot --

19            MR. BAMDAD:  Restructuring?

20            MR. HUEBNER:  Restructuring.  Yeah, exactly.

21            MR. BAMDAD:  Restructuring.

22            MR. HUEBNER:  Yep --

23            THE COURT:  With an R.

24            MR. HUEBNER:  With an R.

25            MR. BAMDAD:  Restructuring what?

1           THE COURT:  Yes, restructure.

2           MR. HUEBNER:  Restructuring, dot --

3           MR. BAMDAD:  Yes.

4           MR. HUEBNER:  PrimeClerk, which is one word, P-R-

5    I-M-E-C-L-E-R-K, dot com, slash --

6           MR. BAMDAD:  Could you repeat that, P-R-I?

7           MR. HUEBNER:  M like Marshall, E like Edward,

8    clerk --

9           MR. BAMDAD:  Clerk?

10           MR. HUEBNER:  Dot com.  C-L-E-R-K, dot com.

11           MR. BAMDAD:  yes.

12           MR. HUEBNER:  Slash and then just as one word,

13    Purdue Pharma.

14           MR. BAMDAD:  Purdue Pharma.  Okay.  Dot com.

15           MR. HUEBNER:  exactly.

16           MR. BAMDAD:  Okay, dot com, Purdue --

17           MR. HUEBNER:  Exactly, but again, if you can't

18    find that, if you really just google Prime, Clerk, and

19    Purdue as three words, it will pop up as the first hit and

20    you'll find it right away.

21           MR. BAMDAD:  Thank you very, very much.

22           MR. HUEBNER:  Absolutely.  It's our job.

23           THE COURT:  Okay.  Does anyone else have anything

24    to say on the motion --

25           MS. ECKE:  Yes, Your Honor --

Page 31

1           THE COURT:  -- which is the Debtors' request to

2     extend the exclusive period?

3           MS. ECKE:  Yes, Your Honor.  I'm Maria Ecke and my

4     son --

5           THE COURT:  Okay --

6           MS. ECKE:  -- David Jonathan --

7           THE COURT:  Ms. Ecke, I'm sorry.  Ms. Ecke, we

8     have your motion on next, so I will address it, but I'm just

9     focusing again on the Debtors' motion for an extension of

10    their exclusive period to file a Chapter 11 plan.  We will

11    get to, shortly, your motion for payment which is on the

12    calendar separately.

13          MS. ECKE:  Thank you, Your Honor.

14          THE COURT:  Okay.  Very well.  All right, anyone

15    else?  Okay.  I will grant the motion of the Debtors for a

16    third extension of their exclusive period to file a Chapter

17    11 plan and the related 60-day extension of the time to

18    solicit acceptances of such a plan.

19          The motion is unopposed and it's understandable

20    why, given the current status of the case, which is first

21    and foremost an active mediation of the primary two open

22    issues remaining in these cases, namely, first the actual

23    forum and governance structure for the post-confirmation

24    entity, which was the subject of substantial discussion at

25    the last omnibus hearing in November, and secondly, the

Page 32

1    potential resolution of two sets of claims asserted against

2    the members or members of the Sackler families, the first

3    being claims that the Debtors would have, such as for the

4    potential avoidance of alleged fraudulent transfers and the

5    like, or derivative claims that they would have, and second,

6    claims that third parties would have which, obviously, would

7    be settled not through the normal 9019 bankruptcy settlement

8    process, but rather in return for some form of permanent

9    release or injunction of civil claims -- of such civil

10   claims.

11          The mediation has not concluded.  I gather it's

12   well underway and to permit that process to conclude and

13   inform a plan, is a critical step -- hopefully the last

14   critical step -- in these cases before a plan would be up

15   for confirmation.

16          That fact alone would really be sufficient under

17   Section 1121 for an extension of exclusivity, but the other

18   factors commonly cited by the courts including in in Re:

19   Adelphia Communications Corp., 342 B.R. 121, 131 (Bankr.

20   S.D.N.Y. 2006) and in Re: McClain Industries, Inc., 87 B.R.

21   830, 834 (Bankr. S.D.N.Y. 1987), also all argue for the

22   further extension sought by the Debtors.

23          I note that Mr. Huebner, the Debtors' counsel, has

24   stated the Debtors' strong desire and -- or inclination to

25   file a Chapter 11 plan before the conclusion of this further

Page 33

1    extended exclusive period, which would be through February

2    15th.  I, of course, am not involved in the mediation and do

3    not know the details of it.

4            But I think it is important, subject, of course,

5    to the mediators who have the ultimate discretion here,

6    telling the parties otherwise, that the parties should focus

7    on an end date for that mediation so that a plan can, in

8    fact, be prepared that has substantial support, and indeed,

9    with respect to third party claims against the Sacklers,

10   more than substantial support, overwhelming support,

11   although not necessarily unanimous support.

12           Knowing the scope of the two issues that are being

13   addressed in the mediation, having had the benefit of

14   reviewing the parties' counsel's fee applications, and

15   obviously, based on my involvement in the case thus far, it

16   seems to me that an outside date for the conclusion of the

17   mediation should be no later than January 31.

18           Now, I know Mr. Huebner said he wanted to file a

19   plan by the end of January, but I want to give the parties

20   enough time, not only to reach what I would hope to be

21   agreements in principle on the two main issues, but to put a

22   lot more detail behind them, and I think that might,

23   realistically, take tow the end of January.

