<span style="color:red">REDACTED</span>

AKIN GUMP STRAUSS HAUER & FELD LLP
Ira S. Dizengoff
Arik Preis
Mitchell Hurley
Joseph L. Sorkin
Sara L. Brauner
One Bryant Park
New York, New York 10036
Telephone: (212) 872-1000
Facsimile: (212) 872-1002

*Counsel to the Official Committee of Unsecured
Creditors of Purdue Pharma L.P.,* et al.

**UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK**

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| PURDUE PHARMA L.P., *et al.*,[1] | ) | Case No. 19-23649 (RDD) |
| | ) | |
| Debtors. | ) | (Jointly Administered) |
| | ) | |

## <u>DECLARATION OF ARIK PREIS DATED NOVEMBER 18, 2020</u>

---

[1] The Debtors in these cases, along with the last four digits of each Debtor's registration number in the applicable jurisdiction, are as follows: Purdue Pharma L.P. (7484), Purdue Pharma Inc. (7486), Purdue Transdermal Technologies L.P. (1868), Purdue Pharma Manufacturing L.P. (3821), Purdue Pharmaceuticals L.P. (0034), Imbrium Therapeutics L.P. (8810), Adlon Therapeutics L.P. (6745), Greenfield BioVentures L.P. (6150), Seven Seas Hill Corp. (4591), Ophir Green Corp. (4594), Purdue Pharma of Puerto Rico (3925), Avrio Health L.P. (4140), Purdue Pharmaceutical Products L.P. (3902), Purdue Neuroscience Company (4712), Nayatt Cove Lifescience Inc. (7805), Button Land L.P. (7502), Rhodes Associates L.P. (N/A), Paul Land Inc. (7425), Quidnick Land L.P. (7584), Rhodes Pharmaceuticals L.P. (6166), Rhodes Technologies (7143), UDF L.P. (0495), SVC Pharma L.P. (5717) and SVC Pharma Inc. (4014). The Debtors' corporate headquarters is located at One Stamford Forum, 201 Tresser Boulevard, Stamford, CT 06901.

<span style="color:red">PUBLICLY FILED PER ORDER [ECF 2404]</span>

REDACTED

Under 28 U.S.C. § 1746, I, Arik Preis,[2] declare under the penalty of perjury that the following is true and correct to the best of my knowledge, information, and belief:

1.      This declaration ("**Declaration**") is submitted in support of the Official Committee of Unsecured Creditors of Purdue Pharma, L.P. et al.'s Motions (defined below) and two reply briefs filed contemporaneously with this Declaration entitled (1) Official Committee of Unsecured Creditors' Reply in Support of Its Motion to Compel Production of Purportedly Privileged Documents, or for *In Camera* Review, Based on Good Cause, Crime Fraud, and At Issue Exceptions to Claims of Privilege (the "**Exceptions Reply**")[3]; and (2) Official Committee of Unsecured Creditors' Reply in Support of Motion to Compel Production of Purportedly Privileged Documents, or for *In Camera* Review, Based on Failure of the Sacklers to Demonstrate Documents Identified on Logs are Privileged (the "**General Challenges Reply,**"[4] and, together with the Exceptions Reply, the "**Replies**").[5]

2.      I am an attorney in good standing admitted to practice in the State of New York, and I am a partner at the law firm of Akin Gump Strauss Hauer & Feld LLP ("**Akin Gump**").  I was admitted to the New York State Bar in 2001 and have been practicing law in the area of bankruptcy and financial restructuring since that time.  I make this Declaration based on my own personal knowledge and belief, and upon documents and information available to me as counsel to the Official Committee of Unsecured Creditors of Purdue Pharma, L.P. et al (the "**UCC**").

---

[2] My legal name is Erik Preis but for my entire life I have utilized the name Arik and not Erik.

[3] For the sake of clarity, the Exceptions Reply is submitted in support of the UCC's *Motion to Compel Production of Purportedly Privileged Documents, or for* In Camera *Review, Based on Good Cause, Crime Fraud, and At Issue Exceptions to Claims of Privilege* [ECF No. 1753] (the "**Exceptions Motion**").

[4] For the sake of clarity, the Challenges Reply is submitted in support of the UCC's *Motion to Compel Production of Purportedly Privileged Documents, or for In Camera Review, Based on Failure of the Sacklers and the Debtors to Demonstrate Documents Identified on Logs are Privileged* [ECF No. 1752] (the "**General Challenges Motion**").  The Exceptions Motion and General Challenges Motion are collectively referred to herein as the "**Motions**."

[5] Capitalized terms used but not defined herein shall have the meanings ascribed to them in the Replies, which the UCC has endeavored to use consistently with definitions used in the Motions.

PUBLICLY FILED PER ORDER [ECF 2404]

REDACTED

3.    The UCC files its Replies in accordance with the briefing schedule provided in the

*Stipulation and Agreed Order Regarding Amended Briefing Schedule in the Chapter 11 Cases*,

executed by the Debtors, the Sacklers, the NCSG, the AHC, and the UCC, which was filed and so

ordered by the Court on October 26, 2020 [ECF No. 1848].  After filing its Motions, the UCC has

continued to meet and confer with counsel for the Side A and Side B Sacklers (collectively, the

"**Sacklers**") and the Debtors (collectively with the Sacklers, the "**Withholding Parties**") in a good

faith effort to resolve by agreement the issues raised by the Motions without the intervention of

the Court.  While the parties informally resolved some of the UCC's challenges, they could not

resolve all the issues as described in the Replies.

4.    This Declaration attaches and describes documents and testimony relied upon in

the Replies.  Certain exhibits attached hereto have been designated as Confidential, Highly

Confidential, Professional's Eyes Only, or Outside Professional's Eyes Only, by one or more

parties to this proceeding and are redacted pursuant to the *Third Amended Protective Order* entered

in these proceedings [ECF No. 1935].  The UCC also files certain correspondence with the

Withholding Parties under seal in an abundance of caution in order to accommodate certain

Withholding Parties' prior positions concerning the confidentiality of email address and other

information that may be contained therein.  By filing in this way, the UCC does not intend to

suggest that it agrees the information is or ought to be confidential.

5.    Attached hereto as **Exhibit A** is a true and correct copy of an excel workbook

containing the entries on Side A's privilege log that the UCC is challenging in the Motions and

Replies, separated by category based on the tabbed worksheets in the excel workbook.  For the

Exceptions Motion and Reply, the privilege entries are a non-exhaustive, illustrative list of the

Challenged Documents (as defined in the Exceptions Motion) that the UCC believes fit within the

PUBLICLY FILED PER ORDER [ECF 2404]

REDACTED

categories of privileged documents the UCC seeks to compel.  This Exhibit A is intended to supersede the Exhibit A attached to the Declaration of Mitchell Hurley Dated September 29, 2020, originally filed in support of the Motions.

