Page 1

1    UNITED STATES BANKRUPTCY COURT

2    SOUTHERN DISTRICT OF NEW YORK

3    Case No. 19-23649-rdd

4    - - - - - - - - - - - - - - - - - - - - - - - - - - - x

5    In the Matter of:

6

7    PURDUE PHARMA L.P.,

8

9            Debtor.

10   - - - - - - - - - - - - - - - - - - - - - - - - - - - x

11

12                    United States Bankruptcy Court

13                    300 Quarropas Street, Room 248

14                    White Plains, NY 10601

15

16                    February 17, 2021

17                    10:13 AM

18

19

20

21   B E F O R E :

22   HON ROBERT D. DRAIN

23   U.S. BANKRUPTCY JUDGE

24

25   ECRO:  ART

1    HEARING re Notice of Agenda/ Agenda for February 17, 2021

2    Hearing

3

4    HEARING re Motion to Intervene filed by KatieLynn B Townsend

5    on behalf of Dow Jones & Company, Inc., Boston Globe Media

6    Partners, LLC, and Reuters News & Media, Inc. (ECF #2022)

7

8    HEARING re Statement/ The Ad Hoc Group of on-Consenting

9    States' Statement Regarding the Motion to Intervene and

10   Unseal Judicial Records by Dow Jones & Company, Inc.,

11   Boston Globe Media Partners, LLC, and Reuters News & Media,

12   Inc. (related document(s)2022) filed by Andrew M. Troop on

13   behalf of Ad Hoc Group of Non-Consenting States (ECF #2065)

14

15   HEARING re Statement in Support of Motion to Intervene

16   (related document(s)2022) filed by Paul A. Rachmuth on

17   behalf of Ad Hoc Committee on Accountability (ECF #2066)

18

19   HEARING re Response /The NAS Children Ad Hoc Committee's

20   Joinder to the Ad Hoc Group of Non-Consenting States'

21   Statement Regarding the Motion to Intervene and Unseal

22   Judicial Records by Dow Jones & Company, Inc., Boston Globe

23   Media Partners, LLC and Reuters News & Media, Inc. (related

24   document(s)2065) filed by Scott S. Markowitz on behalf of Ad

25   Hoc Committee of NAS Babies (ECF #2090)

Page 3

1    HEARING re Statement of The Raymond Sackler Family In

2    Respect of The Motion To Intervene And Unseal Judicial

3    Records By Dow Jones & Company, Inc., Boston Globe Media

4    Partners, LLC, and Reuters News & Media, Inc. (related

5    document(s)2022) filed by Gerard Uzzi on behalf of The

6    Raymond Sackler Family (ECF #2132)

7

8    HEARING re Debtors' Limited Objection to the Media

9    Intervenors' Motions to Intervene and Unseal Judicial

10   Records and Cross-Motion to Seal Certain Judicial Records

11   (related document(s)1828, 2188) filed by Benjamin S.

12   Kaminetzky on behalf of Purdue Pharma L.P. (ECF #2252)

13

14   HEARING re Statement of the Mortimer Sackler Initial Covered

15   Sackler Persons in Respect of the Reply in Support of

16   Motions to Unseal Judicial Records by Dow Jones & Company,

17   Inc., Boston Globe Media Partners, LLC, and Reuters News &

18   Media, Inc. (related document(s)2288) filed by Jasmine Ball

19   on behalf of Beacon Company. (ECF #2301)

20

21

22

23

24

25

Page 4

1    HEARING re Limited Objection of the Raymond Sackler Family

2    to the First and Second Motions to Unseal Judicial Records

3    by Media Intervenors Dow Jones & Company, Inc., Boston

4    Globe Media Partners, LLC, and Reuters News & Media, Inc.

5    (related document(s)2022, 2188) filed by Gerard Uzzi on

6    behalf of The Raymond Sackler Family (ECF #2360)

7

8    HEARING re Mortimer D. Sackler ICSPs Limited Objection to

9    the Media Intervenors Motion to Intervene and Unseal

10   Judicial Records (related document(s)2022, 2188) filed by

11   Jasmine Ball on behalf of Beacon Company. (ECF #2361)

12

13   HEARING re Reply to Motion to Unseal (related

14   document(s)2022) filed by KatieLynn B Townsend

15   on behalf of Dow Jones & Company, Inc., Boston Globe Media

16   Partners, LLC, and Reuters News & Media, Inc. (ECF #2288)

17

18   HEARING re Motion to Amend Proposed Order (related

19   document(s)2022) filed by KatieLynn B Townsend on behalf of

20   Dow Jones & Company, Inc., Boston Globe Media Partners,

21   LLC, and Reuters News & Media, Inc. (ECF #2039)

22

23

24

25

 1    HEARING re Notice of Adjournment of Hearing on Motion to

 2    Intervene and Unseal (related document(s)2022) filed by

 3    KatieLynn B Townsend on behalf of Dow Jones & Company, Inc.,

 4    Boston Globe Media Partners, LLC, and Reuters News & Media,

 5    Inc. (ECF #2091)

 6

 7    HEARING re Stipulation/ Notice of Filing of Stipulation and

 8    Agreed Order Regarding Media Intervenors' Motion to Unseal

 9    Materials Filed in Connection with UCC Privilege Motions and

10    Adjournment of Hearing on Media Intervenors' Motion to

11    Unseal (related document(s)2022) Filed by Benjamin S.

12    Kaminetzky on behalf of Purdue Pharma L.P. (ECF #2136)

13

14    HEARING re Stipulation and Agreed Order Signed on 12/15/2020

15    Regarding Media Intervenors' Motion to Unseal Materials

16    Filed in Connection with UCC Privilege Motions and

17    Adjournment of Hearing on Media Intervenors' Motion to

18    Unseal (related document(s)2022) (ECF #2140)

19

20    HEARING re Debtors' Ex Parte Motion for Entry of an Order

21    Shortening Notice with Respect to Debtors' Motion for Entry

22    of an Order Sealing Judicial Documents (related

23    document(s)2252) filed by Benjamin S. Kaminetzky on behalf

24    of Purdue Pharma L.P. (ECF #2253)

25

Page 6

1    HEARING re Declaration of Jon Lowne in Support of the

2    Debtors' Limited Objection to Media Intervenors' Motions to

3    Intervene (related document(s)2252) filed by Benjamin S.

4    Kaminetzky on behalf of Purdue Pharma L.P. (ECF #2254)

5

6    HEARING re Second Motion to Intervene and Unseal filed by

7    KatieLynn B Townsend on behalf of Dow Jones & Company, Inc.,

8    Boston Globe Media Partners, LLC, and Reuters News &

9    Media, Inc. (ECF #2188)

10

11   HEARING re Debtors' Limited Objection to the Media

12   Intervenors' Motions to Intervene and Unseal Judicial

13   Records and Cross-Motion to Seal Certain Judicial Records

14   (related document(s)1828, 2188) filed by Benjamin S.

15   Kaminetzky on behalf of Purdue Pharma L.P. (ECF #2252)

16

17   HEARING re Statement of the Raymond Sackler Family in

18   Respect of the Second Motion to Unseal Judicial Records by

19   Media Intervenors Dow Jones & Company, Inc., Boston Globe

20   Media Partners, LLC, and Reuters News & Media, Inc. (related

21   document(s)2132, 2188) filed by Gerard Uzzi on behalf of The

22   Raymond Sackler Family. (ECF #2265)

23

24

25

Page 7

1    HEARING re Statement of the Mortimer Sackler Initial Covered

2    Sackler Persons in Respect of the Reply in Support of

3    Motions to Unseal Judicial Records by Dow Jones & Company,

4    Inc., Boston Globe Media Partners, LLC, and Reuters News &

5    Media, Inc. (related document(s)2288) filed by Jasmine Ball

6    on behalf of Beacon Company. (ECF #2301)

7

8    HEARING re Limited Objection of the Raymond Sackler Family

9    to the First and Second Motions to Unseal Judicial Records

10   by Media Intervenors Dow Jones & Company, Inc., Boston

11   Globe Media Partners, LLC, and Reuters News & Media, Inc.

12   (related document(s)2022, 2188) filed by Gerard Uzzi on

13   behalf of The Raymond Sackler Family (ECF #2360)

14

15   HEARING re Mortimer D. Sackler ICSPs Limited Objection to

16   the Media Intervenors Motion to Intervene and Unseal

17   Judicial Records (related document(s)2022, 2188) filed by

18   Jasmine Ball on behalf of Beacon Company. (ECF #2361)

19

20   HEARING re Reply to Motion to Unseal (related document(s)

21   2022) filed by KatieLynn B Townsend on behalf of Dow Jones &

22   Company, Inc., Boston Globe Media Partners, LLC, and

23   Reuters News & Media, Inc. (ECF #2288)

24

25

Page 8

1    HEARING re Debtors' Ex Parte Motion for Entry of an Order

2    Shortening Notice with Respect to Debtors' Motion for Entry

3    of an Order Sealing Judicial Documents (related document(s)

4    2252) filed by Benjamin S. Kaminetzky on behalf of Purdue

5    Pharma L.P. (ECF #2253)

6

7    HEARING re Declaration of Jon Lowne in Support of the

8    Debtors' Limited Objection to Media Intervenors' Motions to

9    Intervene (related document(s)2252) filed by Benjamin S.

10   Kaminetzky on behalf of Purdue Pharma L.P. (ECF #2254)

11

12   HEARING re Mortimer D. Sackler ICSPs Limited Objection to

13   the Media Intervenors Motion to Intervene and Unseal

14   Judicial Records (related document(s)2022, 2188) filed by

15   Jasmine Ball on behalf of Beacon Company. (ECF #2362)

16

17   HEARING re Debtors' Limited Objection to the Media

18   Intervenors' Motions to Intervene and Unseal Judicial

19   Records and Cross-Motion to Seal Certain Judicial Records

20   (related document(s)1828, 2188) filed by Benjamin S.

21   Kaminetzky on behalf of Purdue Pharma L.P. (ECF #2252)

22

23

24

25

Page 9

1    HEARING re Debtors' Ex Parte Motion for Entry of an Order

2    Shortening Notice with Respect to  Debtors' Motion for Entry

3    of an Order Sealing Judicial Documents (related document(s)

4    2252) filed by Benjamin S. Kaminetzky on behalf of Purdue

5    Pharma L.P.(ECF #2253)

6

7    HEARING re Motion to Intervene filed by Katie Lynn B

8    Townsend on behalf of Dow Jones & Company, Inc., Boston

9    Globe Media Partners, LLC, and Reuters News & Media, Inc.

10   (ECF #2022)

11

12   HEARING re Second Motion to Intervene and Unseal filed by

13   KatieLynn B Townsend on behalf of Dow Jones & Company, Inc.,

14   Boston Globe Media Partners, LLC, and Reuters News &

15   Media, Inc. (ECF #2188)

16

17

18

19

20

21

22

23

24

25   Transcribed by:  Sonya Ledanski Hyde

1   A P P E A R A N C E S :

2

3   REPORTERS COMMITTEE

4          Attorneys for Media Intervenors

5          1156 15th Street NW

6          Washington, DC 20005

7

8   BY:   KATE TOWNSEND (TELEPHONICALLY)

9

10   DAVIS POLK & WARDWELL LLP

11          Attorneys for the Debtor

12          450 Lexington Avenue

13          New York, NY 10017

14

15   BY:   MARSHALL HUEBNER (TELEPHONICALLY)

16          GERARD MCCARTHY (TELEPHONICALLY)

17          JAMES MCCLAMMY (TELEPHONICALLY)

18

19   VICTORIA KAMPPI (TELEPHONICALLY)

20          Attorney for Julian Paul Zukmann

21          1112 South B Street

22          San Mateo, CA 94401

23

24

25

1   GREGORY P. JOSEPH LAW OFFICES LLC

2         Attorney for The Raymond Sackler Family

3         485 Lexington Avenue

4         New York, NY 10017

5

6   BY:   GREGORY P. JOSEPH (TELEPHONICALLY)

7

8   DEBEVOISE & PLIMPTON LLP

9         Attorneys for Beacon Company

10        919 Third Avenue

11        New York, NY 10022

12

13  BY:   MAURA MONAGHAN (TELEPHONICALLY)

14

15  ALSO PRESENT TELEPHONICALLY:

16

17  GEORGE CALHOUN

18  EDWARD NEIGER

19  SHEILA BRINBAUM

20  HAYDEN COLEMAN

21  TZERINA DIZON

22  J. JEFFREY

23  NATASHA LABOVITZ

24  EMILY F. MACKAY

25  MARY JO WHITE

Page 12

1   HAROLD WILLIFORD

2   MARC SKAPOF

3   ARTEM SKOROTENSKY

4   BROOKS BARKER

5   SARA BRAUNER

6   MITCHELL P. HURLEY

7   KEVIN MACLAY

8   ARIK PREIS

9   CYRUS MEHRI

10  GERARD MCCARTHY

11  STEPHEN THOMASCH

12  LISA ACQUAVIVA

13  GERARD UZZI

14  HUNTER BLAIN

15  LINDA IMES

16  BENJAMIN KAMINETZKY

17  JEREMY KLEINMAN

18  ALEX LEES

19  GARRETT LYNAM

20  NICHOLAS PRETY

21  FRANK VELLUCI

22  THEODORE WELLS JR.

23  MICHAEL BAIRD

24  JOSEPH BRANDT

25  KENNETH H. ECKSTEIN

Page 13

1  CATRINA SHEA

2  TRUDY SMITH

3  M. VIOLA SO

4  MICHAEL O'NEIL

5  ADAM HABERKORN

6  LOWELL FINSON

7  MARA LEVENTHAL

8  JAKE HOLDREITH

9  XIAOYU DUAN

10  HAYLEY THEISEN

11  PAUL SCHWARTZBERG

12  GEORGE O'CONNOR

13  JASMINE BALL

14  ANDREW TROOP

15

16

17

18

19

20

21

22

23

24

25

1                    P R O C E E D I N G S

2            THE COURT:  Good morning, this is Judge Drain.

3    We're here on in re Purdue Pharma L.P., et al.  Today's

4    calendar is completely telephonic.  You should identify

5    yourself and your client the first time you speak, but also,

6    in light of that, identify yourself thereafter so that the

7    court reporter and I can put together your voice and your

8    name.

9            There's one authorized recording of these

10   hearings, that's taken by Court Solutions, which provides a

11   copy on a daily basis to our clerk's office.  If you want a

12   transcript of your hearing, you should contact the clerk's

13   office to arrange for the production of one.  Because these

14   hearings are telephonic, you should keep your phone on mute

15   unless you're speaking, at which time, of course, you should

16   unmute yourself.  So, with that introduction, I have the

17   amended agenda provided by the Debtors, and I'm happy to go

18   down the agenda in the order set forth on it.

19           MR. HUEBNER:  Thank you, Your Honor.  Good

20   morning, this is Marshall Huebner of Davis Polk.  Am I

21   coming through clearly?

22           THE COURT:  Yes, yes.

23           MR. HUEBNER:  So, Your Honor, as the agenda

24   reflects, the Debtors are not the movant on any motions for

25   today, and in fact, with a very, very, very small exception,

1    we're not actually the Respondent on any motions either.

2    There's one very small item still outstanding.  We have two

3    motions pending for March 1st.  Those motions reflect very

4    broad consent on the relief being requested and are

5    themselves appropriately laconic.  I will be more laconic

6    still, and actually have nothing further to say, and would

7    propose to turn the podium over to the Movant on the first

8    agenda item.

