Page 1

1   UNITED STATES BANKRUPTCY COURT

2   SOUTHERN DISTRICT OF NEW YORK

3   Case No. 19-23649-rdd

4   Adv. Case No. 19-08289-rdd

5   - - - - - - - - - - - - - - - - - - - - - - - - - - x

6   In the Matter of:

7   PURDUE PHARMA L.P.,

8          Debtor.

9   - - - - - - - - - - - - - - - - - - - - - - - - - - x

10  PURDUE PHARMA L.P. et al.,

11                Plaintiff,

12         v.

13  COMMONWEALTH OF MASSACHUSETTS et al.,

14                Defendants.

15  - - - - - - - - - - - - - - - - - - - - - - - - - - x

16                United States Bankruptcy Court

17                300 Quarropas Street, Room 248

18                White Plains, NY 10601

19                March 24, 2021

20                10:04 AM

21

22  B E F O R E :

23  HON ROBERT D. DRAIN

24  U.S. BANKRUPTCY JUDGE

25  ECRO:  UNKNOWN

1    HEARING re Adversary proceeding: 19-08289-rdd Purdue Pharma

2    L.P. et al v. Commonwealth of Massachusetts et al Motion to

3    Shorten Time /Debtors' Ex Parte Motion for Entry of an Order

4    Shortening Notice with Respect to Debtors' Motion to Extend

5    the Preliminary Injunction (related document(s)227) filed by

6    Benjamin S. Kaminetzky on behalf of Avrio Health L.P.,

7    Purdue Pharma Inc., Purdue Pharma L.P., Purdue Pharma

8    Manufacturing L.P., Purdue Pharma of Puerto Rico, Purdue

9    Pharmaceutical Products L.P., Purdue Pharmaceuticals L.P.,

10   Purdue Transdermal Technologies L.P., Rhodes Pharmaceuticals

11   L.P., Rhodes Technologies. (ECF #229)

12

13   HEARING re Adversary proceeding: 19-08289-rdd Purdue Pharma

14   L.P. et al v. Commonwealth of Massachusetts et al Motion to

15   Extend Time /Motion to Extend the Preliminary Injunction

16   (related document(s)2) (ECF #227)

17

18   HEARING re Adversary proceeding: 19-08289-rdd Purdue Pharma

19   L.P. et al v. Commonwealth of Massachusetts et al Memorandum

20   of Law in Support of Motion to Extend the Preliminary

21   Injunction (related document(s)227) filed by Benjamin S.

22   Kaminetzky on behalf of Avrio Health L.P., Purdue Pharma

23   Inc., Purdue Pharma L.P., Purdue Pharma Manufacturing L.P.,

24   Purdue Pharma of Puerto Rico, Purdue Pharmaceutical Products

25   L.P., Purdue Pharmaceuticals L.P., Purdue Transdermal

1    Technologies L.P., Rhodes Pharmaceuticals L.P., Rhodes

2    Technologies (ECF #228)

3

4    HEARING re Adversary proceeding: 19-08289-rdd Purdue Pharma

5    L.P. et al v. Commonwealth of Massachusetts et al Objection

6    to Motion / Fourth Restatement of Limited Objection and

7    Reservation of Rights of Tennessee Public Officials in

8    Response to Debtors' Motion to Continue to Extend the

9    Preliminary Injunction for Richard Sackler. (related

10   document(s)227) filed by Katherine Stadler on behalf of

11   Tennessee Plaintiffs. (ECF #231)

12

13   HEARING re Adversary proceeding: 19-08289-rdd Purdue Pharma

14   L.P. et al v. Commonwealth of Massachusetts et al Opposition

15   Limited Objection of the Ad Hoc Committee on Accountability

16   to the Debtors' Motion to Extend the Preliminary Injunction

17   (related document(s)227) filed by Paul A. Rachmuth on behalf

18   of Ad Hoc Committee on Accountability. (ECF #232)

19

20   HEARING re Adversary proceeding: 19-08289-rdd Purdue Pharma

21   L.P. et al v. Commonwealth of Massachusetts et al Opposition

22   to Purdue's Motion to Extend the Preliminary Injunction

23   (related document(s)228, 227) filed by Andrew M. Troop on

24   behalf of Ad Hoc Group of Non- Consenting States. (ECF #233)

25

Page 4

1    HEARING re Adversary proceeding: 19-08289-rdd Purdue Pharma

2    L.P. et al v. Commonwealth of Massachusetts et al Statement

3    of The Raymond Sackler Family in Support of The Debtors'

4    Motion to Extend the Preliminary Injunction (related

5    document(s)227) filed by Gerard Uzzi on behalf of Raymond

6    Sackler Family. (ECF #234)

7

8    HEARING re Memorandum of Law / Reply Memorandum of Law in

9    Support of Motion to Extend the Preliminary Injunction

10   (related document(s)227) filed by Benjamin S. Kaminetzky on

11   behalf of Avrio Health L.P., Purdue Pharma Inc., Purdue

12   Pharma L.P., Purdue Pharma Manufacturing L.P., Purdue Pharma

13   of Puerto Rico, Purdue Pharmaceutical Products L.P., Purdue

14   Pharmaceuticals L.P., Purdue Transdermal Technologies L.P.,

15   Rhodes Pharmaceuticals L.P., Rhodes Technologies. (ECF #235)

16

17   HEARING re Adversary proceeding: 19-08289-rdd Purdue Pharma

18   L.P. et al v. Commonwealth of Massachusetts et al Statement

19   / Official Committee of Unsecured Creditors' Joinder to

20   Debtors' Reply Memorandum of Law in Support of Motion to

21   Extend the Preliminary Injunction (related document(s)235)

22   filed by Ira S. Dizengoff on behalf of The Official

23   Committee of Unsecured Creditors of Purdue Pharma L.P., et

24   al. (ECF #236)

25

Page 5

1    HEARING re Statement / Ad Hoc Committee's Joinder and

2    Statement in Support of Extension of Preliminary Injunction

3    (related document(s)235, 227) filed by Kenneth H. Eckstein

4    on behalf of Ad Hoc Committee of Governmental and Other

5    Contingent Litigation Claimants. (ECF #238)

6

7    HEARING re Memorandum of Law / Reply Memorandum of Law in

8    Support of Motion to Extend the Preliminary Injunction

9    (related document(s)227) filed by Benjamin S. Kaminetzky on

10   behalf of Avrio Health L.P., Purdue Pharma Inc., Purdue

11   Pharma L.P., Purdue Pharma Manufacturing L.P., Purdue Pharma

12   of Puerto Rico, Purdue Pharmaceutical Products L.P., Purdue

13   Pharmaceuticals L.P., Purdue Transdermal Technologies L.P.,

14   Rhodes Pharmaceuticals L.P., Rhodes Technologies. (ECF #235)

15   Motion to Intervene filed by KatieLynn B Townsend on behalf

16   of Dow Jones & Company, Inc., Boston Globe Media Partners,

17   LLC, and Reuters News & Media, Inc. (ECF #2022)

18

19   HEARING re Statement / The Ad Hoc Group of Non-Consenting

20   States' Statement Regarding the Motion to Intervene and

21   Unseal Judicial Records by Dow Jones & Company, Inc., Boston

22   Globe Media Partners, LLC, and Reuters News & Media, Inc.

23   (related document(s)2022) filed by Andrew M. Troop on behalf

24   of Ad Hoc Group of Non- Consenting States (ECF 2065)

25   Statement in Support of Motion to Intervene (related

Page 6

1    document(s)2022) filed by Paul A. Rachmuth on behalf of Ad

2    Hoc Committee on Accountability. (ECF #2066)

3

4    HEARING re Response /The NAS Children Ad Hoc Committee's

5    Joinder to the Ad Hoc Group of Non-Consenting States'

6    Statement Regarding the Motion to Intervene and Unseal

7    Judicial Records by Dow Jones & Company, Inc., Boston Glob

8    Media Partners, LLC and Reuters News & Media, Inc. (related

9    document(s)2065) filed by Scott S. Markowitz on behalf of Ad

10   Hoc Committee of NAS Babies. (ECF #2090)

11

12   HEARING re Statement of The Raymond Sackler Family In

13   Respect of The Motion To Intervene And Unseal Judicial

14   Records By Dow Jones & Company, Inc., Boston Globe Media

15   Partners, LLC, and Reuters News & Media, Inc. (related

16   document(s)2022) filed by Gerard Uzzi on behalf of The

17   Raymond Sackler Family. (ECF #2132)

18

19   HEARING re Objection to Motion / Debtors' Limited Objection

20   to the Media Intervenors' Motions to Intervene and Unseal

21   Judicial Records and Cross-Motion to Seal Certain Judicial

22   Records (related document(s)1828, 2188) filed by Benjamin S.

23   Kaminetzky on behalf of Purdue Pharma L.P. (ECF #2252)

24

25

1    HEARING re Statement of the Mortimer Sackler Initial Covered

2    Sackler Persons in Respect of the Reply in Support of

3    Motions to Unseal Judicial Records by Dow Jones & Company,

4    Inc., Boston Globe Media Partners, LLC, and Reuters News &

5    Media, Inc. (related document(s)2288) filed by Jasmine Ball

6    on behalf of Beacon Company. (ECF #2301)

7

8    HEARING re Objection to Motion Limited Objection of the

9    Raymond Sackler Family to the First and Second Motions to

10   Unseal Judicial Records by Media Intervenors Dow Jones &

11   Company, Inc., Boston Globe Media Partners, LLC, and Reuters

12   News & Media, Inc. (related document(s)2022, 2188) filed by

13   Gerard Uzzi on behalf of The Raymond Sackler Family. (ECF

14   #2360)

15

16   HEARING re Objection to Motion Mortimer D. Sackler ICSPs

17   Limited Objection to the Media Intervenors Motion to

18   Intervene and Unseal Judicial Records (related

19   document(s)2022, 2188) filed by Jasmine Ball on behalf of

20   Beacon Company. (ECF #2361)

21

22   Supplemental Reply to Motion (related document(s)2022) filed

23   by KatieLynn B Townsend on behalf of Dow Jones & Company,

24   Inc., Boston Globe Media Partners, LLC, and Reuters News &

25   Media, Inc. (ECF 2384)

1    Related Documents: Motion to Amend Proposed Order (related

2    document(s)2022) filed by KatieLynn B Townsend on behalf of

3    Dow Jones & Company, Inc., Boston Globe Media Partners, LLC,

4    and Reuters News & Media, Inc. (ECF #2039)

5

6    HEARING re Notice of Adjournment of Hearing on Motion to

7    Intervene and Unseal (related document(s)2022) filed by

8    KatieLynn B Townsend on behalf of Dow Jones & Company, Inc.,

9    Boston Globe Media Partners, LLC, and Reuters News & Media,

10   Inc. (ECF #2091)

11

12   HEARING re Stipulation / Notice of Filing of Stipulation and

13   Agreed Order Regarding Media Intervenors' Motion to Unseal

14   Materials Filed in Connection with UCC Privilege Motions and

15   Adjournment of Hearing on Media Intervenors' Motion to

16   Unseal (related document(s)2022) Filed by Benjamin S.

17   Kaminetzky on behalf of Purdue Pharma L.P. (ECF #2136)

18

19   HEARING re Stipulation and Agreed Order Signed on 12/15/2020

20   Regarding Media Intervenors' Motion to Unseal Materials

21   Filed in Connection with UCC Privilege Motions and

22   Adjournment of Hearing on Media Intervenors' Motion to

23   Unseal (related document(s)2022) (ECF #2140)

24

25

Page 9

1   HEARING re Motion to Shorten Time / Debtors' Ex Parte Motion

2   for Entry of an Order Shortening Notice with Respect to

3   Debtors' Motion for Entry of an Order Sealing Judicial

4   Documents (related document(s)2252) filed by Benjamin S.

5   Kaminetzky on behalf of Purdue Pharma L.P. (ECF #2253)

6

7   HEARING re Declaration of Jon Lowne in Support of the

8   Debtors' Limited Objection to Media Intervenors' Motions to

9   Intervene (related document(s)2252) filed by Benjamin S.

10  Kaminetzky on behalf of Purdue Pharma L.P. (ECF #2254)

11

12  HEARING re Declaration of Jasmine Ball (related

13  document(s)2361) filed by Jasmine Ball on behalf of Beacon

14  Company. (ECF #2362)

15

16  HEARING re Motion to File Under Seal / Mortimer D. Sackler

17  ICSP's Motion to Seal Documents Submitted in Connection with

18  the Limited Objection to the Media Intervenors' Motion to

19  Intervene and Unseal Judicial Records filed by Jasmine Ball

20  on behalf of Beacon Company (ECF #2396)

21

22  HEARING re Notice of Presentment of Stipulated and Agreed

23  Order Related to the Automatic Stay and the Preliminary

24  Injunction Order filed by James I. McClammy on behalf of

25  Purdue Pharma L.P. (ECF #2402)

Page 10

1    Order signed on 2/22/2021 Granting in part, Denying in part,

2    and Continuing in Part Media Intervenors' Motions to Unseal

3    Judicial Records. By March 10, 2021, the Media Intervenors

4    will inform the Raymond Sackler family whether the Media

5    Intervenors intend to cross examine Garrett Lynam or Frank

6    S. Vellucci at the next omnibus hearing on March 24, 2021

7    (Related Doc # 2022) (ECF #2404)

8

9    HEARING re Stipulation and Agreed Order signed on 2/22/2021

10   Regarding Exhibits for Use at the Hearing on Privilege

11   Motions (related document(s)2402) (ECF #2405)

12

13   HEARING re Order signed on 3/16/2021 Establishing Procedures

14   for Remote Evidentiary Hearing on March 24, 2021, in

15   Connection with Media Intervenors' Motions to Unseal

16   Judicial Records. (ECF #2492)

17

18   HEARING re Stipulation and Agreed Order signed on 3/16/2021

19   Regarding Exchange of Exhibits for Remote Evidentiary

20   Hearing on March 24, 2021, In Connection with Media

21   Intervenors' Motions to Unseal Judicial Records. (ECF #2493)

22

23   HEARING re Second Motion to Intervene and Unseal filed by

24   KatieLynn B Townsend on behalf of Dow Jones & Company, Inc.,

25   Boston Globe Media Partners, LLC, and Reuters News & Media,

Page 11

1    Inc. (ECF #2188)

2

3    HEARING re Objection to Motion / Debtors' Limited Objection

4    to the Media Intervenors' Motions to Intervene and Unseal

5    Judicial Records and Cross-Motion to Seal Certain Judicial

6    Records (related document(s)1828, 2188) filed by Benjamin S.

7    Kaminetzky on behalf of Purdue Pharma L.P. (ECF #2252)

8

9    HEARING re Statement of the Raymond Sackler Family in

10   Respect of the Second Motion to Unseal Judicial Records by

11   Media Intervenors Dow Jones & Company, Inc., Boston Globe

12   Media Partners, LLC, and Reuters News & Media, Inc. (related

13   document(s)2132, 2188) filed by Gerard Uzzi on behalf of The

14   Raymond Sackler Family. (ECF #2265)

15

16   HEARING re Statement of the Mortimer Sackler Initial Covered

17   Sackler Persons in Respect of the Reply in Support of

18   Motions to Unseal Judicial Records by Dow Jones & Company,

19   Inc., Boston Globe Media Partners, LLC, and Reuters News &

20   Media, Inc. (related document(s)2288) filed by Jasmine Ball

21   on behalf of Beacon Company. ( ECF #2301)

22

23

24

25

1   HEARING re Objection to Motion Limited Objection of the

2   Raymond Sackler Family to the First and Second Motions to

3   Unseal Judicial Records by Media Intervenors Dow Jones &

4   Company, Inc., Boston Globe Media Partners, LLC, and Reuters

5   News & Media, Inc. (related document(s)2022, 2188) filed by

6   Gerard Uzzi on behalf of The Raymond Sackler Family. (ECF

7   2360)

8

9   HEARING re Mortimer D. Sackler ICSPs Limited Objection to

10  the Media Intervenors Motion to Intervene and Unseal

11  Judicial Records (related document(s)2022, 2188) . (ECF

12  #2361)

13

14  HEARING re Reply to Motion to Unseal (related

15  document(s)2022) filed by KatieLynn B Townsend on behalf of

16  Dow Jones & Company, Inc., Boston Globe Media Partners, LLC,

17  and Reuters News & Media, Inc. (ECF 2288)

18

19  HEARING re Supplemental Reply to Motion (related

20  document(s)2022) filed by KatieLynn B Townsend on behalf of

21  Dow Jones & Company, Inc., Boston Globe Media Partners, LLC,

22  and Reuters News & Media, Inc. (ECF 2384)

23

24

25

1    Related Documents: Motion to Shorten Time / Debtors' Ex

2    Parte Motion for Entry of an Order Shortening Notice with

3    Respect to Debtors' Motion for Entry of an Order Sealing

4    Judicial Documents (related document(s)2252) filed by

5    Benjamin S. Kaminetzky on behalf of Purdue Pharma L.P. (ECF

6    #2253)

7

8    Declaration of Jon Lowne in Support of the Debtors' Limited

9    Objection to Media Intervenors' Motions to Intervene

10   (related document(s)2252) filed by Benjamin S. Kaminetzky on

11   behalf of Purdue Pharma L.P. (ECF #2254)

12

13   HEARING re Declaration of Jasmine Ball (related

14   document(s)2361) filed by Jasmine Ball on behalf of Beacon

15   Company (ECF #2362)

16

17   HEARING re Motion to File Under Seal / Mortimer D. Sackler

18   ICSP's Motion to Seal Documents Submitted in Connection with

19   the Limited Objection to the Media Intervenors' Motion to

20   Intervene and Unseal Judicial Records filed by Jasmine Ball

21   on behalf of Beacon Company (ECF #2396)

22

23

24

25

1   HEARING re Stipulation / Notice of Filing of Stipulation and

2   Agreed Order Regarding Exhibits for Use at the Hearing on

3   Privilege Motions (related document(s)1753, 1752) Filed by

4   Ira S. Dizengoff on behalf of The Official Committee of

5   Unsecured Creditors of Purdue Pharma L.P., et al. (ECF

6   #2402)

7

8   HEARING re Order signed on 2/22/2021 Granting in part,

9   Denying in part, and Continuing in Part Media Intervenors'

10  Motions to Unseal Judicial Records. By March 10, 2021, the

11  Media Intervenors will inform the Raymond Sackler family

12  whether the Media Intervenors intend to cross examine

13  Garrett Lynam or Frank S. Vellucci at the next omnibus

14  hearing on March 24, 2021 (Related Doc # 2022) (ECF #2404)

15

16  HEARING re Stipulation and Agreed Order signed on 2/22/2021

17  Regarding Exhibits for Use at the Hearing on Privilege

18  Motions (related document(s)2402) (ECF #2405)

19

20  HEARING re Order signed on 3/16/2021 Establishing Procedures

21  for Remote Evidentiary Hearing on March 24, 2021, in

22  Connection with Media Intervenors' Motions to Unseal

23  Judicial Records. Hearing to be held on 3/24/2021 at 10:00

24  AM at Teleconference Line (CourtSolutions) (RDD) (related

25  document(s)2022, 2039). (ECF #2492)

Page 15

1    HEARING re Stipulation and Agreed Order signed on 3/16/2021

2    Regarding Exchange of Exhibits for Remote Evidentiary

3    Hearing on March 24, 2021, In Connection with Media

4    Intervenors' Motions to Unseal Judicial Records. (ECF #2493)

5

6    HEARING re Motion to File Under Seal / Mortimer D. Sackler

7    ICSP's Motion to Seal Documents Submitted in Connection with

8    the Limited Objection to the Media Intervenors' Motion to

9    Intervene and Unseal Judicial Records filed by Jasmine Ball

10   on behalf of Beacon Company (ECF #2396)

11

12   HEARING re Objection to Motion to File Documents Under Seal

13   (related document(s)2396) filed by KatieLynn B Townsend on

14   behalf of Dow Jones & Company, Inc., Boston Globe Media

15   Partners, LLC, and Reuters News & Media, Inc. (ECF #2497)

16

17   Related Documents: Objection to Motion Mortimer D. Sackler

18   ICSPs Limited Objection to the Media Intervenors Motion to

19   Intervene and Unseal Judicial Records (related

20   document(s)2022, 2188) filed by Jasmine Ball on behalf of

21   Beacon Company (ECF #2361)

22

23   HEARING re Declaration of Jasmine Ball (related

24   document(s)2361) filed by Jasmine Ball on behalf of Beacon

25   Company (ECF #2362)

1    HEARING re Notice of Hearing on the Mortimer D. Sackler

2    ICSP's Motion to Seal Documents Submitted in Connection with

3    the Limited Objection to the Media Intervenors' Motion to

4    Intervene and Unseal Judicial Records (related

5    document(s)2396) filed by Jasmine Ball on behalf of Beacon

6    Company (ECF #2397)

7

8    HEARING re Second Motion to Intervene and Unseal filed by

9    KatieLynn B Townsend on behalf of Dow Jones & Company, Inc.,

10   Boston Globe Media Partners, LLC, and Reuters News & Media,

11   Inc. (ECF #2188)

12

13

14

15

16

17

18

19

20

21

22

23

24

25   Transcribed by:  Sonya Ledanski Hyde

Page 17

```
 1   A P P E A R A N C E S :

 2

 3   REPORTERS COMMITTEE FOR FREEDOM OF THE PRESS

 4        Attorneys for Media Intervenors

 5        1156 15th Street NW

 6        Washington, DC 20005

 7

 8   BY:  KATIE TOWNSEND (TELEPHONICALLY)

 9

10   GREGORY P. JOSEPH LAW OFFICES LLC

11        Attorneys for The Raymond Sackler Family

12        485 Lexington Avenue

13        New York, NY 10017

14

15   BY:  GREGORY P. JOSEPH (TELEPHONICALLY)

16

17   MILBANK LLP

18        Attorneys for The Raymond Sackler Family

19        55 Hudson Yards

20        New York, NY 10001

21

22   BY:  GERARD UZZI (TELEPHONICALLY)

23        ALEXANDER B. LEES (TELEPHONICALLY)

24        ASHLEY SATTERLEE (TELEPHONICALLY)

25
```

Page 18

1   JOSEPH HAGE AARONSON LLC

2        Attorneys for The Raymond Sackler Family

3        485 Lexington Avenue, 30th Floor

4        New York, NY 10017

5

6   BY:  MARA LEVANTHAL (TELEPHONICALLY)

7        BENJAMIN ALBERT (TELEPHONICALLY)

8

9   PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP

10        Attorneys for The Raymond Sackler Family

11        1285 Avenue of the Americas

12        New York, NY 10019

13

14   BY:  THEODORE V. WELLS, JR. (TELEPHONICALLY)

15        ROBERTO FINZI (TELEPHONICALLY)

16

17   DAVIS POLK & WARDWELL LLP

18        Attorneys for the Debtor

19        450 Lexington Avenue

20        New York, NY 10017

21

22   BY:  MARSHALL HUEBNER (TELEPHONICALLY)

23        BENJAMIN KAMINETZKY (TELEPHONICALLY)

24        GERARD MCCARTHY (TELEPHONICALLY)

25

1    DEBEVOISE & PLIMPTON LLP

2         Attorneys for Beacon Company

3         919 Third Avenue

4         New York, NY 10022

5

6    BY:  MAURA MONAGHAN (TELEPHONICALLY)

7         JASMINE BALL (TELEPHONICALLY)

8

9    PILLSBURY WINTHROP SHAW PITTMAN LLP

10        Attorneys for the Ad Hoc Group of Non-Consenting States

11        31 West 52nd Street

12        New York, NY 10019

13

14   BY:  ANDREW TROOP (TELEPHONICALLY)

15

16   AKIN GUMP STRAUSS HAUER & FELD LLP

17        Attorneys for the Official Committee of Unsecured

18        Creditors

19        One Bryant Park

20        New York, NY 10036

21

22   BY:  ARIK PREIS (TELEPHONICALLY)

23        MITCHELL HURLEY (TELEPHONICALLY)

24

25

Page 20

1    ALSO PRESENT TELEPHONICALLY:

2

3    ALEX BROZMAN

4    ALEX LEES

5    ANTHONY DE LEO

6    ARTEM SKOROSTENSKY

7    BARBARA VAN ROOYAN

8    BRIAN MANN

9    CATRINA SHEA

10   CLAUDIA SPRINGER

11   CYRUS MEHRI

12   DANIELLE GENTIN-STOCK

13   DANIELLE LEVINE

14   DAVID MOLTON

15   DIANE KELLEHER

16   DONALD CREADORE

17   EMILY KUZNICK

18   GEORGE O'CONNOR

19   HAROLD WILLIFORD

20   HAYDEN COLEMAN

21   HAYLEY THEISEN

22   HUNTER BLAIN

23   JAKE HOLDREITH

24   JAMES MCCLAMMY

25   JEFFREY J.

1   JEREMY RYAN

2   JONATHAN RANDLES

3   JOSEPH BRANDT

4   JOSEPH FRANK

5   JUSTIN ALBERTO

6   KENNETH ECKSTEIN

7   KEVIN MACLAY

8   LAWRENCE FOGELMAN

9   LINDA IMES

10   LIVI MEZEI

11   LOUIS TESTS

12   LOWELL FINSON

13   M. VIOLA SO

14   MARC SKAPOF

15   MARY JO WHITE

16   MEGAN KAPLER

17   MICHAEL KLAUDER

18   MICHAEL O'NEIL

19   MICHAEL QUINN

20   NANCY GOLDIN

21   NATASHA LABOVITZ

22   NICHOLAS PREY

23   PAUL BREENE

24   PAUL SCHWARTZBERG

25   PETER ARONOFF

Page 22

1    RICH ARCHER

2    RICHARD LEVERIDGE

3    RICHARD SHORE

4    SARA BRAUNER

5    SARA ROITMAN

6    SHEILA BIMBAUM

7    STEVEN WILAMOWSKY

8    TANCRED SCHIAVONI

9    TAYLOR HARRISON

10   THEODORE JAMES SALWEN

11   TROY PESINA

12   TZERINA DIZON

13   WARREN USATINE

14   XIAOYU DUAN

15

16   WITNESSES:

17

18   GARRETT LYNAM

19   FRANK S. VELLUCCI

20

21

22

23

24

25

1              P R O C E E D I N G S

2              THE COURT:  The amended agenda for this morning's

3    hearing reflects that the matters scheduled for today, both

4    this morning and this afternoon at 2:00, will be conducted

5    wholly telephonically on Court Solutions with the exception

6    of the motions in Item II on the agenda, the press Motions

7    to Intervene and Unseal and the Motion to Seal Documents.

8    Those matters will be heard or conducted on Zoom for the

9    parties directly involved in those matters with access to

10   others who requested such access by Court Solutions.

11             We'll go through the protocols again when we get

12   to the Zoom evidentiary hearing.  But for all other matters

13   because these matters are completely telephonic, not only

14   should you introduce yourself and your client the first time

15   that you speak, but you should introduce yourself thereafter

16   or identify yourself thereafter so that the court reporter

17   and I can put together your voice with your name.

18             There is one authorized recording of the hearings

19   that's taken by Court Solutions which provides a copy to our

20   clerk's office on a daily basis.  If you want a transcript

21   of your hearing, you should contact the clerk's office to

22   arrange for the production of on.

23             Because these matters where people are appearing

24   by phone are completely telephonic, you need to keep your

25   phone on mute unless of course you're speaking, at which

Page 24

1    point you need to unmute yourself.

2            So with that introduction, I already referenced

3    the amended agenda, and I'm happy to go down the agenda in

4    the order set forth on it unless there's any update or

5    developments that the parties want to raise that would

6    affect the conduct of these hearings.

7            MR. TROOP:  Your Honor, this is Andrew Troop from

8    the non-consenting states.  This has nothing to do with the

9    substance of the hearing.  But as with our last hearing, I'm

10   starting to get emails from people who are on the listen-

11   only line that it's gone dead.

12           THE COURT:  All right.

13           MR. TROOP:  I thought I would raise that so that

14   whoever is on from Court Solutions can perhaps look into

15   that issue.

16           THE COURT:  All right.  The Court Solutions people

17   should check that.  I'll ask one of our people also to

18   confirm that.  When this happened last time, it wasn't

19   clear, but it actually did originate on the line as opposed

20   to individual people's own internet connection.  But I am

21   asking them to immediately try to address that.  Thank you.

22           MR. TROOP:  Thank you, Your Honor, and Mr.

23   Huebner, sir, for cutting you off.

24           MR. HUEBNER:  No, not at all.  I hadn't started

25   yet.  Good morning, Mr. Troop and good morning, everybody.

1          So first of all, I am advised, and, Mr. Troop, if

2      you wouldn't mind watching your email.  But the listen-only

3      line should now be back and working.  It just was tested or

4      something.  I'm getting an email saying we should be good

5      now.

6          Your Honor, just one equally technical

7      housekeeping note.  The Debtors -- I guess Davis Polk,

8      whatever, the Debtors had set up a listen-only line that

9      parties can dial into, or just stay on I guess if that's the

10      one they're already on, for the Zoom portion of the hearing

11      to avoid obviously the burden on chambers of many people who

12      are not actually speaking at that part of the hearing

13      needing Zoom.

14          If the Court would like, I have the code in front

15      of me.  I could read it just so that people can write it

16      down and have it right at hand and not have to go scrambling

17      through the agenda letter and figuring out where it is.  I

18      can do that both now and when we're ready to transition, or

19      I could do it neither time.  Whatever the Court's pleasure

20      is.

21          THE COURT:  Why don't you do it now.  That's fine.

22          MR. HUEBNER:  Okay, Judge.  So if you want to

23      listen to the Zoom part of the hearing that's going to

24      happen in a couple of hours and you're not the speaker,

25      please dial into 1-844-992-4726.  And the access code is

1   1326458457-pound.  And obviously it's a toll-free number

2   which was set up.

3          (Break)

4          So, Your Honor, may I proceed now with the agenda

5   that the Court had suggested would be acceptable?

6          THE COURT:  Yes, that's fine.

7          MR. HUEBNER:  Terrific.  So, good morning, Your

8   Honor.  For the record, I am Marshall Huebner of Davis Polk

9   & Wardwell, LLP on behalf of Purdue Pharma LP and its 22

10  subsidiaries and its general partner, Purdue Pharma

11  Incorporated.

12         The first item on the agenda for today is the

13  Debtor's Motion to Shorten Notice, which is Docket Number

14  229.  This motion seeks to shorten by only two days the

15  notice period for the Debtor's motion to extend the

16  preliminary injunction so that the injunction motion could

17  be heard today at prescheduled omnibus hearing on the

18  preliminary injunction that's scheduled to expire.

19         As we pointed out in the motion, there is no

20  prejudice to any party from this motion to shorten time, as

21  all parties have a full seven-day default period set forth

22  under the local rules to file objections.  I think we

23  actually just took the time off (indiscernible) if my memory

24  is right.  The motion is also uncontested.  And unless

25  someone surprises me, I think that no one has an issue with

Page 27

1   it.  We actually checked with all the major parties on the

2   motion to shorten time and how we were approaching it and

3   heard no objection, and we request that the Court grant the

4   Motion to Shorten Time.

5            THE COURT:  Okay.  I agree with you.  I haven't

6   seen any written responses to the motion to shorten.  Does

7   anyone have anything further to say on this motion?  Okay.

8            Hearing no one, I will grant the motion.  It seeks

9   to shorten time on the hearing with respect to the next

10  motion on the calendar, which is the Debtor's Motion to

11  Extend the Preliminary Injunction in Adversary Proceeding

12  19-08289.  I have received a number of pleadings on that

13  motion, including two objections, and in addition, the

14  Debtor's reply and three pleadings in the court.

15           Given that and my understanding of the parties'

16  familiarity with the issues and the facts of the underlying

17  request for relief as well as there being no opposition to

18  the motion to shorten, I'll grant the motion to shorten.

19  Which, as Mr. Huebner stated, does not shorten the time for

20  pleadings to be filed except with respect to the time within

21  which replies will be filed.

22           So you can email that over to chambers.

23           MR. HUEBNER:  Thank you very much, Your Honor.

24           The next item on the agenda is Docket Number 227,

25  the Debtor's Motion to Extend Preliminary Injunction for 28

Page 28

1    days, until April 21st, 2021.

2            The Court is of course very familiar with the

3    legal basis for and the factual predicates of this

4    preliminary injunction, having already conducted five

5    separate hearings with respect to the injunction and

6    extensions, several of which hearings were quite involved

7    and lengthy.  Therefore, rather than retreading well-worn

8    and hopefully well-briefed ground, I will streamline my

9    remarks and focus on the three objections.

10           Before I begin however, Your Honor, I want to be

11   extremely clear, as I was at the last hearing, so that

12   nobody is under any mistaken impression.  If the progressing

13   agreement between the Debtors, the ad-hoc committee, the

14   multi-state group, and the UCC on the one hand and the

15   Sacklers on the other hand falls off the rails, the

16   injunction that we will request thereafter will look very,

17   very different than this one with respect to the Sacklers.

18           But that is assuredly not where we are today.  And

19   the Debtors, the AHC, the UCC, the MSG on the one hand, and

20   the Sacklers on the other, are productively and seriously

21   engaged virtually seven days a week and around the clock

22   working to attempt to bring to fruition the settlement

23   agreement embodied in the term sheet attached to the plan.

24           Let me spend just a minute or two on the plan,

25   whose filing was a momentous and highly-relevant

1   accomplishment for which credit is due to many parties.  As

2   we, the UCC, and the Ad Hoc Group all pointed out in our

3   pleadings for today's hearing, there is still wood left to

4   chop on a variety of plan issues, large, medium, and small.

5   And I hope and trust and I believe that we will get there on

6   a substantial majority, and maybe even just about all of the

7   issues open in the plan (indiscernible).

8            But as this Court has exhorted and admonished, all

9   of us many times over the last 18 months, do not let the

10  perfect be the enemy of the good, and no one can get or win

11  every point.  There is just too much at stake.

12           Many parties have listened to the Court's

13  exhortations, and the level of support or acceptance of

14  treatment are very material progress towards one of those

15  two foregoing positions that has been built, subject of

16  course to open issues and conditions for some of the

17  parties, is truly extraordinary.

18           The Debtors, the Ad Hoc Committee, which includes

19  states, cities, counties, tribes, and the MDL, PEC, the MSG,

20  the Native American Tribe Group, the Personal Injury Ad Hoc

21  Group, the Hospitals Ad Hoc Group, the NAS Children Ad Hoc

22  Group, the rate payer mediation participants, the Department

23  of Justice, and our Official Committee of Unsecured

24  Creditors have all participated in a court-ordered mediation

25  for months.  Most as participants, a couple of us as

Page 30

1    observers, in some cases for close to a year.  And all those

2    parties are at or moving towards support for, agreement on,

3    or satisfaction with the plan.  Virtually no party in this

4    unthinkably complicated case is still resolutely outside the

5    tent except, seemingly, the NCSG and the five individuals

6    who are members of the Ad Hoc Committee on Accountability.

7    In essence, 29 or so creditors out of over 614,000.  And we

8    have not given up hope that they too will come on board at

9    some point.  Our phone lines are open 24 hours a day and we

10   stand ready to continue working with every party in this

11   case ultimately to hopefully (indiscernible).

12         Today's hearing is of course not about the plan,

13   except that it sort of is.  Because if the very modest 28-

14   day relief requested today is denied, all that so many have

15   worked for for so long will likely be shattered and we will

16   never actually get to have our day in court to demonstrated

17   the legality and wisdom of the plan supported by so many

18   parties.

19         By contrast, and the asymmetry is radical indeed,

20   if our modest 28-day request is granted, everyone will get

21   to have their day in court about the sufficiency of the

22   disclosure statement and later about the legality of the

23   plan.  And it will fall or rise on its merits and applicable

24   law.  And under clear governing black letter law, it is this

25   radical asymmetry, often articulated by courts as the

Page 31

1   balance of the harms, as well as the modesty of the request

2   and the progress made to date that I hope makes this Court's

3   sixth preliminary injunction ruling by far the easiest of

4   them all.

5           Let me turn now to the three objections.  The

6   first was filed by the Tennessee plaintiffs, which Your

7   Honor will recall unsuccessfully pursued an appeal of the

8   preliminary injunction last year.  They incorporate their

9   previous arguments in opposition to the preliminary

10  injunction.  The Court has now rejected these arguments on

11  three occasions.  And Judge McMahon, in an extremely

12  thorough and pretty lengthy opinion, likewise rejected them

13  down the line on appeal.

14          Because the Tennessee plaintiffs conceded that it

15  is a, quote, virtual certainty that the Court will grant the

16  limited extension the Debtors seek, and because they waived

17  their oral argument today, I will not address their

18  objection further.

19          The next objection is that filed by the

20  (indiscernible) Ad Hoc Committee on Accountability, which in

21  fact represents five individuals.  Like other objections

22  this group has lodged, this one unfortunately is almost

23  entirely devoid of legal or factual argument and is instead

24  replete with truly vituperative rhetoric and invective that

25  should have no place in these or really any legal

Page 32

1    proceeding.

2             In fact, I don't even want to dignify this nasty

3    attack with one exception.  After engaging in not

4    particularly helpful and pretty vitriolic arithmetic

5    gymnastics that generated in neither light nor heat for this

6    court or nay party, they claim that all the professionals

7    being paid by the estate are, and I quote, "Being used as

8    instruments of the Sackler's defense team", brief at Page 4.

9             And just which professionals that go into their

10   mathematical total is the Ad Hoc Committee on Accountability

11   impugning?  First, they're attacking the professionals for

12   the UCC, who has engaged in their own investigation of

13   claims against the Sacklers for more than 18 months and have

14   relentlessly attacked and helped procure millions of

15   additional pages of documents in discovery from the

16   Sacklers.

17            Next, they are impugning the professionals for the

18   Ad Hoc Committee, which includes the MDL's plaintiff

19   executive committee, many of the country's most-experienced

20   mass tort lawyers, as well as 23 state attorneys general.

21   The very same ad hoc committee that helped negotiate the

22   settlement agreement with its original $3 billion

23   contribution in 2019, a deal that has now been greatly

24   improved to a guaranteed $4.275 billion with no DOJ

25   dilution.

Page 33

```
 1              Here, they impugn the professionals for the

 2    Debtors and the special committee who have been involved in

 3    everything in these cases since before they were filed, have

 4    published almost a thousand pages of forensic reports that

 5    everyone as far as I know has agreed to and accepted, that

 6    laid their every single payment and every dollar of value

 7    transferred to the Sacklers since 2008, professionals that

 8    facilitated the company's entry into Chapter 11, the removal

 9    of the Sackler's control of the board, and the Debtor's

10    offer from the very first day of these cases to turn over

11    100 percent of itself with no litigation to stakeholders.

12              And seemingly, even the world-class mediators are

13    attacked, who facilitated critical agreements among and

14    between virtually every public and private party or group as

15    to allocation of the Debtor's estates, dedication to

16    abatement, and the $4.275 billion settlement reflected in

17    the term sheet filed with the plan.

18              As the mediators expressly voted on Page 8 of the

19    report filed only yesterday, the facts per term sheet,

20    quote, "follows in the wake of a recommendation made earlier

21    by the two mediators as part of Phase II of the mediation

22    process."  To say that all of these groups and

23    professionals, all of whom or almost all of whom are

24    fiduciaries under state or federal law are, quote,

25    "instruments of the Sackler's defense team" is either
```

Page 34

1   immediately adjacent to or well over the border of

2   appropriate advocacy.

