**LOWE, STEIN, HOFFMAN, ALLWEISS & HAUVER, LLP**
*Counsel for Bridge House Corporation*
701 Poydras Street, Suite 3600
New Orleans, Louisiana 70139-7735
Tel: (504) 581-2450
Mark S. Stein, Esq.
Email: mstein@lowestein.com

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

—————————————————————————————— :
                                                              :
*In re:*                                                  :    Chapter 11
                                                              :
PURDUE PHARMA L.P., *et al.*,              :    Case No. 19-23649 (RDD)
                                                              :
                                      *Debtors*[1]      :    (Jointly Administered)
                                                              :
—————————————————————————————— :

**BRIDGE HOUSE CORPORATION'S OBJECTION
TO DEBTOR'S DISCLOSURE STATEMENT AND SOLICITATION PROCEDURES MOTION**

Bridge House Corporation ("**Bridge House**"), through counsel, Lowe, Stein, Hoffman,

Allweiss & Hauver, LLP, objects to the (i) Debtors' *Disclosure Statement for Chapter 11 Plan*

---

[1]      The Debtors in these cases, along with the last four digits of each Debtor's registration number in the applicable jurisdiction, are as follows: Purdue Pharma L.P. (7484), Purdue Pharma Inc. (7486), Purdue Transdermal Technologies L.P. (1868), Purdue Pharma Manufacturing L.P. (3821), Purdue Pharmaceuticals L.P. (0034), Imbrium Therapeutics L.P. (8810), Adlon Therapeutics L.P. (6745), Greenfield BioVentures L.P. (6150), Seven Seas Hill Corp. (4591), Ophir Green Corp. (4594), Purdue Pharma of Puerto Rico (3925), Avrio Health L.P. (4140), Purdue Pharmaceutical Products L.P. (3902), Purdue Neuroscience Company (4712), Nayatt Cove Lifescience Inc. (7805), Button Land L.P. (7502), Rhodes Associates L.P. (N/A), Paul Land Inc. (7425), Quidnick Land L.P. (7584), Rhodes Pharmaceuticals L.P. (6166), Rhodes Technologies (7143), UDF L.P. (0495), SVC Pharma L.P. (5717) and SVC Pharma Inc. (4014). The Debtors shall include their affiliates and other entities under their control. The Debtors' corporate headquarters is located at One Stamford Forum, 201 Tresser Boulevard, Stamford, CT 06901.

for Purdue Pharma L.P. and its Affiliated Debtors [ECF Docket No. 2488] (the "**Disclosure**

**Statement**") for the *Joint Chapter 11 Plan of Reorganization of Purdue Pharma L.P. and its*

*Affiliated Debtors* [ECF Docket No. 2487] (the "**Plan**")[2] and (ii) *Debtors' Motion to Approve (I)*

*the Adequacy of Information in the Disclosure Statement, (II) Solicitation and Voting*

*Procedures, (III) Forms of Ballots, Notices, and Notice Procedures in Connection Therewith, and*

*(IV) Certain Dates With Respect Thereto* [Docket No. 2489], (the "**Solicitation Procedures**

**Motion**")[ECF Docket No. 2586].

---

## 1.    PRELIMINARY STATEMENT

Bridge House is a social service provider of non-acute care rehabilitation services,

seeking compensation for services to its clients who were injured by the Debtors.[3] Purdue's

*Disclosure Statement* (R. 2487) appropriately classifies Bridge House as a "provider of

healthcare treatment services or social services,"[4] and upon this classification the Debtors

place Bridge House's claim in Class 6 (denominated, "Hospital Claims"). But the Debtors

failed to file the associated *Hospital Trust Procedures* that will govern the distributions within

Class 6—despite the deadline for filing objections on April 23, 2021.

Bridge House objects to the Plan and the adequacy of the *Disclosure Statement* for the

following eight reasons:

---

[2]      Capitalized terms used but not defined herein shall have the meaning given to such
term in the Disclosure Statement or Plan, as the case may be.

[3] Bridge House's *Proof of* Claim.

[4] ECF 2487.

3.1     The *Disclosure Statement* fails to justify the extraordinarily broad releases and injunctions proposed for non-parties, *viz.* the Sackler Families.[5] The Disclosure Statement instead promises to provide this information in Plan Supplement that will be filed. Without such information, creditors cannot determine if the proposed $4.2 billion that the Sackler Families will pay to the Debtors' estates represents fair payment[6] for their releases, which creditors will be compelled to grant under the Plan. The Disclosure Statement also should justify this Court's authority and jurisdiction to compel the releases of claims of third parties through a purported channeling injunction, without their express consent.

3.2     The *Disclosure Statement* fails to justify the prospective releases for entities that will be created under the Plan. The *Disclosure Statement* includes releases and injunctions for the Plan Administration Trust, NewCo, TopCo, the Master Disbursement Trust, and the Creditor Trusts, although none of these entities will come into existence until the effective date of the Plan. The *Disclosure Statement* does not specify the potential claims from which the releases and

---

[5] Capitalized terms herein that are not defined herein have the meanings ascribed to them in the Debtor's *Disclosure Statement*.

