UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

Hearing Date:  May 4, 2021
Hearing Time:  10:00 am

-------------------------------------------------------- x
                                                      :

In re                                          :                Chapter 11

                                                 :

PURDUE PHARMA L.P., *et al.*,         :                Case No. 19-23649 (RDD)

                                                 :

                              Debtors.     :                Jointly Administered

                                                   :

-------------------------------------------------------- x

**OBJECTION OF UNITED STATES TRUSTEE TO DISCLOSURE STATEMENT FOR
CHAPTER 11 PLAN OF PURDUE PHARMA L.P. AND ITS AFFILIATED DEBTORS**

TO:    **THE HONORABLE ROBERT D. DRAIN,
        UNITED STATES BANKRUPTCY JUDGE:**

        William K. Harrington, the United States Trustee for Region 2 (the "United States

Trustee"), hereby submits this objection (the "Objection") to the Disclosure Statement for the

Chapter 11 Plan of Purdue Pharma L.P. and Its Affiliated Debtors (the "Disclosure Statement").

ECF Doc No. 2488.  In support thereof, the United States Trustee respectfully states:

**PRELIMINARY STATEMENT**

        Even though the Debtors' Disclosure Statement is well over 200 pages and includes

hundreds of pages of supporting documentation, it fails to include adequate information in a

readily understandable format to allow all but the most sophisticated creditors to reach an

informed judgment about whether to vote in favor of the proposed plan of reorganization (the

"Plan"). ECF Doc. No. 2487.  A disclosure statement ordinarily must provide sufficient

information for a reasonable investor or creditor to make an informed judgment about whether to

vote for the Plan.  Here, although the Disclosure Statement contains an Executive Summary that

purports to summarize the Plan's terms, the Executive Summary and the remainder of the

Disclosure Statement omit key information that most creditors would need in considering

"EXHIBIT A"

whether to vote in favor of the Plan. Most importantly, the Disclosure Statement omits clear information regarding how claims are likely to be categorized, likely distributions to creditors, the timing of those distributions, and the releases they are being compelled to provide in return for such distributions. Thus, the Disclosure Statement should be amended to provide creditors with this important information in a readily understandable way.

The United States Trustee also objects to the Disclosure Statement on the following grounds:

a. The Disclosure Statement fails to contain adequate information regarding the releases and injunctions granted to the Sackler Families.[1] At present, the Disclosure Statement simply indicates that this information will be provided in an Amended Plan yet to be filed. Without such information, creditors cannot make a reasoned decision about whether the exchange of money, the purported $4.2 billion the Sackler Families will pay to the Debtors' estate, represents a fair exchange or bargain[2] for releases creditors will be compelled to provide under the Plan. Furthermore, the Disclosure Statement should be amended to explain this Court's authority and jurisdiction to compel the release, through a purported channeling injunction, of the claims of third parties without their explicit consent to any such releases.

b. The Disclosure Statement fails to provide sufficient information regarding the justification for the prospective releases provided in the Plan to entities that do not yet exist. The Disclosure Statement provides for releases and injunctions for entities including, the Plan Administration Trust, NewCo, TopCo, the Master Disbursement Trust and the Creditor Trusts, despite the fact that none of these entities will come into existence until the effective date of the Plan. The Disclosure Statement does not explain what claims could possibly be asserted against these entities that need to be released or enjoined, or why such prospective releases and injunctions are legally proper and necessary to the Plan.

c. The Disclosure Statement fails to provide a justification for the releases, injunctions and discharge provided to the Debtors under the Plan. After confirmation, Purdue Pharma "will not emerge from chapter 11". Disclosure Statement at 6. Rather, on the effective date of the Plan, the Debtors' business will be liquidated and transferred to a newly created company or

---

[1] All capitalized terms not defined herein shall have the meaning ascribed to them in the Disclosure Statement.

[2] Over several years before the commencement of these cases, the Debtors allegedly made approximately $10.4 billion of cash distributions and transferred non-cash assets of significant value to or for the benefit of the Sackler Families. Under the Plan, the Sackler Families will make installment payments over a nine-year payment schedule. Without access to the specific release and injunction language, creditors cannot determine the reasonableness of the settlement amount, the payment schedule, or the Sackler Families' good faith in making their proposal. See 11 USC § 1129 (a)(3).

