**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| **In re:** | Chapter 11 |
| **PURDUE PHARMA L.P.,** *et al.*,[1] | Case No. 19-23649 (RDD) |
| **Debtors.** | (Jointly Administered) |

## JOINT OBJECTION OF DISTRIBUTORS, MANUFACTURERS AND PHARMACIES TO DEBTORS' MOTION FOR AN ORDER APPROVING DISCLOSURE STATEMENT

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's registration number are as follows: Purdue Pharma L.P. (7484), Purdue Pharma Inc. (7486), Purdue Transdermal Technologies L.P. (1868), Purdue Pharma Manufacturing L.P. (3821), Purdue Pharmaceuticals L.P. (0034), Imbrium Therapeutics L.P. (8810), Adlon Therapeutics L.P. (6745), Greenfield BioVentures L.P. (6150), Seven Seas Hill Corp. (4591), Ophir Green Corp. (4594), Purdue Pharma of Puerto Rico (3925), Avrio Health L.P. (4140), Purdue Pharmaceutical Products L.P. (3902), Purdue Neuroscience Company (4712), Nayatt Cove Lifescience Inc. (7805), Button Land L.P. (7502), Rhodes Associates L.P. (N/A), Paul Land Inc. (7425), Quidnic Land L.P. (7584), Rhodes Pharmaceuticals L.P. (6166), Rhodes Technologies (7143), UDF LP (0495), SVC Pharma LP (5717) and SVC Pharma Inc. (4014). The Debtors' corporate headquarters is located at One Stamford Forum, 201 Tresser Boulevard, Stamford, CT 06901.

## TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT ........................................................................ 1

ARGUMENT ................................................................................................... 3

I.   The Disclosure Statement Cannot Be Approved Because The Proposed Plan Is
Patently Unconfirmable. ......................................................................... 3

    A.   The Proposed Plan Is Patently Unconfirmable Because It Fails To Comply
With Section 365 ........................................................................... 4

    B.   The Proposed Plan Is Patently Unconfirmable Because It Impermissibly
Extinguishes The DMPs' Independent Contractual Rights Under The
Debtors' Insurance Policies. ........................................................... 7

    C.   The Proposed Plan Is Patently Unconfirmable Because It Illegally
Extinguishes The DMPs' Defensive Rights. ................................... 9

    D.   The Proposed Plan Is Patently Unconfirmable Because It Fails The Best
Interests of Creditors Test. ............................................................. 13

II.  The Proposed Plan Contains Numerous Other Unconfirmable Provisions. ........ 14

    A.   The Proposed Plan's Treatment Of DMP Claims Violates Due Process
And The Proposed Plan Does Not Satisfy The Debtors' Burden To
Disallow Or Subordinate The DMP Claims. ................................... 14

        1.   The Debtors Fail To Properly Notify Holders Of Co-Defendant
Claims That Are Subject To Objection Or Specify The Bases For
Objection. ................................................................................. 14

        2.   The Debtors Fail To Meet Their Burden In Objecting To, And
Moving To Subordinate And Estimate At $0, Co-Defendant
Claims. ..................................................................................... 15

        3.   The Debtors Do Not Allege Any Basis To Subordinate The DMP
Claims. ..................................................................................... 19

        4.   The Debtors Fail To Demonstrate A Basis To Estimate the DMP
Claims At $0 And Improperly Exclude Co-Defendant Claims From
the Disputed Claims Reserve. ................................................... 21

    B.   The DMP Non-Consensual Release Under The Proposed Plan Is
Impermissible Under *Metromedia*. ............................................... 22

    C.   The Proposed Plan Improperly Classifies And Unfairly Discriminates
Against Co-Defendant Claims Within Class 13. .............................. 25

    D.   The Plan Is Not Feasible. ................................................................ 27

III. The Disclosure Statement Fails To Provide Adequate Information Regarding
Critical Aspects of the Proposed Plan as Required Under Section 1125 ............... 28

## TABLE OF CONTENTS
(continued)

Page

A.   The Disclosure Statement Fails To Provide Adequate Information With Respect To The Treatment Of Class 13 Co-Defendant Claims. ......................... 28

B.   The Disclosure Statement Fails To Provide Adequate Information With Respect To The Debtors' Assumption Of The Co-Defendants' Contracts.......... 30

C.   The Disclosure Statement Fails To Provide Adequate Information With Respect To The Debtors' Insurance Policies. ...................................................... 30

D.   The Disclosure Statement Fails To Provide Adequate Information With Respect To The DMP Non-Consensual Release The Shareholder Settlement, The Shareholder Releases, The Shareholder Released Parties And Shareholder Claim Rights. .......................................................................... 31

E.   The Disclosure Statement Fails To Provide Adequate Information With Respect To The Treatment Of Canadian Actions And The Impact Of The Proposed Plan On Canadian Entities. ................................................................ 33

**CONCLUSION** ...................................................................................................................... 35

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*In re 266 Wash. Assocs.*,
141 B.R. 275 (Bankr. E.D.N.Y.), *aff'd*, 147 B.R. 827 (E.D.N.Y. 1992) ...................................4

*In re Adelphia Comm'ns Corp.*,
364 B.R. 518 (Bankr. S.D.N.Y. 2007) ......................................................................................8

*In re Adelphia Commc'ns Corp.*,
368 B.R. 140 (Bankr. S.D.N.Y. 2007) ........................................................................12, 24, 25

*In re Aéropostale, Inc.*,
555 B.R. 369 (Bankr. S.D.N.Y. 2016) ...................................................................................20

*In re Am. Capital Equip., LLC*,
688 F.3d 145 (3d Cir. 2012)......................................................................................................4

*Ex parte Barnett*,
978 So.2d 729 (Ala. 2007) ........................................................................................................9

*In re BOUSA Inc.*,
Case No. 89-B-13380, 2006 WL 2864964 (Bankr. S.D.N.Y. Sept. 29, 2006)........................11

*Brandner v. Allstate Ins. Co.*,
512 N.W.2d 753 (Wis. 1994)......................................................................................................9

*In re Breitburn Energy Partners LP*,
582 B.R. 321 (Bankr. S.D.N.Y. 2018) ...................................................................................26

*Burden v. United States*,
917 F.2d 115 (3d Cir. 1990).....................................................................................................19

*In re Chateaugay Corp.*,
10 F.3d 944 (2d Cir. 1993).......................................................................................................21

*In re Chateauguay Corp.*,
89 F.3d 942 (2d Cir. 1996).......................................................................................................26

*In re Chemtura Corp.*,
448 B.R. 635 (Bankr. S.D.N.Y. 2011) ...................................................................................22

*In re Congoleum Corp.*,
Case No. 09-4371, 2010 WL 2869548 (D.N.J. July 19, 2010)................................................26

-iii-

*In re De Laurentiis Ent. Grp. Inc.*,
   963 F.2d 1269 (9th Cir. 1992) ............................................................................11

*Deutsche Bank AG v. Metromedia Fiber Network, Inc. (In re Metromedia)*,
   416 F.3d 136 (2d Cir. 2005) ...................................................................... *passim*

*In re Ditech Holdings Corp.*
   606 B.R. 544 (Bankr. S.D.N.Y. 2019) ................................................10, 11, 12, 14

*In re Drexel Burnham Lambert Grp., Inc.*,
   113 B.R. 830 (Bankr. S.D.N.Y. 1990) ...............................................................12

*In re Dynamic Brokers, Inc*.,
   293 B.R. 489 (B.A.P. 9th Cir. 2003) ..................................................................17

*In re FairPoint Commc'ns, Inc.*,
   452 B.R. 21 (S.D.N.Y. 2011) ............................................................................12

*Farbe v. Cas. Reciprocal Exch*.,
   765 So.2d 994 (La. 2000) ...................................................................................9

*In re Filex*,
   116 B.R. 37 (Bankr.S.D.N.Y. 1990) ...................................................................4

*In re Forty-Eight Insulations, Inc.*,
   149 B.R. 860 (Bankr. N.D. Ill. 1992) ..................................................................8

*Goodman v. Lozano*,
   223 P.3d 77 (Cal. 2010) .....................................................................................9

*Green v. Welsh*,
   956 F.2d 30 (2d Cir. 1992) ..............................................................................10

*In re Hawker Beechcraft, Inc.*,
   486 B.R. 265 (Bankr. S.D.N.Y. 2013) .................................................................6

*In re Johns–Manville Corp.*,
   68 B.R. 618 (Bankr. S.D.N.Y. 1987) .................................................................27

*Kearny v. Brandt*,
   67 A.3d 601 (N.J. 2013) .....................................................................................9

*Krzykalski v. Tindall*,
   181 A.3d 981 (N.J. 2018) ...................................................................................9

*In re LightSquared Inc.*,
   513 B.R. 56 (Bankr. S.D.N.Y. 2014) ...........................................................25, 27

*In re Lower Bucks Hosp.*,
   471 B.R. 419 (Bankr. E.D. Pa. 2012) ...................................................................32

*In re Montagne*,
   Case No. 08-1022, 2009 WL 1065427 (Bankr. D. Vt. Mar. 26, 2009) ...................20

*In re MPM Silicones, LLC*,
   Case No. 15-1771, 2014 WL 44363335 (Bankr. S.D.N.Y. Sept. 9, 2014) .............24

*NLRB v. Bildisco*,
   465 U.S. 513 (1984) ................................................................................................5

*Official Comm. of Unsecured Creds. v. Mfrs. & Traders Trust Co. (In re Bennett
   Funding Grp.)*,
   146 F.3d 136 (2d Cir. 1998) ..................................................................................11

*Overton's, Inc. v. Interstate Fire & Cas. Ins. Co. (In re SportStuff, Inc.)*,
   430 B.R. 170 (B.A.P. 8th Cir. 2010) .......................................................................8

*In re Petters Co.*,
   419 B.R. 369 (Bankr. D. Minn. 2009) .....................................................................8

*In re Pinnock*,
   594 B.R. 609 (Bankr. S.D.N.Y. 2018) ...................................................................16

*Pollicina v. Misericordia Hosp. Med. Ctr.*,
   624 N.E.2d 974 (N.Y. 1993) ...................................................................................9

*Purdue Pharma L.P. v. AIG Specialty Ins. Co.*,
   Adv. No. 21-01005 (RDD) (Bankr. S.D.N.Y.) .......................................................31

*In re Quigley Co.*,
   377 B.R. 110 (Bankr. S.D.N.Y. 2007) ...............................................................3, 14

*In re Reilly*,
   245 B.R. 768 (2d Cir. B.A.P. 2000) ......................................................................16

*In re Residential Capital, LLC*,
   507 B.R. 477 (Bankr. S.D.N.Y. 2014) ...................................................................16

*In re Residential Capital, LLC*,
   Case No. 12-12020 (MG), 2014 WL 1058921 (Bankr. S.D.N.Y. Mar. 17,
   2014) ......................................................................................................................17

*In re Sabine Oil & Gas Corp.*,
   555 B.R. 180 (Bankr. S.D.N.Y. 2016) ...................................................................12

*In re SelectBuild Ill., LLC,*
    Case No. 09-12085, 2015 WL 3542542 (Bankr. D. Del. May 28, 2015)................................8

*In re SoyNut Butter Co.,*
    Case No. 17-14970, 2018 WL 3689549 (Bankr. N.D. Ill. Aug. 1, 2018)................................8

*MacArthur Co. v. Johns-Manville Corp.,*
    837 F.2d 89 (2nd Cir. 1988).......................................................................................................9

*Sterling Optical Corp.,*
    Case No. 91-15944, 2007 WL 1989233 .................................................................................5

*In re SunEdison, Inc.,*
    575 B.R. 220 (Bankr. S.D.N.Y. 2017)..................................................................................27

*In re SunEdison, Inc.,*
    576 B.R. 453 (Bankr. S.D.N.Y. 2017)............................................................................12, 13

*Taylor v. Solberg,*
    566 Pa. 150 (Pa. 2001).............................................................................................................9

*In re Wash. Mutual, Inc.,*
    442 B.R. 314 (Bankr. D. Del. 2011) ......................................................................................13

*In re Windsor Plumbing Supply Co., Inc.,*
    170 B.R. 503 (Bankr. E.D.N.Y. 1994)...................................................................................22

**Statutes**

11 U.S.C. §§ 101 *et seq.*..........................................................................................................2

11 U.S.C. § 365.................................................................................................................2, 4, 5

11 U.S.C. § 365(b) ...................................................................................................................6

11 U.S.C. § 501......................................................................................................................16

11 U.S.C. § 502(a) .................................................................................................................16

11 U.S.C. § 502(c)(1).............................................................................................................21

11 U.S.C. § 502(e) .................................................................................................................19

11 U.S.C. § 502(e)(1)..............................................................................................6, 18, 19, 28

11 U.S.C. § 502(e)(1)(B) .......................................................................................................18

11 U.S.C. § 503........................................................................................................................7

