**BINDER & SCHWARTZ LLP**

366 Madison Avenue, 6th Floor

New York, New York 10017

Telephone: (212) 510-7008

Facsimile: (212) 510-7299

Eric B. Fisher

*Attorneys for the Public School District Creditors*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re:<br><br>**PURDUE PHARMA L.P.,** *et al.,*<br><br>              **Debtors.**[1] | Chapter 11<br><br>Case No. 19-23649 (RDD)<br><br>(Jointly Administered) |

**OBJECTION OF THE PUBLIC SCHOOL DISTRICT CREDITORS**
**TO DEBTORS' MOTION TO APPROVE (I) THE ADEQUACY OF**
**INFORMATION IN THE DISCLOSURE STATEMENT,**
**(II) SOLICITATION AND VOTING PROCEDURES, (III) FORMS OF BALLOTS,**
**NOTICES AND NOTICE PROCEDURES IN CONNECTION THEREWITH, AND**
**(IV) CERTAIN DATES WITH RESPECT THERETO**

---

[1] The Debtors in these cases, along with the last four digits of each Debtor's registration number in the applicable jurisdiction, are as follows: Purdue Pharma L.P. (7484), Purdue Pharma Inc. (7486), Purdue Transdermal Technologies L.P. (1868), Purdue Pharma Manufacturing L.P. (3821), Purdue Pharmaceuticals L.P. (0034), Imbrium Therapeutics L.P. (8810), Adlon Therapeutics L.P. (6745), Greenfield BioVentures L.P. (6150), Seven Seas Hill Corp. (4591), Ophir Green Corp. (4594), Purdue Pharma of Puerto Rico (3925), Avrio Health L.P. (4140), Purdue Pharmaceutical Products L.P. (3902), Purdue Neuroscience Company (4712), Nayatt Cove Lifescience Inc. (7805), Button Land L.P. (7502), Rhodes Associates L.P. (N/A), Paul Land Inc. (7425), Quidnick Land L.P. (7584), Rhodes Pharmaceuticals L.P. (6166), Rhodes Technologies (7143), UDF L.P. (0495), SVC Pharma L.P. (5717) and SVC Pharma Inc. (4014). The Debtors' corporate headquarters is located at One Stamford Forum, 201 Tresser Boulevard, Stamford, CT 06901.

# TABLE OF CONTENTS

*Page*

TABLE OF AUTHORITIES .................................................................................. iii

PRELIMINARY STATEMENT .......................................................................... 1

BACKGROUND ................................................................................................ 6

PROCEDURAL HISTORY ................................................................................ 8

    A.    The Bankruptcy .................................................................................... 8

    B.    The Creditors' Committee .................................................................... 9

    C.    The Class Action .................................................................................. 10

    D.    The Mediation ...................................................................................... 10

    E.    The Motion For Leave To File Class Proof Of Claim ........................... 12

    F.    The Public School District Creditors' Claims ...................................... 12

    G.    The Proposed Plan of Reorganization .................................................. 13

OBJECTION ....................................................................................................... 13

I.    The Disclosure Statement Fails To Provide Adequate Information ................................. 13

    A.    The Terms Of The Sackler Settlement Agreement Must Be Disclosed ............... 14

        1.    The Disclosure Statement Does Not Identify The "Sackler" Individuals And Entities That Would be Released. ...................................... 15

        2.    The Disclosure Statement Fails To Specify The Claims That Would Be Released. ......................................................................... 16

        3.    The Disclosure Statement Provides Creditors With No Basis To Evaluate The Adequacy Of The Contributions Of The Sackler Parties. ................. 16

        4.    The Disclosure Statement Does Not Adequately Describe The Proposed Restrictions On The Sackler Parties. ...................................... 17

    B.    The Procedure For Allocating NOAT Distributions Is Inadequately Disclosed .. 18

    C.    The Scope Of The Claim Holders' Releases Against The Debtors' "Related Parties" Is Inadequately Disclosed ...................................... 20

II.    The Plan Is Unconfirmable As Written ......................................................... 22

i

A.    The Terms Of The Sackler Release Remain Unwritten........................................ 23

B.    The Claim Holders' Release Provisions Are Impermissibly Overbroad ............. 27

C.    The Plan Improperly Classifies Dissimilar Claims Together .............................. 28

III.    The Proposed Discovery Schedule Is Unreasonable ........................................................ 30

CONCLUSION.................................................................................................................................... 31

# TABLE OF AUTHORITIES

*Page(s)*

## CASES

*Aetna Cas. & Surety Co. v. Clerk, U.S. Bankr. Ct.* (*In re Chateaugay Corp.*),
  89 F.3d 942 (2d Cir. 1996) ..................................................................... 28

*Bd. of Educ. of City of Chicago v. Cephalon, Inc.*,
  No. 19-op-46042 (N.D. Ohio Nov. 20, 2019) ......................................... 10

*BSL Operating Corp. v. 125 E. Taverns, Inc. (In re BSL Operating Corp.)*,
  57 B.R. 945 (Bankr. S.D.N.Y. 1986) ...................................................... 13

*County of Genesee v. McKinsey & Co., Inc.*,
  No. 2:21-cv-01039-JS-SIL (E.D.N.Y. Feb. 25, 2021) ............................ 21

*Deutsche Bank AG v. Metromedia Fiber Network, Inc. (In re Metromedia Fiber
  Network, Inc.)*,
  416 F.3d 136 (2d Cir. 2005) ........................................................ 24, 25, 26

*Gillman v. Cont'l Airlines (In re Cont'l Airlines)*,
  203 F.3d 203 (3rd Cir. 2000) ............................................................ 23, 25

*Holland Indus., Inc. v. United States (In re Holland Indus., Inc.)*,
  103 B.R. 461 (Bankr. S.D.N.Y. 1989) .................................................... 26

*In re Aegean Marine Petroleum Network, Inc.*,
  599 B.R. 717 (Bankr. S.D.N.Y. 2019) ..................................... 23, 24, 25, 26

*In re Digital Impact, Inc.*,
  223 B.R. 1 (Bankr. N.D. Okla. 1998) ......................................... 23, 24, 26

*In re Draiman*,
  450 B.R. 777 (Bankr. N.D. Ill. 2011) ............................................... 27, 28

*In re Ferretti*,
  128 B.R. 16 (D.N.H. 1991) ..................................................................... 18

*In re Filex, Inc.*,
  116 B.R. 37 (Bankr. S.D.N.Y. 1990) ...................................................... 22

*In re FirstEnergy Sols. Corp.*,
  606 B.R. 720 (Bankr. N.D. Ohio 2019) ....................................... 22, 24, 27

*In re Lower Bucks Hosp.*,
  488 B.R. 303 (E.D. Pa. 2013) ................................................................. 14

*In re Lower Bucks Hosp.*,
    471 B.R. 419 (Bankr. E.D. Pa. 2012) ............................................................................ 14, 16

*In re Nat'l Prescription Opiate Consultant Litig.*,
    MDL No. 2996 (J.P.M.L. Mar. 5, 2021) ................................................................................ 21

*In re U.S. Truck Co., Inc.*,
    42 B.R. 790 (Bankr. E.D. Mich. 1984) ................................................................................ 28

*Momentum Mfg. Corp. v. Emp. Creditors Comm. (In re Momentum Mfg. Corp.)*,
    25 F.3d 1132 (2d Cir. 1994) ............................................................................................ 13, 15

*Pape v. Bd. of Educ. of Wappingers Cent. Sch. Dist.*,
    No. 07 Civ. 8828(ER), 2013 WL 3929630 (S.D.N.Y. July 30, 2013) .................................... 6

*Stern v. Marshall*,
    564 U.S. 462 (2011) ....................................................................................................... 23, 24

## STATUTES

11 U.S.C. § 1122 ........................................................................................................................ 28

11 U.S.C. § 1125 ................................................................................................................... 13, 14

11 U.S.C. § 1129 ................................................................................................................... 28, 30

11 U.S.C. § 524 .......................................................................................................................... 23

18 U.S.C. § 1964 ........................................................................................................................ 13

20 U.S.C. § 1401 .......................................................................................................................... 6

20 U.S.C. § 1412 .......................................................................................................................... 6

28 U.S.C. § 157 .......................................................................................................................... 23

29 U.S.C. § 794 ............................................................................................................................ 6

## RULES AND REGULATIONS

34 C.F.R. § 104 ............................................................................................................................ 6

Fed. R. Bankr. P. 3016 ............................................................................................................... 14

## OTHER AUTHORITIES

Boston Herald Wire Servs., *Victims of opioid addiction part of bankruptcy committee in Purdue
    Pharma case*, Boston Herald (Oct. 6, 2019) ............................................................................ 9

