**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| **In re:** | **Chapter 11** |
| **PURDUE PHARMA L.P., et al.,** | **Case No. 19-23649 (RDD)** |
| **Debtors.**[1] | **(Jointly Administered)** |

## FIRST AMENDED JOINT CHAPTER 11 PLAN OF REORGANIZATION OF PURDUE PHARMA L.P. AND ITS AFFILIATED DEBTORS

DAVIS POLK & WARDWELL LLP
450 Lexington Avenue
New York, New York 10017
Telephone: (212) 450-4000
Facsimile: (212) 701-5800
Marshall S. Huebner
Benjamin S. Kaminetzky
Timothy Graulich
Eli J. Vonnegut
Christopher S. Robertson

*Counsel to the Debtors*
*and Debtors in Possession*

Dated: April 23, 2021
New York, New York

---

[1] The Debtors in these cases, along with the last four digits of each Debtor's registration number in the applicable jurisdiction, are as follows: Purdue Pharma L.P. (7484), Purdue Pharma Inc. (7486), Purdue Transdermal Technologies L.P. (1868), Purdue Pharma Manufacturing L.P. (3821), Purdue Pharmaceuticals L.P. (0034), Imbrium Therapeutics L.P. (8810), Adlon Therapeutics L.P. (6745), Greenfield BioVentures L.P. (6150), Seven Seas Hill Corp. (4591), Ophir Green Corp. (4594), Purdue Pharma of Puerto Rico (3925), Avrio Health L.P. (4140), Purdue Pharmaceutical Products L.P. (3902), Purdue Neuroscience Company (4712), Nayatt Cove Lifescience Inc. (7805), Button Land L.P. (7502), Rhodes Associates L.P. (N/A), Paul Land Inc. (7425), Quidnick Land L.P. (7584), Rhodes Pharmaceuticals L.P. (6166), Rhodes Technologies (7143), UDF LP (0495), SVC Pharma LP (5717) and SVC Pharma Inc. (4014). The Debtors' corporate headquarters is located at One Stamford Forum, 201 Tresser Boulevard, Stamford, CT 06901.

## Table of Contents

| | | |
|---|---|---|
| ARTICLE I | DEFINITIONS AND INTERPRETATION. | 1 |
| 1.1 | Definitions | 1 |
| 1.2 | Interpretation; Application of Definitions; Rules of Construction | 31 |
| 1.3 | Reference to Monetary Figures | 32 |
| 1.4 | Controlling Document | 32 |
| ARTICLE II | ADMINISTRATIVE CLAIMS, PROFESSIONAL FEE CLAIMS, PRIORITY TAX CLAIMS AND DOJ FORFEITURE JUDGMENT CLAIM | 32 |
| 2.1 | Administrative Claims | 32 |
| 2.2 | Priority Tax Claims | 33 |
| 2.3 | DOJ Forfeiture Judgment Claim | 33 |
| ARTICLE III | CLASSIFICATION OF CLAIMS AND INTERESTS. | 34 |
| 3.1 | Classification in General | 34 |
| 3.2 | Summary of Classification of Claims and Interests | 34 |
| 3.3 | Voting Classes; Presumed Acceptance by Non-Voting Classes | 35 |
| 3.4 | Voting; Presumptions; Solicitation | 35 |
| 3.5 | Cramdown | 36 |
| 3.6 | No Waiver | 36 |
| ARTICLE IV | TREATMENT OF CLAIMS AND INTERESTS. | 36 |
| 4.1 | Secured Claims (Class 1) | 36 |
| 4.2 | Other Priority Claims (Class 2) | 36 |
| 4.3 | Federal Government Unsecured Claims (Class 3) | 37 |
| 4.4 | Non-Federal Domestic Governmental Claims (Class 4) | 37 |
| 4.5 | Tribe Claims (Class 5) | 38 |
| 4.6 | Hospital Claims (Class 6) | 38 |
| 4.7 | Third-Party Payor Claims (Class 7) | 39 |
| 4.8 | Ratepayer Claims (Class 8) | 39 |
| 4.9 | NAS Monitoring Claims (Class 9) | 39 |
| 4.10 | PI Claims (Class 10) | 40 |
| 4.11 | Avrio General Unsecured Claims (Class 11(a)) | 41 |
| 4.12 | Adlon General Unsecured Claims (Class 11(b)) | 41 |
| 4.13 | Other General Unsecured Claims (Class 11(c)) | 41 |
| 4.14 | Intercompany Claims (Class 12) | 41 |
| 4.15 | Shareholder Claims (Class 13) | 42 |
| 4.16 | Co-Defendant Claims (Class 14) | 42 |

4.17    Other Subordinated Claims (Class 15) ................................................................ 43

4.18    PPLP Interests (Class 16) .................................................................................... 43

4.19    PPI Interests (Class 17)........................................................................................ 43

4.20    Intercompany Interests (Class 18) ....................................................................... 44

4.21    Debtors' Rights with Respect to Unimpaired Claims .......................................... 44

ARTICLE V        MEANS FOR IMPLEMENTATION. ........................................................ 44

5.1    Restructuring Transactions ................................................................................... 44

5.2    Plan Settlements................................................................................................... 45

5.3    The Plan Administration Trust.............................................................................. 52

5.4    NewCo .................................................................................................................. 54

5.5    TopCo ................................................................................................................... 56

5.6    Master Disbursement Trust................................................................................... 57

5.7    Creditor Trusts ..................................................................................................... 62

5.8    Attorneys' Fees and Costs .................................................................................... 66

5.9    Transferability of Distribution Rights.................................................................. 66

5.10    Insurance Neutrality............................................................................................ 66

5.11    [Transfer of Books and Records; Cooperation; Privilege ................................. 66

5.12    Public Document Repository .............................................................................. 67

5.13    Effective Date Cash; Surplus Reserved Cash .................................................... 68

5.14    Corporate Action................................................................................................. 69

5.15    Cancellation of Notes, Interests, Instruments, Certificates and Other Documents ........... 70

5.16    Closing of Chapter 11 Cases .............................................................................. 70

ARTICLE VI        DISTRIBUTIONS. ................................................................................... 70

6.1    Distributions Generally ........................................................................................ 70

6.2    Distributions on the Effective Date...................................................................... 71

6.3    Date of Distributions............................................................................................ 71

6.4    Disbursing Agent ................................................................................................. 71

6.5    Rights and Powers of Disbursing Agent .............................................................. 71

6.6    Expenses of Disbursement Agent ........................................................................ 71

6.7    Delivery of Distributions ..................................................................................... 72

6.8    Undeliverable and Unclaimed Distributions........................................................ 72

6.9    Distribution Record Date ..................................................................................... 72

6.10    Manner of Payment under Plan........................................................................... 72

6.11    Minimum Cash Distributions ............................................................................. 72

6.12    Setoffs and Recoupment ..................................................................................... 72

6.13    Claims Paid or Payable by Third Parties ........................................................... 73

6.14    Distributions After Effective Date ................................................................... 73

6.15    No Postpetition Interest and Penalties on Claims ............................................ 73

6.16    Allocation of Distributions Between Principal and Interest ............................ 73

6.17    No Constructive Receipt ................................................................................... 73

6.18    No Distribution in Excess of Amount of Allowed Claim ................................ 74

6.19    Satisfaction of Claims ...................................................................................... 74

6.20    Withholding and Reporting Requirements ....................................................... 74

ARTICLE VII        PROCEDURES FOR DISPUTED CLAIMS. ........................................ 75

7.1    Disputed Claims Reserve ................................................................................. 75

7.2    Claim Objections .............................................................................................. 75

7.3    No Distribution Pending Allowance ................................................................ 75

7.4    Estimation of Claims ........................................................................................ 75

7.5    Distribution After Allowance .......................................................................... 76

7.6    Resolution of Claims ........................................................................................ 76

7.7    Property Held in Disputed Claims Reserves .................................................... 76

7.8    Claims Resolution Procedures Cumulative ..................................................... 76

7.9    No Postpetition Interest or Penalties on Disputed Claims ............................... 77

ARTICLE VIII        EXECUTORY CONTRACTS AND UNEXPIRED LEASES. ................ 77

8.1    Assumption and Rejection of Executory Contracts and Unexpired Leases ..... 77

8.2    Determination of Contract Disputes and Deemed Consent .............................. 78

8.3    Payments Related to Assumption of Contracts and Leases .............................. 79

8.4    Co-Defendant Indemnification Obligations ..................................................... 79

8.5    Rejection Claims ............................................................................................... 80

8.6    Survival of Certain Indemnification Obligations ............................................. 80

8.7    Compensation and Benefit Plans ...................................................................... 80

8.8    Purdue Pension Plan ......................................................................................... 80

8.9    Insurance Policies ............................................................................................. 81

8.10    Reservation of Rights ....................................................................................... 81

ARTICLE IX        CONDITIONS PRECEDENT TO THE OCCURRENCE OF THE EFFECTIVE
DATE. .............................................................................................................. 82

9.1    Conditions Precedent to Effective Date ........................................................... 82

9.2    Waiver of Conditions Precedent ...................................................................... 83

ARTICLE X        EFFECT OF CONFIRMATION. ......................................................... 84

10.1    Binding Effect .................................................................................................. 84

10.2    Discharge of Claims against and Interests in the Debtors ................................................. 84

10.3    Pre-Confirmation Injunctions and Stays .......................................................................... 84

10.4    Injunction against Interference with Plan ......................................................................... 84

10.5    Plan Injunction ................................................................................................................. 84

10.6    Releases ............................................................................................................................ 85

10.7    Channeling Injunction ...................................................................................................... 88

10.8    MDT Insurer Injunction ................................................................................................... 90

10.9    Settling MDT Insurer Injunction. .................................................................................... 91

10.10   Shareholder Releases ........................................................................................................ 93

10.11   Shareholder Channeling Injunction .................................................................................. 93

10.12   Exculpation ...................................................................................................................... 93

10.13   Injunction Related to Releases and Exculpation .............................................................. 93

10.14   Subordinated Claims ........................................................................................................ 93

10.15   Preservation of Causes of Action and Reservation of Rights .......................................... 94

10.16   Ipso Facto and Similar Provisions Ineffective ................................................................ 94

10.17   No Successor Liability ...................................................................................................... 94

10.18   Special Provisions for United States ................................................................................ 95

ARTICLE XI        RETENTION OF JURISDICTION ............................................................. 97

11.1    Retention of Jurisdiction .................................................................................................. 97

ARTICLE XII       MISCELLANEOUS PROVISIONS. ........................................................ 100

12.1    Exemption from Certain Transfer Taxes ........................................................................ 100

12.2    Dates of Actions to Implement Plan ............................................................................... 100

12.3    Amendments ................................................................................................................... 100

12.4    Revocation or Withdrawal of Plan ................................................................................. 101

12.5    Payment of Statutory Fees .............................................................................................. 101

12.6    Severability .................................................................................................................... 101

12.7    Governing Law ............................................................................................................... 102

12.8    Immediate Binding Effect ............................................................................................... 102

12.9    Successors and Assigns ................................................................................................... 102

12.10   Entire Agreement ............................................................................................................ 102

12.11   Computing Time .............................................................................................................. 102

12.12   Exhibits to Plan .............................................................................................................. 103

12.13   Notices ............................................................................................................................ 103

12.14   Dissolution of the Creditors' Committee ........................................................................ 103

12.15   Reservation of Rights ...................................................................................................... 103

Each of Purdue Pharma L.P., Purdue Pharma Inc., Purdue Transdermal Technologies L.P., Purdue Pharma Manufacturing L.P., Purdue Pharmaceuticals L.P., Imbrium Therapeutics L.P., Adlon Therapeutics L.P., Greenfield BioVentures L.P., Seven Seas Hill Corp., Ophir Green Corp., Purdue Pharma of Puerto Rico, Avrio Health L.P., Purdue Pharmaceutical Products L.P., Purdue Neuroscience Company, Nayatt Cove Lifescience Inc., Button Land L.P., Rhodes Associates L.P., Paul Land Inc., Quidnick Land L.P., Rhodes Pharmaceuticals L.P., Rhodes Technologies, UDF LP, SVC Pharma LP and SVC Pharma Inc. (each, a "***Debtor***" and, collectively, the "***Debtors***" or "***Purdue***") proposes the following first amended joint chapter 11 plan of reorganization pursuant to section 1121(a) of the Bankruptcy Code. Capitalized terms used herein shall have the meanings set forth in <u>Section 1.1</u> below.

**ARTICLE I        DEFINITIONS AND INTERPRETATION.**

      1.1    <u>*Definitions*</u>.

The following terms shall have the respective meanings specified below:

"***Abatement Distribution***" means a distribution from an Abatement Trust to an Authorized Recipient for Authorized Abatement Purposes.

"***Abatement Trust Documents***" means, collectively, the NOAT Documents, the Tribe Trust Documents, the Hospital Trust Documents, the TPP Trust Documents and the NAS Monitoring Trust Documents.

"***Abatement Trusts***" means, collectively, NOAT, the Tribe Trust, the Hospital Trust, the TPP Trust and the NAS Monitoring Trust.

"***Ad Hoc Committee***" means the ad hoc committee of governmental and other contingent litigation claimants identified in the *Verified Statement Pursuant to Bankruptcy Rule 2019* [D.I. 279], as may be amended from time to time.

"***Ad Hoc Group of Hospitals***" means the Ad Hoc Group of Hospitals identified in the *Second Amended Verified Statement of the Ad Hoc Group of Hospitals Pursuant to Bankruptcy Rule 2019* [D.I. 1536].

"***Ad Hoc Group of Individual Victims***" means the Ad Hoc Group of Individual Victims of Purdue Pharma L.P. identified in the *Amended Verified Statement of the Ad Hoc Group of Individual Victims of Purdue Pharma L.P., et al., Pursuant to Bankruptcy Rule 2019* [D.I. 1480], as may be amended from time to time.

"***Adlon General Unsecured Claim***" means any Claim against Adlon Therapeutics L.P. that is not an Administrative Claim, a Priority Claim, a Secured Claim, a Federal Government Unsecured Claim, a Channeled Claim, a Ratepayer Claim, a Co-Defendant Claim, an Other Subordinated Claim, an Intercompany Claim or a Shareholder Claim.

"***Administrative Claim***" means any Claim against any Debtor for costs and expenses of administration of the Chapter 11 Cases pursuant to section 327, 328, 330, 365, 503(b), 507(a)(2) or 507(b) of the Bankruptcy Code, including (i) the actual and necessary costs and expenses incurred on or after the Petition Date and through the Effective Date of preserving the Estates and operating the Debtors' business, (ii) any Professional Fee Claim, (iii) any fee or charge assessed against the Estates pursuant to sections 1911 through 1930 of chapter 123 of title 28 of the United States Code, (iv) any Allowed Claim that is to be treated as an Administrative Claim pursuant to a Final Order of the Bankruptcy Court under

section 546(c)(2) of the Bankruptcy Code, (v) once Allowed in accordance with Section 2.3(a) of the Plan, the DOJ Forfeiture Judgment Claim and (vi) any Allowed Cure Claim.

"*Administrative Claims Bar Date*" means the deadline for filing requests for payment of certain Administrative Claims (other than Professional Fee Claims and the DOJ Forfeiture Judgment Claim), which shall be (i) with respect to Administrative Claims (other than Administrative Claims arising under section 503(b)(9) of the Bankruptcy Code), the first Business Day that is thirty (30) days following the Effective Date and (ii) with respect to the Administrative Claims arising under section 503(b)(9) of the Bankruptcy Code, the General Bar Date.

"*AHC Reimbursement Agreement Assumption Order*" means the *Order Authorizing the Debtors to Assume the Reimbursement Agreement and Pay the Fees and Expenses of the Ad Hoc Committee's Professionals* [D.I. 553], as amended or supplemented by the Bankruptcy Court pursuant to D.I. 1617 and D.I. 2190.

"*Allowed*" means (i) with respect to a Channeled Claim, such Claim that has been allowed in accordance with the applicable Creditor Trust Documents, (ii) with respect to any Adlon General Unsecured Claim or Avrio General Unsecured Claim, such Claim that is Scheduled as not disputed, contingent or unliquidated, and for which no Proof of Claim or Interest, as applicable, has been timely filed, and (iii) with respect to any Claim (other than a Channeled Claim) against a Debtor, such Claim (A) that is allowed pursuant to the Plan or a Final Order, (B) as to which no objection has been timely filed and that is evidenced by a Proof of Claim timely filed by the applicable Bar Date or that is not required to be evidenced by a filed Proof of Claim under the Plan, the Bankruptcy Code or a Final Order, or (C) the amount of which has been agreed, compromised, settled or otherwise resolved pursuant to the authority of the Debtors or the Plan Administration Trustee, as applicable. Except as otherwise specified in the Plan or any Final Order, the amount of an Allowed Claim shall not include interest or other charges on such Claim on and after the Petition Date. No Claim of any Person subject to section 502(d) of the Bankruptcy Code shall be deemed Allowed unless and until such Person pays in full the amount that it owes such Debtor or the Plan Administration Trustee. Correlative terms such as "Allow" and "Allowance" have correlative meanings.

"*Asset*" means, with respect to a Person, all of the right, title and interest of such Person in and to property of whatever type or nature, including real, personal, mixed, intellectual, tangible and intangible property.

"*Assumption Notice*" means a notice of the assumption or assumption and assignment and any proposed Cure Amount provided to counterparties to executory contracts and unexpired leases pursuant to the Solicitation Procedures Order.

"*Authorized Abatement Purpose*" means, with respect to any Abatement Trust, (i) an authorized opioid abatement purpose for which an Abatement Distribution from such Abatement Trust may be used, as set forth in the Abatement Trust Documents for such Abatement Trust, which Abatement Trust Documents shall be attached to the Confirmation Order or (ii) the payment of attorneys' fees and costs of Holders of Channeled Claims channeled to such Abatement Trust (including any counsel to any ad hoc group or other group of such Holders, including any such counsel that is not a Professional Person).

"*Authorized Recipient*" means an eligible recipient of funds from an Abatement Trust in accordance with the Plan, the Confirmation Order and the applicable Abatement Trust Documents.

"*Avrio General Unsecured Claim*" means any Claim against Avrio Health L.P. that is not an Administrative Claim, a Priority Claim, a Secured Claim, a Federal Government Unsecured Claim,

a Channeled Claim, a Ratepayer Claim, a Co-Defendant Claim, an Other Subordinated Claim, an Intercompany Claim or a Shareholder Claim.

"**Bankruptcy Code**" means title 11 of the United States Code, as applicable to the Chapter 11 Cases.

"**Bankruptcy Court**" means the United States Bankruptcy Court for the Southern District of New York having jurisdiction over the Chapter 11 Cases and, to the extent any reference made under section 157 of title 28 of the United States Code is withdrawn or the Bankruptcy Court is determined not to have authority to enter a Final Order on an issue, the United States District Court for the Southern District of New York.

"**Bankruptcy Rules**" means the Federal Rules of Bankruptcy Procedure as promulgated by the United States Supreme Court under section 2075 of title 28 of the United States Code, as amended from time to time, as applicable to the Chapter 11 Cases, and any local rules of the Bankruptcy Court.

"**Bar Date**" means, as applicable, the General Bar Date, the Administrative Claim Bar Date or any other date established by the Bankruptcy Court as the deadline by which Proofs of Claim must be filed.

"**Bar Date Order**" means, collectively, (i) the *Order Establishing (I) Deadlines for Filing Proofs of Claims and Procedures Relating Thereto, (II) Approving the Proof of Claim Forms, and (III) Approving the Form and Manner of Notice Thereof* [D.I. 800] and (ii) the *Order (I) Extending the General Bar Date For a Limited Period and (II) Approving the Form and Manner of Notice Thereof* [D.I. 1221].

"**Benefit Plan**" means any "employee benefit plan" as defined in section 3(3) of ERISA, compensation, employment, consulting, severance, retention or similar plan, agreement, arrangement, program or policy, or other plan, agreement, arrangement, program or policy providing for compensation, bonuses or other forms of incentive compensation, including the Key Employee Plans, vacation benefits, insurance, medical, dental, vision, prescription or fringe benefits, life insurance, perquisites, disability or sick leave benefits or employee assistance program, in each case, that is sponsored, maintained or administered or entered into by the Debtors for the benefit of their respective employees or non-employee directors.

"**Business Day**" means any day other than a Saturday, a Sunday or any other day on which banking institutions in New York, New York are authorized or required by law or executive order to close.

"**Canadian Patient Claim Settlement Stipulation**" means the *Amended and Restated Stipulation and Order Permitting the Filing of a Class Proof of Claim Solely for Administrative Convenience in Order to Effectuate a Potential Settlement in Respect of Certain Canadian Patient Litigation* [D.I. 1515].

"**Canadian Patient Settlement Agreement**" means the "Patient Settlement Agreement" as defined in the Canadian Patient Claim Settlement Stipulation.

"**Canadian Patient Settlement Trust**" means the "Settlement Trust" as defined in the Canadian Patient Claim Settlement Stipulation.

"**Cash**" means all legal tender of the United States of America.

3

"***Cause of Action***" means any Claim, action, class action, claim, cross-claim, third-party claim, cause of action, controversy, demand, right, Lien, indemnity, contribution, reimbursement, guaranty, suit, obligation, liability, debt, damage, judgment, account, defense, remedy, offset, power, privilege, license or franchise, in each case, of any kind, character or nature whatsoever, known or unknown, contingent or non-contingent, matured or unmatured, suspected or unsuspected, liquidated or unliquidated, disputed or undisputed, foreseen or unforeseen, direct or indirect, choate or inchoate, secured or unsecured, assertable directly or derivatively (including, without limitation, under alter ego theories), whether arising before, on or after the Petition Date, in contract or in tort, at law, in equity or otherwise, or pursuant to any other theory of law. For the avoidance of doubt, "Causes of Action" expressly includes (i) any Cause of Action held by a natural person who is not yet born or who has not yet attained majority as of the Petition Date or as of the Effective Date, (ii) any right of setoff, counterclaim or recoupment and any Claim for breach of contract or for breach of duty imposed by law or in equity, (iii) the right to object to or otherwise contest Claims or Interests, (iv) any Claim or Cause of Action pursuant to section 362 of the Bankruptcy Code or chapter 5 of the Bankruptcy Code, (v) any Claim or defense, including fraud, mistake, duress and usury and any other defense set forth in section 558 of the Bankruptcy Code, and (vi) any Claim under any state or foreign law, including for the recovery of any fraudulent transfer or similar Claim.

"***Channeled Claims***" means, collectively, (i) Non-Federal Domestic Governmental Claims, (ii) Tribe Claims, (iii) Hospital Claims, (iv) Third-Party Payor Claims, (v) NAS Monitoring Claims, (vi) PI Claims and (vii) with respect to each of the foregoing clauses (i) through (vi), all Released Claims and Shareholder Released Claims held by Holders of Claims set forth in clauses (i) through (vi) to the extent such Released Claims and Shareholder Released Claims arise out of or relate to such Claims against the Debtors.

"***Channeling Injunction***" means the channeling injunction issued pursuant to Section 10.7 of the Plan.

"***Chapter 11 Cases***" means the cases under chapter 11 of the Bankruptcy Code commenced by the Debtors on or after the Petition Date (and not otherwise dismissed), currently pending in the Bankruptcy Court that are jointly administered in the case styled *In re Purdue Pharma L.P.*, Case No. 19-23649 (RDD).

"***Civil Settlement Agreement***" means that certain civil settlement agreement attached as Exhibit C to the DOJ 9019 Motion, as approved and modified by the DOJ 9019 Order, by and among Purdue Pharma L.P. and the United States, acting through the United States Department of Justice, Civil Division, Commercial Litigation Branch, the United States Attorney's Office for the District of New Jersey, the United States Attorney's Office for the District of Vermont, and on behalf of the Office of Inspector General of the United States Department of Health and Human Services, the Defense Health Agency, acting on behalf of the TRICARE Program, 10 U.S.C. §§ 1071-1110b, and the Office of Personnel Management.

"***Claim***" has the meaning set forth in section 101(5) of the Bankruptcy Code.

"***Class***" means any group of Claims or Interests classified under this Plan pursuant to section 1122(a) of the Bankruptcy Code.

"***Co-Defendant Claim***" means any Claim that (i) either (A) is or could be asserted against any Debtor, including without limitation any Claim that would otherwise be a Cure Claim or (B) seeks to recover from any property of any Debtor or its Estate, including any Purdue Insurance Policy, (ii) is for or based upon or arises from contribution, indemnification, reimbursement, setoff or recoupment or any other similar claim or Cause of Action, and (iii) seeks to recover, directly or indirectly, any costs, losses,

damages, fees, expenses or any other amounts whatsoever, actually or potentially imposed upon the Holder of such Claim, in each case relating to or arising from any actual or potential litigation or dispute, whether accrued or unaccrued, asserted or unasserted, existing or hereinafter arising, based on or relating to, or in any manner arising from, in whole or in part, Opioid-Related Activities or otherwise relating to opioids (including, without limitation, any such Claims asserted by any manufacturer, distributor, pharmacy, pharmacy-benefit manager, group purchasing organization or physician or other contract counterparty or business partner of any Debtor), in each case that is not a Shareholder Claim or a Claim held by any current or former director, officer, employee or agent of the Debtors (other than an Excluded Party). Notwithstanding anything to the contrary in the Plan, any Claim that satisfies the definition of a Co-Defendant Claim shall be a Co-Defendant Claim notwithstanding that such Claim would otherwise satisfy the definition of another type of Claim.

"*Confirmation Date*" means the date on which the Bankruptcy Court enters the Confirmation Order.

"*Confirmation Hearing*" means the hearing to be held by the Bankruptcy Court regarding confirmation of the Plan, as such hearing may be adjourned or continued from time to time.

"*Confirmation Order*" means the order of the Bankruptcy Court confirming this Plan pursuant to section 1129 of the Bankruptcy Code and approving the Plan Settlement, which shall be in form and substance acceptable to the Debtors and reasonably acceptable to the Creditors' Committee and the Governmental Consent Parties.

"*Contract Dispute*" means an unresolved objection regarding assumption or assumption and assignment, Cure Amount, "adequate assurance of future performance" (within the meaning of section 365 of the Bankruptcy Code) or other issues related to assumption or assumption and assignment of an executory contract or unexpired lease.

"*Creditor Trust*" means (i) with respect to Non-Federal Domestic Governmental Claims, NOAT, (ii) with respect to Tribe Claims, the Tribe Trust, (iii) with respect to Hospital Claims, the Hospital Trust, (iv) with respect to Third-Party Payor Claims, the TPP Trust, (v) with respect to NAS Monitoring Claims, the NAS Monitoring Trust and (vi) with respect to PI Claims, the PI Trust.

"*Creditor Trust Documents*"  means (i) with respect to an Abatement Trust, the applicable Abatement Trust Documents and (ii) with respect to the PI Trust, the PI Trust Documents.

"*Creditor Trust Operating Expenses*" means, with respect to each Creditor Trust, any and all costs, expenses, fees, taxes, disbursements, debts or obligations incurred from the operation and administration of such Creditor Trust, including in connection with the reconciliation and administration of the Channeled Claims channeled to such Creditor Trust, working capital and all compensation, costs and fees of the Creditor Trustees of such Creditor Trust and any professionals retained by such Creditor Trustees.

"*Creditor Trust Operating Reserves*" means the reserves to be established to pay the Creditor Trust Operating Expenses of the respective Creditor Trusts. The Creditor Trust Operating Reserves shall be (i) funded with Cash and cash equivalents held by the respective Creditor Trusts in accordance with the respective Creditor Trust Documents and (ii) held by the respective Creditor Trusts in a segregated account and administered by the respective Creditor Trustees.

"*Creditor Trustee(s)*" means each trustee of a Creditor Trust or, collectively, the trustees of the Creditor Trusts, in each case, appointed in accordance with Section 5.7(b) of the Plan.

"***Creditors' Committee***" means the statutory committee of unsecured creditors appointed by the U.S. Trustee on September 27, 2019 pursuant to section 1102(a)(1) of the Bankruptcy Code.

"***Cure Amount***" means the payment of Cash or the distribution of other property (as the parties may agree or the Bankruptcy Court may order) as necessary to (i) cure a monetary default by the Debtors in accordance with the terms of an executory contract or unexpired lease of the Debtors, and (ii) permit the Debtors to assume such executory contract or unexpired lease under section 365(a) of the Bankruptcy Code.

"***Cure Claim***" means a Claim for a Cure Amount in connection with the assumption or assumption and assignment of an executory contract or unexpired lease under section 365(a) of the Bankruptcy Code.

"***D&O Insurance Policies***" means all insurance policies (including extension of coverage of any policy beyond the end of the policy period) for directors', officers', managers' authorized agents' or employees' liability that have been issued at any time to, or provided coverage to, any of the Debtors or their directors, officers, managers or authorized agents, and all agreements, documents or instruments relating thereto.

"***Debtor(s)***" has the meaning set forth in the introductory paragraph of the Plan.

"***Disallowed***" means (i) with respect to a Channeled Claim, such Claim, or any portion thereof, that has been disallowed in accordance with the applicable Creditor Trust Documents and (ii) with respect to any Claim against a Debtor (other than a Channeled Claim), such Claim, or any portion thereof, that (A) has been disallowed under this Plan, by a Final Order or pursuant to a settlement, (B) is Scheduled at zero dollars or as contingent, disputed or unliquidated and as to which a Bar Date has been established but no Proof of Claim has been timely filed or deemed timely filed with the Bankruptcy Court pursuant to either the Bankruptcy Code or any Final Order of the Bankruptcy Court, including the Bar Date Order, or otherwise deemed timely filed under applicable law, or (iii) with respect to any Claim against the Debtors, such Claim that is not Scheduled and as to which a Bar Date has been established but no Proof of Claim has been timely filed or deemed timely filed with the Bankruptcy Court pursuant to either the Bankruptcy Code or any Final Order of the Bankruptcy Court or otherwise deemed timely filed under applicable law. Correlative terms such as "Disallow" have correlative meanings.

"***Disbursing Agent***" means any Person in its capacity as disbursing agent under Article VI of the Plan, including the Plan Administration Trustee acting in such a capacity to make Distributions in respect of Allowed Claims, other than Channeled Claims, pursuant to the Plan.

"***Disclosure Statement***" means the disclosure statement for this Plan, as may be amended or supplemented from time to time, prepared and distributed in accordance with sections 1125, 1126(b) and 1145 of the Bankruptcy Code, Bankruptcy Rules 3016 and 3018 and other applicable law, and all exhibits, appendices, schedules, supplements, modifications, amendments, annexes and attachments to such disclosure statement.

"***Disputed***" means, with respect to a Claim against a Debtor, a Claim that is not yet Allowed or Disallowed, and including, for the avoidance of doubt, any Claim the Holder of which votes to reject the Plan.

"***Disputed Claims Reserves***" means, collectively, the reserves to be established on account of Disputed Avrio General Unsecured Claims, Disputed Adlon General Unsecured Claims and Disputed Other General Unsecured Claims (which may be a single or collective reserve for one or more Classes of Claims). The Disputed Claims Reserves shall be (i) funded on the Effective Date with

Effective Date Cash in an amount determined by the Debtors and reasonably acceptable to the Creditors' Committee and the Governmental Consent Parties and (ii) held by the Plan Administration Trust and administered by the Plan Administration Trustee on and after the Effective Date.

"***Disputed Cure Claim***" means the amount that a counterparty to a Contract Dispute alleges must be paid in order for an executory contract or unexpired lease to be assumed or assumed and assigned as provided under the Plan.

"***Disputed Cure Claims Reserve***" means a reserve established to pay the aggregate amount of Disputed Cure Claims or such lower amount as ordered by the Bankruptcy Court or agreed to by the parties to the applicable executory contract or unexpired lease. The Disputed Cure Claims Reserve shall be (i) funded on the Effective Date with Effective Date Cash in an amount determined by the Debtors and reasonably acceptable to the Creditors' Committee and the Governmental Consent Parties and (ii) held by the Plan Administration Trust in a segregated account and administered by the Plan Administration Trustee on and after the Effective Date.

"***Distribution***" means any initial or periodic payment or transfer of consideration in respect of Allowed Claims made under this Plan; *provided* that (i) all Distributions in respect of Non-Federal Domestic Governmental Claims, Tribe Claims, Hospital Claims, Third-Party Payor Claims and NAS Monitoring Claims shall be exclusively in the form of Abatement Distributions made by the respective Abatement Trusts in accordance with the applicable Abatement Trust Documents; (ii) all Distributions in respect of PI Claims shall be exclusively from the PI Trust in accordance with the PI Trust Documents, and (iii) the only Distribution in respect of Ratepayer Claims shall be the Truth Initiative Contribution.

"***Distribution Record Date***" means the record date for purposes of making Distributions under the Plan on account of Allowed Claims, which date shall be the Effective Date.

"***DOJ***" means the United States Department of Justice.

"***DOJ 9019 Motion***" means the *Motion of Debtors Pursuant to 11 U.S.C. § 105 and Fed. R. Bankr. P. 9019 Authorizing and Approving Settlements Between the Debtor and the United States* [D.I. 1828].

"***DOJ 9019 Order***" means the *Order Pursuant to 11 U.S.C. § 105 and Fed. R. Bankr. P. 9019 Authorizing and Approving Settlements Between the Debtors and the United States* [D.I. 2004].

"***DOJ Civil Claim***" means the "Civil Claim" as defined in the DOJ 9019 Order in the amount of $2.8 billion.

"***DOJ Conviction Judgment Date***" means the date on which the United States District Court for the District of New Jersey enters a judgment of conviction pursuant to the Plea Agreement and the DOJ 9019 Order.

"***DOJ Criminal Fine Claim***" means the "Criminal Fine Claim" as defined in the DOJ 9019 Order in the amount of $3.544 billion.

"***DOJ Forfeiture Judgment Claim***" means the "Forfeiture Judgment" as defined in the DOJ 9019 Order in the amount of $2 billion.

"***DOJ Forfeiture Judgment Credit***" means the amount of value distributed or otherwise conferred by the Debtors in respect of Non-Federal Domestic Governmental Claims and Tribe Claims,

which shall be credited against the DOJ Forfeiture Judgment Claim pursuant to the Plan and the Plea Agreement, it being understood and agreed that (i) the amount so credited shall not exceed $1.775 billion, and (ii) the Confirmation Order shall include a finding that the amount of value distributed or otherwise conferred by the Debtors in respect of Non-Federal Domestic Governmental Claims and Tribe Claims exceeds $1.775 billion.

"***DOJ Forfeiture Payment***" means a payment of $225 million in Cash by PPLP to the United States Marshals in accordance with the Plan, the Plea Agreement and the DOJ 9019 Order.

"***DOJ Resolution***" means the Plea Agreement and the Civil Settlement Agreement, including the settlements contemplated therein and the other terms and conditions thereof.

"***DOJ Unsecured Claims***" means the DOJ Civil Claim and the DOJ Criminal Fine Claim.

"***Domestic Governmental Entity***" means the United States or any State, county, municipality, Tribe, public school district or other Governmental Unit within the United States, or an officer of any of the foregoing in his or her official capacity.

"***Effective Date***" means the date selected by the Debtors for the consummation of the Plan, or as soon thereafter as reasonably practicable.

"***Effective Date Cash***" means, collectively all Cash and cash equivalents of the Debtors (including all amounts received under the Shareholder Settlement Agreement) on the Effective Date prior to the making of any payments by the Debtors in accordance with the Restructuring Transactions, excluding any Cash and cash equivalents (i) in the form of security deposits, (ii) that collateralize any obligations of the Debtors or (iii) that are otherwise subject to any legal, contractual or other restriction on the ability to freely transfer such Cash or cash equivalents.

"***Entity***" has the meaning set forth in section 101(15) of the Bankruptcy Code.

"***ERISA***" means the Employee Retirement Income Security Act of 1974, as amended. 29 U.S.C. §§ 1301-1461.

"***Estate(s)***" means, individually or collectively, the estate or estates of the Debtors created under section 541 of the Bankruptcy Code.

"***Estate Causes of Action***" means any and all Causes of Action that any Debtor may have or be entitled to assert on behalf of its Estate or itself, whether or not asserted.

"***Excluded Assets***" means (i) all Effective Date Cash other than the Initial NewCo Cash and (ii) any other Assets of the Debtors excluded from the transfer to NewCo pursuant to the NewCo Transfer Agreement, including without limitation all MDT Transferred Assets and all PAT Assets.

"***Excluded Party***" means (i) each Person identified on the Schedule of Excluded Parties and (ii) each Holder of a Claim against or Interest in any Debtor that votes to reject (only if such Holder is entitled to vote and is not deemed to reject) or objects to the Plan and such Holder's Related Parties (solely in such Related Parties' respective capacities as Related Parties of such Holder); *provided* that, notwithstanding anything else contained in this Plan, no Shareholder Released Party shall be an Excluded Party in any capacity or respect.

"***Exculpated Parties***" means, collectively, (i) the Debtors, (ii) the Creditors' Committee and its members, solely in their capacity as such, (iii) the Plan Administration Trustee, (iv) the MDT

Trustees and the MDT Executive Director, (v) the Creditor Trustees, (vi) the Supporting Claimants, each solely in their capacities as such, and (vii) with respect to each of the Persons in the foregoing clauses (i) through (vi), each of their Related Parties; *provided*, *however*, that no Excluded Party or Shareholder Released Party shall be an Exculpated Party in any capacity or respect.

"***Federal Government Unsecured Claims***" means the DOJ Unsecured Claims and the Other Federal Agency Claims.

"***Final Order***" means an order or judgment of the Bankruptcy Court, as entered on the docket in any Chapter 11 Case, or of any other court of competent jurisdiction (i) that has not been reversed, stayed, modified or amended, and (ii) (A) as to which the time to appeal, seek certiorari or move for a new trial, re-argument or rehearing has expired according to applicable law and no appeal or petition for certiorari or other proceedings for a new trial, re-argument or rehearing has been timely taken or (B) as to which any appeal that has been taken or any petition for certiorari that has been or may be timely filed has been withdrawn or resolved by the highest court to which the order or judgment was appealed or from which certiorari was sought or the new trial, re-argument or rehearing shall have been denied, resulted in no modification of such order or has otherwise been dismissed with prejudice.

"***General Bar Date***" means July 30, 2020.

"***Governmental Consent Parties***" means (i) the Ad Hoc Committee and (ii) the MSGE Group.

"***Governmental Unit***" has the meaning set forth in section 101(27) of the Bankruptcy Code.

"***Holder***" means a Person holding a Claim or Interest, as applicable.

"***Hospital Claim***" means any Claim against any Debtor that is held by a provider of healthcare treatment services or any social services, in its capacity as such, and that is not held by a Domestic Governmental Entity, including, based on the Debtors' initial review, the Claims set forth in the 1,030 Proofs of Claims filed by hospitals and the 150 Proofs of Claims filed by other treatment providers.

"***Hospital TDP***" means the trust distribution procedures to be implemented by the Hospital Trust setting forth the procedures for the distribution of Abatement Distributions by the Hospital Trust to Authorized Recipients and the Authorized Abatement Purposes for Abatement Distributions from the Hospital Trust, the terms of which shall be consistent with Articles I through XII of the Plan and otherwise acceptable to the Debtors and the Ad Hoc Group of Hospitals and reasonably acceptable to the Creditors' Committee and the Governmental Consent Parties, and which shall be filed by the Debtors with the Plan Supplement [(it being understood and agreed that the form of trust distribution procedures to be implemented by the Hospital Trust filed on April 23, 2021 is acceptable to such parties)].

"***Hospital Trust***" means a trust to be established in accordance with Section 5.7 of the Plan to (i) assume all liability for the Hospital Claims, (ii) hold the MDT Hospital Claim and collect the Initial Hospital Trust Distribution and additional payments due under the MDT Hospital Claim in accordance with the Private Entity Settlements and the Hospital Trust Documents, (iii) administer Hospital Claims and (iv) make Abatement Distributions to Authorized Recipients for Authorized Abatement Purposes, in each case in accordance with the Hospital Trust Documents.

"***Hospital Trust Agreement***" means the trust agreement establishing and delineating the terms and conditions for the creation and operation of the Hospital Trust, the terms of which shall be consistent with Articles I through XII of the Plan and otherwise acceptable to the Debtors and the Ad Hoc

Group of Hospitals and reasonably acceptable to the Creditors' Committee and the Governmental Consent Parties, and which shall be filed by the Debtors with the Plan Supplement.

"*Hospital Trust Documents*" means the Hospital Trust Agreement and the Hospital TDP.

"*Impaired*" means, with respect to any Claim, Interest or Class of Claims or Interests, "impaired" within the meaning of such term in section 1124 of the Bankruptcy Code.

"*Initial Hospital Trust Distribution*" means the payment of $25 million of Effective Date Cash to the Hospital Trust on the Effective Date.

"*Initial NAS Monitoring Trust Distribution*" means the payment of $1 million of Effective Date Cash to the NAS Monitoring Trust on the Effective Date.

"*Initial NewCo Cash*" means $200 million of Effective Date Cash to be transferred to NewCo on the Effective Date.

"*Initial NOAT Distribution*" means the payment to NOAT on the Effective Date of all Effective Date Cash remaining after the satisfaction of all amounts described in Section 5.13(a) of the Plan.

"*Initial PI Trust Distribution*" means the payment of Effective Date Cash to the PI Trust on the Effective Date in an amount equal to (i) $300 million plus (ii) all MDT Bermuda-Form Insurance Proceeds, if any, received by the Debtors on or prior to the Effective Date; *provided* that the aggregate amount of such payment to the PI Trust in respect of this clause (ii) shall not exceed $450 million.

"*Initial Private Creditor Trust Distributions*" means, collectively, the Initial Hospital Trust Distribution, the Initial TPP Trust Distribution, the Initial NAS Monitoring Trust Distribution and the Initial PI Trust Distribution.

"*Initial Public Creditor Trust Distributions*" means, collectively, the Initial NOAT Distribution and the Initial Tribe Trust Distribution.

"*Initial TPP Trust Distribution*" means the payment of $1 million of Effective Date Cash to the TPP Trust on the Effective Date.

"*Initial Tribe Trust Distribution*" means the payment of $50 million of Effective Date Cash to the Tribe Trust on the Effective Date.

"*Insurance Companies*" means, collectively, all Persons that issued any Purdue Insurance Policy, any third-party administrator, claims handling agent or any parent, Subsidiary, affiliate, successor, predecessor or assign of any of the foregoing, solely in such Insurance Company's capacity with respect to a Purdue Insurance Policy.

"*Intercompany Claim*" means any Claim against any Debtor that is held by another Debtor or an affiliate of a Debtor.

"*Intercompany Interest*" means any Interest in any Debtor that is held by another Debtor.

"*Interest*" means any equity security (as defined in section 101(16) of the Bankruptcy Code) in a Person, including any shares, common stock or units, preferred stock or units, or other instrument evidencing any fixed or contingent equity or ownership interest in a Person, including any

option, warrant or other right, contractual or otherwise, to acquire any such interest in such Person, whether or not transferable and whether fully vested or vesting in the future.

"*Interim Compensation Order*" means the *Order Establishing Procedures for Interim Compensation and Reimbursement of Expenses for Retained Professionals* [D.I. 529].

"*IRC*" means the Internal Revenue Code of 1986, as amended.

"*IRS*" means the Internal Revenue Service.

"*Key Employee Plans*" means, collectively, (i) the Key Employee Retention Plan approved by the Bankruptcy Court pursuant to the *Order Authorizing the Debtors to Implement a Key Employee Retention Plan* [D.I. 1762] and (ii) the Key Employee Incentive Plan approved by the Bankruptcy Court pursuant to the *Order Authorizing the Debtors to Implement a Key Employee Incentive Plan* [D.I. 1861] and the *Supplemental Order Authorizing the Debtors to Implement a Key Employee Incentive Plan* [D.I. 2002].

"*Lien*" has the meaning set forth in section 101(37) of the Bankruptcy Code.

"*Liquidating Debtors*" means, collectively, all Debtors that are not Transferred PPLP Subsidiaries, on and after the Effective Date.

"*LRP Agreement*" means the agreement establishing lien resolution procedures with respect to certain claims held by LRP Participating TPPs against Holders of PI Claims and Distributions payable to Holders of PI Claims, the terms of which shall be consistent with Articles I through XII of the Plan and otherwise acceptable to the Debtors, the Ad Hoc Committee of Individual Victims and the Third-Party Payor Group and reasonably acceptable to the Creditors' Committee and the Governmental Consent Parties, and which shall be filed by the Debtors with the Plan Supplement [[(it being understood and agreed that the form of agreement establishing such lien resolution procedures filed on April 23, 2021 is acceptable to such parties)].

"*LRP Participating TPP*" means any Holder of a Third-Party Payor Claim that becomes a party to the LRP Agreement in accordance with the terms thereof.

"*Master Disbursement Trust*" means the trust established in accordance with Section 5.6 of the Plan to, among other things, (i) hold and administer the MDT Transferred Assets, (ii) make payments to the Private Creditor Trusts in satisfaction of the MDT Claims in accordance with the Plan and the Private Entity Settlements and (iii) make Public Creditor Trust Distributions in respect of the MDT Interests from MDT Excess Cash in accordance with the Plan and the Public Entity Settlements.

"*MDT Agreement*" means the trust agreement establishing and delineating the terms and conditions for the creation and operation of the Master Disbursement Trust, the terms of which shall be consistent with Articles I through XII of the Plan and otherwise reasonably acceptable to the Debtors, the Creditors' Committee and the Governmental Consent Parties, and which shall be filed by the Debtors with the Plan Supplement.

"*MDT Bermuda-Form Insurance Proceeds*" means the MDT Insurance Proceeds from the Bermuda-form products liability MDT Insurance Policies, as identified in the MDT Agreement.

"*MDT Causes of Action*" means any and all Retained Causes of Action (i) against Excluded Parties or relating to and necessary to enforce Retained Causes of Action against Excluded Parties, (ii) relating to and necessary to enforce the MDT Insurance Rights, (iii) relating to and necessary

to enforce the MDT Shareholder Rights, including without limitation, but subject to the terms of, the Shareholder Settlement Agreement or (iv) against any other Person that is not an ongoing commercial counterparty of NewCo, to the extent such Retained Causes of Action are not otherwise transferred to the Plan Administration Trust or the Creditor Trusts. For the avoidance of doubt, "MDT Causes of Action" shall include all entitlements, proceeds, payments and benefits of the Debtors to any of the foregoing.

"***MDT Claims***" means, collectively, the MDT Hospital Claim, the MDT TPP Claim, the MDT NAS Monitoring Claim and the MDT PI Claim.

"***MDT Claims Reserve***" means a reserve to be established and held by the MDT Trustees in accordance with, and in the amounts set forth in, Section 5.2(d)(ii) of the Plan, solely upon the commencement and during the continuation of an MDT Reserve Period.

"***MDT Distribution Date***" means July 30, 2022 and each twelve (12)-month anniversary thereof, until the MDT Claims are paid in full.

"***MDT Distributable Sale Proceeds***" means [●]% of (i) the Cash and cash equivalent proceeds in respect of certain sales of Assets of TopCo or its Subsidiaries to be agreed by the Debtors, the Consenting Governmental Parties and the Creditors' Committee, including any Cash or cash equivalents received in respect of any such non-Cash proceeds, *minus* (ii) the sum of (A) all reasonable and documented out-of-pocket fees and expenses of TopCo or any of its Subsidiaries paid to third parties in connection with such event, (B) any taxes paid or reasonably estimated to be payable by TopCo or any of its Subsidiaries in connection with such event and (C) any other amounts required to fund NewCo Operating Expenses or TopCo Operating Expenses, as applicable.[2]

"***MDT Excess Cash***" means (i) all Cash and cash equivalents held by the Master Disbursement Trust (other than any amounts subject to distribution in accordance with Section 5.2(d)(iv) of the Plan), as of the relevant date of determination, in excess of the amounts referenced in Section 5.2(f)(i)(A), (B), (C) and (D) of the Plan and (ii) the portion of any Net Prepaid Settlement Amount in excess of the aggregate amount of all Private Creditor Trusts' Proportionate Settlement Prepayment Shares of such Net Prepaid Settlement Amount.

"***MDT Executive Director***" means the executive director of the Master Disbursement Trust appointed in accordance with Section 5.6(f) of the Plan.

"***MDT Hospital Claim***" means the beneficial interest in the Master Disbursement Trust granted to the Hospital Trust pursuant to the Private Entity Settlements, which interest shall entitle the Hospital Trust to the payment of the amounts set forth in Section 5.2(d)(i)(A) of the Plan.

"***MDT Insurance Collateral***" means the Purdue Insurance Collateral in respect of the MDT Insurance Policies.

"***MDT Insurance Policies***" means (i) all Purdue Insurance Policies listed in Exhibit A to the *Complaint for Declaratory Relief*, Adv. Pro. No. 21-07005 (RDD) [D.I. 1], and (ii) any additional Purdue Insurance Policies agreed by the Debtors and the Governmental Consent Parties, which shall be identified in the MDT Agreement.

---

[2] Subject to ongoing discussions.

"***MDT Insurance Proceeds***" means the Cash proceeds of the MDT Insurance Rights, including but not limited to the Cash proceeds in respect of any MDT Insurance Settlement, whether received before, on or after the Effective Date.

"***MDT Insurance Rights***" means the Purdue Insurance Rights in respect of the MDT Insurance Policies and the MDT Insurance Collateral, which Purdue Insurance Rights shall be transferred by the Debtors to the Master Disbursement Trust on the Effective Date, including without limitation the MDT Insurance Proceeds.

"***MDT Insurance Settlement***" means each settlement agreement concerning the MDT Insurance Rights that (i) the Debtors and an MDT Insurer have entered into pursuant to the Purdue Insurance Stipulation on or before the Confirmation Date and (ii) is approved by the Bankruptcy Court.

"***MDT Insurer***" means an Insurance Company that has issued or has liability to pay under a MDT Insurance Policy, and each of its affiliates, predecessors in interest, and agents, solely in its capacity as such and solely with respect to any MDT Insurance Policy.

"***MDT Insurer Injunction***" means the injunction issued pursuant to Section 10.8 of the Plan.

"***MDT Interests***" means, collectively, the MDT NOAT Interest and the MDT Tribe Interest.

"***MDT NAS Monitoring Claim***" means the beneficial interest in the Master Disbursement Trust granted to the NAS Monitoring Trust pursuant to the Private Entity Settlements, which interest shall entitle the NAS Monitoring Trust to the payment of the amounts set forth in Section 5.2(d)(i)(C) of the Plan.

"***MDT NOAT Interest***" means the beneficial interest in the Master Disbursement Trust granted to NOAT under the Plan pursuant to the Public Entity Settlements, which interest shall entitle NOAT to its share of distributions of MDT Excess Cash in accordance with Section 5.2(e)(i) of the Plan and the MDT Priority Waterfall.

"***MDT Operating Expenses***" means any and all costs, expenses, fees, taxes, disbursements, debts or obligations incurred from the operation and administration of the Master Disbursement Trust, including in connection with the prosecution or settlement of MDT Causes of Action, working capital, all compensation, costs and fees of the MDT Trustees, the MDT Executive Director and any professionals retained by the Master Disbursement Trust, but excluding any amounts to be paid in respect of the MDT Claims or the MDT Interests.

"***MDT Operating Reserve***" means a reserve to be established to pay any and all MDT Operating Expenses. The MDT Operating Reserve shall be (i) funded on the Effective Date with Effective Date Cash in an amount determined by the Debtors with the consent (not to be unreasonably withheld, delayed or conditioned) of the Creditors' Committee and the Governmental Consent Parties, and thereafter with Cash held or received by the Master Disbursement Trust (other than the Cash proceeds of MDT Insurance Rights payable to the PI Trust on account of the MDT PI Claim pursuant to Section 5.2(d)(i)(D) of the Plan) in accordance with the MDT Agreement as determined by the MDT Trustees and (ii) held by the Master Disbursement Trust in a segregated account and administered by the MDT Trustees on and after the Effective Date.

"***MDT PI Claim***" means the beneficial interest in the Master Disbursement Trust granted to the PI Trust pursuant to the Private Entity Settlements, which interest shall entitle the PI Trust to the payment of the amounts set forth in Section 5.2(d)(i)(D) of the Plan.

"***MDT Priority Waterfall***" means the priority waterfall applicable to the Master Disbursement Trust set forth in Section 5.2(f)(i) of the Plan.

"***MDT Reserve Period***" means, until the payment in full in Cash of the MDT Claims, any period (i) commencing upon either (A) the failure of any amounts to be paid to the Master Disbursement Trust when due under the Shareholder Settlement Agreement, (B) the determination by the MDT Trustees, after the receipt of a written acknowledgment by any obligor under the Shareholder Settlement Agreement that any amounts due on the next SSA Payment Date are not expected to be paid, that the Master Disbursement Trust is not likely to be able to fund the payments due on account of the MDT Claims on the next MDT Distribution Date after taking into account all sources of liquidity and expected recoveries by the Master Disbursement Trust or (C) the determination by the MDT Trustees, on or after the date that is one hundred twenty (120) days prior to the third MDT Distribution Date, that the Master Disbursement Trust is not likely to be able to fund the payments due on account of the MDT Claims on the third MDT Distribution Date from the payments due under the Shareholder Settlement Agreement and other sources of liquidity and expected recoveries by the Master Disbursement Trust, and (ii) continuing until (A) all currently and past due payments under the Shareholder Settlement Agreement have been paid in full and, with respect to any such period commencing or continuing upon a determination by the MDT Trustees under the foregoing clause (i)(C), the MDT Trustees determine that the circumstances described in such clause are no longer reasonably likely to occur or (B) the MDT Trustees determine that the Master Disbursement Trust is no longer reasonably likely to be unable to make the required payments on account of the MDT Claims on the next MDT Distribution Date.

"***MDT Shareholder Rights***" means, subject in all respects to the Shareholder Settlement (including all releases and injunctions thereof), any and all rights, titles, privileges, interests, claims, demands and entitlements of the Debtors arising under, or attributable to, any Causes of Action or choses in action against, or proceeds, payments, benefits or indemnities from, Shareholder Released Parties, including without limitation to the extent arising under, or attributable to, the Shareholder Settlement Agreement and any related security agreements, documents, agreements or instruments, in each case whether now existing or hereafter arising, accrued or unaccrued, liquidated or unliquidated, matured or unmatured, disputed or undisputed, fixed or contingent.

"***MDT TPP Claim***" means the beneficial interest in the Master Disbursement Trust granted to the TPP Trust pursuant to the Private Entity Settlements, which interest shall entitle the TPP Trust to the payment of the amounts set forth in Section 5.2(d)(i)(B) of the Plan.

"***MDT Transferred Assets***" means all right, title and interest of the Debtors arising under, or attributable to, (i) the MDT Operating Reserve, (ii) the MDT Causes of Action, (iii) the MDT Insurance Rights, (iv) the MDT Shareholder Rights, (v) any other Excluded Assets that are not PAT Assets and (vi) any Surplus Reserve Cash to be distributed to the Master Disbursement Trust, upon the identification thereof by the Plan Administration Trustee or the dissolution of the Plan Administration Trust, in accordance with Section 5.13(c) of the Plan. For the avoidance of doubt, "MDT Transferred Assets" shall not include any Causes of Action against any Released Party.

"***MDT Tribe Interest***" means the beneficial interest in the Master Disbursement Trust granted to the Tribe Trust under the Plan pursuant to the Public Entity Settlements, which interest shall entitle the Tribe Trust to its share of distributions of MDT Excess Cash in accordance with Section 5.2(e)(i) of the Plan and the MDT Priority Waterfall.

"***MDT Trustees***" means the trustees of the Master Disbursement Trust appointed in accordance with Section 5.6(d) of the Plan.

"***Mediation***" means the mediation authorized by the Bankruptcy Court and described in the *Order Appointing Mediators* [D.I. 895].

"***Minimum Required Settlement Payment***" means, with respect to an SSA Payment Date, the minimum amount payable by the Shareholder Parties under the Shareholder Settlement Agreement on such SSA Payment Date.

"***MSGE Group***" means the Multi-State Governmental Entities Group identified in the *Second Amended Verified Statement of the Multi-State Governmental Entities Group Pursuant to Rule 2019 of the Federal Rules of Bankruptcy Procedure* [D.I. 1794], as amended from time to time; *provided, however*, that, notwithstanding anything herein to the contrary, the MSGE Group shall be a "Governmental Consent Party" and shall have the same consent rights, appointment or selection rights, and any other rights or obligations afforded to other Governmental Consent Parties, such rights not to be reduced or modified without the written consent of the MSGE Group. The foregoing shall not give the MSGE Group any independent or individual rights to make any unilateral decisions, including to appoint or select any trustees, managers, directors, or officers under the Plan. Notwithstanding anything herein to the contrary, the sole remedy of the MSGE Group in respect of its rights hereunder shall be the termination of the Term Sheet (as defined in the MSGE Group Reimbursement Motion) by written notice and withdrawal of the MSGE Group's support of the Plan.

"***MSGE Group Reimbursement Motion***" means the *Debtors' Motion to Enter into Term Sheet with and Pay Certain Fees and Expenses of the Multi-State Governmental Entities Group* [D.I. 2580].

"***MSGE Group Reimbursement Order***" means the *Order Authorizing the Debtors to Enter into Term Sheet with and Pay Certain Fees and Expenses of the Multi-State Governmental Entities Group* [D.I. 2695].

"***NAS Child***" means a natural person who has been diagnosed by a licensed medical provider with a medical, physical, cognitive or emotional condition resulting from such natural person's intrauterine exposure to opioids or opioid replacement or treatment medication, including but not limited to the condition known as neonatal abstinence syndrome.

"***NAS Committee***" means the Ad Hoc Committee of NAS Children identified in the *First Amended Verified Statement of the Ad Hoc Committee of NAS Children Pursuant to Bankruptcy Rule 2019* [D.I. 1582].

"***NAS Monitoring Claim***" means any Claim against any Debtor that is held by, or on account of or on behalf of, a NAS Child and relates to medical monitoring support, educational support, vocational support, familial support or similar related relief, and is not for an alleged personal injury suffered by a NAS Child.

"***NAS Monitoring TDP***" means the trust distribution procedures to be implemented by the NAS Monitoring Trust setting forth the procedures for the distribution of Abatement Distributions by the NAS Monitoring Trust to Authorized Recipients and the Authorized Abatement Purposes for Abatement Distributions from the NAS Monitoring Trust, the terms of which shall be consistent with Articles I through XII of the Plan and otherwise acceptable to the Debtors and the NAS Committee and reasonably acceptable to the Creditors' Committee and the Governmental Consent Parties, and which shall be filed by the Debtors with the Plan Supplement [[(it being understood and agreed that the form of

trust distribution procedures to be implemented by the NAS Monitoring Trust filed on April 23, 2021 is acceptable to such parties)].

"*NAS Monitoring Trust*" means the trust to be established in accordance with Section 5.7 of the Plan to (i) assume all liability for the NAS Monitoring Claims, (ii) hold the MDT NAS Monitoring Claim and collect the Initial NAS Monitoring Trust Distribution and additional payments due under the MDT NAS Monitoring Claim in accordance with the Private Entity Settlements and the NAS Monitoring Trust Documents, (iii) administer NAS Monitoring Claims and (iv) make Abatement Distributions to Authorized Recipients for Authorized Abatement Purposes, in each case in accordance with the NAS Monitoring Trust Documents.

"*NAS Monitoring Trust Agreement*" means the trust agreement establishing and delineating the terms and conditions for the creation and operation of the NAS Monitoring Trust, the terms of which shall be consistent with Articles I through XII of the Plan and otherwise acceptable to the Debtors and the NAS Committee and reasonably acceptable to the Creditors' Committee and the Governmental Consent Parties, and which shall be filed by the Debtors with the Plan Supplement.

"*NAS Monitoring Trust Documents*" means the NAS Monitoring Trust Agreement and the NAS Monitoring TDP.

"*Native American Tribe Group*" means the group consisting of the Muscogee (Creek) Nation, a member of the Ad Hoc Committee, the Cheyenne & Arapaho Tribes, an ex officio member of the Creditors' Committee, and other Tribes represented by various counsel from the Tribal Leadership Committee and the Plaintiffs' Executive Committee in MDL No. 2804.

["*Net Prepaid Settlement Amount*" means (i) the amount of a Minimum Required Settlement Payment that is paid prior to its originally scheduled SSA Payment Date pursuant to a particular Shareholder Prepayment minus (ii) the amount thereof to be reserved in the MDT Operating Reserve. In the event that a Shareholder Prepayment prepays all or any portion of the Minimum Required Settlement Payments due on two or more different SSA Payment Dates, (x) there shall be a separate Net Prepaid Settlement Amount for each such Minimum Required Settlement Payment that is due on a separate SSA Payment Date, such that the Net Prepaid Settlement Amount for each Minimum Required Settlement Payment prepaid in full or in part by each Shareholder Prepayment shall be calculated in accordance with the foregoing and applied in accordance with Sections 5.2(d)(iv)(C) and 5.2(e)(ii) of the Plan separately from the Net Prepaid Settlement Amount for each other Minimum Required Settlement Payment prepaid in full or in part by such Shareholder Prepayment and (y) in calculating the Net Prepaid Settlement Amount for each Minimum Required Settlement Payment that is prepaid in full or in part by such Shareholder Prepayment, the aggregate amount of the Shareholder Prepayment to be reserved in the MDT Operating Reserve shall be allocated to each Net Prepaid Settlement Amount proportionally according to the amount of each Minimum Required Settlement Payment that is prepaid by such Shareholder Prepayment.][3]

"*NewCo*" means a newly formed Delaware limited liability company to be created in accordance with Section 5.4 of the Plan to directly or indirectly receive the NewCo Transferred Assets and operate such NewCo Transferred Assets in accordance with the NewCo Operating Agreement, the NewCo Governance Covenants and the NewCo Operating Injunction.

---

[3] The definition of Net Prepaid Settlement Amount remains subject to ongoing review.

"*NewCo Available Cash*" means all Cash and cash equivalents held by NewCo and its Subsidiaries (other than MDT Distributable Sale Proceeds), as of the relevant date of determination, in excess of the amounts referenced in Section 5.2(f)(ii)(A) of the Plan.

"*NewCo Distribution Date*" means July 15, 2022 and each six (6)-month anniversary thereof.

"*NewCo Excess Cash*" means (i) all Cash and cash equivalents held by NewCo and its Subsidiaries (other than MDT Distributable Sale Proceeds), as of the relevant date of determination, in excess of the amounts referenced in Section 5.2(f)(ii)(A) and (B) of the Plan and (ii) all amounts received by NewCo from the Master Disbursement Trust pursuant to Section 5.2(f)(i)(D) of the Plan; *provided* that amounts described in this clause (ii) shall be promptly distributed to TopCo and shall not be subject to the limitations of a NewCo Distribution Date, or any other limitation, and thereafter distributed promptly by TopCo as a Public Creditor Trust Distribution.

"*NewCo Governance Covenants*" means the provisions contained in the Confirmation Order that will bind NewCo, and any successor owner of NewCo's opioid business, to covenants to ensure that NewCo (i) provides all of its products, including all opioid products, in a safe manner that limits the risk of diversion, (ii) complies with its obligations under the Public Entity Settlements and the Private Entity Settlements, (iii) pursues and implements Public Health Initiatives, and (iv) otherwise takes into account long-term public health interests relating to the opioid crisis and best environmental, social and governance practices in management of a pharmaceutical business, which covenants shall be acceptable to the DOJ and the Governmental Consent Parties and reasonably acceptable to the Debtors; *provided* that the covenants in respect of the foregoing clause (ii) shall be acceptable to the DOJ and reasonably acceptable to the Debtors, the Creditors' Committee and the Governmental Consent Parties.

"*NewCo Guarantee Agreement*" means the guarantee agreement documenting the obligations of NewCo and TopCo to make Cash payments to the Master Disbursement Trust in accordance with Section 5.2(d)(iii) of the Plan, the terms and conditions of which shall be consistent with Articles I through XII of the Plan and otherwise reasonably acceptable to the Debtors, the Creditors' Committee and the Governmental Consent Parties, and which shall be filed by the Debtors with the Plan Supplement.

"*NewCo Interest*" means the sole limited liability company interest in NewCo issued to TopCo pursuant to the Public Entity Settlements, representing 100% of the economic and voting Interests in NewCo.

"*NewCo Managers*" means the members of the board of managers of NewCo appointed in accordance with Section 5.4(d) of the Plan.

"*NewCo Monitor*" means the monitor appointed in accordance with Section 5.4(i) of the Plan to ensure NewCo's compliance with the NewCo Operating Injunction and the NewCo Governance Covenants.

"*NewCo Operating Agreement*" means the limited liability company agreement of NewCo, the terms of which shall be consistent with Articles I through XII of the Plan and the NewCo/TopCo Governance Term Sheet and otherwise acceptable to the DOJ and the Governmental Consent Parties and reasonably acceptable to the Debtors, and which shall be filed by the Debtors with the Plan Supplement.

"*NewCo Operating Expenses*" means any and all costs, expenses, fees, taxes, disbursements, debts or obligations incurred from the operation and administration of NewCo and its

Subsidiaries, including (i) in connection with the Public Health Initiatives, (ii) working capital and other capital needs, (iii) compensation, costs and fees of, and indemnification amounts owed to, the NewCo Managers, the NewCo Monitor and any professionals retained by NewCo or the NewCo Monitor and (iv) any amounts required to satisfy any deficiency of funding in the Wind-Up Reserve. For the avoidance of doubt, amounts to be paid pursuant to the NewCo Guarantee Agreement or as a TopCo Distribution shall not be NewCo Operating Expenses.

"***NewCo Operating Injunction***" means a voluntary injunction to be contained in the Confirmation Order that will bind NewCo, and any successor owner of NewCo's opioid business, to injunctive relief substantially similar to the voluntary injunction set forth in Appendix I to the *Fifteenth Amended Order Pursuant to 11 U.S.C. § 105(a) Granting Motion for a Preliminary Injunction*, Adv. Proc. Case No. 19-08289 (RDD) [D.I. 224], as amended from time to time, with any such changes to such voluntary injunction as may be agreed by the Debtors and the Governmental Consent Parties based upon good-faith discussions and in furtherance of NewCo's purpose as set forth in Section 5.4(b) of the Plan.

"***NewCo Priority Waterfall***" means the priority waterfall applicable to NewCo set forth in Section 5.2(f)(ii) of the Plan.

"***NewCo Transfer Agreement***" means one or more agreements transferring the NewCo Transferred Assets, and all documents and information of the Debtors related thereto, from the Debtors to NewCo or one of its Subsidiaries (or the transfer of the Transferred PPLP Subsidiaries to NewCo or one of its Subsidiaries and the re-vesting of the NewCo Transferred Assets held by such Transferred PPLP Subsidiaries in such Transferred PPLP Subsidiaries), the terms of which shall be consistent with Articles I through XII of the Plan and otherwise acceptable to the Debtors, the DOJ and the Governmental Consent Parties, and which shall be filed by the Debtors with the Plan Supplement.

"***NewCo Transferred Assets***" means (i) the Initial NewCo Cash and (ii) all non-Cash Assets of the Debtors on the Effective Date (prior to giving effect to the Restructuring Transactions) other than the Excluded Assets.

"***NewCo/TopCo Governance Term Sheet***" means the governance term sheet for NewCo and TopCo attached as Appendix F to the Disclosure Statement.

"***NOAT***" means the National Opioid Abatement Trust, a Delaware statutory trust to be established in accordance with Section 5.7 of the Plan to (i) assume all liability for the Non-Federal Domestic Governmental Claims, (ii) hold the MDT NOAT Interest and the TopCo NOAT Interest and collect the Initial NOAT Distribution and other Public Creditor Trust Distributions received in accordance with the Public Entity Settlements, (iii) administer Non-Federal Domestic Governmental Claims and (iv) make Abatement Distributions to Authorized Recipients for Authorized Abatement Purposes, in each case in accordance with the NOAT Documents.

"***NOAT Agreement***" means the trust agreement establishing and delineating the terms and conditions for the creation and operation of NOAT, the terms of which shall be consistent with Articles I through XII of the Plan and otherwise acceptable to the DOJ and the Governmental Consent Parties, in consultation with the Debtors and the Creditors' Committee, and which shall be filed by the Debtors with the Plan Supplement.

"***NOAT Documents***" means the NOAT Agreement and the NOAT TDP.

"***NOAT TDP***" means the trust distribution procedures to be implemented by NOAT setting forth the procedures for the distribution of Abatement Distributions by NOAT to Authorized Recipients and the Authorized Abatement Purposes for Abatement Distributions from NOAT, which shall

be consistent with Articles I through XII of the Plan and otherwise acceptable to the DOJ and the Governmental Consent Parties, in consultation with the Debtors and the Creditors' Committee, and which shall be filed by the Debtors with the Plan Supplement [(it being understood and agreed that the form of trust distribution procedures to be implemented by NOAT filed on April [ ], 2021 is acceptable to such parties)].

"***Non-Federal Domestic Governmental Claim***" means any Claim against any Debtor that is held by a Domestic Governmental Entity other than the United States (including any Claim based on the subrogation rights of the Holder thereof that is not an Other Subordinated Claim), and that is not a Priority Tax Claim or a Tribe Claim.

"***Opioid Proceeds***" means any profits or proceeds derived from the development, production, manufacture, licensing, labeling, marketing, distribution or sale of opioid products by NewCo or the disposition of NewCo's opioid businesses.

"***Opioid-Related Activities***" means the development, production, manufacture, licensing, labeling, marketing, distribution or sale of opioid Products or the use or receipt of any proceeds therefrom, including as described in greater detail in the DOJ Resolution, or the use of opioids, including opioids that are not Products.

"***Other Federal Agency Claim***" means any Claim filed by the United States Department of Health and Human Services, the United States Department of Veterans Affairs, the Indian Health Service and the Centers for Medicare & Medicaid Services, set forth in Proofs of Claim Nos. 138509, 137406, 137782 and 138522, respectively.

"***Other General Unsecured Claim***" means any Claim against any Debtor that is not an Administrative Claim, a Priority Claim, a Secured Claim, a Federal Government Unsecured Claim, a Channeled Claim, a Ratepayer Claim, a Co-Defendant Claim, an Other Subordinated Claim, an Avrio General Unsecured Claim, an Adlon General Unsecured Claim, an Intercompany Claim or a Shareholder Claim.

"***Other General Unsecured Claim Cash***" means $15 million of Effective Date Cash to be used to make Distributions to Holders of Allowed Other General Unsecured Claims.

"***Other Priority Claim***" means any Claim against any Debtor that is entitled to priority of payment as specified in section 507(a) of the Bankruptcy Code and is not an Administrative Claim or a Priority Tax Claim.

"***Other Subordinated Claim***" means any Claim against any Debtor that is subject to subordination under section 509(c) or 510 of the Bankruptcy Code or other applicable law, and that is not a Co-Defendant Claim or a Shareholder Claim. Notwithstanding anything to the contrary outside of this definition in the Plan, any Claim that satisfies the definition of an Other Subordinated Claim shall be an Other Subordinated Claim notwithstanding that such Claim would otherwise satisfy the definition of another type of Claim.

"***PAT Agreement***" means the trust agreement establishing and delineating the terms and conditions for the creation and operation of the Plan Administration Trust, as it may be amended from time to time, the terms of which shall be consistent with Articles I through XII of the Plan and otherwise acceptable to the Debtors, and reasonably acceptable to the Creditors' Committee and the Governmental Consent Parties, and which shall be filed by the Debtors with the Plan Supplement.

"*PAT Assets*" means (i) the PAT Reserves, (ii) the PAT Distribution Accounts, (iii) the Retained Causes of Action relating solely to, and only to the extent necessary for, the administration of Claims against the Debtors (other than Channeled Claims), the enforcement of the Plan Administration Trust's rights and the other responsibilities of the Plan Administration Trust, *provided* that no Retained Causes of Action against Excluded Parties shall constitute PAT Assets, except as necessary to object to and resolve any Disputed Claims held by an Excluded Party and (iv) any other Excluded Assets identified in the PAT Agreement.

"*PAT Distribution Account*" means one or more accounts to be established to make Distributions in respect of Allowed Federal Government Unsecured Claims, Allowed Avrio General Unsecured Claims, Allowed Adlon General Unsecured Claims and Allowed Other General Unsecured Claims (which may be a single or collective account for one or more Classes of Claims). The PAT Distribution Account shall be (i) funded on the Effective Date in accordance with Section 5.13(a)(viii) of the Plan in an amount necessary to make Distributions in respect of such Claims to the extent Allowed as of the Effective Date and periodically funded thereafter in accordance with Section 7.5 of the Plan and (ii) held by the Plan Administration Trust and administered by the Plan Administration Trustee.

"*PAT Distribution Date*" means any date upon which a Distribution is made by the Plan Administration Trustee.

"*PAT Reserves*" means, collectively, the Wind-Up Reserve, the Disputed Claims Reserves, the Disputed Cure Claims Reserve and the Priority Claims Reserve.

"*PBGC*" means the Pension Benefit Guaranty Corporation, a wholly-owned United States government corporation, and an agency of the United States created by ERISA.

"*Person*" means an individual, corporation, partnership, joint venture, association, joint stock company, limited liability company, limited liability partnership, trust, estate, unincorporated organization, Governmental Unit or other Entity.

"*Petition Date*" means September 15, 2019.

"*PI Claim*" means any Claim against any Debtor for alleged opioid-related personal injury or other similar opioid-related claim or Cause of Action, including any opioid-related personal injury Claim or similar opioid-related Claim asserted by a NAS Child, and that is not a Third-Party Payor Claim, a NAS Monitoring Claim or a Claim held by a Domestic Governmental Entity.

"*PI TDP*" means the trust distribution procedures to be implemented by the PI Trust, the terms of which shall be consistent with Articles I through XII of the Plan and otherwise acceptable to the Debtors and the Ad Hoc Group of Individual Victims and reasonably acceptable to the Creditors' Committee and the Governmental Consent Parties, and which shall be filed by the Debtors with the Plan Supplement [(it being understood and agreed that the form of trust distribution procedures to be implemented by the PI Trust filed on April 23, 2021 is acceptable to such parties)].

"*PI Trust*" means the trust to be established in accordance with Section 5.7 of the Plan to (i) assume all liability for the PI Claims, (ii) hold the MDT PI Claim and collect the Initial PI Trust Distribution and additional payments due under the MDT PI Claim in accordance with the Private Entity Settlements and the PI Trust Documents, (iii) administer PI Claims, (iv) make Distributions on account of Allowed PI Claims in accordance with the PI Trust Documents, (v) fund the TPP LRP Escrow Account and make payments therefrom to LRP Participating TPPs, in each case, in accordance with and subject to the terms of the LRP Agreement and (vi) carry out such other matters as are set forth in the PI Trust Documents.

"*PI Trust Agreement*" means the trust agreement establishing and delineating the terms and conditions for the creation and operation of the PI Trust, the terms of which shall be consistent with Articles I through XII of the Plan and otherwise acceptable to the Debtors and the Ad Hoc Group of Individual Victims and reasonably acceptable to the Creditors' Committee and the Governmental Consent Parties, and which shall be filed by the Debtors with the Plan Supplement.

"*PI Trust Documents*" means the PI Trust Agreement, the PI TDP and the LRP Agreement.

"*Plan*" means this joint chapter 11 plan of reorganization for the Debtors, including all appendices, exhibits, schedules and supplements hereto (including the Plan Supplement), as it may be altered, amended or modified from time to time in accordance with the Bankruptcy Code, the Bankruptcy Rules and the terms hereof.

"*Plan Administration Trust*" means the trust to be created in accordance with Section 5.3 of the Plan to administer and make Distributions in respect of Claims against the Debtors (other than Channeled Claims) and administer the Plan.

"*Plan Administration Trustee*" means the trustee of the Plan Administration Trust appointed in accordance with Section 5.3(c) of the Plan.

"*Plan Documents*" means, collectively, the Plan and all documents to be executed, delivered, assumed or performed in connection with the Restructuring Transaction and the occurrence of the Effective Date, including the documents to be included in the Plan Supplement.

"*Plan Injunction*" means the injunctions issued pursuant to Section 10.5 of the Plan.

"*Plan Settlement*" means the settlement of certain Claims and controversies described in Section 5.2 of the Plan, and as further described and explained in the Disclosure Statement.

"*Plan Supplement*" means the supplement or supplements to the Plan containing certain documents relevant to the implementation of the Plan, which shall include the MDT Agreement, the NewCo Transfer Agreement, the NewCo Operating Agreement, the TopCo Operating Agreement, the PAT Agreement, the PI Trust Documents (including the LRP Agreement), the NAS Monitoring Trust Documents, the Hospital Trust Documents, the TPP Trust Documents, the NOAT Documents, the Tribe Trust Documents, the NewCo Guarantee Agreement, the identity of the MDT Trustees, the identity of the MDT Executive Director, the identity of the NewCo Managers, the identity of the TopCo Managers, the identity of the Plan Administration Trustee and PPLP Liquidator, the identity of the Creditor Trustees, the Schedule of Rejected Contracts, the Schedule of Retained Causes of Action, the Schedule of Excluded Parties, the Shareholder Settlement Agreement and the Restructuring Steps Memorandum.

"*Plea Agreement*" means that certain proposed plea agreement attached as Exhibit B to the DOJ 9019 Motion, as approved by the DOJ 9019 Order, by and among (i) Purdue Pharma L.P. and (ii) the United States, acting through the United States Attorney's Office for the District of New Jersey, the United States Attorney's Office for the District of Vermont, and the United States Department of Justice, Civil Division, Consumer Protection Branch.

"*PPI Interest*" means any Interest in Purdue Pharma Inc., whether held directly or indirectly, that existed immediately before the Effective Date.

"*PPLP*" means Purdue Pharma L.P.

"*PPLP Dissolution Date*" means the date on which the PPLP Liquidator dissolves PPLP in accordance with Section 5.14(d) of the Plan.

"*PPLP Interest*" means any Interest in PPLP, whether held directly or indirectly, that existed immediately before the Effective Date.

"*PPLP Liquidator*" means the person appointed in accordance with Section 5.14(c) of the Plan, who will be the same individual appointed as the Plan Administration Trustee.

"*Priority Claim*" means any Priority Tax Claim or Other Priority Claim.

"*Priority Claims Reserve*" means a reserve to be established to pay Allowed Administrative Claims (other than Professional Fee Claims, which shall be paid from the Professional Fee Escrow Account in accordance with Section 2.1(b) of the Plan, and the DOJ Forfeiture Judgment Claim, which shall be paid in accordance with Section 2.3 of the Plan), Allowed Secured Claims and Allowed Priority Claims. The Priority Claims Reserve shall be (i) funded on the Effective Date with Cash and cash equivalents of the Debtors in an amount determined by the Debtors and reasonably acceptable to the Governmental Consent Parties, in consultation with the Creditors' Committee, and (ii) held by the Plan Administration Trust in a segregated account and administered by the Plan Administration Trustee on and after the Effective Date.

"*Priority Tax Claim*" means any Claim against any Debtor that is held by a Governmental Unit and of the kind entitled to priority in payment under sections 502(i) and 507(a)(8) of the Bankruptcy Code.

"*Private Creditor Trusts*" means the Hospital Trust, the TPP Trust, the NAS Monitoring Trust and the PI Trust.

"*Private Entity Settlements*" means the settlement of Hospital Claims, Third-Party Payor Claims, NAS Monitoring Claims and PI Claims provided for under the Plan, as set forth in Section 5.2(d) of the Plan.

"*Privilege*" means any attorney-client privilege, work-product protection, or other privilege or protection of immunity (i) held by any or all of the Debtors or their Estates, (ii) held by the board of directors (or similar body) or any special committee of the board of directors (or similar body) of any of the Debtors and (iii) attaching to any documents, communications, or thing (whether written or oral) including, but not limited to, all electronic information relating to any Purdue Insurance Rights or Estate Causes of Action.

"*Products*" means any and all products developed, designed, manufactured, marketed or sold, in research or development, or supported by, the Debtors, whether work in progress or in final form.

"*Professional Fee Claim*" means a Claim for services or costs incurred in connection with such services, on or after the Petition Date and on or prior to the Effective Date, in each case by Professional Persons that remains unpaid as of the Effective Date, less any existing amounts held as a fee advance, retainer, or as security by a Professional Person that such Professional Person is authorized to use to satisfy Allowed Professional Fee Claims pursuant to the Interim Compensation Order or an order of the Bankruptcy Court authorizing the retention of such Professional Person (other than a reasonable retainer to cover post-Effective Date work); *provided* that, notwithstanding the foregoing, (i) the Professional Fee Claims of the Professional Persons retained by the Ad Hoc Committee shall be subject to the terms of the AHC Reimbursement Agreement Assumption Order and shall also include fees and expenses incurred prior to the Petition Date as and to the extent set forth in the AHC Reimbursement

22

Agreement Assumption Order and (ii) the Professional Fees Claims of the Professional Persons retained by the MSGE Group shall be subject to the terms of the MSGE Group Reimbursement Order.

"***Professional Fee Escrow Account***" means an account funded by the Debtors in Cash on or before the Effective Date to satisfy Allowed Professional Fee Claims in accordance with Section 2.1(b) of the Plan.

"***Professional Person***" means (i) any Person retained by order of the Bankruptcy Court in connection with these Chapter 11 Cases pursuant to section 327, 328, 330, 331, 503(b) or 1103 of the Bankruptcy Code, excluding any ordinary course professional retained pursuant to an order of the Bankruptcy Court, (ii) each of the professionals for the Ad Hoc Committee, as and to the extent authorized by the AHC Reimbursement Agreement Assumption Order and (iii) each of the professionals for the MSGE Group, as and to the extent authorized by the MSGE Group Reimbursement Order.

"***Proof of Claim***" means a proof of Claim against any of the Debtors filed in the Chapter 11 Cases in accordance with section 501 of the Bankruptcy Code.

["***Proportionate Settlement Prepayment Share***" means, with respect to each Private Creditor Trust, such Private Creditor Trust's proportional share of a Net Prepaid Settlement Amount, calculated as a percentage equal to (i) the outstanding amount of such Private Creditor Trust's MDT Claim that is due on the MDT Distribution Date immediately following the originally scheduled SSA Payment Date divided by (ii)(A) the Net Prepaid Settlement Amount plus (B) any remaining amounts not yet paid of the Minimum Required Settlement Payment for such originally scheduled SSA Payment Date (calculated after giving effect to such Shareholder Prepayment and all prior Shareholder Prepayments).][4]

"***Pro Rata Share***" means, with respect to an Allowed Other General Unsecured Claim, the proportion that such Allowed Claim bears to the aggregate amount of Allowed Other General Unsecured Claims and Disputed Other General Unsecured Claims.

"***Protective Order***" means the *Third Amended Protective Order*, 19-23649 (RDD) [D.I. 1935], as amended.

"***Public Creditor Trusts***" means NOAT and the Tribe Trust. "***Public Creditor Trust Distributions***" means any and all payments, transfers and distributions from or on behalf of the Debtors, NewCo, TopCo or the Master Disbursement Trust to either of the Public Creditor Trusts, including without limitation the Initial Public Creditor Trust Distributions and all distributions of MDT Excess Cash and TopCo Excess Cash received by a Public Creditor Trust.

"***Public Document Repository***" means the public document repository to be established as set forth in Section 5.12 of the Plan.

"***Public Entity Allocation***" means the allocations of Public Creditor Trust Distributions between NOAT and the Tribe Trust as set forth in Section 5.2(e)(iv) of the Plan.

"***Public Entity Settlements***" means the settlement of Non-Federal Domestic Governmental Claims and Tribe Claims provided for under the Plan, as set forth in Section 5.2(e) of the Plan.

"***Public Health Initiatives***" means the development and distribution of medicines to treat opioid addiction and reverse opioid overdoses.

---

[4] The definition of Proportionate Settlement Prepayment Share remains subject to ongoing review.

"*Purdue*" has the meaning set forth in the introductory paragraph of this Plan.

"*Purdue Insurance Collateral*" means any collateral the Debtors have provided or set aside to secure obligations under any Purdue Insurance Policy.

"*Purdue Insurance Policies*" means any primary, umbrella, excess, fronting or other insurance policy, whether known or unknown, issued to or that provides or may provide coverage or benefits at any time to the Debtors or under which the Debtors have sought or may seek coverage or benefits, including, without limitation, any such policy for directors' and officers' liability, general liability, product liability, property, workers' compensation, fiduciary liability policy, and all agreements, documents or instruments relating thereto that (i) were issued prior to the Confirmation Date and (ii) cover periods that are, in whole or in part, prior to the Confirmation Date.

"*Purdue Insurance Rights*" means any and all rights, titles, privileges, interests, claims, demands or entitlements of the Debtors to any proceeds, payments, benefits, Causes of Action, choses in action, defense or indemnity arising under, or attributable to, any and all Purdue Insurance Policies or Purdue Insurance Collateral, now existing or hereafter arising, accrued or unaccrued, liquidated or unliquidated, matured or unmatured, disputed or undisputed, fixed or contingent. For the avoidance of doubt, "Purdue Insurance Rights" include any rights of the Debtors to proceeds of Purdue Insurance Policies and Purdue Insurance Collateral.

"*Purdue Insurance Stipulation*" means the *Stipulation and Agreed Order Granting Joint Standing to Prosecute Claims and Causes of Action Related to the Debtors' Insurance Coverage to (1) the Official Committee of Unsecured Creditors and (2) the Ad Hoc Committee of Government and Other Contingent Litigation Claimants* [D.I. 2305].

"*Purdue Monitor*" means the monitor retained pursuant to the voluntary injunction set forth in Appendix I to the *Fifteenth Amended Order Pursuant to 11 U.S.C. § 105(a) Granting Motion for a Preliminary Injunction*, Adv. Proc. Case No. 19-08289 (RDD) [D.I. 224], as amended from time to time.

"*Purdue Pension Plan*" means the Purdue Pharma L.P. Pension Plan, a single-employer defined benefit pension plan covered by Title IV of ERISA.

"*Ratepayer Claim*" means any Claim against any Debtor that arises out of or relates to the payment for health insurance by the Holder of such Claim.

"*Ratepayer Mediation Participants*" means the proposed representatives of classes of privately insured parties who are plaintiffs and proposed class representatives identified in the *Amended Verified Statement of Stevens & Lee, P.C. Pursuant to Bankruptcy Rule 2019* [D.I. 333].

"*Reinstated*" means, with respect to any Claim against or Interest in a Debtor, that such Claim or Interest shall be rendered Unimpaired in accordance with section 1124 of the Bankruptcy Code.

"*Related Parties*" means, with respect to a Person, (i) such Person's predecessors, successors, assigns, Subsidiaries, affiliates, managed accounts or funds, past, present, and future officers, board members, directors, principals, agents, servants, independent contractors, co-promoters, third-party sales representatives, medical liaisons, members, partners (general or limited), managers, employees, subcontractors, agents, advisory board members, financial advisors, attorneys and legal representatives, accountants, investment bankers, consultants, representatives, management companies, fund advisors and other professionals and advisors, trusts (including trusts established for the benefit of such Person), trustees, protectors, beneficiaries, direct or indirect owners and/or equityholders, parents, transferees,

24

heirs, executors, estates, nominees, administrators, and legatees, in each case in their respective capacities as such, and (ii) the Related Parties of each of the foregoing, in each case in their respective capacities as such. For the avoidance of doubt, the citizens and residents of a State shall not be deemed to be Related Parties of such State solely as a result of being citizens or residents of such State.

"***Released Claims***" means any Claims released pursuant to <u>Section 10.6</u> of the Plan.

"***Released Parties***" means, collectively, (i) the Debtors, (ii) the Plan Administration Trust, (iii) NewCo, (iv) TopCo, (v) the Master Disbursement Trust, (vi) with respect to each of the foregoing Entities in clauses (i) through (v), each of their Related Parties, and (vii) solely for purposes of the Releases by the Debtor in <u>Section 10.6(a)</u> of the Plan, the Supporting Claimants, the Creditors' Committee and the Creditors' Committee's members and each of their respective professionals, in each case solely in their respective capacities as such; *provided*, *however*, that, notwithstanding the foregoing or anything herein to the contrary, no Excluded Party or Shareholder Released Party[5] shall be a Released Party in any capacity or respect. For the avoidance of doubt, the Released Parties referenced in clause (vi) of this definition include Persons referenced in clause (ii) of the definition of Related Parties only to the extent (x) a claim arises from actions taken by such Person in its capacity as a Related Party of a Person referenced in clause (i) of the definition of Related Parties and (y) the underlying claim against the Released Party is released against the Person to which the Related Party is related.

"***Releases***" means the releases provided for in <u>Section 10.6</u> of the Plan.

"***Releasing Parties***" means, collectively, (i) the Supporting Claimants, solely in their respective capacities as such, (ii) all Holders of Claims against or Interests in the Debtors and (iii) with respect to each of the foregoing Entities in clauses (i) and (ii) and the Debtors, each of their Related Parties.

"***Restructuring Steps Memorandum***" means the summary of transaction steps to complete the Restructuring Transactions, which shall be consistent with <u>Articles I</u> through <u>XII</u> of the Plan and otherwise acceptable to the Debtors and reasonably acceptable to the Creditors' Committee and the Governmental Consent Parties, and which shall be included in the Plan Supplement.

"***Restructuring Transactions***" means one or more transactions pursuant to section 1123(a)(5)(D) of the Bankruptcy Code, to occur on or before the Effective Date or as soon as reasonably practicable thereafter, that may be necessary or appropriate to effect any transaction described in, approved by, contemplated by or necessary to effectuate this Plan, including (i) the creation of NewCo and the direct or indirect transfer thereto and vesting therein (or in a Subsidiary of NewCo) of the NewCo Transferred Assets free and clear of Claims, Interests and liabilities in accordance with the NewCo Transfer Agreement, (ii) the creation of TopCo and the issuance of the NewCo Interest to TopCo, (iii) the creation of the Master Disbursement Trust and the transfer thereto and vesting therein of the MDT Transferred Assets, (iv) the creation of the Plan Administration Trust and the vesting therein of the PAT Assets, (v) the creation of NOAT and the Tribe Trust and the consummation of the Public Entity Settlements, consisting of the payment of the Initial Public Creditor Trust Distributions and the issuance of the MDT Interests and the TopCo Interests, (vi) the creation of the Private Creditor Trusts and the

---

[5] The Shareholder Settlement, the release of claims and causes of action against the Shareholder Released Parties by the Debtors and the Releasing Parties and the related injunctions (including the Shareholder Channeling Injunction) are integral parts of the global settlement transactions reflected by the Plan. The terms of such releases and injunctions are subject to ongoing negotiations among the Debtors, the Shareholder Released Parties, the Governmental Consent Parties and the Creditors' Committee. The Debtors anticipate filing an amended Plan incorporating such releases upon the parties' agreement to a definitive Shareholder Settlement Agreement prior to the hearing of the Bankruptcy Court to consider entry of the Solicitation Procedures Order.

consummation of the Private Entity Settlements, consisting of the payment of the Initial Private Creditor Trust Distributions and the issuance of the MDT Claims, (vii) the creation and funding of the Priority Claims Reserve and the PAT Distribution Account to make Distributions in respect of Allowed Claims (other than Channeled Claims), (viii) the payment of the Truth Initiative Contribution in satisfaction of the Ratepayer Claims, (ix) entry into the Shareholder Settlement, including the Shareholder Releases and the Shareholder Channeling Injunction in exchange for, among other things, the contribution of funds to the Master Disbursement Trust pursuant to the Shareholder Settlement Agreement, (x) the Releases, injunctions and exculpations set forth herein and in the Confirmation Order and (xi) the transactions set forth in the Restructuring Steps Memorandum.

"*Retained Causes of Action*" means all Estate Causes of Action that are not expressly settled or released under the Plan on or prior to the Effective Date, and which shall include all Causes of Action against Excluded Parties and the Causes of Action set forth on the Schedule of Retained Causes of Action. For the avoidance of doubt, "Retained Causes of Action" shall not include any Causes of Action against any Released Party.

"*Schedule of Excluded Parties*" means the schedule of Excluded Parties filed by the Debtors with the Plan Supplement, which shall include only Persons agreed to by the Debtors and the Governmental Consent Parties, in consultation with the Creditors' Committee.

"*Schedule of Rejected Contracts*" means the schedule of all executory contracts and unexpired leases to be rejected by the Debtors, if any, filed by the Debtors with the Plan Supplement, which shall be in form and substance acceptable to the Debtors and reasonably acceptable to the Governmental Consent Parties, in consultation with the Creditors' Committee.

"*Schedule of Retained Causes of Action*" means the schedule of Retained Causes of Action filed by the Debtors with the Plan Supplement, which shall be in form and substance acceptable to the Debtors and the Governmental Consent Parties and reasonably acceptable to the Creditors' Committee.

"*Scheduled*" means, with respect to any Claim against the Debtors, the status, priority, and amount, if any, of such Claim as set forth in the Schedules.

"*Schedules*" means the schedules of assets and liabilities, statements of financial affairs, lists of Holders of Claims and Interests and all amendments or supplements thereto filed by the Debtors with the Bankruptcy Court to the extent such filing is not waived pursuant to an order of the Bankruptcy Court.

"*Secured Claim*" means any Claim against any Debtor to the extent such Claim is (i) secured by a valid, perfected and non-avoidable Lien on property of a Debtor's Estate, the amount of which is equal to or less than the value of such property (A) as set forth in this Plan, (B) as agreed to by the Holder of such Claim and the Debtors, or (C) as determined by a Final Order in accordance with section 506(a) of the Bankruptcy Code or (ii) subject to any setoff right of the Holder of such Claim under section 553 of the Bankruptcy Code. "Secured Claim" does not include any Claim that meets the definition of "Priority Tax Claim."

"*Securities Act*" means the Securities Act of 1933, as amended.

"*Settled Canadian Patient Claims*" means the "Settled Patient Claims" as defined in the Canadian Patient Claim Settlement Stipulation.

"*Settling MDT Insurer*" means an Insurance Company that has entered into an MDT Insurance Settlement, solely in its capacity as such and solely with respect to any Purdue Insurance Policy released in such MDT Insurance Settlement.

"*Settling MDT Insurer Injunction*" means the injunction issued pursuant to Section 10.9 of the Plan.

"*Shareholder Channeling Injunction*" means the channeling injunction issued pursuant to Section 10.11 of the Plan.

"*Shareholder Claim*" means any Claim against any Debtor or that seeks to recover from any property of any Debtor or its Estate, including from any Purdue Insurance Policy, in each case, that is held by a Shareholder Released Party. Notwithstanding anything to the contrary outside of this definition in the Plan, any Claim that satisfies the definition of a Shareholder Claim shall be a Shareholder Claim notwithstanding that such Claim would otherwise satisfy the definition of another type of Claim.

"*Shareholder Parties*" means the Sackler family members and trusts that are parties to the Shareholder Settlement Agreement.

"*Shareholder Payment Group*" means each distinct group of Shareholder Parties with joint and several payment obligations under the Shareholder Settlement Agreement.

"*Shareholder Prepayment*" means any payment of all or any portion of a Minimum Required Settlement Payment to the Master Disbursement Trust prior to the originally scheduled SSA Payment Date for such Minimum Required Settlement Payment as set forth in the Shareholder Settlement Agreement.

"*Shareholder Released Claims*" means any Claims released pursuant to Section 10.10 of the Plan.

"*Shareholder Released Parties*" means the Persons that shall be released from Claims held by the Debtors subject to and in accordance with the terms of the Shareholder Settlement Agreement.

"*Shareholder Releases*" means the releases provided for in Section 10.10 of the Plan.

"*Shareholder Settlement*" means the transactions contemplated under the Shareholder Settlement Agreement, the release of the Shareholder Released Claims pursuant to Section 10.10 of the Plan, the Shareholder Channeling Injunction pursuant to Section 10.11 of the Plan and all other terms and provisions of the Plan, the Confirmation Order and the other Plan Documents implementing any of the foregoing.

"*Shareholder Settlement Agreement*" means the settlement agreement to be entered into on or prior to the Effective Date by and among the Debtors and the Shareholder Parties, which shall provide for, among other things, the settlement of the Shareholder Released Claims and the payment of the Shareholder Settlement Amount by the Shareholder Parties to the Master Disbursement Trust, and the terms of which shall be consistent with Articles I through XII of the Plan and the Shareholder Settlement Term Sheet and otherwise acceptable to the Debtors, the Creditors' Committee and the Governmental Consent Parties.

"*Shareholder Settlement Amount*" means Cash in an aggregate amount equal to $4.275 billion, which shall be paid by the Shareholder Parties to the Debtors and/or the Master Disbursement Trust on the dates and pursuant to the terms set forth in the Shareholder Settlement Agreement.

"***Shareholder Settlement Term Sheet***" means the term sheet attached as Appendix G to the Disclosure Statement.

"***Solicitation Procedures Order***" means the order entered by the Bankruptcy Court approving (i) the adequacy of information in the Disclosure Statement, (ii) solicitation and voting procedures, (iii) forms of ballots, notices and notice procedures in connection therewith and (iv) certain dates with respect thereto [D.I. [__]].

"***SSA Payment Date***" means each date on which a payment is due under the Shareholder Settlement Agreement.

"***SSA Percentage***" means, with respect to a particular SSA Payment Date, (i) the amount owed under the Shareholder Settlement Agreement on such SSA Payment Date by a particular Shareholder Payment Group *divided* by (ii) the total amount owed under the Shareholder Settlement Agreement on such SSA Payment Date.

"***State***" means any U.S. state, any U.S. territory or the District of Columbia.

"***Subsidiaries***" means, with respect to a Person, all direct and indirect subsidiaries of such Person.

"***Supporting Claimants***" means (i) the Ad Hoc Committee, (ii) the MSGE Group, (iii) the Native American Tribes Group, (iv) the Ad Hoc Group of Individual Victims, (v) the Ad Hoc Group of Hospitals, (vi) the Third-Party Payor Group, (vii) the Ratepayer Mediation Participants, (viii) the NAS Committee and (ix) with respect to each of the foregoing clauses (ii) through (viii), the respective members thereof, solely in their capacity as such.

"***Surplus Reserve Cash***" means any surplus Cash or cash equivalents in any of the PAT Reserves in excess of what is estimated to be necessary to satisfy the obligations for which such amounts were reserved, in each case, as determined by the Plan Administration Trustee in accordance with Section 5.13(c) of the Plan.

"***Third-Party Payor***" means a health insurer, an employer-sponsored health plan, a union health and welfare fund or any other provider of healthcare benefits, and including any third-party administrator or agent on behalf thereof, in each case in its capacity as such.

"***Third-Party Payor Claim***" means any Claim against any Debtor that is held by a Third-Party Payor (including any Claim based on the subrogation rights of the Holder thereof that is not otherwise an Other Subordinated Claim) that is not a Domestic Governmental Entity; *provided* that Claims in respect of self-funded government plans that were and are asserted through private Third-Party Payors shall be included in this definition of "Third-Party Payor Claims." For the avoidance of doubt, claims of Third-Party Payors against Holders of PI Claims or Distributions payable to Holders of PI Claims are not claims against any Debtor and therefore are not included in this definition of "Third-Party Payor Claims."

"***Third-Party Payor Group***" means the group of certain Holders of Third-Party Payor Claims consisting of (i) the Holders of Third-Party Payor Claims represented by the TPP participants in the Mediation listed in Exhibit A of the *Mediators' Report* [D.I. 1716] and (ii) one representative from United Healthcare and one representative from the Ad Hoc Group of Self-Funded Plans identified in the *Verified Statement of the Ad Hoc Group of Self-Funded Health Plans Pursuant to Rule 2019 of the Federal Rules of Bankruptcy Procedure* [D.I. 1243].

"***TopCo***" means a newly formed Delaware limited liability company to be created in accordance with Section 5.5 of the Plan to (i) receive and hold the NewCo Interest and collect TopCo Distributions of NewCo Excess Cash, (ii) make certain payments to the Master Disbursement Trust under the NewCo Guarantee Agreement and (iii) make Public Creditor Trust Distributions in respect of the TopCo Interests from TopCo Excess Cash, in each case in accordance with the Plan and the TopCo Operating Agreement.

"***TopCo Distributions***" means any and all distributions from NewCo to TopCo in respect of the NewCo Interests.

"***TopCo Excess Cash***" means (i) all Cash and cash equivalents of TopCo (other than MDT Distributable Sale Proceeds), as of the relevant date of determination, in excess of the amounts referenced in Section 5.2(f)(iii)(A) of the Plan and (ii) all amounts received by TopCo from the Master Disbursement Trust pursuant to Section 5.2(f)(i)(D) of the Plan; *provided* that all amounts described in this clause (ii) shall be promptly distributed to as Public Creditor Trust Distributions and shall not be subject to the limitations of a NewCo Distribution Date or any other limitation.

"***TopCo Interests***" means the TopCo Tribe Interest and the TopCo NOAT Interest, which shall collectively represent 100% of the voting and economic Interests in TopCo.

"***TopCo Managers***" means the managers of TopCo appointed in accordance with Section 5.5(b) of the Plan.

"***TopCo NOAT Interest***" means a new limited liability company interest in TopCo to be issued to NOAT under the Plan pursuant to the Public Entity Settlements, representing 100% of the voting Interests in TopCo and a portion of the economic interests in TopCo corresponding to NOAT's entitlements under the Public Entity Allocation, which interest shall entitle NOAT to its share of distributions of TopCo Excess Cash in accordance with Section 5.2(e)(iii) of the Plan and the TopCo Priority Waterfall.

"***TopCo Operating Agreement***" means the limited liability company agreement establishing and delineating the terms and conditions for the creation and operation of TopCo, the terms of which shall be consistent with Articles I through XII of the Plan and the NewCo/TopCo Governance Term Sheet and otherwise acceptable to the DOJ and the Governmental Consent Parties and reasonably acceptable to the Debtors, and which shall be filed by the Debtors with the Plan Supplement.

"***TopCo Operating Expenses***" means any and all costs, expenses, fees, taxes, disbursements, debts or obligations incurred from the operation and administration of TopCo, including costs and fees of, and indemnification amounts owed to the TopCo Managers and any professionals retained by TopCo, but excluding any amounts to be paid pursuant to the NewCo Guarantee Agreement or as Public Creditor Trust Distributions.

"***TopCo Priority Waterfall***" means the priority waterfall applicable to TopCo set forth in Section 5.2(f)(iii) of the Plan.

"***TopCo Tribe Interest***" means a new limited liability company interest in TopCo issued to the Tribe Trust under the Plan pursuant to the Public Entity Settlements, representing a portion of the economic interests in TopCo corresponding to the Tribe Trust's entitlements under the Public Entity Allocation, which interest shall entitle the Tribe Trust to its share of distributions of TopCo Excess Cash in accordance with Section 5.2(e)(iii) of the Plan and the TopCo Priority Waterfall.

"***TPP LRP Escrow Account***" means an escrow account to be established, maintained and administered by the Creditor Trustee for the PI Trust and into which the Creditor Trustee for the PI Trust shall deposit a portion of the funds received by the PI Trust pursuant to the Plan, in accordance with and subject to the terms of the LRP Agreement.

"***TPP TDP***" means the trust distribution procedures to be implemented by the TPP Trust setting forth the procedures for the distribution of Abatement Distributions by the TPP Trust to Authorized Recipients and the Authorized Abatement Purposes for Abatement Distributions from the TPP Trust, the terms of which shall be consistent with Articles I through XII of the Plan and otherwise acceptable to the Debtors and the Third-Party Payor Group and reasonably acceptable to the Creditors' Committee and the Governmental Consent Parties, and which shall be filed by the Debtors with the Plan Supplement [(it being understood and agreed that the form of trust distribution procedures to be implemented by the TPP Trust filed on April 23, 2021 is acceptable to such parties)].

"***TPP Trust***" means a trust to be established in accordance with Section 5.7 of the Plan to (i) assume all liability for the Third-Party Payor Claims, (ii) hold the MDT TPP Claim and collect the Initial TPP Trust Distribution and additional payments due under the MDT TPP Claim in accordance with the Private Entity Settlements and the TPP Trust Documents, (iii) administer Third-Party Payor Claims, (iv) make Abatement Distributions to Authorized Recipients for Authorized Abatement Purposes, in each case in accordance with the TPP Trust Documents, and (v) carry out such other matters as are set forth in the TPP Trust Documents.

"***TPP Trust Agreement***" means the trust agreement establishing and delineating the terms and conditions for the creation and operation of the TPP Trust, the terms of which shall be consistent with Articles I through XII of the Plan and otherwise acceptable to the Debtors and the Third-Party Payor Group and reasonably acceptable to the Creditors' Committee and the Governmental Consent Parties, and which shall be filed by the Debtors with the Plan Supplement.

"***TPP Trust Documents***" means the TPP Trust Agreement and the TPP TDP.

"***Transferred PPLP Subsidiary***" means a Debtor that is (i) a Subsidiary of PPLP as of immediately prior to the Effective Date and (ii) acquired directly or indirectly by NewCo pursuant to the NewCo Transfer Agreement.

"***Tribe***" means any American Indian or Alaska Native Tribe, band, nation, pueblo, village or community, that the U.S. Secretary of the Interior acknowledges as an Indian Tribe, as provided in the Federally Recognized Tribe List Act of 1994, 25 U.S.C. § 5130, and as periodically listed by the U.S. Secretary of the Interior in the Federal Register pursuant to 25 U.S.C. § 5131; and any "Tribal Organization" as provided in the Indian Self-Determination and Education Assistance Act of 1975, as amended, 25 U.S.C. § 5304(l).

"***Tribe Claim***" means any Claim against any Debtor that is held by a Tribe, and that is not a Priority Tax Claim.

"***Tribe TDP***" means the trust distribution procedures to be implemented by the Tribe Trust setting forth the procedures for the distribution of Abatement Distributions by the Tribe Trust to Authorized Recipients and the Authorized Abatement Purposes for Abatement Distributions from the Tribe Trust, the terms of which shall be consistent with Articles I through XII of the Plan and otherwise acceptable to the Debtors and the Native American Tribe Group and reasonably acceptable to the Creditors' Committee and the Governmental Consent Parties, and which shall be filed by the Debtors with the Plan Supplement [(it being understood and agreed that the form of trust distribution procedures to be implemented by the Tribe Trust filed on April [ ], 2021 is acceptable to such parties)].

"***Tribe Trust***" means one or more trusts, limited liability companies or other Persons to be established in accordance with Section 5.7 of the Plan to (i) assume all liability for the Tribe Claims, (ii) hold the MDT Tribe Interest and the TopCo Tribe Interest and collect the Initial Tribe Trust Distribution and the other Public Creditor Trust Distributions received in accordance with the Public Entity Settlements, (iii) administer Tribe Claims and (iv) make Abatement Distributions to Authorized Recipients for Authorized Abatement Purposes, in each case in accordance with the Tribe Trust Documents.

"***Tribe Trust Agreement***" means the trust agreement establishing and delineating the terms and conditions for the creation and operation of the Tribe Trust, the terms of which shall be consistent with Articles I through XII of the Plan and otherwise acceptable to the Debtors and the Native American Tribe Group and reasonably acceptable to the Creditors' Committee and the Governmental Consent Parties, and which shall be filed by the Debtors with the Plan Supplement.

"***Tribe Trust Documents***" means the Tribe Trust Agreement and the Tribe TDP.

"***Truth Initiative Contribution***" means a contribution to the Truth Initiative Foundation to be used for national opioid prevention and education efforts, which shall be made by the Debtors in satisfaction of Ratepayer Claims from Effective Date Cash in the amount of $6.5 million *less* the amount paid in respect of attorneys' fees of the Ratepayer Mediation Participants in accordance with Section 5.8 of the Plan.

"***U.S. Trustee***" means the United States Trustee for Region 2.

"***Unimpaired***" means, with respect to any Claim, Interest, or Class of Claims or Interests, not "impaired" within the meaning of such term in section 1124 of the Bankruptcy Code.

"***United States***" means the United States of America, its agencies, departments or agents.

"***Voting Deadline***" means the last day for Holders of Claims and Interests entitled to vote on the Plan to cast their votes to accept or reject the Plan as may be set by the Bankruptcy Court.

"***Voting Representative***" means a Firm representing Holders of Claims in any of the Master Ballot Classes who has returned a properly completed Solicitation Directive (as such terms are defined in the Solicitation Procedures Order).

"***Wind-Up Reserve***" means a reserve to be established to pay any and all costs, expenses, fees, taxes, debts, or obligations incurred from the operation and administration of the Debtors' Estates after the Effective Date (including professional fees and expenses). The Wind-Up Reserve shall be (i) funded with Effective Date Cash in an amount determined by the Debtors, in consultation with the Creditors' Committee and the Governmental Consent Parties, and, to the extent of any deficiency of funding in the Wind-Up Reserve after the Effective Date, Cash from NewCo (or any purchaser of, or successor to, NewCo) and (ii) held by the Plan Administration Trust in a segregated account and administered by the Plan Administration Trustee on and after the Effective Date.

**1.2**    **_Interpretation; Application of Definitions; Rules of Construction_**.

Unless otherwise specified, all section or exhibit references in the Plan are to the respective section in, or exhibit to, this Plan, as the same may be amended, waived, or modified from time to time in accordance with the terms hereof. The words "herein," "hereof," or "hereunder," and other words of similar import refer to this Plan as a whole and not to any particular section, subsection, or clause contained therein and have the same meaning as "in the Plan," "of the Plan," and "under the Plan,"

respectively. The words "includes" and "including" are not limiting. The headings in the Plan are for convenience of reference only and shall not limit or otherwise affect the provisions hereof. For purposes herein: (a) in the appropriate context, each term, whether stated in the singular or plural, shall include both the singular and plural, and pronouns stated in the masculine, feminine, or neuter gender shall include the masculine, feminine, and the neuter gender; (b) any reference herein to a contract, lease, instrument, release, indenture, or other agreement or document being in a particular form or on particular terms and conditions means that the reference document shall be substantially in that form or substantially on those terms and conditions; (c) the rules of construction set forth in section 102 of the Bankruptcy Code shall apply; and (d) any term used in capitalized form herein that is not otherwise defined but that is used in the Bankruptcy Code or the Bankruptcy Rules shall have the meaning assigned to that term in the Bankruptcy Code or the Bankruptcy Rules, as the case may be.

### 1.3    *Reference to Monetary Figures*.

All references in this Plan to monetary figures shall refer to the legal tender of the United States of America unless otherwise expressly provided.

### 1.4    *Controlling Document*.

In the event of an inconsistency between Articles I through XII of the Plan and the Plan Supplement, the terms of Articles I through XII of the Plan shall control, except that in the event of an inconsistency between Articles I through XII of the Plan and the Shareholder Settlement Agreement (or any agreements ancillary to the Shareholder Settlement Agreement), the Shareholder Settlement Agreement (or such ancillary agreement) shall control. In the event of an inconsistency between this Plan and any other instrument or document created or executed pursuant to this Plan, or between this Plan and the Disclosure Statement, this Plan shall control. The provisions of this Plan and of the Confirmation Order shall be construed in a manner consistent with each other so as to effectuate the purposes of each; *provided*, *however*, that, if there is determined to be any inconsistency between any provision of this Plan and any provision of the Confirmation Order that cannot be reconciled, then, the provisions of the Confirmation Order shall govern, and any such provisions of the Confirmation Order shall be deemed a modification of this Plan solely to the extent of such inconsistency.

### ARTICLE II    ADMINISTRATIVE CLAIMS, PROFESSIONAL FEE CLAIMS, PRIORITY TAX CLAIMS AND DOJ FORFEITURE JUDGMENT CLAIM.

### 2.1    *Administrative Claims*.

(a)    **Generally**. Except as provided for herein or in any order of the Bankruptcy Court, and subject to section 503(b)(1)(D) of the Bankruptcy Code, Holders of Administrative Claims (other than Professional Fee Claims and the DOJ Forfeiture Judgment Claim) must file and serve on the Debtors requests for the payment of such Administrative Claims not already Allowed by a Final Order on or before the applicable Administrative Claims Bar Date. Any Holder of an Administrative Claim that is required to, but does not, file and serve a request for payment of such Administrative Claim pursuant to the procedures specified in the Confirmation Order on or prior to the Administrative Claims Bar Date shall be forever barred, estopped and enjoined from asserting such Claims against the Debtors, the Liquidating Debtors, the Transferred PPLP Subsidiaries, the Plan Administration Trust or their respective Assets or properties, and such Claims shall be deemed discharged as of the Effective Date. An Administrative Claim, with respect to which a request for payment has been properly and timely filed pursuant to this Section 2.1(a), shall become an Allowed Administrative Claim if no objection to such request is filed by the Debtors or the Plan Administration Trustee with the Bankruptcy Court on or before the date that is one hundred twenty (120) days after the Effective Date, or such later date as may be fixed by the Bankruptcy Court. If an objection is timely filed, such

Administrative Claim shall become an Allowed Administrative Claim only to the extent Allowed by Final Order or such Claim is settled, compromised or otherwise resolved pursuant to Section 7.6 of the Plan. Except to the extent a Holder of an Allowed Administrative Claim and the Debtor against which such Claim is asserted agree to different treatment, each Holder of an Allowed Administrative Claim (other than a Professional Fee Claim or the DOJ Forfeiture Judgment Claim) shall receive, on account of such Allowed Claim, Cash in an amount equal to the Allowed amount of such Claim from the Priority Claims Reserve within thirty (30) days following the later to occur of (i) the Effective Date and (ii) the date on which such Administrative Claim shall become an Allowed Claim; *provided* that any Administrative Claim that is assumed by NewCo shall be paid by NewCo in the ordinary course of business.

(b)    **Professional Fee Claims**. All Professional Persons seeking awards by the Bankruptcy Court for compensation for services rendered or reimbursement of expenses incurred through and including the Effective Date under (x) section 327, 328, 330, 331, 503(b)(2), 503(b)(3), 503(b)(4), 503(b)(5) or 1103 of the Bankruptcy Code, (y) with respect to the Ad Hoc Committee, the AHC Reimbursement Agreement Assumption Order or (z) with respect to the MSGE Group, the MSGE Group Reimbursement Order, shall (i) file, on or before the date that is forty-five (45) days after the Effective Date, or as soon as reasonably practicable thereafter, their respective applications for final allowances of compensation for services rendered and reimbursement of expenses incurred and (ii) be paid in full in Cash, (A) *first*, from any existing amounts held by a Professional Person as a fee advance, retainer, or security that such Professional Person is authorized to use to satisfy Allowed Professional Fee Claims pursuant to the Interim Compensation Order or the order of the Bankruptcy Court authorizing the retention of such Professional Person (other than a reasonable retainer to cover post-Effective Date work), and (B) *second*, from the Professional Fee Escrow Account, in such aggregate amounts as are Allowed by the Bankruptcy Court or authorized to be paid in accordance with the order(s) relating to or allowing any such Professional Fee Claim. On or prior to the Effective Date, the Debtors shall establish the Professional Fee Escrow Account and, on the Effective Date, fund the Professional Fee Escrow Account with Cash such that the total amount held in the Professional Fee Escrow Account is equal to the sum of each Professional Person's good-faith estimates of its Professional Fee Claims. The procedures for filing objections to Professional Persons' applications for final allowance of compensation for services rendered and expenses incurred shall be set forth in the Confirmation Order.

2.2    *Priority Tax Claims*.

Except to the extent a Holder of an Allowed Priority Tax Claim and the Debtor against which such Claim is asserted agree to different treatment, on the Effective Date or as soon as reasonably practicable thereafter, each Holder of an Allowed Priority Tax Claim shall receive, on account of such Allowed Priority Tax Claim, either Cash in an amount equal to the Allowed amount of such Claim from the Priority Claims Reserve or such other treatment as may satisfy section 1129(a)(9) of the Bankruptcy Code.

2.3    *DOJ Forfeiture Judgment Claim*.

(a)    Allowance: Pursuant to the Plea Agreement and the DOJ 9019 Order, the DOJ Forfeiture Judgment Claim shall be Allowed in the amount of $2.0 billion on the later of (i) the DOJ Conviction Judgment Date and (ii) the entry by the Bankruptcy Court of the Confirmation Order.

(b)    Treatment: In full and final satisfaction, settlement, release and discharge of the DOJ Forfeiture Judgment Claim, the Debtors shall make the DOJ Forfeiture Payment within three (3) Business Days following the DOJ Conviction Judgment Date, which DOJ Forfeiture Payment, in combination with the DOJ Forfeiture Judgment Credit, shall satisfy and discharge the DOJ Forfeiture Judgment Claim in full.

**ARTICLE III        CLASSIFICATION OF CLAIMS AND INTERESTS.**

    3.1    *Classification in General*.

        A Claim or Interest is placed in a particular Class for all purposes, including voting, confirmation and Distributions under this Plan and under sections 1122 and 1123(a)(1) of the Bankruptcy Code. A Claim or Interest is classified in a particular Class for the purpose of receiving Distributions pursuant to this Plan only to the extent such Claim or Interest qualifies within the description of that Class and is classified in other Classes to the extent any portion of the Claim or Interest qualifies within the description of such other Classes; *provided* that, to the extent any Claim satisfies the definition of a Shareholder Claim, a Co-Defendant Claim or an Other Subordinated Claim, such Claim shall be classified as such, notwithstanding that such Claim may satisfy the definition of another type of Claim. A Claim or Interest is also classified in a particular Class for the purpose of receiving Distributions hereunder only to the extent such Claim or Interest is an Allowed Claim or Allowed Interest in that Class and such Claim or Interest has not been satisfied, released or otherwise settled prior to the Effective Date. In no event shall any Holder of an Allowed Claim be entitled to receive payments under this Plan that, in the aggregate, exceed the Allowed amount of such Holder's Claim.

    3.2    *Summary of Classification of Claims and Interests*.

        The following table designates the Classes of Claims against and Interests in the Debtors and specifies which Classes are (a) Impaired or Unimpaired under this Plan, (b) entitled to vote to accept or reject this Plan in accordance with section 1126 of the Bankruptcy Code or presumed to accept or deemed to reject this Plan:

| **Class** | **Type of Claim or Interest** | **Impairment** | **Entitled to Vote** |
|---|---|---|---|
| Class 1 | Secured Claims | Unimpaired | No (Presumed to Accept) |
| Class 2 | Other Priority Claims | Unimpaired | No (Presumed to Accept) |
| Class 3 | Federal Government Unsecured Claims | Impaired | Yes |
| Class 4 | Non-Federal Domestic Governmental Claims | Impaired | Yes |
| Class 5 | Tribe Claims | Impaired | Yes |
| Class 6 | Hospital Claims | Impaired | Yes |
| Class 7 | Third-Party Payor Claims | Impaired | Yes |
| Class 8 | Ratepayer Claims | Impaired | Yes |
| Class 9 | NAS Monitoring Claims | Impaired | Yes |
| Class 10 | PI Claims | Impaired | Yes |
| Class 11(a) | Avrio General Unsecured Claims | Unimpaired | No (Presumed to Accept) |

| Class 11(b) | Adlon General Unsecured Claims | Unimpaired | No (Presumed to Accept) |
|---|---|---|---|
| Class 11(c) | Other General Unsecured Claims | Impaired | Yes |
| Class 12 | Intercompany Claims | Unimpaired or Impaired | No (Presumed to Accept or Deemed to Reject) |
| Class 13 | Shareholder Claims | Impaired | No (Deemed to Reject) |
| Class 14 | Co-Defendant Claims | Impaired | No (Deemed to Reject) |
| Class 15 | Other Subordinated Claims | Impaired | No (Deemed to Reject) |
| Class 16 | PPLP Interests | Impaired | No (Deemed to Reject) |
| Class 17 | PPI Interests | Impaired | No (Deemed to Reject) |
| Class 18 | Intercompany Interests | Unimpaired or Impaired | No (Presumed to Accept or Deemed to Reject) |

### 3.3    *Voting Classes; Presumed Acceptance by Non-Voting Classes*.

With respect to each Debtor, if a Class contains Claims eligible to vote and no Holder of Claims eligible to vote in such Class votes to accept or reject this Plan by the Voting Deadline, this Plan shall be presumed accepted by the Holders of Claims in such Class.

### 3.4    *Voting; Presumptions; Solicitation*.

(a)    **Acceptance by Certain Impaired Classes**. Only Holders of Claims in Classes 3, 4, 5, 6, 7, 8, 9, 10 and 11(c) are entitled to vote to accept or reject this Plan. An Impaired Class of Claims shall have accepted this Plan if (i) the Holders, including Holders acting through a Voting Representative, of at least two-thirds (2/3) in amount of Claims actually voting in such Class have voted to accept this Plan and (ii) the Holders, including Holders acting through a Voting Representative, of more than one-half (1/2) in number of Claims actually voting in such Class have voted to accept this Plan. Holders of Claims in Classes 3, 4, 5, 6, 7, 8, 9, 10 and 11(c) (or, if applicable, the Voting Representatives of such Holders) shall receive ballots containing detailed voting instructions. For the avoidance of doubt, pursuant to and except as otherwise provided in the Solicitation Procedures Order, each Claim in Classes 4, 5, 6, 7, 8, 9 and 10 shall be accorded one (1) vote and valued at one dollar ($1.00) for voting purposes only, and not for purposes of Allowance or distribution, such that each of Classes 4, 5, 6, 7, 8, 9 and 10 shall be deemed to have accepted this Plan if the Holders, including Holders acting through a Voting Representative, of at least two-third (2/3) in number of Claims actually voting in such Class have voted to accept the Plan.

(b)    **Deemed Acceptance by Unimpaired Classes**. Holders of Claims in Classes 1, 2, 11(a) and 11(b) are conclusively presumed to have accepted this Plan pursuant to section 1126(f) of the Bankruptcy Code. Accordingly, such Holders are not entitled to vote to accept or reject this Plan.

(c)    **Deemed Rejection by Certain Impaired Classes**. Holders of Claims and Interests in Classes 13, 14, 15, 16 and 17 are deemed to have rejected this Plan pursuant to

section 1126(g) of the Bankruptcy Code. Accordingly, such Holders are not entitled to vote to accept or reject this Plan.

(d)    **Deemed Acceptance or Rejection by Certain Classes**. Holders of Interests in Classes 12 and 18 are either conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code or are deemed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code. Accordingly, such Holders are not entitled to vote to accept or reject the Plan.

(e)    **Individual Creditor Voting Rights**. Notwithstanding anything to the contrary in this Plan, the voting rights of Holders of Claims in any Class shall be governed in all respects by the Solicitation Procedures Order, including without limitation with respect to the amount of such Claims for voting purposes.

### 3.5    _Cramdown_.

If any Class of Claims is deemed to reject this Plan or is entitled to vote on this Plan and does not vote to accept this Plan, the Debtors may (a) seek confirmation of this Plan under section 1129(b) of the Bankruptcy Code and/or (b) amend or modify this Plan in accordance with the terms hereof and the Bankruptcy Code. If a controversy arises as to whether any Claim or Interest, or any Class of Claims or Interests, is Impaired, the Bankruptcy Court shall, after notice and a hearing, determine such controversy on or before the Confirmation Date.

### 3.6    _No Waiver_.

Nothing contained in this Plan shall be construed to waive a Debtor's or other Person's right to object on any basis to any Claim.

## ARTICLE IV        TREATMENT OF CLAIMS AND INTERESTS.

### 4.1    _Secured Claims (Class 1)_.

(a)    <u>Treatment</u>: Except to the extent a Holder of an Allowed Secured Claim and the Debtor against which such Claim is asserted agree to different treatment, on the Effective Date, or as soon as reasonably practicable thereafter, each Holder of an Allowed Secured Claim shall receive, on account of such Allowed Claim, (i) payment in full in Cash from the Priority Claims Reserve in accordance with section 506(a) of the Bankruptcy Code, (ii) Reinstatement of such Allowed Claim pursuant to section 1124 of the Bankruptcy Code or (iii) such other treatment as may be necessary to render such Claim Unimpaired.

(b)    <u>Impairment and Voting</u>: Secured Claims are Unimpaired. Holders of Secured Claims are conclusively presumed to accept this Plan pursuant to section 1126(f) of the Bankruptcy Code. Therefore, Holders of Secured Claims are not entitled to vote to accept or reject the Plan, and the votes of such Holders will not be solicited with respect to such Secured Claims.

### 4.2    _Other Priority Claims (Class 2)_.

(a)    <u>Treatment</u>: Except to the extent a Holder of an Allowed Other Priority Claim and the Debtor against which such Claim is asserted agree to different treatment, on the Effective Date, or as soon as reasonably practicable thereafter, each Holder of an Allowed Other Priority Claim shall receive, on account of such Allowed Claim, (i) payment in full in Cash from the Priority Claims

Reserve or (ii) such other treatment consistent with the provisions of section 1129(a)(9) of the Bankruptcy Code.

(b)    Impairment and Voting: Other Priority Claims are Unimpaired. Holders of Other Priority Claims are conclusively presumed to accept this Plan pursuant to section 1126(f) of the Bankruptcy Code. Therefore, Holders of Other Priority Claims are not entitled to vote to accept or reject the Plan, and the votes of such Holders will not be solicited with respect to such Other Priority Claims.

### 4.3    *Federal Government Unsecured Claims (Class 3)*.

(a)    Allowance of the DOJ Civil Claim and DOJ Criminal Fine Claim: Pursuant to the DOJ 9019 Order, the DOJ Civil Claim is Allowed in the amount of $2.8 billion. The DOJ Criminal Fine Claim shall be Allowed in the amount of $3.544 billion on the later of (i) the DOJ Conviction Judgment Date and (ii) the entry by the Bankruptcy Court of the Confirmation Order.

(b)    Treatment: On the Effective Date, in full and final satisfaction, settlement, release and discharge of the Allowed Federal Government Unsecured Claims, (i) the Allowed Other Federal Agency Claims shall receive treatment in a manner and amount agreed by the Debtors and the DOJ, and (ii) the DOJ Civil Claim and the DOJ Criminal Fine Claim shall receive treatment in accordance with the DOJ 9019 Order and the DOJ Resolution.

(c)    Impairment and Voting: The Federal Government Unsecured Claims are Impaired. The DOJ is entitled to vote to accept or reject the Plan.

### 4.4    *Non-Federal Domestic Governmental Claims (Class 4)*.

(a)    Treatment: On the Effective Date, in full and final satisfaction, settlement, release and discharge of the Debtors' obligations in respect of Non-Federal Domestic Governmental Claims, NOAT shall receive (i) the Initial NOAT Distribution, (ii) the TopCo NOAT Interest and (iii) the MDT NOAT Interest. As of the Effective Date, liability for all Non-Federal Domestic Governmental Claims shall be assumed by NOAT without further act or deed and shall be satisfied solely from funds held by NOAT as and to the extent provided in the NOAT Documents. Distributions in respect of Non-Federal Domestic Governmental Claims shall be exclusively in the form of Abatement Distributions made by NOAT to Authorized Recipients for Authorized Abatement Purposes, in accordance with the NOAT Documents.

(b)    Channeling: On the Effective Date, pursuant to the Plan, each Holder of a Non-Federal Domestic Governmental Claim shall have its Claim permanently channeled to NOAT, and such Non-Federal Domestic Governmental Claim shall thereafter be asserted exclusively against NOAT and resolved solely in accordance with the terms, provisions and procedures of the NOAT Documents. Pursuant to the Plan, Holders of Non-Federal Domestic Governmental Claims are enjoined from filing against any Debtor, Released Party or Shareholder Released Party any future litigation, Claims or Causes of Action arising out of such Non-Federal Domestic Governmental Claims, and may not proceed in any manner against any Debtor, Released Party or Shareholder Released Party on account of such Claims in any forum whatsoever, including any state, federal or non-U.S. court or administrative or arbitral forum, and are required to pursue such Claims exclusively against NOAT, solely as and to the extent provided in the NOAT Documents.

(c)    Impairment and Voting: Non-Federal Domestic Governmental Claims are Impaired. Holders of Non-Federal Domestic Governmental Claims are entitled to vote to accept or reject the Plan.

### 4.5    *Tribe Claims (Class 5)*.

(a)    <u>Treatment</u>: On the Effective Date, in full and final satisfaction, settlement, release and discharge of the Debtors' obligations in respect of Tribe Claims, the Tribe Trust shall receive (i) the Initial Tribe Trust Distribution, (ii) the TopCo Tribe Interest and (iii) the MDT Tribe Interest. As of the Effective Date, liability for all Tribe Claims shall be assumed by the Tribe Trust without further act or deed and shall be satisfied solely from funds held by the Tribe Trust as and to the extent provided in the Tribe Trust Documents. Distributions in respect of Tribe Claims shall be exclusively in the form of Abatement Distributions made by the Tribe Trust to Authorized Recipients for Authorized Abatement Purposes, in accordance with the Tribe Trust Documents.

(b)    <u>Channeling</u>: On the Effective Date, pursuant to the Plan, each Holder of a Tribe Claim shall have its Claim permanently channeled to the Tribe Trust, and such Tribe Claim shall thereafter be asserted exclusively against the Tribe Trust and resolved solely in accordance with the terms, provisions and procedures of the Tribe Trust Documents. Pursuant to the Plan, Holders of Tribe Claims are enjoined from filing against any Debtor, Released Party or Shareholder Released Party any future litigation, Claims or Causes of Action arising out of or related to such Tribe Claims, and may not proceed in any manner against any Debtor, Released Party or Shareholder Released Party on account of such Claims in any forum whatsoever, including any state, federal or non-U.S. court or administrative or arbitral forum, and are required to pursue such Claims exclusively against the Tribe Trust, solely as and to the extent provided in the Tribe Trust Documents.

(c)    <u>Impairment and Voting</u>: Tribe Claims are Impaired. Holders of Tribe Claims are entitled to vote to accept or reject the Plan.

### 4.6    *Hospital Claims (Class 6)*.

(a)    <u>Treatment</u>: On the Effective Date, in full and final satisfaction, settlement, release and discharge of the Debtors' obligations in respect of Hospital Claims, the Hospital Trust shall receive (i) the Initial Hospital Trust Distribution and (ii) the MDT Hospital Claim. As of the Effective Date, liability for all Hospital Claims shall be assumed by the Hospital Trust without further act or deed and shall be satisfied solely from funds held by the Hospital Trust as and to the extent provided in the Hospital Trust Documents. Distributions in respect of Hospital Claims shall be exclusively in the form of Abatement Distributions made by the Hospital Trust to Authorized Recipients for Authorized Abatement Purposes, in accordance with the Hospital Trust Documents.

(b)    <u>Channeling</u>: On the Effective Date, pursuant to the Plan, each Holder of a Hospital Claim shall have its Claim permanently channeled to the Hospital Trust, and such Hospital Claims shall thereafter be asserted exclusively against the Hospital Trust and resolved solely in accordance with the terms, provisions and procedures of the Hospital Trust Documents. Pursuant to the Plan, Holders of Hospital Claims are enjoined from filing against any Debtor, Released Party or Shareholder Released Party any future litigation, Claims or Causes of Action arising out of or related to such Hospital Claims, and may not proceed in any manner against any Debtor, Released Party or Shareholder Released Party on account of such Claims in any forum whatsoever, including any state, federal or non-U.S. court or administrative or arbitral forum, and are required to pursue such Claims exclusively against the Hospital Trust, solely as and to the extent provided in the Hospital Trust Documents.

(c)    <u>Impairment and Voting</u>: Hospital Claims are Impaired. Holders of Hospital Claims are entitled to vote to accept or reject the Plan.

#### 4.7    *Third-Party Payor Claims (Class 7)*.

(a)    Treatment: On the Effective Date, in full and final satisfaction, settlement, release and discharge of the Debtors' obligations in respect of Third-Party Payor Claims, the TPP Trust shall receive (i) the Initial TPP Trust Distribution and (ii) the MDT TPP Claim. As of the Effective Date, liability for all Third-Party Payor Claims shall be assumed by the TPP Trust without further act or deed and shall be satisfied solely from funds held by the TPP Trust as and to the extent provided in the TPP Trust Documents. Distributions in respect of Third-Party Payor Claims shall be exclusively in the form of Abatement Distributions made by the TPP Trust to Authorized Recipients for Authorized Abatement Purposes, in accordance with the TPP Trust Documents. For the avoidance of doubt, any payments from the TPP LRP Escrow Account to which LRP Participating TPPs may be entitled under the LRP Agreement shall not be subject to this Section 4.7.

(b)    Channeling: On the Effective Date, pursuant to the Plan, each Holder of a Third-Party Payor Claim shall have its Claim permanently channeled to the TPP Trust, and such Third-Party Payor Claims shall thereafter be asserted exclusively against the TPP Trust and resolved solely in accordance with the terms, provisions and procedures of the TPP Trust Documents. Pursuant to the Plan, Holders of Third-Party Payor Claims are enjoined from filing against any Debtor, Released Party or Shareholder Released Party any future litigation, Claims or Causes of Action arising out of or related to such Third-Party Payor Claims, and may not proceed in any manner against any Debtor, Released Party or Shareholder Released Party on account of such Claims in any forum whatsoever, including any state, federal or non-U.S. court or administrative or arbitral forum, and are required to pursue such Claims exclusively against the TPP Trust, solely as and to the extent provided in the TPP Trust Documents.

(c)    Impairment and Voting: Third-Party Payor Claims are Impaired. Holders of Third-Party Payor Claims are entitled to vote to accept or reject the Plan.

#### 4.8    *Ratepayer Claims (Class 8)*.

(a)    Treatment: In full and final satisfaction, settlement, release and discharge of all Ratepayer Claims, on the Effective Date or as soon thereafter as reasonably practicable, Effective Date Cash shall be used to make the Truth Initiative Contribution in an amount equal to $6.5 million *less* any attorneys' fees paid in accordance with Section 5.8 of the Plan.

(b)    Impairment and Voting: Ratepayer Claims are Impaired. Holders of Ratepayer Claims are entitled to vote to accept or reject the Plan.

(c)    Tax Treatment: The Truth Initiative Contribution shall be treated, for U.S. federal income tax purposes, as (i) the cancellation of all Ratepayer Claims for no consideration and (ii) a transfer of Cash to the Truth Initiative Foundation by the Debtors.

#### 4.9    *NAS Monitoring Claims (Class 9)*.

(a)    Treatment: On the Effective Date, in full and final satisfaction, settlement, release and discharge of the Debtors' obligations in respect of NAS Monitoring Claims, the NAS Monitoring Trust shall receive (i) the Initial NAS Monitoring Trust Distribution and (ii) the MDT NAS Monitoring Claim. As of the Effective Date, liability for all NAS Monitoring Claims shall be assumed by the NAS Monitoring Trust without further act or deed and shall be satisfied solely from funds held by the NAS Monitoring Trust as and to the extent provided in the NAS Monitoring Trust Document. Distributions in respect of NAS Monitoring Claims shall be exclusively in the form of Abatement Distributions made by the NAS Monitoring Trust to Authorized Recipients for Authorized Abatement Purposes, in accordance with the NAS Monitoring Trust Documents.

(b)  Channeling: On the Effective Date, pursuant to the Plan, each Holder of a NAS Monitoring Claim shall have its Claim permanently channeled to the NAS Monitoring Trust, and such NAS Monitoring Claims shall thereafter be asserted exclusively against the NAS Monitoring Trust and resolved solely in accordance with the terms, provisions and procedures of the NAS Monitoring Trust Documents. Pursuant to the Plan, Holders of NAS Monitoring Claims are enjoined from filing against any Debtor, Released Party or Shareholder Released Party any future litigation, Claims or Causes of Action arising out of or related to such NAS Monitoring Claims, and may not proceed in any manner against any Debtor, Released Party or Shareholder Released Party on account of such Claims in any forum whatsoever, including any state, federal or non-U.S. court or administrative or arbitral forum, and are required to pursue such Claims exclusively against the NAS Monitoring Trust, solely as and to the extent provided in the NAS Monitoring Trust Documents.

(c)  Impairment and Voting: NAS Monitoring Claims are Impaired. Holders of NAS Monitoring Claims are entitled to vote to accept or reject the Plan.

**4.10**  ***PI Claims (Class 10)***.

(a)  Treatment: On the Effective Date, in full and final satisfaction, settlement, release and discharge of the Debtors' obligations in respect of PI Claims, the PI Trust shall receive (i) the Initial PI Trust Distribution and (ii) the MDT PI Claim. As of the Effective Date, liability for all PI Claims shall be assumed by the PI Trust without further act or deed and shall be satisfied solely from funds held by the PI Trust as and to the extent provided in the PI Trust Documents. Distributions in respect of PI Claims shall be exclusively in the form of Distributions from the PI Trust to Holders of Allowed PI Claims, and shall be subject to the holdback of amounts in the TPP LRP Escrow Account and payments therefrom to LRP Participating TPPs, in each case as required under and subject to the terms of the LRP Agreement.

(b)  Channeling: On the Effective Date, pursuant to the Plan, each Holder of a PI Claim shall have its Claim permanently channeled to the PI Trust, and such PI Claims shall thereafter be asserted exclusively against the PI Trust and resolved solely in accordance with the terms, provisions and procedures of the PI Trust Documents. Pursuant to the Plan, Holders of PI Claims are enjoined from filing against any Debtor, Released Party or Shareholder Released Party any future litigation, Claims or Causes of Action arising out of or related to such PI Claims, and may not proceed in any manner against any Debtor, Released Party or Shareholder Released Party on account of such Claims in any forum whatsoever, including any state, federal or non-U.S. court or administrative or arbitral forum, and are required to pursue such Claims exclusively against the PI Trust, solely as and to the extent provided in the PI Trust Documents.

(c)  Canadian Patient Settlement. Pursuant to the Canadian Patient Claim Settlement Stipulation, if the Canadian Patient Settlement Agreement is approved by the Saskatchewan Court of Queen's Bench and the funds in the Canadian Patient Settlement Trust are released for the benefit of Holders of Settled Canadian Patient Claims (i) no Holder of a Settled Canadian Patient Claim that filed a Proof of Claim shall receive a recovery in respect of such Settled Canadian Patient Claim from any source other than the Patient Settlement Payment (as defined in the Canadian Patient Claim Settlement Stipulation) made from the Canadian Patient Settlement Trust and (ii) in order to receive a recovery in respect of any other Claim for which a Proof of Claim was filed by a Holder of a Settled Canadian Patient Claim, such Holder shall have the burden of proving that such Proof of Claim is not in respect of a Settled Canadian Patient Claim that was released and discharged pursuant to the Canadian Patient Claim Settlement Stipulation and such Holder has not received any recovery from the Canadian Patient Settlement Trust on account of such Claim. No Distributions shall be made on account of any Claims that may constitute Settled Canadian Patient Claims unless and until (x) the Saskatchewan Court

40

of Queen's Bench approves the Canadian Patient Settlement Agreement and all funds in the Canadian Patient Settlement Trust have been distributed to Holders of Settled Canadian Patient Claims in accordance with the Canadian Patient Settlement Agreement or (y) the Saskatchewan Court of Queen's Bench denies the Canadian Patient Settlement Agreement.

(d)    Impairment and Voting: PI Claims are Impaired. Holders of PI Claims are entitled to vote to accept or reject the Plan.

### 4.11    *Avrio General Unsecured Claims (Class 11(a))*.

(a)    Treatment: Except to the extent a Holder of an Allowed Avrio General Unsecured Claim and Avrio Health L.P. agree to different treatment, on the Effective Date, or as soon as reasonably practicable thereafter, each Holder of an Allowed Avrio General Unsecured Claim shall receive, on account of such Allowed Claim, payment in full in Cash.

(b)    Impairment and Voting: Avrio General Unsecured Claims are Unimpaired. Holders of Avrio General Unsecured Claims are conclusively presumed to accept this Plan pursuant to section 1126(f) of the Bankruptcy Code. Therefore, Holders of Avrio General Unsecured Claims are not entitled to vote to accept or reject the Plan, and the votes of such Holders will not be solicited.

### 4.12    *Adlon General Unsecured Claims (Class 11(b))*.

(a)    Treatment: Except to the extent a Holder of an Allowed Adlon General Unsecured Claim and Adlon Therapeutics L.P. agree to different treatment, on the Effective Date, or as soon as reasonably practicable thereafter, each Holder of an Allowed Adlon General Unsecured Claim shall receive, on account of such Allowed Claim, payment in full in Cash.

(b)    Impairment and Voting: Adlon General Unsecured Claims are Unimpaired. Holders of Adlon General Unsecured Claims are conclusively presumed to accept this Plan pursuant to section 1126(f) of the Bankruptcy Code. Therefore, Holders of Adlon General Unsecured Claims are not entitled to vote to accept or reject the Plan, and the votes of such Holders will not be solicited.

### 4.13    *Other General Unsecured Claims (Class 11(c))*.

(a)    Treatment: All Other General Unsecured Claims are Disputed. Except to the extent a Holder of an Allowed Other General Unsecured Claim and the Debtor against which such Claim is asserted agree to different treatment, after the Effective Date upon the Allowance of such Claim in accordance with Article VII of the Plan, each Holder of an Allowed Other General Unsecured Claim shall receive, on account of such Allowed Claim, such Holder's Pro Rata Share of the Other General Unsecured Claim Cash, up to payment in full of such Allowed Claim.

(b)    Impairment and Voting: Other General Unsecured Claims are Impaired. Holders of Other General Unsecured Claims are entitled to vote to accept or reject the Plan.

### 4.14    *Intercompany Claims (Class 12)*.

(a)    Treatment: Except as otherwise provided in the NewCo Transfer Agreement or the Restructuring Steps Memorandum, on or after the Effective Date, Intercompany Claims shall be (x) in the case of Intercompany Claims held by a Liquidating Debtor against another Liquidating Debtor, at the discretion of the Debtors (or the Plan Administration Trustee, as applicable), (y) in the case

of Intercompany Claims held by a Transferred PPLP Subsidiary against another Transferred PPLP Subsidiary, at the discretion of NewCo and (z) otherwise, at the discretion of the Debtors (or the Plan Administration Trustee, as applicable) with the consent (not to be unreasonably withheld, conditioned or delayed) of the Governmental Consent Parties:

(i)    Reinstated; or

(ii)    Compromised and settled or canceled and extinguished with no distribution on account thereof.

(b)    <u>Impairment and Voting</u>: Intercompany Claims are either Unimpaired or Impaired with no distribution on account thereof. Holders of Intercompany Claims are either conclusively presumed to accept this Plan pursuant to section 1126(f) of the Bankruptcy Code or deemed to reject this Plan pursuant to section 1126(g) of the Bankruptcy Code. Therefore, Holders of Intercompany Claims are not entitled to vote to accept or reject the Plan, and the votes of such Holders will not be solicited with respect to such Intercompany Claims.

### 4.15    *Shareholder Claims (Class 13)*.

(a)    <u>Treatment</u>: Holders of Shareholder Claims shall not receive or retain any property on account of such Claims. As of the Effective Date, in accordance with the terms of the Shareholder Settlement Agreement, the Shareholder Released Parties shall release all Shareholder Claims held by such Shareholder Released Parties and shall not receive any distribution on account thereof, and such Claims shall be of no further force or effect.

(b)    <u>Impairment and Voting</u>: Shareholder Claims are Impaired. Holders of Shareholder Claims are deemed to reject this Plan pursuant to section 1126(g) of the Bankruptcy Code. Therefore, Holders of Shareholder Claims are not entitled to vote to accept or reject the Plan, and the votes of such Holders will not be solicited with respect to such Shareholder Claims.[6]

### 4.16    *Co-Defendant Claims (Class 14)*.

(a)    <u>Treatment</u>: [Holders of Co-Defendant Claims shall not receive or retain any property on account of such Claims. As of the Effective Date, all Co-Defendant Claims shall be released in accordance with <u>Section 8.4</u> of the Plan or otherwise deemed expunged, released and extinguished without further action by or order of the Bankruptcy Court with no distribution on account thereof, and shall be of no further force or effect. To the extent not previously filed in a separate motion, the Plan shall constitute an objection to such Claims and a motion to Disallow the Co-Defendant Claims in full, including pursuant to section 502(e)(1) of the Bankruptcy Code, and to estimate such Claims at $0 for purposes of determining the Disputed Claims Reserve with respect to such Claims. In addition, and not in limitation of the foregoing, the Plan shall be deemed to constitute a motion to subordinate such Claims, to the extent such Claims are not Disallowed, under section 509(c) or 510 of the Bankruptcy Code or other applicable law on the basis that such Claims are held by Persons who engaged in, or aided and abetted, or whose Claim arises from (including with respect to the representation of any Person who engaged in), acts or omissions that constitute criminal conduct, fraud, willful misconduct or other wrongful or inequitable conduct in connection with Opioid-Related Activities (or on behalf of such Persons, including such Claims for indemnification, repayment or advancement of fees and expenses, including legal defense fees and expenses). To the extent necessary, the Confirmation Order shall contain

---

[6] Although Holders of Shareholder Claims are deemed to reject the Plan pursuant to section 1126(g) of the Bankruptcy Code, the Shareholder Parties, in all capacities (including as Holders of Claims), have agreed to support the Plan pursuant to the Shareholder Settlement Agreement.

findings supporting the conclusions providing for such subordination of such Claims for the purposes of Distribution on the terms set forth in this <u>Section 4.16</u>. Subject to the Solicitations Procedure Order, each Holder of a Co-Defendant Claim shall be provided a notice informing each such Holder of the proposed treatment of such Claim under the Plan, and affording such Holder the opportunity to object to such treatment or to the subordination thereof.][7]

(b)        <u>Impairment and Voting</u>: Co-Defendant Claims are Impaired. Holders of Co-Defendant Claims are deemed to reject this Plan pursuant to section 1126(g) of the Bankruptcy Code. Therefore, Holders of Co-Defendant Claims are not entitled to vote to accept or reject the Plan, and the votes of such Holders will not be solicited with respect to such Co-Defendant Claims.

### 4.17    *Other Subordinated Claims (Class 15)*.

(a)        <u>Treatment</u>: Other Subordinated Claims are subordinated pursuant to the Plan and section 509(c) and/or 510 of the Bankruptcy Code and/or other applicable law. Holders of Other Subordinated Claims shall not receive or retain any property under this Plan on account of such Claims. As of the Effective Date, Other Subordinated Claims shall be deemed expunged, released and extinguished without further action by or order of the Bankruptcy Court, and shall be of no further force or effect.

(b)        <u>Impairment and Voting</u>: Other Subordinated Claims are Impaired. Holders of Other Subordinated Claims are deemed to reject this Plan pursuant to section 1126(g) of the Bankruptcy Code. Therefore, Holders of Other Subordinated Claims are not entitled to vote to accept or reject the Plan, and the votes of such Holders will not be solicited with respect to such Other Subordinated Claims.

### 4.18    *PPLP Interests (Class 16)*.

(a)        <u>Treatment</u>: In accordance with the terms of the Shareholder Settlement Agreement, Holders of PPLP Interests shall relinquish such Interests and shall not receive or retain any property under the Plan on account of such Interests. As of the PPLP Dissolution Date, all PPLP Interests shall be deemed surrendered, canceled and/or redeemed without further action by or order of the Bankruptcy Court, and shall be of no further force or effect.

(b)        <u>Impairment and Voting</u>: PPLP Interests are Impaired. Holders of PPLP Interests are deemed to reject this Plan pursuant to section 1126(g) of the Bankruptcy Code. Therefore, Holders of PPLP Interests are not entitled to vote to accept or reject the Plan, and the votes of such Holders will not be solicited with respect to such PPLP Interests.

### 4.19    *PPI Interests (Class 17)*.

(a)        <u>Treatment</u>: In accordance with the terms of the Shareholder Settlement Agreement, Holders of PPI Interests shall relinquish such Interests and shall not receive or retain any property under the Plan on account of such Interests. As of the Effective Date, PPI Interests shall be deemed surrendered, canceled and/or redeemed without further action by or order of the Bankruptcy Court, and shall be of no further force or effect.

---

[7] The treatment of Co-Defendant Claims, including the treatment of any Estate Causes of Action against Holders of Co-Defendant Claims and other matters, remains subject to adjustment based on the outcome of ongoing discussions and negotiations among the Debtors, the Governmental Consent Parties and the Holders of Co-Defendant Claims; *provided* that the treatment of Co-Defendant Claims, including the treatment of any Estate Causes of Action against Holders of Co-Defendant Claims shall be subject to the consent of the Governmental Consent Parties.

(b)    Impairment and Voting: PPI Interests are Impaired. Holders of PPI Interests are deemed to reject this Plan pursuant to section 1126(g) of the Bankruptcy Code. Therefore, Holders of PPI Interests are not entitled to vote to accept or reject the Plan, and the votes of such Holders will not be solicited with respect to such PPI Interests.

### 4.20    *Intercompany Interests (Class 18)*.

(a)    Treatment: Except as otherwise provided in the NewCo Transfer Agreement or the Restructuring Steps Memorandum, on the Effective Date, Intercompany Interests shall be:

(i)    with respect to Intercompany Interests in any Transferred PPLP Subsidiary held by PPLP, Reinstated and transferred to NewCo (or one of its Subsidiaries) in accordance with the NewCo Transfer Agreement;

(ii)    with respect to Intercompany Interests in any Transferred PPLP Subsidiary held by another Transferred PPLP Subsidiary, Reinstated or otherwise treated in accordance with the NewCo Transfer Agreement; and

(iii)    with respect to Intercompany Interests in any Debtor that is not a Transferred PPLP Subsidiary, Reinstated solely for administrative convenience until canceled when such Debtor is dissolved or merged out of existence by the Plan Administration Trustee.

(b)    Impairment and Voting: Intercompany Interests are either Unimpaired or Impaired with no distribution on account thereof. Holders of Intercompany Interests are either conclusively presumed to accept this Plan pursuant to section 1126(f) of the Bankruptcy Code or deemed to reject this Plan pursuant to section 1126(g) of the Bankruptcy Code. Therefore, Holders of Intercompany Interests are not entitled to vote to accept or reject the Plan, and the votes of such Holders will not be solicited with respect to such Intercompany Interests.

### 4.21    *Debtors' Rights with Respect to Unimpaired Claims*.

Except as otherwise provided in this Plan, nothing under the Plan shall affect the rights of the Debtors with respect to an Unimpaired Claim, including all rights with respect to legal and equitable defenses to, or setoffs or recoupments against, any such Unimpaired Claims.

## ARTICLE V    MEANS FOR IMPLEMENTATION.

### 5.1    *Restructuring Transactions*.

On or before the Effective Date or as soon as reasonably practicable thereafter, the Debtors may take all actions consistent with this Plan as may be necessary or appropriate to effect any transaction described in, approved by, contemplated by or necessary to effectuate the Restructuring Transactions under and in connection with this Plan, including (a) the execution and delivery of all appropriate agreements or other documents of merger, consolidation, sale, restructuring, conversion, disposition, transfer, dissolution or liquidation containing terms that are consistent with the Plan; (b) the execution and delivery of appropriate instruments of transfer, assignment, assumption or delegation of any Asset, property, interest, right, liability, debt or obligation on terms consistent with the Plan; (c) the

filing of appropriate certificates or articles of organization, limited partnership, incorporation, reincorporation, merger, consolidation, conversion or dissolution pursuant to applicable law; (d) the execution, delivery, filing, recordation and issuance of any other documents, instruments or agreements in connection with the Restructuring Transactions and (e) any transactions described in the Restructuring Steps Memorandum.

     5.2     *__Plan Settlements__*.

     (a)     As further described in the Disclosure Statement, the provisions of this Plan (including the release and injunctive provisions contained in <u>Article X</u> of the Plan) and the other Plan Documents constitute a good faith compromise and settlement among the Debtors, Supporting Claimants, the Shareholder Released Parties and certain other participants in the Mediation of Claims and controversies among such parties reached in connection with the Mediation and otherwise, which such compromise and settlement is necessary and integral to the Plan and the Plan Documents and the success of these Chapter 11 Cases. The Debtors, the Supporting Claimants and the Shareholder Released Parties believe the treatment provided in respect of Claims against and Interests in the Debtors and the treatment of competing Classes of Claims is fair and appropriate only when combined with the distribution scheme, including without limitation all Distributions to be made under the Plan, and the release, injunction and all other provisions contained in the Plan, all of which are material aspects of the Plan.

     (b)     The Plan, including the explanation set forth in the Disclosure Statement, and the Plan Documents shall be deemed a motion to approve the Plan Settlements and the good faith compromise and settlement of all of the Claims, Interests and controversies described in the foregoing <u>Section 5.2(a)</u> pursuant to Bankruptcy Rule 9019, and entry of the Confirmation Order shall constitute the Bankruptcy Court's approval of the Plan Settlements under section 1123 of the Bankruptcy Code and Bankruptcy Rule 9019, as well as a finding by the Bankruptcy Court that the Plan Settlements are fair, equitable, reasonable and in the best interests of the Debtors and their Estates.

     (c)     The Plan, the Plan Settlement, the Plan Documents and the Confirmation Order constitute a good faith compromise and settlement of Claims, Interests and controversies based upon the unique circumstances of these Chapter 11 Cases (such as the total distributable value available, the unique facts and circumstances relating to these Debtors and the need for an accelerated resolution without additional avoidable litigation) such that (i) none of the foregoing documents, nor any materials used in furtherance of Plan confirmation (including, but not limited to, the Disclosure Statement, and any notes related to, and drafts of, such documents and materials), may be offered into evidence, deemed an admission, used as precedent or used by any party or Person in any context whatsoever beyond the purposes of this Plan, in any other litigation or proceeding, except as necessary, and as admissible in such context, to enforce their terms and to evidence the terms of the Plan and the Plan Documents before the Bankruptcy Court or any other court of competent jurisdiction and (ii) any election by any party, in furtherance of such compromise and settlement, to not exercise rights that might be otherwise available to such party shall be understood to be an election made solely in connection with this specific compromise and settlement and to be inapplicable in the absence of such compromise and settlement. The Plan, the Plan Settlement, the Plan Documents and the Confirmation Order will be binding as to the matters and issues described therein, but will not be binding with respect to similar matters or issues that might arise in any other litigation or proceeding in which none of the Debtors, the Plan Administration Trust, the Master Disbursement Trust, the Creditor Trusts, NewCo, TopCo or the Shareholder Released Parties is a party, provided that such litigation or proceeding is not to enforce or evidence the terms of the Plan, the Plan Settlement, the Plan Documents or the Confirmation Order. Any Person's support of, or position or action taken in connection with, this Plan, the Plan Settlement, the Plan Documents and the Confirmation Order may differ from such Person's position or testimony in any other litigation or proceeding not in connection with these Chapter 11 Cases. Further, and, as all parties to the Mediation agreed, this Plan

Settlement is not intended to serve as an example for, or represent the parties' respective positions or views concerning, any other chapter 11 cases relating to opioids, nor shall it be used as precedent by any Person or party in any other such chapter 11 cases that do not involve the Debtors (or their successors) or the Shareholder Released Parties.

       (d)    **Private Entity Settlements**. On the Effective Date, the Private Creditor Trusts shall receive their respective Initial Private Creditor Trust Distributions and their respective MDT Claims. The MDT Claims shall entitle the Private Creditor Trusts to the payments and other benefits set forth below.[8]

       (i)    The Master Disbursement Trust shall make payments of the MDT Claims on each MDT Distribution Date in the amount then due and owing to each Private Creditor Trust. The MDT Claims shall be payable by the Master Disbursement Trust in installments in the amounts and on the MDT Distribution Dates set forth below, which installments shall, to the extent applicable, be reduced as a result of prepayments in accordance with Section 5.2(d)(iv) of the Plan:

    (A)    The MDT Hospital Claim shall be payable in the following installments: (I) $35 million on the first MDT Distribution Date, (II) $45 million on the second MDT Distribution Date, (III) $45 million on the third MDT Distribution Date, (IV) $50 million on the fourth MDT Distribution Date and (V) $50 million on the fifth MDT Distribution Date.

    (B)    The MDT TPP Claim shall be payable in the following installments: (I) $121 million on the first MDT Distribution Date, (II) $121 million on the second MDT Distribution Date and (III) $122 million on the third MDT Distribution Date.

    (C)    The MDT NAS Monitoring Claims shall be payable in the following installments: (I) $24 million on the first MDT Distribution Date and (II) $35 million on the second MDT Distribution Date.

    (D)    The MDT PI Claim shall be payable in the following installments: (I) $200 million on the third MDT Distribution Date, (II) $100 million on the fourth MDT Distribution Date and (III) $100 million on the fifth MDT Distribution Date. In addition, in the event the aggregate MDT Bermuda-Form Insurance Proceeds (whether received before, on or after the fifth MDT Distribution Date) exceed $400 million, the PI Trust shall be entitled to an incremental payment in the amount of the lesser of (x) the aggregate amount of the

---

[8] Subject to adjustment based on ongoing negotiations with respect to the Shareholder Settlement Agreement regarding the timing of payments and other provisions thereunder.

MDT Bermuda-Form Insurance Proceeds in excess of $400 million and (y) $50 million (which shall be in addition to, and not in reduction or substitution of, any of the installment payments set forth in the previous sentence), payable within thirty (30) days of receipt of any such MDT Bermuda-Form Insurance Proceeds, in accordance with Section 5.2(d)(iv)(A) of the Plan.

(ii)    Upon the commencement of an MDT Reserve Period, the MDT Trustees shall provide notice thereof to NewCo and each Creditor Trust and shall establish and fund the MDT Claims Reserve in an amount equal to the payments due on account of the MDT Claims on the next MDT Distribution Date; *provided* that, solely for purposes of any NewCo Distribution Date on January 15 of any year, if such MDT Reserve Period is continuing solely as a result of a payment default by certain Shareholder Payment Groups, such reserve shall be funded in an amount equal to the payments due on account of the MDT Claims on the then-next MDT Distribution Date multiplied by the SSA Percentage of such defaulting Shareholder Payment Groups for the then-next SSA Payment Date. For so long as such MDT Reserve Period is continuing, the MDT Claims Reserve shall remain in place and no TopCo Distributions or Public Creditor Trust Distributions shall be made until the MDT Operating Reserve and the MDT Claims Reserve are fully funded in the amounts required at such time. For the avoidance of doubt, notwithstanding the occurrence and continuation of an MDT Reserve Period, so long as the MDT Operating Reserve and the MDT Claims Reserve are fully funded, the Master Disbursement Trust and TopCo shall continue to make Public Creditor Trust Distributions from MDT Excess Cash and TopCo Excess Cash, respectively, and NewCo shall continue to make TopCo Distributions from NewCo Excess Cash, in each case, solely in accordance with Section 5.2(e) of the Plan.

(iii)   NewCo shall guarantee the obligations of the Master Disbursement Trust to make payments to the Private Creditor Trusts on account of the MDT Claims in accordance with Section 5.2(d)(i) of the Plan, and NewCo and TopCo shall make payments to the Master Disbursement Trust as set forth below in accordance with the NewCo Guarantee Agreement.

(A)    Within ten (10) Business Days following the receipt by NewCo from the MDT Trustees of notice of the commencement of an MDT Reserve Period and on each NewCo Distribution Date and each three-month anniversary of a NewCo Distribution Date, for so long as such MDT Reserve Period is continuing, NewCo shall pay to the Master Disbursement Trust all NewCo Available Cash up to an aggregate amount necessary to ensure that the MDT Operating Reserve and the MDT

Claims Reserve are fully funded at the amounts required as of that date. The amounts required to be paid by NewCo to the Master Disbursement Trust under this Section 5.2(d)(iii)(A) shall be limited to the extent of NewCo Available Cash; *provided* that, in the event there is a deficiency of funding in the MDT Claims Reserve for a period of eighteen (18) months during the continuation of an MDT Reserve Period, the Master Disbursement Trust shall be entitled to accelerate its claims under the NewCo Guarantee Agreement and exercise remedies.

(B)    [Irrespective of whether there is an MDT Reserve Period in effect, until the payment in full in Cash of the MDT Claims, TopCo and NewCo shall pay to the Master Disbursement Trust an amount equal to 100% of the MDT Distributable Sale Proceeds within five (5) Business Days after the receipt thereof; *provided* that (I) MDT Distributable Sale Proceeds of less than $10 million (in the aggregate for TopCo and NewCo) shall be carried forward and accumulated and no distributions to the Master Disbursement Trust on account thereof shall be required until the aggregate amount of the accumulated MDT Distributable Sale Proceeds so received following the Effective Date equals or exceeds such amount and (II) the amounts payable to the Master Disbursement Trust under this Section 5.2(d)(iii)(B) shall not exceed the aggregate outstanding amount owed on account of the MDT Claims (regardless of whether some amounts have yet fallen due). Any non-Cash proceeds in respect of the sale of any Asset of TopCo or any of its Subsidiaries shall be held and not distributed by TopCo or such Subsidiary, as applicable, until the payment in full of the MDT Claims or the disposition of such non-Cash proceeds for Cash; *provided* that the MDT Distributable Sale Proceeds of such non-Cash proceeds shall be subject to this Section 5.2(d)(iii)(B). The Master Disbursement Trust shall apply all amounts received under this Section 5.2(d)(iii)(B) in accordance with Section 5.2(d)(iv)(B) of the Plan.][9]

(iv)    The Master Disbursement Trust shall make prepayments of the MDT Claims from the amounts and in the manner set forth below.

(A)    MDT Bermuda-Form Insurance Proceeds shall be applied toward the prepayment of remaining installments

---

[9] The application of any Net Sale Proceeds remains subject to ongoing discussions among the Debtors, the Supporting Claimants and the Creditors' Committee.

on the MDT PI Claim (as set forth in Section 5.2(d)(i)(D)(I)–(III)) in chronological order by installment payment maturity date until the MDT PI Claim is paid in full and, if any amounts remain, to pay the incremental amounts due to the PI Trust under clauses (x) and (y) of Section 5.2(d)(i)(D), in each case, in the following manner: (I) for the MDT Bermuda-Form Insurance Proceeds received by the Debtors or the Master Disbursement Trust on or prior to the Effective Date, the Debtors or the Master Disbursement Trust shall pay on the Effective Date 100% of such MDT Bermuda-Form Insurance Proceeds to the PI Trust as part of Initial PI Trust Distribution and (II) for any MDT Bermuda-Form Insurance Proceeds received by the Master Disbursement Trust after the Effective Date, the Master Disbursement Trust shall pay to the PI Trust 100% of such MDT Bermuda-Form Insurance Proceeds not later than thirty (30) days after the date of receipt thereof by the Master Disbursement Trust.

(B)     If on any date the Master Disbursement Trust receives MDT Distributable Sale Proceeds, then such MDT Distributable Sale Proceeds shall be applied not later than ten (10) Business Days after such date to prepay any remaining installments of the MDT Claims until paid in full. Such prepayments shall be (I) allocated according to the MDT Distribution Date on which remaining installments of the MDT Claims are due in chronological order of maturity (such that all remaining installments of the MDT Claims due on a particular MDT Distribution Date shall be paid in full before any amounts are allocated to installments of the MDT Claims due on any subsequent MDT Distribution Date) and (II) applied to the remaining installments of the MDT Claims due on a particular MDT Distribution Date on a pro rata basis according to the proportion that the outstanding amount due on each MDT Claim on such MDT Distribution Date bears to the aggregate outstanding amount due on all MDT Claims on such MDT Distribution Date.

(C)     If on any date the Master Disbursement Trust receives a Shareholder Prepayment, then each Net Prepaid Settlement Amount shall be applied not later than ten (10) Business Days after such date to prepay the remaining installments of the MDT Claims due on the MDT Distribution Date that immediately follows the originally scheduled SSA Payment Date of such Net Prepaid Settlement Amount according to each Private Creditor Trust's Proportionate Settlement Prepayment Share of such Net Prepaid Settlement Amount.

49

(e)    **Non-Federal Public Entity Settlements**. On the Effective Date, NOAT and the Tribe Trust shall receive their respective Initial Public Creditor Trust Distributions, MDT Interests and TopCo Interests. The MDT Interests and the TopCo Interests shall entitle NOAT and the Tribe Trust to the payments and other benefits set forth below.[10]

(i)    On each MDT Distribution Date and as otherwise determined by the MDT Trustees, acting in accordance with their fiduciary duties to the Creditor Trusts as beneficiaries of the Master Disbursement Trust, the Master Disbursement Trust shall make Public Creditor Trust Distributions from all MDT Excess Cash in accordance with Section 5.2(e)(iv) of the Plan.

(ii)    Upon the receipt by the Master Disbursement Trust of a Shareholder Prepayment, after the payment to each Private Creditor Trust of its Proportionate Settlement Prepayment Share of any Net Prepaid Settlement Amount in accordance with Section 5.2(d)(iv)(C) of the Plan, the Master Disbursement Trust shall apply the remaining portion of such Net Prepaid Settlement Amount to make Public Creditor Trust Distributions in accordance with Section 5.2(e)(iv) of the Plan.

(iii)    On each NewCo Distribution Date, (A) NewCo shall make a TopCo Distribution from all NewCo Excess Cash and (B) TopCo shall make Public Creditor Trust Distributions from all TopCo Excess Cash in accordance with Section 5.2(e)(iv) of the Plan.

(iv)    All Public Creditor Trust Distributions shall be allocated between NOAT and the Tribe Trust as follows: (A) *first*, until the aggregate amount of Public Creditor Trust Distributions equals $50 million, 100% to the Tribe Trust; (B) *second*, until the aggregate cumulative amount of Public Creditor Trust Distributions equals $1 billion, 100% to NOAT; (C) *third*, until the aggregate cumulative amount of Public Creditor Trust Distributions equals $3 billion, 2.935% to the Tribe Trust and 97.065% to NOAT; (D) *fourth*, until the aggregate cumulative Public Creditor Trust Distributions equals $5 billion, 2.8125% to the Tribe Trust and 97.1875% to NOAT; and (E) *thereafter*, with respect to all additional Public Creditor Trust Distributions, 3% to the Tribe Trust and 97% to NOAT.

(v)    Until the payment in full in Cash of the MDT Claims, all Public Creditor Trust Distributions and TopCo Distributions, other than the Initial Public Creditor Trust Distributions, shall be made (A) only on the dates set forth in Section 5.2(d)(iv)5.2(e)(i)–(iii), (B) only from amounts constituting MDT Excess Cash, NewCo Excess Cash and TopCo Excess Cash, as applicable, and (C) on no less than ten (10) Business Days' notice to the Private

---

[10] Subject to adjustment based on ongoing negotiations with respect to the Shareholder Settlement Agreement regarding the timing of payments and other provisions thereunder.

Creditor Trusts and, except for Public Creditor Trust Distributions made by the Master Disbursement Trust, the Master Disbursement Trust.

(f) **Priority Waterfalls**.

(i)  <u>MDT Priority Waterfall</u>. On each MDT Distribution Date and any other date on which the MDT Trustees determine to make a Public Creditor Trust Distribution, acting in accordance with their fiduciary duties to the Creditor Trusts as beneficiaries of the Master Disbursement Trust, all Cash and cash equivalents of the Master Disbursement Trust (other than any amounts subject to distribution in accordance with <u>Section 5.2(d)(iv)</u> or <u>5.2(e)(ii)</u> of the Plan) shall be applied as follows: (A) *first*, to fund the MDT Operating Reserve in an amount determined by the MDT Trustees; (B) *second*, to pay all outstanding amounts then due or falling due within the next thirty-one (31) days on account of the MDT Claims; (C) *third*, solely during an MDT Reserve Period, to fund the MDT Claims Reserve in the amount required as of that date in accordance with <u>Section 5.2(d)(ii)</u> of the Plan; (D) *fourth*, to NewCo or TopCo, as applicable, for the repayment of the amounts received by the Master Disbursement Trust from NewCo or TopCo pursuant to their respective obligations under the NewCo Guarantee Agreement in accordance with <u>Section 5.2(d)(iii)</u> of the Plan; *provided* that NewCo shall promptly make a TopCo Distribution from all such repayments and TopCo shall promptly make Public Creditor Trust Distributions from all such repayments and such TopCo Distributions; and (E) *fifth*, as Public Creditor Trust Distributions in respect of the MDT Interests.

(ii)  <u>NewCo Priority Waterfall</u>. On each NewCo Distribution Date, all Cash and cash equivalents of NewCo and its Subsidiaries (other than MDT Distributable Sale Proceeds) shall be applied as follows: (A) *first*, to fund the current payment of or reserve for, all NewCo Operating Expenses that are current, reasonably forecasted or budgeted or included in a reasonable reserve for contingent liabilities, including any amounts required to satisfy any deficiency of funding in the Wind-Up Reserve; (B) *second*, to the Master Disbursement Trust in an amount required at that time on account of NewCo's obligations under the NewCo Guarantee Agreement in accordance with <u>Section 5.2(d)(iii)</u> of the Plan, if any, including any amounts required to satisfy any shortfall in funding of the MDT Operating Reserve and the MDT Claims Reserve, if applicable; and (C) *third*, as a TopCo Distribution in respect of the NewCo Interest.

(iii)  <u>TopCo Priority Waterfall</u>. On each NewCo Distribution Date, after the receipt by TopCo of any amounts described in <u>Section 5.2(f)(ii)(C)</u> of the Plan, all Cash and cash equivalents of TopCo (other than MDT Distributable Sale Proceeds) shall be

applied as follows: (A) *first*, to fund the current payment of or reserve for, all TopCo Operating Expenses that are current, reasonably forecasted or budgeted or included in a reasonable reserve for contingent liabilities; and (B) *second*, as Public Creditor Trust Distributions in respect of the TopCo Interests.

(g)    **Shareholder Settlement**. On or before the Effective Date, the Debtors and the Shareholder Parties shall enter into the Shareholder Settlement Agreement. Pursuant to the Shareholder Settlement, in exchange for the Shareholder Releases pursuant to <u>Section 10.10</u> of the Plan, the Shareholder Channeling Injunction pursuant to <u>Section 10.11</u> of the Plan, and certain other agreements set forth in the Shareholder Settlement Agreement, (i) the Shareholder Parties shall pay the Shareholder Settlement Amount to the Master Disbursement Trust in the amount, on the dates and pursuant to the terms set forth in the Shareholder Settlement Agreement, (ii) the Shareholder Claims shall be deemed released on the Effective Date pursuant to <u>Section 4.15</u> of the Plan, (iii) the Shareholder Parties have agreed to support the Plan and (iv) the other agreements and consideration provided by the Shareholder Parties, in each case as more fully set forth in, and subject to the terms and conditions of, the Shareholder Settlement Agreement. The Master Disbursement Trust shall distribute the Shareholder Settlement Amount in accordance with <u>Section 5.2(c)</u><u>5.2(d)</u>–<u>(f)</u> of the Plan.

### 5.3    *The Plan Administration Trust*.

(a)    **Establishment and Purpose of Plan Administration Trust**. On or before the Effective Date, the Debtors shall take all necessary steps to form the Plan Administration Trust in accordance with the Plan and the PAT Agreement. The Plan Administration Trust shall be established for the purposes described in this Plan and any others more fully described in the PAT Agreement, shall have no objective to continue or engage in the conduct of trade or business and shall be subject to the jurisdiction of the Bankruptcy Court. The Plan Administration Trust shall, in each case in accordance with the Plan and the PAT Agreement:

(i)    hold, manage, sell and invest the PAT Assets for the benefit of Holders of Allowed Claims (other than Channeled Claims);

(ii)    administer, process, resolve and liquidate Claims (other than Channeled Claims), including through the prosecution and resolution of objections to Disputed Claims (other than Channeled Claims);

(iii)    hold and maintain the PAT Reserves and the PAT Distribution Account and maintain the Professional Fee Escrow Account; and

(iv)    make Distributions to Holders of Allowed Claims (other than Channeled Claims).

(b)    **Vesting of the PAT Assets in the Plan Administration Trust**. The Plan Administration Trust shall consist of the PAT Assets. On the Effective Date, the PAT Assets shall vest in the Plan Administration Trust, free and clear of all Claims, Interests, Liens, other encumbrances and liabilities of any kind.

(c)    **Appointment and Role of the Plan Administration Trustee**. The Plan Administration Trustee shall be an existing employee of the Debtors selected by the Debtors in their sole discretion or another individual selected by the Debtors with the consent of the Creditors' Committee and the Governmental Consent Parties (which consent shall not be unreasonably withheld, conditioned or

delayed). The identity and compensation of the Plan Administration Trustee shall be disclosed in the Plan Supplement. The appointment of the Plan Administration Trustee shall be approved in the Confirmation Order, and such appointment shall be effective as of the Effective Date. In accordance with the PAT Agreement, the Plan Administration Trustee shall serve in such capacity through the earlier of (x) the date that the Plan Administration Trust is dissolved in accordance with the PAT Agreement and (y) the date the Plan Administration Trustee resigns, is terminated or is otherwise unable to serve for any reason. In furtherance of and consistent with the purpose of the Plan Administration Trust and the Plan, the Plan Administration Trustee shall:

    (i)    have the power and authority to perform all functions on behalf of the Plan Administration Trust;

    (ii)    undertake all administrative responsibilities as are provided in the Plan and the PAT Agreement, including filing the final monthly operating report (for the month in which the Effective Date occurs) and all subsequent quarterly operating reports and administering the closure of the Chapter 11 Cases, which reports shall be delivered to the Master Disbursement Trust;

    (iii)    be responsible for all decisions and duties with respect to the Plan Administration Trust and the PAT Assets; and

    (iv)    take such other actions as the Plan Administration Trust determines to be necessary or desirable to carry out the purposes of the Plan.

    (d)    **Funding of the Wind-Up Reserve; Costs and Expenses of the Plan Administration Trust**. On the Effective Date, the Debtors shall establish and fund the Wind-Up Reserve, which shall vest in the Plan Administration Trust and be held and maintained by the Plan Administration Trustee. In the event of any shortfall of funding in the Wind-Up Reserve, NewCo shall be obligated to satisfy any such deficiency (which obligation shall be assumed by NewCo and any successor to NewCo's business). The costs and expenses of the Plan Administration Trust, including the compensation, fees and expenses of the Plan Administration Trustee and its retained professionals, shall be paid out of the Wind-Up Reserve. The Plan Administration Trustee shall be entitled to reasonable compensation, in an amount to be determined by the Debtors, subject to the consent (not to be unreasonably withheld, conditioned or delayed) of the Creditors' Committee and the Governmental Consent Parties, and to retain and reasonably compensate counsel and other professionals, including any professional who represented parties in interest, including the Debtors, in the Chapter 11 Cases, to assist in its duties as Plan Administration Trustee on such terms as the Plan Administration Trustee deems appropriate without Bankruptcy Court approval, subject to the provisions of the PAT Agreement.

    (e)    **Institution and Maintenance of Legal and Other Proceedings**. As of the date upon which the Plan Administration Trust is established, the Plan Administration Trust shall be empowered to initiate, prosecute, defend and resolve all legal actions and other proceedings related to any Asset, liability or responsibility of the Plan Administration Trust. Such legal actions and other proceedings shall be limited solely to those required for the purposes of reconciling, administering and defending against Claims (other than Channeled Claims) and the other responsibilities of the Plan Administration Trust. The Plan Administration Trust shall be empowered to initiate, prosecute, defend and resolve all such actions in the name of the Debtors or their Estates, in each case if deemed necessary or appropriate by the applicable Plan Administration Trustee. The Plan Administration Trust shall be responsible for the payment of all damages, awards, judgments, settlements, expenses, costs, fees and other charges incurred subsequent to the date upon which the Plan Administration Trust is established

arising from, or associated with, any legal action or other proceeding brought pursuant to the foregoing. For the avoidance of doubt, the Plan Administration Trust, pursuant to section 1123(b)(3)(B) of the Bankruptcy Code and applicable state corporate law, is appointed as the successor-in-interest to, and representative of, the Debtors and their Estates for the retention, enforcement, settlement or adjustment of Claims against the Debtors (other than the Channeled Claims). For the avoidance of doubt, neither the Plan Administration Trust nor the Plan Administration Trustee shall be vested with the rights to pursue any MDT Insurance Rights or MDT Insurance Collateral.

(f) **U.S. Federal Income Tax Matters Relating to Plan Administration Trust**. The Plan Administration Trust is intended to be treated as a trust described in IRC sections 661 through 664 and the regulations promulgated thereunder (a "complex trust"). The Plan Administration Trustee shall file (or cause to be filed) such statements, returns, or disclosures relating to the Plan Administration Trust as are required by any Governmental Unit, including IRS Form 1041, IRS Form 1041-ES, and IRS Schedule K-1. The Plan Administration Trustee shall be responsible for payment, out of the PAT Assets, of any taxes imposed on the Plan Administration Trust or the PAT Assets, including estimated and annual U.S. federal income taxes. The Plan Administration Trustee may request an expedited determination of taxes of the Plan Administration Trust under section 505(b) of the Bankruptcy Code for all returns filed for, or on behalf of, the Plan Administration Trust for all taxable periods through the dissolution of the Plan Administration Trust. Nothing in this Section 5.3(f) shall be deemed to determine, expand or contract the jurisdiction of the Bankruptcy Court under section 505 of the Bankruptcy Code.

(g) **Dissolution, Release of Reserves and Residual Value**. The Plan Administration Trust shall be dissolved and the Plan Administration Trustee shall be discharged from its duties with respect to the Plan Administration Trust upon completion of its duties as set forth in the Plan and satisfaction of the purposes of the Plan Administration Trust as set forth in the Plan and the PAT Agreement, which, for the avoidance of doubt, shall be no earlier than the later of (i) the PPLP Dissolution Date and (ii) the date on which (A) all Disputed Claims (other than Channeled Claims) have been resolved, (B) all PAT Assets have been liquidated and (C) all Distributions required to be made by the Plan Administration Trustee under the Plan and the PAT Agreement have been made, unless dissolution on an earlier date is authorized pursuant to a Final Order of the Bankruptcy Court. Any Cash or cash equivalents in the Plan Administration Trust remaining upon dissolution of the Plan Administration Trust, including any Surplus Reserve Cash remaining in the PAT Reserves, shall be distributed in accordance with Section 5.13(c) of the Plan.

(h) **Exculpation and Indemnification of the Plan Administration Trustee**. To the maximum extent permitted by applicable law, the Plan Administration Trustee shall not have or incur any liability for actions taken or omitted in its capacity as the Plan Administration Trustee, or on behalf of the Plan Administration Trust, except those acts found by Final Order to be arising out of its willful misconduct, bad faith, gross negligence or fraud, and shall be entitled to indemnification and reimbursement for reasonable fees and expenses in defending any and all of its actions or inactions in its capacity as the Plan Administration Trustee, or on behalf of the Plan Administration Trust, except for any actions or inactions found by Final Order to be arising out of its willful misconduct, bad faith, gross negligence or fraud. Any valid indemnification claim of the Plan Administration Trustee shall be satisfied from the Wind-Up Reserve.

**5.4** *NewCo*.

(a) **Establishment and Ownership of NewCo**. On or before the Effective Date, NewCo and any Subsidiaries of NewCo shall be formed in accordance with the Plan and the NewCo Operating Agreement. In accordance with the Public Entity Settlements, upon completion of the

Restructuring Transactions, TopCo shall hold the NewCo Interest, representing 100% of the voting and economic Interests in NewCo.

(b)    **Purpose of NewCo**. From and after the Effective Date, NewCo shall operate the NewCo Transferred Assets in accordance with the terms of the NewCo Operating Agreement, and subject to the NewCo Operating Injunction and the NewCo Governance Covenants set forth in the Confirmation Order. NewCo shall be operated in a responsible and sustainable manner, balancing (i) the interests of its stakeholders to fund and provide abatement of the opioid crisis, (ii) effective deployment of its assets to address the opioid crisis and (iii) the interests of those materially affected by its conduct.

(c)    **Vesting of the NewCo Transferred Assets in NewCo**. On or prior to the Effective Date, pursuant to the Plan and in accordance with the NewCo Transfer Agreement, the NewCo Transferred Assets, including the Initial NewCo Cash, shall be transferred to and vest in NewCo or one or more Subsidiaries of NewCo (other than any NewCo Transferred Assets held by a Transferred PPLP Subsidiary, which shall revest in such Transferred PPLP Subsidiary), in each case free and clear of all Claims, Interests, Liens, other encumbrances and liabilities of any kind, except for NewCo's obligations under the NewCo Guarantee Agreement, NewCo's obligation to satisfy any deficiency of funding in the Wind-Up Reserve (which obligation shall be assumed by NewCo and any successor to NewCo's business) and as otherwise expressly set forth in the NewCo Transfer Agreement. Except as described in the foregoing sentence, NewCo shall have no liability for, and the NewCo Transferred Assets shall vest in NewCo free and clear of, any prepetition and postpetition Claims, Causes of Action or liabilities of any kind, in each case that have been or could have been asserted against the Debtors, their Estates or their property (including, but not limited to, Claims based on successor liability) based on any acts or omissions prior to the Effective Date.

(d)    **Appointment of the NewCo Managers**. The board of managers of NewCo will consist of seven (7) NewCo Managers, each with experience in one or more of the following areas: pharmaceuticals, public policy (including public health policy), law enforcement, ethics and compliance, finance, audit, general business and/or corporate governance issues. The initial NewCo Managers shall be disinterested and independent, and shall be selected by the Governmental Consent Parties, in consultation with the Debtors and the Creditors' Committee, and pursuant to a selection process that is reasonably acceptable to the Debtors; *provided* that the DOJ shall have the right, in its discretion, to observe such selection process.[11] The identity of the initial NewCo Managers shall be included in the Plan Supplement. The appointment of the initial NewCo Managers shall be approved in the Confirmation Order, and such appointment shall be effective as of the Effective Date.

(e)    **NewCo Operating Expenses**. All NewCo Operating Expenses shall be paid by NewCo or its Subsidiaries. On the Effective Date, NewCo shall be funded with the Initial NewCo Cash, which shall vest in NewCo in accordance with Section 5.4(c) of the Plan. For the avoidance of doubt, the NewCo Priority Waterfall shall not limit or restrict the ability of NewCo or its Subsidiaries to pay NewCo Operating Expenses between NewCo Distribution Dates from funds reserved under Section 5.2(f)(ii)(A), generated by the business or otherwise available to NewCo and its Subsidiaries.

(f)    **Identifying Opioid Proceeds**. NewCo shall identify, and report on a publicly available website, the portion of TopCo Distributions that are derived from Opioid Proceeds.

---

[11] If determined to be necessary by the Governmental Consent Parties, NewCo may retain one or more of the four independent directors on PPLP's Special Committee for a period of time to serve as interim directors of NewCo to allow for a period of transition and onboarding of NewCo Managers.

(g)     **NewCo Insurance**. On or prior to the Effective Date, the Debtors shall fund an upfront premium payment from Effective Date Cash to purchase insurance required and appropriate for the business needs of NewCo, including liability and other insurance for NewCo, including without limitation, product liability insurance and directors' and officers' liability insurance for the NewCo Managers, officers and other authorized agents, in an amount and on terms acceptable to the Debtors and the Governmental Consent Parties.

(h)     **NewCo Operating Injunction and NewCo Governance Covenants**. The Confirmation Order will provide for the issuance of the NewCo Operating Injunction and the NewCo Governance Covenants. At all times from and after the Effective Date, NewCo, and any purchaser of NewCo's opioid business, shall remain subject to the NewCo Operating Injunction and the NewCo Governance Covenants.

(i)     **NewCo Monitor**. The Confirmation Order will provide for the appointment of the NewCo Monitor. The initial NewCo Monitor shall be the Purdue Monitor in place as of the Effective Date or otherwise selected by the Governmental Consent Parties with the consent of the Debtors, and in consultation with the Creditors' Committee. The identity of the NewCo Monitor shall be disclosed in the Plan Supplement. The NewCo Monitor shall be responsible for ensuring that NewCo is in compliance with the NewCo Operating Injunction and the NewCo Governance Covenants. NewCo and its professionals and representatives, including the NewCo Managers, shall cooperate and reasonably respond to requests by the NewCo Monitor in the performance of its responsibilities, including reasonable requests for access to relevant books and records of NewCo. In furtherance of the responsibilities of the NewCo Monitor, the NewCo Monitor shall be authorized to seek relief from the Bankruptcy Court to the extent necessary to carry out its obligations hereunder. The NewCo Monitor shall prepare and publish quarterly reports regarding the matters for which the NewCo Monitor is responsible, including NewCo's compliance with the NewCo Operating Injunction and the NewCo Governance Covenants. All compensation, costs and fees of the NewCo Monitor and any professionals retained by the NewCo Monitor shall constitute NewCo Operating Expenses, and shall be paid by NewCo.

(j)     **U.S. Federal Income Tax Matters Relating to NewCo**. The NewCo Managers shall cause NewCo to make a timely election to be treated as a corporation for U.S. federal income tax purposes effective as of the date of its formation by the deadline for making such election (or such later date as to which the IRS has granted an extension for such election) unless the IRS has provided guidance which may be relied upon to the effect that not making such election would not have a material adverse tax effect on NOAT, including by reason of the application of IRC section 115.

(k)     **Exculpation and Indemnification of the NewCo Managers**. To the maximum extent permitted by applicable law, no NewCo Manager shall have or incur any liability for actions taken or omitted in his or her capacity as a NewCo Manager, or on behalf of NewCo, except those acts found by Final Order to be arising out of his or her willful misconduct, bad faith or fraud, and shall be entitled to indemnification and reimbursement for reasonable fees and expenses in defending any and all actions or inactions in his or her capacity as a NewCo Manager, or on behalf of NewCo, except for any actions or inactions found by Final Order to be arising out of his or her willful misconduct, bad faith or fraud. Any valid indemnification claim of any NewCo Manager shall be satisfied by NewCo.

**5.5     _TopCo_**.

(a)     **Establishment and Ownership of TopCo**. On or before the Effective Date, TopCo shall be formed in accordance with the terms of the Plan and the TopCo Operating Agreement. In accordance with the Public Entity Settlements, upon completion of the Restructuring Transactions, NOAT shall hold the TopCo NOAT Interest and the Tribe Trust shall hold the TopCo Tribe Interest, collectively representing 100% of the voting and economic Interests in TopCo.

(b)      **Appointment of the TopCo Managers**. The board of managers of TopCo will consist of three (3) TopCo Managers, each of whom shall be disinterested and independent; *provided* that one (but no more than one) Creditor Trustee of NOAT may serve as a TopCo Manager; *provided further* that any action taken by such individual in his or her capacity as TopCo Manager shall not be subject to the fiduciary duties of such individual in his or her capacity as a Creditor Trustee of NOAT. The initial TopCo Managers shall be selected by the Governmental Consent Parties, in consultation with the Debtors and the Creditors' Committee, and pursuant to a selection process that is reasonably acceptable to the Debtors; *provided* that the DOJ shall have the right, in its discretion, to observe such selection process. The identity of the initial TopCo Managers shall be included in the Plan Supplement. The appointment of the initial TopCo Managers shall be approved in the Confirmation Order, and such appointment shall be effective as of the Effective Date.

(c)      **TopCo Operating Expenses**. TopCo Operating Expenses shall be paid by TopCo.

(d)      **TopCo D&O Insurance and Indemnification**. On or prior to the Effective Date, the Debtors shall fund an upfront premium payment from Effective Date Cash to purchase directors' and officers' liability insurance for the TopCo Managers in an amount and on terms acceptable to the Debtors and the Governmental Consent Parties.

(e)      **Distributions from TopCo Free and Clear**. All Public Creditor Trust Distributions made by TopCo shall be made in accordance with the TopCo Priority Waterfall and on no less than ten (10) Business Days' notice to the Master Disbursement Trust and the Private Creditor Trusts, and thereafter shall be free and clear of all claims, Liens or other recourse or encumbrances, and shall not be subject to disgorgement or recoupment by any Person.

(f)      **U.S. Federal Income Tax Matters Relating to TopCo**. TopCo is intended to be treated as a partnership for U.S. federal income tax purposes and shall be treated consistently for state and local tax purposes, to the extent applicable. Neither TopCo nor any TopCo Manager shall make an election for TopCo to be classified as other than a partnership pursuant to Treasury Regulations section 301.7701-3.

(g)      **Exculpation and Indemnification of the TopCo Managers**. To the maximum extent permitted by applicable law, no TopCo Manager shall have or incur any liability for actions taken or omitted in his or her capacity as a TopCo Manager, or on behalf of NewCo, except those acts found by Final Order to be arising out of his or her willful misconduct, bad faith or fraud, and shall be entitled to indemnification and reimbursement for reasonable fees and expenses in defending any and all actions or inactions in his or her capacity as a TopCo Manager, or on behalf of NewCo, except for any actions or inactions found by Final Order to be arising out of his or her willful misconduct, bad faith or fraud. Any valid indemnification claim of any TopCo Manager shall be satisfied by TopCo.

5.6      *Master Disbursement Trust*.

(a)      **Establishment and Purpose of the Master Disbursement Trust**. On or before the Effective Date, the Debtors shall take all necessary steps to establish the Master Disbursement Trust in accordance with the Plan and the MDT Agreement. The Master Disbursement Trust shall be established for the purposes described in this Plan and any other purposes more fully described in the MDT Agreement, and shall be subject to the jurisdiction of the Bankruptcy Court. The Master Disbursement Trust shall, in each case in accordance with the Plan and the MDT Agreement:

(i)    hold, manage, sell, invest and distribute the MDT Transferred Assets for the benefit of the Creditor Trusts in accordance with the Private Entity Settlements and the Public Entity Settlements;

(ii)    enforce, pursue, prosecute, compromise and/or settle the MDT Causes of Action, the MDT Insurance Rights and the MDT Shareholder Rights, including monitoring and enforcing the Shareholder Settlement Agreement;

(iii)    make payments to the Private Creditor Trusts in satisfaction of the MDT Claims;

(iv)    make Public Creditor Trust Distributions from MDT Excess Cash; and

(v)    publish on a publicly available website reports received from the Abatement Trusts regarding the disbursement, use and efficacy of Abatement Distributions and compliance with Authorized Abatement Purposes.

(b)    **Vesting of the MDT Transferred Assets in the Master Disbursement Trust**. The corpus of the Master Disbursement Trust shall consist of the MDT Transferred Assets. On the Effective Date, pursuant to the Plan and in accordance with the MDT Agreement, the MDT Transferred Assets shall be transferred to and vest in the Master Disbursement Trust free and clear of all Claims, Interests, Liens, other encumbrances and liabilities of any kind (other than the MDT Claims and MDT Interests); *provided* that, to the extent certain Assets comprising the MDT Transferred Assets are not known or identified as of the Effective Date, such Assets shall automatically, and without further act or deed, be transferred to and vest in the Master Disbursement Trust upon the discovery or identification thereof, including, with respect to the Surplus Reserve Cash, in accordance with Section 5.13(c) of the Plan. The Master Disbursement Trust shall have no liability for, and the MDT Transferred Assets shall vest in the Master Disbursement Trust free and clear of, any prepetition and postpetition Claims, Causes of Action or liabilities of any kind, in each case that have been or could have been asserted against the Debtors, their Estates or their property (including, but not limited to, Claims based on successor liability) based on any acts or omissions prior to the Effective Date, except for the MDT Claims. From and after the Effective Date, all proceeds of the MDT Transferred Assets, including without limitation, amounts paid by Insurance Companies under the MDT Insurance Policies and amounts paid under the Shareholder Settlement Agreement, shall be paid to the Master Disbursement Trust to be applied in accordance with the MDT Priority Waterfall and the MDT Agreement.

(c)    **Funding of the Master Disbursement Trust**. The Master Disbursement Trust shall be funded with the proceeds of the MDT Transferred Assets and amounts, if applicable, received pursuant to the NewCo Guarantee Agreement.

(d)    **Appointment and Role of the MDT Trustees**. The board of trustees of the Master Disbursement Trust will consist of three (3) MDT Trustees with experience in financial reorganizations. The MDT Trustees shall be disinterested and independent. [One (1) initial MDT Trustee shall be selected by the Creditors' Committee and two (2) initial MDT Trustees shall be selected by the Governmental Consent Parties,][12] in each case, in consultation with the Debtors and pursuant to a selection process reasonably acceptable to the Debtors; *provided* that, in each case, the DOJ shall have the

---

[12] Subject to ongoing discussions.

58

right, in its discretion, to observe such selection process. The identity of the initial MDT Trustees shall be disclosed in the Plan Supplement. The appointment of the initial MDT Trustees shall be approved in the Confirmation Order, and such appointment shall be effective as of the Effective Date. Upon the payment in full in Cash of all MDT Claims, the MDT Trustees may be removed and replaced by NOAT (including with any of the Creditor Trustees of NOAT) in its sole discretion. In furtherance of and consistent with the purpose of the Master Disbursement Trust and the Plan, the MDT Trustees shall:

> (i)    have the power and authority to perform all functions on behalf of the Master Disbursement Trust;
>
> (ii)    be responsible for all decisions and duties with respect to the Master Disbursement Trust and the MDT Transferred Assets; and
>
> (iii)    in all circumstances, act in a fiduciary capacity for the benefit and in the best interests of the Creditor Trusts, as the beneficiaries of the Master Disbursement Trust, in furtherance of the purpose of the Master Disbursement Trust, and in accordance with the Plan, including Section 5.6(e) of the Plan, and the MDT Agreement.

(e)    [**Fiduciary Duties of the MDT Trustees**. The MDT Trustees shall have fiduciary duties to all Creditor Trusts, as the beneficiaries of the Master Disbursement Trust. The Bankruptcy Court shall have exclusive jurisdiction to determine whether the MDT Trustees have breached their duties or obligations. Should any party believe that the MDT Trustees have breached their duties or obligations, all parties agree that the Bankruptcy Court shall be authorized to make such a determination in an expedited manner and to order appropriate relief (including, if necessary, with respect to any upcoming distributions), and in all events, to make such a decision in no more than thirty (30) days from the filing of the applicable action. All parties in interest (including the Creditor Trustees for the Creditor Trusts and the MDT Trustee selected by the Creditors' Committee) shall have the opportunity to be heard with regard to any such dispute, including by the filing of objections, declarations, statements in support, and other pleadings (including with supporting evidence), and can provide witness testimony at any hearing.][13]

(f)    **Appointment of the MDT Executive Director**. The MDT Executive Director will be an individual with experience in financial reorganizations. The initial MDT Executive Director shall be selected by the MDT Trustees; *provided* that the DOJ shall have the right, in its discretion, to observe such selection process. The identity of the initial MDT Executive Director shall be disclosed in the Plan Supplement. Removal and replacement of the MDT Executive Director shall be determined by the MDT Trustees as set forth in the MDT Agreement. The MDT Executive Director shall:

> (i)    carry out the day-to-day operations of the Master Disbursement Trust;
>
> (ii)    make enforcement, litigation and liquidation recommendations as are reasonably necessary to the MDT Trustees and such other administrative professionals or entities; and

---

[13] The fiduciary duties of the MDT Trustees remain subject to ongoing discussions.

(iii)     have such other duties and responsibilities as set forth in the MDT Agreement and as may be delegated to it by the MDT Trustees in accordance with the MDT Agreement.

(g)     **MDT Operating Expenses**. On the Effective Date, the Debtors shall establish and fund the MDT Operating Reserve, which shall vest in the Master Disbursement Trust in accordance with Section 5.6(b) of the Plan and be held and maintained by the MDT Trustees. Periodically, until the dissolution of the Master Disbursement Trust, the MDT Trustees will replenish the MDT Operating Reserve from Cash held or received by the Master Disbursement Trust to the extent deemed necessary by the MDT Trustees to satisfy and pay estimated future MDT Operating Expenses. The MDT Trustees shall create and maintain an annual budget of MDT Operating Expenses, which shall be reviewed by the Creditor Trustees and reasonably acceptable to the Creditor Trustees. All MDT Operating Expenses shall be satisfied and paid from the MDT Operating Reserve. The MDT Trustees and the MDT Executive Director shall be entitled to reasonable compensation and to retain and reasonably compensate counsel and other professionals to assist in the duties of the Master Disbursement Trust on such terms as the MDT Trustees and the MDT Executive Director deem appropriate without Bankruptcy Court approval, subject to the provisions of the MDT Agreement. The initial compensation of the MDT Trustees and the MDT Executive Director shall be reasonably acceptable to the Debtors, the Creditors' Committee and the Governmental Consent Parties, and thereafter shall be subject to the annual budgets prepared by the MDT Trustees.

(h)     **Transfer of the MDT Insurance Rights**. In furtherance of the transfer of the MDT Transferred Assets to the Master Disbursement Trust and in accordance with the MDT Agreement, on the Effective Date, the Debtors shall irrevocably transfer, grant and assign to the Master Disbursement Trust, and the Master Disbursement Trust shall receive and accept, any and all of the MDT Causes of Action and MDT Insurance Rights. To the extent any Insurance Company would be obligated in respect of any MDT Insurance Policy to pay any Channeled Claim on behalf of one or more of the Debtors, the Debtors shall transfer and assign to the Master Disbursement Trust the right to enforce such Insurance Company's obligation. The foregoing transfer shall be (i) free and clear of all Claims, Liens, encumbrances and Causes of Action of any nature whatsoever, (ii) made to the maximum extent possible under applicable law, (iii) absolute and without requirement of any further action by the Debtors, the Liquidating Debtors, the Plan Administration Trust, the Master Disbursement Trust, the Bankruptcy Court or any other Person, and (iv) governed by, and construed in accordance with, the Bankruptcy Code and the other applicable laws governing the applicable MDT Insurance Policies. The Master Disbursement Trust shall become liable for and shall satisfy, to the extent required under applicable law, any prospective premiums, deductibles, self-insured retentions and any other amounts arising in any way out of the receipt of payment from an Insurance Company in respect of the MDT Insurance Rights; *provided* that, for the avoidance of doubt, the Master Disbursement Trust will not be required to pay premiums or any other amounts for Purdue Insurance Policies that are not MDT Insurance Policies. The transfer of the MDT Insurance Rights contemplated in this Section 5.6(h) is not an assignment of any insurance policy itself. The Confirmation Order shall contain findings reasonably acceptable to the Creditors' Committee and the Governmental Consent Parties and necessary to preserve all MDT Insurance Rights.

(i)     [Reserved]

(j)     **Institution and Maintenance of Legal and Other Proceedings**. As of the date upon which the Master Disbursement Trust is established, the Master Disbursement Trust shall be empowered to initiate, prosecute, defend and resolve all legal actions and other proceedings related to any Asset, liability or responsibility of the Master Disbursement Trust, including in respect of the MDT Causes of Action, the MDT Insurance Rights and the MDT Shareholder Rights. Such legal actions and

other proceedings shall be limited solely to those required for the purposes of satisfying the responsibilities of the Master Disbursement Trust, including in respect of the MDT Causes of Action, the MDT Insurance Rights and the MDT Shareholder Rights. The Master Disbursement Trust shall be empowered to initiate, prosecute, defend and resolve all such actions in the name of the Debtors or their Estates, in each case if deemed necessary or appropriate by the MDT Trustees. The Master Disbursement Trust shall be responsible for the payment of all damages, awards, judgments, settlements, expenses, costs, fees and other charges incurred subsequent to the date upon which the Master Disbursement Trust is established arising from, or associated with, any legal action or other proceeding brought pursuant to the foregoing.

(k)    **U.S. Federal Income Tax Matters Relating to the Master Disbursement Trust**. The Master Disbursement Trust is intended to be treated, and shall be reported, as a "qualified settlement fund" for U.S. federal income tax purposes and shall be treated consistently for state and local tax purposes, to the extent applicable. All parties (including, without limitation, Holders of Claims against or Interests in the Debtors, the Related Parties of such Holders, the Debtors, the Master Disbursement Trust, the MDT Trustees and the Creditor Trusts) shall report consistently with the foregoing. An MDT Trustee shall be the "administrator," within the meaning of Treasury Regulations section 1.468B-2(k)(3), of the Master Disbursement Trust. The administrator of the Master Disbursement Trust shall be responsible for filing all tax returns of the Master Disbursement Trust and the payment, out of the Assets of the Master Disbursement Trust, of any taxes due by or imposed on the Master Disbursement Trust. The MDT Trustees may request an expedited determination under section 505(b) of the Bankruptcy Code for all tax returns filed by or on behalf of the Master Disbursement Trust for all taxable periods through the dissolution of the Master Disbursement Trust. Nothing in this Section 5.6(k) shall be deemed to determine, expand or contract the jurisdiction of the Bankruptcy Court under section 505 of the Bankruptcy Code.

(l)    **Distributions from the Master Disbursement Trust Free and Clear**. All distributions made by the Master Disbursement Trust to the Creditor Trusts shall be made on no less than ten (10) Business Days' notice to all Creditor Trusts, and thereafter shall be free and clear of all Claims, Liens or other recourse or encumbrances, and shall not be subject to attachment, disgorgement or recoupment by any Person. Such distributions to each Creditor Trust shall become the property of such Creditor Trust, and shall be used for the administration (including the payment of Creditor Trust Operating Expenses) of such Creditor Trust, to make Distributions on account of Allowed Channeled Claims channeled to such Creditor Trust in accordance with the applicable Creditor Trust Documents and for such other purposes as may be specifically set forth in the applicable Creditor Trust Documents.

(m)    **Dissolution, Release of Reserves and Residual Value**. The Master Disbursement Trust shall be dissolved and the MDT Trustees and the MDT Executive Director shall be discharged from their respective duties with respect to the Master Disbursement Trust upon completion of their duties as set forth in this Plan and the MDT Agreement, which, for the avoidance of doubt, shall be no earlier than the date on which (i) all Assets held by the Master Disbursement Trust, including the MDT Transferred Assets, have been liquidated and (ii) all payments and other distributions required to be made from the Master Disbursement Trust under the Plan and the MDT Agreement have been made, including payment in full in Cash of all MDT Claims, unless dissolution on an earlier date is authorized pursuant to a Final Order of the Bankruptcy Court. Upon dissolution of the Master Disbursement Trust, any Cash remaining in the MDT Operating Reserve or otherwise held by the Master Disbursement Trust shall be distributed in accordance with the MDT Priority Waterfall and the MDT Agreement.

(n)    **Exculpation and Indemnification of the MDT Trustees and MDT Executive Director**. To the maximum extent permitted by applicable law, each of the MDT Trustees and the MDT Executive Director shall not have or incur any liability for actions taken or omitted in its

capacity as an MDT Trustee or the MDT Executive Director, or on behalf of the Master Disbursement Trust, except those acts found by Final Order to be arising out of its willful misconduct, bad faith, gross negligence or fraud, and shall be entitled to indemnification and reimbursement for reasonable fees and expenses in defending any and all of its actions or inactions in its capacity as an MDT Trustee or the MDT Executive Director, or on behalf of the Master Disbursement Trust, except for any actions or inactions found by Final Order to be arising out of its willful misconduct, bad faith, gross negligence or fraud. Any valid indemnification claim of the MDT Trustees or the MDT Executive Director shall be satisfied from the MDT Operating Reserve.

### 5.7    *Creditor Trusts*.

(a)    **Establishment and Purpose of the Creditor Trusts**. The Confirmation Order shall endorse and direct the establishment of the Creditor Trusts on or prior to the Effective Date in accordance with the terms of the respective Creditor Trust Documents. The Creditor Trusts shall be independent from the Holders of Claims against the Debtors, and shall be subject to the exclusive jurisdiction of the Bankruptcy Court. The Creditor Trusts shall be established for the purposes described in this Plan and any other purposes more fully described in the Creditor Trust Documents. Each Creditor Trust shall, in each case, in accordance with the Plan, the Confirmation Order and the applicable Creditor Trust Documents:

(i)    hold, manage and invest all funds and other Assets received by such Creditor Trust from the Debtors, the Master Disbursement Trust and TopCo, as applicable (including, with respect to the Tribe Trust and NOAT, the TopCo Interests and the MDT Interests), in each case, for the benefit of the beneficiaries of such Creditor Trust;

(ii)    hold and maintain the Creditor Trust Operating Reserve of such Creditor Trust; and

(iii)    administer, process, resolve and liquidate Channeled Claims channeled to such Creditor Trust, in each case as provided in the applicable Creditor Trust Documents.

(b)    **Appointment and Role of the Creditor Trustees**. In furtherance of and consistent with the purposes of the Creditor Trusts and the Plan, the Creditor Trustees shall have the power and authority to perform all functions on behalf of the respective Creditor Trusts. The Creditor Trustees shall undertake all administrative responsibilities as are provided in the Plan and the applicable Creditor Trust Documents. The Creditor Trustees shall be responsible for all decisions and duties with respect to the respective Creditor Trusts. In all circumstances, each Creditor Trustee shall be independent and disinterested and shall act in the best interests of the beneficiaries of such Creditor Trust, in furtherance of the purpose of such Creditor Trust and in accordance with this Plan and the applicable Creditor Trust Documents. In accordance with the Creditor Trust Documents, each Creditor Trustee shall serve in such capacity through the earlier of (x) the date that the applicable Creditor Trust is dissolved in accordance with the applicable Creditor Trust Documents and (y) the date such Creditor Trustee resigns, is terminated or is otherwise unable to serve for any reason. The identity of the initial Creditor Trustees shall be disclosed in the Plan Supplement. The initial Creditor Trustees shall be:

(i)    with respect to NOAT, selected by the Governmental Consent Parties, in consultation with the Debtors and pursuant to a selection process reasonably acceptable to the Debtors; *provided*

that the DOJ shall have the right, in its discretion, to observe such selection process;

(ii)  with respect to the Tribe Trust, selected by the Native American Tribe Group with the consent of the Debtors; and

(iii)  with respect to each of the Private Creditor Trusts, selected by (A) with respect to the Hospital Trust, the Ad Hoc Group of Hospitals, (B) with respect to the TPP Trust, the Third-Party Payor Group, (C) with respect to the NAS Monitoring Trust, the NAS Committee and (D) with respect to the PI Trust, the Ad Hoc Group of Individual Victims, in each case, with the consent of the Debtors (which consent shall not be unreasonably withheld, delayed or denied).

(c)  **Abatement Distributions**. Each Abatement Trust shall, in accordance with the Plan, the Confirmation Order and the applicable Abatement Trust Documents, make Abatement Distributions to Authorized Recipients for Authorized Abatement Purposes. The Abatement Trust Documents for each Abatement Trust shall provide that decisions concerning Abatement Distributions made by Abatement Trusts will consider the need to ensure that underserved urban and rural areas, as well as minority communities, receive equitable access to the funds. Any Domestic Governmental Entity entitled to an Abatement Distribution from NOAT may elect to have such Abatement Distribution, or any portion thereof, paid to the Public Document Repository in accordance with the NOAT Documents.

(d)  **PI Trust Distributions**. The PI Trust shall, in accordance with the Plan, the Confirmation Order and the PI Trust Documents, make Distributions on account of Allowed PI Claims to Holders of such Allowed PI Claims, subject to the holdback of amounts in the TPP LRP Escrow Account and payments therefrom to LRP Participating TPPs, in each case as required under and subject to the terms of the LRP Agreement. Pursuant to and in accordance with the LRP Agreement, the Creditor Trustee for the TPP Trust shall have the right (i) to inquire periodically with the Creditor Trustee for the PI Trust, the claims administrator appointed in respect of the PI Trust and the escrow agent for the TPP LRP Escrow Account as to whether the TPP LRP Escrow Account has been properly funded and payments therefrom are being made to the LRP Participating TPPs as required under the LRP Agreement, and to request evidence of the same and (ii) to seek entry of an order by the Bankruptcy Court enforcing the LRP Agreement, including the obligations to provide such information and evidence, in the event the Creditor Trustee for the TPP Trust reasonably believes that the TPP LRP Escrow Account has not been properly funded as required by the LRP Agreement, payments have not been made to LRP Participating TPPs as required by the LRP Agreement, and/or any of the Creditor Trustee for the PI Trust, the claims administrator appointed in respect of the PI Trust and the escrow agent for the TPP LRP Escrow Account is not responding to reasonable requests by the Creditor Trustee for the TPP Trust for such information and evidence.

(e)  **Abatement Trust Monitoring and Reporting Obligations**. Each Abatement Trust shall (i) monitor the use of funds received by Abatement Distribution recipients in accordance with Authorized Abatement Purposes and (ii) prepare and deliver to the Master Disbursement Trust for publication annual reports on the disbursement, use and, to the extent feasible and cost-effective, efficacy of Abatement Distributions from such Abatement Trust and the compliance by Abatement Distribution recipients with the Authorized Abatement Purposes set forth in the applicable Abatement Trust Documents. In addition, NOAT shall (x) ensure that the Master Disbursement Trust and TopCo comply with their respective obligations to NOAT, including the enforcement of rights and agreements for the benefit of NOAT, (y) monitor the financial and other reports received from TopCo, NewCo, the

Master Disbursement Trust and the States, and publish such reports on a publicly available website, as appropriate in the reasonable discretion of the Creditor Trustees of NOAT, and (z) prepare or direct the preparation of annual audited financial reports of NOAT to be filed with the Bankruptcy Court, delivered to the States and published on a publicly available website. For the avoidance of doubt, NOAT shall not be required to duplicate any reporting performed by the Master Disbursement Trust.

(f) **Assumption of Obligations and Liabilities**. In furtherance of the purposes of the Plan and the Creditor Trusts, and subject to the applicable Creditor Trust Documents, each Creditor Trust shall (i) expressly assume sole and exclusive responsibility and liability for (A) the Channeled Claims channeled to such Creditor Trust and (B) all Creditor Trust Operating Expenses of such Creditor Trust and (ii) have all defenses, cross-claims, offsets and recoupments regarding such Channeled Claims that the Debtors have, or would have had, under applicable law, but solely to the extent consistent with the applicable Creditor Trust Documents and this Plan; *provided* that no such Claims, defenses or rights may be asserted against any Released Party or Shareholder Released Party.

(g) **Administration of Channeled Claims**. All Channeled Claims will be administered, liquidated and discharged pursuant to, and to the extent provided in, the applicable Creditor Trust Documents. The Creditor Trustees shall determine the eligibility, amount and Allowance (if applicable) of the applicable Channeled Claims, in accordance with, and to the extent provided in, the applicable Creditor Trust Documents. In accordance with the trust distribution procedures and other provisions of the applicable Creditor Trust Documents, the Creditor Trustees shall also make all determinations with respect to Distributions to be made by the applicable Creditor Trust, which shall be funded in accordance with the Public Entity Settlements and the Private Entity Settlements, as applicable. The foregoing determinations by the applicable Creditor Trustee shall be final and binding, and shall not be subject to any challenge or review of any kind, by any court or other Person, except as set forth in the Creditor Trust Documents. Distributions by the Creditor Trusts shall be the sole source of recovery, if any, in respect of Channeled Claims, and no Holder of a Channeled Claim shall have any other or further recourse to the Creditor Trusts, the Debtors or their Estates, the Plan Administration Trust, the Master Disbursement Trust, NewCo, TopCo, the other Released Parties or the Shareholder Released Parties; *provided* that the foregoing shall not diminish, or otherwise alter, the rights of LRP Participating TPPs under the LRP Agreement. Holders of Disallowed Channeled Claims shall have no recourse to the Creditor Trusts, the Debtors or their Estates, the Plan Administration Trust, the Master Disbursement Trust, NewCo, TopCo, the other Released Parties or the Shareholder Released Parties in respect of such Disallowed Claims. Distributions made by the Abatement Trusts shall be exclusively in the form of Abatement Distributions to Authorized Recipients for Authorized Abatement Purposes solely as permitted pursuant to the applicable Abatement Trust Documents.

(h) **Institution and Maintenance of Legal and Other Proceedings**. As of the date upon which each Creditor Trust is established, such Creditor Trust shall be empowered to initiate, prosecute, defend and resolve all legal actions and other proceedings related to any Asset, liability or responsibility of such Creditor Trust. Such legal actions and other proceedings shall be limited solely to those required for purposes of reconciling, administering or defending against the Channeled Claims channeled to such Creditor Trust and for enforcing the rights of such Creditor Trust under the Plan and the Plan Documents (including the rights of the Creditor Trustee for the TPP Trust specifically enumerated in the LRP Agreement). Each Creditor Trust shall be empowered to initiate, prosecute, defend and resolve all such actions in the name of the Debtors or their Estates, in each case if deemed necessary by the applicable Creditor Trustee to fulfill the purposes for which such Creditor Trust was created. Each Creditor Trust shall be responsible for the payment of all damages, awards, judgments, settlements, expenses, costs, fees and other charges incurred subsequent to the date upon which such Creditor Trust is established arising from, or associated with, any legal action or other proceeding brought pursuant to the foregoing. For the avoidance of doubt, each Creditor Trust, pursuant to

64

section 1123(b)(3)(B) of the Bankruptcy Code and applicable state corporate law, is appointed as the successor-in-interest to, and representative of, the Debtors and their Estates for the retention, enforcement, settlement or adjustment of the applicable Channeled Claims channeled to such Creditor Trust.

(i)    **Creditor Trust Operating Expenses**. The Creditor Trustees shall be entitled to reasonable compensation and to retain and reasonably compensate counsel and other professionals to assist in their duties without Bankruptcy Court approval, subject to the provisions of the applicable Creditor Trust Documents. Creditor Trust Operating Expenses of each Creditor Trust shall be satisfied and paid from such Creditor Trust's Creditor Trust Operating Reserve in accordance with the applicable Creditor Trust Documents. Periodically, until the dissolution of a Creditor Trust, the applicable Creditor Trustee will replenish the Creditor Trust Operating Reserve from Cash held or received by such Creditor Trust to the extent deemed necessary by such Creditor Trustee to satisfy and pay estimated future Creditor Trust Operating Expenses in accordance with the Creditor Trust Documents.

(j)    **U.S. Federal Income Tax Matters Relating to the Creditor Trusts**. Each Creditor Trust (other than any Tribe Trust entity that is formed as a legal entity other than a trust) is intended to be treated, and shall be reported, as a "qualified settlement fund" for U.S. federal income tax purposes and shall be treated consistently for state and local tax purposes to the extent applicable. All parties (including, without limitation, Holders of Claims against or Interests in the Debtors, the Related Parties of such Holders, the Debtors, the Creditor Trustees, TopCo and the Master Disbursement Trust) will be required to report consistently with the foregoing for all applicable tax reporting purposes. A Creditor Trustee from each relevant Creditor Trust shall be the "administrator" within the meaning of Treasury Regulations section 1.468B-2(k)(3) of the applicable Creditor Trust. The administrator of each such Creditor Trust shall be responsible for filing all tax returns of the applicable Creditor Trust and the payment, out of the assets of such Creditor Trust, of any taxes due by or imposed on such Creditor Trust. Each Creditor Trustee may request an expedited determination of taxes under section 505(b) of the Bankruptcy Code for all tax returns filed by or on behalf of the applicable Creditor Trust for all taxable periods through the dissolution of such Creditor Trust. Nothing in this Section 5.7(j) shall be deemed to determine, expand or contract the jurisdiction of the Bankruptcy Court under section 505 of the Bankruptcy Code. Subject to guidance from the IRS, it is intended that NOAT's income shall be treated as exempt from U.S. federal income tax pursuant to IRC section 115, and shall be treated consistently for state and local tax purposes to the extent applicable.

(k)    **Exculpation and Indemnification of the Creditor Trustees**. To the maximum extent permitted by applicable law, the Creditor Trustees shall not have or incur any liability for actions taken or omitted in their capacities as the Creditor Trustees, or on behalf of the respective Creditor Trusts, except those acts found by Final Order to be arising out of their willful misconduct, bad faith, gross negligence or fraud, and shall be entitled to indemnification and reimbursement for reasonable fees and expenses in defending any and all of their actions or inactions in their capacity as the Creditor Trustees, or on behalf of the respective Creditor Trusts, except for any actions or inactions found by Final Order to be arising out of their willful misconduct, bad faith, gross negligence or fraud. Any valid indemnification claim of the Creditor Trustees shall be satisfied from the respective Creditor Trusts.

(l)    **Dissolution of the Creditor Trusts**. Each Creditor Trust shall be dissolved and the applicable Creditor Trustee shall be discharged from its duties with respect to such Creditor Trust upon completion of its duties and the satisfaction of the purposes of the Creditor Trust as set forth in this Plan and the applicable Creditor Trust Documents.

5.8     *Attorneys' Fees and Costs*.[14]

[Reserved]

5.9     *Transferability of Distribution Rights*.

Any right to receive a Distribution or other payment from the Plan Administration Trust (including any PAT Distribution Account or PAT Reserve), a Creditor Trust or the Master Disbursement Trust (including the MDT Claims Reserve) shall not be evidenced by any certificate, security, receipt or in any other form or manner whatsoever, except on the books and records of the Plan Administration Trust (as maintained by the Plan Administration Trustee), the applicable Creditor Trust (as maintained by the applicable Creditor Trustees) or the Master Disbursement Trust (as maintained by the MDT Trustees), as applicable. Further, any right to receive a Distribution or other payment from the Plan Administration Trust (including any PAT Distribution Account or PAT Reserve), a Creditor Trust or the Master Disbursement Trust (including the MDT Claims Reserve) shall be nontransferable and nonassignable except by will, intestate, succession or operation of law. Any rights to receive a Distribution or other payment from the Plan Administration Trust (including any PAT Distribution Account or PAT Reserve), a Creditor Trust or the Master Disbursement Trust (including the MDT Claims Reserve) shall not constitute "securities" and shall not be registered pursuant to the Securities Act. If it is determined that such rights constitute "securities," the exemption provisions of section 1145(a)(1) of the Bankruptcy Code would be satisfied and such securities would be exempt from registration.

5.10     *Insurance Neutrality*.

Nothing in the Plan, the Plan Documents or the Confirmation Order, including any provision that purports to be preemptory or supervening, shall in any way relate to, or have the effect of, impairing, altering, supplementing, changing, expanding, decreasing or modifying (a) the rights or obligations of any of the Insurance Companies or (b) any rights or obligations of the Debtors arising out of or under any Purdue Insurance Policy.

5.11     [*Transfer of Books and Records; Cooperation; Privilege*.

(a)     **Transfer of Books and Records to NewCo and the Plan Administration Trust**. Except with respect to Excluded Assets, all documents, books and records of the Debtors shall be transferred and assigned to NewCo on or prior to the Effective Date pursuant to the NewCo Transfer Agreement; *provided* that, from and after the date of such transfer, the Plan Administration Trustee shall have the right to retain copies of all transferred documents, books and records and NewCo shall permit the Plan Administration Trustee and its counsel and representatives to have full access to such transferred documents, books and records. All documents, books and records of the Debtors that are Excluded Assets shall be transferred and assigned to the Plan Administration Trust; *provided* that NewCo shall receive copies of all documents, books and records of the Debtors that are Excluded Assets.

(b)     **Cooperation with the Master Disbursement Trust and the Creditor Trusts**. On the Effective Date or as soon as reasonably practicable thereafter, the Debtors shall transfer and assign, or cause to be transferred and assigned, (i) to the MDT Trustees, (A) copies of all MDT Insurance Policies, (B) information and copies of documents, including books and records of the Debtors that reasonably relate to (I) any Claims previously noticed, tendered or submitted or paid by any Insurance Company under the MDT Insurance Policies and (II) any MDT Causes of Action, and (C) other

---

[14] These provisions remain subject to ongoing discussions.

information and copies of all other documents, including books and records of the Debtors that are reasonably necessary to preserve, secure or obtain the benefit of the MDT Insurance Rights, pursue the MDT Causes of Action or liquidate any other MDT Transferred Assets and (ii) to each Creditor Trust, a copy of the Proofs of Claims for Channeled Claims against such Creditor Trust. On and after the Effective Date, the Plan Administration Trustee and NewCo may maintain their respective documents, books and records in accordance with their respective document retention policies. The Plan Administration Trustee and NewCo shall respond to reasonable requests of (x) the MDT Trustees for information and documents related to the MDT Insurance Rights, the MDT Causes of Action or otherwise, in each case to the extent reasonably necessary for the administration of the Master Disbursement Trust, and (y) each Creditor Trustee for information and documents relating to the applicable Channeled Claims or otherwise, in each case to the extent reasonably necessary for the administration of the applicable Creditor Trust. In the event of any dispute between the MDT Trustees and NewCo regarding the delivery of information or documents requested pursuant to clause (x) of the foregoing sentence, the MDT Trustees shall have the right to request intervention by the TopCo Managers to resolve any such dispute.

(c)     **Privilege**. The transfer or assignment of information and copies of documents, including books and records, in accordance with this <u>Section 5.11</u>, shall not result in the destruction or waiver of any applicable Privileges. On the Effective Date, all Privileges in connection with the information or documents transferred in accordance with this <u>Section 5.11</u> shall be transferred to, and vest exclusively in, NewCo, the MDT Trustees, the Plan Administration Trustee and the Creditor Trustees in accordance herewith. Further, with respect to the transfer of Privileges to the MDT Trustees and the Creditor Trustees, such Privileges shall (i) be transferred to such MDT Trustees and Creditor Trustees for the purpose of enabling such Persons to perform their respective duties as set forth in the Plan or in the MDT Agreement or the applicable Creditor Trust Documents and for no other reason, (ii) vest solely in the MDT Trustees and the Creditor Trustees and not in the Master Disbursement Trust or the Creditor Trusts, or any other committee or subcomponent of the Master Disbursement Trust or the Creditor Trusts, or any other Person (including counsel and other professionals) who is (or has been engaged by, represents or has represented) any Holder of a Claim against or Interest in the Debtors or any Person that alleges or may allege a Claim, directly or indirectly, relating to or arising out of the Debtors' Products or operations and (iii) be preserved and not waived as a result of such transfer. For the avoidance of doubt, any such transfer shall have no effect on any right, Claim or Privilege of any Person other than the Debtors. No information subject to a Privilege shall be disclosed or communicated by the MDT Trustees or the Creditor Trustees (x) to any Person not entitled to receive such information, including for the avoidance of doubt any Person (including counsel and other professionals) who is (or has been engaged by, represents or has represented) any Holder of a Claim against or Interest in the Debtors or any Person that alleges or may allege a Claim, directly or indirectly, relating to or arising out of the Debtors' Products or operations or (y) for any reason or in any manner other than as necessary for such Persons to perform their respective duties as set forth in the Plan or in the MDT Agreement or the applicable Creditor Trust Documents. Notwithstanding the foregoing, nothing herein shall preclude the MDT Trustees from providing information or documents received pursuant to this <u>Section 5.11</u> to any Insurance Company as necessary to preserve, secure or obtain the benefit of the MDT Insurance Rights.][15]

5.12    *Public Document Repository*.

On the Effective Date, or as soon as reasonably practicable thereafter, a Public Document Repository shall be established by the Debtors. The parameters of the Public Document Repository shall be acceptable to the Debtors, the Creditors' Committee, Governmental Consent Parties and the DOJ, and in no event shall be less restrictive than the public document repository that the Debtors have agreed to create and host in connection with the DOJ Resolution. For the avoidance of doubt, the

---

[15] Subject to ongoing discussions, including with respect to exclusions for privileged materials.

Public Document Repository shall not be held or administered by the Master Disbursement Trust or any Creditor Trust.

### 5.13    *Effective Date Cash; Surplus Reserved Cash*.

(a)    **Effective Date Fixed Payments**. On the Effective Date, Effective Date Cash shall be used to fund (i) the Professional Fee Escrow Account in an amount necessary to satisfy Professional Fee Claims in accordance with Section 2.1(b) of the Plan, (ii) the Priority Claims Reserve in an amount necessary to satisfy estimated Allowed Administrative Claims (other than Professional Fee Claims and the DOJ Forfeiture Judgment Claim), Allowed Secured Claims and Allowed Priority Claims, (iii) the Disputed Claims Reserves in accordance with Section 7.1 of the Plan, (iv) the Disputed Cure Claims Reserve in accordance with Section 8.2(d) of the Plan, (v) the Wind-Up Reserve in accordance with Section 5.3(d) of the Plan, (vi) the MDT Operating Reserve in accordance with Section 5.6(g) of the Plan, (vii) the Initial NewCo Cash in accordance with Section 5.4(c) of the Plan, (viii) the applicable PAT Distribution Account in the amounts necessary to make Distributions required in accordance with Article IV of the Plan in respect of Allowed Federal Government Unsecured Claims, Allowed Adlon General Unsecured Claims and Allowed Avrio General Unsecured Claims, each to the extent Allowed as of the Effective Date, (ix) the Truth Initiative Contribution and the attorneys' fees of the Ratepayer Mediation Participants in satisfaction of Ratepayer Claims in accordance with Section 4.8 of the Plan, (x) the Initial Private Creditor Trust Distributions, (xi) the Initial Tribe Trust Distribution, (xii) amounts required to establish the Public Document Repository in accordance with Section 5.12 of the Plan, (xiii) the upfront insurance premium payments in accordance with Sections 5.4(g), 5.5(d) and 8.9(a) of the Plan and (xiv) any other amounts required to be paid on the Effective Date pursuant to the Plan. No later than five (5) Business Days prior to the Effective Date, the Debtors shall provide notice to the Creditors' Committee and the Governmental Consent Parties of the then-current estimated amount of Effective Date Cash and all amounts described in this Section 5.13(a), and shall promptly notify the Creditors' Committee and the Governmental Consent Parties of any changes to such estimations prior to the Effective Date. Any objection by the Creditors' Committee or the Governmental Consent Parties with respect to the Debtors' proposed amount of funding of any PAT Reserve shall be resolved by the Bankruptcy Court.

(b)    **Initial NOAT Distribution**. On the Effective Date, all Effective Date Cash remaining after the satisfaction of all amounts described in the foregoing clause (a) shall be used to make the Initial NOAT Distribution, which is currently estimated to be $250 million.[16] An updated estimate of the Initial NOAT Distribution shall be provided in the Plan Supplement.

(c)    **Surplus Reserved Cash**. Prior to the dissolution of the Plan Administration Trust, the Plan Administration Trustee shall determine, on each six (6)-month anniversary of the Effective Date, whether the amounts available in any PAT Reserve exceed the amounts necessary to satisfy the purpose for which such reserves are established. If the Plan Administration Trustee determines that a surplus exists in any PAT Reserve as of the date of such determination, such Surplus Reserve Cash shall be (i) *first*, used to satisfy any funding deficiency in any other PAT Reserve and (ii) *second*, with respect to any amounts not used to satisfy any such funding deficiency in another PAT Reserve, transferred to the Master Disbursement Trust in accordance with the MDT Agreement. All Cash and cash equivalents of the Plan Administration Trust remaining upon the dissolution of Plan Administration Trust, including any remaining Surplus Reserve Cash in the PAT Reserves, shall be transferred to the Master Disbursement Trust in accordance with the MDT Agreement.

---

[16] The final amount of the Initial NOAT Distribution on the Effective Date is subject to adjustment for items outside of the Company's control, including but not limited to, potential variability in investment monetization proceeds, higher than forecasted restructuring-related professional fees and cash collateral necessary to secure insurance coverage for NewCo and TopCo.

5.14    *Corporate Action*.

(a)    **Dissolution of Boards of the Debtors**. As of the Effective Date, the respective boards of directors and managers, as applicable, of each of the Debtors shall be terminated and dissolved and the members of each of the boards of directors and managers, as applicable, of the Debtors shall be deemed to have resigned.

(b)    **Continued Existence of the Liquidating Debtors**. Each of the Debtors, other than the Transferred PPLP Subsidiaries, shall continue to exist as a Liquidating Debtor after the Effective Date in accordance with the laws of the state under which such Debtor was formed and pursuant to its certificate of incorporation, bylaws, articles of formation, operating agreement, and other organizational documents, as applicable, in effect prior to the Effective Date, except to the extent such organizational documents are amended under the Plan, for the limited purposes of liquidating all of the Assets of such Debtor's Estate and making distributions in accordance with the Plan. From and after the Effective Date, except as set forth herein, the Liquidating Debtors (i) for all purposes shall be deemed to have withdrawn their business operations from any state in which the Liquidating Debtors were previously conducting, or are registered or licensed to conduct, their business operations, and shall not be required to file any document, pay any sum, or take any other action in order to effectuate such withdrawal, (ii) shall be deemed to have canceled pursuant to the Plan all PPI Interests and, as of the PPLP Dissolution Date, all PPLP Interests, and (iii) shall not be liable in any manner to any taxing authority for franchise, business, license or similar taxes accruing on or after the Effective Date.

(c)    **Appointment of the PPLP Liquidator as the Sole Representative for the Liquidating Debtors**. On the Effective Date, the PPLP Liquidator shall be appointed as the sole director and sole officer of the Liquidating Debtors, and shall succeed to the powers of the Liquidating Debtors' general partners, directors and officers. From and after the Effective Date, the PPLP Liquidator shall be the sole representative of, and shall act for, the Liquidating Debtors and administer the winding up and dissolution of the Liquidating Debtors. The PPLP Liquidator shall act for the Liquidating Debtors in the same fiduciary capacity as applicable to a board of directors and officers, subject to the provisions hereof (and all certificates of formation, partnership agreements, operating agreements, membership agreements and related documents are deemed amended by the Plan to permit and authorize the same). Any fees and expenses incurred by the PPLP Liquidator shall be paid by the Plan Administration Trustee from the Wind-Up Reserve.

(d)    **Merger; Dissolution; Consolidation of the Liquidating Debtors**. On or after the date(s) upon which the Plan Administration Trust is established, the Liquidating Debtors or the PPLP Liquidator may, subject to the terms of the Plan, cause any or all of the Liquidating Debtors to be merged into one or more of the Liquidating Debtors, dissolved or otherwise consolidated and engage in any other transaction in furtherance of the Plan. Notwithstanding the foregoing, upon the dissolution of each Liquidating Debtor by the PPLP Liquidator after the completion of the acts required of such Liquidating Debtor pursuant to this Plan, such Liquidating Debtor shall be deemed dissolved for all purposes without the necessity for any other or further actions to be taken by or on behalf of such Liquidating Debtor; *provided*, *however*, that each Liquidating Debtor or the PPLP Liquidator, as applicable, shall file with the office of the Secretary of State, or other appropriate office for the state of its organization, a certificate of cancellation or dissolution.

(e)    **Charter and Bylaws**. To the extent necessary or appropriate, the charters, by-laws and other organizational documents of the Debtors shall be amended, or amended and restated as necessary, in a manner consistent with section 1123(a)(6) of the Bankruptcy Code, if applicable, and the terms of this Plan.

(f)    **No Further Action**. Each of the matters provided for under the Plan involving the corporate structure of the Debtors or the Plan Administration Trust, or corporate action to be taken by or required of the Debtors, shall, as of the Effective Date, be deemed to have occurred (unless contemplated hereunder to occur after the Effective Date) and be effective as provided herein, and shall be authorized and approved in all respects without any requirement of further action by any Person, including, but not limited to, the Plan Administration Trustee, the PPLP Liquidator, Holders of Claims against or Interests in the Debtors or directors or officers of the Debtors.

(g)    **Effectuating Documents**. Prior to or after the Effective Date, any appropriate officer of the Debtors or the PPLP Liquidator, as applicable, shall be authorized to execute, deliver, file or record such contracts, instruments, releases, indentures and other agreements or documents, and to take such actions as may be necessary or appropriate to effectuate and further evidence the terms and conditions of the Plan.

(h)    **Exculpation and Indemnification of the PPLP Liquidator**. To the maximum extent permitted by applicable law, the PPLP Liquidator shall not have or incur any liability for actions taken or omitted in its capacity as the PPLP Liquidator, except those acts found by Final Order to be arising out of its willful misconduct, bad faith, gross negligence, or fraud, and shall be entitled to indemnification and reimbursement for reasonable fees and expenses in defending any and all of its actions or inactions in its capacity as the PPLP Liquidator, except for any actions or inactions found by Final Order to be arising out of its willful misconduct, bad faith, gross negligence or fraud. Any valid indemnification claim of the PPLP Liquidator shall be satisfied from the Wind-Up Reserve.

**5.15    _Cancellation of Notes, Interests, Instruments, Certificates and Other Documents_**.

Except as otherwise provided herein, on and after the Effective Date, all PPLP Interests and PPI Interests and all notes, instruments, certificates, agreements, indentures, mortgages, security documents and other documents evidencing Claims against or Interests in the Debtors or obligations of the Debtors or the Liquidating Debtors, as applicable, thereunder or in any way related to the foregoing shall be deemed canceled, satisfied in full and of no further force or effect without any need for further action or approval of the Bankruptcy Court.

**5.16    _Closing of Chapter 11 Cases_**.

After a Debtor's Estate has been fully administered, the Plan Administration Trustee shall seek authority from the Bankruptcy Court to close the applicable Chapter 11 Case in accordance with the Bankruptcy Code and Bankruptcy Rules.

**ARTICLE VI    DISTRIBUTIONS.**

**6.1    _Distributions Generally_**.

Except as otherwise provided in the Plan, the PAT Agreement or the Creditor Trust Documents, all Distributions in respect of Allowed Claims, other than Channeled Claims, shall be made by the Disbursing Agent, or such other Persons designated by the Plan, in accordance with the terms of the Plan, including this Article VI. All Distributions in respect of Allowed Channeled Claims shall be made by the Creditor Trustees or such other Persons designated by the applicable Creditor Trust Documents, in accordance with the terms of the applicable Creditor Trust Documents and the Plan; *provided* that, except with respect to Sections 6.17 through 6.20 of the Plan or as otherwise expressly set forth herein, this Article VI shall not apply to Channeled Claims.

6.2    _**Distributions on the Effective Date**_.

On the Effective Date or as soon as reasonably practicable thereafter, the Disbursing Agent shall make Distributions (a) from the Priority Claims Reserve in respect of Allowed Administrative Claims, Allowed Secured Claims and Allowed Priority Claims, each in an amount and to the extent Allowed as of the Effective Date, and (b) from the PAT Distribution Account in respect of Allowed Federal Government Unsecured Claims, Allowed Avrio General Unsecured Claims and Allowed Adlon General Unsecured Claims, each in an amount required in accordance with this Article VI of the Plan and solely to the extent Allowed as of the Effective Date.

6.3    _**Date of Distributions**_.

In the event that any payment or act under the Plan is required to be made or performed on a date that is not a Business Day, then the making of such payment or the performance of such act may be completed on the next succeeding Business Day, but shall be deemed to have been completed as of the required date.

6.4    _**Disbursing Agent**_.

All Distributions under the Plan in respect of Claims against the Debtors, other than Channeled Claims, shall be made by the Disbursing Agent. The Disbursing Agent shall be deemed to hold all property to be distributed under this Plan in trust for the Persons entitled to receive the same. The Disbursing Agent shall not hold an economic or beneficial interest in the property to be distributed under this Plan. The Disbursing Agent shall not be required to give any bond or surety or other security for the performance of its duties. Channeled Claims shall not be administered by the Disbursing Agent, and shall instead be administered by the applicable Creditor Trustee.

6.5    _**Rights and Powers of Disbursing Agent**_.

The Disbursing Agent shall be empowered to (a) effect all actions and execute all agreements, instruments and other documents necessary to perform its duties under the Plan, (b) make all Distributions contemplated by the Plan, (c) employ professionals to represent it with respect to its responsibilities and (d) exercise such other powers as may be vested in the Disbursing Agent by order of the Bankruptcy Court, pursuant to the Plan or as deemed by the Disbursing Agent to be necessary and proper to implement the provisions of the Plan.

The Disbursing Agent shall only be required to act and make Distributions in accordance with the terms of the Plan and the PAT Agreement, and shall have no liability for actions taken in accordance with the Plan and the PAT Agreement or in reliance upon information provided to it in accordance with the Plan or obligation or liability in respect of any Channeled Claims or for Distributions under the Plan to any party who does not hold an Allowed Claim administered by the Plan Administration Trust at the time of Distribution or who does not otherwise comply with the terms of the Plan; _provided_, _however_, that the foregoing shall not affect the liability that otherwise would result from any such act or omission to the extent such act or omission is determined by a Final Order to have constituted willful misconduct, gross negligence, intentional fraud or criminal conduct of any such Person.

6.6    _**Expenses of Disbursement Agent**_.

Any reasonable fees and expenses incurred by the Disbursing Agent on or after the Effective Date shall be paid in Cash by the Plan Administration Trustee from the Wind-Up Reserve. Fees and expenses incurred by the Creditor Trustees shall be paid by the applicable Creditor Trusts.

6.7     ***Delivery of Distributions***.

Subject to Bankruptcy Rule 9010, the Disbursing Agent shall make all Distributions to any Holder of an Allowed Claim at the address of such Holder (a) as set forth on the Schedules filed with the Bankruptcy Court or (b) on the books and records of the Debtors or their agents, unless the Disbursing Agent has been notified in writing of a change of address, including, without limitation, by filing of a Proof of Claim by such Holder that contains an address for such Holder that is different than the address of such Holder as set forth in the Schedules or on such books and records of the Debtors.

6.8     ***Undeliverable and Unclaimed Distributions***.

In the event that any Distribution to any Holder of an Allowed Claim is returned as undeliverable, no Distribution to such Holder shall be made unless and until the Disbursing Agent has been notified of the then-current address of such Holder, at which time or as soon as reasonably practicable thereafter such Distribution shall be made to such Holder without interest; *provided*, *however*, that all Distributions (other than Distributions in respect of Channeled Claims) that are unclaimed for a period of six (6) months after the Distribution thereof shall be deemed unclaimed property under section 347(b) of the Bankruptcy Code and shall revest in the Plan Administration Trust, and any entitlement of any Holder of any Claims to such Distributions shall be extinguished and forever barred.

6.9     ***Distribution Record Date***.

As of the close of business on the Distribution Record Date, the Claims register shall be closed. The Disbursing Agent shall have no obligation to recognize any transfer of any such Claims occurring after the close of business on the Distribution Record Date and shall instead be entitled to recognize and deal, for all purposes under the Plan, with only those Holders of record as of the close of business on the Distribution Record Date.

6.10     ***Manner of Payment under Plan***.

At the option of the Disbursing Agent, any Cash payment to be made pursuant to the Plan may be made by a check or wire transfer or as otherwise required or provided in the PAT Agreement.

6.11     ***Minimum Cash Distributions***.

The Disbursing Agent shall not be required to make any Distributions of Cash in an amount less than $100, or such lower amount as determined by the Disbursing Agent in accordance with the PAT Agreement, to any Holder of an Allowed Claim; *provided*, *however*, that if any Distribution is not made pursuant to this Section 6.11, such Distribution shall be added to any subsequent Distribution to be made on behalf of such Holder's Allowed Claims. The Disbursing Agent shall not be required to make any final Distribution of Cash in an amount less than $25 to any Holder of an Allowed Claim. If the amount of any final Distribution to any Holder of Allowed Claims would be $25 or less, then such Distribution shall be made available for Distribution to all Holders of Allowed Claims in the same Class receiving final Distributions of at least $25.

6.12     ***Setoffs and Recoupment***.

Subject to Section 2.1 and Sections 10.5 through 10.13 of the Plan, the Disbursing Agent may, but shall not be required to, set off against or recoup from any Claim against the Debtors, and from any payments to be made pursuant to the Plan with respect to such Claim, any Claims

of any nature whatsoever (to the extent permitted by applicable law) that the Debtors or the Plan Administration Trust, as applicable, may have against the Holder of such Claim, but neither the failure to do so nor the allowance of any Claim hereunder shall constitute a waiver or release by the Debtors or the Plan Administration Trust of any such Claim it may have against such Holder.

### 6.13    *Claims Paid or Payable by Third Parties*.

The Plan Administration Trustee shall reduce in full a Claim against the Debtors (other than a Channeled Claim), and such Claim shall be Disallowed without a Claims objection having to be filed and without any further notice to or action, order or approval of the Bankruptcy Court, to the extent that the Holder of such Claim receives payment in full on account of such Claim from any Person that is not a Debtor. Subject to the last sentence of this paragraph, to the extent a Holder of a Claim against the Debtors (other than a Channeled Claim) receives a Distribution on account of such Claim and receives payment from a Person that is not a Debtor on account of such Claim, such Holder shall, within fourteen (14) days of receipt thereof, repay or return the Distribution to the Plan Administration Trust to the extent the Holder's total recovery on account of such Claim from the third party and under the Plan exceeds the amount of such Claim as of the date of any such Distribution under the Plan. The failure of such Holder to timely repay or return such Distribution shall result in the Holder owing the Debtors annualized interest at the federal judgment rate on such amount owed for each Business Day after the fourteen (14)-day grace period specified above until the amount is repaid.

### 6.14    *Distributions After Effective Date*.

Distributions made after the Effective Date to Holders of Disputed Claims that are not Allowed Claims as of the Effective Date, but which later become Allowed Claims, shall be deemed to have been made on the Effective Date.

### 6.15    *No Postpetition Interest and Penalties on Claims*.

Unless otherwise provided for in the Plan or the Confirmation Order or required by the Bankruptcy Code, no Holder of a Claim shall be entitled to interest accruing on or after the Petition Date or to penalties on any Claim. Any such interest or penalty component of any such Claims, if Allowed, shall be paid only in accordance with section 726(b) of the Bankruptcy Code.

### 6.16    *Allocation of Distributions Between Principal and Interest*.

To the extent that any Allowed Claim is based upon any obligation or instrument that is treated for U.S. federal income tax purposes as indebtedness of any Debtor or any other Person and is entitled to accrued but unpaid interest thereon, it is intended, subject to applicable law, that such Distribution shall be allocated first to the principal amount of the Allowed Claim (as determined for U.S. federal income tax purposes) and then, to the extent the consideration exceeds the principal amount of the Allowed Claim, to accrued but unpaid interest.

### 6.17    *No Constructive Receipt*.

No Holder of Allowed Claims shall be treated as receiving a Distribution for U.S. federal income tax purposes except to the extent such Holder is entitled to receive such Distribution directly under the Plan (or such Distribution is made in satisfaction of an obligation of such Holder). All parties (including, without limitation, Holders of Claims against or Interests in the Debtors, the Related Parties of such Holders, the Debtors, the Master Disbursement Trust, the MDT Trustees and the Creditor Trusts) shall report consistently with the foregoing for U.S. federal income tax purposes.

### 6.18   *No Distribution in Excess of Amount of Allowed Claim*.

Notwithstanding anything to the contrary in this Plan, no Holder of an Allowed Claim shall receive, on account of such Allowed Claim, Distributions in excess of the Allowed amount of such Claim when combined with amounts received by such Holder from other sources.

### 6.19   *Satisfaction of Claims*.

Unless otherwise provided herein, the Distributions and deliveries to be made on account of Allowed Claims under this Plan shall, in the aggregate, be in complete and final satisfaction, settlement and discharge of, and exchange for, such Allowed Claims.

### 6.20   *Withholding and Reporting Requirements*.

(a)   **Withholding Rights**. In connection with the Plan, and all instruments or Interests issued in connection therewith and in consideration thereof, any party issuing any instrument or Interest or making any Distribution described in the Plan shall comply with all applicable withholding and reporting requirements imposed by any U.S. federal, state or local or foreign taxing authority, and all Distributions pursuant to the Plan and all related agreements shall be subject to any such withholding or reporting requirements. In the case of a non-Cash Distribution that is subject to withholding, the distributing party may withhold a portion of such distributed property equal in value to the tax required to be withheld, and either (i) sell such withheld property to generate Cash necessary to pay over the withholding tax (or reimburse the distributing party for any advance payment of the withholding tax), or (ii) pay the withholding tax using its own funds and retain such withheld property. Any amounts withheld pursuant to this Section 6.20(a) and properly remitted to the applicable Governmental Unit shall be deemed to have been distributed to, and received by, the applicable recipient for all purposes of the Plan. In the event that any Person issues any instrument or Interest or makes any non-Cash Distribution pursuant to the Plan that is subject to withholding tax and such issuing or distributing party has not sold such withheld property to generate Cash to pay the withholding tax, or paid the withholding tax using its own funds and retained such withheld property as described above, such issuing or distributing party has the right, but not the obligation, to not make a Distribution until such Holder has made arrangements reasonably satisfactory to such issuing or disbursing party for payment of any such tax obligations, after which such issuing or disbursing party shall return to such Holder the portion of the property previously withheld.

(b)   **Forms**. Any party entitled to receive any property as an issuance or Distribution under the Plan shall, upon request, deliver to the Disbursing Agent, the Master Disbursement Trust, the applicable Creditor Trust, NewCo, TopCo or such other Person designated by the Plan Administration Trustee (which Person shall subsequently deliver to the Disbursing Agent any applicable IRS Form W-8 or Form W-9 received), as applicable, a properly executed IRS Form W-9 or Form W-8, as applicable, and any other forms or documents reasonably requested by such party, to reduce or eliminate any withholding required by any federal, state, local or foreign taxing authority. If any such request is made by such party in accordance with the foregoing, and the Holder fails to comply before the date that is three hundred sixty-five (365) calendar days after the request is made, the amount of such Distribution shall irrevocably revert to the Plan Administration Trust, the Master Disbursement Trust, the applicable Creditor Trust, NewCo or TopCo, as applicable, and any Claim with respect to such Distribution shall be discharged and forever barred from assertion against such party or its property.

(c)   **Tax Liability**. Notwithstanding the above, each Holder of an Allowed Claim or other Person that receives or is to receive a Distribution pursuant to this Plan shall have the sole and exclusive responsibility for the satisfaction and payment (to the extent not withheld from such Distribution pursuant to Section 6.20(a) of the Plan) of any tax obligations imposed on such Holder by

74

any Governmental Unit, including income, withholding and other tax obligations, on account of such Distribution.

## ARTICLE VII       PROCEDURES FOR DISPUTED CLAIMS.

### 7.1       *Disputed Claims Reserve*.

From and after the Effective Date, and until such time as all Disputed Claims (other than Channeled Claims) have been compromised and settled or determined by a Final Order of the Bankruptcy Court, the Plan Administration Trustee shall, consistent with and subject to section 1123(a)(4) of the Bankruptcy Code, with respect to each Class of Avrio General Unsecured Claims, Adlon General Unsecured Claims and Other General Unsecured Claims, retain in the applicable Disputed Claims Reserve for such Class an aggregate amount equal to the Distributions that would have been made to Holders of Disputed Claims of such Class as if such Disputed Claims were Allowed Claims against the Debtors, in each case in an amount equal to the least of (i) the filed amount of such Disputed Claims, (ii) the amount determined, to the extent permitted by the Bankruptcy Code and Bankruptcy Rules, by the Bankruptcy Court for purposes of fixing the amount to be retained for such Disputed Claims and (iii) such other amounts as may be agreed upon by the Holders of such Disputed Claims and the Plan Administration Trustee.

### 7.2       *Claim Objections*.

On or after the Effective Date, except as otherwise provided in the Plan, the PAT Agreement or the Creditor Trust Documents, objections to Claims against the Debtors, other than Channeled Claims, may be interposed and prosecuted only by the Plan Administration Trustee. Except with respect to Channeled Claims and as otherwise provided in <u>Section 2.1</u> of the Plan with respect to Administrative Claims, any objections to Claims against the Debtors shall be served on the respective Holders of such Claims and filed with the Bankruptcy Court (a) on or before one hundred eighty (180) days following the later of (i) the Effective Date and (ii) the date that a Proof of Claim is filed or amended or a Claim is otherwise asserted or amended in writing by or on behalf of a Holder of such Claim or (b) on such later date as may be fixed by the Bankruptcy Court. Except as otherwise provided in the Creditor Trust Documents, Channeled Claims shall be treated as unliquidated Disputed Claims for purposes of the applicable Creditor Trust, and in all cases shall be subject to resolution exclusively by the applicable Creditor Trustee in accordance with the applicable Creditor Trust Documents.

### 7.3       *No Distribution Pending Allowance*.

Except as otherwise expressly provided in the Plan, the PAT Agreement or the Creditor Trust Documents, if any portion of a Claim is Disputed, no payment or Distribution provided under the Plan shall be made on account of such Claim unless and until such Disputed Claim becomes an Allowed Claim.

### 7.4       *Estimation of Claims*.

The Debtors (before the Effective Date) or the Plan Administration Trustee (on or after the Effective Date) may, at any time, request that the Bankruptcy Court estimate, pursuant to section 502(c) of the Bankruptcy Code, any Disputed Claim, other than a Channeled Claim, that the Bankruptcy Court has jurisdiction to estimate in accordance with the Bankruptcy Code or other applicable law, regardless of whether an objection was previously filed with the Bankruptcy Court with respect to such Claim, or whether the Bankruptcy Court has ruled on any such objection, and the Bankruptcy Court shall retain jurisdiction to estimate any Claim at any time during litigation concerning any objection to any such Claim, including during the pendency of any appeal relating to any such objection. If the

Bankruptcy Court estimates a Disputed Claim (other than a Channeled Claim), such estimated amount shall constitute either the Allowed amount of such Claim, the amount used to determine the Disputed Claims Reserves or a maximum limitation on such Claim, as determined by the Bankruptcy Court. If such estimated amount constitutes a maximum limitation on such Claim, the Plan Administration Trustee may elect to pursue any supplemental proceeding to object to any ultimate Distribution on account of such Claim.

**7.5** ***Distribution After Allowance***.

On the first PAT Distribution Date following the date on which a Disputed Claim (other than a Channeled Claim) becomes an Allowed Claim against a Debtor, the Disbursing Agent shall remit to the respective PAT Distribution Account, for Distribution to the Holder of such Allowed Claim, the Cash or cash equivalents retained in the applicable Disputed Claims Reserve in an amount equal to the amount that would have been distributed to the Holder of such Claim from the Effective Date through and including the PAT Distribution Date if such Claim had been Allowed as of the Effective Date (net of any costs and expenses, including taxes, of the applicable Disputed Claims Reserve).

**7.6** ***Resolution of Claims***.

Except as expressly provided in the Plan, the PAT Agreement or any order entered by the Bankruptcy Court before the Effective Date, including the Confirmation Order, the Plan Administration Trustee shall have and retain any and all rights and defenses held by the Debtors with respect to any Claim against the Debtors (other than Channeled Claims) as of the Petition Date, and shall have the authority to compromise, settle, otherwise resolve or withdraw any objections to such Claims and to compromise, settle or otherwise resolve any Disputed Claims (other than Channeled Claims) without approval of the Bankruptcy Court. If the Plan Administration Trustee and a Holder of a Disputed Claim (other than a Channeled Claim) are unable to reach a settlement on the Disputed Claim, such Disputed Claim shall be submitted to the Bankruptcy Court for resolution.

Except as expressly provided in the Plan, the applicable Creditor Trust Documents or any order entered by the Bankruptcy Court before the Effective Date, including the Confirmation Order, the applicable Creditor Trustee shall have and retain any and all rights and defenses held by the Debtors with respect to the applicable Channeled Claims, as of the Petition Date, and shall have the sole authority to compromise, settle or otherwise resolve such Channeled Claims without approval of the Bankruptcy Court, in each case in accordance with the applicable Creditor Trust Documents.

**7.7** ***Property Held in Disputed Claims Reserves***.

Each Holder of a Disputed Claim (other than a Channeled Claim) that ultimately becomes an Allowed Claim shall have recourse only to the undistributed Cash held in the applicable Disputed Claims Reserve for satisfaction of the Distributions to which such Holder is entitled under the Plan and the PAT Agreement (net of any costs and expenses, including taxes, of the applicable Disputed Claims Reserve), and not against the Debtors, the Plan Administration Trust, the Creditor Trusts, NewCo, TopCo or the Master Disbursement Trust or any Assets previously distributed on account of any Allowed Claim. Holders of Channeled Claims shall have recourse only to Cash held by the applicable Creditor Trust and solely to the extent provided in the applicable Creditor Trust Documents.

**7.8** ***Claims Resolution Procedures Cumulative***.

All of the objection, estimation, settlement and resolution procedures set forth in this Plan with respect to Claims against the Debtors are intended to be cumulative and not exclusive of

one another. Claims may be established and subsequently settled, compromised, withdrawn or resolved in accordance with this Plan by any mechanism approved by the Bankruptcy Court. Notwithstanding the foregoing, Channeled Claims shall be administered solely in accordance with the applicable Creditor Trust Documents.

### 7.9     *No Postpetition Interest or Penalties on Disputed Claims*.

Unless otherwise specifically provided for in the Plan or the Confirmation Order or required by applicable bankruptcy law, no Holder of a Claim shall be entitled to interest accruing on or after the Petition Date or to any penalties on any Claim. Interest and penalties shall not accrue or be paid upon any Disputed Claim with respect to the period from the Effective Date to the date a Distribution is made thereon, or on and after such Disputed Claim becomes an Allowed Claim.

## ARTICLE VIII     EXECUTORY CONTRACTS AND UNEXPIRED LEASES.

### 8.1     *Assumption and Rejection of Executory Contracts and Unexpired Leases*.

(a)     As of and subject to the occurrence of the Effective Date, all executory contracts and unexpired leases to which any Debtor is a party, as amended pursuant to Section 8.4, shall be deemed assumed by the applicable Debtor and, except with respect to any contract or lease held by a Transferred PPLP Subsidiary, assigned to NewCo or its designee, except for any executory contract or unexpired lease that (i) has previously been assumed or rejected pursuant to a Final Order of the Bankruptcy Court, (ii) is specifically identified on the Schedule of Rejected Contracts, (iii) is the subject of a separate assumption or rejection motion filed by the Debtors under section 365 of the Bankruptcy Code pending on the Confirmation Date, (iv) is the subject of a pending Contract Dispute or (v) is being otherwise treated pursuant to the Plan. The Debtors reserve the right to modify the treatment of any particular executory contract or unexpired lease pursuant to this Plan. Furthermore, notwithstanding anything to the contrary in the Plan, the Debtors may alter, amend, modify or supplement the Schedule of Rejected Contracts and assume, assume and assign or reject executory contracts and unexpired leases at any time prior to the Effective Date or, with respect to any executory contract or unexpired lease subject to a Contract Dispute that is resolved after the Effective Date, within thirty (30) days following entry of a Final Order of the Bankruptcy Court resolving such Contract Dispute.

(b)     Subject to the occurrence of the Effective Date, the payment of any applicable Cure Amount and the resolution of any Contract Dispute, the entry of the Confirmation Order shall constitute approval of the rejections, assumptions and assumptions and assignments provided for in this Plan pursuant to sections 365(a) and 1123 of the Bankruptcy Code. Unless otherwise indicated herein or provided in a separate order of the Bankruptcy Court, rejections, assumptions and assumptions and assignments of executory contracts and unexpired leases pursuant to the Solicitation Procedures Order and this Plan are effective as of the Effective Date. Each executory contract and unexpired lease assumed pursuant to this Plan or by order of the Bankruptcy Court shall vest in and be fully enforceable by the applicable Debtor or NewCo, in each case in accordance with its terms, except as modified by the provisions of this Plan, any order of the Bankruptcy Court authorizing and providing for its assumption, or applicable law.

(c)     Unless otherwise provided herein (including Section 8.4 of the Plan) or by separate order of the Bankruptcy Court, each executory contract or unexpired lease that is assumed or assumed and assigned shall include any and all modifications, amendments, supplements, restatements or other agreements made directly or indirectly by any agreement, instrument or other document that in any manner affects such executory contract or unexpired lease, without regard to whether such agreement, instrument or other document is listed in an Assumption Notice.

(d)        Except as otherwise expressly set forth on an Assumption Notice, any contracts, engagement letters, retention agreements, and similar arrangements, in each case between the Debtors and any attorneys, accountants, financial advisors, investment bankers or similar professionals, representatives or advisors, shall not be treated under the Plan as executory contracts subject to assumption, assumption and assignment, or rejection. Counterparties to any such contracts, engagement letters, retention agreements and similar arrangements were required to file Proofs of Claim by the General Bar Date, and any Allowed Claims relating thereto shall be treated as Other General Unsecured Claims or Co-Defendant Claims, as applicable.

##### 8.2        *Determination of Contract Disputes and Deemed Consent*.

(a)        The Debtors shall serve Assumption Notices in accordance with the Solicitation Procedures Order. If a counterparty to an executory contract or unexpired lease receives an Assumption Notice, but such executory contract or unexpired lease is not listed therein, the proposed Cure Amount for such executory contract or unexpired lease shall be deemed to be zero dollars ($0).

(b)        Any counterparty to an executory contract or unexpired lease shall have the time prescribed in the Solicitation Procedures Order to object to (i) the Cure Amount identified on the Assumption Notice, (ii) adequate assurance of future performance by the applicable Debtor, NewCo or its assignee (within the meaning of section 365 of the Bankruptcy Code) and (iii) any other matter pertaining to assumption or assumption and assignment of such executory contract or unexpired lease on the terms set forth in the Plan and such Assumption Notice.

(c)        To the extent a Contract Dispute is asserted in an objection filed in accordance with the procedures set forth in the Assumption Notice, such Contract Dispute shall be heard by the Bankruptcy Court at the Confirmation Hearing. Following resolution of a Contract Dispute by Final Order of the Bankruptcy Court, the applicable executory contract or unexpired lease shall be deemed assumed or assumed and assigned effective as of the Effective Date, subject to the Debtors' right to reject such executory contract or unexpired lease at any time prior to the Effective Date or, if any Contract Dispute is resolved after the Effective Date, within thirty (30) days following entry of such Final Order of the Bankruptcy Court resolving the applicable Contract Dispute.

(d)        To the extent a Contract Dispute has not been resolved prior to the Effective Date, the Debtors shall establish the Disputed Cure Claims Reserve. Any amounts in the Disputed Cure Claims Reserve remaining after the resolution of all Disputed Cure Claims and the payment of all Cure Amounts with respect to Allowed Cure Claims for contracts and leases to be assumed or assumed and assigned shall be applied in accordance with Section 5.13(c) of the Plan.

(e)        To the extent an objection is not timely filed and properly served on the Debtors with respect to a Contract Dispute, then the counterparty to the applicable contract or lease shall be deemed to have assented to (i) the Cure Amount proposed by the Debtors and (ii) the assumption or assumption and assignment of such contract or lease on the terms set forth in the Plan and the Assumption Notice, notwithstanding any provision of the applicable contract or lease that (A) prohibits, restricts or conditions the transfer or assignment of such contract or lease or (B) terminates or permits the termination of such contract or lease as a result of any direct or indirect transfer or assignment of the rights of the Debtors under such contract or lease or a change in the ownership or control as contemplated by the Plan, and shall forever be barred and enjoined from asserting such objection against the Debtors or terminating or modifying such contract or lease on account of transactions contemplated by the Plan.

(f)        With respect to payment of any Cure Amounts or resolution of Contract Disputes, none of the Debtors, the Liquidating Debtors, the Plan Administration Trustee, TopCo, NewCo or any Transferred PPLP Subsidiary shall have any obligation to recognize or deal with any party other

than the non-Debtor party to the applicable executory contract or unexpired lease, even if such non-Debtor party has sold, assigned or otherwise transferred its Cure Claim.

### 8.3    *Payments Related to Assumption of Contracts and Leases*.

(a)    Subject to resolution of any Contract Dispute, any Cure Claim shall be satisfied, under section 365(b)(1) of the Bankruptcy Code, by the Plan Administration Trust from the Priority Claims Reserve or the Disputed Cure Claims Reserve, as applicable, or NewCo in the ordinary course of business upon assumption thereof.

(b)    Assumption or assumption and assignment of any executory contract or unexpired lease pursuant to the Plan, or otherwise, shall result in the full release and satisfaction of any Claims or defaults, subject to satisfaction of the Cure Amount, whether monetary or nonmonetary, including defaults of provisions restricting the change in control or ownership interest composition or other bankruptcy-related defaults, arising under any assumed executory contract or unexpired lease at any time before the effective date of assumption or assumption and assignment. Any Proofs of Claim filed with respect to an executory contract or unexpired lease that has been assumed shall be deemed Disallowed and expunged, without further notice, or action, order or approval of the Bankruptcy Court or any other Person.

### 8.4    *Co-Defendant Indemnification Obligations*.

(a)    As of the Effective Date, any term of any policy, contract or other obligation applicable to any Debtor shall be void and of no further force or effect to the extent such policy, contract or other obligation creates an obligation of any Debtor, or gives rise to a right under any insurance policy of any Debtor, for the indemnification or reimbursement of any Person for costs, losses, damages, fees, expenses or any other amounts whatsoever relating to or arising from any actual or potential litigation or dispute, whether accrued or unaccrued, asserted or unasserted, existing or hereinafter arising, based on or relating to, or in any manner arising from, in whole or in part, Opioid-Related Activities or otherwise relating to opioids (excluding any indemnification obligations expressly assumed pursuant to Section 8.6 of the Plan).

(b)    The Plan shall constitute (i) an amendment to each assumed or assumed and assigned contract to sever any and all provisions thereof that give rise to any obligation or right described in Section 8.4(a) of the Plan and (ii) an agreement by each counterparty to release any and all obligations and liabilities arising under or relating to such severed provisions and any and all Co-Defendant Claims and Channeled Claims arising under such contract, including any Co-Defendant Claims and Channeled Claims that might otherwise be elevated to administrative status through assumption of such contract. The severed portion of each such contract shall be rejected as of the Effective Date, and any Claims resulting from such rejection shall be forever released and discharged, with no distribution on account thereof. Except to the extent included in the Schedule of Rejected Contracts, each such contract, solely as amended pursuant to this Section 8.4, shall be assumed by the applicable Debtor and, except with respect to any such contract of the Transferred PPLP Subsidiaries, assigned to NewCo (or one of its Subsidiaries). No counterparty or any other Person shall have or retain any Claim, Cause of Action or other right of recovery against the Debtors or any other Person, including without limitation NewCo or any Insurance Company, for or relating to any obligation or right described in Section 8.4(a) of the Plan, any Co-Defendant Claim or the amendment of any contract, or the severance and rejection of obligations and liabilities in connection therewith, described in this Section 8.4(b). On the Effective Date, all Co-Defendant Claims arising under or related to any contract of the Debtors shall be released and discharged with no consideration on account thereof, and all Proofs of Claim in respect thereof shall be deemed Disallowed and expunged, without further notice, or action, order or approval of the Bankruptcy Court or any other Person, and any Channeled Claims arising under or related to any

contract of the Debtors will be treated in accordance with Article IV of the Plan. For the avoidance of doubt, no Co-Defendant Claim or Channeled Claim will be assumed by NewCo, any Transferred PPLP Subsidiary or Liquidating Debtor, elevated to administrative priority status or otherwise receive modified treatment as a result of the assumption or assumption and assignment of any contract pursuant to this Section 8.4.

(c)      In the Assumption Notices, the Debtors shall provide notice to all known counterparties of this Section 8.4. To the extent an objection is not timely filed and properly served on the Debtors with respect to any contract of the Debtors in accordance with the Solicitation Procedures Order, the counterparty to such contract and all other Persons shall be bound by and deemed to have assented to the amendment of such contract, the assumption or assumption and assignment of such amended contract and the severance and release of obligations, liabilities and Claims described in this Section 8.4.

### 8.5     *Rejection Claims*.

In the event that the rejection of an executory contract or unexpired lease by any of the Debtors herein results in damages to the other party or parties to such contract or lease, any Claim for such damages shall be forever barred and shall not be enforceable against the Debtors or their Estates, properties or interests in property, unless a Proof of Claim is filed with the Bankruptcy Court and served upon the Debtors no later than thirty (30) days after the entry of the order of the Bankruptcy Court (including the Confirmation Order) authorizing the rejection of such executory contract or unexpired lease. Any such Claim, to the extent Allowed, shall be classified as an Other General Unsecured Claim, except to the extent such Claim is a Co-Defendant Claim or a Channeled Claim. The Confirmation Order shall constitute the Bankruptcy Court's authorization of the rejection of all the leases and contracts identified in the Schedule of Rejected Contracts.

### 8.6     *Survival of Certain Indemnification Obligations*.

[To come; *provided* that the treatment of indemnification obligations shall be acceptable to the Governmental Consent Parties.]

### 8.7     *Compensation and Benefit Plans*.

Except with respect to any Benefit Plans for which the Debtors have received approval of the Bankruptcy Court to reject or terminate on or before the Effective Date or that are subject to a pending motion to reject or terminate as of the Confirmation Hearing, all Benefit Plans shall be deemed to be, and shall be treated as, executory contracts under this Plan pursuant to sections 365 and 1123 of the Bankruptcy Code and shall be assumed by applicable Debtors and, unless held by a Transferred PPLP Subsidiary, assigned to NewCo (or one of its Subsidiaries).

### 8.8     *Purdue Pension Plan*.

The Purdue Pension Plan has approximately 3,200 participants. PPLP is the contributing sponsor of the Purdue Pension Plan. The Debtors that are members of the contributing sponsor's controlled-group within the meaning of 29 U.S.C. §§ 1301(a)(13), (14) are jointly and severally liable with respect to the Purdue Pension Plan. Further, any non-debtor members of the contributing sponsor's controlled-group are also jointly and severally liable with respect to the Purdue Pension Plan.

Upon the Effective Date, NewCo (or one of its Subsidiaries) shall be deemed to have assumed the Purdue Pension Plan and all liabilities and Assets thereunder and shall comply with all applicable statutory provisions of ERISA and the IRC, including, but not limited to, satisfying the minimum funding standards pursuant to 26 U.S.C. §§ 412, 430, and 29 U.S.C. §§ 1082, 1083, paying the

PBGC premiums in accordance with 29 U.S.C. §§ 1306 and 1307 and administering the Purdue Pension Plan in accordance with its terms and the provisions of ERISA and the IRC (and NewCo reserves all rights thereunder).

Notwithstanding any provision in the Plan to the contrary, no provision contained in the Plan, the Confirmation Order, the Bankruptcy Code (including section 1141 thereof), or any other document filed in the Debtors' bankruptcy cases shall be construed as discharging, releasing, exculpating or relieving any Person (other than the Liquidating Debtors) from any fiduciary duties or liabilities under Title I of ERISA with respect to the Purdue Pension Plan. PBGC and the Purdue Pension Plan shall not be enjoined or precluded from enforcing such fiduciary duties or liabilities under Title I of ERISA as a result of any of the provisions of the Plan, the Confirmation Order, the Bankruptcy Code or any other document filed in the Debtors' bankruptcy cases. The PBGC and the Debtors agree that all Proofs of Claim filed by the PBGC shall be deemed to be withdrawn, with prejudice, as of the Effective Date.

### 8.9 _Insurance Policies_.

(a)    Prior to the Effective Date, the Debtors shall fund an upfront premium payment to purchase appropriate directors' and officers' liability insurance, including tail coverage of up to seven (7) years, for the existing directors of the Debtors, as determined by the Debtors in their sole discretion and acceptable to the Governmental Consent Parties.[17]

(b)    On and after the Effective Date, all Purdue Insurance Policies (other than the MDT Insurance Policies) shall be deemed to be, and shall be treated as, executory contracts under the Plan, and shall be assumed and continue in full force and effect in accordance with their respective terms.

### 8.10 _Reservation of Rights_.

(a)    Neither the exclusion nor the inclusion by the Debtors of any contract or lease on any exhibit, schedule or other annex to this Plan or in the Plan Supplement, nor anything contained in this Plan, shall constitute an admission by the Debtors that any such contract or lease is or is not an executory contract or unexpired lease or that the Debtors have any liability thereunder.

(b)    Except as explicitly provided in this Plan, nothing herein shall waive, excuse, limit, diminish or otherwise alter any of the defenses, Claims, Causes of Action or other rights of the Debtors under any executory or non-executory contract or unexpired lease.

(c)    Nothing in this Plan shall increase, augment or add to any of the duties, obligations, responsibilities or liabilities of the Debtors under any executory or non-executory contract or unexpired or expired lease, including the Purdue Insurance Policies.

(d)    If there is a dispute regarding whether a contract or lease is or was executory or unexpired at the time of its assumption under this Plan, the Debtors shall have thirty (30) days following entry of a Final Order resolving such dispute to alter their treatment of such contract or lease.

---

[17] Treatment of D&O Policies to come; _provided_ that such treatment shall be acceptable to the Governmental Consent Parties.

## ARTICLE IX    CONDITIONS PRECEDENT TO THE OCCURRENCE OF THE EFFECTIVE DATE.

### 9.1    *Conditions Precedent to Effective Date*.

The Effective Date shall not occur unless all of the following conditions precedent have been satisfied:

(a)    the Confirmation Order shall have been entered by the Bankruptcy Court, and shall not be subject to any stay and shall not have been modified or vacated on appeal;

(b)    the Plan Documents shall have been approved of or accepted by all applicable Persons in accordance with the respective consent rights under this Plan, and shall have been filed, executed and delivered, as applicable, and the conditions precedent contained therein shall have been satisfied or waived in accordance with the terms thereof, except with respect to such conditions that by their terms shall be satisfied substantially simultaneously with or after consummation of the Plan;

(c)    the DOJ Resolution (including, for the avoidance of doubt, the entry of a judgment of conviction in strict accordance with the Plea Agreement and the payment in full of the DOJ Forfeiture Payment) shall have been consummated or will be consummated substantially simultaneously with consummation of the Plan;

(d)    the NewCo Operating Agreement shall have been executed and shall be in compliance with the DOJ Resolution, the NewCo Transferred Assets shall have vested in NewCo (or one or more of its Subsidiaries) in accordance with the NewCo Transfer Agreement and the NewCo Managers shall have been appointed;

(e)    the MDT Agreement shall have been executed, the MDT Transferred Assets shall have vested in the Master Disbursement Trust in accordance therewith and the MDT Trustees and the MDT Executive Director shall have been appointed;

(f)    the Creditor Trust Documents shall have been executed and the Creditor Trustees shall have been appointed;

(g)    the Public Entity Settlements shall have been consummated or will be consummated substantially simultaneously with consummation of the Plan, including (i) the payment in full of the Initial Public Creditor Trust Distributions, (ii) the execution of the TopCo Operating Agreement, the appointment of the TopCo Managers and the issuance of the NewCo Interest to TopCo and the TopCo Interests to NOAT and the Tribe Trust and (iii) the issuance of the MDT Interests to NOAT and the Tribe Trust;

(h)    the Private Entity Settlements shall have been consummated or will be consummated substantially simultaneously with consummation of the Plan, including (i) the payment in full of the Initial Private Creditor Trust Distributions, (ii) the issuance of the MDT Claims and (iii) the execution of any Plan Documents required to be executed in connection with the foregoing;

(i)    the Shareholder Settlement Agreement shall have been executed and all amounts required to be paid thereunder on the Effective Date shall have been received, and all of the conditions precedent to the Settlement Effective Date (as defined in the Shareholder Settlement Agreement) shall have been satisfied or waived in accordance with the terms of the Shareholder Settlement Agreement;

(j)       the PAT Agreement shall have been executed, the PAT Assets shall have vested in the Plan Administration Trust in accordance therewith and the Plan Administration Trustee shall have been appointed;

(k)       each of the PAT Reserves, the Professional Fee Escrow Account and the PAT Distribution Accounts shall have been fully funded, and each of the other payments and Distributions of Effective Date Cash described in Section 5.13(a) and (b) of the Plan shall have been made or will be made substantially simultaneously with consummation of the Plan;

(l)       the Debtors shall have obtained all authorizations, consents, regulatory approvals, rulings and documents that are necessary to implement and effectuate the Plan;

(m)       all Professional Fee Claims shall have been paid in full or amounts sufficient to pay such Claims after the Effective Date shall have been placed in the Professional Fee Escrow Account, or shall be otherwise contained in a professional fee retainer, pending approval by the Bankruptcy Court;

(n)       the Debtors shall have implemented the Restructuring Transactions in a manner consistent in all material respects with this Plan;

(o)       the Bankruptcy Court shall have confirmed that the Bankruptcy Code authorizes the transfer and vesting of the MDT Transferred Assets, notwithstanding any terms of the Purdue Insurance Policies or provisions of non-bankruptcy law that any Insurance Company may otherwise argue prohibits such transfer and vesting; and

(p)       all other actions, documents and agreements necessary to implement and effectuate the Plan shall have been effected or executed.

## 9.2    *Waiver of Conditions Precedent*.

(a)       Each of the conditions precedent to the occurrence of the Effective Date may be waived by the Debtors; *provided* that (i) with respect to any condition precedent, the waiver of which would materially and adversely affect the entitlements of any Class of Claims (or any Creditor Trust to which such Claims shall be channeled) represented by any of the Supporting Claimants, the waiver of such condition precedent shall require the consent (not to be unreasonably withheld, conditioned or delayed) of the applicable Supporting Claimants representing such materially and adversely affected Class of Claims, (ii) the waiver of the conditions precedent set forth in Section 9.1(a), (b) (solely with respect to any Plan Document over which the Creditors' Committee has a consent right set forth in the Plan), (e), (f), (h), (i), (j), (k), (m) (solely with respect to Professional Fee Claims by Professional Persons retained by the Creditors' Committee) and (n) of the Plan shall require the consent of the Creditors' Committee (which consent shall not be unreasonably withheld, delayed or conditioned) and (iii) the waiver of the conditions precedent set forth in Section 9.1(a), (b) (solely with respect to any Plan Document over which the Governmental Consent Parties have a consent right set forth in the Plan), (d), (e), (f), (g), (i) and (n) of the Plan shall require the consent of the Governmental Consent Parties (which consent shall not be unreasonably withheld, delayed or conditioned).

(b)       The stay of the Confirmation Order pursuant to Bankruptcy Rule 3020(e) shall be deemed waived by and upon entry of the Confirmation Order, and the Confirmation Order shall take effect immediately upon its entry.

**ARTICLE X        EFFECT OF CONFIRMATION.**

10.1    _**Binding Effect**_.

Except as otherwise provided in section 1141(d)(3) of the Bankruptcy Code, and subject to the occurrence of the Effective Date, on and after the entry of the Confirmation Order, the provisions of this Plan and the Plan Documents shall bind every Holder of a Claim against or Interest in any Debtor and inure to the benefit of, and be binding on, such Holder's respective successors and assigns, regardless of whether the Claim or Interest of such Holder is Impaired under this Plan or whether such Holder has accepted this Plan.

10.2    _**Discharge of Claims against and Interests in the Debtors**_.

Upon the Effective Date and in consideration of the Distributions to be made under this Plan, except as otherwise provided in the Plan or in the Confirmation Order, each Holder (as well as any trustee or agent on behalf of such Holder) of a Claim or Interest and any successor, assign and affiliate of such Holder shall be deemed to have forever waived, released and discharged the Debtors, to the fullest extent permitted by section 1141 of the Bankruptcy Code, of and from any and all Claims, Interests, rights and liabilities that arose prior to the Effective Date. Except as otherwise provided in this Plan, upon the Effective Date, all such Holders of Claims against or Interests in the Debtors, and their successors, assigns and affiliates, shall be forever precluded and enjoined, pursuant to sections 105, 524 and 1141 of the Bankruptcy Code, from prosecuting or asserting any such discharged Claim against, or terminated Interest in, any Debtor.

10.3    _**Pre-Confirmation Injunctions and Stays**_.

Unless otherwise provided in this Plan, all injunctions and stays arising under or entered during the Chapter 11 Cases, whether under section 105 or 362 of the Bankruptcy Code or otherwise, and in existence on the Confirmation Date, shall remain in full force and effect until the later of the Effective Date and the date indicated in the order providing for such injunction or stay.

10.4    _**Injunction against Interference with Plan**_.

Upon entry of the Confirmation Order, all Holders of Claims against or Interests in the Debtors, as well as all other Releasing Parties, and all Released Parties, Shareholder Released Parties and other parties in interests shall be enjoined from taking any actions to interfere with the implementation or consummation of the Plan and the Plan Documents. This Section 10.4 shall be included in the Confirmation Order.

10.5    _**Plan Injunction**_.

(a)        Except as otherwise provided in this Plan or in the Confirmation Order, as of the entry of the Confirmation Order but subject to the occurrence of the Effective Date, to the maximum extent permitted under applicable law, all Persons who have held, hold or may hold Claims against or Interests in the Debtors are, with respect to any such Claim or Interest, permanently enjoined after the entry of the Confirmation Order from: (i) commencing, conducting or continuing in any manner, directly or indirectly, any suit, action or other proceeding of any kind (including any proceeding in a judicial, arbitral, administrative or other forum) against or affecting, directly or indirectly, a Debtor or an Estate or the property of any of the foregoing, or any direct or indirect transferee of any property of, or direct or indirect successor in interest to, any of the foregoing Persons mentioned in this clause (i) or any property of any such transferee or successor; (ii) enforcing, levying, attaching (including any prejudgment attachment), collecting or otherwise recovering in any manner or by any means, whether directly or

indirectly, any judgment, award, decree or order against a Debtor or an Estate or its property, or any direct or indirect transferee of any property of, or direct or indirect successor in interest to, any of the foregoing Persons mentioned in this clause (ii) or any property of any such transferee or successor; (iii) creating, perfecting or otherwise enforcing in any manner, directly or indirectly, any encumbrance of any kind against a Debtor or an Estate or any of its property, or any direct or indirect transferee of any property of, or successor in interest to, any of the foregoing Persons mentioned in this clause (iii) or any property of any such transferee or successor; (iv) acting or proceeding in any manner, in any place whatsoever, that does not conform to, or comply with, the provisions of this Plan; and (v) commencing or continuing, in any manner or in any place, any action that does not comply, or is inconsistent, with the provisions of this Plan; *provided*, *however*, that nothing contained herein shall preclude such Persons who have held, hold or may hold Claims against or Interests in a Debtor or an Estate from exercising their rights, or obtaining benefits, pursuant to, and consistent with, the terms of this Plan and the Plan Documents.

(b)        All Persons, including all governmental, tax and regulatory authorities, lenders, trade creditors, dealers, customers, employees, litigation claimants and other creditors holding Claims, Liens, Interests, charges, encumbrances and other interests of any kind or nature whatsoever, including rights or Claims based on any successor or transferee liability, against or in a Debtor, the NewCo Transferred Assets, the MDT Transferred Assets or the PAT Assets (whether legal or equitable, secured or unsecured, matured or unmatured, contingent or noncontingent, known or unknown), arising under or out of, in connection with, or in any way relating to the Debtors, the NewCo Transferred Assets, the MDT Transferred Assets, the PAT Assets, the operation of the NewCo Transferred Assets prior to the Effective Date or the Restructuring Transactions are forever barred, estopped and permanently enjoined from asserting against the Released Parties, their respective successors and assigns, their property, the NewCo Transferred Assets, the MDT Transferred Assets or the PAT Assets, such Person's Claims, Interests, Liens, charges, encumbrances and other interests (including rights or Claims based on any successor or transferee liability), including, without limitation, by: (i) commencing, conducting or continuing in any manner, directly or indirectly, any suit, action or other proceeding of any kind (including any proceeding in a judicial, arbitral, administrative or other forum) against or affecting, directly or indirectly, a Released Party, or any direct or indirect transferee of any property of, or direct or indirect successor in interest to, any of the foregoing Persons mentioned in this clause (i) or any property of any such transferee or successor; (ii) enforcing, levying, attaching (including any prejudgment attachment), collecting or otherwise recovering in any manner or by any means, whether directly or indirectly, any judgment, award, decree or order against a Released Party, or any direct or indirect transferee of any property of, or direct or indirect successor-in-interest to, any of the foregoing Persons mentioned in this clause (ii) or any property of any such transferee or successor; (iii) creating, perfecting or otherwise enforcing any encumbrance of any kind or asserting any Released Claims in any manner, directly or indirectly, against a Released Party or any of its property, or any direct or indirect transferee of any property of, or successor in interest to, any of the foregoing Persons mentioned in this clause (iii) or any property of any such transferee or successor; (iv) acting or proceeding in any manner, in any place whatsoever, that does not conform to or comply with the provisions of this Plan; and (v) commencing or continuing, in any manner or in any place, any action that does not comply with or is inconsistent with the provisions of this Plan.

10.6    *Releases*.

(a)        **Releases by Debtors**.

**As of the Effective Date, for good and valuable consideration, the adequacy of which is hereby confirmed, including, without limitation, the service of the Released Parties before and during the Chapter 11 Cases to facilitate the reorganization of the Debtors and the implementation of the Restructuring Transactions, and except as otherwise explicitly provided in**

the Plan or in the Confirmation Order, the Released Parties shall be deemed conclusively, absolutely, unconditionally, irrevocably and forever released, to the maximum extent permitted by law, as such law may be extended subsequent to the Effective Date, by the Debtors and the Estates from any and all Claims, counterclaims, disputes, obligations, suits, judgments, damages, demands, debts, rights, Causes of Action, Liens, remedies, losses, contributions, indemnities, costs, liabilities, attorneys' fees and expenses whatsoever, including any derivative claims, asserted or assertable on behalf of the Debtors or their Estates (including any Causes of Action arising under chapter 5 of the Bankruptcy Code), whether liquidated or unliquidated, fixed or contingent, matured or unmatured, known or unknown, foreseen or unforeseen, asserted or unasserted, accrued or unaccrued, existing or hereinafter arising, whether in law or equity, whether sounding in tort or contract, whether arising under federal or state statutory or common law, or any other applicable international, foreign, or domestic law, rule, statute, regulation, treaty, right, duty, requirement or otherwise, that the Debtors or their Estates would have been legally entitled to assert in their own right (whether individually or collectively) or on behalf of the Holder of any Claim against or Interest in the Debtors or on behalf of any other Person, based on or relating to, or in any manner arising from, in whole or in part, the Debtors (as such Entities existed prior to or after the Petition Date), their Estates, the Chapter 11 Cases, the subject matter of, or the transactions or events giving rise to, any Claim or Interest that is treated in the Plan, the business or contractual arrangements or interactions between any Debtor and any Released Party (including the exercise of any common law or contractual rights of setoff or recoupment by any Released Party at any time on or prior to the Effective Date), the Restructuring Transactions, Opioid-Related Activities (regardless of where in the world any such Opioid-Related Activities or any result, loss, injury or damage resulting therefrom occurred), the restructuring of any Claim or Interest before or during the Chapter 11 Cases, the Disclosure Statement, the Plan, and related agreements, instruments, and other documents, and the negotiation, formulation, preparation or implementation thereof, the solicitation of votes with respect to the Plan, or any other act or omission in any way relating to any of the foregoing. The Debtors, the Plan Administration Trust, the Master Disbursement Trust, the Creditor Trusts, NewCo, and any other newly-formed Entities that shall be continuing the Debtors' businesses after the Effective Date shall be bound, to the same extent the Debtors are bound, by the Releases set forth in this <u>Section 10.6(a)</u>.

Notwithstanding anything herein to the contrary, (i) nothing in the Plan shall release any (A) Retained Causes of Action listed on the Schedule of Retained Causes of Action, (B) any Claims or Causes of Action that may be asserted against any Excluded Party or (C) any Claims or Causes of Action against any Holder of a Claim against a Debtor to the extent necessary for the administration and resolution of such Claim against a Debtor in accordance with the Plan and (ii) nothing in this <u>Section 10.6(a)</u> shall (A) release any Claims or Causes of Action that may be asserted against any Shareholder Released Party or (B) be construed to impair in any way the Effective Date or post-Effective Date rights and obligations of any Person under the Plan, the Plan Documents, the Confirmation Order or the Restructuring Transactions, including the Shareholder Settlement Agreement.

(b)    **Releases by Holders of Claims and Interests**.

As of the Effective Date, for good and valuable consideration, the adequacy of which is hereby confirmed, including, without limitation, the service of the Released Parties before and during the Chapter 11 Cases to facilitate the reorganization of the Debtors and the implementation of the Restructuring Transactions, and except as otherwise explicitly provided in the Plan or in the Confirmation Order, the Released Parties shall be deemed conclusively, absolutely, unconditionally, irrevocably and forever released, to the maximum extent permitted by law, as such law may be extended subsequent to the Effective Date, except as otherwise explicitly

provided herein, by the Releasing Parties from any and all Claims, counterclaims, disputes, obligations, suits, judgments, damages, demands, debts, rights, Causes of Action, Liens, remedies, losses, contributions, indemnities, costs, liabilities, attorneys' fees and expenses, in each case, of any kind, character or nature whatsoever, including any derivative claims, asserted or assertable on behalf of the Debtors or their Estates (including any Causes of Action arising under chapter 5 of the Bankruptcy Code), whether liquidated or unliquidated, fixed or contingent, matured or unmatured, known or unknown, foreseen or unforeseen, asserted or unasserted, accrued or unaccrued, existing or hereinafter arising, whether in law or equity, whether sounding in tort or contract, whether arising under federal or state statutory or common law, or any other applicable international, foreign, or domestic law, rule, statute, regulation, treaty, right, duty, requirement or otherwise, that any Releasing Party or any other Persons or parties claiming under or through whom would have been legally entitled to assert in their own right (whether individually or collectively) or on behalf of the Releasing Party or other Person, based on or relating to, or in any manner arising from, in whole or in part, the Debtors (as such Entities existed prior to or after the Petition Date), their Estates, the Chapter 11 Cases, the subject matter of, or the transactions or events giving rise to, any Claim or Interest that is treated in the Plan, the business or contractual arrangements or interactions between any Debtor and any Released Party (including the exercise of any common law or contractual rights of setoff or recoupment by any Released Party at any time on or prior to the Effective Date), the Restructuring Transactions, Opioid-Related Activities (regardless of where in the world any such Opioid-Related Activities or any result, loss, injury or damage resulting therefrom occurred), the restructuring of any Claim or Interest before or during the Chapter 11 Cases, the Disclosure Statement, the Plan and related agreements, instruments, and other documents, and the negotiation, formulation, preparation or implementation thereof, the solicitation of votes with respect to the Plan, or any other act or omission in any way relating to any of the foregoing. This <u>Section 10.6(b)</u> shall not release any Released Party from any criminal action or criminal proceeding arising under a criminal provision of any statute instituted by a Domestic Governmental Entity that has authority to bring such a criminal action or criminal proceeding.

Notwithstanding anything herein to the contrary, (i) nothing in the Plan shall release any (A) Retained Causes of Action listed on the Schedule of Retained Causes of Action, (B) any Claims or Causes of Action that may be asserted against any Excluded Party or (C) any Claims or Causes of Action against any Holder of a Claim against a Debtor to the extent necessary for the administration and resolution of such Claim against a Debtor in accordance with the Plan; (ii) nothing in this <u>Section 10.6(b)</u> shall (A) release any Claims or Causes of Action that may be asserted against any Shareholder Released Party or any Holder of Co-Defendant Claims other than former co-promoters of the Debtors that agree to waive their Co-Defendant Claims or (B) be construed to impair in any way the Effective Date or post-Effective Date rights and obligations of any Person under the Plan, the Plan Documents, the Confirmation Order or the Restructuring Transactions, including the Shareholder Settlement Agreement.

Notwithstanding anything herein to the contrary, the Debtors shall not be released from liability for any Claim that is or may be covered by any Purdue Insurance Policy; *provided* that recovery for any such Claim, including by way of settlement or judgment, shall be limited to the available proceeds of such Purdue Insurance Policy (and any extra-contractual liability of the Insurance Companies with respect to the Purdue Insurance Policies), and no Person or party shall execute, garnish or otherwise attempt to collect any such recovery from any assets other than the available proceeds of the Purdue Insurance Policies. The Debtors shall be released automatically from a Claim described in this paragraph upon the earlier of (x) the abandonment of such Claim and (y) such a release being given as part of a settlement or resolution of such Claim, and shall be released automatically from all Claims described in this paragraph upon the

exhaustion of the available proceeds of the Purdue Insurance Policies (notwithstanding the nonoccurrence of either event described in the foregoing clauses (x) and (y)).

For the avoidance of doubt and without limitation to the foregoing, each Releasing Party that is a Governmental Unit shall be deemed to have released all Released Claims against the Released Parties that are or could have been brought by (x) such Governmental Unit on behalf of citizens, including, without limitation, children and infants (whether born or unborn), or by its consumers, hospitals, subdivisions (political or otherwise, including, but not limited to, municipalities, counties, parishes, villages, tribes, unincorporated districts and hospital districts), public entities, public instrumentalities or public educational institutions or (y) any other person acting or purporting to act in a parens patriae, sovereign, quasi-sovereign, private attorney general, qui tam, taxpayer, or any other capacity on behalf of such Governmental Unit or its citizens, including, without limitation, children and infants (whether born or unborn) or by its consumers, hospitals, subdivisions (political or otherwise, including, but not limited to, municipalities, counties, parishes, villages, tribes, unincorporated districts and hospital districts), cities, public entities, public instrumentalities and public educational institutions.

10.7  *Channeling Injunction*.

In order to supplement the injunctive effect of the Plan Injunction and the Releases set forth in Sections 10.5 and 10.6 of the Plan, the Confirmation Order shall provide for the following permanent injunction to take effect as of the Effective Date:

(a)  **Terms. In order to preserve and promote the settlements contemplated by and provided for in the Plan and to supplement, where necessary, the injunctive effect of the Plan Injunction and the Releases described in Sections 10.5 and 10.6 of the Plan, and pursuant to the exercise of the equitable jurisdiction and power of the Bankruptcy Court under section 105(a) of the Bankruptcy Code, all Persons that have held or asserted, that hold or assert or that may in the future hold or assert any Non-Federal Domestic Governmental Claim, Tribe Claim, Hospital Claim, Third-Party Payor Claim, NAS Monitoring Claim or PI Claim shall be permanently and forever stayed, restrained and enjoined from taking any action for the purpose of directly or indirectly collecting, recovering or receiving payments, satisfaction, recovery or judgment of any form from or against NewCo (or any of its Subsidiaries), TopCo, the Master Disbursement Trust, the Plan Administration Trust or any other Released Party with respect to such Claim and any Released Claims arising out of or related to such Claim, including:**

(i)  **commencing, conducting or continuing, in any manner, whether directly or indirectly, any suit, action or other proceeding, in each case, of any kind, character or nature, in any forum with respect to any such Claims, against or affecting any Released Party, or any property or interests in property of any Released Party with respect to any such Claims;**

(ii)  **enforcing, levying, attaching, collecting or otherwise recovering, by any manner or means, or in any manner, either directly or indirectly, any judgment, award, decree or other order against any Released Party or against the property of any Released Party with respect to any such Claims;**

88

(iii) creating, perfecting or enforcing in any manner, whether directly or indirectly, any Lien of any kind against any Released Party or the property of any Released Party with respect to any such Claims;

(iv) asserting or accomplishing any setoff, right of subrogation, indemnity, contribution or recoupment of any kind, whether directly or indirectly, against any obligation due to any Released Party or against the property of any Released Party with respect to any such Claims; and

(v) taking any act, in any manner, in any place whatsoever, that does not conform to, or comply with, the provisions of the Plan Documents, with respect to such Claims.

(b)    Reservations. Notwithstanding anything to the contrary in **Section 10.7** of the Plan or the Confirmation Order, this Channeling Injunction shall not enjoin:

(i) the rights of Holders of Claims to the treatment afforded them under the Plan and the Plan Documents, including (A) the rights of Holders of PI Claims to assert such Claims and any Released Claims arising out of or related to such PI Claims solely in accordance with the PI Trust Documents solely against the PI Trust, (B) the rights of Holders of Non-Federal Domestic Governmental Claims to assert such Claims and any Released Claims arising out of or related to such Non-Federal Domestic Governmental Claims solely in accordance with the NOAT Documents solely against NOAT, (C) the rights of Holders of Tribe Claims to assert such Claims and any Released Claims arising out of or related to such Tribe Claims solely in accordance with the Tribe Trust Documents solely against the Tribe Trust, (D) the rights of Holders of Hospital Claims to assert such Claims and any Released Claims arising out of or related to such Hospital Claims solely in accordance with the Hospital Trust Documents solely against the Hospital Trust, (E) the rights of Holders of Third-Party Payor Claims to assert such Claims and any Released Claims arising out of or related to such Third-Party Payor Claims solely in accordance with the TPP Trust Documents solely against the TPP Trust and (F) the rights of Holders of NAS Monitoring Claims to assert such Claims and any Released Claims arising out of or related to such NAS Monitoring Claims solely in accordance with the NAS Monitoring Trust Documents solely against the NAS Monitoring Trust, in each case whether or not there are funds to make Distributions in respect of such Claims and whether or not such rights entitle such Holders to Abatement Distributions or any other form of Distributions;

(ii)    **the rights of Persons to assert any Claim, debt, litigation or liability for payment of Creditor Trust Operating Expenses solely against the applicable Creditor Trust;**

(iii)    **the rights of Persons to assert any Claim, debt or litigation against any Excluded Party;**

(iv)    **the rights of the Master Disbursement Trust to pursue and enforce the MDT Shareholder Rights, the MDT Insurance Rights and the MDT Causes of Action;**

(v)    **the rights of the parties to the LRP Agreement to enforce the terms thereof in accordance with the Plan;**

(vi)    **the Creditor Trusts from enforcing their respective rights against the Master Disbursement Trust under the Plan and the MDT Agreement;**

(vii)    **the Master Disbursement Trust from enforcing its rights, on behalf of itself and the Private Creditor Trusts, against NewCo and TopCo under the Plan and the NewCo Guarantee Agreement; or**

(viii)    **NOAT or the Tribe Trust from enforcing their respective rights against TopCo under the TopCo Operating Agreement.**

(c)    **Modifications**. There can be no modification, dissolution or termination of the Channeling Injunction, which shall be a permanent injunction.

(d)    **N**on-Limitation of Channeling Injunction. Nothing in the Plan or the Creditor Trust Documents shall be construed in any way to limit the scope, enforceability or effectiveness of the Channeling Injunction issued in connection with the Plan, except as expressly set forth in Section 10.7(b) of the Plan.

(e)    **Bankruptcy Rule 3016 Compliance**. The Debtors' compliance with the requirements of Bankruptcy Rule 3016 shall not constitute an admission that the Plan provides for an injunction against conduct not otherwise enjoined under the Bankruptcy Code.

**10.8    _MDT Insurer Injunction_**.

(a)    **Terms. In accordance with section 105(a) of the Bankruptcy Code, upon the occurrence of the Effective Date, all Persons that have held or asserted, that hold or assert or that may in the future hold or assert any Claim based on, arising under or attributable to an MDT Insurance Policy shall be, and hereby are, permanently stayed, restrained and enjoined from taking any action for the purpose of directly or indirectly collecting, recovering or receiving payment or recovery on account of any such Claim based on, arising under or attributable to an MDT Insurance Policy from or against any MDT Insurer, including:**

(i)    **commencing, conducting or continuing, in any manner any action or other proceeding of any kind (including an arbitration or other form of alternate dispute resolution)**

90

(ii)     **enforcing, attaching, levying, collecting or otherwise recovering, by any manner or means, any judgment, award, decree or other order against any MDT Insurer, or against the property of any MDT Insurer, on account of any Claim based on, arising under or attributable to an MDT Insurance Policy;**

(iii)    **creating, perfecting or enforcing in any manner any Lien of any kind against any MDT Insurer, or against the property of any MDT Insurer, on account of any Claim based on, arising under or attributable to an MDT Insurance Policy;**

(iv)     **asserting or accomplishing any setoff, right of subrogation, indemnity, contribution or recoupment of any kind, whether directly or indirectly, against any obligation due to any MDT Insurer, or against the property of any MDT Insurer, on account of any Claim based on, arising under or attributable to an MDT Insurance Policy; and**

(v)      **taking any act, in any manner, in any place whatsoever, that does not conform to, or comply with, the provisions of the Plan applicable to any Claim based on, arising under or attributable to an MDT Insurance Policy.**

(b)      **Reservations**. The provisions of this MDT Insurer Injunction shall not preclude the Master Disbursement Trust from pursuing any Claim based on, arising under or attributable to an MDT Insurance Policy, any other claim that may exist under any MDT Insurance Policy against any MDT Insurer, or enjoin the rights of the Master Disbursement Trust to prosecute any action based on or arising from the MDT Insurance Policies or the rights of the Master Disbursement Trust to assert any claim, debt, obligation, cause of action, or liability for payment against a MDT Insurer based on or arising from the MDT Insurance Policies. The provisions of this MDT Insurer Injunction are not issued for the benefit of any MDT Insurer, and no such insurer is a third-party beneficiary of this MDT Insurer Injunction. For the avoidance of doubt, the provisions of this MDT Insurer Injunction shall not enjoin, impair or affect (i) any claims between or among Non-Settling MDT Insurers or (ii) the rights of current and former directors, officers, employees and agents of the Debtors (other than the Shareholder Released Parties and Excluded Parties).

(c)      **Non-Limitation of MDT Insurer Injunction**. Nothing in the Plan or the Creditor Trust Documents shall be construed in any way to limit the scope, enforceability or effectiveness of the MDT Insurer Injunction issued in connection with the Plan.

### 10.9    *Settling MDT Insurer Injunction*.

(a)      **Terms. In accordance with section 105(a) of the Bankruptcy Code, upon the occurrence of the Effective Date, all Persons that have held or asserted, that hold or assert or that may in the future hold or assert any Claim based on, arising under or attributable to an MDT Insurance Policy shall be, and hereby are, permanently stayed, restrained and enjoined from taking any action for the purpose of directly or indirectly collecting, recovering or receiving**

payment or recovery on account of any such Claim based on, arising under or attributable to an MDT Insurance Policy from or against any Settling MDT Insurer, solely to the extent that such Settling MDT Insurer has been released from such Claim under such MDT Insurance Policy pursuant to an MDT Insurance Settlement, including:

(i)      commencing, conducting or continuing, in any manner any action or other proceeding of any kind (including an arbitration or other form of alternate dispute resolution) against any such Settling MDT Insurer, or against the property of such Settling MDT Insurer, on account of such Claim based on, arising under or attributable to such MDT Insurance Policy;

(ii)     enforcing, attaching, levying, collecting or otherwise recovering, by any manner or means, any judgment, award, decree or other order against any such Settling MDT Insurer, or against the property of such Settling MDT Insurer, on account of such Claim based on, arising under or attributable to such MDT Insurance Policy;

(iii)    creating, perfecting or enforcing in any manner any Lien of any kind against any such Settling MDT Insurer, or against the property of such Settling MDT Insurer, on account of such Claim based on, arising under or attributable to such MDT Insurance Policy;

(iv)     asserting or accomplishing any setoff, right of subrogation, indemnity, contribution or recoupment of any kind, whether directly or indirectly, against any obligation due to any such Settling MDT Insurer, or against the property of such Settling MDT Insurer, on account of such Claim based on, arising under or attributable to such MDT Insurance Policy; and

(v)      taking any act, in any manner, in any place whatsoever, that does not conform to, or comply with, the provisions of the Plan applicable to such Claim based on, arising under or attributable to such MDT Insurance Policy.

(b)      **Reduction of Insurance Judgments.** Any right, Claim, or cause of action that an Insurance Company may have been entitled to assert against any Settling MDT Insurer but for the Settling MDT Insurer Injunction, if any such right, Claim, or cause of action exists under applicable non-bankruptcy law, shall become a right, Claim, or cause of action solely as a setoff claim against the Master Disbursement Trust and not against or in the name of the Settling MDT Insurer in question. Any such right, Claim, or cause of action to which an Insurance Company may be entitled shall be solely in the form of a setoff against any recovery of the Master Disbursement Trust from that Insurance Company, and under no circumstances shall that Insurance Company receive an affirmative recovery of funds from the Master Disbursement Trust or any Settling MDT Insurer for such right, Claim, or cause of action. In determining the amount of any setoff, the Master Disbursement Trust may assert any legal or equitable rights the Settling MDT Insurer would have had with respect to any right, Claim, or cause of action.

(c)     **Modifications**. There can be no modification, dissolution or termination of the Settling MDT Insurer Injunction, which shall be a permanent injunction.

(d)     N**on-Limitation of Settling MDT Insurer Injunction**. Nothing in the Plan or the Creditor Trust Documents shall be construed in any way to limit the scope, enforceability or effectiveness of the Settling MDT Insurer Injunction issued in connection with the Plan.

**10.10**    *Shareholder Releases*.

[To come.]

**10.11**    *Shareholder Channeling Injunction*.

[To come.]

**10.12**    *Exculpation*.

To the maximum extent permitted by applicable law, no Exculpated Party shall have or incur, and each Exculpated Party is hereby released and exculpated from: any Claim, obligation, suit, judgment, damage, demand, debt, right, Cause of Action, remedy, loss and liability for any Claim in connection with, or arising out of, the administration of the Chapter 11 Cases; the negotiation and pursuit of the Disclosure Statement (including any information provided, or statements made, in the Disclosure Statement or omitted therefrom), the Restructuring Transactions, the Plan, the Master Disbursement Trust, the Creditor Trusts (including the trust distribution procedures and the other Creditor Trust Documents) and the solicitation of votes for, and confirmation of, the Plan; the funding of the Plan; the occurrence of the Effective Date; the administration of the Plan and the property to be distributed under the Plan; and the wind-up and dissolution of the Debtors and the transactions in furtherance of any of the foregoing, in each case other than Claims or Causes of Action arising out of, or related to, any act or omission of an Exculpated Party that is a criminal act or constitutes fraud, gross negligence or willful misconduct. This exculpation shall be in addition to, and not in limitation of, all other Releases, indemnities, exculpations and any other applicable law or rules protecting such Exculpated Parties from liability. For the avoidance of doubt, this <u>Section 10.12</u> shall not exculpate or release any Exculpated Party with respect to any act or omission of such Exculpated Party prior to the Effective Date that is later found to be a criminal act or to constitute fraud, gross negligence or willful misconduct, including findings after the Effective Date. Notwithstanding anything herein to the contrary, nothing in the Plan shall release any Claims or Causes of Action that may be asserted against any Excluded Party.

**10.13**    *Injunction Related to Releases and Exculpation*.

To the maximum extent permitted under applicable law, the Confirmation Order shall permanently enjoin the commencement or prosecution by any Person, whether directly, derivatively or otherwise, of any Claims, obligations, suits, judgments, damages, demands, debts, rights, Causes of Action, losses or liabilities released pursuant to this Plan, including, without limitation, the Claims, obligations, suits, judgments, damages, demands, debts, rights, Causes of Action and liabilities released or exculpated in this Plan and the Claims, Interests, Liens, other encumbrances or liabilities described in <u>Section 5.3(b)</u>, <u>5.4(c)</u> or <u>5.6(b)</u> of the Plan.

**10.14**    *Subordinated Claims*.

The allowance, classification and treatment of all Claims and Interests and the respective Distributions and treatments in respect thereof under this Plan take into account and conform to the relative priority and rights of the Claims and Interests in each Class in connection with contractual,

legal and equitable subordination rights relating thereto, whether arising under general principles of equitable subordination, section 509(c), 510(a), 510(b) or 510(c) of the Bankruptcy Code or otherwise. Pursuant to sections 509(c) and 510 of the Bankruptcy Code or otherwise, the Debtors reserve the right to reclassify any Allowed Claim or Allowed Interest in accordance with any contractual, legal or equitable subordination relating thereto.

**10.15** ***Preservation of Causes of Action and Reservation of Rights***. As of the Effective Date, (a) the Master Disbursement Trust shall have the right to prosecute any and all MDT Causes of Action, (b) the Plan Administration Trust shall have the right to prosecute any and all Retained Causes of Action relating to and necessary for the administration of Claims against the Debtors (other than Channeled Claims) and the other responsibilities of the Plan Administration Trustee in accordance with the PAT Agreement, (c) each Creditor Trust shall have the right to prosecute any and all Retained Causes of Action relating to and necessary for the administration of the applicable Channeled Claims and the other responsibilities of such Creditor Trust in accordance with the applicable Creditor Trust Documents and (d) NewCo shall have the right to prosecute any and all Retained Causes of Action constituting NewCo Transferred Assets; *provided* that any release by NewCo of such Retained Causes of Action shall be subject to the consent of the TopCo Managers. Pursuant to section 1123(b) of the Bankruptcy Code, except as expressly provided in Sections 10.5 through 10.13 of the Plan, nothing contained in this Plan or the Confirmation Order shall be deemed to be a waiver or relinquishment of any rights, Claims or Causes of Action that the Debtors had immediately before the Effective Date on behalf of the Estates or of themselves in accordance with any provision of the Bankruptcy Code or any applicable nonbankruptcy law, including but not limited to any actions specifically enumerated in the Schedule of Retained Causes of Action. Subject to Sections 10.5 through 10.13 of the Plan, all such rights, Claims and Causes of Action shall be transferred to the Master Disbursement Trust, the Plan Administration Trust, the applicable Creditor Trust or NewCo, as applicable, which shall have, retain, reserve and be entitled to assert all such rights, Claims and Causes of Action as fully as if the Chapter 11 Cases had not been commenced, and all of the Debtors' legal and equitable rights with respect to any Claim or Interest may be asserted after the Effective Date to the same extent as if the Chapter 11 Cases had not been commenced.

**10.16** ***Ipso Facto and Similar Provisions Ineffective***.

Any term of any policy, contract or other obligation applicable to a Debtor shall be void and of no further force or effect with respect to any Debtor to the extent such policy, contract, or other obligation is conditioned on, creates an obligation of any Debtor as a result of, or gives rise to a right of any Person based on any of the following: (a) the insolvency or financial condition of a Debtor; (b) the commencement of the Chapter 11 Cases; (c) the confirmation or consummation of this Plan, including any change of control that shall occur as a result of such consummation; or (d) the Restructuring Transactions.

**10.17** ***No Successor Liability***.

Except as otherwise expressly provided in this Plan and the Confirmation Order, each of NewCo, TopCo, the Master Disbursement Trust, the Plan Administration Trust and the Creditor Trusts (a) is not, and shall not be deemed to assume, agree to perform, pay or otherwise have any responsibilities for any liabilities or obligations of the Debtors or any other Person relating to or arising out of the operations or the Assets of the Debtors on or prior to the Effective Date, (b) is not, and shall not be, a successor to the Debtors by reason of any theory of law or equity or responsible for the knowledge or conduct of any Debtor prior to the Effective Date and (c) shall not have any successor or transferee liability of any kind or character.

### 10.18   *Special Provisions for United States*.

(a)       As to the United States, notwithstanding anything contained in the Plan or Confirmation Order to the contrary, including but not limited to this Article X, nothing in the Plan or Confirmation Order shall:

(i)       limit or expand the scope of discharge, release or injunction permitted to debtors under the Bankruptcy Code. The discharge, release, and injunction provisions contained in the Plan and Confirmation Order are not intended and shall not be construed to bar the United States from, subsequent to the Confirmation Order, pursuing any police or regulatory action, or any criminal action;

(ii)      discharge, release, exculpate, impair or otherwise preclude: (A) any liability to the United States that is not a "claim" within the meaning of section 101(5) of the Bankruptcy Code; (B) any Claim of the United States arising on or after the Effective Date; (C) any liability of the Debtors under police or regulatory statutes or regulations to the United States as the owner, lessor, lessee or operator of property that such Entity owns, operates or leases after the Effective Date; or (D) any liability to the United States, including but not limited to any liabilities arising under the IRC, the environmental laws, the criminal laws, the civil laws or common law, of any Person, including any Released Parties, Shareholder Released Parties or any Exculpated Parties, in each case, other than the Debtors that are Exculpated Parties; *provided, however*, that the foregoing shall not (x) limit the scope of discharge granted to the Debtors under sections 524 and 1141 of the Bankruptcy Code, (y) diminish the scope of any exculpation to which any Person is entitled under section 1125(e) of the Bankruptcy Code or (z) change the treatment of the DOJ Forfeiture Judgment Claim pursuant to Section 2.3 of the Plan or the treatment of the Federal Government Unsecured Claims pursuant to Section 4.3 of the Plan;

(iii)     enjoin or otherwise bar the United States from asserting or enforcing, outside the Bankruptcy Court, any liability described in the preceding clause (ii); *provided, however*, that the non-bankruptcy rights and defenses of all Persons with respect to (A)–(D) in clause (ii) are likewise fully preserved;

(iv)     affect any valid right of setoff or recoupment of the United States against any of the Debtors; *provided, however*, that the rights and defenses of the Debtors with respect thereto are fully preserved (other than any rights or defenses based on language in the Plan or the Confirmation Order that may extinguish setoff or recoupment rights);

(v)      divest any court, commission or tribunal of jurisdiction to determine whether any liabilities asserted by the United States are discharged or otherwise barred by this Confirmation Order,

the Plan or the Bankruptcy Code; *provided, however*, that the Bankruptcy Court shall retain jurisdiction as set forth in and pursuant to the terms of the Plan to the extent permitted by law; or

(vi)     be deemed to (A) determine the tax liability of any Person, including but not limited to the Debtors, (B) have determined the federal tax treatment of any item, distribution or Entity, including the federal tax consequences of the Plan or Confirmation Order, or (C) expressly expand or diminish the jurisdiction of the Bankruptcy Court to make determinations as to federal tax liability and federal tax treatment under the Bankruptcy Code and 28 U.S.C. §§ 157, 1334.

For the avoidance of doubt, the Channeling Injunction set forth in <u>Section 10.7</u> of the Plan and the Shareholder Channeling Injunction set forth in <u>Section 10.11</u> of the Plan do not apply to the rights and causes of action protected by this <u>Section 10.18</u>.

(b)     Several of the Debtors are parties to the various following agreements with the Secretary of the Department of Health and Human Services under which the Debtors owe rebates to third parties:

(i)     The Medicare Coverage Gap Discount Program Agreement is established under 42 U.S.C. §§ 1395w-114A, 1395w-153 and is required should manufacturers wish to have coverage for their products under Medicare Part D. Under the Medicare Coverage Gap Discount Program Agreement, manufacturers agree to reimburse Medicare Part D plan sponsors for certain Coverage Gap discounts the plans provide to Medicare beneficiaries in the Part D coverage gap. CMS requires that a new entity that seeks to assume a Medicare Coverage Gap Discount Program Agreement enter into a novation agreement with CMS with respect to the transfer of such agreement. The Debtors that have entered into Medicare Coverage Gap Discount Program Agreements with the Secretary are: Purdue Pharma L.P. (P1180) and Rhodes Pharmaceuticals L.P. (P1281);

(ii)     The Medicaid Drug Rebate Program, established under section 1927 of the Social Security Act, requires manufacturers to enter into National Drug Rebate Agreements with the Secretary for the coverage and payment of a manufacturer's covered outpatient drugs. Under the Medicaid Drug Rebate Program, if a manufacturer has entered into and has in effect a National Drug Rebate Agreement, Medicaid covers and pays for all of the drugs of that manufacturer dispensed and paid for under the state plan, and in return manufacturers pay applicable rebates to the states. The Debtors that have National Drug Rebate Agreements and the labeler codes associated with the National Drug Rebate Agreements are as follows: Rhodes Pharmaceuticals L.P. (42858), Purdue Pharma L.P. (59011), Avrio Health L.P. (67618) and Adlon Therapeutics L.P. (72912);

96

(iii)    Manufacturers with National Drug Rebate Agreements must also comply with the Drug Pricing Program under section 340B of the Public Health Service Act, 42 U.S.C. § 256b, and have Pharmaceutical Pricing Agreements with the Secretary of the Department of Health and Human Services. Under the Pharmaceutical Pricing Agreements, manufacturers agree to charge a price for covered outpatient drugs that will not exceed the average manufacturer price decreased by a rebate percentage. The Debtors that have Pharmaceutical Pricing Agreements and the labeler codes associated with such agreements are as follows: Rhodes Pharmaceuticals L.P. (42858), Purdue Pharma L.P. (59011), Avrio Health L.P. (67618) and Adlon Therapeutics L.P. (72912); and

(iv)    The Medicare Coverage Gap Discount Program Agreements, the Medicaid National Drug Rebate Agreements and the Pharmaceutical Pricing Agreements identified above provide that, in the event of a transfer of ownership, such agreements are automatically assigned to the new owner and all terms and conditions of such agreements remain in effect as to the new owner. Accordingly, notwithstanding anything contained in the Plan or the Confirmation Order which may be to the contrary, the Debtors shall assume such agreements pursuant to section 365 of the Bankruptcy Code, and upon the Effective Date, the Medicare Coverage Gap Discount Program Agreements, the Medicaid National Drug Rebate Agreements and the Pharmaceutical Pricing Agreements identified above shall be assigned to NewCo. NewCo, as the new owner, will assume the obligations of the Debtors who are parties under such agreements from and after the Effective Date, and to fully perform all the duties and responsibilities that exist under such agreements in accordance with their terms, including the payment of discounts owed to Part D Plan sponsors or payment of rebates owed to states and wholesalers for quarters prior to the Effective Date. For the avoidance of doubt, NewCo shall be liable for any outstanding rebates or discounts owed to third parties (and any applicable interest thereon) arising prior to the Effective Date, as well as any penalties associated with noncompliance by the Debtors with the Medicare Coverage Gap Discount Program Agreements, the Medicaid National Drug Rebate Agreements and the Pharmaceutical Pricing Agreements identified above prior to the Effective Date.

## ARTICLE XI    RETENTION OF JURISDICTION.

### 11.1    *Retention of Jurisdiction*.

(a)    The Bankruptcy Court shall retain exclusive jurisdiction of all matters arising under, arising out of or related to the Chapter 11 Cases and the Plan pursuant to, and for the purposes of, sections 105(a) and 1142 of the Bankruptcy Code and for, among other things, the following purposes:

(i)     to hear and determine applications for the assumption or rejection of executory contracts and unexpired leases and any Disputed Cure Claims or Disputed Claims in respect of rejection damages resulting therefrom;

(ii)    to hear and determine any motions, adversary proceedings, applications, contested matters and other litigated matters pending on, or commenced after, entry of the Confirmation Order;

(iii)   to hear and resolve any disputes arising from or related to (A) any orders of the Bankruptcy Court granting relief under Bankruptcy Rule 2004 or (B) any protective orders entered by the Bankruptcy Court in connection with the foregoing (including the Protective Order);

(iv)    to ensure that Distributions to Holders of Allowed Claims are accomplished as provided in this Plan and the Confirmation Order;

(v)     to consider Claims or the allowance, classification, priority, compromise, estimation or payment of any Claim, including any Administrative Claim or, solely to the extent provided in the applicable Creditor Trust Documents, any Channeled Claim;

(vi)    to enter, implement or enforce such orders as may be appropriate in the event that the Confirmation Order is, for any reason, stayed, reversed, revoked, modified or vacated;

(vii)   to issue and enforce injunctions, enter and implement other orders and take such other actions as may be necessary or appropriate to restrain interference by any Person with the consummation, implementation or enforcement of this Plan, the Confirmation Order or any other order of the Bankruptcy Court;

(viii)  to hear and determine any application to modify this Plan in accordance with section 1127 of the Bankruptcy Code to remedy any defect or omission or reconcile any inconsistency in this Plan, the Disclosure Statement or any order of the Bankruptcy Court, including the Confirmation Order, in such a manner as may be necessary to carry out the purposes and effects thereof;

(ix)    to hear and determine all Professional Fee Claims;

(x)     to resolve disputes concerning any reserves with respect to Disputed Claims or the administration thereof;

(xi)    to hear and resolve disputes related to the MDT Insurance Rights;

(xii)   to hear and determine disputes arising in connection with the interpretation, implementation or enforcement of this Plan, the Confirmation Order, any transactions or payments in furtherance

of the Plan or the Confirmation Order or any agreement, instrument or other document governing, or related to, any of the foregoing, including the Plan Documents;

(xiii)    to take any action and issue such orders, including any such action or orders as may be necessary after entry of the Confirmation Order or the occurrence of the Effective Date, as may be necessary to construe, enforce, implement, execute and consummate this Plan, including any release, exculpation or injunction provisions set forth in this Plan, or to maintain the integrity of this Plan following the occurrence of the Effective Date;

(xiv)    to hear and determine any other matters related to the Chapter 11 Cases and not inconsistent with the Bankruptcy Code or title 28 of the United States Code;

(xv)    to resolve any disputes concerning whether a Person had sufficient notice of the Chapter 11 Cases, the Disclosure Statement, any solicitation conducted in connection with the Chapter 11 Cases, any Bar Date established in the Chapter 11 Cases or any deadline for responding or objecting to a Cure Amount, in each case, for the purpose of determining whether a Claim or Interest is discharged hereunder or for any other purpose;

(xvi)    to hear and determine disputes arising in connection with the interpretation, implementation or enforcement of the Shareholder Settlement Agreement;

(xvii)    to hear and determine disputes arising in connection with (i) the MDT Claims and the interpretation, implementation or enforcement of the NewCo Guarantee Agreement or (ii) the fiduciary duties of the MDT Trustees;

(xviii)    to hear and determine disputes arising in connection with the interpretation, implementation or enforcement of the Creditor Trust Documents, and to hear and determine disputes concerning violations of the Confirmation Order or the use of funds from the Abatement Trusts in violation of the Authorized Abatement Purposes;

(xix)    to determine such other matters, and for such other purposes, as may be provided in the Confirmation Order;

(xx)    to hear and determine all matters relating to the Plan Settlements, to the extent permitted under applicable law; and

(xxi)    to enter a final decree closing each of the Chapter 11 Cases.

(b)    The Bankruptcy Court shall retain jurisdiction of all matters arising under, arising out of or related to the Chapter 11 Cases and the Plan to, among other things, hear and

determine matters concerning state, local and federal taxes in accordance with sections 346, 505 and 1146 of the Bankruptcy Code (including the expedited determination of taxes under section 505(b) of the Bankruptcy Code).

(c)    Notwithstanding anything in this <u>Article XI</u> to the contrary, the resolution of Channeled Claims against the Debtors and the forum in which such resolution shall be determined shall be governed by, and in accordance with, the Creditor Trust Documents.

(d)    By consenting to the treatment provided by this Plan or otherwise supporting the Plan, no State or Tribe shall be construed to have waived any claim of Sovereign Immunity that it may have in any other action or proceeding, including any action or proceeding occurring after the Effective Date.

## ARTICLE XII    MISCELLANEOUS PROVISIONS.

### 12.1    *Exemption from Certain Transfer Taxes*.

To the maximum extent permitted pursuant to section 1146(a) of the Bankruptcy Code, any transfers of property under the Plan pursuant to (a) the issuance, distribution, transfer or exchange of any debt, equity security or other interest in the Debtors, (b) the Restructuring Transactions, (c) the creation, modification, consolidation, termination, refinancing and/or recording of any mortgage, deed of trust or other security interest, or the securing of additional indebtedness by such or other means, or (d) the making, assignment, recording or surrender of any lease or sublease, or the making, delivery or recording of any deed or other instrument of transfer under, in furtherance of or in connection with the Plan, including any deeds, bills of sale or other assignments or instruments of transfer, or assignments executed in connection with any disposition of Assets contemplated by the Plan (including transfers of Assets to and by the Debtors, the Plan Administration Trust, NewCo, TopCo, the Master Disbursement Trust and the Creditor Trusts) shall not be subject to any document recording tax, stamp tax, conveyance fee, intangibles tax, transfer tax (including real estate transfer tax), mortgage tax or mortgage recording tax, sales or use tax, Uniform Commercial Code filing or recording fee, regulatory filing or recording fee or other similar tax or governmental assessment, and the appropriate federal, state, provincial or local government officials or agents shall forego collection of any such tax or governmental assessment and accept for filing and recordation any of the foregoing instruments or other documents without the payment of any such tax or governmental assessment.

### 12.2    *Dates of Actions to Implement Plan*.

In the event that any payment or act under this Plan is required to be made or performed on a date that is not a Business Day, then the making of such payment or the performance of such act may be completed on or as soon as reasonably practicable after the next succeeding Business Day but shall be deemed to have been completed as of the required date.

### 12.3    *Amendments*.

(a)    **Plan Modifications**. This Plan may be amended, modified or supplemented by the Debtors in the manner provided for by section 1127 of the Bankruptcy Code or as otherwise permitted by law, without additional disclosure pursuant to section 1125 of the Bankruptcy Code, except as otherwise ordered by the Bankruptcy Court; *provided* that (i) any such amendment, modification or supplement shall be reasonably acceptable to the Governmental Consent Parties; *provided further* that any such amendment, modification or supplement that expands the scope of the Releases shall be acceptable to the Governmental Consent Parties, and (ii) any such amendment, modification or supplement shall be reasonably acceptable to the Creditors' Committee to the extent that it relates to the

MDT Insurance Rights, expands the scope of the Releases or materially and adversely affects the treatment of Holders of Hospital Claims, Third-Party Payor Claims, PI Claims, NAS Monitoring Claims or Other General Unsecured Claims. In addition, after the Confirmation Date, as long as such action does not materially and adversely affect the treatment of Holders of Allowed Claims pursuant to this Plan, the Debtors may remedy any defect or omission or reconcile any inconsistencies in this Plan or the Confirmation Order with respect to such matters as may be necessary to carry out the purposes or effects of this Plan, and any Holder of a Claim or Interest that has accepted this Plan shall be deemed to have accepted this Plan as amended, modified or supplemented.

(b)    **Certain Technical Amendments**. Prior to the Effective Date, the Debtors, may make appropriate technical adjustments and modifications to this Plan without further order or approval of the Bankruptcy Court; *provided*, *however*, that such technical adjustments and modifications do not adversely affect in a material way the treatment of Holders of Claims and Interests under this Plan.

### 12.4    *Revocation or Withdrawal of Plan*.

The Debtors reserve the right to revoke or withdraw this Plan prior to the Effective Date as to any or all of the Debtors; *provided* that each Debtor shall be entitled to revoke this Plan only in full and not in part. If, with respect to a Debtor, this Plan has been revoked or withdrawn prior to the Effective Date, or if confirmation or the occurrence of the Effective Date as to such Debtor does not occur on the Effective Date, then, with respect to such Debtor: (a) this Plan and the Plan Documents shall be null and void in all respects; (b) any settlement or compromise embodied in this Plan (including the fixing or limiting to an amount any Claim or Interest or Class of Claims or Interests), assumption or rejection of executory contracts and unexpired leases effected by this Plan and any document or agreement executed pursuant to this Plan (including the Plan Documents) shall be deemed null and void; and (c) nothing contained in this Plan shall (i) constitute a waiver or release of any Claim by or against, or any Interest in, such Debtor or any other Person, (ii) prejudice in any manner the rights of such Debtor or any other Person, or (iii) constitute an admission of any sort by any Debtor or any other Person; *provided* that any provisions under the Shareholder Settlement Agreement that are expressly contemplated to survive revocation or reversal of the Plan shall survive.

### 12.5    *Payment of Statutory Fees*.

All fees payable under section 1930 of chapter 123 of title 28 of the United States Code shall be paid on or before the Effective Date by the Debtors. Quarterly fees owed to the U.S. Trustee shall be paid when due in accordance with applicable law and the Debtors shall continue to file reports to show the calculation of such fees for the Debtors' Estates until the Chapter 11 Cases are closed under section 350 of the Bankruptcy Code.

### 12.6    *Severability*.

(a)    Notwithstanding anything else contained in the Plan, (i) each of the provisions of Shareholder Settlement, including, without limitation, the Shareholder Releases and Shareholder Channeling Injunction, is integrated with and integral to both all other provisions of the Shareholder Settlement and the remainder of the Plan and the Plan Documents, and shall not be severable from the remainder of the Shareholder Settlement, the Plan or the Plan Documents; (ii) the Confirmation Order shall constitute a judicial determination that each term and provision of the Shareholder Settlement is (A) valid and enforceable pursuant to its terms, and (B) integral to both the entirety of the Shareholder Settlement and the Plan and may not be excised or modified other than in accordance with the Shareholder Settlement Agreement; (iii) nonseverable from and mutually dependent on each other term in the Shareholder Settlement and the Plan; and (iv) in the event that any one or more provisions of the

Shareholder Settlement are deemed null, void, illegal or unenforceable, the Shareholder Settlement, the Plan, the Confirmation Order and the Plan Documents shall be null and void.

(b)    If, prior to entry of the Confirmation Order, any term or provision of this Plan that is not related to the Shareholder Settlement is held by the Bankruptcy Court to be invalid, void or unenforceable, the Bankruptcy Court, at the request of the Debtors, shall have the power to alter and interpret such term or provision to make it valid or enforceable to the maximum extent practicable, consistent with the original purpose of the term or provision held to be invalid, void or unenforceable, and such term or provision shall then be applicable as altered or interpreted. Notwithstanding any such holding, alteration or interpretation by the Bankruptcy Court, the remainder of the terms and provisions of this Plan shall remain in full force and effect and shall in no way be affected, impaired or invalidated by such holding, alteration or interpretation. The Confirmation Order shall constitute a judicial determination and shall provide that each term and provision of this Plan, as it may have been altered or interpreted in accordance with this Section 12.6, is valid and enforceable pursuant to its terms.

### 12.7    *Governing Law*.

Except to the extent that the Bankruptcy Code or other federal law is applicable, or to the extent that a Plan Document provides otherwise, the rights, duties and obligations arising under this Plan and the Plan Documents shall be governed by, and construed and enforced in accordance with, the internal laws of the State of New York, without giving effect to the principles of conflicts of laws thereof (other than section 5-1401 and section 5-1402 of the New York General Obligations Law).

### 12.8    *Immediate Binding Effect*.

Notwithstanding Bankruptcy Rule 3020(e), 6004(h) or 7062 or otherwise, upon the occurrence of the Effective Date, the terms of this Plan and the Plan Documents shall be immediately effective and enforceable and deemed binding upon and inure to the benefit of the Debtors, the Holders of Claims against and Interests in the Debtors, the Released Parties, the Shareholder Released Parties and each of their respective successors and assigns.

### 12.9    *Successors and Assigns*.

The rights, benefits and obligations of any Person named or referred to in this Plan shall be binding on, and shall inure to the benefit of, any heir, executor, administrator, successor or permitted assign, if any, of each such Person.

### 12.10    *Entire Agreement*.

On the Effective Date, this Plan, the Plan Supplement and the Confirmation Order shall supersede all previous and contemporaneous negotiations, promises, covenants, agreements, understandings and representations concerning such documents, all of which have become merged and integrated into this Plan.

### 12.11    *Computing Time*.

In computing any period of time prescribed or permitted by this Plan, unless otherwise set forth in this Plan or determined by the Bankruptcy Court, the provisions of Bankruptcy Rule 9006 shall apply.

12.12    *Exhibits to Plan*.

        All exhibits, schedules, supplements and appendices to this Plan (including the Plan Supplement) are incorporated into and are part of this Plan as if set forth in full herein.

12.13    *Notices*.

        All notices, requests and demands to or upon the Debtors shall be in writing (including by facsimile transmission) and, unless otherwise provided herein, shall be deemed to have been duly given or made only when actually delivered or, in the case of notice by facsimile transmission, when received and telephonically confirmed, addressed as follows:

        DAVIS POLK & WARDWELL LLP
        450 Lexington Avenue
        New York, New York 10017
        Attn: Marshall S. Huebner, Benjamin S. Kaminetzky, Timothy Graulich, Eli J. Vonnegut, and Christopher S. Robertson

        *Counsel to the Debtors*
        *and Debtors in Possession*

        After the occurrence of the Effective Date, the Plan Administration Trustee shall have authority to send a notice to Entities providing that, to continue to receive documents pursuant to Bankruptcy Rule 2002, such Entities must file a renewed request to receive documents pursuant to Bankruptcy Rule 2002; *provided*, *however*, that the U.S. Trustee need not file such a renewed request and shall continue to receive documents without any further action being necessary. After the occurrence of the Effective Date, the Debtors and the Plan Administration Trustee are authorized to limit the list of Entities receiving documents pursuant to Bankruptcy Rule 2002 to the U.S. Trustee and those Entities that have filed such renewed requests.

12.14    *Dissolution of the Creditors' Committee*.

        On the Effective Date, the Creditors' Committee will dissolve; *provided*, *however*, that following the Effective Date, the Creditors' Committee shall continue in existence and have standing and a right to be heard for the following limited purposes: (a) applications, and any relief related thereto, for compensation by Professional Persons retained by the Creditors' Committee, and (b) any appeals of, or related to, the Confirmation Order or other appeal to which the Creditors' Committee is a party. Upon the dissolution of the Creditors' Committee, the Creditors' Committee, each of its members (including each officer, director, employee or agent thereof) and its respective Professional Persons will cease to have any duty, obligation or responsibility arising from, or related to, the Chapter 11 Cases and shall be released and discharged from all rights and duties from, or related to, the Chapter 11 Cases.

12.15    *Reservation of Rights*.

        Except as otherwise provided herein, this Plan shall be of no force or effect unless the Bankruptcy Court enters the Confirmation Order. None of the filing of this Plan, any statement or provisions of this Plan or the taking of any action by the Debtors with respect to this Plan shall be, or deemed to be, an admission or waiver of any rights of the Debtors with respect to any Claim or Interest prior to the Effective Date.

Dated: April 23, 2021

By: /s/  Jon Lowne
Name: Jon Lowne
Title: Authorized Signatory

**PURDUE PHARMA L.P.**
**PURDUE PHARMA INC.**
**PURDUE TRANSDERMAL TECHNOLOGIES L.P.**
**PURDUE PHARMA MANUFACTURING L.P.**
**PURDUE PHARMACEUTICALS L.P.**
**IMBRIUM THERAPEUTICS L.P.**
**ADLON THERAPEUTICS L.P.**
**GREENFIELD BIOVENTURES L.P.**
**SEVEN SEAS HILL CORP.**
**OPHIR GREEN CORP.**
**PURDUE PHARMA OF PUERTO RICO**
**AVRIO HEALTH L.P.**
**PURDUE PHARMACEUTICAL PRODUCTS L.P.**
**PURDUE NEUROSCIENCE COMPANY**
**NAYATT COVE LIFESCIENCE INC.**
**BUTTON LAND L.P.**
**RHODES ASSOCIATES L.P.**
**PAUL LAND INC.**
**QUIDNICK LAND L.P.**
**RHODES PHARMACEUTICALS L.P.**
**RHODES TECHNOLOGIES**
**UDF LP**
**SVC PHARMA LP**
**SVC PHARMA INC.**