Eisenberg & Baum, LLP
Michael S. Quinn
24 Union Square East, PH
New York, New York 10003
(212) 353-8700
*Counsel to the Ad Hoc Committee on Accountability*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In Re:<br><br>PURDUE PHARMA L.P., *et al.* [1]<br><br>Debtors. | Chapter 11<br><br>Case No.  19-23649 (RDD)<br><br>(Jointly Administered) |

**OBJECTION OF THE AD HOC COMMITTEE ON ACCOUNTABILITY TO DISCLOSURE STATEMENT FOR FIRST AMENDED CHAPTER 11 PLAN OF REORGANIZATION OF PURDUE PHARMA L.P. AND ITS AFFILIATED DEBTORS**

To the Honorable Robert D. Drain, United States Bankruptcy Judge:

<u>**Introduction**</u>

The Ad Hoc Committee on Accountability, by and through its undersigned counsel, hereby submits this objection to the Disclosure Statement and the First Amended Disclosure Statement for Chapter 11 Plan of Purdue Pharma, L.P., et al., ECF Nos. 2488 & 2734.  In support thereof, the Committee on Accountability states the following:

---

[1] The debtors in these chapter 11 cases ("Debtors" or "Purdue"), along with the last four digits of each Debtor's registration number in the applicable jurisdiction, are as follows: Purdue Pharma L.P. (7484), Purdue Pharma Inc. (7486), Purdue Transdermal Technologies L.P. (1868), Purdue Pharma Manufacturing L.P. (3821), Purdue Pharmaceuticals L.P. (0034), Imbrium Therapeutics L.P. (8810), Adlon Therapeutics L.P. (6745), Greenfield BioVentures L.P. (6150), Seven Seas Hill Corp. (4591), Ophir Green Corp. (4594), Purdue Pharma of Puerto Rico (3925), Avrio Health L.P. (4140), Purdue Pharmaceutical Products L.P. (3902), Purdue Neuroscience Company (4712), Nayatt Cove Lifescience Inc. (7805), Button Land L.P. (7502), Rhodes Associates L.P. (N/A), Paul Land Inc. (7425), Quidnick Land L.P. (7584), Rhodes Pharmaceuticals L.P. (6166), Rhodes Technologies (7143), UDF LP (0495), SVC Pharma LP (5717) and SVC Pharma Inc. (4014) (collectively, the "Bankruptcy Cases").

The Committee acknowledges and thanks the Debtors' counsel for extending the deadline to file this objection.  The Committee recognizes the eighteen or so parties that have filed objections to Purdue's Disclosure Statement, which may lead to a more fair and transparent process.[2]  In particular, the Committee recognizes and supports the concerns raised by *Pro Se* litigant Patsy Newmeyer, whose twenty-six year old son Robert died twenty years ago this May. The Committee respectfully suggests the amended disclosure statement should be improved by addressing the questions described below.

## Analysis

According to 11 U.S.C. § 1125, a disclosure statement should contain "adequate information" describing a confirmable plan.[3]  To be approved, a disclosure statement must include sufficient information to apprise creditors of the risks and consequences of the proposed plan.  *In re McLean Indus. Inc.*, 87 B.R. 830, 834 (Bankr. S.D.N.Y. 1987).  The statement should "contain simple and clear language delineating the consequences of the proposed plan on claims and the possible alternatives."[4]

### 1.  How Dangerous is Purdue's Business?

The central goal of Purdue's Plan is to keep the OxyContin business alive.[5]  For some

---

[2] *See* Daniel L. Jackson (ECF No. 2744); Maria Luisa C. Pena (ECF No. 2743); Patsy Newmeyer (ECF No. 2742); The Cherokee Nation (ECF No. 2730); Counties of West Virginia (ECF No. 2725); Barbour County (ECF No. 2723); Johnson & Johnson et al. (ECF Nos. 2722 & 2719); Coroner of St. Bernard Parish (ECF No. 2718); the Parish of DeSoto, Louisiana (ECF No. 2716); the Four Winds Tribe Louisiana Cherokee (ECF No. 2715); the City of Covington, Louisiana (ECF No. 2714); the City of Chillicothe, Ohio (ECF No. 2713); the Carpenter Health Network (ECF No. 2712); Bridge House Corporation (ECF No. 2711); Steadfast Insurance Company, American Guarantee and Liability Insurance Company, and Navigators Specialty Insurance Company (ECF No. 2710); ER Physician Paul S Rothstein (ECF No. 2708); The State of West Virginia (EFC No. 2703); and U.S. Trustee (ECF No. 2686).

