Page 1

1   UNITED STATES BANKRUPTCY COURT

2   SOUTHERN DISTRICT OF NEW YORK

3   Case No. 19-23649-rdd

4   Adv. Case No. 21-07005-rdd

5   - - - - - - - - - - - - - - - - - - - - - - - - - - x

6   In the Matter of:

7

8   PURDUE PHARMA L.P.,

9

10           Debtor.

11   - - - - - - - - - - - - - - - - - - - - - - - - - - x

12   AVRIO HEALTH L.P., et al.,

13                 Plaintiffs,

14           v.

15   AIG SPECIALTY INSURANCE COMPANY (f/k/a American Insurance),

16                 Defendants.

17   - - - - - - - - - - - - - - - - - - - - - - - - - - x

18

19

20

21

22

23

24

25

1          United States Bankruptcy Court

2          300 Quarropas Street, Room 248

3          White Plains, NY 10601

4

5          April 6, 2021

6          10:07 AM

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21   B E F O R E :

22   HON ROBERT D. DRAIN

23   U.S. BANKRUPTCY JUDGE

24

25   ECRO:   UNKNOWN

Page 3

1    HEARING re Notice of Hearing on the NAS Children Ad Hoc

2    Committees Motion for Entry of an Order Authorizing the

3    Filing of Certain Information and Exhibits Under Seal in

4    Connection with the Ex Parte Motion Requesting an Order

5    Authorizing Examinations and Production of Documents

6    (related document(s)2139, 2538).

7

8    HEARING re Motion to Authorize THE NAS CHILDREN AD HOC

9    COMMITTEE'S MOTION ENTRY OF ORDER PURSUANT TO 11 U.S.C. §§

10   105(A) AND 107(B) AND FED. R. BANKR. P. 9018 AUTHORIZING THE

11   FILING OF CERTAIN INFORMATION AND EXHIBITS UNDER SEAL IN

12   CONNECTION WITH THE NAS CHILDREN AD HOC COMMITTEE'S EX PARTE

13   MOTION REQUESTING A COURT ORDER AUTHORIZING EXAMINATIONS

14   PURSUANT TO FEDERAL RULES OF BANKRUPTCY PROCEDURE 2004 AND

15   9006 filed by Scott S. Markowitz on behalf of Ad Hoc

16   Committee of NAS Babies. (ECF #2139)

17

18

19

20

21

22

23

24

25

Page 4

1    HEARING re Objection to Motion / Debtors' Objection to the

2    NAS Children Ad Hoc Committee's Motion for Entry or an Order

3    Pursuant to 11 U.S.C. §§105(a) and 107(b) and Fed. R. Bankr.

4    P. 9018 Authorizing the Filing of Certain Information and

5    Exhibits under Seal in Connection with the NAS Children Ad

6    Hoc Committee Ex Parte Motion Requesting a Court Order

7    Authorizing Examinations Pursuant to Federal Rules of

8    Bankruptcy Procedure 2004 and 9006 (related document(s)2139)

9    filed by James I. McClammy on behalf of Purdue Pharma L.P.

10   (ECF #2155)

11

12   HEARING re Motion to Authorize The NAS Children Ad Hoc

13   Committee's Motion Entry of Order Pursuant to 11 U.S.C.

14   Sections 105(a) and 107(b) and Fed. R. Bankr. P. 9018

15   Authorizing the Filing of Certain Information and Exhibits

16   Under Seal in Connection with the Reply and Supplemental

17   Declaration in Further Support of NAS Children Ad Hoc

18   Committee's Ex Parte Motion Requesting a Court Order

19   Authorizing Examinations Pursuant to Federal Rules of

20   Bankruptcy Procedure 2004 and 9006 filed by Scott S.

21   Markowitz on behalf of Ad Hoc Committee of NAS Babies.

22   (Attachments: # 1 Exhibit A - Proposed Order # 2 Exhibit B -

23   Redacted Debtors' 2004 Reply) (ECF #2538).

24

25

Page 5

1    HEARING re Declaration of James I. McClammy in Support of

2    the Debtors Statement in Response to the Reply of the NAS

3    Children Ad Hoc and Supplemental Declaration in Further

4    Support of its Request for Entry of a Court Order

5    Authorizing Examinations Pursuant to Federal Rules of

6    Bankruptcy Procedure 2004 and 9006 (related document(s)2584)

7    filed by James I. McClammy on behalf of Purdue Pharma L.P.

8    (ECF #2585)

9

10   HEARING re Adversary proceeding: 21-07005-rdd Avrio Health

11   L.P. et al v. AIG Specialty Insurance Company (f/k/a

12   American In  Notice of Adjournment of Hearing for Pretrial

13   Conference filed by Paul E. Breene on behalf of Avrio Health

14   L.P., Purdue Pharma Inc., Purdue Pharma L.P., Purdue Pharma

15   Manufacturing L.P., Purdue Pharma of Puerto Rico, Purdue

16   Pharmaceutical Products L.P., Purdue Pharmaceuticals L.P.,

17   Purdue Transdermal Technologies L.P., Rhodes Pharmaceuticals

18   L.P., Rhodes Technologies. with hearing to be held on

19   4/6/2021 (ECF #37)

20

21   HEARING re Adversary proceeding: 21-07005-rdd Avrio Health

22   L.P. et al v. AIG Specialty Insurance Company (f/k/a

23   American In Pre-trial Conference

24

25

Page 6

```
 1    HEARING re Adversary proceeding: 21-07005-rdd Avrio Health

 2    L.P. et al v. AIG Specialty Insurance Company (f/k/a

 3    American In Letter From Tancred Schiavoni On Behalf Of All

 4    Defendant Insurers (related document(s)38)

 5

 6    HEARING re Adversary proceeding: 21-07005-rdd Avrio Health

 7    L.P. et al v. AIG Specialty Insurance Company (f/k/a

 8    American In

 9    Related Documents:

10    Complaint (document #1)

11    Summon (document #3)

12    Scheduling Order (document #17)

13    Notice of Adjournment of Pre-Trial Conference (document #24)

14    Letter to the Honorable Robert D. Drain Filed by Frederick

15    E. Schmidt on behalf of Liberty Insurance

16    Corporation, Liberty Mutual Fire Insurance Company, Liberty

17    Mutual Insurance Company (document #25)

18

19    HEARING re Motion to Withdraw the Reference of Adversary

20    Proceeding filed by Frederick E. Schmidt on behalf of

21    Liberty Insurance Corporation, Liberty Mutual Fire Insurance

22    Company, Liberty Mutual Insurance Company (document

23    #28)

24

25
```

1    HEARING re Memorandum of Law in Support of Motion to

2    Withdraw the Reference (related document(s)28) filed by

3    Frederick E. Schmidt on behalf of Liberty Insurance

4    Corporation, Liberty Mutual Fire Insurance Company,

5    Liberty Mutual Insurance Company (document #29)

6

7    HEARING re Letter to the Honorable Robert D. Drain Filed by

8    Paul E. Breene on behalf of Avrio Health L.P., Purdue Pharma

9    Inc., Purdue Pharma L.P., Purdue Pharma Manufacturing L.P.,

10   Purdue Pharma of Puerto Rico, Purdue Pharmaceutical Products

11   L.P., Purdue Pharmaceuticals L.P., Purdue Transdermal

12   Technologies L.P., Rhodes Pharmaceuticals L.P., Rhodes

13   Technologies (document #32)

14

15   HEARING re Letter to Judge Drain on behalf of at least 13

16   insurer defendants, who on April 5 will be filing a joint

17   motion to stay this Adversary Proceeding based on a

18   mandatory arbitration provision in their policies Filed by

19   Tancred V. Schiavoni on behalf of Chubb Bermuda Insurance

20   Ltd (document #33)

21

22   HEARING re Letter to the Honorable Robert D. Drain Filed by

23   Frederick E. Schmidt on behalf of Liberty Insurance

24   Corporation, Liberty Mutual Fire Insurance Company, Liberty

25   Mutual Insurance Company (document #34)

Page 8

1     HEARING re Notice of Adjournment of Hearing for Pretrial

2     Conference filed by Paul E. Breene on behalf of Avrio Health

3     L.P., Purdue Pharma Inc., Purdue Pharma L.P., Purdue Pharma

4     Manufacturing L.P., Purdue Pharma of Puerto Rico,

5     Purdue Pharmaceutical Products L.P., Purdue Pharmaceuticals

6     L.P., Purdue Transdermal Technologies L.P.,

7     Rhodes Pharmaceuticals L.P., Rhodes Technologies. with

8     hearing to be held on 4/6/2021 (document #37)

9

10    HEARING re Civil Cover Sheet from U.S. District Court, Case

11    Number: 21-cv-2674 Judge Kenneth M. Karas (related

12    document(s)28) (document #39)

13

14    HEARING re Joint Motion to Withdraw the Reference Of

15    Adversary Proceeding As Against Movants In The Event That

16    The Court Denies The Liberty Mutual Withdrawal Motion filed

17    by Paul R Koepff on behalf of Arch Reinsurance Ltd.

18    (document #47)

19

20    HEARING re Disclosure Statement filed by Kelly Tsai on

21    behalf of American Guarantee and Liability Insurance

22    Company, Steadfast Insurance Company (document #49)

23

24

25

Page 9

```
 1    HEARING re Answer to Complaint (Related Doc # 1) filed by

 2    Kelly Tsai on behalf of American Guarantee and Liability

 3    Insurance Company, Steadfast Insurance Company (document

 4    #51)

 5

 6    HEARING re Statement of Joinder in the Liberty Mutual

 7    defendants' motion to withdraw the reference, (related

 8    document(s)28) filed by Kelly Tsai on behalf of American

 9    Guarantee and Liability Insurance Company, Steadfast

10    Insurance Company (document #52)

11

12    HEARING re Memorandum of Law in Support of Motion to

13    Withdraw the Reference filed by Paul R Koepff on behalf of

14    Arch Reinsurance Ltd.(document #56)

15

16    HEARING re Motion to Stay / Notice of Motion for Arbitration

17    Insurers' Joint Motion to Stay the Claims Against Them in

18    the Adversary Proceeding in Favor of Arbitration filed by

19    Mitchell Jay Auslander on behalf of AIG Specialty

20    Insurance Company (f/k/a American International Specialty

21    Lines Insurance Company), American International

22    Reinsurance Company (f/k/a Starr Excess Liability Insurance

23    International Limited), New Hampshire Insurance

24    Company(document #57)

25
```

Page 10

1    HEARING re Memorandum of Law in Support of the Arbitration

2    Insurers' Joint Motion to Stay the Claims Against Them in

3    the

4

5    HEARING re Adversary Proceeding in Favor of Arbitration

6    (related document(s)57) filed by Mitchell Jay Auslander on

7    behalf of AIG Specialty Insurance Company (f/k/a American

8    International Specialty Lines Insurance Company),

9    American International Reinsurance Company (f/k/a Starr

10   Excess Liability Insurance International Limited), New

11   Hampshire Insurance Company (document #59)

12

13   HEARING re Answer to Complaint (Related Doc # 1) (related

14   document(s)1) filed by Frederick E. Schmidt on behalf of

15   Liberty Insurance Corporation, Liberty Mutual Fire Insurance

16   Company, Liberty Mutual Insurance Company (document #61)

17

18   HEARING re Motion for More Definite Statement / Notice of

19   Motion for a More Definite Statement filed by Mitchell Jay

20   Auslander on behalf of National Union Fire Insurance Company

21   of Pittsburgh, PA (document #62)

22

23

24

25

1    HEARING re Memorandum of Law in Support of National Union's

2    Rule 12(e) Motion for a More Definite Statement (related

3    document(s)62) filed by Mitchell Jay Auslander on behalf of

4    National Union Fire Insurance Company of Pittsburgh, PA

5    (document #63)

6

7    HEARING re Statement Liberty Mutual Insurance Company,

8    Liberty Mutual Fire Insurance Company, and Liberty Insurance

9    Corporation's Rule 7007.1 Disclosure Statement filed by

10   Frederick E. Schmidt on behalf of Liberty Insurance

11   Corporation, Liberty Mutual Fire Insurance Company, Liberty

12   Mutual Insurance Company (document #65)

13

14   HEARING re Answer to Complaint (Related Doc # 1) filed by

15   Lauren M. Macksoud on behalf of XL Insurance America, Inc.

16   (document #70)

17

18   HEARING re Motion for More Definite Statement filed by

19   William T. Russell Jr. on behalf of Gulf Underwriters

20   Insurance Company, St. Paul Fire and Marine Insurance

21   Company (document #71)

22

23

24

25

Page 12

1   HEARING re Memorandum of Law in support of Motion for a More

2   Definite Statement (related document(s)71) filed by

3   William T. Russell Jr. on behalf of Gulf Underwriters

4   Insurance Company, St. Paul Fire and Marine Insurance

5   Company (document #72)

6

7   HEARING re Motion to Dismiss Party filed by Dan D Kohane on

8   behalf of Chubb European Group SE (f/k/a ACE Insurance

9   S.A.N.V.), Darag Insurance UK Limited (f/k/a The Underwriter

10  Insurance Company Limited), QBE UK Limited (f/k/a QBE

11  International Insurance Company Limited), SR International

12  Business Company SE (f/k/a SR International Business

13  Insurance Company Limited), Zurich Specialties London

14  Limited (f/k/a Zurich Reinsurance (London) Limited)

15  (document #73)

