**Hearing Date: May 4, 2021 at 10:00 a.m. (ET)**
**Extended Objection Deadline: April 29, 2021 at 9:00 a.m. (ET)**

PILLSBURY WINTHROP SHAW PITTMAN LLP
Andrew M. Troop
Hugh M. McDonald
Andrew V. Alfano
Melissa S. Pettit
31 West 52nd Street
New York, New York 10019
212-858-1000

*Counsel to the Ad Hoc Group of Non-Consenting States*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | | |
|---|---|---|
| **In re:** | ) | Chapter 11 |
| | ) | |
| **PURDUE PHARMA, L.P., *et al.*,**[1] | ) | Case No. 19-23649 (RDD) |
| | ) | |
| **Debtors.** | ) | (Jointly Administered) |
| | ) | |

**THE AD HOC GROUP OF NON-CONSENTING STATES'**
**OBJECTION TO THE DEBTORS' MOTION TO APPROVE**
**(I) THE ADEQUACY OF INFORMATION IN THE DISCLOSURE STATEMENT,**
**(II) SOLICITATION AND VOTING PROCEDURES, (III) FORMS OF BALLOTS,**
**NOTICES AND NOTICE PROCEDURES IN CONNECTION THEREWITH,**
**AND (IV) CERTAIN DATES WITH RESPECT THERETO**

---

[1] The debtors in these chapter 11 cases ("Debtors" or "Purdue"), along with the last four digits of their federal tax identification numbers, are Purdue Pharma Manufacturing L.P. (3821), Purdue Pharma Inc. (7486), Purdue Transdermal Technologies K.P. (1868), Purdue Pharmaceuticals L.P. (0034), Imbrium Therapeutics L.P. (8810), Adlon Therapeutics L.P. (6745), Greenfield BioVentures L.P. (6150), Seven Seas Hill Corp. (4591), Ophir Green Corp. (4594), Purdue Pharma of Puerto Rico (3925), Avrio Health L.P. (4140), Purdue Pharmaceutical Products L.P. (3902), Purdue Neuroscience Company (4712), Nayatt Cove Lifescience Inc. (7805), Button Land L.P. (6166), Rhodes Associates L.P. (N/A), Paul Land Inc. (7425), Quidnick Land L.P. (7584), Rhodes Pharmaceuticals L.P. (6166), Rhodes Technologies (7143), UDF LP (0495), SVC Pharma LP (5717), and SVC Pharma Inc. (4014). The Debtors' principal offices are at One Stamford Forum, 201 Tresser Boulevard, Stamford, CT 06901.

## <u>TABLE OF CONTENTS</u>

Page

INTRODUCTION ............................................................................................................. 1

OBJECTION .................................................................................................................... 5

I. The Disclosure Statement Cannot Be Approved Because It Describes a Patently Unconfirmable Plan ...................................................................................................... 5

   A. The Non-Consensual Release of State Police Power Claims Renders the Plan Unconfirmable .................................................................................. 6

      1. The Third-Party Releases Are Not Justified Under the Second Circuit's Test in *Metromedia* ........................................................ 6

      2. The Plan Cannot Release State Police Power Claims Absent Specific Consent ................................................................. 10

      3. The Court Has No Subject Matter Jurisdiction to Grant Non-Consensual Third-Party Releases of Police Power and Other Non-Derivative Claims of Sovereign States ................................ 14

      4. The Court Does Not Have Jurisdiction to Grant Criminal Releases ........ 18

   B. The Plan Improperly Classifies States with Political Subdivisions ..................... 19

II. The Disclosure Statement Fails to Provide Adequate Information on Key Issues ........... 22

   A. The Disclosure Statement Fails to Describe the Risks of the Sackler Settlement Agreement ......................................................................... 24

   B. The Disclosure Statement Fails to Describe the Results of the Non-Cash Transfer Valuation Analysis by Bates White ............................................... 26

   C. The Disclosure Statement Fails to Describe the Public Document Repository ....................................................................................... 27

   D. The Disclosure Statement Fails to Describe What Amount Will be Required to be Paid on the United States' Claims .......................................... 28

   E. The Disclosure Statement Fails To Accurately Describe the Current Sackler Settlement .............................................................................. 30

   F. The Disclosure Statement Fails to Describe the Fiduciary Duties of the MDT Trustees ................................................................................... 31

   G. Solicitation Is Premature Because Unresolved Inter-Creditor Deals Must Be Completed, or Progress Materially ..................................................... 31

III. Other Objections ........................................................................................................ 32

i

A.      The Plan Supplement Must Be Filed Sufficiently in Advance to Allow
        Creditors to Make an Informed Decision.............................................................. 32

B.      The Plan Permits the Debtors to Make Plan Amendments in Violation of
        Bankruptcy Code Sections 1127(c) and (d).......................................................... 32

RESERVATION OF RIGHTS ................................................................................................. 33

CONCLUSION......................................................................................................................... 34

# <u>TABLE OF AUTHORITIES</u>

Page(s)

<u>Cases</u>

*Aetna Cas. & Sur. Co. v. Clerk, U.S. Bankr. Court (In re Chateaugay Corp.)*,
    89 F.3d 942 (2d Cir. 1996) ...................................................................................19

*Alfred L. Snapp & Son, Inc. v. Puerto Rico ex rel. Barez*,
    458 U.S. 592 (1982) .............................................................................................21

*Anvil P'ship v. Clifford/Sooner Drilling Program* (*In re Clifford Res., Inc.*),
    24 B.R. 778 (Bankr. S.D.N.Y. 1982) ....................................................................7

*Bank of New York Tr. Co. v. Official Unsecured Creditors' Comm. (In re Pac.
    Lumber Co.)*,
    584 F.3d 229 (5th Cir. 2009) ................................................................................6

*In re Beck Indus. (Feldman v. Trs. of Beck Indus., Inc.)*,
    479 F.2d 410 (2d Cir.1973), *cert. denied* 414 U.S. 858 (1973) .............................7

*Blixseth v. Credit Suisse*,
    961 F.3d 1074 (9th Cir. 2020) ..............................................................................6

*Callaway v. Benton*,
    336 U.S. 132 (1949) .............................................................................................15

*City of Sausalito v. O'Neill*,
    386 F.3d 1186 (9th Cir. 2004) ..............................................................................21

*Class Five Nev. Claimants v. Dow Corning Corp. (In re Dow Corning Corp.)*,
    280 F.3d 648 (6th Cir. 2002) .............................................................................7, 8

*Clinton v. Cedar Rapids & Mo. R. R. Co.*,
    24 Iowa 455 (1868) ..............................................................................................20

*Colorado River Indian Tribes v. Town of Parker*,
    776 F.2d 846 (9th Cir. 1985) ................................................................................21

*Connecticut v. Purdue Pharma L.P.*,
    No. X07 HHD-CV-19-6105325-S (Super. Ct. Apr. 22, 2019) ..............................16

*In re Curtis Ctr. Ltd. Partnership*,
    195 B.R. 631 (Bankr. E.D. Pa. 1996) ..................................................................19

*Deutsche Bank AG, London Branch & Bear, Stearns & Co., Inc. v. Metromedia
    Fiber Network, Inc. (In re Metromedia Fiber Network, Inc)*,
    416 F.3d 136 (2d Cir. 2005) ......................................................................... *passim*

*Dunaway v. Purdue Pharms. L.P. (In re Purdue Pharms. L.P.)*,
   619 B.R. 38 (S.D.N.Y. 2020) ........................................................................................13, 17

*Durant, Nichols, Houston, Hodgson, & Cortese-Costa, P.C. v. Dupont*,
   565 F.3d 56 (2d Cir. 2009) ...................................................................................................14

*El Paso Cty., Tex. v. Trump*,
   982 F.3d 332 (5th Cir. 2020) ...............................................................................................21

*In re Filex, Inc.*,
   116 B.R. 37 (Bankr. S.D.N.Y. 1990) ......................................................................................5

*FTC v. First Alliance Mortg. Co. (In re First Alliance Mortg. Co.)*,
   264 B.R. 634 (C.D. Cal. 2001) .............................................................................................13

*Galerie Des Monnaies of Geneva, Ltd. v. Deutsche Bank, A.G. (In re Galerie Des
   Monnaies of Geneva, Ltd.)*,
   55 B.R. 253 (Bankr. S.D.N.Y. 1985), *aff'd*, 62 B.R. 224 (S.D.N.Y. 1986) ...........................23

*In re Genco Shipping & Trading Ltd.*,
   513 B.R. 233 (Bankr. S.D.N.Y. 2014) ....................................................................................8

*Giammatteo v. Newton*,
   452 F. App'x 24 (2d Cir. 2011) ............................................................................................15

*Gillman v. Cont'l Airlines (In re Cont'l Airlines)*,
   203 F.3d 203 (3d Cir. 2000) ...................................................................................................7

*Hunter v. City of Pittsburgh*,
   207 U.S. 161 (1907) ..............................................................................................................20

*In re Iridium Operating LLC*,
   478 F.3d 452 (2d Cir. 2007) .................................................................................................24

*Johns-Manville Corp. v. Chubb Indem Ins. Co. (In re Johns-Manville Corp.)*,
   517 F.3d 52 (2d Cir. 2008), *vacated & remanded on other grounds*, 557 U.S.
   137 (2009), (2d Cir. 2010) ...................................................................................................15

*Kunica v. St. Jean Fin., Inc.*,
   233 B.R. 46 (S.D.N.Y. 1999) ................................................................................................23

*Landsing Diversified Props.-II v. First Nat'l Bank & Tr. Co. of Tulsa (In re W.
   Real Estate Fund, Inc.)*,
   922 F.2d 592 (10th Cir. 1990) ................................................................................................6

*Makarova v. United States*,
   201 F.3d 110 (2d Cir. 2000) .................................................................................................15

*Massachusetts v. Purdue Pharma L.P.*,
   No. 1884-cv-01808 (Super. Ct. Jan. 31, 2019) ........................................................16

