Jonathan C. Lipson
Temple University-Beasley School of Law
1719 N. Broad St.
Philadelphia, PA 19122
*Counsel to Peter W. Jackson*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In Re: | Chapter 11 |
| PURDUE PHARMA L.P., *et al.* [1] | Case No. 19-23649 (RDD) |
| Debtors. | (Jointly Administered) |

**OBJECTION OF PETER W. JACKSON TO AMENDED DISCLOSURE STATEMENT FOR FIRST AMENDED CHAPTER 11 PLAN FOR PURDUE PHARMA L.P. AND ITS AFFILIATED DEBTORS**

To the Honorable Robert D. Drain, United States Bankruptcy Judge:

**PRELIMINARY STATEMENT**

Peter W. Jackson, a creditor and party in interest, by and through his undersigned counsel, respectfully submits this objection ("Objection") to (1) the *Debtors' Motion to Approve (I) the Adequacy of Information in the Disclosure Statement, (II) Solicitation and Voting Procedures, (III) Forms of Ballots, Notices and Notice Procedures in Connection Therewith, and (IV) Certain Dates with Respect Thereto* [ECF No. 2489 & as revised at ECF No. 2736] (the "Disclosure Statement

---

[1] The debtors in these chapter 11 cases ("Debtors" or "Purdue"), along with the last four digits of each Debtor's registration number in the applicable jurisdiction, are as follows: Purdue Pharma L.P. (7484), Purdue Pharma Inc. (7486), Purdue Transdermal Technologies L.P. (1868), Purdue Pharma Manufacturing L.P. (3821), Purdue Pharmaceuticals L.P. (0034), Imbrium Therapeutics L.P. (8810), Adlon Therapeutics L.P. (6745), Greenfield BioVentures L.P. (6150), Seven Seas Hill Corp. (4591), Ophir Green Corp. (4594), Purdue Pharma of Puerto Rico (3925), Avrio Health L.P. (4140), Purdue Pharmaceutical Products L.P. (3902), Purdue Neuroscience Company (4712), Nayatt Cove Lifescience Inc. (7805), Button Land L.P. (7502), Rhodes Associates L.P. (N/A), Paul Land Inc. (7425), Quidnick Land L.P. (7584), Rhodes Pharmaceuticals L.P. (6166), Rhodes Technologies (7143), UDF LP (0495), SVC Pharma LP (5717) and SVC Pharma Inc. (4014) (collectively, the "Bankruptcy Cases").

- 1 -

Motion"); and the (2) *Amended Disclosure Statement for First Amended Chapter 11 Plan for Purdue Pharma L.P. and Its Affiliated Debtors* [ECF No. 2788] (the "Disclosure Statement").[2]

The Disclosure Statement cannot be approved, and the Disclosure Statement Motion must be denied, because the First Amended Joint Chapter 11 Plan of Reorganization for Purdue Pharma L.P. and its Affiliated Debtors [ECF No. 2731] (the "Plan"), described in the Disclosure Statement, is unconfirmable on its face. A disclosure statement describing a facially unconfirmable plan cannot be approved.

Mr. Jackson references and joins the objections of the Office of the United States Trustee [ECF No. 2686], the Ad Hoc Group of Non-Consenting States [ECF No. 2762], and the Ad Hoc Committee on Accountability [ECF No. 2745].

### Analysis

1.  Section 1125 of the United States Bankruptcy Code provides that a debtor may not solicit votes on a plan "unless, at the time of or before such solicitation, there is transmitted to such holder the plan or a summary of the plan, and a written disclosure statement approved, after notice and a hearing, by the court as containing adequate information."[3] 11 U.S.C. § 1125(b). If the plan is "patently unconfirmable on its face, the application to approve the disclosure statement must be denied, as solicitation of the vote would be futile." *See* In re Quigley Co., Inc., 377 B.R. 110, 115–16 (Bankr. S.D.N.Y. 2007)(*citing* In re Beyond.com Corp., 289 B.R. 138, 140 (Bankr. N.D. Cal.

---

[2] Mr. Jackson recognizes that this Objection is filed after the deadline of April 23, 2021 set forth in the Disclosure Statement Motion (at p. 4). The undersigned counsel conferred with counsel to the Debtors in an effort to address the Objection. While it appears that there may be further iterations of the Disclosure Statement, it is not clear whether the Objection will be resolved thereby. In any case, the liquidation analysis of concern, discussed below, was not released until April 24, 2021—one day *after* the deadline for objections. Mr. Jackson would ask the Court to take these factors into consideration in the event there is a challenge to this objection on grounds of timeliness. Mr. Jackson reserves the right to further object to any modifications of the Disclosure Statement.

