Jasmine Ball
Maura Kathleen Monaghan
Jeffrey J. Rosen
DEBEVOISE & PLIMPTON LLP
919 Third Avenue
New York, New York 10022
Telephone:  (212) 909-6000
Facsimile:  (212) 909-6836

*Attorneys for Beacon Company*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re: | **Chapter 11** |
| **PURDUE PHARMA L.P.,** *et al.*, | **Case No. 19-23649 (RDD)** |
| Debtors.[1] | **(Jointly Administered)** |

**REPLY BY THE SIDE A INITIAL COVERED SACKLER PERSONS**
**IN SUPPORT OF DISCLOSURE STATEMENT FOR SECOND AMENDED PLAN**

---

[1]    The Debtors in these cases, along with the last four digits of each Debtor's registration number in the applicable jurisdiction, are as follows: Purdue Pharma L.P. (7484), Purdue Pharma Inc. (7486), Purdue Transdermal Technologies L.P. (1868), Purdue Pharma Manufacturing L.P. (3821), Purdue Pharmaceuticals L.P. (0034), Imbrium Therapeutics L.P. (8810), Adlon Therapeutics L.P. (6745), Greenfield BioVentures L.P. (6150), Seven Seas Hill Corp. (4591), Ophir Green Corp. (4594), Purdue Pharma of Puerto Rico (3925), Avrio Health L.P. (4140), Purdue Pharmaceutical Products L.P. (3902), Purdue Neuroscience Company (4712), Nayatt Cove Lifescience Inc. (7805), Button Land L.P. (7502), Rhodes Associates L.P. (N/A), Paul Land Inc. (7425), Quidnick Land L.P. (7584), Rhodes Pharmaceuticals L.P. (6166), Rhodes Technologies (7143), UDF LP (0495), SVC Pharma LP (5717) and SVC Pharma Inc. (4014).  The Debtors' corporate headquarters is located at One Stamford Forum, 201 Tresser Boulevard, Stamford, CT 06901.

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ......................................................................................... ii

PRELIMINARY STATEMENT ................................................................................. 1

ARGUMENT ............................................................................................................. 3

I.    The Settlement Agreement Affords Unique Benefits that Could Not Be Obtained
      in Litigation.......................................................................................................... 3

II.   The Settlement Agreement Eliminates Significant Risks that Otherwise Result
      from a Resumption of Litigation......................................................................... 7

      A.    Overview of the Side A ICSP's Defenses to the Estate Claims ............................ 7

      B.    Overview of the Side A ICSP's Defenses to the Third-Party Claims................... 10

CONCLUSION......................................................................................................... 18

# TABLE OF AUTHORITIES

## CASES

*Applewhite v. Commonwealth*,
  No. 330 M.D.2012, 2012 WL 5374328 (Pa. Commw. Ct. 2012)............................................5

*Bernstein v. Starrett City, Inc.*,
  303 A.D.2d 530 (2d Dept 2003) ....................................................................................11

*Bray v. Ingersoll-Rand Co.*,
  No. 3:13-cv-1561 (SRU), 2015 WL 728515 (D. Conn. Feb. 19, 2015) ...............................15

*Buckley Family Tr. v. McCleary*,
  C.A. No. 2018-0903-AGB, 2020 WL 1522549 (Del. Ch. Mar. 31, 2020) ...............................8

*Camden Cnty. Bd. of Chosen Freeholders v. Beretta, U.S.A. Corp.*,
  273 F.3d 536 (3d Cir. 2001)...........................................................................................17

*Cap. One Nat'l Ass'n v. 48-52 Franklin, LLC*,
  No. 12 Civ. 3366 (LGS), 2014 WL 1386609 (S.D.N.Y. Apr. 8, 2014)..................................11

*City of New Haven v. Purdue Pharma L.P.*,
  No. X07-HHD-CV-176086134S,
  2019 WL 423990 (Conn. Super. Ct. Jan. 8, 2019).......................................................7, 14, 15

*Cornelius v. Cain*,
  No. CACE 01-020213(02), 2004 WL 48102 (Fla. Cir. Ct. Jan. 5, 2004) ...............................13

*Di Portanova v. Monroe*,
  229 S.W.3d 324 (Tex. Ct. App. 2006) ............................................................................18

*Diamond v. General Motor Corps.*,
  20 Cal. App. 3d 374 (1971) ............................................................................................5

*Eurycleia Partners, LP v. Seward & Kissel, LLP*,
  12 N.Y.3d 553 (2009) ...................................................................................................12

*Farrell v. Nat'l Gypsum Co.*,
  No. 88 CIV. 8136 (CES), 1991 WL 89632 (S.D.N.Y. May 30, 1991)..................................15

*First Realvest, Inc. v. Avery Builders, Inc.*,
  600 A.2d 601 (Pa. Super. Ct. 1991)..................................................................................8

*Fletcher v. Havre De Grace Fireworks Co.*,
  229 Md. 196 (1962) ......................................................................................................10

*Grewal v. Purdue Pharma L.P.*,
  No. ESX-C-245-17, 2018 WL 4829660 (N.J. Super. Ct. Ch. Div. Oct. 2, 2018)......................7

*Harris v. Purdue Pharma, L.P.*,
    218 F.R.D. 590 (S.D. Ohio 2003) ...........................................................................13

*Howland v. Purdue Pharma*,
    104 Ohio St. 3d 584 (Ohio 2004) ...........................................................................13

*In re Direct Access Partners, LLC*,
    602 B.R. 495 (Bankr. S.D.N.Y. 2019) ......................................................................8

*In re Edgewater Med. Ctr.*,
    373 B.R. 845 (Bankr. N.D. Ill. 2007) .....................................................................10

*In re F-Squared Inv. Mgmt., LLC*,
    No. AP 17-50716, 2019 WL 4261168 (Bankr. D. Del. Sept. 6, 2019) ...................10

*In re Iridium Operating LLC*,
    373 B.R. 283 (Bankr. S.D.N.Y. 2007) ......................................................................9

*In re Joint E. and S. Dists. Asbestos Litig.*,
    No. 92 Civ. 1113 (RWS), 1993 WL 97301 (S.D.N.Y. Mar. 30 1993) ...................15

*In re MF Global Inc.*,
    No. 11-2790 MG, 2012 WL 3242533 (Bankr. S.D.N.Y. Aug. 10, 2012) ................2

*In re NII Holdings, Inc.*,
    536 B.R. 61 (Bankr. S.D.N.Y. 2015) ........................................................................2

*In re Stage Presence, Inc.*,
    592 B.R. 292 (Bankr. S.D.N.Y. 2018), *aff'd*,
    No. 18-cv-10662 (JSR), 2019 WL 2004030 (S.D.N.Y. May 7, 2019) ...................12

*In re W.R. Grace & Co.*,
    475 B.R. 34 (D. Del. 2012) .......................................................................................2

*Laborers Local 17 Health & Benefit Fund v. Philip Morris, Inc.*,
    191 F.3d 229 (2d Cir. 1999) ...................................................................................14

*Lipsky v. Com. United Corp.*,
    551 F.2d 887 (2d Cir. 1976) .....................................................................................9

*Lloyd v. Moore*,
    115 A.D.3d 1309 (4th Dep't 2014) .....................................................................10, 11

*LSSi Data Corp. v. Time Warner Cable, Inc.*,
    892 F. Supp. 2d 489 (S.D.N.Y. 2012) ....................................................................11

*Lyon v. Morphew*,
    424 Mass. 828 (1997) ..............................................................................................10

*Matter of Xonics Photochemical Inc.*,
 841 F.2d 198 (7th Cir. 1988) ............................................................9

*MLM LLC v. Karamouzis*,
 2 A.D.3d 161 (1st Dept 2003)...........................................................11

*Nahl v. Jaoude*,
 968 F.3d 173 (2d Cir. 2020)...............................................................14

