# EXHIBIT A

**SIDE A INITIAL COVERED SACKLER PERSONS' PROPOSED SUPPLEMENT TO THE DEBTORS' DISCLOSURE STATEMENT FOR SECOND AMENDED CHAPTER 11 PLAN FOR PURDUE PHARMA L.P. AND ITS AFFILIATED DEBTORS**

**The Settlement Agreement Offers Numerous Benefits that Would Be Lost if Litigation Resumes**

| Settlement Advantages | Litigation Disadvantages |
|---|---|
| Provides for assurance of liquidated amount of recovery by claimants of $4.275 billion. | Amount of recovery, if any, is uncertain because claimants face significant barriers in proving liability and enforcing any judgment. |
| Remaining resources of Purdue's Estate can be dedicated to opioid abatement. | Estate likely to continue expending tens of millions of dollars per month on legal/professional fees – with little to no prospect for a greater recovery than settlement amount. |
| Incorporated into Plan of Reorganization which will provide equitable distribution of funds between states, within each state, and among governmental and non-governmental creditors. | Would result in race between creditors to judgment. Cases that go to trial first, if successful, would deplete assets potentially available to other creditors. Litigation would become a lottery in which there could be a few winners (at most) and everyone else would likely wind up empty handed. |
| Ensures that funds will be administered as part of a comprehensive opioid abatement program designed by public health experts. | Unknown what would happen to any recovery – could wind up in state/local general funds or with private parties. |
| Distributes resources to communities in a prompt and predictable manner. | Impacted communities will receive nothing while litigation, appeals and enforcement actions drag on for many years. |

**Claimants Face Significant Risks if Litigation Resumes**

> **Fraudulent Conveyance**: Requires the Estate to prove that each challenged distribution is avoidable. The Estate would have to establish that Purdue was insolvent as far back as 2011 in order to recover more than $4.275 billion in non-tax distributions and investments in the IACs.

2

| **Litigation Risk** | |
|---|---|
| Solvency defense: Purdue was solvent when Board authorized non-tax and IAC distributions. | • Purdue, due to restoration of the OxyContin patent, was highly profitable, generating net sales of more than $2 billion per year between 2008 and 2014.<br><br>• By 2014, Purdue had a cash cushion of more than $1 billion and Purdue had a $1.3 billion cushion as of the time of its Chapter 11 filing.<br><br>• Purdue had a history of prevailing in lawsuits or settling them for clearly affordable amounts.<br><br>• Current litigation wave may not be relevant to solvency analysis because it did not start until 2017, by which time non-tax and IAC distributions had already ceased. Further, as outlined below, members of the Sackler families will assert significant defenses to the claims, including the plaintiffs' reliance on novel, unprecedented and controversial extensions of the public nuisance doctrine and attenuated causal chains.<br><br>• Court may determine that Purdue's plea, which the Estate negotiated after filing Chapter 11, cannot be retroactively applied to prove insolvency by the Estate itself years earlier. |
| Purpose of distributions: Distributions were made for entirely lawful purposes. | • Common for owners of closely-held businesses to take distributions as means of realizing profits from solvent business.<br><br>• Tax distributions were paid to the |

3

|  |  |
|---|---|
|  | federal/state taxing authorities and were the means by which Purdue's income was taxed. |
| Judgment enforcement | Proceeds of distributions were divided among numerous family units and trusts. Many of the beneficiary individuals did not serve on Purdue's board and live outside the United States. |

| **Third-Party Claims**: Requires proof that individual members of the Sackler family engaged in unlawful conduct. ||
|---|---|
| **Litigation Risk** |  |
| Allegations must ultimately be supported by evidence. | Members of the Sackler families would argue that many allegations are refuted by the very documents upon which plaintiffs rely. They would also seek to introduce additional evidence, including reports from management, that they will assert repeatedly assured the Board that Purdue was in compliance with its legal obligations and that any issues identified by Purdue's compliance program were addressed appropriately. |
| Limitations on director liability: A director cannot be held responsible for the conduct of a company on whose board he or she served, and is liable only if he personally participated in wrongdoing. A director is entitled to rely on reports from management regarding the company's operations. | Sackler family members who were on Purdue's Board contend that the few allegations made specifically against them do not show any of them participating in Purdue's marketing, much less any wrongful conduct. |
| Corporate separateness defense: Shareholders cannot be held liable for the | Plaintiffs may have no basis to bring causes of action against the trusts that are the |

| | |
|---|---|
| conduct of the company they own. | owners of Purdue. |
| Personal jurisdiction defense: A director can be sued only in a jurisdiction in which he engaged in conduct related to the subject matter of the lawsuit. | Purdue's former directors cannot be sued in virtually all states because they did not engage in Purdue-related business in those fora. A Utah district court issued an extraordinary writ dismissing claims against a Side A former director because the former director had no connection to Utah. |
| Preemption defense: Plaintiffs cannot sustain claims about Purdue's marketing that are contrary to determinations by the FDA. | Plaintiffs would need to overcome argument from the former directors that the allegations against them are contrary to determinations made by the Food and Drug Administration ("FDA") that are set forth on the FDA-approved OxyContin package insert and in the FDA's denial of Citizen Petitions related to OxyContin marketing. One court already dismissed a case against Purdue on that basis. |
| Proximate causation defense: Causes of action require proof that alleged misconduct caused plaintiffs harm. | In cases brought by individuals (before 2010), Purdue repeatedly prevailed or settled for modest amounts because plaintiffs could not prove that Purdue's alleged marketing caused them harm. More recently, two courts similarly dismissed suits brought by government plaintiffs against Purdue because they could not prove causation. It would be even more difficult for plaintiffs to show causation by the Sackler former directors, who were not in Purdue's management and did not participate in operations. |
| The nuisance doctrine is applicable only to property-based torts. Appellate courts have frequently reversed nuisance causes of action that are based on harms allegedly caused by consumer goods. | Plaintiffs rely heavily on the nuisance doctrine, but prior appellate precedent calls into question whether the doctrine is applicable to harms allegedly resulting from the sale of lawful consumer products (here, FDA-approved medicines). It would be an even greater challenge to apply the |

5

|  |  |
|---|---|
|  | nuisance doctrine to the former directors of a company that manufactured consumer products. Even if trial courts permit plaintiffs to go forward with a nuisance claim, plaintiffs would face material risk of reversal on appeal. |
| Statutes of limitations: Claims arising out of conduct that took place before the start of the applicable limitations period are barred. | Much of the conduct on which the allegations underlying Third-Party Claims rely predates the applicable statutes of limitations – including time-barred claims relying on alleged conduct going back to the 1990s. |
| Limited assets available for recovery. | Plaintiffs would have difficulty pursuing the assets of trusts or members of the Sackler family who did not participate and could not have participated in Purdue's alleged conduct. In addition, trusts generally are not liable for the conduct of their beneficiaries and assets held in trusts are not reachable to satisfy judgments against beneficiaries. |