Gerard Uzzi
Alexander B. Lees
MILBANK LLP
55 Hudson Yards
New York, New York 10001
Telephone: (212) 530-5000
Facsimile: (212) 530-5219

Gregory P. Joseph
Mara Leventhal
JOSEPH HAGE AARONSON LLC
485 Lexington Avenue, 30th Floor
New York, New York 10017
Telephone: (212) 407-1200
Facsimile: (212) 407-1280

*Counsel for the Raymond Sackler Family*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re: | Chapter 11 |
| PURDUE PHARMA L.P., *et al.*, | Case No. 19-23649 (RDD) |
| Debtors.[1] | Jointly Administered |

**SUBMISSION BY THE RAYMOND SACKLER**
**FAMILY OF A PROPOSED POSITION STATEMENT FOR**
**INCLUSION OR REFERENCE IN THE DEBTORS' DISCLOSURE STATEMENT**

---

[1] The Debtors in these cases, along with the last four digits of each Debtor's registration number in the applicable jurisdiction, are as follows: Purdue Pharma L.P. (7484), Purdue Pharma Inc. (7486), Purdue Transdermal Technologies L.P. (1868), Purdue Pharma Manufacturing L.P. (3821), Purdue Pharmaceuticals L.P. (0034), Imbrium Therapeutics L.P. (8810), Adlon Therapeutics L.P. (6745), Greenfield BioVentures L.P. (6150), Seven Seas Hill Corp. (4591), Ophir Green Corp. (4594), Purdue Pharma of Puerto Rico (3925), Avrio Health L.P. (4140), Purdue Pharmaceutical Products L.P. (3902), Purdue Neuroscience Company (4712), Nayatt Cove Lifescience Inc. (7805), Button Land L.P. (7502), Rhodes Associates L.P. (N/A), Paul Land Inc. (7425), Quidnick Land L.P. (7584), Rhodes Pharmaceuticals L.P. (6166), Rhodes Technologies (7143), UDF LP (0495), SVC Pharma LP (5717) and SVC Pharma Inc. (4014). The Debtors' corporate headquarters is located at One Stamford Forum, 201 Tresser Boulevard, Stamford, CT 06901.

The Raymond Sackler family, by and through its undersigned counsel, hereby submits a proposed position statement for inclusion or reference in the Debtors' *Disclosure Statement for Second Amended Chapter 11 Plan for Purdue Pharma L.P. and Its Affiliated Debtors* [ECF No. 2825] (the "Disclosure Statement"),[2] and respectfully states as follows:

### STATEMENT

1.  On November 20, 2019, the Raymond Sackler family entered into the *Amended and Restated Case Stipulation Among the Debtors, the Official Committee of Unsecured Creditors and Certain Related Parties* [ECF No. 518] (the "Case Stipulation") with the Debtors and the Creditors' Committee. Pursuant to the Case Stipulation, the Raymond Sackler family agreed, among other things, to provide "a report setting forth the net assets of the Initial Covered Sackler Persons, which report will set forth the approximate aggregate value of the assets owned by category (e.g. cash, securities, real estate, private and other investments, etc.) and the approximate liabilities, also by category" (the "Wealth Report"), and "substantial information with respect to a thorough explanation and analysis of the defenses that the Shareholder Parties intend to make with regard to any and all causes of action that have been or may be (within the reasonable expectation of the Shareholder Parties) brought against them, including, as necessary, caselaw support for such defenses" (the "Defense Presentation"). Case Stipulation at ¶ 17. On December 6, 2019, the Raymond Sackler family delivered the Defense Presentation to the Debtors, the Creditors' Committee, the AHC and the Ad Hoc Group of Non-Consenting States (the "Non-Consenting States"). The Defense Presentation in its original form consisted of more than three and a half hours of oral presentation supported by over 580 slides. The Defense

---

[2]    Capitalized terms not defined herein have the same meanings as in the Disclosure Statement.

2

Presentation was based in large part on information designated as confidential by the Debtors at the time.

2. On April 8, 2021, in response to requests by the House Committee on Oversight and Reform (the "House Committee") for information provided by the Raymond Sackler family pursuant to the Case Stipulation, the Raymond Sackler family provided, among other things, the House Committee with the Wealth Report and a link to a website containing an updated Defense Presentation that substantiates the Raymond Sackler family's assertions that Purdue's documents demonstrate that the Sackler family members who served on Purdue's Board of Directors acted lawfully and ethically. The House Committee declined the Raymond Sackler family's request to make the family's full unredacted April 8, 2021, submission available in connection with the House Committee's determination to publish select information from the Wealth Report, but the House Committee invited the Raymond Sackler family to make additional information available itself.

3. Since the original Defense Presentation was made in December 2019, substantial additional evidence has become available and developed through discovery. Also, the Debtors have consented to lift the confidentiality designation on much of that newly-available evidence and the evidence on which the original Defense Presentation relied. Accordingly, on April 26-27, 2021, the Raymond Sackler family updated the Defense Presentation to incorporate much of this new information (the "April 2021 Defense Presentation"). The website now contains the full unredacted April 2021 Defense Presentation.

