Jonathan C. Lipson
Temple University-Beasley School of Law
1719 N. Broad St.
Philadelphia, PA 19122
*Counsel to Peter W. Jackson*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re: | Chapter 11 |
| PURDUE PHARMA L.P., *et al.* [1] | Case No. 19-23649 (RDD) |
| Debtors. | (Jointly Administered) |

**SUPPLEMENTAL OBJECTION OF PETER W. JACKSON TO DISCLOSURE STATEMENT FOR SECOND AMENDED CHAPTER 11 PLAN FOR PURDUE PHARMA L.P. AND ITS AFFILIATED DEBTORS (FOURTH PLAN SUPPLEMENT)**

To the Honorable Robert D. Drain, United States Bankruptcy Judge:

**PRELIMINARY STATEMENT**

Peter W. Jackson, a creditor and party in interest, by and through his undersigned counsel, respectfully submits this supplemental objection ("**Objection**") to (1) the *Debtors' Motion to Approve (I) the Adequacy of Information in the Disclosure Statement, (II) Solicitation and Voting Procedures, (III) Forms of Ballots, Notices and Notice Procedures in Connection Therewith, and (IV) Certain Dates with Respect Thereto* [ECF No. 2489 & as revised at ECF No. 2736] (the "**Disclosure Statement Motion**"); (2) the *Disclosure Statement for Second Amended Chapter 11*

---

[1] The debtors in these chapter 11 cases ("Debtors" or "Purdue"), along with the last four digits of each Debtor's registration number in the applicable jurisdiction, are as follows: Purdue Pharma L.P. (7484), Purdue Pharma Inc. (7486), Purdue Transdermal Technologies L.P. (1868), Purdue Pharma Manufacturing L.P. (3821), Purdue Pharmaceuticals L.P. (0034), Imbrium Therapeutics L.P. (8810), Adlon Therapeutics L.P. (6745), Greenfield BioVentures L.P. (6150), Seven Seas Hill Corp. (4591), Ophir Green Corp. (4594), Purdue Pharma of Puerto Rico (3925), Avrio Health L.P. (4140), Purdue Pharmaceutical Products L.P. (3902), Purdue Neuroscience Company (4712), Nayatt Cove Lifescience Inc. (7805), Button Land L.P. (7502), Rhodes Associates L.P. (N/A), Paul Land Inc. (7425), Quidnick Land L.P. (7584), Rhodes Pharmaceuticals L.P. (6166), Rhodes Technologies (7143), UDF LP (0495), SVC Pharma LP (5717) and SVC Pharma Inc. (4014) (collectively, the "Bankruptcy Cases").

- 1 -

*Plan for Purdue Pharma, L.P. and its Affiliated Debtors* [ECF No. 2825] (as modified, amended, or supplemented from time to time, the "**Amended Disclosure Statement**"); and (3) the *Fourth Plan Supplement Pursuant to the Second Amended Joint Chapter 11 Plan of Reorganization of Purdue Pharma, L.P. and its Affiliated Debtors* governing the distribution procedure for the personal injury claims trust to be created under the Plan [ECF No. 2868] (the "**PI Trust Distribution Procedures**").

Like the original disclosure statement in this case, the Amended Disclosure Statement cannot be approved, and the Disclosure Statement Motion must be denied, because the *Second Amended Joint Chapter 11 Plan of Reorganization for Purdue Pharma L.P. and its Affiliated Debtors* [ECF No. 2823] (the "**Amended Plan**"), as it would incorporate the PI Trust Distribution Procedures, cannot be confirmed. It would set a trap for unwary personal injury claimants who fail to opt out of the arbitration system it creates and, in the process, force all such creditors to "accept" inchoate nondebtor releases whose terms have not yet been revealed.

Mr. Jackson incorporates by reference the *Objection of Peter W. Jackson to Amended Disclosure Statement for First Amended Chapter 11 Plan for Purdue Pharma, L.P. and its Affiliated Debtors* [ECF No. 2819] ("**Initial Objection**").[2]

## Analysis

1.  The Amended Plan seeks to address, among other things, two types of claims: (1) about 130,000 claims for personal injury and wrongful death asserted against the Debtors, the great

---

[2] Undefined terms used in this Objection have the meanings ascribed to them in Mr. Jackson's Initial Objection.

