## Exhibit A

**Blackline of Disclosure Statement for Third Amended Plan Against
Disclosure Statement for Second Amended Plan**

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re: | Chapter 11 |
| **PURDUE PHARMA L.P.**, *et al.*, | Case No. 19-23649 (RDD) |
| Debtors.[1] | (Jointly Administered) |

**DISCLOSURE STATEMENT FOR ~~SECOND~~THIRD AMENDED JOINT**
**CHAPTER 11 PLAN ~~FOR~~OF REORGANIZATION OF PURDUE PHARMA L.P.**
**AND ITS AFFILIATED DEBTORS**

THIS IS NOT A SOLICITATION OF AN ACCEPTANCE OR REJECTION OF THE PLAN.
ACCEPTANCES OR REJECTIONS MAY NOT BE SOLICITED UNTIL THIS DISCLOSURE
STATEMENT HAS BEEN APPROVED BY THE BANKRUPTCY COURT.  THIS DISCLOSURE
STATEMENT IS BEING SUBMITTED FOR APPROVAL BUT HAS NOT BEEN APPROVED BY THE
BANKRUPTCY COURT.  THE INFORMATION IN THIS DISCLOSURE STATEMENT IS SUBJECT TO
CHANGE.  THIS DISCLOSURE STATEMENT IS NOT AN OFFER TO SELL ANY SECURITIES AND IS
NOT SOLICITING AN OFFER TO BUY ANY SECURITIES.

---

[1]  The Debtors in these cases, along with the last four digits of each Debtor's registration number in the applicable jurisdiction, are as follows: Purdue Pharma L.P. (7484), Purdue Pharma Inc. (7486), Purdue Transdermal Technologies L.P. (1868), Purdue Pharma Manufacturing L.P. (3821), Purdue Pharmaceuticals L.P. (0034), Imbrium Therapeutics L.P. (8810), Adlon Therapeutics L.P. (6745), Greenfield BioVentures L.P. (6150), Seven Seas Hill Corp. (4591), Ophir Green Corp. (4594), Purdue Pharma of Puerto Rico (3925), Avrio Health L.P. (4140), Purdue Pharmaceutical Products L.P. (3902), Purdue Neuroscience Company (4712), Nayatt Cove Lifescience Inc. (7805), Button Land L.P. (7502), Rhodes Associates L.P. (N/A), Paul Land Inc. (7425), Quidnick Land L.P. (7584), Rhodes Pharmaceuticals L.P. (6166), Rhodes Technologies (7143), UDF LP (0495), SVC Pharma LP (5717) and SVC Pharma Inc. (4014).  The Debtors' corporate headquarters is located at One Stamford Forum, 201 Tresser Boulevard, Stamford, CT 06901.

DAVIS POLK & WARDWELL LLP
450 Lexington Avenue
New York, New York 10017
Telephone: (212) 450-4000
Facsimile:  (212) 701-5800
Marshall S. Huebner
Benjamin S. Kaminetzky
Timothy Graulich
Eli J. Vonnegut
Christopher S. Robertson

*Counsel to the Debtors and Debtors in
Possession*

Dated: May ~7~24, 2021
New York, New York

## DISCLAIMER

THIS DISCLOSURE STATEMENT CONTAINS A SUMMARY OF CERTAIN PROVISIONS OF THE PLAN AND CERTAIN OTHER DOCUMENTS AND INFORMATION.   THE FINANCIAL INFORMATION INCLUDED HEREIN IS FOR PURPOSES OF SOLICITING ACCEPTANCES OF THE PLAN AND SHOULD NOT BE RELIED UPON FOR ANY PURPOSE OTHER THAN TO DETERMINE HOW AND WHETHER TO VOTE ON THE PLAN.   THE DEBTORS BELIEVE THAT THESE SUMMARIES ARE FAIR AND ACCURATE.   THE SUMMARIES OF THE FINANCIAL INFORMATION AND THE DOCUMENTS THAT ARE ATTACHED HERETO ARE QUALIFIED IN THEIR ENTIRETY BY REFERENCE TO SUCH INFORMATION AND DOCUMENTS.   IN THE EVENT OF ANY INCONSISTENCY OR DISCREPANCY BETWEEN A DESCRIPTION IN THIS DISCLOSURE STATEMENT AND THE TERMS AND PROVISIONS OF THE PLAN OR SUCH OTHER PLAN-RELATED DOCUMENTS AND INFORMATION, THE PLAN OR SUCH OTHER PLAN-RELATED DOCUMENTS AND INFORMATION, AS THE CASE MAY BE, SHALL GOVERN FOR ALL PURPOSES.

THE STATEMENTS AND INFORMATION CONTAINED HEREIN HAVE BEEN MADE AS OF THE DATE HEREOF UNLESS OTHERWISE SPECIFIED.  HOLDERS OF CLAIMS REVIEWING THIS DISCLOSURE STATEMENT SHOULD NOT INFER AT THE TIME OF SUCH REVIEW THAT THERE HAVE BEEN NO CHANGES IN THE FACTS SET FORTH HEREIN SINCE THE DATE HEREOF.  EACH HOLDER OF A CLAIM ENTITLED TO VOTE ON THE PLAN SHOULD CAREFULLY REVIEW THE PLAN AND THIS DISCLOSURE STATEMENT IN THEIR ENTIRETY BEFORE CASTING A BALLOT (AS DEFINED HEREIN).   THIS DISCLOSURE STATEMENT DOES NOT CONSTITUTE LEGAL, BUSINESS, FINANCIAL, OR TAX ADVICE.  ANY PERSONS DESIRING ANY SUCH ADVICE OR OTHER ADVICE SHOULD CONSULT WITH THEIR OWN ADVISORS.

ALTHOUGH THE DEBTORS HAVE ATTEMPTED TO ENSURE THE ACCURACY OF THE FINANCIAL INFORMATION PROVIDED IN THIS DISCLOSURE STATEMENT, EXCEPT WHERE SPECIFICALLY NOTED, THE FINANCIAL INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT HAS NOT BEEN AUDITED.

THE FINANCIAL PROJECTIONS (AS DEFINED HEREIN) PROVIDED IN THIS DISCLOSURE STATEMENT HAVE BEEN PREPARED BY THE MANAGEMENT OF THE DEBTORS AND THEIR FINANCIAL ADVISORS.  THESE FINANCIAL PROJECTIONS, WHILE PRESENTED WITH NUMERICAL SPECIFICITY, ARE NECESSARILY BASED ON A VARIETY OF ESTIMATES AND ASSUMPTIONS THAT, ALTHOUGH CONSIDERED REASONABLE BY MANAGEMENT, MAY NOT BE REALIZED AND ARE INHERENTLY SUBJECT TO SIGNIFICANT BUSINESS, ECONOMIC, COMPETITIVE, INDUSTRY, REGULATORY, MARKET, AND FINANCIAL UNCERTAINTIES AND CONTINGENCIES, MANY OF WHICH ARE BEYOND THE DEBTORS' CONTROL.  THE DEBTORS CAUTION THAT NO REPRESENTATIONS CAN BE MADE AS TO THE ACCURACY OF THESE FINANCIAL PROJECTIONS OR THE ABILITY TO ACHIEVE THE PROJECTED RESULTS.   SOME ASSUMPTIONS INEVITABLY WILL NOT

MATERIALIZE.    FURTHER, EVENTS AND CIRCUMSTANCES OCCURRING SUBSEQUENT TO THE DATE ON WHICH THESE FINANCIAL PROJECTIONS WERE PREPARED MAY BE DIFFERENT FROM THOSE ASSUMED AND/OR MAY HAVE BEEN UNANTICIPATED AND, THUS, THE OCCURRENCE OF THESE EVENTS MAY AFFECT FINANCIAL RESULTS IN A MATERIALLY ADVERSE OR MATERIALLY BENEFICIAL MANNER.  THE FINANCIAL PROJECTIONS, THEREFORE, MAY NOT BE RELIED UPON AS A GUARANTEE OR OTHER ASSURANCE OF THE ACTUAL RESULTS THAT WILL OCCUR.

NO PARTY IS AUTHORIZED TO GIVE ANY INFORMATION WITH RESPECT TO THE PLAN OTHER THAN THAT WHICH IS CONTAINED IN THIS DISCLOSURE STATEMENT.  NO REPRESENTATIONS CONCERNING THE DEBTORS OR THE VALUE OF THEIR PROPERTY HAVE BEEN AUTHORIZED BY THE DEBTORS OTHER THAN AS SET FORTH IN THIS DISCLOSURE STATEMENT.    ANY INFORMATION, REPRESENTATIONS, OR INDUCEMENTS MADE TO OBTAIN AN ACCEPTANCE OF THE PLAN OTHER THAN, OR INCONSISTENT WITH, THE INFORMATION CONTAINED HEREIN AND IN THE PLAN SHOULD NOT BE RELIED UPON BY ANY HOLDER OF A CLAIM.

WITH RESPECT TO CONTESTED MATTERS, ADVERSARY PROCEEDINGS, AND OTHER PENDING, THREATENED, OR POTENTIAL LITIGATION OR ACTIONS, THIS DISCLOSURE STATEMENT DOES NOT CONSTITUTE, AND MAY NOT BE CONSTRUED BY ANY PARTY AS, AN ADMISSION OF FACT, LIABILITY, STIPULATION, OR WAIVER, BUT RATHER AS A STATEMENT MADE IN SETTLEMENT NEGOTIATIONS.    THIS DISCLOSURE STATEMENT WILL NOT BE ADMISSIBLE IN ANY NON-BANKRUPTCY PROCEEDING NOR WILL IT BE CONSTRUED TO CONSTITUTE ADVICE ON THE TAX, SECURITIES, OR OTHER LEGAL EFFECTS OF THE PLAN AS IT RELATES TO THE HOLDERS OF CLAIMS AGAINST, OR INTERESTS IN, THE DEBTORS.

THE SECURITIES DESCRIBED HEREIN WILL BE ISSUED WITHOUT REGISTRATION UNDER THE UNITED STATES SECURITIES ACT OF 1933, AS AMENDED (THE "**SECURITIES ACT**"), OR ANY SIMILAR FEDERAL, STATE, OR LOCAL LAW, IN RELIANCE ON THE EXEMPTIONS SET FORTH IN SECTION 1145 OF THE BANKRUPTCY CODE.  IN ACCORDANCE WITH SECTION 1125(E) OF THE BANKRUPTCY CODE, A DEBTOR OR ANY OF ITS AGENTS THAT PARTICIPATES, IN GOOD FAITH AND IN COMPLIANCE WITH THE APPLICABLE PROVISIONS OF THE BANKRUPTCY CODE, IN THE OFFER, ISSUANCE, SALE, OR PURCHASE OF A SECURITY, OFFERED OR SOLD UNDER THE PLAN, OF THE DEBTOR, OF AN AFFILIATE PARTICIPATING IN A JOINT PLAN WITH THE DEBTOR, OR OF A NEWLY ORGANIZED SUCCESSOR TO THE DEBTOR UNDER THE PLAN, IS NOT LIABLE, ON ACCOUNT OF SUCH PARTICIPATION, FOR VIOLATION OF ANY APPLICABLE LAW, RULE, OR REGULATION GOVERNING THE OFFER, ISSUANCE, SALE, OR PURCHASE OF SECURITIES.

THIS DISCLOSURE STATEMENT HAS BEEN PREPARED IN ACCORDANCE WITH SECTION 1125 OF THE BANKRUPTCY CODE AND BANKRUPTCY RULE 3016(B) AND NOT IN ACCORDANCE WITH FEDERAL OR STATE SECURITIES LAWS OR OTHER NON-APPLICABLE BANKRUPTCY LAWS.  THIS DISCLOSURE STATEMENT HAS NOT BEEN APPROVED OR DISAPPROVED BY THE UNITED STATES SECURITIES AND EXCHANGE COMMISSION (THE "**SEC**"), NOR HAS THE SEC PASSED UPON THE ACCURACY OR ADEQUACY OF THE STATEMENTS CONTAINED HEREIN.

SEE ARTICLE VIII OF THIS DISCLOSURE STATEMENT, ENTITLED "CERTAIN RISK FACTORS TO BE CONSIDERED PRIOR TO VOTING," FOR A DISCUSSION OF CERTAIN CONSIDERATIONS IN CONNECTION WITH A DECISION BY A HOLDER OF AN IMPAIRED CLAIM TO ACCEPT THE PLAN.

## TABLE OF CONTENTS

PAGE

ARTICLE I

INTRODUCTION ................................................................................................. 1

A.    Purpose of the Disclosure Statement ................................................................... 1

B.    Executive Summary ............................................................................................. 2

C.    Summary of Classification and Treatment of Claims and Interests in the Debtors ....... ~~15~~18

D.    The DOJ Resolution, Settlements with the Private Claimant Groups and Shareholder Contribution Are Interdependent and Vastly Superior to Potential Alternatives ......... ~~20~~23

E.    Channeling Injunction ......................................................................................... ~~22~~25

F.    Releases ............................................................................................................. ~~23~~26

G.    Confirmation of the Plan ..................................................................................... ~~24~~35

H.    Voting Procedures and Voting Deadline ............................................................. ~~25~~37

I.    Disclosure Statement Enclosures ........................................................................ ~~26~~37

J.    Confirmation Hearing ......................................................................................... ~~26~~37

ARTICLE II

GENERAL INFORMATION REGARDING THE DEBTORS ............................................. ~~26~~38

A.    The Debtors' Businesses, Structure, Management, and Employees ...................... ~~26~~38

B.    Debtors' Corporate Structure .............................................................................. ~~36~~48

C.    The Debtors' Prepetition Capital Structure .......................................................... ~~36~~48

D.    Summary of Events Leading to the Chapter 11 Filings ........................................ ~~36~~48

E.    Independence of Company from Sacklers .............................................................. ~~38~~50

ARTICLE III

THE CHAPTER 11 CASES .................................................................................... ~~44~~56

A.    First-Day Motions .............................................................................................. ~~44~~56

B.    Appointment of Statutory Committee .................................................................. ~~44~~56

C.    Filing of Schedules of Assets and Liabilities and Statements of Financial Affairs ....... ~~45~~57

D.    Professional Advisors ......................................................................................... ~~45~~57

E.    CCAA Proceedings ............................................................................................. ~~48~~60

F.    Settlement Framework ........................................................................................ ~~48~~60

G.     Preliminary Injunction and Voluntary Injunction.................................................~~49~~61

H.     Appointment of Monitor ......................................................................................~~51~~63

I.     Appointment of Fee Examiner ..............................................................................~~52~~64

J.     Emergency Relief Fund Negotiations ...................................................................~~52~~64

K.     Bar Date ...............................................................................................................~~53~~65

L.     Entry into Stipulation in Respect of Certain Canadian Patient Litigation ...................~~55~~67

M.     Sale of Rhodes Technologies Manufacturing Facility and Entry into Supply
Agreement.............................................................................................................~~57~~69

N.     Consideration of Unsolicited Offer for Certain Assets..........................................~~57~~69

O.     Continuation of Certain Prepetition Employee Compensation Programs ...................~~60~~72

P.     Key Employee Incentive Program and Key Employee Retention Program .................~~61~~73

Q.     Extension of Exclusive Periods ............................................................................~~62~~74

R.     Information Sharing/Diligence ..............................................................................~~62~~74

S.     Mediation .............................................................................................................~~64~~76

T.     Protocols for the Resolution of Healthcare Liens .................................................~~88~~105

U.     Negotiated Post-Effective Date Structure and Governance of NewCo ...................~~89~~106

V.     DOJ Resolution....................................................................................................~~94~~112

W.     The Debtors' Acceptance of Responsibility and Apologies for Past Misconduct.......~~96~~114

X.     Public Document Repository ................................................................................~~97~~114

Y.     The Special Committee's Investigation and Approval of Settlement of Claims
Against the Sackler Families ................................................................................~~98~~116

Z.     The Terms of Settlement of Claims Against the Sackler Families...........................~~115~~133

AA.     Evaluation of the Settlement with the Sackler Families .........................................~~117~~135

BB.     Creditor Investigations Related to the Settlement with the Sackler Families...........~~117~~154

CC.     Prosecution of Claims and Causes of Action Related to the Debtors' Insurance
Coverage ..............................................................................................................~~118~~155

DD.     Omnibus Claims Objection Procedures ................................................................~~119~~156

EE.     Disclosure Statement Hearing and Confirmation Hearing .......................................~~119~~156

ARTICLE IV

SUMMARY OF THE PLAN     ~~120~~157

A.     Administrative Expense Claims, Professional Fee Claims, Priority Tax Claims and
DOJ Forfeiture Judgment Claim...........................................................................~~122~~159

B.     Classification of Claims and Interests...................................................................~~124~~161

C.  Treatment of Claims and Interests ..................................................... ~~125~~162

D.  Means for Implementation ............................................................ ~~136~~174

E.  Distributions ............................................................................ ~~173~~214

F.  Procedures for Disputed Claims ...................................................... ~~178~~219

G.  Executory Contracts and Unexpired Leases ........................................ ~~180~~222

H.  Conditions Precedent to the Occurrence of the Effective Date .................. ~~187~~229

I.   Effect of Confirmation ................................................................. ~~189~~231

J.   Retention of Jurisdiction .............................................................. ~~206~~258

K.  Miscellaneous Provisions .............................................................. ~~209~~261

ARTICLE V

VOTING REQUIREMENTS; ACCEPTANCE AND CONFIRMATION OF THE PLAN                      ~~213~~266

A.  General .................................................................................... ~~213~~266

B.  Parties in Interest Entitled to Vote ................................................. ~~214~~266

C.  Classes Impaired and Entitled to Vote Under the Plan .......................... ~~214~~267

D.  Voting Procedures and Requirements ............................................... ~~216~~268

E.  Acceptance of the Plan ................................................................. ~~218~~270

F.  Confirmation Without Necessary Acceptances; Cramdown ..................... ~~219~~271

G.  Classification ............................................................................ ~~220~~272

ARTICLE VI

FEASIBILITY AND BEST INTERESTS OF CREDITORS                                      ~~220~~272

A.  Best Interests Test ...................................................................... ~~220~~272

B.  Liquidation Analysis ................................................................... ~~221~~273

C.  Application of the Best Interests Test ............................................... ~~221~~274

D.  Feasibility ................................................................................ ~~221~~274

E.  Valuation of the Debtors ............................................................... ~~222~~274

ARTICLE VII

SECURITIES LAW MATTERS                                                              ~~222~~275

ARTICLE VIII

CERTAIN RISK FACTORS TO BE CONSIDERED PRIOR TO VOTING                              ~~223~~275

A.    Risks Associated with the Bankruptcy Process ........................................... ~~223~~276

B.    Risks Associated with the Debtors' and NewCo's Business Operations and
      Financial Condition ..................................................................................... ~~227~~280

C.    Miscellaneous Risk Factors and Disclaimers ............................................ ~~231~~284

ARTICLE IX

CERTAIN U.S. FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN                           ~~233~~285

A.    General ........................................................................................................ ~~233~~285

B.    Consequences to the Debtors ..................................................................... ~~234~~287

C.    Consequences to Holders of Certain Claims .............................................. ~~235~~288

D.    Tax Treatment of NewCo, TopCo, the Master Disbursement Trust and the Creditor
      Trusts ........................................................................................................... ~~240~~293

E.    Withholding on Distributions and Information Reporting ............................ ~~247~~300

F.    Importance of Obtaining Professional Advice ............................................ ~~247~~301

ARTICLE X

RECOMMENDATION                                                                      ~~248~~301

**Appendices and Schedules**

Appendix A    Debtors' ~~Second~~Third Amended Chapter 11 Plan
Appendix B    Liquidation Analysis
Appendix C    Financial Projections
Appendix D    Valuation Analysis
Appendix E    Organizational Structure
Appendix F    Amended NewCo/TopCo Governance Term Sheet
Appendix G    Shareholder Settlement Term Sheet

# ARTICLE I

# INTRODUCTION

### A.    Purpose of the Disclosure Statement

On September 15, 2019 (the "**Petition Date**"), each of Purdue Pharma L.P. ("**Purdue Pharma**" or "**PPLP**"), its general partner Purdue Pharma Inc. ("**PPI**"), and Purdue Pharma's wholly owned direct and indirect subsidiaries (collectively, the "**Debtors**") filed a voluntary petition for relief under chapter 11 of title 11 of the United States Code (the "**Bankruptcy Code**") in the United States Bankruptcy Court for the Southern District of New York (the "**Bankruptcy Court**").  The Debtors' chapter 11 cases are being jointly administered under the caption *In re Purdue Pharma L.P.*, Case No. 19-23649 (the "**Chapter 11 Cases**").  The Debtors have continued in possession of their property and have continued to operate and manage their businesses as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.  The Debtors submit this disclosure statement (as may be amended, altered, modified, revised, or supplemented from time to time, the "**Disclosure Statement**") in connection with the solicitation of votes on the *Second**Third** Amended Joint Chapter 11 Plan of Reorganization of Purdue Pharma L.P. and Its Affiliated Debtors*, dated May ~~7~~ [•], 2021 (the "**Plan**"), a copy of which is attached hereto as **Appendix A**.

The Debtors submit this Disclosure Statement pursuant to section 1125 of the Bankruptcy Code to holders of Claims against and Interests in the Debtors in connection with (i) the solicitation of acceptances of the Plan and (ii) a hearing to consider confirmation of the Plan.

The purpose of this Disclosure Statement is to describe the Plan and its provisions and to provide adequate information, as required under section 1125 of the Bankruptcy Code, to holders of Claims against the Debtors who will have the right to vote on the Plan so they can make informed decisions in doing so.  Holders entitled to vote to accept or reject the Plan will receive a Ballot together with this Disclosure Statement to enable them to vote on the Plan.

This Disclosure Statement includes, among other things, information pertaining to the Debtors' prepetition business operations and financial history, and the events leading up to the Chapter 11 Cases.  In addition, this Disclosure Statement includes an overview of the Plan (which overview sets forth certain terms and provisions of the Plan), the effects of confirmation of the Plan, certain risk factors associated with the Plan, and the manner in which distributions will be made under the Plan.  This Disclosure Statement also discusses the confirmation process and the procedures for voting, which procedures must be followed by the holders of Claims entitled to vote under the Plan in order for their votes to be counted.

### B.    Executive Summary[2]

On the very first day of these Chapter 11 Cases, the Debtors committed to turn over all of their assets for the benefit of their claimants and the American public, with the goal of directing

---

[2]  Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to such terms in the *Second**Third** Amended Joint Chapter 11 Plan of Reorganization of Purdue Pharma L.P. and Its Affiliated Debtors* (including all exhibits and schedules attached thereto, and as may be amended, altered, modified, or supplemented

as much of the value of their assets as possible to combatting the opioid crisis in this country. Today, the Debtors propose a Plan that delivers on this goal.

Under the Plan, the vast majority of the Debtors' assets will be dedicated to programs to abate the opioid crisis. Billions of dollars will flow into abatement trusts established for the benefit of states and localities, as well as other creditor groups such as Native American Tribes, hospitals, and children with a history of Neonatal Abstinence Syndrome and their guardians. Each of these abatement trusts will require that the funds be dedicated exclusively to opioid abatement efforts, and there will be transparency to so ensure.

The Plan also significantly improves on the initial settlement framework that was in place at the commencement of these Chapter 11 Cases, most notably by increasing the amount that Purdue Pharma's existing shareholders will be required to pay in the aggregate from $3.0 billion to $4.5 billion. Of this sum, $225 million has been paid by the shareholders to satisfy their civil settlement with the United States Department of Justice, leaving $4.275 billion for the creditors in this bankruptcy case. This material improvement in the recovery from the shareholders directly increases by $1.275 billion the amount of funds that can be directed towards abatement.

As for Purdue Pharma, it will cease to exist. On the Effective Date, the Debtors' businesses will be transferred to a newly created company, which will be indirectly owned by two of the opioid abatement trusts. No federal, state, or local governmental entity will own the equity of the new company. The new company will be a private company, will be required to operate in a responsible and sustainable manner, and will be subject to the same laws and regulations as any other pharmaceutical company. The new company will, however, be historic and unique because it will be governed by a charter that will require that it deploy its assets to address the opioid crisis in two ways. First, the new company will continue the Debtors' development of opioid overdose reversal and addiction treatment medications, and will be authorized to deliver an unlimited amount of such medications at cost when development is complete. Second, this new company will continue to grow the Debtors' non-opioid businesses, including developing its robust and diversified pipeline of non-opioid investigative candidates that have the potential to address several serious medical conditions, with resulting improvements in the value of the business benefiting the relevant opioid abatement trusts.

As a result of the improvements to the settlement framework, it is expected that approximately $5 billion in value will be provided to trusts, each with a mission to fund abatement of the opioid crisis. An additional $700 to $750 million will be provided to a trust that will make distributions to qualified personal injury claimants.

The Plan is supported by a litany of the Debtors' creditor constituencies who recommend that eligible Claimholders vote to accept the Plan. The negotiations leading up to the proposal of this widely supported Plan and the key terms of the Plan are summarized below.

---

from time to time, the "**Plan**"); *provided*, that capitalized terms used herein that are not defined herein or in the Plan, but are defined in title 11 of the United States Code (the "**Bankruptcy Code**") or the Federal Rules of Bankruptcy Procedure (the "**Bankruptcy Rules**"), shall have the meanings ascribed to such terms in the Bankruptcy Code or the Bankruptcy Rules, as applicable.

The Debtors are pharmaceutical companies that manufacture, sell, or distribute, among other products, extended-release, long-acting, abuse-deterrent opioid pain medications. The marketing and sale of OxyContin® Extended-Release Tablets ("**OxyContin**"), Purdue Pharma's most prominent pain medication, and certain of the Debtors' other pain medications has been the target of more than 2,900 civil actions pending in various state and federal courts and other fora across the United States and its territories (the "**Pending Actions**"). These Pending Actions name as defendants Purdue Pharma and certain of the other Debtors (the "**Defendant Debtors**"), among other parties, and generally allege that the Defendant Debtors falsely and deceptively marketed OxyContin and other opioid pain medications. In addition to the Pending Actions, the Debtors were subject to investigation by multiple components of the United States Department of Justice (the "**DOJ**") since at least June 2016. Specifically, beginning in the summer of 2016, certain United States Attorney's Offices and components of the DOJ served subpoenas and other requests for documents and information on Purdue Pharma related to topics including but not limited to Purdue Pharma's opioid medications, including OxyContin, the Debtors' monitoring programs, payments to professionals, marketing practices, and other matters.

The Debtors commenced these Chapter 11 Cases because Chapter 11 provided the only framework for halting the destruction of value and unsustainable runaway costs associated with the Pending Actions, centralizing all of the claims against the Defendant Debtors, resolving the litigations rationally and efficiently, and maximizing the value of the Debtors' Estates for the benefit of their stakeholders and the American public. Litigation of thousands of Pending Actions to judgment and through appeals in the civil court system would have resulted in the financial and operational destruction of the Debtors and the immense value that they could otherwise provide, while squandering hundreds of millions of dollars on lawyers' and other professionals' fees. Pre-bankruptcy, professionals' fees relating to litigation and government investigations were accruing at an average rate of over $2 million per week, and that was before a single trial against Purdue had commenced.

Shortly before the Petition Date, after more than a year of intense negotiations, the Debtors, their ultimate owners (trusts for the benefit of members of the Raymond Sackler family and Mortimer Sackler family (the "**Sackler Families**")), and a critical mass of important plaintiff constituencies reached an agreement in principle on the structure of a global resolution of the Pending Actions (the "**Settlement Framework**"). The Settlement Framework had three key basic components. As part of a resolution of the litigation: (i) Purdue Pharma's existing shareholders would relinquish all of their equity interests in the Debtors and consent to the transfer of all of the Debtors' assets to a trust or similar post-emergence structure for the benefit of claimants and the U.S. public, "free and clear" of liabilities to the fullest extent permitted by law; (ii) Purdue Pharma's existing shareholders would engage in a sale process for their ex-U.S. pharmaceutical companies; and (iii) Purdue Pharma's existing shareholders would contribute at least an additional $3 billion over seven years (in addition to 100% of the value of all 24 Debtors), with the hope of substantial further contemplated contributions from the sales of their ex-U.S. pharmaceutical businesses. *See* Article III.F for a further description of the Settlement Framework.

The Settlement Framework, however, was far from a final settlement. Indeed, the Debtors made clear on multiple occasions that the Settlement Framework left many items to be negotiated and resolved. The Debtors, together with the Creditors' Committee, the Ad Hoc

3

Committee of Governmental and Other Contingent Litigation Claimants (the "**AHC**" or "**Ad Hoc Committee**"), the Ad Hoc Group of Non-Consenting States (the "**NCSG**") and the Multi-State Governmental Entity Group (the "**MSGE**" and, together with the AHC and the NCSG, the "**Non-Federal Public Claimants**"), worked tirelessly for more than a year continuing to negotiate improved settlement terms that could be supported by a greater number of significant creditors. The negotiations included a Mediation lasting months that took place in two phases. The first phase of Mediation concerned how the value of the Debtors' Estates should be allocated among creditor constituencies, while the second primarily concerned settlement of the Debtors' causes of action against the Sackler Families.

The first phase of Mediation resulted not only in an agreement on allocation of estate resources among major creditor constituencies, but also an extraordinary commitment from the states, territories, tribes, municipalities and other governmental units, treatment providers, third-party payors and insurance carriers and legal guardians of children born with neonatal abstinence syndrome to accept distributions in the form of funding for programs designed to abate the opioid crisis (distributions to holders of PI Channeled Claims will not be subject to such provision). Under the structure agreed to in the first phase of Mediation, which is embodied in the Plan, funds created for the benefit of each group associated with the Private Claimants[3] will receive fixed cash distributions over time,[4] with varying values and time periods for each such group.

Specifically, of the approximately $5 billion in value that will be provided to trusts with a mission to fund abatement of the opioid crisis, approximately $250 million will be distributed to a trust for hospitals, $365 million will be distributed to a trust for insurers and other third-party payors, and $60 million will be distributed to a trust for NAS monitoring programs. The remainder will be distributed to the two abatement trusts established for non-federal domestic governmental entities and tribal authorities. A description of each of the abatement trusts, how they will be funded, which types of creditors may qualify for distributions from each trust and how distributions will be made is set forth in Article IIIS. Copies of the trust distribution procedures (the "**Trust Distribution Procedures**") for each such trust (and the PI Trust) will be, as defined below) is included in the Plan Supplement.[5]

---

[3] The Private Claimants, as referred to in the Mediators' Report [D.I. 1716] (the "**Mediators' Report**"), consist of (i) personal injury claimants, including guardian claimants asserting claims on behalf of minors with NAS due to exposure to opioids in utero, (ii) claimants comprising a putative class of NAS children seeking medical monitoring funding, (iii) hospitals, (iv) private health insurance carrier plaintiffs and third-party payors and (iv) purchasers of private health insurance.

[4] The Debtors will make a $6.5 million donation (less attorneys' fees) to the Truth Initiative Foundation in satisfaction of the Ratepayer Claims.

[5] Copies of the current drafts of such trust distribution procedures are attached to the *Notice of Filing of Plan Supplement Pursuant to the First Amended Joint Chapter 11 Plan of Reorganization of Purdue Pharma L.P. and its Affiliated Debtors* [D.I. 2732] filed on April 23, 2021, with respect to the Private Creditor Trusts and *Notice of Filing of Second Plan Supplement Pursuant to the First Amended Joint Chapter 11 Plan of Reorganization of Purdue Pharma L.P. and Its Affiliated Debtors* [D.I. 2737] filed on April 25, 2021, with respect to NOAT and the Tribe Trust *or Notice of Filing of Plan Supplement Pursuant to the Third Amended Joint Chapter 11 Plan of Reorganization of Purdue Pharma L.P. and Its Affiliated Debtors* [D.I. 2867] filed on May 15, 2021, as applicable, and substantially final versions thereof will be filed prior to the Disclosure Statement Hearing. Final versions of the PI Trust Documents, the NAS Monitoring Trust Documents, the Hospital Trust Documents, the TPP Trust Documents, the NOAT Documents and the Tribe Trust Documents will be filed with the Plan Supplement on or

An additional $700 to $750 million will be provided to a trust (the "**PI Trust**") that will make distributions to qualified personal injury claimants. Those funds will be split between two separate groups of personal injury claimants: "NAS PI Claimants," who are individuals with personal injury claims arising from intrauterine exposure to opioids resulting from opioid use by a biological mother, and "Non-NAS PI Claimants," who are individuals with personal injury claims arising from their own Purdue opioid use as well as individuals with claims arising from the death of someone else who used Purdue opioids. Together, NAS PI Claimants and Non-NAS PI Claimants form the group of "PI Claimants." The funds provided to the PI Trust under the Plan will be split between a fund for NAS Claimants, which is entitled to receive $45 million, and a fund for the Non-NAS Claimants, which is entitled to receive $655 to $705 million.

~~An additional $700 to $750 million will be provided to a trust that will make distributions to qualified personal injury claimants.~~ The Ad Hoc Group of Individual Victims has performed a preliminary analysis that estimates that a qualified Non-NAS Claimant whose personal injury ~~claimant~~claim is liquidated pursuant to the streamlined procedures set forth in the Non-NAS distribution procedures (the "**Non-NAS PI TDP**")[6] will likely receive between $3,500 and $48,000 in distributions from such trust~~,~~ (subject to reduction on account of trust and attorney fees and expenses), depending on the severity of the injuries ~~suffered, which may~~. These amounts will in some cases be paid out in installments because ~~such trust~~the PI Trust will be funded in installments over five years.  In addition, Non-NAS Claimants who elect to liquidate their opioid-related personal injury claims against the Debtors in the tort system (i.e., by commencing a separate lawsuit) rather than pursuant to the streamlined procedures set forth in the Non-NAS PI TDP, and who successfully obtain a final judgment in respect of such claim, will receive payments on account thereof subject to certain limitations and caps that ensure no personal injury claimant receives more than its pro rata recovery on account of opioid-related personal injury claims against the Debtors.  A detailed description of the ~~trust distribution procedures~~Non-NAS PI TDP that will be used to determine the amount of such distributions is set forth in ~~Article III.T~~Article III.T, and a copy of such distribution procedures is included in the Plan Supplement.

The NAS Committee has prepared a preliminary analysis that estimates that a qualified NAS Claimant whose NAS claims are liquidated pursuant to the streamlined procedures set forth in such trust's distribution procedures (the "**NAS PI TDP**")[7] will likely receive approximately $7,000 in distributions from such trust, subject to reduction on account of trust and attorney fees and expenses, which may be paid out in installments because the PI Trust will be funded in installments over five years. In addition, NAS Claimants that elect to liquidate their opioid-related personal injury claims against the Debtors in the tort system (i.e., by commencing a separate lawsuit) rather than pursuant to the streamlined procedures set forth in the NAS TDP,

---

prior to July 7, 2021, except that the final version of the PI Trust Agreement will be filed on or prior to June 30, 2021.  Copies thereof may be obtained at no charge from the Solicitation Agent by (a) calling the Debtors' restructuring hotline at (844) 217-0912 (toll-free) or (347) 859-8093 (international); (b) visiting the Debtors' restructuring website at https://restructuring.primeclerk.com/purduepharma; (c) writing to Purdue Pharma Ballot Processing, c/o Prime Clerk LLC, One Grand Central Place, 60 East 42nd Street, Suite 1440, New York, NY 10165; and or (d) emailing purduepharmainfo@primeclerk.com. You may also obtain copies of any pleadings filed in these Chapter 11 Cases for a fee via PACER at http://www.nysb.uscourts.gov.
[6] A copy of the PI TDP is included in the Plan Supplement.
[7] A copy of the NAS PI TDP will be included in the Plan Supplement.

and who successfully obtain a final judgment in respect of such NAS PI Claim, will receive payments on account thereof subject to certain limitations and caps that ensure no NAS personal injury claimant receives more than its pro rata recovery on account of opioid-related NAS personal injury claims against the Debtors. A detailed description of the NAS TDP that will be used to determine the amount of such distributions is set forth in Article III.S, and a copy of such distribution procedures will be included in the Plan Supplement.

The chart below sets forth the approximate timing of the projected distributions to each of the Private Claimant trusts ($ millions):

| Trust | Effective Date | 2022 | 2023 | 2024 | 2025 | 2026 | Total |
|---|---|---|---|---|---|---|---|
| Hospital Trust | $25 | $35 | $45 | $45 | $50 | $50 | **$250** |
| TPP Trust | $[1] | $121 | $121 | $122 | - | - | **$365** |
| NAS Monitoring Trust | $[1] | $24 | $35 | - | - | - | **$60** |
| PI Trust[68] | $300 | - | - | $200 | $100 | $100 | **$700 to $750[79]** |
| **Total** | | | | | | | **$1,375 to $1,425** |

The process by which each trust will make distributions to claimants is set forth in the Trust Distribution Procedures applicable to such trust, which are included in the Plan Supplement. **The description of the trust distribution procedures that follows is for explanatory purposes only and is qualified in its entirety by the Trust Distribution Procedures themselves that are filed as part of the Plan Supplement. In the event of any discrepancy between the following description and the Trust Distribution Procedures, the Trust Distribution Procedures control, so all holders of Channeled Claims are strongly encouraged to read the Trust Distribution Procedures for the applicable trust in their entirety.** Importantly, holders of personal injury claims, third-party payor claims, hospital claims or NAS monitoring claims will recover on such claims *only* from the applicable trust, because the Plan "channels" such claims to the trusts. In other words, if you hold one of these types of claims, you will not receive any recovery directly from Purdue Pharma or any other Debtor on account of such claim. The Trust Distribution Procedures describe what claims are channeled, how a claimant may apply to receive distributions from the applicable trust, what factors will determine whether a claimant is eligible to receive distributions, and how the amount of such distributions will be determined, as described in further detail in Article IIIS.

***Personal Injury Claims and the PI Trust.*** Holders of personal injury claims ~~will~~are eligible to receive recoveries only from the PI Trust. The following requirements apply to you if you hold a claim against a Debtor for an opioid-related personal injury, ~~regardless of whether you represent a NAS child,~~ are a member of a Tribe, or are affiliated with any other group

---

[68] Distributions to the PI Trust are subject to prepayment on a rolling basis as insurance proceeds from certain of Purdue's insurance policies are received by the MDT and paid forward to the PI Trust.

[79] The PI Trust will receive at least $700 million, and may receive an additional $50 million depending on the amount of proceeds received on account of certain of Purdue's insurance policies.

associated with a different Creditor Trust.  These requirements differ, however, depending on whether you elect to have your PI Claim against the Debtors liquidated (i) pursuant to the streamlined liquidation procedures set forth in the PI TDP or (ii) through a lawsuit you commence against the PI Trust (and only the PI Trust) in the tort system. They also differ depending on whether your personal injury claim is an NAS PI Claim or a Non-NAS PI Claim. Each is discussed below.

In order to receive a payment from the PI Trust    *Non-NAS PI Channeled Claims Liquidated pursuant to the Non-NAS PI TDP*. In order to be eligible to recover money on your Non-NAS PI Channeled Claim under the Non-NAS PI TDP, you must have *already* filed a Proof of Claim in the Chapter 11 Cases[8] asserting such Non-NAS PI Channeled Claim against one or more Debtors no later than April 23, 2021.[10]  Further, you must complete, sign and submit an *additional* signed claim form ~~no later than 90 days after the Confirmation of the Plan~~*by the date that is 90 days[11] after the Non-NAS Claim Form is disseminated to Non-NAS PI Claimants* describing your injury and electing your payment option, as well as a~~a~~two HIPAA consent ~~form. Both~~forms, and, if applicable, an heirship declaration. All of these forms are attached to the PI ~~Trust Distribution Procedures~~TDP in the Plan Supplement, and will also be available on a website to be set up by the PI Trust.

You will be entitled to receive a recovery on your Non-NAS PI Channeled Claim only if you (or, if applicable, the decedent whose opioid use is the subject of your claim~~, or, in the case of a NAS child, the birth mother whose opioid use is the subject of your claim~~ (the "**Decedent**")) can show that you (or the Decedent) used an opioid that was manufactured by Purdue Pharma or another Debtor.  Furthermore, unless you (or the ~~relevant decedent or birth mother~~Decedent) were a minor when you initiated usage, you will be entitled to receive a recovery only if the opioid you used was prescribed to you and was not, for example, obtained by unlawful means or by a prescription to another person.  You will need to submit evidence to show that you satisfy these criteria. ~~If you represent a NAS child, you will also be required to submit evidence that the child has NAS.~~

Once the deadline for submitting the additional claim form has passed, the claims administrator for the PI Trust (the "**PI Claims Administrator**") will examine the evidence provided with each claim form to determine recoveries, which are expected to range from $3,500 to $48,000.  The amount you receive will depend in part on which payment election you make on your supplemental claim form. You can choose between receiving either an "Easy Payment" of an estimated $3,500,[9][12] or a base-plus-level award that varies depending on the severity of your injury, as discussed in the next paragraph.  Choosing the "Easy Payment" option will get you money sooner, but it means that you will receive only $3,500 and no more.

---

[8] ~~Exceptions for good cause will be considered by the Claims Administrator on a case-by case basis.~~
[10] Subject to exceptions set forth in the Non-NAS PI TDP.
[11] Within 60 days after the Effective Date, the Non-NAS Claim Form will be made available to Non-NAS PI Claimants electronically and, if a Non-NAS PI Claimant is a pro se claimant, also mailed to such Non-NAS PI Claimant in physical copy. When disseminated, the Non-NAS Claim Form will clearly state the absolute deadline (e.g., "January 30, 2022") by which the Non-NAS Claim Form must be returned.
[9][12]   This an estimation based on the PI Claims filed and the money available for distribution and is subject to adjustment.

Base-plus-level awards range in value depending on (i) your ability to show that the opioid use disorder began with a ~~Debtor~~Purdue opioid, (ii) the length of use of the ~~Debtor~~Purdue opioid, and (iii) the severity of the ~~claimant's~~ injuries that gave rise to the claim (e.g., death versus addiction).  If you elect the base-plus-level award, then the PI Trust will review your claim and assign it "points" based on the nature of your claim.  The more points assigned to your claim, the more money you are entitled to receive.  The number of points assigned to each personal injury claim will be as set forth in the grid below:

| | **Tier** | **Base Award** | **Level Awards (one of the below)[10]** | |
|---|---|---|---|---|
| | | | **A** | **B** |
| | **Tier 1A~~: PI~~**<br><br>*Addiction from Purdue Opioids* | ~~20,000 pts~~**Tier 1B**<br><br>*Death on OxyContin* | ~~10,000 pts~~**Tier 2**<br><br>~~OUD Diagnosis, OR MAT for >6 months~~*Purdue Opioids Use ≥6 months* | ~~20,000 pts~~**Tier 3**<br><br>~~Death from an Opioid~~*No Addiction/ Death from Purdue Opioids, and Purdue Opioids Use <6 months* |
| **BASE PAYMENTS** | 20,000 pts[13]~~Tier 1B: PI~~ *Death on OxyContin* | 40,000 pts | ~~N/A~~6,000 pts | ~~N/A~~$3,500 |
| | ~~Tier 2: PI~~ *Purdue Opioids Use ≥6 months* | ~~6,000 pts~~ | ~~3,000 pts~~<br><br>~~OUD Diagnosis, OR MAT for >6 months~~ | ~~20,000 pts~~<br><br>~~Death from an Opioid~~ |
| **LEVELS (one of the below)[14]** | ~~Tier 3: PI~~ *No Addiction/ Death from Purdue Opioids, and Purdue Opioids Use < 6 mo.* | ~~$3,500~~ | ~~N/A~~ | ~~N/A~~ |
| **A** | 10,000 pts | ~~20,000~~ | ~~10,000~~3,000 pts | ~~N/A~~20,000 pts |

[10] ~~If a Claimant does not qualify for additional Level Awards they do not get more money above the Base Award. A Claimant can only qualify for one, but not multiple, Level Awards.~~

[13] Non-NAS Claimants who do not claim addiction, dependence or abuse of opioids are not entitled to receive Tier 1A Awards.

[14] If a Non-NAS PI Claimant does not qualify for additional Level Awards, they do not get additional money above the Base Payment. A Non-NAS PI Claimant can only qualify for one, but not multiple, Level Awards.

| | OUD Diagnosis, OR MAT for >6 months ~~Tier 1A: NAS Addiction from Purdue Opioids, or Purdue Opioids Use During Pregnancy~~ | ~~pts~~ N/A | OUD Diagnosis, OR MAT for >6 months ~~NICU of 2-30 days, OR minor NAS-related injuries~~ | ~~NICU >30 days, OR Other serious NAS-related injuries~~ |
|---|---|---|---|---|
| | ~~Tier 2: NAS Purdue Opioids Use ≥6 months~~ | ~~6,000 pts~~ | ~~3,000 pts~~ ~~NICU of 2-30 days, OR minor NAS-related injuries~~ | ~~20,000 pts~~ ~~NICU >30 days, OR Other serious NAS-related injuries~~ |
| **B** | 20,000 pts Death from an Opioid ~~Tier 3: NAS No Addiction from Purdue Opioids, No Purdue Opioids Use During Pregnancy, and Purdue Opioids Use <6 months~~ | ~~$3,500~~ N/A | ~~N/A~~ 20,000 pts Death from an Opioid | N/A |

These "points" will be converted to dollars to determine your distribution. ~~It is estimated~~ The Ad Hoc Group of Individual Victims estimates that each point will be worth between $0.80 and $1.20, but the exact number is not yet known at this time, because it will depend on how many claims are ultimately eligible for distribution and how many claimants choose the "Easy Payment" option.

Your distribution amount under the PI TDP is a gross number that will be further reduced to pay the fees and expenses of the PI Trust, and where applicable the fees and expenses of your own lawyer(s). Your distribution may also be subject to further reduction on account of amounts prepaid to the United States under the Plan to settle claims or liens, if any, of certain federal government health insurance programs, like Medicare, Tricare, VA, or Medicaid, against you or your distribution on account of your Non-NAS PI Channeled Claims. Your distribution may be further reduced on account of certain liens held by health care insurance companies, also known as "third-party payors" or "TPPs," ~~as well as by certain federal and~~ or liens held by state health ~~insurers like Medicare, Tricare, VA, or Medicaid~~ insurance programs.  Many of the private TPPs with claims related to Purdue opioid products have agreed to ~~resolve~~ a consensual resolution of their liens ~~on PI Claim recovery through~~ against the recoveries of PI Claimants with respect to PI Channeled Claims that are liquidated under the liquidation provisions of the PI TDP. This consensual resolution is governed by a "lien resolution ~~procedure" that~~ program" and includes

voluntary reductions by those TPPs of their liens to 30% of the distribution or less or a cap on their recovery, plus a waiver of all liens against distribution amounts of $3,500 or less. That means that ~~those claimants~~PI Claimants who choose the "Easy Payment" option will likely not have to pay any portion of their distribution to private TPPs, although they may still have to pay a portion to federal or state agencies.  Additional information about the PI ~~Trust Distribution Procedures~~TDP may be found in ~~section~~ 0.

*NAS PI Channeled Claims Liquidated pursuant to the NAS PI TDP.* In order to be eligible to recover money on your NAS PI Channeled Claim under the NAS PI TDP, you must have already filed a Proof of Claim in the Chapter 11 Cases asserting such NAS PI Channeled Claim against one or more Debtors no later than April 23, 2021.[15] Further, you must complete, sign and submit *an additional* signed claim form ***by the date that is 90 days***[16] ***after the NAS Claim Form is disseminated to NAS PI Claimants***, describing your injury and electing your payment option, as well as two HIPAA consent forms and, if applicable, an heirship declaration. All of these forms will be attached to the NAS PI TDP in the Plan Supplement, and will also be available on a website to be set up by the PI Trust. If you are filing the Claim Form on behalf of an NAS child, you will also be required to submit evidence that the child has NAS.

Your distribution amount under the PI TDP is a gross number that will be further reduced to pay the fees and expenses of the PI Trust, and where applicable the fees and expenses of your own lawyer(s). Your distribution may also be subject to further reduction on account of amounts prepaid to the United States under the Plan to settle claims or liens, if any, of certain federal government health insurance programs, like Medicare, Tricare, VA, or Medicaid, against you or your distribution on account of your Non-NAS PI Channeled Claims.  Your distribution may be further reduced on account of certain liens held by health care insurance companies, also known as "third-party payors" or "TPPs," or liens held by state health insurance programs.  The NAS Committee is in discussions with many of the private TPPs with claims related to Purdue opioid products that include voluntary reductions by those TPPs of their liens. As of the date hereof, no agreement has been reached.  If there is an agreement, then the amount the NAS PI Claimants will have to pay to the private TPP's will be reduced, although they may still have to pay a portion to federal or state agencies.  Additional information about the NAS PI TDP may be found in Article III.T.

---

[15] Subject to exceptions set forth in the Non-NAS PI TDP.

[16] Within 60 days after Effective Date, the NAS Claim Form will be made available to NAS PI Claimants electronically and, if an NAS PI Claimant is a pro se claimant, also mailed to such NAS PI Claimant in physical copy. When disseminated, the NAS Claim Form will clearly state the absolute deadline (e.g., "January 30, 2022") by which the NAS Claim Form must be returned.

You will be entitled to a recovery on your NAS Channeled Claim only if you provide evidence ("**Competent Evidence**"), if applicable, of one of the following: (i) a document from a licensed medical provider diagnosing the NAS Child with a medical, physical, cognitive or emotional condition resulting from the NAS Child's intrauterine exposure to opioids or opioid replacement or treatment medication, including but not limited to the condition known as NAS; (ii) a document from a licensed medical provider affirming that the NAS Child had Neonatal Opioid Withdrawal Syndrome ("NOWS"); or (iii) other medical records evidencing that the NAS Child had an NAS diagnosis, post-natal treatment for symptoms caused by opioid exposure, symptoms of post-natal withdrawal from opioids, medical scoring for NAS or NOWS which is positive or indicates fetal opioid exposure, a positive toxicology screen of the birth mother or infant for opioids or opioid-weaning drugs, or a maternal diagnosis of opioid use disorder by the birth mother.

Once the deadline for submitting the additional claim form has passed, the PI Trust will examine the evidence provided with each claim form to determine recoveries, which are expected to be approximately $7,000 per claimant.

*PI Claimants Who Elect to Liquidate the Amount of Their PI Claims in the Tort System*. This discussion applies to you whether your claim is an NAS claim or a Non-NAS Claim. As an alternative to liquidating your PI Channeled Claims pursuant to the streamlined procedures set forth in the PI TDP, you may elect to "opt out" and instead commence your own lawsuit against the PI Trust in the tort system.  If you choose to "opt out," you will be allowed to file in court your PI Claim and your PI Claim only; you will not be allowed to commence lawsuits with respect to any associated PI Channeled Claims (e.g., claims against the Sackler Families) that do not satisfy the definition of a "PI Claim" against a Debtor.

If you choose to "opt out," you must have *already* filed a Proof of Claim in the Chapter 11 Cases[17] asserting your PI Claim no later than that the General Bar Date of July 30, 2020. Further, you must complete, sign and submit an *additional* signed claim form **no later than 90 days after the dissemination of the NAS PI Claim Form and Non-NAS PI Claim Form** indicating your election to "opt out."  These claim forms are attached to the NAS PI TDP and the Non-NAS PI TDP, as applicable, in the Plan Supplement, and will also be available on a website to be set up by the PI Trust.  If you fail to submit this claim form by this deadline, your claim will be permanently forfeited, and you will be forever barred from pursuing it.

An election to liquidate your PI Claim in the tort system instead of under the PI TDP cannot be reversed.  If you submit your claim form to the PI Trust electing to "opt out" of PI TDP liquidation, your only option to pursue your PI Claim will be to file a lawsuit in court against the PI Trust to prove your PI Claim under applicable law.  You will be forever barred from accessing the streamlined and expedited liquidation processes under the PI TDP (including, in the case of Non-NAS PI Claimants, the right to choose to receive the quick "Easy Payment" of $3,500), as well as the expedited appeal process set forth in Exhibit C of the Non-NAS PI TDP.

*Your PI Channeled Claim(s) will be channeled to the PI Trust under the Plan regardless of whether you choose to "opt out."  Accordingly, if you "opt out" of liquidation*

---

[17] Subject to exceptions set forth in the PI TDP.

*under the PI TDP but nonetheless wish to pursue recovery on account of your PI Claim, you will be filing a lawsuit asserting your PI Claim in the tort system against the PI Trust, and not against the Debtors or any members of the Sackler Families.  The Plan releases the Debtors and the members of the Sackler Families from any and all liability on your PI Channeled Claim (including your PI Claim).  Neither the Debtors nor members of the Sackler Families will defend the litigation of your PI Claim in the tort system. Instead, the responsibility, costs and expenses of defending against your PI Claim will fall solely on the PI Trust, and will reduce the already-limited amount of money available to compensate other individual victims of Purdue opioid products.*

*The Plan fixes a set amount of money available to compensate all PI Claimants for their opioid-related personal injuries.  This number will not be increased, regardless of how many PI Claimants "opt out" of the liquidation provisions of the PI TDP.  On average, it costs more money to resolve claims in the tort system than it does to resolve them under the streamlined liquidation procedures of PI TDP.  Therefore, the more PI Claimants who "opt out,", the less money will be available for the individual victims as a group.  Additionally, if, even after reduction of your final judgment pursuant to the opt-out procedures, you ultimately receive more on your PI Claim than you would have received had you liquidated your PI Claim under the PI TDP, then your award will proportionally reduce the awards of the other similarly situated qualified individual victims of Purdue.*

The PI TDP are designed to be "user friendly" for all PI Claimants, including those who are not lawyers or businesspeople.  It offers simplified procedures for you to submit required information and, if eligible, receive money.  In contrast, you would likely need to hire a lawyer to file and prosecute your PI Claim in the tort system.

The liquidation process under the PI TDP is also designed to get you a recovery on your PI Claim relatively quickly and with minimal costs.  While payments for large awards under the PI TDP may be paid in installments over time, litigating your PI Claim in court can take even longer, and can include large costs.  Personal injury claim litigation can take many years and involve significant attorney fees that can be deducted from your recovery, including costs of your individual attorneys' fees and any expert witnesses needed to prove your PI Claim.

The liquidation process under the PI TDP requires you to submit minimal evidence to prove your claim. For example, for Non-NAS PI Claimants, evidence includes things like prescription records or an affidavit swearing that you took certain Purdue opioid products.  For NAS PI Claimants, evidence includes things like a note from your doctor saying that you have NAS. By contrast, the tort system will require you to prove every legal "element" of your PI Claim, such as causation, "duties" owed to you by the tortfeasor, and injury.  In practice, a PI Claimant without sufficient evidence to recover under the liquidation process under the PI TDP is unlikely to meet the high burden of proof required to recover in court.

Further, the PI Trust will be entitled to assert all possible defenses against your PI Claim that the Debtors would have been able to assert, which may include contributory negligence and statutes of limitations. Some defenses may permit a court to dismiss your lawsuit as a matter of law, before the court even reaches the specific facts of your case.

If you do succeed in proving your PI Claim in court, the judgment may still be subject to appeal before it can become a final order.  Appeals add additional time and expense to the litigation process, further reducing the amount of money you can ultimately receive.

Following the resolution of any appeals, any final judgment in respect of a PI Claim liquidated in the tort system is subject to further reduction and limitation before it can be paid from the PI Trust.[18]

For Non-NAS PI Claims, the Ad Hoc Group of Individual Victims estimates that, due to the limited amount of funds to be distributed to the PI Trust Non-NAS Fund from the Debtors' bankruptcy estates, Non-NAS PI Claims liquidated under the Non-NAS PI TDP will be paid by the PI Trust approximately 2.0% of the amount they would be awarded by a court if such PI Claims were litigated in the tort system.  Final judgments of PI Claimants who "opt out" and liquidated their PI Claims in the tort system shall be reduced by the same 2.0%, which number is subject to adjustment over time.  This means that if your final judgment in the tort system is for $100,000, you would be entitled to receive at most $2,000 from the PI Trust (prior to fees and expenses).  Your final judgment is also subject to a maximum cap that is three times the maximum amount you could recover under the liquidation provisions of the PI TDP.

For NAS PI Claims, the NAS Committee estimates that, due to the limited amount of funds to be distributed to the PI Trust NAS Fund from the Debtors' bankruptcy estates, NAS PI Claims liquidated under the NAS PI TDP will be paid by the PI Trust approximately [  ]% of the amount they would be awarded by a court if such PI Claims were litigated in the tort system. Final judgments of PI Claimants who "opt out" and liquidated their PI Claims in the tort system shall be reduced by the same [  ]%, which number is subject to adjustment over time. This means that if your final judgment in the tort system is for $1,000,000, you would be entitled to receive at most $[  ] from the PI Trust (prior to fees and expenses). Your final judgment is also subject to a maximum cap that is three times the maximum amount you could recover under the liquidation provisions of the PI TDP.

Once the cap or percentage reduction is applied, you may discover that you are receiving less from the PI Trust than you would have received had you chosen to liquidate your PI Claim under the PI TDP.  This is a risk that you bear by choosing to "opt out" of liquidation under the PI TDP; you will not be allowed to change your mind at this point and opt back in to the PI TDP.

Finally, PI Claimants who liquidate their PI Claims under the PI TDP benefit from the LRP Agreement, under which various private health insurance companies have agreed to reduce or limit liens they may hold against certain PI Claimants' recoveries on their PI Claims.  PI Claimants who instead pursue their PI Claims in the tort system do not benefit from such agreement, which means that your health insurance company could take a larger portion of whatever recovery you receive.

---

[18]  Any multiple, exemplary, statutory-enhanced and/or punitive damages, attorneys' fees and costs, and interest, awarded by a court as part of a final judgment will be excluded for purposes of calculating any payments to be made by the PI Trust in respect of such final judgment.

[***PI Claimants Who are Minors***. For PI Claimants who are minors under applicable law, an authorized adult will be required to act on behalf of the PI Claimant to make elections and submissions with respect to the PI Trust.  This authorized adult could be the minor's custodial parent, a legal guardian, or another adult custodial caretaker.  ***The PI Trust will hold any amounts owed to a minor PI Claimant in trust until the minor PI Claimant becomes a legal adult under applicable state law***, unless otherwise directed by a qualified court order.]

*Hospital Claims and the Hospital Trust*.  The Hospital Trust is an abatement trust—all funds received from the Hospital Trust by any ~~holder~~Holder of a Hospital Claim must be used for or applied to abatement purposes.  Holders of claims against the Debtors that are hospitals, including both acute-care hospitals and other treatment providers, will only be entitled to receive a recovery (if eligible under the applicable Trust Distribution Procedures) from the Hospital Trust.  For a ~~holder~~Holder of a Hospital Claim to be eligible to receive a payment from the Hospital Trust, they must *either* (1) have filed a Proof of Claim prior to July 30, 2020 *or* (2) be (x) a non-federal acute care hospital as defined by CMS or (y) a non-federal hospital or hospital district that is required by law to provide inpatient acute care and/or fund the provision of inpatient acute care, in each of cases (x) and (y) that is listed on the national registry of hospitals maintained by the American Hospital Directory®.  After the Effective Date, the Hospital Trust will send a notice to each such holder of a Hospital Claim containing a Hospital abatement distribution form.  **In order for a Holder of a Hospital Claim to receive any payment from the Hospital Trust, a Holder of a Hospital Claim must return the hospital abatement distribution form within forty-five days of the deadline set forth on that notice, along with applicable evidence of their claim as described in the Hospital Trust Distribution Procedures.**

The Hospital Trustee will use the evidence provided by each eligible Holder of a Hospital Claim that timely submits a form to calculate the amounts of such Hospital's abatement distributions using a proprietary algorithm.  That algorithm is based on unreimbursed charges incurred by the Hospital, and then applies a weighting formula based on the Hospital's service area, opioid-related patient population, opioid-related unreimbursed charges and whether the Holder of a Hospital Claim either timely filed a Proof of Claim or is a Safety Net Hospital under the CARES Act.  The Hospital Trust will then pro-rate the re-weighted amounts based on the total amounts for all abatement distribution forms received from eligible ~~Hospitals~~Holders of Hospital Claims to determine each eligible ~~Hospital's~~Holder of a Hospital Claim's recovery. **Importantly, if you are a Holder of a Hospital Claim that receives a distribution from the Hospital Trust, you *must* use or apply those payments for authorized abatement purposes only, as set forth in further detail in the Hospital Trust Distribution Procedures and described in Article III.S.1 below.**

*Third-Party Payor Claims and the TPP Trust*.  The TPP Trust is an abatement trust—all funds received from the TPP Trust by any ~~holder~~Holder of a Third-Party Payor Claim must be used for or applied to abatement purposes.  Holders of claims against the Debtors that are third-party payors will only be entitled to receive a recovery from the TPP Trust.  For a ~~holder~~Holder of a Third-Party Payor Claim to be eligible to receive a payment from the TPP Trust, they must have filed a Proof of Claim prior to July 30, 2020.  After the Effective Date, the TPP Trust will send a notice to each such ~~holder~~Holder of a Third-Party Payor Claim containing a TPP abatement claim form.  **In order for a Holder of a Third-Party Payor Claim to receive a**

**payment from the TPP Trust, such Holder of a Third-Party Payor Claim must return the
TPP abatement claim form within forty-five days of the deadline set forth on that notice,
along with a calculation of their "Maximum Eligible Amount" which is based on their
"Purdue-related Opioid Spend" as defined in the TPP Trust Distribution Procedures.**

After reconciliation of claims, removal of duplicates, and other administrative analysis,
the TPP Trustee will use the calculation of the Maximum Eligible Amounts provided by each
eligible Holder of a Third-Party Payor Claim that timely submits a form to calculate the amounts
of such ~~Third-Party Payor's~~Holder's abatement distributions, pro-rated based on the total
amounts for all abatement claim forms received to determine each eligible ~~Third-Party
Payor's~~Holder's percentage recovery from the available funds remaining in the TPP Trust.  The
TPP Trust Distribution Procedures provide a mechanism for challenging such determinations, as
set forth in further detail in Article IIIS.2.  **Importantly, if you are a Holder of a Third-Party
Payor Claim that receives a distribution from the TPP Trust, you must use or apply those
payments for authorized abatement purposes only, as set forth in further detail in the TPP
Trust Distribution Procedures and described in** Article IIIS.2. **below.**

***NAS Monitoring Trust and Grants.***  Claims have been asserted against the Debtors
relating to medical monitoring support, educational support, vocational support, familial support
or similar related relief, and not for an alleged personal injury suffered by ~~a~~an NAS child.  Such
claims do not belong to an NAS child but instead are asserted by other parties on their behalf
who provide medical monitoring support, educational support, vocational support, familial
support or similar services to NAS children.  All such claims are channeled to the NAS
Monitoring Trust and no claimant shall receive a direct recovery on account of those claims
(although the ~~holders~~Holders of NAS child claims may be entitled to a recovery from the PI
Trust as described above).  The NAS Monitoring Trust is an abatement trust and all funds
received from the NAS Monitoring Trust must be used for abatement, for legal fees and costs of
administering the NAS Abatement Trust.  The funds will not be distributed to NAS children or
their guardians but shall instead be used to make grants to organizations that combat the effects
of NAS.  Specifically, pursuant to the terms of the NAS Monitoring Trust Documents, the NAS
Monitoring Trust will make grants in the aggregate amount of (1) no less than 89% of such
distributions (net of attorneys' fees) for the purpose of (x) preparing children with a history of
NAS to be ready to enter school, (y) informing through evidence the Standard of Care for
children ages birth through six years old affected by NAS, with priority given to those ages three
through six or (z) enhancing the mother-child dyad of children affected by NAS and (2) up to 5%
of such distributions (net of attorneys' fees) to research institutions to conduct and publish the
results of research into approaches for helping children and families in instances of fetal opioid
exposure, in each case as set forth in more detail in the NAS Monitoring Abatement Trust
Documents and detailed below in Article IIIS.4, which includes the schedule for submission and
review of grant proposals.

***Public Creditor Trusts***.  In addition to the Private Creditor trusts described above, the
settlement framework provides for the establishment of two public creditor trusts, which will
receive the remainder of the approximately $5 billion in value to be provided for abatement.
Specifically, residual value after satisfying other obligations under the Plan will be distributed

through the National Opioid Abatement Trust (the "**NOAT**") and the Tribe Trust,[11][19] on account of the Non-Federal Domestic Governmental Claims and Tribe Claims, respectively.  All value distributed to NOAT and the Tribe Trust will be exclusively dedicated to programs designed to abate the opioid crisis and for no other purpose (other than to fund administration of the programs themselves and to pay fees and costs).  A schedule of the distributions to be received by NOAT and the Tribe Trust is set forth below:

| Aggregate Amount Received | Allocation Between NOAT and the Tribe Trust | |
|---|---|---|
| | **NOAT** | **Tribe Trust** |
| $0 - $50 million | - | 100.0000% |
| $50 million – $1 billion | 100.0000% | - |
| $1 billion – $3 billion | 97.0650% | 2.9350% |
| $3 billion – $5 billion | 97.1875% | 2.8125% |
| $5+ billion | 97.0000% | 3.0000% |

*National Opioid Abatement Trust*.  The funds distributed to the NOAT under the Plan will be allocated to each state for use within that state based on a detailed mediation and settlement framework for the NOAT that resulted in a detailed methodology for determining the percentage of abatement funds allocated to each state, which is based on, among other things, prescription opioid sales, the prevalence of pain reliever use disorder, overdose deaths, population and other factors.  That methodology resulted in the state-by-state percentage allocations set forth in the table in 0.  Within-state allocations of those funds to Local Governments and other non-Federal Domestic Governmental Entities within each state will be determined either by a default allocation mechanic or a "Statewide Abatement Agreement" if the required level of support can be reached within the applicable state no later than two weeks following the Effective Date.[12][20]  Under the default allocation mechanic, the within-state allocations of funds for abatement purposes shall be apportioned by region, and the specific abatement uses of the funds shall be determined by the state, with input from a consulting body that includes broad local government representation.  Notwithstanding the foregoing, a State and its Local Governments may instead agree to utilize the model developed by Christopher J. Ruhm, Professor of Public Policy and Economics at the University of Virginia.  Further detail on the both inter-state allocation model models and intra-state allocation mechanisms is described in 0 and detailed in the NOAT Distribution Procedures.  The core abatement purposes for which

---

[11][19]  The Tribe Trust refers to one or more trusts, limited liability companies or other Persons to be established in accordance with Section 5.7 of the Plan.

[12][20]  The allocation of Public Funds within a Territory or the District of Columbia will be determined by its local legislative body within one year of the Effective Date, unless that legislative body is not in session, in which case, the allocation of Public Funds shall be distributed pursuant to the direction of the Territory's or District of Columbia's executive, in consultation – to the extent applicable – with its Government Participation Mechanism.

each state may allocate abatement funds are described on Schedules A and B to the NOAT Distribution Procedures, with priority given to the "core strategies" set forth on Schedule A.

**Tribe Trust.** The final abatement trust is the Tribe Trust. Distributions to the Tribes will be required to be used exclusively for abatement purposes and permitted administrative costs, and will be made through one or more Tribe Trust entities that will abide by the Tribe Trust Distribution Procedures. The allocation of distributions among Tribes will be consistent with the Tribal Allocation Matrix set forth on **Schedule E** and the Tribal Allocation Percentages set forth on **Schedule C** to the Tribe Trust Distribution Procedures, which will be included as part of the Tribe Trust Documents filed with the Plan Supplement. The Tribes will use the tribal allocation of Abatement Funds for programs on the approved list of abatement strategies (see **Schedule B** to the Tribe Trust Distribution Procedures) and also for culturally appropriate activities, practices, teachings or ceremonies that are, in the judgment of a tribe or tribal health organization, aimed at or supportive of remediation and abatement of the opioid crisis within a tribal community. A list of representative examples of such culturally appropriate abatement strategies, practices, and programs is attached to the to the Tribe Trust Distribution Procedures as **Schedule D** (the "**Tribal Abatement Strategies**"). The separate allocation of abatement funding and illustrative list of Tribal Abatement Strategies recognizes that American Indian and Alaska Native Tribes and the communities they serve possess unique cultural histories, practices, wisdom, and needs that are highly relevant to the health and well-being of American Indian and Alaska Native people and that may play an important role in both individual and public health efforts and responses in Native communities.

Each Abatement Trust shall (i) monitor the use of funds received by Abatement Distribution recipients in accordance with Authorized Abatement Purposes and (ii) prepare and deliver to the Master Disbursement Trust for publication annual reports on the disbursement, use and, to the extent feasible and cost-effective, efficacy of Abatement Distributions from such Abatement Trust and the compliance by Abatement Distribution recipients with the Authorized Abatement Purposes set forth in the applicable Abatement Trust Documents.

The Debtors believe that funding these dedicated abatement funds, while allocating significant value for distribution to holders of PI Claims, is in the best interest of creditors and of the American public.

While the Mediation was ongoing, the Debtors also reached a settlement with the United States. On November 18, 2020, the Bankruptcy Court approved PPLP entering into (i) a plea agreement (the "**Plea Agreemen**t") by and among PPLP and the United States,[20][21] and (ii) a civil settlement agreement by and between PPLP and the United States (the "**Civil Settlement**," and together with the Plea Agreement, the "**DOJ Resolution**"). On November 24, 2020, in accordance with the terms of the DOJ Resolution, PPLP pled guilty in the United States District Court for the District of New Jersey (the "**New Jersey District Court**") to an information charging it with three felony offenses: one count charging a dual-object conspiracy to defraud the United States and to violate the Food, Drug, and Cosmetic Act, and two counts charging

---

[20][21] Acting through the United States Attorney's Office for the District of New Jersey (the "**NJ USAO**"), the United States Attorney's Office for the District of Vermont ("**VT USAO**"), and the United States Department of Justice, Civil Division, Consumer Protection Branch.

conspiracy to violate the Federal Anti-Kickback Statute.  Consistent with the terms of the Plea Agreement, the New Jersey District Court's consideration of the Plea Agreement has been deferred to the sentencing hearing, which will occur following confirmation of the Debtors' Plan. If the Plea Agreement is accepted by the New Jersey District Court at the sentencing hearing, the DOJ Resolution will fully resolve the United States' civil and criminal investigations into the Debtors' past practices related to the production, sale, marketing and distribution of opioid products.  Pursuant to the Plea Agreement, among other things, the Debtors and the United States agreed to a criminal forfeiture judgment in the amount of $2 billion (the "**Forfeiture Judgment**") that will be entered after confirmation of the Chapter 11 Plan and upon the New Jersey District Court's acceptance of the Plea Agreement, and will be deemed to have the status of an allowed superpriority administrative expense claim against PPLP.

Critically, the United States further agreed to provide a credit offsetting the Forfeiture Judgment (the "**Forfeiture Judgment Credit**") of up to $1.775 billion for value distributed or otherwise conferred by Purdue Pharma under the Plan in respect of claims asserted by state, tribal, or local government entities, *provided* that the Plan provides for the emergence of a public benefit company (or entity with a similar mission) and certain other terms and conditions as described in more detail in the Plea Agreement.  The Forfeiture Judgment Credit therefore helps maximize the amount of value that can be dedicated to abatement purposes.  Distribution of the value from the Debtors' Estates, which is estimated at more than $4 billion, to NOAT and the Tribe Trust to fund abatement programs under the Plan will satisfy the first primary requirement to realize the Forfeiture Judgment Credit.  The transfer of the Debtors' business to NewCo, which is described in more detail below, will satisfy the second primary requirement. Accordingly, the Plan contemplates that the Debtors will be able to utilize the full amount of the Forfeiture Judgment Credit.  *See* Article III.V for a further description of the DOJ Resolution.

Prior to and continuing during and after the second phase of Mediation, which primarily concerned causes of action against the Sackler Families, the Special Committee of the Debtors' Board of Directors, with the advice of legal and financial advisors, conducted a searching and exacting review of their claims against the Sackler Families and related entities (*see* Article II.E.2 below).  The purpose of this comprehensive investigation was to enable the Debtors to continue to negotiate the terms of any final settlement with the Sackler Families and to determine whether proposed settlement terms would fall within the range of reasonableness and would satisfy the standards for approval of settlements in bankruptcy cases, including weighing the value of potential estate claims, the possibility of success on those claims (including the strength of any defenses), the need for protracted litigation with its attendant expense, uncertainty, inconvenience, and delay, and the challenges of collecting on a potential judgment, among other things, against the settlement's immediate and future benefits.

In the second phase of Mediation, the Debtors, the Creditors' Committee, the AHC, the MSGE and the NCSG negotiated with representatives of the Sackler Families regarding a potential resolution of the causes of action against the Sackler Families.  These efforts resulted in material improvements to the terms of the initial Settlement Framework.  Specifically, the amount that the Sackler Families will be required to pay in the aggregate has increased from $3 billion over seven years under the initial Settlement Framework to $4.5 billion over nine years (or ten years if certain amounts are paid ahead of schedule in the first six years), consisting of $4.275 billion that will be paid under the Plan and $225 million that has been paid by the Sackler

Families to satisfy their civil settlement with the United States Department of Justice. The principal consideration for such payments required under the Plan are the release and injunction provisions with respect to specified parties associated with the Sackler Families provided for under the Plan. *See* Article III.Z below and the term sheet setting forth the principal terms of the agreement with the Sackler Families attached hereto as **Appendix G** for a more detailed description of the terms of this settlement. The release and injunction provisions are described in detail in Articles I.E-F below. In summary, the Plan provides for the release of any actual or potential claims or causes of action against the Shareholder Released Parties (defined in Articles I.F.3 below) relating to the Debtors (including claims in connection with Opioid-Related Activities) and an associated channeling injunction. If confirmed, the Plan will conclusively, absolutely, unconditionally, irrevocably, and forever release the Shareholder Released Parties from actual or potential claims or causes of action relating to the Debtors (including claims relating to OxyContin and other opioid medications), subject to the conditions set forth in the Plan, including Sections 10.7(a) and (b) of the Plan. **This summary is a summary only; you are strongly encouraged to read the detailed discussion regarding the release and channeling injunction provisions in Articles I.E-F below.**

Finally, PPLP will not emerge from Chapter 11. Instead, as noted above, substantially all of the Debtors' non-cash assets (other than certain causes of action and insurance rights), including direct or indirect interests in PPLP's subsidiaries as separate legal entities except as otherwise provided by or permitted in the Plan, and approximately $200 million of cash will be transferred directly or indirectly to NewCo, a newly formed limited liability company under Delaware law as described in more detail in Section 5.4 of the Plan. NewCo will be indirectly owned by NOAT and the Tribe Trust, and the net value generated by NewCo will ultimately be directed to abating the opioid crisis. There will also be a guarantee by NewCo in favor of the Master Disbursement Trust as described in more detail in Section 5.2 of the Plan.

NewCo will be required to be operated in a responsible and sustainable manner, balancing: (i) the interests of its stakeholders to fund and provide abatement of the opioid crisis; (ii) effective deployment of its assets to address the opioid crisis; and (iii) the interests of those materially affected by its conduct. As a result, NewCo will operate in an accountable manner with nearly all of the net value that it generates ultimately being used to abate the opioid crisis. The NewCo Managers—who will effectively function as a board of directors for the new company—will initially be selected by the Ad Hoc Committee, and acceptable to the MSGE Group, in consultation with the Debtors and the Creditors' Committee, and pursuant to a selection process that is reasonably acceptable to the Debtors; *provided* that the DOJ shall have the right, in its discretion, to observe such selection process.[14][22] The initial NewCo Managers must all be disinterested and independent, and any replacement NewCo Managers will be selected by the disinterested managers of TopCo, a newly created company that will hold the equity interests and voting rights in NewCo. Additional information about the high-level governance structure of NewCo and TopCo is set forth in the Amended NewCo/TopCo Governance Term Sheet attached hereto as **Appendix F**. The NewCo and TopCo organizational documents and identity of the initial NewCo Managers and initial TopCo Managers will be

---

[14][22] If determined to be necessary by the Governmental Consent Parties, NewCo may retain one or more of the four independent directors on PPLP's Special Committee for a period of time to serve as interim directors of NewCo to allow for a period of transition and onboarding of NewCo Managers.

included in the Plan Supplement.  The Sackler Families will have no role in the selection of the NewCo Managers or in any other aspect of NewCo's governance or operations.

In sum, the cornerstone of the Plan is the recognition by most of the core stakeholder groups that more resources are urgently needed to combat the opioid crisis afflicting the United States.  The Plan enjoys broad support from most of the Debtors' significant creditor groups.  This level of consensus is extraordinary, given the nature of the litigation against the Defendant Debtors and the heterogeneous views on fundamental settlement and allocation issues held over time by the various supporting stakeholders.

THE DEBTORS, [THE AD HOC COMMITTEE,]~~15~~23 THE MSGE, THE NATIVE AMERICAN TRIBES GROUP, THE AD HOC GROUP OF INDIVIDUAL VICTIMS, THE AD HOC GROUP OF HOSPITALS, THE THIRD-PARTY PAYOR GROUP, THE RATEPAYER MEDIATION PARTICIPANTS AND [THE NAS COMMITTEE] (COLLECTIVELY, THE "**SUPPORTING CLAIMANTS**") SUPPORT CONFIRMATION OF THE PLAN AND URGE ALL HOLDERS OF CLAIMS ENTITLED TO VOTE ON THE PLAN TO VOTE TO ACCEPT THE PLAN.  THE SUPPORTING CLAIMANTS BELIEVE THAT THE PLAN PROVIDES THE HIGHEST AND BEST RECOVERY FOR ALL CREDITORS AND IS IN THE BEST INTERESTS OF STAKEHOLDERS OF THE DEBTORS.

### DOJ Statement Regarding Confirmation of the Plan

The Department of Justice has confirmed that, subject to resolution of the treatment of the general unsecured Claims of the Federal Government and agreement on acceptable operating principles and covenants for NewCo, the Plan (i) is consistent with the civil settlement agreement by and between PPLP and the United States and the plea agreement by and among PPLP and the United States that collectively constitute the DOJ Resolution and (ii) satisfies the two conditions precedent to the realization of the full $1.775 billion Forfeiture Judgment Credit—because the Plan provides for (a) the emergence of a public benefit company (or entity with a similar mission), and (b) at least $1.775 billion of value to be distributed or otherwise conferred by Purdue Pharma under the Plan in respect of claims asserted by state, tribal, or local government entities.

### Creditors' Committee Statement Regarding Confirmation of the Plan

~~As the statutory fiduciary for all unsecured creditors in these cases, the Creditors' Committee is generally supportive of (i) most of the economic allocations agreed to during Phase I of Mediation and (ii) the primary economic terms of the agreement in principle reached with the Shareholders in Phase II of Mediation.  The terms of the Phase I economic allocation~~

---

~~15~~23  The Ad Hoc Committee's status as a Supporting Claimant is conditioned upon an acceptable resolution with respect to the following issues (as determined by the Ad Hoc Committee in its sole discretion): (1) the treatment of the general unsecured Claims of the Federal Government; (2) the amounts and payment of professional fees of the Private Claimant Groups; (3) the Persons to be included on the Schedule of Excluded Parties; (4) the terms of the PI ~~Trust Distribution Procedures~~TDP; (5) all other conditions of the Private Claimant Group settlement term sheets as agreed in phase I of the Mediation; and (6) all other open items in the Plan.

agreements and the Phase II agreement in principle are generally reflected and incorporated into the Plan (and, with regard to the Shareholders, the Term Sheet).

Notwithstanding the foregoing, and in addition to the continuing negotiations regarding the agreement in principle with the Shareholders, the Plan also reflects numerous unresolved issues (some of which have been unresolved since September), which are the subject of ongoing negotiations among multiple parties in interest, including the Creditors' Committee. These issues include, but are not limited to, the following:

1. Assurances, guarantees, and mechanics with regard to payment of the Private Entity Settlements;

2. Governance of the Master Distribution Trust;

3. The scope of releases and Excluded Parties;

4. Specific issues regarding the so-called settlements between the Private Entities and holders of Non-Federal Domestic Governmental Claims that were not finalized during Phase I of Mediation (as well as the fact that Phase I of the Mediation did not result in any settlements among certain parties); and

5. Voting and provisional class treatment for certain classes of Claimants.

As such, the UCC does not support all aspects of the Plan in its current form.

Over the coming weeks, the Creditors' Committee expects to continue negotiations with all parties regarding these and various other issues, including, among other things, the terms of the Shareholder Settlement. The Creditors' Committee also hopes (and believes many parties do as well) that the NCSG will join such negotiations and, if possible, be part of an overall and comprehensive resolution. The Creditors' [The Creditors' Committee continues to negotiate and discuss with the Debtors, the Ad Hoc Committee, the MSGE, various public and private claimants and Purdue Pharma's shareholders the terms of the Plan and the proposed settlement with the shareholders. In light of these continuing negotiations and discussions, as of the time of the filing of this Disclosure Statement [for Third Amended Plan], the Creditors' Committee has not yet made a determination as to whether it supports the Plan or the proposed settlement with the shareholders. The Creditors'] Committee will provide further detail and an updated position in the solicitation version of the Disclosure Statement as and when it is approved. The Creditors' Committee is hopeful that ongoing negotiations will be successful and that the Creditors' Committee will be in a position to support the Plan in its entirety at such time.]

[The Debtors have agreed to include in the Solicitation Package a letter from the Creditors' Committee supporting the Plan and providing greater detail regarding the Creditors' Committee's position with respect to the Plan. The views expressed in such letter are those of the Creditors' Committee. The Debtors do not endorse or agree with all of the statements made therein.]

**C.**     **Summary of Classification and Treatment of Claims and Interests in the Debtors**

The Plan is being proposed as a joint plan of reorganization of the Debtors for administrative purposes only, and constitutes a separate chapter 11 plan of reorganization for each Debtor.  The Plan groups the Debtors together solely for purposes of describing treatment under the Plan, confirmation of the Plan and making distributions ("**Plan Distributions**") in respect of Claims against and/or Interests in the Debtors under the Plan.  Such groupings shall not affect any Debtor's status as a separate legal entity, change the organizational structure of the Debtors' business enterprise, constitute a change of control of any Debtor for any purpose, cause a merger or consolidation of any legal entities, nor cause the transfer of any assets or the assumption of any liabilities; and, except as otherwise provided by or permitted in the Plan, all Debtors shall continue to exist as separate legal entities.

Over 614,000 Proofs of Claim were filed in these Chapter 11 Cases by the July 30, 2020 General Bar Date.  More than 550,000 of those Proofs of Claim, approximately 90% of the total, did not state a claim amount.  The approximately 10% of the Proofs of Claim that did state an amount asserted, in the aggregate, claims of over $140 trillion.  Even if the single proof of claim asserting $100 trillion in damages is excluded, the approximately 10% of Proofs of Claim that state claim amounts assert, in the aggregate, claims of over $40 trillion.  For comparison, the gross domestic product of the United States for 2020 is estimated at approximately $20.93 trillion,[16][24] and the gross domestic product of the entire world for 2019 is estimated at approximately $87.80 trillion.[17][25]

The vast majority of the filed Proofs of Claim assert unsecured opioid litigation claims, including the claims in the following classes: Non-Federal Domestic Governmental Claims (Class 4); Tribe Claims (Class 5); Hospital Claims (Class 6); Third-Party Payor Claims (Class 7); Ratepayer Claims (Class 8); NAS Monitoring Claims (Class 9); and PI Claims (~~Class~~Classes 10(a) and 10(b)).  Many of the opioid litigation claims against the Debtors are based upon novel or untested legal theories.  In addition to the legal uncertainties, the value of any opioid litigation claim will depend greatly on the facts and circumstances of the claim, and a number of highly particularized judgments about the quantum of economic and non-economic damages that the claimant has incurred and that are compensable under applicable law.  The information necessary to determine these amounts is also generally not available from the Proofs of Claim, and, in litigation, would be learned through fact and expert discovery.  Any estimate of the aggregate value of opioid litigation claims, and any estimate of the aggregate percentage recovery of a class of opioid litigation claims, would be so uncertain as not to provide claimants with information useful to make judgments about the proposed Plan.

The categories of Claims and Interests listed below classify Claims and Interests for all purposes, including voting, confirmation, and distribution pursuant to the Plan and pursuant to sections 1122 and 1123(a)(1) of the Bankruptcy Code.  For a summary of the treatment of each Class of Claims and Interests, *see* the description below and "Summary of the Plan" in Article IV.

---

[16][24]  Gross Domestic Product, Fourth Quarter and Year 2020 (Second Estimate), BEA 21-06, U.S. Department of Commerce, Bureau of Economic Analysis (Feb. 25, 2021).

[17][25]  GDP (current US$) (NY.GDP.MKTP.CD), World Bank (Feb. 28, 2021).

| Class | Type of Claim or Interest | Impairment | Entitled to Vote |
|---|---|---|---|
| Class 1 | Secured Claims | Unimpaired | No (Presumed to Accept) |
| Class 2 | Other Priority Claims | Unimpaired | No (Presumed to Accept) |
| Class 3 | Federal Government Unsecured Claims | Impaired | Yes |
| Class 4 | Non-Federal Domestic Governmental Claims | Impaired | Yes |
| Class 5 | Tribe Claims | Impaired | Yes |
| Class 6 | Hospital Claims | Impaired | Yes |
| Class 7 | Third-Party Payor Claims | Impaired | Yes |
| Class 8 | Ratepayer Claims | Impaired | Yes |
| Class 9 | NAS Monitoring Claims | Impaired | Yes |
| Class 10(a) | NAS PI Claims | Impaired | Yes |
| Class 10(b) | Non-NAS PI Claims | Impaired | Yes |
| Class 11(a) | Avrio General Unsecured Claims | Unimpaired[~~18~~ 26] | No (Presumed to Accept) |
| Class 11(b) | Adlon General Unsecured Claims | Unimpaired[~~19~~ 27] | No (Presumed to Accept) |

---

[~~18~~ 26] As discussed in the Liquidation Analysis (as defined below), the Debtors believe that the Holders of Avrio General Unsecured Claims would be paid in full in a hypothetical chapter 7 liquidation. Accordingly, the Plan provides that Holders of Avrio General Unsecured Claims will be paid in full under the Plan and are unimpaired.

[~~19~~ 27] As discussed in the Liquidation Analysis (as defined below), the Debtors believe that the Holders of Adlon General Unsecured Claims would be paid in full in a hypothetical chapter 7 liquidation. Accordingly, the Plan provides that Holders of Adlon General Unsecured Claims will be paid in full under the Plan and are unimpaired.

| Class | Type of Claim or Interest | Impairment | Entitled to Vote |
|---|---|---|---|
| Class 11(c) | Other General Unsecured Claims | Impaired | Yes |
| Class 12 | Intercompany Claims | Unimpaired or Impaired | No (Presumed to Accept or Deemed to Reject) |
| Class 13 | Shareholder Claims | Impaired | No (Deemed to Reject) |
| Class 14 | Co-Defendant Claims | Impaired | No (Deemed to Reject) |
| Class 15 | Other Subordinated Claims | Impaired | No (Deemed to Reject) |
| Class 16 | PPLP Interests | Impaired | No (Deemed to Reject) |
| Class 17 | PPI Interests | Impaired | No (Deemed to Reject) |
| Class 18 | Intercompany Interests | Unimpaired or Impaired | No (Presumed to Accept or Deemed to Reject) |

If a controversy arises regarding whether any Claim is properly classified under the Plan, the Bankruptcy Court shall, upon proper motion and notice, determine such controversy at the Confirmation Hearing.  If the Bankruptcy Court finds that the classification of any Claim is improper, then such Claim shall be reclassified and the Ballot previously cast by the holder of such Claim shall be counted in, and the Claim shall receive the treatment prescribed in, the Class in which the Bankruptcy Court determines such Claim should have been classified, without the necessity of resoliciting any votes on the Plan.

For the reasons described above, a traditional recovery percentage for each impaired Class is not provided.  The number of claims in and aggregate treatment provided to such Classes is summarized below.  This summary does not take into account the timing of such distributions or other important factors and does not describe procedures for making distributions to individual claimants.

With respect to the treatment of Other General Unsecured Claims (Class 11(Cc)), the Debtors estimate that, following completion of Claims litigation and related matters, the Other General Unsecured Claim Cash, which is reserved for distribution to Holders of Allowed Other

General Unsecured Claims exclusively, will likely exceed the aggregate amount of Allowed Other General Unsecured Claims. This estimate is based on certain assumptions based on a variety of factors. Should these underlying assumptions prove incorrect, the actual Allowed Other General Unsecured Claims may differ from the Debtors' estimates, and such differences could be material. Because distributions to Holders of Other General Unsecured Claims are linked to the value of Allowed Other General Unsecured Claims, any material increase in the amount of Allowed Other General Unsecured Claims in excess of the Other General Unsecured Claim Cash would materially reduce the recovery to Holders of Other General Unsecured Claims under the Plan.

This summary is qualified in its entirety by the more detailed description provided in the "Summary of the Plan" in Article IV, which sets forth in detail the treatment for certain Classes and the procedures by which the aggregate value provided for a certain Class will be distributed on account of claims in that Class.

| Class | Type of Claim or Interest | Approximate Number of Timely Filed Proofs of Claim | Aggregate Treatment |
|---|---|---|---|
| Class 3 | Federal Government Unsecured Claims | 6 | The Allowed Other Federal Agency Claims shall receive treatment in a manner and amount agreed by the Debtors and the DOJ, and the DOJ Civil Claim and the DOJ Criminal Fine Claim shall receive treatment in accordance with the DOJ 9019 Order and the DOJ ResolutionUnited States shall receive (i) the Initial Federal Government Distribution and (ii) the MDT Federal Government Claim, which collectively total $50 million in payment obligations. |
| Class 4 | Non-Federal Domestic Governmental Claims | 7,600 | Approximately $4.0 billion in estimated cash distributions to NOAT over time (excluding potential proceeds of insurance claims and any release of restricted cash) |

| Class | Type of Claim or Interest | Approximate Number of Timely Filed Proofs of Claim | Aggregate Treatment |
|---|---|---|---|
| Class 5 | Tribe Claims | 400 | Approximately $~~141~~140 million in estimated cash distributions to the Tribe Trust over time (excluding potential proceeds of insurance claims and any release of restricted cash) |
| Class 6 | Hospital Claims | 1,180 | $250 million in funding of Hospital Trust |
| Class 7 | Third-Party Payor Claims | 467,108 | $365 million in funding of TPP Trust |
| Class 8 | Ratepayer Claims | 31 | $6.5 million (less attorneys' fees) Truth Initiative Contribution |
| Class 9 | NAS Monitoring Claims | 3,439 | $60 million in funding of NAS Monitoring Trust |
| Class 10(a) | NAS PI Claims | ~~135,914~~6,283 | $~~700 million to $750~~45 million in funding of ~~the~~ PI Trust with respect to NAS PI Channeled Claims |
| Class 10(b) | Non-NAS PI Claims | 129,631 | $655 million to $705 million in funding of the PI Trust with respect to Non-NAS PI Channeled Claims |
| Class 11(c) | Other General Unsecured Claims | 773 | $15 million in aggregate Other General Unsecured Claim Cash |

## D. The DOJ Resolution, Settlements with the Private Claimant Groups and Shareholder Contribution Are Interdependent and Vastly Superior to Potential Alternatives

The Debtors and their key stakeholders have spent more than two years, at significant expense, to reach the point of proposing a highly negotiated Plan that will put the Debtors' assets and $4.275 billion from the Sackler Families to work abating the opioid crisis. The extraordinary benefits of the proposed Plan are further highlighted by the immensely value-destructive nature of the alternatives to the Plan, which are described below.

Absent the DOJ Resolution, the Debtors would face enormous and potentially catastrophic litigation, prosecution, and possible exclusion from healthcare programs

administered by the federal government.  If the United States were to prevail in a criminal prosecution of the Debtors, it is likely that any convicted party would be excluded from participating in federal healthcare programs.  Additionally, the consequences of the United States prevailing could potentially include a $6.2 billion or more non-dischargeable criminal fine and/or a criminal forfeiture judgment of $3.5 billion.  The DOJ also asserted a substantial claim for civil liability, which the DOJ asserted was non-dischargeable, totaling $2.8 billion or more in damages, which could be trebled to $8.4 billion, plus penalties, as well as claims for civil forfeiture.  Accordingly, the DOJ's claims and the likely massive costs associated with litigation against the DOJ had the potential to wipe out all of the value of the Debtors' Estates—and still do if the conditions to the DOJ Resolution are not met.  Preserving the DOJ Resolution should therefore be of paramount importance to all stakeholders.

The resolution with the Non-Federal Public Claimants embodied in the Plan is critical to preserving and realizing the full benefit of the DOJ Resolution.  As explained above, if less than $1.775 billion of value is provided under the Plan in respect of claims asserted by state, tribal, or local government entities, then there is a dollar-for-dollar increase in the amount of the $2 billion Forfeiture Judgment that must be satisfied in cash rather than through the Forfeiture Judgment Credit, leaving less available for distribution to other creditors.  In addition, the Forfeiture Judgment Credit is conditioned on confirmation of a plan of reorganization that provides for the emergence of a public benefit company or entity with a similar mission.  Accordingly, under the terms of the Plea Agreement, any alternative structure that does not provide for emergence of a public benefit company or entity with a similar mission would reduce the amount available for distribution to other creditors by at least $1.775 billion.  Moreover, additional amounts paid to the DOJ in this scenario would be directed to the DOJ Asset Forfeiture Fund, rather than designated to fund the fight against the opioid crisis.

Preserving the resolutions reached with the Private Claimants in the Mediation (the "**Private-Side Resolutions**") is likewise critical.  If the Debtors were to become unable to satisfy the terms of the Private-Side Resolutions, these bankruptcy proceedings would undoubtedly devolve into an unmitigated and value-destructive tempest, with the various Private Claimant groups vigorously disputing the claims of the Non-Federal Public Claimants, the United States and other Private Claimant groups, and each of those groups compelled to respond in kind against each of the other groups.  The litigation of the complex issues presented by the claims of the Non-Federal Public Claimants and each of the Private Claimant groups, particularly in light of the large number of parties in interest who would be expected to participate with varying goals, would be protracted and incredibly costly.  There can be no assurance that the claims of the Non-Federal Public Claimants would ultimately be allowed in a particular amount or at all at the eventual conclusion of such litigation.  Accordingly, if the Private-Side Resolutions are not preserved, then confirmation of the Plan would be at the very least massively delayed, and, if the outcome of the litigation with the Private Claimants were to preclude providing at least $1.775 billion in respect of claims asserted by state, tribal, or local government entities or emergence of a public benefit company or entity with a similar mission, then the Forfeiture Judgment Credit would be reduced or entirely unavailable, requiring the Debtors to satisfy the $2 billion Forfeiture Judgment in cash. That is a judgment that the Debtors could not satisfy in full, and other creditors would be at risk of receiving no recovery.

The Debtor's Plan, by contrast, facilitates a fair and equitable distribution of funds with certainty regarding the timing of payments. The $4.5 billion in the aggregate paid by Purdue Pharma's shareholders under the settlement embodied in the Plan and their settlement with the DOJ ensures that there will be sufficient funds to meet the terms of the various public and private settlements. As explained above, the DOJ Resolution will require the Debtors to make $2.0 billion in distributions in respect of the Forfeiture Judgment in one form or another (given that the total amount of the Forfeiture Judgment must be either paid to the DOJ Asset Forfeiture Fund or conferred on the Non-Federal Claimants in a manner that allows the Debtors to realize the Forfeiture Judgment Credit) before any payments can be made to holders of unsecured claims, while the Private-Side Resolutions will require the Debtors to make a total of approximately $1.4 billion in distributions. There would be substantial execution risk associated with any structure intended to allow the Debtors to satisfy the Private-Side Resolutions, the DOJ Resolution and the resolution with the Non-Federal Public Claimants without the funding provided under the settlement with Purdue Pharma's shareholders. Accordingly, the contribution required under such settlement ensures that these Chapter 11 Cases will not collapse into the quagmire of expensive litigation and years of delay that would result if the Debtors cannot meet the terms of the Private-Side Resolutions, the DOJ Resolution, or the resolution with the Non-Federal Public Claimants, which are all embodied in the Plan.

The Debtors carefully considered emergence alternatives to raise funds, including assets sales or a sale of the entire company. While a limited portion of the Debtors' assets could potentially be marketed if necessary and value-maximizing, the Debtors, with the assistance of their advisors, including PJT, determined that a sale of the Debtors' business would not be value maximizing or otherwise optimal at this time.

As described in more detail in Article III.N below, the Debtors were approached by one potential purchaser that expressed an interest in acquiring a majority of the Debtors' business, but despite diligent and extensive engagement, the Debtors never received an actionable proposal. Moreover, the Debtors, with the assistance of PJT, assessed the prospects for selling the Debtors' business and concluded that multiple factors weighed against pursuing a sale during the Chapter 11 Cases, including, without limitation, the fact that the revenue streams associated with the Debtors' opioid businesses were likely to be heavily discounted by potential purchasers and that the Debtors' pipeline of investments have not yet reached the stage at which they would traditionally be marketed by a typical pharmaceutical company and therefore are unlikely to be adequately valued by a purchaser. In any event, under the terms of the DOJ Resolution, such a sale would have resulted in the unavailability of the $1.775 billion Forfeiture Judgment Credit and required PPLP to satisfy the entire Forfeiture Judgment in cash. Transferring the Debtors' business to NewCo is therefore both value maximizing with respect to the business itself and with respect to best realizing the Forfeiture Judgment Credit by making the residual value of the business available to the Non-Federal Public Claimants to fund abatement programs.

Accordingly, each of the major compromises embodied in the Plan is necessary for a successful resolution of these Chapter 11 Cases, while a failure of the Plan is likely to result in a scenario that is, or is not materially better than, the outcome described in the Liquidation Analysis, involving years of delay, billions of dollars less in available value, and a foregone ability to use billions of dollars to abate the opioid crisis. The Debtors, like the Supporting

Claimants, therefore strongly urge all eligible holders of impaired Claims to vote to accept the Plan.

### E.    Channeling Injunction

In order to supplement the injunctive effect of the Plan Injunction, the Releases and the Shareholder Releases set forth in Sections 10.5, 10.6 and 10.7 of the Plan for Non-Federal Domestic Governmental Channeled Claims, Tribe Channeled Claims, Hospital Channeled Claims, Third-Party Payor Channeled Claims, NAS Monitoring Channeled Claims and PI Channeled Claims, (collectively, the "**Channeled Claims**"), the Plan provides for the Channeling Injunction to take effect as of the Effective Date to permanently channel all Channeled Claims against any Protected Party to the Creditor Trusts, which will forever stay, restrain, and enjoin all Persons that have held or asserted, or that hold or assert, any Channeled Claims arising out of or related thereto from taking any action to directly or indirectly collect, recover, or receive payment, satisfaction, or recovery from any Protected Party.  All Channeled Claims arising out of or related thereto will be released and bar recovery or any action against any Protected Party for or in respect of all Channeled Claims.  In other words, all Channeled Claims arising out of or related thereto may be asserted only and exclusively against the Creditor Trusts and only to the extent of the right to treatment therefrom afforded under the Plan and the applicable Creditor Trust Documents.

Accordingly, the Channeling Injunction provides for a resolution process administered pursuant to the Plan in an attempt to provide final, fair, and efficient resolution of Channeled Claims against the Debtors and Released Claims arising out of or related thereto. The Channeling Injunction would eliminate the need for prolonged and extremely expensive court involvement. The Plan provides for payment to holders of PI Claims that qualify for payment pursuant to the PI Trust Documents and for treatment of Non-Federal Domestic Governmental Claims, Tribe Claims, Hospital Claims, Third-Party Payor Claims and NAS Monitoring Claims by means of Abatement Distributions made by the respective Abatement Trusts in accordance with the applicable Abatement Trust Documents.

"Protected Parties" means, collectively, (i) the Debtors, (ii) each of the Debtors' Related Parties, (iii) NewCo, (iv) TopCo, (v) the Plan Administration Trust, (v) the Master Disbursement Trust, except, solely to the extent provided in the MDT Documents, with respect to the Channeled Claims channeled to the Master Disbursement Trust, (vi) each Creditor Trust, except, solely to the extent provided in the applicable Creditor Trust Documents, with respect to the Channeled Claims channeled to such Creditor Trust or (vii) the Shareholder Released Parties, subject to Section 10.8(c) of the Plan with respect to the Shareholder Release Snapback Parties.

### F.    Releases[20]

All releases provided for in the Plan specifically exclude from the scope thereof any criminal action or criminal proceeding arising under a criminal provision of any statute instituted (i) by a Domestic Governmental Entity that has authority to bring such a criminal action or criminal proceeding, and (ii) to adjudicate a person's guilt or to set a convicted person's

---

[20] *See* footnote **Error! Bookmark not defined.** regarding Shareholder Releases.

punishment.  In addition, Section 10.19 of the Plan provides that the discharge, release, and injunction provisions contained in the Plan and Confirmation Order are not intended and shall not be construed to bar the United States from, subsequent to the Confirmation Order, pursuing any police or regulatory action, or any criminal action.

## 1.    *Debtors' Releases*

AThe releases granted by the Debtors and their Estates to the Released Parties is a key component of the Debtors' Plan is the releases granted to the Debtors in consideration for their contributions to the Estates both prior to and after the Petition Date, which.  Such releases are provided for in Section 10.6(a) of the Plan.  The parties being released by the Debtors through standard

Specifically, the Plan provides that the Released Parties shall be conclusively, absolutely, unconditionally, irrevocably, fully, finally, forever and permanently released by the Debtors and their Estates from any and all Claims, claims, counterclaims, disputes, obligations, suits, judgments, damages, demands, debts, rights, Causes of Action, Liens, remedies, losses, contributions, indemnities, rights of subrogation, costs, liabilities, attorneys' fees and expenses, in each case, of any kind, character or nature whatsoever, including any derivative claims asserted or assertible by or on behalf of any Debtor or any of their Estates (including any Causes of Action arising under chapter 5 of the Bankruptcy Code) and including any claims that any Debtor or any of their Estates, or that any other Person or party claiming under or through any Debtor or any of their Estates, would have presently or in the future been legally entitled to assert in its own right (whether individually or collectively) or on behalf of any Debtor or any of their Estates or any other Person, notwithstanding section 1542 of the California Civil Code or any law of any jurisdiction that is similar, comparable or equivalent thereto (which shall conclusively be deemed waived), whether liquidated or unliquidated, fixed or contingent, matured or unmatured, known or unknown, foreseen or unforeseen, asserted or unasserted, accrued or unaccrued, existing or hereinafter arising, choate or inchoate, whether in law or equity, whether sounding in tort or contract or based on any other legal or equitable theory or principle (including fraud, negligence, gross negligence, recklessness, reckless disregard, deliberate ignorance, public or private nuisance, breach of fiduciary duty, avoidance, willful misconduct, veil piercing, alter-ego theories of liability, unjust enrichment, disgorgement, restitution, contribution, indemnification, right of subrogation and joint liability), whether *in rem*, *quasi in rem*, *in personam* or otherwise, or whether arising under federal or state statutory or common law, or any other applicable international, foreign or domestic law, rule, statute, regulation, treaty, right, duty, requirement or otherwise, regardless of where in the world accrued or arising, from the beginning of time, in each case, based on or relating to, or in any manner arising from, in whole or in part, the Debtors (as such Entities existed prior to or after the Petition Date), their Estates or the Chapter 11 Cases, including, without limitation, (i) the subject matter of, or the transactions or events giving rise to, any Claim or Interest that is treated in the Plan, (ii) the business or contractual arrangements or interactions between any Debtor and any Released Party (including historical business or contractual arrangements or interactions, any direct or indirect distributions or transfers by any Debtor, and any exercise of any common law or contractual rights of setoff or recoupment by any Released Party at any time on or prior to the Effective Date), (iii) any employment or retention of any Released Party by the Debtors (including any service as a director, officer, executive, consultant or advisor to the Debtors or service in any similar

capacity), (iv) any direct or indirect beneficial ownership of any equity interest in or debt obligation of the Debtors, (v) the Restructuring Transactions, (vi) the Pending Opioid Actions, (vii) Opioid-Related Activities or the Debtors' development, production, manufacture, licensing, labeling, marketing, advertising, promotion, distribution or sale of non-opioid products or the use or receipt of any proceeds therefrom, in each case, including the Debtors' interactions with regulators and regardless of where in the world any such activities or any result, loss, injury or damage resulting therefrom occurred, (viii) any past, present or future use or misuse of any opioid, whether sold by the Debtors or by NewCo or any of its Subsidiaries or otherwise, to the extent arising from an act, conduct, omission, event, transaction, occurrence or continuing condition in any way relating to any of the foregoing, (ix) the restructuring of any Claim or Interest before or during the Chapter 11 Cases, (x) the Disclosure Statement and the Plan and related agreements, instruments and other documents (including the Plan Documents) and the negotiation, formulation, preparation or implementation thereof, (xi) the solicitation of votes with respect to the Plan, or (xii) any other act, conduct, omission, event, transaction, occurrence or continuing condition in any way relating to any of the foregoing.

The "~~debtor releases" include~~Released Parties" mean, collectively, (i) the Debtors, (ii) each of the Debtors' Related Parties and (iii) solely for purposes of the Releases by the Debtors in <u>Section 10.6(a)</u> of the Plan, the Supporting Claimants, the Creditors' Committee and the Creditors' Committee's members and each of their respective professionals, in each case solely in their respective capacities as such; *provided*, *however*, that, notwithstanding the foregoing or anything herein to the contrary, no Excluded Party or Shareholder ~~Released~~Release Snapback Party[21] shall be a Released Party in any capacity or respect. For the avoidance of doubt, the Released Parties referenced in clause (ii) of ~~the~~this definition of Released Parties include Persons referenced in clause (ii) of the definition of Related Parties only to the extent (x) a claim arises from actions taken by such Person in its capacity as a Related Party of a Person referenced in clause (i) of the definition of Related Parties and (y) the underlying claim against the Released Party is released against the Person to which the Related Party is related.

"Excluded Claim" means (i) any criminal action or criminal proceeding arising under a criminal provision of any statute instituted (A) by a Domestic Governmental Entity that has authority to bring such a criminal action or criminal proceeding, and (B) to adjudicate a person's guilt or to set a convicted person's punishment; (ii) any Cause of Action against a Shareholder Released Party by any federal, state or local authority with respect to income taxes imposed on such Shareholder Released Party; (iii) any Cause of Action against an Excluded Party; (iv) any Estate Cause of Action identified on the Schedule of Retained Causes of Action; or (v) any Cause of Action against a Shareholder Released Party by a Person, or by a Shareholder Released Party against a Person, in each case, where such Person is such Shareholder Released Party's current or former officer, director, principal, member, employee, financial advisor, attorney (including, without limitation, any attorney retained by any director, in his or her capacity as

---

[21] ~~The Shareholder Settlement, the release of claims and causes of action against the Shareholder Released Parties by the Debtors and the Releasing Parties and the related injunctions (including the Channeling Injunction) are integral parts of the global settlement transactions reflected by the Plan. The terms of such releases and injunctions are subject to ongoing negotiations among the Debtors, the Shareholder Released Parties, the Governmental Consent Parties and the Creditors' Committee. The Debtors anticipate filing an amended Plan incorporating such releases upon the parties' agreement to a definitive Shareholder Settlement Agreement prior to the hearing of the Bankruptcy Court to consider entry of the Solicitation Procedures Order.~~

such), accountant, investment banker (including, without limitation, investment banker retained by any director, in his or her capacity as such), consultant, expert or other professional, in each case, in such Person's capacity as such, and such Cause of Action is not against a Shareholder Released Party for indemnification, contribution or similar liability-sharing theory in connection with Opioid-Related Activities or Pending Opioid Actions.

To clarify, unless a Person qualifies as a Related Party of the Debtors under clause (i) of the definition of "Related Parties", such Person is generally released only for claims that both arise from actions or omissions that such Person took in its capacity as a Related Party and that are released against the Person through which the Related Party qualifies as related.

Certain parties who are specifically excluded from such releases will be set forth in the Plan Supplement.

### 2.    *Releases by Releasing Parties, Including Holders of Claims and Interests*

In addition to ordinary and customary Debtor releases and exculpations, the Plan provides for certain releases to be deemed granted by the Releasing Parties, including Holders of Claims against or Interests in the Debtors, in favor of the Released Parties. Such release is provided for in Section 10.6(b) of the Plan.[28]

Specifically, the Plan provides that the Released Parties shall be conclusively, absolutely, unconditionally, irrevocably, fully, finally, forever and permanently released by the Releasing Parties from any and all Claims, claims, counterclaims, disputes, obligations, suits, judgments, damages, demands, debts, rights, Causes of Action, Liens, remedies, losses, contributions, indemnities, rights of subrogation, costs, liabilities, attorneys' fees and expenses, in each case, of any kind, character or nature whatsoever, including any derivative claims asserted or assertible by or on behalf of any Debtor or any of their Estates (including any Causes of Action arising under chapter 5 of the Bankruptcy Code) and including any claims that any Releasing Party, or that any other Person or party claiming under or through any Releasing Party, would have presently or in the future been legally entitled to assert in its own right (whether individually or collectively) or on behalf of any Releasing Party or any other Person, notwithstanding section 1542 of the California Civil Code or any law of any jurisdiction that is similar, comparable or equivalent thereto (which shall conclusively be deemed waived), whether liquidated or unliquidated, fixed or contingent, matured or unmatured, known or unknown, foreseen or unforeseen, asserted or unasserted, accrued or unaccrued, existing or hereinafter arising, choate or inchoate, whether in law or equity, whether sounding in tort or contract or based on any other legal or equitable theory or principle (including fraud, negligence, gross negligence, recklessness, reckless disregard, deliberate ignorance, public or private nuisance, breach of fiduciary duty, avoidance, willful misconduct, veil piercing, alter-ego theories of liability, unjust enrichment, disgorgement, restitution, contribution, indemnification, right of subrogation and joint liability), whether *in rem*, *quasi in rem*, *in personam* or otherwise, or whether arising under federal or state statutory or common law, or any other applicable international, foreign or

---

[28] The NAS Committee has requested that the Disclosure Statement specifically state that such releases in favor of the Debtors include, among other things, a release of any causes of action that allege that the Debtors were aware that (i) Oxycodone Hydrochloride must not be used during pregnancy and (ii) fetal exposure to opioids is an injury without a known cure.

domestic law, rule, statute, regulation, treaty, right, duty, requirement or otherwise, regardless of where in the world accrued or arising, from the beginning of time, in each case, based on or relating to, or in any manner arising from, in whole or in part, the Debtors (as such Entities existed prior to or after the Petition Date), their Estates or the Chapter 11 Cases, including, without limitation, (i) the subject matter of, or the transactions or events giving rise to, any Claim or Interest that is treated in the Plan, (ii) the business or contractual arrangements or interactions between any Debtor and any Released Party (including historical business or contractual arrangements or interactions, any direct or indirect distributions or transfers by any Debtor, and any exercise of any common law or contractual rights of setoff or recoupment by any Released Party at any time on or prior to the Effective Date), (iii) any employment or retention of any Released Party by the Debtors (including any service as a director, officer, executive, consultant or advisor to the Debtors or service in any similar capacity), (iv) any direct or indirect beneficial ownership of any equity interest in or debt obligation of the Debtors, (v) the Restructuring Transactions, (vi) the Pending Opioid Actions, (vii) Opioid-Related Activities or the Debtors' development, production, manufacture, licensing, labeling, marketing, advertising, promotion, distribution or sale of non-opioid products or the use or receipt of any proceeds therefrom, in each case, including the Debtors' interactions with regulators and regardless of where in the world any such activities or any result, loss, injury or damage resulting therefrom occurred, (viii) any past, present or future use or misuse of any opioid, whether sold by the Debtors or by NewCo or any of its Subsidiaries or otherwise, to the extent arising from an act, conduct, omission, event, transaction, occurrence or continuing condition in any way relating to any of the foregoing, (ix) the restructuring of any Claim or Interest before or during the Chapter 11 Cases, (x) the Disclosure Statement and the Plan and related agreements, instruments and other documents (including the Plan Documents) and the negotiation, formulation, preparation or implementation thereof, (xi) the solicitation of votes with respect to the Plan, or (xii) any other act, conduct, omission, event, transaction, occurrence or continuing condition in any way relating to any of the foregoing.

~~In addition to ordinary and customary Debtor releases and exculpations, the Plan provides that the Releasing Parties will be deemed to provide a full and complete discharge and release to the Released Parties and their respective property and successors and assigns from any and all Causes of Action whatsoever, whether known or unknown, asserted or unasserted, derivative or direct, foreseen or unforeseen, existing or hereinafter arising, in law, equity, or otherwise, whether for tort, fraud, contract, violations of federal or state securities laws, veil piercing or alter-ego theories of liability, contribution, indemnification, joint liability, or otherwise, arising from or related in any way to such Releasing Parties.~~ The Releasing Parties include, collectively, (i) the Supporting Claimants, solely in their respective capacities as such, (ii) all Holders of Claims against or Interests in the Debtors and (iii) with respect to each of the Entities in the foregoing clauses (i) and (ii) and with respect to the Debtors, each of their Related Parties. ~~Such release is provided for in~~ Section 10.6(b) ~~of the Plan.~~

### *3.*     *Shareholder Releases by Debtors*

The Plan also provides for releases granted by the Debtors and their Estates in favor of the Shareholder Released Parties.  Such release is provided for in Section 10.7(a) of the Plan.

Specifically, the Plan provides that the Shareholder Released Parties shall be conclusively, absolutely, unconditionally, irrevocably, fully, finally, forever and permanently released, subject to clause (z) of the last paragraph of Section 10.7(a) of the Plan, by the Debtors and their Estates from any and all Claims, claims, counterclaims, disputes, obligations, suits, judgments, damages, demands, debts, rights, Causes of Action, Liens, remedies, losses, contributions, indemnities, rights of subrogation, costs, liabilities, attorneys' fees and expenses, in each case, of any kind, character or nature whatsoever, including any derivative claims asserted or assertible by or on behalf of any Debtor or any of their Estates (including any Causes of Action arising under chapter 5 of the Bankruptcy Code) and including any claims that any Debtor or any of their Estates, or that any other Person or party claiming under or through any Debtor or any of their Estates, would have presently or in the future been legally entitled to assert in its own right (whether individually or collectively) or on behalf of any Debtor or any of their Estates or any other Person, notwithstanding section 1542 of the California Civil Code or any law of any jurisdiction that is similar, comparable or equivalent thereto (which shall conclusively be deemed waived), whether liquidated or unliquidated, fixed or contingent, matured or unmatured, known or unknown, foreseen or unforeseen, asserted or unasserted, accrued or unaccrued, existing or hereinafter arising, choate or inchoate, whether in law or equity, whether sounding in tort or contract or based on any other legal or equitable theory or principle (including fraud, negligence, gross negligence, recklessness, reckless disregard, deliberate ignorance, public or private nuisance, breach of fiduciary duty, avoidance, willful misconduct, veil piercing, alter-ego theories of liability, unjust enrichment, disgorgement, restitution, contribution, indemnification, right of subrogation and joint liability), whether *in rem*, *quasi in rem*, *in personam* or otherwise, or whether arising under federal or state statutory or common law, or any other applicable international, foreign or domestic law, rule, statute, regulation, treaty, right, duty, requirement or otherwise, regardless of where in the world accrued or arising, from the beginning of time, in each case, based on or relating to, or in any manner arising from, in whole or in part, the Debtors (as such Entities existed prior to or after the Petition Date), their Estates or the Chapter 11 Cases, including, without limitation, (i) the subject matter of, or the transactions or events giving rise to, any Claim or Interest that is treated in the Plan, (ii) the business or contractual arrangements or interactions between any Debtor and any Shareholder Released Party (including historical business or contractual arrangements or interactions, any direct or indirect distributions or transfers by any Debtor, and any exercise of any common law or contractual rights of setoff or recoupment by any Shareholder Released Party at any time on or prior to the Effective Date), (iii) any employment or retention of any Shareholder Released Party by the Debtors (including any service as a director, officer, executive, consultant or advisor to the Debtors or service in any similar capacity), (iv) any direct or indirect beneficial ownership of any equity interest in or debt obligation of the Debtors, (v) the Restructuring Transactions, (vi) the Pending Opioid Actions, (vii) Opioid-Related Activities or the Debtors' development, production, manufacture, licensing, labeling, marketing, advertising, promotion, distribution or sale of non-opioid products or the use or receipt of any proceeds therefrom, in each case, including the Debtors' interactions with regulators and regardless of where in the world any such activities or any result, loss, injury or damage resulting therefrom occurred, (viii) any past, present or future use or misuse of any opioid, whether sold by the Debtors or by NewCo or any of its Subsidiaries or otherwise, to the extent arising from an act, conduct, omission, event, transaction, occurrence or continuing condition in any way relating to any of the foregoing, (ix) the restructuring of any Claim or Interest before or during the Chapter 11 Cases, (x) the

Disclosure Statement and the Plan and related agreements, instruments and other documents (including the Plan Documents) and the negotiation, formulation, preparation or implementation thereof, (xi) the solicitation of votes with respect to the Plan, or (xii) any other act, conduct, omission, event, transaction, occurrence or continuing condition in any way relating to any of the foregoing. The Debtors, the Plan Administration Trust, the Master Disbursement Trust, the Creditor Trusts, NewCo, TopCo and any other newly-formed Persons that shall be continuing the Debtors' businesses after the Effective Date shall be bound, to the same extent the Debtors are bound, by the Shareholder Releases set forth in Section 10.7(a) of the Plan.

Notwithstanding anything herein to the contrary, (x) nothing in the Plan shall release any Excluded Claim; (y) nothing in Section 10.7(a) of the Plan shall be construed to impair in any way the Effective Date or post-Effective Date rights and obligations of any Person under the Plan, the Plan Documents, the Confirmation Order or the Restructuring Transactions, including the Shareholder Settlement Agreement and the Separation Agreements; and (z) upon the filing of a Notice of Shareholder Release Snapback, (A) the Shareholder Releases set forth in Section 10.7(a) of the Plan shall be entirely null and void, revoked and invalidated, as of the Effective Date, with respect to all members of the Breaching Shareholder Family Group and the Designated Shareholder Released Parties, (B) the *status quo ante* shall be restored in all respects for the Debtors and the Master Disbursement Trust with respect to the members of the Breaching Shareholder Family Group and the Designated Shareholder Released Parties (C) the Master Disbursement Trust shall be deemed to have received and accepted all of the rights with respect to any member of the Breaching Shareholder Family Group and the Designated Shareholder Released Parties, in each case, that the Debtors and their Estates had prior to the Effective Date and that the Master Disbursement Trust would have pursuant to the transfer of the MDT Shareholder Rights to the Master Disbursement Trust if the Shareholder Releases of Section 10.7(a) of the Plan had never been granted, which rights the Debtors and their Estates shall be deemed to have irrevocably transferred, granted and assigned to the Master Disbursement Trust; *provided* that, for the avoidance of doubt, notwithstanding the nullification, voiding, revocation and invalidation pursuant to the foregoing clause (A), the Shareholder Releases shall continue in effect for, and shall be fully enforceable by and for the benefit of, all other Shareholder Released Parties other than the Breaching Shareholder Family Group and the Designated Shareholder Released Parties.

"Shareholder Released Parties" means, collectively, (i) the Shareholder Payment Parties; (ii) the Persons identified on [Exhibit A to the Plan]; (iii) all Persons directly or indirectly owning an equity interest in any Debtor on the date on which such Debtor commenced its Chapter 11 Case; (iv) Sackler Family Members; (v) all trusts for the benefit of any of the Persons identified in the foregoing clause (iv) and the past, present and future trustees (including, without limitation, company trustees and members and managers of trustees that are corporate or limited liability company trustees), protectors and beneficiaries thereof, solely in their respective capacities as such; (vi) all Persons (other than the Debtors) in which any of the Persons identified in any of the foregoing clauses (i) through (v) own, directly or indirectly, an Interest and/or any other Person that has otherwise received or will receive grants, gifts, property or funds from any of the Persons identified in any of the foregoing clauses (i) through (v), solely in their respective capacities as such; and (vii) with respect to each Person in the foregoing clauses (i) through (vi), such Person's (A) predecessors, successors, permitted assigns, subsidiaries, controlled affiliates,

spouses, heirs, executors, estates and nominees, in each case solely in their respective capacities as such, (B) current and former officers and directors, principals, members, employees, financial advisors, attorneys (including, without limitation, attorneys retained by any director, in his or her capacity as such), accountants, investment bankers (including, without limitation, investment bankers retained by any director, in his or her capacity as such), consultants, experts and other professionals, solely in their respective capacities as such, and (C) property possessed or owned at any time or the proceeds therefrom, in each case excluding the Debtors and any Excluded Parties.

### *4.* *Shareholder Releases by Releasing Parties*

The Plan also provides for certain releases to be deemed granted by the Releasing Parties, including Holders of Claims against or Interests in the Debtors, in favor of the Shareholder Released Parties. Such release is provided for in Section 10.7(b) of the Plan.

Specifically, the Plan provides that the Shareholder Released Parties shall be conclusively, absolutely, unconditionally, irrevocably, fully, finally, forever and permanently released, subject to clause (z) of the last paragraph of Section 10.7(b) of the Plan, by the Releasing Parties and all other Persons from any and all Claims, claims, counterclaims, disputes, obligations, suits, judgments, damages, demands, debts, rights, Causes of Action, Liens, remedies, losses, contributions, indemnities, rights of subrogation, costs, liabilities, attorneys' fees and expenses, in each case, of any kind, character or nature whatsoever, including any derivative claims asserted or assertible by or on behalf of any Debtor or any of their Estates (including any Causes of Action arising under chapter 5 of the Bankruptcy Code) and including any claims that any Releasing Party, or that any other Person or party claiming under or through any Releasing Party, would have presently or in the future been legally entitled to assert in its own right (whether individually or collectively) or on behalf of any Releasing Party or any other Person, notwithstanding section 1542 of the California Civil Code or any law of any jurisdiction that is similar, comparable or equivalent thereto (which shall conclusively be deemed waived), whether liquidated or unliquidated, fixed or contingent, matured or unmatured, known or unknown, foreseen or unforeseen, asserted or unasserted, accrued or unaccrued, existing or hereinafter arising, choate or inchoate, whether in law or equity, whether sounding in tort or contract or based on any other legal or equitable theory or principle (including fraud, negligence, gross negligence, recklessness, reckless disregard, deliberate ignorance, public or private nuisance, breach of fiduciary duty, avoidance, willful misconduct, veil piercing, alter-ego theories of liability, unjust enrichment, disgorgement, restitution, contribution, indemnification, right of subrogation and joint liability), whether *in rem*, *quasi in rem*, *in personam* or otherwise, or whether arising under federal or state statutory or common law, or any other applicable international, foreign or domestic law, rule, statute, regulation, treaty, right, duty, requirement or otherwise, regardless of where in the world accrued or arising, from the beginning of time, in each case, based on or relating to, or in any manner arising from, in whole or in part, the Debtors (as such Entities existed prior to or after the Petition Date), their Estates or the Chapter 11 Cases, including, without limitation, (i) the subject matter of, or the transactions or events giving rise to, any Claim or Interest that is treated in the Plan, (ii) the business or contractual arrangements or interactions between any Debtor and any Shareholder Released Party (including historical business or contractual arrangements or interactions, any direct or indirect distributions or transfers by any Debtor, and any exercise of any common law or contractual rights of setoff or

recoupment by any Shareholder Released Party at any time on or prior to the Effective Date), (iii) any employment or retention of any Shareholder Released Party by the Debtors (including any service as a director, officer, executive, consultant or advisor to the Debtors or service in any similar capacity), (iv) any direct or indirect beneficial ownership of any equity interest in or debt obligation of the Debtors, (v) the Restructuring Transactions, (vi) the Pending Opioid Actions, (vii) Opioid-Related Activities or the Debtors' development, production, manufacture, licensing, labeling, marketing, advertising, promotion, distribution or sale of non-opioid products or the use or receipt of any proceeds therefrom, in each case, including the Debtors' interactions with regulators and regardless of where in the world any such activities or any result, loss, injury or damage resulting therefrom occurred, (viii) any past, present or future use or misuse of any opioid, whether sold by the Debtors or by NewCo or any of its Subsidiaries or otherwise, to the extent arising from an act, conduct, omission, event, transaction, occurrence or continuing condition in any way relating to any of the foregoing, (ix) the restructuring of any Claim or Interest before or during the Chapter 11 Cases, (x) the Disclosure Statement and the Plan and related agreements, instruments and other documents (including the Plan Documents) and the negotiation, formulation, preparation or implementation thereof, (xi) the solicitation of votes with respect to the Plan, or (xii) any other act, conduct, omission, event, transaction, occurrence or continuing condition in any way relating to any of the foregoing.

For the avoidance of doubt and without limitation of the foregoing, each Person that is a Governmental Unit or a Tribe shall be deemed to have released all Shareholder Released Claims that have been, are or could have been brought by (1) such Governmental Unit or Tribe in its own right, in its *parens patriae* or sovereign enforcement capacity, or on behalf of or in the name of another Person or (2) any other governmental official, employee, agent or representative acting or purporting to act in a *parens patriae*, sovereign enforcement or quasi-sovereign enforcement capacity, or any other capacity on behalf of such Governmental Unit or Tribe.

Notwithstanding anything herein to the contrary, (x) nothing in the Plan shall release any Excluded Claim; (y) nothing in Section 10.7(b) of the Plan shall be construed to impair in any way the Effective Date or post-Effective Date rights and obligations of any Person under the Plan, the Plan Documents, the Confirmation Order or the Restructuring Transactions, including the Shareholder Settlement Agreement and the Separation Agreements; and (z) upon the filing of a Notice of Shareholder Release Snapback, (A) the Shareholder Releases set forth in Section 10.7(b) of the Plan shall be entirely null and void, revoked and invalidated, as of the Effective Date, with respect to all members of the Breaching Shareholder Family Group and the Designated Shareholder Released Parties and (B) the *status quo ante* shall be restored in all respects for the Releasing Parties with respect to the members of the Breaching Shareholder Family Group and the Designated Shareholder Released Parties; *provided* that, for the avoidance of doubt, notwithstanding the nullification, voiding, revocation and invalidation pursuant to the foregoing clause (A), the Shareholder Releases shall continue in effect for, and shall be fully enforceable by and for the benefit of, all other Shareholder Released Parties other than the Breaching Shareholder Family Group and the Designated Shareholder Released Parties.

 5. *Shareholder Releases by Shareholder Released Parties*

The Plan also provides for the Shareholder Releasing Parties to provide reciprocal releases in favor of the Reciprocal Releasees. Such release is provided for in Section 10.7(c) of the Plan.

Specifically, the Plan provides that the Reciprocal Releasees shall be conclusively, absolutely, unconditionally, irrevocably, fully, finally, forever and permanently released, subject to clause (z) of the last paragraph of Section 10.7(c) of the Plan, by the Shareholder Released Parties from any and all Claims, claims, counterclaims, disputes, obligations, suits, judgments, damages, demands, debts, rights, Causes of Action, Liens, remedies, losses, contributions, indemnities, rights of subrogation, costs, liabilities, attorneys' fees and expenses, in each case, of any kind, character or nature whatsoever, including any derivative claims asserted or assertible by or on behalf of any Debtor or any of their Estates (including any Causes of Action arising under chapter 5 of the Bankruptcy Code) and including any claims that any Shareholder Released Party, or that any other Person or party claiming under or through any Shareholder Released Party or any other Person, would have presently or in the future been legally entitled to assert in its own right (whether individually or collectively) or on behalf of any Shareholder Released Party or any other Person, notwithstanding section 1542 of the California Civil Code or any law of any jurisdiction that is similar, comparable or equivalent thereto (which shall conclusively be deemed waived), whether liquidated or unliquidated, fixed or contingent, matured or unmatured, known or unknown, foreseen or unforeseen, asserted or unasserted, accrued or unaccrued, existing or hereinafter arising, choate or inchoate, whether in law or equity, whether sounding in tort or contract or based on any other legal or equitable theory or principle (including fraud, negligence, gross negligence, recklessness, reckless disregard, deliberate ignorance, public or private nuisance, breach of fiduciary duty, avoidance, willful misconduct, veil piercing, alter-ego theories of liability, unjust enrichment, disgorgement, restitution, contribution, indemnification, right of subrogation and joint liability), whether *in rem, quasi in rem, in personam* or otherwise, or whether arising under federal or state statutory or common law, or any other applicable international, foreign or domestic law, rule, statute, regulation, treaty, right, duty, requirement or otherwise, regardless of where in the world accrued or arising, from the beginning of time, in each case, based on or relating to, or in any manner arising from, in whole or in part, the Debtors (as such Entities existed prior to or after the Petition Date), their Estates or the Chapter 11 Cases, including, without limitation, (i) the subject matter of, or the transactions or events giving rise to, any Claim or Interest that is treated in the Plan, (ii) the business or contractual arrangements or interactions between any Debtor and any Shareholder Released Party (including historical business or contractual arrangements or interactions, any direct or indirect distributions or transfers by any Debtor, and any exercise of any common law or contractual rights of setoff or recoupment by any Shareholder Released Party at any time on or prior to the Effective Date), (iii) any employment or retention of any Shareholder Released Party by the Debtors (including any service as a director, officer, executive, consultant or advisor to the Debtors or service in any similar capacity), (iv) any direct or indirect beneficial ownership of any equity interest in or debt obligation of the Debtors, (v) the Restructuring Transactions, (vi) the Pending Opioid Actions, (vii) Opioid-Related Activities or the Debtors' development, production, manufacture, licensing, labeling, marketing, advertising, promotion, distribution or sale of non-opioid products or the use or receipt of any proceeds therefrom, in each case, including the Debtors' interactions with regulators and regardless of where in the world any such activities or any result, loss, injury or damage resulting therefrom occurred, (viii) any past, present or future use or misuse of any opioid, whether sold by the

Debtors or by NewCo or any of its Subsidiaries or otherwise, to the extent arising from an act, conduct, omission, event, transaction, occurrence or continuing condition in any way relating to any of the foregoing, (ix) the restructuring of any Claim or Interest before or during the Chapter 11 Cases, (x) the Disclosure Statement and the Plan and related agreements, instruments and other documents (including the Plan Documents) and the negotiation, formulation, preparation or implementation thereof, (xi) the solicitation of votes with respect to the Plan, or (xii) any other act, conduct, omission, event, transaction, occurrence or continuing condition in any way relating to any of the foregoing.

Notwithstanding anything herein to the contrary, (x) nothing in the Plan shall release any Excluded Claim; (y) nothing in Section 10.7(c) of the Plan shall be construed to impair in any way the Effective Date or post-Effective Date rights and obligations of any Person under the Plan, the Plan Documents, the Confirmation Order or the Restructuring Transactions, including the Shareholder Settlement Agreement and the Separation Agreements including the rights of any Shareholder Released Party that is a current or former director, officer or employee of the Debtors but is not a Sackler Family Member relating to plan treatment of any claims held by such party; and (z) upon the filing of a Notice of Shareholder Release Snapback and the commencement or continuation of any action or proceeding against a member of a Breaching Shareholder Family Group or a Designated Shareholder Released Party by any Reciprocal Releasee, (A) the releases set forth in Section 10.7(c) of the Plan of any Reciprocal Releasee that has commenced or continued any such action shall be entirely null and void, revoked and invalidated, as of the Effective Date, with respect to the members of the Breaching Shareholder Family Group and the Designated Shareholder Released Parties and (B) the *status quo ante* shall be restored in all respects for the members of the Breaching Shareholder Family Group and the Designated Shareholder Released Parties with respect to any Reciprocal Releasee that has commenced or continued any such litigation; *provided* that, for the avoidance of doubt, notwithstanding the nullification, voiding, revocation and invalidation pursuant to the foregoing clause (A), the releases set forth in Section 10.7(c) of the Plan shall continue in effect for, and shall be fully enforceable by and for the benefit of, all other Reciprocal Releasees, and shall be binding on, and enforceable against, all other Shareholder Released Parties, including any members of the Breaching Shareholder Family Group with respect to any Reciprocal Releasee that has not commenced any such litigation.

## G.    Confirmation of the Plan

### 1.    *Requirements*

The requirements for confirmation of the Plan are set forth in section 1129 of the Bankruptcy Code.  The requirements for approval of the Disclosure Statement are set forth in section 1125 of the Bankruptcy Code.

### 2.    *Approval of the Plan and Confirmation Hearing*

To confirm the Plan, the Bankruptcy Court must hold a hearing to determine whether the Plan meets the requirements of section 1129 of the Bankruptcy Code.

### 3.    *Treatment and Classification of Claims and Interests*

A Claim or Interest is placed in a particular Class for all purposes, including voting, confirmation and Distributions under the Plan and under sections 1122 and 1123(a)(1) of the Bankruptcy Code. A Claim or Interest is classified in a particular Class for the purpose of receiving Distributions pursuant to the Plan only to the extent such Claim or Interest qualifies within the description of that Class and is classified in other Classes to the extent any portion of the Claim or Interest qualifies within the description of such other Classes; *provided* that, to the extent any Claim satisfies the definition of a Shareholder Claim, a Co-Defendant Claim or an Other Subordinated Claim, such Claim shall be classified as such, notwithstanding that such Claim may satisfy the definition of another type of Claim. A Claim or Interest is also classified in a particular Class for the purpose of receiving Distributions under the Plan only to the extent such Claim or Interest is an Allowed Claim or Allowed Interest in that Class and such Claim or Interest has not been satisfied, released or otherwise settled prior to the Effective Date. In no event shall any Holder of an Allowed Claim be entitled to receive payments under the Plan that, in the aggregate, exceed the Allowed amount of such Holder's Claim.

### 4.    *Only Impaired Classes Vote*

Pursuant to the provisions of the Bankruptcy Code, only classes of claims or interests that are "impaired" (as defined in section 1124 of the Bankruptcy Code) under a plan may vote to accept or reject such plan.  Generally, a claim or interest is impaired under a plan if the applicable holder's legal, equitable, or contractual rights are modified under such plan.  In addition, if the holders of claims or interests in an impaired class do not receive or retain any property under a plan on account of such claims or interests, such impaired class is deemed to have rejected such plan under section 1126(g) of the Bankruptcy Code and, therefore, such holders are not entitled to vote on such plan.

Under the Plan, holders of Claims in Classes 3, 4, 5, 6, 7, 8, 9, 10(a), 10(b) and 11(c) are impaired and are entitled to vote on the Plan.

Under the Plan, holders of Claims and Interests in Classes 1, 2, 11(a) and 11(b) are unimpaired and therefore, deemed to accept the Plan.

Under the Plan, holders of Claims and Interests in Classes 13, 14, 15, 16 and 17 are impaired and will not receive or retain any property under the Plan on account of their Claims or Interests in such classes and, therefore, are (i) not entitled to vote on the Plan and (ii) deemed to reject the Plan.

Under the Plan, holders of Claims and Interests in Classes 12 and 18 are either conclusively presumed to have accepted the Plan or are deemed to have rejected the Plan. Accordingly, such Holders are not entitled to vote to accept or reject the Plan.

ACCORDINGLY, A BALLOT FOR ACCEPTANCE OR REJECTION OF THE PLAN IS BEING PROVIDED ONLY TO HOLDERS OF CLAIMS IN CLASSES 3, 4, 5, 6, 7, 8, 9, 10(A), 10(B) AND 11(C).

**H.      Voting Procedures and Voting Deadline**

If you are entitled to vote to accept or reject the Plan, a Ballot is enclosed for the purpose of voting on the Plan.  To ensure your vote is counted, you must complete, date, sign, and promptly mail the Ballot enclosed with the notice or complete your Ballot using the online portal maintained by the solicitation agent (the "**Solicitation Agent**"), in each case indicating your decision to accept or reject the Plan in the boxes provided.

TO BE COUNTED, YOUR BALLOT INDICATING YOUR ACCEPTANCE OR REJECTION OF THE PLAN MUST BE RECEIVED BY THE SOLICITATION AGENT NO LATER THAN 4:00 P.M. (PREVAILING EASTERN TIME) ON **JULY 14, 2021** (THE "**VOTING DEADLINE**").

In order for the Plan to be accepted by an impaired Class of Claims, a majority in number and two-thirds in dollar amount of the Claims voting in such Class must vote to accept the Plan. At least one Voting Class, excluding the votes of insiders, must actually vote to accept the Plan.

YOU ARE URGED TO COMPLETE, DATE, SIGN, AND PROMPTLY MAIL THE BALLOT ENCLOSED WITH THE NOTICE OR COMPLETE YOUR BALLOT USING THE ONLINE PORTAL MAINTAINED BY THE SOLICITATION AGENT.  PLEASE BE SURE TO COMPLETE THE BALLOT PROPERLY AND LEGIBLY AND TO IDENTIFY THE EXACT AMOUNT OF YOUR CLAIM AND THE NAME OF THE HOLDER.  IF YOU ARE A HOLDER OF A CLAIM ENTITLED TO VOTE ON THE PLAN AND YOU DID NOT RECEIVE A BALLOT, YOU RECEIVED A DAMAGED BALLOT, OR YOU LOST YOUR BALLOT, OR IF YOU HAVE ANY QUESTIONS CONCERNING THE DISCLOSURE STATEMENT, THE PLAN, OR PROCEDURES FOR VOTING ON THE PLAN, PLEASE CONTACT THE SOLICITATION AGENT AT (844) 217-0912 (DOMESTIC TOLL-FREE) OR (347) 859-8093 (IF CALLING FROM OUTSIDE THE U.S. OR CANADA) OR AT PURDUEPHARMABALLOTS@PRIMECLERK.COM.  THE SOLICITATION AGENT IS NOT AUTHORIZED TO PROVIDE LEGAL ADVICE AND WILL NOT PROVIDE ANY SUCH ADVICE.

**I.      Disclosure Statement Enclosures**

Accompanying this Disclosure Statement is a ballot (the "**Ballot**") for voting to accept or reject the Plan if you are the record holder of a Claim in a Class entitled to vote on the Plan (each, a "**Voting Class**").

**J.      Confirmation Hearing**

The Bankruptcy Court has scheduled a hearing to consider confirmation of the Plan (the "**Confirmation Hearing**").  The Confirmation Hearing will take place on August 9, 2021 at 10:00 a.m. (prevailing Eastern time).  Parties in interest will have the opportunity to object to the confirmation of the Plan at the Confirmation Hearing.

# ARTICLE II

# GENERAL INFORMATION REGARDING THE DEBTORS

## A.    The Debtors' Businesses, Structure, Management, and Employees

### 1.    *Overview*

The Debtors operate three main business segments through a number of operating subsidiaries: a branded prescription medication business, a generic prescription medication business, and an over-the-counter health and wellness business. The branded prescription medications business consists of both opioid and non-opioid medications, including investment in a robust and diversified pipeline of non-opioid investigative candidates that have the potential to address many serious medical conditions, as described in more detail below. In addition, as part of their commitment to advancing meaningful solutions to the opioid crisis, the Debtors continue to develop, and plan to have NewCo distribute on a nonprofit basis, opioid overdose reversal and addiction treatment medications (the "**Public Health Initiative**").

Purdue Pharma L.P., a Delaware limited partnership headquartered in Stamford, Connecticut, is the Debtors' main operating entity. Purdue Pharma's general partner is Purdue Pharma Inc. Purdue Pharma also has 22 wholly owned operating and nonoperating subsidiaries in the United States and the British Virgin Islands ("**Purdue Subsidiaries**"). An organizational chart setting forth this corporate structure is provided in **Appendix E**. Purdue Pharma and its direct and indirect subsidiaries other than the Rhodes Debtors (defined below) (the "**Purdue Debtors**") primarily operate a branded pharmaceuticals business, while Debtor Rhodes Associates L.P. and its direct and indirect subsidiaries (the "**Rhodes Debtors**") primarily develop and distribute generic pharmaceutical products. The Debtors are managed by a single board of directors and are wholly owned by the same ultimate owners: various trusts for the benefit of the descendants of Mortimer and Raymond Sackler.

### (i)    **Branded Prescription Medication Business**

The Debtors' branded prescription pharmaceutical business, operated by the Purdue Debtors, consists of both opioid and non-opioid medications. The Debtors' three principal branded opioid medications are OxyContin®, Hysingla ER®, and Butrans®:

- OxyContin Extended-Release Tablets: OxyContin is a Schedule II extended-release, long-acting opioid analgesic. Its active pharmaceutical ingredient ("**API**") is oxycodone.[2229] OxyContin received United States Food and Drug Administration ("**FDA**") approval in 1995 and was launched in 1996. In 2010, the FDA approved, and the Purdue Debtors began selling, a new abuse-deterrent formulation of OxyContin formulated with physical and chemical properties intended to make abuse by injection difficult and to reduce abuse via the intranasal route.

---

[2229]  *See* U.S. Food and Drug Admin., OxyContin Full Prescribing Information, at 1 (Sept. 26, 2018), https://www.accessdata.fda.gov/drugsatfda_docs/label/2018/022272s039lbl.pdf (hereinafter "**OxyContin FPI**").

- Hysingla ER Extended-Release Tablets: Hysingla ER is a Schedule II extended-release, long-acting, abuse-deterrent opioid analgesic formulated with physical and chemical properties intended to make abuse by injection difficult and to reduce abuse via the intranasal route.  Its API is hydrocodone.  Hysingla ER was approved by the FDA in 2014 and was launched in 2015.

- Butrans Transdermal System: Butrans is a Schedule III,[2330] seven-day, transdermal patch pain medication.  Its API is buprenorphine.[2431] Butrans was approved by the FDA in 2010 and launched in 2011.

The Purdue Debtors manufacture OxyContin and Hysingla for themselves and, in relatively limited amounts, manufacture OxyContin for certain foreign independent associated companies ultimately owned by the Sackler Families ("**IACs**").  Purdue Pharma also receives royalties from foreign IACs for sales of OxyContin outside the United States.  Butrans is manufactured by a third party, LTS Lohmann Therapie-Systeme AG.

The FDA continues to strike a careful balance between the necessity of OxyContin and other opioid pain medications and the associated risks of misuse, abuse, and addiction.[2532] While OxyContin is approved for the management of pain severe enough to require daily, around-the-clock, long-term opioid treatment and for which alternative treatment options are inadequate, it is required to carry a label with a type of warning—commonly referred to as a black box warning—that is designed to call attention to serious or life-threatening risks.  OxyContin carries the following black box warning:

---

[2330] Schedule III drugs are defined as "drugs with a moderate to low potential for physical and psychological dependence," according to the U.S. Drug Enforcement Administration ("**DEA**").  *See* U.S. Drug Enf't Admin., Drug Schedule (last visited Sept. 15, 2019), https://www.dea.gov/drug-scheduling.

[2431] *See* U.S. Food and Drug Admin., Butrans Full Prescribing Information, at 1 (Sept. 18, 2018), https://www.accessdata.fda.gov/drugsatfda_docs/label/2018/021306s032s034lbl.pdf (hereinafter "**Butrans FPI**").

[2532] *See* Press Release, U.S. Food and Drug Admin., Statement of FDA Commissioner Scott Gottlieb, M.D., on balancing access to appropriate treatment for patients with chronic and end-of-life pain with need to take steps to stem misuse and abuse of opioids (July 9, 2018), https://www.fda.gov/news-events/press-announcements/statement-fda-commissioner-scott-gottlieb-md-balancing-access-appropriate-treatment-patients-chronic. ("[T]he FDA remains focused on striking the right balance between reducing the rate of new addiction by decreasing exposure to opioids and rationalizing prescribing, while still enabling appropriate access to those patients who have legitimate medical need for these medicines.").

---

**WARNING: ADDICTION, ABUSE AND MISUSE; LIFE-THREATENING RESPIRATORY DEPRESSION; ACCIDENTAL INGESTION; NEONATAL OPIOID WITHDRAWAL SYNDROME; and CYTOCHROME P450 3A4 INTERACTION**
*See full prescribing information for complete boxed warning.*

- **OXYCONTIN exposes users to risks of addictions, abuse and misuse, which can lead to overdose and death. Assess each patient's risk before prescribing and monitor regularly for development of these behaviors and conditions. (5.1)**
- **Serious, life-threatening, or fatal respiratory depression may occur. Monitor closely, especially upon initiation or following a dose increase. Instruct patients to swallow OXYCONTIN tablets whole to avoid exposure to a potentially fatal dose of oxycodone. (5.2)**
- **Accidental ingestion of OXYCONTIN, especially in children, can result in a fatal overdose of oxycodone. (5.2)**
- **Prolonged use of OXYCONTIN during pregnancy can result in neonatal opioid withdrawal syndrome, which may be life-threatening if not recognized and treated. If opioid use is required for a prolonged period in a pregnant woman, advise the patient of the risk of neonatal opioid withdrawal syndrome and ensure that appropriate treatment will be available. (5.3)**
- **Initiation of CYP3A4 inhibitors (or discontinuation of CYP3A4 inducers) can result in a fatal overdose of oxycodone from OXYCONTIN. (5.14)**

---

In addition to prescription opioid medications, Purdue Pharma sells, through a subsidiary, a Schedule II, non-opioid branded prescription medication for the management of attention deficit hyperactivity disorder.

Purdue Pharma has also invested—and continues to invest—substantial resources in its pipeline of non-opioid investigative candidates that have the potential to address many serious medication conditions, including difficult-to-treat blood cancers, solid cancers, and central nervous system cancers, overactive bladder, chronic low back pain, bladder pain and insomnia associated with alcohol cessation. For example, Tinostamustine, a potentially first-in-class alkylating deacetylase inhibiting molecule in development for the treatment of certain cancers, is in Phase II trials; IMB-115, an internally discovered compound with a novel mechanism of action in clinical development for the treatment of insomnia associated with alcohol cessation has recently completed a phase 2 proof of concept study which has demonstrated that the drug is efficacious, and is now being progressed to larger phase 3 studies, as well as commencing Phase 1 studies in indications for over active bladder and interstitial cystitis; and ALV-107, which promises fast-acting, targeted, safe and long-acting relief of bladder pain, is soon to begin Phase I-B trials.

        (ii)      **Generic Prescription Medication Business / API Business**

           a.      Rhodes Pharmaceuticals L.P.

The Debtors' generic prescription pharmaceutical business is operated by Purdue Pharma subsidiary Rhodes Pharmaceuticals L.P. ("**Rhodes Pharma**"), a Delaware limited partnership created in late 2007. Rhodes Pharma, which until May 2019 was separately managed from Purdue, *see* Article II.A..1.(ii).c, *infra*, sells a variety of generic prescription medications, including opioid (principally immediate-release) pain relievers.[2633] Rhodes Pharma does not have—and never has had—sales representatives promote or market its opioid drugs to prescribers or patients.

Rhodes Pharma also sells generic non-opioid medications, such as medications to treat attention deficit hyperactivity disorder, high cholesterol, and depression. A Purdue Pharma subsidiary and other non-Debtor entities manufacture finished dosage forms for Rhodes Pharma.

b.        Rhodes Technologies

Rhodes Technologies ("**Rhodes Tech**"), a Delaware general partnership, also became a Purdue Pharma subsidiary (as of May 2019) and a Debtor in the Chapter 11 Cases. Prior to December 31, 2020, Rhodes Tech manufactured active pharmaceutical ingredients (referred to as APIs) that Purdue Pharma used to manufacture its branded finished products and some of Rhodes Pharma's generic finished products.

As further described in Article III.L, on October 1, 2020, the Bankruptcy Court entered an order approving the sale of assets of Rhodes Tech to Noramco Coventry LLC and approving the Debtors' entry into a supply agreement (the "**Supply Agreement**") with Noramco LLC. The Supply Agreement secures provision of APIs to the Debtors for a minimum of seven years, with two two-year renewal options. Noramco LLC is an experienced API manufacturer with the capability to ensure high-quality supply at a cost substantially lower than previously incurred through the vertically integrated structure. The sale transaction closed and the parties entered into the Supply Agreement on December 31, 2020.

c.        The Rhodes Entities Were Managed Separately Prior to May 2019

Prior to 2008, Rhodes Tech (or its predecessor) was a subsidiary of Purdue Pharma. On or around January 1, 2008, Rhodes Tech was moved to a different Sackler Families ownership chain (through Purdue Pharma's distribution of its interest in Rhodes Tech's parent to an affiliate) though with the same ultimate owners. Rhodes Tech then came under common ownership with newly created Rhodes Pharma. Until May 2019, Rhodes Pharma and Rhodes Tech were separately managed by different boards of directors from that of Purdue Pharma.[2734]

---

[2633] Starting in 2017, Purdue Pharma authorized Rhodes Pharma to sell an authorized generic of Butrans (opioid transdermal patch) in exchange for a profit share. Rhodes Pharma's authorized generic Butrans has been sold as a generic product and never promoted to prescribers or patients. Moreover, although Rhodes Pharma's portfolio of products is composed mostly of generic products, in 2015, Rhodes Pharma expanded into a branded prescription product, Aptensio XR, a once-daily extended-release central nervous system stimulant (methylphenidate) indicated for the treatment of attention deficit hyperactivity disorder. Additionally, since 2017, Rhodes Pharma has sold MS Contin and Dilaudid branded opioid pain medications, which were contributed to Rhodes Pharma by Purdue. Rhodes Pharma has never promoted any Dilaudid or MS Contin product to prescribers or patients.

[2734] Prior to May 2019, some Rhodes Pharma and Rhodes Tech directors served as directors or officers of Purdue Pharma.

The ultimate owners of these Rhodes entities, however, have always been the same as Purdue Pharma's—various trusts for benefit of the Sackler Families.

In May 2019, Rhodes Pharma and Rhodes Tech were contributed to Purdue Pharma, becoming subsidiaries of PPLP. Thus, from and after that date, PPI effectively managed Rhodes Pharma and Rhodes Tech. This reorganization was undertaken, among other reasons, to achieve cost and operational efficiencies and so that a single board and management team would be at the helm of the U.S. pharmaceutical businesses in order to, among other things, help facilitate a complex settlement process, including one that potentially could be implemented through chapter 11.

### (iii)    Over-the-Counter Health and Wellness Business

Avrio Health L.P. ("**Avrio**"), a Delaware limited partnership and also a Purdue Pharma subsidiary, operates the Debtors' over-the-counter ("**OTC**") business.[2835] OTC products are FDA-regulated but do not require prescriptions. Avrio's primary products are Betadine (an antiseptic), Senokot and Colace (laxatives), and SlowMag (a supplement). Avrio has no role in the Debtors' branded or generic prescription medication business.

### (iv)    Public Health Initiatives:  Opioid Overdose Reversal and Addiction Treatment Medications

As part of their commitment to advance meaningful solutions to the opioid crisis, the Debtors are pursuing three initiatives: developing and distributing at low or no cost two medications to treat opioid overdoses and a medication to treat opioid addiction. Leading public health officials have encouraged the development of certain of these types of medications, and the Debtors have offered to develop and distribute millions of doses of each at no or low cost to communities throughout the country. During the Chapter 11 Cases, the Debtors have made substantial progress on these initiatives, and the Bankruptcy Court has authorized certain steps that have facilitated that progress.

First, the Debtors are developing emergency opioid overdose treatments containing the opioid antagonist nalmefene.[2936] Emergency opioid overdose rescue drugs, when timely administered, can quickly restore normal respiration to a person whose breathing has slowed or stopped as a result of overdosing with a prescription or illicit opioid.[3037] Synthetic opioids, such as illicit fentanyl and its analogues, are a principal driver of today's epidemic of opioid overdose

---

[2835]  Avrio engages in the marketing, sale, and distribution of four principal and well-known OTC medications: Betadine (an antiseptic that Purdue's predecessor developed 50 years ago for use at home and in hospitals, and which is an important defense against topical infections); Colace and Peri-Colace, now called Colace 2-IN-1 (stool softeners and stool stimulants to treat occasional constipation); Senokot (a laxative for occasional constipation); and SlowMag (a magnesium supplement with high-absorption magnesium chloride plus calcium).

[2936]  Opioid antagonists block or reverse the effects of opioids, including potentially fatal respiratory depression. *See* Nat'l Inst. on Drug Abuse, Medications to Treat Opioid Use Disorder (June 2018), https://www.drugabuse.gov/publications/research-reports/medications-to-treat-opioid-addiction/how-do-medications-to-treat-opioid-addiction-work.

[3037]  *See* U.S. Nat'l. Inst. on Drug Abuse, Opioid Overdose Reversal with Naloxone (Narcan, Evzio) (Apr. 2018), https://www.drugabuse.gov/related-topics/opioid-overdose-reversal-naloxone-narcan-evzio.

deaths.[3138] Doses of existing opioid overdose reversal medications that could reverse prescription opioid or heroin overdoses may not be sufficiently strong or long-lasting to reverse the effects of fentanyl (which is 50 times more potent than heroin).[3239]  For this reason, the Directors of the National Institutes of Health and the National Institute on Drug Abuse have called for the development of "stronger, longer-acting formulations of antagonists."[3340]

In response to that need, the Debtors are developing an opioid overdose reversal medication containing nalmefene,[3441] a strong, long-acting opioid antagonist, in three different injectable forms: (1) a vial, (2) a pre-filled syringe, each for use by healthcare professionals and certain first responders, and (3) an autoinjector, an easy-to-use EpiPen®-like device, for use by friends, family, and caregivers without medical training, as well as by healthcare professionals and first responders. The FDA has granted all three forms of nalmefene expedited regulatory status, thus accelerating the regulatory process. For example, in February of 2019, the FDA granted the Debtors' nalmefene autoinjector "Fast Track" status. Fast Track is a formal designation by the FDA to expedite review and facilitate development of new drugs that the FDA determines are intended to treat a serious or life-threatening condition and fulfill an unmet medical need.  The FDA also granted priority review (including expediting the target date by which to review) to an application for the approval of the nalmefene vial that the Debtors filed during these Chapter 11 Cases in December 2020.

On February 21, 2020, the Bankruptcy Court authorized an important element of the Debtors' nalmefene development program when it approved the Debtors' entry into an agreement with a technology partner to develop the nalmefene autoinjector. *See Order (I) Shortening Notice with Respect to Debtors' Motion for Authorization to Enter into Development Agreement and (II) Authorizing Entry into Development Agreement* [D.I. 868].

The Debtors believe that a settlement that enables them to continue to develop and, if approved by the FDA, distribute millions of doses of all three forms of injectable nalmefene, at no or low cost, to communities and individuals throughout the country could provide great benefit to the public health.

Second, the Debtors are aiding the development of a low-cost, non-prescription (over-the-counter or "**OTC**") naloxone nasal spray to reverse known or suspected opioid overdose. Although intranasal naloxone is currently available to consumers under the brand name Narcan®, access is limited because of Narcan's relatively high cost to consumers and first responders, and because of the requirement that consumers, when obtaining Narcan from a pharmacy, must get this prescription medication from a pharmacist.  Even if a pharmacy stocks Narcan, this interaction can be difficult for the patient due to the ongoing stigma related to opioid use and addiction.   Recognizing the importance of increasing access to naloxone, the FDA has

---

[3138]    *See* Centers for Disease Control and Prevention, Opioid Overdose: Understanding the Epidemic, https://www.cdc.gov/drugoverdose/epidemic/index.html.

[3239]  *See* Volkow N., Collins F*., The Role of Science in Addressing the Opioid Crisis,* N. Engl. J. Med. 377:4  (July 27, 2017), https://www.nejm.org/doi/full/10.1056/NEJMsr1706626.

[3340]  *Id.*

[3441]   A prior version of nalmefene was previously approved by the FDA and later withdrawn from sale by the manufacturer for reasons other than safety or effectiveness. Department of Health and Human Services; Food and Drug Administration. 82 Federal Register 51282 (November 3, 2017).

encouraged pharmaceutical companies to develop an OTC version of intranasal naloxone, including by taking the unprecedented step of developing a model Drug Facts label for the product and conducting the comprehensive testing that drug companies normally must complete themselves to demonstrate that the instructions on the label are simple to follow.[35][42]

Consistent with the FDA's encouragement, the Debtors are working with Harm Reduction Therapeutics ("**HRT**"), an independent pharmaceutical company seeking nonprofit status, to develop a low-cost OTC naloxone nasal spray.  By reducing the cost to consumers and first responders, and allowing consumers to acquire the medication without the shame or fear of needing to procure a prescription or speak with a pharmacist, the Debtors hope to greatly improve access to this needed medication.  To facilitate bringing this low-cost OTC medication to market, the Debtors have paid for HRT's development costs.  On June 25, 2020, the Court entered the *Order Authorizing Debtors to Enter into Funding Agreement* [D.I. 1301], which authorized the Debtors to continue funding certain of those costs.  The Debtors anticipate that it may be necessary to request authority to provide additional funding to HRT prior to confirmation of the Plan.  To provide further assistance, the Debtors have licensed to HRT valuable technical know-how and data and provided regulatory and drug development advice. During the pendency of the Debtors' bankruptcy, HRT has continued to progress the development of OTC naloxone. For example, in January 2021, HRT concluded what is expected to be the sole clinical trial needed for FDA approval.  If and when this medication is approved by the FDA, the Debtors intend to provide millions of doses at low or no cost to help combat the opioid crisis.

Third, during the Chapter 11 Cases, the Debtors, through Rhodes Pharma, have already developed, obtained FDA approval, and manufactured a generic version of Suboxone®[36][43] tablets, a leading opioid addiction treatment consisting of a combination of buprenorphine and naloxone.  Despite evidence that medication-assisted treatment can help many people recover from opioid addiction, these medications remain underutilized, and the cost of treatment is one of the barriers to access.[37][44]  To help ensure broader access, the FDA has facilitated the entry of generic versions of these medicines,[38][45] and, in March of 2020, approved the Debtors' generic version of Suboxone tablets. To increase access to these treatments, the Debtors intend to distribute tens of millions of doses of their buprenorphine/naloxone tablets at low or no cost.

---

[35][42] U.S. Food & Drug Administration, Statement from FDA Commissioner Scott Gottlieb, M.D., on unprecedented new efforts to support development of over-the-counter naloxone to help reduce opioid overdose deaths, https://www.fda.gov/news-events/press-announcements/statement-fda-commissioner-scott-gottlieb-md-unprecedented-new-efforts-support-development-over.

[36][43] *See* https://dailymed.nlm.nih.gov/dailymed/fda/fdaDrugXsl.cfm?setid=da90618a-5621-4b15-bc48-9dcc631418de&type=display.

[37][44] Centers for Disease Control and Prevention, CDC Guideline for Prescribing Opioids for Chronic Pain – United States, 2016, https://www.cdc.gov/mmwr/volumes/65/rr/rr6501e1.htm (though "buprenorphine has been shown to be more effective in preventing relapse among patients with opioid use disorder, ... patient cost can be a barrier to buprenorphine treatment because insurance coverage of buprenorphine for opioid use disorder is often limited"); *see* National Institutes of Health, Methadone and buprenorphine reduce risk of death after opioid overdose, https://www.nih.gov/news-events/news-releases/methadone-buprenorphine-reduce-risk-death-after-opioid-overdose.

[38][45] U.S. Food & Drug Administration, www.fda.gov/news-events/press-announcements/fda-approves-first-generic-versions-suboxone-sublingual-film-which-may-increase-access-treatment.

(v)     **Purdue Pharma Inc.**

PPI is the general partner of Purdue Pharma, and the board of directors of PPI ("**Board**") effectively manages the Debtors.[3946]

*2.     Management*

The Debtors' current management team is composed of highly capable and experienced professionals.  Information regarding the Debtors' senior management is as follows:

| Name | Position |
| --- | --- |
| Craig Landau | President and Chief Executive Officer |
| Jon Lowne | Executive Vice President, Chief Financial Officer |
| Marc L. Kesselman | Executive Vice President, General Counsel |
| David Lundie | Chief Technical Operations Officer |
| Vincent Mancinelli | President, Rhodes Pharmaceuticals L.P. |

(i)     **Craig Landau**

Craig Landau, M.D. has served as Chief Executive Officer and President at Purdue Pharma since June 2017.  Under his leadership, the company voluntarily stopped promoting opioid pain medications to prescribers through sales representatives and via other channels, such as in medical journals, eliminated its opioid medication sales force and has taken meaningful action to address the opioid crisis through research and development as well as through multiple partnerships and other initiatives organized under the company's office of Corporate Social Responsibility. Additionally, he has established several wholly owned operating subsidiaries through which Purdue will develop its emerging portfolio of prescription and non-prescription products and further advance its R&D pipeline in the areas of oncology, CNS, and non-opioid pain.

Dr. Landau joined Purdue Pharma in October 1999 as an Associate Medical Director within the research and development group, until his appointment as President and CEO of Purdue Pharma (Canada) in 2013, and held roles of increasing responsibility within the R&D organization.  Prior to this role in Canada, Craig's U.S. company responsibilities included clinical development, regulatory affairs, risk management as well as R&D innovation.  In these roles, he and his organization were responsible for supporting important health policy initiatives as well as product development and registrations in the U.S. and other regions.

Prior to joining Purdue, he held positions of increasing responsibility for analgesic drug development within the Clinical R&D and Medical Affairs group at Knoll Pharmaceutical Company.

---

[3946]  As illustrated in **Appendix E**, the Purdue Subsidiaries have PPI as a general partner, are indirectly controlled by PPI pursuant to PPI's being a general partner of another Purdue subsidiary, or have Purdue Pharma, directly or indirectly, as their ultimate sole shareholder.

Dr. Landau earned his B.S. in physiology and anatomy from Cornell University and his M.D. from Mount Sinai School of Medicine. He completed his Anesthesiology residency at Yale University with specialty training in chronic pain management, obstetric and peripheral vascular anesthesia.

Dr. Landau is also a U.S. Army veteran, with 14 years of distinguished service as an officer throughout Operation Iraqi Freedom and Operation Enduring Freedom, concluding in 2005. He has advised and served on multiple boards for foundations and nonprofit organizations focusing on rare diseases such as Friedreich ataxia, Adrenoleukodystrophy, and Duchenne Muscular Dystrophy. He has most recently served as Purdue's Ambassador for the American Cancer Society's Real Men Wear Pink of Fairfield County Class of 2018.

(ii)    **Jon Lowne**

Jon Lowne has served as Chief Financial Officer of Purdue Pharma since March 2018.

Mr. Lowne joined the company in 1995 after eight years with Price Waterhouse, working in the audit and business advisory group. Jon worked out of the London, England; Warsaw, Poland; Stamford, CT; and Morristown, NJ offices and gained experience in financial accounting, audit, taxation and due diligence reviews of acquisitions and divestitures across the U.S., the U.K., and Eastern Europe.

Mr. Lowne began his career at Purdue Pharma as Senior Internal Auditor. Mr. Lowne has gained increasing responsibility and over his tenure at Purdue Pharma, serving as Controller from 2005 to July 2017 and Acting CFO from August 2017 to February 2018 before accepting his current role. He is responsible for Finance, IT, Tax and Procurement. In his current role, Mr. Lowne provides leadership, management and strategic direction for all finance, accounting, treasury, risk management, procurement, tax, information technology services and operations, as well as financial planning and analysis. In his prior role as controller, Mr. Lowne directed and coordinated company financial planning and budget functions, oversaw the daily operations of the finance functions, and managed internal and external financial reporting processes, among other responsibilities.

Mr. Lowne earned his Bachelor's degree in industrial economics and accounting at Nottingham University, England. He became a Chartered Accountant in 1990.

(iii)    **Marc L. Kesselman**

Marc L. Kesselman was appointed General Counsel of Purdue Pharma in July 2018, with responsibility for Purdue's legal strategy, corporate governance, compliance and government affairs.

Prior to joining Purdue Pharma, Mr. Kesselman worked for YUM! Brands, Inc. where he served as Chief Legal Officer, Corporate Secretary & Chief Public Policy Officer. In that role, he oversaw all aspects of legal, compliance, regulatory, government affairs, and sustainability agendas for one of the world's largest restaurant companies, with more than 45,000 restaurants in 135 countries and territories. Mr. Kesselman joined YUM! from Dean Foods where he held a similar role. Previously, he was Senior Vice President & General Counsel at PepsiCo Americas

Foods where he oversaw a wide variety of complex commercial, transactional, litigation, regulatory and government affairs issues relating to PepsiCo's food businesses in North and South America.

From 2006 through 2008, Mr. Kesselman served as General Counsel of the U.S. Department of Agriculture (the "**USDA**"), where he advised the Secretary of Agriculture and directed all legal activity for the USDA. From 2003 to 2006 he served as Deputy General Counsel in the White House Office of Management and Budget, where he handled a variety of regulatory, budgetary and legal policy matters. Mr. Kesselman also worked at the U.S. Department of Justice as Senior Counsel in the Office of Legal Policy and as a Trial Attorney in its Civil Division. His work there earned him the John Marshall Award, the Attorney General's highest recognition for trial of litigation.

Mr. Kesselman currently serves on the Board of the U.S. Chamber of Commerce Litigation Center and the Penn Law Alumni Board of Managers. He also recently served as a public member of the Administrative Conference of the United States and a member of the Leadership Council on Legal Diversity. He has previously served on the Board of the Dallas Symphony, on the Campaign Cabinet of the United Way of Metropolitan Dallas, and as Chair of the D.C. Bar Administrative Law Section. Mr. Kesselman holds a J.D. from the University of Pennsylvania, and a B.S. in government from Cornell University.

(iv)    **David Lundie**

David Lundie has served as the Chief Technical Operations Officer of Purdue Pharma since January 9, 2020. Mr. Lundie is responsible for all U.S. manufacturing, quality, active pharmaceutical ingredient (API) supply and supply chain activities, including oversight of the operations in the Wilson, NC facility. He is responsible for strategic alignment of Technical Operations with corporate objectives. He was the business lead for the sale of the Coventry Facility and related assets in 2020.

Mr. Lundie previously served as Chief Operating Officer of Rhodes Tech and Rhodes Pharma from December 2018 to January 2020. Before that, Mr. Lundie served as Senior Vice President, Technical Operations at Purdue Pharma from January 2015 to December 2018, during which time he also served as Senior Vice President, Technical Operations and Technical Operations Director at Mundipharma.

Mr. Lundie joined Purdue Pharmaceuticals LP in 2004 as Vice President, Plant Manager after a successful career with Élan Pharmaceuticals, where he held key management positions in the U.S. and Ireland. He subsequently served as Vice President, Manufacturing and Supply Chain and Vice President, Technical Operations.

Mr. Lundie has a Bachelor of Science degree in molecular genetics from Trinity College in Dublin, Ireland, and a Diploma in Management from the Irish Management Institute.

(v)    **Vincent Mancinelli**

Vincent Mancinelli II is the President of Rhodes Pharmaceuticals and has over 34 years of leadership experience in the pharmaceutical industry. He began leading Rhodes

51

Pharmaceuticals in November 2010. From 2009 to 2010 he was a co-founder and Chief Operating Officer of GenPak Solutions, a specialty pharmaceutical packaging company. Previously, he held various senior executive roles at Mylan from 1986 to 2009 including Mylan's Head of North American Operations and General Manager and Executive Vice President and General Manager of UDL Laboratories, a subsidiary of Mylan.

Mr. Mancinelli graduated magna cum laude from West Virginia University with a Bachelor's degree in biology.

### 3.    *The Debtors' Employees*

The Debtors maintain a workforce of dedicated employees that has enabled them to continue to achieve their high standards of performance, productivity, and safety. The Debtors employ approximately 500 people in active status,[40][47] which represents an approximately 30% reduction since the Petition Date and an approximately 75% reduction since 2017. These employees work in both full-time and part-time positions, including executives, business and operational managers, sales and marketing personnel, medical affairs personnel, research and development personnel, technology operations personnel, human resource professionals, information technology specialists, administrative support staff and other personnel ("**Employees**").

## B.    **Debtors' Corporate Structure**

Purdue Pharma L.P., a Delaware limited partnership, is the Debtors' main operating entity. Purdue Pharma's general partner is PPI. Purdue Pharma also has 22 wholly owned operating and nonoperating subsidiaries in the United States and the British Virgin Islands ("**Purdue Subsidiaries**"). A chart showing the organizational structure of the Debtors is attached hereto as **Appendix E**.

## C.    **The Debtors' Prepetition Capital Structure**

Unlike most debtors, the Debtors have no funded debt, no material past-due trade obligations, and no judgment creditors.

## D.    **Summary of Events Leading to the Chapter 11 Filings**

As noted above in Article I.B, OxyContin, Purdue Pharma's most prominent pain medication, and certain other opioid pain medications have been the target of the Pending Actions, which name the Defendant Debtors, among other parties, and generally allege that the Defendant Debtors falsely and deceptively marketed OxyContin and opioid pain medications. Many further allege that Defendant Debtors and certain related parties are liable for the national opioid crisis.

---

[40][47]   The sale transaction between Rhodes Tech and Normaco Coventry LLC resulted in a headcount reduction of approximately 120 Employees, many of whom received offers of employment from Noramco. The number of employees in active status listed above is after completion of such transaction.

A common set of factual allegations forms the core of these actions: that the Defendant Debtors acted improperly in the marketing and sale of prescription opioid medications, including, principally, OxyContin.  The specific causes of action asserted against the Defendant Debtors in the Pending Actions are predicated on both federal and state laws—with variations among the laws of each state.  They include: (i) state and federal false claims acts; (ii) state consumer protection laws; (iii) statutory and common law public nuisance; (iv) fraud, fraudulent concealment, deceit, and other willful misconduct; (v) negligence, including negligent misrepresentation, negligence per se, and gross negligence; (vi) unjust enrichment; (vii) federal and state civil RICO laws, as well as civil conspiracy; (viii) state-controlled substances acts; (ix) intentional and constructive fraudulent conveyance or transfer; (x) strict products liability; and (xi) wrongful deaths and loss of consortium.

As of the Petition Date, approximately 2,200 of the Pending Actions had been consolidated in a multidistrict litigation pending in the United States District Court for the Northern District of Ohio.  There were also hundreds of actions pending against the Debtors in state and territorial courts throughout the country.  The state court actions included those asserted by Attorneys General of 46 states (which are not part of the Ohio MDL).  Certain of the Defendant Debtors were also named in 13 actions in Canada (the "**Canadian Actions**").  The Canadian Actions were brought on behalf of both private individuals and governmental entities and raised claims predicated on similar allegations and causes of action as the Pending Actions in the United States.

In addition to the Pending Actions, as of the Petition Date, Purdue Pharma was responding to subpoenas and civil investigative demands issued by various components of the DOJ in connection with criminal and civil investigations of Purdue Pharma.  The Debtors had been subject to investigation by the DOJ since at least June 2016.  Specifically, PPLP received a subpoena from a United States Attorney's Office in the summer of 2016 seeking documents and information relating to the marketing of OxyContin and, beginning in December 2017, received additional subpoenas and other requests for documents and information from several other United States Attorney's Offices and components of the DOJ seeking various documents and other information related to topics including but not limited to PPLP's opioid medications, the Debtors' monitoring programs, payments to professionals, marketing practices, and other matters.  In response to the various DOJ requests, to date PPLP has produced to the DOJ more than 13 million documents (totaling over 100 million pages), including more than 2.7 million documents (totaling more than 17 million pages) produced in direct response to the DOJ's requests and millions of additional documents previously produced in civil litigation, state government investigations or Purdue's bankruptcy proceeding and reproduced to the DOJ.  PPLP also provided numerous presentations and submissions to the DOJ in cooperation with its investigations and in the course of plea and settlement negotiations.

The sheer number and scale of the Pending Actions were possibly without precedent.  Purdue is a mid-sized pharmaceutical company that had approximately 700 employees as of the Petition Date.[41][48]  The lawsuits were spread among courts across the country, involve thousands of plaintiffs with differing interests, include scores of legal claims and theories of damages under multiple states' laws, and were at various procedural stages.

---

[41][48]  Plus approximately 40 employees on short-term disability, long-term disability or severance as of such date.

The onslaught of litigation posed a grave threat to the Debtors' continued viability. Litigation of thousands of Pending Actions to judgment and through appeals in the civil court system would have resulted only in the financial and operational destruction of the Debtors and the immense value they could otherwise provide, and the squandering of hundreds of millions of dollars on legal and other professional fees. Pre-bankruptcy, professionals' fees relating to litigation and government investigations were accruing at an average rate of over $2 million per week, and that was before a single trial against Purdue had commenced.

Moreover, the case-by-case mass tort litigation of the type the Defendant Debtors faced prior to the Petition Date in the civil tort system was neither an efficient nor an equitable way to resolve the asserted liability. Such litigation incentivized a multiplicity of "races to the courthouse" as various plaintiffs vied to be the first to trial. For example, several plaintiffs commenced administrative proceedings seeking dozens of trial days to bypass the normal court process and expedite the time by months or years to a final determination of their claims. This kaleidoscope of piecemeal litigation was all but guaranteed to continue to result in inconsistent outcomes and inequitable treatment, as well as unsustainable cost. Any judgments or settlements extracted in the process would, at best, potentially have benefited only those select few plaintiffs who happened to have been positioned at the beginning of the trial and judgment queue. And it would not have benefited even them, because defending over 2,600 lawsuits to conclusion would almost certainly have forced the Defendant Debtors to file for Chapter 11 protection even had they suffered only a small number of significant adverse judgments at the trial level.

The Debtors commenced the Chapter 11 Cases because chapter 11 was the only way to halt the destruction of value and runaway costs associated with the Pending Actions; centralize all of the claims against the Defendant Debtors; address the claims asserted against them efficiently; resolve the litigation rationally; and consummate a global resolution of the Pending Actions—all while conserving the assets of the Debtors' Estates so that billions of dollars in value could be preserved and vital opioid overdose rescue and addiction treatment medications could be delivered to communities across the country impacted by the opioid crisis.

## E.   Independence of Company from Sacklers

### 1.   Independent Board

No member of the Sackler Families is currently a member of the Board or employed by the Debtors. The last member of the Sackler Families to serve on the Board resigned in January 2019. The current Board is composed of the following seven directors (the "**Directors**") (a majority of whom have no prior connection to the Sackler Families):

(i)   **Robert S. "Steve" Miller (Chairman of the Board, appointed in July 2018)**

Mr. Miller has a storied, nearly 50-year career in corporate restructuring, including the successful restructurings of Chrysler (during which he served as the CFO), Delphi Corp. (during which he served as the Chairman and CEO), and American International Group, Inc., where he was Non-Executive Chairman. He authored the 2008 book, *The Turnaround Kid*. He has served on more than a dozen corporate boards including U.S. Bank, United Airlines and Dow DuPont.

(ii)      **Kenneth Buckfire (At-Large Director, appointed in May 2019)**

Kenneth A. Buckfire is President of Miller Buckfire & Co., LLC and a Vice-Chairman of Stifel Financial Corporation's Institutional Banking Group.  He specializes in the restructuring and refinancing of highly leveraged companies in the energy, telecommunications, consumer products, technology and information services industries.  He has won many awards for leading major restructurings such as the City of Detroit, Calpine and General Growth Properties, and for his innovations in the restructuring field.  Prior to co-founding Miller Buckfire in 2002, he was a Managing Director and Co-Head of the Financial Restructuring Group of Wasserstein Perella & Co. He has been a director and co-founder of many public and private companies, and has served as a trustee of several philanthropic and education institutions.  He is a Visiting Professor at the Columbia Business School.

Mr. Buckfire received his Bachelor's degree in economics and philosophy from the University of Michigan (1980) and his MBA from Columbia University (1987).

(iii)      **John S. Dubel (At-Large Director, appointed in July 2019)**

John S. Dubel is the Chief Executive Officer of Dubel & Associates, LLC, a provider of restructuring and turnaround services to underperforming companies, which he founded in 1999. He has over 35 years of experience in Board representation, turnaround management, crisis management, operational restructurings and divestments with respect to distressed companies. Over the course of his career, John has served as an independent board member for numerous companies.  In addition, he has served as the Chief Executive Officer of SunEdison, a renewable energy development company, Chief Executive Officer of Financial Guaranty Insurance Company (FGIC), a monoline insurance company, among others, and as a partner in Gradient Partners, L.P., a single-strategy distressed hedge fund.

Mr. Dubel is a member of the Turnaround Management Association and the American Bankruptcy Institute.  Mr. Dubel received a Bachelor in Business Administration degree from the College of William and Mary.

(iv)      **Michael Cola (Class A Director, appointed in February 2019; At-Large Director, appointed in July 2019)**

Michael Cola is the CEO of Cerecor Inc.  He was appointed CEO in February 2020 in connection with the merger of Cerecor Inc. with Aevi Genomic Medicine, where he served as the President and CEO since September 2013.  Prior to joining Aevi Genomic Medicine, Mr. Cola served as President of Specialty Pharmaceuticals at Shire plc, a global specialty pharmaceutical company, from 2007 until April 2012. He joined Shire in 2005 as EVP of Global Therapeutic Business Units and Portfolio Management. Prior to joining Shire, he was with Safeguard Scientifics, Inc., a growth capital provider to life sciences and technology companies, where he served as President of the Life Sciences Group. While at Safeguard, Mr. Cola served as Chairman and CEO of Clarient, Inc., a cancer diagnostics company subsequently acquired by GE Healthcare, and as Chairman of Laureate Pharma, Inc. Prior to Safeguard Scientifics, Mr. Cola held senior positions in product development and commercialization at Astra Merck, a pharmaceutical company, and at Astra Zeneca, a global biopharmaceutical company.  Mr. Cola

received a B.A. in biology and physics from Ursinus College and an M.S. in biomedical science from Drexel University. He serves on the Board of Directors of Sage Therapeutics and Phathom Pharmaceuticals, and currently serves as Chairman of the Board of Governors of the Boys & Girls Clubs of Philadelphia.

(v)    <b>Anthony Roncalli (Class B Director, appointed in December 2018)</b>

Anthony Roncalli is an attorney and former partner at Norton Rose Fulbright LLP.  Mr. Roncalli has extensive experience advising the Debtors, IACs, and other pharmaceutical and other companies on corporate governance matters and complex tax and structure planning.  Mr. Roncalli also has extensive pharmaceutical transaction experience including licensing, asset acquisition and divestiture transactions and complex pharmaceutical research, development and collaboration transactions. Mr. Roncalli received his Bachelor's degree from Georgetown University and his J.D. from Boston College Law School.

(vi)    <b>Cecil Pickett, Ph.D. (Class A Director, appointed in January 2010)</b>

Dr. Cecil B. Pickett recently served as the President of Research and Development at Biogen and a member of the Board of Directors.  Dr. Pickett earned his B.S. in biology from California State University at Hayward and his Ph.D. in cell biology from University of California, Los Angeles. He previously served as Senior Vice President and President of Schering-Plough Research Institute, the pharmaceutical research arm of Schering-Plough Corporation. Dr. Pickett came to Schering-Plough Research Institute from Merck Research Laboratories, Montreal, Canada, and West Point, Pa., where he served as Senior Vice President of Basic Research. During his 15 years at Merck & Co., Dr. Pickett held various positions of increasing responsibility, including Research Fellow, Biochemical Regulation; Associate Director, Department of Molecular Pharmacology and Biochemistry; Director, Department of Molecular Pharmacology and Biochemistry; Executive Director of Research at the Merck Frosst Center for Therapeutic Research, Montreal; and Vice President of the center. Dr. Pickett also served as a member of the Zimmer Biomet Board of Directors from 2008 through 2018.  Dr. Pickett is currently a member of the Board of Directors of Yumanity Therapeutics, Inc.

Dr. Pickett is an expert in drug discovery and development. During his career, he has overseen all aspects of the internal research and collaboration with partners aimed at developing advanced drug therapies and has played an integral role in bringing several large and small molecule candidates into clinical development.

Dr. Pickett has published extensively in leading research journals and has been a frequent speaker at scientific symposia and conferences. He has received several major academic awards, appointments and fellowships and has served on a number of scientific committees and editorial boards of research journals and organizations. His awards and honors include the UCLA Alumni Association Award for Scholarly Achievement and Academic Distinction; the first Robert A. Scala Award and Lectureship in Toxicology of Rutgers University and the University of Medicine and Dentistry of New Jersey; and the CIIT Centers for Health Research Founders' Award. Dr. Pickett served as a member of the FDA Science Board, the Advisory Committee to the Director of the National Institutes of Health and the National Cancer Policy Board of the Institute of Medicine. He was elected to the National Academy of Medicine in 1993 and has

been a member of the American Society for Cell Biology, American Society of Biochemistry & Molecular Biology, American Association for Cancer Research, and American Association for the Advancement of Science.

Dr. Pickett previously served on the Boards of the following IACs: MNP Consulting Limited (Delaware); Mundipharma Verwaltungsgesellschaft mbH (Germany); and Napp Pharmaceutical Holdings Ltd. (United Kingdom). He resigned from each of these positions on or prior to August 9, 2018.

(vii)    **F. Peter Boer, Ph.D. (Class B Director, appointed in April 2008)**

Dr. Boer is President and CEO of Tiger Scientific Inc., a firm providing consulting and investment services in the technology arena. He has served as President of the Industrial Research Institute and chaired the Selection Committee of the National Medals of Technology, administered by the U.S. Department of Commerce. In addition, Dr. Boer was the John J. Lee Adjunct Professor at Yale University, where he taught environmental engineering in the School of Engineering and Valuation of Technology in the School of Management.

He has served on advisory committees of Princeton University, Harvard University, the University of Chicago, the Los Alamos National Laboratory, and the Environmental Protection Agency.

Before founding Tiger Scientific, he served as Executive Vice President and Chief Technical Officer of W.R. Grace & Co., with responsibilities for R&D, engineering, business development, environment, health, and safety. Prior to that he was with Dow Chemical Company in a variety of R&D and business management positions and with American Can Company as its Vice President and General Manager for Research and Development. Dr. Boer holds an A.B. degree in physics from Princeton University and a Ph.D. in ~~Chemical Physics~~chemical physics from Harvard University, where he did research in borane chemistry that contributed to Professor W. N. Lipscomb's 1976 Nobel Prize in Chemistry. He is also the author of nine books and approximately 80 scientific papers and patents.

Dr. Boer previously served on the Boards of the following IACs and then-separate Rhodes entities: MNP Consulting Limited (Delaware); Mundipharma Verwaltungsgesellschaft mbH (Germany); Napp Pharmaceutical Holdings Ltd. (United Kingdom); Rhodes Pharmaceuticals Inc. (New York); Rhodes Technologies Inc. (Delaware); and SVC Pharma Inc. (Delaware). He resigned from each of these positions on or prior to August 26, 2018.

### 2.    *Formation of the Special Committee*

Purdue Pharma's governance documents irrevocably granted an independent Special Committee of the Board of Directors exclusive authority over the prosecution, defense, and settlement of any causes of action Purdue Pharma may assert against its shareholders as well as members of the Sackler Families and their affiliates.

On May 14, 2019, PPI's shareholders adopted an Amended and Restated Shareholders' Agreement (the "**Shareholders' Agreement**") which, among things, established a "Transaction Committee," and on the same date, PPI filed a corresponding Restated Certificate of

Incorporation ("**Restated Certificate of Incorporation**").    The Restated Certificate of Incorporation provided that the Transaction Committee would be composed of the independent Chairman of the Board, who would chair the committee, and such other Directors appointed by a majority of the Board, none of whom could be a member of the Sackler Families.  The Restated Certificate of Incorporation gave the Transaction Committee exclusive authority over "all dividends by the Corporation to its Shareholders and all distributions by PPLP to its general and/or limited partners."  The Restated Certificate of Incorporation also gave the Transaction Committee authority over any "Affiliate Transaction," defined as including transactions between PPI, PPLP, or PPLP's subsidiaries, on the one hand, and any Class A Shareholder, any Class B Shareholder, any person specified by the Class A or B Shareholders, and any affiliate (other than PPI, PPLP or PPLP's subsidiaries), on the other hand.

On September 3, 2019, PPI's shareholders agreed to an amendment of the Shareholders' Agreement that, among other things, renamed the Transaction Committee the "Special Committee," and on the same date, PPI filed a Certificate of Amendment to its Restated Certificate of Incorporation ("**A&R Certificate of Incorporation**").  The A&R Certificate of Incorporation gave the Special Committee the same authorities as had been granted to the Transaction Committee and, in addition, authority over "Affiliate Litigation," defined as "the prosecution, defense or settlement of any claim or litigation" between the Debtors and the Sackler Families, trusts established by or for the benefit of members of the Sackler Families, and other Sackler-related entities, including the IACs (collectively, the "**Sackler Entities**").  The A&R Certificate of Incorporation made clear that "no dividend, distribution, Affiliate Transaction or Affiliate Litigation shall take place without the approval of the Special Committee."  The A&R Certificate of Incorporation did not modify the composition of the Special Committee, except to allow any At-Large Director to serve as chair of the Special Committee, and still prohibited any member of the Sackler Families from serving on it.[4249]

Chairman Miller and At-Large Directors Buckfire, Cola and Dubel are the members of the Special Committee. Mr. Dubel serves as Chairman of the Committee.  Each member of the Special Committee has decades of restructuring and/or corporate governance expertise, including, in the case of Mr. Cola, in the pharmaceutical and life sciences industries.  Their resumes can be found above, *see supra* Article II.E..1.  None of the Directors serving on the Special Committee has any prior relationship with either of the Sackler Families.

To further safeguard their independence, the members of the Special Committee are protected against removal by the shareholders.  A letter agreement executed by PPI's shareholders, dated November 6, 2019 ("**2019 Letter Agreement**"), irrevocably delegated to the General Counsel of PPI, as proxy for PPI's shareholders, several of the shareholders' rights, including the ability to appoint and remove the Chairman of the Board and the At-Large Directors, all of whom serve on the Special Committee.  The 2019 Letter Agreement directs the General Counsel of PPI to act in accordance with the vote of two-thirds of the Directors in Office of PPI and, in the case of any decision to remove any Director from the Board, to disregard the vote of any affected Director.

---

[4249] As defined in the A&R Certificate of Incorporation, At-Large Directors are those elected jointly by the Class A Shareholders and the Class B Shareholders.  Class A Directors are those elected by the Class A Shareholders and Class B Directors are those elected by the Class B Shareholders.

### 3.    Other Governance Improvements

In addition to adding the independent Directors to the Board and forming the Special Committee (as described above), the Debtors made other significant changes with the goal of allowing the Debtors to operate independently before commencement of these Chapter 11 Cases. All general partnership relationships between Debtor and non-Debtor entities were terminated prior to the Petition Date.  In particular, PPI was removed from its role as the general partner of certain non-Debtor entities and replaced certain non-Debtor entities as the general partner of Debtor entities Purdue Pharmaceutical Products L.P., Avrio Health L.P. and Purdue Neuroscience Company.  As a result, all of PPLP's subsidiaries were directly or indirectly effectively managed by PPI as of the Petition Date and during the pendency of these Chapter 11 Cases.  Officers or employees of PPLP that were simultaneously directors, officers or employees of IACs resigned from such roles at either such IACs or PPLP.  As a result, no current officer or employee of PPLP was director, officer or employee of any IAC on the Petition Date or during the pendency of these Chapter 11 Cases.  In addition, under the supervision of the Special Committee, the Debtors reviewed agreements between the Debtors and the IACs and terminated, amended or documented such agreements as appropriate.

### 4.    Cessation of Cash Distributions

All cash distributions to the Sackler Families ceased in 2017.  In 2017, Purdue Pharma lent $313 million to its parent, Pharmaceutical Research Associates L.P. ("**PRA**"), which was repaid prior to the Petition Date.  A loan of $1.7 million by Purdue Pharma to an IAC was also repaid in 2018.  There are no remaining outstanding loans from Purdue Pharma to any of the IACs.  Reimbursement of the officer/director legal fees owed to members of the Sackler Families ceased as of March 1, 2019, and certain expenses of members of the Sackler Families over the last 10 years have been repaid.

At the direction of the Special Committee and Davis Polk, AlixPartners LLP ("**AlixPartners**") (with the support of Davis Polk and Bates White LLC ("**Bates White**")) prepared (i) a 355-page report (the "**Cash Transfers of Value Report**") setting forth the results of a comprehensive cash transfers of value analysis, based on the identification and quantification of transfers of value on or after January 1, 2008 made as cash distributions, compensation, legal expenses and benefits provided to or for the benefit of the Sackler Families; and (ii) a 400-page report (the "**Intercompany and Non-Cash Transfers Analysis**") setting forth the results of a comprehensive intercompany and non-cash transfer analysis based on the identification and quantification of significant transfers of value on or after January 1, 2008 made as non-cash transfers and cash payments for goods, services, and other consideration among Purdue, PRA, the IACs, and Rhodes. The Cash Transfers of Value Report exhaustively details the $10.4 billion of cash distributions made to or for the benefit for the shareholders from January 1, 2008 to September 30, 2019 (in particular, $4.1 billion in U.S. partner cash distributions, $1.5 billion in distributions for the benefit of ex-US IACs, and $4.7 billion in tax distributions).  The Intercompany and Non-Cash Transfers Analysis identifies and describes 27 categories of dealings between Debtor entities and the IACs, including terms of licenses for various drugs sold by the Debtor entities and IACs, shared R&D, manufacturing and administrative services, and purchases of finished products and active pharmaceutical ingredients, and details 10 non-cash distributions of assets from Purdue Pharma to PRA, which

include distributions of equity interests in other IACs and third-party pharmaceutical companies and of certain intellectual property rights.

Together, these two massively detailed reports provide a complete and total catalog of the financial and contractual connections between the Debtors and the Sackler Families dating back more than a decade. These two reports exemplify the Debtors' extraordinary transparency and commitment to providing creditors and other parties-in-interest with the information necessary to evaluate potential claims and progress towards a settlement.

On December 16, 2019, the Debtors filed the Cash Transfers of Value Report with the Bankruptcy Court [D.I. 654]. On May 29, 2020, the Debtors filed the Intercompany and Non-Cash Transfers Analysis with the Bankruptcy Court [D.I. 1194].

## ARTICLE III

## THE CHAPTER 11 CASES

On the Petition Date, each Debtor filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code. The Chapter 11 Cases are being jointly administered under the caption *In re Purdue Pharma L.P.*, Case No. 19-23649. The Debtors have continued in possession of their property and have continued to operate and manage their businesses as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code. No trustee or examiner has been appointed in these Chapter 11 Cases.

### A.    First-Day Motions

On the Petition Date, the Debtors filed a number of "first-day" motions and applications seeking various relief from the Bankruptcy Court and authorizing the Debtors to maintain their operations in the ordinary course (collectively, the "**First-Day Motions**"). This relief was designed to ensure a seamless transition between the Debtors' prepetition and postpetition business operations, facilitate a smooth transition into chapter 11, maximize the value of the Debtors' assets, and minimize the effects of the commencement of the Chapter 11 Cases. A description of the First-Day Motions is set forth in the *Declaration of Jon Lowne in Support of Debtors' Chapter 11 Petitions and First Day Pleadings* [D.I. 3].

### B.    Appointment of Statutory Committee

On September 27, 2019, the United States Trustee for the Southern District of New York (the "**United States Trustee**") appointed the official committee of unsecured creditors (the "**Creditors' Committee**"). The Creditors' Committee, as originally constituted, comprised the following entities and persons: (i) Blue Cross and Blue Shield Association; (ii) CVS Caremark Part D Services, L.L.C. and CaremarkPCS Health, L.L.C.; (iii) Ryan Hampton; (iv) Cheryl Juaire; (v) LTS Lohmann Therapy Systems, Corp.; (vi) Pension Benefit Guaranty Corporation; (vii) Walter Lee Salmons; (viii) Kara Trainor; and (ix) West Boca Medical Center. *See Notice of Appointment of Official Committee of Unsecured Creditors* [D.I. 131].

On October 21, 2019, the Creditors' Committee granted a request by the MSGE[43][50] to join the Creditors' Committee in an ex officio capacity, and the MSGE designated Cameron County, Texas to act as an ex officio member.

On October 9, 2019, the Native American Tribes filed a motion requesting entry of an order directing the U.S. Trustee to appoint an official committee of Native American affiliated creditors comprising Native American tribes, tribal members and/or support organizations, health organizations or clinics that serve Native American communities. *See Motion Seeking Appointment of an Official Committee of Native American and Native American Affiliated Creditors* [D.I. 276]. On November 4, 2019, the Creditors' Committee invited the Native American Tribes to serve as an ex officio member of the Creditors' Committee. On November 6, 2019, the Native American tribes appointed the Cheyenne and Arapaho Tribes to serve as an ex officio member of the Creditors' Committee and agreed to withdraw their motion.

On June 18, 2020, the Creditors' Committee invited certain public school districts (the "**Public School Districts**") to serve as an ex officio member of the Creditors' Committee. The Public School Districts accepted this invitation on June 19, 2020 and appointed Thornton Township High School District 205 to serve as an ex officio member of the Creditors' Committee.

## C.    Filing of Schedules of Assets and Liabilities and Statements of Financial Affairs

On September 23, 2019, the Debtors filed the *Debtors' Motion for an Order Extending the Time to File Schedules of Assets and Liabilities, Schedules of Current Income and Expenditures, Schedules of Executory Contracts and Unexpired Leases, and Statements of Financial Affairs* [D.I. 3] (the "**Extension Motion**"). On September 18, 2019, the Bankruptcy Court entered an order approving the Extension Motion [D.I. 7]. On October 29, 2019, the Debtors filed their Schedules of Assets and Liabilities and Statements of Financial Affairs [D.I. 357–405].

## D.    Professional Advisors

The Debtors' primary professional advisors include the following:

* On September 16, 2019, the Debtors filed the *Application for an Order Appointing Prime Clerk LLC as Claims and Noticing Agent for the Debtors* [D.I. 4] (the "**Prime Clerk 156(c) Retention Application**"). On September 18, 2019, the Bankruptcy Court entered an order approving the Prime Clerk 156(c) Retention Application [D.I. 60]. On November 6, 2019, the Debtors filed the *Application for an Order Authorizing Employment and Retention of Prime Clerk LLC as Administrative Advisor Nunc Pro Tunc to the Petition Date* [D.I. 439] (the "**Prime Clerk Retention Application**"). On November 21, 2019, the Bankruptcy Court entered an order approving the Prime Clerk Retention Application [D.I. 531].

---

[43][50] The Rule 2019 Statement describing the composition of the MSGE is filed at D.I. 1794.

- On November 5, 2019, the Debtors filed the *Application of Debtors for Authority to Retain and Employ Davis Polk & Wardwell LLP as Attorneys for the Debtors Nunc Pro Tunc to The Petition Date* [D.I. 419] (the "**Davis Polk Retention Application**"). On November 25, 2019, the Bankruptcy Court entered an order approving the Davis Polk Retention Application [D.I. 542].

- On November 5, 2019, the Debtors filed the *Application of Debtors for Authority to Retain and Employ Dechert LLP as Special Counsel for the Debtors Nunc Pro Tunc to The Petition Date* [D.I. 424] (the "**Dechert Retention Application**"). On November 21, 2019, the Bankruptcy Court entered an order approving the Dechert Retention Application [D.I. 525].

- On November 5, 2019, the Debtors filed the *Application of Debtors for Authority to Retain and Employ King & Spalding LLP as Special Counsel for the Debtors Nunc Pro Tunc to The Petition Date* [D.I. 427] (the "**King & Spalding Retention Application**"). On November 25, 2019, the Bankruptcy Court entered an order approving the King & Spalding Retention Application [D.I. 543].

- On November 5, 2019, the Debtors filed the *Application of Debtors for Authority to Retain and Employ Wilmer Cutler Pickering Hale and Dorr LLP as Special Counsel for the Debtors Nunc Pro Tunc to the Petition Date* [D.I. 428] (the "**Wilmer Hale Retention Application**"). On November 25, 2019, the Bankruptcy Court entered an order approving the Wilmer Hale Retention Application [D.I. 544].

- On November 5, 2019, the Debtors filed the *Application of Debtors for Authority to Retain and Employ AlixPartners, LLP as Financial Advisor Nunc Pro Tunc to the Petition Date* [D.I. 429] (the "**AlixPartners Retention Application**"). On November 21, 2019, the Bankruptcy Court entered an order approving the AlixPartners Retention Application [D.I. 527].

- On November 5, 2019, the Debtors filed the *Debtors' Application to Employ PJT Partners LP as Investment Banker Nunc Pro Tunc to the Petition Date* [D.I. 430] (the "**PJT Retention Application**"). On December 5, 2019, the Debtors filed the *Supplemental Declaration of Timothy Coleman in Support of the Debtors' Application to Employ PJT Partners LP as Investment Banker Nunc Pro Tunc to the Petition Date* [D.I. 590]. On December 20, 2019, the Bankruptcy Court entered an order approving the PJT Retention Application [D.I. 728].

- On November 5, 2019, the Debtors filed the *Debtors' Application to Employ Ernst & Young LLP as Its Auditor Nunc Pro Tunc to the Petition Date* [D.I. 432] (the "**E&Y Retention Application**"). On December 23, 2019, the Bankruptcy Court entered an order approving the E&Y Retention Application [D.I. 698]. On August 21, 2020, the Debtors filed the *Notice of Expansion of Scope of Services to Be Provided Pursuant to the Ernst & Young Retention Order* [D.I. 1598]. On September 22, 2020, the Debtors filed the *Second Notice of Expansion of Scope of Services to Be Provided Pursuant to the Ernst & Young Retention Order* [D.I.

1713].  On August 21, 2020, the Debtors filed the *Third Notice of Expansion of Scope of Services to Be Provided Pursuant to the Ernst & Young Retention Order* [D.I. 2035].

- On November 6, 2019, the Debtors filed the *Application of Debtors for Authority to Retain and Employ Skadden, Arps, Slate, Meagher & Flom LLP as Special Counsel to the Debtors Nunc Pro Tunc to the Petition Date* [D.I. 438] (the "**Skadden Retention Application**").  On November 25, 2019, the Bankruptcy Court entered an order approving the Skadden Retention Application [D.I. 545].

- On December 5, 2019, the Debtors filed the *Application of Debtors for an Order Authorizing Them to Retain and Employ Jones Day as Special Counsel, Nunc Pro Tunc to the Petition Date* [D.I. 592] (the "**Jones Day Retention Application**").  On December 20, 2019, the Bankruptcy Court entered an order approving the Jones Day Retention Application [D.I. 690].

- On December 5, 2019, the Debtors filed the *Application of Debtors for Authority to Retain and Employ Arnold & Porter Kaye Scholer LLP as Special Counsel to the Debtors Nunc Pro Tunc to the Petition Date* [D.I. 593] (the "**Arnold & Porter Retention Application**").  On December 20, 2019, the Bankruptcy Court entered an order approving the Arnold & Porter Retention Application [D.I. 691].

- On February 7, 2020, the Debtors filed the *Application for Order Authorizing Employment and Retention of KPMG LLP as Tax Consultants to the Debtors and the Official Committee of Unsecured Creditors Nunc Pro Tunc to December 23, 2019* [D.I. 815] (the "**KPMG Retention Application**").  On February 24, 2020, the Bankruptcy Court entered an order approving the KPMG Retention Application [D.I. 867].

- On May 13, 2020, the Debtors filed the *Application of Debtors for Authority to Retain and Employ Cornerstone Research as Consultants to the Debtors Nunc Pro Tunc to January 14, 2020* [D.I. 1150] (the "**Cornerstone Retention Application**").  On June 11, 2020, the Bankruptcy Court entered an order approving the Cornerstone Retention Application [D.I. 1255].

- On April 13, 2021, the Debtors filed the *Application of Debtors for Authority to Retain and Employ Grant Thornton LLP as Tax Structuring Consultants to the Debtors Nunc Pro Tunc to January 20, 2021* [D.I. 1150] (the "**Grant Thornton Retention Application**").  On April 28, 2021, the Bankruptcy Court entered an order approving the Grant Thornton Retention Application [D.I. 2760].

- The Bankruptcy Court approved procedures for the Debtors to retain and employ certain professionals utilized by the Debtors in the ordinary course of business pursuant to an order entered on November 26, 2019 [D.I. 548].

On April 29, 2021, the United States Trustee filed the *Motion of United States Trustee Pursuant to Sections 105(a), 327, 328, and 330 of the Bankruptcy Code and Rule 2014 of the*

*Federal Rules of Bankruptcy Procedure for Entry of an Order Approving (1) Settlement Agreement with Skadden, Arps, Slate, Meagher & Flom, LLP, Wilmer Cutler Pickering Hale and Dorr LLP, and Dechert LLP and (2) Certain Releases by the Debtors* [D.I. 2763] (the "**Settlement Motion**").  As set forth in the Settlement Motion, Skadden, Arps, Slate, Meagher & Flom, LLP; Wilmer Cutler Pickering Hale and Dorr LLP; and Dechert LLP (collectively, the "**Firms**") did not disclose a written joint defense and common interest agreement that they each entered into prepetition on behalf of the Debtors with various other parties, including members of the Sackler families, as a "connection" at the time of filing of their respective retention applications.  The United States Trustee and the Firms disagree about whether the common interest agreement is a "connection" that is required to be disclosed.  The Motion seeks approval of a settlement agreement between the United States Trustee and the Firms under which the Firms agree to supplement their retention applications to reflect any common interest or joint defense agreement that the Firms entered into on behalf of Debtors with any party in interest identified in the most recent list provided by Debtors' bankruptcy counsel and the Firms will collectively reduce their pending or future fee applications or monthly fee statements, as applicable, by $1.0 million in the aggregate.  The United States Trustee and the Debtors and their estates will release the Firms from all claims relating to alleged disclosure failures concerning common interest agreements.

### E.    CCAA Proceedings

On September 19, 2019, the Ontario Superior Court of Justice (Commercial List) in Toronto, Ontario, Canada (the "**Canadian Court**") entered the *Initial Recognition Order (Foreign Main Proceeding)* pursuant to Part IV of the *Companies' Creditors Arrangement Act*, R.S.C. 1985, c. C-36, as amended, that, among other things, recognized the Chapter 11 Cases as foreign main proceedings (Court File No. CV-19-627656-00CL) (the "**CCAA Proceedings**").

The orders issued by the Canadian Court, among other things, (i) recognized the Chapter 11 Cases as "foreign main proceedings" under the CCAA; (ii) stayed (a) all proceedings in Canada currently under way against or in respect of any of the Debtors or affecting their business or property and (b) all proceedings against certain Canadian affiliates of the Debtors, including Purdue Pharma Inc., Purdue Frederick Inc., and Purdue Pharma;[4451] (iii) appointed Ernst & Young Inc. as information officer to report to the Canadian Court, creditors and other stakeholders in Canada on the status of the Chapter 11 Proceedings; and (iv) recognized certain orders entered in the Chapter 11 Cases to permit the Chapter 11 Debtors to continue operating their respective businesses during the course of the Chapter 11 Proceedings.

### F.    Settlement Framework

Shortly before the Petition Date, the Debtors, the Sackler Families, and the Ad Hoc Committee reached an agreement in principle regarding the Settlement Framework (as defined above).  The Settlement Framework had three basic components: (i) Purdue Pharma's existing shareholders would relinquish all of their equity interests in the Debtors and consent to the transfer of all of the Debtors' assets to a trust or similar post-emergence structure for the benefit

---

[4451] As used in this sentence, "Purdue Pharma Inc." and "Purdue Pharma" refer to Canadian entities that are IACs and not the Debtor entities PPI or PPLP.

of claimants and the U.S. public, "free and clear" of liabilities to the fullest extent permitted by law; (ii) Purdue Pharma's existing shareholders would engage in a sale process for their ex-U.S. pharmaceutical companies; and (iii) Purdue Pharma's existing shareholders would contribute an additional $3 billion over seven years (in addition to 100% of the value of all 24 Debtors), with the hope of substantial further contemplated contributions from the sales of their ex-U.S. pharmaceutical businesses.    This Settlement Framework served as the starting point for negotiating a settlement that could be finalized and effectuated only through chapter 11.

As the Debtors explained early in these Chapter 11 Cases, the Debtors have long viewed the process of confirming a Plan as requiring passing through four "gates." Gate one was reaching agreement with a critical mass of important plaintiff constituencies and the Sackler Families on the Settlement Framework shortly before the Petition Date. Gate two was memorializing the Settlement Framework in the term sheet agreed by and among the Debtors, the Ad Hoc Committee, and the Sackler Families filed with the Court on October 8, 2019.  *See Notice of Filing of Term Sheet with Ad Hoc Committee* [D.I. 257].  Gate three was proposing a comprehensive restructuring transaction based on the Settlement Framework, which the Debtors had always recognized would require massive amounts of diligence, structuring and negotiation. *See* Nov. 19, 2019 Hr'g Tr. 70:8-71:14.  The Debtors and their key stakeholders engaged in an extensive process leading up to filing the Plan, including through the Court-ordered Mediation (defined below), to develop, build upon and refine the Settlement Framework.  That process involved negotiating the proposed terms of the settlement of claims against the Debtors' shareholders, reaching agreement on the allocation of estate value among various classes of creditors and addressing a host of other issues expressly left open in the term sheet memorializing the Settlement Framework.  The Plan represents the culmination of this intensive further negotiation and diligence process.  Gate four is the Confirmation Hearing where the Debtors will seek approval of the substantially improved settlement embodied in the Plan.

## G.    Preliminary Injunction and Voluntary Injunction

On September 18, 2019, the Debtors filed the *Motion for a Preliminary Injunction* [Adv. Proc. No. 19-08289, D.I. 2, 3] (the "**Preliminary Injunction Motion**") for a preliminary injunction (the "**Preliminary Injunction**") to stay active litigation against the Debtors, as well as against their current and former owners (including any trusts and their respective trustees and beneficiaries), officers, directors, employees, and associated entities, arising out of the Debtors' manufacture, distribution, and sale of prescription opioid medications.

The Preliminary Injunction Motion also sought entry of a voluntary injunction against the Debtors, enjoining the Debtors from, among other things, promoting opioid products and providing financial support to third parties for the purpose of promoting opioids or opioid products, subject to enforcement by the Bankruptcy Court (the "**Voluntary Injunction**").  The Debtors requested that the unprecedented Voluntary Injunction be entered to subject themselves to the coercive power of the Court with respect to the commitments set forth therein, to make clear that they are not in any way using chapter 11 as an improper shield for conduct challenged in the Pending Actions, and to demonstrate that they are committed to safely and responsibly maintaining the continuity of supply of the Debtors' FDA-approved medications and fully complying with all federal and state laws and regulations governing pharmaceutical companies.

On October 11, 2019, the Bankruptcy Court held an evidentiary hearing on the Debtors' Preliminary Injunction Motion. The Preliminary Injunction Motion was supported by certain estate stakeholders, including the Creditors' Committee and Ad Hoc Committee, and was opposed by the NCSG and other objectors. On October 11, 2019, the Bankruptcy Court issued an oral ruling entering the Preliminary Injunction, including the Voluntary Injunction, on an interim basis through and including November 6, 2019. *See* Order Pursuant to 11 U.S.C. § 105(a) Granting, in part, Motion for a Preliminary Injunction, *Purdue Pharma L.P. v. Commonw. of Mass.*, Adv. Pro. No. 19-08289 (Bankr. S.D.N.Y. Oct. 11, 2019) [D.I. 82]. On November 6, 2019, the Bankruptcy Court granted the Preliminary Injunction, including the Voluntary Injunction, through April 8, 2020, again over the objection of the NCSG and other objectors, including certain Tennessee plaintiffs (the "**Tennessee Plaintiffs**"). *See* Second Amended Order Pursuant to 11 U.S.C. § 105(a) Granting Motion for a Preliminary Injunction, *Purdue Pharma L.P. v. Commonw. of Mass.*, Adv. Pro. No. 19-08289 (Bankr. S.D.N.Y. Nov. 6, 2019) [D.I. 105]. On March 30, 2020, the Bankruptcy Court entered an order granting the Debtors' motion to extend the Preliminary Injunction, including the Voluntary Injunction, for an additional 180 days, until October 5, 2020, over the limited objection of the NCSG and the Tennessee Plaintiffs. *See* Eighth Amended Order Pursuant to 11 U.S.C. § 105(a) Granting Motion for a Preliminary Injunction, *Purdue Pharma L.P. v. Commonw. of Mass.*, Adv. Pro. No. 19-08289 (Bankr. S.D.N.Y. March 30, 2020) [D.I. 168].[45][52] On October 1, 2020, the Bankruptcy Court entered an order granting the Debtors' motion to extend the Preliminary Injunction, including the Voluntary Injunction, until March 1, 2021, over the limited objection of the NCSG, the Tennessee Plaintiffs, and certain other objectors. *See* Thirteenth Amended Order Pursuant to 11 U.S.C. § 105(a) Granting Motion for a Preliminary Injunction, *Purdue Pharma L.P. v. Commonw. of Mass.*, Adv. Pro. No. 19-08289 (Bankr. S.D.N.Y. October 1, 2020) [D.I. 194]. On March 1, 2021, the Bankruptcy Court entered an order granting the Debtors' motion to extend the Preliminary Injunction, including the Voluntary Injunction, until March 24, 2021, over the limited objection of the Tennessee Plaintiffs. *See* Fifteenth Amended Order Pursuant to 11 U.S.C. § 105(a) Granting Motion for a Preliminary Injunction, *Purdue Pharma L.P. v. Commonw. of Mass.*, Adv. Pro. No. 19-08289 (Bankr. S.D.N.Y. March 1, 2021) [D.I. 224]. On March 26, 2021, the Bankruptcy Court entered an order granting the Debtors' motion to extend the Preliminary Injunction, including the Voluntary Injunction, until April 21, 2021, over the objections of the Non-Consenting States, the Ad Hoc Committee on Accountability, and Tennessee Plaintiffs. *See* Sixteenth Amended Order Pursuant to 11 U.S.C. § 105(a) Granting Motion for a Preliminary Injunction, *Purdue Pharma L.P. v. Commonw. of Mass.*, Adv. Pro. No. 19-08289 (Bankr. S.D.N.Y. March 26, 2021) [D.I. 241]. On April 22, 2021, the Bankruptcy Court entered an order granting the Debtors' motion to extend the Preliminary Injunction, including the Voluntary Injunction, until May 20, 2021, over the objections of the Non-Consenting States and the Ad Hoc Committee on Accountability. *See* Seventeenth Amended Order Pursuant to 11 U.S.C. § 105(a) Granting Motion for a Preliminary Injunction, *Purdue*

---

[45][52] On August 11, 2020, in an appeal filed by the Tennessee Plaintiffs, the United States District Court for the Southern District of New York affirmed the Preliminary Injunction, as extended by the Bankruptcy Court on March 30, 2020. *See In re Purdue Pharmaceuticals, L.P.*, No. 19-cv-10941 (CM), 2020 WL 4596869 (S.D.N.Y. Aug. 11, 2020).

*Pharma L.P. v. Commonw. of Mass.*, Adv. Pro. No. 19-08289 (Bankr. S.D.N.Y. April 22, 2021)
[D.I. 254] (the "**Injunction Order**").[46][53]

The Voluntary Injunction, the terms of which reflect extensive discussions with and input
from parties-in-interest including the NCSG, enjoins the Debtors from, among other things:
(i) engaging in the promotion of opioids or opioid products to prescribers and patients, including
through (a) employing sales representatives to promote opioids or opioid products, or
(b) supporting (financially, in kind or by distributing) any advertising that promotes opioid or
opioid products, whether print or online; (ii) compensating (x) sales or marketing employees
through agreements or packages tied to sales volume, sales goals, or sales quotas for opioid
products, or (y) any person for the prescribing, sale, use, or distribution of opioid products
(except through rebates, chargebacks, and/or savings cards); and (iii) sponsoring or supporting
(financially or in kind) any medical society or patient advocacy group for the purpose of
promoting opioid products.  There are exceptions in the Voluntary Injunction to permit Debtors,
among other things, to maintain a corporate website and to continue to provide information
required by law, scientific and medical information, and information on the FDA-approved
labeling.

## H.    Appointment of Monitor

At the Bankruptcy Court's suggestion, the Debtors agreed to retain a monitor, selected in
consultation with the Creditors' Committee, the NCSG, and the Ad Hoc Committee, to report on
the Debtors' compliance with the terms of the Voluntary Injunction every 90 days.  On February
21, 2020, the Debtors retained Secretary Thomas J. Vilsack, former United States Secretary of
Agriculture and former Governor of Iowa, to serve as the monitor ("**Monitor**").

On May 20, 2020, the Monitor filed the Initial Monitor Report [D.I. 1175] (the "**Initial
Monitor Report**") with the Bankruptcy Court, describing actions taken by the Monitor to date to
determine compliance with the terms and conditions of the Voluntary Injunction and providing a
set of recommendations. On August 18, 2020, the Monitor filed the Second Monitor Report [D.I.
1584] (the "**Second Monitor Report**") with the Bankruptcy Court, describing the steps taken
since the Initial Monitor Report to determine compliance with the terms and conditions of the
Voluntary Injunction, including retention of expert services, and providing a set of further
recommendations.  On November 16, 2020, the Monitor filed the Third Monitor Report [D.I.
1956] (the "**Third Monitor Report**") with the Bankruptcy Court, describing the steps taken
since the Second Monitor Report to determine compliance with the terms and conditions of the
Voluntary Injunction and providing a set of further recommendations. On February 3, 2021, the
Monitor filed the Fourth and Final Monitor's Report [D.I. 2350] (the "**Fourth Monitor's**

---

[46][53]  Arizona, California, Colorado, Connecticut, Delaware, the District of Columbia, Hawaii, Idaho, Illinois, Iowa,
Maine, Maryland, Massachusetts, Minnesota, New Hampshire, New Jersey, New York, Nevada, North Carolina,
Oregon, Pennsylvania, Rhode Island, Vermont, Virginia, Washington, Wisconsin, the NCSG (as listed on the
October 11, 2019 Verified Statement pursuant to Bankruptcy Rule 2019 filed under Docket No. 296 of Case No. 19-
23649), the AHC and each of its members (as listed on the October 10, 2019 Verified Statement pursuant to
Bankruptcy Rule 2019 filed under Docket No. 279 of Case No. 19-23649), and the MSGE and each of its members
(as listed on the October 30, 2019 Verified Statement pursuant to Bankruptcy Rule 2019 filed under Docket No. 409
of Case No. 19-23649) (collectively, the "**Voluntarily Bound Parties**") have each consented and agreed to continue
to abide by the terms of the *Seventeenth Amended Order Pursuant to 11 U.S.C. § 105(a) Granting Motion for a
Preliminary Injunction*, without the need to have any order entered against them.

Report") describing the steps taken since the Third Monitor Report to determine compliance with the terms and conditions of the Voluntary Injunction and providing a set of further recommendations. In each of these four reports, the Monitor stated that the Debtors had been "responsive and cooperative" with the Monitor and that they had made "good faith efforts to comply with the terms and conditions of the Voluntary Injunction."

On February 3, 2021, pursuant to the Fourth and Final Monitor's Report, Secretary Vilsack formally requested in the Fourth Monitor's Report to be discharged of his duties as Monitor. On February 18, 2021, the Debtors retained Stephen Bullock, former Montana Governor and former Montana Attorney General, to replace Secretary Vilsack as Monitor.

## I.     Appointment of Fee Examiner

On April 8, 2020, the Bankruptcy Court entered the *Order Authorizing the Appointment of Independent Fee Examiner Pursuant to 11 U.S.C. § 105(a) and Modifying Interim Compensation Procedures for Certain Professionals Employed Pursuant to 11 U.S.C. § 327* [D.I. 1023], appointing David M. Klauder as the fee examiner in these Chapter 11 Cases.

## J.     Emergency Relief Fund Negotiations

Soon after the Petition Date, negotiations began between the Debtors, the UCC, the AHC, the NCSG, the MSGE and various other stakeholders regarding a proposal to dedicate approximately $200 million of the Debtors' cash on hand to establish an emergency relief fund (the "**ERF**" or the "**Emergency Relief Fund**") during the pendency of the Chapter 11 Cases to provide emergency relief and assistance to respond to the opioid crisis. The Debtors supported the proposal to establish the ERF and believed that the ERF should be distributed as quickly and efficiently as practicable, with the goal of putting the Debtors' assets to work funding worthy causes on the front lines of the opioid crisis rather than sitting on the Debtors' balance sheet.

After high-level negotiations among the parties regarding the nature of the ERF during the initial months of the Chapter 11 Cases, both the Creditors' Committee and AHC began developing detailed proposals for the structure of the ERF. While the AHC worked extensively with governmental constituencies to develop their proposal, the Debtors in parallel worked with the Creditors' Committee to refine the Creditors' Committee's initial proposal. During this time, the parties also continued to engage with each other regarding their high-level goals and priorities in structuring the ERF. On January 22, 2020, the Debtors and the Creditors' Committee provided a working draft proposed structure of the ERF to the AHC, and the AHC provided a draft proposal for the structure of the ERF that had the support of their group and reflected extensive input from the NCSG (although not their formal endorsement). The Debtors then worked extensively with the Creditors' Committee and AHC to understand the goals underlying their respective proposals as well as engaged with the NCSG and the MSGE to understand their specific viewpoints. On February 27, 2020, the Debtors hosted dozens of representatives of major creditor constituencies and interested governmental organizations at a summit in an attempt to negotiate the terms of a unified proposal for an ERF. The Debtors also attempted to craft a proposal that incorporated concepts from the proposals of both the Creditors' Committee and AHC in order to reach a compromise.

These extensive and good-faith negotiations, however, failed to yield full consensus among the parties regarding the proposed structure and governance of the ERF. While the parties were able to reach agreement on the total size of the ERF, the geographic distribution of the funds, and the process of developing initial state/territory-level grant funding proposals, the parties were unable to reach agreement on, among other things, (i) the composition of an ERF review board that would oversee grant allocation decisions and the level of oversight to be provided by such board and (ii) the types of programs that should be eligible for grants, including the degree to which grants should be allocated to newly developed programs relative to existing programs.

Nevertheless, while the parties were not able to reach agreement on an ERF structure that was fully supported by all major case constituencies, the Plan accomplishes the essential goals of the ERF, albeit at a later date, because it contemplates that the distributions to Non-Federal Public Claimants and each of the Private Claimant groups other than the Personal Injury Claimants (as defined below) will dedicate all value received by them through the Plan exclusively to programs designed to abate the opioid crisis.

## K.    Bar Date

On January 3, 2020, the Debtors filed the *Debtors' Motion for Entry of an Order (I) Establishing Deadlines for Filing Proofs of Claim and Procedures Relating Thereto, (II) Approving the Proof of Claim Forms, and (III) Approving the Form and Manner of Notice Thereof* [D.I. 717] (the "**Bar Date Motion**"). On February 3, 2020, the Bankruptcy Court entered an order approving the Bar Date Motion [D.I. 800] (the "**Bar Date Order**"), establishing 5:00 p.m. (Prevailing Eastern Time) on June 30, 2020 (the "**Initial General Bar Date**") as the deadline for all persons and entities (including, without limitation, individuals, partnerships, corporations, joint ventures, trusts, governmental units and Native American Tribes), holding a prepetition claim, as defined in section 101(5) of the Bankruptcy Code (a "**Claim**"), against the Debtors which arose on or prior to the Petition Date, to file a proof of claim. On May 20, 2020, the Debtors filed the *Debtors' Motion Pursuant to 11 U.S.C. §§ 105(a) and 501 and Federal Rules of Bankruptcy Procedure 2002 and 3003(c)(3) for Entry of an Order (I) Extending the General Bar Date for a Limited Period and (II) Approving the Form and Manner of Notice Thereof* [D.I. 1178] (the "**Bar Date Extension Motion**"). On June 3, 2020, the Bankruptcy Court entered an order approving the Bar Date Extension Motion [D.I. 1221] (the "**Bar Date Extension Order**"), extending the Initial General Bar Date to July 30, 2020 at 5:00 p.m. (Prevailing Eastern Time) (the "**General Bar Date**").

Specifically, the Bar Date Extension Order established the following deadlines for filing proofs of claim:

- **General Bar Date**: 5:00 p.m. (prevailing Eastern Time) on July 30, 2020, as the deadline for each person (as defined in section 101(41) of the Bankruptcy Code), governmental unit (as defined in section 101(27) of the Bankruptcy Code), and Native American Tribe to file a proof of claim (as defined in section 101(5) of the Bankruptcy Code) against the Debtors which arose on or prior to September 15, 2019.

- **Rejection Damages Bar Date**: the later of: (i) the General Bar Date; and (ii) thirty (30) days after entry of any order authorizing the rejection of such executory contract or unexpired lease of the Debtors as the deadline by which claimants asserting claims resulting from the Debtors' rejection of an executory contract or unexpired lease must file proofs of claim for damages arising from such rejection.

- **Amended Schedules Bar Date**: the later of: (i) the General Bar Date; and (ii) thirty (30) days after such holders of affected claims are served with notice that the Debtors amended their Schedules of Assets and Liabilities and/or Statements of Financial Affairs (collectively, the "**Schedules**") to identify, reduce, delete, or change the amount, priority, classification, or other status of such a claim as the deadline by which claimants holding claims affected by such amendment or supplement must file proofs of claim with respect to such claim.

The Debtors' notice program provided actual notice of the Bar Dates to known claimants, and included a supplemental notice plan (the "**Supplemental Notice Plan**") to provide an extraordinarily broad array of forms of publication notice to unknown claimants.

The Bar Date form of notice (the "**Bar Date Notice**") (i) notifies claimants of the Bar Dates: (a) who must file a proof of claim, (b) the procedures for filing a proof of claim, and (c) the consequences of failing to timely file a proof of claim; and (ii) states that for a claim to be validly and properly filed, a signed original of the proof of claim form, together with any accompanying documentation, must be filed with Prime Clerk, LLC or the Bankruptcy Court on or before the appropriate Bar Date. The Debtors provided actual notice of the Bar Dates to all known claimants by serving them with the following: (x) the Bar Date Notice and (y) the appropriate proof of claim form(s) and instructions.

The Supplemental Notice Plan employed six additional primary methods of providing notice: (i) paid media (e.g., television, radio, magazine, and newspaper); (ii) online displays across multiple devices and videos (e.g., YouTube); (iii) social media campaigns (e.g., Facebook, Twitter); (iv) out-of-home advertising (e.g., billboards); (v) earned media (e.g., press releases, blogs); and (vi) community outreach.

The Supplemental Notice Plan provided publication notice to areas where claims have arisen or where potential claimants may now be located, including the United States and the U.S. Territories of Guam, U.S. Virgin Islands, Marianas, American Samoa, and Puerto Rico, using the following: (i) broadcast and cable television, radio (terrestrial and streaming), and traditional print media such as magazines and newspapers; (ii) various online displays and videos on websites such as YouTube and Google; (iii) social media, networking and engaging influencers on websites such as Facebook, Instagram, Twitter, and LinkedIn; (iv) static and digital billboards located in high-traffic areas; (v) press releases; and (vi) community outreach via a one-page notice to (a) all prescribers of Purdue brand name medications, (b) U.S. pharmacies and institutions that received certain brand name and generic opioid medications, and (c) third-party organizations such as tribal leaders, veterans communities, treatment and addiction centers, mobile health teams, mining communities, religious leaders, homeless and women's shelters, and government agencies. The Supplemental Notice Plan provided publication notice in both French

and English in Canada using the following: (1) traditional print media such as magazines and newspapers; (2) online and social media, including Google, Facebook, Instagram, and YouTube; and (3) press releases.

Additionally, the Debtors published the notice of the Bar Dates across several print publications in the United States and Canada. In the United States, the Debtors published the full Bar Date Notice in three (3) nationally circulated newspapers and published a summary notice of the Bar Dates in eight (8) consumer magazines, fourteen (14) industry-specific trade magazines, and seventy-nine (79) local newspapers in eleven (11) states. In Canada, the Debtors published a summary notice of the Bar Dates in nine (9) nationally distributed magazines and three (3) nationally circulated newspapers.

The Supplemental Notice Plan cost over $20 million and included a total of over 1.5 billion impressions across social media, display and search platforms. The nearly unprecedented reach and cost of the Supplemental Noticing Plan, which the Debtors developed while engaging extensively with key creditor constituencies, was carefully tailored to the circumstances of potential claims and provided publication notice far beyond what is customary in typical chapter 11 cases. The Bankruptcy Court included in the Bar Date Order its finding that the noticing procedures outlined therein constituted good, sufficient and due notice of the Bar Dates and the procedures for filing proofs of claim in these Chapter 11 Cases.

**L.      Entry into Stipulation in Respect of Certain Canadian Patient Litigation**

Prior to the Petition Date, the lead plaintiffs (collectively, the "**Patient Plaintiffs**") in ten class actions (the "**Canadian Patient Class Actions**") that were commenced in each province of Canada (except Manitoba) between May 11, 2007 and June 22, 2012, on one hand, and the defendants in the Canadian Patient Class Actions, on the other hand, entered into a conditional national class action settlement agreement (the "**Patient Settlement Agreement**"). Pursuant to its own terms and Canadian class action legislation, the Patient Settlement Agreement must be approved by the Ontario Superior Court of Justice, the Superior Court of Quebec, the Supreme Court of Nova Scotia and the Saskatchewan Court of Queen's Bench in order to become effective. The Patient Settlement Agreement has yet to receive the approval of the Saskatchewan Court of Queen's Bench (the "**Saskatchewan Court**"). Proceedings in respect of the Canadian Patient Class Actions are currently stayed and suspended pursuant to the *Order Re: Related Party Stay* entered in the CCAA Proceedings on December 30, 2019.

The Debtors and the Patient Plaintiffs are party to the *Amended and Restated Stipulation and Order Permitting the Filing of a Class Proof of Claim Solely for Administrative Convenience in Order to Effectuate a Potential Settlement in Respect of Certain Canadian Patient Litigation* (the "**Patient Claim Settlement Stipulation**"). The Bankruptcy Court entered an order approving the Patient Claim Settlement Stipulation on July 24, 2020 [D.I. 1515]. The purpose of the Patient Claim Settlement Stipulation is to permit the Patient Plaintiffs to file a Proof of Claim on their own behalf, and on behalf of the Patient Class (as defined in the Patient Claim Settlement Stipulation) in the Canadian Patient Class Actions solely for protecting their claims pursuant to the terms of the Patient Settlement Agreement and not for any other purpose.

On July 30, 2020, Class Counsel (as defined in the Patient Claim Settlement Stipulation) filed a Proof of Claim [Claim No. 146518] (the "**Patient Class Proof of Claim**") in accordance with the Patient Claim Settlement Stipulation.

Prior to the Petition Date, non-Debtor Purdue Pharma (Canada), an independent associated company beneficially owned by the Debtors' shareholders, settled a trust for CAD $20 million (the "**Settlement Trust**"), which is the full amount of the Settlement Payment (as defined in the Patient Settlement Agreement). The funds in the Settlement Trust are held in trust and are sufficient to make payment of the Settled Patient Claims (as defined in the Patient Claim Settlement Stipulation). The funds will only be distributed in accordance with the Patient Settlement Agreement after the occurrence of the Effective Date (as defined in the Patient Settlement Agreement). The Effective Date is the date on which the requisite orders contemplated by the Settlement Agreement have become final orders from which no appeal lies or in respect of which any right of appeal has expired without the initiation of proceedings in respect of that appeal, or proposed appeal such as the delivery of a notice of appeal or application for leave to appeal.

As set forth in the Patient Claim Settlement Stipulation and Section 4.10 of the Plan, if the Canadian Patient Settlement Agreement is approved by the Saskatchewan Court and the funds held in the Settlement Trust are released for benefit of Holders of Settled Patient Claims, (i) the Patient Settlement Agreement and Patient Class Proof of Claim will be the exclusive remedy for all Settled Patient Claims in the Chapter 11 Cases; (ii) the Patient Settlement Agreement and Patient Class Proof of Claim will supersede and replace any other Proof of Claim or portion thereof filed by any of the Patient Plaintiffs, Settlement Patient Claimants (as defined in the Patient Claim Settlement Stipulation), or counsel to any of the foregoing, in the Chapter 11 Cases in respect of Settled Patient Claims; and (iii) upon the Effective Date (as defined in the Patient Settlement Agreement), the Debtors will be deemed to have been completely and unconditionally released, forever discharged, and acquitted from any and all Settled Patient Claims against the Debtors and from any other Proof of Claim or portion thereof in respect of any Settled Patient Claim filed against any Debtor. If the Patient Settlement Agreement is approved by the Saskatchewan Court and the funds in the Settlement Trust are released for the benefit of Holders of Settled Patient Claims: (i) no Settlement Patient Claimant that filed a Proof of Claim in the Chapter 11 Cases shall receive a recovery in respect of a Settled Patient Claim from any source other than the Settlement Payment made from the Settlement Trust; and (ii) any Settlement Patient Claimant that filed a Proof of Claim in the Chapter 11 Cases shall have the burden of proving that such Proof of Claim is not in respect of a Settled Patient Claim that was released and discharged pursuant to the Patient Claim Settlement Stipulation.

No Distributions will be made on account of any Claims that may constitute Settled Patient Claims unless and until (x) the Saskatchewan Court approves the Canadian Patient Settlement Agreement and all funds in the Settlement Trust have been distributed to Holders of Settled Patient Claims in accordance with the Patient Settlement Agreement or (y) the Saskatchewan Court denies the Patient Settlement Agreement. In the event the Saskatchewan Court does not approve the Patient Settlement Agreement, the Patient Claim Settlement Stipulation will be deemed withdrawn and the Patient Class Proof of Claim will be rescinded and deemed null and void.

The Patient Class Proof of Claim does not otherwise prejudice any proof of claim filed in respect of (a) claims against the Debtors arising on or before the Petition Date other than Settled Patient Claims or any other claims of the Settlement Patient Claimants; (b) Settled Patient Claims or any other claims of the Settlement Patient Claimants in the event the Patient Settlement Agreement is not approved by the Saskatchewan Court or the Effective Date does not otherwise occur under the Patient Settlement Agreement; or (c) any claims of Canadian provincial health insurers, whether direct or subrogated to claims of the Patient Plaintiffs and other members of the Patient Class (as defined in the Patient Claim Settlement Stipulation) (the "**Contingent Claims**").  For the avoidance of doubt, the Contingent Claims are subject to the General Bar Date and any Contingent Claim filed after the General Bar Date will be considered untimely.

## M.    Sale of Rhodes Technologies Manufacturing Facility and Entry into Supply Agreement

In April 2020, the Debtors made the decision to explore strategic alternatives with respect to Rhodes Tech's active pharmaceutical ingredient ("**API**") manufacturing business.  The Debtors determined that a transition away from the API manufacturing facility located in Coventry, Rhode Island (the "**Coventry Facility**") would have the effect of unburdening the Debtors from the facility's extensive annual fixed operating costs, creating a variable cost structure as volumes decrease.  The Debtors could not, however, transition away from the Coventry Facility without securing an alternative source of APIs from a credible, high-quality supplier with experience in the API manufacturing industry, and doing so at a lower cost than was then incurred by manufacturing APIs "in house."  Following an extensive marketing and negotiation process, on September 14, 2020, Debtor Rhodes Technologies, Noramco Coventry LLC (the "**Purchaser**"), and Noramco LLC ("**Normaco**"), as guarantor of Purchaser's obligations, executed an asset purchase agreement (the "**APA**") in contemplation of a sale of the Coventry Facility and related assets to the Purchaser and agreed to enter into a long-term supply agreement (the "**Supply Agreement**") under which Noramco would supply the Debtors with all products then manufactured at the Coventry Facility for a minimum term of seven years, with two two-year renewals available at the Debtors' option (collectively, the "**Coventry Transactions**"). The APA also contemplated additional ancillary documents, including a transition services agreement to effectuate the transfer of the Coventry Facility operations from the Debtors to the Purchaser.  On October 1, 2020, the Bankruptcy Court entered the *Order (I) Approving Sale of Debtors' Coventry Facility and Related Assets Free and Clear of Liens, Claims, Interests and Encumbrances, (II) Approving Debtors' Entry into a Long-Term API Supply Agreement, (III) Authorizing Assumption and Assignment, or Assignment, as Applicable, of Executory Contracts and Unexpired Leases and (IV) Granting Related Relief* [D.I. 1765].  The sale of the Coventry Facility closed and the parties entered into the Supply Agreement on December 31, 2020.  The Coventry Transactions are expected to materially increase the value of the Debtors' Estates.

## N.    Consideration of Unsolicited Offer for Certain Assets

In August, 2020, the Debtors were contacted on an unsolicited basis by a party (the "**Interested Party**") interested in discussing a proposed risk evaluation and mitigation strategy ("**REMS**") initiative and a potential acquisition of certain of the Debtors' assets.  At the time of

this initial contact, the Interested Party did not have the financial resources to acquire any material portion of the Debtors' assets. Following several discussions between the Debtors' advisors and the Interested Party, including a call with the Debtors' full management team regarding the proposed REMS initiative in October 2020, the Interested Party provided in November 2020 an asset purchase indication of interest. Although the Interested Party had still not demonstrated any ability to provide financing for any potential acquisition proposal, the Debtors determined that it was nevertheless in the best interests of its stakeholders to afford the Interested Party an opportunity to develop a potential offer. As a result, the Debtors and the Interested Party entered into a customary confidentiality agreement on November 16, 2020. Between late November 2020 and early January 2021, the Debtors executed additional confidentiality agreements with 10 potential financing sources to the Interested Party at the Interested Party's request.

On December 3, 2020, the Interested Party submitted a non-binding proposal to acquire substantially all of the operating assets of the Debtors. Of the aggregate consideration potentially payable to the Debtors under the proposal, approximately 70% was proposed to be paid in cash at closing of a transaction and the remainder was proposed to be payable in cash in the future, subject to material contingencies. The proposal lacked reasonable evidence of the Interested Party's ability to obtain the funds required to pay the proposed acquisition consideration. Notwithstanding that the Interested Party had not provided assurance that it had the ability to obtain the financing necessary to pay for its proposal, in the interest of providing the Interested Party the opportunity to obtain such financing, the Debtors agreed to commence a process to provide substantial due diligence information regarding the Debtors and their businesses to the Interested Party, the potential financing sources identified by the Interested Party, and their respective representatives and advisors.

Beginning in early December 2020 and continuing until late February 2021, the Debtors and their advisors dedicated hundreds of hours of time to obtain, organize, review and process over 22,000 pages of requested due diligence information, at a significant cost to the Debtors in fees and expenses and time commitment of its management and employees. In addition, the Debtors and their advisors conducted numerous due diligence discussions with the Interested Party and their respective representatives and advisors to allow the Interested Party to propose an actionable transaction.

After a number of discussions, given the overall status and timeline of the Debtors' bankruptcy process, the Debtors requested that the Interested Party submit a best and final binding bid with committed financing by January 8, 2021. At the request of the Interested Party, the Debtors agreed to extend the bid date to January 11, 2021. On January 11, 2021, the Interested Party submitted a revised proposal. Notwithstanding the bid requirements specified by the Debtors, the revised proposal was non-binding and subject to due diligence and was not supported by any financing commitments, which would have been required to pay the proposed acquisition consideration. Of the aggregate consideration potentially payable to the Debtors under the revised proposal, which was substantially the same as that in the December 3 proposal, only half would now be payable at closing of a transaction, with the remainder payable over a number of years and subject to significant contingencies. In addition, the non-binding proposal lacked material information necessary for the Debtors to evaluate the value of the proposed consideration. On January 14, 2021, the Interested Party provided certain additional

information; however, such information continued to lack significant information necessary for the Debtors to evaluate the proposal. On a number of occasions, the Debtors, together with the Creditors' Committee and the Ad Hoc Committee, sent follow-up questions to the Interested Party and requested discussions with the Interested Party. None of these discussions clarified all of the required information necessary to evaluate the proposal.

On January 18, 2021 and January 19, 2021, the Interested Party submitted letters from several potential financing sources.  Notwithstanding the bid requirements specified by the Debtors, the financing letters were non-binding, were subject to due diligence and were subject to further internal approvals of the applicable financing parties.  The financing letters also stated that they would not become binding unless and until definitive transaction documents were executed, which the Interested Party estimated would require an additional 60-day period, and also indicated that the financing sources could seek further syndication of their proposed financing commitments, which would also result in additional delay.  Furthermore, certain financing letters described a transaction that would effectively result in parties other than the Interested Party acquiring significant portions of the Debtors' assets.  In addition, the financing letter relating to the proposed acquisition of assets by such other party required the Debtors to deliver certain material assets not owned by the Debtors.

In late January 2021, through ongoing discussions with the Interested Party, the Debtors learned that the Interested Party was in fact only intending to assume a fraction of the Debtors' ordinary course ~~post-petition~~postpetition liabilities, leaving approximately $300 million dollars, and possibly more, of ~~post-petition~~postpetition liabilities to be borne by the bankruptcy estate as administrative claims, effectively resulting in a significant reduction in any upfront consideration offered by the Interested Party.  Moreover, the Purdue Pharma L.P. Pension Plan, a single-employer defined benefit pension plan covered by Title IV of ERISA (the "**Purdue Pension Plan**"),[~~47~~54] would not be transferred with the assets proposed to be acquired, and the Debtors estimate that, if they became subject to unfunded benefit liabilities on account of the Purdue Pension Plan, such claims would likely total approximately $180 million.  Moreover, the Interested Party would not continue the Debtors' Public Health Initiatives or undertake any other initiatives that would have allowed the Debtors to emerge as a public benefit company or similar entity and therefore satisfy the conditions necessary to benefit from the Forfeiture Judgment Credit in the DOJ Resolution.

On February 7, 2021, the Interested Party submitted a proposal that consisted of a completely revised and further degraded proposed transaction structure.  The revised structure contemplated an essentially "seller-financed" transaction whereby the Debtors would effectively transfer substantially all of its assets to the Interested Party in exchange for no consideration at consummation of such transaction, with the potential for the Debtors' Estates to receive payments over many years as repayment of the seller financing to the extent the Interested Party was able to generate sufficient revenues and profits in the future.  The revised proposed transaction structure continued to include the requirement that significant ~~post-~~

---

[~~47~~54]  The Purdue Pension Plan has approximately 3,200 participants.  PPLP is the contributing sponsor of the Purdue Pension Plan.  The Debtors that are members of the contributing sponsor's controlled group within the meaning of 29 U.S.C. §§ 1301(a)(13), (14) are jointly and severally liable with respect to the Purdue Pension Plan.  Further, any non-Debtor members of the contributing sponsor's controlled group are also jointly and severally liable with respect to the Purdue Pension Plan.

petition postpetition liabilities be borne by the bankruptcy estate as administrative claims and the
Purdue Pension Plan remain with the bankruptcy estate as described above.

Notwithstanding that the Interested Party's revised proposals had in each iteration
significantly reduced the proceeds reasonably/potentially deliverable to the Debtors, including
the reduction in proceeds payable at consummation of a transaction to zero, over the ensuing
weeks, the Debtors continued to permit the Interested Party to conduct further due diligence.

Based on a careful review of all of the materials submitted by, and the discussions that
occurred with, the Interested Party, its potential financing sources and their respective
representatives and advisors over many months, the Debtors determined that the proposals
submitted by the Interested Party were not value maximizing for the Debtors and its
stakeholders, provided significantly less cash to the estate than the Debtors' Plan, resulted in
stakeholders continuing to be tied to the performance of the Debtors' opioids business for a
significantly longer period of time than would the Plan, introduced risk of potentially significant
negative tax consequences on stakeholders, and were likely not capable of being executed upon
by the Interested Party, and that further diversion of the Debtors' resources towards discussions
with the Interested Party would only result in significant costs to the Debtors with a high risk of
no transaction being executed.

## O.    Continuation of Certain Prepetition Employee Compensation Programs

In order to maintain business operations during the Chapter 11 Cases, the Debtors sought
to continue certain preexisting employee compensation programs, which were critical to sustain
employee morale and protect the value of the Debtors' business. On September 16, 2019, the
Debtors filed the *Motion of Debtors for Entry of an Order Authorizing (I) Debtors to (A) Pay
Pre-Petition Wages, Salaries, Employee Benefits and Other Compensation and (B) Maintain
Employee Benefits Programs and Pay Related Administrative Obligations, (II) Employees and
Retirees to Proceed with Outstanding Workers' Compensation Claims and (III) Financial
Institutions to Honor and Process Related Checks and Transfers* [D.I. 6] (the "**Wages Motion**").
As part of the relief requested in the Wages Motion, the Debtors sought to continue two long-
standing compensation programs: their annual incentive program (the "**AIP**") and their long-
term results plan (the "**LTRP**," and together with the AIP, the "**PrePetition Incentive Plans**").
The AIP designates payments on an annual basis to eligible employees based on a combination
of employee performance and the performance of the Debtors. The LTRP is a long-term cash
incentive program that provides an annual grant to employees based on a three-year performance
period.  The Debtors also sought, *inter alia*, to continue a non-executive retention plan.

Objections to the Wages Motion were filed by the U.S. Trustee, Nevada Counties and
Municipalities, the Commonwealth of Pennsylvania, the NCSG and the State of Arizona
[D.I. 134, 190, 196, 197, 201]. The New York State Department of Financial Services also
submitted an informal objection [D.I. 99].  The NCSG filed a statement maintaining its and
certain of its members' objections insofar as such objections related to the Debtors' CEO
[D.I. 557].

The Debtors agreed to multiple partial adjournments of the Wages Motion such that
various elements of the relief sought in the Wages Motion were considered at different hearings.

Following extensive negotiations with certain creditor groups, the Debtors agreed to certain modifications to the relief sought in the Wages Motion. The Debtors reached agreement on, or agreement not to object to, modified relief with all relevant creditor groups except with respect to the Debtors' CEO's incentive compensation, which was opposed only by the NCSG. The modified relief sought in the Wages Motion was granted in the *Final Order Authorizing (I) Debtors to (A) Pay Pre-Petition Wages, Salaries, Employee Benefits and Other Compensation and (B) Maintain Employee Benefits Programs and Pay Related Administrative Obligations, (II) Employees and Retirees to Proceed with Outstanding Workers' Compensation Claims and (III) Financial Institutions to Honor and Process Related Checks and Transfers* [D.I. 309]; the *Supplemental Final Order Authorizing (I) Debtors to (A) Pay Pre-Petition Wages, Salaries, Employee Benefits and Other Compensation and (B) Maintain Employee Benefits Programs and Pay Related Administrative Obligations, (II) Employees and Retirees to Proceed with Outstanding Workers' Compensation Claims and (III) Financial Institutions to Honor and Process Related Checks and Transfers* [D.I. 629] and the *Second Supplemental Final Order Authorizing (I) Debtors to (A) Pay Pre-Petition Wages, Salaries, Employee Benefits and Other Compensation and (B) Maintain Employee Benefits Programs and Pay Related Administrative Obligations, (II) Employees and Retirees to Proceed with Outstanding Workers' Compensation Claims and (III) Financial Institutions to Honor and Process Related Checks and Transfers* [D.I. 629].

P.     **Key Employee Incentive Program and Key Employee Retention Program**

The Debtors developed a Key Employee Incentive Program (the "**KEIP**") and the Key Employee Retention Program (the "**KERP**," and together with the KEIP, the "**Compensation Plans**"), in order to ensure the continued motivation, engagement and retention of the Debtors' workforce and the maximization of the value of the Debtors' Estates. On September 9, 2020, the Debtors filed the *Motion of Debtors for Entry of an Order Authorizing Implementation of a Key Employee Incentive Plan and a Key Employee Retention Plan* [D.I. 1674] (the "**Compensation Motion**").

The KEIP, as initially designed, would have applied to the Debtors' eight then-current insider employees, consisting of the: (i) CEO; (ii) CFO; (iii) General Counsel; (iv) Senior Vice President, Intellectual Property Law & Public Health Initiatives; (v) Chief Technical Operations Officer; (vi) President, Imbrium Therapeutics; (vii) President, Rhodes Pharmaceuticals; and (viii) President, Rhodes Technologies. After filing the Compensation Motion, the President of Imbrium Therapeutics and the Debtors' Senior Vice President, Intellectual Property Law & Public Health Initiatives resigned and therefore became ineligible for the proposed KEIP. The KERP applies to virtually all incentive-eligible employees other than the employees covered under the KEIP.

On September 22, 2020, the U.S. Trustee and the Ad Hoc Committee on Accountability filed objections to the Compensation Motion [D.I. 1708, 1710].

After extensive discussions with creditor groups, the Debtors agreed to certain modifications to the proposed KEIP and KERP. The Debtors also agreed to multiple partial adjournments of the Compensation Motion such that various elements of the relief sought in the Compensation Motion were considered at different hearings. On October 1, 2020, the

Bankruptcy Court entered the *Order Authorizing the Debtors to Implement a Key Employee Retention Plan* [D.I. 1762]. On October 28, 2020, the Bankruptcy Court entered the *Order Authorizing the Debtors to Implement a Key Employee Incentive Plan* [D.I. 1861], which granted the Debtors authority to implement the KEIP as modified with respect to (i) General Counsel; (ii) Chief Technical Operations Officer; (iii) President, Rhodes Pharmaceuticals; and (iv) President, Rhodes Technologies. On November 17, 2020, the Bankruptcy Court entered the *Supplemental Order Authorizing the Debtors to Implement a Key Employee Incentive Plan* [D.I. 2002], which granted the Debtors authority to implement the KEIP as modified with respect to the CEO and CFO.

## Q.    Extension of Exclusive Periods

Section 1121(b) of the Bankruptcy Code provides for a period of one hundred twenty (120) days after the commencement of a chapter 11 case during which time a debtor has the exclusive right to file a plan of reorganization (the "**Exclusive Filing Period**"). In addition, section 1121(c)(3) of the Bankruptcy Code provides that if the debtor files a plan within the Exclusive Filing Period, it shall have a period of one hundred eighty (180) days after commencement of the chapter 11 case to obtain acceptances of such plan (the "**Exclusive Solicitation Period**," and together with the Exclusive Filing Period, the "**Exclusivity Periods**"). Pursuant to section 1121(d) of the Bankruptcy Code, the Bankruptcy Court may, upon a showing of cause, extend the Exclusivity Periods.

The Debtors' Exclusive Filing Period and Exclusive Solicitation Period were initially set to expire on January 13, 2020 and March 13, 2020, respectively. On January 28, 2020, the Court entered the *Order Extending the Exclusive Periods Within Which to File a Chapter 11 Plan and Solicit Acceptances Thereof* [D.I. 782] (the "**First Extension Order**") extending the Exclusive Filing Period and the Exclusive Solicitation Period through and including Monday, July 13, 2020 and Wednesday, September 9, 2020, respectively.  On July 24, 2020, the Court entered the *Second Order Extending the Exclusive Periods Within Which to File a Chapter 11 Plan and Solicit Acceptances Thereof* [D.I. 1517] (the "**Second Extension Order**") extending the Exclusive Filing Period and the Exclusive Solicitation Period through and including Thursday, December 10, 2020 and Monday, February 8, 2021, respectively.  On December 16, 2020, the Court entered the *Third Order Extending the Exclusive Periods Within Which to File a Chapter 11 Plan and Solicit Acceptances Thereof* [D.I. 2143] (the "**Third Extension Order**") extending the Exclusive Filing Period and Exclusive Solicitation Period through and including Monday, February 15, 2021 and Monday, May 17, 2021, respectively. On March 1, 2021, the Court entered the *Fourth Order Extending the Exclusive Periods Within Which to File a Chapter 11 Plan* [D.I. 2433] (the "**Fourth Extension Order**") extending the Exclusive Filing Period through and including Monday, March 15, 2021.

## R.    Information Sharing/Diligence

From the outset of their chapter 11 cases, the Debtors have been committed to transparency and robust information sharing, both of which the Debtors believe are critical in cases of this magnitude and public import.  To that end, the Debtors have provided an extensive amount of diligence and discovery material—totaling over 90 million pages—on a wide range of topics, including in response to requests from the Debtors' major creditor groups, such as the

Creditors' Committee, the Ad Hoc Committee, the NCSG, the MSGE, the NAS Committee, the Ad Hoc Group of Hospitals, the Personal Injury Claimants, and the DOJ. A select summary of key aspects of the Debtors' information sharing follows:

In addition to the public reports prepared at the direction of the Debtors' Special Committee described in Article II.E above, the Debtors have provided extensive amounts of document discovery to key stakeholders. These materials include, for example, more than 10 million documents, totaling more than 70 million pages, which had been previously produced by the Debtors in the federal multidistrict litigation pending in the Ohio MDL and in similar non-MDL civil litigations, and more than 2.5 million documents, totaling 13.5 million pages, that had been previously produced to the DOJ in connection with its investigation of the Debtors.

These enormous productions, however, only represent a small fraction of the Debtors' information sharing efforts. Recognizing the Creditors' Committee's important role in these chapter 11 cases, the Debtors also agreed to undertake review of substantial email and document collections from over 50 custodians, including from additional Sackler Families custodians and Directors, in most cases for time periods going back 25 years, and make corresponding productions. These productions have resulted in the provision of more than 680,000 documents, totaling more than 4.2 million pages, to the Creditors' Committee and NCSG.

The Debtors also reached an extraordinary agreement in connection with a negotiated resolution of two motions filed by the Creditors' Committee to share over 16,000 of the Debtors' privileged documents, which are ordinarily not subject to discovery, with the Creditors' Committee on a common interest basis. These productions included privileged documents related to distributions or transfers of assets from the Company to the Sackler Families or entities owned by or operated for the benefit of Sackler Families members; privileged documents that were contemporaneously sent to or by Sackler Families members or Purdue Board members during their time serving on the Debtors' Board; and privileged documents identified by the Debtors' Special Committee's counsel as important to its investigation—all of which go to the heart of the investigation of possible estate claims against the Sacklers. And the Debtors have agreed to continue to produce privileged documents meeting these criteria to the extent discovered during other ongoing document reviews by the Special Committee.

Parallel to the foregoing efforts, the Debtors have separately provided almost a million pages of diligence materials (comprising both original analyses and historical documents) to the Creditors' Committee and other key stakeholders in response to dozens of requests. These include materials comprising original analyses and reams of historical documents on a wide variety of topics, including, for example, compilations of all settlements, lists of all personal injury claims ever filed against Purdue, compilations of licensing and royalty agreements, granular opioid sales data at the prescription level over a 22-year period, and much more.

Finally, the Debtors have worked closely with other parties to support and facilitate extensive discovery and information sharing from members of the Sackler Families and entities associated with them. As a result of the parties' efforts, the Sackler Families, certain financial institutions with which they have had relationships, and other non-Sackler Board members among others, have produced over 600,000 documents (totaling over 3.2 million pages) in these Chapter 11 Cases. The Sackler Families' IACs have also made productions totaling over

830,000 documents and over 8.3 million pages.  Finally, another 180,000 documents, totaling over a 1.3 million pages, have been produced from the files of Norton Rose Fulbright LLP, a longtime advisor to the Debtors, the Sackler Families and Sackler-related entities.  In addition to these document productions, the Creditors' Committee and NCSG took 16 depositions of members of the Sackler Families, current and former Board members, current employees of the Debtors, and other parties, which counsel for the Debtors' Special Committee attended.

## S.    Mediation

On February 20, 2020, the Debtors filed the *Debtors' Motion for Entry of an Order Appointing Mediators* [D.I. 855] (the "**Mediation Motion**"), seeking to appoint the Honorable Layn Phillips and Mr. Kenneth Feinberg as co-mediators (together, the "**Mediators**") to conduct mediation in the Chapter 11 Cases and mandating that the Debtors, the Creditors' Committee, and various ad hoc committees and groups in the Chapter 11 Cases participate in mediation (the "**Mediation**").  After a telephonic hearing on March 2, 2020, the Bankruptcy Court entered an order approving the Mediation Motion.  *See Order Appointing Mediators* [D.I. 895] (the "**Mediation Order**").  The following parties (collectively, the "**Mediation Parties**") participated in the mediation: (i) the Debtors; (ii) the Creditors' Committee (including ex officio members); (iii) the Ad Hoc Committee;[48][55] (iv) the NCSG;[49][56] (v) the MSGE;[50][57] (vi) the Ad Hoc Group of Individual Victims[51][58] (the "**Personal Injury Claimants**"); (vii) the Ad Hoc Group of NAS Children[52][59] (the "**NAS Committee**"); (viii) representatives of a group of hospitals in the United States[53][60] (the "**Ad Hoc Group of Hospitals**"); (ix) counsel for the Blue Cross Blue Shield Association, various private third-party payors and health insurance carrier plaintiffs (the "**Private Third-Party Payors**"); and (x) counsel for a putative class of individual health insurance purchasers[54][61] (the "**Ratepayers**").  The following parties participated in the Mediation process although they were not "Mediation Parties" as defined in the Mediation Order: (a) the United States of America; (b) the Muscogee (Creek) Nation, a member of the Ad Hoc Committee, the Cheyenne and Arapaho Tribes, an ex officio member of the Creditors' Committee, and other federally recognized tribes represented by various counsel from the Tribal Leadership Committee and the Plaintiffs Executive Committee in MDL No. 2804 (the "**Native American Tribes**"); (c) proposed representatives of a putative class of independent public school districts (the "**IPSDs**"); (d) proposed representatives of a putative class of children born with NAS in the State of West Virginia (the "**WV NAS**"); (e) the National Association for the Advancement of Colored People (the "**NAACP**"); and (f) a group of individual victim advocates which refer to themselves as the "Ad Hoc Committee on Accountability."

The Mediators' initial and exclusive objective pursuant to the Mediation Order was to mediate the dispute(s) between the Non-Federal Public Claimants (as defined in the Mediation Motion), on the one hand, and the Private Claimants (as defined in the Mediation Motion), on the other, as to the allocation of value/proceeds available from the Debtors' Estates, including,

---

[48][55]  The Rule 2019 Statement for the Ad Hoc Committee is filed at D.I. 279.

[49][56]  The Rule 2019 Statement for the NCSG is filed at D.I. 296.

[50][57]  The Rule 2019 Statement for the MSGE is filed at D.I. 1794.

[51][58]  The Rule 2019 Statement for the Personal Injury Claimants is filed at D.I. 1480.

[52][59]  The Rule 2019 Statement for the NAS Committee is filed at D.I. 1582.

[53][60]  The Rule 2019 Statement for the Ad Hoc Group of Hospitals is filed at D.I. 1536.

[54][61]  The Rule 2019 Statement for the Ratepayers is filed at D.I. 333.

without limitation, from any settlements, to such claimants, in each case on an aggregate basis as between them. Mediation provided the least expensive means to achieve a consensual resolution of the Chapter 11 Cases and avoid the protracted, burdensome and costly process associated with testing the validity of each of the claims filed in the Chapter 11 Cases through a claims objection process.  The Mediators engaged in numerous informal discussions with the Mediation Parties commencing February 28, 2020, and conducted a series of rigorous formal mediation sessions during the period from March 6, 2020 to September 11, 2020.

The Mediation facilitated the resolution of critical issues in the Chapter 11 Cases. First, the Non-Federal Public Claimants agreed that all value received by them through the Chapter 11 Cases would be exclusively dedicated to programs designed to abate the opioid crisis, and that such value could not be used for any other purpose (other than an amount to fund administration of the programs themselves and to pay legal fees and costs).  Second, the Non-Federal Public Claimants addressed and resolved other significant issues, including value allocation for all Native American Tribes (and the inclusion of culturally appropriate abatement programs for these communities) and a default mechanism that, in the absence of a stand-alone agreement between a State or territory and its political subdivisions, provides a structure and process for applying funds to abate the opioid crisis and ensures consultation through local participation mechanisms in determining which programs will be funded from value received.  Third, agreement was reached on written term sheets with certain individual Private Claimant groups that addressed allocation of estate value to each Private Claimant group.  These agreements provided, among other things, that each class of Private Claimants will receive fixed cash distributions over time, the values and time periods varying for each class.  Moreover, the Ad Hoc Group of Hospitals, the Third-Party Payors, and the NAS Committee (with regard to medical monitoring) each agreed to dedicate substantially all the distributions from their respective Private Creditor Trusts to abate the opioid crisis.  Additional information regarding the results of the Mediation can be found in the *Mediators' Report* [D.I. 1716].  These agreements are embodied in the Plan.

On September 30, 2020, the Bankruptcy Court entered the *Order Expanding Scope of Mediation* [D.I. 1756] (the "**Supplemental Mediation Order**"), which authorized the Mediators to continue the Mediation to resolve certain open issues referenced in the Mediators' Report, as well as to mediate the estate causes of action and any potential claims or causes of action held by any of the Non-Federal Public Claimants against, or that otherwise may become the subject of releases for, members of the Sackler Families in Phase 2 of Mediation.  This phase of Mediation is discussed in Article III.Y below, which describes the settlement of claims against the Sackler Families.

The relevant Classes and the treatment that such Classes will receive based on the agreements reached in the first phase of the Mediation are described in more detail below.

### 1.      *Hospital Claims (Class 6)*

Some providers of healthcare treatment services or social services (excluding Domestic Governmental Entities, the "**Hospitals**") filed Proofs of Claim against the Debtors for, among other things, alleged increased or otherwise un- or under-reimbursed costs relating to the

provision of services to or on account of persons who have, at some point, ingested opioids. Some of these ~~Hospitals~~Holders of Hospital Claims filed prepetition lawsuits, including some putative class actions, against the Debtors.[62]  The ~~Hospitals~~Holders of Hospital Claims have asserted the following causes of action, without limitation, against the Debtors: (i) violations of the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. § 1961, *et seq.* ("**RICO**") and state law equivalents, (ii) nuisance, (iii) negligence, (iv) common law fraud, and (v) violations of state consumer protection statutes.  Pursuant to the Plan, Hospital Claims consist of all Claims against any Debtor held by a provider of healthcare treatment services or any social services, in its capacity as such, and that is not held by a Domestic Governmental Entity, including, based on the Debtors' initial review, the Claims set forth in the 1,030 Proofs of Claims filed by hospitals and the 150 Proofs of Claims filed by other treatment providers.  All Hospital Claims and all ~~related~~ Claims against Released Parties or Shareholder Released Parties held by providers of healthcare treatment services or any social services, in their capacity as such, will be channeled to the Hospital Trust.  The Hospital Trust will be funded in an initial amount of $25 million from the Debtors on the Effective Date. In addition, the Hospital Trust will be entitled to funding from the Master Disbursement Trust in the aggregate amount of $225 million, consisting of (a) $35 million on July ~~30~~31, 2022; (b) $45 million on July ~~30~~31, 2023; (c) $45 million on July ~~30~~31, 2024; (d) $50 million on July ~~30~~31, 2025; and (e) $50 million on July ~~30~~31, 2026 on the terms specified in the Plan.

The Hospital Trust will make distributions (net of attorneys' fees and costs) to those ~~Hospitals~~Holders of Hospital Claims that either (i) filed timely Proofs of Claim prior to the General Bar Date of July 30, 2020, or (ii) are listed on the national registry of hospitals maintained by the American Hospital Directory ®, as in effect on the Effective Date *and* are (x) non-federal acute care hospitals as defined by CMS or (y) non-federal hospitals or hospital districts that are required by law to provide inpatient acute care and/or fund the provision of inpatient acute care, subject to certain other eligibility criteria set forth in the ~~trust distribution procedures (the "~~Hospital Trust Distribution Procedures~~")~~ set forth in the Hospital Trust Documents in the Plan Supplement (those ~~Hospitals~~Holders of Hospital Claims that satisfy such criteria, the "**Hospital Authorized Recipients**").  In order to receive an abatement distribution from the Hospital Trust, ~~Hospitals~~Holders of Hospital Claims will be required to submit a Hospital Abatement Distribution Form (as defined with the Hospital Trust Documents) to the Hospital Trust accompanied by certain additional data.  In particular, the Hospital Abatement Distribution Form includes, among other things, a requirement to (i) certify that such Holder adheres to the standard of care for the emergency department, hospital wards and outpatient clinics at the time of any prospective evaluation, diagnosis, and treatment of OUD, including with respect to the applicable standard of care for the treatment of addiction, acute withdrawal and treatment for OUD with medication assisted treatment, and provides discharge planning and post-discharge care coordination for patients with OUD, including information for appropriate OUD treatment services and (ii) submit, to the extent not already submitted in connection with its Proof of Claim, Requisite Claims Data including, among other things, copies of all claims, complaints, proofs of claim, notices, settlement documents, releases, recoveries, compensation received, or similar documents that a Holder of a Hospital Claim submits or entered into in

---

[62] Capitalized terms used in Article III.S.1 of the Plan shall have the meaning attributed to such terms in the Hospital Trust Documents and the Plan, as applicable.

respect of claims asserted against or to be asserted against any other entity or person arising from or related to such Holder of a Hospital Claim's OUD program or related to any of the injuries that underlie such claim. The amount of the abatement distribution(s) made to each Hospital Authorized Recipient shall be subject to a calculation methodology set forth in the Hospital Trust Documents that is based on (1) the diagnostic codes associated with operational charges incurred by the Hospital Authorized Recipient in connection with the treatment of Opioid Use Disorder ("**OUD**"), (2) the portion of such charges that were not reimbursed, and (3) certain other weighted determination factors, as set forth in further detail therein.

Hospital Authorized Recipients will be required to spend all distributions from the Hospital Trust for Hospital Authorized Abatement Purposes, as defined in the Plan, including (i) the Authorized Abatement Purposes set forth in the Hospital Trust Documents or (ii) the payment of attorneys' fees and costs of the Holders of Hospital Channeled Claims (including counsel to the Ad Hoc Group of Hospitals). Spending for a Hospital Authorized Abatement Purpose is designed to, among other things, provide transportation to treatment facilities for patients with OUD, provide continuing professional education in addiction medicine, including programs addressing stigma, allow participation in community efforts to provide OUD treatment to others in the community, such as those in jails, prisons, or other detention facilities, provide community education events on opioids and OUD, provide Naloxone kits and instruction to patients upon discharge, implement needle exchanges in hospitals or adjacent clinics and provide on-site Medication-Assisted Treatment ("**MAT**") services if possible, build or lease space to add half-way house beds, participate in research regarding development of innovating OUD treatment practices, direct moneys to any other public or private Authorized Recipient of funds concerning the treatment of persons with OUD or other opioid-related diagnoses; *provided* that such recipient's use of such funds would otherwise constitute an Authorized Abatement Purpose, and support MAT Programs. Each Hospital Authorized Recipient will have to submit to the Trustee on its Hospital Abatement Distribution Form a written statement that all funds will be spent only in the Hospital Authorized Recipient's Service Area.

The Hospital Trust's administrative expenses will be governed by the Hospital Trust Agreement. The Hospital Trust Agreement will provide that the Trustee shall use commercially reasonable efforts to ensure that the costs of administering the Hospital Trust are reasonable in all respects, but that the Trustee shall not be bound by any annual or cumulative "caps" on such expenditures.

Subject to the consent of the Debtors (which consent shall not be unreasonably withheld, delayed or denied), the Ad Hoc Group of Hospitals will choose a Trustee. The Hospital Trust Agreement will provide that the Honorable Thomas L. Hogan (ret.) will serve as Trustee. In the event of a vacancy in the Trustee position, whether by term expiration, death, retirement, resignation, or removal, the vacancy shall be filled by the unanimous vote of the Trust Advisory Committee ("**TAC**"). In the event that the TAC cannot appoint a successor Trustee, for any reason, the Bankruptcy Court shall select the successor Trustee. Immediately upon the appointment of any successor Trustee, all rights, titles, duties, powers, and authority of the predecessor Trustee shall be vested in, and undertaken by, the successor Trustee without any further act. Each successor Trustee shall serve until the earliest of (i) the expiration of his or her term, (ii) his or her death, (iii) his or her resignation, (iv) his or her removal, or (v) the termination of the Hospital Trust.

The Hospital Trust Agreement will provide that the initial TAC shall consist of one member. The sole member of the TAC shall be Jeffrey James, CPA. The TAC shall consist of not less than one member, and shall never consist of more than three individuals.

The Hospital Trust Agreement shall provide that the Trustee shall have the power to appoint such officers, hire such employees, engage such legal, financial, accounting, investment, auditing, forecasting, and other consultants, advisors, and agents as the business of the Hospital Trust requires, and delegate to such persons such powers and authorities as the fiduciary duties of the Trustee permit and as the Trustee, in its discretion, deem advisable or necessary in order to carry out the terms of the Hospital Trust, including without limitation the Delaware Trustee, and any third-party claims or noticing agent deemed necessary or convenient by the Trustee, and pay reasonable compensation to those employees, legal, financial, accounting, investment, auditing, forecasting, and other consultants, advisors, and agents employed by the Trustee after the Effective Date (including those engaged by the Hospital Trust in connection with its alternative dispute resolution activities).

The Hospital Trust Agreement will further provide that the Trustee shall receive a retainer from the Hospital Trust for his or her service as a Trustee in the amount of $25,000 per annum, paid annually. Hourly time, as described below, shall first be billed and applied to the annual retainer. Hourly time in excess of the annual retainer shall be paid by the Hospital Trust. For all time expended as a Trustee, including attending meetings, preparing for such meetings, and working on authorized special projects, the Trustee shall receive the sum of $525 per hour. For all non-working travel time in connection with Hospital Trust business, the Trustee shall receive the sum of $275 per hour. All time shall be computed on a decimal (1/10th) hour basis. The Hospital Trust Agreement shall also provide that the member(s) of the Trust Advisory Committee shall receive compensation from the Hospital Trust for services on the TAC at the same hourly rate as the Trustee (but with no annual retainer). Additionally, the Hospital Trust will promptly reimburse the member(s) of the TAC for all reasonable out-of-pocket costs and expenses incurred in connection with the performance of their duties as set forth in the Hospital Trust Documents.

The Hospital Trust Agreement will provide that neither the Trustee nor the Delaware Trustee shall be required to post any bond or other form of surety or security unless otherwise ordered by the Bankruptcy Court.

## 2. Third-Party Payor Claims (Class 7)

Numerous Private Third-Party Payors filed Proofs of Claim against the Debtors seeking damages for allegedly improper and fraudulent prescriptions of opioids and for the alleged increased healthcare costs caused by their members' opioid use and dependency.[63] Some of the Private Third-Party Payors filed prepetition lawsuits against the Debtors asserting, without limitation, (i) violations of RICO and state law equivalents, (ii) nuisance, (iii) negligence, (iv) common law fraud, and (v) violations of state consumer protection statutes. The Private Third-Party Payors were represented in the Mediation by counsel for the Blue Cross Blue Shield

---

[63] Capitalized terms used in Article III.S.2 of the Plan shall have the meaning attributed to such terms in the TPP Trust Documents and the Plan, as applicable.

Association and various Private Third-Party Payors and health insurance carrier plaintiffs. Pursuant to the Plan, Third-Party Payor Claims consist of all Claims against any Debtor held by a health insurer, an employer-sponsored health plan, a union health and welfare fund or any other provider of healthcare benefits, and including any third-party administrator or agent on behalf thereof, in each case in its capacity as such (including any Claim based on the subrogation rights of the Holder thereof that is not ~~otherwise~~ an Other Subordinated Claim) that is not a Domestic Governmental Entity; *provided* that Claims in respect of self-funded government plans that were and are asserted through a private third-party payor are included in the defined term "Private Third-Party Payor Claims." For the avoidance of doubt, claims of Third-Party Payors against Holders of PI Claims or Distributions payable to Holders of PI Claims, to the extent such claims exist, are not claims against any Debtor and therefore are not included in this definition of "Third-Party Payor Claims." All Third-Party Payor Claims and all ~~related~~ Claims against Released Parties or Shareholder Released Parties held by Third-Party Payors that are not Domestic Governmental Entities will be channeled to the TPP Trust. The TPP Trust will be funded in an initial amount of $1 million from the Debtors on the Effective Date. In addition, the TPP Trust will be entitled to further funding from the Master Disbursement Trust in the aggregate amount of $364 million, consisting of (a) $121 million on July ~~30~~31, 2022; (b) $121 million on July ~~30~~31, 2023; and (c) $122 million on July ~~30~~31, 2024 on the terms specified in the Plan.

The TPP Trust will make distributions to eligible Private Third-Party Payors based on their Maximum Eligible Amount ~~(as defined in the TPP Trust Documents)~~ as calculated pursuant to ~~trust distribution procedures~~the TPP Trust Distribution Procedures set forth in the TPP Trust Documents in the Plan Supplement, including the Trust Distribution Procedures included therein ~~(the "TPP Trust Distribution Procedures")~~. The Maximum Eligible Amount is calculated taking into consideration, (i) the number of subscribers or dependents covered under the TPP Claimant's plan during some or all of the period from January 1, 2008 through December 31, 2019 (each, a "**Unique Member**") who were prescribed one or more of the drugs identified on the NDC List;~~55~~64 (ii) the number of unique prescriptions paid, all or in part, by your plan for the drugs identified on the NDC List; (iii) the total final dollars paid by your plan for the prescriptions for the drugs identified in (ii); (iv) the number of Unique Members identified in (i) above who were diagnosed with an Opioid Use Disorder, using one or more of the codes on the OUD ICD 10 List; and (v) for the Unique Members identified in (iv) above, the total dollar amount of medical claims with the ICD, CPT, or HCPS codes on the OUD Medical Claims Codes List, paid for those Unique Members.

~~Private Third-Party Payors~~TPP Authorized Recipients will be required to spend all distributions from the TPP Trust for Authorized Abatement Purposes, as defined in the Plan, which means (i) an authorized opioid abatement purpose, as set forth in the TPP Trust Documents ~~and~~or (ii) the payment of attorneys' fees and costs of ~~the holders of Allowed~~TPP Authorized Recipients (including counsel to the Third-Party Payor ~~Claims~~Group). Spending for an authorized opioid abatement purpose is designed to, among other things, expand access to Medication Assisted Treatment ("**MAT**") therapies, reduce the costs to patients of MAT therapies, improve the delivery of services to treat Opioid Use Disorder ("**OUD**") and Substance

---

~~55~~64 The NDC List, OUD ICD 10 List, and OUD Medical Claims Codes List, as referenced herein, will be included with the Third-Party Payor Abatement Claim Form.

Use Disorder or Mental Health Conditions ("**SUD/MH**"), increase the availability or quality of services to treat OUD and SUD, or subsidize MAT-related expenses, subsidize the cost of treatment for OUD and SUD, and support organizations whose mission is to provide treatment of OUD and SUD.

The amount of the TPP Trust Assets available to make payments to holders of Third-Third Party Claims will be subject to certain deductions, including for the fees and expenses of administering the TPP Trust.

In order to have their Third-Party Claims considered by the TPP Trust, the Holders of such Claims (the Private Third-Party Payors who satisfy such criteria, "**TPP Authorized Recipients**") must:

(i)     Have timely filed a Proof of Claim in the Debtors' Chapter 11 case in accordance with the General Bar Date of July 30, 2020;

(ii)    Timely submit an additional, completed TPP Abatement Claim Form to the TPP Trust by the TPP Abatement Claim Deadline, which shall be no later than the first Business Day that is [sixty (60) days] after the Effective Date of the Plan (the "**TPP Abatement Claim Deadline**"), in accordance with the instructions provided with the TPP Abatement Claim Form; and

(iii)   Have provided in connection with such TPP Abatement Claim Form, by or before the TPP Abatement Claim Deadline, a calculation of its Purdue-Related Opioid Spend (as defined in Appendix B to the Trust Distribution Procedures), utilizing the Maximum Eligible Amount Calculation Methodology.[5665]

After the TPP Abatement Claim Deadline has passed, the TPP Trust Trustee and the Trustee's professionals shall review the applicable Proofs of Claim and TPP Abatement Claim Form and make initial determinations of the Maximum Eligible Amount of each TPP Authorized Recipient and the allocations of Abatement Distributions to such TPP Authorized Recipients. Such TPP Authorized Recipients will then have an opportunity to challenge such determinations, as set forth in the TPP Trust Distribution Procedures.

Any TPP Claimant that failed to timely file a Proof of Claim on or before July 30, 2020, is barred from asserting or seeking to enforce its Third-Party Payor Claim, pursuant to the Bar Date Order, and shall not be a TPP Authorized Recipient or eligible to receive a TPP Abatement Distribution from the TPP Trust.  Any TPP Claimant that does not submit a TPP Abatement Claim Form shall not qualify as a TPP Authorized Recipient, and any TPP Claimant that submits a TPP Abatement Claim Form after the TPP Abatement Claim Deadline shall not qualify as a TPP Authorized Recipient, and shall have no right to any distribution from the TPP Trust. No TPP Abatement Claim Form shall be accepted after the TPP Abatement Claim Deadline.

Private Third-Party Payors may also elect to participate in the LRP Agreement, described in Article IIIS.2 hereof. The LRP Agreement is the result of negotiations between representatives

---

[5665] The Maximum Eligible Amount Calculation Methodology is provided in the TPP Trust Distribution Procedures.

of the Private Third-Party Payors and representatives of the Holders of PI Claims, and provides a lien resolution ~~procedures~~program that address the reimbursement and lien claims that Private Third-Party Payors may hold against Holders of PI Claims and Distributions to Holders of PI Claims. The LRP Agreement is an exhibit to the PI Trust Agreement and is a Plan Document.

**ALL HOLDERS OF THIRD-PARTY PAYOR CLAIMS ARE ENCOURAGED TO CAREFULLY READ THE PLAN, AS WELL AS THE TPP TRUST DISTRIBUTION PROCEDURES (INCLUDING THE INSTRUCTIONS FOR THE CALCULATION AND FILING OF THE TPP ABATEMENT CLAIM FORM), THE ABATEMENT AGREEMENT, THE TPP TRUST AGREEMENT AND THE LRP AGREEMENT. A COPY OF THE PLAN IS ATTACHED HERETO. ALL OF THE OTHER DOCUMENTS IDENTIFIED IN THIS SECTION HAVE EITHER BEEN FILED OR WILL BE FILED WITH THE BANKRUPTCY COURT IN THE PLAN, THIS DISCLOSURE STATEMENT, OR THE PLAN SUPPLEMENT.**

This Disclosure Statement, including the Plan and the other exhibits thereto, and, once filed, the Plan Supplement, may be obtained at no charge from the Solicitation Agent by (a) calling the Debtors' restructuring hotline at (844) 217-0912 (toll-free) or (347) 859-8093 (international); (b) visiting the Debtors' restructuring website at https://restructuring.primeclerk.com/purduepharma; (c) writing to Purdue Pharma Ballot Processing, c/o Prime Clerk LLC, One Grand Central Place, 60 East 42nd Street, Suite 1440, New York, NY 10165; and or (d) emailing purduepharmainfo@primeclerk.com. You may also obtain copies of any pleadings filed in these Chapter 11 Cases for a fee via PACER at http://www.nysb.uscourts.gov.

The administration of the TPP Trust will be governed by the TPP Trust Documents. With the consent of the Debtors (which consent shall not be unreasonably withheld, delayed or denied), the Third-Party Payor Group will select a Trustee.  The Trustee shall have the power and authority to perform all functions on behalf of the TPP Trust, and shall undertake all administrative responsibilities of the TPP Trust (whether directly or through professionals and agents engaged by the TPP Trust, including a claims administrator) as are provided in the Plan and the TPP Trust Documents. The Trustee shall be responsible for all decisions and duties with respect to the TPP Trust, as more fully set forth in the TPP Trust Agreement.

The TPP Trust Agreement will provide that the Trustee shall have the authority to, in his/her discretion, consult with and retain attorneys, financial advisors, accountants, or other professionals and employees, including any third-party claims administrators or claims and noticing agent, as the Trustee deems appropriate in the reasonable exercise of his/her discretion, and who the Trustee reasonably determines to have qualifications necessary to assist the Trustee in the proper administration of the TPP Trust. The Trustee may pay the reasonable fees, costs and expenses of such persons (including to him/herself and his/her firm) out of the assets of the TPP Trust in the ordinary course of business, pursuant to the terms of the TPP Trust Agreement.

The TPP Trust Agreement will provide for the compensation of the Trustee and shall provide that the Trustee shall not be required to post any bond or other form of surety or security unless otherwise ordered by the Bankruptcy Court.

### 3.    *Ratepayer Claims (Class 8)*

Several Ratepayers filed Proofs of Claim against the Debtors under the theory that the opioid crisis caused increased healthcare costs that were, in turn, passed along to them by their insurance providers in the form of increased health insurance premiums, deductibles, and co-payments. Putative Ratepayer class action lawsuits were filed against the Debtors before the petition date, alleging, without limitation, (i) violations of RICO and state law equivalents, (ii) nuisance, (iii) negligence, (iv) common law fraud, and (v) violations of state consumer protection statutes. Pursuant to the Plan, in satisfaction of Ratepayer Claims, which consist of all Claims against any Debtor that arise out of or relate to the payment for health insurance by the Holder of such Claim, the Debtors will make a contribution to the Truth Initiative Foundation to be used for national opioid prevention and education efforts, which shall be made by the Debtors from Effective Date Cash in the amount of $6.5 million less attorneys' fees awarded in respect of Ratepayer Claims.

### 4.    *NAS Monitoring Claims (Class 9)*

The legal guardians of certain NAS Children filed prepetition lawsuits against the Debtors asserting, without limitation, (i) violations of RICO and state law equivalents, (ii) nuisance, (iii) negligence, (iv) common law fraud, and (v) violations of state consumer protection statutes, some of which sought compensation for medical monitoring and opioid related abatement costs.[5766] Pursuant to the Plan, NAS Monitoring Claims consist of all Claims against any Debtor held on account of an NAS Child and relate to medical monitoring support, educational support, vocational support, familial support or similar related relief, and not for an alleged personal injury suffered by an NAS Child. All NAS Monitoring Claims and all ~~related~~ Claims against Released Parties or Shareholder Released Parties that are held on account of an NAS Child and that relate to medical monitoring support, educational support, vocational support, familial support or similar related relief, and are not for alleged personal injuries suffered by an NAS Child will be channeled to the NAS Monitoring Trust. All PI Claims held by NAS Children and their estates or guardians and all related Claims against Released Parties or Shareholder Released Parties will be channeled to the PI Trust, as discussed below. The NAS Monitoring Trust will be funded in an initial amount of $1 million from the Debtors on the Effective Date. In addition, the NAS Monitoring Trust will be entitled to funding from the Master Disbursement Trust in the aggregate amount of $59 million, consisting of (a) $24 million on July ~~30~~31, 2022 and (b) $35 million on July ~~30~~31, 2023 on the terms specified in the Plan.

~~The~~All Distributions in respect of NAS Monitoring ~~Trust will make distributions (net of attorneys' fees and costs)~~Claims shall be exclusively in the form of NAS Monitoring Grants and may be used exclusively for (i) the Authorized Abatement Purposes set forth in the NAS Monitoring Trust Distribution Procedures or (ii) the payment of attorneys' fees and costs of Holders of NAS Monitoring Channeled Claims (including counsel to the NAS Committee) (such Authorized Abatement Purposes, collectively, "**NAS Monitoring Authorized Abatement Purposes**"). The NAS Monitoring Grants will be made to potential Grant Recipients or Grantees who satisfy the eligibility criteria set forth in the NAS Monitoring Trust Distribution

---

[5766] Capitalized terms used in ~~this~~ Article III.S.4 of the Plan shall have the meaning attributed to such terms in the NAS Monitoring Trust Documents and the Plan, as applicable.

Procedures set forth in the NAS Monitoring Trust Documents in the Plan Supplement.  Those potential Grant Recipients or Grantees that satisfy such criteria are considered NAS Authorized Recipients.  No Holders of NAS Monitoring Channeled Claims shall receive direct recoveries on account of their NAS Monitoring Channeled Claims; the NAS Monitoring Trust shall make NAS Monitoring Grants to NAS Authorized Recipients in accordance with the NAS Monitoring Trust Distribution Procedures.

In order to qualify as aan NAS Authorized Recipient and be eligible to receive aan NAS Monitoring Grant, a potential Grant Recipient or Grantee must:

(i) Submit a Grant Proposal Form that complies with the requirements set forth in the NAS Monitoring Trust Distribution Procedures;

(ii) Execute a Grant Agreement that complies with the requirements set forth in the NAS Monitoring Trust Distribution Procedures; and

(iii) Agree to comply with and be bound by the reporting obligations set forth in the NAS Monitoring Trust Distribution Procedures.

The Grant Proposal Form shall provide information on the proposed NAS Abatement Program, as set forth in the NAS Monitoring Trust Distribution Procedures, including a historical chronology of the establishment, function, and region of operation of the proposed NAS Abatement Program, a description of the mission, purpose, and methods of the proposed NAS Abatement Program, where in the United States the program is located and operates, evidence of the efficacy of the program in addressing its mission or purpose, the time period over which any distributions would be spent, and the projected budget for the proposed NAS Abatement Program, among others.

Upon receipt of a Grant Proposal in proper form, a member of the TAC shall review and investigate the Grant Proposal and shall prepare a written report, to be distributed to the Trustee and all other members of the TAC, which summarizes the Grant Proposal and the results of the review and investigation of the Grant Proposal. After distribution of such written report, and at the next regularly occurring meeting or special meeting of the Trustee and the TAC, the Grant Proposal shall be presented for discussion and deliberation and may be voted upon at any subsequent meeting of the Trustee and the TAC.  In the event of a vote of a majority of the members of the TAC to award any NAS Monitoring Grant for the funding of aan NAS Abatement Program sponsored by any Grant Recipient or Grantee, the Trustee shall inform the Grant Recipient or Grantee of the award and of the amount of the Abatement Distribution to be made by the NAS Monitoring Trust to the Grant Recipient or Grantee, provided that no binding agreement for the award of the NAS Monitoring Grant or the Abatement Distribution shall exist until execution and return of the Grant Agreement by the Grant Recipient or Grantee and the receipt of the Abatement Distribution by the Grant Recipient or Grantee.

All NAS Monitoring Grants awarded by the NAS Monitoring Trust will relate to NAS and shall advance all or any of the following goals: (i) preparing children with a history of NAS to be ready to enter or to succeed in school; (ii) informing through evidence the Standard of Care

for all NAS Children ages zero (0) to six (6), with priority given to NAS Children ranging in age from three (3) to six (6); and/or (iii) enhancing the Mother-Child Dyad.

Pursuant to the terms of the NAS Monitoring Trust Documents, the NAS Monitoring Trust will make Grants in the aggregate amount of (1) no less than 89% of such distributions (net of attorneys' fees) for the purpose of (x) preparing children with a history of NAS to be ready to enter school, (y) informing through evidence the Standard of Care for children ages birth through six years old affected by NAS, with priority given to those ages three through six or (z) enhancing the mother-child dyad of children affected by NAS and (2) up to 5% of such distributions (net of attorneys' fees) to research institutions to conduct and publish the results of research into approaches for helping children and families in instances of fetal opioid exposure, in each case as set forth in more detail in the NAS Monitoring Abatement Trust Documents. The schedule for review of grant proposals is set forth in the trust distribution procedures for the NAS Monitoring Trust in the Plan Supplement.

The NAS Monitoring Trust Agreement will govern the administrative expenses of the NAS Monitoring Trust. The NAS Monitoring Trust Agreement shall provide that payment of all costs, fees, expenses and liabilities for operation and/or administration of the Trust, including without limitation fee and expense items referenced in this Agreement, shall be paid from the Corpus of the Trust and that the Trustee shall have the power to pay the reasonable and necessary costs, fees, expenses and liabilities for operation and/or administration of the Trust or its Funds, including without limitation the costs, fees expenses and liabilities authorized by this Agreement and the attorneys' fees and expenses of the NAS ~~Children Counsel~~Committee; provided that an operating and administration fund, established for purposes of operation and administration of the Trust, to be funded with an amount no greater than one and one-half percent (1.5%) of the ~~balance of the Corpus~~net assets not yet Awarded to a Grant Recipient or Grantee at any given time, and to be utilized for the payment of all expenses of operation and administration of the Trust, including without limitation the payment of any compensation to the Trustee and members of the TAC. The Trustee may pay from the Corpus reasonable compensation to the Trustee and any employees, contractors or professionals retained by the Trust. The amounts of such compensation shall be determined by a vote of the majority members of the TAC. Each member of the TAC shall receive compensation from the operating and administration fund of the Trust for attendance at meetings or the performance of other Trust business at a reasonable hourly rate set and determined by a majority vote of the members of the TAC.

The initial Trustee ~~and the initial members of the TAC~~ will be proposed by members of the NAS ~~Children Counsel~~Committee, subject to the consent of the Debtors (which consent shall not be unreasonably withheld, delayed or denied). The Bankruptcy Court shall approve the appointment of the initial Trustee. Appointment of successor Trustees shall be approved by a majority of the members of the TAC.

The NAS Monitoring Trust Agreement will provide that the Trustee shall have the power to appoint, employ, or retain at reasonable cost such individuals as are necessary for operation and administration of the Trust, including without limitation employees, contractors, or professionals, and to delegate to such individuals discrete functions to be performed under the oversight, supervision and/or monitoring of the Trustee, and remit payment, in reasonable

amounts, to employees, contractors, and/or legal, accounting, financial, investment or other professionals necessary for operation or administration of the Trust.

NotwithstandingThe NAS Monitoring Trust Agreement will provide that, notwithstanding any state law to the contrary, the Trustee (including any successor trustee) shall be exempt from giving any bond or other surety in any jurisdiction.

### 5. *Non-Federal Domestic Governmental Claims (Class 4)*

Forty-nine states, the District of Columbia, and five U.S. territories filed Proofs of Claim against the Debtors seeking damages for, without limitation, alleged violations of consumer protection laws, public nuisance, fraud, negligence, negligence per se, elder abuse, violations of racketeering and other statutes, lost revenue, past and future costs and expenses, unliquidated claims based on non-Medicaid population, abatement, fraudulent conveyances or transfers, taxes, fines, penalties, forfeitures, and other penal claims, statutory civil penalties, disgorgement, restitution, mandatory and prohibitory injunctive relief under their respective consumer protection laws, and violations or enforcement of police powers.[67] Various cities, counties, municipalities, and other local governmental entities also filed Proofs of Claim against the Debtors seeking damages under similar theories. Pursuant to the Plan, Non-Federal Domestic Governmental Claims consist of all Claims against any Debtor held by a Domestic Governmental Entity other than the United States (including any Claim based on the subrogation rights of the Holder thereof that is not an Other Subordinated Claim), and not a Priority Tax Claim, a DOJ Forfeiture Judgment Claim, a Federal Government Unsecured Claim or a Tribe Claim. All Non-Federal Domestic Governmental Claims and all related Claims against Released Parties or Shareholder Released Parties held by Domestic Governmental Entities other than the United States or a Tribe will be channeled to NOAT. NOAT and the Tribe Trust will be funded pursuant to the Public Entity Settlements such that the NOAT and the Tribe Trust effectively receive the residual value of the Debtors' Estates. In particular, on the Effective Date, NOAT will receive a distribution of all Effective Date Cash remaining after the satisfaction of all amounts described in Section 5.13(a) of the Plan. NOAT and the Tribe Trust will also effectively receive the value of NewCo (subject to certain guarantees in favor of the Master DistributionDisbursement Trust), and the residual value available from the Master Disbursement Trust that is not used to satisfy the Private Entity Settlements.

### (i) Interstate Allocation of NOAT Abatement Funds

NOAT will allocate funding among states based on a formula developed through extensive negotiations among the Attorneys General of various states. The allocation formula consists of the following metrics, each of which are described in more detail below, weighted as indicated, and subject to reallocation as described below: (a) 85% sub-allocated among (i) 25% amount of prescription opioid sales as measured by morphine milligram equivalents ("**MME**"), (ii) 22% number of persons suffering from pain reliever use disorder, (iii) 22% number of overdose deaths, (iv) 31% population and (b) 15% based on the Opioid MDL Plaintiffs' proposed "negotiation class" metrics. Each metric is described in greater detail below.

---

[67] Capitalized terms used in Article III.S.5 of the Plan shall have the meaning attributed to such terms in the NOAT Documents and the Plan, as applicable.

All states except California agreed to place 1% of their allocation into an "Intensity Fund," which is redistributed to the following small, hard-hit States: Connecticut, Delaware, Kentucky, Maine, Nevada, New Hampshire, Oklahoma, Rhode Island, Utah, Vermont, and West Virginia. Finally, shares of states that have previously settled with any defendant are reallocated to the 34 smallest states. Here, the amount of Kentucky's settlement with Purdue in 2015 and the state portion of Oklahoma's settlement with Purdue in 2019 are reallocated via the "Small State Fund" to the other 32 smallest States (because Kentucky and Oklahoma are excluded from such distributions as the settling states).

The resulting percentage allocation for each State is set forth in the table below:

| State | Final Percentage Division of Funds |
|---|---|
| Alabama | 1.6579015983% |
| Alaska | 0.2681241169% |
| American Samoa* | 0.0175102976% |
| Arizona | 2.3755949882% |
| Arkansas | 0.9779907816% |
| California | 9.9213830698% |
| Colorado | 1.6616291219% |
| Connecticut | 1.3490069542% |
| Delaware | 0.5061239962% |
| District of Columbia | 0.2129072934% |
| Florida | 7.0259134409% |
| Georgia | 2.7882080114% |
| Guam* | 0.0518835714% |
| Hawaii | 0.3476670198% |
| Idaho | 0.5364838684% |
| Illinois | 3.3263363702% |
| Indiana | 2.2168933059% |
| Iowa | 0.7639415424% |
| Kansas | 0.8114241462% |
| Kentucky | 1.5963344879% |
| Louisiana | 1.5326855153% |
| Maine | 0.5725492304% |
| Maryland | 2.1106090494% |
| Massachusetts | 2.3035761083% |
| Michigan | 3.4020234989% |
| Minnesota | 1.2972597706% |
| Mississippi | 0.8994318052% |
| Missouri | 2.0056475170% |
| Montana | 0.3517745904% |
| N. Mariana Islands* | 0.0191942445% |
| Nebraska | 0.4335719578% |
| Nevada | 1.2651495115% |

| | |
|---|---|
| New Hampshire | 0.6419355371% |
| New Jersey | 2.7551354545% |
| New Mexico | 0.8749406830% |
| New York | 5.3903813405% |
| North Carolina | 3.2502525994% |
| North Dakota | 0.1910712849% |
| Ohio | 4.3567051408% |
| Oklahoma | 0.6073894708% |
| Oregon | 1.4405383452% |
| Pennsylvania | 4.5882419559% |
| Puerto Rico** | 0.7324076274% |
| Rhode Island | 0.5040770915% |
| South Carolina | 1.5989037696% |
| South Dakota | 0.2231552882% |
| Tennessee | 2.6881474977% |
| Texas | 6.2932157196% |
| Utah | 1.2039654451% |
| Vermont | 0.2945952769% |
| Virgin Islands* | 0.0348486384% |
| Virginia | 2.2801150757% |
| Washington | 2.3189040182% |
| West Virginia | 1.1614558107% |
| Wisconsin | 1.7582560561% |
| Wyoming | 0.2046300910% |

* Allocations for American Samoa, Guam, N. Mariana Islands, and Virgin Islands are 100% based on population because of lack of available information for the other metrics.

** Allocations for Puerto Rico are 25% based on MMEs and 75% based on population because of lack of available information for the other metrics.

The metrics noted above are calculated as follows:

      a.      Amount of Prescription Opioids Sold as Measured by MME

The MME metric reflects the intensity of prescription opioid sales by state over a nine-year period from 2006 to 2014.  This measure accounts for the flow of prescription opioids from manufacturers to distributors to pharmacies.  The MME metric uses sales data for 12 categories of prescription opioids and was collected in a standardized manner by the Drug Enforcement Administration (DEA) in its Automation of Reports and Consolidated Orders System (ARCOS) database. As part of the National Prescription Opiate Litigation Multi-District Litigation, Case No. 1:17-MD-2804 (N.D. Ohio) (Opioid MDL), the DEA agreed to produce the nine years of data from 2006-2014, which encompassed the peak years of opioid sales in most states. The ARCOS data is standardized by converting data from varying products and prescription strengths into uniform MME totals to accurately reflect higher doses and stronger drugs in the data.

      b.      Pain Reliever Use Disorder

This metric consists of the number of people in each state with pain reliever use disorder, as identified by the annual National Survey on Drug Use and Health conducted by the federal Substance Abuse and Mental Health Services Administration (SAMHSA). The SAMHSA survey is widely used by federal and other agencies. This metric included all three prior years in which pain reliever use disorder was broken down by state, 2015-2017, and included both people receiving treatment and those who are not.

c.    Overdose Deaths

The overdose death metric includes two measures: (1) overdose deaths caused by opioids and (2) overdose deaths caused by all drugs. The overdose death figures used for the metric are from the years 2007-2017, with data drawn from a database compiled by the Centers for Disease Control and Prevention ("**CDC**").  The CDC database does not adjust for local reporting problems that differ from state to state and over time.  To mitigate this data collection issue, figures for all drug overdose deaths, which captures some unidentified opioid overdoses as well as overdoses unrelated to opioids, were considered.

d.    Population

Population is measured by the 2018 U.S. Census estimate.

e.    Negotiation Class Metrics

The Opioid MDL Plaintiffs' proposed "negotiation class" metrics weighting factor consists of the Allocation Model (defined below) applied at the state level.

(ii)    **Intrastate Allocation of NOAT Abatement Funds**

Each State and its Local Governments will have until (14) fourteen days after the Effective Date of the Plan (the "**Agreement Date**") to file with the Bankruptcy Court an agreed-upon allocation or method for allocating the Public Funds for that State dedicated only to Approved Uses (each a "**Statewide Abatement Agreement**" or "**SAA**").  Any State and its Local Governments that have reached agreement before the Effective Date of the Plan that satisfies the metric for approval as described in the immediately following paragraph shall file a notice with the Bankruptcy Court that it has adopted a binding SAA and either include the SAA with its filing or indicate where the SAA is publicly available for the SAA to be effective for the Purdue Bankruptcy. Any dispute regarding allocation within a State will be resolved as provided by the Statewide Abatement Agreement; *provided* that no Statewide Abatement Agreement may remove or otherwise limit the reporting requirements set forth in any of the NOAT Trust Documents, including without limitation in the NOAT Trust Agreement.

A Statewide Abatement Agreement shall be agreed when it has been approved by the State and either (a) representatives of its Local Governments whose aggregate Population Percentages, determined as set forth below, total more than [Sixty Percent (60%), or (b) representatives of its Local Governments whose aggregate Population Percentages total more than fifty percent (50%) provided that these Local Governments also represent 15%] or more of

the State's counties or parishes (or, in the case of States whose counties and parishes that do not function as Local Governments, 15% or more of the State's incorporated cities or towns), by number.

Population Percentages shall be determined as follows: For counties, parishes, or Alaskan boroughs (i.e., county equivalents) that function as Local Governments and contain incorporated municipalities, the Population Percentage of each county equivalent shall be deemed to be equal to (a) (1) 200% of the population of such county equivalent, minus (2) the aggregate population of all Primary Incorporated Municipalities located in such county or parish, divided by (b) 200% of the State's population. A "**Primary Incorporated Municipality**" means a city, town, village or other municipality incorporated under applicable state law with a population of at least 25,000 that is not located within another incorporated municipality, The Population Percentage of each primary incorporated municipality shall be equal to its population (including the population of any incorporated or unincorporated municipality located therein) divided by 200% of the State's population; provided that the Population Percentage of a primary incorporated municipality that is not located within a county equivalent that functions as a Local Government shall be equal to its population (including the population of any incorporated or unincorporated municipality located therein) divided by the State's population.

The Statewide Abatement Agreement will become effective within fourteen (14) days of filing, unless otherwise ordered by the Bankruptcy Court.

A State and its Local Governments may revise, supplement, or refine a Statewide Abatement Agreement by filing an amended Statewide Abatement Agreement that has been approved by the State and sufficient Local Governments to satisfy the approval standards set forth above with the Bankruptcy Court, which shall become effective within fourteen (14) days of filing, unless otherwise ordered by the Bankruptcy Court.

Under the Plan, Public Funds allocated to each Non-SAA State are allocated between a "**Regional Apportionment**" and a "**Non-Regional Apportionment.**" The Proportionate Share of the Regional Apportionment for each Region in a Non-SAA State is determined by reference to the aggregate shares of counties (as used herein, the term county includes parishes), and cities or towns in the cases of a Non-SAA States in which counties do not function as Local Governments, in the Region under an allocation mode (the "**Allocation Model**") available at www.opioidnegotiationclass.info that was developed as part of the establishment of a negotiation class procedure implemented in *In re: National Prescription Opiates Litigation*, MDL No. 2804 (N.D. Ohio). However, notwithstanding the foregoing, a State and its Local Governments may instead agree to utilize the model developed by Christopher J. Ruhm, Professor of Public Policy and Economics at the University of Virginia. Both allocation formulas are set forth in greater detail in the National Opioid Abatement Trust Distribution Procedures.

The Allocation Model employs a three-factor analysis to allocate potential opioids settlement proceeds among counties.  The three factors are:

a.    Opioid Use Disorder ("**OUD**").  Under this factor, each county is assigned a percentage derived by dividing the number of people in the county with OUD by the total number of people nationwide with OUD.  The Model uses data reported in the National Survey on Drug Use and Health ("**NSDUH**") for 2006-2016.

b.    Overdose Deaths.  This factor assigns to each county a percentage of the nation's opioid overdose deaths.  The percentage is based on Multiple Causes of Death ("**MCOD**") data reported by the National Center for Health Statistics ("**NCHS**"), the Centers for Disease Control ("**CDC**") and the Department of Health and Human Services ("**DHHS**").  The data so reported is adjusted using a standard, accepted method (the "**Ruhm Adjustment**") designed to address the well-established under-reporting of deaths by opioid overdose.

c.    Amount of Opioids.  This factor assigns to each county a percentage of the national opioids shipments during 2006-2014 (expressed as morphine milligram equivalents, or MMEs) that produced a negative outcome.  This percentage is based on data reported by the U.S. Drug Enforcement Agency ("**DEA**") in its ARCOS (Automation of Reports and Consolidated Orders System) database.  Each county's share of national shipments is multiplied by the higher of two ratios:  (1) the ratio of the percentage of people in the county with OUD to the percentage of people nationwide with OUD; or (2) the ratio of the percentage of people in the county who died of an opioid overdose between 2006-2016 to the national percentages of opioid overdose deaths during that time.

The Allocation Model gives equal weight to each of these factors.  Thus, a hypothetical county with an OUD percentage of 0.3%, and opioid overdose deaths percentage of 0.2% and an opioid shipments percentage of 0.16% would receive an overall allocation of 0.22%.

Where governments within a county (e.g., the county government, if any, and the governments of its cities and towns) are unable to reach agreement regarding the sharing of the county's overall allocation, the Allocation Model provides for such sharing based on how the governments within the county have historically split funding for categories of government spending relevant to opioids abatement efforts.  This historical analysis employs data reported by the U.S. Census Bureau on local government spending by certain functions.  The Allocation Model assigns to each a portion of the county's overall allocation based on this historical data.

Under the Plan, the Allocation Model shares of each county in a Region are aggregated. Those aggregate Allocation Model shares are then divided by the total Allocation Model shares for all Regions in the State to determine the subject Region's Proportionate Share.  For Non-SAA States in which counties do not function as Local Governments, the Allocation Model shares for each city and town in a Region are aggregated, and the aggregate is divided by the total Allocation Model shares for all cities and towns in the State to determine the Region's Proportionate Share.

One hundred percent (100%) of the funds distributed to NOAT under the Chapter 11 Plan (and not otherwise dedicated to attorneys' fees) shall be used to abate the opioid crisis in accordance with the terms set forth in the National Opioid Abatement Trust Distribution Procedures.  Specifically, (i) no less than ninety five percent (95%) of the Public Funds distributed under the Chapter 11 Plan shall be used for abatement of the opioid crisis by funding opioid or substance use disorder-related projects or programs that fall within the list of uses in Schedule B of the National Opioid Abatement Trust Distribution Procedures (the "**Approved Opioid Abatement Uses**"); (ii) priority should be given to the core abatement strategies ("**Core Strategies**") as identified on Schedule A of the National Opioid Abatement Trust Distribution Procedures; and (iii) no more than five percent (5%) of the Public Funds may be used to fund expenses incurred in administering the distributions for the Approved Opioid Abatement Uses, including the process of selecting programs to receive distributions of Public Funds for implementing those programs and in connection with the Government Participation Mechanism ("**Approved Administrative Expenses**") and together with the other Authorized Abatement Purposes set forth in (i) and (ii), "**Approved Uses**".

In Non-SAA States, Local Governments and States may object to any apportionment, allocation, use or expenditure of Public Funds (an "**Allocation**") solely on the basis that: the Allocation at issue (i) is inconsistent with the provisions of Section 6(1) of the National Opioid Abatement Trust Distribution Procedures with respect to the levels of Regional Apportionments and Non-Regional Apportionments, (ii) is inconsistent with the provisions of Section 6(1) of the National Opioid Abatement Trust Distribution Procedures with respect to the amounts of Local Government Block Grants or Regional Apportionment expenditures, (iii) is not for an Approved Use or (iv) violates the limitations set forth herein with respect to Approved Administrative Fees.  The objector shall have the right to bring that objection to either (a) a state court with jurisdiction within the applicable State ("**State Court**") or (b) the Bankruptcy Court if the Purdue chapter 11 case has not been closed (each an "**Objection**").  If an Objection is filed within fourteen (14) days of approval of an Allocation, then no funds shall be distributed on account of the aspect of the Allocation that is the subject of the Objection until the Objection is resolved or decided by the Bankruptcy Court or State Court, as applicable. There shall be no other basis for bringing an Objection to the approval of an Allocation.

The administrative expenses for NOAT shall be governed by the NOAT Agreement and the National Opioid Abatement Trust Distribution Procedures.  The NOAT Agreement shall provide that all NOAT operating expenses shall be ~~payble~~payable out of the Trust Assets ~~and that the Trustees shall have the power to pay reasonable compensation and expenses to any~~

employees, consultants, advisors, independent contractors, experts, and agents for legal, financial, accounting, investment, auditing, and alternative dispute resolution services.  The National Opioid Abatement Trust Distribution Procedures provide that no more than five percent (5%) of NOAT's funds may be used to fund expenses incurred in administering the NOAT distributions, including the process of selecting recipients to receive NOAT distributions for implementing those programs and in connection with the Government Participation Mechanism.**.**

There**Pursuant to the Plan and the NOAT Agreement, there** shall be three (3) Trustees, selected by the Governmental Consent Parties, in consultation with the Debtors and pursuant to a selection process reasonably acceptable to the Debtors; *provided* that the DOJ shall have the right, in its discretion, to observe such selection process.  The Trustees shall be compensated in an amount to be determined but which shall be disclosed in the annual report.  The procedure for appointing successor Trustees is to be determined.

**The NOAT Agreement will provide that the Trustees shall have the power to appoint such officers and retain such employees, consultants, advisors, independent contractors, experts, and agents and engage in such legal, financial, accounting, investment, auditing, and alternative dispute resolution services and activities as NOAT requires, and delegate to such persons such powers and authorities as the fiduciary duties of the Trustees permit and as the Trustees, in their discretion, deem advisable or necessary in order to carry out the terms of this Trust Agreement; and the Trustees shall have the power to pay reasonable compensation and expenses to any such employees, consultants, advisors, independent contractors, experts, and agents for legal, financial, accounting, investment, auditing, and alternative dispute resolution services and activities.**

The **NOAT Agreement will provide that the** Trustees and the Delaware Trustee shall not be required to post any bond or other form of surety or security unless otherwise ordered by the Bankruptcy Court.

### 6.    *Tribe Claims (Class 5)*

Various federally recognized Indian Tribes filed Proofs of Claim against the Debtors seeking damages of their individual members for a range of alleged harms arising from opioids, including, without limitation, costs related to addiction treatment, therapy, hospitalization, as well as other costs relating to members of the Tribes impacted by opioid use and dependency.[68] All Tribe Claims, which consist of all Claims against the Debtors held by Tribes (including any Claim based on the subrogation rights of a Tribe that is not  ~~otherwise~~ an Other Subordinated Claim) that are not Priority Tax Claims, and all Released ~~Claim~~**Claims** or Shareholder Released ~~Claim that is~~**Claims** held by ~~a Tribe~~**Tribes** will be channeled to the Tribe Trust.  NOAT and the Tribe Trust will be funded pursuant to the Public Entity Settlements such that the NOAT and the Tribe Trust effectively receive the residual value of the Debtors' Estates.  In particular, on the Effective Date, the Tribe Trust will receive a distribution of $50 million.  NOAT and the Tribe Trust will also effectively receive the value of NewCo (subject to certain guarantees in favor of

---

[68] Capitalized terms used in Article III.S.6 of the Plan shall have the meaning attributed to such terms in the Tribe Trust Documents and the Plan, as applicable.

the Master ~~Distribution~~Disbursement Trust), and the residual value available from the Master Disbursement Trust that is not used to satisfy the Private Entity Settlements.

The Tribe Trust's allocation matrix takes into account six data points: (i) MMEs (morphine milligram equivalents) imputed to each Tribe; (ii) drug and prescription opioid overdose rates imputed to each Tribe; (iii) Indian Health Service ("**IHS**") user population for each Tribe; (iv) citizenship population for each Tribe; (v) relative poverty rates imputed to each Tribe; and (vi) relative cost of living imputed to each Tribe. Data are "imputed" to a Tribe by estimation based on population when the data is only available on a county or statewide basis. In the case of MMEs and drug overdose rates, the imputation of the data to a tribal population is multiplied by a "disproportionate impact" adjustment reflecting the higher incidence of opioid use disorder and prescription opioid overdose deaths in tribal communities.

~~Two~~Pursuant to the Tribal Allocation Matrix (Schedule E of the Tribe Trust Distribution Procedures), two computations are undertaken for all Tribes, and then combined together. 85% of a Tribe's matrix share is calculated by considering its imputed MME rate (50%), overdose rates (40%), and poverty rate (10%) as applied to its IHS user population. 15% of a Tribe's matrix share is calculated by considering the same three elements, similarly weighted, as applied to the Tribe's citizenship data. Once these two matrix results are combined, the resulting share is further adjusted by each Tribe's relative cost of living. COLA adjustments are done on a regional basis and are weighted at 10%, resulting in modest adjustments ranging from 1.3% down to 2.4% up. However, the matrix allocates a single amount to all Alaska Tribes and inter-tribal organizations.

The Tribes will use the tribal allocation of Abatement Funds for programs on the approved list of abatement strategies (see Schedule B of the Tribe Trust Distribution Procedures) and also for culturally appropriate activities, practices, teachings or ceremonies that are, in the judgment of a tribe or tribal health organization, aimed at or supportive of remediation and abatement of the opioid crisis within a tribal community. A list of representative examples of such culturally appropriate abatement strategies, practices, and programs set forth in Schedule D of the Tribe Trust Distribution Procedures (the "**Tribal Abatement Strategies**"). The separate allocation of abatement funding and illustrative list of Tribal Abatement Strategies recognizes that American Indian and Alaska Native Tribes and the communities they serve possess unique cultural histories, practices, wisdom, and needs that are highly relevant to the health and well-being of American Indian and Alaska Native people and that may play an important role in both individual and public health efforts and responses in Native communities. For the avoidance of doubt, Schedule D is a non-exhaustive, illustrative list of culturally appropriate activities, practices, teachings or ceremonies that may, in the judgment of a Tribe, be aimed at or supportive of remediation and abatement of the opioid crisis within a tribal community.

The Tribes agree that 100% of the Abatement Funds distributed under the Chapter 11 Plan (and not otherwise dedicated to the attorneys' fee fund(s) or to reasonable administrative costs) shall be used to abate the opioid crisis in accordance with the terms of the Tribe Trust Documents.

The administrative expenses for the Tribe Trust shall be governed by the Tribe Trust Agreement and the Tribe Trust Distribution Procedures. The Tribe Trust Agreement shall

provide that all Tribe Trust operating expenses shall be payable out of the Trust Assets and that the Trustee shall have the power to pay reasonable compensation and expenses to any employees, consultants, advisors, independent contractors, experts, and agents for legal, financial, accounting, investment, auditing, and alternative dispute resolution services. The Tribe Trust Distribution Procedures provide that no more than five percent (5%) of the Tribe Trust's funds may be used to fund expenses incurred in administering the Tribe Trust distributions, including the process of selecting recipients to receive distributions from Tribe Trust.,.

TherePursuant to the Plan and the Tribe Trust Agreement, there shall be three (3) Trustees, selected by the Native American Tribe Group with the consent of the Debtors. The Trustees shall receive compensation in an amount to be determined but which shall be disclosed in the annual report. The procedure for appointing successor Trustees is to be determined.

The Tribe Trust Agreement will provide that the Trustees shall have the power to appoint such officers and retain such employees, consultants, advisors, independent contractors, experts, and agents and engage in such legal, financial, accounting, investment, auditing, and alternative dispute resolution services and activities as the Tribal Abatement Fund Trust ("**TAFT**") requires, and delegate to such persons such powers and authorities as the fiduciary duties of the Trustees permit and as the Trustees, in their discretion, deem advisable or necessary in order to carry out the terms of this Trust Agreement; and the Trustees shall have the power to pay reasonable compensation and expenses to any such employees, consultants, advisors, independent contractors, experts, and agents for legal, financial, accounting, investment, auditing, and alternative dispute resolution services and activities.

The Tribe Trust Agreement will provide that the Trustees and the Delaware Trustee shall not be required to post any bond or other form of surety or security unless otherwise ordered by the Bankruptcy Court.

7.    *[PI Claims (ClassClasses 10(a) and 10(b))*

Many individuals or their estates or guardians assert claims against the Debtors for alleged personal injury or similar claims resulting from opioid use.[58]  Some holders of PI Claims filed prepetition lawsuits against the Debtors, alleging, without limitation, (i) violations of RICO and state law equivalents, (ii) nuisance, (iii) negligence, (iv) common law fraud, and (v) violations of state consumer protection statutes.  [69]  Pursuant to the Plan, PI Claims consist of all

---

[58]  This section provides a summary of certain provisions of the PI Trust Documents, which will be filed with the Plan Supplement.  This section is qualified in its entirety and is subject to the PI Trust Documents, including the exhibits thereto.  The statements contained in this section do not purport to be precise or complete statements of all terms and provisions of the PI Trust Documents referred to therein.  Reference is made to the PI Trust Documents for the full and complete statements of such terms and provisions thereof.  In the event of any conflict between this summary, on the one hand, and the PI Trust Documents, on the other hand, the terms and provisions of the PI Trust Documents shall control.

[69]  This section provides a summary of certain provisions of the PI Trust Documents, which will be filed with the Plan Supplement.  This section is qualified in its entirety and is subject to the PI Trust Documents, including the exhibits thereto.  The statements contained in this section do not purport to be precise or complete statements of all terms and provisions of the PI Trust Documents referred to therein.  Reference is made to the PI Trust Documents for the full and complete statements of such terms and provisions thereof.  In the event of any conflict between this

Claims against any Debtor for alleged opioid-related personal injury or other similar opioid-related claim or Cause of Action against any Debtor, including any opioid-related personal injury Claim or similar opioid-related Claim asserted by a~~a~~an NAS Child, ~~but excluding any claim~~and that is ~~not~~ a Third-Party Payor Claim, a~~a~~an NAS Monitoring Claim, a Hospital Claim or a Claim held by a Domestic Governmental Entity.[70]

All PI Claims and all ~~related~~Released Claims ~~against Released Parties~~ or Shareholder Released ~~Parties~~Claims that are for alleged opioid-related personal injuries or that are similar opioid-related claims or Causes of Action, including any opioid-related personal injury Claims or similar opioid-related Claims asserted by an NAS Child, and that is not a Third-Party Payor Channeled Claim, an NAS Monitoring Channeled Claim or a Hospital Channeled Claim or held by a Domestic Governmental Entity will be channeled to the PI Trust. On the Effective Date, the PI Trust will be funded with an initial amount of $300 million plus all MDT Bermuda-Form Insurance Proceeds, if any and capped at $450 million, received by the Debtors on or prior to the Effective Date. In addition, the PI Trust will be entitled to funding from the Master Disbursement Trust in the following amounts: (1) $200 million on July ~~30~~31, 2024, (2) $100 million on July ~~30~~31, 2025 and (3) $100 million on July ~~30~~31, 2026. In addition, in the event the aggregate MDT Bermuda-Form Insurance Proceeds (whether received before, on or after July ~~30~~31, 2026) exceed $400 million, the PI Trust shall be entitled to an incremental payment in the amount of the lesser of (x) the aggregate amount of the MDT Bermuda-Form Insurance Proceeds in excess of $400 million and (y) $50 million (which shall be in addition to, and not in reduction or substitution of, any of the installment payments set forth in the previous sentence), payable within thirty (30) days of receipt of any such MDT Bermuda-Form Insurance Proceeds, in accordance with the terms specified in the Plan. The PI Trust will make distributions (net of attorneys' fees and costs) to holders of PI Claims pursuant to ~~distribution procedures~~the PI TDP set forth in the PI Trust Documents in the Plan Supplement.

Each time it receives funds received by under the Plan, the PI Trust shall (i) reserve a portion for past and/or future Creditor Trust Operating Expenses of the PI Trust, (ii) deposit 6.43% of the remainder, up to an aggregate of $45 million over time, into a fund dedicated for payments to NAS PI Claimants (the "**NAS PI Fund**"), and (iii) deposit the rest into a fund dedicated for payments to Non-NAS PI Claimants (the "**Non-NAS PI Fund**").

The PI Trust will make distributions (net of attorneys' fees, costs, and other deductions as set forth in the PI TDP) to holders of PI Claims pursuant to the PI TDP set forth in the PI Trust Documents in the Plan Supplement. Distributions on account of NAS PI Claims will be paid exclusively from the NAS PI Fund pursuant to the NAS PI TDP. Distributions on account of Non-NAS PI Claims will be paid exclusively from the Non-NAS PI Fund pursuant to the Non-NAS PI TDP.

Approximately 130,000 opioid-related personal injury victims filed claims in the Chapter 11 Cases. The PI ~~trust distribution procedures (the **"PI Trust Distribution Procedures"**)~~TDP

---

summary, on the one hand, and the PI Trust Documents, on the other hand, the terms and provisions of the PI Trust Documents shall control.

[70] Capitalized terms used in Article III.S.7 of the Plan shall have the meaning attributed to such terms in the PI Trust Documents and the Plan, as applicable.

provide a process for evaluating those claims and ~~providing~~compensating holders of qualifying opioid-related personal injury claims ~~with compensation~~.  The Debtors and the Ad Hoc Group of Individual Victims believe that the Non-NAS PI ~~Trust Distribution Procedures~~TDP are fair and expeditious and resolve Non-NAS opioid-related personal injury claims in a way that is equitable, consistent, transparent and reasonable given the finite amount of funds available to satisfy such claims. ~~The NAS Committee disputes the appropriateness of the PI Trust Distribution Procedures with respect to NAS children for the reasons set forth in the NAS Ad Hoc Committee's Limited Objection to Disclosure Statement and Solicitation Procedures Motion [D.I. 2746].  A copy thereof may be obtained at no charge from the Solicitation Agent by (a) calling the Debtors' restructuring hotline at (844) 217-0912 (toll-free) or (347) 859-8093 (international); (b) visiting the Debtors' restructuring website at https://restructuring.primeclerk.com/purduepharma; (c) writing to Purdue Pharma Ballot Processing, c/o Prime Clerk LLC, One Grand Central Place, 60 East 42nd Street, Suite 1440, New York, NY 10165; and or (d) emailing purduepharmainfo@primeclerk.com. You may also obtain copies of any pleadings filed in these Chapter 11 Cases for a fee via PACER at http://www.nysb.uscourts.gov.~~

**~~Allowance~~**. ~~In order to have his/her PI Claim Allowed under the PI Trust Distribution Procedures and to receive a settlement~~The PI TDP also permit a PI Claimant to irrevocably opt out of the liquidation provisions of the PI TDP in order to instead liquidate his or her PI Claim by prosecuting a lawsuit in the tort system. A PI Claimant who "opts out" will have the right to file against the PI Trust his/her PI Claim, and his/her PI Claim only, in the tort system, and will not be permitted to file any associated PI Channeled Claims (e.g., claims against a member of the Sackler Families) in the tort system.  Any PI Claimant that so elects cannot later seek to liquidate its PI Claim pursuant to the streamlined procedures under the PI TDP. Only after such a PI Claimant obtains a final judgment in the tort system may such PI Claimant be eligible to receive payment from the PI Trust~~, a on its~~ on its PI ~~Claimant must:~~Claim, as described below.

***Liquidation Procedures under the Non-NAS TDP***:

The following summarizes the Non-NAS PI TDP applicable to the Non-NAS PI Claims that are liquidated under the Non-NAS PI TDP:

**Allowance**. For a Non-NAS PI Channeled Claim that is being liquidated pursuant to the streamlined procedures set forth in sections 6 through 9 (inclusive) of the Non-NAS PI TDP to be Allowed, the applicable Non-NAS PI Claimant must, with respect to that Non-NAS PI Channeled Claim:

      (i)      Hold such Non-NAS PI Channeled Claim against one or more Debtors;

      (ii)   ~~(i)~~      Demonstrate usage of a qualifying prescribed opioid listed on Exhibit ~~A~~E of the Non-NAS PI ~~Trust Distribution Procedures,~~TDP;[71]

---

[71] PI Claimants who used only (or, as applicable, where the Decedent or Mother used only) a non-prescribed (diverted) version of a qualifying opioid in Exhibit E to the PI TDP (OxyContin, MS Contin, Dilaudid, Hysingla ER, Butrans, DHC Plus, MSIR, OxyFast, OxyIR, Palladone, or Ryzolt) are not eligible for payments unless that PI

a.  ~~PI Claimants who used only (or, as applicable, where the decedent or birth mother used only) a non-prescribed (diverted) version of a qualifying opioid in Exhibit A (OxyContin, MS Contin, Dilaudid, Hysingla ER, Butrans, DHC Plus, MSIR, OxyFast, OxyIR, Palladone, or Ryzolt) are not eligible for payments unless that PI Claimant, decedent, or mother (as applicable) was a minor when s/he initiated usage of a non-prescribed, branded version of a qualifying opioid in Exhibit A;~~

(iii)  ~~(ii)~~  Have already timely[72] filed an individual personal injury Proof of Claim against one or more Debtors in the Chapter 11 Cases asserting his/her Non-NAS PI Claim against one or more Debtors;

(iv)  ~~(iii)~~  ~~Completed, signed and submitted the~~ Complete, sign and submit the Non-NAS Claim Form attached ~~to the Non-NAS PI TDP~~ as Exhibit ~~B of the PI Trust Distribution Procedures~~ A, checking at least one injury box[73], by the date that is 90 days ~~after Confirmation of the Plan;  and~~[74] after the Non-NAS Claim Form is disseminated to Non-NAS PI Claimants;

(v)  ~~(iv)~~  ~~Executed a~~ Execute the HIPAA ~~form~~ forms attached as Exhibit ~~C~~ D of the Non-NAS PI ~~Trust Distribution Procedures.~~ TDP; and

(vi)  If the Non-NAS PI Channeled Claim concerns the injuries of a Decedent, then also execute and submit the applicable Heirship Declaration attached as Exhibit F of the Non-NAS PI TDP.

Any Non-NAS PI Claimant who is liquidating his or her claims under the liquidating provisions of the Non-NAS PI TDP and satisfies the above requirements with respect to a Non-NAS PI Channeled Claim shall have that Non-NAS PI Channeled Claim Allowed.

~~Any PI Claimant who meets all of the above criteria (i)-(iv) with respect to a given PI Claim shall have that PI Claim Allowed; provided, however, that any PI Claimant who is a NAS Claimant, in addition to the requirements of (i)-(iv) above, have its PI Claim Allowed only if such PI Claimant (A) was exposed in utero from a birth mother who used any opioid,~~[59]~~ (B) was born alive, and (C) either proves a diagnosis of neonatal abstinence syndrome ("**NAS**") in~~

---

Claimant, Decedent, or Mother (as applicable) was a minor when s/he initiated usage of a non-prescribed, branded version of a qualifying opioid in Exhibit E.

[72] Subject to exceptions set forth in the PI TDP.

[73] For the avoidance of doubt, in the event a Non-NAS PI Claimant does not check any injury box from use of opioids on his/her Non-NAS Claim Form, his/her Non-NAS PI Channeled Claim shall be Disallowed. The Non-NAS Claim Form shall include clear language notifying a Non-NAS PI Claimant that if he or she fails to check any injury box from use of opioids, s/he will receive no recovery on its Non-NAS PI Channeled Claim.

[74] Within 60 days after Effective Date, the Non-NAS Claim Form will be made available to Non-NAS PI Claimants electronically and, if a Non-NAS PI Claimant is a pro se claimant, also mailed to such Non-NAS PI Claimant in physical copy. When disseminated, the Non-NAS Claim Form will clearly state the absolute deadline (e.g., "January 30, 2022") by which the Non-NAS Claim Form must be returned.

[59] ~~The opioid used by the Mother does not have to be a qualifying opioid listed on Exhibit A, as long as there is evidence of the Mother's use of a qualifying opioid listed on Exhibit A at some point in time in satisfaction of requirement (a) of § 3 above.~~

~~his/her pre-September 2019 records, or, although not receiving a formal diagnosis of NAS, evidences symptoms of opioid withdrawal (such claimant, a "NAS Claimant"). Each NAS Claimant shall submit evidence of (A)-(C) along with its completed and signed Claim Form.~~

**If a Non-NAS PI Claimant does not ~~meet~~satisfy these ~~criteria~~requirements with respect to ~~its~~a Non-NAS PI Channeled Claim~~, such PI~~ that is being liquidated under §§ 6-9 of the Non-NAS PI TDP, then such Non-NAS PI Channeled Claim shall be Disallowed ~~and shall receive no recovery ($0) from the PI Trust~~.**

**Qualifying Opioid**. One of the following is required to demonstrate a qualifying opioid in Exhibit ~~A~~E of the Non-NAS PI ~~Trust Distribution Procedures~~TDP:

(i)  A Non-NAS PI Claimant who provides evidence of a prescription for brand name OxyContin, MS Contin, Dilaudid, Hysingla ER, Butrans, DHC Plus, MSIR, OxyFast, OxyIR, Palladone, or Ryzolt may rely on the name alone without the necessity of a corresponding NDC number.

(ii) In order for a Non-NAS PI Claimant to qualify based on the use of one of the generic products listed in Exhibit ~~A~~E of the Non-NAS PI ~~Trust Distribution Procedures~~TDP (e.g., oxycodone ER/CR, morphine sulfate ER, hydromorphone), s/he must present either:

(a)  The corresponding NDC number, which is set forth in Exhibit ~~A~~E of the Non-NAS PI ~~Trust Distribution Procedures;60~~ TDP;75 or

(b)  A notation in the record that the product is manufactured or sold by Rhodes or ~~[Purdue]~~.

(iii) A Non-NAS PI Claimant who used (or, as applicable, ~~the decedent whose opioid usage is the basis for the claim, or in the case of a NAS Child, the birth mother) who~~where the Decedent used) a generic oxycodone prescription that does not contain evidence of (i) or (ii) herein may only qualify if the prescription utilizes one of the following:

(a)  Oxycodone CR (or controlled release); or

(b)  Oxycodone ER (extended release).

Non-NAS PI Claimants who used only opioids manufactured by companies other than the Debtors will not be eligible or qualified to receive a settlement payment from the PI Trust. ~~The PI Trust Distribution Procedures~~ on Non-NAS PI Channeled Claims that are liquated under the liquidation provisions of the Non-NAS PI TDP. The Non-NAS PI TDP outline several ways that

---

~~60 Subject to addition of further NDC numbers.~~
75 Subject to addition of further NDC numbers.

individuals can show their eligibility, including through prescription or pharmacy records or, in the absence of this evidence, through affidavits signed under penalty of perjury.  For a complete description of qualifying Purdue products and evidentiary requirements, you should carefully review the Non-NAS PI Trust Distribution ProceduresTDP, which will beis included in the Plan Supplement filed with the Bankruptcy Court and served on applicable parties.

The PI Trust claims administrator will value eligible opioid-related personal injury claims based on a scoring grid that uses objective metrics to assign a certain number of points to different compensable injuries.  The points will ultimately be translated into dollar amounts, to determine the settlement amount payable for specific compensable injuries.

**Payment.** A Non-NAS PI Claimant meeting the requirements of Allowance may elect on the Non-NAS Claim Form to receive a set payment (an "**Easy Payment**") in lieu of other compensation. By electing to do so, such claimant gives up the right to receive a larger payment from the PI Trust.  Based on current estimates by the Ad Hoc Group of Individual Victims, claimants that choose an Easy Payment will likely receive $3,500.  **NOTE: if you select an Easy Payment, you are NOT eligible to receive any additional funds for your Non-NAS PI Claim**. That means you cannot receive any of the Base Payment or Level Awards below. If you select an Easy Payment and your Non-NAS PI Channeled Claim is determined to be ana Non-NAS Allowed PI Channeled Claim, you will receive a payment of $3,500, before deduction of any fees, costs or liens as described herein, within a reasonably short amount of time after receipt of your claims package by the claims administrator, or as soon as all applicable liens have been cleared. It is expected those declining Easy Payment and seeking additional Awards may be paid at later stages, including in installments over time. The Easy Payment is also expected to be free of many (but not all) types of health care liens, including liens of Third-Party Payors.

The scoring grid, detailed in the PI Trust Distribution ProceduresTDP was developed using statistical sampling and modeling performed by financial analysts and experts, based on scoring grids developed in comparable cases, and with unique customization based on the injuries suffered by victims of Purdue's opioid products and activities related thereto.  The chart below summarizes the scoring grid:

| | Tier | ~~Base Award~~ | ~~Level Awards (one of the below)~~[61] | |
|---|---|---|---|---|
| | | | ~~A~~ | ~~B~~ |
| | **Tier 1A**~~: PI~~<br><br>*Addiction from Purdue Opioids* | ~~20,000 pts~~**Tier 1B**<br><br>*Death on OxyContin* | ~~10,000 pts~~**Tier 2**<br><br>~~OUD Diagnosis, OR MAT for >6 months~~*Purdue Opioids Use ≥6 months* | ~~20,000 pts~~**Tier 3**<br><br>~~Death from an Opioid~~*No Addiction/ Death from Purdue Opioids, and Purdue Opioids Use <6 months* |
| **BASE PAYMENTS** | 20,000 pts[76]~~Tier 1B: PI Death on OxyContin~~ | 40,000 pts | ~~N/A~~6,000 pts | ~~N/A~~$3,500 |
| | ~~Tier 2: PI Purdue Opioids Use ≥6 months~~ | ~~6,000 pts~~ | ~~3,000 pts~~<br><br>~~OUD Diagnosis, OR MAT for >6 months~~ | ~~20,000 pts~~<br><br>~~Death from an Opioid~~ |
| **LEVELS (one of the below)**[77] | ~~Tier 3: PI No Addiction/ Death from Purdue Opioids, and Purdue Opioids Use <6 mo.~~ | ~~$3,500~~ | ~~N/A~~ | ~~N/A~~ |
| **A** | 10,000 pts<br><br>OUD Diagnosis, OR MAT for >6 months~~Tier 1A: NAS Addiction from Purdue Opioids, or Purdue Opioids Use During Pregnancy~~ | ~~20,000 pts~~N/A | ~~10,000~~3,000 pts<br><br>OUD Diagnosis, OR MAT for >6 months~~NICU of 2-30 days, OR minor NAS-related injuries~~ | ~~N/A~~20,000 pts<br><br>~~NICU >30 days, OR Other serious NAS-related injuries~~ |

---

~~[61] If a Claimant does not qualify for additional Level Awards they do not get more money above the Base Award. A Claimant can only qualify for one, but not multiple, Level Awards.~~

[76] Non-NAS Claimants who do not claim addiction, dependence or abuse of opioids are not entitled to receive Tier 1A Awards.

[77] If a Non-NAS PI Claimant does not qualify for additional Level Awards, they do not get additional money above the Base Payment. A Non-NAS PI Claimant can only qualify for one, but not multiple, Level Awards.

| | | | | |
|---|---|---|---|---|
| **Tier 2: NAS**<br>*Purdue Opioids Use ≥6 months* | | 6,000 pts | 3,000 pts<br><br>NICU of 2-30 days, OR minor NAS-related injuries | 20,000 pts<br><br>NICU >30 days, OR Other serious NAS-related injuries |
| **B** | 20,000 pts<br><br>Death from an Opioid~~Tier 3: NAS~~<br>*No Addiction from Purdue Opioids, No Purdue Opioids Use During Pregnancy, and Purdue Opioids Use <6 months* | ~~$3,500~~N/A | ~~N/A~~20,000 pts<br><br>Death from an Opioid | N/A |

It is impossible to determine with certainty at this time how these points will translate into dollars and how much money any specific holder of ~~a qualifying opioid-related personal injury claim~~an Allowed Non-NAS PI Channeled Claim will receive from the PI Trust.  That is because the claims administrator must review the evidence submitted by holders of eligible personal injury claims to determine how many qualifying claims fall in each "Tier" of the scoring grid.   Based on preliminary analysis performed to date by the Ad Hoc Group of Individual Victims, it is estimated that holders of Tier 1 claims will likely receive between $16,000 and $48,000, holders of Tier 2 claims will likely receive between $~~5,000~~4,800 and $~~31,000~~31,200, and holders of Tier 3 claims will likely receive $3,500.[~~62~~78]

If a ~~holder of a qualifying opioid-related personal injury claim~~Non-NAS PI Claimant is dissatisfied with the determination under the Non-NAS PI ~~Trust Distribution Procedures~~TDP of the settlement payment ~~such claimant~~he or she is to receive~~, that dissatisfied claimant~~ on a Non-NAS PI Channeled Claim that was liquidated under the liquidation provisions of the Non-NAS PI TDP, then he or she can appeal to the claims administrator.   ~~A claimant who~~If he or she disagrees with the decision of the claims administrator on the appeal, he or she may further appeal to an appeals master appointed by the ~~trustee of the PI Trust~~Trustee.  The decision of the appeals master will be final and binding.

*The PI Trust will hold any amounts owed to a minor PI Claimant in trust until the minor PI Claimant becomes a legal adult under applicable state law,* unless otherwise directed by a qualifying court order.

*          *          *

---

[~~62~~78]  As discussed above, the PI Trust will receive money in installments spread out over a maximum of five years. Accordingly, settlement payments greater than $3,500 may be paid out in installments.

*Opt-Out for a Non-NAS PI Claim:*

If a Non-NAS PI Claimant elects to "opt out" of the liquidation provisions of the PI TDP, the following procedures shall govern, regardless of whether the PI Claim is an NAS PI Claim or a Non-NAS PI Claim.

**Liquidation of PI Claim**.  If a Non-NAS PI Claimant timely filed a proof of claim in the Chapter 11 Cases asserting his/her Non-NAS PI Claim, then it may elect to liquidate such Non-NAS PI Claim in the tort system rather than under the Non-NAS PI TDP by checking the box so indicating on his or her Non-NAS Claim Form, which Non-NAS Claim Form must be filed by the date that is ninety (90) days[79] after the applicable Non-NAS Claim Form is disseminated to him/her.[80] If the Non-NAS PI Claimant makes such election, then the Non-NAS PI Claimant may file a lawsuit regarding only its Non-NAS PI Claim (and no other claims) against only the PI Trust (and including no other parties as defendants) solely in the United States District Court for the Southern District of New York (the "SDNY District Court"),[81] unless such court orders pursuant to 28 USC § 157(b)(5) that such suit may be filed and tried in the United States District Court for the district in which the Non-NAS PI Claim arose. The adjudication of a Non-NAS PI Claim in the tort system shall be deemed to be an adjudication of that Non-NAS PI Claim and any associated Non-NAS PI Channeled Claims of the Non-NAS PI Claimant regarding the same injuries that are the subject of its Non-NAS PI Claim. Any Distribution from the PI Trust on a Final Judgment (as defined below) in respect of such Non-NAS PI Claim, if any, shall be deemed to be a Distribution in satisfaction and conclusive resolution of such Non-NAS PI Claim and such associated Non-NAS PI Channeled Claims.

Any such lawsuit must be filed by the Non-NAS PI Claimant in an individual capacity and not as a member or representative of a class, and no such lawsuit may be consolidated with the lawsuit of any other plaintiff by, or on motion of, any plaintiff.[82] All defenses (including, with respect to the PI Trust, all defenses which could have been asserted by the Debtors, except as otherwise provided in the Plan) shall be available to both sides at trial.[83] Notwithstanding their availability in the tort system, no multiple, exemplary, statutory enhanced and/or punitive damages (i.e., damages other than compensatory damages), and no interest, attorneys' fees or costs (including statutory attorneys' fees and costs) shall be payable, with respect to any Non-NAS PI Claim litigated against the PI Trust in the tort system.

---

[79] Within sixty (60) days after Effective Date, the Non-NAS Claim Form will be made available to Non-NAS PI Claimants electronically and, if the Non-NAS PI Claimant is a pro se claimant, also mailed to such Non-NAS PI Claimant in physical copy. When disseminated, each Non-NAS Claim Form will clearly state the absolute deadline (e.g., "January 30, 2022") by which the Non-NAS Claim Form must be returned.

[80] The filing of a Non-NAS Claim Form indicating that a Non-NAS PI Claimant has elected to liquidate his or her Non-NAS PI Claim in the tort system shall have no effect on any federal or state statute of limitation or repose applicable to the claims asserted by such Non-NAS PI Claimant's action.

[81] The Debtors shall seek an order from the SDNY District Court requiring that lawsuits filed by PI Claimants who elect, subject to the terms hereof, to liquidate their PI Claims by commencing separate lawsuits in the tort system be filed and tried solely in the SDNY District Court pursuant to 28 U.S.C. § 157(b)(5).

[82] The Trustee shall be empowered to (i) bring one or more consolidated actions against multiple PI Claimants who elect, subject to the terms hereof, to liquidate their PI Claims by commencing separate lawsuits in the tort system and (ii) to seek to consolidate multiple lawsuits commenced by individual PI Claimants who elect, subject to the terms hereof, to liquidate their PI Claims by commencing separate lawsuits in the tort system.

[83]  Among other things, the PI Trust reserves all rights to assert that the claim that is the subject of a PI Claimant's lawsuit is not a "PI Claim" within the meaning of the Plan.

Subject to the PI Trust's receipt of a Claim Form so indicating that a Non-NAS PI Claimant has elected to file a lawsuit as set forth above in the tort system, NewCo and the Plan Administration Trust will establish and maintain, as necessary, a document reserve (the "**PI Document Reserve**") containing such materials as are necessary to such lawsuit as discovery material. Any such Non-NAS PI Claimant will be provided access to the PI Document Reserve subject to agreeing to (i) a protective order acceptable to the PI Trustee, the Plan Administration Trustee, and NewCo, and (ii) to the extent that the materials deposited into the PI Document Reserve by the PI Trust include any documents produced by the Shareholder Released Parties (the "**Shareholder Released Party Documents**"), the Protective Order, which shall exclusively govern the terms of disclosure of the Shareholder Released Party Documents. Any such Non-NAS PI Claimant who propounds on the PI Trust, NewCo, the Plan Administration Trustee, any other Creditor Trust, or any Debtor a request for additional document or testimonial discovery must in such request (i) represent that such Non-NAS PI Claimant has conducted a reasonable search of the PI Document Reserve and, if it has been established, the Public Document Repository, and believes, based on such reasonable search, that the documents, information, or testimony it seeks is not available in either the PI Document Reserve or the Public Document Repository, and (ii) state and explain the basis for the Non-NAS PI Claimant's good faith belief that the additional discovery it seeks is relevant to such lawsuit. The PI Trust shall not be liable for any costs incurred by parties other than the PI Trust in connection with third-party discovery propounded by any party other than the PI Trust.[84]

**Allowance**.  If a Non-NAS PI Claimant obtains a judgment on his/her Non-NAS PI Claim in the tort system and such judgment becomes a final order (each, a "**Final Judgment**"), such Final Judgment shall be deemed "Allowed" for purposes under the Plan and shall be payable by the PI Trust, subject to certain limitation on damages and attorneys' fees,[85] as well as the Payment Percentage and the Maximum Value (each as defined below), as described below.

**Limitations on Amount**.  Payment on a Final Judgment for a Non-NAS PI Claim shall not exceed the dollar-equivalent of 120,000 points (the "**Non-NAS Maximum Value**"), which is three times the maximum point value attributed under the liquidation provisions of the Non-NAS PI TDP to eligible claims for the most severe injuries.

Points will be converted to dollars consistent with the conversion set forth in section 8 of the Non-NAS PI TDP.  As set forth in more detail in the Non-NAS PI TDP, the dollar amount ultimately awarded per point will be determined with reference to the funds remaining in the PI Trust and to the pool of claims remaining against the PI Trust.  It will vary depending on how many people choose to opt out their claims and how expensive it is for the PI Trust to defend those claims in the tort system.  It will also depend on the payment elections made by those who are liquidating their claims under sections 6 through 9 (inclusive) of the Non-NAS PI TDP.

---

[84] In order to minimize costs incurred by the PI Trust in connection with third-party discovery, the PI Trustee shall be empowered to seek to consolidate discovery propounded by PI Claimants or the PI Trust in multiple lawsuits commenced by individual PI Claimants who elect, subject to the terms hereof, to liquidate their PI Claims by commencing separate lawsuits in the tort system.

[85]  Notwithstanding their availability in the tort system, no multiple, exemplary, statutory-enhanced and/or punitive damages (i.e., damages other than compensatory damages), and no interest, attorneys' fees or costs shall be payable, with respect to any PI Claim litigated against the PI Trust in the tort system.

At this time, the Ad Hoc Group of Individual Victims estimates that the dollar award amount per point will be between $0.80 and $1.20.

A Final Judgment on a Non-NAS Claim, minus any multiple, exemplary, statutory enhanced and/or punitive damages (i.e., damages other than compensatory damages), interest, attorneys' fees or costs (including statutory attorneys' fees and costs) that may have been awarded as part of such Final Judgment, shall be subject to reduction by the same percentage that Non-NAS PI Claims liquidated under the Non-NAS PI TDP are reduced prior to payment. In other words, a non-NAS PI Claimant who elects to liquidate his or her Non-NAS PI Claim in the tort system shall not be entitled to receive more than his or her pro-rata share of the value available for distribution to all Non-NAS PI Channeled Claims entitled to a recovery pursuant to the Non-NAS PI TDP. Based upon the work of the Ad Hoc Group of Individual Victims, statistical sampling and modeling performed by financial analysts and subject-matter experts for the Ad Hoc Group of Individual Victims and other holders of PI Claims, review of judgments obtained in lawsuits, settlement history, and collaborative discussions with stakeholders, the Base Payments and Level Awards described in the Non-NAS PI TDP represent an estimated pro-rata percentage recovery by PI Claimants holding Allowed PI Channeled Claims of approximately 2.0% (such pro-rata percentage recovery as may be altered over time, the "**Non-NAS Payment Percentage**"). Accordingly, the initial Payment Percentage is 2.0%.

No holder of a Non-NAS PI Claim who elects to liquidate his or her Non-NAS PI Claim in the tort system shall receive a payment that exceeds the liquidated value of his or her Non-NAS PI Claim multiplied by the Non-NAS Payment Percentage in effect at the time of payment (such value so reduced, the "**Non-NAS Percentage-Reduced Claim**"); *provided, however*, that if there is a reduction in the Non-NAS Payment Percentage,[86] the PI Trustee, in his or her sole discretion, may cause the Non-NAS PI Trust to pay a Non-NAS PI Claim based on the Non-NAS Payment Percentage that was in effect prior to the reduction if the judgment in respect of such Non-NAS PI Claim became a Final Judgment prior to the date the Trustee proposes the new Non-NAS Payment Percentage to the Oversight Committee and the processing of such Non-NAS PI Claim was unreasonably delayed due to circumstances beyond the control of the Non-NAS PI Claimant or the Claimant's Counsel (as applicable).

**Payment**.

A Non-NAS PI Claimant who obtains a Final Judgment shall be entitled to receive from the PI Trust, Non-NAS Fund in full and final satisfaction of that Final Judgment, a gross amount (subject to deductions set forth next) equal to the lesser of (i) the Non-NAS Percentage-Reduced Claim and (ii) the Non-NAS Maximum Value, in each case as in effect on the date of the

---

[86]  The Payment Percentage is subject to change if the Trustee with the consent of the PI Trust's oversight committee, determines that an adjustment is required based on current estimates of the number, types, and values of PI Channeled Claims, the value of the assets of the PI Trust available for the payment of Allowed Channeled PI Claims pursuant to the PI TDP and amounts due and estimated to become due pursuant to the PI TDP in respect of Final Judgments obtained by PI Claimants who elect to liquidate their PI Claims in the tort system, all anticipated administrative and legal expenses, and any other material matters that are reasonably likely to affect the sufficiency of funds to pay a comparable percentage of (i) full value to all holders of Allowed Channeled PI Claims and (ii) the Maximum Value to PI Claimants who elect to liquidate their PI Claims in the tort system. When making these determinations, the Trustee shall exercise common sense and flexibly evaluate all relevant factors.

pending payment, as described next (the "Non-NAS Gross Amount"). The Non-NAS Gross Amount shall be subject to deductions for the Non-NAS PI Claimant's ratable share of the fees and expenses of the PI Trust, as well as amounts prepaid to the United States under the Plan to settle claims or liens of one or more federal government health insurance programs against such Non-NAS PI Claimant or any Distribution to such Non-NAS PI Claimant on account of its Non-NAS PI Channeled Claims. The resulting net amount shall be paid to the Non-NAS PI Claimant in the form of an initial payment not to exceed $3,500.00 and five (5) additional equal installments in years six (6) through ten (10) following the year of the initial payment; subject, however, to the prior satisfaction of healthcare liens as set forth below. In no event shall interest be paid in respect of any judgment obtained in the tort system.

None of the Non-NAS Percentage-Reduced Claim, the Non-NAS Maximum Value, the Non-NAS Gross Amount, the deductions therefrom, or the payment schedule is subject to any appeal or reconsideration.

**Health Care Liens, Minors and Heirship**. The PI Trust shall not issue any payment in respect of a Final Judgment until the Claims Administrator has received proof to his or her reasonable satisfaction that any private or governmental health care liens or similar claims against such Final Judgment have been satisfied or will be satisfied out of the recovery.

The special procedures set forth in Exhibit G to the Non-NAS PI TDP shall apply to all Non-NAS PI Claimants who are minors under applicable law. Anyone seeking a Distribution from the PI Trust in their capacity as an heir must execute and submit the applicable Heirship Declaration attached to the Non-NAS PI TDP as Exhibit F.[87]

*          *          *

**_Liquidation Procedures under the NAS TDP_**:

The following summarizes the NAS PI TDP applicable to the NAS PI Claims that are liquidated under the NAS PI TDP:

**Allowance**. For an NAS PI Channeled Claim that is being liquidated pursuant to the streamlined procedures set forth in sections 6 through 9 (inclusive) of the NAS PI TDP to be Allowed, the applicable NAS PI Claimant must, with respect to that NAS PI Channeled Claim:

(i)    Hold such NAS PI Channeled Claim against one or more Debtors;

(ii)   Have already timely[88] filed an individual personal injury Proof of Claim against one or more Debtors in the Chapter 11 Cases asserting his/her NAS PI Claim against one or more Debtors

---

[87] Exhibit F contains two declaration forms. One applies if the Decedent named the Non-NAS PI Claimant as executor in his/her will; the other applies if the Decedent had no will.
[88] Subject to exceptions set forth in the PI TDP.

(iii)    Demonstrate by Competent Evidence (as defined below) a diagnosis by a licensed medical provider of a medical, physical, cognitive or emotional condition resulting from the NAS Child's intrauterine exposure to opioids or opioid replacement or treatment medication, including but not limited to the condition known as neonatal abstinence syndrome ("**NAS**"). The diagnosis can be made by any medical professional, specifically including physicians, nurses, physician assistants, mental health counselor or therapist, or professional at a rehabilitation center. Only NAS PI Claims based on injuries or facts occurring prior to the filing of a Proof of Claim in the Chapter 11 Cases are eligible for recovery;

(iv)    Complete, sign and submit the NAS Claim Form attached to the NAS PI TDP as Exhibit A, checking at least one injury box by the date that is 90 days[89] after the NAS Claim Form is disseminated to NAS PI Claimants;[90]

(v)    Execute the HIPAA forms attached as Exhibit D of the NAS PI TDP; and

(vi)    If the NAS PI Channeled Claim concerns the injuries of a Decedent, then also execute and submit the applicable Heirship Declaration attached as Exhibit F of the Non-NAS PI TDP.

Any NAS PI Claimant who is liquidating his or her claims under the liquidating provisions of the NAS PI TDP and satisfies the above requirements with respect to an NAS PI Channeled Claim shall have that NAS PI Channeled Claim Allowed.

**If an NAS PI Claimant does not satisfy these requirements with respect to an NAS PI Channeled Claim that is being liquidated under the liquidation provisions of the NAS PI TDP, then such NAS PI Channeled Claim shall be Disallowed.**

**Competent Evidence**. To receive recovery on their NAS PI Claim, an NAS PI Claimant must submit one of the following forms of Competent Evidence:

(i)    A document from a licensed medical provider diagnosing the NAS Child with a medical, physical, cognitive or emotional condition resulting from the NAS Child's intrauterine exposure to opioids or opioid replacement or treatment medication, including but not limited to the condition known as NAS;

---

[89] Within 60 days after Effective Date, the NAS Claim Form will be made available to NAS PI Claimants electronically and, if an NAS PI Claimant is a pro se claimant, also mailed to such NAS PI Claimant in physical copy. When disseminated, the NAS Claim Form will clearly state the absolute deadline (e.g., "January 30, 2022") by which the NAS Claim Form must be returned.
[90] If the NAS PI Claimant checks the box on the NAS Claim Form indicating its election to liquidate its NAS PI Claim in the tort system rather than under the liquidation provisions of this NAS PI TDP, then such NAS PI Claim will not be liquidated hereunder.

(ii)    A document from a licensed medical provider affirming that the NAS Child had Neonatal Opioid Withdrawal Syndrome ("NOWS"); or

(iii)    Other medical records evidencing that the NAS Child had an NAS diagnosis, post-natal treatment for symptoms caused by opioid exposure, symptoms of post-natal withdrawal from opioids, medical scoring for NAS or NOWS which is positive or indicates fetal opioid exposure, a positive toxicology screen of the birth mother or infant for opioids or opioid-weaning drugs, or a maternal diagnosis of opioid use disorder by the birth mother.

The Claims Administrator shall have discretion to determine whether these evidentiary requirements have been met, including whether the forms of evidence submitted constitute Competent Evidence.[91]   Any NAS PI Claimant who fails to meet these requirements is not entitled to any payment.

**Payment**. The money available in the PI Trust NAS Fund for distribution to NAS PI Claimants will be divided equally among the Allowed NAS PI Channeled Claims and distributed to the Holders of such Allowed NAS PI Channeled Claims. The PI Trust may issue Distributions on account of Allowed NAS PI Channeled Claims in installments as funds are received by the PI Trust, or in account of installments pursuant to a court order.  As such, it may take several years before you have received all of your Award.

An NAS Claimant meeting the requirement of Allowance shall receive a payment of approximately $7,000, before deduction of any fees, costs or liens as described herein, a portion of which will be paid within a reasonably short amount of time after receipt of your claims package by the claims administrator, or as soon as all applicable liens have been cleared. The balance will be paid in installments over time. The NAS Committee is negotiating to have such payments be made free of many (but not all) types of health care liens, including liens of Third-Party Payors, but there are no assurances that such an agreement will be reached.

Although the Plan channels claims for all types of personal injury damages to the PI Trust, including both economic and non-economic or general damages, Awards issued pursuant to the NAS PI TDP compensate only general pain and suffering on account of the NAS Child's injuries. Because of limited funds, economic damages and punitive damages are not compensable.

***The PI Trust will hold any amounts owed to a minor PI Claimant in trust until the minor PI Claimant becomes a legal adult under applicable state law, unless otherwise directed by a qualifying court order.***

---

[91] Competent Evidence necessary for Allowance of an NAS PI Claim is evidence, in the opinion of the Trustee, that establishes that the occurrence of a diagnosis of NAS with respect to an NAS PI Claimant is more likely true than not true, *i.e.* a probability standard. Competent Evidence requires more than a mere possibility or scintilla of truth, but such standard does not require proof that rises to the level of clear and convincing evidence. However, notwithstanding anything to the contrary in this NAS PI TDP, proof of a prescription of an opioid product shall not be required.

***Opt-Out Procedures for NAS PI Claims***:

If PI Claimant elects to "opt out" of the liquidation provisions of the PI TDP, the following procedures shall govern, regardless of whether the PI Claim is an NAS PI Claim or an NAS PI Claim.

**Liquidation of PI Claim**.  If an NAS PI Claimant timely filed a proof of claim in the Chapter 11 Cases asserting his/her NAS PI Claim, then it may elect to liquidate such NAS PI Claim in the tort system rather than under the NAS PI TDP by checking the box so indicating on his or her NAS Claim Form, which NAS Claim Form must be filed by the date that is ninety (90) days[92] after the applicable NAS Claim Form is disseminated to him/her.[93] If the NAS PI Claimant makes such election, then the NAS PI Claimant may file a lawsuit regarding only its NAS PI Claim (and no other claims) against only the PI Trust (and including no other parties as defendants) solely in the United States District Court for the Southern District of New York (the "**SDNY District Court**").[94] unless such court orders pursuant to 28 USC § 157(b)(5) that such suit may be filed and tried in the United States District Court for the district in which the NAS PI Claim arose. The adjudication of an NAS PI Claim in the tort system shall be deemed to be an adjudication of that NAS PI Claim and any associated NAS PI Channeled Claims of the NAS PI Claimant regarding the same injuries that are the subject of its NAS PI Claim. Any Distribution from the PI Trust on a Final Judgment (as defined below) in respect of such NAS PI Claim, if any, shall be deemed to be a Distribution in satisfaction and conclusive resolution of such NAS PI Claim and such associated NAS PI Channeled Claims.

Any such lawsuit must be filed by the NAS PI Claimant in an individual capacity and not as a member or representative of a class, and no such lawsuit may be consolidated with the lawsuit of any other plaintiff by, or on motion of, any plaintiff.[95]  All defenses (including, with respect to the PI Trust, all defenses which could have been asserted by the Debtors, except as otherwise provided in the Plan) shall be available to both sides at trial.[96] Notwithstanding their availability in the tort system, no multiple, exemplary, statutory enhanced and/or punitive damages (i.e., damages other than compensatory damages), and no interest, attorneys' fees or costs (including statutory attorneys' fees and costs) shall be payable, with respect to any NAS PI Claim litigated against the PI Trust in the tort system.

---

[92] Within sixty (60) days after Effective Date, the Non-NAS Claim Form will be made available to Non-NAS Claimants electronically and, if the Non-NAS PI Claimant is a pro se claimant, also mailed to such Non-NAS Claimant in physical copy. When disseminated, each Non-NAS Claim Form will clearly state the absolute deadline (e.g., "January 30, 2022") by which the Non-NAS Claim Form must be returned.

[93] The filing of a Non-NAS Claim Form indicating that a Non-NAS PI Claimant has elected to liquidate his or her Non-NAS PI Claim in the tort system shall have no effect on any federal or state statute of limitation or repose applicable to the claims asserted by such Non-NAS PI Claimant's action.

[94] The Debtors shall seek an order from the SDNY District Court requiring that lawsuits filed by PI Claimants who elect, subject to the terms hereof, to liquidate their PI Claims by commencing separate lawsuits in the tort system be filed and tried solely in the SDNY District Court pursuant to 28 U.S.C. § 157(b)(5).

[95] The Trustee shall be empowered (i) to bring one or more consolidated actions against multiple PI Claimants who elect, subject to the terms hereof, to liquidate their PI Claims by commencing separate lawsuits in the tort system and (ii) to seek to consolidate multiple lawsuits commenced by individual PI Claimants who elect, subject to the terms hereof, to liquidate their PI Claims by commencing separate lawsuits in the tort system.

[96]  Among other things, the PI Trust reserves all rights to assert that the claim that is the subject of a PI Claimant's lawsuit is not a "PI Claim" within the meaning of the Plan.

Subject to the PI Trust's receipt of a Claim Form so indicating that an NAS PI Claimant has elected to file a lawsuit as set forth above in the tort system, NewCo and the Plan Administration Trust will establish and maintain, as necessary, a document reserve (the "**PI Document Reserve**") containing such materials as are necessary to such lawsuit as discovery material. Any such NAS PI Claimant will be provided access to the PI Document Reserve subject to agreeing to (i) a protective order acceptable to the PI Trustee, the Plan Administration Trustee, and NewCo, and (ii) to the extent that the materials deposited into the PI Document Reserve by the PI Trust include any documents produced by the Shareholder Released Parties (the "**Shareholder Released Party Documents**"), the Protective Order, which shall exclusively govern the terms of disclosure of the Shareholder Released Party Documents. Any such NAS PI Claimant who propounds on the PI Trust, NewCo, the Plan Administration Trustee, any other Creditor Trust, or any Debtor a request for additional document or testimonial discovery must in such request (i) represent that such NAS PI Claimant has conducted a reasonable search of the PI Document Reserve and, if it has been established, the Public Document Repository, and believes, based on such reasonable search, that the documents, information, or testimony it seeks is not available in either the PI Document Reserve or the Public Document Repository, and (ii) state and explain the basis for the NAS PI Claimant's good faith belief that the additional discovery it seeks is relevant to such lawsuit. The PI Trust shall not be liable for any costs incurred by parties other than the PI Trust in connection with third-party discovery propounded by any party other than the PI Trust.[97]

**Allowance**.  If an NAS PI Claimant obtains a judgment on his/her NAS PI Claim in the tort system and such judgment becomes a final order (each, a "**Final Judgment**"), such Final Judgment shall be deemed "Allowed" for purposes under the Plan and shall be payable by the PI Trust, subject to certain limitation on damages and attorneys' fees,[98] as well as the Payment Percentage and the Maximum Value (each as defined below), as described below.

**Limitations on Amount**.  Notwithstanding their availability in the tort system, no multiple, exemplary, statutory enhanced and/or punitive damages (i.e., damages other than compensatory damages), and no interest, attorneys' fees or costs (including statutory attorneys' fees and costs) shall be payable, with respect to any NAS PI Claim litigated against the PI Trust in the tort system.

Payment on a Final Judgment for an NAS Child shall not exceed $21,000 (the "**NAS Maximum Value**") which is estimated to be three times the maximum value that will be distributed under the NAS PI TDP for a given NAS PI Claim.

A Final Judgment on an NAS Claim, minus any multiple, exemplary, statutory enhanced and/or punitive damages (i.e., damages other than compensatory damages), interest, attorneys' fees or costs (including statutory attorneys' fees and costs) that may have been awarded as part

---

[97] In order to minimize costs incurred by the PI Trust in connection with third-party discovery, the PI Trustee shall be empowered to seek to consolidate discovery propounded by PI Claimants or the PI Trust in multiple lawsuits commenced by individual PI Claimants who elect, subject to the terms hereof, to liquidate their PI Claims by commencing separate lawsuits in the tort system.

[98]  Notwithstanding their availability in the tort system, no multiple, exemplary, statutory-enhanced and/or punitive damages (i.e., damages other than compensatory damages), and no interest, attorneys' fees or costs shall be payable, with respect to any PI Claim litigated against the PI Trust in the tort system.

of such Final Judgment, shall be subject to reduction by the same percentage that NAS PI Claims liquidated under the NAS PI TDP are reduced prior to payment. In other words, an NAS PI Claimant who elects to liquidate his or her NAS PI Claim in the tort system shall not be entitled to receive more than his or her pro-rata share of the value available for distribution to all NAS PI Channeled Claims entitled to a recovery pursuant to the NAS PI TDP. In the view of the NAS Committee, the estimated awards for NAS PI Claims liquidated under the NAS PI TDP represent an estimated pro-rata percentage recovery by NAS PI Claimants holding Allowed NAS PI Channeled Claims of approximately [  ]% (such pro-rata percentage recovery as may be altered over time, the "NAS Payment Percentage"). Accordingly, the initial NAS Payment Percentage is [  ]%.

No holder of an NAS PI Claim who elects to liquidate his or her NAS PI Claim in the tort system shall receive a payment that exceeds the liquidated value of his or her NAS PI Claim multiplied by the NAS Payment Percentage in effect at the time of payment (such value so reduced, the "**NAS Percentage-Reduced Claim**"); *provided, however*, that if there is a reduction in the NAS Payment Percentage, the PI Trustee, in his or her sole discretion, may cause the NAS PI Trust to pay an NAS PI Claim based on the NAS Payment Percentage that was in effect prior to the reduction if the judgment in respect of such NAS PI Claim became a Final Judgment prior to the date the PI Trustee proposes the new NAS Payment Percentage to the Oversight Committee and the processing of such NAS PI Claim was unreasonably delayed due to circumstances beyond the control of the NAS PI Claimant or the Claimant's Counsel (as applicable).

**Payment**. An NAS PI Claimant who obtains a Final Judgment shall be entitled to receive from the PI Trust NAS Fund in full and final satisfaction of that Final Judgment, a gross amount (subject to deductions set forth next) equal to the *lesser* of (i) the NAS Percentage-Reduced Claim and (ii) the NAS Maximum Value, in each case as in effect on the date of the pending payment, as described next (the "**NAS Gross Amount**"). The NAS Gross Amount shall be subject to deductions for the NAS PI Claimant's ratable share of the fees and expenses of the PI Trust, as well as amounts prepaid to the United States under the Plan to settle claims or liens of one or more federal government health insurance programs against such NAS PI Claimant or any Distribution to such NAS PI Claimant on account of its NAS PI Channeled Claims. [The resulting net amount shall be paid to the NAS PI Claimant in the form of an initial payment not to exceed $3,500.00 and five (5) additional equal installments in years six (6) through ten (10) following the year of the initial payment; *subject, however*, to the prior satisfaction of healthcare liens as set forth below. In no event shall interest be paid in respect of any judgment obtained in the tort system.]

None of the NAS Percentage-Reduced Claim, the NAS Maximum Value, the NAS Gross Amount, the deductions therefrom, or the payment schedule is subject to any appeal or reconsideration.

**Health Care Liens, Minors and Heirship**. The PI Trust shall not issue any payment in respect of a Final Judgment until the Claims Administrator has received proof to his or her reasonable satisfaction that any private or governmental health care liens or similar claims against such Final Judgment have been satisfied or will be satisfied out of the recovery.

The special procedures set forth in Exhibit E to the NAS PI TDP shall apply to all NAS PI Claimants who are minors under applicable law. Anyone seeking a Distribution from the PI Trust in their capacity as an heir must execute and submit the applicable Heirship Declaration attached to the NAS PI TDP as Exhibit D.[99]

*                *                *

The expenses of the PI Trust shall be governed by the PI Trust Agreement. The PI Trust Agreement provides that the Trustee shall have the power to pay liabilities and expenses of the PI Trust (including indemnification obligations), establish the Creditor Trust Operating Reserve for the PI Trust and such other funds, reserves, and accounts within the PI Trust estate as deemed by the Trustee to facilitate carrying out the purposes of the PI Trust, and pay reasonable compensation to those employees, legal, financial, accounting, investment, auditing, forecasting, and other consultants, advisors, and agents.  The PI Trust Agreement provides that the amount of the PI Trust Assets available to make settlement payments to Holders of Allowed PI Channeled Claims shall be subject to deductions for trust expenses, including, but not limited to, the fees and expenses of PI Trust professionals and employees, including those professionals needed to administer the PI Trust Distribution ProceduresTDP and LRP Agreement, and outside legal, financial, accounting, investment, auditing, forecasting, expert, and other consultants, advisors, and agents.  To the extent such fees and expenses were incurred prior to the Effective Date and were not paid by the PI Trust, the Trustee is authorized to pay or reimburse such fees and expenses from the PI Trust Assets as Trust Expenses.  Fees and expenses of the Appeals Master shall be borne respectively by any PI Claimant who appeals the ruling of the Claims Administrator regarding his or her respective PI Channeled Claims, and such fees and expenses shall be deducted from such PI Claimants' respective payments from the PI Trust.  Additionally, PI Claimants that incurred individual legal fees and expenses (including fees and expenses pursuant to retainer agreements) shall have such individual legal fees and expenses deducted from their respective payments from the PI Trust.

Subject to the Debtors' consent (which consent shall not be unreasonably withheld, delayed or denied), the PI Trust has selected Edgar C. Gentle III toshall serve as Trustee.[100]  In the event of a vacancy in the Trusteetrustee position, whether by term expiration, death, retirement, resignation, or removal, or because the Trustee is otherwise unable to perform its functions as Trusteetrustee, the PI Trust Oversight Committee shall choose a successor Trustee. In the event that the PI Trust Oversight Committee cannot agree on a successor Trusteetrustee, the PI Trust Oversight Committee shall ask the Bankruptcy Court to select the successor Trusteetrustee.

The PI Trust Agreement provides that the PI Trust Oversight Committee shall consist of three (3) members.  Two members of the PI Trust Oversight Committee shall be named by the Ad Hoc Group of Individual Victims.  These two members will select the third member of the PI

---

[99] Exhibit D contains two declaration forms. One applies if the Decedent named the Non-NAS PI Claimant as executor in his/her will; the other applies if the Decedent had no will.

[100] In the event Mr. Gentle becomes unavailable to serve as the Trustee, the Ad Hoc Group of Individual Victims shall, subject to the Debtors' consent (which consent shall not be unreasonably withheld) select a different person to serve as the Trustee in accordance with the Plan.

Trust Oversight Committee.    The members of the PI Trust Oversight Committee shall be compensated as provided in the Budget.  A description of the amounts paid to the PI Trust Oversight Committee members shall be included in the annual report to be filed with the Bankruptcy Court.

The PI Trust Agreement provideswill provide that the Trustee shall receive a retainer from the PI Trust for his service as a Trusteetrustee in the amount of $150,000 per annum, paid annually.  Hourly time, as described below, shall first be billed and applied to the annual retainer. Hourly time in excess of the annual retainer shall be paid by the PI Trust.  For all time expended as Trustee, including attending meetings, preparing for such meetings, and working on authorized special projects, the Trustee shall receive the sum of $400 per hour.   For all non-working travel time in connection with PI Trust business, the Trustee shall receive the sum of $200 per hour.

The PI Trust Agreement will provide that the Trustee shall have the power to appoint such officers and hire such employees and engage such legal, financial, accounting, investment, auditing, forecasting, and other consultants, advisors, and agents as the business of the PI Trust requires, and delegate to such persons such powers and authorities as the fiduciary duties of the Trustee permit and as the Trustee, in his discretion, deems advisable or necessary in order to carry out the terms of this PI Trust Agreement, the PI TDP, and the LRP, and pay reasonable compensation to those employees, legal, financial, accounting, investment, auditing, forecasting, and other consultants, advisors, and agents.

The PI Trust Agreement shallwill provide that the Trustee shall retain a claims administrator ("**Claims Administrator**"), which may be the same individual as the Trustee. The PI Trust has chosen Edgar C. Gentle III to be the Claims Administrator.

The PI Trust Agreement shallwill provide that neither the Trustee nor the Delaware Trustee shall be required to post any bond or other form of surety or security unless otherwise ordered by the Bankruptcy Court.

**T.    Protocols for the Resolution of Healthcare Liens**

This section describes how certain healthcare liens that may affect some payments will be resolved.  The lien resolution program summarized in this section and set forth in the PI Trust Documents applies only to PI Channeled Claims that are liquidated pursuant to the liquidation provisions of the PI TDP, and not to the PI Channeled Claims of PI Claimants who elect to opt out of such liquidation provisions.

The settlementSettlement payments made to holders of qualifying opioid-related personal injury claimsPI Claimants who have received certain types of health insurance coverage for opioid-related injuries may be subject to healthcare liens that, in certain cases, will be resolved through a lien resolution procedureprogram described more fully in the PI Trust Documents, and, in other cases, will remain to be resolved directly with the parties holding such liens.  Under federal law, certain health insurers like Medicare and Medicaid have a statutory right to be reimbursed for the costs of opioid-related medical treatment they paid on behalf of a holder of an opioid-related personal injury claim.  Additionally, if a claimant had private health insurance,

many private health insurance contracts provide a similar right to be reimbursed.  Complying with these statutory and contractual reimbursement and (lien) obligations can be a complicated process.  To address that complexity, the PI Trust will engage a specialist to determine the proper amount and validity of those liens and, thereby, maximize the amount available for payment to a holder of an opioid-related personal injury claim from the PI Trust.  Additionally, the Ad Hoc Group of Individual Victims has negotiated what it believes are favorable repayment terms with many of the private health insurers referred to as third-party payors or "TPPs" as part of the lien resolution ~~procedure~~program.

That lien resolution ~~procedure~~program is set forth in the LRP Agreement.  It provides ~~all holders of qualifying opioid-related personal injury claims~~PI Claimants who receive a recovery on their PI Channeled Claims under the liquidation provisions of the PI TDP with a fair, swift, and cost-effective procedure through which such claimants can resolve any healthcare liens held by private TPPs that choose to participate in that lien resolution procedure.  That lien resolution ~~procedure~~program emerged from intensive negotiations between counsel for the Ad Hoc Group of Individual Victims and a group of private TPPs.  Pursuant to the LRP Agreement, participating private TPPs have agreed to release their claims against and liens on distributions of $3,500 or less made from the PI Trust to ~~holders of qualifying opioid-related personal injury claims~~PI Claimants on PI Channeled Claims that were liquidated under the liquidation provisions of the PI TDP.  For all holders of qualifying opioid-related personal injury claims whose distributions from PI Trust exceed $3,500, the participating private TPPs have agreed to cap the amount payable from such distributions to such participating private TPPs on account of their healthcare liens, and/or "offset" their liens, pursuant to the following:

(i) For any statutory lien (*i.e.* MA, MCOs, FEHBA, etc.): 25%.

(ii) For all preemptive liens (*i.e.* ERISA self-funded, etc.): 25%.

(iii) For all non-preemptive liens in an Anti-Subrogation State: Liens are waived.

(iv) For all non-preemptive liens in a Non-Equity State without contractual recovery rights: Liens are waived.

(v) For all non-preemptive liens not waived pursuant to (iii) or (iv) or otherwise:

   a) Gross Recovery above $50,000: 19.5%.
   b) Gross Recovery between $25,000 and $50,000: 18%.
   c) Gross Recovery below $25,000: 15%.

The "Lien Offset" shall be 30%.

The LRP Agreement is a PI Trust Document that is included in the Plan Supplement.[~~63~~101]

---

[~~63~~101]   A copy of the current draft of the LRP Agreement is attached to the *Notice of Filing of Plan Supplement Pursuant to the First Amended Joint Chapter 11 Plan of Reorganization of Purdue Pharma L.P. and Its Affiliated Debtors* [D.I. 2732] filed on April 23, 2021.

**U.      Negotiated Post-Effective Date Structure and Governance of NewCo**

NewCo's post-Effective Date ownership and governance structure fulfills the vision embodied in the initial Settlement Framework and the DOJ Resolution for the Debtors' businesses to be transferred to a new entity for the benefit of claimants and the U.S. public. The precise terms are the product of extensive negotiations among the Debtors, the AHC, the UCC, the DOJ and other stakeholders, including within the context of the second phase of the Mediation. The diagram and descriptions below summarize key elements of the structure and the related mechanisms by which payments to NOAT, the Tribe Trust and the Private Creditor Trusts will be funded and guaranteed.[64][102]



*1.      NewCo*

NewCo will be a newly formed Delaware limited liability company that will be directly owned by TopCo (which will own 100% of the voting and economic interests in NewCo) and indirectly owned by NOAT and the Tribe Trust.  NewCo's Purpose will be to responsibly, sustainably, and transparently balance (i) the interests of its stakeholders to provide abatement of the opioid crisis, (ii) the effective deployment of its assets to address the opioid crisis, and (iii) the interests of those materially affected by its conduct.  To this end, on or prior to the Effective Date, NewCo will directly or indirectly receive NewCo Transferred Assets, which consist of approximately $200 million of the Debtors' cash and all of the Debtors' non-cash assets (including the equity of the Transferred Debtors) other than rights to certain insurance proceeds and certain causes of action.

---

[64][102]  The Tribe Trust shown in the diagram refers to one or more trusts, limited liability companies or other Persons to be established in accordance with Section 5.7 of the Plan.

NewCo will be governed by a board of seven (7) disinterested and independent NewCo Managers who will each have experience in one or more of the following areas: pharmaceuticals, public policy (including public health policy), law enforcement, ethics and compliance, finance, audit, general business and/or corporate governance issues.  The Ad Hoc Committee and the MSGE Group (collectively, the "**Governmental Consent Parties**"), in consultation with the Debtors and the Creditors' Committee, will select the initial NewCo Managers, pursuant to a selection process that is reasonably acceptable to the Debtors and is subject to observation by the DOJ.

The Confirmation Order will contain the NewCo Governance Covenants, which will require NewCo to: (i) provide all of its products, including all opioid products, in a safe manner that limits the risk of diversion; (ii) comply with its obligations under the Public Entity Settlements and the Private Entity Settlements; (iii) pursue and implement Public Health Initiatives; and (iv) otherwise take into account long-term public health interests relating to the opioid crisis and best environmental, social and governance practices in management of a pharmaceutical business.  The Confirmation Order will also contain the NewCo Operating Injunction, which will bind NewCo and any successors to NewCo, to injunctive relief substantially similar to the voluntary injunction currently in place for the Debtors.

The NewCo Monitor will be appointed to ensure compliance with both the NewCo Governance Covenants and the NewCo Operating Injunction.  The NewCo Monitor will be the existing Purdue Monitor as of the Effective Date or otherwise will be selected by the Governmental Consent Parties with the consent of the Debtors, and in consultation with the Creditors' Committee.

As described in greater detail in the Amended NewCo/TopCo Governance Term Sheet attached as **Appendix F** hereto, the NewCo Managers and TopCo Managers will pursue a transaction or series of transactions to sell the assets of NewCo and/or sell, transfer, or contribute TopCo's equity interests in NewCo.  The NewCo Disposition Event may consist of one or more sales of assets or sales of equity through public or private markets, and may involve commercial buyers or nonprofit buyers.  In pursuing such a NewCo Disposition Event, the NewCo Managers and TopCo Managers will consider which transactions best achieve NewCo's Purpose, taking into account fulfilling the Minimum TopCo Distribution, application of proceeds, and whether the buyers will continue to deploy the purchased assets/securities in furtherance of NewCo's Purpose and the NewCo Governance Covenants.  The NewCo Managers and TopCo Managers will use reasonable best efforts to complete the NewCo Disposition Event by December 31, 2024.  This date may be extended only by no less than a two-thirds majority determination of the TopCo Managers, taking into account NewCo's Purpose, after providing 30 days' written notice to the Attorneys General and other designated governmental and tribal representatives, explaining why such an extension is considered appropriate and advances the public interest.

Additional information about the governance structure of NewCo is set forth in Article IVD.4 and the Amended NewCo/TopCo Governance Term Sheet attached as **Appendix F** hereto.

NewCo or its wholly owned subsidiary will also assume the Purdue Pension Plan.  Specifically, upon the Effective Date, NewCo or its wholly owned subsidiary shall be deemed to

have assumed the Purdue Pension Plan and all liabilities and assets thereunder and shall comply with all applicable statutory provisions of ERISA and the IRC, including, but not limited to, satisfying the minimum funding standards pursuant to 26 U.S.C. §§ 412, 430, and 29 U.S.C. §§ 1082, 1083; paying the PBGC premiums in accordance with 29 U.S.C. §§ 1306 and 1307; and administering the Purdue Pension Plan in accordance with its terms and the provisions of ERISA and the IRC (and NewCo reserves all rights thereunder).[65103]

### 2.    *TopCo*

TopCo will be a newly-formed Delaware limited liability company in which NOAT will hold one hundred percent of the voting interest. NOAT and the Tribe Trust will hold, respectively, majority and minority economic interests in TopCo in percentages corresponding to the Public Entity Allocations agreed to pursuant to the Public Entity Settlements.

TopCo will hold one hundred percent of the equity interests and voting rights in NewCo and will be entitled to collect distributions therefrom. TopCo will be party to the NewCo Credit Support Agreement. TopCo will make distributions of excess cash to NOAT and the Tribe Trust, subject to the terms of its organizational documents and the NewCo Credit Support Agreement.

TopCo will be governed by a board of three (3) disinterested and independent TopCo Managers; *provided* that one (but no more than one) Creditor Trustee of NOAT may serve as a TopCo Manager; *provided, further,* that any action taken by such individual in his or her capacity as TopCo Manager shall not be subject to the fiduciary duties of such individual in his or her capacity as a Creditor Trustee of NOAT. The initial TopCo Managers will be selected by the Governmental Consent Parties, in consultation with the Debtors and the Creditors' Committee, and pursuant to a selection process that is reasonably acceptable to the Debtors. The DOJ will have the right, in its discretion, to observe the selection process.

Additional information about the governance structure of TopCo is set forth in Article IVD.5 and the Amended NewCo/TopCo Governance Term Sheet attached as **Appendix F** hereto.

### 3.    *NOAT*

The NOAT will be a newly formed Delaware statutory trust that will hold one hundred percent of the voting interests and a majority of the economic interests of TopCo (with the Tribe Trust holding the remainder) and a residual interest in the Master Disbursement Trust (together with the Tribe Trust). NOAT will (i) collect (a) all of the Debtors' surplus cash remaining after all required payments are made on the Effective Date and (b) distributions of excess cash from

---

[65103] Notwithstanding any provision in the Plan to the contrary, no provision contained in the Plan, the Confirmation Order, the Bankruptcy Code (including section 1141 thereof), or any other document filed in the Debtors' bankruptcy cases shall be construed as discharging, releasing, exculpating or relieving NewCo or its successors from any liability or responsibility with respect to the Purdue Pension Plan under any law, governmental policy, or regulatory provision. PBGC and the Purdue Pension Plan shall not be enjoined or precluded from enforcing such liability or responsibility as a result of any of the provisions of the Plan, the Confirmation Order, the Bankruptcy Code or any other document filed in the Debtors' bankruptcy cases. The PBGC and the Debtors agree that all Proofs of Claim filed by the PBGC shall be deemed to be withdrawn, with prejudice, as of the Effective Date.

the MDT and TopCo, (ii) assume all liability for and administering the Non-Federal Domestic Governmental Claims, and (iii) make distributions on account of Non-Federal Domestic Governmental Claims to be used for abatement purposes.

No federal, state, or local governmental entity will own any interest in NewCo.

NOAT will be governed by Creditor Trustees of NOAT. The Governmental Consent Parties, in consultation with the Debtors and pursuant to a selection process reasonably acceptable to the Debtors will select such trustees; *provided* that the DOJ shall have the right, in its discretion, to observe such selection process.

### 4.    The Tribe Trust

The Tribe Trust will (i) hold the remainder of the economic interests of TopCo not held by NOAT and a residual beneficiary interest in the Master Disbursement Trust (together with NOAT), (ii) collect an initial distribution of $50 million from the Debtors and the required distributions from the Master Disbursement Trust and NewCo/TopCo, (iii) assume all liability for and administer the Tribe Claims, and (iv) make Abatement Distributions to Authorized Recipients for Authorized Abatement Purposes.

The Tribe Trust will be governed by trustees that will be selected by the Native American Tribe Group, subject to the consent of the Debtors.

### 5.    The Master Disbursement Trust

The Master Disbursement Trust will be a newly formed trust that will (i) hold and administer the MDT Transferred Assets, which will consist of (a) a reserve established to pay MDT operating expenses, (b) any Claims and causes of action against Excluded Parties, (c) certain insurance rights of the Debtors, (d) the right to receive the Required Settlement Payments under the Shareholder Settlement Agreement (and rights to enforce such agreement and pursue claims against applicable Sackler Parties pursuant to the terms of the Shareholder Settlement Agreement if necessary), and (e) any surplus cash of the Plan Administration Trust upon its dissolution; (ii) make payments to the Private Creditor Trusts under the Private Entity Settlements in satisfaction of the MDT Claims; and (iii) make Public Creditor Trust Distributions in respect of the MDT Interests from MDT Excess Cash in accordance with the Plan and the Public Entity Settlements.

The Master Disbursement Trust will be governed by a board of three MDT Trustees. The Governmental Consent Parties will select two initial MDT Trustees and the Creditors' Committee will select one initial MDT Trustee, in each case, in consultation with the Debtors, pursuant to a selection process reasonably acceptable to the Debtors. The DOJ will have the right to observe the selection process. The MDT Trustees will select an MDT Executive Director who will: (i) carry out the day-to-day operations of the Master Disbursement Trust; (ii) make enforcement, litigation and liquidation recommendations as are reasonably necessary to the MDT Trustees and such other administrative professionals or entities; and (iii) have such other duties and responsibilities as set forth in the MDT Agreement and as may be delegated to it by the MDT Trustees in accordance with the MDT Agreement.

### 6. *The Private Creditor Trusts*

The Private Creditor Trusts consist of the PI Trust, the Hospital Trust, the TPP Trust, and the NAS Monitoring Trust. The Private Creditor Trusts will hold beneficial interests in and collect payments from the MDT of a specified amount in accordance with the Private Entity Settlements. Each of the Private Creditor Trusts will assume all liability for and administer Claims in the applicable Class and make distributions or award grants for authorized abatement purposes pursuant to their respective governing documents.

### 7. *The Plan Administration Trust*

The Plan Administration Trust will be established to (i) hold, manage, sell and invest the PAT Assets[66][104] for the benefit of holders of Claims (other than Channeled Claims), (ii) hold and maintain the PAT Reserves[67][105] and the PAT Distribution Account[68][106] and maintain the Professional Fee Escrow Account, (iii) administer, process, resolve and liquidate Claims (other than Channeled Claims), and (iv) make distributions to holders of Allowed Claims (other than Channeled Claims).

The Plan Administration Trust will be administered by the Plan Administration Trustee, who will be responsible for all decisions and duties with respect to the Plan Administration Trust and PAT Assets. The Plan Administration Trustee will be selected by the Debtors.

The Plan Administration Trust shall be dissolved after (a) all Disputed Claims against the Debtors have been resolved, (b) all PAT Assets have been liquidated, (c) the Trust has made all required distributions and (d) PPLP has been dissolved.

### 8. *Effective Date Payments*

On the Effective Date, all cash and cash equivalents of the Debtors will be used to: (i) fund reserves to be held by the Plan Administration Trust;[69][107] (ii) fund the MDT Operating Reserve for the operating expenses of the MDT; (iii) fund the Initial NewCo Cash for post-Effective Date operations; (iv) make distributions under the Plan in respect of the Federal

---

[66][104] The PAT Assets consist of (a) the PAT Reserves; (b) the PAT Distribution Account; (c) any assets not transferred to NewCo or the MDT; and (d) Retained Causes of Action necessary for the administration of Claims against the Debtors (other than Channeled Claims).

[67][105] The PAT Reserves consist of the Wind-Up Reserve, the Disputed Claims Reserves, the Disputed Cure Claims Reserve and the Priority Claims Reserve. The Wind-Up Reserve will be established to pay all costs incurred from the administration of the Debtors' Estates after the Effective Date. The Disputed Claims Reserves will be established to make distributions to Disputed Claims that become Allowed Claims. The Disputed Cure Claims Reserves will be established to pay cure costs associated with contracts and leases assumed by NewCo and the Transferred Debtors. The Priority Claims Reserve will pay Allowed Administrative Claims, Allowed Secured Claims and Allowed Priority Claims,

[68][106] The Pat Distribution Accounts are one or more accounts to be established to make distributions on account of Allowed Claims (other than Channeled Claims).

[69][107] Such reserves include: the Priority Claims Reserve to satisfy Administrative Claims, Secured Claims and Priority Claims, the Disputed Claims Reserve to pay Disputed Other General Unsecured Claims that are ultimately allowed, the Disputed Cure Claims Reserve to pay Disputed Cure Claims that are ultimately allowed, the Professional Escrow Account to pay Professional Fee Claims, and the Wind-Up Reserve to pay for expenses of the Plan Administration Trust.

Government Unsecured Claims, Avrio General Unsecured Claims, Adlon General Unsecured Claims, Other General Unsecured Claims and Ratepayer Claims; (v) provide funding for the establishment of the public document repository; and (vi) make Initial Creditor Trust Distributions under the Private Entity Settlements and the Public Entity Settlements.

### 9.    Dissolution of PPLP and PPI

Under the terms of the Plan, all Interests in PPLP and PPI will be terminated with no distribution. After the Effective Date, PPLP (and any other Debtor not transferred to NewCo) will continue to exist as Liquidating Debtors solely for the purposes of winding up their respective estates and liquidating such entities. To administer the wind-up and liquidation process, the PPLP Liquidator (which will be the Plan Administration Trustee) will assume governance and control of the Liquidating Debtors. The Plan Administration Trustee may dissolve all of the Liquidating Debtors after the Plan Administration Trust is established.

## V.    DOJ Resolution

On October 21, 2020, the Debtors filed a motion (the "**DOJ 9019 Motion**") seeking approval to enter into the DOJ Resolution (as described above in Article I.B). If the Plea Agreement is accepted by the New Jersey District Court, the DOJ Resolution will fully resolve the United States' civil and criminal investigations into the Debtors' past practices related to the production, sale, marketing and distribution of opioid products and enable a value-maximizing restructuring. Pursuant to the DOJ Resolution (including the Plea Agreement, which remains subject to acceptance by the New Jersey District Court), the United States and the Debtors agreed as follows:

- Purdue Pharma agreed to the entry of a criminal forfeiture judgment in the amount of $2 billion (the "**Forfeiture Judgment**"), which Forfeiture Judgment shall, (i) as of the later of (a) entry of the judgment of conviction in accordance with the Plea Agreement and (b) confirmation of the Debtors' Plan, have the status of an allowed superpriority administrative expense claim against Purdue Pharma, and (ii) be satisfied by (A) an upfront payment of $225 million (the "**Forfeiture Payment**") by Purdue Pharma within three business daysBusiness Days following the entry of a judgment of conviction following a sentencing hearing held pursuant to the Plea Agreement and (B) application of a credit (the "**Forfeiture Judgment Credit**") by the United States of up to $1.775 billion for value distributed or otherwise conferred by Purdue Pharma under the Plan in respect of claims asserted by state, tribal, or local government entities;

- The sentence imposed at the sentencing hearing (which shall occur no earlier than 75 days following confirmation of the Debtors' Plan) shall order a criminal fine in the amount of $3.544 billion. The United States shall, as of the later of (i) entry of the judgment of conviction in accordance with the Plea Agreement and (ii) confirmation of the Debtors' Plan, have an allowed, unsubordinated, undisputed, non-contingent, liquidated unsecured claim against Purdue Pharma in such amount (the "**Criminal Fine Claim**");

- The United States shall have an allowed, unsubordinated, undisputed, non-contingent, liquidated unsecured claim against Purdue Pharma in the amount of $2.8 billion arising from the Department of Justice's civil investigation (the "**Civil Claim**");

- The United States and Purdue Pharma stipulated and agreed to the statements set forth in Schedule A to the Plea Agreement (the "**Agreed Statement of Facts**"), and the United States agreed to a resolution in exchange for guilty pleas from Purdue Pharma to a three-count information;

- After the order confirming the Plan has become final and non-appealable, and the Plan has become effective, the Debtors will create and host a public document repository containing non-privileged documents in their possession, custody, or control that they have produced to the United States and that the United States identifies as relating to the charges asserted in the information and the alleged civil violations, which will be publicly available at an easily identifiable and accessible website;

- The New Jersey District Court will determine whether to accept the Plea Agreement at the sentencing hearing. Before the Plea Agreement is accepted by the New Jersey District Court at the sentencing hearing, Purdue Pharma may withdraw its pleas of guilty (i) if the Bankruptcy Court rejects, or otherwise declines to confirm, a Plan that provides for the emergence of a public benefit company (or other entity with a similar mission) or (ii) if the Office of Inspector General of the United States Department of Health and Human Services exercises, or states an intent to exercise, any available authority to exclude Purdue Pharma's successor public benefit company (or other entity with a similar mission) from participation in federal healthcare programs.

On November 17, 2020, the Bankruptcy Court held a hearing to consider approval of the DOJ 9019 Motion. On November 18, 2020, the Bankruptcy Court entered an order approving the DOJ 9019 Motion. *See Order Pursuant to 11 U.S.C. § 105 and Fed. R. Bankr. P. 9019 Authorizing and Approving Settlements Between the Debtors and the United States* [D.I. 2004].

On November 24, 2020, in accordance with the terms of the DOJ Resolution, PPLP pleaded guilty in the New Jersey District Court to an information charging it with three felony offenses: one count charging a dual-object conspiracy to defraud the United States and to violate the Food, Drug, and Cosmetic Act, and two counts charging conspiracy to violate the Federal Anti-Kickback Statute.

The DOJ Resolution preserves billions of dollars of value for creditors other than the federal government and maximizes the value available to address the opioid crisis. It favorably settles the risk of forfeiture or loss of all, or substantially all, of the Debtors' value flowing from the potential for criminal and civil forfeitures, fines, and penalties totaling billions of dollars, many of which are also alleged to be non-dischargeable. It also eliminates the prospect of extraordinarily expensive and value-destructive criminal prosecution and litigation by the federal government against the Debtors. While PPLP will be excluded from participation in federal

healthcare programs if the Plea Agreement is accepted and PPLP is convicted, the DOJ Resolution anticipates the emergence of a public benefit company or entity with a similar mission that can continue to commercialize the Debtors' medications following PPLP's exclusion.  Moreover, if the confirmed Plan provides for emergence of a public benefit company or entity with a similar mission, value distributed or otherwise conferred in respect of claims asserted by state, tribal, or local government entities will receive the benefit of the Forfeiture Judgment Credit up to the $1.775 billion cap.  Accordingly, the DOJ Resolution enables distributions to various claimants under this Chapter 11 Plan that are substantially larger than would likely be possible without such an agreement with the United States.

## W.    The Debtors' Acceptance of Responsibility and Apologies for Past Misconduct

The Debtors have publicly and unequivocally acknowledged and apologized for their past misconduct.

On October 21, 2020, the Debtors issued a press release announcing the DOJ Resolution, under which PPLP pled guilty to three felony offenses—one count charging a dual-object conspiracy to defraud the United States and to violate the Food, Drug, and Cosmetic Act and two counts charging conspiracy to violate the Federal Anti-Kickback Statute—and stipulated to an Agreed Statement of Facts describing the underlying conduct.  In this release, Steve Miller, who joined Purdue's Board as Chairman in July 2018, stated that "Purdue deeply regrets and accepts responsibility for the misconduct detailed by the Department of Justice in the agreed statement of facts." Press Release, Purdue Pharma, Purdue Pharma Reaches Agreement With U.S. Department of Justice (Oct 21, 2020), https://www.purduepharma.com/news/2020/10/21/purdue-pharma-reaches-agreement-with-u-s-department-of-justice/.   In the DOJ Motion, the Debtors also highlighted for the Court that the DOJ Resolution is "the Debtors' public admission of responsibility for their past misconduct." DOJ Motion ¶ 9.

At the hearing in the United States District Court for the District of New Jersey at which PPLP (acting through its Chairman) pled guilty, PPLP again publicly acknowledged and took responsibility for its past misconduct, including acknowledging that "Purdue knowingly and intentionally conspire[d] with others to defraud the DEA by impeding, impairing, obstructing, and defeating the ability of the DEA to prevent the diversion of controlled substances," *US v. Purdue Pharma L.P.*, Tr. 38:21-25 (Nov. 24, 2020), "fail[ed] to cease promoting its opioid products to healthcare providers after receiving information suggesting that those healthcare providers were prescribing opioid products without a legitimate medical purpose and outside the usual course of professional practice, in situations in which Purdue possessed sufficient information that a decision should have been made to cease detailing," *Id.* 39:10-17, and "knowingly and willfully offer[ed] payments to two healthcare providers through the speaker program, where at least one purpose of the payment was to induce those healthcare providers to write more prescriptions for Purdue opioid products." *Id.* 42:6-11.

Purdue's CEO also addressed the Company's past misconduct at a public hearing before the House Committee on Oversight and Reform that was broadcast in video, stating: "To everyone listening who's been impacted by the opioid crisis, I want to be clear and I want to speak directly to you.  On behalf of Purdue as its current leader, I'm profoundly sorry. . . . The company accepts full responsibility for its wrongdoing."  The Role of Purdue Pharma and the

Sackler Family in the Opioid Epidemic: Hearing before the Committee on Oversight and
Reform, 116 Cong. 2 (2020) (Statement of Craig Landau).

## X.    Public Document Repository

The Debtors introduced the idea of creating a public document repository at the October
11, 2019 Preliminary Injunction Hearing and reaffirmed their commitment to creating a public
document repository at five subsequent hearings.  *See* Oct. 11, 2019 Prelim. Inj. Hr'g Tr. 66:17-
18, 67:5-20; Nov. 6, 2019 Prelim. Inj. Hr'g Tr. 30:19-31:19; June 3, 2020 Bar Date Ext. Hr'g Tr.
20:18-21:8; July 23, 2020 Omnibus Hr'g Tr. 48:12-18; Oct. 28, 2020 Omnibus Hr'g Tr. 30:20-
22; Nov. 17, 2020 Omnibus Hr'g Tr. 96:6-24.   Creating a public document repository is
supported by the Debtors' core creditor constituencies as well.

Creation of such a public document repository became a binding obligation of the
Debtors in the DOJ Resolution.   As described above, pursuant to the DOJ Resolution, the
Debtors have agreed that after the order confirming the Plan has become final and non-
appealable, and the Plan has become effective, the Debtors will create and host a public
document repository containing non-privileged documents in their possession, custody, or
control that they have produced to the United States and that the United States identifies as
relating to the charges asserted in the information and the alleged civil violations, which will be
publicly available at an easily identifiable and accessible website.   Pursuant to Section 5.12 of
the Plan, the parameters of the public document repository shall be acceptable to the Debtors, the
Creditors' Committee, the Ad Hoc Committee, the MSGE Group and the DOJ, and in no event
shall be less restrictive than the public document repository that the Debtors have agreed to
create and host in connection with the DOJ Resolution.

The Public Document Repository will contain a copy of the approximately [13,000,000]
documents (of more than 100,000,000 pages) produced by Debtors during the course of the
Purdue Legal Matters and will include the following documents as produced by Debtors: (a)
documents from the Debtors' email system from present and former officers and senior current
and former employees in marketing, sales, R&D, legal, compliance, and regulatory; (b)
documents that members of the Sackler family sent or received on the Debtors' email system; (c)
documents that reflect clinical and pre-clinical research regarding opioids, including research
related to safety and effectiveness of opioids; (d) minutes and documents presented to the Purdue
Board of Directors; (e) marketing and sales plans for opioid medications; (f) sales call notes; (g)
standard operating procedures; (h) suspicious order monitoring data and documents; and (i)
reports of concern and ADD files pertaining to prescribers.

The Public Document Repository will also contain (a) all deposition transcripts taken in
the Purdue Legal Matters of the Debtors' current or former employees and board members,
together with the exhibits to those depositions; *provided* that, with respect to any depositions
taken in the Chapter 11 Cases of the Debtors' former employees and board members who are
also Shareholder Released Parties, the inclusion in the Public Document Repository of the
transcripts thereof and exhibits thereto (to the extent such exhibits were documents produced by
a Shareholder Released Party) shall be subject to the terms set forth in the Shareholder
Settlement Agreement; and (b) documents provided to the Special Committee for review.

Communications between the Debtors and the DOJ regarding settlement between 2015 and 2020 will not be in the Public Document Repository, nor will any internal documents of the Debtors reflecting such discussions or the strategy for such discussions.

The Public Document Repository will not contain or disclose any documents or content of documents that are Privileged, including Privileged documents produced to the DOJ under non-waiver agreements and Privileged documents subject to a clawback by Debtors in the Purdue Legal Matters, or documents that are subject to protections against public disclosure by the Health Insurance Portability and Accountability Act or similar state or federal statute, or reveal the names or email addresses of individual employees or former employees of Debtors. Inadvertent production of Privileged documents to the Public Document Repository does not operate as a waiver of the Privilege and, upon discovery, any Privileged documents must be promptly removed from the Public Document Repository. Any participation in the Public Document Repository by any Shareholder Released Parties will be on terms and conditions solely as set forth in the Shareholder Settlement Agreement.

On the Effective Date or as soon as reasonably practicable thereafter, a Special Master will be appointed, who will oversee a program of public disclosure that includes the following: (a) accomplishing prompt, broad, permanent, public disclosure of millions of the Debtors' documents; (b) engaging with survivors, advocates, journalists, scholars and policymakers to ensure that the disclosure program serves the public; (c) coordinating with the host of the Public Document Repository; (d) ensuring protection for information for which protection is required, such as Privileged information, personal health information, personal identifying information, names and email addresses of individual current and former employees of Debtors, and information subject to confidentiality rights of third parties; (e) selecting and overseeing counsel and/or staff, if necessary, to support the duties and functions of the Special Master; (f) coordinating, as appropriate, with the disclosure of documents from other defendants in opioid cases; and (g) ensuring the long-term sustainability and success of the disclosure program.  To the extent that the Special Master determines that any otherwise non-Privileged information should be redacted to protect trade secrets, trade secrets will not include information reflecting opioid sales or promotional strategies, tactics, targeting, or data, or internal communications related to sales or promotion of opioids. On each of the first five anniversaries of the Effective Date, the Special Master will publish a public report describing the activities of the disclosure program and the use of any funds expended.

Y.    **The Special Committee's Investigation and Approval of Settlement of Claims Against the Sackler Families**

Shortly after it was formed, the Special Committee, in consultation with Davis Polk, discussed certain areas of investigation, including a review of all transfers from Purdue Pharma to or for the benefit of the Sackler Families and Sackler Entities.  This led the Special Committee, again in consultation with Davis Polk, to discuss the nature and scope of an investigation into potential estate claims against the Sackler Families and Sackler Entities. The purpose of this investigation was to form the basis to determine whether to bring litigation against the Sackler Families and Sackler Entities to recover on these potential estate claims or to determine if, in the business judgment of the Special Committee, it was more prudent to seek a

settlement with the Sackler Families and Sackler Entities and whether any proposed Settlement Framework was fair and equitable and thus in the best interests of the estate.[70108]

The Special Committee has met on a regular basis and in special sessions as warranted by circumstances. In total, the Special Committee has held no fewer than 56 meetings between May 21, 2019 and March 14, 2021. During its meetings, the Special Committee received many reports, briefings, and updates from Davis Polk, including reports, briefings and updates, prepared at the request of Davis Polk, from expert accounting and financial advisors at AlixPartners and Bates White regarding the investigation and analysis of potential estate claims against the Sackler Families and Sackler Entities. There have also been hundreds of calls and emails among the members of the Special Committee and with its professionals.

Together with evaluating potential claims by the Debtors against the Sackler Families and Sackler Entities, the Special Committee also considered, among other matters and pursuant to its mandate, (i) a review of all related party transactions that the Debtors maintained with the Sackler Families and Sackler Entities, (ii) the contribution of Rhodes Associates, including Rhodes Pharmaceuticals and Rhodes Technologies, to Purdue Pharma; (iii) the amendment, renegotiation, or termination of certain supply, licensing, and intercompany services agreements between Purdue and the IACs; (iv) a reevaluation of the lease for Purdue Pharma's headquarters with One Stamford Realty L.P. ("**OSR**"); and (v) all requests for advancement of legal fees for current and former officers, directors, and employees in connection with litigation or governmental investigations pending against the Debtors.

### 1.    *Investigation of Potential Estate Causes of Action*

Over the course of more than 22 months, the Special Committee conducted a comprehensive investigation into potential claims that the Debtors may have against the Sackler Families and Sackler Entities. The investigation included an exhaustive review by legal counsel and forensic and financial experts to identify and assess transfers from the Debtors to or for the benefit of the Sackler Families and Sackler Entities and an in-depth legal and factual analysis of the strengths and weaknesses of various potential claims by the Debtors against the Sackler Families and Sackler Entities.

The legal and factual investigation undertaken by Davis Polk on behalf of the Special Committee was conducted by a team of Davis Polk lawyers. The Davis Polk investigation team was led by partner Charles S. Duggan and counsel Margarita Clarens. Mr. Duggan has deep experience representing corporate boards of directors, audit committees and special board committees in conducting internal investigations. Ms. Clarens similarly has extensive experience in conducting internal investigations on behalf of corporations in a broad range of industries.

Beginning in April 2019, in anticipation of the formation of a Special Committee, and continuing through March 2021, the Davis Polk lawyers assisting with the Special Committee's investigation devoted more than 22,500 hours to the investigation and analysis of potential estate claims. Where necessary, the Davis Polk team was supplemented by a separate team of

---

[70108] *See Protective Comm. for Indep. Stockholders of TMT Trailer Ferry, Inc. v. Anderson*, 390 U.S. 414 (1968).

attorneys that performed initial screenings of electronic documents and escalated relevant documents for review by Davis Polk and other professionals, including AlixPartners and Bates White, as appropriate.

(i)    <b>Identification of Potential Claims</b>

At the outset of its investigation, Davis Polk undertook a searching assessment to identify all facts and legal theories that might provide a basis for claims by the Debtors against the Sackler Families and Sackler Entities. To this end, one of the first projects was to review the complaints filed against Purdue Pharma and members of the Sackler Families that asserted claims that in bankruptcy were capable of assertion by the Debtors, such as claims for fraudulent transfer, breach of fiduciary duty, unjust enrichment, veil piercing, and alter ego. In addition, to further ensure that the investigation on behalf of the Special Committee inquired into all facts and circumstances potentially relevant to such claims, Davis Polk also surveyed relevant news articles and media publications relating to Purdue Pharma and the Sackler Families and Sackler Entities for potentially relevant information. Based on this review of public-record materials, Davis Polk identified and evaluated potential subjects for further investigation.

For example, Davis Polk considered allegations made by the Connecticut, Massachusetts, New York, and Oregon Attorneys General, among others, that in the face of mounting litigation risk arising from its sale and marketing of OxyContin, Purdue Pharma, at the direction of the Sackler Families, made hundreds of millions of dollars in shareholder distributions each year for no consideration and in bad faith, leaving behind insufficient assets to satisfy the claims of Purdue Pharma's creditors. Based on these and other similar allegations, as well as information available regarding Purdue Pharma's distributions, Davis Polk continued to investigate fraudulent transfers.

Based on allegations reported by the *Financial Times* that Rhodes Pharma was created in 2008 as part of a scheme to "siphon billions of dollars" out of Purdue Pharma following its guilty plea in 2007 to violations of federal drug marketing laws and $634.5 million settlement, the circumstances surrounding the formation of Rhodes Pharma was similarly identified as a topic for investigation.

In view of these allegations and reports, and supplemented primarily by their ongoing review, the Special Committee and Davis Polk focused the factual investigation and legal analysis on the following potential theories of claims and recoveries against the Sackler Families and Sackler Entities:

- ***Intentional Fraudulent Transfer*** based on theories that members of the Sackler Families, acting based on fears that Purdue Pharma was subject to potentially overwhelming liabilities for harms caused by opioids or for violations of law relating to marketing or other sales practices, caused Purdue Pharma to transfer cash and other assets to the Sackler Families or Sackler Entities with the intent of keeping those assets out of the hands of possible Purdue Pharma creditors.

- ***Constructive Fraudulent Transfer*** based on theories that, while it was legally insolvent as a result of accrued but unliquidated liabilities, Purdue Pharma

131

transferred cash and other assets to the Sackler Families and Sackler Entities without receiving reasonably equivalent value in exchange.

- ***Breach of Fiduciary Duty*** based on theories that members of the Board—including members of the Sackler Families—breached their fiduciary duties to Purdue Pharma by (i) entering into self-dealing transactions that injured Purdue Pharma, (ii) directly causing Purdue Pharma to engage in the misconduct underlying the DOJ settlements and other lawsuits, or (iii) consciously failing to monitor Purdue Pharma's compliance programs.

- ***Unjust Enrichment*** based on theories that members of the Sackler Families and the Sackler Entities had acted in bad faith and, therefore, were unjustly enriched by the transfers of cash and other assets from Purdue Pharma, as well as any additional profits realized as a result of such transfers, at the expense of Purdue Pharma and its creditors.

- ***Veil-Piercing***, as a means of recovery for potential claims, based on theories that members of the Sackler Families controlled and dominated the Debtors and the IACs, that members of the Sackler Families operated the Debtors and IACs as a single enterprise, and that members of the Sackler Families used their control and domination to cause injury generalized to the estate as a whole by transferring value from the Debtors to trusts held for their benefit.

(ii)    **Analysis of Key Legal Issues**

Throughout the investigation, the Special Committee received briefings on and considered various legal matters bearing on the potential estate claims. Specifically, Davis Polk advised the Special Committee on choice of law analyses focused on determining which jurisdiction's laws would govern each of the claims. After canvassing the relevant statutes, case law, and secondary sources, Davis Polk also advised the Special Committee on the substantive elements of each claim including, among others, the "badges of fraud" considered in intentional fraudulent transfer claims, the treatment of unliquidated legal claims in assessing insolvency in constructive fraudulent transfer claims, the fiduciary duties, including the duty of loyalty, owed by a board to a company and, potentially, the company's creditors, and conduct that could constitute a breach of such duties, how a party can recover for unjust enrichment, and when plaintiffs can pierce the corporate veil.

Other legal questions relevant to the potential estate claims were considered as well, including, but not limited to:

a.    Statutes of Limitation / Lookback Periods

Davis Polk evaluated applicable statutes of limitations for each claim under review. Notably, Davis Polk evaluated whether the Company could extend the statute of limitations for a fraudulent transfer recovery action beyond the two-year lookback period provided by section 548 of the Bankruptcy Code. In particular, Davis Polk evaluated the applicability of state or federal

law under section 544, as well as other legal principles and doctrines, that could form the basis of extending the limitations period.

### b.    Prejudgment Interest

Davis Polk considered whether a court would award prejudgment interest in the context of potential estate claims, including an intentional fraudulent transfer recovery action, and, if so, the rate at which prejudgment interest would be set and the date from which prejudgment interest would accrue.  In connection with this analysis, Bates White, at Davis Polk's direction, prepared an analysis of a range of prejudgment interest awards based on various rates and accrual dates.

### c.    Tax Distributions

Davis Polk evaluated whether distributions made for the purpose of satisfying the tax obligations of Purdue Pharma's shareholders (the "**Tax Distributions**") are properly the subject of a constructive or intentional fraudulent transfer recovery action, including whether the Tax Distributions could be considered reasonable equivalent consideration for Purdue Pharma's status as a pass-through entity.

### d.    Collectability of Potential Judgments

Davis Polk also evaluated issues relating to the ability to collect judgments from the Sackler Families' trusts, both in the United States and abroad.  Many of the trusts held for the benefit of the descendants of Mortimer D. Sackler ("**Side A**" of the Sackler Families) are organized in the Bailiwick of Jersey, Channel Isles, and are governed by Jersey law.  For this reason, the Debtors, in conjunction with the Creditors' Committee, negotiated a standstill agreement and retained local counsel in Jersey to provide advice on matters pertaining to Jersey law.

### (iii)    **Collection, Search and Review of Documents**

With respect to the factual investigation conducted on behalf of the Special Committee, a key initial phase focused on identifying, collecting, and processing records—including electronic documents and emails—from Purdue Pharma and other entities that might be relevant to an assessment of potential claims by the Debtors against the Sackler Families and Sackler Entities. In conducting this key initial phase of its review, Davis Polk collected over 21 million documents covering a period of almost 25 years from Purdue Pharma custodial files of 110 current and former Directors, officers, and employees of Purdue Pharma and affiliated entities. The individuals whose records Davis Polk collected for search and review included:

- All members of the Sackler Families who held any position with Purdue Pharma between 1995 and the Petition Date, including as a Director, officer, employee, consultant, or intern;

- Every member of the Board between 1995 and the Petition Date, excepting only the new independent Directors who serve on the Special Committee;

- Each individual who served as a CEO, CFO, or General Counsel of Purdue Pharma between 2006 and 2018;

- Notable advisors to Purdue Pharma or the Sackler Families who held positions at Purdue Pharma or affiliates and were assigned a Purdue Pharma email address, such as Stuart Baker, the longtime corporate secretary for and advisor to the Board, and Stephen Ives, an outside advisor and accountant to certain members of the Sackler Families; and

- Specified custodians, who based on their tenure and positions in Purdue Pharma's legal, government affairs, compliance, corporate security, R&D, sales and marketing, and corporate communications functions, were identified as likely to have information relevant to potential estate claims.

The Purdue Pharma documents collected by Davis Polk included, among other things, custodial records, such as emails and other correspondence, as well as shareholder and Board materials and minutes, organization charts, memoranda, presentations, transaction documents, corporate governance documents, financial statements and projections, legal advice, spreadsheets, and litigation-related documents.

The collection included documents produced by Purdue Pharma in certain prior litigations, such as the opioid-related multidistrict litigation pending in the Northern District of Ohio, and certain government investigations, including the then-pending investigation by the DOJ, as well as the electronic files and records collected for purposes of those productions.

Davis Polk searched this enormous database of electronic records innumerable times in the course of conducting its investigation on behalf of the Special Committee and, as part of its review, developed complex search strings containing hundreds of potentially relevant terms designed to identify documents relevant to potential estate claims. These searches initially identified more than 428,000 internal Purdue Pharma documents for higher-priority review. Utilizing a technology-assisted review algorithm to identify and prioritize documents most likely to be relevant to the investigation, Davis Polk and other attorneys reviewed 175,500 of these documents.

Davis Polk also conducted numerous individual targeted searches, as well as smaller and discrete targeted reviews, to probe key events, individuals, and relevant issues as they were identified over the course of the investigation. For example, in connection with the investigation into the circumstances surrounding the formation of Rhodes Pharma, Davis Polk reviewed and analyzed an additional 30,000 internal Purdue Pharma and Rhodes documents.

The topics and issues investigated by Davis Polk included, among other things:

- Purdue Pharma's exposure to civil or criminal liabilities relating to its sale and marketing of OxyContin, and the awareness by members of the Sackler Families of the same;

- Purdue Pharma's history of OxyContin-related litigation and government investigations, including its prior settlements with private plaintiffs and with various federal, state, and local government agencies;

- Purdue Pharma's history of litigation relating to its patents for OxyContin and related efforts to preserve patent exclusivity;

- Purdue Pharma's compliance with regulatory and other obligations concerning efforts to monitor potential abuse and diversion of OxyContin;

- Histories of and motivations behind various cash and non-cash transfers of value from Purdue Pharma to or for the benefit of the Sackler Families and Sackler Entities;

- Purdue Pharma's risk of potential insolvency and the consideration of restructuring;

- Purdue Pharma's stated business strategies and objectives, including its efforts relating to research and development, mergers and acquisitions, and other business development initiatives;

- Purdue Pharma's efforts to obtain third-party debt or other sources of capital;

- Purdue Pharma's motivations for pursuing an abuse-deterrent formulation of OxyContin;

- Reactions by senior Purdue Pharma executives and members of the Board to press articles reporting on the national opioid crisis; and

- The extent to which members of the Sackler Families controlled or dominated Purdue Pharma.

Davis Polk also reviewed approximately 760,500 additional internal Purdue Pharma documents in connection with responding to requests for discovery from the Creditors' Committee. Also considered and analyzed were documents identified by the Creditors' Committee and shared with Davis Polk on a common interest basis as relevant to the potential claims.

In addition to its collection and review of internal Purdue Pharma documents, Davis Polk also participated in efforts led primarily by the Creditors' Committee and NCSG to obtain discovery from parties and non-parties in these proceedings, including the Sackler Families, the law firm Norton Rose Fulbright LLP, the IACs, certain financial institutions, and others.[71][109] Specifically, on behalf of the Special Committee, Davis Polk participated in over 20 teleconferences between the creditors and Sackler Families and Sackler Entities regarding the

---

[71][109] *See supra*, Article III.QArticle III.R.

scope of discovery, among other issues. Davis Polk also participated in over a dozen additional calls and other communications relating to discovery from Norton Rose Fulbright LLP.

Based on the results of these efforts, Davis Polk, on behalf of the Special Committee, conducted numerous individual targeted searches over custodial documents, electronic records, and financial records produced by the parties and non-parties to probe key events, individuals, and relevant issues, as listed above.

Finally, Davis Polk reviewed and analyzed documents relating to Purdue Pharma's long and complex history of opioid-related litigation and legal liability principally arising from its sale and promotion of OxyContin, as well as relevant documents bearing on its long history of patent litigation. Davis Polk considered and analyzed public and internal documents related to Purdue Pharma's history of litigation and government investigations, including complaints and other court filings, subpoenas, civil investigative demands, plea agreements, settlement documents, and court decisions spanning from early 2001 through the Petition Date.

In all, Davis Polk, and other attorneys working at its direction, reviewed over 960,670 documents, comprising over seven million pages, in connection with its investigation into potential estate claims.

(iv)    <strong>Forensic Analysis of Transfers to or for the Benefit of Sackler Entities</strong>

The Special Committee commissioned a sweeping review of transfers of value to or for the benefit of the Sackler Families and Sackler Entities, including to assess potential recoveries by the Debtors from the Sackler Families and Sackler Entities on a variety of legal theories. In furtherance of the Special Committee's investigation, Davis Polk engaged experts experienced in both forensic accounting and the valuation of pharmaceutical assets to assist Davis Polk by compiling and analyzing data at Purdue Pharma and obtained in discovery from third parties to identify transfers by Purdue Pharma to the Sackler Families and Sackler Entities or commercial dealings with Sackler Entities that might support claims of recoupment by the Debtors, on a variety of legal theories.

In April 2019, Davis Polk engaged AlixPartners to perform a comprehensive forensic review to identify (i) all material cash transfers of value to or for the benefit of the Sackler Families and Sackler Entities and (ii) all materials dealings between Purdue Pharma and the Sackler Families and Sackler Entities, in both cases from 2008 through September 2019.

AlixPartners is a preeminent consulting firm that provides forensic accountings, financial analyses, and other professional services. The AlixPartners team was led by Richard Collura, a Managing Director who specializes in large-scale financial investigations and complex forensic accounting. Mr. Collura has worked with counsel in representing companies, boards of directors, audit committees, special committees, and creditors' committees in connection with bankruptcy cases and other distressed company situations. He is a Certified Public Accountant, Certified Fraud Examiner, Certified Insolvency and Restructuring Advisor, and is certified in financial forensics by the American Institute of Certified Public Accountants. Mr. Collura was assisted in his work by an experienced team of professionals including Certified Public Accountants (CPAs), Certified Fraud Examiners (CFEs), CFA charterholders and Masters of

Business Administration (MBAs), many of whom have been Certified in Financial Forensics by the American Institute of Certified Public Accountants.

AlixPartners has extensive experience conducting large-scale, high-profile independent forensic accounting investigations. Its professionals assisting Davis Polk with the investigation on behalf of the Special Committee have a comprehensive understanding of how transactions are recorded in accounting systems and the technical capabilities to extract, manage, and analyze large sets of transactional data. They have performed complex cash tracing analyses and traced assets transferred around the world, and conducted investigations involving intercompany transactions as well as transactions with insiders and related/affiliated entities.

AlixPartners had full access to Purdue Pharma's internal accounting systems, documents and personnel, including individuals in Purdue Pharma's finance and legal functions, as well as access to personnel at OSR, an IAC that provides facilities and administrative services to Purdue Pharma and PPI, and TXP Services Inc. ("**TXP**"), an IAC that provides accounting and other administrative services to Purdue and PPI.[72][110]

a.    Cash Transfers

At the request and working under the supervision of Davis Polk, AlixPartners generated a comprehensive 355-page report on behalf of the Special Committee of all cash transfers to the Sackler Families and Sackler Entities from January 1, 2008 through September 30, 2019 (the "**1A Report**"). The 1A Report details approximately $10.347 billion in total net cash distributions paid by Purdue Pharma and Rhodes to or for the benefit of the Sackler Families and Sackler Entities during this time period. These amounts include $4.120 billion in cash distributions to partners of Purdue Pharma, approximately $4.680 billion in Tax Distributions for the benefit of partners, and approximately $1.547 billion in distributions earmarked for other Sackler Entities.[73][111]

In preparing its report, AlixPartners reviewed, among other things, organizational charts of entities owned by the Sackler Families, Purdue Pharma's SAP accounting system, audited financial statements, internal financial and accounting statements and records, payroll records, pension benefit records, and travel and expense reimbursement reports and records. AlixPartners interviewed 19 employees of Purdue Pharma, OSR, and TXP in connection with the 1A Report. AlixPartners' investigation and the report required approximately 6,500 hours to complete over the course of seven months.

At Davis Polk's direction, AlixPartners presented its findings as reflected in the draft 1A Report to the Special Committee and furthered certain points of its analysis in response to the Special Committee's review. The Special Committee authorized the Debtors to make the

---

[72][110] The various services agreements between Purdue Pharma and PPI, on the one hand, and TXP and OSR, on the other hand, have been renegotiated at the direction of the Special Committee, such that TXP and OSR no longer provide the accounting, facilities and administrative services to Purdue Pharma and PPI that were historically provided in years prior.

[73][111] The figures identified in the 1A Report were essentially identical to those identified in the Company's earlier calculation.

contents of the report public, and on December 16, 2019, the Debtors filed the 1A Report with the Bankruptcy Court [D.I. 654].[74][112]

b.    Non-Cash Transfers and Intercompany Dealings.

Also at the request and working under the direction of Davis Polk, AlixPartners produced a second comprehensive 400-page report on behalf of the Special Committee that detailed Purdue Pharma's non-cash distributions and transfers and other dealings with Sackler Entities between January 1, 2008 and September 15, 2019 (the "**1B Report**"). The forensic investigation and analysis required for the 1B Report similarly required an exhaustive review of, among other things, organizational charts of entities owned by the Sackler Families, Purdue Pharma's SAP accounting system, audited financial statements, internal accounting records and other documentation regarding intercompany transactions (e.g., invoices and wire instructions) maintained by Purdue Pharma. AlixPartners also interviewed numerous employees of Purdue Pharma and TXP in connection with the 1B Report. AlixPartners' work on the 1B Report required approximately 4,500 hours over a period of 12 months.

The 1B Report identified intercompany dealings between Purdue Pharma and the Sackler Entities, including royalty arrangements to sell OxyContin outside the United States, service agreements, and asset transfers; intercompany dealings between the Rhodes Debtors and Sackler Entities, including for active pharmaceutical ingredients; intercompany dealings between Purdue Pharma and the Rhodes Debtors, including for contract manufacturing services; and non-cash distributions from Purdue Pharma to its shareholders, including distributions of equity in related- and third-party entities and distributions of the rights to non-ADF OxyContin and other products.

At Davis Polk's direction, AlixPartners presented its findings as reflected in the draft 1B Report to the Special Committee and furthered certain points of its analysis in response to the Special Committee's review. The Special Committee authorized the Debtors to make the contents of the report public, and on May 29, 2020, the Debtors filed the 1B Report with the Bankruptcy Court [D.I. 1194].[75][113]

c.    Valuation of Non-Cash Transfers and Intercompany Dealings

As a complement to AlixPartners' work in detailing the transactions contained in the 1B Report, Davis Polk retained the financial advisory firm Bates White, a leading financial consulting firm with expertise in valuation, transfer pricing, econometrics and data analysis and significant experience in the pharmaceutical and life sciences industries, to perform an analysis to determine whether, for each of the material transfers or transactions identified by AlixPartners in the 1B Report, (i) Purdue Pharma received fair value and (ii) if Purdue Pharma did not receive fair value, an estimation of the excess value provided by Purdue Pharma over the value (if any) that it received in exchange. Among numerous other items, Bates White assessed whether, for example, Purdue Pharma granted licenses to various IACs to market and sell OxyContin at royalty rates that were lower than a true arm's-length royalty, or whether Purdue Pharma paid various IACs amounts for services or for supply of API at rates higher than true arm's-length service and supply rates. In addition to this valuation and transfer pricing analysis, Davis Polk

---

[74][112]  The 1A Report was redacted consistent with the operative protective order in the Chapter 11 Cases.
[75][113]  The 1B Report was redacted consistent with the operative protective order in the Chapter 11 Cases.

also asked Bates White to analyze the Tax Distributions identified by AlixPartners in the 1A Report to assess amounts actually paid to taxing authorities, as well as the portions of such amounts attributable to profits earned by Purdue Pharma as opposed to other Sackler Entities.

The valuation and transfer pricing analysis performed by Bates White was led by Dr. David DeRamus, a partner and founding member of Bates White and an expert in transfer pricing and tax, antitrust and competition, and public policy and regulatory economics. He has provided expert analysis on a number of topics, including pricing analysis, damages analysis, quantitative modeling, and valuation. Dr. DeRamus received a doctorate and a master's degree in economics from the University of Massachusetts and a Bachelor's degree from Duke University.

To prepare its transfer pricing analysis, Bates White reviewed, among other things, numerous documents provided by Purdue Pharma and produced by various IACs, including, for example, audited financial statements, Board materials and presentations, intercompany licensing, servicing and manufacturing supply agreements, and other internal records. In addition, Bates White reviewed over 4,000 documents, as well as other data from third-party sources, including, for example, information from commercial databases regarding third-party licensing agreements, public regulatory filings from third parties in the pharmaceutical industry, and other documents in the public domain. Bates White's analysis required approximately 15,130 hours over a period of more than 18 months.

Based on this analysis, Bates White determined in its professional judgment that Purdue Pharma transferred significant value to the Sackler Families and Sackler Entities between January 1, 2008 and September 15, 2019. These value transfers included, among other things, the distribution by Purdue Pharma of non-cash assets on certain occasions between 2008 and 2019—such as, for example, equity interests in businesses distributed out of Purdue Pharma in 2013 and 2014 and the assignment by Purdue Pharma of the right to future royalties payable on non-ADF formulations of OxyContin in 2017. Bates White also determined that certain dealings between Purdue Pharma and the Sackler Families and various Sackler Entities were not conducted on arm's-length terms, including in particular that Purdue Pharma received below-market royalties from the Sackler Families and Sackler Entities on sales of OxyContin.

Davis Polk and Bates White presented Bates White's preliminary findings as to these matters to the Special Committee, including the different amounts of value that Bates White estimated in its professional judgment had been transferred from Purdue Pharma to the Sackler Families and Sackler Entities as a result of the activities identified in the 1B Report.

At Davis Polk's direction, Dr. DeRamus and his colleagues at Bates White also presented their preliminary assessments and analyses with respect to these issues on a common interest basis to the legal counsel and the financial advisors for the Creditors' Committee on May 21, 2020 and September 21, 2020, and members of the investigation teams at Davis Polk and Bates White had numerous follow-on video or telephonic conferences on a common interest basis with the Creditors' Committee and its advisors on Bates White's methodology, views, and the evidence relied upon in making its assessments.

(v)    **Insolvency Analysis**

With respect to its evaluation of potential constructive fraudulent conveyance claims, Davis Polk, on behalf of the Special Committee, directed Bates White to also complete two complementary analyses: (a) a "foreseeability" analysis evaluating the impact that certain events may have had on the foreseeability of Purdue Pharma's default risk and (b) an "accrual analysis" of Purdue Pharma's liabilities to determine its potential insolvency over time.

In conducting these analyses, Bates White reviewed numerous documents including relevant financial statements and business plans, as well as documents reflecting behavior of Purdue Pharma's economic counterparties (e.g., joint ventures, insurers and lenders), market indicators (e.g., Purdue Pharma's indicative credit ratings, industry exclusions, event studies, case studies and competitor disclosures), documents related to the overall legal environment for opioid manufacturers and public awareness of the opioid epidemic, and the DOJ settlement documentation, including any factual admissions and allegations of misconduct.

The foreseeability analysis was led by Dr. Charles Mullin.  Dr. Mullin is the Managing Partner of Bates White and is a recognized expert in statistical and data analysis, econometrics, economic and microsimulation modeling, insurance allocation, and asbestos-related matters.  He has provided expert opinions and testimony in a wide range of matters, including the valuation of mass tort claims in the class action and bankruptcy contexts.  Dr. Mullin has published numerous papers on applied and theoretical econometrics and labor economics in peer-reviewed journals. He received a doctorate in economics from the University of Chicago and a Bachelor's degree in mathematics and economics from the University of California, Berkeley.

Bates White presented the findings of the foreseeability analysis and the accrual analysis to the Special Committee.

(vi)   **Depositions and Interviews**

Davis Polk attended all 16 discovery depositions conducted in these Chapter 11 Cases. The deponents included every living member of the Sackler Families who served on the Board, each of Purdue Pharma's current and former CEOs, and several advisors to Purdue Pharma and the Sackler Families.  The examinations were conducted primarily by counsel for the Creditors' Committee and the NCSG, and in furtherance of cooperation with counsel for both groups, Davis Polk on repeated occasions provided select documents to the Creditors' Committee in advance for potential use during the depositions.  In addition, prior to certain depositions, Davis Polk conferred with counsel for one or both groups regarding potential lines of examination.

In addition to participating in depositions, Davis Polk interviewed a number of key individuals in connection with various aspects of the investigation into potential estate claims. For example, in connection with its investigation into the circumstances surrounding the formation of Rhodes Pharma, Davis Polk interviewed six current and former Purdue Pharma and Rhodes Pharma officers and Directors.  As noted, Bates White and Davis Polk also jointly interviewed 15 Purdue Pharma employees and advisors in connection with the investigation into various cash and non-cash transfers from Purdue Pharma.  In addition, throughout the investigation, Davis Polk held numerous discussions with senior and longtime members of Purdue Pharma's in-house legal department with respect to Purdue Pharma's history of OxyContin-related litigation and government investigations, corporate governance issues, the

140

Board's decision-making processes, including how decisions were made concerning the IACs, the purpose and functions of certain Sackler Entities, and various royalty and licensing arrangements, among other things.[76][114]

### (vii)    Information Presented on Behalf of the Sackler Families

To complement its review of large numbers of internal Purdue Pharma and third-party documents, Davis Polk and its advisors also received and evaluated a series of detailed presentations and supporting documentation provided by representatives of the Sackler Families on several key topics, including the Sackler Families' trust structures, the amount and location of assets held by the Sackler Families, and the Sackler Families' defenses to primary liability and estate claims.  The Sackler Families had agreed to make these presentations, and to supply the required information, under the terms of a case management stipulation signed on November 5, 2019, and so-ordered by the Bankruptcy Court on November 20, 2019.  *See Amended and Restated Case Stipulation Among the Debtors, the Official Committee of Unsecured Creditors and Certain Related Parties* (the "**Case Management Stipulation**") [D.I. 431-1].

- On November 22, 2019, the Davis Polk investigation team attended an approximately four-hour oral presentation by Debevoise & Plimpton LLP ("**Debevoise**") on behalf of Side A and Milbank LLP ("**Milbank**") and Joseph Hage Aaronson LLC ("**Joseph Hage**") on behalf of the descendants of Raymond R. Sackler ("**Side B**" of the Sackler Families) regarding the general classes of assets held by the Initial Covered Sackler Persons ("**ICSPs**"), as defined in the Case Management Stipulation.  The Davis Polk investigation team also received and reviewed an accompanying 130-page presentation from Side A regarding the general classes of assets for Side A ICSPs and a 108-page presentation and 21-page supplemental presentation regarding the general classes of assets for Side B ICSPs;

- On December 9, 2019, the Davis Polk investigation team attended an approximately seven-hour oral presentation by Debevoise on behalf of Side A and Milbank and Joseph Hage on behalf of Side B regarding the Sackler Families' defenses to primary liability and estate claims and arguments in favor of settlement.  The Davis Polk investigation team also received and reviewed an accompanying 128-page presentation from Side A and a 580-page presentation from Side B;

- On January 29, 2020, the Special Committee received an approximately three-hour oral presentation from Debevoise on behalf of Side A and Milbank and Joseph Hage on behalf of Side B regarding their defenses to primary liability and estate claims and arguments in favor of settlement;

---

[76][114]  In connection with the transfer pricing analysis, Davis Polk and Bates White jointly interviewed 13 Purdue Pharma employees, including select members of Purdue Pharma's legal, finance, operations, sales and marketing, R&D, and regulatory affairs functions, as well as two outside advisors associated with Norton Rose Fulbright LLP.

- On January 15, 2020, the Davis Polk investigation team attended an approximately four-and-one-half-hour oral presentation by Debevoise on behalf of Side A and Milbank and Joseph Hage on behalf of Side B covering the aggregate value of the assets and approximate liabilities of the Side B ICSPs. Davis Polk also received and reviewed an accompanying 168-page presentation from Side A and an accompanying 101-page presentation from Side B;

- On August 13, 2020, the Davis Polk investigation team attended an approximately one-hour oral presentation by Milbank, Joseph Hage, and Huron Consulting Group, financial advisors to Side B. Davis Polk also received and reviewed an accompanying 102-page presentation covering the flow of funds from Purdue Pharma to the so-called Top-Level Entities, transfers among the Top-Level Entities, and subsequent transfers to other parties;[77][115] and

- On September 17, 2020, the Davis Polk investigation team attended an approximately one-half-hour oral presentation by Debevoise and received and reviewed 16 accompanying spreadsheets detailing the flow of funds from Purdue Pharma to Beacon Company and related entities, including trusts held for the benefit of members of Side A.

(viii)    **Cooperation with the Creditors' Committee**

In conjunction with and as part of the Special Committee's investigation, Davis Polk and the Special Committee's financial advisors have cooperated on an ongoing basis since early November 2019 with the legal counsel and financial advisors to the Creditors' Committee as co-fiduciaries of the Debtors' Estates, in evaluating potential claims by the Debtors against the Sackler Families and Sackler Entities.

In furtherance of that cooperation, and pursuant to a common interest understanding between counsel for the Debtors and the Creditors' Committee with respect to the assessment and prosecution of the claims of the Debtors' Estates as to the Sackler Families and Sackler Entities, Davis Polk and the Special Committee's financial advisors participated in more than 25 substantive in-person meetings and teleconferences with the legal and financial advisors to the Creditors' Committee, as well as innumerable emails.

In these exchanges, the Creditors' Committee had direct access to the Special Committee's legal and financial advisors on matters concerning potential estate claims. Bates White, for example, participated in numerous hours-long meetings with the Creditors' Committee's counsel and financial advisors for common interest discussions of matters including but not limited to (a) methodological approaches to evaluating the value of non-cash transfers and intercompany transactions between Purdue Pharma and various Sackler Entities; and (b)

---

[77][115]   For purposes of the presentation, the term "Top-Level Entities" was defined to include the Rosebay Medical Company L.P., Trust U/A 11/5/74 fbo Beverly Sackler (a/k/a the "**74A Trust**"), Rosebay Medical Company, Inc., 1974 Irrevocable Trust A fbo BS and RSS, 1974 Irrevocable Trust A fbo BS and JDS, Trust B U/A dtd 11/5/74 fbo Beverly Sackler, 1974 Irrevocable Investment Trust, Raymond R. Sackler Trust 1 dtd 12/23/89, Raymond R. Sackler Trust 2 dtd 12/23/89, Raymond R. Sackler Trust 1B dtd 12/23/89, Raymond R. Sackler Trust 2B dtd 12/23/89, AR Irrevocable Trust and AJ Irrevocable Trust.

interim conclusions by Bates White with respect to the values of various equity transfers, licenses granted with respect to OxyContin, and the 2017 assignment by PPLP of its royalty rights to non-ADF OxyContin.  In the course of these discussions, Bates White explained its methodology and assessment of relevant factors with the Creditors' Committee's financial advisors, Province and Ocean Tomo.  It also discussed its findings with the Ad Hoc Committee's professionals at FTI.

Throughout its investigation, Davis Polk shared with counsel to the Creditors' Committee, on a common interest basis, certain work product concerning potential estate claims, including among other things, preliminary legal analysis, document compilations relevant to specific deponents, and draft reports prepared by AlixPartners and Bates White.

Davis Polk also engaged in extensive discussions with counsel to the Creditors' Committee throughout the discovery period in the Debtors' Chapter 11 Cases, in order to, among other things: (a) identify an appropriately scoped set of documents for the Debtors to produce to the Creditors' Committee and (b) assist with the Creditors' Committee and NCSG's depositions of the Sackler Families, current and former Board members, current employees of the Debtors, and other parties.  With respect to the scope, Davis Polk engaged with the Creditors' Committee to best identify the materials relevant to potential estate claims and to produce an appropriate and extensive volume of documents and information.[78116]

Davis Polk also ensured that non-privileged documents identified by the Special Committee team as relevant to potential estate claims were produced to the Creditors' Committee.  And, pursuant to a stipulation between the Debtors and the Creditors' Committee in connection with a negotiated resolution of two motions filed by the Creditors' Committee, Davis Polk also provided privileged Purdue Pharma documents that were deemed material to its analysis of potential estate claims to the Creditors' Committee on a common interest basis, representing an extraordinary level of cooperation with the Creditors' Committee on the part of the Debtors.  Indeed, soon after the stipulation was reached, the Creditors' Committee itself informed the Bankruptcy Court that it was "aware of no other debtor agreeing to supply privileged documents to its creditors, certainly not on this scale."  *See Creditors' Committee Reply in Support of Its Motion to Compel Production of Purportedly Privileged Documents* [D.I. 2014].

(ix)    **Evaluation of Potential Claims by Special Committee**

As the work of the Special Committee's advisors was ongoing, the Special Committee received regular briefings and a series of in-depth presentations from Davis Polk, AlixPartners, and Bates White on relevant factual findings and legal analysis concerning potential estate claims, including on, among other topics, the value of the distributions to or for the benefit of the Sackler Families and Sackler Entities; the factual investigation into the cash and non-cash transfers made from Purdue Pharma; the transfer pricing analysis to determine whether Purdue Pharma received fair value for each of the material transfers or transactions made from Purdue

---

[78116]   Davis Polk also devised technical solutions with the Debtors' discovery vendor to help remove duplicative documents to ensure efficiency; proposed numerous refinements to improve the Creditors' Committee's search terms; and participated in multiple teleconferences with the Creditors' Committee related to potential custodians of electronic documents for collection and review.

Pharma; the legal framework for evaluating potential estate claims; the availability and range of prejudgment interest on potential estate claims; and the standards used by courts to decide whether to approve settlements in the bankruptcy context.

Davis Polk also periodically provided the Special Committee with a chronology of select documents identified as relevant to potential estate claims, as well as portfolios of the underlying documents. Over time, the chronology was expanded to include pertinent documents from productions by parties and non-parties in the Chapter 11 Cases, such as the Sackler Families and Norton Rose Fulbright LLP, and documents highlighted by the Creditors' Committee as relevant to estate claims.

Based on the investigation and analysis of its advisors, the Special Committee assessed the strength of the estate claims and any issues of fact and law that might be disputed in a potential litigation. The Special Committee considered the strength of the evidence, as well as the legal and expert analyses presented by its advisors. The Special Committee considered a number of issues of fact and law that could affect the value of the claims including, but not limited to:

- The substance and strength of the evidence supporting the estate causes of action, including the substance and strength of any evidence of intent to transfer assets in order to frustrate creditors;

- The legal and factual basis for concluding that Purdue Pharma was insolvent prior to the Petition Date based on unliquidated and, often, unasserted claims;

- The applicable statute of limitations relevant to the fraudulent transfer claims;

- Whether all transfers of value may be avoidable based on fraudulent transfer claims, with a particular focus on Tax Distributions and the below-market royalty arrangements;

- The ability to recover and potential value of prejudgment interest; and

- The collectability of any judgments against individuals, trusts, and other affiliated entities, including in connection with assets located outside the United States.

## 2. *Negotiation and Approval of the Proposed Settlement and Release*

On September 30, 2020, the Bankruptcy Court entered the Supplemental Mediation Order, which authorized the Mediators to continue the Mediation to resolve certain open issues referenced in the Phase 1 Mediators' Report, as well as to mediate the estate causes of action.

On November 13, 2020, in the context of the parties' then-ongoing Mediation, Davis Polk attended an oral presentation by the Creditors' Committee on its provisional views and findings with respect to its investigation of potential estate causes of action. With the consent of the Creditors' Committee, on November 24, 2020, Davis Polk reviewed aspects of the Creditors' Committee's presentation with the Special Committee, and provided the Special Committee with

a redacted version of the presentation consistent with the operative protective order in the Chapter 11 Cases.

In December 2020 and January 2021, as the Mediation advanced, the Special Committee formally met on no fewer than eight occasions. Moreover, counsel had numerous additional calls with the Chair of the Special Committee and other members of the Special Committee. The Special Committee was provided regular updates on the Mediation, including offers and counteroffers that had been communicated through the Mediators by the NCSG, on the one hand, and the Sackler Families, on the other hand. The Special Committee also discussed with its advisors the Debtors' strategic objectives in the Mediation and potential alternative plans of reorganization, including such alternatives that both included and excluded contributions from a potential settlement with the Sackler Families. Among other things, financial advisors provided critical information on the feasibility of the Company to operate post-emergence in light of potential mediation outcomes. Counsel also continued to update the Committee on the ongoing investigation.

On January 19, 2021, Davis Polk received additional information from the Creditors' Committee regarding documents considered by its advisors to be relevant to the estate causes of action, which were subsequently provided to the Special Committee. At the same time, on January 19, 2021, the Special Committee authorized the Special Committee's advisors to continue negotiations at the direction of the Committee Chair in between meetings of the Special Committee. In addition to this authorization, the Special Committee resolved to continue to meet regularly to ensure that, among other things, all members of the Special Committee were apprised of developments in the Mediation and ongoing negotiations.

On January 22, 2021, the Special Committee was advised that the Mediators had made a joint Mediators' proposal. During a nearly two-hour meeting of the Special Committee on January 22, advisors provided the Special Committee with a comprehensive update on the investigation, including analysis of the estate causes of action and potential recoveries. The presentation also discussed the possible methodologies developed by economic advisors at Bates White for calculating the present value of the settlement proposal based on assumptions regarding the payment schedule. Following the presentation, the Special Committee authorized the Debtors to convey to the other parties to the Mediation that the Special Committee supported ongoing negotiations subject to the satisfactory resolution of all economic terms.

With the Special Committee's authorization, the Debtors began to take an active role in the negotiations and at all times kept the Special Committee informed through contemporaneous email, calls and meetings of the status. During a Special Committee meeting on January 28, 2021, the Special Committee was advised that the Debtors, together with the Creditors' Committee, the Ad Hoc Committee, and the MSGE had written to the representatives of the Sackler Families and the Mediators to convey their willingness to continue negotiations with the Sackler Families based on the terms of the Mediators' proposal of January 21, 2021.

On January 29, 2021, the Sackler Families expressed their willingness to engage in such negotiations, accepting a payment amount and proposing a payment schedule. On January 31, 2021, the Mediation formally concluded pursuant to court order, but settlement negotiations continued among the Sackler Families, the Debtors, the NCSG, the Creditors' Committee, the

Ad Hoc Committee, and the MSGE.  From January 29, 2021 to February 18, 2021, the Sackler Families and the Debtors, together with the Creditors' Committee, the Ad Hoc Committee, and the MSGE, exchanged eight offers and counteroffers.  Each of the Creditors' Committee, the Ad Hoc Committee, and the MSGE supported each of the counteroffers.  In addition to the Special Committee's discussion of the negotiations during meetings on February 2 and 16, 2021, the Special Committee Chair, as authorized by the Special Committee, subsequently approved all counteroffers proposed jointly by the Debtors, the Creditors' Committee, the Ad Hoc Committee, and the MSGE to the Sackler Families.  Economic advisors from Bates White provided constant financial analysis of the present value of the settlement proposals.

On February 21, 2021, all members of the Special Committee approved a best and final offer to the Sackler Families regarding the payment schedule.  The offer, also supported by the Creditors' Committee, the Ad Hoc Committee, and the MSGE, as every counteroffer, was accepted by the Sackler Families on February 22.  During a meeting on February 24, the Special Committee was provided an update on negotiations regarding all other terms, including payment guarantees, that the Debtors, the Creditors' Committee, the Ad Hoc Committee, the MSGE, and the Sackler Families were continuing to negotiate.  The Special Committee was also provided an update on any additional investigatory work performed on its behalf.

On March 2, March 8 and March 11, the Special Committee was again provided updates on the ongoing negotiation of the additional settlement terms, including terms relating to credit support, remedies, terms of releases and other terms.  At a meeting of the Special Committee held on Sunday, March 14, in advance of a full board meeting, the Special Committee authorized the filing of the Plan, including the Shareholder Settlement Term Sheet described below.

**Z.**    **The Terms of Settlement of Claims Against the Sackler Families**

The terms of the settlement with certain members of the Sackler Entities (the "**Sackler Parties**") are set forth in the term sheet (the "**Shareholder Settlement Term Sheet**") attached hereto as **Appendix G**, which documents the principal terms of a settlement agreement (the "**Shareholder Settlement Agreement**") that will be included in the Plan Supplement. The rights and obligations of the settling parties under the Shareholder Settlement Agreement remain subject to the finalization of the settlement documents to be included in the Plan Supplement.

The settlement with the Sackler Parties requires payments from the Sackler Parties totaling $4.275 billion over nine years (or ten years if certain amounts are paid ahead of schedule in the first six years), up from $3 billion over seven years under the initial Settlement Framework.  The schedule of payments (the "**Required Settlement Payments**") is set forth below.

| Date | Required Settlement Payments |
| --- | --- |
| Effective Date | $300 million |
| June 30, 2022 | $350 million |
| June 30, 2023 | $350 million |
| June 30, 2024 | $350 million |
| June 30, 2025 | $350 million |

| Date | Required Settlement Payments |
|------|------------------------------|
| June 30, 2026 | $300 million |
| June 30, 2027 | $1 billion |
| June 30, 2028 | $475 million |
| June 30, 2029 | $425 million, subject to deferral of up to $25 million |
| June 30, 2030 | $375 million, subject to deferral of up to $175 million |
| June 30, 2031 | Up to $200 million, consisting of any deferred amounts |

The potential deferral of certain Required Settlement Payments will be applicable as follows: each dollar in excess of $2.5 billion up to and including $2.675 billion in the aggregate that the Master Disbursement Trust actually receives pursuant to the Settlement Agreement on or prior to June 30, 2026 shall defer one dollar, up to a maximum aggregate amount of $175 million, of Required Settlement Payments otherwise payable on June 30, 2030 to instead become payable on June 30, 2031. Furthermore, each dollar in excess of $2.675 billion that the Master Disbursement Trust actually receives pursuant to the Settlement Agreement on or prior to June 30, 2026 shall defer one dollar, up to a maximum aggregate amount of $25 million, of Required Settlement Payments otherwise payable on June 30, 2029 to instead become payable on June 30, 2031. Deferrals shall only be made if the aggregate amount available for deferral exceeds $25 million.

The ~~Sackler Parties will receive the benefit of releases and injunctions with respect to the~~ Sackler Parties and certain other persons and/or individuals to be agreed in connection with the settlement ~~which will be provided for in an amended Plan~~ will receive the benefit of releases and injunctions, as described in Article IF, as consideration for such payments under the Shareholder Settlement Agreement.

~~As described in more detail in the Term Sheet, the Sackler Parties will be required to use their best efforts to sell the IACs within seven years. All gross cash proceeds received by the Sackler Parties from the IACs, in connection with a sale or otherwise, will be deposited and maintained in pledged and perfected deposit accounts for the benefit of the Master Distribution Trust, with certain withdrawals permitted from such accounts as described in the Shareholder Settlement Term Sheet. Certain of such proceeds will be used to satisfy the next due Required Settlement Payment(s), after accounting for a deduction consistent with the initial Settlement Framework based on the amount of previously funded Required Settlement Payments, as well as other deductions to be agreed in connection with the Shareholder Settlement Agreement. In addition, all equity interests in the IACs owned by the Sackler Parties (subject to exclusions as may be agreed in connection with the Shareholder Settlement Agreement), as well as additional collateral to the extent mutually agreed with the Sackler Parties, will serve as collateral with respect to the Required Settlement Payments and other obligations under the Shareholder Settlement Agreement.~~

[Description of covenants, collateral and remedies for breach of the Shareholder Settlement Agreement to come.] In addition, the ~~Sackler Parties and~~ certain ~~other~~ members of the Sackler Entities to be agreed in connection with the Shareholder Settlement Agreement will be prohibited from engaging in the manufacturing or sale of opioids, subject to exceptions to be

147

agreed. ~~The~~ For additional detail regarding such terms, see the Shareholder Settlement ~~Agreement will contain additional affirmative and restrictive covenants of the Sackler Parties that are to be mutually agreed~~ Term Sheet attached hereto as **Appendix G**.

~~Remedies for breach of the Settlement Agreement may include, without limitation, acceleration of the unpaid and unfunded obligations of the defaulting Sackler Parties, voiding the releases applicable to the Sackler Parties that are in breach and certain other members of the Sackler Entities related to the breaching Sackler Parties, foreclosure by the Master Disbursement Trust on the collateral provided under the Shareholder Settlement Agreement, enforcement of confessions of judgment by the applicable Sackler Parties admitting the obligations that have come due and certain other remedies to be mutually agreed. For additional detail regarding such terms, see the Shareholder Settlement Term Sheet attached hereto as~~ **Appendix G**.

The Settlement Agreement will also resolve certain other matters between certain Sackler Entities and the Debtors, including that it shall be a condition precedent to the effectiveness of the Settlement Agreement that the matters related to the ongoing contractual and intellectual property relationships among the Debtors, the Specified Parties (as defined in the Shareholder Settlement Term Sheet) and the IACs have been mutually agreed, and that certain agreements related to such matters have been executed, including, but not limited to, an agreement between Avrio and PRA, pursuant to which (i) certain existing licenses from PRA to Avrio for the exploitation of Senokot-branded and Betadine-branded over-the-counter products will be terminated and (ii) all of the intellectual property licensed from PRA to Avrio under such existing licenses will be assigned to Avrio.

## AA.    Evaluation of the Settlement with the Sackler Families

**[The Debtors' support for the settlement as an element of the Plan is subject to satisfactory resolution of certain terms that continue to be negotiated, including the revised version of the Shareholder Settlement Term Sheet, and associated covenants and provisions regarding collateral and remedies for breach of the Settlement Agreement, which remains to come.]**

A key element of the Plan is the settlement with the Sackler Families, pursuant to which members of the Sackler Families and Sackler Entities will pay $4.275 billion in cash to the Debtors over nine or possibly ten years (as described in detail in Article III.X.) in exchange for a release of potential claims of the Debtors' Estates and of third parties against the Sackler Families, the Sackler Entities and certain other persons. As described above, *see* Article III.W, *supra*, after careful consideration by the Special Committee of the Debtors' and third parties' potential claims against the Sackler Families and Sackler Entities and months of engagement with and the involvement of key creditor constituencies including the Creditors Committee, the Ad Hoc Committee, and the MSGE, the Debtors[117] have determined that the settlement is fair,

---

[117] As discussed in Art. II.E.2, *supra*, Purdue Pharma's governance documents irrevocably granted an independent Special Committee of the Board of Directors exclusive authority over the prosecution, defense, and settlement of any causes of action Purdue Pharma may assert against its shareholders as well as members of the Sackler Families and their affiliates. As such, all references in this Section to considerations and determinations of the Debtors, as they relate to its evaluation of claims against the Sackler Families and Sackler Entities, reflect considerations and determinations of the Special Committee pursuant to this exclusive delegated authority.

equitable and in the best interest of the Debtors' Estates.  Accordingly, the Debtors' support the settlement as an element of the Plan, subject to satisfactory resolution of certain terms that continue to be negotiated.

### *1.    Factors Relevant to Evaluating the Settlement*

Under Federal Rule of Bankruptcy Procedure 9019, any settlement of claims of or against the Debtor is subject to approval by the Bankruptcy Court.  Further, because the settlement is an essential element of the Plan, approval of the settlement by the Bankruptcy Court is a necessary precondition to confirmation and consummation of the Plan.

In *TMT Trailer Ferry*, the U.S. Supreme Court outlined the standards for courts to use in evaluating proposed settlements in bankruptcy.  The key function of courts in that circumstance, the Court explained, is "to compare the terms of the compromise with the likely rewards of litigation." *Protective Committee for Independent Stockholders of TMT Trailer Ferry, Inc. v. Anderson*, 390 U.S. 414, 425 (1968).  Following the Supreme Court's decision in *TMT Trailer Ferry*, courts in the Second Circuit have outlined certain factors to be considered by courts evaluating whether to approve settlements proposed by a debtor in bankruptcy proceedings:

- The balance between the litigation's possibility of success and the settlement's future benefits;

- The likelihood of complex and protracted litigation, "with its attendant expense, inconvenience, and delay," including the difficulty in collecting on the judgment;

- "[T]he paramount interests of the creditors," including each affected class's relative benefits "and the degree to which creditors either do not object to or affirmatively support the proposed settlement";

- Whether other parties in interest support the settlement;

- The "competency and experience of counsel" supporting, and "[t]he experience and knowledge of the bankruptcy court judge" reviewing, the settlement;

- "[T]he nature and breadth of releases to be obtained by officers and directors"; and

- "[T]he extent to which the settlement is the product of arm's length bargaining."

*In re Iridium Operating LLC*, 478 F.3d 452, 462 (2d Cir. 2007).
[To come.]

In the following pages, the Debtors summarize their evaluation of the settlement under the foregoing factors to be considered by the Bankruptcy Court in evaluating the settlement and

the reasons for the Debtors' belief that, under those factors, the settlement should be approved by the Bankruptcy Court as fair, reasonable and in the best interest of the Debtors' Estates. The Debtors understand that the Bankruptcy Court will have to rule on whether the *TMT Trailer* factors are satisfied. For purposes of this Disclosure Statement, the Debtors are providing this analysis for the more limited purpose of assisting creditors in understanding the Debtors' rationale for putting forward the Plan. The Debtors are aware that the claims against the Sackler Families and Sackler Entities discussed herein may be litigated in the future, either because the settlement is not finally approved or because of a future default event. The analysis balances the need for disclosure regarding the Debtors' support for the Plan with the need to avoid any potential prejudice in future litigation.

### 2. *Balancing Possible Litigation Recoveries Against the Benefits of the Settlement*

In the Debtors' estimation, the first factor—the balance between the litigation's likelihood of success and the settlement's future benefits—weighs in favor of approval of the settlement. As explained in more detail below, the likelihood of success in litigating the Debtors' potential claims against the Sackler Families and Sackler Entities is uncertain, whereas the settlement promises very significant future benefits for the Debtors' Estates.

The settlement reflects a reasoned judgment as to the trade-off between a possible but uncertain recovery of a larger amount through continued litigation versus an agreed recovery of settlement payments that are certain, but may be less than what the Debtors potentially could obtain in litigation.

The following section discusses the expected benefits of the settlement and then weighs them against the likelihood of success in litigation.

### (i) The Benefits of the Settlement

There are numerous benefits of the settlement to weigh against the uncertain results of litigation. These include, among other things, the very material $4.275 billion in payments to be made by the Sackler Families, which are a critical element of the Plan. Among other things, these payments make possible the agreed distribution of funds in satisfaction of the Private-Side Resolutions, secure the benefits of the DOJ Resolution for Purdue Pharma and its creditors, and still provide for billions of dollars in cash that will fund the state, local and tribal abatement trusts. The settlement's benefits also include the avoidance of the potentially ruinous disintegration of Purdue Pharma's valuable assets that would result if it were left to participate in years of further litigation.

### a. *The Settlement Payments*

The proposed settlement provides enormous financial value to the Debtors' Estates for the benefit of Purdue Pharma's creditors and improves upon the Settlement Framework announced in September 2019. As described in detail in Article III.X, the settlement with the Sackler Parties requires payments from the Sackler Parties totaling $4.275 billion over nine years (or ten years if certain amounts are paid ahead of schedule in the first six years). These funds will be deposited in trusts established for the benefit of states and localities, as well as other creditor groups such as Native American Tribes, hospitals, and children with a history of

Neonatal Abstinence Syndrome and their guardians.  Each of these trusts will require that the funds be dedicated exclusively to opioid abatement efforts, and there will be transparency to ensure that these requirements are observed.

These guaranteed payments by the Sackler Parties under the proposed settlement materially exceed the benefits contemplated by the Settlement Framework that was under consideration at the time these Chapter 11 Cases commenced in September 2019.  Under the proposed settlement, the Sackler Parties will pay $1.275 billion over and above the guaranteed $3 billion they had offered as of September 2019 (and in addition to the $225 million they have already paid to the DOJ), a material guaranteed additional recovery of funds that will be directed towards abatement under the Plan.  While the initial Settlement Framework obligated the Sackler Families to contribute 90% of any net proceeds from the sale of the IACs in excess of $3 billion up to an additional $1.5 billion (for a theoretical total of $4.5 billion),[118] there was no assurance that (or when) the sale of the IACs would generate more than $3 billion of net proceeds.  Certain due diligence conducted by the Debtors' financial advisors, in close coordination with the financial advisors to the Creditors' Committee and AHC, coupled with expert tax analysis, which noted potential material tax leakage from the sale of the IACs, and the complexity of the relevant corporate and legal structures, led the Debtors to believe that the sale of the IACs was far from certain to generate more than the value of the proposed settlement.  As a result, in the considered judgment of the Debtors, the guaranteed payment of $4.275 billion under the proposed settlement—which will be required regardless of whatever amounts the Sackler Families will be able to recoup from a sale of the IACs—represents a materially improved guaranteed recovery over the previously contemplated Settlement Framework.

The principal consideration to be granted to the Sackler Families in exchange for such payments is the release and injunction provisions with respect to specified parties associated with the Sackler Families provided for under the Plan.  *See* Article III.X, *supra*, and the Shareholder Term Sheet attached hereto as **Appendix G** for a more detailed description of the terms of the settlement.

Because the settlement calls for the Sackler Parties to make payments totaling $4.275 billion over a period of nine years, the Debtors evaluated both the face value of the payments as well as their present value.  The present value of future payments is a function of the applied discount rate.

The Debtors considered a number of approaches to determine the appropriate discount rate, which, from an economic perspective, may reflect the creditworthiness of the payor and risk of nonpayment, or the cost to the payee of the delay in obtaining the funds. The Debtors considered various approaches, including: (i) the time value of money over the payment horizon; (ii) historical AA municipal bond rates between 2008 and 2020 as a reasonable proxy for state and municipal borrowing costs over the future payment horizon; (iii) lower medium grade or even Ba1/BB+ corporate bond yields as a potential proxy for the Sackler Parties' credit risk under the terms contemplated for the settlement; and (iv) other higher rates driven by the

---

[118]  The initial Settlement Framework further obligated the Sackler Families to contribute 50% of any surplus net proceeds above that point.  *See Notice of Filing of Term Sheet with Ad Hoc Committee* [D.I. 257].

Debtors' own cost of capital and other potential factors. These considerations yield discount rates ranging from 2.5%, at the low-end, to 8-10%, at the high-end.

### b.    Other Benefits of the Settlement

The settlement also provides the critical benefit of enabling the Debtors to avoid potential negative consequences that would obtain absent the additional value recovered through the settlement from the Sackler Families.  These include the potentially devastating consequences of being unable to secure the full benefits of the DOJ Resolution and to satisfy the Private-Side Resolutions.  Absent the settlement, the Debtors would also continue to incur the very significant expenses of remaining in bankruptcy for an additional period of unknown length and would need to expend material further resources to litigate the estate claims against the Sackler Families. Absent a resolution in these Chapter 11 Cases, the Preliminary Injunction could expire and tens of thousands of creditors would be competing with each other to obtain judgments.  Moreover, in these circumstances, the Debtors would, themselves, be competing with creditors for whom the Debtors are a fiduciary, diminishing the value of the Debtors' Estates.  The ensuing litigation of claims against the Sackler Families, which could very well continue for years post-emergence, would diminish the value of the assets available to satisfy claimants and, if successful, would certainly result in delayed and inequitable recoveries among potential claimants.

These negative circumstances that the settlement enables the Debtor to avoid are discussed in turn below.

### (1)    DOJ Resolution

Absent the settlement and approval of the Plan, the Debtors would face the possible unwinding of the DOJ Resolution, which could put at risk the entire value of the Debtors' Estates.  Under the terms of the DOJ Resolution, Purdue Pharma pled guilty to certain criminal acts, and the Debtors agreed to a $2 billion Forfeiture Judgment.[119]  The Forfeiture Judgment will have the status of an allowed superpriority administrative expense claim against Purdue Pharma.

Under the terms of the DOJ Resolution, the United States agreed to provide a Forfeiture Judgment Credit of up to $1.775 billion for value distributed or otherwise conferred by Purdue Pharma under the Plan in respect of claims asserted by state, tribal, or local government entities, provided that the Plan provides for the emergence of a public benefit company (or entity with a similar mission) and certain other terms and conditions as described in more detail in the Plea Agreement.

As discussed in Article I.D, if the settlement with the Sackler Parties is not approved, there is considerable risk that the Debtors will not have sufficient value to satisfy both the Private-Side Resolutions, discussed below, and the distributions to the state, tribal and local government entities required to receive the Forfeiture Judgment Credit.  In such a case, the United States will not provide the Forfeiture Judgment Credit, and Purdue Pharma will be forced to pay the full Forfeiture Judgment, $2 billion.  Such funds, if paid to the United States, will be unavailable for distribution to other creditors, and it is the Debtors' understanding that any

---

[119]  The terms of the DOJ Resolution are described in greater detail in Article I.B and I.D, *supra*.

payments into the Department of Justice Asset Forfeiture Fund cannot be specifically designated for opioid abatement efforts.

Absent the DOJ Resolution, the United States could resume its criminal prosecution of the Defendant Debtors, potentially subjecting the Defendant Debtors to a $6.2 billion fine and a $3.5 billion forfeiture judgment.  These exposures, together with the DOJ's $2.8 billion asserted claim for civil liability (which could be trebled to $8.4 billion), would exceed and could potentially consume the entire value of the Debtors' Estates.  Moreover, if the Defendant Debtors were convicted of a crime, they could be excluded from participating in federal healthcare programs, which would threaten the viability of Purdue Pharma and materially degrade the substantial value that Purdue Pharma itself will generate and contribute to the value of the Debtors' Estates.

### (2)    Private-Side Resolutions

Without the financial contribution from the settlement, the Debtors may be unable to satisfy their obligations under the Private-Side Resolutions and the agreements that major stakeholders, including the Non-Federal Public Claimants and the Private Claimants, reached following months of mediation could fail, with very negative potential consequences

Absent the Private-Side Resolutions, the various Private Claimant groups would dispute the claims of the Non-Federal Public Claimants, the United States and other Private Claimant groups, and each of those groups would be compelled to respond in kind against each of the other groups.  Litigation over the claims of the Non-Federal Public Claimants and each of the Private Claimant groups would be protracted and extremely costly.  There would be no assurance that the claims of any particular claimant would ultimately be allowed in any particular amount, or possibly even at all.  And as noted above, if the ultimate resolution failed to provide at least $1.775 billion in respect of claims asserted by state, tribal, or local government entities and emergence of a public benefit company or entity with a similar mission, the DOJ could reduce or retract the Forfeiture Judgment Credit and the Debtors would need to satisfy the $2 billion Forfeiture Judgment in cash (and would be at risk of further criminal prosecution).  In such circumstances, other creditors could receive little to no recovery.

### (3)    Sackler Families' Estates

When these Chapter 11 Cases began, certain members of the Sackler Families and Sackler Entities were faced, in aggregate, with approximately 400 civil suits throughout the United States.  At that time, additional new suits against them were being filed every week.  As a point of reference, at the same time, Purdue Pharma had been named as a defendant in more than 2,900 civil actions pending in various state and federal courts and other fora across the United States and its territories, and was also subject to several governmental investigations.  Purdue Pharma's defense of these numerous matters was causing it to incur professionals' fees at an average rate of over $2 million per week, and these amounts were being incurred solely to pretrial defense costs, because none of these civil actions had yet proceeded to trial.  In the event that thousands of cases are restarted or filed upon the expiration of the stay of litigation against the Sackler Families and Sackler Entities and move toward trial, expenses could be several

multiples of those historical figures. These costs provide a potential basis for gauging the magnitude of the expenses that the Sackler Families and Sackler Entities would incur in continuing to defend the pending and future lawsuits against them in the event the claims against them were not resolved as provided in the proposed settlement.  Absent the proposed settlement, the Sackler Families and Sackler Entities would likely need to incur such expenses, depleting the funds which they would potentially regard as available for compromising the claims against them and Purdue Pharma.

Moreover, in the event that any of the claims asserted in litigation against specific members of the Sackler Families or Sackler Entities by parties other than the Debtors were to succeed, the relevant estates would be depleted by the amounts of the judgments paid to the individual litigants by the particular Sackler Family or Sackler Entity defendants in such actions. For this reason, upon the expiration of the stay of litigation against the Sackler Families and Sackler Entities, there would be a race to the courthouse among their thousands of potential creditors, including both the Debtors and third parties.  The recoveries in these individually prosecuted cases, were they to succeed, would not be equitably distributed among the claimants in the bankruptcy or the persons asserting claims in the litigation against the Sackler Families and Sackler Entities.  Rather, the assets would be recovered by perhaps just the handful of the successful plaintiffs that were the first to obtain enforceable court judgments, until the weight of liabilities or expected liabilities of the individual Sackler Families defendants and Sackler Entities were to exceed the value of their estates.  The litigation against the Sackler Families and Sackler Estates would, if successful, likely force certain members of the Sackler Families or the Sackler Entities into multiple separate bankruptcies.  In other words, the process that, prior to and in this bankruptcy proceeding, after years of costly discovery and negotiations, eventually resulted in the proposed settlement with the Sackler Families would likely have to be recommenced, in effect, in fragmented separate bankruptcy proceedings initiated by each potential judgment creditor or the individual judgment debtor Sackler Families members or Sackler Entities.  Any possible recoveries that might be obtained by claimants or third parties as a result of those proceedings would very likely be delayed and, potentially, lower as compared to the expected recoveries for the same class of claimants under the Plan.

Even if the Debtors were able to secure judgments against members of the Sackler Families or Sackler Entities in the U.S. courts, they would face several obstacles in collecting on those judgments.  The Sackler Families comprise many distinct individuals and family units and the Sackler Entities comprise various businesses around the world.  Many members of the Sackler Families live abroad, and many are not U.S. citizens.  Not all of their very considerable assets may be readily accessible by Purdue Pharma or other claimants seeking to hold the Sackler Families personally liable for the costs of the opioid epidemic.  Accordingly, while the U.S. House Committee on Oversight and Reform publicly reported on April 20, 2021 that the "Sackler family's total net assets equal approximately $11 billion," that figure does not necessarily identify the total assets capable of being recovered by claimants.  Documents released by the Committee on Oversight and Reform indicate that most of the Sackler Families' wealth is concentrated in dozens of U.S. and foreign-based spendthrift trusts.  The ability of the Debtors or other creditor groups to enforce judgments by collecting amounts held by these trusts, or by the Sackler Entities and members of the Sackler Families, in multiple jurisdictions around the world, is highly uncertain.  These considerations as to the uncertain costs of defense and uncertain prospects for enforcing potential U.S. court judgments against members of the Sackler

Families and Sackler Entities make it difficult to conclude that continuing litigation outweighs the certain merits of the proposed settlement.

(ii)    **Likelihood of Successful Litigation**

The benefits of the settlement are to be weighed against an assessment of whether the litigation would be successful—i.e., the amounts that the Debtors might expect to recover in litigated judgments against the Sackler Families and Sackler Entities.

The litigation involves various potential claims, with varying prospects of success and different potential recoveries.

*a.*    *The Debtors' Fraudulent Transfer Claims*

As explained in more detail above, *see* Article II.E, *supra*, the Debtors' advisors have determined that from 2008 through 2019, the Debtors distributed approximately $10.4 billion in cash to Sackler Entities for the benefit of the Sackler Families.  The amounts of these distributions, which include distributions classified for tax purposes, are as follows:

(Added)



In addition to these cash distributions, the Debtors' advisors have also catalogued non-cash distributions made for the benefit of the Sackler Families from 2008 through 2019, as well as various commercial transactions between the Debtors and Sackler Entities, such as supply agreements, service agreements and license-and-royalty arrangements, during the same period. In the opinion of the Debtors' advisors, some of these commercial transactions between the Debtors and Sackler Entities did not reflect reasonable terms of exchange. To the extent that the Sackler Families or Sackler Entities benefitted from above-market or below-market terms of exchange that were not reasonable, the excess benefits they obtained constitute additional transfers of value for the benefit of the Sackler Families. Non-cash transfers and excess benefits based on non-market terms may total in excess of an additional $1.4 billion in value to or for the benefit of the Sackler Families or Sackler Entities from 2008 through 2019.

155

Absent the settlement, the Debtors would litigate to recover all or some of these potential transfers of value made for the benefit of the Sackler Families. The Debtors could pursue recovery of these transfers on a variety of legal theories, but the chief claims would be claims to recover fraudulent transfers, as provided under the Bankruptcy Code and applicable state law. The Bankruptcy Code authorizes debtors to assert two types of fraudulent transfer claims: constructive fraudulent transfers and intentional fraudulent transfers.

A constructive fraudulent transfer is one where the transferor (i.e., Purdue Pharma) received less than reasonably equivalent value for the transfer and was insolvent as of the date of the transfer or became insolvent as a result of the transfer. An intentional fraudulent transfer is one where the transfer was made with an actual intent to hinder, delay, or defraud creditors. A debtor's ability to recover assets that were fraudulently transferred may be limited by the applicable statute of limitations. The amount of recovery if a claim is proven may be increased by prejudgment interest.

In assessing the likelihood of success in litigating the Debtors' fraudulent transfer claims against the Sackler Families and the Sackler Entities, the key factors considered include

(a) whether Purdue Pharma was insolvent as of the time of a particular transfer made for the benefit of the Sackler Families, such that the transfer was constructively fraudulent;

(b) the strength of the evidence that a particular transfer was made with the intent to hinder, delay or defraud creditors, such that the transfer was intentionally fraudulent;

(c) whether distributions made for purposes of funding tax payments owed by the Sackler Families or Sackler Entities can be recovered on a theory of fraudulent transfer;

(d) whether, under the applicable statute of limitations, certain transfers occurred too long ago for the Debtors to seek to recover them;

(e) the time period and rate to be used in calculating prejudgment interest on a successful claim; and

(f) the Debtors' ability to collect a judgment on a successful claim.

Each of these key factors relating to the likelihood of the Debtors' success in recovering transfers for the benefit of the Sackler Families is discussed below.

### (1)    Evidence of Insolvency

To prevail on a claim of constructive fraudulent transfer, a debtor must show that the debtor received less than reasonably equivalent value for the transfer and that the debtor was insolvent at the time of the transfer or was rendered insolvent as a result of the transfer.

At all times prior to the Petition Date—and thus for each of the transfers identified between 2008 and 2019—Purdue Pharma's balance sheet as presented in its audited financial statements indicated that the value of Purdue Pharma's assets exceeded that of its liabilities. The balance sheet is not determinative, however. Although as a general matter unliquidated litigation claims are not counted as liabilities for accounting purposes, courts may consider them when

evaluating a debtor's liabilities for purposes of a claim of constructive fraudulent transfer. Even claims that were not asserted as of the date of a particular transfer may be considered liabilities in this context, if the court determines that the claim had "accrued" by that date and could be timely asserted under the relevant statute of limitations. Whether a claim had accrued and could be timely filed can vary depending on the type of claim, the governing law, the facts regarding the parties' conduct, the nature of the relief sought and the nature of the harm. In determining a debtor's liability for accrued but unasserted claims, courts take varying approaches that, among others, have included considering the likelihood that the plaintiff would succeed, the foreseeability of future litigation of the claims or evidence as to the value of such claims through adjudications or settlements. A court evaluating whether Purdue Pharma was insolvent as of the date of a particular transfer would accordingly assess whether, as of that time, Purdue Pharma's liabilities for accrued claims (even if unasserted) exceeded the value of its assets.

On this basis, the Debtors would seek to establish that Purdue Pharma was insolvent as of a date prior to the Petition Date. The likelihood of being able to demonstrate that Purdue Pharma was insolvent would likely vary over time, in keeping with the changing circumstances. For example, the facts relevant to evaluating whether Purdue Pharma was insolvent in 2008 differ from the facts relevant to evaluating whether Purdue Pharma was insolvent in 2015 or 2019. Many different considerations are relevant to the insolvency analysis. One factor deemed relevant by some courts is the number of asserted claims as of a particular date (e.g., the date of a transfer). As of the Petition Date, approximately 2,900 lawsuits against Purdue were pending in various federal and state courts. Following the Petition Date, many thousands of proofs of claims were filed with the Court. These claims include those seeking recovery on behalf of cities, counties and states, which given their breadth could result in very significant amounts. However, the Sackler Families would point to the fact that between 2008 and 2015, there were relatively few tort claims asserted against Purdue Pharma, and very few governmental claims. Given this history, a court would have to make a judgment as to when it was foreseeable that additional claims by governmental entities and others would be filed against Purdue Pharma, that Purdue Pharma would be deemed to have liability on those claims by governmental entities and others, and that the aggregate liabilities of such claims exceeded Purdue Pharma's very significant enterprise value, so as to render it insolvent.

Even as of the Petition Date, after many such claims had been filed, none had proceeded to trial or resulted in a judgment against Purdue Pharma. Moreover, many of these claims rest on novel theories of liability. Unlike many other mass tort claims, such as asbestos claims, that have a predictable value after many years of litigation, the claims against Purdue Pharma and other opioid manufacturers do not have a history of adjudicated values. The record of litigation against Purdue Pharma has been highly variable: Some cases have been dismissed as legally defective on the pleadings. In many others, courts have held that the complaints stated a valid claim for relief, and many of these were being litigated as of the time of the bankruptcy filing and stay of proceedings. Other cases asserting tort claims have been settled. In 2007, Purdue Pharma and three senior executives reached a settlement with the DOJ and the U.S. Attorney's Office for the Western District of Virginia that resolved federal criminal claims and certain civil claims for $634.5 million, on top of a $19.5 million settlement Purdue Pharma reached that same month with the attorneys general of 26 states and the District of Columbia to resolve certain civil claims. Despite the size of that resolution, Purdue Pharma's enterprise value exceeded amounts that it paid in settlements prior to filing for bankruptcy. In the aggregate, Purdue Pharma paid

approximately $342 million in settlements from 2008 through 2019, excluding matters involving patents and similar intellectual property disputes.

Liabilities based on the total claims asserted by the federal government and resolved through the DOJ Resolution, including those that were not admitted to by the Debtors, would exceed Purdue Pharma's enterprise value today. Courts would likely consider the DOJ Resolution in determining Purdue Pharma's insolvency over time. While there are arguments against the appropriateness of such consideration, the DOJ Resolution, if taken at face value, would support a claim of insolvency prior to the Petition Date. Courts would then have to determine how the liabilities accrued over time. In doing so, a court could consider the various public documents filed by the government. For example, based upon the Agreed Statement of Facts associated with the Plea Agreement, a court might consider the nature and length of the conspiracies alleged. The documents do not explain how liability accrued over time. Further, if a court concluded that significant liabilities accrued in earlier years, as noted above, the court would have to balance such accrued liabilities against Purdue Pharma's significant enterprise value in those years.

There is, accordingly, uncertainty as to whether and what extent the Debtors would prevail in recovering all relevant distributions based a constructive fraudulent transfer claim.

### (2)    Evidence of Intent to Hinder, Delay or Defraud Creditors

To prevail on a claim of intentional fraudulent transfer, a debtor must show that the transferor acted with the intent to hinder, delay or defraud creditors. Such a showing would likely need to be proven by a standard of clear and convincing evidence, not merely a preponderance of the evidence, and it would need to be proven with respect to each individual transfer challenged as having been made with fraudulent intent, including where individuals acted based on multiple interests and motivations.

It is not certain whether the Debtors would prevail in establishing that Purdue Pharma made transfers for the benefit of the Sackler Families with the intention to defraud creditors. There is an extensive discovery record in this case. As is described more fully in Article III.Q above, Purdue Pharma has produced more than 12.5 million documents it had previously produced in prior litigations and to the DOJ, as well as an additional 680,000 documents it produced in response to requests from the Creditors' Committee. For their part, the Sackler Families and Sackler Entities have collectively produced over 1.5 million documents.

Within these materials are documents that could be used to argue that, as early as 2007, individual members of the Sackler Families and members of the Board believed that Purdue Pharma faced substantial legal risks related to its sale and marketing of OxyContin and other opioid products, such as Hysingla ER and Butrans (collectively, the "Opioid Products"). In addition, some documents reflect concerns, at various times, about the concentration of the Sackler Families' wealth in Purdue Pharma, including in respect of legal risks to the business, and discussions of ways to diversify the Sackler Families' wealth beyond their investment in Purdue Pharma, including through strategies to distribute Purdue Pharma's assets. The Sackler Families likely would argue in response that there are also contemporaneous indications

throughout the period from 2007 through 2017 that certain individual members of the Sackler Families and members of the Board did not consider those legal risks to present a threat of insolvency, but instead considered them to be manageable, just as Purdue Pharma had managed its liability exposures to the federal government, 26 states, and the District of Columbia in settling claims with those entities in May 2007 for approximately $650 million.  It is uncertain how a court or jury might evaluate the full body of evidence in an ex post facto reconstruction of the intent of the PPI Board and members of the Sackler Families as of the time of past transfers.

The record of Purdue Pharma's transfers for the benefit of the Sackler Families reflect a large increase in the amount of cash distributions beginning in 2008, shortly after Purdue Pharma's large federal and state settlements.  At the same time, the Sackler Families would likely argue that the increase in distributions coincided with a significant increase in Purdue Pharma's revenues, profits and cash position; and that documents show instances in which members of the Sackler Families chose to reinvest in the business rather than take additional cash distributions.  The Sackler Families may also point to documents indicating that certain transfers of assets and certain off-market intercompany dealings were made based on rational business planning or the continuation of practices, such as distributions for tax purposes, that were consistently followed throughout Purdue Pharma's history going back well before 2008.

While the foregoing does not reflect the full record and considerations available in pursuing a claim of intentional fraudulent transfer, it demonstrates the uncertainty that would face the Debtors if they needed to establish that Purdue Pharma made transfers for the benefit of the Sackler Families with the intention to defraud Purdue Pharma's creditors; or, significantly, that Debtors could succeed in establishing a right to recover amounts on such a claim in excess of the present value of the settlement.

### (3)    Tax Distributions

Since its formation on June 12, 1991 as a Delaware limited partnership, Purdue Pharma has been treated as a "pass-through" entity for U.S. federal income tax purposes, which means that it was not itself subject to U.S. federal income tax.  Purdue Pharma's taxable income instead "passed through" to, and was reportable by, its shareholders.

As set out in agreements entered into by certain of the Debtors' shareholders, the Debtors distributed amounts equal to the income tax liability at the highest tax rate of any shareholder.  Approximately $4.7 billion of the $10.4 billion of cash distributions identified in the 1A Report were identified as tax distributions.

The Debtors would argue that, for any period in which Purdue Pharma was insolvent, tax distributions can be recovered as transfers for less than reasonably equivalent value, because they were paid for the benefit of the Sackler Families without any corresponding benefit to Purdue Pharma.  The Sackler Families would argue in response that the tax distributions were made so Purdue Pharma itself could receive the benefit of being structured as a limited partnership, and thus, not have any entity-level tax obligations.  If it had not been designated as a pass-through entity for tax purposes, Purdue Pharma would have been subject to the federal statutory corporate tax rate of 35% during most of the relevant period.  Many comparable pharma

companies had lower overall effective tax rates, and, accordingly, the amount of taxes that Purdue Pharma would have owed, had it been a taxpayer, is uncertain.  It is difficult to predict how courts would resolve these tax issues.  Courts have reached different conclusions, and the case law is sparse on whether tax distributions should be regarded as transfers "for reasonably equivalent value" in circumstances where the transferor is (like Purdue Pharma) organized as a pass-through entity for purposes of income tax liability and the income associated with its operations is instead assigned to its partners.

Given the lack of uniformity in case law and the lack of controlling authority in the Second Circuit, it is uncertain whether a court would determine that the $4.7 billion in tax distributions made by Purdue Pharma from 2008 through 2017—a significant portion of the total distributions during this period—were transfers for less than "reasonably equivalent value" that could be voided as fraudulent transfers if Purdue Pharma had been insolvent at the time that each tax distribution was made.

### (4)    Statutes of Limitations

A statute of limitations defines the period in which a debtor may recover transfers.  Here, the first fraudulent transfer claims were brought by the New York Attorney General on March 28, 2019, which had the effect of stopping or "tolling" the limitations period.

Under Section 548 of the Bankruptcy Code, the Debtors can recover any fraudulent transfers made up to two years before the first claim was asserted.  As such, a claim pursuant to section 548 would only allow the Debtors to recover transfers made beginning in March 2017, after which there have been limited transfers from Purdue Pharma to or for the benefit of the Sackler Families.

The Debtors could also proceed under Section 544, which allows the Debtors to bring fraudulent transfer claims under applicable state or federal laws.  The Debtors could proceed pursuant to Connecticut's Uniform Fraudulent Transfer Act, which provides for a four-year statute of limitations, or alternatively under the Federal Debt Collection Procedures Act, which provides a six-year statute of limitations.  Because of the involvement of state creditors here, there are also colorable legal arguments that a ten-year statute of limitations could also be appropriate, or that statutes of limitations are inapplicable given the claims asserted by certain state creditors may not be subject to a limitation period under applicable state law.  Such arguments are based on state statutes and case law specific to cases, as here, involving state claimants but have not been significantly developed in the context of bankruptcy proceedings.  If the Debtors are not able to prevail on their ability to extend the statute of limitations to go back further in time, or to use an equitable argument to potentially stop the limitations clock from running for some period, the Debtors would be able to seek to recover transfers made from 2015 or 2013, depending on whether the limitations period is determined to be four or six years, respectively.  As discussed above, distributions from Purdue Pharma had largely ceased by 2017, thereby limiting the amount Debtors would likely be able to recover.

### (5)    Prejudgment Interest

The amount of a debtor's potential recovery in connection with transfers made at a time of insolvency or with an intent to defraud creditors can depend significantly on whether or not

the recovery is augmented by an award of "prejudgment" interest.  Awards of prejudgment interest are not mandated under the Bankruptcy Code.  Whether and in what amount to award prejudgment interest are questions for the court's discretion.

A number of factors would affect a prejudgment interest award.  *First*, while the decision whether to award any prejudgment interest is entirely up to the court's discretion, courts typically do award prejudgment interest in fraudulent transfer cases.  *Second*, the rate at which prejudgment interest is awarded is also discretionary.  Assuming Connecticut law applies, the maximum rate is 10% per annum, but courts can award prejudgment interest at a lower rate more in line with prevailing market rates.  *Third*, courts have the discretion to award prejudgment interest from the date the transfer was made *or* from the date the fraudulent transfer lawsuit was filed.  How a court might ultimately rule on these discretionary matters would materially affect the potential recovery here, where certain transfers were made in 2008, but the first fraudulent transfer complaint was not filed until eleven years later in 2019.

<u>(6)</u>    **Collectability of Potential Judgments**

 Fraudulent transfer claimants can recover from both the transferees, including trusts, and the parties for whose benefit a transfer is made.  Importantly, this means that through a fraudulent transfer claim, a claimant may recover from a spendthrift trust, which could otherwise be considered "judgment proof" in connection with other types of claims.  Here, depending on the resolution of the legal and factual issues discussed above, the Debtors and other claimants could potentially recover up to the total net worth of the members of the Sackler Families and Sackler Entities.

However, there are numerous and substantial obstacles to litigating, enforcing, and collecting against the Sackler Families that create considerable uncertainty with respect to the sums that may ultimately be recoverable.  For one, while the Sackler Families are frequently described as a monolithic entity, there are, in fact, dozens of members of the Sackler Families spread out around the globe over a number of independent family units and ranging in ages from very small children to senior citizens.  Many never served on the Board or otherwise held employment by the Debtors, and because many members of the Sackler Families are not U.S. citizens, they are potentially beyond the reach of U.S. jurisdiction.  Therefore, in order to obtain any significant recovery, the Debtors and other claimants would not be able to simply file a lawsuit against "the Sackler Families," but would instead have to separately sue, prevail, and collect against each of these individuals, and expend considerable resources in the process without any guarantee of success.

Additionally, as has been documented, most of the Sackler Families' wealth is concentrated in dozens of trusts—several of which were established before the invention of OxyContin—located both within and outside the United States.  As disclosed in the 1A Report, while distributions from Purdue Pharma were initially made to two primary trusts, funds have subsequently been dispersed not only to individual members of the Sackler Families around the world, but also to dozens of trusts created for their benefit, including many that are located in the Bailiwick of Jersey in the Channel Isles or other locations, which may not subject to the Bankruptcy Court's jurisdiction.  Notably, in order to recover assets held in Jersey, the Debtors

would likely have to commence a *de novo* fraudulent transfer action in Jersey and relitigate all of the claims against each of these individual trusts.

Given these obstacles to recovery, the Debtors and other claimants may not be able to recover the full amount of a fraudulent transfer judgment, and would likely spend years and significant legal fees attempting to do so. By contrast, the Sackler Families and Sackler Entities have consented to the jurisdiction of the Bankruptcy Court for settlement enforcement purposes, and, in considering the proposed settlement, the Debtors have taken into account these factors in contemplating the collectability of any judgments obtained in U.S. courts.

### b.    Other Potential Claims of the Debtors' Estates

In addition to fraudulent transfer claims, the Debtors' Estates could also pursue unjust enrichment and breach of fiduciary duty claims. Factors that affect the likelihood of a successful litigation of each of those claims are discussed in turn below.

### (1)    Unjust Enrichment

The Debtors could bring an unjust enrichment claim against the recipients of any of the assets wrongfully extracted from Purdue Pharma. The Debtors could argue that the various cash and undervalued non-cash transfers unjustly enriched the recipients thereof at the expense of the Debtors' Estates and, in turn, the creditors. Any unjust enrichment claim would likely be based on the same set of facts as the fraudulent claims; however, the Debtors would not have to prove actual or constructive fraud. They would instead have to prove that any funds transferred out of Purdue Pharma could have been used to satisfy its creditors and that equity and good conscience require the return of the funds to the Debtors for the benefit of all creditors. Even if the Debtors were to prevail in establishing a right to recover under a theory of unjust enrichment, they would likely not be able to seek double recovery under both unjust enrichment and fraudulent transfer theories.

Any unjust enrichment claim is limited to a six-year lookback period, which would only allow the Debtors to seek recovery of transfers dating back to 2013. If they were to succeed on an unjust enrichment claim, the Debtors' ability to collect any such claim would be subject to the same considerations that apply in the fraudulent transfer context.

### (2)    Breach of Fiduciary Duty

The Debtors could potentially assert claims for breach of fiduciary duty against the members of the Board. As a general matter, the general partner of a limited partnership (and, by extension, its board of directors) owes the fiduciary duty of loyalty to the limited partnership.[120] Directors may be liable for a breach of fiduciary duty where they engaged in self-dealing transactions, where they directly caused the partnership to violate the law, or where they failed to implement or adequately monitor internal compliance programs.

---

[120] Partners may choose to disclaim the fiduciary duty of loyalty; however, Purdue Pharma's limited partnership agreement made no mention of the duty until March 7, 2018, when it was amended to disclaim the duty. Accordingly, Purdue Pharma would argue that PPI's directors owed Purdue Pharma a duty of loyalty up until March 7, 2018.

In the case of Purdue Pharma, claims of breach of fiduciary duty based on a theory of self-dealing transactions would largely overlap in terms of evidence and substance with the potential claims of fraudulent transfer discussed above.  Such claims accordingly would be unlikely to add any significant recovery beyond what would already be available to the Debtors under a fraudulent transfer theory.  Indeed, the prospects for recovery may be more limited on claims for breach of fiduciary duty, because recovery would have to be pursued against individual entities for breach of duty, rather than against a transferee of funds based on receipt of a transfer that was either constructively or intentionally fraudulent.

Generally, claims for breach of fiduciary duty by board members based on a failure of oversight face significant challenges of proof.  The limitation period for asserting a claim of breach of fiduciary duty is three years, counted from the date of the Debtors' bankruptcy filing in September 2019, and thus any actions from September 2016 forward that would give rise to liability could potentially support a claim.  There may be grounds for asserting that Purdue Pharma itself engaged in misconduct after September 2016—particularly in light of facts accepted in connection with the recent guilty plea on federal criminal charges—yet there would also have to be evidence tying such conduct to individual members of the Board.

Members of the Sackler Families will argue, as they have publicly stated, that the record shows that Purdue Pharma had a compliance program in place and that the Board received regular briefings with respect to it.  In order for the Debtors to prevail, a court or a jury would need to conclude that members of the Board had reason to doubt such reassurances and failed in their capacities as members of the Board to adequately monitor the compliance program.  It is therefore uncertain whether the Debtors will be able to recover on a breach of fiduciary duty claim premised on the theory that any particular director, or all directors, caused Purdue Pharma to engage in illegal conduct in the period after September 2016.[121]

*c.*        *Third-Party Claims*

In the opinion of the Debtors, the $4.275 billion settlement with the Sackler Families justifies a release of potential third-party claims against the Sackler Families and Sackler Entities.  These third-party claimants are all creditors of the Debtors as well.  As such, they will share in the planned distributions to creditors under the Plan.  And as discussed above, these distributions to creditors under the Plan are to be funded, in significant part, by payments under the settlement with the Sackler Families.  Accordingly, third-party creditors will benefit under the settlement as provided under the Plan.  They will also benefit from the settlement insofar as a failure to approve the settlement as a part of the Plan would present significant risks to the Debtors' Estates and to third parties, as described above.

Third-party creditors of the Sackler Families have brought a variety of claims arising from Purdue Pharma's and the Sackler Families' roles in manufacturing and marketing the various Opioid Products, including OxyContin.  These claims include, but are not limited to, product liability, wrongful death, negligence, including negligent misrepresentation, negligence per se and gross negligence, fraud, fraudulent concealment, deceit and other willful misconduct,

---

[121]  The statute of limitations on a breach of fiduciary duty claim is three years.

163

unjust enrichment, public nuisance, and claims under state consumer protection and controlled substances laws.

While the Debtors recognize the tragic circumstances underlying these suits, third-party creditors nonetheless face significant legal hurdles in proving the elements of their claims and collecting on any judgments. Notably, third-party creditors would need to specifically prove that individual members of the Sackler Families and Sackler Entities engaged in conduct that would give rise to personal liability and that such conduct caused the harms allegedly sustained by such third parties. The Sackler Families and Sackler Entities would surely expend significant resources in defending against any direct claims. Among other things, they would likely argue that while Purdue Pharma manufactured, distributed and marketed its Opioid Products, other parties contributed to the chain of events relating to prescriptions for, consumption of, and harm resulting from, the Opioid Products. Generally, these medications were prescribed for patients by licensed medical doctors, and the prescribing judgments by these "learned intermediaries" have been recognized in court decisions to provide a legal defense to manufacturers of drugs for harms they cause, including harms for opioid addiction allegedly caused by the Opioid Products. Other potential defenses by members of the Sackler Families would include possible misuse of prescription opioids or wrongful conduct by victims, which could potentially preclude or limit liability on the part of the Sackler Families or Sackler Entities or other released parties. State and local nuisance claims face similar hurdles. As noted above, those claims are novel, and the law remains unsettled. In some cases, lawsuits against Purdue Pharma have been dismissed on causation and standing grounds. Many others have survived motions to dismiss, but none had been tried to final judgment at the time of the bankruptcy filing and stay of litigation.

Notably, liability would need to be proven separately against individual members of the Sackler Families based on their own conduct, not simply on the conduct of Purdue Pharma. As a general matter, corporations are treated as distinct and separate entities from their owners for legal purposes, and the owners of businesses are not personally liable for harms caused by the businesses themselves, absent personal conduct that would itself constitute a basis for liability. In special circumstances, a claimant may succeed in "piercing" through a corporation's form and recover directly from the corporation's owners or affiliates. These circumstances are considered exceptional, and the so-called "veil-piercing" doctrine is narrowly construed.

In New York,[122] a court may pierce a corporation's veil if (1) its owners exercised complete domination over the corporation with respect to the transaction at issue; and (2) that domination was used to commit a fraud or wrong that injured the party seeking to pierce the veil. The inquiry into whether an owner dominated and controlled a corporation is highly fact specific and consists of an assessment of ten factors. The presence or absence of any single factor is not dispositive, and the factors cannot be applied in a vacuum; rather, the court must conduct a broad-based inquiry into the facts to determine if the party seeking to pierce the corporate veil has established an improper domination of the corporation. Plaintiffs must then also show that the owners used their control to perpetrate a fraud, injustice, or some other wrong on the plaintiff.

---

[122] New York law likely governs the veil piercing analysis because PPI is incorporated in New York.

In a situation where, as here, the corporate family involves a series of holding companies, creditors would either need to establish the veil piercing factors for each separate entity, or they will have to satisfy a different set of factors corresponding to what is termed the "single enterprise theory" to group together an entire corporate family where the individual entities are so "inextricably intertwined" as to be a "single enterprise." Given the fact-intensive nature of the veil piercing inquiry and the general notion that courts do not often pierce the corporate veil, it is uncertain how a court would weigh the various veil-piercing factors.

As noted, if creditors are unable to successfully pierce the corporate veil, they would need to prove liability based on specific conduct of individual members of the Sackler Families. While approximately a dozen members of the Sackler Families served on the Board or were otherwise involved in Purdue Pharma's business to varying degrees, the record indicates that many members of the Sackler Families were not involved in Purdue Pharma at all, other than as passive recipients—through a series of intermediate entities and trusts—of distributions. Consequently, it will be much more difficult, if not impossible, for the creditors to prove liability by these other members of the Sackler Families. Moreover, the creditors would be limited to recovering from members of the Sackler Families who are liable for misconduct, and not from the full quantum of the Sackler Families' wealth. Further, as noted above, the Sackler Families' wealth is held in dozens of spendthrift trusts, including multiple trusts located outside the United States. These trusts would likely pose a significant obstacle to collecting on judgments against individuals, even if such individuals were the beneficiaries of the trusts.

As a result, the valuation of third-party claims is uncertain and highly speculative. Even if a particular creditor were able to prevail in holding some individual members of the Sackler Families liable and recover from those individuals, for the reasons discussed above, the vast majority of creditors who do not win the race to the courthouse would likely receive nothing. Thus, it is difficult to conclude that expected recoveries on account of direct claims against individual members of the Sackler Families would be greater than the expected future benefits of the substantial amounts to be paid to the Debtors under the settlement for distribution to claimants under the Plan.

The Sackler Families have also submitted filings laying out their own views of the claims against them and their defenses: the *Reply by the Side A Initial Covered Sackler Persons in Support of Disclosure Statement for Second Amended Plan* [D.I. 2833] and the *Submission by The Raymond Sackler Family of a Proposed Position Statement for Inclusion or Reference in the Debtors' Disclosure Statement* [D.I. 2853].[123]

**3.** **Complexity, Expense and Delay of Litigation & Difficulties of Collecting Judgments**

---

[123] Copies thereof may be obtained at no charge from the Solicitation Agent by (a) calling the Debtors' restructuring hotline at (844) 217-0912 (toll-free) or (347) 859-8093 (international); (b) visiting the Debtors' restructuring website at https://restructuring.primeclerk.com/purduepharma; (c) writing to Purdue Pharma Ballot Processing, c/o Prime Clerk LLC, One Grand Central Place, 60 East 42nd Street, Suite 1440, New York, NY 10165; and or (d) emailing purduepharmainfo@primeclerk.com. You may also obtain copies of any pleadings filed in these Chapter 11 Cases for a fee via PACER at http://www.nysb.uscourts.gov.

The second *Iridium* factor—the complexity of the litigation and the likelihood of attendant cost, inconvenience and delay, and likely difficulties in collecting judgments—weighs in favor of the settlement. As explained in detail above, the claims of the Debtors and other parties would require adjudications of many complex matters, including detailed evidence of conduct and events that occurred over many years. These complex matters would include, among others, litigation over evidence regarding the intent behind numerous distinct distributions of assets from Purdue Pharma at different times over a period of years, Purdue Pharma's own accrued liabilities to third parties, if any, at different times—and its solvency or insolvency at particular times in view of any such liabilities. There would also be complex questions of causation and statutes of limitations, as noted above. Many of these issues would likely be litigated, at least in part, through complex expert opinions. The expense of litigating these claims to conclusion would be prodigious and would diminish the Debtors' Estates and the potential assets of the defendants that would be available to satisfy any judgments that the claimants might be capable of obtaining after years of litigation.

There is also a significant risk of difficulties in collecting judgments against the Sackler Families or Sackler Entities. The damages that could potentially be recovered in litigation are necessarily limited by the assets that could be reached to satisfy a judgment. According to information reviewed by the Debtors' representatives, the assets of the Sackler Families exceed the settlement payments by a meaningful amount, but there are potential legal impediments to enforcing possible future court judgments against all of those assets. Some assets, for example, are held in trusts or held personally by individuals in foreign jurisdictions. The ability of the Debtors or third parties to enforce possible future judgments, if obtained, against such assets is uncertain. Accordingly, there is significant risk that the litigation of claims against the Sackler Families and affiliated entities could result in recoveries of amounts less than the payments to be made by the Sackler Families under the settlement.

With respect to third-party claims against the Sackler Families, even if a claimant were to succeed in establishing its claim and piercing the corporate veil, the claimant would still face the challenge of collecting on a judgment against the liable party. As noted above, a significant portion of the wealth of the Sackler Families is held in trusts, both inside and outside the United States. These family trusts are irrevocable, non-donor, spendthrift trusts, and as a result, a plaintiff would face significant challenges in collecting the trusts' assets to satisfy a judgment against an individual member of the Sackler Families. Under Connecticut and Wyoming law, which govern most of the relevant trusts, a plaintiff seeking to enforce a judgment cannot recover a defendant's assets held in spendthrift trusts. A creditor can only garnish or attach trust assets after the assets are distributed to the beneficiaries.

## 4.    *Interest and Support of Creditors & Expertise of Representatives*

The third, fourth, and fifth factors from the *Iridium* case—the interest and support of the creditors, and the expertise of their representatives—similarly weigh in favor of the settlement. The vast majority of creditors, including the Creditors' Committee, AHC, MSGE, the Native American Tribes Group, the Ad Hoc Group of Individual Victims, the Ad Hoc Group of Hospitals, the Third-Party Payor Group, the ratepayer mediation participants, and the NAS Committee support or have no objection to the settlement, subject to satisfactory resolution of certain terms that continue to be negotiated. The Debtors and these committees and other

creditors have been represented by experienced and reputable counsel and financial and economic advisors.

### 5.    Releases of Sackler Families, Sackler Entities and Other Specified Persons

The sixth factor—the nature and breadth of releases of officers and directors or other third parties—is relevant here because the Plan contains releases of third-party claims against the Sackler Families, Sackler Entities and certain others.  In the Second Circuit, third-party releases are appropriate where "unusual circumstances" render the release "truly necessary" to the plan's success.  *In re Metromedia Fiber Network, Inc.*, 416 F.3d 136, 143 (2d Cir. 2005).  That is plainly the case here.  Under the settlement, the Sackler Families will pay $4.275 billion to the Debtors' Estates—a very material sum that will enable the Debtors to satisfy the Plan, including the Private-Side Resolutions, and help to secure the DOJ Resolution.  The agreement by the Sackler Families to pay these very material amounts is conditioned upon, among other things, third-party releases under the Plan for the benefit of the Sackler Families and related persons.  Obtaining these material payments would not be possible without the third-party releases under the Plan.

### 6.    Arm's-Length Negotiation of Settlement Terms

The final *Iridium* factor—whether the settlement was achieved through arm's-length bargaining—is plainly present here.  The settlement was reached after months of vigorous arm's-length bargaining by the Special Committee, the Creditors' Committee, AHC and MSGE, and was facilitated by highly regarded professional mediators.   Details of the Shareholder Term Sheet are set forth in Article III.W, *supra.*

## BB.    Creditor Investigations Related to the Settlement with the Sackler Families

Over the course of over 18 months, the Creditors' Committee conducted an independent investigation of various claims against the members of the Sackler Families and Sackler Entities. This investigation by the Creditors' Committee, which was conducted in parallel with the Special Committee's investigation, was exhaustive and was focused in large but not exclusive part on the various potential claims held by the estate, including fraudulent transfer and breach of fiduciary duty.  Given that the Creditors' Committee serves as a co-fiduciary in these Chapter 11 Cases, the Debtors provided extensive assistance to the Creditors' Committee's investigation.

The Creditors' Committee's advisors vigorously pursued their investigation and obtained significant information regarding the conduct of members of the Sackler Families, the IACs, other Sackler Entities, and the Debtors.  As discussed in detail in Article IIIR, *supra*, the Creditors' Committee obtained access to an immense volume of information including documents from the Debtors, Sackler Families, IACs and other parties.  In total, these productions amounted to almost 100 million pages.

The Creditors' Committee also received information provided voluntarily by the Debtors, which engaged with the Creditors' Committee on the appropriate scope of discovery to ensure maximum effectiveness and efficiency.  To this end, the Debtors voluntarily provided the Creditors' Committee and the NCSG with all non-privileged documents identified by the Special Committee's investigation, including documents not included within the information requests

made by the Creditors' Committee.  Moreover, the Debtors also agreed, in an extraordinary exercise of cooperation, to produce over 16,000 privileged documents to the Creditors' Committee, on a common interest basis, including documents deemed material to the Special Committee's analysis of potential claims against the Sackler Families and Sackler Entities.

Also with the cooperation of the Debtors, the Creditors' Committee obtained discovery from the Sackler Families, Sackler Entities, including the IACs, non-Sackler members of the Board, certain financial institutions and insurance brokers, and Norton Rose Fulbright LLP, which acted as long-time counsel to both the Debtors and Sackler Families.  This extensive discovery provided further information potentially relevant to evaluating the various estate and third-party claims.  These materials were produced to the Debtors as well, and evaluated in connection with the investigation by the Special Committee.  Both the Creditors' Committee and the Special Committee used these documents to, among other things, diligence the various presentations provided by the Sackler Families regarding the wealth of the Sackler Families, the location of their assets, and their potential defenses.

The Creditors' Committee also noticed 16 depositions of members of the Sackler Families and their advisors, members of the Board, Purdue's CEO, and various former employees, some of which were conducted jointly with the NCSG and the Debtors.  To afford the Creditors' Committee and the NCSG maximum scope to examine the witnesses, the Special Committee did not claim time to examine the deponents.  Instead, the Special Committee provided selected documents to the Creditors' Committee in advance of each deposition of the members of the Sackler Familiar to ensure that the Creditors' Committee had the benefit in conducting its examinations of the documents that had been identified as relevant by the Special Committee.  On numerous occasions, the Creditors' Committee used the documents provided by the Special Committee in the course of examining members of the Sackler Families.  The advisors to the Special Committee also shared with the Creditors' Committee and, on occasion, the NCSG, their views on lines of questioning and examination of members of the Sackler Families.

The Debtors also provided the Creditors' Committee with valuable work product compiled by the advisors to the Special Committee for the purpose of assisting the Creditors' Committee's investigation.  For example, the Debtors supplied the Creditors' Committee with drafts of the 1A and 1B Reports, prior to filing those reports on the public docket, and also provided the Creditors' Committee with extensive supporting diligence.  In addition, on numerous occasions, the Debtors provided the Creditors' Committee and its financial advisors with the ongoing analysis performed by Bates White regarding the valuation of assets transferred to or for the benefit of the Sackler Families and Sackler Entities, as well as the transfer pricing analyses conducted by Bates White in respect of various royalty, services, R&D, product, real-estate and other intercompany dealings.  At the direction of the Special Committee's advisors, and on a common interest basis, Bates White on numerous occasions discussed with the Creditors' Committee and its advisors the results of Bates White's factual investigation, which included extensive review of corporate and transactional documents, interviews and analysis of relevant comparable transactions and arrangements.

The AHC also engaged with both AlixPartners and Bates White to diligence the Debtors' extensive disclosures regarding transfers to and for the benefit of the Sackler Families.  The

AHC's financial advisors met on numerous occasions with Bates White to discuss, on a common interest basis, the results of Bates White investigation and valuation analysis. In addition, the Debtors provided diligence in response to particular requests from no less than eight creditor groups, including the Creditors' Committee, AHC, NCSG, MSGE, Private Insurance Claimants, Ad Hoc Group of Individual Victims, NAS Committee and the Ad Hoc Group of Hospitals, and the U.S. Attorney's Office for the Southern District of New York's Civil Division, Tax and Bankruptcy Unit.

## CC.    Prosecution of Claims and Causes of Action Related to the Debtors' Insurance Coverage

On January 20, 2021, the January 29, 2021, the Bankruptcy Court approved the *Stipulation and Agreed Order Granting Joint Standing to Prosecute Claims and Causes of Action Related to the Debtors' Insurance Coverage to (1) the Official Committee of Unsecured Creditors and (2) the Ad Hoc Committee of Governmental and Other Contingent Litigation Claimants* [D.I. 2305] (the "**Insurance Stipulation**"). On January 29, 2021, the Debtors, the Creditors' Committee and the Ad Hoc Committee commenced an adversary proceeding under the authority of the Insurance Stipulation by filing the *Complaint for Declaratory Relief*, Adv. Pro. No. 21-07005 (RDD) [D.I. 1] (the "**Insurance Complaint**"). The Insurance Complaint seeks an order declaring the present and future rights, duties, and liabilities of the Debtors and the MDT Insurers under the MDT Insurance Policies and directing the MDT Insurers to indemnify the Debtors for, or pay on their behalf, damages suffered by the Debtors arising out of the Pending Actions. *E.g.*, Insurance Complaint ¶ 9.

As described in the Complaint, "coverage under the MDT Insurance Policies is subject to limits of liability, where applicable, of approximately $3.3 billion." Insurance Complaint ¶ 6. The amount and timing of any recoveries under the MDT Insurance Policies is uncertain and is the subject of ongoing litigation.

Section 5.6(h) of the Plan provides that, on or before the Effective Date, the Debtors will transfer the MDT Insurance Rights, along with any and all Retained Causes of Action relating to and necessary to enforce the MDT Insurance Rights, to the Master Disbursement Trust. Pursuant to section 5.6(j) of the Plan, the Master Disbursement Trust will be empowered to initiate, prosecute, defend and resolve all legal actions and other proceedings related to any Asset, liability or responsibility of the Master Disbursement Trust, including in respect of the MDT Insurance Rights. Section 5.6(b) of the Plan provides that any amounts paid by Insurance Companies under the MDT Insurance Policies will be paid to the Master Disbursement Trust to be applied in accordance with the MDT Priority Waterfall and the MDT Agreement.

## DD.    Omnibus Claims Objection Procedures

On March 16, 2021, the Debtors filed the *Motion of Debtors for Entry of Order Approving (I) Omnibus Claims Objection Procedures, (II) Omnibus Claims Settlement Procedures and (III) Omnibus Claims Hearing Procedures* [D.I. 2490] (the "**Omnibus Claims Procedures Motion**"). Pursuant to the Omnibus Claims Procedures Motion, the Debtors sought entry of an order approving certain procedures to (a) object to claims (the "**Omnibus Claims Objection Procedures**"), (b) settle disputed claims without further Bankruptcy Court approval

(the "**Omnibus Claims Settlement Procedures**"), and (c) streamline hearings on contested claims (the "**Omnibus Claims Hearing Procedures**").  The Bankruptcy Court granted the relief requested in the Omnibus Claims Procedures Motion on April 22, 2021 [D.I. 2696].

## EE.    Disclosure Statement Hearing and Confirmation Hearing

The hearing to consider approval of the Disclosure Statement will be held on May 12, 2021 at 10:00 a.m. (prevailing Eastern Time).  The deadline to object to the approval of the Disclosure Statement was April 23, 2021 at 4:00 p.m. (prevailing Eastern Time). The deadline for (i) any party that timely filed an objection to file a supplemental objection to the Disclosure Statement and (ii) any party with respect to whom the objection deadline remained pending as of April 29, 2021 on account of an extension granted by the Debtors to file an objection was May 3, 2021, at 4:00 p.m. (prevailing Eastern Time).  Further, the Debtors will seek entry of an order by the Bankruptcy Court scheduling the Confirmation Hearing to consider confirmation of the Plan. The Confirmation Hearing will be held on August 9, 2021 at 10:00 a.m. (prevailing Eastern Time).

## ARTICLE IV

## SUMMARY OF THE PLAN

The Debtors believe that the Plan provides the best and most prompt possible recovery to holders of Claims.  The Debtors believe that (a) through the Plan, holders of Allowed Claims will obtain a recovery from the Debtors' estates equal to or greater than the recovery that they would receive if the Debtors' assets were liquidated under chapter 7 of the Bankruptcy Code and (b) consummation of the Plan will maximize the recovery of the holders of Allowed Claims.

The consummation of a plan is the principal objective of a chapter 11 case.  A plan sets forth the means for satisfying Claims against, and interests in, a debtor.  Confirmation of a plan makes the plan binding upon the debtor and any creditor of, or equity holder in, the debtor, whether or not such creditor or equity holder (a) is impaired under or has accepted the plan or (b) receives or retains any property under the plan.  Subject to certain limited exceptions and other than as provided in the plan itself or the confirmation order, a confirmation order discharges the debtor from any debt that arose prior to the effective date of the plan and substitutes therefor the obligations specified under the confirmed plan.

A chapter 11 plan may specify that the legal, contractual, and equitable rights of the holders of Claims or Interests in certain classes are to remain unaltered by the reorganization effectuated by the plan.  Such classes are referred to as "unimpaired" and, because of such favorable treatment, are deemed to accept the plan.  Accordingly, a debtor need not solicit votes from the holders of Claims or Interests in such classes.  A chapter 11 plan may also specify that certain classes will not receive any distribution of property or retain any Claim against a debtor. Such classes are deemed not to accept the plan and, therefore, need not be solicited to vote to accept or reject the plan.  Any classes that are receiving a distribution of property under the plan but are not unimpaired will be solicited to vote to accept or reject the plan.

Prior to soliciting acceptances of the proposed plan, section 1125 of the Bankruptcy Code requires a debtor to prepare a disclosure statement containing adequate information of a kind, and in sufficient detail, to enable a hypothetical reasonable investor to make an informed judgment regarding the plan.  To satisfy the requirements of section 1125 of the Bankruptcy Code, the Debtors are submitting this Disclosure Statement to holders of Claims against the Debtors who are entitled to vote to accept or reject the Plan.

THE REMAINDER OF THIS SECTION PROVIDES A SUMMARY OF THE STRUCTURE AND MEANS FOR IMPLEMENTATION OF THE PLAN AND THE CLASSIFICATION AND TREATMENT OF CLAIMS AND INTERESTS UNDER THE PLAN.  THIS SECTION IS QUALIFIED IN ITS ENTIRETY BY AND IS SUBJECT TO THE PLAN AS WELL AS THE EXHIBITS THERETO AND DEFINITIONS THEREIN.

THE STATEMENTS CONTAINED IN THIS DISCLOSURE STATEMENT INCLUDE SUMMARIES OF THE PROVISIONS CONTAINED IN THE PLAN AND IN DOCUMENTS REFERRED TO THEREIN.  THE STATEMENTS CONTAINED IN THIS DISCLOSURE STATEMENT DO NOT PURPORT TO BE PRECISE OR COMPLETE STATEMENTS OF ALL THE TERMS AND PROVISIONS OF THE PLAN OR DOCUMENTS REFERRED TO THEREIN.  REFERENCE IS MADE TO THE PLAN AND TO SUCH DOCUMENTS FOR THE FULL AND COMPLETE STATEMENTS OF SUCH TERMS AND PROVISIONS OF THE PLAN OR DOCUMENTS REFERRED TO THEREIN.

THE PLAN ITSELF AND THE DOCUMENTS REFERRED TO THEREIN CONTROL THE ACTUAL TREATMENT OF CLAIMS AGAINST AND INTERESTS IN THE DEBTORS UNDER THE PLAN.  UPON OCCURRENCE OF THE EFFECTIVE DATE, THE PLAN AND ALL SUCH DOCUMENTS WILL BE BINDING UPON ALL HOLDERS OF CLAIMS AGAINST AND INTERESTS IN THE DEBTORS AND THEIR ESTATES AND ALL OTHER PARTIES IN INTEREST.   IN THE EVENT OF ANY CONFLICT BETWEEN THIS DISCLOSURE STATEMENT, ON THE ONE HAND, AND THE PLAN OR ANY OTHER OPERATIVE DOCUMENT, ON THE OTHER HAND, THE TERMS OF THE PLAN AND SUCH OTHER OPERATIVE DOCUMENT SHALL CONTROL.

STATEMENTS AS TO THE RATIONALE UNDERLYING THE TREATMENT OF CLAIMS AND INTERESTS UNDER THE PLAN ARE NOT INTENDED TO, AND SHALL NOT, WAIVE, COMPROMISE, OR LIMIT ANY RIGHTS, CLAIMS, OR CAUSES OF ACTION IN THE EVENT THE PLAN IS NOT CONFIRMED.

As contemplated by the Plan, the Debtors will file with the Court at least seven days before the Voting Deadline (as defined in the Solicitation Procedures Order) the supplement or supplements to the Plan (the "**Plan Supplement**") containing certain documents relevant to the implementation of the Plan, which shall include the MDT Agreement, the NewCo Transfer Agreement, the NewCo Operating Agreement, the TopCo Operating Agreement, the PAT Agreement, the PI Trust Documents (including the LRP Agreement), the NAS Monitoring Trust Documents, the Hospital Trust Documents, the TPP Trust Documents, the NOAT Documents, the Tribe Trust Documents, the NewCo Credit Support Agreement, the identity of the MDT Trustees, the identity of the MDT Executive Director, the identity of the NewCo Managers, the identity of the TopCo Managers, the identity of the Plan Administration Trustee and PPLP

171

Liquidator, the identity of the Creditor Trustees, the Schedule of Rejected Contracts, the Schedule of Retained Causes of Action, the Schedule of Excluded Parties, the Shareholder Settlement Agreement and the Restructuring Steps Memorandum. Notice of filing of the Plan Supplement will be served in accordance with the Solicitation Procedures Order. Once filed, the Plan Supplement (and, at any time, the Disclosure Statement, including the Plan and the other exhibits thereto, Disclosure Statement Order, and all other materials in the Solicitation Package, except Ballots) may be obtained at no charge from the Solicitation Agent by (a) calling the Debtors' restructuring hotline at (844) 217-0912 (toll-free) or (347) 859-8093 (international); (b) visiting the Debtors' restructuring website at https://restructuring.primeclerk.com/purduepharma; (c) writing to Purdue Pharma Ballot Processing, c/o Prime Clerk LLC, One Grand Central Place, 60 East 42nd Street, Suite 1440, New York, NY 10165; and or (d) emailing purduepharmainfo@primeclerk.com. You may also obtain copies of any pleadings filed in these Chapter 11 Cases for a fee via PACER at http://www.nysb.uscourts.gov.

## A.    Administrative Expense Claims, Professional Fee Claims, Priority Tax Claims and DOJ Forfeiture Judgment Claim

### 1.    *Administrative Claims*

(i)    **Generally.**    Except as provided for herein or in any order of the Bankruptcy Court, and subject to section 503(b)(1)(D) of the Bankruptcy Code, Holders of Administrative Claims (other than Professional Fee Claims and the DOJ Forfeiture Judgment Claim) must file and serve on the Debtors requests for the payment of such Administrative Claims not already Allowed by a Final Order on or before the applicable Administrative Claims Bar Date. Any Holder of an Administrative Claim that is required to, but does not, file and serve a request for payment of such Administrative Claim pursuant to the procedures specified in the Confirmation Order on or prior to the Administrative Claims Bar Date shall be forever barred, estopped and enjoined from asserting such Claims against the Debtors, the Liquidating Debtors, the Transferred Debtors, the Plan Administration Trust or their respective Assets or properties, and such Claims shall be deemed discharged as of the Effective Date. An Administrative Claim, with respect to which a request for payment has been properly and timely filed pursuant to ~~the~~ Section 2.1(a) of the Plan, shall become an Allowed Administrative Claim if no objection to such request is filed by the Debtors or the Plan Administration Trustee with the Bankruptcy Court on or before the date that is one hundred twenty (120) days after the Effective Date, or such later date as may be fixed by the Bankruptcy Court. If an objection is timely filed, such Administrative Claim shall become an Allowed Administrative Claim only to the extent Allowed by Final Order or such Claim is settled, compromised or otherwise resolved pursuant to Section 7.7 of the Plan. Except to the extent a Holder of an Allowed Administrative Claim and the Debtor against which such Claim is asserted agree to different treatment, each Holder of an Allowed Administrative Claim (other than a Professional Fee

Claim or the DOJ Forfeiture Judgment Claim) shall receive, on account of such Allowed Claim, Cash in an amount equal to the Allowed amount of such Claim from the Priority Claims Reserve within thirty (30) days following the later to occur of a. the Effective Date and b. the date on which such Administrative Claim shall become an Allowed Claim; *provided* that any Administrative Claim that is assumed by NewCo shall be paid by NewCo in the ordinary course of business.

(ii)    **Professional Fee Claims.**  All Professional Persons seeking awards by the Bankruptcy Court for compensation for services rendered or reimbursement of expenses incurred through and including the Effective Date under (x) section 327, 328, 330, 331, 503(b)(2), 503(b)(3), 503(b)(4), 503(b)(5) or 1103 of the Bankruptcy Code, (y) with respect to the Ad Hoc Committee, the AHC Reimbursement Agreement Assumption Order or (z) with respect to the MSGE Group, the MSGE Group Reimbursement Order, shall a. file, on or before the date that is forty-five (45) days after the Effective Date, or as soon as reasonably practicable thereafter, their respective applications for final allowances of compensation for services rendered and reimbursement of expenses incurred and b. be paid in full in Cash, (1) *first*, from any existing amounts held by a Professional Person as a fee advance, retainer, or security that such Professional Person is authorized to use to satisfy Allowed Professional Fee Claims pursuant to the Interim Compensation Order or the order of the Bankruptcy Court authorizing the retention of such Professional Person (other than a reasonable retainer to cover post-Effective Date work), and (2) *second*, from the Professional Fee Escrow Account, in such aggregate amounts as are Allowed by the Bankruptcy Court or authorized to be paid in accordance with the order(s) relating to or allowing any such Professional Fee Claim. On or prior to the Effective Date, the Debtors shall establish the Professional Fee Escrow Account and, on the Effective Date, fund the Professional Fee Escrow Account with Cash such that the total amount held in the Professional Fee Escrow Account is equal to the sum of each Professional Person's good-faith estimates of its Professional Fee Claims. The procedures for filing objections to Professional Persons' applications for final allowance of compensation for services rendered and expenses incurred shall be set forth in the Confirmation Order.

## 2.    *Priority Tax Claims*

Except to the extent a Holder of an Allowed Priority Tax Claim and the Debtor against which such Claim is asserted agree to different treatment, on the Effective Date or as soon as reasonably practicable thereafter, each Holder of an Allowed Priority Tax Claim shall receive, on account of such Allowed Priority Tax Claim, either Cash in an amount equal to the Allowed amount of such Claim from the Priority Claims Reserve or such other treatment as may satisfy section 1129(a)(9) of the Bankruptcy Code.

## 3.    *DOJ Forfeiture Judgment Claim*

    (i)    **Allowance.**  Pursuant to the Plea Agreement and the DOJ 9019 Order, the DOJ Forfeiture Judgment Claim shall be Allowed in the amount of $2.0 billion on the later of a. the DOJ Conviction Judgment Date and b. the entry by the Bankruptcy Court of the Confirmation Order**.**

    (ii)    **Treatment.**   In full and final satisfaction, settlement, release and discharge of the DOJ Forfeiture Judgment Claim, the Debtors shall make the DOJ Forfeiture Payment within three (3) Business Days following the DOJ Conviction Judgment Date, which DOJ Forfeiture Payment, in combination with the DOJ Forfeiture Judgment Credit, shall satisfy and discharge the DOJ Forfeiture Judgment Claim in full.

## B.    Classification of Claims and Interests

Section 1123 of the Bankruptcy Code provides that a plan must classify the claims and interests of a debtor's creditors and equity interest holders.  In accordance with section 1123 of the Bankruptcy Code, the Plan divides Claims and Interests into Classes and sets forth the treatment for each Class (other than Administrative Expense Claims and Priority Tax Claims, which pursuant to section 1123(a)(1) of the Bankruptcy Code need not be and have not been classified).  The Debtors also are required, under section 1122 of the Bankruptcy Code, to classify Claims against and Interests in the Debtors (except for certain claims classified for administrative convenience) into Classes that contain Claims and Interests that are substantially similar to the other Claims and Interests in such Class.

The Bankruptcy Code also requires that a plan provide the same treatment for each claim or interest of a particular class unless the claim holder or interest holder agrees to a less favorable treatment of its claim or interest.  The Debtors believe that they have complied with such standard.  If the Bankruptcy Court finds otherwise, however, it could deny confirmation of the Plan if the holders of Claims and Interests affected do not consent to the treatment afforded them under the Plan.

A Claim or Interest is placed in a particular Class for all purposes, including voting, confirmation and Distributions under the Plan and under sections 1122 and 1123(a)(1) of the Bankruptcy Code. A Claim or Interest is classified in a particular Class for the purpose of receiving Distributions pursuant to the Plan only to the extent that thesuch Claim or Interest fallsqualifies within the description of that Class and is classified in other Classes to the extent that any portion of the Claim or Interest fallsqualifies within the description of such other Classes. A Claim also is placed; provided that, to the extent any Claim satisfies the definition of a Shareholder Claim, a Co-Defendant Claim or an Other Subordinated Claim, such Claim shall be classified as such, notwithstanding that such Claim may satisfy the definition of another type of Claim. A Claim or Interest is also classified in a particular Class for the purpose of receiving distributions pursuant toDistributions under the Plan only to the extent that such Claim or Interest is an Allowed Claim or Allowed Interest in that Class and such Claim or Interest has not been paidsatisfied, released, or otherwise settled prior to the Effective Date. In no event shall any Holder of an Allowed Claim be entitled to receive payments under the Plan that, in the aggregate, exceed the Allowed amount of such Holder's Claim.

The Debtors believe that the Plan has classified all Claims and Interests in compliance with the provisions of section 1122 of the Bankruptcy Code and applicable case law.  It is possible that a holder of a Claim or Interest may challenge the Debtors' classification of Claims and Interests and that the Bankruptcy Court may find that a different classification is required for the Plan to be confirmed.  If such a situation develops, the Debtors intend, in accordance with the terms of the Plan, to make such permissible modifications to the Plan as may be necessary to permit its confirmation.  Any such reclassification could adversely affect holders of Claims by changing the composition of one or more Classes and the vote required of such Class or Classes for approval of the Plan.  EXCEPT AS SET FORTH IN THE PLAN, UNLESS SUCH MODIFICATION OF CLASSIFICATION MATERIALLY ADVERSELY AFFECTS THE TREATMENT OF A HOLDER OF A CLAIM AND REQUIRES RESOLICITATION, ACCEPTANCE OF THE PLAN BY ANY HOLDER OF A CLAIM OR INTEREST PURSUANT TO THIS SOLICITATION WILL BE DEEMED TO BE A CONSENT TO THE PLAN'S TREATMENT OF SUCH HOLDER OF A CLAIM REGARDLESS OF THE CLASS AS TO WHICH SUCH HOLDER ULTIMATELY IS DEEMED TO BE A MEMBER.

The amount of any impaired Claim that ultimately is Allowed by the Bankruptcy Court may vary from any estimated Allowed amount of such Claim and, accordingly, the total Claims that are ultimately Allowed by the Bankruptcy Court with respect to each impaired Class of Claims may also vary from any estimates contained herein with respect to the aggregate Claims in any impaired Class.  Thus, the actual recovery ultimately received by a particular holder of an Allowed Claim may be adversely or favorably affected by the aggregate amount of Claims Allowed in the applicable Class.  Additionally, any changes to any of the assumptions underlying the estimated Allowed amounts could result in material adjustments to recovery estimates provided herein and/or the actual distribution received by Creditors.  The projected recoveries are based on information available to the Debtors as of the date hereof and reflect the Debtors' views as of the date hereof only.

The classification of Claims and Interests and the nature of distributions to members of each Class are summarized below.  The Debtors believe that the consideration, if any, provided under the Plan to holders of Claims and Interests reflects an appropriate resolution of their Claims and Interests, taking into account the differing nature and priority (including applicable contractual subordination) of such Claims and Interests.  The Bankruptcy Court must find, however, that a number of statutory tests are met before it may confirm the Plan.  Many of these tests are designed to protect the interests of holders of Claims or Interests who are not entitled to vote on the Plan, or do not vote to accept the Plan, but who will be bound by the provisions of the Plan if it is confirmed by the Bankruptcy Court.

## C.    Treatment of Claims and Interests

### 1.    Secured Claims (Class 1)

(i)    **Treatment**: Except to the extent a Holder of an Allowed Secured Claim and the Debtor against which such Claim is asserted agree to different treatment, on the Effective Date, or as soon as reasonably practicable thereafter, each Holder of an Allowed Secured Claim shall receive, on account of such Allowed Claim, a. payment in full in Cash from the

Priority Claims Reserve in accordance with section 506(a) of the Bankruptcy Code, b. Reinstatement of such Allowed Claim pursuant to section 1124 of the Bankruptcy Code or c. such other treatment as may be necessary to render such Claim Unimpaired.

(ii)     **Impairment and Voting**: Secured Claims are Unimpaired. Holders of Secured Claims are conclusively presumed to accept the Plan pursuant to section 1126(f) of the Bankruptcy Code. Therefore, Holders of Secured Claims are not entitled to vote to accept or reject the Plan, and the votes of such Holders will not be solicited with respect to such Secured Claims.

**2.      *Other Priority Claims (Class 2)***

(i)     **Treatment**: Except to the extent a Holder of an Allowed Other Priority Claim and the Debtor against which such Claim is asserted agree to different treatment, on the Effective Date, or as soon as reasonably practicable thereafter, each Holder of an Allowed Other Priority Claim shall receive, on account of such Allowed Claim, a. payment in full in Cash from the Priority Claims Reserve or b. such other treatment consistent with the provisions of section 1129(a)(9) of the Bankruptcy Code.

(ii)     **Impairment and Voting**: Other Priority Claims are Unimpaired. Holders of Other Priority Claims are conclusively presumed to accept the Plan pursuant to section 1126(f) of the Bankruptcy Code. Therefore, Holders of Other Priority Claims are not entitled to vote to accept or reject the Plan, and the votes of such Holders will not be solicited with respect to such Other Priority Claims.

**3.      *Federal Government Unsecured Claims (Class 3)***

(i)     **Allowance of the DOJ Civil Claim and DOJ Criminal Fine Claim**: Pursuant to the DOJ 9019 Order, the DOJ Civil Claim is Allowed in the amount of $2.8 billion. The DOJ Criminal Fine Claim shall be Allowed in the amount of $3.544 billion on the later of a. the DOJ Conviction Judgment Date and b. the entry by the Bankruptcy Court of the Confirmation Order.

(ii)     **Treatment:** On the Effective Date, in full and final satisfaction, settlement, release and discharge of the Allowed Federal Government Unsecured Claims, ~~a. the~~ ~~Allowed~~United States shall receive a. the Initial Federal Government Distribution and b. the MDT Federal Government Claim. The MDT Federal Government Claim shall be payable by the Master Disbursement Trust in the following installments (which installments shall, to the extent applicable, be reduced as a result of prepayments in accordance with Section 5.2(d)(iv) of the Plan): (x) $10 million on July 31, 2022, (y) $10 million on July 31, 2023 and (z) $5

million on July 31, 2024. The Initial Federal Government Distribution and the amounts paid to the United States on account of the MDT Federal Government Claim shall be deemed applied 60% to the DOJ Unsecured Claims and 40% to the Other Federal Agency Claims shall receive treatment in a manner and amount agreed by the Debtors and the DOJ, and b. the DOJ Civil Claim and the DOJ Criminal Fine Claim shall receive treatment in accordance with the DOJ 9019 Order and the DOJ Resolution.

(iii)    **Impairment and Voting:** The Federal Government Unsecured Claims are Impaired. The DOJ isHolders of Federal Government Unsecured Claims are entitled to vote to accept or reject the Plan.

*4.    Non-Federal Domestic Governmental Claims (Class 4)*

(i)    **Treatment:** On the Effective Date, in full and final satisfaction, settlement, release and discharge of the Debtors' obligations in respect of Non-Federal Domestic Governmental Claims, NOAT shall receive a. a. the Initial NOAT Distribution, b. b. the TopCo NOAT Interest and c. c. the MDT NOAT Interest. As of the Effective Date, liability for all Non-Federal Domestic Governmental Claims shall be assumed by NOAT without further act or deed and shall be satisfied solely from funds held by NOAT as and to the extent provided in the NOAT Documents. Distributions in respect of Non-Federal Domestic Governmental Channeled Claims shall be exclusively in the form of Abatement Distributions made by NOAT to Authorized Recipients for Authorized Abatement Purposes, in accordance with the NOAT DocumentsTDP.

(ii)    **Channeling:** OnAs of the Effective Date, pursuant to the Plan, eachin accordance with the Plan and the Master TDP, any and all liability of the Debtors and the other Protected Parties for any and all Non-Federal Domestic Governmental Channeled Claims shall automatically, and without further act, deed or court order, be channeled exclusively to and assumed by NOAT. Each Non-Federal Domestic Governmental Channeled Claim shall be permanently channeled to NOAT, and such Non-Federal Domestic Governmental Channeled Claims shall thereafter be asserted exclusively against NOAT and resolved solely in accordance with the terms, provisions and procedures of the NOAT Documents. Pursuant to the Plan,TDP. The sole recourse of any Person on account of any Non-Federal Domestic Governmental Channeled Claim, whether or not the Holder thereof participated in the Chapter 11 Cases and whether or not such Holder filed a Proof of Claim in the Chapter 11 Cases, shall be to NOAT as and to the extent provided in the NOAT TDP. Holders of Non-Federal Domestic Governmental Channeled Claims are enjoined from filingasserting against any Debtor or other Protected Party any future litigation, Claims or Causes of Action arising out of such Non-Federal Domestic Governmental Channeled ClaimsClaim, and may not proceed in

any manner against any Debtor or other Protected Party on account of
~~such Claims~~any Channeled Claim in any forum whatsoever, including any
state, federal or non-U.S. court or administrative or arbitral forum, and are
required to pursue ~~such~~Non-Federal Domestic Governmental Channeled
Claims exclusively against NOAT, solely as and to the extent provided in
the NOAT ~~Documents~~TDP.

(iii)    **Impairment and Voting**: Non-Federal Domestic Governmental Claims
are Impaired. Holders of Non-Federal Domestic Governmental Claims are
entitled to vote to accept or reject the Plan.

5.    *Tribe Claims (Class 5)*

(i)    **Treatment**: On the Effective Date, in full and final satisfaction,
settlement, release and discharge of the Debtors' obligations in respect of
Tribe Claims, the Tribe Trust shall receive a. the Initial Tribe Trust
Distribution, b. the TopCo Tribe Interest and c. the MDT Tribe Interest.
~~As of the Effective Date, liability for all Tribe Claims shall be assumed by
the Tribe Trust without further act or deed and shall be satisfied solely
from funds held by the Tribe Trust as and to the extent provided in the
Tribe Trust Documents.~~ Distributions in respect of Tribe Claims shall be
exclusively in the form of Abatement Distributions made by the Tribe
Trust to Authorized Recipients for Authorized Abatement Purposes, in
accordance with the Tribe ~~Trust Documents~~TDP.

(ii)    **Channeling:** ~~On~~As of the Effective Date, ~~pursuant to the Plan, each~~in
accordance with the Plan and the Master TDP, any and all liability of the
Debtors and the other Protected Parties for any and all Tribe Channeled
Claims shall automatically, and without further act, deed or court order, be
channeled exclusively to and assumed by the Tribe Trust. Each Tribe
Channeled Claim shall be ~~permanently channeled to the Tribe Trust, and
such Tribe Channeled Claims shall thereafter be~~ asserted exclusively
against the Tribe Trust and resolved solely in accordance with the terms,
provisions and procedures of the Tribe ~~Trust Documents. Pursuant to the
Plan,~~TDP. The sole recourse of any Person on account of any Tribe
Channeled Claim, whether or not the Holder thereof participated in the
Chapter 11 Cases and whether or not such Holder filed a Proof of Claim in
the Chapter 11 Cases, shall be to the Tribe Trust as and to the extent
provided in the Tribe TDP. Holders of Tribe Channeled Claims are
enjoined from ~~filing~~asserting against any Debtor or other Protected Party
any ~~future litigation, Claims or Causes of Action arising out of or related
to such Tribe~~ Channeled ~~Claims~~Claim, and may not proceed in any
manner against any Debtor or other Protected Party on account of ~~such
Claims~~any Channeled Claim in any forum whatsoever, including any
state, federal or non-U.S. court or administrative or arbitral forum, and are
required to pursue ~~such~~Tribe Channeled Claims exclusively against the

Tribe Trust, solely as and to the extent provided in the Tribe ~~Trust Documents~~TDP.

(iii) **Impairment and Voting**: Tribe Claims are Impaired. Holders of Tribe Claims are entitled to vote to accept or reject the Plan.

**6.   *Hospital Claims (Class 6)***

(i) **Treatment**: **O**n the Effective Date, in full and final satisfaction, settlement, release and discharge of the Debtors' obligations in respect of Hospital Claims, the Hospital Trust shall receive a. the Initial Hospital Trust Distribution and b. the MDT Hospital Claim. ~~As of the Effective Date, liability for all Hospital Claims shall be assumed by the Hospital Trust without further act or deed and shall be satisfied solely from funds held by the Hospital Trust as and to the extent provided in the Hospital Trust Documents.~~ Distributions in respect of Hospital Channeled Claims shall be exclusively in the form of Abatement Distributions made by the Hospital Trust to Authorized Recipients for Authorized Abatement Purposes, in accordance with the Hospital ~~Trust Documents~~TDP.

(ii) **Channeling:** ~~On~~As of the Effective Date, ~~pursuant to the Plan, each~~in accordance with the Plan and the Master TDP, any and all liability of the Debtors and the other Protected Parties for any and all Hospital Channeled Claims shall automatically, and without further act, deed or court order, be channeled exclusively to and assumed by the Hospital Trust. Each Hospital Channeled Claim shall be ~~permanently channeled to the Hospital Trust, and such Hospital Channeled Claims shall thereafter be~~ asserted exclusively against the Hospital Trust and resolved solely in accordance with the terms, provisions and procedures of the Hospital ~~Trust Documents. Pursuant to the Plan,~~TDP. The sole recourse of any Person on account of any Hospital Channeled Claim, whether or not the Holder thereof participated in the Chapter 11 Cases and whether or not such Holder filed a Proof of Claim in the Chapter 11 Cases, shall be to the Hospital Trust as and to the extent provided in the Hospital TDP. Holders of Hospital Channeled Claims are enjoined from ~~filing~~asserting against any Debtor or other Protected Party any ~~future litigation, Claims or Causes of Action arising out of or related to such Hospital~~ Channeled ~~Claims~~Claim, and may not proceed in any manner against any Debtor or other Protected Party on account of ~~such Claims~~any Channeled Claim in any forum whatsoever, including any state, federal or non-U.S. court or administrative or arbitral forum, and are required to pursue ~~such~~Hospital Channeled Claims exclusively against the Hospital Trust, solely as and to the extent provided in the Hospital ~~Trust Documents~~TDP.

(iii) **Impairment and Voting**: Hospital Claims are Impaired. Holders of Hospital Claims are entitled to vote to accept or reject the Plan.

7.    *Third-Party Payor Claims (Class 7)*

(i)    **Treatment**: On the Effective Date, in full and final satisfaction, settlement, release and discharge of the Debtors' obligations in respect of Third-Party Payor Claims, the TPP Trust shall receive a. the Initial TPP Trust Distribution and b. the MDT TPP Claim. ~~As of the Effective Date, liability for all Third-Party Payor Claims shall be assumed by the TPP Trust without further act or deed and shall be satisfied solely from funds held by the TPP Trust as and to the extent provided in the TPP Trust Documents.~~ Distributions in respect of Third-Party Payor Channeled Claims shall be exclusively in the form of Abatement Distributions made by the TPP Trust to Authorized Recipients for Authorized Abatement Purposes, in accordance with the TPP ~~Trust Documents~~TDP. For the avoidance of doubt, any payments from the TPP LRP Escrow Account to which LRP Participating TPPs may be entitled under the LRP Agreement shall not be subject to Section 4.7 of the Plan.

(ii)    **Channeling:** ~~On~~As of the Effective Date, ~~pursuant to the Plan, each~~in accordance with the Plan and the Master TDP, any and all liability of the Debtors and the other Protected Parties for any and all Third-Party Payor Channeled Claims shall automatically, and without further act, deed or court order, be channeled exclusively to and assumed by the TPP Trust. Each Third-Party Payor Channeled Claim shall be ~~permanently channeled to the TPP Trust, and such Third-Party Payor Channeled Claims shall thereafter be~~ asserted exclusively against the TPP Trust and resolved solely in accordance with the terms, provisions and procedures of the TPP ~~Trust Documents. Pursuant to the Plan,~~TDP. The sole recourse of any Person on account of any Third-Party Payor Channeled Claim, whether or not the Holder thereof participated in the Chapter 11 Cases and whether or not such Holder filed a Proof of Claim in the Chapter 11 Cases, shall be to the TPP Trust as and to the extent provided in the TPP TDP. Holders of Third-Party Payor Channeled Claims are enjoined from ~~filing~~asserting against any Debtor or other Protected Party any ~~future litigation, Claims or Causes of Action arising out of or related to such Third-Party Payor~~ Channeled ~~Claims~~Claim, and may not proceed in any manner against any Debtor or other Protected Party on account of ~~such Claims~~any Channeled Claim in any forum whatsoever, including any state, federal or non-U.S. court or administrative or arbitral forum, and are required to pursue ~~such~~Third-Party Payor Channeled Claims exclusively against the TPP Trust, solely as and to the extent provided in the TPP ~~Trust Documents~~TDP.

(iii)    **Impairment and Voting**: Third-Party Payor Claims are Impaired. Holders of Third-Party Payor Claims are entitled to vote to accept or reject the Plan.

8.    *Ratepayer Claims (Class 8)*

(i)     **Treatment**: In full and final satisfaction, settlement, release and discharge of all Ratepayer Claims, on the Effective Date or as soon thereafter as reasonably practicable, Effective Date Cash shall be used to make the Truth Initiative Contribution in an amount equal to $6.5 million *less* any attorneys' fees paid in accordance with Section 5.8 of the Plan.

(ii)    **Impairment and Voting**: Ratepayer Claims are Impaired. Holders of Ratepayer Claims are entitled to vote to accept or reject the Plan.

(iii)   **Tax Treatment**: The Truth Initiative Contribution shall be treated, for U.S. federal income tax purposes, as a. the cancellation of all Ratepayer Claims for no consideration and b. a transfer of Cash to the Truth Initiative Foundation by the Debtors.

*9.     NAS Monitoring Claims (Class 9)*

(i)     **Treatment**: On the Effective Date, in full and final satisfaction, settlement, release and discharge of the Debtors' obligations in respect of NAS Monitoring Claims, the NAS Monitoring Trust shall receive a. the Initial NAS Monitoring Trust Distribution and b. the MDT NAS Monitoring Claim. ~~As of the Effective Date, liability for all NAS Monitoring Claims shall be assumed by the NAS Monitoring Trust without further act or deed and shall be satisfied solely from funds held by the NAS Monitoring Trust as and to the extent provided in the NAS Monitoring Trust Document.~~ Distributions in respect of NAS Monitoring Channeled Claims shall be exclusively in the form of Abatement Distributions made by the NAS Monitoring Trust to Authorized Recipients for Authorized Abatement Purposes, in accordance with the NAS Monitoring ~~Trust Documents~~TDP.

(ii)    **Channeling**: ~~On~~As of the Effective Date, ~~pursuant to the Plan, each~~in accordance with the Plan and the Master TDP, any and all liability of the Debtors and the other Protected Parties for any and all NAS Monitoring Channeled Claims shall automatically, and without further act, deed or court order, be channeled exclusively to and assumed by the NAS Monitoring Trust. Each NAS Monitoring Channeled Claim shall be ~~permanently channeled to the NAS Monitoring Trust, and such NAS Monitoring Channeled Claims shall thereafter be~~ asserted exclusively against the NAS Monitoring Trust and resolved solely in accordance with the terms, provisions and procedures of the NAS Monitoring ~~Trust Documents. Pursuant to the Plan,~~TDP. The sole recourse of any Person on account of any NAS Monitoring Channeled Claim, whether or not the Holder thereof participated in the Chapter 11 Cases and whether or not such Holder filed a Proof of Claim in the Chapter 11 Cases, shall be to the NAS Monitoring Trust as and to the extent provided in the NAS Monitoring TDP. Holders of NAS Monitoring Channeled Claims are enjoined from ~~filing~~asserting against any Debtor or other Protected Party

any ~~future litigation, Claims or Causes of Action arising out of or related to such NAS Monitoring~~ Channeled ~~Claims~~Claim, and may not proceed in any manner against any Debtor or other Protected Party on account of ~~such Claims~~any Channeled Claim in any forum whatsoever, including any state, federal or non-U.S. court or administrative or arbitral forum, and are required to pursue ~~such~~NAS Monitoring Channeled Claims exclusively against the NAS Monitoring Trust, solely as and to the extent provided in the NAS Monitoring ~~Trust Documents~~TDP.

(iii)    **Impairment and Voting**: NAS Monitoring Claims are Impaired. Holders of NAS Monitoring Claims are entitled to vote to accept or reject the Plan.

## 10.    *PI Claims (Class 10)*

(i)    ~~**Treatment**~~**PI Trust:** On the Effective Date, in full and final satisfaction, settlement, release and discharge of the Debtors' obligations in respect of PI Claims, the PI Trust shall receive~~a.~~, subject to Section 5.2(h) of the Plan, a. the Initial PI Trust Distribution and ~~b.~~ b. the MDT PI Claim. ~~As of the Effective Date, liability for all PI Claims shall be assumed by the PI Trust without further act or deed and shall be satisfied solely from funds held by the PI Trust as and to the extent provided in the PI~~

(ii)    **[NAS PI Claims (Class 10(a))**

    a.    Treatment: The PI Trust shall deposit the NAS PI Portion into the PI Trust NAS Fund in periodic installments as funds are received by the PI Trust. Distributions in respect of NAS PI Channeled Claims shall be exclusively in the form of Distributions from the PI Trust NAS Fund to Holders of Allowed NAS PI Channeled Claims, in accordance with the NAS PI TDP, and shall be subject to (x) the holdback of amounts in the TPP LRP Escrow Account and payments therefrom to LRP Participating TPPs, in each case as required under and subject to the terms of the LRP Agreement, and (y) the deduction of amounts prepaid to the United States under the United States-PI Claimant Medical Expense Claim Settlement.

    b.    Channeling: As of the Effective Date, in accordance with the Plan and the Master TDP, any and all liability of the Debtors and the other Protected Parties for any and all NAS PI Channeled Claims shall automatically, and without further act, deed or court order, be channeled exclusively to and assumed by the PI Trust. Each NAS PI Channeled Claim shall be asserted exclusively against the PI Trust and resolved solely in accordance with the terms, provisions and procedures of the NAS PI TDP. The sole recourse of any Person on account of any NAS PI Channeled Claim, whether or not the Holder thereof participated in the Chapter 11 Cases and whether or not such Holder filed a Proof of Claim in the Chapter

182

11 Cases, shall be to the PI Trust NAS Fund as and to the extent
provided in the NAS PI TDP. Holders of NAS PI Channeled
Claims are enjoined from asserting against any Debtor or other
Protected Party any Channeled Claim, and may not proceed in any
manner against any Debtor or other Protected Party on account of
any Channeled Claim in any forum whatsoever, including any
state, federal or non-U.S. court or administrative or arbitral forum,
and are required to pursue NAS PI Channeled Claims exclusively
against the PI Trust, solely as and to the extent provided in the
NAS PI TDP.

c.   Impairment and Voting: NAS PI Claims are Impaired. Holders of
NAS PI Claims are entitled to vote to accept or reject the Plan.]

(iii)   **Non-NAS PI Claims (Class 10(b))**

a.   Treatment: The PI Trust ~~Documents~~shall deposit the Non-NAS PI
Portion into the PI Trust Non-NAS Fund in periodic installments
as funds are received by the PI Trust. Distributions in respect of
Non-NAS PI Channeled Claims shall be exclusively in the form of
Distributions from the PI Trust Non-NAS Fund to Holders of
Allowed Non-NAS PI Channeled Claims, in accordance with the
Non-NAS PI TDP, and shall be subject to (x) the holdback of
amounts in the TPP LRP Escrow Account and payments therefrom
to LRP Participating TPPs, in each case as required under and
subject to the terms of the LRP Agreement and (y) the deduction of
amounts prepaid to the United States under the United States-PI
Claimant Medical Expense Claim Settlement.

b.   ~~(ii)~~ Channeling: ~~On~~As of the Effective Date, ~~pursuant to the Plan,~~
~~each~~in accordance with the Plan and the Master TDP, any and all
liability of the Debtors and the other Protected Parties for any and
all Non-NAS PI Channeled Claims shall automatically, and
without further act, deed or court order, be channeled exclusively
to and assumed by the PI Trust. Each Non-NAS PI Channeled
Claim shall be ~~permanently channeled to the PI Trust, and such PI~~
~~Channeled Claims shall thereafter be~~ asserted exclusively against
the PI Trust and resolved solely in accordance with the terms,
provisions and procedures of the ~~PI Trust Documents. Pursuant to~~
~~the Plan,~~Non-NAS PI TDP. The sole recourse of any Person on
account of any Non-NAS PI Channeled Claim, whether or not the
Holder thereof participated in the Chapter 11 Cases and whether or
not such Holder filed a Proof of Claim in the Chapter 11 Cases,
shall be to the PI Trust Non-NAS Fund as and to the extent
provided in the Non-NAS PI TDP. Holders of Non-NAS PI
Channeled Claims are enjoined from ~~filing~~asserting against any
Debtor or other Protected Party any ~~future litigation, Claims or~~

~~Causes of Action arising out of or related to such PI~~ Channeled ~~Claims~~Claim, and may not proceed in any manner against any Debtor or other Protected Party on account of ~~such Claims~~any Channeled Claim in any forum whatsoever, including any state, federal or non-U.S. court or administrative or arbitral forum, and are required to pursue ~~such~~Non-NAS PI Channeled Claims exclusively against the PI Trust, solely as and to the extent provided in the Non-NAS PI ~~Trust Documents~~TDP.

c.      Impairment and Voting: Non-NAS PI Claims are Impaired. Holders of Non-NAS PI Claims are entitled to vote to accept or reject the Plan.

(iv)      ~~(iii)~~ **Canadian Patient Settlement**: Pursuant to the Canadian Patient Settlement Stipulation, if the Canadian Patient Settlement Agreement is approved by the Saskatchewan Court of Queen's Bench and the funds in the Canadian Patient Settlement Trust are released for the benefit of Holders of Settled Canadian Patient Claims a. no Holder of a Settled Canadian Patient Claim that filed a Proof of Claim shall receive a recovery in respect of such Settled Canadian Patient Claim from any source other than the Patient Settlement Payment (as defined in the Canadian Patient Claim Settlement Stipulation) made from the Canadian Patient Settlement Trust and b. in order to receive a recovery in respect of any other Claim for which a Proof of Claim was filed by a Holder of a Settled Canadian Patient Claim, such Holder shall have the burden of proving that such Proof of Claim is not in respect of a Settled Canadian Patient Claim that was released and discharged pursuant to the Canadian Patient Claim Settlement Stipulation and such Holder has not received any recovery from the Canadian Patient Settlement Trust on account of such Claim. No Distributions shall be made on account of any Claims that may constitute Settled Canadian Patient Claims unless and until (x) the Saskatchewan Court of Queen's Bench approves the Canadian Patient Settlement Agreement and all funds in the Canadian Patient Settlement Trust have been distributed to Holders of Settled Canadian Patient Claims in accordance with the Canadian Patient Settlement Agreement or (y) the Saskatchewan Court of Queen's Bench denies the Canadian Patient Settlement Agreement.

~~(iv) **Impairment and Voting**: PI Claims are Impaired. Holders of PI Claims are entitled to vote to accept or reject the Plan.~~

11.      *Avrio General Unsecured Claims (Class 11(a))*

(i)      **Treatment**: Except to the extent a Holder of an Allowed Avrio General Unsecured Claim and Avrio Health L.P. agree to different treatment, on the Effective Date, or as soon as reasonably practicable thereafter, each

Holder of an Allowed Avrio General Unsecured Claim shall receive, on account of such Allowed Claim, payment in full in Cash.

(ii)    **Impairment and Voting**: Avrio General Unsecured Claims are Unimpaired. Holders of Avrio General Unsecured Claims are conclusively presumed to accept the Plan pursuant to section 1126(f) of the Bankruptcy Code. Therefore, Holders of Avrio General Unsecured Claims are not entitled to vote to accept or reject the Plan, and the votes of such Holders will not be solicited.

## 12.    *Adlon General Unsecured Claims (Class 11(b))*

(i)    **Treatment**: Except to the extent a Holder of an Allowed Adlon General Unsecured Claim and Adlon Therapeutics L.P. agree to different treatment, on the Effective Date, or as soon as reasonably practicable thereafter, each Holder of an Allowed Adlon General Unsecured Claim shall receive, on account of such Allowed Claim, payment in full in Cash.

(ii)    **Impairment and Voting**: Adlon General Unsecured Claims are Unimpaired. Holders of Adlon General Unsecured Claims are conclusively presumed to accept the Plan pursuant to section 1126(f) of the Bankruptcy Code. Therefore, Holders of Adlon General Unsecured Claims are not entitled to vote to accept or reject the Plan, and the votes of such Holders will not be solicited.

## 13.    *Other General Unsecured Claims (Class 11(c))*

(i)    **Treatment**: All Other General Unsecured Claims are Disputed. Except to the extent a Holder of an Allowed Other General Unsecured Claim and the Debtor against which such Claim is asserted agree to different treatment, after the Effective Date upon the Allowance of such Claim in accordance with Article VII of the Plan, each Holder of an Allowed Other General Unsecured Claim shall receive, on account of such Allowed Claim, such Holder's Pro Rata Share of the Other General Unsecured Claim Cash, up to payment in full of such Allowed Claim.

(ii)    **Impairment and Voting**: Other General Unsecured Claims are Impaired. Holders of Other General Unsecured Claims are entitled to vote to accept or reject the Plan.

## 14.    *Intercompany Claims (Class 12)*

(i)    **Treatment:** Except as otherwise provided in the NewCo Transfer Agreement or the Restructuring Steps Memorandum, on or after the Effective Date, Intercompany Claims shall be, (x) in the case of Intercompany Claims held by a Liquidating Debtor against another Liquidating Debtor, at the discretion of the Debtors (or the Plan Administration Trustee, as applicable), (y) in the case of Intercompany

Claims held by a Transferred Debtor against another Transferred Debtor, at the discretion of NewCo and (z) otherwise, at the discretion of the Debtors (or the Plan Administration Trustee, as applicable) with the consent (not to be unreasonably withheld, conditioned or delayed) of the Governmental Consent Parties:

a.      Reinstated; or

b.      Compromised and settled or canceled and extinguished with no distribution on account thereof.

(ii)    **Impairment and Voting**: Intercompany Claims are either Unimpaired or Impaired with no distribution on account thereof. Holders of Intercompany Claims are either conclusively presumed to accept the Plan pursuant to section 1126(f) of the Bankruptcy Code or deemed to reject the Plan pursuant to section 1126(g) of the Bankruptcy Code. Therefore, Holders of Intercompany Claims are not entitled to vote to accept or reject the Plan, and the votes of such Holders will not be solicited with respect to such Intercompany Claims.

## 15.    *Shareholder Claims (Class 13)*

(i)     **Treatment:** Holders of Shareholder Claims shall not receive or retain any property on account of such Claims. As of the Effective Date, in accordance with the terms of and except as otherwise expressly provided in the Shareholder Settlement Agreement, the Shareholder Released Parties shall release, all Shareholder Claims held by such Shareholder Released Parties and shall not receiveshall automatically, and without further act, deed or court order, be deemed to have been released without any distribution on account thereof, and such Claims shall be of no further force or effect.

(ii)    **Impairment and Voting**: Shareholder Claims are Impaired. Holders of Shareholder Claims are deemed to reject the Plan pursuant to section 1126(g) of the Bankruptcy Code. Therefore, Holders of Shareholder Claims are not entitled to vote to accept or reject the Plan, and the votes of such Holders will not be solicited with respect to such Shareholder Claims.[79][124]

## 16.    *[Co-Defendant Claims (Class 14)*

(i)     **Treatment**: All Co-Defendant Claims are Disputed. Each Allowed and the Debtors shall seek Disallowance of such Claims pursuant to a separate motion to be filed by the Debtors with the Bankruptcy Court. If any Co-

---

[79][124]   Although Holders of Shareholder Claims are deemed to reject the Plan pursuant to section 1126(g) of the Bankruptcy Code, the Shareholder Payment Parties, in all capacities (including as Holders of Claims), have agreed to support the Plan pursuant to the Shareholder Settlement Agreement.

Defendant Claim is ultimately Allowed, such Claim shall be subordinated pursuant to the Plan and section 509(c) and/or section 510 of the Bankruptcy Code. As a result of such subordination or the Disallowance of such Claims pursuant to a separate motion to be filed by the Debtors with the Bankruptcy Court, Holders of Co-Defendant Claims shall not receive or retain any property on account of such Claims. As of the Effective Date, all Co-Defendant Claims shall be released in accordance with Section 8.4 of the Plan or otherwise deemed expunged, released and extinguished without further action by or order of the Bankruptcy Court with no distribution on account thereof, and shall be of no further force or effect. To the extent necessary, the Confirmation Order shall contain findings supporting the conclusions providing for such subordination of such Claims for the purposes of Distribution on the terms set forth in Section 4.16 of the Plan. Subject to the Solicitations Procedure Order, each Holder of a Co-Defendant Claim shall be provided a notice informing each such Holder of the proposed treatment of such Claim under the Plan, and affording such Holder the opportunity to object to such treatment or to the subordination of such Claim.

(ii)    **Impairment and Voting**: Co-Defendant Claims are Impaired. Holders of Co-Defendant Claims are deemed to reject the Plan pursuant to section 1126(g) of the Bankruptcy Code. Therefore, Holders of Co-Defendant Claims are not entitled to vote to accept or reject the Plan, and the votes of such Holders will not be solicited with respect to such Co-Defendant Claims.][80]

## 17.    *Other Subordinated Claims (Class 15)*

(i)    **Treatment**: Other Subordinated Claims are subordinated pursuant to the Plan and section 509(c) and/or 510 of the Bankruptcy Code and/or other applicable law. Holders of Other Subordinated Claims shall not receive or retain any property under the Plan on account of such Claims. As of the Effective Date, Other Subordinated Claims shall be deemed expunged, released and extinguished without further action by or order of the Bankruptcy Court, and shall be of no further force or effect.

(ii)    **Impairment and Voting**: Other Subordinated Claims are Impaired. Holders of Other Subordinated Claims are deemed to reject the Plan pursuant to section 1126(g) of the Bankruptcy Code. Therefore, Holders of Other Subordinated Claims are not entitled to vote to accept or reject the Plan, and the votes of such Holders will not be solicited with respect to such Other Subordinated Claims.

---

[80]  The treatment of Co-Defendant Claims, including the treatment of any Estate Causes of Action against Holders of Co-Defendant Claims and other matters, remains subject to adjustment based on the outcome of ongoing discussions and negotiations among the Debtors, the Governmental Consent Parties and the Holders of Co-Defendant Claims; *provided* that the treatment of Co-Defendant Claims, including the treatment of any Estate Causes of Action against Holders of Co-Defendant Claims shall be subject to the consent of the Governmental Consent Parties.

18.    *PPLP Interests (Class 16)*

(i)    **Treatment**: In accordance with the terms of the Shareholder Settlement Agreement, Holders of PPLP Interests shall relinquish such Interests and shall not receive or retain any property under the Plan on account of such Interests. As of the PPLP Dissolution Date, all PPLP Interests shall be deemed surrendered, canceled and/or redeemed without further action by or order of the Bankruptcy Court, and shall be of no further force or effect.

(ii)    **Impairment and Voting**: PPLP Interests are Impaired. Holders of PPLP Interests are deemed to reject the Plan pursuant to section 1126(g) of the Bankruptcy Code. Therefore, Holders of PPLP Interests are not entitled to vote to accept or reject the Plan, and the votes of such Holders will not be solicited with respect to such PPLP Interests.

19.    *PPI Interests (Class 17)*

(i)    **Treatment**: In accordance with the terms of the Shareholder Settlement Agreement, Holders of PPI Interests shall relinquish such Interests and shall not receive or retain any property under the Plan on account of such Interests. As of the Effective Date, PPI Interests shall be deemed surrendered, canceled and/or redeemed without further action by or order of the Bankruptcy Court, and shall be of no further force or effect.

(ii)    **Impairment and Voting**: PPI Interests are Impaired. Holders of PPI Interests are deemed to reject the Plan pursuant to section 1126(g) of the Bankruptcy Code. Therefore, Holders of PPI Interests are not entitled to vote to accept or reject the Plan, and the votes of such Holders will not be solicited with respect to such PPI Interests.

20.    *Intercompany Interests (Class 18)*

(i)    **Treatment**: Except as otherwise provided in the NewCo Transfer Agreement or the Restructuring Steps Memorandum, on the Effective Date, Intercompany Interests shall be:

a.    with respect to Intercompany Interests in any Transferred Debtor held by PPLP, Reinstated and transferred to NewCo (or one of its Subsidiaries) in accordance with the NewCo Transfer Agreement;

b.    with respect to Intercompany Interests in any Transferred Debtor held by another Transferred Debtor, Reinstated or otherwise treated in accordance with the NewCo Transfer Agreement; and

c.    with respect to Intercompany Interests in any Debtor that is not a Transferred Debtor, Reinstated solely for administrative convenience until canceled when such Debtor is dissolved or merged out of existence by the Plan Administration Trustee.

(ii)  **Impairment and Voting**: Intercompany Interests are either Unimpaired or Impaired with no distribution on account thereof. Holders of Intercompany Interests are either conclusively presumed to accept the Plan pursuant to section 1126(f) of the Bankruptcy Code or deemed to reject the Plan pursuant to section 1126(g) of the Bankruptcy Code. Therefore, Holders of Intercompany Interests are not entitled to vote to accept or reject the Plan, and the votes of such Holders will not be solicited with respect to such Intercompany Interests.

### 21.  *Debtors' Rights with Respect to Unimpaired Claims*

Except as otherwise provided in the Plan, nothing under the Plan shall affect the rights of the Debtors with respect to an Unimpaired Claim, including all rights with respect to legal and equitable defenses to, or setoffs or recoupments against, any such Unimpaired Claims.

## D.  **Means for Implementation**

### 1.  *Restructuring Transactions*

On or before the Effective Date or as soon as reasonably practicable thereafter, the Debtors may take all actions consistent with the Plan as may be necessary or appropriate to effect any transaction described in, approved by, contemplated by or necessary to effectuate the Restructuring Transactions under and in connection with the Plan, including (i) the execution and delivery of all appropriate agreements or other documents of merger, consolidation, sale, restructuring, conversion, disposition, transfer, dissolution or liquidation containing terms that are consistent with the Plan; (ii) the execution and delivery of appropriate instruments of transfer, assignment, assumption or delegation of any Asset, property, interest, right, liability, debt or obligation on terms consistent with the Plan; (iii) the filing of appropriate certificates or articles of organization, limited partnership, incorporation, reincorporation, merger, consolidation, conversion or dissolution pursuant to applicable law; (iv) the execution, delivery, filing, recordation and issuance of any other documents, instruments or agreements in connection with the Restructuring Transactions and (v) any transactions described in the Restructuring Steps Memorandum.

### 2.  *Plan Settlements*

(i)  As further described in the Disclosure Statement, the provisions of the Plan (including the release and injunctive provisions contained in Article X of the Plan) and the other Plan Documents constitute a good faith compromise and settlement among the Debtors, Supporting Claimants, the Shareholder ~~Released~~Payment Parties and certain other participants in the Mediation of Claims and controversies among such parties reached in connection with the Mediation and otherwise, which such compromise and settlement is necessary and integral to the Plan and the Plan Documents and the success of these Chapter 11 Cases. The Debtors, the Supporting Claimants and the Shareholder ~~Released~~Payment Parties believe the treatment provided in respect of Claims against and

Interests in the Debtors and the treatment of competing Classes of Claims is fair and appropriate only when combined with the distribution scheme, including without limitation all Distributions to be made under the Plan, and the release, injunction and all other provisions contained in the Plan, all of which are material aspects of the Plan.

(ii)     The Plan, including the explanation set forth in the Disclosure Statement, and the Plan Documents shall be deemed a motion to approve the Plan Settlements and the good faith compromise and settlement of all of the Claims, Interests and controversies described in the foregoing Section 5.2(a) pursuant to Bankruptcy Rule 9019, and entry of the Confirmation Order shall constitute the Bankruptcy Court's approval of the Plan Settlements under section 1123 of the Bankruptcy Code and Bankruptcy Rule 9019, as well as a finding by the Bankruptcy Court that the Plan Settlements are fair, equitable, reasonable and in the best interests of the Debtors and their Estates.

(iii)    The Plan, the Plan Settlement, the Plan Documents and the Confirmation Order constitute a good faith compromise and settlement of Claims, Interests and controversies based upon the unique circumstances of these Chapter 11 Cases (such as the total distributable value available, the unique facts and circumstances relating to these Debtors and the need for an accelerated resolution without additional avoidable litigation) such that a. none of the foregoing documents, nor any materials used in furtherance of Plan confirmation (including, but not limited to, the Disclosure Statement, and any notes related to, and drafts of, such documents and materials), may be offered into evidence, deemed an admission, used as precedent or used by any party or Person in any context whatsoever beyond the purposes of the Plan, in any other litigation or proceeding, except as necessary, and as admissible in such context, to enforce their terms and to evidence the terms of the Plan and the Plan Documents before the Bankruptcy Court or any other court of competent jurisdiction and b. any ~~election~~obligation by any party, in furtherance of such compromise and settlement, to not exercise rights that might be otherwise available to such party shall be understood to be an ~~election made~~obligation solely in connection with this specific compromise and settlement and to be inapplicable in the absence of such compromise and settlement. The Plan, the Plan Settlement, the Plan Documents and the Confirmation Order will be binding as to the matters and issues described therein, but will not be binding with respect to similar matters or issues that might arise in any other litigation or proceeding in which none of the Debtors or any other Protected Party is a party, provided that such litigation or proceeding is not to enforce or evidence the terms of the Plan, the Plan Settlement, the Plan Documents or the Confirmation Order. Any Person's support of, or position or action taken in connection with, the Plan, the Plan Settlement, the Plan Documents and the Confirmation Order may differ from such Person's position or testimony in any other litigation

or proceeding not in connection with these Chapter 11 Cases. Further, and, as all parties to the Mediation agreed, the Plan Settlement is not intended to serve as an example for, or represent the parties' respective positions or views concerning, any other chapter 11 cases relating to opioids, nor shall it be used as precedent by any Person or party in any other such chapter 11 cases or in any other proceeding, situation or litigation.

(iv) **Private Entity Settlements.** On the Effective Date, the Private Creditor Trusts shall receive their respective Initial Private Creditor Trust Distributions and their respective MDT Private Claims. The MDT Private Claims shall entitle the Private Creditor Trusts to the payments and other benefits set forth below.[81]

a. The Master Disbursement Trust shall make payments of the MDT Private Claims on each MDT Distribution Date in the amount then due and owing to each Private Creditor Trust. The MDT Private Claims shall be payable by the Master Disbursement Trust in installments in the amounts and on the MDT Distribution Dates set forth below, which installments shall, to the extent applicable, be reduced as a result of prepayments in accordance with Section 5.2(d)(iv) of the Plan:

(1) The MDT Hospital Claim shall be payable in the following installments: (A) $35 million on July 30~~31~~, 2022, (B) $45 million on July 30~~31~~, 2023, (C) $45 million on July 30~~31~~, 2024, (D) $50 million on July 30~~31~~, 2025 and (E) $50 million on July 30~~31~~, 2026.

(2) The MDT TPP Claim shall be payable in the following installments: (A) $121 million on the July 30~~31~~, 2022, (B) $121 million on July 30~~31~~, 2023 and (C) $122 million on July 30~~31~~, 2024.

(3) The MDT NAS Monitoring Claims shall be payable in the following installments: (A) $24 million on July 30~~31~~, 2022 and (B) $35 million on July 30~~31~~, 2023.

(4) The MDT PI Claim shall be payable in the following installments: (A) $200 million on July 30~~31~~, 2024, (B) $100 million on July 30~~31~~, 2025 and (C) $100 million on July 30~~31~~, 2026. In addition, in the event the aggregate MDT Bermuda-Form Insurance Proceeds (whether received before, on or after July 30~~31~~, 2026) exceed $400 million, the PI Trust shall be entitled to an incremental payment in the amount of the lesser of (x) the

---

[81] ~~Subject to adjustment based on ongoing negotiations with respect to the Shareholder Settlement Agreement regarding the timing of payments and other provisions thereunder.~~

aggregate amount of the MDT Bermuda-Form Insurance
Proceeds in excess of $400 million and (y) $50 million
(which shall be in addition to, and not in reduction or
substitution of, any of the installment payments set forth in
the previous sentence), payable within thirty (30) days of
receipt of any such MDT Bermuda-Form Insurance
Proceeds, in accordance with Section 5.2(d)(iv)(A) of the
Plan.

b.      Upon the commencement of an MDT Reserve Period, the MDT
Trustees shall provide notice thereof to NewCo, TopCo and each
Creditor Trust and shall establish and fund the MDT Claims
Reserve in an amount equal to the MDT Claims Reserve Funding
Amount. For so long as such MDT Reserve Period is continuing,
the MDT Claims Reserve shall remain in place and no TopCo
Distributions or Public Creditor Trust Distributions, nor any
repayments by the Master Disbursement Trust to NewCo or
TopCo, shall be made until the MDT Operating Reserve and the
MDT Claims Reserve are fully funded in the amounts required at
such time. For the avoidance of doubt, notwithstanding the
occurrence and continuation of an MDT Reserve Period, so long as
the MDT Operating Reserve and the MDT Claims Reserve are
fully funded, the Master Disbursement Trust and TopCo shall
continue to make Public Creditor Trust Distributions from MDT
Excess Cash and TopCo Excess Cash, respectively, and NewCo
shall continue to make TopCo Distributions from NewCo Excess
Cash, in each case, solely in accordance with Section 5.2(e) of the
Plan.

c.      NewCo shall guarantee the obligations of the Master Disbursement
Trust to make payments to the Private Creditor Trusts on account
of the MDT Claims in accordance with Section 5.2(d)(i) of the
Plan, and NewCo and TopCo shall make payments to the Master
Disbursement Trust as set forth below in accordance with the
NewCo Credit Support Agreement.

(1)     Within five (5) Business Days following the receipt by
NewCo from the MDT Trustees of notice of the
commencement of an MDT Reserve Period and on each
NewCo Distribution Date thereafter, for so long as such
MDT Reserve Period is continuing, NewCo shall pay to the
Master Disbursement Trust all NewCo Available Cash up
to an aggregate amount necessary to ensure that the MDT
Operating Reserve and the MDT Claims Reserve are fully
funded at the amounts required as of that date. The amounts
required to be paid by NewCo to the Master Disbursement
Trust under the Section 5.2(d)(iii)(A) of the Plan shall be

192

limited to the extent of NewCo Available Cash; *provided* that, in the event there is a deficiency of funding in the MDT Claims Reserve for a period of eighteen (18) months during the continuation of an MDT Reserve Period, the Master Disbursement Trust shall be entitled to accelerate its claims under the NewCo Credit Support Agreement and exercise remedies.

(2)     Irrespective of whether there is an MDT Reserve Period in effect, until the payment in full in Cash of the MDT Claims, TopCo and NewCo shall pay to the Master Disbursement Trust an amount equal to 100% of the MDT Distributable Sale Proceeds within five (5) Business Days after the receipt thereof; *provided* that (A) MDT Distributable Sale Proceeds of less than $10 million (in the aggregate for TopCo and NewCo) shall be carried forward and accumulated and no distributions to the Master Disbursement Trust on account thereof shall be required until the aggregate amount of the accumulated MDT Distributable Sale Proceeds so received following the Effective Date equals or exceeds such amount and (B) the amounts payable to the Master Disbursement Trust under the Section 5.2(d)(iii)(B) of the Plan shall not exceed the aggregate outstanding amount owed on account of the MDT Claims (regardless of whether some amounts have yet fallen due). Any non-Cash proceeds in respect of the sale of any Asset of TopCo or any of its Subsidiaries shall be held and not distributed by TopCo or such Subsidiary, as applicable, until the payment in full of the MDT Claims or the disposition of such non-Cash proceeds for Cash; *provided* that the MDT Distributable Sale Proceeds of such non-Cash proceeds shall be subject to the Section 5.2(d)(iii)(B) of the Plan. The Master Disbursement Trust shall apply all amounts received under the Section 5.2(d)(iii)(B) of the Plan in accordance with Section 5.2(d)(iv)(B) of the Plan.

d.     The Master Disbursement Trust shall make prepayments of the MDT Claims from the amounts and in the manner set forth below.

(1)     MDT Bermuda-Form Insurance Proceeds shall be applied toward the prepayment of remaining installments on the MDT PI Claim (as set forth in Section 5.2(d)(i)(D)(I)–(III) of the Plan) in chronological order by installment payment maturity date until the MDT PI Claim is paid in full and, if any amounts remain, to pay the incremental amounts due to the PI Trust under clauses (x) and (y) of

Section 5.2(d)(i)(D) of the Plan, in each case, in the following manner: (A) for the MDT Bermuda-Form Insurance Proceeds received by the Debtors or the Master Disbursement Trust on or prior to the Effective Date, the Debtors or the Master Disbursement Trust shall pay on the Effective Date 100% of such MDT Bermuda-Form Insurance Proceeds to the PI Trust as part of the Initial PI Trust Distribution, subject to Section 5.2(h) of the Plan and (B) for any MDT Bermuda-Form Insurance Proceeds received by the Master Disbursement Trust after the Effective Date, the Master Disbursement Trust shall pay to the PI Trust, subject to Section 5.2(h) of the Plan, 100% of such MDT Bermuda-Form Insurance Proceeds not later than thirty (30) days after the date of receipt thereof by the Master Disbursement Trust (or, if an Escrow Period is then in effect, the next Business Day following the termination thereof).

(2)     If on any date the Master Disbursement Trust receives MDT Distributable Sale Proceeds, then such MDT Distributable Sale Proceeds shall be applied not later than ten (10) Business Days after such date (or, if an Escrow Period is then in effect, the next Business Day following the termination thereof) to prepay any remaining installments of the MDT Claims until paid in full. Such prepayments shall be (A) allocated according to the MDT Distribution Date on which remaining installments of the MDT Claims are due in chronological order of maturity (such that all remaining installments of the MDT Claims due on a particular scheduled MDT Distribution Date shall be paid in full before any amounts are allocated to installments of the MDT Claims due on any subsequent scheduled MDT Distribution Date) and (B) applied to the remaining installments of the MDT Claims due on a particular MDT Distribution Date on a pro rata basis according to the proportion that the outstanding amount due on each MDT Claim on such MDT Distribution Date bears to the aggregate outstanding amount due on all MDT Claims on such MDT Distribution Date.

(3)     If on any date the Master Disbursement Trust receives a Shareholder Prepayment, then each Net Prepaid Settlement Amount shall be applied not later than ten (10) Business Days after such date to prepay the remaining installments of the MDT Claims due on the scheduled MDT Distribution Date that immediately follows the ~~originally~~ scheduled SSA Payment Date of such Net Prepaid

Settlement Amount according to each ~~Private Creditor Trust's~~MDT Claim's Proportionate Settlement Prepayment Share of such Net Prepaid Settlement Amount.

(v)    **Non-Federal Public Entity Settlements.** On the Effective Date, NOAT and the Tribe Trust shall receive their respective Initial Public Creditor Trust Distributions, MDT Interests and TopCo Interests. The MDT Interests and the TopCo Interests shall entitle NOAT and the Tribe Trust to the payments and other benefits set forth below.[82]

a.    ~~On~~Subject to Section 5.2(e)(iv) of the Plan, on each MDT Distribution Date, the Master Disbursement Trust shall make Public Creditor Trust Distributions from all MDT Excess Cash in accordance with Section 5.2(e)(iii) of the Plan.; _provided_ that, solely on the MDT Distribution Date occurring on July 31, 2023, if no MDT Reserve Period is then in effect, the MDT Trustees shall have discretion to hold back up to $25 million of MDT Excess Cash only if, and only to the extent, they reasonably believe in good faith, after analyzing expected assets of the MDT (including on account of the NewCo Credit Support Agreement), that such holdback is necessary to address any expected funding deficiency on the MDT Distribution Date occurring on July 31, 2024.

b.    Subject to Section 5.2(e)(iv) of the Plan, (1) ~~On~~on each NewCo Distribution Date, (A) NewCo shall make a TopCo Distribution from all NewCo Excess Cash and (B) TopCo shall make Public Creditor Trust Distributions from all TopCo Excess Cash in accordance with Section 5.2(e)(iii) of the Plan and (2) upon the receipt by NewCo or TopCo of any repayments from the Master Disbursement Trust pursuant to Section 5.2(f)(i)(D) of the Plan, (A) NewCo shall promptly make a TopCo Distribution from all such repayments and (B) TopCo shall promptly make a Public Creditor Trust Distribution from all such repayments and such TopCo Distributions in accordance with Section 5.2(e)(iii) of the Plan.

c.    All Public Creditor Trust Distributions shall be allocated between NOAT and the Tribe Trust as follows: (1) _first_, until the aggregate amount of Public Creditor Trust Distributions equals $50 million, 100% to the Tribe Trust; (2) _second_, until the aggregate cumulative amount of Public Creditor Trust Distributions equals $1 billion, 100% to NOAT; (3) _third_, until the aggregate cumulative amount of Public Creditor Trust Distributions equals $3 billion, 2.935% to the Tribe Trust and 97.065% to NOAT; (4) _fourth_, until the

---

[82] ~~Subject to adjustment based on ongoing negotiations with respect to the Shareholder Settlement Agreement regarding the timing of payments and other provisions thereunder.~~

aggregate cumulative Public Creditor Trust Distributions equals $5 billion, 2.8125% to the Tribe Trust and 97.1875% to NOAT; and (5) *thereafter*, with respect to all additional Public Creditor Trust Distributions, 3% to the Tribe Trust and 97% to NOAT.

d.    Until the payment in full in Cash of the MDT Claims, all Public Creditor Trust Distributions, other than the Initial Public Creditor Trust Distributions, and TopCo Distributions shall be made (1) only on the dates set forth in Section 5.2(e)(i) and (ii) of the Plan; (2) only from amounts constituting MDT Excess Cash, NewCo Excess Cash or TopCo Excess Cash, as applicable, and (3) except as set forth in Section 5.2(e)(ii)(B) of the Plan, on no less than ten (10) Business Days' notice to the Private Creditor Trusts and, except for Public Creditor Trust Distributions made by the Master Disbursement Trust, the Master Disbursement Trust; *provided* that, irrespective of such notice, no Public Creditor Trust Distributions or TopCo Distributions shall be made (x) upon the commencement and during the continuation of an MDT Reserve Period unless the MDT Operating Reserve and the MDT Claims Reserve have been fully funded or (y) upon the commencement and during the continuation of an Escrow Period.

(vi)    **Priority Waterfalls.**

a.    MDT Priority Waterfall. On each MDT Distribution Date, all Cash and cash equivalents of the Master Disbursement Trust (other than any amounts subject to distribution in accordance with Section 5.2(d)(iv)(A) and (B) of the Plan) shall be applied as follows: (1) *first*, to fund the MDT Operating Reserve in an amount determined by the MDT Trustees; (2) *second*, to pay all outstanding amounts then due or falling due within the next thirty-one (31) days on account of the MDT Claims, including any amounts payable in accordance with Section 5.2(d)(iv)(C) of the Plan; (3) *third*, solely during an MDT Reserve Period, to fund the MDT Claims Reserve in an amount equal to the MDT Claims Reserve Funding Amount as of such date; (4) *fourth*, to NewCo or TopCo, as applicable, for the repayment of the amounts received by the Master Disbursement Trust from NewCo or TopCo pursuant to their respective obligations under the NewCo Credit Support Agreement in accordance with Section 5.2(d)(iii) of the Plan; *provided* that NewCo shall promptly make a TopCo Distribution from all such repayments and TopCo shall promptly make Public Creditor Trust Distributions from all such repayments and such TopCo Distributions; and (5) *fifth*, as Public Creditor Trust Distributions in respect of the MDT Interests.

196

b.    <u>NewCo Priority Waterfall</u>. On each NewCo Distribution Date, all Cash and cash equivalents of NewCo and its Subsidiaries (other than MDT Distributable Sale Proceeds) shall be applied as follows: (1) *first*, to fund the current payment of or reserve for, all NewCo Operating Expenses that are current, reasonably forecasted or budgeted or included in a reasonable reserve for contingent liabilities, including any amounts required to satisfy any deficiency of funding in the Wind-Up Reserve; (2) second, to the Master Disbursement Trust in an amount required to be paid at that time on account of NewCo's obligations under the NewCo Credit Support Agreement in accordance with <u>Section 5.2(d)(iii)(A)</u> of the Plan, if any, including any amounts required to satisfy any shortfall in funding of the MDT Operating Reserve and the MDT Claims Reserve, if applicable; and (3) *third*, as a TopCo Distribution in respect of the NewCo Interest.

c.    <u>TopCo Priority Waterfall</u>. On each NewCo Distribution Date, after the receipt by TopCo of any amounts described in <u>Section 5.2(f)(ii)(C)</u> of the Plan (if applicable), all Cash and cash equivalents of TopCo (other than MDT Distributable Sale Proceeds) shall be applied as follows: (1) *first*, to fund the current payment of or reserve for, all TopCo Operating Expenses that are current, reasonably forecasted or budgeted or included in a reasonable reserve for contingent liabilities; and (2) *second*, as Public Creditor Trust Distributions in respect of the TopCo Interests.

(vii)    **Shareholder Settlement.** On or before the Effective Date, the Debtors and the Shareholder Payment Parties shall enter into the Shareholder Settlement Agreement. Pursuant to the Shareholder Settlement Agreement and the Plan, in exchange for the release and channeling of the Shareholder Released Claims pursuant to the Shareholder Releases and the Channeling Injunction issued for the benefit of the Shareholder Released Parties as set forth in <u>Sections 10.7</u> and <u>10.8</u> of the Plan and the other agreements set forth in the Shareholder Settlement Agreement, a. the Shareholder Payment Parties shall pay the Shareholder Settlement Amount to the Master Disbursement Trust in the amount, on the dates and pursuant to the terms set forth in the Shareholder Settlement Agreement, b. b. the Shareholder Claims shall be deemed released on the Effective Date pursuant to <u>Section 4.15</u> of the Plan, c. c. the MDT Shareholder Insurance Rights shall be transferred to the Master Disbursement Trust in accordance with Section 5.6(j) of the Plan; d. the Shareholder Payment Parties have agreed to support the Plan and d. e. the Shareholder Payment Parties have provided the other agreements and consideration provided byset forth in the Shareholder PartiesSettlement Agreement, in each case as more fully set forth in, and subject to the terms and conditions of, the Shareholder Settlement Agreement. The Master Disbursement Trust shall distribute all

proceeds of the MDT Shareholder Rights, including the Shareholder Settlement Amount, in accordance with the Plan, including Section 5.2(d)–(f) of the Planthereof.

(viii)    **United States-PI Claimant Medical Expense Claim Settlement.** Pursuant to the United States-PI Claimant Medical Expense Claim Settlement:

a.    On the Effective Date of the Plan, the PI Trust shall be deemed, without further action of the Bankruptcy Court or the PI Trust, to have irrevocably assigned to the United States the PI Trust's right to receive $26 million from the Master Disbursement Trust, which amount shall be paid by the Debtors or the Master Disbursement Trust, as applicable, to the United States in installments equal to 3.7143% of the amounts otherwise distributable to the PI Trust under the Plan in the form of the Initial PI Trust Distribution and payments made on account of the MDT PI Claim, and on the same distribution schedule as such distributions to the PI Trust, up to a maximum of $26 million.  Such payments to the United States are a prepayment by the PI Trust of amounts that would otherwise be payable by certain Holders of PI Claims to the Holders of United States-PI Claimant Medical Expense Claims upon receipt by such Holders of PI Claims of Distributions pursuant to the PI TDP and under the Plan.  Such prepayment by the PI Trust shall be borne equitably by such Holders of PI Claims in the form of a reduction in the amounts of the Distributions otherwise payable to such Holders of PI Claims pursuant to the PI TDP.  For the avoidance of doubt, in no event shall (A) the stated amount of the Initial PI Trust Distribution on the stated amount of the MDT PI Claim be altered in a manner that would reduce the aggregate amount to be paid pursuant to Section 5.2(h)(i) of the Plan to the United States, (B) the aggregate amount paid pursuant to Section 5.2(h)(i) of the Plan to the United States exceed $26 million, or (C)  the United States' claim against the Master Disbursement Trust arising from the assignment described in Section 5.2(h) of the Plan be released until the United States has received payments thereof aggregating to $26 million. Should the PI Trust obtain recoveries under the Plan from a source other than the Master Disbursement Trust as a result of either a modification of the MDT Insurer Injunction pursuant to Section 10.10 of the Plan or election by the Master Disbursement Trust of a Release Remedy, the PI Trust shall pay over 3.7143% of any such recoveries to the United States until the United States shall have recovered $26 million in the aggregate pursuant to the United States-PI Claimant Medical Expense Claim Settlement. The United States shall have the right to enforce this obligation notwithstanding the release set forth in Section 5.2(h)(ii) of the Plan.

b.      Notwithstanding Section 10.19 of the Plan, as of the Effective Date, for good and valuable consideration, the adequacy of which is hereby confirmed, the PI Trust, each Holder of a PI Claim and, in respect of each of the PI Trust and each Holder of a PI Claim, its respective agents, representatives, heirs, successors and assigns, in their capacities as such, shall, without any further action by the Bankruptcy Court, be conclusively, absolutely, unconditionally, irrevocably, fully, finally, forever and permanently released by each Holder of a United States-PI Claimant Medical Expense Claim of all United States-PI Claimant Medical Expense Claims and all claims and Causes of Action based on or relating to, or in any manner arising from, in whole or in part, the United States-PI Claimant Medical Claim Settlement (other than a claim or Cause of Action to enforce the United States-PI Claimant Medical Expense Settlement, including, but not limited to any Unites States-PI Claimant Medical Expense Claim Release) that each Holder of a United States-PI Claimant Medical Expense Claim has asserted or could assert on its own behalf or on behalf of another Person or party, notwithstanding section 1542 of the California Civil Code or any law of any jurisdiction that is similar, comparable or equivalent thereto (which shall conclusively be deemed waived) claiming through such Holder of a United States-PI Claimant Medical Expense Claim, against the PI Trust, a Holder of a PI Claim, Distributions to Holders of PI Claims pursuant to the PI TDP or under the Plan and, in respect of each of the PI Trust and each Holder of a PI Claim, its respective agents, representatives, heirs, successors and assigns, in their capacities as such.

c.      As of the Effective Date, for good and valuable consideration, the adequacy of which is hereby confirmed, each Holder of a United States-PI Claimant Medical Expense Claim shall, without any further action by the Bankruptcy Court, be conclusively, absolutely, unconditionally, irrevocably, fully, finally, forever and permanently released by the PI Trust and its agents and representatives, in their capacities as such, of all claims and Causes of Action based on or relating to, or in any manner arising from, in whole or in part, the United States-PI Claimant Medical Claim Settlement (other than a claim or Cause of Action to enforce the United States-PI Claimant Medical Expense Settlement, including, but not limited to, the release set forth in Section (h)(iii) of the Plan) that the PI Trust has asserted or could assert on its own behalf or on behalf of another Person or party, notwithstanding section 1542 of the California Civil Code or any law of any jurisdiction that is similar, comparable or equivalent thereto (which shall conclusively be deemed waived) claiming through the PI Trust, against a Holder of a United States-PI Claimant Medical

Expense Claim and, in respect of each Holder of a United States-PI Claimant Medical Expense Claim, its respective agents, representatives, successors and assigns, in their capacities as such.

d.    The United States Department of Defense, Defense Health Agency (in respect of TRICARE), submits to the jurisdiction of the Bankruptcy Court for purposes of the United States-PI Claimant Medical Expense Claim Settlement, including, but not limited to, the United States-PI Claimant Medical Expense Claims Release.

e.    The United States Department of Health and Human Services, Centers for Medicare & Medicaid Services, the Indian Health Service, the United States Department of Defense, Defense Health Agency (in respect of TRICARE), and the United States Department of Veterans Affairs submit to the exclusive jurisdiction of the Bankruptcy Court for purposes of any proceeding in respect of the interpretation or enforcement of the United States-PI Claimant Medical Expense Claim Settlement including, but not limited to, the United States-PI Claimant Medical Expense Claims Release.

### 3.    *The Plan Administration Trust*

(i)    **Establishment and Purpose of Plan Administration Trust**. On or before the Effective Date, the Debtors shall take all necessary steps to form the Plan Administration Trust in accordance with the Plan and the PAT Agreement. The Plan Administration Trust shall be established for the purposes described in the Plan and any others more fully described in the PAT Agreement, shall have no objective to continue or engage in the conduct of trade or business and shall be subject to the jurisdiction of the Bankruptcy Court. The Plan Administration Trust shall, in each case in accordance with the Plan and the PAT Agreement:

a.    hold, manage, sell and invest the PAT Assets for the benefit of Holders of Allowed Claims (other than Channeled Claims);

b.    administer, process, resolve and liquidate Claims (other than Channeled Claims), including through the prosecution and resolution of objections to Disputed Claims (other than Channeled Claims);

c.    hold and maintain the PAT Reserves and the PAT Distribution Account and maintain the Professional Fee Escrow Account; and

d.    make Distributions to Holders of Allowed Claims (other than Channeled Claims).

(ii) **Vesting of the PAT Assets in the Plan Administration Trust**. The Plan Administration Trust shall consist of the PAT Assets. On the Effective Date, the PAT Assets shall vest in the Plan Administration Trust, free and clear of all Claims, Interests, Liens, other encumbrances and liabilities of any kind.

(iii) **Appointment and Role of the Plan Administration Trustee**. The Plan Administration Trustee shall be an existing employee of the Debtors selected by the Debtors in their sole discretion or another individual selected by the Debtors with the consent of the Creditors' Committee and the Governmental Consent Parties (which consent shall not be unreasonably withheld, conditioned or delayed). The identity and compensation of the Plan Administration Trustee shall be disclosed in the Plan Supplement. The appointment of the Plan Administration Trustee shall be approved in the Confirmation Order, and such appointment shall be effective as of the Effective Date. In accordance with the PAT Agreement, the Plan Administration Trustee shall serve in such capacity through the earlier of (x) the date that the Plan Administration Trust is dissolved in accordance with the PAT Agreement and (y) the date the Plan Administration Trustee resigns, is terminated or is otherwise unable to serve for any reason. In furtherance of and consistent with the purpose of the Plan Administration Trust and the Plan, the Plan Administration Trustee shall:

a. have the power and authority to perform all functions on behalf of the Plan Administration Trust;

b. undertake all administrative responsibilities as are provided in the Plan and the PAT Agreement, including filing the final monthly operating report (for the month in which the Effective Date occurs) and all subsequent quarterly operating reports and administering the closure of the Chapter 11 Cases, which reports shall be delivered to the Master Disbursement Trust;

c. be responsible for all decisions and duties with respect to the Plan Administration Trust and the PAT Assets; and

d. take such other actions as the Plan Administration Trust determines to be necessary or desirable to carry out the purposes of the Plan.

(iv) **Funding of the Wind-Up Reserve; Costs and Expenses of the Plan Administration Trust**. On the Effective Date, the Debtors shall establish and fund the Wind-Up Reserve, which shall vest in the Plan Administration Trust and be held and maintained by the Plan Administration Trustee. In the event of any shortfall of funding in the Wind-Up Reserve, NewCo shall be obligated to satisfy any such

deficiency (which obligation shall be assumed by NewCo and any successor to NewCo's business). The costs and expenses of the Plan Administration Trust, including the compensation, fees and expenses of the Plan Administration Trustee and its retained professionals, shall be paid out of the Wind-Up Reserve. The Plan Administration Trustee shall be entitled to reasonable compensation, in an amount to be determined by the Debtors, subject to the consent (not to be unreasonably withheld, conditioned or delayed) of the Creditors' Committee and the Governmental Consent Parties, and to retain and reasonably compensate counsel and other professionals, including any professional who represented parties in interest, including the Debtors, in the Chapter 11 Cases, to assist in its duties as Plan Administration Trustee on such terms as the Plan Administration Trustee deems appropriate without Bankruptcy Court approval, subject to the provisions of the PAT Agreement.

(v)     **Attorneys' Fees and Expenses of Directors, Officers, Employees and Agents**. The Plan Administration Trust will promptly reimburse as and when incurred the reasonable actual attorneys' fees and related expenses incurred by any current or former director, officer, employee or authorized agent of the Debtors (other than any Sackler Family Member) after the Effective Date and before the sixth (6th) anniversary of the Effective Date in connection with such individual's cooperation with, or in connection with the defense of such individual with respect to, any investigation, prosecution and/or litigation involving conduct relating to the Debtors or the Debtors' business or property or any defense of the Releases or the Channeling Injunction. On or before the Effective Date, the Debtors will establish and fund a segregated account in the amount of $10 million, which shall be held and maintained by the Plan Administration Trustee to fund the foregoing reimbursement obligations. If, at any time, the balance in such segregated account is less than $5 million, NewCo (or, at any time after a sale of all or substantially all Assets of or Interests in NewCo, the Master Disbursement Trust) shall replenish such account so that amounts in the account are not less than $10 million, *provided* that (x) the aggregate amount deposited into the segregated account may not exceed $30 million, and (y) on the sixth (6th) anniversary of the Effective Date, any funds remaining in the segregated account will be released to the Master Disbursement Trust and NewCo's and the Master Disbursement Trust's funding obligations with respect to such account will cease. Notwithstanding the foregoing, the Plan Administration Trust will not reimburse any such amounts incurred by any individual who a. does not provide an appropriate undertaking consistent with the undertakings required for indemnification during the pendency of the Chapter 11 Cases, b. has at any time prior to the Effective Date refused or does at any time after the Effective Date refuse to testify based on a claim of privilege against self-incrimination in any proceeding relating to the Debtors or the Debtors' business or property, or c. is at any time indicted for a felony relating to the Debtors or the Debtors' business or property (*provided*,

*however*, that if such individual is found to be not guilty of such felony, then expenses shall be promptly reimbursed).

(vi) ~~(v)~~ **Institution and Maintenance of Legal and Other Proceedings**. As of the date upon which the Plan Administration Trust is established, the Plan Administration Trust shall be empowered to initiate, prosecute, defend and resolve all legal actions and other proceedings related to any Asset, liability or responsibility of the Plan Administration Trust. Such legal actions and other proceedings shall be limited solely to those required for the purposes of reconciling, administering and defending against Claims (other than Channeled Claims) and the other responsibilities of the Plan Administration Trust. The Plan Administration Trust shall be empowered to initiate, prosecute, defend and resolve all such actions in the name of the Debtors or their Estates, in each case if deemed necessary or appropriate by the applicable Plan Administration Trustee. The Plan Administration Trust shall be responsible for the payment of all damages, awards, judgments, settlements, expenses, costs, fees and other charges incurred subsequent to the date upon which the Plan Administration Trust is established arising from, or associated with, any legal action or other proceeding brought pursuant to the foregoing. For the avoidance of doubt, the Plan Administration Trust, pursuant to section 1123(b)(3)(B) of the Bankruptcy Code and applicable state corporate law, is appointed as the successor-in-interest to, and representative of, the Debtors and their Estates for the retention, enforcement, settlement or adjustment of Claims against the Debtors (other than the Channeled Claims). For the avoidance of doubt, neither the Plan Administration Trust nor the Plan Administration Trustee shall be vested with the rights to pursue any MDT Insurance Rights or MDT Insurance Collateral.

(vii) ~~(vi)~~ **U.S. Federal Income Tax Matters Relating to Plan Administration Trust.** The Plan Administration Trust is intended to be treated as a trust described in IRC sections 661 through 664 and the regulations promulgated thereunder (a "complex trust"). The Plan Administration Trustee shall file (or cause to be filed) such statements, returns, or disclosures relating to the Plan Administration Trust as are required by any Governmental Unit, including IRS Form 1041, IRS Form 1041-ES, and IRS Schedule K-1. The Plan Administration Trustee shall be responsible for payment, out of the PAT Assets, of any taxes imposed on the Plan Administration Trust or the PAT Assets, including estimated and annual U.S. federal income taxes. The Plan Administration Trustee may request an expedited determination of taxes of the Plan Administration Trust under section 505(b) of the Bankruptcy Code for all returns filed for, or on behalf of, the Plan Administration Trust for all taxable periods through the dissolution of the Plan Administration Trust. Nothing in ~~the~~ Section 5.3(~~f~~g) of the Plan shall be deemed to determine, expand or

contract the jurisdiction of the Bankruptcy Court under section 505 of the
Bankruptcy Code.

(viii) (vii) **Dissolution, Release of Reserves and Residual Value**. The Plan
Administration Trust shall be dissolved and the Plan Administration
Trustee shall be discharged from its duties with respect to the Plan
Administration Trust upon completion of its duties as set forth in the Plan
and satisfaction of the purposes of the Plan Administration Trust as set
forth in the Plan and the PAT Agreement, which, for the avoidance of
doubt, shall be no earlier than the later of a. the PPLP Dissolution Date
and b. the date on which (1) all Disputed Claims (other than Channeled
Claims) have been resolved, (2) all PAT Assets have been liquidated and
(3) all Distributions required to be made by the Plan Administration
Trustee under the Plan and the PAT Agreement have been made, unless
dissolution on an earlier date is authorized pursuant to a Final Order of the
Bankruptcy Court. Any Cash or cash equivalents in the Plan
Administration Trust remaining upon dissolution of the Plan
Administration Trust, including any Surplus Reserve Cash remaining in
the PAT Reserves, shall be distributed in accordance with Section 5.13(c)
of the Plan.

(ix) (viii) **Exculpation and Indemnification of the Plan Administration
Trustee**. To the maximum extent permitted by applicable law, the Plan
Administration Trustee shall not have or incur any liability for actions
taken or omitted in its capacity as the Plan Administration Trustee, or on
behalf of the Plan Administration Trust, except those acts found by Final
Order to be arising out of its willful misconduct, bad faith, gross
negligence, or fraud, and shall be entitled to indemnification and
reimbursement for reasonable fees and expenses in defending any and all
of its actions or inactions in its capacity as the Plan Administration
Trustee, or on behalf of the Plan Administration Trust, except for any
actions or inactions found by Final Order to be arising out of its willful
misconduct, bad faith, gross negligence or fraud. Any valid
indemnification claim of the Plan Administration Trustee shall be satisfied
from the Wind-Up Reserve.

4. *NewCo*

(i) **Establishment and Ownership of NewCo**. On or before the Effective
Date, NewCo and any Subsidiaries of NewCo shall be formed in
accordance with the Plan and the NewCo Operating Agreement. In
accordance with the Public Entity Settlements, upon completion of the
Restructuring Transactions, TopCo shall hold the NewCo Interest,
representing 100% of the voting and economic Interests in NewCo.

(ii) **Purpose of NewCo.** From and after the Effective Date, NewCo shall
operate the NewCo Transferred Assets in accordance with the terms of the

NewCo Operating Agreement, and subject to the NewCo Operating
Injunction and the NewCo Governance Covenants set forth in
the Confirmation Order. NewCo shall be operated in a responsible and
sustainable manner, balancing a. the interests of its stakeholders to fund
and provide abatement of the opioid crisis, b. effective deployment of its
assets to address the opioid crisis and c. the interests of those materially
affected by its conduct.

(iii)    **Vesting of the NewCo Transferred Assets in NewCo**. On or prior to the
Effective Date, pursuant to the Plan and in accordance with the NewCo
Transfer Agreement, the NewCo Transferred Assets, including the Initial
NewCo Cash, shall be transferred to and vest in NewCo or one or more
Subsidiaries of NewCo (other than any NewCo Transferred Assets held by
a Transferred Debtor, which shall revest in such Transferred Debtor), in
each case free and clear of all Claims, Interests, Liens, other
encumbrances and liabilities of any kind, except for NewCo's obligations
under the NewCo Credit Support Agreement, NewCo's obligation to
satisfy any deficiency of funding in the Wind-Up Reserve (which
obligation shall be assumed by NewCo and any successor to NewCo's
business) and as otherwise expressly set forth in the NewCo Transfer
Agreement. Except as described in the foregoing sentence, NewCo shall
have no liability for, and the NewCo Transferred Assets shall vest in
NewCo free and clear of, any prepetition and postpetition Claims, Causes
of Action or liabilities of any kind, in each case that have been or could
have been asserted against the Debtors, their Estates or their property
(including, but not limited to, Claims based on successor liability) based
on any acts or omissions prior to the Effective Date.

(iv)    **Appointment of the NewCo Managers**. The board of managers of
NewCo will consist of seven (7) NewCo Managers, each with experience
in one or more of the following areas: pharmaceuticals, public policy
(including public health policy), law enforcement, ethics and compliance,
finance, audit, general business and/or corporate governance issues. The
initial NewCo Managers shall be disinterested and independent, and shall
be selected by the Governmental Consent Parties, in consultation with the
Debtors and the Creditors' Committee, and pursuant to a selection process
that is reasonably acceptable to the Debtors; *provided* that the DOJ shall
have the right, in its discretion, to observe such selection process.[83][125] The
identity of the initial NewCo Managers shall be included in the Plan
Supplement. The appointment of the initial NewCo Managers shall be
approved in the Confirmation Order, and such appointment shall be
effective as of the Effective Date.

---

[83][125] If determined to be necessary by the Governmental Consent Parties, NewCo may retain one or more of the four
independent directors on PPLP's Special Committee for a period of time to serve as interim directors of NewCo to
allow for a period of transition and onboarding of NewCo Managers.

(v)    **NewCo Operating Expenses**. All NewCo Operating Expenses shall be paid by NewCo or its Subsidiaries. On the Effective Date, NewCo shall be funded with the Initial NewCo Cash, which shall vest in NewCo in accordance with <u>Section 5.4(c)</u> of the Plan. For the avoidance of doubt, the NewCo Priority Waterfall shall not limit or restrict the ability of NewCo or its Subsidiaries to pay NewCo Operating Expenses between NewCo Distribution Dates from funds reserved under <u>Section 5.2(f)(ii)(A)</u> of the Plan, generated by the business or otherwise available to NewCo and its Subsidiaries.

(vi)    **Identifying Opioid Proceeds.** NewCo shall identify, and report on a publicly available website, the portion of TopCo Distributions that are derived from Opioid Proceeds.

(vii)    **NewCo Insurance**. On or prior to the Effective Date, the Debtors shall fund an upfront premium payment from Effective Date Cash to purchase insurance required and appropriate for the business needs of NewCo, including liability and other insurance for NewCo, including without limitation, product liability insurance and directors' and officers' liability insurance for the NewCo Managers, officers and other authorized agents, in an amount and on terms acceptable to the Debtors and the Governmental Consent Parties.

(viii)    **NewCo Operating Injunction and NewCo Governance Covenants.** The Confirmation Order will provide for the issuance of the NewCo Operating Injunction and the NewCo Governance Covenants. At all times from and after the Effective Date, NewCo, and any purchaser of NewCo's opioid business, shall remain subject to the NewCo Operating Injunction and the NewCo Governance Covenants.

(ix)    **NewCo Monitor.** The Confirmation Order will provide for the appointment of the NewCo Monitor. The initial NewCo Monitor shall be the Purdue Monitor in place as of the Effective Date or otherwise selected by the Governmental Consent Parties with the consent of the Debtors, and in consultation with the Creditors' Committee. The identity of the NewCo Monitor shall be disclosed in the Plan Supplement. The NewCo Monitor shall be responsible for ensuring that NewCo is in compliance with the NewCo Operating Injunction and the NewCo Governance Covenants. NewCo and its professionals and representatives, including the NewCo Managers, shall cooperate and reasonably respond to requests by the NewCo Monitor in the performance of its responsibilities, including reasonable requests for access to relevant books and records of NewCo. In furtherance of the responsibilities of the NewCo Monitor, the NewCo Monitor shall be authorized to seek relief from the Bankruptcy Court to the extent necessary to carry out its obligations hereunder. The NewCo Monitor shall prepare and publish quarterly reports regarding the matters for which the NewCo Monitor is responsible, including NewCo's

compliance with the NewCo Operating Injunction and the NewCo Governance Covenants. All compensation, costs and fees of the NewCo Monitor and any professionals retained by the NewCo Monitor shall constitute NewCo Operating Expenses, and shall be paid by NewCo.

(x) **U.S. Federal Income Tax Matters Relating to NewCo.** The NewCo Managers shall cause NewCo to make a timely election to be treated as a corporation for U.S. federal income tax purposes effective as of the date of its formation by the deadline for making such election (or such later date as to which the IRS has granted an extension for such election) unless the IRS has provided guidance which may be relied upon to the effect that not making such election would not have a material adverse tax effect on NOAT, including by reason of the application of IRC section 115.

(xi) **Exculpation and Indemnification of the NewCo Managers.** To the maximum extent permitted by applicable law, no NewCo Manager shall have or incur any liability for actions taken or omitted in his or her capacity as a NewCo Manager, or on behalf of NewCo, except those acts found by Final Order to be arising out of his or her willful misconduct, bad faith or fraud, and shall be entitled to indemnification and reimbursement for reasonable fees and expenses in defending any and all actions or inactions in his or her capacity as a NewCo Manager, or on behalf of NewCo, except for any actions or inactions found by Final Order to be arising out of his or her willful misconduct, bad faith or fraud. Any valid indemnification claim of any NewCo Manager shall be satisfied by NewCo.

5. *TopCo*

(i) **Establishment and Ownership of TopCo**. On or before the Effective Date, TopCo shall be formed in accordance with the terms of the Plan and the TopCo Operating Agreement. In accordance with the Public Entity Settlements, upon completion of the Restructuring Transactions, NOAT shall hold the TopCo NOAT Interest and the Tribe Trust shall hold the TopCo Tribe Interest, collectively representing 100% of the voting and economic Interests in TopCo.

(ii) **Appointment of the TopCo Managers**. The board of managers of TopCo will consist of three (3) TopCo Managers, each of whom shall be disinterested and independent; *provided* that one (but no more than one) Creditor Trustee of NOAT may serve as a TopCo Manager; *provided further* that any action taken by such individual in his or her capacity as TopCo Manager shall not be subject to the fiduciary duties of such individual in his or her capacity as a Creditor Trustee of NOAT. The initial TopCo Managers shall be selected by the Governmental Consent Parties, in consultation with the Debtors and the Creditors' Committee, and pursuant to a selection process that is reasonably acceptable to the

Debtors; *provided* that the DOJ shall have the right, in its discretion, to observe such selection process. The identity of the initial TopCo Managers shall be included in the Plan Supplement. The appointment of the initial TopCo Managers shall be approved in the Confirmation Order, and such appointment shall be effective as of the Effective Date.

(iii)  **TopCo Operating Expenses.** TopCo Operating Expenses shall be paid by TopCo.

(iv)  **TopCo D&O Insurance and Indemnification.** On or prior to the Effective Date, the Debtors shall fund an upfront premium payment from Effective Date Cash to purchase directors' and officers' liability insurance for the TopCo Managers in an amount and on terms acceptable to the Debtors and the Governmental Consent Parties.

(v)  **Distributions from TopCo Free and Clear.** All Public Creditor Trust Distributions made by TopCo shall be made in accordance with the TopCo Priority Waterfall and on no less than ten (10) Business Days' notice to the Master Disbursement Trust and the Private Creditor Trusts, and thereafter shall be free and clear of all claims, Liens or other recourse or encumbrances, and shall not be subject to disgorgement or recoupment by any Person.

(vi)  **U.S. Federal Income Tax Matters Relating to TopCo.** TopCo is intended to be treated as a partnership for U.S. federal income tax purposes and shall be treated consistently for state and local tax purposes, to the extent applicable. Neither TopCo nor any TopCo Manager shall make an election for TopCo to be classified as other than a partnership pursuant to Treasury Regulations section 301.7701-3.

(vii)  **Exculpation and Indemnification of the TopCo Managers.** To the maximum extent permitted by applicable law, no TopCo Manager shall have or incur any liability for actions taken or omitted in his or her capacity as a TopCo Manager, or on behalf of NewCo, except those acts found by Final Order to be arising out of his or her willful misconduct, bad faith or fraud, and shall be entitled to indemnification and reimbursement for reasonable fees and expenses in defending any and all actions or inactions in his or her capacity as a TopCo Manager, or on behalf of NewCo, except for any actions or inactions found by Final Order to be arising out of his or her willful misconduct, bad faith or fraud. Any valid indemnification claim of any TopCo Manager shall be satisfied by TopCo.

6.  *Master Disbursement Trust*

(i)  **Establishment and Purpose of the Master Disbursement Trust**. On or before the Effective Date, the Debtors shall take all necessary steps to

establish the Master Disbursement Trust in accordance with the Plan and the MDT Agreement. The Master Disbursement Trust shall be established for the purposes described in the Plan and any other purposes more fully described in the MDT Agreement, and shall be subject to the jurisdiction of the Bankruptcy Court. The Master Disbursement Trust shall, in each case in accordance with the Plan and the MDT Agreement:

a.     hold, manage, sell, invest and distribute the MDT Transferred Assets for the benefit of the Creditor Trusts in accordance with the Private Entity Settlements and the Public Entity Settlements;

b.     enforce, pursue, prosecute, compromise and/or settle the MDT Causes of Action, the MDT Insurance Rights and the MDT Shareholder Rights, including monitoring and enforcing the Shareholder Settlement Agreement;

c.     make payments ~~to the Private Creditor Trusts~~ in satisfaction of the MDT Claims;

d.     make Public Creditor Trust Distributions from MDT Excess Cash; and

e.     publish on a publicly available website reports received from the Abatement Trusts regarding the disbursement and use of Abatement Distributions and compliance with Authorized Abatement Purposes.

(ii)    **Vesting of the MDT Transferred Assets in the Master Disbursement Trust**. The corpus of the Master Disbursement Trust shall consist of the MDT Transferred Assets. On the Effective Date, pursuant to the Plan and in accordance with the MDT Agreement, the MDT Transferred Assets shall be transferred to and vest in the Master Disbursement Trust free and clear of all Claims, Interests, Liens, other encumbrances and liabilities of any kind (other than the MDT Claims and MDT Interests); *provided* that, to the extent certain Assets comprising the MDT Transferred Assets are not known or identified as of the Effective Date, such Assets shall automatically, and without further act or deed, be transferred to and vest in the Master Disbursement Trust upon the discovery or identification thereof, including, with respect to the Surplus Reserve Cash, in accordance with Section 5.13(c) of the Plan. The Master Disbursement Trust shall have no liability for, and the MDT Transferred Assets shall vest in the Master Disbursement Trust free and clear of, any prepetition and postpetition Claims, Causes of Action or liabilities of any kind, in each case that have been or could have been asserted against the Debtors, their Estates or their property (including, but not limited to, Claims based on successor liability) based on any acts or omissions prior to the Effective Date, except for the MDT Claims. From and after the Effective Date, all

proceeds of the MDT Transferred Assets, including without limitation, amounts paid by Insurance Companies under the MDT Insurance Policies and amounts paid under the Shareholder Settlement Agreement, shall be paid to the Master Disbursement Trust to be applied in accordance with the MDT Priority Waterfall and the MDT Agreement.

(iii)   **Funding of the Master Disbursement Trust.** The Master Disbursement Trust shall be funded with the proceeds of the MDT Transferred Assets and amounts, if applicable, received pursuant to the NewCo Credit Support Agreement.

(iv)   **Appointment and Role of the MDT Trustees**. The board of trustees of the Master Disbursement Trust will consist of three (3) MDT Trustees with relevant experience, including in financial reorganizations. The MDT Trustees shall be disinterested and independent. One (1) initial MDT Trustee shall be selected by the Creditors' Committee and two (2) initial MDT Trustees shall be selected by the Governmental Consent Parties, in each case, in consultation with the Debtors and pursuant to a selection process reasonably acceptable to the Debtors; *provided* that, in each case, the DOJ shall have the right, in its discretion, to observe such selection process. The identity of the initial MDT Trustees shall be disclosed in the Plan Supplement. The appointment of the initial MDT Trustees shall be approved in the Confirmation Order, and such appointment shall be effective as of the Effective Date. Upon the payment in full in Cash of all MDT Claims, the MDT Trustees may be removed and replaced by NOAT (including with any of the Creditor Trustees of NOAT) in its sole discretion. In furtherance of and consistent with the purpose of the Master Disbursement Trust and the Plan, the MDT Trustees shall:

  a.   have the power and authority to perform all functions on behalf of the Master Disbursement Trust;

  b.   be responsible for all decisions and duties with respect to the Master Disbursement Trust and the MDT Transferred Assets; and

  c.   in all circumstances and at all times, act in a fiduciary capacity for the benefit and in the best interests of the Creditor Trusts, as the beneficiaries of the Master Disbursement Trust, in furtherance of the purpose of the Master Disbursement Trust, and in accordance with the Plan, including Section 5.6(f) of the Plan, and the MDT Agreement.

(v)   **Appointment of the MDT Executive Director**. The MDT Executive Director will be an individual with experience in financial reorganizations. The initial MDT Executive Director shall be selected by the MDT Trustees; provided that the DOJ shall have the right, in its discretion, to observe such selection process. The identity of the initial MDT Executive

Director shall be disclosed in the Plan Supplement. Removal and replacement of the MDT Executive Director shall be determined by the MDT Trustees as set forth in the MDT Agreement. The MDT Executive Director shall:

a.      carry out the day-to-day operations of the Master Disbursement Trust;

b.      make enforcement, litigation and liquidation recommendations as are reasonably necessary to the MDT Trustees and such other administrative professionals or entities; and

c.      have such other duties and responsibilities as set forth in the MDT Agreement and as may be delegated to ithim or her by the MDT Trustees in accordance with the MDT Agreement.

(vi)   **Obligations of the MDT Fiduciaries**. The MDT Fiduciaries shall take into account the interests of, and owe fiduciary duties to, each of the Creditor Trusts (including the Private Creditor Trusts and the Public Creditor Trusts) in making all decisions on behalf of the Master Disbursement Trust. In furtherance thereof:

a.      in the event of a payment default underSpecified Default (as defined in the Shareholder Settlement Agreement), the MDT Fiduciaries will take into account the remaining rights of the Private Creditor Trusts and the MDT Claims as well as the interests of the Public Creditor Trusts in formulating and exercising appropriate remedies as they relate to the Shareholder ReleasedPayment Parties and the Shareholder Release Snapback Parties, but shall in all events, to the extent there are obligations remaining to the Private Creditor Trusts upon such default, seek to utilize all other available sources of assets (including by (A) enforcement of the NewCo Credit Support Agreement in accordance with the terms thereof) to repay all then-outstanding amounts due and owing and (B) first utilizing commercially reasonable efforts to pursue a Payment Remedy before electing to pursue a Release Remedy (each as defined in the Shareholder Settlement Agreement)) to pay all outstanding amounts owed to the Private Creditor Trusts then-due or to be paid in the future from amounts due from such Breaching Shareholder Family Group until such outstanding amounts have been paid in full;

b.      the Master Disbursement Trust shall provide no less than ten (10) Business Days' advance written notice (unless urgent circumstances require less notice) to each Creditor Trust of any material action proposed to be taken in respect of the MDT Shareholder Rights, including any exercise of remedies under the

Shareholder Settlement Agreement or the commencement or settlement of any litigation against any Shareholder ~~Released~~Payment Party or Shareholder Release Snapback Party;

c.    to the extent there are any disputes raised by any Creditor Trust regarding the operation of the Master Disbursement Trust or the actions of the MDT Fiduciaries (including, without limitation, any failure to give notice of an MDT Reserve Period and any action related to the MDT Shareholder Rights), (1) any Creditor Trustee shall have the right to seek resolution by the Bankruptcy Court of such a dispute, including seeking to enjoin any disputed action by the Master Disbursement Trust, and all MDT Fiduciaries and Creditor Trustees shall have the right to be heard with regard to any such dispute, including by filing objections, declarations, statements in support or other pleadings (including with supporting evidence) or providing witness testimony at any hearing and (2) the Bankruptcy Court shall have exclusive jurisdiction to hear and resolve any such disputes, and shall be authorized to order appropriate relief (subject to the provisions of ~~the~~ Section 5.6(f) of the Plan) and make a determination in an expedited manner, and in all events, shall make such a decision within thirty (30) days from the request for relief;

d.    upon the payment in full in Cash of a Private Creditor Trust's MDT Claim, the Master Disbursement Trust shall have no further fiduciary duties to such Private Creditor Trust, and the Creditor Trustees of such Private Creditor Trust shall have no further rights to commence or participate in any action relating to the operations of the Master Disbursement Trust or the actions of the MDT Fiduciaries;

e.    the MDT Fiduciaries shall (1) provide reasonable reporting to each of the Creditor Trusts regarding the MDT Fiduciaries' activities ~~on~~ at least ~~a semi-annual basis~~every four (4) months (both cumulatively and in the period just ended), including with regard to the MDT Shareholder Rights (or any reporting received), any insurance proceeds, assets (including the value thereof), expenditures ~~and~~, distributions and forward-looking projections (subject to appropriate limitations to be agreed by the Debtors, the Governmental Consent Parties and the Creditors' Committee) and (2) make themselves reasonably available (in addition to holding at least one (1) call every four (4) months for the Creditor Trustees) to answer questions of Creditor Trustees relating to the Master Disbursement Trust's activities;

f.       the MDT Fiduciaries shall be obligated to comply with the terms
of the Plan, including ~~the~~ Section 5.6(f) of the Plan, and the MDT
Agreement; and

g.       in the event of any inconsistency between the terms of ~~the~~
Section 5.6(f) of the Plan and any other provision of the Plan or the
MDT Agreement, the terms of ~~the~~ Section 5.6(f) of the Plan shall
govern unless the MDT Trustees and the Creditor Trustees for each
of the Creditor Trusts mutually agree.

(vii)    **Assumption of Channeled Claims and Master TDP**. As of the Effective
Date, any and all liability of the Debtors and the other Protected Parties for
any and all Channeled Claims shall automatically, and without further act,
deed or court order, be channeled to and assumed by the Master
Disbursement Trust, and each Channeled Claim shall be resolved solely in
accordance with the terms, provisions and procedures of the Master TDP;
*provided* that the Master TDP shall provide that that all Non-Federal
Domestic Governmental Channeled Claims, all Tribe Channeled Claims,
all Hospital Channeled Claims, all Third-Party Payor Channeled Claims,
all NAS Monitoring Channeled Claims and all PI Channeled Claims shall
be further channeled to and assumed exclusively by the respective
Creditor Trusts, and shall be administered, liquidated and discharged
solely pursuant to, and solely to the extent provided in, the applicable
Creditor Trust TDP. In furtherance of the foregoing, the Master
Disbursement Trust, and subject to the MDT Documents, shall (1)
expressly assume sole and exclusive responsibility and liability for (a) the
Channeled Claims, unless and until such Channeled Claims are channeled
to the respective Creditor Trusts, (b) the MDT Private Claims and the
MDT Interests in accordance with the Public Entity Settlements and
Private Entity Settlements, (c) the MDT Federal Government Claim in
accordance with the Plan and (d) the MDT Operating Expenses and (2)
have all defenses, cross-claims, offsets and recoupments regarding
Channeled Claims that the Debtors, the Released Parties and the
Shareholder Released Parties, as applicable, have, or would have had,
under applicable law, but solely to the extent consistent with the MDT
Documents and the Plan; *provided* that no such Claims, defenses or rights
may be asserted against any Protected Party. Distributions in accordance
with the Master TDP and the Creditor Trust TDPs shall be the sole source
of recovery, if any, in respect of Channeled Claims, and Holders of such
Channeled Claims shall have no other or further recourse to the Protected
Parties.

(viii)   ~~(vii)~~ **MDT Operating Expenses**. On the Effective Date, the Debtors shall
establish and fund the MDT Operating Reserve, which shall vest in the
Master Disbursement Trust in accordance with Section 5.6(b) of the Plan
and be held and maintained by the MDT Trustees. Periodically, until the
dissolution of the Master Disbursement Trust, the MDT Trustees will

replenish the MDT Operating Reserve from Cash held or received by the Master Disbursement Trust to the extent deemed necessary by the MDT Trustees to satisfy and pay estimated future MDT Operating Expenses. The MDT Trustees shall create and maintain an annual budget of MDT Operating Expenses, which shall be reviewed by the Creditor Trustees and reasonably acceptable to the Creditor Trustees. All MDT Operating Expenses shall be satisfied and paid from the MDT Operating Reserve. The MDT Trustees and the MDT Executive Director shall be entitled to reasonable compensation and to retain and reasonably compensate counsel and other professionals to assist in the duties of the Master Disbursement Trust on such terms as the MDT Trustees and the MDT Executive Director deem appropriate without Bankruptcy Court approval, subject to the provisions of the MDT Agreement. The initial compensation of the MDT Trustees and the MDT Executive Director shall be reasonably acceptable to the Debtors, the Creditors' Committee and the Governmental Consent Parties, and thereafter shall be subject to the annual budgets prepared by the MDT Trustees.

(ix)    (viii) **Transfer of the MDT Insurance Rights**. In furtherance of the transfer of the MDT Transferred Assets to the Master Disbursement Trust and in accordance with the MDT Agreement, on the Effective Date, the Debtors shall irrevocably transfer, grant and assign to the Master Disbursement Trust, and the Master Disbursement Trust shall receive and accept, any and all of the MDT Causes of Action and MDT Insurance Rights. To the extent any Insurance Company would be obligated in respect of any MDT Insurance Policy to pay any Channeled Claim on behalf of one or more of the Debtors, the Debtors shall transfer and assign to the Master Disbursement Trust the right to enforce such Insurance Company's obligation. The foregoing transfer shall be a. free and clear of all Claims, Liens, encumbrances and Causes of Action of any nature whatsoever, b. made to the maximum extent possible under applicable law, c. absolute and without requirement of any further action by the Debtors, the Liquidating Debtors, the Plan Administration Trust, the Master Disbursement Trust, the Bankruptcy Court or any other Person, and d. governed by, and construed in accordance with, the Bankruptcy Code and the other applicable laws governing the applicable MDT Insurance Policies. The Master Disbursement Trust shall become liable for and shall satisfy, to the extent required under applicable law, any prospective premiums, deductibles, self-insured retentions and any other amounts arising in any way out of the receipt of payment from an Insurance Company in respect of the MDT Insurance Rights; *provided* that, for the avoidance of doubt, the Master Disbursement Trust will not be required to pay premiums or any other amounts for Purdue Insurance Policies that are not MDT Insurance Policies. The transfer of the MDT Insurance Rights contemplated in the Section 5.6(h) of the Plan is not an assignment of any insurance policy itself. The Confirmation Order shall contain findings reasonably acceptable to the Creditors' Committee and

214

the Governmental Consent Parties ~~and~~related to or necessary to preserve all MDT Insurance Rights.

~~(ix) [Reserved]~~

(x)  **Transfer of MDT Shareholder Insurance Rights**. In accordance with the Shareholder Settlement, on the Effective Date, the MDT Shareholder Insurance Rights shall be transferred to the Master Disbursement Trust on terms to be agreed by the Debtors and the Shareholder Payment Parties, the terms of which shall be acceptable to the Creditors' Committee and the Governmental Consent Parties.

(xi)  ~~(x)~~ **Institution and Maintenance of Legal and Other Proceedings**. As of the date upon which the Master Disbursement Trust is established, the Master Disbursement Trust shall be empowered to initiate, prosecute, defend and resolve all legal actions and other proceedings related to any Asset, liability or responsibility of the Master Disbursement Trust, including in respect of the MDT Causes of Action, the MDT Insurance Rights and the MDT Shareholder Rights. Such legal actions and other proceedings shall be limited solely to those required for the purposes of satisfying the responsibilities of the Master Disbursement Trust, including in respect of the MDT Causes of Action, the MDT Insurance Rights and the MDT Shareholder Rights. The Master Disbursement Trust shall be empowered to initiate, prosecute, defend and resolve all such actions in the name of the Debtors or their Estates, in each case if deemed necessary or appropriate by the MDT Trustees. The Master Disbursement Trust shall be responsible for the payment of all damages, awards, judgments, settlements, expenses, costs, fees and other charges incurred subsequent to the date upon which the Master Disbursement Trust is established arising from, or associated with, any legal action or other proceeding brought pursuant to the foregoing.

(xii)  ~~(xi)~~ **U.S. Federal Income Tax Matters Relating to the Master Disbursement Trust.** The Master Disbursement Trust is intended to be treated, and shall be reported, as a "qualified settlement fund" for U.S. federal income tax purposes and shall be treated consistently for state and local tax purposes, to the extent applicable. All parties (including, without limitation, Holders of Claims against or Interests in the Debtors, the Related Parties of such Holders, the Debtors, the Master Disbursement Trust, the MDT Trustees and the Creditor Trusts) shall report consistently with the foregoing. An MDT Trustee shall be the "administrator," within the meaning of Treasury ~~Regulation~~Regulations section 1.468B-2(k)(3), of the Master Disbursement Trust. The administrator of the Master Disbursement Trust shall be responsible for filing all tax returns of the Master Disbursement Trust and the payment, out of the Assets of the Master Disbursement Trust, of any taxes due by or imposed on the Master Disbursement Trust. The MDT Trustees may request an expedited

determination under section 505(b) of the Bankruptcy Code for all tax returns filed by or on behalf of the Master Disbursement Trust for all taxable periods through the dissolution of the Master Disbursement Trust. Nothing in ~~the~~ Section 5.6(k) of the Plan shall be deemed to determine, expand or contract the jurisdiction of the Bankruptcy Court under section 505 of the Bankruptcy Code.

(xiii)   (xii) **Distributions from the Master Disbursement Trust Free and Clear**. All distributions made by the Master Disbursement Trust to the Creditor Trusts shall be made on no less than ten (10) Business Days' notice to all Creditor Trusts, and thereafter shall be free and clear of all Claims, Liens or other recourse or encumbrances, and shall not be subject to attachment, disgorgement or recoupment by any Person. Such distributions to each Creditor Trust shall become the property of such Creditor Trust, and shall be used for the administration (including the payment of Creditor Trust Operating Expenses) of such Creditor Trust, to make Distributions on account of Channeled Claims channeled to such Creditor Trust in accordance with the applicable Creditor Trust ~~Documents~~TDP and for such other purposes as may be specifically set forth in the applicable Creditor Trust Documents.

(xiv)   (xiii) **Dissolution, Release of Reserves and Residual Value**. The Master Disbursement Trust shall be dissolved and the MDT Trustees and the MDT Executive Director shall be discharged from their respective duties with respect to the Master Disbursement Trust upon completion of their duties as set forth in the Plan and the MDT Agreement, which, for the avoidance of doubt, shall be no earlier than the date on which a. all Assets held by the Master Disbursement Trust, including the MDT Transferred Assets, have been liquidated and b. all payments and other distributions required to be made from the Master Disbursement Trust under the Plan and the MDT Agreement have been made, including payment in full in Cash of all MDT Claims, unless dissolution on an earlier date is authorized pursuant to a Final Order of the Bankruptcy Court. Upon dissolution of the Master Disbursement Trust, any Cash remaining in the MDT Operating Reserve or otherwise held by the Master Disbursement Trust shall be distributed in accordance with the MDT Priority Waterfall and the MDT Agreement.

(xv)   (xiv) **Exculpation and Indemnification of the MDT Trustees and MDT Executive Director**. To the maximum extent permitted by applicable law, each of the MDT Trustees and the MDT Executive Director shall not have or incur any liability for actions taken or omitted in ~~its~~his or her capacity as an MDT Trustee or the MDT Executive Director, or on behalf of the Master Disbursement Trust, except those acts found by Final Order to be arising out of ~~its~~his or her willful misconduct, bad faith, gross negligence, or fraud, and shall be entitled to indemnification and reimbursement for reasonable fees and expenses in defending any and all of ~~its~~his or her

actions or inactions in ~~its~~his or her capacity as an MDT Trustee or the MDT Executive Director, or on behalf of the Master Disbursement Trust, except for any actions or inactions found by Final Order to be arising out of ~~its~~his or her willful misconduct, bad faith, gross negligence or fraud. Any valid indemnification claim of the MDT Trustees or the MDT Executive Director shall be satisfied from the MDT Operating Reserve.

7. ***Creditor Trusts***

(i) **Establishment and Purpose of the Creditor Trusts**. The Confirmation Order shall endorse and direct the establishment of the Creditor Trusts on or prior to the Effective Date in accordance with the terms of the respective Creditor Trust Documents. The Creditor Trusts shall be independent from the Holders of Claims against the Debtors, and shall be subject to the exclusive jurisdiction of the Bankruptcy Court (other than as specifically set forth in the Creditor Trust Documents). The Creditor Trusts shall be established for the purposes described in the Plan and any other purposes more fully described in the Creditor Trust Documents. Each Creditor Trust shall, in each case, in accordance with the Plan, the Confirmation Order and the applicable Creditor Trust Documents:

   a.   hold, manage and invest all funds and other Assets received by such Creditor Trust from the Debtors, the Master Disbursement Trust and TopCo, as applicable (including, with respect to the Tribe Trust and NOAT, the TopCo Interests and the MDT Interests), in each case, for the benefit of the beneficiaries of such Creditor Trust;

   b.   hold and maintain the Creditor Trust Operating Reserve of such Creditor Trust; and

   c.   administer, process, resolve and liquidate Channeled Claims channeled to such Creditor Trust, in each case as provided in the applicable Creditor Trust Documents;

(ii) **Appointment and Role of the Creditor Trustees**. In furtherance of and consistent with the purposes of the Creditor Trusts and the Plan, the Creditor Trustees shall have the power and authority to perform all functions on behalf of the respective Creditor Trusts. The Creditor Trustees shall undertake all administrative responsibilities as are provided in the Plan and the applicable Creditor Trust Documents. The Creditor Trustees shall be responsible for all decisions and duties with respect to the respective Creditor Trusts. In all circumstances, each Creditor Trustee shall be independent and disinterested and shall act in the best interests of the beneficiaries of such Creditor Trust, in furtherance of the purpose of such Creditor Trust and in accordance with the Plan and the applicable Creditor Trust Documents. In accordance with the Creditor Trust

Documents, each Creditor Trustee shall serve in such capacity through the earlier of (x) the date that the applicable Creditor Trust is dissolved in accordance with the applicable Creditor Trust Documents and (y) the date such Creditor Trustee resigns, is terminated or is otherwise unable to serve for any reason. The identity of the initial Creditor Trustees shall be disclosed in the Plan Supplement. The initial Creditor Trustees shall be:

a.      with respect to NOAT, selected by the Governmental Consent Parties, in consultation with the Debtors and pursuant to a selection process reasonably acceptable to the Debtors; *provided* that the DOJ shall have the right, in its discretion, to observe such selection process;

b.      with respect to the Tribe Trust, selected by the Native American Tribe Group with the consent of the Debtors; and (which consent shall not be unreasonably withheld, delayed or denied);

c.      with respect to each of the following Private Creditor Trusts, selected by (1) as follows: (1) with respect to the Hospital Trust, the Ad Hoc Group of Hospitals, (2) with respect to the TPP Trust, the Third-Party Payor Group, (3) and (2) with respect to the NAS Monitoring Trust, the NAS Committee and (4) with respect to the PI Trust, the Ad Hoc Group of Individual Victims, in each case, with the consent of the Debtors (which consent shall not be unreasonably withheld, delayed or denied).;

d.      with respect to the Hospital Trust, the Hon. Thomas L. Hogan (Ret.) or, in the event Judge Hogan becomes unavailable to serve as the Creditor Trustee of the Hospital Trust, selected by the Ad Hoc Group of Hospitals with the consent of the Debtors (which consent shall not be unreasonably withheld, delayed or denied); and

e.      with respect to the PI Trust, Edgar C. Gentle III or, in the event Edgar C. Gentle III becomes unavailable to serve as the Creditor Trustee of the PI Trust, selected by the Ad Hoc Group of Individual Victims with the consent of the Debtors (which consent shall not be unreasonably withheld, delayed or denied).

(iii)   **Abatement Distributions.** Each Abatement Trust shall, in accordance with the Plan, the Confirmation Order and the applicable Creditor Trust TDP for such Abatement Trust Documents, make Abatement Distributions to Authorized Recipients for Authorized Abatement Purposes. The Abatement Creditor Trust Documents TDP for each Abatement Trust shall provide that decisions concerning Abatement Distributions made by Abatement Trusts will consider the need to ensure that underserved urban and rural areas, as well as minority communities, receive equitable access

218

to the funds. Any Domestic Governmental Entity entitled to an Abatement Distribution from NOAT that has reached a Statewide Abatement Agreement (as defined in the NOAT TDP) may elect to have such Abatement Distribution, or any portion thereof, paid to the Public Document Repository in accordance with to the extent (x) set forth in the NOAT Documents TDP and (y) consistent with such Statewide Abatement Agreement.

(iv)    **PI Trust Distributions.** The PI Trust shall, in accordance with the Plan, the Confirmation Order and the PI Trust Documents, make Distributions on account of Allowed PI Channeled Claims to Holders of such Allowed PI Channeled Claims, subject to (x) the holdback of amounts in the TPP LRP Escrow Account and payments therefrom to LRP Participating TPPs, in each case as required under and subject to the terms of the LRP Agreement and (y) the deduction of amounts prepaid to the United States under the United States-PI Claimant Medical Expense Claim Settlement. Pursuant to and in accordance with the LRP Agreement, the Creditor Trustee for the TPP Trust shall have the right a. to inquire periodically with the Creditor Trustee for the PI Trust, the claims administrator appointed in respect of the PI Trust and the escrow agent for the TPP LRP Escrow Account as to whether the TPP LRP Escrow Account has been properly funded and payments therefrom are being made to the LRP Participating TPPs as required under the LRP Agreement, and to request evidence of the same and b. to seek entry of an order by the Bankruptcy Court enforcing the LRP Agreement, including the obligations to provide such information and evidence, in the event the Creditor Trustee for the TPP Trust reasonably believes that the TPP LRP Escrow Account has not been properly funded as required by the LRP Agreement, payments have not been made to LRP Participating TPPs as required by the LRP Agreement, and/or any of the Creditor Trustee for the PI Trust, the claims administrator appointed in respect of the PI Trust and the escrow agent for the TPP LRP Escrow Account is not responding to reasonable requests by the Creditor Trustee for the TPP Trust for such information and evidence. After paying or reserving for Creditor Trust Operating Expenses, the PI Trust shall deposit the NAS PI Portion into the PI Trust NAS Fund and the Non-NAS PI Portion into the PI Trust Non-NAS Fund, in each case, periodically as funds are received by the PI Trust. The PI Trust shall make Distributions on account of Allowed NAS PI Channeled Claims solely from the PI Trust NAS Fund in accordance with the NAS PI TDP, and shall make Distributions on account of Allowed Non-NAS PI Channeled Claims solely from the PI Trust Non-NAS Fund in accordance with the Non-NAS PI TDP.

(v)    **Abatement Trust Monitoring and Reporting Obligations.** Each Abatement Trust shall a. monitor the use of funds received by Abatement Distribution recipients in accordance with Authorized Abatement Purposes and b. prepare and deliver to the Master Disbursement Trust for

219

publication annual reports on the disbursement and use of Abatement Distributions from such Abatement Trust and the compliance by Abatement Distribution recipients with the Authorized Abatement Purposes set forth in the applicable Abatement Trust Documents. In addition, NOAT shall (x) ensure that the Master Disbursement Trust and TopCo comply with their respective obligations to NOAT, including the enforcement of rights and agreements for the benefit of NOAT, (y) monitor the financial and other reports received from TopCo, NewCo, the Master Disbursement Trust and the States, and publish such reports on a publicly available website, as appropriate in the reasonable discretion of the Creditor Trustees of NOAT, and (z) prepare or direct the preparation of annual audited financial reports of NOAT to be filed with the Bankruptcy Court, delivered to the States and published on a publicly available website. For the avoidance of doubt, NOAT shall not be required to duplicate any reporting performed by the Master Disbursement Trust.

(vi)    **Assumption of Obligations and Liabilities**. In furtherance of the purposes of the Plan and the Creditor Trusts, pursuant to the Master TDP and subject to the applicable Creditor Trust Documents, each Creditor Trust shall a. expressly assume sole and exclusive responsibility and liability for (1) the Channeled Claims channeled to such Creditor Trust in accordance with the Master TDP and (2) all Creditor Trust Operating Expenses of such Creditor Trust and b. have (A) the rights provided to such Creditor Trust in accordance with the Private Entity Settlements and Public Entity Settlements and (B) all defenses, cross-claims, offsets and recoupments regarding such Channeled Claims that the Debtors, the Released Parties and the Shareholder Released Parties, as applicable, have, or would have had, under applicable law, but solely to the extent consistent with the applicable Creditor Trust Documents and the Plan; *provided* that no such Claims, defenses or rights may be asserted against any Protected Party.

(vii)    **Administration of Channeled Claims**. AllPursuant to the Master TDP, a. all Non-Federal Domestic Governmental Channeled Claims channeled to the Creditor Trusts will be administered, by NOAT and liquidated and discharged pursuant to, and to the extent provided in, the applicable Creditor Trust Documents. The Creditor Trustees shall determine the eligibility, amount and Allowance (if applicable) of the applicable Channeled Claims, in accordance with, and to the extent provided in, the applicable Creditor Trust Documents. In accordance with the trust distribution procedures and other provisions of the applicable Creditor Trust Documents, the Creditor Trustees shall also make all determinations with respect to Distributions to be made by the applicable Creditor Trust, whichNOAT TDP, b. all Tribe Channeled Claims will be administered by the Tribe Trust and liquidated and discharged in accordance with, and to the extent provided in, the Tribe TDP, c. all Third-Party Payor Channeled Claims will be administered by the TPP Trust and liquidated and

discharged in accordance with, and to the extent provided in, the TPP TDP, d. all Hospital Channeled Claims will be administered by the Hospital Trust and liquidated and discharged in accordance with, and to the extent provided in, the Hospital TDP, e. all NAS Monitoring Channeled Claims will be administered by the NAS Monitoring Trust and liquidated and discharged in accordance with, and to the extent provided in, the NAS Monitoring TDP, f. all PI Channeled Claims will be administered by the PI Trust and liquidated and discharged in accordance with, and to the extent provided in, the PI TDP. Each of the Creditor Trusts shall be funded in accordance with the Public Entity Settlements and the Private Entity Settlements, as applicable. The Creditor Trustees shall, in accordance with, and to the extent provided in, the applicable Creditor Trust TDPs, (y) determine the eligibility, amount and Allowance (if applicable) of such Channeled Claims; *provided* that, pursuant to the PI TDP, personal injury or wrongful death claims against the Debtors held by claimants who "opt out" of the liquidation procedures of the PI TDP shall, in accordance with and subject to the terms of the PI TDP, be liquidated in the tort system; and (z) make all determinations with respect to Distributions to be made by the respective Creditor Trusts. The foregoing determinations by the applicable Creditor TrusteeTrustees shall be final and binding, and shall not be subject to any challenge or review of any kind, by any court or other Person, except as set forth in the Creditor Trust DocumentsTDPs. Distributions by the Creditor Trusts shall be the sole source of recovery, if any, in respect of Channeled Claims channeled to the Creditor Trusts, and Holders of such Channeled Claims shall have no other or further recourse to the Protected Parties; *provided* that the foregoing shall not diminish, or otherwise alter, the rights of LRP Participating TPPs under the LRP Agreement. Distributions made by theeach Abatement TrustsTrust shall be exclusively in the form of Abatement Distributions to Authorized Recipients for Authorized Abatement Purposes solely as permitted pursuant to the applicableCreditor Trust TDP for such Abatement Trust Documents.

(viii)    **Institution and Maintenance of Legal and Other Proceedings.** As of the date upon which each Creditor Trust is established, such Creditor Trust shall be empowered to initiate, prosecute, defend and resolve all legal actions and other proceedings related to any Asset, liability or responsibility of such Creditor Trust. Such legal actions and other proceedings shall be limited solely to those required for purposes of reconciling, administering or defending against the Channeled Claims channeled to such Creditor Trust and for enforcing the rights of such Creditor Trust under the Plan and the Plan Documents (including the rights of the Creditor Trustee for the TPP Trust specifically enumerated in the LRP Agreement). Each Creditor Trust shall be empowered to initiate, prosecute, defend and resolve all such actions in the name of the Debtors or their Estates, in each case if deemed necessary by the applicable Creditor Trustee to fulfill the purposes for which such Creditor Trust was

created. Each Creditor Trust shall be responsible for the payment of all damages, awards, judgments, settlements, expenses, costs, fees and other charges incurred subsequent to the date upon which such Creditor Trust is established arising from, or associated with, any legal action or other proceeding brought pursuant to the foregoing. For the avoidance of doubt, each Creditor Trust, pursuant to section 1123(b)(3)(B) of the Bankruptcy Code and applicable state corporate law, is appointed as the successor-in-interest to, and representative of, the Debtors and their Estates for the retention, enforcement, settlement or adjustment of the applicable Channeled Claims channeled to such Creditor Trust.

(ix)    **Creditor Trust Operating Expenses.** The Creditor Trustees shall be entitled to reasonable compensation and to retain and reasonably compensate counsel and other professionals to assist in their duties without Bankruptcy Court approval, subject to the provisions of the applicable Creditor Trust Documents. Creditor Trust Operating Expenses of each Creditor Trust shall be satisfied and paid from such Creditor Trust's Creditor Trust Operating Reserve in accordance with the applicable Creditor Trust Documents. Periodically, until the dissolution of a Creditor Trust, the applicable Creditor Trustee will replenish the Creditor Trust Operating Reserve from Cash held or received by such Creditor Trust to the extent deemed necessary by such Creditor Trustee to satisfy and pay estimated future Creditor Trust Operating Expenses in accordance with the Creditor Trust Documents.

(x)    **U.S. Federal Income Tax Matters Relating to the Creditor Trusts.** Each Creditor Trust (other than any Tribe Trust entity that is formed as a legal entity other than a trust) is intended to be treated, and shall be reported, as a "qualified settlement fund" for U.S. federal income tax purposes and shall be treated consistently for state and local tax purposes to the extent applicable. All parties (including, without limitation, Holders of Claims against or Interests in the Debtors, the Related Parties of such Holders, the Debtors, the Creditor Trustees, TopCo and the Master Disbursement Trust) will be required to report consistently with the foregoing for all applicable tax reporting purposes. A Creditor Trustee from each relevant Creditor Trust shall be the "administrator" within the meaning of Treasury ~~Regulation~~Regulations section 1.468B-2(k)(3) of the applicable Creditor Trust. The administrator of each such Creditor Trust shall be responsible for filing all tax returns of the applicable Creditor Trust and the payment, out of the assets of such Creditor Trust, of any taxes due by or imposed on such Creditor Trust. Each Creditor Trustee may request an expedited determination of taxes under section 505(b) of the Bankruptcy Code for all tax returns filed by or on behalf of the applicable Creditor Trust for all taxable periods through the dissolution of such Creditor Trust. Nothing in ~~the~~ Section 5.7(j) of the Plan shall be deemed to determine, expand or contract the jurisdiction of the Bankruptcy Court under section 505 of the Bankruptcy Code. Subject to

guidance from the IRS, it is intended that NOAT's income shall be treated as exempt from U.S. federal income tax pursuant to IRC section 115, and shall be treated consistently for state and local tax purposes to the extent applicable.

(xi)     **Exculpation and Indemnification of the Creditor Trustees**. To the maximum extent permitted by applicable law, the Creditor Trustees shall not have or incur any liability for actions taken or omitted in their capacities as the Creditor Trustees, or on behalf of the respective Creditor Trusts, except those acts found by Final Order to be arising out of their willful misconduct, bad faith, gross negligence or fraud, and shall be entitled to indemnification and reimbursement for reasonable fees and expenses in defending any and all of their actions or inactions in their capacity as the Creditor Trustees, or on behalf of the respective Creditor Trusts, except for any actions or inactions found by Final Order to be arising out of their willful misconduct, bad faith, gross negligence or fraud. Any valid indemnification claim of the Creditor Trustees shall be satisfied from the respective Creditor Trusts.

(xii)    **Dissolution of the Creditor Trusts**. Each Creditor Trust shall be dissolved and the applicable Creditor Trustee shall be discharged from its duties with respect to such Creditor Trust upon completion of its duties and the satisfaction of the purposes of the Creditor Trust as set forth in the Plan and the applicable Creditor Trust Documents.

**8.**     *[Attorneys' Fees and Costs*[84][126]

[Reserved]

(i)     **Local Government and Tribe Attorneys' Fees and Costs**. On the Effective Date, the Local Government and Tribe Attorney Fee Fund shall be established for the payment of attorneys' fees and costs of Holders of Non-Federal Domestic Governmental Channeled Claims (other than States) and Holders of Tribe Channeled Claims (including any ad hoc group consisting of any of the foregoing), other than fees and costs paid pursuant to the MSGE Group Reimbursement Order. The Local Government and Tribe Attorney Fee Fund shall be funded in an aggregate amount not to exceed $275 million from [5.5]% of each Public Creditor Trust Distribution. Payments from the Local Government and Tribe Attorney Fee Fund and/or the Common Benefit Fund shall be the exclusive means of payment from the Debtors' Estates for fees and costs of any attorney of a Holder of a Non-Federal Domestic Governmental Channeled Claim (other than a State) or a Holder of a Tribe Channeled Claim (or any ad hoc group consisting of any of the foregoing), other than fees and costs paid pursuant to the MSGE Group Reimbursement Order,

---

[84][126]  These provisions remain subject to ongoing discussions.

the AHC Reimbursement Agreement Assumption Order or in accordance
with the Common Benefit Fund. All requests for payment of attorneys'
fees or costs inconsistent with Section 5.8(a) of the Plan, whether under
section 503 of the Bankruptcy Code or otherwise, by any Holder of a Non-
Federal Domestic Governmental Channeled Claim (other than a State) or
Holder of a Tribe Channeled Claim (or any ad hoc group consisting of any
of the foregoing) or any attorney therefor are hereby waived, and any such
request shall be Disallowed in full.

(ii)    **State Attorneys' Fees and Costs. On** the Effective Date, the State
Attorney Fee Fund shall be established for the payment of attorneys' fees
and costs of the States (including any ad hoc group thereof), other than
fees and costs paid pursuant to the AHC Reimbursement Agreement
Assumption Order. The State Attorneys Fee Fund shall be funded in an
aggregate amount not to exceed $225 million from [4.5]% of each Public
Creditor Trust Distribution. Payments from the State Attorney Fee Fund
and/or the Common Benefit Fund shall be the exclusive means of payment
from the Debtors' Estates for fees and costs of any attorney of a State (or
any ad hoc group thereof), other than fees and costs paid pursuant to the
AHC Reimbursement Agreement Assumption Order or in accordance with
the Common Benefit Fund. All requests for payment of attorneys' fees or
costs inconsistent with Section 5.8(b) of the Plan, whether under section
503 of the Bankruptcy Code or otherwise, by any State (or any ad hoc
group thereof) or any attorney therefor are hereby waived, and any such
request shall be Disallowed in full.

(iii)   **Common Benefit Escrow**. On the Effective Date, a Common Benefit
Escrow shall be established [on terms acceptable to the Governmental
Consent Parties] for the benefit of attorneys who have performed work
deemed to benefit all parties to the Chapter 11 Cases. The Common
Benefit Escrow shall be funded by assessments equal to [5]% of each
Distribution made by the Private Creditor Trusts. Such assessments will be
paid by the Private Creditor Trusts to the Common Benefit Escrow on
periodic schedules for each Private Creditor Trust acceptable to the
Governmental Consent Parties, Ad Hoc Group of Hospitals, Third-Party
Payor Group, NAS Committee and Ad Hoc group of Individual Victims,
as applicable. The Common Benefit Escrow shall be held in escrow until
an order is entered by the MDL Court establishing a Common Benefit
Fund, at which time the funds held by the Common Benefit Escrow and all
subsequent assessments shall be transferred to and distributed in
accordance with the order establishing the Common Benefit Fund. To the
extent a Holder of a Hospital Channeled Claim, a Third-Party Payor
Channeled Claim, an NAS Monitoring Channeled Claim, an NAS PI
Channeled Claim or a Non-NAS PI Channeled Claim (or any ad hoc group
consisting of any of the foregoing) has retained separate counsel through
an individual contingency fee arrangement, the amount payable under
Section 5.8(c) of the Plan shall be deducted from any contingency fees

and/or costs, in accordance with the Common Benefit Fund, owed to such separate counsel.[127]

(iv)    **NAS Monitoring Attorneys' Fees and Costs. On** the Effective Date, the NAS Monitoring Attorney Fee Fund shall be established for the payment of attorneys' fees and costs of the NAS Committee with respect to Holders of NAS Monitoring Channeled Claims. The NAS Monitoring Attorney Fee Fund shall be funded with an amount equal to a. [20]% of each Distribution made by the NAS Monitoring Trust *less* b. the amount of such Distributions payable to the Common Benefit Escrow and the Common Benefit Fund under Section 5.8(c) of the Plan. All requests for payments of attorneys' fees or costs inconsistent with Section 5.8(d) of the Plan, whether under section 503 of the Bankruptcy Code or otherwise, by any Holder of an NAS Monitoring Channeled Claim (or any ad hoc group thereof, including the NAS Committee) or any attorney therefor are hereby waived, and any such request shall be Disallowed in full. The NAS Monitoring Attorney Fee Fund shall be administered by the NAS Monitoring Trust on terms acceptable to the NAS Committee.

### 9.    *Transferability of Distribution Rights*

Any right to receive a Distribution or other payment from the Plan Administration Trust (including any PAT Distribution Account or PAT Reserve), a Creditor Trust or the Master Disbursement Trust (including the MDT Claims Reserve) shall not be evidenced by any certificate, security, receipt or in any other form or manner whatsoever, except on the books and records of the Plan Administration Trust (as maintained by the Plan Administration Trustee), the applicable Creditor Trust (as maintained by the applicable Creditor Trustees) or the Master Disbursement Trust (as maintained by the MDT Trustees), as applicable. Further, any right to receive a Distribution or other payment from the Plan Administration Trust (including any PAT Distribution Account or PAT Reserve), a Creditor Trust or the Master Disbursement Trust (including the MDT Claims Reserve) shall be nontransferable and nonassignable except by will, intestate, succession or operation of law. Any rights to receive a Distribution or other payment from the Plan Administration Trust (including any PAT Distribution Account or PAT Reserve), a Creditor Trust or the Master Disbursement Trust (including the MDT Claims Reserve) shall not constitute "securities" and shall not be registered pursuant to the Securities Act. If it is determined that such rights constitute "securities," the exemption provisions of section 1145(a)(1) of the Bankruptcy Code would be satisfied and such securities would be exempt from registration.

### 10.    *Insurance Neutrality*

Nothing in the Plan, the Plan Documents or the Confirmation Order, including any provision that purports to be preemptory or supervening, shall in any way relate to, or have the

---

[127] If the Common Benefit Fund provides for the reimbursement of attorneys' costs, a portion of the Common Benefit Fund assessment (up to 2% of Distributions) may be credited to the reimbursement of such counsel's costs, with the remainder of such assessment credited against such counsel's contingency fees.

effect of, impairing, altering, supplementing, changing expanding, decreasing or modifying (i) the rights or obligations of any of the Insurance Companies or (ii) any rights or obligations of the Debtors arising out of or under any Purdue Insurance Policy.

11.    *Transfer of Books and Records; Cooperation; Privilege*

(i)    **Transfer of Books and Records to NewCo and the Plan Administration Trust**. Except with respect to Excluded Assets, all documents, books and records of the Debtors shall be transferred and assigned to NewCo on or prior to the Effective Date pursuant to the NewCo Transfer Agreement; *provided* that, from and after the date of such transfer, the Plan Administration Trustee shall have the right to retain copies of all transferred documents, books and records and NewCo shall permit the Plan Administration Trustee and its counsel and representatives to have full access to such transferred documents, books and records. All documents, books and records of the Debtors that are Excluded Assets shall be transferred and assigned to the Plan Administration Trust; *provided* that, except for the Excluded Privileged Materials, NewCo shall receive copies of all documents, books and records of the Debtors that are Excluded Assets. Any documents transferred under Section 5.11(a) of the Plan that are documents that were produced to the Debtors by Shareholder Released Parties in connection with Purdue Legal Matters shall continue to remain subject to the terms of the Protective Order and any order of the Bankruptcy Court or provision of this Plan affording confidentiality protections to such documents, unless such documents are included in the Public Document Repository in accordance with the Plan and the Shareholder Settlement Agreement.

(ii)    **Cooperation with the Master Disbursement Trust and the Creditor Trusts**. On the Effective Date or as soon as reasonably practicable thereafter, the Debtors shall transfer and assign, or cause to be transferred and assigned, a. to the MDT Trustees, (1) copies of all MDT Insurance Policies, b. information and copies of documents, including books and records of the Debtors that reasonably relate to (A) any Claims previously noticed, tendered or submitted or paid by any Insurance Company under the MDT Insurance Policies and (B) any MDT Causes of Action, and (2) other information and copies of all other documents, including books and records of the Debtors that are reasonably necessary to preserve, secure or obtain the benefit of the MDT Insurance Rights, pursue the MDT Causes of Action or liquidate any other MDT Transferred Assets and c. to each Creditor Trust, a copy of the Proofs of Claims for Channeled Claims channeled to such Creditor Trust. Subject to Section 5.11(c) of the Plan, the materials to be provided pursuant to Section 5.11(b) of the Plan include those in the possession of the Debtors' current and former insurance coverage counsel. On and after the Effective Date, the Plan Administration Trustee and NewCo may maintain their respective documents, books and records in accordance with their

respective document retention policies set forth in the PAT Agreement and the NewCo Operating Agreement, respectively. Prior to the Effective Date, the Debtors shall use reasonable best efforts to provide the Creditors' Committee and the Governmental Consent Parties reasonable access to current employees and professionals of the Debtors (including insurance brokers) with knowledge concerning the information and documents to be provided to the Master Disbursement Trust under ~~the~~ Section 5.11(b) of the Plan, and, after the Effective Date, NewCo shall use best efforts to provide the Master Disbursement Trust reasonable access to employees and professionals of NewCo with knowledge concerning such information and documents and to facilitate access to former employees and professionals of the Debtors (including insurance brokers). The Plan Administration Trustee and NewCo shall respond to reasonable requests of (x) the MDT Trustees for information and documents related to the MDT Insurance Rights, the MDT Causes of Action or otherwise, in each case to the extent reasonably necessary for the administration of the Master Disbursement Trust, and (y) each Creditor Trustee for information and documents relating to the applicable Channeled Claims or otherwise, in each case to the extent reasonably necessary for the administration of the applicable Creditor Trust. In the event of any dispute between the MDT Trustees and NewCo regarding the delivery of information or documents requested pursuant to clause (x) of the foregoing sentence, the MDT Trustees shall have the right to request intervention by the TopCo Managers to resolve any such dispute.

(iii)   **Privilege**. The transfer or assignment of information and copies of documents, including books and records, in accordance with ~~the~~ Section 5.11 of the Plan, shall not result in the destruction or waiver of any applicable Privileges. On the Effective Date, all Privileges in connection with the information or documents transferred in accordance with ~~the~~ Section 5.11 of the Plan shall be transferred to, and vest exclusively in, NewCo, the MDT Trustees, the Plan Administration Trustee and the Creditor Trustees in accordance herewith. Further, with respect to the transfer of Privileges to the MDT Trustees and the Creditor Trustees, such Privileges shall a. be transferred to such MDT Trustees and Creditor Trustees for the purpose of enabling such Persons to perform their respective duties as set forth in the Plan or in the MDT Agreement or the applicable Creditor Trust Documents and for no other reason, b. vest solely in the MDT Trustees and the Creditor Trustees and not in the Master Disbursement Trust or the Creditor Trusts, or any other committee or subcomponent of the Master Disbursement Trust or the Creditor Trusts, or any other Person (including counsel and other professionals) who is (or has been engaged by, represents or has represented) any Holder of a Claim against or Interest in the Debtors or any Person that alleges or may allege a Claim, directly or indirectly, relating to or arising out of the Debtors' Products or operations and c. be preserved and not waived as a result of such transfer. For the avoidance of doubt, any such transfer shall have no

effect on any right, Claim or Privilege of any Person other than the Debtors. No information subject to a Privilege shall be disclosed or communicated by the MDT Trustees or the Creditor Trustees (x) to any Person not entitled to receive such information, including for the avoidance of doubt any Person (including counsel and other professionals) who is (or has been engaged by, represents or has represented) any Holder of a Claim against or Interest in the Debtors or any Person that alleges or may allege a Claim, directly or indirectly, relating to or arising out of the Debtors' Products or operations or (y) for any reason or in any manner other than as necessary for such Persons to perform their respective duties as set forth in the Plan or in the MDT ~~Agreement~~Documents or the applicable Creditor Trust Documents. Notwithstanding the foregoing, nothing herein shall preclude the MDT Trustees from providing information or documents received pursuant to ~~the~~ Section 5.11 of the Plan to any Insurance Company as necessary to preserve, secure or obtain the benefit of the MDT Insurance Rights.][85]

12.    ***Public Document Repository***[128]

(i)    **Documents.** On the Effective Date, or as soon as reasonably practicable thereafter, a Public Document Repository shall be established by the Debtors and hosted at an academic institution or library which academic institution or library shall have agreed to, and shall, maintain the Public Document Repository for not less than five (5) years from the date it is established. The Public Document Repository shall be publicly available at an easily identifiable and accessible website. The parameters of the Public Document Repository shall be acceptable to the Debtors, the Creditors Committee, Governmental Consent Parties and the DOJ, and shall contain at least the documents that will be part of the public document repository that the Debtors have agreed to create and host in connection with the DOJ Resolution. Debtors shall pay for reasonable costs and expenses to gather and transfer documents to the Public Document Repository. For the avoidance of doubt, the Public Document Repository shall not be held or administered by the Master Disbursement Trust or any Creditor Trust.

a.    The Public Document Repository shall contain a copy of the approximately [13,000,000] documents (of more than 100,000,000 pages) produced by Debtors during the course of the Purdue Legal Matters and shall include the following documents as produced by Debtors: (1) documents from the Debtors' email system from present and former officers and senior current and former employees in marketing, sales, R&D, legal, compliance, and

---

[85] ~~Subject to ongoing discussions, including with respect to exclusions for Privileged materials.~~

[128] This Section remains subject to ongoing review and revision, including with respect to terms proposed by the UCC and the States.

regulatory; (2) documents that ~~members of the~~ Sackler ~~family~~Family Members sent or received on the Debtors' email system; (3) documents that reflect clinical and pre-clinical research regarding opioids, including research related to safety and effectiveness of opioids; (4) minutes and documents presented to the Purdue Board of Directors; (5) marketing and sales plans for opioid medications; (6) sales call notes; (7) standard operating procedures; (8) suspicious order monitoring data and documents; and (9)reports of concern and ADD files pertaining to prescribers.

b.    The Public Document Repository shall also contain ~~(1)~~(1) all deposition transcripts taken in the Purdue Legal Matters of the Debtors' current or former employees and board members, together with the exhibits to ~~those~~such depositions~~, and (2)~~; *provided* that, with respect to any depositions taken in the Chapter 11 Cases of the Debtors' former employees and board members who are also Shareholder Released Parties, the inclusion in the Public Document Repository of the transcripts thereof and exhibits thereto (to the extent such exhibits were documents produced by a Shareholder Released Party) shall be subject to the terms set forth in the Shareholder Settlement Agreement; and (2) documents provided to the Special Committee for review.

c.    Communications between the Debtors and the DOJ regarding settlement between 2015 and 2020 shall not be in the Public Document Repository, nor shall any internal documents of the Debtors reflecting such discussions or the strategy for such discussions.

d.    Notwithstanding anything else in the Plan, the Public Document Repository shall not contain or disclose any documents or content of documents that are Privileged, including Privileged documents produced to the DOJ under non-waiver agreements and Privileged documents subject to a clawback by Debtors in the Purdue Legal Matters, or documents that are subject to protections against public disclosure by the Health Insurance Portability and Accountability Act or similar state or federal statute, or reveal the names or email addresses of individual employees or former employees of Debtors. Inadvertent production of Privileged documents to the Public Document Repository does not operate as a waiver of the Privilege and, upon discovery, any Privileged documents must be promptly removed from the Public Document Repository. Notwithstanding anything else in the Plan, any participation in the Public Document Repository by any Shareholder Released Parties shall be on terms and conditions solely set forth in the Shareholder Settlement Agreement.

229

(ii)    **Disclosure Oversight Special Master.** On the Effective Date or as soon as reasonably practicable thereafter, the Special Master shall be appointed by the Bankruptcy Court. The Special Master's qualifications shall include former service as a judicial officer, whether as a state or federal judge. No current or former director, officer, employee, or attorney of the Debtors or any Person (including counsel and other professionals) who is (or has been engaged by, represents or has represented) any Holder of a Claim against or Interest in the Debtors or any Person that alleges or may allege a Claim, directly or indirectly, relating to or arising out of the Debtors' Products or operations shall be eligible to be appointed as the Special Master or as counsel or staff working under the Special Master, or otherwise oversee or work in any capacity with the Public Document Repository; *provided* that prior work for a member of the Ad Hoc Committee or the MSGE Group that was completed prior to 2015 shall not preclude the appointment of a Special Master. The Special Master's reasonable fees and expenses shall be paid by NewCo. The Special Master shall oversee a program of public disclosure that includes the following:

   a.    accomplishing prompt, broad, permanent, public disclosure of millions of the Debtors' documents;

   b.    engaging with survivors, advocates, journalists, scholars and policymakers to ensure that the disclosure program serves the public;

   c.    coordinating with the host of the Public Document Repository;

   d.    ensuring protection for information for which protection is required, such as Privileged information, personal health information, personal identifying information, names and email addresses of individual current and former employees of Debtors, and information subject to confidentiality rights of third parties;

   e.    selecting and overseeing counsel and/or staff, if necessary, to support the duties and functions of the Special Master;

   f.    coordinating, as appropriate, with the disclosure of documents from other defendants in opioid cases; and

   g.    ensuring the long-term sustainability and success of the disclosure program.

(iii)    **Redaction.** To the extent that the Special Master determines that any otherwise non-Privileged information should be redacted to protect trade secrets, trade secrets shall not include information reflecting opioid sales or promotional strategies, tactics, targeting, or data, or internal communications related to sales or promotion of opioids.

(iv)    **Public Reporting.** On each of the first five anniversaries of the Effective Date, the Special Master shall publish a public report describing the activities of the disclosure program and the use of any funds expended.

13.    *Effective Date Cash; Surplus Reserved Cash*

(i)    **Effective Date Fixed Payments.** On the Effective Date, Effective Date Cash shall be used to fund a. a. the Professional Fee Escrow Account in an amount necessary to satisfy Professional Fee Claims in accordance with Section 2.1(b) of the Plan, b. b. the Priority Claims Reserve in an amount necessary to satisfy estimated Allowed Administrative Claims (other than Professional Fee Claims and the DOJ Forfeiture Judgment Claim), Allowed Secured Claims and Allowed Priority Claims, c. c. the Disputed Claims Reserves in accordance with Section 7.1 of the Plan, d. d. the Disputed Cure Claims Reserve in accordance with Section 8.2(d) of the Plan, e. e. the Wind-Up Reserve in accordance with Section 5.3(d) of the Plan, f. f. the MDT Operating Reserve in accordance with Section 5.6(f) of the Plan, g. g. the Initial NewCo Cash in accordance with Section 5.4(c) of the Plan, h. h. the applicable PAT Distribution Account in the amounts necessary to make Distributions required in accordance with Article IV of the Plan in respect of Allowed Federal Government Unsecured Claims, Allowed Adlon General Unsecured Claims and Allowed Avrio General Unsecured Claims, each to the extent Allowed as of the Effective Date, i. i. the Truth Initiative Contribution and the attorneys' fees of the Ratepayer Mediation Participants in satisfaction of Ratepayer Claims in accordance with Section 4.8 of the Plan, j. j. the Initial Private Creditor Trust Distributions, k. k. the Initial Tribe Trust Distribution, l. l. the Initial Federal Government Distribution, m. amounts required to establish the Public Document Repository in accordance with Section 5.12 of the Plan, m. n. the upfront insurance premium payments and other amounts in accordance with Sections 5.3(e), 5.4(g), and 5.5(d) and 8.9(a) of the Plan and n. o. any other amounts required to be paid on the Effective Date pursuant to the Plan. No later than five (5) Business Days prior to the Effective Date, the Debtors shall provide notice to the Creditors' Committee and the Governmental Consent Parties of the then-current estimated amount of Effective Date Cash and all amounts described in the Section 5.13(a) of the Plan, and shall promptly notify the Creditors' Committee and the Governmental Consent Parties of any changes to such estimations prior to the Effective Date. Any objection by the Creditors' Committee or the Governmental Consent Parties with respect to the Debtors' proposed amount of funding of any PAT Reserve shall be resolved by the Bankruptcy Court.

(ii)    **Initial NOAT Distribution**. On the Effective Date, all Effective Date Cash remaining after the satisfaction of all amounts described in the foregoing clause (i) shall be used to make the Initial NOAT Distribution,

which is currently estimated to be $~~250~~225 million.[~~86~~129] An updated estimate of the Initial NOAT Distribution shall be provided in the Plan Supplement.

(iii)   **Surplus Reserved Cash**. Prior to the dissolution of the Plan Administration Trust, the Plan Administration Trustee shall determine, on each six (6)-month anniversary of the Effective Date, whether the amounts available in any PAT Reserve exceed the amounts necessary to satisfy the purpose for which such reserves were established. If the Plan Administration Trustee determines that a surplus exists in any PAT Reserve as of the date of such determination, such Surplus Reserve Cash shall be a. *first*, used to satisfy any funding deficiency in any other PAT Reserve and b. *second*, with respect to any amounts not used to satisfy any such funding deficiency in another PAT Reserve, transferred to the Master Disbursement Trust in accordance with the MDT Agreement. All Cash and cash equivalents of the Plan Administration Trust remaining upon the dissolution of Plan Administration Trust, including any remaining Surplus Reserve Cash in the PAT Reserves, shall be transferred to the Master Disbursement Trust in accordance with the MDT Agreement.

## *14.   Corporate Action*

(i)   **Dissolution of Boards of the Debtors**. As of the Effective Date, the respective boards of directors and managers, as applicable, of each of the Debtors shall be terminated and dissolved and the members of each of the boards of directors and managers, as applicable, of the Debtors shall be deemed to have resigned.

(ii)   **Continued Existence of the Liquidating Debtors**. Each of the Debtors, other than the Transferred Debtors, shall continue to exist as a Liquidating Debtor after the Effective Date in accordance with the laws of the state under which such Debtor was formed and pursuant to its certificate of incorporation, bylaws, articles of formation, operating agreement, and other organizational documents, as applicable, in effect prior to the Effective Date, except to the extent such organizational documents are amended under the Plan, for the limited purposes of liquidating all of the Assets of such Debtor's Estate and making distributions in accordance with the Plan. From and after the Effective Date, except as set forth herein, the Liquidating Debtors a. for all purposes shall be deemed to have withdrawn their business operations from any state in which the Liquidating Debtors were previously conducting, or are registered or licensed to conduct, their business operations, and shall not be required to file any document, pay any sum, or take any other action in order to

---

[~~86~~129]   The final amount of the Initial NOAT Distribution on the Effective Date is subject to adjustment for items outside of the Debtors' control, including but not limited to, potential variability in investment monetization proceeds, higher than forecasted restructuring-related professional fees and cash collateral necessary to secure insurance coverage for NewCo and TopCo.

effectuate such withdrawal, b. shall be deemed to have canceled pursuant to the Plan all PPI Interests and, as of the PPLP Dissolution Date, all PPLP Interests, and c. shall not be liable in any manner to any taxing authority for franchise, business, license or similar taxes accruing on or after the Effective Date.

(iii)   **Appointment of the PPLP Liquidator as the Sole Representative for the Liquidating Debtors.** On the Effective Date, the PPLP Liquidator shall be appointed as the sole director and sole officer of the Liquidating Debtors, and shall succeed to the powers of the Liquidating Debtors' general partners, directors and officers. From and after the Effective Date, the PPLP Liquidator shall be the sole representative of, and shall act for, the Liquidating Debtors and administer the winding up and dissolution of the Liquidating Debtors. The PPLP Liquidator shall act for the Liquidating Debtors in the same fiduciary capacity as applicable to a board of directors and officers, subject to the provisions hereof (and all certificates of formation, partnership agreements, operating agreements, membership agreements and related documents are deemed amended by the Plan to permit and authorize the same). Any fees and expenses incurred by the PPLP Liquidator shall be paid by the Plan Administration Trustee from the Wind-Up Reserve.

(iv)   **Merger; Dissolution; Consolidation of the Liquidating Debtors**. On or after the date(s) upon which the Plan Administration Trust is established, the Liquidating Debtors or the PPLP Liquidator may, subject to the terms of the Plan, cause any or all of the Liquidating Debtors to be merged into one or more of the Liquidating Debtors, dissolved or otherwise consolidated and engage in any other transaction in furtherance of the Plan. Notwithstanding the foregoing, upon the dissolution of each Liquidating Debtor by the PPLP Liquidator after the completion of the acts required of such Liquidating Debtor pursuant to the Plan, such Liquidating Debtor shall be deemed dissolved for all purposes without the necessity for any other or further actions to be taken by or on behalf of such Liquidating Debtor; *provided*, *however*, that each Liquidating Debtor or the PPLP Liquidator, as applicable, shall file with the office of the Secretary of State, or other appropriate office for the state of its organization, a certificate of cancellation or dissolution.

(v)   **Charter and Bylaws**. To the extent necessary or appropriate, the charters, by-laws and other organizational documents of the Debtors shall be amended, or amended and restated as necessary, in a manner consistent with section 1123(a)(6) of the Bankruptcy Code, if applicable, and the terms of the Plan.

(vi)   **No Further Action**. Each of the matters provided for under the Plan involving the corporate structure of the Debtors or the Plan Administration Trust, or corporate action to be taken by or required of the Debtors, shall,

as of the Effective Date, be deemed to have occurred (unless contemplated hereunder to occur after the Effective Date) and be effective as provided herein, and shall be authorized and approved in all respects without any requirement of further action by any Person, including, but not limited to, the Plan Administration Trustee, the PPLP Liquidator, Holders of Claims against or Interests in the Debtors or directors or officers of the Debtors.

(vii)   **Effectuating Documents**. Prior to or after the Effective Date, any appropriate officer of the Debtors or the PPLP Liquidator, as applicable, shall be authorized to execute, deliver, file or record such contracts, instruments, releases, indentures and other agreements or documents, and to take such actions as may be necessary or appropriate to effectuate and further evidence the terms and conditions of the Plan.

(viii)  **Exculpation and Indemnification of the PPLP Liquidator.** To the maximum extent permitted by applicable law, the PPLP Liquidator shall not have or incur any liability for actions taken or omitted in its capacity as the PPLP Liquidator, except those acts found by Final Order to be arising out of its willful misconduct, bad faith, gross negligence, or fraud, and shall be entitled to indemnification and reimbursement for reasonable fees and expenses in defending any and all of its actions or inactions in its capacity as the PPLP Liquidator, except for any actions or inactions found by Final Order to be arising out of its willful misconduct, bad faith, gross negligence or fraud. Any valid indemnification claim of the PPLP Liquidator shall be satisfied from the Wind-Up Reserve.

### 15.   *Cancellation of Notes, Interests, Instruments, Certificates and Other Documents*

Except as otherwise provided herein, on and after the Effective Date, all PPLP Interests and PPI Interests and all notes, instruments, certificates, agreements, indentures, mortgages, security documents and other documents evidencing Claims against or Interests in the Debtors or obligations of the Debtors or the Liquidating Debtors, as applicable, thereunder or in any way related to the foregoing shall be deemed canceled, satisfied in full and of no further force or effect without any need for further action or approval of the Bankruptcy Court.

### 16.   *Closing of Chapter 11 Cases*

After a Debtor's Estate has been fully administered, the Plan Administration Trustee shall seek authority from the Bankruptcy Court to close the applicable Chapter 11 Case in accordance with the Bankruptcy Code and Bankruptcy Rules.

## E.   Distributions

### 1.   *Distributions Generally*

Except as otherwise provided in the Plan or the PAT Agreement, all Distributions in respect of Allowed Claims, other than Channeled Claims, shall be made by the Disbursing

Agent, or such other Persons designated by the Plan, in accordance with the terms of the Plan, including the Article VI of the Plan. Except with respect to Sections 6.17 and 6.20 of the Plan, the Article VI of the Plan shall not apply to Channeled Claims.

### 2.    *Distributions on the Effective Date*

On the Effective Date or as soon as reasonably practicable thereafter, the Disbursing Agent shall make Distributions (i) from the Priority Claims Reserve in respect of Allowed Administrative Claims, Allowed Secured Claims and Allowed Priority Claims, each in an amount and to the extent Allowed as of the Effective Date, and (ii) from the PAT Distribution Account in respect of Allowed Federal Government Unsecured Claims, Allowed Avrio General Unsecured Claims and Allowed Adlon General Unsecured Claims, each in an amount required in accordance with the Article VI of the Plan and solely to the extent Allowed as of the Effective Date.

### 3.    *Date of Distributions*

In the event that any payment or act under the Plan is required to be made or performed on a date that is not a Business Day, then the making of such payment or the performance of such act may be completed on the next succeeding Business Day, but shall be deemed to have been completed as of the required date.

### 4.    *Disbursing Agent*

The Disbursing Agent shall be deemed to hold all property to be distributed under the Plan in trust for the Persons entitled to receive the same. The Disbursing Agent shall not hold an economic or beneficial interest in the property to be distributed under the Plan. The Disbursing Agent shall not be required to give any bond or surety or other security for the performance of its duties.

### 5.    *Rights and Powers of Disbursing Agent*

The Disbursing Agent shall be empowered to (i) effect all actions and execute all agreements, instruments and other documents necessary to perform its duties under the Plan, (ii) make all Distributions contemplated by the Plan, (iii) employ professionals to represent it with respect to its responsibilities and (iv) exercise such other powers as may be vested in the Disbursing Agent by order of the Bankruptcy Court, pursuant to the Plan or as deemed by the Disbursing Agent to be necessary and proper to implement the provisions of the Plan.

The Disbursing Agent shall only be required to act and make Distributions in accordance with the terms of the Plan and the PAT Agreement, and shall have no (x) liability for actions taken in accordance with the Plan and the PAT Agreement or in reliance upon information provided to it in accordance with the Plan or (y) obligation or liability in respect of any Channeled Claims or for Distributions under the Plan to any party who does not hold an Allowed Claim administered by the Plan Administration Trust at the time of Distribution or who does not otherwise comply with the terms of the Plan; *provided*, *however*, that the foregoing shall not affect the liability that otherwise would result from any such act or omission to the extent such

act or omission is determined by a Final Order to have constituted willful misconduct, gross negligence, intentional fraud or criminal conduct of any such Person.

### 6.    Expenses of Disbursement Agent

Any reasonable fees and expenses incurred by the Disbursing Agent on or after the Effective Date shall be paid in Cash by the Plan Administration Trustee from the Wind-Up Reserve.

### 7.    Delivery of Distributions

Subject to Bankruptcy Rule 9010, the Disbursing Agent shall make all Distributions to any Holder of an Allowed Claim at the address of such Holder (i) as set forth on the Schedules filed with the Bankruptcy Court or (ii) on the books and records of the Debtors or their agents, unless the Disbursing Agent has been notified in writing of a change of address, including, without limitation, by filing of a Proof of Claim by such Holder that contains an address for such Holder that is different than the address of such Holder as set forth in the Schedules or on such books and records of the Debtors.

### 8.    Undeliverable and Unclaimed Distributions

In the event that any Distribution to any Holder of an Allowed Claim is returned as undeliverable, no Distribution to such Holder shall be made unless and until the Disbursing Agent has been notified of the then-current address of such Holder, at which time or as soon as reasonably practicable thereafter such Distribution shall be made to such Holder without interest; *provided*, *however*, that all Distributions made by the Disbursing Agent that are unclaimed for a period of six (6) months after the Distribution thereof shall be deemed unclaimed property under section 347(b) of the Bankruptcy Code and shall revest in the Plan Administration Trust, and any entitlement of any Holder of any Claims to such Distributions shall be extinguished and forever barred.

### 9.    Distribution Record Date

As of the close of business on the Distribution Record Date, the Claims register shall be closed. The Disbursing Agent shall have no obligation to recognize any transfer of any such Claims occurring after the close of business on the Distribution Record Date and shall instead be entitled to recognize and deal, for all purposes under the Plan, with only those Holders of record as of the close of business on the Distribution Record Date.

### 10.   Manner of Payment under Plan

At the option of the Disbursing Agent, any Cash payment to be made pursuant to the Plan may be made by a check or wire transfer or as otherwise required or provided in the PAT Agreement.

### 11.   Minimum Cash Distributions

The Disbursing Agent shall not be required to make any Distributions of Cash in an amount less than $100, or such lower amount as determined by the Disbursing Agent in accordance with the PAT Agreement, to any Holder of an Allowed Claim; *provided*, *however*, that if any Distribution is not made pursuant to ~~the~~ Section 6.11 of the Plan, such Distribution shall be added to any subsequent Distribution to be made on behalf of such Holder's Allowed Claims. The Disbursing Agent shall not be required to make any final Distribution of Cash in an amount less than $25 to any Holder of an Allowed Claim. If the amount of any final Distribution to any Holder of Allowed Claims would be $25 or less, then such Distribution shall be made available for Distribution to all Holders of Allowed Claims in the same Class receiving final Distributions of at least $25.

### 12.    Setoffs and Recoupment

Subject to Section 2.1 and Sections 10.5 through ~~10.12~~10.13 of the Plan, the Disbursing Agent may, but shall not be required to, set off against or recoup from any Claim against the Debtors, and from any payments to be made pursuant to the Plan with respect to such Claim, any Claims of any nature whatsoever (to the extent permitted by applicable law) that the Debtors or the Plan Administration Trust, as applicable, may have against the Holder of such Claim, but neither the failure to do so nor the allowance of any Claim hereunder shall constitute a waiver or release by the Debtors or the Plan Administration Trust of any such Claim it may have against such Holder.

### 13.    Claims Paid or Payable by Third Parties

The Plan Administration Trustee shall reduce in full a Claim against the Debtors, and such Claim shall be Disallowed without a Claims objection having to be filed and without any further notice to or action, order or approval of the Bankruptcy Court, to the extent that the Holder of such Claim receives payment in full on account of such Claim from any Person that is not a Debtor. Subject to the last sentence of this paragraph, to the extent a Holder of a Claim against the Debtors receives a Distribution on account of such Claim and receives payment from a Person that is not a Debtor on account of such Claim, such Holder shall, within fourteen (14) days of receipt thereof, repay or return the Distribution to the Plan Administration Trust to the extent the Holder's total recovery on account of such Claim from the third party and under the Plan exceeds the amount of such Claim as of the date of any such Distribution under the Plan. The failure of such Holder to timely repay or return such Distribution shall result in the Holder owing the Debtors annualized interest at the federal judgment rate on such amount owed for each Business Day after the fourteen (14)-day grace period specified above until the amount is repaid.

### 14.    Distributions After Effective Date

Distributions made after the Effective Date to Holders of Disputed Claims that are not Allowed Claims as of the Effective Date, but which later become Allowed Claims, shall be deemed to have been made on the Effective Date.

### 15.    No Postpetition Interest and Penalties on Claims

Unless otherwise provided for in the Plan or the Confirmation Order or required by the Bankruptcy Code, no Holder of a Claim shall be entitled to interest accruing on or after the

Petition Date or to penalties on any Claim. Any such interest or penalty component of any such Claims, if Allowed, shall be paid only in accordance with section 726(b) of the Bankruptcy Code.

### 16.    *Allocation of Distributions Between Principal and Interest*

To the extent that any Allowed Claim is based upon any obligation or instrument that is treated for U.S. federal income tax purposes as indebtedness of any Debtor or any other Person and is entitled to accrued but unpaid interest thereon, it is intended, subject to applicable law, that such Distribution shall be allocated first to the principal amount of the Allowed Claim (as determined for U.S. federal income tax purposes) and then, to the extent the consideration exceeds the principal amount of the Allowed Claim, to accrued but unpaid interest.

### 17.    *No Constructive Receipt*

No Holder of Claims against the Debtors shall be treated as receiving a Distribution for U.S. federal income tax purposes except to the extent such Holder is entitled to receive such Distribution directly under the Plan (or such Distribution is made in satisfaction of an obligation of such Holder). All parties (including, without limitation, Holders of Claims against or Interests in the Debtors, the Related Parties of such Holders, the Debtors, the Master Disbursement Trust, the MDT Trustees and the Creditor Trusts) shall report consistently with the foregoing for U.S. federal income tax purposes.

### 18.    *No Distribution in Excess of Amount of Allowed Claim*

Notwithstanding anything to the contrary in the Plan, no Holder of an Allowed Claim shall receive, on account of such Allowed Claim, Distributions in excess of the Allowed amount of such Claim when combined with amounts received by such Holder from other sources.

### 19.    *Satisfaction of Claims*

Unless otherwise provided herein, the Distributions and deliveries to be made on account of Allowed Claims under the Plan shall, in the aggregate, be in complete and final satisfaction, settlement and discharge of, and exchange for, such Allowed Claims. The Distributions and deliveries to be made on account of Claims under this Plan shall additionally be in consideration of the release and discharge of any and all Released Claims or Shareholder Released Claims related to or arising from such Claims.

### 20.    *Withholding and Reporting Requirements*

(i)    **Withholding Rights**. In connection with the Plan, and all instruments or Interests issued in connection therewith and in consideration thereof, any party issuing any instrument or Interest or making any Distribution described in the Plan shall comply with all applicable withholding and reporting requirements imposed by any U.S. federal, state or local or foreign taxing authority, and all Distributions pursuant to the Plan and all related agreements shall be subject to any such withholding or reporting requirements. In the case of a non-Cash Distribution that is subject to

withholding, the distributing party may withhold a portion of such distributed property equal in value to the tax required to be withheld, and either a. sell such withheld property to generate Cash necessary to pay over the withholding tax (or reimburse the distributing party for any advance payment of the withholding tax), or b. pay the withholding tax using its own funds and retain such withheld property. Any amounts withheld pursuant to ~~the~~ Section 6.20(a) and properly remitted to the applicable Governmental Unit shall be deemed to have been distributed to, and received by, the applicable recipient for all purposes of the Plan. In the event that any Person issues any instrument or Interest or makes any non-Cash Distribution pursuant to the Plan that is subject to withholding tax and such issuing or distributing party has not sold such withheld property to generate Cash to pay the withholding tax, or paid the withholding tax using its own funds and retained such withheld property as described above, such issuing or distributing party has the right, but not the obligation, to not make a Distribution until such Holder has made arrangements reasonably satisfactory to such issuing or disbursing party for payment of any such tax obligations, after which such issuing or disbursing party shall return to such Holder the portion of the property previously withheld.

(ii)  **Forms**. Any party entitled to receive any Cash or other property under the Plan shall, upon request, deliver to the Disbursing Agent, the Master Disbursement Trust, the applicable Creditor Trust, NewCo, TopCo or such other Person designated by the Plan Administration Trustee (which Person shall subsequently deliver to the Disbursing Agent any applicable IRS Form W-8 or Form W-9 received), as applicable, a properly executed IRS Form W-9 or Form W-8, as applicable, and any other forms or documents reasonably requested by such party, to reduce or eliminate any withholding required by any federal, state, local or foreign taxing authority. If any such request is made by such party in accordance with the foregoing, and the Holder fails to comply before the date that is three hundred sixty-five (365) calendar days after the request is made, the amount of such Distribution shall irrevocably revert to the Plan Administration Trust, the Master Disbursement Trust, the applicable Creditor Trust, NewCo or TopCo, as applicable, and any Claim with respect to such Distribution shall be discharged and forever barred from assertion against such party or its property.

(iii)  **Tax Liability.** Notwithstanding Section 6.20(a) of the Plan, each Holder of a Claim or other Person that receives or is to receive a Distribution pursuant to the Plan shall have the sole and exclusive responsibility for the satisfaction and payment (to the extent not withheld from such Distribution pursuant to Section 6.20(a) of the Plan) of any tax obligations imposed on such Holder by any Governmental Unit, including income, withholding and other tax obligations, on account of such Distribution.

239

### 21.    *Post-Confirmation Claims*

Except as otherwise provided in the applicable Creditor Trust TDP, in the event a Person seeks payment at any time on account of a Channeled Claim as to which no Proof of Claim was filed before the Bar Date and/or for which no motion seeking leave or order granting leave to file a late claim was filed or entered before the Confirmation Date, such Person shall not be entitled to any payment or distribution on account of such Channeled Claim unless the Bankruptcy Court, by final non-appealable order, first grants leave to file a Proof of Claim; if such leave is granted, such Person shall be entitled to receive payment or distributions on account of such Channeled Claim only subject to and in accordance with the provisions of the Plan Documents, including the Master TDP and the Creditor Trust TDPs, as applicable. After the Effective Date, the MDT Trustees and the Creditor Trustees shall have standing to participate in any action before the Bankruptcy Court in respect of the foregoing. For the avoidance of doubt, nothing in this paragraph is intended or shall be construed to enlarge, amend, or modify the provisions of the Bar Date Order, nor is anything in this paragraph intended to derogate from, modify, or amend, the terms and conditions of any Creditor Trust TDP or the Master TDP, nor of the rights of any MDT Trustee, Creditor Trustee or claims administrator for any Creditor Trust.

## F.    **Procedures for Disputed Claims**

### 1.    *Procedures for Disputed Claims Generally*

Except as otherwise provided in the Plan or the PAT Agreement, all Claims against the Debtors that are Disputed as of the Effective Date (other than Channeled Claims) shall be subject to the claims resolution procedures set forth in the Plan, including the <u>Article VII</u> of the Plan. The <u>Article VII</u> of the Plan shall not apply to Channeled Claims.

### 2.    *Disputed Claims Reserve*

From and after the Effective Date, and until such time as all Disputed Claims have been compromised and settled or determined by a Final Order of the Bankruptcy Court, the Plan Administration Trustee shall, consistent with and subject to section 1123(a)(4) of the Bankruptcy Code, with respect to each applicable Class of Claims against the Debtors, retain in the applicable Disputed Claims Reserve for such Class an aggregate amount equal to the Distributions that would have been made to Holders of Disputed Claims of such Class as if such Disputed Claims were Allowed Claims against the Debtors, in each case in an amount equal to the least of (i) the filed amount of such Disputed Claims, (ii) the amount determined, to the extent permitted by the Bankruptcy Code and Bankruptcy Rules, by the Bankruptcy Court for purposes of fixing the amount to be retained for such Disputed Claims and (iii) such other amounts as may be agreed upon by the Holders of such Disputed Claims and the Plan Administration Trustee.

### 3.    *Claim Objections*

On or after the Effective Date, except as otherwise provided in the Plan or the PAT Agreement, objections to Claims against the Debtors may be interposed and prosecuted only by the Plan Administration Trustee. Except as otherwise provided in <u>Section 2.1</u> of the Plan with respect to Administrative Claims, any objections to Claims against the Debtors shall be served

on the respective Holders of such Claims and filed with the Bankruptcy Court (i) on or before one hundred eighty (180) days following the later of a. the Effective Date and b. the date that a Proof of Claim is filed or amended or a Claim is otherwise asserted or amended in writing by or on behalf of a Holder of such Claim or (ii) on such later date as may be fixed by the Bankruptcy Court.

### 4.    *No Distribution Pending Allowance*

Except as otherwise expressly provided in the Plan or the PAT Agreement, if any portion of a Claim is Disputed, no payment or Distribution provided under the Plan shall be made on account of such Claim unless and until such Disputed Claim becomes an Allowed Claim.

### 5.    *Estimation of Claims*

The Debtors (before the Effective Date) or the Plan Administration Trustee (on or after the Effective Date) may, at any time, request that the Bankruptcy Court estimate, pursuant to section 502(c) of the Bankruptcy Code, any Disputed Claim that the Bankruptcy Court has jurisdiction to estimate in accordance with the Bankruptcy Code or other applicable law, regardless of whether an objection was previously filed with the Bankruptcy Court with respect to such Claim, or whether the Bankruptcy Court has ruled on any such objection, and the Bankruptcy Court shall retain jurisdiction to estimate any Claim at any time during litigation concerning any objection to any such Claim, including during the pendency of any appeal relating to any such objection. If the Bankruptcy Court estimates a Disputed Claim, such estimated amount shall constitute either the Allowed amount of such Claim, the amount used to determine the Disputed Claims Reserves or a maximum limitation on such Claim, as determined by the Bankruptcy Court. If such estimated amount constitutes a maximum limitation on such Claim, the Plan Administration Trustee may elect to pursue any supplemental proceeding to object to any ultimate Distribution on account of such Claim.

### 6.    *Distribution After Allowance*

On the first PAT Distribution Date following the date on which a Disputed Claim becomes an Allowed Claim against a Debtor, the Disbursing Agent shall remit to the respective PAT Distribution Account, for Distribution to the Holder of such Allowed Claim, the Cash or cash equivalents retained in the applicable Disputed Claims Reserve in an amount equal to the amount that would have been distributed to the Holder of such Claim from the Effective Date through and including the PAT Distribution Date if such Claim had been Allowed as of the Effective Date (net of any costs and expenses, including taxes, of the applicable Disputed Claims Reserve).

### 7.    *Resolution of Claims*

Except as expressly provided in the Plan, the PAT Agreement or any order entered by the Bankruptcy Court before the Effective Date, including the Confirmation Order, the Plan Administration Trustee shall have and retain any and all rights and defenses held by the Debtors with respect to any Claim against the Debtors as of the Petition Date, and shall have the authority to compromise, settle, otherwise resolve or withdraw any objections to such Claims and to compromise, settle or otherwise resolve any Disputed Claims without approval of the

Bankruptcy Court. If the Plan Administration Trustee and a Holder of a Disputed Claim are unable to reach a settlement on the Disputed Claim, such Disputed Claim shall be submitted to the Bankruptcy Court for resolution.

### 8.    *Property Held in Disputed Claims Reserves*

Each Holder of a Disputed Claim that ultimately becomes an Allowed Claim shall have recourse only to the undistributed Cash held in the applicable Disputed Claims Reserve for satisfaction of the Distributions to which such Holder is entitled under the Plan and the PAT Agreement (net of any costs and expenses, including taxes, of the applicable Disputed Claims Reserve), and not against any Protected Party or any Assets previously distributed on account of any Allowed Claim.

### 9.    *Claims Resolution Procedures Cumulative*

All of the objection, estimation, settlement and resolution procedures set forth in the Plan with respect to Claims against the Debtors are intended to be cumulative and not exclusive of one another. Claims against the Debtors may be established and subsequently settled, compromised, withdrawn or resolved in accordance with the Plan by any mechanism approved by the Bankruptcy Court.

### 10.    *No Postpetition Interest or Penalties on Disputed Claims*

Unless otherwise specifically provided for in the Plan or the Confirmation Order or required by applicable bankruptcy law, no Holder of a Claim shall be entitled to interest accruing on or after the Petition Date or to any penalties on any Claim. Interest and penalties shall not accrue or be paid upon any Disputed Claim with respect to the period from the Effective Date to the date a Distribution is made thereon, or on and after such Disputed Claim becomes an Allowed Claim.

## G.    **Executory Contracts and Unexpired Leases**

### 1.    *Assumption and Rejection of Executory Contracts and Unexpired Leases*

(i)    As of and subject to the occurrence of the Effective Date, all executory contracts and unexpired leases to which any Debtor is a party, as amended pursuant to Section 8.4, shall be deemed assumed by the applicable Debtor and, except with respect to any contract or lease held by a Transferred Debtor, assigned to NewCo or its designee, except for any executory contract or unexpired lease that a. has previously been assumed or rejected pursuant to a Final Order of the Bankruptcy Court, b. is specifically identified on the Schedule of Rejected Contracts, c. is the subject of a separate assumption or rejection motion filed by the Debtors under section 365 of the Bankruptcy Code pending on the Confirmation Date, d. is the subject of a pending Contract Dispute or e. is being otherwise treated pursuant to the Plan. The Debtors reserve the right to modify the treatment of any particular executory contract or unexpired lease pursuant to the Plan. Furthermore, notwithstanding anything to the contrary in the

Plan, the Debtors may alter, amend, modify or supplement the Schedule of Rejected Contracts and assume, assume and assign or reject executory contracts and unexpired leases at any time prior to the Effective Date or, with respect to any executory contract or unexpired lease subject to a Contract Dispute that is resolved after the Effective Date, within thirty (30) days following entry of a Final Order of the Bankruptcy Court resolving such Contract Dispute.

(ii)    Subject to the occurrence of the Effective Date, the payment of any applicable Cure Amount and the resolution of any Contract Dispute, the entry of the Confirmation Order shall constitute approval of the rejections, assumptions and assumptions and assignments provided for in the Plan pursuant to sections 365(a) and 1123 of the Bankruptcy Code. Unless otherwise indicated herein or provided in a separate order of the Bankruptcy Court, rejections, assumptions and assumptions and assignments of executory contracts and unexpired leases pursuant to the Solicitation Procedures Order and the Plan are effective as of the Effective Date. Each executory contract and unexpired lease assumed pursuant to the Plan or by order of the Bankruptcy Court shall vest in and be fully enforceable by the applicable Debtor or NewCo, in each case in accordance with its terms, except as modified by the provisions of the Plan, any order of the Bankruptcy Court authorizing and providing for its assumption, or applicable law.

(iii)    Unless otherwise provided herein (including Section 8.4 of the Plan) or by separate order of the Bankruptcy Court, each executory contract or unexpired lease that is assumed or assumed and assigned shall include any and all modifications, amendments, supplements, restatements or other agreements made directly or indirectly by any agreement, instrument or other document that in any manner affects such executory contract or unexpired lease, without regard to whether such agreement, instrument or other document is listed in an Assumption Notice.

(iv)    Except as otherwise expressly set forth on an Assumption Notice, any contracts, engagement letters, retention agreements, and similar arrangements, in each case between the Debtors and any attorneys, accountants, financial advisors, investment bankers or similar professionals, representatives or advisors, shall not be treated under the Plan as executory contracts subject to assumption, assumption and assignment, or rejection. Counterparties to any such contracts, engagement letters, retention agreements and similar arrangements were required to file Proofs of Claim by the General Bar Date, and any Allowed Claims relating thereto shall be treated as Other General Unsecured Claims or Co-Defendant Claims, as applicable.

2.    *Determination of Contract Disputes and Deemed Consent*

(i)        The Debtors shall serve Assumption Notices in accordance with the Solicitation Procedures Order. If a counterparty to an executory contract or unexpired lease receives an Assumption Notice, but such executory contract or unexpired lease is not listed therein, the proposed Cure Amount for such executory contract or unexpired lease shall be deemed to be zero dollars ($0).

(ii)      Any counterparty to an executory contract or unexpired lease shall have the time prescribed in the Solicitation Procedures Order to object to a. the Cure Amount identified on the Assumption Notice, b. adequate assurance of future performance by the applicable Debtor, NewCo or its assignee (within the meaning of section 365 of the Bankruptcy Code) and c. any other matter pertaining to assumption or assumption and assignment of such executory contract or unexpired lease on the terms set forth in the Plan and such Assumption Notice.

(iii)    To the extent a Contract Dispute is asserted in an objection filed in accordance with the procedures set forth in the Assumption Notice, such Contract Dispute shall be heard by the Bankruptcy Court at the Confirmation Hearing. Following resolution of a Contract Dispute by Final Order of the Bankruptcy Court, the applicable executory contract or unexpired lease shall be deemed assumed or assumed and assigned effective as of the Effective Date, subject to the Debtors' right to reject such executory contract or unexpired lease at any time prior to the Effective Date or, if any Contract Dispute is resolved after the Effective Date, within thirty (30) days following entry of such Final Order of the Bankruptcy Court resolving the applicable Contract Dispute.

(iv)    To the extent a Contract Dispute has not been resolved prior to the Effective Date, the Debtors shall establish the Disputed Cure Claims Reserve. Any amounts in the Disputed Cure Claims Reserve remaining after the resolution of all Disputed Cure Claims and the payment of all Cure Amounts with respect to Allowed Cure Claims for contracts and leases to be assumed or assumed and assigned shall be applied in accordance with Section 5.13(c) of the Plan.

(v)     To the extent an objection is not timely filed and properly served on the Debtors with respect to a Contract Dispute, then the counterparty to the applicable contract or lease shall be deemed to have assented to a. the Cure Amount proposed by the Debtors and b. the assumption or assumption and assignment of such contract or lease on the terms set forth in the Plan and the Assumption Notice, notwithstanding any provision of the applicable contract or lease that (1) prohibits, restricts or conditions the transfer or assignment of such contract or lease or (2) terminates or permits the termination of such contract or lease as a result of any direct or indirect transfer or assignment of the rights of the Debtors under such contract or lease or a change in the ownership or control as contemplated

by the Plan, and shall forever be barred and enjoined from asserting such objection against the Debtors or terminating or modifying such contract or lease on account of transactions contemplated by the Plan.

(vi)     With respect to payment of any Cure Amounts or resolution of Contract Disputes, none of the Debtors, the Plan Administration Trustee, NewCo or any Transferred Debtor shall have any obligation to recognize or deal with any party other than the non-Debtor party to the applicable executory contract or unexpired lease, even if such non-Debtor party has sold, assigned or otherwise transferred its Cure Claim.

### 3.     *Payments Related to Assumption of Contracts and Leases*

(i)     Subject to resolution of any Contract Dispute, any Cure Claim shall be satisfied, under section 365(b)(1) of the Bankruptcy Code, by the Plan Administration Trust from the Priority Claims Reserve or the Disputed Cure Claims Reserve, as applicable, or NewCo in the ordinary course of business upon assumption thereof.

(ii)     Assumption or assumption and assignment of any executory contract or unexpired lease pursuant to the Plan, or otherwise, shall result in the full release and satisfaction of any Claims or defaults, subject to satisfaction of the Cure Amount, whether monetary or nonmonetary, including defaults of provisions restricting the change in control or ownership interest composition or other bankruptcy-related defaults, arising under any assumed executory contract or unexpired lease at any time before the effective date of assumption or assumption and assignment. Any Proofs of Claim filed with respect to an executory contract or unexpired lease that has been assumed shall be deemed Disallowed and expunged, without further notice, or action, order or approval of the Bankruptcy Court or any other Person.

### 4.     *[Co-Defendant Indemnification Provisions*

(i)     In the Assumption Notices, the Debtors shall provide notice to all known counterparties that, except as otherwise provided in the Plan or agreed ~~with~~by any counterparty and the Debtors (with the consent (not to be unreasonably withheld, conditioned or delayed) of the Governmental Consent Parties, and after consultation with the Creditors' Committee), the Plan shall constitute ~~a.~~ a. an amendment to each assumed or assumed and assigned contract or lease as necessary to render null and void any and all terms or provisions thereof solely to the extent such terms or provisions create an obligation of any Debtor (or any assignee thereof), or give rise to a right in favor of any non-Debtor under any MDT Insurance Policy, for the indemnification or reimbursement of any Person for costs, losses, damages, fees, expenses or any other amounts whatsoever relating to or arising from any actual or potential opioid-related litigation or dispute,

245

whether accrued or unaccrued, asserted or unasserted, existing or hereinafter arising, based on or relating to, or in any manner arising from, in whole or in part, Opioid-Related Activities or other conduct occurring prior to the Effective Date; and b. b. an agreement by each counterparty to release the Debtors (and any assignee thereof or successor thereto) and all Insurance Companies from any and all obligations, Claims, Causes of Action and other rights of recovery arising under or relating to such indemnification and reimbursement rights andto the extent relating to any conduct occurring prior to the Effective Date, and an agreement by such party to release any and all Co-Defendant Claims andheld by such party and to channel, in accordance with the Channeling Injunction, all Channeled Claims arising under or relating to such contract, including any such Claims that might otherwise be elevated to administrative status through assumption of such contract or lease. On the Effective Date, (x) all Co-Defendant Claims arising under or related to any such assumed or assumed and assigned contract or lease shall be released and discharged with no consideration on account thereof, and all Proofs of Claim in respect thereof shall be deemed Disallowed and expunged, without further notice, or action, order or approval of the Bankruptcy Court or any other Person and (y) all Channeled Claims arising under or related to any such assumed or assumed and assigned contract or lease shall be channeled in accordance with the Channeling Injunction. For the avoidance of doubt, unless otherwise agreed by the counterparty to any assumed or assumed and assigned contract or lease, the foregoing shall not release or otherwise modify any term or provision of such contract or lease to the extent of any indemnification or reimbursement rights accruing after the Effective Date for conduct occurring after the Effective Date.

(ii)    To the extent an objection to the amendments and releases described in Section 8.4(a) of the Plan is not timely filed and properly served on the Debtors with respect to a contract or lease in accordance with the procedures set forth in the Assumption Notice, a. the counterparty to such contract or lease and all other applicable Persons shall be bound by and deemed to have a. assented to the terms set forth in Section 8.4(a) of the Plan, including the amendment of such contract or lease as described in Section 8.4(a)(i) of the Plan and the assumption or assumption and assignment of such contract or lease, as so amended, and b. released the Debtors, any assignee of the Debtors and the Insurance Companies from any and all rights, obligations, liabilities, Claims, Causes of Action and other rights of recovery described in Section 8.4(a)(ii) of the Plan. Exceptb. except to the extent such contract or lease is included in the Schedule of Rejected Contracts, eachas of the Effective Date, subject to the consensual resolution of any Applicable Contract Dispute by such counterparty and the Debtors (with the consent (not to be unreasonably withheld, conditioned or delayed) of the Governmental Consent Parties, and after consultation with the Creditors' Committee), such contract or lease, solely as amended pursuant to the Section 8.4 of the Plan, shall be

assumed by the applicable Debtor and, except with respect to any such contract of the Transferred Debtors, assigned to NewCo (or one of its Subsidiaries), and c. as of the Effective Date, such counterparty and all other applicable Persons shall be deemed to have released any and all rights, obligations, liabilities, Claims, Causes of Action and other rights of recovery described in Section 8.4(a)(ii) of the Plan.

(iii)    To the extent an objection to the amendment and release described in Section 8.4(a) of the Plan is timely filed and properly served on the Debtors by any counterparty with respect to such counterparty's contract or lease, and such objection has not been consensually resolved between such counterparty and the Debtors (with the consent (not to be unreasonably withheld, conditioned or delayed) of the Governmental Consent Parties, and after consultation with the Creditors' Committee) prior to the Confirmation Hearing, a. such contract or lease shall be deemed to be rejected and, b. any Claims against the Debtors resulting from such rejection shall be classified and treated in accordance with Section 8.5 of the Plan unless otherwise agreed by the Debtors.][87]and c. all Estate Causes of Action against such counterparty shall be preserved and not released and shall constitute Retained Causes of Action.

(iv)    [Except to the extent that the Holder of a Co-Defendant Claim otherwise agrees, the assumption or rejection of a contract or lease with the Holder of a Co-Defendant Claim shall not operate as a. a release of any Co-Defendant Defensive Rights; or b. a release of any rights, interests, benefits, insurance coverage or Claims in or to any MDT Insurance Policies.][130]

5.    *Rejection Claims*

In the event that the rejection of an executory contract or unexpired lease by any of the Debtors herein results in damages to the other party or parties to such contract or lease, any Claim for such damages shall be forever barred and shall not be enforceable against the Debtors or their Estates, properties or interests in property, unless a Proof of Claim is filed with the Bankruptcy Court and served upon the Debtors no later than thirty (30) days after the entry of the order of the Bankruptcy Court (including the Confirmation Order) authorizing the rejection of such executory contract or unexpired lease. Any such Claim shall be classified in accordance with the classification of Claims set forth in Article III of the Plan, including that any such Claims that constitute Co-Defendant Claims shall be classified as such. The Confirmation Order shall constitute the Bankruptcy Court's authorization of the rejection of all the leases and contracts identified in the Schedule of Rejected Contracts.

*6. Survival of Certain Indemnification Obligations*

---

[87]  Co-Defendant treatment generally is subject to ongoing discussions.
      [130] Under discussion.

[To come; *provided* that the treatment of indemnification obligations shall be acceptable
to the Governmental Consent Parties.]

### 6.    7. Compensation and Benefit Plans

Except with respect to any Benefit Plans for which the Debtors have received approval of
the Bankruptcy Court to reject or terminate on or before the Effective Date or that are subject to
a pending motion to reject or terminate as of the Confirmation Hearing, all Benefit Plans shall be
deemed to be, and shall be treated as, executory contracts under the Plan pursuant to sections 365
and 1123 of the Bankruptcy Code and shall be assumed by applicable Debtors and, unless held
by a Transferred Debtor, assigned to NewCo (or one of its Subsidiaries).

### 7.    8. Purdue Pension Plan

The Purdue Pension Plan has approximately 3,200 participants. PPLP is the contributing
sponsor of the Purdue Pension Plan. The Debtors that are members of the contributing sponsor's
controlled-group within the meaning of 29 U.S.C. §§ 1301(a)(13), (14) are jointly and severally
liable with respect to the Purdue Pension Plan. Further, any non-debtor members of the
contributing sponsor's controlled-group are also jointly and severally liable with respect to the
Purdue Pension Plan.

Upon the Effective Date, NewCo (or one of its Subsidiaries) shall be deemed to have
assumed the Purdue Pension Plan and all liabilities and Assets thereunder and shall comply with
all applicable statutory provisions of ERISA and the IRC, including, but not limited to, satisfying
the minimum funding standards pursuant to 26 U.S.C. §§ 412, 430, and 29 U.S.C. §§ 1082,
1083, paying the PBGC premiums in accordance with 29 U.S.C. §§ 1306 and 1307 and
administering the Purdue Pension Plan in accordance with its terms and the provisions of ERISA
and the IRC (and NewCo reserves all rights thereunder).

Notwithstanding any provision in the Plan to the contrary, no provision contained in the
Plan, the Confirmation Order, the Bankruptcy Code (including section 1141 thereof), or any
other document filed in the Debtors' bankruptcy cases shall be construed as discharging,
releasing, exculpating or relieving any Person (other than the Liquidating Debtors) from any
fiduciary duties or liabilities under Title I of ERISA with respect to the Purdue Pension Plan.
PBGC and the Purdue Pension Plan shall not be enjoined or precluded from enforcing such
fiduciary duties or liabilities under Title I of ERISA as a result of any of the provisions of the
Plan, the Confirmation Order, the Bankruptcy Code or any other document filed in the Debtors'
bankruptcy cases. The PBGC and the Debtors agree that all Proofs of Claim filed by the PBGC
shall be deemed to be withdrawn, with prejudice, as of the Effective Date.

### 8.    9. Insurance Policies

(i)    [Nothing in the Plan shall terminate or otherwise reduce the coverage
under any D&O Insurance Policy with respect to conduct occurring on or
prior to the Effective Date, and, after the Effective Date, all directors,
officers, managers, authorized agents and employees of the Debtors who
served in such capacity at any time prior to the Effective Date shall be
entitled to the full benefits of any D&O Insurance Policy for the full term

of such policy, including but not limited to the extension of coverage for a period of six (6) years after the end of such policy period, in accordance with the terms thereof, subject to a. any release or assignment of rights by certain Shareholder Released Parties pursuant to the Shareholder Settlement and b. with respect to D&O Insurance Policies that are MDT Insurance Policies, the provisions of paragraph (b) of Section 8.8 of the Plan.

(ii)    Each Released Party and Shareholder Released Party that is an individual insured under any MDT Insurance Policy will fully cooperate with the Master Disbursement Trust in connection with the settlement of such MDT Insurance Policy, including but not limited to by providing consent to release any rights they have against and under such MDT Insurance Policy in the event that the Master Disbursement Trust has otherwise obtained settlement terms that it deems acceptable in its sole discretion.]

(i)  Prior to the Effective Date, the Debtors shall fund an upfront premium payment to purchase appropriate directors' and officers' liability insurance, including tail coverage of up to seven (7) years, for the existing directors of the Debtors, as determined by the Debtors in their sole discretion and acceptable to the Governmental Consent Parties.[88]

(iii)    (ii) On and after the Effective Date, all Purdue Insurance Policies (other than the MDT Insurance Policies) shall be deemed to be, and shall be treated as, executory contracts under the Plan, and shall be assumed by the applicable Debtor, and shall vest in NewCo, the applicable Transferred Debtor or the Plan Administration Trust, as applicable, in accordance with the NewCo Transfer Agreement and the PAT Agreement and continue in full force and effect in accordance with their respective terms.

## *9.* *10.* *Reservation of Rights*

(i)    Neither the exclusion nor the inclusion by the Debtors of any contract or lease on any exhibit, schedule or other annex to the Plan or in the Plan Supplement, nor anything contained in the Plan, shall constitute an admission by the Debtors that any such contract or lease is or is not an executory contract or unexpired lease or that the Debtors have any liability thereunder.

(ii)    Except as explicitly provided in the Plan, nothing herein shall waive, excuse, limit, diminish or otherwise alter any of the defenses, Claims, Causes of Action or other rights of the Debtors under any executory or non-executory contract or unexpired lease.

---

[88]  Treatment of D&O Policies to come; *provided* that such treatment shall be acceptable to the Governmental Consent Parties.

(iii)    Nothing in the Plan shall increase, augment or add to any of the duties, obligations, responsibilities or liabilities of the Debtors under any executory or non-executory contract or unexpired or expired lease, including the Purdue Insurance Policies.

(iv)    If there is a dispute regarding whether a contract or lease is or was executory or unexpired at the time of its assumption under the Plan, the Debtors shall have thirty (30) days following entry of a Final Order resolving such dispute to alter their treatment of such contract or lease.

## H.    Conditions Precedent to the Occurrence of the Effective Date

### 1.    *Conditions Precedent to Effective Date*

The Effective Date shall not occur unless all of the following conditions precedent have been satisfied:

(i)    the Confirmation Order shall have been entered by the Bankruptcy Court, and shall not be subject to any stay and shall not have been modified or vacated on appeal;

(ii)    the Plan Documents shall have been approved of or accepted by all applicable Persons in accordance with the respective consent rights under the Plan, and shall have been filed, executed and delivered, as applicable, and the conditions precedent contained therein shall have been satisfied or waived in accordance with the terms thereof, except with respect to such conditions that by their terms shall be satisfied substantially simultaneously with or after consummation of the Plan;

(iii)    the DOJ Resolution (including, for the avoidance of doubt, the entry of a judgment of conviction in strict accordance with the Plea Agreement and the payment in full of the DOJ Forfeiture Payment) shall have been consummated or will be consummated substantially simultaneously with consummation of the Plan;

(iv)    the NewCo Operating Agreement shall have been executed and shall be in compliance with the DOJ Resolution, the NewCo Transferred Assets shall have vested in NewCo (or one or more of its Subsidiaries) in accordance with the NewCo Transfer Agreement and the NewCo Managers shall have been appointed;

(v)    the MDT Agreement shall have been executed, the MDT Transferred Assets shall have vested in the Master Disbursement Trust in accordance therewith and the MDT Trustees and the MDT Executive Director shall have been appointed;

(vi)    the Creditor Trust Documents shall have been executed and the Creditor Trustees shall have been appointed;

(vii)    the Public Entity Settlements shall have been consummated or will be consummated substantially simultaneously with consummation of the Plan, including a. the payment in full of the Initial Public Creditor Trust Distributions, b. the execution of the TopCo Operating Agreement, the appointment of the TopCo Managers and the issuance of the NewCo Interest to TopCo and the TopCo Interests to NOAT and the Tribe Trust and c. the issuance of the MDT Interests to NOAT and the Tribe Trust;

(viii)    the Private Entity Settlements shall have been consummated or will be consummated substantially simultaneously with consummation of the Plan, including a. the payment in full of the Initial Private Creditor Trust Distributions, b. the issuance of the MDT Claims and c. the execution of any Plan Documents required to be executed in connection with the foregoing;

(ix)    the Shareholder Settlement Agreement shall have been executed and all amounts required to be paid thereunder on the Effective Date shall have been received, and all of the conditions precedent to the Settlement Effective Date (as defined in the Shareholder Settlement Agreement) shall have been satisfied or waived in accordance with the terms of the Shareholder Settlement Agreement;

(x)    the PAT Agreement shall have been executed, the PAT Assets shall have vested in the Plan Administration Trust in accordance therewith and the Plan Administration Trustee shall have been appointed;

(xi)    each of the PAT Reserves, the Professional Fee Escrow Account and the PAT Distribution Accounts shall have been fully funded, and each of the other payments and Distributions of Effective Date Cash described in Section 5.13(a) and (b) of the Plan shall have been made or will be made substantially simultaneously with consummation of the Plan;

(xii)    the Debtors shall have obtained all authorizations, consents, regulatory approvals, rulings and documents that are necessary to implement and effectuate the Plan;

(xiii)    all Professional Fee Claims shall have been paid in full or amounts sufficient to pay such Claims after the Effective Date shall have been placed in the Professional Fee Escrow Account, or shall be otherwise contained in a professional fee retainer, pending approval by the Bankruptcy Court;

(xiv)    the Debtors shall have implemented the Restructuring Transactions in a manner consistent in all material respects with the Plan;

(xv)    the Bankruptcy Court shall have confirmed that the Bankruptcy Code authorizes the transfer and vesting of the MDT Transferred Assets, notwithstanding any terms of the Purdue Insurance Policies or provisions

of non-bankruptcy law that any Insurance Company may otherwise argue prohibits such transfer and vesting; and

(xvi)   all other actions, documents and agreements necessary to implement and effectuate the Plan shall have been effected or executed.

## 2.   *Waiver of Conditions Precedent*

(i)   Each of the conditions precedent to the occurrence of the Effective Date (other than the condition precedent set forth in Section 9.1(i) of the Plan) may be waived by the Debtors; *provided* that a. with respect to any condition precedent, the waiver of which would materially and adversely affect the entitlements of any Class of Claims (or any Creditor Trust to which such Claims shall be channeled) represented by any of the Supporting Claimants, the waiver of such condition precedent shall require the consent (not to be unreasonably withheld, conditioned or delayed) of the applicable Supporting Claimants representing such materially and adversely affected Class of Claims, b. the waiver of the conditions precedent set forth in Section 9.1(a), (b) (solely with respect to any Plan Document over which the Creditors' Committee has a consent right set forth in the Plan), (e), (f), (h), (i), (j), (k), (m) (solely with respect to Professional Fee Claims by Professional Persons retained by the Creditors' Committee), (n) and (o) of the Plan shall require the consent of the Creditors' Committee (which consent shall not be unreasonably withheld, delayed or conditioned) and c. the waiver of the conditions precedent set forth in Section 9.1(a), (b) (solely with respect to any Plan Document over which the Governmental Consent Parties have a consent right set forth in the Plan), (d), (e), (f), (g), (in) and (no) of the Plan shall require the consent of the Governmental Consent Parties (which consent shall not be unreasonably withheld, delayed or conditioned). The condition precedent set forth in Section 9.1(i) of the Plan may not be waived by any party.

(ii)   The stay of the Confirmation Order pursuant to Bankruptcy Rule 3020(e) shall be deemed waived by and upon entry of the Confirmation Order, and the Confirmation Order shall take effect immediately upon its entry.

## I.   **Effect of Confirmation**

### 1.   *Binding Effect*

Except as otherwise provided in section 1141(d)(3) of the Bankruptcy Code, and subject to the occurrence of the Effective Date, on and after the entry of the Confirmation Order, the provisions of the Plan and the Plan Documents shall bind every Holder of a Claim against or Interest in any Debtor and every Holder of a Shareholder Released claim and inure to the benefit of, and be binding on, any such Holder's respective successors and assigns, regardless of

whether ~~the~~any Claim or Interest of such Holder is Impaired under the Plan or whether such Holder has accepted the Plan.

### 2.    *Discharge of Claims against and Interests in the Debtors*

Upon the Effective Date and in consideration of the Distributions to be made under the Plan, except as otherwise provided in the Plan or in the Confirmation Order, each Holder (as well as any trustee or agent on behalf of such Holder) of a Claim or Interest and any successor, assign and affiliate of such Holder shall be deemed to have forever waived, released and discharged the Debtors (other than the Liquidating Debtors), to the fullest extent permitted by section 1141 of the Bankruptcy Code, of and from any and all Claims, Interests, rights and liabilities that arose prior to the Effective Date. Except as otherwise provided in the Plan, upon the Effective Date, all such Holders of Claims against or Interests in the Debtors, and their successors, assigns and affiliates, shall be forever precluded and enjoined, pursuant to sections 105, 524 and 1141 of the Bankruptcy Code, from prosecuting or asserting any such discharged Claim against, or terminated Interest in, any Debtor. Pursuant to section 1141(d)(3) of the Bankruptcy Code, confirmation of the Plan will not discharge the Liquidating Debtors; *provided* that, upon confirmation of the Plan and the occurrence of the Effective Date, Holders of Claims against and Interests in the Debtors may not seek or receive any payment or other Distribution from, or seek recourse against, the Debtors or their Estates or any other Protected Party, except as expressly provided in the Plan. [The Co-Defendant Defensive Rights shall not be waived, released or discharged and all Co-Defendant Defensive Rights are preserved.][131]

### 3.    *Pre-Confirmation Injunctions ~~and~~, Stays, Stipulations and Discovery Orders*

(i)    Unless otherwise provided in the Plan, all injunctions and stays arising under or entered during the Chapter 11 Cases, whether under section 105 or 362 of the Bankruptcy Code or otherwise, and in existence on the Confirmation Date, shall remain in full force and effect until the later of the Effective Date and the date indicated in the order providing for such injunction or stay.

(ii)    Notwithstanding paragraph (a) of Section 10.3 of the Plan, on the Effective Date, without further action by or order of the Bankruptcy Court:

a.    any and all obligations of the Shareholder Released Parties arising under the Case Stipulation shall terminate and the Case Stipulation shall be withdrawn, vacated and superseded by the Confirmation Order solely with respect to paragraphs 15, 17, 19, 22 and 25 of the Case Stipulation, and solely as such paragraphs apply to any Shareholder Released Party; *provided* that, for the avoidance of doubt, the terms of such paragraphs shall continue in full force and effect with respect to all other parties (if applicable), and all other provisions of the Case Stipulation shall remain in full force and effect, in each case, unless otherwise provided by the Plan;

---

[131] Under review.

253

b.  any and all obligations of any Shareholder Released Party arising under paragraph I of the voluntary injunction set forth in Appendix I to the Preliminary Injunction (and any predecessors or successors of the Preliminary Injunction) shall terminate, and the Preliminary Injunction shall be withdrawn, vacated and superseded by the Confirmation Order solely with respect to paragraph I of the voluntary injunction set forth in Appendix I; *provided* that, for the avoidance of doubt, all other provisions of the Preliminary Injunction shall remain in full force and effect, unless otherwise provided by the Plan; and

c.  Any and all obligations of any Shareholder Released Party arising under any subpoenas issued pursuant to any of *Order Pursuant to Federal Rules of Bankruptcy Procedure 2004 and 9016 Authorizing Examination of Third Parties* [D.I. 992] (as amended by the *Amended Order Pursuant to Federal Rules of Bankruptcy Procedure 2004 and 9016 Authorizing Examination of Third Parties* [D.I. 1008]), the *Order Pursuant to Rules 2004 and 9016 of the Federal Rules of Bankruptcy Procedure Authorizing Examinations of Certain Financial Institutions* [D.I. 1143], the *Order Pursuant to Federal Rules of Bankruptcy Procedure 2004 and 9016 Authorizing Examinations of Document Production by Third Parties* [D.I. 1340] and the *Order Pursuant to Federal Rules of Bankruptcy Procedure 2004 and 9016 Authorizing Examination of Certain Former Debtor Executives, Separately Represented Debtor Personnel, and Norton Rose Fulbright Pursuant to Federal Rules of Bankruptcy Procedure 2004 and 9006* [D.I. 1788] shall terminate.

(iii)  Any and all information shared or produced by any Shareholder Released Party pursuant to the agreements or orders referenced in the foregoing paragraph (b) of Section 10.3 of the Plan, including any such information also shared with Persons not party to the Case Stipulation shall remain subject to the confidentiality terms under which it was shared, including any information that was designated under the Protective Order (or confidentiality agreement that was superseded by the Protective Order), which such information shall remain confidential under the terms of the Protective Order unless such information, materials or documents are included in the Public Document Repository in accordance with the Plan and the Shareholder Settlement Agreement. Names or other identifying information of investments or specific third-party counterparties or advisors with whom or with which a Shareholder Released Party has or had a third-party investment, advisory or business relationship that was disclosed in documents or information produced by a Shareholder Released Party and designated Outside Professional Eyes Only Information under the Protective Order shall retain such designation and be protected accordingly.

### 4.      *Injunction against Interference with Plan*

Subject to <u>Section 12.4</u> of the Plan, upon entry of the Confirmation Order, all Holders of Claims against or Interests in the Debtors, as well as all other Releasing Parties, Released Parties, Shareholder Released Parties and other parties in interests shall be enjoined from taking any actions to interfere with the implementation or consummation of the Plan and the Plan Documents. The <u>Section 10.4</u> of the Plan shall be included in the Confirmation Order.

### 5.      *Plan Injunction*

(i)      Except as otherwise provided in the Plan or in the Confirmation Order, as of the entry of the Confirmation Order but subject to the occurrence of the Effective Date, to the maximum extent permitted under applicable law, all Persons who have held, hold or may hold Claims against or Interests in the Debtors are, with respect to any such Claim or Interest, permanently enjoined after the entry of the Confirmation Order from: a. commencing, conducting or continuing in any manner, directly or indirectly, any suit, action or other proceeding of any kind (including any proceeding in a judicial, arbitral, administrative or other forum) against or affecting, directly or indirectly, a Debtor or an Estate or the property of any of the foregoing, or any direct or indirect transferee of any property of, or direct or indirect successor in interest to, any of the foregoing Persons mentioned in this clause (i) or any property of any such transferee or successor; b. enforcing, levying, attaching (including any prejudgment attachment), collecting or otherwise recovering in any manner or by any means, whether directly or indirectly, any judgment, award, decree or order against a Debtor or an Estate or its property, or any direct or indirect transferee of any property of, or direct or indirect successor in interest to, any of the foregoing Persons mentioned in this clause (i) or any property of any such transferee or successor; c. creating, perfecting or otherwise enforcing in any manner, directly or indirectly, any encumbrance of any kind against a Debtor or an Estate or any of its property, or any direct or indirect transferee of any property of, or successor in interest to, any of the foregoing Persons mentioned in this clause (i) or any property of any such transferee or successor; d. acting or proceeding in any manner, in any place whatsoever, that does not conform to, or comply with, the provisions of the Plan; and e. commencing or continuing, in any manner or in any place, any action that does not comply, or is inconsistent, with the provisions of the Plan; *provided, however*, that nothing contained herein shall preclude such Persons who have held, hold or may hold Claims against or Interests in a Debtor or an Estate from exercising their rights, or obtaining benefits, pursuant to, and consistent with, the terms of the Plan and the Plan Documents.

(ii)      All Persons, including all governmental, tax and regulatory authorities, lenders, trade creditors, dealers, customers, employees, litigation claimants and other creditors holding Claims, Liens, Interests, charges,

255

encumbrances and other interests of any kind or nature whatsoever, including rights or Claims based on any successor or transferee liability, against or in a Debtor, the NewCo Transferred Assets, the MDT Transferred Assets or the PAT Assets (whether legal or equitable, secured or unsecured, matured or unmatured, contingent or noncontingent, known or unknown), arising under or out of, in connection with, or in any way relating to the Debtors, the NewCo Transferred Assets, the MDT Transferred Assets, the PAT Assets, the operation of the NewCo Transferred Assets prior to the Effective Date or the Restructuring Transactions are forever barred, estopped and permanently enjoined from asserting against the Released Parties, their respective successors and assigns, their property, the NewCo Transferred Assets, the MDT Transferred Assets or the PAT Assets, such Person's Claims, Interests, Liens, charges, encumbrances and other interests (including rights or Claims based on any successor or transferee liability), including, without limitation, by: a. commencing, conducting or continuing in any manner, directly or indirectly, any suit, action or other proceeding of any kind (including any proceeding in a judicial, arbitral, administrative or other forum) against or affecting, directly or indirectly, a Released Party, or any direct or indirect transferee of any property of, or direct or indirect successor in interest to, any of the foregoing Persons mentioned in this clause (i) or any property of any such transferee or successor; b. enforcing, levying, attaching (including any prejudgment attachment), collecting or otherwise recovering in any manner or by any means, whether directly or indirectly, any judgment, award, decree or order against a Released Party, or any direct or indirect transferee of any property of, or direct or indirect successor-in-interest to, any of the foregoing Persons mentioned in this clause (i) or any property of any such transferee or successor; c. creating, perfecting or otherwise enforcing any encumbrance of any kind or asserting any Released Claims in any manner, directly or indirectly, against a Released Party or any of its property, or any direct or indirect transferee of any property of, or successor in interest to, any of the foregoing Persons mentioned in this clause (i) or any property of any such transferee or successor; d. acting or proceeding in any manner, in any place whatsoever, that does not conform to or comply with the provisions of the Plan; and e. commencing or continuing, in any manner or in any place, any action that does not comply with or is inconsistent with the provisions of the Plan.

6.    *Releases*

(i)    **Releases by Debtors.**

**As of the Effective Date, for good and valuable consideration, the adequacy of which is hereby confirmed, including, without limitation, the service of the Released Parties before and during the Chapter 11 Cases to facilitate the reorganization of the Debtors and the implementation of the Restructuring Transactions, and except as otherwise explicitly**

provided in the Plan or in the Confirmation Order, the Released Parties shall be ~~deemed~~ conclusively, absolutely, unconditionally, irrevocably ~~and,~~ **fully, finally,** forever **and permanently** released~~, to the maximum extent permitted by law, as such law may be extended subsequent to the Effective Date,~~ by the Debtors and ~~the~~**their** Estates from any and all Claims, **claims,** counterclaims, disputes, obligations, suits, judgments, damages, demands, debts, rights, Causes of Action, Liens, remedies, losses, contributions, indemnities, **rights of subrogation,** costs, liabilities, attorneys' fees and expenses**, in each case, of any kind, character or nature** whatsoever, including any derivative claims~~,~~ asserted or ~~assertable~~**assertible by or** on behalf of ~~the Debtors or~~**any Debtor or any of** their Estates (including any Causes of Action arising under chapter 5 of the Bankruptcy Code**) and including any claims that any Debtor or any of their Estates, or that any other Person or party claiming under or through any Debtor or any of their Estates, would have presently or in the future been legally entitled to assert in its own right (whether individually or collectively) or on behalf of any Debtor or any of their Estates or any other Person, notwithstanding section 1542 of the California Civil Code or any law of any jurisdiction that is similar, comparable or equivalent thereto (which shall conclusively be deemed waived**), whether liquidated or unliquidated, fixed or contingent, matured or unmatured, known or unknown, foreseen or unforeseen, asserted or unasserted, accrued or unaccrued, existing or hereinafter arising, **choate or inchoate,** whether in law or equity, whether sounding in tort or contract~~,~~ **or based on any other legal or equitable theory or principle (including fraud, negligence, gross negligence, recklessness, reckless disregard, deliberate ignorance, public or private nuisance, breach of fiduciary duty, avoidance, willful misconduct, veil piercing, alter-ego theories of liability, unjust enrichment, disgorgement, restitution, contribution, indemnification, right of subrogation and joint liability), whether _in rem, quasi in rem, in personam_ or otherwise, or** whether arising under federal or state statutory or common law, or any other applicable international, foreign~~,~~ or domestic law, rule, statute, regulation, treaty, right, duty, requirement or otherwise, ~~that the Debtors or their Estates would have been legally entitled to assert in their own right (whether individually or collectively) or on behalf of the Holder of any Claim against or Interest in the Debtors or on behalf of any other Person~~**regardless of where in the world accrued or arising, from the beginning of time, in each case,** based on or relating to, or in any manner arising from, in whole or in part, the Debtors (as such Entities existed prior to or after the Petition Date), their Estates~~,~~ **or** the Chapter 11 Cases, **including, without limitation, a.** the subject matter of, or the transactions or events giving rise to, any Claim or Interest that is treated in the Plan, **b.** the business or contractual arrangements or interactions between any Debtor and any Released Party (including ~~the~~**historical business or contractual arrangements or interactions, any direct or indirect distributions or transfers by any Debtor, and any** exercise of any common law or contractual rights of setoff or recoupment by any Released Party at any time on or prior to the Effective Date), **c. any employment or retention of any Released Party by the Debtors (including any service as a director, officer, executive, consultant or advisor to the Debtors or service in any similar capacity), d. any direct or indirect beneficial ownership of any equity interest in or debt obligation of the Debtors, e.** the Restructuring Transactions, **f. the Pending Opioid Actions, g.** Opioid-Related Activities **(or the Debtors' development, production, manufacture, licensing, labeling, marketing, advertising, promotion, distribution or sale of non-opioid products or the use or receipt of any proceeds therefrom, in each case, including the Debtors'**

interactions with regulators and regardless of where in the world any such Opioid-Related Activitiesactivities or any result, loss, injury or damage resulting therefrom occurred), **h. any past, present or future use or misuse of any opioid, whether sold by the Debtors or by NewCo or any of its Subsidiaries or otherwise, to the extent arising from an act, conduct, omission, event, transaction, occurrence or continuing condition in any way relating to any of the foregoing, i.** the restructuring of any Claim or Interest before or during the Chapter 11 Cases, **j.** the Disclosure Statement, **and** the Plan, and related agreements, instruments, and other documents, **(including the Plan Documents)** and the negotiation, formulation, preparation or implementation thereof, **k.** the solicitation of votes with respect to the Plan, or **l.** any other act or, conduct, omission, **event, transaction, occurrence or continuing condition** in any way relating to any of the foregoing. The Debtors, the Plan Administration Trust, the Master Disbursement Trust, the Creditor Trusts, NewCo, **TopCo** and any other newly-formed EntitiesPersons that shall be continuing the Debtors' businesses after the Effective Date shall be bound, to the same extent the Debtors are bound, by the Releases set forth in the Section 10.6(a) of the Plan.

Notwithstanding anything herein to the contrary, **(i)a.** nothing in the Plan shall release any (A) Retained Causes of Action listed on the Schedule of Retained Causes of Action, (B) any Claims or Causes of Action that may be asserted against any Excluded Party or (C) any Claims or CausesExcluded Claim and **b. nothing in Section 10.6(a) of the Plan shall (A) release any Cause** of Action against any **Shareholder Release Snapback Party, (B) release any Estate Cause of Action against a** Holder of a Claim against a Debtor, **to the extent such Estate Cause of Action is** necessary for the administration and resolution of such Claim against a Debtor in accordance with the Plan and (ii) nothing in the Section 10.6(a) of the Plan shall (A) release any Claims or Causes of Action that may be asserted against any Shareholder Released Party or (B**C**) be construed to impair in any way the Effective Date or post-Effective Date rights and obligations of any Person under the Plan, the Plan Documents, the Confirmation Order or the Restructuring Transactions, including the Shareholder Settlement Agreement.

(ii)    Releases by Holders of Claims and InterestsNon-Debtors.

As of the Effective Date, for good and valuable consideration, the adequacy of which is hereby confirmed, including, without limitation, the service of the Released Parties before and during the Chapter 11 Cases to facilitate the reorganization of the Debtors and the implementation of the Restructuring Transactions, and except as otherwise explicitly provided in the Plan or in the Confirmation Order, the Released Parties shall be deemed conclusively, absolutely, unconditionally, irrevocably and forever released, to the maximum extent permitted by law, as such law may be extended subsequent to the Effective Date, except as otherwise explicitly provided herein,**, fully, finally, forever and permanently released** by the Releasing Parties from any and all Claims, **claims,** counterclaims, disputes, obligations, suits, judgments, damages, demands, debts, rights, Causes of Action, Liens, remedies, losses, contributions, indemnities, **rights of subrogation,** costs, liabilities, attorneys' fees and expenses, in each case, of any kind, character or nature whatsoever, including any derivative claims, asserted or assertableassertible by or on behalf of the Debtors or their Estates (including any Causes of Action arising under chapter 5 of the Bankruptcy Code**) and including any claims that any Releasing Party, or**

that any other Person or party claiming under or through any Releasing Party, would have presently or in the future been legally entitled to assert in its own right (whether individually or collectively) or on behalf of any Releasing Party or any other Person, notwithstanding section 1542 of the California Civil Code or any law of any jurisdiction that is similar, comparable or equivalent thereto (which shall conclusively be deemed waived), whether liquidated or unliquidated, fixed or contingent, matured or unmatured, known or unknown, foreseen or unforeseen, asserted or unasserted, accrued or unaccrued, existing or hereinafter arising, choate or inchoate, whether in law or equity, whether sounding in tort or contract, or based on any other legal or equitable theory or principle (including fraud, negligence, gross negligence, recklessness, reckless disregard, deliberate ignorance, public or private nuisance, breach of fiduciary duty, avoidance, willful misconduct, veil piercing, alter-ego theories of liability, unjust enrichment, disgorgement, restitution, contribution, indemnification, right of subrogation and joint liability), whether *in rem, quasi in rem, in personam* or otherwise, or whether arising under federal or state statutory or common law, or any other applicable international, foreign, or domestic law, rule, statute, regulation, treaty, right, duty, requirement or otherwise, ~~that any Releasing Party or any other Persons or parties claiming under or through them would have been legally entitled to assert in their own right (whether individually or collectively) or on behalf of the Releasing Party or other Person~~regardless of where in the world accrued or arising, from the beginning of time, in each case, based on or relating to, or in any manner arising from, in whole or in part, the Debtors (as such Entities existed prior to or after the Petition Date), their Estates, or the Chapter 11 Cases, including, without limitation, a. the subject matter of, or the transactions or events giving rise to, any Claim or Interest that is treated in the Plan, b. the business or contractual arrangements or interactions between any Debtor and any Released Party (including the historical business or contractual arrangements or interactions, any direct or indirect distributions or transfers by any Debtor, and any exercise of any common law or contractual rights of setoff or recoupment by any Released Party at any time on or prior to the Effective Date), c. any employment or retention of any Released Party by the Debtors (including any service as a director, officer, executive, consultant or advisor to the Debtors or service in any similar capacity), d. any direct or indirect beneficial ownership of any equity interest in or debt obligation of the Debtors, e. the Restructuring Transactions, f. the Pending Opioid Actions, g. Opioid-Related Activities (or the Debtors' development, production, manufacture, licensing, labeling, marketing, advertising, promotion, distribution or sale of non-opioid products or the use or receipt of any proceeds therefrom, in each case, including the Debtors' interactions with regulators and regardless of where in the world any such ~~Opioid-Related Activities~~activities or any result, loss, injury or damage resulting therefrom occurred), h. any past, present or future use or misuse of any opioid, whether sold by the Debtors or by NewCo or any of its Subsidiaries or otherwise, to the extent arising from an act, conduct, omission, event, transaction, occurrence or continuing condition in any way relating to any of the foregoing, i. the restructuring of any Claim or Interest before or during the Chapter 11 Cases, j. the Disclosure Statement, and the Plan and related agreements, instruments, and other documents, (including the Plan Documents) and the negotiation, formulation, preparation or implementation thereof, k. the solicitation of votes with respect to the Plan, or l. any other act ~~or~~, conduct, omission, event, transaction, occurrence or continuing condition in any way relating to any of the foregoing. ~~The Section 10.6(b) of the Plan shall~~

not release any Released Party from any criminal action or criminal proceeding arising under a criminal provision of any statute instituted by a Domestic Governmental Entity that has authority to bring such a criminal action or criminal proceeding.

For the avoidance of doubt and without limitation of the foregoing, each Person that is a Governmental Unit or a Tribe shall be deemed to have released all Released Claims that have been, are or could have been brought by (1) such Governmental Unit or Tribe in its own right, in its *parens patriae* or sovereign enforcement capacity, or on behalf of or in the name of another Person or (2) any other governmental official, employee, agent or representative acting or purporting to act in a *parens patriae*, sovereign enforcement or quasi-sovereign enforcement capacity, or any other capacity on behalf of such Governmental Unit or Tribe.

Notwithstanding anything herein to the contrary, (i)a. nothing in the Plan shall release any (A) Retained Causes of Action listed on the Schedule of Retained Causes of Action, (B) any Claims or Causes of Action that may be asserted against any Excluded Party or (C) any Claims or CausesExcluded Claim and b. nothing in Section 10.6(b) of the Plan shall (A) release any Cause of Action against any Shareholder Release Snapback Party or any Holder of Co-Defendant Claims, (B) release any Estate Cause of Action against anya Holder of a Claim against a Debtor, to the extent such Estate Cause of Action is necessary for the administration and resolution of such Claim against a Debtor in accordance with the Plan; (ii) nothing in the Section 10.6(b) of the Plan shall (A) release any Claims or Causes of Action that may be asserted against any Shareholder Released Party or any Holder of Co-Defendant Claims or (BC) be construed to impair in any way the Effective Date or post-Effective Date rights and obligations of any Person under the Plan, the Plan Documents, the Confirmation Order or the Restructuring Transactions, including the Shareholder Settlement Agreement.

Notwithstanding anything herein to the contrary, the Debtors shall not be released from liability for any Claim that is or may be covered by any Purdue Insurance Policy; *provided* that recovery for any such Claim, including by way of settlement or judgment, shall be limited to the available proceeds of such Purdue Insurance Policy (and any extra-contractual liability of the Insurance Companies with respect to the Purdue Insurance Policies), and no Person or party shall execute, garnish or otherwise attempt to collect any such recovery from any assets other than the available proceeds of the Purdue Insurance Policies. The Debtors shall be released automatically from a Claim described in this paragraph upon the earlier of (x) the abandonment of such Claim and (y) such a release being given as part of a settlement or resolution of such Claim, and shall be released automatically from all Claims described in this paragraph upon the exhaustion of the available proceeds of the Purdue Insurance Policies (notwithstanding the nonoccurrence of either event described in the foregoing clauses (x) and (y)).

(iii)    Releases by Debtors of Holders of Claims.

To the maximum extent permitted by applicable law, all Holders of Channeled Claims (excluding any Excluded Party, Shareholder Release Snapback Party or Co-Defendant) are hereby released by the Debtors from any Claim, obligation, suit, judgment,

damage, demand, debt, right, Cause of Action, remedy, loss and liability for any Claim in connection with, or arising out of, (i) the administration of the Chapter 11 Cases; the negotiation and pursuit of the Restructuring Transactions, the Plan, the Master Disbursement Trust, the Creditor Trusts (including the trust distribution procedures and the other Creditor Trust Documents) and the solicitation of votes with respect to, and confirmation of, the Plan; the funding of the Plan; the occurrence of the Effective Date; the administration of the Plan and the property to be distributed under the Plan; and the wind-up and dissolution of the Liquidating Debtors and the transactions in furtherance of any of the foregoing and (ii) such Holder's participation in the Pending Opioid Actions.

Notwithstanding anything herein to the contrary, (x) nothing in the Plan shall release any Excluded Claim and (y) nothing in Section 10.6(c) of the Plan shall (A) release any Estate Cause of Action against a Governmental Unit with respect to taxes, (B) release any Estate Cause of Action against a Holder of a Claim against a Debtor or a Holder of a Channeled Claim, to the extent such Estate Cause of Action is necessary for the administration and resolution of such Claim in accordance with the Plan, (C) release any claim or right arising in the ordinary course of business against ongoing commercial counterparties of NewCo or (D) be construed to impair in any way the Effective Date or post-Effective Date rights and obligations of any Person under the Plan, the Plan Documents, the Confirmation Order or the Restructuring Transactions, including the Shareholder Settlement Agreement.

### 7. *Shareholder Releases*

#### (i) **Releases by Debtors.**

As of the Effective Date, for good and valuable consideration, the adequacy of which is hereby confirmed, and except as otherwise explicitly provided in the Plan or in the Confirmation Order, the Shareholder Released Parties shall be conclusively, absolutely, unconditionally, irrevocably, fully, finally, forever and permanently released, subject to clause (z) of the last paragraph of Section 10.7(a) of the Plan, by the Debtors and their Estates from any and all Claims, claims, counterclaims, disputes, obligations, suits, judgments, damages, demands, debts, rights, Causes of Action, Liens, remedies, losses, contributions, indemnities, rights of subrogation, costs, liabilities, attorneys' fees and expenses, in each case, of any kind, character or nature whatsoever, including any derivative claims asserted or assertible by or on behalf of any Debtor or any of their Estates (including any Causes of Action arising under chapter 5 of the Bankruptcy Code) and including any claims that any Debtor or any of their Estates, or that any other Person or party claiming under or through any Debtor or any of their Estates, would have presently or in the future been legally entitled to assert in its own right (whether individually or collectively) or on behalf of any Debtor or any of their Estates or any other Person, notwithstanding section 1542 of the California Civil Code or any law of any jurisdiction that is similar, comparable or equivalent thereto (which shall conclusively be deemed waived), whether liquidated or unliquidated, fixed or contingent, matured or unmatured, known or unknown, foreseen or unforeseen, asserted or unasserted, accrued or unaccrued, existing or hereinafter arising, choate or inchoate, whether in law or equity, whether sounding in tort or contract or based on any other legal or equitable theory or

principle (including fraud, negligence, gross negligence, recklessness, reckless disregard, deliberate ignorance, public or private nuisance, breach of fiduciary duty, avoidance, willful misconduct, veil piercing, alter-ego theories of liability, unjust enrichment, disgorgement, restitution, contribution, indemnification, right of subrogation and joint liability), whether *in rem, quasi in rem, in personam* or otherwise, or whether arising under federal or state statutory or common law, or any other applicable international, foreign or domestic law, rule, statute, regulation, treaty, right, duty, requirement or otherwise, regardless of where in the world accrued or arising, from the beginning of time, in each case, based on or relating to, or in any manner arising from, in whole or in part, the Debtors (as such Entities existed prior to or after the Petition Date), their Estates or the Chapter 11 Cases, including, without limitation, a. the subject matter of, or the transactions or events giving rise to, any Claim or Interest that is treated in the Plan, b. the business or contractual arrangements or interactions between any Debtor and any Shareholder Released Party (including historical business or contractual arrangements or interactions, any direct or indirect distributions or transfers by any Debtor, and any exercise of any common law or contractual rights of setoff or recoupment by any Shareholder Released Party at any time on or prior to the Effective Date), c. any employment or retention of any Shareholder Released Party by the Debtors (including any service as a director, officer, executive, consultant or advisor to the Debtors or service in any similar capacity), d. any direct or indirect beneficial ownership of any equity interest in or debt obligation of the Debtors, e. the Restructuring Transactions, f. the Pending Opioid Actions, g. Opioid-Related Activities or the Debtors' development, production, manufacture, licensing, labeling, marketing, advertising, promotion, distribution or sale of non-opioid products or the use or receipt of any proceeds therefrom, in each case, including the Debtors' interactions with regulators and regardless of where in the world any such activities or any result, loss, injury or damage resulting therefrom occurred, h. any past, present or future use or misuse of any opioid, whether sold by the Debtors or by NewCo or any of its Subsidiaries or otherwise, to the extent arising from an act, conduct, omission, event, transaction, occurrence or continuing condition in any way relating to any of the foregoing, i. the restructuring of any Claim or Interest before or during the Chapter 11 Cases, j. the Disclosure Statement and the Plan and related agreements, instruments and other documents (including the Plan Documents) and the negotiation, formulation, preparation or implementation thereof, k. the solicitation of votes with respect to the Plan, or l. any other act, conduct, omission, event, transaction, occurrence or continuing condition in any way relating to any of the foregoing. The Debtors, the Plan Administration Trust, the Master Disbursement Trust, the Creditor Trusts, NewCo, TopCo and any other newly-formed Persons that shall be continuing the Debtors' businesses after the Effective Date shall be bound, to the same extent the Debtors are bound, by the Shareholder Releases set forth in Section 10.7(a) of the Plan.

Notwithstanding anything herein to the contrary, (x) nothing in the Plan shall release any Excluded Claim; (y) nothing in Section 10.7(a) of the Plan shall be construed to impair in any way the Effective Date or post-Effective Date rights and obligations of any Person under the Plan, the Plan Documents, the Confirmation Order or the Restructuring Transactions, including the Shareholder Settlement Agreement and the Separation Agreements; and (z) upon the filing of a Notice of Shareholder Release Snapback, (A) the Shareholder Releases set forth in Section 10.7(a) of the Plan shall be entirely null and void,

revoked and invalidated, as of the Effective Date, with respect to all members of the Breaching Shareholder Family Group and the Designated Shareholder Released Parties, (B) the *status quo ante* shall be restored in all respects for the Debtors and the Master Disbursement Trust with respect to the members of the Breaching Shareholder Family Group and the Designated Shareholder Released Parties and for the members of the Breaching Shareholder Family Group and the Designated Shareholder Released Parties with respect to the Debtors and the Master Disbursement Trust (C) the Master Disbursement Trust shall be deemed to have received and accepted all of the rights with respect to any member of the Breaching Shareholder Family Group and the Designated Shareholder Released Parties, in each case, that the Debtors and their Estates had prior to the Effective Date and that the Master Disbursement Trust would have pursuant to the transfer of the MDT Shareholder Rights to the Master Disbursement Trust if the Shareholder Releases of Section 10.7(a) of the Plan had never been granted, which rights the Debtors and their Estates shall be deemed to have irrevocably transferred, granted and assigned to the Master Disbursement Trust; *provided* that, for the avoidance of doubt, notwithstanding the nullification, voiding, revocation and invalidation pursuant to the foregoing clause (A), the Shareholder Releases shall continue in effect for, and shall be fully enforceable by and for the benefit of, all other Shareholder Released Parties other than the Breaching Shareholder Family Group and the Designated Shareholder Released Parties.

(ii)    **Releases by Releasing Parties.**

As of the Effective Date, for good and valuable consideration, the adequacy of which is hereby confirmed, and except as otherwise explicitly provided in the Plan or in the Confirmation Order, the Shareholder Released Parties shall be conclusively, absolutely, unconditionally, irrevocably, fully, finally, forever and permanently released, subject to clause (z) of the last paragraph of Section 10.7(b) of the Plan, by the Releasing Parties and all other Persons from any and all Claims, claims, counterclaims, disputes, obligations, suits, judgments, damages, demands, debts, rights, Causes of Action, Liens, remedies, losses, contributions, indemnities, rights of subrogation, costs, liabilities, attorneys' fees and expenses, in each case, of any kind, character or nature whatsoever, including any derivative claims asserted or assertible by or on behalf of the Debtors or their Estates (including any Causes of Action arising under chapter 5 of the Bankruptcy Code) and including any claims that any Releasing Party, or that any other Person or party claiming under or through any Releasing Party, would have presently or in the future been legally entitled to assert in its own right (whether individually or collectively) or on behalf of any Releasing Party or any other Person, notwithstanding section 1542 of the California Civil Code or any law of any jurisdiction that is similar, comparable or equivalent thereto (which shall conclusively be deemed waived), whether liquidated or unliquidated, fixed or contingent, matured or unmatured, known or unknown, foreseen or unforeseen, asserted or unasserted, accrued or unaccrued, existing or hereinafter arising, choate or inchoate, whether in law or equity, whether sounding in tort or contract or based on any other legal or equitable theory or principle (including fraud, negligence, gross negligence, recklessness, reckless disregard, deliberate ignorance, public or private nuisance, breach of fiduciary duty, avoidance, willful misconduct, veil piercing, alter-ego theories of liability, unjust enrichment, disgorgement, restitution, contribution, indemnification, right of subrogation and joint liability), whether *in rem*, *quasi in rem*, *in personam* or otherwise, or whether

arising under federal or state statutory or common law, or any other applicable international, foreign or domestic law, rule, statute, regulation, treaty, right, duty, requirement or otherwise, regardless of where in the world accrued or arising, from the beginning of time, in each case, based on or relating to, or in any manner arising from, in whole or in part, the Debtors (as such Entities existed prior to or after the Petition Date), their Estates or the Chapter 11 Cases, including, without limitation, a. the subject matter of, or the transactions or events giving rise to, any Claim or Interest that is treated in the Plan, b. the business or contractual arrangements or interactions between any Debtor and any Shareholder Released Party (including historical business or contractual arrangements or interactions, any direct or indirect distributions or transfers by any Debtor, and any exercise of any common law or contractual rights of setoff or recoupment by any Shareholder Released Party at any time on or prior to the Effective Date), c. any employment or retention of any Shareholder Released Party by the Debtors (including any service as a director, officer, executive, consultant or advisor to the Debtors or service in any similar capacity), d. any direct or indirect beneficial ownership of any equity interest in or debt obligation of the Debtors, e. the Restructuring Transactions, f. the Pending Opioid Actions, g. Opioid-Related Activities or the Debtors' development, production, manufacture, licensing, labeling, marketing, advertising, promotion, distribution or sale of non-opioid products or the use or receipt of any proceeds therefrom, in each case, including the Debtors' interactions with regulators and regardless of where in the world any such activities or any result, loss, injury or damage resulting therefrom occurred, h. any past, present or future use or misuse of any opioid, whether sold by the Debtors or by NewCo or any of its Subsidiaries or otherwise, to the extent arising from an act, conduct, omission, event, transaction, occurrence or continuing condition in any way relating to any of the foregoing, i. the restructuring of any Claim or Interest before or during the Chapter 11 Cases, j. the Disclosure Statement and the Plan and related agreements, instruments and other documents (including the Plan Documents) and the negotiation, formulation, preparation or implementation thereof, k. the solicitation of votes with respect to the Plan, or l. any other act, conduct, omission, event, transaction, occurrence or continuing condition in any way relating to any of the foregoing.

For the avoidance of doubt and without limitation of the foregoing, each Person that is a Governmental Unit or a Tribe shall be deemed to have released all Shareholder Released Claims ~~against the Released Parties~~ that have been, are or could have been brought by (1) such Governmental Unit or Tribe in its own right, in its *parens patriae* or sovereign enforcement capacity, or on behalf of or in the name of another Person or (2) any other governmental official, employee, agent or representative acting or purporting to act in a *parens patriae*, sovereign enforcement or quasi-sovereign enforcement capacity, or any other capacity on behalf of such Governmental Unit or Tribe.

*7. Shareholder Releases*

[To come.]

Notwithstanding anything herein to the contrary, (x) nothing in the Plan shall release any Excluded Claim; (y) nothing in Section 10.7(b) of the Plan shall be construed to impair in any way the Effective Date or post-Effective Date rights and obligations of any

**Person under the Plan, the Plan Documents, the Confirmation Order or the Restructuring Transactions, including the Shareholder Settlement Agreement and the Separation Agreements; and (z) upon the filing of a Notice of Shareholder Release Snapback, (A) the Shareholder Releases set forth in Section 10.7(b) of the Plan shall be entirely null and void, revoked and invalidated, as of the Effective Date, with respect to all members of the Breaching Shareholder Family Group and the Designated Shareholder Released Parties and (B) the *status quo ante* shall be restored in all respects for the Releasing Parties with respect to the members of the Breaching Shareholder Family Group and the Designated Shareholder Released Parties; *provided* that, for the avoidance of doubt, notwithstanding the nullification, voiding, revocation and invalidation pursuant to the foregoing clause (A), the Shareholder Releases shall continue in effect for, and shall be fully enforceable by and for the benefit of, all other Shareholder Released Parties other than the Breaching Shareholder Family Group and the Designated Shareholder Released Parties.**

**(iii)    Releases by Shareholder Released Parties.**

**As of the Effective Date, for good and valuable consideration, the adequacy of which is hereby confirmed, and except as otherwise explicitly provided in the Plan or in the Confirmation Order, the Reciprocal Releasees shall be conclusively, absolutely, unconditionally, irrevocably, fully, finally, forever and permanently released, subject to clause (z) of the last paragraph of Section 10.7(c) of the Plan, by the Shareholder Released Parties from any and all Claims, claims, counterclaims, disputes, obligations, suits, judgments, damages, demands, debts, rights, Causes of Action, Liens, remedies, losses, contributions, indemnities, rights of subrogation, costs, liabilities, attorneys' fees and expenses, in each case, of any kind, character or nature whatsoever, including any derivative claims asserted or assertible by or on behalf of the Debtors or their Estates (including any Causes of Action arising under chapter 5 of the Bankruptcy Code) and including any claims that any Shareholder Released Party, or that any other Person or party claiming under or through any Shareholder Released Party or any other Person, would have presently or in the future been legally entitled to assert in its own right (whether individually or collectively) or on behalf of any Shareholder Released Party or any other Person, notwithstanding section 1542 of the California Civil Code or any law of any jurisdiction that is similar, comparable or equivalent thereto (which shall conclusively be deemed waived), whether liquidated or unliquidated, fixed or contingent, matured or unmatured, known or unknown, foreseen or unforeseen, asserted or unasserted, accrued or unaccrued, existing or hereinafter arising, choate or inchoate, whether in law or equity, whether sounding in tort or contract or based on any other legal or equitable theory or principle (including fraud, negligence, gross negligence, recklessness, reckless disregard, deliberate ignorance, public or private nuisance, breach of fiduciary duty, avoidance, willful misconduct, veil piercing, alter-ego theories of liability, unjust enrichment, disgorgement, restitution, contribution, indemnification, right of subrogation and joint liability), whether *in rem, quasi in rem, in personam* or otherwise, or whether arising under federal or state statutory or common law, or any other applicable international, foreign or domestic law, rule, statute, regulation, treaty, right, duty, requirement or otherwise, regardless of where in the world accrued or arising, from the beginning of time, in each case, based on or relating to, or in any manner arising from, in whole or in part, the Debtors (as such Entities existed prior to or after the Petition Date), their Estates or the**

**Chapter 11 Cases, including, without limitation, a. the subject matter of, or the transactions or events giving rise to, any Claim or Interest that is treated in the Plan, b. the business or contractual arrangements or interactions between any Debtor and any Shareholder Released Party (including historical business or contractual arrangements or interactions, any direct or indirect distributions or transfers by any Debtor, and any exercise of any common law or contractual rights of setoff or recoupment by any Shareholder Released Party at any time on or prior to the Effective Date), c. any employment or retention of any Shareholder Released Party by the Debtors (including any service as a director, officer, executive, consultant or advisor to the Debtors or service in any similar capacity), d. any direct or indirect beneficial ownership of any equity interest in or debt obligation of the Debtors, e. the Restructuring Transactions, f. the Pending Opioid Actions, g. Opioid-Related Activities or the Debtors' development, production, manufacture, licensing, labeling, marketing, advertising, promotion, distribution or sale of non-opioid products or the use or receipt of any proceeds therefrom, in each case, including the Debtors' interactions with regulators and regardless of where in the world any such activities or any result, loss, injury or damage resulting therefrom occurred, h. any past, present or future use or misuse of any opioid, whether sold by the Debtors or by NewCo or any of its Subsidiaries or otherwise, to the extent arising from an act, conduct, omission, event, transaction, occurrence or continuing condition in any way relating to any of the foregoing, i. the restructuring of any Claim or Interest before or during the Chapter 11 Cases, j. the Disclosure Statement and the Plan and related agreements, instruments and other documents (including the Plan Documents) and the negotiation, formulation, preparation or implementation thereof, k. the solicitation of votes with respect to the Plan, or l. any other act, conduct, omission, event, transaction, occurrence or continuing condition in any way relating to any of the foregoing.**

**Notwithstanding anything herein to the contrary, (x) nothing in the Plan shall release any Excluded Claim; (y) nothing in Section 10.7(c) of the Plan shall be construed to impair in any way the Effective Date or post-Effective Date rights and obligations of any Person under the Plan, the Plan Documents, the Confirmation Order or the Restructuring Transactions, including the Shareholder Settlement Agreement and the Separation Agreements including the rights of any Shareholder Released Party that is a current or former director, officer or employee of the Debtors but is not a Sackler Family Member relating to plan treatment of any claims held by such party; and (z) upon the filing of a Notice of Shareholder Release Snapback and the commencement or continuation of any action or proceeding against a member of a Breaching Shareholder Family Group or a Designated Shareholder Released Party by any Reciprocal Releasee, (A) the releases set forth in Section 10.7(c) of the Plan of any Reciprocal Releasee that has commenced or continued any such action shall be entirely null and void, revoked and invalidated, as of the Effective Date, with respect to the members of the Breaching Shareholder Family Group and the Designated Shareholder Released Parties and (B) the *status quo ante* shall be restored in all respects for the members of the Breaching Shareholder Family Group and the Designated Shareholder Released Parties with respect to any Reciprocal Releasee that has commenced or continued any such litigation; *provided* that, for the avoidance of doubt, notwithstanding the nullification, voiding, revocation and invalidation pursuant to the foregoing clause (A), the releases set forth in Section 10.7(c) of the Plan shall continue in effect for, and shall be fully enforceable by and for the benefit of, all other Reciprocal**

**Releasees, and shall be binding on, and enforceable against, all other Shareholder Released Parties, including any members of the Breaching Shareholder Family Group with respect to any Reciprocal Releasee that has not commenced any such litigation.**

### 8.    *Channeling Injunction*

In order to supplement the injunctive effect of the Plan Injunction, the Releases and the Shareholder Releases set forth in <u>Sections 10.5</u>, <u>10.6</u> and <u>10.7</u> of the Plan, the Confirmation Order shall provide for the following permanent injunction to take effect as of the Effective Date:

(i)    **Terms. In order to preserve and promote the settlements contemplated by and provided for in the Plan and to supplement, where necessary, the injunctive effect of the Plan Injunction, the Releases and the Shareholder Releases described in <u>Sections 10.5</u>, <u>10.6</u> and <u>10.7</u> of the Plan, and pursuant to the exercise of the equitable jurisdiction and power of the Bankruptcy Court under section 105(a) of the Bankruptcy Code, all Persons that have held or asserted, that hold or assert or that may in the future hold or assert any Channeled Claim shall be permanently and forever stayed, restrained and enjoined from taking any action for the purpose of directly or indirectly collecting, recovering or receiving payments, satisfaction, recovery or judgment of any form from or against any Protected Party with respect to any Channeled Claim, including:**

a.    **commencing, conducting or continuing, in any manner, whether directly or indirectly, any suit, action or other proceeding, in each case, of any kind, character or nature, in any forum in any jurisdiction with respect to any Channeled Claims, against or affecting any Protected Party, or any property or interests in property of any Protected Party with respect to any Channeled Claims;**

b.    **enforcing, levying, attaching, collecting or otherwise recovering, by any means or in any manner, either directly or indirectly, any judgment, award, decree or other order against any Protected Party or against the property of any Protected Party with respect to any Channeled Claims;**

c.    **creating, perfecting or enforcing, by any means or in any manner, whether directly or indirectly, any Lien of any kind against any Protected Party or the property of any Protected Party with respect to any Channeled Claims;**

d.    **asserting or accomplishing any setoff, right of subrogation, indemnity, contribution or recoupment of any kind, whether directly or indirectly, in respect of any obligation due to any**

**Protected Party** or against the property of any **Protected Party** with respect to any **Channeled Claims**; and

e.    taking any act, by any means or in any manner, in any place whatsoever, that does not conform to, or comply with, the provisions of the **Plan Documents**, with respect to any **Channeled Claims**.

(ii)    **Reservations.** Notwithstanding anything to the contrary in ~~the~~ **Section 10.8** of the **Plan** or the **Confirmation Order**, this **Channeling Injunction** shall not stay, restrain, bar or enjoin:

a.    the rights of Holders of **Channeled Claims** to the treatment afforded them under the **Plan** and the **Plan Documents**, including ~~(1)~~ the rights of Holders of ~~PI~~ **Channeled Claims** to assert such **Channeled Claims** solely in accordance with the ~~PI Trust Documents solely against the PI Trust, (2) the rights of Holders of Non-Federal Domestic Governmental Channeled Claims to assert such Channeled Claims solely in accordance with the NOAT Documents solely against NOAT, (3) the rights of Holders of Tribe Channeled Claims to assert such Channeled Claims solely in accordance with the Tribe Trust Documents solely against the Tribe Trust, (4) the rights of Holders of Hospital Channeled Claims to assert such Channeled Claims solely in accordance with the Hospital Trust Documents solely against the Hospital Trust, (5) the rights of Holders of Third-Party Payor Channeled Claims to assert such Channeled Claims solely in accordance with the TPP Trust Documents solely against the TPP Trust and (6) the rights of Holders of NAS Monitoring Channeled Claims to assert such Channeled Claims solely in accordance with the NAS Monitoring Trust Documents solely against the NAS Monitoring Trust~~<u>Master TDP and the Creditor Trust TDPs</u>, in each case whether or not there are funds to make Distributions in respect of such **Channeled Claims** and whether or not such rights entitle such Holders to Abatement Distributions or any other form of Distributions;

b.    the rights of Persons to assert any claim, debt, litigation or liability for payment of **Creditor Trust Operating Expenses** solely against the applicable **Creditor Trust**;

c.    the rights of Persons to assert any claim, debt or litigation against any **Excluded Party**;

    d.    **the rights of the Master Disbursement Trust to pursue and enforce the MDT Shareholder Rights, the MDT Insurance Rights and the MDT Causes of Action;**

    e.    **the rights of the parties to the LRP Agreement to enforce the terms thereof in accordance with the Plan;**

    f.    **the Creditor Trusts from enforcing their respective rights against the Master Disbursement Trust under the Plan and the MDT ~~Agreement~~Documents;**

    g.    **the Master Disbursement Trust from enforcing its rights, on behalf of itself and the Private Creditor Trusts, against NewCo and TopCo under the Plan and the NewCo Credit Support Agreement; or**

    h.    **NOAT or the Tribe Trust from enforcing their respective rights against TopCo under the TopCo Operating Agreement.**

(iii)    **Notice of Shareholder ~~Breach~~. [Release Snapback.** Upon the filing of a Notice of Shareholder ~~Breach~~Release Snapback, the Channeling Injunction shall terminate, be rescinded and have no application, without further order of the Bankruptcy Court, to any suit, action or other proceeding, in each case, of any kind, character or nature, brought ~~by [___]~~ against any member of the Breaching Shareholder Family Group, or any Designated Shareholder Released Party; *provided*, *however*, that the extension of time provided by Section ~~10.8~~10.9(~~d~~a) of the Plan shall continue in effect in accordance with its terms; and *provided further* that, for the avoidance of doubt, notwithstanding the termination and rescission pursuant to Section 10.8(c) of the Plan, the Channeling Injunction shall continue in effect for, and shall be fully enforceable by and for the benefit of, all other Protected Parties, including all other Shareholder Released Parties, other than the Breaching Shareholder Family Group.~~]~~ and the Designated Shareholder Released Parties.

(iv)    **Modifications**. Except as expressly set forth in paragraph (c) of Section 10.8 of the Plan, there can be no modification, dissolution or termination of the Channeling Injunction, which shall be a permanent injunction.

(v.)    **Non-Limitation of Channeling Injunction**. Except as expressly set forth in paragraphs (b) and (c) of Section 10.8 of the Plan, nothing in the Plan or the Creditor Trust Documents shall be construed in any way to limit the scope, enforceability or effectiveness of the Channeling Injunction issued in connection with the Plan.

(vi.)    **Bankruptcy Rule 3016 Compliance**. The Debtors' compliance with the requirements of Bankruptcy Rule 3016 shall not constitute an admission

that the Plan provides for an injunction against conduct not otherwise enjoined under the Bankruptcy Code.

**9.** ***Tolling of Shareholder Released Claims; Violations of Shareholder Releases and Channeling Injunction.***

(i)     (iv) **Tolling of Shareholder Released Claims**. If applicable law, an order in any proceeding or an agreement fixes a period for commencing or continuing an action or proceeding based on a Shareholder Released Claim against a Shareholder Released Party and such Shareholder Released Claim is released pursuant to the Shareholder Releases or such action or proceeding is enjoined by the Channeling Injunction, then such period does not expire with respect to such Shareholder Released Claim with respect to the Master Disbursement Trust (or the MDT Trustees) or the Releasing Parties until the laterlatest of a. the end of such period; b. with respect to the applicable Shareholder Family Group, 180two hundred twenty-five (225) days after the filing of a Notice of Shareholder BreachRelease Snapback; and c. with respect to the applicable Shareholder Family Group, when asuch Shareholder Family Group fulfills its obligations under Section [——2.01] of the Shareholder Settlement Agreement.

(ii)     **Violations of Shareholder Releases and Channeling Injunction**. In the event that any Person takes any action that a Shareholder Released Party believes violates the Shareholder Releases or Channeling Injunction as it applies to any Shareholder Released Party, such Shareholder Released Party shall be entitled to make an emergency application to the Bankruptcy Court for relief, and may proceed by contested matter rather than by adversary proceeding. The Bankruptcy Court shall have jurisdiction and authority to enter final orders in connection with any dispute over whether an action violates the Shareholder Releases or Channeling Injunction. Upon determining that a violation of the Shareholder Releases or Channeling Injunction has occurred, the Bankruptcy Court, in its discretion, may award any appropriate relief against such violating Person, including, but not limited to, a. disgorgement from the violating Person of any funds, assets or other value received, directly or indirectly, pursuant to the Plan or Plan Documents (including fees and expenses paid pursuant to the Plan or Plan Documents on account of legal or other advisory services rendered to or for the benefit of the violating Person); b. the termination of any rights of the violating Person to receive any funds, assets or other value pursuant to the Plan or Plan Documents; c. the reduction of any payments owed by any Shareholder Released Parties under the Shareholder Settlement Agreement to the violating Person in an amount equal to the amount of disgorgement ordered from, or the reduction of future payments ordered to be made to, or on account of, the violating Person (subject to the right of the violating Person to request that any amounts actually disgorged from such violating

Person offset any reduction of future payments ordered to be made to, or on account of, such violating Person); d. an admonition, reprimand or censure of, or citation of contempt by, the violating Person and its counsel; e. a fine or penalty paid into the Bankruptcy Court; f. a bond or other security in an amount equal to any financial obligation ordered by the Bankruptcy Court in respect of the violation; g. an appropriate sanction on any attorney or law firm responsible for the violation; h. injunctive relief to prevent future violations by the Person or its counsel; and i. attorney and other professional fees incurred by any Shareholder Released Party arising from the violation. The provision of any one form of relief shall not preclude the provision of any other form of relief.

(v) **Modifications**. Except as expressly set forth in paragraph (c) of the ~~Section 10.8 of the~~ Plan, there can be no modification, dissolution or termination of the Channeling Injunction, which shall be a permanent injunction.

(vi) **Non-Limitation of Channeling Injunction**. Except as expressly set forth in paragraphs (b) and (c) of the ~~Section 10.8 of the~~ Plan, nothing in the Plan or the Creditor Trust Documents shall be construed in any way to limit the scope, enforceability or effectiveness of the Channeling Injunction issued in connection with the Plan.

(vii) **Bankruptcy Rule 3016 Compliance**. The Debtors' compliance with the requirements of Bankruptcy Rule 3016 shall not constitute an admission that the Plan provides for an injunction against conduct not otherwise enjoined under the Bankruptcy Code.

**10.** ~~9.~~ *MDT Insurer Injunction.*

(i)    **Terms.** In accordance with section 105(a) of the Bankruptcy Code, upon the occurrence of the Effective Date, all Persons that have held or asserted, that hold or assert or that may in the future hold or assert any Claim based on, arising under or attributable to an MDT Insurance Policy shall be, and hereby are, permanently stayed, restrained and enjoined from taking any action for the purpose of directly or indirectly collecting, recovering or receiving payment or recovery on account of any such Claim based on, arising under or attributable to an MDT Insurance Policy from or against any MDT Insurer, including:

a.    commencing, conducting or continuing, in any manner any action or other proceeding of any kind (including an arbitration or other form of alternate dispute resolution) against any MDT Insurer, or against the property of any MDT Insurer, on account of any Claim based on, arising under or attributable to an MDT Insurance Policy;

b.      enforcing, attaching, levying, collecting or otherwise recovering, by any manner or means, any judgment, award, decree or other order against any MDT Insurer, or against the property of any MDT Insurer, on account of any Claim based on, arising under or attributable to an MDT Insurance Policy;

c.      creating, perfecting or enforcing in any manner any Lien of any kind against any MDT Insurer, or against the property of any MDT Insurer, on account of any Claim based on, arising under or attributable to an MDT Insurance Policy;

d.      asserting or accomplishing any setoff, right of subrogation, indemnity, contribution or recoupment of any kind, whether directly or indirectly, against any obligation due to any MDT Insurer, or against the property of any MDT Insurer, on account of any Claim based on, arising under or attributable to an MDT Insurance Policy; and

e.      taking any act, in any manner, in any place whatsoever, that does not conform to, or comply with, the provisions of the Plan applicable to any Claim based on, arising under or attributable to an MDT Insurance Policy.

(ii)    **Reservations.** The provisions of this MDT Insurer Injunction shall not preclude the Master Disbursement Trust from pursuing any Claim based on, arising under or attributable to an MDT Insurance Policy, any other claim that may exist under any MDT Insurance Policy against any MDT Insurer, or enjoin the rights of the Master Disbursement Trust to prosecute any action based on or arising from the MDT Insurance Policies or the rights of the Master Disbursement Trust to assert any claim, debt, obligation, cause of action, or liability for payment against a MDT Insurer based on or arising from the MDT Insurance Policies. The provisions of this MDT Insurer Injunction are not issued for the benefit of any MDT Insurer, and no such insurer is a third-party beneficiary of this MDT Insurer Injunction. ~~For the avoidance of doubt, the provisions of this~~This MDT Insurer Injunction shall not enjoin, impair or affect a. any claims between or among MDT Insurers that are not Settling MDT Insurers ~~or~~; b. the rights of current and former directors, officers, employees and agents of the Debtors ~~(other than~~that are not Sackler Family Members that are preserved under the Plan or c. the terms of the Shareholder ~~Released Parties)~~Settlement Agreement with respect to the MDT Shareholder Insurance Rights.

(iii)   **Modifications.** To the extent the MDT Trustees make a good faith determination that some or all of the MDT Insurance Proceeds are substantially unrecoverable by the Master Disbursement Trust, the Master Disbursement Trust shall have the sole and exclusive authority at any

272

time, upon written notice to any affected MDT Insurer, to terminate, reduce or limit the scope of this MDT Insurer Injunction with respect to any MDT Insurer, *provided* that a. any termination, reduction, or limitation of the MDT Insurer Injunction (A) shall apply equally to all Classes of Claims, and (B) shall comply with any procedures set forth in the MDT Agreement and b. the termination, reduction, or limitation of the MDT Insurer Injunction as it relates to the MDT Bermuda-Form Insurance Policies shall be subject to the consent (not to be unreasonably withheld, conditioned or delayed) of the Creditor Trustee for the PI Trust.

(iv)    (iii) **Non-Limitation of MDT Insurer Injunction.** NothingExcept as set forth in paragraphs (b) and (c) of Section 10.10 of the Plan, nothing in the Plan, the MDT Documents or the Creditor Trust Documents shall be construed in any way to limit the scope, enforceability or effectiveness of the MDT Insurer Injunction issued in connection with the Plan.

**11.    10. *Settling MDT Insurer Injunction.***

(i)    **Terms. In accordance with section 105(a) of the Bankruptcy Code, upon the occurrence of the Effective Date, all Persons that have held or asserted, that hold or assert or that may in the future hold or assert any Claim based on, arising under or attributable to an MDT Insurance Policy shall be, and hereby are, permanently stayed, restrained and enjoined from taking any action for the purpose of directly or indirectly collecting, recovering or receiving payment or recovery on account of any such Claim based on, arising under or attributable to an MDT Insurance Policy from or against any Settling MDT Insurer, solely to the extent that such Settling MDT Insurer has been released from such Claim under such MDT Insurance Policy pursuant to an MDT Insurance Settlement, including:**

a.    **commencing, conducting or continuing, in any manner any action or other proceeding of any kind (including an arbitration or other form of alternate dispute resolution) against any such Settling MDT Insurer, or against the property of such Settling MDT Insurer, on account of such Claim based on, arising under or attributable to such MDT Insurance Policy;**

b.    **enforcing, attaching, levying, collecting or otherwise recovering, by any manner or means, any judgment, award, decree or other order against any such Settling MDT Insurer, or against the property of such Settling MDT Insurer, on account of such Claim based on, arising under or attributable to such MDT Insurance Policy;**

273

    c.    **creating, perfecting or enforcing in any manner any Lien of any kind against any such Settling MDT Insurer, or against the property of such Settling MDT Insurer, on account of such Claim based on, arising under or attributable to such MDT Insurance Policy;**

    d.    **asserting or accomplishing any setoff, right of subrogation, indemnity, contribution or recoupment of any kind, whether directly or indirectly, against any obligation due to any such Settling MDT Insurer, or against the property of such Settling MDT Insurer, on account of such Claim based on, arising under or attributable to such MDT Insurance Policy; and**

    e.    **taking any act, in any manner, in any place whatsoever, that does not conform to, or comply with, the provisions of the Plan applicable to such Claim based on, arising under or attributable to such MDT Insurance Policy.**

(ii)    **Reduction of Insurance Judgments.** Any right, Claim, or cause of action that an Insurance Company may have been entitled to assert against any Settling MDT Insurer but for the Settling MDT Insurer Injunction, if any such right, Claim, or cause of action exists under applicable non-bankruptcy law, shall become a right, Claim, or cause of action solely as a setoff claim against the Master Disbursement Trust and not against or in the name of the Settling MDT Insurer in question. Any such right, Claim, or cause of action to which an Insurance Company may be entitled shall be solely in the form of a setoff against any recovery of the Master Disbursement Trust from that Insurance Company, and under no circumstances shall that Insurance Company receive an affirmative recovery of funds from the Master Disbursement Trust or any Settling MDT Insurer for such right, Claim, or cause of action. In determining the amount of any setoff, the Master Disbursement Trust may assert any legal or equitable rights the Settling MDT Insurer would have had with respect to any right, Claim, or cause of action.

(iii)    **Modifications.** There can be no modification, dissolution or termination of the Settling MDT Insurer Injunction, which shall be a permanent injunction.

(iv)    **Non-Limitation of Settling MDT Insurer Injunction.** ~~Nothing~~Except as set forth in paragraphs (b) and (c) of Section 10.11 of the Plan, nothing in the Plan, the MDT Documents or the Creditor Trust Documents shall be construed in any way to limit the scope, enforceability or effectiveness of the Settling MDT Insurer Injunction issued in connection with the Plan.

**12.**   ~~11.~~ *Exculpation*

To the maximum extent permitted by applicable law, no Exculpated Party shall have or incur, and each Exculpated Party is hereby released and exculpated from: any Claim, obligation, suit, judgment, damage, demand, debt, right, Cause of Action, remedy, loss and liability for any Claim in connection with, or arising out of, the administration of the Chapter 11 Cases; the negotiation and pursuit of the Disclosure Statement (including any information provided, or statements made, in the Disclosure Statement or omitted therefrom), the Restructuring Transactions, the Plan, the Master Disbursement Trust (including the Master TDP and the MDT Agreement), the Creditor Trusts (including the ~~trust distribution procedures~~Creditor Trust TDPs and the other Creditor Trust Documents) and the solicitation of votes for, and confirmation of, the Plan; the funding of the Plan; the occurrence of the Effective Date; the administration of the Plan and the property to be distributed under the Plan; and the wind-up and dissolution of the Liquidating Debtors and the transactions in furtherance of any of the foregoing, in each case other than Claims or Causes of Action arising out of, or related to, any act or omission of an Exculpated Party that is a criminal act or constitutes fraud, gross negligence or willful misconduct. This exculpation shall be in addition to, and not in limitation of, all other Releases, indemnities, exculpations and any other applicable law or rules protecting such Exculpated Parties from liability. For the avoidance of doubt, ~~the~~ Section ~~10.11~~10.12 of the Plan shall not exculpate or release any Exculpated Party with respect to any act or omission of such Exculpated Party prior to the Effective Date that is later found to be a criminal act or to constitute fraud, gross negligence or willful misconduct, including findings after the Effective Date. Notwithstanding anything herein to the contrary, nothing in the Plan shall release any Claims or Causes of Action that may be asserted against any Excluded Party.

### 13. ~~12.~~ Injunction Related to Releases and Exculpation

To the maximum extent permitted under applicable law, the Confirmation Order shall permanently enjoin the commencement or prosecution by any Person, whether directly, derivatively or otherwise, of any Claims, obligations, suits, judgments, damages, demands, debts, rights, Causes of Action, losses or liabilities released pursuant to the Plan, including, without limitation, the Claims, obligations, suits, judgments, damages, demands, debts, rights, Causes of Action and liabilities released or exculpated in the Plan and the Claims, Interests, Liens, other encumbrances or liabilities described in Section 5.3(b), 5.4(c) or 5.6(b) of the Plan.

### 14. ~~13.~~ Subordinated Claims

The allowance, classification and treatment of all Claims and Interests and the respective Distributions and treatments in respect thereof under the Plan take into account and conform to the relative priority and rights of the Claims and Interests in each Class in connection with contractual, legal and equitable subordination rights relating thereto, whether arising under general principles of equitable subordination, section 509(c), 510(a), 510(b) or 510(c) of the Bankruptcy Code or otherwise. Pursuant to sections 509(c) and 510 of the Bankruptcy Code or otherwise, the Debtors reserve the right to reclassify any Allowed Claim or Allowed Interest in accordance with any contractual, legal or equitable subordination relating thereto.

### 15. ~~14.~~ Preservation of Causes of Action and Reservation of Rights

As of the Effective Date, (i) the Master Disbursement Trust shall have the right to prosecute any and all MDT Causes of Action, (ii) the Plan Administration Trust shall have the right to prosecute any and all Retained Causes of Action relating to and necessary for the administration of Claims against the Debtors (other than Channeled Claims) or the other responsibilities of the Plan Administration Trustee in accordance with the PAT Agreement, (iii) each Creditor Trust shall have the right to prosecute any and all Retained Causes of Action relating to and necessary for the administration of the applicable Channeled Claims in accordance with the applicable Creditor Trust ~~Documents~~TDP and (iv) NewCo shall have the right to prosecute any and all Retained Causes of Action constituting NewCo Transferred Assets; *provided* that a. any settlement or release by NewCo of such Retained Causes of Action shall be subject to the consent of TopCo and b. in the event NewCo fails to prosecute any such Retained Causes of Action, TopCo may direct such prosecution by NewCo, in accordance with the NewCo Operating Agreement. Pursuant to section 1123(b) of the Bankruptcy Code, except as expressly provided in Sections 10.5 through ~~10.12~~10.13 of the Plan, nothing contained in the Plan or the Confirmation Order shall be deemed to be a waiver or relinquishment of any rights, Claims or Causes of Action that the Debtors had immediately before the Effective Date on behalf of the Estates or of themselves in accordance with any provision of the Bankruptcy Code or any applicable nonbankruptcy law, including but not limited to any actions specifically enumerated in the Schedule of Retained Causes of Action. Subject to Sections 10.5 through ~~10.12~~10.13 of the Plan, all such rights, Claims and Causes of Action shall be transferred to the Master Disbursement Trust, the Plan Administration Trust, the applicable Creditor Trust or NewCo, as applicable, which shall have, retain, reserve and be entitled to assert all such rights, Claims and Causes of Action in accordance with the Plan as fully as if the Chapter 11 Cases had not been commenced, and all of the Debtors' legal and equitable rights with respect to any Claim or Interest may be asserted after the Effective Date to the same extent as if the Chapter 11 Cases had not been commenced.

### *16. ~~15.~~ Ipso Facto and Similar Provisions Ineffective*

Any term of any policy, contract or other obligation applicable to a Debtor shall be void and of no further force or effect with respect to any Debtor to the extent such policy, contract, or other obligation is conditioned on, creates an obligation of any Debtor as a result of, or gives rise to a right of any Person based on any of the following: (i) the insolvency or financial condition of a Debtor; (ii) the commencement of the Chapter 11 Cases; (iii) the confirmation or consummation of the Plan, including any change of control that shall occur as a result of such consummation; or (iv) the Restructuring Transactions.

### *17. ~~16.~~ No Successor Liability*

Except as otherwise expressly provided in the Plan and the Confirmation Order, each of NewCo, TopCo, the Master Disbursement Trust, the Plan Administration Trust and the Creditor Trusts (i) is not, and shall not be deemed to assume, agree to perform, pay or otherwise have any responsibilities for any liabilities or obligations of the Debtors or any other Person relating to or arising out of the operations or the Assets of the Debtors on or prior to the Effective Date, (ii) is not, and shall not be, a successor to the Debtors by reason of any theory of law or equity or responsible for the knowledge or conduct of any Debtor prior to the Effective Date and (iii) shall not have any successor or transferee liability of any kind or character.

**18.    [Co-Defendant Defensive Rights.**

Notwithstanding anything to the contrary in Article X or in the Plan as it currently exists or as it might be amended in the future, the Confirmation Order or any order entered in connection with the Plan (or the Plan as amended) (or any such order, as amended, modified or supplemented), or any supplement to the Plan (or the Plan as amended), nothing contained in the Plan or any of the foregoing documents or orders (including without limitation, the classification, treatment, allowance, disallowance, release, bar, injunction, Channeling Injunction or any other provision of the Plan or the Plan as amended with respect to, impacting, affecting, modifying, limiting, subordinating, impairing, in any respect, a Co-Defendant Claim), will release, bar, enjoin, impair, alter, modify, amend, limit, prohibit, restrict, reduce, improve or enhance any Co-Defendant Defensive Rights of any Co-Defendant as such rights exist or might in the future exist under applicable non-bankruptcy law. Nothing in the Plan, any of the Plan Documents or in the Confirmation Order shall preclude, operate to or have the effect of, impairing any Holder of a Co-Defendant Claim from asserting in any proceeding any and all Co-Defendant Defensive Rights that it has or may have under applicable law. Nothing in the Plan, any of the Plan Documents or the Confirmation Order shall be deemed to waive any Co-Defendant Defensive Rights, and nothing in this proceeding, the Plan, any of the Plan Documents or the Confirmation Order may be used as evidence of any determination regarding any Co-Defendant Defensive Rights, and under no circumstances shall any Person be permitted to assert issue preclusion or claim preclusion, waiver, estoppel or consent in response to the assertion of an Co-Defendant Defensive Rights. Section 10.18 of the Plan shall be included in the Confirmation Order.][132]

**19.    ~~17.~~ Special Provisions for United States**

(i)    As to the United States, notwithstanding anything contained in the Plan or Confirmation Order to the contrary (except Section 5.25.2(h) of the Plan and the United States-PI Claimant Medical Expense Claim Settlement), including but not limited to the Article X of the Plan, nothing in the Plan or Confirmation Order (except Section 5.25.2(h) of the Plan and the United States-PI Claimant Medical Expense Claim Settlement) shall:

a.    limit or expand the scope of discharge, release or injunction permitted to debtors under the Bankruptcy Code. The discharge, release, and injunction provisions contained in the Plan and Confirmation Order are not intended and shall not be construed to bar the United States from, subsequent to the Confirmation Order, pursuing any police or regulatory action, or any criminal action;

b.    discharge, release, exculpate, impair or otherwise preclude: (1) any liability to the United States that is not a "claim" within the meaning of section 101(5) of the Bankruptcy Code; (2) any Claim of the United States arising on or after the Effective Date; (3) any

---

[132] Under discussion.

liability of the Debtors under police or regulatory statutes or regulations to the United States as the owner, lessor, lessee or operator of property that such Entity owns, operates or leases after the Effective Date; or (4) any liability to the United States, including but not limited to any liabilities arising under the IRC, the environmental laws, the criminal laws, the civil laws or common law, of any Person, including any Released Parties, Shareholder Released Parties or any Exculpated Parties, in each case, other than the Debtors; *provided, however*, that the foregoing shall not (x) limit the scope of discharge granted to the Debtors under sections 524 and 1141 of the Bankruptcy Code, (y) diminish the scope of any exculpation to which any Person is entitled under section 1125(e) of the Bankruptcy Code or (z) change the treatment of the DOJ Forfeiture Judgment Claim pursuant to Section 2.3 of the Plan or the treatment of the Federal Government Unsecured Claims pursuant to Section 4.3 of the Plan;

c.   enjoin or otherwise bar the United States from asserting or enforcing, outside the Bankruptcy Court, any liability described in the preceding clause b; *provided*, *however*, that the non-bankruptcy rights and defenses of all Persons with respect to b–b in clause b are likewise fully preserved;

d.   affect any valid right of setoff or recoupment of the United States against any of the Debtors; *provided*, *however*, that the rights and defenses of the Debtors with respect thereto are fully preserved (other than any rights or defenses based on language in the Plan or the Confirmation Order that may extinguish setoff or recoupment rights);

e.   divest any court, commission or tribunal of jurisdiction to determine whether any liabilities asserted by the United States are discharged or otherwise barred by the Confirmation Order, the Plan or the Bankruptcy Code; *provided, however*, that the Bankruptcy Court shall retain jurisdiction as set forth in and pursuant to the terms of the Plan to the extent permitted by law; or

f.   be deemed to (1) determine the tax liability of any Person, including but not limited to the Debtors, (2) have determined the federal tax treatment of any item, distribution or Entity, including the federal tax consequences of the Plan or Confirmation Order, or (3) expressly expand or diminish the jurisdiction of the Bankruptcy Court to make determinations as to federal tax liability and federal tax treatment under the Bankruptcy Code and 28 U.S.C. §§ 157, 1334.

For the avoidance of doubt, the Channeling Injunction set forth in <u>Section 10.8</u> of the Plan does not apply to the rights and causes of action protected by ~~the~~ <u>Section</u> ~~10.17~~<u>10.19</u> of the Plan.

(ii)    Notwithstanding anything to the contrary herein, nothing in the Plan, the Confirmation Order, the Shareholder Settlement Agreement, or any other document filed in connection with the Plan shall release claims held by the United States of America against the Shareholder Released Parties; *provided* that, for the avoidance of doubt, nothing in the Plan, Confirmation Order, the Shareholder Settlement Agreement or any other document filed in connection with the Plan shall limit the releases contained in the Settlement Agreement between the United States of America and Purdue Pharma L.P., executed on October 21, 2020, or the Settlement Agreement between the United States of America and Dr. Richard Sackler, David Sackler, Mortimer D.A. Sackler, Kathe Sackler, and the Estate of Jonathan Sackler, executed on October 21, 2020.

(iii)    Several of the Debtors are parties to the various following agreements with the Secretary of the Department of Health and Human Services under which the Debtors owe rebates to third parties:

a.    The Medicare Coverage Gap Discount Program Agreement is established under 42 U.S.C. §§ 1395w-l14A, 1395w-153 and is required should manufacturers wish to have coverage for their products under Medicare Part D. Under the Medicare Coverage Gap Discount Program Agreement, manufacturers agree to reimburse Medicare Part D plan sponsors for certain Coverage Gap discounts the plans provide to Medicare beneficiaries in the Part D coverage gap. ~~CMS~~<u>The Centers for Medicare & Medicaid Services</u> requires that a new entity that seeks to assume a Medicare Coverage Gap Discount Program Agreement enter into a novation agreement with ~~CMS~~<u>the Centers for Medicare & Medicaid Services</u> with respect to the transfer of such agreement. The Debtors that have entered into Medicare Coverage Gap Discount Program Agreements with the Secretary are: Purdue Pharma L.P. (P1180) and Rhodes Pharmaceuticals L.P. (P1281);

b.    The Medicaid Drug Rebate Program, established under section 1927 of the Social Security Act, requires manufacturers to enter into National Drug Rebate Agreements with the Secretary for the coverage and payment of a manufacturer's covered outpatient drugs. Under the Medicaid Drug Rebate Program, if a manufacturer has entered into and has in effect a National Drug Rebate Agreement, Medicaid covers and pays for all of the drugs of that manufacturer dispensed and paid for under the state plan, and in return manufacturers pay applicable rebates to the states. The Debtors that have National Drug Rebate Agreements and the

labeler codes associated with the National Drug Rebate Agreements are as follows: Rhodes Pharmaceuticals L.P. (42858), Purdue Pharma L.P. (59011), Avrio Health L.P. (67618) and Adlon Therapeutics L.P. (72912);

c.    Manufacturers with National Drug Rebate Agreements must also comply with the Drug Pricing Program under section 340B of the Public Health Service Act, 42 U.S.C. § 256b, and have Pharmaceutical Pricing Agreements with the Secretary of the Department of Health and Human Services. Under the Pharmaceutical Pricing Agreements, manufacturers agree to charge a price for covered outpatient drugs that will not exceed the average manufacturer price decreased by a rebate percentage. The Debtors that have Pharmaceutical Pricing Agreements and the labeler codes associated with such agreements are as follows: Rhodes Pharmaceuticals L.P. (42858), Purdue Pharma L.P. (59011), Avrio Health L.P. (67618) and Adlon Therapeutics L.P. (72912); and

d.    The Medicare Coverage Gap Discount Program Agreements, the Medicaid National Drug Rebate Agreements and the Pharmaceutical Pricing Agreements identified above provide that, in the event of a transfer of ownership, such agreements are automatically assigned to the new owner and all terms and conditions of such agreements remain in effect as to the new owner. Accordingly, notwithstanding anything contained in the Plan or the Confirmation Order which may be to the contrary, the Debtors shall assume such agreements pursuant to section 365 of the Bankruptcy Code, and upon the Effective Date, the Medicare Coverage Gap Discount Program Agreements, the Medicaid National Drug Rebate Agreements and the Pharmaceutical Pricing Agreements identified above shall be assigned to NewCo. NewCo, as the new owner, will assume the obligations of the Debtors who are parties under such agreements from and after the Effective Date, and to fully perform all the duties and responsibilities that exist under such agreements in accordance with their terms, including the payment of discounts owed to Part D Plan sponsors or payment of rebates owed to states and wholesalers for quarters prior to the Effective Date. For the avoidance of doubt, NewCo shall be liable for any outstanding rebates or discounts owed to third parties (and any applicable interest thereon) arising prior to the Effective Date, as well as any penalties associated with noncompliance by the Debtors with the Medicare Coverage Gap Discount Program Agreements, the Medicaid National Drug Rebate Agreements and the Pharmaceutical Pricing Agreements identified above prior to the Effective Date.

      (iv)    **Notwithstanding** anything to the contrary herein, nothing in the Plan, the Confirmation Order, the Shareholder Settlement Agreement or any other document filed in connection with the Plan shall bind the United States in any application of statutory, or associated regulatory, authority grounded in Title 19 of the Social Security Act, 42 U.S.C. § 1396-1 et seq. (the "**Medicaid Program**") or in section 1115 of Title 11 of the Social Security Act. The United States is neither enjoined nor in any way prejudiced in seeking recovery of any funds owed to the United States under the Medicaid Program.

## J.    Retention of Jurisdiction

### 1.    *Retention of Jurisdiction*

(i)    The Bankruptcy Court shall retain exclusive jurisdiction of all matters arising under, arising out of or related to the Chapter 11 Cases and the Plan pursuant to, and for the purposes of, sections 105(a) and 1142 of the Bankruptcy Code and for, among other things, the following purposes:

    a.    to hear and determine applications for the assumption or rejection of executory contracts and unexpired leases and any Disputed Cure Claims or Disputed Claims in respect of rejection damages resulting therefrom;

    b.    to hear and determine any motions, adversary proceedings, applications, contested matters and other litigated matters pending on, or commenced after, entry of the Confirmation Order;

    c.    to hear and resolve any disputes arising from or related to (1) any orders of the Bankruptcy Court still in effect granting relief under Bankruptcy Rule 2004 or (2) any protective orders entered by the Bankruptcy Court in connection with the foregoing (including the Protective Order);

    d.    to ensure that Distributions to Holders of Allowed Claims are accomplished as provided in the Plan and the Confirmation Order;

    e.    to consider Claims or the allowance, classification, priority, compromise, estimation or payment of any Claim, including any Administrative Claim or, solely to the extent provided in the Master TDP and/or the applicable Creditor Trust ~~Documents~~TDP, any Channeled Claim ~~(other than, solely in the case of the PI Claims held by Holders of PI Claims who timely "opt out" of liquidating their PI Claims under the PI TDP, the liquidation or estimation of contingent or unliquidated personal injury tort or wrongful death Claims against a Debtor's estate for purposes of distribution in the Chapter 11 Cases);~~;

f.      to enter, implement or enforce such orders as may be appropriate in the event that the Confirmation Order is, for any reason, stayed, reversed, revoked, modified or vacated;

g.      to issue and enforce injunctions, enter and implement other orders and take such other actions as may be necessary or appropriate to restrain interference by any Person with the consummation, implementation or enforcement of the Plan, the Confirmation Order or any other order of the Bankruptcy Court;

h.      to hear and determine any application to modify the Plan in accordance with section 1127 of the Bankruptcy Code to remedy any defect or omission or reconcile any inconsistency in the Plan, the Disclosure Statement or any order of the Bankruptcy Court, including the Confirmation Order, in such a manner as may be necessary to carry out the purposes and effects thereof;

i.      to hear and determine all Professional Fee Claims;

j.      to resolve disputes concerning any reserves with respect to Disputed Claims or the administration thereof;

k.      to hear and resolve disputes related to the MDT Insurance Rights;

l.      to hear and determine disputes arising in connection with the interpretation, implementation or enforcement of the Plan, the Confirmation Order, any transactions or payments in furtherance of the Plan or the Confirmation Order or any agreement, instrument or other document governing, or related to, any of the foregoing, including the Plan Documents;

m.      to take any action and issue such orders, including any such action or orders as may be necessary after entry of the Confirmation Order or the occurrence of the Effective Date, as may be necessary to construe, enforce, implement, execute and consummate the Plan, including any release (including, but not limited to, the United States-PI Claimant Medical Expense Claim Releases), exculpation or injunction provisions set forth in the Plan, or to maintain the integrity of the Plan following the occurrence of the Effective Date;

n.      to hear and determine any other matters related to the Chapter 11 Cases and not inconsistent with the Bankruptcy Code or title 28 of the United States Code;

o.      to resolve any disputes concerning whether a Person had sufficient notice of the Chapter 11 Cases, the Disclosure Statement, any solicitation conducted in connection with the Chapter 11 Cases,

282

any Bar Date established in the Chapter 11 Cases or any deadline for responding or objecting to a Cure Amount, in each case, for the purpose of determining whether a Claim or Interest is discharged hereunder or for any other purpose;

p.      to hear and determine disputes arising in connection with the interpretation, implementation or enforcement of the Shareholder Settlement Agreement;

q.      to hear and determine disputes arising in connection with (1) the MDT Claims and the interpretation, implementation or enforcement of the NewCo Credit Support Agreement or (2) operations of the Master Disbursement Trust or the actions of the MDT Fiduciaries;

r.      to hear and determine disputes arising in connection with the interpretation, implementation or enforcement of the Abatement Trust Documents, and to hear and determine disputes concerning violations of the Confirmation Order or the use of funds from the Abatement Trusts in violation of the Authorized Abatement Purposes;

s.      to determine such other matters, and for such other purposes, as may be provided in the Confirmation Order;

t.      to hear and determine all matters relating to the Plan Settlements, to the extent permitted under applicable law; and

u.      to enter a final decree closing each of the Chapter 11 Cases.

(ii)     The Bankruptcy Court shall retain jurisdiction of all matters arising under, arising out of or related to the Chapter 11 Cases and the Plan to, among other things, hear and determine matters concerning state, local and federal taxes in accordance with sections 346, 505 and 1146 of the Bankruptcy Code (including the expedited determination of taxes under section 505(b) of the Bankruptcy Code).

(iii)    Notwithstanding anything in the Article XI of the Plan to the contrary, the resolution of Channeled Claims against the Debtors and the forum in which such resolution shall be determined shall be governed by, and in accordance with, the Master TDP and the Creditor Trust DocumentsTDPs, if applicable.

(iv)     By consenting to the treatment provided by the Plan or otherwise supporting the Plan, no State or Tribe shall be construed to have waived any claim of Sovereign Immunity that it may have in any other action or proceeding, including any action or proceeding occurring after the Effective Date.

**K.**     **Miscellaneous Provisions**

*1.*     *Exemption from Certain Transfer Taxes*

To the maximum extent permitted pursuant to section 1146(a) of the Bankruptcy Code, any transfers of property under the Plan pursuant to (i) the issuance, distribution, transfer or exchange of any debt, equity security or other interest in the Debtors, (ii) the Restructuring Transactions, (iii) the creation, modification, consolidation, termination, refinancing and/or recording of any mortgage, deed of trust or other security interest, or the securing of additional indebtedness by such or other means, or (iv) the making, assignment, recording or surrender of any lease or sublease, or the making, delivery or recording of any deed or other instrument of transfer under, in furtherance of or in connection with the Plan, including any deeds, bills of sale or other assignments or instruments of transfer, or assignments executed in connection with any disposition of Assets contemplated by the Plan (including transfers of Assets to and by the Debtors, the Plan Administration Trust, NewCo, TopCo, the Master Disbursement Trust and the Creditor Trusts) shall not be subject to any document recording tax, stamp tax, conveyance fee, intangibles tax, transfer tax (including real estate transfer tax), mortgage tax or mortgage recording tax, sales or use tax, Uniform Commercial Code filing or recording fee, regulatory filing or recording fee or other similar tax or governmental assessment, and the appropriate federal, state, provincial or local government officials or agents shall forego collection of any such tax or governmental assessment and accept for filing and recordation any of the foregoing instruments or other documents without the payment of any such tax or governmental assessment.

*2.*     *Dates of Actions to Implement Plan*

In the event that any payment or act under the Plan is required to be made or performed on a date that is not a Business Day, then the making of such payment or the performance of such act may be completed on or as soon as reasonably practicable after the next succeeding Business Day but shall be deemed to have been completed as of the required date.

*3.*     *Amendments*

(i)     **Plan Modifications**. The Plan may be amended, modified or supplemented by the Debtors in the manner provided for by section 1127 of the Bankruptcy Code or as otherwise permitted by law, without additional disclosure pursuant to section 1125 of the Bankruptcy Code, except as otherwise ordered by the Bankruptcy Court; *provided* that a. any such amendment, modification or supplement shall be reasonably acceptable to the Governmental Consent Parties; *provided further* that any such amendment, modification or supplement that expands the scope of the Releases shall be acceptable to the Governmental Consent Parties, and b. any such amendment, modification or supplement shall be reasonably acceptable to the Creditors' Committee to the extent that it relates to the MDT Insurance Rights, modifies the Creditors' Committee's consent rights under the Plan, expands the scope of the Releases or materially and adversely affects the treatment of Holders of Hospital Claims, Third-Party

Payor Claims, PI Claims, NAS Monitoring Claims or Other General Unsecured Claims (it being understood that (x) any reduction in the amount of any Initial Private Creditor Trust Distribution, (y) any Private Creditor Trust's MDT Claim or any elimination of any consent rights in favor of such Holders or (z) any modification to Sections 5.2(d) – (h), 5.6 or 5.7 of the Plan to the extent such modification relates to the Master Disbursement Trust or a Private Creditor Trust, shall constitute a such a material and adverse effect). In addition, after the Confirmation Date, as long as such action does not materially and adversely affect the treatment of Holders of Allowed Claims pursuant to the Plan, the Debtors may remedy any defect or omission or reconcile any inconsistencies in the Plan or the Confirmation Order with respect to such matters as may be necessary to carry out the purposes or effects of the Plan, and any Holder of a Claim or Interest that has accepted the Plan shall be deemed to have accepted the Plan as amended, modified or supplemented.

(ii) **Certain Technical Amendments**. Prior to the Effective Date, the Debtors, may make appropriate technical adjustments and modifications to the Plan without further order or approval of the Bankruptcy Court; *provided*, *however*, that such technical adjustments and modifications do not adversely affect in a material way the treatment of Holders of Claims and Interests under the Plan.

### 4.    *Revocation or Withdrawal of Plan*

The Debtors reserve the right to revoke or withdraw the Plan prior to the Effective Date as to any or all of the Debtors; *provided* that each Debtor shall be entitled to revoke the Plan only in full and not in part. If, with respect to a Debtor, the Plan has been revoked or withdrawn prior to the Effective Date, or if confirmation or the occurrence of the Effective Date as to such Debtor does not occur on the Effective Date, then, with respect to such Debtor: (i) the Plan and the Plan Documents shall be null and void in all respects; (ii) any settlement or compromise embodied in the Plan (including the fixing or limiting to an amount any Claim or Interest or Class of Claims or Interests), assumption or rejection of executory contracts and unexpired leases effected by the Plan and any document or agreement executed pursuant to the Plan (including the Plan Documents) shall be deemed null and void; and (iii) nothing contained in the Plan shall a. constitute a waiver or release of any Claim by or against, or any Interest in, such Debtor or any other Person, b. prejudice in any manner the rights of such Debtor or any other Person, or c. constitute an admission of any sort by any Debtor or any other Person; *provided* that any provisions under the Shareholder Settlement Agreement that are expressly contemplated to survive revocation or reversal of the Plan shall survive.

### 5.    *Payment of Statutory Fees*

All fees payable under section 1930 of chapter 123 of title 28 of the United States Code shall be paid on or before the Effective Date by the Debtors. After the Effective Date, the Disbursing Agent or the Plan Administration Trustee, as applicable,Trust shall assume liability for and shall pay, or cause to be paid, any and all Quarterlyquarterly fees owed to the U.S.

Trustee when due in accordance with applicable law, and shall continue to file, or cause to be filed, with the Bankruptcy Court quarterly reports to show the calculation of such fees for the Debtors' Estates. Each of the Debtors shall remain obligated to pay quarterly fees to the U.S. Trustee until such Debtor's Chapter 11 Case is closed, dismissed or converted to a case under chapter 7 of the Bankruptcy Code.

**6.      *Severability***

(i)      Notwithstanding anything else contained in the Plan, a. each of the provisions of Shareholder Settlement, including, without limitation, the Shareholder Releases and the Channeling Injunction, is integrated with and integral to both all other provisions of the Shareholder Settlement and the remainder of the Plan and the Plan Documents, and shall not be severable from the remainder of the Shareholder Settlement, the Plan or the Plan Documents; b. the Confirmation Order shall constitute a judicial determination that each term and provision of the Shareholder Settlement is (1) valid and enforceable pursuant to its terms, and (2) integral to both the entirety of the Shareholder Settlement and the Plan and may not be excised or modified other than in accordance with the Shareholder Settlement Agreement; c. nonseverable from and mutually dependent on each other term in the Shareholder Settlement and the Plan; and d. in the event that any one or more provisions of the Shareholder Settlement are deemed null, void, illegal or unenforceable, the Shareholder Settlement, the Plan, the Confirmation Order and the Plan Documents shall be null and void.

(ii)     If, prior to entry of the Confirmation Order, any term or provision of the Plan that is not related to the Shareholder Settlement is held by the Bankruptcy Court to be invalid, void or unenforceable, the Bankruptcy Court, at the request of the Debtors, shall have the power to alter and interpret such term or provision to make it valid or enforceable to the maximum extent practicable, consistent with the original purpose of the term or provision held to be invalid, void or unenforceable, and such term or provision shall then be applicable as altered or interpreted. Notwithstanding any such holding, alteration or interpretation by the Bankruptcy Court, the remainder of the terms and provisions of the Plan shall remain in full force and effect and shall in no way be affected, impaired or invalidated by such holding, alteration or interpretation. The Confirmation Order shall constitute a judicial determination and shall provide that each term and provision of the Plan, as it may have been altered or interpreted in accordance with ~~the~~ Section 12.6 of the Plan, is valid and enforceable pursuant to its terms.

**7.      *Governing Law***

Except to the extent that the Bankruptcy Code or other federal law is applicable, or to the extent that a Plan Document provides otherwise, the rights, duties and obligations arising under

the Plan and the Plan Documents shall be governed by, and construed and enforced in accordance with, the internal laws of the State of New York, without giving effect to the principles of conflicts of laws thereof (other than section 5-1401 and section 5-1402 of the New York General Obligations Law).

### 8.   Immediate Binding Effect

Notwithstanding Bankruptcy Rule 3020(e), 6004(h) or 7062 or otherwise, upon the occurrence of the Effective Date, the terms of the Plan and the Plan Documents shall be immediately effective and enforceable and deemed binding upon and inure to the benefit of the Debtors, the other Protected Parties, the Holders of Claims against and Interests in the Debtors and the other Releasing Parties and <u>Released Parties and</u> each of their respective successors and assigns.

### 9.   Successors and Assigns

The rights, benefits and obligations of any Person named or referred to in the Plan shall be binding on, and shall inure to the benefit of, any heir, executor, administrator, successor or permitted assign, if any, of each such Person.

### 10.   Entire Agreement

On the Effective Date, the Plan, the Plan Supplement and the Confirmation Order shall supersede all previous and contemporaneous negotiations, promises, covenants, agreements, understandings and representations concerning such documents, all of which have become merged and integrated into the Plan.

### 11.   Computing Time

In computing any period of time prescribed or permitted by the Plan, unless otherwise set forth in the Plan or determined by the Bankruptcy Court, the provisions of Bankruptcy Rule 9006 shall apply.

### 12.   Exhibits to Plan

All exhibits, schedules, supplements and appendices to the Plan (including the Plan Supplement) are incorporated into and are part of the Plan as if set forth in full herein.

### 13.   Notices

All notices, requests and demands to or upon the Debtors shall be in writing (including by facsimile transmission) and, unless otherwise provided herein, shall be deemed to have been duly given or made only when actually delivered or, in the case of notice by facsimile transmission, when received and telephonically confirmed, addressed as follows:

DAVIS POLK & WARDWELL LLP
450 Lexington Avenue
New York, New York 10017

Attn: Marshall S. Huebner, Benjamin S. Kaminetzky, Timothy Graulich, Eli J. Vonnegut, and Christopher S. Robertson

*Counsel to the Debtors
and Debtors in Possession*

After the occurrence of the Effective Date, the Plan Administration Trustee shall have authority to send a notice to Entities providing that, to continue to receive documents pursuant to Bankruptcy Rule 2002, such Entities must file a renewed request to receive documents pursuant to Bankruptcy Rule 2002; *provided, however*, that the U.S. Trustee need not file such a renewed request and shall continue to receive documents without any further action being necessary. After the occurrence of the Effective Date, the Debtors and the Plan Administration Trustee are authorized to limit the list of Entities receiving documents pursuant to Bankruptcy Rule 2002 to the U.S. Trustee and those Entities that have filed such renewed requests.

### 14.    *Dissolution of the Creditors' Committee*

On the Effective Date, the Creditors' Committee will dissolve; *provided*, *however*, that following the Effective Date, the Creditors' Committee shall continue in existence and have standing and a right to be heard for the following limited purposes: (i) applications, and any relief related thereto, for compensation by Professional Persons retained by the Creditors' Committee, [(or any other Professional Persons) and requests for allowance of fees and/or expenses under section 503(b) of the Bankruptcy Code],[133] and (1) any appeals of, or related to, the Confirmation Order or other appeal to which the Creditors' Committee is a party. Upon the dissolution of the Creditors' Committee, the Creditors' Committee, each of its members (including each officer, director, employee or agent thereof) and its respective Professional Persons will cease to have any duty, obligation or responsibility arising from, or related to, the Chapter 11 Cases and shall be released and discharged from all rights and duties from, or related to, the Chapter 11 Cases.

### 15.    *Reservation of Rights*

Except as otherwise provided herein, the Plan shall be of no force or effect unless the Bankruptcy Court enters the Confirmation Order. None of the filing of the Plan, any statement or provisions of the Plan or the taking of any action by the Debtors with respect to the Plan shall be, or deemed to be, an admission or waiver of any rights of the Debtors with respect to any Claim or Interest prior to the Effective Date.

---

[133] Under discussion.

## ARTICLE V

## VOTING REQUIREMENTS; ACCEPTANCE AND CONFIRMATION OF THE PLAN

**A.      General**

The following is a brief summary of the Plan confirmation process.  Holders of Claims and Interests are encouraged to review the relevant provisions of the Bankruptcy Code and/or consult their own attorneys.

Section 1128(a) of the Bankruptcy Code requires the Bankruptcy Court, after notice, to hold a confirmation hearing.  Section 1128(b) of the Bankruptcy Code provides that any party in interest may object to confirmation of the Plan.

Section 1129 of the Bankruptcy Code requires that, in order to confirm the Plan, the Bankruptcy Court must make a series of findings concerning the Plan and the Debtors, including that (i) the Plan has classified Claims in a permissible manner, (ii) the Plan complies with applicable provisions of the Bankruptcy Code, (iii) the Plan has been proposed in good faith and not by any means forbidden by law, (iv) the disclosure required by section 1125 of the Bankruptcy Code has been made, (v) the Plan has been accepted by the requisite votes of holders of Claims (except to the extent that cramdown is available under section 1129(b) of the Bankruptcy Code), (vi) the Plan is feasible and confirmation is not likely to be followed by the liquidation or the need for further financial reorganization of the Debtors unless such liquidation or reorganization is proposed in the Plan, (vii) the Plan is in the "best interests" of all holders of Claims in an impaired Class by providing to such holders on account of their Claims property of a value, as of the Effective Date, that is not less than the amount that such holders would receive or retain in a chapter 7 liquidation, unless each holder of a Claim in such Class has accepted the Plan, and (viii) all fees payable under section 1930 of chapter 123 of title 28 of the United States Code shall be paid on or before the Effective Date by the Debtors. After the Effective Date, the ~~Disbursing Agent or the~~ Plan Administration ~~Trustee, as applicable,~~Trust shall assume liability for and shall pay, or cause to be paid, any and all ~~Quarterly~~quarterly fees owed to the U.S. Trustee when due in accordance with applicable law, and shall continue to file, or cause to be filed, with the Bankruptcy Court quarterly reports to show the calculation of such fees for the Debtors' Estates. Each of the Debtors shall remain obligated to pay quarterly fees to the U.S. Trustee until ~~the earliest of the applicable~~such Debtor's Chapter 11 Case ~~being~~is closed, dismissed, or converted to a case under chapter 7 of the Bankruptcy Code.  The Debtors believe that the Plan satisfies section 1129 of the Bankruptcy Code.

**B.      Parties in Interest Entitled to Vote**

Pursuant to the Bankruptcy Code, only Classes of Claims that are "impaired" (as defined in section 1124 of the Bankruptcy Code) under the Plan are entitled to vote to accept or reject the Plan.  A Class is impaired if the legal, equitable, or contractual rights to which the Claims of that Class entitled the holders of such Claims are modified, other than by curing defaults and reinstating the Claims.  Classes that are not impaired are not entitled to vote on the Plan and are conclusively presumed to have accepted the Plan.  In addition, Classes that receive no

distributions under the Plan are not entitled to vote on the Plan and are deemed to have rejected the Plan.

## C.   Classes Impaired and Entitled to Vote Under the Plan

The following table designates the Classes of Claims against and Interests in the Debtors and specifies which Classes are (i) Impaired and Unimpaired under the Plan, (ii) entitled to vote to accept or reject the Plan in accordance with section 1126 of the Bankruptcy Code, and (iii) deemed to accept or reject the Plan:

| Class | Type of Claim or Interest | Impairment | Entitled to Vote |
|-------|---------------------------|------------|------------------|
| Class 1 | Secured Claims | Unimpaired | No (Presumed to Accept) |
| Class 2 | Other Priority Claims | Unimpaired | No (Presumed to Accept) |
| Class 3 | Federal Government Unsecured Claims | Impaired | Yes |
| Class 4 | Non-Federal Domestic Governmental Claims | Impaired | Yes |
| Class 5 | Tribe Claims | Impaired | Yes |
| Class 6 | Hospital Claims | Impaired | Yes |
| Class 7 | Third-Party Payor Claims | Impaired | Yes |
| Class 8 | Ratepayer Claims | Impaired | Yes |
| Class 9 | NAS Monitoring Claims | Impaired | Yes |
| Class 10(a) | NAS PI Claims | Impaired | Yes |
| Class 10(b) | Non-NAS PI Claims | Impaired | Yes |
| Class 11(a) | Avrio General Unsecured Claims | Unimpaired | No (Presumed to Accept) |
| Class 11(b) | Adlon General Unsecured Claims | Unimpaired | No (Presumed to Accept) |
| Class 11(c) | Other General Unsecured Claims | Impaired | Yes |
| Class 12 | Intercompany Claims | Unimpaired or Impaired | No (Presumed to Accept or Deemed to Reject) |
| Class 13 | Shareholder Claims | Impaired | No (Deemed to Reject) |
| Class 14 | Co-Defendant Claims | Impaired | No (Deemed to Reject) |
| Class 15 | Other Subordinated Claims | Impaired | No (Deemed to Reject) |
| Class 16 | PPLP Interests | Impaired | No (Deemed to Reject) |
| Class 17 | PPI Interests | Impaired | No (Deemed to Reject) |
| Class 18 | Intercompany Interests | Unimpaired or Impaired | No (Presumed to Accept or Deemed to Reject) |

In general, if a Claim or Interest is unimpaired under a plan, section 1126(f) of the Bankruptcy Code deems the holder of such Claim or Interest to have accepted the plan, and thus, the holders of Claims in such unimpaired Classes are not entitled to vote on the plan.  Because Classes 1, 2, 11(a) and 11(b) are unimpaired under the Plan, the holders of Claims and Interests in these Classes are not entitled to vote.

In general, if the holder of an impaired Claim or impaired Interest will not receive any distribution under a plan in respect of such Claim or Interest, section 1126(g) of the Bankruptcy Code deems the holder of such Claim or Interest to have rejected the plan, and thus the holders of Claims in such Classes are not entitled to vote on the plan.  The holders of Claims and

Interests in Classes 13, 14, 15, 16 and 17 are conclusively presumed to have rejected the Plan and are therefore not entitled to vote.

Holders of Interests in Classes 12 and 18 are either conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code or are deemed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code.  Accordingly, such Holders are not entitled to vote to accept or reject the Plan.

### D.    Voting Procedures and Requirements

The Bankruptcy Court can confirm the Plan only if it determines that the Plan complies with the technical requirements of chapter 11 of the Bankruptcy Code.  One of these technical requirements is that the Bankruptcy Court find, among other things, that the Plan has been accepted by the requisite votes of all Classes of impaired Claims and Interests unless approval will be sought under section 1129(b) of the Bankruptcy Code in spite of the nonacceptance by one or more such Classes.

If you have any questions about (i) the procedures for voting your Claim or with respect to the packet of materials that you have received or (ii) the amount of your Claim, please contact the Debtors' Solicitation Agent at (844) 217-0912 (domestic toll-free) or (347) 859-8093 (if calling from outside the U.S. or Canada).  If you wish to obtain (at no charge) an additional copy of the Plan, this Disclosure Statement, or other solicitation documents, you can obtain them from Debtors' Solicitation Agent by: (a) calling (844) 217-0912 (toll-free) or (347) 859-8093 (international);    (b)    visiting    the    Debtors'    restructuring    website    at: restructuring.primeclerk.com/purduepharma; (c) writing to Purdue Pharma Ballot Processing, c/o Prime Clerk LLC, One Grand Central Place, 60 East 42nd Street, Suite 1440, New York, NY 10165; and/or (d) emailing purduepharmaballots@primeclerk.com with a reference to "Purdue Pharma" in the subject line and request paper copies of the corresponding materials.

### 1.    Ballots

Pursuant to Bankruptcy Rule 3017(c), March 10, 2021 shall be the record date for purposes of determining which holders of Claims are entitled to receive solicitation packages and, where applicable, vote on the Plan (the "**Voting Record Date**").  Accordingly, only holders of record as of the Voting Record Date that are otherwise entitled to vote under the Plan will receive a Ballot and may vote on the Plan.

In voting for or against the Plan, please use (i) only the Ballot sent to you with this Disclosure Statement or (ii) the online electronic ballot portal.  If you are a holder of a Claim in Classes 3, 4, 5, 6, 7, 8, 9, 10(a), 10(b) and 11(c) and did not receive a Ballot, if your Ballot is damaged or lost or if you have any questions concerning voting procedures, please contact the Solicitation Agent at (844) 217-0912 (domestic toll-free) or (347) 859-8093 (if calling from outside the U.S. or Canada) or by email at purduepharmaballots@primeclerk.com.

In addition, the Debtors intend to seek approval for an attorney representing four or more holders of Claims in certain Classes to submit the votes of such clients through a single master ballot (a "**Master Ballot**") so long as such attorney follows specified procedures associated therewith.  An attorney electing to utilize such procedure will be required to collect and record

the votes of such clients through customary and accepted practices, or obtain authority to procedurally cast such clients' votes. If your attorney has indicated that your vote will be submitted by Master Ballot, but you prefer to vote by means of an individual Ballot, you may contact the Solicitation Agent at (844) 217-0912 (domestic toll-free) or (347) 859-8093 (if calling from outside the U.S. or Canada) or by email at purduepharmaballots@primeclerk.com.

## 2.    *Submitting Ballots*

If you are entitled to vote to accept or reject the Plan, you should read carefully, complete and submit your Ballot in accordance with the instructions below.

For your vote to be counted, your Ballot must be properly completed, signed, and returned so that it is actually received by the Solicitation Agent, Prime Clerk LLC, by no later than the Voting Deadline, unless such time is extended in writing by the Debtors. If your Ballot is not received by the Solicitation Agent on or before the Voting Deadline, and such Voting Deadline is not extended by the Debtors as noted above, your vote will not be counted. Ballots must be delivered to the Solicitation Agent at the appropriate address listed below:

| If by E-Ballot: | If by standard or overnight | If by hand delivery: |
|---|---|---|
| Visit https://restructuring.primeclerk.com/purduepharma and click on the "Submit E-Ballot" link.<br><br>For your E-Ballot log-in credentials and further detail, please see your Ballot. | Purdue Pharma Ballot Processing c/o Prime Clerk, LLC One Grand Central Place 60 East 42nd Street, Suite 1440 New York, NY 10165 | Purdue Pharma Ballot Processing c/o Prime Clerk, LLC One Grand Central Place 60 East 42nd Street, Suite 1440 New York, NY 10165<br><br>If you plan to hand deliver your Ballot to Prime Clerk's office, please email purduepharmaballots@primeclerk.com at least twenty-four (24) hours in advance to arrange delivery. |

Ballots will not be accepted by telecopy, facsimile, email, or other electronic means of transmission (other than by E-Ballot); *provided* that Master Ballots may be delivered by email and must be delivered pursuant to the instructions set forth on each Master Ballots.

The method of delivery of Ballots to the Solicitation Agent is at the risk of each holder of a Claim, and such delivery will be deemed made only when the original Ballot is actually received by the Solicitation Agent. In all cases, sufficient time should be allowed to assure timely delivery. Any unsigned Ballot or Ballot lacking an original signature will not be counted in determining the acceptance or rejection of the Plan; *provided* that a Ballot cast via the Solicitation Agent's online "E-Balloting" portal or an executed Master Ballot returned electronically pursuant to the Master Ballot Solicitation Procedures will be deemed to contain an original signature. No Ballot should be sent to the Debtors, the Debtors' agents (other than the Solicitation Agent), or the Debtors' financial or legal advisors, and if so sent, and not otherwise properly and timely delivered to the Solicitation Agent, will not be counted. If no holders of Claims in a particular Class that is entitled to vote on the Plan vote to accept or reject the Plan, then such Class shall be deemed to accept the Plan.

If you are a holder of a Claim in Classes 6, 7, 8, 9, or 10 and are represented by an attorney who represents four or more clients that may hold Claims in Classes 6, 7, 8, 9, or 10, you may be eligible to have your attorney vote to accept or reject the Plan on your behalf via Master Ballot.  In such case, your attorney will be required to collect and record your vote through customary and accepted practices, or obtain authority to procedurally cast your vote.  In the event that your attorney votes to accept or reject the Plan on your behalf via Master Ballot and you also submit an individual ballot to accept or reject the Plan, your individual ballot will control over any duplicate vote on the Master Ballot.

### 3.    *Voting of Disputed Claims*

If any party in interest with appropriate standing has filed an objection to a Claim on or before July 7, 2021 at 4:00 p.m. (prevailing Eastern Time) (such claim, a "**Disputed Claim**"), such Disputed Claim is temporarily disallowed, except as otherwise provided in a stipulation, settlement, or other agreement filed by the Debtors or as ordered by the Court prior to or concurrent with entry of an order confirming the Plan, including pursuant to an order on any motion with the Court for an order pursuant to Bankruptcy Rule 3018(a) temporarily allowing such claim for voting purposes filed regarding such Claim that is timely filed pursuant to procedures established by the Bankruptcy Court; *provided* that if the objection seeks to reclassify or reduce the allowed amount of such Claim, then such Claim is temporarily allowed for voting purposes in the reduced amount and/or as reclassified, except as otherwise provided in a stipulation, settlement, or other agreement filed by the Debtors or as may be otherwise ordered by the Court prior to or concurrent with entry of an order confirming the Plan.

### E.    **Acceptance of the Plan**

As a condition to confirmation of the Plan, the Bankruptcy Code requires that each class of impaired claims vote to accept a plan, except under certain circumstances.  *See* "Confirmation Without Necessary Acceptances; Cramdown" below.  A class of claims or interests that is unimpaired under a plan is deemed to have accepted the plan and, therefore, solicitation of acceptances with respect to such class is not required.  A class is impaired unless the plan (i) leaves unaltered the legal, equitable, and contractual rights to which the claim or interest entitles the holder of such claim or interest or (ii) cures any default, reinstates the original terms of the obligation, and does not otherwise alter the legal, equitable, or contractual rights to which the claim or interest entitles the holder of such claim or interest.

Section 1126(c) of the Bankruptcy Code defines acceptance of a plan by an impaired class as acceptance by holders of at least two-thirds in dollar amount and more than one-half in number of claims in that class. Only those holders that are eligible to vote and that actually vote to accept or reject the plan are counted for purposes of determining whether these dollar and number thresholds are met.  Thus, a class of claims will have voted to accept a plan only if two-thirds in amount and a majority in number that actually vote cast their ballots in favor of acceptance.  Under section 1126(d) of the Bankruptcy Code, a class of interests has accepted a plan if holders of such interests holding at least two-thirds in amount that actually vote have voted to accept the plan.  Holders of claims or interests who fail to vote are not counted as either accepting or rejecting a plan.

293

In addition to this voting requirement, section 1129 of the Bankruptcy Code requires that a plan be accepted by each holder of a claim or interest in an impaired class or that the plan otherwise be found by a court to be in the best interests of each holder of a claim or interest in such class. *See* "Best Interests Test" below. Moreover, each impaired class must accept the plan for the plan to be confirmed without application of the "fair and equitable" and "unfair discrimination" tests set forth in section 1129(b) of the Bankruptcy Code discussed below. *See* "Confirmation Without Necessary Acceptances; Cramdown" below.

## F.    **Confirmation Without Necessary Acceptances; Cramdown**

In the event that any impaired class of claims or interests does not accept a plan, a debtor nevertheless may move for confirmation of the plan. A plan may be confirmed, even if it is not accepted by all impaired classes, if the plan has been accepted by at least one impaired class of claims and the plan meets the "cramdown" requirements set forth in section 1129(b) of the Bankruptcy Code. Section 1129(b) of the Bankruptcy Code requires that a court find that a plan (i) "does not discriminate unfairly" and (ii) is "fair and equitable," with respect to each non-accepting impaired class of claims or interests. Here, because holders of Claims and Interests in Classes 13, 14, 15, 16 and 17 are deemed to reject the Plan, the Debtors will seek confirmation of the Plan from the Bankruptcy Court by satisfying the "cramdown" requirements set forth in section 1129(b) of the Bankruptcy Code. The Debtors believe that such requirements are satisfied, as no holder of a Claim or Interest junior to those in Classes 13, 14, 15, 16 and 17 will receive any property under the Plan.

A plan "does not discriminate unfairly" if (i) the legal rights of a non-accepting class are treated in a manner that is consistent with the treatment of other classes whose legal rights are similar to those of the non-accepting class and (ii) no class receives payments in excess of that which it is legally entitled to receive for its claims or interests. The Debtors believe that, under the Plan, all impaired Classes of Claims and Interests are treated in a manner that is consistent with the treatment of other Classes of Claims and Interests that are similarly situated, if any, and no class of Claims or Interests will receive payments or property with an aggregate value greater than the aggregate value of the Allowed Claims or Allowed Interests in such Class. Accordingly, the Debtors believe that the Plan does not discriminate unfairly as to any impaired Class of Claims or Interests.

The Bankruptcy Code provides a non-exclusive definition of the phrase "fair and equitable." In order to determine whether a plan is "fair and equitable," the Bankruptcy Code establishes "cramdown" tests for secured creditors, unsecured creditors, and equity holders, as follows:

1.    ***Secured Creditors.*** Either (i) each impaired secured creditor retains its liens securing its secured claim and receives on account of its secured claim deferred Cash payments having a present value equal to the amount of its allowed secured claim, (ii) each impaired secured creditor realizes the "indubitable equivalent" of its allowed secured claim, or (iii) subject to section 363(k) of the Bankruptcy Code, the property securing the claim is sold free and clear of liens, with such liens to attach to the proceeds of the sale and the treatment of such liens on proceeds to be as provided in clause (i) or (ii) above.

**2.**    **_Unsecured Creditors._**  Either (i) each impaired unsecured creditor receives or retains under the plan property of a value equal to the amount of its allowed claim or (ii) the holders of claims and interests that are junior to the claims of the dissenting class will not receive any property under the plan.

**3.**    **_Equity Interests._**  Either (i) each holder of an equity interest will receive or retain under the plan property of a value equal to the greatest of the fixed liquidation preference to which such holder is entitled, the fixed redemption price to which such holder is entitled or the value of the interest or (ii) the holder of an interest that is junior to the non-accepting class will not receive or retain any property under the plan.

As discussed above, the Debtors believe that the distributions provided under the Plan satisfy the "fair and equitable" standard, where required.

## G.    Classification

The Bankruptcy Code requires that, for purposes of treatment and voting, a chapter 11 plan divide the different claims (excluding administrative claims) against, and equity interests in, a debtor into separate classes based upon their legal nature.  Pursuant to section 1122 of the Bankruptcy Code, a plan may place a claim or an interest in a particular class only if such claim or interest is substantially similar to the other claims or interests of such class.  The Debtors believe that the Plan classifies all Claims and Interests in compliance with the provisions of the Bankruptcy Code because valid business, factual and legal reasons exist for separately classifying the various Classes of Claims and Interests created under the Plan.  Accordingly, the classification of Claims and Interests in the Plan complies with section 1122 of the Bankruptcy Code.

## ARTICLE VI

## FEASIBILITY AND BEST INTERESTS OF CREDITORS

## A.    Best Interests Test

As noted above, even if a plan is accepted by the holders of each class of claims and interests, the Bankruptcy Code requires a court to determine that such plan is in the best interests of all holders of claims or interests that are impaired by that plan and that have not accepted the plan.  The "best interests" test, as set forth in section 1129(a)(7) of the Bankruptcy Code, requires a court to find either that all members of an impaired class of claims or interests have accepted the plan or that the plan will provide a member who has not accepted the plan with a recovery of property of a value, as of the effective date of the plan, that is not less than the amount that such holder would recover if the debtor were liquidated under chapter 7 of the Bankruptcy Code (the "**Best Interests Test**").

To calculate the probable distribution to holders of each impaired class of claims and interests if the debtor were liquidated under chapter 7, a court must first determine the aggregate dollar amount that would be generated from a debtor's assets if its chapter 11 cases were converted to chapter 7 cases under the Bankruptcy Code.  To determine if a plan is in the best

interests of each impaired class, the present value of the distributions from the proceeds of a liquidation of the debtor's unencumbered assets and properties, after subtracting the amounts attributable to the costs, expenses and administrative claims associated with a chapter 7 liquidation, must be compared with the value offered to such impaired classes under the plan.  If the hypothetical liquidation distribution to holders of claims or interests in any impaired class is greater than the distributions to be received by such parties under the plan, then such plan is not in the best interests of the holders of claims or interests in such impaired class.[134]

**B.      Liquidation Analysis**

Amounts that a holder of Claims and Interests in Impaired Classes would receive in a hypothetical chapter 7 liquidation are discussed in the liquidation analysis of the Debtors prepared by the Debtors' management with the assistance of its advisors (the "**Liquidation Analysis**"), which is attached hereto as **Appendix B**.

As described in the Liquidation Analysis, underlying the analysis are a number of estimates and assumptions that, although developed and considered reasonable by the Debtors' management and advisors, are inherently subject to significant uncertainties and contingencies beyond the control of the Debtors and their management.  The Liquidation Analysis is based on assumptions with regard to liquidation decisions and circumstances that are subject to change. Accordingly, the values reflected in the Liquidation Analysis might not be realized if the Debtors were, in fact, to undergo a liquidation.

This Liquidation Analysis is solely for the purposes of (i) providing "adequate information" under section 1125 of the Bankruptcy Code to enable the holders of Claims and Interests entitled to vote under the Plan to make an informed judgment about the Plan and (ii) providing the Bankruptcy Court with appropriate support for the satisfaction of the "Best Interests Test" pursuant to section 1129(a)(7) of the Bankruptcy Code, and should not be used or relied upon for any other purpose, including the purchase or sale of securities of, or Claims or Interests in, the Debtors or any of their Affiliates.

The Debtors do not intend to and do not undertake any obligation to update or otherwise revise the Liquidation Analysis to reflect events or circumstances existing or arising after the date the Liquidation Analysis is initially filed or to reflect the occurrence of unanticipated events. Therefore, the Liquidation Analysis may not be relied upon as a guarantee or other assurance of the actual results that will occur.

In deciding whether to vote to accept or reject the Plan, holders of Claims must make their own determinations as to the reasonableness of any assumptions underlying the Liquidation Analysis and the reliability of the Liquidation Analysis.

---

[134] To the extent relevant for purposes of the Best Interest Test, the Liquidation Analysis assumes that, in a chapter 7 scenario, Holders of Claims and Interests and other non-Debtor Persons would retain their direct claims, if any, against the Shareholder Released Parties.  Section III.AA(2)(ii)(c) above contains a discussion of the value of such claims in a chapter 7 scenario.

## C.     Application of the Best Interests Test

The Debtors believe that, based on the Liquidation Analysis, the Plan satisfies the Best Interests Test.  As the Plan and the Liquidation Analysis attached hereto as **<u>Appendix B</u>** indicate, Confirmation of the Plan will provide each holder of an Allowed Claim in an Impaired Class with an equal or greater recovery than the value of any distributions if the Chapter 11 Cases were converted to cases under chapter 7 of the Bankruptcy Code.

## D.     Feasibility

Section 1129(a)(11) of the Bankruptcy Code requires, as a condition to Confirmation, that the Bankruptcy Court find that Confirmation is not likely to be followed by the liquidation of the Debtors or the need for further financial reorganization, unless such liquidation is contemplated by the Plan.  For purposes of demonstrating that the Plan meets this "feasibility" standard, the Debtors' management has prepared the financial projections, as set forth in **<u>Appendix C</u>** (the "**Financial Projections**").

The Debtors have prepared the Financial Projections solely for the purpose of providing "adequate information" under section 1125 of the Bankruptcy Code to enable the holders of Claims entitled to vote under the Plan to make an informed judgment about the Plan and should not be used or relied upon for any other purpose, including the purchase or sale of securities of, or Claims or Interests in, the Debtors.

In addition to the cautionary notes contained elsewhere in this Disclosure Statement and in the Financial Projections, it is underscored that the Debtors make no representation as to the accuracy of the Financial Projections or their or NewCo's ability to achieve the projected results. Many of the assumptions on which the Financial Projections are based are subject to significant uncertainties.  Inevitably, some assumptions will not materialize, and unanticipated events and circumstances may affect the financial results.  Therefore, the actual results achieved throughout the Projection Period (as defined in the Financial Projections) may vary from the Financial Projections, and the variations may be material.  All holders of Claims in the impaired Classes are urged to examine carefully all of the assumptions on which the Financial Projections are based in connection with their evaluation of, and voting on, the Plan.

Based upon the Financial Projections, the Debtors believe that they will be able to make all distributions and payments under the Plan and that confirmation of the Plan is not likely to be followed by liquidation of NewCo or the need for further restructuring.

## E.     Valuation of the Debtors

In conjunction with formulating the Plan and satisfying its obligations under section 1129 of the Bankruptcy Code, the Debtors, utilizing management's forecasts and with the assistance of PJT, produced the valuation analysis (the "**Valuation Analysis**") estimating the going concern value of the Debtors that is described in **<u>Appendix D</u>** attached hereto and incorporated herein by reference.

# ARTICLE VII

## SECURITIES LAW MATTERS

This Disclosure Statement was not approved by the SEC or any state regulatory authority. Neither the SEC nor any state regulatory authority has passed upon the accuracy or adequacy of this Disclosure Statement, or the exhibits or statements contained herein, and any representation to the contrary is unlawful.

The Plan provides for the offer, issuance, and distribution of interests in the Abatement Trusts, NOAT and the Tribe Trust (collectively, the "**Trust Interests**").  The Debtors believe any and all Trust Interests and the right to receive distributions on account of the Trust Interests will not constitute "securities" as defined in section 2(a)(1) of the Securities Act, section 101(49) of the Bankruptcy Code, and applicable state and local securities laws, and will be exempt from registration under the Securities Act, all rules and regulations promulgated thereunder, and any applicable state or local securities laws and regulations.  The Trust Interests will not be evidenced by any certificate, security, receipt, or in any other form or manner whatsoever, except as maintained on the books and records of the applicable trust.  Further, the Trust Interests shall not be listed for trading on any national securities exchange.

If it is determined that the Trust Interests, the right to receive distributions on account of Trust Interests constitute "securities," the Debtors believe that the issuance and distribution of the Trust Interests satisfies the requirements of section 1145(a)(1) of the Bankruptcy Code and are, therefore, exempt from registration under the Securities Act and state and local securities laws.

To the extent the Trust Interests, the right to receive distributions on account of Trust Interests are determined to be "securities" that do not satisfy the requirements of section 1145(a)(1) of the Bankruptcy Code, the Debtors believe that such interests are issuable without registration under the Securities Act under section 4(a)(2) of the Securities Act.  Section 4(a)(2) of the Securities Act provides that the issuance of securities by an issuer in transactions not involving any public offering are exempt from registration under the Securities Act.

# ARTICLE VIII

## CERTAIN RISK FACTORS TO BE CONSIDERED PRIOR TO VOTING

THE PLAN AND ITS IMPLEMENTATION ARE SUBJECT TO CERTAIN RISKS, INCLUDING, BUT NOT LIMITED TO, THE RISK FACTORS SET FORTH BELOW. HOLDERS OF CLAIMS WHO ARE ENTITLED TO VOTE ON THE PLAN SHOULD READ AND CAREFULLY CONSIDER THE RISK FACTORS, AS WELL AS THE OTHER INFORMATION SET FORTH IN THIS DISCLOSURE STATEMENT AND THE DOCUMENTS DELIVERED TOGETHER HEREWITH REFERRED TO OR INCORPORATED BY REFERENCE HEREIN, BEFORE DECIDING WHETHER TO VOTE TO ACCEPT OR REJECT THE PLAN.  THESE FACTORS SHOULD NOT, HOWEVER, BE REGARDED AS CONSTITUTING THE ONLY RISKS INVOLVED IN CONNECTION WITH THE PLAN AND ITS IMPLEMENTATION.

## A.  Risks Associated with the Bankruptcy Process

### 1.  *Plan Confirmation*

The Debtors can make no assurances that the conditions to confirmation of the Plan will be satisfied or waived or that they will receive the requisite acceptances to confirm the Plan. Further, if the requisite acceptances are not received, the Debtors may seek to accomplish an alternative chapter 11 plan and obtain acceptances to an alternative plan for the Debtors, or otherwise, that may not have the support of the holders of Claims and/or may be required to liquidate these Estates under chapter 7 or 11 of the Bankruptcy Code.  There can be no assurance that the terms of any such alternative restructuring arrangement or plan would be similar to or as favorable to Creditors as those proposed in the Plan.

Even if the Debtors receive the requisite acceptances, there is no assurance that the Bankruptcy Court will confirm the Plan.  Even if the Bankruptcy Court determined that the Disclosure Statement and the balloting procedures and results were appropriate, the Bankruptcy Court could still decline to confirm the Plan if it found that any of the statutory requirements for confirmation had not been met.  Moreover, there can be no assurance that modifications to the Plan will not be required for confirmation or that such modifications would not necessitate the resolicitation of votes.  If the Plan is not confirmed, it is unclear what distributions holders of Claims ultimately would receive with respect to their Claims in a subsequent plan.

### 2.  *Potential Appeals of Confirmation Order*

If the Confirmation Order is entered, certain parties may appeal such Order.  Any appealing party may seek a stay of judgment with respect to the Confirmation Order, which, if granted by the Bankruptcy Court or the district court with appellate jurisdiction with respect to the Confirmation Order, would maintain the status quo that has existed during the Chapter 11 Cases while an appeal remains pending.  Absent the grant of a stay pending appeal (or if applicable conditions to the grant of such a stay, which could include a requirement to post a supersedeas bond, are not satisfied), the Debtors and other parties will have the authority to execute upon and enforce the Confirmation Order so long as the Confirmation Order has not been reversed on appeal.  Accordingly, absent a stay pending appeal, the Effective Date may occur, subject to the terms and conditions precedent in the Plan, and the Plan may be substantially consummated during the pendency of the appeal.  Upon substantial consummation of the Plan, any appeal of the Confirmation Order may become equitably moot.  *See, e.g.*, *In re Chateaugay Corp.*, 10 F.3d 944 (2d Cir. 1993).  If any appeal is found not to be equitably moot in its entirety and confirmation of the Plan is reversed on appeal, the form of available relief and the impact of such relief on the post-Effective Date structure contemplated by the Plan is difficult to predict, but such relief could potentially have a materially adversely impact on the timing or amount of distributions contemplated under the Plan.

### 3.  *Objections to Classification of Claims*

Section 1122 of the Bankruptcy Code requires that the Plan classify Claims against, and Interests in, the Debtors.  The Bankruptcy Code also provides that the Plan may place a Claim or Interest in a particular Class only if such Claim or Interest is substantially similar to the other

Claims or Interests of such Class.  The Debtors believe that all Claims and Interests have been appropriately classified in the Plan.

To the extent that the Bankruptcy Court finds that a different classification is required for the Plan to be confirmed, the Debtors would seek (i) to modify the Plan to provide for whatever classification might be required for confirmation and (ii) to use the acceptances received from any holder of Claims pursuant to this solicitation for the purpose of obtaining the approval of the Class or Classes of which such holder ultimately is deemed to be a member.  Any such reclassification of Claims, although subject to the notice and hearing requirements of the Bankruptcy Code, could adversely affect the Class in which such holder was initially a member, or any other Class under the Plan, by changing the composition of such Class and the vote required for approval of the Plan.  There can be no assurance that the Bankruptcy Court, after finding that a classification was inappropriate and requiring a reclassification, would approve the Plan based upon such reclassification.  Except to the extent that modification of classification in the Plan requires resolicitation, the Debtors will, in accordance with the Bankruptcy Code and the Bankruptcy Rules, seek a determination by the Bankruptcy Court that acceptance of the Plan by any holder of Claims pursuant to this solicitation will constitute a consent to the Plan's treatment of such holder, regardless of the Class as to which such holder is ultimately deemed to be a member.

### 4.    *Failure to Consummate the Plan*

As of the date of this Disclosure Statement, there can be no assurance that the conditions to consummation of the Plan will be satisfied or waived.  Accordingly, even if the Plan is confirmed by the Bankruptcy Court, there can be no assurance that the Plan will be consummated and the restructuring completed.

### 5.    *The Chapter 11 Cases May Be Converted to Cases under Chapter 7 of the Bankruptcy Code*

If the Bankruptcy Court finds that it would be in the best interest of creditors and/or the debtor in a chapter 11 case, the Bankruptcy Court may convert a chapter 11 bankruptcy case to a case under chapter 7 of the Bankruptcy Code.  In such event, a chapter 7 trustee would be appointed or elected to liquidate the debtor's assets for distribution in accordance with the priorities established by the Bankruptcy Code.  The Debtors believe that liquidation under chapter 7 would result in significantly smaller distributions being made to creditors than those provided for in a chapter 11 plan because of (i) the likelihood that the assets would have to be sold or otherwise disposed of in a disorderly fashion over a short period of time, rather than reorganizing or selling the business as a going concern at a later time in a controlled manner, (ii) additional administrative expenses involved in the appointment of a chapter 7 trustee, and (iii) additional expenses and Claims, some of which would be entitled to priority, that would be generated during the liquidation, including Claims resulting from the rejection of unexpired leases and other executory contracts in connection with cessation of operations.

### 6.    *Risk of Delayed Confirmation or Effective Date*

Although the Debtors expect that the Plan will be confirmed on or shortly after the Confirmation Hearing scheduled for August 9, 2021, there is a risk that confirmation of the Plan will be delayed. The occurrence of the Effective Date is subject to the receipt of all authorizations, consents, regulatory approvals, rulings and documents that are necessary to implement and effectuate the Plan. The governmental approval process could take substantial time after confirmation of the Plan. Any delay in the governmental approval processes, or the failure to obtain such approvals, could prolong the Chapter 11 Cases (or result in a liquidation of the Debtors), and reduce recoveries available to creditors.

### 7.    *Plan Releases, Injunctions and Exculpations May Not Be Approved*

There can be no assurance that the Plan releases, injunctions and exculpations as provided in Article X of the Plan, will be granted. Failure of the Bankruptcy Court to grant such relief may result in a plan of reorganization that differs from the Plan or the Plan not being confirmed.

### 8.    *Channeling Injunction*

The Channeling Injunction, which, among other things, bars all persons that have held or asserted, or that hold or assert Channeled Claims or any Released Claims arising out of or related thereto against the Released Parties, is a necessary element of the Plan. There is no guarantee that the validity and enforceability of the Channeling Injunction or the application of the Channeling Injunction to the Channeled Claims and Released Claims arising out of or related thereto will not be challenged, either before or after Confirmation of the Plan.

### 9.    *Insurance Neutrality Provisions*

Certain of Debtors' insurers assert that the language in Section 5.10 of the Plan, titled "Insurance Neutrality," does not adequately protect their rights. They have proposed alternative insurance neutrality language to the Debtors, which is filed at Docket No. 2710, Exhibit A, in Case No. 19-23649. Those insurers contend that the language they have proposed is consistent with language in other plans of reorganization that have been confirmed, and confirmation orders that have been entered, in this district, and they further contend that this Court, or a court on appeal, may require that such language be included within the Plan as a condition to confirmation.

### 10.    *Credit Risk Attendant to Settlement of Claims Against the Sackler Families*

As described in the Shareholder Settlement Term Sheet attached hereto as **Appendix G**, the Shareholder Settlement Agreement will provide for the Sackler Parties to remit $4.275 billion over nine years (or ten years if certain amounts are paid ahead of schedule in the first six years) to the Master Disbursement Trust. The Shareholder Settlement Agreement will provide that the accounts holding all gross cash proceeds received by the Sackler Parties from the IACs (subject to certain permitted withdrawals as described in the Shareholder Settlement Term Sheet), all equity interests in the IACs owned by the Sackler Parties (subject to exclusions as may be agreed in connection with the Shareholder Settlement Agreement), as well as additional collateral to the extent mutually agreed with the Sackler Parties, will serve as collateral with respect to the Required Settlement Payments and other obligations under the Shareholder Settlement

Agreement. Remedies for breach of the Shareholder Settlement Agreement may include, without limitation, acceleration of the unpaid and unfunded obligations of the defaulting Sackler Parties, voiding the releases provided pursuant to the Plan applicable to the Sackler Parties that are in breach and certain other members of the Sackler Entities related to the breaching Sackler Parties, foreclosure by the Master Disbursement Trust on the collateral provided under the Shareholder Settlement Agreement, enforcement of confessions of judgment by the applicable Sackler Parties admitting the obligations that have come due and certain other remedies to be mutually agreed. However, some or all of the Sackler Parties may fail to make such payments in whole or in part (or fail to make timely payments) notwithstanding the satisfaction of all conditions to payment in the Shareholder Settlement Agreement and the covenants contained therein. Such an event presents a credit risk to the Master Disbursement Trust and, to the extent the Master Disbursement Trust is not able to collect such unpaid amounts through the enforcement of remedies under the Shareholder Settlement Agreement, could prevent the Master Disbursement Trust from making required or anticipated payments to the Creditor Trusts.

### 11.    *The New Jersey District Court May not Approve the Plea Agreement*

There can be no assurance that the Plea Agreement will be accepted by the New Jersey District Court at the sentencing hearing, which is a condition precedent to the occurrence of the Effective Date.

### 12.    *Recovery on Account of Other General Unsecured Claims Depends on the Aggregate Amount of Allowed Other General Unsecured Claims*

The Debtors estimate that, following completion of Claims litigation and related matters, the Other General Unsecured Claim Cash will exceed the aggregate amount of Allowed Other General Unsecured Claims.  This estimate is based on certain assumptions based on a variety of factors.  Should these underlying assumptions prove incorrect, the actual Allowed Other General Unsecured Claims may differ from the Debtors' estimates, and such differences could be material.  Because distributions to Holders of Other General Unsecured Claims are linked to the value of Allowed Other General Unsecured Claims, any material increase in the amount of Allowed Other General Unsecured Claims in excess of the Other General Unsecured Claim Cash would materially reduce the recovery to Holders of Other General Unsecured Claims under the Plan.

### 13.    *~~Recovery~~Recoveries on Account of Federal Government Unsecured Claims ~~are Impaired~~ May Impact the Amount of Distributions Made to NOAT and the Tribe Trust*

Under the terms of the Plan, residual value after satisfying other obligations under the Plan will effectively ultimately be distributed to NOAT and the Tribe Trust, in the proportions determined pursuant to the Plan.  As a result, the amount of distributions to NOAT and the Tribe Trust are linked to, *inter alia*, the amount of distributions on account of the Allowed Federal Government Unsecured Claims.  The amount of distributions on account of the Allowed Federal Government Unsecured Claims remains to be agreed with the Holders of such Claims or to be determined pursuant to the Plan.  The amount of such distribution that is ultimately made will reduce the amount of distributions to NOAT and the Tribe Trust.

### 14.    *Co-Defendant Claims May Reduce or Delay Distributions to NOAT and the Tribe Trust*

Under the terms of the Plan, residual value after satisfying other obligations under the Plan will ultimately be distributed to NOAT and the Tribe Trust, in the proportions determined pursuant to the Plan.  As a result, the amount and timing of distributions to NOAT and the Tribe Trust would be impacted by any distributions made to or funds set aside in a disputed claims reserve on account of, Co-Defendant Claims.  To the extent that Debtors are unsuccessful in Disallowing or subordinating the Co-Defendant Claims in whole or in part, prior to the Effective Date a reserve may need to be established on account of any unresolved Co-Defendant Claims, which would delay distributions to NOAT and the Tribe Trust, and any ultimate recoveries by the holders of such Co-Defendant Claims would reduce the amount of distributions to NOAT and the Tribe Trust.

## B.    Risks Associated with the Debtors' and NewCo's Business Operations and Financial Condition

### 1.    *NewCo May Not Be Able to Achieve Its Projected Financial Results*

Actual financial results may differ materially from the Financial Projections.  If the Debtors and/or NewCo do not achieve projected revenue or cash flow levels, NewCo may lack sufficient liquidity to continue operating its business consistent with the Financial Projections after the Effective Date.  The Financial Projections represent management's view based on currently known facts and hypothetical assumptions about their future operations; they do not guarantee NewCo's future financial performance.

### 2.    *NewCo's Effective Tax Rate May Vary From Projections*

The Financial Projections include assumptions as to NewCo's effective tax rate in future years. This assumed tax rate may be higher or lower than NewCo's actual tax rate, which will vary depending upon available tax deductions and changes in statutory tax rates.

### 3.    *The Financial Projections Are Subject to Inherent Uncertainty Due to the Numerous Assumptions upon Which They Are Based*

The Financial Projections are based on numerous assumptions including, without limitation, the timing, confirmation and consummation of the Plan in accordance with its terms, the anticipated future performance of the Debtors and NewCo, general business and economic conditions, and other matters, many of which are beyond the control of the Debtors and some or all of which may not materialize.  Particular uncertainties with respect to the Debtors' operations and financial results arise from the risks and uncertainties relating to, among other things, the following: changes in the demand for the Debtors' pharmaceutical products; legislation and regulations relating to the pharmaceutical industry; operational, permit, and labor factors; fluctuations in the amount of cash the Debtors generate from operations; and numerous other matters of national, regional and global scale, including those of a political, economic, business, competitive or regulatory nature.  Because the actual results achieved throughout the periods covered by the Financial Projections may vary from the projected results, the Financial Projections should not be relied upon as an assurance of the actual results that will occur.

Except with respect to the Financial Projections and except as otherwise specifically and expressly stated herein, this Disclosure Statement does not reflect any events that might occur subsequent to the date hereof. Such events could have a material impact on the information contained in this Disclosure Statement. Neither the Debtors nor NewCo intend to update the Financial Projections. The Financial Projections, therefore, may not reflect the impact of any subsequent events not already accounted for in the assumptions underlying the Financial Projections.

4.      **The Debtors Will Be Subject to the Risks and Uncertainties Associated with the Chapter 11 Cases**

For the duration of the Chapter 11 Cases, the Debtors' ability to operate, develop and execute a business plan, and continue as a going concern, will be subject to the risks and uncertainties associated with bankruptcy. These risks include the following: (i) the ability to develop, confirm and consummate the Plan and transactions contemplated thereunder; (ii) the ability to obtain Bankruptcy Court approval with respect to motions filed in the Chapter 11 Cases from time to time; (iii) the ability to maintain relationships with suppliers, vendors, service providers, customers, employees and other third parties; (iv) the ability to maintain contracts that are critical to the Debtors' operations; (v) the ability of third parties to seek and obtain Bankruptcy Court approval to terminate contracts and other agreements with the Debtors; (vi) the ability of third parties to seek and obtain Bankruptcy Court approval to terminate or shorten the exclusivity period for the Debtors to propose and confirm a chapter 11 plan, to appoint a chapter 11 trustee, or to convert the Chapter 11 Cases to chapter 7 proceedings; and (vii) the actions and decisions of the Debtors' creditors and other third parties who have interests in the Chapter 11 Cases that may be inconsistent with the Debtors' plans.

These risks and uncertainties could affect the Debtors' businesses and operations in various ways. For example, negative events associated with the Chapter 11 Cases could adversely affect the Debtors' relationships with suppliers, service providers, customers, employees and other third parties, which in turn could adversely affect the Debtors' operations and financial condition. Also, the Debtors will need the prior approval of the Bankruptcy Court for transactions outside the ordinary course of businesses, which may limit the Debtors' ability to respond timely to certain events or take advantage of certain opportunities. Because of the risks and uncertainties associated with the Chapter 11 Cases, the Debtors cannot accurately predict or quantify the ultimate impact of events that occur during the Chapter 11 Cases that may be inconsistent with the Debtors' plans.

5.      **Certain Claims May Not Be Discharged and May Have a Material Adverse Effect on the Debtors' Financial Condition and Results of Operations**

The Bankruptcy Code provides that the confirmation of a plan of reorganization discharges a debtor from substantially all debts arising prior to confirmation. With few exceptions, all Claims that arise prior to the Debtors' filing of their petitions or before confirmation of the plan of reorganization (i) would be subject to compromise and/or treatment under the plan of reorganization and/or (ii) would be discharged and/or released in accordance with the terms of the plan of reorganization. Any Claims not ultimately discharged or released

through a plan of reorganization could be asserted against NewCo and may have an adverse effect on NewCo's financial condition and results of operations.

### 6.  Regulatory Risk

As a manufacturer of controlled substances and prescription and over-the-counter pharmaceutical products, the Debtors are subject to regulatory oversight by numerous governmental entities. For example, the Debtors must comply with laws, regulations, guidance documents and standards promulgated by the FDA, the DEA, the Department of Health and Human Services (including its Office of Inspector General), the Center for Medicare and Medicaid Services ("**CMS**"), the Environmental Protection Agency, state boards of pharmacy, and state controlled substance authorities. In particular, the Debtors interact with the FDA on a regular basis in connection with, among other things, new drug applications, abbreviated new drug applications and monitoring of production facilities.  The Debtors regularly interact with the DEA in connection with controlled substance facility registrations and obtaining quota to manufacture controlled substances.  The Debtors also interact with state agencies regarding their manufacturing and selling of controlled substances and pharmaceutical products and the licenses required to engage in these activities. The Debtors are also subject to healthcare fraud and abuse laws, such as the Federal Anti-Kickback Statute, the Federal False Claims Act, and state equivalents thereof.

If the Debtors fail to comply with applicable federal and state laws and regulations, the Debtors could face substantial enforcement actions, including civil, criminal and administrative penalties including product seizures or injunctions, damages, fines and exclusion from federal or state healthcare programs, and their financial condition and operations could be adversely affected. Although compliance programs can mitigate the risk of investigation and prosecution for violations of these laws, the risks cannot be entirely eliminated. In addition, in order to operate their businesses, the Debtors are required to maintain licenses under the laws of various states, which may be impacted by the DOJ Resolution.

Moreover, continued compliance with prevailing laws and regulations imposes significant financial and operational costs on the Debtors, including because these laws and regulations are subject to ongoing government review and interpretation, which can result in shifts in review protocol, government interpretation, and government implementation. Additionally, governments and regulators may modify existing laws or regulations or impose new ones, which may increase the Debtors' costs of compliance significantly.  All of these factors can have material impacts on the Debtors' businesses.

### 7.  The Debtors' Revenues Are Highly Dependent on Medicare, Medicaid, and Commercial Payor Payment Rates

The Debtors ability to generate revenue relies on the prescribing of their medicines which are reimbursed by commercial managed care and government managed Medicare and Medicaid programs.   The debtors provide discounts and rebates to participating managed care organizations and federal and/or state governments to maintain patient access to their medications.  The future revenue of the debtors is highly dependent on the continued formulary coverage from these entities.

Payment rates for Medicaid reimbursable products are set by law and regulation and are therefore beyond the Debtors' ability to control. Prevailing reimbursement for the Debtors' products could be significantly reduced in the future, materially impairing the Debtors' revenue. For example, pursuant to the Debtors' national rebate agreement with the Department of Health and Human Services, Medicaid covers a number of the Debtors' products under a designated rebate program.  In accordance with this program, the Debtors are also required to comply with the United States Department of Health and Human Services' 340B Drug Pricing Program (the "**340B Program**").  Moreover, certain products sold by the Debtors could cease to be reimbursed by Medicaid at all. More generally, ongoing healthcare reform efforts, including efforts to curb the costs of prescription medications, also may impact the Debtors' revenues in the future.

The Debtors business also critically relies on contractual agreements with private third party payors, such as insurance companies or pharmacy benefit managers.  The Debtors have entered into several contracts with private insurers with commercial and/or Medicare Part D business lines and with the CMS to cover certain of their products, pursuant to which the Debtors agreed to pay the private insurers or their representatives which administer the program or CMS certain rebates related to these programs. Rebate rates required by these payors could change materially depending on a variety of factors, including regulatory changes and cost pressures affecting the commercial payors' own businesses. In particular, commercial payors are highly cost sensitive as a result of the rising cost of healthcare and other macroeconomic factors and may pressure the Debtors to accept higher rebate rates as a result. The future revenues of the debtors is highly dependent on the private commercial payers maintaining the Debtors products on their list of drugs that are given formulary coverage. If formulary coverage is lost it is unlikely to be regained in the future by the debtors.  All of the foregoing may materially impact the Debtors' performance in ways that may be difficult to predict or mitigate.

### *8.        The Debtors' Revenues Are Highly Dependent on Wholesale Distribution Channels*

The Debtors' primary channel for sale of prescription products is through wholesalers (collectively, the "**Distributors**"), who distribute these products to retail drugstores, pharmacies, hospitals, long-term care and other mail, retail and non-retail institutions in the United States. These buyers, in turn, dispense these products to patients.  If the Distributors refuse to do business with NewCo due to the rejection of their contracts or otherwise, NewCo would lose access to its primary channel for sale of prescription products, which would likely have a material adverse impact on its operations and revenues and make sale of NewCo at a future date more difficult.  Distributors McKesson Corporation, AmerisourceBergen Drug Corporation and Cardinal Health Inc. accounted for approximately 88% of the Debtors' gross sales as of December 31, 2020.

### *9.*   ~~8.~~ **The Debtors' Intellectual Property May Be Misappropriated or the Debtors May Be Subject to Infringement Claims**

The Debtors rely on intellectual property rights, including licensing arrangements and third-party nondisclosure and assignment agreements, to conduct their businesses. The Debtors' failure to adequately maintain and protect its intellectual property could materially affect the Debtors' intellectual property rights.   The Debtors' intellectual property rights could be

challenged, invalidated or circumvented by others and may be insufficient in scope and strength to meaningfully protect the Debtors. While the Debtors attempt to protect their intellectual property rights, the Debtors cannot guarantee that they will be successful in defending such rights against third parties who may infringe upon them. Similarly, it is possible that third parties will make claims of infringement against the Debtors, and there is no guarantee that the Debtors will successfully defend or otherwise resolve such claims. Any such claims, even if meritless, could disrupt or impose significant costs on the Debtors' businesses.

## C.    Miscellaneous Risk Factors and Disclaimers

### 1.    *The Financial Information Is Based on the Debtors' Books and Records and, Unless Otherwise Stated, No Audit Was Performed*

In preparing this Disclosure Statement, the Debtors relied on financial data derived from their books and records that was available at the time of such preparation. Although the Debtors have used their reasonable business judgment to assure the accuracy of the financial information provided in this Disclosure Statement, and while the Debtors believe that such financial information fairly reflects their financial condition, the Debtors are unable to warrant or represent that the financial information contained in this Disclosure Statement (or any information in any of the exhibits to the Disclosure Statement) is without inaccuracies.

### 2.    *Certain Tax Considerations*

There are a number of material income tax considerations, risks and uncertainties associated with the consummation of the Plan. Holders of Claims and other interested parties should read carefully the discussion in "Certain U.S. Federal Income Tax Consequences of the Plan" below.

### 3.    *No Legal or Tax Advice Is Provided by This Disclosure Statement*

This Disclosure Statement is not legal advice to any person or Entity. The contents of this Disclosure Statement should not be construed as legal, business or tax advice. Each reader should consult its own legal counsel and accountant with regard to any legal, tax and other matters concerning its Claim. This Disclosure Statement may not be relied upon for any purpose other than to determine how to vote to accept or reject the Plan or whether to object to Confirmation.

### 4.    *No Admissions Made*

The information and statements contained in this Disclosure Statement will neither (i) constitute an admission of any fact or liability by any Entity (including the Debtors) nor (ii) be deemed evidence of the tax or other legal effects of the Plan on the Debtors, NewCo, Holders of Allowed Claims or Interests, or any other parties in interest.

### 5.    *Failure to Identify Litigation Claims or Projected Objections*

No reliance should be placed on the fact that a particular litigation claim or projected objection to a particular Claim is, or is not, identified in this Disclosure Statement. The Debtors

may seek to investigate, file, and prosecute Claims and may object to Claims after Confirmation and Consummation of the Plan, irrespective of whether this Disclosure Statement identifies such Claims or objections to Claims.

### 6. *Information Was Provided by the Debtors and Was Relied Upon by the Debtors' Advisors*

Counsel to and other advisors retained by the Debtors have relied upon information provided by the Debtors in connection with the preparation of this Disclosure Statement. Although counsel to and other advisors retained by the Debtors have performed certain limited due diligence in connection with the preparation of this Disclosure Statement and the exhibits to the Disclosure Statement, they have not independently verified the information contained in this Disclosure Statement or the information in the exhibits to the Disclosure Statement.

### 7. *The Debtors Have No Duty to Update*

The statements contained in this Disclosure Statement are made by the Debtors as of the date hereof, unless otherwise specified herein, and the delivery of this Disclosure Statement after that date does not imply that there has not been a change in the information set forth herein since that date. While the Debtors have used their reasonable business judgment so that the information provided in this Disclosure Statement and in the Plan is as accurate as possible, the Debtors nonetheless cannot, and do not, confirm the current accuracy of all statements appearing in this Disclosure Statement. Further, although the Debtors may subsequently update the information in this Disclosure Statement, the Debtors have no affirmative duty to do so unless ordered to do so by the Bankruptcy Court.

### 8. *No Representations Outside This Disclosure Statement Are Authorized*

No representations concerning or relating to the Debtors, the Chapter 11 Cases, or the Plan are authorized by the Bankruptcy Court or the Bankruptcy Code, other than as set forth in this Disclosure Statement. Any representations or inducements made to secure voting Holders' acceptance or rejection of the Plan that are other than as contained in, or included with, this Disclosure Statement, should not be relied upon by voting Holders in arriving at their decision. Voting Holders should promptly report unauthorized representations or inducements to counsel to the Debtors and the Office of the United States Trustee for the Southern District of New York.

## ARTICLE IX

## CERTAIN U.S. FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN

### A.    General

The following discussion summarizes certain material U.S. federal income tax consequences of the implementation of the Plan to the Debtors and to certain U.S. Holders (as defined below) of Claims. This summary does not address the federal income tax consequences to (i) holders of Claims who are deemed to have rejected the Plan in accordance with the provisions of section 1126(g) of the Bankruptcy Code, (ii) holders whose Claims are

Unimpaired, (iii) holders of Federal Government Unsecured Claims or (iv) purchasers of Claims following the Effective Date.

This summary is based on the IRC, existing and proposed Treasury Regulations, judicial decisions, and published administrative rules and pronouncements of the IRS as in effect on the date of this Disclosure Statement, all of which are subject to change, possibly on a retroactive basis. Any such change could significantly affect the U.S. federal income tax consequences described below. Many of the tax consequences described herein are uncertain. The Debtors have not requested an opinion of counsel or a ruling from the IRS with respect to any of the tax aspects of the Plan. Although a request for a private letter ruling from the IRS may be filed on behalf of NOAT as to certain matters (as described below), the Plan is not conditioned upon the request for or receipt of a private letter ruling from the IRS. There is no assurance that the IRS would not take a contrary position as to the federal income tax consequences described herein and that a court would not uphold such a position.

This discussion does not address non-U.S., state, local, or territory tax consequences of the Plan, nor does it purport to address the U.S. federal income tax consequences of the Plan that may be relevant to special classes of taxpayers (e.g., small business investment companies, regulated investment companies, real estate investment trusts, banks and certain other financial institutions, insurance companies, retirement plans, individual retirement accounts, and other tax-deferred accounts, holders that are, or hold Claims through, S corporations, partnerships or other pass-through entities for U.S. federal income tax purposes, persons whose functional currency is not the U.S. dollar, holders who are residents of or otherwise subject to taxation by a U.S. territory or persons who use the accrual method of accounting and report income on an "applicable financial statement" within the meaning of IRC section 451). In addition, this discussion does not address the alternative minimum tax, the "Medicare" tax on unearned income, the Foreign Account Tax Compliance Act, or U.S. federal taxes other than income taxes. This discussion does not address the U.S. federal income tax consequences of the Plan to non-U.S. Holders (as defined below). Non-U.S. Holders should consult their own tax advisors with respect to the tax consequences of the Plan applicable to them.

As used herein, the term "**U.S. Holder**" means a beneficial owner of a Claim that is for U.S. federal income tax purposes (i) an individual who is a citizen or resident of the United States; (ii) a corporation, or other entity taxable as a corporation for U.S. federal income tax purposes, created or organized in or under the laws of the United States, any state thereof or the District of Columbia; (iii) an estate the income of which is subject to U.S. federal income taxation regardless of its source; (iv) a trust, if a court within the United States is able to exercise primary jurisdiction over its administration and one or more U.S. persons have authority to control all of its substantial decisions, or if the trust has a valid election in effect under applicable Treasury Regulations to be treated as a U.S. person; (v) the government of the United States, any state, political subdivision or territory thereof or the District of Columbia; or (vi) any Tribe. As used herein, the term "**non-U.S. Holder**" means a beneficial owner of a Claim that is not a U.S. Holder or a partnership (or other entity or arrangement treated as a partnership or other pass-through entity for U.S. federal income tax purposes).

If a partnership or other entity or arrangement treated as a partnership for U.S. federal income tax purposes holds Claims, the tax treatment of a partner in such partnership generally

will depend upon the status of the partner and the activities of the partnership. *If you are a partner in such a partnership holding any Claims, you should consult your own tax advisor.*

**THE FOLLOWING SUMMARY IS FOR INFORMATIONAL PURPOSES ONLY AND IS NOT A SUBSTITUTE FOR TAX PLANNING OR FOR ADVICE BASED UPON THE PARTICULAR CIRCUMSTANCES PERTAINING TO A HOLDER OF A CLAIM. EACH HOLDER OF A CLAIM IS URGED TO CONSULT ITS OWN TAX ADVISORS FOR THE U.S. FEDERAL, STATE, LOCAL AND NON-U.S. INCOME AND OTHER TAX CONSEQUENCES APPLICABLE TO IT UNDER THE PLAN.**

### B.    Consequences to the Debtors

PPLP and most of its subsidiaries are entities that are disregarded as separate from their owners for U.S. federal income tax purposes.  Accordingly, the U.S. federal income tax consequences arising under the Plan in respect of PPLP and most of its subsidiaries generally will not be recognized by a Debtor, but will instead be recognized by PPLP's parent, PRA, which is not a Debtor.  Because PRA is treated as a partnership for U.S. federal income tax purposes, the tax consequences arising under the Plan in respect of PPLP and most of its subsidiaries generally ~~will~~are expected to be borne by the beneficial owners of PRA.  In addition, several Debtors are direct or indirect subsidiaries of PPLP and are treated as partnerships for U.S. federal income tax purposes.  The U.S. federal income tax consequences of consummating the Plan with respect to such Debtors ~~will also~~generally are expected to be recognized by PRA and generally borne by the beneficial owners of PRA.  Finally, several Debtors (including PPI) are subject to tax as corporations for U.S. federal income tax purposes and may recognize tax consequences resulting from the consummation of the Plan, as discussed below.

The Plan provides that, on the Effective Date, the Debtors will enter into the Restructuring Transactions.  Additional information regarding these transactions will be provided in the Restructuring Steps Memorandum, and the Debtors expect that they will be treated as taxable transfers of the NewCo Transferred Assets and MDT Transferred Assets for U.S. federal income tax purposes.  Any gain or loss upon transfers of NewCo Transferred Assets and MDT Transferred Assets by PPLP and its subsidiaries that are disregarded from PRA ~~will~~is expected to be recognized by PRA and generally borne by the beneficial owners of PRA. The tax consequences of the Restructuring Transactions to a Debtor that is treated as a corporation for U.S. federal income tax purposes will depend on whether the Debtor is a Transferred Debtor.  If a corporate Debtor is a Transferred Debtor, it ~~will~~is not expected to be treated as transferring any of its assets that are NewCo Transferred Assets in the Restructuring Transactions and therefore is not expected to recognize any gain or loss with respect to those assets.  If a corporate Debtor is not a Transferred Debtor, it ~~will~~is expected to be treated as transferring any of its assets that are NewCo Transferred Assets or MDT Transferred Assets to NewCo (or one or more of NewCo's Subsidiaries) or the Master Disbursement Trust, respectively, in a taxable transaction.  Such corporate Debtor ~~will~~is expected to recognize gain or loss upon the transfer of each of those assets in an amount equal to the difference between the fair market value of such asset and the Debtor's tax basis in such asset. Tax on the resulting gain, if any, may be reduced by the Debtor's available tax attributes or deductions, if any.

For a discussion of the consequences of the Restructuring Transactions to NewCo *and the Master Disbursement Trust*, see *"—D. Tax Treatment of NewCo, TopCo, the Master Disbursement Trust and the Creditor Trusts—1. NewCo" and "—D. Tax Treatment of NewCo, TopCo, the Master Disbursement Trust and the Creditor Trusts—3. Master Disbursement Trust.*"

## C. Consequences to Holders of Certain Claims

### 1. Holders of Non-Federal Domestic Governmental Channeled Claims and Tribe Channeled Claims (Classes 4 and 5)

The Plan provides that (i) on the Effective Date, in full and final satisfaction, settlement, release and discharge of the Debtors' obligations in respect of the Non-Federal Domestic Governmental Claims and Tribe Claims, (a) with respect to the Non-Federal Domestic Governmental Claims, NOAT shall receive the Initial NOAT Distribution, the TopCo NOAT Interest and the MDT NOAT Interest, (b) with respect to the Tribe Claims, the Tribe Trust shall receive the ~~TopCo Tribe Interest, the MDT Tribe Interest and the~~ Initial Tribe Trust Distribution, the TopCo Tribe Interest and the MDT Tribe Interest; (ii) as of the Effective Date, any and all liability ~~for~~of the Debtors and the other Protected Parties for any and all Non-Federal Domestic Governmental Channeled Claims and Tribe Channeled Claims shall be channeled exclusively to and assumed by NOAT and the Tribe Trust, respectively, without further act, deed or court order; and (iii) distributions in respect of Non-Federal Domestic Governmental Channeled Claims and Tribe Channeled Claims shall be exclusively in the form of Abatement Distributions by NOAT and the Tribe Trust, respectively. For discussion of the tax treatment of NOAT and the Tribe Trust, see *"—D. Tax Treatment of NewCo, TopCo, the Master Disbursement Trust and the Creditor Trusts—4. NOAT"* and *"—D. Tax Treatment of NewCo, TopCo, the Master Disbursement Trust and the Creditor Trusts—5. Tribe Trust.*"

The Debtors understand that each U.S. Holder of a Non-Federal Domestic Governmental Channeled Claim or a Tribe Channeled Claim is either (i) the government of a U.S. state, territory, the District of Columbia or political subdivision of any of the foregoing or (ii) a Tribe. The Debtors expect that such holders will not be subject to U.S. federal income tax in respect of the Restructuring Transactions or any subsequent Abatement Distributions from NOAT or the Tribe Trust for Authorized Abatement Purposes.

### 2. Holders of Hospital Channeled Claims (Class 6)

The Plan provides that (i) on the Effective Date, in full and final satisfaction, settlement, release and discharge of the Debtors' obligations in respect of the Hospital Claims, the Hospital Trust shall receive (a) the Initial Hospital Trust Distribution and (b) the MDT Hospital Claim; (ii) as of the Effective Date, any and all liability ~~for~~of the Debtors and the other Protected Parties for any and all Hospital Channeled Claims shall be channeled exclusively to and assumed by the Hospital Trust without further act ~~or~~, deed ~~and shall be satisfied solely by funds held by the Hospital Trust~~or court order; and (iii) distributions in respect of Hospital Channeled Claims shall be exclusively in the form of Abatement Distributions from the Hospital Trust for Authorized Abatement Purposes. The Plan further provides that a portion of each Distribution from the Hospital Trust will be paid to the Common Benefit Escrow or Common Benefit Fund. The Plan further provides that the Hospital Trust is intended to be treated as a "qualified settlement fund"

for U.S. federal income tax purposes and that no holder of ~~Claims~~a Claim shall be treated as receiving a distribution for U.S. federal income tax purposes except to the extent such holder is entitled to receive that distribution directly under the Plan or such distribution is made in satisfaction of an obligation of such holder.

Accordingly, assuming this treatment is respected for U.S. federal income tax purposes, a U.S. Holder of a Hospital ~~Claims~~Channeled Claim generally is not expected to be treated as receiving a distribution from the Hospital Trust unless and until the holder is entitled to receive that distribution directly (or a distribution is made in satisfaction of an obligation of such ~~Holder~~holder, including the portion of the distribution to such holder that is paid to the Common Benefit Escrow or Common Benefit Fund), and any amounts received or treated as received by a U.S. Holder of a Hospital Channeled Claim from the Hospital Trust generally are expected to be treated by such holder as if received directly from PRA.  The U.S. federal income tax consequences to a U.S. Holder of a Hospital ~~Claims~~Channeled Claim—including whether such holder may have income or loss on account of distributions it receives in respect of the Claim or payments made in satisfaction of obligations of such holder (including obligations to pay attorney fees and the portion of the distributions to such holder that is paid to the Common Benefit Escrow or Common Benefit Fund) or whether such holder may be entitled to claim a deduction on account of a distribution that satisfied an obligation of such holder—generally will depend upon the nature and origin of the Claim and the particular circumstances applicable to such holder, including whether the holder has previously claimed deductions or losses for U.S. federal income tax purposes with respect to such Claim.  Because the tax consequences under the Plan relevant to U.S. Holders of Hospital Channeled Claims will depend on facts particular to each holder, all U.S. Holders of Hospital Channeled Claims are urged to consult their own tax advisors as to their proper tax treatment under the Plan in light of their particular facts and circumstances.

For a discussion of the tax treatment of the Hospital Trust, see "—*D. Tax Treatment of NewCo, TopCo, the Master Disbursement Trust and the Creditor Trusts—6. Hospital Trust*," below.

### 3. Holders of Third-Party Payor *Channeled* Claims (Class 7)

The Plan provides that (i) on the Effective Date, in full and final satisfaction, settlement, release and discharge of the Debtors' obligations in respect of the Third-Party Payor Claims, the TPP Trust shall receive ~~the~~ (a) the Initial TPP Distribution and (b) the MDT TPP Claim; (ii) as of the Effective Date, any and all liability ~~for~~of the Debtors and the other Protected Parties for any and all Third-Party Payor Channeled Claims shall be channeled exclusively to and assumed by the TPP Trust without further act ~~or~~, deed ~~and shall be satisfied solely by funds held by the TPP Trust~~or court order; and (iii) distributions in respect of Third-Party Payor Channeled Claims shall be exclusively in the form of Abatement Distributions from the TPP Trust to Authorized Recipients for Authorized Abatement Purposes.  The Plan further provides that a portion of each Distribution from the TPP Trust will be paid to the Common Benefit Escrow or Common Benefit Fund. The Plan further provides that the TPP Trust is intended to be treated as a "qualified settlement fund" for U.S. federal income tax purposes and that no holder of ~~Claims~~a Claim shall be treated as receiving a distribution for U.S. federal income tax purposes except to the extent such holder is entitled to receive that distribution directly under the Plan or such Distribution is

made in satisfaction of an obligation of such ~~Holder.~~holder. The Plan further provides that certain holders of Third-Party Payor Channeled Claims will be eligible to receive payments from the LRP Escrow Account pursuant to the LRP Agreement.

Accordingly, assuming this treatment is respected for U.S. federal income tax purposes, with respect to a U.S. Holder of a Third-Party Payor ~~Claims~~Channeled Claim's distribution from the TPP Trust, such holder generally is not expected to be treated as receiving a distribution from the TPP Trust unless and until the holder is entitled to receive that distribution directly (or a distribution is made in satisfaction of an obligation of such ~~Holder~~holder, including the portion of the distribution to such holder that is paid to the Common Benefit Escrow or Common Benefit Fund), and any amounts received or treated as received by a U.S. Holder of a Third-Party Payor Channeled Claim from the TPP Trust generally are expected to be treated by such holder as if received directly from PRA.  The U.S. federal income tax consequences to a U.S. Holder of a Third-Party Payor ~~Claims~~Channeled Claim for such holder's distribution from the TPP Trust— including whether such holder may have income or loss on account of distributions it receives in respect of the Claim or payments made in satisfaction of obligations of such holder (including obligations to pay attorney fees and the portion of the distributions to such holder that is paid to the Common Benefit Escrow or Common Benefit Fund) or may be entitled to claim a deduction on account of a distribution that satisfied an obligation of such holder—generally will depend upon the nature and origin of the Claim and the particular circumstances applicable to such holder, including whether the holder has previously claimed deductions or losses for U.S. federal income tax purposes with respect to such Claim.  The tax treatment of amounts paid to U.S. Holders of a Third-Party Payor Channeled Claim pursuant to the LRP Agreement will depend in part on circumstances relevant to the nature of such holder's underlying lien.  Because the tax consequences under the Plan relevant to U.S. Holders of Third-Party Payor Channeled Claims will depend on facts particular to each holder, all U.S. Holders of Third-Party Payor Channeled Claims are urged to consult their own tax advisors as to their proper tax treatment under the Plan in light of their particular facts and circumstances.

For discussion of the tax treatment of the TPP Trust, see "—*D. Tax Treatment of NewCo, TopCo, the Master Disbursement Trust and the Creditor Trusts—7. TPP Trust*," below.

### 4. Holders of Ratepayer Claims (Class 8)

The Plan provides that on the Effective Date or as soon thereafter as reasonably practicable, the Debtors shall make a contribution of $6.5 million (less certain attorneys' fees) to the Truth Initiative Foundation to be used for national opioid prevention and education efforts in full and final satisfaction of all Ratepayer Claims.

The Plan further provides that for tax purposes these transactions shall be treated as (i) the cancellation of all Ratepayer Claims for no consideration and (ii) a contribution to the Truth Initiative Foundation by the Debtors.  A U.S. Holder of a Ratepayer ~~Claims~~Claim generally is not expected to be treated as receiving taxable consideration in cancellation of its claims.

However, the U.S. federal income tax consequences to a U.S. Holder of a Ratepayer ~~Claims~~Claim is uncertain, including whether any portion of the payment of attorneys' fees would give rise to taxable income to such holder.  Such holders are urged to consult their own tax

advisors as to their proper tax treatment under the Plan in light of their particular facts and circumstances.

### 5. *Holders of NAS Monitoring Channeled Claims (Class 9)*

The Plan provides that (i) on the Effective Date, in full and final satisfaction, settlement, release and discharge of the Debtors' obligations in respect of the NAS Monitoring Claims, the NAS Monitoring Trust shall receive (a) the Initial NAS Monitoring Trust Distribution and (b) the MDT NAS Monitoring Claim; (ii) as of the Effective Date, any and all liability ~~for~~of the Debtors and the other Protected Parties for any and all NAS Monitoring Channeled Claims shall be channeled exclusively to and assumed by the NAS Monitoring Trust without further act ~~or~~, deed ~~and shall be satisfied solely by funds held by the NAS Monitoring Trust~~or court order; and (iii) distributions in respect of NAS Monitoring Channeled Claims shall be exclusively in the form of Abatement Distributions from the NAS Monitoring Trust to Authorized Recipients for Authorized Abatement Purposes.  The Plan further provides that a portion of each Distribution from the NAS Monitoring Trust will be paid to the Common Benefit Escrow or Common Benefit Fund. The Plan further provides that NAS Monitoring Trust is intended to be treated as a "qualified settlement fund" for U.S. federal income tax purposes and that no holder of Claims shall be treated as receiving a distribution for U.S. federal income tax purposes except to the extent such holder is entitled to receive that distribution directly under the Plan or such distribution is made in satisfaction of an obligation of such holder.

Accordingly, assuming this treatment is respected for U.S. federal income tax purposes, a U.S. Holder of an NAS Monitoring ~~Claims~~Channeled Claim generally is not expected to be treated as receiving a distribution from the NAS Monitoring Trust unless and until the holder is entitled to receive that distribution directly (or a distribution is made in satisfaction of an obligation of such holder, including the portion of the distribution to such holder that is paid to the Common Benefit Escrow or Common Benefit Fund), and any amounts treated as received by a U.S. Holder of ~~a~~an NAS Monitoring Channeled Claim from the NAS Monitoring Trust generally are expected to be treated by such holder as if received directly from PRA.  The U.S. federal income tax consequences to a U.S. Holder of an NAS Monitoring ~~Claims~~Channeled Claim—including whether such holder may have income or loss on account of distributions it receives in respect of the Claim or payments made in satisfaction of obligations of such holder (including obligations to pay attorney fees and the portion of the distributions to such holder that is paid to the Common Benefit Escrow or Common Benefit Fund) or whether such holder may be entitled to claim a deduction on account of a distribution that satisfied an obligation of such holder—generally will depend upon the nature and origin of the Claim and the particular circumstances applicable to such holder, including whether the holder has previously claimed deductions or losses for U.S. federal income tax purposes with respect to such Claim. Amounts treated as received by a U.S. Holder of ~~a~~an NAS Monitoring Channeled Claim generally are not expected to be taxable to such holder for U.S. federal income tax purposes to the extent they represent payment for damages (other than punitive damages) received on account of personal physical injuries or physical sickness, within the meaning of IRC section 104.  However, to the extent such payments are attributable to medical expense deductions allowed under IRC section 213 for a prior taxable year, such payments ~~will~~are expected to be taxable as ordinary income to the U.S. Holder.  Because the tax consequences under the Plan relevant to U.S. Holders of NAS Monitoring Channeled Claims will depend on facts particular to each holder, all U.S. Holders of

NAS Monitoring Channeled Claims are urged to consult their own tax advisors as to their proper tax treatment under the Plan in light of their particular facts and circumstances.

For a discussion of the tax treatment of the NAS Monitoring Trust, see "—*D. Tax Treatment of NewCo, TopCo, the Master Disbursement Trust and the Creditor Trusts—8. NAS Monitoring Trust*," below.

### 6.    [Holders of PI Channeled Claims (Class 10)

The Plan provides that (i) on the Effective Date, in full and final satisfaction, settlement, release and discharge of the Debtors' obligations in respect of the PI Claims, the PI Trust shall receive (a) the Initial PI Trust Distribution and (b) the MDT PI Claim; (ii) as of the Effective Date, any and all liability for all PIof the Debtors and the other Protected Parties for any and all PI Channeled Claims shall be channeled exclusively to and assumed by the PI Trust without further act or, deed and shall be satisfied solely by funds held by the PI Trust; and (iii) pursuant to the Plan, and in complete and final satisfaction of their respective Claims, each U.S. Holder of a  PI Claim will receiveor court order; and (iii) (a) distributions in respect of NAS PI Channeled Claims shall be exclusively in the form of distributions from the PI Trust NAS Fund to Holders of Allowed NAS PI Channeled Claims and (b) distributions in respect of Non-NAS PI Channeled Claims shall be exclusively in the form of Distributions from the PI Trust Non-NAS Fund to Holders of Allowed Non-NAS PI Claims as and to the extent provided in the PI Trust DocumentsChanneled Claims. The Plan further provides that the PI Trust is intended to be treated as a "qualified settlement fund" for U.S. federal income tax purposes and that no holder of Claimsa Claim shall be treated as receiving a distribution for U.S. federal income tax purposes except to the extent such holder is entitled to receive that distribution directly under the Plan or such distribution is made in satisfaction of an obligation of such holder.  The Plan further provides that Participating Third-Party Payors will be eligible to receive payments from the LRP Escrow Account pursuant to the LRP Agreement in respect of reimbursement and lien claims they may hold against holders of PI Claims and Distributions to holders of PI Claims.  The Plan further provides that pursuant to the United States-PI Claimant Medical Expense Claim Settlement, a portion of each amount otherwise distributable to the PI Trust shall be paid to by the Debtors or the Master Disbursement Trust, as applicable, to the United States in the form of a prepayment by the PI Trust of amounts that would otherwise be payable by certain Holders of PI Claims to the Holders of United States-PI Claimant Medical Expense Claims upon receipt by such Holders of PI Claims of Distributions, and shall be borne equitably by such Holders of PI Claims in the form of a reduction in the amounts of the Distributions otherwise payable to such Holders of PI Claims. The Plan further provides that a portion of each Distribution from the PI Trust will be paid to the Common Benefit Escrow or Common Benefit Fund.

Accordingly, assuming this treatment is respected for U.S. federal income tax purposes, a U.S. Holder of a PI ClaimsChanneled Claim generally is not expected to be treated as receiving a distribution from the PI Trust unless and until the holder is entitled to receive that distribution directly (or a distribution is made in satisfaction of an obligation of such holder), and any amounts, including the portion of the distribution to such holder that is paid to the Common Benefit Escrow or Common Benefit Fund).  In the case of a U.S. Holder of a PI Channeled Claim who is a minor under applicable law for whom the PI Trust places funds in an account, whether the holder is treated as receiving a distribution from the PI Trust at the time the funds

are placed in such account, and whether the holder (or an eligible parent of the holder that elects to recognize the income in lieu of the holder) will be required to recognize income in respect of any interest or other amounts earned by the account, will depend on the terms of that account. Any amounts received or treated as received by a U.S. Holder of a PI Channeled Claim from the PI Trust generally are expected to be treated by such holder as if received directly from PRA. The U.S. federal income tax consequences to a U.S. Holder of a PI ~~Claims~~Channeled Claim— including (a) whether such holder may have income or loss on account of distributions it receives in respect of the Claim or payments made in satisfaction of obligations of such holder (including any obligation to pay attorney fees, the portion of the distributions to such holder that is paid to the Common Benefit Escrow or Common Benefit Fund, any obligation relating to payments to Participating Third-Party Payors pursuant to the LRP Agreement and any obligation that gave rise to a reduction in the amount of the distribution as a result of the United States-PI Claimant Medical Expenses Settlement), (b) for a U.S. Holder of a PI Channeled Claim who is a minor, the consequences to the holder if the PI Trust places funds in an account for the holder or (c) whether such holder may be entitled to claim a deduction on account of a distribution that satisfied an obligation of such holder—generally will depend upon the nature and origin of the Claim and the particular circumstances applicable to such holder. Amounts received or treated as received by a U.S. Holder of a PI Channeled Claim generally are not expected not be taxable to such holder for U.S. federal income tax purposes to the extent they represent payment for damages (other than punitive damages) received on account of personal physical injuries or physical sickness, within the meaning of IRC section 104. However, to the extent such payments are attributable to medical expense deductions allowed under IRC section 213 for a prior taxable year, such payments ~~will~~are expected to be taxable as ordinary income to the U.S. Holder. To the extent a payment from the PI Trust ~~to a U.S. Holder of PI Claims~~ is treated as a payment on account of damages in respect of a Claim other than for personal physical injury or physical sickness, whether the payment will be includable in the gross income of the holder will depend upon the nature and origin of the Claim and the particular circumstances applicable to the holder, including whether the holder has previously claimed deductions or losses for U.S. federal income tax purposes with respect to such Claim. Because the tax consequences under the Plan relevant to U.S. Holders of PI Channeled Claims will depend on facts particular to each holder, all U.S. Holders of PI Channeled Claims are urged to consult their own tax advisors as to their proper tax treatment under their particular facts and circumstances.

For a discussion of the U.S. federal income tax treatment of the PI Trust, see "—*D. Tax Treatment of NewCo, TopCo, the Master Disbursement Trust and the Creditor Trusts—9. PI Trust*" below.]

### 7.    *Holders of Allowed Other General Unsecured Claims (Class 11(c))*

All Other General Unsecured Claims are Disputed. The Plan provides that, except to the extent a Holder of an Allowed Other General Unsecured Claim and the Debtor against which such Claim is asserted agree to different treatment, after the Effective Date upon the Allowance of such Claim in accordance with Article VII of the Plan, each Holder of an Allowed Other General Unsecured Claim shall receive, on account of such Allowed Claim, such Holder's *Pro Rata* Share of the Other General Unsecured Claim Cash, up to payment in full of such Allowed Claim. The receipt of Cash by a U.S. Holder of an Allowed Other General Unsecured Claim is expected to be treated as a taxable exchange of such holder's Claim for Cash. Accordingly, such

holder generally will recognize gain or loss equal to the difference between: (i) the Cash received in exchange for the Claim and (ii) the holder's adjusted tax basis, if any, in the Claim. The character of such gain or loss as capital gain or loss or as ordinary income or loss will be determined by a number of factors, including the tax status of the holder, whether the Claim constitutes a capital asset in the hands of the holder, whether the Claim was purchased at a discount, whether and to what extent the Claim became worthless in a prior tax year and whether and to what extent the holder has previously claimed a bad debt deduction with respect to its Claim. The deductibility of capital losses is subject to limitations.

If any portion of the Cash received by a U.S. Holder of an Allowed Other General Unsecured Claim is treated as being received in satisfaction of accrued interest, such amount ~~will~~is expected to be taxable to the U.S. Holder as ordinary interest income (if not previously included in the U.S. Holder's gross income under the holder's normal method of accounting). Conversely, a U.S. Holder generally will recognize a deductible loss to the extent any accrued interest was previously included in its gross income and is not paid in full. Such loss may be ordinary, but the tax law is unclear on this point.

The Plan provides that it is intended, subject to applicable law, that distributions with respect to an ~~Other~~ Allowed Other General Unsecured Claim will be allocated first to the principal portion of such Claim (as determined for U.S. federal income tax purposes) and, thereafter, to the remaining portion of such Claim, if any. However, there is no assurance that such allocation would be respected by the IRS for U.S. federal income tax purposes. U.S. Holders are urged to consult their own tax advisors regarding the allocation of consideration received under the Plan, as well as the deductibility of any accrued but unpaid interest and the character of any loss claimed with respect to accrued but unpaid interest previously included in gross income for U.S. federal income tax purposes.

**D.      Tax Treatment of NewCo, TopCo, the Master Disbursement Trust and the Creditor Trusts**

*1.      NewCo*

The U.S. federal income tax treatment of NewCo will depend on whether NewCo elects to be treated as a corporation for U.S. federal income tax purposes. As discussed in *"—4. NOAT"* below, the Plan provides that by a prescribed date, subject to specified conditions, the NewCo Managers will cause NewCo to elect to be treated as a corporation for U.S. federal income tax purposes effective as of the date of NewCo's formation.

If NewCo timely elects to be treated as a corporation for U.S. federal income tax purposes, it will be subject to corporate-level federal income tax (currently at a rate of 21%) on its net income. If NewCo does not make such an election, as long as a single entity owns all of the equity interests in NewCo, it ~~will~~is expected to be treated as an entity that is disregarded as separate from its owner ~~(a "disregarded entity")~~ for U.S. federal income tax purposes (a "disregarded entity"). If NewCo is treated as a disregarded entity ~~for U.S. federal income tax purposes~~, NewCo would not be subject to U.S. federal income tax and its income and deductions would be recognized by its regarded owner, TopCo, and allocated by TopCo to NOAT and the

Tribe Trust in accordance with the TopCo Operating Agreement.  See further discussion below at "—*2. TopCo,*" "—*4. NOAT*," and "—*5. Tribe Trust*."

As discussed above at "—*B. Consequences to the Debtors*," whether or not NewCo elects to be treated as a corporation for U.S. federal income tax purposes, the Restructuring Transactions are expected to be treated as taxable asset transfers.  If NewCo elects to be treated as a corporation, NewCo would be expected to have an initial tax basis in the assets it acquires from the Debtors equal to their respective fair market values as of the Effective Date and would generally be entitled to deductions for amortization and depreciation with respect to its tax basis in certain of its assets, including patents and other intangible property.  If NewCo does not elect to be treated as a corporation and is instead treated as a disregarded entity, NewCo's assets would also be expected to have fair market value tax bases but would be treated for tax purposes as if held directly by TopCo (see further discussion at "—*2. TopCo*," immediately below.)

### 2.    *TopCo*

The Plan provides that TopCo is intended to be treated as a partnership for U.S. federal income tax purposes, and the following discussion assumes that this treatment is respected. TopCo generally will not be subject to U.S. federal income tax and an allocable share of its income or deductions generally will be includable in the income of its members, NOAT and the Tribe Trust.  See further discussion below at "—*4. NOAT*" and "—*5. Tribe Trust*."

If NewCo elects to be treated as a corporation for U.S. federal income tax purposes, TopCo will recognize income attributable to distributions from NewCo and gain or loss, if any, from the sale of the NewCo Interest.  Distributions from NewCo generally will be treated as dividends for U.S. federal income tax purposes to the extent paid out of NewCo's current or accumulated earnings and profits.  To the extent a distribution exceeds NewCo's current and accumulated earnings and profits, the distribution generally will be treated as a non-taxable return of capital to the extent of TopCo's adjusted basis in the NewCo Interest and thereafter as gain from the sale of the NewCo Interest.  Such income or gain ~~will~~is expected to be allocated by TopCo to NOAT and the Tribe Trust in accordance with the TopCo Operating Agreement. TopCo's initial tax basis in the NewCo Interest ~~will~~is expected to be equal to the fair market value of such interest on the Effective Date.

If NewCo does not elect to be treated as a corporation for U.S. federal income tax purposes, it is expected to be treated as a disregarded entity.  As a result of such treatment, TopCo will be treated as directly realizing all income realized by NewCo and directly incurring all expenses incurred by NewCo.  Distributions from NewCo to TopCo ~~will~~are not expected to be recognized for U.S. federal income tax purposes and a sale of all of the NewCo Interest ~~will~~is expected to be treated as a sale of NewCo's assets, with any gain or loss on those assets recognized by TopCo and allocated by TopCo to NOAT and the Tribe Trust in accordance with the TopCo Operating Agreement.

As discussed above at "—*B. Consequences to the Debtors,*" the Restructuring Transactions are expected to be treated as the taxable ~~transfers~~transfer of the NewCo Transferred Assets.  If NewCo does not elect to be treated as a corporation for U.S. federal income tax purposes, TopCo is expected to have an initial tax basis in the NewCo Transferred Assets (other

than such assets held by Transferred Debtors that are not disregarded entities) equal to their fair market values as of the Effective Date.    TopCo ~~will~~is expected to be entitled to claim depreciation or amortization deductions in respect of its tax basis in certain of those assets, including patents and other intangible property, which deductions ~~will~~are expected to be allocated by TopCo to NOAT and the Tribe Trust in accordance with the TopCo Operating Agreement.

### 3.    *Master Disbursement Trust*

The Plan provides that the Master Disbursement Trust is intended to be treated as a "qualified settlement fund" for U.S. federal income tax purposes, and the following discussion assumes that this treatment is respected.  The Plan further provides that all parties (including, without limitation, PRA, the direct and indirect owners of PRA, the Debtors, the MDT Trustees, the MDT Executive Director, the Creditor Trusts, the PI Trust and the holders of Claims) will be required to treat the Master Disbursement Trust as a qualified settlement fund for all applicable tax reporting purposes.

A qualified settlement fund is subject to entity-level tax under generally applicable U.S. federal income tax principles at the maximum federal income tax rate applicable to trusts and estates (currently 37%, increasing to 39.6% beginning in 2026).  The determination of taxable income of qualified settlement funds for U.S. federal income tax purposes is subject to certain exceptions, including: (i) any amounts transferred by or on behalf of the transferors to the qualified settlement fund to resolve or satisfy a liability for which the transferor is liable and the qualified settlement fund is established will generally be excluded from the qualified settlement fund's income, other than dividends on stock of a transferor (or a related person of the transferor), interest on debt of a transferor (or a related person of the transferor) or payments in compensation for late or delayed transfers, (ii) any distribution of property by the qualified settlement fund generally will result in the recognition of gain or loss in an amount equal to the difference between the fair market value of the property on the date of disposition and the qualified settlement fund's adjusted tax basis in such property, and (iii) only limited, specified deductions will be permitted, including deductions for administrative costs and state and local taxes incurred by the qualified settlement fund, and excluding any deductions that would generally be allowable to a corporation or partnership for expenses incurred in the course of a taxpayer's trade or business.  In general, the adjusted tax basis of property received (or treated as received for U.S. federal income tax purposes) by a qualified settlement fund from a transferor will be the fair market value of such property at the time of receipt.

While it is not free from doubt, the Master Disbursement Trust is not expected to recognize income in respect of the Shareholder Settlement Agreement or the NewCo Credit Support Agreement other than in respect of any payments in compensation for late or delayed transfers due thereunder.

The Master Disbursement Trust's administrator will be required to file tax returns on behalf of the Master Disbursement Trust and will be responsible for causing the Master Disbursement Trust to pay any taxes imposed upon the Master Disbursement Trust.

### 4.    *NOAT*

The Plan provides that NOAT is intended to be treated as a qualified settlement fund, and the following discussion assumes that this treatment is respected.  The Plan further provides that all parties (including, without limitation, PRA, the direct and indirect owners of PRA, the Debtors, the NOAT Trustees, TopCo, the Master Disbursement Trust and the holders of Allowed Claims) will be required to treat NOAT as a qualified settlement fund for all applicable tax reporting purposes.

NOAT may seek guidance upon which it may rely from the IRS that its income is exempt from U.S. federal income tax.  NOAT's income derived from the exercise of essential governmental functions may qualify for an exemption from tax pursuant to IRC section 115. The Plan is not conditioned on the receipt of such guidance, and it is possible that no such guidance will be sought or obtained.

The Plan further provides that by a prescribed date, subject to certain conditions, the NewCo Managers will cause NewCo to elect to be treated as a corporation for U.S. federal income tax purposes effective as of the date of NewCo's formation.

Regardless of whether NOAT's income qualifies for an exemption from U.S. federal income tax or how NewCo is classified for U.S. federal income tax purposes, NOAT is not expected to be subject to U.S. federal income tax on its receipt of distributions from the Master Disbursement Trust.

If NewCo is treated as a corporation for U.S. federal income tax purposes and NOAT's income qualifies for exemption from tax, NOAT would not be subject to U.S. federal income tax on (i) income allocated to NOAT by TopCo, including in respect of distributions of NewCo Excess Cash, (ii) income in respect of gain, if any, from TopCo's sale of the NewCo Interest or from a sale of all or part of the TopCo NOAT Interest, (iii) NOAT's receipt of distributions from TopCo, or (iv) income from investments of cash and cash equivalents by NOAT pending distributions.  To the extent that NOAT's income does not qualify for exemption from U.S. federal income tax, NOAT's receipt of items of income described above would be subject to tax in a manner substantially similar to that described above with respect to the Master Disbursement Trust (see "—*3. Master Disbursement Trust*").

If NewCo does not timely elect to be treated as a corporation and NOAT is generally exempt from U.S. federal income tax on its income attributable to assets received in the Restructuring Transactions, NOAT would not be expected to be subject to U.S. federal income tax on (i) income allocated to NOAT by TopCo, including in respect of NewCo's taxable income, (ii) gain, if any, from a sale of NewCo assets, TopCo's sale of the NewCo Interest or a sale of all or part of the TopCo NOAT Interest, (iii) NOAT's receipt of distributions from TopCo or (iv) income from investments of cash and cash equivalents received by NOAT pending distributions.

However, if NewCo does not timely elect to be treated as a corporation and NOAT is not exempt from U.S. federal income tax on its income attributable to NewCo, NOAT would be subject to tax on its share of TopCo's gross income attributable to NewCo at the tax rates applicable to qualified settlement funds (currently 37%, increasing to 39.6% in 2026).

Moreover, unlike a corporation, as a qualified settlement fund, NOAT would not be entitled to claim ordinary course business deductions in respect of that gross income.  In this event, its income would be subject to tax in a manner substantially similar to that described above with respect to the Master Disbursement Trust (see "—*3. Master Disbursement Trust*").

NOAT's administrator will be required to file tax returns on behalf of NOAT and will be responsible for causing NOAT to pay any taxes imposed upon NOAT.

### 5.      *Tribe Trust*

The Plan provides that any Tribe Trust entity that is formed as a trust is intended to be treated as a qualified settlement fund for U.S. federal income tax purposes, and the following discussion assumes that this treatment is respected.  The Plan further provides that all parties (including, without limitation, PRA, the direct and indirect owners of PRA, the Debtors, the Master Disbursement Trust, the Creditor Trustees and the holders of Allowed Claims) will be required to treat such an entity as a qualified settlement fund for all applicable tax reporting purposes.  Accordingly, such an entity generally is expected to be subject to U.S. federal income tax in a manner substantially similar to that discussed above in "—*3. Master Disbursement Trust*."  Such an entity's administrator will be required to file tax returns on behalf of the trust and will be responsible for causing the trust to pay any taxes imposed upon it.  Such an entity should consult its own tax advisors regarding its treatment for U.S. federal income tax purposes.

This discussion does not address the U.S. federal income tax treatment of any Tribe Trust entity that is not formed as a trust.  The tax treatment of such an entity will depend upon the terms of the relevant Tribe Trust Documents which shall be consistent with Articles I through XII of the Plan and otherwise acceptable to the Debtors and the Native American Tribe Group and reasonably acceptable to the Creditors' Committee and the Governmental Consent Parties, and which shall be filed by the Debtors with the Plan Supplement.

### 6.      *Hospital Trust*

The Plan provides that the Hospital Trust is intended to be treated as a qualified settlement fund for U.S. federal income tax purposes, and the following discussion assumes that this treatment is respected.  The Plan further provides that all parties (including, without limitation, PRA, the direct and indirect owners of PRA, the Debtors, the Master Disbursement Trust, the Creditor Trustees and the holders of Allowed Claims) will be required to treat the Hospital Trust as a qualified settlement fund for all applicable tax reporting purposes.

Whether the Hospital Trust qualifies for tax-exempt status under IRC section 501 will depend on facts particular to the Hospital Trust.  If the Hospital Trust does not qualify for such status but its treatment as a qualified settlement fund is respected, distributions it receives from the Master Disbursement Trust are expected to be excluded from its income, and the U.S. federal income tax treatment of the Hospital Trust generally is otherwise expected to be substantially similar to the treatment described above with respect to the Master Disbursement Trust (see "—*3. Master Disbursement Trust*").  If the Hospital Trust qualifies for tax-exempt status under IRC section 501, all income it realizes may be exempt from U.S. federal income tax but the Hospital

Trust may be subject to certain excise taxes.  The Hospital Trust's administrator will be required to file tax returns on behalf of the Hospital Trust and will be responsible for causing the Hospital Trust to pay all taxes, if any, imposed upon the Hospital Trust.  The Hospital Trust should consult its tax advisor regarding whether it may qualify for an exemption from U.S. federal income tax and the tax consequences to it under the Plan.

7.    *TPP Trust*

The Plan provides that the TPP Trust is intended to be treated as a qualified settlement fund for U.S. federal income tax purposes, and the following discussion assumes that this treatment is respected.  The Plan further provides that all parties (including, without limitation, PRA, the direct and indirect owners of PRA, the Debtors, the Master Disbursement Trust, the Creditor Trustees and the holders of Allowed Claims) will be required to treat the TPP Trust as a qualified settlement fund for all applicable tax reporting purposes.

Whether the TPP Trust qualifies for tax-exempt status under IRC section 501 will depend on facts particular to the TPP Trust.  If the TPP Trust does not qualify for such status but its treatment as a qualified settlement fund is respected, distributions it receives from the Master Disbursement Trust ~~should be~~are expected to be excluded from its income, and the U.S. federal income tax treatment of the TPP Trust generally is otherwise expected to be substantially similar to the treatment described above with respect to the Master Disbursement Trust (see "—*3. Master Disbursement Trust*").  If the TPP Trust qualifies for tax-exempt status under IRC section 501, all income it realizes may be exempt from U.S. federal income tax but the TPP Trust may be subject to certain excise taxes.  The TPP Trust's administrator will be required to file tax returns on behalf of the TPP Trust and will be responsible for causing the TPP Trust to pay all taxes, if any, imposed upon the TPP Trust.  The TPP Trust should consult its tax advisor regarding whether it may qualify for an exemption from U.S. federal income tax and the tax consequences to it under the Plan.

8.    *NAS Monitoring Trust*

The Plan provides that the NAS Monitoring Trust is intended to be treated as a qualified settlement fund for U.S. federal income tax purposes, and the following discussion assumes that this treatment is respected.  The Plan further provides that all parties (including, without limitation, PRA, the direct and indirect owners of PRA, the Debtors, the Master Disbursement Trust, the Creditor Trustees and the holders of Allowed Claims) will be required to treat the NAS Monitoring Trust as a qualified settlement fund for all applicable tax reporting purposes.

Whether the NAS Monitoring Trust qualifies for tax-exempt status under IRC section 501 will depend on facts particular to the NAS Monitoring Trust.  If the NAS Monitoring Trust does not qualify for such status but its treatment as a qualified settlement fund is respected, distributions it receives from the Master Disbursement Trust ~~should be~~are expected to be excluded from its income, and the U.S. federal income tax treatment of the NAS Monitoring Trust generally is otherwise expected to be substantially similar to the treatment described above with respect to the Master Disbursement Trust (see "—*3. Master Disbursement Trust*").  If the NAS Monitoring Trust qualifies for tax-exempt status under IRC section 501, all income it

realizes may be exempt from U.S. federal income ~~taxes~~tax, but the NAS Monitoring Trust may be subject to certain excise taxes.  The NAS Monitoring Trust's administrator will be required to file tax returns on behalf of the NAS Monitoring Trust and will be responsible for causing the NAS Monitoring Trust to pay all taxes, if any, imposed upon the NAS Monitoring Trust.  The NAS Monitoring Trust should consult its tax advisor regarding whether it may qualify for an exemption from U.S. federal income tax and the tax consequences to it under the Plan.

### 9.    *PI Trust*

The Plan provides that the PI Trust is intended to be treated as a qualified settlement fund for U.S. federal income tax purposes, and the following discussion assumes that this treatment is respected.  The Plan further provides that all parties (including, without limitation, PRA, the direct and indirect owners of PRA, the Debtors, the Master Disbursement Trustee, the trustee of the PI Trust and the holders of Allowed Claims) will be required to treat the PI Trust as a qualified settlement fund for all applicable tax reporting purposes.

Distributions the PI Trust receives from the Master Disbursement Trust are expected to be excluded from its income, and the U.S. federal income tax treatment of the PI Trust generally is otherwise expected to be substantially similar to the treatment described above with respect to the Master Disbursement Trust (see "*—3. Master Disbursement Trust*").  The PI Trust is expected to be treated for U.S. federal income tax purposes as the owner of the LRP Escrow Account, and, accordingly, the PI Trust is expected to recognize as taxable income any income earned by the LRP Escrow Account.  The PI Trust's administrator will be required to file tax returns on behalf of the PI Trust and will be responsible for causing the PI Trust to pay all taxes, if any, imposed upon the PI Trust.

### 10.    *Plan Administration Trust*

The Plan provides that the Plan Administration Trust will be established for purposes described in the Plan and PAT Agreement, including to: (i) hold, manage, sell, invest and distribute the PAT Assets for the benefit of holders of Allowed Claims (other than Channeled Claims); (ii) administer, process, resolve and liquidate Claims (other than Channeled Claims); (iii) hold and maintain the PAT Reserves and the Recovery Fund and maintain the Professional Fee Escrow Account; and (iv) make Distributions to holders of Allowed Claims (other than Channeled Claims).  The Plan provides that the Plan Administration Trust is intended to be treated as a trust described in IRC sections 661 through 664 and the regulations promulgated thereunder (a "**complex trust**"), and the following discussion assumes that this treatment is respected.  The Plan further provides that all parties (including, without limitation, the Debtors, PRA, the direct and indirect owners of PRA, the Plan Administration Trustee and the holders of Allowed Claims) will be required to treat the Plan Administration Trust as a complex trust for all applicable tax reporting purposes.

A complex trust is treated as a separate entity for U.S. federal income tax purposes~~,~~ that is taxable in accordance with Subchapter J of Chapter 1 of Subtitle A of the IRC, including sections 661 through 664.  Any net income earned by a complex trust is generally subject to tax (currently at a top marginal tax rate of 37%, increasing to 39.6% beginning in 2026).  In

computing its net income, a complex trust is generally allowed a deduction equal to the lesser of
(i) the trust's distributable net income (as determined for U.S. federal income tax purposes) for
the taxable year and (ii) the sum of the amounts of income required to be distributed to
beneficiaries for the taxable year and other amounts properly paid or credited (or deemed paid or
credited) for the taxable year.  A distribution is includible in the beneficiary's gross income in
the year of receipt or deemed distribution by the trust, unless previously included in the
beneficiary's income under such beneficiary's applicable method of accounting.  It is expected
that the Master Disbursement Trust will be treated as the only beneficiary of the Plan
Administration Trust and thus distributions to the Master Disbursement Trust may be subject to
these rules.  The Plan Administration Trustee will file all tax returns of the Plan Administration
Trust and will be responsible for causing the Plan Administration trust to pay all taxes imposed
upon the Plan Administration Trust.

No opinion of counsel or ruling from the IRS has been requested by the Debtors or Plan
Administration Trustee concerning the tax status of Plan Administration Trust.  Accordingly,
there can be no assurance that the IRS would not take a contrary position.  The Plan
Administration Trust should consult its tax advisor regarding the tax consequences to it under the
Plan.

## E.    Withholding on Distributions and Information Reporting

Information reporting requirements may apply to distributions or payments, including
payments of interest, if any, pursuant to the Plan.  All distributions to holders of Claims under
the Plan are subject to any applicable tax withholding.  Under U.S. federal income tax law,
interest, dividends and other reportable payments to U.S. Holders may, under certain
circumstances, be subject to "backup withholding" at the then-applicable withholding rate
(currently 24%).  Backup withholding generally applies if the holder (i) fails to furnish its social
security number or other taxpayer identification number, (ii) furnishes an incorrect taxpayer
identification number, (iii) fails properly to report interest or dividends, or (iv) under certain
circumstances, fails to provide a certified statement, signed under penalty of perjury, that the tax
identification number provided is its correct number and that it is not subject to backup
withholding.  Backup withholding is not an additional tax but merely an advance payment, which
may be refunded to the extent it results in an overpayment of tax by timely filing an appropriate
claim for refund with the IRS (generally, a U.S. federal income tax return).  Certain persons are
exempt from backup withholding and information reporting, including governments of U.S.
states or political subdivisions thereof and non-U.S. governments and, in certain circumstances,
corporations and financial institutions.  Holders of Claims are urged to consult their own tax
advisors regarding the potential for and applicable law governing backup and other tax
withholding and information reporting in connection with the transactions contemplated by the
Plan.

In addition, Treasury Regulations generally require disclosure by a taxpayer on its U.S.
federal income tax return of certain types of transactions in which the taxpayer participated,
including, among other types of transactions, certain transactions that result in the taxpayer's
claiming a loss in excess of specified thresholds.  U.S. holders are urged to consult their tax

advisors regarding these regulations and whether the transactions contemplated by the Plan would be subject to these regulations and require disclosure on the U.S. holders' tax returns.

**F.      Importance of Obtaining Professional Advice**

      **THE FOREGOING DISCUSSION OF CERTAIN MATERIAL U.S. FEDERAL INCOME TAX CONSIDERATIONS IS FOR GENERAL INFORMATION ONLY AND IS NOT TAX ADVICE.    HOLDERS SHOULD CONSULT THEIR OWN TAX ADVISORS REGARDING THE U.S. FEDERAL INCOME TAX CONSEQUENCES TO THEM OF THE CONSUMMATION OF THE PLAN DESCRIBED HEREIN, AS WELL AS OTHER APPLICABLE TAX CONSEQUENCES, INCLUDING ANY TAX CONSEQUENCES ARISING UNDER STATE, LOCAL OR NON-U.S. TAX LAWS. NEITHER THE DEBTORS NOR THEIR PROFESSIONALS WILL HAVE ANY LIABILITY TO ANY PERSON ARISING FROM OR RELATED TO THE U.S. FEDERAL, STATE, LOCAL, NON-U.S. OR ANY OTHER TAX CONSEQUENCES OF THE PLAN OR THE FOREGOING DISCUSSION.**

**ARTICLE X**

**RECOMMENDATION**

      The Debtors believe that confirmation and consummation of the Plan are in the best interests of the Debtors, their Estates and their creditors.  The Plan provides for an equitable distribution to holders of Claims.  The Debtors believe that any alternative to confirmation of the Plan, such as liquidation under chapter 7 of the Bankruptcy Code, could result in significant delay, litigation and additional costs, as well as a reduction in the distributions to holders of Claims in certain Classes.  **Consequently, the Debtors, [the Ad Hoc Committee,][89][135]  the MSGE Group, the Native American Tribes Group, the Ad Hoc Group of Individual Victims, the Ad Hoc Group of Hospitals, the Third-Party Payor Group, the Ratepayer Mediation Participants and the [NAS Committee] urge all eligible holders of impaired Claims to vote to ACCEPT the Plan and to complete and submit their Ballots so that they will be RECEIVED by the Solicitation Agent on or before the Voting Deadline.**

---

[89][135]   The Ad Hoc Committee's status as a Supporting Claimant is conditioned upon an acceptable resolution with respect to the following issues (as determined by the Ad Hoc Committee in their sole discretion): (1) the treatment of the general unsecured Claims of the Federal Government; (2) the amounts of, and mechanisms for payment of, professional fees of the Private Claimant Groups from the Creditor Trusts; (3) the Persons to be included on the Schedule of Excluded Parties; (4) the terms of the PI Trust Distribution ProceduresTDP and (5) certain other issues currently being negotiated.

Dated: May ~~7~~24, 2021

By:    */s/* Jon Lowne
              Name: Jon Lowne
              Title: Authorized Signatory

**PURDUE PHARMA L.P.**
**PURDUE PHARMA INC.**
**PURDUE TRANSDERMAL**
**TECHNOLOGIES L.P.**
**PURDUE PHARMA MANUFACTURING**
**L.P.**
**PURDUE PHARMACEUTICALS L.P.**
**IMBRIUM THERAPEUTICS L.P.**
**ADLON THERAPEUTICS L.P.**
**GREENFIELD BIOVENTURES L.P.**
**SEVEN SEAS HILL CORP.**
**OPHIR GREEN CORP.**
**PURDUE PHARMA OF PUERTO RICO**
**AVRIO HEALTH L.P.**
**PURDUE PHARMACEUTICAL**
**PRODUCTS L.P.**
**PURDUE NEUROSCIENCE COMPANY**
**NAYATT COVE LIFESCIENCE INC.**
**BUTTON LAND L.P.**
**RHODES ASSOCIATES L.P.**
**PAUL LAND INC.**
**QUIDNICK LAND L.P.**
**RHODES PHARMACEUTICALS L.P.**
**RHODES TECHNOLOGIES**
**UDF LP**
**SVC PHARMA LP**
**SVC PHARMA INC.**

**<u>Appendix A</u>**

**~~Second~~<u>Third</u> Amended Plan**

[Filed at D.I. ~~2823~~<u>2904</u>]

**<u>Appendix B</u>**

**Liquidation Analysis**

# I.
# LIQUIDATION ANALYSIS

## A.  Introduction

Under the "best interests" of creditors test set forth in Bankruptcy Code section 1129(a)(7), a bankruptcy court may not confirm a plan of reorganization unless the plan provides, with respect to each impaired class, that each holder of a claim or interest in such class who does not otherwise vote in favor of the plan receive property of a value, as of the effective date of the plan, that is not less than the amount that such holder would receive or retain if the debtor(s) were liquidated under chapter 7 of the Bankruptcy Code as of such date. To demonstrate that the Plan satisfies the "best interests" of creditors test, the Debtors have
prepared the hypothetical liquidation analysis attached hereto as **Exhibit 1** (the "**Liquidation Analysis**"), which is based upon certain assumptions discussed below and in the notes accompanying the Liquidation Analysis (the "**Notes**"). Capitalized terms not defined in the Notes shall have the meanings ascribed to them in the Plan and the Disclosure Statement.

The Liquidation Analysis estimates potential Cash distributions to holders of Allowed Claims and Allowed Interests in a hypothetical chapter 7 liquidation of the Debtors' assets (the "**Assets**"). Asset values discussed in the Liquidation Analysis may differ materially from values referred to in the Plan and Disclosure Statement. The Debtors prepared the Liquidation Analysis with the assistance of their advisors.

## B.  Scope, Intent, and Purpose of the Liquidation Analysis

The determination of the costs of, and hypothetical proceeds from, the liquidation of the Assets is an uncertain process involving the extensive use of estimates and assumptions that, although considered reasonable by the Debtors, are inherently subject to significant business, political, economic, and competitive uncertainties and contingencies beyond the control of the Debtors, their management, and their advisors. Inevitably, some assumptions in the Liquidation Analysis would not materialize in an actual chapter 7 liquidation, and unanticipated events and circumstances could affect the ultimate results in an actual chapter 7 liquidation. In addition, the Debtors' management cannot judge with any degree of certainty the effect of the forced-liquidation asset sales on the recoverable value of the Assets. The Liquidation Analysis was prepared for the sole purpose of generating a reasonable, good-faith estimate of the proceeds that would be generated if the Debtors were liquidated in accordance with chapter 7 of the Bankruptcy Code. The Liquidation Analysis is not intended and should not be used for any other purpose. The underlying financial information in the Liquidation Analysis was not compiled or examined by any independent accountants. No independent appraisals were conducted in preparing the Liquidation Analysis. **NEITHER THE DEBTORS NOR THEIR ADVISORS MAKE ANY REPRESENTATION OR WARRANTY THAT THE ACTUAL RESULTS WOULD OR WOULD NOT APPROXIMATE THE ESTIMATES AND ASSUMPTIONS REPRESENTED IN THE LIQUIDATION ANALYSIS. ACTUAL RESULTS COULD VARY MATERIALLY**.

In preparing the Liquidation Analysis, the Debtors estimated Allowed Claims based upon a review of Claims listed on the Debtors' Schedules, Claims listed in the Debtors' current books and records and Proofs of Claim filed to date. In addition, the Liquidation Analysis includes estimates for Claims not currently reflected in the books and records or asserted in the Chapter 11 Cases, but which could be asserted and Allowed in a chapter 7 liquidation, including Administrative Claims, wind-down costs, and trustee fees. The Bankruptcy Court has not estimated or otherwise fixed the total amount of Allowed Claims used for purposes of preparing the Liquidation Analysis. The Debtors' estimate of Allowed Claims set forth in the

1

#9448266\v2

Liquidation Analysis should not be relied on for any other purpose, including determining the value of any distribution to be made on account of Allowed Claims under the Plan. **NOTHING CONTAINED IN THE LIQUIDATION ANALYSIS IS INTENDED TO BE OR CONSTITUTES A CONCESSION OR ADMISSION OF THE DEBTORS. THE ACTUAL AMOUNT OF ALLOWED CLAIMS IN THE CHAPTER 11 CASES COULD MATERIALLY DIFFER FROM THE ESTIMATED AMOUNTS SET FORTH IN THE LIQUIDATION ANALYSIS**.

## II.
## GLOBAL NOTES TO THE LIQUIDATION ANALYSIS

### A.  Liquidation Date and Appointment of a Chapter 7 Trustee

The Liquidation Analysis assumes the conversion of the Chapter 11 Cases to chapter 7 liquidation cases on or about September 30, 2021 (the "**Liquidation Date**"). On the Liquidation Date, it is assumed that the Bankruptcy Court would appoint a chapter 7 trustee (the "**Trustee**") to oversee the liquidation of the Debtors' Estates. As the Debtors would not generate revenues or cash flows following the Liquidation Date, the Trustee would need to use cash on hand, receivables, and proceeds from the immediate liquidation of Assets to fund the ongoing expenses of the Estates. The Liquidation Analysis assumes that the Trustee would have adequate liquidity to fund the wind-down of the operations and the fees associated with such a liquidation. In the event of an actual liquidation of the Debtors, there is a risk that the Trustee would not have adequate liquidity on hand to settle administrative expenses as incurred, at which point the Trustee might request a dismissal of the chapter 7 cases. If such a scenario were to occur, the recoveries to creditors would be severely impaired as compared with the hypothetical results contained in the Liquidation Analysis.

For the purposes of the Liquidation Analysis, the Debtors are using the most recent available balance sheets as of February 28, 2021 (the "**Balance Sheet Date**") as the basis for book value of the Assets. It is assumed there would be no material change between the Debtors' Assets on the Liquidation Date and the Balance Sheet Date, except as otherwise noted in the assumptions below. The Liquidation Analysis assumes that the Trustee would wind down and monetize the Assets of the Debtors over a twelve-month period, using cash on hand and the proceeds of the Assets to fund the expenses associated with the wind-down of operations. Litigation in respect of Shareholder Claim Rights[1] and claims allowance and allocation could extend beyond twelve months and generate significant costs that could further dilute recoveries in a chapter 7 liquidation.  The Liquidation Analysis has been drafted on a legal-entity-by-legal-entity basis for each of the Debtors.

### B.  Primary Assets of the Debtors

The Debtors have Assets[2] in the form of (i) cash and cash equivalents, (ii) accounts receivable, (iii) inventory ("**Inventory**"), (iv) restricted cash accounts (v) prepaid expenses & other current assets, (vi) property, plant, and equipment ("**PP&E**"), (vii) intangible assets, (viii) investments in non-Debtor companies, (ix) other non-current assets, (x) Shareholder Claim Rights.[‡] The Liquidation Analysis assumes a range (high, medium, and low) of recoveries for these Assets assuming a forced-liquidation asset sale process for certain of the Assets conducted by the Trustee. The Debtors' management believes that values

---

[1] For purposes of the Liquidation Analysis, "**Shareholder Claim Rights**" means any and all rights, titles, privileges, interests, claims, demands and entitlements of the Debtors arising under, or attributable to, any Causes of Action or choses in action against, or proceeds, payments, benefits or indemnities from, any Sackler family members and trusts, including any Shareholder Party, in each case whether now existing or hereafter arising, accrued or unaccrued, liquidated or unliquidated, matured or unmatured, disputed or undisputed, fixed or contingent.

[2] The Liquidation Analysis does not include any estimate for recoveries for Purdue Insurance Rights.

[‡] ~~The Liquidation Analysis does not include any estimate for recoveries for Purdue Insurance Rights.~~

#9448266|v2

derived from the liquidation assumed in the Liquidation Analysis do not generate a significant recovery for stakeholders as compared with the recovery proposed under the Plan.

The Liquidation Analysis assumes the Debtors would allow, and the Trustee would use, the proceeds of the liquidation of Assets to fund the wind-down expenses. These receivables and other proceeds would be used first to fund the liquidation of the Estates and then to satisfy Claims in the order of priority set forth in section 726 of the Bankruptcy Code.

### C. Forced-Liquidation Sale Process

The liquidation sale process would proceed concurrently with the shutdown of the Debtors' manufacturing facility in Wilson, North Carolina. A significant portion of the gross proceeds distributable to creditors would come from the collection of accounts receivable as well as from the liquidation of inventory, real property and equipment and certain brands, patents and other intangible assets, which liquidation is subject to various offsetting costs. The Liquidation Analysis also assumes that certain staff currently employed by the Debtors would remain with the Debtors through the course of the wind-down. Costs associated with these employees have been included in the operational wind-down expense to support the Trustee in collecting and liquidating the Assets.

The Liquidation Analysis assumes that the Debtors will be subject to a withdrawal liability on account of the Purdue Pension Plan (the "**Qualified Pension Plan**") and the PBGC. The Debtors estimate that the Qualified Pension Plan claim amounts would total approximately $163 million based on the Debtors' most recent actuarial estimates of withdrawal liabilities. The Debtors also assumed that the Qualified Pension Plan claims would be asserted at each of the Debtor entities, based on a "controlled group" (as defined in the Employee Retirement Income Security Act) theory of liability. Further, the Debtors have made the assumption that certain other claims which could be asserted in a chapter 7 liquidation—such as potential rejection damages claims for contracts that would be assumed or rejected in a chapter 11 reorganization— are not estimated in the Liquidation Analysis, which claims would otherwise further dilute recovery to creditors.

The Liquidation Analysis assumes that the estimated sale proceeds for the Assets would be less than the tax basis of the Assets and would not generate any additional tax liabilities. Should the tax treatment and effect of the liquidation transactions result in a tax liability that was not reduced by other tax benefits, recoveries in the Liquidation Analysis could change materially.

### III.
### SPECIFIC NOTES TO THE ASSET ASSUMPTIONS
### CONTAINED IN THE LIQUIDATION ANALYSIS

The Liquidation Analysis refers to certain categories of Assets. The numerical/alphabetical designations below correspond to the line items listed in Exhibit 1, each with a specific Note.

1. Cash and Cash Equivalents

   - In the Liquidation Analysis, "cash and cash equivalents" comprises cash and marketable securities. The cash balance shown is the Debtors' current unrestricted cash forecast as of the Liquidation Date. Full recovery is anticipated on cash and marketable securities.

2. Accounts Receivable

#9448266lv2

- Accounts Receivable includes all third-party trade accounts receivable. Allowances for doubtful accounts, accrued returns, cash payment discounts, wholesaler fees and chargebacks are included in receivables. The liquidation analysis assumes that upon conversion to a chapter 7, the Debtors' ability to collect on its receivables will be negatively impacted by an increase in product returns for certain products as the end market demand for its products declines.

- Approximately 90% of the Debtors' outstanding trade accounts receivable are due from 3 main pharmaceutical distributors from which the Debtors have historically seen minimal loss rates. However, potential risks exist around the ability to collect on the Debtors' outstanding accounts receivable due to potential setoff claims against the Debtors.

- Accounts receivable due from associated companies are deemed to have the same recovery assumptions as accounts receivable with third-parties.

- Debtor-to-Debtor intercompany receivables are deemed to have no recoverable value in this analysis.

- For purposes of the Liquidation Analysis, the liquidation proceeds of accounts receivable were estimated to range from 50-76% of net book value.

3. Inventory

- Inventory consists of raw materials, work in process and finished goods which were evaluated for recovery at the product level. The book value of inventory represents the lower of cost or market value. The liquidation analysis assumes that manufacturing facilities would initiate shutdown at the start of the liquidation period and that the raw material and work in progress would not have recoverable value. The Debtors would be expected to sell the remaining finished goods at significantly higher than cost and therefore, results in estimated recovery rate ranges over 100%. The liquidation analysis assumes that sufficient proceeds will not be immediately available to pay accrued rebates, that the Debtors would need to significantly decrease the market price of inventory on hand to account for the increased final cost to customers.

- The liquidation analysis assumes a recovery range for finished goods of 199-397% of net book value and a recovery range for total inventory of 100-200%.

4. Prepaid Expenses and Other Current Assets

- Prepaid Expenses and Other Current Assets primarily includes prepaid retainers and prepaid insurance expense for which the Debtors anticipate no recoverable value.

5. Restricted Cash

- Restricted Cash consists primarily of cash collateralized for insurance policies and trust account agreements with pharmacy benefit managers. The funds related to insurance policies have an estimated recovery of 0-50% of net book value.

6. Property and Equipment, net (PP&E)

#9448266lv2

- Property and Equipment, net ("PP&E") comprises Land and Buildings, Leasehold Improvements, Machinery & Equipment ("Equipment"), Furniture and Fixtures ("Furniture"), Computer Software and Equipment ("Software") and Construction in Progress. Recovery ranges for PP&E were based on management's knowledge of the underlying assets and estimates of their ultimate sale values. The estimated recovery ranges for the various components of PP&E are as follows:

  - Land and Buildings    25-45%
  - Equipment             5-15%,
  - Furniture             5-10%,
  - Software              2-4%.

- Leasehold Improvements and Construction in Progress are estimated to have no recovery value.

- PP&E consists primarily of a manufacturing facility in Wilson, NC owned by Purdue Pharmaceuticals L.P. and Leasehold improvements owned by Rhodes Pharmaceuticals L.P. The blended recovery for PP&E is 14-27%.

7. Investments at Cost

- Investments at Cost include the Debtors' investments in early stage privately held companies. Primarily due to the estimated high illiquidity discounts, the Debtors assume a recovery rate of 38-63%.

8. Intangible Assets

- Intangible assets include brands, patents, trademarks, know-how and ANDAs for branded and generic products.

  - Intangible assets are held on the Debtors' balance sheets at cost.
  - The liquidation analysis estimates that the liquidation of the brands held by Avrio and the ANDAs, patents and other intangibles for the Debtors' generic and branded pharmaceutical products would be at a significant discount to the going concern value of the Debtors' ongoing business operations.
  - Total proceeds are estimated to be $104-$242 million or 110-254% of net book value

9. Other Assets (Non-Current)

- Other long-term assets consist primarily of prepaid rent and are estimated to have no recoverable value.

- Proceeds from Causes of Action arising under chapter 5 of the Bankruptcy Code ("Avoidance Actions") may be available for distribution to Holders of Administrative Claims, Priority Claims, and General Unsecured Claims in accordance with the priorities established by the Bankruptcy Code. The Debtors, however, believe that recoveries from Avoidance Actions (other than, for the avoidance of doubt, recoveries in respect of Shareholder Claim Rights), if any, would be speculative in nature and have not included any such proceeds in the Liquidation Analysis.

#9448266lv2

19-23649-shl    Doc 2908-1    Filed 05/24/21    Entered 05/24/21 15:24:26    Exhibit A-
Incremental Blackline    Pg 344 of 407

10. Shareholder ~~Settlement~~Claim Rights

- The Liquidation Analysis assumes that there is no settlement with the shareholders.[3]
- The amount of any hypothetical judgment is unknowable. However, the Debtors believe that recoveries in respect of Shareholder Claim Rights in the context of a hypothetical chapter 7 liquidation would likely be lower than recoveries under the Shareholder Settlement Agreement for a number of reasons, including:
  - Shareholder Released Parties would pay for Shareholder Releases under the Plan.
  - The Trustee and its counsel would not be familiar with the extremely complicated and extensive factual record, which could affect the Trustee's ability to prosecute the Shareholder Claim Rights.
  - The Shareholder Settlement allows for the consensual resolution of other complex issues, including collectability.
  - In a hypothetical chapter 7 liquidation, the Debtors would be one party of many pursuing claims against the Debtors' shareholders, and the Debtors might not "win the race to the courthouse."
- The Liquidation Analysis assumes that the recoveries in respect of Shareholder Claim Rights are estimated to be $746-$2,238 million and received at PPLP.
  - To estimate midpoint recoveries, the Debtors discounted the total value of contributions under the Shareholder Settlement to 12/31/2021 using a discount rate of 9% and estimated recovery rate of 50% under a hypothetical chapter 7 liquidation scenario, exclusive of litigation-related costs and expenses.


## IV.
## SPECIFIC NOTES TO THE LIQUIDATION COST ASSUMPTIONS CONTAINED IN THE LIQUIDATION ANALYSIS

1. Chapter 7 Trustee Fees

- Represents the costs of payment of statutorily allowed reasonable compensation to the Trustee. Estimated Trustee fees are calculated in accordance with section 326 of the Bankruptcy Code as follows: not to exceed 25 percent on the first $5,000 or less, 10 percent on any amount in excess of $5,000 but not in excess of $50,000, 5 percent on any amount in excess of $50,000 but not in excess of $1,000,000, and reasonable compensation not to exceed 3 percent of such moneys in excess of $1,000,000, upon all moneys disbursed or turned over in the case by the trustee to parties in interest, excluding the debtor, but including holders of secured claims. For the purposes of this analysis, Chapter 7 Trustee Fees are assumed to be 2-3% of total liquidation proceeds, excluding recoveries related to cash and cash equivalents available to the Trustee as of the Liquidation Date.

2. Chapter 7 Professional Fees and Claims Resolution Costs

- Pursuant to section 726 of the Bankruptcy Code, the allowed administrative expenses incurred by the Trustee, including fees and expenses incurred in resolving the Debtors' claims register, which currently constitutes over 614,000 claims asserted in a face amount of approximately

---

[3] To the extent relevant for purposes of the "best interests" of creditors test set forth in Bankruptcy Code section 1129(a)(7), the Liquidation Analysis assumes that, in a chapter 7 scenario, Holders of Claims and Interests and other non-Debtor Persons would retain their direct claims, if any, against the Shareholder Released Parties. Section III.AA(2)(ii)(c) of the Disclosure Statement contains a discussion of the value of such claims in a chapter 7 scenario.

#9448266lv2

$41 trillion[34], and expenses relating to the sale of the Debtors' assets.

- The Trustee's fees and expenses will be entitled to payment in full prior to any distribution to chapter 11 Administrative Claims and Other Priority Claims.

- The Liquidation Analysis assumes that the Private-Side Resolutions, which among other things were conditioned on confirmation of a plan of reorganization that includes a settlement of Shareholder Claim Rights, are not satisfied.

- As discussed in Section 1.D of the Disclosure Statement, absent the Private-Side Resolutions, litigation among various creditor constituencies could continue for many years and at great expense. The Liquidation Analysis assumes that such litigation takes 5-10 years. Trustee professional fees, including fees incurred in connection with allocation-related litigation and litigation in respect of Shareholder Claim Right, is estimated to be $520-$1,560 million.

3. Transaction cost advisory fees

- Fees are estimated to be 2-3% of the sales value of the Debtors' PP&E and intangible assets due to the need to hire brokers and/or other specialists to market and liquidate these assets for the Debtors.

4. Wind down costs

- Wind down costs are based on a percentage of general and administrative (G&A) expenses and are estimated to be 20-25% of annual expenses in year 1 and decreasing percentages in subsequent years.

5. Severance

- Severance is estimated at two weeks of payroll expense.

### IV.
### SPECIFIC NOTES TO THE CLAIMS ASSUMPTIONS
### CONTAINED IN THE LIQUIDATION ANALYSIS

The Liquidation Analysis sets forth an allocation of the liquidation proceeds to holders of Claims and Interests in accordance with the priorities set forth in section 726 of the Bankruptcy Code. In preparing the Liquidation Analysis, the Debtors estimated Allowed Claims based upon a review of Claims listed on the Debtors' Schedules, Claims listed in the Debtors' current books and records and Proofs of Claim filed to date. In addition, the Liquidation Analysis includes estimates for certain costs and claims not currently asserted in these Chapter 11 Cases, but which could be asserted and allowed in a chapter 7 liquidation. These costs and claims include those incurred to manage the chapter 7 liquidation (such as trustee and professional fees and operational winddown costs), and additional Administrative Claims.

To date, the Bankruptcy Court has not estimated or otherwise fixed the total amount of Allowed Claims. For purposes of the Liquidation Analysis, the Debtors' estimates of Allowed Claims are used. Therefore, the Debtors' estimate of Allowed Claims set forth in the Liquidation Analysis should not be relied on for any other purpose, including determining the value of any distribution to be made on account of Allowed Claims and Interests under the Plan.

1. Superpriority Administrative Expense Claims

---

[34] Exclusive of a single personal injury claim filed in the amount of $100 trillion. Claims filed in amounts certain represent approximately 10% of the claims pool.

#9448266lv2

- The Liquidation Analysis assumes that the DOJ Forfeiture Judgment Claim is Allowed against PPLP in the amount of $2 billion and that the DOJ Forfeiture Judgment Credit is unavailable.

2. Administrative Claims

- Administrative Claims arising in a hypothetical chapter 7 liquidation may include, among other things: (1) Claims arising pursuant to section 503(b)(9) of the Bankruptcy Code; (2) postpetition trade payables; (3) accrued postpetition employee obligations; (4) accrued taxes; (5) accrued utility payments; and (6) post-petition intercompany payables.

- This Liquidation Analysis assumes there will be approximately $341 million in Administrative Expense Claims outstanding as of the Liquidation Date, which includes:

  o Post-petition trade payable claims
  o Rejection damage claims resulting from the cancellation of the "Avrio Lease" that was previously assumed post-petition by the Debtors
  o Rejection damage claims resulting from the cancellation of the "PPLP lease" that was entered into post-petition by the Debtors
  o Amounts owed under the debtor's Incentive and Retention plans
  o Post-petition accrued expenses

- This Liquidation Analysis concludes that, on a consolidated basis, Administrative Expense Claims will receive a 16% recovery in the mid scenario, while receiving a 2% in the low scenario and a 96% recovery in the high scenario. The variance in recovery is due to the significant variability in liquidation proceeds between the low and high case.

3. Priority Claims

- The Liquidation Analysis assumes that there are $0.8 million in Priority Employee claims based upon the priority wage cap and the number of total employee claims filed. The priority claims are assumed to receive an equivalent recovery to the assumed administrative claims, which ranges from 0-96%.

- The Liquidation Analysis assumes that there are $0.8 million in Priority Tax claims, which consists of accrued Taxes reflected on the balance sheet that are not yet due and payable, or that are being contested in good faith, in accordance with GAAP. The priority claims are assumed to receive an equivalent recovery to the assumed administrative claims, which ranges from 0-100%.

4. Class 4 – General Unsecured Claims

- Prepetition accounts payable – The Liquidation Analysis assumes that all undisputed prepetition accounts payable claims will be allowed in full in a Chapter 7 scenario.

- Pension Benefit Guaranty Corporation termination claim – The Liquidation Analysis includes a claim estimate of $163 million related to the termination of the Debtors defined benefit pension plan.

#9448266lv2

- Contract rejection damages – The Liquidation Analysis includes an estimate for rejection damages related to the rejection of the Debtors' prepetition lease at One Stamford Forum.

- Opioid Litigation –The Liquidation Analysis assumes that all opioid-related claims asserted against the Debtors are asserted solely against Debtor PPLP.  As discussed herein and in Section 1.D of the Disclosure Statement, a chapter 7 liquidation would likely involve extensive and value-destructive litigation regarding the validity and amount of the these claims, and there can be no assurance that any particular claim would ultimately be allowed in a particular amount or at all at the eventual conclusion of such litigation.  For illustrative purposes only, the Liquidation Analysis shows contingent liability claims in the asserted face amount of approximately $41 trillion[35].

---

[35] Exclusive of a single personal injury claim filed in the amount of $100 trillion.  Claims filed in amounts certain represent approximately 10% of the claims pool.

9

**EXHIBIT 1**

**Hypothetical Liquidation Analysis**

#94482661v2

**Purdue Pharma L.P., et al**

($ in millions)

| Assets | Book Value | Estimated Recovery Rate | | | Estimated Recovery Value | | |
|---|---|---|---|---|---|---|---|
| | | High | Mid | Low | High | Mid | Low |
| **Current Assets** | | | | | | | |
| Cash and Cash Equivalents (Net) | $ 943.2 | 100.0% | 100.0% | 100.0% | $ 943.2 | $ 943.2 | $ 943.2 |
| Accounts Receivable (Net) | 150.3 | 75.5% | 62.9% | 50.3% | 113.5 | 94.6 | 75.7 |
| Inventories, Net | 83.3 | 200.1% | 150.1% | 100.0% | 166.7 | 125.0 | 83.4 |
| Prepaid Expenses & Other Current Assets | 51.1 | 4.8% | 3.6% | 2.4% | 2.4 | 1.8 | 1.2 |
| Restricted Cash | 29.9 | 1.3% | 0.6% | 0.0% | 0.4 | 0.2 | - |
| **Total Current Assets** | $ 1,257.8 | | | | $ 1,226.2 | $ 1,164.8 | $ 1,103.4 |
| **Non-Current Assets** | | | | | | | |
| Property and Equipment, net | $ 66.5 | 26.7% | 20.1% | 13.6% | $ 17.8 | $ 13.4 | $ 9.0 |
| Investments at Cost | 44.6 | 63.2% | 50.7% | 38.2% | 28.2 | 22.6 | 17.1 |
| Investments in Associated Companies | 9.7 | 0.0% | 0.0% | 0.0% | - | - | - |
| Restricted Cash - Long-Term | 148.5 | 50.0% | 25.0% | 0.0% | 74.3 | 37.1 | - |
| Intangible Assets, Net | 95.1 | 254.0% | 181.9% | 109.8% | 241.5 | 172.9 | 104.4 |
| Other Assets | 16.5 | 0.0% | 0.0% | 0.0% | - | - | - |
| **Total Assets** | $ 1,638.7 | 96.9% | 86.1% | 75.3% | $ 1,587.9 | $ 1,410.9 | $ 1,233.9 |
| **Liquidation Proceeds** | | | | | | | |
| Liquidation Proceeds from Assets | | | | | $ 1,587.9 | $ 1,410.9 | $ 1,233.9 |
| Sackler Settlement | | | | | 2,238.3 | 1,492.2 | 746.1 |
| **Total Liquidation Proceeds** | | | | | $ 3,826.3 | $ 2,903.2 | $ 1,980.0 |
| **Liquidation Costs** | | | | | | | |
| Chapter 7 Trustee Fees | | -2.0% | -2.5% | -3.0% | (57.7) | (49.0) | (31.1) |
| Chapter 7 Professional Fees | | | | | (520.0) | (975.0) | (1,560.0) |
| Transaction Costs/Advisory Fees | | -2.0% | -2.5% | -3.0% | (5.2) | (4.7) | (3.4) |
| Wind Down Costs | | | | | (43.7) | (68.8) | (100.4) |
| Severance | | | | | (4.1) | (4.1) | (4.1) |
| **Total Liquidation Costs** | | | | | $ (630.6) | $ (1,101.5) | $ (1,699.0) |
| **Net Liquidation Proceeds Available to Creditors** | | | | | $ 3,195.6 | $ 1,801.6 | $ 281.1 |

| Creditor Class | | Estimated Claim Allowed | | | Estimated Recovery by Class of Claims ($)/(%) | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| | | High | Mid | Low | High | | Mid | | Low | |
| DOJ - Criminal Forfeiture | $ (2,000.0) | $ 2,000.0 | $ 2,000.0 | $ 2,000.0 | $ 2,000.0 | 100.0% | $ 1,651.8 | 82.6% | $ 266.5 | 13.3% |
| Administrative Expense Claims | $ (341.4) | $ 344.9 | $ 341.4 | $ 337.9 | 330.2 | 95.7% | 54.3 | 15.9% | 8.1 | 2.4% |
| Priority Claims | $ (1.6) | $ 1.6 | $ 1.6 | $ 1.6 | 1.6 | 97.8% | 0.0 | 0.7% | 0.0 | 0.1% |
| LSTC - Prepetition Accounts Payable | (12.9) | 12.9 | 12.9 | 12.9 | 1.6 | 12.8% | 0.7 | 5.5% | 0.0 | 0.0% |
| PBGC - Termination | (163.0) | 163.0 | 163.0 | 163.0 | 163.0 | 100.0% | 94.8 | 58.2% | 6.4 | 3.9% |
| Contract Rejection Damages | (41.1) | 41.1 | 41.1 | 41.1 | 0.1 | 0.2% | 0.0 | 0.0% | - | 0.0% |
| Contingent Litigation Liability | (41,000,000.0) | 41,000,000.0 | 41,000,000.0 | 41,000,000.0 | 699.1 | 0.0% | - | 0.0% | - | 0.0% |
| General Unsecured Claims | $ (41,000,217.0) | $ 41,000,217.0 | $ 41,000,217.0 | $ 41,000,217.0 | 863.9 | 0.0% | 95.5 | 0.0% | 6.4 | 0.0% |
| **Total Claims** | $ (41,002,560.0) | $ 41,002,563.5 | $ 41,002,560.0 | $ 41,002,556.5 | $ 3,195.6 | 0.0% | $ 1,801.6 | 0.0% | $ 281.1 | 0.0% |

11

#94482661v2

**Purdue Pharma L.P.**

($ in millions)

| Assets | Book Value | Estimated Recovery Rate | | | Estimated Recovery Value | | |
|---|---|---|---|---|---|---|---|
| | | High | Mid | Low | High | Mid | Low |
| **Current Assets** | | | | | | | |
| Cash and Cash Equivalents (Net) | $ 943.2 | 100.0% | 100.0% | 100.0% | $ 943.2 | $ 943.2 | $ 943.2 |
| Accounts Receivable (Net) | 79.6 | 59.7% | 49.8% | 39.8% | 47.6 | 39.6 | 31.7 |
| Inventories, Net | 9.1 | 1386.5% | 1039.9% | 693.2% | 125.5 | 94.1 | 62.7 |
| Prepaid Expenses & Other Current Assets | 28.7 | 3.9% | 2.9% | 1.9% | 1.1 | 0.8 | 0.6 |
| Restricted Cash | 29.9 | 1.3% | 0.6% | 0.0% | 0.4 | 0.2 | - |
| Total Current Assets | $ 1,090.4 | | | | $ 1,117.7 | $ 1,077.9 | $ 1,038.2 |
| **Non-Current Assets** | | | | | | | |
| Property and Equipment, net | $ 6.9 | 5.5% | 4.1% | 2.6% | $ 0.4 | $ 0.3 | $ 0.2 |
| Investments at Cost | 10.5 | 25.0% | 12.5% | 0.0% | 2.6 | 1.3 | - |
| Investments in Associated Companies | 383.7 | 0.0% | 0.0% | 0.0% | - | - | - |
| Restricted Cash - Long-Term | 148.4 | 50.0% | 25.0% | 0.0% | 74.2 | 37.1 | - |
| Intangible Assets, Net | 3.8 | 1159.6% | 773.1% | 386.5% | 44.3 | 29.5 | 14.8 |
| Other Assets | 3.5 | 0.0% | 0.0% | 0.0% | - | - | - |
| Total Assets | $ 1,647.2 | 75.2% | 69.6% | 63.9% | $ 1,239.2 | $ 1,146.2 | $ 1,053.1 |
| **Liquidation Proceeds** | | | | | | | |
| Liquidation Proceeds from Assets | | | | | $ 1,239.2 | $ 1,146.2 | 1,053.1 |
| Sackler Settlement | | | | | 2,238.3 | 1,492.2 | 746.1 |
| Total Liquidation Proceeds | | | | | $ 3,477.6 | $ 2,638.4 | $ 1,799.2 |
| **Liquidation Costs** | | | | | | | |
| Chapter 7 Trustee Fees | | -2.0% | -2.5% | -3.0% | $ (50.7) | $ (42.4) | $ (25.7) |
| Chapter 7 Professional Fees | | | | | (472.5) | (886.1) | (1,417.8) |
| Transaction Costs/Advisory Fees | | -2.0% | -2.5% | -3.0% | (0.9) | (0.7) | (0.4) |
| Wind Down Costs | | | | | (32.5) | (51.1) | (74.6) |
| Severance | | | | | (2.0) | (2.0) | (2.0) |
| Total Liquidation Costs | | | | | $ (558.6) | $ (982.3) | $ (1,520.5) |
| **Funding of Liquidation Costs for Other Debtor Entities** | | | | | $ (2.7) | $ (4.3) | $ (12.2) |
| **Excess Proceeds Available from Other Debtor Entities** | | | | | $ 53.0 | $ - | $ - |
| **Net Liquidation Proceeds Available to Creditors** | | | | | $ 2,969.3 | $ 1,651.8 | $ 266.5 |

| Creditor Class | | Estimated Claim Allowed | | | Estimated Recovery by Class of Claims ($)/(%) | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| | | High | Mid | Low | High | | Mid | | Low | |
| DOJ - Criminal Forfeiture | $ (2,000.0) | $ 2,000.0 | $ 2,000.0 | $ 2,000.0 | $ 2,000.0 | 100.0% | $ 1,651.8 | 82.6% | $ 266.5 | 13.3% |
| Administrative Expense Claims | $ (268.6) | $ 268.6 | $ 268.6 | $ 268.6 | 268.6 | 100.0% | $ - | 0.0% | $ - | 0.0% |
| Priority Claims | $ (1.6) | $ 1.6 | $ 1.6 | $ 1.6 | $ 1.6 | 100.0% | $ - | 0.0% | $ - | 0.0% |
| LSTC - Prepetition Accounts Payable | (7.7) | 7.7 | 7.7 | 7.7 | 0.0 | 0.0% | - | 0.0% | - | 0.0% |
| PBGC - Termination | (163.0) | 163.0 | 163.0 | 163.0 | - | 0.0% | - | 0.0% | - | 0.0% |
| Contract Rejection Damages | (40.6) | 40.6 | 40.6 | 40.6 | - | 0.0% | - | 0.0% | - | 0.0% |
| Contingent Litigation Liability | (41,000,000.0) | 41,000,000.0 | 41,000,000.0 | 41,000,000.0 | 699.1 | 0.0% | - | 0.0% | - | 0.0% |
| General Unsecured Claims | $ (41,000,211.3) | $ 41,000,211.3 | $ 41,000,211.3 | $ 41,000,211.3 | 699.1 | 0.0% | $ - | 0.0% | $ - | 0.0% |
| Total Claims | $ (41,002,481.6) | $ 41,002,481.6 | $ 41,002,481.6 | $ 41,002,481.6 | $ 2,969.3 | 0.0% | $ 1,651.8 | 0.0% | $ 266.5 | 0.0% |

12

#94482661v2

**Nayatt Cove Lifescience**

($ in millions)

| Assets | Book Value | Estimated Recovery Rate High | Mid | Low | Estimated Recovery Value High | Mid | Low |
|---|---|---|---|---|---|---|---|
| **Current Assets** | | | | | | | |
| Cash and Cash Equivalents (Net) | $ - | 0.0% | 0.0% | 0.0% | $ - | $ - | $ - |
| Accounts Receivable (Net) | - | 0.0% | 0.0% | 0.0% | - | - | - |
| Inventories, Net | - | 0.0% | 0.0% | 0.0% | - | - | - |
| Prepaid Expenses & Other Current Assets | 0.0 | 6.0% | 4.5% | 3.0% | 0.0 | 0.0 | 0.0 |
| Restricted Cash | - | 0.0% | 0.0% | 0.0% | - | - | - |
| **Total Current Assets** | $ 0.0 | | | | $ 0.0 | $ 0.0 | $ 0.0 |
| | | | | | | | |
| **Non-Current Assets** | | | | | | | |
| Property and Equipment, net | $ - | 0.0% | 0.0% | 0.0% | $ - | $ - | $ - |
| Investments at Cost | 34.1 | 75.0% | 62.5% | 50.0% | 25.6 | 21.3 | 17.1 |
| Investments in Associated Companies | - | 0.0% | 0.0% | 0.0% | - | - | - |
| Restricted Cash - Long-Term | - | 0.0% | 0.0% | 0.0% | - | - | - |
| Intangible Assets, Net | - | 0.0% | 0.0% | 0.0% | - | - | - |
| Other Assets | - | 0.0% | 0.0% | 0.0% | - | - | - |
| **Total Assets** | $ 34.1 | 75.0% | 62.5% | 50.0% | $ 25.6 | $ 21.3 | $ 17.1 |
| | | | | | | | |
| **Liquidation Proceeds** | | | | | | | |
| Liquidation Proceeds from Assets | | | | | $ 25.6 | $ 21.3 | $ 17.1 |
| Sackler Settlement | | | | | - | - | - |
| **Total Liquidation Proceeds** | | | | | $ 25.6 | $ 21.3 | $ 17.1 |
| | | | | | | | |
| **Liquidation Costs** | | | | | | | |
| Chapter 7 Trustee Fees | | -2.0% | -2.5% | -3.0% | $ (0.5) | $ (0.5) | $ (0.5) |
| Chapter 7 Professional Fees | | | | | (4.5) | (7.2) | (10.4) |
| Transaction Costs/Advisory Fees | | -2.0% | -2.5% | -3.0% | - | - | - |
| Wind Down Costs | | | | | - | - | - |
| Severance | | | | | - | - | - |
| **Total Liquidation Costs** | | | | | $ (5.0) | $ (7.7) | $ (10.9) |
| | | | | | | | |
| **Funding Required from Purdue Pharma L.P.** | | | | | $ - | $ - | $ - |
| **Excess Proceeds Available to Purdue Pharma L.P.** | | | | | $ - | $ - | $ - |
| | | | | | | | |
| **Net Liquidation Proceeds Available to Creditors** | | | | | $ 20.6 | $ 13.6 | $ 6.1 |

| Creditor Class | Estimated Claim Allowed High | Mid | Low | Estimated Recovery by Class of Claims ($)/(%) High | | Mid | | Low | |
|---|---|---|---|---|---|---|---|---|---|
| DOJ - Criminal Forfeiture | $ - | $ - | $ - | $ - | 0.0% | $ - | 0.0% | $ - | 0.0% |
| Administrative Expense Claims | $ - | $ - | $ - | $ - | 0.0% | $ - | 0.0% | $ - | 0.0% |
| Priority Claims | $ - | $ - | $ - | $ - | 0.0% | $ - | 0.0% | $ - | 0.0% |
| LSTC - Prepetition Accounts Payable | - | - | - | - | 0.0% | - | 0.0% | - | 0.0% |
| PBGC - Termination | (163.0) | 163.0 | 163.0 | 20.6 | 12.6% | 13.6 | 8.4% | 6.1 | 3.8% |
| Contract Rejection Damages | - | - | - | - | 0.0% | - | 0.0% | - | 0.0% |
| Contingent Litigation Liability | - | - | - | - | 0.0% | - | 0.0% | - | 0.0% |
| General Unsecured Claims | $ (163.0) | $ 163.0 | $ 163.0 | $ 20.6 | 12.6% | $ 13.6 | 8.4% | $ 6.1 | 3.8% |
| **Total Claims** | $ (163.0) | $ 163.0 | $ 163.0 | $ 20.6 | 12.6% | $ 13.6 | 8.4% | $ 6.1 | 3.8% |

13

#94482661v2

**Purdue Pharmaceuticals L.P.**

($ in millions)

| Assets | Book Value | Estimated Recovery Rate | | | Estimated Recovery Value | | |
|---|---|---|---|---|---|---|---|
| | | High | Mid | Low | High | Mid | Low |
| **Current Assets** | | | | | | | |
| Cash and Cash Equivalents (Net) | $ - | 0.0% | 0.0% | 0.0% | $ - | $ - | $ - |
| Accounts Receivable (Net) | - | 0.0% | 0.0% | 0.0% | - | - | - |
| Inventories, Net | 32.9 | 2.4% | 1.8% | 1.2% | 0.8 | 0.6 | 0.4 |
| Prepaid Expenses & Other Current Assets | 7.1 | 6.0% | 4.5% | 3.0% | 0.4 | 0.3 | 0.2 |
| Restricted Cash | - | 0.0% | 0.0% | 0.0% | - | - | - |
| **Total Current Assets** | $ 40.1 | 0.0% | 0.0% | | $ 1.2 | $ 0.9 | $ 0.6 |
| | | | | | | | |
| **Non-Current Assets** | | | | | | | |
| Property and Equipment, net | $ 55.4 | 31.1% | 23.4% | 15.8% | $ 17.2 | $ 13.0 | $ 8.8 |
| Investments at Cost | - | 25.0% | 12.5% | 0.0% | - | - | - |
| Investments in Associated Companies | - | 0.0% | 0.0% | 0.0% | - | - | - |
| Restricted Cash - Long-Term | 0.1 | 50.0% | 25.0% | 0.0% | 0.1 | 0.0 | - |
| Intangible Assets, Net | - | 0.0% | 0.0% | 0.0% | - | - | - |
| Other Assets | 12.9 | 0.0% | 0.0% | 0.0% | - | - | - |
| **Total Assets** | $ 108.5 | 17.1% | 12.8% | 8.6% | $ 18.5 | $ 13.9 | $ 9.4 |
| | | | | | | | |
| **Liquidation Proceeds** | | | | | | | |
| Liquidation Proceeds from Assets | | | | | $ 18.5 | $ 13.9 | $ 9.4 |
| Sackler Settlement | | | | | - | - | - |
| **Total Liquidation Proceeds** | | | | | $ 18.5 | $ 13.9 | $ 9.4 |
| | | | | | | | |
| **Liquidation Costs** | | | | | | | |
| Chapter 7 Trustee Fees | | -2.0% | -2.5% | -3.0% | $ (0.4) | $ (0.3) | $ (0.3) |
| Chapter 7 Professional Fees | | | | | (2.5) | (4.7) | (7.5) |
| Transaction Costs/Advisory Fees | | -2.0% | -2.5% | -3.0% | (0.3) | (0.3) | (0.3) |
| Wind Down Costs | | | | | - | - | - |
| Severance | | | | | (0.6) | (0.6) | (0.6) |
| **Total Liquidation Costs** | | | | | $ (3.8) | $ (6.0) | $ (8.7) |
| | | | | | | | |
| **Funding Required from Purdue Pharma L.P.** | | | | | $ - | $ - | $ - |
| **Excess Proceeds Available to Purdue Pharma L.P.** | | | | | $ - | $ - | $ - |
| | | | | | | | |
| **Net Liquidation Proceeds Available to Creditors** | | | | | $ 14.7 | $ 7.9 | $ 0.6 |

| Creditor Class | Book Value | Estimated Claim Allowed | | | Estimated Recovery by Class of Claims ($)/(%) | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| | | High | Mid | Low | High | | Mid | | Low | |
| DOJ - Criminal Forfeiture | $ - | $ - | $ - | $ - | $ - | 0.0% | $ - | 0.0% | $ - | 0.0% |
| Administrative Expense Claims | $ (3.8) | $ 3.8 | $ 3.8 | $ 3.8 | $ 3.8 | 100.0% | $ 3.8 | 100.0% | 0.6 | 16.9% |
| Priority Claims | $ - | $ - | $ - | $ - | $ - | 0.0% | $ - | 0.0% | $ - | 0.0% |
| LSTC - Prepetition Accounts Payable | (0.5) | 0.5 | 0.5 | 0.5 | 0.0 | 6.7% | 0.0 | 2.5% | - | 0.0% |
| PBGC - Termination | (163.0) | 163.0 | 163.0 | 163.0 | 10.9 | 6.7% | 4.2 | 2.5% | - | 0.0% |
| Contract Rejection Damages | - | | | | | 0.0% | | 0.0% | | 0.0% |
| Contingent Litigation Liability | - | | | | | 0.0% | | 0.0% | | 0.0% |
| General Unsecured Claims | (163.5) | 163.5 | 163.5 | 163.5 | 10.9 | 6.7% | 4.2 | 2.5% | - | 0.0% |
| **Total Claims** | $ (167.2) | $ 167.2 | $ 167.2 | $ 167.2 | $ 14.7 | 8.8% | $ 7.9 | 4.7% | $ 0.6 | 0.4% |

14

#94482661v2

**Purdue Neuroscience Company**

($ in millions)

| Assets | Book Value | Estimated Recovery Rate | | | Estimated Recovery Value | | |
|---|---|---|---|---|---|---|---|
| | | High | Mid | Low | High | Mid | Low |
| **Current Assets** | | | | | | | |
| Cash and Cash Equivalents (Net) | $ - | 0.0% | 0.0% | 0.0% | $ - | $ - | $ - |
| Accounts Receivable (Net) | - | 0.0% | 0.0% | 0.0% | - | - | - |
| Inventories, Net | - | 0.0% | 0.0% | 0.0% | - | - | - |
| Prepaid Expenses & Other Current Assets | - | 0.0% | 0.0% | 0.0% | - | - | - |
| Restricted Cash | - | 0.0% | 0.0% | 0.0% | - | - | - |
| **Total Current Assets** | $ - | | | | $ - | $ - | $ - |
| | | | | | | | |
| **Non-Current Assets** | | | | | | | |
| Property and Equipment, net | $ - | 0.0% | 0.0% | 0.0% | $ - | $ - | $ - |
| Investments at Cost | - | 25.0% | 12.5% | 0.0% | - | - | - |
| Investments in Associated Companies | - | 0.0% | 0.0% | 0.0% | - | - | - |
| Restricted Cash - Long-Term | - | 0.0% | 0.0% | 0.0% | - | - | - |
| Intangible Assets, Net | - | 0.0% | 0.0% | 0.0% | - | - | - |
| Other Assets | - | 0.0% | 0.0% | 0.0% | - | - | - |
| **Total Assets** | $ - | 0.0% | 0.0% | 0.0% | $ - | $ - | $ - |
| | | | | | | | |
| **Liquidation Proceeds** | | | | | | | |
| Liquidation Proceeds from Assets | | | | | $ - | $ - | $ - |
| Sackler Settlement | | | | | - | - | - |
| **Total Liquidation Proceeds** | | | | | $ - | $ - | $ - |
| | | | | | | | |
| **Liquidation Costs** | | | | | | | |
| Chapter 7 Trustee Fees | | -2.0% | -2.5% | -3.0% | $ - | $ - | $ - |
| Chapter 7 Professional Fees | | | | | - | - | - |
| Transaction Costs/Advisory Fees | | -2.0% | -2.5% | -3.0% | - | - | - |
| Wind Down Costs | | | | | - | - | - |
| Severance | | | | | - | - | - |
| **Total Liquidation Costs** | | | | | $ - | $ - | $ - |
| | | | | | | | |
| **Funding Required from Purdue Pharma L.P.** | | | | | $ - | $ - | $ - |
| **Excess Proceeds Available to Purdue Pharma L.P.** | | | | | $ - | $ - | $ - |
| | | | | | | | |
| **Net Liquidation Proceeds Available to Creditors** | | | | | $ - | $ - | $ - |

| Creditor Class | | Estimated Claim Allowed | | | | | | Estimated Recovery by Class of Claims ($)/(%) | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | High | | Mid | | Low | | High | | Mid | | Low | |
| DOJ - Criminal Forfeiture | $ - | $ - | | $ - | | $ - | | $ - | 0.0% | $ - | 0.0% | $ - | 0.0% |
| Administrative Expense Claims | $ (0.0) | $ 0.0 | | $ 0.0 | | $ 0.0 | | $ - | 0.0% | $ - | 0.0% | $ - | 0.0% |
| Priority Claims | $ - | $ - | | $ - | | $ - | | $ - | 0.0% | $ - | 0.0% | $ - | 0.0% |
| LSTC - Prepetition Accounts Payable | - | - | | - | | - | | - | 0.0% | - | 0.0% | - | 0.0% |
| PBGC - Termination | (163.0) | 163.0 | | 163.0 | | 163.0 | | - | 0.0% | - | 0.0% | - | 0.0% |
| Contract Rejection Damages | - | - | | - | | - | | - | 0.0% | - | 0.0% | - | 0.0% |
| Contingent Litigation Liability | - | - | | - | | - | | - | 0.0% | - | 0.0% | - | 0.0% |
| General Unsecured Claims | $ (163.0) | $ 163.0 | | $ 163.0 | | $ 163.0 | | $ - | 0.0% | $ - | 0.0% | $ - | 0.0% |
| **Total Claims** | $ (163.0) | $ 163.0 | | $ 163.0 | | $ 163.0 | | $ - | 0.0% | $ - | 0.0% | $ - | 0.0% |

15

#9448266lv2

**Purdue Pharma of Puerto Rico**

($ in millions)

| Assets | Book Value | Estimated Recovery Rate | | | Estimated Recovery Value | | |
|---|---|---|---|---|---|---|---|
| | | High | Mid | Low | High | Mid | Low |
| **Current Assets** | | | | | | | |
| Cash and Cash Equivalents (Net) | $    - | 0.0% | 0.0% | 0.0% | $    - | $    - | $    - |
| Accounts Receivable (Net) | - | 0.0% | 0.0% | 0.0% | - | - | - |
| Inventories, Net | - | 0.0% | 0.0% | 0.0% | - | - | - |
| Prepaid Expenses & Other Current Assets | 0.0 | 6.0% | 4.5% | 3.0% | 0.0 | 0.0 | 0.0 |
| Restricted Cash | - | 0.0% | 0.0% | 0.0% | - | - | - |
| **Total Current Assets** | $    0.0 | 0.0% | 0.0% | 0.0% | $    0.0 | $    0.0 | $    0.0 |
| | | | | | | | |
| **Non-Current Assets** | | | | | | | |
| Property and Equipment, net | $    - | 0.0% | 0.0% | 0.0% | $    - | $    - | $    - |
| Investments at Cost | - | 25.0% | 12.5% | 0.0% | - | - | - |
| Investments in Associated Companies | - | 0.0% | 0.0% | 0.0% | - | - | - |
| Restricted Cash - Long-Term | - | 0.0% | 0.0% | 0.0% | - | - | - |
| Intangible Assets, Net | - | 0.0% | 0.0% | 0.0% | - | - | - |
| Other Assets | - | 0.0% | 0.0% | 0.0% | - | - | - |
| **Total Assets** | $    0.0 | 6.0% | 4.5% | 3.0% | $    0.0 | $    0.0 | $    0.0 |
| | | | | | | | |
| **Liquidation Proceeds** | | | | | | | |
| Liquidation Proceeds from Assets | | | | | $    0.0 | $    0.0 | $    0.0 |
| Sackler Settlement | | | | | - | - | - |
| **Total Liquidation Proceeds** | | | | | $    0.0 | $    0.0 | $    0.0 |
| | | | | | | | |
| **Liquidation Costs** | | | | | | | |
| Chapter 7 Trustee Fees | | -2.0% | -2.5% | -3.0% | $    (0.0) | $    (0.0) | $    (0.0) |
| Chapter 7 Professional Fees | | | | | (0.0) | (0.0) | (0.0) |
| Transaction Costs/Advisory Fees | | -2.0% | -2.5% | -3.0% | - | - | - |
| Wind Down Costs | | | | | - | - | - |
| Severance | | | | | - | - | - |
| **Total Liquidation Costs** | | | | | $    (0.0) | $    (0.0) | $    (0.0) |
| | | | | | | | |
| **Funding Required from Purdue Pharma L.P.** | | | | | $    - | $    - | $    - |
| **Excess Proceeds Available to Purdue Pharma L.P.** | | | | | $    - | $    - | $    - |
| | | | | | | | |
| **Net Liquidation Proceeds Available to Creditors** | | | | | $    0.0 | $    0.0 | $    0.0 |

| Creditor Class | Book Value | Estimated Claim Allowed | | | Estimated Recovery by Class of Claims ($)/(%) | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| | | High | Mid | Low | High | | Mid | | Low | |
| DOJ - Criminal Forfeiture | $    - | $    - | $    - | $    - | $    - | 0.0% | $    - | 0.0% | $    - | 0.0% |
| Administrative Expense Claims | $    (0.0) | $    0.0 | $    0.0 | $    0.0 | $    0.0 | 79.0% | $    0.0 | 44.6% | $    0.0 | 7.2% |
| Priority Claims | $    - | $    - | $    - | $    - | $    - | 0.0% | $    - | 0.0% | $    - | 0.0% |
| LSTC - Prepetition Accounts Payable | (0.0) | 0.0 | 0.0 | 0.0 | - | 0.0% | - | 0.0% | - | 0.0% |
| PBGC - Termination | (163.0) | 163.0 | 163.0 | 163.0 | - | 0.0% | - | 0.0% | - | 0.0% |
| Contract Rejection Damages | - | - | - | - | - | 0.0% | - | 0.0% | - | 0.0% |
| Contingent Litigation Liability | - | - | - | - | - | 0.0% | - | 0.0% | - | 0.0% |
| General Unsecured Claims | (163.0) | 163.0 | 163.0 | 163.0 | - | 0.0% | - | 0.0% | - | 0.0% |
| **Total Claims** | $    (163.0) | $    163.0 | $    163.0 | $    163.0 | $    0.0 | 0.0% | $    0.0 | 0.0% | $    0.0 | 0.0% |

16

#9448266lv2

**Purdue Transdermal Technologies L.P.**

($ in millions)

| Assets | Book Value | Estimated Recovery Rate | | | Estimated Recovery Value | | |
|---|---|---|---|---|---|---|---|
| | | High | Mid | Low | High | Mid | Low |
| **Current Assets** | | | | | | | |
| Cash and Cash Equivalents (Net) | $    - | 0.0% | 0.0% | 0.0% | $    - | $    - | $    - |
| Accounts Receivable (Net) | (0.8) | -18.4% | -15.3% | -12.3% | 0.1 | 0.1 | 0.1 |
| Inventories, Net | 1.6 | 1552.5% | 1164.4% | 776.2% | 24.5 | 18.4 | 12.3 |
| Prepaid Expenses & Other Current Assets | 1.7 | 6.0% | 4.5% | 3.0% | 0.1 | 0.1 | 0.1 |
| Restricted Cash | - | 0.0% | 0.0% | 0.0% | - | - | - |
| **Total Current Assets** | $    2.5 | | | | $    24.8 | $    18.6 | $    12.4 |
| **Non-Current Assets** | | | | | | | |
| Property and Equipment, net | $    - | 0.0% | 0.0% | 0.0% | $    - | $    - | $    - |
| Investments at Cost | - | 25.0% | 12.5% | 0.0% | - | - | - |
| Investments in Associated Companies | - | 0.0% | 0.0% | 0.0% | - | - | - |
| Restricted Cash - Long-Term | - | 0.0% | 0.0% | 0.0% | - | - | - |
| Intangible Assets, Net | - | 0.0% | 0.0% | 0.0% | - | - | - |
| Other Assets | - | 0.0% | 0.0% | 0.0% | - | - | - |
| **Total Assets** | $    2.5 | 984.6% | 738.9% | 493.3% | $    24.8 | $    18.6 | $    12.4 |
| **Liquidation Proceeds** | | | | | | | |
| Liquidation Proceeds from Assets | | | | | $    24.8 | $    18.6 | $    12.4 |
| Sackler Settlement | | | | | - | - | - |
| **Total Liquidation Proceeds** | | | | | $    24.8 | $    18.6 | $    12.4 |
| **Liquidation Costs** | | | | | | | |
| Chapter 7 Trustee Fees | | -2.0% | -2.5% | -3.0% | $    (0.5) | $    (0.5) | $    (0.4) |
| Chapter 7 Professional Fees | | | | | (3.3) | (6.2) | (10.1) |
| Transaction Costs/Advisory Fees | | -2.0% | -2.5% | -3.0% | - | - | - |
| Wind Down Costs | | | | | - | - | - |
| Severance | | | | | - | - | - |
| **Total Liquidation Costs** | | | | | $    (3.8) | $    (6.7) | $    (10.5) |
| **Funding Required from Purdue Pharma L.P.** | | | | | $    - | $    - | $    - |
| **Excess Proceeds Available to Purdue Pharma L.P.** | | | | | $    - | $    - | $    - |
| **Net Liquidation Proceeds Available to Creditors** | | | | | $    21.0 | $    11.9 | $    1.9 |

| Creditor Class | Book Value | Estimated Claim Allowed | | | Estimated Recovery by Class of Claims ($)/(%) | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| | | High | Mid | Low | High | | Mid | | Low | |
| DOJ - Criminal Forfeiture | $    - | $    - | $    - | $    - | $    - | 0.0% | $    - | 0.0% | $    - | 0.0% |
| Administrative Expense Claims | $    (1.6) | $    1.6 | $    1.6 | $    1.6 | $    1.6 | 100.0% | $    1.6 | 100.0% | $    1.6 | 100.0% |
| Priority Claims | $    - | $    - | $    - | $    - | $    - | 0.0% | $    - | 0.0% | $    - | 0.0% |
| LSTC - Prepetition Accounts Payable | (1.2) | 1.2 | 1.2 | 1.2 | 0.1 | 11.8% | 0.1 | 6.2% | 0.0 | 0.2% |
| PBGC - Termination | (163.0) | 163.0 | 163.0 | 163.0 | 19.2 | 11.8% | 10.2 | 6.2% | 0.3 | 0.2% |
| Contract Rejection Damages | - | | | | - | 0.0% | - | 0.0% | - | 0.0% |
| Contingent Litigation Liability | - | | | | - | 0.0% | - | 0.0% | - | 0.0% |
| General Unsecured Claims | (164.2) | 164.2 | 164.2 | 164.2 | 19.4 | 11.8% | 10.2 | 6.2% | 0.3 | 0.2% |
| **Total Claims** | $    (165.8) | $    165.8 | $    165.8 | $    165.8 | $    21.0 | 12.7% | $    11.9 | 7.2% | $    1.9 | 1.2% |

17

#94482661v2

**Imbrium Therapeutics L.P.**

($ in millions)

| Assets | Book Value | Estimated Recovery Rate High | Estimated Recovery Rate Mid | Estimated Recovery Rate Low | Estimated Recovery Value High | Estimated Recovery Value Mid | Estimated Recovery Value Low |
|---|---|---|---|---|---|---|---|
| **Current Assets** | | | | | | | |
| Cash and Cash Equivalents (Net) | $  - | 0.0% | 0.0% | 0.0% | $  - | $  - | $  - |
| Accounts Receivable (Net) | 0.5 | 75.0% | 62.5% | 50.0% | 0.4 | 0.3 | 0.2 |
| Inventories, Net | - | 0.0% | 0.0% | 0.0% | - | - | - |
| Prepaid Expenses & Other Current Assets | - | 0.0% | 0.0% | 0.0% | - | - | - |
| Restricted Cash | - | 0.0% | 0.0% | 0.0% | - | - | - |
| **Total Current Assets** | $  0.5 | | | | $  0.4 | $  0.3 | $  0.2 |
| **Non-Current Assets** | | | | | | | |
| Property and Equipment, net | $  0.5 | 10.2% | 6.8% | 3.5% | $  0.1 | $  0.0 | $  0.0 |
| Investments at Cost | - | 25.0% | 12.5% | 0.0% | - | - | - |
| Investments in Associated Companies | - | 0.0% | 0.0% | 0.0% | - | - | - |
| Restricted Cash - Long-Term | - | 0.0% | 0.0% | 0.0% | - | - | - |
| Intangible Assets, Net | - | 0.0% | 0.0% | 0.0% | - | - | - |
| Other Assets | - | 0.0% | 0.0% | 0.0% | - | - | - |
| **Total Assets** | $  1.0 | 41.5% | 33.7% | 26.0% | $  0.4 | $  0.3 | $  0.3 |
| **Liquidation Proceeds** | | | | | | | |
| Liquidation Proceeds from Assets | | | | | $  0.4 | $  0.3 | $  0.3 |
| Sackler Settlement | | | | | - | - | - |
| **Total Liquidation Proceeds** | | | | | $  0.4 | $  0.3 | $  0.3 |
| **Liquidation Costs** | | | | | | | |
| Chapter 7 Trustee Fees | | -2.0% | -2.5% | -3.0% | $  (0.0) | $  (0.0) | $  (0.0) |
| Chapter 7 Professional Fees | | | | | (0.1) | (0.1) | (0.2) |
| Transaction Costs/Advisory Fees | | -2.0% | -2.5% | -3.0% | (0.0) | (0.0) | (0.0) |
| Wind Down Costs | | | | | (1.3) | (2.1) | (3.0) |
| Severance | | | | | (0.3) | (0.3) | (0.3) |
| **Total Liquidation Costs** | | | | | $  (1.7) | $  (2.5) | $  (3.5) |
| **Funding Required from Purdue Pharma L.P.** | | | | | $  1.3 | $  2.2 | $  3.3 |
| **Excess Proceeds Available to Purdue Pharma L.P.** | | | | | $  - | $  - | $  - |
| **Net Liquidation Proceeds Available to Creditors** | | | | | $  - | $  - | $  - |

| Creditor Class | Book Value | Estimated Claim Allowed High | | Estimated Claim Allowed Mid | | Estimated Claim Allowed Low | | Estimated Recovery by Class of Claims ($)/(%) High | | Mid | | Low | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| DOJ - Criminal Forfeiture | $  - | $ | - | $ | - | $ | - | $  - | 0.0% | $  - | 0.0% | $  - | 0.0% |
| Administrative Expense Claims | $  (4.3) | $ | 4.3 | $ | 4.3 | $ | 4.3 | $  - | 0.0% | $  - | 0.0% | $  - | 0.0% |
| Priority Claims | $  - | $ | - | $ | - | $ | - | $  - | 0.0% | $  - | 0.0% | $  - | 0.0% |
| LSTC - Prepetition Accounts Payable | (0.2) | | 0.2 | | 0.2 | | 0.2 | | 0.0% | | 0.0% | | 0.0% |
| PBGC - Termination | (163.0) | | 163.0 | | 163.0 | | 163.0 | | 0.0% | | 0.0% | | 0.0% |
| Contract Rejection Damages | - | | - | | - | | - | | 0.0% | | 0.0% | | 0.0% |
| Contingent Litigation Liability | - | | - | | - | | - | | 0.0% | | 0.0% | | 0.0% |
| General Unsecured Claims | (163.2) | $ | 163.2 | $ | 163.2 | $ | 163.2 | $  - | 0.0% | $  - | 0.0% | $  - | 0.0% |
| **Total Claims** | $  (167.5) | $ | 167.5 | $ | 167.5 | $ | 167.5 | $  - | 0.0% | $  - | 0.0% | $  - | 0.0% |

#9448266lv2

**Greenfield Bio Ventures L.P.**

($ in millions)

| Assets | Book Value | Estimated Recovery Rate High | Mid | Low | Estimated Recovery Value High | Mid | Low |
|---|---|---|---|---|---|---|---|
| **Current Assets** | | | | | | | |
| Cash and Cash Equivalents (Net) | $  - | 0.0% | 0.0% | 0.0% | $  - | $  - | $  - |
| Accounts Receivable (Net) | - | 0.0% | 0.0% | 0.0% | - | - | - |
| Inventories, Net | - | 0.0% | 0.0% | 0.0% | - | - | - |
| Prepaid Expenses & Other Current Assets | - | 0.0% | 0.0% | 0.0% | - | - | - |
| Restricted Cash | - | 0.0% | 0.0% | 0.0% | - | - | - |
| **Total Current Assets** | $  - | | | | $  - | $  - | $  - |
| | | | | | | | |
| **Non-Current Assets** | | | | | | | |
| Property and Equipment, net | $  - | 0.0% | 0.0% | 0.0% | $  - | $  - | $  - |
| Investments at Cost | - | 25.0% | 12.5% | 0.0% | - | - | - |
| Investments in Associated Companies | - | 0.0% | 0.0% | 0.0% | - | - | - |
| Restricted Cash - Long-Term | - | 0.0% | 0.0% | 0.0% | - | - | - |
| Intangible Assets, Net | - | 0.0% | 0.0% | 0.0% | - | - | - |
| Other Assets | - | 0.0% | 0.0% | 0.0% | - | - | - |
| **Total Assets** | $  - | 0.0% | 0.0% | 0.0% | $  - | $  - | $  - |
| | | | | | | | |
| **Liquidation Proceeds** | | | | | | | |
| Liquidation Proceeds from Assets | | | | | $  - | $  - | $  - |
| Sackler Settlement | | | | | - | - | - |
| **Total Liquidation Proceeds** | | | | | $  - | $  - | $  - |
| | | | | | | | |
| **Liquidation Costs** | | | | | | | |
| Chapter 7 Trustee Fees | | -2.0% | -2.5% | -3.0% | $  - | $  - | $  - |
| Chapter 7 Professional Fees | | | | | - | - | - |
| Transaction Costs/Advisory Fees | | -2.0% | -2.5% | -3.0% | - | - | - |
| Wind Down Costs | | | | | (1.3) | (2.1) | (3.1) |
| Severance | | | | | - | - | - |
| **Total Liquidation Costs** | | | | | $ (1.3) | $ (2.1) | $ (3.1) |
| | | | | | | | |
| **Funding Required from Purdue Pharma L.P.** | | | | | $ 1.3 | $ 2.1 | $ 3.1 |
| **Excess Proceeds Available to Purdue Pharma L.P.** | | | | | $  - | $  - | $  - |
| | | | | | | | |
| **Net Liquidation Proceeds Available to Creditors** | | | | | $  - | $  - | $  - |

| Creditor Class | | Estimated Claim Allowed High | Mid | Low | Estimated Recovery by Class of Claims ($)/(%) High | | Mid | | Low | |
|---|---|---|---|---|---|---|---|---|---|---|
| DOJ - Criminal Forfeiture | $  - | $  - | $  - | $  - | $  - | 0.0% | $  - | 0.0% | $  - | 0.0% |
| Administrative Expense Claims | $  - | $  - | $  - | $  - | $  - | 0.0% | $  - | 0.0% | $  - | 0.0% |
| Priority Claims | $  - | $  - | $  - | $  - | $  - | 0.0% | $  - | 0.0% | $  - | 0.0% |
| LSTC - Prepetition Accounts Payable | - | - | - | - | - | 0.0% | - | 0.0% | - | 0.0% |
| PBGC - Termination | (163.0) | 163.0 | 163.0 | 163.0 | - | 0.0% | - | 0.0% | - | 0.0% |
| Contract Rejection Damages | - | - | - | - | - | 0.0% | - | 0.0% | - | 0.0% |
| Contingent Litigation Liability | - | - | - | - | - | 0.0% | - | 0.0% | - | 0.0% |
| General Unsecured Claims | (163.0) | 163.0 | 163.0 | 163.0 | - | 0.0% | - | 0.0% | - | 0.0% |
| **Total Claims** | $ (163.0) | $ 163.0 | $ 163.0 | $ 163.0 | $  - | 0.0% | $  - | 0.0% | $  - | 0.0% |

19

#9448266lv2

**Adlon Therapeutics L.P.**

($ in millions)

| Assets | Book Value | Estimated Recovery Rate | | | Estimated Recovery Value | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| | | High | Mid | Low | High | | Mid | | Low | |
| **Current Assets** | | | | | | | | | | |
| Cash and Cash Equivalents (Net) | $ - | 0.0% | 0.0% | 0.0% | $ - | | $ - | | $ - | |
| Accounts Receivable (Net) | 2.2 | 75.0% | 62.5% | 50.0% | 1.7 | | 1.4 | | 1.1 | |
| Inventories, Net | 0.7 | 76.6% | 57.4% | 38.3% | 0.6 | | 0.4 | | 0.3 | |
| Prepaid Expenses & Other Current Assets | 5.5 | 6.0% | 4.5% | 3.0% | 0.3 | | 0.2 | | 0.2 | |
| Restricted Cash | - | 0.0% | 0.0% | 0.0% | - | | - | | - | |
| **Total Current Assets** | $ 8.5 | 0.0% | 0.0% | 0.0% | $ 2.6 | | $ 2.1 | | $ 1.6 | |
| **Non-Current Assets** | | | | | | | | | | |
| Property and Equipment, net | $ - | 0.0% | 0.0% | 0.0% | $ - | | $ - | | $ - | |
| Investments at Cost | - | 25.0% | 12.5% | 0.0% | - | | - | | - | |
| Investments in Associated Companies | - | 0.0% | 0.0% | 0.0% | - | | - | | - | |
| Restricted Cash - Long-Term | - | 0.0% | 0.0% | 0.0% | - | | - | | - | |
| Intangible Assets, Net | 8.0 | 56.5% | 28.2% | 0.0% | 4.5 | | 2.3 | | - | |
| Other Assets | - | 0.0% | 0.0% | 0.0% | - | | - | | - | |
| **Total Assets** | $ 16.5 | 42.9% | 26.2% | 9.5% | $ 7.1 | | $ 4.3 | | $ 1.6 | |
| **Liquidation Proceeds** | | | | | | | | | | |
| Liquidation Proceeds from Assets | | | | | $ 7.1 | | $ 4.3 | | $ 1.6 | |
| Sackler Settlement | | | | | - | | - | | - | |
| **Total Liquidation Proceeds** | | | | | $ 7.1 | | $ 4.3 | | $ 1.6 | |
| **Liquidation Costs** | | | | | | | | | | |
| Chapter 7 Trustee Fees | | -2.0% | -2.5% | -3.0% | $ (0.1) | | $ (0.1) | | $ (0.0) | |
| Chapter 7 Professional Fees | | | | | (0.4) | | (1.4) | | (2.9) | |
| Transaction Costs/Advisory Fees | | -2.0% | -2.5% | -3.0% | (0.1) | | (0.1) | | - | |
| Wind Down Costs | | | | | (1.4) | | (2.1) | | (3.1) | |
| Severance | | | | | - | | - | | - | |
| **Total Liquidation Costs** | | | | | $ (2.0) | | $ (3.7) | | $ (6.0) | |
| **Funding Required from Purdue Pharma L.P.** | | | | | $ - | | $ - | | $ 4.5 | |
| **Excess Proceeds Available to Purdue Pharma L.P.** | | | | | $ - | | $ - | | $ - | |
| **Net Liquidation Proceeds Available to Creditors** | | | | | $ 5.1 | | $ 0.6 | | $ - | |

| Creditor Class | Book Value | Estimated Claim Allowed | | | | | | Estimated Recovery by Class of Claims ($)/(%) | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | High | | Mid | | Low | | High | | Mid | | Low | |
| DOJ - Criminal Forfeiture | $ - | $ - | | $ - | | $ - | | $ - | 0.0% | $ - | 0.0% | $ - | 0.0% |
| Administrative Expense Claims | $ (3.1) | $ 3.1 | | $ 3.1 | | $ 3.1 | | $ 3.1 | 100.0% | 0.6 | 18.5% | $ - | 0.0% |
| Priority Claims | $ - | $ - | | $ - | | $ - | | $ - | 0.0% | $ - | 0.0% | $ - | 0.0% |
| LSTC - Prepetition Accounts Payable | (0.4) | 0.4 | | 0.4 | | 0.4 | | 0.0 | 1.2% | - | 0.0% | - | 0.0% |
| PBGC - Termination | (163.0) | 163.0 | | 163.0 | | 163.0 | | 2.0 | 1.2% | - | 0.0% | - | 0.0% |
| Contract Rejection Damages | - | - | | - | | - | | - | | - | 0.0% | - | 0.0% |
| Contingent Litigation Liability | - | - | | - | | - | | - | | - | 0.0% | - | 0.0% |
| General Unsecured Claims | $ (163.4) | $ 163.4 | | $ 163.4 | | $ 163.4 | | $ 2.0 | 1.2% | $ - | 0.0% | $ - | 0.0% |
| **Total Claims** | $ (166.5) | $ 166.5 | | $ 166.5 | | $ 166.5 | | $ 5.1 | 3.0% | $ 0.6 | 0.3% | $ - | 0.0% |

20

#9448266lv2

**Purdue Pharma Inc.**

($ in millions)

| Assets | Book Value | Estimated Recovery Rate | | | Estimated Recovery Value | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| | | High | Mid | Low | High | | Mid | | Low | |
| **Current Assets** | | | | | | | | | | |
| Cash and Cash Equivalents (Net) | $ - | 0.0% | 0.0% | 0.0% | $ - | | $ - | | $ - | |
| Accounts Receivable (Net) | - | 0.0% | 0.0% | 0.0% | - | | - | | - | |
| Inventories, Net | - | 0.0% | 0.0% | 0.0% | - | | - | | - | |
| Prepaid Expenses & Other Current Assets | 0.4 | 6.0% | 4.5% | 3.0% | 0.0 | | 0.0 | | 0.0 | |
| Restricted Cash | - | 0.0% | 0.0% | 0.0% | - | | - | | - | |
| **Total Current Assets** | $ 0.4 | 0.0% | 0.0% | 0.0% | $ 0.0 | | $ 0.0 | | $ 0.0 | |
| | | | | | | | | | | |
| **Non-Current Assets** | | | | | | | | | | |
| Property and Equipment, net | $ - | 0.0% | 0.0% | 0.0% | $ - | | $ - | | $ - | |
| Investments at Cost | - | 25.0% | 12.5% | 0.0% | - | | - | | - | |
| Investments in Associated Companies | 9.7 | 0.0% | 0.0% | 0.0% | - | | - | | - | |
| Restricted Cash - Long-Term | - | 0.0% | 0.0% | 0.0% | - | | - | | - | |
| Intangible Assets, Net | - | 0.0% | 0.0% | 0.0% | - | | - | | - | |
| Other Assets | - | 0.0% | 0.0% | 0.0% | - | | - | | - | |
| **Total Assets** | $ 10.1 | 0.2% | 0.2% | 0.1% | $ 0.0 | | $ 0.0 | | $ 0.0 | |
| | | | | | | | | | | |
| **Liquidation Proceeds** | | | | | | | | | | |
| Liquidation Proceeds from Assets | | | | | $ 0.0 | | $ 0.0 | | $ 0.0 | |
| Sackler Settlement | | | | | - | | - | | - | |
| **Total Liquidation Proceeds** | | | | | $ 0.0 | | $ 0.0 | | $ 0.0 | |
| | | | | | | | | | | |
| **Liquidation Costs** | | | | | | | | | | |
| Chapter 7 Trustee Fees | | -2.0% | -2.5% | -3.0% | $ (0.0) | | $ (0.0) | | $ (0.0) | |
| Chapter 7 Professional Fees | | | | | (0.0) | | (0.0) | | (0.0) | |
| Transaction Costs/Advisory Fees | | -2.0% | -2.5% | -3.0% | - | | - | | - | |
| Wind Down Costs | | | | | - | | - | | - | |
| Severance | | | | | - | | - | | - | |
| **Total Liquidation Costs** | | | | | $ (0.0) | | $ (0.0) | | $ (0.0) | |
| | | | | | | | | | | |
| **Funding Required from Purdue Pharma L.P.** | | | | | $ - | | $ - | | $ - | |
| **Excess Proceeds Available to Purdue Pharma L.P.** | | | | | $ - | | $ - | | $ - | |
| | | | | | | | | | | |
| **Net Liquidation Proceeds Available to Creditors** | | | | | $ 0.0 | | $ 0.0 | | $ 0.0 | |

| Creditor Class | Book Value | Estimated Claim Allowed | | | | | | Estimated Recovery by Class of Claims ($)/(%) | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | High | | Mid | | Low | | High | | Mid | | Low | |
| DOJ - Criminal Forfeiture | $ - | $ - | | $ - | | $ - | | $ - | 0.0% | $ - | 0.0% | $ - | 0.0% |
| Administrative Expense Claims | $ - | $ - | | $ - | | $ - | | $ - | 0.0% | $ - | 0.0% | $ - | 0.0% |
| Priority Claims | $ (0.0) | $ 0.0 | | $ 0.0 | | $ 0.0 | | $ 0.0 | 69.0% | $ 0.0 | 39.0% | $ 0.0 | 6.3% |
| LSTC - Prepetition Accounts Payable | (0.2) | 0.2 | | 0.2 | | 0.2 | | - | 0.0% | - | 0.0% | - | 0.0% |
| PBGC - Termination | (163.0) | 163.0 | | 163.0 | | 163.0 | | - | 0.0% | - | 0.0% | - | 0.0% |
| Contract Rejection Damages | - | | | | | | | - | 0.0% | - | 0.0% | - | 0.0% |
| Contingent Litigation Liability | - | | | | | | | - | 0.0% | - | 0.0% | - | 0.0% |
| General Unsecured Claims | $ (163.2) | $ 163.2 | | $ 163.2 | | $ 163.2 | | $ - | 0.0% | $ - | 0.0% | $ - | 0.0% |
| **Total Claims** | $ (163.2) | $ 163.2 | | $ 163.2 | | $ 163.2 | | $ 0.0 | 0.0% | $ 0.0 | 0.0% | $ 0.0 | 0.0% |

21

**Purdue Pharmaceutical Products L.P.**

($ in millions)

| Assets | Book Value | Estimated Recovery Rate High | Mid | Low | Estimated Recovery Value High | | Mid | | Low | |
|---|---|---|---|---|---|---|---|---|---|---|
| **Current Assets** | | | | | | | | | | |
| Cash and Cash Equivalents (Net) | $ - | 0.0% | 0.0% | 0.0% | $ - | | $ - | | $ - | |
| Accounts Receivable (Net) | 0.1 | 75.0% | 62.5% | 50.0% | | 0.1 | | 0.1 | | 0.1 |
| Inventories, Net | - | 0.0% | 0.0% | 0.0% | | - | | - | | - |
| Prepaid Expenses & Other Current Assets | - | 0.0% | 0.0% | 0.0% | | - | | - | | - |
| Restricted Cash | - | 0.0% | 0.0% | 0.0% | | - | | - | | - |
| **Total Current Assets** | $ 0.1 | | | | $ | 0.1 | $ | 0.1 | $ | 0.1 |
| **Non-Current Assets** | | | | | | | | | | |
| Property and Equipment, net | $ - | 0.0% | 0.0% | 0.0% | $ - | | $ - | | $ - | |
| Investments at Cost | - | 25.0% | 12.5% | 0.0% | | - | | - | | - |
| Investments in Associated Companies | - | 0.0% | 0.0% | 0.0% | | - | | - | | - |
| Restricted Cash - Long-Term | - | 0.0% | 0.0% | 0.0% | | - | | - | | - |
| Intangible Assets, Net | - | 0.0% | 0.0% | 0.0% | | - | | - | | - |
| Other Assets | - | 0.0% | 0.0% | 0.0% | | - | | - | | - |
| **Total Assets** | $ 0.1 | 75.0% | 62.5% | 50.0% | $ | 0.1 | $ | 0.1 | $ | 0.1 |
| **Liquidation Proceeds** | | | | | | | | | | |
| Liquidation Proceeds from Assets | | | | | $ | 0.1 | $ | 0.1 | $ | 0.1 |
| Sackler Settlement | | | | | | - | | - | | - |
| **Total Liquidation Proceeds** | | | | | $ | 0.1 | $ | 0.1 | $ | 0.1 |
| **Liquidation Costs** | | | | | | | | | | |
| Chapter 7 Trustee Fees | | -2.0% | -2.5% | -3.0% | $ | (0.0) | $ | (0.0) | $ | (0.0) |
| Chapter 7 Professional Fees | | | | | | (0.0) | | (0.0) | | (0.0) |
| Transaction Costs/Advisory Fees | | -2.0% | -2.5% | -3.0% | | (0.0) | | (0.0) | | (0.0) |
| Wind Down Costs | | | | | | - | | - | | - |
| Severance | | | | | | - | | - | | - |
| **Total Liquidation Costs** | | | | | $ | (0.0) | $ | (0.0) | $ | (0.1) |
| **Funding Required from Purdue Pharma L.P.** | | | | | $ | - | $ | - | $ | - |
| **Excess Proceeds Available to Purdue Pharma L.P.** | | | | | $ | - | $ | - | $ | - |
| **Net Liquidation Proceeds Available to Creditors** | | | | | $ | 0.1 | $ | 0.0 | $ | 0.0 |

| Creditor Class | Book Value | Estimated Claim Allowed High | | Mid | | Low | | Estimated Recovery by Class of Claims ($)/(%) High | | | Mid | | | Low | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| DOJ - Criminal Forfeiture | $ - | $ - | | $ - | | $ - | | $ - | | 0.0% | $ - | | 0.0% | $ - | | 0.0% |
| Administrative Expense Claims | $ (4.6) | $ 4.6 | | $ 4.6 | | $ 4.6 | | $ 0.1 | | 1.5% | $ 0.0 | | 0.9% | $ 0.0 | | 0.2% |
| Priority Claims | $ (0.0) | $ 0.0 | | $ 0.0 | | $ 0.0 | | $ - | | 0.0% | $ - | | 0.0% | $ - | | 0.0% |
| LSTC - Prepetition Accounts Payable | (0.0) | 0.0 | | 0.0 | | 0.0 | | | | 0.0% | | | 0.0% | | | 0.0% |
| PBGC - Termination | (163.0) | 163.0 | | 163.0 | | 163.0 | | | | 0.0% | | | 0.0% | | | 0.0% |
| Contract Rejection Damages | - | - | | - | | - | | | | 0.0% | | | 0.0% | | | 0.0% |
| Contingent Litigation Liability | - | | | | | | | | | 0.0% | | | 0.0% | | | 0.0% |
| General Unsecured Claims | $ (163.0) | $ 163.0 | | $ 163.0 | | $ 163.0 | | $ - | | 0.0% | $ - | | 0.0% | $ - | | 0.0% |
| **Total Claims** | $ (167.6) | $ 167.6 | | $ 167.6 | | $ 167.6 | | $ 0.1 | | 0.0% | $ 0.0 | | 0.0% | $ 0.0 | | 0.0% |

22

#9448266lv2

**Purdue Pharma Manufacturing L.P.**

($ in millions)

| Assets | Book Value | Estimated Recovery Rate | | | Estimated Recovery Value | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| | | High | Mid | Low | High | | Mid | | Low | |
| **Current Assets** | | | | | | | | | | |
| Cash and Cash Equivalents (Net) | $ - | 0.0% | 0.0% | 0.0% | $ - | | $ - | | $ - | |
| Accounts Receivable (Net) | - | 0.0% | 0.0% | 0.0% | - | | - | | - | |
| Inventories, Net | - | 0.0% | 0.0% | 0.0% | - | | - | | - | |
| Prepaid Expenses & Other Current Assets | 1.0 | 6.0% | 4.5% | 3.0% | 0.1 | | 0.0 | | 0.0 | |
| Restricted Cash | - | 0.0% | 0.0% | 0.0% | - | | - | | - | |
| **Total Current Assets** | $ 1.0 | | | | $ 0.1 | | $ 0.0 | | $ 0.0 | |
| | | | | | | | | | | |
| **Non-Current Assets** | | | | | | | | | | |
| Property and Equipment, net | $ - | 0.0% | 0.0% | 0.0% | $ - | | $ - | | $ - | |
| Investments at Cost | - | 25.0% | 12.5% | 0.0% | - | | - | | - | |
| Investments in Associated Companies | - | 0.0% | 0.0% | 0.0% | - | | - | | - | |
| Restricted Cash - Long-Term | - | 0.0% | 0.0% | 0.0% | - | | - | | - | |
| Intangible Assets, Net | - | 0.0% | 0.0% | 0.0% | - | | - | | - | |
| Other Assets | - | 0.0% | 0.0% | 0.0% | - | | - | | - | |
| **Total Assets** | $ 1.0 | 6.0% | 4.5% | 3.0% | $ 0.1 | | $ 0.0 | | $ 0.0 | |
| | | | | | | | | | | |
| **Liquidation Proceeds** | | | | | | | | | | |
| Liquidation Proceeds from Assets | | | | | $ 0.1 | | $ 0.0 | | $ 0.0 | |
| Sackler Settlement | | | | | - | | - | | - | |
| **Total Liquidation Proceeds** | | | | | $ 0.1 | | $ 0.0 | | $ 0.0 | |
| | | | | | | | | | | |
| **Liquidation Costs** | | | | | | | | | | |
| Chapter 7 Trustee Fees | | -2.0% | -2.5% | -3.0% | $ (0.0) | | $ (0.0) | | $ (0.0) | |
| Chapter 7 Professional Fees | | | | | (0.0) | | (0.0) | | (0.0) | |
| Transaction Costs/Advisory Fees | | -2.0% | -2.5% | -3.0% | - | | - | | - | |
| Wind Down Costs | | | | | - | | - | | - | |
| Severance | | | | | - | | - | | - | |
| **Total Liquidation Costs** | | | | | $ (0.0) | | $ (0.0) | | $ (0.0) | |
| | | | | | | | | | | |
| **Funding Required from Purdue Pharma L.P.** | | | | | $ - | | $ - | | $ - | |
| **Excess Proceeds Available to Purdue Pharma L.P.** | | | | | $ - | | $ - | | $ - | |
| | | | | | | | | | | |
| **Net Liquidation Proceeds Available to Creditors** | | | | | $ 0.1 | | $ 0.0 | | $ 0.0 | |

| Creditor Class | | Estimated Claim Allowed | | | | | | Estimated Recovery by Class of Claims ($)/(%) | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | High | | Mid | | Low | | High | | Mid | | Low | | |
| DOJ - Criminal Forfeiture | $ - | $ - | | $ - | | $ - | | $ - | 0.0% | $ - | 0.0% | $ - | 0.0% | |
| Administrative Expense Claims | $ (0.3) | $ 0.3 | | $ 0.3 | | $ 0.3 | | $ 0.1 | 20.4% | $ 0.0 | 11.5% | $ 0.0 | 1.9% | |
| Priority Claims | $ (0.0) | $ 0.0 | | $ 0.0 | | $ 0.0 | | $ - | 0.0% | $ - | 0.0% | $ - | 0.0% | |
| LSTC - Prepetition Accounts Payable | (0.2) | 0.2 | | 0.2 | | 0.2 | | - | 0.0% | - | 0.0% | - | 0.0% | |
| PBGC - Termination | (163.0) | 163.0 | | 163.0 | | 163.0 | | - | 0.0% | - | 0.0% | - | 0.0% | |
| Contract Rejection Damages | - | | | | | | | - | 0.0% | - | 0.0% | - | 0.0% | |
| Contingent Litigation Liability | - | | | | | | | - | 0.0% | - | 0.0% | - | 0.0% | |
| General Unsecured Claims | $ (163.2) | $ 163.2 | | $ 163.2 | | $ 163.2 | | $ - | 0.0% | $ - | 0.0% | $ - | 0.0% | |
| **Total Claims** | $ (163.4) | $ 163.4 | | $ 163.4 | | $ 163.4 | | $ 0.1 | 0.0% | $ 0.0 | 0.0% | $ 0.0 | 0.0% | |

23

#94482661v2

**Seven Seas Hill Corp.**

($ in millions)

| Assets | Book Value | Estimated Recovery Rate | | | Estimated Recovery Value | | |
|---|---|---|---|---|---|---|---|
| | | High | Mid | Low | High | Mid | Low |
| **Current Assets** | | | | | | | |
| Cash and Cash Equivalents (Net) | $ - | 0.0% | 0.0% | 0.0% | $ - | $ - | $ - |
| Accounts Receivable (Net) | - | 0.0% | 0.0% | 0.0% | - | - | - |
| Inventories, Net | - | 0.0% | 0.0% | 0.0% | - | - | - |
| Prepaid Expenses & Other Current Assets | - | 0.0% | 0.0% | 0.0% | - | - | - |
| Restricted Cash | - | 0.0% | 0.0% | 0.0% | - | - | - |
| **Total Current Assets** | $ - | | | | $ - | $ - | $ - |
| | | | | | | | |
| **Non-Current Assets** | | | | | | | |
| Property and Equipment, net | $ - | 0.0% | 0.0% | 0.0% | $ - | $ - | $ - |
| Investments at Cost | - | 0.0% | 0.0% | 0.0% | - | - | - |
| Investments in Associated Companies | - | 0.0% | 0.0% | 0.0% | - | - | - |
| Restricted Cash - Long-Term | - | 0.0% | 0.0% | 0.0% | - | - | - |
| Intangible Assets, Net | - | 0.0% | 0.0% | 0.0% | - | - | - |
| Other Assets | - | 0.0% | 0.0% | 0.0% | - | - | - |
| **Total Assets** | $ - | 0.0% | 0.0% | 0.0% | $ - | $ - | $ - |
| | | | | | | | |
| **Liquidation Proceeds** | | | | | | | |
| Liquidation Proceeds from Assets | | | | | $ - | $ - | $ - |
| Sackler Settlement | | | | | - | - | - |
| **Total Liquidation Proceeds** | | | | | $ - | $ - | $ - |
| | | | | | | | |
| **Liquidation Costs** | | | | | | | |
| Chapter 7 Trustee Fees | | -2.0% | -2.5% | -3.0% | $ - | $ - | $ - |
| Chapter 7 Professional Fees | | | | | - | - | - |
| Transaction Costs/Advisory Fees | | -2.0% | -2.5% | -3.0% | - | - | - |
| Wind Down Costs | | | | | - | - | - |
| Severance | | | | | - | - | - |
| **Total Liquidation Costs** | | | | | $ - | $ - | $ - |
| | | | | | | | |
| **Funding Required from Purdue Pharma L.P.** | | | | | $ - | $ - | $ - |
| **Excess Proceeds Available to Purdue Pharma L.P.** | | | | | $ - | $ - | $ - |
| | | | | | | | |
| **Net Liquidation Proceeds Available to Creditors** | | | | | $ - | $ - | $ - |

| Creditor Class | Book Value | Estimated Claim Allowed | | | Estimated Recovery by Class of Claims ($)/(%) | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| | | High | Mid | Low | High | | Mid | | Low | |
| DOJ - Criminal Forfeiture | $ - | $ - | $ - | $ - | $ - | 0.0% | $ - | 0.0% | $ - | 0.0% |
| Administrative Expense Claims | $ - | $ - | $ - | $ - | $ - | 0.0% | $ - | 0.0% | $ - | 0.0% |
| Priority Claims | $ - | $ - | $ - | $ - | $ - | 0.0% | $ - | 0.0% | $ - | 0.0% |
| LSTC - Prepetition Accounts Payable | - | - | - | - | - | 0.0% | - | 0.0% | - | 0.0% |
| PBGC - Termination | - | - | - | - | - | 0.0% | - | 0.0% | - | 0.0% |
| Contract Rejection Damages | - | - | - | - | - | 0.0% | - | 0.0% | - | 0.0% |
| Contingent Litigation Liability | - | - | - | - | - | 0.0% | - | 0.0% | - | 0.0% |
| General Unsecured Claims | - | $ - | $ - | $ - | $ - | 0.0% | $ - | 0.0% | $ - | 0.0% |
| **Total Claims** | $ - | $ - | $ - | $ - | $ - | | $ - | | $ - | |

#9448266lv2

**Ophir Green Corp.**

($ in millions)

| Assets | Book Value | Estimated Recovery Rate | | | Estimated Recovery Value | | |
|---|---|---|---|---|---|---|---|
| | | High | Mid | Low | High | Mid | Low |
| **Current Assets** | | | | | | | |
| Cash and Cash Equivalents (Net) | $ - | 0.0% | 0.0% | 0.0% | $ - | $ - | $ - |
| Accounts Receivable (Net) | - | 0.0% | 0.0% | 0.0% | - | - | - |
| Inventories, Net | - | 0.0% | 0.0% | 0.0% | - | - | - |
| Prepaid Expenses & Other Current Assets | - | 0.0% | 0.0% | 0.0% | - | - | - |
| Restricted Cash | - | 0.0% | 0.0% | 0.0% | - | - | - |
| **Total Current Assets** | $ - | | | | $ - | $ - | $ - |
| | | | | | | | |
| **Non-Current Assets** | | | | | | | |
| Property and Equipment, net | $ - | 0.0% | 0.0% | 0.0% | $ - | $ - | $ - |
| Investments at Cost | - | 0.0% | 0.0% | 0.0% | - | - | - |
| Investments in Associated Companies | - | 0.0% | 0.0% | 0.0% | - | - | - |
| Restricted Cash - Long-Term | - | 0.0% | 0.0% | 0.0% | - | - | - |
| Intangible Assets, Net | - | 0.0% | 0.0% | 0.0% | - | - | - |
| Other Assets | - | 0.0% | 0.0% | 0.0% | - | - | - |
| **Total Assets** | $ - | 0.0% | 0.0% | 0.0% | $ - | $ - | $ - |
| | | | | | | | |
| **Liquidation Proceeds** | | | | | | | |
| Liquidation Proceeds from Assets | | | | | $ - | $ - | $ - |
| Sackler Settlement | | | | | - | - | - |
| **Total Liquidation Proceeds** | | | | | $ - | $ - | $ - |
| | | | | | | | |
| **Liquidation Costs** | | | | | | | |
| Chapter 7 Trustee Fees | | -2.0% | -2.5% | -3.0% | $ - | $ - | $ - |
| Chapter 7 Professional Fees | | | | | - | - | - |
| Transaction Costs/Advisory Fees | | -2.0% | -2.5% | -3.0% | - | - | - |
| Wind Down Costs | | | | | - | - | - |
| Severance | | | | | - | - | - |
| **Total Liquidation Costs** | | | | | $ - | $ - | $ - |
| | | | | | | | |
| **Funding Required from Purdue Pharma L.P.** | | | | | $ - | $ - | $ - |
| **Excess Proceeds Available to Purdue Pharma L.P.** | | | | | $ - | $ - | $ - |
| | | | | | | | |
| **Net Liquidation Proceeds Available to Creditors** | | | | | $ - | $ - | $ - |

| Creditor Class | Book Value | Estimated Claim Allowed | | | Estimated Recovery by Class of Claims ($)/(%) | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| | | High | Mid | Low | High | | Mid | | Low | |
| DOJ - Criminal Forfeiture | $ - | $ - | $ - | $ - | $ - | 0.0% | $ - | 0.0% | $ - | 0.0% |
| Administrative Expense Claims | $ - | $ - | $ - | $ - | $ - | 0.0% | $ - | 0.0% | $ - | 0.0% |
| Priority Claims | $ - | $ - | $ - | $ - | $ - | 0.0% | $ - | 0.0% | $ - | 0.0% |
| LSTC - Prepetition Accounts Payable | - | - | - | - | - | 0.0% | - | 0.0% | - | 0.0% |
| PBGC - Termination | - | - | - | - | - | 0.0% | - | 0.0% | - | 0.0% |
| Contract Rejection Damages | - | - | - | - | - | 0.0% | - | 0.0% | - | 0.0% |
| Contingent Litigation Liability | - | - | - | - | - | 0.0% | - | 0.0% | - | 0.0% |
| General Unsecured Claims | $ - | $ - | $ - | $ - | $ - | 0.0% | $ - | 0.0% | $ - | 0.0% |
| **Total Claims** | $ - | $ - | $ - | $ - | $ - | 0.0% | $ - | 0.0% | $ - | 0.0% |

25

#9448261v2

**Avrio Health L.P (formerly Purdue Products L.P.)**

($ in millions)

| Assets | Book Value | Estimated Recovery Rate | | | Estimated Recovery Value | | |
|---|---|---|---|---|---|---|---|
| | | High | Mid | Low | High | Mid | Low |
| **Current Assets** | | | | | | | |
| Cash and Cash Equivalents (Net) | $ - | 0.0% | 0.0% | 0.0% | $ - | $ - | $ - |
| Accounts Receivable (Net) | 7.0 | 75.0% | 62.5% | 50.0% | 5.2 | 4.4 | 3.5 |
| Inventories, Net | 5.8 | 140.4% | 105.3% | 70.2% | 8.2 | 6.1 | 4.1 |
| Prepaid Expenses & Other Current Assets | 2.3 | 6.0% | 4.5% | 3.0% | 0.1 | 0.1 | 0.1 |
| Restricted Cash | - | 0.0% | 0.0% | 0.0% | - | - | - |
| **Total Current Assets** | $ 15.1 | 0.0% | 0.0% | 0.0% | $ 13.6 | $ 10.6 | $ 7.6 |
| **Non-Current Assets** | | | | | | | |
| Property and Equipment, net | $ 0.2 | 0.0% | 0.0% | 0.0% | $ - | $ - | $ - |
| Investments at Cost | - | 75.0% | 62.5% | 50.0% | - | - | - |
| Investments in Associated Companies | - | 0.0% | 0.0% | 0.0% | - | - | - |
| Restricted Cash - Long-Term | - | 0.0% | 0.0% | 0.0% | - | - | - |
| Intangible Assets, Net | 64.9 | 234.9% | 176.2% | 117.5% | 152.5 | 114.4 | 76.3 |
| Other Assets | 0.1 | 0.0% | 0.0% | 0.0% | - | - | - |
| **Total Assets** | $ 80.4 | 206.5% | 155.4% | 104.3% | $ 166.1 | $ 125.0 | $ 83.9 |
| **Liquidation Proceeds** | | | | | | | |
| Liquidation Proceeds from Assets | | | | | $ 166.1 | $ 125.0 | $ 83.9 |
| Sackler Settlement | | | | | - | - | - |
| **Total Liquidation Proceeds** | | | | | $ 166.1 | $ 125.0 | $ 83.9 |
| **Liquidation Costs** | | | | | | | |
| Chapter 7 Trustee Fees | | -2.0% | -2.5% | -3.0% | $ (3.3) | $ (3.1) | $ (2.5) |
| Chapter 7 Professional Fees | | | | | (22.0) | (42.0) | (67.7) |
| Transaction Costs/Advisory Fees | | -2.0% | -2.5% | -3.0% | (3.1) | (2.9) | (2.3) |
| Wind Down Costs | | | | | (2.4) | (3.7) | (5.4) |
| Severance | | | | | (0.1) | (0.1) | (0.1) |
| **Total Liquidation Costs** | | | | | $ (30.9) | $ (51.8) | $ (78.1) |
| **Funding Required from Purdue Pharma L.P.** | | | | | $ - | $ - | $ - |
| **Excess Proceeds Available to Purdue Pharma L.P.** | | | | | $ 53.0 | $ - | $ - |
| **Net Liquidation Proceeds Available to Creditors** | | | | | $ 135.2 | $ 73.2 | $ 5.8 |

| Creditor Class | Book Value | Estimated Claim Allowed | | | Estimated Recovery by Class of Claims ($)/(%) | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| | | High | Mid | Low | High | | Mid | | Low | |
| DOJ - Criminal Forfeiture | $ - | $ - | $ - | $ - | $ - | 0.0% | $ - | 0.0% | $ - | 0.0% |
| Administrative Expense Claims | $ (6.1) | $ 6.1 | $ 6.1 | $ 6.1 | $ 6.1 | 100.0% | $ 6.1 | 100.0% | $ 5.8 | 95.1% |
| Priority Claims | $ - | $ - | $ - | $ - | $ - | 0.0% | $ - | 0.0% | $ - | 0.0% |
| LSTC - Prepetition Accounts Payable | (1.3) | 1.3 | 1.3 | 1.3 | 1.3 | 100.0% | 0.6 | 49.3% | - | 0.0% |
| PBGC - Termination | (163.0) | 163.0 | 163.0 | 163.0 | 74.8 | 45.9% | 66.4 | 40.7% | - | 0.0% |
| Contract Rejection Damages | - | | | | - | 0.0% | - | 0.0% | - | 0.0% |
| Contingent Litigation Liability | - | | | | - | 0.0% | - | 0.0% | - | 0.0% |
| General Unsecured Claims | (164.3) | 164.3 | 164.3 | 164.3 | 76.0 | 46.3% | 67.0 | 40.8% | - | 0.0% |
| **Total Claims** | $ (170.4) | $ 170.4 | $ 170.4 | $ 170.4 | $ 82.1 | 48.2% | $ 73.2 | 42.9% | $ 5.8 | 3.4% |

#9448261v2

**UDF LP**

($ in millions)

| Assets | Book Value | Estimated Recovery Rate | | | Estimated Recovery Value | | |
|---|---|---|---|---|---|---|---|
| | | High | Mid | Low | High | Mid | Low |
| **Current Assets** | | | | | | | |
| Cash and Cash Equivalents (Net) | $ - | 0.0% | 0.0% | 0.0% | $ - | $ - | $ - |
| Accounts Receivable (Net) | - | 0.0% | 0.0% | 0.0% | - | - | - |
| Inventories, Net | - | 0.0% | 0.0% | 0.0% | - | - | - |
| Prepaid Expenses & Other Current Assets | - | 0.0% | 0.0% | 0.0% | - | - | - |
| Restricted Cash | - | 0.0% | 0.0% | 0.0% | - | - | - |
| **Total Current Assets** | $ - | | | | $ - | $ - | $ - |
| | | | | | | | |
| **Non-Current Assets** | | | | | | | |
| Property and Equipment, net | $ - | 0.0% | 0.0% | 0.0% | $ - | $ - | $ - |
| Investments at Cost | - | 75.0% | 62.5% | 50.0% | - | - | - |
| Investments in Associated Companies | 2.6 | 0.0% | 0.0% | 0.0% | - | - | - |
| Restricted Cash - Long-Term | - | 0.0% | 0.0% | 0.0% | - | - | - |
| Intangible Assets, Net | - | 0.0% | 0.0% | 0.0% | - | - | - |
| Other Assets | - | 0.0% | 0.0% | 0.0% | - | - | - |
| **Total Assets** | $ 2.6 | 0.0% | 0.0% | 0.0% | $ - | $ - | $ - |
| | | | | | | | |
| **Liquidation Proceeds** | | | | | | | |
| Liquidation Proceeds from Assets | | | | | $ - | $ - | $ - |
| Sackler Settlement | | | | | - | - | - |
| **Total Liquidation Proceeds** | | | | | $ - | $ - | $ - |
| | | | | | | | |
| **Liquidation Costs** | | | | | | | |
| Chapter 7 Trustee Fees | | -2.0% | -2.5% | -3.0% | $ - | $ - | $ - |
| Chapter 7 Professional Fees | | | | | - | - | - |
| Transaction Costs/Advisory Fees | | -2.0% | -2.5% | -3.0% | - | - | - |
| Wind Down Costs | | | | | - | - | - |
| Severance | | | | | - | - | - |
| **Total Liquidation Costs** | | | | | $ - | $ - | $ - |
| | | | | | | | |
| **Funding Required from Purdue Pharma L.P.** | | | | | $ - | $ - | $ - |
| **Excess Proceeds Available to Purdue Pharma L.P.** | | | | | $ - | $ - | $ - |
| | | | | | | | |
| **Net Liquidation Proceeds Available to Creditors** | | | | | $ - | $ - | $ - |

| Creditor Class | Book Value | Estimated Claim Allowed | | | | | | Estimated Recovery by Class of Claims ($)/(%) | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | High | | Mid | | Low | | High | | Mid | | Low | |
| DOJ - Criminal Forfeiture | $ - | $ - | | $ - | | $ - | | $ - | 0.0% | $ - | 0.0% | $ - | 0.0% |
| Administrative Expense Claims | $ - | $ - | | $ - | | $ - | | $ - | 0.0% | $ - | 0.0% | $ - | 0.0% |
| Priority Claims | $ - | $ - | | $ - | | $ - | | $ - | 0.0% | $ - | 0.0% | $ - | 0.0% |
| LSTC - Prepetition Accounts Payable | | - | | - | | - | | - | 0.0% | - | 0.0% | - | 0.0% |
| PBGC - Termination | (163.0) | 163.0 | | 163.0 | | 163.0 | | - | 0.0% | - | 0.0% | - | 0.0% |
| Contract Rejection Damages | - | - | | - | | - | | - | 0.0% | - | 0.0% | - | 0.0% |
| Contingent Litigation Liability | - | - | | - | | - | | - | 0.0% | - | 0.0% | - | 0.0% |
| General Unsecured Claims | (163.0) | 163.0 | | 163.0 | | 163.0 | | - | 0.0% | - | 0.0% | - | 0.0% |
| **Total Claims** | $ (163.0) | $ 163.0 | | $ 163.0 | | $ 163.0 | | $ - | 0.0% | $ - | 0.0% | $ - | 0.0% |

27

#9448266lv2

Rhodes Associates L.P.

($ in millions)

| Assets | Book Value | Estimated Recovery Rate | | | Estimated Recovery Value | | |
|---|---|---|---|---|---|---|---|
| | | High | Mid | Low | High | Mid | Low |
| **Current Assets** | | | | | | | |
| Cash and Cash Equivalents (Net) | $ - | 0.0% | 0.0% | 0.0% | $ - | $ - | $ - |
| Accounts Receivable (Net) | - | 0.0% | 0.0% | 0.0% | - | - | - |
| Inventories, Net | - | 0.0% | 0.0% | 0.0% | - | - | - |
| Prepaid Expenses & Other Current Assets | - | 0.0% | 0.0% | 0.0% | - | - | - |
| Restricted Cash | - | 0.0% | 0.0% | 0.0% | - | - | - |
| **Total Current Assets** | $ - | | | | $ - | $ - | $ - |
| | | | | | | | |
| **Non-Current Assets** | | | | | | | |
| Property and Equipment, net | $ - | 0.0% | 0.0% | 0.0% | $ - | $ - | $ - |
| Investments at Cost | - | 75.0% | 62.5% | 50.0% | - | - | - |
| Investments in Associated Companies | - | 0.0% | 0.0% | 0.0% | - | - | - |
| Restricted Cash - Long-Term | - | 0.0% | 0.0% | 0.0% | - | - | - |
| Intangible Assets, Net | - | 0.0% | 0.0% | 0.0% | - | - | - |
| Other Assets | - | 0.0% | 0.0% | 0.0% | - | - | - |
| **Total Assets** | $ - | 0.0% | 0.0% | 0.0% | $ - | $ - | $ - |
| | | | | | | | |
| **Liquidation Proceeds** | | | | | | | |
| Liquidation Proceeds from Assets | | | | | $ - | $ - | $ - |
| Sackler Settlement | | | | | - | - | - |
| **Total Liquidation Proceeds** | | | | | $ - | $ - | $ - |
| | | | | | | | |
| **Liquidation Costs** | | | | | | | |
| Chapter 7 Trustee Fees | | -2.0% | -2.5% | -3.0% | $ - | $ - | $ - |
| Chapter 7 Professional Fees | | | | | - | - | - |
| Transaction Costs/Advisory Fees | | -2.0% | -2.5% | -3.0% | - | - | - |
| Wind Down Costs | | | | | - | - | - |
| Severance | | | | | - | - | - |
| **Total Liquidation Costs** | | | | | $ - | $ - | $ - |
| | | | | | | | |
| **Funding Required from Purdue Pharma L.P.** | | | | | $ - | $ - | $ - |
| **Excess Proceeds Available to Purdue Pharma L.P.** | | | | | $ - | $ - | $ - |
| | | | | | | | |
| **Net Liquidation Proceeds Available to Creditors** | | | | | $ - | $ - | $ - |

| Creditor Class | Book Value | Estimated Claim Allowed | | | Estimated Recovery by Class of Claims ($)/(%) | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| | | High | Mid | Low | High | | Mid | | Low | |
| DOJ - Criminal Forfeiture | $ - | $ - | $ - | $ - | $ - | 0.0% | $ - | 0.0% | $ - | 0.0% |
| Administrative Expense Claims | $ - | | | | - | 0.0% | - | 0.0% | - | 0.0% |
| Priority Claims | $ - | $ - | $ - | $ - | $ - | 0.0% | $ - | 0.0% | $ - | 0.0% |
| LSTC - Prepetition Accounts Payable | - | - | - | - | - | 0.0% | - | 0.0% | - | 0.0% |
| PBGC - Termination | (163.0) | 163.0 | 163.0 | 163.0 | - | 0.0% | - | 0.0% | - | 0.0% |
| Contract Rejection Damages | - | - | - | - | - | 0.0% | - | 0.0% | - | 0.0% |
| Contingent Litigation Liability | - | | | | - | 0.0% | - | 0.0% | - | 0.0% |
| General Unsecured Claims | (163.0) | 163.0 | 163.0 | 163.0 | - | 0.0% | - | 0.0% | - | 0.0% |
| **Total Claims** | $ (163.0) | $ 163.0 | $ 163.0 | $ 163.0 | $ - | 0.0% | $ - | 0.0% | $ - | 0.0% |

28

#94482661v2

**Rhodes Pharmaceuticals LP**

($ in millions)

| Assets | Book Value | Estimated Recovery Rate | | | Estimated Recovery Value | | |
|---|---|---|---|---|---|---|---|
| | | High | Mid | Low | High | Mid | Low |
| **Current Assets** | | | | | | | |
| Cash and Cash Equivalents (Net) | $ - | 0.0% | 0.0% | 0.0% | $ - | $ - | $ - |
| Accounts Receivable (Net) | 73.6 | 75.0% | 62.5% | 50.0% | 55.2 | 46.0 | 36.8 |
| Inventories, Net | 29.0 | 24.6% | 18.5% | 12.3% | 7.1 | 5.4 | 3.6 |
| Prepaid Expenses & Other Current Assets | 3.3 | 6.0% | 4.5% | 3.0% | 0.2 | 0.1 | 0.1 |
| Restricted Cash | - | 0.0% | 0.0% | 0.0% | - | - | - |
| **Total Current Assets** | $ 105.9 | 0.0% | 0.0% | 0.0% | $ 62.5 | $ 51.5 | $ 40.5 |
| **Non-Current Assets** | | | | | | | |
| Property and Equipment, net | $ 3.5 | 3.8% | 3.1% | 2.5% | $ 0.1 | $ 0.1 | $ 0.1 |
| Investments at Cost | - | 75.0% | 62.5% | 50.0% | - | - | - |
| Investments in Associated Companies | - | 0.0% | 0.0% | 0.0% | - | - | - |
| Restricted Cash - Long-Term | - | 0.0% | 0.0% | 0.0% | - | - | - |
| Intangible Assets, Net | 21.9 | 183.2% | 122.2% | 61.1% | 40.2 | 26.8 | 13.4 |
| Other Assets | - | 0.0% | 0.0% | 0.0% | - | - | - |
| **Total Assets** | $ 131.4 | 78.3% | 59.7% | 41.1% | $ 102.8 | $ 78.4 | $ 53.9 |
| **Liquidation Proceeds** | | | | | | | |
| Liquidation Proceeds from Assets | | | | | $ 102.8 | $ 78.4 | $ 53.9 |
| Sackler Settlement | | | | | - | - | - |
| **Total Liquidation Proceeds** | | | | | $ 102.8 | $ 78.4 | $ 53.9 |
| **Liquidation Costs** | | | | | | | |
| Chapter 7 Trustee Fees | | -2.0% | -2.5% | -3.0% | $ (2.1) | $ (2.0) | $ (1.6) |
| Chapter 7 Professional Fees | | | | | (14.2) | (26.3) | (41.9) |
| Transaction Costs/Advisory Fees | | -2.0% | -2.5% | -3.0% | (0.8) | (0.7) | (0.4) |
| Wind Down Costs | | | | | (4.3) | (6.8) | (10.0) |
| Severance | | | | | (0.3) | (0.3) | (0.3) |
| **Total Liquidation Costs** | | | | | $ (21.7) | $ (36.1) | $ (54.2) |
| **Funding Required from Purdue Pharma L.P.** | | | | | $ - | $ - | $ 0.3 |
| **Excess Proceeds Available to Purdue Pharma L.P.** | | | | | $ - | $ - | $ - |
| **Net Liquidation Proceeds Available to Creditors** | | | | | $ 81.1 | $ 42.3 | $ - |

| Creditor Class | Book Value | Estimated Claim Allowed | | | Estimated Recovery by Class of Claims ($)/(%) | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| | | High | Mid | Low | High | | Mid | | Low | |
| DOJ - Criminal Forfeiture | $ - | $ - | $ - | $ - | $ - | 0.0% | $ - | 0.0% | $ - | 0.0% |
| Administrative Expense Claims | $ (41.8) | $ 45.3 | $ 41.8 | $ 38.3 | $ 45.3 | 100.0% | $ 41.8 | 100.0% | $ - | 0.0% |
| Priority Claims | $ - | $ - | $ - | $ - | $ - | 0.0% | $ - | 0.0% | $ - | 0.0% |
| LSTC - Prepetition Accounts Payable | (1.0) | 1.0 | 1.0 | 1.0 | 0.2 | 21.8% | 0.0 | 0.3% | - | 0.0% |
| PBGC - Termination | (163.0) | 163.0 | 163.0 | 163.0 | 35.5 | 21.8% | 0.4 | 0.3% | - | 0.0% |
| Contract Rejection Damages | (0.5) | 0.5 | 0.5 | 0.5 | 0.1 | 21.8% | 0.0 | 0.3% | - | 0.0% |
| Contingent Litigation Liability | - | - | - | - | - | 0.0% | - | 0.0% | - | 0.0% |
| General Unsecured Claims | $ (164.4) | $ 164.4 | $ 164.4 | $ 164.4 | 35.8 | 21.8% | 0.4 | 0.3% | - | 0.0% |
| **Total Claims** | $ (206.2) | $ 209.7 | $ 206.2 | $ 202.8 | $ 81.1 | 38.7% | $ 42.3 | 20.5% | $ - | 0.0% |

#9448266lv2

**Button Land L.P.**

($ in millions)

| Assets | Book Value | Estimated Recovery Rate High | Mid | Low | Estimated Recovery Value High | Mid | Low |
|---|---|---|---|---|---|---|---|
| **Current Assets** | | | | | | | |
| Cash and Cash Equivalents (Net) | $ - | 0.0% | 0.0% | 0.0% | $ - | $ - | $ - |
| Accounts Receivable (Net) | - | 0.0% | 0.0% | 0.0% | - | - | - |
| Inventories, Net | - | 0.0% | 0.0% | 0.0% | - | - | - |
| Prepaid Expenses & Other Current Assets | - | 0.0% | 0.0% | 0.0% | - | - | - |
| Restricted Cash | - | 0.0% | 0.0% | 0.0% | - | - | - |
| **Total Current Assets** | $ - | | | | $ - | $ - | $ - |
| | | | | | | | |
| **Non-Current Assets** | | | | | | | |
| Property and Equipment, net | $ - | 0.0% | 0.0% | 0.0% | $ - | $ - | $ - |
| Investments at Cost | - | 75.0% | 62.5% | 50.0% | - | - | - |
| Investments in Associated Companies | - | 0.0% | 0.0% | 0.0% | - | - | - |
| Restricted Cash - Long-Term | - | 0.0% | 0.0% | 0.0% | - | - | - |
| Intangible Assets, Net | - | 0.0% | 0.0% | 0.0% | - | - | - |
| Other Assets | - | 0.0% | 0.0% | 0.0% | - | - | - |
| **Total Assets** | $ - | 0.0% | 0.0% | 0.0% | $ - | $ - | $ - |
| | | | | | | | |
| **Liquidation Proceeds** | | | | | | | |
| Liquidation Proceeds from Assets | | | | | $ - | $ - | $ - |
| Sackler Settlement | | | | | - | - | - |
| **Total Liquidation Proceeds** | | | | | $ - | $ - | $ - |
| | | | | | | | |
| **Liquidation Costs** | | | | | | | |
| Chapter 7 Trustee Fees | | -2.0% | -2.5% | -3.0% | $ - | $ - | $ - |
| Chapter 7 Professional Fees | | | | | - | - | - |
| Transaction Costs/Advisory Fees | | -2.0% | -2.5% | -3.0% | - | - | - |
| Wind Down Costs | | | | | - | - | - |
| Severance | | | | | - | - | - |
| **Total Liquidation Costs** | | | | | $ - | $ - | $ - |
| | | | | | | | |
| **Funding Required from Purdue Pharma L.P.** | | | | | $ - | $ - | $ - |
| **Excess Proceeds Available to Purdue Pharma L.P.** | | | | | $ - | $ - | $ - |
| | | | | | | | |
| **Net Liquidation Proceeds Available to Creditors** | | | | | $ - | $ - | $ - |

| Creditor Class | Book Value | Estimated Claim Allowed High | Mid | Low | Estimated Recovery by Class of Claims ($)/(%) High | | Mid | | Low | |
|---|---|---|---|---|---|---|---|---|---|---|
| DOJ - Criminal Forfeiture | $ - | $ - | $ - | $ - | $ - | 0.0% | $ - | 0.0% | $ - | 0.0% |
| Administrative Expense Claims | $ - | $ - | $ - | $ - | $ - | 0.0% | $ - | 0.0% | $ - | 0.0% |
| Priority Claims | $ - | $ - | $ - | $ - | $ - | 0.0% | $ - | 0.0% | $ - | 0.0% |
| LSTC - Prepetition Accounts Payable | - | - | - | - | - | 0.0% | - | 0.0% | - | 0.0% |
| PBGC - Termination | (163.0) | 163.0 | 163.0 | 163.0 | - | 0.0% | - | 0.0% | - | 0.0% |
| Contract Rejection Damages | - | - | - | - | - | 0.0% | - | 0.0% | - | 0.0% |
| Contingent Litigation Liability | - | - | - | - | - | 0.0% | - | 0.0% | - | 0.0% |
| General Unsecured Claims | (163.0) | 163.0 | 163.0 | 163.0 | - | 0.0% | - | 0.0% | - | 0.0% |
| **Total Claims** | **(163.0)** | **163.0** | **163.0** | **163.0** | **$ -** | **0.0%** | **$ -** | **0.0%** | **$ -** | **0.0%** |

#94482661v2

Quidnick Land L.P.

($ in millions)

| Assets | Book Value | Estimated Recovery Rate | | | Estimated Recovery Value | | |
|---|---|---|---|---|---|---|---|
| | | High | Mid | Low | High | Mid | Low |
| **Current Assets** | | | | | | | |
| Cash and Cash Equivalents (Net) | $ - | 0.0% | 0.0% | 0.0% | $ - | $ - | $ - |
| Accounts Receivable (Net) | - | 0.0% | 0.0% | 0.0% | - | - | - |
| Inventories, Net | - | 0.0% | 0.0% | 0.0% | - | - | - |
| Prepaid Expenses & Other Current Assets | - | 0.0% | 0.0% | 0.0% | - | - | - |
| Restricted Cash | - | 0.0% | 0.0% | 0.0% | - | - | - |
| **Total Current Assets** | $ - | | | | $ - | $ - | $ - |
| | | | | | | | |
| **Non-Current Assets** | | | | | | | |
| Property and Equipment, net | $ - | 0.0% | 0.0% | 0.0% | $ - | $ - | $ - |
| Investments at Cost | - | 75.0% | 62.5% | 50.0% | - | - | - |
| Investments in Associated Companies | - | 0.0% | 0.0% | 0.0% | - | - | - |
| Restricted Cash - Long-Term | - | 0.0% | 0.0% | 0.0% | - | - | - |
| Intangible Assets, Net | - | 0.0% | 0.0% | 0.0% | - | - | - |
| Other Assets | - | 0.0% | 0.0% | 0.0% | - | - | - |
| **Total Assets** | $ - | 0.0% | 0.0% | 0.0% | $ - | $ - | $ - |
| | | | | | | | |
| **Liquidation Proceeds** | | | | | | | |
| Liquidation Proceeds from Assets | | | | | $ - | $ - | $ - |
| Sackler Settlement | | | | | - | - | - |
| **Total Liquidation Proceeds** | | | | | $ - | $ - | $ - |
| | | | | | | | |
| **Liquidation Costs** | | | | | | | |
| Chapter 7 Trustee Fees | | -2.0% | -2.5% | -3.0% | $ - | $ - | $ - |
| Chapter 7 Professional Fees | | | | | - | - | - |
| Transaction Costs/Advisory Fees | | -2.0% | -2.5% | -3.0% | - | - | - |
| Wind Down Costs | | | | | - | - | - |
| Severance | | | | | - | - | - |
| **Total Liquidation Costs** | | | | | $ - | $ - | $ - |
| | | | | | | | |
| **Funding Required from Purdue Pharma L.P.** | | | | | $ - | $ - | $ - |
| **Excess Proceeds Available to Purdue Pharma L.P.** | | | | | $ - | $ - | $ - |
| | | | | | | | |
| **Net Liquidation Proceeds Available to Creditors** | | | | | $ - | $ - | $ - |

| Creditor Class | Book Value | Estimated Claim Allowed | | | Estimated Recovery by Class of Claims ($)/(%) | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| | | High | Mid | Low | High | | Mid | | Low | |
| DOJ - Criminal Forfeiture | $ - | $ - | $ - | $ - | $ - | 0.0% | $ - | 0.0% | $ - | 0.0% |
| Administrative Expense Claims | $ - | $ - | $ - | $ - | $ - | 0.0% | $ - | 0.0% | $ - | 0.0% |
| Priority Claims | $ - | $ - | $ - | $ - | $ - | 0.0% | $ - | 0.0% | $ - | 0.0% |
| LSTC - Prepetition Accounts Payable | - | - | - | - | - | 0.0% | - | 0.0% | - | 0.0% |
| PBGC - Termination | (163.0) | 163.0 | 163.0 | 163.0 | - | 0.0% | - | 0.0% | - | 0.0% |
| Contract Rejection Damages | - | - | - | - | - | 0.0% | - | 0.0% | - | 0.0% |
| Contingent Litigation Liability | - | - | - | - | - | 0.0% | - | 0.0% | - | 0.0% |
| General Unsecured Claims | (163.0) | 163.0 | 163.0 | 163.0 | - | 0.0% | - | 0.0% | - | 0.0% |
| **Total Claims** | $ (163.0) | $ 163.0 | $ 163.0 | $ 163.0 | $ - | 0.0% | $ - | 0.0% | $ - | 0.0% |

31

#9448266lv2

**Paul Land Inc.**

($ in millions)

| Assets | Book Value | Estimated Recovery Rate | | | Estimated Recovery Value | | |
|---|---|---|---|---|---|---|---|
| | | High | Mid | Low | High | Mid | Low |
| **Current Assets** | | | | | | | |
| Cash and Cash Equivalents (Net) | $ - | 0.0% | 0.0% | 0.0% | $ - | $ - | $ - |
| Accounts Receivable (Net) | - | 0.0% | 0.0% | 0.0% | - | - | - |
| Inventories, Net | - | 0.0% | 0.0% | 0.0% | - | - | - |
| Prepaid Expenses & Other Current Assets | - | 0.0% | 0.0% | 0.0% | - | - | - |
| Restricted Cash | - | 0.0% | 0.0% | 0.0% | - | - | - |
| **Total Current Assets** | $ - | | | | $ - | $ - | $ - |
| | | | | | | | |
| **Non-Current Assets** | | | | | | | |
| Property and Equipment, net | $ - | 0.0% | 0.0% | 0.0% | $ - | $ - | $ - |
| Investments at Cost | - | 75.0% | 62.5% | 50.0% | - | - | - |
| Investments in Associated Companies | - | 0.0% | 0.0% | 0.0% | - | - | - |
| Restricted Cash - Long-Term | - | 0.0% | 0.0% | 0.0% | - | - | - |
| Intangible Assets, Net | - | 0.0% | 0.0% | 0.0% | - | - | - |
| Other Assets | - | 0.0% | 0.0% | 0.0% | - | - | - |
| **Total Assets** | $ - | 0.0% | 0.0% | 0.0% | $ - | $ - | $ - |
| | | | | | | | |
| **Liquidation Proceeds** | | | | | | | |
| Liquidation Proceeds from Assets | | | | | $ - | $ - | $ - |
| Sackler Settlement | | | | | - | - | - |
| **Total Liquidation Proceeds** | | | | | $ - | $ - | $ - |
| | | | | | | | |
| **Liquidation Costs** | | | | | | | |
| Chapter 7 Trustee Fees | | -2.0% | -2.5% | -3.0% | $ - | $ - | $ - |
| Chapter 7 Professional Fees | | | | | - | - | - |
| Transaction Costs/Advisory Fees | | -2.0% | -2.5% | -3.0% | - | - | - |
| Wind Down Costs | | | | | - | - | - |
| Severance | | | | | - | - | - |
| **Total Liquidation Costs** | | | | | $ - | $ - | $ - |
| | | | | | | | |
| **Funding Required from Purdue Pharma L.P.** | | | | | $ - | $ - | $ - |
| **Excess Proceeds Available to Purdue Pharma L.P.** | | | | | $ - | $ - | $ - |
| | | | | | | | |
| **Net Liquidation Proceeds Available to Creditors** | | | | | $ - | $ - | $ - |

| Creditor Class | Book Value | Estimated Claim Allowed | | | | | | Estimated Recovery by Class of Claims ($)/(%) | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | High | | Mid | | Low | | High | | Mid | | Low | |
| DOJ - Criminal Forfeiture | $ - | $ - | | $ - | | $ - | | $ - | 0.0% | $ - | 0.0% | $ - | 0.0% |
| Administrative Expense Claims | $ - | - | | - | | - | | $ - | 0.0% | $ - | 0.0% | $ - | 0.0% |
| Priority Claims | $ - | $ - | | $ - | | $ - | | $ - | 0.0% | $ - | 0.0% | $ - | 0.0% |
| LSTC - Prepetition Accounts Payable | - | - | | - | | - | | $ - | 0.0% | $ - | 0.0% | $ - | 0.0% |
| PBGC - Termination | (163.0) | 163.0 | | 163.0 | | 163.0 | | - | 0.0% | - | 0.0% | - | 0.0% |
| Contract Rejection Damages | - | - | | - | | - | | - | 0.0% | - | 0.0% | - | 0.0% |
| Contingent Litigation Liability | - | - | | - | | - | | - | 0.0% | - | 0.0% | - | 0.0% |
| General Unsecured Claims | (163.0) | 163.0 | | 163.0 | | 163.0 | | $ - | 0.0% | $ - | 0.0% | $ - | 0.0% |
| **Total Claims** | $ (163.0) | $ 163.0 | | $ 163.0 | | $ 163.0 | | $ - | 0.0% | $ - | 0.0% | $ - | 0.0% |

32

**Rhodes Technologies**

($ in millions)

| Assets | Book Value | Estimated Recovery Rate | | | Estimated Recovery Value | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| | | High | Mid | Low | High | | Mid | | Low | |
| **Current Assets** | | | | | | | | | | |
| Cash and Cash Equivalents (Net) | $ - | 0.0% | 0.0% | 0.0% | $ | - | $ | - | $ | - |
| Accounts Receivable (Net) | 4.3 | 75.0% | 62.5% | 50.0% | | 3.3 | | 2.7 | | 2.2 |
| Inventories, Net | 2.0 | 0.0% | 0.0% | 0.0% | | - | | - | | - |
| Prepaid Expenses & Other Current Assets | 0.9 | 6.0% | 4.5% | 3.0% | | 0.1 | | 0.0 | | 0.0 |
| Restricted Cash | - | 0.0% | 0.0% | 0.0% | | - | | - | | - |
| **Total Current Assets** | $ 7.2 | 0.0% | 0.0% | 0.0% | $ | 3.3 | $ | 2.8 | $ | 2.2 |
| **Non-Current Assets** | | | | | | | | | | |
| Property and Equipment, net | $ - | 0.0% | 0.0% | 0.0% | $ | - | $ | - | $ | - |
| Investments at Cost | - | 75.0% | 62.5% | 50.0% | | - | | - | | - |
| Investments in Associated Companies | 2.4 | 0.0% | 0.0% | 0.0% | | - | | - | | - |
| Restricted Cash - Long-Term | - | 0.0% | 0.0% | 0.0% | | - | | - | | - |
| Intangible Assets, Net | - | 0.0% | 0.0% | 0.0% | | - | | - | | - |
| Other Assets | - | 0.0% | 0.0% | 0.0% | | - | | - | | - |
| **Total Assets** | $ 9.6 | 34.6% | 28.7% | 22.9% | $ | 3.3 | $ | 2.8 | $ | 2.2 |
| **Liquidation Proceeds** | | | | | | | | | | |
| Liquidation Proceeds from Assets | | | | | $ | 3.3 | $ | 2.8 | $ | 2.2 |
| Sackler Settlement | | | | | | - | | - | | - |
| **Total Liquidation Proceeds** | | | | | $ | 3.3 | $ | 2.8 | $ | 2.2 |
| **Liquidation Costs** | | | | | | | | | | |
| Chapter 7 Trustee Fees | | -2.0% | -2.5% | -3.0% | $ | (0.1) | $ | (0.1) | $ | (0.1) |
| Chapter 7 Professional Fees | | | | | | (0.6) | | (0.9) | | (1.3) |
| Transaction Costs/Advisory Fees | | -2.0% | -2.5% | -3.0% | | (0.5) | | (0.8) | | (1.2) |
| Wind Down Costs | | | | | | - | | - | | - |
| Severance | | | | | | (0.6) | | (0.6) | | (0.6) |
| **Total Liquidation Costs** | | | | | $ | (1.8) | $ | (2.5) | $ | (3.2) |
| **Funding Required from Purdue Pharma L.P.** | | | | | $ | - | $ | - | $ | 1.0 |
| **Excess Proceeds Available to Purdue Pharma L.P.** | | | | | $ | - | $ | - | $ | - |
| **Net Liquidation Proceeds Available to Creditors** | | | | | $ | 1.5 | $ | 0.3 | $ | - |

| Creditor Class | | Estimated Claim Allowed | | | | | | Estimated Recovery by Class of Claims ($)/(%) | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | High | | Mid | | Low | | High | | Mid | | Low | |
| DOJ - Criminal Forfeiture | $ - | $ | - | $ | - | $ | - | $ - | 0.0% | $ - | 0.0% | $ - | 0.0% |
| Administrative Expense Claims | $ (6.5) | $ | 6.5 | $ | 6.5 | $ | 6.5 | $ 1.5 | 23.2% | $ 0.3 | 4.6% | $ - | 0.0% |
| Priority Claims | $ - | $ | - | $ | - | $ | - | $ - | 0.0% | $ - | 0.0% | $ - | 0.0% |
| LSTC - Prepetition Accounts Payable | (0.3) | | 0.3 | | 0.3 | | 0.3 | | 0.0% | | 0.0% | | 0.0% |
| PBGC - Termination | (163.0) | | 163.0 | | 163.0 | | 163.0 | | 0.0% | | 0.0% | | 0.0% |
| Contract Rejection Damages | - | | - | | - | | - | | 0.0% | | 0.0% | | 0.0% |
| Contingent Litigation Liability | - | | | | | | | | 0.0% | | 0.0% | | 0.0% |
| General Unsecured Claims | (163.3) | | 163.3 | | 163.3 | | 163.3 | $ - | 0.0% | $ - | 0.0% | $ - | 0.0% |
| **Total Claims** | $ (169.8) | $ | 169.8 | $ | 169.8 | $ | 169.8 | $ 1.5 | 0.9% | $ 0.3 | 0.2% | $ - | 0.0% |

33

#94482661v2

**SVC Pharma Inc.**

($ in millions)

| Assets | Book Value | Estimated Recovery Rate | | | Estimated Recovery Value | | |
|---|---|---|---|---|---|---|---|
| | | High | Mid | Low | High | Mid | Low |
| **Current Assets** | | | | | | | |
| Cash and Cash Equivalents (Net) | $ - | 0.0% | 0.0% | 0.0% | $ - | $ - | $ - |
| Accounts Receivable (Net) | - | 0.0% | 0.0% | 0.0% | - | - | - |
| Inventories, Net | - | 0.0% | 0.0% | 0.0% | - | - | - |
| Prepaid Expenses & Other Current Assets | 0.1 | 6.0% | 4.5% | 3.0% | 0.0 | 0.0 | 0.0 |
| Restricted Cash | - | 0.0% | 0.0% | 0.0% | - | - | - |
| **Total Current Assets** | $ 0.1 | 0.0% | 0.0% | 0.0% | $ 0.0 | $ 0.0 | $ 0.0 |
| **Non-Current Assets** | | | | | | | |
| Property and Equipment, net | $ - | 0.0% | 0.0% | 0.0% | $ - | $ - | $ - |
| Investments at Cost | - | 75.0% | 62.5% | 50.0% | - | - | - |
| Investments in Associated Companies | 0.0 | 0.0% | 0.0% | 0.0% | - | - | - |
| Restricted Cash - Long-Term | - | 0.0% | 0.0% | 0.0% | - | - | - |
| Intangible Assets, Net | - | 0.0% | 0.0% | 0.0% | - | - | - |
| Other Assets | - | 0.0% | 0.0% | 0.0% | - | - | - |
| **Total Assets** | $ 0.1 | 3.8% | 2.8% | 1.9% | $ 0.0 | $ 0.0 | $ 0.0 |
| **Liquidation Proceeds** | | | | | | | |
| Liquidation Proceeds from Assets | | | | | $ 0.0 | $ 0.0 | $ 0.0 |
| Sackler Settlement | | | | | - | - | - |
| **Total Liquidation Proceeds** | | | | | $ 0.0 | $ 0.0 | $ 0.0 |
| **Liquidation Costs** | | | | | | | |
| Chapter 7 Trustee Fees | | -2.0% | -2.5% | -3.0% | $ (0.0) | $ (0.0) | $ (0.0) |
| Chapter 7 Professional Fees | | | | | (0.0) | (0.0) | (0.0) |
| Transaction Costs/Advisory Fees | | -2.0% | -2.5% | -3.0% | - | - | - |
| Wind Down Costs | | | | | - | - | - |
| Severance | | | | | - | - | - |
| **Total Liquidation Costs** | | | | | $ (0.0) | $ (0.0) | $ (0.0) |
| **Funding Required from Purdue Pharma L.P.** | | | | | $ - | $ - | $ - |
| **Excess Proceeds Available to Purdue Pharma L.P.** | | | | | $ - | $ - | $ - |
| **Net Liquidation Proceeds Available to Creditors** | | | | | $ 0.0 | $ 0.0 | $ 0.0 |

| Creditor Class | Book Value | Estimated Claim Allowed | | | Estimated Recovery by Class of Claims ($)/(%) | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| | | High | Mid | Low | High | | Mid | | Low | |
| DOJ - Criminal Forfeiture | $ - | $ - | $ - | $ - | $ - | 0.0% | $ - | 0.0% | $ - | 0.0% |
| Administrative Expense Claims | $ - | $ - | $ - | $ - | $ - | 0.0% | $ - | 0.0% | $ - | 0.0% |
| Priority Claims | $ - | $ - | $ - | $ - | $ - | 0.0% | $ - | 0.0% | $ - | 0.0% |
| LSTC - Prepetition Accounts Payable | | - | - | - | - | 0.0% | - | 0.0% | - | 0.0% |
| PBGC - Termination | (163.0) | 163.0 | 163.0 | 163.0 | 0.0 | 0.0% | 0.0 | 0.0% | 0.0 | 0.0% |
| Contract Rejection Damages | - | - | - | - | - | 0.0% | - | 0.0% | - | 0.0% |
| Contingent Litigation Liability | - | - | - | - | - | 0.0% | - | 0.0% | - | 0.0% |
| General Unsecured Claims | $ (163.0) | $ 163.0 | $ 163.0 | $ 163.0 | $ 0.0 | 0.0% | $ 0.0 | 0.0% | $ 0.0 | 0.0% |
| **Total Claims** | $ (163.0) | $ 163.0 | $ 163.0 | $ 163.0 | $ 0.0 | 0.0% | $ 0.0 | 0.0% | $ 0.0 | 0.0% |

34

**SVC Pharma L.P.**

($ in millions)

| Assets | Book Value | Estimated Recovery Rate | | | Estimated Recovery Value | | |
|---|---|---|---|---|---|---|---|
| | | High | Mid | Low | High | Mid | Low |
| **Current Assets** | | | | | | | |
| Cash and Cash Equivalents (Net) | $    - | 0.0% | 0.0% | 0.0% | $    - | $    - | $    - |
| Accounts Receivable (Net) | - | 0.0% | 0.0% | 0.0% | - | - | - |
| Inventories, Net | 2.2 | 0.0% | 0.0% | 0.0% | - | - | - |
| Prepaid Expenses & Other Current Assets | - | 0.0% | 0.0% | 0.0% | - | - | - |
| Restricted Cash | - | 0.0% | 0.0% | 0.0% | - | - | - |
| **Total Current Assets** | $    2.2 | | | | $    - | $    - | $    - |
| | | | | | | | |
| **Non-Current Assets** | | | | | | | |
| Property and Equipment, net | $    - | 0.0% | 0.0% | 0.0% | $    - | $    - | $    - |
| Investments at Cost | - | 75.0% | 62.5% | 50.0% | - | - | - |
| Investments in Associated Companies | - | 0.0% | 0.0% | 0.0% | - | - | - |
| Restricted Cash - Long-Term | - | 0.0% | 0.0% | 0.0% | - | - | - |
| Intangible Assets, Net | - | 0.0% | 0.0% | 0.0% | - | - | - |
| Other Assets | - | 0.0% | 0.0% | 0.0% | - | - | - |
| **Total Assets** | $    2.2 | 0.0% | 0.0% | 0.0% | $    - | $    - | $    - |
| | | | | | | | |
| **Liquidation Proceeds** | | | | | | | |
| Liquidation Proceeds from Assets | | | | | $    - | $    - | $    - |
| Sackler Settlement | | | | | - | - | - |
| **Total Liquidation Proceeds** | | | | | $    - | $    - | $    - |
| | | | | | | | |
| **Liquidation Costs** | | | | | | | |
| Chapter 7 Trustee Fees | | -2.0% | -2.5% | -3.0% | $    - | $    - | $    - |
| Chapter 7 Professional Fees | | | | | - | - | - |
| Transaction Costs/Advisory Fees | | -2.0% | -2.5% | -3.0% | - | - | - |
| Wind Down Costs | | | | | - | - | - |
| Severance | | | | | - | - | - |
| **Total Liquidation Costs** | | | | | $    - | $    - | $    - |
| | | | | | | | |
| **Funding Required from Purdue Pharma L.P.** | | | | | $    - | $    - | $    - |
| **Excess Proceeds Available to Purdue Pharma L.P.** | | | | | $    - | $    - | $    - |
| | | | | | | | |
| **Net Liquidation Proceeds Available to Creditors** | | | | | $    - | $    - | $    - |

| Creditor Class | Book Value | Estimated Claim Allowed | | | Estimated Recovery by Class of Claims ($)/(%) | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| | | High | Mid | Low | High | | Mid | | Low | |
| DOJ - Criminal Forfeiture | $    - | $    - | $    - | $    - | $    - | 0.0% | $    - | 0.0% | $    - | 0.0% |
| Administrative Expense Claims | $    (0.7) | $    0.7 | $    0.7 | $    0.7 | $    - | 0.0% | $    - | 0.0% | $    - | 0.0% |
| Priority Claims | $    - | $    - | $    - | $    - | $    - | 0.0% | $    - | 0.0% | $    - | 0.0% |
| LSTC - Prepetition Accounts Payable | | - | - | - | - | 0.0% | - | 0.0% | - | 0.0% |
| PBGC - Termination | (163.0) | 163.0 | 163.0 | 163.0 | - | 0.0% | - | 0.0% | - | 0.0% |
| Contract Rejection Damages | - | - | - | - | - | 0.0% | - | 0.0% | - | 0.0% |
| Contingent Litigation Liability | - | - | - | - | - | 0.0% | - | 0.0% | - | 0.0% |
| General Unsecured Claims | $    (163.0) | $    163.0 | $    163.0 | $    163.0 | $    - | 0.0% | $    - | 0.0% | $    - | 0.0% |
| **Total Claims** | $    (163.7) | $    163.7 | $    163.7 | $    163.7 | $    - | 0.0% | $    - | 0.0% | $    - | 0.0% |

35

#94482661v2

## Appendix C

**Financial Projections**

**Financial Projections**

In connection with the Disclosure Statement,[1] the Debtors' management team ("Management") prepared financial projections ("Financial Projections") for NewCo for fiscal years 2021 through 2025 (the "Projection Period"). The Financial Projections were prepared by Management and are based on a number of assumptions made by Management with respect to the future performance of NewCo's business. **Although Management has prepared the Financial Projections in good faith and believes the assumptions to be reasonable, there can be no assurance that such assumptions will be realized. As described in detail in the Disclosure Statement, a variety of risk factors could affect NewCo's financial results and must be considered. Accordingly, the Financial Projections should be reviewed in conjunction with a review of the risk factors set forth in the Disclosure Statement and the assumptions described herein, including all relevant qualifications and footnotes.**

The Debtors believe that the Plan meets the feasibility requirements set forth in section 1129(a)(11) of the Bankruptcy Code, as confirmation is not likely to be followed by liquidation or the need for further financial reorganization of the Debtors or any successor under the Plan. In connection with the planning and development of a plan of reorganization and for the purposes of determining whether such plan would satisfy this feasibility standard, the Debtors analyzed their ability to satisfy their financial obligations while maintaining sufficient liquidity and capital resources.

**These Financial Projections were not prepared with a view toward compliance with published guidelines of the United States Securities and Exchange Commission or guidelines established by the American Institute of Certified Public Accountants for preparation and presentation of prospective financial information. An independent auditor has not examined, compiled or performed any procedures with respect to the prospective financial information contained in this Exhibit and, accordingly, it does not express an opinion or any other form of assurance on such information or its achievability. Debtors' independent auditor assumes no responsibility for, and denies any association with, the prospective financial information.**

**Principal Assumptions for the Financial Projections**

The Financial Projections are based on, and assume the successful implementation of, the Debtors' current business plan ("Business Plan"). Both the Business Plan and the Financial Projections reflect numerous assumptions, including various assumptions regarding the anticipated future performance of NewCo, industry performance, general business and economic conditions, and other matters, many of which are beyond the control of the Debtors. These projections assume that the Company continues to operate its business in the ordinary course, do not forecast for any potential future operating asset sales or for the future NewCo Disposition Event and do not include all agreed to governance terms.

In addition, the assumptions do not take into account the uncertainty and disruption of business that may accompany an ongoing restructuring in Bankruptcy Court due to a delay in the confirmation of the Plan, which among other things, may lead to a loss of key employees.

Therefore, although the Financial Projections are necessarily presented with numerical specificity, the actual results achieved during the Projection Period will likely vary from the projected results. These variations may be material. Accordingly, no definitive representation can be or is being made with respect to the accuracy of the Financial Projections or the ability of NewCo to achieve the projected results of operations. See "Risk Factors."

In deciding whether to vote to accept or reject the Plan, creditors must make their own determinations as

to the reasonableness of such assumptions and the reliability of the Financial Projections. See "Risk Factors."

Moreover, the Financial Projections were prepared solely in connection with the restructuring pursuant to the Plan.

Under Accounting Standards Codification "ASC" 852, "Reorganizations" ("ASC 852"), the Debtors note that the Financial Projections reflect the operational emergence from chapter 11 but not the impact of fresh start accounting that will likely be required upon emergence. Fresh start accounting requires all assets, liabilities, and equity instruments to be valued at "fair value." The Financial Projections account for the reorganization and related transactions pursuant to the Plan. While the Debtors expect that NewCo will be required to implement fresh start accounting upon emergence, they have not yet completed the work required to quantify the impact to the Financial Projections. When NewCo fully implements fresh start accounting, differences are anticipated and such differences could be material.

**Safe Harbor Under The Private Securities Litigation Reform Act of 1995**

The Financial Projections contain statements which constitute "forward-looking statements" within the meaning of the Securities Act of 1933, as amended (the "Securities Act") and the Securities Exchange Act of 1934, as amended by the Private Securities Litigation Reform Act of 1995 (the "Exchange Act"). Forward-looking statements in the Financial Projections include the intent, belief, or current expectations of the Debtors and members of its management team with respect to the Business Plan and NewCo's future liquidity, as well as the assumptions upon which such statements are based.

While the Debtors believe that the expectations are based on reasonable assumptions within the bounds of their knowledge of their business and operations, parties in interest are cautioned that any such forward-looking statements are not guarantees of future performance, and involve risks and uncertainties, and that actual results may differ materially from those contemplated by such forward-looking statements.

**Select Risk Factors Related to the Financial Projections**

The Financial Projections are subject to inherent risks and uncertainties, most of which are difficult to predict and many of which are beyond Management's control. Many factors could cause actual results, performance or achievements to differ materially from any future results, performance or achievements expressed or implied by these forward-looking statements. A description of the risk factors associated with the Plan, the Disclosure Statement, and the Financial Projections is included in Article VIII.B of the Disclosure Statement.

**<u>Financial Projections General Assumptions</u>**

<u>Basis of presentation (non-GAAP)</u>

- The consolidated financial statements include NewCo and its subsidiaries, as successors to the operating businesses of Purdue Pharma L.P. and its Debtor subsidiaries. All significant intercompany transactions and accounts have been eliminated.

- The Debtors' liabilities subject to compromise account balance consists of $4,275 million of opioid litigation contingency accrual (expected to be paid by the Company's shareholders) and approximately $12 million of pre-petition trade liabilities. Upon emergence, the Debtors' forecasts reclassify the liability associated with the cash settlement that is expected to be paid by the Company's pre-petition shareholders (and therefore not part of Debtors cash projections) to equity as

a capital contribution based on the settlement agreement with the pre-petition shareholders. The pre-petition trade liabilities are assumed to be settled in cash. Other balance sheet projections do not include adjustments for fresh start accounting; projections are non-GAAP and not created in accordance with American Institute of Certified Public Accountants Statement of Position 90-7.

- The calculation of the cash Distributions to Claimants from Newco is calculated as cash in excess of $200 million (refer to "Allocation of Estate Distributable Value under the Plan" below).

## Allocation of Estate Distributable Value under the Plan

- Pursuant to Section 5.13(a) of the Plan, the Debtors' Effective Date Cash will be used to (i) fund the Professional Fee Escrow Account, the PAT Reserves and PAT Distribution Accounts to pay Professional Fee Claims and operating expenses of the Plan Administration Trust and to make distributions to Holders of Allowed Claims that will be administered by the Plan Administration Trust, (ii) fund the MDT Operating Reserve to pay operating expenses of the Master Disbursement Trust, (iii) contribute the Initial NewCo Cash to NewCo in the amount of $200 million, (iv) make the Truth Initiative Contribution, the Initial Tribe Trust Distribution and the Initial Private Creditor Trust Distributions on account of Ratepayer Claims, Tribe Claims, Hospital Claims, Third-Party Payor Claims, NAS Monitoring Claims and PI Claims and (v) pay the other required amounts pursuant to the Plan.

- Pursuant to Section 5.13(b) of the Plan, all Effective Date Cash remaining after the satisfaction of the amounts described above will be used to make the Initial NOAT Distribution, which is currently estimated to be $~~244~~219 million.

- On or as soon as practicable after the Effective Date, the NewCo Transferred Assets, consisting of the Initial NewCo Cash and all of the operating assets of the Debtors (including all non-cash assets of the Debtors other than the Excluded Assets), will be transferred directly or indirectly to NewCo or one or more of its subsidiaries.

- On Each NewCo Distribution Date, all cash held at NewCo ~~cash~~ in excess of the minimum cash amount of $200 million will be distributed to TopCo after the payment of any amounts required to be paid to the MDT under the NewCo/TopCo Guarantee Agreement. All cash received by TopCo in excess of amounts TopCo uses to fund operating expenses will be immediately distributed by TopCo to NOAT and the Tribe Trust.

- On the Effective Date, the Master Disbursement Trust will receive the MDT Transferred Assets (consisting of Shareholder Claim Rights, including the rights to receive payments due under the Shareholder Settlement Agreement, the MDT Insurance Rights and the MDT Causes of Action).

- The Master Disbursement Trust will use available cash to fund operating expenditures of the Master Disbursement Trust (including the payment of fees for certain third-party services and the compensation of the MDT Trustees and the MDT Executive Director) and to make distributions to the Private Creditor Trusts on each MDT Distribution Date in accordance with the terms outlined in Section 5.2(d) of the Plan. MDT Excess Cash will ultimately be distributed to NOAT and the Tribe Trust.

- Amounts paid in respect of the Shareholder Settlement Agreement are forecasted based on the terms set forth in the Plan and Disclosure Statement.

- The timing of any recoveries in respect of MDT Insurance Rights is currently uncertain and such recoveries have not been included in the forecast for conservatism.

- Distributions to each Creditor Trust will be used to make Distributions on account of Claims channeled to such Creditor Trust in accordance with the Plan, in addition to paying certain attorneys' fees and costs and funding operating expenditures of such Creditor Trust.

Below is brief description of selected forecasted financial statement items for the NewCo operating assets:

### Non-GAAP P&L

- Net Sales

  - NewCo will continue to operate the business under six main segments:

    1. Branded Opioids: Prescription opioids, including OxyContin, Hysingla, and Butrans
    2. Avrio Health: Over-the-counter brands such as Betadine, Senokot, Colace, and SlowMag
    3. Adhansia (collectively with the Branded Opioids and Avrio Health, the "Branded Business"): Prescription ADHD medication, with a differentiated 16-hour label
    4. Rhodes Pharmaceuticals (the "Generic Business"): Primarily generic solid oral-dose opioids, transdermal prescription medications, ADHD prescription medications and other prescription medications
    5. Pipeline Assets: Early stage non-opioid assets that require investment to reach commercialization or potential inflection point (for next decisions around further investment or monetization) but present upside if successfully developed; range of therapeutic areas from oncology to non-opioid pain; and
    6. Public Health Initiative: Five products currently in development (one of which is now approved and four others that are estimated to launch between end of 2021 to end of 2023) that will provide lifesaving medicines to address and abate the ongoing opioid epidemic.

  - In determining net sales for Branded Opioids and Adhansia, the Debtors first forecast gross sales based upon a combination of historical sales, demand trends, industry growth/decline, competitive landscape and market share assumptions. Management then forecasts the appropriate gross to net adjustments, such as expected returns, wholesaler fees and rebates, amongst other adjustments, to determine the appropriate net sales forecast for each product.

  - The Branded Opioids segment forecasts net sales to continue to decline in line with the overall market decline in opioid prescriptions, with some adjustments due to changes in market share from year to year.

  - Rhodes Pharmaceutical's net sales are forecasted to increase each year during the projection period as the Debtors' investment in its generic pipeline leads to new products coming to market each year during the 2021-2025 timeframe.

  - Avrio Health's core strategy of growing its core business and investing in new innovations in digestive health and wound care is forecasted to increase top line revenue steadily each year.

- Net sales for Adhansia, a recently launched ADHD product, are expected to rise each year as the product gains market share after its initial launch in mid-2019.

- Cost of Sales

  - Cost of sales forecasts for each product include the cost of goods sold, royalty expense and shipping and warehousing costs. The forecasts for each of the products are consistent with the Debtors' historical margins. Over time the Debtors' consolidated margins are expected to shift with its underlying product mix.

- General and Administrative

  - General and administrative expenses primarily consist of salaries and benefits and related overhead costs for functions such as the Finance, Legal and Human Resources, amongst others.

- Legal Fees – Ordinary Course

  - Ordinary course legal fees are primarily related to outside legal fees for general corporate, patent defense/prosecution, employment, regulatory and insurance.

- Research and Development

  - Research and development expenses primarily include expenses for salaries and benefits, the development of the Public Health Initiative (Nalmafene and OTC Naloxone) and investment in the for-profit pipeline.

- Milestones

  - Milestone expenses are either (i) pre NDA milestone payments related to research projects or (ii) the amortization of capitalized NDA approval or launch milestone payments.

- Medical Affairs

  - Medical Affairs cost primarily relate to expenses for salaries and benefits, opioid FDA commitments, Adhansia post marketing studies, Adhansia FDA commitments, future pipeline product research, and adverse event reporting which includes the multitude of claims filed in the bankruptcy proceedings.

- Sales and Promotion

  - Sales and promotion expenses are primarily related to salary and benefit costs of the commercial team, the cost of the third party Adhansia sales force, sales and marketing expenses related to the over the counter consumer health and Adhansia products and data expenses. The company does not have a sales force for marketing opioid products to healthcare providers.

- Health Care Reform Fee / Opioid Tax

- The health care reform fee is an annual tax paid to the IRS by pharmaceutical manufacturers, generally related to sales made to specified programs. This line of the profit and loss statement also includes various taxes on sales made to certain states, including opioid taxes.

- Other

  - Other expenses primarily represent annual bonus and long-term employee incentive compensation payments.

- Other Items

  - Other items primarily relate to third party royalty income, royalty expenses and interest income.

- PHI Costs

  - Upon emergence, NewCo will provide overdose and addiction treatment medications ("Public Health Initiative" or "PHI") at or below cost to the U.S. public. The cost of developing the PHI products are included in these forecasts. However, the additional costs of manufacturing and distributing the products are excluded from the forecasts. The forecasts assume the PHI products are provided at cost (i.e. Selling price equals cost), resulting in zero net cash flow impact.

- Legal Fees - Non-Recurring

  - Non-recurring legal fees are primarily due to bankruptcy and litigation related professional fees.

- One Time Charges / Other Items

  - One-time charges are primarily related to non-recurring expenses including asset impairments / write-offs, or severance.

- Taxes

  - The potential future tax liabilities of NewCo remain uncertain and will depend, among other factors, on (1) whether NewCo elects to be treated as a corporation for U.S. federal income tax purposes and (2) the tax basis of Newco's assets at emergence that will be based on a detailed valuation performed by a qualified third party expert (this valuation has yet to be performed). Due to the uncertainty of the future tax liabilities, the cash flow statement is shown without tax. The Debtors continue to work to optimize NewCo's post-emergence structure to minimize its future tax liabilities, however, the ultimate result of this process remains uncertain. The Debtors' current preliminary estimates are that NewCo could incur $75 million to $150 million over the period 2021 to 2025 in tax liabilities, but is highly dependent on (1) and (2) above. Even if NewCo were to incur tax liabilities of such magnitude, NewCo would retain sufficient liquidity to meet all future obligations.

**Non-GAAP Balance Sheet**

- Cash and Cash Equivalents

- The Debtors record all highly liquid instruments, with a maturity of less than 90 days when acquired, to be cash equivalents. The forecast is assumed to distribute all cash in excess of $200 million.

- Investments

  - Investments classified as available-for-sale are carried at estimated fair value with unrealized gains and losses recorded to net income.

  - Investments in privately held companies are accounted for using the cost method. The carrying value of investments in privately held companies are accounted for using the net asset value plus or minus changes resulting from observable price changes in orderly transactions for the identical or similar investment of the same issuer.

- Receivables

  - Allowance for doubtful accounts, accrued return reserves, cash payment discounts, wholesaler fees and chargebacks are included in receivables. Receivables generally are due within 30 to 60 days for the Branded Business and generally are between 60 and 100 days for the Generic Business. Credit is extended to customers based on an evaluation of their financial condition and collateral is not required. Consistent with historical trend, account write-offs have been assumed to be de-minimis.

- Inventories

  - Inventories, consisting of raw materials, work in progress and finished goods, are stated at the lower of cost or net realizable value and computed using the first-in, first-out method.

  - Inventory balances are forecasted based on quantities needed to fulfill forecasted sales and are consistent with historical inventory management practices.

- Prepaid expenses and other assets

  - Amount consist primarily of prepaid operating expenses, retainers relating to advisors and deposits, and other advances to vendors.

- Restricted Cash

  - The Debtors' restricted cash primarily relates to cash collateralized for insurance policies and trust agreements. These cash collateralization requirements are in place due to the Debtors' branded opioid business. The forecasted reductions in restricted cash represent the release of funds that will revert to NewCo based upon the underlying contractual terms and conditions in the underlying agreements.  For illustrative purposes, these releases of funds are shown as reverting to NewCo, although they may ultimately revert directly to the MDT to the extent that the underlying policies and restricted cash balances are transferred to the MDT at emergence.

- Property and Equipment

7

- Property and equipment are stated at cost and depreciated primarily using the straight-line method over the estimated useful lives of the related assets.

- Forecasted amounts for capital expenditures consist of maintenance expenditures including ordinary course alterations and repairs.

- Intangible Assets

  - Finite lived intangible assets (consisting of acquisition costs, approval or launch milestones for patent rights for OxyContin, Dilaudid, Fenofibrate, Adhansia, Hysingla, Paroxetine) are amortized using the straight-line method over the estimated useful lives of the related assets up to fifteen years.

  - Indefinite lived intangibles are stated at cost and not subject to amortization. The trademarks and products rights not subject to amortization are related to the Colace®, Colace® 2-in-1, Slow-mag® and mineral oil products.

- Other Assets

  - Other assets balance consists of prepaid rent.

- Accounts Payable

  - Accounts payable consists of trade payables and accrued operating expenses.

- Accrued Expenses and Other Liabilities

  - This amount consists primarily of accrued rebates, accrued and unpaid legal expenses, salaries and benefits, state opioid taxes, royalty expenses and other accrued expenses.

  - Revenue from sales of products is recognized at the time title passes to the customer, which generally occurs upon receipt by the customer. The Company establishes:

    o Returns, early payment discounts, customer discounts, wholesaler fees, chargebacks, Medicaid, Medicare and commercial rebates in the same period as the related sales are recognized in determining net sales. Accrued returns, cash payment discounts, wholesaler fees and chargebacks are included in receivables. Rebates are included in accrued expenses.

    o Rebate accruals are recorded for (1) the future rebates that will be paid on the value of inventory held within the distribution channel that has not been consumed by the end customer as of a reporting date and (2) rebates that have either been invoiced to the Company and not paid or rebates that are estimated based on consumption by the end customer. Information is regularly reviewed to confirm amounts of inventory in the distribution channel, such as data from several large customers' inventory management systems, and for other customers, data from third parties to help estimate the amount of inventory held by retail.

    o Royalty accruals from the licensing of product rights over the periods earned.

8

- Other Long-Term Liabilities

  - Other long-term liabilities consist primarily of employee defined pension benefits liability and employee post-retirement benefits liability related to the retirement and medical benefits provided by the Debtors to substantially all employees through a former, now frozen (see below) noncontributory defined benefit pension plan and a postretirement health care and life insurance plan.

  - Effective December 31, 2017, all remaining participants of the Debtors' defined pension plan ceased to accrue any additional benefits. The postretirement health care and life insurance plan was also amended effective January 1, 2018 to close post-65 medical coverage and life insurance coverage to future retirees.

## Cash Flows

- Operating Activities

  - Change in working capital is driven by ordinary course changes in accounts receivable, accounts payable, inventory, other current assets and other current liabilities.

- Investing Activities

  - Capital expenditures largely reflect manufacturing facility replacement of equipment and IT applications/infrastructure.

  - In forecasting the proceeds from sale of investments, the forecasted sale amount is estimated based on the sale of one investment using the market price as of December 31, 2020 as a proxy for the sale price. More recently, the market price of this investment has traded at approximately 50% of its price at year end. While the future sale proceeds will depend upon, among other factors, the prevailing market price at the time of such sale, the Debtors believe that the potential for lower sale proceeds presents little to no risk in the context of the overall plan.

  - The release of restricted cash is forecasted based upon the assumption of restricted cash collateral backstopping various of the Debtors' insurance policies. For the component of this restricted cash collateral transferred directly to the MDT, the released restricted cash would also be transferred directly to the MDT. However, as previously stated, for illustrative purposes, the Financial Projections reflect release of restricted cash associated with historical insurance policies is released at NewCo and subsequently transferred to the MDT and NOAT through the semiannual excess cash distributions.

- Financing Activities

  - The contribution represents $4.275 billion in aggregate payments due under the Shareholder Settlement Agreement as outlined in the Disclosure Statement and Plan, which will be recorded in the Debtors' financials as a shareholder contribution, but which will be paid directly to Master Disbursement Trust under the Shareholder Settlement Agreement.

## Claimant Trusts

- Operating Expenses

- MDT and TopCo expenses represent preliminary estimates of the go forward costs to administer each entity and to perform the duties for which each entity has been created.

- Cash Balances

  - MDT and TopCo are assumed to hold cash equal to the next year of operating expenses.

- Distributions

  - Private settlement payments, tribe distributions and NOAT distributions are made per the terms of the plan of reorganization

| 1. Consolidated Non-GAAP P&L ($ in millions) | Q1 2021 Forecast | Q2 2021 Forecast | Q3 2021 Forecast | Q4 2021 Forecast | FY 2021 Forecast | FY 2022 Forecast | FY 2023 Forecast | FY 2024 Forecast | FY 2025 Forecast |
|---|---|---|---|---|---|---|---|---|---|
| NET SALES | $ 188 | $ 173 | $ 172 | $ 171 | $ 703 | $ 695 | $ 756 | $ 824 | $ 533 |
| Cost of Goods Sold | (57) | (54) | (46) | (56) | (213) | (228) | (237) | (245) | (248) |
| GROSS PROFIT | 131 | 119 | 125 | 115 | 490 | 467 | 519 | 578 | 284 |
| General and Administrative | (19) | (21) | (18) | (19) | (77) | (69) | (70) | (70) | (66) |
| Legal Fees - Ordinary Course | (3) | (3) | (3) | (3) | (13) | (19) | (13) | (13) | (8) |
| Research and Development | (26) | (39) | (28) | (31) | (123) | (97) | (53) | (44) | (36) |
| Milestones | (1) | (4) | (1) | (1) | (6) | (3) | (5) | (4) | (0) |
| Medical Affairs | (9) | (11) | (14) | (14) | (47) | (34) | (28) | (16) | (9) |
| Sales and Promotion | (29) | (31) | (27) | (27) | (114) | (110) | (110) | (103) | (90) |
| Health Care Reform Fee | (3) | (3) | (3) | (3) | (11) | (11) | (11) | (12) | (4) |
| Other | (10) | (10) | (10) | (10) | (40) | (31) | (30) | (28) | (24) |
| OPERATING EXPENSES | (100) | (120) | (104) | (107) | (431) | (375) | (320) | (289) | (238) |
| OPERATING PROFIT | 31 | (1) | 22 | 8 | 59 | 92 | 199 | 289 | 47 |
| Other Items | 1 | 1 | 1 | 1 | 6 | 5 | 9 | 9 | 9 |
| PROFIT BEFORE NON-RECURRING & ONE-TIME CHARGES | 32 | 0 | 23 | 9 | 65 | 97 | 208 | 298 | 56 |
| Legal Fees - Non-Recurring | (88) | (60) | (93) | - | (241) | (10) | - | - | - |
| Reserve for Trust Admin / Ops. And Other Costs | - | - | (75) | - | (75) | - | - | - | - |
| One Time Charges / Other Items | (2) | (2) | (1) | (2) | (8) | (5) | (6) | (6) | (14) |
| PROFIT (LOSS) | $ (58) | $ (62) | $ (146) | $ 7 | $ (259) | $ 82 | $ 202 | $ 293 | $ 42 |

| 2. Consolidated Non-GAAP Balance Sheets ($ in millions) | Q1 2021 Forecast | Q2 2021 Forecast | Q3 2021 Forecast | Q4 2021 Forecast | FYE 2021 Forecast | FYE 2022 Forecast | FYE 2023 Forecast | FYE 2024 Forecast | FYE 2025 Forecast |
|---|---|---|---|---|---|---|---|---|---|
| **Assets** | | | | | | | | | |
| Current Assets: | | | | | | | | | |
| Cash and cash equivalents | $ 991 | $ 972 | $ 200 | $ 200 | $ 200 | $ 200 | $ 200 | $ 200 | $ 200 |
| Available for sale securities | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 1 |
| Accounts receivable | 119 | 114 | 116 | 119 | 119 | 129 | 156 | 178 | 113 |
| Due from associated companies | 7 | 7 | 7 | 8 | 8 | 6 | 5 | 5 | 5 |
| Inventories | 72 | 65 | 66 | 70 | 70 | 55 | 55 | 57 | 53 |
| Restricted Cash | 26 | 26 | 26 | - | - | 15 | - | - | 38 |
| Prepaid expenses and other assets | 65 | 54 | 70 | 68 | 68 | 59 | 43 | 34 | 26 |
| Total current assets | 1,281 | 1,240 | 486 | 466 | 466 | 465 | 460 | 513 | 398 |
| Property, plant, and equipment, net | 89 | 88 | 87 | 86 | 86 | 79 | 72 | 65 | 58 |
| Restricted cash - long-term | 123 | 123 | 123 | 123 | 123 | 108 | 109 | 71 | 72 |
| Investment in associated companies | - | - | - | - | - | - | - | - | - |
| Investments at cost | 90 | 46 | 46 | 46 | 46 | 46 | 46 | 46 | 46 |
| Intangible assets, net | 77 | 76 | 75 | 75 | 75 | 72 | 72 | 71 | 70 |
| Other assets | 3 | 3 | 3 | 3 | 3 | 0 | 0 | 0 | 0 |
| Total assets | $ 1,662 | $ 1,576 | $ 820 | $ 799 | $ 799 | $ 770 | $ 758 | $ 767 | $ 645 |
| **Liabilities** | | | | | | | | | |
| Current liabilities: | | | | | | | | | |
| Accounts payable | $ 43 | $ 47 | $ 42 | $ 43 | $ 43 | $ 47 | $ 39 | $ 37 | $ 32 |
| Accrued expenses and taxes | 298 | 274 | 238 | 232 | 232 | 227 | 228 | 246 | 128 |
| Due to associated companies | 3 | 3 | 3 | 3 | 3 | 0 | 0 | 0 | 0 |
| Total current liabilities | 344 | 324 | 282 | 279 | 279 | 274 | 267 | 283 | 160 |
| Other liabilities | 73 | 69 | 64 | 57 | 57 | 50 | 43 | 37 | 32 |
| Due to associated companies | 11 | 11 | 11 | 11 | 11 | 11 | 11 | 11 | 11 |
| Liabilities subject to compromise | 4,287 | 4,287 | - | - | - | - | - | - | - |
| Total liabilities | 4,715 | 4,690 | 357 | 347 | 347 | 335 | 321 | 331 | 204 |
| **Equity** | | | | | | | | | |
| Retained earnings and partners' capital | (3,014) | (3,076) | 500 | 491 | 491 | 467 | 464 | 458 | 459 |
| Accumulated other comprehensive loss | (39) | (38) | (37) | (39) | (39) | (31) | (27) | (22) | (17) |
| Total stockholder's equity | (3,053) | (3,114) | 463 | 452 | 452 | 436 | 437 | 436 | 442 |
| Total liabilities and stockholder's equity | $ 1,662 | $ 1,576 | $ 820 | $ 799 | $ 799 | $ 770 | $ 758 | $ 767 | $ 645 |

(Modified)

| P Cash Flow Metrics | Q1 2021 Forecast | Q2 2021 Forecast | Q3 2021 Forecast | Q4 2021 Forecast | FY 2021 Forecast | FY 2022 Forecast | FY 2023 Forecast | FY 2024 Forecast | FY 2025 Forecast |
|---|---|---|---|---|---|---|---|---|---|
| **Operating activities** | | | | | | | | | |
| Net Income (before distributions to claimants) | $ (58) | $ (62) | $ (146) | $ 7 | $ (259) | $ 82 | $ 202 | $ 293 | $ 42 |
| Adjustments to reconcile net income to net cash provided by operating activities | | | | | | | | | |
| Depreciation and amortization | 4 | 4 | 4 | 4 | 17 | 16 | 13 | 13 | 13 |
| Working capital changes | 36 | 0 | (72) | (9) | (44) | 2 | (8) | 1 | (46) |
| Shareholder Contributions | - | - | (4,275) | - | (4,275) | - | - | - | - |
| Long-term assets and liabilities | 13 | (3) | (3) | (8) | (1) | 3 | (1) | (1) | 0 |
| Net cash provided by operating activities | (5) | (60) | (4,492) | (6) | (4,563) | 103 | 206 | 305 | 9 |
| **Investing activities** | | | | | | | | | |
| Capital expenditures | (2) | (2) | (3) | (3) | (10) | (6) | (6) | (6) | (6) |
| Proceeds from sale of fixed assets | - | - | - | - | - | - | - | - | - |
| Purchase of intangibles | - | - | - | - | - | - | - | - | - |
| Purchase of investments | (4) | - | - | - | (4) | - | - | - | - |
| Proceeds from sale of investments | - | 43 | - | - | 43 | - | - | - | - |
| Restricted cash, net | 41 | (0) | (0) | 26 | 67 | (0) | 15 | (1) | 38 |
| Net cash used in investing activities | 35 | 41 | (3) | 24 | 97 | (7) | 9 | (7) | 32 |
| **Financing activities** | | | | | | | | | |
| Shareholder Contributions | - | - | 4,275 | - | 4,275 | - | - | - | - |
| Payment to DOJ | - | - | (250) | - | (250) | - | - | - | - |
| Distributions to TopCo and MDT | - | - | (303) | (17) | (320) | (96) | (215) | (299) | (40) |
| Net cash used in financing activities | - | - | 3,722 | (17) | 3,680 | (96) | (215) | (299) | (40) |
| Increase (decrease) in cash and cash equivalents | 30 | (19) | (772) | 0 | (786) | 0 | - | (0) | 0 |
| Unrestricted Cash at beginning of period | 961 | 991 | 972 | 200 | 961 | 208 | 208 | 208 | 208 |
| **Unrestricted Cash at end of period** | $ 991 | $ 972 | $ 200 | $ 200 | $ 208 | $ 208 | $ 208 | $ 208 | $ 208 |

(Modified graphics)

|  | Q3 2021 Forecast | Q4 2021 Forecast | 2021 Forecast | 2022 Forecast | 2023 Forecast | 2024 Forecast | 2025 Forecast | Cumulative 2021 - 2025 |
|---|---|---|---|---|---|---|---|---|
| Total Cash Sweep from Debtors/NewCo[1] | $ 380 | $ 17 | $ 386 | $ 96 | $ 215 | $ 299 | $ 40 | $ 1,006 |
| **MDT** | | | | | | | | |
| Shareholder Proceeds | 300 | - | 300 | 350 | 350 | 350 | 350 | 1,700 |
| Cash Sweep from Debtors/NewCo | 63 | 3 | 66 | - | - | 29 | - | 95 |
| **Total Cash Inflows** | **363** | **3** | **366** | **350** | **350** | **379** | **350** | **1,795** |
| MDT Expenses | - | (7) | (7) | (25) | (12) | (12) | (12) | (69) |
| Private Settlements | (334) | - | (334) | (180) | (201) | (367) | (150) | (1,232) |
| **Total Cash Outflows** | **(334)** | **(7)** | **(341)** | **(205)** | **(213)** | **(379)** | **(162)** | **(1,300)** |
| **Net Increase / (Decrease) in Cash** | **30** | **(4)** | **25** | **145** | **137** | **-** | **188** | **495** |
| Opening MDT Cash Balance | $ - | $ 30 | $ - | $ 25 | $ 12 | $ 12 | $ 12 | $ - |
| Net Increase / (Decrease) in Cash | 30 | (4) | 25 | 145 | 137 | - | 188 | 495 |
| NOAT Distribution[2] | - | - | - | (158) | (137) | - | (188) | (483) |
| **Ending MDT Cash Balance** | **$ 30** | **$ 25** | **$ 25** | **$ 12** | **$ 12** | **$ 12** | **$ 12** | **$ 12** |
| **TopCo** | | | | | | | | |
| Cash Sweep from Debtors/NewCo | 206 | 14 | 290 | 96 | 215 | 270 | 40 | 916 |
| **Total Cash Inflows** | **206** | **14** | **290** | **96** | **215** | **270** | **40** | **916** |
| TopCo Expenses | - | (2) | (2) | (7) | (7) | (7) | (7) | (29) |
| Tribe Settlement Distribution | (50) | - | (50) | - | - | (4) | (6) | (61) |
| **Total Cash Outflows** | **(50)** | **(2)** | **(52)** | **(7)** | **(7)** | **(11)** | **(13)** | **(90)** |
| **Net Increase / (Decrease) in Cash** | **256** | **13** | **288** | **89** | **208** | **259** | **27** | **828** |
| Opening TopCo Cash Balance | $ - | $ 7 | $ - | $ 7 | $ 7 | $ 7 | $ 7 | $ - |
| Net Increase / (Decrease) in Cash | 256 | 13 | 288 | 89 | 208 | 259 | 27 | 828 |
| NOAT Distribution[2] | (249) | (13) | (256) | (89) | (208) | (259) | (27) | (819) |
| **Ending TopCo Cash Balance** | **$ 7** | **$ 7** | **$ 7** | **$ 7** | **$ 7** | **$ 7** | **$ 7** | **$ 7** |
| **Total NOAT Distribution[2]** | **$ (249)** | **$ (13)** | **$ (256)** | **$ (247)** | **$ (345)** | **$ (259)** | **$ (215)** | **$ (1,302)** |

[1] The cash sweep of $380mm in Q3 2021 includes $36mm paid out in the $75mm "Reserve for Trust Admin/ Ops. And Other Costs" amount reflected on the consolidated P&L in Q3 2021.

[2] For the avoidance of doubt, the NOAT distributions exclude any potential professional fees that may need to ultimately be paid out of these distributions.

## **Appendix D**

## **Valuation Analysis**

#94482745v3

## Valuation Analysis

THE INFORMATION CONTAINED HEREIN IS NOT A PREDICTION OR GUARANTEE OF THE ACTUAL MARKET VALUE THAT MAY BE REALIZED THROUGH THE SALE OF ANY SECURITIES OR ASSETS TO BE SOLD PURSUANT TO THE PLAN. THE INFORMATION IS PRESENTED SOLELY FOR THE PURPOSE OF PROVIDING ADEQUATE INFORMATION UNDER SECTION 1125 OF THE BANKRUPTCY CODE TO ENABLE THE HOLDERS OF CLAIMS ENTITLED TO VOTE TO ACCEPT OR REJECT THE PLAN TO MAKE AN INFORMED JUDGMENT ABOUT THE PLAN AND SHOULD NOT BE USED OR RELIED UPON FOR ANY OTHER PURPOSE, INCLUDING THE PURCHASE OR SALE OF CLAIMS AGAINST THE DEBTORS OR ANY OF THEIR AFFILIATES.[1]

Solely for the purposes of the Plan and the Disclosure Statement, PJT Partners LP ("PJT"), as investment banker to the Debtors, has estimated a range of value (the "Valuation Range") for the Debtors (the "Valuation Analysis"). The Valuation Analysis is based on financial and other information provided to PJT by the Debtors' management, the Financial Projections attached to the Disclosure Statement as **Appendix C**, and information from other sources. The Valuation Analysis is as of March 29, 2021, with an assumed Effective Date of September 30, 2021. The Valuation Analysis utilizes market data as of March 29, 2021. As used herein, the Valuation Range includes a range of value solely in respect of: (i) the enterprise value of the sum of the parts of the business segments of the Debtors; (ii) the anticipated unrestricted cash on the Debtors' balance sheet as of September 30, 2021; and (iii) the market value of Debtor's investments as of March 29, 2021. Third-party sources of value, such as net proceeds realized from shareholder settlement payments or from the rights to insurance policies held by the Debtors, are not included in the Valuation Range or the Valuation Analysis. In addition, any value realized or to be realized from the development of the Debtors' pipeline assets or from the Public Health Initiatives is also not included in the Valuation Range or the Valuation Analysis. The valuation estimates set forth herein represent valuation analyses of the Debtors generally based on the application of customary valuation techniques to the extent deemed appropriate by PJT.

In preparing its valuation, PJT considered a variety of factors and evaluated a variety of financial analyses. Given the Debtors' Financial Projections span across multiple different business models and therapeutic areas, the valuation presented herein utilizes a sum-of-the-parts valuation methodology that relies on, to the extent applicable for the separate business segments, (i) comparable company analysis, (ii) comparable precedent transaction analysis, and (iii) discounted cash flow analysis. While a discounted cash flow analysis was considered for the consolidated Debtors, it was not utilized as a formal methodology for valuation purposes due to fundamental differences of the underlying businesses, including, but not limited to, differences in the risk and cost of capital between the business segments.

i.   *Comparable Company Analysis*: The comparable company analysis estimates value based on a relative comparison with other publicly traded companies with similar operating and financial characteristics. Under this methodology, the enterprise

---

[1] Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to them in the *Disclosure Statement for the Chapter 11 Plan of Reorganization of Purdue Pharma L.P. and its Debtor Affiliates* (the "Disclosure Statement") to which this analysis is attached as **Appendix D**.

value for each selected public company is determined by examining the trading prices for the equity securities of such company in the public markets and adding the aggregate amount of outstanding net debt for such company (at book value) and minority interest. Such enterprise values are often expressed as multiples of various operating metrics, including revenue and EBITDA, depending on the type of the subject business. The total value is then calculated by applying the observed multiples to the relevant metrics of the subject business. The selection of public comparable companies for this purpose was based on various parameters that were deemed relevant by PJT.

ii.    *Comparable Precedent Transaction Analysis*: The precedent transaction analysis estimates value based on a relative comparison with other sale transactions of companies with similar operating and financial characteristics. Under this methodology, the total value of the subject business is estimated by applying observed multiples from prior sales of comparable companies and/or assets to the relevant operating metrics of the subject business. The selection of precedent transactions for this purpose was based on various parameters that were deemed relevant by PJT.

iii.    *Discounted Cash Flow Analysis*: The discounted cash flow analysis is a forward-looking enterprise valuation methodology that estimates the value of a business by calculating the present value of expected future cash flows to be generated by the business, combined with the present value of the terminal value, if applicable, of the business segment at the end of the forecast period. Under this methodology, projected future cash flows are discounted by the business segment's weighted average cost of capital, which reflects the estimated blended rate of return that would be required by debt and equity investors to invest in the business based on its capital structure. The terminal value is calculated by applying a relevant perpetuity growth rate to the cash flow of the business segment in the final year of the Financial Projections.

The preparation of a valuation analysis is a complex analytical process involving subjective determinations about which methodologies are most appropriate and relevant to the subject business. The application of those methodologies to particular facts and circumstances is not readily suitable to summary description.

For purposes of the Valuation Analysis, PJT assumed that no material changes that would affect estimated value will occur between the date of filing of the Disclosure Statement and the assumed Effective Date. PJT's Valuation Analysis does not constitute an opinion as to the fairness from a financial point of view of the consideration to be received or paid under the Plan, of the terms and provisions of the Plan, or with respect to any other matters.

Based on the aforementioned analyses, and other information described herein and solely for purposes of the Plan, the Valuation Range of the Debtors' businesses, as of an assumed Effective Date of September 30th, 2021, is approximately $1.6 billion to approximately $2.0 billion (with the mid-point of such range being approximately $1.8 billion).

The Valuation Range, as estimated by PJT, is part of the overall value delivered under the Plan. The other sources of value include the payment of $4.275 billion by certain Shareholder Released Parties under the Shareholder Settlement, the rights to insurance assets, and the Public Health Initiatives which is separately valued by the management.

THE VALUATION ANALYSIS REFLECTS WORK PERFORMED BY PJT ON THE BASIS OF INFORMATION IN RESPECT OF THE BUSINESS AND ASSETS OF THE DEBTORS AVAILABLE TO PJT AS OF MARCH 29, 2021. IT SHOULD BE UNDERSTOOD THAT, ALTHOUGH SUBSEQUENT DEVELOPMENTS MAY HAVE AFFECTED OR MAY AFFECT PJT'S CONCLUSIONS, PJT DOES NOT HAVE ANY OBLIGATION TO UPDATE, REVISE, OR REAFFIRM THE VALUATION ANALYSIS AND DOES NOT INTEND TO DO SO.

PJT DID NOT INDEPENDENTLY VERIFY THE FINANCIAL PROJECTIONS OR OTHER INFORMATION THAT PJT USED IN THE VALUATION ANALYSIS, AND NO INDEPENDENT VALUATIONS OR APPRAISALS OF THE DEBTORS OR THEIR ASSETS WERE SOUGHT OR OBTAINED IN CONNECTION THEREWITH. THE VALUATION ANALYSIS WAS DEVELOPED SOLELY FOR PURPOSES OF THE PLAN AND THE ANALYSIS OF POTENTIAL RELATIVE RECOVERIES TO CREDITORS THEREUNDER. THE VALUATION ANALYSIS REFLECTS THE APPLICATION OF VARIOUS VALUATION TECHNIQUES, DOES NOT PURPORT TO BE AN OPINION AND DOES NOT PURPORT TO REFLECT OR CONSTITUTE AN APPRAISAL, LIQUIDATION VALUE, OR ESTIMATE OF THE ACTUAL MARKET VALUE THAT MAY BE REALIZED THROUGH THE SALE OF ANY SECURITIES AND/OR FUNDED DEBT THAT MAY BE ISSUED, WHICH MAY BE SIGNIFICANTLY DIFFERENT THAN THE AMOUNTS SET FORTH IN THE VALUATION ANALYSIS.

THE VALUE OF AN OPERATING BUSINESS IS SUBJECT TO NUMEROUS UNCERTAINTIES AND CONTINGENCIES THAT ARE DIFFICULT TO PREDICT AND WILL FLUCTUATE WITH CHANGES IN FACTORS AFFECTING THE FINANCIAL CONDITION AND PROSPECTS OF SUCH A BUSINESS. AS A RESULT, THE VALUATION ANALYSIS IS NOT NECESSARILY INDICATIVE OF ACTUAL OUTCOMES, WHICH MAY BE SIGNIFICANTLY MORE OR LESS FAVORABLE THAN THOSE SET FORTH HEREIN. BECAUSE SUCH ESTIMATES ARE INHERENTLY SUBJECT TO UNCERTAINTIES, NEITHER THE DEBTORS, PJT, NOR ANY OTHER PERSON ASSUMES RESPONSIBILITY FOR THEIR ACCURACY.

Management of the Debtors advised PJT that the Financial Projections were reasonably prepared in good faith and on a basis reflecting the Debtors' best estimates and judgments as to the future operating and financial performance of the Debtors' businesses. If the businesses perform at levels below or above those set forth in the Financial Projections, such performance may have a materially negative or positive impact, respectively, on their valuation.

In preparing the Valuation Analysis, PJT: (a) reviewed certain historical financial information of the Debtors for recent years and interim periods; (b) discussed certain aspects of the Debtors' performance, future prospects, and industry observations with certain members of the management of the Debtors; (c) reviewed certain financial and operating data of the Debtors, including the Financial Projections; (d) assumed business segments will be tax paying entities and

overlaid an illustrative tax expense where appropriate; (e) reviewed certain publicly available financial data for, and considered the market value of, public companies that PJT deemed generally relevant in analyzing the value of certain business segments of the Debtors; (f) reviewed certain publicly available data for, and considered the market values implied therefrom, recent transactions involving assets and companies comparable in certain respects to certain business segments of the Debtors; and (g) considered certain economic and industry information that PJT deemed generally relevant to the Debtors. PJT assumed and relied on the accuracy and completeness of all financial and other information furnished to it by the Debtors' management and other parties as well as publicly available information.

The Valuation Analysis does not constitute a recommendation to any Holder of Allowed Claims, or any other person as to how such person should vote or otherwise act with respect to the Plan. PJT has not been requested to, and does not express any view as to, the potential trading value of any funded debt or other securities that may be issued by NewCo on issuance or at any other time.

PJT did not estimate the value of any potential tax attributes (such as carryforwards under section 163(j) of the Tax Code) that may survive the restructuring or otherwise evaluate the tax implications of the Plan on the Debtors' businesses. Any changes to the assumptions on the availability of tax attributes, the amount of the tax basis, or the impact of cancellation of indebtedness income on the projections could materially impact the conclusions reached in the Valuation Analysis.

THE SUMMARY SET FORTH ABOVE DOES NOT PURPORT TO BE A COMPLETE DESCRIPTION OF THE VALUATION ANALYSIS PERFORMED BY PJT. THE PREPARATION OF A VALUATION ANALYSIS INVOLVES VARIOUS DETERMINATIONS AS TO THE MOST APPROPRIATE AND RELEVANT METHODS OF FINANCIAL ANALYSIS AND THE APPLICATION OF THESE METHODS IN THE PARTICULAR CIRCUMSTANCES AND, THEREFORE, SUCH AN ANALYSIS IS NOT READILY SUITABLE TO SUMMARY DESCRIPTION. THE VALUATION ANALYSIS PERFORMED BY PJT IS NOT NECESSARILY INDICATIVE OF ACTUAL VALUES OR FUTURE RESULTS, WHICH MAY BE SIGNIFICANTLY MORE OR LESS FAVORABLE THAN THOSE DESCRIBED HEREIN.

PJT IS ACTING AS INVESTMENT BANKER TO THE DEBTORS, AND HAS NOT AND WILL NOT BE RESPONSIBLE FOR, AND HAS NOT AND WILL NOT PROVIDE ANY TAX, ACCOUNTING, ACTUARIAL, LEGAL, OR OTHER SPECIALIST ADVICE TO THE DEBTORS OR ANY OTHER PARTY IN CONNECTION WITH THE DEBTORS' CHAPTER 11 CASES, THE PLAN, OR OTHERWISE.

# Appendix E

## Organizational Structure

## Appendix E

### Organizational Structure



**<u>Appendix F</u>**

**Amended NewCo/TopCo Governance Term Sheet**

## NEWCO/TOPCO GOVERNANCE TERM SHEET

## INTRODUCTION

This term sheet (the "**NewCo/TopCo Governance Term Sheet**") sets forth certain salient governance terms relating to NewCo and TopCo in connection with a proposed chapter 11 plan (the "**Plan**") for Purdue Pharma L.P. ("**PPLP**") and its affiliates that are debtors and debtors in possession (collectively, "**Purdue**" or the "**Debtors**").[1]   This NewCo/TopCo Governance Term Sheet does not include a description of all of the terms, conditions, and other provisions that are to be contained in the definitive documentation governing NewCo and TopCo.   The Plan will not contain any terms or conditions that are materially inconsistent with this NewCo/TopCo Governance Term Sheet.

| | |
|---|---|
| **Purpose and Covenants** | NewCo shall operate in accordance with the terms of section 5.4(b) of the Plan and shall be subject to the NewCo Operating Injunction and the NewCo Governance Covenants (NewCo's "**Purpose**"). |
| **Minimum TopCo Distribution** | NewCo shall use best efforts to make TopCo Distributions from NewCo Excess Cash in an aggregate amount of $~~850~~825 million[2] (*less* amounts distributed by the Debtors on the Effective Date pursuant to the Initial NOAT Distribution and the Initial Tribe Trust Distribution) consisting of an aggregate amount of $50 million through January 15, 2023, an incremental aggregate amount of $200 million through January 15, 2024 and an incremental aggregate amount of $300 million through January 15, 2025, *plus* any NewCo Excess Cash from potential asset sales or incremental cash flows from performance improvement initiatives (the "**Minimum TopCo Distribution**") in order to fulfill NewCo's Purpose of effective deployment of its assets to abate the opioid crisis; *provided*, *however*, that, in seeking to fund the Minimum TopCo Distribution, the NewCo Board shall consider (i) NewCo Operating Expenses and (ii) NewCo's Purpose.<br><br>NewCo shall use best efforts to make the Minimum TopCo Distribution from available funds (including excess cash from operations, asset sale proceeds and proceeds from financings) constituting NewCo Excess Cash by January 15, 2025. The Minimum TopCo Distribution shall be deemed satisfied and reduced by all TopCo Distributions and any transfers of NewCo Available Cash and Net Sale Proceeds to the Master Disbursement Trust to fund any obligations to the Master Disbursement Trust in respect of the NewCo~~/TopCo Guarantee~~ Credit Support Agreement. Subject to the NewCo Priority Waterfall, NewCo shall make TopCo Distributions of NewCo Excess Cash on each NewCo Distribution Date. |
| **NewCo Disposition Event** | As described below, the NewCo Managers and TopCo Managers shall pursue a transaction or series of transactions to sell the assets of NewCo and/or sell, transfer, or contribute TopCo's equity interests in NewCo (such event, the "**NewCo Disposition Event**"). The NewCo Disposition Event may consist of one or more sales of assets or sales of equity through public or private markets, and may involve commercial buyers or non-profit buyers.   In pursuing such a NewCo Disposition Event, the NewCo Managers and TopCo Managers shall consider which transactions best achieve |

---

[1]   Capitalized terms used but not otherwise defined in this NewCo/TopCo Governance Term Sheet shall have the meanings ascribed to such terms in the Plan.

[2]   As adjusted by the impact of debt, if applicable.

NewCo's Purpose, taking into account fulfilling the Minimum TopCo Distribution, application of proceeds, and whether the buyers will continue to deploy the purchased assets/securities in furtherance of NewCo's Purpose and the NewCo Governance Covenants.

Within 120 days of the Effective Date, the board of NewCo (the "**NewCo Board**") shall retain one or more recognized, independent investment bankers or similar professionals (the "**NewCo Disposition Advisors**") to advise on the relative merits of potential transactions to effectuate the Minimum TopCo Distribution and the NewCo Disposition Event, it being understood and agreed that while the board of NewCo Managers (the "**NewCo Board**") and the board of TopCo Managers (the "**TopCo Board**") are free to retain advisors to effectuate asset sales and a NewCo Disposition Event on terms they choose, the NewCo Disposition Advisor shall not be retained to effectuate any such transaction on a "success fee" or similar basis in order to avoid a conflict of interest in such NewCo Disposition Advisor's analysis of the merits of any such transaction(s).  By the later of December 31, 2021 and six months following the Effective Date, and semi-annually thereafter, the NewCo Board, working with the NewCo Disposition Advisors, shall provide to TopCo, who shall report to NOAT, and the Master Disbursement Trust, a report (the "**NewCo Strategic Options Report**") assessing and recommending strategic options to effectuate the Minimum TopCo Distribution and the NewCo Disposition Event, including, for example, sales of NewCo Transferred Assets, financings, sales of NewCo to a commercial buyer or a non-profit organization, initial public offering opportunities, or private equity transactions.  The report shall address the market for these opportunities and likely valuations, potential to maximize near-term proceeds and long-term value, tax implications, and the effect of any transaction on the continuation of NewCo's stated Purpose and the NewCo Governance Covenants, including the likelihood of the continuation of the Public Health Initiatives.  The report shall also include recommendations for implementing these strategic options consistent with the timing set out below.  The NewCo Strategic Options Report shall also address how the NewCo Disposition Event would be implemented in coordination with the funding of the Minimum TopCo Distribution.

Any transaction involving the opioid assets must include an agreement satisfactory to the NewCo Board and TopCo Board that the transferee shall be bound by (and will not transfer such assets to any subsequent transferee that does not so agree to be bound by and to similarly bind its transferees to) the applicable terms of the NewCo Operating Injunction and the NewCo Governance Covenants.

The NewCo Managers and TopCo Managers shall use best efforts to complete the Minimum TopCo Distribution and the NewCo Disposition Event by **December 31, 2024**.  The deadline to complete the NewCo Disposition Event may be extended only by no less than a two-thirds (2/3) majority determination of the TopCo Managers, taking into account NewCo's stated Purpose, after providing thirty (30) days' written notice to the Attorneys General and other designated governmental and tribal representatives, explaining why such an extension is considered appropriate and advances the public interest.  There shall be a maximum of two, one-year extensions of the time for completion of the NewCo Disposition Event.  The NewCo Managers shall report to the TopCo Managers every three months after an extension regarding the status of continuing efforts to effectuate the Minimum TopCo Distribution and the NewCo Disposition Event and whether one further extension is appropriate to protect or advance the public interest asserted in the initial extension.  In considering the

|  | NewCo Disposition Event, NewCo Managers may consider alternative transactions, including contributing NewCo's assets to a non-profit entity, converting NewCo to a not-for-profit entity, or if NewCo's financial situation requires, winding down NewCo.  Likewise, the TopCo Managers and the NewCo Managers may consider selling, transferring, or otherwise contributing TopCo's equity interest in NewCo to effectuate the NewCo Disposition Event. |
|---|---|
| **NewCo Governance Principles** | The NewCo Managers shall not be required to maximize sales or profits, but rather shall be allowed to take all elements of NewCo's Purpose into account. <br><br> For the avoidance of doubt, in balancing the interests of NewCo's equityholders prior to implementation of the NewCo Disposition Event, the NewCo Managers shall give priority to funding the Minimum TopCo Distribution for the purpose of devoting funds to statewide opioid abatement programs. <br><br> NewCo will be required to be operated in a responsible and sustainable manner taking into account the public interest in transparency regarding NewCo. |
| **Reporting Requirements** | The NewCo Managers shall prepare (i) semi-annual public benefit reports to be published publicly, which shall describe the effectuation of NewCo's Purpose, the short-term and long-term value being created by NewCo and the public benefits being achieved consistent with NewCo's Purpose, and (ii) semi-annual financial and operating reports to be delivered to TopCo and NOAT. |
| **Transition Protocol** | The Ad Hoc Committee and Debtors will cooperate and agree to a transition protocol to be enacted once the Confirmation Order has been entered to ensure the Debtors operate pursuant to the applicable terms of the NewCo/TopCo Governance Term Sheet and the NewCo Managers and TopCo Managers are enabled to effectively manage their respective entities upon emergence.  The Debtors will provide mutually agreed upon bi-weekly reporting to the Ad Hoc Committee advisors for the time period between entry of the Confirmation Order and the Effective Date. <br><br> Once the Confirmation Order has been entered, the Debtors will agree to allow one mutually agreed observer at full board meetings, who can be excluded in the Debtors' sole and absolute discretion for privilege, bankruptcy, creditor or stakeholder specific or any other considerations not related to the overall commercial activities and operations of the Debtors or the transition to NewCo. |
| **NewCo Operating Agreement** | The NewCo Operating Agreement shall, among other things, (i) provide that NewCo shall operate in a manner consistent with, and in furtherance of, its Purpose and the terms hereof, (ii) obligate the NewCo Managers and NewCo to regularly evaluate whether NewCo's conduct of its business constitutes the optimal method or methods of fulfilling its Purpose, (iii) provide for the terms of the Minimum TopCo Distribution set forth in this NewCo/TopCo Governance Term Sheet, (iv) provide for implementation of the NewCo Disposition Event, (v) provide for the reporting requirements set forth in this NewCo/TopCo Governance Term Sheet and (vi) address how NewCo may respond to any patent-related issues associated with OxyContin.[3] |
| **Public Health** | NewCo shall continue to support the development of Public Health Initiative products on terms to be set forth in the NewCo Operating Agreement, which will be consistent with the States' respective priorities in their opioid abatement programs; *provided* that, from June 30, 2021 until satisfaction of the Minimum TopCo Distribution, the |

---

[3]   Post-Effective Date treatment of patents to be the subject of further discussion.

| Initiative Development Budget | budget for direct research and development spending in support of such Products shall not exceed $50 million (the "**Public Health Initiative Development Budget**"), it being understood and agreed that other related costs and expenses, such as overhead allocations and medical affairs expenses, shall not be part of the Public Health Initiative Development Budget.  Any costs of providing the Public Health Initiative products below cost will additionally be credited against the Public Health Initiative Development Budget. |
|---|---|
| | The NewCo Board and the TopCo Board shall periodically evaluate the efficacy of the Public Health Initiative projects.  The TopCo Board's evaluation shall consider the extent to which the Public Health Initiative projects will be value accretive to the interests of TopCo's members.  Following satisfaction of the Minimum TopCo Distribution and through the NewCo Disposition Event, the NewCo Board, with the consent of the TopCo Board, may expand the Public Health Initiative Development Budget by up to an additional $35 million.  Following the NewCo Disposition Event, NewCo's investment in Public Health Initiative products shall no longer be limited by the Public Health Initiative Development Budget. Any acquirer of assets from NewCo shall not be limited by the Public Health Initiative Development Budget. |
| | Consistent with NewCo's Purpose, the NewCo Managers shall determine the most effective means by which to utilize funds budgeted for Public Health Initiative projects and to otherwise comply with the NewCo Governance Covenants. |
| **Injunctive Relief and Best-in-Class Compliance Systems** | At all times from and after the Effective Date, NewCo and any purchaser of NewCo's opioid-related assets shall remain subject to the NewCo Operating Injunction and the NewCo Governance Covenants. In addition, the NewCo Managers shall be required to adopt the best-in-industry compliance systems designed to ensure that all of NewCo's Products are sold and distributed in the safest manner possible and without diversion. |
| | TopCo shall be responsible for the selection of any replacement of the NewCo Monitor, if any, required after Effective Date. |
| **NewCo Managers** | In the event of a vacancy on the NewCo Board, either as a result of death, resignation or removal by TopCo (acting through the TopCo Managers), TopCo (acting through the TopCo Managers) may fill such vacancy. |
| | Any or all NewCo Managers can be removed at any time and without cause by the sole voting member of NewCo. |
| | For the avoidance of doubt, the holders of Interests in the Debtors or their Related Parties (other than the Debtors) shall have no role in the appointment of any of the TopCo Managers, the NewCo Managers, the Creditor Trustees for NOAT and the Tribe Trust or the MDT Trustees, or any other role relating to TopCo, NewCo, NOAT, the Tribe Trust or the Master Disbursement Trust. |

| **TopCo Operating Agreement** | Prior to the Effective Date, the holders of membership interests in TopCo shall execute a limited liability company operating agreement (the "**TopCo Operating Agreement**"), that will, among other things, establish and delineate the terms and conditions with respect to the operation of TopCo, the selection process for the TopCo Managers and the rights, duties, and obligations of the TopCo Managers with respect to TopCo and NewCo, consistent with the terms hereof. |
|---|---|

4

| **TopCo Managers** | It is contemplated that one Creditor Trustee for NOAT will serve as a TopCo Manager. |
|---|---|
| | In the event of a vacancy on the TopCo Board, either as a result of death, resignation or removal by the NOAT (acting as the sole voting member), the Creditor Trustees for NOAT shall fill such vacancy with a disinterested and independent manager. |
| | Any or all TopCo Managers can be removed at any time and without cause by the sole voting member of TopCo. |
| | The TopCo Managers shall be charged with working with the NewCo Managers to effectuate the Minimum TopCo Distribution and a NewCo Disposition Event in a manner consistent with NewCo's Purpose. |

## Appendix G

**~~Sackler~~Shareholder Settlement Agreement Term Sheet**

## SETTLEMENT AGREEMENT TERM SHEET

This term sheet (this "Term Sheet") sets forth the principal terms of a settlement agreement (the "Settlement Agreement"; the agreements, instruments and documents that secure and/or evidence the liens securing the obligations under the Settlement Agreement, the "Collateral Documents" and, together with the Settlement Agreement and the other definitive documents entered into in connection with the Settlement Agreement, the "Definitive Documents") to be entered into by and among the Debtors (as defined herein), the Master Disbursement Trust established pursuant to the Plan (as defined herein) (the "MDT"), [NewCo (as defined in the Plan)] and the Specified Parties (as defined herein) in connection with the cases commenced under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code") that are currently pending and jointly administered by the United States Bankruptcy Court for the Southern District of New York (the "Bankruptcy Court") under the caption *In re Purdue Pharma L.P., et al.*, Case No. 19-23649 (RDD) (the "Bankruptcy Cases"). The Settlement Agreement, and the authority of the Debtors to enter into the Definitive Documents, will be subject to the approval of the Bankruptcy Court, pursuant to and in accordance with (i) the plan to be filed in connection with the Bankruptcy Cases (the "Plan"), (ii) the Confirmation Order (as defined herein) and (iii) the Definitive Documents.

This Term Sheet is subject to, and does not purport to summarize, all of the conditions, covenants, representations, warranties and other terms and provisions that will be contained in the Definitive Documents to be mutually agreed to, if any, relating to matters covered hereby.

This non-binding Term Sheet is highly confidential and provided for discussion purposes only and does not constitute an offer, agreement or commitment to enter into the Definitive Documents, another business transaction or a relationship, all of which are subject to further diligence and negotiation. This Term Sheet is intended to be protected by Federal Rule of Evidence 408 and any other applicable statutes or doctrines protecting the disclosure of confidential information and information exchanged in the context of settlement discussions.

| SUMMARY OF PRINCIPAL TERMS | |
|---|---|
| **Specified Parties** | Certain persons included in distinct groups as set forth in an exhibit to be attached to the Definitive Documents[1] (such exhibit, the "Specified Parties Exhibit", and such persons set forth therein, the "Specified Parties"). |
| **Aggregate Settlement Amount** | $4,275,000,000 (the "Aggregate Settlement Amount"). |
| **Required Settlement Payments** | The "A-Side Payment Parties" and "B-Side Payment Parties" identified on the Specified Parties Exhibit (together, the "Payment Parties") shall fund, or cause to be funded, the Aggregate Settlement Amount in the amounts and by the applicable deadlines set forth below (each such payment, a "Required Settlement Payment" and each such deadline, a "Funding Deadline"): |

| Funding Deadline | Required Settlement Payment |
|---|---|
| Plan Effective Date | $300 million |
| June 30, 2022 | $350 million |
| June 30, 2023 | $350 million |
| June 30, 2024 | $350 million |
| June 30, 2025 | $350 million |
| June 30, 2026 | $300 million |
| June 30, 2027 | $1,000 million |
| June 30, 2028 | $475 million |

| | | |
|---|---|---|
| | June 30, 2029 | $425 million, subject to deferral as set forth below |
| | June 30, 2030 | $375 million, subject to deferral as set forth below |
| | June 30, 2031 | Up to $200 million, in specified circumstances as set forth below |

Each dollar in excess of $2.5 billion up to and including $2.675 billion in the aggregate that the MDT actually receives pursuant to the Settlement Agreement on or prior to June 30, 2026 shall defer one dollar, up to a maximum aggregate amount of $175 million, of Required Settlement Payments otherwise payable on June 30, 2030 to instead become payable on June 30, 2031. Furthermore, each dollar in excess of $2.675 billion that the MDT actually receives pursuant to the Settlement Agreement on or prior to June 30, 2026 shall defer one dollar, up to a maximum aggregate amount of $25 million, of Required Settlement Payments otherwise payable on June 30, 2029 to instead become payable on June 30, 2031; provided that deferrals shall only be made if the aggregate amount available for deferral exceeds $25 million.

| **Allocation of Settlement Obligations** | Each of the "General Obligors" identified on the Specified Parties Exhibit (each an "A-Side General Obligor") shall, on a joint and several basis with the other A-Side General Obligors, fund or cause to be funded, when due, 50% of the Aggregate Settlement Amount (subject to adjustment), in accordance with the Funding Deadline for each Required Settlement Payment.

The "A-Side Payment Parties" identified on the Specified Parties Exhibit (the "A-Side Payment Parties", and each of the eight distinct groups in such exhibit, the "A-Side Payment Groups") shall, on a joint and several basis with the other A-Side Payment Parties that are within the same A-Side Payment Group, fund or cause to be funded, when due pursuant to this Term Sheet (or as otherwise required by the Definitive Documents), in the aggregate 50% of the Aggregate Settlement Amount (subject to adjustment), but only to the extent such amount is not funded by the A-Side General Obligors as contemplated above; provided that any A-Side Payment Party that is an individual is only liable for their A-Side Payment Group's portion to the extent such amount is not funded by the trusts and entities in that A-Side Payment Group. The allocation among the eight A-Side Payment Groups is to be mutually agreed.

Each of the "B-Side Payment Parties" identified on the Specified Parties Exhibit (the "B-Side Payment Parties", as included in distinct groups in such exhibit, the "B-Side Payment Groups", together with the A-Side Payment Groups, the "Payment Groups") shall, on a joint and several basis with the other B-Side Payment Parties that are within the same B-Side Payment Group, fund or cause to be funded, when due, 25% of the Aggregate Settlement Amount (subject to adjustment), in accordance with the Funding Deadline for each Required Settlement Payment. |
|---|---|

| **Adjustments to A-Side** | Further adjustments to the allocation of the Aggregate Settlement Amount |
|---|---|

---

¹ Final list of persons and groups to be agreed subject to additional diligence on the assets of the family and in connection with the execution of the Definitive Documents.

| | |
|---|---|
| **and B-Side Settlement Obligations** | between the A-Side Payment Groups and B-Side Payment Groups may be agreed; provided that such adjustments shall in no event reduce the Aggregate Settlement Amount obligations of the Specified Parties. |
| **Sale of IACs and Use of Net Proceeds** | The Specified Parties that are "A-Side IAC Payment Parties" and "B-Side IAC Payment Parties" identified on the Specified Parties Exhibit (collectively, the "IAC Payment Parties", as included in groups on such exhibit, the "IAC Payment Groups") shall, during the 7-year period commencing on the Plan Effective Date, use their best efforts to sell or cause to be sold to one or more third parties all of such IAC Payment Parties' direct or indirect interests in the non-U.S. pharmaceutical companies listed on an exhibit to be attached to the Definitive Documents (the "IACs") and/or the assets of such IACs (each, a "Sale"), subject to carve outs as may be mutually agreed. The obligation to effectuate a Sale is subject to and may be limited by applicable laws and other restrictions as may be mutually agreed. |
| | The IAC Payment Parties shall, on a joint and several basis with the other IAC Payment Parties within the same IAC Payment Group, fund or cause to be funded to the MDT, within [45] days from the receipt thereof, (i) [●]%[2] of the cash proceeds actually received by the IAC Payment Parties from a Sale and (ii) dividends or other distributions received by the IAC Payment Parties from the IACs (excluding certain tax distributions), in each case less (x) the amount of Required Settlement Payments previously funded by a Payment Group from sources other than Sale proceeds and (y) certain deductions and other adjustments to be mutually agreed ("Net Proceeds"). |
| | The amount of Net Proceeds actually received by the MDT shall be deemed to satisfy, and reduce, dollar-for-dollar, the next due Required Settlement Payment(s) of the A-Side Payment Group or B-Side Payment Group applicable to the IAC Payment Party that has funded or caused to be funded such Net Proceeds. |
| **Collateral** | The Specified Parties shall provide collateral as security for the payment in full when due of all obligations under the Settlement Agreement (the "Collateral"). Collateral shall include: |
| | (i) all equity interests now or hereafter owned by the IAC Payment Parties or their subsidiaries in the IACs (subject to exclusions as may be agreed) (the "Pledged Shares"); and |
| | (ii) additional collateral, to the extent mutually agreed. |
| | In addition to and not limiting the foregoing, the IAC Payment Parties shall deposit and maintain at all times, or cause to be deposited and maintained at all times, all gross cash proceeds received, directly or indirectly, by the IAC Payment Parties from a Sale and all dividends and other distributions received by the IAC Payment Parties from the IACs in a deposit account or other |

---

[2] Such percentage to be based on tax calculations to be mutually agreed upon applicable to the Sales. Additional mechanics on deducting certain expenses in connection with a Sale to be agreed.

4831-9716-3488
#94591214v1

| | account that is pledged as Collateral and perfected on terms to be mutually agreed. Withdrawals from such accounts by the Specified Parties shall be permitted only to pay the amounts required to be paid to the MDT under the Settlement Agreement and certain expenses and taxes[3] as contemplated by the definition of "Net Proceeds." |
|---|---|
| **IAC Information Rights** | The IAC Payment Parties shall provide the following information and reports to the MDT:<br><br>• Quarterly and annual financial statements of the IACs.<br>• Quarterly reports on dividends or distributions made by the IACs and/or received by the IAC Payment Parties, including detail on tax distributions and/or non-tax distributions.<br>• Following any Sale, a report setting forth a calculation of Net Proceeds received in respect of such Sale, with dispute resolution mechanics regarding such calculation to be mutually agreed.<br>• Other information, reports and mechanics to be mutually agreed. |
| **IAC Operating Covenants** | The Definitive Documents shall contain the following covenants regarding the business and operations of the IACs:<br><br>• Restrictions on material transactions that would otherwise restrict, hinder or impair the ability of IACs to participate in a Sale.<br>• Restrictions on affiliate transactions and investments, subject to exceptions to be mutually agreed.<br>• Restrictions on repurchases or redemptions of equity interests of the IACs, except to the extent the proceeds are treated as dividends or distributions for purposes of determining Net Proceeds to be used for purposes of satisfying a Required Settlement Payment.<br>• Restrictions on amendments of IAC organizational documents that would reasonably be expected to be material and adverse to the MDT or otherwise frustrate the intent and purposes of the Settlement Agreement.<br>• Other covenants to be mutually agreed.<br><br>The foregoing covenants shall not restrict the ability of the IACs to make certain payments to or receive certain payments from other IACs, provided, for the avoidance of doubt, that all IAC Payment Parties are subject to the Settlement Agreement. |
| **Representations and Warranties** | The Definitive Documents shall contain the following representations and warranties of the Specified Parties (including with respect to the IACs):<br><br>• Validity, good standing, qualification and authority of the Specified Parties to enter into the Definitive Documents, including as to the applicable trustee's authority and trust formation.<br>• Non-contravention of organizational documents or laws. |

---

[3] Additional mechanics on withdrawals based on assumed tax rates and/or clawbacks based on actual tax liabilities to be agreed.

5

| | |
|---|---|
| | • Completeness of the list of IACs provided to the MDT. |
| | • Ownership of the IACs. |
| | • Accuracy of certain information provided relating to the Specified Parties. |
| | • Other representations and warranties to be mutually agreed. |
| **Exit of Opioid Business** | The Specified Parties and certain other family members, to be agreed, covenant and agree not to engage in the manufacturing or sale of opioids, subject to exceptions to be agreed. |
| **Covenants** | The Definitive Documents shall contain the following covenants applicable to the Specified Parties (including the IAC Payment Parties):[4] |
| | • Information covenants to be mutually agreed. |
| | • Prohibition on any action to avoid, circumvent, frustrate or impair the ability of any Specified Party to satisfy the obligations under the Definitive Documents. |
| | • Non-interference with confirmation or consummation of the Plan and implementation of the transactions contemplated by the Definitive Documents. |
| | • Consent to cancellation of direct and indirect interests held in Purdue Pharma L.P. |
| | • Go-forward rights, if any, under the Debtors' insurance and directors and officers' liability policies to be mutually agreed. |
| | • No mergers, consolidations, divisions, or sales unless the successor or transferee, as applicable, assumes the obligations under the Definitive Documents. |
| | • Restrictions on affiliate transactions, subject to exceptions to be mutually agreed. |
| | • Restrictions on distributions made by the Specified Parties that are trusts or other entities. |
| | • Limitation on ability of the Specified Parties that are trusts to enter into transactions that restrict or impair ability to sell or liquidate assets, subject to exceptions as may be mutually agreed. |
| | • Submission to jurisdiction. |
| | • Other covenants to be mutually agreed. |
| **Shareholder Releases** | The Plan shall provide for releases that include the Specified Parties and certain other persons and/or individuals to be mutually agreed, and remedies relating to the releases, in each case that are in form and substance to be mutually agreed. |
| **Remedies** | Remedies for breach may include, without limitation, one or more of the following (i) all unpaid and unfunded obligations of the defaulting Specified Parties becoming immediately due and payable, (ii) voiding of the Shareholder Releases (as defined in the Plan) with respect to the members of the defaulting |

---

[4] Covenants to be tailored to each Specified Party as appropriate to reflect the nature of such party (i.e., whether they are individuals, trusts or other entities).

6

|  | Family Group[5], (iii) foreclosure by the MDT on the Collateral of the defaulting Specified Parties, (iv) enforcement of confessions of judgment by the applicable Specified Parties admitting the obligations that have come due and (v) certain other remedies to be mutually agreed (including potential additional fees to the extent mutually agreed).<br><br>All overdue amounts or obligations of the Paying Parties under the Settlement Agreement shall be subject to a fee for late payment accruing in an amount equal to [●]% per annum. |
|---|---|
| **Conditions Precedent** | The conditions precedent to the effectiveness of the Settlement Agreement shall include, without limitation:<br>• The disclosure statement order and confirmation order (the "Confirmation Order") entered by the Bankruptcy Court shall be in full force and effect.<br>• The MDT shall have received, as applicable: (a) one or more excerpts from orders of the Royal Court in Jersey confirming authority to enter into the Definitive Documents by the relevant Jersey trusts; (b) further acknowledgements from beneficiaries and/or other Shareholder Released Parties regarding certain covenants and agreements with respect to the obligations of the Specified Parties that are trusts; or (c) such other assurances as to the authority of the Specified Parties that are trusts to enter into the Definitive Documents, in each case, as may be mutually agreed.<br>• Occurrence of the Plan effective date.<br>• Execution and delivery of all Definitive Documents.<br>• Receipt by the MDT of the first Required Settlement Payment.<br>• Receipt of confessions of judgment in form and substance satisfactory to the MDT.<br>• Such other reassurances and documents as may be mutually agreed. |
| **Certain Agreements** | It shall be a condition precedent to the effectiveness of the Settlement Agreement that the matters related to the ongoing contractual and intellectual property relationships among the Debtors, the Specified Parties and the IACs have been mutually agreed, and that certain agreements related to such matters have been executed. |
| **Restitution** | The Settlement Agreement shall provide that (i) to the extent that any transfers made by the Debtors, the Shareholder Released Parties or Pharmaceutical Research Associates L.P. pursuant to the Plan and the Settlement Agreement are within the scope of Internal Revenue Code section 162(f) and are permitted to be treated as "restitution" under Internal Revenue Code section 162(f) and applicable Treasury regulations thereunder, such transfers shall be so treated for purposes of that provision, and (ii) a statement to this effect shall be included in the Plan Supplement (as defined in the Plan). |

---

[5]  "Family Groups" shall mean distinct groups of Shareholder Released Parties (as defined in the Plan) that correspond to a specific Payment Group. The list of Family Groups and corresponding Payment Groups to be agreed.

7

4831-9716-3488
#94591214v1

| Document Repository | The Plan shall provide for the inclusion in the public document repository to be established pursuant to the Plan of certain documents produced by the Shareholder Released Parties, the scope and terms of which are to be mutually agreed. |
|---|---|

[Updated Term Sheet to come.]

8