DAVIS POLK & WARDWELL LLP
450 Lexington Avenue
New York, New York 10017
Telephone: (212) 450-4000
Facsimile: (212) 701-5800
Marshall S. Huebner
Benjamin S. Kaminetzky
Darren S. Klein
James I. McClammy
Christopher S. Robertson
Gerard X. McCarthy

*Counsel to the Debtors
and Debtors in Possession*

**UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re: | **Chapter 11** |
| **PURDUE PHARMA L.P.,** *et al.*, | **Case No. 19-23649 (RDD)** |
| Debtors.[1] | **(Jointly Administered)** |

**DEBTORS' OMNIBUS REPLY IN FURTHER SUPPORT OF THE MOTION TO
APPROVE (I) THE ADEQUACY OF INFORMATION IN THE DISCLOSURE
STATEMENT, (II) SOLICITATION AND VOTING PROCEDURES, (III) FORMS OF
BALLOTS, NOTICES AND NOTICE PROCEDURES IN CONNECTION THEREWITH,
AND (IV) CERTAIN DATES WITH RESPECT THERETO**

---

[1] The Debtors in these cases, along with the last four digits of each Debtor's registration number in the applicable jurisdiction, are as follows: Purdue Pharma L.P. (7484), Purdue Pharma Inc. (7486), Purdue Transdermal Technologies L.P. (1868), Purdue Pharma Manufacturing L.P. (3821), Purdue Pharmaceuticals L.P. (0034), Imbrium Therapeutics L.P. (8810), Adlon Therapeutics L.P. (6745), Greenfield BioVentures L.P. (6150), Seven Seas Hill Corp. (4591), Ophir Green Corp. (4594), Purdue Pharma of Puerto Rico (3925), Avrio Health L.P. (4140), Purdue Pharmaceutical Products L.P. (3902), Purdue Neuroscience Company (4712), Nayatt Cove Lifescience Inc. (7805), Button Land L.P. (7502), Rhodes Associates L.P. (N/A), Paul Land Inc. (7425), Quidnick Land L.P. (7584), Rhodes Pharmaceuticals L.P. (6166), Rhodes Technologies (7143), UDF LP (0495), SVC Pharma LP (5717) and SVC Pharma Inc. (4014). The Debtors' corporate headquarters is located at One Stamford Forum, 201 Tresser Boulevard, Stamford, CT 06901.

<u>**TABLE OF CONTENTS**</u>

P<small>AGE</small>

PRELIMINARY STATEMENT ................................................................................................ 1

KEY MODIFICATIONS TO PLAN AND DISCLOSURE STATEMENT ................................. 4

    I.    Summary of Modifications to the Plan........................................................ 4

    II.    Summary of Modifications to the Disclosure Statement........................................... 6

ARGUMENT ........................................................................................................................... 7

    I.    The Disclosure Statement Should Be Approved Under Section 1125 of the Bankruptcy Code and All Remaining Disclosure-Related Objections Should Be Overruled ................................................................................................... 7

        A.    The Disclosure Statement Contains "Adequate Information" ...........................7

        B.    The Debtors Have Modified and Supplemented the Disclosure Statement in Response to This Court's Guidance, Material Developments in Negotiations, and the Objections Where Appropriate .....................................10

        C.    The Remaining Disclosure-Related Objections Seek Modifications That Are Neither Appropriate Nor Required Under Section 1125...........................13

    II.    The Plan Objections Raise Confirmation Issues To Be Addressed at the Confirmation Hearing............................................................................................... 15

        A.    The Debtors Have Properly Classified Claims .................................................17

        B.    Challenges to Trust Distribution Procedures Are Premature and Misplaced ..........................................................................................................24

        C.    The Debtors Will Demonstrate That the Shareholder Release and Channeling Injunction Are Permissible Under *Metromedia*..........................28

        D.    Best Interest Objections Are Premature and Misplaced ..................................36

        E.    The Remainder of the Objections Should Be Overruled .................................38

CONCLUSION....................................................................................................................... 39

# TABLE OF AUTHORITIES

C<small>ASES</small>

P<small>AGE(S)</small>

*In re A.H. Robins Co., Inc.*,
88 B.R. 742 (E.D. Va. 1988) ....................................................................................23

*In re A.H. Robins Co., Inc.*,
880 F.2d 694 (4th Cir. 1989) ................................................................................. 30

*In re Airadigm Commc'ns, Inc.*,
519 F.3d 640 (7th Cir. 2008) ................................................................................. 30

*In re Am. Capital Equip., LLC*,
688 F.3d 145 (3d Cir. 2012) .................................................................................. 17

*In re AOV Indus., Inc.*,
792 F.2d 1140 (D.C. Cir. 1986) ............................................................................ 35

*In re Ashley River Consulting, LLC*,
No. 14-13406 (MG), 2015 WL 6848113 (Bankr. S.D.N.Y. Nov. 6, 2015) ............................ 8

*In re Blitz U.S.A., Inc.*,
No. 11-13603 (PJW), 2014 WL 2582976 (Bankr. D. Del. Jan. 30, 2014) ...........................26

*Cadle Co. II, Inc. v. PC Liquidation Corp. (In re PC Liquidation Corp.)*,
383 B.R. 856 (E.D.N.Y. 2008) .................................................................... 7, 8, 14

*In re Cardinal Congregate I*,
121 B.R. 760 (Bankr. S.D. Ohio 1990) ................................................................. 17

*In re CDECO Mar. Constr., Inc.*,
101 B.R. 499 (Bankr. N.D. Ohio 1989) ................................................................. 14

*Aetna Cas. & Sur. Co. v. Clerk, U.S. Bankr. Court (In re Chateaugay Corp.)*,
89 F.3d 942 (2d Cir. 1996) .................................................................................... 18

*City of Clinton v. Cedar Rapids & M.R.R. Co.*,
24 Iowa 455 (1868) ..............................................................................................20

*City of New York v. Beretta U.S.A. Corp.*,
315 F. Supp. 2d 256 (E.D.N.Y. 2004) ..................................................................20

*In re Cuyahoga Equip. Corp.*,
    980 F.2d 110 (2d Cir. 1992) ........................................................................... 36

*Deutsche Bank AG v. Metromedia Fiber Network, Inc.  (In re Metromedia)*,
    416 F.3d 136 (2d Cir. 2005) ............................................................... 29, 31, 32

*In re Ditech Holding Corp.*,
    606 B.R. 544 (Bankr. S.D.N.Y. 2019) ...........................................................37

*In re Dow Corning Corp.*,
    280 F.3d 648 (6th Cir. 2002) ................................................................... 30, 31

*In re Drexel Burnham Lambert Grp.*,
    138 B.R. 723 (Bankr. S.D.N.Y. 1992) .......................................................18, 21

*In re Drexel Burnham Lambert Grp.*,
    960 F.2d 285 (2d Cir. 1992) .................................................................... 29, 32

*In re Drexel Burnham Lambert Grp.*,
    No. 90 B 10421, 1992 WL 62758 (Bankr. S.D.N.Y. Mar. 5, 1992) ..................... 29

*In re Genco Shipping & Trading Ltd.*,
    513 B.R. 233 (Bankr. S.D.N.Y. 2014) ................................................................ 29

*In re Glob. Indus. Techs, Inc.*,
    645 F.3d 201 (3d Cir. 2011) ............................................................................. 30

*Hunter v. Pittsburgh*,
    207 U.S. 161 (1907)...........................................................................................20

*Kirk v. Texaco, Inc.*,
    82 B.R. 678 (S.D.N.Y. 1988) ....................................................................... 7, 8

*Lynch v. Lapidem Ltd. (In re Kirwan Offices S.a.R.L.)*,
    592 B.R. 489 (S.D.N.Y. 2018) ...........................................................29, 34, 35, 36

*In re Lisanti Foods, Inc.*,
    329 B.R. 491 (D.N.J. 2005) ........................................................................... 23

*MacArthur Co. v. Johns-Manville Corp.*,
    837 F.2d 89 (2d Cir. 1988) ........................................................................... 29

*Matter of Colin*,
    44 B.R. 806 (Bankr. S.D.N.Y. 1984)...............................................................37

*Matter of Johns-Manville Corp.*,
    68 B.R. 618 (Bankr. S.D.N.Y. 1986) .................................................................................. 23

*In re Millennium Lab Holdings II, LLC*,
    945 F.3d 126 (3d Cir. 2019) .......................................................................... 30, 35

*Monarch Life Ins. Co. v. Ropes & Gray*,
    65 F.3d 973 (1st Cir. 1995) .......................................................................... 30

*In re MPM Silicones, LLC*,
    No. 14-22503 (RDD), 2014 WL 4436335 (Bankr. S.D.N.Y. Sept. 9, 2014) ......................... 35

*Nat'l Heritage Found., Inc. v. Highbourne Found.*,
    760 F.3d 344 (4th Cir. 2014) ...................................................................... 30

*In re Nat'l Prescription Opiate Litig.*,
    No. 1:17-md-2804, 2021 WL 320754 (N.D. Ohio Feb. 21, 2021) ......................................... 28

*Nessel ex rel. Mich. v. Amerigas Partners, L.P.*,
    954 F.3d 831 (6th Cir. 2020) ...................................................................... 22

*In re Purdue Pharm. L.P.*,
    619 B.R. 38 (S.D.N.Y. 2020) ...................................................................... 32, 36

*Purdue Pharma L.P. v. Ky.*,
    704 F.3d 208 (2d Cir. 2013) ...................................................................... 30, 31

*In re Quigley Co.*,
    377 B.R. 110 (Bankr. S.D.N.Y. 2007) ............................................................ *passim*

*In re Quigley Co.*,
    437 B.R. 102 (Bankr. S.D.N.Y. 2010) ............................................................ 37, 38

*In re Residential Capital, LLC*,
    519 B.R. 890 (Bankr. S.D.N.Y. 2014) ............................................................ 27

*In re Residential Capital, LLC*,
    508 B.R. 838 (Bankr. S.D.N.Y. 2014) ............................................................ 29

*In re Sabine Oil & Gas Corp.*,
    555 B.R. 180 (Bankr. S.D.N.Y. 2016) ............................................................ 19, 20

*In re Seaside Eng'g & Surveying*,
    780 F.3d 1070 (11th Cir. 2015) .................................................................. 30

*In re SunEdison, Inc.*,
  576 B.R. 453 (Bankr. S.D.N.Y. 2017)........................................................................ 27

*In re W.R. Grace & Co.*,
  475 B.R. 34 (D. Del. 2012) ...................................................................................... 27

*W. Virginia ex rel. McGraw v. CVS Pharm., Inc.*,
  646 F.3d 169 (4th Cir. 2011) .................................................................................... 30

*Wyeth v. Levine*,
  555 U.S. 555 (2009) ..................................................................................................22

STATUTES & RULES

11 U.S.C. § 101(15) ...................................................................................................... 31

11 U.S.C. § 1122 ......................................................................................................18, 21

11 U.S.C. § 1125 ................................................................................................... *passim*

11 U.S.C. § 1126(c) ......................................................................................................22

11 U.S.C. § 1129(a)(7) ..................................................................................................37

11 U.S.C. § 1452(a) ...................................................................................................... 31

28 U.S.C. § 157 ....................................................................................................... 27, 34

28 U.S.C. § 1334(b) ...................................................................................................... 34

28 U.S.C. § 1930(a)(6) ................................................................................................. 12

OTHER AUTHORITIES

7 Collier on Bankruptcy 1122.03[3] (16th ed. 2021) ...................................................21

H.R. Rep. No. 95-595 (1977), *as reprinted in* 1978 U.S.C.C.A.N. 5963) ................................. 7, 8

Purdue Pharma L.P. ("**PPLP**") and its affiliated debtors in the above-captioned chapter 11 cases, as debtors and debtors in possession (collectively, the "**Debtors**"), respectfully submit this omnibus reply ("**Reply**") to the objections (the "**Objections**," and the parties who filed Objections, "**Objectors**")[1] and in further support of the *Debtors' Motion to Approve (I) the Adequacy of Information in the Disclosure Statement, (II) Solicitation and Voting Procedures, (III) Forms of Ballots, Notices and Notice Procedures In Connection Therewith, and (IV) Certain Dates With Respect Thereto* [Dkt. No. 2489] ("**Motion**"), and state the following:

## PRELIMINARY STATEMENT

1.      Through the Motion, the Debtors seek authority to solicit a joint plan of reorganization ("**Plan**")[2] that dedicates the overwhelming majority of the Debtors' assets and more than $4 billion in recoveries from the Debtors' shareholders and ultimate owners to combat and abate the opioid crisis and to support individuals and communities affected by it.  The Plan is the result of tireless effort and delicate negotiations undertaken by many parties in these chapter 11 cases—parties that often held different views on fundamental issues that had to be, and have in large measure been, painstakingly reconciled over time.  Although a great deal of material progress has been made, including over the last few days, that work is not yet finished.  As of the time of this filing, certain open issues remain.  Among these are issues with respect to the proposed settlement with the Shareholders ("**Proposed Shareholder Settlement**") and with respect to the Plan itself.  The Debtors, the Official Committee of Unsecured Creditors ("**UCC**"), the Ad Hoc Committee of Governmental and Other Contingent Litigation Claimants ("**Ad Hoc**

---

[1] The Debtors will address the Joint Objection of the Distributors, Manufacturers and Pharmacies ("**DMPs**") [Dkt. No. 2719] and Johnson & Johnson's Joinder to the DMPs' Joint Objection [Dkt. No. 2722] in a separate reply memorandum.

