KRAMER LEVIN NAFTALIS
& FRANKEL LLP
Kenneth H. Eckstein
Rachael Ringer
David E. Blabey Jr.
1177 Avenue of the Americas
New York, NY 10036
Telephone: (212) 715-9100

GILBERT LLP
Scott D. Gilbert (admitted *pro hac vice*)
Craig Litherland (admitted *pro hac vice*)
Kami E. Quinn (admitted *pro hac vice*)
100 New York Ave, NW, Suite 700
Washington, D.C. 20005
Telephone: (202) 772-2200

BROWN RUDNICK LLP
David J. Molton
Steven D. Pohl
7 Times Square
New York, NY 10036
Telephone: (212) 209-4800

OTTERBOURG P.C.
Melanie L. Cyganowski
Jennifer S. Feeney
230 Park Avenue
New York, NY 10169
Telephone: (212) 661-9100

*Attorneys for the Ad Hoc Committee*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**
------------------------------------------------------------------X
                                                            :
In re:                                                      :   Chapter 11
                                                            :
PURDUE PHARMA L.P., *et al.*,                               :   Case No. 19-23649 (RDD)
                                                            :
                            Debtors.                        :   (Jointly Administered)
                                                            :
------------------------------------------------------------------ X

**AD HOC COMMITTEE'S RESPONSE TO**
**DISCLOSURE STATEMENT OBJECTIONS**

The Ad Hoc Committee of Governmental and Other Contingent Litigation Claimants (the

"**Ad Hoc Committee**")[1] hereby submits this response to various objections (the "**Objections**") to

approval of the disclosure statement (the "**Disclosure Statement**") [Dkt. No. 2907] filed by the

above-captioned debtors and debtors-in-possession (the "**Debtors**"), including: (i) the original

objection (the "**Public Schools Objection**") [Dkt. No. 2720] filed by a group of public school

---

[1] The members of the Ad Hoc Committee are set forth in the Rule 2019 statement filed at Docket Number 279.

districts (the "**Public School District Creditors**"), and a "supplement" thereto (the

"**Supplemental Public Schools Objection**") [Dkt. No. 2773], and (ii) the objection (the "**West**

**Virginia Objection**") [Dkt. No. 2703] filed by the State of West Virginia, as modified by West

Virginia's subsequent Statement (the "**West Virginia Statement**") [Dkt. No. 2857].

### Preliminary Statement

1.      The Debtors' filing of a chapter 11 plan and accompanying disclosure statement

marks an important milestone in these cases.  Nearly twenty months after the petition date, it is at

last possible to envision the prospect of emergence.  The chapter 11 plan does not enjoy complete

consensus, and there is work still to be done.  Yet whatever developments may lie ahead, it is

worth noting the significance of moving forward with a plan that is projected to put greater than

$5 billion to direct use for abatement of the opioid crisis.

2.      A series of objections have been filed to the Disclosure Statement.  The Debtors

have filed a comprehensive response, but the Ad Hoc Committee writes separately to emphasize

that, despite the outsized voice of a handful of dissenters, there is one area in which there is in fact

a high degree of consensus:  the inter-State allocation of abatement funds and the mechanisms for

the intra-State allocations that will follow.  The allocations and allocation mechanics, set forth in

the National Opioid Abatement Trust Distribution Procedures (defined below), are the product of

extensive negotiations among the States, local governments, and Tribes.   The inter-State

allocations reflect the input of States large and small, rural and urban, Democratic and Republican,

consenting and non-consenting, while the intra-State allocation mechanics reflect the further input

of a representative cross-section of municipalities and local governments.  The public creditor

objectors to the chapter 11 plan's allocation-related provisions – principally the Public School

District Creditors and the State of West Virginia – are a distinct minority.

