**BINDER & SCHWARTZ LLP**
366 Madison Avenue, 6th Floor
New York, New York 10017
Telephone: (212) 510-7008
Facsimile: (212) 510-7299
Eric B. Fisher

*Attorneys for the Public School District Creditors*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

|  |  |
|---|---|
| In re:<br><br>**PURDUE PHARMA L.P.,** *et al.,*<br><br>        **Debtors.**[1] | Chapter 11<br><br>Case No. 19-23649 (RDD)<br><br>(Jointly Administered) |

**SECOND SUPPLEMENT TO OBJECTION OF THE**
**PUBLIC SCHOOL DISTRICT CREDITORS**
**TO DEBTORS' MOTION TO APPROVE (I) THE ADEQUACY OF**
**INFORMATION IN THE DISCLOSURE STATEMENT,**
**(II) SOLICITATION AND VOTING PROCEDURES, (III) FORMS OF BALLOTS,**
**NOTICES AND NOTICE PROCEDURES IN CONNECTION THEREWITH, AND**
**(IV) CERTAIN DATES WITH RESPECT THERETO**

---

[1] The Debtors in these cases, along with the last four digits of each Debtor's registration number in the applicable jurisdiction, are as follows: Purdue Pharma L.P. (7484), Purdue Pharma Inc. (7486), Purdue Transdermal Technologies L.P. (1868), Purdue Pharma Manufacturing L.P. (3821), Purdue Pharmaceuticals L.P. (0034), Imbrium Therapeutics L.P. (8810), Adlon Therapeutics L.P. (6745), Greenfield BioVentures L.P. (6150), Seven Seas Hill Corp. (4591), Ophir Green Corp. (4594), Purdue Pharma of Puerto Rico (3925), Avrio Health L.P. (4140), Purdue Pharmaceutical Products L.P. (3902), Purdue Neuroscience Company (4712), Nayatt Cove Lifescience Inc. (7805), Button Land L.P. (7502), Rhodes Associates L.P. (N/A), Paul Land Inc. (7425), Quidnick Land L.P. (7584), Rhodes Pharmaceuticals L.P. (6166), Rhodes Technologies (7143), UDF L.P. (0495), SVC Pharma L.P. (5717) and SVC Pharma Inc. (4014). The Debtors' corporate headquarters is located at One Stamford Forum, 201 Tresser Boulevard, Stamford, CT 06901.

# TABLE OF CONTENTS

*Page*

TABLE OF AUTHORITIES ......................................................................................... ii

PRELIMINARY STATEMENT ................................................................................... 1

SUPPLEMENTAL OBJECTION ................................................................................. 3

I.      The Disclosure Statement Is Fatally Deficient ................................................. 3

        A.      The Terms Of The Sackler Release Remain Inadequately Disclosed ................... 3

        B.      The Debtors' Evaluation Of The Sackler Settlement Is Inadequate ...................... 6

        C.      The Breadth Of The Release Of The Debtors Is Misleadingly Understated and
                Inadequately Disclosed ........................................................................ 8

        D.      The Scope Of The Channeling Injunction Is Inadequately Disclosed ................. 10

II.     The Third Amended Plan Is Patently Unconfirmable ....................................... 11

        A.      The Release Of The Sackler Families Is Impermissibly Overbroad .................... 12

        B.      The Release Of The Debtors Is Impermissibly Overbroad ................................ 15

        C.      The Plan's Classification Scheme Violates The Bankruptcy Code ...................... 16

CONCLUSION ........................................................................................................ 17

# TABLE OF AUTHORITIES

**CASES**

*Ad Hoc Comm. of Pers. Injury Asbestos Claimants v. Dana Corp. (In re Dana Corp.)*,
    412 B.R. 53 (S.D.N.Y. 2008) ............................................................................... 17

*Amchem Prods., Inc. v. Windsor*,
    521 U.S. 591 (1997) ............................................................................................... 16

*In re Aegean Marine Petroleum Network, Inc.*,
    599 B.R. 717 (Bankr. S.D.N.Y. 2019) ............................................................. 14, 15

*In re AOV Indus., Inc.*,
    792 F.2d 1140 (D.C. Cir. 1986) ............................................................................ 17

*In re Dynegy Inc.*,
    486 B.R. 585 (Bankr. S.D.N.Y. 2013) ................................................................... 15

*In re Filex, Inc.*,
    116 B.R. 37 (Bankr. S.D.N.Y. 1990) ..................................................................... 11

*In re FirstEnergy Sols. Corp.*,
    606 B.R. 720 (Bankr. N.D. Ohio 2019) ................................................................. 15

*In re Payment Card Interchange Fee & Merch. Disc. Antitrust Litig.*,
    827 F.3d 223 (2d Cir. 2016) .................................................................................. 14

*In re Quigley Co., Inc.*,
    377 B.R. 110 (Bankr. S.D.N.Y. 2007) ................................................................... 11

