Page 1

```
 1   UNITED STATES BANKRUPTCY COURT

 2   SOUTHERN DISTRICT OF NEW YORK

 3   Case No. 19-23649-rdd

 4   - - - - - - - - - - - - - - - - - - - - - - - - - - - x

 5   In the Matter of:

 6

 7   PURDUE PHARMA L.P.,

 8            Debtor.

 9   - - - - - - - - - - - - - - - - - - - - - - - - - - - x

10   Adv. Case No. 19-08289-rdd

11   - - - - - - - - - - - - - - - - - - - - - - - - - - - x

12   PURDUE PHARMA L.P. et al.,

13                 Plaintiffs,

14            v.

15   COMMONWEALTH OF MASSACHUSETTS et al.,

16                 Defendant.

17   - - - - - - - - - - - - - - - - - - - - - - - - - - - x

18   Adv. Case No. 21-07005-rdd

19   - - - - - - - - - - - - - - - - - - - - - - - - - - - x

20   AVRIO HEALTH L.P. et al,

21                 Plaintiffs,

22            v.

23   AIG SPECIALTY INSURANCE COMPANY,

24                 Defendants.

25   - - - - - - - - - - - - - - - - - - - - - - - - - - - x
```

1                United States Bankruptcy Court

2                300 Quarropas Street, Room 248

3                White Plains, NY 10601

4

5                May 20, 2021

6                10:04 AM

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21   B E F O R E :

22   HON ROBERT D. DRAIN

23   U.S. BANKRUPTCY JUDGE

24

25   ECRO:  UNKNOWN

Page 3

1    HEARING re Status Conference Regarding Motion to Approve

2    Disclosure Statement

3

4    HEARING re Interim Fee Application of Prime Clerk LLC,

5    Administrative Advisor to the Debtors, for Compensation and

6    Reimbursement of Expenses for the Period from February 1,

7    2020 through January 31, 2021 (ECF #2482)

8

9    HEARING re Motion to Approve Compromise Motion of United

10   States Trustee Pursuant to Sections 105(a), 327, 328 and 330

11   of the Bankruptcy Code and Rule 2014 of the Federal Rules of

12   Bankruptcy Procedure for Entry of an Order Approving (1)

13   Settlement Agreement with Skadden Arps Slate Meagher & Flom,

14   LLP, Wilmer Cutler Pickering Hale and Dorr, LLP, and

15   Dechert, LLP and (2) Certain Releases by the Debtors (ECF

16   #2763)

17

18   HEARING re Motion to File Proof of Claim After Claims Bar

19   Date filed by Kyle M. Parks (ECF #2057).

20

21   HEARING re Motion to Allow Claims /Motion Tolling Filing

22   Deadline (Claim submitted but not filed - pending

23   disposition of the motion) filed by Arlandis C. Issac (ECF

24   #2069) .

25

1    HEARING re Motion to Allow Claims / Motion for Tolling

2    Filing Deadline (Claim submitted but not filed - pending

3    disposition of the motion) filed by Andre S. Youngblood (ECF

4    # 2071) .

5

6    HEARING re Motion to File Proof of Claim After Claims Bar

7    Date /Motion to Request Extension for Filling Proof of Claim

8    (Claim was not included with the motion) filed by Shane

9    Christian Peterson (ECF #2086).

10

11    HEARING re Motion to Allow Claims /Motion for Tolling Filing

12    Deadline (Claim submitted but not filed - pending

13    disposition of the motion) filed by Neal W. King (ECF

14    #2088).

15

16    HEARING re Motion to File Proof of Claim After Claims Bar

17    Date filed by Troy A. Pesina (ECF #2193)

18

19    HEARING re Letter to Judge Drain regarding the 4/21/21

20    hearing Filed by Troy A. Pesina (ECF #2597)

21

22    HEARING re Motion to File Proof of Claim After Claims Bar

23    Date (Claim submitted but not filed - pending disposition of

24    the motion) filed by Lisa M. Acquaviva (ECF #2211)

25

```
1    HEARING re Motion to File Proof of Claim After Claims Bar

2    Date filed by Brian Lee Danner. (ECF #2458)

3

4    HEARING re Adversary proceeding: 19-08289-rdd Purdue Pharma

5    L.P. et al v. Commonwealth of Massachusetts et al Motion to

6    Extend Time / Motion to Extend the Preliminary Injunction

7

8    HEARING re Adversary proceeding: 21-07005-rdd Avrio Health

9    L.P. et al v. AIG Specialty Insurance Company (f/k/a

10   American In Notice of Hearing on Plaintiffs Motion for Entry

11   of an Order (I) Authorizing Plaintiffs to Redact and File

12   Under Seal Certain Confidential Information and (II)

13   Granting Related Relief (related document(s)129)

14

15   HEARING re Adversary proceeding: 21-07005-rdd Avrio Health

16   L.P. et al v. AIG Specialty Insurance Company (f/k/a

17   American In Motion to File Under Seal Motion to Seal

18   Documents Submitted in Connection with Plaintiffs

19   Consolidated Memorandum of Law in Opposition to Defendants

20   Motions to Dismiss for Lack of Personal Jurisdiction

21   (related document(s)88, 84, 90, 77, 82, 80, 73)

22

23

24

25   Transcribed by:  Sonya Ledanski Hyde
```

                                                        Page 6

1   A P P E A R A N C E S :

2

3   DAVIS POLK & WARDWELL LLP

4       Attorneys for the Debtor

5       450 Lexington Avenue

6       New York, NY 10017

7

8   BY:   MARSHALL HUEBNER (TELEPHONICALLY)

9         CHRISTOPHER ROBERTSON (TELEPHONICALLY)

10        BENJAMIN KAMINETZKY (TELEPHONICALLY)

11

12  UNITED STATES DEPARTMENT OF JUSTICE

13        Attorney for the U.S. Trustee

14        201 Varick Street, Suite 1006

15        New York, NY 10014

16

17  BY:   PAUL SCHWARTZBERG (TELEPHONICALLY)

18

19  AKIN GUMP STRAUSS HAUER & FELD LLP

20        Attorney for the Official Committee of Unsecured

21        Creditors

22        One Bryant Park

23        New York, NY 10036

24

25  BY:   JAMES McCLAMMY (TELEPHONICALLY)

Page 7

1

2    EISENBERG & BAUM, LLP

3         Attorney for Ad Hoc Committee on Accountability

4         24 Union Square East

5         New York, NY 10003

6

7    BY:  MICHAEL QUINN (TELEPHONICALLY)

8

9    PILLSBURY WINTHROP SHAW PITTMAN LLP

10        Attorney for the Ad Hoc Group of Non-Consenting States

11        31 West 52nd Street

12        New York, NY 10019

13

14   BY:  ANDREW TROOP (TELEPHONICALLY)

15

16   GILBERT LLP

17        Attorney for Ad Hoc Committee of Governmental and Other

18        Contingent Litigation Claimants

19        700 Pennsylvania Ave SE

20        Washington, VA 20003

21

22   BY:  RICHARD LEVERIDGE (TELEPHONICALLY)

23

24

25

1   CLYDE & CO

2        Attorney for Arch Reinsurance

3        405 Lexington Avenue

4        New York, NY 10174

5

6   BY:  HARRIS WIENER (TELEPHONICALLY)

7

8   IFRAH LAW PLLC

9        Attorney for Allied World

10        1717 Pennsylvania Ave NW

11        Washington, DC 20006

12

13   BY:  GEORGE CALHOUN (TELEPHONICALLY)

14

15

16

17

18

19

20

21

22

23

24

25

```
1                   P R O C E E D I N G S
2             THE COURT:  Good morning.  This is Judge Drain.
3    We're here in In re Purdue Pharma L.P., et al.
4             These matters today are being heard completely
5    telephonically.  That means that in addition to introducing
6    yourself and your client the first time that you speak, you
7    should state your name if you speak later so that the court
8    reporter and I can put together your voice with your name.
9             There's one authorized recording of these
10   hearings.  It's taken by Court Solutions, which provides a
11   copy on a daily basis to our clerk's office.  If you want a
12   transcript, you should contact the clerk's office to arrange
13   for the production of one.
14            Because these hearings are completely telephonic,
15   you need to keep your phone on mute, unless of course,
16   you're speaking, at which point you need to unmute yourself.
17            So with that introduction, I have the agenda for
18   the hearing and I'm happy to go down it in the order of the
19   agenda.
20            MR. HUEBNER:  Terrific.  Good morning, Your Honor.
21   For the record, this is Marshall Huebner of Davis Polk &
22   Wardwell LLP on behalf of the Debtors.  Let me first ask
23   whether I can be heard clearly.
24            THE COURT:  Yes, you can be heard fine.
25            MR. HUEBNER:  Terrific.  Thank you, Your Honor.
```

Page 10

1    So going down the agenda, that is exactly what we had in

2    mind, so if it's okay with the Court, I will begin with the

3    sort of status update on the disclosure statement.

4            THE COURT:  Okay.

5            MR. HUEBNER:  So Your Honor, as I told the Court

6    on May 12th, I thought that it was highly likely that we

7    would be able to proceed with the disclosure statement in

8    the coming days.

9            And that's because as I sat there on May 12th, I

10   actually saw, along with an extraordinarily devoted and

11   hard-working Davis Polk team and many other firms for many

12   other parties, saw a path to resolution on the issues that

13   remained.  And, you know, whether we were on the X yard line

14   or the Y yard line, I'm not sure that always works

15   perfectly, but we certainly appeared pretty close with the

16   number of issues dwindling.

17           The first or five days since the May 12th hearing

18   where Your Honor graciously gave us extra dates went

19   extremely well, and I will soon give a fly by update.  Some

20   pretty important things that were not resolved on May 12th

21   that are now very close to resolution, in some cases at

22   resolution, and in some cases, you know, sort of, like,

23   hopefully a few (indiscernible) units away from being ready

24   to move to documentation.

25           But candidly, the last two to three days have been

Page 11

1    much more difficult with respective issues that remain, and

2    it is not currently clear to me whether we have a path to

3    being done by May 26th with a disclosure statement that

4    actually is ready for solicitation to creditors.

