Jonathan C. Lipson
Temple University-Beasley School of Law
1719 North Broad Street
Philadelphia, PA 19122
*Counsel to Peter W. Jackson*

## UNITED STATES BANKRUPTCY COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| In re: | Chapter 11 |
| PURDUE PHARMA L.P., *et al.* [1] | Case No.  19-23649 (RDD) |
| Debtors. | (Jointly Administered) |

## NOTICE OF MOTION FOR ORDER TO APPOINT EXAMINER
## PURSUANT TO 11 U.S.C. § 1104(c)

PLEASE TAKE NOTICE that Peter W. Jackson, a creditor and party in interest ("**Movant**"), by and through its undersigned counsel, filed a motion (the "**Motion**") for entry of an order, pursuant to section 1104(c) of title 11 of the United States Code (the "**Bankruptcy Code**"), for the appointment of an examiner in the above captioned cases.

PLEASE TAKE FURTHER NOTICE that a hearing on the Motion will be held before the Honorable Robert D. Drain at the United States Bankruptcy Court for the Southern District

---

[1] The debtors in these chapter 11 cases ("**Debtors**" or "**Purdue**"), along with the last four digits of each Debtor's registration number in the applicable jurisdiction, are as follows: Purdue Pharma L.P. ("**PPLP**") (7484), Purdue Pharma Inc. (7486), Purdue Transdermal Technologies L.P. (1868), Purdue Pharma Manufacturing L.P. (3821), Purdue Pharmaceuticals L.P. (0034), Imbrium Therapeutics L.P. (8810), Adlon Therapeutics L.P. (6745), Greenfield BioVentures L.P. (6150), Seven Seas Hill Corp. (4591), Ophir Green Corp. (4594), Purdue Pharma of Puerto Rico (3925), Avrio Health L.P. (4140), Purdue Pharmaceutical Products L.P. (3902), Purdue Neuroscience Company (4712), Nayatt Cove Lifescience Inc. (7805), Button Land L.P. (7502), Rhodes Associates L.P. (N/A), Paul Land Inc. (7425), Quidnick Land L.P. (7584), Rhodes Pharmaceuticals L.P. (6166), Rhodes Technologies (7143), UDF LP (0495), SVC Pharma LP (5717) and SVC Pharma Inc. (4014) (collectively, the "**Bankruptcy Cases**").

of New York, White Plains Division, 300 Quarropas Street White Plains, New York 10601 (the "Bankruptcy Court"), on June 16, 2021 at 10:00 a.m. (prevailing Eastern Time) or as soon thereafter as counsel may be heard (the "**Hearing**").

PLEASE TAKE FURTHER NOTICE that objections, if any, to the Motion must comply with the Federal Rules of Bankruptcy Procedure and the Local Bankruptcy Rules for the Southern District of New York.  Objections, if any, to the Motion must be filed with the Court no later than June 13, 2021 at 4:00 p.m. (prevailing Eastern Time) (the "**Objection Deadline**") and served so as to be actually received by such time by (i) counsel to the Movant, Jonathan C. Lipson, Temple University-Beasley School of Law, 1719 North Broad Street, Philadelphia, PA 19122 (jlipson@temple.edu); and Karen F. Neuwirth, Martin S. Rapaport, P.C., 18 East 48th Street 6th Floor, New York, N.Y. 10017 (manhatoffice@yahoo.com); and (ii) all parties on the Master Service List, as defined in the Case Management Order [ECF No. 498], which may be found https://restructuring.primeclerk.com/purduepharma/Home-Index.

PLEASE TAKE FURTHER NOTICE that that if no objections to the Motion are timely filed, served and received in accordance with this notice and the Case Management Order, the Court may grant the relief requested in the Motion without further notice or hearing.

Dated: June 1, 2021                    Respectfully Submitted,
        Philadelphia, PA

                            By:    /s/ Jonathan C. Lipson
                                   Jonathan C. Lipson
                                   Temple University-Beasley School of Law
                                   1719 North Broad St.
                                   Philadelphia, PA 19122
                                   215-204-0608
                                   jlipson@temple.edu
                                   *Counsel to Peter W. Jackson*

                                    /s/ Karen F. Neuwirth
                                   Karen F. Neuwirth
                                   Martin S. Rapaport, P.C.
                                   18 East 48th Street
                                   6th Floor
                                   New York, N.Y. 10017
                                   (212) 688-1980
                                   manhatoffice@yahoo.com
                                   *Co-counsel to Peter W. Jackson*

Jonathan C. Lipson
Temple University-Beasley School of Law
1719 North Broad Street
Philadelphia, PA 19122
Counsel to Peter W. Jackson

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| In re: | Chapter 11 |
| PURDUE PHARMA L.P., et al. [2] | Case No.  19-23649 (RDD) |
| Debtors. | (Jointly Administered) |

## MOTION FOR ORDER TO APPOINT EXAMINER
## PURSUANT TO 11 U.S.C. § 1104(c)

---

[2] The debtors in these chapter 11 cases ("**Debtors**" or "**Purdue**"), along with the last four digits of each Debtor's registration number in the applicable jurisdiction, are as follows: Purdue Pharma L.P. ("**PPLP**") (7484), Purdue Pharma Inc. (7486), Purdue Transdermal Technologies L.P. (1868), Purdue Pharma Manufacturing L.P. (3821), Purdue Pharmaceuticals L.P. (0034), Imbrium Therapeutics L.P. (8810), Adlon Therapeutics L.P. (6745), Greenfield BioVentures L.P. (6150), Seven Seas Hill Corp. (4591), Ophir Green Corp. (4594), Purdue Pharma of Puerto Rico (3925), Avrio Health L.P. (4140), Purdue Pharmaceutical Products L.P. (3902), Purdue Neuroscience Company (4712), Nayatt Cove Lifescience Inc. (7805), Button Land L.P. (7502), Rhodes Associates L.P. (N/A), Paul Land Inc. (7425), Quidnick Land L.P. (7584), Rhodes Pharmaceuticals L.P. (6166), Rhodes Technologies (7143), UDF LP (0495), SVC Pharma LP (5717) and SVC Pharma Inc. (4014) (collectively, the "**Bankruptcy Cases**").

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ....................................................................................................

INTRODUCTION ..................................................................................................... 1

PRELIMINARY STATEMENT ................................................................... 1

JURISDICTION ................................................................................... 5

RELIEF REQUESTED......................................................................... 6

FACTUAL BACKGROUND ................................................................. 6

    A.   The Term Sheet, Preliminary Injunction, DOJ Settlements, and Plan............................ 6
        1.   The Term Sheet............................................................................. 6
        2.   The Preliminary Injunction ....................................................... 6
        3.   The DOJ Settlements ................................................................. 7
        4.   The Plan, the Disclosure Statement, and the Releases..................................... 9

    B.   Questions about the Shareholder Settlement ....................................... 10
        1.   The Independence of the Special Committee ....................................... 11
        2.   Conflicting Statements about the Sacklers' Alleged Control of the Debtors .............. 17
        3.   The Lopsided DOJ Settlement Agreement ....................................... 19
        4.   The Limits of Other Checks--Forum Shopping ....................................... 21

ARGUMENT AND BASIS FOR RELIEF........................................................ 24

    A.   An Examiner is Required by Statute and Necessary to Determine Whether the Decision
    to Settle was Made Independently and at Arm's Length................................... 24
        1.   Section 1104(c) is Not Optional ....................................................... 26
        2.   The Appointment of Examiner for the Limited Purposes Proposed is in the Interests of
    the Estates and the Public Interest ....................................................... 27

    B.   A Supervisory Examination—The Cenveo Example ....................................... 29

NOTICE ......................................................................................... 33

CONCLUSION................................................................................... 34

PROPOSED ORDER........................................................................... 1

# TABLE OF AUTHORITIES

## CASES

*Auerbach v. Bennett*,
   393 N.E.2d 994 (N.Y. 1979) ............................................................................. 16

*In re 1243 20th Street, Inc.*,
   6 B.R. 683 (Bankr. D.D.C. 1980) ..................................................................... 26

*In re Calpine Corp.*,
   No. 05-60200 (BRL) (Bankr. S.D.N.Y. 2005) .................................................. 27

*In re Cenveo, Inc.*,
   Case No. 18-22178-rdd, (Bankr. S.D.N.Y. Mar. 15, 2018), ECF No. 203 ................ 2, 4, 29, 30

*In re Dewey & LeBoeuf LLP*,
   478 B.R. 627 (Bankr. S.D.N.Y. 2012) .............................................................. 27

*In re Enron Corp.*,
   No. 01-16034 (Bankr. S.D.N.Y. Dec. 2, 2001) ................................................. 25

*In re Iridium Operating LLC*,
   478 F.3d 452 (2d Cir. 2007) ........................................................................ passim

*In re Lehman Brothers Holdings, Inc.*,
   No. 08-13555 (Bankr. S.D.N.Y. Sept. 15, 2008) .............................................. 25

*In re Lenihan*,
   4 B.R. 209 (Bankr. D.R.I. 1980) ...................................................................... 26

*In re Loral Space & Commc'ns, Ltd.*,
   No. 04-CIV-8645RPP, 2004 WL 2979785, at *4 (S.D.N.Y. Dec. 23, 2004) ..................... 26. 29

*In re Lyondell Chemical Co.*,
   No. 09-10023 (REG) (Bankr. S.D.N.Y. Oct. 26, 2009) ..................................... 25

*In re Mechem Financial of Ohio, Inc.*,
   92 B.R. 760 (Bankr. N.D. Ohio 1988) .............................................................. 26

*In re Metromedia, Inc.*,
   416 F.3d 136 (2d Circ. 2005) .................................................................... 10, 24

*In re Mirant Corp.*,
   No. 03-46591 (Bankr. N.D. Tex. July 14, 2003). .............................................. 25

*In re New Century TRS Holdings, Inc.*,
  No. 07-10416 (Bankr. D. Del. April 2, 2007) ........................................................................ 25

*In re Purdue Pharm. L.P.*,
  619 B.R. 38 (S.D.N.Y. 2020) ................................................................................................ 19

*In re Revco D.S., Inc.*,
  898 F.2d 498 (6th Cir. 1990) ................................................................................................ 26

*In re The Bible Speaks*,
  74 B.R. 511 (Bankr. D. Mass. 1987) ..................................................................................... 26

*In re UAL Corp.*,
  307 B.R. 80 (Bankr. N.D. Ill. 2004) ...................................................................................... 26

*In re Washington Mutual, Inc.*,
  No. 08-12229 (Bankr. D. Del. Nov. 1, 2008). ....................................................................... 25

*In re Worldcom*,
  No. 02-13533 (Bankr. S.D.N.Y. July 21, 2002) .................................................................... 25

*Protective Comm. for Indep. Stockholders of TMT Trailer Ferry, Inc. v. Anderson*,
  390 U.S. 414 (1968) ........................................................................................................ passim

*Purdue Pharma, L.P. v. Commw of Mass.*,
  Adv. Pro. No. 19-08289 (Bankr. S.D.N.Y Oct. 11, 2019) [ECF No. 82] .................................. 7

*Zapata Corp. v. Maldonado*,
  430 A.2d 779 (Del. 1981) ...................................................................................................... 17

## STATUTES

11 U.S.C. § 330 ....................................................................................................................... 37
11 U.S.C. § 105 ......................................................................................................................... 8
11 U.S.C. § 105(a) ..................................................................................................................... 7
11 U.S.C. § 1104(c) ............................................................................................................ passim
11 U.S.C. § 1104(c)(2) .......................................................................................................... 4, 26
11 U.S.C. §§ 1107(a) and 1108 ................................................................................................. 5
11 U.S.C. § 1109(b) ................................................................................................................. 38
28 U.S.C. § 1408 ..................................................................................................................... 22
28 U.S.C. § 157(b) ................................................................................................................... 35
28 U.S.C. § 157(b)(2) ................................................................................................................ 5
28 U.S.C. §§ 157 and 1334 ........................................................................................................ 5
28 U.S.C. §§ 157(a)- (b) and 1334(b) ...................................................................................... 35
U.S. Const., art. III ................................................................................................................. 35

**OTHER AUTHORITIES**

124 CONG. REC. S17, 403-34 (daily ed. Oct. 6, 1978)................................................... 25
7 COLLIER ON BANKRUPTCY ............................................................................. 25-27
Adam J. Levitin, *Purdue's Poison Pill:  The Breakdown of Chapter 11's Checks and Balances,*
    110 TEX. L. REV. __ (forthcoming 2021).......................................................... 17, 23
Steve Miller, *The Turnaround Kid* (2008) ................................................................ 17

**RULES**

Fed. R. Bankr. P. 1015(b) ................................................................................... 5
Fed. R. Bankr. P. 9019 ....................................................................................... 8
Fed. R. Evid. 502(d)......................................................................................... 38
R. 1073-1(a) .................................................................................................. 22

## INTRODUCTION

Peter W. Jackson, a creditor and party in interest (the "**Movant**"), by and through his undersigned counsel, hereby submits this Motion ("**Motion**") to appoint an examiner pursuant to 11 U.S.C. § 1104(c) in the above-captioned cases for the limited purposes set forth in the form of Proposed Order attached as Exhibit A to this Motion (the "**Proposed Order**").  In support of this Motion, Mr. Jackson respectfully represents as follows:

## PRELIMINARY STATEMENT

These cases have been overshadowed by a single, critical question: who is responsible for the Debtors' confessed crimes and the harm they caused?  While Purdue Pharma, L.P. ("**PPLP**" or "**Purdue**") has agreed to plead guilty to three federal felonies deriving from its marketing, labeling and sale of prescription opioids, no individual has been charged criminally.  All civil suits arising from the Debtors' misconduct—including roughly 600 directly against the Debtors' ultimate beneficial owners, the Sackler families—have been enjoined by this Court.  There have been strong allegations that certain members of the Sackler families bear this responsibility (the "**Sackler Allegations**"), and equally strong denials from them.  While the case has involved massive—perhaps a record amount of—discovery, it has been contained among and analyzed by a small group of case insiders.

