Page 1

1    UNITED STATES BANKRUPTCY COURT

2    SOUTHERN DISTRICT OF NEW YORK

3    Case No. 19-23649-rdd

4    - - - - - - - - - - - - - - - - - - - - - - - - - - x

5    In the Matter of:

6

7    PURDUE PHARMA L.P.,

8

9            Debtor.

10   - - - - - - - - - - - - - - - - - - - - - - - - - - x

11

12                    United States Bankruptcy Court

13                    300 Quarropas Street, Room 248

14                    White Plains, NY 10601

15

16                    June 2, 2021

17                    3:11 PM

18

19

20

21   B E F O R E :

22   HON ROBERT D. DRAIN

23   U.S. BANKRUPTCY JUDGE

24

25   ECRO:  ART

1    HEARING re Continuance from June 1, 2021 Hearing via Zoom –

2    Motion to Approve (I) the Adequacy of Information in the

3    Disclosure Statement, (II) Solicitation and Voting

4    Procedures, (III) Forms of Ballots, Notices and Notice

5    Procedures in Connection Therewith, and (IV) Certain Dates

6    with Respect Thereto (ECF #2489)

7

8    HEARING re Notice of Hearing /Notice of Supplemental Hearing

9    on Debtors Motion to Approve (I) the Adequacy of Information

10    in the Disclosure Statement, (II) Solicitation and Voting

11    Procedures, (III) Forms of Ballots, Notices and Notice

12    Procedures in Connection Therewith, and (IV) Certain Dates

13    with Respect Thereto (related document(s)2489)

14

15

16

17

18

19

20

21

22

23

24

25    Transcribed by:  Sonya Ledanski Hyde

```
 1    A P P E A R A N C E S :

 2

 3    DAVIS POLK & WARDWELL LLP

 4         Attorneys for Debtor

 5         450 Lexington Avenue

 6         New York, NY, 10017

 7

 8    BY:  MARSHALL HUEBNER (TELEPHONICALLY)

 9         JAMES MCCLAMMY (TELEPHONICALLY)

10

11    WHITE & CASE LLP

12         Attorneys for Ad Hoc Group of Individual Victims of

13         Purdue Pharma LP

14         1221 Avenue of the Americas

15         New York, NY 10020

16

17    BY:  J. CHRISTOPHER SHORE (TELEPHONICALLY)

18

19    KRAMER LEVIN NAFTALIS & FRANKEL LLP

20         Attorneys for the Ad Hoc Committee

21         1177 Avenue of the Americas

22         New York, NY 10036

23

24    BY:  KENNETH ECKSTEIN (TELEPHONICALLY)

25
```

```
1   AKIN GUMP STRAUSS HAUER & FELD LLP

2        Attorneys for the Official Committee of Unsecured

3        Creditors

4        One Bryant Park

5        New York, NY 10036

6

7   BY:  ARIK PREIS (TELEPHONICALLY)

8

9   PAUL S. ROTHSTEIN, P.A.

10        Attorneys for Dr. Michael Masiowski

11        626 NE 1st Street

12        Gainesville, FL 32601

13

14   BY:  PAUL ROTHSTEIN (TELEPHONICALLY)

15

16   PILLSBURY WINTHROP SHAW PITTMAN LLP

17        Attorneys for Ad Hoc Group of Non-Consenting States

18        31 West 52nd Street

19        New York, NY 10019

20

21   BY:  ANDREW TROOP (TELEPHONICALLY)

22

23

24

25
```

1                    P R O C E E D I N G S

2          THE COURT:  Good afternoon.  This is Judge Drain

3    and we're here in In re. Purdue Pharma LP on the continued

4    hearing on the Debtors' request for approval on the

5    disclosure statement for Chapter 11 plan.

6          I have received and reviewed a blacklined fifth

7    amended joint Chapter 11 plan, blacklined against the fourth

8    one, that was discussed at the hearing last week and related

9    disclosure statement, as well as a blacklined proposed order

10   approving the disclosure statement and solicitation, other

11   confirmation procedures.

12         So why don't we hear from the Debtors' counsel.

13         MR. HUEBNER:  Thank you very much, Your Honor.

14   Good afternoon.  For the record, this is Marshall Huebner of

15   Davis Polk & Wardwell on behalf of the Debtors.

16         Your Honor, I am honored to not have needed

17   permission today to keep my camera off because, unlike in

18   every prior hearing, I am not in fact madly triaging

19   objections and resolving things and getting texts and emails

20   as we speak because, in fact, today is a monumental and

21   momentous day in these cases for the stakeholders of Purdue

22   and, hopefully frankly, for the opioid crisis and the

23   American people more generally.

24         Simply stated, Your Honor, we got there.  And when

25   I say we got there, let me tell you what I believe that that

Page 6

1    means.  Virtually, every single organized party in this

2    case, most of whom are representing hundreds or thousands or

3    tens of thousands or, in some cases, over 100,000 creditors

4    in many cases, entities that believed that they were victims

5    of Purdue's conduct and have claims in the billions or tens

6    of billions or hundreds of billions have worked together

7    now, in some cases for over a year, in some cases two years,

8    to come together with a plan and a structure and trust and

9    trust procedures that they believe do the best that is

10   possible with the assets of this company to both address the

11   opioid crisis and provide compensation or restitution where

12   possible.

13          The number of those groups that now stand in

14   support of the plan, I believe is close to if not actually

15   without any precedence in American bankruptcy history.  By

16   our count, it is the Debtors, the ad hoc committee of

17   supporting governmental entities, which as this Court knows,

18   includes the MDLPEC, a great number of states, and a variety

19   of major cities and counties and other governmental entities

20   as well, the unsecured creditor committee which has non-

21   governmental entities, and then ex-officio members as well

22   that was appointed by the Department of Justice to be

23   broadly representative of creditors and includes victim

24   advocates and individual victims, both adult victims and NAS

25   people, parents of grandchildren, you know, dealing with

Page 7

1    unthinkable situations and the like, as well as cities and

2    counties.

3           We have the MSGE group, the multi-state government

4    group, which speaks for thousands of municipalities,

5    separate arms of local governments, who obviously have the

6    material role both in the past and also in the future.  We

7    have the groups of tribes.  We have the personal injury

8    group, which I believe speaks for a number of clients in the

9    six figures, which all by itself would be the largest number

10   of claims ever filed in any other bankruptcy case in U.S.

11   history, just the PIs alone leaving aside all other claims

12   in this case.

13          We have two different sides of the NAS group: we

14   have the NAS medical monitoring group and the NAS personal

15   injury group.  There is also the hospitals group, which

16   organizes the core members earlier in the case.  There are

17   the third-party payors, and there are the rate payers.

18          And so, I want to say something loud and clear so

19   that it is not lost on anyone.  Nothing that is beginning to

20   move forward today to the next phase related to something

21   that has been agreed to between Purdue and the shareholders.

22   It has been agreed to after hundreds of millions of dollars

23   of work by an almost uncountable number of law firms, class

24   action law firms, mass tort law firms, corporate law firms,

25   litigation law firms, each representing clients with

Page 8

1    passionate deeply held views, all of whom believe that the

2    path we are now on is the best available path, including

3    people who are fiduciaries for their citizens at the local

4    level, fiduciaries for their citizens at the state level,

5    fiduciaries for all citizens at the federal governmental

6    level, and obviously two sets of fiduciaries appointed under

7    the Federal Bankruptcy Code.

8            We are, of course, aware that a small number of

9    individual creditors and the NAS NCSG and the schools and

10   potentially some individual states, including West Virginia,

11   are not yet on board.  And as I have said at every hearing

12   until the final moment of these cases, we will not stop

13   working to broaden the consensus even further from the

14   extraordinary, unprecedented level at which it already

15   stands.  We are mediating as we speak with the non-

16   consenting states.

17           As Your Honor heard two disclosure statement

18   hearings ago, we agreed, of course readily and happily, to

19   mediate before Kenneth Feinberg with the schools to see if

20   something could be resolved, and we continue to be open and

21   listen as hard as we can to all other remaining objectors

22   between now and confirmation.  But it does obviously bear

23   mentioning that the number of people who are actually

24   represented by the 11 groups already on board is, of course,

25   extraordinary in terms of the breadth and depth and scope of

1    the Chapter 11 case.

2            So, Your Honor, between our last hearing and this

3    one -- kind of feels like it was a while ago, but obviously,

4    it was only yesterday -- we actually were able to resolve

5    and document issues that the Debtors and other critical

6    stakeholders believed have to be resolved and put in an

7    appropriate level of documentation before we were

8    comfortable as fiduciaries for all, proceeding with

9    solicitations.

10            Number one is the final Sackler issue for now, and

11    I stress for now -- it should be lost on nobody as I've now

12    said it almost every relevant hearing -- we do not have a

13    fully executed settlement agreement.  We never thought that

14    we would.  It was never the goal; it was never realistic.

15    But we have, in fact, resolved the material business terms

16    in the settlement.

17            You know, there was the framework that I announced

18    a long time ago that has morphed radically since these cases

19    were filed, and then there were email agreements that came

20    out of mediation that provided a schedule of payments and

21    certain other salient numbers with respect to the mediator's

22    own joint proposal of 4275 that, as the Court knows, was

23    accepted by the AHC, the UCC, the MSGE, and the special

24    committee and negotiated.

25            And so, there is a lot of wood to chop and plenty

1    of peoples' rights are clearly reserved in the plan.  We

2    still have to get yes on execution documents that have to be

3    executed.  And, of course, as we discussed at the last

4    hearing or two, in utterly final form and probably even

5    signed by the plan supplement date.

