DAVIS POLK & WARDWELL LLP
450 Lexington Avenue
New York, New York 10017
Telephone: (212) 450-4000
Facsimile: (212) 701-5800
Marshall S. Huebner
Benjamin S. Kaminetzky
Eli J. Vonnegut
James I. McClammy
Gerard X. McCarthy

*Counsel to the Debtors
and Debtors in Possession*

**UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re: | Chapter 11 |
| **PURDUE PHARMA L.P.**, *et al.*, | Case No. 19-23649 (RDD) |
| **Debtors.**[1] | **(Jointly Administered)** |

## DEBTORS' OPPOSITION TO MOTION FOR
## ORDER TO APPOINT EXAMINER

---

[1] The Debtors in these cases, along with the last four digits of each Debtor's registration number in the applicable jurisdiction, are as follows: Purdue Pharma L.P. (7484), Purdue Pharma Inc. (7486), Purdue Transdermal Technologies L.P. (1868), Purdue Pharma Manufacturing L.P. (3821), Purdue Pharmaceuticals L.P. (0034), Imbrium Therapeutics L.P. (8810), Adlon Therapeutics L.P. (6745), Greenfield BioVentures L.P. (6150), Seven Seas Hill Corp. (4591), Ophir Green Corp. (4594), Purdue Pharma of Puerto Rico (3925), Avrio Health L.P. (4140), Purdue Pharmaceutical Products L.P. (3902), Purdue Neuroscience Company (4712), Nayatt Cove Lifescience Inc. (7805), Button Land L.P. (7502), Rhodes Associates L.P. (N/A), Paul Land Inc. (7425), Quidnick Land L.P. (7584), Rhodes Pharmaceuticals L.P. (6166), Rhodes Technologies (7143), UDF LP (0495), SVC Pharma LP (5717) and SVC Pharma Inc. (4014). The Debtors' corporate headquarters is located at One Stamford Forum, 201 Tresser Boulevard, Stamford, CT 06901.

## TABLE OF CONTENTS

PRELIMINARY STATEMENT ............................................................................... 1

ARGUMENT .......................................................................................................17

I.  The Appointment of an Examiner Would Be Antithetical to the Interests of the
    Creditors and Other Interests of the Estate.............................................................17

II. An Examiner Is Not Appropriate Under Section 1104(c)(2) ...................................21

    A.  The Movant Has Not Established That the Fixed, Liquidated, Unsecured
        Debt Threshold Has Been Satisfied ...........................................................21

    B.  Appointment of an Examiner Is Neither Mandatory nor Appropriate ............23

    C.  The Movant Has Waived the Right to Seek Appointment of an Examiner ......26

# TABLE OF AUTHORITIES

### CASES

PAGE(S)

*In re Bradlees Stores, Inc.*,
   209 B.R. 36 (Bankr. S.D.N.Y. 1997) .................................................................................. 27

*In re Calpine Corp.*,
   No. 05-60200 (Bankr. S.D.N.Y. Oct. 24, 2007), ECF No. 6467 ......................................... 27

*In re Dewey & Leboeuf LLP*,
   478 B.R. 627 (Bankr. S.D.N.Y. 2012) ................................................................... 18, 22–25

*In re Enron Corp.*,
   No. 01-16034 (Bankr. S.D.N.Y. Apr. 8, 2002), ECF No. 2838........................................... 20

*In re Gliatech, Inc.*,
   305 B.R. 832 (Bankr. N.D. Ohio 2004) .............................................................................. 18

*In re Innkeepers USA Tr.*,
   No. 10-13800 (Bankr. S.D.N.Y. Sept. 30, 2010), ECF No. 546.................................... 19, 20

*In re Iridium Operating LLC*,
   478 F.3d 452 (2d Cir. 2007) ......................................................................................... 5, 19

*In re Loral Space & Commc'ns, Ltd.*,
   No. 04 Civ. 8645RPP, 2004 WL 2979785 (S.D.N.Y. Dec. 23, 2004) ................................. 24

*Mazzeo v. United States (In re Mazzeo)*,
   131 F.3d 295 (2d Cir. 1997) .............................................................................................. 18

*In re Residential Capital, LLC*,
   474 B.R. 112 (Bankr. S.D.N.Y. 2012) ................................................................... 6, 24, 25

*In re Revco D.S., Inc.*,
   898 F.2d 498 (6th Cir. 1990) ............................................................................................ 24

*In re Schepps Food Stores, Inc.*,
   148 B.R. 27 (S.D. Tex. 1992) ............................................................................................ 27

*In re Sletteland*,
   260 B.R. 657 (Bankr. S.D.N.Y. 2001) ............................................................................... 18

*In re Spansion, Inc.*,
    426 B.R. 114 (Bankr. D. Del. 2010) ........................................................................... 24, 25

## STATUTES & RULES

11 U.S.C. § 105 ................................................................................................................ 23
11 U.S.C. § 1104(c) .................................................................................................... *passim*
Fed. R. Bankr. P. 2004 ...................................................................................................... 14
Fed. R. Bankr. P. 9019 ...................................................................................................... 23

## OTHER AUTHORITIES

7 Collier on Bankruptcy ¶ 1104.03(2)(b) (16th Ed. 2021) ...................................................... 27
H.R. Rep. No. 95-595, 95th Cong., 1st Sess. 403 (1977) ...................................................... 25
Jonathan C. Lipson, Letter of Bankruptcy Law Professors to United States Trustee
Requesting an Examiner in the Purdue Pharma Chapter 11 Reorganization (Nov. 5, 2019),
    https://ssrn.com/abstract=3532642 ............................................................................... 6, 28
Jonathan C. Lipson, *Understanding Failure: Examiners and the Bankruptcy Reorganization
of Large Public Companies*,
    84 Am. Bankr. L.J. 1, 53 n.214 (2010) ............................................................................ 20

Purdue Pharma L.P. ("**PPLP**") and its affiliated debtors in the above-captioned chapter 11 cases, as debtors and debtors in possession (collectively, "**Debtors**"), hereby submit this opposition ("**Opposition**") to the *Motion for Order to Appoint Examiner Pursuant to 11 U.S.C. § 1104(c)* [ECF No. 2963] ("**Motion**") filed by Peter W. Jackson.[2] The Debtors respectfully state as follows:

### PRELIMINARY STATEMENT

1.       On the eve of confirmation, almost 21 months after the petition date, Peter Jackson ("**Movant**") has moved to appoint an examiner pursuant to 11 U.S.C. § 1104(c). With no factual support, no admissible evidence, and only unsupported innuendo accusing multiple parties including estate fiduciaries and this Court of impropriety, the Movant claims that the historic shareholder settlement embodied in the Debtors' plan of reorganization ("**Shareholder Settlement**," and the plan of reorganization, "**Plan**") was somehow the result of undue influence of members of the Sackler Families. The Movant further asserts that the Official Committee of Unsecured Creditors ("**UCC**"), a statutory fiduciary, "could have" but did not "act[] as a check on questions of independence." (Mot. ¶ 49.) And the Movant contends that even this Court cannot serve as an adequate "check" (notwithstanding its responsibilities to evaluate the Shareholder Settlement and third-party releases contained therein at confirmation) because this Court has already made up its mind and will approve the settlement and releases "with little scrutiny." (Mot. ¶ 55.) The Ad Hoc Committee of Governmental and Other Contingent Litigation Claimants ("**Ad Hoc Committee**") (which represents the interests of 23 attorneys general as well as analogous officials from the inhabited territories) and the Multi-State Governmental Entities ("**MSGE**") seemingly do not even merit a mention. Thus, in the

---

[2] To be clear, the position of the Debtors on this inappropriate request for relief is in no way, shape, or form intended to denigrate the unspeakably tragic loss suffered by the Movant and his family.

