Kevin C. Maclay, Esq. (admitted *pro hac vice*)
Todd E. Phillips, Esq.
Monty Crawford, Esq. (*pro hac vice* pending)
George M. O'Connor, Esq. (admitted *pro hac vice*)
CAPLIN & DRYSDALE, CHARTERED
One Thomas Circle, NW, Suite 1100
Washington, DC 20005

*Counsel for the Multi-State Governmental Entities Group*

## UNITED STATES BANKRUPTCY COURT
## FOR THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| In re:<br><br>PURDUE PHARMA L.P., *et al.*,<br><br>Debtors.[1] | Chapter 11<br><br>Case No. 19-23649 (RDD)<br><br>(Jointly Administered) |

## THE MULTI-STATE GOVERNMENTAL ENTITIES
## GROUP'S OPPOSITION TO PETER W. JACKSON'S MOTION FOR
## ORDER TO APPOINT EXAMINER PURSUANT TO 11 U.S.C. § 1104(c)

---

[1]    The Debtors in these cases, along with the last four digits of each Debtor's registration number in the applicable jurisdiction, are as follows: Purdue Pharma L.P. (7484), Purdue Pharma Inc. (7486), Purdue Transdermal Technologies L.P. (1868), Purdue Pharma Manufacturing L.P. (3821), Purdue Pharmaceuticals L.P. (0034), Imbrium Therapeutics L.P. (8810), Adlon Therapeutics L.P. (6745), Greenfield BioVentures L.P. (6150), Seven Seas Hill Corp. (4591), Ophir Green Corp. (4594), Purdue Pharma of Puerto Rico (3925), Avrio Health L.P. (4140), Purdue Pharmaceutical Products L.P. (3902), Purdue Neuroscience Company (4712), Nayatt Cove Lifescience Inc. (7805), Button Land L.P. (7502), Rhodes Associates L.P. (N/A), Paul Land Inc. (7425), Quidnick Land L.P. (7584), Rhodes Pharmaceuticals L.P. (6166), Rhodes Technologies (7143), UDF L.P. (0495), SVC Pharma L.P. (5717) and SVC Pharma Inc. (4014).  The Debtors' corporate headquarters is located at One Stamford Forum, 201 Tresser Boulevard, Stamford, CT 06901.

# TABLE OF CONTENTS

PRELIMINARY STATEMENT ................................................................. 1

BACKGROUND ................................................................................... 3

I.    THE PREPETITION NEGOTIATIONS AND SETTLEMENT FRAMEWORK ............... 3

II.   INVESTIGATIONS BY KEY CONSTITUENCIES ........................................... 4

III.  MEDIATIONS AND SETTLEMENT OF THE SACKLER CLAIMS ........................ 6

ARGUMENT ...................................................................................... 7

I.    THIS COURT SHOULD DENY APPOINTMENT OF AN EXAMINER  UNDER
      § 1104(c) .................................................................................. 7

   A.   Section 1104(c) Does Not Mandate the Appointment of an Examiner ........................... 7

   B.   The Movant Has Not Satisfied His Burden of Establishing the Existence of Fixed,
        Liquidated, and Unsecured Debts in Excess of $5 Million ............................................ 10

   C.   Appointment of an Examiner Would Be Inappropriate under the Present
        Circumstances ....................................................................... 11

      1.   The Proposed Investigation Would Duplicate Investigations Conducted by Other
           Constituencies ............................................................... 11

      2.   Appointment of an Examiner Would Impose Increased Costs and Delay with No
           Corresponding Benefits .................................................... 14

      3.   The Timing of the Motion Suggests That It Is a Litigation or Negotiation Tactic ........ 15

      4.   Appointment of an Examiner Is Unnecessary and Would Not Be in the Best
           Interests of Creditors or the Estate ...................................... 15

   D.   Even If the Court Concludes that Appointment of an Examiner Is Otherwise
        Mandatory, the Motion Should Be Denied Under the Laches Doctrine ........................ 16

II.   THE PROPOSED INVESTIGATION RELATES TO PLAN CONFIRMATION
      ISSUES THAT SHOULD BE ADDRESSED BY KEY STAKEHOLDERS
      RATHER THAN AN EXAMINER ....................................................... 18

III.  THE CIRCUMSTANCES IN THIS CASE ARE NOT ANALOGOUS TO THE
      CIRCUMSTANCES IN *IN RE CENVEO* .............................................. 20

CONCLUSION ................................................................................... 22

i

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*In re Bradlees Stores, Inc.*,
    209 B.R. 36 (S.D.N.Y. 1997)..........................................................................................15, 16

*Dewey & LeBoeuf LLP,*
    478 B.R. 627 (Bankr. S.D.N.Y. 2012)..........................................................................9, 10, 11

*Doscher v. Sea Port Group Securities, LLC*,
    832 F.3d 372 (2d Cir. 2016)..................................................................................................8

*In re Erickson Retirement Communities,*
    425 B.R. 309 (Bankr. N.D. Tex. 2010)..................................................................................18

*King v. St. Vincent's Hosp.*,
    502 U.S. 215 (1991)..............................................................................................................8

*Kokoszka v. Belford*,
    417 U.S. 642 (1974)..............................................................................................................8

*In re Loral Space & Communications Ltd.*,
    313 B.R. 577 (Bankr. S.D.N.Y. 2004)..................................................................................18

*In re Mechem Fin. of Ohio, Inc.*,
    92 B.R. 760 (Bankr. N.D. Ohio 1988)..................................................................................13

*Mazzeo v. United States* (*In re Mazzeo*),
    131 F.3d 295 (2d Cir. 1997)................................................................................................10

*Nyack Hosp. v. Moran*,
    2010 WL 4118355 (S.D.N.Y. June 1, 2020) ........................................................................8

*In re Residential Capital, LLC*,
    474 B.R. 112 (Bankr. S.D.N.Y. 2012)..................................................................8, 9, 11, 13

*In re Schepps Food Stores, Inc.*,
    148 B.R. 27 (S.D. Tex. 1992) ........................................................................................15, 17

*In re Sletteland*,
    260 B.R. 657 (Bankr. S.D.N.Y. 2001)..................................................................................13

