KRAMER LEVIN NAFTALIS
& FRANKEL LLP
Kenneth H. Eckstein
Rachael Ringer
David E. Blabey Jr.
1177 Avenue of the Americas
New York, NY 10036
Telephone: (212) 715-9100

GILBERT LLP
Scott D. Gilbert (admitted *pro hac vice*)
Craig Litherland (admitted *pro hac vice*)
Kami E. Quinn (admitted *pro hac vice*)
100 New York Ave, NW, Suite 700
Washington, D.C. 20005
Telephone: (202) 772-2200

BROWN RUDNICK LLP
David J. Molton
Steven D. Pohl
7 Times Square
New York, NY 10036
Telephone: (212) 209-4800

OTTERBOURG P.C.
Melanie L. Cyganowski
Jennifer S. Feeney
230 Park Avenue
New York, NY 10169
Telephone: (212) 661-9100

*Attorneys for the Ad Hoc Committee*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

------------------------------------------------------------------X
                                           :

In re:                              :    Chapter 11
                                           :

PURDUE PHARMA L.P., *et al.*,         :    Case No. 19-23649 (RDD)
                                           :

                Debtors.        :    (Jointly Administered)
                                           :

------------------------------------------------------------------ X

## AD HOC COMMITTEE'S OBJECTION
## TO MOTION TO APPOINT AN EXAMINER

       The Ad Hoc Committee of Governmental and Other Contingent Litigation Claimants (the

"**Ad Hoc Committee**")[1] hereby submits this objection to the *Motion for Order to Appoint*

*Examiner* (the "**Examiner Motion**") [Dkt. No. 2963] filed by Professor Jonathan C. Lipson on

behalf of personal injury claimant Peter W. Jackson (the "**Movant**"), a creditor of the above-

captioned debtors and debtors-in-possession (the "**Debtors**").

---

[1] The members of the Ad Hoc Committee are set forth in the Rule 2019 statement filed at Docket Number 279.

**Preliminary Statement**

1.      The Examiner Motion, filed over a year-and-a-half into these cases, some nineteen months after Professor Lipson first asked the United States Trustee to appoint an examiner, and just two short months before the start of a contested confirmation hearing for which intensive preparations are already well underway, is in the best interests of no party in interest in these cases and should be denied.  Contrary to the Movant's argument, the appointment of an examiner is not mandatory under the governing statute and is manifestly inappropriate here.

2.      To begin with, the decision to appoint an examiner is discretionary, even in a case in which fixed, liquidated, unsecured debts exceed $5 million.[2]  This Court so ruled in *Loral*[3], and other courts have agreed.  As Judge Glenn observed in *Residential Capital*:  "The appointment of an examiner would be inappropriate if the motion was filed for an improper purpose such as a litigation tactic to delay a case, or if there is no factual basis to conclude that an investigation needs to be conducted, or if an appropriate and thorough investigation has already been conducted (or is nearly complete) by a creditors committee or a governmental agency."[4]  Here, for the reasons identified in *Residential Capital* and other cases, as well as considerations unique to this case, the Court should exercise its discretion to deny the Examiner Motion.

3.      *First*, the motion is untimely.  The alleged grounds for the motion have been known to Professor Lipson since at least November 2019 (when he requested an examiner in a letter to the United States Trustee) and to the Movant since at least July 2020 (when he requested an examiner in a letter to the Court).  To appoint an examiner now would disrupt the substantial

---

[2] As the Debtors explain in their objection, it is not clear that "fixed" debts actually do exceed $5 million in this case.

[3] *In re Loral Space & Commc'ns Ltd.*, 313 B.R. 577 (Bankr. S.D.N.Y. 2004) ("***Loral I***"), *rev'd* No. 04 Civ. 8645 (RPP), 2004 WL 2979785 (S.D.N.Y. Dec. 23, 2004).

[4] *In re Residential Capital, LLC*, 474 B.R. 112, 121 (Bankr. S.D.N.Y. 2012) (citing Transcript of Examiner Hearing at 98:12-100:21, *Wash. Mut. Inc.*, No. 08-12229 (MFW) (Bankr. D. Del. May 5, 2010), ECF No. 3699).

progress that has been made in the case, and risk – indeed, virtually ensure – additional delays in the resolution of these cases and additional administrative costs on top of those already incurred.

