Jonathan C. Lipson
Temple University-Beasley School of Law
1719 North Broad Street
Philadelphia, PA 19122
Counsel to Peter W. Jackson

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| In re: | Chapter 11 |
| PURDUE PHARMA L.P., et al. [1] | Case No.  19-23649 (RDD) |
| Debtors. | (Jointly Administered) |

**REPLY OF PETER W. JACKSON TO OBJECTIONS TO MOTION
FOR ORDER TO APPOINT EXAMINER
PURSUANT TO 11 U.S.C. § 1104(c)**

---

[1] The debtors in these chapter 11 cases ("**Debtors**" or "**Purdue**"), along with the last four digits of each Debtor's registration number in the applicable jurisdiction, are as follows: Purdue Pharma L.P. ("**PPLP**") (7484), Purdue Pharma Inc. (7486), Purdue Transdermal Technologies L.P. (1868), Purdue Pharma Manufacturing L.P. (3821), Purdue Pharmaceuticals L.P. (0034), Imbrium Therapeutics L.P. (8810), Adlon Therapeutics L.P. (6745), Greenfield BioVentures L.P. (6150), Seven Seas Hill Corp. (4591), Ophir Green Corp. (4594), Purdue Pharma of Puerto Rico (3925), Avrio Health L.P. (4140), Purdue Pharmaceutical Products L.P. (3902), Purdue Neuroscience Company (4712), Nayatt Cove Lifescience Inc. (7805), Button Land L.P. (7502), Rhodes Associates L.P. (N/A), Paul Land Inc. (7425), Quidnick Land L.P. (7584), Rhodes Pharmaceuticals L.P. (6166), Rhodes Technologies (7143), UDF LP (0495), SVC Pharma LP (5717) and SVC Pharma Inc. (4014) (collectively, the "**Bankruptcy Cases**").

# TABLE OF CONTENTS

**TABLE OF AUTHORITIES** ................................................................................................ **3**

**INTRODUCTION** ............................................................................................................... **1**

**PRELIMINARY STATEMENT** ......................................................................................... **1**

   *I.   The Statutory Criteria Have Been Satisfied* ............................................................ *6*

     A.   **The Debtors' Qualifying Debts Exceed $5 million** ....................................... 6

     B.   **The Limited Examination Proposed is Appropriate and in the Interests of
Creditors and the Public.** ............................................................................... 8

        1.   *A Limited Examination is Appropriate Because the Investigations Thus Far Have
Produced No Public Report on the Board's Independence.* ............................. 8

        2.   *This Case Must Account for the Public's Interest in the Integrity of the
Reorganization Process.* ................................................................................ 12

        3.   *An Improved Settlement is Not Evidence of Independence if Settlement was the Only
Option.* ........................................................................................................... 14

   *II.   The Motion is Timely and is Tailored to Avoid Delay.* ..................................... *17*

     A.   **The Motion and Proposed Order are not Barred by "Laches" or Waiver** .......... 17

     B.   **Objectors Grossly Mischaracterize the Relief Sought, which is Appropriately
Time-Limited.** ................................................................................................ 20

**CONCLUSION** ................................................................................................................ **23**

**LIPSON DECLARATION** ................................................................................................ **24**

# TABLE OF AUTHORITIES

## CASES

*In re Bradlees Store,*
    209 B.R. 36 (S.D.N.Y. 1997)...................................................................................... 18

*In re Enron Corp.,*
    No. 01-16034 (Bankr. S.D.N.Y. Dec. 2, 2001)...................................................... 13

*In re Innkeepers USA Trust,*
    No. 10-13800 (Bankr. S.D.N.Y. Sept. 30, 2010) .................................................. 11

I*n re Ionosphere Clubs, Inc.,*
    156 B.R. 414, 432 (S.D.N.Y. 1993)........................................................................ 12

*In re Korvettes, Inc.,*
    67 B.R. 730, 734 (S.D.N.Y. 1986) ..........................................................................18

*In re Lehman Brothers Holdings, Inc.,*
    No. 08-13555 (Bankr. S.D.N.Y. Sept. 15, 2008) .................................................. 13

*In re Lyondell Chemical Co.,*
    No. 09-10023 (REG) (Bankr. S.D.N.Y. Oct. 26, 2009)........................................ 13

*In re Mirant Corp.,*
    No. 03-46591 (Bankr. N.D. Tex. July 14, 2003). ................................................. 13

*In re New Century TRS Holdings, Inc.,*
    No. 07-10416 (Bankr. D. Del. April 2, 2007)....................................................... 13

*In re Washington Mutual, Inc.,*
    No. 08-12229 (Bankr. D. Del. Nov. 1, 2008). ...................................................... 13

*In re Worldcom,*
    No. 02-13533 (Bankr. S.D.N.Y. July 21, 2002) ................................................... 13

*United States v. Repass,*
    688 F.2d 154, 158 (2d Cir. 1982)............................................................................ 18

## STATUTES

11 U.S.C. § 105................................................................................................................ 7
11 U.S.C. § 1104(c) ................................................................................................. passim
11 U.S.C. § 1104(c)(2)..................................................................................................... 8

18 U.S.C. § 3282(a) ................................................................................................................... 15

**OTHER AUTHORITIES**

124 CONG. REC. H11, 103 (daily ed. Sept. 28, 1978) ............................................................. 17

124 CONG. REC. S17, 403-34 (daily ed. Oct. 6, 1978) ............................................................. 12

7 COLLIER ON BANKRUPTCY ............................................................................................ 8, 12, 17

**RULES**

Fed. R. Bankr. P. 9019 ................................................................................................................ 7

## INTRODUCTION

Peter W. Jackson, a creditor and party in interest (the "**Movant**"), by and through his undersigned counsel, hereby submits this Reply ("**Reply**") to objections[2] to Movant's *Motion for Order to Appoint Examiner Pursuant to 11 U.S.C. § 1104(c)* [ECF No. 2963] (the "**Motion**") in the above-captioned cases for the limited purposes set forth in the form of Proposed Order attached as Exhibit A to the Motion (the "**Proposed Order**"). In support of this Reply, Mr. Jackson respectfully represents as follows:

## PRELIMINARY STATEMENT

The Objectors protest too much.

Rather than address a single one of the concerns identified in the Motion—all taken straight from the Debtors' own pleadings and documents—the Objectors distort applicable law, ignore critical facts, and grossly misstate the relief sought in the Motion.

