**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re: | Chapter 11 |
| PURDUE PHARMA L.P., *et al.* [1] | Case No.  19-23649 (RDD) |
| Debtors. | (Jointly Administered) |

### DECLARATION OF JONATHAN C. LIPSON IN SUPPORT OF REPLY OF PETER W. JACKSON TO OBJECTIONS TO MOTION FOR ORDER TO APPOINT EXAMINER PURSUANT TO 11 U.S.C. § 1104(c)

COMMONWEALTH OF PENNSYLVANIA )
                                                            ) s.s.:
COUNTY OF PHILADELPHIA             )

Jonathan C. Lipson, being duly sworn, upon his oath deposes and states as follows in support of the *Reply of Peter W. Jackson to Objections to Motion for Order to Appoint Examiner Pursuant to 11 U.S.C. § 1104(c)* (the "**Reply**"):

1.    Attached as Exhibit 1 is a spreadsheet containing citations to and quotations from letters docketed in the above-captioned cases.

2.    Attached as Exhibit 2 is a true and correct copy of a letter dated November 5, 2021 addressed to William K. Harrington, Esq. seeking the appointment of an examiner in these cases.

---

[1] The debtors in these chapter 11 cases ("**Debtors**" or "**Purdue**"), along with the last four digits of each Debtor's registration number in the applicable jurisdiction, are as follows: Purdue Pharma L.P. ("**PPLP**") (7484), Purdue Pharma Inc. (7486), Purdue Transdermal Technologies L.P. (1868), Purdue Pharma Manufacturing L.P. (3821), Purdue Pharmaceuticals L.P. (0034), Imbrium Therapeutics L.P. (8810), Adlon Therapeutics L.P. (6745), Greenfield BioVentures L.P. (6150), Seven Seas Hill Corp. (4591), Ophir Green Corp. (4594), Purdue Pharma of Puerto Rico (3925), Avrio Health L.P. (4140), Purdue Pharmaceutical Products L.P. (3902), Purdue Neuroscience Company (4712), Nayatt Cove Lifescience Inc. (7805), Button Land L.P. (7502), Rhodes Associates L.P. (N/A), Paul Land Inc. (7425), Quidnick Land L.P. (7584), Rhodes Pharmaceuticals L.P. (6166), Rhodes Technologies (7143), UDF LP (0495), SVC Pharma LP (5717) and SVC Pharma Inc. (4014) (collectively, the "**Bankruptcy Cases**").

3.      Attached as Exhibit 3 is a true and correct copy of an email from Judge Robert D. Drain to the undersigned dated November 12, 2019.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct, and that this Affidavit was executed the 15TH day of June, 2021.

/s/ Jonathan C. Lipson
JONATHAN C. LIPSON

**EXHIBIT 1**
**(Docketed Letters Spreadsheet)**

## Accountability Letters

| Docket Number | Sender | Date Sent | Key Phrases/Notes |
|---|---|---|---|
| 2966 | Michael W. Normile III | 5/19/2021 | -"Chapter 11 bankruptcy being requested by Purdue... for one and only one reason, in an attempt to avoid responsibility for their actions..." <br> -"a barely felt slap on the wrist" |
| 129 | John Farrell, N.M.D. | 9/22/2019 | -"[Richard Sackler and Purdue] **must pay a price** if only to demonstrate to others that you will not escape with fortune intact after causing such harm..." |
| 249 | Joanne Peterson | 10/1/2019 | -"Purdue Pharma and the Sackler family need to be held accountable." <br> -"Families deserve to know the truth regarding what Purdue and the Sacklers have been doing..." |
| 261 | Lydia Conley, Association for Behavioral Healthcare | 10/1/2019 | -"It is not in the public interest for the court to stop all cases as the public deserves to understand what Purdue and the Sacklers knew and the extent of their involvement in deceptive marketing strategies." |
| 262 | Steve Walsh, Massachusetts Health & Hospital Association | 10/1/2019 | -"Purdue Pharma's well-documented deception relating to opioids and the nationwide tragedy that followed its actions requires a full acounting of its responsibility." <br> -"The court should not permit Purdue Pharma and the Sacklers to escape their responsibilities with incomplete and inadequate restitution..." |
| 263 | Lora Pellegrini, Massachusetts Association of Health Plans | 10/2/2019 | -"The Attorney General's [of Massachusetts] suit seeks accountability and a finding of wrongdoing against Purdue and the Sackler family... We believe [the suit] is in the public's interest and should be allowed to go forward." |
| 264 | Martin Walsh, Mayor of the City of Boston | 10/3/2019 | -"The proposed settlement does not hold Purdue of the Sacklers accountable. <br> -"There is not enough transparency regarding how the settlement will be funded, beyond the $3 billion that has been guaranteed." |
| 265 | Maryanne Frangules, Massachusetts Organization for Addiction Recovery (MOAR) | 10/1/2019 | -"We are asking you to hold Purdue and the Sacklers' [sic] accountable." |
| 269 | Steven A. Tolman, Massachusetts AFL-CIO | 10/1/2019 | -"I am writing in support of Massachusetts Attorney General... and the 24 other attorneys general across the country who are opposing Purdue Pharma's proposed settlement and request for a nationwide injunction." |

| 270 | Charles Baker, Governor of Massachusetts | | -"As Governor of Massachusetts, I am writing to convey my opposition to the imposition of a nationwide injunction... And my support for Attorney General Healy's decision... To reject their settlement offer."<br>-"A settlement and injunction that would allow Purdue and the Sacklers to avoid trials and escape accountability for a second time is not in the public interest." |
|---|---|---|---|
| 271 | Edward J. Bisch | 10/3/2019 | -"I am writing in support of the twenty-five attorney generals [sic] who are opposing Purdue Pharma's proposed settlement and request for a nationwide injunction."<br>-"We did not know [during the 2007 trial] how involved the Sacklers were in running [Purdue]." |
| 272 | Andrew Kolodny, MD, Physicians for Responsible Opioid Prescribing | 10/3/2019 | -"Physicians for Responsible Opioid Prescribing, an organization with a mission to reduce opioid-related morbidity and mortality  caused by overprescribing of opioid analgesics, is strongly opposed to the settlement offer from Purdue Pharma." |
| 280 | Stephen G. Gelfand, MD, Physicians for Responsible Opioid Prescribing | 10/5/2019 | -"...any settlement which allows [Richard Sackler] and the rest of the Sackler family members who sat on Purdue's Board of Directors to escape accountability should be clearly rejected." |
| 299 | Tom Wolf, Governor of Pennsylvania | 10/11/2019 | -"As Governor of the Commonwealth of Pennsylvania, I write to inform you of my opposition to any order that might impede the Commonwealth, or any plaintiff, from holding accountable Purdue Pharma and the Sackler family for their roles in the Opioid Crisis." |
| 331 | Sarah Thrower | 9/23/2019 | -"The associated Press reveals that the Sacklers' wealth is shielded in a web of companies and trusts... [and the] complexity of those structures, coupled with their offshore reach, not only affect the calculus for governent lawyers as they weigh how to go after Purdue, but are a clear and flagrant disrepect for the courts..." |
| 442 | Marcia & Michael Julian | 11/1/2019 | -Allowing the settlement "would shield the Sackler family from the public disclosure of the facts and evidence..." |
| 443 | Kimberly Krawczyk | 11/7/2019 | -"The Sackler family needs to be held accountable..."<br>-"I am asking you to help us hold Purdue accountable for their actions." |
| 570 | Colleen & Gary Breitbord | 11/25/2019 | -"This is the time to draw the line in the sand, to apply accountability and justice." |

