**Hearing Date and Time: July 19, 2021, at 10:00 a.m. (prevailing Eastern Time)**
**Objection Date and Time: July 12, 2021 at 4:00 p.m. (prevailing Eastern Time)**

DAVIS POLK & WARDWELL LLP
450 Lexington Avenue
New York, New York 10017
Telephone: (212) 450-4000
Facsimile: (212) 701-5800
Marshall S. Huebner
Eli J. Vonnegut
James M. Millerman
Marc J. Tobak
Dylan A. Consla

*Counsel to the Debtors*
*and Debtors in Possession*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| **In re:** | **Chapter 11** |
| **PURDUE PHARMA L.P.,** *et al.*, | **Case No. 19-23649 (RDD)** |
| **Debtors.**[1] | **(Jointly Administered)** |

### NOTICE OF HEARING ON MOTION OF DEBTORS FOR ENTRY OF AN ORDER AUTHORIZING IMPLEMENTATION OF 2021 KEY EMPLOYEE INCENTIVE PLAN AND 2021 KEY EMPLOYEE RETENTION PLAN

**PLEASE TAKE NOTICE** that on June 28, 2021, the above-captioned debtors and

debtors in possession in these proceedings (collectively, the "**Debtors**") filed the *Motion of*

---

[1] The Debtors in these cases, along with the last four digits of each Debtor's registration number in the applicable jurisdiction, are as follows: Purdue Pharma L.P. (7484), Purdue Pharma Inc. (7486), Purdue Transdermal Technologies L.P. (1868), Purdue Pharma Manufacturing L.P. (3821), Purdue Pharmaceuticals L.P. (0034), Imbrium Therapeutics L.P. (8810), Adlon Therapeutics L.P. (6745), Greenfield BioVentures L.P. (6150), Seven Seas Hill Corp. (4591), Ophir Green Corp. (4594), Purdue Pharma of Puerto Rico (3925), Avrio Health L.P. (4140), Purdue Pharmaceutical Products L.P. (3902), Purdue Neuroscience Company (4712), Nayatt Cove Lifescience Inc. (7805), Button Land L.P. (7502), Rhodes Associates L.P. (N/A), Paul Land Inc. (7425), Quidnick Land L.P. (7584), Rhodes Pharmaceuticals L.P. (6166), Rhodes Technologies (7143), UDF LP (0495), SVC Pharma LP (5717) and SVC Pharma Inc. (4014). The Debtors' corporate headquarters is located at One Stamford Forum, 201 Tresser Boulevard, Stamford, CT 06901.

*Debtors for Entry of an Order Authorizing Implementation of 2021 Key Employee Incentive Plan and 2021 Key Employee Retention Plan* (the "**Motion**").  A hearing on the Motion will be held on **July 19, 2021** at **10:00 a.m.** (prevailing Eastern Time) (the "**Hearing**") before the Honorable Robert D. Drain, United States Bankruptcy Judge, United States Bankruptcy Court for the Southern District of New York, at the United States Bankruptcy Court for the Southern District of New York, 300 Quarropas Street, White Plains, New York 10601 (the "**Bankruptcy Court**"), or at such other time as the Bankruptcy Court may determine.

PLEASE TAKE FURTHER NOTICE that pursuant to General Order M-543, dated March 20, 2020 (Morris, C.J.) ("**General Order M-543**"), and at the Bankruptcy Court's directive, the Hearing will be conducted via Zoom® videoconference so long as General Order M-543 is in effect, or unless otherwise ordered by the Bankruptcy Court.[2]  Parties wishing to appear at, or attend, an omnibus hearing conducted via Zoom® videoconference are required to register their appearance by 4:00 p.m. (prevailing Eastern Time) the day before such omnibus hearing at https://ecf.nysb.uscourts.gov/cgi-bin/nysbAppearances.pl.

PLEASE TAKE FURTHER NOTICE that the Hearing may be continued or adjourned thereafter from time to time without further notice other than an announcement of the adjourned date or dates at the Hearing or a later hearing.  The Debtors will file an agenda before the Hearing, which may modify or supplement the motions to be heard at the Hearing.

PLEASE TAKE FURTHER NOTICE that any responses or objections (the "**Objections**") to the Motion shall be in writing, shall conform to the Federal Rules of Bankruptcy Procedure and the Local Bankruptcy Rules for the Southern District of New York, shall be filed with the Bankruptcy Court (a) by attorneys practicing in the Bankruptcy Court,

---

[2] A copy of General Order M-543 can be obtained by visiting https://www.nysb.uscourts.gov/news/general-order-m-543-court-operations-under-exigent-circumstances-created-covid-19.

including attorneys admitted *pro hac vice*, electronically in accordance with General Order M-399 (which can be found at https://www.nysb.uscourts.gov/sites/default/files/m399.pdf), and (b) by all other parties in interest, on a CD-ROM, in text-searchable portable document format (PDF) (with a hard copy delivered directly to Chambers), in accordance with the customary practices of the Bankruptcy Court and General Order M-399, to the extent applicable, and shall be served in accordance with the *Second Amended Order Establishing Certain Notice, Case Management, and Administrative Procedures* entered on November 18, 2019 [ECF No. 498], so as to be filed and received no later than **July 12, 2021** at **4:00 p.m.** (prevailing Eastern Time) (the "**Objection Deadline**").

PLEASE TAKE FURTHER NOTICE that any objecting parties are required to attend the Hearing and a failure to appear may result in relief being granted upon default; *provided* that objecting parties shall attend the Hearing via Zoom® so long as General Order M-543 is in effect or unless otherwise ordered by the Bankruptcy Court.

PLEASE TAKE FURTHER NOTICE that if no Objections are timely filed and served with respect to the Motion, the Debtors may, on or after the Objection Deadline, submit to the Bankruptcy Court an order substantially in the form of the proposed order annexed to the Motion, which order may be entered without further notice or opportunity to be heard.

PLEASE TAKE FURTHER NOTICE that copies of the Motion may be obtained free of charge by visiting the website of Prime Clerk LLC at https://restructuring.primeclerk.com/purduepharma.  You may also obtain copies of any pleadings by visiting the Bankruptcy Court's website at https://www.nysb.uscourts.gov in accordance with the procedures and fees set forth therein.

[*Remainder of Page Intentionally Left Blank*]

Dated: June 28, 2021
      New York, New York

DAVIS POLK & WARDWELL LLP

*/s/ Eli J. Vonnegut*_____

450 Lexington Avenue
New York, New York 10017
Telephone: (212) 450-4000
Facsimile: (212) 701-5800
Marshall S. Huebner
Eli J. Vonnegut
James M. Millerman
Marc J. Tobak
Dylan A. Consla

*Counsel to the Debtors*
*and Debtors in Possession*

DAVIS POLK & WARDWELL LLP
450 Lexington Avenue
New York, New York 10017
Telephone: (212) 450-4000
Facsimile: (212) 701-5800
Marshall S. Huebner
Eli J. Vonnegut
James M. Millerman
Marc J. Tobak
Dylan A. Consla

*Counsel to the Debtors*
*and Debtors in Possession*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| **In re:** | **Chapter 11** |
| **PURDUE PHARMA L.P.,** *et al.*, | **Case No. 19-23649 (RDD)** |
| **Debtors.**[1] | **(Jointly Administered)** |

**MOTION OF DEBTORS FOR ENTRY OF AN ORDER AUTHORIZING**
**IMPLEMENTATION OF 2021 KEY EMPLOYEE INCENTIVE**
**PLAN AND 2021 KEY EMPLOYEE RETENTION PLAN**

The above-captioned debtors and debtors-in-possession (collectively, the "**Debtors**," the

"**Company**," or "**Purdue**"), by and through their undersigned counsel, hereby submit this *Motion*

*of Debtors for Entry of an Order Authorizing Implementation of 2021 Key Employee Incentive*

*Plan and 2021 Key Employee Retention Plan* (the "**Motion**"). In support of the Motion, the

---

[1] The Debtors in these cases, along with the last four digits of each Debtor's registration number in the applicable jurisdiction, are as follows: Purdue Pharma L.P. (7484), Purdue Pharma Inc. (7486), Purdue Transdermal Technologies L.P. (1868), Purdue Pharma Manufacturing L.P. (3821), Purdue Pharmaceuticals L.P. (0034), Imbrium Therapeutics L.P. (8810), Adlon Therapeutics L.P. (6745), Greenfield BioVentures L.P. (6150), Seven Seas Hill Corp. (4591), Ophir Green Corp. (4594), Purdue Pharma of Puerto Rico (3925), Avrio Health L.P. (4140), Purdue Pharmaceutical Products L.P. (3902), Purdue Neuroscience Company (4712), Nayatt Cove Lifescience Inc. (7805), Button Land L.P. (7502), Rhodes Associates L.P. (N/A), Paul Land Inc. (7425), Quidnick Land L.P. (7584), Rhodes Pharmaceuticals L.P. (6166), Rhodes Technologies (7143), UDF LP (0495), SVC Pharma LP (5717) and SVC Pharma Inc. (4014). The Debtors' corporate headquarters is located at One Stamford Forum, 201 Tresser Boulevard, Stamford, CT 06901.

Debtors rely on the *Declaration of Jon Lowne in Support of the Motion of Debtors for Entry of an Order Authorizing Implementation of 2021 Key Employee Incentive Plan and 2021 Key Employee Retention Plan* (the "**Lowne Declaration**" or "**Lowne Decl.**"), attached hereto as **Exhibit B**, and the *Declaration of Josephine Gartrell in Support of the Motion of Debtors for Entry of an Order Authorizing Implementation of 2021 Key Employee Incentive Plan and 2021 Key Employee Retention Plan* (the "**Willis Towers Declaration**" or "**Willis Towers Decl.**"), attached hereto as **Exhibit C**, and respectfully state as follows:

## JURISDICTION AND VENUE

1.      The United States Bankruptcy Court for the Southern District of New York (the "**Court**") has jurisdiction to consider this matter pursuant to 28 U.S.C. §§ 157 and 1334 and the *Amended Standing Order of Reference M-431*, dated January 31, 2012 (Preska, C.J.).  This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2) and, pursuant to Rule 7008 of the Federal Rules of Bankruptcy Procedure (the "**Bankruptcy Rules**"), the Debtors consent to entry of a final order by the Court in connection with this Motion to the extent that it is later determined that the Court, absent consent of the parties, cannot enter a final order or judgment consistent with Article III of the United States Constitution.

2.      Venue is proper before the Court pursuant to 28 U.S.C. §§ 1408 and 1409.

## BACKGROUND

3.      On September 15, 2019 (the "**Petition Date**"), the Debtors commenced the above-captioned chapter 11 cases (the "**Chapter 11 Cases**") by filing with the Court voluntary petitions for relief under chapter 11 of the Bankruptcy Code (as defined below).  The Debtors continue to operate their businesses and manage their properties as debtors in possession, pursuant to sections

1107(a) and 1108 of the United States Code, 11 U.S.C. § 101 *et seq.* (as amended or modified, the "**Bankruptcy Code**").

4.      On September 27, 2019, the United States Trustee for Region 2 appointed an official committee of unsecured creditors (the "**UCC**"). *See Notice of Appointment of Official Committee of Unsecured Creditors* [ECF 131].

5.      Information about the Debtors' businesses and the events leading up to the Petition Date can be found in the *Debtors' Informational Brief* filed on September 16, 2019 [ECF 17], which is incorporated herein by reference.

6.      The Debtors' Chapter 11 Cases are being jointly administered pursuant to Bankruptcy Rule 1015(b) and the *Order Directing Joint Administration of Chapter 11 Cases* [ECF 59], entered by the Court on September 18, 2019 in each of the Chapter 11 Cases.

## PRELIMINARY STATEMENT

7.      The Debtors and their stakeholders have made tremendous progress in these Chapter 11 Cases since this Court approved compensation programs for calendar year 2020, which effectively took the place of the Debtors' longstanding, annually renewed incentive compensation programs.  The disclosure statement approved by this Court on June 3, 2021 reflects broad support for the Debtors' proposed plan of reorganization from most of the Debtors' creditor constituencies, including the UCC, the Ad Hoc Committee of Governmental and Other Contingent Litigation Claimants (the "**Ad Hoc Committee**"), the Multi-State Governmental Entities Group (the "**MSGE**"), the Native American Tribes Group, the Ad Hoc Group of Individual Victims, the Ad Hoc Group of Hospitals, the Third-Party Payor Group, the Ratepayer Mediation Participants and the NAS Committee.  While solicitation is ongoing, the Debtors continue to work tirelessly to build further support for their proposed plan of reorganization, including through two different

3

mediations approved by this Court, to prepare for a successful confirmation hearing beginning on August 9, 2021, and to complete the myriad steps necessary for a smooth emergence, so that the value of the Debtors' estates can be put to work helping address and combat the opioid crisis as quickly as possible.

8.    The Debtors' workforce has been instrumental both in achieving the progress to date and in shepherding the Debtors' assets and businesses through these challenging Chapter 11 Cases to enable the reorganized Debtors to put as much estate value as possible to work for the American people.  That value—measured in the billions—depends on the efforts and skill of the Debtors' employees.  The experience, expertise and knowledge of the Debtors' highly skilled, trained and educated workforce is necessary to allow the Debtors to operate in their highly regulated industry and navigate the challenges stemming from the Debtors' restructuring. Motivation and retention of the Debtors' valuable key employees, through continued appropriate and competitive compensation, remains mission critical to maintaining and driving productivity, morale and achievement to maximize value for the benefit of all stakeholders.

9.    This Court has had several prior occasions to consider the Debtors' longstanding, annually authorized compensation programs, having first approved consensually modified payments under such compensation programs on account of 2019 and earlier performance periods and subsequently approving a key employee incentive plan (the "**2020 KEIP**") and a key employee retention plan (the "**2020 KERP**" and, together with the 2020 KEIP, the "**2020 Compensation Plans**"), which were closely based on such longstanding programs, again subject to consensually modified payments and other terms.

10.    This Court recognized that the structure of the 2020 Compensation Plans was "consistent with industry standards," Hr'g Tr., 138:1, Sept. 30, 2020, and that the 2020

4

Compensation Plans were necessary to keep the compensation of the Debtors' employees in line with the market. Hr'g Tr., 142:16–20, Sept. 30, 2020 (observing with respect to various employee populations that "[t]he record is clear that these payments, in addition to . . . tracking a longstanding practice of over 30 years, in most cases, albeit reduced from what they were prepetition, [are] necessary to compensate these employees at market in their industry"); Hr'g Tr., 23:8–10, Oct. 28, 2020 ("[T]he revised proposal does place these executives in the middle of industry compensation for people performing jobs like theirs . . . ."); Hr'g Tr., 46:2–8, Nov. 17, 2020 ("[T]he proposed KEIP for these two individuals . . . clearly put[s] their treatment at market for similar pharmaceutical companies even though Purdue obviously is in a bankruptcy case with substantial additional tasks to be performed by these two people."). Moreover, this Court has recognized that these programs are "part of annual compensation." Hr'g Tr., 52:13–14, Nov. 17, 2020. Accordingly, the Debtors believe that continuation of these programs for 2021 is critical in order to appropriately incentivize and compensate the Debtors' employees, just as they were in 2019 and 2020. The Debtors therefore propose the adoption of a 2021 key employee incentive plan (the "**2021 KEIP**") and a 2021 key employee retention plan (the "**2021 KERP**" and, together with the 2021 KEIP, the "**2021 Compensation Plans**").

11.    Given the extensive discussion and analysis of the 2020 Compensation Plans both by creditors (including the UCC, the Ad Hoc Committee and the MSGE) and by the Court, the 2021 Compensation Plans are modeled closely on the 2020 Compensation Plans. The Debtors' compensation consultants at Willis Towers Watson have also again benchmarked the compensation that the Debtors seek to award under the 2021 Compensation Plans against compensation at similar, non-debtor pharmaceutical companies as well as against similar compensation programs of other chapter 11 debtors. Willis Towers Watson did so using its

standard methodology of updating its survey data along with the Debtors' revenue to benchmark the 2021 Compensation Plans. The results of this benchmarking exercise demonstrate that the compensation the Debtors seek to award each 2021 KEIP Participant (as defined below), on average, has declined modestly from 2020 in its market positioning, that the market position of the 2021 KERP remains similar to that of the 2020 KERP and that the total cost of the 2021 Compensation Plans remains similarly positioned against compensation programs of similar chapter 11 debtors.

12.    The modest differences between the 2021 Compensation Plans and the 2020 Compensation Plans result from ordinary, year-to-year increases in base salary and, with respect to participants in the 2021 KERP, promotions and other changes to the employee population. Importantly, in order to ensure that the Debtors and their stakeholders can focus on the critical work needed to advance the proposed plan of reorganization, the award amounts for which the Debtors now seek approval under the proposed 2021 Compensation Plans take into account all the heavily negotiated reductions and other substantial concessions agreed to by the Debtors with respect to the 2020 Compensation Plans. Moreover, in addition to the two executives who separated from the Debtors while the motion to approve the 2020 KEIP was under consideration, a participant in the 2020 KEIP has since separated from the Debtors, naturally reducing the amount of compensation for which the Debtors seek approval. Accordingly, the Court should approve the 2021 Compensation Plans for the same reasons that it approved the 2020 Compensation Plans.

## THE DEBTORS' HISTORICAL COMPENSATION PLANS

13.    As set forth in greater detail in the *Motion of Debtors for Entry of an Order Authorizing (I) Debtors to (A) Pay Pre-Petition Wages, Salaries, Employee Benefits and Other Compensation and (B) Maintain Employee Benefits Programs and Pay Related Administrative*

*Obligations, (II) Employees and Retirees to Proceed with Outstanding Workers' Compensation Claims and (III) Financial Institutions to Honor and Process Related Checks and Transfers* [ECF 6],[2] for more than 30 years the Debtors maintained a performance-based Annual Incentive Plan (the "**AIP**") for the majority of their employees. The AIP provided annual cash bonuses tied to achievement of company and individual performance metrics. Lowne Decl. ¶ 4. The Debtors also maintained a Long-Term Results Plan (the "**LTRP**" and, together with the AIP, the "**Prepetition Compensation Plans**") for nearly twenty years, under which eligible employees received annual grants that could result in cash payouts based on achievement of performance goals measured over a three-year performance period. Lowne Decl. ¶ 4. The Prepetition Compensation Plans were used effectively for years to drive performance and productivity. Lowne Decl. ¶ 4.

14.    The Debtors have also historically maintained various retention plans in the ordinary course of business, as needed, to retain key employees. Lowne Decl. ¶ 5. The Debtors implemented retention plans for certain executive and non-executive employees in both 2018 and 2019, which were carefully calibrated to ensure that key employees were incentivized to remain employed with the Debtors through the end of 2020, which was deemed a critical period for the Debtors. The retention plan approved by this Court in December 2019 (the "**2019 Retention Plan**") provided for cash-based awards to approximately 120 non-insider employees and was structured to retain their services through December 31, 2020.[3] Lowne Decl. ¶ 5.

---

[2] Additional information about the AIP and LTRP (each as defined below) can be found in the *Second Supplemental Declaration of Jon Lowne in Support of the Motion of Debtors for Entry of an Order Authorizing (I) Debtors to (A) Pay Pre-Petition Wages, Salaries, Employee Benefits and Other Compensation and (B) Maintain Employee Benefits Programs and Pay Related Administrative Obligations, (II) Employees and Retirees to Proceed with Outstanding Workers' Compensation Claims and (III) Financial Institutions to Honor and Process Related Checks and Transfers* [ECF 554].

[3] *See Supplemental Final Order Authorizing (I) Debtors to (A) Pay Certain Pre-Petition Wages, Salaries, Employee Benefits and Other Compensation and (B) Maintain Employee Benefits Programs and Pay Related Administrative*

## APPROVAL OF 2019 AND 2020 PROGRAMS WITH NEGOTIATED ADJUSTMENTS

15.    In September 2019, the Debtors sought authority from this Court to make payments (the "**2019 Payments**") owed under the 2019 AIP, outstanding LTRPs with payments due in early 2020 and the 2019 Retention Plan.  Following extensive negotiations with their various creditor constituencies and agreed modifications, the Debtors secured the support or non-objection of all parties in the case (including the UCC) other than the Ad Hoc Group of Non-Consenting States (the "**NCSG**"), and the negotiated payments were approved by the Court.  In authorizing the Debtors to make the 2019 Payments with the negotiated reductions, this Court observed that the 2019 Payments were appropriate because the Company should have "a proper compensation structure.  Because otherwise what they own is going to deteriorate."  Hr'g Tr., 113:5–7, Dec. 4, 2019.

16.    In 2020, the Debtors replaced the Prepetition Compensation Plans with the 2020 KEIP and 2020 KERP, which closely paralleled the Prepetition Compensation Plans.  Lowne Decl. ¶ 7.  Payments under the annual award component of the 2020 KEIP (the "**2020 KEIP Annual Award**") and the long-term incentive compensation grant component of the 2020 KEIP (the "**2020 KEIP Long-Term Award**") were both contingent upon the Debtors' achievement of certain 2020 performance metrics (the "**2020 Performance Metrics**") pertaining to value creation, innovation and efficiency, and people and culture that were similar to the Debtors' historical metrics under the Prepetition Compensation Plans.  If the Debtors failed to meet the threshold level for the 2020 Performance Metrics, no 2020 KEIP Annual Award or 2020 KEIP Long-Term Award would have been paid to any participant in the 2020 KEIP.  Payments under the annual award component of

---

*Obligations, (II) Employees and Retirees to Proceed with Outstanding Workers' Compensation Claims and (III) Financial Institutions to Honor and Process Related Checks and Transfers* [ECF 629] (the "**Supplemental Final Wages Order**").

the 2020 KERP (the "**2020 KERP Annual Award**"), the long-term compensation grant component of the 2020 KERP (the "**2020 KERP Long-Term Award**") and the continuation of the Debtors' program of making targeted retention payments to certain employees under the 2020 KERP (the "**2020 Targeted Retention Awards**") were not subject to performance criteria so as to provide participants in the 2020 KERP with greater certainty about their compensation.  Lowne Decl. ¶ 8.  The 2020 KEIP and 2020 KERP were consistent with the Debtors' historical practice, competitive with the market and necessary for the preservation of the value of the Debtors' estates. Lowne Decl. ¶ 8.