24           On the other hand, I think that it is important to

25   have an end date and that that end date is a realistic one,

Page 34

1    given the literally tens, if not hundred, of thousands of

2    hours put into the analyses of these two issues already.  I

3    simply cannot concede that the parties will not know the

4    answer one way or another as to whether they can reach

5    agreement on these two issues by that date.

6            So, I want you to tell the mediators that that is

7    a deadline I believe would -- should be set and is set,

8    unless they strongly disagree with it.  The most difficult -

9    - as far as conceptual difficulty is concerned -- issue in

10   these cases has already been mediated.  When these cases

11   began, it was clear to me, and I think clear to all the

12   parties, that the truly novel issue here in these cases is

13   the allocation of the Debtors' value to what one can

14   conceivably view as a creditor body comprising almost

15   everyone in the United States and how that money should be

16   spent or that value should be spent.

17           Remarkably, there was incredible consensus on that

18   issue after a lengthy mediation facilitated by, as I've

19   said, two of the most talented mediators in the world, and

20   great good will and efforts by very diverse parties,

21   including thousands of governmental entities and 48 states.

22           The two remaining issues, while obviously

23   difficult and sensitive, can be resolved more quickly with

24   the same level of good will, which I know these parties

25   collectively have.  The corporate structure and corporate

1   governance issues demand careful consideration, but

2   ultimately, require focus on delivering the maximum amount

3   of value consistent with proper social and business conduct

4   to the people who have been injured by these Debtors.

5        There is no easy answer to that.  There are

6   conflicts of interest, potentially, everywhere, just as, for

7   example, one could argue that the acceptance of a

8   substantial amount of revenue from tobacco taxes is a

9   conflict of interest.  Almost everything involving realizing

10  value for beneficiaries here could be couched as a conflict

11  of interest, but of course, ultimately, one needs to get

12  satisfied that the value is being used properly and most

13  effectively and provides enough flexibility in its

14  government structure to change course, if necessary.

15       I trust you all can do that, and do that promptly

16  and well before January 31.  As far as the issues with the

17  Sacklers are concerned, the parties know, but everyone

18  should know, that I have no power over criminal liability.

19  We're ultimately here in these cases talking about a

20  resolution of claims for money.

21       The parties don't have to reach agreement, but I

22  urge them to do their best to do so by January 31 on those

23  issues so that if possible, a settlement is reached on both

24  the Debtor claims and, potentially, the third-party claims

25  that would allocate funds in an appropriate amount to abate

Page 36

1    the opioid crisis.

2            If that isn't done, as far as third party claims,

3    there's an obvious alternative, though it seems to me,

4    knowing those basic facts, knowing the strength and

5    weaknesses of the Debtor estate claims and the third party

6    claims, the parties simply need to conclude these

7    negotiations so that a plan can be filed because, as we all

8    know, every day that passes some poor soul is not getting

9    either the counseling that he or she needs or the treatment

10   he or she needs or an NAS baby is no longer a baby and her

11   grandparents are not getting the help they need.

12           So please, get it done.  All right.  I would like

13   to move on the agenda to the third matter, which is Ms.

14   Ecke's claim payment motion and then we can come back to the

15   fee applications.

16           MR. HUEBNER:  That's perfect, Your Honor.  I

17   actually was about to make that same request, so thank you

18   for that.  Your Honor, one very, very tiny technical point,

19   and apologies for this.  We actually asked for 60 days on

20   filing a plan but 90 days on soliciting, given --

21           THE COURT:  Oh, that's right.

22           MR. HUEBNER:  -- claim --

23           THE COURT:  You're right.  It's normally 60 days

24   for solicitation, but you asked for 90 days and that's

25   warranted given the size of the creditor body here.

1           MR. HUEBNER:  So, apologies.  I didn't want to be

2      persnickety, but I did want to point it out.

3           THE COURT:  Right.

4           MR. HUEBNER:  So, with that, Your Honor, we will

5      send in the order for entry.  There are no comments from any

6      part on the form of it, and I think that we are now ready to

7      move to Agenda Item No. 3, Mr. McClammy will be handling

8      that for the Debtors, but obviously, it is Ms. Ecke's

9      motion, so I will turn the podium over to her.

10          THE COURT:  Okay.

11          MS. ECKE:  Thank you, Your Honor.  I'm Maria Ecke

12     and my son David Jonathan Ecke died December 17th, 2015, and

13     I have a letter that I wrote to Ryan Hampton, Blue Cross

14     Blue Shield Association; CVS Caremark Part D Services, LLC;

15     Health, LLC; Cheryl Juaire; LTS Lohrmann Therapy Systems

16     Corporation; Pension Benefits Guarantee Corporation; Walter

17     Lee Salmons; Kara Trainor; and West Boca Medical Center; the

18     Official Committee of Unsecured Creditors care of Akin,

19     Gump, Strauss, Hauer, and Feld.  It's concerning my motion

20     for claim payment.

21          "Dear Committee Members:  According to Google, the

22     Sackler family behind Purdue Pharma is one of the richest

23     families in the U.S. with an estimated $13 billion fortune

24     from the sales of the controversial prescription pain

25     killer, OxyContin.  According to Forbes, also on Google,

1   today Purdue is still a hundred percent owned by the Sackler

2   family, generates some $13 billion in sales in the U.S.

3   separate Sackler-owned companies, which sell drugs in

4   Europe, Canada, Asia, and Latin America.  An estimated 20

5   family members share in the fortune.  Sacklers withdrew $12

6   billion over 13 years from Purdue Pharma as the opioid

7   epidemic grew.