6.      Attached hereto as **Exhibit B** is a true and correct copy of an excel workbook containing the entries on Side B's privilege log that the UCC is challenging in the Motions and Replies, separated by category based on the tabbed worksheets in the excel workbook.  For the Exceptions Motion and Reply, the privilege entries are a non-exhaustive, illustrative list of the Challenged Documents (as defined in the Exceptions Motion) that the UCC believes fit within the categories of privileged documents the UCC seeks to compel.  This Exhibit B is intended to supersede the Exhibit B attached to the Declaration of Mitchell Hurley Dated September 29, 2020, originally filed in support of the Motions.

7.      Attached hereto as **Exhibit C** is a list of document control numbers corresponding to certain Privilege Log entries for which the UCC requests *in camera* review.  The list is organized categorically and by Withholding Party.  The document control numbers in Exhibit C are presented as a limited sampling of materials that the UCC believes would enable the Court to make a reasoned determination whether further *in camera* review or other relief is appropriate respecting categories of documents identified in the General Challenges Reply.

8.      Attached hereto as **Exhibit 110** is a true and correct copy of a letter from Mitchell Hurley to Alexander Lees, dated September 25, 2020.

9.      Attached hereto as **Exhibit 111** is a true and correct copy of a letter from Mitchell Hurley to Alexander Lees, dated October 12, 2020.

10.     Attached hereto as **Exhibit 112** is a true and correct copy of a letter from Mitchell Hurley to Jasmine Ball, dated October 14, 2020.

PUBLICLY FILED PER ORDER [ECF 2404]

REDACTED

11.     Attached hereto as **Exhibit 113** is a true and correct copy of an email from Elizabeth Scott to Jasmine Ball, dated October 20, 2020.

12.     Attached hereto as **Exhibit 114** is a true and correct copy of an email from Elizabeth Scott to Jasmine Ball, dated October 23, 2020.

13.     Attached hereto as **Exhibit 115** is a true and correct copy of an email from Elizabeth Scott to Jasmine Ball, dated October 29, 2020.

14.     Attached hereto as **Exhibit 116** is a true and correct copy of a letter from Alexander Lees to Mitchell Hurley, dated September 28, 2020.

15.     Attached hereto as **Exhibit 117** is a true and correct copy of a letter from Alexander Lees to Mitchell Hurley, dated October 19, 2020.

16.     **Exhibit 118** to this Declaration has been intentionally omitted.

17.     **Exhibit 119** to this Declaration has been intentionally omitted.

18.     **Exhibit 120** to this Declaration has been intentionally omitted.

19.     **Exhibit 121** to this Declaration has been intentionally omitted.

20.     Attached hereto as **Exhibit 122** is a true and correct copy of an email from Stuart Baker dated November 1, 2018, which was produced to the UCC under the Bates number MSF00470861.

21.     Attached hereto as **Exhibit 123** is a true and correct copy of an email exchange between Mortimer Sackler and Antony Mattessich, dated April 24, 2017, which was produced to the UCC under the Bates number MSF00575712.

22.     Attached hereto as **Exhibit 124** is a true and correct copy of an email from Stuart Baker to Richard Sackler, dated November 22, 2013, which was produced to the UCC under the Bates number RSF_OLK00070002.

PUBLICLY FILED PER ORDER [ECF 2404]

REDACTED

23.     Attached hereto as **Exhibit 125** is a true and correct copy of a July 27, 2011 email from Cecil Pickett forwarding a Stuart Baker email with attachment titled "Proposed 2012 Calendar of Meetings and Board Calls," which was produced to the UCC under the Bates numbers PPLPUCC9002657293-94.

24.     Attached hereto as **Exhibit 126** is a true and correct copy of an email chain dated June 21, 2019, which was produced to the UCC under the Bates number MSF00997606.

25.     Attached hereto as **Exhibit 127** is a true and correct copy of an excel spreadsheet containing text messages including Dame Theresa Sackler and others, which was produced to the UCC under the Bates number MSF90089695.

26.     Attached hereto as **Exhibit 128** is a true and correct copy of an email from Paul Gallagher, Senior Managing Director at Teneo, dated May 20, 2019, which was produced to the UCC under the Bates number PPLPUCC002663187.

27.     Attached hereto as **Exhibit 129** is a true and correct copy of an email from Paul Gallagher, Senior Managing Director at Teneo, dated May 20, 2019, which was produced to the UCC under the Bates number PPLPUCC002664919.

28.     Attached hereto as **Exhibit 130** is a true and correct copy of an email from Mortimer Sackler dated May 21, 2019, which was produced to the UCC under the Bates number PPLPUCC002662986.

29.     **Exhibit 131** to this Declaration has been intentionally omitted.

30.     Attached hereto as **Exhibit 132** is a true and correct copy of an email from David Lundie to John Donovan, dated February 8, 2012, which was produced to the UCC under the Bates number PPLPC036000177151.

PUBLICLY FILED PER ORDER [ECF 2404]

REDACTED

31.  Attached hereto as **Exhibit 133** is a true and correct copy of a September 2010 email chain which was produced to the UCC under the Bates number PPLPUCC002449097.

32.  Attached hereto as **Exhibit 134** is a true and correct copy of an email from Michael Friedman dated March 5, 2006, which was produced to the UCC under the Bates number PPLPUCC002603602.

33.  Attached hereto as **Exhibit 135** is a true and correct copy of a February 15, 2011 email from Jonathan Sackler attaching Purdue board and management discussion materials, which was produced to the UCC under the Bates number PPLPUCC9003800123.

34.  Attached hereto as **Exhibit 136** is a true and correct copy of excerpts from the minutes of a March 4, 2003 meeting of the board of directors of Purdue Pharma Inc., which was produced to the UCC under the Bates number PPLPUCC500647319.

35.  Attached hereto as **Exhibit 137** is a true and correct copy of a May 5, 2017 email from Craig Landau attaching a Purdue diagnostic and forward plan, which was produced to the UCC under the Bates number PWG004670879.

36.  Attached hereto as **Exhibit 138** is a true and correct copy of a February 2007 email chain which was produced to the UCC under the Bates number PPLPC061000013858.

37.  Attached hereto as **Exhibit 139** is a true and correct copy of a March 2008 email chain which was produced to the UCC under the Bates number PPLPC012000174476.

38.  Attached hereto as **Exhibit 140** is a true and correct copy of an February 2012 email chain which was produced to the UCC under the Bates number PPLPUCC9002981007.