9            THE COURT:  Okay, very well.

10           MS. TOWNSEND:  Good morning, Your Honor.  This is

11   Katie Townsend with the Reporters Committee for Freedom of

12   the Press on behalf of the Media Intervenors, Dow Jones &

13   Company, Inc., Boston Globe Media Partners, LLC, and Reuters

14   News & Media, Inc.  Since we are the Movants on the first

15   agenda item, I thought I would go ahead and get started.  I

16   would ask first if Your Honor had any questions or specific

17   order that he would like me to address the remaining issues,

18   or I could just, by way of background, provide kind of an

19   update on where the parties are now.

20           THE COURT:  Okay, well, let me let you know my

21   state of preparedness, here.  I, of course, held a hearing

22   on these two motions, both of which sought to unseal

23   portions of the filed record relating to the motion by the

24   Creditors' Committee to determine the applicability of the

25   privileges asserted by the ASIB, Sackler families as well as

Page 16

```
 1    the Debtors in the ongoing discovery between the parties.

 2              At that hearing, I directed further briefing as

 3    well as asked the parties to focus more intently and more

 4    specifically on whether the remaining documents that were at

 5    issue -- and obviously, they've been very considerably

 6    narrowed down by all the parties, including the Media

 7    Intervenors since the media motions were filed, and I gather

 8    that process happened as far as the narrowing down is

 9    concerned, and that the remaining documents at issue, all

10    other ones either being released or agreed to be released,

11    or alternatively, there being agreements, which I think had

12    already been set forth on the record, to the redaction of

13    personally identifying information and the like, is limited

14    to the identities of commercial counterparties - current

15    commercial counterparties, that is, with the two sides are

16    the Sackler family and a small remaining dispute with regard

17    to two exhibits, two declarations, submitted in connection

18    with the Unsecured Creditors' Committee's motion.

19              I have the additional briefing submitted by the

20    Side A and Side B Sackler parties that were submitted on

21    February 7th as well as the reply or the combined reply by

22    the Media Intervenors to those filings, which was filed

23    February 14th.  So, I also understand that the Debtors have

24    narrowed down their request for continued redaction of

25    portions of the two exhibits that I previously mentioned -
```

Page 17

1    Exhibits 123 and 137.  So, that's the state of my

2    information so far.  So, if you want to update me from

3    there, that's fine.

4           MS. TOWNSEND:  Thank you, Your Honor.  And I would

5    say I have little to add to that summary.  You will recall

6    that, at the prior hearing in this matter, I informed the

7    Court that the Media Intervenors were in a position to

8    voluntarily withdraw their pending motions to unseal without

9    prejudice except as to those 17 remaining documents that we

10   contended are still, you know, contend are still improperly

11   sealed or overly redacted.  The majority of those - 15 of

12   those 17 documents - are what the parties have been

13   referring to as privileged law materials and there are two

14   categories of redactions urged by the Sackler family, Side A

15   and Side B, that are in dispute.  The other two documents,

16   as Your Honor has pointed out, are Exhibit 123 to the

17   October 14th 2020 Leventhal Declaration and Exhibit 137 to

18   the November 18th, 2020 Pries Declaration.  Those are

19   documents that were redacted by the Debtors, purportedly on

20   the ground that they contained confidential commercial

21   information under § 107(b).

22           As Your Honor indicated yesterday, we, along with

23   the Court, were informed by Debtors' counsel that they were

24   -- had voluntarily removed some of the redactions that were

25   in dispute as to both of those documents, Exhibit 123 and

Page 18

1    Exhibit 137.  There are still redactions that remain,

2    including a full paragraph at Exhibit 137, which is the 2017

3    memo from Purdue's president and CEO, Mr. Landau, expressing

4    his views about the challenges facing the company.  We

5    certainly welcome the Debtors' decision to abandon certain

6    of those redactions to those two documents.  It remains that

7    the Debtors bear the burden of demonstrating that the

8    remaining redactions fall within the scope of § 107(b)1 and

9    that there's a compelling need to preclude public access.

10            It's still our position that they haven't met that

11   burden, and as we emphasized, I think, in our prior

12   briefing, Your Honor, it's not clear to us how unsealing

13   these documents in their entirety, particularly given that

14   they are now four or five years old at least, would give an

15   unfair advantage to any competitor of Purdue Pharma and

16   (indiscernible) showing us the need to that end to the

17   Court.  So, I recognize Your Honor has those documents.  I

18   think our position is that they should be -- the remaining

19   redactions should be unsealed.

20            And with respect to the remaining 15 documents,

21   Your Honor, those -- I can address those as well.  Those are

22   the privileged law materials that were filed with the Court.

23   They're currently sealed in their entirety, however, the

24   parties are now largely, I think it's fair to say, in

25   agreement that they should be unsealed with certain

Page 19

1   redactions.  My clients, for example, are not challenging

2   the redaction of PAI and certain names of individuals in

3   those records.  I think that's reflected in the record

4   before the Court.

5            Where they're in disagreement is on the Sackler

6   family's position that 1) the names of indefinite

7   counterparties should be redacted, and 2) the names of

8   public-facing businesses owned in whole or in part by the

9   Mortimer Sackler family initial covered persons of Side A

10   should be redacted.  The Media Intervenors' position is that

11   neither category of information can be properly redacted.

12   Certainly, the Sackler family have not demonstrated that the

13   information falls within the scope of an exception to §

14   107's broad public access mandate or demonstrated a

15   compelling need to redact this information.

16            First, with respect to the investment counterparty

17   information, the Court heard argument on this issue at the

18   last hearing in terms of the new arguments that have been

19   asserted by the Raymond Sackler family in their supplemental

20   filing.  I won't spend too much time addressing the

21   suggestion that the Media Intervenors did not timely object

22   the redaction of this information in the privilege log

23   materials.  I think it's evident that we followed the

24   process and the timeline stipulated to by the parties, and

25   so ordered by the Court for disputing the basis for any

Page 20

1    redactions.

2          Moreover, while it's certainly true that every

3    Court has supervisory power of its own records and files, as

4    we indicated in our brief, that does not mean that the Court

5    can seal or redact material in a manner that's at odds with

6    statutory or constitutional mandates.  I think here, it's

7    clear that § 107 and the First Amendment provide the

8    relevant standards that must be met for sealing a redaction

9    of this information to be permitted.

10         So, I would focus, Your Honor, on what I think is

11   the dispositive issue with respect to the investment

12   counterparty information, and that's the Side B's argument

13   that this information falls within the scope of confidential

14   commercial information for § 107(b)1.  And as we argued in

15   our brief, it doesn't - not under the Second Circuit's

16   definition of that term.  As you know, Your Honor, § 107

17   makes any paper filed in a bankruptcy matter a public record

18   open for public inspection unless one of § 107's express,

19   enumerated exceptions applies.  And those exceptions,

20   including § 107(b)1, are narrowly construed.  Consistent

21   with that, the Second Circuit on Orion Pictures interpreted

22   commercial information in that context to be information, if

23   disclosed, would give an unfair advantage to competitors by

24   revealing details about the entity's commercial operations.

25         It's not --

Page 21

1          THE COURT:  Do you -- can I interrupt you?  Do you

2     think that Orion Pictures limited its definition of

3     commercial information in § 107(b)1 to that circumstance, as

4     opposed to applying what the bankruptcy judge found there,

5     which was that it did, in fact -- the disclosure would, in

6     fact, assist competitors?

7          MS. TOWNSEND:  I think it did, Your Honor, and I

8     think subsequent case law that we cite in our briefing

9     suggest that that narrower interpretation is consistent with

10    the intent of § 107, which is the broad disclosure mandate,

11    and it's consistent with the plain language, I think, of the

12    Second Circuit's decision in Orion Pictures.  I think it's

13    not -- and I want to really underscore this. The Side B

14    seems to suggest that this is a sort of catchall exception

15    that allows sealing or redaction of anything that could

16    conceivably harm their economic interests.  And --

17          THE COURT:  Right -- which is what Judge Gerber

18    and Judge Glenn found years after Orion Pictures was

19    decided.

20          MS. TOWNSEND:  I think there are --

21          THE COURT:  Judge -- I'm sorry, Judge Gerber and

22    Judge Bernstein found, years after Orion Pictures was

23    decided.  They both say harm, or provide a commercial

24    disadvantage in --

25          MS. TOWNSEND:  I think --

1           THE COURT:  -- in Dryer and Global Crossing.

2           MS. TOWNSEND:  And I think with respect to Global

3     Crossing, the cases that are cited that we point to, Your

4     Honor, that were cited by Side B in their briefing, we noted

5     and we explained with respect to Global Crossing, the

6     information could have given an unfair advantage to

7     competitors as part of a sale process, so I don't think -- I

8     think the language of that case, it doesn't -- the actual

9     outcome of that case doesn't suggest a much broader, let

10    along the kind of clearly broad interpretation of just any

11    kind of economic harm that I think is being posited by the

12    Sackler families here.  It doesn't suggest that that's

13    actually what the court was doing in Global Crossing.  In

14    that case, the court found that public disclosure of the

15    information, which were included dates by which the Debtors

16    were required to sell certain assets and information would

17    give potential buyers substantial leverage.  So, that's the

18    kind of competitive disadvantage that the Second Circuit in

19    Orion Pictures was focused on and talking about and limiting

20    the scope of § 107(b)1 to.  So, I don't think --

21          THE COURT:  Well, let me ask you -- and of course,

22    you would have the right, in an evidentiary hearing, to

23    cross-examine the declarants.  It was submitted, in

24    connection with the more recent responses, by the Raymond

25    Sackler family, but they allege - one of them being the

Page 23

1    manager of the home office - that in the past, when the

2    identity of commercial -- of the commercial counterparties

3    was revealed, those counterparties, in several instances,

4    either cashed out the fund or refused to continue in

5    business.  How is that any less of a competitive

6    disadvantage than disclosing the information about the

7    decision making for the hedge fund at issue in in re Dryer,

8    LLP as far as putting the hedge fund at a disadvantage?

9            In Dryer, the decision-making analysis, Judge

10   Bernstein found, could have been used by competitors to, in

11   essence, take strategies and ideas from the hedge fund that

12   wanted that information redacted in the Lynam and Vellucci

13   declarations.  It's asserted that the investment would

14   simply be cashed out or precluded from being taken, and

15   presumably, someone else would step in, in the home office's

16   place, a third party, to take that position.  It seems to me

17   that, if you limit it to competitive disadvantage, it's not

18   really saying enough because you're still at a competitive

19   disadvantage.

20           MS. TOWNSEND:  I think, Your Honor, the argument

21   that's been made by the Raymond Sackler family is that

22   disclosure of counterparty information could encourage - and

23   I acknowledge this, or I acknowledge that this is the

24   argument they're making - that it could encourage these

25   investment counterparties to stop doing business with the

Page 24

1    Sackler families because of the reputational effects which

2    would, or in their mind -- which would, in turn, if they

3    stopped doing business with them, in turn hurt the Sackler

4    family financially.  So, I would posit that that is the

5    case.  But it's also not the kind of -- it's not information

6    that's provided about the business to a competitor that

7    would provide -- that would create a competitive -- unfair

8    competitive disadvantage.

9              In our briefing, Your Honor, embarrassment, or

10   harm to reputation, be it from the disclosure of non-

11   scandalous, non-defamatory, truthful information isn't

12   sufficient to warrant unsealing under § 107(b), so I think

13   there's a very distinct difference between information that,

14   if disclosed, could just by virtue of associating the

15   counterparty with the Sackler family, that may cause them

16   not to want to be associated with them publicly and pull

17   back, that is quite different than the type of information

18   that § 107(b)1 was intended to protect, which is commercial

19   information which, if it was given to a competitor, would

20   place the Debtor at a competitive disadvantage.  It's just a

21   different -- I think it is quite a different analysis, and I

22   think it really is a reputational argument that the Sackler

23   family is positing, which is just not, as we point out in

24   our briefing, a basis for sealing.

25              THE COURT:  Well, let me explore that a bit.  The

Page 25

1    Sacklers have not opposed, ultimately, the release of

2    information that could be derogatory to their reputation.

3    What they're opposing is the disclosure of the actual names

4    of the commercial counterparties in which they have invested

5    their money, on the basis that those counterparties would

6    withdraw or close out the funds or withdraw access to the

7    commercial deals that they expose them to.

8            There's no suggestion, I think, although this

9    should be explored, that the commercial counterparties,

10   since this is prospective information, are engaging in or

11   assisting in the Sacklers' alleged misconduct, which I agree

12   with you, would be reputational.  This seems to be something

13   at a different level.  It's not like, for example, a

14   complaint, as was the case in Food Management, that asserted

15   that the Debtors' counsel had assisted in misconduct by the

16   Debtor, and therefore was being sued for that, to which the

17   Debtors' counsel responded, not under § 107(b)1, which is

18   the commercial section - which by the way, doesn't refer to

19   competition at all - and instead responded under (b)2, which

20   is scandalous or defamatory matter, and Judge Glenn very

21   correctly said that, in that context, unsubstantiated harm

22   to the law firm's reputation is not sufficient for that type

23   of relief.

24           MS. TOWNSEND:  Correct, Your Honor, but I think

25   that where the reputational harm is being asserted is

1    reputational harm to the investment counterparties merely by

2    their association with the Sackler family and therefore --

3              THE COURT:  Well, the counterparties aren't making

4    the motion.  It's the Sacklers that are making the motion

5    and they want to prevent the counterparties from withdrawing

6    based on -- I'm using - I'm inferring what the Sacklers are

7    suggesting - cancel culture.  Not because the counterparties

8    are doing anything wrong, but simply that they'd rather just

9    not have their name in the paper and they're withdrawing.

10   But it's not the counterparties are not the ones that are

11   seeking this relief.  So, it doesn't -- it isn't really

12   based on the counterparties' reputation.  In fact, I did

13   have a question for you.  What is the purpose in naming them

14   as opposed to just describing them generically?

15             MS. TOWNSEND:  I think from our perspective, Your

16   Honor, the documents themselves, in our view, should be

17   redacted to the greatest extent possible, and those names

18   are reflected in the documents.  Unless there's some basis,

19   unless there's some ground to redact them, and we don't --

20   respectfully, we think that there is no basis within § 107

21   to redact the names of these investment counterparties, if

22   they don't fall within the scope of § 107(b)1, then they

23   should be redacted.

24             THE COURT:  Well, maybe I wasn't -- maybe I wasn't

25   clear in my question.  I'm trying to figure out why the

Page 27

1   names are important, as opposed to the nature of them, which

2   is already part of the public record, I guess.  Although,

3   if, for example, it was asserted that the counterparties

4   themselves had assisted the Sacklers in doing the things

5   that the underlying motion here, i.e. the Committee's

6   motion, asserted was a reason for granting the motion, I

7   would understand the -- I think, the argument that the names

8   are sought to be withheld for an improper purpose, i.e.,

9   simply because of the alleged effect on their reputation of

10  being claimed to be involved by the Creditors' Committee in

11  the facts that they alleged were the basis for my granting

12  their motion to find that the privilege didn't apply.

13          But if the purpose here is solely to harm the

14  Sacklers by limiting their ability to engage in business

15  now, I'm not sure -- I mean, isn't that just a commercial

16  factor?  That really isn't reputation at that point.