3           Before moving on, Your Honor.  I do want to thank

4   counsel for one thing, remind us all about Lehman.  Because

5   as the Court likely remembers, I have actually spoken myself

6   about Lehman several times from this podium.  And my fears

7   about Lehman are quite relevant and worth repeating briefly

8   today.

9           Lehman had about 65,000 claims.  We have almost

10  ten times that number.  Over 600,000.  Estimates of Lehman's

11  claims by dollar amount ranged from about $362 billion to

12  about $819 billion at the high side.  Here, by contrast, our

13  claims are in the tens of trillions.  An estate filed claim

14  alone is $2.156 trillion.

15          Yes, the first 18 months of this case have been

16  expensive.  This is one of the most complex cases ever filed

17  anywhere, with about ten ad hoc groups, each claiming

18  hundreds of billions or trillions of dollars in damages and

19  with billions of dollars of claims against related parties

20  at stake.

21          And Lehman, which I spent about two years of my

22  life on as lead counsel for Lehman Europe, is exactly what

23  so many of us have been working so desperately to avoid, is

24  that the cost of the Lehman proceedings has been something

25  like $6 billion and counting, with about half of that, $3

Page 35

1    billion, as incurred professional fees as creditors fought

2    with each other and with the debtors for more than a decade

3    about relative entitlement to the debtors assets.  And when

4    you're a debtor that has hundreds of billions of dollars in

5    assets in cash and marketable securities and hedge rights

6    and bonds and the like and the whole case is about which

7    hedge funds or which major bank gets exactly what number of

8    cents on the dollar, maybe that's okay.  But when you have

9    less than $10 billion all in and American lives are actually

10   at stake, years and years of (indiscernible), inter-creditor

11   warfare and delay and the billions of dollars of fees that

12   would accompany resolving a claims pool, one that's ten

13   times larger in file claim number and much, much larger than

14   that and far more fact-intensive than Lehman's claims pool,

15   would be an unthinkable travesty.

16          This is case is not, or at least it shouldn't be

17   about politics or political affiliations, or just money.  It

18   is about saving American lives and helping those ravaged by

19   one of the worst crises of the modern era and one of the

20   worst times in recent modern history for health and safety.

21          So by all means, let us keep Lehman very much in

22   mind as a terrifying cautionary tale for what so many of us

23   in this plan seeks to avoid.  I have nothing further to say

24   about this objection.

25          Finally, there is the objection of the non-

Page 36

1    consenting states.  As in March, 2020 and September 2020,

2    the non-consenting states, again, seek to disrupt what has

3    been the status quo for now nearly 18 months and restarted

4    unending frenzy of uncoordinated litigation by hundreds of

5    parties in dozens and dozens of courtrooms against the

6    Sacklers.

7              Pretty amazingly, they go so far as to claim,

8    seemingly because they themselves are not on board with the

9    plan that so many others are working towards or support,

10   that, quote, "The reasons the Court imposed the preliminary

11   injunction no longer exists", closed quote, brief at Page 2.

12   Wow.

13             In fact, under the law, including Judge McMahon's

14   ruling on appeal, the case for the preliminary injunction

15   has never been anywhere near as strong as it is today.  The

16   relief the Debtors seek today is expressly supported by the

17   AHG, the MSG, and the UCC.  And among the hundreds of

18   thousands of stakeholders and stakeholder groups not

19   objecting are of course the United States Department of

20   Justice, the personal injury claimants, the third-party

21   payors, the hospitals, the rate payors, the NAS children,

22   the Native American tribes, et cetera, et cetera, et cetera.

23             So while the maximum of about 29 creditors raised

24   to you no reason whatsoever for the injunction, about

25   600,000 of us respectfully disagree.  We think that the plan

1    that was filed last Monday, the culmination of determined,

2    extraordinary efforts by many, many parties over a very,

3    very long period of time, amply provides all the reasons a

4    court could ever need under governing law and has already

5    been applied five times by this Court.  A plan that, while

6    work remains to be done, one, incorporates the many

7    agreements reached in Phase One of the mediation among about

8    ten groups, including the productively engaged non-

9    consenting states group in Phase One requiring the

10   allocation of the value of the Debtor's estates and its

11   dedication almost exclusively to abatement, a goal that so

12   many of us have articulated from the literally the opening

13   moment of this case.

14          Two, it incorporates the court-approved resolution

15   of the Department of Justice's civil and criminal

16   investigations of debtors and satisfies the two conditions

17   under which the DOJ, remarkably, and in the public interest

18   and the interest of the American people, agreed to waive

19   $1.775 billion of its cash recovery so that it could go --

20   and there is a correct use of the word irony here -- to

21   state and local governments for opioid crisis abatement.

22          And three, contains an agreement in principle to

23   resolve the claims against the Sackler families and weighted

24   entities in exchange for, among other things, guaranteed

25   payments of $4.275 billion to the estates with no dilution

1    from the Sackler's separate settlements with the DOJ.

2              Not one of these critically-important steps would

3    have been possible or would remain possible absent a

4    preliminary injunction and the almost year-long court

5    ordered mediation that it permitted.

6              I think it is quite telling, Your Honor, that the

7    non-consenting states mostly just regurgitate, in many cases

8    actually verbatim or close to it, arguments from the

9    previous pleadings that this Court has already rejected,

10   many of which Judge McMahon also expressly rejected in the

11   analogous Tennessee plaintiffs' appeal.  In fact, most of

12   their pleading are really just a preview of plan

13   confirmation objections that have no relevance today.

14             I know that Your Honor has read all the papers

15   with customary care, so I will keep my remaining remarks

16   short and reserve the right to offer appropriate rebuttal as

17   necessary.

18             I think it is helpful to (indiscernible) Your

19   Honor about (indiscernible) the many points that the non-

20   consenting states don't really address, which absent alone

21   is fatal to their position.

22             The first of the four preliminary injunction

23   factors is of course likelihood of success with

24   reorganization.  The non-consenting states do not address

25   the likelihood of success (indiscernible), at least not as

Page 39

1   such.  This is entirely surprising, as this factor is easily

2   satisfied.  A plan is now on file that enjoys an

3   extraordinary full-blown level of support, support that I

4   might add the Debtors have every intention of continuing to

5   work night and day to further expand.

6          While there are undoubtedly open issues to be

7   negotiated in the coming weeks, as I keep saying, the plan

8   demonstrates that in the words of Judge McMahon, quote, "The

9   prospect of reorganization remain viable".  Again, in Judge

10  McMahon's words, "There may be bumps along the road, whether

11  related to the adequacy of particular disclosures or

12  parties' respective positions on the merits.  But the fact

13  that discussions are continuing provide support for the

14  finding that the continuing injunction increases the

15  likelihood of a successful reorganization," closed quote,

16  Page 59.

17         In fact, the likelihood of reorganization here is

18  immeasurably better when the chief judge of the Southern

19  District of New York so ruled, and as of course the plan

20  evidences, we are way, way past near, quote, "Continuing

21  discussions," which Judge McMahon found many months ago

22  itself was sufficient to justify the injunction.

23         The only thing that the non-consenting states sort

24  of say about this factor, on Page 7 and in Footnote 20, is

25  that the plan can't succeed because it has third-party

Page 40

1    releases.  Rather shockingly, while they list about 19

2    places that they claim, "Find no authority for the

3    imposition of third-party releases," they fail to cite all

4    of or in fact any of the substantial circuit-level

5    authority, including in the Second, Third, Fourth, Sixth,

6    Seventh, and Eleventh Circuit at the circuit level then

7    rules the other way.  Including of course the governing

8    caselaw handed down by the Second Circuit in Metromedia and

9    its progeny that holds, along with many other cases in this

10   and other circuits, that non-debtor releases are permissible

11   when justified.

12           I always thought that counsel was obligated, at

13   least in New York, to direct a court to directly controlling

14   precedent when arguing their points of law, but we all know

15   about Metromedia, and I'll just leave it at that.

16           The second factor is irreparable harm.  Will the

17   Debtor suffer irreparable harm if the injunction is not

18   extended?  As we lay out in our reply, so I will touch this

19   lightly and quickly, every single one of the harms that

20   justified entry of the injunction in the past is present

21   today and in fact is much more present.

22           I spoke a few minutes ago about the radical

23   asymmetry in harm.  In essence because the non-consenting

24   states are not, or not yet hopefully, on board, they want to

25   destroy everything that the rest of us have worked for for

Page 41

1    years and deny all the other stakeholders in this case the

2    opportunity even to have this Court decide whether the plan

3    should or should not be confirmed.  We are ready to have

4    that fight if needed at confirmation, although we very much

5    hope by the time we get there it won't be needed.  What we

6    are not willing to do on behalf of the over 600,000

7    stakeholders for whom we are fiduciary is to be denied the

8    opportunity even to do so because one half of one of about

9    12 organized creditor groups in this case, no matter how

10   important, is not presently on board.  Actually, I think the

11   UCC tallied 14 organized groups in this case.  So I guess

12   you can do the math any way you want.

13            And it's difficult to overstate how much is at

14   stake.  After 18 months of nonstop effort, and yes, hundreds

15   of millions of dollars of associated expenses incurred by

16   multiple parties and paid for by the estate, the Debtors and

17   a substantial majority of their stakeholders have crafted a

18   highly-negotiated and broadly-consensual resolution to a

19   dizzying array of issues, again, with wood still to chop.

20   If and when confirmed, the plan will put a hundred percent

21   of the Debtor's multi-billion-dollar asset base plus

22   billions more extracted from the Sacklers to work abating

23   the opioid crisis.

24            By contrast, the return to the pre-injunction

25   litigation world would be disastrous and would most

Page 42

1   certainly result in the collapse of the plan.  Because of

2   course if the non-consenting states get to litigate, we all

3   have to litigate.  No one can afford to be last in the

4   uncontrolled nationwide race to the courthouse.  Least of

5   all the Debtors, who in fact own by far the most valuable

6   claims against the Sacklers and will be put into direct

7   competition with their own stakeholder in the

8   (indiscernible) and fracas to recover against the

9   shareholders.

10          Second, the deeply interdependent Phase One

11  mediation agreements among the Debtor's creditors would

12  almost surely collapse, which would in turn lead to all-out

13  intercreditor warfare as each group battles to secure the

14  diminished and ever-shrinking value of available

15  distributions.  For example, the personal injury claimants

16  stand very ready to litigate their view that their claims

17  are senior and superior to those of the states.  Hospitals

18  might well do the same.  And so on and so on.

19          In addition, the immense benefits of the

20  resolution with the DOJ, including the $1.775 billion

21  forfeiture credit in favor of states and local governments

22  would likely be lost, as too would the Sackler's $4.275

23  billion in settlement, replaced and fed by years and years

24  of litigation spanning the globe.

25          Such a result would be tragic.  Billions of

Page 43

1   dollars of value and the imminent prospect of the global

2   value maximizing abatement-centric resolution contemplated

3   by the plan will be lost, almost surely irretrievably.

4           And what is the non-consenting states' response to

5   all of this?  An offhand, one-sentence assertion that

6   lifting the injunction will, "advance these cases".  Look at

7   their brief at Page 7.  "Ending the preliminary injunction

8   will advance the case."  But we all know that that's totally

9   untrue.  And this Court has already so ruled on at least two

10  occasions, on both March 18th and September 30th when it

11  rejected the previous, identical, and indeed almost verbatim

12  request of the non-consenting states to end the injunction.

13  And that in one case was a year ago.  A year before we

14  worked for a year to build the plan that's now on file.

15          There is simply no basis, legal of factual, to

16  revisit the court's previous multiple findings of

17  irreparable harm.  To the contrary, all the facts today

18  further confirm the wisdom of the Court's prior ruling, and

19  the facts today are probably a fortiori squared or even

20  cubed from the prior hearing.

21          The bulk of the non-consenting states remaining

22  assertions are shoehorned into the balance of harms, the

23  (indiscernible) preliminary injunction factors.  But there

24  can be no reasonable dispute that the balance of harms and

25  the public interest support extending the injunction.

Page 44

1          The preliminary injunction has now been in place

2   for a little over 18 months.  The relative harm of

3   continuing the injunction for only 28 days, which is all we

4   are asking for today, remains minimal, particularly where

5   the states are seeking only money damages for past wrongful

6   conduct and the voluntary injunction negotiated at

7   extraordinary length and agreed to and entered on consent

8   now monitored by Governor Steve Bullock and enforceable by

9   this Court remain absolutely fully in play.

10          The non-consenting states present three arguments

11   as to why a continued injunction is allegedly not in the

12   public interest.  Let's look at each.  Each of the three has

13   been rejected by the court in the past, and each should be

14   rejected again.

15          First, the non-consenting states astonishingly

16   continue to contend that the preliminary injunction will,

17   quote, "Keep information about a national crisis from coming

18   into light," closed quote, brief at 4.  They made this basis

19   argument verbatim in March, 2020, and it was rightly

20   rejected by the Court then.

21          As this court held, "The record is crystal clear

22   that there has been substantial disclosure and that that

23   disclosure is ongoing".  March 18th, 2020 Hearing

24   Transcript, 90, Line 15 to 91, Line 7.  This claim, which

25   they also keep repeatingly announcing to the media, is

Page 45

1     flatly false.  Nothing about these cases has stifled

2     disclosure or information sharing.  Quite the contrary.  The

3     court injunction has enabled an extraordinary amount of

4     information to flow and allowed the Debtors and key creditor

5     groups, including the non-consenting states, to obtain

6     millions and millions of pages of financial and other

7     information from the Sackler families and their entities.

8     This included information about their assets and the form in

9     which they are held, something that as this Court has noted

10    many times, usually can't be obtained either at all or only

11    after first winning a judgement on the merits.  And this was

12    in addition to over 90 million pages of materials provided

13    by the Debtors.

14           To stress this point, Your Honor, the non-

15    consenting states fully participated in this process.  They

16    had access to these productions, they had the benefit of

17    them as they investigated and negotiated.  But don't only

18    take my word for it, Your Honor, take theirs.  On Pages 1

19    and 3 of their objection, the non-consenting states fully

20    admit that during the "standdown" afforded by the

21    preliminary injunction, they were able to "immerse

22    themselves in discovery", "confirm the Sackler's enormous

23    wealth", "and uncover even more facts demonstrating the

24    Sackler's culpability".

25           What their objection ostensibly boils down to is a

Page 46

1    nebulous claim that all of this is not enough.  But to the

2    extent that the non-consenting states are complaining that

3    these exchanges had been made pursuant to a highly-

4    negotiated and agreed court-approved protective order, they

5    should be reminded that they negotiated and signed that

6    protective order, an order that is entirely typical in

7    large, complicated negotiations.

8            And to the extent that the non-consenting states

9    are continuing to claim that trials are the only mechanism

10   for obtaining accountability and truth, that is also flatly

11   false.  We cited the court, again, who ruled on this very

12   issue in our papers.

13           Finally, I just don't understand how people keep

14   making the claims that they are.  Not only is the

15   information sharing to date tens and tens of millions of

16   pages of documents that is utterly without precedent, the

17   plan will culminate -- it will culminate -- in a publicly-

18   available repository of documents that will further advance

19   transparency and public accountability while avoiding the

20   immensely value-destructive prospect of potentially never-

21   ending litigation the tort systems have secured.

22           As the Court remembers, we said this, the Debtors

23   said it at the preliminary injunction hearing, the first one

24   18 months ago, we have reaffirmed it six times on the record

25   from the podium, it is a requirement of the DOJ settlement

Page 47

1    as the minimum and it is embodied in the plan.  The

2    endlessly recycled canard that these cases are restraining

3    disclosure and hindering transparency is utterly untrue and

4    utterly without merit.

5         Second, the non-consenting states argue that "The

6    public is harmed because extending this court's injunction

7    will continue to give the Sacklers the benefits of

8    bankruptcy without the corresponding responsibilities".  I

9    don't really know what this means, the benefits of

10   bankruptcy.  First of all, this is just totally baseless.

11   And of course this also is a recycled argument that the

12   Court ruled on.  On October 11th at the hearing transcript

13   at Page 117, Line 3 to 7, the Court expressly ruled on this

14   very point, that the preliminary injunction is not "giving

15   anyone a free pass or absolving anyone of liability".  On

16   March 18th transcript, 98, 17 to 99, 3, the Court again

17   ruled on the same argument, "This is not a free pass to the

18   related parties".  But here we are hearing it again.

19        As everyone knows, the purpose of the injunction

20   is to protect the Debtor and their stakeholders.  And these

21   Chapter 11 cases and the claims against the Sacklers and the

22   immense progress that has been made building a widely-

23   supported plan that will dedicate billions of dollars and

24   100 percent of the Debtor's assets to abating the opioid

25   crisis.

Page 48

1          Third, the non-consenting states claim that

2     continuing the injunction will harm the public because it

3     "wrongly interferes with the enforcement of state law"

4     against the Sacklers.  But again, this Court, in judgement

5     and on appeal, have already held that this interest, while

6     very important, is outweighed by the necessity of protecting

7     the organization and providing the parties with a potential

8     opportunity to work towards a value-maximizing, consensual

9     resolution to the Debtor's cases as opposed to unmitigated

10    fracas that would otherwise obtain.

11         And with this I'll close, Your Honor, because this

12    has -- this goal, this aim, this attempt at resolution has

13    never been closer or more critical than it is today.  We

14    might not get there, but we are at very long last not all

15    that many yards for the goal line, an accomplishment that

16    hundreds of people have devoted thousands and thousands of

17    hours to facilitating.  The notion that we shouldn't even be

18    allowed to try to get there, that we shouldn't even be

19    allowed to bring to this Court and appeals as needed for

20    consideration a plan that will deliver a hundred percent of

21    the Debtor's and billions of additional dollars to

22    (indiscernible), that simply cannot be countenanced.

23         We ask that our very modest 28-day extension,

24    supported by virtually all stakeholders or not objected to

25    in this case, be granted.  Unless the Court has further

Page 49

1    questions, I'll respond on rebuttal if needed.

2              THE COURT:  Okay.  I may ask some more questions

3    later, but I don't right now.  I already noted that I have

4    written statements by the Official Unsecured Creditors'

5    Committee and the Ad Hoc Committee of governmental and other

6    contingent litigation claimants in support of the motion, as

7    well as statements by the Raymond Sackler family in support

8    of the motion.

9              I could hear from those who support the injunction

10   at this point, or you all could simply reserve your

11   statements if you think it's warranted after I hear from the

12   objectors.

13             MR. UZZI:  Your Honor, it's Gerard Uzzi of

14   Milbank.  Can you hear me?

15             THE COURT:  Yes.  Fine, thanks.

16             MR. UZZI:  Yes, Your Honor.  On behalf of the

17   Raymond Sackler family, we don't have anything to add in

18   addition to our written statement, but we would like the

19   opportunity to respond to it if necessary later.

20             THE COURT:  Okay.

21             MR. ECKSTEIN:  Your Honor, good morning.  This is

22   Kenneth Eckstein of Kramer Levin on behalf of the Ad Hoc

23   Committee of Governmental Claimants.

24             THE COURT:  Right.

25             MR. ECKSTEIN:  We appreciate that Your Honor has

1   noted our submission, and we are happy to rely upon the

2   supports stated in our pleading, and we reserve the

3   opportunity following the arguments by parties opposing in

4   the event we need to supplement that.

5           THE COURT:  Okay.  Thank you.

6           MR. PREIS:  Your Honor, this is Arik Preis from

7   Akin Gump.  Can you hear me?

8           THE COURT:  Yes, I can.  Thanks.

9           MR. PREIS:  Good morning.  Again, for the record,

10  Arik Preis, Akin Gump Strauss Hauer & Feld on behalf of the

11  Official Committee of Unsecured Creditors.

12          Like Mr. Eckstein and Mr. Uzzi, we, on behalf of

13  the Official Committee, will take the same approach.

14          THE COURT:  Okay.  Thank you.  Anyone else before

15  we turn to the objectors?  Okay.

16          I said that there were two objections to the

17  motion.  I did not mention the two Tennessee counties'

18  objection, which stated that the counties were not going to

19  (indiscernible) in oral argument and assumed, in essence,

20  that I would grant the motion. So, what I was referring to

21  was the Ad Hoc Committee of Non-Consenting States and the

22  the so-called Ad Hoc Committee on Accountability. I'm happy

23  to hear from both of them and frankly if the Tennessee

24  counties change their mind, I'll get them one, too.

25  Although I will note that the state of Tennessee I believe

Page 51

1   is within Mr. Eckstein's group and is supporting the

2   extension of the injunction.

3            MR. ECKSTEIN:  That is correct, Your Honor.

4            THE COURT:  Okay.  All right.  So I don't know if

5   you've decided on an order on this, but I'm happy to hear

6   from the two other objectors.

7            MR. TROOP:  Thank you, Your Honor.  This is Andres

8   Troop for the non-consenting states from Pillsbury Winthrop

9   Shaw Pittman.  Mr. Quinn apparently flipped the coin for us

10  last night, and I get to go first.

11           THE COURT:  Okay.

12           MR. TROOP:  Can you hear me, Your Honor?

13           THE COURT:  I can hear you fine, thanks.

14           MR. TROOP:  Thank you.  Your Honor, a couple of

15  things.  I have about four to five minutes' worth of points

16  to make, and then it was my intent to rely on our

17  previously-filed papers.  I have no intention of truly

18  retreading old ground.  As Mr. Huebner has said, we've been

19  through this issue on multiple occasions.  If that's an

20  acceptable way to proceed, Your Honor, I will go ahead and

21  do that.

22           THE COURT:  Okay.

23           MR. TROOP:  Thank you, Your Honor.  So for 18

24  months, no group has worked harder trying to resolve all the

25  issues in these cases.  Despite being on the outside from

Page 52

1   day one, the non-consenting states, which represents about

2   53 percent of the United States' population, not only

3   engaged, but demonstratively shaped Phase One of the

4   mediation, achieving what many believed was impossible, a

5   state (indiscernible) political subdivision commitment to

6   use distributions for abatement of the opioid crisis and

7   related inter non-federal governmental entity allocations

8   and agreements with the representatives of the most

9   significant private creditor groups, dedicating substantial

10  portions of their recoveries to abatement as well.  This

11  effort continued throughout Phase Two.

12          The non-consenting states led the way to close the

13  gap with the NES group on its treatment under the plan and

14  has narrowed the remaining gaps with third-party payors and

15  the hospitals.  The non-consenting states also made multiple

16  proposals to the Sacklers during Phase Two.

17          No one disputes the non-consenting states' good

18  faith efforts to try to reach a resolution with the

19  Sacklers, just like no one disputes that the Sacklers are

20  worth multiples of nominal value how the resolution being

21  advanced or that the current proposal would result in

22  litigation over its, in our position, fatally flawed efforts

23  to impose compulsory releases on sovereign states

24  (indiscernible) other issues.

25          Given all this, circumstances have changed since

Page 53

1    October 2019 when, as we point out in our recent objection,

2    the preliminary injunction was (indiscernible) the parties

3    see if they could reach a consensual resolution with the

4    Sacklers.

5          The Debtors contain that ending the preliminary

6    injunction will blow up the good progress in this case.  We

7    say that's not the point, not at this point in time.  The

8    point is that attorney generals are supposed to do their

9    jobs to sue or settle police power claims.  Restraining that

10   ability further, particularly against the non-debtors,

11   interferes with the responsibly reposed in the 25 attorney

12   generals and the non-consenting state group by their

13   constituents to enforce their laws, to do their jobs.

14         And again, to be clear, the non-consenting states

15   have been instrumental in the progress made to date with

16   other public creditors, private creditors, and the Sacklers,

17   as I summarized.  All these keeping in mind the welfare of

18   their residents and the public interest.

19         All we ask is that you have confidence in our

20   demonstrably effective and constructive work to push parties

21   towards a better deal that the non-consenting states may be

22   able to accept without the preliminary injunction in place

23   so that attorney generals can freely exercise their

24   responsibilities.

25         And, Your Honor, I am confident that if the

Page 54

1    preliminary injunction stays in place, the non-consenting

2    states will yield voluntarily and continue their efforts

3    trying to reach a consensual resolution as well, albeit,

4    frankly, with much less competence in achieving an

5    acceptable result.

6          Your Honor, that's all I planned to say.  So

7    unless you have questions, as I said, I will rely on our

8    cumulative filings to date in opposition to this requested

9    extension of the preliminary injunction.  Thank you.

10         THE COURT:  Okay.  I did have a few questions.

11   First, I want to go back to a couple of points that Mr.

12   Huebner made.  Is there any dispute by the nonconsenting

13   states group that they have had access to the discovery and

14   analyses obtained by the Official Creditors Committee

15   related to the Sacklers?

16         MR. TROOP:  Your Honor, we've been provided

17   information in accordance with the protective order.  That

18   point is not whether the states have been able to have

19   access to that information; it's whether the public has.

20         THE COURT:  Right.  But again, you've said that

21   you want me to enable your clients to do their jobs and

22   that's true.  I do want them to be able to do their jobs,

23   but when one focuses on disclosure in a bankruptcy case and

24   in particular Section 1125 of the Bankruptcy Code, which

25   states that "adequate information means information of the

1    kind and in sufficient detail as far as is reasonably

2    practicable in light of the nature and history of the Debtor

3    and the condition of the Debtor's books and records" that

4    would enable a "hypothetical investor typical of holders of

5    claims or interests in the case to make an informed judgment

6    about the plan."

7              Congress goes on to state that "investor typical

8    of holders of claims or interests of the relevant class

9    means investor having a claim or interest of the relevant

10   class."  Your clients are the claimholders, right not their

11   voters.  So when one talks about them doing their job, my

12   question is, have they had sufficient information to do

13   their job?  Yes or no?

14             MR. TROOP:  Your Honor, the answer is, we've had

15   access to all of the information, and we don't support the

16   settlement.  So clearly, we have had enough information to

17   make that decision.  But I do think, Your Honor,

18   respectfully, that the premise fails to account for the

19   unique position that states and their attorney generals hold

20   even as claimholders in the case, that their position is not

21   limited in the way that a private party's claim for having

22   been unpaid for goods delivered to a Debtor applies.

23             We cite the first Diamond case in our --

24             THE COURT:  I agree.  They are --

25             MR. TROOP:  -- right, Your Honor --

Page 56

1          THE COURT:  They are the claimant and they're the

2     chosen representative of their respective states.  I just

3     continue to be baffled by the argument that, somehow, they

4     are lacking in information when it appears to me to be the

5     case that more information has been provided with respect to

6     this plan and more specifically with respect to the elements

7     of a settlement with the Sacklers than I have ever seen, and

8     I would daresay have ever been provided in any Chapter 11

9     case.

10          So to lead their constituents to believe that they

11     have been kept in the dark, seems to me to be simply a lie.

12     Why don't we move on?

13          The next question I have is really a question for

14     all parties, but I would like you to perhaps amplify on it,

15     if you can.  You stated in your brief oral argument that no

16     one disputes a statement that is in the objection as well

17     that "As has been publicly reported" -- no citation was

18     given to that, and of course, that's not evidence -- "the

19     Sacklers are worth multiples of the new settlement's nominal

20     amount."

21          I guess it's a question for everyone.  Is there,

22     in fact, consensus on that?

23          MR. UZZI:  Your Honor, Gerard Uzzi of Milbank for

24     the Raymond Sackler family.  Can you hear me?

25          THE COURT:  Yes, I can, thanks.

Page 57

1          MR. UZZI:  Your Honor, we have provided

2     extraordinary disclosures and diligence and discovery

3     relating to the wealth of the Sacklers and our views with

4     respect to how to value that wealth and we have not been

5     informed or challenged with respect to those views in any

6     material way, so I don't believe there is a dispute among

7     the parties on that issue.  I'm not sure that answers your

8     question.

9          THE COURT:  Well, I guess the question is, do you

10    agree with the statement, then?

11         MR. UZZI:  As to -- we don't disagree with the

12    statement, Your Honor.

13         THE COURT:  Okay.  Very well.  That's important to

14    know.  Thank you.  So Mr. Troop, there's --

15         MR. HUEBNER:  Your Honor --

16         THE COURT:  -- there's a footnote in the objection

17    that suggests that the plan might provide for and the Court

18    might grant a release under the plan that would extend to

19    criminal liability.  I guess this is another question,

20    perhaps, for the Debtors, but is that even in contemplation

21    by the Debtors as plan proponents?

22         MR. HUEBNER:  Your Honor, Marshall Huebner of

23    Davis Polk.  So the precise contours of the releases, as you

24    might imagine, are under very active negotiation.  This

25    Court has already opined quite clearly that it views itself

Page 58

1   as not having any authority to grant involuntary criminal

2   releases.  I think we have always so understood the law and

3   we are working on the topic and I don't yet know exactly

4   what the contours are of where we're going to land, but

5   there obviously is a combination of people who are

6   voluntarily agreeing to a settlement agreement if we get

7   there from here and others who are not.

8           But, you know, we've had this discussion already,

9   a lot of us here, and frankly, it's déjà vu all over again,

10  and you can be sure that we have and have circulated the

11  Court's quote to remind people of the Court's view on the

12  lack of propriety or jurisdiction, et cetera, of involuntary

13  third-party releases with respect to criminal claims.

14          THE COURT:  Okay.  So if there were to be any such

15  a release, it would be a consensual one, in other words, it

16  would appear to me, and not a nonconsensual one,

17  notwithstanding the possible meaning of Footnote 4 in the

18  objection.  And I will reiterate, I do not believe that a

19  bankruptcy court has any power to force any sort of

20  involuntary release of criminal liability on anyone.

21          The last question is really for Mr. Troop.  Page 8

22  of this eight-page objection states that the -- I'm sorry,

23  if the injunction as it would apply to the Sacklers were not

24  extended, during the period of the requested injunction, and

25  then it says "and afterward," the nonconsenting states will

Page 59

1    not contend that any determination in their actions against

2    non-debtors is binding on the Debtors.  What did you mean by

3    afterward?  Forever?

4              MR. TROOP:  Yes, Your Honor.  I mean, if we're

5    going to prove up liability against the Debtor, we're going

6    to have to do it separately.

7              THE COURT:  And would that apply to other parties

8    as well to those litigations?

9              MR. TROOP:  By "other parties," Your Honor, do you

10   mean co-defendants like distributors --

11             THE COURT:  Co-defendants or intervenors.

12             MR. TROOP:  I'm sorry, Your Honor, I was -- I

13   couldn't hear you.

14             THE COURT:  Sure, I'm sorry.  I talked over you.

15   Would that -- could that agreement apply to the current

16   parties to those litigations and any intervenors on the

17   plaintiffs' side?

18             MR. TROOP:  On the plaintiffs' side.  So, Your

19   Honor, I can only speak for our states, but I do believe

20   that when it is -- as it relates to our state claims, we're

21   the only plaintiffs.  So there aren't any other plaintiffs

22   who would be bound.  If someone were to intervene as a

23   plaintiff, I think they would have to be bound by the same

24   restrictions that we've agreed to vis-à-vis the Debtor.

25             If not, we would commit to come back to the Court,

Page 60

1    to you, to resolve it.  Sure.

2              THE COURT:  All right.  Is this the first that

3    people have actually thought of this issue?

4              MR. TROOP:  Your Honor, no one has raised the

5    issue of an intervening plaintiff in a state police power

6    action before, and I would -- and Your Honor, it is the

7    first, so I'm responding off the top of my head.  It strikes

8    me as likely very difficult for someone to intervene on

9    behalf of a state attorney general and satisfy the general

10   intervention provision.  That --

11             THE COURT:  Well, they wouldn't be intervening on

12   behalf of.  They would be saying that there would be clear

13   common issues of law and fact and their interests weren't

14   represented because they had other claims, et cetera.

15   Under, I'm assuming, 24 or 25 different laws of different

16   jurisdictions as far as right to intervene.

17             MR. TROOP:  Yeah, and --

18             THE COURT:  -- 24 or 25 different claims, right,

19   because you used the term police power, but not all of the

20   claims -- I mean, I believe as far as the Sacklers are

21   concerned, since they are not in any way running Purdue,

22   that these claims are all for money, right?  It's not for

23   injunctive relief.

24             MR. TROOP:  Not -- there would be some injunctive

25   relief, Your Honor, to ban them from being in this business.

Page 61

1    But yes, it's also for monetary relief.

2            THE COURT:  Right.  Okay.  All right.  All right,

3    I have read the pleading and I think your answers and

4    others' answers to my questions are helpful, so I appreciate

5    it.  I don't know if you have anything more to say on this,

6    Mr. Troop?

7            MR. TROOP:  Not at this time, Your Honor.  Thank

8    you.

9            THE COURT:  Okay, thank you.  Okay, so that leaves

10   the so-called Ad Hoc Committee on Accountability.

11           MR. QUINN:  Good morning, Your Honor.  This is

12   Michael Quinn of Eisenberg and Baum for the Ad Hoc Committee

13   on Accountability.

14           THE COURT:  Right.

15           MR. QUINN:  I'd like to briefly address how the

16   Court's decision on the preliminary injunction today will

17   affect the public interest, and I'd like to do it by making

18   three points.

19           First, accountability is part of the public

20   interest.  Accountability matters.  It matters morally,

21   legally, and even practically.  For years, the lack of

22   accountability has made the opioid crisis worse.  People

23   have died because of it.  When the Court makes its decision

24   about this injunction, the Court should consider whether it

25   is allowing bad actors to escape accountability.

Page 62

1          Second, the lessons --

2          THE COURT:  Can I -- I'm sorry, Mr. Quinn, can I

3     interrupt you?  What --

4          MR. QUINN:  Of course.

5          THE COURT:  -- do you mean by accountability?  I

6     just want to make sure I understand what you mean by that

7     term.

8          MR. QUINN:  Your Honor, I mean that the Sacklers

9     should be held to the same accountability that anybody else

10    in their position would be held.  So, but for having

11    billions of dollars, saying that if you don't hold up this

12    injunction, they'll take away their promise of $4.75

13    billion.  That's what I mean by accountability, that they

14    would go through the same legal process that any one of us

15    would have to go through --

16         THE COURT:  Okay.

17         MR. QUINN:  -- on their liability.

18         THE COURT:  That's helpful.  So I mean, in fact,

19    lifting the injunction -- and I'm assuming you are seeking

20    that it be lifted so that any individual could sue the

21    Sacklers -- would result in a lawsuit, right?  That's the

22    consequence of lifting the injunction, a lawsuit.

23         MR. QUINN:  There's two consequences, Your Honor.

24    One -- well, there's many consequences.  I don't want to put

25    a number on it.  One, there may be lawsuits.  Two, Richard

Page 63

1    Sackler's side of the family and Mortimer Sackler's side of

2    the family would declare bankruptcy.  Three --

3              THE COURT:  Well, why would that be the case if

4    there were no judgments?  Don't you have a lawsuit first and

5    a judgment before you declare bankruptcy?  Not always, but

6    wouldn't that be the logical result?

7              MR. QUINN:  I've seen it done both ways, Your

8    Honor.  In this case, it would appear to me that Purdue

9    filed for bankruptcy prior to a judgment in Ohio.  I've also

10   seen it where after a judgment, individuals or organizations

11   file bankruptcy then.

12             THE COURT:  Okay.  I interrupted you.  You were --

13   so those are two consequences of lifting the injunction.

14   Are there any others?

15             MR. QUINN:  I could imagine other consequences.

16   If the Sacklers, for example, pulled out of this case,

17   there's a possibility that the Department of Justice would

18   go back and evaluate their settlement with Purdue and with -

19   - their civil settlement with the Sacklers.

20             THE COURT:  Right.  That wouldn't put money in the

21   pockets of the people that would be bringing lawsuits, would

22   it?

23             MR. QUINN:  Directly or indirectly?  Possibly not

24   directly, however, the federal government represents the

25   people and there might be a way that indirectly it does put

Page 64

1    money in the pockets of the people or provide them with

2    help.  I can think of even a fourth consequence of revoking

3    -- of not enforcing this injunction.  I could imagine the

4    Sacklers willingly just give the money to the states right

5    now.  I don't think there needs to be a bargain for exchange

6    in the interests of helping the general public abate the

7    opioid crisis.

8              I don't think there needs to be an exchange for

9    releases.  If their intention is to actually help this

10   country abate the opioid crisis, there are many families

11   like the Sacklers who donate substantial amount of money to

12   worthy causes.  So I could see them just doing that.

13             THE COURT:  Well, they could do that now, right?

14             MR. QUINN:  Yeah.

15             THE COURT:  Okay.

16             MR. QUINN:  But when they say --

17             THE COURT:  So I'm focusing on the --

18             MR. QUINN:  -- that they're going to take away --

19             THE COURT:  -- and the argument about

20   accountability, and it does seem to me, one way or another,

21   the difference is the ability to bring a lawsuit, whether

22   it's existing claimants in this case who would bring a

23   lawsuit against the Sacklers or the United States which also

24   is a claimant in this case, it's -- the whole point of the

25   injunction is to preliminarily enjoin lawsuits to see if

Page 65

1    claims against the Sacklers can be settled.

2            Now, if the lawsuits are brought, one would have

3    that same dynamic, right?  Most lawsuits involve at least

4    some analysis of a settlement and ability to pay and

5    everything else.  And you are familiar, right, with the TMT

6    Trailer Ferry and Iridium standards for evaluating a

7    settlement?

8            MR. QUINN:  They don't come to mind, Your Honor,

9    but I've been thinking about a lot of things recently.

10           THE COURT:  Okay --

11           MR. QUINN:  I do believe --

12           THE COURT:  -- the controlling factors laid out by

13   the Supreme Court in the TMT Trailer Ferry case in 1968, 390

14   U.S. 414, 424, and as cited by the Second Circuit, in re:

15   Iridium Operating, LLC, 478 F.3d. 452 (Second Circuit 2007).

16   Those are the factors and they're astute and well considered

17   and well recognized in evaluating whether a settlement makes

18   sense and should be approved by a Court on notice to all

19   parties in interest.

20           Those are also the factors that state and federal

21   courts consider as well in deciding whether to approve a

22   settlement of litigation.  They include the legal risks on

23   both sides, i.e., the merits of the claims and the merits of

24   the defenses.  They include the competence of counsel on

25   both sides and the views of the parties to the case.  In a

Page 66

1      bankruptcy case, that includes the creditors who are to get

2      notice of the settlement and can weigh in on it.

3              That includes the costs and delay of further

4      litigation and it includes whether the settlement

5      consideration is adequate in light of all of those factors,

6      including the nature of the release to be obtained and

7      whether it is overly broad.  Have you given any thought to

8      whether any of those factors would apply in any of the

9      litigations that you would want to have proceed?