[6] Over several years before the commencement of these cases, the Debtors allegedly made approximately $10.4 billion of cash distributions and transferred non-cash assets of significant value to or for the benefit of the Sackler Families. Under the Plan, the Sackler Families will make installment payments over a nine-year payment schedule. Without access to the specific release and injunction language, creditors cannot determine the reasonableness of the settlement amount, the payment schedule, or the Sackler Families' good faith in making their proposal. See 11 USC § 1129 (a)(3).

injunctions would shield these entities, or why such prospective releases and injunctions would be lawful and necessary.

3.3    The *Disclosure Statement* fails to justify the releases, injunctions, and discharge to be afforded the Debtors under the Plan. Here, Purdue Pharma "will not emerge from chapter 11,"[7] so there seems no reason to discharge them. On the effective date of the Plan, the Debtors' businesses will be liquidated and transferred to one or more entities to be formed. Because liquidating debtors are not entitled to a discharge under 11 U.S.C. § 1141(d)(3), the Debtors' unjustified discharges are not proper.

3.4    The *Disclosure Statement* does not include the required liquidation analysis, which is necessary for creditors to determine (i) the potential liquidation value of the Debtors' assets, (ii) the potential value of litigation against the Sackler Families to be released under the Plan, and (iii) whether the Plan will provide creditors a distribution that is not less than they would receive if the Debtors were liquidated under Chapter 7.[8]

3.5    The *Disclosure Statement* does not justify paying class 11A and B unsecured claims in full and paying other classes of unsecured claims, such as Class 6 to which Bridge House has been allotted, only lesser, pro rata distributions.

3.6    The *Disclosure Statement* references various organizational and trust documents, but neither these documents nor the identities of the initial

---

[7] *Disclosure Statement*, at 6.

[8] *See* 11 U.S.C. §1129(a)(7).

managers and trustees are provided with the *Disclosure Statement.* This information is promised for a forthcoming Plan Supplement, but Bridge House is unable to consent to the Plan without these disclosures. The Plan Supplement is promised a mere five calendar days (which includes a Saturday and a Sunday) before the Plan's proposed deadline for voting on the Plan. This will not allow sufficient time to evaluate the promised Plan Supplement. Instead, the Plan Supplement should be supplied at least ten calendar days before the deadline for voting, and reserve all rights to the parties. The Plan Supplement should disclose, at least, the compensation to be paid to the initial managers and trustees, the process used to select the managers and trustees, whether the trusts and trustees will be bonded, and the provisions for the retaining and compensating professionals.

3.7     The *Disclosure Statement* does not provide for post-confirmation reporting to be required for the entities to be created under the Plan, nor provide a source or means of payment for the post-confirmation fees that will be required under 28 U.S.C. § 1930(a)(6) after the Plan becomes effective.

3.8     The *Disclosure Statement* fails to justify or provide authority for the Plan provisions that will permit the Debtors (i) to adjust or expunge a claim from the official claims register without notice or a court order if the claim has been satisfied, amended, or superseded; (ii) count late-filed ballots, in the Debtors' discretion, without notice or a court order; and (iii) to deem classes of creditors that do not vote for the Plan, or are not entitled to do so, as an accepting class.

For these eight reasons, Bridge House objects to the Plan and requests that the Court deny approval of the *Disclosure Statement* unless modified to correct or remedy these deficiencies, as more fully explained hereinafter.

## 2.    Background.

### 2.1    General Background.

Bridge House is a social service organization rendering non-acute rehabilitation care to individuals in its various facilities. As a result of the Debtors' conduct, its facilities were inundated with uninsured and underinsured persons, the vast majority of whom required longer stays and more complex care than their non-opioid-related counterparts.[9] In this proceeding, Bridge House seeks compensation from the Debtors for such longer stays and more complex care.

The Debtors commenced voluntary cases under chapter 11 of the Bankruptcy Code on September 15, 2019. The Debtors continue to operate as debtors in possession, under sections 1107(a) and 1108 of the Bankruptcy Code. The Debtors' cases are being jointly administered for procedural purposes only, pursuant to Rule 1015(b) of the Federal Rules of Bankruptcy Procedure.[10]

The Debtors are pharmaceutical companies that manufacture, sell, or distribute products that include extended-release, long-acting opioid pain medications.[11] The Debtors are wholly

---

[9] *See* Addendum no. 11 to Bridge House's *Proof of Claim*.

[10] ECF No. 59.