2

"EXHIBIT A"

companies.  Under 11 U.S.C. § 1141(d)(3), liquidating debtors are not entitled to a discharge under the plain language of the Bankruptcy Code.

d.  The Disclosure Statement does not include the required liquidation analysis.  A liquidation analysis is necessary for creditors to determine and understand the potential liquidation value of the Debtors' assets, the potential value of the litigation against the Sackler Families, and whether the Plan provides creditors a distribution not less than the creditors would receive if the Debtors were liquidated under chapter 7.  See 11 U.S.C. §1129(a)(7).

e.  The Disclosure Statement does not provide sufficient information about or explain clearly why class 11A and B unsecured claims will be paid in full while other classes of unsecured claims will only receive a pro rata distribution.

f.  The Disclosure Statement references certain organizational and trust documents, but neither these documents nor the identities of the initial managers and trustees are in the Disclosure Statement.  This information will purportedly be included in a Plan Supplement.  At present, it is contemplated that the Plan Supplement will be filed five calendar days (including an intervening weekend) before the voting deadline on the Plan.  But to give parties sufficient time to review this information, it should be supplied at least ten calendar days before the voting deadline on the Plan, with all parties reserving their rights in connection thereto.  Furthermore, the Plan Supplement should disclose, among other things, the compensation of the initial managers and trustees, the process used to select the managers and trustees, whether the trusts/trustees will be bonded, and the provisions for the retention and compensation of these entities' professionals.

g.  The Disclosure Statement does not contain sufficient information about or explain clearly post-confirmation reporting requirements and duties and the payment of post-confirmation fees due under 28 U.S.C. § 1930(a)(6) after the effective date of the Plan.

h.  The Disclosure Statement fails to provide sufficient information regarding the justification for the Plan provisions permitting the Debtors (a) to adjust or expunge a claim from the official claims register without notice or a court order if the claim has been satisfied, amended or superseded, (b) to count ballots (without notice or a court order) that are untimely filed, and (c) to deem a class of creditors that does not vote to accept the Plan as an accepting class of creditors.

For these reasons, as detailed more fully below, the United States Trustee respectfully

requests that the Court deny approval of the Disclosure Statement, unless modified to address

these issues.

3

"EXHIBIT A"

## BACKGROUND

General Background

1. The Debtors commenced voluntary cases under chapter 11 of the Bankruptcy Code on September 15, 2019 (the "Petition Date").

2. The Debtors are authorized to continue to operate their businesses and manage their properties as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

3. The Debtors' chapter 11 cases are being jointly administered for procedural purposes only pursuant to Rule 1015(b) of the Federal Rules of Bankruptcy Procedure. ECF No. 59.

4. The Debtors are pharmaceutical companies that manufacture, sell, or distribute, among other products, extended-release, long-acting opioid pain medications. See First Day Brief, ECF No. 17 at 1.

5. The Debtors are wholly owned by a non-debtor, Pharmaceutical Research Associates LP ("PRA"). Id. at 16. PRA is owned by two entities, each of which is ultimately owned by various trusts for the benefit of Debtors' ultimate owners, the Sackler Families. Id.

6. From January 1, 2008, to September 30, 2019, Purdue Pharma and related entities made $10.4 billion of cash distributions to or for the benefit of its shareholders ($4.1 billion in US partner cash distributions, $1.5 billion in distributions for the benefit of ex-US IACs, and $4.7 billion in tax distributions). Disclosure Statement at 35.

7. During that same time, it is believed that Purdue Pharma also transferred significant value in non-cash assets to its shareholders, such as equity interests in businesses distributed out of Purdue Pharma in 2013 and 2014 and the assignment by Purdue Pharma of

4

"EXHIBIT A"

the right to future royalties payable on non-ADF formulations of OxyContin in 2017.  Id. at 79.
In addition, certain dealings between Purdue Pharma and the Sackler Families are thought not
to have been conducted on arms-length terms, including that Purdue Pharma received below-
market royalties from the Sackler Families and Sackler entities on sales of OxyContin.  Id.

8.      The Debtors commenced these cases because OxyContin® Extended-Release
Tablets CII, the Debtors' most prominent pain medication, has made them the target of over
2,600 civil actions pending across the United States and its territories.  First Day Brief at 16.
The lawsuits have proved unmanageable for the Debtors.  Id.

9.      In connection with those lawsuits, before filing these cases, the Debtors, the
Sackler Families, and a critical mass of plaintiff constituencies reached an agreement in
principle on a global resolution of those lawsuits to be finalized and effectuated in these chapter
11 cases.  Id. at 3.

10.      As part of that agreement, Purdue's existing shareholders agreed to relinquish
their equity interests in the Debtors and to consent to the transfer of all of the Debtors' assets to a
public benefit trust, "free and clear" of Purdue's liabilities to the fullest extent permitted by law.
Moreover, Purdue's existing shareholders will sell their ex-U.S. pharmaceutical companies, and
they will contribute an additional $3 billion over seven years (in addition to 100% of the value of
all 24 Debtors).  Id. at 3-4.

11.      On September 27, 2019, the United States Trustee appointed an official
committee of unsecured creditors (the "Official Committee").  ECF No. 131.

12.      On or about October 20, 2020, the Sackler Families entered into a civil settlement
agreement with the United States Department of Justice.  ECF No. 1833.  Under the settlement
agreement the Sackler Families collectively will make a payment in the amount of $225 million

5

"EXHIBIT A"

to the United States.  Id. at ¶ 3.  In return, the Sackler Families were released "from any civil or administrative monetary claim."  Id. at Settlement Agreement at ¶ 4.  The settlement did not provide releases from criminal liability.  Id. at ¶ 8.b.