11 U.S.C. § 506(a) ...................................................................................................12

11 U.S.C. § 509(c) .................................................................................19, 20, 21, 28

11 U.S.C. § 510(c) ...................................................................................................19

11 U.S.C. § 524 ..................................................................................................10, 11

11 U.S.C. § 553 ..................................................................................................11, 12

11 U.S.C. § 726(b) ...................................................................................................14

11 U.S.C. § 1122(a) .................................................................................................26

11 U.S.C. § 1125 ................................................................................................28, 32

11 U.S.C. § 1125(a)(1) .............................................................................................28

11 U.S.C. § 1126(g) .................................................................................................13

11 U.S.C. § 1129(a)(1) .............................................................................................14

11 U.S.C. § 1129(a)(7) .............................................................................................13

11 U.S.C. § 1129(a)(7)(A) .......................................................................................13

11 U.S.C. §1129(a)(7)(A)(ii) ...................................................................................13

11 U.S.C. § 1129(a)(11) ...........................................................................................27

**Federal Rules**

Fed. R. Bankr. P. 3001(f) .........................................................................................16

Fed. R. Bankr. P. 3007 .............................................................................................17

Fed. R. Bankr. P. 3007(e) ...................................................................................15, 17

Fed. R. Bankr. P. 7007 .............................................................................................16

Fed. R. Bankr. P. 7008 .............................................................................................20

Fed. R. Civ. P. 7(b)(1)(B) ........................................................................................16

**State Statutes**

Conn. Gen. Stat. § 52-572h........................................................................................9

Del. Code Ann. tit. 10, § 6304 ...................................................................................9

Haw. Rev. Stat. § 663-15.5 .......................................................................................9

Idaho Code § 6-805 ...................................................................................................9

Iowa Code § 668.7 .....................................................................................................9

Mass. Gen. Laws ch. 231B, § 4 ................................................................................9

Md. Code Ann., Cts. & Jud. Proc. § 3-1404 ............................................................9

Minn. Stat. § 604.01 ..................................................................................................9

Mo. Rev. Stat. § 537.060 ...........................................................................................9

N.C. Gen. Stat. § 1B-4 ..............................................................................................9

N.D. Cent. Code § 32-35-04 ......................................................................................9

N.J. Stat. Ann. § 2A:15-5.3. ......................................................................................9

Neb. Rev. Stat. § 25-21,185.11 .................................................................................9

Ohio Rev. Code Ann. § 2315.32-36 ..........................................................................9

Ok. Stat. tit. 12, § 832(H) .........................................................................................9

R.I. Gen. Laws § 10-6-7 ............................................................................................9

S.C. Code Ann. § 15-38-50 .......................................................................................9

S.D. Codified Laws § 15-8-17 ...................................................................................9

Tenn. Code Ann. § 29-11-105 .................................................................................10

Tenn. Code Ann. § 29-11-107(d) ............................................................................10

Utah Code Ann. § 78B-5-820 ..................................................................................10

Va. Code Ann. § 8.01-35.1 ......................................................................................10

W. Va. Code 55-7-13(d)(1)......................................................................................10

**Other Authorities**

Restatement (Second) Torts § 433A .........................................................................9

The Distributors, Manufacturers and Pharmacies listed on the attached **Exhibit A** (collectively, the "DMPs"),[1] by and through their respective undersigned counsel, hereby submit this joint objection (the "Objection")[2] to the Disclosure Statement Motion.[3]  In support of this Objection, the DMPs respectfully state as follows:[4]

## PRELIMINARY STATEMENT

1.       The DMPs are committed to addressing opioid addiction and abuse.  The DMPs support that being the fundamental premise of a plan.  Indeed, certain of the DMPs are actively implementing and developing and others plan to implement and distribute high impact solutions that fight abuse and treat addiction.  However, because the Proposed Plan is so unfairly prejudicial to the DMPs, the DMPs are forced to object to ensure they are afforded due process and to preserve basic rights under the Bankruptcy Code.

2.       The DMPs manufacture, distribute and/or dispense, *inter alia*, opioid medications and opioid abatement products.  The DMPs timely filed multiple proofs of claim against the Debtors (the "DMP Claims").[5]  The DMP Claims are based on contractual indemnification rights,

---

[1] The DMPs joining in this Objection are each represented by separate counsel, and they each hereby join in the objections raised herein in their separate capacities.  Certain factual arguments raised herein do not apply to all DMPs and each DMP joins in arguments only to the extent applicable.  Other than as reflected in this Objection, no DMP acts, represents, or speaks on behalf of (or purports to act, represent or speak on behalf of) any other DMP or any other entities in connection with the Chapter 11 Cases.

[2] Capitalized terms used but not defined in this Objection shall have the meaning ascribed to them in the Proposed Plan.

[3] *Debtors' Motion To Approve (I) The Adequacy of Information in the Disclosure Statement, (II) Solicitation and Voting Procedures, (III) Forms of Ballots, Notices and Notice Procedures In Connection Therewith, and (IV) Certain Dates With Respect Thereto*, Docket No. 2489 (the "Disclosure Statement Motion").

[4] The DMPs do not consent to the jurisdiction of this Court or the entry of a final order or judgment by this Court on any matter other than this Objection, and reserve all rights to challenge the subject matter, core, non-core, or other jurisdiction, and/or constitutional authority, of this Court to enter final judgment on any matter other than this Objection.

[5] Certain DMPs are also co-defendants in opioid-related litigation in Canada involving the Debtors, and have rights under applicable provincial law and at common law to seek contribution, indemnity and/or judgment reduction from the Debtors on those Canadian actions.

rights of common law contribution and common law indemnity, rights under Purdue Insurance Policies, other contractual and common law rights based on the thousands of lawsuits regarding the manufacture, distribution and sale of opioid products (the "Opioid Litigation"),[6] and certain DMP Claims also assert general unsecured trade claims.[7]

3.      The DMP Claims also include hundreds of millions of dollars in liquidated amounts, based on, among other things, contractual arrears, settlement payments and/or attorneys' fees that have been incurred or paid in connection with the Opioid Litigation. Some aspects of the DMP Claims are presently contingent and/or unliquidated.

4.      The DMPs join together in objecting to the Debtors' Disclosure Statement Motion because the Proposed Plan contains several provisions that render it so patently unconfirmable that solicitation of the Proposed Plan in its present form would serve no purpose, be a waste of resources, and only serve to create delay, litigation and uncertainty, thus impeding the Debtors' reorganization. In particular, the Proposed Plan violates Section 365[8] by permitting the Debtors to cherry-pick provisions in the DMPs' executory contracts (the "Contracts") by assuming those terms that are favorable, and discarding those that are not. The Proposed Plan also illegally eliminates certain of the DMP's independent contractual rights as additional insureds under the Debtors' insurance policies. The Proposed Plan also illegally seeks to destroy all of the DMPs'

---

[6] The DMPs have disputed the allegations in the Opioid Litigation, and each DMP reserves all rights to assert any and all claims, defenses, rights of setoff, recoupment and other rights available to it, as applicable, in connection with the Opioid Litigation. In addition, the DMPs have asserted or may assert their rights under applicable law to seek allocation of fault to the Debtors and other defendants in connection with any judgment issued in the Opioid Litigation even if a defendant's liability is discharged under the Proposed Plan. The DMPs also have defenses available to them under applicable law that could mitigate or eliminate their liability in the Opioid Litigation. Nothing contained herein shall be an admission of any fact or theory in connection with the Opioid Litigation.

[7] The nature of the DMP Claims vary among the DMPs. For example, certain DMPs do not have contracts with the Debtors. Accordingly, each DMP joins this Objection solely to extent applicable to its particular DMP Claims.

[8] Unless otherwise specified a reference to "Section" is a reference to a provision of the United States Bankruptcy Code, 11 U.S.C. §§ 101 et seq.

rights, remedies and defenses against the Opioid Plaintiffs in the Opioid Litigation, including rights

of setoff and recoupment, reimbursement, apportionment of fault, judgment reduction and all other

similar rights that would be operative as a matter of law (the "<u>DMP Defensive Rights</u>").  Finally,

in eliminating the DMPs' vested state law and contractual rights, which they would retain in a

chapter 7 liquidation, the Proposed Plan fails the best interests test under Section 1129(a)(7).

Taken together, these defects in the Proposed Plan unfairly prejudice the DMPs in several material

ways.  The Proposed Plan also contains numerous other infirmities that the DMPs will address at

confirmation.

5.      The DMPs also object to the Disclosure Statement Motion because the Disclosure

Statement fails to provide adequate information to creditors.   Among other deficiencies, the

Disclosure Statement fails to adequately disclose and describe the treatment of Class 13 "Co-

Defendant Claims."  Indeed, it includes no factual allegations or legal bases to justify the Debtors'

wholesale objection to those claims.  The Disclosure Statement also fails to adequately disclose

and describe the Debtors' assumption of certain contracts and the bases for stripping out

indemnification provisions; the Debtors' insurance policies and any claims preserved thereunder;

the bases for the Proposed Plan's broad releases (and corresponding disparate treatment of the

DMPs); and the treatment of the Canadian Actions and Canadian Debtor entities.

6.      For the reasons set forth herein, the Court should deny approval of the Disclosure

Statement.

## <u>ARGUMENT</u>

**I.      The Disclosure Statement Cannot Be Approved Because The Proposed Plan Is
Patently Unconfirmable.**

7.      A disclosure statement describing a patently unconfirmable plan cannot be

approved.  *See In re Quigley Co.*, 377 B.R. 110, 116 (Bankr. S.D.N.Y. 2007) ("A disclosure

3

statement must . . . describ[e] a confirmable plan. If the plan is patently unconfirmable on its face, the application to approve the disclosure statement must be denied, as solicitation of the vote would be futile.") (collecting cases); *see also In re 266 Wash. Assocs.*, 141 B.R. 275, 288 (Bankr. E.D.N.Y.), *aff'd*, 147 B.R. 827 (E.D.N.Y. 1992); *In re Filex*, 116 B.R. 37, 41 (Bankr.S.D.N.Y. 1990). A plan is patently unconfirmable where: (1) confirmation defects cannot be overcome by creditor voting results; and (2) those defects concern matters upon which material facts are either not in dispute or have not been fully developed before the disclosure statement hearing. *See In re Am. Capital Equip., LLC*, 688 F.3d 145, 154–55 (3d Cir. 2012).

8.     Here, the Proposed Plan contains at least three illegal provisions that render it patently unconfirmable and must be modified before the Debtors serve the Disclosure Statement and solicit plan acceptances. *First* the Proposed Plan violates Section 365 by unilaterally eliminating indemnification and other provisions in assumed Contracts without consent, while dispensing with the Debtors' cure obligations. *Second*, the Proposed Plan impermissibly extinguishes certain DMPs' independent contract rights as additional insureds under the Debtors' insurance policies. *Third*, the Proposed Plan extinguishes the DMPs Defensive Rights. Because the Proposed Plan strips the DMPs of the foregoing rights and claims, the Proposed Plan is also patently unconfirmable because it fails the best interests test. The Proposed Plan also suffers from myriad other deficiencies that the DMPs will raise at confirmation.

### A.     The Proposed Plan Is Patently Unconfirmable Because It Fails To Comply With Section 365.

9.     The Proposed Plan is patently unconfirmable because it fails to comply with Section 365. Section 8.4(a) of the Proposed Plan states:

> As of the Effective Date, any term of any policy, contract or other obligation applicable to any Debtor shall be void and of no further force or effect to the extent such policy, contract or other obligation creates an obligation of the Debtor, or gives

4

rise to a right under any insurance policy of any Debtor, for the indemnification or reimbursement of any Person . . . based on or relating to . . . Opioid-Related Activities or otherwise relating to opioids …"[9]

10.     Section 8.4(b) further states that the Proposed Plan constitutes both an "amendment to each assumed or assumed and assigned contract to sever any and all provisions thereof that give rise to any obligation or right described in Section 8.4(a) of the Proposed Plan" and "an agreement by each counterparty to release any and all obligations and liabilities arising under or relating to such severed provisions and any and all Co-Defendant Claims . . . arising under such contract."[10] The severed portion of each such contract shall be rejected as of the Effective Date, and any Claims resulting from such rejection shall be forever released and discharged."[11]

11.     The Debtors' attempt to re-write the Contracts through the Proposed Plan violates Section 365 in three material ways.

12.     *First*, the Proposed Plan violates the fundamental principle that contracts must be assumed *cum onere*, by providing that the Debtors will *unilaterally* amend the Contracts to remove the applicable DMP's indemnification, reimbursement and insurance rights, while assuming the remainder of the Contracts, and all without the DMPs' consent.  This is classic cherry-picking and plainly violates Section 365.  *See, e.g.*, *Sterling Optical Corp.*, Case No. 91-15944, 2007 WL 1989233, at *11 n.13 (Bankr. S.D.N.Y. July 11, 2007 ("A debtor may not reject (*i.e.* breach) one obligation under a contract and still enjoy the benefits of that same contract.") (citations and quotations omitted); *see also NLRB v. Bildisco*, 465 U.S. 513, 531-32 (1984) ("Should the debtor-in-possession elect to assume the executory contract, however, it assumes the contract *cum onere*.").  Put another way, "a debtor must assume or reject an entire contract, and cannot cherry-

---

[9] Proposed Plan § 8.4(a).