Evie Blad, *Why the Feds Still Fall Short on Special Education Funding*, EducationWeek (Jan. 10, 2020)...................................................................................................... 7

Jason W. Harbour & Tara L. Elgie, *The 20-Year Split: Nonconsensual Nondebtor Releases*, 21 Norton J. Bankr. L. & Prac. 4 Art. 4 (July 2012)............................................... 23

Mary-Margaret A. Fill, et al., *Educational Disabilities Among Children Born with Neonatal Abstinence Syndrome*, Official J. of the Am. Acad. of Pediatrics (Sept. 2018) ...................... 7

Nat'l Council on Disability, *Broken Promises: The Underfunding of IDEA* (Feb. 7, 2018).......... 7

Nat'l Ctr. For Educ. Statistics, 2020 Digest of Educ. Statistics, Table 214.10 ............................ 9

Paul L. Morgan & Yangyang Wang, *The Opioid Epidemic, Neonatal Abstinence Syndrome, and Estimated Costs for Special Education Services*, Am J. Managed Care (July 30, 2019) .. 7

Press Release, House Comm. on Oversight and Reform, *Committee Releases Documents Showing Sackler Family Wealth Totals $11 Billion* (Apr. 20, 2021) ..................................... 17

Press Release, House Comm. on Oversight and Reform, *Maloney, DeSaulnier Introduce SACKLER Act to Prevent Bad Actors from Evading Responsibility Through Bankruptcy Proceedings* (Mar. 19, 2021) ................................................................................. 17

The Baltimore City Board of School Commissioners, the Board of Education of Miami-Dade County Public Schools, and the Board of Education of Thornton Township High School District 205, together with the other public school districts identified in Exhibit A to this objection (collectively, the "Public School District Creditors"), in their individual and representative capacities, by and through undersigned counsel, respectfully submit this objection (the "Objection") to the Disclosure Statement for Chapter 11 Plan for Purdue Pharma L.P. and its Affiliated Debtors (the "Disclosure Statement") (ECF No. 2488) and the Debtors' Motion to Approve (I) the Adequacy of Information in the Disclosure Statement, (II) Solicitation and Voting Procedures, (III) Forms of Ballots, Notices and Notice Procedures in Connection Therewith, and (IV) Certain Dates with Respect Thereto (the "Motion") (ECF No. 2489).  To the extent that the Objection also concerns the dates for plan confirmation discovery set forth in the proposed order submitted by the Debtors, the Objection is also filed in opposition to Debtors' Motion for Order Establishing Confirmation Schedule and Protocols (ECF No. 2536).

## PRELIMINARY STATEMENT

> *"The whole people must take upon themselves the education of the whole people and must be willing to bear the expenses of it. There should not be a district of one mile square without a school in it, not founded by a charitable individual but maintained at the expense of the people themselves."*

John Adams, Letter to John Jebb (Sept. 10, 1785)

1.    America's public schools stand at the front lines of the opioid crisis, and America's public schools are uniquely positioned to address its effects.  Through properly funded special education and supplemental education services, public schools can deliver direct and immediate assistance to meet the developmental and educational challenges faced by children impacted by opioids.  Without such support, many of these children will struggle to succeed in school, putting them at risk for the remainder of their lives:  low educational

1

attainment is directly associated with increased rates of arrest and incarceration, unemployment and low wages, reliance on public health services, and dependence on public cash, food, and housing assistance programs.  Because early intervention in the public schools can help avert these outcomes, abatement efforts led by the public schools promise to have a salutary multiplier effect, reducing the amounts that other governmental claimants might otherwise need to spend on public assistance, criminal justice, and public health.  The allocation of adequate funding to the public schools—for the maintenance, expansion, and improvement of educational services for children affected by opioids—is therefore an essential component of any effective abatement plan.

2.    The Public School District Creditors—a broad and varied cross-section of the nation's public school districts, ranging from the urban to the rural, the large to the small—bring this objection not only to oppose the Disclosure Statement but to sound an alarm.  The Debtors have proposed a plan of reorganization (the "Plan") that denies public schools any genuine prospect of funding.  Worse yet, the Plan contemplates controversial and far-reaching releases that would cut off any prospect of alternate recovery to public school districts by extinguishing their present and future claims against culpable non-debtor third parties, including members of the Sackler family.  The Disclosure Statement filed by the Debtors does nothing to allay the Public School District Creditors' growing concern that the educational needs of opioid-impacted children have not received, and may never receive, a fair hearing.  Not only does the Disclosure Statement contain scarcely a word of reference to America's public schools, but it offers no assurance that America's public school districts will receive any funding at all in exchange for the extraordinary releases that the Plan seeks to impose.

2

3.       The educational needs of opioid-impacted children have had no champion in this reorganization other than the public school districts themselves, and at every step of the way, the interests of the public school districts have been sidelined or overlooked, and their efforts to be heard have been effectively blocked.  Despite the Debtors' substantial efforts to disseminate notice far and wide, only a small handful of the nation's over 13,000 public school districts were included in the Debtors' direct mail initiative, and the supplemental mass media campaign overwhelmingly targeted *individuals* harmed directly or indirectly by opioids.  It was as if the Debtors did not recognize the existence of the public schools as a separate constituency with a stake in the bankruptcy.  This failure to acknowledge the unique needs of the public schools has persisted throughout the reorganization process.

4.       The public school districts have nevertheless persisted in seeking to make their voices heard in the proceedings.  The public school districts affirmatively petitioned for permission to submit their claims to mediation and in April 2020 were granted leave by this Court to do so.  As the mediators recognized, the public school districts participated in good faith in the mediation process, but despite the mediators' best efforts to achieve a comprehensive resolution, the needs of the public schools were unresolved.

5.       This Court has made it clear that it is never too late to achieve an amicable resolution, and consistent with this guidance, the Public School District Creditors remain open to resuming mediation efforts.  Indeed, in the months since the conclusion of the mediation, and with the support and encouragement of the mediators, the Public School District Creditors have continued to reach out to the Debtors and other creditor parties in the hopes of achieving a consensual agreement.  To date, however, no resolution has been reached.  The Public School District Creditors' ongoing efforts to engage constructively have been broadly rebuffed, and their

3

call for a dedicated allocation to meet the educational needs of opioid-impacted children has gone unheard.  Indeed, the Debtors have affirmatively excluded the Public School District Creditors from negotiations with regard to the abatement plan.

6.      Reading between the lines of the Disclosure Statement, it appears that the Debtors propose to channel public school district claims into an abatement trust.  This arrangement may create the superficial impression that public school districts can expect to receive a fair share of abatement funding, but in fact the public schools are not guaranteed any voice at all in the allocation decisions.  Indeed, it is the understanding of the Public School District Creditors that the States and the Multistate Governmental Entities Group (the "MSGE Group") have already reached an allocation agreement that effectively excludes the Public School District Creditors, creating an undisclosed barrier to recovery.  Adding insult to injury, the Plan would release and enjoin public school districts' claims against numerous third parties—including but not limited to Sackler family members and related entities—with no assurance that funding will be allocated to the educational needs of opioid-impacted children.  If the Public School District Creditors are being asked to relinquish their rights to redress in exchange for what may be no consideration at all, then the Disclosure Statement should say so in plain English.

7.      The Disclosure Statement is remarkable for just how little it reveals about key aspects of the reorganization plan.  Top of the list, of course, is the release of the Sacklers and related non-debtor entities, which is clearly the most controversial feature of the proposed plan.  And yet its terms remain undisclosed and, in fact, may still be in negotiation.  The Debtors ask the creditors to accept on blind faith that if the reorganization is to succeed, the Sacklers and related entities must be permitted to immunize themselves from full accountability.  But the Disclosure Statement fails to provide even the most rudimentary information about the terms of

4

the release, including the scope and estimated value of the claims that creditors would be forced

to trade away.  In its current form, the Disclosure Statement does not even spell out exactly who

is to be released and exactly who is to do the releasing.  In order to meaningfully assess the

fairness of the proposed non-debtor releases, creditors are also entitled to know not only how

much the Sackler families and related parties are *willing* to pay, but also how much more they

may be *able* to pay.

8.      That is not all that the Debtors leave out.  According to the Disclosure Statement,

the task of allocating funds to state and local abatement programs is to be centralized under a

National Opioid Abatement Trust ("NOAT"), into which the claims of the Public School District

Creditors would be channeled.  But the Disclosure Statement is all but silent as to the NOAT's

decision-making procedures and distribution priorities.  It does not explain how the NOAT will

go about allocating its limited funds among the various abatement programs.  Most importantly

here, the Disclosure Statement provides the Public School District Creditors with no means of

assessing whether educational programs and services in the public schools will receive anything

even approaching a fair share of the funding under the proposed plan of reorganization.  The

Disclosure Statement gives no assurance that America's public schools districts will receive *any*

funds at all.