[3] 11 U.S.C. § 1125 (Information of a kind, and in sufficient detail, as far as is reasonably practicable in light of the nature and history of the debtor and condition of the debtor's books and records . . . that would enable such a hypothetical reasonable investor . . . to make an informed judgment about the plan. . . .); *see also Momentum Mfg. Corp. v. Employee Creditors Comm. (In re Momentum Mft. Corp.)*, 25 F.3d 1132, 1136 (2d Cir. 1994).

[4] *In re Copy Crafters Quickprint, Inc.*, 92 B.R. 973, 981 (Bankr. N.D.N.Y. 1988).

[5] *See e.g.,* Disclosure Statement at 3 (without bankruptcy, "[l]itigation of thousands of Pending Actions to judgment and through appeals in the civil court system would have resulted in the financial and operational destruction" of

creditors, a crucial factor in assessing the Plan is whether continuing Purdue's business will cause more people to become addicted to opioids, overdose, and die.  Purdue should revise its Disclosure Statement to include a detailed, up-to-date, honest answer to this question.  Purdue should include its best available data, estimates, and projections specifying, each year for the next five years, as a consequence of Purdue continuing in the opioid business, how many people will: (i) develop substance use disorder, (ii) overdose, (iii) be born with Neonatal Abstinence Syndrome, and (iv) die.  No creditor should vote on this Plan without this information.

The Committee on Accountability anticipates that Purdue will inappropriately resist any request to disclose information about the harm caused by its business.

First, Purdue often emphasizes that the profits from its future opioid sales will pay for treatment to help people addicted to opioids.  People who have experience with dependency issues know that the damage from this business is so much greater than its profit.  That's why Purdue is in bankruptcy in the first place: because the liabilities from its dangerous business vastly exceeded the profit – maybe by a factor of a hundred, if not a thousand.  The Committee on Accountability suspects that Purdue can never sell enough OxyContin to make enough money to pay to repair the damage that it will inflict by selling OxyContin.  Instead, the Purdue to emerge from this bankruptcy — NewCo— will collect money that goes to some people, while inflicting injuries and deaths that money can never cure.  Regardless, even if Purdue contends that the benefits from future opioid sales outweigh the harms, the proper way to allow creditors to assess that balance is by disclosure.

Second, Purdue may assert that it does not matter how many people become addicted,

---

Purdue).  The Committee on Accountability is concerned that the bankruptcy to date, and even more so the proposed bankruptcy Plan, may hurt people by keeping Purdue in business, while the "operational destruction" of Purdue as a result of its richly deserved liabilities could have stopped a dangerous business and saved lives.

overdose, or die because NewCo won't be legally liable for the future harms.  Such a position is wrong as a matter of morality and law.  As people making a decision about a Plan, creditors should be armed with the best available information about whether that Plan will injure and kill people— regardless of the legal defenses and indemnifications NewCo will enjoy.  Real world consequences still matter, even if the legal system makes legal consequences go away.  Moreover, even as to the legal exposure, Purdue and the creditors should not assume that a new company will be able to cause deaths and injuries with impunity.  Every future death, every new dependency will inspire lawyers, advocates and activists to continue their efforts seeking accountability.

Third, Purdue may assert that the business is safe now, because it has a monitor, is not marketing, and states that it designed an injunction overseen by triple blue chip, best in the business, businessmen. If Purdue projects that people will not become addicted, will not overdose, and will not die – then Purdue should say so in the Disclosure Statement.  The Committee on Accountability doubts that Purdue will be willing to say that, because it is not true.  The point of disclosure on this topic is for Purdue to say, in public, before creditors vote, what its best estimate is for future injuries, overdoses and death.