16

17  HEARING re Corporate Ownership Statement . Corporate parents

18  added to case: The Travelers Indemnity Company. Corporate

19  Affiliates added to case:, The Travelers Companies, Inc.,

20  Travelers Insurance Group Holdings Inc., Travelers Property

21  Casualty Corp.. Filed by William T. Russell Jr. on behalf of

22  Gulf Underwriters Insurance Company (document #74)

23

24

25

Page 13

1   HEARING re Corporate Ownership Statement . Corporate parents

2   added to case: The Travelers Companies, Inc.. Filed by

3   William T. Russell Jr. on behalf of St. Paul Fire and Marine

4   Insurance Company (document #76)

5

6   HEARING re Motion to Dismiss Adversary Proceeding For Lack

7   of Personal Jurisdiction filed by Barbara M. Almeida on

8   behalf of Chubb Bermuda Insurance Ltd. (f/k/a ACE Bermuda

9   Insurance Ltd.) (document #77)

10

11   HEARING re Memorandum of Law In Support Of Motion To Dismiss

12   For Lack Of Personal Jurisdiction filed by Barbara M.

13   Almeida on behalf of Chubb Bermuda Insurance Ltd. (f/k/a ACE

14   Bermuda Insurance Ltd.) (document #78)

15

16   HEARING re Motion to Withdraw the Reference filed by Dan D

17   Kohane on behalf of AIG Specialty Insurance Company (f/k/a

18   American International Specialty Lines Insurance Company),

19   American International Reinsurance Company (f/k/a Starr

20   Excess Liability Insurance International Limited), Aspen

21   American Insurance Company, Chubb European Group SE (f/k/a

22   ACE Insurance S.A.N.V.), Darag Insurance UK Limited (f/k/a

23   The Underwriter Insurance Company Limited), National Union

24   Fire Insurance Company of Pittsburgh, PA, New Hampshire

25   Insurance Company, North American Elite Insurance Company,

Page 14

1    QBE UK Limited (f/k/a QBE International

2    Insurance Company Limited), SR International Business

3    Company SE (f/k/a SR International Business Insurance

4    Company Limited), XL Bermuda Ltd., XL Insurance America,

5    Inc., Zurich Specialties London Limited (f/k/a

6    Zurich Reinsurance (London) Limited) (document #79)

7

8    HEARING re Motion to Dismiss Adversary Proceeding For Lack

9    of Personal Jurisdiction filed by George Calhoun IV on

10   behalf of Allied World Assurance Company, Ltd.

11   (document #80)

12

13   HEARING re Memorandum of Law In Support of Motion To Dismiss

14   For Lack Of Personal Jurisdiction filed by Paul R Koepff

15   on behalf of Arch Reinsurance Ltd. (document #81)

16

17   HEARING re Motion to Dismiss Adversary Proceeding For Lack

18   of Personal Jurisdiction filed by George Calhoun IV on

19   behalf of Allied World Assurance Company, Ltd.

20   (document #82)

21

22

23

24

25

1    HEARING re Memorandum of Law In Support of Defendant Allied

2    World Assurance Company Ltd's Motion to Dismiss For

3    Lack of Personal Jurisdiction (related document(s)82) filed

4    by George Calhoun IV on behalf of Allied World

5    Assurance Company, Ltd. (document #83)

6

7    HEARING re Motion to Dismiss Adversary Proceeding filed by

8    Thomas Maeglin on behalf of Liberty Mutual Insurance Europe

9    SE (f/k/a Liberty International Insurance Company)

10   (document #84)

11

12   HEARING re Memorandum of Law IN SUPPORT OF THE MOTION OF

13   LIBERTY MUTUAL INSURANCE EUROPE SE TO DISMISS FOR LACK OF

14   PERSONAL JURISDICTION (document #85)

15   Answer to Complaint (Related Doc # 1) filed by Dan D Kohane

16   on behalf of North American Elite Insurance

17   Company (document #86)

18

19   HEARING re Answer to Complaint (Related Doc # 1) filed by

20   Dan D Kohane on behalf of Aspen American Insurance

21   Company (document #87)

22

23   HEARING re Motion to Dismiss Adversary Proceeding For Lack

24   of Personal Jurisdiction filed by Richard Joseph Geddes on

25   behalf of XL Bermuda Ltd. (document #88)

1   A P P E A R A N C E S :

2

3   DAVIS POLK & WARDWELL

4        Attorneys for Debtor

5        450 Lexington Avenue

6        New York, NY, 10017

7

8   BY:   MARSHALL HUEBNER (TELEPHONICALLY)

9        JAMES MCCLAMMY (TELEPHONICALLY)

10

11   TARTER KRINSKY & DROGIN

12        Attorneys for NAS Committee

13        1350 Broadway

14        New York, NY, 10018

15

16   BY:   SCOTT MARKOWITZ (TELEPHONICALLY)

17

18   LAW OFFICE OF KEVIN THOMPSON

19        Attorneys for NAS

20        1835 Upperline

21        New Orleans, LA, 70115

22

23   BY:   KEVIN THOMPSON (TELEPHONICALLY)

24

25

1    REED SMITH

2         Attorneys for Debtors

3         599 Lexington Avenue

4         New York, NY, 10022

5

6    BY:  PAUL BREENE (TELEPHONICALLY)

7

8    GILBERT LLP

9         Attorneys for Ad Hoc Committee

10        700 Pennsylvania Ave SE

11        Washington, DC 20003

12

13   BY:  RICHARD LEVERIDGE (TELEPHONICALLY)

14

15   O'MELVENY

16        Attorneys for Arbitration Insurers

17        7 Times Square

18        New York, NY 10036

19

20   BY:  TANCRED SCHIAVONI (TELEPHONICALLY)

21

22

23

24

25

Page 18

1   MINTZ LEVIN COHN FERRIS GLOVSKY & POPEO, P.C.

2       Attorneys for Liberty Insurance Corporation

3       88 Wharf Street

4       Milton, MA, 02186

5

6   BY:  KIM MARRKAND (TELEPHONICALLY)

7

8   CLYDE & CO

9       Attorneys for Arch Reinsurance Ltd.

10       405 Lexington Avenue

11       New York, NY, 10174

12

13   BY:  PAUL KOEPFF

14

15   WILLKIE FARR & GALLAGHER

16       Attorneys for Certain AIG Insurers

17       787 Seventh Avenue

18       New York, NY, 10019

19

20   BY:  MITCHELL AUSLANDER

21

22

23

24

25

1            Page 19

2     1   IFRAH LAW PLLC

3     2      Attorneys for Ironshore Specialty Insurance Company

4     3      1717 Pennsylvania Avenue, NW

5     4      Washington, DC, 20006

6     5

7     6   BY:  GEORGE CALHOUN

8     7

9     8   ALSO APPEARING TELEPHONICALLY:

10    9   DONALD CREADORE, NAS Committee

11   10   SCOTT BICKFORD, NAS Committee

12   11

13   12

14   13

15   14

16   15

17   16

18   17

19   18

20   19

21   20

22   21

23   22

24   23

25   24

Page 20

1                   P R O C E E D I N G S

2            THE COURT:  Good morning, this is Judge Drain.  We

3       are here on a non-omnibus hearing and conference agenda in

4       In re Purdue Pharma LP.

5            These matters are being heard completely

6       telephonically.  Therefore, in addition to introducing

7       yourself and your client the first time that you speak, you

8       should state your name if you speak later so that the court

9       reporter and I can put together your voice with your name.

10           There is one authorized recording of today's

11      hearings that's taken by Court Solutions which provides a

12      copy on a daily basis to our clerk's office.  If you want a

13      transcript of your hearing from today, you should contact

14      the clerk's office to arrange for the production of one.

15           Because these matters are being heard completely

16      telephonically, you need to keep your phone on mute unless

17      of course you're speaking, at which point you need to unmute

18      yourself.

19           So with that introduction, I have the amended

20      agenda for this morning's hearing and I'm happy to go down

21      the agenda in the order on it.

22           MR. HUEBNER:  Your Honor, it's Marshall Huebner

23      from Davis Polk.  Can I just have 40 or 45 seconds before we

24      start the agenda?

25           THE COURT:  Okay, that's fine.

Page 21

1            MR. HUEBNER:  Good morning, Your Honor.  May it

2     please the Court.  Marshall Huebner of Davis Polk & Wardwell

3     on behalf of the Debtors.  Just a quick update that I think

4     chambers certainly knows about, but for the benefit of the

5     many parties to the case.

6            Progress absolutely continues the pace.  Many

7     items that we discussed at some length at our most recent

8     omnibus hearing with respect to both issues on the plan that

9     include both intra-private, and public-private and intra-

10    public and estate and creditor Sackler (indiscernible).

11    This is a very complicated case with very complicated issues

12    and many, many parties and many sort of crosscurrents and

13    cross threads.  And so unfortunately, we are not going to be

14    able to have a disclosure statement on April 21st, which

15    would have required in our view substantially advanced

16    documents filed really probably round about today or close

17    to today in order to be fair and appropriate and give people

18    as much notice as we reasonably can.

19            We are working both with chambers and, frankly,

20    with others who have hearings scheduled for the first week

21    in May to see exactly what slot we can pop out.  This

22    morning I offered a dear friend a box of Godiva and two

23    fruit baskets to switch hearing spots with us.  So we'll see

24    if that bears fruit.  But I did want to let people know as

25    soon as that comes to rest, which should be I think in the

Page 22

1    next day or so, we will of course work with chambers and

2    file a notice of adjournment that we're staying the hearing

3    to the new date with the appropriate both objection deadline

4    and reply deadline.  I just did want to give everyone a

5    public service announcement in case -- although I know all

6    the core parties to the case I think know about, the fact

7    that the schedule is shifting slightly, I did want to let

8    the larger world know in case anybody else was working on

9    disclosure statement objections or other documents where an

10   earlier update would be much nicer than a later one.

11           So apologies for the interjection, but I thought

12   that it was important for parties to know where we stand and

13   that things are still progressing on the various fronts that

14   we're working on.  And with that, Your Honor, neither of the

15   two matters -- well, the second one I guess sort of is, but

16   the first one is -- we are definitely not the movant until

17   and unless someone tells me that I have it wrong.  I would

18   propose to turn the virtual podium over to counsel for the

19   NAS folks.

20           THE COURT:  Okay, very well.  Thank you.  So

21   you're right.  The first matter on the agenda for today is

22   the NAS Children Ad Hoc Committee's Motion to seal certain

23   documents in which they seek discovery under Bankruptcy Rule

24   2004.

25           I have reviewed the pleadings on this, which with

Page 23

1    the exception of the initial pleading, have nothing to do

2    with sealing and everything to do with the merits of the

3    original Rule 2004 motion which then changed significantly

4    in a so-called reply, the so-called objection to the sealing

5    motion, dated March 19th.

6              So maybe to begin, someone from the NAS Committee

7    can update me on where this matter stands.

8              MR. MARKOWITZ:  Good morning, Your Honor.  It's

9    Scott Markowitz, Tarter, Krinsky & Drogin, counsel for the

10   NAS Committee.

11             As Your Honor knows, the NAS Committee

12   representatives are lawyers who represent the children.  And

13   on the call is Donald Creadore and Scott Bickford.  And they

14   are closer to the details to this, so they are going to be

15   addressing Your Honor's questions and making the argument.

16             THE COURT:  Okay.

17             MR. MARKOWITZ:  Don?

18             MR. CREADORE:  Good morning, Your Honor.  Can you

19   hear me?

20             THE COURT:  Yes, I can hear you fine.  Thanks.

21             MR. CREADORE:  Good morning.  Thank you.  You

22   asked a procedural question.  Yes, this is actually a

23   continuation of the motion that was filed in December

24   seeking to seal but also request examinations.  And I

25   believe as the objections and as the other pleadings seem to

1    lead us to conclude, that this is also an argument and

2    typically it seems to be primarily based upon the need for

3    examinations and that the reason for disclosure was a

4    complementary request that was made because of the nature

5    and the confidential nature I should say of the documents

6    that have been provided to the Court in an unredacted

7    fashion and to certain isolated parties pursuant to the

8    order.

9           THE COURT:  Okay.  Have there been any further

10   developments on the merits of the Rule 2004 motion?

11           MR. CREADORE:  For me to report on behalf of the

12   NAS Ad Hoc Committee, the report would be that we have

13   reached an impasse, and that would be part of the

14   presentation that we would have this morning.  I intend just

15   to provide a short, brief opening remark and then I was

16   going to follow that with addressing three points, the first

17   point being the informal discovery and where we've gotten to

18   to date with that would be of interest to the Court.  The

19   second point would be why the relief is consistent with

20   Bankruptcy Rule 2004, and the third point was how the NAS --

21   the claims I should say of NAS children suffer irreparable

22   injury if the relief was not awarded.