*In re Millennium Lab Holdings II, LLC.*,
   945 F.3d 126 (3d Cir. 2019)................................................................................7

*Minnesota v. Purdue Pharma L.P.*,
   No. 27-CV-18-10788 (Dist. Ct. Aug. 5, 2019) ........................................................16

*Nat'l Heritage Found., Inc. v. Highbourne Found.*,
   760 F.3d 344 (4th Cir. 2014) .............................................................................7

*Nessel ex rel. Mich. v. AmeriGas Partners, L.P.*,
   954 F.3d 831 (6th Cir. 2020) ............................................................................12

*New Hampshire v. Purdue Pharma*,
   No. 17-cv-427-PB, 2018 WL 333824 (D. N.H. Jan. 9, 2018) ................................11

*Oneida Motor Freight, Inc. v. United Jersey Bank*,
   848 F.2d 414 (3d Cir. 1988)..............................................................................23

*In re Phx. Petroleum Co.*,
   278 B.R. 385 (Bankr. E.D. Pa. 2001) ................................................................5-6

*Prince George's Cty., Md. v. Levi*,
   79 F.R.D. 1 (D. Md. 1977)...............................................................................22

*Purdue Pharma, L.P. v. Ky.*,
   704 F.3d 208 (2d Cir. 2013).............................................................................11

*In re PWS Holding Corp.*,
   228 F.3d 224 (3d Cir. 2000)...............................................................................6

*In re Quigley Co.*,
   377 B.R. 110 (Bankr. S.D.N.Y. 2007)..................................................................5

*Resorts Int'l v. Lowenschuss (In re Lowenschuss)*,
   67 F.3d 1394 (9th Cir. 1995) ..............................................................................6

*Rhode Island v. Lead Indus. Ass'n, Inc.*,
   No. 99-5226, 2001 WL 345830 (Super Ct. Apr. 2, 2001) ....................................21

*In re Sabine Oil & Gas Corp.*,
   555 B.R. 180 (Bankr. S.D.N.Y. 2016).............................................................14, 15

*SE Prop. Holdings, LLC v. Seaside Eng'g & Surveying., Inc. (In re Seaside Eng'g*
   *& Surveying, Inc.)*,
   780 F.3d 1070 (11th Cir. 2015) ...........................................................................7

*SEC v. Drexel Burnham Lambert Grp., Inc. (In re Drexel Burnham Lambert Grp., Inc.)*,
    960 F.2d 285 (2d Cir.1992)..................................................................................7

*Town of Brookline v. Operation Rescue*,
    762 F. Supp. 1521 (D. Mass. 1991) ...................................................................22

*West Va. v. CVS Pharmacy, Inc.*,
    646 F.3d 169 (4th Cir. 2011) .............................................................................11

*Wyeth v. Levine*,
    555 U.S. 555 (2009)...........................................................................................11

## Statutes and Codes

United States Code,
    Title 11, Section 101(27) ...................................................................................12
    Title 11, Section 105 .....................................................................................12, 13
    Title 11, Section 362 ..........................................................................................13
    Title 11, Section 524...................................................................................6, 12, 14
    Title 11, Section 1122...................................................................................3, 6, 19
    Title 11, Section 1125.................................................................................22, 32, 33
    Title 11, Section 1126(c).....................................................................................20
    Title 11, Section 1127.....................................................................................32, 33
    Title 11, Section 1129(a)(1)................................................................................19
    Title 28, Section 1452(a)....................................................................................12

## Rules and Regulations

Federal Rules of Bankruptcy Procedure,
    Rule 3018(a)........................................................................................................3
    Rule 9019 ......................................................................................................28-29

## Other Authorities

House Comm. On Oversight & Reform, *Committee Releases Documents Showing Sackler Family Wealth Totals $11 Billion* (April 20, 2021), *available at* https://oversight.house.gov/news/press-releases/committee-releases-documents-showing-sackler-family-wealth-totals-11-billion...................................................9

vi

To the Honorable Robert D. Drain, United States Bankruptcy Judge:

For its objection (the "Objection") to the Debtors' *Motion to Approve (I) the Adequacy of Information in the Disclosure Statement, (II) Solicitation and Voting Procedures, (III) Forms of Ballots, Notices and Notice Procedures in Connection Therewith, and (IV) Certain Dates with Respect Thereto* [Docket No. 2489] (the "Disclosure Statement Motion") and the *Disclosure Statement for First Amended Chapter 11 Plan for Purdue Pharma L.P. and Its Affiliated Debtors* [Docket No. 2734] (the "Disclosure Statement"),[2] the Ad Hoc Group of Non-Consenting States (the "Non-Consenting States")[3] respectfully states as follows:

## INTRODUCTION

1.        The Debtors' proposed Disclosure Statement purports to describe an end to a long journey to address the opioid crisis in America and the role that the Debtors and their controlling shareholders and families played in creating it.  The reality, however, is that the Plan fails to hold those responsible shareholders appropriately accountable and instead proposes that this Court override the independent sovereign judgments of the Attorneys General of each Non-Consenting State as to what is required to achieve accountability within their respective States.  There is no dispute that this crisis has impacted all of America.  Everyone, every State, has been required to deal with its horrible impact.  The economic costs to America have been, and continue to be, in the trillions of dollars, and the non-economic impact is unquantifiable.

---

[2]  The Debtors filed the *First Amended Joint Chapter 11 Plan of Reorganization of Purdue Pharma L.P. and Its Affiliated Debtors* [Docket No. 2731] on April 23, 2021 (the "Plan") and the Disclosure Statement on April 24, 2021.  The Disclosure Statement and Plan amend the *Disclosure Statement for Chapter 11 Plan for Purdue Pharma L.P. and Its Affiliated Debtors* [Docket No. 2488] and the *Joint Chapter 11 Plan of Reorganization of Purdue Pharma L.P. and Its Affiliated Debtors* [Docket No. 2487].  Capitalized terms used but not defined herein have the meanings given in the Disclosure Statement.  By agreement with the Debtors, the deadline for the Non-Consenting States to file this Objection was set as 9:00 a.m. on April 29, 2021, and the Non-Consenting States provided the Debtors with the then current working draft of this Objection on April 27, 2021.

[3]  California, Colorado, Connecticut, Delaware, the District of Columbia, Hawaii, Idaho, Illinois, Iowa, Maine, Maryland, Massachusetts, Minnesota, Nevada, New Hampshire, New Jersey, New York, North Carolina, Oregon, Pennsylvania, Rhode Island, Vermont, Virginia, Washington, and Wisconsin.

2.     Yet, despite their own admitted guilt, the Debtors seek to cram down an unconfirmable plan that, among other things, would absolve non-Debtor wrongdoers in exchange for the stretched-out payment of only a tiny fraction of their independent liability, unlawful gains, and current wealth, over the objection of Attorneys General from 24 States and the District of Columbia, representing 53% of the U.S. population.  This outcome is unjust, and the Plan, with its non-consensual releases of State sovereign claims, is unconfirmable as a matter of law.[4]

3.     To support their position that non-consensual third-party releases should be approved in these cases, the Debtors contend that the proposed payment from the Sackler Families is "important" and "necessary" to their ability to reorganize.  This argument may have fleeting appeal, but only because the Debtors have proposed a reorganization plan beyond their own means. The Debtors could reorganize without a Sackler contribution.  No payment from the Sackler Families is necessary to fund the Debtors' proposed post-confirmation operations, and no member of the Sackler Family is, or will be, involved in the Debtors' post-confirmation business.  Payment from the Sackler Families is only necessary to fund distributions premised on the receipt of the payment from the Sackler Families—a syllogism—not the kind of important and necessary contribution contemplated as a prerequisite for non-consensual releases of any kind, much less of non-consensual releases of State police power claims against non-debtors.

---

[4] The revised versions of the Disclosure Statement and Plan, currently on file with the Court, continue to omit critical provisions and information relating to the Sackler Families, including with respect to the releases proposed to be provided to them, the channeling injunction proposed to accompany those releases, and the timing of payments, all of which are subject to ongoing negotiations.  These omissions must be rectified before any solicitation is authorized, and additional time to supplement objections or raise new objections, if any, and for the Court to consider them, must be provided before any disclosure statement is approved.  Nonetheless, for purposes of this Objection, the Non-Consenting States assume that the Disclosure Statement and Plan proposed by the Debtors will ultimately include broad third-party releases of the Sackler Families.  Furthermore, these omissions are but two examples of critical omissions of adequate information from the Disclosure Statement.  Another such omission is the lack of any information or adequate description of the negotiated resolution of attorneys' fees among Non-Federal Public Claimants, and with Private Creditors that is a requirement of the various mediated resolutions in these cases.  The Non-Consenting States understand that these details remain blank because there is no final agreement to disclose.

4.      The Plan also is unconfirmable as a matter of law because it proposes an improper classification scheme under Bankruptcy Code section 1122 combining the States and political subdivisions, clearly a scheme to advance the Debtors' cramdown aspirations.   Under this proposed classification scheme, States, individually or collectively, could have their votes against or for the Plan nullified by the more numerous votes of their own or other States' political subdivisions, especially if the Debtors' other proposal to value each non-Federal governmental unit's claim at $1.00 for voting purposes is sustained.[5]   This classification scheme and voting limitation is not only inequitable but also violates the core of state sovereignty, upends the *parens patriae* powers of the States, and undermines the broad statutory, constitutional, and common-law powers that State Attorneys General have as chief law enforcement officers for their citizens.

5.      These objections to certain foundational pillars of the Plan should come as no surprise to the Court or other parties in interest.  Indeed, at the recent April 21, 2021 hearing, the Court, aware of open issues particularly involving the Sackler Families, proposed a further mediation before one of the Court's colleagues.  Following the Court's offer, the Non-Consenting States notified the Debtors and other stakeholders on April 22 that they are willing to participate promptly in mediation before a Bankruptcy Judge.  Although the Debtors advised that they were considering the offer, they otherwise have not responded to the Non-Consenting States other than to make clear their intent to proceed with this contested Disclosure Statement, so much of which involves unresolved issues with the Sackler Families.