[3] 11 U.S.C. § 1125 ("adequate information" is "information of a kind, and in sufficient detail, as far as is reasonably practicable in light of the nature and history of the debtor and condition of the debtor's books and records . . . that would enable such a hypothetical reasonable investor . . . to make an informed judgment about the plan. . . ).

2003) (collecting cases); In re 266 Washington Assocs., 141 B.R. 275, 288 (Bankr. E.D.N.Y.), *aff'd*, 147 B.R. 827 (E.D.N.Y. 1992); In re Filex, 116 B.R. 37, 41 (Bankr. S.D.N.Y. 1990)).

2. Here, the Plan described in the Disclosure Statement is facially unconfirmable for two reasons. *First*, by failing to value claims that personal injury and wrongful death tort claimants have asserted or could assert directly against the Debtors' shareholders and related entities, the Plan would violate the "best interest of creditors" test of section 1129(a)(7). *Second*, the Plan would effectively force all personal injury and wrongful death claimants into a kind of mandatory arbitration, which exceeds the powers vested in Bankruptcy Courts.

**I.**    *The Missing Value of the Sackler Direct Claims*

3. Shortly after the commencement of these cases on September 15, 2019 (the "Petition Date"), this Court granted a preliminary injunction enjoining public and private entities from the commencement or continuation of active judicial, administrative, or other actions or proceedings "arising from or in any way relating to the Debtors' prescription opioid business." *See* Order Pursuant to 11 U.S.C. § 105(a) Granting, in Part, Motion for a Preliminary Injunction, Purdue Pharma, L.P. v. Commw of Mass., Adv. Pro. No. 19-08289 (Bankr. S.D.N.Y Oct. 11, 2019) [ECF No. 82].[4] Among other things, this preliminary injunction halted about 600 lawsuits asserting direct personal injury and/or wrongful death tort claims against members of the Sackler family (the "Sackler Direct Claims").

4. The Plan appears to depend on nondebtor releases and channeling injunctions ("Shareholder Releases") that would, in essence, make the preliminary injunction permanent. According to the Disclosure Statement, the Plan and the Shareholder Releases are "integral parts"

---

[4] The preliminary injunction has been extended many times. *See* Seventeenth Amended Order Pursuant to 11 U.S.C. § 105(a) Granting Motion for a Preliminary Injunction, Purdue Pharma, L.P. v. Commw of Mass., Adv. Pro. No. 19-08289 (Bankr. S.D.N.Y. Apr. 22, 2021) [ECF No. 254].

of a "global settlement" that has been negotiated and mediated during the past 19 months. Disclosure Statement, at 23, n. 22.

5.  Yet, critical elements of this settlement have not been disclosed. Neither the Disclosure Statement nor the Plan define, describe, or explain the Shareholder Releases or indicate which members of the Sackler family (or related entities) would receive them. Sections 10.10 and 10.11 of the Plan, where they are to appear, say simply "[To come]." Plan, at 93. The final form of any such releases may not be known until long after approval of the Disclosure Statement—or, indeed, after confirmation of the Plan.[5]

6.  The Plan does provide for broad releases and channeling injunctions generally, including as to direct claims that might otherwise be asserted against other nondebtors arising from, or related to, the Debtors' misconduct.[6] Moreover, the term sheet filed at the outset of these cases indicates that any contribution by the Sacklers will be "[i]n exchange for comprehensive

---

[5] The Shareholder Releases will be embodied in a "Shareholder Settlement Agreement," defined in the Plan to mean "the <u>settlement agreement to be entered into on or prior to the Effective Date</u> by and among the Debtors and the Shareholder Parties. . . . See Plan, at 27. The "Effective Date" cannot occur until the Plan is confirmed—long after approval of any disclosure statement.