*Sackler v. Utah Div. of Consumer Prot.*,
 No. 190905862 at 10 (D. Utah Oct. 10, 2019).....................................7

*State ex rel. Jennings v. Purdue Pharma L.P.*,
 No. N18C-01-223 MMJ CCLD,
 2019 WL 446382 (Del. Super. Ct. Feb. 4, 2019) ............................7, 17

*State Ex Rel. Stenehjem v Purdue Pharma L.P.*,
 No. 08-2018-CV-01300, 2019 WL 2245743 (N.D. Dist. May 10, 2019) ...................7, 14, 15

*State v. Lead Indus., Ass'n, Inc.*,
 951 A.2d 428 (R.I. 2008).....................................................................17

*Tavarez v. Naugatuck Bd. of Educ.*,
 No. 08–cv–725, 2012 WL 1435284 (D. Conn. Apr. 25, 2012) .............11

*United States v. Purdue Frederick Co., Inc.*, 495 F. Supp. 2d 569, 575 (W.D. Va.
 2007) ....................................................................................................7

*Walden v. Fiore*,
 571 U.S. 277 (2014).............................................................................12

*Wesolek v. Jumping Cow Enters., Inc.*,
 51 A.D.3d 1376 (4th Dept 2008) ........................................................11

**STATUTES**

N.Y. Bus. Corp. Law § 717 .......................................................................12

**OTHER AUTHORITIES**

3 TREATISE ON THE LAW OF CORPS. § 20:1 (3d 2020) ...................................8

*U.S. Opioid Dispensing Rate Maps*, CENTERS FOR DISEASE CONTROL AND
 PREVENTION, https://www.cdc.gov/drugoverdose/maps/rxrate-maps.html............16

*List of Controlled Substances*, DRUG ENFORCEMENT ADMINISTRATION,
 https://www.deadiversion.usdoj.gov/schedules/#:~:text=Examples%20of%20
 Schedule%20II%20narcotics,opium%2C%20codeine%2C%20and%20hydroc
 odone.....................................................................................................13

*Facts About Fentanyl,* DRUG ENFORCEMENT AGENCY,
    https://www.dea.gov/resources/facts-about-fentanyl...............................................15

Press Release, DRUG ENFORCEMENT AGENCY, DEA Reports Significant Increase
    in Counterfeit Pills in Minnesota (Aug. 12, 2020), https://www.dea.gov/press-
    releases/2020/08/12/dea-reports-significant-increase-counterfeit-pills-
    minnesota. ................................................................................................................16

3A Fletcher, CYCLOPEDIA OF THE LAW OF CORPORATIONS §1137 (2019) ............................10, 12

Carmen Forman, *Stitt Signs Bill Clarifying AG's Role in Settling Lawsuits,*
    OKLAHOMAN (May 29, 2019),
    https://www.oklahoman.com/article/5632507/stitt-signs-bill-clarifying-ags-
    role-in-settling-lawsuits. .........................................................................................6

Letter from Janet Woodcock, M.D., Dir., Ctr. for Drug Eval. & Res., to Andrew
    Kolodny, M.D., Pres. Physicians for Responsible Opioid Prescribing, Re
    Docket No. FDA-2012-P-0818 (Sept. 10, 2013),
    https://paindr.com/wp-
    content/uploads/2013/09/FDA_CDER_Response_to_Physicians_for_Respons
    ible_Opioid_Prescribing_Partial_Petition_Approval_and_Denial.pdf. ...................14

*National Drug Overdose Deaths Involving Select Prescription and Illicit Drugs,*
    NATIONAL INSTITUTE OF DRUG ABUSE,
    https://www.drugabuse.gov/drug-topics/trends-statistics/overdose-death-rates.....................16

OxyContin Package Insert, PURDUE PHARMA L.P. (Apr. 25, 2001),
    https://web.archive.org/web/20040719100631/http://www.fda.gov/cder/foi/lab
    el/2001/20553s022lbl.pdf. .......................................................................................13

*Oxymorphone,* UNITED STATES FOOD & DRUG ADMINISTRATION,
    https://www.fda.gov/drugs/postmarket-drug-safety-information-patients-and-
    providers/oxymorphone-marketed-opana-er-
    information#:~:text=In%20June%202017%2C%20the%20FDA ...........................14

Crystal Phend, *Tobacco Master Settlement at 20 Years,*
    MEDPAGE TODAY (Nov. 24, 2018),
    https://www.medpagetoday.com/primarycare/smoking/76496 ................................6

RESTATEMENT (THIRD) OF TORTS: LIAB. FOR ECON. HARM § 8 cmt. g (AM. LAW
    INST. 2020) ..............................................................................................................17

E.I. Truong, S.K. Kishawi, V.P. Ho et al., *Opioids and Injury Deaths: A
    Population-Based Analysis of the United States from 2006 to 2017,*
    INJURY (Mar. 9, 2021) (forthcoming),
    https://www.injuryjournal.com/article/S0020-1383(21)00233-3/fulltext. ..............16

v

A.Y. Walley, D. Bernson, M. Larochelle et al., *The Contribution of Prescribed
and Illicit Opioids to Fatal Overdoses in Massachusetts, 2013-2015*,
134(6) Pub. Health Rep. 667 (Nov.-Dec. 2019),
https://www.ncbi.nlm.nih.gov/pmc/articles/PMC6832088/ ...................................................16

Charles Alan Wright & Arthur R. Miller, 18B Fed. Prac. & Proc. Juris. § 4474.1
*Criminal Conviction as Preclusion in Civil Proceeding—Conviction by Plea*
(2d ed.) ......................................................................................................................................9

The Dr. Mortimer Sackler Initial Covered Sackler Persons ("**Side A ICSPs**"),[2] by and through their undersigned counsel, hereby submit this Reply in support of the Debtors' Disclosure Statement for Second Amended Chapter 11 Plan for Purdue Pharma L.P. and Its Affiliated Debtors ("**Disclosure Statement**"), Dkt. No. 2825.  The Side A ICSPs respectfully state as follows:

## PRELIMINARY STATEMENT

1.      The Side A ICSPs are submitting this Reply to respond to the argument of various objectors that the Disclosure Statement does not present a sufficient analysis of the proposed settlement with members of the Sackler families, pursuant to which they would make payments of $4.275 billion.[3]  The Court has similarly requested that the Disclosure Statement be supplemented with an analysis of the benefits of settlement and the risks of litigation.[4]  The Side A ICSPs therefore propose to incorporate the attached Side A Initial Covered Sackler Persons' Proposed Supplement to the Debtors' Disclosure Statement for Second Amended Chapter 11 Plan for Purdue Pharma L.P. and Its Affiliated Debtors (attached as Exhibit A) into the Disclosure Statement to address these issues.

---

[2]    The Mortimer Sackler ICSPs include Theresa Sackler, Ilene Sackler Lefcourt, Kathe Sackler, and Mortimer D.A. Sackler, as well as trusts for their benefit and the trustees of those trusts.  Amended and Restated Case Stipulation Among the Debtors, the Official Committee of Unsecured Creditors and Certain Related Parties dated Nov. 20, 2019 ¶ 1, *In re Purdue Pharma L.P.* (Bankr. S.D.N.Y. Nov. 20, 2019), ECF. No. 518.

[3]    *See, e.g.*, Obj. of United States Trustee to Disclosure Statement for Chapter 11 Plan of Purdue Pharma L.P. and Its Affiliated Debtors at 2, *In re Purdue Pharma L.P.* (Bankr. S.D.N.Y. Apr. 21, 2021), Dkt. No. 2686; Ad Hoc Group of Non-Consenting States' Obj. to the Debtors' Mot. to Approve (I) Adequacy of Information in Disclosure Statement, (II) Solicitation and Voting Procedures, (III) Forms of Ballots, Notices and Notice Procedures in Connection Therewith, and (IV) Certain Dates with Respect Thereto ¶ 6, *In re Purdue Pharma L.P.* (Bankr. S.D.N.Y. Apr. 29, 2021), Dkt. No. 2762 [hereinafter "*NCSG Obj.*"].