4. The Raymond Sackler family has been unfairly accused — most recently in a filing by the Non-Consenting States on April 29, 2021 — of "unlawful conduct" and "decades of misconduct[.]" *The Ad Hoc Group of Non-Consenting States' Objection to the Debtors' Motion*

3

*to Approve (I) the Adequacy of Information in the Disclosure Statement, (II) Solicitation and Voting Procedures, (III) Forms of Ballots, Notices and Notice Procedures in Connection Therewith, and (IV) Certain Dates with Respect Thereto* at ¶¶ 16, 28 [ECF No. 2762] (the "Non-Consenting States' Objection"). The Non-Consenting States also insist that "[a] substantive evaluation of the merits of the settlement with the Sackler Families" is essential. *Id.* at ¶ 6, sixth bullet point. The Raymond Sackler family has also been unfairly criticized for not presenting evidence to defend itself against the demonstrably false allegations levied against it. Recently, the Ad Hoc Committee on Accountability stated that "[i]t appears that some people inside the bankruptcy know about confidential evidence that most people do not know about. . . . Have the Sacklers identified this evidence to Purdue? Is this evidence part of their joint defense?" *Objection of the Ad Hoc Comm. on Accountability to Disclosure Statement for First Amended Chapter 11 Plan of Reorganization of Purdue Pharma L.P. and Its Affiliated Debtors* [ECF No. 2745] (the "AHCA Objection"). The Non-Consenting States have contended that, "in this Court, the most important information about the Sacklers is kept secret. When the Sacklers presented their defenses to the allegations against them, their defense presentation itself was secret. Under this Court's Protective Order, no one is allowed to reveal the Sacklers' defense." *The Non-Consenting States' Voluntary Commitment and Limited Opposition in Response to Purdue's Motion to Extend the Preliminary Injunction* [ECF No. 150] (the "Non-Consenting States' Limited Opposition") (citations omitted). Previously, the Raymond Sackler family's ability to respond to allegations has been constrained by the Debtors' confidentiality restrictions on key information. Those restrictions having been substantially eased, the April 2021 Defense Presentation responds to that criticism.

4

5. The April 2021 Defense Presentation responds to the Non-Consenting States' insistence on the need for a substantive evaluation of the merits of the settlement and disproves their evidentially unsupported claim of unlawful conduct by the Raymond Sackler family. It painstakingly examines all of the claims that have been levied against the Sackler families and demonstrates that there are substantial — and, in the Raymond Sackler family's view, meritorious — defenses to all of them. The Raymond Sackler family has highlighted portions of the Defense Presentation in the attached position statement (the "Position Statement"). But given the complexity of the issues and the breadth of the April 2021 Defense Presentation, it is not practicable to reduce it to a few paragraphs. For any party interested in hearing the Raymond Sackler family's side of the story — and whether the evidence actually supports the media narrative — the April 2021 Defense Presentation is linked to the Position Statement and furnishes that side of the story.

6. The Raymond Sackler family believes it is important for parties entitled to vote on the Plan to know what alternative they would face if the settlement with the Sackler families were rejected — namely, years of costly litigation that very likely could result in no recovery for claimants or the public, let alone anything near the value currently being offered to help abate the opioid crisis. Parties in interest in these cases have a tendency to assume that Purdue's value — and the Sackler families' wealth — would be available for them even if the Plan were not confirmed and there were no settlement. The Non-Consenting States' Objection is a case in point: it claims that no contribution from the families is necessary to fund a reorganization of the Debtors. But this glosses over a critical fact. As of today, the members of the Raymond Sackler family are parties in interest in the Debtors, and if there is no settlement, the Raymond Sackler family will protect its interests and its members' wealth will not just be available for the taking.

Claimants should understand what the litigation alternative would look like, and what defenses and arguments the Raymond Sackler family would make. The Position Statement outlines those defenses and arguments at a high level and directs claimants to the Defense Presentation for a fuller explanation.

7. The Raymond Sackler family has provided to the Debtors the Position Statement, attached here as <u>Exhibit A</u>, which provides a very high-level summary of the Defense Presentation as well as the URL address for the website provided to the House Committee. The Debtors declined to include the Position Statement in the Disclosure Statement, but have offered to reference the Position Statement, as it appears on the docket, in the Disclosure Statement. The Raymond Sackler family has no objection to the Debtors' suggested course of action but will defer to the Court's discretion in determining the most appropriate way for the Disclosure Statement to reflect its position.

## **CONCLUSION**

8. The Raymond Sackler family respectfully requests that its Position Statement either be included in the Disclosure Statement or referenced therein by docket number. The Raymond Sackler family also respectfully requests it be granted such other relief as is just and proper.

Dated:  May 12, 2021
        New York, New York

                                         */s/ Gerard Uzzi*
                                         Gerard Uzzi
                                         Alexander B. Lees
                                         **MILBANK LLP**
                                         55 Hudson Yards
                                         New York, NY 10001
                                         Telephone: (212) 530-5000

        */s/ Gregory P. Joseph*
Gregory P. Joseph
Mara Leventhal
**JOSEPH HAGE AARONSON LLC**
485 Lexington Avenue, 30th Floor
New York, New York 10017
Telephone: (212) 407-1200

*Counsel for the Raymond Sackler Family*

## Exhibit A

**Position Statement**

**Position Statement of the Raymond Sackler Family**

**I.     Introduction**

The Raymond Sackler family supports confirmation of the Plan, which will provide billions of dollars of abatement resources to communities in need. As part of those efforts, the Sackler families will contribute $4.275 billion dollars to the Debtors and relinquish their interests in Purdue.