The undersigned Counsel recognize that this Objection is filed after the April 23, 2021 objection deadline set by the Debtors. Counsel would note that the PI Trust Distribution Procedures were filed at around 9:00 p.m. on May, 17, 2021—over three weeks after the objection deadline. Counsel made an effort to confer about the issues addressed in this Objection, but were unable to resolve them given time constraints. Mr. Jackson would respectfully ask the Court to take these factors into consideration in the event this Objection is challenged on grounds of timeliness.

bulk of which are contingent and unliquidated (Amended Disclosure Statement, at 82[3]) (the "**PI Claims**"); and (2) claims asserted in about 600 complaints against various nondebtors, including certain members of the Sackler family, and which are the subject of an ongoing preliminary injunction in this case (the "**Sackler Direct Claims**").[4]

2. As explained in the Initial Objection, the PI Claims and the Sackler Direct Claims present both distributive and procedural problems. Distributively, section 1129(a)(7) of the Bankruptcy Code requires that the Plan pay creditors at least as much as they would receive or retain on account of such claims in a chapter 7 liquidation (the so-called "best interests of creditors") test. But the Debtors have thus far not shown that to be the case with respect to the Sackler Direct Claims, which would be "channeled" away from nondebtors who might otherwise be liable therefor.[5] Procedurally, bankruptcy courts generally lack the power to adjudicate personal injury or wrongful death tort claims, whether against the Debtors or nondebtors.

3. The Amended Plan and PI Trust Distribution Procedures purport to solve these problems through the construction of "consent" via an "opt out mechanism": if creditors *affirmatively* so elect, they may use the "tort system" outside of bankruptcy. Failing to make this

---

[3] The liquidation analysis in the Disclosure Statement notes that "Claims filed in amounts certain represent approximately 10% of the claims pool." Amended Disclosure Statement App. C., at 6, n. 2.

[4] *See* Order Pursuant to 11 U.S.C. § 105(a) Granting, in Part, Motion for a Preliminary Injunction, Purdue Pharma, L.P. v. Commw of Mass., Adv. Pro. No. 19-08289 (Bankr. S.D.N.Y Oct. 11, 2019) [ECF No. 82].

[5] At a hearing May 12, 2021, this Court suggested that the Debtors amend their disclosure statement to so provide:

> There's a consistent drumbeat in the objections, which is, to give the objectors the most credit: We're not sure what these claims are, but they're being released and I'd like to know more about the merits of them before I agree to vote in favor of a plan or not object to a plan that releases them. . . . I think it should be in the disclosure statement, and I think it should be in the liquidation analysis. And, frankly, I think the Debtors should state their views on the potential risks of direct third-party claim litigation in contrast to the settlement . . . ."

*Hr'g Trans*, May 12, 2021, at 19, 21 & 24. In light of this, Mr. Jackson does not separately address the "best interests" issues presented by the Amended Disclosure Statement, but reserves the right to do so as and when the Debtors further amend the Amended Disclosure Statement to address these concerns.

election, however, they must assert their claims in the arbitral proceedings created by the PI Trust Distribution Procedures. PI Trust Distribution Procedures, at 2. Either way, holders of PI claims may assert these claims "against only the PI Trust (and including no other parties as defendants)." *Id.* at Ex B, p 1. Personal injury and wrongful death tort claimants would thus lose all ability to pursue nondebtors for harm within the scope of the releases and channeling injunctions that are, or will become, part of the Plan, including the Sackler Direct Claims.

4. While "consent" may cure certain procedural problems with the Amended Plan's treatment of PI Claims and the Sackler Direct Claims, the new opt-out mechanisms in the PI Trust Distribution Procedures and Amended Plan are "simply not realistic or fair, and would stretch the meaning of "consent" beyond the breaking point." *In re SunEdison, Inc*., 576 B.R. 453, 461 (Bankr. S.D.N.Y. 2017) (internal quotations and citations omitted).

5. Because the original PI Trust Distribution Procedures were impermissible, and the new opt-out election cannot save them, the Amended Plan is unconfirmable. Because the Court should not approve a disclosure statement for a plan that is unconfirmable,[6] the Amended Disclosure Statement should not be approved.