[2] References to the "Plan" refer to the Third Amended Plan filed contemporaneously herewith.

1

Committee" or "**AHC**"), the Multi-State Governmental Entities Group ("**MSGE**"), and others

are working around the clock to resolve the open points and come to agreement.  The Debtors

hope and expect that a Plan that maximizes value for creditors and fairly and expeditiously

resolves these extraordinarily complex chapter 11 cases will be finalized shortly, in advance of

the hearing.

2.      While the Debtors would have preferred that all of the remaining open issues be

resolved before filing their reply brief in support of their motion to approve the Disclosure

Statement,[3] time is of the essence.  The Plan, Disclosure Statement, and record are today

sufficiently developed to enable the Court to address and overrule the objections to the disclosure

statement, and the lingering items will be addressed in advance of the hearing so as to enable the

Court to permit solicitation to commence.  Holding the current schedule will help ensure that

these cases remain on track and funds are timely distributed for use in abating the opioid crisis.

3.      The question before the Court is whether the Disclosure Statement allows a

"hypothetical investor of the relevant class" to cast an informed vote on the Plan.  11 U.S.C.

§ 1125(a)(1).  The Debtors respectfully submit that it does.  Altogether, the Disclosure Statement

spans over 300 pages and contains a plain-English executive summary and reams of information

of great import to creditor constituencies.  This information includes, but is not limited to,

detailed information concerning claimants' treatment under the Plan and no fewer than 19 pages

describing the Debtors' assessment of the proposed resolution with the Shareholder Parties.  And

all of this is against the backdrop of the tens of millions of pages of discovery and diligence that

has been made available to key constituencies in these bankruptcy proceedings and will be made

yet more broadly available in the lead up to confirmation.  As this Court recently observed,

---

[3] References to the "Disclosure Statement" refer to the Disclosure Statement to the Third
Amended Plan.

"more information has been provided with respect to this [P]lan and more specifically with respect to the elements of a settlement with the Sacklers than [the Court] had[] ever seen, and [perhaps] ha[s] ever been provided in any [c]hapter 11 case." (Mar. 24, 2021 Hr'g Tr. 56:4-9.)

4.    The Objections to the Disclosure Statement that remain come, broadly speaking, in one of two stripes: (1) Objections with respect to the adequacy of disclosures provided in the Disclosure Statement; and (2) Objections to confirmation of the Plan.  For ease of reference, the Debtors have prepared a summary of the Objections and the Debtors' responses thereto, which is attached as Exhibit A ("**Objections Response Chart**").

5.    Consistent with the Debtors' long-standing practice of building consensus and addressing creditor concerns where practicable, the Debtors (and other parties) have worked hard to try to address the issues raised with respect to the adequacy of disclosure.  In response to Objections, discussions with certain Objectors (including the United States Trustee ("**U.S. Trustee**" or "**UST**")), on-the-record guidance from the Court, and ongoing negotiations and developments more generally, the Debtors have made substantial revisions and additions to the version of the Disclosure Statement filed on March 15.  The Debtors have done so even where the Debtors believe that additional disclosure goes well beyond the dictates of Section 1125.  In particular, the Disclosure Statement, as amended, contains a significantly expanded section explaining the Proposed Shareholder Settlement and the Debtors' assessment of it.  Dozens of pages have been revised or added since the Disclosure Statement was first filed.  A number of Objectors have confirmed that these revisions have resolved their Objections—including those of Steadfast Insurance Company, American Guarantee and Liability Insurance Company, Navigators Specialty Insurance Company ("**Insurers**") (Dkt. No. 2710); Bridge House Corporation (Dkt. No. 2711); Carpenter Health Network (Dkt. No. 2712); City of Chillicothe,

Ohio (Dkt. No. 2713); City of Covington, Louisiana (Dkt. No. 2714); the Four Winds Tribe

Louisiana Cherokee (Dkt. No. 2715); Parish of DeSoto (Dkt. No. 2716); the Northwestern Band

of the Shoshone Nation (Dkt. No. 2717); Dr. Gregory Fernandez in his Official Capacity as the

Coroner of St. Bernard Parish (Dkt. No. 2718); and the Ad Hoc Committee of NAS Children

("**NAS**" or "**NAS Committee**") (Dkt. Nos. 2746, 2749).  The Debtors respectfully submit that

the revisions to the Disclosure Statement sufficiently address the vast majority of remaining

Objections to "adequacy of disclosure," and those that have not been addressed are without merit

and should be overruled.

6.      What remains are Objections to plan confirmation that are premature and not

properly considered at this time.  These include, among others, Objections to classification,

treatment, and the third-party releases contained within the Plan—objections that courts,

including this one, <u>routinely</u> hold should be addressed in the context of confirmation and not at

the time of approval of the disclosure statement.  None of these Objections meets the very high

burden of rendering confirmation of the Plan "impossible" or, put another way, establishing that

the Plan is "patently unconfirmable."  To the contrary, as the Debtors will demonstrate on a full

record at confirmation, the Plan fully accords with applicable provisions of the Bankruptcy Code

and the Objections to confirmation are misplaced.

<u>**KEY MODIFICATIONS TO PLAN AND DISCLOSURE STATEMENT**</u>

**I.    Summary of Modifications to the Plan**

7.      The Debtors have added and modified language in a number of key provisions in

the Plan since the initial filing, including, among others, the following:

      a.      <u>The Proposed Shareholder Releases and Channeling Injunction</u>.  The Plan
now sets forth the language governing the proposed Shareholder Releases
and Channeling Injunction.  (Plan §§ 10.7-8.)

b.      <u>No Criminal Releases</u>.  The Plan clarifies that the releases by holders of claims and interests shall not release any Released Party from any criminal action or proceeding arising under a criminal provision of any statute by a Domestic Governmental Entity that has authority to bring such a criminal action or criminal proceeding.  (*Id.* §§ 1.1 ("Excluded Claim"); 10.6.)

c.      <u>Co-Defendants (Class 14)</u>.  The Plan includes a number of modifications and additions relating to the treatment of Co-Defendant Claims, certain of which remain the subject of ongoing discussions.  (*Id.* §§ 1.1 ("Co-Defendant Claims", "Co-Defendant Defensive Rights"), 4.16, 8.4(c), 8.4(d), 10.2, 10.18.)

d.      <u>Federal Government Unsecured Claims (Class 3)</u>.  In light of the resolution reached between the federal government and the Debtors' public-side creditors concerning the treatment of the Federal Government Unsecured Claims (as defined in the Plan), the Plan now provides that the United States shall receive $50 million (in installments, as set forth in Section 4.3(b) of the Plan) in respect of the Federal Government Unsecured Claims.

e.      <u>NAS PI Claims (Class 10(a))</u>.  The Plan incorporates an agreement between the PI Claimants and NAS Committee pursuant to which a fund (the "**PI Trust NAS Fund**") shall be established by the PI Trust, and funded with up to $45 million (the "**NAS PI Portion**" as defined in the Plan) in accordance with Section 4.10(b) of the Plan, to make distributions on account of NAS PI Channeled Claims (as defined in the Plan) in accordance with trust distribution procedures to be implemented by the PI Trust with respect to NAS PI Channeled Claims.

f.      <u>United States-PI Claimant Medical Expense Claim Settlement</u>.  The Plan now incorporates a settlement reached between the PI Claimants and certain federal government agencies, described in Section 5.2(h) of the Plan, concerning the recovery of payments made by federal governmental health insurance programs to Holders of PI Claims, pursuant to which the United States shall receive up to $26 million.

g.      <u>LRP Agreement</u>.  In light of the resolution reached between the TPPs and the PI Claimants, the Plan incorporates the agreement establishing lien resolution procedures with respect to certain claims held by the LRP Participating holders of Third-Party Payor Claims against holders of PI Claims and Distributions payable thereto.  (*Id.* § 5.7(d).)

h.      <u>TopCo Managers</u>.  The Plan now provides that one (but not more than one) Creditor Trustee of the National Opioid Abatement Trust ("**NOAT**") may serve as a TopCo Manager.  (*Id.* § 5.5.)

    i.    <u>The MDT Insurer Injunction and the Settling MDT Insurer Injunction</u>. (Plan §§ 10.9-10). The Plan now includes injunctions preventing both MDT Insurers and Settling MDT Insurers from, among other things, commencing actions or proceedings against any MDT Insurer or Settling MDT Insurer (as applicable), or against the property of an MDT Insurer or MDT Settling Insurer (as applicable), on account of any Claim based on, arising under, or attributable to an MDT Insurance Policy.

## II.    Summary of Modifications to the Disclosure Statement

8.    Key additions and modifications to the Disclosure Statement, including to address the Objections, since the March 15, 2021 initial filing include:

a.    A new section of the Disclosure Statement titled "Evaluation of the Settlement with the Sackler Families," describing the Debtors' view that the proposed settlement is reasonable, fair, and in the best interests of the Debtors' estates. (Disclosure Stmt. § III.AA.)

b.    A description of the proposed Shareholder Releases. (*Id.* § IV.I.7.)

c.    A description of the Channeling Injunction. (*Id.* § IV.I.8.)

d.    A description in the executive summary of each of the creditor abatement trusts, how they will be funded, which types of creditors may qualify for distributions from each trust, and how distributions will be made based on the now-filed trust distribution procedures for each such trust (including the PI Trust). (*Id.* §§ I.B, III.S.)

e.    A new section of the Disclosure Statement titled "The Debtors' Acceptance of Responsibility and Apologies for Past Misconduct." (*Id.* § III.W.)

f.    A notation that the deadline for the Plan Supplement to be filed has been extended from five days to seven days before the Voting Deadline. (*Id.* § IV.)

g.    A description of the FDA's warning label requirement for OxyContin. (*Id.* § II.A.)

h.    A description of the Plan treatment of claims filed in respect of certain Canadian Patient Litigation. (*Id.* § III.L.)

i.    A description of claims and causes of action related to the Debtors' Insurance Coverage. (*Id.* § III.CC.)

j.    A clarification that the Plan shall not release any Released Party from any criminal action or criminal proceeding and clarification that Governmental

Unit parties are deemed to have released all Released Claims against the Released Parties.  (*Id.* §§ I.F, IV.I.4.)

k.  A description of the MDT Insurer Injunction and Settling MDT Insurer Injunction.  (*Id.* §§ IV.I.10-11.)

l.  Numerous other additions and modification in response to the Objections, as reflected in the Objections Response Chart.