3.       When the Public School District Creditors and West Virginia filed their disclosure

statement objections, the National Opioid Abatement Trust Distribution Procedures had not yet

been filed.  Those procedures have now been filed [*see* Dkt. No. 2737], and they describe, with

specificity, each State's allocated share of abatement funds, the mechanisms for distributing such

funds within each State, and the ways in which Local Governments (defined below and including

the Public School District Creditors) are entitled to participate in allocation decisions.  The

procedures further dictate the permitted disposition of abatement funds, incorporating two lengthy

lists of permitted uses and core abatement strategies.  Whatever disclosure-related objections were

raised by the Public School District Creditors and West Virginia, the additional information now

made available through the filing of the National Opioid Abatement Trust Distribution Procedures

(and related changes to the Disclosure Statement) have cured them – as West Virginia

acknowledges.  *See* West Virginia Statement ¶ 3

4.       The remaining objections are confirmation ones, not properly considered at this

time.  In any event, they are misplaced.  The Public School District Creditors assert that the Plan

does not guarantee them any specific recovery.  But in the unique circumstances of this case, where

nearly all public creditors and the Court are in agreement that abatement, not pecuniary recoveries,

is the goal, this objection is misplaced.  Moreover, the permitted uses and core strategies prescribed

by the National Opioid Abatement Trust Distribution Procedures contain a series of detailed

abatement uses and strategies that are designed to benefit the public schools.  West Virginia asserts

that allocation is premised too heavily on population – but population is but one of several metrics

upon which allocation was based, and the large States accommodated the concerns of the smaller,

hard-hit States through various adjustments described further below.

5.     For these and other reasons discussed below, and as further delineated in the Debtors' briefs, the Ad Hoc Committee urges the Court to approve the Disclosure Statement and allow these cases to pass this important first threshold to confirmation and the long-awaited opportunity to begin the abatement of the harm caused by Purdue.[2]

## Background

6.     The Debtors' chapter 11 plan (the "**Plan**") [Dkt. No. 2904], from the non-federal public creditors' perspective, is centered principally on abatement of the opioid crisis.   In furtherance of this goal, the Plan calls for the establishment of two trusts that will distribute funds to authorized recipients to be employed strictly for abatement purposes:  a National Opioid Abatement Trust, or "**NOAT**," for distributions to States for the benefit of their respective Local Governments and public schools, and a "**Tribe Trust**," each of which will be funded by significant Debtor assets and by substantial contributions from the Sackler families.

7.     Claims held by States, counties, municipalities, public school districts, and other non-federal domestic governmental entities (not including Tribes) (the "**Non-Federal Domestic Governmental Claims**") are placed in Class 4, while claims held by Tribes (the "**Tribe Claims**") are placed in Class 5.  *See* Plan Art. 4.4, 4.5.  These claims, in broad strokes, will be satisfied by way of abatement distributions from NOAT (in the case of the Non-Federal Domestic Governmental Claims) and the Tribe Trust (in the case of the Tribe Claims), to be made in accordance with specified trust distribution procedures (the "**National Opioid Abatement Trust Distribution Procedures**" and the "**Tribe Trust Distribution Procedures**," respectively), filed as part of the Debtors' plan supplement.  [Dkt. No. 2737-1.]

---

[2] The Ad Hoc Committee continues to negotiate certain open issues concerning the Plan, and, while significant progress has been made, the Ad Hoc Committee is not yet in a position to indicate support for the Plan. The Ad Hoc Committee reserves all of its rights in this regard.

8.      The details of the National Opioid Abatement Trust Distribution Procedures are discussed further below, but they function, as to non-Tribes, generally as follows:

- NOAT is charged with the responsibility of distributing abatement funds (the "**Public Funds**") to the States and Local Governments. *See generally* National Opioid Abatement Trust Distribution Procedures §§ 1, 2.