*In re U.S. Truck Co., Inc.*,
    42 B.R. 790 (Bankr. E.D. Mich. 1984) .................................................................. 16

*Momentum Mfg. Corp. v. Emp. Creditors Comm. (In re Momentum Mfg. Corp.)*,
    25 F.3d 1132 (2d Cir. 1994) .................................................................................... 3

**STATUTES**

11 U.S.C. § 1123 ........................................................................................................ 16

11 U.S.C. § 1125 .......................................................................................................... 2

**OTHER AUTHORITIES**

Press Release, House Comm. on Oversight and Reform, *Committee to Hold Second Hearing on
    Sackler Family's Role in Opioid Crisis and Need for Reform* (May 13, 2021) ...................... 11

The Public School District Creditors, in their individual and representative capacities, by and through undersigned counsel, respectfully submit this second supplemental objection to the Debtors' Motion to Approve (I) the Adequacy of Information in the Disclosure Statement, (II) Solicitation and Voting Procedures, (III) Forms of Ballots, Notices and Notice Procedures in Connection Therewith, and (IV) Certain Dates with Respect Thereto (ECF No. 2489).[2]

## PRELIMINARY STATEMENT

1.    The Debtors have made a moving target of the disclosure statement, issuing update after update even after relevant objections deadlines had passed.  The latest iteration was filed about three weeks after the expiration of the latest objections deadline and less than forty-eight hours prior to the scheduled hearing.[3]  But despite all the postponements and eleventh-hour

---

[2] This objection supplements the Objection of the Public School District Creditors to Debtors' Motion to Approve (I) the Adequacy of Information in the Disclosure Statement, (II) Solicitation and Voting Procedures, (III) Forms of Ballots, Notices and Notice Procedures in Connection Therewith, and (IV) Certain Dates with Respect Thereto (the "Objection") (ECF No. 2720) and the Supplement to Objection of the Public School District Creditors to Debtors' Motion to Approve (I) the Adequacy of Information in the Disclosure Statement, (II) Solicitation and Voting Procedures, (III) Forms of Ballots, Notices and Notice Procedures in Connection Therewith, and (IV) Certain Dates with Respect Thereto (the "First Supplemental Objection") (ECF No. 2773).  Capitalized terms not otherwise defined have the meanings given to them in the Objection and the First Supplemental Objection.

[3] The Second Amended Joint Chapter 11 Plan of Reorganization of Purdue Pharma L.P. and Its Affiliated Debtors ("Second Amended Plan") (ECF No. 2823) was filed on a Friday night, several days after the deadline for supplemental objections had passed, and the corresponding disclosure statement—Disclosure Statement for Second Amended Chapter 11 Plan for Purdue Pharma L.P. and Its Affiliated Debtors (ECF No. 2825)—was filed just a few hours later, minutes after midnight.  The Third Amended Joint Chapter 11 Plan of Reorganization of Purdue Pharma L.P. and Its Affiliated Debtors ("Third Amended Plan") (ECF No. 2904) and the Disclosure Statement for Third Amended Joint Chapter 11 Plan of Reorganization of Purdue Pharma L.P. and Its Affiliated Debtors (the "Disclosure Statement") (ECF No. 2907) were filed on May 24, 2021, less than forty-eight hours prior to the scheduled hearing.  In light of the lateness of the filing of the Third Amended Plan and the Disclosure Statement, the Public School District Creditors respectfully submit that due process requires an adjournment of the hearing to afford creditors a fair opportunity to review.

revisions, fatal flaws remain.  The plan of reorganization, now three times amended, remains

unconfirmable as written, and the disclosure statement, more than three times amended, remains

fundamentally deficient.

2.      Indeed, the Disclosure Statement has in some respects become *less* transparent,

not more.  A disclosure statement should describe, clearly and concisely, what creditors stand to

gain or lose from a proposed plan of reorganization, in sufficient detail to permit creditors to cast

informed votes.  *See* 11 U.S.C. §§ 1125(a)(1), (b).  Far from providing full and fair disclosure,

the Debtor's Disclosure Statement too often leaves creditors to guess—or even worse, threatens

to lead them astray—about the meaning of key terms and the effect of key provisions.  Perhaps

most conspicuously, the terms of the settlement with the Sackler families—which the Debtors

characterize as an "integral" element of the reorganization plan—have not been fully revealed,

and the settlement term sheet has been stricken from the Disclosure Statement.

3.      The Public School District Creditors have followed the developments in this

proceeding—including the successive iterations of the disclosure statement and the

reorganization plan—with growing concern.  America's public schools have been hard-hit by the

opioid crisis, and the Public School District Creditors believe that America's public schools have

a critical role to play in the abatement of that crisis.  The public schools are uniquely positioned

to improve the lives of opioid-impacted children—through, among other things, special

education programs and supplemental educational services—and early intervention in the public

schools promises to head off some of the most pervasive and long-term effects of the opioid

epidemic.  Accordingly, adequate funding of the public schools is an essential component of any

effective abatement strategy.  And yet the Debtors' proposed plan of reorganization leaves no

room for the funding of vital public school programs.