5         This would be just a terrible, terrible shame

6    because losing May 26th, I think makes it extraordinarily

7    likely, maybe even a virtual certainty, that we could no

8    longer hold the August confirmation schedule that so many

9    people have been working, you know, 16/18/19 hours a day to

10   try to keep to get as much money out as quick as we can for

11   abatement.

12        But unfortunately, you know, the 7-yard line or

13   the 5-yard line or the 2-yard line or even the 1-yard line

14   is just not the same as being done, and then you have to

15   have a plan and disclosure statement that is actually ready

16   to send to creditors to vote on in order to ask a Court to

17   approve a disclosure statement.

18        It is possible that because the delay would be so

19   terribly costly and risky for so many parties that we will

20   get there by May 26th.  I certainly am not giving up hope

21   and nobody is letting up on the gas pedal.  It is also

22   possible that, you know, some time may just be needed,

23   especially in particular a couple of issues that are proving

24   extremely intractable.

25        And, you know, several parties have expressed

Page 12

1    views several times that this is a deal breaker and they're

2    out and if we don't do it exactly this way, there's no deal

3    and we should start preparing for the alternative, and

4    obviously, you know, language like that makes it very

5    difficult for us to continue to broker everybody sort of

6    towards peace.  And it's a case where there are strongly

7    held views that many people, I guess, feel that they have

8    bent as far as they can, and I think that not everyone

9    weighs the risks and the costs of potentially delay and,

10   frankly, what we have all built so far not going forward.

11        And, frankly, people seem to be -- or at least

12   articulating -- that they weigh it very differently that I

13   do and that the Debtors do, but, you know, everyone

14   obviously has informed and sophisticated opinions and

15   they'll carry them through as they see fit.

16        So there are two things that I think, you know,

17   might prove necessary.  Number one is just time, you know,

18   these are hard issues.  These are among the most complex

19   cases ever filed, certainly with the most creditors and the

20   most claims ever in world history, and it is not simple, and

21   it has political overtones and public health overtones and

22   everything that the Court knows well; I won't belabor it.

23   And it may just be that a little bit of a, kind of you know,

24   a relaxation of the relentless pressure that the deal has

25   been under on issues large and small may actually be

Page 13

1   necessary to get people into the mode that will get us over

2   the goal line.

3            The second issue that may actually help turn sort

4   of some magic keys and some tumblers is something I was

5   happy to report is entirely and unsurprisingly entirely

6   positive, which is the incipient mediation commenced by

7   Judge Chapman.  The time, effort, and intensity that she has

8   already brought to bear is remarkable, let alone for a

9   sitting S.D.N.Y. bankruptcy judge with a very full docket

10  and a full load.

11           And obviously, if that progresses, which we all

12  very much hope it will, and progresses hopefully well in

13  advance of June 30, that may also provide additional

14  dimensionality that makes it possible to resolve issues that

15  as of now it is not obvious that we will be able to resolve

16  in the next very small number of days.

17           As the Court and others are well aware, our reply

18  brief is due Monday, it is already Thursday, and the 26th is

19  just coming very quickly.  And, you know, we were, as I

20  said, for several days on the trajectory that was extremely

21  hopeful, but things have, in fact, you know, gotten a little

22  bit more complicated in the last few days.

23           That say, let me turn to the positive because

24  there is a lot of positive, and many of the issues that

25  actually were not done on May 12th I think are in a much

Page 14

1    better place.  I'm going to choose my words extremely

2    carefully on each of these issues.  I hope I choose them

3    carefully enough.  The number of emails we've got from

4    different parties saying you can only say it exactly this

5    way or only use these exact words or don't say anything more

6    than this was a pretty, frankly, vertiginous number of

7    directives and tic-tocks.

8            And so, I think we're going to err on the side of

9    conservativism on each of the issues and hopefully will not

10   describe progress greater than has been made, but the

11   progress is very material on the issues that by and large

12   are intercreditor issues.  There's nowhere else that the

13   Debtor itself can flex or give.  You know, we are really I

14   think very much in mediation and mediator mode ourselves,

15   you know, trying to resolve what is almost exclusively a

16   complex conundrum on intercreditor issues.

17           So let me go through some of those because I do

18   want to give a lot of sort of optimism for the things that

19   have been accomplished while being realistic and sober about

20   the things that still lie ahead.

21           Issue number one is the structure and, you know,

22   post-emergent structures for the sort of what I'll just call

23   the public/private split.  As the Court surely remembers,

24   you know, the overwhelming majority or substantial majority

25   of the estate assets are going to non-federal governmental

Page 15

1    actors to be used exclusively for abatement.  There is, you

2    know, $1.4 or $1.5 -- it depends how you count it and who

3    you count -- billion dollars going to the private mostly for

4    abatement, other than the PIs.  Obviously, this is a

5    multiyear payout situation as to many of the private groups.

6    It is obviously also a multiyear pay-in situation from the

7    Sacklers.

8           And so, working -- and with this, I do give a nod

9    to the UCC that has been sort of the group negotiator

10   largely for the private side, which has made everybody's

11   bias I think much more efficient, you know, opposite

12   primarily the ad hoc committee with us as mediating with

13   respect to, you know, the master disbursement trust

14   structure, you know, ensuring that the payment close work

15   correctly, that there are reserve sets, that contingencies

16   and eventualities are addressed.  You know, what happens if

17   Newco sells assets; what happens if there are prepayments

18   from the shareholders.  You know, it's a very complicated

19   deal that goes on for many years with many what if this

20   happens and what if that happens.

21          And I think we have made tremendous, tremendous

22   progress addressing pretty much every contingency and

23   possibility that almost any of the many creative people on

24   the deal could think of and there's sort of the home and

25   sort of a coin sorter for almost all of them, which is

Page 16

1    great.

2            Number two is the trust distribution procedures,

3    also very complicated as the Court knows well.  We have over

4    600,000 filed claims, which is multiples of the next biggest

5    case in terms of number of claims ever filed, and there are

6    essentially going to be sub-trusts created for each of the

7    private side deals and there needs to be trust distribution

8    procedures or TDPs that relate to how that money gets, you

9    know, whacked up and how, you know, claims get validated and

10   what are the authorized abatement uses and things like that.

11           And a lot of those have been hitting the docket as

12   fast as we can get them final enough to file, and there's

13   still a few final open issues being put to bed and those

14   will continue to be filed and that, I think, is definitely a

15   clear pathway to finality on.

16           You know, while many of the issues are largely

17   internal to creditors, obviously issues also face the

18   Sacklers.  Those negotiations and documentations and emails,

19   you know, are almost literally in the 20 to 21 hour a day

20   range right now with, you know, documents coming back and

21   forth from all sides.  There are issues left, to be sure.

22   We are not done with that deal yet, but we are getting a lot

23   closer, and we are getting closer by the day.  And while I

24   can't promise that we're going to get there, it certainly

25   feels like everyone is in deal-making mode, and that

Page 17

1    continues the pace and there are already calls set up and

2    already meetings tonight.

3            Number four is the federal government, which has

4    had a great number of issues still open in the case, and I

5    think on this one, it's fair to say that the progress has

6    just been simply tremendous.  You know, ironically, although

7    the federal government is the single largest obviously

8    government in our country, the commercial approach and

9    frankly, the speed with which they have been able to react

10   to things and their public mindedness continues to be quite

11   notable.

12           As Your Honor may remember from the DOJ deal, one

13   very large open item was exactly what the plan treatment and

14   recovery was, what's going to be on the $6.544 billion

15   dollars of claims, the non-forfeiture claims that the DOJ

16   has against the Debtors.  That is now basically agreed with

17   the relevant creditors.  It's still moving along through the

18   machinery of governmental approval, so I don't want to

19   overuse words like agreement in principle, so I want to make

20   sure I get that one right, but let's just say that that one

21   is, you know, not on my top X list of worries.

22           There are other areas where the federal government

23   is also implicated, you know, for example, with respect to

24   personal injury claimants.  As I have now learned during

25   this case, very often when personal injury claimants get

1  recoveries with respect to torts, the federal and maybe

2  other governments as well have something to say about that

3  because it may be that a bunch of the medical or other costs

4  that were incurred were actually already repaid by Medicare

5  or Medicaid or the VA or other federal programs; there's a

6  Medicare secondary payer statute.

7          And so, you know, what exactly the federal

8  government position is vis-à-vis several of the private

9  claimant categories in this case, including both the

10 personal injury claimants and the TPP since, you know,

11 certainly in the federal government's view, they themselves

12 are a large TPP, third-party payor, maybe the largest and

13 sort of what their role is within that class also could have

14 been something that derailed, frankly, the plan.  But I have

15 a fair amount of optimism and, frankly, more than that that

16 all the issues that relate to faith in the federal

17 government are moving along and are where they need to be.

18          Your Honor certainly knows that the NAS group --

19 not the medical monitoring side, which was part of the phase

20 one term sheet, but the sort of NAS as personal injury

21 claimants -- filed a quite thoughtful and detailed objection

22 to the disclosure statement.  The primary issue there is

23 essentially the division of recoveries between -- again, I'm

24 overgeneralizing, but adult tort victims in the PI class and

25 NAS victims in the PI class, and we are optimistic that that

1    actually is not far from an agreed resolution.

2            I think parties are working very hard on that and

3    it's really an issue that is between the NAS PIs and the

4    non-NAS PIs, and I think that people are very focused on it.

5    I could be wrong, but if my memory is right, Ken Feinberg

6    has actually also been assisting with that in a sort of post

7    -- end of mediation encore to try to help bring that home.

8            Co-defendant claims issues are also things that,

9    you know, it's not really a disclosure issue per se, but

10   lots of calls are happening and lots of people are being

11   thoughtful about that and, you know, that obviously is

12   something that is also moving along.

13           You know, there is an issue with respect to -- you

14   know what?  I'm actually going to leave it at that, because

15   what I don't want to do is actually step into something that

16   is controversial.  And frankly, to be very straight about

17   it, I don't really want to sort of maybe inadvertently

18   trigger a maelstrom.  And some of the issues that remain are

19   very complicated, and I'm a little bit concerned that by

20   even naming them, frankly, you know, it would not be a

21   positive step for the case.