Rather than answer this question through litigation, the board of directors of Purdue Pharma, Inc., a New York corporation and PPLP's general partner ("**PPI**" and the "**PPI Board**"), elected to adopt the "Settlement Framework," as defined in the Debtors' proposed plan of reorganization (the "**Plan**").[3]  While there may have been good reason to implement the Settlement

---

[3] Unless otherwise indicated, this Motion relies on and references the Fourth Amended Joint Chapter 11 Plan of Reorganization of Purdue Pharma L.P. and Its Affiliated Debtors [ECF No. 2936] (the "**Plan**") and the Disclosure Statement for Fourth Amended Joint Chapter 11 Plan of Reorganization of Purdue Pharma L.P. and Its Affiliated

Framework, there must first be a determination that the decision to settle, rather than to sue, was made independently, in good faith, and at arm's length, as required by applicable case law.

A review of the Disclosure Statement and other pleadings and materials in these Bankruptcy Cases indicates that there may be reason for concern. Among other things, it appears that--

- The Settlement Framework may have been established while the Debtors were still under the control of the Sackler Families;

- The Sackler Families retained the power to influence the PPI Board even after commencement of these cases;

- The Disclosure Statement omits critical statements about the Sackler Families' historic control of, and entanglement with, the Debtors;

- Despite the Sackler Families' alleged control, the settlement with the United States Department of Justice ("**DOJ**") places the great bulk of the cost of the Debtors' criminal misconduct on the Debtors; and

- Other checks in the system (e.g., the Creditors' Committee) have been constrained by stipulations and customs in practice that favor settlement over litigation.

These and similar concerns are red flags calling for scrutiny of the decision to settle the

---

Debtors [ECF No. 2937] (the "**Disclosure Statement**"). Movant recognizes that the Debtors and various parties are at work on a subsequent revision to the Plan and Disclosure Statement. For the reasons discussed herein, it is highly unlikely that a revised Disclosure Statement would address the concerns noted in this Motion. At the same time, the Second Amended Order Establishing Certain Notice, Case Management, and Administrative Procedures [ECF No. 498] in these cases requires the Motion to be filed and served fifteen (15) calendar days before the next Omnibus Hearing, which is currently scheduled for June 16, 2021. The Movant reserves the right to amend this Motion in the event subsequent changes to the Plan or Disclosure Statement materially affect the request for relief in this Motion. Capitalized terms used without definition in this Motion have the meanings ascribed to such terms in the Plan and Disclosure Statement.[4] *See* Order Appointing an Examiner Pursuant to 11 U.S.C. 1104(c)(2), *In re Cenveo, Inc.*, Case No. 18-22178-rdd, (Bankr. S.D.N.Y. Mar. 15, 2018), ECF No. 203 [hereinafter "**Cenveo Examiner Order**"].

Sackler Allegations pursuant to the Shareholder Settlement described in the Disclosure Statement. If the Shareholder Settlement was a fait accompli from the outset, creditors and the public should know that.

Ordinarily, these concerns would be addressed by way of objection to a motion to approve the Shareholder Settlement or to confirm the Plan. Given the voluminous record in this case, and concerns about maintaining confidentiality and attorney-client privilege, however, it is highly unlikely that these concerns will be addressed credibly and publicly in connection with any such motion. While procedures to confirm the Plan create a "Document Reserve," those materials are available only to those who agree to keep what they see confidential.

Given the unique and undisputed public interest in this case, and the power that the Sackler Families and their Related Entities may have wielded over the PPI Board, there must be an independent assessment of, and public report on, the decision to accept and implement the Settlement Framework as to the Sackler Allegations.

Congress created a mechanism to do this: a chapter 11 examiner. Section 1104(c) of the United States Bankruptcy Code provides that a bankruptcy court "shall" order the appointment of an examiner "to conduct such an investigation of the debtor as is appropriate, including an investigation of any allegations of fraud, dishonesty, incompetence, misconduct, mismanagement, or irregularity in the management of the affairs of the debtor of or by current or former management of the debtor, if": (1) "such appointment is in the interests of creditors, any equity security holders, and other interests of the estate"; or (2) "the debtor's fixed, liquidated, unsecured debts, other than debts for goods, services, or taxes," exceed $5 million. 11 U.S.C. § 1104(c).

The statutory criteria are inarguably satisfied in these cases. No plan has yet been confirmed, and the Debtors' November 2020 settlement with the DOJ created a qualifying

unsecured claim in excess of $2 billion. No one questions the public interest in these cases or the need for assurance that settlement with the Sacklers, rather than litigation, is in fact in the interests of creditors, the Debtors' estates, and the public. The plain language of the Bankruptcy Code and sound policy reasons require the appointment of an examiner in these cases.

At the same time, the Movant recognizes that this case has had the benefit of extraordinary expertise, including the participation of leading mediators and a corporate monitor. Unfortunately, while these mechanisms may be laudable, they appear to focus on the Debtors' present and future (and, in the case of mediation, to have occurred largely in secret). Questions about the decision to settle the Sackler Allegations involve the Debtors' *past*. While the Plan would create a "Document Repository" with the Debtors' historical documents, it may not contain those relevant to the Shareholder Settlement and Sackler Allegations. In any case, it will be accessible only *after* the Plan is confirmed—with the Shareholder Releases permanently shielding the Sackler Families from further scrutiny or potential liability arising from the Sackler Allegations.

The Movant recognizes that appointing an examiner at this stage of these cases may be disruptive, would add cost, and may delay resolution. The Bankruptcy Code requires an examiner "to conduct such an investigation of the debtor as is appropriate," (*id.*)—not for any and every purpose.

For these reasons, Movant seeks the appointment of a "supervisory" examiner, adapted from the examination recently ordered by this Court in *In re Cenveo*.[4] As set forth in the form of Proposed Order, the Movant seeks appointment of an examiner for the limited purpose of examining and reporting on whether the decision by the PPI Board to implement the Settlement

---

[4] *See* Order Appointing an Examiner Pursuant to 11 U.S.C. 1104(c)(2), *In re Cenveo, Inc.*, Case No. 18-22178-rdd, (Bankr. S.D.N.Y. Mar. 15, 2018), ECF No. 203 [hereinafter "**Cenveo Examiner Order**"].

Framework as to the Sackler Allegations, including the Shareholder Releases to be provided in the Plan, was made independently, in good faith, and at arm's length, as required by applicable case law.

In further support of this Motion, the Movant respectfully represents as follows:

## JURISDICTION

1.    On September 15, 2019 (the "**Petition Date**"), the Debtors each commenced a voluntary case under chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court for the Southern District of New York (the "Court").  The Debtors are authorized to operate their businesses and manage their properties as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

2.    The Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334 and the Amended Standing Order of Reference M-431, dated January 31, 2012 (Preska, C.J.). This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2).

3.    These cases are being jointly administered pursuant to Bankruptcy Rule 1015(b) and the Order Directing Joint Administration of Chapter 11 Cases [ECF No. 59] entered by the Court in each of these cases.

4.    On September 27, 2019, the United States Trustee for the Southern District of New York appointed the official committee of unsecured creditors (the "Creditors' Committee" or "UCC").  No trustee or examiner has been appointed in these Cases.

5.    As set forth in the Affidavit of Peter W. Jackson in Support of Motion for Order to Appoint an Examiner Pursuant to 11 U.S.C. § 1104(c) (the "**Jackson Affidavit**"), attached as Exhibit B, the Movant is a creditor and party in interest by virtue of the fact that in August, 2006,

his daughter, Emily Ruth Jackson, passed away due to respiratory depression after ingesting a single OxyContin pill.  He timely filed a proof of claim in these cases.

## RELIEF REQUESTED

6.     The Movant seeks entry of an order, in the form attached hereto as Exhibit A, (i) appointing an examiner in these chapter 11 cases pursuant to Bankruptcy Code section 1104(c) and (ii) granting related relief.

## FACTUAL BACKGROUND

### A.     The Term Sheet, Preliminary Injunction, DOJ Settlements, and Plan

7.     These cases have been punctuated by four events:[5] (i) the filing of a term sheet describing the Settlement Framework; (ii) the entry and continuation of a preliminary injunction halting litigation against the Sackler Families; (iii), the settlements with the DOJ; and (iv) the promulgation of the Plan and Disclosure Statement.  Each creates questions about the extent to which the PPI Board, and its "**Special Committee**", would have had the capacity to assess the Settlement Framework independently or to challenge it, if appropriate.

### 1.     The Term Sheet

8.     According to the Disclosure Statement, "[s]hortly before the Petition Date, the Debtors, the Sackler Families, and the Ad Hoc Committee [of certain consenting creditors] reached an agreement in principle regarding the Settlement Framework." Disclosure Statement, at 65.  It appears that this Settlement Framework was reflected in an unsigned, and undated "Summary

---

[5] These are not the "four gates" identified in the Disclosure Statement.  Disclosure Statement, at 65-66.

Term Sheet" ("Term Sheet") filed by the Debtors October 8, 2018. *See* Notice of Filing of Term Sheet with Ad Hoc Committee, [ECF No. 257].

9.      The Term Sheet and Settlement Framework essentially provided that the Sackler Families would cede ownership and control of the Debtors to or for the benefit of creditors, and contribute an additional sum (at the time $3 billion) "[i]n exchange for comprehensive releases in the form and manner to be agreed upon by the parties," (*id*., ¶¶ 5-6) which now appear to take the form of the "Shareholder Releases" proposed in the Plan.

**2.      The Preliminary Injunction**

10.      Shortly after the Petition Date, the Bankruptcy Court granted a preliminary injunction enjoining public and private entities from the commencement or continuation of active judicial, administrative, or other actions or proceedings "arising from or in any way relating to the Debtors' prescription opioid business" ("**Preliminary Injunction**").  *See* Order Pursuant to 11 U.S.C. § 105(a) Granting, in Part, Motion for a Preliminary Injunction, *Purdue Pharma, L.P. v. Commw of Mass.,* Adv. Pro. No. 19-08289 (Bankr. S.D.N.Y Oct. 11, 2019) [ECF No. 82].[6] Among other things, the Preliminary Injunction halted about 600 lawsuits asserting direct personal injury and/or wrongful death claims against members of the Sackler family, and which represent at least certain aspects of the civil claims constituting the Sackler Allegations.[7]

**3.      The DOJ Settlements**

11.      On October 21, 2020, the Debtors filed a motion seeking approval to enter into a settlement with the United States. *See* Motion of Debtors Pursuant to 11 U.S.C. § 105 and Fed. R.

---

[6] The preliminary injunction has been extended repeatedly.  *See* Eighteenth Amended Order Pursuant to 11 U.S.C. § 105(a) Granting Motion for a Preliminary Injunction, [ECF No. 2897].

[7] The Disclosure Statement states that such "claims include, but are not limited to, product liability, wrongful death, negligence, including negligent misrepresentation, negligence per se and gross negligence, fraud, fraudulent concealment, deceit and other willful misconduct, unjust enrichment, public nuisance, and claims under state consumer protection and controlled substances laws."  Disclosure Statement, at 162.