6         The issue that was yet to be resolved as of

7    yesterday on this hopefully unlikely one, which is what

8    happens if, God forbid, 2022 has dawned and we have still

9    not gone effective and what exactly is sort of the relevant

10   rights and remedies and pathways for that pathway, we've

11   resolved it in a way that the AHC, the UCC, the debtors and

12   the Sacklers worked on until actually just about an hour and

13   a half ago.

14        And it actually is, in our view, quite reasonable

15   and acceptable, which is that if we emerge prior to February

16   28, 2022 -- and we expect to emerge well before then -- then

17   all of the payments are made exactly as set forth in the

18   schedule.  If we are delayed somehow beyond February 28,

19   2022, then the first regularly scheduled payment, which is

20   currently contemplated to be made on June 30, 2022, has to

21   be no earlier than the four-month anniversary of the last

22   day of the month in which we actually emerge.

23        Because the Sacklers have to make a payment on the

24   effective date, I may ask for a four-month window so that

25   payments don't get bunched together for reasons I don't

Page 11

1    really need to go into, but reasons that ultimately the

2    negotiating parties on the other side found acceptable.

3              And then the only other aspect of that -- which is

4    in fact, so unthinkably remote that I wouldn't even mention

5    it except for the sake of completeness, I don't want someone

6    to say he didn't mention it -- is that if we emerge after

7    October 2022, which I actually believe is unthinkable, then

8    the first payment as I already discussed is no earlier than

9    the four-month anniversary of the last month in which we

10   emerged.

11             But then the second annual schedule payment could

12   hypothetically be coming up right after that, so we've

13   agreed that there also needs to be a five-month window

14   between regularly scheduled payments, the annual payments

15   basically, that otherwise would be deferred and paid on the

16   later date because of a delayed effectiveness.

17             But to be clear, we think this second prong is, in

18   fact, unthinkable.  I don't even know what percent to assign

19   to it, .01, because we'd have to not be out of bankruptcy

20   for almost another year and a half, which I'm not sure

21   either the people or the entity would necessarily be able to

22   get there on.  And even the first one, which gives us all

23   the way to February 28th with no delay at all was an

24   acceptable resolution to the negotiating parties.

25             There were two primary intercreditor issues, Your

Page 12

1    Honor, that I described briefly yesterday were still

2    somewhat open, and those have now moved to a sort of

3    documented acceptable level of resolution.  Number one is

4    futures, or I really should again say potential futures

5    since the disclosure statement now adds language, and I

6    believe that, as I said yesterday, every party to whom I had

7    spoken about this issue believes, and I believe, stands

8    ready to help litigate as needed that.

9              In fact, there are no futures in this case given

10   the nature of the history of the company at a minimum since

11   2018 and the nature of the product.

12             But because we are extremely conservative and

13   careful and want to have a potential home for all parties,

14   even ones that we think extremely unlikely to in fact be

15   extent, the dynamic and structure that I discussed

16   yesterday, which is the personal injury claimant

17   representatives agreeing to administer a trust or sub-trust

18   funded essentially by, you know, the residential creditors,

19   the AHC agreed to this and the UCC was very much on board as

20   well, with $5 million, which for statistical reasons we can

21   explain at confirmation, we believe is far more than

22   adequate to deal with any potential future claims.

23             That has now been put to rest at a sufficient

24   level of documentation, which in our view -- obviously, the

25   Court ultimately, hopefully will share that view -- but the

1   Debtors and the PIs and the UCC and the AHC believe that we

2   have done what we need to to be able to move forward today

3   and not suffer the terrible economic loss and really

4   terrible further delay of not being able to keep the

5   schedule that we've all worked so hard to keep.

6           The final issue, Your Honor, as I discussed

7   yesterday, was fees.  And I'm delighted to report -- again,

8   subject, of course in all events, the Court's satisfaction -

9   - that that issue has now likewise been resolved.

10          This is a complicated case and obviously, as the

11  Court knows as I've described and others have as well, you

12  know, there are, among other things, law firms who have been

13  working on this situation on a contingency class action type

14  basis for years, you know, as I understand it in many cases,

15  on their own nickel and believe -- and I'm sure it's true --

16  that they are in no small part, along with the AG's offices

17  themselves, you know, responsible, at least in part, for

18  bringing us to where we are now and the hope to put billions

19  of dollars to work virtually exclusively for abatement.

20          And so, sorting out with all those various groups

21  that I mentioned who are both advocating for their own

22  clients, in some cases, you know, very passionately opposite

23  the states; for example, in phase one mediation where, as we

24  discussed at prior hearings, both the NCSG and the AHC,

25  played such a powerful vibrant role in working out the sort

Page 14

1    of public-private split in the cases, and then in other

2    cases, you know, opposite Purdue itself both prior to and

3    during the bankruptcy case.

4            And so, there is a structure in there that in

5    very, very broad brushstrokes what I described the other day

6    about the governmental side legal fees, which will go, among

7    other things, to states and counties and non-federal

8    governmental entities directly, in part to reimburse some of

9    those entities who did not hire outside counsel but

10   nonetheless invested massive resources in this situation

11   over an extended period in some cases, obviously to the law

12   firms that some of those governmental entities did hire, in

13   many cases, on a contingency basis, although that's not

14   something to which the Debtors' have particularly material

15   visibility.

16           There are also obviously the fees of each of the

17   private groups that were addressed at a very high-level sort

18   of summary term sheet form in the phase one mediation term

19   sheets that were agreed to under the auspices of Messrs.

20   Feinberg and Lane, or I guess Judge Lane and Mr. Feinberg.

21   And then there is also the, essentially for lack of a better

22   phrase, the MDL common benefit construct, which I think in,

23   you know, 30,000-foot terms, reflects an agreement of

24   roughly 5 percent overall to come from each of the organized

25   private groups, in many cases paid by their employers in

Page 15

1    sort of a formulaic split, to be tendered over to the MDL

2    common benefit fund, which again, not my world.

3            But I have been told repeatedly that this is

4    entirely typical in sort of the mass tort/MDL context that

5    sort of, you know, the people who were, you know, first and

6    primarily on scene and did the work for a very extended

7    period, you know, essentially do get a fee fund or sharing

8    or enhancement with respect to the recoveries of people who

9    come later and who benefit greatly from the work done by

10   those who came before them.

11           So that also, in several places, including in

12   particular I think Section 5.8 of the plan, is now

13   documented.  I believe that it has been agreed to or is no

14   longer being objected to by any of the private groups, and

15   the language was negotiated with extraordinary focus by many

16   parties; maybe that's the most artful way to say it.

17           And so, with respect to things that are open --

18   again, as I already said before, I don't need to belabor it

19   -- there is still a lot of work to do with the Sacklers and

20   there are different dates on which different things have to

21   be done and finalized.  And I think the commercial spirit of

22   wanting to get this done, along with that kind of primaries

23   agreed to continue and I think many parties believe we are

24   going to get there, which is why we're actually ready to

25   launch solicitation with the level of documentation and

Page 16

1   there are some very detailed collateral term sheets attached

2   to the documents, and we'll talk in a few minutes about some

3   of the many things we added to the disclosure statement on

4   that front.

5        I think one of the relatively few things I was

6   corrected on at the prior hearing by Mr. Fogelman, who by

7   the way, is awesome -- I just want to say that for the

8   record, and I think the federal government's participation

9   has really been a model in this case and we are grateful for

10  their engagement, including at just all hours of the day and

11  night, both nights and weekends -- you know, corrected me

12  slightly that the federal government is still, you know, in

13  the process of approving the deals that were agreed to and

14  are laid out.  But I have confidence that they wouldn't be

15  permitting solicitation and put the discussion and

16  description of the deals in the documents if they didn't

17  have a pretty high degree of confidence that those were

18  going to be sort of finally stamped and chopped and double

19  signed as they need to be.

20        Obviously, since the futures and personal injury

21  thing came together very quickly, there is documentation to

22  do on that, you know, is it a trust or a sub-trust or

23  vigenary rights, you know, all sorts of things like that we

24  discussed a little bit yesterday.  But those are things I

25  think, given the standard under 1125, that I think it is, I

Page 17

1   believe, clear beyond peradventure know, you know,

2   individual hypothetical creditor has to know exactly how

3   those sort of, you know, arterials and capillaries

4   ultimately are routed in order to cast an informed vote on

5   the plan.

6         So, Your Honor, it is an extraordinary day,

7   obviously, we don't take for granted.  This is not the end

8   of the confirmation hearing.  No one is taking a valedictory

9   lap of any kind.  There are hundreds of thousands of

10  creditors who need to vote.  There are two litigations left

11  to do.  I have no doubt that there will be some, you know,

12  serious things to discuss at the confirmation hearing.

13        But the fact that so many representatives of so

14  many groups who have worked for so long have all come to the

15  resolution where they affirmatively support the plan, asked

16  that it be sent out for votes to creditors, as is sort of

17  our way in this country, can cast an informed vote and then

18  ultimately bring to the Court any legal issues that remain

19  is obviously, I think an achievement on the part of so very

20  many people that it actually does take a minute to sort of

21  pause and note.

22        So, Your Honor, what I was planning to do at this

23  point was to take -- I mean, obviously I will do none of it

24  or only part of it as is the Court's pleasure -- to take a

25  very high-speed tour through the blacklined disclosure

1    statement that was sent out to I believe all 124 core

2    parties who are on the Court's Zoom list.  We also obviously

3    filed pleadings and blacklines as soon as was humanly

4    possible.

5              I am not, of course, going to stop and say, you

6    know, on this here page, we changed fourth to fifth.  I

7    think I can hopefully be prejudicious in sort of deciding

8    what needs to be worked on and explained for the parties.

9    The public, for example, who may not have had time or

10   interest or inclination to wade through a highly technical

11   390-page blackline in the last 62 minutes, or I could not do

12   that at all if the Court feels that, you know, the nature of

13   the blacklining and the Court's own review was sufficient

14   that there's simply no need for a walkthrough.