1

Movant's through-the-looking-glass world, an examiner must be appointed to investigate and report on the process by which the Debtors have determined to settle the so-called Sackler Allegations and whether that process and the resulting decision "was undertaken independently of the direct or indirect influence of, or interference by, the Sackler Families and their Related Entities, made in good faith, and w[as] negotiated at arm's length." (Proposed Order ¶ 2.)

2.    This baseless Motion does not even bother to address the actual facts—that the Ad Hoc Committee, the UCC, and the MSGE each <u>independently</u> negotiated and agreed to the proposed settlement after extensive mediation. The Motion is utterly devoid of evidence, grossly distorts the record, and reflects either a reckless disregard for the truth or willful misrepresentation of all that has transpired and the highly adversarial process by which the Shareholder Settlement contained in the Plan—and negotiated by <u>four</u> parties opposite the Sackler Families after more than a year of discovery and months of mediation—came to be.

3.    After over a year of intense, hard-fought negotiations prior to the Debtors' bankruptcy, the Debtors, the Debtors' shareholders, and a critical mass of plaintiff constituencies reached an agreement in principle on a framework ("**Settlement Framework**") of a global resolution of litigation in connection with Purdue's marketing, manufacturing, and sale of opioid medications. The Settlement Framework had, broadly speaking, three core pillars pursuant to which Purdue's shareholders would: (1) relinquish their equity interests in the Debtors; (2) engage in a sale process for their ex-U.S. pharmaceutical businesses; and (3) make a multi-billion-dollar payment to the Debtors' estates. The plaintiff constituencies that negotiated and supported the Settlement Framework included no fewer than 23 state attorneys general and analogous officials from the five U.S. territories, as well as the court-appointed Plaintiffs' Executive Committee and Co-Lead Counsel in the federal multi-district opioid litigation pending in Ohio. It was <u>these</u> parties, including many of the nation's most prominent class action lawyers, that negotiated opposite the Sackler Families in the lead-up to Purdue's bankruptcy—

2

<u>not</u> the Special Committee of the Board of Directors. The Movant's ignorance of (or willful attempt to rewrite) history notwithstanding, these formidable plaintiff constituencies played <u>the</u> critical role in shaping the Settlement Framework opposite the Sackler Families.

4.       At the same time, the Debtors and all parties in interest recognized that the Settlement Framework was just that—a <u>framework</u> and starting place for achieving a value maximizing resolution of the Debtors' bankruptcy. As early as the first day hearing, the Debtors made clear that they intended to "listen hard and . . . work to expand the number of parties supporting the [S]ettlement [F]ramework" (Sept. 17, 2019 Hr'g Tr. at 17:21–25), and that there would be "plenty of opportunity over the next many months to discuss and join issues on various difficult subjects" including "[t]he shape and contours of the global resolution." (Sept. 17, 2019 Hr'g Tr. at 19:10–13.) Also early in these cases, the Debtors explained that, in their view, any settlement would have to pass through "four gates." The first of these was reaching an agreement in principle on a settlement framework with a critical mass of parties, and the second of these was memorializing that framework in a written term sheet (which was filed on October 8, 2019). (Nov. 19, 2019 Hr'g Tr. at 70:8–14.) Gate three was proposing a comprehensive restructuring transaction based on the Settlement Framework, which the Debtors informed the Court and parties in interest would require "massive amounts of diligence, structuring, and negotiation." (Nov. 19, 2019 Hr'g Tr. at 70:15–19.) And the fourth gate is the confirmation hearing where the Debtors' Plan (hopefully) is approved. (Nov. 19, 2019 Hr'g Tr. at 70:20–21.)

5.       Exactly as the Debtors committed, "massive amounts of diligence, structuring, and negotiation" ensued. The UCC and other parties embarked on a comprehensive investigation of claims that spanned nearly a year and a half, at a cost of many tens of millions of dollars. The Special Committee of the Debtors' Board of Directors continued their searching review of the claims of the Debtors and their estates against the Sackler Families and related entities. In addition, more information and discovery was exchanged "with respect to elements

of [the] settlement with the Sacklers than [this Court] had[] ever seen, and [perhaps] ha[s] ever been provided in any [c]hapter 11 case." (Mar. 24, 2021 Hr'g Tr. 56:6–9.)

6.      These processes culminated during the so-called "phase two mediation" with respect to claims against members of the Sackler Families and related entities, and discussions that continued after the phase two mediation formally concluded. This mediation was overseen by two of the finest mediators in the country,[3] and the Debtors were far from the only protagonists negotiating. The economic terms of the Shareholder Settlement in the Plan and the resulting (and materially improved) $4.275 billion contribution were the direct result of a joint recommendation made by the mediators (as set forth in the mediator's report at docket no. 2548). It was the <u>mediators</u>, after almost a year of work, who jointly proposed $4.275 billon as the appropriate amount to resolve these cases, which led to a series of offers and counteroffers between the UCC, the Ad Hoc Committee, the Multi-State Governmental Entities Group, and the Debtors, on the one hand, and representatives of the Sacklers, on the other, with respect to timing and other terms. This led to the filing of the Debtors' Plan and settlement term sheet on March 15, 2021.

7.      Then, over the following weeks, these same parties continued their intense, near-constant negotiations to resolve open issues in connection with the Shareholder Settlement, which culminated in the filing of the amended Plan and approval of the Debtors' Disclosure Statement on June 3, 2021. Now, only after having run the gauntlet of these difficult and at times antagonistic negotiations, the Shareholder Settlement and the Plan more generally have the support of almost every key creditor constituency in these chapter 11 cases.

8.      Against this backdrop, the Movant's request for the appointment of an examiner borders on frivolous. The Movant claims that the appointment of an examiner is in the interests

---

[3] The mediators were the Honorable Layn Philips and Kenneth Feinberg.

4

of the estates and "necessary to determine whether the decision to settle was made independently and at arm's length." (Mot. at 25.) As set forth above, and extensively in the Disclosure Statement, the Shareholder Settlement reflected in the Plan was brutally hard fought by the Ad Hoc Committee, the MSGE, and the UCC. These parties formed entirely independent views of the settlement. Moreover, the examination proposed by the Movant would not only squander significant time and substantial resources but would also usurp the role of this Court at confirmation, where one factor the Court must consider is assessing the Shareholder Settlement under the standards set forth by the Second Circuit in *In re Iridium Operating LLC*, 478 F.3d 452, 465 (2d Cir. 2007), is whether the settlement is the product of arm's length bargaining. To the extent the Movant wants to litigate the issue of the Special Committee's independence or the reasonableness of the Shareholder Settlement more generally—and he is of course free to do so—he must proceed pursuant to the confirmation discovery and litigation procedures recently entered by this Court, as to which the Movant did not object.

9.    Nor is the appointment of an examiner "mandatory" under section 1104(c)(2), as the Movant contends. First, the relevant statutory debt threshold is not satisfied by the claims of the United States identified by the Movant because those claims are either not in existence today, or subject to contingencies. Even were that threshold satisfied, however, appointment of an examiner would still be unwarranted under the circumstances. Section 1104(c) provides that a court should only appoint an examiner to conduct an investigation of the debtor "as is appropriate," and many courts have held that this language confers upon courts discretion to refuse to appoint an examiner notwithstanding satisfaction of the debt threshold. Indeed, courts routinely do so where the examiner motion "was filed for an improper purpose such as a litigation tactic to delay a case, or if there is no factual basis to conclude that an investigation needs to be conducted, or if an appropriate and thorough investigation has already been conducted (or is nearly complete) by a creditors committee or governmental agency." *In re*

*Residential Capital, LLC*, 474 B.R. 112, 121 (Bankr. S.D.N.Y. 2012). Every one of these circumstances is met here, perhaps more than in any prior case. At least two comprehensive investigations have been conducted (one by the Debtors' Special Committee and the other by the UCC), there is no factual basis whatsoever to conclude an examination along the lines suggested by the Movant needs to be conducted, and the Motion smacks of a litigation tactic—particularly as it comes with no prior notice (1) on the heels of this Court's rejection of the Movant's recent attempt to thwart solicitation of the Plan and stymie the Debtors' reorganization by objecting to the Debtors' Plan as "patently unconfirmable"; (2) nearly 21 months after the petition date; and (3) a mere day before this Court approved the Debtors' Disclosure Statement.