*U.S. Bank Nat'l Ass'n v. Wilmington Tr. Co.* (*In re Spansion, Inc.*),
    426 B.R. 114 (Bankr. D. Del. 2010) ............................................................................9, 13, 18

**Page(s)**

**Docketed Cases**

*In re Asarco*,
   No. 05-21207 (Bankr. S.D. Tex. March 4, 2008) ...................................................18

*In re Cenveo, Inc.*,
   No. 18-22178 (RDD) (Bankr. S.D.N.Y.) ........................................................20, 21

*In re Calpine Corp.*,
   No. 05-60200 (Bankr. S.D.N.Y. Oct. 24, 2007) ........................................15, 17, 18

*In re Innkeepers USA Trust*,
   No. 10-13800 (SCC) (Bankr. S.D.N.Y. Sept. 30, 2010)....................................9, 19

*In re Paddock Enterprises, LLC*,
   No. 20-10028 (LSS) (Bankr. D. Del. June 17, 2020) ..............................................9

*In re Visteon Corp.*,
   No. 09-11786 (CSS) (Bankr. D. Del. May 12, 2010) ......................................10, 18

**Statutes**

11 U.S.C. § 1104(c) ........................................................................................... *passim*

**Other Authorities**

7 Collier on Bankruptcy ¶ 1104.03 (16th ed. 2020) ..............................................7, 16

H.R. REP. NO. 95-595, (1977)......................................................................................8

1978 U.S.C.C.A.N. 5963 ..............................................................................................8

The Multi-State Governmental Entities Group (the "**MSGE Group**") in the chapter 11 cases (the "**Chapter 11 Cases**") of the above-captioned debtors and debtors in possession (the "**Debtors**" or "**Purdue Pharma**"), by and through its undersigned counsel, hereby submits this objection to Peter W. Jackson's (the "**Movant**") *Motion For Order to Appoint Examiner Pursuant to 11 U.S.C. § 1104(c)* [ECF No. 2963] (the "**Motion**"). In opposition to the Motion, the MSGE Group respectfully states as follows:

## PRELIMINARY STATEMENT

As this Court commented in a July 23, 2020 hearing, the premise of the Motion "that there is no investigation going on, that this case's purpose is somehow to let the Sacklers get away with it and that without appointment of an examiner there won't be an investigation, is just *completely and utterly misguided*."[2] In that hearing, the Court admonished the parties not to be "guided by . . . some misguided law professor who does not take the basic due diligence . . . to actually look at the actual transcript and the record in the case before spouting off about the need for an examiner, including completely ignoring the appointment of a corporate monitor, the commitment as part of the injunction to have a full account, and the examinations that are going on."[3] Movant did not take heed.

Appointing an examiner at the final stages of this bankruptcy to duplicate investigations already conducted by other parties, and after extensive mediation efforts resulted in a wide-spread consensus on the parameters of a plan of reorganization, would be inappropriate and counterproductive. It would impose excessive costs on the estates that would otherwise go towards abatement of the opioid crisis and would result in substantial delay in confirmation of the plan.

---

[2] *See* Hr'g Tr. 56:15-22 (emphasis added).
[3] *Id.* at 57:7-16.

The MSGE Group, the Ad Hoc Committee of Governmental and Other Contingent Litigation Claimants (the "**AHC**"), the Ad Hoc Group of Non-Consenting States (the "**NCSG**"), and the Official Committee of Unsecured Creditors (the "**UCC**") all had the benefit of exhaustive investigations of the same topics for which Movant seeks an examiner. The MSGE Group arrived at its decision to support the Sackler settlement after informed and independent deliberation, and with the benefit of the massive amount of information reviewed and considered in the Chapter 11 Cases and in the many prepetition cases brought by the MSGE Group's members against the Debtors and the Sacklers.[4] Movant fails to offer any justifiable rationale for the duplication, cost, and delay he seeks to impose.

It is important to also note that the MSGE Group, the AHC, the DOJ, and the NCSG are all independent from the Debtors and from each other, and each is a substantial party in interest in this bankruptcy. Movant's proposed investigation of the *initial* prepetition settlement framework is irrelevant, as the *current* settlement was negotiated by these independent parties utilizing independent and world-renowned mediators. Movant's rhetoric regarding the DOJ Settlement, forum shopping, and certain entities allegedly being beholden to the Sacklers cannot overcome the undisputed fact that the current settlement substantially altered the prior settlement framework and was negotiated at arms-length by these independent parties-in-interest.

Moreover, Section 1104(c) of the Bankruptcy Code does not compel appointment of an examiner – it only requires appointment of an examiner "as is appropriate." Realizing that this provision could be abused for litigation or negotiation advantage, many courts have recognized

---

[4] The MSGE Group is comprised of approximately 1,300 cities, counties, tribal nations, and other governmental entities, representing a collective constituency of more than 60 million individuals across 38 states and territories of the United States. Members of the MSGE Group were long engaged in prepetition opioid litigation against the Debtors and make up a critical and substantial portion of the public entities whose cases ultimately drove the Debtors into chapter 11.

that it would be an absurd result to mandate appointment of an examiner in every case even where the $5 million debt threshold is met. There has to be an appropriate investigation that needs to be done. Almost two years after the petition date, almost a year after Movant raised this issue with the Court, and two months before the confirmation hearing, Movant files this Motion to bring everything to a halt. On its face, the timing suggests that this Motion was brought to delay or thwart confirmation, which this Court should reject.

Even if the Court concludes that §1104(c) otherwise mandates appointment of an examiner, Movant's substantial and unjustified delay in seeking this relief warrants denial under the laches doctrine. The Court also has discretion to limit any examiner to no duties or very limited duties, and to a very circumscribed timeframe. At bottom, the key issues underlying the Motion are plan confirmation issues that should be and have been resolved by the main creditor constituencies in the case.