4.      *Second*, the requested investigation is unnecessary and duplicative.  The Examiner Motion proceeds from the false premise that the Debtors' Special Committee, and not their creditors, was primarily responsible for negotiating the settlement with the Sacklers.  In fact, that settlement – both in its prepetition form and as subsequently modified and enhanced postpetition – was driven principally by the efforts of the Ad Hoc Committee, the Official Committee, and other creditor groups.  The settlement framework put in place at the outset of the case was the result of arduous negotiations conducted under the supervision of a Federal District Court Judge and independent mediators and involving not just Purdue and the Sacklers (who Movant suggests may have colluded), but also 24 States and the Plaintiffs Executive Committee in the pending federal multi-district opioid litigation (who were unquestionably adverse to the Sacklers and Purdue).  Not satisfied with the initial settlement framework, the Official Committee and the Non-Consenting States launched an extensive investigation in bankruptcy, obtaining millions of documents and hundreds of hours of testimony from the Sacklers and Purdue.  That investigation, coupled with months of mediation, resulted in material improvements to the prepetition deal.  The Examiner Motion largely ignores the work done by these highly motivated and organized creditor groups – the Ad Hoc Committee, the Official Committee, the Non-Consenting States, and others – in favor of a flawed narrative of secrecy and collusion.

5.      *Third*, the primary question posed by the Movant – whether Purdue's "decision to settle, rather than to sue, was made independently, in good faith, and at arm's length, as required by applicable case law" (Examiner Motion at 1-2) – will be addressed and answered at the confirmation hearing.  The Debtors, as the Movant notes, can confirm their settlement plan only if

it meets the relevant standards in the Second Circuit.  To the extent those standards include a consideration of the good faith and arm's length nature of the settlement, the Debtors will be put to their proof and the facts the Movant seeks to elicit through an examination will come out at trial.

6.      *Fourth*, the public's interest in a full accounting of the Debtors' and Sacklers' misconduct will be served in other ways.  The Debtors and Sacklers have made voluminous materials available to the public during these cases, and have agreed to establish a document repository after confirmation.  To be sure, not all discovery has been made public due to assertions of confidentiality or privilege – but an examiner would face such claims as well.  In any event, to assert, as the Movant does, that discovery has "been contained among and analyzed by a small group of case insiders" (Examiner Motion at 1) is to ignore that those case "insiders" comprise representatives of each of the Debtors' main constituencies, including the thousands of States, municipalities, and Tribes that have worked so hard to bring justice to their citizens.

7.      In sum, not only is an examiner not *required* in these cases, there is simply no cogent, nor even colorable, basis to appoint one.

## Relevant Background

### A.      The Settlement Framework

8.      As explained in the disclosure statement (the "**Disclosure Statement**") [Dkt. No. 2983] for the Debtors' chapter 11 plan (the "**Plan**") [Dkt. No. 2982], the Debtors' bankruptcy cases were preceded not just by extensive litigation with their public creditors and others, but also by a year-long period of intensive negotiations among the Debtors, the Sacklers, and "a critical mass of important plaintiff constituencies."  Disclosure Statement at 3-4.  The history of those negotiations is set forth in the *Debtors' Informational Brief* (the "**Informational Brief**") [Dkt. No. 17], filed

on the petition date, and in the Ad Hoc Committee's *Statement in Support of Debtors' Motion to Assume Prepetition Reimbursement Agreement* (the "**Statement in Support**") [Dkt. No. 486].

9.      The prepetition negotiations among these parties resulted in an agreement on what has come to be called the "**Settlement Framework**" – a deal between the Sacklers, the Debtors, and that "critical mass" of plaintiffs.  The Settlement Framework was supported by the attorneys general for 23 States and five United States territories, as well as the Plaintiffs' Executive Committee ("**PEC**") and Co-Lead Counsel in the pending multi-district litigation – the latter of whom were charged with principal responsibility for negotiating on behalf of the thousands of municipal, tribal, and other plaintiffs involved in the MDL.  *See* Informational Brief at 44-45; Statement in Support at ¶¶ 2, 15-16.