The simple fact is that the Debtors' own Disclosure Statement shows that the Debtors have qualifying debts well in excess of the statutory threshold and that nothing so far in this case has addressed, or likely will address, the limited but critical question the Proposed Order would have an examiner investigate and publicly report on: Was the decision by the board of directors (the "**Board**") of Purdue Pharma, Inc. ("**PPI**"), to settle and release the Sackler Families regarding the Sackler Allegations made independently?

---

[2] *Debtors' Opposition to Motion for Order to Appoint Examiner* [ECF. No. 3020] ("**Debtors' Objection**"); *The Multi-State Governmental Entities Group's Opposition to Peter W. Jackson's Motion for Order to Appoint Examiner Pursuant to 11 U.S.C. § 1104(c)* [ECF No. 3021] ("**MSGE Objection**"); *Ad Hoc Committee's Objection to Motion to Appoint an Examiner* [ECF No. 3022] ("**AHC Objection**"); and *Objection of the Official Committee of Unsecured Creditors Motion to Appoint Examiner Pursuant to 11 U.S.C. § 1104(c)* [ECF No. 3023] ("**UCC Objection**") (collectively, the "**Objections**" and the "**Objectors**"; respectively each, an "**Objection**" and "**Objector**").

Nor would the examination proposed produce the cost, delay or duplication of effort that the Objectors fear. The examination provided in the Proposed Order specifically states that "the Examiner shall not conduct his or her own discovery of the Examination Topics but, rather, the Examiner shall, using discovery already produced (and being produced) in these cases, examine and report (as provided in this Order) on the Examination Topics." *Proposed Order*, at 2, ¶ 2.[3]

To argue, as the Official Committee of Unsecured Creditors ("**UCC**") does, that such a limited investigation—which must be completed no later than 10 days *before* commencement of the hearing to confirm the plan of reorganization in this case[4]--is "woefully misguided" (*UCC Objection*, at 5) is to concede either that the Board did not act independently, or that such a determination is "of no actual benefit to the Debtors' creditors." *Id*. Yet, it appears, paradoxically that the UCC conducted this very investigation, but has apparently not released its analysis.[5] Thus, the Proposed Order calls for a supervisory examination to assess and report publicly on the work that was done, not to re-do that work.

Rather than address the merits of the Motion—for example, by simply stating what the UCC found in its own investigation—the Objectors' only responses to the question in issue are to

---

[3] The "**Examination Topics**" are: "(i) the process by which the board of directors of Purdue Pharma, Inc., a New York corporation ("**PPI**") decided to settle the "**Sackler Allegations**" (as provided in the Motion); and (ii) whether that process, and the resulting decision to settle the Sackler Allegations pursuant to the Settlement Framework with the Shareholder Releases, were undertaken independently of the direct or indirect influence of, or interference by, the Sackler Families or their Related Entities, made in good faith, and were negotiated at arm's length." *Proposed Order*, at 2, ¶ 2.

[4] The hearing on confirmation of the *Fifth Amended Joint Chapter 11 Plan of Reorganization of Purdue Pharma L.P. and Its Affiliated Debtors*, dated June 2, 2021 (the "**Plan**") is currently scheduled to commence August 9, 2021. *See Order Approving: (I) the Adequacy of Information in the Disclosure Statement, (II) Solicitation and Voting Procedures, (III) Forms of Ballots, Notices, an Notice Procedures in Connection Therewith*, at 4 [ECF No. 2971-1] ("**Confirmation Procedures Order**"). The Proposed Order provides that the public report it contemplates must be released no later than 10 days before commencement of the hearing on confirmation of the Plan. *See Proposed Order* at 3,¶ 4.

[5] The UCC argues that the proposed examination and report would "overlap entirely with the comprehensive investigation" (*UCC Objection*, at 6) that it already conducted. It may overlap with the investigation, but there has been no public report, by the UCC or any other party in these cases.

provide lengthy descriptions of the many steps in their investigations, and to conclude, in essence, that (1) litigating against the Sackler Families would be difficult and time-consuming; (2) the Sacklers may be judgment proof; and (3) therefore, the available deal is better than any alternatives.[6] The analysis is absent, perhaps due to stringent protective orders and confidentiality stipulations in these cases.[7]

In an ordinary case, this may be sufficient. But here, publicly available documents filed in this case raise important questions about the Board's independence that the Objectors have not addressed. As explained in the Motion, these include:

- Statements in the Debtors' plea agreement with United States Department of Justice (DOJ) that certain members of the Sackler Families were the Debtors' "de-facto CEO" and "exercised substantial oversight over management's operations of Purdue." *See Motion*, at 8 (citing *Motion to Confirm That Payment by the Sackler Families Under Settlement with the United States Department of Justice Is Not Prohibited by This Court* [ECF No. 1833], Ex. A at 4 ¶ 14 & *Motion of Debtors Pursuant to 11 U.S.C. § 105 and Fed. R. Bankr. P. 9019 Authorizing and Approving*

---

[6] The "Plan Support Letter" that the UCC attaches to its Objection explains as follows:

1.      [T]he Sacklers likely are liable to the Debtors (and thus to their creditors) in amounts far in excess of the Settlement Amount, **but** obtaining judgments to establish that liability could take years; and there can be no guarantee of success";

2.      "The Sacklers have assets far in excess of the $4.275 billion Settlement Amount, **but** obtaining a judgment against the Sacklers does not guarantee that either the Debtors or their creditors will be able to access those assets, many of which are in overseas trusts" and

3.      "[T]he UCC also believes that the Debtors' creditors may well also hold direct claims against the Sacklers far in excess of their total assets. ***Without the Preliminary Injunction and settlement in place to restrain litigation against the Sacklers, however, the Sacklers are likely to exhaust their collectible assets fighting and/or paying ONLY the claims of certain creditors with the best ability to pursue the Sacklers in court***." Plan Support Letter, at 20 (emphasis and capitalization in original).

It is unfortunate this was not presented to parties in the Disclosure Statement process, because the last point may be wrong. These creditor actions may have been stayed, as they are here, if either a trustee were appointed in these chapter 11 cases or the cases were converted to liquidations under chapter 7.