| 661 | *Various Individuals | 12/17/2019 | *55 identical letters were sent by individuals under this docket number.<br>-The letter asserts agreement with the Massachusetts Attorney General's opposition to the settlement and seeks accountability for Purdue and the Sacklers. |
| 709 | Leona Nuss | 12/16/2019 | -"I am writing in support of the twenty-five attorney generals [sic] who are opposing Purdue Pharma's proposed settlement and request for a nationwide injunction." |
| 710 | Mike Sacca | 12/17/2019 | -"A settlement and injunction that would allow Purdue and the Sacklers to avoid trials and escape accountability for a second time is not what this country stands for, not in the public interest." |
| 968 | Tim Kramer | 3/20/2020 | -"I realize the addict has to take some responsibility for their part... Those legalized DR.ug dealers... Should be held responsible to the same degree." |
| 1089 | Official Committee of Unsecured Creditors (UCC) | 4/26/2020 | -"From the perspective of the [Official Committee of Unsecured Creditors] and other creditor groups, no such releases can be provided, nor any settlement evaluated, without exhaustive discovery."<br>-""the UCC must assess the strength of the claims against the Sacklers and Purdue..." |
| 1107 | Andrew M. Troop, Counsel to the Non-Consenting States | 4/29/2020 | -"Transparency about the Sacklers and Purdue is critically important to be able to explain to the public any resolution of these cases and to the integrity of this bankruptcy process." |
| 1124 | Corey Dodge | 5/1/2020 | *Marked confidential. |
| 1133 | Harrison Cullen | 5/7/2020 | *Marked confidential. |
| 1141 | Joanne Peterson | 6/26/2020 | *Marked confidential. |
| 1142 | Stephen G. Gelfand, Second Letter | 5/11/2020 | -"[Richard and Arthur Sackler]... took advantage of the known effects of dependency and addiction with the chronic use of Valium, by marketing this potent brain-active tranquilizer for all degrees of anxiety, especially to housewives for the minor stresses and tensions of everyday living. " |
| 1145 | Edward J. Bisch | 5/13/2020 | *Marked confidential. |
| 1146 | Ruby Thomas | 5/13/2020 | *Marked confidential. |
| 1149 | Barbara Van Rooyan | 5/13/2020 | *Marked confidential. |
| 1153 | Cynthia Munger | 5/14/2020 | *Marked confidential. |
| 1160 | Maryanne Frangules | 5/16/2020 | *Marked confidential. |
| 1174 | Leona Nuss | 5/20/2020 | *Marked confidential. |
| 1261 | Ricardo Vela | 6/12/2020 | *Marked confidential. |

| | | | |
|---|---|---|---|
| 1261 | Thomas Hickey | 5/25/2020 | *Marked confidential. |
| 1300 | John Yarbrough | 6/22/2020 | *Marked confidential. |
| 1309 | Dan Schneider | 6/29/2020 | -"The way [OxyContin] was designed and marketed it was easily abused. They knew this." |
| 1311 | Michael S. Quinn, Counsel to the Ad Hoc Committee on Accountability | 6/29/2020 | -"Before the Court approaches decisions about subordination of creditor claims under sections 509 and 510(c) of the U.S. bankruptcy code, it is important to have transparency on the complicity or misconduct of corporate creditors [such as CVS].<br>-The lack of serious factual investigation in this proceeding should not be considered an achievement." |
| 1495 | Harrison Cullen, OxyJustice | 7/16/2020 | -Letter is in support of Change.Org petition with over 3,500 signatures that states "We Demand Accountability and Transparency from Purdue Pharma and the Sacklers! Url: https://www.change.org/p/judge-drain |
| 1538 | Peter W. Jackson | 7/15/2020 | -"I write to ask this Court to appoint an examiner..."<br>-"I hoped and expected that the Court would understand the importance of making the truth known."<br>-"It is particularly important to shine a bright light on all available evidence so that the American public can understand, once and for all, exactly how this company and their owners conducted themselves and how their actions sparked the epidemic that continues to harm Americans." |
| 1541 | Je Se Mendez | 7/30/2020 | *Marked confidential. |
| 1581 | Darryl Lee Haan | 8/10/2020 | *Marked confidential. |
| 1934 | Dan Schneider, Second Letter | 11/11/2020 | -"I have lost a son and as a Pharmacist saw many die by Purdue's unlawful misleading marketing of OxyContin."<br>-"...the Settlement should not be approved." |
| 2056 | Andrew Kolodny, MD, Physicians for Responsible Opioid Prescribing, Second Letter | 12/2/2020 | -"PROP is writing to share our perspective with the Court on the potential negative public health impact of preserving Purdue's business as a public benefit company (PBC)." |