17.    The initial proposed 2020 KEIP and 2020 KERP included significant reductions in payments as compared to the Debtors' historical practices.  Moreover, the Debtors again engaged in intensive negotiations with key creditor groups and agreed to yet further reductions.  The Debtors' agreed-upon reductions to the 2020 KEIP in both the initial motion and subsequent negotiations for each of the five 2021 KEIP Participants (as defined below) are set forth in **Table 1** below:

**TABLE 1**

| KEIP Participant | Stage | Agreed Reduction in Amount of: | | | Total Reduction |
| --- | --- | --- | --- | --- | --- |
| | | KEIP Annual Award | LTRP Payouts Due in 2022 | LTRP Grant Payable in 2023 | |
| **President & Chief Executive Officer** | Motion: | ($715,639) | ($339,207) | ($811,588) | ($1,866,434) |
| | Negotiation: | ($593,000) | ($55,651) | ($36,521) | ($685,172) |
| | **Total:** | **($1,308,639)** | **($394,858)** | **($848,109)** | **($2,551,606)** |
| **Executive Vice President, Chief Financial Officer** | Motion: | ($89,991) | ($49,003) | ($200,000) | ($338,994) |
| | Negotiation: | ($0) | ($16,766) | ($9,000) | ($25,766) |
| | **Total:** | **($89,991)** | **($65,769)** | **($209,000)** | **($364,760)** |
| **Executive Vice President, General Counsel and Corporate Secretary** | Motion: | ($502,579) | ($119,720) | ($515,000) | ($1,137,299) |
| | Negotiation: | ($175,000) | ($40,963) | ($23,175) | ($239,138) |
| | **Total:** | **($677,579)** | **($160,683)** | **($538,175)** | **($1,376,437)** |

| | | | | |
|---|---|---|---|---|
| **Chief Technical Operations Officer** | Motion: | ($75,774) | ($46,493) | ($200,000) | ($322,267) |
| | Negotiation: | ($54,753) | ($15,908) | ($9,000) | ($79,661) |
| | **Total:** | **($130,527)** | **($62,401)** | **($209,000)** | **($401,928)** |
| **President, Rhodes Pharmaceuticals** | Motion: | ($29,645) | ($13,367) | ($59,225) | ($102,237) |
| | Negotiation: | ($31,501) | ($4,573) | ($2,665) | ($38,739) |
| | **Total:** | **($61,146)** | **($17,940)** | **($61,890)** | **($140,976)** |
| **Total:** | Motion: | ($1,413,628) | ($567,790) | ($1,785,813) | ($3,767,231) |
| | Negotiation: | ($854,254) | ($133,861) | ($80,361) | ($1,068,476) |
| | **Total:** | **($2,267,882)** | **($701,651)** | **($1,866,174)** | **($4,835,707)** |

18. Changes to the 2020 KERP included, among other things, reducing the total amount of payments to be made by over $4,000,000 in the aggregate.

19. Following the agreed modifications, none of the UCC, NCSG, Ad Hoc Committee or MSGE objected to the approval of the 2020 KEIP or 2020 KERP, including the 2020 Targeted Retention Awards,[4] and the Court authorized the 2020 Compensation Plans with the negotiated modifications.[5] In authorizing the 2020 KEIP, the Court observed that "the revised proposal does place these executives in the middle of industry compensation." Hr'g Tr., 23: 6–10, Oct. 28, 2020. Similarly, the Court observed with respect to the 2020 KERP that the "payments, in addition to . . . tracking a longstanding practice of over 30 years," were "necessary to compensate these employees at market in their industry." Hr'g Tr., 142: 16–20, Sept. 30, 2020.

---

[4] *See* 2020 KERP Reply; *Debtors' Supplemental Statement in Support of Motion of Debtors for Entry of an Order Authorizing Implementation of a Key Employee Incentive Plan and a Key Employee Retention Plan* [ECF 1847] (the "**First Supplemental 2020 KEIP Statement**"); *Debtors' Supplemental Reply in Support of Motion of Debtors for Entry of an Order Authorizing Implementation of a Key Employee Incentive Plan and a Key Employee Retention Plan* [ECF 1960] (the "**Second Supplemental 2020 KEIP Statement**").

[5] *See Order Authorizing the Debtors to Implement a Key Employee Retention Plan* [ECF 1762]; *Order Authorizing the Debtors to Implement a Key Employee Incentive Plan* [ECF 1861] (the "**2020 KEIP Order**"); and *Supplemental Order Authorizing the Debtors to Implement a Key Employee Incentive Plan* [ECF 2002] (the "**Supplemental 2020 KEIP Order**").

## THE PROPOSED COMPENSATION PLANS

20.    The Debtors are now seeking approval to renew the 2020 Compensation Plans for 2021—importantly incorporating the highly negotiated reductions described above, subject to ordinary course, year-over-year increases, and certain further reductions driven by employee attrition since the Debtors sought approval of the 2020 Compensation Plans.  The Debtors again rely on declarations by Mr. Lowne and Willis Towers Watson to establish that the Debtors' compensation programs are reasonable and necessary to maximize the value of their business.

21.    The attrition levels that the Debtors continued to experience last year under a similar compensation program have reinforced the Debtors' strong belief that maintaining compensation in line with the Debtors' historical practice and competitive with the market is critical to their ability to motivate and retain their highly skilled workforce, and that a reduction in historical compensation levels would damage the business.  The Debtors are drawing closer to completing a value-maximizing restructuring and emergence from bankruptcy and need the continued support of their employees to complete the process and deliver as much value as possible to their stakeholders upon completion.  Lowne Decl. ¶ 41.

22.    The 2021 Compensation Plans, like the 2020 Compensation Plans they are based on, are designed to continue to balance two paramount needs of the Debtors: first, the need to pay competitive and motivating compensation and give the workforce clarity regarding compensation to avoid further increases in attrition, and second, the need to tailor their compensation practices to their present circumstances—in particular, the current phase and target trajectory of these Chapter 11 Cases.  Lowne Decl. ¶ 11.  The resulting package includes the following components:

   a)    the 2021 KEIP described in Section I, below, for insider employees that, like the 2020 KEIP, replaces the 2021 AIP award that otherwise would have been payable in 2022 with an incentive-based award and provides for a long-term award payable

in 2024 in place of the LTRP grant that participants otherwise would have received in 2021; and

b)   the broadly applicable 2021 KERP described in Section II, below, for non-insider employees that, like the 2020 KERP, replaces the 2021 AIP award that otherwise would have been payable in 2022 with a retention award, provides for a long-term award payable in 2024 in place of the LTRP grant that participants otherwise would have received in 2021, and provides for additional targeted retention payments for certain employees.

Lowne Decl. ¶¶ 12–13.

23.    Consistent with their practice last year with respect to the 2020 Compensation Plans, the Debtors and their management team worked extensively with Willis Towers Watson as their independent compensation consultant to benchmark the Debtors' employee compensation against the market, taking into account the Debtors' unique circumstances when designing the 2021 Compensation Plans.  Lowne Decl. ¶ 14; Willis Towers Decl. ¶¶ 11–13.

24.    The Debtors' employees continue to bear uncommon burdens, worsened by continuing attrition—combined with an industry-wide difficult hiring market—leading to a high workload for remaining employees and further exacerbated by the complex and charged nature of these chapter 11 proceedings.  Lowne Decl. ¶ 15.  The Company maintains lean operations, and in the face of ongoing attrition, the Debtors have struggled to fill open positions.  Indeed, 28 positions have opened at the Company year to date, with 17 remaining unfilled as of the date of this Motion. Lowne Decl. ¶ 15.  And the eleven filled positions remained vacant, on average, for more than 42 days.  Lowne Decl. ¶ 15.

25.    At the same time, the Debtors' employees continue to be tasked with achieving a critically important goal—preserving the Debtors' estates' value while also positioning the Debtors' estates to be a uniquely powerful asset in the fight against the opioid crisis.  While the Debtors hope and believe that they are drawing closer to a successful conclusion of these Chapter

12

11 Cases, obstacles to a prompt emergence remain. Departing from the Debtors' historical compensation practices during the period over which the Debtors hope to deliver a successful emergence from these Chapter 11 Cases for all stakeholders could jeopardize the Debtors' ability to retain and motivate the individuals they need to complete that process and to maintain their business operations, thereby putting at risk the Debtors' ability to deliver value to their stakeholders. Lowne Decl. ¶ 16. Aggregate compensation under the proposed 2021 Compensation Plans remains consistent both with the levels negotiated with the UCC and other critical stakeholders under the 2020 Compensation Plans and generally <u>below</u> the compensation levels under the Debtors' longstanding Prepetition Compensation Plans, because of the reductions to certain of the 2020 Compensation Plans that were negotiated with the UCC and other critical stakeholders last year that would remain in place under the proposed 2021 KEIP and 2021 KERP.

## I.    The Proposed 2021 KEIP

### A.    <u>Participants</u>

26.    The proposed 2021 KEIP would apply to the Debtors' five current insider employees, consisting of the: (i) President & Chief Executive Officer (the "**CEO**"); (ii) Executive Vice President, Chief Financial Officer (the "**CFO**"); (iii) Executive Vice President, General Counsel and Corporate Secretary (the "**General Counsel**"); (iv) Chief Technical Operations Officer; and (v) President, Rhodes Pharmaceuticals (collectively, the "**2021 KEIP Participants**" and each, a "**2021 KEIP Participant**"). The Debtors believe that it is important to continue to incentivize the 2021 KEIP Participants, as their institutional knowledge and skills remain essential to guiding the Debtors through their novel restructuring and maximizing the value of the Debtors' estates through the conclusion of the Chapter 11 Cases. Lowne Decl. ¶ 17.

27.     The 2021 KEIP Participants continue to perform a variety of functions for the Debtors, including providing critical management, operations, finance and legal services.  They are responsible for helping determine the Debtors' strategic plan and facilitating the achievement of the Debtors' goals.   Lowne Decl. ¶ 18.   In addition to these significant day-to-day responsibilities, these individuals' workloads remain further elevated as a result of the Chapter 11 Cases and the Debtors' smaller workforce.  Lowne Decl. ¶ 18.  Moreover, where the Debtors last year first sought authority to pay eight participants under the 2020 KEIP, only five 2021 KEIP Participants remain, dividing the same crucial leadership roles among a leaner executive team. Lowne Decl. ¶ 18.  The 2021 KEIP Participants continue to make extraordinary efforts to shepherd the Debtors' businesses, maximize estate value and steer the Debtors through their still incredibly complex restructuring.  Lowne Decl. ¶ 18.  Accordingly, the Debtors believe that the 2021 KEIP Participants should continue to be appropriately incentivized to ensure optimal recoveries for all stakeholders.  None of the 2021 KEIP Participants will be eligible to participate in the proposed 2021 KERP (including the 2021 Targeted Retention Awards, as defined below), and the purpose of the proposed 2021 KEIP is to incentivize the 2021 KEIP Participants.  Lowne Decl. ¶ 18.

B.     Structure

28.     As further discussed below, each 2021 KEIP Participant will receive an award comprised of (i) an annual award (the "**2021 KEIP Annual Award**") with a target value, which is also the award's maximum value, set forth in **Table 2**, below, and (ii) a long-term incentive compensation grant payable in 2024 (the "**2021 KEIP Long-Term Award**").  Lowne Decl. ¶ 19.

29.     2021 KEIP Annual Award payments will be contingent upon the Debtors' achievement of certain 2021 performance metrics discussed in more detail below (the "**2021 Performance Metrics**"), at the threshold or target performance levels, as applicable, with straight-

line interpolation to be used if such actual performance falls between such amounts.  Lowne Decl.

¶ 20.  No payment under the 2021 KEIP Annual Award would be made to any of the 2021 KEIP

Participants if the Debtors fail to meet the threshold level for the 2021 Performance Metrics.  The

maximum cost of the 2021 KEIP Annual Award is $5,392,700.  Lowne Decl. ¶ 20.

### TABLE 2

| KEIP Participant | Payout Range = 75% to 100% | |
| --- | --- | --- |
| | Threshold 2021 KEIP Annual Award | Target 2021 KEIP Annual Award |
| President & Chief Executive Officer | $1,645,125 | $2,193,500 |
| Executive Vice President, Chief Financial Officer | $566,925 | $755,900 |
| Executive Vice President, General Counsel and Corporate Secretary | $1,320,375 | $1,760,500 |
| Chief Technical Operations Officer | $316,350 | $421,800 |
| President, Rhodes Pharmaceuticals | $195,750 | $261,000 |
| Total | $4,044,525 | $5,392,700 |

30.    Each 2021 KEIP Participant's target 2021 KEIP Annual Award is equal to the target

amount of the 2021 AIP award that the participant otherwise would have been eligible to receive,

as reduced by the same concessions that were agreed with respect to the 2020 KEIP Annual Award

approved last year.  Lowne Decl. ¶ 21.

31.    The 2020 KEIP Annual Award also included a component replacing and

repurposing the LTRP payouts that otherwise would have been payable in early 2021.  This year,

the corresponding LTRP payouts that otherwise would have been payable in early 2022 have

already been approved by the Court.  Accordingly, the 2021 KEIP Annual Award does not include

any component replicating those awards.  The proposed amount of the 2021 KEIP Annual Award

is therefore correspondingly lower than equivalent awards with respect to the 2020 KEIP.  Lowne

Decl. ¶ 22.

32.    Subject to achievement of the 2021 Performance Metrics at a threshold level, the

2021 KEIP Annual Award will be paid as follows: (i) subject to the 2021 KEIP Participant's

continued employment through the payment date (other than as provided below), 50% paid on the

Company regular payroll date closest to October 1, 2021, subject to clawback of the full amount paid if the 2021 KEIP Participant resigns or is terminated for any reason other than by the Debtors without cause prior to March 15, 2022, which mirrors the approximate historical payment date of the Debtors' longstanding AIP, and (ii) subject to the 2021 KEIP Participant's continued employment through the payment date, the remaining 50% paid on the Company regular payroll date closest to March 15, 2022.[6]  Lowne Decl. ¶ 23.  The first payment amount will assume target-level performance and the second payment will include a true-up, if any, including a potential clawback of the first payment for any amount that would not have otherwise been paid if threshold or target performance is not met.  Lowne Decl. ¶ 23.  If the Debtors emerge at any time prior to any outstanding payment date, the remaining full 2021 KEIP Annual Award payment would be paid on the emergence date at the target 2021 KEIP Annual Award value, again subject to clawback (a) of the full amount paid if the 2021 KEIP Participant resigns or is terminated for any reason other than by the Debtors without cause prior to March 15, 2022, or (b) for any amount that would not have otherwise been paid if threshold or target performance is not met (such clawback to occur by March 15, 2022).  Lowne Decl. ¶ 23.  All amounts payable under the 2021 KEIP Annual Award will be subject to acceleration at the target 2021 KEIP Annual Award value in the event of a termination of employment by the Debtors without cause, subject to clawback for any amount that would not have otherwise been paid if threshold or target performance is not met (such clawback to occur by March 15, 2022).  Lowne Decl. ¶ 23; Willis Towers Decl. ¶ 17.

---

[6] These dates represent a minor deviation from the timeline approved in connection with the 2020 KEIP Annual Award.  The 2020 KEIP Annual Award is subject to a clawback date of the earlier of June 30, 2021 and emergence, and the Court approved payment dates on the closest scheduled payroll dates to November 1, 2020 and March 31, 2021 (for the Debtors' CEO and CFO, the first payment was set for the closest scheduled payroll date to November 18, 2020).  *See* First Supplemental KEIP Statement ¶ 4 & n.4; Second Supplemental KEIP Statement ¶ 4 & n.5; Supplemental 2020 KEIP Order.  This year, in light of their impending emergence, the Debtors believe that preserving a clawback right based on their historical compensation timeline irrespective of when emergence occurs is prudent and thus are seeking approval of a March 15, 2022 clawback date for the 2021 KEIP Annual Award and 2021 KEIP Annual Award payment dates on the closest scheduled payroll dates to October 1, 2021 and March 15, 2022.

33.     Consistent with Purdue's longstanding compensation practices, each 2021 KEIP Participant will also receive a 2021 KEIP Long-Term Award, which is designed to mimic the economic structure of the LTRP grant that the participant otherwise would have received in 2021, payable in 2024.  Lowne Decl. ¶ 24.  The target amount of the 2020 KEIP Long-Term Award included a 52.25% aggregate reduction (consisting of an initial 50% reduction in the original proposal and a further 4.5% reduction of the already reduced amount that was agreed with the UCC and other key stakeholders) as compared to the target LTRP grant that otherwise would have been received based on historical practice.  Lowne Decl. ¶ 24.  The same aggregate reduction of 52.25% has been applied to the target amount of the 2021 KEIP Long-Term Award.  Actual payouts will be based on the same 2021 Performance Metrics that apply to the 2021 KEIP Annual Award that are described below, and therefore will depend solely on the Company's performance in 2021.  Lowne Decl. ¶ 24.

34.     Consistent with changes made to the 2020 KEIP Long-Term Awards at the request of creditors, payments due under the 2021 KEIP Long-Term Awards will accelerate at target value upon the Debtors' emergence from bankruptcy, subject to a clawback by the post-emergence entities following emergence (a) for the full amount paid if the 2021 KEIP Participant resigns or is terminated for any reason other than by the Debtors without cause prior to the date that such payments would otherwise have been made absent emergence or (b) for any amount that would not have otherwise been paid if threshold or target performance is not met (such clawback to occur by March 15, 2022).  Willis Towers Decl. ¶ 20.  Such amounts will also be subject to acceleration at target value in the event of a termination of employment prior to emergence by the Debtors without cause, subject to clawback for any amount that would not have otherwise been paid if

17

threshold or target performance is not met (such clawback to occur by March 15, 2022).  The maximum aggregate amount of such payments is approximately $1,710,000.  Lowne Decl. ¶ 25.

C.    Metrics

35.    In early 2021, the Board of Directors of Purdue Pharma Inc. (the "**Board**"), with the recommendation of the Board's Compensation and Talent Committee (the "**Compensation Committee**") and guidance from Willis Towers Watson, set the 2021 Performance Metrics, consistent with the Company's longstanding practice of approving performance metrics early in each calendar year.  Lowne Decl. ¶ 26; Willis Towers Decl. ¶ 21.  The Board determined that it was in the best interest of the Debtors and the post-emergence entities to apply the 2021 metrics to the long-term award for years subsequent to 2021 given that the Debtors are anticipated to emerge well before the completion of the typical three-year performance period for such awards.

36.    The 2021 Performance Metrics are based on the same three strategic pillars as the metrics with respect to the 2020 KEIP and the historical and longstanding AIP: value creation (representing 40% of the 2021 Performance Metrics), innovation and efficiency (50% of the 2021 Performance Metrics) and people and culture (10% of the 2021 Performance Metrics).  Lowne Decl. ¶ 27.  At the time the 2021 Performance Metrics were set by the Board, they were challenging, required extensive achievement and presented a meaningful risk of not being met at the threshold level required for payment.  Lowne Decl. ¶ 27.  The 2021 KEIP Participants have been focused on driving the Debtors to meet these goals during the first half of 2021 and will need to continue to apply substantial efforts to achieve these metrics in the second half of 2021.  Indeed, while certain of the target metrics have been met, others remain in progress, and still others the Company will be unable to satisfy.  Lowne Decl. ¶ 27.  The Board was focused this year—as it is

every year—on setting such "stretch" goals, which ensures that the 2021 KEIP will have the intended incentivizing effect.

        1.      Value Creation

37.    The value creation metric is designed to measure and reward long-term success of the Debtors' business based on certain nonfinancial operational goals, such as meeting certain deadlines with respect to the Company's testing and development of non-opioid products, including overdose treatment products.  **Table 3** below sets forth certain key operational and developmental goals that the Debtors have identified as key to the long-term success of the Debtors' business.  Lowne Decl. ¶ 28.

### TABLE 3

| 2021 Value Creation Performance Metrics | 2021 Performance Target | % of Value Creation | % of 2021 Performance Metrics |
|---|---|---|---|
| **Public Health Initiatives[7]** | | | |
| Provide support to HRT to allow an NDA filing for OTC intra-nasal naloxone | End of Q3 2021 | 40% | 16.0% |
| Nalmefene autoinjector registration stability initiation on the fully assembled device | End of Q4 2021 | | |
| Secure approval for the Nalmefene vial and file the ANDA for the pre-filled syringe | End of Q4 2021 | | |
| **Progressing the Pipeline** | | | |
| (a) Complete proof of concept for Sunobinop in insomnia associated with alcohol cessation and (b) make go/no go decision for progression to Phase 3 | (a) End of Q2 2021; (b) Year-End 2021 | 30% | 12.0% |
| Progress the global development of Tinostamustine in cancer patients to allow cohort prioritization decisions in hemato-oncology and solid tumors | End of Q2 2021 | | |
| **Delivery of Project Catalyst Implementation Plan to Include Regulatory Submission on the Following API Transfers:** | | | |
| Oxycodone / APAP Tabs | End of Q4 2021 | 5% | 1.8% |
| Oxycodone Tabs | End of Q4 2021 | 3% | 1.2% |
| **RALP and Progressing the Generic Pipeline** | | | |
| Scopolamine TDS – Completion of Skin Sensitization and Irritation Study | End of Q3 2021 | 5% | 2.1% |
| Lisdexamfetamine Capsules – Submit ANDA | End of Q4 2021 | 5% | 1.8% |

---

[7] All medications referred to in this section are potential treatments for opioid overdose.

| | | | |
|---|---|---|---|
| Dihydroergotamine Nasal Spray – Completion of IVBE Study | End of Q2 2021 | 5% | 1.8% |
| Theophylline ER Tablets (300 mg) – Finalize and submit FDA responses and define clinical path forward | End of Q2 2021 | 5% | 2.1% |
| Varenicline Tablets – FDA approval | End of Q3 2021 | 3% | 1.2% |
| **Total** | | **100%** | **40.0%** |

2.      Innovation and Efficiency

38.      The innovation and efficiency metric is designed to capture key financial and operational goals, including important business metrics such as operating profits, net sales and operating losses.  **Table 4** below sets forth certain key financial and operational goals that the Debtors have identified as key to the long-term success of the Debtors' business.  Lowne Decl. ¶ 29.

**TABLE 4**

| 2021 Innovation and Efficiency Performance Metric[8] | 2021 Performance Target | % of Innovation and Efficiency | % of 2021 Performance Metrics |
|---|---|---|---|
| Consolidated total business Operating Profit | $69 million | 40% | 20.0% |
| Adhansia XR Net Sales | $14 million | 20% | 10.0% |
| Avrio Net Sales | $97.7 million | 20% | 10.0% |
| Reduce Rhodes (RALP) 2021 Funding Requirement by $45 million from 2020 amount | ($45 million) | 20% | 10% |
| **Total** | | **100%** | **50%** |

3.      People and Culture

39.      Finally, nurturing the Debtors' human resources and organizational culture will be critical to keeping the Debtors on the path to emergence and beyond.  Such steps include (i) conducting readiness activities to prepare for emergence from bankruptcy and (ii) establishing and supporting implementation of a diversity, equity and inclusion ("**DE&I**") roadmap through the end of 2021 to ensure a sustainable and accountable DE&I profile for the organization.  This

---

[8] Adhansia XR is a central nervous system stimulant prescription medicine used for the treatment of ADHD in people six years of age and older.  Avrio Health L.P. is a wholly owned subsidiary of the Debtors which produces over-the-counter consumer health products, including Betadine (a wound care product), Colace (a stool softener), Senokot (a laxative) and SlowMag Mg (a magnesium supplement).

metric will be reviewed holistically and will represent 10% of the target 2021 KEIP Annual Award. Lowne Decl. ¶ 30.

### D.    Commercial Reasonableness

40.    The 2021 KEIP is consistent with the Debtors' historical compensation practices, although lower in amount given the continuation of concessions agreed to last year, while the challenges faced by the 2021 KEIP Participants remain elevated as they continue to navigate the difficult terrain the Debtors face as they seek to emerge from bankruptcy.  Lowne Decl. ¶ 31. During the course of the Chapter 11 Cases, the challenges faced by the 2021 KEIP Participants have remained significant due to the extremely complex and highly litigious nature of these Chapter 11 Cases.  Lowne Decl. ¶ 31.