8           "To my understanding, after my conversation dated

9   December 12, 2020, with attorney Edan Lisovicz of Akin,

10  Gump, Strauss, Hauer, and Feld, LLP; emails to Ryan Hampton,

11  Committee member; and attorney Ed Neiger who represents the

12  victims in this case, I learned that the Sackler family only

13  wants to settle for $3 billion over seven years.  This is

14  the amount of money that the Sackler family still make per

15  year.

16          "The amount of $3 billion is a slap in the face of

17  many Americans who have lost their beloved children or

18  relatives because of this illegally pushed drug by Purdue.

19  How can mediators and attorney put a price on the lives of

20  victims and the injury that it has caused to families unless

21  they have lost children to the drug themselves?  Purdue

22  Pharma should pay Claim No. 16810 to Maria Zekoff Ecke,

23  Richard Roberts Claim No. 22855, Richard Ecke's claim No.

24  23016 in the amount of $242 million and Peter

25  (indiscernible) Claim No. 16817 in the amount of $250,000,

1   which is less than originally asked for.

2            "My son was worth much, much more than $242

3   million, which I put on the paperwork to you.  He was the

4   great-great grandson of the treasure to the tsar of the

5   Ukraine, Konstantin Makarenko, one of two living relatives.

6   He was my firstborn who died needlessly.  There is clear and

7   convincing evidence of Purdue Pharma's gross negligence and

8   reckless indifference to the patients' health, wellbeing,

9   and suffering.

10           "My son David Jonathan Ecke has such potential in

11  his life to help everyone with his study of botany like his

12  great-grandmother, Maria Baklin only to be maimed and killed

13  by these devil drugs.  Purdue Pharma needs to pay or

14  otherwise make me whole.

15           "The mediators, Layn Phillips, Kenneth Feinberg,

16  and the Court should also be careful which company they

17  choose to administer the settlement.  My own personal

18  experience with Kurtzman Carson Consultants of 75 Rowland

19  Way, Suite 250, Novato, California 94945 and other KCC

20  affiliates such as Galardi and Company, LLC in Louisville,

21  Kentucky; Epic Global Claims Administrator in San Francisco;

22  and U.S. megabanks which put me in foreclosure was much less

23  than satisfactory.

24           "All this had a negative effect on my family's

25  life, and ultimately, led to my divorce.  But Purdue

1   Pharma's addictive drug OxyContin and oxycodone, which led

2   to the death of my beautiful, smart son David Jonathan Ecke

3   on December 17, 2015, was the destruction of our lives.

4   Doctors and Purdue Pharma needlessly prescribed this devil

5   drug to my son due to greed.  Only one doctor prescribed

6   physical therapy which my son actually needed.  Now I only

7   have tears and memories to comfort me.  Thank you from a

8   bereaved mother, Maria Ecke, and I sent a copy to you, Judge

9   Drain, and I sent a copy to Marshall Huebner, and to Lane

10   Phillips, and to Kenneth Feinberg.  This is -- the letter

11   that I just read you is a little bit revised from the copy

12   that I mailed you because I mailed it only yesterday.  Thank

13   you.

14          THE COURT:  Okay.  And thank you.  Now I have

15   reviewed that letter and I've heard you carefully, Ms. Ecke.

16   I've also reviewed the debtor's objection to the motion.  Do

17   the debtors have anything more to say that they haven't said

18   in the objection?

19          MR. MCCLAMMY:  Thank you, Your Honor.  This is Jim

20   McClammy from Davis Polk on behalf of the debtors.  The only

21   thing I will say, similar to what we've stated in our

22   papers, is we truly understand that these claims are rising

23   from tragic circumstances and as the Court is aware, as Mr.

24   Huebner stated earlier, the debtors, you know, remain

25   sympathetic to those affected by the opioid crisis and very

Page 41

1   much committed to moving these cases forward as quickly and

2   efficiently as we can.  And otherwise, we will stand on our

3   papers unless Your Honor has any further questions.

4           THE COURT:  Okay.  No, I don't.  So, Ms. Ecke, I'm

5   going to give you my ruling on the motion, and also address

6   what I think are important points you've made in that motion

7   and in your letter.

8           As far as the debtors are concerned, not the

9   Sackler family members but just the debtors, the motion

10  seeks a particular form of relief.  It's seeks immediate

11  payment of the claims that were filed by you and others

12  referenced in your letter.  It is of course absolutely true

13  that one really cannot put a price on a human life or even,

14  frankly, on an injury to someone who survives but has been

15  harmed.  At the same time, that is what courts do often

16  because claims are asserted against companies and people for

17  such loss and the courts knowing full well that they're

18  engaging in a legal fiction, nevertheless, do put a price on

19  that loss and also determine issues such as causation and

20  the like -- legal issues.

21          We do it all the time, and indeed, mediators do it

22  too.  Mr. Feinberg, as I think you may know, was the lead

23  mediator on the 911 claims.  He had the difficult choice of

24  allocating the money provided by our government to those

25  victims and their families.  One cannot allocate a recovery

Page 42

1    without doing that type of analysis even though we all know

2    separately as people that it's not enough ever.  So I am,

3    again, addressing that portion of your motion that seeks

4    immediate payment of the claim filed in this case against

5    the Purdue debtors for money for that loss.