39.  Attached hereto as **Exhibit 141** is a true and correct copy of a November 2013 email chain which was produced to the UCC under the Bates number SideA00429689.

PUBLICLY FILED PER ORDER [ECF 2404]

REDACTED

40.     Attached hereto as **Exhibit 142** is a true and correct copy of a June 2015 email chain which was produced to the UCC under the Bates number PPLPUCC9004448656.

41.     Attached hereto as **Exhibit 143** is a true and correct copy of excerpts from a February 11, 2010 letter from Amy D'Agostino to Cecil Pickett attaching executed Director Agreements, which was produced to the UCC under the Bates number CP0000001.

42.     Attached hereto as **Exhibit 144** is a true and correct copy of Executive Committee Meeting Notes & Actions, dated September 21, 2011, which was produced to the UCC under the Bates number RSF_OLK00035017.

43.     Attached hereto as **Exhibit 145** is a true and correct copy of an April 2012 email chain, which was produced to the UCC under the Bates number PPLPC012000372585.

44.     Attached hereto as **Exhibit 146** is a true and correct copy of a September 11, 2013 memorandum from McKinsey to John Stewart and Russ Gasdia, which was produced to the UCC under the Bates number PPLPC012000441614.

45.     Attached hereto as **Exhibit 147** is a true and correct copy of an August 15, 2013 email from Richard Sackler, which was produced to the UCC under the Bates number PPLPUCC9002391802.

46.     Attached hereto as **Exhibit 148** is a true and correct copy of an email from Stuart Baker dated August 21, 2013, which was produced to the UCC under the Bates number PPLPC045000016165.

47.     Attached hereto as **Exhibit 149** is a true and correct copy of an April 6, 2014 email from Edward Mahony, which was produced to the UCC under the Bates number PPLPC012000471641.

PUBLICLY FILED PER ORDER [ECF 2404]

REDACTED

48.     Attached hereto as **Exhibit 150** is a true and correct copy of excerpts from a presentation titled: Changes in prescriptions of OxyContin and OPANA ER after introduction of tamper resistant formulations among potentially problematic and comparator prescribers, which was produced to the UCC under the Bates number PPLPC019000826509.

49.     Attached hereto as **Exhibit 151** is a true and correct copy of a May 21, 2007 email and attached May 2007 calendar printout, which was produced to the UCC under the Bates numbers PPLPUCC001531749-50.

50.     Attached hereto as **Exhibit 152** is a true and correct copy of excerpts from an August 2013 email from Donna Condon attaching an August 8, 2013 memorandum from McKinsey to John Stewart and Russ Gasdia, which was produced to the UCC under the Bates number MDSF00986947.

51.     Attached hereto as **Exhibit 153** is a true and correct copy of a June 2014 email chain, which was produced to the UCC under the Bates number PPLPC045000017003.

52.     Attached hereto as **Exhibit 154** is a true and correct copy of excerpts from a Purdue OxyContin Annual Marketing Plan, dated October 6, 2013, which was produced to the UCC under the Bates number PAK000062549.

53.     Attached hereto as **Exhibit 155** is a true and correct copy of excerpts from an August 15, 2013 Purdue board meeting agenda and attached August 8, 2013 memorandum from McKinsey which was produced to the UCC under the Bates number PPLP004409890.

54.     Attached hereto as **Exhibit 156** is a true and correct copy of an October 8, 2011 Google news alert, which was produced to the UCC under the Bates number RSF00683542.

55.     Attached hereto as **Exhibit 157** is a true and correct copy of a November 1, 2013 Google news alert, which was produced to the UCC under the Bates number RSF_OLK00008429.

9

REDACTED

56.     Attached hereto as **Exhibit 158** is a true and correct copy of an April 18, 2015 Google news alert, which was produced to the UCC under the Bates number MDSF00514742.

57.     Attached hereto as **Exhibit 159** is a true and correct copy of a July 2016 email chain, which was produced to the UCC under the Bates number PWG004484978.

58.     Attached hereto as **Exhibit 160** is a true and correct copy of a January-February 2008 email chain, which was produced to the UCC under the Bates number SideA00391976.

59.     Attached hereto as **Exhibit 161** is a true and correct copy of a February 2008 email chain, which was produced to the UCC under the Bates number PPLPC042000011810.

60.     Attached hereto as **Exhibit 162** is a true and correct copy of an October 2014 email chain, which was produced to the UCC under the Bates number PPLPUCC000335135.

61.     Attached hereto as **Exhibit 163** is a true and correct copy of document titled "CEO Considerations," which was produced to the UCC under the Bates number PPLPUCC001662356.

62.     Attached hereto as **Exhibit 164** is a true and correct copy of excerpts from a Dec. 6, 2019 "Presentation of Defenses ('Side A')," which was provided to the UCC by counsel for Side A.

63.     Attached hereto as **Exhibit 165** is a true and correct copy of excerpts from an October 8, 2010 Purdue news summary, which was produced to the UCC under the Bates number PPLPC061000060749.

64.     Attached hereto as **Exhibit 166** is a true and correct copy of an April 2012 email chain, which was produced to the UCC under the Bates number MARSH-PURDUE-001112.

65.     Attached hereto as **Exhibit 167** is a true and correct copy of a May 11, 2012 email and attached presentation and timeline, which was produced to the UCC under the Bates number MARSH-PURDUE-001768.

PUBLICLY FILED PER ORDER [ECF 2404]

REDACTED

66.     Attached hereto as **Exhibit 168** is a true and correct copy of a May 2012 email chain, which was produced to the UCC under the Bates number MARSH-PURDUE-001777.

67.     Attached hereto as **Exhibit 169** is a true and correct copy of a July 2015 email chain, which was produced to the UCC under the Bates number MDSF00450185.

68.     Attached hereto as **Exhibit 170** is a true and correct copy of a June 2016 email chain, which was produced to the UCC under the Bates number MDSF00010697.

69.     Attached hereto as **Exhibit 171** is a true and correct copy of excerpts from a February 29, 2012 Purdue news summary, which was produced to the UCC under the Bates number IACS_ESI_0000490680.

70.     Attached hereto as **Exhibit 172** is a true and correct copy of an March 30, 2016 letter from Moody's Investor Services, which was produced to the UCC under the Bates number PPLPUCC003938943.

71.     Attached hereto as **Exhibit 173** is a true and correct copy of an April 7, 2016 letter from Standard & Poor's Ratings Services, which was produced to the UCC under the Bates number PPLPUCC500143127.

72.     Attached hereto as **Exhibit 174** is a true and correct copy of a document titled "Proposal Regarding Board Practices," which was produced to the UCC under the Bates number MSF00144650.