17  Doesn't that just go right to the plain language of §

18  107(b)1, which again, says: "To protect an entity with

19  respect to commercial information".  You focus on commercial

20  again.  If the information is just to prevent these parties

21  from engaging in commerce with the Sacklers, it has no other

22  purpose, then wouldn't that be covered by § 107(b)1?

23          MS. TOWNSEND:  I'm not sure, Your Honor, when you

24  refer to purpose, I mean, I think the perspective of the

25  Media Intervenors is that the records that have been filed

Page 28

1    in this case, consistent with § 107(a) should be public to

2    the greatest extent possible.  I don't think --

3             THE COURT:  No, but I'm focusing on the actual

4    language.  "Commercial information."

5             MS. TOWNSEND:  Right.

6             THE COURT:  Congress made a distinction in

7    bankruptcy cases between commercial information that was

8    protected - and I fully agree with you that there have to be

9    extraordinary circumstances to apply § 107(b)1 - but -- and

10   that would include, for example, precluding the protection

11   if it was asserted that the reason for the sealing was

12   simply to protect the movant from reputational injury,

13   particularly when that reputational injury was in the

14   context of the fundamental conduct of the bankruptcy case,

15   as was the case in Food Management, but if the purpose of

16   seeking the relief under § 107(b)1 is purely commercial,

17   then it would seem to me that (b)1 would apply, and here I'm

18   trying to figure out whether there's any purpose served by

19   the disclosure other than to provide commercial harm.

20            MS. TOWNSEND:  Well, first, Your Honor, I think

21   commercial information is the language in the statute.  I

22   think, as we discussed in our briefing, the Second Circuit

23   in Orion Pictures has --

24            THE COURT:  Well, let's just accept that I don't

25   believe the Second Circuit cabined the language to

1    competitive disadvantage.  The finding by the bankruptcy

2    judge was that there was a competitive disadvantage, and so

3    that's what the Second Circuit focused on in responding,

4    again, to a contrary argument that said, oh, no, it has to

5    be a trade secret.  Circuit said, no.  A competitive

6    commercial advantage is enough.  That wasn't limiting it to

7    competitive disadvantage.  But again, I go back to my basic

8    point, which is, if you're running a family office that

9    manages the family's investments, as one of the witnesses

10   does, then isn't it at a competitive disadvantage versus

11   other family offices and hedge funds if it's not allowed to

12   invest in certain investments solely based upon the

13   disclosure of counterparties' names?

14            MS. TOWNSEND:  It would be allowed -- I mean, it

15   would not be prohibited from doing so.  I think the concern

16   that has been raised by the Sackler family is that the

17   reputational harm of being associated with the Sackler

18   family would cause or could cause some of these

19   counterparties to no longer want to do business with them.

20   And that's --

21            THE COURT:  All right, and how is that even

22   reputational harm?  I mean, the United States government is

23   perfectly happy to take taxes from the Sackler family.  Are

24   they suffering -- is the government suffering reputational

25   harm for doing that?

1            MS. TOWNSEND:  And Your Honor, I'm not --

2            THE COURT:  Isn't just a cold -- isn't just a cold

3    and calculated business determination by these funds that

4    they just don't want to see their name in the paper and be

5    the subject of tweets?

6            MS. TOWNSEND:  That may be the case.  I'm not sure

7    that the -- I think I would characterize it in the argument

8    that the Sackler families appear to be making which is that

9    -- or which we understand them to be making which is that

10   these -- if they are -- the public association would then

11   cause them to withdraw from doing business with them.

12   That's my understanding of their argument.  I'm not

13   suggesting that that is, in fact, the case, that they would

14   somehow be reputationally harmed by their association with

15   the Sackler family.  I think that's the argument that the

16   Sackler family is making to urge the redaction of this

17   material.  Their claim is that if these companies are

18   publicly associated with them, then they will pull back,

19   which will ultimately harm the Sackler family's sort of

20   general economic interests.

21            And I think our point is that even if, Your Honor,

22   you take a broader view of what § (b)1 protects, you know,

23   it protects something broader than just information that --

24   about a business that, if provided to a competitor, would

25   put the business at a competitive disadvantage, if it's

1    broader than that, I think it's still not so broad as to

2    reach the sort of, quite frankly, speculative -- because

3    we're sort of relying on the theory that these companies

4    will -- these investment counterparties will, in fact,

5    because their name is disclosed, pull back, which you know,

6    we're just -- that argument depends upon that, and that that

7    -- even if that occurs, that that's the kind of harm that §

8    (b)1 is intended to shield.  And I think our position is

9    that it is not, even if you take a broader -- a broader view

10   of what § (b)1 was intended to protect.

11             THE COURT:  Well, I agree with you that the

12   original pleadings were speculative on this point, but I now

13   have -- which was not the case, for example, in the GM

14   opinion by Judge Glenn that you cited two declarations which

15   actually list a number of times when funds redeemed the

16   investments out of the fund and -- although this is somewhat

17   vague, Mr. Lynam says: "Additionally, I'm aware of or have

18   been informed of at least six other financial institutions

19   that terminated their bank and their broker-dealer

20   relationships with the Jonathan Sackler family, or decided

21   to avoid or limit business with the Jonathan Sackler family.

22   These events occurred between May 2019 and late 2020."  So,

23   I'm not sure how speculative it is at this point.  Again,

24   you're perfectly entitled to cross-examine these two people,

25   Mr. Lynam and Mr. Vellucci, who also details similar actions

1    by those with business relationships with the Sacklers in

2    Paragraph 5 as to how real it is, and of course, one could

3    make that point that, where there is someone that does make

4    the calculated decision that, although it may not affect our

5    reputation truly, we just don't want to deal with this,

6    there may be plenty of others who say, I will invest the

7    money and take my fees out of it.  But I guess at this

8    point, I don't -- I'm not sure it really is speculative,

9    given those declarations.

10           MS. TOWNSEND: I think, Your Honor, it's

11   speculative to the extent that it relies on the notion that

12   because this is -- there -- similar -- perhaps similar

13   situations have occurred in the past that they're

14   necessarily going to occur in the future by virtue of these

15   particular redactions no longer being redacted on these

16   particular names no longer being redacted.  And I would note

17   that again, I think that, to the extent the type of harm

18   that's being asserted is sort of a generalized economic harm

19   that could flow simply from disclosure of an association, I

20   -- that is -- it's beyond what § 107(b)1 was intended to

21   shield, and I think it's no different --

22           THE COURT:  Are you relying on anything besides

23   Orion for that proposition?

24           MS. TOWNSEND:  In addition to Orion, Your Honor,

25   we cited -- I'm just going to look at the case.  We also

Page 33

1    cited the in re Motors Liquidation Company, Southern

2    District of New York case that also indicates that harm --

3    information provided to a competitor that would provide a

4    competitive -- that would put the debtor at a competitive

5    disadvantage is the type of information that is intended to

6    be protected by § 107(b)1.

7            THE COURT:  But neither of these cases say it's

8    the only information that's intended to be protected.

9            MS. TOWNSEND:  I think they're defining commercial

10   information.  And I would posit, Your Honor, that even if

11   you take a broader view of what could be competitively

12   disadvantageous, that would be covered by § 107(b)1, the

13   information or the argument that's being made with respect

14   to these investment counterparties is really no different

15   than an argument that the attorneys in this case don't want

16   to be associated, or don't want their business to be harmed,

17   don't want other clients to maybe not want to work with

18   them, if they are found to be representing, or they are

19   publicly disposed to be representing the Sackler families,

20   therefore -- and then they won't want to represent them and

21   then therefore, they should be able to seal their

22   identities.  I mean, I think that this -- it's difficult to

23   draw a line if the economic harm is the result of individual

24   choices being made by third parties just by virtue of the

25   fact that the documents are not being sealed or that there's

Page 34

1    transparency there.

2            THE COURT:  Actually, there's a really good case

3    that does draw the line: in re Gordon Properties, LLC. 536

4    B.R. 703 Bankr. E.D. Va.  And again, most of these cases

5    that deal with reputation - in fact, I think all of them -

6    are ones under § 107(d)2: scandalous or defamatory, not

7    (b)1.  And in fact, for example, in Food Management Group,

8    the law firm didn't make any attempt to make the showing

9    under (b)1.

10           MS. TOWNSEND:  And that's precisely our point,

11   Your Honor, is that this is -- it's difficult to make that

12   showing and that that's not the showing that's been

13   attempted to be made here.  It's an effort to sort of push

14   some of these reputational harm considerations granted to a

15   third party, directed at a -- you know, reputational harm to

16   a third party that could have economic effects on the

17   Sackler family, to push that under (b)1, and I think that is

18   precisely what our argument is, that that's not proper, that

19   your embarrassment or harm to reputation are not grounds for

20   redaction under § 107, and that under 107 -- certainly not

21   under § 107(b)1, which is designed to protect, again,

22   confidential commercial information that would place, in our

23   view, a party at a competitive disadvantage.

24           But again, is the relationship between these

25   parties sort of confidential commercial information of the

1   kind - and that really is the question - of the kind §

2   107(b)1 was intended to prevent?  Is that the kind -- is

3   another third party deciding not to do business with the

4   Sackler family, is that the harm that § 107(b)1 was intended

5   to shield against?  And I would say, Your Honor, that I

6   think, to the extent that's the way it's interpreted, it has

7   -- it has a few limits.  I think you could make an argument

8   that is -- has that sort of two-step process and this could

9   have a negative economic impact on a Debtor, I think is the

10  party that would normally be at issue.  I think that the --

11  drawing a line would be difficult to do.

12          I think -- so, our argument would be that it is

13  not within the scope of § 107(b)1 - not that we're trying to

14  put it under § 107(c), but that we're saying if the concern

15  is reputational harm, it should be sitting under that

16  provision.  If it can't fit under that provision, it doesn't

17  fit under § 107(b)1.

18          THE COURT:  Well, again, I agree with you

19  completely that reputational harm is not a basis unless it's

20  analyzed with far more proof that, in fact, something is in

21  fact scandalous or defamatory and this point of case law

22  detailing the burden on that, that a movant that wants

23  something sealed has to meet.  But I guess it seems to me

24  that, in looking at the purpose of the rule, and the

25  statements of its purpose, which is to safeguard the

Page 36

1    integrity, quality, and respect of our judicial system,

2    particularly in the context of bankruptcy proceedings, which

3    are ongoing and therefore need to be transparent generally,

4    that one can fairly easily make a distinction where it

5    appears that the only harm is commercial as opposed to

6    reputational, that -- and that harm doesn't go to the

7    bankruptcy case or the process, i.e., unlike the law firm in

8    Food Management, I don't think that the basis for wanting

9    this information has anything to do with the bankruptcy

10   case.

11          But certainly, the names of these parties on a

12   privilege log had nothing to do with the UCC's motion, which

13   went to other parties, and the nature of the communications,

14   not the actual recipient or subject, the name as opposed to

15   the subject matter of the communication.  So, I think you

16   actually could cabin it quite easily by saying, look, if the

17   only purpose here is to harm, as opposed to disclose

18   information that has some bearing on the bankruptcy case,

19   then I don't see why it wouldn't fall within the exception.

20   And I'm not sure that is the case here, but I know that I

21   asked you a couple of times and you haven't really answered:

22   what's the difference between simply naming the type of

23   business as opposed to the actual name other than to hope

24   that they would create a story -- that that would create a

25   story that would lead to harm to the Sacklers?

Page 37

1          MS. TOWNSEND:  I think I would -- I mean, I would

2     reject, Your Honor, that the notion that my clients are

3     looking in some way to harm the Sacklers or have a purpose

4     of doing so.  I think certainly the records that have been

5     unsealed in this case to date --

6          THE COURT:  I'm sorry, I want to be clear.  I'm

7     not saying that that is your purpose.  I guess I'm thinking

8     along the lines that Judge Gerber thought in Global Crossing

9     where he made that very distinction.  Exo had a purpose to

10    mess up the sale.  He said he didn't see how the Media

11    Intervenors, some of whom are the same people you're

12    representing, had that same purpose, but the effect was the

13    same, and there was no other effect.  And that's where I'm

14    focusing on.  Is there any other effect here besides the

15    risk of these entities stopping doing business with the

16    Sacklers?

17          MS. TOWNSEND:  Your Honor, I would say that, not

18    knowing what those -- the names are, not having access to

19    the information that's redacted, and in fact, not having

20    seen the privilege logs, I mean, those documents are still

21    sealed in their entirety, it is difficult for me to -- the

22    materials that these names are reflected on, it's difficult

23    for me to point specifically to the potential value to

24    members of the public of that specific information because I

25    don't have it.  What I'm saying is --

1          THE COURT:  Well, that's a very -- I agree, that's

2     a very fair point.  For example, if these entities, turned

3     out, were laundering money for the Sacklers, somehow, I

4     completely understand your point.  And the burden is really

5     on the Sacklers to show that these are just prospective

6     future relationships.  I understand that point.

7          MS. TOWNSEND:  And I don't think that the -- we're

8     -- we -- I don't think that we're suggesting misconduct on

9     the part of -- and I don't -- I would be clear that we're

10    not necessarily suggesting the conduct on the part of any of

11    these entities, but whether or not that's the case, I don't

12    think it alters the burden on the Sackler families to

13    demonstrate harm that would flow.  And I think I will go

14    back to the --

15         THE COURT:  I agree with that.  I think that's

16    true.  But on the other hand, it seems to me, if the only

17    reason is dog -- for the story would be dog bites man, as

18    opposed to man bites dog, it would seem to me that the harm

19    here is purely commercial.

20         MS. TOWNSEND:  I think I would say, Your Honor,

21    that I would just posit as a sort of hypothetical along

22    these lines, there's certainly information that has been

23    unsealed in this case that, if you were talking

24    specifically, let's say, about -- maybe we shouldn't talk

25    about this case in particular, I can just say as a

1    hypothetical, if we're talking about a situation where a

2    debtor was in bankruptcy, there was information that wasn't

3    -- that was -- that, if it were unsealed would cause

4    reputational harm to the debtor and therefore, economic

5    harm, because perhaps, or arguably could cause economic harm

6    because a party might boycott that debtor's company if they

7    learned of X information, let's say.  Again, I think the

8    problem with that kind of argument, which is effectively the

9    arguments being made here, that there's a commercial harm

10   because -- that would flow from some reputational harm,

11   potentially, and I'm just taking out the third party in this

12   hypothetical, that that would be -- I think that would

13   clearly not be sufficient.  I think that the debtor in that

14   kind of situation would have to demonstrate that the -- that

15   -- it would have to demonstrate something other than just

16   mere reputational harm.

17           And certainly, there could be economic

18   consequences that flow from that, from reputational harm,

19   whether it's to the Debtor or to a third party, but those

20   aren't the types of direct, concrete, competitive harms that

21   (b)1 is intended to protect against.  And so, I think I

22   would, again, sort of press Your Honor on that scope of (b)1

23   and whether this type of -- whether the Sackler families,

24   excuse me, are able to make -- to demonstrate -- you know,

25   meet their burden to demonstrate that this information is

1    within the scope of that exemption.