10             MR. QUINN:  Well, Your Honor, I don't think this

11     is a situation -- I don't consider this to be a situation

12     where there should be zero trial.  So while I understand the

13     balancing of the Iridium factors, I also understand that

14     from coast to coast, a lot of people have been harmed.

15             THE COURT:  So would you handle that trial?

16             MR. QUINN:  Not --

17             THE COURT:  Or would you want someone else to do

18     it for your client?

19             MR. QUINN:  Well, I'd like to consult with -- you

20     know, I'd like to consult with my partners and -- I wouldn't

21     mind handling that trial, Your Honor.

22             THE COURT:  You recognize that you'd actually have

23     to introduce evidence, right?

24             MR. QUINN:  Yes.

25             THE COURT:  Not statements from articles and ad

Page 67

1    hoc quotes.

2              MR. QUINN:  Yes, Your Honor.

3              THE COURT:  You'd actually have to show causation

4    --

5              MR. QUINN:  Yes, Your Honor.

6              THE COURT:  -- proximate cause, right?

7              MR. QUINN:  Yes.  Yes, Your Honor.

8              THE COURT:  Okay.  All right.

9              MR. QUINN:  Are you recommending --

10             THE COURT:  When faced with that burden, you

11   really think that it would be in the client's interest not

12   even to consider a settlement in light of those well-

13   articulated and well-understood standards?

14             MR. QUINN:  A total settlement for all parties or

15   a settlement for my client?

16             THE COURT:  Well, I'm assuming that the -- well,

17   I'll just say for -- you can only deal with your own

18   clients.  That's where your duty lies as a lawyer.

19             MR. QUINN:  Yes.  I would love the opportunity to

20   bring a trial, Your Honor, for my client.

21             THE COURT:  No, my question was different.

22             MR. QUINN:  Okay.

23             THE COURT:  Do you believe that --

24             MR. QUINN:  There's a likelihood of success?

25             THE COURT:  -- your duty as a lawyer to those

Page 68

1   clients would be to tell them that under no circumstances

2   should you consider any settlement, just take whatever comes

3   as far as a determination of liability or not?

4           MR. QUINN:  Well, Your Honor, I think in the world

5   of possibility for a settlement, there may be a settlement

6   my clients could conceivably be interested in and I wouldn't

7   mind talking to the other parties about that.  I really

8   haven't had an opportunity to.  However, I think my clients

9   would fully support after I give them the risk of bringing a

10  trial.  I think my clients would fully support we conduct a

11  trial.

12          THE COURT:  So that analysis hasn't yet been done

13  on behalf of your committee?

14          MR. QUINN:  I think not, not specifically, but

15  yeah, based on my client -- what my clients have told me,

16  based on our conversation, I think they would be very

17  interested in a trial.

18          THE COURT:  Well, since you didn't know the

19  standards for a settlement, I'm assuming that's the case.

20  You haven't been able to brief them on it.

21          MR. QUINN:  Well, I didn't know at the moment,

22  Your Honor.

23          THE COURT:  Okay.

24          MR. QUINN:  Like I said, there's a lot on my mind.

25  But however, that does -- thank you for discussing them with

1    me.  It does remind me of the Iridium factors.

2          THE COURT:  Right.  Okay.  I interrupted you.  You

3    can keep going.

4          MR. QUINN:  Your Honor, are you suggesting that we

5    could possibly carve out sort of a trial to look at the

6    liability?

7          THE COURT:  No, I am not.

8          MR. QUINN:  Okay.

9          THE COURT:  What I am trying to probe is how

10   serious this objection really is and how focused on the

11   facts it really is.  The facts that we're aware of, it's

12   very serious.  Of course, we're not privy to all of the

13   information that other parties have received, but yeah,

14   we're pretty serious.  We worked tirelessly on this case.

15         THE COURT:  Okay.

16         MR. QUINN:  Your Honor, if I can continue, I'd

17   also like to discuss the lessons taught by this case and how

18   they're important.  When we allow powerful interests to buy

19   their way out of trouble, we teach the powerful that they

20   can get away with it.  At the same time, we also teach a

21   lesson to all the victims, that the powerful can take

22   everything away from you, that no matter now many letters

23   you write, how many laws you pass, no matter how many

24   funerals you attend, the powerful can still get away with

25   it.  This is the wrong lesson and it harms the public

1    interest.

2          Third, Your Honor, Purdue sometimes says I only

3    represent five people.  I'm not here to apologize for that.

4    My clients are speaking up for real values, for values that

5    are true, and values that matter a lot.  I hear the

6    executives and the bankers and the bankruptcy lawyers

7    talking about maximizing value in this case, the file briefs

8    that talk about millions of this and billions of that.

9          But the people who have been hurt in this crisis,

10   the people who won't be able to say goodnight to their kids

11   tonight because their kids were killed by Purdue's drugs,

12   these are the people paying attention to the values that

13   matter the most.  Accountability matters to them, Your

14   Honor.  That's all I have.  Thank you.

15          THE COURT:  Well, what bankers are you talking

16   about?  This is one of the rare mega-Chapter 11 cases that

17   as far as I can see has no bank debt, no financial debt.

18          MR. QUINN:  So I mean the financial analysts in

19   this case, Your Honor.  I think they're called AlixPartners

20   --

21          THE COURT:  Right, the ones who were trying to

22   figure out how much money there is to distribute for

23   abatement, right?

24          MR. QUINN:  Yeah.  I've seen two reports by them,

25   Your Honor.

Page 71

```
 1                THE COURT:  Right.

 2                MR. QUINN:  And they discuss --

 3                THE COURT:  So really, when you refer to bankers,

 4      which is a nice sound bite, what you're referring to are the

 5      professionals who are looking to see what money is available

 6      to go to abatement, correct?

 7                MR. QUINN:  Well, they're also looking to see how

 8      -- what money was transferred to the Sacklers.  I think

 9      they've evaluated a number of things, but --

10                THE COURT:  Right.

11                MR. QUINN:  -- ultimately --

12                THE COURT:  Right.  If you were to litigate this

13      case, you wouldn't do the same thing or would you just

14      assume that they were -- they got money and try to convince

15      a court that that would be enough, that you wouldn't

16      actually need any proof by way of tracing?

17                MR. QUINN:  Well, I would certainly look into the

18      transfers, Your Honor.

19                THE COURT:  Right, which has already been done and

20      which you're apparently, I guess, criticizing.  I'm not

21      sure.  It doesn't really make a whole lot of sense to me.

22      Let me go to another --

23                MR. QUINN:  Well --

24                THE COURT:  -- point.

25                MR. QUINN:  -- I'm about --
```

Page 72

```
 1                THE COURT:  As far as the people who have been

 2      hurt, obviously, many people, in fact all of the claimants

 3      in this case who've asserted a claim have asserted a claim

 4      because they were hurt.  I understand that completely.  How

 5      does distributing all of the money to abatement somehow not

 6      address that hurt, except with respect to the negotiated

 7      hundreds of millions of dollars of payment to personal

 8      injury claimants?

 9                MR. QUINN:  All of the money, Your Honor?  I --

10                THE COURT:  All of Purdue.  All of Purdue.

11                MR. QUINN:  All of Purdue.

12                THE COURT:  Right.

13                MR. QUINN:  Well, I think that's a start, Your

14      Honor, but I understand that there's a negotiation over the

15      third-party non-Debtor's contribution in this case as well.

16                THE COURT:  Right.

17                MR. QUINN:  And, you know, I think that's a

18      sticking point as far as -- you know, and I addressed it in

19      my brief.  What does all of the money mean?  We understand

20      from report, and you're right, they come from news sources

21      because that -- we sort of work on the edges of information

22      we can compile -- that revenues of Purdue were significant

23      and that that money went to the Sacklers.

24                We understand from the Alix -- I believe from one

25      AlixPartners report that the Sacklers transferred ten and
```

Page 73

1    change billion dollars over the course of the OxyContin

2    business, and we also understand that they held $5 billion

3    of that for tax obligations.  So that leaves about, you

4    know, an additional amount -- I don't know whether that was

5    actually paid or it was just held for tax obligations, but

6    from the information that we can see, we believe that there

7    is more money that could go towards abatement.

8            THE COURT:  That, I think, is in all likelihood

9    true.  Have you evaluated any of the defenses that the

10   Sacklers might have to liability?

11           MR. QUINN:  Yes.

12           THE COURT:  You have.

13           MR. QUINN:  Well, we've already seen -- we've seen

14   one of their defenses is that they say that their

15   consultants and professionals -- which is McKinsey and their

16   attorneys -- guided the board on business decisions, so

17   that's a good defense that they've brought up.  We've also

18   seen -- I've heard of defenses regarding causation.  How do

19   you prove that the Sacklers were responsible for the

20   flooding of OxyContin onto the streets across America?  And

21   that's something I would willingly take on in an article in

22   a court or in a state court.

23           And I understand there are pretty good defenses.

24   There's also defenses regarding statute of limitations, the

25   idea of fraudulent wire transfers could've possibly -- we

Page 74

1    could've already blown through the statute of limitations.

2    Some of these transfers happened in 2012, '13, '14, '15, and

3    I think the statute of limitation is three years, so that

4    would be a defense we would have to evaluate.

5             THE COURT:  Okay.

6             MR. QUINN:  And I'm sure there are a host of other

7    defenses.  I haven't started writing a complaint, Your

8    Honor, because of this injunction.

9             THE COURT:  Right.  Okay.  That's helpful to me.

10   Anything else?

11            MR. QUINN:  No, just thank you for the time, Your

12   Honor.

13            THE COURT:  Okay, thank you.  All right.  Does

14   anyone else have anything to say on this motion?

15            MR. HUEBNER:  Your Honor, it's Marshall Huebner.

16   If there are no others, I would like to take just about two

17   minutes.  I will be very brief and surgical in addressing a

18   couple of the Court's questions, because obviously, we are

19   on some level, having a prequel about plan and related

20   issues and there are just a couple things that came up in

21   the colloquies with others that I think are probably worth,

22   as I said, just a couple minutes from the Debtors.

23            THE COURT:  Okay.

24            MR. HUEBNER:  So let me first begin with Mr.

25   Troop.  So first, let me sort of sandwich him on both sides.

Page 75

1    I think in my opening remarks, I expressed appreciation and

2    noted the active involvement and important, intense

3    participation of the non-consenting states in phase one with

4    respect to the intercreditor issues.  I don't know that any

5    one person should say that they worked harder than anyone

6    else in this case.  I think a lot of people sort of would

7    wear that crown of thorns, at least potentially, but I

8    absolutely agree with it.  I think I said it up front and

9    I'd say it again and give them thanks for constructive

10   engagement on the variety of issues in the case.

11          I also, obviously, don't disagree that they are

12   sovereign states, but there is - you know, that is relevant

13   but it's not the answer to everything, as this Court knows,

14   and we obviously will stand ready to litigate it if we have

15   to.  Once someone files a proof of claim and participates in

16   a bankruptcy case, the question of how sovereign immunity

17   works and how the 11th Amendment works and what happens when

18   you're seeking money damages, whether or not under police

19   power, is a question on which there's a bunch of law, and

20   frankly, we're very ready and willing to litigate it if we

21   have to.

22          His articulation, of course, proves way too much

23   because if you are to take the view that no sovereign state

24   -- or maybe sovereign county or sovereign municipality, but

25   let's just go with states for now -- could ever be bound

1    against its will to a plan, you can imagine a situation

2    where 614,999 creditors, including 49 of the 50 states and

3    the Department of Justice and every single stakeholder group

4    all want to do Plan X but according to Mr. Troop, if one

5    single state says, "Unless you pay me five times per citizen

6    what everyone else is getting, I can block this plan for all

7    time, no matter how many years you spend in Chapter 11 and

8    how many hundreds of millions of dollars get burned on

9    professional fees, you're not going anywhere," that can't be

10   right and it isn't right and it's not the law.

11            Second of all, I think Your Honor handled and

12   questioned and probed on the transparency point.  I do want

13   to add only one thought to it.  We are in the middle of a

14   contested bankruptcy case.  Tens of million documents were

15   produced in discovery.  The notion that, again, we see

16   repeated to the media again and again that somehow because

17   these documents are not already public, somehow things are

18   being hidden really does a disservice to everyone.  It's not

19   fair.  It's not true.

20            There's no litigation where midstream, as you get

21   documents in discovery, you're allowed to put them out in

22   the public record, let alone where you yourself negotiated

23   and signed and a federal court entered a protective order

24   saying exactly how the document could and could not be used.

25            Next, with respect to the Sackler wealth, and this

Page 77

1    is an important point.  This is not a case where a single

2    shareholder got distributions and controlled a company and

3    now has a net worth, very substantially in excess of, let's

4    just say, the distributions.  If it was, we wouldn't be

5    settling or working towards a settlement at the numbers at

6    which we're currently working.

7           If there was one shareholder who dominated this

8    company or any company from the beginning and they got --

9    let's just use the numbers -- $10.8 billion and we believe

10   that the company was insolvent the entire time, and they

11   didn't have good defenses, and there was no statute of

12   limitations, and a million other things, we wouldn't be

13   settling for X percent of that single individual's net

14   worth.

15          But the facts here are actually vastly more

16   complicated because, in fact, we all love to say the

17   Sacklers, but of course, the Sacklers split and then split

18   and then split again.  And part of the analysis that has

19   been done with extraordinary, painstaking care over, by now,

20   several years, is to weigh and assess their recoverability

21   against each individual Sackler pod.

22          Mr. Uzzi who spoke before speaks for one side of

23   the family, the Raymond Sackler side, and Raymond Sackler

24   was married once and had two children, Richard and Jonathan

25   who live in the United States and most of their assets are

1    in United States, and I'll leave it at that.

2            Mortimer Sackler was married three times and I

3    believe ceased to be a U.S. citizen many decades ago and

4    there are children and grandchildren from each of those

5    three marriages, each of whom got separate, fractionated

6    distributions, many of which live overseas and have never

7    been on the board, and that is one of thousands of factors

8    that under the TMT Trailer factors that this Court laid out,

9    the Debtors and the UCC and the MSG and the AHC who actually

10   know quite a lot about all of these things considered and

11   weighed and used and weaponized in their negotiations with

12   the Sacklers.

13           And so while it is true -- and I can't say more

14   than this because I actually would be violating of the Court

15   order in the UCC-Debtor-AHC Tripartite Stipulation No. 2

16   about the trade was, we got unbelievable amounts of

17   information from them about their net worth to an

18   extraordinarily granular level and we're just not free to

19   make it public.

20           We weighed and assessed the recoverability against

21   each pod that got transfers.  It's not one person who got

22   $10 billion and still has it.  It's something like ten

23   family pods all over the world, many of which were never on

24   the board and were never officers of the company and got

25   their money a while ago.

1           So I do want the Court and all parties to

2    understand that you can like the settlement or not -- and I

3    think we all would like to get more from the Sacklers to

4    give to abatement.

5           There's no question about that, but the notion

6    that sort of cavalierly four major creditor groups, all of

7    whom are fiduciaries for half the country or more cavalierly

8    and stupidly did a bad settlement with someone who was worth

9    multiples of what's being paid, it's just not true and it's

10   just misleading and it's misleading to the public and it

11   does no service to what actually is going on here, but the

12   parties who are at the core of it actually know.

13          Finally, with respect to Mr. Troop, two quick

14   things.  Number one, I appreciate, because I was going to do

15   it but the Court paused and asked Mr. Troop about, again,

16   completely overbroad claim that these are all police power

17   claims.  This is something that we looked at very

18   intensively, especially with the original litigation.  At

19   most, we'll just say it's a blend and even within a given

20   complaint by a given state, some of which, as Your Honor

21   noted/remembered, have up to something like 29 counts just

22   from individual causes of action and individual complaints.

23          Some are probably police power.  Some are

24   definitely police power.  Some are arguably police power.

25   Many are unquestionably not police power.  But the important

Page 80

1   thing for the American people to understand is that Purdue

2   stopped detailing in 2018.  We move for a voluntary self-

3   injunction on the face -- the opening day of this case.

4   It's about 15 single-spaced pages long.  It was negotiated

5   for three weeks with all the dissenting states and the

6   consenting states and the UCC and everybody signed off on

7   it.

8          Our original monitor who's filed report after

9   report is now once again the Secretary of Agriculture of the

10  United States of America and our new monitor suggested yet

11  again by the creditors -- I actually think probably even the

12  dissenting states -- is a former attorney general and state

13  governor.  This is not about conduct anymore.  It's about

14  past conduct and money.

15         The second thing, with apologies to Mr. Troop, is

16  that the Debtors are, in fact, no longer willing to allow

17  the dissenting states to "voluntarily comply."  We have been

18  extraordinarily flexible and courteous as the non-consenting

19  states have litigated against us again and again on this and

20  other issues and lost every time, and then after they lose,

21  they come and say, we lost the injunction hearing, but we

22  would like to voluntarily comply as opposed to the Court

23  just entering an order enjoining us, which is what we just

24  finished litigating and did not prevail.

25         For a variety of reasons, including the approach

1    of what sounds like it's to be a confirmation hearing on

2    related and analogous issues, we have moved for an extension

3    of an injunction and an injunction under applicable law is,

4    we believe, what needs to issue against the objecting

5    parties.

6            With respect to Mr. Quinn, again, just because I

7    think there was a little bit of inaccuracy, and I apologize

8    about the DOJ situation.  Let me just explain to the Court,

9    and I guess for the record, the facts as I understand them.

10    The DOJ civil settlement with the Sacklers, I believe, is

11    closed.  I don't believe it was conditioned or tied to the

12    Sacklers reaching an agreement on a plan.

13            As far as I understand it, the Sacklers had paid

14    the civil settlement amount to the DOJ and that is behind

15    us.  Equally importantly, no Sackler, and in fact, no

16    individual received criminal releases from the DOJ.  No

17    party received criminal releases, no individual person,

18    certainly no shareholder.  Whether or not this plan goes

19    forward or not when the Sacklers paid this amount or some

20    other amount to the estate, I believe the DOJ will do

21    whatever it believes it needs to do, as did Department of

22    Justice of United States of America with respect to that

23    issue.

24            But what I do know is that the DOJ settlement with

25    Purdue is an extraordinary settlement for the American

Page 82

1    people, to which both Mr. Quinn and the dissenting states

2    objected and were overruled.  We don't need to re-try a

3    seven-hour hearing that was extremely involved, but suffice

4    it to say that at its face, in one of the most extraordinary

5    pro-abatement, protect the American people actions I have

6    ever seen, the DOJ has agreed to take almost nothing for

7    itself despite having super senior forfeiture, off the top,

8    non-dischargeable claims, as long as Purdue's assets are

9    deployed for the public good and at least $1.775 billion

10   goes to states and local governments exclusively for

11   abatement.

12        And the DOJ signed off with the language in the

13   disclosure statement confirming that those conditions were

14   met and that they expected the credit will be available to

15   the American people.  So as opposed to $1.775 billion going

16   into the general U.S. Treasury where under the Miscellaneous

17   Receipts Act it cannot be earmarked for abatement, they're

18   letting it flow through the plan off to the National Opioid

19   Abatement Trust so that every one of those almost $2 billion

20   can be used to save American lives.

21        So Your Honor, I'll stop there, I think.  I made

22   that moderately lengthy opening oral argument.  I think our

23   opening papers were quite complete.  I believe we did what

24   we had to in our reply papers and we ask that this sixth

25   extension of the objection which again, I remind everyone,

1    is only 28 days long and if we are able to get to a deal

2    that is fully and appropriately documented and an agreed

3    plan and disclosure statement by April 21st, we hope that

4    it'll be a day of incredible positive import for the case.

5              But if that fails, as I said at the outset, we

6    will be moving for a very different injunction with respect

7    to the Sacklers.  It's only about maximizing the value of

8    the estate and it's never, ever, ever been about protecting

9    the Sacklers.  With that, I have nothing further.

10             THE COURT:  Okay.  Anyone else?

11             MR. TROOP:  Your Honor -- Your Honor, it's Andrew

12   -- I'm sorry.  Go ahead.

13             THE COURT:  go ahead.

14             MR. TROOP:  Mr. Preis, I think you wanted to say

15   something.  Go ahead.

16             MR. PREIS:  No.  Your Honor, this is Arik Preis

17   from Akin Gump on behalf of the Official Creditors

18   Committee.  We had said that we would speak after all the

19   objectors had spoken.  I have maybe two minutes, but I --

20   I'll speak whenever you would like, or if you're cutting it

21   off, I also -- I understand.

22             THE COURT:  No, you can go ahead now.  That's

23   fine.

24             MR. PREIS:  Okay.  For the record again, Arik

25   Preis from Akin Gump Strauss Hauer and Feld on behalf of the

Page 84

1    Official Creditors Committee.  As I said, I will be very

2    brief.  The Debtors have made a very compelling case for why

3    the facts in these cases meet the standards for extending

4    the preliminary injunction until April 21.  For our part, we

5    want to be very pointed.

6              We view the filing of the plan as an important

7    first step after eighteen very long months of the case, as

8    Mr. Huebner pointed out.  The plan aggregates negotiations

9    and discussions among 14 very disparate groups and best as

10   the Debtors could, on March 15th.

11             Moreover, the plan, as it is currently drafted,

12   cannot go forward without the value from the shareholder

13   settlement.  Therefore, quite plainly, the estate needs the

14   injunction to continue to allow for negotiations and

15   discussion to continue to see if a final settlement can be

16   reached.

17             Indeed, it kind of goes without saying that

18   terminating the injunction now to allow the states to

19   recommence their litigation against the Sacklers would

20   destroy 18 months of progress in these cases and would put

21   us back to where we were pre-petition.  We made an argument

22   about this in October of 2019.  Those same concepts apply

23   now, tenfold as Mr. Huebner pointed out, and that would be,

24   to put it lightly, suboptimal.

25             That all being said, and as we noted in our

Page 85

1    joinder and the disclosure statement -- and in the

2    disclosure statement, the plan as drafted is still not in a

3    form that the Creditors Committee can support.  First, while

4    we obviously support the primary economic terms of the

5    agreement in principle with the shareholders, for reasons

6    that ultimately we will make clear in a filing if we

7    ultimately do get (sound drops), the shareholder settlement

8    still has many open issues that require a lot of

9    negotiation.

10           Second, the plan itself has numerous items still

11   left to be negotiated among various parties, including items

12   that have been open for more than half the year.  We are

13   encouraged by the discussions in phase one and phase two,

14   but all parties really need to focus in the next few weeks

15   to reach resolution on these issues and all parties,

16   including the non-consenting states, we would ask, be

17   willing to compromise for the good of the case, and frankly,

18   the good of the American public.

19           I believe Your Honor put it well, back in late

20   July, when you told everyone -- this was a month before

21   phase one was over.  You told everyone, we have one month

22   left to get to resolution.  And you said something like,

23   everyone should put their best foot forward.  We would

24   encourage the same kind of directive here.

25           But getting back to the instant motion, in light

Page 86

1     of the current facts and circumstances of the case,

2     extending the preliminary injunction until April 21 to allow

3     for negotiations and discussions to continue is in the best

4     interest of all creditors.  Thank you.

5              THE COURT:  Okay, thanks.

6              MR. ECKSTEIN:  Your Honor, this is Kenneth

7     Eckstein, if I may, and I know Your Honor has shown a lot of

8     patience, but I would appreciate if I could also just add a

9     brief --

10             THE COURT:  Sure.

11             MR. ECKSTEIN:  -- comment with respect to this

12    motion.

13             THE COURT:  Go ahead.

14             MR. ECKSTEIN:  Thank you very much, Your Honor.

15    Kenneth Eckstein, of Kramer Levin, on behalf of the Ad Hoc

16    Committee of (sound drops).

17             Your Honor, this is an important stage in the case

18    and consistent with the views expressed by Mr. Huebner and

19    by Mr. Preis, I also want to reiterate that, number one, the

20    Ad Hoc Committee supports the short extension of the

21    preliminary injunction and concurs with the views expressed

22    by Mr. Huebner, by Mr. Preis and others, that significant

23    progress has been made in this case, and that the case will

24    clearly benefit, in our view, from an additional amount of

25    time to permit all parties to resolve significant open

Page 87

1    issues that remain and need to be closed in order for there

2    to in fact be a plan and disclosure statement that is ready

3    for this Court to consider.

4           We think it's important for the Court to

5    appreciate that while there has been significant progress,

6    there does remain significant work that needs to be done

7    both in order to arrive at an acceptable resolution with the

8    Sacklers over a settlement agreement, and the Court guidance

9    today and over the last several months will be very useful

10   in hopefully reaching that resolution.

11          And in addition, as Mr. Preis indicated, there are

12   still open issues with respect to the plan.  And all of the

13   parties hopefully will be able to bring those issues to a

14   successful conclusion over the next several weeks, and we

15   look forward to continuing to work, as Mr. Huebner

16   indicated, virtually seven days a week over the next couple

17   of weeks in order to permit us to get to a disclosure

18   statement hearing on April 21st.

19          So we do support the injunction to extend it for

20   several weeks to allow this process to include.  But we

21   didn't want to leave today's hearing without making it very

22   clear that there is still work to be done.  And we believe

23   that all parties need to be very focused in order to

24   hopefully achieve the goals that we are all striving for in

25   terms of putting forward and effective and successful plan

Page 88

1    of reorganization in this case.

2              Thank you, Your Honor.

3              THE COURT:  Okay.  Thanks.  Mr. Troop, I think you

4    were going to say something then?

5              MR. TROOP:  Sorry, Your Honor.  I muted myself out

6    of caution and only unmuted 1.  Yes, Your Honor.  Andrew

7    Troop on behalf of the non-consenting states.

8              First, I'm sure that Mr. Huebner was caught up in

9    his exuberance, but we never said we worked harder than

10   anyone else, but we worked as hard as anyone else.

11             Secondly, similarly in his exuberance, I think

12   that he conflates two issues.  Our issues have never been

13   whether we can be bound to a plan, or even to a settlement

14   of estate claims against the Sacklers.  The issue is whether

15   we can be bound to a plant that imposes non-consensual

16   releases of state direct claims.  That's a totally different

17   issue, Your Honor, a legally totally different issue.

18             And, Your Honor, to my knowledge, not one that has

19   been applied by any court in the context of police power

20   actions by state sovereigns.  But we'll litigate that if we

21   have to.

22             Third, Your Honor, I was thinking about Mr.

23   Huebner's answer to your question about criminal releases,

24   and it struck me that there's only one inference to draw

25   from that explanation.  And that is that someone must still

Page 89

1    be asking for a criminal release.  Otherwise, the answer

2    would have been no.  From his perspective, no, there will be

3    no criminal releases.

4              Finally, Your Honor --

5              THE COURT:  Well, again, I guess to me this is

6    largely a red herring.  One can ask and one can give, but

7    one can't be imposed.  And the implication of your pleading,

8    and perhaps what your clients have been telling their

9    constituents and others, is that somehow I would impose a

10   criminal release.  And that's just not true.  I wouldn't.

11             MR. TROOP:  Understood, Your Honor.  But let me be

12   more -- let me be a little more surgical about it then,

13   which is you may not impose it, but if the Sackler

14   contribution is contingent on getting a criminal release,

15   then we're not getting out of dates.

16             THE COURT:  I understand your point.  That's a

17   separate point.

18             MR. TROOP:  Okay.  But -- and Your Honor, I'm not

19   --

20             THE COURT:  But I think being clear on these

21   issues is important.

22             MR. TROOP:  Thank you, Your Honor.  I'm sorry.  I

23   thought I was being clear, but obviously --

24             THE COURT:  Well, now you are, where I thought the

25   pleading was not.

1          MR. TROOP:  No, I apologize.  Well, but Your

2     Honor, it's often like Mr. Huebner, I'm bound by

3     confidentiality in connection with what we learned during

4     the course of the mediation, and I neither want to say too

5     much nor too little.  So I have to draw my inference from

6     what Mr. (indiscernible) and Mr. Huebner said today.

7          Finally, Your Honor, we find it -- I find it

8     distressing that the Debtors choose, if your inclination is

9     to extend the injunction, not to extend the possibility for

10    voluntary compliance.  If the goal here is to try our best,

11    we said that we would continue to do so, and to do so

12    without having to deal with additional litigation expense

13    dealing with --

14          THE COURT:  But I -- you know --

15          MR. TROOP:  But that's his call --

16          THE COURT:  I'm glad you raised that point.  I

17    tend to agree with you.  Courts always rule, or can always

18    rule in the alternative, and I don't see why, given the

19    representation that you made, that your clients would still

20    work with the parties on a plan and be open to further

21    negotiations, that we shouldn't continue as we have with a

22    ruling in the alternative.

23          MR. TROOP:  Thank you, Your Honor.  That's all I

24    had to add.

25          THE COURT:  Okay.  All right.  I have before me

Page 91

1    the Debtors' motion for a further extension of the

2    preliminary injunction in this adversary proceeding to be

3    conterminous with their scheduled hearing on approval of a

4    disclosure statement under Section 1125 of the Bankruptcy

5    Code, related to a plan that was filed -- that is a plan of

6    reorganization that was filed on March 15th of this year.

7    In essence, it would be a 28-day continuation or extension

8    of the preliminary injunction already in effect in this

9    case.

10          Obviously, I'm not writing on a blank slate in

11   this case.  There have been extensive hearings and rulings

12   by me, and in one case, or in one instance, by Chief Judge

13   McMahon, related to prior requests for the imposition and

14   extension of this preliminary injunction.

15          The standard is, I believe, clear and not really

16   in dispute by the parties.  It is an injunction specifically

17   under Section 105(a) of the Bankruptcy Code enjoining acts

18   against third parties, as well as -- although this is not a

19   disputed aspect of the request -- an injunction of the

20   exercise of police power against the Debtors, in furtherance

21   of Section 1129, ultimately, of the Bankruptcy Code, i.e.

22   the Debtors' ability to reorganize.

23          The case law is clear that in this context,

24   Section 105(a) is to be "construed liberally to enjoin suits

25   that might impede the reorganization process."  Lautenberg

1   Foundation v. Picard, In Re: Bernard L. Madoff Investment

2   Securities LLC, 512 F. App'x 18 (2d Cir. 2013).  See also

3   McArthur Company v. Johns Manville Corp., 827 F.2d 89, 92

4   (2d Cir. 1988).  That literal construction reflects "the

5   underlying principle of preserving the debtor's estate for

6   the creditors and funneling claims to one proceeding in the

7   Bankruptcy Court."  Id. at p. 94.

8           Circuit also held in SEC v. Drexel Burnham Lambert

9   Group, Inc., In Re: Drexel Burnham Lambert Group, Inc., 560

10  F.2d, 285, 293 (2d Cir. 1992) that it has held that Section

11  105(a) is properly used to enjoin creditors' lawsuits

12  against third parties where the injunction plays an

13  important part in the debtor's reorganization plan.  See

14  also Queenie Ltd. v. Nygard International, 321 F.3d, 282,

15  287 (2d Cir. 2003) Sotomayor, J.

16          It's not (indiscernible) in the necessary

17  facilitation of a Chapter 11 plan that underlies the

18  application of the four factors the courts consider when

19  they impose an injunction, and in this context, the

20  bankruptcy context.

21          They are, 1, whether there is a likelihood of a

22  successful reorganization; 2, whether there is an imminent

23  irreparable harm to the estate in the absence of an

24  injunction; 3, whether the balance of harms tips in favor of

25  the moving party; and 4, whether the public interest weighed

1   in favor of an injunction.  See In Re: Purdue Pharm. --

2   that's P-H-A-R-M-period -- 619 B.R. 38, 59 (S.D.N.Y. 2020)

3   and In Re: Lyondell Chemical Company, 402 B.R. 571, 587-589

4   (Bankr. S.D.N.Y. 2009).

5           The Debtors clearly are more down the road to

6   obtaining confirmation of the Chapter 11 plan in this case,

7   and they were when those decisions were entered.  As noted

8   by Chief Judgment McMahon in the Purdue Pharma case that I

9   previously cited, so long as the prospects of reorganization

10  remain viable, and if the Debtors are essentially more

11  likely to reorganize with the injunction in place, that

12  injunction should be granted.  619 B.R. 59.

13          Unlike the facts that applied to that appeal, not

14  only are the prospects of reorganization remaining viable,

15  but it appears at this point that the Debtors have forged,

16  with very hard work by multiple constituents, including one

17  of the objectors here, the Ad Hoc Committee of Non-

18  Consenting States, substantial consensus in support of a

19  Chapter 11 plan.

20          The Debtors themselves, as well as those who have

21  filed pleadings in support of the extension, namely the

22  official Unsecured Creditors Committee and the so-called

23  settled governmental entities Ad Hoc Committee, have all

24  been clear that nevertheless, important issues remain to be

25  negotiated during this roughly four-week period to actually

Page 94

1    have key support for a fundamental feature of the plan,

2    which in broad strokes, in broad economic strokes, is agreed

3    by them, but not in important details.  That feature is the

4    proposed monetary contribution by the Sackler families, or

5    members of the Sackler family, in return for some form of

6    release.

7           The Debtors, the Committee and others have also

8    made it clear that if those agreements are not reached, it

9    is quite likely that they will be pursuing a very different

10   plan that will not provide for a contribution by those non-

11   debtor parties or for a release of them.

12          Your plan, as I noted, reflects an enormous amount

13   of work, facilitated by two of the best mediators in the

14   country, who have now written their reports on both phases

15   of the mediation directed by the Court at the request of the

16   parties.

17          So-called phase 1 mediation primarily focused on

18   the allocation of value and distribution of value from the

19   Debtors' estate and under a plan, including if there were to

20   be a Sackler contribution to it.  The second phase of the

21   mediation primarily involved negotiating the amount and

22   terms of a potential Sackler contribution.

23          The first phase of the mediation was remarkably

24   successful, although there are, as I understand from the

25   mediation statements filed, a handful of open issues, which

Page 95

1   I trust can be resolved, or if not, will be decided by the

2   Court.

3            Remarkably, as a result of that process, and it

4   took a long time, because it was a difficult process, given

5   the number of claims asserted against this case by disparate

6   groups of creditors, all of whom strongly believe in the

7   merits of their claims, that with the exception of an agreed

8   amount allocated to those who work directly personally

9   injured by the Debtors, the remaining amount would go to

10  abatement of the nation's opioid crisis, and not for any

11  other purpose.

12           This is an important agreement that can be

13  actually enforced under a Chapter 11 plan.  It is also a

14  remarkable agreement in the sense that it furthers, in

15  essence, a selfless, on behalf of the claimant, approach to

16  devoting the estate's resources to abatement.

17           I am pleased to see, notwithstanding some

18  statements that may have been misinterpreted in the press,

19  that as far as I can tell, no party in interest disputes

20  that all of the Debtors' estate should be used for

21  abatement.

22           No party in interest takes the position, as stated

23  by Dr. Pangloss in Candide and Dr. Candide when they saw

24  Admiral Byng being executed, that in this country they think

25  it wise to shoot an admiral from time to time to encourage

Page 96

1    the others.  Rather, the money, the value, will be put to

2    what the parties have correctly decided is the best use

3    abatement.

4            Phase 2 of the mediation appears again, both from

5    my review of the plan and disclosure statement and the

6    mediators' second report, to have been largely successful in

7    reaching agreement and centered on after, I believe,

8    Herculean good faith efforts by all the parties, and

9    mediators' proposal, with respect to a contribution by

10   members of the Sackler family.

11           I set a firm mediation deadline in that Phase 2

12   mediation because I believe that deadlines after a

13   reasonable period for the parties to become informed of the

14   facts and develop their views benefit from a deadline.  It

15   ended before complete agreement, even by those parties who

16   have agreed on the basic economic terms.  It also ended

17   without agreement from the non-consenting states group.

18           Nevertheless, the Debtors have believed, and all

19   parties other than the non-consenting states and the so-

20   called Ad Hoc Committee for Accountability believe, that the

21   plan negotiation process should continue on the fast-track

22   that it is on leading up to the disclosure statement hearing

23   in April.  I agree that is the most productive use of all

24   the parties' time and effort, with that deadline very much

25   in mind.

Page 97

1          It is in that context that I evaluate today the

2     four factors that I've already listed.  It is clear to me

3     that there is, or would be, an imminent irreparable harm to

4     the Debtors' estate and the prospects of a reorganization

5     around an abatement plan that maximizes the money dedicated,

6     solely dedicated, to abatement, if the injunction were not

7     extended, as requested by the Debtors.  But it is clear to

8     me that within the short timeframe that I have largely

9     directed, the parties have their hands full in concluding

10    negotiations so that a plan can be evaluated along with a

11    suitable disclosure statement.

12         To turn the focus now to multiple litigations,

13    arguably at least in 24 or 25 different states or

14    governmental entities, potentially involving multiple other

15    parties besides the Sacklers and the non-consenting states,

16    would very clearly irreparably harm the ability to conclude

17    these important negotiations.

18         It is also clear to me that the balance of harms

19    tips in favor of the Debtor and those who support the

20    extension of the injunction and continued negotiations.

21    Indeed, I take quite seriously the power of the non-

22    consenting states.  And I've asked myself quite carefully

23    whether, in fact, because of the position that they have

24    taken with respect to this particular motion, the plan is

25    not valid and, therefore, the Debtors' the organization is

1    not valid.

2              It appears to me -- and this is not a criticism --

3    that to the contrary, the refusal to extend the injunction

4    and to permit litigations to commence or recommence during

5    this 28-day period, would provide little, if any, benefit to

6    the non-consenting states.  The litigations would barely get

7    off the ground.  And, as I think it is quite proper of them,

8    they have stated that they would continue to negotiated,

9    albeit in that much more confusing and distracting

10   environment.

11             Frankly, the presence of a deadline focuses

12   everyone's attention much more than the distraction of

13   additional multi-state, multi-party litigation that,

14   frankly, I do not believe has been fully thought through, as

15   far as its effect on the Debtors' estate, including for some

16   of the reasons I raised during oral argument.

17             Finally, I have considered whether the public

18   interest weighs in favor of the injunction.  Of course, the

19   public interest in the plan that maximizes available value

20   for abatement of the opioid crisis is enormous.  In

21   response, the non-consenting states assert that there is a

22   strong public interest in the following.  The first point

23   being also raised by counsel for the Ad Hoc Committee on

24   Accountability.

25             First, some form of accountability by the

Page 99

1    Sacklers.  Of course, lifting the injunction leads to

2    litigation, which leads ultimately to the same analysis,

3    which all litigators undertake, in fact, I believe,

4    ethically must undertake if they are to properly represent

5    their clients, of the merits of a settlement versus the

6    merits of litigating to judgment.

7             Those very analyses are what the Debtor purports

8    to have been undertaken already, and which will be before

9    the parties if and when the Court considers a request for

10   confirmation of a plan that includes a Sackler contribution.

11            On the other hand, it is clear to me that starting

12   that process all over again in multiple state court

13   litigations with multiple parties would preclude the prompt

14   consideration of those settlement versus litigation factors

15   the context of this case, for which so many people have

16   placed so much time and effort in trying to narrow, so that

17   the consideration can be done on a fully informed basis.