[11] *See* First Day Brief, ECF No. 17 at 1.

owned by a non-debtor, Pharmaceutical Research Associates LP ("PRA"),[12] which is owned by two entities, each of which is ultimately owned or controlled by various trusts for the benefit of Debtors' ultimate owners, the Sackler Families.[13]

From January 1, 2008, to September 30, 2019, Purdue Pharma and related entities made cash distributions of $10.4 billion to or for the benefit of its shareholders ($4.1 billion in US partner cash distributions, $1.5 billion in distributions for the benefit of ex-US IACs, and $4.7 billion in tax distributions).[14] During that same period, Purdue Pharma is believed also to have transferred valuable non-cash assets to its shareholders, such as ownership interests in businesses during the years 2013 and 2014 and the right to future royalties payable on certain formulations of OxyContin in 2017.[15] Further, certain dealings between Purdue Pharma and the Sackler Families are reasonably believed to have been conducted on other than arms-length terms, including below-market royalties from the Sackler Families and Sackler entities to Purdue Pharma on sales of OxyContin.[16]

The Debtors commenced these cases in response to thousands of lawsuits seeking damages resulting from OxyContin® Extended-Release Tablets CII.[17] By then, the Debtors, the Sackler Families, and a critical mass of plaintiff constituencies had reached an agreement

---

[12] *Id.*, at 16.

[13] *Id.*

[14] *Disclosure Statement*, at 35.

[15] *Id.*, at 79.

[16] *Id.*

[17] First Day Brief at 16.

in principle on a global settlement to be effected in bankruptcy.[18] Under their prepetition agreement, Purdue's shareholders agreed to relinquish their equity in the Debtors and to transfer the Debtors' assets to a public benefit trust, "free and clear" of Purdue's liabilities to the fullest extent permitted by law. Moreover, Purdue's existing shareholders agreed to sell their ex-U.S. pharmaceutical companies and contribute an additional $3 billion over seven years to satisfy claims, in addition to the liquidation value of the Debtors.[19]

### 2.2    Proposed Plan and Disclosure Statement.

On March 15, 2021, the Debtors filed their Plan and an accompanying *Disclosure Statement.* The Plan is based on the prepetition settlement agreement but increases the amount that Purdue Pharma's existing shareholders will pay to creditors in bankruptcy from the original $3.0 billion to $4.275 billion[20] The payment would be made over nine or ten years.[21] The principal consideration for those payments is release and injunction provisions under the Plan benefitting specified parties associated with the Sackler Families.[22] Although a "term sheet" summarizing the settlement agreement with the Sackler Families is annexed to the Plan, the actual settlement agreement has not been disclosed and is promised for a future Plan Supplement.[23] Similarly, the *Shareholder Releases and Shareholder Channeling*

---

[18] *Id.,* at 3.

[19] *Id.,* at 3-4.

[20] *Disclosure Statement*, at 2.

[21] *Id.,* at 87.

[22] *Id.,* at 6.

[23] *Id.,* at 87.

*Injunction for the benefit of the Sackler Families*, which will be set forth in sections 10.8 and 10.9 of the Plan, are not yet disclosed and are described only as "to come."[24] Instead, the *Disclosure Statement* provides only that the "Debtors anticipate filing an amended Plan incorporating such releases upon the parties' agreement to a definitive Shareholder Settlement agreement prior to the hearing of the Bankruptcy Court to consider entry of the Solicitation Procedures Order."[25]

Under the Plan, Purdue Pharma will not emerge from chapter 11.[26] On the effective date of the Plan, the Debtors' businesses will be transferred to NewCo, a company to be created for this.[27] TopCo, another company to be created, will hold the equity interests and voting rights in NewCo.[28] TopCo is to be owned by the National Opioid Abatement Trust ("NOAT") and the Tribe Trust, as defined in the Plan.[29] The NewCo and TopCo organizational documents and the identity of their initial managers are undisclosed and promised to be disclosed only later when a promised Plan Supplement is filed.[30]

The Plan provides that approximately $5 billion will be contributed to six or more trusts, each with a mission to fund abatement of the opioid crisis.[31] An additional $700 to $750

---

[24] Plan at 10.8 and 10.9.

[25] *Disclosure Statement*, at 15-16 n.14.

[26] *Id.*, at 2.

[27] *Id.*, at 6.

[28] *Id.*

[29] *Id.*, at 6 and 63.

[30] *Id.*, at 6, 115 and 116.

[31] *Id.* at 2.

million will be provided to a trust that will distribute to personal injury claimants.[32] These

trusts to be established would include at least the following:[33]

| Class 4 | Non-Federal Domestic Governmental Claims | 7,607 | Approximately $4.0 billion in estimated cash distributions to NOAT over time (excluding potential proceeds of insurance claims and any release of restricted cash) |
|---|---|---|---|
| Class 5 | Tribe Claims | 400 | Approximately $141 million in estimated cash distributions to the Tribe Trust over time (excluding potential proceeds of insurance claims and any release of restricted cash) |
| Class 6 | Hospital Claims | 1,178 | $250 million in funding of Hospital Trust |
| Class 7 | Third-Party Payor Claims | 467,102 | $365 million for TPP Trust |
| Class 9 | NAS Monitoring Claims | 3,439 | $60 million for an NAS Monitoring Trust |
| Class 10 | PI Claims | 134,718 | $700 million to $750 million for PI Trust |

In addition to these trusts, the Plan also provides for creation of a Master Disbursement

Trust and a Plan Administration Trust,[34] but the trust documents and the identity of the

trustees are not provided in the *Disclosure Statement*. Instead, these are promised for a

forthcoming Plan Supplement.[35]

---

[32] *Id.*

[33] *Id.*, at 11-12.