13.      On November 24, 2020, Purdue Pharma, L.P pled guilty in the United States District Court for the District of New Jersey to an information charging it with three felony offenses: one count charging a dual-object conspiracy to defraud the United States and to violate the Food, Drug, and Cosmetic Act, and two counts charging conspiracy to violate the Federal Anti-Kickback Statute.  Disclosure Statement at 14.  If the Plea Agreement is accepted by the New Jersey District Court at the sentencing hearing, the agreement will fully resolve the United States' civil and criminal investigations into the Debtors' past practices related to the production, sale, marketing, and distribution of opioid products.  Id.

                    Plan and Disclosure Statement

14.      On March 15, 2021, the Debtors filed their Plan and accompanying Disclosure Statement.

15.      The Plan advances, in large part with some notable changes, the initial settlement framework that was in place at the commencement of these chapter 11 cases, most notably by increasing the amount that Purdue Pharma's existing shareholders will be required to pay in the aggregate from $3.0 billion to $4.275 billion to creditors in these cases. Disclosure Statement at 2.  The payment is to be made over no fewer than nine years (ten years if certain payments are made ahead of schedule).[3]  Id. at 87.  The principal consideration for the

---

[3] The payment schedule is as follows:

"EXHIBIT A"

payments is release and injunction provisions benefitting specified parties associated with the Sackler Families.  Id. at 6.

16.     Although a term sheet for the settlement agreement with the Sackler Families is annexed to the Plan, the actual settlement agreement will be included in a Plan Supplement.  Id. at 87.

17.     Similarly, the Shareholder Releases and Shareholder Channeling Injunction for the benefit of the Sackler Families, which will be set forth in sections 10.8 and 10.9 of the Plan, are described as "to come."  Plan at 10.8 and 10.9.  In fact, the Disclosure Statement provides

| Date | Required Settlement Payments |
|---|---|
| Effective Date | $300 million |
| June 30, 2022 | $350 million |
| June 30, 2023 | $350 million |
| June 30, 2024 | $350 million |
| June 30, 2025 | $350 million |
| June 30, 2026 | $300 million |
| June 30, 2027 | $1 billion |
| June 30, 2028 | $475 million |
| June 30, 2029 | $425 million, subject to deferral of up to $25 million |
| June 30, 2030 | $375 million, subject to deferral of up to $175 million |
| June 30, 2031 | Up to $200 million, consisting of any deferred amounts |

The potential deferral of certain Required Settlement Payments will be applicable as follows: each dollar in excess of $2.5 billion up to and including $2.675 billion in the aggregate that the Master Disbursement Trust actually receives pursuant to the Settlement Agreement on or prior to June 30, 2026, shall defer one dollar, up to a maximum aggregate amount of $175 million, of Required Settlement Payments otherwise payable on June 30, 2030, to instead become payable on June 30, 2031. Furthermore, each dollar in excess of $2.675 billion that the Master Disbursement Trust actually receives pursuant to the Settlement Agreement on or prior to June 30, 2026, shall defer one dollar, up to a maximum aggregate amount of $25 million, of Required Settlement Payments otherwise payable on June 30, 2029, to instead become payable on June 30, 2031. Deferrals shall only be made if the aggregate amount available for deferral exceeds $25 million.  Disclosure Statement at 87.

7

"EXHIBIT A"

that the "Debtors anticipate filing an amended Plan incorporating such releases upon the parties' agreement to a definitive Shareholder Settlement agreement prior to the hearing of the Bankruptcy Court to consider entry of the Solicitation Procedures Order." Disclosure Statement at 15-16 n.14.

18. As for Purdue Pharma, it will not emerge from chapter 11. Id. at 2. On the effective date of the Plan, the Debtors' business will be transferred to NewCo, a newly created company. Id. at 6.

19. TopCo, also a newly created company, will hold the equity interests and voting rights in NewCo. Id.

20. TopCo will be owned by the National Opioid Abatement Trust ("NOAT") and the Tribe Trust, as defined in the Plan. Id. at 6 and 63.

21. The NewCo and TopCo organizational documents and the identity of their initial managers will be included in a Plan Supplement. Id. at 6, 115 and 116.

22. Under the Plan, approximately $5 billion in value will be provided to trusts, each with a mission to fund abatement of the opioid crisis. Id. at 2. An additional $700 to $750 million will be provided to a trust that will make distributions to personal injury claimants. Id. According to the Disclosure Statement, the Ad Hoc Group of Individual Victims believes Personal injury claimants may receive between $3,500 and $48,000. Id. at 61. Payments of more than $3,500 will be paid in installments. Id. More specifically, as set forth in the Disclosure Statement, the Plan provides for the creation of not fewer than six trusts to satisfy creditor claims as set forth below:

"EXHIBIT A"

| Class 4 | Non-Federal Domestic Governmental Claims | 7,607 | Approximately $4.0 billion in estimated cash distributions to NOAT over time (excluding potential proceeds of insurance claims and any release of restricted cash) |
|---|---|---|---|
| Class 5 | Tribe Claims | 400 | Approximately $141 million in estimated cash distributions to the Tribe Trust over time (excluding potential proceeds of insurance claims and any release of restricted cash) |
| Class 6 | Hospital Claims | 1,178 | $250 million in funding of Hospital Trust |
| Class 7 | Third-Party Payor Claims | 467,102 | $365 million in funding of TPP Trust |
| Class 9 | NAS Monitoring Claims | 3,439 | $60 million in funding of NAS Monitoring Trust |
| Class 10 | PI Claims | 134,718 | $700 million to $750 million in funding of PI Trust |

Id. at 11-12.