[10] Proposed Plan § 8.4(b).

[11] Proposed Plan § 8.4(b).

pick the provisions it does not like." *In re Hawker Beechcraft, Inc.*, 486 B.R. 265, 278 (Bankr. S.D.N.Y. 2013).

13.    **Second**, the Proposed Plan attempts to take away the rights of certain creditors (*i.e.* creditors holding Class 13 claims) to assert or be paid cure costs, by providing that "[t]he severed portion of each such contract shall be rejected as of the Effective Date, and any Claims resulting from such rejection shall be forever released and discharged."[12]  The proposed disallowance of any "Co-Defendant Claims" under Section 8.4(b) (which is incorporated into Section 4.15(a)) would include the portion of the DMPs' cure costs under the Contracts relating to contribution, indemnification, reimbursement, and setoff or recoupment, which are required to be paid under Section 365(b).  In defiance of the Bankruptcy Code, Section 8.4(b) of the Proposed Plan unilaterally precludes the DMPs from asserting or recovering cure costs.  Moreover, the Proposed Plan ignores that a number of the Contract counterparties filed claims pertaining to pre-petition defaults under their respective Contracts, indicating that the appropriate cure costs for many of the Contracts total millions of dollars.

14.    **Third**, once the Contracts are assumed, the new Contract counterparty, NewCo, which is <u>not</u> a Debtor, must perform all obligations under the assumed / assigned Contracts when due, even if those obligations may be contingent or unliquidated today.[13]  The assuming party or assignee cannot strip the indemnity out of an executory contract when it is assumed and assigned or assumed and retained.  The post-assumption contract continues to be operative in the hands of the non-debtor / assignee the same as if the bankruptcy had never occurred.

15.    Regardless of whether the Contracts are assumed (in which case these "disputed"

---

[12] Proposed Plan § 8.4(b).

[13] Section 502(e)(1) does not apply to the DMPs' indemnity claims where the co-liability requirement of section 502(e)(1) is not met.

amounts become cure obligations), or rejected (in which case these amounts become rejection damages claims), in <u>either</u> case, the Debtors cannot by fiat shunt the DMPs' currently non-contingent and unliquidated claims into Class 13 (or any other class) and wipe them out. The effort to impose such disparate treatment relative to other similarly situated creditors and force the affected DMPs into expedited litigation of the non-contingent and unliquidated DMP Claims on 502(e) or subordination grounds violates due process.[14]    In addition, it violates hornbook bankruptcy law. To the extent such claims are treated as cure claims (as they would be if the Contracts are assumed and retained, or assumed and assigned), the resulting claims <u>either</u> would be entitled to priority as an administrative expense under Bankruptcy Code Section 503 in the Debtors' chapter 11 cases, or paid by Newco post-confirmation (qua non-debtor counter-party) as such claims become liquidated and non-contingent over time – in both scenarios, the resulting cure claim would be paid in "whole" dollars and not "bankruptcy" dollars.

16.    Moreover, if these Contracts are assumed and retained or assumed and assigned to NewCo, in the event of a judgment against a DMP post-confirmation, such DMP should be able to assert its indemnity claim against the new Contract counterparty which has assumed the obligations of the current Contract counterparty.  Finally, assumption of any Contract will negate any purported bankruptcy subordination of the obligations under such Contract.

17.    Each of these reasons render the Proposed Plan patently unconfirmable, and consequently the Disclosure Statement should not be approved.

**B.    The Proposed Plan Is Patently Unconfirmable Because It Impermissibly Extinguishes The DMPs' Independent Contractual Rights Under The <u>Debtors' Insurance Policies.</u>**

18.    Section 8.4(a) of the Proposed Plan also illegally purports to terminate any

---

[14] *See infra* Section II.A (Proposed Plan treatment of DMP Claims violates due process).

creditor's rights as an additional insured under the Debtors' insurance policies without providing any replacement for this coverage or adequate protection for the rights creditors will lose in those policies if the Proposed Plan is confirmed.[15]  Because such a provision renders the Proposed Plan patently unconfirmable, the Court should not approve the Disclosure Statement until the Debtors eliminate this illegal provision from the Proposed Plan.

19.    For certain of the DMPs, the right to receive coverage under the Debtors' insurance policies is part of their Contracts and thus, cannot be discontinued if the Debtors seek to assume those Contracts, making this provision doubly problematic.[16]

20.    The overwhelming majority of courts hold that a debtor cannot extinguish a co-insured's property interest in insurance proceeds without providing that co-insured with a replacement for the property rights that are lost.  The "case law recognizes that any individual insured has a contractually-distinct status that runs directly between itself and the insurer.  This makes the right to receive payment on a covered claim the property of that insured itself."  *In re Petters Co.*, 419 B.R. 369, 376 (Bankr. D. Minn. 2009); *accord Overton's, Inc. v. Interstate Fire & Cas. Ins. Co. (In re SportStuff, Inc.)*, 430 B.R. 170, 178 (B.A.P. 8th Cir. 2010) ("The bankruptcy court did not have the jurisdiction or authority to impair or extinguish [an additional insured's] independent contractual rights.").[17]  Even in *MacArthur Co. v. Johns-Manville Corp.*, in which the Second Circuit approved a settlement that released the debtors' insurers from claims by parties

---

[15] This provision is in conflict with Section 10.6(b) of the Proposed Plan, which contemplates that creditors whose claims are covered by the Debtors' insurance policies may recover from the proceeds of those policies.

[16] *See supra* Section I.A.

[17] *See also In re Adelphia Comm'ns Corp.*, 364 B.R. 518, 527 (Bankr. S.D.N.Y. 2007) (directors' and officers' rights in policies were not property of the estate and could not be released); *In re SelectBuild Ill., LLC*, Case No. 09-12085, 2015 WL 3542542, at *4 (Bankr. D. Del. May 28, 2015) (status as an additional insured creates independent contractual rights between additional insured the debtor); *In re SoyNut Butter Co.*, Case No. 17-14970, 2018 WL 3689549, at *4-5 (Bankr. N.D. Ill. Aug. 1, 2018) (distributors additional insured rights could not be released by the debtor); *In re Forty-Eight Insulations, Inc.*, 149 B.R. 860, 865 (Bankr. N.D. Ill. 1992) (non-debtor's interests in insurance policies are not property of the estate).

8

claiming coverage under a vendor endorsement, it emphasized that those claims were "not extinguished," but rather were channeled to the proceeds of the debtor's settlement with its insurers and thus adequately protected.  837 F.2d 89 (2nd Cir. 1988) .

21.    The same should follow here.  Certain DMPs have independent, contractual rights as additional insureds under the Debtors' insurance policies that they may enforce against the Debtors' insurers.  These rights belong to the DMPs, not to the Debtors. The Debtors have no right to terminate these rights.  However, at a minimum, the Debtors should not be permitted to do so without adequately protecting the interests of the DMPs in those rights through the protection of covered claims under the channeling injunction or similar mechanisms under the Proposed Plan.

**C.    The Proposed Plan Is Patently Unconfirmable Because It Illegally Extinguishes The DMPs' Defensive Rights.**

22.    The Proposed Plan purports to bar the post-confirmation assertion of DMP Defensive Rights[18] against the Released Parties (which includes the Opioid Plaintiffs).

23.    The DMP Defensive Rights cannot be eliminated through the Proposed Plan.

---

[18] The DMP Defensive Rights include the right of any DMP to raise any arguments in the Opioid Litigation that relate to apportioning of fault to the Debtors and/or any member of the Sackler family. Generally recognized tort principles give DMPs the right to apportion any damages among "two or more causes" where "each of the causes in question consists of the tortious conduct of a person."  Restatement (Second) Torts § 433A, cmt. a.  For purposes of such apportionment, "it is immaterial whether all or any such persons are joined as defendants in the particular action."  *Id. See also, e.g.*, *Krzykalski v. Tindall*, 181 A.3d 981 (N.J. 2018) (permitting allocation of fault to "phantom defendants"); *Kearny v. Brandt*, 67 A.3d 601 (N.J. 2013) (recognizing the right of joint defendants to apportion fault to dismissed parties); *Goodman v. Lozano*, 223 P.3d 77 (Cal. 2010) (in cases of partial settlements, the non-settling defendants are entitled to a setoff of any judgment for which they are jointly and severally liable); *Ex parte Barnett*, 978 So.2d 729 (Ala. 2007) (Alabama law applies the *pro tanto* approach and offsets the remaining defendants' liability by the settlement amount); *Taylor v. Solberg*, 566 Pa. 150 (Pa. 2001) (under Pennsylvania law, a partial settlement triggers a *pro rata* reduction of the remaining tortfeasors' liability); *Farbe v. Cas. Reciprocal Exch.*, 765 So.2d 994 (La. 2000) (Louisiana defendants are entitled to a setoff for the percentage share of fault of any settled party); *Pollicina v. Misericordia Hosp. Med. Ctr.*, 624 N.E.2d 974 (N.Y. 1993) (New York law permits the remaining defendants to a setoff of the total damages by the greater of the *pro rata* or the *pro tanto* approach); *Brandner v. Allstate Ins. Co.*, 512 N.W.2d 753 (Wis. 1994) (under Wisconsin law, a partial settlement results in a reduction of the plaintiff's damages award by the settling defendants' *pro rata* share); Conn. Gen. Stat. § 52-572h; Del. Code Ann. tit. 10, § 6304; Haw. Rev. Stat. § 663-15.5; Idaho Code § 6-805; 740 Il. Comp. Stat. 100/2; Iowa Code § 668.7; Md. Code Ann., Cts. & Jud. Proc. § 3-1404;  Mass. Gen. Laws ch. 231B, § 4; Minn. Stat. § 604.01; Mo. Rev. Stat. § 537.060; Neb. Rev. Stat. § 25-21,185.11; N.J. Stat. Ann. § 2A:15-5.3; N.C. Gen. Stat. § 1B-4; N.D. Cent. Code § 32-35-04; Ohio Rev. Code Ann. § 2315.32-36; Ok. Stat. tit. 12, § 832(H). 10 R.I. Gen. Laws § 10-6-7; S.C. Code Ann. § 15-38-50; S.D. Codified

9

Pg 19 of 52

However, two sections of the Proposed Plan attempt to do just that. Sections 8.4(a) and 8.4(b) of the Proposed Plan purport to permit the assumption of Contracts while eviscerating the provisions of such Contracts that provide protection to the DMPs, including the DMP Defensive Rights.[19] Additionally, Section 10.6(b) of the Proposed Plan, which contains the DMP Non-Consensual Release (defined below), specifically releases and enjoins the right of a Releasing Party (here, the DMPs), to exercise, among other things, any Claim, demands, Causes of Action, remedies, contributions and indemnities, which are in essence, the DMP Defensive Rights.[20]

24.    The Proposed Plan's attempt to extinguish the DMP Defensive Rights does not comply with the Bankruptcy Code or case law thereunder in at least five ways.

25.    *First*, the bankruptcy discharge cannot eliminate affirmative defenses. The DMP Defensive Rights, which include affirmative defenses, setoffs, recoupment, allocation of liability, judgment credit, and other rights against numerous third parties in the Opioid Litigation, ***who are not in any way related to the Debtors***, should survive bankruptcy discharge. *See Green v. Welsh*, 956 F.2d 30, 33 (2d Cir. 1992) ("the language of these sections [including § 524] reveals that Congress sought to free the debtor of his personal obligations while ensuring that no one else reaps a similar benefit"). As observed by Judge Garrity in *Ditech* in the context of recoupment, "defenses to enforcement" cannot be extinguished in bankruptcy under a plan "because they are

---

Laws § 15-8-17; Tenn. Code Ann. §§ 29-11-105, 107(d); Utah Code Ann. § 78B-5-820; Va. Code Ann. § 8.01-35.1; W. Va. Code 55-7-13(d)(1).

[19] Proposed Plan § 8.4(b) ("No counterparty or any other Person shall have or retain any Claim, Cause of Action or other right of recovery against the Debtors or any other Person, including without limitation Newco or any Insurance Company, for or relating to any obligation or right described in Section 8.4(a) of the Plan, any Co-Defendant Claim or the amendment or any contract, severance and rejection of obligations and liabilities in connection therewith, described in this Section 8.4(b). On the Effective Date, all Co-Defendant Claims arising under or related to any contract of the Debtors shall be released and discharged with no consideration on account thereof, and all Proofs of Claim in respect thereof shall be deemed Disallowed and expunged, without further notice, or action, order or approval of the Bankruptcy Court or any other Person[.]").