9.      For these reasons and the reasons set forth below, the Public School District

Creditors are constrained to object to the Disclosure Statement.  The Disclosure Statement is

fatally deficient, not only because it omits so much essential information, but also because it

rests on a reorganization plan that is manifestly unconfirmable as written.  Public school districts

are being asked to relinquish their potential rights to recovery against the Sacklers—as well as

related non-debtors—on terms that cannot be reviewed because they have not even been

disclosed.  What little is known about the proposed releases suggests that they may exceed the powers of this Court to curtail creditors' rights to bring claims against non-debtors.

10.    And what, exactly, is being offered to the Public School District Creditors in return?  The Plan offers no assurance that educational programs for opioid-impacted children will receive any funding at all.  Public school districts cannot reasonably be expected to trade away their right to redress from the Sacklers (and other responsible third parties) in exchange for what amounts, at best, to a hope and a prayer that some consideration might be given to the developmental and educational needs of children impacted by opioids.  America's public schools are entitled to more.

## BACKGROUND

11.    America's public schools operate under a federal mandate, imposed by the Individuals with Disabilities Education Act ("IDEA"), to identify children with special needs and to provide them, at public expense, with free and appropriate public education, including "special education and related services" tailored to their unique needs.  *See* 20 U.S.C. §§ 1401(9), 1412(a)(3)(A); *see also Pape v. Bd. of Educ. of Wappingers Cent. Sch. Dist.*, No. 07 Civ. 8828(ER), 2013 WL 3929630, *1 n.3 (S.D.N.Y. July 30, 2013) ("Under the statute, any state receiving federal funds must provide a free appropriate public education . . . to disabled children.").  Section 504 of the Rehabilitation Act of 1973, 29 U.S.C. § 794 (2016), imposes "parallel requirements on schools to provide special education and related services."  *Pape*, 2013 WL 3929630, at *11; *see also* 34 C.F.R. §§ 104.31–104.37 (2000).  The federal mandate is

6

chronically and significantly underfunded, leaving states and school districts to bear the brunt of the shortfall.[2]

12.      For public schools, the funding challenge has been greatly aggravated by the opioid crisis, which has increased—and continues to increase—the number of students needing special education or supplemental educational services.  For example, children who develop Neonatal Abstinence Syndrome ("NAS") as a result of *in utero* opioid exposure have been found significantly more likely than other children to develop subsequent educational disabilities that require special education interventions and services.[3]  Dr. Ira J. Chasnoff, a Professor of Clinical Pediatrics at the University of Illinois College of Medicine, estimates that "[a]t any given time, 30 percent of children born opioid exposed will need and receive special education services."[4] The costs of meeting the developmental and educational needs of children impacted by opioids—including children exposed to opioids *in utero* and children whose lives and families have been otherwise disrupted by opioids—are staggering.  The Public School District Creditors

---

[2] *See generally* Evie Blad, *Why the Feds Still Fall Short on Special Education Funding*, EducationWeek (Jan. 10, 2020), https://www.edweek.org/teaching-learning/why-the-feds-still-fall-short-on-special-education-funding/2020/01 ("[F]ederal funding for what's now known as the Individuals with Disabilities Education Act has consistently fallen short of the target included in the law, leaving state *and local officials on the hook*." (emphasis added)); Nat'l Council on Disability, *Broken Promises: The Underfunding of IDEA* (Feb. 7, 2018), https://ncd.gov/sites/default/files/NCD_BrokenPromises_508.pdf.

[3] *See* Mary-Margaret A. Fill, et al., *Educational Disabilities Among Children Born with Neonatal Abstinence Syndrome*, Official J. of the Am. Acad. of Pediatrics (Sept. 2018), https://pediatrics.aappublications.org/content/142/3/e20180562; *see also* Paul L. Morgan & Yangyang Wang, *The Opioid Epidemic, Neonatal Abstinence Syndrome, and Estimated Costs for Special Education Services*, Am J. Managed Care (July 30, 2019), https://www.ajmc.com/view/opioid-epidemic-neonatal-abstinence-syndrome-estimated-costs-special-education-services ("Children who are prenatally exposed to opioids are about twice as likely as nonexposed children to display intellectual disabilities and mild developmental impairments at 1 year of age.").

[4] *See* Declaration of Dr. Ira J. Chasnoff ¶¶ 1, 7-11 (ECF No. 1211-2).

7

currently estimate additional educational costs attributable to NAS alone well in excess of $127 billion.

13.    America's public schools are uniquely positioned to help abate the opioid crisis. No other creditor constituency can facilitate abatement more effectively than the public schools. Building on existing infrastructure and decades of experience, public schools can deliver expanded education resources directly to children impacted by opioids.  Such early intervention is critical, for lack of educational success places children "at a higher risk for mental and physical illness, substance abuse, unemployment, and other adverse outcomes later in life."[5]  On the other hand, "[e]nrollment in early intervention and special education programs positively affects developmental outcomes," and the benefits of such services "appear to extend into adulthood."[6]

## PROCEDURAL HISTORY

### A.    The Bankruptcy

14.    In September 2019, Purdue Pharma L.P. ("Purdue Pharma") and numerous affiliated debtors (collectively, the "Debtors") filed voluntary petitions for relief in this Court under Chapter 11 of the Bankruptcy Code.

15.    On February 3, 2020, this Court entered an order establishing June 30, 2020 as the general deadline for proofs of claim and approving the form of notice of the bar date.  *See* Order Establishing (I) Deadlines for Filing Proofs of Claim and Procedures Relating Thereto, (II) Approving the Proof of Claim Forms, and (III) Approving the Form and Manner of Notice

---

[5] *See* Fill, *supra* note 3.

[6] *See id*.

Thereof ¶¶ 2-3 (ECF No. 800).[7]  The Court directed that the bar date notice and proof of claim

forms be served by first-class mail on "all creditors and other known holders of claims as of the

date of the Bar Date Order," as well as "all parties known to the Debtors as having potential

claims against the Debtors' estates." *Id.* ¶¶ 18d & 18i (emphasis in original).  On information and

belief, the Debtors mailed written notice of the bar date to only a handful of the over 13,000

public school districts nationwide.[8]

### B.    The Creditors' Committee

16.    On September 27, 2019, the United States Trustee appointed the official

committee of unsecured creditors (the "Creditors' Committee").  *See* Notice of Appointment of

Official Committee of Unsecured Creditors (ECF No. 131).  The initial appointees to the

Creditors' Committee included representatives of the healthcare and insurance industries, as well

as four individuals impacted by the opioid epidemic, but no school district representatives.  *See*

*id*.[9]  On June 18, 2020, certain public school districts were invited to serve on the committee in

an *ex officio* capacity.  *See* Disclosure Statement § III.B.

---

[7] The general bar date was subsequently extended to July 30, 2020.  *See* Order (I) Extending the
General Bar Date for a Limited Period and (II) Approving the Form and Manner of Notice
Thereof (ECF No. 1221).

[8] *See* Nat'l Ctr. For Educ. Statistics, 2020 Digest of Educ. Statistics, Table 214.10, *available at*
https://nces.ed.gov/programs/digest/d20/tables/dt20_214.10.asp (selected school years from
1869-70 through 2018-19).

[9] *See* Boston Herald Wire Servs., *Victims of opioid addiction part of bankruptcy committee in
Purdue Pharma case*, Boston Herald (Oct. 6, 2019),
https://www.bostonherald.com/2019/10/06/victims-of-opioid-addiction-part-of-bankruptcy-
committee-in-purdue-pharma-case/ ("Kara Trainor is a mother of a child born dependent on
opioids. Walter Lee Salmons, a grandfather, is helping raise two affected children. Ryan
Hampton is an activist in recovery from opioid addiction. Cheryl Juaire lost her 23-year-old son
to a heroin overdose after he became addicted to prescription painkillers.").

### C.    The Class Action

17.    On November 20, 2019, the Board of Education of the City of Chicago brought a class action in the U.S. District Court for the Northern District of Ohio, on behalf of "all public school districts which are independent units of government," against more than a dozen manufacturers and distributors of opioids, alleging violations of RICO, statutory consumer fraud and deceptive practices protections, and the common law.  *See* Class Action Complaint ¶¶ 4, 580-697, *Bd. of Educ. of City of Chicago v. Cephalon, Inc.,* No. 19-op-46042 (N.D. Ohio Nov. 20, 2019).  The class action complaint sought, among other things, past and continuing costs associated with special educational services, including "special programs for children with opioid-related learning disabilities, or for children in need of psychological counseling due to opioid-related family crisis."  *See id.* ¶ 699.  As a result of the stay of litigation and its extension to the Sacklers, the class action complaint did not name Purdue Pharma, certain affiliated debtors, the Raymond Sackler Trust, or individual Sackler family members as party defendants, identifying them instead as unnamed co-conspirators.  *See id.* ¶¶ 13 n.15, 50-59.