Fourth, Purdue may say projections are too difficult.  That is false.  Purdue and its counsel have the most complete set of information on the harms of its opioids business that has ever existed, including more than one hundred thousand personal injury claims and data from insurance companies covering millions of people.  Purdue should think carefully before saying the danger of its business cannot be quantified.  Moreover, if the harms cannot be estimated, and they can, then that alone could be a reason to shut down the company.

Fifth, Purdue may say that the patients who become addicted to its opioids shouldn't count as victims, because opioids are fungible dangers in a competitive marketplace for dangerous drugs:

if Purdue stopped selling OxyContin, the same patients would just become addicted to a competing opioid brand.  The Committee hopes Purdue does not advance this position.  That attitude is not the right way to protect the public from danger.  When multiple companies in the market engage in a dangerous activity, it is not wise or appropriate to let each one ignore the consequences of its product because others are out there doing it too.  That approach would have allowed many harmful practices to continue, at great cost to society.

Sixth, Purdue may balk, claiming it does not need to estimate or disclose the harms from its business because it sells drugs approved by the FDA.  That approach is part of what got us into this crisis.  The Committee on Accountability agrees that the FDA approval is a relevant factor and should be included in the Disclosure Statement, as it is.  The Committee respectfully suggests that the best understanding of the actual injuries to people who use Purdue's products is also relevant and important and should be disclosed.

Finally, the need to disclose harm by Purdue's ongoing opioid business is of paramount importance because Purdue's plan is for the new company to be a "historic and unique" business, that will be likely lauded by fifty state attorneys general and the Department of Justice on the day it is born.  This is a recipe for disaster.  All the wrong people will have the incentive to keep problems at NewCo out of the public eye.  That kind of political protection may be why the Sacklers want Purdue to have this historic and unique status.  It is also a reason why it is important to disclose the expected harms now— in easily understandable terms of how many people are expected to become addicted, overdose and die.  People should know what their government is getting into.

**2. Will People Without Purdue Prescriptions Get Nothing?**

As the Committee on Accountability indicated at the recent hearing, the Disclosure Statement says that personal injury victims can only receive any recovery if they "show that they or their injured family member(s) were prescribed and used a Purdue opioid."[6] That restriction in the Plan is significant and unjust.

Purdue should amend the Disclosure Statement to explain— in detail and in language accessible to every creditor – how this restriction came about, why it is necessary, why it is legal, how it will be implemented, and how people harmed by it can pursue some alternative means of justice. Purdue should include in that explanation a specific answer to the Court's question of whether the Plan imposes a restriction independent of state law. Purdue should include in that explanation, a specific disclosure about whether individuals who receive nothing under the Plan will have their legal claims extinguished against both Purdue and the Sacklers, and if so, what body of law allows those claims to be extinguished.

Purdue should also disclose which key constituencies imposed this restriction. For example, was this restriction required by Purdue or the Sacklers? Was this restriction endorsed by government creditors, whose own claims are not restricted this way? Purdue should disclose what analysis, if any, indicates that the victims of its crimes are limited to patients prescribed Purdue drugs. In particular, was the criminal conspiracy with Practice Fusion directed to Purdue branded opioids, or extended-release opioids? Was the conspiracy to defraud the DEA regarding opioid quotas limited to Purdue branded opioids, or extended-release opioids? Were Purdue's false claims about addictiveness limited to Purdue branded opioids, or "the opioids?"[7]

The Committee on Accountability notes that the issues posed by these questions could be

---

[6] Disclosure Statement at 70.
[7] *See* ECF No. 248 (Adversary Proceeding); *see also* ECF No. 1188.

resolved.  Purdue could remove artificial barriers to recovery.

### 3.  How Many People Who Filed Claims Will Get Nothing?

Purdue either has estimated or can easily estimate how many people who filed claims will get nothing under the plan.  Purdue should disclose that estimate so that creditors are informed. Whether the Plan will leave tens of thousands of people with no recovery is a material fact for creditors to assess whether the Plan deserves support.