23           And then of course I also intend to spend a brief

24   moment in a bullet-like fashion to respond to some of the

25   fresh concerns that debtors had raised in their statement as

Page 25

1   well as previously in their objections.  And then of course

2   I'd leave it open for the Court to determine how it would

3   like to proceed from there.

4          I by no reason mean by just discussing just

5   several points of the objections in the statement that has

6   been recently filed to mean that the other ones aren't

7   important, and of course we would be prepared to respond to

8   them as well.  That was my initial thoughts, Your Honor.

9          THE COURT:  What discovery relief are you seeking

10  at this point?

11         MR. CREADORE:  Well, as a general matter, the NAS

12  Ad Hoc Committee is requesting access to all toxicology

13  studies, including materials not released to the FDA.  The

14  reason has been we've been asking for this information

15  because it's vitally important to us as part of our due

16  diligence.  And for eight months and counting we've been

17  seeking it.  For many months, eight months and counting as

18  well, the adult PIs have added a new twist by insisting that

19  in every draft of the proposed TDP for distribution of

20  opioid funds, the PI claims of NAS children scientifically

21  substantiate their claims for personal injuries sustained.

22  Now, this standard does not apply to adult PI claims.  It

23  only applies to the NAS children.

24         Now, the Debtors are continuing to endorse this

25  criteria irrespective of the fact that it applies only to

Page 26

1    the PI claims of NAS children in this case.  But nonetheless

2    as a result of this unique circumstances, the PI claims of

3    NAS children will require access from the Debtors to the

4    information being requested in order to satisfy the

5    eligibility requirements, in order to --

6            THE COURT:  Can I interrupt you on that point

7    then?  This is one of the points I was referring to when it

8    seemed to me, as I stated, that the initial basis for the

9    December 2004 motion changed significantly with the March 19

10   reply by the NAS Committee.

11           If the purpose of obtaining toxicology studies is

12   to substantiate proofs of claim that have been filed -- and

13   obviously there was a bar date in this case and I think

14   we're only talking about claims that have been filed -- then

15   the proper vehicle for taking such discovery is under the

16   Part 7 rules for contested matters as set out in a number of

17   cases, including I think probably most recently by Judge

18   Trust in In re Orion Healthcorp, Inc., 596 B.R. 228, 236

19   (Bankr. E.D.N.Y. 2019).

20           A Rule 2004 request is a different procedural

21   device.  Its purpose is to enable parties in interest to

22   determine whether they have a claim and/or to take discovery

23   otherwise pertinent to the administration of the case or the

24   Debtor's assets.

25           MR. CREADORE:  May I respond to that, Judge?

Page 27

1          MR. BICKFORD:  Actually --

2          THE COURT:  But maybe you want the bankruptcy

3     lawyer to respond.

4          MR. BICKFORD:  Your Honor, this is Scott Bickford

5     with Mr. Creadore for the NAS children.  The issue that you

6     bring up is that the NAS children, because of the manner in

7     which the pleadings have been filed in this case,

8     specifically the disclosure statement which omits

9     qualification and eligibility for NAS children is at the

10    heart of the issue because there had been no qualification,

11    there has been no eligibility set.  And although we've been

12    privy to the iterations of the TDP, which will control

13    whether or not these NAS children actually have a claim,

14    presently the Debtor has embraced a position which will

15    require us to augment scientific information regarding

16    certain claims so that the children can have a claim within

17    the bankruptcy.  Otherwise, because there has been a

18    requirement thus far of scientific proof on behalf of the

19    NAS children, not the adult victims, but just the NAS

20    children, and that scientific proof is contained within

21    toxicology statements, some of which have been provided by

22    Mundipharma already in this case readily within a number of

23    days.  And I think our request is that we get the remaining

24    toxicology statements not provided to the DA or a definitive

25    statement from the Debtor that those don't exist.  And I

Page 28

1    think that the Court brought that up in December, and we're

2    bringing it up again, that this is what's sought after, and

3    that's why it's sought after.

4            And as long as the cloud remains as to the

5    qualifications and eligibility of any who participate in

6    this bankruptcy and those qualifications are specifically

7    left out of the disclosure statement, then we're in this

8    box.  And that's where this discovery is aimed, Your Honor.

9            THE COURT:  I guess partly I'm confused because

10   none of this point was made in any of the pleadings, which

11   is very frustrating to me.  I'm also confused because I

12   don't understand what you mean by cannot participate in

13   these cases.  Are you saying cannot participate in the sense

14   of getting a distribution on account of an allowed personal

15   injury claim, or in some other way?

16           MR. MCCLAMMY:  Your Honor, Jim McClammy for the

17   Debtors.  May I be heard for just one moment?

18           THE COURT:  Well, unless it's to say that the

19   issue I'm raising is not an issue, I'd like to continue my

20   question of counsel for the NAS Ad Hoc Committee.

21           MR. MCCLAMMY:  It does pertain to that, Your

22   Honor, and was only to raise a slight objection to the

23   discussion of something that's not before the Court, which

24   is the repeated referral to a trust distribution procedure

25   that still remains very much in discussion and has not been

1   finalized.  So I only raise that point, Your Honor.

2              THE COURT:  Okay, fine.

3              MR. BICKFORD:  And, Your Honor, I would agree with

4   that.  And the problem is that the trust distribution

5   agreement, while the Debtors say it is not finalized, I

6   don't know -- it is they that are (indiscernible) at this

7   point.  But that document is covered, according to the

8   Debtors at least at this point, by a privilege of mediation

9   because it was discussed in mediation.  And it makes it very

10  difficult.  I can only tell you at this point what our

11  understanding of the last iteration is.  And I can tell you

12  that the disclosure statement filed by the Debtor

13  specifically omits qualification and eligibility for NAS

14  children to participate in getting a claim at all.  And --

15             THE COURT:  Well, I'm sorry, let me --

16             MR. BICKFORD:  And that is the issue and that's --

17             THE COURT:  That's my question.  I have before me

18  a description from the disclosure statement of the NAS Class

19  9 claims, which is the NAS Monitoring Claims.  We're not

20  talking about that, right?  That's a separate --

21             MR. BICKFORD:  That is correct, Your Honor.

22             THE COURT:  But that description also says, "All

23  PI claims held by NAS children or their states or guardians

24  and all related claims against release parties or

25  shareholder release parties will be channeled to the PI

1    trust as discussed below."

2            MR. BICKFORD:  And that is correct.  And there is

3    a statement within the disclosure statement which says that

4    we have omitted qualification and eligibility criteria.

5            THE COURT:  I'm sorry, we have what?  We have

6    omitted?

7            MR. BICKFORD:  Qualification and eligibility

8    criteria from the disclosure statement.

9            THE COURT:  We have omitted -- you have to explain

10    to me the import of that.  What does that mean?

11            MR. BICKFORD:  Well, I perceive what it means is

12    that the criteria which someone is qualified or eligible to

13    participate in the PI pool of money dedicated to adult and

14    NAS victims has been purposely left out of the disclosure

15    statement and is going to be contained in some future-filed

16    trust distribution procedure.  But as it stands right now,

17    neither the eligibility or the qualifications for an NAS

18    claimant to claim money has been disclosed, or according now

19    to the Debtor, is still in a state of flux.

20            THE COURT:  Well, isn't it just -- well, that may

21    be the case.  But the plan says all PI claims of NAS

22    children and their estates or guardians will be channeled to

23    the PI trust.  So as we now stand, it's a PI claim, whatever

24    that is.  Right?  You have to show claim for a personal

25    injury.

Page 31

1          MR. BICKFORD:  It is a PI claim, but whether or

2     not I qualify or I am eligible to make that claim within the

3     trust is the issue.  And --

4          THE COURT:  Isn't that the same thing for any

5     personal injury claimant whether they have a claim or not?

6          MR. BICKFORD:  The answer would be yes.  But in

7     terms of how the last iteration of the trust distribution

8     procedure unfolds, the children basically have to produce

9     scientific data to raise the claims that they can be

10     monetized with.  And --

11          THE COURT:  Okay.  So would any personal injury

12     claimant have to produce something to justify their claim if

13     there's an objection to the claim.

14          MAN:  No.

15          THE COURT:  No?  PI claimants don't have to prove

16     their claim in some way, shape, or form if there is an

17     objection?

18          MR. BICKFORD:  Well, if there's -- I wasn't the

19     person that said no, Your Honor.  And the issue is in this

20     case what's being asked is in fact -- what's being asked to

21     support those claims is the information that we're asking

22     for in this motion.

23          THE COURT:  How is it being asked if there's no

24     objection to the claims on file yet?  There's no -- I don't

25     understand how it's being asked.  If it were asked, it would

Page 32

1    be part of a contested matter.

2              MR. BICKFORD:  Simply put, the requisite for us to

3    file a claim based upon what we understand now TDP is will

4    require the information that we're seeking from the Debtor.

5              THE COURT:  But the claims are already filed.

6    There's a bar date.  They're filed already.

7              MR. BICKFORD:  In order for the claim to be

8    eligible or qualify.

9              THE COURT:  What else would it be other than a

10   personal injury claim?

11             MR. BICKFORD:  That I have a specific injury that

12   is or is not covered.

13             THE COURT:  Right.  So what else would it be other

14   than a personal injury claim?

15             MR. BICKFORD:  I --

16             MR. MARKOWITZ:  Judge, this is Scott Markowitz.  I

17   think what we're trying to say is that no one's going to be

18   objecting to claims here.  There's going to be a person

19   appointed, as in other of these kind of cases, that applies

20   points and then makes a distribution based upon those

21   points.  There's no objections to claims.  The Debtor is not

22   objecting to claims.  Nobody is objecting to claims here.

23   It's just there's going to be a process --

24             THE COURT:  I'm assuming -- well, maybe I'm

25   missing something.  But I'm assuming that if Mary Smith

Page 33

1    files a claim that is not based on fact, is not based on

2    anything, that there will be an objection to her claim by

3    whoever is administering the trust.  It's not fair to all

4    the other people that have real claims.

5            MR. MARKOWITZ:  If there's something that extreme.

6    But there's not really claims like that.  There's claims of

7    children who were born with various levels of problems.  And

8    in order to ascertain the amount of points to determine a

9    dollar amount, I think what Mr. Bickford is saying is that

10   these reports, this information that we believe the Debtor

11   has, and I know the IACs have produced it, helps to provide

12   that information to the claims reviewer so that that can --

13   that the sufficient number of points to monetize that claim

14   can be ascertained.  And without that information, it's

15   solely in control of the Debtors.  It hampers the ability to

16   monetize a claim on a scoring grid.  And these documents are

17   in the possession of the Debtor is what we believe.  And

18   that's what he's saying.

19           THE COURT:  You know what?  You guys have got to

20   write this out for me.  This is the third iteration of the

21   reason for this motion.  This is ridiculous, honestly.  If

22   that's what you're fighting about, you should spell it out.

23   I could think of a response right now, Mr. Markowitz, to

24   what you just told me, which is that if all of these claims

25   are going to be allowed as filed, why does a toxicology

Page 34

```
 1    study that goes to liability not a strength of a claim?  Why

 2    is it relevant in the first place?

 3             MR. THOMPSON:  This is Kevin Thompson, Your Honor,

 4    for the NAS.  I'm an environmental attorney and I deal with

 5    these issues constantly.  They don't go to liability.  They

 6    go to the strength of the claim.  They go to the issue of

 7    causation.  And the issue that has been presented by the

 8    defendants and the industry in a number of depositions is

 9    that while there may be association with the long-term

10    effects of NAS that has been proven, there is not causation

11    that has been proven.

12             We would of course argue with that.  And the best

13    evidence we have found to support our causation arguments

14    have come from the documents that have been adduced through

15    the informal discovery.  That informal discovery has also --

16             THE COURT:  I'm sorry, I'm going to have to

17    interrupt.  Isn't causation another word for liability?

18             MR. THOMPSON:  No, Your Honor.  Specific and

19    general causation in toxicology and in toxic cases of

20    injury, the liability is they breach some sort of

21    responsibility.  The causation goes to you may have been

22    guilty of releasing a toxin or a pharmaceutical into the

23    market or into the environment that may have caused an

24    injury or may have been a breach of your duty.  But with

25    each individual claimant or plaintiff or class member, there
```

Page 35

1    generally has to be a general causation and a specific

2    causation established before you can recover.  And that's

3    where we are.  The liability is not an issue in a case like

4    this.  It's often not an issue in a matter of environmental

5    class distribution of funds.  But what is a matter is

6    whether or not you have general and specific causation for a

7    class member, claimant, mass tort participant.

8              And the only place on earth we're going to find

9    these is here.  It's not overburdensome because the IACs

10   have already signed an agreement and did it over a weekend.

11   We think that there's -- plus, the IAC response showed us

12   that there were -- when they gave us their list, we found

13   all sorts of studies that we couldn't find anywhere else.