---

[5] The Non-Consenting States reserve their rights to seek temporary allowance of its member States' claims for voting purposes pursuant to Federal Rule of Bankruptcy Procedure 3018(a), although there is no justified basis for reducing the States' aggregate proof of claim from $2.156 trillion to $55 articulated by the Debtors.

6.          In addition to describing a plan that is facially unconfirmable, the Disclosure

Statement fails to provide adequate or accurate information necessary for creditors to make an

informed judgment on the Plan on other issues, including:

- The risks on implementation of a Plan conditioned on broad non-consensual third-party releases of the Sackler Families, the justification for granting the releases, and attendant risks that the releases will not be approved.

- The potential impact of even an unsuccessful confirmation order appeal on the timing of distributions to creditors, and additional administrative expenses.

- The Master Disbursement Trust's ability to force the Sackler Families to make payments under the settlement agreement upon default, including the guarantees and security securing those payments, remedies upon a breach, and the risks to the estate of non-payment.

- The terms governing the public document repository.

- Treatment of the United States' general unsecured claims for civil and criminal penalties totaling approximately $6.3 billion under the DOJ Settlement, and the claims of federal agencies not addressed by the DOJ Settlement, and their impact on distributions to creditors.

- A substantive evaluation of the merits of the settlement with the Sackler Families.

- A substantive analysis of non-cash transfers to the Sackler Families that was conducted by Bates White.

- A meaningful comparison of the initial Settlement Framework (which was rejected by the Non-Consenting States) to the current settlement agreement with the Sackler Families to support the Debtors' contention that the current settlement is $1.275 billion more than the prepetition settlement structure.[6]

---

[6]  The Non-Consenting States also join in and adopt the *Objection of United States Trustee to Disclosure Statement for Chapter 11 Plan of Purdue Pharma L.P. and its Affiliated Debtors* [Docket No. 2686] (the "UST Objection"). The issues raised by the UST Objection will only be addressed to the extent necessary to add context to this Objection.

- The treatment of attorney fee claims by public and private creditor groups, the negotiated resolution of which is a condition to various mediated resolutions in this case.

- The fiduciary duties of the MDT Trustees.

7.      Moreover, solicitation of the Plan is premature because there remain unresolved disputes within and between creditor constituencies that must be wrapped up for creditors to make an informed decision on the Plan.  This includes resolutions with holders of the Hospital Claims, the private health insurers referred to as third-party payors or "TPPs," the personal injury claimants, the U.S. Department of Justice, and the UCC.

8.      For all these reasons, the Court should not approve the Disclosure Statement or authorize solicitation of votes on the Plan.

## OBJECTION

### I.    The Disclosure Statement Cannot Be Approved Because It Describes a Patently Unconfirmable Plan

9.      Courts routinely hold that if a plan is unconfirmable as a matter of law, its related disclosure statement should not be approved.  *In re Quigley Co.*, 377 B.R. 110, 115-16 (Bankr. S.D.N.Y. 2007) ("If the plan is patently unconfirmable on its face, the application to approve the disclosure statement must be denied as solicitation of the vote would be futile"); *In re Filex, Inc.*, 116 B.R. 37, 40-41 (Bankr. S.D.N.Y. 1990) (stating that "this court will not approve a disclosure statement for an admittedly unconfirmable plan").

10.     Bankruptcy courts have an obligation to guard against unnecessary expenditures and waste of estate assets.  *See In re Phx. Petroleum Co.*, 278 B.R. 385, 394 (Bankr. E.D. Pa. 2001) ("If the disclosure statement describes a plan that is so 'fatally flawed' that confirmation is 'impossible', the court should exercise its discretion to refuse to consider the adequacy of disclosures . . . because undertaking the burden and expense of plan distribution and vote

solicitation is unwise and inappropriate if the proposed plan could never legally be confirmed.")
(citations omitted).

11.     The Debtors seek approval of the Disclosure Statement for a Plan that is patently
unconfirmable because it (1) impermissibly imposes non-consensual releases of State police
power claims against the Sackler Families and others; and (2) improperly puts the States in the
same class as their political subdivisions in violation of Bankruptcy Code section 1122.[7]  If the
Disclosure Statement is approved, the Debtors will incur millions of dollars in fees and expenses
unnecessarily by soliciting votes on a Plan that cannot be confirmed.

### A.  The Non-Consensual Release of State Police Power Claims Renders the Plan Unconfirmable

#### 1.  The Third-Party Releases Are Not Justified Under the Second Circuit's Test in *Metromedia*

12.     The anticipated third-party non-consensual releases of State police power claims
against the Sackler Families render the Plan unconfirmable as a matter of law because they do not
satisfy the Second Circuit's requirements for non-consensual releases in *Metromedia* and its
progeny.  The Plan seeks to impose unprecedented releases of sovereign State police power claims.

13.     In *Metromedia*, though it rejected the bright line rule of a minority of circuits,[8] the
Second Circuit was careful to hold that non-consensual third-party releases are proper only in
"unique" and "unusual circumstances."  *Deutsche Bank AG, London Branch & Bear, Stearns &*

---

[7]  There may be other obstacles to confirmation as well, but here the Non-Consenting States focus on these two fundamental problems with the Plan, reserving these and other objections for confirmation as applicable.

[8]  The Fifth and Tenth Circuits reject the imposition of third-party non-consensual releases.  *See e.g.*, *Bank of New York Tr. Co. v. Official Unsecured Creditors' Comm. (In re Pac. Lumber Co.)*, 584 F.3d 229, 252 (5th Cir. 2009); *Landsing Diversified Props.-II v. First Nat'l Bank & Tr. Co. of Tulsa (In re W. Real Estate Fund, Inc.)*, 922 F.2d 592, 601–02 (10th Cir. 1990).  The Ninth Circuit was understood to have a categorical ban on non-consensual releases, *see Resorts Int'l v. Lowenschuss (In re Lowenschuss)*, 67 F.3d 1394, 1401–02 (9th Cir. 1995), but has since stated that Bankruptcy Code section 524(e) does not preclude non-consensual third-party releases and cited Third Circuit Court of Appeals precedent on when limited releases can be approved.  *See Blixseth v. Credit Suisse*, 961 F.3d 1074, 1083 (9th Cir. 2020) (citing *In re PWS Holding Corp.*, 228 F.3d 224 (3d Cir. 2000)).

*Co., Inc. v. Metromedia Fiber Network, Inc.*, (*In re Metromedia Fiber Network, Inc*), 416 F.3d 136, 142-43 (2d Cir. 2005); *see also In re Millennium Lab Holdings II, LLC.*, 945 F.3d 126, 129 (3d Cir. 2019) (approving non-consensual third-party release involving "specific, exceptional" facts). Non-debtor releases easily lend themselves to abuse because they operate like a bankruptcy discharge without the appurtenant obligations. *See Metromedia*, 416 F.3d at 142; *accord Gillman v. Cont'l Airlines (In re Cont'l Airlines)*, 203 F.3d 203, 214 (3d Cir. 2000); *Nat'l Heritage Found., Inc. v. Highbourne Found.*, 760 F.3d 344, 348 (4th Cir. 2014); *Class Five Nev. Claimants v. Dow Corning Corp. (In re Dow Corning Corp.)*, 280 F.3d 648, 657-58 (6th Cir. 2002); *SE Prop. Holdings, LLC v. Seaside Eng'g & Surveying., Inc. (In re Seaside Eng'g & Surveying, Inc.)*, 780 F.3d 1070, 1077 (11th Cir. 2015).

14.    A third-party non-consensual release does not become appropriate merely because the released party intends to contribute something to a plan. *See Metromedia*, 416 F.3d at 143. To the contrary, the third-party release must play an important part in the debtor's reorganization plan beyond simply adding distributable dollars. *See Metromedia*, 416 F.3d at 141 (citing *SEC v. Drexel Burnham Lambert Grp., Inc. (In re Drexel Burnham Lambert Grp., Inc.)*, 960 F.2d 285, 293 (2d Cir.1992)); *see also See In re Beck Indus., (Feldman v. Trs. of Beck Indus., Inc.)*, 479 F.2d 410 (2d Cir.1973), *cert. denied* 414 U.S. 858 (1973) (court declined to enjoin state lawsuit brought by a parent corporation, a debtor in a Chapter X case, which if determined adversely, would have impaired the value of the stock of a non-debtor subsidiary); *see also Anvil P'ship v. Clifford/Sooner Drilling Program,* (*In re Clifford Res., Inc.*), 24 B.R. 778, 780 (Bankr. S.D.N.Y. 1982) (court declined to permit removal of an action to the Bankruptcy Court because it "would be to give non-debtors aligned with [the debtor] the benefits of the Bankruptcy Code without the attendant burdens" and "it would not further the purpose of the Bankruptcy Code to retain the action").

15.      Applying *Metromedia*, courts in this jurisdiction have held that a non-debtor release

may be justified in cases where (i) the released parties provide a substantial contribution to the

debtor's estate, (ii) where the claims are "channeled" to a settlement fund rather than extinguished,

(iii) where the enjoined claims would indirectly impact the debtor's reorganization by way of

indemnity or contribution, (iv) where the plan otherwise provides for the full payment of the

enjoined claims, or (v) where the creditors consent. *See In re Genco Shipping & Trading Ltd.*, 513

B.R. 233, 269 (Bankr. S.D.N.Y. 2014); *see also Metromedia*, 416 F.3d at 142.  Courts also require

that non-consensual third-party releases receive "overwhelming support." *See, e.g.*, *Dow Corning

Corp.*, 280 F.3d at 658 ("The impacted class, or classes, has overwhelmingly voted to accept the

plan…."); Dec. 15, 2020 Hr'g Tr. 33:8-11 ("[A]nd indeed, with respect to third party claims against

the Sacklers, more than substantial support, *overwhelming support*, although not necessarily

unanimous support" from States is needed) (emphasis added).