[6] Section 10.6 of the Plan provides in pertinent part that "the <u>Released Parties</u> <u>shall be deemed</u> conclusively, absolutely, unconditionally, irrevocably and forever <u>released</u>, to the maximum extent permitted by law, as such law may be extended subsequent to the Effective Date, except as otherwise explicitly provided herein, <u>by the Releasing Parties from any and all Claims</u>." Plan, at 86 (emphasis supplied). Section 10.7 of the Plan provides that "<u>all Persons that have held</u> or asserted . . . [any] <u>PI Claim shall be permanently and forever stayed</u>, restrained and enjoined <u>from taking any action</u> for the purpose of directly or indirectly collecting, recovering or receiving payments, satisfaction, recovery or judgment of any form from or <u>against</u> . . . any other <u>Released Party</u>". Plan, at 88 (emphasis supplied).

   The term "Released Parties" includes the Debtors and "their Related Parties." Plan, at 25. The Plan defines "Related Parties" to include "<u>past, present, and future officers, board members</u>, directors, principals, agents, servants, independent contractors, co-promoters, third-party sales representatives, medical liaisons, members, partners (general or limited), managers, employees, subcontractors, agents, advisory board members, financial advisors, attorneys and legal representatives, accountants, investment bankers, consultants, representatives, management companies, fund advisors and other professionals and advisors, trusts." Plan, at 25 (emphasis supplied). The Plan defines "Releasing Parties" as including all holders of Claims against or Interests in the Debtors." Plan, at 25. The Plan adopts the Bankruptcy Code's definition of "Claims" (Plan, at 4), which appears to mean the Plan would release any "right to payment, whether or not such right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured, or unsecured." 11 U.S.C. § 101(5).

releases in the form and manner to be agreed upon by the parties."[7]  Thus, the Plan appears to contemplate that the Sackler Direct Claims will be resolved through channeling injunctions, as "Channeled Claims." Plan at 4.[8]

7. The Disclosure Statement appears to contain no analysis of the basis for granting the Shareholder Releases or the merits of the Sackler Direct Claims.  It appears that the Debtors' professionals undertook substantial investigations and analyses of various claims of the Debtors' *estates* against the Sacklers.[9]  But the Disclosure Statement provides little analysis of those claims, and even less of the Sackler Direct Claims, though they, too, would be released and enjoined permanently under the Plan.[10]

8. The liquidation analysis contained in the Disclosure Statement does discuss the effect of a chapter 7 liquidation on the proposed settlement with the Sacklers.  For these purposes, "[t]he Liquidation Analysis assumes that there is no settlement with the shareholders" and that "[t]he amount of any hypothetical judgment is *unknowable*." Disclosure Statement, at 5 (emphasis supplied).

---

[7] *See* Notice of Filing of Term Sheet with Ad Hoc Committee [ECF No. 257], at ¶¶ 5 & 6.

[8] The Plan defines a "Channeled Claim" as including "Released Claims and Shareholder Released Claims held by Holders of Claims set forth in clauses (i) through (vi) to the extent such Released Claims and Shareholder Released Claims arise out of or relate to such Claims against the Debtors." Plan, at 4.

[9] The Disclosure Statement does describe the many meetings and discussions that various parties had about the estates' claims against the Sacklers.  "Davis Polk lawyers . . . devoted more than 22,500 hours to the investigation and analysis of potential estate claims. Where necessary, the Davis Polk team was supplemented by a separate team of attorneys that performed initial screenings of electronic documents and escalated relevant documents for review by Davis Polk and other professionals, including AlixPartners and Bates White, as appropriate." Disclosure Statement, at 99.

[10] The Disclosure Statement recounts in detail the many meetings and investigations in which the "Special Committee" of the Debtors' board of directors engaged.  The purpose of the investigation appears not to have been to assess the Sackler Direct Claims, but instead estate claims against the Sacklers, e.g., "to form the basis to determine whether to bring litigation against the Sackler Families and Sackler Entities to recover on these *potential estate claims* or to determine if, in the business judgment of the Special Committee, it was more prudent to seek a settlement with the Sackler Families and Sackler Entities and whether any proposed Settlement Framework was fair and equitable and thus in the *best interests of the estate*." Disclosure Statement, at 98 (emphasis supplied).

9. The liquidation analysis "assumes" that the recoveries in respect of "Shareholder Claim Rights" are estimated to be $746-$2,238 million and received at PPLP." Disclosure Statement App. C, at 6. The Plan defines "Shareholder Claim Right" as any "Claim *against any Debtor* or that seeks to recover *from* any property of *any Debtor or its Estate . . .* that is held by a *Shareholder Released Party*." Plan, at 27 (emphasis supplied).