[4]    *See* Tr. of Hr'g at 105:3-25, *In re Purdue Pharma L.P.*, No. 19-23649-RDD) (Bankr. S.D.N.Y. Mar. 24, 2021), Dkt. No. 2608 ("I believe it is important in that this further statement . . . lay out in more detail the arguments for and against continued litigation against the Sacklers, not only on the estate claims, but also on non-estate claims. . . . [T]he public, for example, may not understand the importance of corporate separability from its shareholders, may not understand the limitations that Congress has placed, and notwithstanding very recent case law continues to place and not even consider changing on a Court's ability in a bankruptcy case to award a fraudulent transfer, as well as issues regarding collectability and the like.").

1

2.      The proposed Supplement provides an overview of (i) the benefits of settlement that would not be achievable through piecemeal tort litigation in courts scattered across the country and (ii) the risks of litigation of the "Third-Party Claims"—principally statutory and common law tort claims brought against certain members of the Sackler families—and the "Estate Claims"— principally claims for the return of distributions.  While it is possible the Debtors may further add to the disclosure statement to address some of these issues (and indeed the current draft contains a placeholder to that effect), in the meantime the Side A ISCPs believe that interested parties would benefit from having a full perspective regarding the benefits of settlement and the risks of litigation.  The Side A ICSPs therefore suggest that any additional information added by the Debtors should include the Supplement, which succinctly presents the relevant issues in chart form.

3.      The proposed settlement provides benefits in the form of billions of dollars of funding for the opioid abatement plan set forth in the Debtors' proposed Plan of Reorganization (the "Plan"), which will facilitate tailored, evidence-based public health programs and an equitable distribution of resources among communities across the country.  Litigation in the tort system, even if successful, could not accomplish these critical objectives.  And this Court has repeatedly emphasized the importance of settlements in bankruptcy proceedings:  "Compromise and settlement are the heart and soul of every successful chapter 11 proceeding"[5] because settlement "minimize[s] costly litigation and further[s] parties' interests in expediting the administration of the bankruptcy estate."[6]

---

[5]      *In re NII Holdings, Inc.*, 536 B.R. 61, 65 (Bankr. S.D.N.Y. 2015).

[6]      *In re MF Global Inc.,* No. 11-2790 MG, 2012 WL 3242533, at *5 (Bankr. S.D.N.Y. Aug. 10, 2012); *see also In re W.R. Grace & Co.*, 475 B.R. 34, 79 (D. Del. 2012) (approving settlement where it eliminated "the high degree of uncertainty that would accompany continued litigation" and would "allow [the debtor's] creditors to recover funds much sooner than they otherwise could have done").

4.      The settlement also eliminates the risks to the Estate and other plaintiffs that would result from the resumption of litigation.[7]  Litigation would be highly uncertain, as illustrated by Purdue's prior successes in defeating opioid-related tort lawsuits filed against it or resolving such suits for modest amounts of money.  Were litigation to resume, plaintiffs would once again face numerous barriers to establishing that Purdue's conduct was unlawful.  If plaintiffs cannot show that Purdue's marketing was unlawful, then the Third-Party Claims, which are predicated on Purdue's conduct, necessarily would fail as well.  It is important also to note that the Sackler families have additional, independent defenses available to them beyond those available to Purdue, including the most basic defense of all:  they acted lawfully.  The Sackler families would also assert defenses to the Estate Claims, which rest on the mistaken assumption that Purdue was somehow insolvent at a time when it was generating billions of dollars per year and faced minimal litigation exposure.  Litigation is also time consuming:  the process of trial court litigation, appeals, and judgment enforcement (if any) takes many years.  And, as the bankruptcy case has amply demonstrated, litigation is extraordinarily expensive, depleting resources that could otherwise be dedicated to public health initiatives under the proposed settlement.

## ARGUMENT

## I.      The Settlement Agreement Affords Unique Benefits that Could Not Be Obtained in Litigation

5.      The $4.275 billion to be paid by the Sackler families under the Settlement Agreement — in addition to their contribution of the full value of Purdue — is the financial linchpin of the comprehensive opioid abatement process set forth in by the Plan.  Their

---

[7]      This filing and the Supplement are meant only for informational purposes.  The Side A ICSPs are not intending to actually litigate their defenses to the Estate or Third-Party Claims or even to describe them in exhaustive detail.

additional cash contribution will fund the lion's share of the abatement program. The Side A ICSPs have long supported a global resolution of claims against the Debtors and members of the Sackler families that would result in billions of dollars being dedicated to opioid abatement. The Plan principally accomplishes precisely this objective through the National Opioid Abatement Trust ("NOAT") and the "Public Creditor Trust Distribution Procedures," which provide a detailed mechanism to ensure that payments made by the Sackler families and certain Estate resources are dedicated to opioid abatement programs selected by public health experts and equitably allocated across the country.[8] To achieve these objectives, the Plan provides:

- A formula that provides for an equitable allocation of available funds between different states based on a formula developed during the course of a lengthy mediation;[9]

- A framework for determining how funds received by each state will be allocated within the state (*i.e.*, divided between the state and local governments);[10]

- A carefully-considered list of approved uses of the NOAT funding, including such critical public health measures as distributing life-saving Naloxone or other medications used to reverse opioid overdoses and increasing distribution of medication-assisted treatment ("MAT"), the gold standard in treatment for individuals suffering from opioid abuse disorder;[11]

- A mechanism for ensuring that state and local governments can cooperate to develop an evidence-based approach to abatement to meet the state's greatest needs while also addressing the needs of local communities;[12]

---

[8]     Public Creditor Trust Distribution Procedures, *In re Purdue Pharma L.P.*, No. 19-23649 (RDD) (Bankr. S.D.N.Y. Apr. 25, 2021), Dkt. No. 2737, Attach. 1. West Virginia has objected to the allocation of abatement funds between states, but that just highlights the importance of ensuring a fair distribution of resources – something that cannot be achieved if a race between claimants to be the first to final verdict. *See* Objection to Debtors' Motion to Approve Disclosure Statement, *In re Purdue Pharma L.P.*, No. 19-23649 (RDD) (Bankr. S.D.N.Y. Apr. 23, 2021), Dkt. No. 2703.

[9]     Public Creditor Trust Distribution Procedures, *In re Purdue Pharma L.P.*, No. 19-23649 (RDD) (Bankr. S.D.N.Y. Apr. 25, 2021), Dkt. No. 2737, Attach. 1, at 30–32.

[10]     *Id.* at 32–34.

[11]     *Id.* at 16–29.

[12]     *Id.* at 9–14.

- A requirement that 95% of the funds be dedicated to abatement – with a maximum of 5% to be used for administrative costs; and[13]

- A mechanism for ensuring that the uses of abatement funds are publicly disclosed and subject to independent audit to confirm that they are being used properly.[14]

6.      Unlike the Plan, the civil tort system would not allow for an equitable distribution of resources in communities across the United States even in the event that litigation was to be successful.  Were litigation to resume, plaintiffs across the country would race to be first to the courthouse with the aim of being first to reach final judgment in a litigation against members of the Sackler families.  While the Side A ICSPs believe that no plaintiff should win such litigation if the law is properly applied to the facts (or sustain any win on appeal), even plaintiffs who are more bullish on their claims should recognize a high risk of unequal outcomes among similarly situated plaintiffs based on timing.  Litigation would effectively become a "lottery ticket" where a few winners (if any) tried to lay claim to a prize while most creditors would wind up with nothing.

7.      The type of sophisticated and targeted abatement program contemplated under the Plan could not be achieved even if plaintiffs are successful in the civil tort system.  Outside the context of settlement, courts cannot mandate the implementation of complex social programs, particularly where they require coordination with numerous government agencies.[15]  It is highly

---

[13]    *Id.* at 3.