For years, the news media and plaintiffs' lawyers have falsely blamed the Sackler families for causing the opioid epidemic with hyperbolic and sensationalized attacks unsupported by actual evidence. The Raymond Sackler family has until recently declined, for the most part, to address these attacks publicly. As a result, the Raymond Sackler family has learned the hard way that unsubstantiated attacks that remain unaddressed for too long gain a life of their own. The Raymond Sackler family has expressed its deep regret that OxyContin, a medication that has helped millions of people afflicted with chronic pain, played a role in anyone's suffering. The Raymond Sackler family has also repeatedly maintained that Purdue's documents, when made public, will demonstrate that the Sackler family members who served on Purdue's board of directors acted lawfully and ethically at all times.

On November 20, 2019, the Sackler families entered into a "Case Stipulation" with the Debtors and the Official Committee of Unsecured Creditors in these chapter 11 cases. As part of that stipulation, the Sackler families agreed to provide an explanation and analysis related to their assets and the defenses that they would make with regard to all causes of action. The wealth presentation sets out in detail the Raymond Sackler family's consolidated net worth. The defense presentation meticulously examines all of the claims asserted against the Sackler families and demonstrates with actual evidence exactly how the allegations made against the Sackler families have been distorted and how the claims are without merit. The defense presentation, when originally made on December 6, 2019, was more than three and a half hours of oral presentation and was supported by 580 slides. The Raymond Sackler family has since updated its defense presentation based upon evidence made available to parties taking discovery in the chapter 11 cases. The updated defense presentation is now more than seven hours of oral presentation supported by 832 slides. When the original defense presentation was made, much of the evidence that it relied upon was confidential information of the Debtors. As a result, until recently, the Raymond Sackler family was unable to make the defense presentation public or to respond adequately to allegations made against it in pleadings and the media despite its repeated requests for the public disclosure of that confidential information. Consent to the disclosure of the relevant evidence in the defense presentation has recently been granted. The Raymond Sackler family has supported and continues to support the disclosure of Purdue's confidential information.

On April 8, 2021, in response to requests by the House Committee on Oversight and Reform for information provided by the Sackler families under the Case Stipulation, the Raymond Sackler family provided the House Committee with a link containing an updated defense presentation substantiating the Raymond Sackler family's assertions that Purdue's documents demonstrate that the Sackler family members who served on Purdue's board acted lawfully and ethically. The House Committee declined the Raymond Sackler family's request to make its full unredacted April 8, 2021, submission available in connection with the House Committee's

- 1 -

determination to publish select information from the wealth presentation, but invited the Raymond Sackler family to make additional information available itself.

The Raymond Sackler family has created a website consisting of publicly available information that contains the full wealth presentation, its updated defense presentation (now including previously-confidential information that has been publicly disclosed since April 8, 2021), and other information to which each of the parties who have agreed to the support the Shareholder Settlement had access. The website can be accessed at the following address:

https://relevantlawsuitdocuments.com

The Raymond Sackler family's defense presentation is too voluminous to contain in its entirety in this Disclosure Statement. The Raymond Sackler family encourages all interested parties to access the website to gain a better understanding of the Raymond Sackler family's positions. The website includes sections explaining in detail the falsehoods from the lawsuits commenced by the Commonwealth of Massachusetts and State of New York that were then copied by most other plaintiffs, as well as the propriety of all distributions to the Sackler families from Purdue. In addition to the entire seven-hour defense presentation of the Raymond Sackler family, the website contains a twenty-minute abbreviated summary of the Raymond Sackler family's positions. Finally, the website includes the more than 400 pages of material provided to the House Committee on Oversight and Reform.

The views and opinions expressed on the website constitute those of the Raymond Sackler family only. The website is provided for informational purposes only to allow the viewer to understand the facts as well as the views and opinions of the Raymond Sackler family. The website is not intended to be and should not be construed as a solicitation of votes for or against any plan of reorganization that may be pursued in these chapter 11 cases. Parties in interest entitled to vote on any such plan of reorganization should refer to the Bankruptcy Court's docket for information regarding any such plan of reorganization.

The following sections are not a substitute for the full defense presentation, but summarize the contents of the presentation and the reasons why the proposed Shareholder Settlement is in the best interests of stakeholders.

II.    **The false narrative perpetuated by politicians, plaintiffs' lawyers, and the press**

As described in the Raymond Sackler family's defense presentation, for decades before OxyContin's introduction, medical experts around the world expressed great concern about the undertreatment of chronic pain. *See* Defense Presentation Part 1 at 3-5 [numerical references are to slide numbers]. OxyContin was created by Purdue in response to that serious public health concern. Purdue did not create a market for OxyContin by encouraging doctors to prescribe opioids. Rather, the World Health Organization, American Medical Association and many other governmental and medical organizations had already determined that people were needlessly suffering and not receiving adequate care, and that opioids were an appropriate, and underutilized, tool to help them. In some states, doctors were prosecuted for not prescribing painkillers to patients when needed to treat their pain. *See id.* at 5-12. OxyContin was introduced to address that medical need consistent with the best available science at the time. To this day, medical experts continue

to believe that ensuring access to opioids for patients in pain is a key element of modern treatment protocols. *See* FDA, A GUIDE TO SAFE USE OF PAIN MEDICINE, https://www.fda.gov/consumers/consumer-updates/guide-safe-use-pain-medicine. For many of the 50 million adults in America who suffer from chronic pain (https://www.cdc.gov/mmwr/volumes/67/wr/mm6736a2.htm), prescription opioids like OxyContin have provided relief.