I. ***Claims Resolution Problems in the Absence of Consent***

6. The Amended Plan's new opt-out mechanism all but concedes that, absent consent, the PI Trust Distribution Procedures are not valid. In the absence of "consent," the Amended Plan's proposed treatment of PI Claims and Sackler Direct Claims would render the Plan

---

[6] Section 1125 of the United States Bankruptcy Code provides that a debtor may not solicit votes on a plan "unless, at the time of or before such solicitation, there is transmitted to such holder the plan or a summary of the plan, and a written disclosure statement approved, after notice and a hearing, by the court as containing adequate information." 11 U.S.C. § 1125(b). As explained in the Initial Objection, if a plan is "patently unconfirmable on its face, the application to approve the disclosure statement must be denied, as solicitation of the vote would be futile." *See In re Quigley Co., Inc*., 377 B.R. 110, 115–16 (Bankr. S.D.N.Y. 2007)(citing *In re Beyond.com Corp*., 289 B.R. 138, 140 (Bankr. N.D. Cal. 2003) (collecting cases); *In re 266 Washington Assocs*., 141 B.R. 275, 288 (Bankr. E.D.N.Y.), *aff'd*, 147 B.R. 827 (E.D.N.Y. 1992); *In re Filex*, 116 B.R. 37, 41 (Bankr. S.D.N.Y. 1990)).

unconfirmable because, among other reasons, the Plan would not comply with "applicable provisions" of the Bankruptcy Code and the Judicial Code. *See* 11 U.S.C. § 1129(a)(1).[7]

7.  In simplified terms, it appears that the Amended Plan places PI Claims in Class 10 and treats them as "Channeled Claims." As such, and assuming the holder does not opt out, they will be allowed (or not) pursuant to procedures set forth in the PI Trust Distribution Procedures.

8.  The PI Trust Distribution Procedures appear to vest in an "administrator" the power to allow or disallow PI Claims. "If a holder of a qualifying opioid-related personal injury claim is dissatisfied with the determination under the PI Trust Distribution Procedures of the settlement payment such claimant is to receive," the Amended Disclosure Statement explains, the "dissatisfied claimant can appeal to the claims administrator." Amended Disclosure Statement, at 86. A personal injury claimant who "disagrees with the decision of the claims administrator on the appeal may further appeal to an appeals master appointed by the trustee of the PI Trust." *Id.* The decision of the appeals master "will be final and binding." *Id.* at 86.

9.  It thus appears that the Amended Plan creates a process that fully decides the allowability and amount of claims for personal injury or wrongful death torts without any opportunity for hearing before or determination by *any* judge. It is tantamount to mandatory arbitration of claims that would otherwise be subject to ordinary adjudication.[8]

---

[7] *See In re Am. Cap. Equip., Inc.*, 405 B.R. 415, 426 (Bankr. W.D. Pa. 2009), *aff'd sub nom. Skinner Engine Co. v. Allianz Glob. Risk U.S. Ins. Co.*, No. BKY 01-23987, 2010 WL 1337222 (W.D. Pa. Mar. 29, 2010), *aff'd sub nom. In re Am. Cap. Equip., LLC*, 688 F.3d 145 (3d Cir. 2012) (refusing to confirm plan requiring Bankruptcy Court to liquidate personal injury tort claims in violation of 28 U.S.C. § 157(b)(2)(B) because doing so would violate 11 U.S.C. § 1129(a)(1)).

[8] Although "[a]rbitration is a term that eludes easy definition," *AMF Inc. v. Brunswick Corp.*, 621 F. Supp. 456, 459 (E.D.N.Y. 1985), the Second Circuit appears to have adopted a broad one: An enforceable arbitration clause in a contract is one "that clearly manifests an intention by the parties to submit certain disputes to a specified third party for binding resolution." *Milligan v. CCC Info. Servs. Inc.*, 920 F.3d 146, 151 (2d Cir. 2019)(citing *McDonnell Douglas Finance Corp. v. Pennsylvania Power & Light Co.*, 858 F.2d 825, 830 (2d Cir. 1988)).