## **ARGUMENT**

I.  **The Disclosure Statement Should Be Approved Under Section 1125 of the Bankruptcy Code and All Remaining Disclosure-Related Objections Should Be Overruled**

A.  **The Disclosure Statement Contains "Adequate Information"**

9.  Section 1125 of the Bankruptcy Code requires the proponent of a chapter 11 plan to provide holders of impaired claims and interests entitled to vote on the plan with "adequate information" regarding the plan.  *See* 11 U.S.C. §§ 1125(a)-(b).  "Adequate information" is "information of a kind, and in sufficient detail, as far as is reasonably practicable in light of the nature and history of the debtor . . . that would enable . . . a hypothetical investor of the relevant class to make an informed judgment about the plan."  *Id.* § 1125(a)(1); *see also* Mot. ¶¶ 11-13 [Dkt. No. 2489].

10.  This statutory definition confers wide discretion on bankruptcy courts to determine what information is necessary based on the facts and circumstances of each case.  *See Kirk v. Texaco, Inc.*, 82 B.R. 678, 682 (S.D.N.Y. 1988) ("The legislative history could hardly be more clear in granting broad discretion to bankruptcy judges under § 1125(a).") (citing H.R. Rep. No. 95-595, at 408-09 (1977), *as reprinted in* 1978 U.S.C.C.A.N. 5963, 6365); *see also Cadle Co. II, Inc. v. PC Liquidation Corp. (In re PC Liquidation Corp.)*, 383 B.R. 856, 865 (E.D.N.Y. 2008) ("The standard for disclosure . . . is flexible and what constitutes 'adequate information' in any particular situation is determined on a case-by-case basis, with the determination being

largely within the discretion of the bankruptcy court." (citations omitted)).  Indeed, as the

legislative history makes clear, courts should apply a "practical approach" in determining what

information may be necessary.  *Kirk*, 82 B.R. at 682 (quoting H.R. Rep. No. 95-595, at 408-09).

Relevant factors include "the complexity of the case, the benefit of additional information to

creditors and other parties in interest, and the cost of providing additional information," 11

U.S.C. § 1125(a)(1), as well as "the need for relative speed in solicitation and confirmation [and]

the need for investor protection," H.R. Rep. No. 95-595 at 408-09.  "In reorganization cases," in

particular, "there is frequently great uncertainty."  *Id.*  "Therefore, the need for flexibility is

greatest."  *Id.*

11.     At the same time, it is black letter law that a disclosure statement "need not

include such information about . . . other possible or proposed plan[s]," 11 U.S.C. § 1125(a)(1);

*Kirk*, 82 B.R. at 684—a lesson seemingly lost on some of the Objectors.  Nor is the plan

proponent required to encumber the disclosure statement with unreasonably specific information

on every issue, dispute, or critique that a particular creditor or creditor group might wish to raise

with respect to the Plan.  *See In re Ashley River Consulting, LLC*, No. 14-13406 (MG), 2015 WL

6848113, at *7 (Bankr. S.D.N.Y. Nov. 6, 2015) (noting that disclosure statement "should not be

burdened with overly technical and extremely numerous additions, where such information

would serve only to diminish the understanding of a typical creditor or interest holder"

(quotations omitted)).  To the contrary, the determinative criterion is whether the disclosure

statement provides sufficient information under the circumstances so that the average creditor

can make an informed judgment about whether to accept or reject the plan.

12.     The Disclosure Statement satisfies this standard.  It contains over 300 pages of

robust disclosure on every material facet of these chapter 11 cases—the adequacy of almost all

of which is uncontested.  As the Debtors established in their Motion, for example, the Disclosure Statement sets out background on the Debtors, their businesses and governance structure, and the circumstances that gave rise to these chapter 11 cases in great detail.  (*See* Disclosure Stmt. §§ II.A–E; Mot. ¶¶ 14-15.)  It provides a comprehensive summary of the proposed Plan, including the corporate, governance, and trust mechanisms by which 100% of the value of the estates would be transferred for the benefit of creditors.  (Disclosure Stmt. §§ IV.B-K.)  And it sets forth a detailed accounting of each critical event that led to the formulation and filing of the Plan, including each of the interdependent settlements and proposed resolution with the shareholders that form the foundation of the Plan.  (*Id.* §§ III.F, L, S, U-V, Y-BB.)

13.     With respect to the proposed settlement of estate claims against members of the Sackler Families and associated entities, the Disclosure Statement provides a detailed overview of certain key terms of the Proposed Shareholder Settlement (*id.* § III.Z), a 17-page summary describing the Special Committee's independent investigation into the potential claims against the Sackler Families being compromised (*Id.* § III.Y), and a 19-page section describing the Debtors' view that the proposed settlement is reasonable, fair, and in the best interests of the Debtors' estates (*Id.* § III.AA).  In addition, the Disclosure Statement also details creditor investigations related to the Proposed Shareholder Settlement.  (*Id.* § III.BB.)  The Disclosure Statement and Plan also set forth, in clear and conspicuous language, the terms of the Proposed Shareholder Releases and the Channeling Injunction.  (*Id.* §§ I.E-F, IV.I.7-8; s*ee also* Plan §§ 10.7-10.9.)   As stated at the outset of the brief, the Debtors and other key estate stakeholders continue to work on an around-the-clock basis to finalize the Proposed Shareholder Settlement.[4]

---

[4] To the extent that certain information about the Plan will be provided in the Plan Supplement before the Voting Deadline, that is entirely appropriate under the circumstances of these immensely complicated chapter 11 cases.  As Article IV of the Disclosure Statement makes

**B.**    **The Debtors Have Modified and Supplemented the Disclosure Statement in Response to This Court's Guidance, Material Developments in Negotiations, and the Objections Where Appropriate**

14.    As set forth above, in the time since the Debtors' initial disclosure statement was filed, the Debtors have worked and are continuing to work alongside others to close out open points in the Plan including those concerning the Proposed Shareholder Settlement. The revisions that the Debtors have made are reflected in the cumulative blackline of the Disclosure Statement filed contemporaneously herewith ("**Cumulative Disclosure Statement Blackline**").

15.    On March 9, 2021, the Debtors circulated an initial draft of the Disclosure Statement to representatives of every major creditor constituency in these cases.[5]  The Debtors

---

clear, and as is the norm in many complex bankruptcies, the Debtors will file and serve a Plan Supplement at least seven days before the Voting Deadline. This approach and proposed timing will enable the Debtors to continue to refine critical Plan documents and concepts with key stakeholders over the coming weeks while providing creditors entitled to vote with ample time to formulate a yet more informed view on the Plan, to the extent they find this information relevant, prior to casting their ballots. Courts in this district and elsewhere <u>routinely</u> approve disclosure statements that provide for the filing of Plan Supplements containing similar information within a similar time frame. *See, e.g.*, Order Approving Disclosure Stmt., *In re Windstream Holdings, Inc.*, Case No. 19-22312 (RDD) (Bankr. S.D.N.Y. May 14, 2020), Dkt. No. 1814 (approving the filing of the plan supplement containing Assumed Executory Contract and Unexpired Lease List, Rejected Executory Contract and Unexpired Lease List, and Schedule of Retained Causes of Action seven days before the voting deadline); Order Approving Disclosure Stmt., *In re Sears Holdings Corp.*, Case No. 18-23538 (RDD) (Bankr. S.D.N.Y. June 28, 2019), Dkt. No. 4392 (approving the filing of the plan supplement containing Schedule of Individuals or Entities Not Considered "Released Parties" or "Related Parties" under the Plan, Schedule of Assumed Executory Contracts and Unexpired Leases, and Liquidating Trustee seven days before the voting deadline); Order Approving Disclosure Stmt., *In re Insys Therapeutics, Inc.*, Case No. 19-11292 (KG) (Bankr. D. Del. Dec. 4, 2019), Dkt. No. 952 (approving the filing of the plan supplement containing Schedule of Assumed and Assigned Contracts, Schedule of Retained Causes of Action, List of Non-Released Parties, Victim Restitution Trust Asset Transfer Agreement, Liquidation Trust Agreement, Class Claim Procedures and Class Representative for various class claims seven days before the voting deadline).

[5] These included the Department of Justice, the UCC, the Ad Hoc Committee, the Ad Hoc Group of Non-Consenting States ("**NCSG**" or "**Non-Consenting States**"), the MSGE, certain Native American Tribes ("**Tribes**"), the Ad Hoc Group of Individual Victims ("**PI Claimants**"), NAS Committee, a group of hospitals ("**Hospitals**"), the Private Third-Party Payors ("**Private TPPs**"), and individual health insurance purchasers ("**Ratepayers**").

have since circulated several additional revised drafts of the Disclosure Statement—each time

incorporating appropriate comments and feedback.  In addition, in response to this Court's

guidance at the March 24 Omnibus hearing that the disclosure statement should "lay out in more

detail the arguments for and against continued litigation against the Sacklers, not only on the

estate claims, but also on non-estate claims" (Mar. 24, 2021 Hr'g Tr. 104:25-105:7), the Debtors

crafted an entirely new section of the Disclosure Statement entitled "Evaluation of the Settlement

with the Sackler Families," which contains over 19 pages of analysis on this topic.  (Disclosure

Stmt. § III.AA; *see supra* Part I.A.)  In response to Objections and to further guidance from the

Court at the May 12 hearing, the discussion of non-estate claims in this section is cross-

referenced in the Debtors' liquidation analysis, and the liquidation analysis further clarifies that

non-estate claims would not be released in a hypothetical chapter 7 scenario.  (Disclosure Stmt.

§§ VI.A & n. 135, B; *see also id.* App. B.)

16.    Consistent with their long-standing approach in these chapter 11 cases of seeking

to avoid unnecessary litigation and address concerns of estate constituencies where practicable,

the Debtors have made other changes to the Disclosure Statement to address many of the

Objections, which are reflected in the Objections Response Chart and blackline of the Disclosure

Statement.  (*See generally* Objs. Resp. Chart; Cumulative Disclosure Stmt. Blackline.).

17.    The Debtors' response to the concerns raised by the U.S. Trustee is

representative.  Upon receiving the Objection from the docket, counsel for the Debtors worked

quickly to productively engage with the U.S. Trustee and, as a result of productive discussions,

made revisions designed to address the overwhelming majority of the U.S. Trustee's concerns.[6]

---

[6] Notwithstanding the Debtors' efforts to resolve all of the U.S. Trustee's Objections, a number
of Objections remain.  (*See* Objs. Resp. Chart 1(a)-(e) & (j).)  In response to these Objections,
the Debtors, for example, moved the Plan Supplement filing deadline up from five to seven days

(*See generally* Objs. Resp. Chart 1.)  For example, the Debtors added a plain-English section to

the Disclosure Statement's executive summary in response to the U.S. Trustee's concern

regarding whether the average creditor, particularly personal injury creditors, would know what

distributions they can expect from the applicable Creditor Trusts (UST Obj. at 13-14, Dkt. No.

2686; Disclosure Stmt. §§ I.B, III.S; *see also* Third Plan Suppl. (May 15, 2021), Dkt. No. 2867

(replacing and superseding prior versions of the Hospital, TPP, NOAT, and Tribe TDP); Fourth

Plan Suppl. (May 17, 2021), Dkt. No. 2868 (replacing and superseding prior version of the Non-

NAS PI TDP); Objs. Resp. Chart 1(a).)  The Debtors also removed the Creditor Trusts from the

scope of the releases provided under the Plan (*see* UST Obj. at 19; *infra* Cumulative Disclosure

Stmt. Blackline § I.F.; Objs. Resp. Chart 1(f)); excepted for discharge all of the <u>liquidating</u>

Debtors (*see* UST Obj. at 20-21; Disclosure Stmt. §§ IV.C.18, IV.D.14; Objs. Resp. Chart 1(g));

filed the liquidation and valuation analyses and financial projections (which were always

contemplated to be included) (*see* UST Obj. at 17; Disclosure Stmt. Apps. B-D; Objs. Resp.