- The Public Funds are allocated among the States and Territories in accordance with specified allocation percentages previously determined by the Attorneys General (and not subject to modification by NOAT), *see id.*, Schedule C, to be used strictly for abatement of the opioid crisis by funding opioid or substance use disorder-related projects or programs that fall within a list of approved uses (the "**Approved Opioid Abatement Uses**"), *see id.* § 2, with priority given to certain core abatement strategies (the "**Core Strategies**"), *id.*[3]

- Each State and its Local Governments (a term that includes counties, cities, towns, parishes, villages, municipalities, and school districts[4]) are given the option of reaching their own bespoke agreement concerning the allocation of Public Funds for Approved Opioid Abatement Uses within the State (a "**Statewide Abatement Agreement**" or "**SAA**"). *See id.*, Schedule C.

- If a State and its Local Governments do not agree on the terms of a Statewide Abatement Agreement (such a State, a "**Non-SAA State**"), Public Funds are allocated within the State in accordance with a so-called "**Default Allocation Mechanism**," *see id.* § 6, which requires, among other things, the creation of a mechanism for the State to consult with its respective Local Governments (the "**Government Participation Mechanism**," or "**GPM**"). *See id.* § 7.

9.      The Tribe Trust, for its part, is funded according to a schedule set forth in the Tribe Trust Distribution Procedures. *See id.* § 7. The Tribes are to use the tribal allocation of abatement funds (such tribal allocation, together with the Public Funds, the "**Abatement Funds**") for the aforementioned Approved Opioid Abatement Uses, and also for culturally appropriate activities,

---

[3] The Public Funds may also be used, in an amount of no more than five percent, to fund expenses incurred in administering distributions for Approved Opioid Abatement Uses. *See id.*

[4] The term "Local Governments" is defined to include "each county, city, town, parish, village, and municipality that is a Domestic Governmental Entity or other holder of a Non-Federal Domestic Governmental Claim that is otherwise not a 'State' as defined in the Plan." National Opioid Abatement Trust Distribution Procedures § 1.

practices, teachings, or ceremonies, examples of which are set forth in Schedule D to the Tribe

Trust Distribution Procedures. *See id*. § 5.

## Response to Objections

10.    The standards for approval of a disclosure statement are described in detail by the

Debtors and will not be repeated in full.  Several points are worth emphasis here.  *First*, that the

definition of "adequate information" is a flexible one:  "In reorganization cases, there is frequently

great uncertainty.  Therefore, the need for flexibility is greatest."  H.R. Rep. No. 95-595, at 409

(1977).  *Second*, that the adequacy of information is measured by reference to an "investor typical

of holders of claims or interest of the relevant class" (*see* 11 U.S.C. § 1125(a)) – a highly relevant

qualifier in a case in which the great majority of non-federal public creditors have participated in,

and/or endorse, the proposed allocation of Abatement Funds.  *Third*, that disclosure statement

hearings anticipate, but do not preempt, confirmation hearings, and objections to confirmation are

thus generally considered premature.  *See, e.g.*, *In re Quigley Company, Inc.*, 377 B.R. 110, 119

(Bankr.  S.D.N.Y.  2007) (acknowledging  existence  of  "confirmation  issues,"  but  approving

disclosure statement).  *Fourth*, that there is no requirement that a disclosure statement describe

with perfect particularity what recovery each individual creditor is likely to receive.  *Menard-*

*Sanford v. Mabey (In re A.H. Robins Co.*), 880 F.2d 694, 697 (4th Cir. 1989) (disclosure was

adequate notwithstanding absence of "ranges of recovery for claimants with specified injuries").[5]

11.    Weighed against these standards, and as further described below, the Disclosure

Statement contains "adequate information" and should be approved.

---

[5] In *A.H. Robins*, the disclosure statement "explained, among much more, the amount to be put into trust and made available for the payment of claims, the various estimates of how much money was required, a warning that the funds furnished to pay the estimates might not be enough to pay all claims in full, the sources of funding, an explanation of the various funding provisions which depended on the outcome of various appeals, how claims would be handled, the four options for processing claims, and the background of the case." *Id*. at 696-97.