4.      Understanding the importance of the public schools to the opioid-abatement goals of this Court, the Public School District Creditors have long supported a dedicated allocation of abatement funds for the public schools.  However, the public school districts have been persistently marginalized in this proceeding, and the protocols governing distributions to state and local governments were developed without their input.  As a result, the Debtors' proposed plan of reorganization makes no provision for public school programs addressed to the developmental and educational needs of children impacted by opioids, including children exposed to opioids *in utero*.  The funding priorities of the public schools have been pushed aside.[4]

5.      That the proposed plan of reorganization offers little or nothing to the public schools does not, however, mean that the plan would not *take* from the public schools.  To the contrary, through far-reaching non-consensual releases, the Debtors propose to close public school districts off from every avenue of recovery beyond what the plan itself has to offer.  And for America's public schools, what the plan has to offer is next to nothing.

## SUPPLEMENTAL OBJECTION

**I.      The Disclosure Statement Is Fatally Deficient**

**A.      The Terms Of The Sackler Release Remain Inadequately Disclosed**

6.      The principle of "full and fair disclosure" requires that third-party releases be explained to creditors plainly and directly, without equivocation.  *See Momentum Mfg. Corp. v. Emp. Creditors Comm. (In re Momentum Mfg. Corp.)*, 25 F.3d 1132, 1136 (2d Cir. 1994).  Far

---

[4] The Public School District Creditors have reason to believe that allocation deals may have been entered between or among other non-federal domestic governmental creditors in this proceeding that would artificially limit the amount of funding available to public schools.  On May 13, 2021, the Public School District Creditors served discovery requests seeking, among other things, information regarding any such allocation deals.

from addressing the release of the Sackler families head on, the Debtors appear reluctant even to use the terms "Sackler" and "release" in the same sentence.  The Sackler release is euphemistically described as a release of *shareholders*, and the "Releases" section of the Disclosure Statement scarcely mentions the Sackler name at all—just two references buried in almost ten pages of tightly-packed text.  *See* Disclosure Statement § I.F.  Creditors have a right to be told upfront that Sackler family members are among the shareholders to be released.[5]

7.    The Disclosure Statement also leaves basic questions about the Sackler release unanswered.  For starters, who exactly is to be released?  One section of the Disclosure Statement states that the "Sackler Parties*"* and *"certain other persons and/or individuals"* will "receive the benefit of releases and injunctions . . . ."  *See id*. § III.Z (emphasis added).  Those "other persons and/or individuals" are unidentified, and the term "Sackler Parties" is itself amorphous, apparently intended to include any number of unspecified Sackler family members, trusts, and/or "Sackler-related entities."[6]  Compounding the confusion, a competing section of the Disclosure Statement refers to a release not of the "Sackler Parties" but of the "Shareholder Released Parties," *see id*. §§ I.F(3)-(4), a term that is defined only in the section of the Disclosure Statement addressing the release by *the Debtors*.  *See id*. § I.F(3).  Moreover, that definition includes imbedded terms—"Shareholder Payment Parties," "Sackler Family

---

[5] Earlier versions of the Disclosure Statement had referred to the settlement agreement with the Sackler families under two different names:  The "Sackler Settlement Agreement" and the "Shareholder Settlement Agreement."  In the latest version, the Debtors have replaced the term "Sackler Settlement Agreement" with "Shareholder Settlement Agreement" throughout.

[6] The "Sackler Parties" are defined to mean "certain members of the Sackler Entities," *see* Disclosure Statement § III.Z, and the "Sackler Entities," in turn, appear to include the families of Raymond and Mortimer Sackler (the "Sackler Families"), unspecified trusts established by or for the benefit of Sackler family members, and other indeterminate "Sackler-related entities."  *See id*. §§ I.B, II.E(2).

Members"—which are themselves not defined in the Disclosure Statement.  Creditors thus must

consult the Third Amended Plan to even begin to understand the true breadth of the release

which, as explained below, encompasses not only Sackler family members but also a host of

indeterminate third parties.[7]

       8.      It is also not clear exactly whose claims are to be released.  According to the

Disclosure Statement, "certain releases" in favor of the "Shareholder Released Parties" will be

"deemed granted" by the "Releasing Parties."  *See id*. § I.F(4).  This formulation, which occurs

in the first sentence of the section on "Shareholder Releases by Releasing Parties," is doubly

misleading.  First, the relevant release clause in the Third Amended Plan purports to bind not

only the "Releasing Parties" but "*all other Persons*."  Third Amended Plan § 10.7(b) (emphasis

added).  The heading to Section I.F(4) of the Disclosure Statement, and the opening sentence of

that section, improperly suggest that only the claims of "Releasing Parties" will be subject to

release.  Second, the term "Releasing Parties" is itself not defined in this subsection of the