22           And as I said, we're not giving up hope that the

23   26th is possible, but we're also being sober and realistic.

24   You know, obviously, a true asymptote always approaches zero

25   but never quite gets there.  This case is not going to be a

Page 20

1    true asymptote, we are going to get there, but I'm not

2    comfortable making any promises to the Court as to sort of

3    exactly on what day I think that's currently the most

4    likely.

5              With respect to the disclosure statement itself,

6    Your Honor, there, I'd like to report it's hopefully

7    positive, you know.  As I hope the Court knows by now that

8    we worked very hard to accommodate every objection we

9    possibly can with something that we believe is reasonable,

10   as opposed to just saying sort of we'll see you in court;

11   it's just not our way.

12             And so, the disclosure statement gets longer and

13   longer every time we file it, but also in some ways, sort of

14   shorter, you know, executive summaries and, you know, the

15   U.S. Trustee asked us for much more sort of plain English

16   and chart form and things that make it more accessible given

17   the nature of many of the claimants.

18             And I think that we actually -- when you put aside

19   -- and again, I apologize to anyone on the other side about

20   this, I'll be very brief and light.  But if you put aside

21   the disclosure statement objections that we believe are

22   confirmation objections because they basically think the

23   disclosure statement should not be approved because it is

24   flatly illegal for the following reasons.  You know, the

25   actual, what I'll call disclosure statements, we actually

Page 21

1    think are getting quite dramatically narrowed as we work

2    hard to listen and hear what peoples' real concerns are and

3    they had disclosure either directly or through crosslinks to

4    their own documents where we believe it's appropriate, you

5    know.

6            And obviously the Court knows how much information

7    has been provided in this case in general and has expressed

8    views on that, so I won't belabor the point.  There clearly

9    are going to be objections that are unresolved at the

10   disclosure statement hearing.  You know, I think principally

11   been non-consenting states have several objections that are

12   not going away at the time of the disclosure statement.  I

13   hope that they will go away if there's a mediated outcome

14   under Judge Chapman sort of guidance and tutelage.

15           The ad hoc committee on accountability, you know,

16   remains obviously in a decidedly different place, but it's

17   five individuals or members of that committee that do have a

18   different view about what's best, which we'll talk about in

19   a few minutes on the PI, which frankly, I don't think anyone

20   else in the entire case shares.

21           And for now, at least the public schools, which

22   are sort of the subdivision of the non-federal governmental

23   claimants, we just don't -- we're not going to have a

24   solution for at the time of the disclosure statement.  I

25   think that, you know, it is an issue that is largely an

Page 22

1    inter non-federal governmental issue that we know that the

2    ad hocs are focused on and we hope that someday we'll get

3    topped out there that people can live with that will work

4    for them, but I don't think that's likely to be done by

5    then.

6           So that is all I had to say, the sort of

7    disclosure statement status, as I said there.  There is a

8    lot of progress and it shouldn't be masked, but there still

9    some great complexities ahead and May 26th is coming very

10   quickly and so, I just don't know yet.  And I would never

11   obviously say anything to a court or really to anyone

12   actually ever in any context that I did not believe is true.

13   And so, that is where we are.

14          So I don't know if anyone else feels the need to

15   be heard with respect to the disclosure statement status

16   conference.  It was really the (indiscernible) most update

17   for the Debtors.  But obviously, if someone feels that I

18   misspoke or just adding their voice for the Court or the

19   public's knowledge is important.  Obviously, I'm just the

20   Debtors' lawyer; I have nothing to say about that, other

21   than to say that from the Debtors' perspective, we are

22   otherwise ready to move on to the rest of the agenda.

23          THE COURT:  Okay, thanks for the update.  You

24   noted -- and I don't have a problem with this -- that you

25   didn't want to get into the details of the open issues, so

Page 23

1    I'll limit my remarks to this.

2            First, if there truly is an intractable issue that

3    the Debtors will just have to make a choice on and you

4    really believe that that may remain intractable, reasonably

5    speaking, for now at least, regardless of whether you

6    proceed or not and a change to resolve it wouldn't require

7    re-solicitation or materially re-solicitation, then I think

8    the Debtors just have to make a choice and set a deadline

9    for people to make their choice on it.

10           On the other hand, if delay is caused simply by

11   documenting a complicated agreement reached in principle, I

12   certainly fully understand another short delay of the

13   disclosure statement hearing.  But, you know, as the lawyers

14   on the phone know well, Chapter 11 cases move in stages and

15   there are plenty of times when issues remain open up to

16   approaching the confirmation hearing itself.

17           And I don't think we could just have multiple

18   adjournments in the hopes that people who may be waiting for

19   that type of deadline to make up their minds before then,

20   but I'm speaking in very general terms.  The Debtors have

21   quite a bit of discretion as to when they want to move

22   forward or not and when they need to make a choice one way

23   or another as to what plan they're going to put out and ask

24   to be voted on.

25           MR. HUEBNER:  Your Honor, we appreciate that.  You

Page 24

```
 1    know, I think thus far, you know, we have completely

 2    resisted, like absolutely resisted, you know, essentially

 3    calling the question in response to views of several parties

 4    that if we don't do exactly Y, they will walk, or if we do

 5    X, they will walk, and then we just go back to the drawing

 6    board and work even a little harder and try to be a little

 7    bit more creative and, you know, try to help where we can

 8    and sort of needle and cajole.

 9            At some point, that bag of tricks will be empty,

10    and we may have to make some hard choices and just say,

11    look, this is the best we know how to do, and if you really

12    mean it and you really want to vote against this plan and

13    object to it and tear it all down and start from scratch,

14    you know, we understand.

15            But we can't do better when we have, you know, two

16    credit groups each saying, you know, one says if you do X,

17    I'm out, and one says if you do not X, I'm out.  You know,

18    if we can't get one or both of them past that position, at

19    some point, we have to make a choice and we will.  We've

20    been suffering, frankly, quite an extraordinarily number of

21    slings and arrows and worse than that to sort of stay in our

22    role as mediator and helper and facilitator, but we

23    appreciate the guidance.

24            At some point if we have to, we will switch to a

25    different approach because we won't have a choice because
```

1    there'll be nothing else to do other than say, you know

2    what, the best thing we know how to do is X, and if you

3    really truly want to make -- you know, try to block that

4    from coming to fruition, that's certainly your right to do

5    so.  I very much hope it will not come to that.

6              And as I said, there are two great, you know,

7    hopefully, keys left.  One may just be a little bit of time,

8    although it's going to come at a terrible, terrible cost in

9    terms of delay and run rate.  You know, sometimes parties

10   just need to step back in order to be able to step forward

11   again.

12             And the second is the mediation.  Obviously, if a

13   revised shareholder deal is cut, you know, that brings in a

14   whole bunch of dissenting states and presumably, more value

15   from the Sacklers; that may create an opportunity to solve

16   problems in the way that we don't currently have tools for

17   now.  But we appreciate the guidance, and we'll continue to

18   do our level best to stay both level and to stay at our

19   best.

20             THE COURT:  Okay.

21             MR. HUEBNER:  So unless there are other comments

22   from other parties, I would propose to begin to march

23   through our happily very largely uncontested yet again

24   agenda.

25             THE COURT:  Okay, that's fine.

Page 26

1          MR. HUEBNER:  Mr. Robertson, that the Prime Clerk

2     motion is yours and I trust you will turn the podium after

3     that, I believe, to Mr. McClammy.

4          MR. ROBERTSON:  Great.  Thank you, Marshall.  Good

5     morning, Your Honor.  Christopher Robertson, Davis Polk &

6     Wardwell on behalf of the Debtors.  Can I be heard clearly?

7          THE COURT:  Yes, you can.

8          MR. ROBERTSON:  Thank you, Your Honor.  The first

9     uncontested matter on the agenda is the agenda is the

10    application of Prime Clerk LLC in its capacity as

11    administrative advisor to the Debtors for reimbursement of

12    fees for the period from February 1, 2020 through January

13    31, 2021.  I'll be very brief.

14         Your Honor, this application was filed on March

15    15, but it was inadvertently not noticed for the April 21

16    omnibus hearing and was, therefore, not granted by the

17    omnibus fee order that this Court entered on April 22nd.  We

18    therefore noticed this application for today's hearing.  The

19    fee examiner appointed in these cases has reviewed the

20    application and has confirmed that he has no objection.

21         Your Honor, really on behalf of Prime Clerk, we

22    would ask that Your Honor approve the application and would

23    propose to submit a form of order following the hearing.

24         THE COURT:  Okay.  I will grant the application,

25    which is for a modest amount, almost all of which is in

Page 27

1    connection with preparing for a solicitation of a plan that

2    involves a highly unusual number of parties whose votes

3    would be solicited and complex ways to reach them.

4           So it's reasonable time, the rates are reasonable,

5    and it's unopposed, so you can email the order with Schedule

6    A and B to chambers granting the motion.

7           MR. ROBERTSON:  Thank you, Your Honor.  I will now

8    turn the podium to I believe Marshall said Mr. McClammy.

9    The next motion on the agenda is the U.S. Trustee's

10   settlement motion, so Mr. Schwartzberg, forgive me if this

11   goes to you.

12          MR. SCHWARTZBERG:  Good morning, Your Honor.  Paul

13   Schwartzberg from the U.S. Trustee's Office.

14          THE COURT:  Good morning.

15          MR. SCHWARTZBERG:  On April 29th at ECF Docket No.

16   2763, the United States Trustee filed a settlement agreement

17   to resolve a dispute regarding disclosure under Bankruptcy

18   Rule 2014 with Skadden Arps Slate Meagher & Flom, Wilmer

19   Hale, Pickering Hale and Dorr -- William Cutler, Pickering

20   Hale and Dorr, and Dechert.

21          Specifically, in their applications, those

22   applications, those firms did not disclose that prepetition

23   that they had entered into a written joint defense and

24   common interest agreement on behalf of the Debtors with

25   other parties, including members of the Sackler families.