Bankr. P. 9019 Authorizing and Approving Settlements Between the Debtors and the United States [ECF No. 1828].  On November 18, 2020, the Court approved PPLP entering into: (i) a plea agreement (the "**Plea Agreement**") by and among PPLP and the United States; and (ii) a civil settlement agreement by and between PPLP and the United States. *See* Order Pursuant to 11 U.S.C. § 105 and Fed. R. Bankr. P. 9019 Authorizing and Approving Settlements Between the Debtors and the United States [ECF No. 2004].

12.     On November 24, 2020, PPLP pleaded guilty to an information charging it with three felony offenses: one count charging a dual-object conspiracy to defraud the United States and to violate the Food, Drug, and Cosmetic Act, and two counts charging conspiracy to violate the Federal Anti-Kickback Statute.  Disclosure Statement, at 124.

13.     If the Plea Agreement is accepted by the United States District Court for the District of New Jersey, the Purdue-DOJ settlement will, according to the Disclosure Statement, "fully resolve the United States' civil and criminal investigations into the Debtors' past practices related to the production, sale, marketing and distribution of opioid products."  Disclosure Statement, at 18.  Among other things, the DOJ settlement gives the United States "an allowed, unsubordinated, undisputed, noncontingent, liquidated unsecured claim against Purdue Pharma in the amount of $2.8 billion arising from the Department of Justice's civil investigation" and a total claim of about $8 billion for other elements of the settlement.  Disclosure Statement, at 124.

14.     At the same time, the Sacklers entered into a settlement of their civil liability with the DOJ.  In exchange for the Sackler Families' payment of $225 million, the DOJ agreed to "release the Named Sacklers . . . from any and all civil or administrative monetary claims."  *See* Motion to Confirm That Payment by the Sackler Families Under Settlement with the United States

Department of Justice Is Not Prohibited by This Court [ECF No. 1833], Ex. A, ¶ 4 (unpaginated original) ("**Sackler Settlement Motion**").

15.    The DOJ did not at that time release claims against the Sacklers for criminal liability.  *See* Sackler Settlement Motion, Ex. A, Addendum A ("**Sackler Addendum**"), ¶ 8.a. According to the DOJ, however, from 2010 to 2018 certain members of the Sackler Families "knowingly caused the submission of false and fraudulent claims to federal health care benefit programs for Purdue's opioid drugs that were prescribed for uses that were unsafe, ineffective, and medically unnecessary, and that were often diverted for uses that lacked a legitimate medical purpose."  Sackler Addendum at 2, ¶ 5.  Although they "knew that the legitimate market for Purdue's opioids had contracted, the Named Sacklers nevertheless requested that Purdue executives recapture lost sales and increase Purdue's share of the opioid market."  *Id.* at 1, ¶ 3. These and similar statements in the DOJ settlements represent at least some aspects of the criminal claims constituting the Sackler Allegations.

### 4.    The Plan, the Disclosure Statement, and the Releases

16.    On March 15, 2021, the Debtors filed the Plan and Disclosure Statement with the Court.  According to the Disclosure Statement, the Plan—and the Shareholder Settlement and Releases—are part of a "global resolution" of claims against the Debtors and the Sackler Families. Disclosure Statement, at 3.

17.    As expected, the Plan apparently contains broad releases and channeling injunctions for the benefit of the Sackler Families, their Related Parties, and other nondebtors.  It also contains certain improvements over the Term Sheet, including that the Sackler Families would increase their cash contribution from $3 billion to about $4.2 billion payable over nine or ten years

(depending on how quickly payments are made). The Plan also apparently resolves significant intercreditor disputes.

18.    While the Plan would create a "Public Document Repository," it would exclude "any documents or content of documents that are Privileged, including Privileged documents produced to the DOJ under non-waiver agreements and Privileged documents subject to a clawback by Debtors in the Purdue Legal Matters, or documents that are subject to protections against public disclosure by the Health Insurance Portability and Accountability Act or similar state or federal statute, or reveal the names or email addresses of individual employees or former employees of Debtors." Disclosure Statement, at 127. Moreover, it would not be created until *after* the Plan has been confirmed, and the Sacklers presumably released.

### B.    Questions about the Shareholder Settlement

19.    The Disclosure Statement provides exhaustive detail—40-plus pages—about the many steps the Special Committee, its professionals, and other key participants in these cases, such as the Creditors' Committee, took to analyze settlement factors governed by applicable case law. While the Disclosure Statement contains an ample discussion of the estates' property-based (e.g., voidable transfer) claims, it raises more questions than it answers regarding the Sackler Allegations and the decision to settle them.

20.    The Disclosure Statement notes that the Shareholder Settlement should be evaluated by the Court pursuant to the so-called *TMT Trailer Ferry* and *Iridium* factors. Disclosure Statement, at 152 (citing *Protective Comm. for Indep. Stockholders of TMT Trailer Ferry, Inc. v. Anderson*, 390 U.S. 414 (1968); *In re Iridium Operating LLC*, 478 F.3d 452, 462 (2d Cir. 2007)).[8]

---

[8] *See also Hr'g Trans*, Mar. 24, 2021, at 103 ("I will apply the *TMT* and *Iridium* factors if I have to, as well as the *Metromedia* standard for a third-party injunction and relief if I have to. But they all have to do with the risks and rewards of the settlement versus litigation, the costs and delay of continued litigation versus the structure of a

21.    In *TMT Trailer Ferry*, the Supreme Court held that, when asked to approve a settlement in bankruptcy, the court should "compare the terms of the compromise with the likely rewards of litigation." *TMT Trailer Ferry*, 390 U.S. at 425.  Notably, in that case, the Supreme Court *reversed* the lower courts' decision to approve a settlement following extensive investigations by a bankruptcy trustee into allegations of self-dealing by certain parties in connection with a plan of reorganization approved by the lower courts.[9] *Id.* (*rev'g* 364 F.2d 936 (5th Cir. 1966)). Although all classes of creditors other than the United States had accepted the plan, and the District Court had confirmed it (*id.* at 422), the Supreme Court reversed the lower courts because it was "essential that every important determination in reorganization proceedings receive the 'informed, independent judgment' of the bankruptcy court." *See TMT Trailer Ferry*, 390 U.S., at 424, (quoting *National Surety Co. v. Coriell,* 289 U.S. 426, 436 (1933)).

22.    In *Iridium*, the Second Circuit Court of Appeals articulated a 7-factor test courts should use in deciding whether a settlement should be approved. The seventh *Iridium* factor is "the extent to which the settlement is the product of arm's length bargaining." *Iridium*, 478 F.3d, at 462.

23.    As explained below, important decisions leading to the Settlement Framework may have been made before the PPI Board or its Special Committee were "independent" of the Sackler

---

settlement, issues pertaining to collectability and ability to pay if a settlement is not reached, and the consequences to other parties, as well as those who won't reach agreement if litigation proceeds.").

[9] The Court explained—

Fourteen days of hearings were held, 2,200 pages of testimony transcribed, and some 60 exhibits collected. [the trustee's] report from this investigation covers 40 pages in the original record. He concluded the debtor's business had been 'wrecked by gross mismanagement, by unwise and unsound expansion financed primarily through the sale of securities in disregard of the protective provisions of the Securities Act of 1933,' and that the debtor had substantial causes of action against holders of the Caplan mortgage. Upon the recommendation of Anderson, the trial court vacated its order confirming the 1959 plan, and the Court of Appeals affirmed."

Protective Comm. for Indep. S'holders of *TMT Trailer Ferry, Inc. v. Anderson*, 390 U.S. 414, 421 (1968).

Families, who may have continued to exert influence over PPI Board during these cases.  If so, that framework may have been foreordained and irreversible.  Moreover, restrictions on the flow of information in this case mean that the investigations, negotiations, and mediations that followed cannot provide assurance that that predicate decision, from which all else has flowed in this case, was itself independent and made at arm's length.  Other checks in the system, such as the Creditors' Committee and this Court, may not be sufficient to permit the "'informed, independent judgment' of the bankruptcy court" required by *TMT Trailer Ferry*.  *See* 390 U.S., at 424.

### 1.    The Independence of the Special Committee

24.    The Disclosure Statement indicates that, shortly before the Petition Date, the Sackler Families apparently ceded control of the PPI Board to the Special Committee, which was given "exclusive authority over the prosecution, defense, and settlement of any causes of action Purdue Pharma may assert against its shareholders as well as members of the Sackler Families and their affiliates."  Disclosure Statement, at 34.  The Disclosure Statement states that this rendered the Special Committee "independent."  *Id.*[10]

25.    Unfortunately, the timing of the formation of the Special Committee, and steps to shield it from the Sackler Families, are unclear, but problematic.  It appears that the Special Committee was not given this authority until September 3, 2019—less than two weeks before the Petition Date—and was apparently not insulated from removal by the Sacklers until November 6, 2019—nearly two months into the case.[11]

---

[10]  The Disclosure Statement provides that "Purdue Pharma's governance documents irrevocably granted an independent Special Committee of the Board of Directors exclusive authority over the prosecution, defense, and settlement of any causes of action Purdue Pharma may assert against its shareholders as well as members of the Sackler Families and their affiliates." Disclosure Statement, at 58. As discussed in this Motion, assuming this is true, the important questions involving timing: Was this true before—or only after—the Settlement Framework was established?

[11] The Disclosure Statement provides as follows:

26.     To this day, the Sacklers' powers with respect to the Debtors' board of directors are opaque.  The Debtors are, and always have been, privately held, so there is little public information about their governance.  The Debtors' bylaws, for example, are apparently not publicly available, which makes it impossible to fully evaluate the extent of the board's independence from the Sacklers. The Document Reserve created in connection with Plan confirm is no solution, because it requires those who would review it to keep what they see confidential.

27.     It appears that the Debtors did not formally take their first steps toward independence from the Sackler Families until May 14, 2019, when PPI's shareholders (who are unnamed but were presumably members of the Sackler Families or Related Entities, or their designees) "adopted an Amended and Restated Shareholders' Agreement (the "**Shareholders' Agreement**") which, among things, established a 'Transaction Committee,' and on the same date, [] filed a corresponding Restated Certificate of Incorporation ("**Restated Certificate of Incorporation**")."[12]  Disclosure Statement, at 58.

---

To further safeguard their independence, the members of the Special Committee are protected against removal by the shareholders. A letter agreement executed by PPI's shareholders, dated November 6, 2019 ("2019 Letter Agreement"), irrevocably delegated to the General Counsel of PPI, as proxy for PPI's shareholders, several of the shareholders' rights, including the ability to appoint and remove the Chairman of the Board and the At-Large Directors, all of whom serve on the Special Committee. The 2019 Letter Agreement directs the General Counsel of PPI to act in accordance with the vote of two-thirds of the Directors in Office of PPI and, in the case of any decision to remove any Director from the Board, to disregard the vote of any affected Director.

Disclosure Statement, at 59.

[12] According to an "Informational Brief" filed by the Debtors at commencement of these cases, "shareholder entities ultimately owned by the descendants of Mortimer Sackler have the right to appoint up to two "Class A Directors," and shareholder entities ultimately owned by the descendants of Raymond Sackler have the right to appoint up to two "Class B Directors." These shareholders apparently also jointly appoint a Board chair and additional "At-Large Directors."  *See* Debtor's Informational Brief [ECF No. 17].

According to a report of the Special Committee released in December 2019, the tenures of the members of the Sackler Families on PPI's board were as follows:

28.     The Restated Certificate of Incorporation provided that the Transaction Committee would be composed of the "independent Chairman of the Board, who would chair the committee, and such other Directors appointed by a majority of the Board, none of whom could be a member of the Sackler Families."  Disclosure Statement, at 58.  The Disclosure Statement does not say who the other members of the Transaction Committee were at that time, or how they might have been insulated from direct or indirect influence by the Sackler Family, and thus "independent," other than that they would not be members of the Sackler Families themselves.