15             But we do not know of any unresolved issues, even

16   with respect to the objectors that I would say were largely

17   overruled.  My hope, although someone is always welcome to

18   surprise me, but I affirmatively do not know of anyone whose

19   issues are unresolved.  I believe that, for example, with

20   respect to Mr. Rothstein's clients, I think there's a way

21   forward that Mr. (indiscernible) can describe that actually

22   results in the resolution of that disclosure statement

23   objection.

24             With respect to Mr. Lipson's client, I believe

25   that while he obviously filed an examiner motion that I am

Page 19

```
 1    not going to discuss today unless the Court directs me to, I
 2    believe that his disclosure statement issues are now
 3    resolved and, of course, he did make clear that he reserves
 4    his rights with respect to confirmation and other issues.
 5    And I am hopeful that the Court, having of course, reviewed
 6    it, will see not only that we didn't have the word that
 7    twice anywhere anymore, but that also the many comments made
 8    by the Court on the disclosure statement and the procedures
 9    order were hopefully input to the Court's satisfaction.
10              So I guess probably I should just simply stop
11    talking for a moment because it certainly is more than
12    possible that somebody else would like to speak before I go
13    into, if it is the Court's pleasure, kind of a high-speed
14    walkthrough of the changes in the documents.  But obviously,
15    I'm sort of here to serve, so whether it is the Court or
16    someone else, I'm honored and happy to take direction for
17    whatever seems most sensible for the rest of this hearing.
18              THE COURT:  Okay.  Well, I did have a chance to go
19    through the documents.  Maybe it'd be worthwhile for me to
20    give you my comments and questions first and then we can see
21    if we need to hear from anyone else.  The answers to those
22    comments and questions may obviate anyone else raising
23    issues, at least on those points.
24              MR. HUEBNER:  Sure.
25              THE COURT:  I thought I would begin with the
```

Page 20

1    disclosure statement first, the redlined version if you all

2    have it there.  And I appreciate that the Debtors and the

3    other parties were working on this document until quite

4    recently, so some of my comments may already have been

5    addressed.

6              On page 2 and 3, there's some bracketed language.

7    On 2, there's brackets around the ad hoc group of individual

8    victim's support, and then on page 3, there's bracket

9    language that says a statement from the official committee

10   of unsecured creditors regarding their support for the plan

11   is included in the solicitation package.  And there's a

12   later section -- if I can find it -- on page 24 that also

13   has brackets for the ad hoc committee support, as well as on

14   25, brackets around the creditors' committee statement

15   regarding confirmation.

16             So those are all -- obviously it's related

17   question to your comment, which is what is the status of the

18   brackets at this point; are they coming out; are they

19   staying in?  I don't know if you could have the language

20   stay in if it's not the case.  I was assuming they were

21   placeholders until the point where you're going forward.

22             MR. HUEBNER:  So, Your Honor, I'll let Mr. Shore

23   and Mr. Price speak for themselves, and Mr. Eckstein as

24   well.  I'm quite confident I know the answer and it's a good

25   one, that just the brackets could not come off at 1:08 p.m.,

Page 21

1    but the brackets are and will be coming off at 3:35 p.m.

2    We've actually confirmed that directly with Mr. Price.  Mr.

3    Eckstein, I actually forgot that I promised Mr. Shore that

4    the PI brackets were still in there as well, so I don't want

5    to over speak, but I'm pretty sure I know the answer.

6            THE COURT:  Okay.  I don't care which of you wants

7    to go first.  Mr. Price, did you want to go first?

8            MR. PRICE:  Sure.  I can confirm that the reason

9    the brackets was put on is because we were waiting to see

10   the final documents, but they can come off now and I can

11   confirm what Mr. Huebner said.

12           THE COURT:  Okay.  And before I hear from the

13   other attorneys, I want to say I reviewed the committee

14   letter that's referred to in the disclosure statement and

15   provided what I think were fairly mild comments really aimed

16   at making sure it was clear.  And as I understand it, that

17   would be the version that would go out, Mr. Price?

18           MR. PRICE:  Correct.

19           THE COURT:  Okay, and I'm comfortable with that

20   going out.  It's an unusual letter in support of a plan in

21   that most such letters are usually a page to two pages.

22   This is a very lengthy description of the work that the

23   official committee did and their thought process with

24   respect to the plan and the case as a whole.

25           And in the context of this case, which is one

Page 22

1    where the committee has worked very diligently but very

2    often behind the scenes and they do represent essentially as

3    a fiduciary all of the unsecured creditors in this case,

4    which is essentially all of the creditors in this case, they

5    I think will write, and having a more complete expository

6    letter so that people really could get a largely or in large

7    part behind the scenes look at all the things that they have

8    done in the case, so I'm comfortable with the length here.

9              I think it should be more than just a hyperlink.

10   I think there are, as Mr. Huebner said, a really large

11   number of creditors here.  And I think within that large

12   number, there's probably a large number of people who really

13   don't, even in today's day and age, feel comfortable with a

14   hyperlink in a document that they receive.  I don't know if

15   that's been discussed with the Debtors, but I think there

16   needs to be some way to get access to it besides just a

17   hyperlink.

18             MR. HUEBNER:  Let me help, Your Honor.  We'd

19   always intended to append it, and I actually believe there's

20   a reference later in the document that does append it.  We

21   obviously view the UCC debtor as being categorically very

22   different than the sort of websites of the Sacklers, for

23   example, and I believe that we're soliciting -- you know,

24   people get documents different ways, but whatever way it's

25   sent out, it will be either electronically or in paper

Page 23

1    depending on the nature of the package that's sent; it won't

2    just be a hyperlink.

3              THE COURT:  Okay.  All right, very well.  So Mr.

4    Chore for the ad hoc group of individual victims.

5              MR. SHORE:  Thank you, Your Honor.  This is where

6    we are right now.  We have not run the formal process of

7    getting committee approval, and it is a little different

8    because constituents of this group are a little different

9    than the creditors' committee.

10             We will try to get that done.  The changes that

11   were made this morning, in our view, were material changes

12   that resolved issues that we had.  We'll leave the brackets

13   in for now.  We'll try to get rid of them before the Debtors

14   send the document out for solicitation.  If we can't get

15   there for whatever reason, we can just take it (sound

16   glitch).

17             THE COURT:  I'm sorry.  We could what?

18             MR. SHORE:  We would just then take out the

19   language that had -- just take out the bracketed material.

20             THE COURT:  Okay, that's fine.  And then Mr.

21   Eckstein for the ad hoc committee.

22             MR. ECKSTEIN:  Your Honor, good afternoon.

23   Kenneth Eckstein of Kramer Levin, counsel for the ad hoc

24   committee of governmental entities.

25             First, Your Honor, we appreciate the Court's

Page 24

1   indulgence both today and over the last several days in

2   accommodating what was a very lengthy process, and we

3   appreciate the patience and the Court of letting this play

4   out because a lot of constructive progress has been made

5   over the last several days.

6        Your Honor, I'm pleased to be able to report that

7   the ad hoc committee supports the disclosure statement be

8   approved today.  That doesn't mean that there are not still

9   a few remaining items that are open, both on a preliminary

10  level and a more extensive level.  But I think at this

11  point, we have built in appropriate consent rights in the

12  documents that will allow us to deal with the various issues

13  that we need to get handled over the next several days and

14  weeks.

15       And so, based upon the consent rights and the

16  understandings that we've reached, the committee is

17  supportive of approval of the disclosure statement and

18  believe it is appropriate and a very positive step to move,

19  hopefully, toward the confirmation.

20       THE COURT:  Okay.  So I think that section is on

21  page 24 of the blacklined.  I had sort of a subsidiary

22  question, which is there were some -- I think you and

23  counsel for the Debtors may want to look at footnote 33,

24  which appears in that box on page 24, to see whether all of

25  those things are still the case or whether some of them come

Page 25

1    out at this point.

2            MR. HUEBNER:  The whole footnote comes out.

3    Again, those are things we resolved between 1:12 and now.

4            THE COURT:  All right, very well.

5            MR. HUEBNER:  We're going to remove the footnote.

6            THE COURT:  Okay.  On a different topic of

7    brackets, footnote 6 on page 5 has brackets upon, in one

8    section in the instructions on where to find the current

9    filings.  Someone just needs to make sure that those

10   instructions are clear and that the brackets should come

11   out.  I'm assuming it probably does.

12           MR. HUEBNER:  Your Honor, just to give the Court

13   comfort.  There's obviously going to be a full bracket

14   search before anything goes to print.  Because the schedules

15   and attachments were still coming in, but we wanted to get

16   this on the docket as soon as humanly possible the second it

17   was agreed to, we just chose to do it in that order.  So

18   some of these brackets, you know, again, were still true at

19   1:12 and are not true by now.

20           THE COURT:  Okay, that's fine.  So the next set of

21   comments appears on multiple pages of the disclosure

22   statement and also in the solicitation exhibits.  I still

23   think the description in the disclosure statement and

24   instructions on the solicitation form is still confusing on

25   the steps that a non-NAS PI claimant and an NAS PI claimant

Page 26

1    need to take with respect to the next step in processing

2    their claim.  They appear at page 8, 11, 13, 109, I think

3    that may be it, of the -- nope, 114 -- of the disclosure

4    statement and 119 and 121.

5         The good news is that they appear twice in each --

6    on those pages because there's the same information given

7    for the non-NAS PI claimants and the NAS PI claimants, so

8    the number of changes looks like a lot but it's the same for

9    each group.