10.    Finally, the doctrines of waiver and laches provide a separate and independent basis to deny the Motion. Nearly a year ago, in July 2020, the Movant filed a letter requesting an examiner but declined this Court's invitation to treat that letter as a motion. (Jackson Decl. ¶ 3.) Moreover, in November 2019—<u>19 months</u> before this Motion was filed—the Movant's now-counsel (then without a client) sent a letter to the U.S. Trustee urging the U.S. Trustee to seek appointment of an examiner, for among other reasons, because of his (speculative and erroneous) concern that the Special Committee might not be independent.[4] Rather than pursue relief at those earlier times, the Movant (and his counsel) now (in one case almost two years later) seek the appointment of examiner approximately <u>60 days</u> before the confirmation hearing. Courts have often found that the right to request an examiner has been waived where, as here, the Movant waits until the eve of confirmation to make such a motion, a waiver only amplified by the Movant's and Professor Lipson's abandonment of their previous requests.

---

[4] *See* Jonathan C. Lipson, Letter of Bankruptcy Law Professors to United States Trustee Requesting an Examiner in the Purdue Pharma Chapter 11 Reorganization (Nov. 5, 2019), https://ssrn.com/abstract=3532642.

## BACKGROUND

### I.    The Pre-Petition Litigation

11.    Prior to the commencement of these chapter 11 cases, the Debtors and their related parties, including their ultimate owners, the Sackler Families, faced nearly 3,000 lawsuits spread across dozens of state and federal courts throughout the United States arising from the Debtors' manufacturing, marketing, and sale of opioid pain medications (the "**Pending Actions**").[5]  Case-by-case litigation of the Pending Actions, however, would have been immensely value-destructive.  Not only did the Pending Actions incentivize many inequitable "races to the courthouses" where various plaintiffs attempted to leapfrog one another to be the first to trial, but also they forced Purdue to spend millions of dollars—per week—in legal and professional costs directly related to defending the Pending Actions.  (*See* Decl. of J. O'Connell, *Purdue Pharma L.P. v. Commonwealth of Mass.*, Adv. Pro. No. 19-08289 (RDD) (Bankr. S.D.N.Y. Sept. 18, 2019) [ECF No. 6], ¶ 17.)  And all of this was in addition to the Department of Justice's civil and criminal investigations of the Debtors, which were ongoing at the time.

12.    It ultimately became clear that continued litigation on the scale faced by the Debtors was simply untenable, particularly in light of the unjustifiable costs and the risk of inconsistent judgments.  It was equally clear that bankruptcy was the only forum available that could halt the immense destruction of value associated with continued litigation of the Pending Actions and productively orient the parties toward a value maximizing and equitable resolution of the litigation.

### II.    Pre-Petition Negotiations and the Settlement Framework

13.    For the better part of the year proceeding the Debtors' chapter 11 petitions, a number of plaintiff constituencies—including many state attorneys general and the Plaintiffs

---

[5] Approximately 2,000 of these Pending Actions had been transferred to a multi-district litigation in Ohio ("**Ohio MDL**").

Executive Committee ("**PEC**") in the Ohio MDL—the Sackler Families, and Purdue engaged in discussions concerning a potential global resolution of the Pending Actions. These negotiations resulted in an agreement in principle on the structure of a global resolution of opioid litigations ("**Settlement Framework**") in the days leading up to the Debtors' bankruptcy filings on September 15, 2019. The Settlement Framework, as noted above, had substantial but far from unanimous support and was later memorialized in an unsigned term sheet among the Ad Hoc Committee, the Debtors, and Shareholders Parties. *See* Summary Term Sheet, *In re Purdue Pharma,* No. 19-23649 (RDD) (Bankr. S.D.N.Y. Oct. 8, 2019) (hereinafter, the "**Settlement Framework Term Sheet**") [ECF No. 257].

14.    Two important attributes of the Settlement Framework are elided or ignored by the Movant but bear particular emphasis here. First, the Settlement Framework was negotiated with the Sackler Families by a wide and representative swath of plaintiff constituencies, including no fewer than 23 state attorneys' general, the PEC and co-lead counsel in the Ohio MDL. (*See* Settlement Framework Term Sheet at 4 (describing a "comprehensive settlement" among the Debtors, the Ad Hoc Committee (which included the PEC and representative states, municipalities, and others) and the Shareholder Parties).) The PEC, for example, comprised attorneys at law firms that collectively represent over 1,000 municipalities (including cities, counties, towns, and villages), as well as Native American tribes, individuals, and third-party payors.[6] Indeed, these entities, and certain other governmental parties, were directly spearheading negotiations with the Sackler Families. Only after this preliminary, albeit broad-based, support for a potential global resolution was achieved did the Debtors initiate these

---

[6] *See* Renewed Mot. to Approve Co-Leads, Co-Liaisons, and Executive Committee (ECF No. 34), *In re National Prescription Opiate Litigation*, MDL No. 2804 (N.D. Ohio Jan. 3, 2018); Marginal Entry Order Granting Mot. to Approve Co-Leads, Co-Liaisons, and Executive Committee (ECF No. 37), *In re National Prescription Opiate Litigation*, MDL No. 2804 (N.D. Ohio Jan. 4, 2018).

chapter 11 cases, which were necessary to stem the destruction of value associated with continued litigation of the Pending Actions in the tort system, centralize claims against the Debtors before this Court, and provide the breathing room necessary to further develop the Settlement Framework.[7]

15.      Second, and notwithstanding repeated and unsupported characterizations of the Settlement Framework as somehow "foreordained" and "irreversible" (*E.g.*, Mot. ¶ 23), the record of these cases is clear that the Settlement Framework was a launching point—not the end point—for negotiations regarding the shape and contours of an ultimate resolution with the Sackler Families. (*See* Sept. 17, 2019 Hr'g Tr. at 19:10–13; *see also* Mar. 18, 2020 Hr'g Tr. 31:15–18 ("[T]here's still a lot of work they've required in this case to determine whether parties support the settlement framework"); Mar. 24, 2021 Hr'g Tr. 28:18–23 ("[T]he Debtors, the AHC, the UCC, the MSG on the one hand, and the Sacklers on the other, are productively and seriously engaged virtually seven days a week and around the clock working to attempt to bring to fruition the settlement").) The Debtors also emphasized that a critical "precondition[]" to any final resolution with the Debtors' shareholders was "massive amounts of diligence" and information sharing with stakeholders. (Nov. 19, 2019 Hr'g Tr. 70:8–72:3; *see also id.* ("As