## **BACKGROUND**

## I.    **THE PREPETITION NEGOTIATIONS AND SETTLEMENT FRAMEWORK**

On September 15, 2019 (the "**Petition Date**"), the Debtors filed for chapter 11 protection to address the thousands of lawsuits, and investigations, pending against them and their ultimate owners, the Sacklers, stemming from the Debtors' manufacturing, marketing, and sale of opioids. The filing of the Chapter 11 Cases was preceded by a year of intense negotiations between the Debtors, the Sacklers, and certain plaintiff constituencies, including at least 23 attorneys general as well as the Plaintiffs Executive Committee from one of the pending multi-district litigations

against Purdue.[5]  The negotiations culminated in "an agreement in principle on the structure of a

global resolution" of the pending litigation (the "**Settlement Framework**").[6]

The Settlement Framework was just that – a framework.  It was not a final settlement.  It

merely served as a starting point for the ensuing negotiations and mediations among the key

constituencies in this bankruptcy case.  Far from the Settlement Framework being "foreordained"

or "irreversible" (*see* Motion ¶ 23), it remained unclear in March 2020 which parties would support

it, and as late as March 2021, many parties were still engaged in intense negotiations with respect

to the Settlement Framework, which ended up being substantially revised.[7]

## II.    INVESTIGATIONS BY KEY CONSTITUENCIES

In May 2019, Purdue Pharma's Board of Directors formed a special committee (then

known as the Transaction Committee) (the "**Special Committee**"), which spent almost two years

investigating potential claims the Debtors may have against the Sacklers.[8]  While Movant

questions whether the Special Committee was independent from the Sacklers, the Motion offers

only innuendo and speculation to support this claim.[9]  *See, e.g.*, Motion ¶ 34-35.  More importantly,

---

[5] *See* Disclosure Statement for Fifth Amended Joint Chapter 11 Plan of Reorganization of Purdue Pharma L.P. and its Affiliated Debtors [ECF No. 2983], at 3 (hereinafter "**Disclosure Statement**").

[6] *Id.*  The Settlement Framework was later memorialized in an unsigned term sheet among the Debtors, the Shareholder Parties, and the AHC.  *See* Summary Term Sheet [ECF No. 257].

[7] *See* Mar. 18, 2020 Hr'g Tr. 31:15-18 (Counsel for the UCC informing this Court that "there's still a lot of work they've required in this case to determine whether parties support the settlement framework . . ."); *see also* Mar. 24, 2021 Hr'g Tr. 28:18-23 ("[T]he Debtors, the AHC, the UCC, the MSG[E] on the one hand, and the Sacklers on the other, are productively and seriously engaged virtually seven days a week and around the clock working to attempt to bring to fruition the settlement . . .").

[8] *See* Disclosure Statement at Section Y; 157-77.

[9] *See, e.g.*, Motion ¶ 35 ("Indeed, to this day, it is not clear what powers the Sackler Families may exert, directly or indirectly, over the Special Committee because the Debtors' bylaws and other governance documents (*e.g.*, the Shareholders Agreement) are apparently not publicly available.").

Movant ignores the various *independent* stakeholders that have also investigated and analyzed claims against the Sacklers.

For example, the UCC undertook an exhaustive and independent investigation into estate claims against the Sacklers. The UCC reviewed millions of documents produced by the Debtors, analyzed the Sacklers' liabilities arising from the Debtors' opioid business, and analyzed the Settlement Framework (among other issues).[10] Contrary to Movant's baseless assertion that the UCC did not act as a check on the Debtors or Sacklers,[11] the record shows that the UCC vigorously litigated against the Debtors and the Sacklers in connection with its investigation, which include: (i) the UCC obtaining Rule 2004 discovery of certain members of the Sacklers;[12] (ii) the UCC joining the NCSG for purposes of obtaining Rule 2004 discovery of certain Sackler Financial Institutions;[13] (iii) the UCC moving to compel production of privileged documents from the Debtors, resulting in the production of over 16,000 privileged documents;[14] and (iv) the UCC (joined by the NCSG) deposing 16 members of the Sacklers, their advisors, and board members,

---

[10] *See, e.g.*, Official Committee of Unsecured Creditors' Motion to Compel Production of Purportedly Privileged Documents, or for In Camera Review, Based on Failure of the Sacklers and the Debtors to Demonstrate Documents Identified on Logs Are Privileged [ECF. No. 1752]; Official Committee of Unsecured Creditors' Motion to Compel Production of Purportedly Privileged Documents, or for In Camera Review, Based on Good Cause, Crime Fraud, and At Issue Waiver Exceptions to Claims of Privilege [ECF. No. 1753].

[11] *See* Motion ¶ 49.

[12] *See* Order Pursuant to Federal Rules of Bankruptcy 2004 and 9016 Authorizing Examination of Third Parties [ECF No. 992].

[13] *See* Order Pursuant to Federal Rules of Bankruptcy 2004 and 9016 Authorizing Examination of Certain Financial Institutions [ECF No. 1143].

[14] *See* Stipulation and Agreed Order Regarding Official Committee's Motions to Compel and the Debtors' Motion for a Protective Order [ECF No. 1955].

among others.[15]  As this Court itself has observed, the breadth of discovery provided in this case

has been unprecedented.[16]

## III.    MEDIATIONS AND SETTLEMENT OF THE SACKLER CLAIMS

The negotiations among the parties included a two-phase mediation, presided over by two

extremely highly-regarded mediators, Ken Feinberg and Layn Phillips.  The first phase concerned

how the value of the Debtors' estate should be allocated among the creditor constituencies,

resulting in an agreement to accept distributions in the form of funding for programs designed to

abate the opioid crisis.[17]  The second phase focused primarily on settlement of the Debtors' and

third-party civil causes of action against the Sacklers.[18]

In the second phase, the MSGE Group, the Debtors, the Sacklers, the UCC, and the AHC

negotiated at length regarding a potential resolution of the claims against the Sacklers.  Although

the Movant speculates that the mediation focused on the "present and future," the focus of the

mediation was settling claims arising from the Sacklers' prepetition conduct, as evidenced by this

Court's Order dated September 30, 2020, expanding the scope of the mediation to claims that could

be asserted by the estates and non-federal public claimants against the Sacklers.[19]

After many weeks of exhaustive and adversarial negotiations, on January 22, 2021, the

mediators submitted a joint proposal increasing the contributions by the Sacklers from $3.0 billion

---

[15] Disclosure Statement at 86.