10.     Shortly after filing for bankruptcy, the Debtors filed a term sheet embodying the Settlement Framework.  *Notice of Filing of Term Sheet With Ad Hoc Committee* [Dkt. No. 257].

**B.      The Post-Petition Improvements to the Settlement Framework**

11.     Once the Debtors were in bankruptcy, the Official Committee of Unsecured Creditors (the "**Committee**" or "**Official Committee**") and the Ad Hoc Group of Non-Consenting States (the "**Non-Consenting States**"), not satisfied with the original Settlement Framework, embarked on an extensive investigation of the Debtors and the Sacklers.  *See* Disclosure Statement at 177-78 (describing the "vigorous" investigation over the course of 18 months, including the production of almost 100 million pages of documents and numerous depositions).

12.     The key case parties engaged in an extensive mediation, as well, with the second phase of the mediation focusing on the settlement of estate and third-party claims against the Sacklers and the sufficiency of the proposed Sackler contribution to the reorganization.  *See* Disclosure Statement at 21-22, 86-87; *see also Mediators' Report* [Dkt. No. 2548] (Mar 23, 2021).

13.    As a result of these substantial efforts, the initial Settlement Framework was materially improved, with the amount of the Sackler contribution increasing from $3 billion over seven years to $4.5 billion over nine years.  See Disclosure Statement at 22 & App. G.

**C.    The Public Disclosure of Information**

14.    In addition to the extensive disclosure of information to litigants and parties in interest in connection with the investigation led by the Committee and the Non-Consenting States, the Debtors have made additional efforts at transparency, including:

- The establishment of a "document reserve" for confirmation, comprising, among other things, "non-privileged materials the Debtors have produced in these Chapter 11 Cases" and "transcripts of depositions of the Debtors' current and former employees, directors, officers, and advisors, taken in prepetition civil litigation or in connection with these Chapter 11 Cases." *See Second Amended Order Granting Debtors' Motion for Order Establishing Confirmation Schedule and Protocols* at 6-7 [Dkt. No. 2989].

- The agreement to establish a public post-confirmation "document repository" which will contain, among other things, "a copy of the more than 13,000,000 documents (of more than 100,000,000 pages) produced by Debtors during the course of the Purdue Legal Matters." *See* Plan § 5.12.

**D.    The Prior Requests for an Examiner**

15.    Both Professor Lipson and the Movant have each previously requested the appointment of an examiner in these cases (albeit not by formal motion) and the subject of an examiner has been a topic of discussion at prior hearings.

16.    By letter dated November 5, 2019 (the "**Lipson Letter**"), Professor Lipson and certain other law professors asked the United States Trustee to seek an order for the appointment of an examiner, citing, among other things, the need for an "independent examination," the "potential conflict among creditors" that might hamper an investigation by the Official Committee,

and "the extraordinary public interest in these cases." *See* Lipson Letter at 2, 4, 6-10.[5]  It does not

appear that the United States Trustee acted on the Lipson Letter.

17.       By letter dated July 15, 2020 (the "**Movant's Letter**") [Dkt. No. 1538], the Movant

asked the Court to appoint an examiner.  The Movant states that he did not pursue his request

further because he did not have counsel at the time.  *See* Examiner Motion, Ex. B at ¶ 3.

18.       While the Court has not been presented with a formal motion for an examiner, it

has had occasion to express certain views on the subject.

> Where you have an extremely active group of creditors with an extremely
> broad base, there's no reason to have a third-party examiner, who in any
> event can only make recommendations and conclusions, which as many
> cases where examiners have been appointed illustrate are often contested by
> the parties thereafter as being simply one party's view based on a nonpublic
> record, because most of what an examiner is told is not public, and is not
> even a basis for a particular person commencing litigation.

Transcript of Hearing at 84:17-85:2 (Sept. 30, 2020).[6]

## Objection

## I.       The Appointment of an Examiner is Not Mandatory

19.       While case law is not unanimous, the better view is that the appointment of an

examiner is not mandatory upon request, even when the debtor's fixed debts exceed $5 million.