[7] The Protective Orders in this case appear to limit access to, and the use of, information that may be relevant to the Sackler Allegations. *See, e.g.*, Third Amended Protective Order [ECF No. 1935] at 16 ("No person or entity subject to the Protective Order shall disclose or permit the disclosure of any information designated as Protected Information to any person or entity except as expressly set forth in this Protective Order."). This Protective Order provides that any party receiving confidential information "shall not disclose the contents of such Confidential Information to any person or entity unless such person or entity falls within at least one of the following categories . . . The Court, any trial or appellate court to which an appeal of a decision of the Court is taken, and any members of the courts' staff to whom it is necessary to disclose the information; provided that no such information shall be publicly filed unless required by an order of the Court." Protective Order, at 19-20.

*Settlements Between the Debtors and the United Sta*tes [ECF No. 1828], Ex. A, at 4 ¶ 14 ("**Purdue-DOJ Settlement**").

- The Debtors have repeatedly justified the preliminary injunction in these cases on grounds that the Debtors and Sacklers were "inextricably intertwined" and had "common interests." *See* Motion, at 19 (citing *In re Purdue Pharm. L.P.*, 619 B.R. 38, 43 (S.D.N.Y. 2020)).
- It appears that ostensibly independent members of the "Special Committee" of the Board (the "**Special Committee**") may have been subject to removal by the Sackler Families until November 2019—two months into these cases, and well after the decision to settle had been made. Motion, at 13.
- To this day, the Debtors' governance is opaque, as the Debtors are wholly-owned by the Sackler Families, and their governing documents are not publicly available.

Indeed, the Debtors concede that the decision to settle was not made by the Special Committee, but instead by a group of plaintiffs' attorneys and the Sacklers, when the Sacklers and their Board decided on the "core pillars" of the settlement, one of which was that the Sacklers were going to give up the Debtors' assets.[8]  However, the Sacklers did not, at that time, give up their *control* of the Debtors.  It is this mismatch—the decision to give up the Debtors while still controlling future decisions by them—that warrants a public report, because the settlement at that time (and still) contemplates releases of the Sacklers.  The question is thus simple: did the Sacklers in effect control the decision to release themselves?

The Disclosure Statement[9] approved recently in these cases could have addressed these issues—indeed, Movant objected to the Disclosure Statement in part on these grounds[10]—but it does not.  Rather, the gist of the Disclosure Statement, as well as the "Plan Support Letter" that the UCC will apparently send to creditors (and attached to its objection), is the same: a lengthy

---

[8] "It was these parties, including many of the nation's most prominent class action lawyers, that negotiated opposite the Sackler Families in the lead-up to Purdue's bankruptcy— not the Special Committee of the Board of Directors. The Movant's ignorance of (or willful attempt to rewrite) history notwithstanding, these formidable plaintiff constituencies played the critical role in shaping the Settlement Framework opposite the Sackler Families." Debtors' Objection, at 2-3

[9] *See Disclosure Statement or Fifth Amended Joint Chapter 11 Plan of Reorganization of Purdue Pharma, L.P. an Its Affiliated* Debtors [ECF No. 2969] ("**Disclosure Statement**").

[10] *See Objection of Peter W. Jackson to Amended Disclosure Statement for First Amended Chapter 11 Plan for Purdue Pharma L.P. and its Affiliated Debtors* [ECF No. 2819].

-4-

summary of meetings and mediations, with the summary conclusion that litigation with the Sacklers would be complicated and, even if successful, collection may be difficult because they may have rendered themselves judgment proof.

Here, the Board's decision to settle and release the Sacklers warrants the public report of an examiner on the Examination Topics for two reasons. *First*, the undisputed public interest in these cases requires independent assurance of the integrity of the reorganization process. If the Plan is confirmed as expected, this may be the last chance personal injury claimants such as the Movant have to learn about the Sackers' role in their injury. Moreover, these may be the only high profile chapter 11 cases involving serious criminal misconduct which fail to have some independent assessment of, and public report on, the culpability of those allegedly responsible for the harm.

*Second,* while the Plan may reflect important developments since the Settlement Framework was announced, the initial decision to settle appears to have been the first link in a chain of decisions, including the Preliminary Injunction, mediations, and now the Plan. But if that initial decision to settle was not made independently, it is unclear whether creditors could have had meaningful choices thereafter.

To be clear: the Movant does not seek an examiner to explore the underlying allegations against the Sackler families or others who potentially caused the Debtors' confessed crimes. The Movant seeks only to assure such persons did not also skew this reorganization process.

The tone and tenor of the Objections—and their failure to address the merits of the Motion—are, unfortunately, not arguments *against* granting the relief sought; they are arguments *for* it. If the answers to the questions posed in the Motion are obvious, the Objectors have had

twenty months to show that.  That they have not, and still do not, will only fuel further doubt about these cases, which is exactly what an examiner could help to dispel.

## ARGUMENT

### I.    The Statutory Criteria Have Been Satisfied

1.    The Objectors argue that the Motion should be denied because the statutory criteria have not been satisfied.  *See, e.g., Debtors' Objection*, at 17*; UCC Objection*, at 9.  They are wrong.

2.    Section 1104(c) of the United States Bankruptcy Code provides that a bankruptcy court "shall" order the appointment of an examiner "to conduct such an investigation of the debtor as is appropriate, including an investigation of any allegations of fraud, dishonesty, incompetence, misconduct, mismanagement, or irregularity in the management of the affairs of the debtor of or by current or former management of the debtor, if": (1) "such appointment is in the interests of creditors, any equity security holders, and other interests of the estate"; or (2) "the debtor's fixed, liquidated, unsecured debts, other than debts for goods, services, or taxes," exceed $5 million.  11 U.S.C. § 1104(c).

3.    The statutory criteria are satisfied in these cases.  No trustee has been appointed, and the plan has not yet been confirmed.  The Debtors' November 2020 settlement with the DOJ created a qualifying unsecured claim in excess of $2 billion.  Moreover, the limited examination proposed is "appropriate" because assuring the integrity of this reorganization is in the interests of creditors and the public.

### A.    The Debtors' Qualifying Debts Exceed $5 million

4.    Certain Objectors claim that the Debtors lack the qualifying debt to meet the threshold set by 11 U.S.C. § 1104(c). The Debtors and UCC, for example, argue that the Debtors'

obligations under its settlement with the Department of Justice (DOJ) are somehow not "fixed," but are instead "contingent" because, in the words of the Debtors, "the DOJ has the option to rescind the civil settlement agreement and pursue any claims or actions against the Debtors in the event that no fewer than five contingencies come to pass." *Debtors' Objection*, at 23. See also *UCC Objection*, at 15 ("the DOJ itself retains the authority to reject its liquidated claim and seek greater damages through litigation if certain conditions are not met.").