| | | | |
|---|---|---|---|
| 2106 | David Herzberg & Joseph M. Gabriel | 12/12/2020 | -"Because Purdue's greatest misdeed was to pioneer the use of these unethical and illegal activities in the promotion of a powerful opioid, true abatement requires correcting these corrupt practices, not just changing Purdue's behavior."<br>-"We do not think transforming Purdue into a public benefit corporation will accomplish these goals..."<br>-"We therefore urge the Court and the parties to seek a resolution that begins to address broader, systemic problems in the pharmaceutical industry exacerbated by Purdue's misdeeds." |
| 2108 | Emily Walden, FED UP! | 12/8/2020 | -"Purdue's business should not be preserved as a 'public benefit' company to keep selling OxyContin or provide a legacy for the Sackler family."<br>-"For recovery efforts to succeed, it is essential that people who have been hurt by opioids be able to trust the organizations that provide medicines and services for recovery." |
| 2129 | Keola Maluhia Kekuewa | 12/6/2020 | -"I need closure so I can move on with my life." |
| 2210 | Maria Ecke | 12/13/2020 | -"The [settlement] amount of $ Billion is a slap in the face of the many Americans who have lost their beloved children or relatives because of this illegally pushed drug by Purdue Pharma." |
| 2280 | Deborah Clonts | 1/7/2021 | -"Your honor, I want to voice my opinion on the Sacklers being allowed to continue to produce opioids." |
| 2363 | Deborah Clonts, Second Letter | 2/8/2021 | -"I ask if any relief is granted, your honor decide a fair amount for my pain and suffering. |
| 2541 | Ronald Earl Seely | 3/15/2021 | -"The documents [I have submitted] show that, without dispute... Purdue Pharma L.P. et al is responsible for the death of my son in their production of oxycontin. I have requested a settlement... I ame begging the court to look into this matter..." |
| 2592 | Michael Michmali | 4/2/2021 | -"Please your honor hold these people accountable for what they have done." |
| 2618 | Marco A. Mangoné | 4/5/2021 | -"I do not agree with this bad move [permitting Purdue's Settlement Agreement] intended to try to avoid their responsibilities with the patients that lost their lives due to the use of the medicine they were selling." |
| 2627 | Aaron Stimms | 4/26/2021 | Follow-up to letter objecting to Disclosure Statement. |
| 2652 | Ralph Norman Olsen | 12/31/2020 | -"To even consider a settlement that can partially be paid by profits of Purdue Pharma selling more opioids is an insult..." |

| 2654 | Scotti Madison | 3/25/2021 | -"Upon my recent review of the latest Purdue Pharma Plan of Reorganization email, I can tell there is a lot to still determine and much work ahead of you." |
| 2768 | Chester Cleo Williams III | 4/19/2021 | -"Now it's time for Purdue to pay for all the lost lives and overdoses..." |
| 2950 | Carrie L. McGaha | 5/27/2021 | -"...opiate crisis at the hand of the Sackler family and participating physicians. This crisis was by design." |

| | |
|---|---|
| Number of Letters Seeking Accountability | 59 |
| Other Letters | 36 |
| Total Number of Letters | 95 |

**EXHIBIT 2**
**(United States Trustee Letter)**

**TEMPLE** UNIVERSITY®
Beasley School of Law

**Jonathan C. Lipson**
**Harold E. Kohn Professor of Law**
*tel* 215-204-0608
*email:* jlipson@temple.edu

1719 N. Broad Street
Philadelphia, PA 19122

*fax* 215-204-1185
*web* www.temple.edu/lawschool

November 5, 2019

*Via Email* william.k.harrington@usdoj.gov
William K. Harrington, Esq.
United States Trustee (Region 2)
U.S. Federal Office Building
201 Varick Street Room 1006
New York, NY 10014

Re: *Purdue Pharma, LP, et al.*, case no. 19-23649 (Bankr. S.D.N.Y.)

Dear Mr. Harrington:

We write to urge the Office of the United States Trustee to seek an order for the appointment of a chapter 11 examiner in the reorganization of Purdue Pharma, L.P., *et al.* ("Purdue Pharma" or the "Debtors"), pursuant to section 1104(c) of the United States Bankruptcy Code. This case presents unique challenges to the chapter 11 system which an examiner could better address than other alternatives.

*Introduction*

The *Purdue Pharma* case is unique because the opioid crisis in America is unique. Opioid abuse is a "national public health care emergency,"[1] an "epidemic" in the words of the U.S. Department of Health and Human Services, accounting for more than 42,000 deaths in 2016.[2] "Every day," according to the National Institute on Drug Abuse, "more than 130 people in the United States die after overdosing on opioids."[3] As the Debtors themselves acknowledge, "America faces a profound problem of opioid abuse, misuse and addiction, one that has led to the loss of tens of thousands of lives each year."[4] The crisis has spurred over 2600 lawsuits against the Debtors, and is thus the chief cause of their bankruptcy filing.[5]

---

[1] *See, e.g.,* National Inst. on Drug Abuse, *Opioid Overdose Crisis*, available at https://www.drugabuse.gov/drugs-abuse/opioids/opioid-overdose-crisis ("the misuse of and addiction to opioids—including prescription pain relievers, heroin, and synthetic opioids such as fentanyl—is a serious national crisis that affects public health as well as social and economic welfare.) (rev'd Jan. 2019) [hereinafter *Overdose Crisis*]. The U.S. Department of Health and Human Services has declared the opioid crisis a "public health emergency." News Release, Dept. Heath & Hum. Servs, *HHS Acting Secretary Declares Public Health Emergency to Address National Opioid Crisis*, Oct. 26, 2017, available at https://www.hhs.gov/about/news/2017/10/26/hhs-acting-secretary-declares-public-health-emergency-address-national-opioid-crisis.html. [hereinafter *HHS Public Health Emergency*].

[2] *See* U.S. Department of Health and Human Services, *What is the U.S. Opioid Epidemic?* Available at https://www.hhs.gov/opioids/about-the-epidemic/index.html.

[3] *See Overdose Crisis*, *supra* note 1.

[4] Informational Brief, *In re* Purdue Pharma, L.P., case no. [19-23649], 34 (Sept. 15, 2019) [hereinafter, *Informational Brief*].

[5] *Id.* at 39 ("Against the backdrop of today's opioid crisis, the Defendant Debtors have been named in more than 2,600 lawsuits filed throughout the state and federal court systems.").

This preprint research paper has not been peer reviewed. Electronic copy available at: https://ssrn.com/abstract=3532642



**TEMPLE** UNIVERSITY®
Beasley School of Law

1719 N. Broad Street          *fax* 215-204-1185
Philadelphia, PA 19122        *web* www.temple.edu/lawschool

Admittedly, this crisis—and the Debtors' role in it—involve complex questions that a bankruptcy examiner cannot fully answer.  Nevertheless, *Purdue Pharma* presents two more limited, but key, questions that are appropriate for a bankruptcy examination: (i) What role did certain members of the Sackler family—who apparently owned and controlled the Debtors at all relevant times—play with respect to the Debtors' role in this crisis? and (ii) What prepetition transfers were made to the Sackler family and/or insiders of the Debtors which may be recoverable for the benefit of the estates?

For the reasons discussed below, we believe that a properly targeted bankruptcy examination, carefully monitored by the Bankruptcy Court, would produce more credible answers to these two questions, at lower cost, than any alternatives available to the Bankruptcy Court, the parties, or the many other courts where the underlying lawsuits are pending.