41.    For each 2021 KEIP Participant, the total cost of the proposed 2021 KEIP Annual Award is approximately the same as the component of the 2020 KEIP Annual Award that effectively replicated the AIP, subject to modest and typical year-over-year increases, and even as the five 2021 KEIP Participants shoulder the responsibilities previously carried by the eight executives the Debtors first sought authority to pay under the 2020 KEIP.  Lowne Decl. ¶ 32.  In addition, the component of the 2020 KEIP Annual Award that effectively replicated LTRP payouts that would otherwise have been made in early 2021 has been removed from the proposed 2021 KEIP given that the LTRP payouts in early 2022 were already addressed and approved last year.

42.    While the General Counsel's participation in the 2021 KEIP would result in nominally above-market compensation for an ordinary pharmaceutical company of Purdue's size, it was the Debtors' business judgment that they required significantly greater expertise and experience in a General Counsel than would an ordinary peer pharmaceutical company, particularly in light of the pre-bankruptcy litigation that was already at a fever pitch when the

Company recruited the General Counsel. It remains the Debtors' business judgment that they continue to require that level of expertise and experience in a general counsel. In addition to managing all of the usual complex legal issues necessary to run a diversified pharmaceutical business, the Debtors' General Counsel is responsible for overseeing an extraordinarily complex restructuring process, including working to achieve a global resolution of over 2,800 lawsuits and filed claims seeking more than $10 trillion in the aggregate.

43.    For 2020, the Court approved similar nominally above-market compensation—to which the Debtors' major creditor constituencies did not object—stating that, "[w]ith regard to the Debtor's general counsel, . . . [t]hat person's job description it appears clear to me is not comparable to other general counsel in this industry, requires more expertise and more work, frankly, and I think the parties in interest have recognized that as well in not objecting to the general counsel's proposed compensation package as set forth in the agreed revisions here which is over market for general counsels generally in this industry, but reflects the added duties and expertise that a general counsel has." Hr'g Tr., 24:18–25:5, Oct. 28, 2020. Such compensation is also in line with the compensation of the General Counsel that was approved in 2019. The Debtors continue to believe that the General Counsel's compensation is appropriate and reasonable, especially given the immense challenges he faces in his role with the Debtors, and in light of his past experience and expertise and the other opportunities available to him. Lowne Decl. ¶ 33; Willis Towers Decl. ¶ 28. Accordingly, the Debtors submit that the proposed 2021 KEIP with respect to the General Counsel is reasonable and should be approved.

44.    Historically, the LTRP has been an important component of the Debtors' overall compensation strategy, and something the Debtors rely on to ensure the total compensation of their senior executives is competitive with the market. Lowne Decl. ¶ 34. Last year, this Court

approved the 2020 KEIP Long-Term Award that effectively replicated the LTRP grants that would otherwise have been made last year, subject to negotiated concessions.[9]  The Debtors accordingly believe that the grant to the 2021 KEIP Participants of similar long-term awards payable in 2024 in the form of the 2021 KEIP Long-Term Awards is necessary, appropriate and consistent with the Debtors' historical compensation practices.  Lowne Decl. ¶ 34.  The proposed amount of the 2021 KEIP Long-Term Awards reflects the concessions agreed to last year, subject to normal and modest year-over-year increases.  The loss of the long term grants without substitution would represent a significant decrease in overall compensation, which could jeopardize the Debtors' ability to incentivize the 2021 KEIP Participants and ensure stability in the workforce and the long-term value of the enterprise.  Lowne Decl. ¶ 34.

45.    The proposed 2021 KEIP would continue to provide incentive compensation to 2021 KEIP Participants that is effectively the same as or under the amounts provided in the 2020 KEIP, is in line with or below the Debtors' historical practices and compares reasonably to market compensation levels for the Debtors' peers.  Given the challenging roles and responsibilities that the 2021 KEIP Participants must continue to fulfill, reduced headcount, the extremely challenging nature of these jobs in the difficult context of these Chapter 11 Cases, and the efforts required to achieve the performance goals established for the 2021 KEIP, it is abundantly clear that this compensation is appropriate and necessary for the preservation of the value of the Debtors' estates.

---

[9] *See* 2020 KEIP Order; Supplemental 2020 KEIP Order.

## II.    The Proposed 2021 KERP

### A.    Participants

46.    The Debtors seek authorization to implement the 2021 KERP for virtually[10] all incentive-eligible employees other than the 2021 KEIP Participants (the "**2021 KERP Participants**").  The 2021 KERP Participants have continued to undertake significant efforts to maintain the value of the Debtors' business—including during the unique environment of the COVID-19 pandemic—and enable the Debtors' continued progress toward a successful restructuring.  Lowne Decl. ¶ 35.  They have continued this Herculean task under significant stresses, including reduced employee headcount combined with a very competitive market for talent to replace departing employees, which has increased the burdens on many of the remaining employees and has had a negative effect on morale, yet the 2021 KERP Participants nonetheless continue to deliver extraordinary business results.  Lowne Decl. ¶ 35.  As of the date of this Motion, approximately 506 employees will participate in the 2021 KERP, of which 19 will be Vice President or higher and 487 will be middle management, professional employees and support and technical staff, which include scientific researchers as well as regulatory, compliance, quality and manufacturing personnel.[11]  Lowne Decl. ¶ 35.

47.    This Court has repeatedly held that the Debtors have appropriately distinguished between insiders and non-insiders.  Hr'g Tr., 133:19–20, Sept. 30, 2020 ("No one has contended here that any of the participants in the KERP is an insider . . . .");  Hr'g Tr., 109:19–24, Dec. 4,

---

[10] A small number of employees either previously did not participate in the AIP and therefore will not participate in the 2021 KERP or currently are not eligible to participate in the 2021 KERP.  Additionally, for the avoidance of doubt, no employee to whom the Company provides notice of separation prior to this Court's approval, if any, of the 2021 KERP will be a 2021 KERP Participant.

[11] In instances where the separation of existing 2021 KERP Participants from the Debtors results in newly hired employees taking on their roles or responsibilities, the 2021 KERP would allow the Debtors to include such newly hired employees as 2021 KERP Participants, if such newly hired employees would otherwise have been eligible to participate in the 2021 AIP and LTRP, as applicable.

2019 ("[T]he company engaged in the proper process to determine whether someone was an insider or not. Nothing I've heard today changes that analysis, and I'll rest on my rulings on that point."). Applying the same criteria that the Debtors previously used to determine insider status last year,[12] no 2021 KERP Participant is an insider.

B.    Payout Structure

48.    As further discussed below, each 2021 KERP Participant will receive an award comprised of (i) an amount equal to the 2021 KERP Participant's target AIP (the "**2021 KERP Annual Award**"), (ii) a long-term incentive compensation grant payable in 2024 (the "**2021 KERP Long-Term Award**"), and (iii), with respect to certain 2021 KERP Participants, additional targeted retention payments (the "**2021 Targeted Retention Award**").

49.    Each 2021 KERP Participant's 2021 KERP Annual Award is equal to the target amount of the 2021 AIP award they otherwise would have been eligible to receive, payable in 2022. The 2021 KERP Annual Award is not subject to performance criteria to provide the 2021 KERP Participants with greater certainty about their compensation. This is expected to help retain 2021 KERP Participants under the present challenging and uncertain conditions. Lowne Decl. ¶ 37.

50.    The 2021 KERP Annual Award will be paid as follows: (i) 50% paid on the Company regular payroll date closest to October 1, 2021 and (ii) the remaining 50% paid on the Company regular payroll date closest to March 15, 2022. Lowne Decl. ¶ 38. Other than for hourly employees, the first payment of the 2021 KERP Annual Award is subject to a clawback if the 2021

---

[12] The Company categorized an employee as an insider if the employee met any one of the following five criteria. The employee: (1) is an officer appointed by the Board; (2) holds the title of Chief Executive Officer, Chief Financial Officer, Chief Operating Officer, General Counsel or Senior Vice President; (3) reports to the Board; (4) has authority to make Company-wide or strategic decisions, including critical financial decisions; or (5) is in a position to determine his or her own compensation. Notably, no insider employee of the Debtors is in a position to determine his or her own compensation, which is the responsibility of the Compensation Committee and the Board.

KERP Participant resigns or is terminated for any reason other than by the Debtors without cause prior to March 15, 2022.[13]  Lowne Decl. ¶ 38.  Payments under the 2021 KERP Annual Award will be subject to the 2021 KERP Participant's continued employment through the applicable payment date, with acceleration in the event that a 2021 KERP Participant's employment is terminated by the Debtors without cause.  Lowne Decl. ¶ 38.  In the event the Debtors emerge from bankruptcy any time prior to a payment date, the remaining full amount of the 2021 KERP Annual Award would accelerate and be payable, again subject to a clawback, other than for hourly employees, if the 2021 KERP Participant resigns or is terminated for any reason other than by the Debtors without cause prior to March 15, 2022.  Lowne Decl. ¶ 38; Willis Towers Decl. ¶ 42.  The total aggregate target (and maximum) payment under the 2021 KERP Annual Award is approximately $16,100,000.  Lowne Decl. ¶ 38.

51.    Consistent with past practice, certain 2021 KERP Participants will receive a 2021 KERP Long-Term Award that is essentially the same as the 2020 KERP Long-Term Award and is designed to mimic the economic structure of the LTRP grant that otherwise would have been granted to the 2021 KERP Participant in 2021 under Purdue's longstanding compensation practices.  Lowne Decl. ¶ 39.  The amount of such grant will be equal to 60% of the target LTRP grant that otherwise would have been granted to the 2021 KERP Participant in 2021 and will be essentially the same as the award under the 2020 KERP, subject to modest, ordinary course year-over-year base salary increases, promotions and other changes to the employee population.

---

[13] These dates represent a minor deviation from the timeline approved in connection with the 2020 KERP Annual Award.  The 2020 KERP Annual Award is subject to a clawback date of the earlier of June 30, 2021 and emergence, and the Court approved payment dates on the closest scheduled payroll dates to November 1, 2020 and March 31, 2021.  *See Debtors' Omnibus Reply in Support of Motion of Debtors for Entry of an Order Authorizing Implementation of a Key Employee Incentive Plan and a Key Employee Retention Plan* [ECF 1742].  This year, in light of their impending emergence, the Debtors believe that preserving a clawback right based on their historical compensation timeline irrespective of when emergence occurs is prudent and thus are seeking approval of a March 15, 2022 clawback date for the 2021 KERP Annual Award and 2021 KERP Annual Award payment dates on the closest scheduled payroll dates to October 1, 2021 and March 15, 2022.

Lowne Decl. ¶ 39.  The 2021 KERP Long-Term Award will not be subject to performance metrics. Lowne Decl. ¶ 39.

52.     Payments due under the 2021 KERP Long-Term Awards will accelerate upon the Debtors' emergence from bankruptcy, subject to clawback (other than for hourly employees) through the date the payments otherwise would have been made absent emergence if the 2021 KERP Participant resigns or is terminated for any reason other than by the Debtors without cause. Willis Towers Decl. ¶ 44.  Such amounts will also be subject to acceleration in the event of a termination of employment prior to emergence by the Debtors without cause.  Willis Towers Decl. ¶ 44.  The aggregate total cost of these 2021 KERP Long-Term Awards for all 2021 KERP Participants is approximately $6,000,000.  Lowne Decl. ¶ 39.

53.     In addition, for multiple years the Debtors have used targeted retention awards, most recently in the form of the 2020 Targeted Retention Awards, to preserve and maximize the value of the Debtors' estates.  Lowne Decl. ¶ 40.  Even with such programs in place, the Debtors have continued to see attrition, which the Debtors believe would have been dramatically higher in the absence of such programs.  Lowne Decl. ¶ 40.  The Debtors therefore seek approval of the 2021 Targeted Retention Awards in an aggregate amount of up to $7,200,000.[14]  Lowne Decl. ¶ 40.  The 2021 Targeted Retention Awards will renew the Debtors' 2020 Targeted Retention Awards and allow the Debtors to continue their practice of making targeted retention payments to an identified group of key employees.

---

[14] Last year, this Court approved the 2020 Targeted Retention Awards in the amount of $8.1 million.  That figure included approximately $900,000 in retention awards that were intended to be granted to employees of Rhodes Technologies.  Due to the Debtors' sale of Rhodes Technologies, such awards were ultimately not granted.  As a result, the Debtors paid out approximately $7.2 million in 2020 Targeted Retention Awards, and the Debtors believe the same figure remains appropriate this year.

54.    The 2021 Targeted Retention Awards will be payable in the fourth quarter of 2021 and the first quarter of 2022.  Lowne Decl. ¶ 40.  Other than for hourly employees, 2021 Targeted Retention Award payments are subject to a clawback if the 2021 KERP Participant resigns or is terminated for any reason other than by the Debtors without cause before September 30, 2022. Lowne Decl. ¶ 40.  Payments under the 2021 Targeted Retention Awards will be subject to the applicable employee's continued employment through the applicable payment date, with such payments to accelerate upon emergence or if the applicable employee is terminated by the Debtors without cause.  Lowne Decl. ¶ 40.

C.    Commercial Reasonableness

55.    The 2021 KERP is commercially appropriate and reasonable.  Given the continued extraordinary burdens on the 2021 KERP Participants from the challenges of operating in chapter 11 and the negative press environment faced by Purdue, there is a very real risk that additional employees will continue to depart to work elsewhere.  Lowne Decl. ¶ 41.  Indeed, attrition has remained high, with 25 resignations thus far in 2021 alone, which represents a year-to-date annualized voluntary turnover rate of 9.74%.  Lowne Decl. ¶ 41.  Further, there continue to be cases of employees timing their resignations to coincide with the end of clawback periods, and Purdue anticipates that the number of voluntary resignations may increase following the expiration of the June 30, 2021 clawback date for the 2020 KERP Annual Award.  Lowne Decl. ¶ 41.  The strain of these Chapter 11 Cases creates the very real risk that, without continuation of the Debtors' normal annual compensation practices in the form of the 2021 KERP, the Debtors may lose an unacceptable number of their employees to competing employers able to offer market compensation and job security that the Debtors cannot match.  Lowne Decl. ¶ 41.  Additional defections among the Debtors' workforce could significantly hamper their operations and possibly

jeopardize the Debtors' timely emergence. Lowne Decl. ¶ 41. Moreover, the Debtors have continued to face significant challenges in hiring over the past year—28 headcount positions have opened year to date, 17 of which remain unfilled—and it remains extremely unlikely that the Debtors would be able to find sufficient, if any, qualified replacements during the critical period leading up to the Debtors' emergence. Lowne Decl. ¶ 41. If not for the compensation programs in place for 2020, including the 2020 Targeted Retention Awards, the Debtors believe that the attrition rate would have been significantly higher. Lowne Decl. ¶ 41. Failure to implement the 2021 KERP could have a devastating effect on the Debtors' ability to retain the individuals they need to maintain their business operations and deliver a successful emergence from these Chapter 11 Cases for all stakeholders. Lowne Decl. ¶ 41.

56.     The 2021 KERP Annual Award is consistent with the Debtors' historical compensation practices. The 2021 KERP Annual Award is essentially the same as the AIP component under the 2020 KERP Annual Award, subject to modest, ordinary course year-over-year increases, and is substantially equivalent to historical annual AIP payouts for this group. Lowne Decl. ¶ 42. The clawback through March 15, 2022 provides a powerful retentive element—just like the effect of AIP payments typically being made in March of each year. Lowne Decl. ¶ 42. Similarly, the 2021 KERP Long-Term Award is likewise essentially the same as the 2020 KERP Long-Term Award, subject to modest, ordinary course year-over-year increases. Lowne Decl. ¶ 42. Additionally, the Debtors have identified 2021 KERP Participants to receive 2021 Targeted Retention Awards through a detailed and thorough process to identify employees whose services are particularly critical to preserving and maximizing the value of the Debtors' estates. Lowne Decl. ¶ 42. The 2021 Targeted Retention Awards are consistent with the amounts of awards under the prior targeted retention programs, including the 2020 Targeted Retention

Awards, which have helped partially mitigate, but not entirely resolve, the issue of attrition among these critical employees.  Lowne Decl. ¶ 42.

57.    In sum, the 2021 KERP compensates key employees in line with the Debtors' market-based historical practices and is critical to retaining the Debtors' employees, who are needed to preserve the value of the Debtors' estates.

## RELIEF REQUESTED

58.    By this Motion, and pursuant to sections 363(b) and 503(c)(3) of the Bankruptcy Code, the Debtors seek entry of an order, substantially in the form of the proposed order attached hereto as **Exhibit A**, authorizing the implementation of the 2021 KEIP and the 2021 KERP.

## BASIS FOR RELIEF

I.    **Section 503(c)(1) of the Bankruptcy Code Does Not Bar the Proposed 2021 Compensation Plans**

A.    Section 503(c)(1) Is Not Applicable to the 2021 KEIP Because It Is an Incentive Plan

59.    Section 503(c)(1) of the Bankruptcy Code does not apply to the 2021 KEIP because it is designed to incentivize, rather than retain, the 2021 KEIP Participants.  Indeed, this Court concluded that the 2020 KEIP was properly analyzed under section 503(c)(3) rather than section 503(c)(1).  Hr'g Tr., 24:14–16, Oct. 28, 2020.  The proposed 2021 KEIP is substantially similar to the 2020 KEIP and applies to a subset of the participants in the 2020 KEIP, so the proposed 2021 KEIP is likewise appropriately considered under section 503(c)(3) rather than section 503(c)(1).

60.    Section 503(c)(1) of the Bankruptcy Code, with limited exceptions, prohibits a transfer to an "insider of the debtor for the purpose of inducing such person to remain with the debtor's business."  This provision, however, does not apply to performance-based incentive plans. *See In re Hawker Beechcraft, Inc.*, 479 B.R. 308, 313 (Bankr. S.D.N.Y. 2012) ("§ 503(c)(1) does not prevent a debtor from adopting a plan that rewards insiders for achieving financial or other

targets, rather than for simply remaining in the employment of the debtor, even though the incentive plan has a retentive effect."). Under section 503(c)(1), a debtor is required to show, by a preponderance of evidence, that the key employee incentive plan "is primarily incentivizing and not primarily retentive." *In re Residential Capital, LLC*, 478 B.R. 154, 170 (Bankr. S.D.N.Y. 2012).

61.    A compensation plan that includes "some retentive effect" still passes muster under section 503(c)(1) where, as here, it is "overall . . . incentivizing in nature." *In re Dana Corp.*, 358 B.R. 567, 571 (Bankr. S.D.N.Y. 2006); *see also Residential Capital*, 478 B.R. at 171 ("When a plan is designed to motivate employees to achieve specified performance goals, it is primarily incentivizing, and thus not subject to section 503(c)(1)."). Courts routinely find that compensation plans are sufficiently incentivizing if they are "tied . . . to the achievement of particular financial milestones." *See, e.g.*, *In re Borders Grp., Inc.*, 453 B.R. 459, 471–72 (Bankr. S.D.N.Y. 2011). When evaluating whether performance goals are sufficiently challenging, courts do not analyze whether the "targets now appear achievable in hindsight" but rather "review[] a [compensation plan] that was designed to incentivize work" even if it "is already partially performed." *In re Aralez Pharm. US Inc.*, No. 18-12425 (MG), 2018 WL 6060356, at *5 (Bankr. S.D.N.Y. Nov. 19, 2018).

62.    Here, the 2021 KEIP primarily incentivizes the 2021 KEIP Participants to achieve performance goals and thus is not prohibited by section 503(c)(1) of the Bankruptcy Code. As set forth above, all components of the 2021 KEIP are incentive-based: the 2021 KEIP Annual Award and 2021 KEIP Long-Term Award will be subject solely to satisfaction of the 2021 Performance Metrics. Lowne Decl. ¶¶ 20, 24. These performance goals are neither bound to happen nor easily

achievable. Indeed, while certain of the target metrics have been met, others remain works in progress, and still others will not be satisfied by the Company. Lowne Decl. ¶ 27.

63.     The 2021 Performance Metrics utilize a similar rubric and were set in a similar manner to the 2020 Performance Metrics. The 2021 Performance Metrics are similarly ambitious, having threshold targets that are difficult to achieve both individually and when considered in combination and will require the 2021 KEIP Participants' diligent and committed efforts. Lowne Decl. ¶ 27. The 2021 Performance Metrics are tied to the same high-level categories of goals as the 2020 Performance Metrics, including, among other things, financial metrics, value creation and innovation—all of which impact the long-term health of the Debtors' estates. Moreover, many of the same headwinds that resulted in additional challenges in achieving the 2020 Performance Metrics are still present, including the difficulty of operating in chapter 11, the reputational challenges faced by the Debtors and the continued high employee attrition rate. This Court already found that the 2020 Performance Metrics were incentivizing,[15] and the 2021 Performance Metrics are closely based on the 2020 Performance Metrics, carefully and rigorously updated for the Company's performance and other changes in circumstances since that time. Lowne Decl. ¶ 27.

64.     That some of the performance-based goals are in progress does not render them as having been less challenging when originally designed, which is when the incentivizing nature is measured with respect to KEIPs that are already partially performed. *See Aralez Pharm.*, 2018 WL 6060356, at *5 (authorizing insider compensation plan based on the incentivizing nature of performance goals when originally developed).

---

[15] *See* 2020 KEIP Order; Supplemental 2020 KEIP Order; Hr'g Tr., 49:1–3, Nov. 17, 2020 ("[T]he metrics for the incentive compensation are not challenged and have already been approved by me with respect to the 2019 KEIP . . . .").

65.    Accordingly, the 2021 KEIP should properly be evaluated under section 503(c)(3) of the Bankruptcy Code, rather than section 503(c)(1).

B.    Section 503(c)(1) Is Not Applicable to the 2021 KERP Because It Does Not Include Insiders

66.    Section 503(c)(1) likewise does not bar the 2021 KERP because that plan includes only non-insiders.  Section 503(c)(1) prohibits "a transfer made to . . . an insider of the debtor for the purpose of inducing such person to remain with the debtor's business," but it does not prohibit retention-oriented transfers to non-insiders.  *See In re GT Advanced Techs., Inc.*, No. 14-11916-HJB, 2015 WL 5737181, at \*4 (Bankr. D.N.H. Sept. 30, 2015) ("Section 503(c) distinguishes between those employees who are 'insiders' and those who are not . . . . Section 503(c)(3) relaxes those requirements with respect to non-insiders, requiring only that the proposed retention payments be 'justified by the facts and circumstances of the case.'").

67.    This Court has previously ruled as to which employees of the Debtors are and are not insiders, and the Debtors have excluded all insiders from the 2021 KERP.[16]  Section 503(c)(1), therefore, does not prohibit the 2021 KERP.

## II.    The Proposed 2021 Compensation Plans Represent a Valid Exercise of the Debtors' Business Judgment Under Section 503(c)(3) of the Bankruptcy Code

68.    Both the 2021 KEIP and the 2021 KERP should be approved under section 503(c)(3) of the Bankruptcy Code because the 2021 Compensation Plans are essential to the success of the Debtors' restructuring efforts and reflect the sound exercise of the Debtors' business judgment.