6              Now with respect to that motion, there is a

7    fundamental principle of bankruptcy law which is that,

8    claims like this -- unsecured claims -- do not get paid

9    until a plan is confirmed that sets up a mechanism and a

10   distribution scheme for paying all of the claims asserted

11   against the debtor.  The rationale for that is a simple one.

12   No individual creditor should get a leg up on payment over

13   all the rest.  Rather, there should be a collective

14   resolution proposed, sent out on notice so that all the

15   creditors can see whether they think it's fair or not and

16   complies with the bankruptcy law, and if it's approved,

17   confirmed.  And then the claim payment mechanism would go in

18   effect.

19             Now here, it is clear to me not only that that

20   must happen first according to the bankruptcy law but also

21   the claims themselves -- and they are tens of thousands --

22   hundreds of thousands of claims filed in this case -- need

23   to be sorted through, analyzed, and addressed to see whether

24   they should be allowed.  Most of those claims, because of

25   the very hard work that was done in the first mediation in

Page 43

1  this case, will not have to go to that process if a plan is

2  confirmed, based on the settlements reached in that

3  mediation because those claimants have agreed that whatever

4  money would go to them would instead go to efforts to abate

5  the opioid crisis going forward.  That applies to most of

6  the claimants who have filed claims in this case.

7          It does not apply to personal injury claimants

8  like you on behalf of your son.  The settlement with respect

9  to those who were representing personal injury claimants in

10 large numbers -- a large number of those people, that is --

11 have agreed to use a hopefully streamlined and cost-

12 effective way to look at those claims on an individual

13 basis, to discern -- determine -- whether they are properly

14 against Purdue and the amount that those claims should be

15 allowed at.  In my experience in a lot of other cases

16 involving personal injury claims, those types of processes

17 result in 99.99 percent of the time an agreement between the

18 claimant and the post-confirmation claim manager as to how

19 the claim would be allowed and the amount.

20         But that will have to happen too.  So under the

21 bankruptcy law, it is premature to provide for payment now.

22 And so the motion before me which specifically seeks for

23 such an early payment must be denied without prejudice of

24 course to your rights as a claimant and the other people's

25 rights as a claimant but to have their claims paid after a

1    plan is confirmed.

2         Now as far as the portion of your letter dealing

3    with the Sackler family, I guess all I can say is that the

4    creditors committee and others in these cases and the

5    debtors have spent already I estimate based on looking at

6    fee applications well over 50,000 hours analyzing potential

7    claims against the Sacklers.  Just like you cannot put a

8    price ultimately on a human life, there is a legal analysis

9    that needs to be done that is separate from whatever one

10   might think morality might require because the laws lay out

11   specific rights and defenses with respect to all actual

12   legal claim that might exist against the Sacklers.  And it's

13   crystal clear to me that the lawyers in this case have

14   provided, have undertaken, and shared as detailed a legal

15   analysis and factual analysis of those rights and defenses

16   as one would ever see in a court of law.

17        So whatever result is reached, it will be guided

18   by that analysis because ultimately it's the legal merits of

19   those claims that have to guide the parties and ultimately

20   me.   We only have the laws that we have, in other words,

21   and that is what the mediation is addressing now and I hope

22   will result in an agreement that is acceptable to, as a

23   legal matter, the vast majority of people involved in this

24   case including you.

25        But again, at this point in the case, I really

1    can't say any more than that with regard to how you've

2    raised questions or issues regarding ultimately claims

3    against the Sacklers.  One thing is clear already.  They

4    will not retain any equity in these debtors under a plan.

5    They will lose it all.  The issue is, what else will they

6    pay, and that is under very heavy negotiation after the

7    extensive analysis that I've already discussed.

8              So I will ask the debtors to submit an order

9    denying the motion's request for immediate payment,

10   obviously, without prejudice to Ms. Ecke's right to receive

11   a distribution in respect of her claim and the other claims

12   referenced in the motions right to receive a distribution as

13   and when those claims would be allowed and pursuant to a

14   plan in this case.

15             I have seen at least two other letters that are

16   somewhat similar to Ms. Ecke's.  They did not schedule a

17   hearing on a motion similar to Ms. Ecke's and we have not

18   done so given the clear requirements of the bankruptcy code

19   that would require denial of such a motion and my belief

20   that the motion really -- those letters that I've received

21   since Ms. Ecke's letter didn't as clearly ask for payment.

22   So I think that if there are similar letters coming in in

23   the future, unless they actually ask to have a hearing

24   scheduled, counsel for the debtors should reach out to the

25   person who sent to the letter and say -- refer them to this

Page 46

1    ruling and this order and say if they want to have a hearing

2    they can, but otherwise, their claim will be dealt with as

3    part of the post-confirmation process for considering claims

4    that would receive some form of monetary distribution under

5    the plan as opposed to having their distribution be in the

6    form of abatement efforts generally.

7              MR. MCCLAMMY:  Thank you, Your Honor.  We will

8    definitely prepare the form of order.  I believe there be

9    two other -- two of those motions may have actually gotten

10   docketed with a notice of a hearing for the January hearing.

11   I know we've been in touch with one of the moving parties

12   there and we will reach out to the other to see if we can

13   resolve that in advance.

14             THE COURT:  Okay.

15             MS. KRAWEZYK:  Excuse me.

16             THE COURT:  I think those are probably letters I

17   was referring to.  And again, I didn't think they actually

18   asked for a hearing or actually asked for immediate payment.