73.     Attached hereto as **Exhibit 175** is a true and correct copy of a July 16, 2017 email from Mortimer Sackler which was produced to the UCC under the Bates number SideA00229177.

74.     Attached hereto as **Exhibit 176** is a true and correct copy of a March 10, 2008 email from Richard Sackler which was produced to the UCC under the Bates number PPLPC023000164605.

PUBLICLY FILED PER ORDER [ECF 2404]

REDACTED

75. Attached hereto as **Exhibit 177** is a true and correct copy of an April-May 2011 email chain which was produced to the UCC under the Bates number PPLPUCC9000363533.

76. Attached hereto as **Exhibit 178** is a true and correct copy of *Purdue's Written Responses to 30(b)(6) Topics*, served in connection with *In re: National Prescription Opiate Litigation*, MDL No. 2804, in the United States District Court, Northern District of Ohio, which was produced to the UCC under the Bates number POK003735973.

77. Attached hereto as **Exhibit 179** is a true and correct copy of a June 18, 2014 Purdue news summary, which was produced to the UCC under the Bates number POK003746339.

78. Attached hereto as **Exhibit 180** is a true and correct copy of an April 12, 2012 OxyContin Market Events presentation, which was produced to the UCC under the Bates number PPLPC012000372437.

79. Attached hereto as **Exhibit 181** is a true and correct copy of excerpts from an August 13, 2014 presentation from JP Morgan, which was produced to the UCC under the Bates number PPLPUCC000281516.

80. Attached hereto as **Exhibit 182** is a true and correct copy of the Purdue plea agreement with the United States dated October 20, 2020 and filed in these proceedings at EFC No. 1828-2.

81. Attached hereto as **Exhibit 183** is a true and correct copy of excerpts from a notification of patent decision in *In re Oxycotin Antitrust Litig.*, No. 1:06-cv-13095-SHS (S.D.N.Y. Jan. 7, 2008), which was produced to the UCC under the Bates number PURCHI-000834581.

82. Attached hereto as **Exhibit 184** is a true and correct copy of an August 17, 2020 letter to Mitchell Hurley.

PUBLICLY FILED PER ORDER [ECF 2404]

REDACTED

83.    Attached hereto as **Exhibit 185** is a true and correct copy of excerpts from the audited combined financial statements of Purdue for years ended December 31, 2007 and 2006, which was produced to the UCC under the Bates number PPLPUCC500056846.

84.    Attached hereto as **Exhibit 186** is a true and correct copy of a May 1999 email chain, which was produced to the UCC under the Bates number PPLPUCC000004987.

85.    Attached hereto as **Exhibit 187** is a true and correct copy of a March 2007 email chain, which was produced to the UCC under the Bates number PPLPUCC004057767.

86.    Attached hereto as **Exhibit 188a** is a true and correct copy of privilege slip sheet, which was produced to the UCC under the Bates number PPLPC051000035807, and is identified in metadata as the parent document of PPLPC051000035808 (Ex. 188b to this Declaration).

87.    Attached hereto as **Exhibit 188b** is a true and correct copy of a 2006 Comment published in Northwestern University Law Review titled: "West Virginia's Painful Settlement: How the OxyContin Phenomenon and Unconventional Theories of Tort Liability May Make Pharmaceutical Companies Liable for Black Markets," which was produced to the UCC under the Bates number PPLPC051000035808.

88.    Attached hereto as **Exhibit 189** is a true and correct copy of a Purdue News Summary circulated on June 20, 2014, which was produced to the UCC under the Bates number PAZ000115626.

89.    Attached hereto as **Exhibit 190** is a true and correct copy of a June 2014 email chain, which was produced to the UCC under the Bates number PPLPC045000017003.

90.    Attached hereto as **Exhibit 191** is a true and correct copy of excerpts from the audited combined financial statements of Purdue for years ended December 31, 2008 and 2007, which was produced to the UCC under the Bates number PPLPUCC500056885.

PUBLICLY FILED PER ORDER [ECF 2404]

REDACTED

91.     Attached hereto as **Exhibit 192** is a true and correct copy of a May 2012 email chain, which was produced to the UCC under the Bates number MARSH-PURDUE-001863.

92.     Attached hereto as **Exhibit 193** is a true and correct copy of a April 2012 email chain, which was produced to the UCC under the Bates number MARSH-PURDUE-001114.

93.     Attached hereto as **Exhibit 194** is a true and correct copy of a May 2012 email chain, which was produced to the UCC under the Bates number MARSH-PURDUE-001804.

94.     Attached hereto as **Exhibit 195** is a true and correct copy of excerpts from a privilege log dated March 5, 2019, produced by the Debtors in connection with MDL litigation, and provided to the UCC in connection with these proceedings.

95.     Attached hereto as **Exhibit 196** is a true and correct copy of a November 2020 email chain between counsel for Norton Rose Fulbright, the UCC, and the Debtors, among others.

96.     Attached hereto as **Exhibit 197** is a true and correct copy of a November 8, 2020 email from Katherine Porter to counsel for the Debtors concerning deposition scheduling.

97.     Attached hereto as **Exhibit 198** is a true and correct copy of a November 15, 2020 email from Katherine Porter attaching the current deposition schedule in these proceedings.

98.     Attached hereto as **Exhibit 199** of  State Settlement Agreement and Release dated July 17, 2007, and entered into by the State of Washington and The Purdue Frederick Company, Inc. and Purdue Pharma L.P., which was produced to the UCC under the Bates number PPLPC030000403213.

99.     Attached hereto as **Exhibit 200** is a true and correct copy of the online curriculum vitae of Norton Rose Fulbright attorney Donald Strauber, which was obtained on November 17, 2020, at https://www.nortonrosefulbright.com/en-us/people/1016474.

PUBLICLY FILED PER ORDER [ECF 2404]

REDACTED

100.    Attached hereto as **Exhibit 201** is a true and correct copy of the affidavit of Edward B. Mahony, dated February 4, 2014, and submitted in connection with the lawsuit styled *Purdue Pharma L.P. v. Combs*, Case No. 2013-CA-001941, in the Commonwealth of Kentucky Court of Appeals.

101.    Attached hereto as **Exhibit 202** is a true and correct copy of the following journal article: Ryan N. Hansen, et al., Economic Costs of Nonmedical Use of Prescription Opioids, 27 CLINICAL J. OF PAIN 194 (2011).

102.    Attached hereto as **Exhibit 203** is a true and correct copy of excerpts from the audited combined financial statements of Purdue for years ended December 31, 2009 and 2008, which was produced to the UCC under the Bates number PPLPUCC500056924.

103.    Attached hereto as **Exhibit 204** is a true and correct copy of a December 24, 2010 email to Richard Sackler titled "What's new for 'oxycontin' in PubMed," which was produced to the UCC under the Bates number RSF_OLK00055037.