2             THE COURT:  Okay.

3             MS. TOWNSEND:  And I realize we've been -- Your

4    Honor has been gracious and letting the argument argue for a

5    bit of time.  I would like to, if possible, move to the

6    second category of information that the Sackler families

7    argue should be redacted, and that's the names of businesses

8    owned in whole or in part by the Mortimer Sackler family

9    initial (indiscernible) Side A.  We think that information,

10   too, should not be redacted.  I think there were different

11   rationales posited for that.  So, would Your Honor like me

12   to move to that argument?

13            THE COURT:  Yes.  Yeah, that's fine.  This is the

14   § 107(c) argument.

15            MS. TOWNSEND:  Correct, Your Honor.  And § 107(c)1

16   permits redaction of certain identifying information in

17   order to protect individuals to the extent the Court finds

18   the disclosure of such information would create undue risk

19   of identity theft or other unlawful injury to the individual

20   or the individual's property.  That's the language of (c)1,

21   and as we point out in our briefing, in in re Abea, Inc. - I

22   think I'm pronouncing that correctly, the person who seeks

23   to prevent disclosure must support that with a concrete

24   showing of potential harm.  Here, no individual at purported

25   risk of harm has been identified.  Side A would like to

Page 41

1    shield the names of business entities, and that the first --

2    that the speculative, I would say, theory that the -- that

3    is being proffered in support of that is that because

4    members of the Sackler family have been the target of public

5    ire and unquestionably, Your Honor, I think the language --

6           THE COURT:  Can I -- can I interrupt you?  And

7    this is really more of a question for the Mortimer Sackler

8    side.  § 107(c)1, the introductory clause says: "The

9    Bankruptcy Court, for cause, may protect an individual with

10   respect to the following types of information"  "To the

11   extent the court finds the disclosure of such information

12   would create undue risk of identity theft or unlawful injury

13   to the individual or the individual's property".

14          The circuit has long interpreted the word

15   "individual" in the Bankruptcy Code as applying to people,

16   real people, as opposed to businesses.  It did so, first and

17   foremost, in interpreting what was then 362(h) and is now

18   362(k) of the Bankruptcy Code in the Chateaugay case, which

19   says: "except as provided in Paragraph 2, an individual

20   injured by any willful violation of a stay provided in this

21   section shall recover actual damages including costs and

22   attorneys' fees, and, in appropriate circumstances, may

23   recover punitive damages."

24          The court said, Congress knows how to distinguish

25   between individual and corporate entity in the Bankruptcy

Page 42

1   Code and here, individual means person.  And the same word

2   is used in § 107(c)1.  So, maybe before we should go

3   further, I should hear from counsel for the Mortimer Sackler

4   side on this point.

5            MS. MONAGHAN:  Sure, Your Honor.  This is Maura

6   Monaghan from Debevoise & Plimpton on behalf of the Mortimer

7   Sackler family.  So, looking at § 107(c)1, it refers to the

8   Bankruptcy Court's for cause may protect an individual with

9   respect to the following types of information, and that

10  includes (c)1(b), other information.

11           THE COURT:  Right.

12           MS. MONAGHAN:  So, in this case, the Mortimer

13  Sackler family individuals, the initial covered Sackler

14  parties, are the movants.  They're seeking the protection

15  that the information to be protected includes the

16  identification of these public-facing businesses, and I want

17  to emphasize, it's only the public-facing businesses that we

18  are addressing in this request.  It's not all businesses.

19  And I think that that's a common sense reading of the

20  statutory provision that prevents the Bankruptcy Court from

21  otherwise being helpless to protect the unlawful injury to

22  individual's property that is intended to be protected and

23  explicitly referenced in § 107(c)1.

24           THE COURT:  So, the property here would be their

25  ownership interest in these public-facing businesses?

1      MS. MONAGHAN:  Yes, the businesses themselves are

2  property belonging to the members of the Mortimer Sackler

3  family.

4      THE COURT:  But -- well, all right.

5      MS. MONAGHAN:  And I would point out, Your Honor,

6  that otherwise, you'd really be left without an ability to

7  protect against what we think is a very real prospect of

8  injury.  I acknowledge that it's difficult to quantify that

9  risk, but for example, if you look at Exhibit 2 to the Ball

10  declaration, it shows how, in response to court documents

11  being publicized by the media, one of these people posted,

12  "so let's find their addresses and burn their" - and I'll

13  omit the adjective because of the Court's dignity - "houses

14  down."  And so, there is a real risk that court documents

15  that publicize the identification of these businesses - say,

16  for example, and this is a hypothetical example, you know,

17  it says there's a coffee shop in New York City owned by the

18  Sacklers, it becomes a physical target of that injury.

19      THE COURT:  Well, the businesses haven't been

20  identified, right?  I don't know what they are --

21      MS. MONAGHAN:  They are -- the information

22  proposed to be redacted is the names of the public-facing

23  businesses.

24      THE COURT:  But I mean the nature of them hasn't

25  been identified.

Page 44

1          MS. MONAGHAN:   No.   We have only identified them

2     as public-facing.

3          THE COURT:   Right, so, you know, there could be a

4     wide -- you know, a wide range of property and I really

5     wonder what -- I guess I understand physical harm but you

6     know, beyond that, I'm not quite sure that this statute

7     really is intended to cover, for example, a drop in a public

8     company's share price because a substantial amount of the

9     shares are revealed to be owned by an individual who makes

10    this motion.

11         MS. MONAGHAN:   Correct, Your Honor, but that's not

12    information that we are seeking to shield.   These are

13    entities that are privately owned, in whole or in

14    substantial part, by members of the Sackler family.

15         THE COURT:   But again, I don't know what they are.

16    I don't know if they're investment vehicles, for example, I

17    don't know if they're, like, hedge funds that then own stock

18    in lots of other companies --

19         MS. MONAGHAN:   No, Your Honor --

20         THE COURT:   -- if they're brick and -- or if

21    they're brick and mortar businesses, you know.   If -- how

22    they're named, how easy it is to actually find what they

23    own.   None of that is really disclosed.

24         MS. MONAGHAN:   Well, Your Honor, we find ourselves

25    a little bit between a rock and a hard place on that.   If we

Page 45

1    disclose them in a court filing to which the Media

2    Intervenors have access, we sort of go in a circle.

3            THE COURT:  Well, I can always review that

4    information in camera and then talk about it generically on

5    the record.

6            MS. MONAGHAN:  If Your Honor would like us to do

7    that, we certainly can.  I can say, when we identify public-

8    facing businesses, we do not mean shares in funds that own

9    small percentages.  We're talking about brick and mortar

10   businesses that people could walk up to and throw a brick

11   through the window of.

12           THE COURT:  Okay.  All right, so, I interrupted --

13   I interrupted Ms. Townsend.  I just wanted to address that

14   up-front issue.  So, Ms. Townsend, you can keep going.

15           MS. TOWNSEND:  Thank you, Your Honor.  And I'll

16   respond to that.  I think we cited in our briefing in re

17   Motions Seeking Access to 2019 Statements, which is a 2018

18   case in the Delaware Bankruptcy Court that I think really --

19   I think brings to light the type of information that §

20   107(c) was intended to protect in that case - social

21   security numbers, medical histories, individuals' names and

22   addresses of individual elderly claimants.  It -- I think

23   that's the kind of information that § 107(c)1 is geared

24   toward.  And in fact, you know, my clients have not

25   challenged the redaction of things like home addresses and

1    phone numbers, even the names of certain individuals.

2             To be clear, what we're talking about here are the

3    names of businesses owned in whole or in part by Side A

4    parties, and no showing has been made, quite frankly, that

5    the redaction of those names is warranted.  The mere fact

6    that an -- and because I'm not going to dispute that the

7    individual members of the Sackler family have been the

8    target of hateful online posting, but that doesn't translate

9    to every employee of every business in any way associated

10   with the Sackler family will be targeted for violence.  I

11   think that that --

12             THE COURT:  Again, we're not focusing on the

13   employees, because that's not going to be disclosed.  It's

14   the businesses themselves that is the basis for this §

15   107(c) argument.

16             MS. TOWNSEND:  Correct, Your Honor, and the

17   argument that's being made by the Side A parties is that if

18   the names of those public-facing businesses are going to

19   disclose, then employees there could be targeted for

20   violence, the buildings themselves could be targeted with

21   vandalism, and I think that's a bridge -- quite honestly, a

22   bridge too far.  It's very speculative, it's very

23   attenuated.  There's no examples of any threats directed at

24   any business or any other entity that has been affiliated

25   with the Sackler family.  And quite honestly, Your Honor,

Page 47

1    there have been many, many examples of museums and other

2    institutions or entities that have been affiliated with the

3    Sackler family that have not been targeted with violence.

4    And certainly, again, there's nothing in the record to

5    suggest that redacting the names -- solely the names -- and

6    you're right Your Honor, solely the names of these

7    businesses, is the kind of harm that would justify redaction

8    under § 107(b)1.  And I would be -- or (c), rather, excuse

9    me.

10            And I'd be remiss, Your Honor, if I didn't point

11   out -- and we point this out in our briefing, that the

12   seriousness of these concerns is, quite frankly, strongly

13   undercut by the fact that Side A only raised it at the last

14   hearing before Your Honor.  There was no issue concerning

15   any type of safety concern or vandalism concern or anything

16   along those lines that was raised in the conferment sessions

17   or with the Court prior to the last hearing.  And at the

18   last hearing, there was a statement concerning potential

19   safety issues that the Side A parties suggested would --

20   they wouldn't -- would make them want to argue for redacting

21   some certain names.  It didn't indicate at the time that

22   they were talking about business entities.

23            And so, I think that, from our perspective, Your

24   Honor, there's simply no basis, certainly no showing has

25   been made that that information should be redacted.  And

1    finally, Your Honor -- and I ask that the submissions that

2    were made under seal by Side A, in connection with their

3    supplemental briefing, be unsealed.  There was no motion to

4    seal, there was no specific showing that that information

5    should be sealed and filed with the Court, and I would also

6    just note that in the publicly filed versions of the

7    supplemental brief, it refers, in substance, to what was --

8    what was filed under seal.  So, I don't really understand

9    the basis for that filing being made under seal, but I would

10   ask, at this point, that those documents be unsealed as

11   well.

12           THE COURT:  Okay.

13           MS. TOWNSEND:  Thank you, Your Honor.  And I'm

14   happy to answer additional questions about that specific

15   category of redactions.

16           THE COURT:  Great.  So, Ms. Ball, let's address

17   that last point first.  Was there a seal in motion with

18   respect to this limited objection that was filed on the 7th?

19           MS. MONAGHAN:  No, Your Honor.  We had explained -

20   - this is Ms. Monaghan, I'm sorry, from Debevoise &

21   Plimpton.

22           THE COURT:  Oh, I'm sorry.  Right.

23           MS. MONAGHAN:  As we had explained -- it's

24   understandable because it was Ms. Ball's declaration.  As we

25   had explained in Ms. Ball's declaration and in

Page 49

1    correspondence to the Court, we filed the URLs and the full

2    images under seal because otherwise, you're giving the

3    public directions to this hateful, vitriolic speech and we

4    didn't want to draw further attention to it.  The unredacted

5    versions were provided to Ms. Townsend.  So, it's not the

6    case that they were without the information in full.  And

7    so, the information is available to all of the counsel that

8    were parties to this motion and the explanation for why the

9    URLs were not provided was disclosed in the brief.

10            THE COURT:  All right, but you know, I have a

11   specific practice for dealing with sealing motions, and

12   something really can't be filed on the docket unless there

13   is such a motion in redacted form.  So, I think it's

14   incumbent upon you to make such a motion and if it is

15   limited, as you've said, and not to the whole declaration

16   and the exhibits, it might be granted, it might not.  If

17   it's just limited to, you know, a reference to a threatening

18   tweet, I guess I would understand why that might be sealed.

19   But unless you make that motion promptly, I think Ms.

20   Townsend's right.  The whole thing needs to be filed.

21            MS. MONAGHAN:  All right.  We will promptly make

22   that motion.

23            THE COURT:  Okay.  And again, the practice on that

24   is you email chambers the redacted and unredacted document

25   or documents with the motion.  If the Court feels that the

1    motion is clear and clearly supported, then I may issue an

2    order then, or alternatively, like my colleagues, I may

3    direct a hearing on it.  But I need a motion.

4            MS. MONAGHAN:  I understand.

5            THE COURT:  So, on the -- let's go to the other

6    point, main point, I think that Ms. Townsend raised, which

7    is, the proof here for this request under § 107(c) as

8    opposed to (b)1, is limited, it appears to me, to threats

9    made of the Sacklers, or to the Sacklers themselves.

10   There's no real discussion of threats made to any assets or

11   businesses tied to the Sacklers, and in fact, the Sacklers

12   are publicly tied to various institutions which have not

13   experienced, it's asserted, and there's nothing to the

14   contrary in the pleading, vandalism or the like.  What is

15   your response to that?

16           MS. MONAGHAN:  Well, Your Honor, counsel referred

17   to the case in re Motion Seeking Access to 2019 Statements,

18   which makes clear that the assessment of the risk is forward

19   looking, and that the standard does not require evidence of

20   injury having occurred in the past or under similar

21   circumstances.  We have shown you --

22           THE COURT:  But in that case -- in that case, one

23   could reasonably infer the risk of injury because the

24   personally identifiable information was going to be

25   disclosed, which, within itself had that -- carried that

1     risk.  I mean, there is -- that doesn't mean the past can't

2     be prologue.  I don't think you have to show that there's

3     already been a threat to one of these public facing

4     businesses, but on the other hand, I think it's a legitimate

5     response to say that there are publicly identified

6     institutions that have a tie to the Sacklers and they have

7     not been threatened other than, perhaps, with you know,

8     cancel culture.

9             MS. MONAGHAN:  Well, Your Honor, I would again

10    point to Exhibit 2 to the Ball declaration which says,

11    "Let's find their addresses and burn their... houses down."

12            THE COURT:  I understand but --

13            MS. MONAGHAN:  So, that's their property and so

14    the distinction that the media counsel is drawing is that

15    the people who made these threats to their residential

16    property won't extend those threats to their business

17    property.  That seems like a pretty fine distinction to draw

18    when you're not talking about ownership of a share of stock.

19    It is also the case that these are -- businesses are unlike

20    institutions like museums where the link to the Sacklers is

21    more remote, and those institutions have nonetheless had

22    protests and the like.  These are entities that are owned by

23    the Sacklers where the same degree of remoteness, people

24    have other reasons for staying their hand with respect to

25    the Metropolitan Museum, than they might have with respect

Page 52

1    to a restaurant owned by a member of the Sackler family.

2            And I think otherwise, the level of proof that the

3    Media Intervenors are demanding requires you to wait until

4    the horse is out of the barn to close the door.

5            THE COURT:  Well, the protests were not unlawful,

6    right?

7            MS. MONAGHAN:  No, the protests were not unlawful,

8    as far as I know.  I mean, I don't know if they might have

9    violated some city ordinance or something, but I would also

10   note that we raised in our papers that, under the Brown v.

11   Maxwell case, the court can apply a balancing test and in

12   this case, we are talking about information with respect to

13   a discovery motion that has not been heard.  Many of the

14   entries are ones to which the official committee has

15   withdrawn its challenge, and when you're balancing the

16   information value versus the risk, in this case, we would

17   submit, for the reasons that you were discussing with

18   respect to the § 107(b)1 analysis, the informational value

19   is very low.  Disclosing that these businesses are owned by

20   Sacklers is not particularly meaningful.

21           THE COURT:  Well, I'd like -- I guess I'd like to

22   push back on that.  Isn't a focus, a prime focus, of the

23   incredibly detailed discovery that has taken place in this

24   case tied to the Sacklers' assets?