18            It appears to me, therefore, that the

19   accountability public interest asserted by the two objectors

20   is no more than what I believe to be a misguided leverage

21   point, or a point to obtain leverage in a negotiation that

22   is already primed to be taken with full knowledge of the

23   leverage points on a short deadline.

24            It is also asserted that somehow the public needs

25   more information to evaluate a settlement.  Notwithstanding

Page 100

1    Congress' directive that it is claimants who need

2    information as set forth in Section 1129(a)(2) of the

3    Bankruptcy Code and the clear factual record, indeed the

4    transparent record, to use a word that has been much abused

5    in this case, that the non-consenting state claimants have

6    every scrap of information that they need to do their jobs

7    as the chief legal officers of the states that they

8    represent to make a choice, and before making that choice on

9    the plan, to negotiate.

10           At some point, if that point ever was actually

11   done, holding everyone's finger up to the winds doesn't

12   count.  I agree entirely with Mr. Troop's statement.  I need

13   to let the claimants do their jobs based on the information

14   they have.  And I will reiterate, I know of no bankruptcy

15   case -- and I've been practicing in this area since 1984 --

16   where there has been so much information provided to enable

17   a set of claimants to evaluate a choice between settlement

18   and its alternative litigation.

19           The last aspect of the public interest in the

20   brief objections that were filed may not even really appear

21   or are articulated in the objections, but I will raise it

22   anyway.  There is the notion that somehow opening these

23   cases to litigation against third parties, against the

24   Sacklers in multiple forums, will somehow shed more light on

25   the role that they played in the opioid crisis.

Page 101

1         First, again, that process, that litigation

2    process is a very different process than the bankruptcy

3    process.  It will result in far less information being made

4    available than is already in the possession of the non-

5    consenting states and the other parties in interest who

6    generally support the plan process continuing along the

7    lines that it is on.

8         Secondly, (indiscernible) evaluates in the context

9    of litigation, whether it's in the bankruptcy context or a

10   non-bankruptcy context, the alternative is settlement.

11        Third, as stated by Sybille Bedford, who knew a

12   lot about trials, "Trials are wonderful devices for learning

13   about human nature, but they also teach one the near

14   impossibility of reaching the truth."

15        It is much more likely that a full body of

16   information that will enable academics and the public to get

17   a full assessment of the truth of Purdue's and the Sackler's

18   role in the opioid crisis will ensure from the depository of

19   information that the debtors have already agreed to make

20   public after confirmation of a plan with the Department of

21   Justice, and which they commit themselves to, again, and the

22   plan that's on file with the Court.

23        There is one other important aspect of that

24   commitment.  If key parties in interest do not support a

25   plan -- and I'm not saying it's necessarily this plan as

Page 102

1    drafted, in fact, in all likelihood, it won't be.  But if

2    someone does not support a plan, that information will show,

3    or at least will enable people if they care and one would

4    think that the public and the media care, to decide whether

5    they did a good job in making that decision to support the

6    plan or not.

7              What sunshine could be better than that?  And that

8    goes for the Sacklers as well.

9              I want to go back then to the point about whether

10   there's a likelihood of a successful reorganization.  The

11   non-consenting states are suggesting, although they are

12   careful and I take this into account in my ruling not to be

13   adamant on this, that they will not make any agreement with

14   the Sacklers.

15             Someone who is not familiar with bankruptcy

16   practice may not appreciate that it is often the case that

17   important claimants in a case say they will not agree to X

18   when there is still time to change their minds and to change

19   others' minds.  Bankruptcy plans are often negotiated in an

20   iterative fashion.  It is, of course, also the case that at

21   some point, it's much harder to turn the train or shutting

22   off to another track.

23             The non-consenting states are represented by

24   experienced bankruptcy counsel.  I cannot sitting here today

25   know what is impeding an agreement between the non-

Page 103

1    consenting states and the Sacklers.  I do not know where the

2    push will come to shove on that issue, and there are

3    multiple factors to consider that are not before me at this

4    point.

5             They will come before me and I will apply the TMT

6    and Iridium factors if I have to, as well as the Metromedia

7    standard for a third-party injunction and relief if I have

8    to.  But they all have to do with the risks and rewards of

9    the settlement versus litigation, the costs and delay of

10   continued litigation versus the structure of a settlement,

11   issues pertaining to collectability and ability to pay if a

12   settlement is not reached, and the consequences to other

13   parties, as well as those who won't reach agreement if

14   litigation proceeds; namely would the merits of the phase

15   one mediation aligned, would the Department of Justice

16   simply take the money and distribute it, would the Sacklers

17   face much more risk and appropriate if they didn't settle.

18            All of these issues to my mind cannot be

19   determined effectively by lifting the injunction, nor would

20   the negotiation of those issues and analysis of them be

21   furthered by extending the injunction.

22            Before I got on the bench, I had a negotiation

23   with a lawyer who came wearing a lot of clothes.  He had an

24   overcoat, a hat, a muffler, a vest, and his suit coat.  As

25   we negotiate -- first, he took those things off.  As we

Page 104

1   negotiated, he would put one on, I guess indicating that he

2   was thinking about leaving, and then he'd put another one,

3   and now he had his vest and his coat on.  We kept

4   negotiating.  He put his overcoat on, kept negotiating.  He

5   put his hat on, kept negotiating.

6          He actually left.  A few minutes later, there was

7   a knock on the door.  He'd forgotten something, his

8   galoshes.  We negotiated the rest of the deal.

9          This is, of course, a much more important case

10  than that, although that was an important case.  But I

11  firmly trust that at some point the parties here will, in

12  fact, negotiate a consensual plan that takes into account

13  the risks and rewards of settlement with the Sacklers versus

14  further litigation, and the options of what happens

15  thereafter need to be preserved during that negotiation for

16  the uncertainty is what happens -- of what happens

17  thereafter needs to be preserved.

18          So I believe there is a likelihood of a successful

19  reorganization on this record.  I, therefore, will grant the

20  motion.  However, I am perfectly prepared to enter an order

21  that also, as the prior orders have done, reflects that the

22  non-consenting states, as stated by Mr. Troop, do agree to

23  the further imposition of the injunction for the 28-day

24  period.

25          I'd like to say two more things related to the

Page 105

 1    plan process.  First, that I'm assuming that the people who

 2    are in charge of the plan and working on the negotiations

 3    are fully aware of this.  I believe it is important in that

 4    this further statement is brought before the Court that it

 5    lay out in more detail the arguments for and against

 6    continued litigation against the Sacklers, not only on the

 7    estate claims, but also on non-estate claims.

 8         I had previously in this case directed the parties

 9    not to litigate those issues through the press or through

10    pleadings filed in the case, that the parties could discuss

11    them, but I think it's important so that the public does

12    know generally the considerations that have led parties, if

13    in fact they do reach that final agreement with the

14    Sacklers, to support that agreement as opposed to continued

15    litigation.

16         But I have no doubt that the key parties in

17    interest have that information that they demand now and

18    clearly have the ability to analyze it on a legal basis.

19    But the public, for example, may not understand the

20    importance of corporate separability from its shareholders,

21    may not understand the limitations that Congress has placed,

22    and notwithstanding very recent case law continues to place

23    and not even consider changing on a Court's ability in a

24    bankruptcy case to award a fraudulent transfer, as well as

25    issues regarding collectability and the like.

1           I had debated suggesting to the parties that they

2    consider, also given the open issues, to whether and on what

3    basis the Court would approve a plan injunctive and third-

4    party release over the objection of a group of states at

5    this number, as opposed to one or two or three or four or

6    five.

7           It seems to me one could intellectually conceive

8    of a plan, particularly given that the parties have already

9    worked out allocations that might, with the Sacklers

10   agreement, carve out a material number of non-consenting

11   states.  However, having heard carefully not only Mr.

12   Huebner, but Mr. Preis and Mr. Eckstein, both of whom have,

13   I know, no brief for the Sacklers, that seems to me that the

14   focus on the issues that they have identified is more than

15   enough for the next few weeks.

16          I will make one last point, again, hoping to give

17   the parties some guidance on how to use this limited amount

18   of time that's left to (indiscernible).

19          Mr. Quinn raised an important point.  Thus far, I

20   believe in large measure, although perhaps not entirely, the

21   Sackler family members, well represented by bankruptcy and

22   litigation counsel, have focused on the merits of the claims

23   against them, and I trust that the mediation, particularly

24   having read the mediator's second report which references a

25   mediation proposal forming the basis around which parties

1    have agreed, has also focused on the traditional TMT Trailer

2    Ferry Iridium analyses, i.e., the merits of the claims and

3    the like, and that's perfectly appropriate.

4            I will know, however, that historically the

5    Sacklers have given lots of money to charity; some

6    charities, including my own college, have saw fit not to

7    take any more.

8            In any event, there's absolutely nothing

9    preventing the Sacklers from making an additional charitable

10   contribution in a meaningful way, which one would hope might

11   resolve an impasse with the non-consenting states and

12   address the fundamental cloud and roll with them without

13   admitting any sort of liability given the charitable

14   benefit.  I can sort of think of no better use to put to put

15   donated money, so I'll leave it at that.

16           I'll look for an order, Mr. Huebner.  You can

17   email it chambers.  You don't need to formally settle it on

18   the parties, but you should run it by the usual counsel so

19   they can make sure it's consistent with my ruling.

20           MR. HUEBNER:  Sure.  Your Honor, may I just

21   address this form of order for just one second?  I do think

22   it's important.  I don't want to be misunderstood by

23   anybody.

24           I mean, number one, as I think I've already said,

25   you know, we take no joy ever in litigating against anyone,

Page 108

1    let alone obviously 24 sovereign states who we very, very,

2    very, very much hope we can now find a way to bring into the

3    tent.

4            On the other hand, you know, the job that we need

5    to do here, assuming that the plan comes to fruition, is to

6    get it confirmed and to have that confirmation upheld on

7    appeal.  And one of the concerns that we have is that in our

8    courtesy and thoughtfulness -- all of us, not just the

9    debtors -- (indiscernible) unnecessary appeals and allowing

10   voluntary compliance, I'll just be very straightforward

11   about it.

12           I don't want to hear at the confirmation hearing

13   or on appeal that neither this Court nor any Court has every

14   enjoined a sovereign state even temporarily.  We've now

15   litigated four times and they've lost four times.

16           THE COURT:  Well, I said I would rule -- Mr.

17   Huebner, I said I would rule in the alternative.  By the

18   way, they're supposed to -- you know, I don't know if

19   there's a difference.  I mean, it's just an Eleventh

20   Amendment issue.  The Eighth Circuit, plenty of Circuits and

21   the ones that enter itself to the statute makes it clear

22   that the Court has the power under Section 105 that to

23   enjoin a governmental entity notwithstanding 363(d)(4).

24           MR. HUEBNER:  Well, I was about --

25           THE COURT:  So I just -- I don't want to -- I

Page 109

1    really want to focus the parties on (indiscernible).

2              MR. HUEBNER:  Your Honor, I was able to go to a

3    place that I think you're going to like a lot.

4              THE COURT:  Okay.

5              MR. HUEBNER:  I wasn't asking that you not allow

6    voluntarily compliance.  I heard you the first time and I do

7    the same.  My only point is going to be a much smaller one.

8    I wanted the Court to understand why that was our thought

9    and that I think the order will need some slightly different

10   language than the prior one.

11             We're delighted obviously with the Court's

12   position and (indiscernible) pitch the request to

13   voluntarily comply.  We just are not willing to have it used

14   against us, including in confirmation and otherwise, and

15   which the Court's ruled in the alternative, I think

16   (crosstalk).

17             THE COURT:  I know that I, and I'm quite sure that

18   courts on appeal will understand the context here, so I

19   don't -- that's fine.

20             MR. HUEBNER:  That will be fine.  We heard you

21   loud and clear.  We'll play with the words.  I'm sure we

22   will find a balance that works for everyone.  I think we all

23   understand each other quite well and know what's happened

24   (indiscernible).  Now, we're just confirming that sort of

25   message received and, as we always do, I trust we will

Page 110

1    figure out an acceptable form of order.

2            I didn't want anybody to think, God forbid, that

3    this was motivated under any sort of (indiscernible).  Quite

4    the contrary, we're trying to do our job here and we're now

5    moving towards confirmation and, you know, the hearings

6    ahead of us are at least as much in our thoughts as today's

7    hearing.  So that's all I have to say.  We will figure it

8    out.

9            Your Honor, just to turn back to technology for a

10   minute.  I believe -- and I'm a little sort of focused --

11   but I believe that we are now ready to turn to the sort of

12   the break the Court would like to impose or agree to let

13   people do what they need to for just a few minutes.  We've

14   been at this for 2 hours and 39 minutes, to turn to the Zoom

15   portion where, as I said before and I think the Court had

16   asked if I'd be ready to announce the dial-in information

17   again.

18           There are a few participants who actually already

19   have their Zoom credentials to have kind of speaking and

20   video lines.  But for the general public and all the other

21   parties, anyone who would like to follow the next section of

22   the hearing use the toll-free dial-in number.  And then

23   we're actually going to flip back to Court Solutions I

24   believe for the third part, which is the pretrial

25   conference, but that obviously will be announced when we

Page 111

1    conclude the second sort of like an Oreo of Court Solutions,

2    Zoom, Court Solutions.

3            So if the Court agrees, I guess, let me first ask

4    what time the Court would like the parties to dial in either

5    to Zoom and/or the toll-free number and then we're back.

6    I'll read the number into the record again for everybody's

7    convenience.

8            THE COURT:  It's 20 of now.  Let's make it 10 of

9    1:00.  And just to step back for a second to the preliminary

10   injunction request, it sounds like I may not get an order

11   today.

12           The extension of the injunction is effective as of

13   my ruling and parties should not be taking action or

14   derogation of it while the order is being prepared, and it's

15   conceivable it won't be entered until tomorrow at some

16   point.

17           So let's resume with the next hearing at 10 of

18   1:00 Eastern time.

19           MR. HUEBNER:  Shall I provide the number again?

20           THE COURT:  Yes.

21           MR. HUEBNER:  Okay.  It is 1-844-992-4726, and the

22   access code is 1326458457#.  Hopefully, that'll work for

23   everybody.

24           THE COURT:  Okay, very well.  So I'll see you all

25   in about 10 minutes.  Thank you everyone.

1          MR. HUEBNER:   Thank you, Your Honor.

2          (Recess)

3          THE COURT:  Okay, good afternoon.  We are back on

4     the record in In Re Purdue Pharma L.P. et al.  And we are at

5     the matters listed in or under II on the amended agenda.

6     They come in the context of two related motions by Dow Jones

7     & Company Inc., Boston Globe Media Partners LLC, and Reuters

8     News and Media Inc. to unseal portions of the record in

9     these cases, and a second motion by the same media parties

10    to do the same thing with regard to other matters.  And then

11    finally I have a motion by Mortimer D. Sackler to seal a

12    portion of a declaration.

13          Why don't I take the parties appearances first and

14    then I'll go back to the particular context of this hearing,

15    which I believe is quite limited based on the record of the

16    last hearing on these motions and my order dated February

17    17th, 2021, which really left open only two remaining

18    issues, one of which I'm not sure is still open, under

19    Paragraph 3B and 5B of that order.  But why don't I take the

20    parties' appearances first.

21          MS. TOWNSEND:  Good afternoon, Your Honor.  Katie

22    Townsend of the Reporters Committee for Freedom of the Press

23    on behalf of the Media Intervenors.

24          THE COURT:  Good morning.

25          MR. JOSEPH:  Good afternoon, Your Honor.  Gregory

Page 113

1    Joseph on behalf of the Raymond Sackler family and the two

2    witnesses who will be cross-examined, Mr. Lynam and Mr.

3    Vellucci.

4            THE COURT:  Good morning, or good afternoon.

5            MS. MONAGHAN:  Good afternoon, Your Honor.  It's

6    Maura Monaghan from Debevoise & Plimpton on behalf of the

7    Mortimer D. Sackler family.

8            THE COURT:  Good morning.

9            MR. MCCARTHY:  Good afternoon, Your Honor.  Gerry

10   McCarthy from Davis Polk & Wardwell on behalf of the

11   Debtors.

12           THE COURT:  Okay.  Good afternoon.  All right.  So

13   as I said, a lot has gone on with these motions.  They have

14   been largely mostly consensually resolved by the release of

15   information.  To the extent that they were not consensually

16   resolved by order following the February 17, 2021 hearing,

17   which is actually dated February 22nd, 2021, dealt with all

18   of the remaining issues, of which there were few.  Again,

19   with respect to two.

20           The first being whether the Sackler families may

21   redact the names of third-party business counterparties and

22   investment advisors that have ongoing commercial

23   relationships with the families, their entities, or trusts,

24   which is defined as current counterparty information, really

25   just the names of those business counterparties and

Page 114

1    investment advisors.

2              And then Paragraph 5B stated, "The Court defers

3    its ruling as to whether the section at the bottom of Page 9

4    that was identified by the Court at the February 17, 2021

5    hearing is appropriately redacted".  That's the section at

6    Page 9 of Exhibit 137 to the declaration of Arik Preis

7    referred to further up in Paragraph 5.

8              So I have the pretrial order on this which

9    references the admission of the testimony of the two

10   witnesses on the first issue.  Maybe you call can tell me,

11   is there any remaining issue with regard to the material at

12   the bottom of Page 9 of Exhibit 137 of Mr. Preis'

13   declaration?

14             MR. MCCARTHY:  Your Honor, this is Gerry McCarthy

15   from Davis Polk for the Debtors.  There is no remaining

16   issue.  The Debtors, pursuant to your order, consulted with

17   counsel for the IACs, and that document was filed without

18   that redaction on February 25th.

19             THE COURT:  Okay.

20             MR. SKAPOF:  Yes, Your Honor, it's Mark Skapof

21   from Royer Cooper Cohen Braunfeld on behalf of the IACs.

22   And I can confirm that as well.

23             THE COURT:  Okay, thank you.  So, Ms. Townsend, I

24   don't know if you need any further order on that if the

25   document is actually public.  I would only defer it if the

Page 115

1    parties raised an issue.  So I would think we don't need an

2    order on that, but I'm happy to hear from you on that point.

3         MS. TOWNSEND:  I don't think we need an order on

4    that, Your Honor.  It's been released from our perspective.

5         THE COURT:  Okay, very well.  So I then want to

6    turn to the first issue.  And in the pre-hearing order on

7    this, the parties laid out and I ordered how the leadup to

8    this hearing would take place and the conduct of the

9    hearing.  One of those aspects of the order was that the

10   parties would use their best efforts to agree on the

11   admissibility of as many exhibits as they could and provide

12   the Court with a joint exhibit book of exhibits that are

13   deemed admissible.

14        I actually got that book physically after the

15   start of this morning's hearing, so I haven't had a chance

16   to look at it.  But I see it is extensive and it lists,

17   includes rather, 54 documents.  I just want to confirm that

18   the admissibility of those exhibits is agreed.

19        MS. TOWNSEND:  If I may, Your Honor, I will note

20   that we were inclusive in terms of what we provided the

21   witnesses and then in turn provided to the Court.  I don't

22   anticipate that we will utilize all of those exhibits during

23   the hearing.  We didn't pre-mark the exhibits.  We intended

24   to refer to them by tab number, mark them as we went in

25   terms of what we would utilize.  Then of course Media

Page 116

1    Intervenors' counsel can provide the Court and counsel for

2    the Raymond Sackler family with the marked exhibits

3    following the hearing.

4            But I just wanted to caution that we recognize

5    that time is -- or flag that we recognize that time is

6    somewhat short.  The binder includes, for example, all of

7    the privileged log materials that are at issue, or at least

8    excerpts of them.  We don't anticipate going through all of

9    those with the witnesses.

10           THE COURT:  Okay.

11           MS. TOWNSEND:  So I believe that the parties have

12   stipulated to authenticity as to all exhibits.  I will

13   obviously let Mr. Joseph correct me if I'm wrong.  The

14   parties are reserving their -- any objections vis-à-vis use

15   of the -- how the documents are utilized during the hearing.

16           THE COURT:  Okay.

17           MS. TOWNSEND:  So, Gerry, do you have anything to

18   add?

19           MR. MCCARTHY:  Your Honor, the only exhibits in

20   the binder that are ours are the two declarations.  And we

21   don't anticipate objecting on evidentiary grounds, but since

22   there are some newspaper articles in there, I don't know how

23   they're going to be used.

24           THE COURT:  All right.  So the admissibility isn't

25   necessarily agreed except as to the two declarations.  But I

Page 117

1    will assume if someone seeks to introduce an exhibit, that

2    if it's not objected to, that it will be admitted.  And is

3    there no objection as to foundation?  I mean, as opposed to

4    hearsay or something like that?

5              MR. MCCARTHY:  Correct, Your Honor.

6              THE COURT:  Okay, very well.  All right.  I guess

7    the last thing I'd say, although I think maybe this is

8    implicit in what Ms. Townsend said, you intend to use some

9    of these exhibits during cross.  If you want any other

10   exhibit admitted, you should let me know so I can be aware

11   of it and read it.  And you should tell me why it's

12   important.

13             I intend to rule from the bench today.  I don't

14   want this to be further delayed.  So I'm not contemplating a

15   further submission.  The record can reflect what's actually

16   been introduced if someone wants to appeal, but I will just

17   go on the record that I've heard today and rule from the

18   bench.

19             So I think we're ready then to move to cross-

20   examination.  Again, I had noted at the February 17th

21   hearing that these declarations had been submitted, it

22   wasn't an evidentiary hearing with regard to the witnesses,

23   and that the media intervenors would have the opportunity if

24   they wanted to examine the witnesses, which we're going to

25   be doing now.

Page 118

1          So do you want to have Mr. Lynam go first, Mr.

2    Joseph?

3          MR. JOSEPH:  Yes, Your Honor.

4          THE COURT:  Okay.  So would you raise your right

5    hand, sir?  Do you swear to tell the truth, the whole truth,

6    and nothing but the truth, so help you God?

7          MR. LYNAM:  Yes, Your Honor.

8          THE COURT:  You can put your hand down.  And it's

9    G-a-r-r-e-t-t, L-y-n-a-m?

10         MR. LYNAM:  Yes.  Correct.

11         THE COURT:  Okay.  Mr. Lynam, you submitted a

12   declaration in this matter dated February 7th, 2021.  You

13   understand that it was intended to be your direct testimony?

14         MR. LYNAM:  Yes.

15         THE COURT:  And is there anything in it with that

16   understanding in mind that you would wish to change at this

17   point?

18         MR. LYNAM:  No.

19         THE COURT:  Okay.  All right.  So, Ms. Townsend,

20   you can go ahead with cross.

21         MS. TOWNSEND:  Thank you, Your Honor.  Thank you.

22             CROSS-EXAMINATION OF GARRETT LYNAM

23   BY MS. TOWNSEND:

24   Q    Good afternoon, Mr. Lynam.  Mr. Lynam, could you please

25   state your current employment position for the record?

1  A    Yes.  I am employed by Kokino, LLC, and my title is

2  General Counsel and Chief Compliance Officer.

3  Q    You've worked at Kokino since 2015, is that correct?

4  A    Correct.

5  Q    And if I say Kokino, you'll understand that I'm

6  referring to Kokino, LLC, correct?

7  A    Yes, that is correct.

8  Q    Other than general counsel and chief compliance officer

9  at Kokino, have you held any other positions since 2015?

10 A    I'm not sure I understand your question.  Can you

11 clarify that?

12 Q    Sure.  Since 2015, other than your positions at Kokino,

13 have you held any other positions of employment?

14 A    No.  I've only been employed at Kokino, LLC.

15 Q    You testified in your direct written testimony that

16 Kokino is a single-family office owned by the Jonathan

17 Sackler family that provides investment management and other

18 services to their family and other associated family

19 clients.  What did you mean by other associated family

20 clients?

21 A    So in addition to the family members themselves, there

22 are entities and trusts that are formed for the benefit of

23 those family members.  That's what I was referencing.

24 Q    Approximately how many other associated family entities

25 does Kokino provide services to?

1   A    I don't know the exact number off the top of my head,

2   but it is several dozen.

3   Q    Several dozen.  You testified that you understood that

4   certain documents related to these bankruptcy proceedings

5   are currently under seal and contain the names of certain

6   hedge funds, banks, brokerages, private equity firms,

7   venture capital firms, financial advisors, et cetera, with

8   which Kokino and members of the Jonathan Sackler family have

9   ongoing investments of business relationships.  What was

10  that understanding based on?

11  A    So my understanding of the universe of documents that

12  contained the names that the Sackler family is seeking to

13  redact is based on my conversations with counsel to the

14  Raymond Sackler family.

15  Q    Is it based on anything else?

16  A    It's also based on my own review of the privilege logs

17  in question.

18  Q    Okay.  So you've reviewed privilege logs that were --

19  that you understand to have been filed under seal in these

20  bankruptcy proceedings, is that correct?

21  A    I have reviewed privilege logs that are pertinent to

22  the Raymond Sackler family, correct.

23  Q    When did you review those privilege logs?

24  A    I don't recall the exact date, but it was several weeks

25  ago.

Page 121

1   Q    Was it before or after February 7th, 2021, the date of

2   your declaration?

3   A    I believe it would have been before.

4   Q    Other than the privilege logs materials that you

5   referred to, have you reviewed any other documents that have

6   been filed in these bankruptcy proceedings?

7   A    I'm not entirely sure what you mean.  I do review the

8   bankruptcy docket.  So I review many documents that are

9   filed on the docket.

10  Q    Have you reviewed any other documents filed in these

11  bankruptcy proceedings other than the privilege log

12  materials that you understand to be under seal, either in

13  whole or in part?

14  A    I'm not sure.

15  Q    Okay.  Did the privilege log materials you reviewed

16  contain the names of attorneys with which Kokino and other

17  members of the Jonathan Sackler family have ongoing

18  investments or other business relationships?

19  A    Yes.

20  Q    Is it your understanding that the privilege log

21  materials that you reviewed are entirely or partially under

22  seal?

23  A    My understanding is that a version of the privilege log

24  has been filed and it contains redactions of current

25  business counterparties.

Page 122

1    Q    Do you know the names of the hedge funds, banks,

2    brokerages, private equity firms, venture capital firms,

3    financial advisors, et cetera, with which Kokino and members

4    of the Jonathan Sackler family have ongoing investments or

5    other business relationships that are currently under seal

6    in those privilege log materials?

7    A    Yes, I do.

8    Q    Okay.  So to be clear, I'm not asking you to give me

9    those names.  But if I were to ask you right now to name

10   those parties that have current or ongoing investments or

11   other business relationships with the Jonathan Sackler

12   family or Kokino, you could do so, correct?

13   A    It would be to name them in their entirety.  Off the

14   top of my head, there were more than two dozen instances.

15   Q    How many of those more than two dozen names of parties

16   that have ongoing business or investment relationships with

17   Kokino and members of the Jonathan Sackler family are names

18   of individuals as opposed to entities?

19   A    I don't know the exact number.  Very few would be

20   individuals, if any.

21   Q    Would less than or fewer than five be a good estimate

22   of the number of names of individuals that are redacted from

23   the privilege log materials you reviewed?

24   A    Again, I don't know the exact number, and I don't want

25   to speculate.

Page 123

1    Q    To be clear, I don't want you to speculate.  But if you

2    can give me a best estimate, I would appreciate that.  It's

3    not -- it's fewer than half, would you say that?

4    A    It's certainly fewer than half.  I agree with that.

5    Q    Of the more than two dozen names of entities that have

6    ongoing investments or other business relationships with

7    Kokino, members of the Jonathan Sackler family, how many of

8    those are hedge funds?

9    A    Again, I don't know the exact number, but I recall

10   several hedge fund names appearing in the unredacted

11   privilege log that I originally (indiscernible).

12   Q    How many of those names are of banks?

13   A    There are names of banks.  The number is fewer than the

14   hedge funds.  But I don't know the exact number.

15   Q    How many of the redacted names are of brokerages?

16   A    Again, I don't know the exact number.  But brokerages

17   did appear on the list.

18   Q    How many of those names are of private equity firms?

19   A    Again, I don't know the exact number, but private

20   equity firms to my recollection were somewhere named on the

21   list.

22   Q    How many are names of venture capital firms?

23   A    Again, I don't know the exact number, but venture

24   capital firms were on the list.

25   Q    How many are the names of financial advisors?

1    A    Can you clarify what you mean by financial advisors?

2    Q    Well, why don't you tell me what you meant by financial

3    advisors in your declaration.

4    A    Sure.  So a financial advisor in my declaration was

5    referring to anybody who provides investment advice.  Could

6    include investment manager, it could include an individual.

7    So that's what I had in mind.

8    Q    Okay.  So using that definition of financial advisor,

9    how many names of financial advisors are redacted from the

10   privilege log materials that you reviewed?

11   A    I cannot give you the exact number.  I don't have that

12   material in front of me.  But I do recall financial advisors

13   were on the list.

14   Q    Your declaration also included a sort of catchall et

15   cetera.  In other words, hedge funds, banks, brokerages,

16   credit equity firms, venture capital firms, financial

17   advisors, et cetera, with which Kokino and members of the

18   Jonathan Sackler family have ongoing investments or other

19   business relationships.  That did you mean by et cetera?

20   A    Can I refer to my declaration to refresh my memory?

21   Q    You can.  And in fact, Mr. Lynam, let me ask you -- and

22   maybe I should have asked this at the beginning --

23   A    Sure.

24   Q    Did you receive a binder of documents for use at this

25   hearing?

Page 125

1    A    I did.  I have it next to me.

2    Q    Okay, great.  Why don't you turn to Tab 1.  That's the

3    declaration of Garrett Lynam, ECF 2360-3.  And we can mark

4    that as Exhibit 1.  And I'll refer to that, just for sake of

5    clarity, as Tab 1 and Exhibit 1 from here on out.

6              (Exhibit 1 was marked for identification)

7    A    Okay.

8    Q    And I'm referring to Paragraph 3 of your declaration on

9    Page 2.

10   A    Okay, I see it.

11   Q    And what do you -- what did you mean by et cetera, e-t-

12   c, period, Paragraph three of your declaration?

13   A    Sure.  So what I meant was that the universe of what I

14   mean by business relationships is not limited to hedge

15   funds, banks, brokerage, private equity firms, venture

16   capital firms, financial advisors.  For instance, I recall

17   one name that was simply just a consultant who I would not

18   consider to be a financial advisor.

19   Q    Why would you not consider that consultant to be a

20   financial advisor?

21   A    Because the consultant does not provide investment

22   advice.

23   Q    Is this a consultant who was retained to provide advice

24   concerning potential charitable contributions?  Does that

25   sound right?

Page 126

1    A    Yes.  He may have been.

2    Q    Mr. Lynam, can I have you take a look actually at Tab 5

3    of your binder.  We can mark that as Exhibit 2.  I'll give

4    you a second to get there.  This is a document that is -- it

5    has an ECF number at the top, Document 2441-3.  Do you see

6    that?

7              (Exhibit 2 was marked for identification)

8    A    Yes, I do.

9    Q    Okay.  And this is a document that was filed as Exhibit

10   B to the declaration of Arik Preis, Part One.  And it reads,

11   (indiscernible), amended Exhibit B, (indiscernible) initial

12   covered Sackler person's privilege log entries subject to

13   UCC's Challenges Motion and Exceptions Motion.

14   A    Yes.

15   Q    Could you turn to the second page of this document and

16   tell me if this looks like the privilege log that you

17   reviewed?

18   A    Yes.  At first glance, it does resemble it.  I don't

19   know precisely if it is what I reviewed, but it certainly

20   resembles it, yes.

21   Q    Okay.  Going back to the names of the parties that are

22   included in the privilege log materials that you reviewed

23   with which Kokino and members of the Jonathan Sackler family

24   have ongoing investments or other business relationships,

25   are any of those the names of publicly-traded companies?

Page 127

1    A    So various publicly-traded companies that have been --

2    who have had their shares purchased by members of the

3    Jonathan Sackler family or other family clients are

4    disclosed in SEC filings.  We are not seeking to redact

5    those names.

6    Q    So just to make sure that the record is clear, so it's

7    your testimony that in the privilege log materials you

8    reviewed, none of the redacted names of parties that have

9    ongoing investment or other business relationships with the

10   Raymond Sackler family or with Kokino are the names of

11   publicly-traded companies.  Is that right?

12   A    No, that's not -- that's not correct.  To clarify, the

13   Jonathan Sackler family is not seeking to redact the names

14   of any publicly-traded companies that appear in SEC filings

15   that are published or filed by the Jonathan Sackler family.

16   Q    Okay.  So in other words, there are publicly-traded or

17   the names of publicly-traded companies that are redacted in

18   the privilege log materials that you have reviewed.  Is that

19   right?

20   A    There are names of publicly-traded companies that are

21   held by third-party investment advisors.  Those fillings

22   that name the companies, if there are any, would not have

23   been filed by the Sackler family.  And there is no tie to

24   the Sackler family and those publicly-traded companies that

25   I am aware of.

Page 128

1    Q    How many publicly-traded companies -- strike that.  How

2    many names of publicly-traded companies are redacted from

3    the privilege log materials that you've reviewed?

4    A    Again, we are not seeking to redact any names of

5    companies that appear in the Kokino or the Jonathan Sackler

6    family SEC filings.  I am aware of one other name that is a

7    publicly-traded company that is a portfolio investment of a

8    private fund that the Sackler family is invested in.

9    Q    So of the more than two dozen names of parties that

10   Kokino and members of the Jonathan Sackler family have an

11   ongoing investment or business relationship with, to your

12   knowledge, only one of those redacted names is the name of a

13   publicly-traded company.

14   A    Yes.

15   Q    Are there any subsidiaries of publicly-traded companies

16   that are redacted from the privilege log materials that you

17   reviewed?

18   A    No, not to my knowledge.

19   Q    Are any of the names that are redated from the

20   privilege log materials reviewed the names of other

21   associated family clients that Kokino provides investment

22   services to?

23   A    No.  We are not seeking to redact the names of other

24   Kokino family clients.

25   Q    Are any of the names that are redacted from the

Page 129

1    privilege log materials you reviewed the names of family

2    clients associated with other members of the Sackler family?

3    A    Sorry, Ms. Townsend, could you ask the question one

4    more time?  I just wanted to make sure I heard it correctly

5    Q    Sure.  Are any of the names that are redacted from the

6    privilege log materials that you reviewed the names of other

7    associated family clients that are associated with other

8    members of the Sackler family, not Raymond Sackler?

9    A    I mean, I can only speak for the Jonathan Sackler

10   family.  So I do not know.  We are not trying to seek to

11   redact the names of the Jonathan Sackler and Kokino family

12   clients.

13   Q    Okay.  According to your direct testimony, Hildene

14   Capital Management LLC forced both the Jonathan Sackler and

15   Richard Sackler families out of Hildene-managed hedge funds

16   in late 2018.  That's in Paragraph 5 of your declaration at

17   Tab 1, Exhibit 1.  Do you see that?

18   A    Yes.  Let me flip there so I can see it.  Okay.

19   Q    When did you learn that Hildene Capital Management LLC

20   had decided to force both the Jonathan Sackler and Richard

21   Sackler families out of Hildene-managed hedge funds?

22   A    So I learned this prior to Thanksgiving in 2018.

23   Q    In November of 2018?

24   A    It was in November of 2018.

25   Q    How did you learn about that decision?

Page 130

1  A    One of the Kokino employees who oversees the hedge fund

2  portfolio came to me, I am general counsel of Kokino, and he

3  informed me about this news.  And I then reviewed the legal

4  options that Kokino would have.

5  Q    If I say Hildene, you'll know I'm referring to Hildene

6  Capital Management LLC, right?

7  A    Yes.

8  Q    In late 2018, Brett Jefferson was the fund manager at

9  Hildene, correct?

10  A    So just to clarify, I believe Mr. Jefferson is one of

11  the team members or maybe one of the principals at Hildene.

12  I believe it's an organization composed of several people.

13  Q    Okay.  So it's your understanding then in late 2018

14  that Brett Jefferson was a principal at Hildene.  Is that

15  right?

16  A    That's correct, yes.

17  Q    Did you communicate with Mr. Jefferson about what drove

18  Hildene's redemption decision in late 2018?

19  A    No, I did not.

20  Q    Did you communicate with anyone at Hildene in late 2018

21  about what was driving its redemption decision?

22  A    I responded to various requests from Hildene in 2018

23  relating to what we call know-your-customer requirements.

24  They were inquiring about who the Jonathan Sackler family

25  investors were, essentially.  So I don't recall exactly who

Page 131

1    I communicated with at Hildene about this topic, but I

2    worked with them in that capacity.

3    Q    And you understood those requests -- well, strike that.

4    Those requests were made before or after you learned of

5    Hildene's redemption decision?

6    A    The requests were made before.

7    Q    And what did you understand the purpose of those

8    requests were?

9    A    So the administrator for Hildene was asking for

10   information about the ultimate owners of this investment for

11   the Jonathan Sackler family.  It's a pretty typical and

12   routine request.  It was unusual I thought because this

13   Hildene investment had been held for many, many years and I

14   would have thought that they knew who the owners were.  So I

15   provided them with the materials.

16   Q    Did you ask anyone at Hildene why they were seeking

17   that information?

18   A    No, I did not.

19   Q    Cold you turn to Tab 21 in your binder?

20   A    Sure.

21   Q    And we'll mark that as Exhibit 3.

22        (Exhibit 3 was marked for identification)

23   Q    This is a Wall Street Journal article entitled, "Hedge

24   Fund Tosses Family That Controls Maker of OxyContin".  And

25   it's dated March 7th, 2019.  Do you see that?

Page 132

1    A    Yes, I do.

2    Q    Is this the article that you were referring to in your

3    written direct testimony as the March 2019 WSJ article?

4    A    I believe so, but let me just refer to my declaration

5    to confirm that the title is the same.  Yes.

6    Q    So this Exhibit 3, Tab 21 is the article you were

7    referring to in your declaration, is that right?

8    A    In Paragraph 5 I believe of my declaration, yes.

9    Q    Thank you.  Can you turn to Page 3 of 8 of this Exhibit

10   3?  On the bottom-right-hand corner there is a little page

11   number designation.

12   A    Yes, I see it.

13   Q    I would direct your attention to the third full

14   paragraph on this page.  It reads, "'An opioid-related

15   tragedy affected someone with a personal relationships to me

16   ant other members of Hildene,' Mr. Jefferson said in a

17   statement last week about the incident, which he said

18   occurred several years ago.  The Stanford, Connecticut hedge

19   fund donated at that time to an organization fighting the

20   opioid crisis and since then has repeatedly considered

21   ending its relationship with the Sackler family.  He wrote,

22   'Last year, the weight on my conscience led me to terminate

23   the relationship and initiate the redemption procedure,' Mr.

24   Jefferson wrote."  Is that your understanding of Hildene's

25   basis for terminating its relationship with the Sackler

Page 133

1   family?