[34] *Id.*, at 66.

[35] *See, e.g., Id.*, at 124.

In addition to the shareholder releases to be provided to the Sackler Families, section 10.6(b) of the Plan requires holders of claims to provide releases to "Released Parties" "to the maximum extent permitted by law, as such law may be extended subsequent to the Effective Date" of, among other things, "any and all claims" related to the Debtors.[36] The term "Released Parties" is expansive and includes, among others, (i) the Debtors, (ii) the Plan Administration Trust, (iii) NewCo, (iv) TopCo, (v) the Master Disbursement Trust, (vi) the Creditor Trusts, and (vii) with respect to each of the foregoing Entities in clauses (i) through (vi), each of their Related Parties."[37]

The term "Related Parties" is likewise expansive and includes such Person's predecessors, successors, assigns, Subsidiaries, affiliates, managed accounts or funds, past, present, and future officers, board members, directors, principals, agents, servants, independent contractors, co-promoters, third-party sales representatives, medical liaisons, members, partners (general or limited), managers, employees, subcontractors, agents, advisory board members, financial advisors, attorneys and legal representatives, accountants, investment bankers, consultants, representatives, management companies, fund advisors and other professionals and advisors, trusts (including trusts established for the benefit of such Person), trustees, protectors, beneficiaries, direct or indirect owners and/or equity holders, parents, transferees, heirs, executors, estates, nominees, administrators, legatees, and the Related Parties of each of the foregoing...."[38]

---

[36] Plan, at 10.6(b).

[37] Plan, at 21.

[38] *Id.*

Additionally, persons that assert claims to be paid by the trusts are also subject to a channeling injunction that prohibits them from taking any action against a Released Party.[39] Section 10.2 of the Plan provides the Debtors a discharge to "the fullest extent permitted by section 1141 of the Bankruptcy Code, of and from any and all Claims, Interests, rights and liabilities that arose prior to the Effective Date."[40]

Finally, the Plan calls for the payment by the Debtors of all United States Trustee quarterly fees:

> All fees payable under section 1930 of chapter 123 of title 28 of the United States Code shall be paid on or before the Effective Date by the Debtors. Quarterly fees owed to the U.S. Trustee shall be paid when due in accordance with applicable law and the Debtors shall continue to file reports to show the calculation of such fees for the Debtors' Estates until the Chapter 11 Cases are closed under section 350 of the Bankruptcy Code.
>
> Plan, at § 12.5.

As noted, "the Debtors' businesses are to be transferred to a newly created company, which is to be owned indirectly by two of the opioid abatement trusts."[41] The *Disclosure Statement* does not address how the Debtors will be able to pay the quarterly fees or if the Plan Administration Trust or some other post-confirmation entity will do so.

On March 18, 2021, the Debtors moved for approval of a scheduling order in connection with the Plan process.[42] The proposed scheduling order would permit the Debtors to file the Plan Supplement by Friday, July 9, 2021, and fix the deadline to vote for the Plan on

---

[39] Plan at 10.7.

[40] Plan at 10.2.

[41] *Id.*

[42] ECF No. 2536.

Wednesday, July 14, 2021.[43] This would allow only 5 days for creditors to review the promised Plan Supplement, and two of those five are a Saturday and a Sunday.

## 3.    Objections.

### 3.1    Applicable Law.

Section 1125 of the Bankruptcy Code mandates that a disclosure statement contain "adequate information" describing a confirmable plan.[44] The Bankruptcy Code defines "adequate information" as: "[i]nformation of a kind, and in sufficient detail...that would enable such a hypothetical reasonable investor of the relevant class to make an informed judgment about the plan...."[45] Indeed, Congress intended the disclosure statement "to be the primary source of information upon which creditors and shareholders could rely in making an informed judgment about a plan of reorganization."[46]

To be approved, a disclosure statement must include sufficient information to apprise creditors of the risks and financial consequences of the proposed plan.[47] Although the

---

[43] *Id.*, at ¶ 7.

[44] 11 U.S.C. § 1125.

[45] 11 U.S.C. § 1125(a)(1).

[46] *In re Scioto Valley Mortg. Co.*, 88 B.R. 168, 170 (Bankr. S.D. Ohio 1988); *see also Momentum Mfg. Corp. v. Employee Creditors Comm. (In re Momentum Mfg. Corp.)*, 25 F.3d 1132, 1136 (2d Cir. 1994) ("The Code obliges a Debtor to engage in full and fair disclosure"); *In re Adelphia Commc'ns Corp.*, 352 B.R. 592, 596 (Bankr. S.D.N.Y. 2006) (The Bankruptcy Code "provides that acceptances or rejections of a reorganization plan can't be solicited without first giving the creditors or others so solicited a court approved disclosure statement, which provides 'adequate information.'"); *Accord, Kunica v. St. Jean Fin., Inc.*, 233 B.R. 46, 54 (S.D.N.Y. 1999).