23.     In addition to the above referenced trusts, the Plan also calls for the creation of a

Master Disbursement Trust and a Plan Administration Trust.  Id. at 66.

24.     Trust documents and the identity of the trustees are not included in the

Disclosure Statement.  Instead, trust documents and the identity of the trustees will be disclosed

in the Plan Supplement.  See e.g., Id. at 124.

25.     In addition to the shareholder releases provided to the Sackler Families, section

10.6(b) of the Plan requires holders of claims to provide releases to "Released Parties" "to the

maximum extent permitted  by law, as such law may be extended subsequent to the Effective

Date" of, among other things, "any and all claims" related to the Debtors.  Plan at 10.6(b).

9

"EXHIBIT A"

26. The term "Released Parties" includes, among others, (i) the Debtors, (ii) the Plan Administration Trust, (iii) NewCo, (iv) TopCo, (v) the Master Disbursement Trust, (vi) the Creditor Trusts, (vii) with respect to each of the foregoing Entities in clauses (i) through (vi), each of their Related Parties." Plan at 21.

27. The term "Related Parties" includes such Person's predecessors, successors, assigns, Subsidiaries, affiliates, managed accounts or funds, past, present, and future officers, board members, directors, principals, agents, servants, independent contractors, co-promoters, third-party sales representatives, medical liaisons, members, partners (general or limited), managers, employees, subcontractors, agents, advisory board members, financial advisors, attorneys and legal representatives, accountants, investment bankers, consultants, representatives, management companies, fund advisors and other professionals and advisors, trusts (including trusts established for the benefit of such Person), trustees, protectors, beneficiaries, direct or indirect owners and/or equity holders, parents, transferees, heirs, executors, estates, nominees, administrators, legatees, as well as the Related Parties of each of the foregoing, in each case in their respective capacities as such." Id.

28. Additionally, persons that assert claims to be paid by the trusts are also subject to a channeling injunction that prohibits them from taking any action against a Released Party. Plan at 10.7

29. Section 10.2 of the Plan provides the Debtor a discharge to "the fullest extent permitted by section 1141 of the Bankruptcy Code, of and from any and all Claims, Interests, rights and liabilities that arose prior to the Effective Date." Plan at 10.2

30. Finally, the Plan calls for the payment by the Debtors of all United States Trustee quarterly fees. Specifically, the Plan provides:

10

"EXHIBIT A"

> All fees payable under section 1930 of chapter 123 of title 28 of the United States Code shall be paid on or before the Effective Date by the Debtors. Quarterly fees owed to the U.S. Trustee shall be paid when due in accordance with applicable law and the Debtors shall continue to file reports to show the calculation of such fees for the Debtors' Estates until the Chapter 11 Cases are closed under section 350 of the Bankruptcy Code.

Plan at section 12.5.

31.    As noted in the Disclosure Statement, "the Debtors' businesses will be transferred to a newly created company, which will be indirectly owned by two of the opioid abatement trusts." Id. The Disclosure Statement does not address how the Debtors will be able to pay the quarterly fees or if the Plan Administration Trust, or some other post-confirmation entity, will be responsible to report and pay quarterly fees.

32.    On March 18, 2021, the Debtors moved for approval of a scheduling order in connection with the Plan process. ECF No. 2536. The Debtors seek, among other things, authority to file the Plan Supplement by Friday, July 9, 2021, and set the voting deadline for the Plan on Wednesday, July 14, 2021. Id. at ¶ 7. Accordingly, the Debtors propose only 5 days in the middle of the summer—*which includes a weekend*—to allow creditors to review the Plan Supplement.

11

"EXHIBIT A"

## OBJECTION

### A.    General Standards

Section 1125 of the Bankruptcy Code provides that a disclosure statement must contain "adequate information" describing a confirmable plan.  11 U.S.C. § 1125.  The Bankruptcy Code defines "adequate information" as:

> information of a kind, and in sufficient detail, as far as is reasonably practicable in light of the nature and history of the debtor and the condition of the debtor's books and records . . . that would enable a such a hypothetical reasonable investor . . . to make an informed judgment about the plan . . . .

11 U.S.C. § 1125(a)(1); see also Momentum Mfg. Corp. v. Employee Creditors Comm. (In re Momentum Mfg. Corp.), 25 F.3d 1132, 1136 (2d Cir. 1994); In re Adelphia Commc'ns Corp., 352 B.R. 592, 596 (Bankr. S.D.N.Y. 2006); Kunica v. St. Jean Fin., Inc., 233 B.R. 46, 54 (S.D.N.Y. 1999).