[20] Proposed Plan § 10.6(b).

neither 'claims' nor 'debts,' nor 'interests.'" *In re Ditech Holdings Corp.* 606 B.R. 544, 596 (Bankr. S.D.N.Y. 2019) (collecting cases); *see also In re De Laurentiis Ent. Grp. Inc.*, 963 F.2d 1269, 1276-77 (9th Cir. 1992) (holding that a creditor's setoff right against the debtor survives a discharge).

26.     ***Second***, Sections 8.4 and 10.6(b) of the Proposed Plan disregard the ample case law holding that the discharge granted in connection with confirmation of a bankruptcy plan cannot extinguish setoff rights which are statutorily preserved under Section 553.  *See, e.g.*, *Official Comm. of Unsecured Creds. v. Mfrs. & Traders Trust Co. (In re Bennett Funding Grp.)*, 146 F.3d 136, 138–39 (2d Cir. 1998) (explaining that Section 553 "does not create a right of setoff but rather preserves whatever right exists under applicable non-bankruptcy law."); *In re BOUSA Inc.*, Case No. 89-B-13380, 2006 WL 2864964, at *6 (Bankr. S.D.N.Y. Sept. 29, 2006) ("[C]onfirmation of a debtor's plan of reorganization does not extinguish prepetition setoff rights," subject to inapposite exceptions) (citation omitted).  The DMPs' rights to assert the DMP Defensive Rights against Released Parties are often characterized as setoff rights.  The Proposed Plan cannot provide benefits and protections to third parties that it cannot even provide to the Debtors.  Indeed, Section 524 disclaims the direct extension of a discharge granted to a debtor to a third party liable on the same debt.  The preservation of the DMP Defensive Rights under Section 553 is required by law, particularly given that the Debtors have implied that they hold claims against the DMPs that arose pre-petition.[21]  The Proposed Plan cannot circumvent Section 553's express preservation of the DMPs' setoff rights by prohibiting the DMPs' post-confirmation exercise of setoff rights against the Debtors and the Released Parties.[22]

---

[21] *See* Proposed Plan §§ 8.1, 8.3, 8.4.

[22] *See* Proposed Plan §§ 8.4(b), 10.6(b).

27.    **Third**, the DMP Defensive Rights of setoff are to be treated as secured claims that cannot be unilaterally stripped or rendered unsecured.  *See In re Drexel Burnham Lambert Grp., Inc.*, 113 B.R. 830, 839 n.10 (Bankr. S.D.N.Y. 1990) ("Under § 506(a), a creditor having a valid right of setoff is treated as a secured creditor.").[23]  The improper extinguishment of the DMP Defensive Rights under the Proposed Plan, especially without any corresponding adequate protection, renders it patently unconfirmable, and as such the Disclosure Statement cannot be approved.

28.    **Fourth**, the DMP Defensive Rights of recoupment cannot be extinguished by the Proposed Plan.  *See Ditech*, 606 B.R. at 596 (recoupment rights "cannot be extinguished in bankruptcy—whether through a sale or discharge under a plan—because they are neither 'claims' nor 'debts,' nor 'interests.'").

29.    **Fifth**, the unprecedented[24] non-consensual release and injunction of the DMP Defensive Rights[25] (the "<u>DMP Non-Consensual Release</u>") fails to satisfy the *Metromedia* test as applied to the DMPs and the DMP Defensive Rights.

---

[23] Consistent with Section 506(a), the Proposed Plan defines the term "Secured Claim" to *include* "any Claim against any Debtor to the extent such Claim is … subject to any setoff right of the Holder of such Claim under section 553 of the Bankruptcy Code."  Proposed Plan § 1.1 at. p. 23.

[24] After reviewing dozens of cases approving contested non-consensual third-party releases, not a single example emerged that extinguishes <u>defensive rights</u> as the DMP Non-Consensual Release purports to do.  *See, e.g.*, *In re SunEdison, Inc.*, 576 B.R. 453, 462-63 (Bankr. S.D.N.Y. 2017) (approving non-consensual third party releases as to claims that would trigger indemnification claims against the debtor, but refusing to grant third party injunctions that were much broader than such indemnification obligations); *In re Sabine Oil & Gas Corp.*, 555 B.R. 180, 290, 93 (Bankr. S.D.N.Y. 2016) (third party releases could be granted where debtors  would have had contingent indemnification obligations absent the third party releases); *In re FairPoint Commc'ns, Inc.*, 452 B.R. 21, 23, 29 (S.D.N.Y. 2011) (approving releases that enjoined a third party from pursuing non-derivative claims that directly affect [the] bankruptcy estate" because the plan provisions were "carefully crafted so that [they are] limited to actions that create contingent obligations against the estate"); *In re Adelphia Commc'ns Corp.*, 368 B.R. 140, 263-69 (Bankr. S.D.N.Y. 2007) (approving third-party releases only to the extent that they (1) triggered indemnity obligations of the debtors; (2) parties that contributed $17.5 billion to facilitate the restructuring, and (3) consensual releases).

[25] The "Released Claims" are broadly defined under the Proposed Plan to encompass any claims, Causes of Action, counterclaims, defenses, indemnity and rights, that are based on or relate to the Debtors, the Chapter 11 Cases, any Claim that is restructured before or during the Chapter 11 Cases, and the Opioid-Related Activities.  Proposed Plan at 21; §§ 10.6(a), 10.6(b).

12

**D.      The Proposed Plan Is Patently Unconfirmable Because It Fails The Best Interests of Creditors Test.**

30.      Section 1129(a)(7) provides that a plan can only be confirmed if impaired creditors that have rejected the plan "will receive or retain under the plan on account of such claim or interest, property of a value, as of the effective date of the plan, that is not less than the amount that such holder would so receive or retain if the debtor were liquidated under chapter 7 of this title on such date." 11 U.S.C. § 1129(a)(7)(A).

31.      A chapter 11 plan that denies recovery to holders of allowed unsecured claims and releases third-party claims or rights of that creditor does not comply with Section 1129(a)(7) and cannot be confirmed. *See In re SunEdison, Inc.*, 576 B.R. 453, 457 n.4 (Bankr. S.D.N.Y. 2017) (stating that a plan that provided for nonconsensual releases of creditors deemed to reject the plan pursuant to 11 U.S.C. § 1126(g) "would violate the best interests test under 11 U.S.C. §1129(a)(7)(A)(ii) and render the Plan unconfirmable. While the class would not receive a distribution in either chapter 11 or 7, the class members would retain their third party claims in a chapter 7"); *see also In re Wash. Mutual, Inc.*, 442 B.R. 314, 359-60 (Bankr. D. Del. 2011) ("In a case where claims are being released under the chapter 11 plan but would be available for recovery in a chapter 7 case, the released claims must be considered as part of the analysis in deciding whether creditors fare at least as well under the chapter 11 plan as they would in a chapter 7 liquidation.").

32.      The Proposed Plan violates the best interests test on three grounds. *First*, the Non-Consensual DMP Releases eliminate the DMP Defensive Rights that the DMPs would otherwise retain in a chapter 7 liquidation.[26]  As a result, the Proposed Plan will not meet the best interests

---

[26] *See supra* Section I.C; *see also infra,* Section II.B.

13

test.  *See Ditech*, 606 B.R. at 615 (citing *Quigley*, 437 B.R. 102 145 (Bankr. S.D.N.Y. 2010))

(Debtors failed to satisfy best interests test because liquidation analysis failed to account for non-

debtor claims).

33.    ***Second***, as set forth above in Section I.B the Proposed Plan extinguishes the rights

of certain DMPs to be named as additional insureds under certain of the Debtors' insurance

policies,[27] which would also be retained in a chapter 7.[28]

34.    ***Third,*** the Proposed Plan fails to provide any benefits or protections to the holders

of Class 13 claims, and in fact eliminates them.  By contrast, the Proposed Plan provides an

affirmative recovery to other general unsecured claims that would have equal priority under

Section 726(b) with the claims included in Class 13.

35.    Based upon the foregoing, the Proposed Plan is patently unconfirmable because it

will fail the best interests test.

## II.    The Proposed Plan Contains Numerous Other Unconfirmable Provisions.[29]

### A.    The Proposed Plan's Treatment Of DMP Claims Violates Due Process And The Proposed Plan Does Not Satisfy The Debtors' Burden To Disallow Or Subordinate The DMP Claims.

#### 1.    *The Debtors Fail To Properly Notify Holders Of Co-Defendant Claims That Are Subject To Objection Or Specify The Bases For Objection.*

36.    Due process requires that a party receive notice and a meaningful opportunity to be

heard, prior to judicial action being taken against a party.  The Proposed Plan's treatment of Co-

Defendant Claims violates due process because it does not adequately identify or describe the

specific claims that are subject to objection, or the factual or legal basis for such treatment.  The

---

[27] Proposed Plan § 8.4 (elimination of rights to indemnification or reimbursement against a Debtor's insurer).

[28] *See* Section I.B *supra*.

[29] All of the problems with the Proposed Plan noted herein also render the Proposed Plan unconfirmable for failure to comply with Section 1129(a)(1).

Debtors embed in Section 4.15(a) of the Proposed Plan a purported objection to all "Co-Defendant Claims." But that term is so broadly defined that a holder of such claim cannot ascertain if the objection applies to a Cure Claim, a rejection damage claim, a trade claim, a liquidated indemnity claim (contract or otherwise), an unliquidated claim (contract or otherwise), a setoff right or other assertable defense, or another type of asserted claim.[30] Nor have the Debtors identified the holders of such claims, the claim numbers of affected claims, and/or the relevant portions of such claims to which they object and seek disallowance, estimation and subordination.[31] Without such information, the DMPs cannot be expected to know whether their claims, and what portions thereof, are subject to Section 4.15 of the Proposed Plan, especially given the sweeping definition of "Co-Defendant Claim" under the Proposed Plan. Holders of Co-Defendant Claims have a fundamental due process right, to know which of their proofs of claim, and what portions thereof, are subject to the Proposed Plan's sweeping statements and purported objections.

37.    Unless the Proposed Plan comports with the DMPs' due process rights by giving fair notice of what is at issue, and the specific grounds therefor, it cannot be confirmed.[32]

## 2. *The Debtors Fail To Meet Their Burden In Objecting To, And Moving* **To Subordinate And Estimate At $0, Co-Defendant Claims.**

38.    The treatment of Class 13 in the Proposed Plan simply creates by fiat, a conclusion that disallows and subordinates thousands of proofs of claim, each of which contains multiple, disparate and discrete elements and bases. The Proposed Plan does not meet the burden of pleading

---

[30] Proposed Plan § 4.15(a).

[31] As described below, Bankruptcy Rule 3007(e), which applies to the Debtors' objection to claims under the Proposed Plan, requires that an omnibus objection identify each affected claimant's name and cross-reference the affected claim numbers. However, even if Bankruptcy Rule 3007(e) does not technically apply to omnibus objections asserted through a chapter 11 plan, process requires that notice be provided to each affected claimant.

[32] The Disclosure Statement is likewise deficient inasmuch as it does not contain this material information. *See supra* Section III.A.

facts with particularity that overcomes the *prima facie* validity of the DMP Claims, let alone

establishes as a matter of law that the DMP Claims should be subordinated and estimated at $0.[33]

Accordingly, the DMP Claims are entitled to recovery under the Proposed Plan and, to the extent

they remain subject to objection, an adequate reserve must be funded for the benefit of such claims.

39.     Section 502(a) provides that "[a] claim or interest, proof of which is filed under

section 501 . . . is deemed allowed, unless a party in interest . . . objects."  11 U.S.C. § 502(a).  In

addition, pursuant to Bankruptcy Rule 3001(f), a correctly and timely filed proof of claim

constitutes *prima facie* evidence of the validity and amount of the claim.  *See* Fed. R. Bankr. P.

3001(f).

40.     As this Court has explained in prior opinions, objections to proofs of claim are

subject to a shifting burden of proof.  *See In re Pinnock*, 594 B.R. 609, 612 (Bankr. S.D.N.Y.

2018).  To overcome the *prima facie* validity of a proof of claim, the objector "must come forth

with evidence which, if believed, would refute at least one of the allegations essential to the claim."

*In re Reilly*, 245 B.R. 768, 773 (2d Cir. B.A.P. 2000); s*ee also In re Pinnock*, 594 B.R. at 612.

Consequently, "[i]f the objector does not introduce[] evidence as to the invalidity of the claim or

the excessiveness of its amount, **the claimant need offer no further proof of the merits of the**

**claim.**"  *In re Residential Capital, LLC,* 507 B.R. 477, 490 (Bankr. S.D.N.Y. 2014) (emphasis

added) (second alteration in original) (internal citation omitted).