### D.    The Mediation

18.    In February 2020, the Debtors moved for the appointment of mediators.  *See* Debtors' Motion for Entry of an Order Appointing Mediators (ECF No. 855).  Acknowledging that the "myriad constituencies" implicated by the reorganization had "vastly differing views on the merits of the claims asserted by other creditor groups, as well as on how value should be allocated between creditor groups," the Debtors nevertheless expressed hope that mediation would be able to "advance these cases by addressing the relative allocations as among creditor groups."  *See id.* ¶ 2.

19.    The Debtors' motion was granted by order of this Court dated March 3, 2020. *See* Order Appointing Mediators (ECF No. 895).  The Court appointed the Honorable Layn

Phillips and Mr. Kenneth Feinberg to conduct the mediation as co-mediators. *See id*. ¶ 2. The Court's order provided that "[a]dditional parties in interest other than the Mediation Parties . . . may participate voluntarily in the mediation in response to a request from the Mediators, or further order of this Court." *See id*. ¶ 7. Mediation commenced promptly upon the Court's appointment of the mediators; mediation statements were received in early March, and the first meeting was held on March 11, 2020. *See* Mediators' Report at 1 (ECF No. 2548).

20.     On April 13, 2020, the boards of education of three public school districts—East Aurora School District 131, Thornton Township High School District 205, and Thornton Fractional Township High School District 215—filed a motion requesting that their claims be included in the Court-approved mediation process. *See* Motion to Submit Claims of Independent Public School Districts to Mediation (ECF No. 1038). The motion was resolved pursuant to a so-ordered stipulation dated April 21, 2020. *See* Stipulation & Agreed Order (ECF No. 1073). The stipulation provided that the movant school districts would be accorded the opportunity to present their claims and related issues to the mediators, but it did not grant them the status of mediation parties. *See id*. ¶¶ 5(b), 6. The stipulation called for reasonable coordination between the movant school districts and other public creditors, including the sharing of expert reports. *See id*. ¶ 5(e).

21.     The representatives of the public school districts participated in good faith in the mediation. *See* Mediator's Report ¶ 1 (ECF No. 1716). The mediators secured agreement on the proportionate allocation of the Debtors' assets as between the public and private creditor groups. *See* Mediators' Report § D(i) (ECF 2548). However, despite the best efforts of the mediators and the good-faith participation of the public school district representatives, no agreement was reached regarding the allocation of estate assets to public school districts. *See* Mediator's Report

¶ 4 (ECF No. 1716) ("No agreement between the PSDs and the Non-Federal Government Entities has been reached to date."); Mediators' Report § D(ii) (ECF No. 2548) (noting that the "public school districts and the NAS children physical injury group" were "unable to achieve agreement on allocation *inter se*").[10]

### E.    The Motion For Leave To File Class Proof Of Claim

22.    On June 1, 2020, a group of public school districts moved for leave to file a proof of claim on behalf of "limited fund" class comprising all independent public school districts nationwide.  *See* Motion by Public School Districts for an Order Allowing Them to Proceed with a Class Proof of Claim and Certifying a Class (ECF No. 1211).  The movants maintained that a class action approach would be the "best, most efficient, timely, and effective mechanism this Court has to give school districts a meaningful opportunity to bring their claims against the Debtors, to prevent their disenfranchisement . . . and to guarantee that a meaningful portion of the Debtors' estates is spent to abate the ravages of the opioid crisis that have been visited on children across the nation."  *See id.* ¶ 22.

### F.    The Public School District Creditors' Claims

23.    Numerous public school districts and boards of education have filed proofs of claim in this proceeding, and a motion for leave to file a class proof of claim on behalf of the public school districts remains pending before the Court.  Based on expert analysis to date, the Public School District Creditors estimate that prenatal opioid exposure alone has caused aggregate damages to America's public school districts well in excess of $127 billion.[11]  Unique

---

[10] The mediators have continued in their efforts to facilitate a resolution and stand ready to continue to do so on a volunteer basis.

[11] Numerous public school districts have filed proofs of claim on behalf of themselves and national classes in the amount of approximately $382 billion, reflecting a trebling of the $127

among the creditors in this reorganization, the Public School District Creditors seek abatement to address escalating education costs attributable to the opioid crisis.

G.    **The Proposed Plan of Reorganization**

24.    On March 15, 2021, the Debtors filed their proposed Chapter 11 plan of reorganization.  *See* Joint Chapter 11 Plan of Reorganization of Purdue Pharma L.P. and Its Affiliated Debtors (ECF No. 2487).  On the same day, the Debtors filed the Disclosure Statement at issue here.  *See* Disclosure Statement for Chapter 11 Plan for Purdue Pharma L.P. and Its Affiliated Debtors (ECF No. 2488).

## OBJECTION

25.    A disclosure statement must describe a proposed reorganization plan in sufficient detail to permit an informed vote by creditors, and the plan that it describes must be confirmable. The Disclosure Statement here fails on both counts.

I.    **The Disclosure Statement Fails To Provide Adequate Information**

26.    A debtor seeking to solicit acceptance of a plan of reorganization must provide "full and fair disclosure."  *Momentum Mfg. Corp. v. Emp. Creditors Comm. (In re Momentum Mfg. Corp.)*, 25 F.3d 1132, 1136 (2d Cir. 1994) (The principle of disclosure is of "prime importance in the reorganization process.").  Above all, the disclosure statement must provide "sufficient information to permit enlightened voting by holders of claims or interests."  *BSL Operating Corp. v. 125 E. Taverns, Inc. (In re BSL Operating Corp.)*, 57 B.R. 945, 950 (Bankr. S.D.N.Y. 1986).  The Disclosure Statement propounded by the Debtors here fails to provide the "adequate information" required by law.  *See* 11 U.S.C. §§ 1125(a)(1), (b).

---

billion figure pursuant to 18 U.S.C. § 1964(c).  *See, e.g.*, Proof of Claim No. 616156 (Board of Education of Thornton Township High School District 205, on behalf of itself and Illinois State and national classes).

### A.    The Terms Of The Sackler Settlement Agreement Must Be Disclosed

27.    When, as here, a proposed plan of reorganization releases non-debtors, the plan's proponent must be "punctilious in adhering to all of the procedural requirements of the Bankruptcy Code and the rules of court, especially the pre-solicitation disclosure requirements of 11 U.S.C. § 1125(b)." *In re Lower Bucks Hosp.*, 471 B.R. 419, 464 (Bankr. E.D. Pa. 2012), *aff'd* 488 B.R. 303 (E.D. Pa. 2013). The plan and the disclosure statement must describe the release in "specific and conspicuous" language, using "bold, italic, or underlined text." *See* Fed. R. Bankr. P. 3016(c).

28.    The Disclosure Statement does not come close. Indeed, the Sackler release is a complete void. The Disclosure Statement does not identify (a) which individuals and entities would be released; (b) on what terms they would be released; (c) the scope of the claims that creditors would be forced to release; (d) or the adequacy of the consideration the "Sackler Parties" are currently offering (compared to the value of the claims from which they would be immunized).[12] All that is clear is that the "Sackler Parties" are prepared to buy what amounts to civil impunity for their alleged role in the opioid crisis. But the $4.275 billion on offer is dwarfed by the massive potential liabilities faced by the Sacklers, not to speak of the unidentified non-debtor entities who would also share in the release.

---

[12] The lack of clarity is compounded because the Disclosure Statement refers to the Sackler settlement by two different names. The Disclosure Statement makes occasional reference to a "Shareholder Settlement Agreement," but this appears to be nothing more than the Sackler Settlement Agreement by another name. *See, e.g.*, Disclosure Statement §§ I.F(1) n.14, IV.C(15)(i), IV.C(17)(i), IV.C(18)(i), IV.D(2)(iv) n.66, IV.D(2)(vii), IV.D(6)(i)(b), IV.D(6)(ii), IV.H(1)(ix). IV.J(1)(p), IV.K.(6)(i), IX.D(3). Only a close reading of the Disclosure Statement and the Plan brings this to light: The Plan defines the "Shareholder Settlement Term Sheet" as the Appendix G term sheet—*i.e.*, the Sackler Settlement Agreement Term Sheet—and the Plan's definition of the "Shareholder Settlement Agreement" refers to the same $4.275 billion to be paid by the Sackler Parties under the Sackler Settlement Agreement. *See* Plan § 1.1.