For example, Question 13 on the Personal Injury Proof of Claim Form asked: "Were you prescribed or administered a Purdue brand name opioid by a healthcare professional?" and instructed victims to check a box for Unknown, No, or Yes.  Purdue should disclose in the Disclosure Statement how many personal injury claim forms indicated Unknown, No, or Yes. Purdue likely has far more data and analysis than that question alone.  Indeed, Purdue must have some analysis in order to believe that the Plan as to personal injury creditors is fair.  Purdue cannot be proceeding blindly.  Purdue should reveal estimates of how many people who filed claims will get nothing, and why.

### 4.  Who Are The Two Doctors Purdue Admitted To Bribing and The Ten Doctors With Whom Purdue Conspired To Defraud The DEA?

Purdue has admitted to crimes involving specific doctors whose identities have not been disclosed.  Purdue admitted that:

> Purdue Pharma L.P. knowingly and intentionally conspired and agreed with others to commit an offense against the United States, that is, to knowingly and willfully offer payments in the form of speaker fees and other payments (*e.g.,* travel, lodging, consulting fees) to two HCPs with at least one purpose to induce those HCPs to write more prescriptions of Purdue opioid products….[8]

Purdue also admitted that:

---

[8] ECF No. 1829-2 at 18.

Purdue knowingly and intentionally conspired and agreed with others to defraud the DEA by impeding its lawful governmental functions and rights by: failing to maintain effective controls against diversion in that, with respect to more than one hundred HCPs, including ten of the HCPs the United States has identified for Purdue in the course of plea negotiations, Purdue, *inter alia*, failed to: (1) report and provide complete and accurate information to DEA about HCPs after the HCPs were flagged by internal anti-diversion programs, in situations in which the Company possessed sufficient information that should have led to a report; and (2) cease detailing HCPs after receiving information suggesting that those HCPs were prescribing opioid products without a legitimate medical purpose and outside the usual course of professional practice, in situations in which Purdue possessed sufficient information that a decision should have been made to cease detailing.[9]

More than 100,000 people filed claims for personal injuries, but they cannot know whether they received opioid prescriptions from the two doctors Purdue bribed or the ten doctors about which Purdue defrauded the DEA. The Disclosure Statement does not identify the doctors' names. Whether a settlement is appropriate depends on the circumstances, and knowing whether Purdue has admitted to committing federal felonies involving your doctor is a material circumstance.

### 5. Who Committed The Crimes At Purdue?

As noted in Question one, one thing that stands out from Purdue's conduct in this bankruptcy is its strong interest in continuing a business that many people expected would be shut down. Because creditors are now being asked to vote to continue the business even further, some creditors would like to know whether their vote is providing shelter and protection to Purdue employees who committed crimes. This is especially so for people whose lives were devastated by Purdue's crimes. It is difficult to stomach voting for a bankruptcy plan that provides continued employment to criminals. If there is a chance that the Plan will protect and employ even one criminal who caused terrible injuries and deaths, it would be better to shut the entire company down.

The way to address this issue is for Purdue to disclose who committed the crimes. Purdue

---

[9] ECF No. 1828-2 at 17.

admitted to specific felonies based on specific conduct, memorialized in public court filings. Purdue knows who did each act that it admitted to in its plea; but Purdue chose to keep that information a secret. Purdue should disclose in the Disclosure Statement who engaged in criminal conduct and whether each such person is still working at the company today. It is hard to imagine how Purdue could or should ever gain public trust without that disclosure.

### 6. What Happened To The Claims Against McKinsey?

Last December, the Sacklers argued to the Bankruptcy Court that McKinsey was responsible for some of Purdue's "marketing program" stating: "The Board Was Statutorily Entitled To Rely On McKinsey's And Management's Advice."[10] A few months later, McKinsey paid the government $641 million to settle claims for its work at Purdue. It seems that the bankruptcy estate and the creditors themselves may have valuable claims against McKinsey. If they are similar in size to McKinsey's settlement, those claims could almost double the money available for personal injury victims in this case. The Debtors have immediate access to witnesses and evidence about those claims. But the Committee on Accountability has not been able to discern what is happening to anyone's claims against McKinsey under the Plan.