14             That only people on earth that are going to do

15   this kind of animal toxicology for the manufacturers, and

16   Purdue in particular, years before the new drug application

17   was filed -- this is what they don't want to give us, this

18   is where the truth lies.  No one else on earth will ever do

19   this.  And toxicology, animal toxicology is the crux of

20   proving specific and general causation.  Association is but

21   one part of that.  These studies done in the 80s and 90s,

22   this is the proof that everyone needs.  It's also critical

23   for our abatement efforts.

24             THE COURT:  All right.  I repeat myself.  I like

25   to see things in writing.  I think that is due to the

Page 36

1    parties generally.  There is a well-established principle

2    that's inherently in the bankruptcy rules that when one is

3    dealing with a specific, in your words, defense to a claim,

4    you follow the Part 7 rules, not the Rule 2004 rules.

5           Now, maybe there's something I'm missing here.

6    But we've now spent 15 minutes on this.  And, frankly, I'm

7    hearing enough self-contradictory statements and still don't

8    understand the context in which you're seeking it at this

9    point, which is nowhere in the pleading, that you're going

10   to have to supplement it with something that actually

11   focuses on why you want this.  And I don't need to hear from

12   a fifth lawyer from the NAS Committee on that issue.

13          Now, as far as the other points that are raised

14   here, the Debtors have stated in Paragraph 22 of their reply

15   with I guess on exception that they have in fact provided

16   everything or that your clients have everything, the

17   exception being CCDS for

                              hydromorphone hydrochloride.  My

18   inclination pending anything else is to have the NAS

19   Committee take oral examination of whoever is the document

20   custodian that has informed the Debtors of the facts that

21   they are alleging in Paragraph 22 and generally the facts

22   that they are alleging in their reply or objection to the

23   March 19 request, including with respect to the "central

24   repository" in Stamford, Connecticut and the company core

25   data sheets.

Page 37

1              MR. BICKFORD:  Thank you, Your Honor.

2              MR. MCCLAMMY:  Your Honor, Jim McClammy, Davis

3     Polk, on behalf of the Debtors.  May I be heard just

4     briefly?

5              THE COURT:  Sure.

6              MR. MCCLAMMY:  Thank you, Your Honor.  Really just

7     want to address the one point.  And we appreciate Your

8     Honor's time.  And I think we've all been struggling with

9     some of the same issues that Your Honor has raised here to

10    exactly what this goes to.  But I didn't want to leave the

11    misimpression that was created by NAS counsel on the record

12    without responding.

13             They mentioned that the studies that they're

14    asking for are things that the Debtors do not want to

15    provide and that the IACs have provided within just a matter

16    of days.  As we set out in our papers and as Your Honor has

17    noted, we have in fact provided the NAS Committee with the

18    information that we believe is available on all of these

19    studies.  And as a matter of practice, these things as we

20    understand it are kept as part of the NDAs and the

21    investigatory NDAs and those things have been made available

22    to them, as the NAS Committee and themselves cited.  Dr.

23    Landau testified as his deposition already that all studies,

24    both clinical and preclinical, intended to support the

25    approval and registration of a product are part of the new

Page 38

1   drug applications and therefore are submitted to the FDA.

2   And that's the reason for that.

3          And to the extent that they're looking for the

4   possibility that some other study was either in the

5   possession of the debtors, the only way for us to look for

6   that would be to have some guided search.  And they have

7   asked us to now -- all the materials that were provided to

8   the UCC, which includes information from over 50 custodians

9   going back in many cases more than 25 years, which resulted

10  in us producing 680,000 documents to the UCC, of which they

11  ran their search terms through.  And we didn't tell them

12  which search terms to run or not run.  They were able to

13  take a look through.  And that produced I think 260,000 of

14  the Debtor's documents.

15         And so to the extent that they believe that there

16  are other studies out there, it is likely that those studies

17  or references to them would be contained within the results

18  of the material that they've already provided.  And I do not

19  believe they've completed a review of those materials.  And

20  we would ask that to the extent that we're back at this and

21  I do think that, obviously Your Honor is correct, this is

22  not a matter for Rule 2004.  But to the extent we're back

23  here even in another context, the information that's being

24  sought should be informed by the review of the material they

25  already have access to.

Page 39

1          With that, unless Your Honor has any further

2     questions, I will end my remarks there at this time.

3          THE COURT:  Well, I do have this question.  I've

4     been assuming, but maybe I'm wrong about this, that there is

5     a person or maybe a department at the debtors that in

6     essence has responsibilities for these types of documents

7     and that enables the Debtors to state in their response to

8     the March 19 request the statements that they make in

9     Paragraphs 19 through 22, including Footnote 15, which

10    states that, among other things, there simply is no

11    repository of information or studies not submitted to the

12    FDA.

13          So is there an archivist or a department that is

14    responsible for keeping such studies?

15          MR. MCCLAMMY:  It is our understanding that this

16    would be included in the regulatory affairs function.  That

17    being said, Your Honor, I'm not sure that it is one

18    particular person.  We have over the course of the year-plus

19    in addressing the inquiries for the NAS Committee consulted

20    with a number of both present and former employees to

21    provide the information that we have provided.  And --

22          THE COURT:  Well, but I think we need to have the

23    equivalent of a 30(b)(6) to be the person who is deposed on

24    this as to the Debtor's efforts to comply with the discovery

25    requests and their document retention pertaining to these

1    requests.

2            MR. MCCLAMMY:  And is Your Honor thinking that --

3            THE COURT:  I completely agree with your

4    statement, which is consistent with the chambers conference

5    we had on this late last summer that before one makes the

6    argument that something hasn't been produced, the documents

7    that have been produced, including through the production to

8    the Creditors' Committee, need to be searched.  And if there

9    is a belief that additional searches would be warranted, I

10   think it's incumbent upon the parties to discuss additional

11   search terms that weren't used before.  And I say that by

12   saying both parties, both sides on this.  And I don't have

13   the impression that that's been done yet.

14           MR. MCCLAMMY:  Thank you, Your Honor.  And just

15   one question regarding the deposition.

16           THE COURT:  Well, we can get to that in just a

17   second.

18           It may be that this was brought on, and it was

19   brought on a request for an expedited hearing because of

20   some relevance to the parties' discussions over the

21   disclosure statement.  But frankly, that appears nowhere in

22   the pleadings.  And what I'm being told by three or four

23   different counsel on the phone didn't make a whole lot of

24   sense.  So unless it can be put in a more focused manner, I

25   don't want to proceed today and run the risk of tripping

Page 41

1     over the Part 7 rules for contested matters, which would be

2     a claim objection, as opposed to going ahead with Rule 2004

3     discovery.  Other than I think -- because I believe this is

4     important -- having at least the best-situated person be

5     deposed to the Debtor's document retention and document

6     production with respect to the specific categories of

7     information sought in these requests.  That does not include

8     information held by third parties.  That type of request

9     needs to be made of a third party, obviously.  But requests

10    pertaining to information in the Debtor's possession,

11    custody, or control.

12           Now, Mr. McClammy, you were going to say something

13    about the deponent or the deposition?

14           MR. MCCLAMMY:  Just one question, Your Honor.  And

15    that is whether Your Honor is envisioning kind of a sitting

16    deposition or if it's to be done by, for example, a

17    deposition by written questions that we can respond to and

18    have a response done under oath.  My only concern is an

19    unfocused effort to kind of go beyond the scope of just mere

20    document retention issues on what should be a fairly

21    straightforward endeavor.

22           THE COURT:  All right.  Well, I don't know.  Have

23    the parties discussed that all?

24           MR. CREADORE:  No we haven't, Your Honor.  And I

25    think -- this is Don Creadore, by the way, speaking on

Page 42

1    behalf of the NAS Committee.  And I would prefer that the

2    parties do discuss that prior to making any representations

3    as to how to proceed.  But our initial inclination would be

4    that we would want an actual examination and not done by

5    written interrogatories.

6            THE COURT:  Okay.  That's fine.  You can discuss

7    that.  I mean, one of my problems with the two motions was

8    that it wasn't really clear to me what documents were being

9    sought.  So I think even if the deposition is live and in

10   person, although you all should discuss whether live and in

11   person means by Zoom or literally in person.  I think you

12   should narrow down what documents or categories of documents

13   you're talking about so that the person who is being deposed

14   can prepare herself or himself with sufficient information

15   to be ready to answer those questions, which would include

16   potentially and probably likely talking to other people at

17   Purdue.

18           MR. CREADORE:  That's all sensible, Your Honor.

19   And I suspect ourselves and the Debtors can work to some

20   type of amenable understanding going forward.

21           I would like the Judge to note though that yes, we

22   have been given many, many documents, terabytes of

23   documents.  But yet having to go through them in a workman-

24   like fashion creates quite a burden.  Many different levels

25   of protocols to get the documents.  And even the last

Page 43

1    instance when we talk about the company core data sheets, of

2    which we know by reference to its table of contents in one

3    of the exhibits we submitted, there's no less than 13

4    burdens.  So, understandably, we ask them for providing

5    copies of versions 1.0 to version 13.0, for example.  And

6    the response was, well, you have all those documents, and

7    here are the Bates ranges for them.  And that may be

8    suitable, but I will let you know that going to each Bates

9    range and dragging down these documents and certifying that

10   they are the proper and accurate documents certainly seems

11   to be an extra added step.  And would seem to be not a great

12   burden for the Debtors since they do maintain we think

13   (indiscernible) records that they at least --

14           MR. MCCLAMMY:  I'm sorry, Your Honor, if I may --

15           THE COURT:  But that's -- no, no, you don't have

16   to.  That's the responsibility of the party taking

17   discovery.  You know, this is a committee made up of

18   lawyers, litigators who take discovery.  You could do the

19   search term for the CCDS.  You know, if you want to rely on

20   the debtors to respond, I don't get it.  That's like asking

21   them again.  Search the documents for the term.  That's what

22   they would be doing.  Company core data sheets.

23           MR. JOHNSON:  Kevin Johnson, Your Honor, the

24   documents are not in this collection.  The NDL documents

25   only included those documents that were provided in support

Page 44

1    of those studies in support of the new drug application.

2              MR. MCCLAMMY:  I'm sorry, Your Honor --

3              THE COURT:  But I was responding to the prior

4    statement by I think Mr. Creadore that it's burdensome on

5    the NAS Committee to search for those documents, that it's

6    even burdensome to read the documents identified with the

7    Bates numbers.  Yes, discovery is burdensome on both sides.

8    But the burden to read what's already been produced is on

9    the party to whom it's been produced.

10             MR. MCCLAMMY:  And Mr. Creadore is well aware that

11   in addition to providing the Bates numbers for the CCDS, we

12   also provided one copy of the actual documents themselves

13   and provided that to them over a file-sharing website and

14   then provided the actual PDF when they were having trouble

15   with the site.  So it's not the case that we're only

16   providing Bates numbers.  We've oftentimes provided the

17   actual documents themselves.

18             THE COURT:  But I guess -- I mean, that's fine.

19   That's nice.  But I just -- you know, yes, this is an

20   expensive process.  When you ask for a lot and you say I

21   want everything that could potentially cover the subject,

22   that's what you get.  And then you have to search it.

23             MR. CREADORE:  This is Don Creadore.  I appreciate

24   your concerns, Judge.  And it wasn't meant to create an

25   issue about burdens, by the way.  It was just more

Page 45

1    conversational.  So my apologies we went --

2              THE COURT:  Well, I thought you were asking me to

3    rule on something, and I just did.  All right?  So I did.

4              MR. CREADORE:  Thank you.

5              THE COURT:  All right. So is everyone clear about

6    what's to happen next?  There should be a meet and confer

7    where you talk about the subject matter, namely the

8    documents that you want to have confirmed have been looked

9    for.  And the physical nature of the deposition, whether

10   it's interrogatories or live deposition.  And if it's live,

11   whether it would be conducted remotely or in person.

12             And then if you want to brief the issue as to the

13   applicability of Rule 2004 to the parties to the disclosure

14   statement.  And the treatment of the PI claims that are NAS

15   claims, you need to separately brief that and get a hearing

16   date on it.  Although perhaps the deposition will resolve

17   that issue.  Thank you.

18             MR. HUEBNER:  Your Honor, Marshall Huebner.  Just

19   one question from my end.  I think that when you had ruled a

20   little while ago, you said that they first had to finish

21   going through the documents they already had and actually

22   know what they had and didn't before they would then proceed

23   to a deposition.  I hope that that also stands as part of

24   the ruling.

25             MR. CREADORE:  Your Honor, if I may be heard.  The

Page 46

1    enormity of the documents that have been produced I think

2    doesn't mandate that we provide that type of representation.

3    I know we will have a focused examination on the topics that

4    are of most interest and required for due diligence on

5    behalf of PI claims of NAS children.

6              THE COURT:  Well, I think -- look, you're going to

7    be asking questions of this witness like what have you done

8    to search for a -- I forget the term --

9              MR. CREADORE:  Toxicology study?

10             THE COURT:  A company core data sheet, series of

11   drafts.  And I think that I can't imagine anyone asking that

12   question and being prepared for a deposition without having

13   already searched the documents that have been provided for

14   that term, similarly.