16.      In determining whether the Sackler Families will make a sufficiently substantial

contribution, the Court should consider the vast liabilities for which the Sackler Families seek

releases, their unlawful conduct, the vast amount of the Sackler Families' wealth, and the terms

and conditions of their future payments.

17.      It is undisputed that the Sackler Families are worth "multiples" of the $4.275 billion

*nominal* settlement amount.  *See* Mar. 24, 2021 Hr'g Tr. 56:18-22 (The Court: "[T]he Sacklers are

worth multiples of the new settlement's nominal amount.  I guess it's a question for everyone.  Is

there, in fact, consensus on that?"), 57:11-12 (Mr. G. Uzzi: "[W]e don't disagree with the

statement.").  From 2008 to 2012 alone, the Debtors transferred nearly $7 billion to or for the

benefit of the Sackler Families, and through 2016, the total cash distributions amount to more than

$10 billion, plus, it appears, at least another $1 billion in other property.[9]  These amounts pale in comparison to the claims being asserted against them as well as the Debtors' estates and their wealth.  There is not parity between the proposed settlement and the claims being released in the judgment of the State Attorneys General that would be forced to give up their direct claims.

18.     Further, third-party claims against the Sackler Families will not have any meaningful impact on the Debtors' reorganization by way of indemnity or contribution.  To the extent that members of the Sackler Families have indemnity rights, their indemnification claims should be disallowed or subordinated under the Plan due to their conduct.  The Sackler Families' indemnity obligates the Debtors to pay for any judgments only if the Sackler Families acted in "good faith" and have not engaged in unlawful conduct.  The circumstances of these cases, including a guilty plea by the Debtors for illegal conduct spanning a decade or more while under the Sacklers' close control, belie any claim that there is a link between the Sackler Families and the Debtors through viable claims of indemnity or contribution that would impact the Debtors' reorganization efforts.

19.     Finally, the currently proposed Plan does not have "overwhelming support."  The Non-Consenting States collectively represent 53% of the U.S. population and almost half the States in the U.S., including Washington D.C., and have asserted claims in excess of $1 trillion.  In their sovereign capacities, these States' Attorneys General have determined that the current proposal is

---

[9]   *See Official Committee of Unsecured Creditors' Motion to Compel Production of Purportedly Privileged Documents, or for in Camera Review, Based on Good Cause, Crime Fraud, and at Issue Exceptions to Claims of Privilege* ¶ 4 [Docket No. 1753] (the "UCC Privilege Motion").  Indeed, another objection set forth below relates to the failure of the Disclosure Statement to accurately reveal the value of non-monetary distributions to the Sackler Families.  A recent release by Congress reports that the Sackler Families have a net worth of more than $11 billion, calculated as of more than a year and a half ago for the Mortimer Sackler (Side A) family and more than six months ago for the Raymond Sackler (Side B) family.  *See* House Comm. On Oversight & Reform, *Committee Releases Documents Showing Sackler Family Wealth Totals $11 Billion* (April 20, 2021), *available at* https://oversight.house.gov/news/press-releases/committee-releases-documents-showing-sackler-family-wealth-totals-11-billion.

not adequate because, without limitation, the Sackler Families are not paying enough, quickly enough, providing adequate security for their payment obligations and providing enough transparency into their conduct or making other concessions. Though there is no level of plan approval by States that could justify the non-consensual release of any non-consenting State's police power claims against non-debtor Sackler family members, the "overwhelming" lack of agreement among U.S. states over releasing the Sackler Families underscores the impropriety of the non-consensual releases proposed by the Plan, even under the most aggressively broad reading of *Metromedia*.

### 2. The Plan Cannot Release State Police Power Claims Absent Specific Consent

20.       Section IV.I.6 of the Disclosure Statement describes, *inter alia*, the non-consensual release of States' police power claims against "Released Parties," which include non-Debtors,[10] as follows:

> For the avoidance of doubt and without limitation to the foregoing, each Releasing Party that is a Governmental Unit shall be deemed to have released all Released Claims against the Released Parties *that are or could have been brought by (x) such Governmental Unit on behalf of citizens*, including, without limitation, children and infants (whether born or unborn), or by its consumers, hospitals, subdivisions . . . , public entities, public instrumentalities or public educational institutions or (y) *any other person acting or purporting to act in a parens patriae, sovereign, quasi-sovereign, private attorney general, qui tam, taxpayer, or any other capacity on behalf of such Governmental Unit or its citizens*, including, without limitation, children and infants (whether born or unborn) or by its

---

[10] Again, neither the Disclosure Statement nor the Plan describe the releases proposed to be provided to the Sackler Families. The Non-Consenting States presume for the purpose of this Objection that those releases are at least as broad and encompassing as the one described here. Of course, until the releases and channeling injunction as they relate to the Sackler Families are included in the Disclosure Statement and the Plan, and fully explained in the Disclosure Statement, the Disclosure Statement cannot be approved. Presumably, these key terms are not included because there is not yet a fully agreed-to deal with the Sackler Families with any group in the case, again making approval of a Disclosure Statement and Plan premised on such a deal premature, at best.

> consumers, hospitals, subdivisions . . . , cities, public entities, public
> instrumentalities and public educational institutions.

Disclosure Statement § IV.I.6 (emphasis added).

21.    There is no precedent that supports imposing a non-consensual third-party release

of a State's police power claim, and the lack of directly analogous precedent is hardly surprising.

22.    Enforcement of state consumer protection and public nuisance laws is among the

paramount duties of the States and serves the public's non-monetary interests, even if the remedy

is in part or even predominantly monetary. *See, e.g.*, *Wyeth v. Levine*, 555 U.S. 555, 593-94 (2009)

(Congress' comprehensive scheme of prescription drug regulation depends upon concurrent

exercise of state police powers).  It is an essential and federal constitutionally protected function

of sovereign States to enforce their own regulatory laws in their local courts and administrative

bodies:

> Were [the federal courts] now to mandate that the State was not entitled to pursue
> its action in its own courts, we would risk trampling on the sovereign dignity of the
> State . . . .    [O]ur constitutional structure . . . serves the important function of
> preserving the dignity to which states are entitled as residuary sovereigns and joint
> participants in the governance of the Nation.  It does so by preventing States from
> being involuntarily dragged into any court—a prerogative of sovereigns well
> established at the time of the founding.

*West Va. v. CVS Pharmacy, Inc.*, 646 F.3d 169, 178 (4th Cir. 2011) (quotations and citations

omitted); *see also Purdue Pharma, L.P. v. Ky.*, 704 F.3d 208, 217 (2d Cir. 2013) (rejecting Purdue

Pharma's arguments for federal jurisdiction over Attorney General *parens patriae* lawsuits); *New

Hampshire v. Purdue Pharma*, No. 17-cv-427-PB, 2018 WL 333824, at *4 (D. N.H. Jan. 9, 2018)

(States suing to protect citizens from opioid injuries are acting "in a sovereign capacity to protect

[their] citizens" and federal law "does not deprive states of the power to litigate such claims in

their own courts.").

11

23.     Indeed, Congress must include a clear statement before a federal statute will be interpreted to "effectively invalidate the [state] Legislature's determination that an Attorney General should be able to sue for injuries to consumers . . . ." *Nessel ex rel. Mich. v. AmeriGas Partners, L.P.*, 954 F.3d 831, 838 (6th Cir. 2020).

24.     No such clear statement exists in the Bankruptcy Code or its related jurisdictional provisions in Title 28.

25.     To the contrary, Bankruptcy Code section 524(e) makes clear that a debtor's restructuring of its debts (getting a discharge) does not "affect the liability of any other entity . . . for [] such debt." And Bankruptcy Code section 524(g), which is the only Bankruptcy Code provision authorizing channeling injunctions and effectively non-consensual third-party releases, and then only in asbestos cases, does not clearly state that it applies to a "governmental unit," which under Bankruptcy Code section 101(27) would include a State, indicating that Congress did not intend to include States even in the Bankruptcy Code's one exception to section 524(e).

26.     In addition, 28 U.S.C. § 1452(a) prohibits removal of state police power actions to any federal court pursuant to its bankruptcy authority, further evidencing Congress' intent that bankruptcy courts cannot involuntarily cause the release of State police power claims. The proposed release of the Sackler Families is tantamount to the involuntary dismissal of State police powers claims against the Sackler Families pursuant to a Federal bankruptcy court order.

27.     Congress' decision not to interfere with the exercise of State police power by Attorneys General against non-debtors also is properly inferred from the way the Bankruptcy Code addresses police power claims directly against debtors. Absent this Court's section 105(a) injunction or, in the case of the Non-Consenting States their voluntary agreement, States were free to continue to exercise their respective police powers unfettered from the automatic stay, even as

against the Debtors, notwithstanding the automatic stay. *See* 11 U.S.C. § 362(a), (b)(4). And as the District Court made clear in its decision upholding this Court's preliminary injunction under section 105(a), the use of section 105(a) to temporarily override that exception to the automatic stay is limited to the narrow goal then being advanced: creating space and time to determine whether a *consensual* resolution of, among other things, Sackler liability could be negotiated. *Dunaway v. Purdue Pharms. L.P., (In re Purdue Pharms. L.P.)*, 619 B.R. 38, 62 (S.D.N.Y. 2020).[11] In so limiting her decision, Chief Judge McMahon seems to have at least implicitly recognized the same maxim as the District Court in *First Alliance*, even though it reached a different conclusion with respect to imposing a temporary stay: "[T]he hardship to the governmental units of not being allowed to proceed with their actions in their chosen forums includes harms different in character from the harms normally considered on motions for injunctions under § 105." *FTC v. First Alliance Mortg. Co. (In re First Alliance Mortg. Co.)*, 264 B.R. 634, 659 (C.D. Cal. 2001).[12]

28.     The Non-Consenting States either brought or have police power claims against the Sackler Families for decades of misconduct. The proposed third-party releases will result in a non-

---

[11] Chief Judge McMahon carefully crafted her decision to support only the temporary restraint of claims directly against the Sackler Families to facilitate negotiations over a consensual resolution. The District Court recognized that extending that restraint permanently, which is what the proposed third-party releases and related channeling injunction do, requires a different calculus, which for the reasons stated herein do not support compulsory plan releases. *See Dunaway*, 619 B.R. at 62 ("Whether Dr. Sackler gets the protection that Appellants fear (and oppose) will be decided in the context of other motions in this bankruptcy. And there is no timetable for addressing them, as Judge Drain remains 'far from approving any sort of permanent injunction and release with respect to third parties in this case.'" (citation omitted)).