10. Without any definition of the Shareholder Releases, the term "Shareholder Released Party" is incomplete. The liquidation analysis does, however, appear to be limited to claims against the Debtors or their estates—not claims that will be "channeled" away from nondebtors and subject to the Shareholder Releases.[11]

11. Not surprisingly, the Disclosure Statement asserts that "the Debtors believe that recoveries in respect of Shareholder Claim Rights in the context of a hypothetical chapter 7 liquidation would likely be lower than recoveries under the Shareholder Settlement Agreement." Disclosure Statement App. C, at 5. The reasons listed in the liquidation analysis are:

- "Shareholder Released Parties" (to-be-defined in the Plan) would pay for Shareholder Releases under the Plan.
- A chapter 7 trustee and its counsel would not be familiar with the extremely complicated and extensive factual record, which could affect the Trustee's ability to prosecute the "Shareholder Claim Rights."
- The Shareholder Settlement allows for the consensual resolution of other complex issues, including collectability.

---

[11] The Plan defines "Allowed" to include "Channeled Claims," but the Liquidation Analysis states that-

> In preparing the Liquidation Analysis, the Debtors estimated *Allowed Claims* based upon a review of Claims listed on the *Debtors' Schedules*, Claims listed in the Debtors' current books and records and *Proofs of Claim* filed to date. In addition, the Liquidation Analysis includes estimates for Claims not currently reflected in the books and records or asserted in the Chapter 11 Cases, but which could be asserted and Allowed in a chapter 7 liquidation, including Administrative Claims, wind-down costs, and trustee fees. The Bankruptcy Court has not estimated or otherwise fixed the total amount of Allowed Claims used for purposes of preparing the Liquidation Analysis."

Disclosure Statement App. C, at 1 (emphasis supplied).

- In a hypothetical chapter 7 liquidation, the Debtors would be one party of many pursuing claims against the Debtors' shareholders, and the Debtors might not "win the race to the courthouse."

*Id.* at 5-6.

12. Although the liquidation analysis considers a hypothetical judgment against the Sacklers to be "unknowable," *id.* at 5, it appears that this analysis values the Sackler Direct Claims at $0 because they may be complicated to assert and difficult to collect. The liquidation analysis thus appears to focus exclusively on the value of claims that the *estate* could assert against the Sacklers and to treat the Sackler Direct Claims as having no apparent value at all. *See also id* at 8 ("The Liquidation Analysis assumes that all opioid-related claims asserted against the Debtors are asserted solely against Debtor PPLP.").

13. It is, of course, possible that the Sackler Direct Claims have no value. But that seems implausible. Shortly before the Petition Date, certain members of the Sackler family apparently lost motions to dismiss at least some of such claims.[12] At minimum, it would appear that the Sackler Direct Claims had value sufficient to justify seeking and granting the preliminary injunction in this case.

14. Lacking such analysis, or valuing the Sackler Direct Claims at $0, it is not possible to see how the Plan could satisfy the "best interest of creditors" test under 11 U.S.C. § 1129(a)(7).[13]

---

[12] The brief filed by certain states opposed to the preliminary injunction cited two such cases: State of Rhode Island v. Purdue Pharma L.P., et al., C.A. No. PC-2018-4555, 2019 WL 3991963 (Providence Super. Ct. Aug. 16, 2019) (ruling regarding Richard Sackler); In the Matter of Purdue Pharma, DCP Legal File No. CP-2019-005, DCP Case No. 107102 (Utah Dep't of Comm. July 15, 2019) Order On Motion To Dismiss Of The Sackler Respondents (ruling regarding Richard and Kathe Sackler). *See* The States' Coordinated Opposition to the Debtors' Motion for Preliminary Injunction of States' Law Enforcement Actions against the Sacklers*,* at 8, Purdue Pharma, L.P. v. Commw of Mass., Adv. Pro. No. 19-08289 (Bankr. S.D.N.Y. Apr. 22, 2021) [ECF No. 41].

[13] The so-called "best interests" test requires, in pertinent part, that "[w]ith respect to each impaired class of claims or interests—(A) <u>each holder</u> of a claim or interest of such class—(i) has accepted the plan; or (ii) will <u>receive or retain</u> under the plan on account of such claim or interest property of a value, as of the effective date of the plan, that is not less than the amount that such holder would <u>so receive or retain</u> if the debtor were liquidated under chapter 7 of this title on such date . . . ." 11 U.S.C. § 1129(a)(7) (emphasis added).