[14]    *Id.* at 14–15.

[15]    *See, e.g., Diamond v. General Motor Corps.*, 20 Cal. App. 3d 374, 383 (1971) ("It is indisputable that there exists, within the community, a substantial difference of opinion as to what changes in industrial processes should be required and how soon, what new technology is feasible, what reduction in the volume of goods and services should result and what increase in production costs for the sake of cleaner air will be acceptable. These issues are debated in the political arena and are being resolved by the action of those elected to serve in the legislative and executive branches of government. . . . The objective, which plaintiff envisions to justify his class action, is judicial regulation of the processes, products and volume of business of the major industries of the county.  It was entirely reasonable for the trial court to conclude from the face of the pleading that such an undertaking was beyond its effective capability."); *Applewhite v. Commonwealth*, No. 330 M.D.2012, 2012 WL

uncertain whether any prevailing creditor would be required to dedicate any recovery to opioid abatement, much less the type of comprehensive abatement strategies outlined in the Plan. Instead, recoveries could wind up being disbursed to the general funds of state and local governments, private parties, and attorneys – and spent on purposes having nothing to do with public health.  This risk is not theoretical:  only a tiny fraction of the billions of dollars that were paid as part of the tobacco settlement were dedicated to smoking cessation efforts.[16]  Indeed, after the Oklahoma Attorney General and Purdue reached a settlement that resulted in the funding of a National Center for Addiction Studies and Treatment – an innovative opioid abatement program – the Oklahoma state legislature quickly changed the law to require all funds from future settlements to be deposited in the state treasury.[17]  This Court has sought to avoid such outcomes by urging the parties to negotiate a compromise that will dedicate resources to opioid abatement.[18]

---

5374328, at *4 (Pa. Commw. Ct. 2012) ("[A] mandatory injunction should not be granted when its enforcement will require too great an amount of supervision by the court.").

[16]   Crystal Phend, *Tobacco Master Settlement at 20 Years*, MEDPAGE TODAY (Nov. 24, 2018), https://www.medpagetoday.com/primarycare/smoking/76496 (a report by the American Lung Association for "fiscal year 2018 showed that less than 3% of the Master Settlement funds went to such programs.  A couple of states have even in the past used it to benefit the tobacco industry . . . North Carolina, for example, used 75% of the funds for tobacco production." (quotations omitted)).

[17]   Carmen Forman, *Stitt Signs Bill Clarifying AG's Role in Settling Lawsuits*, OKLAHOMAN (May 29, 2019), https://www.oklahoman.com/article/5632507/stitt-signs-bill-clarifying-ags-role-in-settling-lawsuits.

[18]   *See* Tr. of Hr'g at 166:2–5, *In re Purdue Pharma L.P.*, 19-23649-rdd (Nov. 19, 2019), Dkt. No. 550 ("I think the states appreciate that this money needs to go where it is most in need of going and that we don't repeat the experience of some states from the tobacco settlements, for example.").  *See also* Tr. of Hr'g at 25:21–26:3, *In re Purdue Pharma L.P.*, 19-23649-rdd (Sept. 30, 2020), Dkt. No. 2054 ("I'm also gratified to see that the parties and interests have acknowledge the importance of devoting substantially all of the resources of these debtors to abatement which uniquely in a bankruptcy case can be binding for all time if a plan is confirmed.  That was a goal of key parties in this case and me since the beginning of this case and is a great achievement given the diverse interests involved."); Tr. of Hr'g at 47:25–48:6, *In re Purdue Pharma L.P.*, 19-23649-rdd (Oct. 10, 2019), Dkt. No. 325 ("So I hope that you all will be able to work  together to use the money as wisely as possible, and through a plan which under the Bankruptcy Code and ultimately the Constitution can, in fact, be binding forever, unlike individual settlements in a non-bankruptcy context, where funds dedicated to solving a public health crisis can and have been invaded for other purposes.").

II.    **The Settlement Agreement Eliminates Significant Risks that Otherwise Result from a Resumption of Litigation**

8.    Litigation always entails a risk that the claimant can lose.  Significantly, in litigation prior to Purdue's Chapter 11 filing, Purdue consistently defeated claims brought by individuals or resolved them for modest amounts;[19] Purdue has also prevailed against government plaintiffs in the only two cases that proceeded to final judgment;[20] claims against Purdue by certain other government plaintiffs were substantially reduced;[21] and a state district court, acting on appellate review, issued an extraordinary writ dismissing an action against a Side A ICSP former director[22] (the only case involving a Side A ICSP to go to judgment).

9.    The Estate and other plaintiffs who would pursue lawsuits against Sackler family members would similarly face significant litigation risks.  If the Settlement Agreement is not consummated and litigation resumes, the Side A ICSPs would mount strong defenses to both the Estate Claims and Third-Party Claims.

A.    **Overview of the Side A ICSP's Defenses to the Estate Claims**

10.    The Estate Claims are subject to significant litigation risk, both because they could fail altogether and because the $4.275 billion proposed settlement amount compares

---

[19]    *See, e.g.*, *United States v. Purdue Frederick Co., Inc.*, 495 F. Supp. 2d 569, 575 (W.D. Va. 2007) ("As to any individuals injured by the use of OxyContin, the difficulties of establishing causation are demonstrated by the numerous civil suits that have been filed by such persons against Purdue, including two before this court. . . . Courts have consistently found that despite extensive discovery, plaintiffs were unable to show that Purdue's misbranding proximately caused their injuries.")..

[20]    *State Ex Rel. Stenehjem v Purdue Pharma L.P.*, No. 08-2018-CV-01300, 2019 WL 2245743 (N.D. Dist. May 10, 2019); *City of New Haven v. Purdue Pharma L.P.*, No. X07-HHD-CV-176086134S, 2019 WL 423990 (Conn. Super. Ct. Jan. 8, 2019).

[21]    *See, e.g.*, *Grewal v. Purdue Pharma L.P.*, No. ESX-C-245-17, 2018 WL 4829660 (N.J. Super. Ct. Ch. Div. Oct. 2, 2018) (dismissing public nuisance claim against Purdue and substantially narrowing the timeframe for other claims based on statutes of limitation); *State ex rel. Jennings v. Purdue Pharma L.P.*, No. N18C-01-223 MMJ CCLD, 2019 WL 446382 (Del. Super. Ct. Feb. 4, 2019) (dismissing claims for public nuisance, civil conspiracy, and unjust enrichment against Purdue).

[22]    *Sackler v. Utah Div. of Consumer Prot.*, No. 190905862 at 10 (D. Utah Oct. 10, 2019).

favorably to the amount the Estate could realistically hope to claw back even assuming successful litigation. Distributions from a company to its shareholders are proper so long as a company is solvent. [23] It is not only lawful but entirely common for the owners of closely-held businesses to receive distributions as a means of achieving a return on their investment. [24] But whether and when Purdue became insolvent is a complicated question without a clear answer. The date of its insolvency depends on the point in time (if ever) when its opioid-related liabilities became real and fixed enough to outweigh its assets.

11.     Purdue has never been adjudged liable by any court to any plaintiff for opioid-related liabilities. To the contrary, as described above, Purdue historically won the cases filed against it or settled them for manageable amounts. It faced very little opioid-related litigation brought by government plaintiffs until relatively shortly before it filed for Chapter 11. In 2014, it had only two such cases against it[25]; in 2015, that number had only risen to three cases and in 2016, to four cases. The wave of litigation that led to the Chapter 11 filing really only gathered steam in 2017. But by 2017, Purdue had ceased all distributions (other than to pay taxes) to its shareholders. Even before that, Purdue's level of distributions had slowed, so much so that it

---

[23]     *See, e.g., Buckley Family Tr. v. McCleary*, C.A. No. 2018-0903-AGB, 2020 WL 1522549, at *5 (Del. Ch. Mar. 31, 2020) ("It is settled law in this State that the declaration and payment of a dividend rests in the discretion of the corporation's board of directors in the exercise of its business judgment . . . ." (quoting *Gabelli & Co. v. Liggett Grp., Inc.*, 479 A.2d 276, 280 (Del. 1984))); 3 TREATISE ON THE LAW OF CORPS. § 20:1 (3d 2020); *First Realvest, Inc. v. Avery Builders, Inc.*, 600 A.2d 601, 604 (Pa. Super. Ct. 1991) ("All corporations are formed for the benefit of their shareholders and the shareholders draw out profits.").