The seeds of the opioid epidemic now facing the country began well before OxyContin's introduction in 1996, with the opioid crisis now fueled by street drugs like illicit fentanyl and heroin. As described in the defense presentation, OxyContin has always been a small portion of the opioid market: at its peak, it represented less than 4% of the prescription opioid market, and had decreased to 1.4% by 2018. *See* Defense Presentation Part 6 at 21-34. And the extended-release formulation of OxyContin was believed to make the new medicine less likely to be abused. *See* Defense Presentation Part 3 at 14-22. When the original formulation of OxyContin became, tragically, the subject of misuse, Purdue spent hundreds of millions of dollars on efforts to combat abuse and diversion, including by developing an abuse-deterrent formulation, winning praise from the DEA, governors and 42 state attorneys general. *See* Defense Presentation Part 5 at 79-82, 85-87.

Nevertheless, it is the Raymond Sackler family's view that Purdue has now become a scapegoat for the opioid epidemic, portrayed in the press and in lawsuits as the cause of the crisis, even though the federal government has been on record for almost 20 years that this is not true. Defense Presentation Part 6 at 32. Michael Moore, an attorney for opioid claimants, acknowledged the plan of the plaintiffs' bar to use the media to blame Purdue and the Sackler families for an opioid epidemic that took root long before the introduction of OxyContin. He told 60 Minutes: "The court of public opinion is sometimes the most powerful court." And Moore spoke years ago about how "this litigation will vilify them"—meaning the Sacklers—and it did. The plan worked: the press repeatedly printed untrue headlines and stories. In 2017, for example, the *New Yorker* published an article claiming that the Sacklers were responsible for creating "millions of addicts." Yet there is no factual basis to assert that high-priced, branded, prescription opioids with a tiny share of the market generated "millions of addicts." To the contrary, the Food & Drug Administration (FDA) states that iatrogenic addiction (the official name for addiction resulting from a properly prescribed medicine taken by a patient as instructed) is rare. *See* Defense Presentation Part 5 at 26. A 2019 study placed the risk of iatrogenic addiction at about 1%. *See* Defense Presentation Part 6 at 44.

In the Raymond Sackler family's view, the efforts of plaintiffs' attorneys to vilify the Sacklers crystalized in early 2019, with the filing of an amended complaint by the Commonwealth of Massachusetts in a lawsuit against Purdue, the Sackler family members who served on the board, and others. The complaint alleges, in histrionic terms, that members of the Sackler families who served as directors of Purdue were liable for Purdue's allegedly unfair and deceptive marketing practices, for negligence, and for creating a public nuisance. The Raymond Sackler family is convinced the evidence shows that the Massachusetts complaint was thoroughly deceptive. It claimed to draw on documents that purportedly showed that Sackler family members were heavily involved in the day-to-day business of marketing Purdue's opioid medications. In reality, as Defense Presentation Part 2 demonstrates in detail, the Massachusetts complaint cited documents out of context, misportrayed documents as saying things they do not actually say, and

otherwise mischaracterized the evidence to give a false impression of Sackler family "control" over Purdue's marketing. *See* Defense Presentation Part 2 at 9-168.

The Massachusetts complaint served as a template for New York and scores of counties, municipalities, and states around the country who filed copycat actions. A huge wave of new lawsuits then mimicked the Massachusetts allegations, verbatim or in substance. Subsequent complaints naming the Sackler family directors seek relief based on substantially the same allegations and characterizations as those made in the Massachusetts complaint. The main thrust is that Sackler family directors allegedly controlled and oversaw Purdue's allegedly deceptive sales and marketing practices as directors (and, at various points before May 2007, as officers). The subsequent actions that copied Massachusetts's complaint repeated these misleading and inaccurate characterizations of the documents. Early in these chapter 11 cases, when the Sackler families gave their initial defense presentations to the plaintiffs in accordance with the Case Stipulation and laid out the many falsehoods in the Massachusetts and New York complaints, one of the lead plaintiff lawyers felt compelled to address the audience: "[l]istening to [this] . . . you would think that my office . . . filed a complaint based on legally unsustainable theories, many legally unsustainable theories, cherry-picked the facts, distorted the documents, and committed various other sins bordering on—if not incompetence then malpractice and something akin to Rule 11 violations" (a reference to a rule prohibiting lawyers from bringing frivolous or bad-faith lawsuits).

Mainly as a result of the false allegations in the Massachusetts complaint and the many copycat pleadings, the dominant narrative over the last several years has become a story portraying the Sackler families as the cause of the opioid epidemic. The truth, however, is that while Purdue was not perfect—it entered into guilty pleas related to sales conduct in 2007 and 2020—there has never been any evidence that the Sackler family orchestrated or participated in any wrongful conduct, and the company has been subject to in-depth monitoring by federal agencies, internal Compliance professionals, and external counsel. This monitoring is explained in detail in the defense presentation. *See* Defense Presentation Part 1 at 17-30. Each monitoring report reached the same conclusion: that the company's compliance systems were strong and all laws were being followed. *See* Defense Presentation Part 1 at 37. When the company filed for bankruptcy in 2019, it made clear in its filings before the Bankruptcy Court that it did so because of the overwhelming number of lawsuits, not the strength of the claims.