10. Such a procedure violates the Bankruptcy Code and Judicial Code for at least four reasons.

11. *First*, such determinations are not "core" matters as to which this Court may enter a final order (*e.g.*, an order confirming the Amended Plan). As explained in the Initial Objection, while "core proceedings" include the confirmation of plans of reorganization (28 U.S.C. § 157(b)(2)(L)), they do not include "the liquidation or estimation of contingent or unliquidated personal injury tort or wrongful death claims against the estate for purposes of distribution in a case under title 11." 28 U.S.C. § 157(b)(2)(B). Congress specifically sought to protect the right to an adjudication of such claims outside of bankruptcy, providing that "[t]he district court *shall order* that personal injury tort and wrongful death claims shall be tried in the district court in which the bankruptcy case is pending, or in the district court in the district in which the claim arose, as determined by the district court in which the bankruptcy case is pending." 28 U.S.C. § 157(b)(5) (emphasis supplied).

12. This is especially problematic where, as here, PI Claims that have been or could be asserted against nondebtors would be "channeled" into the PI Trust and (presumably) made subject to the Shareholder Releases (as defined in the Amended Plan). The District Court has held in this case that the Bankruptcy Court cannot exercise "arising in" jurisdiction—the power to enter final orders—over the merits of direct claims arising under applicable state law asserted against the Sacklers—that is, the Sackler Direct Claims. *See In re Purdue Pharms. L.P.*, 619 B.R. 38, 56-57 (S.D.N.Y. 2020) ("The Bankruptcy Court cannot now, nor will it ever be able to, adjudicate the *Dunaway* claims against Dr. Sackler without first being permitted to do so by this court, reviewing an order of the Bankruptcy Judge *de novo*."). It appears that the PI Trust Distribution Procedures seek to dodge this restriction.

13.     *Second*, the PI Trust Distribution Procedures would eliminate any right to a jury trial on such claims, a right Congress specifically sought to preserve in cases of personal injury or wrongful death torts.  *See* 28 U.S.C. § 1411(a)("title 11 do[es] not affect any right to trial by jury that an individual has under applicable nonbankruptcy law with regard to a personal injury or wrongful death tort claim.").

14.     *Third,* while Bankruptcy Courts may "authorize [a] matter to be submitted to final and binding arbitration" they may do so only on "stipulation of the parties."  Fed. R. Bankr. P. 9019(c).  Bankruptcy Courts cannot force parties to arbitrate claims which would otherwise be subject to an adjudication.  *See Jorgensen v. Federal Land Bank* (*In re Jorgensen*), 66 B.R. 104, 108 (Bankr. 9th Cir. 1986) (absent stipulation of the parties, bankruptcy court may not appoint an arbitrator).  As explained below, the opt-out mechanism in the PI Trust Distribution Procedures would not be an enforceable "stipulation" under Rule 9019(c).

15.     *Fourth*, special masters, who would resolve appeals of PI Claim determinations, are not permitted in cases under title 11.  *See* Fed. R. Bankr. P. 9031 ("Rule 53 F.R.Civ.P. does not apply in cases under the Code.").  *See also* Paulette J. Delk, *Special Masters in Bankruptcy: The Case Against Bankruptcy Rule 9031,* 67 Mo. L. Rev. 29, 57 (2002)("The effect of Federal Rule of Bankruptcy Procedure 9031 is to deny both the district court and the bankruptcy court the right to appoint a special master in appropriate cases.").

16.     The only possible way the Amended Plan can retain such mechanisms is if creditors "consent" to them, which the Amended Plan would purport to induce through the new PI Trust Distribution Procedures.

**II.    *Illusory Consent***

17.    As amended, it appears that the PI Trust Distribution Procedures seek to induce consent to arbitration through an "opt out" mechanism.  All PI Claims will be channeled into the "streamlined procedures" described above *unless* the holder of a PI Claim "opts out" of them.  *See* PI Trust Distribution Procedures, at 2.  To opt out, the holder must: (i) have timely filed a proof of claim against one or more of the Debtors; and (ii) elect, using a "Claim Form" to be attached as Exhibit A to the procedures, to "assert and liquidate" such claim "in the tort system at his/her own expense."  PI Trust Distribution Procedures, at 2.

18.    Critically, it appears that any such holder who *fails* affirmatively to opt out will be deemed to have agreed to the PI Trust's streamlined procedures, and perhaps for other purposes as well (discussed further below).