Chart 1(h)); added disclosures regarding the treatment of Classes 11(a) and 11(b) (*see* UST Obj.

at 14; Disclosure Stmt. § I.C; Objs. Resp. Chart 1(i)); and clarified the Debtors' post-

confirmation reporting requirements and duties and the payment of post-confirmation fees under

28 U.S.C. § 1930(a)(6) (*see* UST Obj. at 21-22; Disclosure Stmt. § IV.K.5; Objs. Resp.

Chart 1(k)).  These revisions have addressed many of the U.S. Trustee's concerns, and thus the

---

prior to the Voting Deadline (*see* UST Obj. at 14-15; Disclosure Stmt. §§ I.B n.5, IV; Proposed
Order ¶ 6 n.4; Objs. Resp. Chart 1(j)), and removed the language regarding amending or
expunging claims from the official claims register without notice to the Court and counting
ballots that are untimely filed (*see* UST Obj. at 22; Disclosure Stmt. § I.G.3; Objs. Resp.
Chart 1(l)).  For these reasons and the additional reasons set forth in the Objections Response
Chart, the Debtors submit that the Disclosure Statement is adequate.

vast majority of concerns raised by the many Objectors that incorporated the U.S. Trustee's

Objections by reference have impliedly been addressed as well.[7]

18.    In addition to the foregoing, the Debtors have added disclosure to address other

Objections, including those filed by the Non-Consenting States and the Insurers.  For example,

with respect to the Non-Consenting States, the additional disclosure relates to risks concerning

(i) appeals (*see* NCSG Obj. ¶¶ 6, 57-58, Dkt. No. 2762; Disclosure Stmt. § VIII.A.2; Objs. Resp.

Chart 12(e)); and (ii) treatment of the United States' and federal agencies' general unsecured

claims (*see* NCSG Obj. ¶¶ 6, 63-66; Disclosure Stmt. § VIII.A.13; Objs. Resp. Chart 12(j)).)  In

addition, the Debtors reached an agreement with the Insurers with respect to appropriate

disclosure of the disagreement between the Debtors and Insurers regarding whether the insurance

neutrality language in the Plan adequately protects the Insurers' rights.  (Disclosure Stmt.

§ IV.D.10.)  The Insurers have confirmed that their Objection on this point is resolved.

Moreover, the Debtors and the Insurers have agreed to continue discussions regarding the

applicable provisions in the Plan with a goal of addressing the underlying disagreement.  These

revisions and others set forth in the Objections Response Chart demonstrate satisfaction of

section 1125.

### C.    The Remaining Disclosure-Related Objections Seek Modifications That Are Neither Appropriate Nor Required Under Section 1125

19.    The remaining disclosure-related Objections seek to advance, in large measure,

the particular interests of certain creditor constituencies or to persuade other stakeholders—

through the <u>Debtors</u>' Disclosure Statement—to reject the Plan.  To take one of the more striking

---

[7] (*See* Objs. Resp. Chart 3(a) (Bridge House Corporation), 4(a) (Carpenter Health Network); 5(a) City of Chillicothe, Ohio; 6(a) (City of Covington, Louisiana); 7(a) the Four Winds Tribe Louisiana Cherokee); 8(a) (Parish of DeSoto); 9(a) (the Northwestern Band of the Shoshone Nation); 10(a) (Dr. Gregory Fernandez in his Official Capacity as the Coroner of St. Bernard Parish); 20(e) (Public Schools).)

examples, the Objection of the Ad Hoc Committee on Accountability ("**AHCA**"), which represents just five individual creditors, propounds sixteen "questions" that it demands the Debtors answer in the Disclosure Statement.  (*See generally* AHCA Obj., Dkt. No. 2745.)  Most of these questions are, like prior AHCA filings, seemingly designed to garner media headlines. For instance, the AHCA requests that the Debtors disclose how many will "die" as a result of Plan confirmation so that creditors are "armed with the best available information about whether that Plan will injure and kill people."  (*Id.* at 4.)  The AHCA goes so far as to cast aspersions on the attorneys general of fifty states and the Department of Justice, claiming that "[a]ll the wrong people will have the incentive to keep problems at NewCo out of the public eye."  (*Id.* at 5.)  The fundamental purpose of the Disclosure Statement—to provide adequate information—is not served by requiring the Debtors to include reference to specialized interests, litigation positions, or philosophical objections that certain creditors might have with the Plan—a point frequently emphasized by courts.  *See* Hr'g Tr. 160:11-161:16, *In re Delphi Corp.*, No. 05-44481 (Bankr. S.D.N.Y. Dec. 7, 2007), Dkt. 11870 (objections that unduly sought to "put[] in the debtors' document the objectors' litigation positions" were "overkill"); *In re PC Liquidation*, 383 B.R. at 861, 865-66 (affirming bankruptcy court's finding that there is no "significant benrefit from [trying to reach some consensual text with [the objecting creditor] regarding the parties' respective litigation positions]") (first alteration in original); *see also In re CDECO Mar. Const. Inc.*, 101 B.R. 499, 501 (Bankr. N.D. Ohio 1989) ("A disclosure statement is simply not the place to argue various theories of recovery or to demonstrate results of 'what if' kinds of proof.").

20.     Even so, the Debtors have endeavored to address certain Objections of the AHCA, albeit not necessarily in the way the AHCA suggests.  For example, the AHCA

complains about the amount and timing of the Proposed Shareholder Settlement payment—
which is, at bottom, a critique of disclosure concerning the Proposed Shareholder Settlement.
(AHCA Obj. at 11-12.) The Disclosure Statement, as amended, contains 19 pages on the
settlement and why, assuming such agreement is reached, it should be approved as fair,
reasonable, and in the best interests of the Debtors' estates.

21.    Although the Debtors have sought to accommodate as many modifications from
as many parties as reasonably practicable, *see supra* Section I.B, the Debtors could not, in the
interest of crafting a fair and accurate Disclosure Statement, accept changes that were plainly for
improper purposes or would otherwise needlessly encumber the already incredibly lengthy
Disclosure Statement. For the reasons set forth in the Debtors' Objections Response Chart and
above, all remaining disclosure-related Objections should be overruled and the Disclosure
Statement, as amended, should be approved.

## II.    The Plan Objections Raise Confirmation Issues To Be Addressed at the Confirmation Hearing

22.    Many Objections are not actually objections to the adequacy of the information
contained in the Disclosure Statement but rather are substantive confirmation objections. These
include Objections to the classification of certain claims under section 1122 (*see* NCSG Obj.
¶¶ 42-50; Public Schools Obj. ¶¶ 58-61, Dkt. No. 2720); challenges to treatment and certain trust
distribution procedures (*see, e.g.*, WV Obj. ¶¶ 5-6, Dkt. No. 2703; Jackson Suppl. Obj. ¶¶ 1-34,
Dkt. No. 2881); the Plan's third-party releases provisions (*see* NCSG Obj. ¶¶ 12-40; Public
Schools Obj. ¶¶ 47-54); and best interest objections (Jackson Obj. ¶ 2, Dkt. No. 2819)
(collectively, the "**Plan Objections**").

23.    As a threshold matter, all of the Plan Objections are premature and should be
deferred to the confirmation hearing. Courts routinely hold that challenges to a plan of

reorganization itself—including challenges to classification, treatment, and third-party releases—should generally be addressed at confirmation <u>after</u> voting creditors have been informed about the proposed plan, a vote has been taken, and there is an opportunity to develop a full factual record. *See, e.g.*, Hr'g Tr. 143:24-144:14, 161:7-16, *In re Delphi Corp.*, No. 05-44481 (RDD) (Bankr. S.D.N.Y. Dec. 7, 2007), Dkt. No. 11870 (overruling objections regarding classification and disparate treatment "based on . . . conclusion that the plan [was] not facially unconfirmable or, in the alternative, that the plan [might] be subject to modification under 1127 of the Code in a relatively easy way given the manner in which the debtors w[ould] be tabulating votes . . . ."); *In re Quigley Co.*, 377 B.R. 110, 119 (Bankr. S.D.N.Y. 2007) (approving disclosure statement over objections that raised "confirmation issues that require an evidentiary hearing"); Hr'g Tr. 91:6-19, *In re Windstream Holdings Inc.*, No. 19-22312 (RDD) (Bankr. S.D.N.Y. May 8, 2020), Dkt. No. 1988 (stating that disclosure statement objections raising jurisdictional issues regarding third-party releases would "always be denied" unless there were a shift under the governing case law); Hr'g Tr. 19:8-9, *In re Arcapita Bank B.S.C. (C)*, No. 12-11076 (SHL) (Bankr. S.D.N.Y. Apr. 26, 2013), Dkt. No. 1057 ("There was a lot about third[-]party releases . . . [a]nd that's a plan issue."); Order Regarding Mot. to Approve Disclosure Stmt., *In re New York City Off-Track Betting Corp.*, No. 09-17121 (MG) (Bankr. S.D.N.Y. Dec. 1, 2010), Dkt. No. 234 (approving disclosure statement over objections that court lacked subject matter jurisdiction to grant third-party releases and that third-party release and exculpation provisions were improper).

24.    In fact, the only circumstance when an otherwise "adequate" disclosure statement should not be approved is where the plan is "so fatally flawed that confirmation is <u>impossible</u>." *In re Cardinal Congregate I*, 121 B.R. 760, 764 (Bankr. S.D. Ohio 1990) (emphasis added).  In other words, unless the plan is "patently unconfirmable on its face," objections to the plan should

not be considered at the disclosure statement hearing. *In re Quigley Co., Inc.*, 377 B.R. at 115-16. The "patent unconfirmability" bar is just as high as the name suggests. To prevail, the effect of which is to prevent solicitation and stymie the reorganization, the Objectors must demonstrate that there are "(1) confirmation 'defects [that cannot] be overcome by creditor voting results' and (2) those defects 'concern matters upon which all material facts are not in dispute or have been fully developed at the disclosure statement hearing.'" *In re Am. Capital Equip., LLC*, 688 F.3d 145, 155-56, 164 (3d Cir. 2012) (quotation omitted).

25.    None of the Objectors come close to demonstrating that the Plan is patently unconfirmable. To the extent the Objections remain unresolved by confirmation (and the Debtors hope to resolve their concerns consensually before confirmation), Objectors will have ample opportunity to raise their Objections after discovery, the development of a full evidentiary record, and further briefing. (*See* Amended Order Granting Debtors' Motion for Order Establishing Confirmation Schedule & Protocols, ¶¶ 3-4 (May 21, 2021), Dkt. No. 2894.) The Court should therefore overrule the Plan Objections in their entirety and defer any arguments related to confirmability. Nevertheless, in light of the focus by a handful of the Objectors on these issues, and cognizant of the public's interest in these chapter 11 cases, the Debtors find themselves compelled to respond briefly to the principal Plan Objections to put beyond any doubt that the issues raised by the Objectors are without merit.

### A.    The Debtors Have Properly Classified Claims

26.    Certain Objectors—specifically, the Non-Consenting States and the Public School Claimants—contend that the Plan is patently unconfirmable because their claims are improperly classified with claims of similar claimants. (NCSG Obj. ¶¶ 42-50; Public Schools Obj. ¶ 58.) These Objections not only fall far short of establishing that confirmation is impossible but also are substantively without merit.