## I.      The Public Schools Objection Should be Overruled

12.      The Public Schools Objection raises both disclosure- and confirmation-related issues.  The disclosure issues, to the extent any had merit, have been addressed by the filing (after submission of the Public Schools Objection) of revised Plan-related documents.  The confirmation issues are premature, as the Plan is not "manifestly unconfirmable."

### A.      The School Districts' Disclosure Objections Have Been Addressed

13.      The Public School District Creditors assert, principally, that the Disclosure Statement is "all but silent as to the NOAT's decision-making procedures and distribution priorities."  Public Schools Obj. ¶ 8; *see also id*. ¶ 35.  It is "critical," they contend, that creditors "understand how the NOAT proposes to pick and choose among abatement initiatives, the priorities that may guide its decision-making process, and whether any predetermined allocation amounts have already [been] reserved for certain creditor groups."  *Id*. ¶ 36.

14.      As an initial matter, the Public Schools Objection reflects a fundamental misconception of how the National Opioid Abatement Trust Distribution Procedures work.  NOAT has no power or discretion to "pick and choose among abatement initiatives."  Instead, how Public Funds are to be used within a particular State is left to that State and its Local Governments (subject to the requirement that they be used consistent with the National Opioid Abatement Trust Distribution Procedures, including the Approved Uses and Core Strategies).  NOAT, in essence, is a pass-through, designed to facilitate the transfer of Abatement Funds to the States.

15.      Whatever the initial merits of the Public School District Creditors' other disclosure-related arguments, they have since been fully addressed by the filing of the National Opioid Abatement Trust Distribution Procedures.  Among other things:

16.    The procedures set forth each State's percentage allocation of abatement funds. Schedule C of the National Opioid Abatement Trust Distribution Procedures sets forth the percentage division of Public Funds among each eligible State and Territory.  The formula by which the percentages were calculated is described in the Disclosure Statement.  *See* Disclosure Statement at Art.III.S.5.i.

17.    The procedures provide a detailed description of approved abatement uses and core abatement strategies – many of which directly reference the schools.  Section 2 of the National Opioid Abatement Trust Distribution Procedures requires both that no less than 95% of the Public Funds shall be used for abatement of the opioid crisis by funding projects or programs that fall within the list of Approved Opioid Abatement Uses reflected in Schedule B, and that priority be given to the list of Core Strategies identified in Schedule A.  The Schedules include uses and/or strategies that will directly benefit public schools, including:  (i) "[e]xpand[ing] training for first responders, schools, community support groups and families," (ii) "[p]rovid[ing] education to school-based and youth-focused programs that discourage or prevent misuse," (iii) "[f]unding for evidence-based prevention programs in schools," (iv) "[c]reat[ing] or support[ing] school-based contacts that parents can engage with to seek immediate treatment services for their child; and support prevention, intervention, treatment, and recovery programs focused on young people," (v) "[f]und[ing] evidence-based prevention programs in schools or evidence-informed school and community education programs and campaigns for students, families, school employees, school athletic programs, parent-teacher and student associations, and others," (vi) "[s]chool-based or youth-focused programs or strategies that have demonstrated effectiveness in preventing drug misuse and seem likely to be effective in preventing the uptake and use of opioids," (vii) "[s]upporting greater access to mental health services and supports for young people, including

8

services and supports provided by school nurses, behavioral health workers or other school staff,"
and (viii) "[e]nabl[ing] school nurses and other school staff to respond to opioid overdoses, and
provid[ing] them with naloxone, training, and support." *See generally* Schedules A & B.[6]