Disclosure Statement, and a creditor who succeeds in locating the definition in an earlier

subsection, *see* Disclosure Statement § I.F(2), will find that the term includes not only "Holders

of Claims" but also all of their "Related Parties," a term that is itself undefined in the Disclosure

Statement.  The omission is significant, because the term "Related Parties," as used in the

---

[7] Presumably, some individuals and entities will be specifically excluded from the release, but
both the Disclosure Statement and the Third Amended Plan keep the identities of such excluded
parties a secret.  Creditors are entitled to know whether the reorganization plan purports to shut
down claims against, for example, McKinsey & Co., Inc.  The Disclosure Statement also
continues to equivocate on the exclusion of the Sackler family and related entities from the
opioid business.  *See* Disclosure Statement § III.Z (indicating that the prohibition against the
manufacture or sale of opioids will be subject to undisclosed "exceptions to be agreed" and will
apply only to "certain members of the Sackler Entities" whose identities also remain to be
agreed).  Similarly, the Disclosure Statement adverts opaquely to undisclosed "covenants,
collateral and remedies for breach," the descriptions of which are still "to come."  *See id.*

reorganization plan, is startlingly expansive, embracing an ever-expanding web of individuals and entities, many of them unknown, many of them unknowable. *See* Objection ¶¶ 41-45; First Supplemental Objection ¶¶ 15, 17. Nothing in the Disclosure Statement puts creditors on notice that the term "Related Parties" encompasses such a vast array of third parties.[8]

9.      The Disclosure Statement also fails adequately to disclose exactly which claims against the Sackler families would be released, and it provides no information about the estimated value of those claims. In a section entitled "The Terms of Settlement of Claims Against the Sackler Families," the Disclosure Statement invites creditors to consult the "Shareholder Settlement Term Sheet" for "additional detail," *see* Disclosure Statement § III.Z, but the term sheet is in fact a mere placeholder, stating only that the terms of the settlement with the Sackler families (the "Sackler Settlement") are still "to come." *See id.*, Appendix G. A creditor seeking even a partial understanding of the scope of the proposed releases must look to a different section of the Disclosure Statement altogether, a section on "Shareholder Releases by Releasing Parties" which does not even refer to the Sackler family by name and which is further obscured by the use of terms defined only in the Third Amended Plan. *See id.* § I.F(4).

B.      **The Debtors' Evaluation Of The Sackler Settlement Is Inadequate**

10.     The Debtors' evaluation of the "Sackler Settlement is also inadequate. It is not a good start that the Debtors' own support for the settlement is conditioned on the "satisfactory resolution" of unspecified terms that "continue to be negotiated." *See id.* § III.AA. The

---

[8] As noted in the First Supplemental Objection, the definition of "Released Parties" was modified in an apparent effort to place some limitations on the extent to which the term may encompass "Related Parties" of "Related Parties." *See* Third Amended Plan § 1.1; First Supplemental Objection ¶ 17 n.7. Whatever the effect of that modification may be, the definition of "Releasing Parties" has not been so modified and thus reaches all the "Related Parties" of all the "Related Parties" of all the "Holders of Claims against or Interests in the Debtors." *See* Third Amended Plan § 1.1 (definitions of "Related Parties," "Releasing Parties").

6

Disclosure Statement can scarcely provide useful guidance to creditors when the Debtors themselves are still hedging their bets. In any event, the Debtors' evaluation is far too generalized to permit a reasonably informed assessment of the fairness of the settlement terms as applied to any particular creditor or creditor group. *See id*.[9] Among other things, the Debtors' evaluation makes no allowance for the differences between the many creditors in this proceeding who have pending or potential claims against third parties such as the Sackler families. These creditors are not all similarly situated; the distribution and allocation of funds under the Third Amended Plan will not be *pro rata* among creditors, and some creditors may receive nothing at all. But the Disclosure Statement nevertheless lumps all of the "third-party claimants" together without distinction. *See id*. § III.AA(2)(ii)(c). Because the Debtors' evaluation of the Sackler settlement treats "third-party claimants" as an abstract unity, it offers no genuine guidance to any individual creditor or creditor group about the benefits or drawbacks of the settlement agreement for them.

11.    Nor does the Disclosure Statement provide creditors with any meaningful basis for evaluating the fairness of the $4.275 billion currently on offer. The Disclosure Statement does not explain how the Debtors arrived at this figure, or how it compares to the estimated value of the claims to be released, or how much more may have been left on the table. The Debtors also provide no justification for the protracted payment plan, under which payments would not be completed for up to a decade.

---

[9] The Debtors' evaluation of the Sackler Settlement confusingly suggests that only creditors of the Debtors will be bound by the Sackler releases. *See* Disclosure Statement § III.AA(2)(ii)(c). ("These third-party claimants are all creditors of the Debtors as well."). This appears inconsistent with the relevant provision of the reorganization plan, which purports to bind the "Releasing Parties and *all other Persons*." *See* Third Amended Plan § 10.7(b) (emphasis added).