Page 28

1           The United States Trustee informally raised this

2    issue with the firms.  The firms advised us that they do not

3    consider the common interest agreement as a connection

4    required under Rule 2014 to be disclosed.  Obviously, the

5    United States Trustee and the firms disagree on this issue.

6    But after negotiations, we entered into the settlement as

7    set forth on the docket.

8           Under the settlement agreement, the firms will

9    supplement their retention applications to reflect any

10   common interest or joint defense agreements they entered

11   into on behalf of the Debtors with any party in interest.

12   And in the aggregate, the firms will collectively reduce

13   their pending or future fee applications or monthly fee

14   statements by $1 million in the aggregate.  And in exchange,

15   the United States Trustee and the Debtors will release the

16   firms from all claims relating to alleged disclosure

17   failures concerning the common interest agreements.

18          There have been no objections to the settlement.

19   However, we did receive an informal comment from counsel to

20   the Raymond Sackler family, and counsel has requested that

21   in the first full paragraph of the settlement agreement, we

22   move the phrase, "its beneficial owners" and all the parties

23   have agreed to that.  And we've actually circulated an

24   amended settlement agreement that we have executed that I

25   would propose to hand up or email to chambers with the

Page 29

1    proposed order so that those could be filed together and

2    reflect the amendment to the settlement agreement.

3            Other than that, Your Honor, I have nothing to add

4    unless Your Honor has any questions.

5            THE COURT:  No, I don't have any questions.  I

6    have reviewed the settlement agreement, which recites the

7    parties' respective positions, and it appears to me that the

8    settlement that the U.S. Trustee has negotiated and that the

9    Debtors are also a party to is a reasonable resolution of

10   this dispute, at least given the recitations in the

11   agreement.

12           Bankruptcy Rule 2014 requires more disclosure than

13   the retention and compensation provisions of the Code

14   provide for limiting compensation, which is reasonable for

15   those who drafted the rule to have provided for so that

16   professionals err on the side of more disclosure rather than

17   less when they seek to be retained and at the time establish

18   that they are not disinterested and/or don't hold or

19   represent an adverse interest to the Debtors or to the

20   estates.

21           The word connected or connections in Rule 2014 is

22   at times difficult to apply to particular facts, and that

23   reflects I think the way that courts have dealt with

24   failures to disclosure under Rule 2014.

25           Here, the U.S. Trustee in its position recites

Page 30

1    that it has not found evidence that the failure to disclose

2    in this case was intentional or that there was an effort by

3    any of the firms to mislead.  In addition, of course, the

4    firms state that they did not believe that they needed to

5    make such disclosure under Rule 2014.

6           Given all of the facts here, again, just as

7    reflected in the agreement itself, it appears to me that the

8    resolution is a reasonable one, particularly given that it

9    has been on notice for approval without objection by any

10   party in interest who might have asserted that the

11   connection that is now disclosed would be one that would be

12   disabling under 327 or 330 of the Bankruptcy Code.  And, of

13   course, this motion is unopposed.

14          So in light of that, I will approve the

15   settlement, which again, is reasonable and certainly within

16   what I would exercise is my discretion here if this matter

17   were to be litigated.  See generally 9, Collier of

18   Bankruptcy, Paragraph 2014.05 and the cases cited therein.

19          So, Mr. Schwartzberg, you can email the proposed

20   order after having filed the slightly revised agreement,

21   which I guess you should refer to in the order, just copying

22   the three firms as well as the Debtors' counsel and that

23   order will be entered.

24          MR. SCHWARTZBERG:  Thank you very much, Your

25   Honor.

Page 31

1              THE COURT:  Okay, thank you.

2              MR. HUEBNER:  Your Honor, just 20 seconds from us.

3    The Debtors were also asked to give up claims in connection

4    with this.  We are very comfortable that the Debtors don't

5    have claims that are not being, at a minimum, fairly

6    settled.  You know, as the Court probably knows, you know,

7    we had never even seen before a disclosure of signing a

8    joint defense agreement or common interest agreement or even

9    stipulation on behalf of a client as being a disclosable

10   connection, and I actually believe that people went and

11   looked at several dozen retention applications.

12             So just because the Debtor should never be giving

13   up claims even against their own professionals, frankly,

14   that they have not themselves formed a view about.  I do

15   want to give the Court comfort that we didn't obviously goes

16   out, they just add our signature to someone else's stip.

17   You know, the work was done to give us comfort that, in

18   fact, the Debtors did not have and would not ever have

19   asserted claims against these three firms, including among

20   many other reasons, that the Debtors of course knew about

21   these common interest agreements because they were executive

22   on the Debtors' behalf.

23             So don't need to say more than that, but I did

24   want to give the Court comfort as the second party releasing

25   claims that we are, you know, extremely comfortable.

1          THE COURT:  Okay.  Very well, thank you.  The next

2     matter on the calendar is really several matters, each of

3     which is a motion by a claimant, in each case, an

4     individual, that is a person, for leave to file a late claim

5     or have a claim filed after the bar date treated as being

6     timely filed.  It's items 4 through 11 -- let me just check

7     -- yes, 4 through 11 of the agenda, the movants being Kyle

8     Parks, Arlandis Issac, Andre Youngblood, Shane Christian

9     Peterson, Neil King, Troy Pesina, Lisa Acquaviva, and Brian

10    Danner.

11         These motions are unopposed.  Moreover, the

12    Debtors have filed a proposed order that would provide for

13    the claims to be treated as timely.  I'm not sure who from

14    the Debtors are appearing on this, but I wanted to lay that

15    out in case we have any of the movants on the phone, since

16    it's my understanding that these motions are not opposed

17    and, therefore, I don't need to hear oral argument on them.

18         But why don't I hear from the Debtors as to why

19    they've proposed resolving these motions as set forth in

20    their proposed order granting late claim motions.

21         MR. McCLAMMY:  Thank you, Your Honor.  Good

22    morning.  This is Jim McClammy of Davis Polk on behalf of

23    the Debtors.  First, we'd like to thank the Court for its

24    accommodations in providing time for the parties to work

25    through these issues while also addressing other major

Page 33

1    issues in this case.

2            As Your Honor has noted, there are, at Docket Nos.

3    4 through 11, per se motions that have been filed to allow

4    these late claims.  And with the exception of Miss

5    Acquaviva, who I believe I see in the virtual courtroom, all

6    are incarcerated individuals.  The incarcerated individuals

7    have mainly pointed to shutdowns or quarantining as being

8    the reason for their inability to file the late claims.  Ms.

9    Acquaviva has a declaration from a healthcare provider that

10   also supports her request.

11           And in light of the limited number of late claim

12   motions that have been filed to date, combined with the fact

13   that the personal injury trust distribution procedures in

14   their current state, which I believe can be found at Docket

15   No. 2732, provide a mechanism for compensating personal

16   injury claims filed before April 23rd of 2021.

17           And in light of the fact that this order preserves

18   the ability of the trust to review the merits of these

19   claims and is clear that the order applies only to these

20   claims that have been filed as of this date.  In light of

21   both the limited number and the desire to kind of conserve

22   the resources of the estate, the Debtors would propose that

23   the order that was submitted at Docket No. 2865 be entered.

24   We did consult with the Official Committee of Unsecured

25   Creditors and the ad hoc group for the individual victims,

Page 34

1    and they've consented to the relief requested here.

2              THE COURT:  Okay.  So just to summarize then, one

3    point, the Debtors did perform due diligence on each of

4    these motions and determined that there would be a

5    reasonable argument by the movants, each movant that

6    excusable neglect under Pioneer would apply and, therefore,

7    it was not worth litigating the merits of the motions.

8              MR. McCLAMMY:  That is correct, Your Honor.

9              THE COURT:  All right.  And given the filing of

10   the proposed order and the fact that no one else has

11   objected, as well as what you represented to me as far as

12   the involvement of the creditors' committee and the PI

13   group, I think this is a reasonable resolution of each of

14   these motions.

15             I think you've made it clear, but I want to make

16   it clear.  If someone else hereafter files a late claim,

17   they should clearly not assume that it will be treated in

18   the same way, i.e., deemed timely, and that the relief that

19   I would be granting with respect to these motions as per the

20   order that was filed is limited to these motions and not to

21   other claims that would be filed or might be filed in the

22   future.

23             So I will grant each of the motions as set forth

24   in the proposed order, that it was prepared by the Debtors

25   and filed on the docket.  Unless anyone has any problem with

Page 35

1    the form of that proposed order, I'll use it as the basis

2    for granting each of the motions.

3            MR. McCLAMMY:  Thank you very much, Your Honor.

4            THE COURT:  So you can email that order to

5    chambers for entry.

6            MR. McCLAMMY:  Thank you, we will do that.  And I

7    believe the next item on the agenda will be handled by Mr.

8    Huebner.

9            THE COURT:  Okay.

10           MR. HUEBNER:  Okay.  So, Your Honor, the next item

11   is the extension of the preliminary injunction.

12           Look, as the Court and all parties now, instead of

13   having sought a 60-day or a 90-day and having to do this

14   only once, we actually feel very strongly that it's

15   important to take this in the smaller available bites and

16   only go essentially from hearing to hearing and not more

17   than that.

18           And so, we're now here I think for the third or

19   fourth time with the same largely sort of layout of parties.

20   And so, I'm going to be extraordinarily brief because, you

21   know, we just don't need to, I think, spend a lot of time

22   and, frankly, of even money on this.

23           It is a very modest 27-day extension.  The Judge -

24   - that's you -- Your Honor strongly recommended that we go

25   to mediation one last time with a brand-new judicial

1   mediator.  At the request of multiple parties, including the

2   dissenting states, as I talked about, we are already doing

3   that.  I think -- I don't know which of the brief extensions

4   should be put easier than its forebearers, but given that

5   we're now engaged in this mediation, I think it's

6   particularly important.

7              I appreciate that the non-consenting states, you

8   know, chose to again rest, you know, largely on their prior

9   papers and file something only brief.  I think we did the

10  same thing, and so I'm not really going to engage in any

11  oral argument with respect to the five individuals

12  comprising the, quote, "ad hoc committee" on accountability.