29.     As of May 2019—when the Transaction Committee was formed—it appears that a majority of the PPI Board may not have been independent, as they were appointed by members of the Sackler Family or their Related Entities: Messrs. Boer (Class B, added 2008); Pickett (Class A added January 2010); Roncalli (Class B; added December 2018); Cola (Class A; added February 2019); and Buckfire (added May 2019).[13]  While it is not clear whether Mr. Buckfire was appointed before or after creation of the Transaction Committee, it appears that a majority of the PPI Board as described in the Disclosure Statement (four of the six members) continued to represent one side

**Appendix B - List of Sackler Family Members**

| Name | Purdue Director Begin Date | Purdue Director End Date |
|---|---|---|
| Jonathan D. Sackler | 10/2/1990 | 12/8/2018 |
| Ilene Sackler Lefcourt | 10/2/1990 | 10/9/2018 |
| Kathe A. Sackler | 10/2/1990 | 9/27/2018 |
| Richard S. Sackler | 10/2/1990 | 7/24/2018 |
| Raymond R. Sackler | 10/2/1990 | 7/17/2017 |
| Mortimer D. Sackler | 10/2/1990 | 3/24/2010 |
| Mortimer D.A. Sackler | 1/15/1993 | 1/16/2019 |
| Theresa E. Sackler | 1/15/1993 | 9/7/2018 |
| Beverly Sackler | 1/15/1993 | 10/17/2017 |
| Samantha (Sackler) Hunt | 1/15/1993 | 3/8/2003 |
| David A. Sackler | 7/19/2012 | 8/14/2018 |

*See Notice of Filing of Report of the Special Committee* (#1) [ECF No. 654].

[13] See Disclosure Statement, at 55-56.

or the other of the Sackler Families—with whom the Debtors were apparently negotiating the Settlement Framework that has shaped this case.

30.    On September 3, 2019, PPI's shareholders apparently agreed to convert the Transaction Committee to the "Special Committee" that appears to have made important decisions for the Debtors regarding the Plan and Disclosure Statement going forward.[14]   That Special Committee is comprised of Messrs. Miller, Buckfire, Cola and Dubel, none of whom currently appear to be designees of the Sackler Family (although, as noted, Mr. Cola served as a Class A director (apparently representing the Mortimer Sackler side) from February to July of 2019, after which he became an "at large" director).  Disclosure Statement, at 57.

31.    The Disclosure Statement goes to great lengths to assert that the Special Committee is, in fact, independent of the Sackler Families.  This may or may not be true today, but there is reason for concern that the PPI Board was not independent when important decisions were made that set this case on a course that may have rendered the Shareholder Settlement all but inevitable.

32.    *First*, as noted, it appears that the Settlement Framework was negotiated and established *before* the Special Committee was formed. While the Term Sheet may have left items to be negotiated and resolved (Disclosure Statement, at 3), it is unclear how much latitude the Special Committee could have had to reverse the decision to settle, and instead to litigate with the Sacklers, even if litigation might have been in the interests of the estates.

---

[14] The Disclosure Statement provides that

> [A]n amendment of the Shareholders' Agreement that, among other things, renamed the Transaction Committee the "Special Committee," and on the same date, PPI filed a Certificate of Amendment to its Restated Certificate of Incorporation ("A&R Certificate of Incorporation"). The A&R Certificate of Incorporation gave the Special Committee the same authorities as had been granted to the Transaction Committee and, in addition, authority over "Affiliate Litigation," defined as "the prosecution, defense or settlement of any claim or litigation" between the Debtors and the Sackler Families, trusts established by or for the benefit of members of the Sackler Families, and other Sackler-related entities, including the IACs (collectively, the "Sackler Entities").

Disclosure Statement, at 58 (describing September 3, 2019 amendments).

33.     The Disclosure Statement asserts that the Special Committee's decision to accept the Settlement Framework should be subject to "business judgment" review.    Disclosure Statement, at 128.    Under New York law, however, this deferential level of review may not be appropriate where directors "participated in any of the challenged first-tier transactions" or had "prior knowledge of or were in any way involved in any of these transactions."    *Auerbach v. Bennett*, 47 N.Y.2d 619, 631, 393 N.E.2d 994, 1001 (1979).

34.     Here, it appears that the Term Sheet and the Settlement Framework may well have been substantially negotiated by the PPI Board *prior* to formation of the Special Committee, when it was still apparently dominated by members of the Sackler Families or their designees.    The Transaction Committee (the Special Committee's apparent predecessor) was not formed until May of 2019, but as noted above, the Disclosure Statement indicates that the Debtors began negotiating the Settlement Framework a year *before* the Petition Date, around the fall of 2018.    If the Settlement Framework was negotiated by a Sackler-controlled board, then the Sacklers may, in effect, have been on *both sides* of that transaction with respect to creditors, raising questions about whether a business judgment standard of review is appropriate, and whether it was negotiated at arm's length as required by *Iridium*.

35.     *Second*, it appears that the Special Committee was not, in fact, insulated from removal by the Sackler Families until November 6, 2019, nearly two months *after* the Petition Date, and about a month after the Term Sheet was filed.    Indeed, to this day, it is not clear what powers the Sackler Families may exert, directly or indirectly, over the Special Committee because the Debtors' bylaws and other governance documents (*e.g.*, the Shareholders Agreement) are apparently not publicly available.

36.     *Third*, even if the members of the Special Committee are no longer susceptible to influence by the Sackler Families, they may have been reluctant to challenge the Settlement Framework in light of the insular nature of chapter 11 practice.  Messrs Miller and Buckfire are well-known, highly-regarded reorganization specialists.  Scholarship has found that large and complex reorganizations, such as the Debtors', are often dominated by a small number of professionals and judges, who frequently appear in the same cases together.[15]

37.     Expectations about future interactions may well influence current decision-making. In *Zapata v. Maldonado,* for example, the Delaware Supreme Court recognized that, in the context of reviewing a settlement decision by a special litigation committee, relationships among directors may require "inquiry as to independence, good faith and reasonable investigation [as a] sufficient safeguard against abuse, perhaps subconscious abuse."  *Zapata Corp. v. Maldonado*, 430 A.2d 779, 787 (Del. 1981).  It is not difficult to imagine that relationships among the members of the Special Committee and key participants in this case may have affected the decision to settle or sue, whether "conscious" or "subconscious."[16]

38.     These concerns about independence are not merely hypothetical: certain statements, acts and omissions in these cases suggest that critical decisions may in fact have favored the Sacklers at the expense of the Debtors and their estates.

### 2.     Conflicting Statements about the Sacklers' Alleged Control of the Debtors

---

[15] A forthcoming paper by Professor Adam Levitin, for example, argues that: "an attorney with a large case bankruptcy practice has a high likelihood of soon ending up back before one of the handful of judges who are getting most of the large cases. This dynamic makes it imperative for these repeat players to ensure that they stay in the judge's good graces. They know that if they anger the judge by being zealous advocates in one case, they will bear the consequences the next time they appear before the judge, and they worry that clients will not want to hire an attorney who is known to be out of favor with the judge hearing a case."  Adam J. Levitin, *Purdue's Poison Pill: The Breakdown of Chapter 11's Checks and Balances,* 110 TEX. L. REV. __ (forthcoming 2021), *available at* https://papers.ssrn.com/sol3/papers.cfm?abstract_id=3851339.

[16] Mr. Miller, for example, has apparently bragged about napping in Judge Drain's chambers.  *See* Steve Miller, *The Turnaround Kid,* 223 (2008).

39.     The Disclosure Statement considers whether, or to what extent, creditors or the estate might have "veil piercing" or "single enterprise" claims against the Sackler Families. Both are important because such claims would potentially expose all of the Sacklers Families' assets (allegedly worth much more than their $4.2 billion proposed payments under the Shareholder Settlement) to judgment and recovery by creditors (or the estate, on creditors' behalf). Unfortunately, the Disclosure Statement raises more questions than it answers when read in the light of other important developments in this case.

40.     The Disclosure Statement asserts that New York law provides that "a court may pierce a corporation's veil if (1) its owners exercised *complete domination* over the corporation with respect to the transaction at issue; and (2) that domination was used to *commit a fraud or wrong* that injured the party seeking to pierce the veil." Disclosure Statement at 163.  Assuming for the sake of analysis that this is the correct standard, it is simply not clear how the Special Committee reconciled this standard with allegations in the DOJ Settlements regarding the Sackler Families' control of the Debtors, which do not appear to be discussed in the Disclosure Statement.

41.     As noted above, according to Purdue's Plea Agreement in connection with the DOJ Settlements, before the they resigned from the PPI Board, certain members of the Sackler Families "exercised substantial oversight over management's operations of Purdue."  Plea Agreement at 4. The Sacklers were, in the words of the DOJ and the Debtors' own Plea Agreement, the Debtors' "de-facto CEO."  *See* Sackler Addendum, at 4, ¶12.  Debtors' Addendum at 4, ¶ 14.  Although the Sackler Families may deny the Sackler Allegations, it appears that they or Related Entities owned all of the Debtors' voting equity and (at least until November 2019) controlled the composition of the PPI board.

42.     Similarly, the Disclosure Statement provides that "where, as here, the corporate family involves a series of holding companies, creditors would either need to establish the veil piercing factors for each separate entity, or they will have to satisfy a different set of factors corresponding to what is termed the "single enterprise theory" to group together an entire corporate family where the individual entities are so "inextricably intertwined" as to be a "'single enterprise.'" Disclosure Statement, at 163.

43.     Assuming this is the correct standard, the Disclosure Statement fails to explain how, if at all, the Special Committee reconciled it with the Debtors' own repeated statements that the Debtors and the Sacklers were "inextricably intertwined" for purposes of seeking and obtaining the Preliminary Injunction.   The Debtors have frequently argued that they have an "identity of interest" with the Sacklers that justified the granting and continuation of the preliminary injunction in these cases. *See, e.g., In re Purdue Pharm. L.P.*, 619 B.R. 38, 43 (S.D.N.Y. 2020).[17]   It is difficult to see how the Debtors and the Sackler Families could be "inextricably intertwined" for purposes of protecting the Sacklers, but *not* for purposes of enabling creditors to recover.

### 3.     The Lopsided DOJ Settlement Agreement

44.     The economics of the DOJ settlements also raise questions about the Special Committee's independence.  The Purdue-DOJ settlement compromised and resolved potentially ruinous civil and criminal litigation against Purdue by reducing and allowing the United States' various claims against Purdue—allegedly worth as much as $18 billion—for about $8 billion,

---

[17] *In re Purdue Pharm. L.P.*, 619 B.R. 38, 43 (S.D.N.Y. 2020) (finding the claims against the Sacklers were, Purdue argued, "based on conduct substantially identical to, and inextricably intertwined with, that alleged to have been engaged in by the Debtors").

nearly $2 billion of which will be paid to certain governments, in principle to abate the opioid crisis.

45.    While those features were laudable, the Purdue-DOJ settlement presented two problems.  *First*, it pushed most of the costs of the Sackler Family's alleged misconduct onto Purdue and, ultimately, to Purdue's creditors.  If, however, certain members of the Sackler Families did control Purdue, as alleged, it is not clear why the Sacklers are paying only $225 million, estimated to be about 2% of their wealth, while the Debtors agreed to pay $8 billion— over *thirty-five times more* than the Sacklers.  Sackler Settlement Motion, Ex. A, at ¶ 4

46.    *Second*, the Purdue-DOJ settlement contained a so-called "poison pill," which makes any serious challenge to the Plan (or the Shareholder Settlement it would embody) very costly.  Specifically, it provides that the "Debtors will not propose a Plan of Reorganization or liquidation that is inconsistent with this [Settlement] Agreement," Purdue Settlement at ¶ III.8.e, and if a Plan of Reorganization is not confirmed that "provides for the emergence from the Chapter 11 Cases of a public benefit company (or entity with a similar mission), Purdue and the United States each have the option to rescind this Agreement." *Id.* ¶ III.8.f. If the United States rescinds, it may reinstate all of its claims, including a $2 billion dollar administrative priority claim based on its criminal forfeiture powers, an $8.4 billion dollar unsecured claim, and the right to assert civil forfeiture powers.[18] Purdue Settlement at ¶¶ III.10 & III.8.f.

47.    These characteristics of the Purdue-DOJ settlement further cemented the Shareholder Settlement, and raise questions about whether the Special Committee's decision to implement it reflected independent decision-making.

---

[18] In Claim 137848, the United States claims up to $8.4 billion in treble damages claims, while also reserving the right of civil forfeiture, which would render assets traceable to the alleged wrongdoing forfeit to the government as of the time of the wrongdoing, 18 U.S.C. § 981(f), and therefore not property of the Debtors' bankruptcy estates.

### 4.    The Limits of Other Checks--Forum Shopping

48.    Obviously, many other participants in these cases could have (and, in fact, may have) investigated the PPI Board's decision to settle the Sackler Allegations.  Unfortunately, there is little evidence of this in the record, and reason for concern that it will never become part of the record without an independent examiner.