10        And I think the description on page 13 is the

11   right one and I would just suggest that you mimic it in the

12   other sections.  Again, the concept is that you must return

13   the form indicating whether you opt out in order to opt out

14   and go to the tort system, but you do not need to fill out

15   the sections of the form regarding supporting evidence of

16   your claim, and that's well stated on page 13.

17        However, if you do not return the form at all or

18   if you choose not to opt out and don't fill out the form,

19   then your claim won't be allowed.

20        MR. HUEBNER:  So, Your Honor, let -- sorry,

21   apologies.

22        THE COURT:  I mean, I think my concern is that

23   when you read this language, someone will think I've got to

24   fill out the evidence on the claim form whether I opt out or

25   not, and that's more confusing on the other pages than page

1    13.

2              MR. HUEBNER:  So, Your Honor, if I may, let me

3    just ask Mr. McClammy: Does this make sense, are you good

4    with this; can we take page 13 and essentially replicate it

5    on all the other cited pages; is there anything that we need

6    to describe or explain or is the judge just sort of dead

7    right and we'll do it?

8              MR. McCLAMMY:  Yeah, no.  I don't think that we

9    should have any problem with that at all.

10             MR. HUEBNER:  Okay.  Consider it done, Your Honor.

11             THE COURT:  So the one change on 13 I would have

12   is in that second full paragraph, it says that if you fail

13   to submit your claim form by this deadline, you will be

14   deemed not to have opted out and will, therefore, be subject

15   to the non-opt-out provisions of the PITDP described above,

16   which provide that if you fail to -- and then I would add

17   this phrase -- "complete and return the NAS PI claim form by

18   the deadline, your personal injury claims will be

19   disallowed."

20             So just to make it clear that unless they're

21   opting out and they send that opt-out form in, they have to

22   actually complete the rest of the form and send it in.

23             MR. HUEBNER:  So, Your Honor, assuming I was

24   following correctly, you want the words, "complete and" --

25             THE COURT:  Yeah.

1          MR. HUEBNER:  -- added before the word "return."

2          THE COURT:  Right, complete and, exactly.

3          MR. HUEBNER:  Done.

4          THE COURT:  And I think you just have to make

5    corresponding changes on those other pages that I

6    referenced.

7          MR. HUEBNER:  Yeah.  And, Your Honor, it's not so

8    easy to see in the blacklined, but, you know, we've bolded

9    things where we want to make sure that they're sort of

10   maximal visual pop out for people to make sure that they

11   don't miss the language, and we'll obviously ensure that the

12   formatting that sort of gives a shoutout to things that are

13   really quite important to individuals is as clear as we can

14   make it.

15         THE COURT:  Okay.  So on that point on 109 and

16   114, you have that highlighted language, which says:

17   Regardless of whether you elect to opt out or to have your

18   claim liquidated under the non-NAS PITDP, you must submit

19   the non-NAS PI claim for as instructed by the deadline,

20   which is 90 days -- the other one says 150 for the NAS ones

21   -- after the non-NAS PI claim form is disseminated.  Failure

22   to timely submit the non-NAS PI claim form -- and there's a

23   parenthetical -- and any required supporting evidence).  And

24   then I would add this phrase, for those who do not opt out -

25   - and then the closed parenthesis -- will result in your

1    claim being disallowed.

2           MR. HUEBNER:  Where it says fail to submit, would

3    you like it to say fail to complete and submit so that it

4    matches?

5           THE COURT:  This is in the special highlighting

6    language that you referenced.

7           MR. HUEBNER:  Oh, okay.

8           THE COURT:  And before the end of that

9    parenthetical after the word evidence, I would add, for

10   those who do not opt out.

11          MR. HUEBNER:  Okay.  Mr. McClammy, could you just

12   nod so I know that this is all agreed?

13          THE COURT:  He's nodding.  And then the same

14   change would be on 119.

15          MR. McCLAMMY:  For the record, yes.

16          THE COURT:  And the same change would be on 119

17   and the parenthetical which deals with the NAS PI claims.

18   And there's a similar change in Exhibit 2-A and Exhibit 2-B

19   dealing with, aging, this same point, so you just make

20   similar changes there.  Okay.

21          MR. HUEBNER:  Absolutely, Your Honor.

22          THE COURT:  All right.  Okay.  If you go to page

23   116 of the blacklined disclosure statement, there's the

24   section dealing with hospital claims and the hospital trust

25   and there's the boldfaced language, which hasn't changed

Page 30

```
 1    from version four, saying what needs to be returned, the

 2    hospital abatement distribution form within 45 days of the

 3    deadline.

 4             At the hearing last week, there was discussion

 5    where it was asserted that unless you are literally a

 6    hospital -- for example, if you're not a hospital and you're

 7    an emergency room, business or physician -- you can't get

 8    the information necessary to fill out the form.  And I said

 9    the Debtors should go and discuss that and see if that's

10    true and if that's the case, they need to make sure the form

11    is something that people who fit into the hospital claims

12    beneficiaries' claimants' group could actually submit a

13    claim on.

14             So I don't know if this has been resolved, but I

15    just wanted to raise it because there wasn't a change as far

16    as I could see.

17             MR. HUEBNER:  Mr. McClammy, could I ask your

18    assistance on this?

19             MR. McCLAMMY:  Certainly, yes.  We did go back,

20    Your Honor, and both look at that provision and also have a

21    discussion with counsel for the hospital group and have

22    gotten comfortable that, one, obviously as Your Honor is

23    aware, the description of who was able -- who fits within

24    this class includes the healthcare providers that have filed

25    proofs of claim.
```

Page 31

1               THE COURT:  Right.

2               MR. McCLAMMY:  But two, that they are, in fact,

3       able to submit the necessary certifications and paperwork to

4       demonstrate that they've had a loss and are otherwise

5       qualified to receive a distribution under the trust

6       distribution procedures.

7               THE COURT:  Okay.

8               MR. ROTHSTEIN:  Your Honor, this is Paul

9       Rothstein, although it shows Kyle Alexander.  We have agreed

10      to continue to enter negotiations and discussions with the

11      Debtor in regards to this, and we've also agreed that we

12      will reserve the rights to raise this as a confirmation plan

13      issue if we're not able to reach a resolution.  They'd

14      promised us good faith negotiations.

15              THE COURT:  All right, that's fine.  Thank you.

16      On the same page, it's above this, it's the paragraph on the

17      future PI channel claims.  Right at the bottom of the

18      paragraph, it says that all amounts remaining in the PI

19      futures trust upon the resolution of all future PI channel

20      claims asserted by holders of future PI channel claims on or

21      about the sixth anniversary of the effective date shall be

22      contributed pursuant to the confirmation order and in

23      accordance with the PI futures trust documents.

24              I guess the obviously question is contributed

25      where.  I mean, is there a sort of a general statement that

Page 32

1    can be made there or is it...

2            MR. HUEBNER:  Yeah.  So, Your Honor, I believe it

3    to be the case, but I'll ask Mr. Shore or one of his

4    colleagues to correct me if I misspeak, that the reversion

5    is to the PI trust, in part, so that if there are futures

6    who are PIs, we can sort of pro rata everybody, both in the

7    futures category and the main PI category, to ensure that

8    the treatment remains, you know, non-discriminatory and even

9    per, you know, number of points or a category evidentiary or

10   the like.

11           But, you know, there were a bunch of subteens as

12   were raising on about 20 issues to get to today.  So if the

13   final final final lap is, otherwise, I'll ask someone to

14   correct me, but I believe the missing noun is the PI trust.

15           THE COURT:  Okay.

16           MR. BICKFORD:  Your Honor, Scott Bickford.  May I

17   speak?

18           THE COURT:  Sure.

19           MR. BICKFORD:  I'm representing the NAS ad hoc

20   committee.  I would just point out to Mr. Huebner that the

21   NAS children actually maybe more prone to have a latent

22   onset of a condition which is not a present injury at this

23   point.  And as you're drafting this language, I notice that

24   the NAS children versus the PI trusts were left out, and

25   since they're separate pots now, I would ask you to consider

Page 33

1   that, or the Court consider.

2            THE COURT:  Well, I think Mr. Huebner's answer, as

3   I took it, was it would be contributed to the PI trust for

4   pro rata distribution to any remaining future PI channel

5   claims and PI claims and that would -- if an NAS PI -- well,

6   it wouldn't be an NAS PI creditor, it'd be a future creditor

7   who happened to be an NAS victim would a future creditor, so

8   it'd be pro rata to them.

9            MR. HUEBNER:  So I think that I tried very hard

10  not to misstep, so I do think I need Mr. Shore to reflect on

11  whether the percentage split between adult and NAS would

12  summarily be, you know, sort of coin sorted.  And again,

13  we're talking about probably very small sums, but

14  nonetheless, it's not really for me to confirm.  I think I

15  need Mr. Shore to speak up.

16           MR. SHORE:  Yeah.  Your Honor, this is one of the

17  issues that was a follow-on issue to the big issue, which is

18  making sure which trust is responsible for what types of

19  claims.

20           THE COURT:  All right, so it's still being sorted

21  out.

22           MR. SHORE:  Yes.

23           THE COURT:  And we're talking about a relatively

24  small amount of money.

25           MR. SHORE:  Correct.

1          THE COURT:  Okay, that's fine.  So I guess there's

2     no change that needs to be there.

3          MR. HUEBNER:  Especially, Your Honor, just to give

4     everybody the more (indiscernible), because obviously the

5     expenses of doing this have to get paid out of the corpus

6     and it's six years.  Even with very efficient low-cost

7     administration, it's just hard to see that there's going to

8     be a material sum left within the scope of the existing main

9     trust and the like, but we'll figure it out.  People are

10    moving quickly here and it's a very minor economic point,

11    but we'll figure it out.