---

[7] The Movant surprisingly states that the Preliminary Injunction issued by this Court in September 2019 should "create[] questions" concerning the Special Committee's independence. (Mot. ¶¶ 7, 10.) This claim is frivolous and reflects a failure on the part of the Movant and counsel to familiarize themselves with the record in these cases in even the most cursory of ways. This Court has held time and again that the preliminary injunction was necessary to protect this reorganization and prevent irreparable harm. (*See* Eighteenth Am. Order Pursuant to 11 U.S.C. § 105(a) Granting Mot. Prelim. Inj., *Purdue Pharma L.P. v. Commonwealth of Mass.*, Adv. Pro. No. 19-08289 (RDD) (Bankr. S.D.N.Y. May 24, 2021) [ECF No. 264].) Moreover, the preliminary injunction has had the consistent support of key creditor constituencies from the outset, including the UCC and Ad Hoc Committee. (*See* Ad Hoc Committee's Stmt. in Support of a Limited and Conditional Stay, *Purdue Pharma L.P. v. Commonwealth of Mass.*, Adv. Pro. No. 19-08289 (RDD) (Bankr. S.D.N.Y. Oct. 8, 2019) [ECF No. 64]; Official Committee of Unsecured Creditors' Stmt. in Support of Debtors' Mot. for a Prelim. Inj., *Purdue Pharma L.P. v. Commonwealth of Mass.*, Adv. Pro. No. 19-08289 (RDD) (Bankr. S.D.N.Y. Oct. 11, 2019) [ECF No. 79].)

these questions and dozens and dozens of others make clear, there are huge amounts of work to be done on this hugely complicated multi-billion dollar, multi-continent, multi-country, multi-year deal or whatever variant of it we end up with.").) Simply put, nothing about the proposed resolution contemplated by the Settlement Framework was final on day one of these cases. Indeed, in recent motions to extend the Preliminary Injunction, the Debtors were clear that parties at that time still remained "in the midst of intense negotiations concerning a potential resolution of claims by the estates and other parties against members of the Sackler Families" that might not come to fruition and, for that reason, reserved their right to seek more narrow relief or terminate the injunction in the event that "the Debtors and other core estate stakeholders fail to resolve the remaining open terms." (*See, e.g.*, Mem. of Law in Support of Mot. to Extend the Prelim. Inj., *Purdue Pharma L.P., v. Common. Mass.*, Adv. Pro. No. 19-08289 (RDD) (May 6, 2021) [ECF No. 259] at 1–2.) And at the May 20 omnibus hearing, counsel for the Debtors acknowledged that absent progress on critical items, a final settlement might not even be reached.

### III.    Investigations by the Special Committee of the Board of Directors of the Debtors and the UCC

16.    Nor could the Settlement Framework possibly have been final on day one of these case. That is because the Special Committee's investigation of potential claims against the Sackler Families was far from complete and the UCC's investigation had not even commenced (because the UCC had not even been formed).

17.    The precursor to the independent Special Committee (the Transaction Committee) was constituted in May 2019 and vested with exclusive authority over all transactions between Purdue and members of the Sackler Families. (*See* Disclosure Stmt. for Fifth Amended Joint Chapter 11 Plan of Reorganization of Purdue Pharma L.P. and its Affiliated Debtors, *In re Purdue Pharma, L.P.*, No. 19-23649 (RDD) (Bankr. S.D.N.Y. June 3, 2021) [ECF No. 2983] ("**Disclosure Statement**"), at § II.E.2.) In September 2019, shortly before these cases were

10

commenced, the Special Committee was vested with the additional (and exclusive) authority over the prosecution, defense, and settlement of any causes of action that the Debtors may assert against its shareholders and members of the Sackler Families and their affiliates in bankruptcy. At all times, the Special Committee has been composed of four blue-chip restructuring and pharmaceutical professionals, none of whom had any prior connection to the Sackler Families. (*See* Disclosure Stmt. § II.E.2.) And to yet further safeguard their independence, the members of the Special Committee were protected against removal by the Debtors' shareholders, and have been since November 2019—an extraordinary and all but unprecedented protection. (*See* Disclosure Stmt. § II.E.2.)

18.     Beginning in the spring and summer of 2019, and then over the course of the next 22 months, the Special Committee conducted a comprehensive investigation into potential claims that the Debtors may have against the Sackler Families and associated entities, the details of which are set out in detail in the Debtors' recently approved Disclosure Statement. (*See* Disclosure Statement § Y.) This investigation involved, among other things, an exhaustive review of allegations made in lawsuits by the States and in the news media; identification of potential legal claims that might be brought against the Sackler Families and associated entities; analysis of key legal issues; the collection and review of hundreds of thousands of documents; forensic analyses of transfers to or for the benefit of the Sackler Families, including all cash and non-cash transfers (published on the docket); expert analysis of the Debtors' solvency; and material collaboration on all of the foregoing with the UCC. (*Id.*) The Special Committee met no fewer than 56 times between May 2019 and March 2021, during which meetings it received many reports, briefing and updates from its counsel at Davis Polk, Alix Partners, Bates White, and other advisors. (*Id.*)

19.     The Special Committee's investigation was not, of course, the only investigation conducted in these chapter 11 cases. The UCC (an independent fiduciary that represents all

unsecured creditors, and whose members include several opioid victims and advocates) conducted its own massive, searching and independent investigation into potential claims against the Sackler Families without relying on the Special Committee's findings—another fact all but ignored by the Movant. The UCC, for example, relentlessly pursued and obtained significant discovery from the Debtors, the Sackler Families and their associated entities and financial institutions on a wide variety of topics going back decades (discussed more below); analyzed millions of documents in furtherance of its investigation; evaluated the legal merits of potential claims against the Sackler Families, including fraudulent transfer, breach of fiduciary duty, and direct claims arising out of the Sackler Families' involvement in the Debtors' prepetition marketing of opioids; and diligenced the proposed resolution contemplated by the Settlement Framework.[8] All told, the UCC's professionals spent thousands of hours and tens of millions of dollars of estate resources completing its investigation. While the Movant has offensively all but dismissed the role that the UCC and many other creditor groups have played in these cases, it is beyond cavil that this investigation was painstaking, independent, and comprehensive.

## IV.    Information Sharing and Discovery

20.    Also at the outset of these cases, and in furtherance of the Debtors' commitments to provide unprecedented amounts of information to key stakeholders, the Debtors embarked an unparalleled discovery production to provide the information necessary for creditors to investigate potential claims and consider whether to support the Settlement Framework—an effort that was substantially complete in late 2020 but which still continues today.

---

[8] (*See, e.g.*, Official Committee of Unsecured Creditors' Motion to Compel Production of Purportedly Privileged Documents, or for In Camera Review, Based on Failure of the Sacklers and the Debtors to Demonstrate Documents Identified on Logs Are Privileged, In re Purdue Pharma et al. No. 19-23649 (RDD) (Bankr. S.D.N.Y. Sept. 30, 2020) [ECF No. 1752]; Official Committee of Unsecured Creditors' Motion to Compel Production of Purportedly Privileged Documents, or for In Camera Review, Based on Good Cause, Crime Fraud, and At Issue Exceptions to Claims of Privilege, In re Purdue Pharma et al. No. 19-23649 (RDD) (Bankr. S.D.N.Y. Sept. 30, 2020) [ECF No. 1753].)

21.    As just one early example, in the very first month of these cases, the Debtors, the

UCC, and the Sackler Families reached an agreement whereby the Debtors and the Sackler

Families would provide certain diligence materials to the UCC and others ("**UCC Stipulation**").

*See* Case Stipulation among the Debtors, the Official Committee of Unsecured Creditors and

Certain Related Parties at ¶¶ 7, 17, *In re Purdue Pharma L.P.*, No. 19-23649 (Bankr. S.D.N.Y.

Oct. 11, 2019) [ECF No. 291].[9]  The Debtors began producing materials pursuant to the UCC

Stipulation almost immediately.    (*See* Decl. Benjamin Kaminetzky, *Purdue Pharma v.*

*Commonwealth of Mass.*, Adv. Pro. No. 19-08289 (RDD) (Bankr. S.D.N.Y. Mar. 12, 2020)

[ECF No. 148].)  Although the Movant absurdly cites the UCC Stipulation as evidence that the

UCC somehow did not serve as an adequate "check" in these chapter 11 cases (Mot. ¶ 49), the

reality is that the UCC Stipulation secured for the UCC and the Debtors important commitments

from the Sackler Families, including but not limited to a provision barring certain members of

the Sackler Families from taking any action with respect to their property with the intent or

material effect of frustrating any judgment that might be obtained against them (UCC Stipulation

¶ 13), as well as commitments to provide material amounts of information and presentations on

the value, location, and format of their assets (UCC Stipulation ¶ 17).