[16] "[M]ore information has been provided with respect to this plan and more specifically with respect to the elements of a settlement with the Sacklers than I have ever seen, and I would daresay have ever been provided in any Chapter 11 case."  Mar. 24, 2021 Hr'g Tr. 56:4-9.

[17] Disclosure Statement at 4.

[18] *Id.*

[19] Order Expanding Scope of Mediation [ECF No. 1756].

to \$4.275 billion.[20]  For the next several weeks, the MSGE Group, the Sacklers, the Debtors, the

UCC, and AHC exchanged many offers and counteroffers concerning the Sackler contributions,

resulting in agreement on the key terms for the \$4.275 billion payment.[21]  In the subsequent five

weeks, these same five parties negotiated, and reached agreement on, other material terms, such

as payment guarantees, credit support, remedies, and releases.

## ARGUMENT

I.    **THIS COURT SHOULD DENY APPOINTMENT OF AN EXAMINER UNDER § 1104(c)**

Movant asks this Court to appoint an examiner on the grounds that it is in the best interest

of the creditors under § 1104(c)(1), and because appointment of an examiner is allegedly

mandatory under § 1104(c)(2) as the Debtors' "fixed, liquidated, unsecured debts . . . exceed

\$5,000,000." Motion ¶ 60.  Both arguments are without merit.

### A.    Section 1104(c) Does Not Mandate the Appointment of an Examiner

Section 1104(c) of the Code does not mandate the appointment of an examiner where the

proposed investigation is inappropriate.  While there is a split in authority[22] with respect to whether

appointment of an examiner is mandatory in cases where the \$5 million fixed debt threshold of

§ 1104(c)(2) is met, the statutory language, the legislative history, and the weight of recent

authority all support the view that appointment of an examiner is not mandatory.

---

[20] *See* Mediators' Report [ECF No. 2548], at 9 ("This Term Sheet follows in the wake of a recommendation made earlier by the two Mediators as part of Phase Two of the mediation process.").

[21] Disclosure Statement, Section AA.2.

[22] *See* 7 Collier on Bankruptcy ¶ 1104.03 (16th ed. 2020) ("Notwithstanding the mandatory language of section 1104(c), some courts have denied the appointment of an examiner even when the debtor's fixed, liquidated, unsecured debts, other than debts for goods, services or taxes, or debts owing to an insider, exceed \$5 million.").

Statutes must be construed as a whole, rather than by cherry-picking individual words. *See Nyack Hosp. v. Moran*, 2010 WL 4118355, at *4 (S.D.N.Y. June 1, 2020) ("When interpreting a statute, the court will not look merely to a particular clause in which general words may be used, but will take in connection with it the whole statute . . ." (quoting *Kokoszka v. Belford*, 417 U.S. 642, 650 (1974)); *see also Doscher v. Sea Port Group Securities, LLC*, 832 F.3d 372, 382 (2d Cir. 2016) (referencing "the cardinal rule that a statute is to be read as a whole, since the meaning of statutory language, plain or not, depends on context." (quoting *King v. St. Vincent's Hosp.*, 502 U.S. 215, 221 (1991)). While § 1104(c) does contain the phrase "the court *shall* order the appointment of an examiner," this language must be interpreted in conjunction with the remainder of that sentence, "to conduct such an investigation of the debtor *as is appropriate*." § 1104(c) (emphasis added).

The interpretation that §1104(c) does not require appointment of an examiner is also supported by legislative history, which provides that the "standards for the appointment of an examiner are the same as those for the appointment of a trustee; *the protection must be needed*, and the costs and expenses must not be disproportionately high." H.R. REP. NO. 95-595, at 403 (1977), *as reprinted in* 1978 U.S.C.C.A.N. 5963, 6359 (emphasis added); *see also In re Residential Capital, LLC,* 474 B.R. 112, 120-21 (Bankr. S.D.N.Y. 2012) ("[t]his legislative purpose is met when an examiner motion is denied in cases with fixed debts in excess of $5 million where the evidence establishes that the protection of an examiner is not needed under the facts and circumstances of the case.").

Consistent with the statutory language and legislative history, many courts have held § 1104(c) does not require appointment of an examiner where the proposed investigation would be inappropriate under the circumstances. In *Residential Capital*, after an exhaustive analysis of

the statute, legislative history and the case law, Judge Glenn concluded that "appointment of an examiner is not mandatory in *all* cases satisfying subsection (c)(2) because the phrase 'such an investigation of the debtor as is appropriate' provides a limitation on the requirement for appointment of an examiner under either subsections (1) or (2)." *In re Residential Capital, LLC*, 474 B.R. at 116-17. Judge Glenn reasoned that while "section 1104(c) expresses a Congressional preference for appointment of an independent examiner to conduct a necessary investigation, the facts and circumstances of the case may permit a bankruptcy court to deny the request for appointment of an examiner even in cases with more than $5 million in fixed debts." *Id.* at 121.

Courts in this circuit and other circuits have reached the same conclusion. *See, e.g.*, *In re Dewey & LeBoeuf LLP*, 478 B.R. 627, 639 (Bankr. S.D.N.Y. 2012) ("this Court . . . adheres to the view that it retains the discretion to deny a motion for appointment of an examiner.") (internal citation omitted); Hr'g Tr. 167:11-170:22, *In re Innkeepers USA Trust*, No. 10-13800 (SCC) (Bankr. S.D.N.Y. Sept. 30, 2010) [ECF No. 546] (finding it unnecessary to decide whether appointment was mandatory, but observing that a growing number of courts reject construction of section 1104(c)(2) that mandates appointment of examiner simply because $5 million threshold was exceeded if other facts do not make such appointment "appropriate," or have appointed examiners with limited or no authority); Hr'g Tr. 7:15-19, *In re Paddock Enterprises, LLC*, No. 20-10028 (LSS) (Bankr. D. Del. June 17, 2020) [ECF No. 376] (stating that the Delaware Bankruptcy Court "has consistently ruled that Section 1104(c) is not mandatory" and that the court would "not deviate from that holding even assuming that the level of fixed liquidated unsecured debt exceeds $5 million dollars."); *U.S. Bank Nat'l Ass'n v. Wilmington Tr. Co.* (*In re Spansion, Inc.*), 426 B.R. 114, 128 (Bankr. D. Del. 2010) (denying motion to appoint examiner under § 1104(c)(2) because "as is appropriate" language afforded court discretion to deny appointment

that would result in waste and delay); Hr'g Tr. 170:16-20, *In re Visteon Corp.*, No. 09-11786 (CSS) (Bankr. D. Del. May 12, 2010) (denying appointment of examiner and finding "it would be an absurd result to find that in every case where the financial criteria is met and a party-in-interest asks, the Court must appoint an examiner. There has to be an appropriate investigation that needs to be done.").