20.       The relevant provision of the Bankruptcy Code, section 1104(c), provides:

> If the court does not order the appointment of a trustee under this section,
> then at any time before the confirmation of a plan, on request of a party in
> interest or the United States trustee, and after notice and a hearing, the court
> *shall* order the appointment of an examiner to conduct such an investigation
> of the debtor *as is appropriate*, including an investigation of any allegations
> of fraud, dishonesty, incompetence, misconduct, mismanagement, or

---

[5] The Lipson Letter is linked from a blog post by Professor Lipson and available at:
https://www2.law.temple.edu/10q/wp-content/uploads/2019/11/Purdue-Examiner-Letter-v1.4.1-SUBMITTED.pdf.

[6] *See also* Transcript of Hearing at 56:18-22 (July 23, 2020) (noting that "to believe that there is no investigation going
on, that this case's purpose is somehow to let the Sacklers get away with it and that without the appointment of an
examiner there won't be an investigation, is just completely and utterly misguided").

irregularity in the management of the affairs of the debtor of or by current or former management of the debtor, if—

(1) such appointment is in the interests of creditors, any equity security holders, and other interests of the estate; or

(2) the debtor's fixed, liquidated, unsecured debts, other than debts for goods, services, or taxes, or owing to an insider, exceed $5,000,000.

11 U.S.C. § 1104(c) (emphases added).

21.     While the statute uses the term "shall," there is good reason to believe that the appointment of an examiner is not always required simply because the debtor's fixed, liquidated, unsecured debts (other than excluded debts) exceed $5 million.  First, the court need only order "such an investigation . . . *as is appropriate*."  *Id.* (emphasis added).  If no investigation is "appropriate," then no investigation is required.[7]  Second, as with many legal rights, the right to the appointment of an examiner (such as it is) may be waived – including because of delay.  Finally, both of the preceding factors – lack of propriety and delay – can contribute to a third reason for denying an examiner motion:  its use for improper leverage or tactical advantage.

22.     The better-reasoned cases support this interpretation of the statute.  *See Residential Capital*, 474 B.R. at 121 ("While section 1104(c) expresses a Congressional preference for appointment of an independent examiner to conduct a necessary investigation, the facts and circumstances of the case may permit a bankruptcy court to deny the request for appointment of an examiner even in cases with more than $5 million in fixed debts."); *Spansion*, 426 B.R. at 127-28 (denying appointment of examiner under § 1104(c)(2),  noting "[t]o appoint an examiner with no meaningful duties strikes me as a wasteful exercise, a result that could not have been intended

---

[7] In the alternative, an examiner could be appointed with an extremely limited scope.  Yet if there is no scope that would be "appropriate," it would seem fruitless, if not absurd, to appoint a mandate-less examiner.  *See U.S. Bank Nat'l Ass'n v. Wilmington Trust Co. (In re Spansion, Inc.)*, 426 B.R. 114, 127-28 (Bankr. D. Del. 2010) ("To appoint an examiner with no meaningful duties strikes me as a wasteful exercise.").

by Congress"); *Loral I*, 313 B.R. at 587 ("If the only requested appointment is wholly inappropriate, why should the court stretch to fashion a more appropriate job description for an examiner if none would justify *sua sponte* appointment?"); *see also In re Schepps Food Stores, Inc.*, 148 B.R. 27, 30-31 (S.D. Tex. 1992) (finding that creditor had waived right to appointment of an examiner by waiting until "the eve of the confirmation hearing" to make it request).

23.     Thus, the Court has discretion to deny the Examiner Motion even if (and the Debtors contest this point) the Debtors' fixed, liquidated, unsecured debts may exceed $5 million.

## II.    An Examiner is Inappropriate in the Context of these Cases

24.     Just as an examination is not required, it is also not warranted – or "appropriate" – in the context of these cases.  Reasons of delay, cost, prejudice, duplication of effort, and the sheer lack of need for an examiner's services dictate against its appointment.

### A.    The Examiner Motion is Untimely and Prejudicial

25.     The Movant and his counsel have both separately been aware of the asserted grounds for the appointment of an examiner for many months, having informally (yet publicly) requested such appointment in the past.  They can offer no legitimate reason for having waited until now, just two months before the confirmation hearing, to file a formal motion.  While the statute contains no specific deadline for the filing of a motion, delay, in this case, is inextricably linked to the question of whether an examination is "appropriate."