5.      But this is wrong, for three reasons. *First*, the Debtors' own Disclosure Statement says that "The United States shall have an allowed, unsubordinated, undisputed, noncontingent, liquidated unsecured claim against Purdue Pharma in the amount of $2.8 billion arising from the Department of Justice's civil investigation (the "Civil Claim")." *Disclosure Statement*, at 131.

6.      *Second*, even if the DOJ rescinded the settlement, that would not render the DOJ's claim "unfixed" or "unliquidated".  The Order approving that settlement provides that in the event of rescission, the DOJ would still have "an undisputed, noncontingent, and liquidated, allowed unsecured claim against Debtors for the full amount of the DOJ Civil Proof of Claim." *See Purdue-DOJ Settlement*, at 4.[11]  In rescission, the DOJ's claim would balloon, but the claim itself would become neither contingent nor unliquidated.  The possibility that the DOJ may not pursue it does not render it contingent:  creditors can always forego collection, but that does not make their claims "contingent."

7.      *Third*, and in any case, the Disclosure Statement indicates that the DOJ has stated that the Plan itself is largely consistent with the civil settlement.[12]  If, as the Debtors frequently

---

[11] In Proof of Claim 137848, filed 07/30/2020, the United States asserted, among others a $2.8 billion claim for false and fraudulent claims, which could be trebled under the False Claims Act and an unjust enrichment claim for $2.8 billion.

[12] *Disclosure Statement*, at 23-24.

say, the Plan enjoys overwhelming support, rescission of the DOJ claim is very difficult to imagine.

That claim cannot be considered "contingent" for these purposes.

As *Collier* explains:

> "[s]ection 1104(c)(2) does not leave any room for the court to exercise discretion about whether an examiner should be appointed, as long as the $5 million threshold is met and a motion for appointment of an examiner is made by a party in interest.  If Congress intended to subject the appointment issue to the court's discretion, it could have said so. Section 1104(c)(2) states that the court *shall* order the appointment of an examiner if the prescribed debts exist. It would be inappropriate to read *shall* to *mean* may because in certain circumstances a court disagrees with the result that would be reached.

7 COLLIER ON BANKR. P. 1104.03 (Through June 2021; Release No. 158) (footnotes omitted).

### B.    The Limited Examination Proposed is Appropriate and in the Interests of Creditors and the Public.

8.      It is of course true that, even if "mandatory," an examination can be limited to the appropriate facts and circumstances.  7 COLLIER ON BANKR. P. 1104.03 (Through June 2021; Release No. 158).  The Objectors argue that no examination would be appropriate here.[13]  The UCC, for example, argues that the relief sought in the Proposed Order is merely "wasting time and resources . . ." and is thus "contrary to 'the interests of creditors, any equity security holders, and other interests of the estate.'"  UCC Objection, at 5.  The Objectors are wrong, however, for three reasons.

### 1.    *A Limited Examination is Appropriate Because the Investigations Thus Far Have Produced No Public Report on the Board's Independence.*

9.      First, all important analysis of the Examination Topics appears to remain subject to protective orders.

---

[13] Or only a superficial one, as the MSGE cynically suggests, arguing that the examiner should have "few or no current duties and otherwise take all steps to limit delay of the resolution of the Chapter 11 Cases and the further depletion of estate funds."  *See* MSGE Objection, at 18, n. 27.  Of course, the Proposed Order *does* contemplate a very limited role for an examiner here that would have to be completed before commencement of the Confirmation Hearing—points the MSGE and other Objectors ignore.

10. Counsel to the Debtors has argued that the "endlessly recycled canard that these cases are restraining disclosure and hindering transparency is utterly untrue and utterly without merit." *Hr'g Trans*, Mar. 24, 2021, at 47. While it appears that significant amounts of information have been exchanged among key participants in these cases, the information produced has been subject to intensive protective orders and confidentiality stipulations. The net effect has been to keep significant amounts of relevant information or its analysis concealed from the public. Concerns about transparency are not a "canard," particularly in cases with such a salient public interest.

11. Indeed, troubled by the lack of transparency in these cases, certain media organizations (the "**Media Intervenors**") filed in November 2020 a *Motion to Intervene and Unseal Judicial Records by Dow Jones & Company, Boston Globe Media Partners, LLC, and Reuters News & Media, Inc.* Nov. 23, 2020 [ECF No. 2022] (the "**Media Intervenors' Motion**"). The Media Intervenors' Motion has been resolved in part by stipulation, but also apparently remains the subject of dispute between the Media Intervenors and certain members of the Sackler Family. *See H'rg Trans*, Mar. 24, 2021, at 112, *et seq.*

12. Following the partial resolution of the Media Intervenors' Motion, some previously confidential information relevant to the Sacklers' independence from the Debtors became public, including a "joint defense and common interest" agreement among counsel to the Debtors and the Sacklers. According to a recent settlement with the United States Trustee, these common interest agreements were undisclosed and may have remained in force well into these cases.[14] While the Debtors and Sacklers may have had a "common interest" *prior* to bankruptcy, it is difficult how

---

[14] *Motion of United States Trustee Pursuant to Sections 105(a), 327, 328, and 330 of the Bankruptcy Code and Rule 2014 of the Federal Rules of Bankruptcy Procedure for Entry of an Order Approving (1) Settlement Agreement with Skadden, Arps, Slate, Meagher & Flom, LLP, Wilmer Cutler Pickering Hale and Dorr LLP, and Dechert LLP and (2) Certain Releases by the Debtors* [D.I. 2763] (the "**Counsel Settlement Motion**").

that could remain the case once the Sacklers decided to relinquish the Debtors, much less to put the Debtors into chapter 11 cases.

13.     The Disclosure Statement in these cases could have addressed the questions raised by this information.  But it did not.  Incredibly, it does not even mention the fact that the Media Intervenors' Motion was filed, or that previously confidential information about the Sacklers' relationship to the Debtors has been released as a result.[15]

14.     The UCC objects that the informational function of an examiner "has already been performed in these cases, not only by the Debtors and [UCC], but also by the attorneys general of 48 states and countless other parties."   *UCC Objection*, at 16.   Unfortunately, while the *investigations* that an examiner would undertake may have been performed, the Objectors point to no public *analysis* of the Examination Topics, other than the bald and self-serving assertions that the main creditor representatives are "independent."