We understand that Judge Drain has temporarily ordered the automatic stay expanded to halt litigations with plaintiffs who have not agreed to participate in the *Purdue Pharma* reorganization in the hopes of a settlement.[6]  Such a settlement, if forthcoming, may reduce the scope of an examiner's role, but not the overall need for one.  The unique public interest in this case is strong and unlikely to be addressed without the aid of an independent examination.

*Who We Are*

We are professors at law schools throughout the United States.[7]  One of us has written extensively about the use of examiners in chapter 11 cases.[8]  We have no involvement in these cases, and submit this letter based solely on our concern for the operation of the chapter 11 system.

*Bankruptcy Examiners*

As you know, section 1104(c) of the United States Bankruptcy Code provides that a bankruptcy court "shall" order the appointment of an examiner "to conduct such an investigation of the debtor as is appropriate, including an investigation of any allegations of fraud, dishonesty, incompetence, misconduct, mismanagement, or irregularity in the management of the affairs of the debtor of or by current or former management of the debtor, if": (1) such appointment is "in the interests of creditors, any equity security holders, and other interests of the estate"; or (2) the

---

[6] Mary Williams Walsh, *Judge Orders Pause in Opioid Litigation Against Purdue Pharma and Sacklers*, N.Y. Times, Oct. 11, 2019, available at https://www.nytimes.com/2019/10/11/health/purdue-bankruptcy-opioids.html.

[7] "We" are the undersigned and supporting signatories listed on Appendix A.  This letter was originally submitted Nov. 5, 2019 by Jonathan Lipson, Adam Levitin and Stephen Lubben.  Additional signatories joined thereafter, and all are listed on Appendix A.

[8] Jonathan C. Lipson, *Examining Success*, 90 AM. BANKR. L.J. 1 (2016) (with C. Marotta) [hereinafter "*Examining Success*"]; Jonathan C. Lipson, *Understanding Failure: Examiners and the Bankruptcy Reorganization of Large Public Companies*, 84 AM. BANKR. L.J. 1 (2010) [hereinafter "*Understanding Failure*"]. Other leading work on examiners includes Daniel J. Bussel, *A Third Way: Examiners As Inquisitors*, 90 AM. BANKR. L.J. 59, 61 (2016) [hereinafter "*Third Way*"]; Daniel J. Bussel, *Ethics for Examiners*, 84 FORDHAM L. REV. 2073 (2016).

In the interest of full disclosure, Jonathan Lipson worked for Judge Drain in 1990-1991 as an associate at Milbank, Tweed, Hadley & McCloy.  That experience has not affected the views expressed in this letter.

This preprint research paper has not been peer reviewed. Electronic copy available at: https://ssrn.com/abstract=3532642



TEMPLE UNIVERSITY®
Beasley School of Law

1719 N. Broad Street                    fax 215-204-1185
Philadelphia, PA 19122                  web www.temple.edu/lawschool

debtor's fixed, liquidated unsecured debts, other than debts for "goods, services, or taxes," exceed $5 million.[9]   11 U.S.C. §1104(c).

As you also know, the "shall" in section 1104(c) is not a strong command.  Studies have found that, notwithstanding this language, examiners are rarely sought or appointed.[10]  Judges "are often reluctant to appoint an examiner if there is no apparent benefit to the estate or if a party requests one for transparently strategic reasons."[11]  Thus, the important question is:  Why would an examiner be superior to the other mechanisms available under chapter 11?

There are two high-level answers: (i) economic efficiency; and (ii) public legitimacy.  Either would be sufficient grounds to support an examination in this case.  The combination here makes the case for an examiner compelling.

*Efficiency—The Economics of Bankruptcy Examiners*

The dominant argument against the appointment of an examiner is economic:  a bankruptcy examination is ordinarily difficult to justify as an administrative expense of the estate.  Other checks and balances in the system—a creditors' committee; the "public" nature of the reorganization process—are thought to be sufficient in most cases to explain how and why a debtor encountered financial distress.  "As professionals paid from the estate—in effect, with money that would otherwise go to creditors—courts and system participants worry that examiners could simply be expensive fishing expeditions."[12]

Thus, cases which can support a bankruptcy examination are axiomatically rare: they will be cases with significant equity in the estate and some pressing reason to believe that the ordinary operation of the system will be inadequate.

---

[9] We note that it is somewhat unclear whether the Debtors have fixed, liquidated unsecured debts, other than debts for "goods, services, or taxes," in excess of $5 million.  According to Official Form 204 filed by Purdue Pharma (the *List of Creditors Who Have the 50 Largest Unsecured Claims and Are Not Insiders*), it would appear that the Debtors have more than $5 million in fixed and liquidated unsecured debts.  A significant portion of such claims, however, appear to be for "Payer Rebates"—a term not explained in Form 204.  If such claims are for "goods or services," as that term is used in section 1104(c)(2), then such debts may not count toward the $5 million calculation.  In any case, an examiner would be in the interests of the estate, regardless of the amount of the Debtors' qualifying unsecured debt.

[10] One study found that examiners were sought in only 14% of eligible cases, and appointed less than half the time sought. *See Examining Success, supra* note 8, at 4 (observing that "Stakeholders in chapter 11 cases rarely want examiners.").

[11] *See Understanding Failure, supra* note 8, at 3.

We are aware, of course, that Judge Drain declined to appoint an examiner in the *Loral* bankruptcy.  *In re* Loral Space & Comm'ns Ltd., 313 B.R. 577, 587 (Bankr. S.D.N.Y. 2004), rev'd and remanded sub nom. *In re* Loral Space & Comm'ns, Ltd., No. 04 CIV. 8645RPP, 2004 WL 2979785 (S.D.N.Y. Dec. 23, 2004).  We think this case is easy to distinguish from *Loral*.  The examiner there was sought to perform a valuation of the debtor, a task that, Judge Drain observed, "not only [was] far removed from the normal "investigatory" function of an examiner, as set forth in the statutory text, but also [was] unsupported by credible allegations of misconduct . . . ." *Loral*, 313 B.R. at 587.  Although Judge Drain's decision was reversed by the District Court on grounds that an examiner was "mandatory" under the Bankruptcy Code, we do not take a position with respect to that issue.  Under any reading of the statute, there are ample grounds for a bankruptcy examiner in this case.

[12] *Examining Success supra* note 8, at 14.

3

This preprint research paper has not been peer reviewed. Electronic copy available at: https://ssrn.com/abstract=3532642



**T** TEMPLE UNIVERSITY®
Beasley School of Law

1719 N. Broad Street
Philadelphia, PA 19122

*fax* 215-204-1185
*web* www.temple.edu/lawschool

This is such a case. Here, the Debtors' estates appear to have ample equity. The Debtors' petition for chapter 11 relief estimated that the Debtors have $1-10 billion in assets as against liabilities of $500 million to $1 billion.[13] According to the summary of the Debtors' recently-filed schedules of assets and liability, there is no secured debt.[14] A properly targeted examination should therefore not impose a significant burden on the Debtors' operating cash flow or assets.