---

[16] *See* Supplemental Final Wages Order; 2020 KEIP Order; Supplemental 2020 KEIP Order; Hr'g Tr., 133: 19–20, Sept. 30, 2020 ("No one has contended here that any of the participants in the KERP is an insider . . . ."); Hr'g Tr., 109:19–24, Dec. 4, 2019 ("[T]he company engaged in the proper process to determine whether someone was an insider or not.  Nothing I've heard today changes that analysis, and I'll rest on my rulings on that point.").

69.    Section 503(c)(3) of the Bankruptcy Code prohibits certain transfers "that are outside the ordinary course of business and not justified by the facts and circumstances of the case." "Courts have held that the 'facts and circumstances' language of section 503(c)(3) creates a standard no different than the business judgment standard under section 363(b)." *Borders Grp.*, 453 B.R. at 473; *see also In re Velo Holdings Inc.*, 472 B.R. 201, 212 (Bankr. S.D.N.Y. 2012) ("[T]he 'facts and circumstances' language of section 503(c)(3) creates a standard no different than the business judgment standard under section 363(b)."). A debtor satisfies the business judgment standard if it shows that the proposal "is within the fair and reasonable business judgment of the [d]ebtors and thus within the zone of acceptability." *Dana Corp.*, 358 B.R. at 572.

70.    Courts have described the business judgment standard as "deferential," *In re Alpha Nat. Res., Inc.*, 546 B.R. 348, 356 (Bankr. E.D. Va.), *aff'd sub nom. United Mine Workers of Am. 1974 Pension Plan & Tr. v. Alpha Nat. Res., Inc.*, 553 B.R. 556 (E.D. Va. 2016), and a "more liberal . . . review," *In re Glob. Home Prods., LLC*, 369 B.R. 778, 783 (Bankr. D. Del. 2007). Additionally, "[w]here the debtor articulates a reasonable basis for its business decisions (as distinct from a decision made arbitrarily or capriciously), courts will generally not entertain objections to the debtor's conduct." *Comm. of Asbestos-Related Litigants and/or Creditors v. Johns-Manville Corp.* (*In re Johns-Manville Corp.*), 60 B.R. 612, 616 (Bankr. S.D.N.Y. 1986).

71.    In *In re Dana Corp.*, the court distilled six factors (the "***Dana II* Factors**") for determining whether a compensation proposal satisfies the business judgment test.

  (a) "Is there a reasonable relationship between the plan proposed and the results to be obtained, i.e., will the key employee stay for as long as it takes for the debtor to reorganize or market its assets, or, in the case of a performance incentive, is the plan calculated to achieve the desired performance?"

  (b) "Is the cost of the plan reasonable in the context of the debtor's assets, liabilities and earning potential?"

(c) "Is the scope of the plan fair and reasonable; does it apply to all employees; does it discriminate unfairly?"

(d) "Is the plan or proposal consistent with industry standards?"

(e) "What were the due diligence efforts of the debtor in investigating the need for a plan; analyzing which key employees need to be incentivized; what is available; what is generally applicable in a particular industry?" and

(f) "Did the debtor receive independent counsel in performing due diligence and in creating and authorizing the incentive compensation?"

358 B.R. at 576–77 (emphasis omitted). The fact that all the *Dana II* Factors support approval of the 2021 KEIP and 2021 KERP, as set forth below, further confirms that the Debtors exercised sound business judgment when developing the 2021 KEIP and 2021 KERP.

72.      *First*, with respect to the 2021 KEIP, the Debtors and their advisors designed the plan to incentivize the 2021 KEIP Participants to work diligently to ensure that the Debtors will remain viable and well-positioned to put the value of their estates to use upon emergence. As described above, the Debtors carefully designed a well-balanced system of 2021 Performance Metrics, which are based on the same rubric as the previously approved 2020 Performance Metrics, in order to incentivize the 2021 KEIP Participants to focus on value creation, innovation and efficiency, and people and culture, all of which are important goals that will collectively enable the Debtors to best deliver value upon emergence for the benefit of all stakeholders and the American public generally. The payments under the 2021 KEIP are directly tied to specific and measurable goals within each of these categories. There is therefore a clear and reasonable relationship between the 2021 KEIP and the goals that the Debtors seek to achieve.

73.      With respect to the 2021 KERP, the Debtors appropriately tailored the plan to encourage non-insider employees to remain in their positions during the bankruptcy process. The proposed 2021 KERP is substantially similar to the 2020 KERP, which was, in turn, largely based

on the Debtors' Prepetition Compensation Plans.  The proposed 2021 KERP, like its predecessors, is tailored to provide the market levels of compensation necessary to retain key employees.  Willis Towers Decl. ¶ 53.  Moreover, the Willis Towers Declaration confirms that the compensation provided under the 2021 KERP is in line with similarly sized companies in chapter 11 proceedings, both on an aggregate and a per-person basis.  Willis Towers Decl. ¶ 51–52.  In addition, with a year-to-date annualized voluntary turnover rate of 9.74%, the Debtors continue to face a real and serious attrition problem and cannot risk reducing the resources devoted to addressing attrition issues at this critical stage in the Chapter 11 Cases.  Lowne Decl. ¶ 41.  The 2021 KERP and its 2021 Targeted Retention Awards, which were designed to ensure retention of the Debtors' most critical employees, are in line with an expiring program that had a critical and positive effect in retaining many employees but still could not stop material attrition.  A *reduction* in compensation would create a severe risk that the Debtors could experience an increased level of attrition that would be devastating to their business.

74.     *Second*, the 2021 KEIP is reasonable in the context of the Debtors' assets, liabilities and earning potential.  The absolute maximum dollar cost of the 2021 KEIP Annual Award plus 2021 KEIP Long-Term Award is approximately $7.1 million, which represents 1.01% of the Debtors' revenue.  Willis Towers Decl. ¶ 34.  As set forth in the Willis Towers Declaration, the cost of the 2021 KEIP is in line with market standards for comparably sized companies in bankruptcy.  Willis Towers Decl. ¶¶ 34–35.  Compared to similarly sized companies in chapter 11 proceedings, the 2021 KEIP's cost, as measured by the target (maximum) cost, is between the 50th and 75th percentiles.  Willis Towers Decl. ¶ 34.  Though the cost of the 2021 KEIP as a percentage of revenue has risen, Willis Towers Decl. ¶ 34, this increase is primarily attributable to the Debtors' decreased revenue throughout the duration of these Chapter 11 Cases.  Lowne Decl. ¶ 32.

Moreover, the six participants in the 2020 KEIP have been reduced to the five 2021 KEIP Participants, all of whom must continue to perform their preexisting roles amid the challenging environment presented by these Chapter 11 Cases. Additionally, the aggregate cost of compensation for the 2021 KEIP Participants is consistent with the costs of the substantially similar 2020 KEIP, which included concessions that were painstakingly negotiated with key creditor constituencies. Willis Towers Decl. ¶ 37. Willis Towers Watson's analysis benchmarking the 2021 KEIP's target (maximum) cost to the key employee incentive plans of comparable debtors is summarized in **Table 5** below:

### TABLE 5

| Aggregate KEIP Cost vs. Comparable Debtors | Purdue Target/Max Performance and Payout of KEIP Annual Award plus Long-Term Award | Market 50th Percentile | | Market 75th Percentile | | Market 90th Percentile | |
|---|---|---|---|---|---|---|---|
| | | Target | Max | Target | Max | Target | Max |
| $000s | $7,100 | $5,100 | $6,700 | $9,800 | $14,600 | $14,000 | $25,300 |
| Percentage of Revenue | 1.01% | 0.42% | 0.56% | 0.71% | 0.97% | 0.99% | 1.70% |

75.     The costs of the 2021 KERP are also reasonable in the context of the Debtors' assets, liabilities and earning potential. As described in more detail in the Willis Towers Declaration, the cost of the 2021 KERP Annual Award plus the 2021 KERP Long-Term Award is approximately $22.1 million, which represents 3.14% of revenue, and the cost of the 2021 Targeted Retention Awards is up to $7,200,000, which represents 1.02% of revenue. Willis Towers Decl. ¶¶ 51–52. This aggregate cost is similar to the cost of the equivalent elements of the 2020 KERP and the Debtors' previous compensation arrangements for the same categories of employees. While the cost-to-revenue ratios for the 2021 KERP Annual Award plus the 2021 KERP Long-Term Award and 2021 Targeted Retention Awards represent above-market levels, the facts and circumstances of these cases justify such costs. The Debtors are managing through

a uniquely complex chapter 11 process and significant reputational challenges, which have depressed employee morale and significantly hindered the Debtors' ability to retain key employees.  As the Debtors have suffered attrition, the workload on the remaining employees has only increased.  Mitigating this attrition is vital to preserving the value of the Debtors' estates.  The Debtors have also shifted significant resources to public health initiatives aimed at combating the opioid crisis and to the development of non-opioid investigative candidates, neither of which generates current revenue but both of which require considerable employee resources.  Moreover, the comparisons largely relate to bankruptcies where there is very little cash on the balance sheet, which is unlike this case where the Debtors have in excess of $1.1 billion.  Providing appropriate compensation—even at a larger-than-normal percentage of revenue—to help retain key employees is reasonable in this context and beneficial to all stakeholders.  And, importantly, the 2021 KERP Annual Award and 2021 Targeted Retention Awards are sized in part to make up for comparatively low base salaries relative to market compensation and result in total direct compensation (as defined in the Willis Towers Declaration) that remains competitive with the 75th percentile for relevant groups of 2021 KERP Participants, as described further below.  Willis Towers Decl. ¶ 48–52.  These analyses are summarized in **Tables 6**, **7** and **8** below:

**TABLE 6**

| Employee Group | N | Variance to Market TDC (Purdue Target TDC) | | | Variance to Market TDC (Purdue TTDC + Retention) | | | Variance to Market TDC (Purdue Base Only) | | |
|---|---|---|---|---|---|---|---|---|---|---|
| | | P25 | P50 | P75 | P25 | P50 | P75 | P25 | P50 | P75 |
| Non-Insider (Executive Survey) | 41 | 36% | 8% | -14% | 75% | 39% | 10% | -18% | -35% | -48% |
| Non-Insider (Middle Management & Professional Survey) | 233 | 29% | 11% | -5% | 35% | 16% | -1% | 8% | -7% | -21% |

**TABLE 7**

| Aggregate KERP Cost vs. Comparable Debtors | Purdue Target/Max Performance and Payout of KERP Annual Awards and Long-Term Awards (without retention) | Market 50th Percentile | Market 75th Percentile | Market 90th Percentile |
|---|---|---|---|---|
| $000s | $22,100 | $11,800 | $24,000 | $33,300 |
| Percentage of Revenue | 3.14% | 0.63% | 1.23% | 2.49% |

**TABLE 8**

| Aggregate Targeted Retention Cost vs. Comparable Debtors | Purdue Targeted Retention Awards | Market 50th Percentile | Market 75th Percentile | Market 90th Percentile |
|---|---|---|---|---|
| $000s | $7,200 | $2,748 | $3,650 | $7,650 |
| Percentage of Revenue | 1.02% | 0.20% | 0.38% | 0.66% |

76.     *Third*, the 2021 KEIP is fair and reasonable and does not discriminate unfairly.  The 2021 KEIP Participants are a subset of the participants in the 2020 KEIP, after one former participant separated from the Company.  Moreover, the process for setting performance metrics, the nature of those performance metrics and the aggregate compensation payable on account of the proposed 2021 KEIP Annual Award are similar to those with respect to the 2020 KEIP and the AIP payments previously approved by the Court.

77.     The 2021 KERP is also fair and reasonable.  First, the proposed 2021 KERP is essentially identical to the 2020 KERP, which, in turn, was largely based on previously approved programs.  In addition, and consistent with past practice, all employees (other than 2021 KEIP Participants) eligible to participate in the AIP and/or LTRP of the Debtors (approximately 506 employees) are 2021 KERP Participants.  Lowne Decl. ¶ 35.  Considering the Debtors' current

headcount, retaining all 2021 KERP Participants is critical to the Debtors' ability to survive restructuring and remain viable in the long term.

78.    *Fourth*, the Debtors previously engaged Willis Towers Watson to assist in the development of the 2020 KEIP and 2020 KERP, which were approved by this Court.  The Debtors have again relied on Willis Towers Watson's expertise to ensure that both the proposed 2021 KEIP and 2021 KERP are similarly in line with market standards for comparably sized companies in bankruptcy, other than with limited and well-justified exceptions carefully and deliberately chosen by the Debtors.  As fully explained in the Willis Towers Declaration, Willis Towers Watson again surveyed recent key employee incentive programs and continuations of broad-based programs and undertook an extensive analysis to identify market standards.  Willis Towers Decl. ¶¶ 32, 46.

79.    At one of the hearings regarding approval of the 2020 KEIP last year, this Court emphasized that compensation of similar executives at peer pharmaceutical companies outside of the chapter 11 context is an important reference point for determining the reasonableness of a KEIP, stating that "I want to know about . . . the industry standard" and "I would benefit from . . . a focus on the market of the Debtors' competitors."  Hr'g Tr., 143:7–10, 17–19, Sept. 30, 2020.  The Debtors and their compensation consultants at Willis Towers Watson continue to be guided by this principle.

80.    Similar to last year, Willis Towers Watson performed a comparison of the compensation of the 2021 KEIP Participants (assuming approval of the 2021 KEIP) to compensation at similar pharmaceutical companies that participated in Willis Towers Watson's 2020 Pharmaceutical and Health Sciences Executive Compensation Survey Report (the "**Survey**").  The results of this benchmarking analysis are shown in **Table 9** below, along with a comparison against the benchmarks performed last year after taking into account the agreed

concessions (rather than the benchmarks provided in connection with the motion that was filed last year):

**TABLE 9**

| Title | Variance to Market Target TDC | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| | Purdue Base + KEIP | | | Purdue Base + KEIP (2020) | | | Purdue (Base Only) | | |
| | P25 | P50 | P75 | P25 | P50 | P75 | P25 | P50 | P75 |
| President & CEO | 28% | -6% | -31% | 55% | 8% | -24% | -38% | -55% | -67% |
| Chief Financial Officer | 39% | 8% | -17% | 53% | 11% | -20% | -28% | -44% | -57% |
| General Counsel | 294% | 188% | 110% | 316% | 199% | 115% | 94% | 42% | 3% |
| Chief Technical Operations Officer | 38% | 3% | -23% | 34% | 10% | -9% | -22% | -42% | -57% |
| President, Rhodes Pharmaceuticals | 33% | -4% | -45% | 27% | -1% | -22% | -20% | -42% | -67% |
| Average (excl. GC) | 35% | 0% | -29% | 42% | 7% | -19% | -27% | -46% | -62% |

81.     As shown above, the average compensation with the 2021 KEIP for the insiders (excluding the General Counsel) is at the 50th percentile. Willis Towers Decl. ¶ 26. Indeed, the market positioning of each 2021 KEIP Participant's total direct compensation has come down year over year. In particular, the CEO's compensation has gone from slightly above median to slightly below it, notwithstanding his stewardship of the Debtors during these unprecedented Chapter 11 Cases, along with the vital role he has played in maximizing the value of the Debtors' estates for the benefit of their stakeholders. While the General Counsel's compensation would be above market for an ordinary pharmaceutical company of Purdue's size, as previously discussed, it represents compensation in line with the market for other opportunities available to the General Counsel and is appropriate in light of his qualifications, which the Debtors determined were necessary for overseeing this extraordinarily complex legal situation.

82.     In addition, last year, in response to the Court's questions, Willis Towers Watson addressed the distinction between equity and cash. While Purdue provides cash-based long-term incentive awards, many of its peer pharmaceutical companies are primarily public or pre-IPO companies that frequently offer equity-based long-term incentive compensation. In the

*Supplemental Declaration of Josephine Gartrell in Support of Motion of Debtors for Entry of Order Authorizing Implementation of a Key Employee Incentive Plan and Key Employee Retention Plan* [ECF 1847-2], Willis Towers Watson explained that, while it is true that equity is riskier than cash due to potential market fluctuations, Purdue's incentive compensation programs in prior years had allowed participants to earn up to 150% or more of target compensation in the event of above-target performance on the applicable performance metrics, which partially replicated the greater variation and upside associated with equity-based long-term incentive programs.  That feature, however, has been discontinued postpetition while the downside risk if target performance is not achieved remains, reducing the value of an award granted at a given target amount to a 2021 KEIP Participant.  Willis Towers Watson took the view that it would not be appropriate to discount the cash incentive opportunities under the 2021 KEIP for benchmarking purposes on account of the risks associated with equity that in many cases comprise elements of the incentive programs offered by comparable non-debtor pharmaceutical companies in the Survey.  Willis Towers Decl. ¶ 30.  The proposed 2021 KEIP similarly contains the same downside-only structure, given that it is essentially identical to the 2020 KEIP, so benchmarking the proposed 2021 KEIP in the same manner as the 2020 KEIP remains appropriate.

83.    Finally, Willis Towers Watson has also verified that the metrics that inform the payment and grant amounts under the 2021 KEIP are consistent with typical practices generally and practices in the pharmaceutical industry specifically.  Willis Towers Decl. ¶ 35.

84.    The Debtors determined that the cost of the 2021 KERP relative to market standards is justified by the recent high level of employee attrition that the Debtors must address and because, when considered in the context of the 2021 KERP Participants' base pay, the 2021 KERP is necessary to bring the total direct compensation of the 2021 KERP Participants in line with the

total direct compensation provided to similarly situated employees of other pharmaceutical companies. Willis Towers Decl. ¶ 48. Specifically, the 2021 KERP Participants' total direct compensation including the 2021 KERP remains competitive with the 75th percentile range of the market with respect to both non-insider executives and middle management, even taking into account retention awards to such employees that are not factored into total direct compensation in the market survey. Willis Towers Decl. ¶ 48.

85.     *Fifth*, the Compensation Committee engaged in a rigorous process to develop the 2021 KEIP and 2021 KERP, including thorough due diligence regarding their proposed terms. Lowne Decl. ¶¶ 14, 26, 42; Willis Towers Decl. ¶ 21. Additionally, the proposed 2021 KEIP and 2021 KERP are both essentially identical to the 2020 KEIP and 2020 KERP that were approved by this Court last year. The 2020 Compensation Plans were, in turn, largely continuations of the Debtors' Prepetition Compensation Plans, which have "satisfied the independent 'test of time'" and previously withstood this Court's scrutiny. *Glob. Home Prods.*, 369 B.R. at 786 (emphasizing the "nearly identical" nature of the previously used and proposed plans under the business judgment standard).

86.     *Lastly*, the Debtors worked closely with Willis Towers Watson to determine that the structure of the 2020 KEIP and 2020 KERP remained appropriate when replicating that structure in the proposed 2021 KEIP and 2021 KERP, including consulting with Willis Towers Watson on how the 2021 KEIP and 2021 KERP impact the market positioning of the 2021 KEIP Participants and 2021 KERP Participants relative to peer non-debtor pharmaceutical companies and how the 2021 KEIP and 2021 KERP compare to similar plans implemented by comparable chapter 11 debtors. Willis Towers Decl. ¶¶ 11–13. This rigorous process and thorough consideration of advice from outside experts regarding the 2021 KEIP and 2021 KERP support

the conclusion that approval of the 2021 KEIP and 2021 KERP represents a reasonable business judgment.

87.    For all of the aforementioned reasons, the Debtors exercised sound business judgment when developing the 2021 KEIP and 2021 KERP and respectfully submit that they satisfy the requirements of section 503(c)(3) of the Bankruptcy Code.

### III.    The Proposed 2021 Compensation Plans Represent a Valid Exercise of the Debtors' Business Judgment Under Section 363(b)(1) of the Bankruptcy Code

88.    The 2021 Compensation Plans should also be approved under section 363(b)(1) of the Bankruptcy Code, which empowers the Court to authorize a debtor to "use, sell, or lease, other than in the ordinary course of business, property of the estate."  To approve the use of estate property under section 363(b)(1) of the Bankruptcy Code, the Second Circuit requires a debtor to show that the decision to use the property outside of the ordinary course of business was based on the debtor's sound business judgment in light of "all salient factors" relating to the bankruptcy case.  *Comm. of Equity Sec. Holders v. Lionel Corp.* (*In re Lionel Corp.*), 722 F.2d 1063, 1071 (2d Cir. 1983) ("The rule we adopt requires that a judge determining a § 363(b) application expressly find from the evidence presented before him at the hearing a good business reason to grant such an application."); *In re Ionosphere Clubs, Inc.*, 100 B.R. 670, 675 (Bankr. S.D.N.Y. 1989); *see also In re MF Glob. Inc.*, 467 B.R. 726, 730 (Bankr. S.D.N.Y. 2012) ("Although not specified by section 363, the Second Circuit requires that transactions under section 363 be based on the sound business judgment of the debtor or trustee.").

89.    As set forth above, the Debtors have adequately shown that both of the 2021 Compensation Plans are reasonable exercises of their sound business judgment and thus permitted under section 363(b)(1).  The 2021 Compensation Plans are essentially identical to the 2020 Compensation Plans, which, in turn, were largely consistent with the Debtors' prior practices.  The

2021 KEIP and 2021 KERP, like the 2020 KEIP and 2020 KERP, were developed with the assistance of independent experts, with market benchmarks in mind. Both the 2021 KEIP and the 2021 KERP are necessary to the Debtors' current ability to operate and to preserving the value of the Debtors' estates. Lowne Decl. ¶ 16. Without the 2021 Compensation Plans, the Debtors are at serious risk of losing even more key employees—a problem compounded by the Debtors' difficulty in attracting new employees. Lowne Decl. ¶ 15. This ominous combination threatens the viability of the Debtors' estates, and the 2021 Compensation Plans are directed at addressing this risk. The Debtors believe that it is critical to renew their longstanding compensation practices in the form of these 2021 Compensation Plans, which are carefully tailored to retain key employees, whose performance of their responsibilities is essential, now more than ever. Lowne Decl. ¶¶ 16, 41.

## NOTICE AND NO PRIOR REQUEST

90.     Notice of this Motion will be provided to (a) the entities on the Master Service List (as defined in the Case Management Order and available on the Debtors' case website at https://restructuring.primeclerk.com/purduepharma) and (b) any person or entity with a particularized interest in the subject matter of this Motion (together with the entities on the Master Service List, the "**Notice Parties**"). The Debtors respectfully submit that no further notice is required.