19   I think they were slightly different than Ms. Ecke's letter

20   so you can relay that to them too.

21             MR. MCCLAMMY:  Yes, Your Honor.

22             MS. KRAWEZYK:  Your Honor?  Excuse me.

23             THE COURT:  Sure.

24             MS. KRAWEZYK:  My name is Kimberly Krawezyk.  I

25   did send you a letter at the beginning of the process.  I'm

1   a resident of Massachusetts.  I lost my brother tragically

2   at the tip of the epidemic in 2012 and I'm the class action

3   with the state of Massachusetts.  I would like to speak in

4   the honor, in memory of my brother.  Would you like me to

5   read the letter that I did provide to you or would you just

6   like to just speak in his memory?

7            THE COURT:  Well, ma'am, I have to say, ma'am, I

8   hold hearings on what is scheduled before me.  There are

9   literally hundreds of thousands of people who have lost dear

10  family members because of opioids.  I don't think that this

11  is the proper forum to do this.  Again, the courts decide

12  matters that are brought before them and notice for the

13  parties.  Your brother's memory, obviously, is dear and I

14  don't want you to think that your memory of him and hurt

15  from his loss isn't front and center in my mind and frankly

16  in the minds of the lawyers and financial people who are

17  trying to resolve this case.  But our job (indiscernible).

18  Believe me, we understand, I think, the tragedy that

19  countless families have felt and we simply can't turn these

20  hearings into something that the law really doesn't

21  contemplate which is focusing on things beyond what is

22  actually scheduled to be heard, that the parties prepare on,

23  brief, and analyze.

24            So I'm not going to let you speak further on this.

25  As much as I know your words are important, this isn't the

```
 1    right setting for it.

 2              MS. KRAWEZYK:  Okay.  I thank you for that but

 3    when I did register for this call I believe that

 4    (indiscernible) gave me the option to speak.

 5              THE COURT:  Well, but ma'am, that's largely a

 6    mechanical and scheduling matter and it's assumed --

 7              MS. KRAWEZYK:  Oh.

 8              THE COURT:  -- that the people who are speaking

 9    will be speaking on the matters that are calendared for that

10    day.

11              MS. KRAWEZYK:  Oh, okay.  My --

12              THE COURT:  I don't -- we don't have our people in

13    the clerk's office interrogate people about what they're

14    going to say or the like, but it's assumed that they will be

15    addressing the things that are actually to be decided by me

16    on that particular calendar day which is why Ms. Ecke was

17    allowed to speak because she had calendared her motion and

18    it was heard and decided.

19              MS. KRAWEZYK:  I see.  Okay.  My apologies.  At

20    some point, I really would like to --

21              THE COURT:  No, it's completely -- look, it's

22    completely understandable.  I'm not faulting you.  You're

23    not a lawyer.  You've been through a lot and I want to make

24    sure that -- well, let me say this.  I think what Ms. Ecke

25    said and what we've heard from other people, both in letters
```

Page 49

1    and in court, speaks for people like you as well.

2                MS. KRAWEZYK:  Okay.  My apologies.  As some

3    point, I would like to speak.  He was my last family member

4    and my entire family has been affected through this epidemic

5    and through Purdue Pharma's family.  So I really would like

6    to speak from the pain that it has created and me being left

7    behind with no family.  So thank you, Your Honor, for your

8    time and I will just listen.  Thank you.

9                THE COURT:  Okay.  And thank you.  And I do want

10   to assure and Ms. Ecke and, frankly, anyone else that from

11   the start of this case, my goal and I believe, frankly, all

12   of the parties' goal has been to use the value of these

13   debtors to abate the opioid crisis going forward as much as

14   that can be done, consistent with being socially

15   responsible, and to address the monetary claims of people

16   specifically injured who are not willing to have the

17   recovery go to abatement to prevent future losses.  That's

18   what the parties are negotiating right now and have

19   negotiated to a large measure.

20                Okay.  I think that leaves on the calendar the

21   interim fee applications which I already referenced a couple

22   of times.

23                MR. HUEBNER:  It does, Your Honor.  So the record

24   again, Marshall Huebner of Davis Polk I guess sort of behalf

25   of -- I'm not really on behalf of everybody but just to give

1    the Court an update.

2           Your Honor, the fee examiner once again sprung

3    into action in a timely and efficient.  I believe that they

4    contacted basically every party who submitted a fee

5    application with a detailed report -- ours was actually many

6    pages long -- raising questions and comments and asking for

7    further documentation about various fees, various expense,

8    various time entries.  There is issues with respect to, you

9    know, too many people at hearings, too many people on

10   conferences.  You know, the type of things that I can

11   believe that their (indiscernible).

12          It took until late last night because there was a

13   lot of stuff obviously for them to wade through and the

14   counterparties, but I believe that it is now the case that

15   reductions have been agreed to between, in each case,

16   bilaterally, the examiner and each of the professionals from

17   whom they sought reductions.  And so obviously, we all of

18   course are at the Court's pleasure but I think that from a

19   procedural approach in order to obviously do this as cost

20   effectively and efficiently as possible, you know, we've at

21   work preparing an omnibus order in the type of form I think

22   it's been used at the last couple of quarterly hearings that

23   reflects and addresses the reductions and obviously will

24   save cost by having a single order if and only of course if

25   that's the Court's pleasure that does -- I know that at

Page 51

1   least for some of the firms, while, you know, it's even

2   difficult to articulate words about the needs of

3   professional service firms in light of the, you know, people

4   that the Court has just been talking to who obviously

5   deserve everybody's infinite sympathy, there are year-end

6   issues that people are facing, obviously because of the

7   delay payment structure embedded in the bankruptcy system in

8   general.