104.    Attached hereto as **Exhibit 205** is a true and correct copy of excerpts from the audited combined financial statements of Purdue for years ended December 31, 2010 and 2009, which was produced to the UCC under the Bates number PPLPUCC500056963.

105.    Attached hereto as **Exhibit 206** is a true and correct copy of an October 2014 email chain, which was produced to the UCC under the Bates number PPLPC045000017072.

106.    Attached hereto as **Exhibit 207** is a true and correct copy of an email from Howard Udel forwarding a March 10, 2008 article titled: "Anatomy Of A Patent Dispute: Purdue Pharma's OxyContin Battle," which was produced to the UCC under the Bates number MSF01116645.

107.    Attached hereto as **Exhibit 208** is a true and correct copy of an excerpt from a distributions summary spreadsheet provided by Side A to the UCC.

PUBLICLY FILED PER ORDER [ECF 2404]

REDACTED

108.    Attached hereto as **Exhibit 209** is a true and correct copy of a March 2007 email chain, which was produced to the UCC under the Bates number PPLPUCC9004824942.

109.    Attached hereto as **Exhibit 210** is a true and correct copy of an annual report review letter to Purdue from the Office of Inspector General, U.S. Department of Health & Human Services, dated May 6, 2009, which was produced to the UCC under the Bates number PNY000127987.

110.    Attached hereto as **Exhibit 211** is a true and correct copy of an annual report review letter to Purdue from the Office of Inspector General, U.S. Department of Health & Human Services, dated April 1, 2010, which was produced to the UCC under the Bates number PPLP004250164.

111.    Attached hereto as **Exhibit 212** is a true and correct copy of an annual report review letter to Purdue from the Office of Inspector General, U.S. Department of Health & Human Services to Purdue, dated January 28, 2011, which was produced to the UCC under the Bates number PPLPUCC001877705.

112.    Attached hereto as **Exhibit 213** is a true and correct copy of an annual report review letter to Purdue from the Office of Inspector General, U.S. Department of Health & Human Services to Purdue, dated March 8, 2012, which was produced to the UCC under the Bates number PPLPUCC001884369.

113.    Attached hereto as **Exhibit 214** is a true and correct copy of an annual report review letter to Purdue from the Office of Inspector General, U.S. Department of Health & Human Services to Purdue, dated January 24, 2013, which was produced to the UCC under the Bates number PPLP004427723.

PUBLICLY FILED PER ORDER [ECF 2404]

REDACTED

114. Attached hereto as **Exhibit 215** is a true and correct copy of an August 2014 email chain, which was produced to the UCC under the Bates number PPLPUCC9004797180.

115. Attached hereto as **Exhibit 216** is a true and correct copy of the September 3, 2019 Amendment to the Shareholders' Agreement executed between Purdue Pharma Inc. and certain PPI Shareholders, which was provided to the UCC by the Debtors.

116. Attached hereto as **Exhibit 217** is a true and correct copy of hearing transcript excerpts from the Nov. 19, 2019 hearing in this matter.

117. Attached hereto as **Exhibit 218** is a true and correct copy of deposition transcript excerpts from the October 30, 2020 deposition of Cecil Pickett, Ph.D.

118. Attached hereto as **Exhibit 219** is a true and correct copy of deposition transcript excerpts from the November 4, 2020 deposition of Stuart Baker.

119. Attached hereto as **Exhibit 220** is a true and correct copy of deposition transcript excerpts from the September 22, 2020 deposition of Stephen Ives.

120. Attached hereto as **Exhibit 221** is a true and correct copy of deposition transcript excerpts from the August 28, 2020 deposition of David Sackler.

121. Attached hereto as **Exhibit 222** is a true and correct copy of deposition transcript excerpts from the September 2, 2020 deposition of Marianna Sackler.

122. Attached hereto as **Exhibit 223** is a true and correct copy of deposition transcript excerpts from the November 5, 2020 deposition of Kathe Sackler.

123. Attached hereto as **Exhibit 224** is a true and correct copy of deposition transcript excerpts from the October 27, 2020 deposition of John Stewart.

124. Attached hereto as **Exhibit 225** is a true and correct copy of deposition transcript excerpts from the October 30, 2020 deposition of Mark Timney.

PUBLICLY FILED PER ORDER [ECF 2404]

REDACTED

125.    Attached hereto as **Exhibit 226** is a true and correct copy of deposition transcript excerpts from the November 10, 2020 deposition of Mortimer D.A. Sackler.

126.    Attached hereto as **Exhibit 227** is a true and correct copy of deposition transcript excerpts from the September 24, 2020 deposition of Theresa Sackler.

127.    Attached hereto as **Exhibit 228** is a true and correct copy of deposition transcript excerpts from the November 16, 2020 deposition of Peter Boer.

Executed on: November 18, 2020

*/s/ Arik Preis*
Arik Preis

18

# EXHIBIT 137

**Chu, Jennifer L.**

---

**Subject:**                    FW: Craig's diagnostic and forward plan for the Sackler Pharma Enterprise

Begin forwarded message:

**From:** Landau, Dr. Craig ███████████████████
**Date:** May 5, 2017 at 4:37:43 PM EDT
**To:** Mortimer Sackler ████████████████████
**Cc:** Landau, Dr. Craig ██████████████████████
**Subject: Craig's diagnostic and forward plan for the Sackler Pharma Enterprise**

Dear Mortimer,

Per your request, I've attached a document outlining my thoughts on the issues facing the global enterprise, and what should be done to address them.  I'm really pleased that you and Dr. Kathe reached out and are planning to put a proposal forward to the Board.  Not sure of your plan, but please feel free to share with other Board members and reach out to me with any questions or clarifications you may need.

A couple of important things to note:

- I drew on files / data I had available to me from previous board meetings as I didn't wish to involve or engage others on this effort with requests for additional data. For this reason, while everything is directionally correct, certain individual stats may need to be updated.
- Much of the information and perspective written into the document is highly sensitive, and if available to my peers or their subordinates, could be very damaging. I'm certain you understand this and will ensure the document stays at the board level (I'm just a bit nervous).
- Lastly, I didn't "sugar coat" anything. While I like to be diplomatic, this is no time to mince words or be anything but direct. Hope it doesn't offend you or anyone on the Board. I wrote the document, including the proposed solutions as if it were **my** business.

Happy to hear of any feedback you may have whenever you have time.

Regards and enjoy the weekend.