25           MS. MONAGHAN:  Your Honor, that's the --

Page 53

1          THE COURT:  So that, you know, the parties in

2    interest can evaluate whether the settlement proposed by

3    them would be a proper settlement, one of the factors being

4    the ability of the settling party to pay a judgment if a

5    judgment were ever obtained.  And that in addition to that,

6    there's discovery as to transfers that the Sacklers made.

7    So, I think that assets owned by the Sacklers are, to me,

8    much more front and center than business counterparties with

9    the Sacklers are.

10          MS. MONAGHAN:  Your Honor, but that discovery is

11   with respect to ability to pay.  It's not with respect to,

12   you know, what is the name of this particular public-facing

13   business.  Because once you have the name, you know, it's

14   very well to say you can redact the address.  It's pretty

15   easy to figure out the address once you have the names.  And

16   I don't think that purpose has to do with disclosure of

17   names recorded on a privilege log.

18          THE COURT:  Well, it does let you figure out what

19   they own, or something that they own.

20          MS. MONAGHAN:  Yes, Your Honor, but that

21   information, for all the reasons that have been discussed,

22   have been transparently disclosed to all the parties in

23   interest that are negotiating the resolution.  The question

24   here is whether the Media Intervenors have access to those

25   names, not whether those names have been provided to counsel

Page 54

1    who are doing due diligence on the assets and the ability to

2    pay.

3              THE COURT:  Right.  I guess I'm just focusing on

4    your balancing point.  I mean, I think the ACNS case at the

5    circuit level, albeit it's the Third Circuit instead of the

6    Second, although, interestingly, the Third Circuit seems to

7    interpret the Orion Pictures case consistent with its

8    observation, states that: "Every court has a supervisory

9    power over its own records and files, and access has been

10   denied where court files might have become a vehicle for

11   improper purposes."  And it would seem to me that it may be

12   that an improper purpose to obtain this information would be

13   if it were solely to harm the Sacklers, but I was positing a

14   perfectly legitimate purpose, which is to identify the

15   assets.

16             MS. MONAGHAN:  Your Honor, I don't think that the

17   -- that question seems more relevant to whether the

18   motivation of the official committee in filing the document

19   was an improper purpose or not, and that is not what we are

20   contending.  It does not seem to have the same significance

21   to the question of whether the Media Intervenors should have

22   access to the document or not.  As I read the Brown v.

23   Maxwell balancing test, that's looking at, sort of, the

24   value of the information to the general public.  The reason

25   that they're drawing the distinction between discovery

1  disputes and actual evidence, for example, is because of the

2  lower value to the public of that information.

3           In this case, no one is contending that the

4  information has been withheld from the parties making

5  decisions about the settlement, they're not contending that

6  there is something about -- you know, there's no litigation

7  in the Bankruptcy Court with respect to the nature of these

8  assets that is requiring the Court to look into what they're

9  worth, or how they're held, or where they're located.  What

10 happened was, there was a discovery dispute still unheard,

11 and at the time of that discovery dispute, which was

12 subsequently narrowed, the privilege log contained entries

13 that almost, you know, sideways, referred to these entities.

14 The harm that that risk is not in any way related to the

15 purpose of that initial motion.

16           THE COURT:  Okay.

17           WOMAN 1:  Your Honor, if I may, this is

18 (indiscernible).

19           THE COURT:  Do either of you have anything more to

20 add to this aspect of the argument?

21           MS. MONAGHAN:  I would just ask that --

22           THE COURT:  On the § 107(c) point.

23           MS. TOWNSEND:  Yes.  Just to clarify, Your Honor,

24 I think counsel for Side A cited Brown v. Maxwell.  I think,

25 as we covered in the last hearing, and as addressed in our

1   briefing, the common law presumption of access and balancing

2   under the common law test is not really what's at issue

3   here.  The standard in § 107(c)1 under § 107(c)1, Side A

4   bears the burden of making a concrete showing of harm that

5   would flow from disclosure of the information that they want

6   to redact.  So, this notion of balancing simply isn't the

7   right standard, and we would contend that they have not made

8   that showing.  But I just wanted to clarify that because I

9   think there's been some confusion, or I shouldn't say

10  confusion, but there's been some differing arguments on that

11  point.

12          THE COURT:  Right.  Okay.  Ms. Townsend, let me

13  ask you: do you -- would you -- do you want to cross-examine

14  the two witnesses for the other side of the Sackler family's

15  opposition, Mr. Lynam and Mr. Vellucci, knowing that I have

16  their declarations here and this wasn't scheduled is an

17  evidentiary hearing, but you know, I have their declarations

18  and they say what they say.

19          MS. TOWNSEND:  It would --

20          THE COURT:  Either -- you either want to cross-

21  examine them now or you know, at an evidentiary hearing

22  limited to their cross examination that I would hold

23  shortly, and probably by Zoom or Teams or something like

24  that, so people can actually see them, see the Court, and

25  see counsel.

Page 57

1              MS. TOWNSEND:  Your Honor, I would suggest -- and

2    I appreciate that offer, and I think we -- I think we would.

3    I think what I would suggest prior to that is that the

4    parties -- that the remainder of the privilege log materials

5    be unsealed.  I understand that, you know --

6              THE COURT:  I thought -- I want to make sure I

7    heard.  You mean be unsealed?

8              MS. TOWNSEND:  Correct, so the privilege log

9    materials right now are entirely sealed and --

10             THE COURT:  Right, but I thought there was an

11   agreement to unseal them, right, except for these specific

12   limited identities?

13             MS. TOWNSEND:  That's correct, Your Honor, but we

14   don't have those at this point in time --

15             THE COURT:  Right, no, I agree.  That -- right,

16   there's -- I don't see any reason to hold off on that, given

17   the agreement to unseal them.

18             MS. TOWNSEND:  Right, and then I think that would

19   help us, Your Honor, the Media Intervenors, review what's

20   been redacted for these purposes, and that -- we could then

21   inform the Court whether or not we think it makes sense to

22   cross-examine the Debtors -- or excuse me, I apologize, the

23   Declarants -- cross-examine the Declarants as to the §

24   107(b)1 arguments as to the counterparties.

25             THE COURT:  Right, okay.  Okay.  Why don't we turn

Page 58

1    to the other issue, which is the issue with the Debtors?  I

2    will come back to this with a ruling, but I want to cover

3    that issue first.  So, I guess what I would like to do with

4    that, I have, I believe, the new proposed redactions of

5    Exhibit 123 and 137.  When we left off in January, I said I

6    would have to review the proposed redactions then to see

7    whether I could simply rule on the papers.  And I reviewed

8    them and informed the parties that I could not simply review

9    on the papers because it didn't leap out to me whether the

10   proposed redactions properly fit within the framework of §

11   107(b)1, and for these purposes, I think the framework is a

12   lot clearer than what we've been discussing in connection

13   with the Raymond Sackler objection.

14          And I needed to hear from, primarily, the Debtors

15   as to why they felt that they did fit within the framework.

16   Since then, the Debtors, as we noted, reduced the number of

17   redactions, but I think I still have the same -- the same

18   issue.  So, I think I need to hear from the Debtors focusing

19   first on 137 as to why the proposed more recent redactions

20   do fit the framework.  Now, the first proposed redaction is

21   an easy one.  It's an email, and the parties, I don't think,

22   oppose the redaction of people's emails, correct, Ms.

23   Townsend?

24          MS. TOWNSEND:  That's correct, Your Honor.  We

25   wouldn't challenge that redaction.

1           THE COURT:  Okay, so that redaction is on Page 2

2    of Exhibit 137.  And who's going to be arguing this on

3    behalf of the Debtors?

4           MR. MCCARTHY:  Your Honor, for the record Gerry

5    McCarthy of Davis Polk on behalf of the Debtors.  Can you

6    hear me clearly?

7           THE COURT:  Yeah, I can hear you fine, thanks.

8    So, I think you need to describe this generically via these

9    two paragraphs and in other paragraphs that we're talking

10   about and highlight to me what the concern is.  Obviously,

11   this is a 2017 document, and the movant, Media Intervenors,

12   have made the point that it's old, nothing can really be

13   affecting the Debtors' competitive, commercial position in

14   it today.  And sometimes, when I see -- when I see some of

15   the redactions, I think I have a clear basis to disagree

16   with that because they're talking about things that are

17   clearly forward-looking, and deal with specific events that

18   -- or specific products that -- why don't we just dive in

19   here?  The first bullet point on Page 2.  Why does that --

20   and we can use the framework that was clearly acceptable to

21   the Second Circuit in Orion Pictures, which is competitive

22   disadvantage.  Why does this paragraph's disclosure put the

23   Debtors at a competitive disadvantage?

24           MR. MCCARTHY:  Absolutely, Your Honor.  And I'd

25   like to first step back just to describe what this document

Page 60

1    is.  This is a document that was drafted, Your Honor was

2    correct, in May 2017, by the Debtors' now current Chief

3    Executive Officer.  This is the sort of document that, in

4    the normal course, businesses all across the country would

5    keep confidential in full, and the Debtor has also treated

6    confidentially.  They were not the ones to file this

7    document.

8            With respect to the age of the document,

9    generally, I'd only say that the Debtors accounted for the

10   age in their redactions.  If this was a document dated today

11   or last month, and this applies to Leventhal 123 as well,

12   the Debtors would have withheld that document in full as

13   being commercially harmful.  But turning to the first

14   redaction, Your Honor, that addresses the loss of

15   exclusivity of certain products (indiscernible).  Loss of

16   exclusivity is, at bottom, an estimate of when branded

17   products will become subject to generic competition.  You

18   know, a significant portion of a product's value is realized

19   during the time period where it has market exclusivity.  And

20   it's -- that's generally determined by a mix of patent

21   rights and regulatory exclusivity, and something I didn't

22   know before going to the (indiscernible) is it's not a date

23   you can look up in a book.  It's a probabilistic judgment.

24   It requires a legal judgment, it requires a business

25   judgment, and it can change.

1        But if information about loss of exclusivity was

2    released, that would enable competitors to craft their

3    competitor strategies in response to -- including, for

4    instance, coming in, in generic market, knowing when to

5    prepare their generic drugs for coming in.  it could impact

6    patent disputes and inability to negotiate favorable patent

7    resolutions and challenges.  So, in the Debtor's view, this

8    type of redaction falls at the core of what 107 was designed

9    to protect.  It's confidential information, it's commercial

10   information.

11        THE COURT:  And that goes to -- ultimately, you're

12   saying the fact that, referring to lost exclusivity, is not

13   something that's publicly known?  It's based on an internal

14   assessment as well as external assessment?

15        MR. MCCARTHY:  That's right, Your Honor.  And many

16   of the redactions across the two documents relate in some

17   way to loss of exclusivity.

18        THE COURT:  Right.  Okay.  All right.

19        MR. MCCARTHY:  And I don't know, you know, if you

20   want to go line by line here or --

21        THE COURT:  No, no, I agree with you --

22        MR. MCCARTHY:  -- you just want me to summarize

23   the (indiscernible).

24        THE COURT:  -- a lot of these deal with -- a lot

25   of these deal with the exclusivity point.  So, we may go

Page 62

1   line by line, but I -- on this one, and all future

2   exclusivity references, Ms. Townsend, do you have any

3   response to that?

4           MS. TOWNSEND:  Your Honor, I think again, it's

5   difficult for us.  Obviously, we don't have -- we're not

6   privy to what's under the redactions.  I would say that,

7   with respect to loss of exclusivity issues, you know, we

8   would -- again, it's difficult for me to respond because I

9   can't see exactly what's there.  To the extent that the

10  Court finds that that's information that would, if exposed

11  to a competitor, result in competitive disadvantage to the

12  Debtor, I think that would fall within the category of §

13  107(b)1.  But we're not in a position, necessarily, to

14  evaluate specifically what's under those redactions.

15          THE COURT:  Right.  But I am, and I don't think

16  you need to be, under the case law.  I conclude that this is

17  covered, this paragraph, and similar references to

18  predictions about lost exclusivity or continued exclusivity

19  in the two exhibits as well are properly protected under §

20  107(b)1, and the specific case law, including the Orion

21  Pictures case that the parties have cited.  The next

22  paragraph, which is also on Page 2, doesn't deal with

23  exclusivity.  It deals with current forecasts with regard to

24  a particular product.

25          I guess my question is, why would this again, if

1    it does, put the debtor at a commercial disadvantage if it

2    were disclosed?

3             MR. MCCARTHY:  Your Honor, I apologize if I'm not

4    following.  I think that -- if that's -- that second

5    paragraph that's redacted -- I think it does deal with

6    exclusivity, and I don't want to divulge the information but

7    it --

8             THE COURT:  So LOE means exclusivity?

9             MR. MCCARTHY:  Yes.  What -- LOE refers to loss of

10   exclusivity, Your Honor.

11            THE COURT:  All right.  Okay.  So my ruling stands

12   on that, then, for the same reason.

13            I have to tell you that which respect to the first

14   two redactions on the next page, they seem to me not to rise

15   to the level of what is protected under 107(b).  They may be

16   -- the heading may be somewhat embarrassing, but I don't

17   think it's -- it puts you at a competitive disadvantage,

18   particularly given that we're talking again about 2017 here

19   and among other things, it's clear from the record in this

20   case that Dr. Landau, when he became the CEO, has tried to

21   change certain things, including this heading so that -- it

22   would appear to me that this is more of a past piece of

23   information as opposed to something that would prospectively

24   harm the debtors.  To me, the same for the first paragraph

25   at the top of page 3 unless I'm missing something about the

Page 64

1    particular product that's mentioned there.

2              MR. MCCARTHY:  Well, Your Honor, let me start with

3    the first paragraph which, to say they're the most

4    (indiscernible) contains Dr. Landau's assessment of Purdue's

5    capabilities with respect to core technology in their

6    pharmaceutical products compared to competitors.  This is

7    not the sort of information that any company would release.

8    The debtor as CEO's assessment of that.  And if it's

9    released it could encourage competitors to take certain

10   actions -- come into market and things like that.

11             With respect to the second redaction which is the

12   -- and Your Honor's referring to the header of the bullet --

13   is that correct?

14             THE COURT:  Yes, yeah.

15             MR. MCCARTHY:  And that again is another

16   assessment of the debtor's CEO that, I think, demonstrates

17   the strategic focus of the debtors and is not public and is

18   not generally known, and competitors would betray commercial

19   information about the debtors to competitors.

20             THE COURT:  But it's an assessment that he made

21   when he wasn't CEO, three-and-a-half years ago.

22             MR. MCCARTHY:  Understood, Your Honor.

23             THE COURT:  Unless the product referred to in the

24   -- is there anything about the anacronym product that's

25   referred to in the first bullet point that has any, you

Page 65

1   know, (indiscernible) --

2          MR. MCCARTHY:  So that anacronym refers to abuse-

3   deterent properties of products, not a specific product.

4   (indiscernible) products that are important to the debtor.