2   A    No, that's not what was communicated to me in 2018.

3   Q    What was communicated to you in 2018?

4   A    As I mentioned, an employee of Kokino came to me and

5   told me that Hildene was force redeeming, forcing the

6   Sackler family out of their hedge fund.  And the reason that

7   I was provided was that the mounting legal issues facing

8   Purdue and the reputational and PR narrative that had been

9   surfacing at that time made Hildene uncomfortable and they

10  felt that an ongoing relationship with the Sackler family

11  would be detrimental to their business.

12  Q    Who told you that?

13  A    I was told this by the head of Kokino's hedge fund

14  strategy.  His name is Randy Rose.  He is an employee of

15  Kokino.

16  Q    So, again, no one from Hildene communicated that to

17  you.  Is that right?

18  A    Correct.  This communication came from Mr. Rose.

19  Q    You testified in your declaration that this March 2019

20  WSJ article outlined how, "Reputational concerns drove

21  Hildene's redemption decision".  Would you characterize past

22  opioid-related tragedy weighing on someone's conscience to

23  be a reputational concern?

24  A    I would consider that, but I would consider announcing

25  that the hedge fund donated at that time to an organization

1    to be indicative of more than just something weighing on

2    somebody's personal conscience.

3    Q    Do you think that Mr. Jefferson's statements as

4    reflected in this WSJ article is false?

5    A    I don't want to say anything bad about Mr. Jefferson.

6    All I can testify to is that this statement in the article

7    does not match what my understanding was at the time in

8    2018.

9    Q    So just to be clear with respect to your testimony, you

10   believe that this March 2019 WSJ article outlined how

11   reputational concerns drove Hildene's redemption decision

12   based on the portion of the statement where Mr. Jefferson

13   stated that the hedge fund donated at that time, several

14   years ago, to an organization fighting the opioid crisis.

15   Is that accurate?

16   A    In order to respond to your question, I would like to

17   just review the whole article.  Because you are referring to

18   one paragraph in this article.

19   Q    Sure.  Why don't you review the entire article at

20   Exhibit 3 at Tab 21 and tell me where in the article it

21   outlines how reputational concerns drove Hildene's

22   redemption decision.

23   A    Sure.  Okay.  So on Page 3, the first full paragraph,

24   it says that, "Citing the Sackler's ties to opioids, fund

25   manager Brett Jefferson last year forced the Sackler

Page 135

1     entities invested in the firm to start redeeming their

2     investments in Hildene".  So he is saying that because of

3     the Sackler's ties to opioids, he is no longer comfortable

4     with them being investors in his hedge fund.

5     Q    So, Mr. Lynam, in the very next paragraph is the

6     paragraph that I read to you earlier, the one that begins,

7     "An opioid-related tragedy affected someone with a personal

8     relationship to me" and then explains Hildene's redemption

9     decision as being based on, "the weight on my conscience".

10    A    I'm sorry, Ms. Townsend, I didn't hear the end of your

11    statement there.  There was another noise that came through

12    on the speaker.

13    Q    Sure.  I apologize.  Let me --

14    A    It's not your fault.

15    Q    The paragraph that you cited is immediately followed by

16    the statement reported by the Wall Street Journal of Mr.

17    Jefferson indicating that it was, "The weight on my

18    conscience that led me to terminate the relationship and

19    initiate the redemption procedure".  And certainly he refers

20    to an opioid-related tragedy that affected someone with a

21    personal relationship to him.  Isn't that an ethical

22    concern, not a reputational concern?

23    A    I mean, in the sentence before it, it says, "Purdue has

24    denied allegations that it is to blame for the opioid

25    epidemic.  And then it dumps in to saying, citing the

1    Sackler's ties to opioids, this is what Brett Jefferson did.

2    And he does mention that there was an opioid-related tragedy

3    that affected somebody with a personal relationship to him.

4    I mean, in this context he is broadcasting this to the world

5    through the Wall Street Journal.  So he's trying to send a

6    message to the world.  That's how I interpreted it.

7    Q    And so I'll ask you again.  Do you think that Mr.

8    Jefferson's statement that's reflected in this Wall Street

9    Journal article is false?

10              MR. JOSEPH:  Objection.  Calls for speculation.

11              THE COURT:  Well, I actually think we've covered

12   this.  I think you've asked this before.

13   BY MS. TOWNSEND:

14   Q    To your knowledge, Mr. Lynam, prior to publication of

15   this March 2019 WSJ article, was the business relationship

16   between the Sacklers and Hildene publicly known?

17   A    No, not to my knowledge.

18   Q    To your knowledge, prior to Hildene's redemption

19   decision in late 2018, was the business relationship between

20   the Sacklers and Hildene publicly known?

21   A    I believe that's the question you just asked.  The

22   answer is no.  I do not think it was publicly known.

23   Q    Okay.  So public disclosure of the business

24   relationship between the Sacklers and Hildene did not occur

25   until after Hildene had already made its redemption

Page 137

1    decision.  Is that right?

2    A    To my recollection, this -- I believe this article was

3    the instance of this forced redemption being made public.

4    So the answer is yes, it came out after the redemption

5    happened.

6    Q    Mr. Lynam, can you look at Paragraph 6 of your

7    declaration?  We marked that as Exhibit 1.  It's also Tab 1.

8    A    Paragraph 6?  Sure.

9    Q    Yes.

10   A    The pages are sticking together.  Okay.

11   Q    You testified in early March 2019, DeepCurrents

12   Investment Group informed Kokino that DeepCurrents was

13   redeeming the Jonathan Sackler family from its hedge fund.

14   Do you see that?

15   A    Yes.

16   Q    And if I say DeepCurrents, you'll know I'm referring to

17   DeepCurrents Investment Group, right?

18   A    Yes, I will.

19   Q    When did you learn that DeepCurrents was redeeming the

20   Jonathan Sackler family from its hedge fund?

21   A    In early March 2019.

22   Q    How did you learn that?

23   A    I learned about it from Kokino's president and chief

24   investment officer.

25   Q    You testified that Kokino understood that DeepCurrents'

1   decision to redeem the Jonathan Sackler family from its

2   hedge fund was directly related to the March 2019 WSJ

3   article and DeepCurrents' concern that maintaining a

4   commercial relationship with the Jonathan Sackler family in

5   light of the public disclosure would be detrimental to

6   DeepCurrents' business.  Who at Kokino had that

7   understanding?

8   A   So Kokino's president and chief investment officer

9   spoke with DeepCurrents about this.  In my declaration, I

10  point out the timing.  So the March 2019 Wall Street Journal

11  article came out in March, 2019.  I believe it was early in

12  the month.  Yes.  March 7th, as referenced in Paragraph 5.

13  Very soon thereafter, DeepCurrents informed our president

14  that they were redeeming our investment because it had been

15  named in that Wall Street Journal article, and therefore

16  publicly linked to the Sackler family.

17  Q   Can you turn to Page 7 of this article?

18  A   Can you remind me what tab the article is?

19  Q   Yes.  It is Tab 21, Exhibit 3.

20  A   An can you remind me what page you'd like me to turn

21  to?

22  Q   Page 7 of 8.  I'll direct you to the -- are you there?

23  A   Yes, I am here.

24  Q   Okay, great.  I'll direct you to the third full

25  paragraph at that begins, "Brian Olson, a co-founder of

Page 139

1    hedge fund giant Viking Global, heads Kokino."  Do you see

2    that?

3    A    Yes, I do.

4    Q    Okay.  And then there is a reference in the last

5    sentence of that paragraph to DeepCurrents Investment Group.

6    Is that the public disclosure that you are referring to in

7    Paragraph 6 of your declaration?

8    A    Yes, I believe it is.

9    Q    Now, you testified that Kokino's president and CEO told

10   you of the decision to redeem.  Is that right?

11   A    Can you say that one more time, Ms. Townsend?  I didn't

12   hear the very end of your question.

13   Q    Let me start it this way.  Who is the president and --

14   who was president and CEO of Kokino in March 2019?

15   A    Sure.  So the president and chief investment officer

16   was and still is Brian Olson.

17   Q    And it's your testimony that Mr. Olson told you of

18   DeepCurrents' redemption decision.  Is that right?

19   A    Yes.  He told me because I am Kokino's general counsel

20   and we wanted to understand what our options were in light

21   of this development from a legal perspective.

22   Q    Did you communicate with anyone at DeepCurrents in or

23   around March 2019 about what was driving its redemption

24   decision?

25   A    No, I personally did not.

Page 140

1   Q    So your knowledge about what was potentially driving

2   DeepCurrents' redemption decision is based solely on your

3   discussion with Mr. Olson.  Is that correct?

4   A    No.  The basis of my testimony, as described in my

5   declaration, was my firsthand knowledge and conversations I

6   had with Kokino employees and my review of Kokino business

7   records, including emails.  So I spoke with Mr. Olson about

8   this.  He also shared email correspondence with me.  And the

9   correspondence was between him and the principal at

10  DeepCurrents.

11  Q    Did the email correspondence that Mr. Olson showed you

12  refer to this March 2019 WSJ article?

13  A    Yes, it did.

14          MR. JOSEPH:  Objection.  I'm going to object to

15  referring to matters not in evidence.  Counsel did not ask

16  for a deposition of the witness, which he would have been

17  made available for.  And it's not appropriate to ask him to

18  remember emails.

19          MS. TOWNSEND:  I was --

20          THE COURT:  Well --

21          MS. TOWNSEND:  I'm happy to move on, but it sounds

22  like this witness has personal knowledge of what he is

23  testifying --

24          THE COURT:  He did say he -- it was based on his

25  personal knowledge, Mr. Joseph.  And I think he said he saw

Page 141

1    the email.  So...

2              MR. JOSEPH:  Thank you, Your Honor.

3              THE COURT:  Okay.

4    BY MS. TOWNSEND:

5    Q    Let me ask this, Mr. Lynam.  Separate and apart from

6    your discussion with Mr. Olson and the emails between Mr.

7    Olson and individuals at DeepCurrents, is your understanding

8    as to the basis for DeepCurrents' redemption decision based

9    on anything else?

10   A    No.  It's based on my conversations with Mr. Olson and

11   the emails that I reviewed.

12   Q    You indicated that one of the emails that you reviewed,

13   or at least one of the emails you reviewed, directly

14   referenced the March 2019 WSJ article.  What did it say

15   about that article if you remember?

16   A    Sure.  It generally said that Mr. Olson emailed

17   DeepCurrents and said it was strange that DeepCurrents was

18   mentioned in this article because we certainly didn't

19   provide DeepCurrents' name to the Wall Street Journal.  And

20   that's how it was referenced.

21   Q    When determining whether to accept or keep a client, an

22   investment firm will consider an investor's financial

23   situation, right?

24   A    I'm not sure exactly what you mean.  Could you rephrase

25   that or could you clarify that question?

1   Q    Sure.  When determining whether or not to accept or

2   keep an existing client, an investment firm is going to take

3   into account that client's financial situation, right?

4   A    I mean, in order to invest in hedge funds such as

5   DeepCurrents, investors have to have a certain amount of

6   assets.  It's not for people who can't afford to lose the

7   investment.

8   Q    And when determining whether to accept or keep a

9   client, an investment firm might consider for example

10  whether there are factors that might make that investor

11  quick to redeem, correct?

12  A    So Kokino doesn't accept capital from outside

13  investors.  I can't testify as to what other investment

14  managers may or may not do.

15  Q    So it's your testimony that Kokino understood that

16  DeepCurrents' redemption decision was directly related to

17  what was recorded in the March 2019 WSJ article, is that

18  right?

19  A    Yes.  I would say my understanding is but for this

20  March 2019 article, DeepCurrents would not have force

21  redeemed the Jonathan Sackler family.  I have no indication

22  that it would have.

23  Q    Did -- but -- strike that.  But no one at DeepCurrents

24  told you that was the case?

25  A    Well, what do you mean by that was the case?

Page 143

```
 1   Q    No one at DeepCurrents communicated to you that but for

 2   this March 2019 WSJ article, that it would have redeemed,

 3   correct?

 4   A    No.  DeepCurrents communicated to Kokino that it was

 5   uncomfortable being publicly linked to the Sackler family

 6   and therefore it was redeeming Kokino's investment.  Kokino

 7   was one of the first investors of the fund.  We weren't just

 8   a passing ship in the night.  We were a fundamental seed

 9   investor for the fund.

10   Q    Was the -- so I get the language that you just used,

11   that DeepCurrents is -- was uncomfortable being linked to

12   the Jonathan Sackler family.  Was that language that you saw

13   in one of the emails that you reviewed?

14   A    No.  It's language that I learned from Mr. Olson.  We

15   spoke with DeepCurrents about this when he met with me to

16   discuss the legal options that Kokino would have with

17   respect to the situation.

18   Q    I see.  So that's what Mr. Olson told you he

19   understood, based on his discussions with DeepCurrents. Is

20   that right?

21   A    Yes.

22   Q    Can you look at Page 2 of the 2019 -- March 2019 WSJ

23   article that's Tab 21, Exhibit 3?

24   A    Okay.

25   Q    The article -- let me know when you're there.
```

Page 144

1    A    So I'm on Page 2 of 8 of Tab 21, which I think is where

2    you wanted me to go, right?

3    Q    That is, yes, where I --

4    A    Okay.

5    Q    You see the second full paragraph in that page, the

6    article reports -- the second sentence of that paragraph

7    that Purdue, which has been an important source of the

8    family's wealth and income, is considering filing for

9    bankruptcy, the Wall Street Journal has reported, citing

10   people familiar with the matter.  Do you see that?

11   A    Yes.

12   Q    Do you think the fact that the March 2019 WSJ article

13   reported the Purdue was, at the time, considering filing for

14   bankruptcy could've been a factor in DeepCurrents' decision

15   to redeem the Jonathan Sackler family from its hedge fund?

16   A    I couldn't answer that question.  I don't know.

17   Q    Do you think Purdue considering filing for bankruptcy

18   would be an appropriate consideration for DeepCurrents in

19   determining whether or not to force a redemption?

20   A    I don't know.

21   Q    Can you look at Page 4 of Tab 21, Exhibit 3?  It's the

22   same March 2019 WSJ article.

23   A    Okay, I'm on Page 4.

24   Q    The article reports in the, I think it's the second

25   full paragraph, the one beginning "Some members of the

Page 145

1   Sackler family who have been active in Purdue are now named

2   (sound drops)."  You see that?

3   A    So Ms. Townsend, I'm sorry, your audio came in and out

4   and I just tried turning up my speaker to hear it, but are

5   you asking me about the third -- the second paragraph, the

6   second full paragraph at the start of Page 4, "Some members

7   of the Sackler family who have been active in Purdue are now

8   named as defendants in two dozen opioid lawsuits."

9   Q    Yes.

10  A    Okay.

11  Q    That is exactly what I was directing you to.

12  A    Thank you.

13  Q    Could DeepCurrents' decision to redeem the Jonathan

14  Sackler family from its hedge fund been directly related to

15  the March 2019 WSJ article reporting that at the time,

16  members of the Sackler family were named as defendants in at

17  least two dozen opioid lawsuits?

18  A    I don't know.  Those lawsuits were pending before

19  DeepCurrents redeemed the Jonathan Sackler family.  I -- as

20  mentioned in my declaration, this article came out.  It

21  mentioned DeepCurrents.  DeepCurrents then redeemed us.

22  Q    Would -- do you think that the legal -- strike that.

23  Would legal exposure for the Sackler family, the kind of

24  legal exposure reported in the March 2019 WSJ article, be a

25  reasonable factor for Deep Currents to consider when

Page 146

1    determining whether to redeem the Jonathan Sackler family

2    from its hedge fund?

3    A    DeepCurrents had no insight as the legal exposure of

4    the Sackler family, as you describe it.  It was a hedge fund

5    investment.  We completed subscription documents, made

6    regulatory reps and warranties.  At no point did anybody

7    from DeepCurrents ask me about the legal exposure of the

8    Sackler family.

9    Q    But DeepCurrents was aware that some members of the

10   Sackler family who've been active in Purdue were, at the

11   time of this March 2019 WSJ article, named as defendants in

12   at least two dozen opioid lawsuits, correct?

13   A    I don't know if they knew that or not.  They may have.

14   Q    Well, if they read this article, this March 2019 WSJ

15   article, they did know that, right?

16   A    I imagine so.

17   Q    Can you --

18             MR. JOSEPH:  May I object to calling for

19   speculation as to what they knew and referencing an article

20   that's after the decision is made?

21             THE COURT:  I'm sorry, I thought the article was

22   being cited as a reason for the decision, so I don't think

23   it is speculation on this one.  Some of the other questions

24   asked --

25             MAN 1:  You're right, Your Honor --

Page 147

```
 1            THE COURT:  -- turned out to be speculation, but
 2    it was fair to ask them.
 3            MAN 1:  That's fair.
 4            THE COURT:  Okay.
 5    BY MS. TOWNSEND:
 6    Q    Mr. Lynam, can you look at Page 7 of Tab 21, Exhibit 3?
 7    That's the same March 2019 WSJ article.
 8    A    Yes.
 9    Q    It states in the sort of middle of the page, the
10    paragraph beginning "Jonathan Sackler is also an investor in
11    Brookside Equity Partners and Soundview Real Estate
12    Partners."  Do you see that?
13    A    Yes, I do.
14    Q    Does Jonathan Sackler have a current investment
15    relationship with Brookside Equity Partners?
16            MR. JOSEPH:  Objection, Your Honor.  They
17    shouldn't be able to obtain through questioning --
18            THE COURT:  Well --
19            MR. JOSEPH:  -- they're seeking on the motion.
20            THE COURT:  That's fair.
21            MS. TOWNSEND:  Well, let me ask this.  Maybe this
22    will address it.
23    BY MS. TOWNSEND:
24    Q    Mr. Lynam, is Brookside Equity partners the name of an
25    entity redacted in the privilege log materials?
```

1           MAN 1:  Objection.  It's exactly the same point.

2           THE COURT:  I guess -- I agree.  Sustained.  But I

3     think you can say something to the effect that, have any of

4     these -- did any of these other entities names in this

5     article leave because of the article.

6           MR. JOSEPH:  Your Honor, I object to your

7     question, because it (sound drops) already investors.

8           THE COURT:  Not necessarily current -- no, they're

9     not current investors.  Not necessarily.  They could leave

10    for other reasons.  It's just because of this article.

11          MAN 1:  I take it my objections to Your Honor's

12    question is overruled and I accept that.

13          THE COURT:  No, if -- again, Mr. Lyman, I want to

14    be clear, the question is, not that any of these names here,

15    either in this paragraph or elsewhere -- let's just start

16    with this paragraph -- are current counterparties but to

17    your knowledge, did any of them who are named as investors

18    back in 2019 leave as a result of the WSJ article.

19          THE WITNESS:  Yes, DeepCurrents did.

20          THE COURT:  No, but -- I'm sorry, besides

21    DeepCurrents.  It's really just this paragraph here that

22    lists three -- four -- well, two investors and two portfolio

23    companies.

24          MR. JOSEPH:  Your Honor, that's only probative if

25    they were counterparties at the time.  They wouldn't be

Page 149

1    redacted if they're former counterparties.  They'd already

2    be on the list.

3            THE COURT:  No, but again, it is probative in the

4    sense that the declaration states that this article had a

5    major effect, obviously listed a lot of companies.  If a lot

6    of the companies listed in the article didn't leave because

7    of this article, then that rebuts the contention of the

8    declaration.

9            MR. JOSEPH:  Only if they were and are --

10            THE COURT:  Not necessarily, just if they were.

11    Not --

12            MAN 1:  But --

13            THE COURT:  -- they are.

14            MAN 1:  If they were not, then an answer to that

15    doesn't -- it's not probative.

16            THE COURT:  Well, you're -- there should be a

17    foundation for the question, which is, was this article

18    accurate about this paragraph that Jonathan Sackler is also,

19    at the time of the article, an investor in Brookside Equity

20    Partners and Soundview Real Estate Partners.

21            MAN 1:  And an objection to that has already been

22    sustained, because that's the information they're seeking.

23            THE COURT:  No, it's as -- they're seeking it

24    today, the information as of today, not back in March of

25    2019.

Page 150

1          MAN 1:  Your Honor --

2          THE COURT:  So that is a proper foundation to lay.

3     Obviously, if the Wall Street Journal got its facts wrong

4     and there never were, then you don't need to ask the next

5     question.

6          MAN 1:  All I would say, Your Honor, is if they

7     were and remain, then that's disclosing a --

8          THE COURT:  No, it doesn't.  Just if they were,

9     not and remain.  And remain is not part of the question.

10          MAN 1:  But --

11          THE COURT:  A lot can happen in two years.

12          MAN 1:  That's the next question.

13          THE COURT:  No.  Well, it may be, but that -- your

14     objection to that question would be sustained.

15          MAN 1:  Thank you, Your Honor.

16          THE COURT:  Okay.  So first, Mr. Lynam, you see

17     the four names here.

18          THE WITNESS:  Yes.

19          THE COURT:  To your knowledge, is this statement

20     accurate as of the time this article was written?

21          THE WITNESS:  Yes, and just to be clear, are you

22     referencing the paragraph that starts with "Jonathan Sackler

23     is also an investor"?

24          THE COURT:  Yes.  Yes, correct.

25          THE WITNESS:  Yes.  So yes, this paragraph was

Page 151

1    accurate at the time.

2              THE COURT:  Okay.  And so, I think the next

3    question, then, would be, did this article cause any of

4    these investments to be lost to Jonathan Sackler?

5              MAN 1:  And that one, I do object to.  That is

6    seeking current investment counterparty information.

7              THE COURT:  Well, no, because --

8              MAN 1:  Because --

9              THE COURT:  Again, not just lost, because of this

10   disclosure, because of this article.  Remember, we're

11   talking about publishing more articles with more names, so I

12   think it's appropriate to say because of this article, to

13   your knowledge, were any of these investments lost.

14             THE WITNESS:  Sure.  So, the answer is yes, but

15   I'm referring actually to the bottom of the page in

16   particular.  There's a reference to fund manager Thomas

17   Russo of Gardner, Russo, and Gardner.  My declaration speaks

18   to an instance of a fund manager -- excuse me, an investment

19   advisor terminating relationships with the Jonathan Sackler

20   family in July 2020.  I spoke with Mr. Russo in July of

21   2020.  He informed me that because of his tie to the Sackler

22   family in the media and because of the general cancel

23   culture tone of the media coverage about the Sackler family,

24   following Jon Sackler's death in June 2020, Mr. Russo was no

25   longer comfortable working with the Sackler family, and that

Page 152

1    relationship was a very longstanding one that went back to

2    the 1990s.

3                 THE COURT:  Okay.  Ms. Townsend, I -- do you want

4    to go ahead?

5                 MS. TOWNSEND:  Thank you, Your Honor.

6    BY MS. TOWNSEND:

7    Q    Mr. Lynam, so it's your testimony that Mr. Russo is one

8    of the three unreported investment managers identified or

9    referred to in Paragraph 6 of your declaration?  Is that

10   right?

11   A    Let me just refresh my memory about the exact paragraph

12   number.

13   Q    Sure, and it's Exhibit 1, Tab 1.

14   A    Okay.  So, Paragraph 7 of my declaration references two

15   investment advisors in the middle of the paragraph and one

16   of them informed Kokino on or around July 14th, 2020 that

17   they wished to end their business with the family.  That is

18   referencing Gardner Russo.  And we are not seeking to redact

19   Gardner Russo's name from the privilege log.

20   Q    Are the other two unreported investment managers that

21   you refer to in your declaration in Paragraph 7 of your

22   declaration, are those also individuals whose names are not

23   redacted in the privilege log?

24   A    That is correct.  They are not current business

25   counterparties, so they are not redacted.

Page 153

1   Q   Okay.  So, you testified -- let's go through each of

2   those.  You testified that one hedge fund manager informed

3   Kokino on or around October 3rd, 2019 that it would redeem

4   the Jonathan Sackler family's investment in its hedge fund.

5   What is the name of that hedge fund manager?

6   A   Its name is Briarwood.

7   Q   And did Briarwood, in fact, redeem the Jonathan Sackler

8   family's investment in its hedge fund?

9   A   Yes.

10   Q   When did it do that?

11   A   In late 2019.

12   Q   How did you learn of Briarwood's decision to redeem the

13   Jonathan Sackler family's investment in its hedge fund?

14   A   So Briarwood was a longstanding hedge fund

15   relationship.  Jonathan Sackler's family was a seed investor

16   in the hedge fund and helped it get started.  And again, Mr.

17   Rose who I described earlier informed me as general counsel

18   for Kokino that because of the fear of being connected to

19   the Sackler family and the perceived adverse effects that

20   that connection would have on Briarwood's business,

21   Briarwood was seeking to force redeem the Jonathan Sackler

22   family and what were Kokino's options given that scenario.

23   Q   So to be clear, you learned of Briarwood's redemption

24   decision in late 2019 from Mr. Olson.  Is that correct?

25   A   No, it's not correct.  I learned it from Mr. Rose.

Page 154

1   Q    I apologize.  Remind me Mr. Rose's position and title.

2   A    Mr. Rose oversees the hedge fund portfolio at Kokino.

3   Q    Okay.  Did you speak to anyone at Briarwood about its

4  redemption decision in late 2019?

5   A    Not that I recall.

6   Q    Have you ever spoken with anyone at Briarwood about its

7  redemption decision?

8   A    No, but I asked Mr. Rose to go back to Briarwood and

9  remind them of their privacy policy.

10   Q    Why would you do that?

11   A    Because we didn't want this redemption to be widely

12  communicated.

13   Q    Why is that?

14   A    Because it's a highly uncommon occurrence for a

15  investor to be force redeemed from a hedge fund.  In my

16  experience, I've only seen it recently with these instances

17  that I'm talking about in my declaration.

18   Q    Was the Sackler family's relationship with Briarwood

19  public prior to its redemption decision?

20   A    No.

21   Q    Purdue filed for bankruptcy on September 15th, 2019,

22  correct?

23   A    I believe so.

24   Q    That's fewer than three weeks before Briarwood informed

25  Kokino that it would redeem the Jonathan Sackler family's

Page 155

1   investment in its hedge fund, right?

2   A    Yes.  Approximately, I believe.  Yes.

3   Q    Do you think it's possible that the fact that Purdue

4   declared bankruptcy was a factor in Briarwood's decision to

5   redeem the Jonathan Sackler family's investment in its hedge

6   fund?

7   A    I can't speculate as to exactly what calculus went

8   through Briarwood's head, so that's my response.

9   Q    You cited in your written testimony an article that was

10  published in New York Times a couple of months later on

11  December 16th, 2019 entitled "Purdue Pharma Payments to

12  Sackler Family Soared Amid Opioid Crisis."  That's at Tab

13  26.  Can you turn to Tab 26?

14  A    Yes.

15          MS. TOWNSEND:  We'll mark that as Exhibit 4.

16      (Exhibit 4 Marked For Identification.)

17  BY MS. TOWNSEND:

18  A    Okay.

19  Q    You testified that two days after that New York Times

20  article was published on December 18th, 2019, an investment

21  counterparty notified Kokino that it would terminate its

22  business relationship with the Jonathan Sackler family in

23  2020 due to the impact on their business if their

24  relationship with the Jonathan Sackler family became known.

25  A    Correct.

1   Q    I apologize.  I was looking at your declaration.  I

2   didn't want to confuse you.

3   A    That's okay.  I follow you.

4   Q    This article, it's Paragraph 8.

5   A    Yes, Paragraph 8 of my declaration.

6   Q    What did you mean by investment counterparty in this --

7   in Paragraph 8 of your declaration?

8   A    I'm referring to a financial intermediary.

9   Q    Did that financial intermediary, in fact, terminate its

10  business relationship with the Jonathan Sackler family in

11  2020?

12  A    Yes, it did.

13  Q    Do any members of the Sackler family or any associated

14  family entities have any ongoing relationship with that

15  financial intermediary?

16  A    No.  No, and just to clarify for the record, the

17  business counterparty communicated to us that it was ceasing

18  to work with us and it gave us a period of time to move the

19  assets away from its accounts into another financial

20  institution.

21  Q    How did you learn that that financial intermediary was

22  going to be terminating its business relationship with the

23  Jonathan Sackler family?

24  A    So I learned about this from Kokino as chief operating

25  officer who was the relationship with the financial

Page 157

1    intermediary in question.  He sits next to me.  His office

2    is next door to me.  He came to me informing me that this

3    financial counterparty was terminating the Jonathan Sackler

4    family's accounts and that it would be unwinding the support

5    that we needed to maintain this proprietary trading

6    strategy.  This was a significant development, so he wanted

7    to know what legal options Kokino might have.

8    Q    Did he tell you anything else?

9    A    Yes, he did.

10   Q    What else did he tell you?

11   A    He told me that the financial counterparty in question,

12   given all the media surrounding the Sackler family, all of

13   which is negative, they could not justify or they could not

14   determine how they would communicate or answer to the

15   shareholders if their shareholders found out that they were

16   holding assets of the Sackler family.

17   Q    Is that the sole basis for your testimony in Paragraph

18   8 concerning the December -- the notification on December

19   18th, 2019 by an investment counterparty that would be

20   terminating (sound drops) the Jonathan Sackler family?

21   A    No, it's not.

22   Q    What else forms the basis for that?

23   A    I reviewed the actual termination letters that the

24   financial counterparties sent Kokino.

25   Q    What did those, if anything -- strike that.  What did

Page 158

1    those letters indicate, if they indicated anything, about

2    the reason for the termination?

3    A    They do not go into the reason.  They just say that the

4    business accounts closed and you have to move your assets

5    out by this date.

6    Q    Did you ever speak with anyone at the financial

7    intermediary about the reason for their decision to

8    terminate the business relationship with the Jonathan

9    Sackler family?

10   A    It's possible that I did, but not that I can recall.

11   Q    To your knowledge, in their discussion with Kokino's

12   CEO or communications with Kokino's CEO, rather, did anyone

13   from that financial intermediary cite the New York Times

14   article that you've cited in Paragraph 8 of your

15   declaration, the one we've marked as Exhibit 4?

16   A    So Kokino's chief operating officer had had several

17   conversations with this financial counterparty over the

18   months preceding December 2019 and he told me that every

19   time a bad article comes out, this financial counterparty

20   seems to wince.  So here, this article from the New York

21   Times came out on December 16th and then two days later,

22   this financial counterparty, investment counterparty,

23   informed Kokino that it would terminate its business

24   relationship, as I described in my declaration.

25   Q    So is it fair to say it was your assumption based on

Page 159

1    your discussions with the CEO that this December 18th, 2019

2    -- excuse me, December 16th, 2019 New York Times article was

3    somehow connected to the financial intermediary's decision

4    to terminate its business relationship?

5    A    It's not my assumption.  It's what my -- our chief

6    operating officer told me.  He told me this article was the

7    last straw.

8    Q    And this is many layers of -- perhaps lacking personal

9    knowledge, but did he --

10              MR. JOSEPH:  Object as (sound drops).

11   BY MS. TOWNSEND:

12   Q    Did the CEO tell you that someone from this financial

13   intermediary had cited this article or he just told you that

14   was what he thought?

15   A    I don't recall.

16   Q    Looking back at Paragraph 7 of your declaration -- and

17   that's Exhibit 1, Tab 1 if you want to turn back to that.

18   A    Okay.

19   Q    You've indicated that -- you testified that two

20   investment advisors informed Kokino on or around July 14th,

21   2020 and September 30th, 2020 respectively that they wished

22   to end their business relationships with the family.

23   A    Yes.

24   Q    With respect to July 14th, 2020, you indicated that

25   that investment advisor was Mr. Russo.  Is that correct?

Page 160

1    A    To be precise, it was Gardner Russo.  Tom -- Mr. Russo

2    works at Gardner Russo.

3    Q    Thank you.  Okay.  Was -- it was Gardner Russo.  How

4    did you learn that Gardner Russo had decided to end its

5    business relationship with the family -- Sackler family?

6    A    I learned when Mr. Russo told me.

7    Q    Okay.  So, you had conversation with Mr. Russo about

8    that decision?

9    A    Yes, I did.

10   Q    What did Mr. Russo tell you was the basis for that

11   decision?

12   A    Mr. Russo told me that notwithstanding the fact that

13   his firm had worked with the Sackler family for decades, the

14   uniformly bad media coverage of the Sackler family had

15   prompted him to be approached by personal and professional

16   contacts and he had been tied to the Sackler family in an

17   article which we already went through earlier during this

18   testimony, and since Jon Sackler had passed away recently

19   and he's -- he viewed his primary relationship to be with

20   Jonathan Sackler maintaining the business relationship with

21   the Jonathan Sackler family.

22   Q    Did Mr. Russo tell you anything else?

23   A    Not that I recall.

24   Q    -- that conversation?

25   A    No, not that I recall.

Page 161

1    Q    Was that conversation before or after Gardner Russo

2    informed Kokino on or around July 14th, 2020 of its decision

3    to end its business relationship with the family?

4    A    So when I say somebody informed Kokino, what I'm

5    referring to is somebody informed the personnel who works

6    for Kokino.  In this instance, July 14th, 2020, was the date

7    that I, in the first instance, learned this from Mr. Russo.

8    So that's what I mean by somebody -- Kokino was informed

9    around that date.

10   Q    I see.  So that conversation with Mr. Russo that you

11   were referring to took place on or around July 14th, 2020.

12   Is that right?

13   A    Correct.

14   Q    Did you have any other conversations with Mr. Russo

15   about Gardner and Russo's decision to terminate its business

16   relationship with the family?

17   A    Yes.  I believe I did, because it was a, what I refer

18   to as a managed account.  It's a brokerage account with

19   trading authority given to the investment advisor, so there

20   was some back and forth over the coming days where we had to

21   sever their connection to the account.  Just operationally,

22   we had to do a bit more work.

23   Q    Did you have -- during those discussions, that back and

24   forth over the following days, did you have any further

25   discussions with Mr. Russo about the reasons for Gardner

Page 162

1  Russo terminating its business relationship with the family?

2  A    No, he was very clear with me on July 14th what his

3  reasons were.

4  Q    In Paragraph 7, you referred to another investment

5  advisor that informed Kokino on or around September 30th,

6  2020 that it wished to end its business relationship with

7  the family.  Did it, in fact, end its business relationship

8  with the family?

9  A    Sorry, Ms. Townsend, can you ask that question one more

10  time?  I didn't hear it entirely.

11  Q    Sure.

12  A    Thank you.

13  Q    In Paragraph 7, you --

14  A    Yes.

15  Q    -- also referred to an investment advisor that informed

16  Kokino on or around September 30th --

17  A    Yes.

18  Q    -- 2020 of its decision to end its business

19  relationship with the family.

20  A    Yes, I see that.

21  Q    That investment advisor did, in fact, end its

22  relationship with the family.  Is that correct?

23  A    Yes.  Specifically, the investment advisor communicated

24  to Kokino that it was no longer comfortable working with the

25  Sackler family, so it was a managed account again and we

Page 163

1   worked with them to disengage them from the account.

2   Q    Is that investment advisor named in the privilege log

3   materials that you reviewed?

4   A    No, not to my recollection.

5   Q    Is the relationship between or prior relationship, I

6   should say -- strike that.  With respect to the investment

7   advisor that informed Kokino on September 30th, 2020 that it

8   wished to end its business relationship with the family, was

9   its business relationship with the family public at that

10  point in time?

11  A    No.

12  Q    Has it ever been made public, to your knowledge?

13  A    No, not to my knowledge.

14  Q    Did you speak with anyone at that investment advisor

15  about its decision to end its business relationship with the

16  family?

17  A    No, I did not.  Again, this was an instance where

18  Kokino was informed through its president and chief

19  investment officer that this counterparty no longer wanted

20  to work with the Jonathan Sackler family.

21  Q    And you were then in turn informed by the president and

22  chief investment officer, is that correct?

23  A    Yes, that's correct.

24  Q    In Paragraph 9 of your declaration, which is Exhibit 1,

25  Tab 1, you testified that you're aware of or have been

Page 164

1    informed of at least six other financial institutions that

2    between May 2019 and late 2020 either terminated their

3    banking or broker dealership -- dealer relationships with

4    the Jonathan Sackler family and associated business entities

5    or private foundations or decided to avoid or limit business

6    with the Jonathan Sackler family.  Do you see that

7    testimony?

8    A    Yes, I do.

9    Q    Of the six financial institutions that you were

10   referring to, how many, in fact, terminated a banking or

11   broker dealership -- excuse me, broker dealer relationship

12   with the Jonathan Sackler family?

13   A    So all six of these financial institutions were broker

14   dealers or banks and I think that answers your question.  If

15   it doesn't, you can ask me again.

16   Q    Of those six financial institutions, how many, in fact,

17   terminated their relationship with the Jonathan Sackler

18   family?

19   A    Five of them.  No, I'm sorry.  Let me correct that.

20   Four of them.

21   Q    So with respect to the other two of the six financial

22   institutions you're referring to in this paragraph, they, in

23   your words, decided to avoid or limit business --

24   A    That's correct.

25   Q    -- the Sackler family, but did not terminate a

Page 165

1    relationship.  Is that right?

2    A    That's correct.  Yes, that is correct.

3    Q    With respect to the four banking institutions that

4    terminated their relationships with the Jonathan Sackler

5    family, are they -- are any of those four identified or

6    named in the privilege log materials that you reviewed?

7    A    Well, I know that they're not redated.  I don't recall

8    if they're mentioned or not at all.  The privilege log is

9    tens of thousands of rows.

10   Q    What are the names of those four institutions?

11   A    They are two banks in Bermuda.  One is HSBC.  One is

12   Butterfield.  Royal Bank of Canada and the fourth one is a

13   brokerage firm called Interactive Brokers.

14   Q    With respect to HSBC, when did that institution end its

15   business relationship with the Sackler family?

16   A    So the communication -- the formal communication that I

17   received was a letter, came in October 2019 -- October 15th,

18   2019.

19   Q    Is that how you learned of its decision to end its

20   business relationship with the Sackler family?

21   A    Yes.

22   Q    Did you ever speak with anyone at HSBC concerning that

23   decision?

24   A    No, I did not.  The letter was provided to me as legal

25   counsel for Kokino.  So, I didn't personally speak with HSBC

Page 166

1    about this.

2    Q    Prior to that decision in October 2019, was HSBC's

3    banking or broker dealer relationship with the Jonathan

4    Sackler family public?

5    A    No, not to my knowledge.

6    Q    With respect to Butterfield, when did that institution

7    end its business relationship with the Sackler family?

8    A    The same day, October 15th, 2019.

9    Q    Did you communicate with anyone at Butterfield about

10   its reasons for that decision?

11   A    No.  No, the situation was very similar to HSBC.

12   Q    At the time, in October of 2019, was Butterfield's

13   relationship with the Sackler family publicly known?

14   A    Not to my knowledge.

15   Q    With respect to the Royal Bank of Canada, when did that

16   institution end its business relationship with the Sackler

17   family?