[47] *See, In re McLean Indus., Inc.*, 87 B.R. 830, 834 (Bankr. S.D.N.Y. 1987) ("substantial financial information with respect to the ramifications of any proposed plan will have to be provided to, and digested by, the creditors and other parties in interest in order to arrive at an informed decision concerning the acceptance or rejection of a proposed plan").

adequacy of the disclosure statement is determined on a case-by-case basis, the disclosure statement must "contain simple and clear language delineating the consequences of the proposed plan on [creditors'] claims and the possible [Bankruptcy Code] alternatives...."[48]

The purpose of the disclosure statement is to give creditors enough information so that they can make an informed choice of whether to approve or reject the debtor's plan.[49] The disclosure statement must inform the average creditor what it will receive and when and what contingencies might intervene.[50] Section 1125 of the Bankruptcy Code is biased towards more disclosure rather than less.[51] The "adequate information" requirement merely establishes a floor, and not a ceiling, for disclosure to voting creditors.[52] Once the "adequate disclosure" floor is satisfied, additional information in a disclosure statement is permissible, provided the additional information is accurate and its inclusion is not misleading.[53]

3.2    *The Disclosure Statement fails to provide creditors with "Adequate Information," as Required by Section 1125 of the Bankruptcy Code, here failing to include the final proposed Hospital TDP and other essential documents.*

The *Disclosure Statement* fails to provide essential information to creditors about potential distributions and their timing. Class 6 claims, to which Bridge House's claims are

---

[48] *In re: Copy Crafters Quickprint, Inc.*, 92 B.R. 973, 981 (Bankr. N.D.N.Y. 1988).

[49] *In re Duratech Indus.*, 241 B.R. 291, 298 (Bankr. E.D.N.Y. 1999), *aff'd*, 241 B.R. 283 (E.D.N.Y. 1999).

[50] *In re Ferretti*, 128 B.R. 16, 19 (Bankr. D.N.H. 1991).

[51] *See In re Crowthers McCall Pattern, Inc.*, 120 B.R. 279, 300 (Bankr. S.D.N.Y. 1990).

[52] *Adelphia*, 352 B.R. at 596 (*citing, Century Glove, Inc. v. First American Bank of New York*, 860 F.2d 94, 100 (3d Cir. 1988)).

[53] *Adelphia*, 352 B.R. at 596.

presently allocated, omits the Hospital Trust instrument and trust distribution procedures, which are necessary components of the Plan and without which neither Bridge House nor any of the Class 6 can approve the Plan.

Additionally, the *Disclosure Statement* should clarify disparities in the Plan's proposed distributions to the various classes of creditors. For example, Class 11A (Avrio general unsecured claims) and Class 11B (Adlon general unsecured claims) are unimpaired and would be paid in full,[54] whereas other classes of unsecured creditors would be paid only a small fraction on their claims. The *Disclosure Statement* should explain and justify such disparate treatment. Likewise, the *Disclosure Statement* fails to provide the estimated distribution to Class 11C (other general unsecured claims).[55] The *Disclosure Statement* should provide this. If the Debtors are unable to determine those amounts, then they should be required to say so and explain it.

### 3.3 *By withholding information required for a confirmable plan until a future Plan Supplement, the Debtors would allow insufficient time for creditors to review that essential information.*

The Debtors promise to provide the omitted but essential information for their Plan in a Plan Supplement by Friday, July 9, 2021, although their proposed deadline to vote on the Plan is a mere five days later, on July 14, 2021. The promised Plan Supplement will contain documents identifying the Creditor Trustees, the MDT Trustees, the MDT Executive Director, the NewCo Managers, and the TopCo Managers, as well as various trust documents.[56] This

---

[54] *Disclosure Statement*, at 99 and 100.

[55] *Disclosure Statement* at 100.

[56] Plan, at 18; *Disclosure Statement*, at 6, 115, and 116.

Plan Supplement is promised to include documents and information that are essential to the Plan, the Trusts, and the organization of NewCo and TopCo, and these will impair the rights of creditors, whose claims will be extinguished in this proceeding. For creditors to review this important information, any Plan supplement(s) should be filed no less than ten business days before the voting deadline on the Plan, instead of the scant three business days that the Debtors are proposing, with all parties reserving their rights. Moreover, the trust documents, which will provide for the timing and amounts to be distributed within each Class, should include explanation of the process to select the trustees and any executive staff, the compensation for such persons, any security to be provided, and the provisions for the retention and compensation of professionals.