To be approved, a disclosure statement must include sufficient information to apprise creditors of the risks and financial consequences of the proposed plan.  See In re McLean Indus., Inc., 87 B.R. 830, 834 (Bankr. S.D.N.Y. 1987) ("substantial financial information with respect to the ramifications of any proposed plan will have to be provided to, and digested by, the creditors and other parties in interest in order to arrive at an informed decision concerning the acceptance or rejection of a proposed plan").  Although the adequacy of the disclosure statement is determined on a case-by-case basis, the disclosure statement must "contain simple and clear language delineating the consequences of the proposed plan on [creditors'] claims and the possible [Bankruptcy Code] alternatives . . . ."  In re Copy Crafters Quickprint, Inc., 92 B.R. 973, 981 (Bankr. N.D.N.Y. 1988).

12

"EXHIBIT A"

Section 1125 of the Bankruptcy Code is biased towards more disclosure rather than less. See In re Crowthers McCall Pattern, Inc., 120 B.R. 279, 300 (Bankr. S.D.N.Y. 1990). The "adequate information" requirement merely establishes a floor, and not a ceiling, for disclosure to voting creditors. Adelphia, 352 B.R. at 596 (citing Century Glove, Inc. v. First American Bank of New York, 860 F.2d 94, 100 (3d Cir. 1988)). Once the "adequate disclosure" floor is satisfied, additional information can go into a disclosure statement too, at least so long as the additional information is accurate and its inclusion is not misleading. Adelphia, 352 B.R. at 596. The purpose of the disclosure statement is to give creditors enough information so that they can make an informed choice of whether to approve or reject the debtor's plan. In re Duratech Indus., 241 B.R. 291, 298 (Bankr. E.D.N.Y. 1999), aff'd, 241 B.R. 283 (E.D.N.Y. 1999). The disclosure statement must inform the average creditor what it will receive and when and what contingencies might intervene. In re Ferretti, 128 B.R. 16, 19 (Bankr. D.N.H. 1991).

**B. The Disclosure Statement Does Not Provide Adequate Disclosure**

**(i) The Disclosure Statement Fails to Provide Important Information to Creditors About Potential Distributions and their Timing**

Despite its length, the Disclosure Statement does not contain the information that is most germane to creditors: *what distributions can creditors expect under the Plan and when will creditors likely receive those distributions.*

This information should be prominently displayed in accessible language so creditors can easily determine their likely recoveries. The Disclosure Statement does not include such information in a readily understandable format for the average creditor. For example, certain Personal Injury claim holders would need to cull through the first sixty pages of the Disclosure Statement to find an estimate by the Ad Hoc Group of Individual Victims as to their potential

13

"EXHIBIT A"

range of recovery (it is estimated to be between $3,500 and $48,000). Disclosure Statement at 61. This information should be clarified and highlighted in the Executive Summary so that opioid victims (and other creditors) can easily discern their potential recoveries under the Plan.

Additionally, the Disclosure Statement should clarify disparities between the Plan's proposed distributions to different classes of creditors. For example, Class 11A (Avrio general unsecured claims) and Class 11B (Adlon general unsecured claims) are unimpaired and will be paid in full under the Plan. Disclosure Statement at 99 and 100. Meanwhile, other unsecured creditor classes will receive only a small fraction of the claims they assert. The Disclosure Statement should explain these discrepancies.

Likewise, the Disclosure Statement fails to provide information regarding the estimated distribution to Class 11C (other general unsecured claims). Disclosure Statement at 100. The Disclosure Statement should provide this information, and, if the Debtors are unable to determine such amounts, they should say so and explain why not.

**(ii)    Creditors Will Not Be Given Sufficient Time to Review Material Information**

As currently contemplated, the Debtors intend to file their Plan Supplement on or before Friday, July 9, 2021. The deadline to vote on the Plan is currently set for July 14, 2021—a mere five days later. Included in the supplement or supplements to be filed by the Debtors will be documents identifying the Creditor Trustees, the MDT Trustees, the MDT Executive Director, the NewCo Managers, and the TopCo Managers, as well as various trust documents. See Plan at 18, Disclosure Statement at 6, 115, and 116. The Plan supplement(s) will clearly include documents and information that are essential to the Plan, the Trusts, and the organization of NewCo and TopCo, and that will potentially impact the rights of creditors. For

14

"EXHIBIT A"

creditors to have time for a meaningful review of this information, any Plan supplement(s) should be filed no less than ten business days before the voting deadline on the Plan, with all parties reserving their rights in connection thereto.  Further, regarding any trust documents that are filed, information must be provided about the trusts, including the process to select the trustees and executive director, the compensation of the trustees and executive directors, whether the trusts or trustees will be bonded, and what provisions have been made for the retention and compensation of professionals.