41.     The DMP Claims were properly and timely filed and, thus, are presumptively valid.

The Debtors' bare pronouncements in Section 4.15 of the Proposed Plan that the DMP Claims in

---

[33] Nor does the Proposed Plan conform to the standard set by this Court on April 22, 2021, in the *Order Approving (I) Omnibus Claims Objection Procedures, (II) Omnibus Claims Settlement Procedures And (III) Omnibus Claims Hearing Procedures*, which provides: "For the avoidance of doubt, any Omnibus Claims Objection shall state with particularity the factual and legal grounds for the objection in accordance with Bankruptcy Rule 7007 and Federal Rule of Civil Procedure 7(b)(1)(B)."  ECF No. 2696.

Class 13 are objectionable, should be disallowed, estimated at $0 and subordinated are insufficient to satisfy the Debtors' initial burden of proof to refute each of the DMP Claims. To meet their burden, the Debtors must assert their objections with specificity to refute each DMP Claim. *See In re Residential Capital, LLC*, Case No. 12-12020 (MG), 2014 WL 1058921, at *5 (Bankr. S.D.N.Y. Mar. 17, 2014) (overruling the debtors' omnibus "boilerplate books and records" objection as insufficient to shift the burden because the debtors failed to present evidence specifically addressing the creditor's contentions contained in the proof of claim).

42.     Although the Debtors assert their purported objections through the Proposed Plan, instead of a separately filed objection, such purported objections must still comply with the "essence of [Bankruptcy] Rule 3007," which requires that a creditor receive specific notice of the objection and its grounds. *In re Dynamic Brokers, Inc*., 293 B.R. 489, 497 (B.A.P. 9th Cir. 2003).[34] The Proposed Plan's boilerplate language in Section 4.15 violates the terms and essence of Bankruptcy Rule 3007(e), and denies creditors the information that must be included in a claim objection in any other scenario. Consequently, to the extent that the Proposed Plan serves as a vehicle to litigate all Co-Defendant Claims, it is woefully inadequate and fails to satisfy the minimum requirements of due process and the Bankruptcy Rules.

43.     To upend and brush aside the entirety of the DMP Claims, the Debtors appear to

---

[34] In *Dynamic Brokers*, the Bankruptcy Appellate Panel of the Ninth Circuit explained:

  [U]tilizing a plan confirmation proceeding as a method of objecting to a claim presents troubling policy issues in the face of rules of procedure that appear to require formal objections to claims. . . . Neither the statute nor the rules say, "oh, by the way, we can also sandbag you by sneaking an objection into a reorganization plan and hoping you do not realize that we can use this device to circumvent the claim objection procedure mandated by the rules. . . . by holding that the essence of Rule 3007 must be complied with, we are holding that considerations of due process mandate great caution and require that the creditor receive specific notice (not buried in a disclosure statement or plan provision) of at least the quality of specificity, and be afforded the same opportunity to litigate one-on-one, as would be provided with a straightforward claim objection under Rule 3007.

293 B.R. at 497.

principally rely upon Section 502(e)(1). That section provides for the disallowance of certain contingent claims for contribution or reimbursement upon which the Debtor is co-liable with the creditor. *See* 11 U.S.C. § 502(e)(1). But the Proposed Plan ignores the complexity of 502(e)(1). The Proposed Plan does not specify which of Section 502(e)(1)'s three subsections the Debtors are relying upon in their attempt to object to the Co-Defendant Claims. The Co-Defendants should not have to guess at the grounds for objection or be required to shadow box with the Debtors. Moreover, the Debtors have failed to plead sufficient facts in connection with the proposed treatment to refute at least one allegation essential to each of the DMP Claims.

44.     Presumably, the Debtors' objection rests on Section 502(e)(1)(B), which provides for the disallowance of contingent claims for reimbursement or contribution to the extent the claimant and the Debtor are both liable on a creditor's claim.[35] But even assuming for the sake of argument that Section 502(e)(1)(B) applies to *some* of the DMP Claims, there is absolutely no basis to conclude it applies to *all* such claims, or any clarity from the Debtors as to which portions of the thousands of claims they believe are objectionable on that basis.

45.     The Proposed Plan disregards the fact that, to the extent the DMPs assert the DMP Defensive Rights in the Opioid Litigation, the "co-liability" prong of Section 502(e)(1) is not satisfied. That is, if a judgment is rendered in the Opioid Litigation that apportions fault, or applies a judgment reduction mechanism, or applies a similar principle that limits a DMP's liability to *only its own fault*, then such judgment is no longer a debt for which the Debtor is co-liable with the creditor. Similarly, any contribution or indemnity claim affirmatively asserted against the Debtors by a DMP that is based upon a determination that apportions fault or liability as described above is likewise *not* predicated upon a debt for which the Debtor is co-liable with the creditor,

---

[35] *See* 11 U.S.C. § 502(e)(1)(B).

and is therefore outside the scope of Section 502(e).

46.    And by way of other examples, many Co-Defendant Claims, or parts of those claims, are neither for reimbursement nor contribution, such as trade claims for amounts due to DMPs or other prepetition contractual arrears that arose in the ordinary course. Further, many of the Co-Defendant Claims are not contingent, such as claims based on settlement payments or attorneys' fees and other legal expenses that, to date, have already been incurred or paid in connection with the Opioid Litigation.[36]  None of these claims fall under Section 502(e)(1). Nonetheless, the Proposed Plan dispenses with all of them with no factual or legal support, and ignores the Co-Defendant Claims for purposes of the distributions and reserves contemplated under the Proposed Plan.  Without a mechanism for dealing with such potential distributions and reserves, the Proposed Plan is unconfirmable as a matter of law.[37]

### 3.    *The Debtors Do Not Allege Any Basis To Subordinate The DMP Claims.*

47.    Under Section 4.15 of the Proposed Plan, the Debtors move to subordinate all Co-Defendant Claims "under section 509(c) or 510 of the Bankruptcy Code or other applicable law."[38]

48.    However, equitable subordination must be supported by "particular facts"; courts may not categorically reorder claims under Section 510(c).  *See Burden v. United States*, 917 F.2d 115, 120 (3d Cir. 1990) ("We believe that the notice and hearing requirement calls on courts to explore the particular facts and circumstances presented in each case before determining whether subordination of a claim is warranted."); *see also In re Montagne*, Case No. 08-1022, 2009 WL 1065427, at *4 (Bankr. D. Vt. Mar. 26, 2009) (requiring debtor to support its claim for equitable

---

[36] These examples are by way of illustration, and the DMPs reserve all rights to argue that other aspects of their claims are likewise excluded from Section 502(e)(1).

[37] And again, the Disclosure Statement is deficient because it fails to contain the information described in this section of the Objection.  *See supra* Section III.A.

[38] Proposed Plan § 4.15(a).

subordination "by simple, concise, and direct allegations tied to particular facts") (citing Fed. R. Bankr. P. 7008)).

49.    The Debtors do not assert any particular facts here.  The only information provided in the Disclosure Statement as justification for subordination of the Co-Defendant Claims are vague conclusory allegations that "such Claims are held by Persons who engaged in, or aided and abetted, or whose Claim arises from . . . acts or omissions that constitute criminal conduct, fraud, willful misconduct or other wrongful or inequitable conduct in connection with Opioid-Related Activities (or on behalf of such Persons, including such Claims for indemnification, repayment or advancement of fees and expenses, including legal defense fees and expenses)."[39]  These self-serving and conclusory allegations fail to meet the necessary pleading standards required to support a motion seeking the punitive request of claim subordination, and are strongly disputed.[40]

50.    Moreover, despite differing facts at issue for each DMP, the Disclosure Statement does not provide any basis for lumping all of the DMP Claims together, notwithstanding the uniquely different claims and contractual relationships of each DMP.  The Debtors have not, and cannot make subordination a "one size fits all" process for all DMPs, let alone without making *any allegations* supporting their theories.

51.    Likewise, the Debtors have failed to establish that, or explain how, any Co-Defendant Claim, including the DMP Claims, is subject to subordination under Section 509(c). That section only applies to subrogees and the Debtors have not asserted that the DMPs are subrogees or alleged any facts to demonstrate that the DMPs would qualify as subrogees for

---

[39] Disclosure Statement  Art. IV.C.15(i).

[40] Courts in the Second Circuit generally require the party seeking to equitably subordinate a claim to demonstrate that: (i) the claimant engaged in "inequitable conduct," directed at the debtor or its assets or liabilities; (ii) the inequitable conduct resulted in injury to the debtor or creditors of the bankrupt and conferred an unfair advantage on the claimant, and (iii) equitable subordination of the claim is consistent with the provisions of the Bankruptcy Code. *See In re Aéropostale, Inc.,* 555 B.R. 369, 397 (Bankr. S.D.N.Y. 2016).

20

purposes of Section 509(c).

52.     That the Proposed Plan completely ignores the likelihood that the DMP Claims will

not be subordinated, also renders the Proposed Plan unconfirmable as a matter of law.[41]

    **4.  *The Debtors Fail To Demonstrate A Basis To Estimate the DMP Claims At $0 And Improperly Exclude Co-Defendant Claims From the Disputed Claims Reserve.***

53.     The Debtors seek to estimate all Co-Defendant Claims at $0 and exclude them from

the Disputed Claims Reserve.[42]   However, as the Debtors have not alleged sufficient legal and

factual bases to sustain an objection to any individual DMP Claim, let alone demonstrate a

probability that all of the DMP Claims will be disallowed in full, the Debtors' motion to estimate

the DMP Claims at $0 likewise fails of its own accord.

54.     Estimation of contingent or unliquidated claims arises under Section 502(c)(1).[43]

The "clearly stated purpose" of Section 502(c)(1) is "to allow estimation of claims in order to

avoid undue delay in the administration of bankruptcy proceedings." *In re Chateaugay Corp.*, 10

F.3d 944, 957 (2d Cir. 1993).

55.     Here, the Debtors have made no allegation that the DMP Claims, particularly as to

liquidated and non-contingent amounts, qualify for estimation.[44]

56.     More importantly, the Debtors have not explained the factual or legal basis, or their

---

[41] And yet again, the Disclosure Statement is deficient because it fails to contain the information described in this section of the Objection. *See supra* Section III.A.

[42] *See* Proposed Plan § 4.15(a).

[43] Section 502(c)(1) provides: "[t]here shall be estimated for purpose of allowance under this section—(1) any contingent or unliquidated claim, the fixing or liquidation of which, as the case may be, would unduly delay the administration of the case." 11 U.S.C. § 502(c)(1).

[44] As noted above in Section 1.A, the currently unliquidated and contingent cure amounts will be liquidated over time provided the Contracts are assumed as they appear to be under the Proposed Plan.

underlying methodology, for estimating the DMP Claims at $0.[45]  Accordingly, the Proposed Plan

must provide a reserve for the Co-Defendant Claims, and failure to do so renders the Proposed

Plan unconfirmable.

### B.    The DMP Non-Consensual Release Under The Proposed Plan Is Impermissible Under *Metromedia*.[46]

57.    The Proposed Plan imposes upon the DMPs,[47] the DMP Non-Consensual Release,

which releases and/or effectively destroys the DMP Defensive Rights as to the Debtors, the Trusts,

and their Related Parties.  Given the broad definition of "Related Parties,"[48] the Released Parties

include the Trust beneficiaries, which would include the Opioid Plaintiffs.

58.    While the DMPs acknowledge that third-party releases are permissible in certain

circumstances, here they are not.  The Proposed Plan would impermissibly strip the DMPs of

fundamental rights, such as well recognized common law and statutory rights to apportion fault

and liability, and to limit liability to non-debtors to reflect recognized principles of fairness and

comparative fault.  Moreover, the injunction provisions enjoin the DMPs from asserting the DMP

Defensive Rights in the Opioid Litigation.  For example, in order to seek judgment reduction or

offset, state law might require a DMP to identify a Debtor as an absentee defendant or a settling

---

[45] *See In re Chemtura Corp.*, 448 B.R. 635, 660 (Bankr. S.D.N.Y. 2011) ("Bankruptcy courts have employed a wide variety of methods to estimate claims, including summary trial, a full-blown evidentiary hearing, and a review of pleadings and briefs followed by oral argument of counsel") (citations omitted); *In re Windsor Plumbing Supply Co., Inc.*, 170 B.R. 503, 521 (Bankr. E.D.N.Y. 1994) ("[a]n estimator of claims must take into account the likelihood that each party's version might or might not be accepted by a trier of fact. The estimated value of a claim is then the amount of the claim diminished by probability that it may be sustainable only in part or not at all").

[46] In addition to the DMP Non-Consensual Release discussed herein, the Proposed Plan contemplates a release of all claims by the Opioid Plaintiffs and the DMPs, respectively, against the Sacklers and Related Parties with regard to anything potentially related to the Debtors, their bankruptcy estates, and/or any property of the foregoing (the "Sackler Third Party Release").  As written, the Sackler Third Party Release would apply to any claims the DMPs might have against the Sacklers for indemnification or contribution arising out of the Opioid Litigation that could form the basis of a defense (including apportionment of fault and judgment reduction) in the Opioid Litigation.  Because the precise terms of the Sackler Third Party Release are not yet known, the DMPs reserve their rights to challenge the same.