14

29.    The law does not allow the Debtors to satisfy their disclosure obligations with empty circumlocutions about release terms yet to be negotiated.  What is required is a full accounting of the proposed terms of the release, including the individuals and entities to be released and the estimated value of the released claims.  Anything less falls short of "full and fair disclosure."  *See In re Momentum*, 25 F.3d at 1136.

### 1.    The Disclosure Statement Does Not Identify The "Sackler" Individuals And Entities That Would be Released.

30.    As an initial matter, neither the Disclosure Statement nor the Plan sufficiently identifies the individuals or entities to be released under the Sackler Settlement Agreement.  The Disclosure Statement states merely that the "Sackler Parties" and "certain other persons and/or individuals" are to "receive the benefit of releases and injunctions."  Disclosure Statement § III.X.  But who exactly are the "Sackler Parties"?  The term is never properly defined and may encompass any or all of an indeterminate number of Sackler-related individuals, trusts and business organizations.[13]  Which of these entities and individuals are to be released?  And who are the "other persons and/or individuals" who will also share in the benefits of the release?  The Disclosure Statement does not disclose.[14]

---

[13] The "Sackler Parties" appear to be an unspecified subset of the so-called "Sackler Entities." Disclosure Statement § X.  These "Sackler Entities," in turn, are expansively defined to include the families of Raymond and Mortimer Sackler (the "Sackler Families"), unspecified trusts "established by or for the benefit of members of the Sackler Families," and other unspecified "Sackler-related entities."  *Id*. §§ I(B), II(E)(2).

[14] The "Shareholder Releases" section of the Settlement Agreement Term Sheet sheds no additional light, indicating only that the "Plan shall provide for releases that include the Specified Parties and certain other persons and/or individuals to be mutually agreed . . . ."  These "Specified Parties" are, in fact, not specified at all:  They are defined simply as "[c]ertain persons included in distinct groups as set forth in an exhibit to be attached to the Definitive Documents."

**2.    The Disclosure Statement Fails To Specify The Claims That Would Be Released.**

31.    Nor does the Disclosure Statement meaningfully address the scope, nature or value of the claims to be released or enjoined.  *See Lower Bucks Hosp.*, 471 B.R. at 462 (disclosure of non-debtor release inadequate where, among other things, disclosure statement "failed to give [creditors] any sense of what they may have had to give up" in order to obtain benefits of reorganization plan).

32.    The Settlement Agreement Term Sheet is a model of vagueness, offering only a nonspecific prophecy that the Plan "shall provide for releases" in a "form and substance to be mutually agreed."  The Plan itself does no better:  Its definition of the released claims points the reader to a placeholder provision that remains unwritten.[15]  What claims are to be released, and by whom?  What is the scope of the release, and what is the value of the released claims?  The Disclosure Statement does not disclose.

**3.    The Disclosure Statement Provides Creditors With No Basis To Evaluate The Adequacy Of The Contributions Of The Sackler Parties.**

33.    Even from the scant details provided by the Disclosure Statement, it is clear that the release sought by the Sacklers would extinguish substantial claims not part of the Debtors' estate.  But the Disclosure Statement provides creditors with no reasonable basis for evaluating the adequacy of the consideration the Sackler Parties are offering.  The need for full disclosure is underscored by the magnitude of the damage caused by the opioid crisis; indeed, the school district claims alone exceed by multiples the amount that the Sackler Parties have put on the

---

[15] *See* Plan §§ 1.1 (defining "Shareholder Released Claims" as claims "released pursuant to <u>Section 10.8</u> of the Plan") (emphasis in original), 10.8 ("To come.").

table and their entire reported net worth.[16]  Creditors are entitled to know not only how much the

Sackler Parties are willing to pay to buy their immunity, but also how much the Sackler Parties

are *holding back*.

### 4. The Disclosure Statement Does Not Adequately Describe The Proposed Restrictions On The Sackler Parties.

34.     These are not the only omissions.  The Disclosure Statement assures creditors that

the Sackler Parties (whoever they are) will be prohibited from "engaging in the manufacturing or

sale of opioids."  Disclosure Statement § III.X.  Small comfort, given that this moratorium is

subject to unspecified "exceptions" yet "to be agreed."  *See id*.  The Debtors also promise that

the Sackler Settlement Agreement will impose additional "affirmative and restrictive covenants"

on the Sackler Parties, to be "mutually agreed."  *See id*.  What are these covenants, and to whom,

exactly, will they apply?  What enforcement mechanisms are available if they are breached?

Again, the Disclosure Statement does not disclose.[17]

---

[16] *See* Press Release, House Committee on Oversight and Reform, *Committee Releases Documents Showing Sackler Family Wealth Totals $11 Billion* (Apr. 20, 2021), *available at* https://oversight.house.gov/news/press-releases/committee-releases-documents-showing-sackler-family-wealth-totals-11-billion.

[17] On March 19, 2021, Representatives Carolyn B. Maloney (D-NY) and Mark DeSaulnier (D-CA) introduced a bill to prohibit non-debtor releases dubbed the "Stop Shielding Assets from Corporate Known Liability by Eliminating Non-Debtor Releases (SACKLER) Act."  *See* Press Release, House Committee on Oversight and Reform, *Maloney, DeSaulnier Introduce SACKLER Act to Prevent Bad Actors from Evading Responsibility Through Bankruptcy Proceedings* (Mar. 19, 2021), *available at* https://oversight.house.gov/news/press-releases/maloney-desaulnier-introduce-sackler-act-to-prevent-bad-actors-from-evading.  The proposed legislation is self-evidently inspired by the Purdue Pharma reorganization.  *See id.* (The "SACKLER Act would hold members of the Sackler family accountable for their significant role in fueling an opioid crisis that has claimed nearly half a million lives."); *see also* SACKLER Act, *available at* https://oversight.house.gov/sites/democrats.oversight.house.gov/files/MALONE_033_xml.pdf. The existence of this bill, and its potential implications (if any) for the contemplated Sackler release, should be disclosed in the Disclosure Statement.

**B.**     **The Procedure For Allocating NOAT Distributions Is Inadequately Disclosed**

35.     The Disclosure Statement is fatally deficient in other fundamental respects, as well. Under the reorganization plan, as described by the Disclosure Statement, the NOAT will be exclusively responsible for making distributions "for abatement purposes" to all non-federal domestic governmental claims. *See* Disclosure Statement §§ III.R(6), III.T(3), IV.C(4)(i) ("Distributions in respect of Non-Federal Domestic Governmental Claims shall be exclusively in the form of Abatement Distributions made by NOAT to Authorized Recipients for Authorized Abatement Purposes."). The Disclosure Statement explains that the NOAT will be required to "consider the need to ensure that underserved urban and rural areas, as well as minority communities, receive equitable access to the funds." *See id*. § IV.D(7)(iii). However, the Disclosure Statement is otherwise uninformative about the NOAT's decision-making process.

36.     The opioid crisis has done vast harm to school districts, municipalities, counties and states, far more harm than could ever be redressed even if every penny of the Debtors' estate were available for distribution. Given the finite funds at the NOAT's disposal, there is simply not enough to go around. It is therefore critical that creditors understand how the NOAT proposes to pick and choose among abatement initiatives, the priorities that may guide its decision-making process, and whether any predetermined allocation amounts have already reserved for certain creditor groups. Absent such information, individual creditors—and, indeed, whole subclasses of creditors—will be left with no real basis for assessing whether, and how, their claims may be satisfied under the reorganization plan. *See In re Ferretti*, 128 B.R. 16, 19 (D.N.H. 1991) ("[A] proper disclosure statement must clearly and succinctly inform the average unsecured creditor what it is going to get, when it is going to get it, and what contingencies there are to getting its distribution.").

37.     The Disclosure Statement is completely unsatisfactory on this key point.  Indeed, it provides no grounds for the Public School District Creditors to expect *any* funding at all from the NOAT, much less funding in amounts sufficient to address in a meaningful way the vast and escalating education costs attributable to the opioid crisis.  To state the obvious, a disclosure statement is of little use if it leaves creditors with no basis for estimating how much they are likely to be paid on their claims.

38.     The Disclosure Statement here leaves far too many key questions unanswered. How will the NOAT go about allocating its limited funds among the various abatement programs?  What criteria will be applied in determining entitlement to funding?  What prevents the NOAT from favoring one constituency over another?  What assurance do the Public School District Creditors have that the Debtors will not make—or have not already made—allocation commitments that may reduce or even eliminate the Public School District Creditors' potential share?  Is it the case—as the Public School District Creditors have been led to believe—that the States and the MSGE Group have already reached agreements amongst themselves on allocations by the NOAT, agreements that exclude the Public School District Creditors?

39.     The Disclosure Statement also fails to disclose what protections, if any, will be afforded to creditors whose claims are channeled to the NOAT.  For example, as in other mass tort bankruptcy proceedings premised on channeling injunctions, will claimholders have the right to opt out of the NOAT procedures?  Can the Public School District Creditors challenge and appeal determinations of the NOAT if they do not receive their fair share of abatement funds?