It is not clear whether Purdue ever investigated claims against McKinsey; whether Purdue tried to negotiate a settlement with McKinsey; or whether claims against McKinsey are being extinguished in Purdue's Plan. The Committee on Accountability may investigate the sufficiency of the Debtors' diligence regarding McKinsey during the coming months. As an initial step, Purdue should disclose the circumstances and plans regarding McKinsey in the Disclosure Statement so that creditors are informed.

### 7. What Are The Specific Commitments For The Document Repository?

---

[10] ECF No. 2093 at 28.

The Disclosure Statement should provide more information about the document repository. Will Purdue disclose in the repository the 100 million pages of evidence that it produced to investigators?  How long will the public have to wait to see the documents?  Will Purdue provide the funding that is necessary for prompt and complete disclosure?  Will it secret "privileged" documents, even if such documents would shed light on the underlying causes of the Opioid Crisis? Specific commitments regarding the document repository are material factors for creditors considering whether to support the Plan.

**8.  Will The Sacklers Admit Wrongdoing?**

One of the improvements in the Disclosure Statement from March 15th to April 24th is the addition of a new Section III.W, "The Debtors' Acceptance of Responsibility and Apologies for Past Misconduct."  It is important that Purdue accepts responsibility and apologizes.  Now, the Disclosure Statement should also say whether Sackler family members are going to admit wrongdoing.  When Kathe Sackler testified to Congress that there is nothing she would have done differently, it stood out as extraordinarily disrespectful and hurtful to people who have suffered the consequences of Purdue's business.  Whether or not the Sacklers admit wrongdoing is a material factor for creditors considering whether to support the Plan.

**9.  When Can Museums Take Down The Sackler Name?**

The Committee on Accountability understands that important institutions, including some of the most significant museums in the world, are watching this bankruptcy to see whether and when they will take down the Sackler name.  Members of the Committee on Accountability have been leading on this issue for years.  This Disclosure Statement should say whether the proposed injunctions and releases in the Plan will allow the Sacklers, even after this case, to bring lawsuits to enforce the contracts that keep their name on institutions like the Metropolitan Museum of Art.

Of all the rights that are being swapped, channeled, and extinguished in the Plan, the Sacklers' right to have their name glorified is one that should be extinguished. Will a channeling injunction prevent Museums from removing the Sackler names? What will happen to the Sackler naming rights is a material factor for creditors considering whether to support the Plan.

**10. Why Should The Sacklers Take Nine Years To Pay?**

The Disclosure Statement should better address a puzzling aspect of the Plan: why was it decided that the Sacklers should take nine years to pay? Purdue should understand why this delay raises questions. In the Executive Summary, Purdue emphasizes: "the cornerstone of the Plan is the recognition by most of the core stakeholder groups that more resources are urgently needed to combat the opioid crisis afflicting the United States."

It is jarring to hear Purdue speak about combatting the opioid crisis. Despite claiming this cornerstone, the Plan does not deliver resources urgently at all. The April 24 Disclosure Statement says a grand total of approximately $1.3. billion will flow into the National Opioid Abatement Trust throughout the entire five-year period of 2021, 2022, 2023, 2024, and 2025.[11] For the entire nation. Compared to the resources that federal, state, local, and private sources are already expending to address the crisis, that is small. Over the next five years, it's about four dollars per American.

The Disclosure Statement should explain why the Sackler payments are so low and so slow. Were larger, faster payments considered? Was that reason examined and found to be invalid? The Committee will not be the last to ask these questions. If the current Plan is adopted, people will be asking for years – literally for nine years— why Purdue made a Plan for the Sacklers to pay so slowly when "more resources are urgently needed" now.

---

[11] ECF No. 2734 at 276.

One of the troubling things about the Plan is that, after paying the proposed settlement over nine years, the Sacklers will probably be richer than they are today. Because the settlement payments are only a fraction of the Sacklers' expected investment returns during those nine years, they will just keep getting richer. This is a failure of accountability.