15             MR. CREADORE:  Agreed.

16             THE COURT:  So I just -- this deposition is only

17   going to happen once.  So if there's, again, a question for

18   the witness about a central depository in Connecticut, I

19   can't imagine asking that question and being well-informed

20   to follow up on it unless you do the search of the documents

21   that have already been produced for those terms.  But again,

22   I'm not going to direct another deposition if that -- you

23   know, if you say, well, now we've searched and we have more

24   questions.  That's just backwards.  So I'm assuming you will

25   do targeted searches -- if you haven't already, maybe you

Page 47

1    have -- for each of the types of documents you want to

2    follow up on to verify the statements that are in the

3    Debtor's response that they have diligently looked for and

4    provided everything that was responsive.

5            MR. THOMPSON:  Yes, Your Honor.  This is Kevin

6    Thompson.  We have done said searches.  We continue to do

7    them.  And we have --

8            THE COURT:  But if you're continuing to do them,

9    you haven't done them yet.  You ought to finish it and have

10   the deposition when you're done.  Otherwise it's a waste of

11   time.

12           MR. THOMPSON:  They gave us two terabytes of

13   documents, Your Honor.  And --

14           THE COURT:  That's why you do searches.  That's

15   why you do (indiscernible) searches.

16           MR. THOMPSON:  We are employing machine learning,

17   typical searches, artificial intelligence, predictive

18   searches, predictive coding.  We are pulling out everything,

19   and we have been.  And we will be prepared for this

20   deposition, Your Honor.

21           THE COURT:  Okay, good.  That's fine.  That's what

22   I wanted to hear.  Okay.  All right.

23           So, Mr. Huebner, I'm assuming they will do it.  If

24   they haven't, it will be in large measure a wasted

25   deposition.  But I don't think these lawyers will do that be

Page 48

1    they're dedicated lawyers.

2            MR. HUEBNER:  Thank you, Your Honor.  It sounds

3    like we've all heard what we need to do today.

4            Your Honor, does that bring us to number two, or

5    are there other items that other people would like to

6    further discuss on the NAS "2004 motion"?

7            THE COURT:  I think that brings us to number two

8    then.

9            MR. HUEBNER:  Okay.  So let me turn the podium

10   over to Mr. Paul Breene.  Your Honor, just so the Court is

11   aware, just as a quick stage-setter for the pretrial

12   conference, the insurance assets are obviously of extreme

13   importance as a valuable asset of the estate.  As the Court

14   surely remembers, they are the only item in this case where

15   the Debtors agree to share standing, you know, temporarily

16   with the AHC and the UCC.  You know, obviously showing

17   respect and involvement to two of our core creditor groups

18   in a somewhat unusual way.  And this is I think the next

19   foray forward on insurance issues.  Davis Polk is not

20   handling this today.  And so if it is okay with the Court, I

21   would turn the podium over to Mr. Paul Breene, who I think

22   is going to kick off for the company and creditors.

23           THE COURT:  Okay, that's fine.  So just to be

24   clear, we are here in Purdue Pharma L.P. against AIG

25   Specialty Insurance Company, et al, Adversary Proceeding 21-

Page 49

1    07005.  And this is the initial pretrial conference in this

2    adversary proceeding.  There is a scheduling order in place.

3    It's a rather short one, and it's been agreed by the

4    parties, which reflected the adjournment of the initial

5    conference in light of, among other things, the adjourned or

6    extended date for the defendant to answer or move, which was

7    yesterday, and also laid out a date for the plaintiffs to

8    oppose any such motions and then the defendant's reply to

9    those opposition papers.  That's in a March 5, 2021

10   scheduling order.

11            So I have read I believe the letters from certain

12   counsel, including from Mr. Breene from Reed Smith and

13   counsel for various insurers, including Mr. Schiavoni from

14   O'Melveny and Ms. Marrkand from the Mintz Levin firm with

15   respect to their views as to what should be accomplished

16   today.

17            I am also aware that a number of motions were

18   filed yesterday consistent with the scheduling order either

19   joining in an earlier motion seeking withdrawal of the

20   reference with regard to this adversary proceeding, a motion

21   for a stay in light of the arbitration provisions and

22   various insurance agreements with regard to certain of the

23   insurer defendants.

24            So with that, I just want to let you know what

25   I've been through as far as reading material.  So, Mr.

Page 50

1    Breene, you can go ahead.

2          MR. BREENE:  Thank you, Your Honor.  Paul Breene,

3    Reed Smith, insurance counsel to the Debtors.  I just want

4    to make sure you can hear me well.

5          THE COURT:  I can hear you fine, thanks.

6          MR. BREENE:  Okay.  Thank you very much, Your

7    Honor.

8          As Your Honor is aware, you entered the

9    stipulation granting joint standing to the Debtors as well

10   as the Ad Hoc Committee of Governmental and Other Contingent

11   Litigation Claimants, as well as the Official Committee of

12   Unsecured Creditors.  So the three constituencies, all are

13   plaintiffs in this adversary proceeding.  While I will be

14   kicking it off and we'll be happy to respond to Your Honor's

15   questions, I know that at the very least Rick Leveridge of

16   Gilbert representing the Ad Hoc Committee and potentially

17   Warren Usatine of Cole Schotz representing the UCC may also

18   be chiming in with respect to this matter.

19         Your Honor, our -- when you granted the

20   stipulation seeking joint standing for the three

21   constituencies, that was on January 20th, you specifically

22   said there's no reason for any delay in resolving the

23   Debtor's insurance claims.  And we couldn't agree with you

24   more.  We feel that this matter should move forward as

25   expeditiously as possible.

1           As Your Honor is aware, we are seeking

2   approximately $3.3 billion worth of insurance proceeds.  And

3   that is a -- as Mr. Huebner has indicated and as all counsel

4   in the January 20th hearing indicated, that is a very

5   significant asset of the estate and has significant

6   ramifications for the implementation and confirmation of the

7   plan.  We don't think there's any basis for delaying in any

8   way proceeding with this matter.  And as a result, we have

9   sought to, pursuant to Your Honor's rules, we sent the

10  insurance companies, back on March 17th, the week before the

11  originally-scheduled conference, a proposed scheduling

12  order.  And that scheduling order would have a close of

13  discovery six months after this Court decided the various

14  motions which of course were expected to be made at the time

15  and now have been made as of yesterday, or January 28th.  We

16  also asked that a final pretrial conference be scheduled for

17  June 28th -- or June 16th, I'm sorry, or as soon as the

18  Court could hear it.

19           THE COURT:  June 16th, 2022, right?

20           MR. BREENE:  Yes, I'm sorry.  January 28th, 2022

21  and June 16th, 2022, yes.  And that schedule that we

22  proposed, Your Honor, did, you know, we felt take

23  significantly into account the fact that we knew that the

24  insurance companies intended to make the various motions

25  that they made yesterday.  It took into account the briefing

Page 52

1    schedule that had been agreed upon and it took into account

2    some time for Your Honor to decide those, to hear those

3    motions and decide them.  And that is why, frankly, we

4    proposed a schedule which we believe is significantly longer

5    than ordinary bankruptcy adversary proceeding schedule would

6    go.  But it did recognize that there would be some

7    preliminary motion practice in the beginning.

8            I'd like to get to the various arguments that have

9    been made in which the insurance companies have sought to

10   delay this matter.

11           As an initial matter, as the Court is aware, on

12   March 22nd, or actually I guess it was the Friday before,

13   the insurance companies sent Your Honor a letter seeking to

14   adjourn the scheduling conference.  And Your Honor denied

15   that request.

16           Thereafter we had a meet and confer on March 22nd

17   a couple days before the originally-scheduling conference,

18   pretrial conference, in which we sought to get some

19   agreement on a schedule for discovery and the final pretrial

20   and trial of this matter.

21           It became clear at the time that in fact the

22   insurance companies would like to not schedule anything but

23   in fact would like to wait until all of the motions have

24   been decided, both the motion to withdraw the reference,

25   which is currently pending before Judge Karas, as well as

Page 53

1    the motions that were expected at the time and now have been

2    made to stay this matter pending arbitration and also to

3    dismiss the matter on the grounds of lack of personal

4    jurisdiction which were made by certain of the foreign

5    insurance companies.

6            For various reasons, Your Honor, we don't think

7    that any of those motions or the pendency of the motion to

8    withdraw the reference warrant any delay whatsoever in the

9    schedule that we have proposed.  And just to briefly touch

10   on the issues, a significant issue that the insurance

11   companies have relied upon is that they should not be

12   subjected to discovery at this point if they are seeking to

13   stay the matter, you know, in favor of arbitration or if

14   they are seeking to have the matter dismissed because the

15   Court lacks personal jurisdiction.

16           In our view, discovery should go forward, Your

17   Honor.  And we of course don't intend, and I know the Court

18   would not intend to prejudice those arguments.  But it is a

19   simple matter we think that the Court could direct that

20   discovery move forward and that that discovery and parties'

21   participation in that discovery would not be a waiver of any

22   of their jurisdictional or defenses.  I think that that

23   could be done.

24           And the reality is, Your Honor, they've indicated

25   that if they get dismissed and they go on to arbitration or

Page 54

1    elsewhere that the discovery that we're seeking would be a

2    waste of time.  And in fact -- and that same argument has

3    been made with respect to those insurance companies that

4    have either made or joined the motion to withdraw the

5    reference.  And, Your Honor, we feel nothing to be further

6    from the truth.  Getting this thing moving, getting close to

7    a decision on the insurance asset is enormously important,

8    as Mr. Huebner has said, as all the counsel in the various

9    constituencies seeking this insurance have said, it is

10   enormously important and central to the plan and will have a

11   significant impact on both the allocation and timing of

12   estate proceeds, you know, once that gets to the

13   (indiscernible).  And we feel that there is no reason to

14   delay this matter by several months.  We think it will all

15   end up here before Your Honor because we think it belongs

16   here.

17          But even if that is incorrect and ultimately this

18   matter splits into what the insurance companies would like,

19   which would be 16 separate arbitrations and another matter

20   before the district court, none of the work that gets done

21   now will be a waste of time.  And therefore on that matter

22   we think the Court should move forward.

23          Another issue that's been raised as a reason that

24   the Court should not move forward is that some -- and I

25   believe it's as of last night maybe four or five -- of the

Page 55

1    insurance companies will be demanding a jury trial.  The

2    fact of the matter is we will contest that they have a right

3    to a jury trial with respect to this matter.  But even in

4    fact if this Court determines that they have a right to a

5    jury trial, as the Court has indicated and ruled in the

6    Windstream case, even if this Court cannot constitutionally

7    make a final determination, the Court certainly can make

8    findings of fact and conclusions of law and the Court can

9    submit this matter to the district court right at the end in

10   a trial-ready manner so as not to have delay and so as to

11   have been able to handle the case management and all of the

12   preliminary matters in a manner consistent with moving

13   forward with the plan and the estate.

14            So the other matter, Your Honor, is we of course

15   believe that this is a core proceeding and it will be in

16   front of this Court.  And we are in the process of briefing

17   and opposing Liberty Mutual's motion to withdraw the

18   reference, which our response to that at this point is due

19   at the same time that our oppositions to all the other

20   motions that were filed yesterday is due, on May 3rd.  And

21   because we believe it's core or we think it will all remain

22   before this Court -- and, Your Honor, even if it's not core

23   or even if the Court rules that there are issues that are

24   going to be tried in front of a jury and therefore the final

25   adjudication is beyond this Court's constitutional

1    jurisdiction, we think the best place for this matter and

2    the place where it will end up residing is before this

3    Court.  And therefore, we ask that the Court enter our

4    scheduling order as we have submitted it.  And it was

5    submitted with my letter on March 22nd as Document 32 in

6    this adversary proceeding and set a briefing deadline and

7    the final pretrial conference.

8              And with that, Your Honor, I would ask that my co-

9    plaintiff counsel in this matter, Rick Leveridge, be allowed

10   to chime in and add whatever he thinks should be added.

11             THE COURT:  Yeah, go ahead.  You may be on mute.

12   I don't know.  Or you may just not want to add anything,

13   which is fine.  All right.

14             Mr. Breene, you answered one of my questions,

15   which is whether the motion to withdraw the reference that

16   was filed in March has gone to the district court and been

17   assigned to a district judge.  And you've confirmed that

18   it's been assigned to Judge Karas.  I did have some other

19   questions though.

20             Your proposed pretrial order contemplates close of

21   discovery in the adversary proceeding six months after a

22   ruling on a motion to dismiss.  I'm assuming that would also

23   -- well, you also say or a date in January of 2022.  In any

24   event, you're contemplating six months of discovery after

25   the ruling on the motions to dismiss, correct?

1           MR. BREENE:  Your Honor, yes, although we put an

2     end date on that of January 28th.  But of course if the

3     court felt that a minimum of six months and potentially with

4     all of these motions which are -- I think the final briefs

5     are due May 20th.  And granted there's a lot of motions and

6     it may take a little longer for this Court to hear them and

7     decide them.  And I think that certainly from the Debtor's

8     perspective, and I won't speak for the committees, but I

9     would assume that they would agree that if it took a little

10    longer for the Court to decide those motions and all of

11    those motions, we would extend that January 28th date so as

12    to allow six months of discovery.