[12] Consistent with these principles, the official position of the United States Department of Justice is that the non-consensual release of government claims against non-debtors is never lawful. *See* Brief for the United States as Amicus Curiae at 12, *Lynch v. Mascini Holdings, Ltd. (In re Kirwan Offices S.a.R.L.)*, Case No. 18-3371 (2d Cir. Oct. 7, 2019) ECF No. 119 ("third-party releases are impermissible"); *see also id.* at 15 n.3 ("Moreover, the government's view is that, even assuming that releases may be appropriate in certain circumstances, no such releases should ever apply to the government, as its interests are distinct from those of ordinary creditors or other outsiders who may have claims against participants in the bankruptcy process. For example, no bankruptcy court order should release non-debtors from their obligations under criminal laws, tax laws, environmental laws, or other public health and safety laws....").

consensual settlement of these state law claims against the Sackler Families being imposed on States without their consent.  The Court should not, through third-party non-consensual releases of non-debtors, strip the public of the protections of State-by-State police/regulatory powers at the core of our federal constitutional system.

### 3. The Court Has No Subject Matter Jurisdiction to Grant Non-Consensual Third-Party Releases of Police Power and Other Non-Derivative Claims of Sovereign States

29.    A non-consensual release of state police power claims also exceeds this Court's subject matter jurisdiction for at least two reasons.  There is no Bankruptcy Code authority for granting that release, and the claims to be released will not affect the estate *res* in a manner that justifies the exercise of jurisdiction.  It is axiomatic that "federal courts are courts of limited jurisdiction" and, as such, "lack the power to disregard such limits as have been imposed by the Constitution or Congress." *Durant, Nichols, Houston, Hodgson, & Cortese-Costa, P.C. v. Dupont*, 565 F.3d 56, 62 (2d Cir. 2009).

30.    As noted above, the only provision in the Bankruptcy Code that authorizes third-party releases and channeling injunctions is section 524(g).  By its terms, that section applies only to asbestos cases, and even then, it does not clearly apply to a "governmental unit," like a State.  Thus, contrary to *Metromedia* and its progeny, the Fifth and Tenth Circuits concluded properly that non-consensual third-party releases simply are not permitted by the Bankruptcy Code or envisioned for use by Congress other than in asbestos cases.  *See* footnote 8 and accompanying text *supra*.  No one contends that section 524(g) applies in this case.

31.     It is the Debtors' burden to show that subject matter jurisdiction exists over all non-estate claims between non-debtors subject to a non-consensual release, *In re Sabine Oil &*

*Gas Corp.*, 555 B.R. 180, 288 (Bankr. S.D.N.Y. 2016), [13] and that the claims "directly affect the *res* of the bankruptcy estate." *Johns-Manville Corp. v. Chubb Indem Ins. Co.* (*In re Johns-Manville Corp.*), 517 F.3d 52, 66 (2d Cir. 2008), *vacated & remanded on other grounds*, 557 U.S. 137 (2009), *aff'g in part & rev'g in part*, 600 F.3d 135 (2d Cir. 2010).

32.     Non-debtor releases cannot be given simply because a party stands ready to contribute money for a release of claims that arise out of the same set of operative facts as claims against the debtors. *See In re Johns-Manville Corp.*, 517 F.3d at 66 (a bankruptcy court does not acquire subject matter jurisdiction "to enjoin claims brought against a third-party non-debtor solely on the basis of that third-party's financial contribution to a debtors' estate."). Otherwise, "a debtor could create subject matter jurisdiction over any non-debtor third party by structuring a plan in such a way that it depended upon third-party contributions." *See id*. It is typical in mass tort bankruptcies for non-debtor parties to have a willingness to pay for a release of liabilities arising from the same circumstances as the debtor. However, a predicate to granting a release to that party is that the court have subject matter jurisdiction over the third-party claims. *In re Sabine Oil & Gas Corp.*, 555 B.R. at 288 ("If it has subject matter jurisdiction to enjoin third-party claims, a bankruptcy court may approve a non-debtor release 'under some circumstances, but not as a routine matter' and 'only in rare cases.'"). Again, the party asserting subject matter jurisdiction has the burden of proving that jurisdiction exists. *Giammatteo v. Newton*, 452 F. App'x 24, 27 (2d Cir. 2011); *Makarova v. United States*, 201 F.3d 110, 113 (2d Cir. 2000).

33.     Under their police power authority, the Non-Consenting States have asserted state law claims, and if not asserted prior to the commencement of these cases otherwise have state law

---

[13]    Under the Bankruptcy Act, the Supreme Court held that a referee in bankruptcy did not have subject matter jurisdiction to enjoin permanently a state court lawsuit between non-debtor entities. *See Callaway v. Benton*, 336 U.S. 132, 134-36 (1949).

claims, directly against various members of the Sackler Families based upon their unlawful and

tortious prepetition actions with respect to the opioid crisis. The record is clear that the Sackler

Families directed, approved and benefitted from the illegal promotion of addictive opioids.[14] The

Non-Consenting States have the sovereign right, indeed the sovereign obligation, to prosecute or

settle these kinds of claims against the Sacklers in their independent judgment, and as noted above,

the independent exercise of this sovereign right is enshrined in our constitution and federal

structure. Simply put, the Sackler Families cannot be relieved of their liability to a State other than

by trial (or case-dispositive motions) in State Court or voluntary settlement, and the Debtors cannot

compel the releases of these claims without a State's consent.

34.    The potential of indemnity claims by members of the Sackler Families should not

alter this conclusion. *See, e.g.*, *Debtors' Omnibus Reply Brief in Further Support of Motion for a*

*Preliminary Injunction*, Adv. Proc. Docket No. 59 at 37 ("[T]he Sackler Related Parties can

demand indemnification from Purdue for legal fees and for any judgments. As a result, permitting

the Related Party Claims to go forward will cause irreparable harm to the Debtors' estates….").

35.    Since entry of the preliminary injunction, the Debtors have pled guilty to three

federal felony counts for acts from 2007 to 2017 that occurred while the company was under close

Sackler control.[15] A concurrent settlement between the DOJ and members of the Sackler Families

---

[14]  *See e.g.*, *Massachusetts v. Purdue Pharma L.P.*, No. 1884-cv-01808 (BLS2) (Mass. Super. Ct. Jan. 31, 2019), Compl. at 52, 270-272 (asserting claims of unfair and deceptive acts and practices and public nuisance against Sackler family members personally because "Massachusetts law against unfair and deceptive conduct in commerce applies to individuals regardless of whether they are officers, directors, or employees."); *Connecticut v. Purdue Pharma L.P.*, No. X07 HHD-CV-19-6105325-S (Conn. Super. Ct. Apr. 22, 2019), Am. Compl. at 47-50 (alleging violation of Unfair Trade Practices Act for deception and unfairness committed by Sackler family members); *Minnesota v. Purdue Pharma L.P.*, No. 27-CV-18-10788 (Minn. Dist. Ct. Aug. 5, 2019), 1st Am. Compl. at 102-121 (asserting claims against Sackler family members in their individual capacities for consumer fraud, deceptive trade practices, false statements in advertising, deceptive acts perpetrated against senior citizens and disabled persons, unlawful trade practices, undertaking of special duty, public nuisance, and false claims act).

[15]  *See Notice of Hearing on Motion of Debtors Pursuant to 11 U.S.C. § 105 and Fed. R. Bankr. P. 9019 Authorizing and Approving Settlements Between the Debtors and the United States* [Docket No. 1828] (the "DOJ Settlement Motion"), Ex. B (Plea Agreement).

required the Sackler Families pay $225 million to the United States for the release of civil claims, with criminal claims being preserved.[16] Under these circumstance, the likelihood that the Debtors' alleged indemnity obligations would survive seems remote at best, and any indemnity claims likely would be subordinated even if allowed. The Debtors' have the burden of showing that the Sackler Families, who have agreed to pay $4.275 billion only if they get compulsory releases, would in fact receive indemnification—notwithstanding their liability for estate claims in the billions and State claims in the trillions—because their indemnity provisions cover only "good faith" actions.[17]

36.    The District Court's decision in *Dunaway*, 619 B.R. at 38, did not address whether this Court has the power to impose a non-consensual release of State police power claims. Moreover, the bases for its holding with respect to a temporally limited stay are no longer applicable. Eight months after *Dunaway* and more than a year and half after these cases were filed, a consensual resolution has not been achieved and guilty pleas have been entered. The predicate for the preliminary injunction no longer applies and cannot be used to justify permanent non-consensual third-party releases.[18]

37.    For these reasons, this Court lacks the authority to impose non-consensual releases of State police power claims and thus cannot approve the Disclosure Statement because proceeding to confirmation is futile.

---

[16]  *See id*.

[17]  *See Declaration of Hayden A. Coleman*, Adv. Proc. Docket No. 61, Ex. S ¶ 1 ("The Company shall not be obligated to indemnify the Indemnitee if a final decision by a court having jurisdiction in the matter shall establish that the Indemnitee *did not act in good faith*, and, with respect to any criminal action or proceeding, *had reasonable cause to believe that his or her conduct was unlawful*.") (emphasis added); ¶ 3 ("The Company shall to the fullest extent permitted by applicable law advance all costs and expenses (including attorneys' fees and expenses) incurred by the Indemnitee … against an undertaking by or on behalf of the Indemnitee *to repay such costs and expenses if it shall ultimately be determined that the Indemnitee is not entitled to be indemnified by the Company* ….") (emphasis added).

[18]  *See* footnote 11 and accompanying text *supra*.