To satisfy the "best interests" test, the Disclosure Statement should include a liquidation analysis comparing creditors' recoveries under the Plan against the value creditors would "receive *or retain*" in a chapter 7 liquidation of the Debtors. 11 U.S.C. § 1129(a)(7) (emphasis supplied). In a chapter 7 liquidation creditors would *retain* the Sackler Direct Claims because the Sacklers could not get the Shareholder Releases, which are not authorized by any provision of chapter 7 of the Bankruptcy Code.

15. Another court in this district (in *In re Ditech Holding*) recently refused to confirm a plan on these very grounds. *See* In re Ditech Holding Corp., 606 B.R. 544, 614 (Bankr. S.D.N.Y. 2019) (denying confirmation on best-interests grounds where liquidation analysis "did not account for" value of consumer protection claims that would be enjoined as to nondebtors under the proposed plan). *See also* Ralph Brubaker, *Bankruptcy Injunctions and Complex Litigation: A Critical Reappraisal of Non–Debtor Releases in Chapter 11 Reorganizations*, 1997 U. ILL. L. REV. 959, 992 (1997). A best interests analysis therefore requires some valuation of the Sackler Direct Claims, which requires an evaluation of their merits, and a showing that the Plan will provide treatment that is equal to, or better than, the rights that would otherwise be retained.

16. It is no answer to say that the Debtors and the Sacklers are "inextricably intertwined," as the Debtors have argued in support of the preliminary injunction. *See, e.g.,* In re Purdue Pharm. L.P., 619 B.R. 38, 43 (S.D.N.Y. 2020). Whether the Sackler Direct Claims are, in fact, in addition to or different from claims against the Debtors has not been determined in this case.

17. Nor can the Debtors simply throw up their hands and argue that such claims are "speculative" or "hypothetical," and thus "unknowable." The Debtors in *DiTech* made similar arguments at confirmation—and lost because, the Court reasoned, the viability of such claims is

"entirely dependent on the specific factual and legal details related to each claim." *See DiTech, supra,* at 618.

18. Tellingly, the Disclosure Statement's liquidation analysis does not use typical language that would assure creditors that the Plan satisfies the best interests test of section of 1129(a)(7). Instead, it says that "management believes that values derived from the liquidation assumed in the Liquidation Analysis *do not generate a significant recovery* for stakeholders as compared with the recovery proposed under the Plan." Disclosure Statement, App. C at 2 (emphasis supplied). It is not clear what this means: a "significant recovery" derived from a liquidation might be less than—or greater than—recoveries "as compared with" the Plan.

19. The typical language in a disclosure statement assures creditors that they would, in fact, fare better under the plan than in a chapter 7 liquidation. In *Frontier Communications,* for example, this Court recently approved a disclosure statement with the following language: "Under the Plan, *each creditor class will receive equal or greater value than they would if the Debtors were to liquidate.*" *See* Notice of Filing of Exhibits D, E and F to the Disclosure Statement Relating to the Joint Plan of Reorganization of Frontier Communications Corporation and its Debtor Affiliates Pursuant to Chapter 11 of the Bankruptcy Code, In re Frontier Comm's Corp., (Bankr. S.D.N.Y 20-22476)(RDD), Jun 20, 2020 [ECF No. 524] (unpaginated original & emphasis supplied). The Disclosure Statement here provides no such assurance.

20. Failing to value the Sackler Direct Claims, or valuing them at $0 with no analysis, the Plan cannot satisfy the "best interest of creditors" test of 11 U.S.C. § 1129(a)(7). The Disclosure Statement supporting the Plan therefore cannot be approved.

II. **Bankruptcy Courts Have No Power to Determine Personal Injury or Wrongful Death Claims against Nondebtors for Distributional Purposes.**

21. Approximately 130,000 opioid-related personal injury victims filed claims in these cases, most of which appear to be contingent and unliquidated. Disclosure Statement, at 82.[14] Bankruptcy Courts have no authority under the Judicial Code to determine the merits of such claims—especially when they could be asserted against nondebtors. But that is what the Plan effectively does. Because this exceeds the authority of this Court, the Plan is unconfirmable.