[24]     *In re Direct Access Partners, LLC*, 602 B.R. 495, 545 (Bankr. S.D.N.Y. 2019) ("[C]orporations and limited liability companies often make profit distributions – in fact, that is the very purpose for which business is conducted.").

[25]     The case brought by the Kentucky Attorney General was still pending in 2014, but it was resolved in 2015 when Purdue agreed to pay $24 million to settle the matter. Agreed Judgment and Stipulation of Dismissal with Prejudice, *Kentucky v. Purdue Pharma L.P.*, No. 07-CI-01303 ¶ 13 (Ky. Cir. Ct. Dec. 22, 2015).

built up an enormous $1.3 billion cushion of cash[26] — essentially foregone distributions — by the time of the filing, representing a 30% increase in its cash reserves over what Purdue had at the time the first two cases were filed in late 2014. This is exactly the opposite of the pattern that would be expected if shareholders were receiving fraudulent conveyances: instead of decreasing and then stopping, distributions would accelerate as litigation mounted. That is simply not what happened here.

12.    The Side A ICSPs fully recognize that Purdue pled guilty to opioid-related crimes in October 2020, but Purdue's plea agreement with the Department of Justice ("DOJ") in 2020 (the "DOJ Plea") does not demonstrate that Purdue was insolvent three years earlier when the last non-tax distributions were made, for two reasons. First, solvency is assessed at the time of the transfer, not with the benefit of hindsight.[27] A 2020 plea agreement does not establish that transfers many years earlier were wrongful. Second, the Estate — the sole party with exclusive standing to pursue fraudulent conveyance claims — cannot use the product of an agreement the Estate itself negotiated as the basis to declare that Purdue was actually insolvent years earlier and that it is now therefore entitled to seek to recover billions of dollars from Purdue's shareholders.[28] Furthermore, because the DOJ Plea does not connect any of Purdue's conduct to

---

[26]    *Decl. of Jon Lowne in Support of the Debtors' Chapter 11 Petitions and First Day Pleadings* ¶ 40, *In re Purdue Pharma L.P.*, No. 19-23649-rdd (Bankr. S.D.N.Y. Sept. 16, 2019), Dkt. No. 3.

[27]    *See In re Iridium Operating LLC*, 373 B.R. 283, 345 (Bankr. S.D.N.Y. 2007) ("In determining whether a company was adequately capitalized, courts examine not what ultimately happened to the company, but whether the company's then-existing cash flow projections . . . were reasonable and prudent when made."); *see also Matter of Xonics Photochemical Inc*., 841 F.2d 198, 201 (7th Cir. 1988) (Posner, J.) (stating that "remote contingencies, which do not seriously endanger the [defendant's ability to pay its debts, [are not] deemed to make an otherwise solvent firm bankrupt"].

[28]    *See Lipsky v. Com. United Corp.*, 551 F.2d 887 (2d Cir. 1976) (stating that "a prior judgment can only be introduced in a later trial for collateral estoppel purposes if the issues sought to be precluded were actually adjudicated in the prior trial"); Charles Alan Wright & Arthur R. Miller, 18B Fed. Prac. & Proc. Juris. § 4474.1 *Criminal Conviction as Preclusion in Civil Proceeding—Conviction by Plea* (2d ed.) ("The conviction does not rest on actual adjudication or determination of any issue. Just as issue preclusion should not rest on civil judgments by consent, stipulation, or default, so it should not rest on a plea of guilty." (footnotes omitted)).

profits or distributions in any year, the Plea cannot be used to demonstrate that the amount

Purdue owed to the government in any given year (if any) exceeded Purdue's considerable cash

reserves.[29]

13.    The Estate would have to establish that Purdue was insolvent as far back as 2011

in order to recover more than $4.275 billion in non-tax distributions and investments in the IACs.

Indeed, all non-tax distributions to shareholders from the time of the introduction of OxyContin

were less than $4.275 billion.  To state the proposition is to demonstrate how challenging it is:

the Estate would have to prove that somehow Purdue continued operating as a zombie company

for eight years, building up a very large cash reserve, despite being insolvent.

### B.    Overview of the Side A ICSP's Defenses to the Third-Party Claims

14.    The Third-Party Claims rest on novel, highly contested theories of liability that

require proof not only that Purdue's marketing was unlawful but that each defendant personally

participated in that conduct.[30]  The Side A ICSPs are prepared to demonstrate both that claims

against Purdue are unsustainable and that the former directors of Purdue carried out their

governance responsibilities lawfully and ethically.  Certainly no Side A ICSP acted unlawfully.

---

[29]    *See, e.g., In re F-Squared Inv. Mgmt., LLC*, No. AP 17-50716, 2019 WL 4261168 (Bankr. D. Del. Sept. 6, 2019) (*F Squared*) (that fact that the debtor had engaged in securities fraud and paid $35 million to the SEC did not mean that it was "insolven[t] from inception" of its first misconduct:  "The Trustee provides no facts that show that Debtors would be liable for the full amount of any debt to the SEC at the instance of the first securities law violation in 2008, or that the [product giving rise to its liability] constituted the largest portion of Debtors' revenue from the beginning.  To the contrary, the Transfer Order states that the violations occurred *over a period of time* between 2008 and 2013."); *In re Edgewater Med. Ctr.*, 373 B.R. 845 (Bankr. N.D. Ill. 2007) ("To reach a finding of insolvency, however, the court would have to disregard the large amounts of cash the debtor had on hand and speculate on what the Department of Human Services would have done if it had discovered the Medicare fraud.  The court declines to engage in that type of speculation and finds and concludes that the plaintiff has not met its burden of proving insolvency.").

[30]    *See, e.g., Fletcher v. Havre De Grace Fireworks Co.*, 229 Md. 196, 200-01 (1962) (Director liable for corporate torts only where he or she "specifically directed, or actively participated or cooperated in, a particular act."); *Lloyd v. Moore*, 115 A.D.3d 1309, 1310 (4th Dep't 2014) (stating that a director can be liable only if she "personally participate[d] in malfeasance or misfeasance constituting an affirmative tortious act" (quotations omitted)); *accord* 3A Fletcher, *Cyclopedia of the Law of Corporations* § 1137 (2019); *see also Lyon v. Morphew*, 424 Mass. 828, 833 (1997) ("general supervisory role" of corporate officer is not sufficient for a finding of personal participation).

Further, numerous members of the Side A Sackler family and trusts for their benefit that are contributing to the $4.275 billon payment to be made under the Settlement Agreement cannot be the subject of Third-Party Claims because they never held any position at Purdue. There is no question as to the lawfulness of their conduct because they indisputably did not engage in any conduct at all.

15.     The Side A ICSPs are prepared to assert these defenses, among others:

16.     **Allegations are not evidence**. The Third-Party Claims rely on allegations that have never been proven in court.[31] And, "a complaint is not evidence."[32] Plaintiffs will be unable to prove their allegations because they are untrue and in many cases are refuted by the very documents upon which they rely. The Side A ICSPs would be prepared to introduce additional evidence, including that the Board received repeated assurances from management that Purdue was complying with its legal obligations and that any issues identified by Purdue's management were appropriately addressed.