The Raymond Sackler family asserts that the sensational story told by the plaintiffs and the media is untrue and unprovable. Throughout these chapter 11 cases, the major parties in interest have taken extraordinarily broad discovery, at substantial cost to the estate, to determine whether they could ever prove that story. This discovery effort involved the production of over 100 million pages of documents, including emails and other communications, as well as disclosure by the Sackler families of the details of their wealth and the trust structure that holds it. Certain parties in interest also have gained access to voluminous additional documents belonging to Purdue. The Raymond Sackler family believes that this vast trove of information confirms that the allegations against the Sackler families have no merit. Further, even if the claims were to result in judgments for the plaintiffs, the facts and governing law would preclude recoveries in excess of the $4.275 billion currently offered by the Sackler families on top of their equity in Purdue.

### III. Obstacles to proving liability

#### A. Marketing and diversion claims

To understand why the Raymond Sackler family believes that the plaintiffs are unlikely to succeed on the merits, it is important to view the current allegations against the backdrop of what happened at Purdue in 2007. That year, the company pleaded guilty to criminal charges relating to its marketing of OxyContin—based on conduct that ended on June 30, 2001—and reached settlements with federal and state governments. These settlements are described in the defense presentation. *See* Defense Presentation Part 1 at 17-26. There were no allegations that any of the Sackler family members did anything wrong. Purdue accepted responsibility for this conduct. It paid more than $600 million to settle the governments' claims and committed to fixing the problem, including by implementing a robust system for detecting diversion of OxyContin, a rigorous compliance regime, and submitting to a federal monitorship that would scrutinize its marketing activity. *See id.* at 18, 38-41; Part 2 at 2-6.

As the defense presentation demonstrates, many of the plaintiffs' current arguments rely heavily on a handful of documents that all predate Purdue's 2007 settlements. *See* Defense Presentation Part 2 at 134-144. Events before the settlements cannot be the basis of any lawsuit today because the federal and state governments granted releases of liability in connection with the settlements, and new claims based on decades-old conduct would be untimely. In the Raymond Sackler family's view, it would also be unreasonable. In the late 1990s and early 2000s, the public health concern was chronic pain, not opioid overuse. *See* Defense Presentation Part 1 at 3-12. The prevailing scientific consensus was that the medical use of opioids was rarely associated with addiction. States enacted laws protecting doctors from claims of overprescribing painkillers, and occasionally disciplined doctors for not prescribing *enough* painkillers. New York—which has now sued Purdue and Sackler family members—was among the states that enacted laws specifically intended to increase prescriptions of painkillers. The Raymond Sackler family believes that evaluating the introduction of OxyContin by today's standards, when the public health focus has shifted to the opioid epidemic, rather than the contemporary standards of 1996 to 2001, is wrong.

But even still, in the Raymond Sackler family's view, the stale evidence supposedly showing wrongdoing by members of the Sackler families in the pre-2007 period is weak or irrelevant. For example, as set forth in detail in the defense presentation, some plaintiffs point to emails from around two decades ago in which Dr. Richard Sackler made comments to friends and family members about those addicted to drugs, which now—twenty years later, when the world knows much more about addiction and social attitudes have changed—seem insensitive. *See* Defense Presentation Part 1 at 2. But those stale comments, for which Dr. Sackler has apologized, are not evidence of misleading marketing or any other wrongdoing.

OxyContin has never been sold other than through doctors writing prescriptions for it, and it has never been advertised to the general public. In 2001, five years after the drug was introduced, a black-box label warning was added on every OxyContin prescription. *See id.* at 52-60. That is the most serious warning placed in the labelling of a prescription medication. The updated label retracted the claim that OxyContin was less likely to be abused and reinforced instructions to avoid breaking, chewing, or crushing the tablets, which carried a heightened risk of overdose. *See id.* at

54-57. The label further provided a warning for doctors that they should consider the potential for abuse, misuse, and diversion when prescribing OxyContin, demonstrating that there has never been any attempt to hide the risk of abuse and addiction. After the label changed, Purdue affirmatively sent more than half a million letters to prescribers to alert them to the revision, emphasizing the potential for abuse.

Before and after the 2007 settlements, Purdue's directors oversaw significant efforts to prevent abuse and diversion of Purdue's medications, which included an abuse and diversion detection program that was ratified by 27 state attorneys general in 2007, and again by New York State in 2015. New York's outside auditor submitted three reports—in 2016, 2017, and 2018—confirming that Purdue was implementing its ADD Program "reasonabl[y]," "conscientiously and in good faith," and identifying just one determination—out of a total of 906—that, while still conscientious and in good faith, he thought was not reasonable. In addition, Purdue (with the support of its board of directors) invested hundreds of millions of dollars to develop the first abuse-deterrent opioid: an OxyContin pill that could not be easily crushed, snorted, or dissolved in water and injected. *See* Defense Presentation Part 3 at 14-17. At the time, that new technology was praised by the Drug Enforcement Agency, the FDA, and 42 attorneys general from around the country as a way to combat the opioid crisis.