19.    As noted above, Federal Rule of Bankruptcy Procedure 9019(c) permits arbitration only upon "stipulation of the parties."  *See* Fed. R. Bankr. P. 9019(c).  *See also* Ralph R. Mabey, Charles J. Tabb, Ira S. Dizengoff, *Expanding the Reach of Alternative Dispute Resolution in Bankruptcy: The Legal and Practical Bases for the Use of Mediation and the Other Forms of ADR*, 46 S.C. L. REV. 1259, 1313 (1995)("Bankruptcy Rule 9019(c) limits the use of binding arbitration in bankruptcy cases to instances where the parties consent.").

20.    Rule 9019(c) recognizes the general rule that arbitration is "a creature of contract, a device of the parties rather than the judicial process. If the parties have agreed to submit a dispute for a decision by a third party, they have agreed to arbitration." *See AMF Inc. v. Brunswick Corp.*, 621 F. Supp. 456, 460 (E.D.N.Y. 1985).  Because the PI Trust Distribution Procedures function as a form of arbitration, whether they are binding on creditors would therefore be evaluated as a

question of contract law. *See First Options of Chicago, Inc. v. Kaplan,* 514 U.S. 938, 943 (1995) ("arbitration is simply a matter of contract between the parties").

21. Here, the "election" promised under the Amended Plan and Disclosure Statement would fail to satisfy basic contract law, and so cannot be an effective means to implement the PI Trust Distribution Procedures, for three reasons.

22. *First,* creditors may not be bound to such provisions by their silence, as the opt-out mechanism would do. "The first principle that underscores all of our arbitration decisions," the Supreme Court has stated, is that "[a]rbitration is strictly a matter of consent . . . ." *See Granite Rock Co. v. Int'l Brotherhood of Teamsters*, 561 U.S. 287, 299 (2010).

23. In the context of nondebtor releases, the Bankruptcy Court for the Southern District of New York has held that consent "by silence" will be ineffective. *In re SunEdison, Inc.,* 576 B.R. 453, 458 (Bankr. S.D.N.Y. 2017). In *SunEdison,* Judge Bernstein observed that "[c]onsent through silence or inaction – "deemed consent" – raises a [] difficult question." *Id.* at 458. "Absent a duty to speak," he reasoned, "silence does not constitute consent." *Id.* ("An offeror has no power to transform an offeree's silence into acceptance when the offeree does not intend to accept the offer[.]" (*quoting Karlin v. Avis,* 457 F.2d 57, 62 (2d Cir.), *cert. denied*, 409 U.S. 849 (1972))).

24. Here, the PI Trust Distribution Procedures would force all creditors to relinquish their right to assert claims against the Debtors and nondebtors alike, *unless* they affirmatively elect otherwise. A failure to elect otherwise—silence—would thus apparently be considered evidence of consent under the Plan. But Judge Bernstein found this to be unacceptable in the context of nondebtor releases, and it is hard to see how arbitration should be different:

> Charging all inactive creditors with full knowledge of the scope and implications of the proposed third party releases, and implying a "consent" to the third party releases based on the creditors' inaction, is simply not realistic or fair, and would stretch the meaning of

"consent" beyond the breaking point.

*SunEdison, Inc.*, 576 B.R. at 461 (quoting *In re Chassix Holdings, Inc.,* 533 B.R. 64, 81 (Bankr. S.D.N.Y. 2015)).

25. It is no answer to say, as the Debtors might, that nondebtor releases are doctrinally distinct from arbitration stipulations. While that may be true in the details, *SunEdison* and the great bulk of arbitration precedent teach that both should be evaluated against basic contract principles. That would appear to be especially so here, where the PI Trust Distribution Procedures would, in fact, also have the effect of implementing the sorts of problematic nondebtor releases at issue in *SunEdison*.

26. *Second,* the PI Trust Distribution Procedures' "litigation option" strips important rights that personal injury tort claimants would otherwise have outside bankruptcy. Even if creditors who want their "day in court" follow the steps proscribed in the Amended Disclosure Statement to preserve those rights, other constraints on litigation imposed by the Amended Plan would render the "election" a false choice.