17

27.    Section 1122 of the Bankruptcy Code affords debtors significant discretion to classify claims together so long as "such claim or interest is substantially similar to the other claims or interests of such class."  11 U.S.C. § 1122(a).  "[C]lassification is constrained by two straight-forward rules:  Dissimilar claims may not be classified together; similar claims may be classified separately only for a legitimate reason."  *In re Quigley Co., Inc*., 377 B.R. at 116 (quoting *Aetna Cas. & Sur. Co. v. Clerk, U.S. Bankr. Court (In re Chateaugay Corp.)*, 89 F.3d 942, 949 (2d Cir. 1996)).  All that is required to justify a classification framework that follows these basic rules is that a "reasonable basis" exists for the framework.  *In re Drexel Burnham Lambert Grp., Inc.*, 138 B.R. 723, 757 (Bankr. S.D.N.Y. 1992) ("A plan proponent is afforded significant flexibility in classifying claims under § 1122(a) if there is a reasonable basis for the classification scheme and if all claims within a particular class are substantially similar.").

28.    The Debtors' classification framework comfortably satisfies section 1122(a), as will be conclusively demonstrated at confirmation, and is in many ways an outgrowth of the first phase of mediation in these chapter 11 cases.  There, the Non-Federal Public Claimants (i.e., States and municipalities) reached agreements-in-principle memorialized in term sheets with certain private-side claimant groups that resolved the issue of allocation of estate value to each such private-side group, thereby resolving in large measure the critical issue of allocation among the Debtors' public and private creditors.  (*See* Mediators' Report, ¶¶ 5-7 (Sept. 23, 2020), Dkt. No. 1716.)  In addition, the Non-Federal Public Claimants agreed that all value received by them through these chapter 11 cases would be exclusively dedicated to programs designed to abate the opioid crisis.  (*Id.* ¶ 3.)  Finally, the Non-Federal Public Claimants reached agreement on a default mechanism that, in the absence of a standalone agreement between a state or territory and its political subdivisions, provides a structure and process for applying funds to abate the opioid

crisis.  (*Id.* ¶ 4.)  As set forth in greater detail in the Disclosure Statement, NOAT will first allocate funding among states based on a formula developed through extensive negotiation among the attorneys general of various states.  (Disclosure Stmt. § III.S.5(i).)  Funds will then be allocated within a particular state through either a Statewide Abatement Agreement among the state and its local governments or a default mechanism.  (*Id.* § III.S.5(ii).)

29.    The Debtors' classification framework reflects the structure contemplated by the mediation.  Indeed, the Plan classifies the proofs of claim that assert opioid litigation claims into nine classes (Classes 3 through 10(b)) based on the fact that nearly all of these classes will be channeled to separate creditor trusts that will be established either to fund abatement programs across the United States (such as NOAT in the case of the Non-Federal Public Claimants) or make cash distributions to individual creditors pursuant to trust distribution procedures, consistent with the results of the mediation.[8]  (*See, e.g.*, Disclosure Stmt. at §§ I.B, III.S.)  This is more than ample justification for the classification regime and it is consistent with numerous mass tort and other large-scale chapter 11 plans involving multi-trust distribution frameworks. *See, e.g., In re Sabine Oil & Gas Corp.*, 555 B.R. 180, 310-11 (Bankr. S.D.N.Y. 2016) (plan proponent must only show a rational or reasonable business, factual, and/or legal basis to justify separate classification of similar claims); *see also* Confirmed Plan of Reorganization, *In re PG&E Corp.*, No. 19-30088 (Bankr. N.D. Cal. Mar. 17, 2020), Dkt. No. 6340 (separating classifying unsecured creditors whose recoveries were to come from different trusts); Confirmed Second Am. Plan of Reorganization, *In re Insys Therapeutics, Inc.*, No. 19-11292 (Bankr. Del.

---

[8] The Secured Claims (Class 1) and Other Priority Claims (Class 2) involve creditors that have not asserted opioid litigation claims and are not the focus of any of the objections.  Both the NAS PI Claims (Class 10(a)) and Non-NAS PI Claims (Class 10(b)) will be channeled to the PI Trust. The Debtors will make a contribution to the Truth Initiative Foundation in satisfaction of the Ratepayer Claims (Class 8).  (Disclosure Stmt. § III.S.3.)

Jan. 16, 2020), Dkt. No. 1115 (same); Confirmed Fifth Am. Plan of Reorganization, *In re TK Holdings Inc.*, No. 17-11375 (Bankr. D. Del. Feb. 21, 2018), Dkt. No. 2120 (same); Confirmed Second Am. Plan of Reorganization, *In re Motors Liquidation Co.*, No. 09-50026 (Bankr. S.D.N.Y. Mar. 29, 2011), Dkt. No. 9941 (same); Confirmed First Am. Plan of Reorganization, *In re W.R. Grace & Co.*, No. 01-1139 (Bankr. D. Del. Jan. 31, 2011), Dkt. No. 26155 (same).

30.     Notwithstanding the Non-Consenting States' participation in the first phase of mediation alongside local governmental entities and the fact that both the States and local governmental entities are recovering through NOAT, the Non-Consenting States object to the Plan's classification framework on that ground that it classifies the claims of states in Class 4 with claims of other Non-Federal Public Claimants such as municipalities.  In support, the Non-Consenting States advance a number of inapposite legal doctrines—an amorphous rendering of state sovereignty, *parens patriae*, and the ancient and inapplicable "Dillon Rule"[9]—that they believe demonstrate that States are different in kind from municipalities.  (NCSG Obj. ¶¶ 42-50.) These arguments miss the mark, however, because they attempt to distinguish between State and municipal claimants, not their claims.  The only relevant inquiry in determining whether two claims are properly classified together—an inquiry the Non-Consenting States all but ignore—is whether the claims are "substantially similar."  11 U.S.C. § 1122(a).  "Claims are similar if they have 'substantially similar rights to the debtor's assets.'"  *In re Quigley Co., Inc.*, 377 B.R. at

---

[9] The "Dillon Rule" originates from an 1868 Iowa Supreme Court case, *City of Clinton v. Cedar Rapids & Mo. R.R. Co.*, 24 Iowa 455 (1868), and stands for the principle that municipal and local governments derive their power from states and are therefore considered an extension of the state.  *Id.* at 474-75; *Hunter v. Pittsburgh*, 207 U.S. 161, 178-79 (1907). Not only is the Dillon Rule completely irrelevant to the propriety of the Debtors' classification regime in the Plan, but it is not even a rule that is uniformly followed, with a majority of states repudiating its limited construction of municipal governing power either in whole or in part.  *See, e.g.*, *City of New York v. Beretta U.S.A. Corp.*, 315 F. Supp. 2d 256 (E.D.N.Y. 2004) (observing that the home rule, which recognizes a more independent realm of authority for municipal governments, "is part of the law, in constitutional or statutory form, of all but two states").

116 (emphasis omitted) (quoting *Drexel Burnham Lambert Grp.*, 138 B.R. at 757); *see also* 7

Collier on Bankruptcy 1122.03[3] (16th ed. 2021) (noting that courts "look[] at the nature of the

claim (e.g., senior or subordinated, secured or unsecured), and the relationship of the claim to

property of the debtor").

31.     This permissive standard is fatal to the Non-Consenting States' Objections.  State

and municipal opioid litigation claims are facially "similar."  Class 4 comprises all proofs of

claim filed by non-federal domestic governmental entities, including the States, the District of

Columbia, U.S. territories, counties, cities, towns, and other local governmental entities.  These

claims are all brought by governmental entities representing the same citizenry.  (Disclosure

Stmt. §§ III.S.5, IV.C.4.)  They all arise out of the Debtors' production, marketing, and sale of

opioids and allege many similar theories of recovery, including but not limited to public

nuisance, fraud, and negligence.  (*Id.* § III.S.5.)  They generally seek redress for the same alleged

conduct and public nuisance.  They seek, in the main, monetary damages or injunctive relief that

is the subject of the Voluntary Injunction imposed by this Court.  (*Id.*)  And, importantly, they

are all unsecured—and, thus, have an identical relationship to the property in the Debtors'

estates.  This alone is sufficient to classify them together under section 1122(a).  *See In re*

*Quigley Co. Inc.*, 377 B.R. at 116 (rejecting classification challenge at the disclosure statement

stage because "[a]ll of the PI Claimants [had] the same legal rights against [the Debtor's] estate;

they are unsecured creditors").  Finally, as observed above, these claims are classified separately

from other types of opioid-related litigation claims because, among other reasons, the claims in

Class 4 would receive approximately $4 billion in estimated cash distributions to NOAT over

time.  Pursuant to the Plan, those distributions are to be used exclusively for funding abatement

programs based upon interstate and intrastate allocation percentages and procedures that were

agreed to by and among the States and local governments in this Class.  (*See* Disclosure Stmt.
§§ I.C, III.S.5.)

32.     The Non-Consenting States' principal response is that the Plan's classification
framework runs afoul of principles of state sovereignty because, in effect, municipalities and
other local governments may vote to accept the Plan over their Objection.  (*See* NCSG Obj.
¶¶ 44-45 ("States . . . could have their votes against or for the Plan effectively nullified by the
more numerous votes of their own or other states' political subdivisions").)  But this has nothing
to do with state sovereignty properly conceived.  It is simply a function of the rules governing
voting under the Bankruptcy Code.[10]  *See* 11 U.S.C. § 1126(c).

33.     Against this backdrop, the Non-Consenting States' remaining arguments also miss
their mark.  For example, the Non-Consenting States' contention that "political subdivisions" do
not have the power to sue on behalf of their citizens or enforce consumer protection laws (NCSG
Obj. ¶¶ 48-49), is not a proper classification objection.  It is an argument that (at least some)
municipalities' and other local governments' proofs of claim should be disallowed under non-
bankruptcy law, at least in part.  (NCSG Obj. ¶¶ 45-46 (acknowledging that any applicable law
differs from State to State).)  Regardless, it does not demonstrate that the Plan is unconfirmable
"on its face."  The Non-Consenting States also suggest that the aggregate value of their
(untested) proofs of claim somehow sets their claims apart.  (NCSG Obj. ¶ 44.)  But the <u>amount</u>
of the asserted claim is irrelevant for classification purposes.  *See In re Lisanti Foods, Inc.*, 329
B.R. 491, 510 (D.N.J. 2005) (explaining that "the amount of the [creditor]'s claim does not

---

[10] The Non-Consenting States cite to *Wyeth v. Levine* and *Nessel ex rel. Mich. v. AmeriGas
Partners, L.P.*, in support of their classification argument.  Those cases, however, are entirely
irrelevant and not, in fact, about classification or even bankruptcy more generally. *See Wyeth*,
555 U.S. 555, 593-94 (2009) (considering a question of federal preemption in a failure to warn
tort case); *Nessel*, 954 F.3d 831, 833-34, 838 (6th Cir. 2020) (considering a question concerning
the applicability of the Class Action Fairness Act (CAFA) to a case with illegal pricing claims).

implicate the legal character of the claim, and therefore separate classification [is] not warranted

under the Code") (emphasis in original)).[11]  At bottom, none of the authorities cited by the Non-

Consenting States <u>require</u> the Debtors to separately classify States under the Bankruptcy Code.

And while the Non-Consenting States might prefer to be separately classified—in other words, to

improperly gerrymander themselves—the Debtors are well within their discretion to classify

their claims in Class 4 to facilitate the abatement-centric resolutions contemplated by the Plan.

34.    The classification arguments raised by the Public School Claimants fail for

similar reasons.  The Public School Claimants argue that they should be classified in their own

class because the "'open ended' character of the harm . . . sets the public school claimants apart."