18.    The procedures describe the process by which each State and its Local
Governments will allocate abatement funds among them – and how Local Governments (including
public school districts) can participate in that process.  The National Opioid Abatement Trust
Distribution Procedures provide Local Governments with an important and meaningful voice in
intra-State allocation decisions.  Each State and its Local Governments are given the opportunity
to enter into a Statewide Abatement Agreement, reflecting an agreed-upon allocation or method
of allocating the State's Public Funds.  *See* National Opioid Abatement Trust Distribution
Procedures § 6.2.  If no SAA is reached, the procedures erect a default allocation mechanism for
distribution of Public Funds throughout the State.  *See id.* at § 6.1.  The details of the mechanism
are complex, but as most relevant here, the procedures require that "the State shall allocate funds
under the Regional Distribution mechanism only after meaningfully consulting with its respective
Local Governments."  *Id.* at § 7.  The board, council, committee, or other body that is charged with
identifying and making allocation and abatement recommendations to the State – the Government
Participation Mechanism – must include equal representation of the State and its Local
Governments, must hold public meetings, and must "consult[] with community stakeholders,
including Local Governments."  *Id.* at § 7.1-7.4.  Through this approach, community input can
contribute to the amelioration of a national public health crisis.

---

[6] The Public School District Creditors acknowledge that the Approved Uses "contemplate some programs that may
involve the public schools."  *See* Supplement Public Schools Obj. at 3, n. 3.  To the extent the Public School District
Creditors contend that these Approved Uses fall short, that is a confirmation objection.

19.     The Public School District Creditors contend that a disclosure statement "is of little use if it leaves creditors with no basis for estimating how much they are likely to be paid on their claim." Public Schools Obj. ¶ 37. This is not, in fact, the law, as disclosure statements may be approved even where individual creditor recoveries remain uncertain. *See, e.g.*, *A.H. Robins*, 880 F.2d at 697 (described above). In any event, the Disclosure Statement and Plan are clear on what recoveries Non-Federal Domestic Governmental Claims as a whole are to receive, and how those funds will be distributed. In the unique context of this case, where abatement is the focus, the disclosure of the mechanisms by which allocation and abatement will be accomplished are far more important than the disclosure – impossible at this time – of what specific funds will be disbursed for the benefit of individual public creditors.

20.     Finally, the Public School District Creditors raise two specific questions concerning the treatment of Non-Federal Domestic Governmental Claims. First, "will claimholders have the right to opt out of the NOAT procedures," and second, can school districts "challenge and appeal determinations of the NOAT?" Public Schools Obj. ¶ 39. Both questions are premised on a misunderstanding of NOAT's purpose. Simply put, NOAT has no role in intra- or inter-State allocation (other than to make distributions to the States in accordance with pre-determined percentages), and thus makes no "determinations" that a public school might wish to contest.[7]

**B.     The School Districts' Confirmation Objections are Premature**

21.     The Public School District Creditors also contend that the Plan is "manifestly unconfirmable," contending, primarily, that a plan that does not guarantee them a distribution cannot incorporate a third-party release. *See* Public Schools Obj. ¶¶ 9-10. This objection, together

---

[7] Separately, the Creditor Trust Distribution Procedures do allow for limited judicial review of State-specific allocation decisions. In a Non-SAA State, a Local Government that objects to a particular allocation may, depending on the circumstances, have the right to bring that objection to either a state court or the Bankruptcy Court. *See id.* § 7.6.

with related complaints (e.g., that the Public School District Creditors have "no voice, no input, and no assurance of funding," *id.* ¶ 46), is not properly raised at this time. Whatever the breadth and validity of the notion of a "patently unconfirmable" plan, it manifestly does not include a plan that could be confirmed if creditors accept it. *See, e.g.*, *In re Copy Crafters Quickprint, Inc.*, 92 B.R. 973 (Bankr. N.D.N.Y. 1988) (patently unconfirmable objections "are restricted to those defects that could not be cured by voting"). And since there is no reasonable dispute that a *consensual* third-party release is permissible, any objections to the scope of the releases should be addressed only at confirmation, when consent, or its absence, will have crystallized.