12.     The Debtors dwell instead on the general risks of litigation for prospective third-party claimants.  *See id*.  However, it is a truism that litigation carries risk.  What the Debtors need to explain is why $4.275 billion, meted out over a period of nine or ten years, is an adequate amount, over an appropriate period, in light of the risk.  That question goes unanswered in the Disclosure Statement.  With respect to the Public School District Creditors in particular, it is critically important that the Disclosure Statement make clear the extent to which the rights of public school districts will be extinguished in exchange for no meaningful consideration.

13.     The Debtors rest instead on a vague and conclusory promise that third-party claimants "will share in the planned distributions to creditors under the Plan."  *See id*.  But for public school district creditors, this is an empty promise.  As the Debtors' plan supplements have made clear, the public schools will not be receiving any meaningful funding for special education programs or supplemental educational services directed at the needs of opioid-impacted children.  *See* First Supplemental Objection ¶¶ 7-10; Notice of Filing of Third Plan Supplement Pursuant to the Second Amended Joint Chapter 11 Plan of Reorganization of Purdue Pharma L.P. and its Affiliated Debtors ("Third Plan Supplement"), Exhibit G (ECF No. 2867).

C.     **The Breadth Of The Release Of The Debtors Is Misleadingly Understated and Inadequately Disclosed**

14.     The Third Amended Plan contains an expansive release of the Debtors and the Debtors' "Related Parties."  Third Amended Plan §§ 1.1 (definition of "Released Parties"), 10.6(b).  The Disclosure Statement describes this provision as a release of the "Released Parties" by the "Releasing Parties."  *See* Disclosure Statement § I.F(2).  This characterization of the Section 10.6(b) release is misleading as written.

15.     First, the Disclosure Statement does not adequately convey the true sweep of the release, which, as the Third Amended Plan reveals, purports to extend not only to the Debtors

8

but also to a profusion of additional "Related Parties"—including all the Debtors' past, present and future advisors, agents, board members, consultants, directors, employees, managers, officers, independent contractors, subcontractors, and so on—and in some circumstances even to the "Related Parties" of these "Related Parties." *See* Third Amended Plan §§ 1.1 (definitions of "Related Parties," "Released Parties"), 10.6(b).  None of this is made clear by the Disclosure Statement.

16.    Second, the Disclosure Statement does not adequately identify who would be giving up their claims against the Debtors under the reorganization plan.  Creditors, certainly. But seemingly also the creditors' "Related Parties."  *See id*. § 1.1 (definition of "Releasing Parties").  As noted above, the term "Related Parties" is never defined in the Disclosure Statement.  Accordingly, a creditor may read the Disclosure Statement from start to finish and back again without ever appreciating, for example, that the term "Related Parties" includes all of the creditor's past, present and future employees, and all of the past, present and future employees of those employees, and so forth, for every one of the creditor's advisors, agents, consultants, and so on.  *See id*. (definition of "Related Parties").

17.    Finally, the scope of the Section 10.6(b) release has been modified in a way that is not adequately disclosed in the Disclosure Statement.  Section 10.6(b) had at one time provided, in relevant part, that "each *Releasing Party* that is a Governmental Unit shall be deemed to have released all Released Claims . . . ."  *See* First Amended Plan § 10.6(b) (emphasis added).  In the latest versions of the reorganization plan, the sentence has been altered to read, "each *Person* that is a Governmental Unit . . . shall be deemed to have released all Released Claims . . . ."  *See* Third Amended Plan § 10.6(b) (emphasis added).  Despite that change in wording, the first reference to Section 10.6(b) in the Disclosure Statement describes the provision as a release by

9

the "Releasing Parties." *See* Disclosure Statement § I.F(2) ("[T]he Plan provides for certain

releases to be deemed granted by the Releasing Parties . . . .   Such release is provided for in

<u>Section 10.6(b)</u> of the Plan.").   The difference between "Releasing Party" and "Person" in

Section 10.6(b) is dramatic.   A "Releasing Party" might at least arguably mean only those who

have filed proofs of claim in this bankruptcy proceeding. *See* Third Amended Plan § 1.1

(defining "Releasing Parties" to include "all Holders of Claims against or Interests in the

Debtors").   But "Person," by contrast, is far broader. *See id.* (definition of "Person").   If the

switch from "Releasing Party" to "Person" in Section 10.6(b) of the Third Amended Plan was

intended to bind entities, including public school districts, that are not creditors in this

bankruptcy proceeding, the Disclosure Statement should make that plain.