13  I do note, as we said in our papers, I only want to call one

14  thing out and I will leave it at that, that people have been

15  waiting too long and that's exactly the point.  What they've

16  been waiting for is resources and money and an end to the

17  cost and burn of these cases and they availability of

18  billions of dollars.

19             And as I have said at several hearings before, I

20  think people who think about an end to the injunction, I'm

21  just not sure that it's properly understood just what it

22  would mean if everything we have been working on for two

23  years now and everybody involved, including the federal

24  government, half the states, the MDLPEC, the municipalities

25  group, the UCC, all the private side groups, right.

Page 37

1           If all of that falls apart and we're literally set

2     back to sort of utter (indiscernible) and ground zero, the

3     unthinkable horrific chaos of every creditor litigating

4     against every other creditor, every creditor racing every

5     other creditor to the courthouse to recover first from the

6     Sacklers, the estate itself, you know, probably the holder

7     of a very, very wide margin, the best claims against the

8     Sacklers itself having to compete with, you know, 48 states

9     and the federal government and others and thousands of

10    private plaintiffs all also fighting one another, the delay,

11    the cost of that, it's just almost impossible to

12    contemplate.

13          And so, for the reasons that we've set forth in

14    our papers, you know, we are getting ever closer.  June is

15    going to be another extremely important month.  We're taking

16    this injunction extension in the smallest possible bites we

17    know how.  We are very ready, make no mistake as I said at

18    the last hearing and in our prior filings, to pivot to an

19    extremely different approach with respect to the Sacklers if

20    we are unable to reach a deal and this injunction will most

21    assuredly not be continuing in its current form if things

22    fall apart.  And obviously, we're working with our

23    stakeholders on that as well.

24          We hope it will never come to pass and we will get

25    this over the goal line a new and ever more improved form.

Page 38

1    But for that, we otherwise rest on our papers and believe

2    that the injunction should be extended to the June hearing.

3              THE COURT:  Okay.  As you noted, the request is

4    not opposed by most of the parties in interest in this case

5    by a wide margin.  There is a limited objection or a

6    continuing objection and voluntary commitment by the ad hoc

7    group of non-consent states, as well as a limited objection

8    from the so-called ad hoc committee on accountability, both

9    of which I've reviewed as well as the Debtors' reply.

10             I'm happy to hear briefly from their counsel.

11             MR. QUINN:  Good morning, Your Honor.  It's

12   Michael Quinn of Eisenberg & Baum on behalf of the ad hoc

13   committee on accountability.  Can you hear me?

14             THE COURT:  Yes, thanks.

15             MR. QUINN:  Great.  The sole point my clients want

16   to convey today, Your Honor, is that the Sacklers should

17   face a trial.

18             My clients believe that when people look back at

19   this case, they will ask how it was possible that after so

20   many people allege that the Sacklers caused a national

21   crisis, the case got set aside.  People will say that the

22   key step in how the Sacklers avoided a trial was this

23   preliminary injunction by the Court.  This injunction is the

24   magic trick in the Sacklers' strategy.  It's been in place

25   for 588 days today.

1           I listened to the Court at the last hearing

2    address how it is important that the disclosure statement

3    should explain the merits of the allegations against the

4    Sacklers and explain why Purdue believes it's fair to

5    extinguish all those claims.

6           Purdue did not file that explanation before the

7    disclosure statement hearing that was scheduled in April.

8    Purdue did not file that explanation before the disclosure

9    statement that was scheduled for May 12th, and Purdue did

10   not file that explanation before the disclosure statement

11   that was scheduled for today.

12          I believe that a reason for these delays is

13   because Purdue is trying to do the wrong thing.  They are

14   trying to force a settlement on a case that is better suited

15   for a trial.  That's all, Your Honor.  Thank you.

16          THE COURT:  Okay.  Mr. Troop, do you have anything

17   to say?

18          MR. TROOP:  Just briefly, Your Honor.  For the

19   record, Andrew Troop from Pillsbury Winthrop Shaw Pittman on

20   behalf of the non-consenting states.

21          I just want to perhaps clarify in case I heard Mr.

22   Huebner incorrectly, something that he just said, which is

23   to make it clear, as I know you know, Your Honor, that the

24   phase one agreements, particularly with the private

25   creditors and the inter-governmental non-federal commitment

Page 40

1    to opioid abatement, is a process not only in which the non-

2    consenting states participated, helped lead, and is

3    generally, you know, a party to all of those resolutions.

4    Somehow when he goes through that list, he seems to forget

5    the effort and work that the non-consenting states have put

6    into that.

7              Secondly, Your Honor, I just want to respond to

8    one thing in the Debtors' reply.  The Debtors seems to

9    suggest that -- well, don't seem to suggest -- they suggest

10   there's some dissidence between the non-consent states

11   continuing their principled objection to this Court's

12   issuance of a preliminary injunction limiting -- potentially

13   limiting the rights of states to pursue their police power,

14   regulatory or, frankly, any claims against the non-debtor

15   Sacklers.

16             That is not at all inconsistent with the non-

17   consenting states' commitment to work in this Chapter 11

18   case to see if there is a consensual resolution to be

19   reached, and hence the voluntary commitment and hence the

20   commitment I made to you on October 11th, I believe it was,

21   2019 that the non-consenting states notwithstanding being

22   non-consenting would be full and active participants in this

23   Chapter 11 case.

24             I know everyone knows that, Your Honor.  The fact

25   that the Debtors try to paint it different is slightly

Page 41

1    irksome, but nothing more than that.  It's not changing our

2    attitude on anything.  And with that, we otherwise rest on

3    our papers.  Thank you, Your Honor.

4              THE COURT:  Okay, thank you.

5              MR. HUEBNER:  Your Honor, just 30 seconds if I

6    may, and then I think we're probably (sound glitch) today,

7    at least from the Debtors' perspective.

8              With respect to Mr. Quinn, Your Honor, it is just

9    so both offensive and factually wrong, frankly almost

10   outrageous, to call the injunction the Sacklers' magic

11   trick.  The injunction was requested by the Debtors with the

12   support of the Official Committee of Unsecured Creditors

13   representing all unsecured creditors and the support of the

14   AHC representing the MDL plaintiffs' executive committee who

15   are the ones, along with the states, who have been suing the

16   Sacklers for years, and the consenting states, which are

17   about half the states in the country.

18             It is there because almost every creditor in this

19   case believes it in their and the estate's best interest.

20   To attempt repeatedly to cast this as something the Sacklers

21   have hoodwinked us all into is totally offensive, so let me

22   be very clear: they are the defendants, we are the

23   plaintiffs.  We have an injunction in place because we think

24   it will get us to the best place for our stakeholders.

25             And if they avoid a trial, it will not be because

Page 42

1    of this injunction; that is why it is a temporary

2    injunction.  If they avoid trial, it is because they are

3    paying billions and billions of dollars that the

4    overwhelming majority of creditors in this case believe are

5    the right outcome or the best available outcome and that

6    will pass the many strictures and requirements of 1129 to be

7    confirmed by this Court; that's how the bankruptcy system

8    works.

9            With respect to Mr. Troop, I fear that seethings

10   by the irksome may have just been a result of either

11   mishearing or me misspeaking; and if it is, I'm always happy

12   to apologize when I see the transcript.  I don't believe I

13   said anything about the parties who worked on phase one

14   mediation.  Mr. Troop is absolutely right.  I think whenever

15   that has come up, I think -- I hope I've been very clear.

16   The non-consenting states were incredibly important and

17   positive participants on those.

18           In fact, Mr. Troop's emails themselves recently

19   served as a vehicle to get us over the goal line on a very

20   thorn issue when other people did not remember what had been

21   done and Mr. Troop actually did and found the emails to

22   prove it on an intercreditor issue.  So to the extent that

23   somehow I discussed phase one and left them off as an

24   important contributor, I'm delighted to apologize.  I don't

25   think I did, but if I did, I certainly try very hard, I

Page 43

1    think, not to be irksome to anybody.

2           I'll leave aside the dismiss point.  We have a

3    difference of opinion obviously as to whether lifting the

4    injunction today and having thousands of lawsuits proceed

5    against the Sacklers would be a good thing or a bad thing.

6    People are allowed to have a difference of opinion on that;

7    that's okay.  I think we'll go back to resting on our papers

8    and certainly approach the rest of May and June, I think all

9    of us, with the same desire to get to the best possible

10   outcome for our clients and for the estate.

11          THE COURT:  Okay.  All right.  I have before me

12   the Debtors' motion for the continuation of the preliminary

13   injunction that has been in effect in this case since the

14   state of the case through the next omnibus hearing date,

15   which is less than a month away, June 16th.

16          The standard for evaluating such a request is well

17   established and, in fact, law of the case as set out in In

18   re. Purdue Pharma LP, 619 B.R. 38, 58 through 59, (S.D.N.Y.

19   2020) and the cases cited in that opinion and in my two

20   earlier bench rulings granting the injunction.

21          The standard, which is not addressed by the ad hoc

22   committee's objection at all, is the basic well recognized

23   preliminary injunction standard with one focus on the

24   bankruptcy context, which is that when one focuses on the

25   prong of both irreparable harm and success on the merits,

Page 44

1      i.e., likelihood of success on the merits, one focuses on

2      the ultimate goal of a Chapter 11 case, which is whether

3      they will be a successful reorganization and whether the

4      proposed injunction would make it substantially more likely

5      that that reorganization occur or, phrased differently, if

6      the injunction is not granted whether the chances of a

7      successful reorganization are substantially jeopardized.

8              Here, as Mr. Huebner stated, the Debtors

9      themselves, the Debtors' estates have asserted substantial

10     claims against many, if not all, of the covered parties,

11     that is the third parties covered by the injunction.

12     Litigation on those claims arguably is covered by the

13     automatic stay even as to governmental entities, certainly

14     it would be as to the individuals in the other objector or

15     the ad hoc committee on accountability.