49.    The Creditors' Committee, for example, could have acted as a check on questions of independence, but early in these cases ceded important powers in order to obtain voluntary discovery.  Specifically, at the outset of these cases, the Creditors Committee entered into a stipulation with the Debtors and the Sacklers regarding the production of information.[19]  As part of that stipulation, the Creditors' Committee agreed that it would not seek or support the appointment of a chapter 11 examiner or trustee, or the conversion or dismissal of these cases.[20] While it appears that the Creditors' Committee and the Sacklers have since then become more adversarial, it does not appear that the Creditors' Committee has reported on the timing and independence of the creation of the Settlement Framework, and whether that should have been accepted as to the Sackler Allegations.[21]

---

[19] *See, e.g.,* Case Stipulation Among the Debtors, the Official Committee of Unsecured Creditors and Certain Related Parties, [ECF No. 291] (providing that during the "Initial Stay Period," the "UCC shall not file, directly or indirectly support, or encourage any other party to file, and shall join the Debtors in opposing, any motion by any party seeking (i) to investigate or prosecute, or standing to investigate or prosecute, estate claims or causes of action, (ii) the appointment of a trustee, examiner (with or without expanded powers), responsible person, or any similar relief with respect to the Debtors' or this Bankruptcy Court's current rights, powers, authority and obligations, or (iii) the dismissal or conversion of these chapter 11 cases to chapter 7 cases").  The "Initial Stay Period" was defined as "180 days . . . from October 15, 2019. Id. at 3.  This stipulation was subsequently amended and restated November 20, 2019, but did not appear to change the timing of the Initial Stay Period.  *See* Amended and Restated Case Stipulation Among the Debtors, the Official Committee of Unsecured Creditors and Certain Related Parties [ECF No. 518].

[20] *Id.*

[21] To be clear, the Creditors' Committee and the Special Committee appear to have devoted significant time and energy to assessing and asserting claims for property transfers to the Sackler (e.g., fraudulent transfer).  The examination proposed in this Motion would not assess those, except as necessary to investigate and report on the Examination Topics.

50.    Similarly, it would appear that all (or almost all) discovery and investigations and negotiations in these cases have occurred subject to confidentiality agreements and protective orders ("**Protective Orders**") which constrain parties from disclosing publicly any findings they may have with respect to questions regarding the decisions to settle the Sackler Allegations.[22] While the Debtors have created a "Document Reserve for Confirmation," which may well contain responsive material, access to those materials is subject to the Protective Orders. *See* Amended Order Granting Debtors' Motion for Order Establishing Confirmation Schedule and Protocols [ECF No. 2894], at 6. ("The Protective Order entered by the Court, as amended from time to time, shall govern all discovery in connection with the Confirmation Proceedings.").

51.    Finally, the Court itself could and should be a check on the independence of the PPI Board, as required by *TMT Trailer Ferry*.  There have, however, been concerns that Purdue's connection to White Plains (and thus this Court) were created for this case, which may lead to doubts about any determination this Court makes in this regard.

52.    Under 28 U.S.C. § 1408, a debtor may commence a case where its domicile or "principal place of business" is located.  Under local rule 1073-1(a), a case shall be assigned to this Court where "the principal place of business . . . set forth on the petition is in Westchester

---

[22] The Protective Orders in this case appear to limit access to, and the use of, information that may be relevant to the Sackler Allegations.  *See, e.g.*, Third Amended Protective Order [ECF No. 1935] at 16 ("No person or entity subject to the Protective Order shall disclose or permit the disclosure of any information designated as Protected Information to any person or entity except as expressly set forth in this Protective Order.").   This Protective Order provides that any party receiving confidential information "shall not disclose the contents of such Confidential Information to any person or entity unless such person or entity falls within at least one of the following categories . . . The Court, any trial or appellate court to which an appeal of a decision of the Court is taken, and any members of the courts' staff to whom it is necessary to disclose the information; provided that no such information shall be publicly filed unless required by an order of the Court." Protective Order, at 19-20.

County."[23]  The Comments to local rule 1703-1 indicate that "[t]his rule was amended in 2004 to eliminate the use of a post office box address as the basis for case assignment."

53.    Here, it appears that PPI is incorporated in New York but has no substantial connection to Westchester County.  The "office" of this entity is, according to its Restated Certificate of Incorporation, New York County—not Westchester County.  *See* Restated Certificate of Incorporation of Purdue Pharma, Inc. Art. FOURTH, May 14, 2019.

54.    On March 1, 2019, six months before declaring bankruptcy and two months before forming the Transaction Committee—that is, while dominated by designees of the Sackler Families—the PPI Board authorized changing its registered agent (not its principal place of business) to White Plains, New York, which appears to be its only connection to Westchester County and thus to venue in this Court.  *See* Certificate of Change, Purdue Pharma, Inc. Mar. 1, 2019. [24]

55.    If the PPI Board changed its address solely to create venue in this Court, there is at least the appearance that the Debtors, while still controlled by Sackler Family designees, sought this Court in particular in the belief that it would approve the Shareholder Settlement with little scrutiny of the Sackler Allegations.  The record thus far in this case indicates that the belief may have been well founded: "[I]t appears to me to have always been the case and will continue to be the case," the Court observed at a September 2020 hearing, that "a plan in which [the Sackler Families] do make a material contribution that satisfies the Second Circuit's test in *In re*

---

[23] Local Rules, United States Bankruptcy Court, Southern District of New York, Assignment of Cases and Proceedings, available at https://www.nysb.uscourts.gov/rule-1073-1.

[24] The Debtors' petition itself lists no principal place of business for PPNYI other than Stamford, Connecticut.  *See* Voluntary Petition for Non-Individuals Filing for Bankruptcy [ECF No. 1] (indicating Debtor's address as One Stamford Forum 201 Tresser Boulevard, Stamford, CT 06901).

*Metromedia, Inc.*, 416 F.3d 136 (2d Circ. 2005), is not only possible but the most likely outcome in this case." *Hr'g Trans*, Sept. 30, 2020, at 79:12-17.

56.     This may be true, but the public interest in these cases requires there to be no doubt about the process by which the decision was made to settle rather than to sue.  The timing of critical, prebankruptcy acts (e.g., negotiation of the Settlement Framework; the formation of the Special Committee), the residual powers of the Sackler Families to potentially influence the PPI Board, and concerns about checks and balances in the chapter 11 process all raise questions about whether the decision to adopt and implement the Settlement Framework as to the Sackler Allegations was made independently, in good faith, and at arm's length, as required by as required by *TMT Trailer Ferry* and *Iridium*.

57.     The most efficient and credible way to address these concerns is to appoint an examiner for the limited purposes described below.

### ARGUMENT AND BASIS FOR RELIEF

58.     Section 1104(c) of the Bankruptcy Code provides, in pertinent part, that—

> at any time before the confirmation of a plan. . . the court shall order the appointment of an examiner to conduct such an investigation of the debtor as is appropriate, including an investigation of any allegations of fraud, dishonesty, incompetence, misconduct, mismanagement, or irregularity in the management of the affairs of the debtor of or by current or former management of the debtor, if—
>
> > (1) such appointment is in the interests of creditors, any equity security holders, and other interests of the estate; or
> >
> > (2) the debtor's fixed, liquidated, unsecured debts, other than debts for goods, services, or taxes, or owing to an insider, exceed $5,000,000.

59.     Legislative history shows that Congress created the role of examiner to provide "special protection for the large cases having great public interest . . . to determine fraud or

wrongdoing . . . ."[25]  Examiners have played important, sometimes crucial, roles in some of the

nation's largest and most controversial reorganizations, including in *Enron*,[26] *Worldcom*,[27]

*Mirant*,[28] *New Century*,[29] *Lyondell Chemical*,[30] *Washington Mutual*,[31] and *Lehman Brothers*.[32]

### A.    An Examiner is Required by Statute and Necessary to Determine Whether the Decision to Settle was Made Independently and at Arm's Length.

60.    Here, there is no question that no plan has been confirmed, or that the Debtors'

fixed, liquidated, unsecured debts, other than debts for goods, services, or taxes, or owing to an

insider, exceed $5,000,000.  The Debtors' obligations to the United States under the Purdue-DOJ

settlement vastly exceed this amount.   Moreover, and more important, a supervisory examination

as proposed below is in the "interests of creditors" and "other interests of the estate"—the general

public—as a way to assure that the Special Committee made the decision to settle rather than

litigate with the Sackler Families at arm's length and independently, as required by applicable case

law.

---

[25] *See* 124 Cong. Rec. S17, 403-34 (daily ed. Oct. 6, 1978) (statement of Senator DeConcini) (quoted in Collier on Bankruptcy, App. 14.4(f)(iii) (15th ed., Rev 2002)).

[26] *In re Enron Corp.*, No. 01-16034 (Bankr. S.D.N.Y. Dec. 2, 2001).

[27] *In re Worldcom*, No. 02-13533 (Bankr. S.D.N.Y. July 21, 2002).

[28] *In re Mirant Corp.*, No. 03-46591 (Bankr. N.D. Tex. July 14, 2003).

[29] *In re New Century TRS Holdings, Inc.*, No. 07-10416 (Bankr. D. Del. April 2, 2007).

[30] *In re Lyondell Chemical Co.*, No. 09-10023 (REG) (Bankr. S.D.N.Y. Oct. 26, 2009).

[31] *In re Washington Mutual, Inc.*, et al., No. 08-12229 (Bankr. D. Del. Nov. 1, 2008).

[32] *In re Lehman Brothers Holdings, Inc.*, No. 08-13555 (Bankr. S.D.N.Y. Sept. 15, 2008).

### 1.    Section 1104(c) is Not Optional.

61.    Section 1104(c) is not an optional provision.  Its command—"shall"—is just that: a requirement in cases in which the statutory criteria have been satisfied.  In *In re Loral*, United States District Judge Patterson observed that "[o]n its face, Section 1104(c)(2) mandates the appointment of an examiner where a party in interest moves for an examiner and the debtor has $5,000,000 of qualifying debt." *In re Loral Space & Commc'ns, Ltd.*, No. 04-CIV-8645RPP, 2004 WL 2979785, at *4 (S.D.N.Y. Dec. 23, 2004). In such circumstances the "Bankruptcy Court had no discretion to deny appointment of an examiner." *Id.* at *4.

62.    The Second Circuit has not yet considered whether this provision of the Bankruptcy Code is in fact mandatory.  The only appellate court to consider the issue, the Sixth Circuit, as well as a number of bankruptcy courts, have stated that it is.  *See In re Revco D.S., Inc.,* 898 F.2d 498, 500–01 (6th Cir. 1990) (holding that appointment of an examiner is mandatory in view of the phrase "the court shall order"); *In re UAL Corp.,* 307 B.R. 80, 86 (Bankr. N.D. Ill. 2004) (same); *In re Mechem Financial of Ohio, Inc.,* 92 B.R. 760 (Bankr. N.D. Ohio 1988) (same); *In re The Bible Speaks,* 74 B.R. 511, 514 (Bankr. D. Mass. 1987) (same); *In re 1243 20th Street, Inc.,* 6 B.R. 683, 685 n. 3 (Bankr. D.D.C. 1980) (same); *In re Lenihan,* 4 B.R. 209, 211 (Bankr. D.R.I. 1980) (same).

63.    As stated in *Collier on Bankruptcy,* "Section 1104(c)(2) does not leave any room for the court to exercise discretion about whether an examiner should be appointed, as long as the $5,000,000 threshold is met and a motion for appointment of an examiner is made by a party in interest," 7 COLLIER ON BANKRUPTCY ¶ 1104.03[2][b] at 1104–38.

64.    It is, of course, true that "[m]ere allegations of fraud, dishonesty, incompetence, misconduct, mismanagement or irregularity in the management of the affairs of the debtor of or by current or former management, are insufficient to justify the appointment of an examiner under

section 1104(c). Such allegations of misconduct must be supported by facts." *See* 7 COLLIER ON BANKRUPTCY ¶ 1104.03[3].

65.    Here, however, we have not only facts, but the Debtors' own confession that it committed felonies; allegations that the "inextricably intertwined" Sacklers were the Debtors' "de-facto CEO" when the Debtors committed those felonies; and evidence which calls into question whether the Special Committee was in a position independently to decide to settle with, or sue, the Sackler Families.

66.    Where courts have denied the appointment of an examiner, they have done so on grounds that the examiner was sought not for informational reasons consistent with sound bankruptcy policy, but instead as an "improper . . . litigation tactic to try to derail approval" of a settlement. *In re Dewey & LeBoeuf LLP*, 478 B.R. 627, 639 (Bankr. S.D.N.Y. 2012); *In re Calpine Corp.*, No. 05-60200 (BRL) (Bankr. S.D.N.Y. 2005), Docket No. 6467 at 73 (refusing to appoint examiner, noting that the request "smacks more of litigation leverage than the protection of the unrepresented public as the statute intended").