12         THE COURT:  Okay.  And I appreciate people have

13    been working very hard on this issue around the clock, but I

14    found this language confusing.  It appears at page 21 and

15    238 of the blackline, it's also in the plan, and it deals

16    with the operation of 5.8.

17         It says, to the extent a holder of -- and it lists

18    what I'll refer to as the private side claims -- or any ad

19    hoc group consisting of holders of any of the foregoing has

20    retained counsel through a contingency fee arrangement.  The

21    full amount payable under Section 5.8(c) of the plan shall

22    be deducted from any contingency fees owed to such

23    contingency counsel; so far clear.

24         And then it says, however, the applicable holder

25    and its counsel in their sole discretion may agree that an

Page 35

1    amount up to but not exceeding 40 percent of the amount

2    payable under Section 5.8(c) of the plan may be implied to

3    the reimbursement of actual costs and expenses incurred by

4    such holders' counsel, in which case, such agreed cost

5    reimbursement amount shall not reduce the contingency fee

6    amounts payable to such counsel.

7              So I just want to make sure what we're talking

8    about here are costs and expense, not fees, that's point

9    one; is that right?

10             MR. HUEBNER:  I'll be subject to correction, but I

11   believe the answer is yes, Your Honor.  This is 40 percent

12   of essentially the 5 percent that is at issue here, so it's

13   essentially 2 percent that is potentially allocable to

14   actual costs and the like, as opposed to reducing the

15   contingency fee award.

16             THE COURT:  Okay.  I just wanted clarification on

17   that.

18             MR. HUEBNER:  And I think Your Honor is exactly

19   right.

20             THE COURT:  I wanted clarification on that.  I

21   mean, I had someone argue to me the other day costs and

22   disbursements includes fees and I laughed at her, but

23   nevertheless, I don't want to, you know, leave that stone

24   unturned and in this context.

25             MR. HUEBNER:  Again, Your Honor, I do want to

Page 36

1    pause because, as I was very upfront about, this is not my

2    world.  I'm quite -- pretty sure I'm right, but if someone

3    believes that I am not correct and fees are meant to be

4    captured by this and not merely actual costs and expenses,

5    like I said the other day, please speak now or forever be

6    deemed to agree.

7              THE COURT:  Okay, all right.  I'm seeing people

8    either nodding or not nodding, but they're not telling me

9    otherwise.  I mean, that's certainly how I read costs and

10   expenses here.

11             MR. HUEBNER:  And certainly is how we do as well.

12             THE COURT:  Okay.  All right.  I only have two

13   other points on the disclosure statement.  The next to last

14   one is on page 156 to 157, where the Debtors, as we

15   discussed, added substantial language about the Sackler

16   family's wealth.

17             The one thing that's missing here, unless it's

18   somewhere else, is just sort of an aggregate number.  I had

19   assumed that you would give an aggregate number and then the

20   discussion about how it's actually distributed in a fairly

21   complex way among the various family members, but I didn't

22   see an aggregate number.

23             MR. HUEBNER:  Yeah.  So, Your Honor, I actually

24   think it is somewhere else.  There are actually two

25   different sections that address the Sackler wealth.  One of

1    them, as Your Honor had specifically requested, you asked us

2    not to merely hyperlink and discuss the wealth presentation

3    lead by -- not lead, that was not the word I meant to use --

4    released by Congress.

5              I would ask somebody from my team, since I'm

6    working kind of fast here and I'm not used to being on

7    camera, where we can point the judge to that other section

8    that, in fact, has the A side aggregate number, the B side

9    aggregate number, describes the bring down that Mr. Joseph

10   described recently, and what it did and did not do to the

11   number in the congressional.  It is there; I just need the

12   page number.

13             MR. KLEIN:  Your Honor, it's Darren Klein from

14   Davis Polk.  If you look at the new language on page 164 and

15   165 of the blackline, it starts with, this side A and side B

16   breakdown of 4.8 billion and 6.2 billion respectively.

17             THE COURT:  Okay, I see it.  I see it, which is

18   really -- I mean, it's a continuation from the language that

19   I was pointing to, so I do see it.  Thank you.  And then my

20   last --

21             MR. TROOP:  Your Honor?

22             THE COURT:  Oh, go ahead, Mr. Troop.

23             MR. TROOP:  I'm sorry, Your Honor.  I was just

24   going to say if we can stay on this point for just a second

25   so I can ask a question if you don't mind.

Page 38

1              THE COURT:  Okay.

2              MR. TROOP:  Andrew Troop for the non-consenting

3    states.  Your Honor, I think one of the things that we

4    talked about in a previous hearing was whether the

5    congressional numbers are the same numbers that the Debtor

6    has, and that is that the purpose of this was to display

7    what the Debtors have, not merely what congress has.

8              And as I read the two sections together, the one

9    that you referred to earlier and this one, it is admittedly

10   unclear to me whether the Debtor is saying that its

11   information and the information that it relied on is the

12   same as the information that is included in these

13   congressional references and, therefore, is as admitted to

14   varying degrees out of date or whether the Debtors have more

15   up-to-date information or different information.

16             And I had heard Mr. Huebner say last time he

17   needed to check to see whether they have it under some

18   confidentiality restriction or the like or not, and in that

19   regard, I may have a view as to whether the Debtors should

20   be allowed to keep it confidential in this context.

21             But at the very least, the Debtors should disclose

22   whether they have it and whether they're not disclosing it

23   because it's confidential.  And I'm not casting aspersions

24   on anyone; it's really just a question unclear to me from

25   the last hearing.

```
 1                THE COURT:  Okay.

 2                MR. HUEBNER:  Sure.  So, Your Honor, let me

 3     volunteer a couple of thoughts.  Number one, I think we

 4     should turn back to page 156 because there's a paragraph

 5     that I think is going to be quite important on this point.

 6     And let me first zoom out for a minute because every time

 7     someone just says the Debtors, and maybe people maybe

 8     misunderstand that this is a deal between just the Debtors

 9     and the Sacklers, I just have to stop and say that's just

10     not the right way to think about it.  It is the official

11     committee of unsecured creditors, the Debtors, the AHC and

12     UCC.

13                THE COURT:  Right.

14                MR. HUEBNER:  So when you turn to page 156, you'll

15     see the first entirely new paragraph actually expressly

16     discusses -- and by the way, this is another place where Mr.

17     Troop and the NCSGs get another vote of thanks and a

18     shoutout and acknowledgement because obviously, they joined

19     the UCC in most of the most hard-hitting and intense

20     discovery filed against the Sacklers.

21                And Your Honor surely remembers that banks all

22     over the world were subpoenaed and had to provide

23     substantial information in discovery and the like, and so,

24     that's exactly what this first paragraph on 156 talks about,

25     which is that there were additional sources.  We obviously
```

Page 40

1    didn't rely on the congressional report.  We and actually

2    the NCSG as well as the proponent of discovery, and so,

3    let's be clear about it all, got very substantial

4    information about the Sacklers' wealth and its location both

5    in (indiscernible) presentations contemplated by

6    stipulations those many years ago.

7            Then in very hard-hitting discovery, as the Court

8    remembers, the Sacklers brutally -- sorry, shouldn't be

9    adding title -- the Sacklers fought very hard and

10   ultimately, there were sort of settlements on the courthouse

11   steps.  Then in connection with what I'll just call the pods

12   and the satisfaction of the four negotiating parties

13   opposite the Sacklers, we did receive further detailed

14   information about the asset mix and overall net worth and

15   liquid net worth of each of the various pods, which is what

16   led to the very detailed term sheets and other full set of

17   covenants and collateral and new SBV structures and all

18   sorts of stuff to protect people.

19           Mr. Troop's question is, and it's a fair question,

20   do the Debtors -- and I guess I'll just add it's just the

21   Debtors, I can't speak for others -- know of financial

22   information about their net worth that is different than the

23   information to which, for example, Mr. Troop is privy, and I

24   believe it is different than the defied bring down coupled

25   with the congressional wealth filing.  I believe the answer

Page 41

1    is no.

2              Whereas I think we have much more detailed

3    information on a pod-by-pod basis, but I do not believe that

4    we have a reason to believe that we have a reason to believe

5    that the numbers that are public are fundamentally incorrect

6    and either understate or overstate their wealth.  But I did

7    not expect this question and obviously, I'm dealing with

8    dozens and dozens of issues.

9              And so, I would ask Ms. Libby, for example, if she

10   is comfortable, confirming that that appears to be correct

11   or if we need to go talk to the many financial advisors --

12   two for the Debtors at least, two for the AHC at least, two

13   for the UCC at least -- who did the diligence to confirm

14   that it is the view of those who are sophisticated in

15   financial matters and diligence -- which I'm just a lawyer,

16   I'm not -- you know, we believe that there is a variance

17   that needs to be disclosed.

18              So Ms. Libby, if I could ask you in the first

19   instance and if the answer is we're just not comfortable

20   answering on the fly because it just wasn't a question that

21   we thought we were going to get asked, that's a fine answer.

22   But I'm just -- I want to be very careful not to over speak

23   about what we know.

24              MS. LIBBY:  Sure, Your Honor.  I think the answer

25   is that we did receive additional information.  I do not

Page 42

1    believe that anything that we've received is, you know,

2    materially inconsistent with what has been publicly

3    reported, and obviously, the Sacklers have put out their own

4    information which is consistent with that.

5            You know, part of the issue is that much of the

6    actual valuation, you know, it depends on the value of the

7    IACs themselves, so it's sort of hard to put out a concrete

8    number with respect to that.  But I do think that what we

9    have is probably largely accurate, though we're, of course,

10   happy to go confirm with financial advisors.