22.    Then, over the next year and a half, the Debtors produced a staggering amount of

material—over 90 million pages—to estate stakeholders on a wide variety of issues, including

materials going to both estate claims and underlying opioid liability claims. This discovery

included, among other things, all documents produced by the Debtors in the federal multi-district

---

[9] The obligations of the Shareholder Parties were expanded and amended on November 5, 2019 (*see* Amended and Restated Case Stipulation among the Debtors, the Official Committee of Unsecured Creditors and Certain Related Parties ¶ 17, *In re Purdue Pharma L.P.*, No. 19-23649 (Bankr. S.D.N.Y. Nov. 5, 2019) [ECF No. 431-1]) and the Court endorsed the stipulation on November 20, 2019 (*see* Amended and Restated Case Stipulation among the Debtors, the Official Committee of Unsecured Creditors and Certain Related Parties, *In re Purdue Pharma L.P.*, No. 19-23649 (Bankr. S.D.N.Y. Nov. 20, 2019) [ECF No. 518]).

litigation pending in the Ohio MDL and in similar non-MDL civil litigations and millions of pages of documents produced to the DOJ in connection with its investigation of the Debtors; millions of <u>additional</u> pages of material that the Debtors collected from over 50 custodians, including from additional Sackler Family custodians and directors for time periods going back 25 years; as well as reams of additional historical analysis and diligence to enable the parties to assess the economics of the Settlement Framework.

23.    Moreover, the UCC, often in conjunction with the Non-Consenting States (a constituency that does not currently support the Shareholder Settlement), vigorously pursued significant amounts of discovery and due diligence in these cases, including directly from the Sackler Families and their associated entities and financial institutions. For example, the UCC moved for, and secured, an order authorizing Rule 2004 discovery of certain individual Sackler family members. (*See* Order Pursuant to Federal Rules of Bankruptcy 2004 and 9016 Authorizing Examination of Third Parties, *In re Purdue Pharma*, No. 19-23649 (RDD) (Bankr. S.D.N.Y. Mar. 27, 2020) [ECF No. 992].) The Non-Consenting States, joined by the UCC, also secured Rule 2004 discovery of certain of the Sackers financial institutions. (*See* Order Pursuant to Federal Rules of Bankruptcy 2004 and 9016 Authorizing Examination of Certain Financial Institutions, *In re Purdue Pharma*, No. 19-23649 (RDD) (Bankr. S.D.N.Y. May 12, 2020) [ECF No. 1143].) The UCC moved to compel the production of privileged documents from the Debtors, which resulted in an agreement under which the Debtors shared over 16,000 of the Debtors' <u>privileged</u> documents with the UCC on a common interest basis (including communications with members of the Sackler Families), all of which go to the heart of the investigation of possible claims against the Sacklers. (*See* Stipulation and Agreed Order Regarding Official Committee's Motions to Compel and the Debtors' Motion for a Protective Order, *In re Purdue Pharma*, No. 19-23649 (RDD) (Bankr. S.D.N.Y. Nov. 15, 2020) [ECF No. 1955].) The UCC and the Non-Consenting States also took 16 depositions of members of the

Sackler Families, current and former Board members, current employees of the Debtors, and other parties. (*See* Disclosure Stmt. § III.R.)

24.     The scope of material provided in these cases was historic, and included significant discovery of overseas persons and non-parties, all of which would likely have been difficult, if not impossible, to obtain in civil litigation. As this Court recently observed, "more information has been provided with respect to this [P]lan and more specifically with respect to the elements of a settlement with the Sacklers than [the Court] had[] ever seen, and [perhaps] ha[s] ever been provided in any [c]hapter 11 case." (Mar. 24, 2021 Hr'g Tr. 56:5–9.)

## V.     Mediation and Continued Negotiations Regarding a Possible Shareholder Settlement

25.     As information sharing was reaching its zenith, and as the Debtors' and UCC's investigations were proceeding apace towards their respective conclusions, the Debtors and their creditors turned their attention and focus toward the second phase of mediation, during which the parties agreed to mediate to see if a settlement could be reached with the Sackler Families. Contrary to the Movant's totally made up and utterly false claim that the mediation focused on the "present and future" (Mot. at 4), the mediation was in fact focused on the <u>past</u>, as it addressed the claims that creditors and the Debtors have against the Sackler Families arising from past conduct and how those claims might be settled.

26.     In September 2020, following the largely successful mediation of a number of critical allocation issues among the debtors' creditors before two of the countries' most respected and preeminent mediators (*see* Mediators' Report, *In re Purdue Pharma*, No. 19-23649 (RDD) (Bankr. S.D.N.Y. Sep. 23, 2020) [ECF No. 1716]), the Court formally entered an order expanding the scope of mediation to mediate potential claims that may be asserted by the estates and the Non-Federal Public Claimants (which include states, municipalities, cities, and towns) against the Sackler Families (*see* Order Expanded Scope of Mediation, *In re Purdue Pharma*, No. 19-23649 (RDD) (Bankr. S.D.N.Y. Sept. 30, 2020) [ECF No. 1756]). On January 22, 2021,

after weeks of intense negotiations—and over eleven months after they first began work on these cases—the mediators made a joint proposal regarding the economic terms of a potential shareholder contribution. (*See* Mediators Report, *In re Purdue Pharma et. al.*, Case No. 19-23649 (RDD) (Bankr. S.D.N.Y. Mar. 23, 2021) [ECF No. 2548].) The mediation then formally concluded on January 31, 2021.

27.    The mediators' $4.275 billion proposal precipitated additional productive negotiations. (*See* Mediators Report, *In re Purdue Pharma et. al.*, Case No. 19-23649 (RDD) (Bankr. S.D.N.Y. Mar. 23, 2021) [ECF No. 2548] (noting that contribution element to Shareholder Settlement agreement "follows in the wake of a recommendation made earlier by the two mediators as part of the Phase Two of the mediation process").) As described at length in the Debtors' Disclosure Statement (Disclosure Stmt. § AA.2), five parties negotiated for the next six weeks. From January 29, 2021 to February 18, 2021, the Sackler Families, the Debtors, the UCC, the Ad Hoc Committee, and the MSGE exchanged <u>eight</u> offers and counteroffers (each of which, as to the Debtors, had been authorized by the Debtors' Special Committee after careful review). (*Id.*) As a result of these intense efforts, the parties agreed to a payment schedule and other key terms for the $4.275 billion settlement, an agreement reached by each of the UCC, the Ad Hoc Committee, and the MSGE, and the Debtors' Special Committee <u>independently</u> of one another. Finally, over the next [eight] weeks, these five parties successfully negotiated regarding other material terms, including payment guarantees, credit support, remedies, and the terms of releases (among many other items). The notion advanced by the Movant—that it was the Special Committee alone that negotiated this deal with the Sacklers—is false and grossly irresponsible.

28.    This all culminated in the Debtors' Fifth Amended Joint Plan of Reorganization and corresponding Amended Disclosure Statement (the latter approved on June 3, 2021). (*See* Order Approving Disclosure Statement, *In re Purdue Pharma*, No 19-23649 (RDD) (Bankr. S.D.N.Y. June 3, 2021) [ECF No. 2988].) The Plan has the support of virtually every major

16

organized creditor constituency in these chapter 11 cases, including the UCC, the Ad Hoc Committee, the MSGE, the Native American Tribes Group, the Ad Hoc Group of Individual Victims, the Ad Hoc Group of Hospitals, the Third-Party Payor Group, the Ratepayer Mediation Participants, and the NAS Committee.