Accordingly, pursuant to the principles governing statutory construction and the clear legislative history, this Court should similarly conclude that § 1104(c) does not mandate appointment of an examiner.

### B.    The Movant Has Not Satisfied His Burden of Establishing the Existence of Fixed, Liquidated, and Unsecured Debts in Excess of $5 Million

Movant bears the burden of proof to demonstrate that appointment of an examiner is proper under § 1104(c), which here requires establishing that the "debtor's fixed, liquidated, unsecured debts . . . exceed $5,000,000." *In re Dewey & LeBoeuf*, 478 B.R. at 636 ("the moving party has the burden to prove that an examiner should be appointed."). In *Dewey & LeBoeuf*, the court held that a "fixed debt" is "generally, a permanent form of debt commonly evidenced by a bond or debenture; long-term debt", whereas a "contingent" debt is "a debt that is not presently fixed but that may become fixed in the future with the occurrence of some event," or "one which the debtor will be called upon to pay upon the occurrence or happening of an extrinsic event which will trigger . . . liability." *Id.* at 637 (quoting *Mazzeo v. United States* (*In re Mazzeo*), 131 F.3d 295, 303–05 (2d Cir. 1997)).

Movant asserts that "[t]he Debtors' obligations to the United States under the Purdue-DOJ settlement vastly exceed" the statutory requirement of $5 million. Motion ¶ 60. The DOJ's forfeiture and criminal fine claims against the Debtors, however, remain contingent on the District Court accepting Purdue Pharma's plea agreement at sentencing or confirmation of the Debtors'

10

plan.  *See* Order Pursuant to 11 U.S.C. § 105 and Fed. R. Bankr. P. 9019 Authorizing and

Approving Settlements Between the Debtors and the United States [ECF No. 2004].  With respect

to the DOJ's civil claim, the Court's order approving the settlement also provides the DOJ with

the option under certain circumstances to rescind the civil settlement agreement and pursue claims

against the Debtors.  *See id.,* ¶¶ 6-7.  Thus, the Debtors' obligations under the DOJ resolution do

not constitute "fixed" debts under § 1104(c)(2).

### C.    Appointment of an Examiner Would Be Inappropriate under the Present Circumstances

Courts in the Southern District of New York analyze the following factors in determining

whether an investigation by an examiner would be inappropriate:  "(1) whether the investigation

has already been conducted by other parties; (2) whether the appointment of an examiner would

increase costs and cause a delay with no corresponding benefit; and (3) the timing and underlying

motives of the motion, *i.e.* whether it is a litigation tactic or an attempt to gain an advocate, or

whether the motion comes after an undue delay."  *In re Residential Capital, LLC*, 474 B.R. at 120

(internal citation omitted); *see also In re Dewey & LeBoeuf LLP*, 478 B.R. at 639 ("the

appointment of an examiner would be inappropriate if the motion was filed for an improper

purpose such as a litigation tactic to delay a case, or if there is no factual basis to conclude that an

investigation needs to be conducted, or if an appropriate and thorough investigation has already

been conducted (or is nearly complete) by a creditors committee or a governmental agency.")

(internal quotation marks and citation omitted).  All three factors unequivocally support denial of

the Motion.

### 1.    *The Proposed Investigation Would Duplicate Investigations Conducted by Other Constituencies*

Movant claims that there have been allegations that certain members of the Sacklers bear

responsibility for criminal activity (the "**Sackler Allegations**") and that "there must be an

independent assessment of, and public report on, the decision to accept and implement the Settlement Framework as to the Sackler Allegations." Motion at 1-3. But the settlement does not purport to resolve any criminal liability of the Sacklers, and their activities have been thoroughly investigated by various independent parties. Those investigations involved, among other things, the review of tens of millions of pages of documents, and depositions of the Sacklers and the Debtors' directors.

Movant offers three responses—all without merit—to the fact that the proposed investigations would be duplicative and a waste of estate resources. *First*, he argues that it "appears" that the investigations in this case "have focused on property transfers" and not on the "Sackler allegations." Motion ¶ 78. Movant's rank speculation could not be more wrong. The prior investigations expressly covered the Sackler Allegations, and the potential causes of action against the Sacklers were investigated thoroughly by multiple independent entities, as were all aspects of the Sacklers' conduct. *See* Disclosure Statement at 157-79. Indeed, the thoroughness of these investigations likely served to significantly increase the value of the settlement. Movant has not, and cannot, offer evidence to support the allegation that the investigations were not undertaken or completed, and even concedes that they "may have" been. Motion ¶ 48.

*Second*, Movant claims that an examination is needed to determine "the types of claims that might be asserted in light of the Sackler Allegations." Motion ¶ 79. Again, as set forth above, this question has been investigated and evaluated at length by the MSGE Group, the AHC, the NCSG, the UCC, the Special Committee, the DOJ, and other parties-in-interest. Once again, Movant offers no evidence to support his contention that these issues have not been examined fully.

*Third*, Movant asserts that even if the work of the proposed examiner is duplicative of the work completed to date, the Court should appoint the examiner because the prior work does "not appear to be in the public record of these cases." Motion ¶ 80. The fact that the details of an investigation have not been made public is not grounds for appointing an examiner to repeat the same investigation. Movant offers no reason why any examiner would not be subject to the same protective order and, further, fails to acknowledge that extensive public disclosures concerning investigations of claims against the Sacklers have already been made in the Chapter 11 Cases.[23] In any event, appointing an examiner to conduct a duplicative examination at great cost to the estates is not the proper remedy for a request for disclosure.