26.     These cases were commenced in the wake of substantial prepetition litigation against the Debtors and the negotiation, principally between the constituent members of the Ad Hoc Committee and the Sacklers, of the initial Settlement Framework.  The litigating, and settling, claimants were at that point already deep into their own investigations of the Debtors' and Sacklers' misconduct.  However, other constituents – including the Official Committee and the

Non-Consenting States – were unconvinced that the initial settlement was sufficient. Thus, upon the Debtors' bankruptcy filing, a structure was put in place for a robust and active investigation by the Official Committee and the Non-Consenting States.[8] An examiner, in view of these developments, would have been inappropriate even at the outset of these cases. Now, with the passage of almost two years, an examiner is even less appropriate, as enormous additional resources have been expended in the postpetition investigation of the Sacklers' and Debtors' bad acts.

27.    Those resources have, for the most part, been well spent. At this point in the case, the majority of the Debtors' creditors have finally reached agreement with the Debtors and the Sacklers on the terms of a chapter 11 plan. Reaching this consensus was no easy feat, requiring months of mediation, countless hours of informal negotiations, and the provision of substantial diligence and discovery. A negotiated, and to a large degree, consensual, resolution of these cases would represent a monumental achievement. Yet the Examiner Motion, filed on the cusp of confirmation, threatens to damage the fragile consensus that has been reached, and to delay the long-awaited goal of these cases: confirmation of a chapter 11 plan that will deliver much-needed funds to the abatement of the opioid crisis and provide some measure of recompense to the many entities and individuals harmed by the Debtors' misconduct. If the main case parties, represented by sophisticated legal and financial advisors and informed by the results of extensive independent

---

[8] *See, e.g., Notice of Filing of Case Stipulation Among the Debtors, the Official Committee of Unsecured Creditors and Certain Related Parties* [Dkt. No. 291] (October 11, 2019) (calling for provision of substantial discovery and diligence from the Debtors and the Sacklers to the Committee); *Ex Parte Motion of the Official Committee of Unsecured Creditors of Purdue Pharma, et al., for an Order Authorizing Examination Pursuant to Federal Rules of Bankruptcy Procedure 2004 and 9006* [Dkt. No. 981] (March 25, 2020); *Ad Hoc Group of Non-Consenting States' Joinder In, and Statement With Respect To, Ex Parte Motion of the Official Committee of Unsecured Creditors of Purdue Pharma, et al., for an Order Authorizing Examinations Pursuant to Federal Rules of Bankruptcy Procedure 2004 and 9016 [sic]* [Dkt. No. 989] (March 26, 2020).

investigations by multiple parties, have determined to proceed to confirmation, that goal should
not be impeded by the last-minute request of a single creditor.

28.     The Movant will likely contend that the facts have changed since the time of his (or
his counsel's) initial request for an examiner, such that he should not be faulted for his delay.  And
the truth is that the facts *have* changed:  the parties have much *more* information available to them
now than they did in July 2020 or November 2019, thanks to the investigations by the Committee,
the Non-Consenting States, and others.   Other factors identified in the Examiner Motion are
irrelevant.  While the Debtors' "fixed" debts may not have been known in November 2019 (or
even now), that fact alone would not have precluded the filing of an examiner motion, since the
"public interest" grounds advanced in the Examiner Motion would have (if meritorious) supported
appointment of an examiner under the first prong of section 1104(c).  *See* 11 U.S.C. § 1104(c)(1)
(examiner may be appointed if "such appointment is in the interests of creditors").   And to the
extent the Movant suggests he postponed the filing of his motion in hopes that the Disclosure
Statement would address his concerns (*see* Examiner Motion ¶84), there is a mismatch between
that rationale and the scope of the Movant's proposed examination.   The publication of an
examiner report ten days before the confirmation hearing, as Movant proposes, would do nothing
to rectify any omissions in the Disclosure Statement and would fall after the Plan voting deadline.