15.     The UCC says that it "thoroughly evaluated" these very questions, as evidenced by the list of questions it investigated in the Plan Support Letter attached to their Objection:

- 10. At what point in time did the Sacklers (and the Purdue Board) begin to owe fiduciary duties to Opioid Claimants?
- 11. What knowledge did the Sacklers have of the impending onslaught of litigation liability they would face and when did they have that knowledge?
- 12. What knowledge did the Sacklers have that Purdue had engaged in conduct that would lead to the onslaught of litigation liability they ultimately would face? When did they have that knowledge? Were they the architects of that conduct, or did they just receive reports from management?
- 13. Did the Sacklers micromanage the affairs of Purdue, such that they had full knowledge of all of Purdue's Conduct?

*Plan Support Letter,* at 22.

---

[15] The Disclosure Statement does acknowledge the existence of the Counsel Settlement Motion, but contains no analysis of it, or of the effect that such agreements may have had on the independence of the Board or the Special Committee. *See Disclosure Statement,* at 68-69

16.     While the Plan Support Letter notes these, and the many other questions the UCC pursued, it provides no analysis of what they found.  Like the Disclosure Statement, it offers elaborate descriptions of the many documents it reviewed, depositions it took, and procedural skirmishes it had. *See Plan Support Letter*, at 9-17; 21-22.  But other than claiming that litigation would be uncertain and collection potentially difficult, it provides no analysis why the settlement to be proposed is appropriate. The UCC may well have asked—and answered—the right questions, but it has not shared those answers in a case where the public interest warrants insight into them.

17.     The Motion plainly anticipated that key participants in these cases may have conducted this work (which, contrary to the UCC's claim, was not a "waste" (*UCC Objection*, at 8)), and thus seeks an examiner not to re-do it (unless it was not properly done in the first place), but for the limited purposes of reviewing and reporting on this work publicly. *See Motion*, at 28 ("Movant is cognizant of the fact that the key participants in these cases have performed significant amounts of work to investigate, analyze, mediate and negotiate the issues in question here.  These cases have already seen professional fees in excess of $400 million, and an examiner should not duplicate the work that has been done").

18.     The Objectors argue that any information that an examination might produce will come out in the confirmation hearing.  The MSGE, for example, suggests that the Objectors and other key participants in theses are "combatants" who are "well armed and highly motivated." *See MSGE Objection* at 19 (quoting In re Innkeepers USA Trust, No. 10-13800 (Bankr. S.D.N.Y. Sept. 30, 2010 [ECF No. 546]).  This may be true, but their motivation is likely to be maximize the settlement amount, not to assess and report on the integrity of the process that led to a deal that they want consummated as quickly as possible.

19.     In an ordinary case, that may be acceptable.  But, as the parties and this Court have repeatedly acknowledged, this is not an ordinary case. If there had been any meaningful and independent report of the Board's decisionmaking process, and its independence from the Sacklers, that might well have obviated the need for an examiner.  But if the Sacklers were able to influence the Board at crucial moments before or during this case, the so-called "combatants" in this case may have seen little choice but to grant the Sacklers the releases contained in the proposed settlement from the outset.

2.      *This Case Must Account for the Public's Interest in the Integrity of the Reorganization Process.*

20.     Second, the UCC mistakenly argues that an examination of the sort sought in the Proposed Order "could not possibly benefit creditors by augmenting their recoveries or in any other manner that parties may believe these Chapter 11 Cases should address."  *UCC Objection*, at 10 (citing In re Ionosphere Clubs, Inc., 156 B.R. 414, 432 (S.D.N.Y. 1993)).  Ordinarily, augmenting the estate is an appropriate (probably the main) reason for appointing an examiner, but it is certainly not the only one.

21.     As Senator DeConcini explained in the legislative history to the Bankruptcy Code, the role of examiner exists to provide "special protection for the large cases having great public interest . . . to determine fraud or wrongdoing . . . ."[16] Examiners have played important, sometimes crucial, roles in some of the nation's largest and most high-profile reorganizations, including in

---

[16] *See* 124 CONG. REC. S17, 403-34 (daily ed. Oct. 6, 1978) (statement of Senator DeConcini) (quoted in COLLIER ON BANKRUPTCY, App. 14.4(f)(iii) (15th ed., Rev 2002)).

*Enron*,[17] *Worldcom*,[18] *Mirant*,[19] *New Century*,[20] *Lyondell Chemical*,[21] *Washington Mutual*,[22] and

*Lehman Brothers*.[23]

22.     There is little doubt that these Chapter 11 Cases are every bit as important to the

public as those earlier ones.  If, however, these cases conclude without an examiner as proposed,

they may be the only such high profile cases involving serious criminal misconduct without any

independent assessment of the role played by those most overtly associated with the wrongdoing.

While the Motion does not seek an investigation of that conduct, the integrity of this reorganization

requires the minimal assurance that those most plausibly in control of the Debtors did not also

unduly influence the decision to release them from alleged misconduct.

23.     Creditors such as Movant fear that that may be happening in these cases.  And he

is not alone.  Although the Plan and proposed settlement may well be supported by key creditor

representatives, it is only now going to a vote, so we do not know what the general creditor

population might think.  What is clear is that many individual creditors and parties in interest have

written to the Court raising concerns about "transparency" and "accountability" that have not been

addressed, and which are bound up with the Board's decision to settle with, and release, the

Sacklers:

- "Purdue Pharma's well-documented deception relating to opioids and the nationwide tragedy that followed its actions requires a full accounting of its responsibility. . . .The court should not permit Purdue Pharma and the Sacklers to escape their responsibilities with incomplete and inadequate restitution..." See

---

[17] *In re Enron Corp.*, No. 01-16034 (Bankr. S.D.N.Y. Dec. 2, 2001).

[18] *In re Worldcom*, No. 02-13533 (Bankr. S.D.N.Y. July 21, 2002).

[19] *In re Mirant Corp.*, No. 03-46591 (Bankr. N.D. Tex. July 14, 2003).

[20] *In re New Century TRS Holdings, Inc.*, No. 07-10416 (Bankr. D. Del. April 2, 2007).

[21] *In re Lyondell Chemical Co.*, No. 09-10023 (REG) (Bankr. S.D.N.Y. Oct. 26, 2009).