At the same time, and as noted above, it appears that there are essentially two questions that a bankruptcy examiner could answer more efficiently, effectively and with greater legitimacy than the ordinary mechanisms available: (i) the role of the Sackler family in the operation of the Debtors; and (ii) the propriety of prepetition transfers by the Debtors. There are, for example, concerns that the Debtors are using chapter 11 to shield the Sacklers from additional scrutiny—initially via the stay and, ultimately, through third-party releases in a reorganization plan—and that executives and directors of the Debtors,[15] as well as members of the Sackler family,[16] may have stripped assets out of the Debtors in anticipation of bankruptcy.

An examiner's independent, non-adversarial production of information about these disputes would likely help to spur resolution and, if appropriate, increased contributions by the Sackler family and/or recoveries from transferees of property of the Debtors. Although promoting settlement is not necessarily the principal function of a bankruptcy examiner, examiners can be highly effective at persuading parties to soften their litigation stances in order to come to settlement.[17]

Nor is an examination likely to duplicate ongoing litigation. If anything, a bankruptcy examiner, particularly if armed with subpoena power and the power to question witnesses under oath,[18] may produce relevant factual information more efficiently than the adversarial litigation process that would take place around the nation but for Judge Drain's expanded stay.

This would be especially true if the parties are unable to come to some resolution in connection with that stay and Judge Drain nevertheless ordered it extended.[19] There is no reason to

---

[13] *See* Official Form 201, Voluntary Petition for Non-Individuals Filing for Bankruptcy, *In re* Purdue Pharma, L.P. (Sept. 15, 2019)[hereinafter "*Petition*"], items 15 and 16.

[14] *See* Global Notes and Statements of Limitation, Methodology, and Disclaimers Regarding the Debtors' Schedules of Assets and Liabilities and Statements of Financial Affairs, *In re* Purdue Pharma, L.P., et al., case no. 19-23649 (Oct. 29, 2019) at 8 ("Schedule D – Creditors Holding Secured Claims. The Debtors are not aware of any secured claims against the Debtors.").

[15] *See* Paul Schott, *Purdue Pharma paid $9 million to CEO before bankruptcy*, STAMFORD ADVOCATE, Oct. 30, 2019, available at https://www.stamfordadvocate.com/business/article/Purdue-Pharma-paid-9-million-to-CEO-before-14580113.php.

[16] *See* Paul Schott, *Connecticut looks to keep pursuing Purdue Pharma, Sackler claims*, STAMFORD ADVOCate, Oct. 5, 2019, available at https://www.stamfordadvocate.com/business/article/Connecticut-looks-to-keep-pursuing-Purdue-Pharma-14494923.php.

[17] *See, e.g.,* Michael Oneal, *Tribune Co. reaches bankruptcy settlement with 2 creditors*, CHICAGO TRIBUNE, Sept. 28, 2010, available at https://www.chicagotribune.com/business/ct-xpm-2010-09-28-ct-biz-0929-tribune-20100928-1-story.html. *See also , supra* note 8, at 2 (discussing examiners' role in settlements in large chapter 11 cases).

[18] For a discussion of powers to be accorded an examiner, including the subpoena power, see Bussel, *Third Way, supra* note 8, at 120-22.

[19] We expect that Judge Drain will continue the expanded stay, at least to some extent. To permit any significant amount of litigation against the Debtors to continue in other courts would defeat the purpose of the reorganization.

This preprint research paper has not been peer reviewed. Electronic copy available at: https://ssrn.com/abstract=3532642



1719 N. Broad Street
Philadelphia, PA 19122

fax 215-204-1185
web www.temple.edu/lawschool

think that, in that case, the plaintiffs who have resisted it would suddenly become docile participants in the Debtors' chapter 11 case. Rather, we imagine that they would continue to fight on at least two fronts. One would be a collateral or appellate challenge to the expanded stay, itself. The other would be to pursue their litigation strategies within the reorganization, for example through Rule 2004 examinations of the Sackler family and the Debtors' management.[20] Both are likely to be costly to the Debtors' estates, and neither is likely to produce information as efficiently and credibly as a bankruptcy examiner.

To be sure, the appointment of an examiner may not, in itself, halt either (or both) efforts. However, the presence of a bankruptcy examiner may help to persuade judges in other fora to respect the stay because the reorganization process takes the underlying claims seriously and provides a more efficient means of generating information salient to their resolution than other pathways, including litigation in those courts.

*Duplication of Effort?*

Still, there may be three other, more specific concerns about duplication of effort. We address each.

First, the Debtors may argue that they have answered, or will answer, the questions noted above. In particular, they may point out that they filed an Informational Brief ("<u>Informational Brief</u>")[21] with their petitions which argues, in various ways, that the chapter 11 process and this reorganization are the best plausible paths to resolving the challenges that the Debtors and their creditors face. That brief provides a fairly detailed discussion of the Debtors' role in the development and distribution of opioids; their efforts to remediate the harms of the opioid crisis; and, most importantly, the need to use chapter 11 to implement a settlement with many, but not all, of the plaintiffs in the underlying litigations.[22]

Although the Sackler family would apparently relinquish ownership of the Debtors and make additional contributions to the proposed settlement, the Informational Brief does not address the merits of the two basic issues noted above, namely the role of the Sackler family in running the Debtors and prepetition transfers. Without some clarity on those questions, it will be difficult to

---

[20] One can further imagine serious challenges to claims estimation and determination procedures, including over whether such proceedings are "core" under 28 U.S.C. § 157(b)(2)(B)(excepting from "core" proceedings the "liquidation or estimation of contingent or unliquidated personal injury tort or wrongful death claims against the estate for purposes of distribution in a case under title 11").

[21] *See* Informational Brief, *supra* note 4.

[22] The Informational Brief explains three key elements of the proposed settlement:

Under the agreed-upon Settlement Structure, as part of a resolution of the litigation: (1) Purdue's existing shareholders will relinquish all of their equity interests in the Debtors and consent to the transfer of all of the Debtors' assets to a trust or similar post-emergence structure for the benefit of claimants and the U.S. public, "free and clear" of Purdue's liabilities to the fullest extent permitted by law; (2) Purdue's existing shareholders will engage in a sale process for their ex-U.S. pharmaceutical companies; and (3) Purdue's existing shareholders will contribute an additional $3 billion over seven years (in addition to 100% of the value of all Debtors), with the hope of substantial further contemplated contributions from the sales of their ex-U.S. pharmaceutical businesses.