91.     No prior motion for the relief requested herein has been made in this or any other Court.

*[Remainder of Page Intentionally Left Blank]*

WHEREFORE, for the reasons set forth herein, the Debtors respectfully request that the

Court (i) enter the proposed order authorizing the Debtors to implement the 2021 KEIP and the

2021 KERP and (ii) grant such other and further relief as is just and proper.

Dated: June 28, 2021
      New York, New York                 DAVIS POLK & WARDWELL LLP

                                       */s/ Eli J. Vonnegut*_____

                                       450 Lexington Avenue
                                       New York, New York 10017
                                       Telephone: (212) 450-4000
                                       Facsimile: (212) 701-5800
                                       Marshall S. Huebner
                                       Eli J. Vonnegut
                                       James M. Millerman
                                       Marc J. Tobak
                                       Dylan A. Consla

                                       *Counsel to the Debtors
                                       and Debtors in Possession*

**<u>Exhibit A</u>**

**Proposed Order**

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re: | **Chapter 11** |
| **PURDUE PHARMA L.P.**, *et al.*, | **Case No. 19-23649 (RDD)** |
| **Debtors.**[1] | **(Jointly Administered)** |

## ORDER AUTHORIZING THE DEBTORS TO IMPLEMENT 2021 KEY EMPLOYEE INCENTIVE PLAN AND 2021 KEY EMPLOYEE RETENTION PLAN

Upon the motion (the "**Motion**")[2] of Purdue Pharma L.P. and its affiliates that are debtors and debtors in possession in these cases (collectively, the "**Debtors**") for entry of an order (this "**Order**") approving and authorizing the 2021 KEIP and the 2021 KERP, as more fully set forth in the Motion; and upon the Lowne Declaration and the Willis Towers Watson Declaration; and the Court having jurisdiction to consider the matters raised in this Motion pursuant to 28 U.S.C. §§ 157(a)−(b) and 1334(b) and the Amended Standing Order of Reference M-431, dated January 31, 2012 (Preska, C.J.); and consideration of the Motion and the relief requested therein being a core proceeding under 28 U.S.C. § 157(b); and venue being proper before the Court pursuant to 28 U.S.C. §§ 1408 and 1409; and due and proper notice of the Motion having been

---

[1] The Debtors in these cases, along with the last four digits of each Debtor's registration number in the applicable jurisdiction, are as follows: Purdue Pharma L.P. (7484), Purdue Pharma Inc. (7486), Purdue Transdermal Technologies L.P. (1868), Purdue Pharma Manufacturing L.P. (3821), Purdue Pharmaceuticals L.P. (0034), Imbrium Therapeutics L.P. (8810), Adlon Therapeutics L.P. (6745), Greenfield BioVentures L.P. (6150), Seven Seas Hill Corp. (4591), Ophir Green Corp. (4594), Purdue Pharma of Puerto Rico (3925), Avrio Health L.P. (4140), Purdue Pharmaceutical Products L.P. (3902), Purdue Neuroscience Company (4712), Nayatt Cove Lifescience Inc. (7805), Button Land L.P. (7502), Rhodes Associates L.P. (N/A), Paul Land Inc. (7425), Quidnick Land L.P. (7584), Rhodes Pharmaceuticals L.P. (6166), Rhodes Technologies (7143), UDF LP (0495), SVC Pharma LP (5717) and SVC Pharma Inc. (4014). The Debtors' corporate headquarters is located at One Stamford Forum, 201 Tresser Boulevard, Stamford, CT 06901.

[2] Capitalized terms used but otherwise not defined herein will have the meanings set forth in the Motion.

provided to the Notice Parties, and it appearing that no other or further notice need be provided; and the Court having reviewed the Motion and held a hearing to consider the relief requested in the Motion (the "**Hearing**"); and, after due deliberation, the Court having determined that the legal and factual bases set forth in the Motion and at the Hearing establish good and sufficient cause for the relief granted herein; and the Court having determined that the relief requested in the Motion is in the best interests of the Debtors, their creditors, their estates, and all other parties in interest; and all objections to the Motion, if any, having been withdrawn, resolved, or overruled; and upon all of the proceedings had before the Court and after due deliberation and sufficient cause appearing therefor;

IT IS HEREBY ORDERED THAT:

1.      Pursuant to sections 105(a), 363, and 503(c)(3) of the Bankruptcy Code, the Motion is granted as set forth herein.

2.      The 2021 KEIP is approved in its entirety.

3.      The 2021 KERP is approved in its entirety.

4.      The Debtors are authorized, but not directed, to take all actions necessary to implement the 2021 KEIP on the terms and conditions set forth in the Motion, including making any payments pursuant to the terms of the 2021 KEIP.

5.      The Debtors are authorized, but not directed, to take all actions necessary to implement the 2021 KERP on the terms and conditions set forth in the Motion, including making any payments pursuant to the terms of the 2021 KERP.

6.      Once earned, the Debtors' obligations to pay amounts that become due and owing under the 2021 KEIP shall constitute administrative expenses pursuant to section 503(b) of the

Bankruptcy Code, thereby entitled to priority payment pursuant to section 507(a)(2) of the Bankruptcy Code.

7.      Once earned, the Debtors' obligations to pay amounts that become due and owing under the 2021 KERP shall constitute administrative expenses pursuant to section 503(b) of the Bankruptcy Code, thereby entitled to priority payment pursuant to section 507(a)(2) of the Bankruptcy Code.

8.      Nothing in this Order or any action taken by the Debtors in furtherance of the implementation hereof shall be deemed to constitute an assumption or rejection of any executory contract or unexpired lease pursuant to section 365 of the Bankruptcy Code, and all of the Debtors' rights with respect to such matters are expressly reserved.

9.      Notwithstanding the relief granted herein and any actions taken hereunder, nothing contained herein shall (a) create, nor is it intended to create, any rights in favor of, or enhance the status of any claim held by, any person or entity or (b) be deemed to convert the priority of any claim from a prepetition claim into an administrative expense claim.

10.     Nothing in this Order nor the Debtors' payment of claims pursuant to this Order shall be construed as or deemed to constitute (a) an agreement or admission by the Debtors as to the validity of any claim against the Debtors on any ground, (b) a grant of third-party beneficiary status or bestowal of any additional rights on any third party, (c) a waiver or impairment of any rights, claims, or defenses of the Debtors' rights to dispute any claim on any ground, (d) a promise by the Debtors to pay any claim, or (e) an implication or admission by the Debtors that such claim is payable pursuant to this Order.

11.     For the avoidance of doubt, to the extent that any 2021 KEIP Participant or 2021 KERP Participant is determined by a final order of this Court or any court of competent jurisdiction

3

to have (a) knowingly participated in any criminal misconduct in connection with his or her employment with the Debtors or (b) been aware, other than from public sources, of acts or omissions of others that such 2021 KEIP Participant or 2021 KERP Participant knew at the time were fraudulent or criminal with respect to the Company's commercial practices in connection with the sale of opioids and failed to report such fraudulent or criminal acts or omissions internally at the Company or to law enforcement authorities at any time during his or her employment with the Company, such 2021 KEIP Participant or 2021 KERP Participant shall not be eligible to receive any payments approved by this Order.  All parties' rights, if any, to seek disgorgement of payments following the entry of such final order are reserved.  The CEO shall not take any action with respect to his compensation under the 2021 KEIP with the intent or material effect of frustrating enforcement of any potential judgment of the Court in these Chapter 11 Cases or any other actions pending against him in any other court or jurisdiction with respect to such amounts.

12.    Any Bankruptcy Rule (including, but not limited to, Bankruptcy Rule 6004(h)) or Local Rule that might otherwise delay the effectiveness of this Order is hereby waived, and the terms and conditions of this Order shall be effective and enforceable immediately upon its entry.

13.    The contents of the Motion and the notice procedures set forth therein are good and sufficient notice and satisfy the Bankruptcy Rules and the Local Bankruptcy Rules for the Southern District of New York, and no other or further notice of the Motion or the entry of this Order shall be required.

14.    The Debtors are authorized to take all such actions as are necessary or appropriate to implement the terms of this Order.

15.    The Court shall retain exclusive jurisdiction to hear and determine all matters arising from or related to the implementation, interpretation, and enforcement of this Order.

White Plains, New York
Dated: _____, 2021

_____
THE HONORABLE ROBERT D. DRAIN
UNITED STATES BANKRUPTCY JUDGE

## Exhibit B

**Lowne Declaration**

DAVIS POLK & WARDWELL LLP
450 Lexington Avenue
New York, New York 10017
Telephone: (212) 450-4000
Facsimile: (212) 701-5800
Marshall S. Huebner
Eli J. Vonnegut
James M. Millerman
Marc J. Tobak
Dylan A. Consla

*Counsel to the Debtors
and Debtors in Possession*

**UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| **In re:** | **Chapter 11** |
| **PURDUE PHARMA L.P.,** *et al.*, | **Case No. 19-23649 (RDD)** |
| **Debtors.**[1] | **(Jointly Administered)** |

**DECLARATION OF JON LOWNE IN SUPPORT OF THE MOTION OF DEBTORS
FOR ENTRY OF AN ORDER AUTHORIZING IMPLEMENTATION OF 2021 KEY
EMPLOYEE INCENTIVE PLAN AND 2021 KEY EMPLOYEE RETENTION PLAN**

I, Jon Lowne, being fully sworn, hereby declare that the following is true to the best of my

knowledge, information and belief:

1.      I am an Executive Vice President and the Chief Financial Officer of Purdue Pharma

L.P. ("**PPLP**" and, collectively with each of the other above-captioned debtors, the "**Debtors**," the

---

[1] The Debtors in these cases, along with the last four digits of each Debtor's registration number in the applicable jurisdiction, are as follows: Purdue Pharma L.P. (7484), Purdue Pharma Inc. (7486), Purdue Transdermal Technologies L.P. (1868), Purdue Pharma Manufacturing L.P. (3821), Purdue Pharmaceuticals L.P. (0034), Imbrium Therapeutics L.P. (8810), Adlon Therapeutics L.P. (6745), Greenfield BioVentures L.P. (6150), Seven Seas Hill Corp. (4591), Ophir Green Corp. (4594), Purdue Pharma of Puerto Rico (3925), Avrio Health L.P. (4140), Purdue Pharmaceutical Products L.P. (3902), Purdue Neuroscience Company (4712), Nayatt Cove Lifescience Inc. (7805), Button Land L.P. (7502), Rhodes Associates L.P. (N/A), Paul Land Inc. (7425), Quidnick Land L.P. (7584), Rhodes Pharmaceuticals L.P. (6166), Rhodes Technologies (7143), UDF LP (0495), SVC Pharma LP (5717) and SVC Pharma Inc. (4014). The Debtors' corporate headquarters is located at One Stamford Forum, 201 Tresser Boulevard, Stamford, CT 06901.

"**Company**" or "**Purdue**").  I was first employed by Purdue as Senior Internal Auditor in 1995 and gained increasing responsibility in the Company's finance team over time, including as Controller from 2005 to July 2017, and then as Acting Chief Financial Officer from August 2017 to February 2018.  Since March 2018, I have been the Chief Financial Officer of PPLP.  I am familiar with the day-to-day operations, business and financial affairs of the Debtors.

2.      I submit this declaration (this "**Declaration**") in further support of the *Motion of Debtors for Entry of an Order Authorizing Implementation of 2021 Key Employee Incentive Plan and 2021 Key Employee Retention Plan* (the "**Motion**").[2]  I am authorized to submit this Declaration on behalf of the Debtors.

3.      Except as otherwise indicated, all facts set forth in this Declaration are based upon my personal knowledge, my review of relevant documents, information provided to me by other employees of the Company and Willis Towers Watson, or my opinion based upon experience, knowledge and information concerning the operations of the Debtors and the pharmaceutical industry as a whole.  If called upon to testify, I would testify competently to the facts set forth in this Declaration.

### The Debtors' Historical Compensation Plans

4.      For more than 30 years the Debtors maintained a performance-based Annual Incentive Plan (the "**AIP**") for the majority of their employees.  The AIP provided annual cash bonuses tied to achievement of company and individual performance metrics.  The Debtors also maintained a Long-Term Results Plan (the "**LTRP**" and, together with the AIP, the "**Prepetition Compensation Plans**") for nearly twenty years, under which eligible employees received annual grants that could result in cash payouts based on achievement of performance goals measured over

---

[2] Capitalized terms used and not otherwise defined herein have the meanings ascribed to them in the Motion.

2

a three-year performance period.  The Prepetition Compensation Plans were used effectively for years to drive performance and productivity.

5.    The Debtors have also historically maintained various retention plans in the ordinary course of business, as needed, to retain key employees.  The Debtors implemented retention plans for certain executive and non-executive employees in both 2018 and 2019, which were carefully calibrated to ensure that key employees were incentivized to remain employed with the Debtors through the end of 2020, which was deemed a critical period for the Debtors.  The retention plan approved by this Court in December 2019 (the "**2019 Retention Plan**") provided for cash-based awards to approximately 120 non-insider employees and was structured to retain their services through December 31, 2020.[3]

**Approval of 2019 and 2020 Programs with Negotiated Adjustments**

6.    In September 2019, the Debtors sought authority from this Court to make payments (the "**2019 Payments**") owed under the 2019 AIP, outstanding LTRPs with payments due in early 2020 and the 2019 Retention Plan.  Following extensive negotiations with their various creditor constituencies and agreed modifications, the Debtors secured the support or non-objection of all parties in the case (including the Official Committee of Unsecured Creditors (the "**UCC**")) other than the Ad Hoc Group of Non-Consenting States (the "**NCSG**"), and the negotiated payments were approved by the Court.

7.    In 2020, the Debtors replaced the Prepetition Compensation Plans with a key employee incentive plan (the "**2020 KEIP**") and a key employee retention plan (the "**2020 KERP**"

---

[3] *See Supplemental Final Order Authorizing (I) Debtors to (A) Pay Certain Pre-Petition Wages, Salaries, Employee Benefits and Other Compensation and (B) Maintain Employee Benefits Programs and Pay Related Administrative Obligations, (II) Employees and Retirees to Proceed with Outstanding Workers' Compensation Claims and (III) Financial Institutions to Honor and Process Related Checks and Transfers* [ECF 629].

and, together with the 2020 KEIP, the "**2020 Compensation Plans**"), which closely paralleled the Prepetition Compensation Plans.  Payments under the annual award component of the 2020 KEIP (the "**2020 KEIP Annual Award**") and the long-term incentive compensation grant component of the 2020 KEIP (the "**2020 KEIP Long-Term Award**") were both contingent upon the Debtors' achievement of certain 2020 performance metrics (the "**2020 Performance Metrics**") pertaining to value creation, innovation and efficiency, and people and culture that were similar to the Debtors' historical metrics under the Prepetition Compensation Plans.  If the Debtors failed to meet the threshold level for the 2020 Performance Metrics, no 2020 KEIP Annual Award or 2020 KEIP Long-Term Award would have been paid to any participant in the 2020 KEIP.

8.      Payments under the annual award component of the 2020 KERP (the "**2020 KERP Annual Award**"), the long-term compensation grant component of the 2020 KERP (the "**2020 KERP Long-Term Award**") and the continuation of the Debtors' program of making targeted retention payments to certain employees under the 2020 KERP (the "**2020 Targeted Retention Awards**") were not subject to performance criteria so as to provide participants in the 2020 KERP with greater certainty about their compensation.  The 2020 KEIP and 2020 KERP were consistent with the Debtors' historical practice, competitive with the market and necessary for the preservation of the value of the Debtors' estates.

9.      The initial proposed 2020 KEIP and 2020 KERP included significant reductions in payments as compared to the Debtors' historical practices.  Moreover, the Debtors again engaged in intensive negotiations with key creditor groups and agreed to yet further reductions.  The Debtors' agreed-upon reductions to the 2020 KEIP in both the initial motion and subsequent negotiations for each of the five 2021 KEIP Participants (as defined below) are set forth in **Table 1** below:

**TABLE 1**

| KEIP Participant | Stage | Agreed Reduction in Amount of: | | | Total Reduction |
| | | KEIP Annual Award | LTRP Payouts Due in 2022 | LTRP Grant Payable in 2023 | |
|---|---|---|---|---|---|
| **President & Chief Executive Officer** | Motion: | ($715,639) | ($339,207) | ($811,588) | ($1,866,434) |
| | Negotiation: | ($593,000) | ($55,651) | ($36,521) | ($685,172) |
| | **Total:** | **($1,308,639)** | **($394,858)** | **($848,109)** | **($2,551,606)** |
| **Executive Vice President, Chief Financial Officer** | Motion: | ($89,991) | ($49,003) | ($200,000) | ($338,994) |
| | Negotiation: | ($0) | ($16,766) | ($9,000) | ($25,766) |
| | **Total:** | **($89,991)** | **($65,769)** | **($209,000)** | **($364,760)** |
| **Executive Vice President, General Counsel and Corporate Secretary** | Motion: | ($502,579) | ($119,720) | ($515,000) | ($1,137,299) |
| | Negotiation: | ($175,000) | ($40,963) | ($23,175) | ($239,138) |
| | **Total:** | **($677,579)** | **($160,683)** | **($538,175)** | **($1,376,437)** |
| **Chief Technical Operations Officer** | Motion: | ($75,774) | ($46,493) | ($200,000) | ($322,267) |
| | Negotiation: | ($54,753) | ($15,908) | ($9,000) | ($79,661) |
| | **Total:** | **($130,527)** | **($62,401)** | **($209,000)** | **($401,928)** |
| **President, Rhodes Pharmaceuticals** | Motion: | ($29,645) | ($13,367) | ($59,225) | ($102,237) |
| | Negotiation: | ($31,501) | ($4,573) | ($2,665) | ($38,739) |
| | **Total:** | **($61,146)** | **($17,940)** | **($61,890)** | **($140,976)** |
| **Total:** | Motion: | ($1,413,628) | ($567,790) | ($1,785,813) | ($3,767,231) |
| | Negotiation: | ($854,254) | ($133,861) | ($80,361) | ($1,068,476) |
| | **Total:** | **($2,267,882)** | **($701,651)** | **($1,866,174)** | **($4,835,707)** |

10.     Changes to the 2020 KERP included, among other things, reducing the total amount of payments to be made by over $4,000,000 in the aggregate.

**The Proposed Compensation Plans**

11.     Like last year, the Debtors propose the adoption of a key employee incentive plan (the "**2021 KEIP**") and key employee retention plan (the "**2021 KERP**" and, together with the 2021 KEIP, the "**2021 Compensation Plans**"). The 2021 Compensation Plans, like the 2020 Compensation Plans they are based on, are designed to continue to balance two paramount needs of the Debtors. First, the Debtors need to pay competitive and motivating compensation and give the workforce clarity regarding compensation to avoid further increases in attrition. Second, the

Debtors need to tailor their compensation practices to their present circumstances—in particular, the current phase and target trajectory of these Chapter 11 Cases.

12.     The 2021 KEIP, like the 2020 KEIP, replaces the 2021 AIP award that otherwise would have been payable in 2022 with an incentive-based award.  The 2021 KEIP also provides for a long-term award payable in 2024 in place of the LTRP grant that participants otherwise would have received in 2021.

13.     The 2021 KERP, like the 2020 KERP, replaces the 2021 AIP award that otherwise would have been payable in 2022 with a retention award.  The 2021 KERP also provides for (i) a long-term award payable in 2024 in place of the LTRP grant that participants otherwise would have received in 2021 and (ii) additional targeted retention payments for certain employees.

14.     Consistent with their practice last year with respect to the 2020 Compensation Plans, the Debtors and their management team worked extensively with Willis Towers Watson as their independent compensation consultant.

15.     The Debtors' employees continue to bear uncommon burdens, worsened by continuing attrition—combined with an industry-wide difficult hiring market—leading to a high workload for remaining employees and further exacerbated by the complex and charged nature of these chapter 11 proceedings.  The Company maintains lean operations, and in the face of ongoing attrition, the Debtors have struggled to fill open positions.  Indeed, 28 positions have opened at the Company year to date, with 17 remaining unfilled as of the date hereof.  And the eleven filled positions remained vacant, on average, for more than 42 days.

16.     The 2021 Compensation Plans would essentially renew the 2020 Compensation Plans and remain consistent with the Debtors' compensation plans and practices in prior years.  I believe that departing from the Debtors' historical compensation practices would make it much

more difficult for the Debtors to retain employees who are necessary to maintain the Debtors' business operations.  I believe that the 2021 Compensation Plans are reasonably tailored and necessary to realize the Debtors' objective of a successful emergence from chapter 11.

### The Proposed 2021 KEIP

*The 2021 KEIP Participants*

17.      The proposed 2021 KEIP would apply to five of the Debtors' current employees (each, a "**2021 KEIP Participant**" and together, the "**2021 KEIP Participants**").  The 2021 KEIP Participants are the only employees who meet at least one of the criteria for being an "insider" that are set forth in the Motion.  These employees' institutional knowledge and skills remain essential to guiding the Debtors through their novel restructuring and maximizing the value of the Debtors' estates through the conclusion of the Chapter 11 Cases.  The 2021 KEIP Participants consist of the: (i) President & Chief Executive Officer (the "**CEO**"); (ii) Executive Vice President, Chief Financial Officer (the "**CFO**"); (iii) Executive Vice President, General Counsel and Corporate Secretary (the "**General Counsel**"); (iv) Chief Technical Operations Officer; and (v) President, Rhodes Pharmaceuticals.  The Debtors believe that it is important to continue to incentivize the 2021 KEIP Participants, as their institutional knowledge and skills remain essential to guiding the Debtors through their novel restructuring and maximizing the value of the Debtors' estates through the conclusion of the Chapter 11 Cases.

18.      The 2021 KEIP Participants continue to perform a variety of functions for the Debtors, including providing critical management, operations, finance and legal services.  They are responsible for helping determine the Debtors' strategic plan and facilitating the achievement of the Debtors' goals.  In addition to these significant day-to-day responsibilities, these individuals' workloads remain further elevated as a result of the Chapter 11 Cases and the Debtors' smaller

workforce.  Moreover, where the Debtors last year first sought authority to pay eight participants under the 2020 KEIP, only five 2021 KEIP Participants remain, dividing the same crucial leadership roles among a leaner executive team.  The 2021 KEIP Participants continue to make extraordinary efforts to shepherd the Debtors' businesses, maximize estate value and steer the Debtors through their restructuring.  Accordingly, the Debtors believe that the 2021 KEIP Participants should continue to be appropriately incentivized to ensure optimal recoveries for all stakeholders.  None of the 2021 KEIP Participants will be eligible to participate in the proposed 2021 KERP (including the 2021 Targeted Retention Awards, as defined below), and the purpose of the proposed 2021 KEIP is to incentivize the 2021 KEIP Participants.

***The 2021 KEIP Structure***

19.     Each 2021 KEIP Participant will receive an award comprised of (i) an annual award (the "**2021 KEIP Annual Award**") with a target value, which is also the award's maximum value, set forth in **<u>Table 2</u>**, below, and (ii) a long-term incentive compensation grant payable in 2024 (the "**2021 KEIP Long-Term Award**").

20.     2021 KEIP Annual Award payments will be contingent upon the Debtors' achievement of certain 2021 performance metrics discussed in more detail below (the "**2021 Performance Metrics**"), at the threshold or target performance levels, as applicable, with straight-line interpolation to be used if such actual performance falls between such amounts.  No payment under the 2021 KEIP Annual Award would be made to any of the 2021 KEIP Participants if the Debtors fail to meet the threshold level for the 2021 Performance Metrics.  The maximum cost of the 2021 KEIP Annual Award is $5,392,700.