9           There's already -- you know, this period already

10  ended a little while ago and much of the work was worked

11  several months ago and so I think then particularly with

12  year-end approaching, subject obviously (indiscernible) the

13  Court's concerns, I think that there are quite a few firms

14  on all sides who be very appreciative of if possible being

15  paid before year end.  This is a lot to clear on the company

16  side.  The company actually does itself shut down the first

17  (indiscernible) at the end of the year as many do.  So at

18  this point, I'm going to stop talking and ask the Court for

19  guidance but I think that's probably the update on where we

20  are on the fee apps for the various parties in the agenda

21  letter which is (indiscernible) resolved.

22          THE COURT:  Okay.  Let me make sure I completely

23  understand.  So recently, like basically yesterday, maybe

24  the day before, the fee examiner and each of the applicants

25  has agreed on the amount that would be sought here?

```
 1              MR. HUEBNER:  Yes, Your Honor.  That's correct and

 2   apologies if I was --

 3              THE COURT:  And also allowed on an interim basis?

 4              MR. HUEBNER:  Yes.  Yes, Your Honor.

 5              THE COURT:  Okay.  And is there any -- would that

 6   assume that with respect to the amounts agreed to be allowed

 7   that that full amount would be paid knowing that there's at

 8   least another quarter where there would be the 20 percent

 9   holdback going forward?

10              MR. HUEBNER:  Yes, Your Honor.  I mean, there's

11   probably more than a quarter again because of the time lag.

12              THE COURT:  Yeah.

13              MR. HUEBNER:  I don't think (indiscernible) --

14              THE COURT:  That's right because this goes through

15   September.

16              MR. HUEBNER:  -- so it's, you know, October or

17   November, December, January, February --

18              THE COURT:  Right.

19              MR. HUEBNER:  There's probably a bunch of months

20   left, you know, where obviously for some months work has

21   been done but zero's been paid.  I think for -- actually,

22   I'm not even sure there's a single month where 80 percent

23   has yet been paid and there are obviously the months yet to

24   be worked --

25              THE COURT:  Right.
```

1          MR. HUEBNER:  -- where there's a delay in payment

2     as well as the 80/20 until there'll (indiscernible) one more

3     interim hearing or just a final hearing.

4          THE COURT:  Okay.  So I have reviewed these

5     applications and there are 26 of them, a fairly dizzying

6     array of professionals.  I didn't have the benefit obviously

7     of seeing the agreements with the fee examiner.  However, I

8     do have the benefit in this case of there being a fee

9     examiner, Mr. Klauder, and it appears clear to me from his

10    firm's application and prior appearances that he is quite

11    diligent in going over the applications.

12         So this is what I'll do.  I will have you submit

13    the order.  The applications are otherwise unopposed and as

14    agreed with the fee examiner are unopposed as well.  I had

15    concerns about a number of these applications and I assume

16    that they are subsumed in the agreements that the fee

17    examiner has reached with the applicants.  What I will do,

18    and I know Mr. Klauder and his counsel are on the call, I

19    will simply note some thematic concerns that I have and

20    leave it at that.  I trust -- I assume that he has -- he had

21    those as well and that they informed at least in part what

22    he asked the professionals to agree to as far as reductions.

23    If he hasn't, however, I would want him both going forward

24    as well as in respect of the final applications to consider

25    these issues and basically decide whether he believes that

Page 54

1   there should be an additional reduction as part of the final

2   application in light of my raising them.

3        The first is one that a number of the applications

4   share and has always been a bugaboo of mine which is the

5   time spent of monthly applications and fee applications.  I

6   appreciate that because of the public nature of these

7   applications, time does need to be spent in reviewing them

8   to see whether anything that might waive the attorney/client

9   privilege or another privilege should be redacted, but there

10  are a number of applications where, you know, an excess of

11  200 hours is spent on time just for monthly and interim

12  applications.  There are some well over 100 hours and I'm

13  assuming that the fee examiner has looked at those and

14  decided which should be reduced and which are legitimate in

15  light of the requirement that Congress imposes to provide

16  more disclosure than you would normally do and to make it

17  public as opposed to just a disclosure to a client.  But

18  that's one concern.

19       The other concern I have is potential duplication

20  of effort and I don't know who should be doing what and who

21  is the duplicator and frankly, I would be exploring whether

22  it is actually duplication, but I'm just going to go through

23  now where I have a concern.  And again, this doesn't reflect

24  that I believe one firm is a duplicator and the other isn't

25  because it's hard for me to tell without further enquiry.

1          But with regard to the KPMG application which is

2   almost entirely for tax analysis, it would appear to me that

3   there's a distinct possibility of potential duplication with

4   Province's work on tax matters which is far less.  And maybe

5   it's not duplication.  I don't know but that's a concern.

6          With Skadden's work, almost all of which is

7   respect of dealing with the Department of Justice and the

8   DOJ settlement, it appears to me there's a potential

9   duplication with work on similar issues with the DOJ by King

10   and Spaulding.  Again, I'm not sure whether one firm or the

11   other is doing work that it doesn't need to do but it's

12   worth looking at.