-Craig

1

PUBLICLY FILED PER ORDER [ECF 2404]

Produced by Purdue Pharma L.P., pursuant to Multistate Work Group Requests
Subject to the Confidentiality Agreement dated February 16, 2017
Confidential Treatment Requested

PWG004670879

CONFIDENTIAL DOCUMENT

# Sackler Pharma Enterprise

DIAGNOSTIC AND FORWARD PLAN

Craig Landau, MD

## I.  SITUATION

■ The global Sackler pharmaceutical enterprise is at an inflection point with significant challenges to its cash flow, stability, and future.

■ The U.S. Purdue organization, once a growth engine and primary funding source for the group is declining precipitously, faces intensifying headwinds and requires immediate stabilization.

■ The expectation is that the <u>current</u> revenue decline in the US business will be offset by significant <u>future</u> revenue growth from **LAM** (consumer /OTC) and **Rhodes** (generics) where profit margins are low, there is limited intellectual property and significant business risk and complexity.

■ Given the urgency of the issues laid out below, a fundamental reassessment of our operating model and strategy along with immediate change is needed in order to prevent further business decline and ensure a sustainable, growth-oriented business going forward.

■ Maintaining the status quo should be considered an active decision and in my view, will likely lead to further deterioration of the business from which recovery is uncertain.

## II.  THE ISSUES FACING OUR BUSINESS

■ **Our current global investment strategy does <u>NOT</u> serve the best interest of the global enterprise or the shareholders.**

  – Three distinct business types (branded Rx/Biosimilars, consumer/OTC, generics) are being run through four separate regions (five if Rhodes is included), with the Board of Directors serving as the "de-facto" CEO.

  – The resultant global product mix has produced lower gross margins, high operating costs to net sales (39% U.S., 36% EU, 82% LAM, 30% Canada) vs. benchmark (25%-30% for similar sized pharma), elevated complexity, inefficiency, lack of focus and alignment, and as a result, heightened business risk.

  – The current business consists of over 70 different products across 49 different countries, with > 90% of profit for the global enterprise generated from only

1

PUBLICLY FILED PER ORDER [ECF 2404]

Produced by Purdue Pharma L.P., pursuant to Multistate Work Group Requests
Subject to the Confidentiality Agreement dated February 16, 2017
Confidential Treatment Requested

PWG004670880

12 countries, with the remaining countries in loss positions or generating minimal profit.

– Investments (infrastructure, R&D and BD) remain mostly non-strategic, short-term oriented with long payback periods, and given funding limitations, carry significant opportunity costs. In addition, there is inconsistency in how financials are reviewed with some countries using 10 year NPVs, some 15 year NPVs, and others ascribing large terminal values.

– Collectively, the IACs are pursuing too many therapeutic areas, and with the exception of opioid analgesics, we lack the focus, scale and necessary depth and breadth of expertise to invest and compete effectively in many regions. Despite many efforts across all regions, we have failed to establish a meaningful presence (i.e. a #1-2 position) in any other TA beyond pain.

■ **The US business is in a state of decline and will soon be unable to fund either/both investments or distributions going forward**

– Despite 20 years of success, the US business remains heavily reliant on OxyContin, a declining brand; appropriate investments have not been made to diversify the business and ensure a sustainable future.

– In spite of significant efforts, the recent BD-driven approach to re-growing the US business has not delivered on its promise. Further, there's been a reluctance to pursue smaller, "digestible" on- or near-market opportunities.

– There is a high rate of employee turnover, with many directors and executives having left the organization, and certain key employees at high flight risk.

– With an increasingly turbulent external environment and a business driven almost exclusively by opioid sales, the exodus of critical personnel and their experience leaves the organization highly vulnerable to external threats (FDA/regulatory, competitors, critics).

  □ Valuable organizational history (facts and nuances) has been lost, creating gaps in knowledge required to defend our position in a variety of legal settings.

  □ The essential and industry-leading opioid risk management / epidemiology function built through 2012 has been reduced to a "skeleton crew."

  □ While once strong, collaborative and respectful, our relationship and credibility with FDA has deteriorated over the past 3 years (e.g. failed

2

PUBLICLY FILED PER ORDER [ECF 2404]

Produced by Purdue Pharma L.P., pursuant to Multistate Work Group Requests
Subject to the Confidentiality Agreement dated February 16, 2017
Confidential Treatment Requested

PWG004670881

UNREDACTED - CONTAINS OUTSIDE PROFESSIONALS' EYES ONLY INFORMATION.
TREAT SUBJECT TO PROTECTIVE ORDER

ADF/OxyIR Advisory Committee, Epidemiology sNDA defense, Phase IV
ADF commitment submissions).

– The de-emphasis (by plan) of R&D has left the organization unable to
innovate, create value internally, or effectively manage external R&D-driven
opportunities (e.g. lemborexant, timeline and budget overruns).

  ▫ Outsource Management, Clinical Development and Clinical Trial
  Operations functions have been downsized to a level inadequate to
  appropriately engage, manage, and/or oversee external clinical
  development projects in parallel to our partners and Contract Research
  Organizations.

  ▫ Importantly, the R&D talent gap has also impaired our due diligence
  capabilities and ability to execute appropriately informed BD transactions
  with third parties.

- **Management incentives have been focused on top-line growth, with
  little to no focus on profitability.**

  – With U.S. Purdue financing severely limited, the LAM region is using debt to
  purchase expensive on-market genericized products in attempts to leverage
  the investment in recently built infrastructure.   Utilizing debt to fund
  operating costs is a high stakes gamble, not sustainable and should be a
  source of concern (i.e. Valeant model).

  – Over $1B US has been invested to date in emerging markets, with limited
  intellectual property, a high level of sovereign risk and increased business
  complexity.  Almost $6B in additional investments are required over the next
  10-years to drive further growth in this region with only $2B in expected
  profit to be returned to the business.

  – While growth in certain consumer products ▮▮▮▮▮ is being established,
  the expansion of product offerings is too diverse, the margins too low, and
  business complexity too high.

  – The focus has been on expansion across countries with limited consideration
  for price, margins or infrastructure > leading to lack of profitability in many
  territories now and in the foreseeable future.

  – Certain products are currently being sold below fully loaded cost in some
  markets, as local management is shielded from true cost of goods and
  incented exclusively on sales.

3

PUBLICLY FILED PER ORDER [ECF 2404]

Produced by Purdue Pharma L.P., pursuant to Multistate Work Group Requests
Subject to the Confidentiality Agreement dated February 16, 2017
Confidential Treatment Requested

PWG004670882



### SUMMARY

In the face of significant market pressures, our current investment strategy, a weak organic innovation pipeline, limited success in BD and limited resources for external assets, the global business as it stands is not sustainable.