5          THE COURT:  To me, that paragraph then is too

6   generic.  If I were a competitor, I wouldn't really know

7   what -- where I had achieved some position and where I

8   hadn't so I don't believe that these two items are actually

9   properly protected.  They're just not -- I just can't see

10   them really putting the debtor at a -- debtors at a

11   competitive disadvantage in a way that the case law talks

12   about.  And I'm guided a lot in that regard, although it's a

13   case from another jurisdiction, by -- if I could find it now

14   -- well, I'll tell you in a minute, the case that is -- I

15   found that discussion of how one distinguishes information

16   properly protected by 107 and information that doesn't.  But

17   you'll have to wait for me on that.

18          The last redacted item on page 3 is a reference to

19   a particular product.  Why would the disclosure of that

20   product name put the debtors at a competitive disadvantage?

21          MR. MCCARTHY:  Your Honor, this paragraph --

22          THE COURT:  Is this a product that's being

23   developed -- that still being developed or, you know, is

24   there some other reason why the name itself shouldn't be

25   disclosed?

Page 66

1            MR. MCCARTHY:  No.  This is not a secret product,

2    Your Honor.  This a product about which, like the

3    information is not generally known -- (indiscernible).  And

4    the assessment of this product relative to other product

5    offerings, this is something that's not publicly available.

6    It's internal debtor assessment.

7            THE COURT:  Okay.  But unlike the first paragraph,

8    here, a specific product was identified and so a competitor

9    could in fact focus in on the assessment of that product,

10   and I think that would in fact put the debtors at a

11   competitive disadvantage.  And you're saying to me that this

12   information as to this product is not public.

13           MR. MCCARTHY:  That's right, Your Honor.

14           MR. HUEBNER:  Your Honor, with apologies to Mr.

15   McCarthy, just for ten seconds.  I know this a little bit

16   unorthodox, but I'm actually getting texts in the background

17   from the client and I just want to jump in for an extra

18   second, which is, competitors would absolutely know the

19   product and the acronym reference.  And in fact, the client

20   has real concern that both to managed care and prescribers,

21   this information could be currently used against the debtors

22   to direct competitive harm.  So the (indiscernible) Mr.

23   McCarthy they just happen to not have his telephone number

24   so they're texting me in the background --

25           THE COURT:  Right.

1          MR. HUEBNER:  I'm limited on what I can say, but

2     this acronym is something very specific.  There actually is

3     a primary competitor in this market that frankly is doing

4     things that we are not doing because of things like the

5     self-injection and giving them this type of additional

6     information, in fact I am told, would be directly harmful to

7     us at the present --

8          THE COURT:  I'm sorry.  Are you -- you were -- are

9     you referring to the acronym in the first paragraph on this

10    page or the one we've just been talking about?

11         MR. HUEBNER:  So I don't have the document open

12    because I have the text open from the client.  Let me see if

13    they are -- the first paragraph.

14         THE COURT:  So that's not just sort of a generic

15    description of something.  It's a reference to a specific

16    product or type of products?

17         MR. HUEBNER:  It's a reference to specific

18    attributes of a product that are not common and are

19    different -- that's why this -- are differentiating -- and

20    again, I don't want to overspeak because I'm not a pharma

21    expert, but, you know, what I'm hearing in the background

22    from the CEO by text is that this could likely be -- at the

23    present time lead to changes in behavior by our primary

24    competitor if they have this knowledge about the products

25    with this attribute because in the future (indiscernible)

1    market.

2              THE COURT:  Okay.

3              MR. HUEBNER:  Which is why, again, as the Court

4    knows, out of thousands of documents, you know, we asked for

5    a few redactions on only two documents and we then went back

6    and took another pass and we really truly only left in the

7    things that we believe satisfied the current standard.

8              THE COURT:  All right.  Well, all right.  Based on

9    that representation as to the reference to the specific

10   product or specific range of products in this paragraph, I

11   change my mind and find that it is covered by 107(b)(1).  By

12   the way, the case that I was trying to find I just found is

13   quite a recent case, In re CV -- I'm sorry -- C2R Global

14   Manufacturing, 2020 Bankruptcy Lexus 3452, Bankruptcy ED

15   Wisconsin, December 10, 2020, where the judge really goes

16   through as we're doing now almost line by line, an

17   assessment of whether language really does put the debtor at

18   a competitive disadvantage or not.

19             So turning to page 4, the summary that is referred

20   to, again, includes loss of exclusivity so that would be

21   covered.  The blocked-out paragraph above it and the whole

22   section is -- I guess the question I have here is, is this

23   something that would still be applicable today?  I mean,

24   this refers to something --

25             MR. MCCARTHY:  Your Honor --

Page 69

```
 1            THE COURT:  -- in the present time, in the present

 2  -- you know, in the present tense -- again, back in May of

 3  2017.  Is it still applicable now, though -- the issue that

 4  -- this -- the accepted bullet points is addressing -- or

 5  are addressing?

 6            MR. MCCARTHY:  Yes, Your Honor.  In some aspects,

 7  this would still be applicable and this -- obviously, the

 8  issue that this is addressing is an aspect of the

 9  pharmaceutical business which is core to any pharmaceutical

10  business and if released could, not only give competitors

11  information about that critical function, but also impact

12  our -- the debtor's ability to partner with other entities.

13            THE COURT:  I guess what I'm asking, though, is,

14  is this particular problem still a problem?

15            MR. MCCARTHY:  Yes, Your Honor.  If -- with

16  respect to the redactions generally, if the information

17  (indiscernible) or could not be used, we've removed those

18  redactions.

19            THE COURT:  Okay.  And I'm assuming I know the

20  answer to this, but I'm going to ask you anyway.  This is

21  also information that is not within the knowledge of the

22  debtor's competitors already?

23            MR. MCCARTHY:  This information is kept

24  confidential by the debtors.

25            THE COURT:  Okay.  All right.  Well, I will permit
```

Page 70

1    it to be redacted as well under 107(b).

2              The information on page 7 is really covered by my

3    earlier ruling regarding the last redaction on page 3 so I

4    don't think we need to cover it again.  It would be properly

5    protected given --

6              MR. MCCARTHY:  That's right, Your Honor, and the

7    next redaction is along those lines as well -- page 3.  So

8    carry -- the first one carries over --

9              THE COURT:  Yeah.  It refers to the same product

10   and actually referring to two competitors too so that

11   clearly falls within 107(b).  I didn't really have a problem

12   with the bottom redaction either which deals with -- which

13   identifies potential products for divestiture.  My only

14   question, again, and you can give me a generic answer to

15   this or general answer, which is, has any of this become

16   public?

17             MR. MCCARTHY:  Your Honor, I don't believe so, but

18   I'm not a hundred percent confident in that.  I don't

19   believe so.  This has been reviewed by the debtors and if it

20   was public it would have been redacted.

21             THE COURT:  Okay.  All right.  Well, that would

22   have been the only issue here because this is clearly

23   something that falls within the case law under 107(b)(1).

24             I wasn't sure about the redaction at the bottom of

25   page 9, however.  I wasn't sure whether this was something

Page 71

1   that would simply be a potential source of media coverage or

2   embarrassment or really affects the business itself in

3   dealing with competitors.

4           MR. MCCARTHY:  No, Your Honor.  It's the latter

5   and this relates to Purdue Canada which is not the debtor's

6   (indiscernible) entity under the rule and Dr. Landau at the

7   time was a executive at Purdue Canada and (indiscernible)

8   tips forth a particular strategy for developing a market

9   that is not -- would not be generally known to competitors.

10          THE COURT:  And --

11          MR. MCCARTHY:  -- that competitors could use.

12          THE COURT:  Has that market -- is the -- are there

13  efforts to develop that market underway?

14          MR. MCCARTHY:  Well, you know -- as it sits right

15  now, Your Honor, I do not have the status of the efforts to

16  develop that market by the non-debtor (indiscernible).

17          THE COURT:  I'm sorry.  Can you say that again?

18          MR. MCCARTHY:  As I sit here right now, I'm not

19  fully aware of the efforts of the non-debtor entity to

20  develop that market as it stands today.

21          THE COURT:  All right.  But -- so this is not an

22  entity -- is this an entity that the debtors are going to be

23  owning?

24          MR. MCCARTHY:  This is not an entity the debtors

25  are going to be owning.  This is an entity -- a related

1   entity, Purdue Canada -- where -- which at the time Dr.

2   Landau served as a high-ranking executive of.  I believe

3   he's (indiscernible) advisor.

4           THE COURT:  So if -- is the debtor under some sort

5   of confidentiality agreement with that entity not to reveal

6   this type of information?

7           MR. MCCARTHY:  I don't believe so, Your Honor.

8           THE COURT:  Okay.  So I don't -- I actually don't

9   think this fits, then, within 107(b)(1).  It doesn't affect

10  the debtor going forward as far as I can tell from what

11  you've described to me, so I don't believe this should be

12  covered.

13          MR. MCCARTHY:  Your Honor, one point is that the

14  rule itself doesn't just protect, I suppose, the debtor.  It

15  also protects other entities.

16          THE COURT:  I understand, but they're not --

17  again, the debtor isn't implementing the strategy itself and

18  there's no indication that there's any agreement to keep

19  this confidential with the other entity, so I just don't,

20  you know -- based on what I know, this was -- this struck me

21  as something that might have been a good idea at the time

22  but that the debtor didn't implement, now can't implement,

23  and whether it's going to implemented elsewhere or not is an

24  open question because the entity is not under the debtor's

25  control.

Page 73

1          MR. MCCARTHY:  Understood, Your Honor.

2          THE COURT:  Okay.  Okay.  And the last one here

3    is, I think, on page 12, and again, this one seemed to me to

4    be covered clearly by 107(b)(1) as it deals with projected

5    technologies, investments, and the like in specific -- in a

6    specific product that I'm assuming because it and not the

7    other two products is one that you believe still requires to

8    be kept confidential.

9          MR. MCCARTHY:  That's right, Your Honor.

10          THE COURT:  Okay.  So that's covered by 107(b)(1).

11   Now it does refer to Purdue Canada, but, again, this is much

12   more specific than sort of the general -- and an actual

13   initiative -- that was already underway as opposed to the

14   more general description on page 9 that we discussed.

15          So I think that covers Exhibit 137.  I appreciate

16   that those actions to the other exhibit are more numerous,

17   but I think we ought to cover them here which is Exhibit 123

18   which is a June 8, 2016, apparently, power point

19   presentation entitled Media Update.  I think the first

20   proposed redaction is on page 5 and it is clearly forward-

21   looking and refers to the LLE point for specific identified

22   products so to me, that would be covered by my prior ruling

23   with regard to the other exhibit.

24          The next redaction, I believe, is on page 9, and

25   this was not so clear to me.  Why would this disclosure or

Page 74

1   disclosure of this item put the debtor as a competitive

2   disadvantage?

3           MR. MCCARTHY:  Your Honor, this graph actually a

4   is a -- in many ways a visual reflection of the loss of

5   exclusivity point.  If you could --

6           THE COURT:  I'm sorry.  Could you -- you're coming

7   through a little garbled.  If you could -- I didn't hear you

8   after, this graph is a, and then I couldn't really hear you.

9           MR. MCCARTHY:  It visually depicts potential

10  effects of the loss of exclusivity point that we discussed

11  earlier, and looking at it, it would be clear that that was

12  driving the depiction, and LOE is referenced on the right-

13  hand side of the graph as well.

14          THE COURT:  It is?  I don't see that, but I will

15  take your word for it.

16          MR. MCCARTHY:  Is the number at the bottom of the

17  slide 5?

18          THE COURT:  No, this is slide 9 I'm talking about,

19  page 9.

20          MR. MCCARTHY:  Understood, Your Honor.  It's the -

21  - so it's the same explanation.  It's not referenced but the

22  slide itself makes clear what the effect of the LOE will be.

23          THE COURT:  It reflects that?  Okay.

24          MR. MCCARTHY:  Yes.

25          THE COURT:  All right.  Very well.

1            MR. MCCARTHY:  As you compare the slide at page 5

2     and page 9 you can see that (indiscernible) similar.

3            THE COURT:  I see.  Got it.  They are -- they do

4     track each other.  Okay.  And I'm assuming, therefore, that

5     the answer is the same on slide 12 except slide 12 is --

6            MR. MCCARTHY:  That's right, Your Honor.

7            THE COURT:  -- in more detail with regard to

8     specific products.  So --

9            MR. MCCARTHY:  Much more detail, Your Honor, but

10    the same answer.

11           THE COURT:  Okay.  So I understood the rationale

12    behind the redaction -- the partial redaction -- on slide 13

13    except I want to confirm that -- well, I -- the redaction

14    lists specific products.  The heading for it says, approval

15    requested this week, which, at least, left in my mind that

16    impression that these products are now public and I wasn't

17    sure why, therefore, it needing to be redacted.

18           MR. MCCARTHY:  Your Honor, so these are, as I

19    understand it, potential deals that the companies was

20    thinking about pursuing.

21           THE COURT:  All right.  So when it says approval

22    (indiscernible) --

23           MR. MCCARTHY:  (indiscernible) counterparty.

24           THE COURT:  So when you say approval is requested

25    this week, those are not public approvals?  Those are

Page 76

1    approvals requested of the board or someone like that?

2                MR. MCCARTHY:  I understand management or the

3    board (indiscernible) is this develop an opportunity and

4    pursuing it with those counterparties.  Those opportunities

5    would be in (indiscernible) or subject to confidentiality

6    agreement as well between the counterparties.

7                THE COURT:  Okay.  So these are not approvals that

8    publicly requested to take certain actions, like anti-trust

9    approvals or drug approvals, things like that?

10               MR. MCCARTHY:  Absolutely not, Your Honor.

11               THE COURT:  Okay.  So I think the next redaction

12   is all the way up to page 49 unless I'm missing something.

13               MR. MCCARTHY:  That's right, Your Honor.

14               THE COURT:  And I better -- okay, good.  I better

15   make sure I've printed it out accurately.  And again, this

16   is a partial redaction in a column headed, examples of

17   current projects.  So is this current project something that

18   remains confidential even though this is, you know, four-

19   and-a-half years old -- four years old?

20               MR. MCCARTHY:  Yes, Your Honor.  And this is not -

21   - on 49 and 50, these are not necessarily current projects

22   but, you know, relationships between -- like a very

23   important aspect of -- just speaking about it generically --

24   Purdue's business where if this was divulged, it could

25   impact that and harm the competitors and their ability to

Page 77

1    conduct their business and get revenue.

2            THE COURT:  And I'm sorry -- well, I wanted to get

3    to the next page but -- let's just turn to that.  These are

4    things that are ongoing?  I'm just confused.  Again, my

5    question is, these are -- both of these things describe

6    action plan.  Are these action plans being fulfilled or are

7    they to be fulfilled?

8            MR. MCCARTHY:  Your Honor, these relate to certain

9    issues concerning formulary status which is very important

10   for the debtor's business, the ability to be on formularies.

11   And to the extent this was released, it would cause

12   reconsideration in any way of that status, it would be

13   extremely detrimental -- like competitively harmful -- to

14   the debtors.

15           THE COURT:  Okay.

16           MR. MCCARTHY:  Much in the same way in Orion it

17   wasn't certainly -- the competitors certainly used the

18   information.  I think they could here.  But Orion took a

19   much broader view of competitive harm and that case involved

20   a licensing agreement which if released would harm the

21   entity, Orion Pictures', ability to negotiate favorable

22   agreements with its customers which would in turn advantage

23   competitors.  Much of the same rationale is applicable here

24   with respect to these two slides.  Sorry, 49 and 52.