18   A    I believe that Butterfield, HSBC, and Royal Bank of

19   Canada all communicated their termination to the Jonathan

20   Sackler family in October 2019.

21   Q    Did you communicate with anyone at the Royal Bank of

22   Canada regarding that decision?

23   A    No. Again, I did not.  These events were all sort of

24   cold, uniform letter that came to us.  My inference, and I

25   believe it's a reasonable inference, is that the tone of the

Page 167

1    press that surrounded the Sackler family in October 2019,

2    which, shortly after the bankruptcy, my belief is that tone

3    caused these institutions to sever ties with the Jonathan

4    Sackler family.  The HSBC and Butterfield accounts had been

5    open for decades -- I believe close to 1990, maybe 1987 for

6    one of them -- and the Royal Bank of Canada account had been

7    open since (sound drops).  So, these were longstanding

8    relationships.

9    Q    Did you communicate with anyone from Interactive

10   Brokers about its decision to terminate its business

11   relationship with the Sackler family?

12   A    So I was the point of contact with Interactive Brokers

13   for these accounts.  Interactive Brokers is a clever

14   business model.  It's a very low-cost model, so you don't

15   typically have human contact.  Most of it is done through

16   email.  I received an email in late 2020 which informed me

17   that the accounts we had recently opened closed.  I thought

18   this was alarming because we worked with Interactive Brokers

19   for many, many years (sound drops) 2015, maybe 2018, and

20   then we ceased working with them and then we turned back to

21   them again and they wouldn't open the account.

22   Q    Did you communicate with Interactive Brokers about its

23   reason for that decision?

24   A    No.  I don't think I would've even had the opportunity

25   to because of how their business model is set up.

Page 168

1    Q    October 15th, 2019 is pretty much exactly one month

2    after Purdue declared bankruptcy.  Is that correct?

3    A    That's --

4    Q    Or filed for bankruptcy.  Is that right?

5    A    Yes, that's correct.

6    Q    Do you think that Purdue's filing for bankruptcy in

7    (sound drops) 2019 could've had any impact on the decision

8    of any four of these institutions to terminate their

9    business relationship with the Sackler family?

10   A    No.  My inference is that these businesses were

11   concerned that being connected to the Jonathan Sackler

12   family would somehow be bad for their business.

13   Q    But that inference isn't based on any information that

14   you received from any of those institutions, right?

15   A    No, but I think it's a reasonable inference because

16   between May 2019 and May 2020, the Sackler family was

17   viciously and inaccurately portrayed in the press.  So

18   that's the basis of my inference.

19   Q    You don't think it's a reasonable inference that any

20   one of these institutions might have been reacting to the

21   fact that Purdue filed bankruptcy in September of 2019?

22   A    I mean, with Interactive Brokers, for example, the

23   account owners aren't even owners of Purdue.  So, I don't

24   know.

25   Q    Of the two institutions that you indicated decided to

Page 169

1    avoid or limit business with the Jonathan Sackler family,

2    how many of those at that time -- of those two at the time

3    had an existing business relationship with (sound drops)?

4    A    So one of them was a longstanding counterparty and it

5    refused to open up new accounts going forward.  The other

6    one was a dormant relationship that we worked with for many,

7    many years and we wanted to turn back to them and they just

8    didn't want to engage us anymore.

9    Q    With respect to -- and I apologize if you -- you may

10   have already answered this, but I want to make sure I'm

11   clear on this.

12   A    Sure.

13   Q    With respect to those two institutions, those two

14   institutions have existing business relationships with the

15   Sackler family.  Is that correct?

16   A    One of them certainly did.  The other one used to have

17   a relationship with us and we stopped working with them for

18   various reasons and we decided to try to try to turn back to

19   them.  So, it was reestablishing a former relationship.

20   That's --

21   Q    That was the -- that's the institution where you

22   referred to the relationship at dormant.  Is that right?

23   A    That's what I meant.  Yes.

24   Q    With respect to both of those institutions -- well,

25   strike that.  With respect to the first of those two

Page 170

1   institutions, not the one with the dormant relationship

2   A    Mm hmm.

3   Q    Was its business relationship with the Sackler family

4   publicly known at the time it made a decision to avoid or

5   limit future business with the Sackler family?

6   A    No, I don't think it was.

7   Q    Is that relationship publicly known now?

8   A    No, I don't think it is.

9   Q    With respect to the second institution you referred to

10  as a dormant relationship, with respect to that, was the

11  relationship at any time between that institution and the

12  Jonathan Sackler family, to your knowledge, public

13  information?

14  A    No, it would not have been public.

15  Q    Before -- and I'm almost done, Mr. Lynam, but before we

16  wrap up, I wanted to turn back to a piece of your testimony.

17  I inadvertently went off of it relatively quickly.  If you

18  could look back, actually, at Tab 26 --

19  A    Okay.

20  Q    -- (indiscernible) Exhibit 4.  That's "The New York

21  Times" article that you cited and referred to in your

22  declaration.

23  A    No.

24  Q    And you stated in your written testimony that that

25  article reported that the Attorney General of New York

Page 171

1   publicly stated that, "We must see detailed financial

2   records showing how much the Sacklers profited", and that

3   "We need full transparency into their total assets."

4   A    Yes.  That's correct.  That's what was in my

5   declaration.

6   Q    Please look at Page 1 of that article that we've marked

7   as Exhibit 4 at Tab 26.  If you -- this article is reporting

8   on the filing of an audit, specifically a 350-page

9   (indiscernible) accounting for (indiscernible) AlixPartners.

10  It was filed in this bankruptcy proceeding, correct?

11  A    Yes, that's what's referenced here on Page 1.

12  Q    Okay.  In Paragraph 2 of that article, it states that

13  the account report is "likely to renew questions about how

14  much the Sacklers should pay to resolve more than 2,800

15  lawsuits that seek to hold Purdue accountable for the opioid

16  crisis."  You see that?

17  A    Sorry, Ms. Townsend.  I actually didn't hear what

18  section you were referencing to.  There was a bit of

19  background noise.  Would you mind restating that?

20  Q    Sure.  It is Paragraph 2 on Page 1, the last -- I think

21  it's the second and also last sentence of that paragraph

22  that --

23  A    Yes.

24  Q    -- the audit is likely to renew questions about how

25  much the Sacklers should pay to resolve more than --

Page 172

1    A    Yes.

2    Q    -- 2,800 lawsuits that seek to hold Purdue accountable

3    for the opiate crisis.

4    A    Yes, I see it.

5    Q    Do you think that questions about the Sackler family's

6    financial exposure in connection with 2,800 pending

7    lawsuits, as reported in this "New York Times" article could

8    have an affected an investment party -- investment

9    counterparty's decision to continue or not continue a

10   business relationship with the Sackler family?

11   A    Are you asking me to give my view about how other

12   people would have interpreted this development?

13   Q    Well, you cited this article --

14   A    Yes.

15   Q    -- in your declaration as -- at least portions of it --

16   as something you interpreted as being a basis for investment

17   counterparties --

18   A    Yes.

19   Q    -- who made their business relationships with the

20   Sackler family.  Is that right?

21   A    Yes, I did.  That's in my declaration.

22   Q    So I'm asking if a party, an investment counterparty

23   reading this article, might legitimately be concerned about

24   the Sackler family's financial exposure in connection with

25   2,800 pending lawsuits, as reported in this article.  Would

Page 173

1    that factor into their decision to continue or not continue

2    a business relationship with the Sackler family?

3    A    I think the counterparty would have been concerned

4    about being publicly tied to the Sackler family and becoming

5    subject to audits, such as what's described in this

6    paragraph.

7    Q    And you think that based on your reading of the

8    article?

9    A    No.   I also believe what Letitia James said at the

10   bottom of the page.   "We need full transparency into their

11   total assets and must know whether they sheltered them in an

12   effort to protect against creditors and victims."   So you

13   have the New York Attorney General saying that she wants

14   transparency into their total assets.

15   Q    The statement that you just read from New York Attorney

16   General James, the portion of it you just read, "We need

17   full transparency into their total assets and must know

18   whether they sheltered them in an effort to protect against

19   creditors and victims", do you understand the "we" in that

20   sentence to be referring to the Attorney General's office?

21   A    I don't have the original press release in front of me

22   where this was taken from.   But it is a statement that is

23   attributed to Letitia James, the Attorney General of New

24   York.   So I would imagine it's referring to her office.

25   Q    Okay.   So you interpret this statement as the Attorney

Page 174

1    General stating that her office needs full transparency into

2    their total assets.  Is that right?

3    A    That's correct.  That's my interpretation.

4    Q    Would the New York Attorney General's public statement

5    that her office was investigating the Sackler family to

6    determine whether they had sheltered assets in an effort to

7    protect against creditors and victims be a legitimate

8    business concern for a party doing business with the Sackler

9    family?

10   A    I mean, I can't say for sure, but it is a factor to be

11   taken into account.  I think it's reasonable to say that.

12   Q    I thin, Mr. Lynam, that I don't have any additional

13   questions for you.

14          MS. TOWNSEND:  Judge Drain, I'm not sure if Mr.

15   Joseph would like to do any redirect?

16          THE COURT:  Do you have any redirect, Mr. Joseph?

17          MR. JOSEPH:  A few questions, Your Honor.

18            REDIRECT EXAMINATION OF GARRETT LYNAM

19   BY MR. JOSEPH:

20   Q    And Mr. Lynam, if you could have Exhibit 1, your

21   declaration open?

22   A    Sure.

23   Q    With respect to Paragraph 6 and your testimony

24   concerning DeepCurrents and the fact that the family had

25   been a seed investor in DeepCurrents, prior to "The Wall

Page 175

1   Street Journal" article, which was marked as Exhibit 21, had

2   DeepCurrents ever indicated any intention to terminate its

3   relationship with the Jonathan Sackler family?

4   A    No.

5   Q    And with respect to Paragraph 7 of your declaration and

6   your testimony concerning Briarwood, another investment in

7   which the family had been a seed investor, how long had the

8   family had that relationship prior to the termination?

9   A    Mr. Joseph, I'm sorry.  There was a lot of background

10  noise just as you were speaking.  Could you please pose the

11  question again?

12  Q    Sure.  With respect to Paragraph 7 and Briarwood --

13  A    Mm hmm.

14  Q    -- how long prior to the termination in October of 2019

15  had that seed and investor relationship?

16  A    Sure.  So I remember working on the investment

17  documents for this investment when I was at Chadbourne &

18  Parke before I came to Kokino.  That would have been around

19  2014.

20  Q    And with respect to Paragraph 7 and Gardner Russo or

21  Gardner Russo & Gardner LLC, I believe you mentioned that

22  that relationship went back to the 90s?  Am I right about

23  that?

24  A    Yes.  In connection with this event, I reviewed the

25  investment advisory agreements governing this commercial

Page 176

1    relationship, and the oldest one that I had was from the

2    early 1990s.

3    Q    And with respect to the third investment advisor, the

4    one that terminated on September 30, 2020?

5    A    Yes.

6    Q    How long had that relationship been in existence prior

7    to the termination?

8    A    So, again, I remember working on the investment

9    documents when I was at Chadbourne & Parke, so it could have

10   been 2013 or 2014.

11   Q    And with respect to all three of these relationships,

12   before the adverse publicity about the family started

13   emerging, had any of them indicated any intention to

14   terminate their relationship with the family?

15   A    No.

16           MS. TOWNSEND:  Objection to adverse publicity.

17   It's not clear, Mr. Joseph, what you're referring to.

18           THE COURT:  Could you be more specific, Mr.

19   Joseph?

20           MR. JOSEPH:  Or we can refer to "The Wall Street

21   Journal" article as one example.  But we have hundreds of

22   thousands of tweets that are negative about the family.

23   We've got media coverage that's been going on since 2019

24   that has been identify the family as being culpable.  One

25   narrative that has taken root.  That's the publicity I'm

1    referring to.

2              MS. TOWNSEND:  Well, that's outside the scope, I

3    would say, of Mr. Lynam's testimony.  If there were --

4              THE COURT:  (indiscernible) to "The Wall Street

5    Journal" article.

6              MR. JOSEPH:  All right.

7    BY MR. HUEBNER:

8    Q    Prior to the "The Wall Street Journal" article, had any

9    of these three long-time investment advisors indicating any

10   intention to terminate their relationship with the family?

11   A    No.

12   Q    And with respect to Paragraph 8 and your testimony

13   concerning the financial intermediary that terminated the

14   relationship two days after "The New York Times" story,

15   before that story and the other stories you said made it

16   wince about the Sackler family, had that financial

17   intermediary ever indicated an intention to terminate its

18   relationship with the Sackler family?

19   A    No.  we had worked with them for several years and

20   actually created a trading strategy that depended on

21   financing they provided and trading capabilities that we

22   really dealt with them.  So we were good partners.

23   Q    And with respect to the banks referred to, banks and

24   brokerage firms in Paragraph 9, relationships that I believe

25   you testified went back to 1987 --

Page 178

1    A      The oldest one, yes.

2    Q      Well, you testified to another in the early 90s,

3    another in 2000.  Had any of those institutions indicated

4    any intention to terminate relationships with the Sackler

5    family prior to "The Wall Street Journal" article?

6    A      I just have to refresh my memory about the date of "The

7    Wall Street Journal" article.

8    Q      March of '19.

9    A      No.  As I mentioned in my declaration, these events

10   occurred between May 2019 and May 2020.  I had no indication

11   that a termination or avoidance or limitation of business

12   was in the cards.

13   Q      And outside of this litigation, does Kokino maintain

14   the names of current investment counterparties in

15   confidence?

16   A      Yes, it does.

17   Q      Are all of the employees even aware of the names of

18   current investment counterparties?

19   A      No.  We disclose business counterparties on a need to

20   know basis if it's in furtherance of a business purpose.

21          MR. JOSEPH:  Thank you, Your Honor.  I have no

22   additional questions for the witness.

23          THE COURT:  Okay.  Any recross on those questions?

24          MS. TOWNSEND:  No, Your Honor.

25          THE COURT:  Okay.  I would normally ask -- say you

Page 179

1   could step down now, Mr. Lynam.  But you can actually turn

2   off your screen.

3             THE WITNESS:  Okay.  Thank you.

4             MR. JOSEPH:  Your Honor, we have to phone the next

5   witness because counsel didn't want him present during the

6   first cross.

7             THE COURT:  Okay.

8             MR. JOSEPH:  That's being done --

9             THE COURT:  Does anyone need like a five minute

10  break, or are we ready to go as soon as we (indiscernible)

11  Mr. Vellucci?

12            MR. JOSEPH:  We're ready, for the family, Your

13  Honor.

14            MS. TOWNSEND:  I'm ready, Your Honor.

15            THE COURT:  Okay.  Who is setting him up?  Is that

16  you (indiscernible), or is he calling in?

17            MR. JOSEPH:  He's going to just click on the Zoom

18  link he has.

19            THE COURT:  Okay.

20            MR. JOSEPH:  He has the --

21            THE COURT:  All right.

22            MR. JOSEPH:  We're calling him.  We're making the

23  phone call.

24            THE COURT:  Great.

25            WOMAN:  He should be logging in now.

Page 180

1              THE COURT:  All right.  I think Mr. Vellucci has

2    joined us, then.  So again, as I understand it, Mr.

3    Vellucci's declaration is intended to be admitted as his

4    direct testimony, and there's no objection to that.  So, Mr.

5    Vellucci, would you raise your right hand, please?  Do you

6    swear or affirm to tell the truth, the whole truth, and

7    nothing but the truth, so help you God?

8              MR. VELLUCCI:  I do.

9              THE COURT:  Okay.  Thank you.  You can put your

10   hand down.  And it's Frank S. V-E-L-L-U-C-C-I?

11             THE WITNESS:  That is correct.

12             THE COURT:  Okay.  Mr. Vellucci, you submitted a

13   declaration, knowing that it would be your direct testimony

14   in this matter, dated February 7, 2021.  Knowing that's the

15   case, sitting here today is there anything in it that you

16   would wish to change?

17             THE WITNESS:  No, there is not.

18             THE COURT:  Okay.  All right.  Ms. Townsend, do

19   you want to go ahead with cross?

20             CROSS EXAMINATION OF FRANK VELLUCCI

21   BY MS. TOWNSEND:

22   Q    Good afternoon, Mr. Vellucci.  Before we get started,

23   did you receive a binder of materials, (indiscernible)

24   materials?  It looks like you have it handy.  Perfect.  Just

25   wanted to make sure.

Page 181

1           Can you state -- the Court has already had you

2    spell your name, or spelled your name, so I would actually

3    do that for the Court Reporter.  But could you state your

4    current employment title for the record, please?

5    A    Sure.  I'm the Executive Vice President, General

6    Counsel of Summer Road, LLC.

7    Q    Do you currently have any other positions of

8    employment?

9    A    Yes.

10   Q    What are those?

11   A    I am of counsel at Norton Rose Fullbright, and I'm

12   owner, CEO of Sweetcatch Poke.

13   Q    How long have you been of counsel at Norton Rose?

14   A    I've been of counsel at Norton Rose since September

15   1st, when I joined Summer Road.

16   Q    And prior to that, you were a partner there?

17   A    Yes.

18   Q    And I apologize.  The last -- the other position you

19   mentioned was -- I want to make sure I get this right -- CEO

20   of Sweetcatch Poke?  Is that right?

21   A    That is correct.

22   Q    How long have you held that position?

23   A    Since November of 2018.

24   Q    Now, you testified that you've been employed at Summer

25   Road since 2020.  Is that right?

Page 182

1    A    Yes.

2    Q    When in 2020 did you begin to work at Summer Road?

3    A    September 1st.

4    Q    Okay.  Prior to joining Summer Road in September of

5    2020, did you work for the Sackler family?

6    A    Yes.

7    Q    In what capacity?

8    A    I was a partner at Norton Rose Fulbright, and before

9    that, Chadbourne & Parke.

10   Q    And you represented -- strike that.  What was your -- I

11   take it you were there -- you are attorneys for members of

12   the Sackler family.  Is that right?

13   A    Yes.

14   Q    Which members of the Sackler family were you and

15   attorney for prior to September 1, 2020?

16   A    I worked for all Sackler family members, along with the

17   operating companies, both in the U.S. and (indiscernible)

18   corporate transactions.

19   Q    You testified that Summer Road is a single-family

20   office owned by the Richard Sackler family that provides

21   investment management and other services to their family and

22   other associated family clients.  What did you mean by other

23   associated family clients?

24   A    Other members -- other family clients.  Under the

25   Investment Advisor rule, a single-family office has --

1    advises family clients only.  And so they do not need to

2    register under the Investment Advisor Act under the family

3    office exemption.  So we only advise family clients.

4    Q    Is an entity like Cap 1 LLC, for example, a family

5    clients of Summer Road?

6    A    Yes.

7    Q    You testified in your declaration that you understand

8    that certain documents related to this bankruptcy proceeding

9    are currently under seal, and that those documents contain

10   the names of certain hedge funds, banks, brokerages, private

11   equity firms, venture capital firms, financial advisors, et

12   cetera, with which Summer Road and members of the Richard

13   Sackler family have ongoing investments or other business

14   relationships.  What is that understanding based on?

15   A    I mean, I'm the general counsel of Summer Road, and I

16   know the various investments and financial counterparties

17   that they have.

18   Q    What is your understanding that certain documents in

19   these bankruptcy proceedings contain the names of those

20   parties with which Summer Road and members of the Richard

21   Sackler family have ongoing investments or other business

22   relationships?

23   A    I understand many of them are privilege logs that were

24   requested to have current counterparties names redacted.

25   Q    What's the basis for that understanding?

Page 184

1   A    My basis?

2   Q    Yes.

3   A    Court filings and discussions with outside counsel.

4   Q    As you review the privilege log materials that you

5   referenced as containing certain counterparty information?

6   A    Yes.

7   Q    When did you review those privilege log materials?

8   A    Sometime earlier this year.

9   Q    Did you review those privilege log materials prior to

10  submitting your declaration to the Court on February seven,

11  2021?

12  A    Yes.

13  Q    Have you reviewed those privilege log materials or any

14  privilege log materials since then?

15  A    Not really.

16  Q    What do you mean by not really?

17  A    I might have looked at them briefly.

18  Q    When you reviewed those privilege log materials prior

19  to February 7, 2021, were you specifically looking for the

20  names of parties with which Summer Road and members of the

21  Richard Sackler family have ongoing investments or other

22  business relationships?

23  A    Yes.

24  Q    Is that why you reviewed them?

25  A    Yes.

Page 185

1    Q    Is it your understanding that those privilege log

2    materials are entirely or only partially under seal in the

3    vacancy proceeding?

4    A    I don't know.

5    Q    Let me ask that a different way.  That might have been

6    a confusing question.  Is it your understanding that the

7    privilege log materials that you reviewed have been filed

8    publicly with the Court in redacted form, with only certain

9    information under seal, or do you believe they are

10   completely sealed?

11   A    I should pay more attention.  I don't know.  I don't

12   know.

13   Q    Do you know the names of the hedge funds, banks,

14   brokerages, private equity firms, venture capital firms,

15   financial advisors, et cetera, with which Summer Road and

16   members of the Richard Sackler family have ongoing

17   investments or other business relationships that are

18   contained in those privilege log materials that you

19   reviewed?

20   A    Yes, I do.

21   Q    So if I -- and to be clear, I'm not asking you to tell

22   me what those names are -- but if I were to ask you right

23   now to name those parties with which Summer Road or the

24   Richard Sackler family has a current ongoing investment or

25   business relationship with, you could do so, right?

Page 186

1    A    Yes.

2    Q    To your knowledge, how many parties with which Summer

3    Road and members of the Richard Sackler family have ongoing

4    investments or other business relationships with are

5    currently under seal in the privilege log materials that you

6    reviewed?

7    A    I don't know the exact number, but -- no.  A couple

8    dozen, I would assume.

9    Q    So you don't know the exact number, but you think 24 --

10   A    Twenty-four.

11   Q    -- is a good estimate?

12   A    Yeah, twenty to thirty.  Yes.

13   Q    Okay.  Twenty to thirty.  Do you know how many of those

14   twenty to thirty parties whose names are under seal in the

15   privilege log materials you reviewed are the names of

16   individuals, as opposed to entities?

17   A    Do I know how many of each, are you asking me?

18   Q    Do you know how many names are of individuals, as

19   opposed to entities?

20   A    I don't know.

21   Q    Do you know how many of those parties whose names are

22   under seal are hedge funds?

23   A    I don't know the exact number.

24   Q    What about banks?  Do you know how many of those

25   parties, the names of which are sealed in these proceedings,

1    are banks?

2    A    I don't know the exact number.

3    Q    If I were to ask you that same question for the number

4    of brokerages, private equity firms, venture capital firms,

5    you'd give me the same answer?  You don't know the exact

6    number?

7    A    Exactly.  I don't know that without the document in

8    front of me.

9    Q    To your knowledge, are any of the redactions of names

10   of parties that Summer Road and members of the Richard

11   Sackler family have ongoing investments or other business

12   relationships with, are any of those publicly traded

13   companies?

14   A    I think so.

15   Q    Do you know how many?

16   A    I don't recall.

17   Q    Are any of those entities, the names of which are

18   redacted in the materials that you reviewed subsidiaries of

19   publicly traded companies?

20   A    I don't know.  I don't think so.

21   Q    Are any of the redactions of the names of parties with

22   which Summer Road and members of the Richard Sackler family

23   have ongoing investments or other business relationships the

24   names of other associated family clients of the Sackler

25   family?

Page 188

1   A    Can you repeat that, please?

2   Q    Sure.  Are any of the names of parties with which

3   Summer Road and members of the Richard Sackler family have

4   ongoing investments or other business relationships with

5   that are under seal in the privilege log materials you

6   reviewed the names of other associated family clients of the

7   Sackler Family?

8   A    No, they are not.

9   Q    You testified in your -- well, let me do this.  Why

10  don't you turn to Tab 2, which is a copy of your

11  declaration?  We'll mark that as Exhibit 5.  And Mr.

12  Vellucci, I'll refer to that as Tab 2 and Exhibit 5 moving

13  forward.  Do you see that copy of --

14  A    Yes.

15  Q    -- your declaration?

16  A    Yes, I do.

17  Q    Okay.  So do you want to look at Paragraph 4 of your

18  declaration?  It starts on Page 2.

19  A    Yes.

20  Q    You testified that you have been informed of at least

21  seven financial institutions that either terminated their

22  banking or broker dealerships with the -- I'm sorry --

23  strike that.  You testified that you have been informed of

24  at least seven financial institutions that either terminated

25  their banking or broker-dealer relationships with the

Page 189

1    Richard Sackler family and associated business entities or

2    private foundations, or decided to avoid or limit business

3    with the Richard Sackler family and associated business

4    entities or private foundations, between April 2019 and

5    February 2021.  How were you informed of that?

6    A    I was informed of that by having discussions with

7    various employees here at Summer Road, along with looking at

8    corporate records and other correspondence.

9    Q    Why don't we go through each of those?  So of the seven

10   financial institutions that you were referring to in

11   Paragraph 4 of your declaration, how many were you informed

12   terminated a relationship with the Richard Sackler family

13   and associated business entities or private foundations

14   between April 2019 and February 2021?

15   A    No.  I said seven completely terminated and one

16   partially terminated.  In my declaration, it says at least

17   seven financial institutions.

18   Q    I see, okay.  Thank you for clarifying that.

19   A    No problem.

20   Q    Of these seven that completely terminated their

21   relationship with the Richard Sackler family, are any of

22   those institutions identified in a privilege log materials

23   by name that you reviewed?

24   A    No.

25   Q    Of the, with respect to the one institution that

Page 190

1    partially limited, I guess, its relationship with the

2    Richard Sackler family, is that entity to your knowledge

3    identified in the privilege log materials?

4    A    I don't recall right now.  I would have at the time,

5    but I don't have the list in front of me.

6    Q    With respect to the first of the seven financial

7    institutions -- and this might get a little confusing, so

8    why don't I call the first one financial institution A.  Do

9    you have financial institution A in your mind?  Well,

10   actually, let me ask this.  Strike that.

11         Of the financial institutions that you testified

12   terminated their relationship with the Richard Sackler

13   family, how many of those relationships are public

14   knowledge?

15   A    I don't believe any of them are public knowledge.

16   Q    Okay.  Of those seven, how many of those financial

17   institutions, seven financial institutions informed Summer

18   Road that they were terminating -- strike that.

19         Of the seven financial institutions you testified

20   terminated completely their relationship with the Richard

21   Sackler family and associated businesses or private

22   foundations, how many did so prior to September 1st, 2020

23   when you joined Summer Road?

24   A    The majority of them.  I mean, I think four or five of

25   them did.

Page 191

```
 1    Q    How many -- maybe I'll ask the flip of this; it might

 2    be easier for you to answer.  How many of those seven

 3    financial institutions that completely terminated their

 4    relationship with the Richard Sackler family did so after

 5    September 1st, 2019 after you had started with Summer Road -

 6    - or 2020, excuse me, September 1st, 2020.

 7    A    I believe two.

 8    Q    How did -- the first of those two, when did they

 9    terminate their relationship with Richard Sackler family?

10    A    One terminated in November of 2020.

11    Q    And the other terminated when?

12    A    I believe February 2021.

13    Q    With respect to the institution that terminated its

14    relationship with the Richard Sackler family in November of

15    2020, how did you learn of that termination?

16    A    It was brought to my attention by the fund manager that

17    oversees -- from the accounting manager that oversees the

18    accounts and said that the broker had discontinued the

19    relationship.

20    Q    The fund manager at that institution or a fund manager

21    within Summer Road?

22    A    A fund manager at our affiliated family office North

23    Bay.

24    Q    Did you speak with anyone about -- at that institution

25    about that institution's decision to terminate its
```

1    relationship with the Richard Sackler family in November of

2    2020?

3    A    No, I did not.

4    Q    And when you said North Bay, you're referring to North

5    Bay Associates; is that right?

6    A    That is correct.

7    Q    And North Bay Associates is a single-family house owned

8    by the Raymond Sackler family; is that right?

9    A    Yes, it is.

10   Q    So what's the relationship between Summer Road and

11   North Bay Associates?

12   A    North Bay handles the accounting and other financial

13   matters for Summer Road and other family members and

14   clients.

15   Q    With respect to the institution that terminated its

16   relationship with the Richard Sackler family in February of

17   2021, how did you learn about that decision?

18   A    I was informed of it by our head trader at Summer Road.

19   Q    Did you speak with anyone at that institution about its

20   reasons for terminating its relationship with the Richard

21   Sackler family in February 2021?

22   A    Did I speak to anybody?

23   Q    Yes.

24   A    I spoke with the individuals involved, and I found out

25   about it after the fact in preparation for, you know, my

Page 193

1    declaration.

2    Q    Okay.  So when you say the individuals involved, you

3    mean the individuals involved at Summer Road?

4    A    Yes.

5    Q    Okay.  You didn't speak with anyone at the institution

6    that terminated its relationship with the Richard Sackler

7    family, did you?

8    A    No, I did not.

9    Q    And you learned about that February 2021 termination in

10   connection with preparing for the declaration that you

11   submitted on February 7th, 2020 in this bankruptcy

12   proceeding, correct?

13   A    That is correct.

14   Q    With respect to the four financial institutions that

15   terminated their banking or broker-dealer relationship with

16   the Richard Sackler family prior to September 1st, 2020 --

17   A    I'm actually hearing a lot of background noise.

18           THE COURT:  That's my phone.  I'm using it for

19   something.

20           THE WITNESS:  Okay.  I'm sorry.  I'm sorry, Your

21   Honor, I was missing some of the words that Ms. Townsend was

22   saying.

23           MS. TOWNSEND:  I'm just going to start again.

24           THE WITNESS:  Sure.

25   BY MS. TOWNSEND:

Page 194

1    Q    Of the four financial institutions that informed --

2    strike that.  Of the four financial institutions that

3    terminated a banking or broker-dealer relationship with the

4    Richard Sackler family prior to September 1st, 2020, how did

5    you learn of those terminations?

6    A    In discussions with various employees of Summer Road

7    and reviewing the records of Summer Road.

8    Q    Okay.  But those happened before you were employed

9    there, correct?

10   A    That is correct.

11   Q    You testified in your declaration that you believe that

12   decisions to terminate business banking and broker-dealer

13   relationships with the Richard Sackler family and associated

14   business entities or private foundations were motivated by

15   concern over the risks that their (sound glitch)

16   relationship with the Richard Sackler family would become

17   public and that such publicity would be detrimental to their

18   business.  What's the basis for that belief with respect to,

19   let's start with the entity that terminated its relationship

20   in February of 2021?

21   A    That the reason for that believe is in discussing with

22   main trader here at Summer Road that dealt with that broker,

23   he's head of our arbitrage division.  He said that there was

24   this -- you know, they've had a very long relationship and

25   they came and, you know, kind of out of the blue said that

Page 195

1    they were canceling the relationship, terminating the

2    relationship due to an increased risk profile.

3            And it was thought that that was just pretextual

4    for not wanting to be associated with Summer Road and the

5    Sackler family in fear that if it got disclosed publicly,

6    that they would have, you know, tweets and other things, you

7    know, on them and it would hurt the counterparty's business.

8            MS. TOWNSEND:  We'll pause for a second.  There's

9    a little bit of background noise.

10   BY MS. TOWNSEND:

11   Q    Mr. Vellucci, I just want to clarify that a bit.  So it

12   was your understanding that the institution that terminated

13   its relationship with the Richard Sackler family in February

14   2021 informed the Richard Sackler family that the basis for

15   doing so was an increased risk profile, and that that was

16   interpreted by individuals at Summer Road as a pretext; is

17   that accurate?

18   A    Yes.

19   Q    With respect to the institution that terminated its

20   relationship with the Richard Sackler family in November of

21   2020, what's the basis for your belief that it was motivated

22   by concerns over the risk that its commercial relationship

23   with the Richard Sackler family would become public and that

24   such publicity would be detrimental to its business?

25   A    It's based off of various familiar claimed documents

Page 196

1      that the broker wanted us to prepare and provide them,

2      documents that they get, you know, annually.  And after that

3      presentation and they've been a broker for multiple years,

4      they gave us a 30-day notice that they were terminating.

5              And it was the belief of the North Bay Associate

6      person working with this broker, because it's a broker for

7      an investment advisor, an outside investment advisor, and it

8      was her belief that it was due to publicity, you know,

9      surrounding the Sacklers and the fear that this broker did

10     not want to be, you know, exposed that they were doing

11     business with the Sacklers.

12     Q     And she, who works at North Bay Associates,

13     communicated that belief to you; is that right?

14     A     Yes.

15     Q     Did she communicate what the basis of her belief was?

16     A     It was based off of other brokers terminating the

17     relationship, and at least three of them doing so explicitly

18     saying that they terminated the relationship because of the

19     publicity surrounding the Sacklers and the fear that they --

20     you know, it will be disclosed that they are -- you know,

21     publicly disclosed that they are doing business with the

22     Sacklers and that would hurt that bank's or broker's

23     business to be, you know, due to, you know, kind of false

24     narrative that's been in the press for multiple years.

25     Q     And that was the explanation that was given to you by a

Page 197

1    North Bay Associates with respect to the November 2021

2    decision of a financial institution to terminate its

3    relationship with the Richard Sackler family; is that right?

4    A    November 2020, not 2021.

5    Q    Thank you.

6    A    Yes, that is correct.

7    Q    With respect to the four financial institutions that

8    terminated their relationships with the Richard Sackler

9    family prior to September 1st, 2020, what's the basis for

10   your belief that their decisions were motivated by concerns

11   over the risk that their (sound glitch) relationship with

12   the Richard Sackler family would become public and that such

13   publicity would be detrimental to their business?

14   A    In multiple discussions with colleagues of mine at

15   Summer Road who were -- who had conversations and, you know,

16   correspondence with those banks and brokers and were told

17   that the reason for the termination was due to, you know,

18   quote/unquote, "higher ups" that wanted to cancel the

19   relationship.  You know, one relationship that our head of

20   mortgage arbitrage had was, you know, predated his time even

21   at Summer Road, and they had a relationship for over 15

22   years that followed, you know, my colleague through three

23   other hedge funds he was at prior to Summer Road.

24           And the broker was pretty upset about it, but he

25   said it was out of his hands, and he told our head of

Page 198

1    mortgage arbitrage is because of the publicity and the fear

2    that if it was disclosed that they were doing business with

3    Summer Road/the Sacklers that it would be detrimental to the

4    counterparty's business.

5    Q    Other than those conversations with other employees at

6    Summer Road and individuals at North Bay Associates, is

7    there any other basis for your belief that those four

8    financial institutions terminated their relationships with

9    the Richard Sackler family prior to September 1st, 2020 were

10   motivated by concerns over the risk that their commercial

11   relationship with the Richard Sackler family would become

12   public?

13   A    I think, are you asking me if other than the interviews

14   that I (sound glitch), (sound glitch) I did with my

15   colleagues along with looking at various records that they

16   provided to me, did I have any other belief or information?

17   Q    Correct.  Do you have anything other than records you

18   reviewed or conversations with your colleagues?

19   A    No, I do not.

20   Q    Do any of the written records that you reviewed

21   expressly indicate, or expressly state rather, that any of

22   these seven financial institutions were -- their decision to

23   terminate their relationship with the Richard Sackler family

24   was motivated by concerns over the risk that their

25   commercial relationship with the Richard Sackler family

1   would become public?

2   A    Yes.   There were contemporaneous writings by those

3   colleagues to other colleagues at Summer Road explaining the

4   reason for termination.   Each of the banks, except for one,

5   would never put it into writing the reason for their

6   termination, and they would only do it verbally.

7   Q    So you have no written records from any of those

8   financial institutions indicating a basis for terminating a

9   banking relationship with the Richard Sackler family; is

10   that accurate?

11   A    What I have are text messages between Summer Road and

12   some of these banks where they say, you know what, hey,

13   sorry, we can't make this trade for you -- and I'm just

14   summarizing -- and, you know, my colleague would say why,

15   and then they would say, you know, give me a call and I'll

16   explain.   And after that conversation, there would be an

17   email from the trader to our COO telling them about the

18   change in circumstances because the COO is in charge of

19   making sure we have these banking relationships, and he

20   would give the explanation of why.

21          Sometimes, like I said, three of them were

22   explicit of the reason why, because they were fearful of

23   publication of their name and being associated with doing

24   business with Summer Road that would hurt their bank or

25   brokerage business; others were pretextual.   You know, one I

Page 200

1    mentioned earlier said it was because of the risk; a couple

2    of others said because of low business that Summer Road did

3    with those brokers.

4              But the reality is the amount of business that we

5    were doing when they terminated was the same that we'd been

6    doing for three to five years that we had been working with

7    them previously at Summer Road III, Summer Road IV, Summer

8    Road V.  And it was in the strong belief of those brokers,

9    the outside brokers -- our traders at Summer Road that the

10   real reason was because of the fear of publicity surrounding

11   the Sacklers and the false narrative that's been perpetrated

12   by the press.

13   Q    So just to make sure that I have your testimony clear

14   because I want to make sure that we get this right.  Of

15   these seven financial institutions that terminated their

16   relationship with the Richard Sackler family between April

17   2019 and February of 2021, three of those seven in your

18   words were explicit in informing someone at Summer Road at

19   someone at North Bay Associates that they were concerned

20   over the risk that their commercial relationship with the

21   Richard Sackler family would become public; is that

22   accurate?

23   A    That is accurate, except for the three that were

24   explicitly saying that they did not want to continue their

25   relationship with Summer Road due to the fear of it being

1   disclosed and the impact it would have on their business;

2   all three of those were communicated to me by Summer Road

3   employees.  The one implicit one that we mentioned about

4   earlier was the one by North Bay Associate employee.

5   Q    Okay.  And all three of those financial institutions

6   that you indicated were explicit in their reasons for

7   terminating their relationship with the Richard Sackler

8   family to employees of Summer Road made that explicit orally

9   only; in other words, there's nothing in writing that

10  reflects that.

11  A    Again, there is --

12         MAN 1:  I think he's already testified about this,

13  Your Honor.

14         THE COURT:  Okay.  I don't think Ms. Townsend's

15  going to go further on that point though, so why don't we

16  move on.

17  BY MS. TOWNSEND:

18  Q    There was one financial institution that you mentioned

19  that Summer Road -- or rather that you were informed had

20  decided to avoid or limit its business with the Richard

21  Sackler family and associated business entities or private

22  foundations; is that right?

23  A    Are you reading from my declaration or are you

24  mentioning --

25  Q    Yeah.  Look at paragraph 4 of your declaration, you

Page 202

1    said there were at least seven financial institutions that

2    terminated their banking or broker-dealer relationships or

3    decided to avoid or limit business with the Richard Sackler

4    family.  Do you see that paragraph there at 4?

5    A    Yes, I do.

6    Q    Okay.  So we talked about the seven financial

7    institutions that you testified terminated their

8    relationship, and you indicated that there was one that

9    decided to avoid or limit business with the Richard Sackler

10   family, correct?

11   A    That is correct.

12   Q    Okay.  The one that decided to avoid or limit business

13   with the Richard Sackler family, when did it make that

14   decision?

15   A    It made that decision when they terminated our broker

16   relationship with them in April of 2019, which was right

17   after publication in the "Wall Street Journal" about

18   different counterparties to the Sackler family.

19   Q    That entity continues to have a business relationship

20   with the Richard Sackler family; is that correct?