### 3.4    Broad releases, injunctions, and discharge of the Sackler Families are provided without justification

The *Disclosure Statement* should provide additional information regarding the Sackler Family Releases to show that the plan is proposed in good faith and that the proposed settlement with them is fair and reasonable. As now, the Plan and *Disclosure Statement* describe the Shareholder Releases and the Shareholder Channeling Injunction for the benefit of the Sackler Families only as "to come."[57] The *Disclosure Statement* indicates that the "Debtors anticipate filing an amended Plan incorporating such releases upon the parties' agreement to a definitive Shareholder Settle [*sic*]

---

[57] Plan at 10.8 and 10.9.

agreement prior to the hearing of the Bankruptcy Court to consider entry of the Solicitation Procedures Order."[58]

Non-debtor releases must meet the standard articulated in *Deutsche Bank AG v. Metromedia Fiber Network, Inc.* (In re Metromedia Fiber Network, Inc.)[59] (hereinafter, "Metromedia"). There, the Second Circuit held that merely including non-debtor releases in the Plan is not sufficient for their effectiveness; debtors must additionally show that the facts justify such releases.[60]

Here, the *Disclosure Statement* provides that the Sackler Families would be released from any and all claims against them in exchange for the payment of $4.275 billion to the various trusts during the next nine or ten years.[61] The released claims will be expansive—even though (1) Purdue Pharma pleaded guilty to three felony offenses: one count charging a dual-object conspiracy to defraud the United States and to violate the Food, Drug, and Cosmetic Act and two counts charging conspiracy to violate the Federal Anti-Kickback Statute;[62] (2) the Sackler Families agree to pay $225 million to the United States in a civil settlement;[63] and Purdue Pharma and related entities distributed $10.4 billion and (upon information and belief) valuable non-cash assets that are otherwise beyond reach of creditors in bankruptcy.

---

[58] *Disclosure Statement*, at 15-16 n. 14.

[59] *Deutsche Bank AG v. Metromedia Fiber Network, Inc.* (In re Metromedia Fiber Network, Inc.), 416 F.3d 136, 141 (2d Cir. 2005)

[60] *Id.,* at 141-43.

[61] *Id.*, at 87.

[62] *Disclosure Statement*, at 14.

[63] ECF No. 1833, at ¶ 3.

This occurred between January 1, 2008, and September 30, 2019, to or for the benefit of their shareholders.[64] Such non-cash assets are believed to include equity interests in businesses distributed in-kind from Purdue Pharma in 2013 and 2014 and Purdue Pharma's assignment of future royalties payable on non-ADF formulations of OxyContin in 2017.[65] In addition, certain dealings between Purdue Pharma and the Sackler Families may not have been conducted on arms-length terms, including that Purdue Pharma received below-market royalties from the Sackler Families and Sackler entities on sales of OxyContin.[66]

The aggregate $4.275 billion that the Sackler Families will pay for distribution to creditors to be released from liability and litigation lacks adequate justification, so that a creditor could not reasonably determine whether the proposed $4.275 billion to be paid is an appropriate settlement based on their current net worth. Significantly, the documents and information omitted from the Plan filed include omission of the required liquidation analysis (Appendix B) that is necessary for this evaluation. The Plan merely provides that the liquidation analysis is "To Come,"[67] preventing a proper assessment of the Sackler Families' releases. The liquidation analysis is necessary to determine how the Debtors value potential litigation against the Sackler Families and what, if any, recovery might otherwise be obtainable. This information is necessary for creditors to determine if the funds to be provided by the shareholders represent a fair, meaningful,

---

[64] *Disclosure Statement*, at 35.

[65] *Id.*, at 79.

[66] *Id.*

[67] Plan at Appendix B.

and reasonable settlement.[68] Accordingly, the Debtors should provide their liquidation analysis at least ten business days before the voting deadline for the Plan, rather than the proposed five days, two of which are a Saturday and a Sunday, as argued, *supra*, for the omitted financial projections at Appendix C and valuation analysis at Appendix D.

### 3.5    *The* Disclosure Statement *does not adequately justify this Court's granting non-party releases to the Sackler Families.*

Creditors may have claims against the Sackler Families based upon their wrongdoing. The Sackler Families are non-debtors, and their assets that will not be contributed under the Plan are not property of the bankruptcy estates. If the Plan is confirmed, then the trusts will be created and funded in part by $4.275 billion from the Sackler Families in exchange for their releases. Is this enough money to bar creditor claims against the Sackler Families and their non-estate assets? The burden is on the Debtors to make this necessary showing.

Accordingly, the *Disclosure Statement* should be amended to justify this and to justify this Court's authority and jurisdiction to release the non-debtor Sackler Families and their non-estate assets from the claims that the Debtors might otherwise assert.[69]

---

[68] *See In re Lehman Brothers Holdings Inc.*, 435 B.R. 122, 134 (S.D.N.Y. 2010) (In determining whether a compromise should be approved, the court must determine whether it is "fair and equitable."); *In re CR Stone Concrete Contractors, Inc.*, 346 B.R. 32, 49 (Bankr. D. Mass. 2006) ("The burden of proof is on the party seeking approval of the proposed settlement.").