### (iii)    Broad Releases, Injunctions and Discharge Are Provided Without Adequate Information About Why Such Broad Releases Are Warranted

*The Disclosure Statement Should Provide Additional Information Regarding the Sackler Family Releases Necessary to Determine Whether the Plan is Proposed in Good Faith and Whether the Proposed Settlement with the Sackler Families is Fair and Reasonable*

In the Plan attached to the Disclosure Statement, the Shareholder Releases and the Shareholder Channeling Injunction for the benefit of the Sackler Families are described as "to come."  Plan at 10.8 and 10.9.  The Disclosure Statement further provides that the "Debtors anticipate filing an amended Plan incorporating such releases upon the parties' agreement to a definitive Shareholder Settle agreement prior to the hearing of the Bankruptcy Court to consider entry of the Solicitation Procedures Order."  Disclosure Statement at 15-16 n. 14.

Non-debtor releases must meet the standard of <u>Deutsche Bank AG v. Metromedia Fiber Network, Inc. (In re Metromedia Fiber Network, Inc.)</u>, 416 F.3d 136, 141 (2d Cir. 2005) ("Metromedia").  In <u>Metromedia</u>, the Second Circuit held that non-debtor releases do not pass muster merely because they appear in the plan; the Debtors must demonstrate that the facts justify the release being sought—a rare circumstance.  <u>See</u> <u>id.</u> at 141-43.  Here, the Disclosure Statement provides that the Sackler Families are being released from any and all claims against

15

"EXHIBIT A"

them in exchange for the payment of $4.275 billion to various trusts over the next nine or ten years.  <u>Id.</u> at 87.

The Plan ostensibly will release the Sackler Families from a multitude of claims.  As the Disclosure Statement explains, Purdue Pharma pled guilty to three felony offenses: one count charging a dual-object conspiracy to defraud the United States and to violate the Food, Drug, and Cosmetic Act and two counts charging conspiracy to violate the Federal Anti-Kickback Statute.  Disclosure Statement at 14.  In addition, the Sackler Families entered into a civil settlement agreement with the United States Department of Justice.  ECF No. 1833.  Under the settlement agreement, the Sackler Families collectively will pay $225 million to the United States.  <u>Id</u>. at ¶3.

 Further, from January 1, 2008, to September 30, 2019, Purdue Pharma and related entities distributed $10.4 billion to or for the benefit of its shareholders.  Disclosure Statement at 35.  During that same time, it is believed that Purdue Pharma also transferred significant and valuable non-cash assets to its shareholders, such as equity interests in businesses distributed out of Purdue Pharma in 2013 and 2014 and the assignment by Purdue Pharma of the right to future royalties payable on non-ADF formulations of OxyContin in 2017.  <u>Id</u>. at 79.  In addition, certain dealings between Purdue Pharma and the Sackler Families may not have been conducted on arms-length terms, including that Purdue Pharma received below-market royalties from the Sackler Families and Sackler entities on sales of OxyContin.  <u>Id</u>.

To resolve all litigation in connection with the Debtors and the operation of their businesses, the Sackler Families will pay in the aggregate $4.275 billion to the estates for distribution to creditors.  Disclosure Statement at 2.  The payment will be made over no fewer than nine years (ten years if certain payments are made ahead of schedule).  <u>Id</u>. at 87.

16

"EXHIBIT A"

Without adequate information about the releases, a creditor could not reasonably determine whether the proposed $4.275 billion to be paid by the Sackler Families (*over nine years*) is a realistic settlement amount based on their current net worth. Furthermore, the Disclosure Statement does not address why the payments by the Sackler Families cannot be made in fewer than nine or ten years.

In this regard, it is significant that the liquidation analysis (Appendix B) is not attached to the Disclosure Statement or Plan. Rather, once again, the Plan merely provides that it is "To Come." Plan at Appendix B. The liquidation analysis is necessary to determine how the Debtors value potential litigation against the Sackler Families and what, if any, recovery they may obtain. This information is necessary for creditors to determine if the funds to be provided by the shareholders represent a fair, meaningful, and reasonable settlement. See In re Lehman Brothers Holdings Inc., 435 B.R. 122, 134 (S.D.N.Y. 2010) (In determining whether a compromise should be approved, the court must determine whether it is "fair and equitable."); In re CR Stone Concrete Contractors, Inc., 346 B.R. 32, 49 (Bankr. D. Mass. 2006) ("The burden of proof is on the party seeking approval of the proposed settlement."). Accordingly, the Debtors should provide their liquidation analysis (as well as their missing financial projections at Appendix C and valuation analysis at Appendix D), not less than ten business days *before* the voting deadline on the Plan, with all parties reserving their rights in connection thereto.