[47] "Releasing Parties" are defined to include "Holders of Claims or Interests," which includes the DMPs.

[48] Proposed Plan § 1.1 at 21.

joint tortfeasor—which the Proposed Plan may deem the pursuit of an indirect claim that affects a

Debtor, in violation of the Section 10.5(a)(i) of the Proposed Plan.[49] Not only do these provisions

only alter rights existing solely between parties other than the Debtors (and the Sacklers), they also

have the perverse effect of raising the possibility of double recovery by Opioid Plaintiffs, who

retain claims against the Debtors but bind the DMPs so that they cannot assert any DMP Defensive

Rights to reduce their liability to the Opioid Plaintiffs in the Opioid Litigation.

59.    In the Second Circuit, a Bankruptcy Court may only approve a non-consensual

third-party release and only after a factual finding that the circumstances are unique and render the

scope of the third party release important to the plan. *Deutsche Bank AG v. Metromedia Fiber

Network, Inc. (In re Metromedia)*, 416 F.3d 136, 141–43 (2d Cir. 2005) (involuntary releases

should only be approved if they are an important part in a reorganization plan, because a non-

debtor release is a device that lends itself to abuse," the potential for which "is heightened when

releases afford blanket immunity.").

60.    Courts evaluating non-consensual third-party releases will consider whether: (i) the

releases are important to the success of the plan; (ii) the estate received substantial consideration

from the party being released; (iii) the enjoined claims were channeled to a settlement fund rather

than extinguished; (iv) the enjoined claims would indirectly impact the debtor's reorganization by

way of indemnity or contribution; (v) the plan otherwise provided for the full payment of enjoined

claims; and (vi) the creditors consent. *See Metromedia*, 416 F.3d, at 142-143.

61.    Here, the DMP Non-Consensual Release does not satisfy <u>any</u> of the *Metromedia*

factors, and its inclusion renders the Proposed Plan unconfirmable.

---

[49] Proposed Plan § 10.5(a)(i) (prohibiting any holder of a Claim or Interest against the Debtor from, with respect to
such Claim or Interest, "commencing or conducting . . . directly or indirectly, any suit, action or other proceeding of
any kind . . . against or affecting, directly or indirectly, a Debtor or an Estate or the property of any of the foregoing.").
Sections 10.5(b)(i) and (ii) trigger parallel problems.

62.     *First,* the agreed-upon allocation of distributions set forth in the Proposed Plan would not be reduced or impacted by the preservation of the DMP Defensive Rights.   Indeed, an agreement as to the treatment of certain claims is not sufficient to justify approval of the DMP Non-Consensual Release as necessary to the success of the Proposed Plan.  A party cannot make a release necessary merely by saying so, or construct a plan to depend on such release and then proclaim that the release is necessary to the plan constructed around it.  This is bootstrapping.  *See In re Adelphia Commc'ns Corp.*, 368 B.R. at 269 ("It would set the law on its head if parties could get around it by making a third party release a *sine qua non* of their deal, to establish a foundation for an argument that the injunction is essential to the reorganization, or even 'an important part' of the reorganization.").

63.     The DMP Non-Consensual Release does not serve any apparent function other than to significantly hamstring the DMPs in the Opioid Litigation.  The DMP Defensive Rights would not and could not result in any conceivable effect that extends beyond the confines of the Opioid Litigation.[50]  They serve solely as an allocation and judgment reduction mechanism in the event any of the DMPs are found liable in, or agree to pay judgments in, the Opioid Litigation.  Simply put, the Opioid Plaintiffs' recoveries and claims against the non-debtor DMPs have nothing to do with the implementation of, or the ultimate success of the Proposed Plan.

64.     *Second,* the Opioid Plaintiffs have not provided any consideration to the Debtors' estates in exchange for benefitting from the DMP Non-Consensual Release.  That the Opioid Plaintiffs have agreed to an allocation of billions of dollars of existing estate assets amongst themselves does not satisfy the additional consideration component required to receive the

---

[50] The DMP Defensive Rights do not seek recovery from the Debtors, "under the artifice of proceedings against a third party." *In re MPM Silicones, LLC*, Case No. 15-1771, 2014 WL 44363335, at *33 (Bankr. S.D.N.Y. Sept. 9, 2014). The DMP Defensive Rights are not even claims or counterclaims against the third party Opioid Plaintiffs:  they are merely defenses available to the DMPs as defendants in the Opioid Litigation.

extraordinary grant of third-party releases in these Chapter 11 Cases. *See Genco*, 513 B.R. at 272 (substantial consideration typically includes forgoing consideration and contributing value).[51] Therefore, the "substantial contribution" prong of the *Metromedia* test has not been satisfied.

65.    ***Third***, the DMP Defensive Rights enjoined under the Proposed Plan are *not* being channeled to a settlement fund.    The DMP Defensive Rights simply vaporize with no consideration.  This prong of the *Metromedia* test is simply ignored, let alone satisfied.

66.    ***Fourth***, the Proposed Plan does not provide for *any* distribution on account of the DMP Defensive Rights or even on account of any DMP released Claims.[52]  Accordingly, this prong of the *Metromedia* is not satisfied or even applicable.

67.    ***Fifth***, the DMP Defensive Rights are independent from the DMP Claims and do not trigger indemnity or contribution claims against the Debtors.  Accordingly, this prong of *Metromedia* is not satisfied.

68.    ***Sixth***, because the Proposed Plan conclusively presumes the DMPs reject the Proposed Plan, the DMPs cannot be deemed to consent to the DMP Non-Consensual Release.  The DMPs unequivocally do not consent to the DMP Non-Consensual Release, and therefore this prong of the *Metromedia* test is not satisfied.

69.    Because none of the *Metromedia* factors have been satisfied as to the DMP Non-Consensual Release, such release cannot be approved.

**C.    The Proposed Plan Improperly Classifies And Unfairly Discriminates Against Co-Defendant Claims Within Class 13.**

70.    The Proposed Plan cannot be confirmed because it places all of the various types

---

[51] *See also Adelphia*, 368 B.R. at 268 (refusing to grant third-party releases to settling parties who "were merely striking the kinds of deals with respect to their shares of the pie that chapter 11 contemplates).

[52] *See* Proposed Plan § 4.15.

of Co-Defendant Claims which are substantially *dissimilar* claims in a single class, in violation of Section 1122(a). And, in so doing, it also unfairly discriminates against holders of "Co-Defendant Claims" given the treatment under the Proposed Plan of other general unsecured claims.[53]

71.    "Dissimilar claims may not be classified together, similarly claims may be classified separately only for a legitimate reason." *In re Congoleum Corp.*, Case No. 09-4371, 2010 WL 2869548 at *2 (D.N.J. July 19, 2010) (quoting *In re Chateauguay Corp.*, 89 F.3d 942, 949 (2d Cir. 1996) (internal quotations omitted)).

72.    Here, the Proposed Plan's classification scheme flouts both these rules because it classifies together a broad swath of dissimilar claims, and because it classifies Co-Defendant Claims separately from other claims that are of equal priority, without any basis, and eviscerates the DMP Defensive Rights. For example, "Co-Defendant Claims" include claims with markedly different legal characteristics such as, *inter alia*, non-contingent and liquidated reimbursement claims, contingent as well as noncontingent contractual indemnification claims related to the Opioid Litigation, and even, in certain circumstances, general unsecured trade claims unrelated to the Opioid Litigation.

73.    This disparate treatment not only violates Section 1122(a), but it also results in unfair discrimination, particularly given the treatment of the DMP Defensive Rights. *In re Breitburn Energy Partners LP*, 582 B.R. 321, 350 (Bankr. S.D.N.Y. 2018) (the prohibition against unfair discrimination is designed to "protect against horizontal discrimination" and to "assure fair treatment among classes of the same priority") (quoting *In re SunEdison, Inc.*, 575 B.R. 220, 226 (Bankr. S.D.N.Y. 2017)); *see also In re LightSquared Inc.*, 513 B.R. 56, 99 (Bankr. S.D.N.Y. 2014) ("[t]he purpose of the [unfair discrimination] requirement is to ensure that a dissenting class

---

[53] *See* Proposed Plan § 4.13 (treatment of Other General Unsecured Claims).

26

will receive relative value equal to the value given to all other similarly situated creditors") (citing *In re Johns–Manville Corp.*, 68 B.R. 618, 636 (Bankr. S.D.N.Y. 1987)).

74.     In addition, the Proposed Plan fails to provide any disputed claims reserve for Co-Defendant Claims[54]—effectively ensuring that those claims will be extinguished even if the Debtors do not prevail in disallowing and/or subordinating every Co-Defendant Claim.

## D.     The Plan Is Not Feasible.

75.     Section 1129(a)(11) provides that a chapter 11 plan should be confirmed only if the court finds, upon the evidentiary record, that its approval "is not likely to be followed by the liquidation, or the need for further financial reorganization, of the debtor or any successor to the debtor under the plan, unless such liquidation or reorganization is proposed in the plan." 11 U.S.C. § 1129(a)(11).

76.     The Proposed Plan fails Section 1129(a)(11)'s feasibility test in at least two ways. ***First***, the success of the Proposed Plan depends on future business relationships with many of DMPs, but proposes to eliminate their DMP's substantive and procedural rights in a manner that makes it unreasonable to assume their continued support.[55]  ***Second***, the Debtors have yet to identify which executory contracts and unexpired leases they propose to assume and the attendant cure costs, which makes it impossible to determine whether the Proposed Plan is feasible.

77.     As these defects in the Proposed Plan are part of its foundational fabric, the Proposed Plan is of its own accord demonstrably and patently unconfirmable.

---

[54] The definition of "Disputed Claims Reserves" in the Proposed Plan makes clear that they are only available for certain classes.  *See* Proposed Plan § 1.1 at p. 6-7.

[55] Proposed Plan § 4.15(a)

III.   **The Disclosure Statement Fails To Provide Adequate Information Regarding Critical Aspects of the Proposed Plan as Required Under Section 1125.**

78.     Section 1125 provides that a disclosure statement must contain "adequate information" describing a proposed chapter 11 plan. 11 U.S.C. § 1125.  The Bankruptcy Code defines "adequate information" as:

> information of a kind, and in sufficient detail, as far as is reasonably practicable in light of the nature and history of the debtor and the condition of the debtor's books and records . . . that would enable such a hypothetical investor. . . to make an informed judgment about the plan . . . .

11 U.S.C. § 1125(a)(1).

79.     Here, the Disclosure Statement contains significant disclosure infirmities and fails to provide basic and routine information that one would expect to see in a disclosure statement in a case of this magnitude and complexity.

A.   **The Disclosure Statement Fails To Provide Adequate Information With Respect To The Treatment Of Class 13 Co-Defendant Claims.**

80.     As noted above, the DMP Claims fall within Class 13, which includes "Co-Defendant Claims."[56]

81.     The Disclosure Statement lacks any allegations whatsoever to support the Debtors' request to disallow the Co-Defendant Claims pursuant to Section 502(e)(1).[57]

82.     The Disclosure Statement also does not explain the legal basis for the Debtors' alleged equitable subordination claims (or any alleged claim under Section 509(c)).  Instead, the Proposed Plan simply states that "[t]o the extent necessary, the Confirmation Order shall contain

---

[56] The entire section in the Disclosure Statement describing the treatment of Co-Defendant Claims is bracketed with a footnote indicating that the treatment is "subject to adjustment . . . ."  However, the Proposed Plan is crystal clear that, through the Proposed Plan, the Debtors object to all Co-Defendant Claims and seek their disallowance and/or subordination.  Proposed Plan § 4.15(a)

[57] *See also* Section II.A *supra*.

28

findings supporting the conclusions providing for subordination of such Claims for the purposes of Distribution."[58] This statement falls far short of constituting "adequate information" on the treatment of each of the DMP Claims and the basis for such treatment. Moreover, such treatment, especially in the context of a fast-approaching plan confirmation hearing is an egregious violation of the DMPs' due process rights as to notice and timing. The Proposed Plan has the effect of bringing the entirety of the Opioid Litigation into this Court as part of the confirmation hearing.[59] If the Debtors had brought an adversary proceeding alleging equitable subordination with only these generalizations, it would be dismissed at the pleading stage. And, if the Debtors re-plead, the lawsuit would take months or years to litigate to conclusion.

83.    In addition, also absent in the Disclosure Statement is a necessary discussion of the risks associated with confirmation of the Proposed Plan in the event the Bankruptcy Court rules that disallowance and/or equitable subordination is not applicable to some or all of the DMP Claims, including the impact of having to establish a reserve for and distributions on account of the DMP Claims.[60]

84.    The Disclosure Statement also fails to detail the significant costs to the estates of engaging in the Debtors' proposed "fast track" process of litigating with the DMPs. Any equitable subordination inquiry will necessarily involve very complex issues of fact underlying the Opioid Litigation.

---

[58] Proposed Plan § 4.15(a).