40.     Full and fair disclosure requires answers to all of these questions.

**C.    The Scope Of The Claim Holders' Releases Against The Debtors' "Related Parties" Is Inadequately Disclosed**

41.    In addition to the unwritten Sackler Release, the Plan includes an expansive release of the Debtors and others, covering a wide array of claims related to, among other things, the Debtors, their estates, and the manufacture and sale of opioids.  Plan § 10.6(b).  In its description of this release provision, the Disclosure Statement states simply that the Plan includes a "full and complete discharge and release to the Released Parties and their respective property and successors and assigns . . . ."  *See* Disclosure Statement § I.F.2.  But who are the "Released Parties"?  It is a critical question, and its answer is nowhere to be found in Disclosure Statement.

42.    Only through close scrutiny of the Plan itself may a determined and observant creditor discover that the "Released Parties" include not only the Debtors, NewCo and TopCo, the Plan Administration Trust, the Master Disbursement Trust and the Creditor Trusts, but also all of the "Related Parties" of those entities, including:

> predecessors, successors, assigns, Subsidiaries, affiliates, managed accounts or funds, past, present, and future officers, board members, directors, principals, agents, servants, independent contractors, co-promoters, third-party sales representatives, medical liaisons, members, partners (general or limited), managers, employees, subcontractors, agents, advisory board members, financial advisors, attorneys and legal representatives, accountants, investment bankers, consultants, representatives, management companies, fund advisors and other professionals and advisors, trusts . . ., trustees, protectors, beneficiaries, direct or indirect owners and/or equityholders, parents, transferees, heirs, executors, estates, nominees, administrators, legatees . . . .

Plan § 1.1.

43.    Such an all-embracing definition would be sufficiently objectionable in itself, but the Plan goes one step further, drawing in all of the "Related Parties" of the "Related Parties," as well.  *See id.* (including the "Related Parties of each of the foregoing").  Thus, employees of

employees, advisors of agents, consultants to advisors, and so on, are all also captured within the meaning of "Released Parties."

44.    The same two-degrees-of-separation approach applies to the definition of "Releasing Parties," rendering that definition similarly unworkable.   The "Releasing Parties" encompass not only the holders of claims against the Debtors, but also the "Related Parties" of those claim holders, and the "Related Parties" of such "Related Parties."  *See id*.  Thus, the same vast assortment of advisors of agents, consultants of employees, representatives of subcontractors, and so on, is also captured within the definition of "Releasing Parties."[18]

45.    Nothing in the Disclosure Statement alerts creditors to the astonishing sweep of the proposed release.  The implications are not merely theoretical.  To take just one example, numerous creditors in this bankruptcy have lawsuits pending against McKinsey & Company, Inc. ("McKinsey"), a consulting firm formerly engaged by Purdue Pharma and alleged to have masterminded a marketing strategy aimed at "turbocharging" OxyContin sales.[19]  How many of these creditors even suspect that a vote for the Plan could be a vote to extinguish their own pending or contemplated lawsuits against non-debtor defendants such as McKinsey?  A

---

[18] It is unclear whether the definition of "Releasing Parties" purports to encompass the thousands of public school districts that have not filed individual proofs of claim in this proceeding.  If so, then the definition is manifestly overreaching.  But if not, then the contemplated non-debtor release appears to be significantly incomplete, for absent recognition of the public school districts' class claim, all non-debtor parties would remain subject to liability in the class actions pending in the Northern District of Ohio.

[19] *See, e.g.*, Notice of Removal, Exhibit 2 (First Amended Complaint ¶ 17), ECF No. 1-2, *County of Genesee v. McKinsey & Co., Inc.*, No. 2:21-cv-01039-JS-SIL (E.D.N.Y. Feb. 25, 2021).  McKinsey has remarked in court filings that the Purdue Pharma bankruptcy proceedings are "likely to have a significant effect on how the claims against [it] may be resolved."  *See* Brief in Support of Defendants' Motion for Transfer of Actions Pursuant to 28 U.S.C. § 1407 for Coordinated or Consolidated Pretrial Proceedings 7, ECF No. 1-1, *In re Nat'l Prescription Opiate Consultant Litig.*, MDL No. 2996 (J.P.M.L. Mar. 5, 2021).

Disclosure Statement should inform creditors, not set traps for the unwary. For this reason, too, the Disclosure Statement should not be approved.[20]

## II.    The Plan Is Unconfirmable As Written

46.    A disclosure statement cannot be approved if it fails to describe a *confirmable* plan. *See In re Filex, Inc.*, 116 B.R. 37, 41 (Bankr. S.D.N.Y. 1990) ("A court approval of a disclosure statement for a plan which will not, nor can not, be confirmed by the Bankruptcy Court is a misleading and artificial charade which should not bear the imprimatur of the court."). Thus, "if it appears there is a defect that makes a plan inherently or patently unconfirmable, the Court may consider and resolve that issue at the disclosure stage . . . ." *In re FirstEnergy Sols. Corp.*, 606 B.R. 720, 731-33 (Bankr. N.D. Ohio 2019) (rejecting disclosure statement where overbreadth of nonconsensual non-debtor release rendered plan unconfirmable). As discussed below, the Debtors have advanced an untenable plan of reorganization that provides the public schools with no voice, no input and no assurance of funding. The Public School District Creditors respectfully submit that the Plan cannot be confirmed as written.

---

[20] Compounding the confusion, the Disclosure Statement's description of the release provision contains an error:

"[T]he Plan provides that the Releasing Parties will be deemed to provide a full and complete discharge and release to the Released Parties . . . from any and all Causes of Action whatsoever . . . arising from or related in any way to such *Releasing* Parties."

Disclosure Statement § I.F.2 (emphasis added).

This description is inaccurate as written. The relevant section of the Plan provides for a release from claims arising from or related to the Debtors, their estates, the Chapter 11 cases, *etc*., *see* Plan § 10.6(b), but it does not provide for a release from claims arising from or related to the *Releasing* Parties.

## A.    The Terms Of The Sackler Release Remain Unwritten

47.    The authority of the Bankruptcy Courts to issue nonconsensual, third-party releases has been, and remains, a fraught question in the federal courts.  With the exception of a category of asbestos-related claims not at issue here, nothing in the Bankruptcy Code expressly authorizes the release or permanent injunction of claims against non-debtors.  *See Gillman v. Cont'l Airlines (In re Cont'l Airlines)*, 203 F.3d 203, 211 (3rd Cir. 2000).[21]  For this reason and others, some Courts of Appeal have held that nonconsensual non-debtor releases fall outside the power of the Bankruptcy Courts.  *See In re Aegean Marine Petroleum Network, Inc.*, 599 B.R. 717, 722 (Bankr. S.D.N.Y. 2019) (citing cases).[22]  Indeed, as one Bankruptcy Court observed, even if a creditor's claim against a non-debtor was found to fall within the "related to" jurisdiction of a Bankruptcy Court, any final order or judgment with respect to such a claim could not, absent consent of all parties, be entered by the Bankruptcy Court in any event.  *See In re Digital Impact, Inc.*, 223 B.R. 1, 14 n.8 (Bankr. N.D. Okla. 1998) (citing 28 U.S.C. §§ 157(c)(1)-(2)).  The U.S. Supreme Court's decision in *Stern v. Marshall*, 564 U.S. 462 (2011), revisiting the issue of the adjudicatory authority reserved exclusively to the Article III courts, casts still further doubt on the powers of the Bankruptcy Courts to foreclose claims against non-debtor third parties on a unilateral basis; after all, actions against non-debtors, by

---

[21] Tellingly, the section of the Code that authorizes release of non-debtor asbestos claims requires that an order confirming a plan of reorganization containing such a release must be "issued or affirmed by the *district court* . . . ."  11 U.S.C. § 524(g)(3)(A) (emphasis added).

[22] The circuit split has persisted for decades and is ripe for resolution by the United States Supreme Court.  *See* Jason W. Harbour & Tara L. Elgie, *The 20-Year Split: Nonconsensual Nondebtor Releases*, 21 Norton J. Bankr. L. & Prac. 4 Art. 4 (July 2012) ("[T]he Supreme Court has not resolved the more than 20-year long circuit split over whether a bankruptcy court has the power to permanently enjoin future actions against nondebtor entities without consent of the enjoined entity.").

their very nature, do not "stem[] from the bankruptcy itself," nor are they

"necessarily . . . resolved in the claims allowance process." *Stern*, 564 U.S. at 499.[23]  As *Stern*

makes clear, powers long held to be within the authority of the Bankruptcy Courts—and, indeed,

written into statutory law—may nevertheless fail to pass Constitutional muster.  *See id*. at 482.