The Disclosure Statement should disclose the current amount, location, and liquidity of the wealth of the Sackler family members who are seeking benefits from the bankruptcy. If they had filed for bankruptcy, all creditors would have had that information all along. Last week, Congress reported that certain Sacklers have $11 billion: including $950 million in cash; more than $2.9 billion in marketable securities, hedge funds, and brokerage accounts; more than $1 billion in real estate; more than $1 billion in private equity investments; and more than $250 million in art, jewelry, and "collectibles."[12] Creditors should not have to rely on Congressional investigators; this information should be disclosed in the Disclosure Statement. Moreover, some of the information from Congress was dated January 15, 2020. Creditors deserve disclosure of current information about the Sacklers' wealth.

## 11. What About The SACKLER Act?

The "SACKLER Act" refers to House Resolution 2096, the "Stop Shielding Assets from Corporate Known Liability by Eliminating Non-Debtor Releases (SACKLER) Act." In part, it provides that "Section 105(b) of title 11, United States Code, is amended by striking "a court may not" and all that follows, and inserting the following: "a court may not— (a) appoint a receiver in a case under this title; or (2) except as provided by section 524(g) of this title, enjoin or release a claim against a non-debtor by a State, municipality, federally recognized Tribe, or the United

---

[12] Press Release, Committee Releases Documents Showing Sackler family Wealth Totals $11 Billion, House Committee On Oversight and Reform, Apr. 20, 2021, *available at* https://oversight.house.gov/news/press-releases/committee-releases-documents-showing-sackler-family-wealth-totals-11-billion.

States.'"

The Disclosure Statement should disclose what has happened to date regarding the SACKLER Act and what plans Purdue has developed to handle the range of scenarios going forward. For creditors without specialized knowledge, it is difficult to understand what to expect about the intersection of this pending legislation and this case. If the Act becomes law in June, will Purdue suspend the voting and announce a new plan? Is Purdue lobbying against the Act? Will Purdue seek some sort of exception? Has Purdue spoken with the Sacklers about it? Has Purdue conducted an analysis of it at all? This is a subject on which Purdue's lawyers have specialized expertise, and it would be helpful to creditors if the Disclosure Statement explained in accessible language the risks and possibilities that creditors should expect.

### 12. Why Did The Sacklers Underfund The Pension Plan?

The April 24 Disclosure Statement says "Pension Plan claim amounts would total approximately $163 million" if Purdue were liquidated.[13]   As far as the Committee on Accountability has been able to discern, that liability is being imposed on the creditors and the estate in the form of NewCo assuming the Purdue Pension Plan.

The Disclosure Statement should explain whether and how and why Purdue, under the Sacklers' control, underfunded a pension plan by $163 million. Without any explanation, it is difficult for the creditors to assess why the creditors and the estate, as opposed to the Sacklers, should bear the cost of funding this expense. It appears that the Sacklers underfunded their company Pension plan at the very same time in which they paid themselves more than $10 billion. That deserves more explanation.

---

[13] ECF No. 2734 at 233.

**13. How Much Is Purdue Really Worth?**

The April 24 Disclosure Statement says Purdue expects to lose $259 million in 2021; then collect $82 million profit in 2022; $202 million in 2023; $293 million in profit in 2024; and $42 million profit in 2025.[14]

These projections make the Committee on Accountability wonder, again, why all the extraordinary efforts are being made to continue this business. NewCo may never earn in profits as much money as was spent on Professionals during this bankruptcy.  Purdue touted a landmark settlement of "$10-$12 billion," but its actual business projections show only $619 million in profit, even if you don't count the quarter-billion-dollar 2021 loss and consider only the years expected to be profitable ahead.

**14. Why Is Peter Boer Still On The Purdue Board?**

Chapter II.E. of the Disclosure Statement is titled "Independence of Company from Sacklers."  That Chapter should disclose why Peter Boer is still on the Board of Purdue.  Boer wrote one of the most notorious documents in the case: a 2007 memo in which he advised the Sacklers to put their money overseas.  The Official Creditors Committee itself highlighted Boer's memo in support of its motion to invoke the crime-fraud exception.[15]  And, as the Committee on Accountability feared would happen, Purdue's Special Committee considered Boer's overseas trust defense as a reason to support the Sacklers' settlement.[16]  Mr. Boer is an eye-witness, participant, and defendant in the events at the heart of the case.

Creditors deserve an explanation about why Mr. Boer is still on the Board.  The Disclosure Statement should say whether Purdue ever investigated Mr. Boer's misconduct; whether Purdue

---

[14] ECF No. 2734 at 275.