13          MR. LEVERIDGE:  Your Honor, this is Rick Leveridge

14    on behalf of the Ad Hoc Committee.  I think I had some

15    technical difficulties before.  Can you hear me?

16          THE COURT:  Yes.  I can hear you fine now.

17    Thanks.

18          MR. LEVERIDGE:  Thank you.  I'm very sorry for the

19    -- I'd just like to add to what Mr. Breene just said.  First

20    of all, we do envision discovery starting now.  So the fact

21    that we used the dates of the earlier of six months from

22    when you rule on the motions or January 28th, it wasn't our

23    intention, and I certainly don't want to have any confusion

24    for the Court, we envision that discovery would proceed now,

25    not wait until you -- because we do think that discovery

Page 58

1    should proceed now.  And the Debtor in fact has made clear

2    to the insurers that once the insurers sign the protective

3    order in these cases, without prejudice, as Mr. Breene said,

4    to their position on personal jurisdiction or arbitration,

5    that the Debtor will provide a substantial number of

6    documents to them to get the ball rolling.  And of course we

7    would proceed with discovery as appropriate in the time

8    between now and the rulings on the motion.

9            So it's not a -- we weren't going to start as of

10   the time of your ruling.  We put that in, frankly, to engage

11   the insurers in a negotiation on a schedule because they had

12   already indicated that the motion was a significant

13   milestone for them.  Frankly, unfortunately, as Mr. Breene

14   said, we had the meet and confer.  We provided them with our

15   schedule.  They refused to even engage on a schedule.  So I

16   want to reinforce Mr. Breene's submission that we believe

17   that the schedule we have submitted, that the insurers have

18   refused to provide an alternative to, should be the schedule

19   that the Court enters.

20           THE COURT:  Okay.  So this leads to my second

21   question, which is really a two-parter.  First is in my

22   experience, insurance litigation is largely document-based,

23   if not entirely.  Each side argues the plain meaning of the

24   documents at issue.  I'd like to have a better sense from

25   the plaintiffs as well as the defendants as to what sort of

Page 59

1    discovery is contemplated here and why it would take

2    potentially eight or nine months.

3            MR. LEVERIDGE:  Your Honor --

4            MR. BREENE:  Your Honor --

5            MR. LEVERIDGE:  Go ahead, Paul.

6            MR. BREENE:  Your Honor, this is Paul Breene from

7    Reed Smith again.  Your Honor, we don't disagree with you

8    that it doesn't -- it shouldn't take that long.  I mean, we

9    were -- you know, the schedule we proposed was, as Mr.

10   Leveridge indicated, to try to engage and come to an

11   agreement.  We are making an assumption on what the

12   insurance companies would want.  I mean, as Mr. Leveridge

13   indicated, we are -- it's our intention to make, you know,

14   literally tens of millions of documents essentially

15   available as soon as the insurance companies are willing to

16   sign the acknowledgement that is required under the

17   protective order in place in this case.

18            And again, one of the objections to that has been

19   that they can't sign the acknowledgement because that would

20   subject them to personal jurisdiction or somehow prejudice

21   the arbitration arguments.  And our view on that, Your

22   Honor, is that this Court can easily order that such a move

23   which would expedite discovery enormously, at least from the

24   policyholder, the Debtor's perspective, would not prejudice

25   those claims.

1           And what typically takes a long time, Your Honor,

2    is a lot of discovery against the policyholder here, the

3    Debtor.  But in this instance, which is somewhat unique,

4    virtually every document under the sun at Purdue, at the

5    Debtor, has either been produced or certainly is an

6    electronic format.  And we believe we can get our discovery

7    out essentially very quickly.  We assume the discovery that

8    the insurance companies will want will be relating to

9    similar matters that were produced in the underlying cases

10   as well as specific to the insurance.  We are prepared to

11   produce those almost immediately.

12          The discovery that we will be seeking from the

13   insurance companies -- and I certainly will allow Rick

14   Leveridge to expound on this as well -- would be their

15   claims files and their underwriting files essentially.  Also

16   potentially how they have treated other opioid policyholders

17   with similar claims.

18          But, you know, it is a finite amount of discovery.

19   It's pretty specific. And the only other aspect that I can

20   see, our seeking is -- you know, again, those motions came

21   in yesterday.  Among them is the motion with respect to

22   personal jurisdiction.  We believe we have enough

23   documentation and enough information to successfully oppose

24   that motion.  But again, having not been through that motion

25   entirely, it may be that some personal jurisdiction

Page 61

1   discovery of those insurance companies that have made the

2   motion to dismiss on personal jurisdiction grounds may be

3   required.

4            And, Rick, if you had additional...

5            MR. LEVERIDGE:  I don't have anything additional

6   other than to say that we would -- once we've reviewed the

7   briefs that came in last night, if there's jurisdictional

8   discovery, we would be prepared to initiate that as soon as

9   possible.

10           THE COURT:  Okay.

11           MR. SCHIAVONI:  Your Honor, this is --

12           THE COURT:  Go ahead.

13           MR. SCHIAVONI:  Your Honor, this is Tancred

14   Schiavoni for O'Melveny for the arbitration insurers.  May I

15   be heard at this point?

16           THE COURT:  Well, I have one other question before

17   I turn to the defendants, which is a subset, I think it's

18   about half of the defendants, apparently don't have the

19   personal jurisdiction defense or lack of personal

20   jurisdiction defense.  And they may well be overlapping to

21   some extent.  But, again, a significant number of defendants

22   don't have arbitration provisions in their policies, or at

23   least have not sought a stay in light of such provision.

24           Did you discuss in your meet and confer, and if

25   not do you have views on taking discovery of the parties

Page 62

```
 1    that are not subject to the arbitration issue or the

 2    personal jurisdiction issue and not as to the others?

 3              MR. BREENE:  Your Honor, we -- I'm sorry, Paul

 4    Breene again, insurance counsel for the Debtors.  We did

 5    discuss that.  In fact, it was raised by one of the

 6    insurance company's lawyers.  And we responded that we would

 7    be seeking discovery as to all insurance companies, those

 8    with the arbitration clauses and those with personal

 9    jurisdiction issues, as well as those without.

10              It is not our intention to set up sort of a two-

11    tier discovery process here.  We think that discovery should

12    move forward as to all insurance companies.  We think the

13    Court can easily render the issue that has been raised as to

14    participation in discovery when the arbitration, insurance

15    companies, and personal jurisdiction insurance companies

16    feel that they may not ultimately be before the Court and

17    protect those rights so that -- and the discovery would move

18    forward.  And the discovery would be used.  I mean, the

19    discovery would be used in -- if in fact there are

20    ultimately this insurance coverage adversary proceeding

21    pending here and 16 arbitrations pending around the world,

22    the arbitration insurance companies will still use the same

23    discovery and it will have already been done.  And

24    therefore, it will never be a waste of time and it will move

25    this process forward even if it is delayed by the fact that,
```

Page 63

1   you know, certain of these insurance companies end up in

2   arbitrations around the world.

3          THE COURT:  Okay.  All right.  Mr. Schiavoni, do

4   you want to go ahead?

5          MR. SCHIAVONI:  Yes, Your Honor.  Thank you very

6   much.  It's Tancred Schiavoni from O'Melveny.

7          Your Honor, I represent Arch Bermuda and Chubb

8   Bermuda here.  But the insurers have tried to work together

9   to present as little argument as possible.  So what we've

10  done is I will speak on behalf of my two clients, but we

11  submitted a letter to you on behalf of those insurers that

12  have arbitration, mandatory arbitration provisions and

13  personal jurisdiction motions.  And Kim Marrkand will speak

14  to you on behalf of the other insurers.

15         There are 13 insurers that have mandatory

16  arbitration provisions.  They are identified in the letter I

17  submitted to you.  11 of those insurers have also brought

18  motions to dismiss based on lack of personal jurisdiction.

19  These are insurers that by and large are based in Bermuda or

20  London where all of the insurance process, the underwriting,

21  placement, brokering of the insurance takes place in those

22  cases.

23         These insurers represent -- it's about half of the

24  25 defendants in the insurance adversary proceeding.  And,

25  Your Honor, I submit to you really briefly and I'll try to

Page 64

1    get right to the point why it is that especially with regard

2    to these insurers, it's premature to go forward.  But really

3    on behalf of all the insurers, it's premature.

4            First, Your Honor, we negotiated with Mr. Breene a

5    briefing schedule for these motions.  We made a number of

6    concessions to make sure that that briefing schedule was

7    prompt.  It is a prompt schedule.  The motion on the

8    arbitration to stay based on the arbitration, mandatory

9    provisions, and the personal jurisdiction provisions sets a

10   schedule where they be fully briefed by May 20.  That's a

11   short schedule, it's prompt.  Those motions will be fully

12   briefed very much in the near term.

13           The same is true with respect to the motion to

14   withdraw the reference.  They're going to be briefed very

15   quickly.  We have a district court judge assigned, and I'm

16   certain he's going to get to those motions quickly.  Second,

17   Your Honor -- so this is not an effort to delay the case by

18   any means at all.

19           Second, in light of the nature of the motions that

20   are before the Court, it really would be prejudicial to go

21   forward and set a pretrial order at this time rather than

22   after May 20, and particularly one that deals with far-

23   reaching discovery, which Mr. Breene, to his credit, has

24   been very candid that that's exactly what he seeks here.

25   The arbitration provisions, the mandatory arbitration

Page 65

1    provisions for the contracts, one of their very purposes is

2    to keep the insurers and the policyholders that agree to

3    them from being embroiled in this very kind of type of

4    discovery.  So to have them submitted to the discovery

5    before their motions could be heard is prejudicial, Your

6    Honor.  And at a bare minimum we would ask --

7              THE COURT:  Can I interrupt you on that point?

8              MR. SCHIAVONI:  Yes, Your Honor.

9              THE COURT:  Have the two sides discussed what

10   discovery they believe would be an element of the

11   arbitration proceedings if the litigation were stayed as to

12   those defendants in deference to the arbitration?

13             MR. SCHIAVONI:  There's not been meet and confers

14   on that issue, Your Honor, as the parties have focused on

15   trying to bring these motions forward as fast as possible.

16             THE COURT:  Well, I mean, I guess what I'm hearing

17   is the debtors are offering to provide you a head start if

18   you want it on a range of documents that probably would far

19   exceed what would be required in the arbitration, but you

20   would have a head start on it.  It wasn't really clear to me

21   what they would be seeking from your side pending a ruling

22   on the stay motions which would probably come in early June.

23   I am assuming it could be pretty narrowly tailored, at least

24   during that period, to what would be forthcoming in any

25   event in the arbitration.  So I don't see why the parties

Page 66

1    wouldn't discuss that at this point.

2             MR. SCHIAVONI:  Well, Your Honor, I think there's

3    likely to be significant disagreement about what the nature

4    and scope of the discovery would be permitted against the

5    carriers with --

6             THE COURT:  No, no, no.  Because you haven't even

7    talked about it.  So I think you've got to talk about it.

8             MR. SCHIAVONI:  We would -- Your Honor, to be

9    clear on this, we would ask at a minimum that we be able to

10   brief that issue if we do not have agreement on it, and that

11   we be permitted --

12            THE COURT:  Oh, of course.  Of course.  That's a

13   separate point.  But I don't understand why people don't

14   think practically.  If the rationale is that you would be

15   prejudiced by having discovery go forward pending a ruling

16   on the stay motions, I guess it is conceivable that under

17   the applicable arbitration rules, and different insurers

18   have different rules, there would be literally no discovery.

19   But I find that a little hard to believe.  And I think this

20   group of litigators probably knows pretty well what is a

21   definite amount of discovery that would happen.  And that's

22   all that I would have in mind during an interim period that

23   people should reasonably agree on, as opposed to discovery

24   that would be up to the discretion of the arbitrators.

25   Which I agree with you, it would be prejudicial to have

Page 67

1    taken place before a determination of the stay motion.

2          MR. SCHIAVONI:  Judge, even with respect to the

3    discovery that has been volunteered, look, I appreciate the

4    notion of trying to reach practical ways to go forward.  But

5    even with respect to that, the notion is that the foreign

6    defendants here that believe that they have motions for lack

7    of personal jurisdiction, Mr. Breene is asking them all to

8    submit themselves to the jurisdiction of this Court by

9    entering into the protective order in this Court, to

10   participate in that discovery.  And really what we're

11   talking about here is a relatively short period of time to

12   get these motions fully briefed before Your Honor or before

13   the district court.  And, you know, the deciding court at

14   that point would have a much better sense of what the issues

15   are with regard to the arbitration provisions.  And we're

16   really just talking about less than 60 days to do that.  So

17   those would be two of the reasons.

18          And the third reason, Your Honor, on why we think

19   that the scheduling order at this time is premature is we do

20   have a motion to withdraw before the district court.

21   Liberty Mutual has moved on that.  The arbitration insurers

22   have brought a separate motion to withdraw the reference.