### 4.    The Court Does Not Have Jurisdiction to Grant Criminal Releases

38.    This Court has repeatedly stated that it does not have the power to approve involuntary releases of criminal liability.  *See* Mar. 24, 2021 Hr'g Tr. 58:18-20 ("And I will reiterate, I do not believe that a bankruptcy court has any power to force any sort of involuntary release of criminal liability on anyone."); *see also* Dec. 15, 2020 Hr'g Tr. 35:18 (The Court "ha[s] no power over criminal liability.").

39.    Notwithstanding the Court's invitation for the Debtors or others to confirm that the proposed releases under the Plan do not and will not cover criminal releases of the Sackler Families, the Debtors effectively declined to do so.  *See* Mar. 24, 2021 Hr'g Tr. 57:20-58:13 (The Court:  Are criminal releases "even in contemplation by the Debtors as plan proponents?"  Mr. M. Huebner:  "[W]e've had this discussion already, a lot of us here, and frankly, it's déjà vu all over again, and you can be sure that we have and have circulated the Court's quote to remind people of the Court's view on the lack of propriety or jurisdiction, et cetera, of involuntary third-party releases with respect to criminal claims.")

40.    As filed, neither the Disclosure Statement nor the Plan answers the question whether the releases of the Sackler Families to be contained in the Plan are intended to include the non-consensual release of criminal liability.  The Disclosure Statement only provides that: "Section 10.6(b) of the Plan shall not release any Released Party from any criminal action or criminal proceeding arising under a criminal provision of any statute instituted by a Domestic Governmental Entity that has authority to bring such a criminal action or criminal proceeding." Disclosure Statement § IV.I.6(ii).  No member of the Sackler Families, however, is a "Released

Party."[19]   Thus, it remains unclear whether the Debtors will seek non-consensual releases of the criminal liability of the Sackler Families. Indeed, the Disclosure Statement and Plan do not disclose the scope of the Sackler Families' releases at all.

41.       Based upon this issue alone, the Court cannot confirm the Plan.  It thus cannot approve the Disclosure Statement and permit the solicitation of votes on the Plan.

### B.   The Plan Improperly Classifies States with Political Subdivisions

42.       To obtain confirmation of the Plan, the Debtors, among other things, must demonstrate that the Plan satisfies Bankruptcy Code section 1129(a)(1), including demonstrating proper classification of claims under Bankruptcy Code section 1122.   The propriety of a classification scheme may be decided at the disclosure statement stage to avoid the solicitation of an unconfirmable plan.  *See In re Curtis Ctr. Ltd. Partnership*, 195 B.R. 631, 638 (Bankr. E.D. Pa. 1996) (considering at disclosure statement stage whether classification scheme rendered plan patently unconfirmable).

43.       Bankruptcy Code section 1122 provides that "a plan may place a claim or an interest in a particular class only if such claim or interest is substantially similar to the other claims or interests of such class."  11 U.S.C. § 1122(a).   By its express terms, Bankruptcy section 1122(a) requires that dissimilar claims not be classified together.  *See Aetna Cas. & Sur. Co. v. Clerk, U.S. Bankr. Court (In re Chateaugay Corp.)*, 89 F.3d 942, 949-51 (2d Cir. 1996) ("Dissimilar claims may not be classified together….").

44.       The Plan classifies the States with their political subdivisions in Class 4 "Non-Federal Domestic Governmental Claims."   *See* Plan § 4.4; Disclosure Statement § IV.C.4.

---

[19] The definition of Released Party in the Plan specifically states: "notwithstanding the foregoing or anything herein to the contrary, no Excluded Party or Shareholder Released Party shall be a Released Party in any capacity or respect." Plan at p. 25 (footnote omitted).  Each member of the Sackler Families is a proposed Shareholder Released Party.

The Bankruptcy Code provides for class approval of a plan if, of the creditors voting, creditors holding one-half in number of allowed claims and two-thirds in amount vote to accept. *See* 11 U.S.C. § 1126(c). Under the Plan and voting procedures proposed by the Debtors, however, each entity in Class 4 will have a claim of $1 for voting purposes.[20] As constructed by the Debtors, therefore, the amount prong of section 1126's otherwise two-prong test is effectively merged out of existence for determining whether Class 4 has accepted the Plan. *See* Disclosure Statement Motion ¶ 27(iii). This is true even though the $2.156 trillion aggregate consolidated claim filed by all States likely exceeds the claims of political subdivisions exponentially.

45.     Under the current classification scheme, States, individually or collectively, could have their votes against or for the Plan effectively nullified by the more numerous votes of their own or other States' political subdivisions. This violates the core of state sovereignty as "[m]unicipal corporations are political subdivisions of the state, created as convenient agencies for exercising such of the governmental powers of the state as may be [en]trusted to them." *See Hunter v. City of Pittsburgh*, 207 U.S. 161, 178 (1907). By classifying the States with their political subdivisions, the Plan attempts to reverse this role by creating the potential that political subdivisions will be decision makers for (effectively sovereign over) not only their respective States, but other States as well.

46.     The impropriety of classifying States and their political subdivisions together is highlighted by the so-called Dillon Rule.[21] In a number of States, whether they are Non-Consenting States or Consenting States, political subdivisions have little or no authority to assert claims that are reserved for the State or have not been delegated to them. The classification scheme

---

[20] The Non-Consenting States separately challenge this proposal for valuing their claims for voting purposes as well. *See* below.

[21] *Clinton v. Cedar Rapids & Mo. R. R. Co.*, 24 Iowa 455 (1868).

proposed by the Debtors ignores this intra-state issue of authority and effectively provides political subdivisions the potential to impact their own States through confirmation of a plan of reorganization in a way that upends State sovereignty as preserved by the Constitution and our federal form of government.

47.    The Plan's classification scheme also upends *parens patriae* and undermines the broad statutory, constitutional, and common-law powers that the States have in their role as chief law enforcement for their citizens.  States have a quasi-sovereign interest in the "health and well-being—both physical and economic—of its residents" and in not being "discriminatorily denied its rightful status within the federal system."  *Alfred L. Snapp & Son, Inc. v. Puerto Rico ex rel. Barez*, 458 U.S. 592, 607 (1982).  The doctrine of *parens patriae* allows States to sue to remedy injury to its residents.  *See id.*; *see also Rhode Island v. Lead Indus. Ass'n, Inc.*, No. 99-5226, 2001 WL 345830, *2 (Super Ct. Apr. 2, 2001) (state Attorneys General have "exclusive" authority to bring suits on the public's behalf).

48.    Political subdivisions, by contrast, generally do not have the ability to sue on behalf of their citizens as *parens patriae*.  The Ninth Circuit, for example, has long held that cities cannot sue as *parens patriae*.  *See Colorado River Indian Tribes v. Town of Parker*, 776 F.2d 846, 848 (9th Cir. 1985) ("[Cities] cannot sue as parens patriae because their power is derivative and not sovereign.").  A municipality may not "simply assert the particularized injuries to the 'concrete interests' of its citizens on their behalf."  *City of Sausalito v. O'Neill*, 386 F.3d 1186, 1197 (9th Cir. 2004).   The Fifth Circuit Court of Appeals has similarly held that cities cannot sue as *parens patriae.  See El Paso Cty., Tex. v. Trump*, 982 F.3d 332, 338 (5th Cir. 2020) (political subdivisions of the State "may not assert the economic injuries of its citizens on their behalf as *parens patriae*" but instead must show it has itself suffered an injury).  Multiple district courts have come to the

same conclusion. *See e.g.*, *Prince George's Cty., Md. v. Levi*, 79 F.R.D. 1, 4 (D. Md. 1977) ("The power of a political subdivision of a state is 'derivative and not sovereign', and it may only sue to vindicate its own interests."); *Town of Brookline v. Operation Rescue*, 762 F. Supp. 1521, 1524 (D. Mass. 1991) ("*Parens patriae* standing is not available to political subdivisions of the state."). Therefore, only States can bring suits on the public's behalf.

49.     Further, cities often lack authority to enforce state and federal statutes, such as consumer protection laws, which States can and do rely on in litigation in response to the opioid crisis.  Only the States can fully engage in responsive *parens patriae* and statutory litigation on behalf of the State's entire citizenry, but this classification scheme risks the ability of States to resolve such claims.  This risk is exacerbated by the proposed $1 estimation of each Non-Federal Domestic Governmental Claim because State claims are weighted equally with each other and each political subdivision.  *See* Disclosure Statement Motion, Ex. 1 § D.

50.     The economic stakes of the opioid crisis are profound and uniquely related to the *parens patriae*, statutory and common-law authority of the Attorneys General.  This role should not be derogated by maneuvering to gerrymander an accepting class of non-federal public claimants to advance, among other things, the patina of "overwhelming" support for third-party releases from a combined State/political subdivision class.  For these reasons, the classification scheme is improper and soliciting a Plan that maintains it should not be approved.

## II.    The Disclosure Statement Fails to Provide Adequate Information on Key Issues

51.     Bankruptcy Code section 1125 defines "adequate information" as "information of a kind and in sufficient detail, as far as is reasonably practicable in light of the nature and history of the debtor and the condition of the debtor's books and records . . . that would enable such a hypothetical investor of the relevant class to make an informed judgment about the plan." 11 U.S.C. § 1125(a)(1).  Creditors and this Court alike must rely on the Disclosure Statement to assist

them in making informed judgments about the Plan.  Accordingly, the Disclosure Statement must provide adequate information to enable them to make these informed judgments.  *See Kunica v. St. Jean Fin., Inc.*, 233 B.R. 46, 52 (S.D.N.Y. 1999) ("The importance of full disclosure is underlaid by the reliance placed upon the disclosure statement by the creditors and the court.") (citation omitted); *see also Galerie Des Monnaies of Geneva, Ltd. v. Deutsche Bank, A.G. (In re Galerie Des Monnaies of Geneva, Ltd.)*, 55 B.R. 253, 259 (Bankr. S.D.N.Y. 1985), *aff'd*, 62 B.R. 224 (S.D.N.Y. 1986) and *aff'd*, No. 86 Civ. 397 (JMW), 1986 WL 6230 (S.D.N.Y. May 27, 1986) ("The preparing and filing of a disclosure statement is a most important step in the reorganization of a Chapter 11 debtor. It is relied on by both the creditors of the debtor before they vote on the plan of reorganization, and by the bankruptcy court before approving it.") (citations omitted). Indeed, "the debtor's obligation to provide sufficient data to satisfy the [Bankruptcy] Code standard of 'adequate information'" cannot be overemphasized.  *Kunica*, 233 B.R. at 52 (quoting *Oneida Motor Freight, Inc. v. United Jersey Bank*, 848 F.2d 414, 417 (3d Cir. 1988)).