22. Bankruptcy judges may hear and determine all cases under title 11 and all "core proceedings arising under title 11, or arising in a case under title 11." 28 U.S.C. § 157(b)(1). While "core proceedings" include the confirmation of plans of reorganization (28 U.S.C. § 157(b)(2)(L)), they do not include "the liquidation or estimation of contingent or unliquidated personal injury tort or wrongful death claims against the estate for purposes of distribution in a case under title 11." 28 U.S.C. § 157(b)(2)(B). Indeed, Congress specifically sought to protect the right to an adjudication of such claims outside of bankruptcy, providing that "[t]he district court *shall order* that personal injury tort and wrongful death claims shall be tried in the district court in which the bankruptcy case is pending, or in the district court in the district in which the claim arose, as determined by the district court in which the bankruptcy case is pending." 28 U.S.C. § 157(b)(5) (emphasis supplied).

23. As Judge Lifland observed *In re Chateaugay,* "[t]he cases are clear that a bankruptcy court may not hear proceedings to liquidate or estimate personal injury tort or wrongful death claims for the purpose of determining the distribution payable to such claimants." *See* In re Chateaugay Corp., 111 B.R. 67, 72 (Bankr. S.D.N.Y. 1990), *aff'd*, 130 B.R.

---

[14] The liquidation analysis in the Disclosure Statement notes that "Claims filed in amounts certain represent approximately 10% of the claims pool." Disclosure Statement App. C., at 6, n. 2.

403 (S.D.N.Y. 1991), *aff'd in part, rev'd in part*, 961 F.2d 378 (2d Cir. 1992), *and aff'd*, 146 B.R. 339 (S.D.N.Y. 1992)(*citing* In re Waterman S.S. Corp*.,* 63 B.R. 435, 436 (Bankr.S.D.N.Y.1986); In re UNR Industries, Inc*.,* 45 B.R. 322, 324–25 (N.D.Ill.1984)). While the Bankruptcy Court may estimate such claims for purposes of determining voting rights or plan feasibility, *id*. at 72, the Plan goes well beyond this, to create a process that will determine whether and how claims for personal injury or wrongful death will be allowed and, if so, in what amounts they will be paid.

24. In simplified terms, it appears that the Plan places claims for personal injury and wrongful death torts (defined in the Plan as "PI Claims") in Class 10 and treats them as "Channeled Claims." As such, they will be allowed (or not) pursuant to procedures set forth in Exhibit C to the Plan, "Individual Purdue Pharma LP Trust Distribution Procedures" ("PI Trust Distribution Procedures"). *See* Notice of Filing of Plan Supplement Pursuant to the First Amended Joint Plan of Reorganization of Purdue Pharma, L.P. and its Affiliated Debtors, Ex. C [ECF No. 2732].

25. The PI Trust Distribution Procedures appear to vest in an "administrator" the power to allow or disallow PI Claims. "If a holder of a qualifying opioid-related personal injury claim is dissatisfied with the determination under the PI Trust Distribution Procedures of the settlement payment such claimant is to receive," the Disclosure Statement explains, the "dissatisfied claimant can appeal to the claims administrator." Disclosure Statement, at 86. A personal injury claimant who "disagrees with the decision of the claims administrator on the appeal may further appeal to an appeals master appointed by the trustee of the PI Trust." *Id.* The decision of the appeals master "will be final and binding." Id. at 86.

26. It thus appears that the Plan creates a process that fully decides the allowability and amount of claims for personal injury or wrongful death torts without any opportunity for hearing

- 11 -

before or determination by *any* judge. It is tantamount to mandatory arbitration of claims that would otherwise be subject to ordinary adjudication.[15]

27. It is no answer to say, as the Debtors might, that a bankruptcy court may determine whether the claims should be disallowed for other reasons. *See* In re Residential Cap., LLC, 519 B.R. 890, 902 (Bankr. S.D.N.Y. 2014). *Chateaugay, supra*, at 76 ("[A] finding that the claim is subject to disallowance as a matter of law is not tantamount to a determination on the merits of the personal injury tort or wrongful death claim.").

28. Here, the Plan would outsource to private administrators who are not (apparently) judges the sole and exclusive power to make every determination with respect to such claims. While estimation of PI Claims may be necessary for certain purposes (e.g., to determine voting amounts), the Plan eliminates any role for any court to determine, according to the rule of law, whether PI Claims are to be paid or not. It would also appear to eliminate any right to a jury trial on such claims, a right Congress specifically sought to preserve in cases of personal injury or wrongful death torts. *See* 28 U.S.C. § 1411(a)("title 11 do[es] not affect any right to trial by jury that an individual has under applicable nonbankruptcy law with regard to a personal injury or wrongful death tort claim.").