17.     **Limitations on director liability**. A director cannot be held responsible for the conduct of the company on whose board he or she served and is liable only if he or she personally participated in wrongdoing.[33] Further, directors are entitled to rely on reports from

---

[31]   The Non-Consenting State Group, for example, alleged in a recent filing that "the record is clear" that unspecified members of the Sackler families engaged in misconduct – yet they supported this allegation by summarizing unproven allegations in their complaints. *NCSG Obj.* ¶ 33 & n.14.

[32]   *Cap. One Nat'l Ass'n v. 48-52 Franklin, LLC*, No. 12 Civ. 3366 (LGS), 2014 WL 1386609, at *9 (S.D.N.Y. Apr. 8, 2014); *see also, e.g.*, *LSSi Data Corp. v. Time Warner Cable, Inc.*, 892 F. Supp. 2d 489, 502 (S.D.N.Y. 2012) ("LSSi's factual characterization of itself in a Complaint in another lawsuit—let alone its claim in that lawsuit as to how the legal terms of art found in § 251(b)(3) apply to it—does not merit any deference, and certainly not in this litigation.") (collecting citations); *Tavarez v. Naugatuck Bd. of Educ.*, No. 08–cv–725, 2012 WL 1435284, at *5 (D. Conn. Apr. 25, 2012) ("[A]llegations in a complaint are not evidence").

[33]   *See Lloyd*, 115 A.D.3d at 1310 (defendant "cannot be held individually liable to plaintiff" where he "did not personally participate in malfeasance or misfeasance constituting an affirmative tortious act"); *Bernstein v. Starrett City, Inc.*, 303 A.D.2d 530, 532 (2d Dept 2003) ("[A] corporate officer may not be held liable for the negligence of the corporation merely because of his or her official relationship to it."); *MLM LLC v. Karamouzis*, 2 A.D.3d 161, 161-62 (1st Dept 2003) ("We reject plaintiff's claim that defendant, a principal of the restaurant corporation, engaged in allegedly tortious conduct, for which he should be held individually

11

management regarding Purdue's operations.[34]  Here, in the absence of settlement, the Side A

ICSPs would be prepared to demonstrate that the few specific allegations that have been made

against them during the course of nearly two years of litigation do not show that any of them

were participating in Purdue's marketing, much less personally engaging in wrongful conduct.

18.    **Corporate separateness defense**.  Corporate and individual liability are starkly

different under our laws.  Shareholders cannot be held liable for the conduct of the company they

own.[35]  Plaintiffs therefore have no basis to bring causes of action against the trusts that own

Purdue or against Sackler family members on the grounds that they are beneficiaries of those

trusts.

19.    **Lack of personal jurisdiction**.  Third-Party Claims brought in the vast majority

of courts across the country will not even get off the ground against the Side A ICSPs because

the court lacks personal jurisdiction over them.  As a matter of basic due process, a defendant

can only be sued in a jurisdiction in which he or she engaged in conduct related to the subject

---

responsible.  Such conduct amounts, at most, to nonfeasance, for which defendant is not liable."); *Wesolek v. Jumping Cow Enters., Inc.*, 51 A.D.3d 1376, 1379 (4th Dept 2008) (sole shareholder and director not liable for company's alleged negligence "as a matter of law"); 3A Fletcher, CYCLOPEDIA OF THE LAW OF CORPORATIONS §1137 (2019) (corporate director "is not personally liable for torts of the corporation . . . merely by virtue of holding corporate office, but can only incur personal liability by participating in the wrongful activity").

[34]    N.Y. Bus. Corp. Law § 717.

[35]    *See, e.g., In re Stage Presence, Inc.*, 592 B.R. 292, 302 (Bankr. S.D.N.Y. 2018), aff'd, No. 18-cv-10662 (JSR), 2019 WL 2004030 (S.D.N.Y. May 7, 2019) ("Under New York law, the separate existence and status of a corporation is not lightly disregarded.  As the New York Court of Appeals held . . . in the ordinary case it is perfectly legal to incorporate for the express purpose of limiting the liability of the corporate owners.  In fact, the very nature and purpose of conducting business through a corporation is to shield the owners from direct liability for the debts incurred in connection with that business.  Accordingly, an owner ordinarily is not liable for the debts incurred by a corporation." (citations and quotations omitted)).  This principle applies equally to limited partners.  *Eurycleia Partners, LP v. Seward & Kissel, LLP*, 12 N.Y.3d 553, 562 (2009) (stating that "a limited partner 'is in a position analogous to that of a corporate shareholder, an investor who likewise has limited liability and no voice in the operation of an enterprise'" (quoting *Lichtyger v. Franchard Corp.*, 18 N.Y.2d 528, 536 (1966))).

matter of the lawsuit.[36]  In Utah, a district court issued an extraordinary writ dismissing an

administrative claim brought by the State's Division of Consumer Protection against a Side A

former director because that former director had no connection to Utah.[37]  Similar outcomes

would likely repeat themselves in states across the country, including many in which no Side A

ICSP has even set foot.

20.    **Preemption**.  The Third-Party Claims are based on allegations regarding

Purdue's marketing that are contrary to determinations made by the Food and Drug

Administration ("FDA") that are set forth on the FDA-approved OxyContin label and in the

FDA's denial of Citizen Petitions related to OxyContin marketing.  Plaintiffs' core arguments are

that OxyContin is unsafe because of the risk of abuse and addiction and that Purdue should not

have promoted OxyContin for use in treating long-term chronic pain.  The risk of abuse and

addiction, however, has always been known:  it has always been disclosed on the FDA-approved

label[38] and is the basis for OxyContin's classification as a Schedule II medication.[39]  OxyContin

---

[36]    *See, e.g.*, *Walden v. Fiore*, 571 U.S. 277, 285 (2014) ("For a State to exercise jurisdiction consistent with due process, the defendant's suit-related conduct must create a substantial connection with the forum State.").

[37]    *See supra* note 22

[38]    *See, e.g.*, OxyContin Package Insert, PURDUE PHARMA L.P. (Apr. 25, 2001), https://web.archive.org/web/20040719100631/http://www.fda.gov/cder/foi/label/2001/20553s022lbl.pdf. Courts have also recognized the warning of addiction on the OxyContin label. *See Harris v. Purdue Pharma, L.P.*, 218 F.R.D. 590, 597 (S.D. Ohio 2003) ("OxyContin is . . . alleged to have place[d] the patient at risk of addiction, a known risk to the medical community, and a risk clearly labeled on the drug."); *see also Howland v. Purdue Pharma*, 104 Ohio St. 3d 584, 589 (Ohio 2004) ("On July 25, 2001, the FDA ordered Purdue to issue a 'black box warning,' the strongest warning for an FDA-approved drug, on all OxyContin labels.  The warning would call attention to the drug's potential for misuse, abuse, and diversion and limit the class of patients for whom OxyContin is appropriate."); *Cornelius v. Cain*, No. CACE 01-020213(02), 2004 WL 48102, at *1 (Fla. Cir. Ct. Jan. 5, 2004) ("The FDA approved the package insert for OxyContin in December 1995.  The package insert for OxyContin provided accurate, clear, and unambiguous warnings to prescribing physicians of the risks associated with OxyContin, including the risks of consuming excessive amounts of OxyContin.  Specifically, the package insert warns [of] DRUG ABUSE AND DEPENDENCE.").