And as also set forth in the defense presentation, the Sackler family members on Purdue's board and the highly qualified outside directors received detailed quarterly compliance reports from management certifying that Purdue was operating legally. *See* Defense Presentation Part 1 at 38, 48, 53-87. In 2005, the board of directors implemented a strict compliance regime, then updated that regime in 2007. It monitored management's implementation of that program, received detailed presentations showing effective implementation, and incentivized compliance by making it part of bonus calculations. Every decision by the directors—and board service was the only role any Sackler family member had at Purdue after mid-2007—was made considering what they understood was a rigorous and successful compliance regime. In fact, at all times for the period from mid-2007 to mid-2012, the federal monitor confirmed that Purdue's marketing was conducted in accordance with its Corporate Integrity Agreement with the federal government and which was designed to ensure compliance with federal healthcare law. *See* Defense Presentation Part 1 at 37-41. And in July 2012, as the federal oversight period approached its end, Purdue kept and strengthened its compliance program, including through continued oversight by outside lawyers. *See id.* at 37, 42-47, 77.

Throughout the time period at issue, the board followed standards for pharmaceutical company boards set by the Health and Human Services Inspector General. As described in the defense presentation, the company's compliance program was overseen by senior executives, and followed the industry's best practices: (i) district managers were required to observe and report interactions between sales representatives and doctors and report any non-compliance; (ii) the sales force was required to adhere to the materials approved by medical, legal, and regulatory affairs; (iii) employees were extensively trained on compliance; (iv) the company audited potential areas of risk and remediated any issues; (v) senior executives evaluated the highest-priority compliance risks; (vi) the company monitored any potential violations through sales call notes; and (vii) outside counsel twice reviewed and positively endorsed Purdue's compliance program. *See* Defense Presentation Part 1 at 66-77.

As set forth in the defense presentation, the Sackler families had no reason to believe that Purdue's marketing was unlawful or that its anti-diversion efforts were not effective. *See* Defense Presentation Part 1 at 37-97; Defense Presentation Part 2 at 3-7; Defense Presentation Part 3 at 4, 70-157. The directors oversaw a compliance regime that management reports, as well as the federal government, told them was working. OxyContin's marketing is subject to FDA oversight. The board knew that the FDA issues warning letters when it concludes that marketing materials violate its guidelines, for any reason. Only two such letters were sent to Purdue about OxyContin, and none after 2003. The board therefore had every reason to believe that Purdue's marketing and advertising materials complied with the law. And no members of the Sackler family were ever asked to approve the content of any marketing materials.

In 2020, Purdue pleaded guilty to additional offenses as part of a settlement with the federal government, which is to be part of a broader global settlement of litigation against Purdue in bankruptcy. In the Raymond Sackler family's view, nothing about the guilty plea enhances the merits of the claims brought against the family members. There is no suggestion, much less any evidence, that any family members participated in or even knew about the conduct for which Purdue was criminally charged in 2020, and neither Purdue's criminal plea nor the civil settlement entered into by certain members of the Sackler family supports any claim against the Raymond Sackler family. These points are described in the defense presentation, Part 1 at 28-29; Part 3 at 5-69, 83-153; Part 4 at 67-70; Part 5 at 3-22; and Part 6 at 66, 120.

As to the deceptive marketing claims, not only did the board not directly approve the content of any marketing material, but the Raymond Sackler family believes the evidence shows the statements that are alleged to be misleading were nothing of the sort. For example, as described in the defense presentation, there is nothing deceptive about the assertion that there is no ceiling dose for an opioid: the FDA itself *rejected* a maximum daily dose for OxyContin in 2013 and continues to do so today. *See* Defense Presentation Part 5 at 54. Similarly, there is nothing misleading about the assertion that OxyContin's 2010 reformulation successfully deters abuse. *See id.* at 71-72. To the contrary: the FDA-approved label reflects the FDA's determination that the reformulated product has "abuse-deterrent properties," and the evidence shows that it did, in fact, deter abuse. *See id.* at 72-76. And significantly for this case, federal law requires drug promotion to be consistent with the FDA label. *See id.* at 93. Drug manufacturers like Purdue are thus required to promote consistently with the FDA label. Because many of the alleged misrepresentations are consistent with the label, the Raymond Sackler family believes the mis-marketing claims must fail.

### B. Fraudulent transfer claims

The plaintiffs claim that the Sackler families improperly withdrew billions from Purdue to escape judgments in the lawsuits Purdue now faces. These claims, which seek to recover the distributions Purdue made as fraudulent transfers, now belong to the Purdue bankruptcy estate. To succeed, the estate would have to show either that Purdue was insolvent at the time of the distributions or that board members knew, from as early as 2007, that the company would one day face an onslaught of cases asserting marketing claims that would drive it into bankruptcy and that awareness of this potential liability drove Purdue board members to approve dividends to keep the money away from the plaintiffs. *See* Defense Presentation Part 4 at 2-7.