27. Any personal injury claimant who does affirmatively opt out, for example, will *still* lose the rights: (i) to form, certify or participate in a class in prosecution of such claim (PI Trust Procedures, at Ex. B, p. 1); (ii) to assert such claim against any defendant other than the PI Trust, including nondebtors who may otherwise have independent liability for such claims and who will be released under the Plan (and shielded by channeling injunctions) (*id.*); and (iii) to recover attorney's or similar fees, even if they were otherwise available under applicable law. *Id.* at 2.

28. While the litigation option may preserve a "day in court" for the attentive creditor, the PI Trust Distribution Procedures are designed to assure that it will be a very short day.

29. *Third,* even if assent by silence is somehow permissible, the Amended Plan and Disclosure Statement fail to provide even the most basic information needed to enable creditors to make an informed decision whether to opt out. Among other things, in their current forms, the Amended Plan and Disclosure Statement:

- Fail to provide a sample of the "Claim Form" (Exhibit A) that creditors must use to opt out;
- Fail to specify the terms or scope of the Shareholder Releases to which personal injury claimants may be asked to consent by opting out of the PI Trust Distribution Procedures; and
- Fail to specify the discount rate that would apply to PI Claims liquidated through the tort system. *See* PI Trust Distribution Procedures, Ex B, at 2 (omitting "point value" amounts for application to PI Claims).

30. In *SunEdison,* Judge Bernstein directed the debtors to modify their disclosure statement and ballots to "make clear in conspicuous language that the Debtors intended to ask the Court, at the confirmation hearing, to deem the failure to vote by parties entitled to vote as consent to the Release." *See SunEdison, Inc.,* 576 B.R., at 457. Here, unfortunately, the Amended Disclosure Statement says nothing at all about this election—much less in the "conspicuous language" that might be required to render it effective to show that creditors consented to it.

31. Failing to satisfy the most basic requirements of contract law, the "consent" that would be induced by the "election" in the PI Trust Distribution Procedures is illusory. Thus, as demonstrated above, the Amended Plan is left to implement those procedures forcibly—but impermissibly—in violation of section 1129(a)(1)'s requirement that the Plan comply with the applicable provisions of the Bankruptcy Code and the Judicial Code. 11 U.S.C. § 1129(a)(1).

**III.  *Stealth Consent***

32.  Finally, and as noted above, "consent" may cure some of the problems presented by the Amended Plan's treatment of the PI Claims and Sackler Direct Claims, including on the permissibility of nondebtor releases and Bankruptcy Court jurisdiction over such claims.

33.  There is, however, the risk that if creditors are deemed to consent to the PI Trust Distribution Procedures by their silence, they will *also* be deemed to have assented for these other purposes, a form of stealth consent that is not consensual at all.

34.  To be sure, none of the Amended Plan, Amended Disclosure Statement, or PI Trust Distribution Procedures say this explicitly.  But that is the problem:  if the Debtors intend to use creditors' decisions to remain in or opt out of the PI Trust Distribution Procedures as grounds to argue that the nondebtor releases are consensual, that this Court has jurisdiction over these claims, or for other purposes, they should say so conspicuously—or make clear that that is not the case.

**Conclusion**

The amended PI Trust Distribution Procedures do little more than set a trap for unsophisticated personal injury victims, who will sacrifice any meaningful right to an adjudication of their claims according to the rule of law, whether they stay in or opt out of those procedures. The Amended Plan cannot be confirmed with such procedures because, absent consent, they exceed the powers of this Court and directly contradict otherwise applicable law. Because the consent they purport to create is illusory, the Amended Plan is unconfirmable. The Amended Disclosure Statement that would solicit votes on it thus cannot be approved, and the Disclosure Statement Motion should be denied.

Dated: May 18, 2021        Respectfully Submitted,
      Philadelphia, PA

By:   /s/ Jonathan C. Lipson
     Jonathan C. Lipson (JL-3507)
     Temple University-Beasley School of Law
     1719 North Broad St.
     Philadelphia, PA 19122
     215-204-0608
     jlipson@temple.edu
     *Counsel to Peter W. Jackson*

     /s/ Karen F. Neuwirth
     Karen F. Neuwirth
     Martin S. Rapaport, P.C.
     18 East 48th Street
     6th Floor
     New York, N.Y. 10017
     (212) 688-1980
     manhatoffice@yahoo.com
     *Co-counsel to Peter W. Jackson*