(Public Schools Obj. ¶ 58.)  But, like other claims in Class 4, the Public School Claimants'

claims also arise from the Debtors' marketing and sale of opioids (Public Schools Obj. ¶¶ 56, 58)

---

[11] The Non-Consenting States also appear to suggest that valuing their claims at $1 for voting purposes is improper (NCSG Obj. ¶ 49.)  That is incorrect.  In mass tort bankruptcy cases (such as these), tort claims are frequently estimated for voting purposes because liquidating each tort claim to a specific amount would be virtually impossible and immensely value-destructive.  *See, e.g.*, *In re A.H. Robins Co., Inc.*, 88 B.R. 742, 747 (E.D. Va. 1988) ("Any attempt to evaluate each individual claim for purposes of voting on the Debtor's Plan of Reorganization would, as a practical matter, be an act of futility and would be so time consuming as to impose on many, many deserving claimants further intolerable delay all not only to their detriment, but to the detriment of the financial well being of the estate as well."); *Matter of Johns-Manville Corp.*, 68 B.R. 618, 631 (Bankr. S.D.N.Y. 1986) (The "objections [to estimation at $1 for voting] ignore both the realities of this case, and the equities which need to be addressed thereunder."); *In re TK Holdings Inc.*, No. 17-13775, Dkt. No. 1639 (Bankr. D. Del. Jan. 5, 2018) (estimation for voting purposes at $1 approved without objection).  Here, the Debtors face over 600,000 proofs of claim.  Moreover, many of the opioid litigation claims against the Debtors are based upon novel or untested legal theories and the value of any opioid litigation claim will depend greatly on the facts and circumstances of the claim, and a number of highly particularized judgments about the quantum of economic and non-economic damages that the claimant has incurred and that are compensable under applicable law.  These are <u>precisely</u> the kind of circumstances for which the $1-for-voting-purposes method is well suited.  Importantly, no party (including the NCSG) has (or can) suggest a better, more equitable alternative to $1 voting given the circumstances of these cases.

and are disputed and unsecured.  For the same reasons stated above, these too are properly

classified.  (*See supra* ¶¶ 29-32.)

### B.    Challenges to Trust Distribution Procedures Are Premature and Misplaced

35.    Certain Objectors—such as West Virginia, the Public School Claimants, and Peter

W. Jackson—challenge to varying degrees and in varying ways the trust distribution procedures

that will govern distributions under the Plan (collectively, the "**TDP Objectors**").  (*See* WV Obj.

¶ 6 (alleging that interstate allocation of abatement funds under the National Opioid Abatement

Trust Distribution Procedures ("**NOAT TDP**") "will render the plan unconfirmable because . . .

West Virginia will suffer badly"); Public Schools Obj. ¶ 46 (arguing that Plan is "untenable"

because NOAT TDP allegedly provide "schools with no voice, no input and no assurance of

funding"); Jackson Suppl. Obj. ¶¶ 17-31 (alleging that consent to adjudication under the Non-

NAS PI TDP is illusory).)  Each of these Objections is premature and misplaced.

36.    None of the TDP Objectors can demonstrate that the trust distribution procedures

are illegal or inappropriate on their face.  To the contrary, challenges to treatment—particularly

ones predicated on the fairness of trust distribution procedures—are quintessential plan

objections that should be and nearly always are reserved for confirmation.  *See, e.g.*, *In re

Quigley Co., Inc.*, 377 B.R. at 119 (approving disclosure statement over objection and noting that

same treatment, among other issues raised, was a "confirmation issue[]").  West Virginia, in fact,

expressly concedes as much with respect to the interstate allocation issue that it raises, stating

that while it "intends to[] object to the approval of the Plan insofar as it adopts the allocation

scheme as presently structured," "West Virginia does not intend to raise confirmation issues at

this juncture."  (*See* WV Stmt. Regarding Obj. ¶ 3, Dkt. No. 2857.)

37.    Although ostensibly framed as a disclosure statement objection, the Public School

Claimants allege that NOAT will "pick and choose among abatement initiatives" (Public Schools

Obj. ¶ 36) and the schools' interests will not be adequately accounted for in deployment of

abatement funds (*id.* ¶ 59).  These Objections, however, share a fundamentally flawed premise as

to how the NOAT TDP operates.  Under the NOAT TDP, the allocation of how funds are to be

used within a particular State is left to that State and its local governments (subject to the

requirement that they be used consistent with the NOAT TDP).  Moreover, the NOAT TDP

provides a detailed description of approved abatement uses and core abatement strategies, many

of which directly benefit public schools.  The Debtors understand that the Ad Hoc Committee

will file a pleading providing more detailed analysis on this issue.[12]

38.    Finally, Peter W. Jackson challenges the Non-NAS PI TDP as "patently

unconfirmable" and claims that the so-called "opt-out" mechanism that permits personal injury

claimants to elect to liquidate their claims against the Debtors in court is somehow improper.

Not so.  Bankruptcy courts routinely confirm plans of reorganization that establish personal

injury trusts with comparable streamlined procedures for fair distribution of funds and subject to

an "opt-out" to the tort system—a point elided entirely by Mr. Jackson.  *See, e.g.*, *In re Blitz*

*U.S.A., Inc.*, No. 11-13603 (PJW), 2014 WL 2582976 (Bankr. D. Del. Jan. 30, 2014); Blitz

---

[12] Likewise, objector Dr. Michael Masiowski ("**Masiowski**"), an independent emergency room
physician, suggests that treatment providers other than hospitals are ineligible for a distribution
under the trust distribution procedures applicable to Class 6 ("**Hospital TDP**").  (Masiowski
Suppl. Obj. at 6, Dkt. No. 2749.)  That is incorrect.  The Hospital TDP are generally applicable
to claims filed by hospitals and by "other treatment providers" in Class 6.  (Plan § 1.1 (defining
"Hospital Claim," i.e. the claims in Class 6, as those, in part, "held by a provider of healthcare
treatment services or any social services").)  Moreover, each claimant—whether a hospital or
non-hospital treatment provider—that makes the required certifications (Hospital TDP §§ 3, 7)
and submits the necessary abatement form and proof of claims data (Hospital TDP §§ 4.1(a)(c),
5) is eligible to recover under the applicable model.  The Debtors have amended the Disclosure
Statement to explain the required certifications for a claimant to qualify for a distribution under
the Hospital TDP.  (Disclosure Stmt. § III.S.1.)  To the extent Dr. Masiowski is objecting to the
substance of the Hospital TDP themselves (including as to required certifications (Masiowski
Suppl. Obj. at 6) or the model governing distributions (*id.*)), those objections are premature
confirmation objections and should be overruled.

Personal Injury Trust Agreement, *In re Blitz U.S.A., Inc.*, No. 11-13603 (PJW) (Bankr. D. Del. Dec. 18, 2013), Dkt. No. 2000-2; Confirmation Order, *In re Metex Mfg. Corp.*, No. 12-14554-CGM (Bankr. S.D.N.Y. June 23, 2014), Dkt. No. 567; Form of Asbestos PI Trust Distribution Procedures, *In re Metex Mfg. Corp.*, No. 12-14554-CGM (Bankr. S.D.N.Y. Dec. 23, 2014), Dkt. No. 364-3; Confirmation Order, *In re United Gilsonite Labs.*, No. 11-02032 (RNO) (Bankr. M.D. Pa. Dec. 8, 2014), Dkt. No. 2190; First Am. United Gilsonite Labs. Asbestos Personal Injury Trust Distribution Procedure, *In re United Gilsonite Labs.*, No. 11-02032 (RNO) (Bankr. M.D. Pa. Dec. 8, 2014), Dkt. No. 2189-1.  Mr. Jackson's argument to the contrary misunderstands how the Non-NAS PI TDP operate and rests on inapplicable case law.  He contends that "any [PI claim] holder who fails affirmatively to opt out will be deemed to have agreed to the PI Trust's streamlined procedures" and "creditors may not be bound to such [Non-NAS PI TDP] provisions by their silence, as the opt-out mechanism would do."  (Jackson Suppl. Obj. ¶¶ 17, 22; *see also id.* ¶ 31 (alleging that such "deemed consent" renders the Plan patently unconfirmable").)  This, however, misstates the nature of the opt-out mechanism.  Under the Non-NAS PI TDP, holders of personal injury claims in Class 10 may choose to have their claims liquidated according to the Non-NAS PI TDP's streamlined procedures (Non-NAS PI TDP §§ 6-9) or they may elect to liquidate claims in the tort system.  (*Id.* § 1, Ex. B.)  But, in either case, claimants must submit a claim form to the trust affirmatively selecting—by checking or not checking a box—which of the two pathways they intend to pursue, and if a claimant fails to submit a claim form, no claim will be liquidated and no distribution will be made on account of that claim.  (*See id.* § 3(d) (requiring submission of claim form checking at least one injury box for allowance under the Non-NAS PI TDP); *id.* § 1 (requiring submission of claim form to elect

to liquidate in tort system).)  In other words, no claim will be liquidated under the Non-NAS PI

TDP absent an affirmative act by the claimant.[13]

39.    The primary authority that Mr. Jackson relies on, *In re SunEdison, Inc.*, 576 B.R.

453, 458 (Bankr. S.D.N.Y. 2017), is wholly inapposite.  The question in *SunEdison* was whether

a creditor's <u>failure to vote</u> on the plan may be deemed to be consent to the plan's release of third-

party claims contained in the plan.  *See id.* at 457-58, 46.  This circumstance is far from the one

at hand and ignores that the claims of personal injury claimants will be liquidated only after an

affirmative act on their part, as set forth above.  Mr. Jackson also claims that the Non-NAS PI

TDP's tort-system litigation option improperly "strips important rights," such as the right to form

a class claim, assert claims against defendants other than the PI Trust, or recover attorney's or

similar fees.  (Jackson Obj. ¶¶ 26-27.)  These Objections are without merit but in any case are

objections to the substance of the Non-NAS PI TDP themselves, which are appropriately raised

and addressed at confirmation, if at all.  And as noted above, the Debtors will demonstrate at

confirmation that treatment of PI claims comports with the Bankruptcy Code—as underscored by

the Ad Hoc Group of Individual Victims.

40.    Simply put, none of the TDP Objections should thwart solicitation of the Plan.

---

[13] Mr. Jackson's argument that the Plan is patently unconfirmable because the Court lacks "core" jurisdiction to confirm the Plan and the Non-NAS PI TDP (Jackson Suppl. Obj. ¶¶ 11-12, 31) likewise fails.  Under 28 U.S.C. § 157, Congress granted bankruptcy courts the authority to enter final orders in all "core" proceedings.  Confirmation of a plan of reorganization is a "core" matter.  *See* 28 U.S.C. § 157(b)(2)(L).  Moreover, the Non-NAS PI TDP does not implicate 28 U.S.C. 157(b)(2)(B) because the Non-NAS PI TDP provides personal injury claimants with the choice to liquidate their personal injury claims against the estates in the tort system or under the Non-NAS PI TDP's streamlined procedures.  *See In re Residential Capital, LLC*, 519 B.R. 890, 901-02 (Bankr. S.D.N.Y. 2014) (explaining that under § 157(b)(2)(B), a bankruptcy court lacks authority to estimate or liquidate claims for distributional purposes only "absent consent"); *see also In re W.R. Grace*, 475 B.R. 34, 75 (D. Del. 2012) (affirming confirmation of plan that established personal injury trusts and claims procedures where those procedures provided the option to liquidate claims in the tort system and rejecting argument that trust structure violated the claimants' statutory right to a jury trial).

C.     **The Debtors Will Demonstrate That the Shareholder Release and Channeling Injunction Are Permissible Under *Metromedia***

41.    A number of Objectors, led by the Non-Consenting States, allege that the Plan's proposed release of members of the Sackler Families and their associated entities render the Plan patently unconfirmable.  These Objections, broadly speaking, break along three lines.  First, several Objectors argue or suggest that non-consensual third-party releases are or should not be permissible under the Bankruptcy Code, either categorically or to their claims.  (NCSG Obj. ¶¶ 20-28.)  Second, some Objectors argue that the releases in the Plan fail to satisfy the criteria set forth in *Metromedia*.  (NCSG Obj. ¶¶ 12-19.)  Finally, the Non-Consenting States argue that this Court lacks the subject matter jurisdiction to enter third-party releases in these cases (NCSG Obj. ¶¶ 29-37).  These Objections to releases (including as to jurisdiction) are <u>classic</u> confirmation objections that should be litigated only on a fully developed evidentiary record at confirmation.[14]  However, as explained below, each of these Objections is also misconceived and does not come close to establishing that the Plan is illegal on its face such that solicitation should not proceed.