**II.     The West Virginia Objection, to the Extent Not Withdrawn, Should be Overruled**

22.     The West Virginia Objection, filed by the State of West Virginia and joined by various counties, cities, and towns located in West Virginia (collectively, the "**West Virginia Objectors**"), had initially argued that the Disclosure Statement should not be approved because it failed to disclose the allocation of abatement funds among the States. *See, e.g.*, West Virginia Obj. ¶ 3. Upon the filing of the revised Disclosure Statement, West Virginia has now withdrawn its disclosure-related objections. *See* West Virginia Statement ¶ 3 ("West Virginia acknowledges, in direct result of its Objections, the Debtor has provided a formula setting forth distribution percentages, rendering the objection to the Disclosure Statement moot….").

23.     The West Virginia Objectors also argue – while conceding that the issue is properly heard at confirmation – that the allocation mechanism for abatement distributions from the NOAT is unfair because it is "based almost entirely on population" and is therefore unfair towards less populous municipalities. West Virginia Obj. ¶ 5; *see also* West Virginia Statement ¶ 3 (stating that "West Virginia does not intend to raise confirmation issues at this juncture"). This argument is, indeed, a confirmation issue. But in any event, the West Virginia Objectors are incorrect.

24.     Population is but one of several factors in the allocation formula.  *See* Disclosure

Statement at Art.III.S.5.i (describing formula under which population (i) was just one of four

factors considered in arriving at 85% of the allocation – with population accounting for 31% of

the 85%, and (ii) had no role at all in arriving at the remaining 15% of the allocation).  Moreover,

under the National Opioid Abatement Trust Distribution Procedures, West Virginia benefits from

(i) an "Intensity Fund" under which 1% of the distributions that would otherwise go to each state

(other than California) are re-allocated to twelve small, hard-hit States, and (ii) a "Small State

Fund" under which the 32 smallest states benefit from shares that would otherwise have gone to

Kentucky and Oklahoma (who settled with Purdue pre-petition and are therefore not included as

beneficiaries of the Small State Fund).  *See id.*  These adjustments result in West Virginia, which

has a population of 0.55% of the national population, receiving 1.16% of the Public Funds

distributed to the States and Territories.  *See* National Opioid Abatement Trust Distribution

Procedures, Schedule C.

25.     In sum, the West Virginia Objectors' assertion that the National Opioid Abatement

Trust Distribution Procedures are unfair to less populous states is incorrect.  To the extent these

objections to the Plan are not resolved prior to confirmation, they should be overruled.

WHEREFORE, for the foregoing reasons, the Ad Hoc Committee respectfully requests

that the Court enter an order approving the Disclosure Statement and overruling the Objections.

Dated:  May 24, 2021                              Respectfully submitted,


                                                  /s/ *Kenneth H. Eckstein*
                                                  Kenneth H. Eckstein
                                                  Rachael Ringer
                                                  David E. Blabey Jr.
                                                  KRAMER LEVIN NAFTALIS & FRANKEL LLP
                                                  1177 Avenue of the Americas
                                                  New York, NY 10036

Telephone: (212) 715-9100
Email: keckstein@kramerlevin.com
      rringer@kramerlevin.com
      dblabey@kramerlevin.com

Scott D. Gilbert (admitted *pro hac vice*)
Craig Litherland (admitted *pro hac vice*)
Kami E. Quinn (admitted *pro hac vice*)
GILBERT LLP
100 New York Ave, NW, Suite 700
Washington, D.C. 20005
Telephone: (202) 772-2200
Email: gilberts@gilberlegal.com
      litherlandc@gilbertlegal.com
      quinnk@gilbertlegal.com

David J. Molton
Steven D. Pohl
BROWN RUDNICK LLP
7 Times Square
New York, NY 10036
Telephone: (212) 209-4800
Email: dmolton@brownrudnick.com
      spohl@brownrudnick.com

Melanie L. Cyganowski
Jennifer S. Feeney
OTTERBOURG P.C.
230 Park Avenue
New York, NY 10169
Telephone: (212) 661-9100
Email: mcyganowski@otterbourg.com
      jfeeney@otterbourg.com

*Attorneys for the Ad Hoc Committee*