D.    **The Scope Of The Channeling Injunction Is Inadequately Disclosed**

18.    In the Third Amended Plan, the scope of the "Channeling Injunction" has been

expanded to include claims against Sackler family members, in a manner that could not have

been better calculated to escape notice, through the use of the defined term, "Protected Party,"

*see id.* § 10.8, which had not existed in the first two iterations of the reorganization plan.   The

Third Amended Plan now purports to enjoin any "Channeled Claim" against any "Protected

Party," *see id.* § 10.8(a), and the Disclosure Statement has been adjusted accordingly. *See*

Disclosure Statement §§ I.E, IV.I(8).[10]

19.    But who is a "Protected Party"?   A creditor must read to the end of the section to

learn that the term "Protected Parties" is defined to include not only the Debtors, the Debtors'

"Related Parties," and various others, but also all "Shareholder Released Parties." *See id.* § I.E

---

[10] Section I.E of the Disclosure Statement fails to make clear that *future* claims—as well as past
and present claims—are to be enjoined.

(definition of "Protected Parties").  And a creditor must then turn to an altogether different section of the Disclosure Statement to learn that the term "Shareholder Released Parties" includes, among others, all "Sackler Family Members."  *See id*. § I.F(3) (definition of "Shareholder Released Parties").  Only by this circuitous route may a creditor discover what has been so well-hidden:  The channeling injunction under the Third Amended Plan—unlike the initial iterations of the channeling injunction—now purports to enjoin claims *against Sackler family members*, as well as a myriad of additional third-party entities.  Hiding the ball in this way is not disclosure; it is concealment.[11]

## II.    The Third Amended Plan Is Patently Unconfirmable

20.    The Disclosure Statement cannot be approved for the additional reason that the Third Amended Plan is unconfirmable as written.  *See In re Quigley Co., Inc.*, 377 B.R. 110, 116-117 (Bankr. S.D.N.Y. 2007) ("If the plan is patently unconfirmable on its face, the application to approve the disclosure statement must be denied . . . ."  ); *see also In re Filex, Inc.*, 116 B.R. 37, 41 (Bankr. S.D.N.Y. 1990).  Among other things, the proposed releases are unjustifiably expansive and fall outside this Court's power to enforce, and the classification scheme propounded by the Debtors would improperly rob public school district creditors of any meaningful vote.  The Court should exercise its discretion to vet and address these fundamental and inescapable problems at this stage of the proceeding in order to avoid the colossal waste of

---

[11] The Disclosure Statement continues to make no mention of the SACKLER Act or the risks it may pose to the viability of the proposed releases of the Sackler Parties.  *See* Objection ¶ 34 n.17; *see also* Press Release, House Committee on Oversight and Reform, *Committee to Hold Second Hearing on Sackler Family's Role in Opioid Crisis and Need for Reform* (May 13, 2021) (describing forthcoming hearing to, among other things, "evaluate the need for Congress to enact reforms like the SACKLER Act—legislation that would prevent individuals who have not filed for bankruptcy, like members of the Sackler family, from obtaining releases from individual liability through bankruptcy proceedings"), *available at* https://oversight.house.gov/news/press-releases/committee-to-hold-second-hearing-on-sackler-family-s-role-in-opioid-crisis-and.

resources and harm to the case that would result from authorizing the Debtors to proceed with a solicitation of votes on a legally unconfirmable plan.

   A.    **The Release Of The Sackler Families Is Impermissibly Overbroad**

   21.    In earlier iterations of the reorganization plan, the section devoted to the release of the Sackler families had been left blank.  The Public School District Creditors expected that the Debtors would seek to release the Sackler families and related entities in the broadest possible terms.  But now that some of the blanks have finally been filled in, the expansiveness of the proposed release surpasses expectations.  *See* Third Amended Plan §§ 10.7(a)-(b).  What the Third Amended Plan contemplates is an impermissibly all-encompassing, nonconsensual release that would extinguish the claims not only of creditors and claim holders in this bankruptcy, but also of untold numbers of individuals and entities who have never appeared in this proceeding and may not even know of its existence.

   22.    It is hard to overstate the overbreadth of the proposed release.  The Debtors seek to bestow upon the Sackler dynasty a kind of hereditary immunity that would extend not only to living members of the Sackler family, but to *all* descendants of Raymond and Mortimer Sackler, all current and former spouses of Raymond and Mortimer Sackler, and all current and former spouses of all of the descendants of Raymond and Mortimer Sackler, in perpetuity.  *See id*. §§ 1.1 (definitions of "Sackler Family Members," "Shareholder Released Parties"), 10.7(a)-(b). The release would also encompass, without limitation, trusts for the benefit of the descendants of Raymond and Mortimer Sackler, as well as a host of unnamed current and former consultants, employees, experts, and "other professionals."  *See id*. § 1.1 (definition of "Shareholder Released Parties").  Indeed, wherever Sackler money goes, so goes the immunity:  The release reaches any companies (save the Debtors themselves) in which the Sackler descendants hold an ownership

12

interest, as well as anyone at all who has received *or will ever receive* any gifts or property or funds from the Sackler descendants. *See id*.