16             But given issues with respect to interpreting

17     362(b)(4) as it applies to governmental entities and the

18     prospect of multiple and perhaps thousands of litigations,

19     which either intentionally or inadvertently would assert

20     estate claims as actually having been claims of the third-

21     party plaintiffs, an injunction is warranted to make it

22     crystal clear that claims that the Debtors' estate would

23     have, such as for fraudulent transfers or veil piercing or

24     the like, are in fact enjoined against the covered parties.

25             In addition, the Debtors have also pointed out

Page 45

1  that there are hundreds, in fact thousands, of litigations

2  pending around the country by third-party plaintiffs against

3  various covered parties, including in the MDL and as

4  asserted by various governmental entities.

5          The parties to the MDL and most of those

6  governmental entity plaintiffs support the injunction so

7  that they can hopefully resolve, on a collective basis that

8  is fair and efficient and reasonable, those claims so that

9  the funds can be put to the best use.  That's entirely

10 consistent with the Bankruptcy Code and the case law

11 supporting preliminary injunctions in this context.

12          Bankruptcy is all about the commons, particularly

13 where there are, as here, hundreds of thousands of claims

14 and, in fact, claims on behalf of the federal government and

15 all of the states, except for the two that were settled

16 prepetition.  There's a fundamental bankruptcy policy, which

17 is also, frankly, common sense that where there are such a

18 multitude of claims, they should be dealt with not by having

19 races to the courthouse and to judgment and enforcement, but

20 rather, in a way that maximizes the recovery and the best

21 use of the recovery for everyone.

22          I will note that what is being enjoined here are

23 all civil claims, claims money.  We're talking about money,

24 not crimes.  Mr. Quinn and his committee, and it continues

25 again in this pleading, seems to conflate the two.  He

Page 46

1    spends most of his pleading talking about a criminal case

2    against a doctor in Queens as if I were enjoining criminal

3    prosecutions; that is simply not true.  And frankly, to

4    suggest otherwise is either a lie or just plain dumb.

5            So we are talking about money, which is a

6    fundamental right that parties have to negotiate over, and

7    the vast multitude of parties in interest in this case

8    recognize that and believe that it is more likely than not

9    that a successful reorganization will be achieved here in

10   this case with a collective solution that involves not only

11   the Debtors' estates' claims for money, but also third-

12   parties claims for money against the covered parties, namely

13   the Sackler families and those related to them.

14           There is a, I believe, legitimate dispute between

15   the non-consenting states and the other parties in interest

16   in this case who, contrary to the non-consenting states,

17   either affirmatively support or do not object to the

18   extension of the injunction; namely, whether the prospect of

19   reaching a confirmable plan of reorganization here that

20   includes an appropriate contribution by the covered parties

21   are furthered or harmed by the continuation of litigation

22   and the commencement of litigation against those parties

23   while the plan is being negotiated.

24           One could take the view, as the non-consenting

25   states have, that that type of litigation would not impair

Page 47

1   the parties' ability to negotiate a plan.  But I think the

2   better view is and I so find that, in fact, when one is

3   focusing on thousands of lawsuits in multiple jurisdictions

4   that could have different results given the different laws

5   involved and the different parties involved and the true

6   complexity of the negotiations that would be taking place at

7   the same time, the better view by far is that those lawsuits

8   should be preliminary enjoined to see if a plan can be

9   reached that is confirmable.

10          Certainly, the prospects for such a plan are

11  better today than they were at the commencement of this

12  case.  We have had I think an unprecedented amount of

13  disclosure, I believe far more than the disclosure that

14  would occur in any individual lawsuit, that has led to a

15  substantial consensus by parties in interest in this case in

16  support of a plan and even consensus by the so-called non-

17  consenting states on material elements of such a plan.

18          Moreover, we have ongoing negotiations as to the

19  claims that a plan, if proposed, would resolve with the

20  consent of the presently non-consenting states, as I've

21  directed and as is being conducted now by my colleague,

22  Bankruptcy Judge Chapman.

23          So it appears to me that the timing here supports

24  clearly continuation of the injunction to let those efforts

25  continue and, hopefully to reach some level of agreement.

Page 48

1    If that has not happened at the end of the day, we'll have

2    to see whether a final injunction in a plan is warranted or

3    not.  That process is simply not a process that's done in

4    the dark or by snapping one's finger.  The Court needs a

5    clear evidentiary record.

6            Believe it or not, Mr. Quinn, that is called a

7    trial under the bankruptcy rules with an opportunity to be

8    heard, to argue, to present witnesses, and to take

9    discovery.  And again, there has been substantial, enormous

10   discovery in this case already that has informed the

11   parties' judgments here as to how the case should go.

12           And a bankruptcy case itself is a global trial;

13   that's why it's called a case with a docket, with rulings.

14   And then within it, there are contested matters, including a

15   confirmation hearing that are governed by the Part 7 rules

16   incorporated in Bankruptcy Rule 9014, which in essence track

17   the Federal Rules of Civil Procedure and any other Rules of

18   Federal Civil Procedure that the Court further incorporates.

19           So I will overrule both of the objections.  I

20   appreciate the restrained nature of the ad hoc committees of

21   non-consenting states objection and also their continued

22   willingness to participate constructively in consensual

23   solutions in this case, or at least trying to achieve

24   consensual solutions in this case and trust they will

25   continue to do so.  After all, they are public servants who

Page 49

1    represent the people in their respective states.

2            They, along with the other parties in interest in

3    this case, have already, as I hope I tried to establish on

4    the very first day of this case I believe is the right

5    approach, accept it that the money here should be used for

6    abatement primarily since abatement not only helps their

7    state's citizens as a whole, but also those who have been

8    individually injured by opioids.

9            And I hope that that principle, if an appropriate

10   amount of money is negotiated, will control here.  But we

11   don't know yet; that's why this is a preliminary injunction,

12   not a final injunction.  But we will see whether that leads

13   to a plan that would lead to a final result or not that

14   maximizes the use of this money and does not -- I repeat

15   does not, since I don't have the power to do so -- resolve

16   any criminal liability, if there is any.  It's just not a

17   topic that has come before me and never will.

18           So Mr. Huebner, your firm can email the order

19   extending the injunction, which I'm sure will track the last

20   order, except with the different dates of course and perhaps

21   additional matters added to the list of proceedings, and

22   it'll be in it.  In the meantime, the injunction will remain

23   in effect pending entry of the order.

24           MR. HUEBNER:   Thank you, Your Honor.  And just to

25   give Mr. Quinn comfort or, frankly, to put to bed I guess an

Page 50

1    aspersion that was cast to be a little bit more precise.

2    The reason we have not yet filed the quite-detailed

3    explanation of the factors considered by the special

4    committee is actually entirely appropriate in our role as

5    plaintiff, which is we don't have a deal yet.  And to

6    explain publicly, you know, a sort of flyby of strengths,

7    weaknesses, considerations, issues, and factors for the

8    world and the plaintiffs to see and the defense to see in

9    its final form, we don't have a deal yet; it's not in the

10   estate's best interest.

11          And to give credit where credit is due, my memory

12   could be wrong, but I actually believe we were going to file

13   it.  It might have been Mr. Price, who I don't think anybody

14   can accuse of being sort of, you know, a magician helping

15   the Sacklers with magic tricks who said to me the (sound

16   glitch) in a nice way of, are you out of your mind; you

17   don't put this out in the public until the deal is done.

18          So there also, maybe it was not intended to sort

19   of be, you know, an aspersion.  But to be clear, in our role

20   as plaintiff with a defendant with whom we have not yet

21   settled, who we have not yet put out for the world to see

22   our explanation of how and why we compromised and what we

23   considered and not filing, that was with everybody's full

24   support.

25          Your Honor, there is one housekeeping matter that

Page 51

1      I need to turn over to Mr. Kaminetzky and the procedure

2      orders that we entered -- that the Court entered that we've

3      handed up and that the Court entered that there's a date

4      technicality that needs to be addressed in light of the fact

5      the disclosure statement order is not being entered today.

6      And so, if I could ask for the Court's indulgence one more

7      very quick matter, I would ask Mr. Kaminetzky to explain

8      what we need.

9                  THE COURT:  That's fine.  And what you're

10     referring to, of course, is that the scheduling order

11     leading up to a confirmation hearing recognized that the

12     dates might shift if the disclosure statement is not

13     approved as of a certain date.

14                 MR. KAMINETZKY:  Good morning, Your Honor.  This

15     is Benjamin Kaminetzky at Davis Polk, counsel for the

16     Debtors.  You're precisely right.  The schedule that -- or

17     the order that Your Honor entered last week at Docket No.

18     2868 says that the order will terminate and cease to have

19     any affect if and only if the disclosure statement order is

20     not approved at the disclosure statement hearing on May

21     20th, 2021, and that's at paragraph 8 of the order.

22                 So we respectfully request, Your Honor, in light

23     of today's developments, that paragraph 8 is amended to say

24     if not approved by May 26th or such other date set by the

25     Court; this way, you know, the order will remain in effect.

1          And we are happy to report, Your Honor, that the

2     document reserve that we described in detail at the last

3     hearing was opened on Saturday morning and parties that have

4     already signed the protective order received an email with

5     their login credentials at the same time.  So the process

6     contemplated by the order that Your Honor entered is already

7     up and running, and so, we just ask for this minor amendment

8     to the order to change the May 20th to May 26th and add the

9     language, "or such other date set by the Court" so we don't

10    have to come back to Your Honor on this issue.

11          THE COURT:  Well, I'm fine with the 26th being in

12    there and the other language, but I want to make it clear, I

13    think this is consistent with the way the order is order;

14    that is if it's moved substantially off of the 26th, as Mr.

15    Huebner suggested it might be, we'll have to change other

16    dates too.

17          MR. KAMINETZKY:  Yes, Your Honor, that's obviously

18    the case.  I mean, as Mr. Huebner said, you know, if we're

19    much past the 26th, we might have to go back to the drawing

20    board with respect to, you know, kind of much larger issues.

21    But if we can make this change for the time being, I think

22    that would be helpful, especially considering that in a

23    sense we've already started to comply with the order.