**2.    The Appointment of Examiner for the Limited Purposes Proposed is in the Interests of the Estates and the Public Interest.**

67.    Here, the Movant believes it will not be possible to approve the Shareholder Settlement under *TMT Trailer Ferry* or *Iridium* without a credible and independent investigation and public report on the analyses that led to the settlement of the Sackler Allegations, for three reasons.

68.    *First*, the problems of independence noted above mean that creditors have good reason for concern that the decision to settle was made—and made inevitable—before these cases were commenced, by the Debtors' board when it was under the direct or indirect control of the Sackler Families.  By the time the Special Committee was formed, and insulated from influence

-27-

by the Sackler Families, it may have been too late for the Special Committee to do anything more than try to improve that settlement, even if litigation may have been in the interests of creditors and the estate.

69.     *Second*, mechanisms that would ordinarily establish the independent, arm's length nature of this decision may not be able to address this question here in a public and credible fashion.  While key participants  in these cases may have scrutinized the Sackler Allegations and the Special Committee's decision to settle them, they, too, may have confronted a situation where the decision to settle had already been made, and was virtually irreversible.   In any case, the great bulk of creditors have no such insight because discovery and negotiations in these cases have proceeded in secret.

70.     *Third*, there is a unique and undisputed public interest in these cases.  That public interest cannot be vindicated if the decision to settle the Sackler Allegations was not made independently and at arm's length, as required by *TMT Trailer Ferry* and *Iridium.*  It is perhaps not surprising that there have been over 3800 signatures to a change.org petition calling for an examiner in these chapter 11 cases.[33]  The public's view of the public interest in these cases may differ from that of those who run this case on a day-to-day basis.

71.     At the same time, the Movant is cognizant of the fact that the key participants in these cases have performed significant amounts of work to investigate, analyze, mediate and negotiate the issues in question here.  These cases have already seen professional fees in excess of $400 million, and an examiner should not duplicate the work that has been done. The Court must appoint an examiner to "conduct such an investigation of the debtor as is appropriate"—not any

---

[33] *See* P.A.I.N./Nan Goldin, *We Demand Accountability and Transparency from Purdue Pharma and the Sacklers!* Change.org, available at https://www.change.org/p/judge-drain?recruited_by_id=4d4cbdf0-f7d1-11e7-8c38-41643502f324 (last visited Dec. 5, 2020).

examiner to do anything merely because the statute says so. 11 U.S.C. § 1104(c). The model developed by this Court in the *Cenveo* case suggests a way to strike the proper balance here.

### B.    A Supervisory Examination—The Cenveo Example

72.    The Movant believes that credible answers to questions surrounding the settlement of the Sackler Allegations can be provided through the use of an examiner on a limited, supervisory basis, much as this Court did in the *Cenveo* case in 2019.[34]

73.    Cenveo was apparently a printing business. A creditor, Brigade Capital Partners, LP. ("Brigade"), sought the appointment of an examiner because, it argued, "the Debtors' controlling shareholders, officers and/or directors. . . have been involved in insider/related party transactions."[35]

74.    Prior to bankruptcy, an independent director of Cenveo had been appointed to oversee an investigation into potential claims or causes of action against officers, directors, insiders and other parties arising out of prepetition conduct. This was not sufficient, Brigade argued, because the debtors in *Cenveo* allegedly "provided no other details about the scope of the investigation."[36] This was, to the movants, "a red flag and an express concession that an independent investigation into the Debtors' prepetition business affairs is necessary and warranted

---

[34] *See In re Cenveo, Inc.*, No. 18-22178-rdd  (Bankr. S.D.N.Y. 2018) ["**Cenveo**"]. It appears that this Court proposed a similar approach in *Loral,* although the movant (appellant) did not accept that. *Loral District Court* at *4 (observing that "Judge Drain had prescribed an investigatory role for the examiner at the hearing. Instead of appointing an examiner to conduct a going concern valuation as the Ad Hoc Committee had requested, he proposed at the hearing to appoint an examiner "to review whether the Debtors and the Creditors' Committee's professionals had followed proper procedures in conducting their valuation analyses").

[35] *See* Motion of Brigade Capital Management, LP for the Appointment of an Examiner Pursuant to 11 U.S.C. § 1104(c), *In re Cenveo, Inc.*, No. 18-22178-rdd at p. 1 (Bankr. S.D.N.Y. Mar. 12, 2018), ECF No. 76-1 ("**Cenveo Motion**"). It appears that movant Brigade was represented in this matter by Akin Gump, counsel to the Creditors' Committee in these cases.

[36] *Id.*

in these chapter 11 cases," but had to be conducted by someone who was not "controlled by the Debtors who already agreed to provide such individuals a full release."[37]

75.    This Court apparently agreed, and ordered the appointment of an examiner for the limited purpose of "looking over the shoulder" of primary professionals engaged in the analysis in dispute and, to the extent the debtors chose to continue their own internal investigation, "over their counsel's shoulder, too."[38]

76.    Here, there is credible reason for concern that the decision to grant the Shareholder Releases, per the Settlement Framework, was made by the PPI Board when it was still under the control of the Sackler Families.  As in *Cenveo,* this Court should order the appointment of an independent and experienced litigator with significant plaintiffs' and/or governmental representation experience—and not a chapter 11 practitioner—to investigate and report on whether the Special Committee negotiated the Settlement Framework, Term Sheet, and Shareholder Releases as to the Sackler Allegations independently, in good faith, and at arm's length.[39]  As in *Cenveo*, the examiner need not conduct his or her own investigation (except as necessary to address the Examination Topics, as defined in the Proposed Order), but instead draw on and evaluate the significant discovery that has already occurred for purposes of assessing the Examination Topics. Such examiner should then promptly provide a public report of his or her findings.

77.    The Debtors may object that enormous amounts of time, energy and professional resources have already been devoted to these cases.  Any investigation, even one as tailored in the Proposed Order, would duplicate work done by their counsel, counsel to the Creditors' Committee or other key participants in these cases.   But that objection fails for three reasons.

---

[37] *Cenveo* Motion, at 2.

[38] Report of Susheel Kirpalani, Examiner, *In re Cenveo, Inc*., No. 18-22178 at 1 (Bankr. S.D.N.Y. June 6, 2018).

[39] *Id.* at 1.

78.     *First,* it appears that the bulk of the investigations and reports to date have focused on property transfers to or for the benefit of the Sackler Families, and not on the Sackler Allegations, themselves. *See, e.g.,* Notice of Filing of Report of the Special Committee [ECF No. 654] (reporting on Alix Partners' voidable transfer analysis). The Sackler Allegations go to their role in the Debtors' decisions to market, label and sell OxyContin and to influence the PPI Board's decision to settle rather than sue, which may have little do with fraudulent transfer and similar claims.

79.     *Second,* while the Disclosure Statement does have some discussion of the types of claims that might be asserted in light of the Sackler Allegations, the Debtors' response is largely that such claims (whether "direct" or "derivative") are complicated, uncertain, and that collection would be difficult. Disclosure Statement at 164. But the Sacklers Families' alleged control of the Debtors, described above, creates a potentially triable issue of fact that may undercut claims of complexity and uncertainty, leaving only collectability as the principal basis for deciding to settle. To say that judgments against the Sackler Families are uncollectible may impliedly concede liability, surely something the Sackler Families would not want to do.

80.     *Third,* even if these analyses have been performed by other parties, such as the Creditors' Committee, those analyses do not appear to be in the public record of these cases. Indeed, it appears that the Creditors' Committee may still have unresolved discovery disputes with the Sackler Families, so it is not clear whether or to what extent they have completed such analysis.

81.     The Movant recognizes that this Court has approved many innovative mechanisms in this case in an attempt to help rehabilitate the Debtors, including the so-called "self-injunction," the appointment of a corporate monitor, and the use of accomplished mediators. These steps may well have been necessary and helpful to enable the Debtors to produce the Plan and Disclosure

Statement.  Unfortunately, all are focused on the Debtors' present and future, and are predicated on the prior decision to settle the Sackler Allegations.  While settlement with the Sackler Families may ultimately be in the best interests of the estates and the public, questions about the Sacklers' role in negotiating that settlement, and the PPI Board's capacity to challenge that settlement, require an independent investigation and report.

82.     Indeed, the Sackler Families themselves have often noted that they believe they have been unfairly presented in these cases and in the media.  The Raymond Sackler side, for example, recently observed that it has "stated before and reiterates now [that] Purdue's documents, which remain confidential despite the family's repeated attempts to have them de-designated and published, will prove that the Sacklers acted ethically and legally at all times." *See* Statement of the Raymond Sackler Family in Support of the Debtors' Motion to Extend the Preliminary Injunction*, at 2 [ECF No. 250].  The Sackler Families should welcome a brief, but critical, independent investigation to vindicate their position.

83.     If, however, the Sackler Families influenced or predetermined the outcome, or unduly constrained the PPI Board's independence, that may call into question the Settlement Framework and all that followed.  In that event, approval of the Shareholder Settlement and confirmation of the Plan may not be appropriate.  While that would be a potentially drastic turn of events, it is not worse than a finding in the future that this process, and this Court, were used to advance an improper agenda.

84.     At the same time, the Movant is aware that the Court has made statements to the effect that it believes appointing an examiner would not be a productive use of the Debtors'

resources.[40]  The Movant has taken these statements seriously, and had hoped that the Disclosure Statement would credibly address the concerns noted above.  But, it has not, and what was filed shows that it cannot,  because it raises more questions than it answers.  The Movant thus hopes that the Court's statements about examiners were not pre-judgments of an issue not then before the Court.

## NOTICE

85.    Notice of this Motion has been provided (a) to the entities on the Master Service List (as defined in the Case Management Order and available on the Debtors' case website at http://www.restructuring.primeclerk.com/purduepharma/) and (b) any person or entity with a particularized interest in the subject matter of this Motion.  The Movant respectfully submits that no other or further notice is necessary.

86.    No previous request for the relief sought herein has been made by the Movant to this or any other court.[41]

---

[40] As the Court stated in July 2020:

> The press, who in a number of totally irresponsible articles led people who have truly suffered, because of the opioid crisis, to believe that there is no investigation going on, that this case's purpose is somehow to let the Sacklers get away with it and that without the appointment of an examiner there won't be an investigation, is just completely and utterly misguided.

> So, for anyone to believe that they should be driven by such trash is just a big mistake.  We cannot muzzle the press, but certainly, people should understand that what is being put out as if it was news is completely false and should lead them to decide that they do not want to buy or click on that publication in the future because they cannot trust it to do the basic due diligence that any reporter should do.

> So, I don't want to hear some idiot reporter or some bloggist quoted to me again in this case.  And you and your client should not be guided by anything of that sort or some misguided law professor who does not take the basic due diligence that you would think he or she would want a first-year law student to do to actually look at the actual transcript and the record in the case before spouting off about the need for an examiner, including completely ignoring the appointment of a corporate monitor, the  commitment as part of the injunction to have a full account,  and the examinations that are going on.

*Hr'g Trans.* July 23, 2020, at 56:13-25; 57:1-16. As noted, the mechanisms the Court described—the corporate monitor, the injunction, and ongoing investigations—have nothing to do with scrutiny of the Sacklers, or are subject to onerous confidentiality restrictions.  While they may be laudable in their own right, they are not substitutes for the transparency that an examiner could produce.

[41] As noted in the Jackson Affidavit, Movant filed a letter with the Court in July 2020 seeking the appointment of an examiner, but this letter was not taken up as a request for relief by the Court.

## **CONCLUSION**

For the foregoing reasons, the Movant respectfully requests that the Court (i) enter an order, in the form attached hereto as Exhibit A, appointing an examiner in these chapter 11 cases pursuant to Bankruptcy Code section 1104(c), and (ii) grant such other and further relief as the Court deems just, proper, and equitable.