11           MR. HUEBNER:  Yeah.

12           THE COURT:  Well, what I would suggest -- and

13   obviously is Mr. Price or Mr. Troop have something to

14   suggest to you that this isn't accurate -- you add a

15   sentence on page 164 after the reference that Mr. Klein

16   directed me to, to the 4.8 and 6.2 billion, to state that

17   while as discussed at wherever this section is -- that the

18   discussion on page 156, the Debtors and other parties were

19   provided with substantially detailed information or

20   substantially more detailed information than those

21   documents.  The Debtors do not believe that the aggregate

22   value stated above -- I'm sorry -- the value of the assets

23   stated above is materially different than the amounts set

24   forth in those documents.

25           MR. HUEBNER:  Yeah.  And, Your Honor, because

Page 43

1    there are three parties who are opposite the Sacklers who

2    each had two financial advisors, we're actually going to

3    confirm that with the UCC and the ad hoc before we do it.

4    And I would ask Mr. Troop -- because, again, this is just

5    about truth and information -- that if he or others believed

6    that those numbers are materially wrong based on facts they

7    have, I would ask that someone call us and tell us that

8    because it would be very weird if someone sort of, you know,

9    asked us to do all this and then the next day -- which I'm

10   sure is not the case -- says, actually, they're worth $18

11   billion and this was all terrible and you're all a bunch of

12   fools.

13            MR. TROOP:  Your Honor, I'm not asking this

14   question because I'm looking to sandbag anyone.  I have -- I

15   have financial information that in the main or side B is up

16   to date through September 2020.  I have information for side

17   A that in the main appears up to date through September

18   2019.  A lot has happened in the intervening period of time

19   that could have caused some assets to go up or down or

20   rebound or whatever, and I just don't know because it hasn't

21   been shared with me.

22            THE COURT:  Okay.

23            MR. TROOP:  And that's why --

24            THE COURT:  Go ahead.

25            MR. TROOP:  And that's why my question was at the

Page 44

1    last hearing and the hearing before it, the Debtors ought to

2    say as of what date they have the information brought down

3    to if they can't do better or if they have information

4    that's different, they can disclose that it's different and

5    we can deal with the rest through confirmation discovery.

6    Right, Your Honor?

7              THE COURT:  All right.  Well, I mean, look, the

8    Sacklers are not allowed to make material transfers of

9    assets under the injunction, so we're just talking about --

10   I think -- market factors primarily between September and

11   now and, you know, markets go up and they go down, sometimes

12   they go down within the same month.

13             So I think the statement that there's not a -- if

14   it's true and, again, just double check that with the

15   committee as well -- that there's not a material difference,

16   although the Debtors and other parties have more specific

17   information that may have been -- and what may have been

18   released and what was released by congress is sufficient

19   here.

20             MR. HUEBNER:  Okay.  And we'll certainly do that,

21   Your Honor, we'll confirm, and we will, of course, add an

22   appropriate sentence.

23             THE COURT:  Okay.  The last comment on page 240,

24   there's a heading that says transferability of distribution

25   rights.  And I would just make that non-transferability of

Page 45

1    distribution rights because that's what the paragraph is all

2    about and I don't want someone just to read the heading and

3    think, oh great, I could make a marketing in this.

4              MR. HUEBNER:  Understood.

5              MS. LIBBY:  Your Honor, going back to just the

6    section they were just on.  We did want to flag that we will

7    have a few additional cleanup comments just that will go to

8    how we had described the asset coverage that we list there,

9    so you'll see that come across when we file an updated one,

10   but it will just be a few lines about it.

11             THE COURT:  Okay, that's fine.

12             MR. HUEBNER:  Yeah.  And, Your Honor, on that

13   point, to be clear, you know, we aren't hashing a couple of

14   typos here and there, you know, we changed a number where we

15   shouldn't have in one place.  I don't think we're going to

16   call that the sixth amended plan.  I think these are really

17   just ministerial cleanup comments and I think, you know, for

18   worse, the fifth time is the charm.

19             THE COURT:  Okay.  On the plan, I had one comment.

20   It's probably worth --

21             MR. HUEBNER:  And, Your Honor, with apologies.

22   Just so I can follow, are you in the blacklined that was

23   sent to chambers at 1:11?

24             THE COURT:  Yes.

25             MR. HUEBNER:  Okay.  I have it open.

1           THE COURT:  But actually before then, let me ask.

2    Does anyone have any further comments on the modified -- or

3    the modifications to the disclosure statement that are in

4    the fifth amended -- the disclosure statement for the fifth

5    amended plan if there's anyone on the phone.

6           MR. BICKFORD:  Your Honor, Scott Bickford for the

7    NAS ad hoc.  I do.

8           THE COURT:  Okay.

9           MR. BICKFORD:  I'll be pithy and brief, and I just

10   would direct the Court to page 15 of the disclosure

11   statement, and this is more a comment and a concern that

12   some of the constituents representing NAS children have.

13   The Court will note in the first paragraph, it says, "The PI

14   Trust will hold amounts owed to a minor PI claimant in trust

15   until the minor PI claimant becomes a legal adult under the

16   applicable statute."

17          The way this default presently works and has not

18   yet been worked out, is that some of these kids' funds are

19   going to be held until the year 2038, which I will be of a

20   very advanced age at that point.  And there is an escape

21   clause, which basically allows a court of competent

22   jurisdiction that.

23          THE COURT:  Right.

24          MR. BICKFORD:  In our discussions, we believed

25   Your Honor's court is, in fact, a court of competent

Page 47

1   jurisdiction based upon the law that we've looked at, and I

2   just want to bring this to the attention because it's of

3   great concern to some of the NAS victims who really would

4   like to get their monies now rather than in 2038, and we'll

5   be bringing this matter again to the Debtors and to Your

6   Honor before plan confirmation.

7           THE COURT:  Okay.  I mean, I think as far as the

8   disclosure statement is concerned, it does have that

9   important phrase, "Unless otherwise directed by a court of

10  competent jurisdiction," so I think the disclosure statement

11  is fine.

12          The only thing I would add to that, and I

13  appreciate the heads up, is that whoever seeks such relief

14  needs to be really careful to serve the governmental entity,

15  I'm assuming, that is given the role of making sure that

16  this money for a minor is properly used, so that, you know,

17  there is someone on the other side of the litigation, at

18  least that gets notice of it, that is required to get

19  notice.

20          MR. BICKFORD:  Yeah.  And therein lay the rub

21  relative to, you know, in some states presently, because of

22  the amounts involved and the NAS distribution, there isn't a

23  kind of state court approval process; in other states, there

24  is a mandatory state approval process, which essentially

25  costs a lot of money to both file for and then retain

Page 48

1    counsel to essentially get those documentations.

2         In other cases, such as Deepwater Horizon MDL, the

3    federal court itself basically oversaw the amounts and

4    approved those amounts so that it wasn't necessary to do the

5    expense, and this is the legal rationale that we've been

6    discussing with the Debtors that would allow Your Honor --

7         THE COURT:  Well, again, as long as it's

8    procedurally proper, I have no problem with what you're

9    suggesting.

10        MR. BICKFORD:  Thank you, Your Honor.

11        THE COURT:  Okay.

12        MR. TROOP:  Your Honor, just one more.  Andrew

13   Troop again for the non-consenting states.  Just one more

14   thing that jumped out at me.  On page 47 of the blackline of

15   the disclosure statement, the Debtors have added the

16   sentence that you referenced about making it clear that two-

17   thirds in number will effectively be required.

18        What this doesn't allow for is that the dollar

19   amount could change pursuant to an estimation motion under

20   Rule 3018(a), which is contemplated by the procedures.  So I

21   was just wondering whether there should be some carveout or

22   maybe it could just say pursuant to or subject to change as

23   set forth.

24        THE COURT:  No, I would say accordingly, and then

25   you could and then add comma, and subject to parties' rights

Page 49

1    to seek allowance of a claim in a different matter under the

2    solicitation procedures, and then continue on with the rest

3    of it.

4              MR. TROOP:  Okay.  Thank you, Your Honor.  I was

5    sure that was everyone's intent.  It just jumped at me.

6    Thank you.

7              MR. HUEBNER:  I do want to just prophylactically

8    express sort of terror at that unfolding because it will

9    quickly become an arm's race for size of claim, you know,

10   the minute the first one hits and says I want --

11             THE COURT:  I have control of that process.  I

12   need to know basically why someone would be doing that and

13   set it up.  I mean, it's an estimation proceeding, and I

14   normally --

15             MR. HUEBNER:  Because I --

16             THE COURT:  I normally hear those things after the

17   vote to see whether it matters.

18             MR. HUEBNER:  Yeah, because one of the concerns

19   obviously, Your Honor, is every stakeholder group and every

20   creditor group obviously get that our claims docket is at

21   $40 trillion and that's only the 10 percent that are

22   liquidated, so it's a --

23             THE COURT:  I understand, which is why they're

24   being allowed and $1.00.  But I think someone who's

25   sophisticated enough to bring that type of motion would

1    probably also understand that it's fairly destructive,

2    including to their own clients and constituents, but it's

3    true.  It's an accurate point that Mr. Troop makes.

4          MR. HUEBNER:  As always, Your Honor.  That was all

5    I wanted to say; I'm just fearful.

6          THE COURT:  All right.  So on the plan, two

7    comments.  One is just I think maybe when I said this, it

8    didn't come through clearly.  On the definition of allowed

9    on page 2 of the blackline, second to last line, you did put

10   in, "for which it is liable."  This is the 502(d).  But then

11   at the end of the sentence after the word trustee, plan

12   administration trustee, it should say, "as provided in such

13   section," because it's only the liability, you know, that's

14   covered in 502(d).