## ARGUMENT

29.     Notwithstanding all of the foregoing, the Movant seeks the appointment of a "supervisory" examiner at the twelfth hour to conduct an investigation into whether "the Special Committee negotiated the Settlement Framework, Term Sheet, and Shareholder Releases as to the Sackler Allegations independently, in good faith, and at arm's length" (Mot. ¶ 76; *see also* Mot. at 4–5) on two grounds. First, the Movant contends that the appointment is required under section 1104(c)(1) because such an examination is in "the 'interests of creditors' and 'other interests of the estates'—the general public." (Mot. ¶ 60.) Second, the Movant claims that appointment of an examiner is mandatory under section 1104(c)(2) because the Debtors have "fixed, liquidated, unsecured debts" in excess of $5,000,000. Neither argument is availing. To the contrary, the Movant has fallen far short of demonstrating that the appointment of an examiner is either appropriate or warranted—a burden that the Debtors respectfully submit is impossible to carry in the context of, and at the late date in, these chapter 11 cases.

**I.     The Appointment of an Examiner Would Be Antithetical to the Interests of the Creditors and Other Interests of the Estate**

30.     Section 1104(c)(1) of the Bankrupt Code provides that an examiner shall be appointed if the Court determines in its discretion that an examiner is "in the interests of creditors, any equity security holders, and other interests of the estate." "Mere allegations" regarding irregularity to be made the subject of an examination "are insufficient to justify the appointment of an examiner under section 1104(c)." *Dewey & LeBoeuf LLP*, 478 B.R. 627, 640 (Bankr. S.D.N.Y. 2012). Instead, "allegations of misconduct must be supported by <u>facts</u>." *Id.* (emphasis added). Moreover, an examiner must "be in the interest of everyone with a stake in

the case" and not serve only the parochial interests of a single creditor or creditor group in

opposition to the plan. *In re Gliatech, Inc.*, 305 B.R. 832, 836 (Bankr. N.D. Ohio 2004); *accord*

*In re Sletteland*, 260 B.R. 657, 672 (Bankr. S.D.N.Y. 2001) ("[A] creditor group, no matter how

dominant, cannot justify the appointment of a trustee or examiner simply by alleging that it

would be in its interests. It must show that the appointment is in the interests of all those with a

stake in the estate.").

       31.      The appointment of an examiner here along the lines proposed by the Movant at

this late stage would be antithetical to the interests of the creditors and the estates for at least

three reasons. First, the investigation proposed by the Movant is both entirely misconceived and

entirely pointless. The proposed examination is misconceived because, as demonstrated above,

it rests on a fundamentally false premise as to how and by whom the Shareholder Settlement was

negotiated over the last several years and utterly ignores the important roles played by the court-

appointed mediators and multiple key estate constituencies, including but not limited to the

UCC, AHC, and MSGE. The proposed examination is pointless because in less than two short

months there will be a confirmation hearing where the reasonableness of the Shareholder

Settlement under Rule 9019 will be litigated, in all likelihood very intensely, and the Court will

consider (among many other things) whether the Shareholder Settlement was the product of

arm's length negotiation. *See In re Iridium Operating LLC*, 478 F.3d 452, 465 (2d Cir. 2007).

Indeed, the Movant's proposed examination seems all but designed to permit the Movant to

circumvent the pre-trial discovery and litigation procedures recently put in place by this Court to

facilitate an orderly run up to confirmation. (*See* Second Am. Order Granting Debtors' Motion

for Order Establishing Confirmation Schedules and Protocols, *In re Purdue Pharma L.P.*, No.

19-23649 (RDD) (Bankr. S.D.N.Y. June 3, 2021) [ECF No. 2989].) If the Movant believes that

the Shareholder Settlement was not negotiated at arm's length or in good faith, he should litigate

it at confirmation.  The proposed examination should not and cannot be a substitute for the Movant and his counsel undertaking this work.

32.    Second, and relatedly, the appointment of an examiner would needlessly squander estate resources that could otherwise be conserved and put to use abating the opioid crisis in accordance with the Plan.  In one of the few correct statements in Motion, the Movant acknowledges that the proposed examiner "would duplicate work done by [the Debtors' counsel], counsel to the Creditors' Committee or other key participants in these cases." (Mot. ¶ 77.)  Courts have routinely denied requests to appoint examiners in similar circumstances. (*See, e.g.*, Hr'g Tr. at 167:11–170:22,  *In re Innkeepers USA Tr.*, No. 10-13800 (SCC) (Bankr. S.D.N.Y. Sept. 30, 2010), ECF No. 546 (declining to appoint an examiner because the requested investigation topics and allegations would be addressed "as part of the [official committee of unsecured creditors'] investigation,  or in the plan process"); *see also* Sept. 30, 2020 Omnibus Hr'g Tr. 84:18–85:2  ("Where you have an extremely active group of creditors with an extremely broad base, there's no reason to have a third-party examiner, who in any event can only make recommendations and conclusions, which as many cases where examiners have been appointed illustrate are often contested by the parties thereafter as being simply one party's view").)[10]

33.    Finally, the soft and hard costs of appointing an examiner here and the resulting harm to all those communities and individuals that stand to benefit from the Plan cannot be measured in the dollars charged by the examiner and his professionals alone.  As the Movant acknowledges, "appointing an examiner at this stage of these cases may be disruptive . . . and

---

[10] Examiner investigations can be exorbitantly expensive even where the examiner is directed to investigate on a limited basis and avoid duplication of investigations that have already occurred. *See* Jonathan C. Lipson, *Understanding Failure: Examiners and the Bankruptcy Reorganization of Large Public Companies*, 84 Am. Bankr. L.J. 1, 53 n.214 (2010) (describing that examiner costs can be "significant" and noting that "examiners in *Enron* famously cost about $100 million."); *In re Enron Corp.*, No. 01-16034 (AJG) (Bankr. S.D.N.Y. Apr. 8, 2002), ECF No. 2838 (ordering that "the Enron Examiner, to the extent possible, shall avoid duplication of effort of Debtors and any official Committee").

may delay resolution."  (Mot. at 4 (emphasis added).)  Delayed resolution  means a delay in

concluding  these chapter 11 cases and their material costs, and a delay in distributing  billions  of

dollars  in value to be put to use abating the opioid  crisis.  Many parties have worked to the point

of collapse to keep the current confirmation  schedule and avoid the tragic and very material costs

of delay.  Such a delay should  not and cannot be countenanced, particularly  for an examination

requested by a single  creditor that would serve no useful purpose  whatsoever.

34.    The Movant's pleading  also contains a smattering of additional  arguments and

asides that bear no relationship  to the Motion  before the Court or the mildest  scrutiny.  For

example, the Movant contends that the settlement  between DOJ and the Sackler Families  is

"lopsided"  because the Debtors are paying  significantly  more than the Sacklers.  (Mot. ¶¶ 44–

47.)  But that is the agreement that the <u>DOJ struck with the Sacklers</u>; the Debtors and the Special

Committee  had nothing  to do with the terms of that agreement.  Moreover, the settlement  with

the Debtors reflects both civil and criminal  resolutions.  The DOJ's settlement  with the Sackler

Families  announced in October 2020 resolved  only civil  liability.