Courts routinely decline appointing an examiner where investigations (and attendant discovery) covering the same issues have been, or are being, conducted by parties-in-interest. *See In re Residential Capital, LLC*, 474 B.R. at 121 ("The appointment of an examiner would be inappropriate . . . if an appropriate and thorough investigation has already been conducted (or is nearly complete) by a creditors committee or a governmental agency."); *In re Sletteland*, 260 B.R. 657, 672 (Bankr. S.D.N.Y. 2001) (noting that the appointment of an examiner may be unwarranted where an official committee could appropriately perform the investigation); *Spansion, Inc.*, 426 B.R. at 128 (denying appointment of examiner where "the Creditors Committee and various *ad hoc* committees have vigorously represented the interests of unsecured creditors" and "have had ample opportunity to conduct—and have conducted—extensive discovery, and to investigate the Debtors"); *In re Mechem Fin. of Ohio, Inc.*, 92 B.R. 760, 761 (Bankr. N.D. Ohio 1988) (denying appointment of examiner where, among other things, creditors' committee was supervising

---

[23] *See, e.g.*, Notice of Filing of Report of the Special Committee [ECF No. 654]; Notice of Filing of Report of the Special Committee [ECF No. 1194].

debtor's activities, was authorized to perform investigations, and could pursue preference claims). Accordingly, the Motion must be denied because it seeks to duplicate exhaustive investigations already performed by multiple independent parties.

2.   *Appointment of an Examiner Would Impose Increased Costs and Delay with No Corresponding Benefits*

Movant first raised the issue of appointment of an examiner in his July 15, 2020 letter to the Court. Motion, Ex. B-2. Despite this fact, he waited almost a year to bring this Motion – after other stakeholders completed their investigations, after approval of the disclosure statement, and less than two months before the confirmation hearing. In his proposed order, Movant proposes that the examiner would review these **millions** of pages of documents and provide a report within 30 days of the later of the examiner's retention date or 10 days before the confirmation hearing (currently scheduled for August 9, 2021), which is facially an absurd deadline. *Id.,* Ex. A ¶ 4.

During the bankruptcy, the investigations into, and the analysis of, the Sackler Allegations by the MSGE Group, the AHC, the NCSG, the UCC, and the Special Committee lasted over a year, and in the case of the members of the AHC, NCSG and MSGE Group, significantly preceded the bankruptcy as well. The DOJ investigation also apparently lasted several years. It is reasonable to assume that any commensurate investigation by an examiner would take at least a year, if not longer. Any suggestion by Movant that an examiner can finish the proposed investigation within a couple of months is either impractical and unrealistic, or is a recipe for a pointless exercise designed to accomplish nothing but delay.

Moreover, these Chapter 11 Cases are currently costing the estate millions every month in professional fees. Extending the bankruptcy and adding an additional layer of examination would significantly increase these costs. All funds expended as a result of this delay would be funds no longer available for opioid abatement.

3.    *The Timing of the Motion Suggests That It Is a Litigation or Negotiation Tactic*

In May 2021, Movant filed two objections to the Amended Disclosure Statement,[24] which were ultimately rejected by this Court.[25]  Movant was represented by the same counsel in those objections but waited until after the Court approved the Disclosure Statement to bring this motion. Movant could have sought this relief any time after the Petition Date, or at a minimum, after he addressed the same concerns in his July 2020 letter.  This unjustified delay suggests an intent to delay or thwart confirmation of the plan.  *See, e.g.*, *In re Schepps Food Stores, Inc.*, 148 B.R. 27, 31 (S.D. Tex. 1992) (noting that the movant waited until "twenty days after the date of the confirmation hearing was set [] to make its request" and finding that that the movant's "interest in the appointment of an examiner is a tactic to prevent confirmation, rather than to investigate bad faith allegations."); *see also, e.g.*, Hr'g Tr. 72:23-73:1, *In re Calpine Corp.*, No. 05-60200 (Bankr. S.D.N.Y. Oct. 24, 2007) [ECF No. 6467] ("Practically speaking, [movant] seeks an examiner to perform the type of discovery that [it] believes it needs to oppose confirmation and is already in the midst of."); *In re Bradlees Stores, Inc.*, 209 B.R. 36, 39 (S.D.N.Y. 1997) ("With nineteen days left before the limitations period expires, the impracticality of the movants' request is obvious and suggests that the request is nothing more than a litigation/negotiation tactic").

4.    *Appointment of an Examiner Is Unnecessary and Would Not Be in the Best Interests of Creditors or the Estate*

Movant asserts that an examiner "is in the 'interests of creditors' and 'other interests of the estate'—the general public—as a way to assure that the Special Committee made the decision to settle rather than litigate with the Sackler Families at arm's length and independently. . . ."  Motion

---

24    ECF Nos. 2819, 2881.
25    ECF No. 2988.

¶ 60.  To the contrary, the imposition of unnecessary cost and delay is detrimental to the interests of creditors and the general public.  As mentioned, tens of millions of pages of documents have been reviewed.  The longer this case drags on, and the more professional fees it accrues, the less money is available to the public for opioid abatement and for tort victims.

Nor is an examiner necessary at this point.  The current plan was extensively negotiated (and facilitated by skilled mediators) at arms-length by the Debtors, the UCC, the MSGE Group, the AHC, and the NCSG, among others.  The current plan is substantially different from the original Settlement Framework and was negotiated by entities clearly not beholden to the Sacklers. The Motion ignores all of this.

Finally, the MSGE Group, which represents the interests of approximately 60 million residents of approximately 1300 local governmental entities, and the AHC, the NCSG, and the UCC all are substantial parties in this case whose motives should not be impugned.  In contrast, Movant is not a fiduciary to anyone and appears to be bringing this motion to delay or prevent confirmation of the plan.  Accordingly, this Court should reject Movant's claim that appointment of an examiner would be in the best interest of creditors and the estate.

### D.    Even If the Court Concludes that Appointment of an Examiner Is Otherwise Mandatory, the Motion Should Be Denied Under the Laches Doctrine

It is well-established that "(f)ailure to make a timely request for the appointment of an examiner may provide the court with a basis for denying the request on the ground of laches." 7 Collier on Bankruptcy ¶ 1104.03 (16th ed. 2020); *see also In re Bradlees Stores*, 209 B.R. at 39 (finding that a "party in interest may waive its right to seek the appointment of an examiner").