29.     The Movant may also contend that the scope of his requested examination is narrow
enough that it threatens no undue cost or delay.  This is implausible.  The confirmation schedule
is already tight, and will require the Debtors, the Ad Hoc Committee, the Official Committee, and
the various other supporting and objecting parties to work nearly nonstop between now and the

scheduled start of the confirmation hearing on August 9.[9]  Parties cannot afford the distraction of

an ongoing parallel examiner investigation, in which some parties (e.g., the Debtors and Sacklers)

will be integrally involved, and which others (e.g., the Ad Hoc Committee, Official Committee,

and Non-Consenting States) will be required to closely monitor.

30.    It is simply unrealistic, moreover, to think that an examiner could serve and review

document discovery, conduct interviews and depositions, familiarize itself with the legal

landscape, and process and evaluate substantial and complex allegations against the Debtors and

the Sacklers in just a month, or a little more.  The proposed examination here is a far cry from that

ordered in *Cenveo*, where the examiner (who was strictly limited by budget and staffing constraints

imposed by the Court) was tasked only with "looking over the shoulder" of other investigating

parties.  *See* Examiner Motion ¶ 75 (characterizing the examiner order entered in *In re Cenveo,

Inc.*, No. 18-22178 (Bankr. S.D.N.Y. Mar. 15, 2018) [Dkt. No. 203]).

31.    In sum, the Movant's delay, coupled with the prejudice resulting therefrom, is

reason enough to deny the Examiner Motion.  *See, e.g.*, *Schepps*, 148 B.R. at 30-31.

**B.    An Examiner is Superfluous in these Cases**

32.    In addition to being costly, prejudicial, and impractical, the appointment of an

examiner is also, quite simply, unnecessary.  Without diminishing the contributions of other

parties, the Debtors' misconduct, and that of the Sacklers, has been investigated and/or evaluated

by all of the major creditor constituencies in these cases, including: the public creditors party to

the initial Settlement Framework, including 23 States, 5 territories, and the PEC; the Ad Hoc

---

[9] *See Second Amended Order Granting Debtors' Motion for Order Establishing Confirmation Schedule and Protocols* [Dkt. No. 2989] (establishing, among other things, deadlines of: June 14 for responding to document requests; June 15 for submitting initial expert reports; June 25 for substantially completing document production; July 6 for submitting rebuttal expert reports; July 15 for completing discovery, including depositions; July 19 for submitting objections to the Plan; July 26 for the exchange of initial witness and exhibit lists; and August 2 for the filing of the Debtors' confirmation brief and replies to Plan objections).

Committee; the Official Committee; and the Non-Consenting States. These parties were given access, among other things, to nearly 100 million pages of documents, dozens of depositions (including those conducted in prepetition litigation), and reams of financial analysis and data. Not all of this has been made public to date, but the Debtors have committed to publishing substantial portions of it after their Plan is confirmed. *See* Plan § 5.12.

33.    The Movant may contend that the provision of information, no matter how substantial, does not amount to the same thing as an examiner's report. But the fundamental purpose of a report is to inform, and there is little doubt that the Debtors' main creditor constituencies – including State attorneys general and other public officials charged with protecting the rights of their citizens – are as well informed in this case as the creditors in any of the large chapter 11 cases cited in the Movant's brief. Examiner Motion at ¶ 59 (citing, *inter alia, Enron, Worldcom,* and other cases).

34.    Moreover, the Movant's arguments are once again at odds with the relief he requests. Accepting, for a moment, that an examiner could answer the "single, critical question" posed by the Movant – i.e., "who is responsible for the Debtors' confessed crimes and the harm they caused" (Examiner Motion at 1) – the report that the Movant has actually requested would do nothing to answer that question. The Movant is mistaken to suggest that the Settlement Framework was collusive or "foreordained"; it was reached only after extensive and arms' length negotiations between the Sacklers, the Debtors, and a cross-section of the litigants most aggressively pursuing their prepetition claims against those parties. But in any event, a public report on the "decision to accept and implement the Settlement Framework" (Examiner Motion at 3, 4-5) would provide only a limited window into the actions of the Sacklers, and would not touch upon any of the bad acts

that have captured the public's interest (i.e., the Sacklers' role in and contributions to the opioid crisis).