[22] *In re Washington Mutual, Inc.*, et al., No. 08-12229 (Bankr. D. Del. Nov. 1, 2008).

[23] *In re Lehman Brothers Holdings, Inc.*, No. 08-13555 (Bankr. S.D.N.Y. Sept. 15, 2008).

Letter from Steve Walsh, Massachusetts Health & Hospital Association, Oct. 10, 2019 [ECF No. 262].

- "Any settlement which allows [Richard Sackler] and the rest of the Sackler family members who sat on Purdue's Board of Directors to escape accountability should be clearly rejected."  See Letter of Stephen G. Gelfand, MD, Physicians for Responsible Opioid Prescribing, Oct. 5, 2019 [ECF 299].

- Allowing the proposed settlement "would shield the Sackler family from the public disclosure of the facts and evidence..."  See Letter of Marcia & Michael Julian, Nov. 1, 2019 [ECF No. 442].

- "I need closure so that I can move on with my life."  Letter of Keola Maluhia Keku, Dec. 13, 2020 ECF No. 2210].[24]

24.    It is no answer to say that the Plan would create a "Public Document Repository."

*See, e.g., UCC Objection*, at 5, n. 11; *AHC Objection*, at 4.  While a Public Document Repository is a laudable idea, it is subject to significant constraints, the most obvious of which are that it will not become available until after the Plan is confirmed—and the Sacklers released—and it does not appear that it will contain publicly accessible information that would be the subject of the proposed examination.  Among other things, the Public Document Repository would exclude privileged documents and may exclude deposition transcripts of the Sackler Families, as they remain subject to the terms of the Shareholder Settlement, which has not yet been finalized.[25]

3.    *An Improved Settlement is Not Evidence of Independence if Settlement was the Only Option.*

25.    Third, the UCC loudly and repeatedly claims that no examination is warranted

because it "***never had any intention of taking the Settlement Framework as a given***, and instead

---

[24] Summaries of these, and nearly 60 other letters calling for some kind of "transparency" or "accountability" before the Sacklers are released under the Plan, is attached as Exhibit 1 to the *Declaration of Jonathan C. Lipson in Support of Reply of Peter W. Jackson to Objections to Motion Seek Order Appointing Examiner Pursuant to 11 U.S.C. § 1104(c)* ("**Lipson Declaration**").  To be clear: Movant does not seek an examination of the underlying "Sackler Allegations," as discussed in the Motion.

[25] The Disclosure Statement contains the following proviso regarding the Document Repository:  "provided that, with respect to any depositions taken in the Chapter 11 Cases of the Debtors' former employees and board members who are also Shareholder Released Parties, the inclusion in the Public Document Repository of the transcripts thereof and exhibits thereto (to the extent such exhibits were documents produced by a Shareholder Released Party) shall be subject to the terms set forth in the Shareholder Settlement Agreement; and (b) documents provided to the Special Committee for review." *Disclosure Statement*, at 134.

spent its time investigating the underlying claims and routes to recoveries." *UCC Objection*, at 13 (emphasis in original). The UCC's position on this is a confusing distraction. It claims, on the one hand, that the Settlement Framework is now "moot" (id. at 5), but nowhere explains how its basic aspects—in particular the release of the Sacklers—have changed. Rather, they argue that the Plan reflects an "***improved*** settlement." Id. at 4 (emphasis in original).[26]

26.    While it may be true that some elements of the Settlement Framework have changed, the "backbone of the settlement"[27]—to discharge all Purdue opioid litigation, and release the Sacklers in exchange for the Debtors' assets and a cash payment—has not. The important questions embodied in the Examination Topics are not whether the UCC took the Settlement Framework as "given," but whether the Board's *initial* decision to settle at all was made independently, and, if not, whether the UCC or any other set of creditor representatives were thereafter in a position to challenge that?

27.    The evidence so far is not promising. As noted above, the Debtors seem to concede that the Board's Special Committee did not make this decision—the Board under the Sacklers' control did. *See Debtors' Objection*, at 2-3. Even after the Special Committee was appointed (which was shortly before the Petition Date, or September 15, 2019), it appears that the Board was not insulated from removal by the Sacklers until at least November 6, 2019. *See Disclosure Statement,* at 63. The DOJ Settlement approved in December 2020 left the Debtors with almost all of the liability for the Debtors' misconduct, even as the Debtors' own documents indicated that

---

[26] *See also Plan Support Letter*, at 10 ("The UCC analyzed the Settlement Framework in light of the findings from [its i]nvestigation, and worked to maximize the estates' value by ensuring that the clai.ms against the Sacklers would be prosecuted if the Settlement Framework was not sufficiently improved").

[27] *See Statement of Raymond Sackler Family & Beacon Co. in Support of Debtors' Mot. for Prelim. Inj.*, Oct. 8, 2019 [ECF No. 63].

the Sackler Families controlled the Debtors at all times relevant to the Debtors' plea.[28]  *See Purdue-DOJ Settlement.*

28.    The UCC vaguely asserts that it had "prepare[d] . . . a motion to take possession of and litigate the Debtors' estate['s][sic] causes of action" (*UCC Objection*, at 7-8), but that motion was never filed, and it is not clear what effect, if any, it had.  It is, however, clear that the UCC was stymied by the Special Committee.  The Special Committee refused to provide its solvency analysis to the UCC,[29] and for a time aggressively litigated privilege issues with the UCC, just as the Sacklers did. The UCC now claims that it "is aware of no other creditors' committee that has obtained comparable access to such a volume of privileged documents from a debtor in bankruptcy, and appreciates the Debtors' willingness to provide—and constructive cooperation in providing—these documents to the UCC in connection with its Investigation." *Plan Support Letter*, at 12.

29.    This may be true, but it may have been too little, too late.  The UCC did not resolve this dispute with the Debtors until November 6, 2020, over a year after the Petition Date and after critical further agreements, such as the "Phase 1 Mediation," had been reached, in September 2020.[30]  *See Notice of Agreement Between Debtors and Official Committee of Unsecured Creditors*

---

[28] It is no answer to say that the Sacklers may yet be prosecuted criminally, because the DOJ has not released its right to do so.  If any government were to charge members of the Sackler Families, it seems highly likely that that would disrupt the 9- or 10-year payment terms of the Sacklers' contribution.  Given their alleged wealth, it is difficult to see why they wish to take so long to satisfy their obligations, but it is notable that at least some applicable criminal statutes of limitation (such as those involving the Debtors' crimes) are much shorter than the Sacklers' 10-year payment period. It appears, for example, that most, if not all of the criminal charges pled to are covered by a general five-year statute of limitations provided by 18 U.S.C. § 3282(a) ("Except as otherwise expressly provided by law, no person shall be prosecuted, tried, or punished for any offense, not capital, unless the indictment is found or the information is instituted within five years next after such offense shall have been committed.").