*See* Informational Brief, *supra* note 4, at 44 (footnote omitted).

This preprint research paper has not been peer reviewed. Electronic copy available at: https://ssrn.com/abstract=3532642



TEMPLE UNIVERSITY®
Beasley School of Law

1719 N. Broad Street          *fax* 215-204-1185
Philadelphia, PA 19122        *web* www.temple.edu/lawschool

assess whether the Sacklers' contributions warrant the relief they will presumably seek.[23]  Thus, it will be difficult to assess whether a plan of reorganization implementing this proposed settlement can, or should, be confirmed.

Because a plan of reorganization can be "crammed down" against dissenters if a sufficient number and amount of creditors in other classes support the plan, there is reason to think that the plan process will force some claimants to accept the outcome of the reorganization whether they like it or not.  This is, of course, an essential aspect of reorganization, and it is ordinarily not especially problematic.

Here, however, dissenters may have strong and unusual reasons to challenge the plan process.  If, for example, the role that the Sacklers played is not clarified, non-settling plaintiffs may be justified in believing that the reorganization was used to shield them from scrutiny.  Conversely, the Sacklers' contributions may be generous in light of their role with the Debtors, and so may be a second-best solution that most participants in these cases should come to accept.

It is no answer to defer these questions to the plan and disclosure statement stage of the case.  While a plan cannot be confirmed unless supported by a disclosure statement containing "adequate information" (11 U.S.C. § 1125), a disclosure statement is unlikely to be an effective way to address the important questions in this case.  Among other things, it will be produced by a party that supports plan confirmation, and thus (most likely) the settlement noted above.  In that case, it could not independently assess the merits of the issues that create concern here.

The Debtors are, in short, unlikely to be able to address these issues more effectively than a neutral bankruptcy examiner.

Second, some may point out that there is a "Special Committee" of the Board of Directors ("Special Committee") of Purdue Pharma, Inc., ("PPI"), the general partner of Debtor Purdue Pharma (the limited partnership and lead debtor).[24]  The Debtors' Informational Brief states that

---

[23] If, for example, a plan of reorganization seeks to provide third-party releases for the Sacklers, there would have to be a determination of whether their contribution was "substantial consideration" in circumstances that were "unique," among other things.  *See In re* Metromedia Fiber Network, Inc., 416 F.3d 136, 143 (2d Cir. 2005).  For his part, Judge Drain has approved such releases, at least where they are not "overreaching on their face":

> While it is true that third-party releases and related injunctions in Chapter 11 plans and confirmation orders are, under the law of the Second Circuit, proper only in rare cases, see Deutsche Bank AG v. Metromedia Fiber Network, Inc., 416 F.3d 136, 141 (2d Cir.2005), if they are consensual or are not objected to after proper notice, courts generally approve them unless they are truly overreaching on their face.

*In re* MPM Silicones, LLC, No. 14-22503-RDD, 2014 WL 4436335, at \*32 (Bankr. S.D.N.Y. Sept. 9, 2014), aff'd, 531 B.R. 321 (S.D.N.Y. 2015), aff'd in part, rev'd in part and remanded sub nom. Matter of MPM Silicones, L.L.C., 874 F.3d 787 (2d Cir. 2017).  Here, it would be very difficult to assess the relative value of the Sacklers' contributions under any standard ("substantial," "unique" or "overreaching").  A bankruptcy examination could help answer this question.

[24] According to the Informational Brief, the names, dates of appointment and board positions of the Special Committee members are as follow:

This preprint research paper has not been peer reviewed. Electronic copy available at: https://ssrn.com/abstract=3532642



1719 N. Broad Street                *fax* 215-204-1185
Philadelphia, PA 19122              *web* www.temple.edu/lawschool

"Under PPI's Shareholder Agreement, the Special Committee is required to approve, and has full delegated authority with respect to, all matters between the Debtors, on the one hand, and any member of the Sackler Families or any of their affiliates, on the other."[25]  In particular, it appears that the Special Committee "has been overseeing various investigations, including an exhaustive review by outside experts of distributions made by the Debtors to the Sackler Families and their affiliates, as well as any dealings between the Debtors and any member of the Sackler Families or any of their affiliates."[26]  Thus, like *Enron*, and other companies that have faced allegations of serious wrongdoing, the Debtors are apparently using the mechanism of an internal investigation by a special committee of the board to assess at least some allegations of wrongdoing.

This is commendable, but it is difficult at this point to know how independent the Special Committee can be.  Unlike *Enron*, the Debtors are not publicly-traded entities, so the Shareholders Agreement that apparently governs their appointment is not readily available.  It is thus possible that members of the Sackler family retain power to remove them.  Although we have no reason to doubt the integrity of the members of the Special Committee, we also note concerns recently raised about payments to one of its members.[27]  In any case, even with an independent investigation in *Enron*, the court there also appointed a bankruptcy examiner.  It is hard to see why the same should not be true with *Purdue Pharma*.

Third, there may be concerns that the Official Committee of Unsecured Creditors can and should conduct all the investigations needed in this case.  Here, the problem is not the potential for (the appearance of) conflicts of interest, as may be the case with the Special Committee, but instead potential conflict among creditors.  The Official Committee, for example, appears to be comprised of both commercial creditors (e.g., CVS; Blue Cross-Blue Shield) and individuals who may be plaintiffs in lawsuits against the Debtors.[28]  They may well have different interests and goals in these cases.  Moreover, several ad hoc committees appear to have formed.  Thus, these cases involve creditors who have settled with the Debtors and those who have not; creditors who are government entities and those who are not; and other creditors caught in between.  It is not difficult to imagine

| Robert S. "Steve" Miller | July 2018 | Chairman of the Board |
|---|---|---|
| Kenneth Buckfire | May 2019 | At-Large Director |
| John S. Dubel | July 2019 | At-Large Director |
| Michael Cola | July 2019 | At-Large Director |

*See* Informational Brief, *supra* note 4, at 14.

[25] *See* Informational Brief, *supra* note 4, at 15.

[26] *See* Informational Brief, *supra* note 4, at 16.

[27] *See* Schott, *supra* note 15.  We also note that it is not immediately apparent whether the Special Committee has independent counsel and, if so, who is paying for such counsel.  The Informational Brief states that "AlixPartners LLP, Bates White, and Davis Polk & Wardwell LLP have dedicated more than 12,000 hours to these projects to date at the direction and under the supervision of the Special Committee," *See* Informational Brief, *supra* note 4, at 16.  If these firms also represent the Debtors, generally, in these cases (e.g., as with Davis Polk), it may be difficult for them to provide the independent advice required for an effective investigation.