**TABLE 2**

| KEIP Participant | Payout Range = 75% to 100% | |
| --- | --- | --- |
| | Threshold 2021 KEIP Annual Award | Target 2021 KEIP Annual Award |
| President & Chief Executive Officer | $1,645,125 | $2,193,500 |
| Executive Vice President, Chief Financial Officer | $566,925 | $755,900 |
| Executive Vice President, General Counsel and Corporate Secretary | $1,320,375 | $1,760,500 |
| Chief Technical Operations Officer | $316,350 | $421,800 |
| President, Rhodes Pharmaceuticals | $195,750 | $261,000 |
| **Total** | **$4,044,525** | **$5,392,700** |

21.     Each 2021 KEIP Participant's target 2021 KEIP Annual Award is equal to the target amount of the 2021 AIP award that the participant otherwise would have been eligible to receive, as reduced by the same concessions that were agreed with respect to the 2020 KEIP Annual Award approved last year.

22.     The 2020 KEIP Annual Award also included a component replacing and repurposing the LTRP payouts that otherwise would have been payable in early 2021.  This year, the corresponding LTRP payouts that otherwise would have been payable in early 2022 have already been approved by the Court.  Accordingly, the 2021 KEIP Annual Award does not include any component replicating those awards.  The proposed amount of the 2021 KEIP Annual Award is therefore correspondingly lower than equivalent awards with respect to the 2020 KEIP.

23.     Subject to achievement of the 2021 Performance Metrics at a threshold level, the 2021 KEIP Annual Award will be paid as follows: (i) subject to the 2021 KEIP Participant's continued employment through the payment date (other than as provided below), 50% paid on the Company regular payroll date closest to October 1, 2021, subject to clawback of the full amount paid if the 2021 KEIP Participant resigns or is terminated for any reason other than by the Debtors without cause prior to March 15, 2022, which mirrors the approximate historical payment date of the Debtors' longstanding AIP, and (ii) subject to the 2021 KEIP Participant's continued employment through the payment date, the remaining 50% paid on the Company regular payroll

9

date closest to March 15, 2022.[4]  The first payment amount will assume target-level performance and the second payment will include a true-up, if any, including a potential clawback of the first payment for any amount that would not have otherwise been paid if threshold or target performance is not met.  If the Debtors emerge at any time prior to any outstanding payment date, the remaining full 2021 KEIP Annual Award payment would be paid on the emergence date at the target 2021 KEIP Annual Award value, again subject to clawback (a) of the full amount paid if the 2021 KEIP Participant resigns or is terminated for any reason other than by the Debtors without cause prior to March 15, 2022, or (b) for any amount that would not have otherwise been paid if the threshold or target performance is not met (such clawback to occur by March 15, 2022).  All amounts payable under the 2021 KEIP Annual Award will be subject to acceleration at the target 2021 KEIP Annual Award value in the event of a termination of employment by the Debtors without cause, subject to clawback for any amount that would not have otherwise been paid if threshold or target performance is not met (such clawback to occur by March 15, 2022).

24.     Consistent with Purdue's longstanding compensation practices, each 2021 KEIP Participant will also receive a 2021 KEIP Long-Term Award, which is designed to mimic the economic structure of the LTRP grant that the participant otherwise would have received in 2021, payable in 2024.  The target amount of the 2020 KEIP Long-Term Award included a 52.25%

---

[4] These dates represent a minor deviation from the timeline approved in connection with the 2020 KEIP Annual Award.  The 2020 KEIP Annual Award is subject to a clawback date of the earlier of June 30, 2021 and emergence, and the Court approved payment dates on the closest scheduled payroll dates to November 1, 2020 and March 31, 2021 (for the Debtors' CEO and CFO, the first payment was set for the closest scheduled payroll date to November 18, 2020).  *See Debtors' Supplemental Statement in Support of Motion of Debtors for Entry of an Order Authorizing Implementation of a Key Employee Incentive Plan and a Key Employee Retention Plan* [ECF 1847] ¶ 4 & n.4; *Debtors' Supplemental Reply in Support of Motion of Debtors for Entry of an Order Authorizing Implementation of a Key Employee Incentive Plan and a Key Employee Retention Plan* [ECF 1960] ¶ 4 & n.5; *Supplemental Order Authorizing the Debtors to Implement a Key Employee Incentive Plan* [ECF 2002].  This year, in light of their impending emergence, the Debtors believe that preserving a clawback right based on their historical compensation timeline irrespective of when emergence occurs is prudent and thus are seeking approval of a March 15, 2022 clawback date for the 2021 KEIP Annual Award and 2021 KEIP Annual Award payment dates on the closest scheduled payroll dates to October 1, 2021 and March 15, 2022.

aggregate reduction (consisting of an initial 50% reduction in the original proposal and a further 4.5% reduction of the already reduced amount that was agreed with the UCC and other key stakeholders) as compared to the target LTRP grant that otherwise would have been received based on historical practice. The same aggregate reduction of 52.25% has been applied to the target amount of the 2021 KEIP Long-Term Award. Actual payouts will be based on the same 2021 Performance Metrics that apply to the 2021 KEIP Annual Award that are described below, and therefore will depend solely on the Company's performance in 2021.

25.     Payments due under the 2021 KEIP Long-Term Awards will accelerate at target value upon the Debtors' emergence from bankruptcy, subject to a clawback by the post-emergence entities following emergence (a) for the full amount paid if the 2021 KEIP Participant resigns or is terminated for any reason other than by the Debtors without cause prior to the date that such payments would otherwise have been made absent emergence or (b) for any amount that would not have otherwise been paid if threshold or target performance is not met (such clawback to occur by March 15, 2022). Such amounts will also be subject to acceleration at target value in the event of a termination of employment prior to emergence by the Debtors without cause, subject to clawback for any amount that would not have otherwise been paid if threshold or target performance is not met (such clawback to occur by March 15, 2022). The maximum aggregate amount of such payments is approximately $1,710,000.

**The 2021 KEIP Metrics**

26.     In early 2021, the Board of Directors of Purdue Pharma Inc. (the "**Board**"), with the recommendation of the Board's Compensation and Talent Committee (the "**Compensation Committee**") and guidance from Willis Towers Watson, set the 2021 Performance Metrics, consistent with the Company's longstanding practice of approving performance metrics early in

11

each calendar year.  The Board determined that it was in the best interest of the Debtors and the post-emergence entities to apply the 2021 metrics to the long-term award for years subsequent to 2021, given that the Debtors are anticipated to emerge well before the completion of the typical three-year performance period for such awards.

27.    The 2021 Performance Metrics are based on the same three strategic pillars as the metrics with respect to the 2020 KEIP and the historical and longstanding AIP: value creation (representing 40% of the 2021 Performance Metrics), innovation and efficiency (50% of the 2021 Performance Metrics) and people and culture (10% of the 2021 Performance Metrics).  These 2021 Performance Metrics are ambitious, having threshold targets that are difficult to achieve both individually and when considered in combination, and will require the 2021 KEIP Participants' diligent and committed efforts.  At the time the 2021 Performance Metrics were set by the Board, they were challenging, required extensive achievement and presented a meaningful risk of not being met at the threshold level required for payment.  The 2021 KEIP Participants have been focused on driving the Debtors to meet these goals during the first half of 2021 and will need to continue to apply substantial efforts to achieve these metrics in the second half of 2021.  Indeed, while certain of the target metrics have been met, others remain in progress, and still others the Company will be unable to satisfy.

28.    The value creation metric is designed to measure and reward long-term success of the Debtors' business based on certain nonfinancial operational goals, such as meeting certain deadlines with respect to the Company's testing and development of non-opioid products, including overdose treatment products.  **Table 3** below sets forth certain key operational and developmental goals that the Compensation Committee approved as key to the long-term success of the Debtors' business.

**TABLE 3**

| 2021 Value Creation Performance Metrics | 2021 Performance Target | % of Value Creation | % of 2021 Performance Metrics |
|---|---|---|---|
| **Public Health Initiatives[5]** | | | |
| Provide support to HRT to allow an NDA filing for OTC intra-nasal naloxone | End of Q3 2021 | 40% | 16.0% |
| Nalmefene autoinjector registration stability initiation on the fully assembled device | End of Q4 2021 | | |
| Secure approval for the Nalmefene vial and file the ANDA for the pre-filled syringe | End of Q4 2021 | | |
| **Progressing the Pipeline** | | | |
| (a) Complete proof of concept for Sunobinop in insomnia associated with alcohol cessation and (b) make go/no go decision for progression to Phase 3 | (a) End of Q2 2021; (b) Year-End 2021 | 30% | 12.0% |
| Progress the global development of Tinostamustine in cancer patients to allow cohort prioritization decisions in hemato-oncology and solid tumors | End of Q2 2021 | | |
| **Delivery of Project Catalyst Implementation Plan to Include Regulatory Submission on the Following API Transfers:** | | | |
| Oxycodone / APAP Tabs | End of Q4 2021 | 5% | 1.8% |
| Oxycodone Tabs | End of Q4 2021 | 3% | 1.2% |
| **RALP and Progressing the Generic Pipeline** | | | |
| Scopolamine TDS – Completion of Skin Sensitization and Irritation Study | End of Q3 2021 | 5% | 2.1% |
| Lisdexamfetamine Capsules – Submit ANDA | End of Q4 2021 | 5% | 1.8% |
| Dihydroergotamine Nasal Spray – Completion of IVBE Study | End of Q2 2021 | 5% | 1.8% |
| Theophylline ER Tablets (300 mg) – Finalize and submit FDA responses and define clinical path forward | End of Q2 2021 | 5% | 2.1% |
| Varenicline Tablets – FDA approval | End of Q3 2021 | 3% | 1.2% |
| **Total** | | **100%** | **40.0%** |

29.     The innovation and efficiency metric is designed to capture key financial and operational goals, including important business metrics such as operating profits, net sales and operating losses.  **Table 4** below sets forth certain key financial and operational goals that the Debtors have identified as key to the long-term success of the Debtors' business.

---

[5] All medications referred to in this section are potential treatments for opioid overdose.

**TABLE 4**

| 2021 Innovation and Efficiency Performance Metric[6] | 2021 Performance Target | % of Innovation and Efficiency | % of 2021 Performance Metrics |
|---|---|---|---|
| Consolidated total business Operating Profit | $69 million | 40% | 20.0% |
| Adhansia XR Net Sales | $14 million | 20% | 10.0% |
| Avrio Net Sales | $97.7 million | 20% | 10.0% |
| Reduce Rhodes (RALP) 2021 Funding Requirement by $45 million from 2020 amount | ($45 million) | 20% | 10% |
| **Total** | | **100%** | **50%** |

30.    Finally, nurturing the Debtors' human resources and organizational culture will be critical to keeping the Debtors on the path to emergence and beyond.  Such steps include (i) conducting readiness activities to prepare for emergence from bankruptcy and (ii) establishing and supporting implementation of a diversity, equity and inclusion ("**DE&I**") roadmap through the end of 2021 to ensure a sustainable and accountable DE&I profile for the organization.  This metric will be reviewed holistically and will represent 10% of the target 2021 KEIP Annual Award.

***Importance of the 2021 KEIP***

31.    The Debtors strongly believe that maintaining compensation in line with the Debtors' historical practice and competitive with the market is critical to their ability to motivate and retain their highly skilled workforce.  The Debtors believe that appropriately compensating their employees is necessary to be able to complete a value-maximizing restructuring and emerge from bankruptcy.  The 2021 KEIP essentially renews the 2020 KEIP and is consistent with the Debtors' historical compensation practices, although lower in amount given the continuation of concessions agreed to last year, while the challenges faced by the 2021 KEIP Participants remain elevated as they continue to navigate the difficult terrain the Debtors face as they seek to emerge

---

[6] Adhansia XR is a central nervous system stimulant prescription medicine used for the treatment of ADHD in people six years of age and older.  Avrio Health L.P. is a wholly owned subsidiary of the Debtors which produces over-the-counter consumer health products, including Betadine (a wound care product), Colace (a stool softener), Senokot (a laxative) and SlowMag Mg (a magnesium supplement).

14

from bankruptcy.  During the course of the Chapter 11 Cases, the challenges faced by the 2021

KEIP Participants have remained significant due to the extremely complex and highly litigious

nature of these Chapter 11 Cases.

32.     For each 2021 KEIP Participant, the total cost of the proposed 2021 KEIP Annual

Award is approximately the same as the component of the 2020 KEIP Annual Award that

effectively replicated the AIP, subject to modest and typical year-over-year increases, and even as

the five 2021 KEIP Participants shoulder the responsibilities previously carried by the eight

executives the Debtors first sought authority to pay under the 2020 KEIP.  In addition, the

component of the 2020 KEIP Annual Award that effectively replicated LTRP payouts that would

otherwise have been made in early 2021 has been removed from the proposed 2021 KEIP, given

that the LTRP payouts in early 2022 were already addressed and approved last year.  Though the

cost of the 2021 KEIP as a percentage of revenue has risen, this increase is primarily attributable

to the Debtors' decreased revenue throughout the duration of these Chapter 11 Cases.

33.     While the General Counsel's participation in the 2021 KEIP would result in

nominally above-market compensation for an ordinary pharmaceutical company of Purdue's size,

it was the Debtors' business judgment that they required significantly greater expertise and

experience in a General Counsel than would an ordinary peer pharmaceutical company,

particularly in light of the pre-bankruptcy litigation that was already at a fever pitch when the

Company recruited the General Counsel.  It remains the Debtors' business judgment that they

continue to require that level of expertise and experience in a general counsel.  In addition to

managing all of the usual complex legal issues necessary to run a diversified pharmaceutical

business, the Debtors' General Counsel is responsible for overseeing an extraordinarily complex

restructuring process, including working to achieve a global resolution of over 2,800 lawsuits and

15

filed claims seeking more than $10 trillion in the aggregate.  The Debtors continue to believe that the General Counsel's compensation is appropriate and reasonable, especially given the immense challenges he faces in his role with the Debtors, and in light of his past experience and expertise and the other opportunities available to him.

34.    Historically, the LTRP has been an important component of the Debtors' overall compensation strategy, and something the Debtors rely on to ensure the total compensation of their senior executives is competitive with the market.  Last year, this Court approved the 2020 KEIP Long-Term Award that effectively replicated the LTRP grants that would otherwise have been made last year, subject to negotiated concessions.  The Debtors accordingly believe that the grant to the 2021 KEIP Participants of similar long-term awards payable in 2024 in the form of 2021 KEIP Long-Term Awards is necessary, appropriate, and consistent with the Debtors' historical compensation practices.  The proposed amount of the 2021 KEIP Long-Term Awards reflects the concessions agreed to last year, subject to normal and modest year-over-year increases.  The loss of the long term grants without substitution would represent a significant decrease in overall compensation, which could jeopardize the Debtors' ability to incentivize the 2021 KEIP Participants and ensure stability in the workforce and the long-term value of the enterprise.

## The KERP

### The 2021 KERP Participants

35.    The Debtors seek authorization to implement the 2021 KERP for virtually[7] all incentive-eligible employees other than the 2021 KEIP Participants (the "**2021 KERP Participants**").  The 2021 KERP Participants have continued to undertake significant efforts to

---

[7] A small number of employees either previously did not participate in the AIP and therefore will not participate in the 2021 KERP or currently are not eligible to participate in the 2021 KERP.  Additionally, for the avoidance of doubt, no employee to whom the Company provides notice of separation prior to this Court's approval, if any, of the 2021 KERP will be a 2021 KERP Participant.

16

maintain the value of the Debtors' business—including during the unique environment of the COVID-19 pandemic—and enable the Debtors' continued progress toward a successful restructuring. They have continued this Herculean task under significant stresses, including reduced employee headcount combined with a very competitive market for talent to replace departing employees, which has increased the burdens on many of the remaining employees and has had a negative effect on morale, yet the 2021 KERP Participants nonetheless continue to deliver extraordinary business results. As of the date hereof, approximately 506 employees will participate in the 2021 KERP, of which 19 will be Vice President or higher and 487 will be middle management, professional employees and support and technical staff, which include scientific researchers as well as regulatory, compliance, quality and manufacturing personnel.[8] None of the 2021 KEIP Participants are eligible to participate in the 2021 KERP. No 2021 KERP Participant meets any of the criteria for being an insider as set forth in the Motion.

***The KERP Payout Structure***

36.    Each 2021 KERP Participant will receive an award comprised of (i) an amount equal to the 2021 KERP Participant's target AIP (the "**2021 KERP Annual Award**"), (ii) a long-term incentive compensation grant payable in 2024 (the "**2021 KERP Long-Term Award**"), and (iii), with respect to certain 2021 KERP Participants, additional targeted retention payments (the "**2021 Targeted Retention Award**").

37.    Each 2021 KERP Participant's 2021 KERP Annual Award is equal to the target amount of the 2021 AIP award they otherwise would have been eligible to receive, payable in 2022. The 2021 KERP Annual Award is not subject to performance criteria to provide the 2021

---

[8] In instances where the separation of existing 2021 KERP Participants from the Debtors results in newly hired employees taking on their roles or responsibilities, the 2021 KERP would allow the Debtors to include such newly hired employees as 2021 KERP Participants, if such newly hired employees would otherwise have been eligible to participate in the 2021 AIP and LTRP, as applicable.

KERP Participants with greater certainty about their compensation. The Debtors expect this structure to help retain 2021 KERP Participants under the present challenging and uncertain conditions.

38.    The 2021 KERP Annual Award will be paid as follows: (i) 50% paid on the Company regular payroll date closest to October 1, 2021 and (ii) the remaining 50% paid on the Company regular payroll date closest to March 15, 2022. Other than for hourly employees, the first payment of the 2021 KERP Annual Award is subject to a clawback if the 2021 KERP Participant resigns or is terminated for any reason other than by the Debtors without cause prior to March 15, 2022.[9] Payments under the 2021 KERP Annual Award will be subject to the 2021 KERP Participant's continued employment through the applicable payment date, with acceleration in the event that a 2021 KERP Participant's employment is terminated by the Debtors without cause. In the event the Debtors emerge from bankruptcy any time prior to a payment date, the remaining full amount of the 2021 KERP Annual Award would accelerate and be payable, again subject to clawback, other than for hourly employees, if the 2021 KERP Participant resigns or is terminated for any reason other than by Debtors without cause prior to March 15, 2022. The total aggregate target (and maximum) payment under the 2021 KERP Annual Award is approximately $16,100,000.

---

[9] These dates represent a minor deviation from the timeline approved in connection with the 2020 KERP Annual Award. The 2020 KERP Annual Award is subject to a clawback date of the earlier of June 30, 2021 and emergence, and the Court approved payment dates on the closest scheduled payroll dates to November 1, 2020 and March 31, 2021. *See Debtors' Omnibus Reply in Support of Motion of Debtors for Entry of an Order Authorizing Implementation of a Key Employee Incentive Plan and a Key Employee Retention Plan* [ECF 1742]. This year, in light of their impending emergence, the Debtors believe that preserving a clawback right based on their historical compensation timeline irrespective of when emergence occurs is prudent and thus are seeking approval of a March 15, 2022 clawback date for the 2021 KERP Annual Award and 2021 KERP Annual Award payment dates on the closest scheduled payroll dates to October 1, 2021 and March 15, 2022.

39.    Consistent with past practice, certain 2021 KERP Participants will receive a 2021 KERP Long-Term Award that is essentially the same as the 2020 KERP Long-Term Award and is designed to mimic the economic structure of the LTRP grant that otherwise would have been granted to the 2021 KERP Participant in 2021 under Purdue's longstanding compensation practices.  The amount of such grant will be equal to 60% of the target LTRP grant that otherwise would have been granted to the 2021 KERP Participant in 2021 and will be essentially the same as the award under the 2020 KERP, subject to modest, ordinary course year-over-year base salary increases, promotions and other changes to the employee population.  The 2021 KERP Long-Term Award will not be subject to performance metrics.  Payments due under the 2021 KERP Long-Term Awards will accelerate upon the Debtors' emergence from bankruptcy, subject to clawback (other than for hourly employees) through the date the payments otherwise would have been made absent emergence if the 2021 KERP Participant resigns or is terminated for any reason other than by the Debtors without cause. Such amounts will also be subject to acceleration in the event of a termination of employment prior to emergence by the Debtors without cause.  The aggregate total cost of these 2021 KERP Long-Term Awards for all 2021 KERP Participants is approximately $6,000,000.

40.    In addition, for multiple years the Debtors have used targeted retention awards, most recently in the form of the 2020 Targeted Retention Awards, to preserve and maximize the value of the Debtors' estates.  Even with such programs in place, the Debtors have continued to see attrition, which the Debtors believe would have been dramatically higher in the absence of such programs.  The Debtors therefore seek approval of the 2021 Targeted Retention Awards in an aggregate amount of up to $7,200,000.[10]  The 2021 Targeted Retention Awards will renew the

---

[10] Last year, this Court approved the 2020 Targeted Retention Awards in the amount of $8.1 million.  That figure included approximately $900,000 in retention awards that were intended to be granted to employees of Rhodes

Debtors' 2020 Targeted Retention Awards and allow the Debtors to continue their practice of making targeted retention payments to an identified group of key employees. The 2021 Targeted Retention Awards will be payable in the fourth quarter of 2021 and the first quarter of 2022. Other than for hourly employees, 2021 Targeted Retention Award payments are subject to a clawback if the 2021 KERP Participant resigns or is terminated for any reason other than by the Debtors without cause before September 30, 2022. Payments under the 2021 Targeted Retention Awards will be subject to the applicable employee's continued employment through the applicable payment date, with such payments to accelerate upon emergence or if the applicable employee is terminated by the Debtors without cause.

***Importance of the 2021 KERP***

41.    The Debtors believe that the 2021 KERP is commercially appropriate and reasonable. Given the continued extraordinary burdens on the 2021 KERP Participants from the challenges of operating in chapter 11 and the negative press environment faced by Purdue, there is a very real risk that additional employees will continue to depart to work elsewhere. Indeed, attrition has remained high, with 25 resignations thus far in 2021 alone, which represents a year-to-date annualized voluntary turnover rate of 9.74%. Further, there continue to be cases of employees timing their resignations to coincide with the end of clawback periods, and Purdue anticipates that the number of voluntary resignations may increase following the expiration of the June 30, 2021 clawback date for the 2020 KERP Annual Award. As the Debtors have suffered attrition, the workload on the remaining employees has only increased. The strain of these Chapter 11 Cases creates the very real risk that, without continuation of the Debtors' normal annual

---

Technologies. Due to the Debtors' sale of Rhodes Technologies, such awards were ultimately not granted. As a result, the Debtors paid out approximately $7.2 million in 2020 Targeted Retention Awards, and the Debtors believe the same figure remains appropriate this year.

compensation practices in the form of the 2021 KERP, the Debtors may lose an unacceptable number of their employees to competing employers able to offer market compensation and job security that the Debtors cannot match. Additional defections among the Debtors' workforce could significantly hamper their operations and possibly jeopardize the Debtors' timely emergence. Moreover, the Debtors have continued to face significant challenges in hiring over the past year— 28 headcount positions have opened year to date, 17 of which remain unfilled—and it remains extremely unlikely that the Debtors would be able to find sufficient, if any, qualified replacements during the critical period leading up to the Debtors' emergence. If not for the compensation programs in place for 2020, including the 2020 Targeted Retention Awards, the Debtors believe that the attrition rate would have been significantly higher. Failure to implement the 2021 KERP could have a devastating effect on the Debtors' ability to retain the individuals they need to maintain their business operations and deliver a successful emergence from these Chapter 11 Cases for all stakeholders.