13          With Jeffries' work and Province's work of sale

14   alternatives or sale exploration or exploration of sale

15   alternatives, there's also a potential for duplication with

16   the same caveat.  I'm not sure who's duplicating what.  Now

17   I appreciate Jeffries is on a flat fee but I'm not sure

18   whether the two firms are basically doing the same work as

19   far as exploring alternative sale possibilities.

20          There are obviously several counsel representing

21   the ad hoc group of consenting governmental entities.  It

22   appears to me in most cases they have divided up the work

23   among themselves so there's not duplication of effort, but I

24   did have questions as to whether when they bill for case

25   administration, meetings, plan and disclosure statement,

Page 56

1    asset analysis, and business operations sort of across the

2    board they should all be doing that.  In addition, there

3    seems potentially to have been duplication of effort between

4    Kramer Levin and Otterbourg on the governmental entity's own

5    proofs of claim.  Again, that may not be the case.  Maybe

6    they divided up the tasks and I'm not sure who should if

7    they didn't not have been billing for this.

8            And then lastly, for the Baird firm and I am

9    concerned about this one because it's billed as a final

10   application -- the Baird firm was the creditors committee's

11   efficiency counsel and yet it seems to have spent a lot of

12   time generally attending hearings, not just on their matters

13   but the hearings generally -- $43,000 worth -- reviewing the

14   docket generally, case administration generally, and staying

15   informed on the status of other opioid cases in litigation.

16   And that's of concern to me.  It's not something that

17   efficiency counsel normally would do.  Normally, they're

18   given a specific task or tasks and told to do it and not to

19   attend all hearings, for example.  So I guess given that

20   that is a final application, my view, because it well be

21   that I am more aggressive on this application than the fee

22   examiner might have been, that it should be treated as not a

23   final but a last interim so that the examiner can consider

24   those points in connection with the final fee application

25   process.

Page 57

1        Obviously, no judge likes to have a firm just

2    gorge money but the Baird firm is large enough so that I

3    trust that if there is a determination that the agreement

4    reached with the fee examiner doesn't cover the points that

5    I just raised, the Baird firm to good for it to give it

6    back.

7        Lastly, the Akin Gump application includes in the

8    expenses roughly 1.2 million of, quote, professional fees

9    legal, close quote.  I'm assuming that's contract lawyers.

10   I want to make sure that the fee examiner has reviewed what

11   they were doing as well to make sure that it satisfied

12   Section 331 of the bankruptcy code.  I'm assuming that those

13   people's work is in addition to the over 19,000 hours of

14   analysis of pre-petition transactions that Akin Gump lawyers

15   themselves engaged in during this fee period.  But I don't

16   know.  I don't know what they were doing so that's another

17   issue that I want to make sure the fee examiners consider.

18       So with those remarks, and again, they won't

19   affect the order except with respect to the Baird firm which

20   I believe should be treated simply as an interim order, I'll

21   grant the applications as agreed with the fee examiner,

22   subject to final fees of course or final fee applications.

23       MR. HUEBNER:  We will send in the order in Word.

24   We will also of course make the transcript available to the

25   fee examiner as soon as it arrives so that the Court's

1    concerns as articulated are sort of there in writing which

2    may or may not lessen the burden of the Court to put all

3    them in the fee order itself.

4            THE COURT:  Right.

5            MR. HUEBNER:  So we will act as messenger.

6    (indiscernible) than likely Mr. Klauder is online but, you

7    know, we often get the transcripts first.

8            Your Honor, with respect to the time for billing

9    just so the Court understands at least from my perspective

10   and the rest I think we'll leave to the future.  Certainly,

11   you know, we at Davis Polk -- I can only speak for myself --

12   are very mindful of that.  You know, there are sort of

13   guidelines of, you know, the number of percent points that

14   courts have generally found acceptable.  We actually write

15   off time as we need to to stay well underneath that, but it

16   is also correct as the Court noted that because of things

17   like the DOJ investigation, civil and criminal issues, very

18   confidential negotiations, and the like, you know, there is

19   an unusual need for redaction.  This is a very different

20   case for all of us, frankly, and whether it's, you know, the

21   UCC or the debtors or the ad hocs, you know, people don't

22   want, I think, others to be able to figure out things from

23   our very detailed and monthly time records that are

24   decidedly not public.  And so I think that, you know --

25   well, I think we actually stayed under 2 percent which is

1    way under what many of the cases say.  You know, I think

2    that there is a little extra work to do here.  This is not

3    just a second-lien group equitizing and refinancing the

4    first lien.  Obviously, it's very socially complicated,

5    legally complicated, and politically complicated.

6            But obviously, everybody I'm sure heard the Court

7    loud and clear and will continue to (indiscernible) that

8    they need to and I'm sure the fee examiner heard the Court

9    very loud and clear as well including the appreciation for

10   the very hard work.  And I can certainly, from my

11   perspective, confirm that they kept stuff, you know,

12   sometimes like with incredible (indiscernible), you know,

13   this $12 thing didn't match, you know, kind of thing, so

14   they certainly are doing their work within intensity and

15   alacrity.

16           Your Honor, that does complete the agenda.  I

17   think (indiscernible) emails during the hearing that unless

18   I am wrong further confirm that the public assess -- you

19   know, journalists unsealing motion -- is in fact resolved

20   and I think a stipulation should be coming to the Court

21   today that we second the, what I'll call, the family

22   privilege motions to which the debtors are not party.

23   Obviously, we still have, I guess, seven days left.  We'll

24   see where that goes, but for now I think that should be the

25   totality of the docket for the extra final 2020 hearing.