4

PUBLICLY FILED PER ORDER [ECF 2404]

Produced by Purdue Pharma L.P., pursuant to Multistate Work Group Requests
Subject to the Confidentiality Agreement dated February 16, 2017
Confidential Treatment Requested

PWG004670883

## III.  SOLUTIONS

## Guiding Principles and Strategic Overview

A true sense of urgency and a series of decisive actions are needed, and are outlined on the pages that follow.

One potential and significant change would be to appoint a global CEO and consolidate all regional businesses as one, multinational company. While doing so may in the long run provide substantial benefit, certain internal considerations may prevent this from occurring. Further, globalizing the business will introduce new challenges, complexities and risks that may be too great to endure at this critical time.

<u>However, there is reason to be optimistic</u>. The most significant issues negatively impacting the global enterprise (leadership, leadership incentives, investment strategy, lack of R&D, and heightened business complexity) can be addressed <u>without</u> full globalization, as the requisite understanding of the issues, necessary changes, and leadership <u>already exist</u> within the business.

The following principles **upon which the company was founded** should be followed on a global basis:

- Entrepreneurial, market-driven
- Delivery of innovative medicines that provide value to patients
- Restore a passion for the <u>development</u> of these innovative products
- Reliance on leadership with deep organizational experience and loyalty to the shareholders

We will adopt a strategy to re-trench, simplify the business and develop a pipeline and product portfolio that enables a sustainable future for the global enterprise. This strategy and the following steps (if taken immediately) are "no-regret moves" and will advance the business, <u>regardless</u> of potential future changes to regional or global structure:

- Stop the bleeding now (stop spending money on non-profitable products and territories)
- Drive immediate returns to the business (financial and qualitative)
- Install a focus on profitability, not top-line growth
- Implement leadership changes that leverage existing strengths, retain key talent and provide development opportunities and successors for the future
- Incur as little business disruption as possible

5

PUBLICLY FILED PER ORDER [ECF 2404]

Produced by Purdue Pharma L.P., pursuant to Multistate Work Group Requests
Subject to the Confidentiality Agreement dated February 16, 2017
Confidential Treatment Requested

PWG004670884

The plan to achieve the above strategy requires pursuit and/or changes to the following four (4) elements:

1) Retain regional commercial centers with strong leadership and a clear vision

2) Create a global portfolio mgmt function to drive intelligent BD/R&D investments

3) Re-boot & globalize R&D to improve focus, save money, and enhance yield of new innovative products

4) Expand the remit of global operations to simplify operations and reduce COGs

| | |
|---|---|
| Retain Regional Commercial Centers | Create a Global Portfolio Management Function |
| Re-boot and Globalize R&D | Expand remit of Global Operations |

## 1. Regional Commercial Centers

Re-focus the business towards Regional Commercial Centers with accountability directly to the Board with each leader (below) responsible for their full end-to-end commercial P&L, excluding R&D expenses.   Regions will have responsibly for Sales & Marketing, Medical Affairs, Market Access, HR, Finance, Legal, Customer Service and some local presence for Regulatory, IT, Supply Chain and Distribution.

**Proposed leadership:**

Europe +/- Australia (Antony Mattessich)

U.S./Canada (Craig Landau)

LAM +/- Australia (Raman Singh)

6

PUBLICLY FILED PER ORDER [ECF 2404]

Produced by Purdue Pharma L.P., pursuant to Multistate Work Group Requests
Subject to the Confidentiality Agreement dated February 16, 2017
Confidential Treatment Requested

PWG004670885

Through active management by each **Regional Commercial Center**, the following actions should be taken in the immediate-, mid-, or long-term:

– <u>Implement structural / leadership changes at Executive and Director levels to stabilize each business</u> (**immediate**):

- ☐ Ensure retention of critical personnel
- ☐ Signal immediate change and revitalize organization with trusted leadership who has direct experience and credibility (internally and externally)
- ☐ Lay out regional and global priorities and dedication to a "one-for-all" approach to the global enterprise and shareholders

– <u>Reduce Operating Costs</u> (**immediate**):

- ☐ Cease operations in countries that are not profitable (both in LAM and EU), sell off country rights to products where sales are material enough to warrant.
- ☐ Reduce S&P / overheads, primarily in the LAM and US regions
    - LAM region accounts for approx. 28% of the global S&P overheads with expenses outpacing net sales growth and business losses through to 2019
    - In the U.S., immediately reduce S&P and overheads by ~$150M through across the board headcount reductions, with a disproportionate amount from the field force and a <u>full zero-based discretionary spend review</u> with a focus on analgesic marketing programs; S&P/overheads are currently at roughly $500M/yr, and while projected to decline, this decline is not fast enough in the face of further sales erosion.



7

PUBLICLY FILED PER ORDER [ECF 2404]

Produced by Purdue Pharma L.P., pursuant to Multistate Work Group Requests
Subject to the Confidentiality Agreement dated February 16, 2017
Confidential Treatment Requested

PWG004670886



– <u>Undertake a comprehensive portfolio rationalization exercise</u> to determine which additional products to divest or out-license in select territories.

– <u>Clean up product profiles with SKU rationalization</u> in both developed and emerging markets.

– <u>Consider condensing the three **Rhodes** businesses into a single entity:</u>
  ◻ Install focus on API manufacturing and unique, strategic opportunities that play on our Intellectual Property position and manufacturing capability.
  ◻ Reduce infrastructure costs ensure proper management personnel and expertise is retained or recruited.



– <u>Drive growth by exploiting our position in opioids</u> to become the global leader in pain and adjacent therapies (**immediate**):
  ◻ Restore appropriate focus on the patient, patient access and the proper practice of pain management across the global organization.

8

PUBLICLY FILED PER ORDER [ECF 2404]

Produced by Purdue Pharma L.P., pursuant to Multistate Work Group Requests
Subject to the Confidentiality Agreement dated February 16, 2017
Confidential Treatment Requested

PWG004670887

- Deploy Purdue Canada's guidelines-based "Patient First" program in the U.S. and other regions as a <u>global commitment and standard-setting approach</u> for pharmaceutical companies in the opioid space.

- Curtail traditional opioid product detailing by sales representatives and leverage Medical Science Liaisons, physician support and e-detailing /technology approaches that are more appropriate given the nature of the external environment, and far less expensive.

- Pursue a multi-health authority (global) initiative to align on opioid benefit-risk and measures to ensure appropriate patient access, labelling and risk mitigation measures.

- In the U.S., revive epidemiology / ADF strategy and re-engage FDA with constructive data acquisition plan and steps to ensure appropriate prescribing and physician engagement.

- Pursue opioid consolidation strategy as other companies abandon the space, creating a company focused entirely on abuse deterrent opioid and non-opioid analgesic therapeutics.

- More aggressively pursue a broader non-opioid Pain franchise including related CNS and Addiction opportunities.