25           THE COURT:  All right.  Well, indulge me.  Give me

1    a definition of formulary.

2         MR. MCCARTHY:  Formulary at the highest level I

3    understand it is the way like how Purdue's products are

4    covered by various insurance companies.

5         MR. HUEBNER:  Mr. McCarthy, if you don't mind,

6    since this is so critical and I know we're ranging far

7    afield and I've had a bunch of meetings that might help, let

8    me jump in for a second.

9         Your Honor, it's almost difficult to overstate how

10   important formulary is, so sort of give an insurance company

11   the product of a given pharmaceutical company can either be

12   not available at all -- a preferred product to which

13   consumers are kind of, you know, steered in a way, not

14   exactly because obviously the prescriber ultimately has

15   choice.  They can be tier one.  They can be tier two.  So

16   you might, you know, recommend (indiscernible) your parents

17   for, you know, their annual sort of Medicare Part D, one of

18   the main things you compare is the drugs that they take,

19   under which of the parts of the insureds, you know, are you

20   considered preferred, better pricing, not available at all.

21   So if you have, you know, a parent who's a diabetic, if it's

22   not on formulary insurance plan A, you just won't even

23   consider that plan, that that's the drug (indiscernible) so

24   that it's covered, so you'd instead go with insurance plan

25   B.  And so it is of inestimable importance to the running of

Page 79

 1    Purdue's business and its ability to generate revenue to pay

 2    all the stakeholders in this case to the best of the

 3    debtor's ability, you know, both during and after the

 4    proceeding.

 5              THE COURT:  Because of its direct tie and these

 6    projects to relationships with the insurers.

 7              MR. HUEBNER:  Exactly.  Being taken off of the

 8    formulary is an extraordinarily negative event.  Being

 9    downgraded on formulary is a negative event and winning

10    preferred status would or being up-tiered on formulary for a

11    major insurer is a very major positive event, obviously, in

12    all events, assuming that, you know, it's being done

13    properly and full compliance with law and the like.  But,

14    yes, that's kind of, you know -- I don't want to draw

15    analogies because I'm nervous (indiscernible) especially

16    with tier two to reach (indiscernible) analogies, but it

17    certainly radically changes the prescriber and the ultimate

18    patient's kind of access to the medications as compared to

19    (indiscernible).

20              THE COURT:  All right.  And these two slides

21    reference initiatives that the debtors were undertaking or

22    were going to undertake to insure ongoing proper, in their

23    view, formulary treatment.

24              MR. HUEBNER:  Yeah.

25              THE COURT:  All right.  I believe that they're

Page 80

1    properly redacted.  74 is really a repeat of the earlier --

2    I'm sorry -- forgive me.  74 is really a repeat of an

3    earlier discussion we had on --

4              MR. MCCARTHY:  That's right, Your Honor.  It's --

5              THE COURT:  (indiscernible)

6              MR. MCCARTHY:  -- actually the exact same --

7              THE COURT:  It's the really the exact same one

8    that I've already ruled on it so we don't need to cover that

9    again.

10             MR. MCCARTHY:  And the next slide is the similar

11   rationale except that the slide (indiscernible) --

12             THE COURT:  Which is 109, I think.  And --

13             MR. MCCARTHY:  The redactions to 109, Your Honor,

14   deal with the specific products -- information concerning

15   them that are being developed with third parties.  It's just

16   a confidentiality agreement and you'll see on the right-hand

17   of the -- the names of the (indiscernible) but the

18   information -- it's of joint information between Purdue and

19   the other entities -- (indiscernible) confidentiality so we

20   redacted the names.

21             THE COURT:  And these initiatives that are ones

22   where there's competition in the market?

23             MR. MCCARTHY:  Yes, Your Honor.

24             THE COURT:  All right.  So that would be covered

25   also by 107(b)(1).  And then slide 120, these are again the

Page 81

1    transactions in the pipeline and I'm going to have the same

2    question which is, these apparently have not been announced?

3            MR. MCCARTHY:  Your Honor, these are the same

4    exact transactions actually that are on the other slide, I

5    believe.

6            THE COURT:  And again, they weren't announced

7    then?

8            MR. MCCARTHY:  No.

9            THE COURT:  Okay.  They're still potential, right?

10   They're not -- they haven't fallen by the wayside?

11           MR. MCCARTHY:  I don't know whether these deals

12   are being actively pursued, Your Honor, although they would

13   be subject to, in a normal course, confidentiality

14   agreements at the time of party which typically in the

15   pharmaceutical industry and I understand it have five- and

16   sometimes ten-year terms (indiscernible).

17           THE COURT:  Well, just -- I mean, the existence of

18   these deals would be -- put it differently.  If the deal

19   fell through, the very existence of discussing them would be

20   covered by a confidentiality agreement?

21           MR. MCCARTHY:  I understand that, Your Honor.

22   That's what I understand, Your Honor.

23           THE COURT:  To highlight, I guess, the -- or

24   protect them from being targets from other parties, I

25   suppose.

1          MR. MCCARTHY:  that's right.  And that's why, as

2    we understand it, the deals were put under NDA for -- to

3    even begin discussions.

4          THE COURT:  Okay.  All right.  This slide is

5    covered then.  121 is again a reference that has been dealt

6    with earlier.  122, the entire slide is deleted and just

7    explain for me -- to me generically what the rationale for

8    deleting the slide is.

9          MR. MCCARTHY:  Your Honor, these are net sales

10   projections that, if you look across, first the debtor --

11   this is confidential information (indiscernible) the debtors

12   don't know.  In addition, it also shows, if you take a look

13   at the numbers and the way they track across -- if you take

14   the first line, the loss of exclusivity point we discussed

15   earlier.

16         THE COURT:  Okay.  They also cover this year

17   through 2025.

18         MR. MCCARTHY:  Yes.

19         THE COURT:  So I believe this would be covered as

20   well by 107(b).  Page 124 has the same --

21         MR. MCCARTHY:  These, again, are the same six or

22   seven --

23         THE COURT:  Right.  (indiscernible) so that would

24   be covered.  125 is essentially the same chart --

25         MR. MCCARTHY:  That's right, Your Honor.

Page 83

1            THE COURT:  -- reflecting the information that

2     we've already discussed would be properly protected.  127

3     deals with the same parties that have previously been

4     identified and protected.  128 does as well as does 129.

5            MR. MCCARTHY:  And 130 (indiscernible).

6            THE COURT:  (indiscernible) does 130.  And then

7     142 -- yeah, it wasn't clear to me why this -- these -- part

8     of these two columns were redacted.  Is this also reflect

9     (indiscernible) or is it something else?

10           MR. MCCARTHY:  No, Your Honor.  We're looking at

11    slide 131 just to be clear.

12           THE COURT:  No, 142.

13           MR. MCCARTHY:  Oh, 142.  This slide has other

14    information, not -- doesn't deal with loss or exclusivity

15    but things like rebate rates and royalty expenses that are

16    for -- core to the debtor's business and if known at all to

17    competitors would -- could, a, impact the debtor's ability

18    to negotiate with counterparties, and would also invaluable

19    to competitors.

20           THE COURT:  And that goes back to 2017?

21           MR. MCCARTHY:  Yes, Your Honor.

22           THE COURT:  They haven't changed?

23           MR. MCCARTHY:  They could change, Your Honor, but,

24    as I understand it, even the historical look-back over that

25    period is -- and the projections there could be used by

Page 84

1    competitors.

2            THE COURT:  Because these things are negotiated.

3            MR. MCCARTHY:  that's right, Your Honor.

4            THE COURT:  The royalty expense, that is.

5            MR. MCCARTHY: Royalty expenses and rebates

6    ultimately (indiscernible) up the percentage of sales, yes.

7            THE COURT:  Okay.  I agree with that.

8            MR. MCCARTHY:  In the footnote, just to be clear,

9    there's a redaction to a particular royalty, a counterparty

10   to that royalty --

11           THE COURT:  Right.  (indiscernible)

12           MR. MCCARTHY: -- and the (indiscernible).  The

13   second one deals with loss of exclusivity.

14           THE COURT:  Right.  Okay.  And a similar point for

15   144.  So --

16           MR. MCCARTHY:  That's right, Your Honor.

17           THE COURT:  -- I think that's the last proposed

18   redaction, right?  so --

19           MR. MCCARTHY: That is, Your Honor.

20           THE COURT:  All right.  So again, consistent with

21   the case law going back to Orion Pictures, I found that most

22   of these as I've indicated are properly protected under

23   107(b)(1).  The debtors have narrowed them down, I believe,

24   satisfactorily to cover things that truly are disclosures

25   that put them in a disadvantage in their business going

1    forward.

2              MR. MCCARTHY:  Your Honor, could I revisit the

3    Canada redaction.  Just got an email from the debtors on

4    that.  Just to flesh out my answer there and that's in Price

5    Exhibit 137.  I believe it's the last redaction we

6    discussed.  I think the debtors do believe it is a viable

7    opportunity that could be explored and while we haven't

8    spoken to Purdue Canada about that opportunity, it was an

9    opportunity that I think remains viable today and was

10   written about while Dr. Landau was in fact a chief executive

11   officer of Purdue Canada.

12             THE COURT:  But how do the debtors -- how would

13   they be able to purse that opportunity if they are no longer

14   in control of Purdue Canada?

15             MR. MCCARTHY:  I don't think, Your Honor, that

16   Section 107 is confined to the opportunities the debtors can

17   pursue.  It protects confidential, commercial information of

18   an entity.  And if you said that --

19             THE COURT:  But --

20             MR. MCCARTHY:  -- Dr. Landau was --

21             MR. JOSEPH:  Your Honor, this Gregory Joseph for

22   the Raymond Sackler family, if I may.

23             THE COURT:  Okay.

24             MS. JOSEPH:  We have not seen this and as the co-

25   owners ultimately of Purdue Canada, we would ask for an

Page 86

1    opportunity to see what's been redacted so that we can make

2    a determination under 107(b)(1) if we may.  We simply don't

3    know what's being discussed.

4              THE COURT:  Okay.

5              MR. HUEBNER:  Your Honor, let me -- sorry.

6    (indiscernible) Let me just be very clear.  This is not

7    primarily or probably at all a debtor opportunity.  Your

8    Honor, you are quite right.  I think the point is a

9    different one which is, (indiscernible) at the time was CEO

10   of Purdue Canada which has never been part of the debtors,

11   has never been owned by the Purdue.  It has never been under

12   any of the debtors as a, just, separate Sackler owned

13   entity.  This is about an opportunity that I think they were

14   considering exploring that may still be viable for them to

15   explore.  It's not really about the debtors.  I just wanted

16   to be sure (indiscernible) that's actually important.

17             THE COURT:  And my question was whether it's

18   really even viable for --

19             MR. HUEBNER:  The problem is --

20             THE COURT:  -- Canada and I guess Mr. Joseph's

21   point is Purdue Canada hasn't seen this so (indiscernible) -

22   -

23             MR. SKAPOF:  Your Honor, this is Marc Skapof of

24   Royer Cooper Cohen & Braunfeld.  We represent the IACs,

25   among which is Purdue Canada.  So we not seen this

Page 87

1    unredacted document either, similar to Mr. Joseph.  You

2    know, we would at least like the opportunity to show it --

3    to review it ourselves and also for Purdue Canada to

4    determine, you know, whether this is something that they

5    have an interest, you know, in keeping redacted, you know,

6    whether it's for now or, you know, on a more permanent

7    basis.

8              THE COURT:  All right.  I'll give you that

9    opportunity although I have to say I'm pretty skeptical

10   given the fairly general nature of what's disclosed here.

11   But I'll give you that opportunity before the next hearing.

12             MR. HUEBNER:  Your Honor, and that's exactly where

13   I was going, Your Honor, which is --

14             THE COURT:  Yes.

15             MR. HUEBNER:  -- just not a debtor thing.  This is

16   another entity's information and they've -- haven't seen it

17   yet and (indiscernible) suggest that they get the chance.

18   And they may say they're fine with it and it can be

19   unredacted and -- in which case, we're happy to do so.  And

20   if they have an issue, they can (indiscernible) or talk to

21   the media folks or the like and obviously (indiscernible)

22   perchance (indiscernible) is needed, then we'll go back to

23   being an observer on this one page and I think the rest is

24   already resolved.

25             THE COURT:  Okay.  All right.  Very well.  So my

Page 88

1    ruling is final except on that one point and the debtors

2    will promptly show this page to the appropriate people at

3    Purdue Canada and we'll see if they have an issue and if

4    they do, they can address it at the next hearing -- So

5    regarding its disclosure.

6            Let me go back, then, to the media intervener's

7    motion and the Sackler family's two responses.  I have

8    carefully considered the response by the Mortimer Sackler

9    family which not only raising the 107(b)(1) exception to the

10   generally -- to the requirement of the disclosure publicly

11   of filed documents on under 107(a) of the bankruptcy code.

12   Also asserts an exception under 107(c) of the bankruptcy

13   code which, again, permits the bankruptcy court for cause to

14   protect -- and this says "may protect" -- an individual with

15   respect to the following types of information to the extent

16   the Court finds that disclosure of such information would

17   create undue risk of identity or other unlawful injury to

18   the individual or the individual's property.  And the

19   subsection of that section relied upon is subsection B,

20   namely other information contained in a paper described in

21   subparagraph A which is any information -- any means of

22   identification as defined in section 1028(d) at title 18, a

23   personally identifiable information contained in a paper

24   filed or to be filed in a case under this title.

25           The other information here that the Mortimer

1    Sackler family contends should be protected is the identity

2    -- the name -- of, quote, public facing businesses or

3    entities owned in whole or in part by the Sacklers.  The

4    objection by the Mortimer Sackler family does not identify

5    further even generically those public facing businesses and

6    further, identifies as a risk of providing an injury to

7    property as clarified on the record, namely the individual

8    family members interest in those business, i.e., ownership

9    interests in those businesses, various threats made on

10   social media against the Sacklers personally.

11          The case law is clear that a request to seal under

12   107 of the bankruptcy code is extraordinary relief.  There's

13   a strong presumption and policy of open access to court

14   records, including especially in the bankruptcy context and

15   the exceptions as enunciated in section 107(b) are to be

16   construed in a narrow way such that the burden of proof is

17   heavy, requiring an extraordinary circumstance or compelling

18   need (indiscernible) generally video software dealer's

19   association, (indiscernible) Orion Pictures, Corp., In re

20   Orion Pictures, Corp., 21 F3rd 2427 2nd Circ 1994 and a

21   whole host of other cases, including most recently, Motors

22   Liquidation Company Avoidance Action Trust v JPMorgan, Chase

23   Bank, NA (In re Motors Liquidation Company 561 B.R. 3642

24   Bankruptcy SDNY 2016).

25          The case law under section 106 -- I'm sorry --

1    107(c) is fairly limited and generally addresses and

2    protects personally identifying information that would lead

3    to identity theft or other unlawful injury to the individual

4    or the individual's property, the leading case, I believe,

5    being, In re AC&S Inc., 775 fed appendix 78 3rd Circ August

6    19, 2019 and the very well-reasoned comprehensive district

7    court opinion affirmed by that decision which is caption In

8    re Motion Seeking Access to 2019 Statements 585 B.R. 733 D

9    Delaware 2018.

10           That appellate court decision construing actually

11    the leading second circuit decision, In re Orion Pictures

12    Corp., which I've already cited, states that section 107 as

13    a whole codified the common law and evidenced Congress's

14    strong desire to preserve the public's right of access to

15    judicial records and bankruptcy proceedings, setting forth

16    certain specific enumerated exceptions, recognizing that the

17    public's right of access to judicial records is not

18    absolute.  The court goes to state -- this is the third

19    circuit -- "in doing so, Congress specifically authorized

20    courts to protect any means of identification.  Moreover,

21    every court has supervisory power over its own records and

22    files and access has been denied where court files might

23    have become a vehicle for improper purposes" 735 Fed

24    appendix at 79 through 80.  Footnote 5 in that discussion

25    finds favorably Evans v United States, (indiscernible) U.S.