21   A    It's a large financial institution, and another

22   division of the financial institution does do work with the

23   independent associated companies.

24   Q    This decision to limit its business with the Richard

25   Sackler -- well, strike that.  This financial institution's

Page 203

1    decision to limit its business relationship with the Richard

2    Sackler family in April of 2019 happen before you were with

3    Summer Road, correct?

4    A    That is correct.

5    Q    When did you learn of that decision?

6    A    I learned of that decision in preparation for writing

7    the declaration.

8    Q    Okay.  How did you learn about that decision?

9    A    Again, I spoke to various executives and traders here

10   at Summer Road and our financial records if final trades

11   that were made by each of these financial institution

12   brokers, along with the correspondence and information from

13   my colleagues here at Summer Road.

14   Q    You didn't have any conversations at any point in time

15   with anyone at that financial institution about its decision

16   to limit its business relationship with the Richard Sackler

17   family in April 2019, did you?

18   A    No, I did not.

19   Q    And just to be clear, you may have already answered

20   this and I apologize if you did and I'm repeating myself,

21   but just to be clear that seven financial institutions that

22   terminated their relationship and this financial institution

23   that decided to limit its business relationship with the

24   Richard Sackler family, to your knowledge, none of those

25   relationships have ever been publicly known; is that

Page 204

1    correct?

2    A    That is correct.

3    Q    Thank you.  Why don't you take a look at paragraph 5 of

4    your declaration; that's tab 2, Exhibit 5, paragraph 5 is on

5    page 3.

6    A    Yes.

7    Q    You testified that in Spring of 2019, media reports

8    about the Richard Sackler family's investment in Peak

9    Resorts, Inc. prompted calls for boycotts of its resort

10   properties.  You didn't work for Summer Road in the Spring

11   of 2019, did you?

12   A    I was not an employee of Summer Road, but I was outside

13   counsel for Summer Road during the Spring of 2019.

14   Q    Okay.  But you cite in your written testimony two news

15   articles about the Richard Sackler family's investment in

16   Peak Resorts, Inc. and one of its resorts, Mount Snow in

17   Vermont.  One of those is a "VTDigger" article dated April

18   18th, 2019 entitled, "Sackler Family has largest stake in

19   Mount Snow's parent company," and the other is a "Boston

20   Globe" article dated May 6th, 2019 entitled, "The Sackler

21   family's involvement in Mount Snow stirs controversy."  Do

22   you see that in paragraph 5 of your declaration?

23   A    Yes, I do.

24   Q    Okay.  The Sackler family's investment in Peak Resorts,

25   Inc. was public information prior to the publication of both

Page 205

```
 1    of these articles, correct?

 2    A    Yes.

 3    Q    And the Sackler family's investment in Peak Resorts,

 4    Inc. had been public since 2015, had it not?

 5    A    I don't remember the first date that it became public,

 6    but whenever the first SEC filing that recorded it would be

 7    the date that it became public.

 8    Q    Can you look at tab 24 -- and we can mark that as

 9    Exhibit 6.

10    A    Bear with me.

11    Q    No problems.

12    A    Your binder is not turning very well.  Okay, tab 24,

13    "Sackler family has the largest stake in Mount Snow's parent

14    company."

15    Q    Yes.  Is the "VTDigger" article you referenced in your

16    written testimony?

17    A    I just want to make sure this -- a lot of articles got

18    picked up by other newspapers.  I believe -- yes.  Yes, it

19    is.

20    Q    So the information in this article is based on SEC

21    filings, correct?

22    A    I --

23    Q    That was a tough question.  Let me do it this way

24    instead.  Why don't you look at page 3 of this article,

25    which is tab 24, Exhibit 6.  Are you there?
```

Page 206

1    A    Page 3 of 9?

2    Q    Yes.

3    A    Mm hmm.

4    Q    Okay.  So you see in the article, it states, "Cap 1 has

5    owned shares in Peak Resorts since at least 2015, SEC

6    documents show."  Does that indicate that this article is

7    based at least in part or this portion of the article is

8    based at least in part on SEC documents dating back to at

9    least 2015?

10    A    Yes.

11    Q    Why don't we look at the "Boston Globe" article, can

12    you turn to tab 19 of the binder?  We'll mark that as

13    Exhibit 7.  Are you there?

14    A    Not yet.  I'm there now.

15    Q    Is this the "Boston Globe" article you refer to in your

16    written testimony?

17    A    Yes, it is.

18    Q    Is your statement in paragraph 7 of your declaration

19    that -- strike that.  Is your statement in your written

20    testimony that media reports about the Richard Sackler

21    family's investment in Peak Resorts, Inc. prompted calls for

22    boycotts of its resort properties based on anything other

23    than the "VTDigger" article, the "Boston Globe" article, and

24    the comment thread that you cite in your declaration?

25    A    Yes, it is.

1    Q    What else is it based on?

2    A    Based on my conversations with Summer Road's executive

3    vice president in charge of investments, who was also a

4    former board member of Peak Resorts.

5    Q    And what did that -- what in those conversations

6    indicate to you that there were calls for boycotts of Peak

7    Resorts, Inc. properties?

8    A    I mean, he just -- he told me that there were multiple

9    boycotts called for against Peak Resorts.  He also told a

10   story of how when these articles broke, there was reporters

11   that stayed at the bottom of the mountain and when skiers

12   finished their run, the reporter would ask the skier, "Do

13   you know that the Sacklers own this mountain and what do you

14   think about that."

15   Q    Based on what you were told by other employees --

16   strike that.  Other than what you were told by other

17   employees at Summer Road and the "Boston Globe" article, the

18   "VTDigger article" and the comment to the thread that are

19   cited in paragraph 5 of your declaration, is there anything

20   else that forms the basis for your understanding that media

21   reports about the Richard Sackler family's investment in

22   Peak Resorts, Inc. prompted calls for a boycott of the

23   properties?

24   A    So it was discussions with my colleague at Summer Road

25   who said that there were these, you know, boycotts that were

1    mentioned, and I just did a quick Google search and I pulled

2    up a couple of articles, but I did not do extensive

3    research, and I assume if I did more research, I would have

4    pulled up many, many more articles about it.

5    Q    What makes you assume that you would have picked up

6    more -- pulled many more articles?

7    A    Because I did a quick Google search and got these --

8    you know, found these articles and felt that was sufficient

9    to add to my declaration and did not go further than that.

10   But as everybody knows, if you do further Google searches

11   and research, you'd probably find a lot more articles and

12   other threads and blog posts.

13   Q    Can you turn to page 6 of 8 of tab 19, Exhibit 7; that

14   is the "Boston Globe" article that we were just referencing.

15   A    You said page 6 of 8?

16   Q    Page 6 of 8 of Exhibit 7?

17   A    Mm hmm.

18   Q    And you'll notice towards the end of the page, there's

19   a paragraph that begins, "In the popular 'Ski the East"

20   Facebook group, some users discussing the ownership

21   situation, said they'd bypass Mount Snow next year.  One

22   even tried to get a hashtag going, hashtag boycott Mount

23   Snow."  Do you see that?

24   A    Yes, I do.

25   Q    The article goes on to report that others took a more

Page 209

```
 1    measured view.  "How about we make the community of Peak

 2    Resorts areas a success, despite who happens to have

 3    invested, not tear down the economic fabric to spite an

 4    investor."  Another person wrong, "Any actions that are

 5    positive or negative are more critically felt by those

 6    living in the community."

 7             Is it fair to say that this "Boston Globe" article

 8    was reporting on disagreement among skiers as to whether a

 9    boycott of Mount Snow would be appropriate?

10    A    Unfortunately, the last line of page 6 to 8 is cut off

11    in my binder.

12    Q    It's continued on page 7, so it's at the top of page 7.

13    A    So it says, "area success despite who," another person

14    wrote?

15    Q    No.  It's at the very top, "happens to have invested,

16    not tear down the economic fabric to spite one investor."

17    A    Yes, I do see it now.

18    Q    So is it fair to say this article was reporting on some

19    disagreement among skiers as to whether a boycott of Mount

20    Snow would be appropriate?

21    A    I have no basis for making any assumption there.

22    Q    When you -- you cited this article as evidence in your

23    declaration that there were calls for a boycott, correct?

24    A    Yes.

25    Q    And don't you think this article also reflects
```

Page 210

1    disagreement with the notion of a boycott?

2    A    I think this reflects the reality of these boycotts,

3    you know, and it's a shame.  I mean, these are premised on

4    articles that were not factual, that attacked the Sacklers

5    personally for gain by, you know, I would say plaintiff's

6    lawyers who said that was their strategy.  And now, it

7    causes this cancel culture.

8             MR. TROOP:  Your Honor, I think that's complete

9    speculation with regard to the --

10             THE COURT:  Could you just identify yourself,

11   please?

12             MR. TROOP:  (indiscernible) for personal

13   knowledge.

14             THE COURT:  I'm sorry.  Can you just identify

15   yourself?

16             MR. TROOP:  Your Honor, I'm sorry.  Andrew Troop

17   for the non-consenting states, Your Honor.  Mr. Vellucci

18   several times has identified the articles are perpetrating a

19   false narrative and he's continuing to do so without any

20   basis or foundation to do so.  It is improper.

21             THE COURT:  Okay.  I think it's largely irrelevant

22   to this dispute in any event, so I'm not putting much stock,

23   if any, in the statement.  I also think the question is

24   basically answered by reading the article itself, so I think

25   we should move on, the question that Ms. Townsend had asked.

1          MR. TROOP:  Thank you, Your Honor.  Just to be

2    clear, we're not conceding any of those (crosstalk).

3          MAN 1:  Objection, Your Honor.

4          THE COURT:  This is not oral argument.  I ruled on

5    the objection and I told you that I'm not going to consider

6    that response, so let's move on.

7          MR. TROOP:  Thank you, Your Honor.

8          THE WITNESS:  I did base my response on actual

9    knowledge that these articles are incorrect, including --

10         THE COURT:  Well, the article we're referring to

11   is just about the ownership in the resorts.

12         THE WITNESS:  Yes.  And what I was saying is that

13   because these incorrect articles and filings by Attorney

14   Generals that --

15         THE COURT:  Let's move on, please.  This is not

16   the point to litigate the merits of claims against the

17   Sacklers.  This is a narrow issue under Section 107 of the

18   Bankruptcy Code.

19         THE WITNESS:  I'm sorry, Your Honor.

20         THE COURT:  I have a question related to this.

21   Did the Sacklers lose money on the investment in resorts or

22   Mount Snow as a result of any of these articles?

23         THE WITNESS:  I don't know the financial impact of

24   these articles on their overall investments.  It's a public

25   company, the price fluctuates based on sales of season

1    passes and other, you know, things like, you know, skiers

2    will buy at the various resorts, so I'm not sure how this

3    impacted the stock price of Peak Resorts --

4              THE COURT:  Okay.

5              THE WITNESS:  -- and their revenue.

6              THE COURT:  Okay, thanks.

7    BY MS. TOWNSEND:

8    Q    Mr. Vellucci, to your knowledge, did any organized

9    widespread boycott of Mount Snow follow the publication of

10   the "Boston Globe" article that you referenced in your

11   declaration?

12   A    I don't know.

13   Q    To your knowledge, was there any organized widespread

14   boycott of Mount Snow that followed the publication of the

15   "VTDigger" article?

16   A    I know that there were calls to do boycotts, and I

17   don't know whether those took place.

18   Q    (crosstalk) calls were successful, right?

19   A    Yes.  I do not know if they were successful.

20   Q    Okay.  Summer Road sold its stake in Peak Resorts; is

21   that correct?

22   A    Yes.

23   Q    And when did that sale take place?

24   A    It took place when Peak Resorts sold their company to

25   another ski company called Vail Resorts.  It wasn't a sale;

Page 213

1   it was an acquisition that all shareholders were bought out.

2   Q    And is it correct that Vail Resorts, Inc. paid the

3   Sackler family a premium on the share price to acquire their

4   share of Peak Resorts?

5   A    Vail Resorts paid all shareholders the same amount of

6   money for the shares that each public shareholder owned in

7   the company.

8   Q    And was that amount that was paid a premium on the July

9   2020 stock price of Peak Resorts?

10  A    I don't recall what the stock price was in July 2020.

11  I don't know if they paid above whatever the trading price

12  was at the time or below.  I would assume it was above, as

13  most mergers are, most public mergers are at above the

14  current stock price.

15  Q    Okay.

16  A    But if you're asking whether the Sacklers got a

17  premium, the answer is no, they did not get any premium;

18  they were treated just like every other shareholder of Peak

19  Resorts, which is a public company.

20  Q    You said in your direct testimony a comment to a thread

21  that was posted online in something called Teton Gravity

22  Research forum.  What is Teton Gravity Research forum?

23  A    I'm sorry.  Can you -- which exhibit are you

24  referencing?

25  Q    Take a look at your declaration, which is Exhibit 5,

Page 214

1    tab 2.

2    A    Yes.

3    Q    And if you look at paragraph 5, that was the paragraph

4    we were just discussing.  You cited a comment to a thread

5    hosted by user -- with the username Old Goat --

6    A    Yes.

7    Q    -- from Teton Gravity Research forums; do you see that?

8    A    Okay.

9    Q    Can you turn to tab 31, please?

10   A    Okay.

11   Q    And we're going to mark that, I believe we're on

12   Exhibit 8, so we'll mark that as Exhibit 8.  Is this the

13   comment thread, the first post is entitled, "Boycott any of

14   the Peak Resorts" that you were referring to in paragraph 5

15   of your direct testimony?

16   A    Can you repeat that?  There's some interference.

17   Q    Sure.  Is this what we've marked as Exhibit 8 a

18   printout of the comment thread, the first post is entitled,

19   "Boycott any of the Peak Resorts" that you're referring to

20   in paragraph 5 of your declaration?

21   A    Yes, it is.

22   Q    Can you turn to the specific comment you cited in your

23   direct testimony?  I believe it's at the bottom of page 2.

24   It's from someone with the username, Old Goat and it has a

25   date and timestamp of April 21st, 2019.  Yes, April 21st,

Page 215

```
1    2019 at 1:41 p.m.  Well, actually strike that.  I'm not sure

2    that we got the timestamp correctly.  Let me just ask you,

3    on page 2 of Exhibit 8, the bottom of page 2, you see the

4    username Old Goat and the comment under that?

5    A    Yes, but he used it -- he joined in January of 2008.

6    Q    Right.  That is the comment that you were citing in

7    your declaration, correct?

8    A    Yes.

9    Q    Do you know anything about the person behind the

10   username Old Goat?

11   A    I mean, just to be clear, I was citing the full thread

12   that's here, not just that comment.

13   Q    Oh, because the declaration reads, "Old Goat comment to

14   thread," and it appears that it's only referring -- or at

15   least referring specifically to that comment.

16   A    Yeah.  I think it's the URL but let me look at it, but

17   okay, yes.

18   Q    And I intended to ask you this previously, but I'll ask

19   you know.  What is Teton Gravity Research forum?

20   A    It is a blog for skiing enthusiasts --

21   Q    And is this --

22   A    -- is my understanding.

23   Q    And you located this through Google searching?

24   A    Yeah.  Like I said earlier, I did a very quick Google

25   search, and this is one of the first things that popped up.
```

Page 216

1    Q    Okay.  So you don't know anything about the username

2    behind -- or the person behind the username Old Goat

3    included in this comment thread, do you?

4    A    No, other than what's here in this comment thread about

5    boycotting Peak Resorts.

6    Q    You don't know if that person has ever been to a Peak

7    Resorts property, do you?

8    A    I do not know.

9    Q    Okay.  The comment that you cited says, "I'm up for the

10   boycott.  Where's Mount Snow?"  Does this indicate someone

11   who is a frequent skier of Mount Snow?

12   A    I think this indicates somebody who would like to

13   boycott Mount Snow based on the other blog posts, and is

14   asking for directions to Mount Snow so they can carry out

15   the boycott.

16   Q    Isn't a boycott when someone who would normally use a

17   product or a service stops using that product or service?

18   A    I mean, I don't narrowly define boycott in that manner.

19   Q    How do you define boycott?

20   A    I would say anyone who is trying to either not use it

21   themselves or trying to get others not to use a specific

22   product.  Like for example, in New York City, there are

23   many, you know, I would call boycotts outside of office

24   buildings by people who are union members against non-union

25   members, and they are -- you know, they have a big, you

Page 217

1    know, inflatable (indiscernible).

2            I don't -- you know, they're wanting people to

3    boycott, not necessarily, you know, those individuals who

4    are not the ones actually working in that building.

5    Q    So this comment from old goat that you've cited in your

6    declaration that says, "I'm up for the boycott, where is

7    Mount Snow?" that is, in your view, evidence of an organized

8    boycott effort directed at Mount Snow that could cause

9    financial harm to Peak Resorts?

10   A    Yes.

11   Q    How many comments are included in this thread in its

12   entirety?

13   A    It looks like there's almost 20 posts in this --

14   Q    So a total of -- I think I counted 19, but a total of

15   19 or 20 comments to this comment thread.  Again, you think

16   that that is a evidence of an organized boycott effort

17   directed at Mount Snow that would cause financial harm to

18   Peak Resorts?

19   A    This is, in my belief, this is one thread and there's

20   probably other articles or threads out there.  I just did

21   not do extensive research because it's pretty apparent,

22   based on the articles about people mentioning boycotts and

23   this thread that there was this discussion to boycott Peak

24   Resorts.

25   Q    Mr. (indiscernible), I just have a couple of additional

1    questions for you, and then I will turn it over to Mr.

2    Joseph, if he has any -- a re-direct.  When determining

3    whether to accept or keep a client or maintain a business

4    relationship, an investment or business counterparty, will

5    they consider an investor's or its counterparty's financial

6    situation?

7    A    Yes.

8    Q    Would it consider, for example, whether or not, in the

9    case of the Richard Sackler family, Purdue was declaring

10   bankruptcy?

11   A    That's a good question.  It was asked in one of the

12   threads that I reviewed from one of the banks or brokers.

13   At the time the (indiscernible) came out about, you know,

14   does this impact Summer Road, and the broker wrote back, no,

15   this does not impact Summer Road.  And you know, they had a

16   little bit of an exchange that didn't impact it.

17         And but that bank still wound up canceling due to,

18   you know, higher ups thinking that the relationship was not

19   good for that bank's, you know, business going forward.

20   Q    So you said -- when you say when the article came out,

21   are you referring to news reports that in September of 2019,

22   that Purdue had filed for bankruptcy?  Is that what you're

23   referring to?

24   A    Yeah, there were also articles that were alluding to it

25   previously, but I think this is the September 2019 article.

1   Q    Okay.  And so, your testimony is that after that --

2   after it was public that Purdue had filed for bankruptcy in

3   September 2019, one financial institution had questions for

4   Summer Road about how that would affect Summer Road, is that

5   right?

6   A    Well, not just one.  One of the seven canceled the

7   relationship completely, had an email exchange or text

8   exchange with one of the high traders here at Summer Road.

9   But our Executive Vice President in charge of investments,

10  after actually -- not after the September article, it was

11  actually after the March 2019 article in the "Wall Street

12  Journal", that he started fielding a lot of calls regarding

13  Summer Road and you know, the relationships.

14  Q    And is that because in March of 2019, the "Wall Street

15  Journal" reported that Purdue was considering filing for

16  bankruptcy, is that right?

17  A    No, this was the article regarding where there were a

18  couple of financial institutions that said that they were no

19  longer doing business with various Sackler family offices.

20  Q    Can you turn to Tab 20 of your binder?  This is an

21  article that has been previously marked as Exhibit --

22          MR. JOSEPH:  I believe it's Exhibit 21 that was

23  marked as Exhibit 3.

24          MS. TOWNSEND:  Exhibit 3.  Thank you, Mr. --

25          MR. JOSEPH:  That's the next -- it's the next

```
 1    Exhibit in the binder.

 2              MS. TOWNSEND:  Yes, it was marked as Exhibit 3.

 3    You're correct.  Tab 21.

 4    BY MS. TOWNSEND:

 5    Q    Are you with me, Mr. Vellucci?

 6    A    Yes, I am.

 7    Q    Okay.  Is this the March 2019 "Wall Street Journal"

 8    article you were referring to?

 9    A    No, this is dated February 2020.

10    Q    No, that I think at the top is the date that we printed

11    it.  So if you look at the article itself, Page 1 of the

12    article --

13    A    Oh I'm sorry.  Is this -- maybe I'm looking at the

14    wrong one.  Is this tab --

15    Q    Tab 21.

16    A    Tab 21, okay.  I was at -- I was on -- sorry, I was on

17    Tab 20.  I apologize.

18              MR. JOSEPH:  Yeah, that was on Tab 21.  It's Tab

19    21.

20    BY MS. TOWNSEND:

21    Q    Tab 21.

22    A    Tab 21.

23    Q    I'm sorry about that.  It's the article entitled "Hedge

24    Fund Tosses Family That Controls Maker of Oxycontin".  Do

25    you see that?
```

1    A    Yes, March 7th, 2019.  Yes, I do see that on there.

2    Q    Is this the article, the March 2019 "Wall Street

3    Journal" article that you were referring to?

4    A    Yes, it is.

5    Q    Can you look at the second page of that article?

6    A    Okay.

7    Q    And the first full paragraph on that page, the second

8    sentence reads, "Purdue, which has been an important source

9    of the family's wealth and income is considering filing for

10   bankruptcy, 'The Wall Street Journal' has reported, citing

11   people familiar with the matter."  Does that refresh your

12   recollection that this article references the fact that

13   Purdue, at the time, was considering filing for bankruptcy?

14   A    It does refresh my memory that this article also

15   mentions that.  Yes, it does.  Thank you.

16   Q    If you look at the next paragraph of that article, it

17   mentions, on that same page, Page 2 of 8, Exhibit 3, it

18   mentions, "Lawsuits by 36 states and more than 1,600 cities

19   and counties against Purdue.  Other drug makers and

20   distributers of prescription painkillers are starting to

21   focus on Sackler family members."  Do you see that?

22   A    Yes.

23   Q    Is the litigation that was pending against Purdue and

24   the Sackler family at the time this article came out, would

25   that be a relevant consideration for a counterparty doing

Page 222

1    business with the Sackler family to take into account?

2    A     They have not up until this article.

3    Q     So you mean that prior to this article, to your

4    knowledge, no investment counterparty or business

5    counterparty to the Richard Sackler family had taken into

6    account the more than 2,000 lawsuits pending against Purdue

7    and the Sackler family in determining whether or not to

8    continue their relationship with the Richard Sackler family?

9    A     That is correct.  Of the seven, actually eight banks

10   and brokers who we discussed earlier, they all took action

11   after this article.

12   Q     But you don't know whether or not they were considering

13   or taking into account the fact that Purdue and the Sackler

14   family had significant -- potentially significant legal

15   exposure from these pending lawsuits?  You don't know that,

16   right?

17   A     I do not know that, but the issue -- there is no

18   bankruptcy risk with respect to the broker dealers that we

19   handle, the two-day turnaround from when you buy and sell a

20   security.  So there is no bankruptcy risk, and we assured,

21   when asked, as I mentioned earlier, that a Purdue bankruptcy

22   had no impact on our ability to continue trading with them.

23           And it was after this article that came out that

24   our Executive Vice President in charge of investments

25   started fielding many calls from different funds that we

Page 223

1    were invested in.  And for the most part, these funds are

2    already, or companies or counterparties are already fully

3    funded.  You know, it's an equity investment, so there is no

4    real financial risk, you know, continuing financial risk.

5              So it was not -- had anything to do with the

6    concern about a financial situation at Summer Road.  And if

7    they did, they were told there was no issue and they

8    wouldn't really have had anything to be concerned with,

9    since I mentioned all these investments or the vast majority

10   were already fully funded.

11   Q    You don't recall -- I guess you were not at Summer Road

12   until September of 2020, but to your knowledge, did any

13   business or investment counterparties, the Richard Sackler

14   family ask about any of the legal exposure either at Purdue

15   or any member of the Sackler family from the pending -- at

16   any time -- a pending litigation or numerous lawsuits

17   pending against Purdue in the Sackler family?

18   A    What's -- what is the time period that you're asking

19   about?

20   Q    Let me ask pre -- or post-March 2019.  So post this

21   "Wall Street Journal" article, after this "Wall Street

22   Journal" article, are you aware of -- well, strike that.

23   You weren't there at the time, so strike that.

24             MS. TOWNSEND:  I think I'm done with this witness,

25   Your Honor.  Perhaps Mr. Joseph would like --

```
 1              THE COURT:  Okay, any re-direct?

 2              MR. JOSEPH:  A few questions, Your Honor.

 3              RE-DIRECT EXAMINATION OF FRANK S. VELLUCCI

 4   BY MR. JOSEPH:

 5   Q    Mr. Vellucci, does Summer Road keep the names of its

 6   current investor counterparties in confidence?

 7   A    Yes, it does.

 8   Q    How does it do that?

 9   A    Well, each employee signs in terms of employment that

10   has very strict confidence including confidentiality of any

11   investments that they are aware of at Summer Road.

12   Q    And are all employees at Summer Road aware of current

13   investment counterparty information?

14   A    It's on a need to know basis.  Some will know, some

15   will not.  It depends on if that's the area that they're

16   investing in.

17   Q    Now you mentioned that some names of public companies

18   appear on the privileged law?  Do you remember that?

19   A    I -- yes, I do recall.  I'm not positive that there are

20   public companies on that privileged log.

21   Q    Well, are there -- just --

22   A    Well, there could be.  I just -- I don't recall.  I

23   don't have a list in front of me.

24   Q    Does Summer Road have any financial intermediary

25   relationships with public companies in which they're current
```

1    investment counterparties?

2    A    Yes.

3    Q    And to your knowledge, are any public company names

4    that appear in any SEC filing on a privileged log?

5    A    No, they're not.

6    Q    You talked a good bit about the banks in Paragraph 4.

7    Before the "Wall Street Journal" article appeared that you

8    were just talking about with Ms. Townsend, had any of these

9    institutions indicated any intent to terminate their

10   relationships with Summer Road?

11   A    They had not, to my knowledge.

12            MR. JOSEPH:  Thank you, Your Honor.  That's all I

13   have for this witness.

14            THE COURT:  Okay, any re-cross on that, Ms.

15   Townsend?

16            MS. TOWNSEND:  I don't have any re-cross for this

17   witness, Your Honor.

18            THE COURT:  Okay, very well.  So Mr. Vellucci, you

19   can sign off at this point.

20            THE WITNESS:  Okay.  Thank you, Your Honor.

21            THE COURT:  Okay.  I am prepared to hear brief

22   oral arguments on this.  I don't know if people need a, you

23   know, five-minute break to gather their thoughts or you want

24   to just go right into it?

25            MR. JOSEPH:  We're prepared to go right into it.

1           MS. TOWNSEND:  I am as well, Your Honor.

2           THE COURT:  Okay.  So the factual record is

3    closed.  I gather there were no objections to the -- I think

4    we got up to eight exhibits.  So they're admitted into

5    evidence.  If I missed one, if we're up to nine, then the

6    ninth is admitted to, but I think we were up to eight.

7           So the party seeking redaction, in my view, has

8    the burden of proof, so I should hear from Mr. Joseph first.

9    And again, we're just talking about -- notwithstanding some

10   of the questions, the redaction of individual names, right,

11   whether there are people or companies that fall within the

12   definition of current contractual counterparties or current

13   counterparties.

14          So that -- that's what I'm focusing on, and

15   whether the burden is established or met under any

16   subsection of Section 107 of the Bankruptcy Code or

17   otherwise.

18          MR. JOSEPH:  Your Honor, what the evidence shows

19   is that on March 7th of 2019, the "Wall Street Journal"

20   publishes an article disclosing the identity of the

21   counterparty.  Two days later, the counterparty calls and

22   says it's ending the relationship because it doesn't --

23   because of that disclosure.

24          I mean, that's uncontested evidence.  On December

25   16th of 2019, the New York Attorney General is quoted in

Page 227

1    "The New York Times" as saying we're going to get all

2    financial information, everything relating to the Sacklers.

3    Two days later, a counterparty calls and terminates the

4    relationship, a proprietary relationship that they worked on

5    before.

6              Three more counterparties terminated their

7    relationships in 2020 for the same reason Mr. Vellucci just

8    testified that three of the banks were explicit in this and

9    it's reflected in texts and emails, business records that he

10   reviewed.  Multiple institutions are explicit on this.  And

11   if bankruptcy risk was something that would add onto this

12   before, just think of how more aggravated it's going to be

13   at this point if they lose additional investment

14   counterparties, which the evidence shows will happen.

15             But in terms of the statute, I can be very brief.

16   It's undisputed that the information is confidential.  It's

17   maintained in confidence.  It's undisputed that it's

18   commercial.  It's certainly not non-commercial.

19             I mean, there's no contrary evidence on those

20   points which are the requirement for a mandatory protection

21   under 107(b)(1).  I'm not going to get into the cases.  Your

22   Honor has already discussed those last time with Ms.

23   Townsend.

24             But I would say that we actually parallel exactly

25   the situation in Orion, but I'm not going to get into case

Page 228

1    law discussion.  Thank you.

2            THE COURT:  Well, we did discuss at the last

3    hearing the meaning of the term commercial information in

4    107(b)(1) in how it relates to the -- well, two other

5    provisions of the statute, namely 107(b)(2), which is to

6    protect a person with respect to scandals or defamatory

7    manner contained in the paper filed in case under this

8    title.

9            And then (c)(1), to protect an individual with

10   respect to the following types of information, and that

11   includes a person's name or an entity's name in Section 10 -

12   - 18.1028(d).  To the extent the Court finds that disclosure

13   such definition would create undue risk of -- it wouldn't be

14   identity theft that it says, "Or other unlawful injury to

15   the individual or the individual's property."

16           So when we were discussing, again, commercial

17   information in 107(b)(1),the argument was made with I think

18   some cogency that given the other two provisions that I've

19   mentioned, it can't be information that goes just to one's

20   reputation.

21           And a lot of the evidence, to the extent it was

22   laid out and I'll come back to the nature of the evidence in

23   a moment.  Basically, was premised on reputational concerns

24   that the counterparties felt they would have, whether those

25   were real or not.  So how is it commercial information?

Page 229

1              Is anything that harms a Debtor -- I'm sorry, in

2    this case, not a Debtor, anything that harms a company or a

3    person that harms them in terms of their net worth,

4    confidential commercial information?  I'm assuming it's kept

5    confidential.  I don't think there's any dispute about that.

6    So is that really commercial information if it harms their

7    net worth?  Is that the only tie-in that's necessary?

8              MR. JOSEPH:  Your Honor, we're not talking about

9    reputation from the perspective of a family.  We're way

10   beyond --

11             THE COURT:  No, we're talking about the reputation

12   concerns raised by the counterparties.

13             MR. JOSEPH:  But the reputation concerns that

14   they've identified, we're not here to protect the

15   counterparties.

16             THE COURT:  No, I know.  We're -- I agree.  But

17   again, the harm here is harm because of a concern about

18   reputation of the counterparties to the Sackler entities or

19   the Sacklers themselves --

20             MR. JOSEPH:  Your Honor --

21             THE COURT:  So its economic harm.  But is that

22   commercial information if it's economic harm?

23             MR. JOSEPH:  It -- the only reason for these

24   relationships is commercial.  The only reason that you have

25   a relationship with an investment manager is a commercial

Page 230

1    relationship.  And when they communicated their reputational

2    concerns, what they communicated was it would harm them and

3    their business, but I'm not here to protect them.

4              THE COURT:  I understand.

5              MR. JOSEPH:  I'm saying that all of our

6    information, our relationship we have with the private

7    equity fund is purely commercial.  We're not seeking

8    reputational protection from that from the perspective of

9    the entity -- and 107(b)(1) talks about the entity, the

10   information's purely commercial.  It's purely financial.

11             It's only going to harm the families, which now

12   have a prospective obligation to fund $4.275 billion over

13   the next 10 years, or nine years.  And there's no reason

14   that that commercial information should be allowed to harm

15   them.

16             And we've seen repeatedly that's the case.  We

17   have speculation, well, could they have taken bankruptcy

18   into account?  Could they have taken other things into

19   account?  They did no discovery.  There's no evidence of it.

20   It's just speculation that they're calling it.

21             What we know is what they said.  And what they

22   said was that they were uncomfortable dealing with the

23   Sacklers and they were going to terminate that commercial

24   relationship, which is our relationship, and that we need

25   stable relationships to be able to fund for the next nine or

Page 231

```
 1    10 years.

 2              THE COURT:  Well, I guess the -- to me, maybe this

 3    point raises the issue about whether this is commercial or

 4    not.  Let's assume for the moment that some aspect or some

 5    basis for the termination of relationships, not entirely,

 6    but in part, could be justified by a concern of the

 7    financial condition of the Sacklers, could be.

 8              I think under your definition of commercial

 9    information, that wouldn't matter.  It would still harm

10    them, right?

11              MR. JOSEPH:  Well, first of all, I would've

12    thought that a concern about bankruptcy would be commercial

13    in nature and not --?

14              THE COURT:  That's what I'm saying.  I'm trying to

15    figure out whether that even matters under your definition

16    of commercial or whether there has to be something, you

17    know, to show that they're doing it just for a reputational

18    -- their reputational reason, the (indiscernible) --

19              MR. JOSEPH:  But Your Honor, whatever their reason

20    is, if the disclosure is going to call -- cause commercial

21    harm to us, I mean, it's still a commercial harm to us,

22    whatever their motivation.  It could be completely random.

23    You know, they don't want to see their names.  These --

24    we're talking about prime investments.

25              They're not looking for investors.  There's more
```

Page 232

1    money chasing deals than deals are out there.  They don't

2    need drama.  They don't need any of this.  And that's why

3    they continually walk away and it hurts the family

4    commercially.

5            THE COURT:  All right, but people -- I mean,

6    they're -- just turning to the case law briefly.  And I

7    wanted to hear the record before concluding with the case

8    law.  As I noted, there are plenty of decisions that show

9    that mere harm isn't enough.

10            For example, in the food management case, I think

11    it would be fair to assume that the information about the

12    law firm at issue in that case going public might well cause

13    them to get fewer clients in the future.

14            But that didn't motivate the Court, and I think

15    properly didn't motivate the Court.  And in fact, the movant

16    itself I think knowing that that was probably an issue,

17    relied on A2, a scandalous or defamatory matter.  And the

18    Judge said they didn't establish their burden on that.  So

19    again, I come back to, is mere harm enough?  I'm not sure it

20    is.

21            MR. JOSEPH:  Your Honor, in Food Management, we

22    had a lawyer who had defrauded the Court.  And Judge Glenn

23    said the public interest and openness of the Court

24    proceedings is that its zenith, when issues concerning the

25    integrity and transparency of Bankruptcy Court proceedings

Page 233

1    are involved.

2         That -- if there was a collateral effect on them

3    commercially, that wasn't the nature of the defense that was

4    being laid.  What we're saying is, we're talking about

5    tangible commercial harm, and we're talking about clearly

6    commercial information.

7         And it -- you -- it's not different, Your Honor.

8    We're trying in Orion, the issue was that Dances with Wolves

9    was being provided McDonald's and Orion was trying to deploy

10   its content and competition with others.  We're trying to

11   deploy our assets in competition with others.

12        And it's harm that is going to come from these

13   disclosures.  And there's no basis for that kind of

14   distinction.  There's nothing non-commercial about this.

15   It's not going to effect the Sackler's reputation at this

16   point, whether or not somebody terminates.

17        It's going to harm them significantly financially.

18   They have to be able to maintain relationships, maintain

19   investments, exit at appropriate times.  They've got a

20   payment schedule to meet.  It's necessary that their

21   commercial information, which is confidential, is protected.

22   And this is purely commercial from their perspective.

23        THE COURT:  So 107(c) actually covers revealing a

24   name that we create undue risk of unlawful injury, i.e. harm

25   that has to be shown to be unlawful or undue risk of it.

Page 234

1    Are you saying that in (b)(1), the Court shouldn't do that

2    same type of analysis?

3            MR. JOSEPH:  I'm saying, Your Honor, that those

4    are separate, that (b)(1) is mandatory if it's confidential

5    and commercial.  But the (c)(1) analysis would be on the

6    side of the counterparties.  We're not here to protect the

7    counterparties, that's not the --

8            THE COURT:  Well, it just says injuries.  So --

9            MR. JOSEPH:  It says, other unlawful injury --

10           THE COURT:  I -- yes.  Well, it actually doesn't

11   read that way, I think.  It says, "The Bankruptcy Court for

12   cause may protect an individual," which could be the

13   Sacklers, I suppose, not all of their companies, but it

14   could be the Sacklers, "with respect to the disclosure of

15   information that would create an undue risk of other

16   unlawful injury to the individual."

17           Congress put in the word unlawful there instead of

18   just mere harm, by means of identifying a name.  And I don't

19   think it has to be that individual's name, but again, I'm

20   just wondering whether looking at the whole statute,

21   Congress is setting up a harder test than just mere harm,

22   although I guess you're saying in the commercial context

23   under (b)(1), you don't need to go through that analysis.

24           MR. JOSEPH:  Correct.  It's mandatory.  But I'd

25   also say that you'd have to be interpreting individual in

Page 235

1    two different ways to read (c)(1) the way you're reading it

2    because if at the beginning it's talking about the Sacklers,

3    then when it talks about identity theft of that individual,

4    it's got to be talking about the Sacklers.  And we're not

5    talking about that.  PPI -- personal identifying

6    information, PII is being protected.  We're only in (b)(1).

7             THE COURT:  Well, I don't think C is just limited

8    to identity theft, but I understand your point, I think.

9    Okay?

10            MR. JOSEPH: Fair enough, Your Honor.  We're not

11   claiming unlawful injury.  If that were the requirement,

12   then you'd say with respect to commercial, there has to be

13   some unlawful injury?  That's not the way the statute reads.

14            Let me make another point.  (b)(1) is actually not

15   original language, all right?  (b)(1), which was adopted in

16   1978, adopts the language out of Rule 26(c)(1) of the

17   Federal Rules of Civil Procedure.  And commercial

18   information is given a very broad definition there --

19   anything that can cause harm to the person whose information

20   is being disclosed.  And it's the exact same phrase,

21   confidential commercial information.

22            THE COURT:  Okay.  Now Ms. Townsend has brought

23   out a fair amount of testimony that including the articles

24   that were referred to in the two declarations themselves,

25   that really the disclosure wasn't that big a deal, or

1    reflected concerns that weren't just tied to having a

2    relationship with the Sacklers.  What is your response to

3    that?

4             MR. JOSEPH:  That was not true of any one of those

5    that are specifically identified as having communicated that

6    the concern was public association with the Sacklers.  What

7    she focused on were the banks.  And as to those, we have

8    testimony that three were explicit that that was the reason.