[69] *In re Johns-Manville Corp.*, 517 F.3d 52, 66 (2d Cir. 2008), vacated & remanded on other grounds, 557 U.S. 137 (2009), *aff'g in part & rev'g in part*, 600 F.3d 135 (2d. Cir. 2010) ("a bankruptcy court only has jurisdiction to enjoin third-party non-debtor claims that directly affect the res of the bankruptcy estate."); *In re Aegean Marine Petroleum Network, Inc.*, 599 B.R. 717, 723 (Bankr. S.D.N.Y 2019) ("third-party claims that are the subject of the proposed releases in this case are not claims against the estate or against property of the estate. A bankruptcy court has no in rem jurisdiction over such third-party claims."); *In re SunEdison, Inc.*, 576 B.R. 453,464 (Bankr. S.D.N.Y. 2017) (including third-party releases in a plan requires a debtor to "demonstrate how the outcome of the claims to be released might have a conceivable effect on the Debtors' estates…."); *In re Dreier LLP*, 429 B.R. 112, 133 (Bankr.

### 3.6    The Disclosure Statement *should provide additional information regarding the proposed third-party releases and injunction.*

The liability shield afforded by the Plan's releases and channeling injunctions will benefit (i) the Debtors, (ii) the Plan Administration Trust, (iii) NewCo, (iv) TopCo, (v) the Master Disbursement Trust, (vi) the Creditor Trusts, and (vii) with respect to each of the foregoing Entities in clauses (i) through (vi), each of their Related Parties."[70] The "Released Parties" would be released under the Plan "to the maximum extent permitted by law, as such law may be extended subsequent to the Effective Date" from "any and all claims" related to the Debtors.[71] The channeling injunction broadly enjoins certain creditors and redirects their claims against Released Parties to the various trusts to be created under the Plan.[72] The *Disclosure Statement* does not address why it is appropriate to provide such broad releases and injunctions to the entities that do not yet exist.[73] Also unstated are the particular claims that would be released or enjoined under the cloak of generality, nor how such broad releases and injunctions are necessary to the Plan or beneficial to the creditors. Nor is any justification

---

S.D.N.Y. 2010) (because the court lacks jurisdiction to enjoin claims that do not affect property of the estate or the administration of the estate, non-debtor third-party releases must be limited to claims that are derivative of the debtors).

[70] Plan at 21, Sections 10.6(b) and 10.7.

[71] Id. at section 10.6(b) (emphasis added).

[72] *Id.*, at section 10.7.

[73] *i.e.,* the Plan Administration Trust, NewCo, TopCo, the Master Disbursement Trust, the Creditor Trusts, and with respect to each of the foregoing entities, each of their Related Parties.

offered for providing that such releases should be "extended subsequent to the Effective Date" or by what lawful authority this Court might do so.[74]

The *Disclosure Statement* should be amended to justify these releases and channeling injunctions, or eliminate them.

3.7    *The Disclosure Statement* should provide additional justification regarding the proposed debtor discharge.

Section 10.2 of the Plan also provides the Debtors a discharge to "the fullest extent permitted by section 1141 of the Bankruptcy Code, of and from any and all Claims, Interests, rights and liabilities that arose prior to the Effective Date," although the *Disclosure Statement* seems to obviate such discharge because Purdue Pharma "will not emerge from chapter 11."[75] Instead, the Debtors' business is to be transferred to NewCo, a company created specifically for this.[76] "After the Effective Date, PPLP (and any other Debtor not transferred to NewCo) will continue to exist as Liquidating Debtors solely for the purposes of winding up their respective estates and liquidating these entities." This violates § 1141 of the Bankruptcy Code.

---

[74] See Metromedia, 416 F. 3d at 141-143 (non-debtor release in a plan of reorganization should not be approved absent the finding that truly unusual circumstances render the release terms important to the success of the plan); *In re Washington Mut., Inc.*, 442 B.R. 314, 348 (Bankr. D. Del. 2011) (post-confirmation entities "have done nothing yet for which they need a release" and will not come into existence until after confirmation).

[75] *Disclosure Statement*, at 2.

[76] *Id.*, at 6.

Section 1141(d)(3) of the Bankruptcy Code provides that the confirmation of a plan does not discharge a debtor if (i) the plan provides for the liquidation of all or substantially all of the property of the estate, (ii) the debtor does not engage in business after consummation of the plan, and (iii) the debtor would be denied a discharge under section 727(a) of the Bankruptcy Code if the case were a chapter 7 liquidation case.[77] Here, the Plan nevertheless provides for (i) liquidation of the Debtors' assets, (ii) the Debtors will not retain any significant assets to operate after the consummation of the Plan, and (iii) the Debtors, as partnerships or corporations, would not be entitled to a discharge in a chapter 7 case. Therefore, the Debtors should not be discharged under the Plan, absent justification for discharges, releases, and injunctions benefitting the Debtors as set forth in the *Disclosure Statement*.[78]

3.8    *The* Disclosure Statement *does not provide sufficient information to determine if the estates will comply with 28 U.S.C. § 1930(a)(6) after confirmation.*

Quarterly fees payable in Chapter 11 cases under 28 U.S.C. § 1930(a)(6) must be paid for each and every calendar quarter, including any fraction thereof, in which a debtor's or debtor-in-possession's bankruptcy case remains in chapter 11 and is not

---

[77] 11 U.S.C. §1141(d)(3); *In re Wood Family Interests, Ltd.*, 135 B.R. 407, 410 (Bankr. D. Colo. 1989) (holding that a discharge is not available to corporate or partnership debtors who propose a liquidating plan of reorganization).