"EXHIBIT A"

*The Disclosure Statement Should Address This Court's Authority and*
*Jurisdiction to Enable the Sackler Family Releases*

Creditors potentially have claims against the Sackler Families based upon their wrongdoing. The Sackler Families are non-debtors and their assets—especially those not being contributed pursuant to the Plan—are not property of the bankruptcy estates. If the Plan is confirmed, trusts will be created and funded by monies from the Sackler Families. In return, releases will be imposed that bar the claims of creditors against the non-debtor Sackler Families and their non-estate assets. The Disclosure Statement should be amended to explain why the Debtors believe this Court has the authority and jurisdiction to order the release of the personal claims of creditors—claims the Debtors could not bring—against the Sackler Families and their non-estate assets. In re Johns-Manville Corp., 517 F.3d 52, 66 (2d Cir. 2008), vacated & remanded on other grounds, 557 U.S. 137 (2009), aff'g in part & rev'g in part, 600 F.3d 135 (2d Cir. 2010) ("a bankruptcy court only has jurisdiction to enjoin third-party non-debtor claims that directly affect the *res* of the bankruptcy estate."); see also In re Aegean Marine Petroleum Network, Inc., 599 B.R. 717, 723 (Bankr. S.D.N.Y 2019) ("third-party claims that are the subject of the proposed releases in this case are not claims against the estate or against property of the estate. A bankruptcy court has no *in rem* jurisdiction over such third-party claims."); In re SunEdison, Inc., 576 B.R. 453,464 (Bankr. S.D.N.Y. 2017) (including third-party releases in a plan requires a debtor to "demonstrate how the outcome of the claims to be released might have a conceivable effect on the Debtors' estates . . ."); In re Dreier LLP, 429 B.R. 112, 133 (Bankr. S.D.N.Y. 2010) (because the court lacks jurisdiction to enjoin claims that do not affect property of the estate or the administration of the estate, non-debtor third-party releases must be limited to claims that are derivative of the debtors).

"EXHIBIT A"

*The Disclosure Statement Should Provide Additional Information Regarding the*
*<u>Proposed Third-Party Releases and Injunction</u>*

As set forth above, the Plan provides the benefit of non-debtor third party releases and

channeling injunctions to, among others, (i) the Debtors, (ii) the Plan Administration Trust, (iii)

NewCo, (iv) TopCo, (v) the Master Disbursement Trust, (vi) the Creditor Trusts, (vii) with

respect to each of the foregoing Entities in clauses (i) through (vi), each of their Related Parties."

Plan at 21, Sections 10.6(b) and 10.7.  The "Released Parties" will be released "to the maximum

extent permitted  by law, as such law may be *extended subsequent to the Effective Date*" from,

among other things, "any and all claims" related to the Debtors.  <u>Id</u>.  at section 10.6(b) (emphasis

added).  The channeling injunction enjoins certain creditors and directs their claims against

Released Parties towards the various trusts created under the Plan.  <u>Id</u>. at section 10.7.

The Disclosure Statement does not address why it is appropriate to provide releases and

injunctions to the Plan Administration Trust, NewCo, TopCo, the Master Disbursement Trust,

the Creditor Trusts, and with respect to each of the foregoing entities, each of their Related

Parties.   As of today, these entities do not exist.  It is unclear what is being released or enjoined

and why such releases and injunctions are necessary to the Plan.  It is similarly unclear why any

such releases should be "extended subsequent to the Effective Date" and what authority exists

to permit a forward-looking release.  <u>See</u> <u>Metromedia</u>, 416 F. 3d at 141-143 (non-debtor release

in a plan of reorganization should not be approved absent the finding that truly unusual

circumstances render the release terms important to the success of the plan); <u>In re Washington

Mut., Inc.,</u> 442 B.R. 314, 348 (Bankr. D. Del. 2011) (post-confirmation entities "have done

nothing yet for which they need a release" and will not come into existence until after

confirmation).  The Disclosure Statement should be amended to address these issues.

19

"EXHIBIT A"

*The Disclosure Statement Should Provide Additional Information*
*Regarding the Proposed Debtor Discharge*

In addition to the third-party release and injunction provided to the Debtors noted above,

section 10.2 of the Plan provides the Debtors a discharge to "the fullest extent permitted by

section 1141 of the Bankruptcy Code, of and from any and all Claims, Interests, rights and

liabilities that arose prior to the Effective Date." Plan at 10.2

As noted in the Disclosure Statement, however, Purdue Pharma "will not emerge from

chapter 11." Disclosure Statement at 2. On the effective date of the Plan, the Debtors' business

will be transferred to NewCo, a newly created company. Id. at 6. "After the Effective Date,

PPLP (and any other Debtor not transferred to NewCo) will continue to exist as Liquidating

Debtors solely for the purposes of winding up their respective estates and liquidating such

entities." Id. at 67.

Section 1141(d)(3) of the Bankruptcy Code provides that the confirmation of a plan does

not discharge a debtor if (i) the plan provides for the liquidation of all or substantially all of the

property of the estate, (ii) the debtor does not engage in business after consummation of the plan,

and (iii) the debtor would be denied a discharge under section 727(a) of the Bankruptcy Code if

the case were a chapter 7 liquidation case. 11 U.S.C. §1141(d)(3); see also In re Wood Family

Interests, Ltd., 135 B.R. 407, 410 (Bankr. D. Colo. 1989) (holding that a discharge is not

available to corporate or partnership debtors who propose a liquidating plan of reorganization).