[59] Contemporaneously herewith, the DMPs are filing a joint objection to the *Debtors' Motion for Order Establishing Confirmation Schedule and Protocols* [Docket No. 2536] that sets forth their objections to the Debtors' proposed schedule and protocols governing discovery and litigation related to confirmation of the Proposed Plan, including, presumably, the Debtors' request to estimate and subordinate the DMP Claims.

[60] For example, if some or all of the DMP Claims are in fact deemed allowed, the Disclosure Statement must include information on how the Debtors will address, among other things: (i) the reserve created to make distributions on account of those claims; (ii) the necessary Plan modifications on the treatment of and reserve for such claims; and (iii) whether the Proposed Plan will require re-solicitation.

29

**B.      The Disclosure Statement Fails To Provide Adequate Information With
Respect To The Debtors' Assumption Of The Co-Defendants' Contracts.**

85.      The Disclosure Statement fails to include any discussion of the risks to the Debtors'

post-confirmation business in the event that: (a) the Bankruptcy Court rules that the Debtors may

not eliminate indemnification provisions in connection with any Contract assumption;[61] or (b) the

Debtors reject the Contracts.

86.      The Proposed Plan contemplates the Debtors' successor – NewCo – continuing to

operate the Debtors' current opioid businesses after the effective date of the Proposed Plan.  Those

ongoing operations will require the DMPs' participation.  If the Debtors were to lose some or all

of those relationships due to the rejection of the Contracts, it could have a very significant, material

adverse impact on NewCo, as well as the ability of the Debtors to satisfy creditor claims under the

Proposed Plan.  All of those risks should be set forth in detail in the Disclosure Statement.

**C.      The Disclosure Statement Fails To Provide Adequate Information With
Respect To The Debtors' Insurance Policies.**

87.      The Disclosure Statement contains inadequate information with respect to the

Debtors' insurance policies in two respects.  ***First***, the DMP Claims against a Purdue Insurance

Policy may be disallowed, with no property being distributed to, or retained by, the DMPs, under

Section 4.15 of the Proposed Plan.

88.      However, Section 10.6(b) of the Proposed Plan provides that:

> Notwithstanding anything herein to the contrary, the Debtors shall
> not be released from liability for any Claim that is or may be covered
> by any Purdue Insurance Policy; *provided* that recovery for any such
> Claim, including by way of settlement or judgment, shall be limited
> to the available proceeds of such Purdue Insurance Policy…[62]

---

[61] Many of the DMPs assert contractual indemnity rights related to the Opioid Litigation.  The Debtors fail to provide any information as to the order of magnitude of such indemnity claims and their impact upon NewCo if assumed, let alone how NewCo would honor such assumed indemnity claims.

[62] Proposed Plan § 10.6(b).

89.    The Debtors must clarify in the Proposed Plan and explain in the Disclosure Statement whether the preservation of claims against Purdue Insurance Policies in Section 10.6(b) of the Proposed Plan overrides the purported disallowance and/or subordination of the DMP Claims in Section 4.15 of the Proposed Plan.  If it does not, the Debtors must set forth their legal basis for attempting to extinguish the DMPs' rights to seek recoveries from insurance proceeds.

90.    ***Second***, the Disclosure Statement must also disclose additional information on the scope of available insurance coverage.[63]  The Debtors should include a detailed explanation in the Disclosure Statement of the nature and extent of their insurance coverage and the expected issues in dispute in the Insurance Action.

**D.    The Disclosure Statement Fails To Provide Adequate Information With Respect To The DMP Non-Consensual Release The Shareholder Settlement, The Shareholder Releases, The Shareholder Released Parties And Shareholder Claim Rights.**

91.    The Proposed Plan provides for disparate treatment of the DMPs by way of the DMP Non-Consensual Release.

92.    The Debtors should be required to include in the Disclosure Statement the legal bases they rely upon to eviscerate the DMPs' Defensive Rights.  The DMPs – and creditors voting on the Proposed Plan – need to have sufficient information in order to determine if those bases have any legal merit.

93.    In addition, the information contained in the Disclosure Statement relating to the Shareholder Settlement, Shareholder Release, Shareholder Released Parties and Shareholder

---

[63] The Debtors have already commenced a declaratory judgment action against their insurers on the scope of available coverage.  *See Purdue Pharma L.P., et al. v. AIG Specialty Ins. Co. et al.*, Adv. No. 21-01005 (RDD) (Bankr. S.D.N.Y.) (the "Insurance Action").  The Insurance Action represents that Purdue may have up to $3.3 billion in coverage, which would be a very significant pool of money to satisfy creditor claims.  *See Insurance Action*, Complaint ¶ 6.

31

Claim Rights is not sufficient for Section 1125 purposes.[64] Also, while the Shareholder Settlement Term Sheet is attached to the Disclosure Statement, the "Specified Parties" to be released are not disclosed. Rather, the Shareholder Settlement Term Sheet notes that a "Final List of persons and groups to be agreed subject to additional diligence on the assets of the family in connection with the execution of the Definitive Documents."

94.    It also appears that the "Shareholder Claim Rights" which are claims of the Debtors "arising under or attributable to, any Causes of Action against, or proceeds, payments, benefits or indemnities from the Shareholder Released Parties" are being transferred to the MDT Trust. However, it is unclear whether the Trusts (and their beneficiaries) will receive additional consideration from the Shareholder Released Parties that could result in an additional offset or reduction of liability of the DMPs in the Opioid Litigation.

95.    Finally, it is unclear from the Disclosure Statement whether the Debtors' Canadian affiliates are Related Parties under the Proposed Plan that would be entitled to a release.

96.    For these reasons, the Disclosure Statement, in its current form, does not satisfy the requirements under Section 1125. *See In re Lower Bucks Hosp.*, 471 B.R. 419, 463-64 (Bankr. E.D. Pa. 2012) (subsequent history omitted) (third-party release included as part of debtors' proposed Chapter 11 plan was not adequately disclosed, because disclosure statement (i) did not conspicuously identify the release in accordance with Fed. R. Bankr. P. 3016(b) and (ii) did not give details as to what the releasing parties would be giving up so as to allow parties to make an informed decision).

---

[64] For example, the Shareholder Releases in Section 10.8 of the Proposed Plan and the Shareholder Channeling Injunction in Section 10.9 of the Proposed Plan are each blank, with a note "To Come." Also, while the Shareholder Settlement Term Sheet is attached to the Disclosure Statement, the "Specified Parties." Proposed Plan §§ 10.8, 10.9.

E.      **The Disclosure Statement Fails To Provide Adequate Information With Respect To The Treatment Of Canadian Actions And The Impact Of The Proposed Plan On Canadian Entities.**

97.      The Disclosure Statement fails to adequately describe the treatment of the thirteen Canadian Actions (each of which was stayed following the Petition Date) and the impact of the Proposed Plan on certain Canadian affiliates of the Debtors, including Purdue Pharma Inc., Purdue Frederick Inc., and Purdue Pharma L.P. (the "Canadian Entities").  This disclosure is important for all creditors, but particularly for those (including certain of the DMPs) who are co-defendants or counterparties in the Canadian Actions.

98.      ***First,*** the Canadian Actions were each stayed based on representations made by the Canadian Entities in those actions that, *inter alia*, "it is anticipated that each of [the Canadian Entities] will assist the Chapter 11 Debtors in reaching a potential global resolution of all claims against the parties, including the Canadian Litigation."[65]  Yet, the Disclosure Statement does not provide any substantive detail regarding the Canadian Actions, mentioning them only twice, once as part of a broader discussion of the pre-petition events, and once in connection in describing a prepetition settlement.[66]  The Disclosure Statement provides no information regarding whether the Canadian Actions will be continued or settled in connection with the Plan, which is particularly concerning given that the Disclosure Statement suggests that the assets of the Canadian Entities may be used to satisfy claims and that the Canadian Entities will receive a full release under the Plan.

99.      ***Second***, the Disclosure Statement does not provide information regarding the identity of the non-United States pharmaceutical companies which are independent associated

---

[65] Application Record of Purdue Pharma L.P., Court File No. CV-19-627656-00CL ("Application Record"), Affidavit of Lee Nicholson sworn September 18, 2019 ("Nicholson Affidavit"),Tab 2, page 22 at para. 20.

[66] Disclosure Statement Arts. II.D; IV.C.10.

companies of the Sackler Families, which entities the Disclosure Statement states will be sold by the Sackler Parties to fund the Master Distribution Trust.  In particular, the Disclosure Statement fails to state whether any of the Canadian Entities are independent associated companies, which independent associated companies are slated to be sold, and whether any of the independent associated companies will continue to operate.  This is critical information for creditors, because to the extent the Debtors propose to sell the Canadian Entities to fund the Master Distribution Trust, that will deprive Canadian creditors of recourse to the assets of the Canadian Entities and would be contrary to Canadian insolvency law.

## **CONCLUSION**

WHEREFORE, the DMPs respectfully request this Court (i) deny approval of the

Disclosure Statement; and (ii) grant such other further relief as this Court deems just and proper.


Dated: April 23, 2021

*/s/ Michael H. Goldstein*
**GOODWIN PROCTER LLP**
Michael H. Goldstein
William P. Weintraub
Howard S. Steel
Barry Z. Bazian
Stacy Dasaro
Artem Skorostensky
The New York Times Building
620 Eighth Avenue
New York, New York 10018
Tel: (212) 813-8840
Fax: (212) 409-8404
Email: mgoldstein@goodwinlaw.com
            wweintraub@goodwinlaw.com
            hsteel@goodwinlaw.com
            bbazian@goodwinlaw.com
            sdasaro@goodwinlaw.com
            askorostensky@goodwinlaw.com

*Counsel for Teva Pharmaceuticals USA, Inc.
and Related Entities*

*/s/ Claudia Z. Springer*
**REED SMITH LLP**
Christopher A. Lynch
599 Lexington Avenue
New York, New York 10022-7650
Tel: (212) 521-5400
Fax: (212) 521-5450
Email: clynch@reedsmith.com


-and-


**REED SMITH LLP**
Claudia Z. Springer (*admitted Pro Hac Vice*)
Three Logan Square
1717 Arch Street, Suite 3100
Philadelphia, Pennsylvania 19103
Tel: (215) 851-8100
Fax: (215) 851-1420
Email: cspringer@reedsmith.com

-and-


**CRAVATH, SWAINE & MOORE LLP**
Michael T. Reynolds
Worldwide Plaza
825 Eighth Avenue
New York, New York 10019
Tel: (212) 474 - 1552
Fax: (212) 474 - 3700
Email: mreynolds@cravath.com

*Counsel for AmerisourceBergen Drug Corporation*

/s/ Douglas K. Mayer

**WACHTELL, LIPTON, ROSEN & KATZ**

Richard G. Mason
Douglas K. Mayer
Elaine P. Golin
Angela K. Herring
51 W. 52nd St.
New York, New York 10019
Tel: (212) 403-1000
Fax:  (212) 403-2000
Email: RGMason@wlrk.com
         DKMayer@wlrk.com
         EPGolin@wlrk.com
         AKHerring@wlrk.com

*Counsel for Cardinal Health, Inc. and Related Entities*

/s/Geoffrey S. Goodman

**FOLEY & LARDNER LLP**

Geoffrey S. Goodman
321 N. Clark Street, Suite 2800
Chicago, Illinois 60654-5313
Tel: (312) 832-4500
Fax: (312) 832-4700
E-mail: ggoodman@foley.com

-and-

**FOLEY & LARDNER LLP**

Leah M. Eisenberg, Esq.
90 Park Avenue
New York, New York 10016
Tel: (212) 682-7474
Fax: (713) 276-6727
E-mail: leisenberg@foley.com

*Counsel for CVS Pharmacy, Inc. and its Related Entities*

/s/ Catherine Steege

**JENNER & BLOCK LLP**

Catherine Steege
Melissa Root
353 N. Clark Street
Chicago, Illinois 60654
Tel: (312) 222-9350
Email: csteege@jenner.com
         mroot@jenner.com

-and-

**JENNER & BLOCK LLP**

Richard Levin
919 Third Avenue
New York, New York 10022-3908
Tel: (212) 891-1600
Email: rlevin@jenner.com

*Counsel for McKesson Corporation and Related Entities*

/s/ Evan M. Jones

**O'MELVENY & MYERS LLP**

Evan M. Jones (admitted *pro hac vice*)
400 South Hope Street
Los Angeles, California 90071
Tel: (213) 430-6000
Email: ejones@omm.com

-and-

**O'MELVENY & MYERS LLP**

Nathaniel Asher
Adam P. Haberkorn
7 Times Square
New York, New York  10036
Tel: (212) 326-2000
Email: nasher@omm.com
         ahaberkorn@omm.com

*Counsel for Johnson & Johnson, Janssen Pharmaceuticals, Inc., Ortho-McNeil- Janssen Pharmaceuticals, Inc. n/k/a Janssen Pharmaceuticals, Inc., Janssen Pharmaceutica, Inc. n/k/a Janssen Pharmaceuticals, Inc., Alza Corporation, Janssen Ortho LLC, and Janssen Inc.*