48.     Although the Second Circuit has issued no blanket prohibition, it has instructed

that non-debtor releases are to be approved only in "rare cases" where "truly unusual

circumstances render the release terms important to success of the plan . . ."  *Deutsche Bank AG

v. Metromedia Fiber Network, Inc. (In re Metromedia Fiber Network, Inc.)*, 416 F.3d 136, 141-

43 (2d Cir. 2005) ("No case has tolerated nondebtor releases absent the finding of circumstances

that may be characterized as unique.").  Indeed, "[n]o circuit has held or even suggested that

such releases are anything less than an extraordinary use of the bankruptcy court's power."  *In re

FirstEnergy Sols.*, 606 B.R. at 733 (noting that the "circuit split occupies the spectrum between

'impossible' and 'very rare'").

49.     As the Second Circuit has recognized, there is a real "potential for abuse" inherent

in non-debtor releases, and that potential for abuse is "heightened when releases afford blanket

immunity."  *See In re Metromedia Fiber Network*, 416 F.3d at 142.  Bankruptcy Courts should

be "particularly skeptical of broad and general releases that are not tied, in a demonstrated way,

to something that the reorganization needs to accomplish."  *In re Aegean Marine*, 599 B.R. at

727.

---

[23] The nonconsensual release of claims against a non-debtor third party also raises significant due
process concerns.  *See In re Digital Impact*, 223 B.R. at 13 n.6 ("A release, or permanent
injunction, contained in a confirmed plan . . . has the effect of a judgment—a judgment against
the claimant and in favor of the non-debtor, *accomplished without due process*." (emphasis
added)).

50.    Non-debtor releases are, in short, not to be approved lightly.  A Court considering a non-debtor release must conduct a thorough inquiry to determine whether the breadth and scope of the proposed releases and injunctions are truly "necessary" to the plan.  *See In re Metromedia Fiber Network*, 416 F.3d at 143.  The Court must "consider not only the contributions made by the proposed releasees, but also the particular claims that are to be released, whether the releasing parties are otherwise getting recoveries on those released claims, and the fairness of the releases from the point of view of the people upon whom the releases are to be imposed."  *In re Aegean Marine*, 599 B.R. at 728.

51.    Such an inquiry is impossible when, as here, the terms of the non-debtor release not only cannot be reviewed by the creditors but have been kept from the Court itself.  The Court cannot determine that the Sackler release is an essential element of the Plan without knowing the full scope of the release or the specific parties to whom the release will be directed.  Indeed, based on what little is known about the releases, it appears that many of the proposed released parties may not even be contributing funds to the Plan at all.

52.    The Plan also provides no meaningful basis for finding that the release and injunction of the Public School District Creditors' claims are adequately supported by consideration.  As discussed above, the Plan provides no assurance that any funding will be allocated to special education or other educational programs in the public schools.  *See In re Aegean Marine*, 599 B.R. at 727 (rejecting nonconsensual releases where, among other things, there was "no suggestion" that the proposed releasees "provided a specific recovery to the people whose claims would be taken"); *see also In re Cont'l Airlines*, 203 F.3d at 215 (finding release provisions legally insupportable where, among other things, "Plaintiffs received no consideration in exchange for having their lawsuits permanently enjoined").

53.    It is not enough that prospective releasees may have contributed funds, even substantial funds, to the reorganization process. *See In re Metromedia Fiber Network*, 416 F.3d at 143; *see also In re Aegean Marine*, 599 B.R. at 727 ("Doing positive things in a restructuring case—even important positive things—is not enough.").  Facilitating a debtor's reorganization cannot provide a jurisdictional basis for a bankruptcy court to extinguish claims against a non-debtor, as that would be a path to "asserting unlimited jurisdiction." *See Holland Indus., Inc. v. United States (In re Holland Indus., Inc.)*, 103 B.R. 461, 466 (Bankr. S.D.N.Y. 1989); *see also In re Digital Impact*, 223 B.R. at 13-14 (A "court cannot assume jurisdiction in order to enjoin actions to protect a third party who is capitalizing a plan, even though such an injunction appears to be a critical pre-requisite to the adoption of a successful plan.").  Nor can creditors' claims against a non-debtor be summarily extinguished by means of a non-consensual release without violating due process.

54.    If the Sacklers wish to obtain the benefits of bankruptcy-like insulation from the consequences of their conduct, then Sackler family members and related entities should be required to file their own individual bankruptcy proceedings, in which these issues can properly be addressed under rigorous court supervision of their assets.  The current Plan impermissibly allows the Sacklers to escape scrutiny while availing themselves of the "fresh start" benefits of bankruptcy by free-riding on the Purdue Pharma bankruptcy.  *See In re Metromedia Fiber Network*, 416 F.3d at 142 (cautioning that non-debtor release "may operate as a bankruptcy discharge arranged without a filing and without the safeguards of the Code").  This free-riding problem is all the more flagrant with respect to released parties who may not be contributing a dime to the reorganization plan.  The release of such parties cannot possibly be essential or integral to the Debtors' reorganization process.

B.    **The Claim Holders' Release Provisions Are Impermissibly Overbroad**

55.    As discussed above, Section 10.6(b) of the proposed plan provides for a release of the Debtors and others that is objectionably overbroad, among other things because the definitions of "Released Parties" and "Releasing Parties" are so extraordinarily far-reaching in their scope.  Together, the defined terms create an exponentially expanding web of released and releasing parties, extending backward into the past and forward into the future.  The release thus encompasses a vast and indeterminate multitude and may function as an improper back-door release of untold numbers of non-debtors, including non-debtors who may have contributed nothing to the reorganization.[24]

56.    The decision of the Northern District of Illinois in *In re Draiman*, 450 B.R. 777 (Bankr. N.D. Ill. 2011) is instructive on this point.  The bankruptcy court there took issue with a proposed release of the debtor's "employees," explaining that the term "employees" was so "vastly encompassing" that it resulted in an "overly extensive" definition of the released parties. *See In re Draiman*, 450 B.R. at 798-99 ("[T]he Debtor has failed to demonstrate why it is necessary to release such a wide spectrum of individuals and/or entities.").  The definitions of "Released Parties" and "Releasing Parties" in the Debtors' proposed plan encompass not only employees but employees of employees, as well as a host of similarly far-flung permutations: advisors to consultants, managers of subcontractors, agents of medical liaisons, employees of

---

[24] *See In re FirstEnergy Sols.*, 606 B.R. at 733 ("A debtor cannot save a plan with overbroad release language by demonstrating with evidence that troublesome application of the release is unlikely; it must show that the release provision is, on its face, permissible as to any possible claim that could be affected in light of the debtor's circumstances, its plan of reorganization, and the foreseeable claims of the debtor's creditors.").

"other professionals," *etc*.  The Debtors have offered no justification for proposing releases of such bewildering and unpredictable reach.[25]

### C.    The Plan Improperly Classifies Dissimilar Claims Together

57.    The classification of bankruptcy claims is "constrained by two straight-forward rules" derived from 11 U.S.C. § 1122(a): "Dissimilar claims may not be classified together; similar claims may be classified separately only for a legitimate reason." *Aetna Cas. & Surety Co. v. Clerk, U.S. Bankr. Ct.* (*In re Chateaugay Corp.*), 89 F.3d 942, 949 (2d Cir. 1996).  A proposed plan of reorganization is unconfirmable if its classification scheme fails to satisfy this statutory requirement.  *See In re U.S. Truck Co., Inc.*, 42 B.R. 790, 794-96 (Bankr. E.D. Mich. 1984) (striking proposed plan unconfirmable where dissimilar claims were classed together); *see also In re Draiman*, 450 B.R. at 790 ("The improper classification of claims results in denial of confirmation under § 1129(a)(1).").

58.    As a result of the opioid epidemic, public school districts have sustained, and will continue to sustain, long-term and ongoing harm of a sort that distinguishes them from other creditors in the non-federal domestic governmental class.  The burden of opioids on public education is continuous and pervasive, extending from earliest childhood through young adulthood.  The "open ended" character of the harm thus sets the public school claimants apart. *See In re U.S. Truck*, 42 B.R. at 795-96.  Moreover, the classification scheme proposed by the Debtors lumps all non-federal domestic governmental claims together in a way that—whether intentionally or not—threatens to disenfranchise the Public School District Creditors.  *See* Plan

---

[25] As noted above, non-debtor McKinsey—a consulting firm formerly engaged by Purdue Pharma to help market OxyContin, and against which numerous creditors in this bankruptcy proceeding have filed suit—may fall within the scope of the release, together with all of its "Related Parties."