[15] ECF No. 2157, ¶ 3.

[16] *See* April 24 Disclosure Statement, ECF No. 2734 at 91 (considering the "collectability of any judgments against individuals, trusts, and other affiliated entities, including in connection with assets located outside the United States.").

ever took any steps to evaluate the conflict presented by Mr. Boer; whether Purdue entered into a written or unwritten agreement with the Sacklers that they would keep Mr. Boer on the Board; whether Purdue instituted policies to limit Mr. Boer's communications with the Sacklers; and whether Mr. Boer has in fact communicated with the Sacklers during this case.

### 15. What Is The Evidence That The Sacklers Acted Ethically and Lawfully?

For some creditors, the most important goal of this litigation is to learn who caused the opioid crisis. In a brief filed last week, the Richard Sackler family stated that: "Purdue's documents, which largely remain confidential despite the family's repeated attempts to have them de-designated and published, will prove that the Sacklers acted ethically and legally at all times."[17] The Sacklers also stated that they will reveal this evidence: "When it comes time for the Court to consider the propriety of the settlement, the Raymond Sackler family will introduce that evidence. Or if the settlement is derailed by the actions of the AHCA or otherwise, the family will introduce that evidence in the context of objecting to claims filed by the claimants in these cases."[18]

It appears that some people inside the bankruptcy know about confidential evidence that most people do not know about. The Disclosure Statement should disclose what is going on with this evidence. Have the Sacklers identified this evidence to Purdue? Is this evidence part of their joint defense?

At least some creditors, who were severely harmed by Purdue and the Sacklers, do not understand why this evidence could not have been revealed by now. During the bankruptcy, whole books have been written about the Sacklers, movies have been produced, legislation has been introduced, universities and museums have had to choose whether to keep or drop the Sackler name. Thousands of other people accused of illegal conduct, who are not the Sacklers, have been

---

[17] ECF No. 250 (Adversary Proceeding).
[18] *Id.* at 3.

tried, convicted, sentenced, and imprisoned. And still, the evidence about the Sacklers remains secret. It seems that someone made a calculation that it's more important to have four billion dollars than the truth. For the benefit of the creditors, the Disclosure Statement should explain what is going on with this evidence.

The Committee on Accountability is concerned about the possibility that evidence is being withheld on purpose until after the creditors vote. The Sacklers seem to indicate that they know now, for certain, that they will disclose certain specific Purdue documents to creditors, the Court, and the public this August. That evidence should be disclosed now. If it really plays out that the evidence about the Sacklers' guilt or innocence is concealed for years and then revealed for the first time just after the votes are cast, that will cement in the minds of many creditors and the public that the bankruptcy was unfair.

**16. When Is The Plan Likely To Become Effective?**

The Committee on Accountability has observed that, in discussions with a wide variety of people interested in this case— from families hurt by opioids to prosecutors to law professors— there is a wide range of expectations about when a reorganization plan is likely to become effective. Some have estimated that the Plan may take effect in early 2022, but others expect the appeals process will delay the Plan for several years. Information about the likely timing is material to creditors. Purdue and its attorneys have specialized knowledge and know more about this than many creditors do. Purdue has probably made tradeoffs and calculations in designing the Plan, with the likely timing of the Effective Date in mind. Purdue should disclose what it knows and what it estimates about when the Plan is likely to become effective.

<u>Conclusion</u>

There are so many significant questions, reflected in this objection and in the objections of

others, that the Court should not approve a Disclosure Statement on May 4. Instead, Purdue should

prepare and file a further amended proposed Disclosure Statement to which creditors can respond.

For these reasons, the Committee on Accountability respectfully objects to the Disclosure

Statement.

Dated: April 26, 2021                  Respectfully Submitted,
   New York, NY               Eisenberg & Baum, LLP

          By:  /s/ Michael S. Quinn
             Michael S. Quinn (mq-1640)
             24 Union Square East, Fourth Floor
             New York, New York 10003
             (212) 353-8700
             mquinn@eandblaw.com
             *Counsel to Ad Hoc Committee on Accountability*