23   We join in Liberty Mutual's motion.  We feel that the

24   reference should be withdrawn in its entirety.  But the

25   arbitration insurers here have really separate and

Page 68

1    independent grounds to withdraw the reference based on what

2    are really sort of somewhat unique facts here, but facts

3    that other courts have looked at involving the Federal

4    Arbitration Act, application of the New York Convention,

5    which is a treaty, and the very, very strong deference that

6    the Supreme Court has given to enforcement of arbitration

7    proceedings, especially involving international treaties, as

8    this one would here.

9            Your Honor, the motions on arbitration are well-

10   founded.  In the FM Global case as well as in ResCap, Judge

11   Glenn and Judge Lane, involving very similar groups of

12   insurers, you know, all stayed in favor of arbitration.  We

13   think these are well-founded motions.

14           But the effort here to sort of move forward in

15   light of just a May 20 schedule is not really borne out by

16   what the overall context of this case is.  Importantly, the

17   plan of reorganization is not contingent on insurance or the

18   availability of insurance proceeds.  Everybody went into the

19   plan eyes open on that issue.  It's quite clear from the

20   plan that the plan will be confirmed before there is a final

21   order in the adversary proceeding.  There is not a need to

22   move forward on a schedule here that tramples the

23   substantive rights of the arbitration insurers, Your Honor.

24           We're really just asking for what we think is a

25   very short delay so that when either Your Honor or the

Page 69

1    district court decides this motion or enters a discovery

2    order, it's got before it all of the motions that we have,

3    has a better understanding of the proceedings, and that

4    whatever order is then entered is entered with that

5    knowledge and that it's a good order based upon the issue

6    fully being briefed before the Court. We're not seeking any

7    real delay here. We'd have we think a decision on this very

8    quickly after May 20. Thank you, Your Honor, for listening

9    to me.

10           THE COURT: Okay. I appreciate that you've tried

11   to coordinate this. I don't know if anyone else wants to

12   speak from the defendant's side.

13           MS. MARRKAND: Yes, Your Honor. This is Kim

14   Marrkand. I represent Liberty Insurance Corporation. For

15   the record, Liberty Mutual Fire Insurance Company and

16   Liberty Mutual Insurance Company, Your Honor. And I appear

17   today with my co-counsel, Mr. (indiscernible). Thank you

18   very much, Your Honor, for the opportunity to be heard.

19           So we are not, pardon me, one of the parties that

20   is in arbitration here or a party that's raised personal

21   jurisdiction as Your Honor had identified. But I think it's

22   important to give you a little context about who Liberty

23   Mutual is, Your Honor.

24           And we issued approximately 23 prepetition

25   policies to Purdue Pharma. And, Your Honor, they span the

Page 70

1    years 2003 to 2017.  And we believe that none of them

2    provide coverage.  Really just to cut to the chase, because

3    all of our policies exclude coverage for any Purdue

4    products.  And, Your Honor, when I say that, I also mean the

5    tower above us, all of the other excess insurers, call them

6    the non-arbitration insurers.  And this is an unusual case.

7    And we know -- you know much better than me, Your Honor.

8    You have been steeped in this case since it was filed.  But

9    one of the things, and it was even telling in the earlier

10   motion discussion, Liberty Mutual and all of the other

11   insurers, whether arbitration insurers or not, none of us

12   have been involved in anything to do with Purdue's

13   bankruptcy.  And I know Your Honor knows the plan.  I know

14   you know very much about the mediators.  All of that has

15   taken place without Liberty Mutual or the other insurer.  We

16   have never been involved in any of that.  So we are neither

17   a part of nor a problem that needs to be addressed for the

18   plan to be confirmed, as Mr. Schiavoni said.  And I think,

19   Your Honor, this is a very unusual case where expediency for

20   expediency's sake just doesn't justify a discovery order at

21   this time.

22          And what our recommendation is, Your Honor -- and

23   I know it is a big recommendation to the Court -- is that

24   you defer entering any pretrial order until we know who will

25   be in the case.

1        THE COURT:  That's contrary to how the district

2    courts handle motions to withdraw reference and share the

3    work with the bankruptcy judges over the last 15 years.

4        MR. MARRKAND:  Your Honor, I'm sorry, I didn't

5    mean to interrupt.

6        THE COURT:  I mean, unless a district judge has a

7    real yen to take on an entire case, the clear practice in

8    the Southern District of New York is to let the bankruptcy

9    judge manage the adversary proceeding unless and until it

10   gets to a trial.

11       MR. MARRKAND:  Your Honor, and we are very

12   familiar with that and we know that.  And that's why we

13   understand that in those cases though, my understanding of

14   them, Your Honor, is they were not Purdue Pharma like.  And

15   what I mean by that here that here, by that, Your Honor, is

16   that this is, as you know, a case where Purdue Pharma's

17   solvency is not at issue, where plan confirmation does not

18   turn on the assets that may or may not be recovered.  The

19   settlement, the mediated settlement had nothing to do with

20   the insurers.  And respectfully, Your Honor, I think the

21   norm isn't this case.  And that is why, yes, often the

22   district court does defer to the expertise of the bankruptcy

23   court.

24       But here, Your Honor, that's why what we would

25   respectfully request at a minimum is -- Liberty Mutual filed

Page 72

1      its motion to stay.  We would like you to see that, Your

2      Honor, and why this case is different.

3                  Under the briefing schedule, --

4                  THE COURT:  I'm sorry.  You filed a motion to stay

5      or a motion to withdraw the reference?

6                  MR. MARRKAND:  Both, Your Honor.  The motion to

7      withdraw the reference has been assigned, and Judge Karas

8      has that.  We were waiting to file the motion to stay this

9      action until we could see if we could get on your docket for

10     May 20th.  And --

11                 THE COURT:  I'm sorry.  What is the basis for a

12     motion to stay?

13                 MR. MARRKAND:  The motion -- because, Your Honor,

14     we believe that this is the exceptional case where the

15     motion to withdraw the reference could very well be granted.

16     And what we are asking --

17                 THE COURT:  I'm sorry.  Maybe you just didn't

18     understand me on this point.  The allocation of work between

19     the district courts and the bankruptcy courts where there is

20     a motion to withdraw the reference is not a question of

21     deferring to the bankruptcy judge's expertise in bankruptcy

22     matters.  It's an allocation of the work that we do.  The

23     district courts -- and I know for a fact that the district

24     judges that sit in this courthouse are really busy.  And

25     they decide really important matters, such as whether people

Page 73

1    go to jail or not for years.  And generally speaking -- and

2    it doesn't matter whether it's a bankruptcy matter that's

3    important to a case to the extent that it is core

4    (indiscernible), or a simple litigation where the debtor is

5    seeking to augment its estate, will defer to the bankruptcy

6    judge to manage the case until, if it ever does, get to

7    trial.

8              MR. MARRKAND:  Yes, Your Honor.  We recognize

9    that.

10             THE COURT:  This is -- so I guess you can file a

11   motion for a stay to be heard sometime next month.  But to

12   me, that seems like a waste of time.  I understand clearly a

13   motion to stay in light of the Federal Arbitration Act.

14   That's not a waste of time.  That's important.  And I

15   appreciate that it was done promptly and that there is a

16   prompt briefing schedule set on it.

17             But a motion to stay pending an argument or on

18   withdraw the reference, give me a break.

19             MR. MARRKAND:  Yes, Your Honor, I --

20             THE COURT:  You know, there is a point where

21   insurers really do have to be careful about denying

22   coverage.  And delay can be denied.

23             MR. MARRKAND:  Your Honor, I can -- I'm not tone

24   deaf to the frustration from the bench.  I appreciate it and

25   I understand it.  But I would like to say in terms of delay,

Page 74

1    if it would consider just one thing, which is the insurers

2    have been here all this time.  That's why I mentioned that

3    our policies to back to '03.  You've had this bankruptcy

4    petition in front of you for a long time.  We never got any

5    notice at all, Your Honor.

6          The delay -- so I know I'm -- I hope I'm not

7    trying your patience, but I hope the exasperation might be

8    refocused on the debtors here, who are very strategic, Your

9    Honor, who got everything lined up, who came before you in

10   January as if to say oh, we forgot about the insurers.

11   Absolutely not true, Your Honor.  They waited until they

12   could do -- and that's a strategic decision.  And they are

13   entitled to file their adversary proceeding whenever they

14   want.  But in terms of delay, Your Honor, we haven't

15   delayed.  As soon as we got served, we were on the phone

16   with Mr. Breene.  And I think, with all candor, the parties

17   have had a very cordial and professional relationship.  And

18   they have discussed in good faith how to move this along.

19   And that's why we tried to do an expedited briefing

20   schedule.

21         We would be -- I understand too -- all of the

22   defendant insurer, Your Honor, understand the uphill battle

23   we faced to convince you, frankly, about the merits under

24   this particular set of circumstances that a stay may be

25   warranted.

Page 75

1         All I would ask is the briefing on our motion to

2    stay closes May 20th.  That is a date -- an omnibus hearing

3    date.  We would be more than happy, Your Honor -- we filed

4    our motion.  Debtor's response, or plaintiff in this case,

5    response is due May 3rd.  And our reply is due May 20.  We

6    could easily move that up a week, serve our reply on May

7    14th, and then be in front of you on May 20th.  And we also

8    understand, Your Honor, very much about the burden on the

9    district court.  We understand that.

10        And we would not be here -- nobody would appear --

11   I can't speak for everybody.  I know my client would not let

12   me appear before you as an officer of the court and make a

13   specious or silly argument unless we had very strong

14   grounds.  You may decide, Your Honor, that they're not

15   grounds enough.  But I do think this is the extraordinary

16   case that merits a close look by you.  And that's why we've

17   taken these extraordinary steps knowing, as I said, it's an

18   uphill battle.

19        I think when we were discussing with plaintiff's

20   counsel a scheduling order, what we were trying to do was

21   say could we at least wait until we see if you, Your Honor,

22   would consider staying this action.  All of that could be

23   resolved, I suspect, by May 20th.  Because I suspect you

24   will come on the bench if -- May 20th -- if we can get on

25   your agenda that day, we were trying to work with chambers

1    to do that -- you will come prepared with a ruling.  I think

2    what we're trying to do here is understand what discovery

3    needs to be taken of whom and by whom.  And what we are

4    trying to avoid, Your Honor, is chaos.  Ten million -- I

5    just heard, I think it was Mr. Breene maybe say tens of

6    millions of documents.  That's not a normal coverage case,

7    Your Honor.  We don't do that here.  And we're trying to be

8    practical using your word.  And we know enough about you.

9    You don't want us wasting your time.  What we're trying to

10   do is not waste everyone's time --

11          THE COURT:  I don't understand why you are not

12   discussing now, whether it's going to be taking place in the

13   district court or here, what discovery would be warranted.

14   Why don't you have that meet and confer right now?  Why

15   don't you have it in March?

16          MR. MARRKAND:  Because, Your Honor, as Mr.

17   Schiavoni said, we were trying to work out a compromise with

18   the debtors.  And they were very frank.  They did not want

19   to delay discovery.  And so we came to what I would call an

20   impasse.  But we have certainly been looking at, for

21   example, the protective order.  And what Mr. Breene did

22   circulate, it is a protective order I think you're very

23   familiar with.  It's the third iteration or the third

24   amended protective order.  It's approximately 45 pages long.

25   And it deals with all of the other parties that have been in

Page 77

1   front of you.  Obviously none of the insurers.  And one of

2   the issues, Your Honor, is -- and please bear with me just

3   for another minute to explain the significance of the

4   protective order.  If the Court, Judge Karas, were to

5   withdraw the reference, we don't want to have a protective

6   order in place that works in the bankruptcy court but

7   involves all those other parties that seemingly imposes

8   certain obligations on any new party.  And there is some

9   irony in the version of the protective order being provided

10  to us.  It specifically excludes insurers.

11          Now, I think we can work that all out, and we

12  would probably have a new protective order.  And we are more

13  than willing to do that, Your Honor.  But as Mr. Schiavoni

14  pointed out -- and that's with the arbitration insurers.

15  But for the non-arbitration insurers, Your Honor, we can

16  definitely work with Mr. Breene on a protective order

17  because we know we're going to need that in whatever forum

18  we're in.

19          So to not monopolize the microphone, Your Honor, I

20  appreciate that you heard Mr. Schiavoni and me.  As I said,

21  what we're asking for is your consideration in this

22  extraordinary case under extraordinary circumstances for a

23  delay.  It is likely to be no longer -- no later I should

24  say -- until May 20th.

25          THE COURT:  Okay.  I have a couple of questions

Page 78

1    for the plaintiff's counsel.  But before that, if anyone

2    else on the defendant's side wants to say anything, I'm

3    happy to hear you.

4         MR. KOEPFF:  Your Honor, this is Paul Koepff from

5    Clyde & Co.  We represent Arch Re.  It's an arbitration

6    insurer and it's also an insurer moving for personal

7    jurisdiction.  Actually, the total number of insurers moving

8    in arbitration are 16 of the 25, three more have filed an

9    arbitration motion.