52.     As drafted, the Disclosure Statement is inadequate and fails to provide creditors and the Court with information necessary to evaluate the Plan on a number of key points.  In addition to the deficiencies addressed in the UST Objection which are incorporated here by reference, key deficiencies include (i) a substantive evaluation of the settlement with the Sackler Families; (ii) the results of the Debtors' analysis of the non-cash transfers to or for the benefit of the Sackler Families and Sackler Entities; (iii) contours of the public document repository; and (iv) what will be paid to the United States pursuant to the DOJ Settlement and on other claims.

### A. The Disclosure Statement Fails to Describe the Risks of the Sackler Settlement Agreement

53.      The Plan's reliance on payments from the Sackler Families creates a number of risks that could delay significantly, or block outright, distributions to creditors under the Plan. These risks must be adequately described for creditors to make an informed judgment.

54.      *First*, the Disclosure Statement omits a sufficient substantive analysis of the risks and rewards of the settlement agreement required under the factors for approval of a settlement outlined by the Second Circuit in *In re Iridium Operating LLC*, 478 F.3d 452 (2d Cir. 2007). This analysis is crucial for creditors to effectively evaluate whether the settlement agreement appropriately settles the Sackler Families' estate and third-party liabilities. In fact, the Court implored the Debtors at the March 24, 2021 hearing to include this analysis in the Disclosure Statement, and so far, they have failed to do so. *See* Mar. 24, 2021 Hr'g Tr. 105:3-7 ("I believe it is important in that this further statement is brought before the Court that it lay out in more detail the arguments for and against continued litigation against the Sacklers, not only on the estate claims, but also on non-estate claims."). The absence of these disclosures alone warrants denial of the Disclosure Statement Motion.

55.      *Second,* the Disclosure Statement fails to address the reasonableness of the amounts being paid under the Sacklers' Settlement and the 9-10 year period over which these payments (without interest) are made. Among other things, the Disclosure Statement lacks detail regarding the wealth of the Sackler Families and why that wealth (admittedly multiples of the nominal amount of the proposed payment by the Sackler Families) cannot be paid immediately or over a period substantially less than 9-10 years from the Effective Date, especially since that wealth has now been shielded from litigation and permitted grow for more than 19 months during a robust investment market for many.

24

56.        *Third*, as drafted, the Disclosure Statement fails to adequately explain the Master Disbursement Trust's ability to force the Sackler Families to make payments under the settlement agreement upon a default or the challenges that the Master Disbursement Trust would face in trying to enforce payment obligations.   The Disclosure Statement does not adequately describe the guarantees and security for payments under the settlement agreement, the Master Disbursement Trust's remedies upon a breach, and the attendant risks to the estate of non-payment.  For example, the Disclosure Statement gives only brief attention to the collateral securing the $4.275 billion settlement payments.  *See* Disclosure Statement § VIII.A.8 ("all gross cash proceeds received by the Sackler Parties from the IACs . . . , all equity interests in the IACs . . . , as well as additional collateral to the extent mutually agreed with the Sackler Parties, will serve as collateral with respect to the Required Settlement Payments and other obligations under the Sackler Settlement Agreement.").   Furthermore, stating that non-payment by the Sackler Families presents a "credit risk" is so generic as to be almost meaningless, and does not give creditors adequate information to make an informed judgment as to whether it is better to settle with broad releases in favor of the Sackler Families knowing the risks of enforcing the settlement or to litigate notwithstanding any risk of collecting on judgments in the absence of a settlement.  *See id*.  Accordingly, the Disclosure Statement should include a list of all the collateral securing the Sackler Families' payment obligations, the value of that collateral, an analysis of the Master Disbursement Trust's ability to foreclose and liquidate it upon default, and any other issues that relate to the Master Disbursement Trust's ability to collect in the event of non-payment.  The amounts at stake, the term of payments, the whereabouts of certain members of the Sackler Families and their self-touted asset protection regime into which they deposited the billions that they caused to be taken out of the Debtors with knowledge of on-going liability risk based on opioid sales, all underscore the importance of these

disclosures.  The summary currently in Article VIII of the Disclosure Statement on these issues is insufficient.

57.      *Fourth*, with respect to the third-party non-consensual releases of the Sackler Families, the Disclosure Statement must, at a minimum, adequately disclose the unprecedented nature of the releases, the purported legal and factual justifications for granting the releases, and the attendant risks that the releases will not be approved and the settlement agreement fails.  The Disclosure Statement merely states that "[t]here can be no assurance" that the releases will be granted.  *See* Disclosure Statement § VIII.A.6.  The Debtors should be required to articulate the risks that come with seeking approval of the broad non-consensual third-party releases sought by the Plan.

58.      *Finally*, the Disclosure Statement fails to adequately explain the potential impact of an appeal on distributions to creditors.  The Plan's Effective Date is conditioned upon entry of a final, non-appealable order of an order approving the Sackler Families' settlement and their releases, which in this case would be the confirmation order.  *See* Plan § 9.1(a).  An appeal of an order approving third-party releases, including a confirmation order, is an undeniable possibility and could cause significant delays in the Plan's effectiveness and distributions.  These risks need to be described in more detail for creditors to make an informed judgment on the Plan.

### B. The Disclosure Statement Fails to Describe the Results of the Non-Cash Transfer Valuation Analysis by Bates White

59.      The Debtors' Special Committee conducted a review of the cash and non-cash transfers by the Debtors to or for the benefit of the Sackler Families and the Sackler Entities to determine the claims the Debtors' estates held against them and whether to litigate or settle those claims.  *See* Disclosure Statement § III.Y.1.iv.  The Debtors' retained AlixPartners to conduct a forensic review culminating in two written accounting reports totaling over 750 pages.  *See id*.

The Debtors' also retained Bates White, a financial consulting firm, to value the non-cash transfers. *See id.*

60.     According to the Disclosure Statement, Bates White reviewed over four thousand documents and spent approximately 15,130 hours on its review. *See id.* Despite the significant amount of time and money dedicated to this analysis, the results of the non-cash transfer valuation (estimated by the Unsecured Creditors' Committee to be *at least* $1 billion[22] and possibly more) by Bates White are not disclosed in the Disclosure Statement. An adequate description of these results should be provided to creditors as they try to make an informed decision whether the settlement agreement is an appropriate resolution of the liabilities of the Sackler Families and their non-Debtor affiliates.

61.     The importance of adequate disclosure of these transactions cannot be overstated. The Sackler Families have been in a position to control both debtors and other Sackler entities for decades, and the evidence demonstrates that they clearly did so to Debtors' detriment and the Sacklers' advantage. Yet, the Disclosure Statement does not offer creditors enough information to evaluate the contemplated exchange of benefits under the proposed Plan for the proposed non-debtor releases. Without more, it is impossible for the creditors to make appropriate decisions concerning the releases.

### C. The Disclosure Statement Fails to Describe the Public Document Repository

62.     An essential component of the resolution of these cases is the public document repository. That repository will bring important information to the public about the conduct of the Debtors and the Sackler Families. It became a binding obligation of the Debtors under the DOJ Resolution. *See* Disclosure Statement § III.X. Aside from a boilerplate statement that the

---

[22] *See* UCC Privilege Motion ¶ 4.

repository will be established by the Debtors (as they are required to), the Disclosure Statement fails to disclose crucial information about it, including what categories of documents will be made available in the repository and how and by whom it will be maintained.  *See* Disclosure Statement § III.X.  Public disclosure of documents and sunlight into the conduct that took place at Purdue is of paramount importance to the Non-Consenting States, as well as other creditor constituencies. Comments provided by the Non-Consenting States to the Disclosure Statement to address this issue were not incorporated by the Debtors, nor were they addressed even in concept.  Indeed, comments to the document repository presented collectively by the Non-Consenting and Consenting States (the ultimate economic holders under the Debtors' Plan) have not been incorporated, disclosed or addressed.  The Plan should provide for robust document disclosures beyond that currently contemplated, including that all evidence produced during the various investigations into the Debtors should be made public, and the Disclosure Statement should adequately describe the document repository.  Even if the Debtors are unwilling to agree with the Non-Consenting States and Consenting States on terms for the document depository now, those terms should be disclosed so that creditors know that a vote for the Plan is a vote for less robust document repository than that advanced by States.

### D. The Disclosure Statement Fails to Describe What Amount Will be Required to be Paid on the United States' Claims

63.    The Debtors' settlement with the United States provides for allowed general unsecured claims for civil and criminal fines in the aggregate amount of approximately $6.3 billion.[23]  *See* Disclosure Statement § IV.C.3 ("[T]he DOJ Civil Claim and the DOJ Criminal Fine Claim shall receive treatment in accordance with the DOJ 9019 Order and the DOJ Resolution.")

---

[23]  *See Order Pursuant to 11 U.S.C. § 105 and Fed. R. Bankr. P. 9019 Authorizing and Approving Settlements Between the Debtors and the United States* ¶¶ 5-6 [Docket No. 2004] (providing for allowance of general unsecured claims for $3.544 billion on account of criminal fine liability and $2.8 billion arising from the DOJ's civil investigation).