29. Claims for personal injury or wrongful death may involve important and difficult questions of duty, breach, and causation that require analysis and consideration by lawyers and judges and (in some cases) a jury. The PI Trust Procedures, however, set up a series of bright-line tests that arbitrarily decide what type of evidence is required to have such a claim allowed. The

---

[15] Indeed, the Plan specifically divests this Court of jurisdiction over Channeled Claims in deference to the PI Trust Distribution Procedures. Disclosure Statement, at 180 ("Notwithstanding anything in [] Article XI of the Plan to the contrary, the resolution of Channeled Claims against the Debtors and the forum in which such resolution shall be determined shall be governed by, and in accordance with, the Creditor Trust Documents," i.e., the PI Trust Distribution Procedures).

Disclosure Statement, for example, says that a personal injury claimant can recover "only if the opioid you used was prescribed to you." Disclosure Statement, at 6. If that is, in fact, the applicable legal standard, the Disclosure Statement should say so, citing appropriate authority.[16] If not, it is not clear what the legal authority for such a rule is.

30. This is especially problematic where, as here, PI Claims that have been or could be asserted against the Sacklers and other nondebtors would be "channeled" into the PI Trust and (presumably) made subject to the Shareholder Releases. The District Court has held in this case that the Bankruptcy Court cannot exercise "arising in" jurisdiction—the power to enter final orders—over the merits of direct claims arising under applicable state law asserted against the Sacklers—that is, the Sackler Direct Claims. In re Purdue Pharms. L.P., 619 B.R. 38, 56 (S.D.N.Y. 2020)("[T]he Bankruptcy Court cannot exercise "arising in" jurisdiction over the merits of the claims against Dr. Sackler in the *Dunaway* Action.").[17]

31. Similarly, it would appear that Chief Judge McMahon has reasoned that a confirmation order that permanently releases or enjoins the Sackler Direct Claims—as the Shareholder Releases will presumably do—cannot be finally adjudicated by this Court, either; it must be subject to *de novo* review by the District Court. *Id*. at 56-57 ("The Bankruptcy Court cannot now, nor will it ever be able to, adjudicate the *Dunaway* claims against Dr. Sackler without first being permitted to do so by this court, reviewing an order of the Bankruptcy Judge *de novo.*").

---

[16] To be clear: Mr. Jackson does not concede that that is the appropriate evidentiary standard.

[17] The District Court further stated that:

> The TDDLA claims against Dr. Sackler are entirely independent of the bankruptcy proceeding; they arise under a state statute and they were filed months before there was any bankruptcy. Neither the TDDLA nor the lawsuit references or depends on any order of the Bankruptcy Court for their existence. Thus, Judge Drain exceeded his authority to "enforce or implement court orders" under Section 105 when he identified the *Dunaway* Action as a core proceeding.

In re Purdue Pharms. L.P., 619 B.R. 38, 56 (S.D.N.Y. 2020).

32. Given the foregoing, it would appear that the Court has no power to enter a final order confirming the Plan if it channels PI Claims as proposed, and contains the Shareholder Releases as expected. Any plan that purports to do so would be unconfirmable by this Court.

### Conclusion

The Disclosure Statement reflects a Plan that cannot be confirmed by this Court in its current form. The Disclosure Statement thus cannot be approved, and the Disclosure Statement Motion should be denied.

Dated: May 6, 2021　　　　　　　　　　　　　Respectfully Submitted,
　　　　Philadelphia, PA

　　　　　　　　　　　　　　　　By:　　/s/ Jonathan C. Lipson
　　　　　　　　　　　　　　　　　　　　Jonathan C. Lipson (JL-3507)
　　　　　　　　　　　　　　　　　　　　Temple University-Beasley School of Law
　　　　　　　　　　　　　　　　　　　　1719 North Broad St.
　　　　　　　　　　　　　　　　　　　　Philadelphia, PA 19122
　　　　　　　　　　　　　　　　　　　　215-204-0608
　　　　　　　　　　　　　　　　　　　　jlipson@temple.edu
　　　　　　　　　　　　　　　　　　　　*Counsel to Peter W. Jackson*