[39]    *See List of Controlled Substances*, DRUG ENFORCEMENT ADMINISTRATION (stating that Schedule II substances "have a high potential for abuse which may lead to severe psychological or physical dependence"; listing OxyContin as a Schedule II substance), *available at* https://www.deadiversion.usdoj.gov/schedules/#:~:text=Examples%20of%20Schedule%20II%20narcotics,opium%2C%20codeine%2C%20and%20hydrocodone.

was approved by the FDA in 1995 and remains approved to this day. The FDA's approval

reflects its judgment that the medicine is safe and effective for its intended uses, notwithstanding

the real, fully disclosed risks of abuse and addiction that OxyContin presents.[40] And, in 2013 the

FDA <u>denied</u> a Citizen Petition filed by an organization (led by an individual who is now a paid

plaintiff expert) that sought to curtail the prescribing of opioids for long-term chronic pain by

imposing limitations both on the daily quantity of opioids that can be prescribed and the duration

of an opioid prescription.[41] Prior to Purdue's Chapter 11 filing, one court had already granted

summary judgment, dismissing a suit against Purdue, because the claims were preempted.[42]

21.    **Proximate causation defense**. A fundamental principle of tort law is that a

plaintiff must demonstrate that the defendant proximately caused harm to the plaintiff.[43] As

---

[40] The FDA notably came to a different conclusion with respect to another extended release opioid, Opana ER. Notwithstanding that FDA approved a reformulated version of the medicine in 2011, in 2017, FDA requested that the manufacturer remove the product from the market because the benefits no longer outweighed the risks – and Opana ER was subsequently removed from the market. *Oxymorphone*, UNITED STATES FOOD & DRUG ADMINISTRATION, https://www.fda.gov/drugs/postmarket-drug-safety-information-patients-and-providers/oxymorphone-marketed-opana-er-information#:~:text=In%20June%202017%2C%20the%20FDA,Opana%20ER%20from%20the%20market.

[41] Letter from Janet Woodcock, M.D., Dir., Ctr. for Drug Eval. & Res., to Andrew Kolodny, M.D., Pres. Physicians for Responsible Opioid Prescribing, Re Docket No. FDA-2012-P-0818 (Sept. 10, 2013), https://paindr.com/wp-content/uploads/2013/09/FDA_CDER_Response_to_Physicians_for_Responsible_Opioid_Prescribing_Partial_Petition_Approval_and_Denial.pdf.

[42] *Stenehjem*, 2019 WL 2245743, at *7 ("[W]hen presented with many of the same concerns the State alleges against Purdue in its Complaint regarding the enhanced risks of using opioids in high doses and for long durations, and with inadequate or misleading warnings, the FDA chose neither to impose those limits on opioid use nor to add warnings about those risks. The Court concludes this is 'clear evidence' under [the Supreme Court's decision in *Wyeth v. Levine*] that the FDA would not have approved the changes to Purdue's labeling that the State contends were required to satisfy North Dakota law."); *City of New Haven*, 2019 WL 423990, at *7 (Conn. Sup. Ct. Jan. 8, 2019) (stating that plaintiffs' alleged injuries "are a long radius and many concentric circles away" from the defendants' alleged conduct and that plaintiffs failed to "even suggest[] to the court a way it could rationally make the required connections").

[43] *Nahl v. Jaoude*, 968 F.3d 173, 182 (2d Cir. 2020) (stating the "general principle of tort law that '[a]n actor's liability is limited to those harms that result from the risks that made the actor's conduct tortious'" (alteration in original) (quoting RESTATEMENT (THIRD) OF TORTS: LIAB. FOR PHYSICAL AND EMOTIONAL HARM § 29 (AM. LAW INST. 2010); *Laborers Local 17 Health & Benefit Fund v. Philip Morris, Inc.*, 191 F.3d 229, 236 (2d Cir. 1999) (stating that "one notion traditionally included in the concept of proximate causation is the requirement that there be 'some direct relation between the injury asserted and the injurious conduct alleged'" (quoting *Holmes v. Sec. Inv'r Protection Corp.*, 503 U.S. 258, 268 (1992))).

described above, individual plaintiffs have been historically unsuccessful in proving that

<u>Purdue's</u> alleged marketing practices caused them to suffer harm.  And two courts have already

dismissed claims against Purdue that were brought by governmental plaintiffs because they could

not prove that Purdue had caused them to suffer harm.[44]  It clearly would be an insuperable

challenge for plaintiffs to prove that any individual member of the Side A Sackler family

proximately caused an injury to them.

22.    The term "opioid" is a broad one, encompassing both prescription medicines and

illicit substances, including heroin and fentanyl.  Fentanyl has emerged as a particular scourge

because it is so lethal.[45]  It is an enormously challenging and novel legal proposition to assert that

a prescription medicine manufacturer (let alone its shareholders or directors) can be held liable

for harms related to illegal products that it neither produces, markets nor promotes.[46]  The public

health initiatives under the proposed settlement and Plan provide for the dissemination of

---

[44]    *Stenehjem*, 2019 WL 2245743, at *11 ("The Court concludes the State's causal theory is too attenuated and requires dismissal of the State's Consumer Fraud Law Claims as a matter of law.  If the State can proceed on the causation it has alleged in this lawsuit against Purdue, it begs the question of how far the causal chain can go.  There are a seemingly limitless number of actors who could have 'tried harder' under the State's theory and claims.  Purdue is no higher up in the causal chain under the facts alleged by the State than any other actor who could be held liable.  The State has not pleaded facts that Purdue's alleged misrepresentations caused North Dakota doctors to write medically unnecessary prescriptions or that Purdue's alleged misrepresentation caused the State to reimburse prescriptions."); *City of New Haven*, 2019 WL 423990, at *8 (stating that municipal "expenses [allegedly incurred due to Purdue's marketing practices] are a long radius and many concentric circles away from the simple observation that promoting more addiction creates more addicts," and "[t]o fairly measure the number of rings and the length of the radius between drug makers pumping out too many pills and police officers piling up too much overtime requires . . . guesswork").

[45]    *See, e.g.*, *Facts About Fentanyl,* DRUG ENFORCEMENT AGENCY, *available at* https://www.dea.gov/resources/facts-about-fentanyl.

[46]    *See, e.g.*, *Bray v. Ingersoll-Rand Co.*, No. 3:13-cv-1561 (SRU), 2015 WL 728515, at *5 (D. Conn. Feb. 19, 2015) (dismissing products liability claim where "the plaintiffs here have not offered evidence connecting [decedent's] exposure to asbestos to products manufactured by [defendants]"); *In re Joint E. and S. Dists. Asbestos Litig.*, No. 92 Civ. 1113 (RWS), 1993 WL 97301, at *2–3 (S.D.N.Y. Mar. 30 1993) (granting defendant's motion for summary judgment in asbestos case on causation grounds where "the plaintiff has put forth no evidence that [he] was exposed to the defendant's products"); *Farrell v. Nat'l Gypsum Co.*, No. 88 CIV. 8136 (CES), 1991 WL 89632, at *2–3 (S.D.N.Y. May 30, 1991) (dismissing claim where plaintiff failed to meet her burden of showing that "[decedent] was exposed to defendants' merchandise and that it is more likely than not that this exposure was a substantial factor in his injury").

15

abatement funds without discriminating between individuals who abuse illicit and prescription opioids[47]; these initiatives are aimed at providing assistance to communities and individuals in need.  The proximate cause analysis undertaken in litigation, by contrast, would have to be focused on that distinction.

23.    The core problem that plaintiffs face in proving proximate causation is that a developing body of evidence refutes the claim that prescribing opioids caused overdose deaths. Government data shows that opioid prescriptions have been steadily declining since 2011, but since that same time, the number of opioid-related overdose deaths has increased significantly.[48] A study to be published in a leading medical journal confirms this conclusion:

> [O]ur study found no significant association between the amount of prescription opioid MEDs and injury-related mortality in the United States from 2006-2017. In comparing within-state variation for each year, the quantity of prescription opioids received had <u>no consistent association</u> with unintentional [*i.e.*, overdose], suicide or homicide deaths."[49]

In other words, not only did a high rate of prescriptions not cause opioid-related deaths, it was not even correlated with them.[50]

---

[47]    Indeed, due to the flood of counterfeit pills on the black market, individuals who believe that they are using diverted prescription medications may in fact be consuming fentanyl-laced products.  *See* Press Release, DRUG ENFORCEMENT AGENCY, DEA Reports Significant Increase in Counterfeit Pills in Minnesota (Aug. 12, 2020), https://www.dea.gov/press-releases/2020/08/12/dea-reports-significant-increase-counterfeit-pills-minnesota.