The Raymond Sackler family believes that, when distributions were made to Sackler family members, no one—not Purdue, not the Sackler family members, and not anyone else—knew or expected Purdue to face the wave of opioid-related marketing lawsuits or judgments that began in 2017 (when the current wave of litigation exploded). *See id.* at 13-16. Over two-thirds of the distributions were made between 2008 and 2012, a period when the federal monitor was overseeing Purdue to make sure it was operating in compliance with its Corporate Integrity Agreement, which was written to ensure that Purdue was complying with federal healthcare law. During this period and thereafter, through 2018, the board received detailed quarterly reports from management confirming Purdue's compliance with state and federal law. *See id.* at 5, 12; Defense Presentation Part 1 at 37-41, 48. As described in the defense presentation, each year, Purdue kept an enormous amount of cash on hand—more than a billion dollars a year from 2014 onward. *See* Defense Presentation Part 4 at 11. By 2008, management told the board that all OxyContin litigation could be "closed out" for $200 million. *See* Defense Presentation Part 4 at 18. By 2010-11, there were only 24 products liability suits pending against Purdue, and all but 3 were dormant. *See id.* at 20. Within four years, there were only 19 products liability suits and all were dormant. *See id.* By 2016, the board was told that the risk of litigation for Purdue was "low." *See id.* at 24. Meanwhile, Purdue spent over a billion dollars on research and development to strengthen its business through innovation. *See id.* at 5.

As set forth in detail in the defense presentation, other sophisticated market participants also did not anticipate opioid litigation liabilities beyond Purdue's ability to pay. *See* Defense Presentation Part 4 at 71-92. In 2014, JPMorgan opined that Purdue could raise $1 billion to $1.5 billion in debt financing. The experience of other opioid manufacturers was similar and supported Purdue management's view that there was no significant litigation risk when the distributions were made. That other opioid manufacturers—who are alleged to have been complicit with Purdue in causing the opioid crisis—could continue to access capital markets is, in the Raymond Sackler family's view, compelling evidence confirming that sophisticated financial parties did not foresee the wave of opioid litigation that eventually led to Purdue's bankruptcy filing: those with publicly traded bonds did not experience material decreases in their bond prices until 2018; and credit rating agencies did not begin to view opioid litigation as a basis for a downgrade of these bond issuances until 2018.

The plaintiffs predominantly rely on only a handful of documents to argue that Sackler family members knew they would one day face liability. In the Raymond Sackler family's view, when read in full and in context, none of those documents demonstrates that any member of the Sackler families anticipated the avalanche of lawsuits that triggered Purdue's bankruptcy. *See* Defense Presentation Part 4 at 32-47. The Raymond Sackler family believes the central problem with the fraudulent transfer claims is that there is no evidence linking the dated, scattered communications on which the plaintiffs rely to the contemporaneous views of any family member or Purdue director at the time the distributions were made or the actual decisions made in the board room. None of the contemporaneous communications or board materials or meeting minutes shows that the distributions had anything to do with a fear of liability. Just the opposite. Each distribution required a formal vote by the entire Purdue board of directors, which included responsible and highly credentialed directors unrelated to the Sackler families. *See id.* at 130, 133. They were not motivated to approve wrongful distributions, and they faced powerful legal incentives to ensure that every distribution was proper.

Nor does the Raymond Sackler family believe that Purdue's 2020 guilty plea establishes that Purdue's distributions were fraudulent. There is no allegation by the federal government, let alone any evidence, that Purdue's board had any knowledge of the criminal conduct to which the company pled guilty, so approval of the distributions could not have been motivated by any concern about eventual liability for that conduct. This is described in the defense presentation in Part 4 at 66-70. In addition, distributions from Purdue were authorized only after management determined how much cash was needed for operations, including legal expenses, and Purdue always had a huge cash cushion providing it with resources to resolve unforeseen matters, like unexpected litigation. In any event, Purdue's guilty plea would not be binding on the Sackler families in any fraudulent transfer or other litigation against them by Purdue's estate. If the fraudulent transfer claims were litigated, the Raymond Sackler family would challenge whether there is any factual or legal support for the company's admissions.

## IV. Obstacles to collection

In addition to the difficulty of proving claims against the Sackler family members, the Raymond Sackler family believes that the plaintiffs also would face significant obstacles to their ability to recover any substantial judgments, were they ever to obtain any. And the obstacles they would face in trying to recover at least $4.275 billion, the amount of cash consideration offered in the settlement under the Plan, would be especially high. This is an independent reason why the Raymond Sackler family believes that claimants would fare better by settling than by litigating.

### A. Marketing and diversion claims

The Sackler families' relationship to Purdue now spans at least four generations. As part of ordinary-course tax and estate planning dating back decades, the families established spendthrift trusts to hold their ownership interests in Purdue. The Raymond Sackler family's equity interest in Purdue, for example, is held in trusts that were established in 1974 and 1989. Most of the Sackler families' wealth that derived from Purdue is therefore not held personally by individual family members but instead in the spendthrift trusts that have owned Purdue since long before OxyContin was invented, and that received distributions of Purdue's profits over the decades.

It is the Raymond Sackler family's position that the assets of spendthrift trusts cannot be used to satisfy creditors of a beneficiary of the trusts, such as an individual family member who may be named as a defendant. Those funds therefore cannot be accessed to satisfy the plaintiffs' marketing or diversion claims, which seek to impose liability on individual family members who served on Purdue's board of directors. Instead, the plaintiffs would be limited to satisfying any judgment out of the individual defendants' personal assets. The Raymond Sackler family members who served on Purdue's board of directors have a combined total of approximately $692 million of personal assets. And the entirety of this amount would be available only if plaintiffs obtained judgments against *all* the Raymond-side director family members. As to some of them, however, there have been virtually no substantive allegations at all.