### *Non-Consensual Third-Party Releases Are Authorized by Controlling Second Circuit Law*

42.    First, there can be no dispute—as this Court has recognized on multiple occasions—that third-party releases are permissible under the Bankruptcy Code.  The Second

---

[14] *See, e.g.*, Hr'g Tr. 27:22-29:3, *In re Tops Holding II Corp.*, No. 18-22279 (RDD) (Bankr. S.D.N.Y. Oct. 17, 2018), Dkt. No. 760 (reserving subject matter jurisdiction and constitutional power issues regarding third-party releases for confirmation because the "facts were important" to determining those issues); Hr'g Tr. 24:25-25:5, *In re 21st Century Oncology*, No. 17-22770 (RDD) (Bankr. S.D.N.Y. Jan. 12, 2018), Dkt. No. 916 ("[U]ltimately, the issue of the release in its propriety, is a confirmation issue."); Hr'g Tr. 29:5-20, *In re Coudert Bros. LLP*, No. 06-12226 (RDD) (Bankr. S.D.N.Y. June 3, 2008), Dkt. No. 689 (assertion that third-party releases constituted a "bribe" couched releases in "terms [that] presuppose[d] a ruling on the nature of [creditor's] claims" and was a confirmation issue); *In re Drexel Burnham Lambert Grp.*, No. 90 B 10421, 1992 WL 62758, at *1 (Bankr. S.D.N.Y. Mar. 5, 1992) (objections to a plan's releases and injunction provisions were confirmation objections not properly raised as objections to the disclosure statement).

Circuit has long confirmed the availability of third-party releases under appropriate

circumstances. *See Deutsche Bank AG v. Metromedia Fiber Network, Inc.,* (*In re Metromedia*),

416 F.3d 136, 141-43 (2d Cir. 2005) (confirming that bankruptcy court has power to approve

nondebtor releases in "unique" circumstances); *In re Drexel Burnham Lambert Grp.*, *Inc.,* 960

F.2d 285, 293 (2d Cir. 1992) ("[A] court may enjoin a creditor from suing a third party, provided

the injunction plays an important part in the debtor's reorganization plan."); *MacArthur Co. v.*

*Johns-Manville Corp.*, 837 F.2d 89, 93-94 (2d Cir. 1988) ("[Section 105(a) has been construed

liberally to enjoin suits that might impede the reorganization process.").   So too have numerous

bankruptcy and district courts in this jurisdiction. *See, e.g.*, *Lynch v. Lapidem Ltd.* (*In re Kirwan*

*Offices S.a.R.L.*), 592 B.R. 489, 509-12 (S.D.N.Y. 2018); *In re Genco Shipping & Trading Ltd.*,

513 B.R. 233, 269 (Bankr. S.D.N.Y. 2014); *In re Residential Capital, LLC*, 508 B.R. 838, 849

(Bankr. S.D.N.Y. 2014); *see also* Mar. 24, 2021 Hr'g Tr. 104:5-17 (recognizing that Court will

analyze third-party releases proposed in any plan under *Metromedia*); Feb. 21, 2020 Hr'g Tr.

39:19-40:4 (deeming it "a huge error of law and a huge mistake" to assert that "the Bankruptcy

Court does not have the power to approve a third party release under the case law").   The

majority of other Circuits to have addressed the question are in accord. *See In re Millennium*

*Lab Holdings II, LLC.*, 945 F.3d 126, 137-40 (3d Cir. 2019), *cert. denied sub nom. ISL Loan Tr.*

*v. Millennium Lab Holdings II, LLC*, 140 S. Ct. 2805 (2020); *In re Seaside Eng'g & Surveying,*

*Inc.*, 780 F.3d 1070, 1076-79 (11th Cir. 2015); *In re Glob. Indus. Techs., Inc.*, 645 F.3d 201, 206

(3d Cir. 2011); *In re Airadigm Commc'ns, Inc.*, 519 F.3d 640, 655-58 (7th Cir. 2008); *In re Dow*

*Corning Corp.*, 280 F.3d 648, 656-58 (6th Cir. 2002); *Monarch Life Ins. Co. v. Ropes & Gray*,

65 F.3d 973, 984-85 (1st Cir. 1995); *In re A.H. Robins Co., Inc.*, 880 F.2d 694, 700-02 (4th Cir.

1989); *see also Nat'l Heritage Found., Inc. v. Highbourne Found.*, 760 F.3d 344, 350 (4th Cir. 2014), *cert. denied*, 135 S. Ct. 961 (2015).

43.     The Non-Consenting States appear to concede as much.  Citing facially inapposite cases, Bankruptcy Code provisions, and statutes, they instead ask this Court to craft from whole cloth an exception to *Metromedia* for so-called police power actions that finds no support in applicable law.  (NCSG Obj. ¶¶ 21-28.)  For example, the Non-Consenting States claim that the Plan cannot release consumer protection and public nuisance actions because enforcement of those laws is a "constitutionally protected function."  (*Id.* ¶ 22 (citing cases).)  But the handful of cases on which they rely have <u>nothing</u> to do with third-party releases in the confirmation context. To the contrary, they stand only for the entirely irrelevant proposition that a *parens patriae* action does not fall within the statutory definition of "class action" under the <u>Class Action Fairness Act</u> ("CAFA") and thus cannot be removed to federal court.  (*Id.* (citing *W. Va. ex rel. McGraw v. CVS Pharmacy, Inc.*, 646 F.3d 169, 174 (4th Cir. 2011)); *see also id.* (citing *Purdue Pharma L.P. v. Ky.*, 704 F.3d 208, 220 (2d Cir. 2013) ("[T]he District Court correctly determined that Plaintiffs' action is not a 'class action' as defined in CAFA, and therefore the case was properly remanded.") and *New Hampshire v. Purdue Pharma*, No. 17-CV-427-PB, 2018 WL 333824, at *2 (D.N.H. Jan. 9, 2018) (same).)[15]

44.     Next, the Non-Consenting States argue that a "police power" exception to *Metromedia* should be inferred from section 524(g) (which provides for channeling injunctions in asbestos cases) and section 362(b)(4) (which exempts "police and regulatory power" litigation

---

[15] For substantially similar reasons, the Non-Consenting States' argument that Congress' intent concerning the scope of the power to enter releases in connection with confirmation of a Plan may be inferred from 11 U.S.C. § 1452(a), a statute also governing removal of actions to federal court (NCSG Obj. ¶ 26), falls flat.  No claims are being removed to federal court. The Non-Consenting States do not, and cannot, cite a single bankruptcy authority substantiating that logical leap.

by governmental units from the automatic stay).  (NCSG Obj. ¶¶ 24-27.)  But this merely

rehashes the same textual arguments that have long been rejected by the Second Circuit and

others as a basis to preclude non-consensual third-party releases in non-asbestos cases.  *See, e.g.*,

*Metromedia*, 416 F.3d at 142 (acknowledging section 524(g) but affirming court's power to enter

non-consensual releases in a non-asbestos case); *Dow Corning*, 280 F.3d at 656 ("The

Bankruptcy Code does not explicitly prohibit . . . a bankruptcy court to enjoin a non-consenting

creditor's claims against a non-debtor to facilitate a reorganization plan.").[16]

45.    Finally, the Debtors are puzzled to see the Non-Consenting States suggest that

Judge McMahon's opinion <u>affirming</u> the Court's preliminary injunction—an opinion which is

devastating to the arguments that the Non-Consenting States have repeatedly advanced in that

context—somehow should be read to express skepticism that this Court may approve non-

consensual third-party releases in these cases.  (NCSG Obj. ¶ 27 (citing *In re Purdue Pharms.*

*L.P.*, 619 B.R. 38, 62 (S.D.N.Y. 2020).)  To the contrary, Judge McMahon's opinion expressly

contemplates that a non-consensual release may be appropriate if the applicable legal

requirements are satisfied.  *See In re Purdue Pharms.*, 619 B.R. at 58-59, 62.  Moreover, the

portion of the opinion cited by the Non-Consenting States has nothing to do with the propriety of

releases in connection with confirmation.  There, Judge McMahon was responding to the

Appellants' "overblown" arguments that the preliminary injunction would lead <u>inexorably</u> to a

release of Richard Sackler.  *Id.* at 62.  As Judge McMahon went on to correctly observe,

"whether Dr. Sackler gets the protection [of a release] that Appellants fear (and oppose) will be

---

[16] The Non-Consenting States also claim that section 524(g) does not "clearly apply to a
'governmental unit,' like a State."  (NCSG Obj. ¶ 30.)  The Non-Consenting States do not
explain the source of the alleged ambiguity, and, in any event, section 524 speaks in terms of
injunctions against "entities."  "Entity," as defined in the Bankruptcy Code, includes
governmental units.  11 U.S.C. § 101(15).

decided in the context of other motions in this bankruptcy." *Id*. And the time at which that issue

can and should be decided is indisputably at confirmation, not now.

> ### The Debtors Will Demonstrate On a Full Record That Non-Consensual Third-Party Releases Are Necessary and Appropriate

46.    In *Metromedia*, the Second Circuit confirmed that a bankruptcy "court may enjoin

a creditor from suing a third party provided the injunction plays an important part in the debtor's

reorganization."  416 F.3d at 141 (quoting *In re Drexel Burnham Lambert Grp., Inc.*, 960 F.2d at

293).  Although recognizing that third-party releases are reserved for cases involving "rare" and

"unique" circumstances, the Court of Appeals emphasized that the inquiry is "not a matter of

factors and prongs."  *Id.* at 141-42.  The Court then provided a disjunctive enumeration of

circumstances where non-debtor releases have been found to be appropriate, including where the

estate received substantial consideration, where the enjoined claims were channeled to a

settlement trust rather than extinguished, and where the enjoined claims would directly impact

the debtor's reorganization by way of indemnity or contribution.  *Id.* at 142.

47.    While the Debtors leave a full presentation on *Metromedia* to another day, this

much is clear:  the proposed Shareholder Releases are the lynchpin of the value-maximizing,

abatement-centric resolution proposed in the Plan.  In exchange for the Shareholder Releases, the

Plan contemplates that the Sackler Families will pay $4.275 billion in cash to the Debtors'

estates—a $1.275 billion increase over the resolution proposed in the initial Settlement

Framework.  This contribution, if agreement with the shareholders is reached, would avoid the

considerable risk that the Debtors' estates will not have sufficient value to satisfy the terms of

various public- and private-side settlements reached in mediation, and as a result, that they would

not be able to take advantage of the Judgement Forfeiture Credit in the DOJ Resolution (which

provides up to a $1.775 billion credit for value distributed to State, Tribal, and local

governmental entities).  (Disclosure Stmt. §§ I.B, I.D.)  In other words, the Proposed Shareholder

Settlement contribution is critical to ensuring that billions of dollars are preserved for non-

federal and private-side creditors and can be put to work abating the opioid crisis through the

Plan's abatement trust structure.  (Disclosure Stmt. §§ I.B, I.D.).  Moreover, a satisfactory

contribution by the Debtors' shareholders is a key condition of the various allocation agreements

reached in mediation among the Debtors' creditors.  (*Id.*)  Thus, the Shareholder Releases are

critical to avoiding incredibly complex, potentially years-long inter-creditor litigation on

allocation that would most certainly result in the destruction of significant estate value.

Whatever "unique" or "rare" might mean, these cases, quite likely the most complex mass tort

chapter 11 cases in history, most certainly qualify.  The possibility of third-party releases in

cases such as these is essential to achieving a true, value-maximizing peace.