23.     And that is not the end of it. The release also appears intended to embrace, as a separate matter, every party who will be contributing to the $4.275 billion settlement amount. *See id*. (definitions of "Shareholder Payment Party," "Shareholder Released Parties," "Shareholder Settlement Agreement," "Shareholder Settlement Amount"). Because the terms of the Sackler Settlement remain undisclosed, creditors can only guess at who all these additional released parties are, or how many of them there might be. The clear inference to be drawn, however, is that some indeterminate number of unspecified parties—including some Sackler family members—will enjoy the benefits of the release even though they will *not* be paying any part of the $4.275 billion settlement amount. Why such unidentified, non-contributing parties should be entitled to a release under the reorganization plan is not explained.[12]

24.     The release is also impermissibly overbroad with respect to the individuals and entities it purports to bind, which include not only the Debtors and their estates, and not only the creditors in this proceeding, but *everyone else*. The pertinent provision, headed "Releases by Non-Debtors," purports to reach not only the "Releasing Parties" but also "*all other Persons*." *See id*. § 10.7(b) (emphasis added). This covers all the bases, capturing all individuals and associations, all corporations and partnerships, and all governmental units and tribes—without their consent and possibly without their knowledge—regardless of whether they will receive any consideration under the Third Amended Plan or have participated in this proceeding in any way.

---

[12] The release also purports to extend to all persons identified in an as-yet unspecified annex of the as-yet undisclosed Shareholder Settlement Agreement. *See* Third Amended Plan § 1.1 (defining "Shareholder Released Parties" to include the "Persons identified on [Annex [_]] to the Shareholder Settlement Agreement").

*See id.* § 1.1 (definition of "Person").[13]  This aspect of the release raises obvious due process

alarms:  The release purports to bind present and future claimants who have not received

adequate notice, whose interests have not been adequately represented in this proceeding, and

who stand to gain nothing from the settlement.  *See In re Aegean Marine Petroleum Network,*

*Inc.*, 599 B.R. 717, 725-26 (Bankr. S.D.N.Y. 2019); *see also In re Payment Card Interchange*

*Fee & Merch. Disc. Antitrust Litig.*, 827 F.3d 223, 238-40 (2d Cir. 2016) (finding denial of due

process where class counsel compelled release of claims by class members who "gain[ed] no

appreciable benefit" or "no benefit at all" under settlement).[14]

      25.     The scope of the claims to be released is likewise overreaching.  The Third

Amended Plan purports to release the "Shareholder Released Parties" not only from claims

arising from so-called "Opioid-Related Activities," but also from claims arising from the

development, manufacture, marketing, distribution or sale by the Debtors of *all other products*.

*See* Third Amended Plan § 10.7(b) (encompassing "Opioid-Related Activities" as well as the

"development, production, manufacture, licensing, labeling, marketing, advertising, promotion,

distribution or sale of *non-opioid* products or the use or receipt of any proceeds therefrom"

(emphasis added)).  The Debtors offer no hint as to what non-opioid-related claims they have in

mind, much less any justification for including such claims in the scope of the release.  *See In re*

---

[13] The reworked channeling injunction—which now purports to shield "Sackler Family Members" from civil liability—would similarly enjoin "all Persons" with a past, present or future "Channeled Claim."  *See* Third Amended Plan § 10.8.

[14] As noted in the Public School District Creditors' initial objection, only a small fraction of the nation's over 13,000 public school districts were noticed by mail, and the Debtors' supplemental mass media campaign was targeted primarily at *individuals* harmed directly or indirectly by opioids.  *See* Objection ¶ 3.

*Aegean*, 599 B.R. at 727-28; *see also In re FirstEnergy Sols. Corp.* , 606 B.R. 720, 732-33 (Bankr. N.D. Ohio 2019).

26.     Finally, the Debtors propose to confer upon the "Shareholder Released Parties" a kind of blanket immunity that is disfavored in this Circuit, if it is not prohibited outright. *See In re Dynegy Inc.*, 486 B.R. 585, 594 (Bankr. S.D.N.Y. 2013) ("The Second Circuit forbids nondebtor releases that grant 'blanket immunity' to the nondebtor parties."). A release gives "blanket immunity" if it fails to carve out "causes of action based upon theories of gross negligence, willful misconduct, fraud, or criminal conduct . . . ." *See id.* (citation and internal quotation marks omitted). In the releases at issue here, causes of action for fraud, gross negligence and willful misconduct, far from being carved out, are *expressly written in*. *See* Third Amended Plan §§ 10.7(a)-(b).

### B.     The Release Of The Debtors Is Impermissibly Overbroad

27.     The proposed release of the Debtors and their "Related Parties" is also impermissibly overbroad. *See id*. § 10.6(b). Here again, the definition of "Related Parties" is problematic, for as discussed above, it casts a net so extraordinarily wide that its reach cannot even be predicted. *See id*. § 1.1 (definition of "Related Parties"). Moreover, the wording in Section 10.6(b) appears to have been deliberately adjusted to bind *all* governmental units and Indian tribes, whether or not they have filed proofs of claim in this proceeding. *See id*. § 10.6(b) (extending the release to "*each Person* that is a Governmental Unit or a Tribe" (emphasis added)). And these releases, like the releases of the "Shareholder Released Parties," purport to apply even to causes of action grounded in fraud, gross negligence, or intentional wrongdoing. *See id*. §§ 10.6(a)-(b); *see also In re Dynegy*, 486 B.R. at 594.