24          THE COURT:  Okay, that's fine, so you can email

25    that to chambers.

Page 53

1          MR. KAMINETZKY:  Thank you, Your Honor.

2          THE COURT:  Okay.  And I think the last matter on

3   the agenda is in the adversary proceeding, I'll just refer

4   to as the insurance adversary proceeding, Purdue Pharma v.

5   AIG Specialty Insurance, et al.  And it's plaintiffs' motion

6   for entry of an order under Section 107(b) of the Bankruptcy

7   Code, sealing certain exhibits or portions of exhibits that

8   they would like to have sealed in connection with their

9   response to certain of the insurer defendants' motions to

10  dismiss for lack of personal jurisdiction.

11         MR. LEVERIDGE:  Your Honor, this is Richard

12  Leveridge.

13         THE COURT:  Great.  I was going to say I don't

14  know who from the plaintiff side is going to handle this,

15  but you should go ahead at this point.

16         MR. LEVERIDGE:  Thank you, Your Honor.  This is

17  Richard Leveridge from Gilbert LLP.  Can you hear me?

18         THE COURT:  Yes, thanks.

19         MR. LEVERIDGE:  Okay, wonderful.  My firm and I

20  represent the ad hoc committee of governmental and other

21  contingent litigation claimants, but I am going to be

22  speaking on behalf of all the plaintiffs in the adversary,

23  which include the Debtors and the Official Committee of

24  Unsecured Creditors.

25         This, as the Court knows, is an insurance coverage

Page 54

1    adversary proceeding.  The three groups that I've mentioned

2    are coordinating and serving as co-plaintiffs in that action

3    against many insurers.  There are 11 insurers who filed

4    motions to dismiss for lack of personal jurisdiction.  The

5    briefing schedule set by the Court called for their briefs

6    to be filed on April 5th, our opposition on May 3rd, and

7    then they have replies to today.

8            In connection with our opposition and in the

9    initial pretrial conference that the Court held with the

10   parties on March 24th, there was a discussion of the

11   potential need for jurisdictional discovery.  After the

12   briefs were filed in support of the motions, we engaged

13   counsel for the insurers to discuss jurisdictional discovery

14   that we thought was appropriate for purposes of responding

15   to their motions.  That process, as is described in my law

16   partner's Jason Rubenstein's declaration, which is Docket

17   No. 131, involved quite a bit of back and forth.

18           The discovery was narrowed in order to allow the

19   insurers to respond before our briefs were due on May 3rd.

20   It was also conditioned by them on the entry of a

21   confidentiality agreement, which is Exhibit E to Mr.

22   Rubenstein's declaration.  In connection with that

23   confidentiality agreement, our use of material that was

24   provided in the jurisdictional discovery was limited for the

25   purpose of responding to the motions to dismiss.  And if

1    material was designated as confidential, we were required to

2    take appropriate steps to seal or redact such confidential

3    information in submitting any memoranda of law or briefs or

4    other matters.

5              And so, the material that we got from the

6    insurers, which came in, you know, just days before our

7    briefs were due, were designated as confidential.  We

8    honored our obligations under the confidentiality agreement,

9    and that's what led to this motion.  We have designated or

10   redacted the material that the insurers designated as

11   confidential and, for that reason, have submitted this

12   motion.

13             THE COURT:  Okay.

14             MR. LEVERIDGE:  And the material that is at issue

15   is largely commercial related information that was provided

16   in response to our discovery requests.

17             THE COURT:  All right.  Well, I guess it was

18   arguably within the definition of confidential in the

19   confidentiality agreement that you've referred to and is

20   attached as Exhibit E to Mr. Rubenstein's affidavit in

21   support of the motion, which defines confidential documents

22   and information as any non-public business-related document,

23   information or material.

24             But based on my review of the unredacted exhibits,

25   I have a real question as to (a) whether much of this, much

Page 56

1    of the redactions are, in fact, confidential non-public, and

2    (b) even if they are, whether they fall into the definition

3    of confidential commercial information in 107(b) of the

4    Bankruptcy Code, which the courts have construed, in large

5    measure, as being more narrow than commercial information,

6    although that's the -- I'm sorry -- information that

7    pertains to someone's business, and instead construed it

8    largely as information that if disclosed would put the party

9    who has designated it as covered by 107(b), at a competitive

10   disadvantage.

11          And here, it's really not explained, and I

12   understand why you haven't explained it.  Because you're the

13   plaintiff, you don't really know exactly why the moving

14   insurers have designated this information as confidential,

15   so you have to speculate and you've pretty much just

16   speculated in very general terms.

17          But I've looked at it and I'm having a very hard

18   time seeing how any of it is information that isn't public

19   since most of the information either identifies lawsuits

20   that have been filed against the insurers in the United

21   States or arbitrations that they've now sought to have

22   confirmed in a lawsuit; or state that they don't have any

23   information responsive to the documents, which really isn't

24   information; or lastly, is information that, at least unless

25   I hear something to the contrary, doesn't seem to me to be

1    the type of information that would put an insurer at a

2    competitive disadvantage with other insurers.

3              So maybe I should hear from the insurers that have

4    designated this information as confidential before I simply

5    rule and deny the motion.

6              MR. LEVERIDGE:  Your Honor, this is Rick

7    Leveridge.  Certainly, you've captured our situation

8    perfectly.  The material was designated as confidential, and

9    we received it on the eve of having to file our briefs.  We

10   erred on the side of making sure that we didn't violate the

11   confidentiality agreement under which we got the material.

12             I know Mr. Wiener is here.  I would defer to him

13   in terms of the assertion of the confidentiality.

14             THE COURT:  Okay, that's fine.

15             MR. WIENER:  Thank you, Mr. Leveridge.  Can you

16   hear me okay, Your Honor?

17             THE COURT:  Yes, I can.  Can you just state your

18   name and who you're representing again?

19             MR. WIENER:  Yes, Your Honor.  This is Harris

20   Wiener of Clyde & Co.  I'm representing Arch Reinsurance.

21   We are one of the 11 personal jurisdiction insurers

22   mentioned by Mr. Leveridge.

23             And as Your Honor mentioned, and Mr. Leveridge I

24   think accurately captured, it was a back-and-forth

25   discussion that was conducted on an expedited basis and

Page 58

1    pressured by the plaintiffs' knowledge and recitation that

2    their deadline for their opposition to this personal

3    jurisdiction motion was fast approaching.

4            For that reason, the personal jurisdiction

5    insurers, including Arch, my client, did not seek to contest

6    to a large degree the amount or the categories or the

7    relevance of certain information sought by the plaintiffs,

8    but rather all parties -- and I think Mr. Leveridge would

9    agree -- worked towards a timely and efficient way of

10   reaching an agreement on what categories of documents and

11   information would be produced, in what form, and then

12   quickly worked towards a confidentiality agreement that all

13   parties would agree to.  And this back and forth did

14   involve, you know, quite a bit of meet and confers, emails,

15   telephone conferences, and drafting.

16           For that reason, the personal jurisdiction

17   insurers were in a position of having to disclose

18   information very quickly and documents very quickly because

19   they did not want to be in a position of hindering the

20   plaintiffs, obviously with the deadline approaching for

21   their opposition.  And the documents that were produced and

22   the information that was produced was agreed to be produced

23   under the terms of this confidentiality agreement, and that

24   was something the plaintiffs wanted to agree to and were

25   willing to work with from the very beginning.

Page 59

1              With respect to the information and the documents

2    that were produced, it's the position of the personal

3    jurisdiction insurers this is not public information, with

4    the exception of certain lists of cases that I think Your

5    Honor mentioned; obviously knowledge of certain core

6    proceedings and publicly filed dockets would not necessarily

7    fall under that.  And I believe that the plaintiffs did a

8    good job of redacting what is confidential and not redacting

9    or withholding from public view information that is

10   confidential for businesses purposes.

11             Included in some of the information -- and

12   obviously, we're on a public call here -- but is information

13   as to the business operations, the details in the aggregate

14   of contracts written by the personal jurisdiction insurers,

15   and that is some of the information that is confidential and

16   would put the personal jurisdiction insurers in a

17   competitive disadvantage as to areas of --

18             THE COURT:  How would it do so?  That seemed to me

19   to be the only possible type of information that's redacted

20   here that, you know, conceivably could, but I had a hard

21   time seeing how it would, i.e., how much you've underwritten

22   in a, you know, particular country.

23             MR. WIENER:  Yes, Your Honor.  It's a combination

24   of underwritten and policy limits as well; it's both sides

25   of things.  And obviously, when an insurer is both competing

1    with business with other foreign insurers in Bermuda,

2    speaking as counsel to Arch Reinsurance which is a Bermuda

3    insurer, they're in a position often of having to negotiate

4    against parties that would not necessarily have disclosed

5    this information because there are many insurers in Bermuda

6    that are not a party to this proceeding, of course, and

7    therefore, would be able to know some of the aggregate

8    information and some of the financial information that is

9    not public.

10              THE COURT:  But how does that -- but again, how --

11    I still -- if insurer X in Bermuda knows that Arch has

12    underwritten X policies in the United States, how does that

13    affect any negotiation with either a prospective customer or

14    another insurer?

15              MR. WIENER:  The knowledge of the amounts of

16    premiums and the amounts of limits issued, as compared to

17    other potential business or existing business, is relevant,

18    Your Honor, and it does necessarily cast insurers in

19    different lights in terms of their potential size, potential

20    ability to serve clients -- excuse me -- serve insureds and

21    issue policies.  And this is the type -- for that reason,

22    this is the type of information that is not generally

23    considered public information; it is confidential business

24    information.

25              And the personal jurisdiction insurers believe the

Page 61

1    plaintiffs in their motion to seal specified that the

2    sealing order should be issued as justice requires, and it

3    does not require a heightened standard that some other --

4    you know, under some other circumstances would need to be

5    met, such that a party doesn't have to necessarily show good

6    cause; it just has to show that there is a potential

7    confidential business information that doesn't necessarily

8    have to rise to the level of a trade secret.  And for that

9    reason --

10            THE COURT:  You're moving on to a legal argument

11   which I disagree with and you haven't really answered my

12   factual question.  I'm assuming -- maybe I'm wrong -- that

13   someone enters into an insurance contract with an insurer

14   will ask them whether they have experience and also whether

15   they have the resources to actually pay if they have -- you

16   know, if called upon to do so.  And these are regulated

17   businesses, right?