Dated: June 1, 2021      Respectfully Submitted,
   Philadelphia, PA

      By:  /s/ Jonathan C. Lipson
         Jonathan C. Lipson
         Temple University-Beasley School of Law
         1719 North Broad St.
         Philadelphia, PA 19122
         215-204-0608
         jlipson@temple.edu
         Counsel to Peter W. Jackson

         /s/ Karen F. Neuwirth
         Karen F. Neuwirth
         Martin S. Rapaport, P.C.
         18 East 48th Street
         6th Floor
         New York, N.Y. 10017
         (212) 688-1980
         manhatoffice@yahoo.com
         Co-counsel to Peter W. Jackson

# EXHIBIT A
## PROPOSED ORDER

Jonathan C. Lipson
Temple University-Beasley School of Law
1719 North Broad Street
Philadelphia, PA 19122
Counsel to Peter W. Jackson

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| In Re: | Chapter 11 |
| PURDUE PHARMA L.P., et al.[42] | Case No.  19-23649 (RDD) |
| Debtors. | (Jointly Administered) |

## ORDER TO APPOINT EXAMINER
## PURSUANT TO 11 U.S.C. § 1104(c)

Upon the motion of Peter W. Jackson ("**Movant**") pursuant to 11 U.S.C. 1104(c) for the

appointment of an examiner in the above-captioned cases [Docket No. __] (the "**Motion**"); and

this Court having jurisdiction over this matter pursuant to 28 U.S.C. §§ 157(a)- (b) and 1334(b)

and the Amended Standing Order of Reference from the United States District Court for the

Southern District of New York, dated January 31, 2012; and this Court having found that this is a

core proceeding pursuant to 28 U.S.C. § 157(b) that this Court may decide by a final order

consistent with Article III of the United States Constitution; and this Court having found that notice

of the Motion and opportunity for a hearing on the Motion were appropriate under the

circumstances and that no other notice need be provided; and the Court having reviewed the

---

[42] The debtors in these chapter 11 cases ("**Debtors**" or "**Purdue**"), along with the last four digits of each Debtor's registration number in the applicable jurisdiction, are as follows: Purdue Pharma L.P. ("**PPLP**") (7484), Purdue Pharma Inc. (7486), Purdue Transdermal Technologies L.P. (1868), Purdue Pharma Manufacturing L.P. (3821), Purdue Pharmaceuticals L.P. (0034), Imbrium Therapeutics L.P. (8810), Adlon Therapeutics L.P. (6745), Greenfield BioVentures L.P. (6150), Seven Seas Hill Corp. (4591), Ophir Green Corp. (4594), Purdue Pharma of Puerto Rico (3925), Avrio Health L.P. (4140), Purdue Pharmaceutical Products L.P. (3902), Purdue Neuroscience Company (4712), Nayatt Cove Lifescience Inc. (7805), Button Land L.P. (7502), Rhodes Associates L.P. (N/A), Paul Land Inc. (7425), Quidnick Land L.P. (7584), Rhodes Pharmaceuticals L.P. (6166), Rhodes Technologies (7143), UDF LP (0495), SVC Pharma LP (5717) and SVC Pharma Inc. (4014) (collectively, the "**Bankruptcy Cases**").

Motion; and the Court having held a hearing to consider the relief requested in the Motion on a final basis (the "**Hearing**"); and the Court having determined that the legal and factual bases set forth in the Motion and at the Hearing establish just cause for the relief granted herein; and the Court having determined that the relief requested is in the best interests of the Debtors, their estates, creditors and all parties in interest; and upon all of the proceedings had before the Court and after due deliberation and sufficient cause appearing therefor,

IT IS HEREBY ORDERED THAT:

The Motion is granted as provided herein, and the United States Trustee is directed to appoint an examiner (the "**Examiner**") in these chapter 11 cases pursuant to section 1104(c) of the Bankruptcy Code qualified to perform the tasks set forth herein.

1.      The Examiner shall be an independent and experienced litigator with significant plaintiffs' and/or governmental representation experience, and not a chapter 11 practitioner.

2.      Upon appointment, the Examiner shall investigate and report on (i) the process by which the board of directors of Purdue Pharma, Inc., a New York corporation ("**PPI**") decided to settle the "Sackler Allegations" (as provided in the Motion); and (ii) whether that process, and the resulting decision to settle the Sackler Allegations pursuant to the Settlement Framework with the Shareholder Releases, were undertaken independently of the direct or indirect influence of, or interference by, the Sackler Families or their Related Entities, made in good faith, and were negotiated at arm's length  (collectively, the "**Examination Topics**"); provided, however that (except as necessary to investigate and report on the Examination Topics) the Examiner shall not conduct his or her own discovery of the Examination Topics but, rather, the Examiner shall, using discovery already produced (and being produced) in these cases, examine and report (as provided in this Order) on the Examination Topics.  The Examiner shall be given access to all materials and

- 2 -

discovery produced in these cases, by any party, relevant to the scope of the Examination Topics, however and to whomever produced.

3.      No later than seven (7) days after being appointed, the Examiner shall meet and confer with the advisors for the Debtors, the Sackler Families, the Creditors' Committee, the Movant and such other parties as the United States Trustee deems appropriate in its reasonable discretion (the "**Examination Parties**") for the purpose of obtaining an overview concerning the status of each party's respective investigation and analysis of the Examination Topics.

4.      The Examiner shall prepare and file a public report (the "**Report**") on his or her findings regarding the Examination Topics within 30 days of the later of (x) the Examiner Retention Date (as defined below), or (y) ten (10) days before the commencement of the Confirmation Hearing on the Plan.  The time to file the Report may be extended by Order of the Court upon application by the Examiner for cause shown.  The Examiner may file subsequent Reports in the event the Plan is further amended with respect to the Examination Topics.

5.      Nothing contained in this Order shall diminish the powers and authority of the Debtors, the Creditors' Committee, or other Examination Parties to investigate any other claims or causes of action of the estates.

6.      The Examiner shall be compensated and reimbursed for his or her expenses pursuant to the Order Establishing Procedures for Interim Compensation and Reimbursement of Expenses for Retained Professionals, dated November 21, 2019 [Docket No. 529] (the "**Compensation Procedures Order**"), and such compensation and reimbursement shall be reviewed pursuant to section § 330 of the Bankruptcy Code.  The Examiner may retain such counsel and professionals as are reasonably necessary to accomplish the tasks set forth in this Order. The date of an order approving such retention shall be the "**Examiner Retention Date**".

7.      In accordance with Rule 502(d) of the Federal Rules of Evidence, all privileges, protections, confidentiality and immunities (including, without limitation, the attorney-client privilege and the work-product doctrine), shall remain in full force and effect as to any information provided to the Examiner, and shall not be waived or in any way impaired in connection with these chapter 11 cases (including in connection with any current or subsequent adversary proceeding outside these chapter 11 cases by disclosure or production by or among the Examination Parties of any materials protected by such privileges, protections, confidentiality and immunities, or compliance with any other aspect of this Order); provided, however, that nothing in this provision shall be construed to require, to preclude, or to govern in any way, the production of privileged materials or to constrain the Examiner's ability to produce and promulgate the Report.  In the event of conflict between any protective orders in this case and this Order, this Order shall govern.

8.      The Examiner shall be a "party in interest" under section 1109(b) of the Bankruptcy Code with respect to matters that are within the scope of the duties delineated in this Order or as such duties may hereafter be modified by this Court, and shall be entitled to appear at hearings and be heard with respect to matters that are within the Examiner's duties.

Dated: _____
White Plains, New York


_____
THE HONORABLE ROBERT D. DRAIN
UNITED STATES BANKRUPTCY JUDGE

**EXHIBIT B**
**JACKSON AFFIDAVIT**

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

In re:                                                                Chapter 11

PURDUE PHARMA L.P., *et al.* [1]                                      Case No. 19-23649
                                                                      (RDD)
                                  Debtors.
                                                                      (Jointly Administered)

### AFFIDAVIT OF PETER W. JACKSON IN SUPPORT OF MOTION
### FOR ORDER TO APPOINT EXAMINER
### PURSUANT TO 11 U.S.C. § 1104(c)

STATE OF ILLINOIS          )
                           ) S.S.:
COUNTY OF McHENRY          )

Peter W. Jackson, being duly sworn, upon his oath deposes and states as follows in

support of the *Motion for Order to Appoint Examiner Pursuant to 11 U.S.C. § 1104(c)* (the

"**Motion**"):

1.    In August 2006, my daughter, Emily Ruth Jackson, passed away due to

respiratory depression after ingesting a single OxyContin pill.

2.    In light of this, I filed in these Bankruptcy Cases the proof of claim substantially

in the form attached as Exhibit 1.[2]

---

[1] The debtors in these chapter 11 cases ("**Debtors**" or "**Purdue**"), along with the last four digits of each Debtor's
registration number in the applicable jurisdiction, are as follows: Purdue Pharma L.P. ("**PPLP**") (7484), Purdue
Pharma Inc. (7486), Purdue Transdermal Technologies L.P. (1868), Purdue Pharma Manufacturing L.P. (3821),
Purdue Pharmaceuticals L.P. (0034), Imbrium Therapeutics L.P. (8810), Adlon Therapeutics L.P. (6745), Greenfield
BioVentures L.P. (6150), Seven Seas Hill Corp. (4591), Ophir Green Corp. (4594), Purdue Pharma of Puerto Rico
(3925), Avrio Health L.P. (4140), Purdue Pharmaceutical Products L.P. (3902), Purdue Neuroscience Company
(4712), Nayatt Cove Lifescience Inc. (7805), Button Land L.P. (7502), Rhodes Associates L.P. (N/A), Paul Land Inc.
(7425), Quidnick Land L.P. (7584), Rhodes Pharmaceuticals L.P. (6166), Rhodes Technologies (7143), UDF LP
(0495), SVC Pharma LP (5717) and SVC Pharma Inc. (4014) (collectively, the "**Bankruptcy Cases**").

[2] The form submitted was signed, but I did not retain an image of that version.

3.      On or about July 15, 2020, I submitted the letter attached as Exhibit 2 to the

Court.  At that time, a representative of the Court contacted me to ask if I wished to have the

attached letter considered by the Court as a motion.  I declined this invitation at the time because

I did not have counsel.  I did so without prejudice, and now submit in connection herewith the

Motion.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury under the laws of the

United States of America that the foregoing is true and correct, and that this Affidavit was

executed the 31ˢᵀ day of _May_____, 2021.

_____

PETER W. JACKSON

SWORN TO AND SUBSCRIBED before

Me this 31ˢᵗ day of _May___, 2021

_____

NOTARY PUBLIC

"OFFICIAL SEAL"
PAULETTE L. DEBELING
NOTARY PUBLIC, STATE OF ILLINOIS
MY COMMISSION EXPIRES 05/12/22

**EXHIBIT 1**
**(Peter W. Jackson Proof of Claim)**

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| **In re:** | **Chapter 11** |
| **PURDUE PHARMA L.P.,** *et al.,* | **Case No. 19-23649 (RDD)** |
| **Debtors.** | **(Jointly Administered)** |

# Personal Injury Claimant Proof of Claim Form
## (Including Parents and Guardians)

You may file your claim electronically at **PurduePharmaClaims.com** via the link entitled "Submit a Claim."

**For questions regarding this Proof of Claim Form, please call Prime Clerk at (844) 217-0912 or visit
PurduePharmaClaims.com.**

Read the instructions at the end of this document before filling out this form. This form is for individuals to assert an unsecured claim against the Debtors seeking damages based on actual or potential future personal injury to the claimant or another (for example, deceased, incapacitated, or minor family member) related to the taking of a Purdue Opioid and/or the taking of another opioid for which You believe Purdue is responsible for Your damages.

**Do not** use this form to assert only a non-personal injury claim against the Debtors based on or involving opioids or their production, marketing and sale, including without limitation, the Debtors' production, marketing and sale of Purdue Opioids. File such claims on a General Opioid Claimant Proof of Claim Form. However, if You have a claim against the Debtors based on or involving the production, marketing and sale of opioids, in addition to Your claim based on personal injury, You may include information related to that claim on the Personal Injury Claimant Proof of Claim Form by completing Part 5 of this form.

**Do not** use this form to assert any other pre-petition claims, including secured claims or claims entitled to priority under 11 U.S.C. § 507(a). Secured claims, claims entitled to priority under 11 U.S.C. § 507(a) and non-opioid related claims should be filed on a Non-Opioid Claimant Proof of Claim Form (Form 410).

Creditor (also referred to as "You" throughout) shall provide information responsive to the questions set forth below. Creditors may include parents, foster parents, and guardians submitting claims on behalf of minors with Neonatal Abstinence Syndrome ("NAS"). Instructions and definitions are provided at the end of this document. You shall provide information reasonably available to You and are not excused from providing the requested information for failure to appropriately investigate Your claim. You shall supplement Your responses if You learn that they are incomplete or incorrect in any material respect.

Personal Injury Claimant Proof of Claim Forms and any supporting documentation submitted with the form shall remain highly confidential and shall not be made available to the public. For the avoidance of doubt, all pages of the Personal Injury Claimant Proof of Claim Form and supporting documentation shall be treated as highly confidential and made available only to Prime Clerk, the Court and to those that agree to be bound by the Protective Order.