15         And then the last point is not a change.  It's

16   just to note that the definitions of professional person and

17   professional fee claims, in large measure, don't include the

18   5.8 professional fees, but the language in the disclosure

19   statement makes it clear that 1129(a)(4) is a confirmation

20   requirement, et cetera.  So I just want to highlight for you

21   all that you don't here have any sort of process for a

22   deadline to submit professional fee claims, and you may just

23   want to think about that.

24         MR. HUEBNER:  Yeah.  So, Your Honor, just a little

25   bit of kind of my reference by baseball -- I'm not very good

Page 51

1    with sprots metaphors -- we actually briefly talked about

2    where it should go in the plan versus the disclosure

3    statement.  We decided that it's really a plan issue per se.

4              Your Honor made it very clear that essentially

5    with respect to these, you know, sort of class action

6    contingency fee things that are not normally within the

7    ambit of the Bankruptcy Court's approval is normally the

8    claimant just gets their distribution and they pay their

9    lawyer as they see fit.

10             Here, it's just much much more complicated, and we

11   talked about it at the last hearing, and we certainly talked

12   at great length with the non-federal governmental creditors,

13   about essentially coming up with a process in advance of

14   confirmation and everybody understands (indiscernible) and

15   then make sure that we will have to bring that process to

16   the Court.  They're not really professional persons per se

17   and exactly -- they're not estate professional persons per

18   se; they're actually the lawyers for private creditors who

19   are not governed by 327, 328, 330, 331.

20             But we have to figure out as the Court directed us

21   to.

22             THE COURT:  That's all I'm raising.  This

23   definition has 45 days for the defined term professional

24   persons to submit their fee apps, and I'm just noting that

25   you all should focus on, you know, how you're going to put

1    that issue before the Court for the non-professionals who

2    are getting fees.  And there may well be a distinction

3    between those who are just getting their contingency fees

4    and, you know, and others.

5              MR. HUEBNER:  Mr. Eckstein?

6              THE COURT:  I mean, I'm not going to weigh in

7    anymore on that issue.  It's really just a timing issue that

8    I wanted to raise, and you guys have obviously focused on it

9    too.

10             MR. HUEBNER:  Yup.

11             THE COURT:  Okay.

12             MR. ECKSTEIN:  Your Honor, before we leave this

13   point, if I could confer -- this is Kenneth Eckstein of

14   Kramer Levin -- just on the process.  We have thought about

15   it a fair amount, and I thought there was a reference in the

16   documents -- I believe it was in the disclosure statement --

17   to the fact that the process will be presented to the Court

18   prior to or in connection with confirmation.  And I think

19   that to the extent it's going to include written

20   submissions, I think there's a schedule for the submission

21   of written materials, including declarations and memoranda

22   of law.

23             And so, I think the expectation is that we will

24   develop a process and we will also develop a comprehensive

25   presentation so that Your Honor can make the appropriate

Page 53

1    evaluations on whatever standard you ultimately determine is

2    applicable and you can do so in connection with

3    confirmation.

4              And I think that to the extent it's going to

5    include written submissions, I think there's a schedule for

6    the submission of written materials, including declarations

7    and memoranda of law.

8              And so I think the expectation is that we will

9    develop a process and we will also develop a comprehensive

10   presentation so that Your Honor can make the appropriate

11   evaluations on whatever standard you alternately determine

12   is applicable, and you can do so in connection with

13   confirmation.

14             THE COURT:  Right.  And I think the disclosure

15   statement makes that point.  I just wanted to highlight that

16   if you were thinking it was 45 days after the effective

17   date, that only applies to the professionals under 327 and

18   1102.

19             MR. ECKSTEIN:  Right.  We appreciate that point

20   and are in agreement --

21             THE COURT:  Or as least the defined term

22   professionals.  So does anyone have anything more to say on

23   the disclosure statement?  All right.  As I said at Friday's

24   --

25             MR. ECKSTEIN:  Your Honor.  Your Honor --

Page 54

1          THE COURT:  Oh.  Sorry.

2          MR. ECKSTEIN:  With apologies.  I think you may

3    have meant the plan, which is the document we just finished

4    talking about.

5          THE COURT:  Well, there was a tie-in from the plan

6    to the disclosure statement, so I'm covering -- I'm assuming

7    no one has any more comments on the plan that aren't

8    confirmation issues.  I get to pull rank and point out

9    things that I think you should just fix in the plan now,

10   which were, as you can see, very minor.

11         I said last week that with the changes, and of

12   course the resolution of the open issues that you've all

13   resolved and feel comfortable proceeding with, I found the

14   disclosure statement to contain adequate information for

15   purposes of 1125 of the Bankruptcy Code.  And the revision

16   with the very minor changes that we've gone through on the

17   record today does so as well, but also is now reflective of

18   the agreements that have been set forth on the record so

19   that the Debtor feels comfortable going out and soliciting

20   votes on the plan.  So, I will approve the disclosure

21   statement.

22         MR. ECKSTEIN:  Thank you, Your Honor.

23         THE COURT:  And just attorn to the order approving

24   the disclosure statement, I did have a handful comments on

25   it also.

1          MR. ECKSTEIN:  Your Honor, with apologies, just so

2     I can follow along, are we looking now at the blacklined

3     attached --

4          THE COURT:  Yes.

5          MR. ECKSTEIN:  -- to the 1:19 PM email?

6          THE COURT:  Yes.

7          MR. ECKSTEIN:  Okay.  I have it open.

8          THE COURT:  Okay.  So, on Page 4, we have the

9     schedule.  And maybe I wasn't clear on this.  In the next to

10    last box of the schedule, deadline to file the confirmation

11    brief and omnibus reply to plan objections, I would put a

12    comma and add, "witness declarations and joint exhibit

13    book."  I'm sorry, comma, "and provide to chambers witness

14    declarations and joint exhibit book."

15         MR. ECKSTEIN:  Okay.  I will ask -- obviously the

16    answer is absolutely.  And if for some reason some

17    litigation expert, which I am not, says like, wait, that,

18    you know, is not what we thought, again, I will ask the 197

19    people on this phone to please speak up or forever be deemed

20    to have agreed.

21         THE COURT:  Okay.  Okay.  And then now we go to

22    the exhibits.  Exhibit 1 is the solicitation and billing

23    procedures.  This is a small point, but on the second page

24    of that solicitation and billing procedures exhibit, C113

25    says, at the Debtors' election, a cover letter and a

1    committee letter.  Can we take out the Debtors' election

2    now, because you're actually doing it, right?  Both of these

3    things?

4              MR. ECKSTEIN:  Yes, Your Honor.  We -- now you're

5    catching stray clauses in exhibits to exhibits.

6              THE COURT:  Right.

7              MR. ECKSTEIN:  Yes, that's clearly an error, and

8    we should have deleted it.

9              THE COURT:  Okay.

10             THE COURT:  No, actually that's not true.  119, we

11   were not ready to delete it.  But now that the Committee is

12   on board, of course it comes out.

13             THE COURT:  All right.  And then Exhibit 10 is the

14   plan supplement notice.

15             MR. ECKSTEIN:  Actually, Your Honor, just to be

16   clear, in C113, if we're being really, really precise, the

17   answer/or should be converted to an and --

18             THE COURT:  Right.

19             MR. ECKSTEIN:  -- because there is both a cover

20   letter --

21             THE COURT:  They're both --

22             MR. ECKSTEIN:  -- from the Debtors and a letter

23   from the Committee.

24             THE COURT:  Correct.

25             MR. ECKSTEIN:  We will take out the slash or.

1              THE COURT:  Right.  Okay.  And then Exhibit 10,

2     the plan supplement notice, I don't think -- I think you

3     need to add this future trust document to this list.

4              MR. ECKSTEIN:  I'm just trying desperately to get

5     to the exhibit quickly; it's not on the screen.

6              THE COURT:  Right, it's pretty far back.  It's

7     Exhibit 10.

8              MR. ECKSTEIN:  The problem is that I don't have a

9     portfolio that lets me skip right to exhibits.  I keep

10    trying to --

11             THE COURT:  In any event, the plan supplement

12    notice, the second paragraph says, as contemplated by the

13    plan and the disclosure statement order, the Debtors filed a

14    fifth plan supplement with the Court on May 26.  Oh, I see.

15    Well, I'm just wondering whether you need to update this.

16             MR. ECKSTEIN:  Yeah.  So, I'm going to ask -- I'm

17    almost there; I'm at 9 -- I'm scrolling as fast as I can.

18    Okay.  Plan supplement notice.  Sorry, Your Honor, what page

19    of the notice of filing of plan supplement (indiscernible) -

20    -

21             THE COURT:  Well, it's the first --

22             MR. ECKSTEIN:  -- is (indiscernible) on?

23             THE COURT:  It's the notice of filing of plan

24    supplement.

25             MR. ECKSTEIN:  Right.

1          THE COURT:  And it's -- I'm not quite sure what

2     this paragraph is supposed to do.  It says that as

3     contemplated by the plan -- you fill in May 26th -- but then

4     there's certain things in this list that you haven't

5     provided yet, like the shareholder settlement agreement.  So

6     it doesn't --

7          MR. ECKSTEIN:  Yeah.

8          THE COURT:  It's either -- this is either a notice

9     that basically says on date blank, we will -- we filed the

10     following.  And you just put a list of all the things that

11     you need to file in the future.  Or this describes what's

12     already been filed, you know, as of today's date.  But right

13     now --

14          MR. ECKSTEIN:  Yeah.

15          THE COURT:  -- it's kind of in between.

16          MR. ECKSTEIN:  Yeah.  No, something is a little

17     broken here.