35.    The Movant also baselessly suggests—yet again casting direct aspersions on the

integrity  of this Court—that the Court cannot serve as an adequate "check" in these chapter 11

cases, its obligations  under the law to assess the reasonableness of the Shareholder Settlement

notwithstanding.   (Mot. ¶¶ 51–56.)  Finally,  to the extent the Movant contends that there is

something  nefarious about discovery being produced pursuant to protective orders (Mot. ¶ 50),

that frivolous  argument betrays a profound  ignorance  of how the U.S. legal system works, and

has been repeatedly rejected by this Court.[11]  This practice is the norm in <u>any</u> complex litigation,

---

[11] (*See, e.g.*, Jan 20, 2021 Hr'g Tr. 88:6-14 ("As part of that discovery, as is quite
common, customary, the parties, both the targets of the discovery and the parties seeking
discovery,  agreed to protective  orders to be so ordered by me whereby they contemplated that
certain information  provide in the discovery  would remain confidential and, in fact, at different
levels of confidentiality.   That's a common  practice to enable discovery  to proceed quickly
without  fights over what is produced in the first instance.").)

as the Movant's counsel should well know. Indeed, the Movant (and his counsel) are free to sign the protective order at any time and gain access to millions of documents that have been provided to many parties in these cases.[12] None of these arguments come close to carrying the Movant's burden of establishing that the appointment of an examiner is in the interests of the estates.[13]

## II.   An Examiner Is Not Appropriate Under Section 1104(c)(2)

36.   The Movant separately seeks the appointment of an examiner under section 1104(c)(2). Section 1104(c)(2) provides that "the court shall order the appointment of an examiner to conduct such an investigation of the debtor as is appropriate . . . if . . . the debtor's fixed, liquidated, unsecured debts, other than debts for goods, services, or taxes, or owing to an insider, exceed $5,000,000." The Movant argues that this provision requires appointment of an examiner because "there is no question that . . . the Debtors' fixed, liquidated, unsecured debts" exceed $5,000,000" and, in light of the satisfaction of that threshold, the appointment of an examiner is mandatory. (Mot. ¶¶ 60–66.) Section 1104(c)(2), however, does not and cannot rescue the Movant's late-breaking and deleterious request for an examiner.

### A.   The Movant Has Not Established That the Fixed, Liquidated, Unsecured Debt Threshold Has Been Satisfied

37.   It is well established that the moving party bears the burden of showing that an examiner should be appointed, and to carry that burden in the context of section 1104(c)(2), the

---

[12] The Movant also raises several objections to the adequacy of the information in the Debtors' Disclosure Statement. (Mot. at 2 ("The Disclosure Statement omits critical statements about the Sackler Families' historic control of, and entanglement with, the Debtors.").) But despite filing two objections to the Disclosure Statement (and appearing at each of the hearings on the Disclosure Statement), the Movant never raised these objections, which are plainly meritless. (*See* Disclosure Stmt. § III.Y–BB.)

[13] The Movant offers a series of unsubstantiated allegations as to why, in his opinion, the investigations were either deficient or improperly disclosed. (Mot. ¶¶ 78–80 (alleging that investigations should have focused more direct claims and that results of investigations do not appear in the public record).) But these allegations are simply not credible in light of clear public record in these chapter 11 cases of a robust and adversarial investigation.

Movant must (among other things) "establish fixed, liquidated, unsecured debts of the type specified" in the statute. *In re Dewey & LeBoeuf*, 478 B.R. at 636. Here, the Movant contends that "[t]he Debtors' obligations to the United States under the Purdue-DOJ settlement vastly exceed" the statutory requirement. (Mot. ¶ 60.) That is not correct.

38.     The Debtors' obligations under the DOJ settlement do not satisfy section 1104(c)(2). The Bankruptcy Code does not define what constitutes fixed and liquidated debt for purposes of section 1104(c)(2), and the case law is sparse. However, one court (relying on *Black's Law Dictionary*) has observed that "fixed debt" is "generally, a permanent form of debt commonly evidenced by a bond or debenture; long-term debt." *In re Dewey & LeBoeuf*, 478 B.R. at 637. A "fixed debt" is not a "contingent" debt, which is "[a] debt that is not presently fixed but may become fixed in the future with the occurrence of some event," or "one which the debtor will be called upon to pay upon the occurrence or happening of an extrinsic event which will trigger . . . liability." *Id.* (quoting *Mazzeo v. United States (In re Mazzeo)*, 131 F.3d 295, 303–05 (2d Cir. 1997)).

39.     Although the Movant does not specify which obligations under the DOJ settlement he contends satisfy the relevant debt threshold, he is presumably referencing the criminal forfeiture claim of $2 billion; the $3.544 criminal fine claim; and the $2.8 billion civil claim arising from the DOJ's civil investigation of the Debtors. But none of these is "fixed." The forfeiture claim and the criminal fine claim will come into existence only as of the later of the District Court accepting Purdue's plea agreement at sentencing or confirmation of the Debtors' plan—both future, contingent events. (*See* Order Pursuant to 11 U.S.C. § 105 and Fed. R. Bankr. Proc. 9019 Authorizing and Approving Settlements Between the Debtors and the United States, *In re Purdue Pharma*, No. 19-23649 (RDD) (Bankr. S.D.N.Y. Nov. 18, 2020) [ECF No. 2004] ("**9019 Order**") ¶¶ 3, 5.) And although the order approving the DOJ settlement provides that "[t]he United States shall have an allowed, unsubordinated, undisputed, non-

contingent, liquidated unsecured" civil claim (9019 Order ¶ 6), that too is not "fixed" because the DOJ has the option to rescind the civil settlement agreement and pursue any claims or actions against the Debtors in the event that no fewer than five contingencies come to pass. (9019 Order ¶¶ 6–7.) For all of these reasons, the Movant's argument that the Debtors' obligations to the United States pursuant to the DOJ resolution satisfies section 1104(c)(2) must be rejected.

### B. Appointment of an Examiner Is Neither Mandatory nor Appropriate

40.     Far more importantly, even if the Movant had demonstrated that the statutory predicates of section 1104(c)(2) were satisfied, the appointment of an examiner would still be unwarranted and inappropriate. To be sure, certain courts—relying on the phrase "shall order the appointment of an examiner" in the introductory provision of section 1104(c)—have held that the appointment of an examiner is mandatory if the movant establishes that the Debtors' fixed, liquidated, unsecured debts exceed $5,000,000. *See, e.g.*, *In re Revco D.S., Inc.*, 898 F.2d 498, 500–01 (6th Cir. 1990); *In re Loral Space & Communications, Ltd.*, No. 04 Civ. 8645RPP, 2004 WL 2979785, at *4–5 (S.D.N.Y. Dec. 23, 2004). But many other courts have observed that the same introductory provision makes clear any examination ordered by the court must be "as is appropriate," which in turn affords courts discretion to refuse to appoint an examiner where such appointment would, in fact, not be appropriate. *See, e.g., In re Residential Capital, LLC*, 474 B.R. at 121 ("While section 1104(c) expresses a Congressional preference for appointment of an independent examiner to conduct a necessary investigation, the facts and circumstances of the case may permit a bankruptcy court to deny the request for appointment of an examiner even in cases with more than $5 million in fixed debts."); *In re Dewey & LeBoeuf LLP*, 478 B.R. at 639 (concluding "that the Examiner Motion should be denied even if the debt threshold in section 1104(c)(2) is satisfied" because motion was an inappropriate litigation tactic); *In re Spansion, Inc.*, 426 B.R. 114, 126–27 (Bankr. D. Del. 2010) (although debt threshold was met, relying on "as is appropriate" language to deny request to appoint examiner where "[a]ll of the parties have

had ample opportunity to conduct—and have conducted—extensive discovery, and to investigate the Debtors" on the grounds that appointment of an examiner "would cause undue cost to the estate, which would be harmful to the Debtors and would delay administration of th[e] chapter 11 case").[14]