In *Bradlees Stores*, certain holders of trade claims (the "**Claims Traders**") moved for appointment of an examiner to investigate a prepetition transaction.  *Id.* at 37.  The court held that "the Claims Traders have waived the right to seek" appointment of an examiner, reasoning that,

among other things, (i) "appointment of an examiner to conduct a new investigation at this time would be duplicative, needless and wasteful"; (ii) with nineteen days left before the limitations period expires, "the request is nothing more than a litigation/negotiation tactic"; and (iii) the "movants have had over nineteen months to seek this relief." *Id.* at 39; *see also, e.g.*, Hr'g Tr. 72:4-10, *In re Calpine Corp.*, No. 05-60200 (Bankr. S.D.N.Y. Oct. 24, 2007) [ECF No. 6467] (holding that movant had waived its right to request an examiner by waiting "almost two years after the [P]etition [D]ate, more than seven months after [debtor] first disclosed the possibility of substantive consolidation in February, and less than two months before the confirmation hearings."); *In re Schepps Food Stores*, 148 B.R. at 31 (holding that movant waived its right to seek appointment of an examiner by "waiting twenty days after the date of the confirmation hearing" to make its request even though its concerns date back several months).

Here, Movant's request for an examiner comes approximately 22 months after the Petition Date, after approval of the Disclosure Statement, after identical investigations have been conducted by various stakeholders, after an extended and successful mediation, and only two months before the confirmation hearing. By his own admission, Movant has had these concerns for close to a year as evidenced by his July 2020 letter. *See* Motion, Ex. B-2. Movant, however, expressly declined the Court's invitation to have his letter considered as a motion at that time[26]

---

[26] Movant now asserts this failure was due to his lack of counsel at the time. It is unclear when movant obtained counsel. Movant filed two objections to the Amended Disclosure Statement, represented by Prof. Jonathan C. Lipson, of Temple University-Beasley School of Law, dated May 6, 2021, and May 18, 2021 (*See* ECF Nos. 2819, 2881). In addition, Movant's counsel appears to have been involved in this bankruptcy from the inception. In November 2019, Mr. Lipson sent a letter to the U.S. Trustee requesting appointment of an examiner allegedly because of his concern about the independence of the Special Committee (among other reasons). *See* Lipson, Jonathan C., Letter of Bankruptcy Law Professors to United States Trustee Requesting an Examiner in the Purdue Pharma Chapter 11 Reorganization (Nov. 5, 2019), available at https://ssrn.com/abstract=3532642. Mr. Lipson, along with two other law professors, also filed an

and chose to wait until two months before the confirmation hearing to request an examiner.  *See*

Motion, Ex. B ¶ 3.

Accordingly, even if the Court concludes that appointment of an examiner is otherwise

mandatory under § 1104(c), denial of the Motion is warranted due to Movant's substantial and

unjustified delay in seeking this relief.[27]

## II.    THE PROPOSED INVESTIGATION RELATES TO PLAN CONFIRMATION ISSUES THAT SHOULD BE ADDRESSED BY KEY STAKEHOLDERS RATHER THAN AN EXAMINER

Courts have refused to appoint examiners where the key issues in question pertain to plan

confirmation and thus should be resolved by the key stakeholders in the case. *See* Hr'g Tr. 73:9-

12, *In re Calpine Corp.*, No. 05-60200 (Bankr. S.D.N.Y. Oct. 24, 2007) [ECF No. 6467] ("the

mandatory nature of [Section 1104(c)] was not intended and should not be relied upon to permit

blatant interference with the Chapter 11 case or the plan confirmation process"); *see also Spansion,*

*Inc.*, 426 B.R. at 128 (denying appointment of examiner where, *inter alia*, "the allegations of bad

faith against the Debtors' management" provided "a classic confirmation dispute, rather than

grounds for an investigation by an examiner"); Hr'g Tr. 171:7-21, *In re Visteon Corp.*, No. 09-

11786 (CSS) (Bankr. D. Del. May 12, 2010) [ECF No. 3145] (concluding that the "case does not

---

*amici curiae* brief dated November 10, 2020, in opposition to the proposed settlement between the Debtors and the DOJ (*See* ECF No. 1913-1).

[27] If this Court holds that §1104(c) does mandate appointment of an examiner, such an appointment should, as numerous bankruptcy courts have done, restrict the examiner to few or no current duties and otherwise take all steps to limit delay of the resolution of the Chapter 11 Cases and the further depletion of estate funds.  *See, e.g.*, Order Directing Appointment of Examiner Under 11 U.S.C. § 1104(c) and 1106, *In re Asarco*, No. 05-21207 (Bankr. S.D. Tex. March 4, 2008) [ECF No. 7081] (after granting examiner motion, ordering that the "Examiner shall not have any current duties"); *In re Erickson Retirement Communities*, 425 B.R. 309, 317 (Bankr. N.D. Tex. 2010) (stating that were there no standing/waiver issues, the court would "appoint an examiner with no duties" since the court "would be hard pressed to find any useful purpose for an examiner"); *In re Loral Space & Communications Ltd.,* 313 B.R. 577, 587 (Bankr. S.D.N.Y. 2004) (noting that it may be appropriate under certain circumstances to restrict examiner's investigation to a limited role).

need an examiner" where the issues gave rise to "a good old fashioned fight over a debtor that has some value," which should be contested and resolved at confirmation); *see also* Hr'g Tr. 167:21-168:3, *In re Innkeepers USA Trust*, No. 10-13800 (Bankr. S.D.N.Y. Sept. 30, 2010) [ECF No. 546] ("[C]ourts have quite understandably and properly, I believe, pushed back and declined to appoint an examiner to join an otherwise crowded fray, in which the many combatants are well armed and highly motivated.").