35.    The Movant's requested report is thus both duplicative – in that the main parties in interest have already investigated the Debtors' and Sacklers' prepetition conduct – and oddly misdirected – in that it focuses on an aspect of the case unlikely to excite the public interest that the Movant invokes.  For both these reasons, the report is unnecessary.

### C.    The Examiner Motion Raises Confirmation Issues

36.    The Examiner Motion, in addition to requesting an examination that is duplicative of work that has already been performed, also anticipates issues that, if relevant, will be aired at confirmation.  The Examiner Motion explains that a report is needed to help show "whether the decision by the PPI Board to implement the Settlement Framework . . . was made independently, in good faith, and at arm's length, as required by applicable case law."  Examiner Motion at 1-2. But an examiner report is not the proper way to raise these issues – a confirmation trial is.  Courts routinely address such issues at confirmation[10], and if they are relevant here, the confirmation hearing itself will fulfill the very function that the Movant seeks from the examiner report: the public disclosure and evaluation of the events leading up to the Settlement Framework.  An examiner report does not supplant, and indeed adds nothing to, this confirmation inquiry.[11]

### D.    The Public Interest Is Served In Other Ways

37.    Finally, the Ad Hoc Committee is sensitive to the concerns of parties who may believe that the story of the Debtors' and the Sacklers' wrongdoing must be told.  That story,

---

[10] *See generally, e.g.*, *Motorola, Inc. v. Off. Comm. of Unsecured Creditors (In re Iridium Operating LLC)*, 478 F.3d 452, 462 (2d Cir. 2007) (setting forth factors for approval of a settlement).

[11] For the avoidance of doubt, the Ad Hoc Committee has no current position on the issue of whether the prepetition negotiations among the parties are relevant to confirmation of the Plan.

however, has been and can be revealed in other ways.  The proceedings in this case, including
countless hearings, thousands of filings, and the Debtors' (and, to an extent, the Sacklers')
publication and disclosure of significant documents, have all contributed to the public knowledge
of the events preceding the bankruptcy.  The Debtors, upon confirmation, will make an enormous
repository of documents available for public consumption and study.  The confirmation hearing
itself is likely to be contested and evidentiary, and many of the questions raised by the Examiner
Motion may be addressed in that context, as well.  Thus, the Ad Hoc Committee's objection should
not be read to suggest that the public interests at stake are not important, but merely that they have
been, and will be, addressed in other ways more appropriate to the context of this case.

WHEREFORE, for the foregoing reasons, the Ad Hoc Committee respectfully requests
that the Court enter an order denying the Examiner Motion.

Dated:  June 13, 2021                          Respectfully submitted,

                                               /s/ *Kenneth H. Eckstein*
                                               Kenneth H. Eckstein
                                               Rachael Ringer
                                               David E. Blabey Jr.
                                               KRAMER LEVIN NAFTALIS & FRANKEL LLP
                                               1177 Avenue of the Americas
                                               New York, NY 10036
                                               Telephone: (212) 715-9100
                                               Email: keckstein@kramerlevin.com
                                                       rringer@kramerlevin.com
                                                       dblabey@kramerlevin.com

                                               Scott D. Gilbert (admitted *pro hac vice*)
                                               Craig Litherland (admitted *pro hac vice*)
                                               Kami E. Quinn (admitted *pro hac vice*)
                                               GILBERT LLP
                                               100 New York Ave, NW, Suite 700
                                               Washington, D.C. 20005
                                               Telephone: (202) 772-2200
                                               Email: gilberts@gilberlegal.com
                                                       litherlandc@gilberlegal.com
                                                       quinnk@gilberlegal.com

David J. Molton
Steven D. Pohl
BROWN RUDNICK LLP
7 Times Square
New York, NY 10036
Telephone: (212) 209-4800
Email: dmolton@brownrudnick.com
      spohl@brownrudnick.com

Melanie L. Cyganowski
Jennifer S. Feeney
OTTERBOURG P.C.
230 Park Avenue
New York, NY 10169
Telephone: (212) 661-9100
Email: mcyganowski@otterbourg.com
      jfeeney@otterbourg.com

*Attorneys for the Ad Hoc Committee*