[29] Plan Support Letter, at 10 ("The UCC did not have access to the Special Committee's insolvency analysis described in the Disclosure Statement, and thus the UCC conducted an independent insolvency analysis, spanning 2008 through 2017").

[30] The Phase 1 mediation—which largely resolved intercreditor issues—apparently concluded in September 2020. *See Mediators' Report*, Sept. 23, 2020 [ECF No. 1716].

*Regarding Privilege Motions and Adjournment of Hearing with Respect to Remaining Privilege Disputes as to the Sacklers* [ECF No. 1908].

30.    As the Plan Support Letter makes clear, the results of that Mediation made inevitable a plan that settled with, and released, the Sacklers. *Plan Support Letter*, at 17 (discussing the "importance of achieving a resolution with the Sacklers in order to preserve the Phase I Mediation Settlements"). While the Phase II mediation apparently resolved certain issues between creditors and the Sacklers, it appears that the UCC's discovery disputes with the Sacklers remain unresolved. *See Plan Support Letter*, at 12, n. 18.

31.    In any event, the UCC's independence is not in question. Nor is its decision to try to improve the Settlement Framework, as it appears to have done. The questions that the Debtors' own pleadings, and the conduct of the Sacklers and the Board before and during this case raise, are whether the Board itself made the decision to settle independently, free from control of the Sacklers, such that the UCC and other creditor representatives would have been able to litigate with the Sacklers if the Settlement Framework, or its development thereafter, proved unsatisfactory?

32.    The scrutiny of this reorganization will be too severe to leave these questions unanswered. An examiner, as proposed, would help to allay these concerns.

II.    **The Motion is Timely and is Tailored to Avoid Delay**.

A.    **The Motion and Proposed Order are not Barred by "Laches" or Waiver**

33.    Some Objectors argue that the Court cannot grant the Motion because it is barred by laches or the Movant waived his right to seek an examiner by virtue of correspondence seeking an examiner. These objections are misplaced, and the caselaw on which the Objectors rely is inapposite, for two reasons.

34.    *First*, the time to appoint an examiner ends not at the approval of a disclosure statement but, as the Bankruptcy Code plainly states, when a plan is confirmed.  11 U.S.C. § 1104(c).  No plan has yet been confirmed. Legislative history makes clear that an examiner's investigation should occur independent of other bankruptcy procedures. "The remarks of the bill's managers, Congressman Don Edwards and Senator Dennis DeConcini, specifically state that 'It will not be necessary for the court to consider the report of the examiner prior to approval of a disclosure statement. The *investigation of the examiner is to proceed on an independent basis from the procedure of the reorganization under chapter 11.*'"[31]

35.    *Second*, the Objectors make great effort to argue that the Motion was somehow barred by "laches" or waiver.  In the Second Circuit, however, laches "is not a defense to an action filed within the applicable statute of limitations . . . ."[32]  Under section 1104, an examiner may be sought and appointed "any time before the confirmation of a plan."[33]  Thus, the examiner motion falls within the statutory limitations period, and laches should not be available as a defense.

36.    The Debtors and the UCC cite *In re Bradlees Stores*[34] for the proposition that simply by filing an examiner motion late in the proceedings, a movant may have waived his or her right under laches.[35]  But that is misleading.  In *Bradlees*, the applicable statute of limitations was for the *claims* that the movants wanted the examiner to investigate.[36]  The waning limitations

---

[31] 7 COLLIER ON BANKR. P. 1104.03, n.24 (quoting 124 CONG. REC. H11,103 (daily ed. Sept. 28, 1978), reprinted in App. Pt. 4(f)(i) infra; S17,420 (daily ed. Oct. 6, 1978), reprinted in App. Pt. 4(f)(iii) infra.) (emphasis supplied).

[32] United States v. Repass, 688 F.2d 154, 158 (2d Cir. 1982).  *See also* In re Korvettes, Inc., 67 B.R. 730, 734 (S.D.N.Y. 1986) ("Laches is not applicable where the cause of action is governed by a statute of limitations.").

[33] 11 U.S.C. § 1104(c).

[34] 209 B.R. 36 (S.D.N.Y. 1997).

[35] *See* UCC Objection, at 9 n.15; Debtors' Objection, ¶ 43 ("Here, the Movant improperly seeks an appointment of an examiner on the eve of confirmation. That alone is sufficient to find waiver.").

[36] *Id.*, at 37.

period for the underlying claim that the examiner would examine was the theme that the *Bradlees* court kept returning to. "With nineteen days left before the limitations period expires, the impracticality of the movants' request is obvious and suggests that the request is nothing more than a litigation/negotiation tactic."[37]

37.    Here, by contrast, there is no comparable limitations period other than Plan confirmation, and the Proposed Order is tailored to require that the examiner's report be complete and released 10 days *before* the hearing on that begins.  While that obviously leaves little time for the examiner, if the UCC and other parties have already done the work, the examination should be a comparatively brief process of evaluating that work and reporting the analysis and results.

38.    Nor is the Motion a "litigation tactic" to increase payouts or delay resolution.[38] Rather, like many individuals harmed by the Debtors, the Movant wants not more money, but some assurance about the integrity of the process by which the Sacklers will almost certainly obtain exoneration.  The Debtors' own statements about the Sacklers have created questions about this process, which available information has not answered.

39.    The Objectors also make much of the fact that the Movant (in July 2020) and his counsel (in November 2019) informally called for the appointment of an examiner.  But in both cases, the Court warned that no examiner should be sought at those points.  As set forth in the Lipson Declaration, upon receiving Counsel's 2019 letter (written in his capacity as an academic, and without standing to seek an examiner), the Court warned Counsel to "stop sending these letters and read the transcript"—a warning Counsel heeded.  *See Lipson Declaration*, Ex. 2.

---

[37] *Id.*

[38] As the Plan Support Letter makes plain, private claimants' recoveries are already capped by the Phase I Mediation: any further recoveries would go to certain public claimants.  *See Plan Support Letter*, at 21 ("*any increase in the Settlement Amount would not benefit any Private Claimant*").