[28] Notice of Appointment of Official Committee of Unsecured Creditors, *In re* Purdue Pharma, L.P., case no 19-23649 (Sept. 27, 2019).

This preprint research paper has not been peer reviewed. Electronic copy available at: https://ssrn.com/abstract=3532642



**TEMPLE** UNIVERSITY®
Beasley School of Law

1719 N. Broad Street          *fax* 215-204-1185
Philadelphia, PA 19122        *web* www.temple.edu/lawschool

that these groups will have different views about how to proceed.  Those differences may become costly disputes in these cases.

Again, an examination is not a guarantee against such disputes, but it does make collateral challenges to the reorganization process less compelling and therefore less likely to impose needless cost and delay.

*Legitimacy—The Public Interest*

Even if all of the current plaintiffs in the underlying lawsuits agreed to put down their litigation arms and make peace with the Debtors and the Sacklers, we think there is another, equally important, reason for an examiner in these cases:  the legitimacy of the chapter 11 process.  We do not use "legitimacy" in a fancy way:  we mean simply that there is intense public scrutiny of these cases given the severity of the opioid crisis, and serious concern about the propriety of the process, in particular that these cases may be used to shield the Sackler family and/or the Debtors from scrutiny in ways that many might find problematic.[29]  Neither settlement of the underlying lawsuits, nor any plan of reorganization, is likely to produce a publicly-available report that would allay these concerns.  A bankruptcy examination can and should.

Addressing the public interest is not ordinarily a reason, in itself, to appoint an examiner.  Although legislative history to the Bankruptcy Code suggests that examiners were intended to do just that, the economic concerns noted above have largely displaced Senator DeConcini's claim that examiners would provide "special protection for the large cases having great public interest . . . to determine fraud or wrongdoing on the part of present management."[30]  While examiners are rare, they have nevertheless played important, sometimes critical, roles in some of the nation's largest and most controversial reorganizations, including *Enron,*[31] *Worldcom,*[32] *Mirant,*[33] *New Century*[34] *Lyondell Chemical,*[35] *Washington Mutual,*[36] and *Lehman Brothers.*[37]  The notoriety of those cases reflected public concerns that an examiner helped to address.

The Debtors' cases implicate the public interest for many obvious reasons:  they are the subject of extraordinary media attention; many of the plaintiffs in the underlying litigations are

---

[29] For discussions of "legitimacy" in criminal law, see Tom R. Tyler, *Reducing Corporate Criminality: The Role of Values,* 51 AM. CRIM. L. REV. 267, 268–69 (2014)(defining legitimacy as "the belief that those in power deserve to rule and make decisions influencing the lives of everyone, and the perception that they "ought to be obeyed.") (quoting Ian Hurd, *Legitimacy and Authority in International Politics,* 53 INT'L ORG. 379, 381 (1999)).

[30] *See* 124 CONG. REC. S17, 403-34 (daily ed. Oct. 6, 1978) (statement of Senator DeConcini) (quoted in COLLIER ON BANKRUPTCY, App. 14.4(f)(iii) (15th ed., Rev 2002)).

[31] *In re* Enron Corp., No. 01-16034 (Bankr. S.D.N.Y. Dec. 2, 2001).

[32] *In re* Worldcom, No. 02-13533 (Bankr. S.D.N.Y. July 21, 2002).

[33] *In re* Mirant Corp., No. 03-46591 (Bankr. N.D. Tex., July 14, 2003).

[34] *In re* New Century TRS Holdings, Inc., No. 07-10416 (Bankr. D. Del. April 2, 2007).

[35] *In re* Lyondell Chemical Co., No. 09-10023 (REG) (Bankr. S.D.N.Y. Oct. 26, 2009).

[36] *In re* Washington Mutual, Inc., et al., No. 08-12229 (Bankr. D. Del. Nov. 1, 2008).

[37] *In re* Lehman Brothers Holdings, Inc., No. 08-13555 (Bankr. S.D.N.Y. Sept. 15, 2008).

This preprint research paper has not been peer reviewed. Electronic copy available at: https://ssrn.com/abstract=3532642



**TEMPLE** UNIVERSITY®
Beasley School of Law

1719 N. Broad Street                    fax 215-204-1185
Philadelphia, PA 19122              web www.temple.edu/lawschool

public actors (e.g., state and local governments); the opioid crisis of which these cases are a part has been characterized as a "public health emergency."[38]

There are also three other specific reasons why an examiner would be appropriate to address the public interest in this case. The first reflects a desire on the part of victims of the opioid crisis to "have their day in court" and to get a more complete accounting of Purdue Pharma's role in the opioid crisis.[39] If the Debtors confirm a plan along the lines suggested in the Informational Brief, the bankruptcy process would, for all practical purposes, foreclose that opportunity, and the closure that would come with it.

To be sure, the costs of vindicating the dignitary interests of thousands of alleged victims of the Debtors would be astronomical, and good reason for the Debtors to have sought chapter 11 protection. But merely suppressing this aspect of the opioid crisis in a chapter 11 plan would not relieve the pressure that many may feel to better understand the roots of the crisis.

It is not difficult to imagine, for example, that victims may believe that the Sacklers are seeking to hide behind chapter 11 in order to prevent revelation of their role.[40] It is also possible that the Sackler family has been inaccurately and unfairly maligned in the media. A bankruptcy examiner may help to substantiate the views of the plaintiff/victims, or the Sacklers, or neither. But, the ordinary operation of the chapter 11 process will provide no such clarity, and thus neither closure for the victims of the opioid crisis nor redemption for the Sacklers.

Second, the Debtors' cases may well be a template for other companies with opioid exposure. Much as *Manville* and *A.H. Robins* created models from which hundreds of cases involving mass tort liability were resolved, it seems highly likely that companies such as Johnson & Johnson, also facing opioid exposure, will watch the Debtors' cases closely. The conduct of this reorganization will have collateral consequences for other important cases involving opioid abuse, further magnifying the public impact.

Third, significant doubts about the legitimacy of the Debtors' reorganization may lead Congress to amend the Bankruptcy Code. This may be problematic for those who believe that Congress has generally done a poor job of amending the Bankruptcy Code in recent years.[41] Congress may be the ultimate voice of the public interest, but it is not necessarily one that understands chapter 11 very well.

---

[38] *See, e.g., Opioid Crisis* and other sources *supra* note 1.