42.     The 2021 KERP Annual Award is consistent with the Debtors' historical compensation practices. The 2021 KERP Annual Award is essentially the same as the AIP component under the 2020 KERP Annual Award, subject to modest, ordinary course year-over-year increases, and is substantially equivalent to historical annual AIP payouts for this group. The clawback through March 15, 2022 provides a powerful retentive element—just like the effect of AIP payments typically being made in March of each year. Similarly, the 2021 KERP Long-Term Award is likewise essentially the same as the 2020 KERP Long-Term Award, subject to modest, ordinary course year-over-year increases. Additionally, the Compensation Committee and management selected 2021 KERP Participants to receive 2021 Targeted Retention Awards through a detailed and careful review of employee roles and job functions in order to identify employees

21

whose services are particularly critical to preserving and maximizing the value of the Debtors' estates. The 2021 Targeted Retention Awards are consistent with the amounts of awards under the prior targeted retention programs, including the 2020 Targeted Retention Awards, which have helped partially mitigate, but not entirely resolve, the issue of attrition among these critical employees.

## Conclusion

43.    I believe that the 2021 Compensation Plans are crucial to the Debtors' business operations during the pendency of the Chapter 11 Cases, as they will maintain employee morale, dedication, confidence, and cooperation and maximize the Debtors' ability to reorganize successfully. The value of the Debtors' business derives in large part from the efforts, experience, expertise and knowledge of the Debtors' highly skilled, trained and educated workforce. The workforce must be retained and motivated in order to allow the Debtors to operate in their highly regulated industry. Motivation and retention of the Debtors' valuable key employees, through continued appropriate and competitive compensation, are mission critical. This has never been more important to the Debtors as they draw nearer to completing a value-maximizing restructuring and ask their workforce to help deliver as much value as possible to their stakeholders. I believe that the failure to authorize these programs would irreparably impair the Debtors' relationships with their employees, adversely impact the Debtors' ability to deliver superior products and services, and hinder the Debtors' restructuring efforts.

44.    In sum, I believe that the relief requested in the Motion is necessary to avoid irreparable harm to the Debtors and constitutes a critical element in maximizing the value of the Debtors' business.

*[Remainder of Page Intentionally Left Blank]*

22

45.    I declare under penalty of perjury that, to the best of my knowledge and after reasonable inquiry, the foregoing is true and correct.

Executed:   June 28, 2021

By:   */s/ Jon Lowne*
Jon Lowne
Executive Vice President and Chief
Financial Officer

**<u>Exhibit C</u>**

**Willis Towers Watson Declaration**

DAVIS POLK & WARDWELL LLP
450 Lexington Avenue
New York, New York 10017
Telephone: (212) 450-4000
Facsimile: (212) 701-5800
Marshall S. Huebner
Eli J. Vonnegut
James M. Millerman
Marc J. Tobak
Dylan A. Consla

*Counsel to the Debtors
and Debtors in Possession*

**UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| **In re:** | **Chapter 11** |
| **PURDUE PHARMA L.P.,** *et al.*, | **Case No. 19-23649 (RDD)** |
| **Debtors.**[1] | **(Jointly Administered)** |

**DECLARATION OF JOSEPHINE GARTRELL IN SUPPORT OF THE
MOTION OF DEBTORS FOR ENTRY OF AN ORDER AUTHORIZING
IMPLEMENTATION OF 2021 KEY EMPLOYEE INCENTIVE
PLAN AND 2021 KEY EMPLOYEE RETENTION PLAN**

I, Josephine Gartrell, being fully sworn, hereby declare that the following is true to the best

of my knowledge, information and belief:

---

[1] The Debtors in these cases, along with the last four digits of each Debtor's registration number in the applicable jurisdiction, are as follows: Purdue Pharma L.P. (7484), Purdue Pharma Inc. (7486), Purdue Transdermal Technologies L.P. (1868), Purdue Pharma Manufacturing L.P. (3821), Purdue Pharmaceuticals L.P. (0034), Imbrium Therapeutics L.P. (8810), Adlon Therapeutics L.P. (6745), Greenfield BioVentures L.P. (6150), Seven Seas Hill Corp. (4591), Ophir Green Corp. (4594), Purdue Pharma of Puerto Rico (3925), Avrio Health L.P. (4140), Purdue Pharmaceutical Products L.P. (3902), Purdue Neuroscience Company (4712), Nayatt Cove Lifescience Inc. (7805), Button Land L.P. (7502), Rhodes Associates L.P. (N/A), Paul Land Inc. (7425), Quidnick Land L.P. (7584), Rhodes Pharmaceuticals L.P. (6166), Rhodes Technologies (7143), UDF LP (0495), SVC Pharma LP (5717) and SVC Pharma Inc. (4014). The Debtors' corporate headquarters is located at One Stamford Forum, 201 Tresser Boulevard, Stamford, CT 06901.

1.      I am a Senior Director at Willis Towers Watson PLC ("**Willis Towers Watson**"). Willis Towers Watson has been engaged by Purdue Pharma L.P. and its above-captioned wholly owned direct and indirect subsidiaries (collectively, the "**Debtors**" or the "**Company**") to provide compensation consulting services and to serve as advisors to the Compensation and Talent Committee (the "**Compensation Committee**") of the Board of Directors of Purdue Pharma Inc. (the "**Board**").  I am familiar with the structure of the Debtors' pre- and post-petition compensation plans, including the Debtors' proposed key employee incentive plan (the "**2021 KEIP**") and the Debtors' proposed key employee retention plan (the "**2021 KERP**").

2.      I submit this declaration (this "**Declaration**") on behalf of Willis Towers Watson in support of the *Motion of Debtors for Entry of an Order Authorizing Implementation of 2021 Key Employee Incentive Plan and 2021 Key Employee Retention Plan* (the "**Motion**").[2]  I am authorized to submit this Declaration on behalf of the Debtors.

3.      Except as otherwise indicated, all facts set forth in this Declaration are based upon my personal knowledge, my review of the 2021 KEIP and 2021 KERP, my team's and my research into compensation practices for companies in the biopharma industry and general industry, as well as other companies that have recently filed for chapter 11 protection, and information supplied to me by members of the Debtors' management team and the Debtors' other advisors.  For the reasons described below, it is my opinion that the 2021 KEIP and 2021 KERP are appropriate and reasonable.  If called upon to testify, I would testify competently to the facts set forth in this Declaration.

---

[2] Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to such terms in the Motion.

## QUALIFICATIONS AND BACKGROUND

**A. Qualifications.**

4.      I received my Juris Doctor from the University of San Diego School of Law in 1998, graduating Magna Cum Laude and Order of the Coif, and my Bachelor of Arts in international business from San Diego State University in 1994.  After working at Gibson, Dunn & Crutcher LLP as an associate in the corporate practice, Pillsbury Winthrop Shaw Pittman LLP as an associate in the executive compensation practice, and The Loftin Firm, P.C. where I was a partner and then of counsel in the corporate practice, I became an executive compensation consultant at the Hay Group LLC in 2014.  I joined Willis Towers Watson in 2016 where I have been continuously employed ever since.

5.      Willis Towers Watson is an international professional services firm that offers a wide variety of services to public and private clients, including expert analysis of executive and management compensation.  Willis Towers Watson designs and delivers solutions that manage risk, optimize benefits, cultivate talent, and expand the power of capital to protect and strengthen institutions and individuals.  Willis Towers Watson focuses on four key business segments: corporate risk and brokering; human capital and benefits; exchange solutions; and investment, risk, and reinsurance.

6.      My responsibilities at Willis Towers Watson have primarily involved consulting to for-profit companies and not-for-profit organizations, specifically regarding executive compensation.  I routinely work with public and private companies in various industries regarding compensation philosophy, pay competitiveness, incentive plan design, and other compensation-related analyses and have participated in the development and design of hundreds of management and employee incentive plans for companies in and outside of bankruptcy.

3

7.     I am highly experienced in executive, management, and employee compensation with over 20 years of experience in the field.  During my tenure at Willis Towers Watson, I have worked closely with a range of companies undergoing a financial restructuring in developing a variety of pre-petition and post-petition compensation arrangements, including compensation plans and programs for senior executive and non-executive employees.  Specifically, I have led or co-led the review and design of key employee incentive plans, key employee retention plans, and other similar plans in a number of chapter 11 cases, including *In re Mallinckrodt plc*, Case No: 20-12522 (JTD) (Bankr. D. Del.); *In re PES Holdings, LLC*, Case No. 19-11626 (LSS) (Bankr. D. Del.); *In re Cloud Peak Energy Inc.*, Case No. 19-11047 (CSS) (Bankr. D. Del.); *In re FULLBEAUTY Brands Holdings Corp.*, Case No. 19-22185 (RDD) (Bankr. S.D.N.Y.); *In re Parker Drilling Co.*, Case No. 18-36958 (MI) (Bankr. S.D. Tex.); *In re Aegean Marine Petroleum Network Inc.*, Case No. 18-13374 (MEW) (Bankr. S.D.N.Y.); *In re Westmoreland Coal Co.*, Case No. 18-35672 (DRJ) (Bankr. S.D. Tex.); *In re ATD Corp.*, Case No. 18-12221 (KJC) (Bankr. D. Del.); *In re Claire's Stores, Inc.*, Case No. 18-10584 (MFW) (Bankr. D. Del.).

**B.  Background.**

8.     After Willis Towers Watson was first retained by the Debtors in 2019, I, in coordination with my team at Willis Towers Watson, familiarized myself with the Debtors' operations, business goals, and pre- and post-petition compensation practices, and since that time, my team and I have become very familiar therewith.  My team and I provided input and advice on the design, structure, and total cost of the 2020 KEIP and 2020 KERP and provided pay benchmarking thereof, as described in more detail in my declarations submitted in connection therewith in the fall of 2020.  *See Declaration of Josephine Gartrell in Support of the Motion of Debtors for Entry of Order Authorizing Implementation of a Key Employee Incentive Plan and*

4

*Key Employee Retention Plan* [ECF 1674-3] (the "**Initial 2020 Gartrell Declaration**");
*Supplemental Declaration of Josephine Gartrell in Support of the Motion of Debtors for Entry of
Order Authorizing Implementation of a Key Employee Incentive Plan and Key Employee Retention
Plan* [ECF 1847-2] (the "**First Supplemental 2020 Gartrell Declaration**"); *Second Supplemental
Declaration of Josephine Gartrell in Support of the Motion of Debtors for Entry of Order
Authorizing Implementation of a Key Employee Incentive Plan and Key Employee Retention Plan*
[ECF 1960-2] (the "**Second Supplemental 2020 Gartrell Declaration**").

9.     Prior to commencing these Chapter 11 Cases, Purdue maintained a performance-
based Annual Incentive Plan (the "**AIP**") for the majority of their employees. The AIP provided
annual cash bonuses tied to achievement of company and individual performance metrics. The
Company also maintained a performance-based Long-Term Results Plan (the "**LTRP**" and,
together with the AIP, the "**Prepetition Compensation Plans**"), under which eligible employees
received annual grants that could result in cash payouts based on achievement of performance
goals measured over a three-year performance period.

10.     In 2020, Purdue replaced the Prepetition Compensation Plans with a 2020 key
employee incentive plan (the "**2020 KEIP**") and a 2020 key employee retention plan (the "**2020
KERP**" and, together with the 2020 KEIP, the "**2020 Compensation Plans**"), which closely
paralleled the Prepetition Compensation Plans. Payments under the annual award component of
the 2020 KEIP and the long-term incentive compensation grant component of the 2020 KEIP were
both contingent upon the Debtors' achievement of certain 2020 performance metrics (the "**2020
Performance Metrics**") that were similar to the Debtors' historical metrics under the Prepetition
Compensation Plans. Payments under the annual award component of the 2020 KERP, the long-
term compensation grant component of the 2020 KERP and the Debtors' targeted retention award

program were not subject to performance criteria so as to provide participants in the 2020 KERP with greater certainty about their compensation.

11.    This year, the Debtors have again proposed a key employee incentive plan (the "**2021 KEIP**") and a key employee retention plan (the "**2021 KERP**" and, together with the 2021 KEIP, the "**2021 Compensation Plans**"), which essentially renew the 2020 Compensation Plans. In developing and evaluating the 2021 Compensation Plans, Willis Towers Watson updated its pay benchmarking by refreshing and analyzing relevant market compensation data, including total direct compensation offered by companies in Willis Towers Watson's 2020 Pharmaceutical Executive Compensation and Middle Management, Professional and Support Surveys.  Among other things, my team and I provided input and advice on the design, structure, and total cost of the 2021 KEIP and 2021 KERP, building upon our input and advice on the design, structure and total cost of the 2020 KEIP and 2020 KERP.  In connection with this process, Willis Towers Watson worked closely with the Debtors' senior management team and its other advisors. Additionally, Willis Towers Watson leveraged its own experience designing programs for similarly situated companies, both inside and outside of chapter 11 bankruptcy.  The 2021 KEIP and 2021 KERP reflect the input and guidance provided by myself and my colleagues at Willis Towers Watson.

12.    Importantly, the 2021 KEIP and the 2021 KERP were subject to oversight, review, and approval by the Board.  Willis Towers Watson was involved in and consulted on the design of the 2021 KEIP and the 2021 KERP, and prior to internal approval of the 2021 KEIP and the 2021 KERP by the Debtors, Willis Towers Watson presented its analysis of their appropriateness and reasonableness to the Debtors' senior management, the Compensation Committee, and the Board.  Willis Towers Watson's primary goal in the course of these interactions was to develop its

independent assessment of the 2021 KEIP and the 2021 KERP as appropriate and reasonable, drawing directly upon the specific needs of the Debtors, relevant market data and Willis Towers Watson's experience in designing comparable programs for similarly situated companies.

13.    The Debtors commenced these Chapter 11 Cases to maximize the value of the Debtors' estates for their stakeholders.  Recognizing the unique facts of these Chapter 11 Cases and that employee performance will play a critical role in achieving a favorable outcome for all parties, the Debtors, in conjunction with Willis Towers Watson and their other advisors, undertook a collaborative process to design appropriate and reasonable compensation programs for 2021. The culmination of that work resulted in the 2021 KEIP, which is designed to incentivize five crucial senior level insider employees (the "**2021 KEIP Participants**") to achieve challenging financial and operational targets, and the 2021 KERP, which is designed to retain all other eligible employees of the Debtors (the "**2021 KERP Participants**") during the pendency of these Chapter 11 Cases.

## 2021 KEY EMPLOYEE INCENTIVE PLAN

### A.  Overview of the 2021 KEIP.

14.    The 2021 KEIP is designed to incentivize the 2021 KEIP Participants to achieve the targeted business performance goals (the "**2021 Performance Metrics**") set out in Purdue's 2021 Corporate Scorecard (the "**Scorecard**").   The 2021 KEIP Participants consist of all participants in the 2020 KEIP that remain employed by the Company at this time.  The Debtors' management team made the decision regarding the 2021 KEIP Participants with the advice of Willis Towers Watson and their other advisors.

15.    The 2021 KEIP establishes a sliding scale of potential award opportunities based on the extent to which the Debtors succeed in accomplishing the goals set out in the Scorecard.

**Table 1** below shows two levels of weighted performance targets which modify awards under the 2021 KEIP to potentially be earned based on the Scorecard performance, with interpolation for performance between the levels:

### TABLE 1

| Threshold | Target/Max |
|---|---|
| 75% | 100% |

16.     Each 2021 KEIP Participant will receive an award comprised of (i) an annual award (the "**2021 KEIP Annual Award**") and (ii) a long-term incentive compensation grant payable in 2024 (the "**2021 KEIP Long-Term Award**").

17.     Amounts due under the 2021 KEIP Annual Award will not exceed $5,392,700 in the aggregate and, subject to achievement of the 2021 Performance Metrics at a threshold level, will be paid as follows: (i) subject to the 2021 KEIP Participant's continued employment through the payment date (other than as provided below), 50% paid on the Company regular payroll date closest to October 1, 2021, subject to clawback of the full amount paid if the 2021 KEIP Participant resigns or is terminated for any reason other than by the Debtors without cause prior to March 15, 2022, which mirrors the approximate historical payment date of the Debtors' longstanding AIP, and (ii) subject to the 2021 KEIP Participant's continued employment through the payment date, the remaining 50% paid on the Company regular payroll date closest to March 15, 2022.  The first payment amount will assume target-level performance and the second payment will include a true-up, if any, including a potential clawback of the first payment for any amount that would not have otherwise been paid if threshold or target performance is not met.  If the Debtors emerge at any time prior to any outstanding payment date, the remaining full 2021 KEIP Annual Award payment would be paid on the emergence date at the target 2021 KEIP Annual Award value, again subject to clawback (a) of the full amount paid if the 2021 KEIP Participant resigns or is terminated for

any reason other than by the Debtors without cause prior to March 15, 2022, or (b) for any amount that would not have otherwise been paid if threshold or target performance is not met (such clawback to occur by March 15, 2022). All amounts payable under the 2021 KEIP Annual Award will be subject to acceleration at the target 2021 KEIP Annual Award value in the event of a termination of employment by the Debtors without cause, subject to clawback for any amount that would not have otherwise been paid if threshold or target performance is not met (such clawback to occur by March 15, 2022).

18.     The titles of the individual 2021 KEIP Participants and their respective proposed 2021 KEIP Annual Award opportunities are identified in **Table 2** below. Each 2021 KEIP Participant's target 2021 KEIP Annual Award is equal to the target amount of the 2021 AIP award that the participant otherwise would have been eligible to receive, as reduced by the same concessions that were agreed with respect to payments due under the annual award component of the 2020 KEIP approved last year.

**TABLE 2**

| 2021 KEIP Participant | Payout Range = 75% to 100% | |
| --- | --- | --- |
| | Threshold 2021 KEIP Annual Award | Target 2021 KEIP Annual Award |
| President & Chief Executive Officer | $1,645,125 | $2,193,500 |
| Executive Vice President, Chief Financial Officer | $566,925 | $755,900 |
| Executive Vice President, General Counsel and Corporate Secretary | $1,320,375 | $1,760,500 |
| Chief Technical Operations Officer | $316,350 | $421,800 |
| President, Rhodes Pharmaceuticals | $195,750 | $261,000 |
| **Total** | **$4,044,525** | **$5,392,700** |

19.     Consistent with Purdue's longstanding compensation practices, each 2021 KEIP Participant will also receive a 2021 KEIP Long-Term Award, which is designed to mimic the economic structure of the LTRP grant that the participant otherwise would have received in 2021, payable in 2024. The target amount of the equivalent long-term award granted last year as part of the 2020 KEIP included a 52.25% aggregate reduction (consisting of an initial 50% reduction in

the original proposal and a further 4.5% reduction of the already reduced amount that was agreed

with the Official Committee of Unsecured Creditors and other key stakeholders) as compared to

the target LTRP grant that otherwise would have been received based on historical practice.  The

same aggregate reduction of 52.25% has been applied to the target amount of the 2021 KEIP Long-

Term Award.  Actual payouts will be based on the same 2021 Performance Metrics that apply to

the 2021 KEIP Annual Awards and therefore will depend solely on the Company's performance

in 2021.

20.    Payments due under the 2021 KEIP Long-Term Awards will accelerate at target

value upon the Debtors' emergence from bankruptcy, subject to a clawback by the post-emergence

entities following emergence (a) for the full amount paid if the 2021 KEIP Participant resigns or

is terminated for any reason other than by the Debtors without cause prior to the date that such

payments would otherwise have been made absent emergence or (b) for any amount that would

not have otherwise been paid if threshold or target performance is not met (such clawback to occur

by March 15, 2022).  Such amounts will also be subject to acceleration at target value in the event

of a termination of employment prior to emergence by the Debtors without cause, subject to

clawback for any amount that would not have otherwise been paid if threshold or target

performance is not met (such clawback to occur by March 15, 2022).  The maximum aggregate

amount of such payments is approximately $1,710,000.

**B.    Performance Metrics.**

21.    The 2021 KEIP is purely incentive based.  The 2021 KEIP Annual Awards and

2021 KEIP Long-Term Awards will be conditioned on the 2021 KEIP Participants' ability to meet

the 2021 Performance Metrics set out in the Scorecard, thus ensuring that the 2021 KEIP

Participants are properly incentivized to work toward a value-maximizing restructuring of the

Debtors' estates during this critical stage of these Chapter 11 Cases. In early 2021, the Board, with the recommendation of the Compensation Committee and guidance from Willis Towers Watson, identified and approved the 2021 Performance Metrics to be applied to any incentive compensation programs adopted by the Debtors. The 2021 Performance Metrics rely on the same three strategic pillars as the 2020 Performance Metrics and the metrics which historically applied to the AIP: (i) value creation (representing 40% of the 2021 Performance Metrics); (ii) innovation and efficiency (50% of the 2021 Performance Metrics); and (iii) people and culture (10% of the 2021 Performance Metrics).

22.     The value creation metric is designed to measure and reward the long-term success of the Debtors' business based on certain nonfinancial operational goals, such as meeting certain deadlines with respect to the Company's testing and development of overdose treatment products and other non-opioid products. **Table 3** below sets forth certain key operational and developmental goals that the Debtors have identified as critical to the long-term success of the Debtors' business.

**TABLE 3**

| 2021 Value Creation Performance Metrics | 2021 Performance Target | % of Value Creation | % of 2021 Performance Metrics |
|---|---|---|---|
| Public Health Initiatives[3] | | | |
| Provide support to HRT to allow an NDA filing for OTC intra-nasal naloxone | End of Q3 2021 | 40% | 16.0% |
| Nalmefene autoinjector registration stability initiation on the fully assembled device | End of Q4 2021 | | |
| Secure approval for the Nalmefene vial and file the ANDA for the pre-filled syringe | End of Q4 2021 | | |

---

[3] All medications referred to in this section are potential treatments for opioid overdose.

| Progressing the Pipeline | | | |
|---|---|---|---|
| (a) Complete proof of concept for Sunobinop in insomnia associated with alcohol cessation and (b) make go/no go decision for progression to Phase 3 | (a) End of Q2 2021; (b) Year-End 2021 | 30% | 12.0% |
| Progress the global development of Tinostamustine in cancer patients to allow cohort prioritization decisions in hemato-oncology and solid tumors | End of Q2 2021 | | |
| **Delivery of Project Catalyst Implementation Plan to Include Regulatory Submission on the Following API Transfers:** | | | |
| Oxycodone / APAP Tabs | End of Q4 2021 | 5% | 1.8% |
| Oxycodone Tabs | End of Q4 2021 | 3% | 1.2% |
| **RALP and Progressing the Generic Pipeline** | | | |
| Scopolamine TDS – Completion of Skin Sensitization and Irritation Study | End of Q3 2021 | 5% | 2.1% |
| Lisdexamfetamine Capsules – Submit ANDA | End of Q4 2021 | 5% | 1.8% |
| Dihydroergotamine Nasal Spray – Completion of IVBE Study | End of Q2 2021 | 5% | 1.8% |
| Theophylline ER Tablets (300 mg) – Finalize and submit FDA responses and define clinical path forward | End of Q2 2021 | 5% | 2.1% |
| Varenicline Tablets – FDA approval | End of Q3 2021 | 3% | 1.2% |
| **Total** | | **100%** | **40.0%** |

23.     The innovation and efficiency metric is designed to capture key financial and operational goals, including important business metrics such as operating profits, net sales and operating losses.  **Table 4** below sets forth certain key financial and operational goals that the Debtors have identified as critical to the long-term success of the Debtors' business.

## TABLE 4

| 2021 Innovation and Efficiency Performance Metric[4] | 2021 Performance Target | % of Innovation and Efficiency | % of 2021 Performance Metrics |
|---|---|---|---|
| Consolidated total business Operating Profit | $69 million | 40% | 20.0% |
| Adhansia XR Net Sales | $14 million | 20% | 10.0% |
| Avrio Net Sales | $97.7 million | 20% | 10.0% |
| Reduce Rhodes (RALP) 2021 Funding Requirement by $45 million from 2020 amount | ($45 million) | 20% | 10% |
| **Total** | | **100%** | **50%** |

---

[4] Adhansia XR is a central nervous system stimulant prescription medicine used for the treatment of ADHD in people six years of age and older.  Avrio Health L.P. is a wholly owned subsidiary of the Debtors which produces over-the-counter consumer health products, including Betadine (a wound care product), Colace (a stool softener), Senokot (a laxative) and SlowMag Mg (a magnesium supplement).

12

24.     As I understand it, the People and Culture metric includes (i) conducting readiness activities to prepare for emergence from bankruptcy and (ii) establishing and supporting implementation of a diversity, equity and inclusion ("**DE&I**") roadmap through the end of 2021 to ensure a sustainable and accountable DE&I profile for the organization.

**C.     Evaluation of the 2021 KEIP.**

25.     In assessing the appropriateness and reasonableness of the 2021 KEIP, I worked with my team to analyze competitive target/max total direct compensation, a standard benchmark that includes base salary, short-term incentives, and long-term incentives ("**Total Direct Compensation**"), for all 2021 KEIP Participants.

26.     As my primary reference point for the competitiveness of Total Direct Compensation of all 2021 KEIP Participants, my team and I analyzed the compensation opportunities of executives at relevant market comparators in the pharmaceutical industry. Specifically, my team and I matched the 2021 KEIP Participants to survey benchmarks at companies in Willis Towers Watson's 2020 Pharmaceutical and Health Sciences Executive Compensation Survey Report (the "**Survey**"), based on our understanding of each 2021 KEIP Participant's job duties and responsibilities within the Debtors' organization. For each survey benchmark, my team and I developed, where possible, revenue-adjusted survey data for Total Direct Compensation. The result of this analysis, as well as a comparison to a similar analysis that my team conducted last year,[5] is shown in **Table 5** below:

---

[5] My team and I conducted a similar analysis last year with respect to the proposed 2020 KEIP, which is set forth in the Initial 2020 Gartrell Declaration. My team and I then provided updated versions of such analysis after taking into account certain consensual reductions in compensation that were negotiated with key creditor constituencies last year, which are set forth in First Supplemental 2020 Gartrell Declaration and Second Supplemental 2020 Gartrell Declaration. The table includes the results of such updated analysis.

13

**TABLE 5**

| Title | Variance to Market Target TDC | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| | Purdue Base + KEIP | | | Purdue Base + KEIP (2020) | | | Purdue (Base Only) | | |
| | P25 | P50 | P75 | P25 | P50 | P75 | P25 | P50 | P75 |
| President & CEO | 28% | -6% | -31% | 55% | 8% | -24% | -38% | -55% | -67% |
| Chief Financial Officer | 39% | 8% | -17% | 53% | 11% | -20% | -28% | -44% | -57% |
| General Counsel | 294% | 188% | 110% | 316% | 199% | 115% | 94% | 42% | 3% |
| Chief Technical Operations Officer | 38% | 3% | -23% | 34% | 10% | -9% | -22% | -42% | -57% |
| President, Rhodes Pharmaceuticals | 33% | -4% | -45% | 27% | -1% | -22% | -20% | -42% | -67% |
| Average (excl. GC) | 35% | 0% | -29% | 42% | 7% | -19% | -27% | -46% | -62% |

27.     As shown above, the average compensation for the 2021 KEIP Participants (excluding the General Counsel) is at the 50th percentile.  Moreover, the market position of Total Direct Compensation for the 2021 KEIP Participants with the proposed 2021 KEIP in place will be lower on average compared to the market position in 2020.  In addition, if the Debtors do not receive approval from the Court to implement the 2021 KEIP, Total Direct Compensation (currently representing only adjusted base salaries) for the 2021 KEIP Participants, in aggregate, would fall 27% below the market 25th percentile of Total Direct Compensation (excluding the General Counsel) and 46% below the market median (excluding the General Counsel).  In other words, the 2021 KEIP Participants would be materially undercompensated versus comparable executives at similarly sized organizations in the pharmaceutical industry.  These circumstances could significantly undermine the Debtors' ability to motivate their senior management to achieve desired business objectives.  The 2021 KEIP is, in part, designed to address some of this shortfall. It is also my experience that it would be highly uncommon for a distressed entity comparable to the Debtors' size and scope to fail to provide short- and long-term, cash-based incentive opportunities for a relevant compensation period, and the 2021 KEIP is necessary to address compensation in 2021 just as the 2020 KEIP addressed compensation in 2020.

28.     I understand from discussions over the last two years with the Debtors and their

other outside advisors that the General Counsel is critical to the Debtors' operations and the success of these Chapter 11 Cases. Although the General Counsel's compensation continues to be high compared to the market, as it was under the 2020 KEIP, his compensation—including the 2021 KEIP—is similar to his compensation under the approved 2020 KEIP and is reasonable in light of my understanding of the importance of his role to the Debtors' successful operation during these Chapter 11 Cases and through emergence therefrom, as well as the Debtors' need of a highly credentialed and qualified general counsel in light of their present circumstances. I also understand that, in addition to the General Counsel's leadership prior to these immensely litigious and highly public Chapter 11 Cases, the Debtors' General Counsel faces the additional challenge of ensuring the future success of the Debtors' estates and the successful emergence from these Chapter 11 Cases. Moreover, I understand that when the General Counsel accepted the role with the Debtors, he forewent similar opportunities at other companies offering notably higher compensation packages. Accordingly, the General Counsel's compensation—including the 2021 KEIP—is reasonable in light of the aforementioned facts and circumstances as I understand them to be; again and particularly, the immense challenges he faces in his role with the Debtors and his significant experience and expertise.

29.    Based on the results of these benchmarking analyses, and my experience with other incentive compensation arrangements implemented in chapter 11 cases, I believe the 2021 KEIP and the 2021 KEIP Participants' potential Total Direct Compensation levels are appropriate in light of competitive market practice for companies like the Debtors that operate in the pharmaceutical industry, and reasonable in light of the Debtors' current circumstances. Critically, the absence of both short- and long-term incentive opportunities for the 2021 KEIP Participants would significantly undermine the current competitiveness of the Debtors' compensation

structure, which in turn could negatively impact the Debtors' ability to motivate current management to achieve desired business objectives.

30.     As previously discussed in the First Supplemental 2020 Gartrell Declaration, many of Purdue's peer pharmaceutical companies are primarily public or pre-IPO companies that frequently offer equity-based long-term incentive compensation.  It is true that equity is riskier than cash due to potential market fluctuations.   However, Purdue's historical incentive compensation programs, which have consistently been cash-based rather than equity-based, typically allowed participants to earn up to 150% or more of target compensation in the event of above-target performance on the applicable performance metrics, which partially replicated the greater variation and upside associated with equity-based long-term incentive programs.  This practice was initially discontinued under the AIP in 2019 as part of the changes agreed to with creditor constituencies and remains absent from the 2020 KEIP and proposed 2021 KEIP, so the current incentive opportunity is limited to a maximum of 100% of target under the 2021 KEIP. Particularly in this context, where the 2021 KEIP provides for downside but not upside, I believe that it would not be appropriate to discount the cash incentive opportunities under the 2021 KEIP for benchmarking purposes on account of the risks associated with equity that in many cases comprise elements of the incentive programs offered by comparable non-debtor pharmaceutical companies in the Survey.

31.     In addition, the long-term incentive opportunities under the 2021 KEIP are measured against 2021 performance only, just as long-term incentive opportunities under the 2020 KEIP were measured against performance in 2020 only, whereas long-term incentives, including the Debtor's pre-petition LTRPs, are typically measured based on multi-year performance periods. I understand that this adjustment was necessary because the Company hopes to emerge well before

the completion of the typical three-year performance period, and establishing performance goals for beyond 2021 was essentially impossible given the significant anticipated changes to the Debtors upon emergence. On balance, the shorter performance period provides the 2021 KEIP Participants with greater visibility of achievement and thereby decreases the level of risk as compared to a multi-year performance period. Like the 2020 KEIP, the proposed 2021 KEIP includes a 52.25% reduction relative to the amount of the LTRP grant that otherwise would have been granted to the 2021 KEIP Participants under the Debtors' past practices. I believe, based on my team's assessment of the proposed discount, that such reduction is more than sufficient to reasonably account for the decreased risk associated with the shorter performance period for long-term incentive opportunities under the 2021 KEIP.

32.    To assess the appropriateness and reasonableness of the design of the 2021 KEIP, I analyzed 33 comparable examples (general industry) of key employee incentive plans approved since 2016 with company revenues between $500 million and $5 billion. These companies include Aceto Corporation; Appvion, Inc.; Avaya Inc.; Bristow Group Inc.; California Resources Corp.; Celadon Group, Inc.; Ciber, Inc.; Claire's, Inc.; Cloud Peak Energy Inc.; Cumulus Media Inc.; Diamond Offshore Drilling, Inc.; Ditech Holding Corp.; Ezra Holdings Limited; FirstEnergy Solutions Corp.; FTD Companies, Inc.; Gander Mountain Company Inc.; GenON Energy; Gymboree Group, Inc.; hhgregg, Inc.; Intelsat S.A.; LSC Communications, Inc.; Marsh Supermarkets; Neiman Marcus Group LTD LLC; NPC International, Inc.; Payless Inc.; PHI Inc.; Real Industry, Inc.; RTW Retailwinds, Inc.; Stage Stores, Inc.; Valaris plc; Velocity Holdings Company, Inc.; Welded Construction, L.P.; and Westinghouse Electric Company LLC.

33.    In conducting this analysis, I also relied upon my significant consulting experience in the analysis and design of incentive plans generally at other companies.

17

34.     To assess the appropriateness and reasonableness of the cost of the 2021 KEIP, my team and I reviewed the proposed target and maximum cost (Target = Maximum for the 2021 KEIP) expressed in the following two ways: (i) as an aggregate amount, and (ii) as a percentage of the Debtors' revenue.  This comparison can be observed in **Table 6** below:

### TABLE 6

| Aggregate KEIP Cost vs. Comparable Debtors | Purdue Target/Max Performance and Payout of KEIP Annual Award plus Long-Term Award | Market 50th Percentile | | Market 75th Percentile | | Market 90th Percentile | |
|---|---|---|---|---|---|---|---|
| | | Target | Max | Target | Max | Target | Max |
| $000s | $7,100 | $5,100 | $6,700 | $9,800 | $14,600 | $14,000 | $25,300 |
| Percentage of Revenue | 1.01% | 0.42% | 0.56% | 0.71% | 0.97% | 0.99% | 1.70% |

## D.     Appropriateness of the 2021 KEIP.

35.     For the aforementioned reasons and based on my experience with incentive-based compensation programs employed by companies in chapter 11, I believe the design, structure, cost and individual opportunities available under the 2021 KEIP is appropriate and consistent with market practice.

## E.     Reasonableness of the 2021 KEIP.

36.     The 2021 KEIP Participants are continuing to manage the Debtors during a challenging time for the Debtors, in which they navigate difficult terrain as they seek to emerge from bankruptcy.  It is my strong impression and understanding that the Debtors and 2021 KEIP Participants face immense challenges that go beyond those typically faced by companies in chapter 11.

37.     For each 2021 KEIP Participant, the total cost of the 2021 KEIP Annual Award is approximately the same as the component of the 2020 KEIP that effectively replicated the AIP, subject to modest and typical year-over-year increases, and is substantially similar to, or lower

than, the 2021 KEIP Participants' historical annual AIP award.

38.    It is my understanding that the challenges faced by the 2021 KEIP Participants continue to be elevated during these Chapter 11 Cases due to the extremely complex and highly litigious nature of the bankruptcy case.  The Debtors have determined that it is appropriate to continue to compensate the General Counsel to account for his extraordinary stewardship during these litigious Chapter 11 Cases and incentivize him to continue to lead the Debtors toward a successful restructuring.  I understand that the Debtors require a General Counsel with the highest level of expertise and resilience; a true strategic advisor to the CEO.  It is also my understanding that the incumbent General Counsel was an external hire who was identified as one of the only candidates who could fill the role under the circumstances at the time of hire and currently. Accordingly, the Debtors' incentive-based compensation programs for the 2021 KEIP Participants are appropriate in light of the circumstances faced by the Debtors in this restructuring.

39.    For these reasons and based on my experience with incentive-based compensation programs employed by companies in chapter 11, as well as the environment in which the Debtors are operating, I believe the design, structure, cost and individual opportunities available under the 2021 KEIP are reasonable.

## 2021 KEY EMPLOYEE RETENTION PLAN AND
## 2021 TARGETED RETENTION AWARDS

### A.  Overview of the 2021 KERP.

40.    The 2021 KERP Participants consist of approximately 506 incentive-eligible employees, of which 19 hold a position of Vice President or higher and 487 will be middle management, professional employees and support and technical staff, which include scientific researchers as well as regulatory, compliance, quality and manufacturing personnel.  None of the 2021 KEIP Participants are eligible to participate in the 2021 KERP, and no 2021 KERP

Participant is an insider.  Each 2021 KERP Participant will receive an award (a "**2021 KERP Annual Award**") that replaces the 2021 KERP Participants' 2021 AIP payouts that otherwise would have been due in 2022, and certain 2021 KERP Participants will receive a long-term incentive compensation grant payable in 2024 (a "**2021 KERP Long-Term Award**") that replaces the LTRP grant that such 2021 KERP Participant would otherwise have received.  Certain 2021 KERP Participants will also receive additional targeted retention payments (the "**2021 Targeted Retention Awards**").

41.     Each 2021 KERP Participant's 2021 KERP Annual Award is equal to the target amount of the 2021 AIP award they otherwise would have been eligible to receive, payable in 2022.  The 2021 KERP Annual Award is not subject to performance criteria to provide the 2021 KERP Participants with greater certainty about their compensation.  This is expected to help retain the 2021 KERP Participants under the present challenging and uncertain conditions.

42.     The 2021 KERP Annual Award will be paid as follows: (i) 50% paid on the Company regular payroll date closest to October 1, 2021 and (ii) the remaining 50% paid on the Company regular payroll date closest to March 15, 2022.  Other than for hourly employees, the first payment of the 2021 KERP Annual Award is subject to a clawback if the 2021 KERP Participant resigns or is terminated for any reason other than by the Debtors without cause prior to March 15, 2022.  Payments under the 2021 KERP Annual Award will be subject to the 2021 KERP Participant's continued employment through the applicable payment date, with acceleration in the event that a 2021 KERP Participant's employment is terminated by the Debtors without cause.  In the event the Debtors emerge from bankruptcy any time prior to a payment date, the remaining full amount of the 2021 KERP Annual Award would accelerate and be payable, again subject to a clawback, other than for hourly employees, if the 2021 KERP Participant resigns or is terminated

20

for any reason other than by the Debtors without cause prior to March 15, 2022. The total aggregate target (and maximum) payment under the 2021 KERP Annual Award is approximately $16,100,000.

43.    Consistent with past practice, certain 2021 KERP Participants will receive a 2021 KERP Long-Term Award that is essentially the same as the 2020 KERP Long-Term Award and is designed to mimic the economic structure of the LTRP grant that otherwise would have been granted to the 2021 KERP Participant in 2021 under Purdue's longstanding compensation practices. The amount of such grant will be equal to 60% of the target LTRP grant that otherwise would have been granted to the 2021 KERP Participant in 2021 and will be essentially the same as the award under the 2020 KERP, subject to modest, ordinary course year-over-year base salary increases, promotions and other changes to the employee population. The 2021 KERP Long-Term Award will not be subject to performance metrics.

44.    Payments due under the 2021 KERP Long-Term Awards will accelerate upon the Debtors' emergence from bankruptcy, subject to clawback (other than for hourly employees) through the date the payments otherwise would have been made absent emergence if the 2021 KERP Participant resigns or is terminated for any reason other than by the Debtors without cause. Such amounts will also be subject to acceleration in the event of a termination of employment prior to emergence by the Debtors without cause. The aggregate total cost of these 2021 KERP Long-Term Awards for all 2021 KERP Participants is approximately $6,000,000.

45.    In addition, for multiple years the Debtors have used targeted retention awards, most recently in the form of the 2020 Targeted Retention Awards, to preserve and maximize the value of the Debtors' estates. Even with such programs in place, the Debtors have continued to suffer significant levels of attrition, which the Debtors believe would have been dramatically

21

higher in the absence of such programs.  The Debtors therefore seek approval of the 2021 Targeted

Retention Awards in an aggregate amount of up to $7,200,000.[6]  The 2021 Targeted Retention

Awards will renew the Debtors' 2020 Targeted Retention Awards and allow the Debtors to

continue their practice of making targeted retention payments to an identified group of key

employees.  The 2021 Targeted Retention Awards will be payable in the fourth quarter of 2021

and the first quarter of 2022.  Other than for hourly employees, 2021 Targeted Retention Award

payments are subject to a clawback if the 2021 KERP Participant resigns or is terminated for any

reason other than by the Debtors without cause before September 30, 2022.  Payments under the

2021 Targeted Retention Awards will be subject to the applicable employee's continued

employment through the applicable payment date, with such payments to accelerate upon

emergence or if the applicable employee is terminated by the Debtors without cause.

46.     In assessing the appropriateness and reasonableness of the 2021 KERP, I worked

with my team to analyze 25 comparable examples (general industry) of approved programs that

capture all or a portion of pre-restructuring incentive plans since 2016 with company revenues

between $500 million and $5 billion; these programs may take the form of incentive or retention

programs depending on the company.  These companies include: Appvion, Inc.; Arch Coal, Inc.;

ATD Corporation; Basic Energy Services; Breitburn Energy Partners LP; Bristow Group Inc.;

California Resources Corporation; Cenveo, Inc.; Claire's Inc.; Cloud Peak Energy Inc.; Covia

Holdings Corporation; Cumulus Media Inc.; Diamond Offshore Drilling, Inc.; Energy XXI Ltd.;

FirstEnergy Solutions Corp.; Hexion Holdings LLC; Intelsat S.A.; Linn Energy; LSC

---

[6] Last year, this Court approved the 2020 Targeted Retention Awards in the amount of $8.1 million.  That figure
included approximately $900,000 in retention awards that were intended to be granted to employees of Rhodes
Technologies.  Due to the Debtors' sale of Rhodes Technologies, such awards were ultimately not granted.  As a
result, the Debtors paid out approximately $7.2 million in 2020 Targeted Retention Awards, and the Debtors believe
the same figure remains appropriate this year.

Communications, Inc.; Oasis Petroleum Inc.; Real Industry, Inc.; Valaris plc; Verso Corporation;

Westmoreland Coal Company; and Whiting Petroleum Corporation.

47.     My team and I then compared the aggregate cost of the 2021 KERP Participants'

Total Direct Compensation for both non-insider executives and middle management and

professionals.

48.     The aggregate market positioning is shown in **Table 7** below:

**TABLE 7**

| Employee Group | N | Variance to Market TDC (Purdue Target TDC) | | | Variance to Market TDC (Purdue TTDC + Retention) | | | Variance to Market TDC (Purdue Base Only) | | |
|---|---|---|---|---|---|---|---|---|---|---|
| | | P25 | P50 | P75 | P25 | P50 | P75 | P25 | P50 | P75 |
| Non-Insider (Executive Survey) | 41 | 36% | 8% | -14% | 75% | 39% | 10% | -18% | -35% | -48% |
| Non-Insider (Middle Management & Professional Survey) | 233 | 29% | 11% | -5% | 35% | 16% | -1% | 8% | -7% | -21% |

49.     Based on the results of these benchmarking analyses, my experience in other

incentive compensation arrangements implemented in chapter 11 cases, and my understanding of

the Debtors' challenges as represented by the Debtors and their other outside advisors such as the

environment in which the Debtors are operating and the rate at which the Debtors are affected by

employee attrition, I believe the 2021 KERP and the 2021 KERP Participants' aggregate Total

Direct Compensation levels are appropriate and reasonable.

50.     In conducting this analysis, I also relied upon my significant consulting experience

in the analysis and design of retention plans.

51.     To assess the appropriateness and reasonableness of the cost of the 2021 KERP,

my team and I reviewed the proposed cost of the 2021 KERP expressed in the following three

ways: (i) as an aggregate amount; (ii) as a percentage of the Debtors' revenue; and (iii) as a cost

per person.  This comparison can be observed in **Table 8** below:

**TABLE 8**

| Aggregate KERP Cost vs. Comparable Debtors | Purdue Target/Max Performance and Payout of KERP Annual Awards and Long-Term Awards (without retention) | Market 50th Percentile | Market 75th Percentile | Market 90th Percentile |
|---|---|---|---|---|
| $000s | $22,100 | $11,800 | $24,000 | $33,300 |
| Percentage of Revenue | 3.14% | 0.63% | 1.23% | 2.49% |
| $000s Cost per Person | $43.5 | $48.1 | $58.4 | $87.8 |

52.    To assess the appropriateness and reasonableness of the cost of the 2021 Targeted Retention Awards, my team and I reviewed the proposed cost expressed in the following two ways: (i) as an aggregate amount and (ii) as a percentage of the Debtors' revenue.  This comparison can be observed in **Table 9** below:

**TABLE 9**

| Aggregate Targeted Retention Cost vs. Comparable Debtors | Purdue Targeted Retention Awards | Market 50th Percentile | Market 75th Percentile | Market 90th Percentile |
|---|---|---|---|---|
| $000s | $7,200 | $2,748 | $3,650 | $7,650 |
| Percentage of Revenue | 1.02% | 0.20% | 0.38% | 0.66% |

Also, in my experience, and the data show, that programs such as the Debtors' proposed 2021 KERP and 2021 Targeted Retention Awards are regularly utilized by similarly situated companies to retain personnel such as the 2021 KERP Participants.

### B.  Appropriateness and Reasonableness of the 2021 KERP and 2021 Targeted Retention Awards.

53.    Based on my education, experience, and the work I have done in this case and in similar cases, I believe that the design, structure, cost, and award opportunities available under the

2021 KERP and 2021 Targeted Retention Awards are appropriate and reasonable given the facts

and circumstances of these Chapter 11 Cases as I understand them.

*[Remainder of Page Intentionally Left Blank]*

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

Dated: June 28, 2021

*/s/ Josephine Gartrell*
Josephine Gartrell
Senior Director
Willis Towers Watson PLC