Page 60

```
1    The Court (indiscernible)

2             MS. ECKE:  Excuse --

3             MR. HUEBNER:  But -- I'm sorry.  Please, ma'am.

4             MS. ECKE:  Excuse me, Your Honor.  This Maria

5    Ecke.  And can I just ask you some questions?

6             THE COURT:  Well, let Mr. Huebner finish and then

7    you can.

8             MS. ECKE:  Oh, okay.  Sorry.

9             THE COURT:  That's fine.

10            MR. HUEBNER:  Your Honor, I was pretty much done.

11   I just wanted to wish everybody a safe and healthy end to

12   the year and holiday season.  This has obviously been, you

13   know, particular about as terrible a year as many of us in

14   our lifetimes have seen wrack our society and I just hope

15   that on a personal level, everyone is able to find, you

16   know, safety and a little bit of joy and obviously good

17   health as we roll into a new year that hopefully will bright

18   in every way and the thank many parties for their

19   extraordinary efforts.  We still have a couple of large

20   things to get through, but we've gotten through many already

21   and with the Court's guidance we now know that one way or

22   another, you know, unless something very unforeseeable

23   happens, there will be a plan of reorganization filed in

24   these cases in the next weeks and that I think it's

25   (indiscernible).  Ms. Ecke, that was all I had to say so I
```

Page 61

1    guess I turn the podium back to you.

2         MS. ECKE:  Thank you.  Your Honor, as you know I

3    want to start a foundation in my late son's honor.  Again,

4    since my claim is without prejudice after the restructuring,

5    how do I handle my claim going forward?

6         THE COURT:  Well, we don't know exactly because

7    the plan hasn't been filed, but the basic outline of the

8    statement for personal injury claims which is what your

9    claim class would in all likelihood be, contemplates a claim

10   allowance process and then if the claim is allowed, a

11   monetary distribution from a fund that has been negotiated -

12   - and aggregate fund.

13        It is, I think, a given that claims in all

14   likelihood won't be paid in full but it is expected there

15   will be monetary payments.  It would be made to the claimant

16   and then the claimant can do whatever he or she wants to do

17   with that money.  You can donate to a hospital.  You can set

18   up a foundation.  You can use it to pay your mortgage.  You

19   know, you can use it -- it's up to you at that point after

20   the distribution is made.

21        MS. ECKE:  How do you judge what the people are

22   going to say it's worth?

23        THE COURT:  Well, that is normally a matter that

24   does not come before the Court.  Believe it or not, most of

25   these types of claims in other cases are resolved by

Page 62

1    agreement because the claim process usually involves

2    experienced people who sort of lay out the law on these

3    types of claims and people hopefully will understand that

4    they're generally pretty objective and they'd rather resolve

5    it than spend the money on a lawyer to fix a higher amount.

6    And a lot depends of what the percentage distribution will

7    be, obviously.  If you're getting 5 percent of your claim,

8    you'd much less likely to pay a lawyer than if it looks like

9    everyone is going to get 95 percent of their claim if you

10   dispute the amount.

11          But that's really a matter, again, for the future.

12   But I can tell you that in a lot of the large cases I've had

13   where there have been many, many personal injury claims,

14   it's very, very rare of those claims to be decided -- I mean

15   in a trial -- and in any event, it would be decided by a

16   district judge or a state court judge given a peculiarity of

17   the bankruptcy code dealing with personal injury claims.

18          So that's about all I can say on that point.

19          MS. ECKE:  Thank you, Your Honor.

20          THE COURT:  Okay.  Thank you.  All right,

21   everyone.  Thank you very much.  I know this is

22   (indiscernible) but I really do urge you all to try to wrap

23   up the two remaining large issues in this case between now

24   and the end of the mediation at the end of January.

25          MR. TROOP:  Your Honor, this is Andrew Troop.

Page 63

1    Totally unrelated to the merit meeting, but I don't know if

2    Court Solutions is on the line.  I received several emails

3    or texts during the course of the hearing that the debtors

4    listen-only free line went silent for several minutes at a

5    time.

6              THE COURT:  All right.

7              MR. TROOP:  And so I --

8              THE COURT:  Well, I apologize for that.  I --

9    there were a lot of people of this line and I'll note there

10   have been some problems recently with the Court Solutions

11   provider depending on the strength of people's internet

12   connection.  We'll look into it.  But I thank you for noting

13   it.

14             MR. TROOP:  I appreciate it, Your Honor.  Have a

15   good of year all of you.

16             THE COURT:  Okay.  Same to you, Mr. Troop.  All

17   right, everyone.  I'm going to hang up at this point.  Thank

18   you all.

19             (Whereupon these proceedings were concluded)

20

21

22

23

24

25

Page 64

1                              I N D E X

2

3                              RULINGS

4                                              Page        Line

5

6    Motion to Extend Exclusivity Period Granted  31         15

7

8    Fee Applications Granted                      57         21

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 65

```
 1              C E R T I F I C A T I O N

 2

 3       I, Sonya Ledanski Hyde, certified that the foregoing

 4    transcript is a true and accurate record of the proceedings.

 5

 6

 7

 8    Sonya Ledanski Hyde

 9

10

11

12

13

14

15

16

17

18

19

20    Veritext Legal Solutions

21    330 Old Country Road

22    Suite 300

23    Mineola, NY 11501

24

25    Date:  December 16, 2020
```