– <u>Leverage Canada's progressive and leading position in the global Cannabis sector</u> by creating a distinct (separate) Canada-based, non-prescription **Medical Cannabis business** and **Center of Excellence** (**near term**):

- Leverages the unique local opportunity to shape the market and become a near term, credible leader in the space within Canada

- Will serve as the foundation for growth in other markets as continued regulatory and policy evolution creates business opportunities

- Capitalize on this rapidly growing global opportunity and associated market "frothiness" to generate near-term financial gain through a potential public offering of the business

- Create an innovation-driven R&D pipeline and associated IP estate to create and protect products that will benefit patients within and outside of Canada; these products can be deployed within the IAC framework to accommodating territories or out-licensed interested 3rd parties

9

PUBLICLY FILED PER ORDER [ECF 2404]

Produced by Purdue Pharma L.P., pursuant to Multistate Work Group Requests
Subject to the Confidentiality Agreement dated February 16, 2017
Confidential Treatment Requested

PWG004670888

UNREDACTED - CONTAINS OUTSIDE PROFESSIONALS' EYES ONLY INFORMATION.
TREAT SUBJECT TO PROTECTIVE ORDER

## 2. Create a Global Portfolio Management Function

Absent a global CEO and unifying strategy, the **Global Portfolio Management** function would ensure that each region follow an appropriate and integrated BD/R&D investment strategy, where each investment is "worked up" with consistent standards, and is appropriately constructed to leverage our presence in multiple markets.  The function would be comprised of three core representatives from BD, Finance and R&D, plus an "acting" Global CMO to provide clinical perspective:



CORE MEMBERS

Business development (Paul Medeiros - EU)

Finance (Kelly Martin - Canada)

R&D (Julie Ducharme – U.S.)

-------------------------------------------------

(Acting) Global CMO (Craig Landau)

The Global Portfolio Management function would report to **Antony Mattessich**, to leverage his demonstrated commercial experience and strategic vision.

Through the active management of the **Global Portfolio Management** function, the following actions should be taken **immediately**:

– Lead the creation of an **Investment and Therapeutic Area Framework** to produce a focused, balanced and appropriate R&D pipeline and portfolio of marketed products.

  □ The framework will guide BD / R&D investments with a decided TA focus and provide clarity for "off-target" investments on a regional or multi-regional basis.

  □ At present, the TA focus for the Rx business should include pain, medical cannabis and other opportunities (e.g. better chemotherapy) that leverage our existing infrastructure and capabilities (commercial, R&D, market access).

  □ Ensure continued adherence to the framework within and across regions.

  □ The framework would also be instrumental in deciding on which non-core assets and franchises should be divested.

10

PUBLICLY FILED PER ORDER [ECF 2404]

Produced by Purdue Pharma L.P., pursuant to Multistate Work Group Requests
Subject to the Confidentiality Agreement dated February 16, 2017
Confidential Treatment Requested

PWG004670889

## 3. Re-Boot and Globalize R&D

Long-term, sustainable growth must be achieved through the development and commercialization of innovative, patent-protected medicines that bring recognized value and differentiation to patients and their physicians. Going forward, R&D and Clinical colleagues must have a more prominent voice in portfolio management as well as in determining overall business strategy for the IACs.

In addition, to be successful and cost effective, we must consolidate R&D under one leader with direct accountability to one of the Regional Commercial Leaders. All functions (e.g. pharmaceutics, analytics, virtual discovery, toxicology, clinical research and pharmacology, clinical trial operations, outsource management, pharmacovigilance, biostatistics, data management, regulatory affairs) will be integrated and managed more effectively and efficiently on a global basis.

Head of Global R&D to be **Julie Ducharme**, leveraging her excellent basic science experience, drug development, research network, administrative and clear communication skills.

Global R&D reports to **Craig Landau** to leverage his clinical experience and success and experience in drug development, regulatory strategy and health policy outcomes.

Through the active management of the **Global R&D** function, the following actions should be taken **immediately and in the mid-term**:

– Perform a thorough review and analysis of all existing R&D programs, regardless of source to decide whether to kill or continue with each project (**immediate**).

  □ The review will be fearless and data-driven. Only pipeline projects with a clear and supportive business case will be funded. All others will be either divested, killed of shelved.

  □ Programs that will be specifically challenged include lemborexant, VAN (V120083), TKA (VM902A), Sigma-1 and MR502 Triple (ICS/LABA/LAMA)

– Implement additional restructure within global R&D (**immediate)**

  □ Adopt a more fully outsourced / variable pricing model with strategic partnerships with 2 or 3 global CROs and an appropriate number of boutique CROs offering repeated services within TAs of focus (e.g. pain, cannabis research, oncology, etc).

11

PUBLICLY FILED PER ORDER [ECF 2404]

Produced by Purdue Pharma L.P., pursuant to Multistate Work Group Requests
Subject to the Confidentiality Agreement dated February 16, 2017
Confidential Treatment Requested

PWG004670890

– <u>Pursue staged investments in multiple, external, early stage projects and technologies (academia, biotech)</u> (**mid-term**):

  ▫ Provide downstream access to known programs and potential later stage R&D assets for acquisition, in-licensing or with an established equity position, returns driven through out-licensing or sale of assets to third parties.

  ▫ Examples include Purdue Canada investments in:

    - Theracaine (lipophilic salt delivery platform for local anesthetics)

    - Amorchem (mucoadhesive nanoparticle platform for ophthalmology and other uses)

– <u>Consider installing an external development engine</u> (**mid-term**):

  ▫ Invest and/or partner with one or two select (i.e. appropriately focused) VCs to access promising development stage assets for long term, and potentially joint-value creation where Purdue/Mundipharma could be the commercial outlet for products developed through the partnership, or participate financially through sale or out-license to a 3rd party.

## 4. Expand Remit of Global Operations

Continue to consolidate all API production, manufacturing, quality and supply chain operations across the globe, leveraging select manufacturing plants to provide lower cost of goods, an objective already under pursuit by the current head (David Lundie).

– Capacity optimization and plant closures to align with the product portfolio – now and in the future (i.e. Germany, Pickering, Treyburn)...following portfolio rationalization (secondary to portfolio management activity)

– Optimize production of API for both Purdue and 3rd parties  (i.e. Rhodes Tech)

Head of Global Operations (**David Lundie** – no change from present)

Reporting to (**Antony Mattessich**) – no change from present)

12

PUBLICLY FILED PER ORDER [ECF 2404]

Produced by Purdue Pharma L.P., pursuant to Multistate Work Group Requests
Subject to the Confidentiality Agreement dated February 16, 2017
Confidential Treatment Requested
PWG004670891