Page 91

1    255 259 through 60 for the proposition that when Congress

2    codifies the common law, the latter informs construction of

3    the statute.

4            I want to ask whoever is not on mute to put their

5    phone on mute.

6            (Aside conversation)

7            THE COURT:  Please put your phone on mute or we

8    will disconnect you.

9            Ry, can you put that person on mute?  Can you

10   identify here?

11           MR. MCCARTHY:  I believe she said her name was

12   (indiscernible), Your Honor, because she said

13   (indiscernible).  I don't know if that helps.

14           (Aside conversation)

15           THE COURT:  All right.  Thank you.  Let me

16   continue with my ruling.  And, I believe that, if in fact a

17   proper showing had been made here the relief would be

18   warranted, albeit, the relief would be to protect a person's

19   equity interests in a company.  I further believe that

20   because one is not focusing on more tangible property or the

21   person's own safety, that showing should be higher than the

22   already difficult showing required by the Second Circuit and

23   the other case law.  I conclude that the Mortimer Sackler

24   Family has not made such a showing in connection with the

25   objection filed on February 7th.  I simply do not have

Page 92

1    enough information as to the risk to the property itself,

2    which includes or would have to include an assessment of the

3    nature of that property, which, as I said before, except in

4    the most generic terms has not been identified.  I also

5    agree with counsel for the Movant, Media Intervenors, that

6    while the statute is forward-looking, past behavior is

7    relevant and there is no record of unlawful activity

8    directed against any entities or property owned by the

9    Mortimer Sackler Family identified in the supporting

10   Declaration to the 107(c) Objection.  There are, I believe,

11   clearly hostile and unwarranted threats identified on social

12   media, but they go to the Sacklers individually, not their

13   property and on this record, I'm not prepared to -- except

14   in one instance, rather, which refers to a house -- I'm not

15   prepared to grant the relief on this record as to the mere

16   identity of their public facing businesses.

17          I will note further that, to the extent as the

18   Third Circuit did and interpreted the Second Circuit also as

19   permitting, I should interpret or apply a common law gloss

20   to 107 and here, particularly, 107(c).  It does not appear

21   to me that the disclosure would be for an improper purpose

22   and one that would only be one that would lead to harm to

23   the Sacklers' property.  As I noted during oral argument,

24   to the extent and nature of that property has been a central

25   issue in this Chapter 11 case.  I recognize that that

Page 93

1   disclosure here is in the context of a motion filed where

2   the identity of these entities is remotely, if at all,

3   relevant.  But it is relevant, generally, in the bankruptcy

4   case.  So, I will grant the Media Intervenors Motion with

5   respect to the names of the public facing businesses.  As I

6   noted also, the agreement by the Sackler families not to

7   seek redaction or sealing with respect to the other

8   information covered by the Movant, Media Intervenors, should

9   be effectuated now.  Which would leave, the really quite

10  modest at this point, remaining issue as to the disclosure

11  of the identities of current and prospective counterparties

12  to the Sacklers in commercial settings.  Again, the burden

13  here and to support sealing is a high one, as I've already

14  noted, but as the statute says, if an exception is shown,

15  the Court shall, it has no discretion otherwise, protect the

16  party, whether that is through forward action, if necessary,

17  or more limited non-disclosure.  The exception relied upon

18  with respect to this information is 107(b)(1) of the

19  Bankruptcy Code to protect an entity, in this case the

20  Sackler families, with respect to a trade secret or

21  confidential research development or commercial information.

22  The Sacklers contend that the identity of their commercial

23  counterparties is commercial information for purposes of

24  Section 107(b)(1) and therefore, that it must be protected.

25  When they originally made this argument, albeit in the

Page 94

1    context of many other types of information that they were

2    seeking at that point to remain under seal, they did not

3    provide factual support for it.  They have since done so and

4    submitted a declaration of two witnesses and those

5    declarations, by Mr. Lowne and Mr. Vellucci both assert in

6    more than a conclusory way, that in the recent past, the

7    disclosure of unrelated commercial counterparties to one or

8    more of the Sacklers has led that commercial counterparty to

9    cease business relationships with them to redeem funds

10   invested with them and to other business transactions with

11   them.  It is contended by the Movant that such a potential

12   harm is not covered by Section 107(b)(1) of the Bankruptcy

13   Code that the harm covered by Section 107(b)(1) is limited

14   to the disclosure of information that, if disclosed, would

15   put the party at a commercial disadvantage with its

16   competitors.  That is clearly an accepted basis under

17   Section 107(b)(1) of the Bankruptcy Code, as specifically

18   found by the Second Circuit in the Orion Pictures case.

19   However, the statute is not confined to the entity seeking

20   protections being put at a disadvantage with its

21   competitors.  And there is significant post-Orion caselaw

22   now holding to the contrary that Section 107(b)(1),

23   "protects parties from the release of information that could

24   cause them harm or give competitors and unfair advantage",

25   Gowan v. Westford Asset Management LLC (In re Dreier LLP)

Page 95

```
 1    485 B.R. 821, 823 (Bankruptcy SDNY 2013), citing for that

 2    proposition, Orion Pictures 21 F.3d 27, as well as In re

 3    Global Crossing, Ltd. 295 B.R. 720, 725, (Bankruptcy SDNY

 4    2003), which uses the same formulation, could cause them

 5    harm or give competitors an unfair advantage.  This, of

 6    course, doesn't change the heavy burden that our Movant

 7    faces, but I believe is a more accurate reading of the

 8    statute and the caselaw.

 9            The Movant, Media Intervenors, also contends that

10    the information here is sought to be protected as a mere

11    embarrassment or harm to reputation based on the disclosure

12    of non-scandalous, non-defamatory information, which is

13    separately protected under 107(b)(2) and is not asserted

14    here.  And that is clearly a valid legal proposition as set

15    forth in numerous decisions, including Gitto v. Worcester

16    Telegram and Gazette Corp. (In re Gitto Global Corp. 422

17    F.3d 7-8 (1st Cir. 2005) (In re MUMA Services 279 B.R. 478-

18    484 (Bankruptcy Delaware 2002) and (indiscernible)

19    Bankruptcy paragraph 107.3 (16th Edition 2020), as well as

20    under the common law, including such cases as Brown v.

21    Williamson Tobacco Corp. v. FTC 710 S.2d 1165, 1179 (6th

22    Cir. 1983) and Joy v. North 692 F.2d 880, 893 (2d Cir.1982).

23    The issue here is whether, in fact, this disclosure is to

24    prevent embarrassment or merely harm to reputation that

25    would rise to the level of scandalous or defamatory
```

Page 96

1    information, which it clearly doesn't.  I've considered that

2    issue carefully and believe that on these facts,

3    particularly given that counsel for the Movant had not had

4    the opportunity to cross-examine the Declarants, cannot

5    answer it on this record.  It would appear to me that, if

6    the reason for the non-disclosure is as the declarations

7    state, solely because the counterparties would, based on a

8    purely commercial determination, cease doing business with

9    the Sacklers, it would appear to me that it would be --

10   their own identity would be properly protected commercial

11   information since they have no reason for their taking that

12   action as predicted by the two declarations, would be to

13   avoid, as a commercial matter, their being reported on as

14   engaging in business with the Sacklers.  On the other hand,

15   if the rationale for ceasing doing business is that they

16   would be exposed as being involved with the Sacklers in an

17   improper way, whatever that would be, including, for

18   example, to shield the Sacklers from their creditors, the

19   information would (indiscernible) quite neatly into the fact

20   pattern of In re Food Management Group, LLC 359 B.R. 543

21   (Bankruptcy SDNY 2007) and similar cases where the fact that

22   the party didn't like the disclosure tied directly into the

23   party's role in the bankruptcy case or related to the

24   administration of a bankruptcy case and therefore, was not

25   purely commercial.  We simply don't know enough, and the

1    Media Intervenors should have the opportunity to explore

2    what side of the line the disclosure of these parties' names

3    would play.

4            It is argued that, because of the tangential

5    relationship of this disclosure to the underlying motion

6    that the Movants seek to have unsealed, should lead the

7    Court to balance the interests of the Sacklers in not having

8    their assets depleted by them losing investment

9    opportunities as against, and favorably as against, the

10   limited interest of the media in reporting the names of

11   these counterparties.  A substantial body of caselaw says

12   that that balancing task doesn't apply in bankruptcy cases

13   and that 107 takes over the field.  In addition to the Gitto

14   Global case that I previously cited.  See also In re Roman

15   Catholic Archbishop of Portland in Oregon 661 F.3d 417-430

16   (9th Circuit 2001), (indiscernible) 132 Supreme Court 1867

17   2012 and Neil v. Kansas City Star In re Neil 461 F.3d 1048

18   (8th Circuit 2006), as well as In re Food Management Group

19   LLC 359 B.R. at 354-55 and the G.M. case that I previously

20   cited.  It appears to me that the Second Circuit has not

21   decided this issue.  They did not do so in Orion Pictures

22   and, in fact, if the Third Circuit's interpretation of Orion

23   Pictures is accurate, that I previously quoted.  On the

24   other hand, I think the balancing, if one should, at all,

25   balance here, is not a narrow balancing looking at the

Page 98

1    context of the underlying motion that's led to this issue,

2    which is not, at this point, being pursued by the Unsecured

3    Creditors' Committee or the relevance of the information to

4    that motion.  But generally, the purpose of it in contrast

5    to the harm that its publication would cause to commercial

6    dealings.  And here, although the statute doesn't require

7    this, it refers to any entity and not just the Debtor, I do

8    accept, as I did back in May of 2020, the Sacklers' argument

9    that, at least while they are in good faith pursuing a

10   global settlement in this case, any harm to their assets run

11   the serious risk of harming recoveries by creditors of this

12   case since those assets are being proposed, in large

13   measure, to be distributed to creditors in this case, to, as

14   the parties have already negotiated, alleviate the opioid

15   crisis.  So, it would appear to me that the harm here could

16   be deadly destructive.

17          On the other hand, if the purpose of disclosure is

18   more than simply based on idle curiosity, giving parties the

19   opportunity to exercise cancel culture, I would seriously

20   wonder whether the motion should be granted and would lean

21   heavily towards, instead shielding the exposure.  I would

22   urge the parties to consider, as is consistent with the

23   caselaw, a lesser form of disclosure, namely describing

24   these entities generically as opposed to by their specific

25   name, which most recently, by District Judge Laura Taylor

Page 99

1    Swain, was pointed out as a proper approach to these types

2    of issues, namely having the most disclosure that one could

3    have without tripping over 107, being one.  See In re

4    Financial Oversight and Management Board 406 F.3d 180-188

5    (DPR 2019).  I do believe, whether it's either under 106(c)

6    or, more likely, under 107(b)(1), Second Circuit caselaw as

7    to an improper purpose for disclosure still exists

8    (indiscernible) 107's enactment.  Again, I don't have any

9    evidence to show that the effect of this disclosure will be

10   used solely for an improper purpose and that's the reason

11   why I'm adjourning the hearing as to these remaining limited

12   sealed -- this remaining sealed information.  So, I hope

13   that the parties will now review the substantial amount of

14   information that has been, or will be, unsealed, based on my

15   rulings today and will address whether they want to pursue

16   any evidentiary hearing I'm allowing them, namely the

17   examination of these two declarants.  They relieve further

18   or take up the notion of generic disclosure of these

19   counterparties as opposed to their specific identity.  But

20   in any event, I'll decide that remaining issue if the

21   parties want me to decide it after taking evidence in the

22   form of cross-examination and re-direct of the two

23   witnesses.

24            So, I'll ask Ms. Townsend to submit an Order

25   granting the relief that I have granted, memorializing the

Page 100

1    agreement to release the other information and adjourning

2    the hearing to permit cross-examination of the two

3    declarants.  You don't have to formally settle that Order,

4    but you should run it by counsel for the Sacklers and the

5    Debtor before you email it to Chambers so they can make sure

6    it's consistent with my ruling and please copy them on it,

7    as well, when you -- copy them on the email when you send it

8    to Chambers.

9              MS. TOWNSEND:  We'll do so, Your Honor.

10             THE COURT:  Okay.  Thank you very much.  I think

11   that concludes this morning's hearing, it now being 1, but I

12   don't think there are any other matters on the agenda.  Is

13   that correct?

14             MAN:  Yes, Your Honor.  I believe that it is, and

15   we are next before you on March (indiscernible).

16             THE COURT:  Okay, very well.

17             MR. JOSEPH:  Excuse me, Your Honor.  Before

18   adjournment, this is Gregory Joseph for the Raymond Sackler

19   Family.  We did not have an opportunity to argue on the

20   107(b)(1), which is perfectly fine on the commercial

21   counterparties since it's being deferred, but I would like

22   to offer into evidence the two Declarations of Mr. Lowne and

23   Mr. Vellucci?

24             THE COURT:  Well, I will -- because they will be

25   cross-examined, I'll put that in at that point.

Page 101

1          MR. JOSEPH:  That's fine, Your Honor and at that

2     point, will I be given an opportunity to argue it, even if

3     there is no cross --

4          THE COURT:  Well, both sides will be given an

5     opportunity after the examination of the witnesses.

6          MR. JOSEPH:  And what if the Media Intervenors

7     decide not to cross-examine?

8          THE COURT:  Well, in all likelihood, I'll grant

9     the motion then.

10         MR. JOSEPH:  Thank you, Your Honor.

11         THE COURT:  Okay.  I mean, I'm sorry.  We have to

12    be clear on what motions we're talking about.  In all

13    likelihood, I will grant your motion or your request to keep

14    that information sealed.

15         MR. JOSEPH:  Understood, Your Honor.  Thank you

16    very much.

17         THE COURT:  Okay.  Although I might say that, in

18    all likelihood, I will grant it in the form of having these

19    entities be described generically as opposed to revealing

20    their actual names.  But we'll see where we are.  The

21    parties have been able to work out, at this point, about

22    99.9 percent of the issues originally raised by the Media

23    entities in a way that has led to the disclosure.  With that

24    99.9 percent of the information, we'll see where we get with

25    these last, what are they, 17 names.  Okay, anyone else?

Page 102

1      All right.  Thank you, everyone.

2                MS. TOWNSEND:  Thank you, Your Honor.

3                MR. JOSEPH:  Thank you, Your Honor.

4                (Whereupon these proceedings were concluded)

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 103

1              C E R T I F I C A T I O N

2

3        I, Sonya Ledanski Hyde, certified that the foregoing

4    transcript is a true and accurate record of the proceedings.

5

6

7

8    Sonya Ledanski Hyde

9

10

11

12

13

14

15

16

17

18

19

20    Veritext Legal Solutions

21    330 Old Country Road

22    Suite 300

23    Mineola, NY 11501

24

25    Date:  February 18, 2021