9             And as to others, it's speculative as to whether

10   there were other reasons, but we've only identified those

11   that were explicit with Summer Road or with Kokino.  It was

12   --

13            THE COURT:  Well, I mean, I think there was

14   testimony that personnel at Kokino or Summer Road believed

15   that stated rationales were pretexts or pretextual, and

16   there's, you know, a clear paragraph in the "Wall Street

17   Journal" article that the -- I want to get the name of the

18   company -- the Deep Currents Fund or maybe it's the Hildene

19   Fund, I forget -- one of them said that it was going to

20   terminate because of a connection to someone who either

21   themselves or had a relative who OD'd.

22            MR. JOSEPH:  But Hildene is not one that we're

23   relying on.  Hildene is not one that said for other reasons.

24   Now it's also true that that was deemed to be pretextual

25   because of other conversations, which may or may not be the

1    case.  But Hildene is not a name we're seeking to protect.

2            THE COURT:  Oh I understand.  But I mean, there

3    may be -- I guess what you're saying is I should infer that

4    the ones that remain are remaining largely because they

5    haven't been identified.  And if they would be identified,

6    they would stop.  They're not -- they wouldn't stop because

7    of some other reason, because they're existing now.

8            So you're saying there must be only one inference,

9    which is that they would terminate at this point because of

10   the publicity, right?

11           MR. JOSEPH:  Correct, Your Honor.  As several who

12   have left have explicitly said.

13           THE COURT:  Right, okay.  Okay.  All right, Ms.

14   Townsend?

15           MS. TOWNSEND:  Thank you, Your Honor.  First, I

16   don't want to rehab all the legal arguments Your Honor

17   entertained, extensive legal arguments at the last hearing

18   on the scope of Section 107(b)(1).  It's the (indiscernible)

19   intervener's position that commercial information in this

20   context should be construed narrowly to include only that

21   information that would give an unfair advantage to

22   competitors.  But setting that aside --

23           THE COURT:  Well, can we just explore that point

24   again?  I mean, aren't these Sackler vehicles competing with

25   other family offices and other private investors for the

Page 238

1   business of these counterparties?  So that the disclosure of

2   the names, if they would -- if I determine that they would

3   run the serious risk of causing those counterparties to

4   terminate long-standing profitable relationships cause a

5   competitive disadvantage?

6           MS. TOWNSEND:  I don't think that's a competitive

7   disadvantage in the way that Orion refers to competitive

8   disadvantage in the sense that could there -- let me step

9   back for a minute.  I do want to say, Your Honor, that to

10  the extent that confidential commercial information does

11  have the kind of broader scope that Mr. Joseph is suggesting

12  that it does, I don't think that he can have his cake and

13  eat it, too, and then say it's very broadly interpreted and

14  it's a mandatory (indiscernible).

15          And anything you say is confidential information,

16  therefore, should be redacted.  I think to the extent the

17  Court is entertaining a broader view of what qualifies as

18  confidential commercial information under Section 107(b)(1),

19  but I think there does have to be some evidence of harm,

20  some kind of competitive harm.

21          Now I'd like to focus on the evidence that the

22  Sackler family has presented, which is the declarations of

23  Mr. Lynam and the declarations from Mr. Vellucci to

24  demonstrate their -- support for the notion that if these

25  counterparty names are, you know, unredacted in these

Page 239

1    privileged logs, that all of these entities will ceases

2    their business relationships for the Sackler family.

3              So first, I think if we look at both declarations,

4    but what we're seeing here is really rank speculation piled

5    on top of hearsay and --

6              THE COURT:  Well, can I -- I said I would address

7    the evidentiary issue here.  These declarations were

8    admitted into evidence.  And there was no objection based on

9    hearsay.  So I don't know how to -- I mean, why should I

10   then apply the hearsay rule?

11             MS. TOWNSEND:  I take that, Your Honor.  I will

12   say that with respect to you know, we did not object to the

13   admissibility of these declarations subject to cross-

14   examination.

15             THE COURT:  Right.

16             MS. TOWNSEND:  I think there are aspects that we

17   were able to get the witnesses to comment on.  I mean, from

18   the face of it, it wasn't clear that Mr. Lynam had never

19   spoken to anyone at Hildene about the redemption decision.

20   I think that's information that's subject to objection after

21   we go through cross-examination to determine whether or not

22   he has personal knowledge.  So I think --

23             THE COURT:  Well, I don't understand.  You

24   normally object during cross-examination, when someone

25   testifies in a way that implicates the hearsay rule, so that

Page 240

1   I can hear further argument and perhaps voir dire as to

2   exceptions to the rule.  And that didn't happen.

3          MS. TOWNSEND:  I think, Your Honor, what these --

4   even setting aside hearsay, I think what we have here is

5   pure speculation.  There is not testimony.  There was not

6   testimony, as Mr. Joseph said, from any current investment

7   counterparties or even explicit statements from current

8   investment counterparties as to their intention to terminate

9   their business relationships with the Sackler family, if

10  their names are unsealed in privileged logs.

11         And in fact, what we have is declarations where

12  the Sackler family is pointing to what they claim is

13  historical evidence of entities terminating those

14  relationships when their names are disclosed.  And yet,

15  almost all of the examples, with very few exceptions, are

16  situations where those names have never been publicly

17  disclosed.

18         They're not publicly disclosed now.  Those

19  entities didn't terminate their relationships with the

20  Sackler family because they were named in a newspaper

21  article.  They were never named in a newspaper article.

22  There was significant testimony from each witness that those

23  names aren't public.

24         And with respect to the names that are public, you

25  had Mr. Lynam, for example, pointing to Hildene and saying,

Page 241

1    oh, "The New York Times" article.  I thought this was a

2    very, quite frankly, not credible testimony to say that a

3    "New York Times" article indicated that there were

4    reputational concerns, when in fact, what the -- Mr.

5    Jefferson of Hildene said was that he had concerns of

6    conscience based on a personal experience with an opioid

7    related tragedy.

8            THE COURT:  I thought that was "The Wall Street

9    Journal" article, but it doesn't matter.  I understand the

10   point.  But can I -- I mean, I think -- again, I mentioned

11   this to Mr. Joseph, and I'd like your view on it, too.  I

12   guess that testimony -- and there is testimony about other

13   counterparties terminating once articles do go public.  It's

14   a mixed bag.

15           I think ultimately what I'm being asked is to

16   infer that the counterparties that have stayed working with

17   the Sacklers might well leave, if the facts change and they

18   are actually identified.  The ones who left before they were

19   identified and still haven't been identified were the most

20   skittish, right?

21           The ones who read the articles that identified

22   others and assumed that the would be identified already were

23   the next most skittish.  And the ones who stayed are not

24   necessarily the ones who would stay through thick and thin,

25   right?  So in a way, you're asking me, I think, to ignore

Page 242

1    that inference and to gamble that they won't leave.

2              MS. TOWNSEND:  I think, Your Honor, that it's -- I

3    would say that it's the Raymond Sackler family's burden to

4    demonstrate that that inference is well-supported by facts.

5              THE COURT:  All right.

6              MS. TOWNSEND:  And I think that there -- you --

7    the evidence that's submitted to date by the Raymond Sackler

8    family I think as cross-examination indicated doesn't even

9    demonstrate that -- doesn't even establish that the

10   companies that terminated those relationships did so, but

11   would not have done so, but for news media reporting on the

12   Sackler family (indiscernible) --

13             THE COURT:  Well, there was some that did.

14   There's some that terminated right after the articles came

15   out, for example.

16             MS. TOWNSEND:  I think (indiscernible), which Mr.

17   -- was referenced in Mr. Lynam's testimony I think is the

18   only entity that the record -- that there was evidence that

19   indicates may have terminated their relationship you know,

20   within a couple of days of that "New York Times" article.

21   But it was -- maybe it was because of "The New York Times"

22   article, but was it because they were named in that "Wall

23   Street Journal" article, I believe?

24             Was it because they were named in that "Wall

25   Street Journal" article, or was it because that "Wall Street

1    Journal" article was also reporting on a series of other

2    such things that were happening in the world of Purdue and

3    the Sackler family at the time, including the possibility

4    that they would be declaring bankruptcy, which could I think

5    reasonably have a financial effect on the Sackler families

6    and could be something that certainly a sophisticated

7    investment manager and hedge fund would want to take into

8    consideration, if they're deciding whether or not to

9    continue a relationship.

10           And 2,800 lawsuits pending against the Sackler

11   family at that point in time and Purdue at that point in

12   time.  And all of these factors, I think, you know, Mr.

13   Joseph has said I'm speculating by saying that these are

14   factors might have been relevant to their decision, but

15   there's no evidence they weren't relevant.  And in fact, in

16   most --

17           THE COURT:  Well, actually, there is evidence that

18   --

19           MS. TOWNSEND:  There is no evidence that --

20           THE COURT:  There is evidence that they weren't

21   relevant in the sense that there's testimony that most, and

22   then it was later said the vast majority, I'll just go with

23   most, of the funds were fully funded.  So there's no credit

24   risk on that fund.

25           And that, as far as the brokers are concerned,

Page 244

1    there's really no bankruptcy risk.  There may be some

2    relationships, for example, with the trading platform, where

3    the first witness said that they -- Mr. Lynam, that they

4    lost $20 million on, that I believe he testified involved

5    credit being provided by that platform.

6           So there, I understand your point.  But otherwise,

7    I think you have to ask yourself why would a fully funded

8    fund force a redemption?  They don't need any more -- based

9    on financial concerns as opposed to being named or being

10   caught up in the whole story.  And I'm not saying that as

11   like, a fictious story.  I'm saying the news story of the

12   Sacklers and Purdue.  What is your response on that?  I mean

13   --

14          MS. TOWNSEND:  Well, I don't think --

15          THE COURT:  Generally, people -- if they're not

16   providing credit, want money.  You know?  When you have a

17   banking relationship, unless they're loaning you money,

18   you're the creditor.  You're depositing with the bank.  If

19   you've invested fully in a fund, then they don't want

20   anymore.  They can't get anymore.  And they're just

21   redeeming you.  So it's like take your money back.

22          So to me, the credit issue in broad brush has some

23   credibility, I agree, but in terms of the testimony, I'm not

24   sure it really does, except maybe on the trading platform or

25   trading strategy, when there was I think a statement by Mr.

1    Lynam that that company had provided some form of credit

2    support.

3              MS. TOWNSEND:  I would say, Your Honor, that I

4    think the whole -- to characterize it as sort of a whole

5    story as though it's a news story, I think this is some key

6    components.  So for example, there was the comments from the

7    New York Trade General, Leticia James, that were cited in

8    Mr. Lynam's declaration that referred to the fact that the

9    New York Attorney General's Office is investigating the

10   Sackler family.

11             That had nothing to do with public disclosure of

12   that information.  She was calling for transparency for her

13   office and --

14             THE COURT:  Well, didn't she claim credit for the

15   Jay Alix report and you know, so I don't -- you know, I

16   don't know.  I really -- it's hard for me to know what these

17   types of statements really mean.  But again, I'm just going

18   back to a fundamental point, which I think the Sacklers are

19   relying on, which is I should infer that the ones who

20   remain, some of them at least, will not remain if they're

21   disclosed because of the publicity one way or another.

22             I mean, they have remained through the disclosure

23   that has occurred in this Chapter 11 case.  They've

24   remained, notwithstanding, the New York AG statement that

25   she wanted to have a full investigation.  You're saying they

Page 246

1    would remain under all circumstances.

2           The only thing that would be different, I think,

3    and given where we are at this point, is their name being

4    revealed.  And you're basically saying that's not enough, I

5    can't make an inference from that.  Mr. Jacobs, Mr. Joseph

6    is saying, yes, I can make an inference from that, and it's

7    not a hard one to make.

8           Can I switch to another point?  You -- at the end

9    of our discussion about commercial information, you said

10   that if one is to define commercial information broadly, it

11   should be more of a balancing test.

12          And certainly, one can argue that in Food

13   Management, Judge Glenn rightly determined that even though

14   there might be some impact on the law firm at issues ability

15   and new clients or compete with other law firms, the fact

16   that all of this occurred in the bankruptcy case.

17          And the whole purpose of 107 is, and generally,

18   for disclosure of judicial records, is as Collier states,

19   the basis for this right to access is not a proprietary

20   interest in the information, but rather, the public's

21   interest in monitoring the workings of the judicial system.

22          So obviously, when you know, a bankruptcy case

23   issue is front and center in the bankruptcy case, I can

24   certainly understand why you would balance that off against

25   the undoubted commercial effect that disclosure would have

Page 247

1    on the law firm at issue.

2          But I asked you this question at the hearing in

3    February, and other than the answer that we're entitled to

4    it no matter what, I don't think I got an answer to the

5    question.  So I'll ask it again, which is, what is the

6    purpose of disclosing the names, other than just the

7    relationships.  And the concern that clearly exists, that

8    disclosure of the names would harm the Sacklers.  Is there a

9    purpose that goes to, again, the purpose of the statute,

10   which is to monitor the workings of the judicial system?

11         MS. TOWNSEND:  These materials, the privileged log

12   materials that we're referring to were filed in connection

13   with the (indiscernible) privileges motion, which challenged

14   withholdings of records and assertions of privilege on

15   behalf of the Sackler families and indicated potentially as

16   has been reported -- indicated potentially that information

17   was being, and particularly information was being withheld

18   in order to mask financial transactions that would in turn

19   allow assets to be sheltered.

20         I'm not trying to characterize it, I'm just saying

21   these are what the allegations said.  And for members of the

22   public who are following this bankruptcy proceeding and

23   trying to understand what the parties arguments are and

24   trying to understand what's being filed with the Court, full

25   access to those exhibits, including the privileged log

Page 248

1    materials that were filed are important for the -- for

2    members of the public to see.

3                THE COURT:  Okay.

4                MS. TOWNSEND:  And certainly for members of the

5    press who have been looking -- who looked through every

6    document that's filed, as Your Honor knows, look through

7    every document that's filed in this bankruptcy proceeding.

8    This is a very important case.  And so --

9                THE COURT:  So even though we discussed this at

10   the last hearing and one of the reasons I think for this

11   hearing was to give you the chance to ask those types of

12   questions, I don't think you asked one question as to

13   whether any of these entities was used to shield assets.

14               MS. TOWNSEND:  And Your Honor, I didn't understand

15   the purpose of the cross-examination to be designed -- I --

16   it was limited to their direct testimony.  And I understood

17   it to be -- or the purpose of it was to determine whether or

18   not, for Your Honor to determine whether or not

19   (indiscernible) had made it out of the showing of the

20   (indiscernible) would be sort of a certainty of harm

21   economic harm that would fall -- befall it if this

22   information was -- I didn't understand Your Honor --

23               THE COURT:  Well, I mean, I --

24               MS. TOWNSEND:  -- to be asking for the media

25   interveners to demonstrate affirmatively some separate

Page 249

1  public interest in access to these specific names, which we

2  don't have.  So it is difficult for us to argue --

3            THE COURT:  Well, but you could ask, right?  I

4  mean, I -- we discussed this at Page 38 of the transcript,

5  actually, starting at Page 37.  You say, I would say that

6  not knowing what those, the names are, not having access to

7  the information that's redacted, and in fact, not having

8  seen the privileged logs, I mean, those documents are still

9  sealed in their entirety.

10           It is difficult for me to -- the materials that

11  these names are reflected on, it's -- and by the way,

12  they're not sealed in their entirety.  We're just talking

13  about the names at this point.

14           MS. TOWNSEND:  At the time, they were, Your Honor

15  --

16           THE COURT:  I understand.  I just want to make

17  sure that there's no misunderstanding on that for those who

18  are listening.  It is difficult for me to -- the materials

19  of these names are reflected on -- it's difficult for me to

20  point specifically to potential value to members of the

21  public of that specific information because I don't have it.

22           What I'm saying is, and then I'd interrupt you and

23  I say, well, that's a very -- I agree, that's a very fair

24  point.  For example, if these entities turned out were

25  laundering money for the Sacklers somehow, I completely

Page 250

1   understand your point, and the burden is really on the

2   Sacklers to show that these are just prospective future

3   relationships.  I understand that point.

4           And then you say, and I don't think that we're

5   suggesting misconduct on the part of -- and I don't -- I

6   want to be clear that we're not necessarily suggesting the

7   conduct on the part of any of these entities.  But whether

8   or not that's the case, I don't think it alters the burden

9   on the Sackler families to demonstrate harm that would flow,

10  that's a fair point.  I -- that's my interpretation of it

11  right now.

12          And I think I will go back to that -- and then I

13  interrupted you again, and I say, I agree with that.  I

14  think that's true.  But on the other hand, it seems to me

15  the only reason is where the story would be dog bites man as

16  opposed to man bites dog, it would seem to me that the harm

17  here is purely commercial because you're not really being

18  precluded from anything other than man bites dog, that these

19  people have a relationship on a going forward basis as

20  opposed to anything relating to man biting the dog, that

21  there's something nefarious in the relationship.

22          So I just, you know, I asked the parties again,

23  why are the names important?  Why can't you just describe

24  them?  And you know, the stories I guess are news in the

25  sense that it reflects the simple power of disclosure on

Page 251

1      economic activity by having the story come out.

2           But if you balance that against the harm to the

3      Sacklers, and if the Sackler plan contribution happens to

4      the Debtors, I'm not sure that that type of story really

5      needs anything other than what we already know, which is

6      that being associated with a difficult story is something

7      that a lot of companies want to avoid.

8           MS. TOWNSEND:  I would say, Your Honor, I don't --

9      I wouldn't necessarily characterize it as just a -- as sort

10     of a difficult news story.  I mean, I do think that it's a

11     difficult -- it's certainly a high profile case.  It

12     presents a lot of I think the complicated nature of the

13     bankruptcy proceeding, the way it's unfolded, the other

14     litigation and lawsuits that have been brought against the

15     Sackler family individually, the settlement with the

16     Department of Justice, all of this is obviously in the

17     public interest, in the public space.

18          THE COURT:  Right.

19          MS. TOWNSEND:  It's not just -- (indiscernible) in

20     other words, it is actually a story that --

21          THE COURT:  Well, wouldn't this particular story

22     that would come out based on the sealing of these names be

23     limited to very much like the story that appeared in the

24     "Wall Street Journal", i.e. more people are revealed to have

25     had business dealings and have business dealings with the

Page 252

1   Sacklers currently?  Isn't that the whole story?  I mean,

2   that's what I'm focusing on, as opposed to all the other

3   reporting.  So you know, I don't --

4           MS. TOWNSEND:  I don't know that there would be,

5   quite honestly, Your Honor, a story at all.

6           THE COURT:  Well --

7           MS. TOWNSEND:  I think it would depend --

8           THE COURT:  Yeah, that's a good point.  I guess

9   that's why, if I am to balance -- look, I'll give you a

10  couple of examples.  Look, and I'm not talking about your

11  clients, all right?  I'm talking about a hypothetical, you

12  know, news institution, a radio station or a magazine or

13  whatever that -- where let's say the -- there's a filing

14  under seal, under the protective order that happens to

15  attach to it, it's not central to the filing, but it happens

16  to attach to it an email where someone says, yeah, I'm going

17  to pass -- I'm going to write this story or I'm going to

18  pass this story onto Reporter X.

19          I know that he never does any research on his own

20  and never asks any meaningful questions and we'll get it out

21  there in the press.  Now that's obviously going to be

22  damaging in some sense to that media outlet, that reporter.

23  To me, that doesn't necessarily mean that it should stay

24  under seal, right?

25          But on the other hand, I think that's news.  Now I

1    don't -- the Court's aren't really particularly supposed to

2    get into news, but I'm really trying to figure out what --

3    you know, where, where's the news of just revealing the

4    names other than to see, you know, sort of like poking a

5    pen, what'll happen.  Will they actually quit?  Will they

6    actually do a forced redemption?

7              MS. TOWNSEND:  I think, Your Honor, that the

8    standards are setup so that disclosure is automatic.  The

9    Court shouldn't have to -- quite honestly probably doesn't

10   want to and shouldn't have to wrestle with these questions

11   of news judgment and what news organizations might focus on,

12   what they might not.

13             THE COURT:  No, I know.  We're beyond that,

14   though, because there is a motion to treat this as

15   confidential.  I'm putting -- even though this was filed

16   under seal, the burden is on the Sacklers here.  So we're

17   beyond that point.  We're dealing with the statute.  And I

18   guess I tend to agree with you, that it one's to have a

19   broad meaning that basically any harm that affects ones

20   commercial business can't just be the end of it.

21             There's got to be some balancing somewhere.  I

22   mean, I just can't imagine how a Court would say that the,

23   you know, either if the story is we think that one of these

24   companies was used to launder money or the story is I could

25   get Reporter X to say whatever I want him to because he's

Page 254

1    lazy and we'll use that as part of our strategy.

2              You know, that's a -- that's pretty important to

3    the case.  That's a very case specific -- both of those

4    disclosures are very case specific, which again, is the

5    purpose, ultimately, of this section, so people can see how

6    cases are run -- whole bankruptcy cases.  I'm just having a

7    hard time seeing that with the evidence before me as to the

8    purpose of this disclosure.

9              MS. TOWNSEND:  And I think Your Honor, with

10   respect to balancing, it's -- I would emphasize that the

11   showing that needs to be made by the Sackler family, and I

12   would reiterate, I don't think it's been made because many

13   of the companies that have reportedly, you know, cutoff

14   their business relationships with the Sackler family didn't

15   do so because their names were made public.

16             THE COURT:  Right.

17             MS. TOWNSEND:  Because their names were --

18             THE COURT:  They already did it.

19             MS. TOWNSEND:  And so, I --

20             THE COURT:  Yeah, they already did it, and they

21   did it before they were disclosed.  And some of them -- most

22   of them have not been disclosed.  I get that.  I understand

23   that point and I'm going to have to think about that

24   carefully, the burden point.

25             MS. TOWNSEND:  I do think that -- and I would also

1    emphasize that there are legitimate both, I would think

2    business -- there are other investors in some of these funds

3    who may themselves want to know who else has invested in

4    these funds.  There is legitimate public interest and value

5    in knowing the names of these entities in part so that news

6    organizations can do further investigation.

7              THE COURT:  But it doesn't have anything to do

8    with the case.  And again, that's the purpose of this rule,

9    is to let the public see what's happening in the case.

10             MS. TOWNSEND:  That's correct.  And these filings

11   were made in connection with -- or these exhibits were filed

12   in connection with filings that made very significant, I

13   would say, allegations that were reported on by news

14   organizations.

15             THE COURT:  But not as to these names.  The names

16   are -- I think are -- I wanted you to have a chance to bring

17   out any information about the names, but the names

18   themselves have nothing to do with the motion.  They were

19   attached to emails that in a chain that were going to

20   whether Mr. Vellucci is properly asserting the

21   attorney/client privilege.  It doesn't really have anything

22   to do with identifying these people, these companies.

23             MS. TOWNSEND:  Your Honor, even if the motion

24   itself wasn't specifically expressly focused on these

25   specific individual entities, these are exhibits that were

1    filed in connection with the motion.  And the expectation or

2    the assumption, the very strong assumption is that all of

3    that material will be made publicly available, unless --

4              THE COURT:  Except there is a -- there is this

5    exception, which is what we're focused on.  I think we're

6    going in circles at this point, but I do understand what

7    you're saying.  I -- part of it, I agree with.  Part of it,

8    I'm not sure about, part of it, I disagree with.

9              MS. TOWNSEND:  Does anyone else have anything to

10   say on this?  I know that there were a couple of joinders or

11   statements in support of the motion?  Those statements were

12   made well before the issues were narrowed down to the sole

13   issue that we've been discussing for the last two and a half

14   hours or three hours.  Does anyone have anything further to

15   say?

16             MR. TROOP:  Your Honor, I think -- Andrew Troop

17   for the non-consenting states.  We filed a statement --

18             THE COURT:  You're going to have to speak a little

19   closer to the mic, Mr. Troop.

20             MR. TROOP:  Sorry, Your Honor.  I have a little

21   technical difficulty in the middle.  Your Honor, the non-

22   consenting states filed a statement in support of

23   disclosure.

24             THE COURT:  Right.

25             MR. TROOP:  And the non-consenting states are

Page 257

1    (indiscernible) --

2              THE COURT:  I'm sorry, I can't -- after I heard

3    you --

4              MR. TROOP:  Your Honor --

5              THE COURT:  -- your statement in support of

6    disclosure --

7              MR. TROOP:  Are always in favor of disclosure,

8    Your Honor.  I have nothing to add to the arguments

9    (indiscernible) --

10             THE COURT:  Well, I want to explore that.  If I

11   find that the disclosure will impair the Sackler's ability

12   in a meaningful way, will impair the Sackler's ability to

13   pay whatever settlement might be agreed, or whatever

14   judgment might be entered against them, why would the -- why

15   would your clients believe that's a good thing?

16             MR. TROOP:  Because disclosure has its own

17   independent benefit for State Attorney Generals in the

18   enforcement of their actions.  But Your Honor, I can --

19             THE COURT:  Well, I mean --

20             MR. TROOP:  I'm not (indiscernible) any showing --

21             THE COURT:  No, but I just want to stick with that

22   point, though.  I just want to stick with that point.

23             MR. TROOP:  Okay.

24             THE COURT:  I understand that they have important

25   policy concerns to reconcile -- information, disclosure and

Page 258

1    recovery.  But they have been quite vocal about their belief

2    that the Sacklers should pay more money faster.  And if I

3    conclude that this harms that ability, isn't that like

4    saying they've cheered on a train wreck and then want a

5    bigger dividend from the railroad?

6              MR. TROOP:  Your Honor, I do not profess to be

7    able to perfectly balance or make logical the competing

8    concerns of any client in a particular area.  In this area,

9    Your Honor, there is a -- there are two things at play from

10   the State's perspective.

11             The first is that there's been no evidence that

12   the termination of any of these relationships cost any

13   Sackler any loss of value.  And therefore, the proposition,

14   which underlies the hypothetical ruling, the hypothetical

15   reason for your ruling, is not proven in light of -- a lot

16   of things in light of that.  That's number one.

17             THE COURT:  Okay.  And that's the point that I

18   understood Ms. Townsend was making, and that I had to think

19   about.  But that's a perfectly valid point.  I understand

20   that.  And the burden is heavy.

21             MR. TROOP:  It's a very heavy burden, Your Honor -

22   -

23             THE COURT:  Okay.

24             MR. TROOP:  -- and we don't --

25             THE COURT:  But I -- you were going to go onto

Page 259

1    point two.

2            MR. TROOP:  And point two is, Your Honor, even if

3    there is some impact, given the enormity of the Sackler

4    wealth, it would still permit more to be paid and to be paid

5    sooner.  So we don't need to reach the --

6            THE COURT:  I'm sorry, what -- I'm sorry,

7    disclosure would lead to being paid sooner?  I didn't follow

8    that.

9            MR. TROOP:  I'm sorry, Your Honor.  Assume that,

10   which is what I think you've asked me to assume, is that if

11   you disclose the nature of the counterparties, it might have

12   some negative impact --

13           THE COURT:  Right.

14           MR. TROOP:  -- on the Sackler's overall wealth.

15   And my response to that is the wealth is so enormous that

16   impact would not prohibit more being paid more quickly,

17   particularly on a lack of record as to what that impact

18   might be.  And then, finally, Your Honor --

19           THE COURT:  Well, I guess -- I'm sorry.

20           MR. TROOP:  That's okay.

21           THE COURT:  I interrupt you because you make

22   interesting points.  And I do this all the time because you

23   make interesting points all the time.  But there's really no

24   -- nothing in the record either way as to the nature of the

25   Sackler's wealth, you know?  There's nothing I am aware of

Page 260

1    in the record that says that they -- that their wealth is

2    primarily in cash as opposed to investments in funds that

3    are sunk in assets that are difficult to liquidate and

4    depend upon the functioning of those counterparties.

5            So I guess I just have to recognize that I don't

6    have evidence either way on that point, and focus on who has

7    the burden of proof.

8            MR. TROOP:  I'll leave it at that, Your Honor.

9    I'm not going to argue.

10           THE COURT:  Okay, fine.  Okay.

11           MR. TROOP:  Thank you.  I have nothing else to

12   say, Your Honor, (indiscernible).

13           THE COURT:  All right, very well.  This has been a

14   long day.  I appreciate the effort that the parties put into

15   this in enabling the hearing to take place the way it did.

16   Notwithstanding my saying I would rule from the bench, I do

17   want to review the transcript, the record, and weigh that

18   record against the burden of proof here, which again, the

19   Sacklers have.

20           And that goes, I believe, to primarily the

21   commercial impact that the record shows of the disclosure of

22   these investment commercial counterparties.  Although,

23   again, it does appear to me that the sole purpose of getting

24   that disclosure is basically to see what happens, you know,

25   poking up a pin to see whether these people will leave or

Page 261

1    not, which is, I don't believe, a good thing for this case.

2            But I'll say it one more time.  It is clear and

3    always has been that the burden of proof here is a heavy

4    one.  And the purpose of this evidentiary hearing, which Ms.

5    Townsend took up the gauntlet on is to actually hear the

6    evidence on that point.  So I'll give you my ruling

7    promptly.  Thank you.

8            MS. TOWNSEND:  Thank you, Your Honor.  If I may,

9    just one note.  I just want to be clear that my clients who

10    are reporting on this matter have no desire or intention or

11    motivation to harm the Sackler family, either financially or

12    otherwise.

13            I think our interest in access here is not -- just

14    to clarify -- not to sort of poke it with a pin to see if it

15    will in fact, what sort of the results that has been

16    speculated that business parties will no longer want to do

17    business with the Sackler family, that's not what the goal

18    of my client's goal is.

19            My client's goal is to obtain access to fully --

20    the fullest record possible in this bankruptcy proceeding.

21    So I just wanted to be clear on that, that there's no intent

22    certainly by my clients to do anything other than just

23    obtain as much access -- as much public access to as much

24    information in this bankruptcy proceeding as possible.

25            THE COURT:  Well, I don't know if you've discussed

Page 262

1    this, but if I were in Mr. Joseph's position, I would assume

2    that one very clear option there is to actually publish them

3    as opposed to just having them to do one's research.  But

4    we'll leave it at that.

5            And again, as stated in -- we talked about this

6    last time, too.  As stated in the Global Crossing case, I,

7    like Judge Gerber in that case, don't really believe that

8    the news media is going -- with the intention of harming

9    something.  It's just that the consequence of the story

10   might be to do that.  And it's hard to see what other effect

11   would be worthwhile in a story, as opposed to research.

12           Nevertheless, in finding that the disclosure would

13   harm the Debtor in that case, Judge Gerber said after Orion,

14   he would seal the information.  Now that was a different

15   case.  Each one of these is on its own facts.  The effect of

16   that disclosure, he found, would've clearly harmed the

17   Debtor.

18           There are other cases, and we talked about this,

19   too, like the GM Motor Liquidation case, where there was no

20   evidence how it would harm.  That was an easy one for Judge

21   Glenn.  If there's no evidence how it would harm the Debtor,

22   then there's no reason not to disclose.  This is kind of in

23   between.

24           So again, I'll give you my ruling soon.  If you --

25   as you did with every other issue in this case, except for

Page 263

1    the handful that I dealt with, with the Debtors last time,

2    can reach some agreement, let me know so I can go work on

3    something else on how to deal with this.

4           I really would appreciate that, as I've

5    appreciated your ability to resolve all the other issues in

6    connection with these motions.  So the last matter on the

7    calendar was a motion to seal parts of the declaration of

8    Ms. Ball submitted in response to the earlier opposition,

9    which I denied to the news media's -- or the media

10   intervener's request for the documents to be filed under

11   seal.

12          I don't know if that's still being pursued.  I

13   don't -- there was no additional pleading filed on it other

14   than the motion itself.  I believe that the media

15   interveners have agreed that any PII would be deleted, if

16   there is any in Ms. Ball's declaration.

17          So I'm not quite sure what we're fighting over at

18   this point on making that whole declaration public.  I will

19   note that I think correctly Mr. Joseph in the last matter

20   said the issue of tweets, threats, etc. are already out in

21   the public domain.

22          And he was focusing just on commercial

23   information.  So I guess other than the notion, which is I

24   suppose one that could be argued that if someone sees this

25   information in Ms. Ball's declaration that was redacted,

Page 264

1    other people will do similarly, make similarly heinous

2    threats.  But I just -- I don't know.  Are we still fighting

3    over this issue?

4              MR. MONAGHAN:  Your Honor, this is Maura Monaghan

5    from Debevoise & Plimpton.  I don't know that we're still

6    fighting over the issue.

7              THE COURT:  Okay.

8              MR. MONAGHAN:  I think that might be a question

9    for Ms. Townsend.  The information in question is simply the

10   actual URLs and images of the sites from which the examples

11   of the threats were taken.  And the rationale was that if

12   people are encouraged to go to these sites, which have not

13   just this examples, but are full of hateful, anti-Semitic

14   vitriol against the Sacklers, that it does pose a risk of

15   encouraging people to kind of gather with others.  And

16   whether the Court's docket itself should become a gateway to

17   that kind of hateful content.

18             A copy without the redactions was provided to Ms.

19   Townsend, so she has it to the extent she wanted to verify

20   that the threats were there.  And as we say, the motion was

21   already ruled on.

22             THE COURT:  So we're just talking about the URL

23   addresses at this point?

24             MR. MONAGHAN:  Correct.

25             THE COURT:  And only in the sense that publishing

Page 265

1    it would encourage people, whereby they could go on their

2    own if they wanted to, but this would encourage them -- make

3    it easier for them to do that?

4              MR. MONAGHAN:  Exactly, and lead them down a

5    rabbit hole on the internet, yeah.

6              THE COURT:  Well, people go down the rabbit hole

7    on the internet on their own all the time, as we've learned

8    to our dismay over the last few months in other instances

9    that I think we all know about.  So I don't know.  Is that -

10   - are the media interveners pursuing that disclosure or is

11   that something they want to think about.  I'm not sure this

12   has been discussed.

13             MR. MONAGHAN:  We did file, Your Honor, just to be

14   clear -- we filed an objection to that motion --

15             THE COURT:  Yes, yes.

16             MR. MONAGHAN:  -- to seal those portions of Ms.

17   Ball's declaration on March 17th.  It's our view that we

18   were just discussing this in the context of confidential

19   commercial information, but --

20             THE COURT:  Right --

21             MR. MONAGHAN:  -- the default is obviously

22   disclosure.  The showing has to be very -- there has to be a

23   showing made that sealing is necessary for some reason, even

24   setting aside the exceptions at this point, and whether it

25   falls within an exception.

1                  As we put out in our opposition, this is

2        information that is already referenced in the public filings

3        that were made by the Sackler family.  It's publicly

4        available information on the internet.  Anyone can find it.

5        There's simply no reason for this material to be sealed.  So

6        --

7                  THE COURT:  So again, this is not under 107(b)(1).

8        This is under 107(c), I think, right?

9                  MR. MONAGHAN:  Correct, yes.

10                  THE COURT:  So I -- look, I don't like encouraging

11       people to act in a way that is not logical, reasonable, that

12       is instead a potentially violent and in the form of hate

13       speech.  But it is public information already.  And I don't

14       have sufficient evidence, I believe, to show that this

15       additional disclosure, to the extent that the news media

16       would actually print it, and I frankly think given the news

17       media's position on hate speech, I doubt they would print

18       it.

19                  And frankly, I think it would be assumed that they

20       wouldn't, that -- and frankly, those who would circulate it,

21       to my mind, would lose all credibility in this case, to the

22       extent that they would want to have that.  But I think

23       again, you need a heavy showing.  It's not scandalous.  It's

24       not defamatory.  It doesn't fit into (b)(2).  So it's undue

25       -- well, let's read this statute together.

Page 267

```
 1                    MR. MONAGHAN:  It's a risk of unlawful injury to
 2        the --
 3                    THE COURT:  Right.
 4                    MR. MONAGHAN:  -- individual or the individual's
 5        property, Your Honor.
 6                    THE COURT:  Right.  "Create undue risk of other
 7        unlawful injury to the individual or the individual's
 8        property."  And it focuses primarily on identification in A,
 9        or other information contained in the paper described in
10        Subparagraph A.  This is actually identifying something
11        else, which is a website from some other person.
12                    It doesn't neatly fit into the statute.  And
13        further, while I agree with you and with the media
14        interveners that the excerpted language, which I think now
15        is public is something that most people would lose their
16        jobs over in today's world.
17                    I don't think the burden has been established here
18        to keep the URLs secret.  I would be pretty shocked if they
19        were published by these media interveners.  It is
20        conceivable to me that someone else would comb through the
21        docket and publish it.
22                    I think that the animus towards the Sacklers
23        already is being managed by the Sacklers generally.
24        Obviously, I take anyone's safety seriously, but the effort
25        that it would take to engage in such a publicity campaign
```

Page 268

1    could be taken already by going into the internet and doing

2    the same thing.

3         So logically, again, I don't think the burden is

4    met here to seal the document.  I guess the order can make

5    it clear that by granting the motion and finding that the

6    (indiscernible) Sackler family has not carried its burden of

7    proof, the Court is in no way endorsing any of the speech

8    disclosed in the declaration or the website or sites.

9         You don't have any problem with that, do you Ms.

10   Townsend, since that's what your client (indiscernible)

11   said?

12        MS. TOWNSEND:  I don't, Your Honor.

13        THE COURT:  Okay.  So that's how I'll rule on this

14   motion.  You can email that order to chambers.  You don't

15   need to formally settle it on Ms. Monaghan and Ms. Ball, but

16   you should run it by them to make sure that they can confirm

17   that it's consistent with my ruling.

18        MS. TOWNSEND:  I'll do so, Your Honor.  Thank you.

19        THE COURT:  Okay, thank you.  All right.  I had

20   originally scheduled a pre-trial conference in the newly

21   filed insurance litigation about three and a half hours ago.

22   One of the people in the Clerk's Office passed me a note

23   saying that the parties had asked that they be relieved from

24   waiting on the phone.

25        I think they made a good choice, given that they

Page 269

1    would've been waiting for three and a half hours.  And

2    instead, they asked that I have the conference on a

3    different date readily close to today, which we're going to

4    do.

5             So those of you who didn't get that message from

6    our Clerk's Office, I'm not proceeding with the only other

7    matter that was on today's agenda, which was the 2 o'clock

8    pre-trial conference in the insurance litigation.  I don't

9    know if anyone has any questions on that.  If not, that does

10   conclude today's agenda, and I'll sign off as well.  Okay.

11   There being no questions or comments, I'll conclude the

12   hearing.  Thank you.

13            (Whereupon these proceedings were concluded at

14   5:06 PM)

15

16

17

18

19

20

21

22

23

24

25

Page 270

**I N D E X**

RULINGS

|                                              | Page | Line |
|----------------------------------------------|------|------|
| Motion granted in respect to URLs            | 268  | 5    |

Page 271

1                    C E R T I F I C A T I O N

2

3        I, Sonya Ledanski Hyde, certified that the foregoing

4    transcript is a true and accurate record of the proceedings.

5

6

7

8    Sonya Ledanski Hyde

9

10

11

12

13

14

15

16

17

18

19

20    Veritext Legal Solutions

21    330 Old Country Road

22    Suite 300

23    Mineola, NY 11501

24

25    Date:  March 26, 2021