[78] *In re Bigler*, LP, 442 B.R. 537, 544-56 (Bankr. S.D. Tex. 2010) (where liquidating debtor is not permitted a discharge due to section 1141(d)(3), a plan injunction preventing post-confirmation prosecution of claims that would operate as a discharge is also impermissible).

closed, converted, or dismissed.[79] Quarterly fees are computed from the disbursements

made by the debtor's bankruptcy estate.[80]

Here, the Plan requires the Debtors to pay the United States Trustee quarterly fees:

> All fees payable under section 1930 of chapter 123 of title 28 of the United States Code shall be paid on or before the Effective Date by the Debtors. Quarterly fees owed to the U.S. Trustee shall be paid when due in accordance with applicable law and the Debtors shall continue to file reports to show the calculation of such fees for the Debtors' Estates until the Chapter 11 Cases are closed under section 350 of the Bankruptcy Code.
>
> Plan at section 12.5.

However, because "the Debtors' businesses will be transferred to a newly created

company, which will be indirectly owned by two of the opioid abatement trusts,"[81] the

Debtors would have no apparent resources from which to pay such fees.  The Plan calls for

the creation of a post-petition Plan Administration Trust,[82] by authority conferred under

section 1123(b)(3)(B) of the Bankruptcy Code and applicable state law, and the Plan

Administration Trust is appointed as the successor-in-interest to, and representative of,

the Debtors and their Estates for the purposes of winding up, meaning the retention,

enforcement, settlement, or adjustment of Claims against the Debtors (other than the

Channeled Claims).[83] However, left unstated is whether the Plan Administration Trust will

---

[79] *In re Aquatic Development Group, Inc.*, 352 F.3d 671 (2d Cir. 2003); *see also* 28 U.S.C. § 1930(a)(6).

[80] 28 U.S.C. § 1930(a)(6).

[81] *Id.*

[82] *Id.*, at 66.

[83] *Disclosure Statement*, at 112.

pay the quarterly fees, or they will be paid from another source. The Disclosure Statement

and Plan should be clarified on this point.

      3.9   *The* Disclosure Statement *contains dubious provisions that should be justified or eliminated.*

      The *Disclosure Statement* contains at least four procedural provisions of dubious

validity that should be justified with appropriate authority or eliminated. Those

dubious provisions include the following:

> "[A]ny Claim or Interest that has been paid or satisfied, or any Claim or Interest that has been amended or superseded, may be adjusted or expunged on the official claims register without a claims objection having to be filed and without any further notice to or action, order, or approval of the Bankruptcy Court."

> *Disclosure Statement*, at 16-17.

The *Disclosure Statement* should be amended to provide the authority that would allow the

Debtor to amended or expunge a claim from the official claims register under any

circumstances, without specific notice or an order of this Court directed to each affected

claimant.

      Second, the *Disclosure Statement* provides:

> "[A]ny Ballots received after the Voting Deadline will not be counted absent the consent of the Debtors (in their sole discretion)."

> *Disclosure Statement*, at 174.

The *Disclosure Statement* should be amended to provide the authority that allows the Debtors

(without notice or a Court order) to count late-filed ballots under any circumstances.

      Third, the *Disclosure Statement* provides:

> "[i]f no holders of Claims in a particular Class that is entitled to vote on the Plan vote to accept or reject the Plan, then such Class shall be deemed to accept the Plan."

*Disclosure Statement*, at 174.

The *Disclosure Statement* should be amended to provide the authority to deem the Plan accepted by a class of creditors under any circumstance, if such class of creditors does not vote to accept the Plan.

Fourth, the *Disclosure Statement* provides:

> "[i]f no holders of Claims in a particular Class that is entitled to vote on the Plan vote to accept or reject the Plan, then such Class shall be deemed to accept the Plan."
>
> *Disclosure Statement* at 174.

The *Disclosure Statement* should be amended to provide the authority that allows the Debtors to *deem* a class of creditors that is not entitled to vote on the Plan an accepting class.

## 4.    Request for relief.

Bridge House Corporation asks the Court to sustain its objections set forth herein and order that the Plan and Disclosure Statement be modified or supplemented to eliminate the objections set forth herein, in default whereof the Debtor's Plan should be rejected.

Date: April 22, 2021

New Orleans, Louisiana

**LOWE, STEIN, HOFFMAN,
ALLWEISS & HAUVER, LLP**

/s/ Mark S. Stein
_____

Mark S. Stein, Esq.
701 Poydras Street, Suite 3600
New Orleans, Louisiana 70139-7735
Tel: (504) 581-2450
Email: mstein@lowestein.com

*Counsel for Bridge House Corporation*

*Pro Hac Vice Application Pending*