Because (i) the Plan provides for the liquidation of the Debtors' assets, (ii) the Debtors

will not retain any significant assets to operate after the consummation of the Plan, and (iii) the

Debtors, as partnerships or corporations, would not be entitled to a discharge in a chapter 7 case,

the Disclosure Statement should explain why the Debtors are entitled to discharges, releases, and

20

"EXHIBIT A"

injunctions.   See In re Bigler, LP, 442 B.R. 537, 544-56 (Bankr. S.D. Tex. 2010) (where

liquidating debtor is not permitted a discharge due to section 1141(d)(3), a plan injunction

preventing post-confirmation prosecution of claims that would operate as a discharge is also

impermissible).

### C.      The Disclosure Statement Does Not Provide Sufficient Information to Determine if the Estates will Comply with 28 U.S.C. § 1930(a)(6) After Confirmation

Chapter 11 quarterly fees due pursuant to 28 U.S.C. § 1930(a)(6) must be paid for each

and every calendar quarter, including any fraction thereof, in which the debtor's or debtor-in-

possession's bankruptcy case remains in chapter 11 and is not closed, converted, or dismissed.

See In re Aquatic Development Group, Inc., 352 F.3d 671 (2d Cir. 2003); see also 28 U.S.C. §

1930(a)(6).   Quarterly fees are based upon disbursements.  28 U.S.C. § 1930(a)(6).

The Plan requires the Debtors to pay all United States Trustee quarterly fees:

> All fees payable under section 1930 of chapter 123 of title 28 of the United States Code shall be paid on or before the Effective Date by the Debtors. Quarterly fees owed to the U.S. Trustee shall be paid when due in accordance with applicable law and the Debtors shall continue to file reports to show the calculation of such fees for the Debtors' Estates until the Chapter 11 Cases are closed under section 350 of the Bankruptcy Code.

Plan at section 12.5.

As noted in the Disclosure Statement, "the  Debtors' businesses will be transferred to a

newly created company, which will be indirectly owned by two of the opioid abatement trusts."

Id.  The Plan calls for the creation of a post-petition Plan Administration Trust.[4]  Id. at 66.  The

Disclosure Statement does not address how the Debtors will be able to pay the quarterly fees, or

---

[4] The Plan Administration Trust, pursuant to section 1123(b)(3)(B) of the Bankruptcy Code and applicable state corporate law, is appointed as the successor-in-interest to, and representative of, the Debtors and their Estates for the retention, enforcement, settlement or adjustment of Claims against the Debtors (other than the Channeled Claims). Disclosure Statement at 112.

"EXHIBIT A"

if the Plan Administration Trust, or some other entity, will be responsible for such fees. The Disclosure Statement and Plan should be amended to indicate what post-confirmation entity will be responsible to report disbursements to the United States Trustee and to pay quarterly fees.

**D.    The Disclosure Statement Contains Problematic Procedural Provisions that Should be Eliminated or Clarified**

The Disclosure Statement contains several problematic procedural provisions. Either these provisions should be eliminated, or the Debtors should amend the Disclosure Statement to explain the authority for them. Specifically:

- Pursuant to the Disclosure Statement "[a]ny Claim or Interest that has been paid or satisfied, or any Claim or Interest that has been amended or superseded, may be adjusted or expunged on the official claims register without a claims objection having to be filed and without any further notice to or action, order, or approval of the Bankruptcy Court." Disclosure Statement at 16-17. The Disclosure Statement should be amended to provide the authority that would allow the Debtor to amended or expunge a claim from the official claims register without notice or an order of this Court.

- The Disclosure Statement provides that "any Ballots received after the Voting Deadline will not be counted absent the consent of the Debtors (in their sole discretion)." Disclosure Statement at 174. The Disclosure Statement should be amended to provide the authority to allow the Debtors (without notice or a Court order) to count *any* ballots that are untimely filed.

- The Disclosure Statement provides that "[i]f no holders of Claims in a particular Class that is entitled to vote on the Plan vote to accept or reject the Plan, then such Class shall be deemed to accept the Plan." Disclosure Statement at 174. The Disclosure Statement should be amended to provide the authority to allow the Debtors to count a class of creditors that does not vote to accept the Plan to be deemed an accepting class of creditors.

"EXHIBIT A"

WHEREFORE, the United States Trustee respectfully submits that the Court sustain the

Objection of the United States Trustee and grant such other relief as is just.

Dated: New York, New York
      April 21, 2021

                                    Respectfully submitted,

                                    WILLIAM K. HARRINGTON
                                    UNITED STATES TRUSTEE, Region 2

                                    By: */s/ Paul K. Schwartzberg*
                                    Paul K. Schwartzberg, Trial Attorney
                                    201 Varick Street, Room 1006
                                    New York, New York 10014
                                    Tel. (212) 510-0500

"EXHIBIT A"