*/s/ Norman L. Pernick*
**COLE SCHOTZ P.C.**
Norman L. Pernick
500 Delaware Avenue, Suite 1410
Wilmington, Delaware 19801
Tel: (302) 652-3131
Fax: (302) 652-3117
Email: npernick@coleschotz.com


-and-

**COLE SCHOTZ P.C.**
David M. Bass
1325 Avenue of the Americas, 19th Floor
New York, New York 10019
Tel: (212) 752-8000
Fax: (212) 752-8393
Email: dbass@coleschotz.com

*Counsel for Endo International plc and its
Related Entities*


*/s/ Joseph D. Frank*
**FRANKGECKER LLP**
Joseph D. Frank (admitted *pro hac vice*)
Jeremy C. Kleinman (admitted *pro hac vice*)
1327 W. Washington Blvd., Suite 5 G-H
Chicago, Illinois  60607
Tel: (312) 276-1400
Fax: (312) 276-0035
Email: jfrank@fgllp.com
        jkleinman@fgllp.com

*Counsel for Walgreen Co., Walgreen Eastern
Co., Inc. and Walgreen Arizona Drug Co.*


*/s/ Jeremy W. Ryan*
**POTTER ANDERSON & CORROON LLP**
Jeremy W. Ryan, Esq.
Aaron H. Stulman, Esq.
D. Ryan Slaugh, Esq.
1313 N. Market Street, Sixth Floor
Wilmington, Delaware 19801
Tel: (302) 984-6000
Fax: (302) 658-1192
Emails: jryan@potteranderson.com
        astulman@potteranderson.com
        rslaugh@potteranderson.com

*Counsel for Walmart Inc.*


*/s/ Mark S. Indelicato*
**HAHN & HESSEN LLP**
Mark S. Indelicato, Esq.
488 Madison Avenue
New York, New York 10022
Tel: (212) 478-7200
Fax: (212) 478-7400
E-mail: mindelicato@hahnhessen.com

*Counsel for Mylan Inc., Mylan Pharmaceuticals Inc.,
Mylan Technologies Inc., Mylan Specialty L.P., Mylan
Bertek Pharmaceuticals Inc., Mylan Pharmaceuticals
ULC, BGP Pharma ULC, and Viatris Inc. (successor-
in-interest to Mylan N.V.)*

*/s/ Ryan A. Wagner*
**GREENBERG TRAURIG, LLP**
Ryan A. Wagner
200 Park Avenue
New York, NY 10166
Telephone: 212.801.3191
Email: wagnerr@gtlaw.com

*Counsel for Sandoz Inc.*

*/s/ Henry J. Jaffe*
**TROUTMAN PEPPER HAMILTON
SANDERS LLP**
Henry J. Jaffe (admitted *pro hac vice*)
Marcy J. McLaughlin Smith (admitted *pro hac
vice*)
Hercules Plaza
1313 N. Market Street, Suite 5100
P.O. Box 1709
Wilmington, Delaware 19899-1709
Tel: (302) 777-6500
Fax: (302) 421-8390
Email: Henry.Jaffe@troutman.com
            Marcy.Smith@troutman.com

-and-

**TROUTMAN PEPPER HAMILTON
SANDERS LLP**
Suzanne Forbis Mack (*pro hac vice* to be filed)
3000 Two Logan Square
Eighteenth and Arch Streets
Philadelphia, Pennsylvania 19103
Tel: (215) 981-4000
Fax: (215) 981-4750
Email: Suzanne.Mack@troutman.com

-and-

*/s/ G. Robert Gage, Jr.*
**GAGE SPENCER & FLEMING LLP**
G. Robert Gage, Jr.
410 Park Avenue
New York, New York 10022
Tel: 212-768-4900
Fax: 212-768-3629
Email: grgage@gagespencer.com

*Counsel for Allergan Finance, LLC, Allergan Limited,
Allergan Sales, LLC, Allergan USA, Inc., Allergan, Inc.,
Warner Chilcott Sales (US), LLC, and AbbVie Inc.*

*/s/ Reuel D. Ash*
**ULMER & BERNE LLP**
Reuel D. Ash (0055843)
600 Vine Street, Suite 2800
Cincinnati, Ohio  45202
Tel: (513) 698-5118
Fax: (513) 698-5119
Email: rash@ulmer.com

*Counsel for Amneal Pharmaceuticals LLC, Amneal
Pharmaceuticals of New York, LLC, Impax
Laboratories, Inc. and Impax Laboratories, LLC*

*/s/ Gregory Gartland*
**WINSTON & STRAWN, LLP**
Gregory Gartland
200 Park Avenue
New York, New York 10166
Tel: (212) 294-2693
Email: ggartland@winston.com

*Counsel for Hikma Pharmaceuticals USA Inc. f/k/a
West-Ward Pharmaceuticals Corp.*

38

**TROUTMAN PEPPER HAMILTON
SANDERS LLP**
Alissa K. Piccione
875 Third Avenue
New York, NY 10022
Tel: (212) 704-6000
Fax: (212) 704-6288
Email: Alissa.Piccione@troutman.com

*Counsel for Sun Pharmaceuticals Canada, Inc.,
Sun Pharmaceutical Industries, Inc., and
Ranbaxy Pharmaceuticals Canada Inc.*

*/s/ Thomas E. Rice*
**BAKER STERCHI COWDEN & RICE LLC**
Thomas E. Rice
2400 Pershing Road, Suite 500
Kansas City, Missouri 64108-2533
Tel: 816-471-2121
Email: rice@bscr-law.com

*Counsel for KVK - Tech, Inc*

*/s/ John P. McDonald*
**LOCKE LORD LLP**
John P. McDonald (*admitted pro hac vice*)
Brandan J. Montminy (*admitted pro hac vice*)
2200 Ross Avenue, Suite 2800
Dallas, TX 75201
Tel: (214) 740-8000
Fax: (214) 740-8800
Email: jpmcdonald@lockelord.com
        brandan.montminy@lockelord.com

*Counsel for Henry Schein, Inc.; Henry Schein
Medical Systems, Inc.; Insource, Inc.; and
General Injectables & Vaccines, Inc.*

## EXHIBIT A[1]

### Distributors, Manufacturers and Pharmacies

***AbbVie***
- AbbVie Inc.

***Allergan***
- Allergan Limited f/k/a Allergan plc f/k/a Actavis plc
- Allergan Finance, LLC f/k/a Actavis, Inc. f/k/a Watson Pharmaceuticals, Inc.
- Allergan Sales, LLC
- Allergan USA, Inc.
- Allergan, Inc.
- Warner Chilcott Sales (US), LLC

***AmerisourceBergen***
- AmerisourceBergen Drug Corporation, in its individual capacity
- AmerisourceBergen Drug Corporation, as successor in interest to Bellco Drug Corp.
- Integrated Commercialization Solutions, Inc.
- American Medical Distributors, Inc.
- AmerisourceBergen Corporation
- J.M. Blanco, Inc.
- MWI Veterinary Supply, Inc.
- PharMEDium Services, LLC
- H.D. Smith Holdings LLC
- H.D. Smith, LLC
- Valley Wholesale Drug Co., LLC

***Amneal***
- Amneal Pharmaceuticals of New York, LLC
- Amneal Pharmaceuticals LLC

***Impax Laboratories***
- Impax Laboratories, Inc.
- Impax Laboratories, LLC

***Cardinal***
- Cardinal Health, Inc.
- Cardinal Health 3, LLC
- Cardinal Health 3, Inc.
- Cardinal Health 5, LLC
- Cardinal Health 6 Inc. (f/k/a Physicians Purchasing, Inc.)

---

[1] The DMPs reserve all rights to modify, amend, and/or supplement this **Exhibit A** from time to time. Information regarding the claims filed by each DMP can be found in the DMPs' respective proofs of claim.

- Cardinal Health 100, Inc.
- Cardinal Health 103, Inc.
- Cardinal Health 104 LP
- Cardinal Health 105, Inc. (d/b/a Specialty Pharmaceutical Services)
- Cardinal Health 106, Inc.
- Cardinal Health 107, LLC
- Cardinal Health 107 Inc.
- Cardinal Health 108, LLC (f/k/a Cardinal Health 108, Inc.) (d/b/a Specialty Pharmaceutical Distribution) (d/b/a Metro Medical Supply)
- Cardinal Health 110, LLC (d/b/a Gen-Source RX) (f/k/a Cardinal Health 110, Inc.)
- Cardinal Health 112, LLC
- Cardinal Health 113, Inc.
- Cardinal Health 113, LLC
- Cardinal Health 122, LLC (f/k/a P4 Healthcare, LLC)
- Cardinal Health 132, LLC
- Cardinal Health 200, LLC
- Cardinal Health 201, LLC
- Cardinal Health 201, Inc.
- Cardinal Health 411, Inc.
- Cardinal Health 414, LLC
- Cardinal Health P.R. 120, Inc. (f/k/a Borschow Hospital & Medical Supplies, Inc.)
- Cardinal Health Pharmacy Services, LLC
- Dik Drug Company, LLC
- The Harvard Drug Group, L.L.C. (d/b/a Major Pharmaceuticals) (d/b/a Rugby Laboratories)
- Kinray, LLC (f/k/a Kinray, Inc.)
- Kinray I LLC
- ParMed Pharmaceuticals, LLC (f/k/a Parmed Pharmaceuticals, Inc.)

### *CVS*
- CVS Caremark Part D Services, L.L.C.
- Caremark PCS Health, L.L.C.

### *Endo*
- Endo International plc
- Endo Health Solutions Inc.
- Endo Pharmaceuticals Inc.
- Par Pharmaceutical, Inc.
- Par Pharmaceutical Companies, Inc.
- Endo Generics Holdings, Inc.
- Vintage Pharmaceuticals, LLC
- Generics Bidco I, LLC
- DAVA Pharmaceuticals, LLC
- Paladin Labs Inc.

### *Henry Schein*
- Henry Schein, Inc.
- Henry Schein Medical Systems, Inc.
- Insource, Inc.
- General Injectables & Vaccines, Inc.

### *Hikma*
- Hikma Pharmaceuticals USA Inc.
- Boehringer Ingelheim Corp.
- Baxter Healthcare Corp.

### *Johnson & Johnson*
- Johnson & Johnson
- Janssen Pharmaceuticals, Inc.
- Ortho-McNeil-Janssen Pharmaceuticals, Inc. n/k/a Janssen Pharmaceuticals, Inc.
- Janssen Pharmaceutica, Inc. n/k/a Janssen Pharmaceuticals, Inc.
- Alza Corporation
- Janssen Ortho LLC
- Janssen Inc.

### *KVK-Tech*
- KVK - Tech, Inc.

### *McKesson*
- McKesson Corporation
- McKesson Canada Corporation
- McKesson Medical Surgical Inc.
- Health Mart Systems, Inc.
- PSS World Inc.
- McKesson Specialty Care Distribution Corporation
- McKesson Specialty Distribution, LLC
- McKesson Medical-Surgical Minnesota Supply Inc.

### *Mylan*
- Mylan Inc.
- Viatris Inc. successor-in-interest to Mylan N.V.
- Mylan Pharmaceuticals Inc.
- Mylan Institutional Inc.
- Mylan Technologies Inc.
- Mylan Specialty L.P.
- Mylan Bertek Pharmaceuticals Inc.
- Mylan Pharmaceuticals ULC
- BGP Pharma ULC

### *Sandoz*
- Sandoz Inc.

### *Sun Pharmaceuticals*
- Sun Pharmaceuticals Canada, Inc.
- Sun Pharmaceutical Industries, Inc.
- Ranbaxy Pharmaceuticals Canada Inc.

### *Teva*
- Teva Pharmaceuticals USA, Inc.
- Cephalon, Inc.
- Cupric Holding Co., Inc.
- Teva Canada Limited
- Teva Pharmaceutical Holdings Cooperative U.A.
- Teva Pharmaceuticals Europe B.V.
- Teva Sales and Marketing, Inc.
- Teva Branded Pharmaceutical Products R&D, Inc.
- Anda, Inc.
- Anda Pharmaceuticals, Inc.
- Anesta LLC
- Barr Laboratories Inc.
- Teva Biopharmaceuticals USA, Inc.
- Anda Marketing Inc.
- Actavis Pharma, Inc.
- Actavis LLC
- Actavis South Atlantic LLC
- Actavis Mid Atlantic LLC
- Actavis Totowa LLC
- Actavis Elizabeth LLC
- Actavis Kadian LLC
- Watson Laboratories, Inc.
- Teva Puerto Rico LLC
- Actavis Laboratories UT, Inc.
- Actavis Laboratories FL, Inc.
- Cobalt Pharmaceuticals Inc.

### *Walgreens*
- Walgreen Co.
- Walgreen Eastern Co., Inc.
- Walgreen Arizona Drug Co.

### *Walmart*
- Walmart Inc.