§§ 3.2, 4.4.  As discussed above, the Public School District Creditors have not been treated on a

par with other creditors in the non-federal domestic governmental class, and the structure of the

reorganization plan suggests that the interests of the Public School District Creditors will

continue to be relegated to second-class status.

59.     Under the Plan, distributions on account of non-federal domestic governmental

claims are the exclusive province of the NOAT, *see* Disclosure Statement § IV.C(4)(i), and the

NOAT's distribution decisions will be controlled by trustees selected in the first instance by the

Ad Hoc Committee and the MSGE Group (the "Government Consent Parties").  *See* Plan

§ 5.7(b)(i).  The Government Consent Parties will thus play a key role in determining the

composition of the NOAT and, as a likely result, in shaping the NOAT's distribution priorities.

However, while the Government Consent Parties include numerous states, counties and cities,

they include no members dedicated specifically to representing the unique interests of the public

schools.  And the States have amply demonstrated that they are not committed to the needs of the

public schools stemming from the opioid crisis.[26]

60.     That the Debtors will be seeking a "cramdown" confirmation further underscores

the need for the Public School District Creditors to occupy a separate voting class.  *See*

Disclosure Statement § V.F ("[T]he Debtors will seek confirmation of the Plan from the

Bankruptcy Court by satisfying the 'cramdown' requirements set forth in section 1129(b) of the

Bankruptcy Code.").  If the Public School District Creditors were to be outvoted by other

constituencies within the non-federal domestic governmental claims class, resulting in approval

---

[26] At least forty-eight states and the District of Columbia have filed suits to recover opioid-related costs.  *See* Declaration of Benjamin Goldberg ¶¶ 2-3 (ECF No. 1473-1).  A review of complaints filed by these forty-eight states and the District of Columbia found that only four referred to the costs of special education or other educational services provided by the public schools.  *See id*. ¶¶ 4-5.

of the Plan by that class, then the Public School District Creditors would find themselves stripped of key protections under the "cramdown" provisions of the Bankruptcy Code, despite their objections to the Plan. *See* 11 U.S.C. § 1129(b). To avoid this result, the public school districts should be assigned to a distinct voting class to ensure that their interests, and the educational needs of children exposed to opioids, are properly represented and protected.

61.    Other groups of creditors—including, among others, holders of Tribe Claims, Hospital Claims, Third-Party Payor Claims, Ratepayer Claims, NAS Monitoring Claims and PI Claims (all as defined in the Plan)—have each been assigned to their own respective class and are assured that they will receive value under the Plan on account of their claims. There is no reason why the Public School District Creditors could not receive similar treatment.

## III.    The Proposed Discovery Schedule Is Unreasonable

62.    The discovery schedule proposed by the Debtors further demonstrates their disregard for the rights of stakeholders to obtain the information needed to fairly consider the proposed Plan. On its face, it is not a serious schedule. This is a multibillion-dollar bankruptcy case of considerable complexity, and the Debtors nevertheless propose to compress all document discovery into a four-week period. *See* Debtors' Motion for Order Establishing Confirmation Schedule and Protocols ¶¶ 7-8 (ECF No. 2536). The schedule requires the resolution of all discovery-related objections and the substantial completion of all document production within that four-week timeframe. The Public School District Creditors firmly believe that creditors should be paid on their claims as promptly as possible, but not at the expense of fundamental due process. The rushed schedule proposed by the Debtors only reinforces the Public School District Creditors' perception that the Debtors aim to push through their Plan without providing creditors a meaningful opportunity to review and consider its terms. The Public School District Creditors respectfully submit that the Court should not enter the Debtors' proposed discovery schedule and

should instead require the parties to confer on a more reasonable schedule that is fair to all

stakeholders.

## **CONCLUSION**

For the foregoing reasons, the Public School District Creditors respectfully request that

the Court (i) sustain these objections; (ii) deny approval of the Disclosure Statement; and (iii)

grant such other and further relief as the Court deems appropriate.


Dated:  April 23, 2021                                  Respectfully submitted,
        New York, New York

                                                        */s/ Eric B. Fisher*
                                                        Eric B. Fisher
                                                        **BINDER & SCHWARTZ LLP**
                                                        366 Madison Avenue, 6th Floor
                                                        New York, New York 10017
                                                        Tel: (212) 510-7008
                                                        Fax: (212) 510-7299
                                                        efisher@binderschwartz.com

                                                        Matthew J. Piers
                                                        Charles D. Wysong
                                                        Emily R. Brown
                                                        Margaret Truesdale
                                                        **HUGHES SOCOL PIERS
                                                        RESNICK & DYM, LTD.**
                                                        70 W. Madison Street, Suite 4000
                                                        Chicago, IL 60602
                                                        Tel: (312) 580-0100
                                                        Fax: (312) 580-1994
                                                        mpiers@hsplegal.com
                                                        cwysong@hsplegal.com
                                                        ebrown@hsplegal.com
                                                        mtruesdale@hsplegal.com

Cyrus Mehri
Steve Skalet
Joshua Karsh
Aisha Rich
**MEHRI & SKALET, PLLC**
1250 Connecticut Ave., NW, Suite 300
Washington, D.C. 20036
Tel: (202) 822-5100
Fax: (202) 822-4997
cmehri@findjustice.com
sskalet@findjustice.com
jkarsh@findjustice.com
arich@findjustice.com

Wayne Hogan
Leslie Goller
**TERRELL HOGAN YEGELWEL, P.A.**
233 E. Bay Street, 8th Floor
Jacksonville, FL 32202
Tel.: (904) 722-2228
hogan@terrellhogan.com
lgoller@terrellhogan.com

Neil Henrichsen
Dawn Stewart
**HENRICHSEN LAW GROUP, PLLC**
1440 G. Street, NW
Washington, D.C. 20005
Tel.: (202) 423-3649
Fax: (202) 379-9792
nhenrichsen@hslawyers.com
dstewart@hslawyers.com

*Attorneys for the Public School District Creditors*

# EXHIBIT A

**EXHIBIT A – School District Clients**

Board of Education of Miami-Dade County Public Schools
Baltimore City Board of School Commissioners
Board of Education of Rochester City School District
Board of Education of Minnetonka School District No. 276

## Illinois

Board of Education of East Aurora School District No. 131
Board of Education of Thornton Township High School District 205
Board of Education of Thornton Fractional Township High Schools, Illinois District No. 215
Board of Education of Joliet Township High School District 204
Board of Education of the City of Chicago, School District 299

## West Virginia

Board of Education of Mason County Public School District
Board of Education of Putnam County Schools
Board of Education of Wyoming County Schools
Board of Education of Marion County Schools

## Kentucky

Board of Education of Fayette County Public Schools
Board of Education of LaRue County Schools
Board of Education of Bullitt County School District
Board of Education of Breathitt County Schools
Board of Education of Estill County Schools
Board of Education of Harrison County Schools
Board of Education of Hart County Schools
Board of Education of Jefferson County Public Schools
Board of Education of Johnson County School District
Board of Education of Lawrence County Schools
Board of Education of Martin County Schools
Board of Education of Menifee County Schools
Board of Education of Owsley County Schools
Board of Education of Wolfe County Schools

## Maine

Board of Education of Bangor School Department
Board of Education of Cape Elizabeth School Department
Board of Education of Maine Regional School Unit #10
Board of Education of Maine Regional School Unit #13
Board of Education of Maine Regional School Unit #25
Board of Education of Maine Regional School Unit #26
Board of Education of Maine Regional School Unit #29
Board of Education of Maine Regional School Unit #34
Board of Education of Maine Regional School Unit #40
Board of Education of Maine Regional School Unit #50
Board of Education of Maine Regional School Unit #57
Board of Education of Maine Regional School Unit #60
Board of Education of Maine Regional School Unit #71
Board of Education of Maine Regional School Unit #9
Board of Education of Maine School Administrative District #11
Board of Education of Maine School Administrative District #15
Board of Education of Maine School Administrative District #28
Board of Education of Maine School Administrative District #35
Board of Education of Maine School Administrative District #44
Board of Education of Maine School Administrative District #53
Board of Education of Maine School Administrative District #55
Board of Education of Maine School Administrative District #6
Board of Education of Maine School Administrative District #61
Board of Education of Maine School Administrative District #72
Board of Education of Portland School Department
Board of Education of Scarborough School Department
Board of Education of South Portland School Department
Board of Education of St. George Municipal School District
Board of Education of Waterville School Department
Board of Education of Ellsworth School Department

## New Hampshire

Board of Education of Goshen School District
Board of Education of Kearsarge Regional School District-SAU 65
Board of Education of Lebanon School District
Board of Education of Pittsfield School District
Board of Education of Tamworth School District

**<u>New Mexico</u>**

Board of Education of Eunice Public School District
Board of Education of Gallup-McKinley County School District