10        Your Honor, the only thing I'd like to point out

11   is we would like a chance to put before Your Honor, and of

12   course Mr. Breene can respond, the case law that

13   demonstrates when someone has a personal jurisdiction

14   defense, they're not obligated to get involved either

15   (indiscernible) seeking document discovery or responding to

16   document discovery.  And similarly, there's case law that

17   says there's no obligation that arbitration insurers filed

18   such a motion to seek discovery or to provide discovery.

19   And I think Mr. Schiavoni's letter, footnote, he cited one

20   of the cases.

21        So the only request I would say is if the

22   arbitration insurers, 16 of them, and overlapping the 11

23   personal jurisdiction insurers could put before Your Honor

24   the case law that says there shouldn't be merits discovery

25   until those motions are --

Page 79

1           THE COURT:  I don't think you need to do that.

2    I'm familiar with those issues.

3           MR. KOEPFF:  Thank you.  And nothing further, Your

4    Honor.

5           THE COURT:  Okay.  So going back to --

6           MR. MCNALLY:  Your Honor.  Your Honor.

7           THE COURT:  Go ahead.

8           MR. MCNALLY:  Daren McNally.  I represent Chubb

9    Bermuda with Tancred Schiavoni.  Putting aside whether or

10   not the personal jurisdiction questions whether or not the

11   debtor can force us to participate in a US-based discovery

12   before there has been a ruling on personal jurisdiction, I

13   just wanted to point out that the Bermuda foreign are very

14   unique and different from typical occurrence-based domestic

15   policies and will give rise to very different issues such as

16   whether or not there is an integrated occurrence, whether or

17   not the insured has satisfied a maintenance deductible, the

18   application of commercial risk exclusion.  These are all

19   very unique issues that really don't appear at all in

20   domestic policies.  So my only point is that discovery

21   wouldn't even be the same.  That's all.

22           THE COURT:  Okay.  All right.

23           MR. AUSLANDER:  Your Honor, this is Mitch

24   Auslander from Willkie Farr & Gallagher.  We are counsel to

25   a number of AIG insurers.

1          It's certainly very difficult to argue with the

2     notion, as Your Honor suggested, that people should talk

3     about whether there is any discovery.  I think it will be

4     difficult to reach agreement on it.  But at least on behalf

5     of my clients, we're perfectly happy to talk to Mr. Breene

6     and the other plaintiffs about voluntary discovery.  I think

7     it's highly unlikely, with all due respect, that there can

8     be an order requiring the arbitration insurers to engage in

9     discovery, but we're certainly willing to talk about it.

10         But the point I wanted to make is you asked Mr.

11    Breene before about the possibility of taking discovery from

12    the non-arbitration insurers.  And I agree with him that

13    having two-tier discovery is probably not a good idea.  We

14    think that it will cause confusion, duplication.  If anybody

15    comes back into the case, do-overs.  And given what Mr.

16    Schiavoni and Ms. Marrkand said about timing, which we agree

17    that we are on a relatively short timeframe, that it does

18    make sense not to go forward with discovery and certainly

19    not to tier discovery until those motions are decided.

20    Thank you.

21         MR. CALHOUN:  Your Honor, George Calhoun for

22    Ironshore Specialty Insurance Company.  I wanted to join in

23    the comments of my colleagues and also just to point out

24    that for one of my clients, Ironshore, we were before you

25    more than a year ago with a motion for relief from stay and

Page 81

1    were told that the debtors weren't ready to go forward.

2    They very much intentionally put these issues off.  The plan

3    is not contingent on it and is fully joined in the arguments

4    that it's reasonable to delay discovery until conclusion of

5    the arbitration of personal jurisdiction motions, if for no

6    other reason than the fact that a document dump of tens of

7    millions or ten million -- it doesn't really even make a

8    difference -- is an undertaking of a massive size and not

9    something that would be targeted, which is really what, if

10   we agree, we can discuss.  But it's targeted discovery, not

11   a document dump of over ten million documents from one of

12   the larger bankruptcies in recent memory.  Thank you, Your

13   Honor.

14          THE COURT:  Okay.  This is a question for Mr.

15   Breene or one of his colleagues.  You are offering, and it

16   sounds very generous, to provide the defendants with what

17   you believe is sort of the outer limits of what they would

18   ever want in the form of discovery promptly.  But it is

19   conditioned upon entry into an agreed protective order.

20          You said that you could do that with appropriate

21   reservations to ensure that those who are asserting either

22   lack of personal jurisdiction or a right to arbitration.

23   But given that it's a protective order that would be

24   enforced by the Court, how would you actually do that?

25   Wouldn't they be submitting at least to the Court insofar as

Page 82

1   that order was concerned and be bound by my enforcement of

2   it?

3          MR. BREENE:  Yes, Your Honor.  I'm sorry.  Paul

4   Breene for the Debtors.  Yes, Your Honor.  I think what I

5   was suggesting is that this Court potentially could use its

6   equitable powers to enter into a special order, frankly,

7   which would protect the personal jurisdiction and

8   arbitration, insurance companies' claims and against any

9   waiver based upon entering into a protective order.  That

10  was what I was suggesting.

11         THE COURT:  Okay.  All right.  Well, let me tell

12  you how I'm coming out on this.  To me, 60 days is actually

13  a meaningful time and should be used productively.  And I'm

14  very frustrated by the parties' inability to focus on how to

15  use that time productively besides briefing the issues that

16  are scheduled to be briefed before me.

17         Having said that, I do not believe that either

18  side is suggesting a two-tier discovery process.  And even

19  if one did, I would be reluctant to have us go down that

20  path.  Which means that there are two important gatekeeping

21  issues before me, at least I believe promptly before me.

22         The first is the argument made in a number of

23  recently-filed motions to dismiss that the Court lacks

24  personal jurisdiction over the movant.  And the second is,

25  again, the subject of a number of pending motions which

Page 83

1   seeks a stay in light of the arbitration provisions in the

2   applicable policies.

3           I am extremely reluctant, and I don't believe I

4   need briefing on this, to direct discovery pending my

5   decision on those motions.  I will come back to what I

6   believe should be done by the parties.  And I think their

7   failure to do it, even if I cannot compel them to do so --

8   and that issue remains open -- will be telling down the road

9   in the conduct of this litigation, wherever it is conducted

10  and potentially on issues regarding wrongful denial of

11  coverage.  But I'll come back to that.

12          I believe that the only discovery that needs to be

13  taken on a compelled basis is fact discovery on the issue of

14  personal jurisdiction.  The parties should promptly meet and

15  confer to discuss whether they intend to take the discovery,

16  and of course that's the plaintiffs, and work out a schedule

17  for doing so if they do intend to take such discovery.

18          If they cannot reach such an agreement, plaintiffs

19  (indiscernible) defendants want that discovery, you can set

20  up a discovery conference with me promptly and I'll resolve

21  that issue.

22          Because of the inadvisability of doing two-tier

23  discovery, those defendants who are not in the group that

24  have arbitration provisions or assert a lack of personal

25  jurisdiction in essence will get a free ride on compel

Page 84

1    discovery until I decide those motions.

2            I want to be clear, however, the Court has

3    continuing jurisdiction while a motion to withdraw the

4    reference is pending.  The case law is quite clear on that

5    and the policy behind it is quite clear.  One should not be

6    able to bring a halt to litigation in bankruptcy court where

7    the court clearly has subject matter jurisdiction while a

8    motion to withdraw the reference is pending and being

9    decided.

10            Moreover, although I will of course carefully

11   consider a motion to stay pending a decision on withdrawal

12   of the reference, as I've stated, the case law and practice

13   of the Southern District argues strongly that in 99 out of a

14   hundred such cases, the district court reserves on the

15   motion at the time where there would be a trial, if any, but

16   leaves it up to the bankruptcy court to manage litigation

17   process, including entering interlocutory orders before that

18   phase of the litigation.  And I do not see a basis for

19   delaying discovery because of pending motions to withdraw

20   the reference.

21            I also am perplexed by the notion that one could

22   withdraw a motion in an adversary proceeding, mainly a

23   motion to stay to compel arbitration.  I do not believe 28

24   U.S.C. 157(d) contemplates such an action.  And the case law

25   cited, albeit this will be for the district court to decide,

1    really doesn't go off on that basis, but rather reflects a

2    decision to withdraw the reference of the whole adversary

3    proceeding or counts within the adversary proceeding, not

4    with respect to a particular motion.  So that is I

5    appreciate largely gratuitous to you all.  But on the other

6    hand, I think gives you some guidance on where I will be

7    coming out.  If I decide that I have jurisdiction, personal

8    jurisdiction that is, and/or that the arbitration provisions

9    either don't apply to this litigation or conceivably are

10   overwritten by the Bankruptcy Code.

11           In the meantime -- and this should happen promptly

12   -- the parties should meet and confer so that wherever this

13   litigation goes, the 60 days are not wasted as the last

14   month has been and they start belatedly only on focusing on

15   the nature of discovery to be taken.  They should meet and

16   confer now as to first what discovery definitely would be

17   required in an arbitration proceeding.  Secondly, they

18   should meet and confer on the nature of a protective order

19   in that context that would be appropriate.  And thirdly,

20   they should meet and confer on limitations on the discovery

21   that the debtors are willing to provide under a protective

22   order, i.e. the targeted discovery that one of the counsel

23   for the defendants has said the defendants want.  To me,

24   that is all time well spent.  And the refusal to spend it I

25   believe would have consequences in any future litigation.

Page 86

1    So that should take place as well as the meet and confer on

2    the limited discovery pertaining to the personal

3    jurisdiction issue.

4              I don't know if anyone has any questions on that.

5              Okay, so I think it's clear what needs to be done.

6    And I would expect that you all will be talking about this

7    certainly by the end of this week and set up a meeting and

8    submit and I would hope agreed discovery schedule on the

9    discovery I am directing, which is as to the personal

10   jurisdiction point and also meet and confer as to the other

11   issues that I just described.

12             So unless anyone has any more questions, I think

13   that will conclude the conference.

14             MR. LEVERIDGE:  Your Honor, this is Rick Leveridge

15   on behalf of the Ad Hoc Committee.  Thank you for your

16   direction, and we will certainly do exactly what you've

17   directed us to do.  The one point that I don't want to be

18   lost in all of this is, you know, as we discussed at the

19   outset of this hearing, the schedule that we proposed is a

20   generous schedule.  And there's no -- you know, I just don't

21   agree with the point that we need to know who is in to set

22   the schedule.  We set the schedule based on an expectation

23   that these motions would not be successful and all of these

24   defendants are going to be in this case and would ask that

25   the court at least consider entering a schedule now based on

Page 87

1    the schedule we proposed because the insurers have refused

2    to engage.  And then the parties will know where we are.

3              THE COURT:  The schedule to me did not seem

4    unreasonable.  One of the reasons that I believe the parties

5    need to meet and confer, as I've discussed, is to ensure

6    that they will be prepared to discuss any further schedule

7    or any ramifications with respect to a schedule.  I will

8    treat the hearing on the motions to dismiss and the motions

9    for stay also on the calendar as a second pretrial

10   conference.  And if I deny those motions or any of them,

11   those parties and the other parties will need to be fully

12   prepared to discuss a discovery schedule, which is another

13   reason why, again, they need to meet and confer now to focus

14   on it.  And, frankly, I'm telling you right now six months

15   of discovery given what the Debtors have volunteered, which

16   will be narrowed and focused in the meet and confer that

17   I've already said should occur now, seems reasonable to me.

18              But I don't see a reason to set it at this point.

19   I think it's more properly set after determination of those

20   motions.  But I will have the second pretrial conference

21   that same day at that same hearing, and I'll set the

22   schedule then and be informed by what the parties have done

23   to refine their thinking on it between now and then.

24              MR. LEVERIDGE:  Thank you very much, Your Honor.

25              MR. KOEPFF:  Your Honor, this is Paul Koepff from

Page 88

1    Clyde.  Have you yet set a date for the hearing on the

2    motions?

3              THE COURT:  I haven't.  You need to speak to Ms.

4    Lee on that.  She is the person that handles my calendar,

5    and she's very good at it.  So she'll find you all a date.

6              MR. KOEPFF:  Thank you.

7              THE COURT:  Okay.  All right.  Anything else?

8    Okay.

9              MR. SCHIAVONI:  Nothing else, Your Honor.  Tancred

10   Schiavoni.  Thank you very much.

11             THE COURT:  Okay, very well.  So that concludes

12   today's agenda as well in the Purdue Pharma cases.  So,

13   hearing no one to the contrary, I'll hang up at this point.

14   Thanks, everyone.

15             (Whereupon these proceedings were concluded at

16   12:13 PM)

17

18

19

20

21

22

23

24

25

Page 89

1                        C E R T I F I C A T I O N

2

3        I, Sonya Ledanski Hyde, certified that the foregoing

4    transcript is a true and accurate record of the proceedings.

5

6

7

8    Sonya Ledanski Hyde

9

10

11

12

13

14

15

16

17

18

19

20    Veritext Legal Solutions

21    330 Old Country Road

22    Suite 300

23    Mineola, NY 11501

24

25    Date:  April 7, 2021