The DOJ 9019 Order and the DOJ Resolution merely say that these claims are to be treated fairly and equitably in relation to other creditors.[24]

64.    In addition, Other Federal Agency Claims were asserted by the United States in proofs of claim not covered by the DOJ Resolution and will receive "treatment in a manner and amount agreed by the Debtors and the DOJ."  *See* Plan § 1.1 ("'***Other Federal Agency Claim***' means any Claim filed by the United States Department of Health and Human Services, the United States Department of Veterans Affairs, the Indian Health Service and the Centers for Medicare & Medicaid Services, set forth in Proofs of Claim Nos. 138509, 137406, 137782 and 138522, respectively."); *see also* Plan § 4.3(b) ("[T]he Allowed Other Federal Agency Claims shall receive treatment in a manner and amount agreed by the Debtors and the DOJ.").

65.    Nothing in the Disclosure Statement discloses or explains the likely pay out for any of these U.S. claims or any agreement addressing the treatment of Other Federal Agency Claims.

66.    Because the Plan provides for fixed amounts to be devoted for the satisfaction of nearly all creditor claims, the failure of the Disclosure Statement (and concurrently the Plan) to fix (presumably with DOJ's consent) or estimate (perhaps without its consent) the amount to be paid on the $6.3 billion DOJ claims and Other Federal Agency Claims leaves gaping holes in critical data required for any creditor to be able to analyze the Plan and decide whether to accept the treatment proposed for them.  For example, without this information, it is impossible to assess the amount likely to be distributed to each creditor class on the Effective Date.  It similarly is impossible to assess whether future funding will be enough for creditor classes to receive the fixed amounts intended to be devoted to them under the Plan.  And, because the "fair and equitable"

---

[24] *See id*. ¶ 7 (giving the DOJ rights to rescind the agreement if the plan "does not treat the Allowed Claims fairly and equitably or discriminates unfairly against such claims."); DOJ Settlement Motion, Ex. B ¶ 2 ("Debtors shall propose and obtain confirmation of a plan that . . . provides fair and equitable treatment to the United States and does not unfairly discriminate against the United States.").

analysis likely includes some comparison based on Non-Federal Public Claims as well, the

Disclosure Statement's silence on the amount of Non-Federal Public claims, asserted in aggregate

amounts exceeding $2.756 trillion, further exacerbates the lack of adequate information being

provided to creditors who are supposed to be able to make an informed judgment on the Plan based

solely on the Disclosure Statement.[25]

### E. The Disclosure Statement Fails To Accurately Describe the Current Sackler Settlement

67.      The Debtors assert that the current settlement agreement with the Sackler Families

results in a $1.275 billion improvement in distributable estate value from the initial Settlement

Framework.  *See, e.g.*, Disclosure Statement § I.B ("This material improvement in the recovery

from the shareholders directly increases by $1.275 billion the amount of funds that can be directed

towards abatement."); *see also id*. ("The Plan also significantly improves on the initial settlement

framework that was in place at the commencement of these Chapter 11 Cases, most notably by

increasing the amount that Purdue Pharma's existing shareholders will be required to pay in the

aggregate from $3.0 billion to $4.5 billion.").  That assertion is misleading.

68.      Though the current settlement agreement increases the *guaranteed* nominal amount

that might be paid by the Sackler Families over 9+ years, when compared to the initial Settlement

Framework, it decreases the nominal value that might have been paid by the Sacklers over a shorter

period of seven (7) years by $275 million under that same initial Settlement Framework.  It is only

an improvement over the initial Settlement Framework because the Sackler Families' promise of

$1.5 billion in upside that was tied to the value of their ex-U.S. pharmaceutical companies turned

---

[25] Although this deficiency may not rise to the level of a "fatal flaw," permitting solicitation on a Plan that has not resolved the amount to be paid on the DOJ's allowed $6.3 billion unsecured claim is potentially so impactful on creditors that delaying solicitation until the issue is resolved and can be fully explained in the Disclosure Statement would be sensible.

out to be unlikely to be realized in the proposed timeframe.  Comments provided by the Non-Consenting States to the Disclosure Statement to address this issue were not incorporated by the Debtors, nor were they addressed in concept.  Accordingly, the Disclosure Statement should be revised to correct the inaccuracies described herein.

### F.  The Disclosure Statement Fails to Describe the Fiduciary Duties of the MDT Trustees

69.      The Disclosure Statement in its current form states that the fiduciary duties of the MDT Trustees are subject to ongoing negotiations.  *See* Disclosure Statement § IV.D.6.v.  The scope of those fiduciary duties should be disclosed so that creditors can make an informed judgment on the Plan.  Information about the trusts, including the trust documents that will be disclosed in the Plan Supplement, will potentially impact the rights of creditors.

### G.  Solicitation Is Premature Because Unresolved Inter-Creditor Deals Must Be Completed, or Progress Materially

70.      Solicitation of the Plan is premature because there remain unresolved issues within or between major creditor constituencies and the resolutions of these issues might materially impact creditor expected recoveries.  This includes unresolved issues with holders of the Hospital Claims, the TPPs, and the personal injury claimants, and for example includes the resolution of attorney fee claims that must be resolved under the mediation agreements upon with the Plan is based.  Rushing to approve a Disclosure Statement that will have to be amended (perhaps several more times) is a waste of resources by the Debtors' estates and all parties in interest.

71.      Further, the terms of the trust distribution procedures among holders of Non-Federal Governmental Domestic Claims have not been finalized.

72.      At a minimum, the Disclosure Statement should make clear the risk that any holder may withdraw consent to the proposed distribution procedures if all these issues are not resolved satisfactorily.

31

## III.    Other Objections

### A.   The Plan Supplement Must Be Filed Sufficiently in Advance to Allow Creditors to Make an Informed Decision

73.        As noted in the UST Objection, the Disclosure Statement Motion provides that the Plan Supplement will be filed on July 9, 2021, a mere five (5) calendar days prior to the July 14, 2021 Voting Deadline, and ten calendar days prior to the July 19, 2021 Plan Objection Deadline. The Plan Supplement includes the Shareholder Settlement Agreement, the NOAT Documents, and the Schedule of Excluded Parties, among other documents.  The Plan Supplement documents are needed for the Non-Consenting States and other creditors to effectively evaluate the Plan.  Those documents must be filed further in advance than the current timeline set forth in the Disclosure Statement Motion.  Filing the Plan Supplement on June 30, 2021, or if dates otherwise move, at least two weeks before the voting deadline, is the shortest amount of time that creditors should be given to receive and evaluate Plan Supplement materials in a case as complex as this one.

### B.   The Plan Permits the Debtors to Make Plan Amendments in Violation of Bankruptcy Code Sections 1127(c) and (d)

74.        Section 12.3 of the Plan permits the Debtors to modify the scope of the Plan's releases on consent of the Governmental Consent Parties (which do not include the Non-Consenting States) without additional disclosure pursuant to Bankruptcy Code section 1125.  *See* Plan § 12.3 ("This Plan may be amended, modified or supplemented by the Debtors in the manner provided for by section 1127 of the Bankruptcy Code or as otherwise permitted by law, without additional disclosure pursuant to section 1125 of the Bankruptcy Code, except as otherwise ordered by the Bankruptcy Court . . . *provided further* that any such amendment, modification or supplement that expands the scope of the Releases shall be acceptable to the Governmental Consent Parties…..").  This provision potentially violates Bankruptcy Code sections 1127(c) and (d), which require that plan modifications comply with the disclosure provisions in Bankruptcy

Code section 1125 and permits holders to change votes based on disclosure of material revisions to a plan. *See* 11 U.S.C. § 1127(c)-(d). Given the controversy surrounding the releases being granted in the Plan, the Plan should make it clear that the Debtors will seek Court authorization to modify any of the Plan's releases and resolicit the Plan to extent necessary.

## <u>RESERVATION OF RIGHTS</u>

75.     This Objection is submitted without prejudice to, and with a full reservation of, the Non-Consenting States' rights to object to confirmation of the Plan on any basis, or to supplement this Objection in writing or at the Disclosure Statement hearing including, without limitation, in the event the Debtors amend or otherwise modify the Disclosure Statement or the Plan. Notwithstanding this Objection, the NCSG continues to regularly engage with the Debtors, the Sackler Families, the AHC, the UCC, the MSGE and other parties in interest to reach a consensual plan and presented for confirmation as soon as practicable.

[*balance of page intentionally left blank*]

## **CONCLUSION**

WHEREFORE, for all of the foregoing reasons, the Non-Consenting States respectfully request that this Court: (i) deny approval of the Disclosure Statement and related voting and confirmation procedures or, alternatively, to the extent the Court determines approval of the Disclosure Statement is warranted, condition approval on the Debtors adequately addressing the issues set forth in herein; and (ii) grant the Non-Consenting States such other relief as the Court deems just and proper.

Dated:  April 29, 2020
New York, New York

Respectfully submitted,

PILLSBURY WINTHROP SHAW PITTMAN LLP

By:      _/s/ Andrew M. Troop_
       Andrew M. Troop
       Hugh M. McDonald
       Andrew V. Alfano
       Melissa S. Pettit
       31 West 52nd Street
       New York, NY 10019
       Tel: (212) 858-1000
       Email: andrew.troop@pillsburylaw.com
           hugh.mcdonald@pillsburylaw.com
           andrew.alfano@pillsburylaw.com
           melissa.pettit@pillsburylaw.com

_Counsel to the Ad Hoc Group of Non-Consenting States_

## CERTIFICATE OF SERVICE

I, Melissa S. Pettit, hereby certify that, on April 29, 2021, I caused true and correct copies of the foregoing document to be served (i) by the Court's Case Management/Electronic Case File (CM/ECF) System to all parties who are deemed to have consented to electronic service; (ii) by email upon the parties who provided email addresses set forth in the Master Service List maintained by the Debtors in respect of these chapter 11 cases; and (iii) by email upon the chambers of the Honorable Judge Robert D. Drain (rdd.Chambers@nysb.uscourts.gov) and the Office of the United States Trustee for the Southern District of New York (Attn: Paul K. Schwartzberg, paul.schwartzberg@usdoj.gov).

*/s/ Melissa S. Pettit*
Melissa S. Pettit