[48]    *See Number of National Drug Overdose Deaths Involving Select Prescription and Illicit Drugs*, NATIONAL INSTITUTE OF DRUG ABUSE (showing overall opioid overdose deaths increasing 118% between 2011 and 2019), *available at* https://www.drugabuse.gov/drug-topics/trends-statistics/overdose-death-rates; *U.S. Opioid Dispensing Rate Maps*, CENTERS FOR DISEASE CONTROL AND PREVENTION (showing the number of opioid prescriptions dropping by approximately 40% from 2011 to 2019), *available at* https://www.cdc.gov/drugoverdose/maps/rxrate-maps.html.

[49]    E.I. Truong, S.K. Kishawi, V.P. Ho et al., *Opioids and Injury Deaths: A Population-Based Analysis of the United States from 2006 to 2017*, INJURY (Mar. 9, 2021) (forthcoming), at 4 https://www.injuryjournal.com/article/S0020-1383(21)00233-3/fulltext.

[50]    The absence of connection between opioid prescribing an overdose deaths is confirmed by a study of opioid-related overdose deaths that found that the post-mortem toxicology reports of 98.7% decedents showed that they were abusing at least one substance for which they did not have a prescription.  *See* A.Y. Walley, D. Bernson, M. Larochelle et al., *The Contribution of Prescribed and Illicit Opioids to Fatal Overdoses in Massachusetts, 2013-2015*, 134(6) Pub. Health Rep. 667 (Nov.-Dec. 2019),

24.    **Public nuisance doctrine is inapplicable**.  Plaintiffs rely heavily on the nuisance doctrine, but that doctrine does not apply here.  Appellate courts have repeatedly recognized that the nuisance doctrine is intended for property-based torts and that expanding the doctrine to include causes of action based on the sale of lawful consumer products (here, FDA-approved prescription medications) would lead to "a monster that would devour in one gulp the entire law of tort."[51]  It would be even more unwarranted and unprecedented to apply the nuisance doctrine to former directors of a company that manufactured consumer products.[52]  Even if trial courts permit plaintiffs to go forward with nuisance claims – which some have refused to do[53] – plaintiffs are at a significant risk of reversal on appeal.

---

https://www.ncbi.nlm.nih.gov/pmc/articles/PMC6832088/ ("[o]nly 1.3% ... of decedents had an active prescription for each opioid indicated in their postmortem toxicology report").

[51]    *Camden Cnty. Bd. of Chosen Freeholders v. Beretta, U.S.A. Corp*., 273 F.3d 536, 540 (3d Cir. 2001) ("Whatever the precise scope of public nuisance law in New Jersey may be, no New Jersey court has ever allowed a public nuisance claim to proceed against manufacturers for lawful products that are placed in the stream of commerce.  On the contrary, the courts have enforced the boundary between the well-developed body of product liability law and public nuisance law.  Otherwise, if public nuisance law were permitted to encompass product liability, nuisance law 'would become a monster that would devour in one gulp the entire law of tort.'  If defective products are not a public nuisance as a matter of law, then the non-defective, lawful products at issue in this case cannot be a nuisance without straining the law to absurdity." (quoting *Tioga Pub. Sch. Dist. v. U.S. Gypsum Co.*, 984 F.2d 915, 921 (8th Cir. 1993))).  *See also, e.g., State v. Lead Indus., Ass'n, Inc.*, 951 A.2d 428, 456 (R.I. 2008) ("The law of public nuisance never before has been applied to products, however harmful.  Courts . . . consistently have rejected product-based public nuisance suits against lead pigment manufacturers, expressing a concern that allowing such a lawsuit would circumvent the basic requirements of products liability law. . . . Courts . . . have expressed their concern over the ease with which a plaintiff could bring what properly would be characterized as a products liability suit under the guise of product-based public nuisance.") (reversing jury verdict); RESTATEMENT (THIRD) OF TORTS: LIAB. FOR ECON. HARM § 8 cmt. g (AM. LAW INST. 2020) ("[P]ublic nuisance is an inapt vehicle" for addressing "problems caused by dangerous products" and "contemporary case law has made clear that [the doctrine's] reach remains more modest" than the "broad language that can be read to encompass anything injurious to public health and safety.").

[52]    The Sackler former directors also cannot be subject to nuisance claims because they did not control the prescription opioid products at the time of the alleged harms.  *See Lead Indus.*, 951 A.2d at 449("[A] defendant must have control over the instrumentality causing the alleged nuisance at the time the damage occurs." (emphasis omitted)).

[53]    *See State ex rel. Jennings v. Purdue Pharma, L.P.*, C.A. No. N18C-01-223 MMJ CCLD, 2019 WL 446382, at *12 (Del. Super. Ct. Feb. 4, 2019) (dismissing nuisance claim against Purdue and stating that "[t]here is a clear national trend to limit public nuisance to land use").

25.    **Statutes of limitations**.  Some, much, or all of the conduct on which the allegations underlying Third-Party Claims rely predates the applicable statutes of limitations – including the clearly time-barred claims relying on alleged conduct going back to the 1990s.

26.    **Limited assets are available for recovery**.  Plaintiffs could not pursue the assets of trusts and members of the Sackler family who had no role on Purdue's board because they could not have participated in Purdue's alleged conduct.  Furthermore, discretionary trusts do not generally have liability for the conduct of their beneficiaries and assets held in trusts are not reachable to satisfy judgments against beneficiaries.[54]

27.    **Litigation is extremely expensive**.  Each month, tens of millions of dollars from the Estate are being consumed by payment of legal and professional fees.  This trend will continue so long as there is no global resolution of all litigation involving the Debtors and members of the Sackler families.  Absent litigation, these resources could be dedicated to opioid abatement.  Furthermore, were tort litigation to resume, assets of the Sackler families would similarly be consumed by legal and professional fees; these resources would not be available for payment as part of any future resolution.

## **CONCLUSION**

28.    The Side A ICSPs recognize that there is a significant difference of opinion between the parties pursuing the Estate and Third-Party Claims and the Sackler family members who vigorously deny those claims.  The Bankruptcy Court has repeatedly urged all parties to move past these differences and to pursue a settlement that will lead to timely deployment of resources that are desperately needed to abate the opioid crisis.  The Side A ICSPs are pleased

---

[54]    *See, e.g.*, *Di Portanova v. Monroe*, 229 S.W.3d 324 (Tex. Ct. App. 2006) ("The beneficiary of a discretionary trust cannot compel the trustee to pay him or to apply for his use any part of the trust property, nor can a creditor of the beneficiary reach any part of the trust property until it is distributed to the beneficiary. . . . A court cannot substitute its discretion for that of a trustee, and can interfere with the exercise of discretionary powers only in cases of fraud, misconduct, or clear abuse of discretion.").

that agreement has been reached with the Debtors and the vast majority of creditors that will

achieve that and that the Debtors have now formulated a detailed plan governing how settlement

proceeds and Estate resources can be used for a wide variety of carefully selected, life-saving

programs.  The Side A ICSPS respectfully submit that the Supplement proposed for inclusion in

the Disclosure Statement presents useful information that can assist creditors in evaluating the

unique benefits of settlement and litigation risks associated with the Estate and Third-Party

Claims.


Dated:    May 10, 2021
          New York, New York


                                    By:     /s/ Jasmine Ball _____
                                            Jasmine Ball
                                            Maura Kathleen Monaghan
                                            Jeffrey J. Rosen
                                            DEBEVOISE & PLIMPTON LLP
                                            919 Third Avenue
                                            New York, New York 10022
                                            Telephone:  (212) 909-6000
                                            Facsimile:  (212) 909-6836
                                            Email:  jball@debevoise.com
                                                    mkmonaghan@debevoise.com
                                                    jrosen@debevoise.com

                                            *Attorneys for Beacon Company*