The Raymond Sackler family expects that litigation against the Sackler family members would be extremely expensive for the individual defendants, which would deplete their assets available for recovery in litigation. Purdue disclosed at the outset of these chapter 11 cases that its defense costs for 2019 alone were projected to be $263 million. The family members, who are

- 9 -

exposed to hundreds of lawsuits premised on identical factual allegations and legal theories as Purdue, would face similar expenses. After a few years of litigation, the $692 million in Raymond-side personal assets potentially available to satisfy judgments on the marketing claims would likely be substantially diminished if not spent entirely.

So too does the Raymond Sackler family expect that there would be other degradations of value in a litigation scenario. The $692 million estimate of the Raymond-side personal wealth includes the interests that those family board members hold in the IACs, and it assumes that the IACs are worth $3 billion. In a settlement scenario, this is a plausible estimate: the families could voluntarily seek to monetize the entirety of the IACs in an orderly and consensual sale process that maximizes value. Absent a settlement, by contrast, no such orderly sale would result and the Raymond Sackler family believes it would be impossible to achieve this same level of value. The Sackler family members personally own only minority interests in the IACs (the remainder is held in trusts), so claimants seeking to satisfy a judgment against the individuals would have to force a sale of a minority stake. And the sale would be forced rather than consensual, which would depress value even further. Thus, in a judgment-collection scenario, the Raymond Sackler family does not believe it is plausible to assume that the IACs would be worth $3 billion, or that the Raymond-side personal wealth would be as high as $692 million.

### B. Fraudulent transfer claims

Unlike the marketing and diversion claims brought against the individual family members, the estate's fraudulent transfer claims target the wealth held in spendthrift trusts that are indirect owners of, and recipients of distributions from, Purdue. But even if the fraudulent transfer claims were established, the Raymond Sackler family believes that the estate would face substantial difficulty recovering more than the $4.275 billion currently being offered.

As detailed in the defense presentation, of the approximately $10.3 billion in distributions that Purdue made from 2008 to 2017, nearly half—about $4.7 billion—was transferred by Purdue to pay taxes on Purdue's income. *See* Defense Presentation Part 4 at 93-97. Nearly 90% of that amount was in fact paid to governmental entities to satisfy taxes. This means the tax distributions, to the extent actually passed on to taxing authorities, cannot be recovered from the Sackler family trusts. The trusts do not have the money; the taxing authorities do—that money has already been paid to the state and federal governments that have asserted claims against the Sackler families. Plus, the Raymond Sackler family would argue that the tax distributions conferred a dollar-for-dollar benefit on Purdue to the extent they were used to pay taxes, thus precluding claims to recover them as fraudulent: since the owners paid the taxes, Purdue was relieved of the obligation to do so itself.

In addition, approximately $1.5 billion of all the distributions were not made to the Sackler family trusts. *See id.* at 101-104. Instead, they were made to the holding company immediately above Purdue, and then reinvested in the IACs. These so-called "ex-US distributions," in the Raymond Sackler family's view, cannot be recovered from the spendthrift trusts on a theory of fraudulent transfer because the trusts are not the transferees of the distributions—the IACs are.

This means that, in the Raymond Sackler family's view, only approximately $4.12 billion of the total distributions, plus the 10% of tax distributions that were not used to pay taxing

- 10 -

authorities (approximately $468 million), are even potentially capable of being recovered from the Sackler family trusts on a fraudulent transfer claim. The Raymond Sackler family believes that Purdue's bankruptcy estate will face a significant legal obstacle to recovering even this amount due to the lookback period for fraudulent transfer claims. Under the Bankruptcy Code, the estate can recover only transfers made within two years before the petition date; under applicable state law, the Raymond Sackler family believes, the estate is limited to looking back only three years. These limitations are explained in the defense presentation in Part 4 at 105-114. Apart from tax distributions, the total distributions made in the three years before the first complaint alleging fraudulent transfer was filed were less than 10% of the $4.275 billion that the Sackler families are contributing through the proposed settlement. Excluding both tax and ex-US distributions, that percentage falls to less than 5%.

As described in more detail in the defense presentation, even if the estate could overcome the three-year time limit that the Raymond Sackler family believes applies, and even if tax distributions and ex-US distributions could be recovered, given the size of the distributions made by Purdue each year, the estate would have to look back seven years—to 2012—to recover transfers exceeding $4.275 billion. *Id*. at 9, 112. If tax distributions and ex-US distributions are excluded, as the Raymond Sackler family believes they must be, the estate would have to look back more than 11 years—before 2008—to achieve a recovery exceeding $4.275 billion. This means the estate would have to show that, as early as those dates (*i.e.*, 2008 and 2012), Purdue was insolvent or *knew* it would face a wave of lawsuits that did not begin until 2017. The Raymond Sackler family believes that this is especially implausible considering that from 2007 to 2012, Purdue was under federal monitorship and the board was being told that the federal monitor had confirmed Purdue's compliance with its Corporate Integrity Agreement and by management that it was operating in compliance with the law.