48.     The Non-Consenting States ignore virtually all of this and instead proffer a

handful of counter-arguments, none of which provides a basis to preclude solicitation of the Plan.

For example, the Non-Consenting States allege that *Metromedia* cannot be satisfied because the

Sacklers are "worth "multiples" of the proposed $4.275 billion settlement amount.  (NCSG Obj.

¶ 17.)  The Debtors will show, however, that the proposed contribution amount is fair and

reasonable in light of the risks associated with continued litigation (and collection if such

litigation were successful).  (Disclosure Stmt. § III.AA.)  The Non-Consenting States also claim

that the Plan does not have overwhelming support because the Non-Consenting States do not

support the Plan and they "represent" 53% of the U.S. population.  (NCSG Obj. ¶ 19.)  But that

is nothing but a misleading canard—and one that the Non-Consenting States have trotted out

before.  If an agreement with the shareholders can be reached, the Plan will enjoy wide support

from every major creditor constituency in these cases (other than the Non-Consenting States)

who collectively represent many hospitals, third-party payers, and rate payers; hundreds of

States, Tribes, municipal and local governments; and countless personal injury claimants,

including many of those whom the Non-Consenting States purport to represent.

### The Bankruptcy Court Has Jurisdiction to Confirm a Plan Providing for Non-Consensual Third-Party Releases

49.      Contrary to the Non-Consenting States' assertions, the Bankruptcy Court has

subject matter jurisdiction to confirm the Plan, including the Plan's proposed third-party releases.

Congress' grant of jurisdiction extends to all civil proceedings "arising under," "arising in" or

"related to" cases under title 11.  28 U.S.C. § 1334(b).  Further, under 28 U.S.C. § 157(b),

bankruptcy courts have the power to "hear and determine" and "enter appropriate orders and

judgments" in all "core proceedings" that arise under title 11 or arise in a case under title 11,

including "confirmations of a plan."  28 U.S.C. § 157(b).  When a bankruptcy court considers the

involuntary release of claims against a third-party non-debtor in connection with the

confirmation of a proposed plan of reorganization, it acts pursuant to its core jurisdiction.  *See In*

*re Kirwan Offices S.a.R.L.*, 592 B.R. 489, 504 (S.D.N.Y. 2018), *aff'd sub nom. In re Kirwan*

*Offices S.a.R.L.*, 792 F. App'x 99 (2d Cir. 2019); *In re MPM Silicones, LLC*, No. 14-25503

(RDD), 2014 WL 4436335, at *1, *34 (Bankr. S.D.N.Y. Sept. 9, 2014) ("I firmly believe that I

have jurisdiction over this [third-party release] issue . . . and that I can issue a final order on it

within the confines of *Stern v. Marshall*, given that this is in the context of the confirmation of

the plan, and pertains ultimately to the debtors' rights under the Bankruptcy Code."); *see also In*

*re Millennium Lab Holdings II, LLC.*, 945 F.3d at 137 (in appeal from confirmation of plan

containing non-consensual third-party releases, holding that "[t]he Bankruptcy Court

indisputably had 'core' statutory authority to confirm the plan"); *In re AOV Indus., Inc.*, 792 F.2d

1140, 1145 (D.C. Cir. 1986) ("The approval of a disclosure statement and the confirmation of a

reorganization plan are clearly proceedings at the core of bankruptcy law . . . [a]lthough the bankruptcy court's decision may have an impact on claims outside the scope of the immediate proceedings."). Accordingly, the Bankruptcy Court has the indisputable authority to adjudicate the proposed Plan, including confirming the third-party releases that are part of the Plan.

50.    The Non-Consenting States advance two principal-counter arguments, neither of which is meritorious nor renders the Plan illegal on its face. Their first argument—that the Court lacks jurisdiction because "[t]here is no Bankruptcy Code authority" for granting a "police power" release (NCSG Obj. ¶ 29)—is irrelevant and, as noted above, directly contrary to *Metromedia* and other applicable case law. The Bankruptcy Court's jurisdiction flows from section 1334 of Title 28. The Non-Consenting States next argue, echoing the "conceivable effects" test for determining whether the Court has related to jurisdiction, that "the claims to be released will not affect the estate *res*." (*Id.*) This argument is not only incorrect but also wrongly presumes that the only statutory basis for confirming the Plan is the Court's "related to" jurisdiction. It is not. As the District Court explained in *Kirwan*—and highlighted in these cases—"although a bankruptcy court's 'consider[ation] [of] a third-party release as part of a proposed plan of reorganization . . . may have the effect of a ruling on the merits, it is not a ruling on the merits—and thus operates on an entirely different jurisdictional footing.'" *In re Purdue Pharms.*, 619 B.R. at 57 (quoting *In re Kirwan Offices S.a.R.L.*, 592 B.R. at 507). Put another way, where a third-party release is "necessary to the plan's operation," the Bankruptcy Court acts within its "core" "arising in" or "arising under" authority to confirm the Plan. *In re Kirwan Offices S.a.R.L.*, 592 B.R. at 507. Here, for the reasons discussed above, the proposed

releases are necessary and integral to the Plan.  Thus, the Court, at a minimum, possesses "core"

subject matter jurisdiction to consider and approve the releases.[17]

### D.    Best Interest Objections Are Premature and Misplaced

51.    The Objection filed by Peter W. Jackson argues that the disclosure statement is

facially unconfirmable because, "by failing to value claims that personal injury and wrongful

death tort claimants have asserted or could assert directly against the Debtors' shareholders and

related entities, the Plan would violate the 'best interest of creditors' test of section 1129(a)(7)."

(*See* Jackson Obj. ¶ 2).  This Objection should be overruled.

52.    By its nature, this is a Plan Objection.  Under the "best interests" test, each holder

of a claim or interest in an impaired class must either accept the plan or receive or retain under

the plan on account of its claim or interest property of a value, as of the plan's effective date, that

is not less than the amount such holder would receive or retain if the debtor were liquidated

under chapter 7.  *See* 11 U.S.C. § 1129(a)(7)(A).  Thus, the very definition of the "best interests"

test establishes that an objection on this ground presents a confirmation issue, and a confirmation

issue alone: the test applies only if a creditor votes against the plan, which cannot be determined

until after the vote takes place.  *See Matter of Colin*, 44 B.R. 806, 809 (Bankr. S.D.N.Y. 1984)

(declining to apply the best interests of creditors test under section 1129(a)(7) at the disclosure

---

[17] Contrary to the Non-Consenting States arguments, the potential for indemnification claims by the Sackler Families further supports the Court's exercise of jurisdiction to consider the third-party releases.  The Non-Consenting States do not dispute that numerous members of the Sackler Families, their estates, or their associated entities have filed contingent proofs of claim for indemnification.  (NCSG Obj. ¶ 18.)  While the Non-Consenting States would prefer that these potential claims be considered for jurisdictional purposes only insofar as the Sacklers "in fact receive indemnification," that is not the law. The Bankruptcy Court has related to jurisdiction over any claims that might have a "conceivable effect" on the bankruptcy estates.  *See In re Cuyahoga Equip. Corp.*, 980 F.2d 110, 114-15 (2d Cir. 1992) (holding that "litigation falls within [a bankruptcy court's] 'related to' jurisdiction" if it "has a significant connection with a pending bankruptcy proceeding [such that] its outcome might have any 'conceivable effect' on the bankrupt estate") (citation omitted).

statement stage because that section only becomes applicable upon the casting of a negative vote against the plan and "the confirmation of the proposed plan [wa]s not yet in issue").

53.     In addition, and as the Debtors will demonstrate at confirmation, the Liquidation Analysis properly does not ascribe value to direct claims against the Debtors' Shareholders.  Mr. Jackson's reliance on *In re Ditech Holding Corp.*, 606 B.R. 544 (Bankr. S.D.N.Y. 2019), is misplaced.  The *Ditech* court held that a debtor's liquidation analysis must account for third-party claims that would be released under a chapter 11 plan but retained by creditors in a hypothetical chapter 7 scenario where the value of such claims is not speculative and can be estimated.  *Id*. at 614-15 ("The Liquidation Analysis did not account for the[] [c]onsumer [c]laims, but should have.  That is because these claims: (i) fit the definition of 'property,' (ii) have 'value' and (iii) although they are unliquidated, they are 'neither speculative nor incapable of estimation.'") (quoting *In re Quigley Co.*, 437 B.R. 102, 145-46 (Bankr. S.D.N.Y. 2010)). *Ditech* closely followed *Quigley*, which similarly held that third-party claims against a non-debtor that were "neither speculative nor incapable of estimation" must be included in a liquidation analysis where those claims would be released under a chapter 11 plan but retained in a hypothetical chapter 7 liquidation.  *See Quigley*, 437 B.R. at 134, 145 (holding that third-party claims against the debtor's parent were capable of estimation because the court could look to twenty years of settlement data to ascertain the claims' value).

54.     Here, by contrast, the value of direct third-party claims against the Debtors' Shareholders is highly speculative and cannot be estimated.  The Debtors have included in their Disclosure Statement a robust discussion of the contingent and speculative nature of these third-party claims, and the significant legal hurdles creditors would face in litigating them and collecting on any resulting judgments.  (*See* Disclosure Stmt. § III.AA.)  As explained in greater

detail in the Disclosure Statement, third-party creditors would, among other things, need to specifically prove that individual members of the Sackler Families and Sackler Entities were liable based on their own conduct, not simply on the conduct of the Debtors, or establish the exceptional circumstances required to pierce the corporate veil of a series of holding companies or satisfy the test for a "single enterprise theory." (*Id.*)  The Disclosure Statement also discusses how the Sackler Families would undoubtedly devote significant assets to defending against any direct claims and the likely difficulties in collecting on any judgments that might ultimately be obtained.  (*See id.*)  Nothing in *Ditech*, *Quigley*, or any other case or statute cited by any Objector requires the Debtors to attempt to value claims like these for purposes of the Liquidation Analysis.

55.     Moreover, consistent with this Court's guidance at the hearing on May 12, 2021, the Debtors have included a footnote in their Liquidation Analysis clarifying that, to the extent relevant for purposes of satisfying the "best interests" test, third-party claims would not be released in a hypothetical chapter 7 liquidation.  (*See* May 12, 2021 Hr'g Tr. 19:21-26:19; Liquidation Analysis, Disclosure Stmt. App. B, at 5 n.3.)  The footnote also provides readers with a cross-reference to the discussion of third-party claims in the Disclosure Statement.  (*See* Liquidation Analysis, Disclosure Stmt. App. B, at 5 n.3 (citing Disclosure Stmt. § III.AA(2)(ii)(c)).)

56.     The Debtors respectfully submit that these disclosures are more than sufficient to permit the Debtors to proceed with solicitation of the Plan, and that any remaining "best interests" Objections should be decided at confirmation.

### E.     The Remainder of the Objections Should Be Overruled

57.     Several other Objectors raise a host of additional Objections, including Objections to the Plan, the Disclosure Statement, and various trust distribution procedures, which the

Debtors address in the Objections Response Chart, attached hereto as Exhibit A.  The Debtors respectfully submit that these remaining Objections should be overruled for the reasons set forth therein.

## **CONCLUSION**

WHEREFORE, the Debtors respectfully request that the Court enter the Order granting the relief requested in the Motion and such other relief as the Court deems appropriate under the circumstances.

Dated:    May 24, 2021
New York, New York

DAVIS POLK & WARDWELL LLP

By:    */s/ Darren S. Klein*

450 Lexington Avenue
New York, New York 10017
Telephone: (212) 450-4000
Facsimile:  (212) 701-5800
Marshall S. Huebner
Benjamin S. Kaminetzky
Darren S. Klein
James I. McClammy
Christopher S. Robertson
Gerard X. McCarthy

*Counsel to the Debtors
and Debtors in Possession*