15

C.    **The Plan's Classification Scheme Violates The Bankruptcy Code**

28.    Finally, the Third Amended Plan persists in improperly grouping the public

school districts together with other non-federal domestic governmental claimants in a single class

of creditors.

29.    As discussed in the public schools' earlier Objection and Supplemental Objection,

this classification structure effectively deprives public schools of a voice, for it ensures that

public school district creditors—having been denied an opportunity to shape the allocation

protocols and priorities—can now be outvoted by other non-federal domestic governmental

claimants who were not shut out of the negotiations and whose claims are, by contrast,

accommodated under the NOAT distribution procedures.  *See* Objection ¶¶ 57-61; First

Supplemental Objection ¶ 17; *see also In re U.S. Truck Co., Inc.*, 42 B.R. 790, 795 (Bankr. E.D.

Mich. 1984) (cautioning against the possibility that a "discrete sub-class of unsecured claims"

may be "intentionally included within a more inclusive class to deny that sub-class any vote on a

plan").  The fact that the public school district creditors are left without a meaningful vote under

the reorganization plan further underscores the fundamental unfairness of forcing nonconsensual

releases upon them.  *See Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 627 (1997) ("[T]he

adversity among subgroups requires that the members of each subgroup cannot be bound to a

settlement except by consents given by those who understand that their role is to represent solely

the members of their respective subgroups." (internal quotation marks and citation omitted).

30.    The classification arrangement also violates Section 1123(a)(4) of the Bankruptcy

Code, which requires that, absent consent to the contrary, each claim within a class be accorded

the "same treatment."  11 U.S.C. § 1123(a)(4).  As discussed by the Public School District

Creditors in their earlier supplemental objection, the "Core Strategies" and "Approved Uses" that

govern the NOAT distribution procedures effectively preclude the allocation of funding to public

16

schools for special education and supplemental educational services directed to the needs of opioid-affected children.  *See* Third Plan Supplement, Exhibit G; *see also* First Supplemental Objection ¶¶ 7-10.  By preemptively foreclosing any genuine prospect of such funding, the reorganization plan denies public school district creditors the "same opportunity" as other claimants to receive payment on their claims.  *See Ad Hoc Comm. of Pers. Injury Asbestos Claimants v. Dana Corp. (In re Dana Corp.)*, 412 B.R. 53, 62 (S.D.N.Y. 2008); *see also In re AOV Indus., Inc.*, 792 F.2d 1140, 1151-54 (D.C. Cir. 1986).

## **CONCLUSION**

For the foregoing reasons, the Public School District Creditors respectfully request that the Court (i) sustain their objections; (ii) deny approval of the Disclosure Statement; and (iii) grant such other and further relief as the Court deems appropriate.

Dated: May 24, 2021             Respectfully submitted,
     New York, New York

                        */s/ Eric B. Fisher*
                        Eric B. Fisher
                        **BINDER & SCHWARTZ LLP**
                        366 Madison Avenue, 6th Floor
                        New York, New York 10017
                        Tel: (212) 510-7008
                        Fax: (212) 510-7299
                        efisher@binderschwartz.com

Matthew J. Piers
Charles D. Wysong
Emily R. Brown
Margaret Truesdale
**HUGHES SOCOL PIERS
RESNICK & DYM, LTD.**
70 W. Madison Street, Suite 4000
Chicago, IL 60602
Tel: (312) 580-0100
Fax: (312) 580-1994
mpiers@hsplegal.com
cwysong@hsplegal.com
ebrown@hsplegal.com
mtruesdale@hsplegal.com

Cyrus Mehri
Steve Skalet
Joshua Karsh
Aisha Rich
**MEHRI & SKALET, PLLC**
1250 Connecticut Ave., NW, Suite 300
Washington, D.C. 20036
Tel: (202) 822-5100
Fax: (202) 822-4997
cmehri@findjustice.com
sskalet@findjustice.com
jkarsh@findjustice.com
arich@findjustice.com

Wayne Hogan
Leslie Goller
**TERRELL HOGAN YEGELWEL, P.A.**
233 E. Bay Street, 8th Floor
Jacksonville, FL 32202
Tel.: (904) 722-2228
hogan@terrellhogan.com
lgoller@terrellhogan.com

Neil Henrichsen
Dawn Stewart
**HENRICHSEN LAW GROUP, PLLC**
1440 G. Street, NW
Washington, D.C. 20005
Tel.: (202) 423-3649
Fax: (202) 379-9792
nhenrichsen@hslawyers.com
dstewart@hslawyers.com

*Attorneys for the Public School District Creditors*