18            MR. WIENER:  Of course, that's true.

19            THE COURT:  So they're also regulating by people

20   who confirm what they have to pay, available to pay.  And I

21   just -- I don't see what underwriting a particular type of

22   insurance for a particular period puts you at a commercial

23   disadvantage, and again, that's the standard.

24            MR. WIENER:  And I apologize.  I was not trying to

25   say, Your Honor, that any of the insurers would be unable to

1    meet their obligations under a contract.  Rather, if a

2    broker in Bermuda -- and obviously, brokers in Bermuda would

3    potentially be aware of this if it were not to be sealed --

4    is aware of the certain amount of premiums or the certain

5    amount of limits issued by certain insurers for certain

6    types of risks, there's a good chance that brokers will --

7    that could hurt an insurer's attempt to either maintain a

8    foothold in a business, break into a business, write new

9    business because it would show their current limits separate

10   and apart from their ability to actually execute the

11   contract.

12          And that's exactly what we're trying to maintain,

13   is that the insurers should be placed in --

14          THE COURT:  How does it show their current limits

15   if you just show the amount that they've underwritten for

16   U.S.-based insureds and for the 2020 fiscal year and the

17   2020 year, the premium from U.S.-based insureds?  How does

18   that -- I don't see how that shows, other than just what

19   they've paid out at that time, you know, not limits on what

20   they can do in the future.

21          MR. WIENER:  Yes.  But by definition, obviously,

22   the past information could be used to project into the

23   future because it is just from last year, as you said, 2020.

24          THE COURT:  But it doesn't even show what they

25   have as an ability to issue in the future.  It just says

Page 63

1    this is what we've done in 2020.

2         MR. WIENER:  Yes.  And our exact point is that an

3    insured should be able to rely upon and take and credit an

4    insurer's statement that they have the ability to issue and

5    an insured's desire to enter into a contract within an

6    insured through a broker in Bermuda without a broker saying

7    to an insured or an insured looking at this non-public

8    information about what type of business this insurer has

9    done in the past and whether this type of insurer is

10   particularly large or small in this market, whether this

11   type of insurer is competitive and issues 10 percent of the

12   limits of the insurers or 100 percent of the limits --

13   excuse me -- of their competitors or 100 percent or 200

14   percent.

15         And it would, in fact, put them in a peered

16   category or show them -- put them at a competitive

17   disadvantage as compared to those other insurers who did not

18   have to disclose this information and for whom this

19   information is not public.

20         THE COURT:  Okay.  Well, of course, I don't have

21   any evidence on any of that.  But I think I've heard enough,

22   unless someone else wants to speak for their client who's an

23   insurer.

24         MR. WIENER:  I would only ask one other thing,

25   Your Honor, if I could just have the Court's indulgence, is

Page 64

1    that because the insurers, the personal jurisdiction

2    insurers do not oppose this motion to seal, there was no

3    opposition or no supplemental material put in.  If Your

4    Honor is not inclined to grant the motion to seal at this

5    hearing, we would ask that the personal jurisdiction

6    insurers be permitted to submit supplemental briefing in

7    order to present their position in support of the motion to

8    seal.

9               THE COURT:  When is the hearing on the motion to

10   dismiss?

11              MR. HUEBNER:  June 21st, Your Honor.

12              MR. WIENER:  June 21st, yes, Your Honor.

13              THE COURT:  I'm sorry, June 21st?

14              MR. WIENER:  Yes, Your Honor.

15              THE COURT:  All right.  I guess I don't have a

16   problem with that, although I do have a problem.  I don't

17   think I need briefing; what I need is evidence.

18              I can tell you though that with the exception of

19   the paragraphs in some of the exhibits that refer to either

20   premium generated or limits of policies issued, I don't see

21   anything that even remotely comes into play under 107(b).

22   The references are to litigations or statements that there

23   are no documents that are responsive to the request, and

24   that's just not going to cut it.

25              So I think the parties should focus on the point

Page 65

1  that you and I have been going over for the last few minutes

2  as a factual matter as to how that might put an insurer at a

3  competitive disadvantage.  And, of course, if there's

4  something else like that in the materials and I just missed

5  it, you can certainly bring that up.  But other than that, I

6  just don't see a basis with regard to the other redactions

7  for granting this motion under any circumstances.

8           So it's June 21st, you say, so you can respond by

9  June 14th.  And what we'll really be focusing on is, you

10  know, this will be an exhibit at the trial and what can be

11  discussed at the trial, so I'll give you my ruling before

12  the -- at the trial, well, it is a trial.

13           MR. CALHOUN:  Your Honor, may I be heard briefly?

14  This is George Calhoun for Allied World.

15           THE COURT:  Okay.

16           MR. CALHOUN:  I just wanted to make two quick

17  points in response to your questions, and I appreciate the

18  opportunity.  For our client, the only things that we

19  designated as confidential were the premium and limit

20  information.  We didn't designate any cases or anything like

21  that as confidential.  I think the -- on that point, if

22  anyone else has something that says they can, but that

23  information is confidential, and it does impact our

24  business.

25           Brokers with access to that information could know

Page 66

1    that someone might be anxious to get more business in an

2    area because their premium is lower or that they already

3    have a lot and that might be closer to their underwriting

4    limits.  So, I mean, it's a piece of a puzzle, but it's an

5    important piece and it very much could impact the

6    businesses, so I ask you to take that into account.

7            The other thing I wanted to add, and I think you

8    were kind of getting there when you were talking about the

9    hearing date, is that the arbitration insurers are a little

10   bit of a -- excuse me -- personal jurisdiction insurers are

11   in a little bit of a bind here in that one of the issues

12   that we had was, and because we maintain that the personal

13   jurisdiction -- what we're calling the personal jurisdiction

14   insurers are not subject to the Court's jurisdiction.

15           That, you know, we couldn't come in and file a

16   motion to seal these materials ourselves because we maintain

17   that we're not subject to the Court's jurisdiction and the

18   confidentiality agreement that we negotiation at great

19   length with the plaintiffs and we appreciate their efforts

20   on that, preserve the disputes about whether something is

21   confidential for essentially a third party to resolve until

22   this Court's made its decision on whether it has personal

23   jurisdiction or if it moves them to arbitration and it might

24   never need to make that decision.

25           And I would suggest just as a practical matter, it

Page 67

1    makes sense to carry this, you know, accept the materials

2    under seal for the 30 days until the Court has an

3    opportunity to hear the personal jurisdiction issues.  And

4    if it concludes that it has personal jurisdiction, it can

5    then dispose of it in the ordinary course or not; but rather

6    than making that ruling now, waiting until you've decided

7    the personal jurisdiction issues that might eliminate some

8    of the trickier aspects of this.

9            THE COURT:  Okay.  Well, why don't you discuss

10   that with your allies, your allied counsel, as well as with

11   the plaintiffs' counsel; that may be a reasonable solution

12   here.

13           MR. WIENER:  Your Honor, speaking for the

14   plaintiffs, we'll be happy to do that.  As long as you can

15   read the material, that's what's important to us for

16   purposes of the hearing on June 21st.

17           THE COURT:  I have to say as an aside, I think as

18   far as the public interest in this information is concerned,

19   how much a particular insurer has underwritten with a

20   particular type of insurance in a U.S. market is, you know,

21   maybe the type of thing that "Insurance News" might want to

22   public, but other than that, I can't imagine (sound drops)

23   particular interesting, so that may be a reasonable solution

24   here.

25           Okay.  But I'll give you that date anyway if you

Page 68

1    can't reach an agreement on that and you want to have a

2    ruling before the hearing on the motions to dismiss, which

3    again is June 14th.

4              MR. WIENER:  Thank you, Your Honor.

5              MR. CALHOUN:  Thank you, Your Honor.

6              THE COURT:  Okay.  If you want to resolve it,

7    just, you know, file a letter on the docket saying that the

8    parties all agree to defer this issue until the Court's

9    ruling on the motion to dismiss.

10             MR. WIENER:  Thank you, Your Honor.

11             THE COURT:  Okay, very well.  All right.  I think

12   that concludes this morning's agenda, and hearing no one

13   else to the contrary, I will ring off at this point.  Thanks

14   everyone.

15             (Whereupon these proceedings were concluded at

16   11:44 AM)

17

18

19

20

21

22

23

24

25

```
 1                          I N D E X

 2

 3                           RULINGS

 4                                        Page      Line

 5   Interim Fee Application of Prime Clerk LLC

 6   Granted                              26        24

 7   Motion to Approve Compromise Motion of U.S.

 8   Trustee Granted                      30        14

 9   Motion to File Proof of Claim After Claims

10   Bar Granted                          34        23

11   Motion to Allow Claims /Motion Tolling Filing

12   Deadline Granted                     34        23

13   Motion to Allow Claims / Motion for Tolling

14   Filing Deadline Granted              34        23

15   Motion to File Proof of Claim After Claims

16   Bar Date /Motion to Request Extension for

17   Filling Proof of Claim Granted       34        23

18   Motion to Allow Claims /Motion for Tolling

19   Filing Deadline Granted              34        23

20   Motion to File Proof of Claim After Claims

21   Bar Date Granted                     34        23

22   Motion to File Proof of Claim After Claims

23   Bar Date Granted                     34        23

24   Motion to File Proof of Claim After Claims

25   Bar Date Granted                     34        23
```

Page 70

1                         C E R T I F I C A T I O N

2

3        I, Sonya Ledanski Hyde, certified that the foregoing

4    transcript is a true and accurate record of the proceedings.

5

6

7

8    Sonya Ledanski Hyde

9

10

11

12

13

14

15

16

17

18

19

20    Veritext Legal Solutions

21    330 Old Country Road

22    Suite 300

23    Mineola, NY 11501

24

25    Date:  May 24, 2021