**Fill in all the information about the claim as of September 15, 2019, the Petition Date. You may also fill in information regarding any claims You believe You may have after September 15, 2019 on this form. This form should be completed to the best of Your ability with the information available to You. If You are unable to answer certain questions at this time, the absence of an answer, by itself, will not result in the denial of Your claim, though You may be asked or required to provide additional information at a later date. You may also amend or supplement Your claim after it is filed.**

Please note that supporting documentation is requested in certain portions of the form. Please provide the requested information to the best of Your ability. At Your discretion, You may also provide additional information to supplement Your claim in any manner available to You.

**Do not** send original documents, as they will not be returned, and they may be destroyed after scanning.

| **Part 1:** | **Identify the Claim** |
|---|---|

| | |
|---|---|
| 1. Who is the creditor? | Peter W. Jackson |
| | Name of the individual to be paid for this claim. If the creditor is a minor (under 18), please provide only the minor's initials. |
| | Other names the creditor used with the debtor, including maiden or other names used: |
| | _____ |
| | If Your claim is based on personal injury to another (for example, a deceased, incapacitated, or minor family member), please provide the name of that other person (that is, the injured person). If the injured person is a minor (under 18), please provide only the minor's initials: |
| | Emily R. Jackson |
| | If You are submitting a claim on behalf of another person, please provide Your name and relationship to that person: |
| | Peter W. Jackson, father of Emily R. Jackson |
| | If you are submitting a claim on behalf of a minor, are You the Legal Guardian? |
| | ☐ No    ☐ Yes |

| 2. | What is the year of birth, gender, and last 4 digits of the social security number of the creditor (or injured person, if the claim is based on the personal injury of another)? | Year of Birth: 1988 <br><br> Gender: ☐ Male  ☒ Female <br><br> Last 4 Digits of Social Security Number (if available): XXX-XX-__9__ __9__ __1__ __1__ |

| 3. | Where should notices and payments to the creditor be sent? <br><br> Federal Rule of Bankruptcy Procedure (FRBP) 2002(g) | **Where should notices to the creditor be sent?** <br><br> 4622 Valley View Road <br> Prairie Grove, IL  60012 <br><br><br><br> Contact phone  224-612-1803 <br> Contact email  beepjackson@comcast.net | **Where should payments to the creditor be sent?** (if different) <br><br><br><br><br><br><br><br> Contact phone _____ <br> Contact email _____ |

| 4. | Does this claim amend one already filed? | ☒ No. <br> ☐ Yes. Claim number on court claims registry (if known)_____ | Filed on _____ <br> MM / DD / YYYY |

| 5. | Do you know if anyone else has filed a proof of claim for this claim? | ☒ No. <br> ☐ Yes. Who made the earlier filing? _____ | |

---

**Part 2:    Attorney Information (Optional)**

| 6. | Are You represented by an attorney in this matter? <br><br> You do not need an attorney to file this form. | ☒ No. <br> ☐ Yes. If yes, please provide the following information: <br><br> Law Firm Name _____ <br><br> Attorney Name _____ <br><br> Address _____ <br><br> City _____  State _____  ZIP Code _____ <br><br> Contact phone _____  Contact email _____ |

---

**Part 3:    Information as of September 15, 2019, the Petition Date, About Your Claim**

| 7. | How much is the claim? | $ _____ or <br> ☐    Unknown. |

| 8. | Select all that apply to You. | ☐    Creditor has been injured by use of an opioid. <br><br> ☐    Although Creditor is not currently aware of any injury, Creditor wants to file now to keep the ability to seek payment if Creditor has a future injury or harm due to use of an opioid. <br><br> ☒    Creditor has a claim arising out of another person's use of an opioid. ***Please answer all questions in Part 4 as if that person (the injured person) is filling out the form.*** <br><br> ☐    Creditor is submitting a claim on behalf of a minor with NAS. ***Please answer all questions in Part 4 as if the birth mother of the minor is filling out the form (to the extent such information is available to You).*** |

| | | |
|---|---|---|
| **9.  Briefly describe the type of injury alleged from Your use or another person's use of an opioid. Select all that apply.**<br><br>Attach additional sheets if necessary. | ☒ Death<br>☐ Overdose<br>☐ Addiction/Dependence/Substance Use Disorder<br>☐ Lost Wages/Earning Capacity<br>☒ Loss of Consortium<br>☐ NAS-related<br>    ☐ Learning Disability<br>    ☐ Spina Bifida<br>    ☐ Developmental Disability<br>    ☐ Heart Defects<br>    ☐ Congenital Defects or Malformations<br>☐ Expenses for Treatment<br>☐ Other (describe): | |
| **10. Describe the basis for Your claim, including all alleged causes of action, sources of damages, etc., You are asserting against the Debtors.**<br><br>Attach additional sheets if necessary. | | |
| **11. Please identify and quantify each category of damages or monetary relief that You allege, including all injunctive relief that You seek. Check as many boxes as are applicable.** | ☐ Compensatory: $_____   or   ☒ Unknown<br>(for example, lost wages, pain and suffering, expenses not reimbursed, loss of consortium, etc.)<br><br>☐ Punitive: $_____   or   ☒ Unknown<br><br>☒ Other (describe): Injunctive relief to include items as specified in enclosed statement of relief being sought. | |

| 12. **Have You ever filed a lawsuit against any of the Debtors at any time?** | ☒ No |
| | ☐ Yes. If yes, please provide the following information and attach supporting documentation: |

Case Caption: _____

Court and Case/Docket Number: _____

Attorney Information:

_____
Law Firm Name

_____
Attorney Name

_____
Address

_____
City                     State                ZIP Code

Contact phone _____ Contact email _____

---

**Part 4:  Information About Opioid Use**

If You have a claim arising out of another person's use of an opioid, please answer these questions as if the injured person is filling out the form.  If You are submitting a claim on behalf of a minor with NAS, please answer these questions as if the birth mother of the minor is filling out the form (to the extent such information is available to You).

| 13. **Were You prescribed or administered a Purdue brand name opioid by a healthcare professional?** | ☐ Unknown (select if You were prescribed a prescription opioid but do not know the specific medication). |
| | ☒ No. |
| | ☐ Yes. If yes, please provide the following information to the extent reasonably available: |

**Please identify the Purdue brand name opioid(s) that You were prescribed or administered by a healthcare professional.  Check as many medications as applicable.**

| ☐ Butrans® | ☐ OxyContin® |
| ☐ DHC Plus® | ☐ OxyFast® |
| ☐ Dilaudid® | ☐ OxyIR® |
| ☐ Hysingla ER® | ☐ Palladone® |
| ☐ MS Contin® | ☐ Ryzolt® |
| ☐ MSIR® | |

| 14. **Were You ever prescribed or administered *any* opioid (other than a Purdue brand name opioid) by a healthcare professional?** | ☒ Unknown (select if You were prescribed a prescription opioid but do not know the specific medication). |
| | ☐ No. |
| | ☐ Yes. If yes, please provide the following information to the extent reasonably available: |

Non-Purdue Brand Name Opioid, if known: _____

**Please identify the generic opioid(s) that You were prescribed or administered by a healthcare professional.  Check as many medications as applicable.**

| ☐ Buprenorphine transdermal system | ☐ Oxycodone extended-release tablets |
| ☐ Hydrocodone and acetaminophen tablets (generic to Vicodin® or Norco®) | ☐ Oxycodone immediate-release tablets |
| ☐ Hydromorphone immediate-release tablets | ☐ Oxycodone and acetaminophen tablets (generic to Percocet®) |
| ☐ Hydromorphone oral solution | ☐ Tramadol extended-release tablets |
| ☐ Morphine extended-release tablets | |
| ☐ Other Generic: _____ | |

| **Part 5:** | **Other (Non-Personal Injury) Opioid-Related Claims** |
|---|---|

15. **Do You believe You have any other claims against the Debtors based on or involving the Debtors' production, marketing and sale of Purdue Opioids that are not based on a personal injury?**

☒ No.

☐ Yes. If yes, please describe the nature of the claim(s) (Attach additional sheets if necessary).

16. **How much is the claim?**

$ _____ or

☐ Unknown.

| **Part 6:** | **Supporting Documentation** |
|---|---|

17. **Please provide the following documentation if You would like (but You are not required) to supplement this proof of claim.**

▪ Provide any documents supporting Your claim, including but not limited to: any complaint that You have filed against the Debtor(s), prescriptions, pharmacy records or statements showing prescriptions, or any records supporting Your claims of damages.

| **Part 7:** | **Sign Below** |
|---|---|

**The person completing this proof of claim must sign and date it. FRBP 9011(b).**

If you file this claim electronically, FRBP 5005(a)(2) authorizes courts to establish local rules specifying what a signature is.

**A person who files a fraudulent claim could be fined up to $500,000, imprisoned for up to 5 years, or both. 18 U.S.C. §§ 152, 157, and 3571.**

*Check the appropriate box:*

☒ I am the creditor.

☐ I am the creditor's attorney, guardian, kinship (or other authorized) caretaker, executor, or authorized agent.

☐ Other (describe): _____

I have examined the information in this *Proof of Claim* and have a reasonable belief that the information is true and correct.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on date _____ (mm/dd/yyyy)

_____
Signature

Print the name of the person who is completing and signing this claim:

Name   Peter        William        Jackson
       First name          Middle name            Last name

Title  _____

Company _____

Address  4622 Valley View Road
       Number      Street
       Prairie Grove, IL  60012
       City                          State

       ZIP Code

Contact phone  224-612-1803         Email  beepjackson@comcast.net

**EXHIBIT 2**
**(Peter W. Jackson Letter to Court)**

July 15, 2020

Honorable Robert D. Drain
United States Bankruptcy Court
Southern District of New York
300 Quarropas Street
White Plains, NY 10601-4140

Re: *Purdue Pharma, LP, et al.*, case no. 19-23649 (Bankr. S.D.N.Y.)

Dear Judge Drain,

I write to ask this Court to appoint an examiner, pursuant to Section 1104 of the United States Bankruptcy Code, to investigate all Purdue Pharma documents and the role of the Sackler family in the marketing, labeling and sale of OxyContin. Unfortunately, I am a creditor of Purdue Pharma because my daughter, Emily Jackson, died of an overdose on August 18, 2006, after ingesting one OxyContin pill. She was 18 years old.

In 2007, I testified at the Purdue sentencing hearing before the Honorable James P. Jones, a federal District Court judge in West Virginia. At that time, I was unaware of the role the Sackler family had played in the misbranding of OxyContin. Sadly, I was not the only bereaved parent in the courtroom and I was not the only one who was still in the dark.

Since 2007, I have learned that much information was withheld from the public view, both related to Purdue and to the role of the Sacklers who, I now understand, apparently made many of the decisions that led to this crisis. Your Honor, this made me feel as though we were being used as part of a scheme to make it look like the government was

taking bold action, while in reality many pertinent facts as to Purdue's conduct and the involvement of the Sacklers were hidden from view. When I learned that this bankruptcy proceeding could result in immunity from civil lawsuits for the Sackler family, I hoped and expected that the Court would understand the importance of making the truth known. For my family, the truth is the only thing that matters. No amount of money could ever fill the hole in my life created by the loss of my sweet daughter.

The best outcome to this bankruptcy proceeding for the many families that have been shattered by this company's aggressive and illegal marketing strategies is a fair, comprehensive and public review of all available evidence as to what exactly this company and the Sackler family have done. It is particularly important to shine a bright light on all available evidence so that the American public can understand, once and for all, exactly how this company and their owners conducted themselves and how their actions sparked the epidemic that continues to harm Americans.

If we are to avoid repeating the same mistakes made in the past, and if we are to learn from mistakes that have been made by our government in allowing this company to conduct itself in a manner detrimental to the public health, the secrecy must end – here and now. Your Honor, we know that this is our last chance.

As one of the many thousands of parents who have had their families ripped apart by the fraudulent marketing of OxyContin and the ensuing opioid epidemic, I believe it is critical that an independent examiner be appointed to credibly report the evidence in this case. Additionally, as someone who testified at the 2007 sentencing hearing, I would like to know how it is possible for Purdue Pharma and the Sacklers to have caused even more damage after a federal criminal prosecution and guilty plea.

Your Honor, I am not an attorney, I am not represented by an attorney in this case and I do not have access to the legal resources available to Purdue Pharma or the Sacklers. I

2

respectfully ask the Court to give my request the consideration due to a creditor's motion.

Sincerely,

Peter W. Jackson