18          THE COURT:  Yeah.

19          MR. ECKSTEIN:  Again, I might be wrong, but if

20     this is the notice that is to be filed in July --

21          THE COURT:  When you file --

22          MR. ECKSTEIN:  -- saying, oh, we have now filed

23     plan supplements --

24          THE COURT:  Right.

25          MR. ECKSTEIN:  -- and having to say we filed the

1    fifth plan supplement on May 26th, and it includes the

2    following materials, suggests that it was on May 26th, which

3    --

4                THE COURT:  So, what --

5                MR. ECKSTEIN:  -- of course is not correct.

6                THE COURT:  Right.  So, what I suggest you do --

7                MR. ECKSTEIN:  I see Mr. Klein --

8                THE COURT:  I think --

9                MR. ECKSTEIN:  We just split it --

10               THE COURT:  I think this is the document --

11               MR. ECKSTEIN:  -- and we say what was --

12               THE COURT:  -- that needs to be filed by the plan

13   supplement deadline.  And it should say two things.  First,

14   we've already filed a plan supplement with regard to the

15   following docket, so they could be found -- the following

16   documents, so they could be found at, you know, Docket X, Y

17   and Z.  So that -- and we're not going to file any more of

18   those on those topics.  And then this is a notice that as of

19   today we have filed the following, the remaining ones --

20               MR. ECKSTEIN:  Yes.

21               THE COURT:  -- need to be filed by the deadline.

22               MR. ECKSTEIN:  Yeah.

23               THE COURT:  And I think you need to add --

24               MR. ECKSTEIN:  So --

25               THE COURT:  -- to the list the futures trust

Page 60

1    information.

2            MR. ECKSTEIN:  Yeah, I would also suggest one last

3    thing.  And again, we're fixing things on the fly and we're

4    very grateful that you caught it, but unless I'm wrong, this

5    actually did not quite work, well then Mr. Klein will

6    correct me, there are at least two, if my memory is correct

7    from prior hearings, different plan supplement dates.

8            So just to round it out, I would say that on the

9    first one, we should also say, moreover, what's still coming

10   on the final plan supplement filing date is X.  That way,

11   each time we give people maximal notice.  This is already

12   what was filed.  This is what's being filed today.  And this

13   is what's going to be filed or before date X.  And obviously

14   in the final one, we don't have to do that last step because

15   there's nothing further coming.

16           But Mr. Klein, can I ask you to step in, because

17   it may be that I'm just misspeaking and that this is exactly

18   correct and I'm just missing the boat?

19           THE COURT:  No, I think that's --

20           MR. KLEIN:  No, I think --

21           THE COURT:  I think you're correct.

22           MR. KLEIN:  I think that's right.

23           THE COURT:  Because you want -- this is to alert

24   people to all of the documents.  And some of them will have

25   already been filed and they should know where to look for

Page 61

1    them.  And then you're going to tell them what needs to be

2    filed still.

3            MR. KLEIN:  Yeah.  Your Honor, it's Darren Klein.

4    I would just say that this is just a form and there's

5    probably a little more flexibility as we go.  We're probably

6    going to file a plan supplement periodically --

7            THE COURT:  Right.

8            MR. KLEIN:  -- as things get done.  And we'll

9    update the notice appropriately --

10           THE COURT:  Just make sure the notice tells people

11   what you've filed already.

12           MR. KLEIN:  Yes.

13           THE COURT:  Okay.  All right.  Next to last, this

14   is a small one, but I think it's important.  And this is

15   Exhibit 11 -- no, I'm sorry, Exhibit 12.

16           MR. ECKSTEIN:  I'm there.

17           THE COURT:  Exhibit 12.  Confirmation hearing

18   notice.

19           MR. ECKSTEIN:  I'm there.

20           THE COURT:  There's a footnote, Footnote 3, that

21   says, parties or a member of the public who wish to

22   participate listen only can do so.  But then it says, free

23   of charge telephonically, and a number to be provided.  And

24   I think it just should say how.  You know, where can they

25   find that number.  Not that it's available now, but you

Page 62

 1   know...

 2           MR. ECKSTEIN:  Yeah.  So Your Honor, here's what

 3   we'll do.  If we know the number by the time this gets

 4   filed, of course we'll put it in.  If we don't, since we use

 5   the Prime Clerk website for free access to all case

 6   information, we'll direct them to that website --

 7           THE COURT:  Find it there.

 8           MR. ECKSTEIN:  -- where they will find a posting

 9   that will have the number.  Mr. Klein, is that a sensible

10   resolution?

11           MR. KLEIN:  Yes.

12           THE COURT:  Okay.

13           MR. ECKSTEIN:  Okay.  And thank you for catching

14   that, Your Honor.

15           THE COURT:  All right.

16           MR. ECKSTEIN:  We are working on (indiscernible)

17   very hard to let everybody participate as much as possible.

18           THE COURT:  Right.  Okay.  And then last comment

19   is on Exhibit 14.  You dealt with this, I think, fine in

20   other materials here.  But I find this exhibit still quite

21   confusing, if I'm a PI lawyer.  It's not stated in the past

22   tense.  As I understand it, April 27th was the deadline to

23   do the --

24           MR. ECKSTEIN:  That collect.

25           THE COURT:  -- solicitation directive where the

1   attorney could vote the claims with their clients' consent.

2        MR. ECKSTEIN:  Yeah, yeah, I --

3        THE COURT:  No, that's at the top of Page 4.

4   Paragraph 3 --

5        MR. ECKSTEIN:  Yeah, I'm there.

6        THE COURT:  -- still suggests that you can still

7   make a choice.  So I think --

8        MR. ECKSTEIN:  Yeah, but that -- yeah, we just

9   failed to catch that, Your Honor, like we did in other

10  places, we'll say that this already happened, and the

11  deadline was April 27th --

12       THE COURT:  Right.

13       MR. ECKSTEIN:  -- for the election to have been

14  made.

15       THE COURT:  Right.

16       MR. ECKSTEIN:  Mr. Klein, if you could just nod

17  that that's correct?  You don't have to...  Yep, Mr. Klein

18  has nodded.

19       THE COURT:  Okay.  All right.  But with those

20  changes, the exhibits are fine, and the order is fine.

21       MR. ECKSTEIN:  Okay.

22       THE COURT:  All right.  So, I don't know if people

23  have been typing away during this hearing, but I am prepared

24  to --

25       MR. ECKSTEIN:  Yeah.  Actually, Your Honor, just

1    again, I know the team will catch this, but since now I'm

2    trying to be as careful and precise as I can, if you scan

3    down a little bit farther -- in your case, flipping pages --

4    there's a document, Exhibit 16, which is the plan language

5    version.  For example, that has -- Footnote 1 says at a

6    number to be provided.  So we will --

7            THE COURT:  Right.  Same issue.

8            MR. ECKSTEIN:  -- of course, sweep through all the

9    exhibits and try to catch any other places where we did not

10   catch the things you caught and conform them.

11           THE COURT:  Right.

12           MR. ECKSTEIN:  And so I just wanted to flag that

13   as I was finishing my scrolling --

14           THE COURT:  Right.

15           MR. ECKSTEIN:  -- to make sure I wasn't

16   (indiscernible) myself.

17           THE COURT:  So, yeah, same point.  So just

18   mechanically, it's 20 of 5:00.  Realistically, is this

19   something that people should be waiting around for tonight,

20   or can get first thing in the morning?  Will it only be

21   available, you know -- you all don't seem to sleep anymore.

22   So will it really be available at like, you know, 2:00 in

23   the morning, in which case I'll tell you I will be asleep?

24   So just trying to get a sense of when you'll file the final

25   version of the disclosure statement for the fifth amended

Page 65

1   plan and the plan, and email the order approving and the

2   solicitation procedures and the exhibits to chambers for

3   entry?

4           MR. ECKSTEIN:  Yeah.  So, Your Honor, here's what

5   I would suggest, if it's okay with the Court.  The gas

6   light, the low gas light is on, but we're not quite

7   sputtering on fumes just yet.  People have in fact been

8   madly updating every document as you've been giving what in

9   fact is a very small number of comments.

10          We are very tight on time.  What I'd like to do,

11  if it's okay with the Court, is within the hour, give the

12  Court of sense of, we're only 45 minutes away; if it's

13  possible to enter it today, we would be greatly grateful.

14  Or, you know, this is going to take three more hours.  Of

15  course, we would never ask the Court and the (indiscernible)

16  to wait around until 8:00 or 9:00 at night.  At that point -

17  -

18          THE COURT:  Well --

19          MR. ECKSTEIN:  -- the day is gone in any event.

20          THE COURT:  Well, you could if it's a total

21  crisis.  But if it isn't, I can enter it tomorrow morning.

22          MR. ECKSTEIN:  Yeah.  So, you know, let us sort of

23  massively parallel process, and if we're able to knock it

24  out --

25          THE COURT:  Okay.

Page 66

1            MR. ECKSTEIN:  -- in the next, you know, short

2    time, we'll just be in touch with chambers.

3            THE COURT:  That's fine.

4            MR. ECKSTEIN:  And obviously, we're working as

5    fast as we can.

6            THE COURT:  That's fine.  Okay.  Very well.  Thank

7    you, everybody.

8            MR. ECKSTEIN:  Thank you, Your Honor.

9            (Whereupon these proceedings were concluded at

10    4:40 PM)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 67

```
 1                         I N D E X

 2

 3                         RULINGS

 4                                        Page       Line

 5

 6    Disclosure Statement Approved        54         20

 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

Page 68

1                C E R T I F I C A T I O N

2

3        I, Sonya Ledanski Hyde, certified that the foregoing

4   transcript is a true and accurate record of the proceedings.

5

6   *[signature]*

7

8   Sonya Ledanski Hyde

9

10

11

12

13

14

15

16

17

18

19

20   Veritext Legal Solutions

21   330 Old Country Road

22   Suite 300

23   Mineola, NY 11501

24

25   Date:  June 4, 2021