41.    Courts have repeatedly refused to appoint an examiner under section 1104(c)(2) in several circumstances, including where: (1) the investigation has already been conducted by other parties; (2) the examination would increase costs and cause a delay with no corresponding benefit; and (3) the motion is a litigation tactic and filed late in the case. *See In re Dewey & LeBoeuf LLP*, 478 B.R. at 639; *In re Spansion, Inc.*, 426 B.R. at 126–27; *see also In re Residential Capital LLC*, 474 B.R. at 120. Here, all three circumstances are present. As set forth above, there have already been robust investigations conducted by not one but two estate fiduciaries (and many other parties) over a nearly two-year period. Appointment of an examiner would increase cost and cause delay with no corresponding benefit. And the Motion, which was filed nearly contemporaneously with this Court's rejection of the Movant's objection to the Debtors' disclosure statement and attempt to thwart solicitation of the Plan, is a barely disguised litigation tactic. Indeed, it appears designed to make an end run around the procedures order entered by this Court entirely and litigate issues that will be before the Court in approximately 60 days. And this follows nearly a year after the Movant filed a letter with this Court seeking the appointment of an examiner (that he subsequently decided not to pursue) and 19 months after the Movant's now-counsel, in his capacity as a professor, wrote to the U.S. Trustee requesting that

---

[14] This is consistent with the legislative history of section 1104(c). At the time the statute was passed, Congress stated that "[t]he standards for the appointment of an examiner are the same as those for the appointment of a trustee; the protection must be needed, and the cost and expense must not be disproportionately high." H.R. Rep. No. 95-595, 95th Cong., 1st Sess. 403 (1977) (emphasis added). In other words, while the statute may express a Congressional preference for the appointment of examiners, the legislature recognized that the appropriateness of such appointment was best left to the discretion of the court.

the U.S. Trustee seek the appointment of an examiner in these cases—a request that did not bear fruit and that he did nothing to pursue further until now.[15]

42.    The Movant's reliance on this Court's recent order appointing an examiner in *In re Cenveo*, No. 18-22178 (RDD) (Bankr. S.D.N.Y. Mar. 6, 2018) for the proposition that an examiner is warranted here is entirely misplaced. There, this Court acknowledged that there were "clearly cases" holding that a court retains discretion to refuse to appoint an examiner where the motion "happens towards the end of a case" and the examiner would be "a total waste of time, a litigation delay tactic." (*See* Mar. 6 Hr'g Tr. 86:9–87:19, *In re Cenveo*, No. 18-22178 (RDD) (Bankr. S.D.N.Y. Mar. 6, 2018) (hereinafter, "*Cenveo* Transcript"), ECF No. 367.) In *In re Cenveo*, however, the motion for an examiner was filed "not at the end of the case" but in the beginning, just 10 days after the chapter 11 cases commenced, under circumstances where all parties agreed at least some form of investigation of insider transactions (by someone) was required. (*Id.* at 87:20–88:1.) Against that backdrop, this Court held that the "grounds for the request for an examiner are legitimate enough that the no examination at all approach [did not] really lie" and thus appointed an examiner with a very circumscribed role to, "in essence, look over the shoulder of the committee and focus on their investigation and whether they are within reasonable guidelines looking in the right places." *Id.* at 87:8–90:18.) The facts and circumstances of these almost 21-month old chapter 11 cases could not be more different from

---

[15] The Debtors firmly believe that appointment of an examiner would be inappropriate here. In the event that this Court determines otherwise and holds that appointment under the circumstances is mandatory, the Debtors respectfully submit that the examination should be limited to a single day of interviews of the lead counsel to the creditor groups who investigated the Sackler Families and negotiated the Shareholder Settlement—namely the UCC, AHC, and MSGE—concerning whether these groups' decisions to support the Shareholder Settlement was made independently of the Special Committee and at arm's length from the Sackler Families.

those present in *In re Cenveo*, and *In re Cenveo* does not support in any way the appointment of examiner here.

### C. The Movant Has Waived the Right to Seek Appointment of an Examiner

43.      Finally, the doctrines of waiver and laches provide a separate and independent ground for denying the Motion. Courts have long recognized that "[a] party in interest may waive its right to seek the appointment of an examiner." *See In re Bradlees Stores, Inc.*, 209 B.R. 36, 39–40 (Bankr. S.D.N.Y. 1997). Here, the Movant improperly seeks an appointment of an examiner on the eve of confirmation. That alone is sufficient to find waiver. *See* Hr'g Tr. 72:5–73:19; *In re Calpine Corp.*, No. 05-60200 (Bankr. S.D.N.Y. Oct. 24, 2007) [ECF No. 6467] (holding movant "waived its right to request an examiner by waiting . . . almost two years after the petition date . . . and less than two months before the confirmation hearings."); *In re Bradlees Stores, Inc.*, 209 B.R. at 39–40 (denying motion for examiner "regardless of whether section 1104(c)(2) is mandatory or discretionary, [because] a party in interest may waive its right to seek the appointment of an examiner."); *see also In re Schepps Food Stores, Inc.*, 148 B.R. 27, 30 (S.D. Tex. 1992) (denying motion to appoint examiner even after finding § 1104(c)(2) was mandatory because "[t]he request for the appointment of an examiner came on the eve of the confirmation hearing"); 7 Collier on Bankruptcy ¶ 1104.03(2)(b) (16th ed. 2021) ("Failure to make a timely request for the appointment of an examiner may provide the court with a basis for denying the request on the ground of laches.").

44.      Nor is there any reason whatsoever to excuse the delay of either the Movant or his previously clientless counsel. To the contrary, the Movant himself filed a letter requesting an examiner in July 2020—nearly one year ago—but declined this Court's invitation to treat that letter as a motion. (Jackson Decl. ¶ 3.) The Movant's counsel sent a letter to the U.S. Trustee in November 2019—<u>19 months</u> before this Motion was filed—urging the U.S. Trustee to seek appointment of an examiner, for among other reasons, because of his (erroneous) concern that

the Special Committee might not be independent.[16]  Neither the Movant nor his counsel took any additional steps to seek the appointment of an examiner until filing this Motion on June 1, 2021—approximately **60 days** before trial is set to commence.  The delay is fatal and smacks of gamesmanship.

## CONCLUSION

45.    For all of the foregoing reasons, the Debtors respectfully request that the Court deny the Motion.  Many parties unquestionably adverse to the Sacklers—including the UCC, the Ad Hoc Commtitee, and the MSGE—have worked tirelessly for months or years to investigate claims and to negotiate a settlement with the Sackler Families, and those parties—guided by experienced and highly regarded mediators—have <u>independently</u> negotiated and determined that the settlement reached is reasonable and in the best interests of the estates.  That Shareholder Settlement is the cornerstone of a Plan that, if confirmed, will effectuate the transfer of billions of dollars to creditors and the American people to help abate the opioid crisis and compensate individual victims.  The appointment of an examiner at this late hour, under these circumstances, would serve no useful purpose whatsoever and would introduce unwarranted expense and delay.  That result should not be countenanced.

---

[16] *See* Jonathan C. Lipson, Letter of Bankruptcy Law Professors to United States Trustee Requesting an Examiner in the Purdue Pharma Chapter 11 Reorganization (Nov. 5, 2019), https://ssrn.com/abstract=3532642.

Dated:  June 13, 2021
New York, New York

DAVIS POLK & WARDWELL LLP

By:  */s/ Marshall S. Huebner*

450 Lexington Avenue
New York, New York 10017
Telephone: (212) 450-4000
Facsimile:  (212) 701-5800
Marshall S. Huebner
Benjamin S. Kaminetzky
Eli J. Vonnegut
James I. McClammy
Gerard X. McCarthy

*Counsel to the Debtors*
*and Debtors in Possession*