Here, the Movant requests an investigation into whether "the process by which the board of directors of Purdue Pharma, Inc. decided to settle the 'Sackler Allegations' . . . [was] undertaken independently[,] . . . made in good faith, and [] negotiated at arm's length." Motion, Ex. A ¶ 2. Movant concedes that his concerns would ordinarily "be addressed by way of objection to a motion to approve the Shareholder Settlement or to confirm the Plan." *Id.* at 3.

Despite this candid admission, Movant contends that given "the voluminous record in this case, and concerns about maintaining confidentiality and attorney-client privilege . . . it is highly unlikely that these concerns will be addressed credibly and publicly in connection with any such motion." *Id.* Movant offers no factual support or other explanation for this claim. The opposite is actually true: complex bankruptcies tend to include highly sophisticated stakeholders and professionals that increase the likelihood of vigorous litigation and negotiation, both prior to and during the confirmation process, if warranted.

While Movant attempts to position himself as an advocate for the public interest in the Motion, he omits any mention of the substantial roles of the MSGE Group, the AHC, and the NCSG in these Chapter 11 Cases. These governmental entity groups have spent close to two years now investigating, analyzing, negotiating and litigating various issues in this bankruptcy to

vindicate the public interest.  As such, these key stakeholders are the appropriate parties to address these confirmation issues rather than an examiner.

Accordingly, the Court should reject the Motion and allow these confirmation issues to be addressed by the parties-in-interest at the upcoming confirmation hearing.

## III.    THE CIRCUMSTANCES IN THIS CASE ARE NOT ANALOGOUS TO THE CIRCUMSTANCES IN *IN RE CENVEO*

Movant claims to seek "the appointment of a 'supervisory' examiner, adapted from the examination recently ordered by this Court in *In re Cenveo*."  Motion at 4.  However, the circumstances in *Cenveo* are not analogous to the facts here.  Nor is Movant seeking appointment of an examiner in a strictly supervisory role modeled after *Cenveo*.

*First,* in *Cenveo*, Brigade Capital Management filed its motion seeking appointment of an examiner **10 days** after the Petition Date.[28]  Brigade sought the relief before any "independent party or creditor representative [had] begun or conducted a similar investigation."[29]  In stark contrast, Movant brings this Motion almost **2 years** after the Petition Date, and after substantial and expensive investigations covering the same issues have been completed by various constituencies.

*Second*, in *Cenveo*, the Court appointed an examiner in a supervisory role only, restricting the examiner from conducting an "independent investigation into the facts" or from conducting "an analysis of the merits of any particular cause of action."[30]  The Court permitted the examiner

---

[28] *See* Voluntary Petition for Non-Individuals Filing for Bankruptcy, filed on February 2, 2018, *In re Cenveo, Inc.,* No. 18-22178 (RDD) (Bankr. S.D.N.Y.) [ECF No. 1].  *See also* Motion of Brigade Capital Management, LP For the Appointment of an Examiner Pursuant to 11 U.S.C. § 1104(c), filed on February 12, 2018, *In re Cenveo, Inc.,* No. 18-22178 (RDD) (Bankr. S.D.N.Y.) [ECF No. 76-1] ("Cenveo Examiner Motion").

[29] *See* Cenveo Examiner Motion ¶ 28.

[30] *See* Order Appointing an Examiner Pursuant to 11 U.S.C. § 1104(c)(2), *In re Cenveo, Inc.*, No. 18-22178 (RDD) (Bankr. S.D.N.Y.) [ECF No. 203], ¶ 4.

to "examine and report . . . on whether the investigations of Cenveo and the Committee into the Examination Topics are being conducted reasonably, independently, and in good faith, [whether] the investigations of Cenveo and the Committee have concluded and are complete, and [whether] Cenveo's and the Committee's respective conclusions are reasonable based on applicable law and the facts and circumstances relevant thereto."[31]

Movant's claim that he is seeking appointment of a "supervisory" examiner, adapted from *Cenveo*[32] is discredited by his own proposed order, which provides that the "Examiner shall *investigate and report* on" issues related to the Purdue Pharma's board's decision to settle the Sackler allegations.[33]  In *Cenveo*, the Court ordered the examiner to supervise the *forthcoming* investigations of the debtor and the creditors' committee, and forbade the examiner from conducting any independent factual or legal analysis.  Whereas here, the Movant wants the examiner to conduct an independent factual and legal analysis after the investigations covering the same issues have already occurred.

Accordingly, the Court should find that *Cenveo* is not analogous, that Movant is not seeking a supervisory examiner, and deny the Motion for these and the foregoing reasons.

---

[31] *Id.*

[32] *See* Motion at 4.

[33] *See* Motion, Ex. A ¶ 2 (emphasis added).

## **CONCLUSION**

For the foregoing reasons, the Court should deny the Motion to appoint an examiner in this case.

Dated: June 13, 2021                    Respectfully submitted,

*/s/ Kevin C. Maclay*
Kevin C. Maclay, Esq. (admitted *pro hac vice*)
Todd E. Phillips, Esq.
Monty Crawford, Esq. (*pro hac vice* pending)
George M. O'Connor, Esq. (admitted *pro hac vice*)
Caplin & Drysdale, Chartered
One Thomas Circle, NW, Suite 1100
Washington, D.C. 20005
Tel: (202) 862-5000
Fax: (202) 429-3301
kmaclay@capdale.com
tphillips@capdale.com
mcrawford@capdale.com
goconnor@capdale.com

*Counsel for the Multi-State Governmental*
*Entities Group*

## <u>CERTIFICATE OF SERVICE</u>

I certify that on June 13, 2021, I caused a copy of the foregoing to be served electronically upon counsel or parties of record via the Court's CM/ECF Notification system.  I also certify that service is being made via email upon counsel of record.  Further service is being made, pursuant to the Order Establishing Certain Notice, Case Management, and Administrative Procedures [ECF No. 72], upon the following parties:

Honorable Judge Robert D. Drain
United States Bankruptcy Court
Southern District of New York
300 Quarropas Street, Room 248
White Plains, NY 10601
***Via Overnight Delivery***

Attn: Paul K. Schwartzberg
Office of the United States Trustee
Southern District of New York
201 Varick Street, Suite 1006
New York, NY 10014
***Via First-Class Mail***

*/s/ George M. O'Connor*
George M. O'Connor