40.    Similarly, after Movant submitted his July 15, 2020 letter (attached as Exhibit 2 to the *Affidavit of Peter W. Jackson in Support of Motion to Support Order to Appoint Examiner Pursuant to 11 U.S.C. § 1104(c)*), the Court at the July 23, 2020 Omnibus Hearing warned counsel to the UCC that "you and your client should not be guided by . . . some misguided law professor who does not take the basic due diligence that you would think he or she would want a first-year law student to do to actually look at the actual transcript and the record in the cases before spouting off about the need for an examiner, including completely ignoring the appointment of a corporate monitor, the  commitment as part of the injunction to have a full account,  and the examinations that are going on." *Hr'g Trans*. July 23, 2020, at 56:13-25; 57:1-16.[39]

41.    The Movant and Counsel heeded these warnings, and waited until now to seek an examiner in the hope that the Disclosure Statement would provide some answers to the questions reflected in the Examination Topics.  But it does not.  It cannot be the case that Movant has been deemed to have waived his statutory right to seek an examiner because he and his Counsel took seriously the Court's warnings against seeking this relief earlier in the case.

**B.    Objectors Grossly Mischaracterize the Relief Sought, which is Appropriately Time-Limited.**

42.    The Objectors mischaracterize the relief sought in the Motion.  Contrary to the UCC's claims, the Motion does not call for a reinvestigation of the "Sackler Allegations" (UCC Obj at 5); does *not* call for a reinvestigation of the settlement to be embodied in the Plan (*id*.); and does *not* call for an investigation of the DOJ Settlement. *Id*.  In a footnote, the UCC concedes that the relief sought in the Proposed Order "is limited in scope," as it clearly is to investigate only two

---

[39] As noted in the Motion, the mechanisms the Court described—the corporate monitor, the injunction, and ongoing investigations—have nothing to do with scrutiny of the Sacklers, or are subject to onerous confidentiality restrictions. While they may be laudable in their own right, they are not substitutes for the transparency that an examiner's report on the Examination Topics would produce.

related questions comprising the Examination Topics: (i) the process by which the Board decided

to settle the "Sackler Allegations"; and (ii) whether that process, and the resulting decision to settle

the Sackler Allegations pursuant to the Settlement Framework with the Shareholder Releases, were

undertaken independently of the direct or indirect influence of, or interference by, the Sackler

Families or their Related Entities, made in good faith, and were negotiated at arm's length.

*Proposed Order* at 2, ¶ 2.

43.    Similarly, many Objectors claim that an examination will cause delay, and encroach

on the confirmation process.  The MSGE, for example, argues that "[o]n its face, the timing

suggests that this Motion was brought to delay or thwart confirmation, which this Court should

reject." MSGE Objection, at 7.  But even a cursory review of the Proposed Order would show that

this is false.  As noted above, it must be completed 10 days *before* commencement of the

confirmation hearing.

44.    Some Objectors argue that the Movant himself should litigate these issues in

connection with Plan confirmation.  *See Debtors' Objection*, at 5.    That, however is both

unrealistic and irrelevant.  The Confirmation Procedures Order gives the Debtors until July 7, 2021

to file supplements to the Plan, thereby largely finalizing it.  *Confirmation Procedures Order*, at

4. Objections to confirmation are, however, due 12 days later, on July 19, 2021.  Precisely because

the record is voluminous and subject to protective order, it is not plausible that any creditor could

reinvent the work that has apparently already been done in less than two weeks.

45.    Nor is it relevant.  The single creditor who sought an examiner in *Cenveo*[40] was not

forced to litigate on his own, rather than have an examiner appointed, even though that creditor

---

[40] Discussed in the *Motion*, at 31-33 (citing *Motion of Brigade Capital Management, LP for the Appointment of an Examiner Pursuant to 11 U.S.C. § 1104(c)*, *In re Cenveo, Inc.*, No. 18-22178-rdd at p. 1 (Bankr. S.D.N.Y. Mar. 12, 2018), ECF No. 76-1)).

was clearly a well-armed "combatant," in the MSGE's words.  As explained above, the mere fact that other mechanisms may address similar issues in the reorganization process is not an argument against the appointment of an examiner.

46.    Finally, even if the proposed examination does cause delay, the Debtors seem prepared for that.  At the June 3 hearing, the Debtors specifically warned that these cases may go well into 2022.[41]  While Movant hopes and expects these cases will end well before then, neither the Debtors nor any major participant in these cases can realistically be prejudiced by the limited examination proposed in the Motion, since it must end before the start of the Confirmation Hearing.

---

[41] Counsel noted "for the sake completeness" the payment schedule adjustments that would occur if "we emerge after October 2022, which I actually believe is unthinkable."  *See Hr'g Trans.,* June 2, 2021, at 6/2/21, 9-11, 25;1-25;1-24. Such delay may be "unthinkable", but this case has already taken over twenty months.

## **CONCLUSION**

Examiners can assure the integrity of the reorganization process in special cases of great public interest. This is such a case. Questions about the Board's independence will not simply disappear after confirmation. They will linger and fuel concern not only about the Sackler families, but whether they manipulated the reorganization process to gain exoneration. The appointment of an examiner as proposed is this Court's last, best chance to quell those concerns.

For the foregoing reasons, the Movant respectfully requests that the Court (i) deny the Objections and enter an order, in the form attached to the Motion as Exhibit A, appointing an examiner in these chapter 11 cases pursuant to Bankruptcy Code section 1104(c), and (ii) grant such other and further relief as the Court deems just, proper, and equitable.


Dated: June 15, 2021                              Respectfully Submitted,
        Philadelphia, PA

                        By:    /s/ Jonathan C. Lipson
                               Jonathan C. Lipson
                               Temple University-Beasley School of Law
                               1719 North Broad St.
                               Philadelphia, PA 19122
                               215-204-0608
                               jlipson@temple.edu
                               Counsel to Peter W. Jackson

                               /s/ Karen F. Neuwirth
                               Karen F. Neuwirth
                               Martin S. Rapaport, P.C.
                               18 East 48th Street
                               6th Floor
                               New York, N.Y. 10017
                               (212) 688-1980
                               manhatoffice@yahoo.com
                               Co-counsel to Peter W. Jackson

EXHIBIT A
LIPSON DECLARATION