[39] As the *New York Times* recently observed "The Purdue deal, the most comprehensive of any settlement so far in thousands of opioid-related cases nationwide, holds great symbolic as well as practical value." *See* Walsh, *supra* note 6.

[40] We note in this regard that the State of California recently amended its complaint to add "allegations regarding the Sackler family, who significantly contributed to, and profited from, the harmful impact of opioids in our communities." *See* Press Release, *Attorney General Becerra Files Amended Complaint in Lawsuit Against Purdue Pharma, Adds Eight Additional Members of the Sackler Family*, Oct. 3, 2019, available at https://oag.ca.gov/news/press-releases/attorney-general-becerra-files-amended-complaint-lawsuit-against-purdue-pharma.

[41] *See, e.g.,* Jonathan C. Lipson, *Bargaining Bankrupt: A Relational Theory of Contract in Bankruptcy*, 6 HARV. BUS. L. REV. 239, 294–95 (2016)(observing that "it is highly likely that any effort [by Congress] to amend the Bankruptcy Code today would be as fraught with cronyism as were the 2005 amendments to the Bankruptcy Code that have been decried for their ineptitude and bias.").

This preprint research paper has not been peer reviewed. Electronic copy available at: https://ssrn.com/abstract=3532642



TEMPLE UNIVERSITY®
Beasley School of Law

1719 N. Broad Street        *fax* 215-204-1185
Philadelphia, PA 19122      *web* www.temple.edu/lawschool

As one of us has explained elsewhere, "there is little doubt that examiners' reports in cases such as *Enron*, *Worldcom*, and *Lehman Brothers* performed an important public service in explaining the spectacular . . . collapses of these firms."[42]  So, too, in *Purdue Pharma*: the extraordinary public interest in these cases warrants a targeted bankruptcy examination.

We appreciate your attention to this matter.  We are at your disposal to discuss this further.

Best,

Jonathan C. Lipson

cc:    The Hon. Robert D. Drain, United States Bankruptcy Judge (via email)
       Peg Brickley, Wall Street Journal (via email)
       Marshall S. Huebner, Esq., Davis Polk & Wardwell (via email)
       Ira S. Dizengoff, Esq., Akin Gump Strauss Hauer & Feld LLP (via email)
       Arik Preis, Esq., Akin Gump Strauss Hauer & Feld LLP (via email)

---

[42] *Examining Success supra* note 8, at 9.

This preprint research paper has not been peer reviewed. Electronic copy available at: https://ssrn.com/abstract=3532642


TEMPLE UNIVERSITY®
Beasley School of Law

1719 N. Broad Street          *fax* 215-204-1185
Philadelphia, PA 19122        *web* www.temple.edu/lawschool

Appendix A—Signatories

| Name and Title | Affiliation |
|---|---|
| Ralph Brubaker, Carl L. Vacketta Professor of Law | University of Illinois College of Law |
| Kara J. Bruce, Professor of Law | University of Toledo College of Law |
| Laura Napoli Coordes, Associate Professor of Law | Arizona State University - Sandra Day O'Connor College of Law |
| A. Mechele Dickerson, Arthur L. Moller Chair in Bankruptcy Law and Practice | The University of Texas at Austin School of Law |
| Jared Ellias, Professor of Law | University of California, Hastings College of the Law |
| Pamela Foohey, Associate Professor of Law | University of Indiana Maurer School of Law |
| Edward J. Janger, David M. Barse Professor & Associate Dean for Research and Scholarship | Brooklyn Law School |
| Adam J. Levitin, Agnes N. Williams Research Professor; Professor of Law* | Georgetown University Law Center |
| Angela Littwin, Ronald D. Krist Professor of Law | University of Texas, Austin |
| Lynn M. LoPucki, Security Pacific Bank Distinguished Professor of Law | UCLA Law School |
| Stephen J. Lubben, Harvey Washington Wiley Chair in Corporate Governance & Business Ethics* | Seton Hall University School of Law |
| Ronald J. Mann, Albert E. Cinelli Enterprise Professor of Law and co-director of the Charles Evans Gerber Program in Transactional Studies at Columbia Law School | Columbia Law School |
| Nathalie Martin, Professor and Frederick M. Hart Chair in Consumer and Clinical Law | University of New Mexico School of Law |
| Megan McDermott, Lecturer | University of Wisconsin School of Law |

This preprint research paper has not been peer reviewed. Electronic copy available at: https://ssrn.com/abstract=3532642

# TEMPLE UNIVERSITY®
## Beasley School of Law

1719 N. Broad Street
Philadelphia, PA 19122

*fax* 215-204-1185
*web* www.temple.edu/lawschool

| | |
|---|---|
| Juliet M. Moringiello, Professor and Associate Dean for Research and Faculty Development | Widener University Commonwealth Law School |
| Chrystin Ondersma, Professor of Law | Rutgers Law School |
| Robert K. Rasmussen, J. Thomas McCarthy Trustee Chair in Law and Political Science | USC Gould School of Law |
| Mark J. Roe, David Berg Professor of Law | Harvard Law School |
| Jay L. Westbrook, Benno C. Schmidt Chair of Business Law | University of Texas at Austin School of Law |
| William J. Woodward, Jr., Professor of Law, Emeritus | Temple University-Beasley School of Law |

\* Original signatories.  Others joined subsequent to the initial submission on Nov. 5, 2019.

This preprint research paper has not been peer reviewed. Electronic copy available at: https://ssrn.com/abstract=3532642

**EXHIBIT 3**
**(Judge Drain Email)**

---

**Robert Drain** judge_drain@nysb.uscourts.gov <u>via</u> fedcourts.onmicrosoft.com          Tue, Nov 12, 2019, 2:39 PM    ☆  ↩  ⋮

to Jonathan ▾

Stop copying me on these letters and study the hearing transcripts.

**From:** Jonathan Lipson <<u>jonathan.lipson@temple.edu</u>>
**Sent:** Tuesday, November 12, 2019 12:08 PM
**To:** <u>william.k.harrington_usdoj.gov</u> <<u>william.k.harrington@usdoj.gov</u>>;
**Cc:** NYSBml_Drain's_Chambers <<u>rdd.chambers@nysb.uscourts.gov</u>>; Peg Brickley <<u>peg.brickley@wsj.com</u>>; <u>marshall.huebner@davispolk.com</u>;
<u>idizengoff@akingump.com</u>; Preis, Arik <<mark>apreis@akingump.com</mark>>; Adam Levitin <<u>adam.levitin@georgetown.edu</u>>; Stephen Lubben
<<u>stephen.lubben@gmail.com</u>>
**Subject:** In re Purdue Pharma--Examiner Appointment--Additional Signatories

Dear Mr. Harrington:

