

Page 1

1    UNITED STATES BANKRUPTCY COURT

2    SOUTHERN DISTRICT OF NEW YORK

3    Case No. 19-23649 (RDD)

4    - - - - - - - - - - - - - - - - - - - - - - - - - - - x

5    In the Matter of:

6

7    PURDUE PHARMA L.P.,

8

9          Debtor.

10   - - - - - - - - - - - - - - - - - - - - - - - - - - - x

11

12                   United States Bankruptcy Court

13                   300 Quarropas Street, Room 248

14                   White Plains, NY 10601

15

16                   June 16, 2021

17                   10:19 AM

18

19

20

21   B E F O R E :

22   HON ROBERT D. DRAIN

23   U.S. BANKRUPTCY JUDGE

24

25   ECRO:   ART

Page 2

1   HEARING re Notice of Agenda/ Agenda for June 16, 2021

2

3   HEARING re  Motion to File Proof of Claim After Claims Bar

4   Date with hearing to be held on 6/16/2021 at 10:00 AM at

5   Teleconference Line (CourtSolutions) (RDD) (related

6   document(s)2834).

7

8   HEARING re Letter re: motion to file proof of claim after

9   the bar date & reporting problems connecting to May 14, 2021

10  hearing (related document(s)2834) (ECF #2899)

11

12  HEARING re Statement I Notice of Filing of Proposed Order

13  Granting Late Claim Motion (related document(s)2834) filed

14  by James I. McClammy on behalf of Purdue Pharma L.P.

15  (ECF #3011)

16

17  Adversary proceeding: 19-08289-rdd Purdue Pharma L.P. et al

18  v. Commonwealth of Massachusetts et al

19  HEARING re Motion to Extend Time I Motion to Extend the

20  Preliminary Injunction (ECF #269)

21

22  HEARING re Memorandum of Law in Support of Motion to Extend

23  the Preliminary Injunction (related document(s)269) filed by

24  Benjamin S. Kaminetzky on behalf of Avrio Health L.P.,

25  Purdue Pharma Inc., Purdue Pharma L.P., Purdue Pharma

Page 3

1   Manufacturing L.P., Purdue Pharma of Puerto Rico, Purdue

2   Pharmaceutical Products L.P., Purdue Pharmaceuticals L.P.,

3   Purdue Transdermal Technologies L.P., Rhodes Pharmaceuticals

4   L.P., Rhodes Technologies. (ECF #270)

5

6   HEARING re Objection to Motion I CONTINUING OBJECTION AND

7   VOLUNTARY COMMITMENT IN RESPONSE TO PURDUE'S MOTION TO

8   EXTEND THE PRELIMINARY INJUNCTION (related document(s)269)

9   filed by Andrew M. Troop on behalf of Ad Hoc Group of Non-

10  Consenting States. (ECF #272)

11

12  HEARING re Reply to Motion /Reply Memorandum in Further

13  Support of Motion to Extend the Preliminary Injunction

14  (related document(s)269) filed by Benjamin S. Kaminetzky on

15  behalf of Avrio Health L.P., Purdue Pharma Inc., Purdue

16  Pharma L.P., Purdue Pharma Manufacturing L.P., Purdue Pharma

17  of Puerto Rico, Purdue Pharmaceutical Products L.P., Purdue

18  Pharmaceuticals L.P., Purdue Trartsdermal Technologies L.P.,

19  Rhodes Pharmaceuticals L.P., Rhodes Technologies. (ECF #273)

20

21  HEARING re Application for Appointment of Chapter 11

22  Examiner filed by Jonathan C Lipson on behalf of Peter

23  Jackson (ECF #2963)

24

25

Page 4

1    HEARING re Opposition / Debtors' Opposition to Motion for

2    Order to Appoint an Examiner (related document(s)2963) filed

3    by Marshall Scott Huebner on behalf of Purdue Pharma L.P.

4    (ECF #3020)

5

6    HEARING re Opposition to Peter W. Jackson's Motion for Order

7    to Appoint Examiner (related document(s)2963) filed by Todd

8    E. Phillips on behalf of Multi-State Governmental Entities

9    Group. (ECF #3021)

10

11   HEARING re Objection to Motion I Ad Hoc Committee's

12   Objection to Motion to Appoint an Examiner (related

13   document(s)2963) filed by Kenneth H. Eckstein on behalf of

14   Ad Hoc Committee of Governmental and Other Contingent

15   Litigation Claimants. (ECF #3022)

16

17   HEARING re Objection /Objection of the Official Committee of

18   Unsecured Creditors to Motion to Appoint Examiner Pursuant

19   to 11 U.S.C. § 1104(c) (related document(s)2963) filed by

20   Ira S. Dizengoff on behalf of The Official Committee of

21   Unsecured Creditors of Purdue Pharma L.P., et al.

22   (ECF #3023)

23

24

25

1    HEARING re Reply Memorandum of Law (related document(s)2963)

2    filed by Martin S. Rapaport on behalf of Peter Jackson.

3    (ECF #3034)

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25    Transcribed by:  Sonya Ledanski Hyde

```
 1   A P P E A R A N C E S :

 2

 3   DAVIS POLK & WARDWELL LLP

 4       Attorneys for Debtor

 5       450 Lexington Avenue

 6       New York, NY, 10017

 7

 8   BY:  MARSHALL HUEBNER (TELEPHONICALLY)

 9

10   PILLSBURY WINTHROP SHAW PITTMAN LLP

11       Attorneys for Ad Hoc Group of Non-Consenting States

12       31 West 52nd Street

13       New York, NY 10019

14

15   BY:  ANDREW TROOP (TELEPHONICALLY)

16

17   EISENBERG & BAUM, LLP

18       Attorneys for Ad Hoc Committee

19       24 Union Square East, Fourth Floor

20       New York, New York 1000

21

22   BY:  MICHAEL S. QUINN (TELEPHONICALLY)

23

24   TEMPLE UNIVERSITY-BEASLEY SCHOOL OF LAW

25       Attorney for Peter Jackson
```

Page 7

1        1719 N. Broad Street

2        Philadelphia, PA 19122

3

4   BY:  JONATHAN C. LIPSON (TELEPHONICALLY)

5

6   WHITE & CASE LLP

7        Attorneys for Ad Hoc Group of Individual Victims of

8        Purdue Pharma LP

9        1221 Avenue of the Americas

10       New York, NY 10020

11

12  BY:  J. CHRISTOPHER SHORE (TELEPHONICALLY)

13

14

15

16

17  JOSEPH HAGE AARONSON

18       Attorneys for The Raymond Sackler Family

19       485 Lexington Avenue, 30th Floor

20       New York, NY 10017

21

22  BY:  GREGORY JOSEPH (TELEPHONICALLY)

23

24  KRAMER LEVIN NAFTALIS & FRANKEL LLP

25       Attorneys for the Ad Hoc Committee

Page 8

1          1177 Avenue of the Americas

2          New York, NY 10036

3

4    BY:  KENNETH ECKSTEIN (TELEPHONICALLY)

5

6    BINDER & SCHWARTZ LLP

7          Attorneys for Baltimore City Board of School

8          Commissioners et al.

9          366 Madison Avenue, Sixth Floor

10         New York, NY 10017

11

12   BY:  ERIC FISHER (TELEPHONICALLY)

13

14

15

16

17   ASSISTANT UNITED STATES ATTORNEYS

18         86 Chambers Street, Third Floor

19         New York, New York 10007

20

21   BY:  LAWRENCE H. FOGELMAN (TELEPHONICALLY)

22

23   AKIN GUMP STRAUSS HAUER & FELD LLP

24         Attorneys for the Official Committee of Unsecured

25         Creditors

1          One Bryant Park

2          New York, NY 10036

3

4    BY:  ARIK PREIS (TELEPHONICALLY)

5

6    MARTZELL BICKFORD CENTOLA

7          Attorneys for Ad Hoc Committee of NAS Babies

8          338 Lafayette Street

9          New Orleans, LA 70130

10

11   BY:  SCOTT R. BICKFORD (TELEPHONICALLY)

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1              P R O C E E D I N G S

2              THE COURT:  Okay, good morning.  This is Judge

3    Drain.  We're here in In re:  Purdue Pharma, LP.  I have the

4    agenda for today's hearing, and I'm happy to go down the

5    calendar, in the order of the agenda.

6              MR. HUEBNER:  Terrific.  Good morning, Your Honor.

7    Can you hear me clearly?

8              THE COURT:  Yes, and see you.

9              MR. HUEBNER:  Well, probably better just to hear

10   me.  So, the first item on the agenda -- there are three

11   items on for the agenda today.  The first is an uncontested

12   claims related matter that my colleague Ms. Jacquelyn

13   Knudson will be handling, so if I may turn over the virtual

14   podium to her.

15             THE COURT:  Okay, that's fine.

16             MS. KNUDSON:  Morning, Your Honor.  For the record

17   --

18             THE COURT:  Morning.

19             MS. KNUDSON:  -- Jacquelyn Knudson of Davis, Polk,

20   and Wardwell on behalf of the Debtors.  Can you hear me

21   clearly?

22             THE COURT:  Yes.  Fine, thank.

23             MS. KNUDSON:  Excellent.  As set forth in Mr.

24   Cobb's motion, he's been incarcerated for the past 17 years.

25   He notes that he has no access to a computer and the

Page 11

1   internet and is not allowed to make toll-free calls.  He

2   also cited COVID-19 lockdowns of the prison as an additional

3   reason for his untimely claim.  Based on these assertions,

4   we believe there's a colorable basis for granting Mr. Cobb's

5   requested extension.

6           Moreover, given the limited number of late claim

7   motions filed to date, and the fact that the proposed order

8   preserves the trust's ability to review the merits of Mr.

9   Cobb's claim, and also, in an effort to avoid the undue cost

10  of litigating this motion, we believe the proposed order is

11  a reasonable resolution.

12          As we've done in the past, we also consulted with

13  both the Creditors Committee and the Ad Hoc Group of

14  Individual Victims, and they have both consented to the

15  relief requested.  I'm happy to answer any questions Your

16  Honor may have.  Otherwise, in light of the foregoing, the

17  Debtors (sound drops) at Docket No. 3011 be entered.

18          THE COURT:  Right.  I don't have any questions.

19  The Debtors' decision, which is unopposed, to grant the late

20  claim motion, is warranted here under Rule 9006, and

21  Pioneer, it's clear to me that Mr. Cobb's failure to file a

22  timely proof of claim is based on excusable neglect.  It

23  really isn't, one would say, neglect, so much as the fact

24  that he's, as you said, incarcerated, has very limited

25  access to the means to file a claim, and he diligently tried

Page 12

1    to do so.  So, under all those circumstances, I'll grant the

2    I'll enter the order granting the motion, which, as I note,

3    and as you've noted, makes it clear that this shouldn't be

4    read as any sort of overall authority to file a late claim.

5              MS. KNUDSON:  Yes, Your Honor.  Thank you.

6              THE COURT:  Okay.  So, you can email that order to

7    chambers.

8              MS. KNUDSON:  Thank you, Your Honor.  We will.

9              THE COURT:  Okay.

10             MR. HUEBNER:  And Your Honor, as I think the Court

11   knows, this is the approach we've really taken with

12   everybody, you know, even where it requires a bunch of work

13   from the Debtors, the UCC, and other parties.  We're really

14   trying very hard (sound drops) and circumstances where we

15   think it's appropriate (sound drops) you know, not (sound

16   drops) circumstances, including incarceration, but I think

17   that we have worked very hard (sound drops), and I'm glad

18   that no parties are objecting to resolutions like this, the

19   relief (sound drops).

20             The second item on the agenda, Your Honor, I, at

21   least, intend to be extraordinarily brief.  You know, as the

22   Court, obviously, will know, the disclosure statement is out

23   as we speak for a vote or in the process of getting out with

24   thumb drives and documents being printed, our confirmation

25   hearing is now out, weeks away.

1          We actually feel quite strongly, along with,

2     obviously, many other parties, that we need (sound drops) to

3     get us to confirmation, but obviously, having, you know,

4     merely a few weeks before confirmation, while we very much

5     hope that a subset, and ideally, in a fantasy world, all of

6     the Nonconsenting States come into the deal, we cannot agree

7     with their petition that if their mediation fails, the

8     injunction ends and, essentially, you know, everything we've

9     been working for is put onto a radically different track,

10    especially days before the confirmation hearing from

11    (indiscernible) to get to confirmation clearly is the right

12    answer.

13          We note that the (indiscernible) the injunction

14    requested is supported by virtually every party in the case,

15    implicitly or explicitly, and opposed only by the NCSG.

16    They have, graciously, been brief in their pleadings.  We

17    were graciously brief in our reply.  We have no problem with

18    continuing to construct a voluntary compliance as opposed

19    to, obviously, a mandatory injunction, and with that I would

20    propose to rest on the papers.

21          THE COURT:  Okay.  All right.  And I believe there

22    was only, as you say, the one objection to the motion,

23    which, as I read it, was a limited objection as to the

24    duration of the extension of the preliminary injunction, and

25    that was by the Nonconsenting States Group.  Mr. Troop, do

Page 14

1    you have anything further to say in support of the

2    objection?

3            MR. TROOP:  Thank you, Your Honor.  Can you hear

4    me clearly?

5            THE COURT:  Yes, and see you.

6            MR. TROOP:  Thank you.  Your Honor, I really don't

7    have anything terribly substantive to say in addition to

8    what's in our pleadings.  The practice in this case has been

9    to keep people on short leashes in connection with the

10   mediations that are ongoing, and deadlines coming back to

11   you pending (sound drops).

12           So, it seemed to me, simply from a (sound drops)

13   the NCSG, simply from a perspective of good case management,

14   that not waiting until confirmation to be back before you,

15   might result in something that changes your mind with regard

16   to the preliminary injunction, or might not, and that, given

17   the way that the hearings on the preliminary injunction have

18   condensed themselves over time, it did not seem a terrible

19   imposition to doing the process.

20           So, Your Honor, with that, I otherwise rest on our

21   papers.  Thank you.

22           THE COURT:  Okay.  So, let me be clear, Mr.

23   Huebner.  The proposed extension would go through the date

24   of the scheduled confirmation hearing?

25           MR. HUEBNER:  I think that's right, Your Honor.  I

1     actually apologize.  I don't have the proposed order in

2     front of me.  I think that the structure was designed to get

3     us through confirmation --

4              THE COURT:  Mr. Troop is raising his hand.  It's -

5     -

6              MR. TROOP:  8/30.  I think it's August 30th, the

7     stay request.

8              MR. HUEBNER:  Yeah --

9              THE COURT:  Which is the date of the hearing,

10    right, or is the hearing the 28th?

11             MR. TROOP:  The hearing starts on the 9th and I

12    believe --

13             THE COURT:  An extra day is reserved.

14             MR. TROOP:  Extra day reserved.

15             MR. HUEBNER:  Yeah.

16             THE COURT:  All right.  Well, I -- obviously, no

17    one has objected to extension of the injunction, at least

18    through the date of the ongoing mediation.  The issue is

19    whether I should extend it further through the confirmation

20    hearing, which would be the reserved dates for that hearing.

21    Frankly, I think the unusual circumstance that would argue

22    for not doing that, would be a turn of events at the

23    confirmation hearing that would suggest that a plan that

24    contemplated a settlement that would include a substantial

25    payment by the Sackler families would not be confirmed, and

1    that no similar plan would be confirmed.

2            That is, of course, certainly possible.  However,

3    it seems to me, given the need to have some control over

4    where the case would go after that, I think having it

5    through the scheduled dates is warranted, even if I

6    concluded, for example, earlier than that, because the

7    confirmation hearing wouldn't run through the 30th, that I

8    wouldn't confirm the plan.

9            I still think there's probably a worthwhile basis

10   to have an injunctive pause for a few days, up to August

11   30th, for everyone to get their bearings, and I think the

12   parties' focus, in addition, obviously, to being on the

13   mediation, should be on preparing for the confirmation

14   hearing, rather than adding the potential litigation over

15   the preliminary injunction to that hearing, so I will grant

16   the motion through the last date scheduled for that hearing,

17   for the reasons that I've previously granted extensions and,

18   as affirmed by then Chief Judge McMahon, I believe that the

19   injunction is warranted.

20           The issue raised was the timing issue, which I've

21   just separately addressed.  In terms of the balancing of the

22   harms over the timing issue, it seems to me that a focus on

23   the mediation and confirmation litigation is the key focus

24   at this time, rather than an additional focus that might

25   take place after the mediation, if the mediation is not

Page 17

1    wholly successful on litigation over the preliminary

2    injunction.

3            So, I will grant the requested extension, again,

4    with the language that has been agreed pertaining to the

5    Nonconsenting States, as reiterated in their limited

6    objection to this extension motion.  So, you can email that

7    order to chambers, Mr. Huebner.

8            MR. HUEBNER:  Thank you, Your Honor.

9            THE COURT:  Okay.

10           MR. HUEBNER:  Your Honor, the third item on the

11   agenda, and final item on the agenda, is the motion filed by

12   Professor Lipson seeking employment of an (sound drops).  It

13   is his motion, so I would turn the podium over to him.

14           THE COURT:  Okay.

15           MR. LIPSON:  Thank you, Your Honor.  Jonathan

16   Lipson for Peter Jackson.  Can you hear me and see me, Your

17   Honor?

18           THE COURT:  Yes, I can, thanks.

19           MR. LIPSON:  Thank you.  Fifteen years ago, Peter

20   and Ellen Jackson lost their daughter, Emily, after she

21   ingested a single OxyContin pill, went to sleep, never woke

22   up.  Since that time, the Jacksons have struggled to

23   understand how and why this happened, who was responsible,

24   and how it could be prevented in the future.

25           Today, they find themselves, like thousands of

Page 18

1    creditors in this case, confronting a process -- this

2    Chapter 11 case -- that is, to them, opaque and byzantine.

3    Like many creditors in these cases, the Jacksons worry that

4    the owners of the Debtors, the Sackler families, may have

5    manipulated this process to obtain releases that will, once

6    granted, almost certainly make it impossible to learn any

7    more about the secretive family that has controlled the

8    Debtors.

9            As explained in our motion and reply, there is

10   reason for concern.  The Debtors' objection practically

11   concedes that the board of directors that made this decision

12   shortly before bankruptcy was not independent of them, and

13   there's evidence from the Debtors' own --

14           THE COURT:  Which decision are you discussing, Mr.

15   Lipson?

16           MR. LIPSON:  The decision to release the Sacklers.

17           THE COURT:  And you contend that that decision was

18   a binding decision and, in essence, controlled bankruptcy

19   process, correct?

20           MR. LIPSON:  I contend that it had a significant

21   and undue -- may have had a significant and undue influence.

22           THE COURT:  And what is your evidence for that?

23           MR. LIPSON:  The evidence is the Debtors' own

24   statements, involving things like the historic control that

25   --

1           THE COURT:  No, no.  I'm saying controlling the

2   bankruptcy process.

3           MR. LIPSON:  So --

4           THE COURT:  Your evidence on that point.  Well,

5   let me start with a basic question, Mr. Lipson.  What is the

6   examination by the proposed examiner that you would propose

7   here?  It is, in my view, to use your phrase,

8   (indiscernible) and byzantine.  So, let's be clear.  What

9   are you seeking here, to have the examiner examine?

10          MR. LIPSON:  The process by which the board of

11  directors of Purdue Pharma --

12          THE COURT:  The entire process, from beginning to

13  end?

14          MR. LIPSON:  The Sackler board negotiated --

15          THE COURT:  There is no Sackler board, all right.

16  There's a Purdue board.  Listen, you're a law professor,

17  right?  Words are important to lawyers, right?  So again, I

18  go back to, what is the examination that you are seeking

19  here?  Because that is how I am going to review your request

20  for relief.  In your reply, which came in at 9:30 last

21  night, you state, at one point, that you seek a

22  determination --

23          MR. LIPSON:  Your Honor, if I may help you, I can

24  tell you in very simple terms what we're trying to have an

25  examiner --

1              THE COURT:  Okay.  That's probably a good idea,

2     because what I was going to go through is the various points

3     where you seek different relief, not only in the initial

4     motion, but in the reply, so you tell me now, what is the

5     relief you're seeking?

6              MR. LIPSON:  We simply want to know whether the

7     process by which the board of directors of Purdue Pharma,

8     during this case, and shortly before this case, to release

9     the Sacklers, was free of influence by the Sacklers.  We

10    know that these are privately --

11             THE COURT:  So, let's -- let me stop there,

12    because this is important --

13             MR. LIPSON:  -- according to the Debtors' own

14    disclosure statement --

15             THE COURT:  Please.  You want to know whether the

16    process was free from the Sacklers' influence, right?

17    That's what you want to investigate, whether the people on

18    the board who made the decision, as embodied in the plan

19    that's before the Court, were independent of the Sacklers.

20    That's what you're looking for.

21             MR. LIPSON:  That's correct, and would you like me

22    to tell you why we are concerned --

23             THE COURT:  No, no.  I want to first know what the

24    relief is.

25             MR. LIPSON:  The relief is just that, Your Honor.

Page 21

1             THE COURT:  Just that.

2             MR. LIPSON:  And not even to do an independent

3   investigation.  We assume that the Creditors Committee in

4   this case has done this investigation, because they say so

5   in their plan support letter.  But what they haven't done,

6   by virtue of the protective orders and confidentiality

7   stipulations in this case, is revealed their analysis.  So,

8   creditors, like Mr. Jackson, are outside, not able to

9   understand all of the red flags --

10            THE COURT:  No, but, again, I -- this goes to,

11  again, the relief you are seeking.  Your pleading is replete

12  with allegations about an inadequate, you contend,

13  investigation of the "Sackler allegations," which, by the

14  way, you also don't define; although, when you appear to

15  define them on the first page of your pleading, they appear

16  to be allegations about criminal conduct by the Sacklers,

17  which is an odd thing, since that's not the subject of this

18  bankruptcy case, this not being a criminal case.

19            But, let's skip over that for a moment.  And that

20  is a point that, I think, you may well have misled the

21  public over, because you lump that concept into a review,

22  which you say you're comfortable that the Committee has done

23  as far as the potential liability of the Sacklers in a civil

24  respect, i.e., for money, not criminal liability, but for

25  money, to the Debtors' estates and creditors, and

Page 22

1    separately, to potential third parties, with respect to

2    their claims against the Sacklers.

3            That's not what you want to have investigated,

4    right.  What you want to have investigated is whether the

5    board, and more specifically, the independent committee of

6    the board, that the Debtors say was charged with approving

7    the plan, was independent, right?  So, I guess, my question

8    on that is, you've couched that specifically in that way,

9    and that is relatively easy to investigate, one way or

10   another.

11           You look at the board's independence.  You look at

12   the people who are on the board.  You talk to them.  You

13   look at the -- any limitations on their independence, either

14   actual, in terms of corporate governance, or de facto, and

15   you get a result.  Are they under the influence of or unduly

16   influenced by the Sacklers?  On the other hand --

17           MR. LIPSON:  Your Honor --

18           THE COURT:  -- there are times when you say you

19   want to investigate the board's whole process in negotiating

20   a settlement.  And to me, that is entirely open ended,

21   because that results in an investigation of all of the

22   twists and turns, and we know there have been many -- in

23   fact, they were not resolved until the morning of the file

24   hearing on the disclosure statement leading to a plan that

25   the Debtors were actually prepared to go forward with.

Page 23

1                    That involves, in my view, and extensive,

2        unnecessary, and microscopic view of each decision along the

3        way as to whether to make a negotiating point here or there

4        or elsewhere.

5                    MR. LIPSON:  Your Honor, would you like me to

6        argue the motion or --

7                    THE COURT:  No, I'm asking a question about what

8        the motion is about, so do you want to do that?  Do you want

9        to have the examiner review that entire process?  No.

10                   MR. LIPSON:  No.

11                   THE COURT:  Okay.

12                   MR. LIPSON:  We want to understand whether or to

13       what extent the Sackler families, who, at least until

14       November of 2019, apparently have the power to remove

15       members of the Special Committee.  It's not an independent

16       committee, Your Honor.  It's a Special Committee, which, of

17       course, might affect their capacity to be independent.  We

18       know, during these cases, that the -- it appears the

19       Debtors' own lawyers and lawyers for the Sacklers have

20       entered into a common interest agreement, so to just settle

21       with the U.S. Trustee, is very difficult to understand how

22       the Debtors and the Sacklers could have a common interest at

23       this point.

24                   On your point about our claims about the

25       inadequacy of the investigation, our whole point, Your

Page 24

1    Honor, is we have no idea whether the investigation was

2    inadequate.  I do not believe we said that.  What we're

3    saying, is that this is a case of extraordinary public

4    interest, and in case of extraordinary public interest,

5    Congress said very clearly, examiners must be appointed to

6    conduct appropriate investigations of wrongdoing and other

7    potentially --

8             THE COURT:  But you have -- all right, that's fine

9    --

10            MR. LIPSON:  We have found --

11            THE COURT:  I'm just trying to figure out what you

12   are contending is the appropriate investigation.  I think I

13   have that answer now, which is determine -- to determine or

14   investigate whether the Special Committee, which I gather

15   made the decision to authorize the Debtors to seek

16   confirmation of the plan that is before the Court, did so on

17   a basis independent of the Sacklers.

18            MR. LIPSON:  Correct, and that is in ii of our

19   order, Your Honor.

20            THE COURT:  Well, I understand, but your order

21   covers other -- can be read more broadly than that, but this

22   is what you are seeking.

23            MR. LIPSON:  Your Honor, if that is correct, and

24   if you are comfortable with narrowing it that way, I think

25   we can -- we may well be amendable to that, because that is

Page 25

1    our underlying concern.  As you know, Your Honor, contrary

2    to what you just said, I am not the one creating concern

3    about the Sacklers.  The Sacklers have been the subject of

4    scrutiny and concern for many years.  Mr. Jackson testified

5    in 2007 at the sentencing hearing, only to learn that it

6    turned out -- according to some, we don't know -- that the

7    Sacklers had allegedly manipulated the legal and regulatory

8    process to shield themselves.

9            Many claims of this sort have been made.  We're

10   not citing those, but the facts in this case, the Debtors'

11   own claims that the Sacklers were the de facto CEOs of a

12   company that has now pleaded guilty a second time --

13           THE COURT:  They don't say that as far as the

14   bankruptcy, period.  Right?  Do you have any evidence to say

15   that that statement, or any of the statements in connection

16   the plea agreement, pertain to the period after these

17   Debtors filed Chapter 11?

18           MR. LIPSON:  Not that statement, Your Honor, but

19   that is not --

20           THE COURT:  Do you have any evidence to support

21   the idea that the Sacklers have been the de facto management

22   of these Debtors, since the commencement of the Chapter 11

23   case?

24           MR. LIPSON:  De facto management since the Chapter

25   11 case?  No, Your Honor, but that --

1           THE COURT:  Or de -- all right.  Then, my next

2   question.  Do you have any evidence that they were the de

3   facto board of these Debtors since the commencement of the

4   Chapter 11 case?

5           MR. LIPSON:  I think that is unclear.  If they had

6   the power to remove the board --

7           THE COURT:  What evidence do you have on that?

8           MR. LIPSON:  The Debtors' own admission that they

9   had to eliminate the power that the Sacklers had to remove

10  the directors in November of 2019.  And more importantly,

11  Your Honor, that the governance documents of these Debtors

12  are not public.  We have never seen their bylaws.  We have

13  no idea what residual powers the Sacklers may or may not

14  have been able to wield over --

15          THE COURT:  Okay, that's fine.  That's a

16  relatively easy thing to figure out, right?

17          MR. LIPSON:  Correct.

18          THE COURT:  In fact, one could've --

19          MR. LIPSON:  That's why we say --

20          THE COURT:  -- a 2004 request to do it, instead of

21  making a motion for an examiner, but nevertheless, that's a

22  relatively easy thing to figure out.

23          MR. LIPSON:  Right.  This is why we say, this

24  should be a fairly painless and easy process, if, in fact,

25  the process has been free of undue influence by the

1    Sacklers.  But it is important, Your Honor, to understand

2    that the motivation here is not Mr. Jackson's own litigation

3    position only.  He's concerned about the integrity of this

4    process, and that is why --

5             THE COURT:  Well, let's go to that, all right?

6    Because as the judge, I actually do get to ask these

7    questions of you.

8             MR. LIPSON:  Of course.

9             THE COURT:  Do you ever watch the History Channel?

10            MR. LIPSON:  I do not, Your Honor.

11            THE COURT:  Okay.  Well, they have some good

12   programs on it, but a lot of their programs go like this.

13   They show an image that's kind of cool, of something, like

14   the Nazca lines or a marine --

15            MR. LIPSON:  I'm not familiar with that, Your

16   Honor.  Sorry.

17            THE COURT:  A marine mine for a ship, and then

18   they say, "Some people say there are questions about the

19   origins of these."  And then, they go on to ask the

20   questions, without any evidence, although -- other than

21   saying some people ask.  I refer to pleadings that do the

22   same thing, as History Channel pleadings.

23            They say, "some people raise questions," or "some

24   people ask the following," or "some scholars say," and then

25   they try to link all that together, without evidence to

Page 28

1    reach a conclusion.  So other than the board issue, are you

2    pursuing any of those points today?  Because if you are, I

3    need to pursue them with you.  If you're not, if you

4    basically eschew them as to "your general contentions" that

5    some people have questions about the conduct of this case, I

6    will pursue them with you, and we'll get to the bottom of it

7    right now, as to your basis and your logic on it.

8            MR. LIPSON:  As we say in our motion, we are not

9    asking for a secondary analysis of the underlying

10   allegations of the Sacklers.

11           THE COURT:  That's not my question.  What else are

12   you saying you want to deal with, as far as the questions

13   you say have been raised about the conduct of this case,

14   beyond the question that you say is now the only basis for

15   your request for an examiner, which is to investigate the

16   independence of the board in making a decision to propose

17   for confirmation, the plan before me?

18           MR. LIPSON:  Are you asking me what the basis for

19   that --

20           THE COURT:  No, I'm asking you if you want to

21   explore anything else.

22           MR. LIPSON:  I just said, no.

23           THE COURT:  All right.  So, all of these

24   statements in your motion about, for example, the Committee

25   or the Court -- and I do take this personally, sir -- not

Page 29

1    being able to police the process and, implicitly, alleging

2    that the Court is somehow biased, you're eschewing at this

3    point?  If not, we will go through them, sentence by

4    sentence.

5              MR. LIPSON:  Your Honor, those are examples of

6    reasons for concern.  They are not History Channel facts.

7              THE COURT:  All right, then let's go through them.

8              MR. LIPSON:  Your Honor -- fine.  Would Your Honor

9    please tell me where you are?

10             THE COURT:  As soon as I get there.

11             MR. LIPSON:  Your Honor, if I may, if I offended

12   you --

13             THE COURT:  No, no.  It's not a question of

14   offense.  It's a question of actually making false or

15   illogical allegations.

16             MR. LIPSON:  I'm sorry, Your Honor.  You said you

17   took it personally, so I thought that that meant you were --

18             THE COURT:  Well, I do, when my integrity is

19   challenged.

20             MR. LIPSON:  I'm not challenging your integrity.

21             THE COURT:  Oh, really?  Really, you're not?

22             MR. LIPSON:  Absolutely not, Your Honor.

23             THE COURT:  Uh huh.  So, let's look at Page 17 of

24   your motion.  All right?

25             MR. LIPSON:  I'm there.

Page 30

1          THE COURT:  Are you there?  All right.  You refer

2     to the reluctance of parties -- and I think it's not just

3     limited to the Special Committee, because you later refer to

4     the Creditors Committee in this vein as well -- to

5     "challenge the settlement framework in light of the insular

6     nature of Chapter 11 practice."  That's a quote.  Then, you

7     refer to two members of the Special Committee, Messrs.

8     Miller and Buckfire, well-known, highly regard

9     reorganization specialists.

10          Here's a -- okay, I appreciate you don't watch the

11     History Channel, but here's the line.  "Scholarship has

12     found that large and complex reorganizations such as the

13     Debtors' are often dominated by a small number of

14     professionals and judges, who frequently appear in the same

15     cases together."

16          And then, in Paragraph 37, you state, "It is not

17     difficult to imagine that relationships among the members of

18     the Special Committee and key participants in this case" --

19     I take it that means judges -- "may have affected the

20     decision to settle or sue, whether conscious or

21     subconscious."

22          Then, you cite a forthcoming paper, hasn't been

23     published.  I'm assuming that the editors of the Texas Law

24     Review still retain some control over it, right?

25          MR. LIPSON:  Believe so, Your Honor.  I don't

Page 31

1  know.  You'd have to ask them.

2         THE COURT:  And in fact, it is coming out, if

3  ever, in 2022, as stated on their website, which your

4  pleading directed me to, and I would think they would change

5  it, since the professor who, I guess, unlike you, did not

6  have the courage to join in this pleading, refers, as a

7  basis for some of his statements, that the original version

8  of the disclosure statement -- not the one approved, but the

9  original version -- didn't discuss the Sackler issues in

10 detail.  You think the editors might want to change that and

11 maybe other aspect of it?

12        In any event, you say, in this Law Review, because

13 attorneys appear in front of a handful of judges, "This

14 dynamic makes it imperative for these repeat players to

15 ensure that they stay in the judges' good graces.  They know

16 that if they anger the judge by being zealous advocates in

17 one case, they will bear the consequences the next time they

18 appear before the judge, and worry that clients will not

19 want to hire them."

20        To me, that suggests that they somehow know the

21 judge is doing something improper and don't want to speak up

22 and tell him.  Is that what you are citing it for, that

23 proposition?

24        MR. LIPSON:  No, Your Honor, what I'm --

25        THE COURT:  So, why are you citing -- what are you

Page 32

1    citing it for?

2            MR. LIPSON:  I'm citing it for the proposition

3    that, as Professor Levitin, who is a national -- an

4    internationally renowned scholar, says, in large bankruptcy

5    cases, there is, in fact, empirically, a small number of law

6    firms that appear over and over again, in front of a small

7    number of judges, and there is a strong impetus to settle.

8            We are not challenging --

9            THE COURT:  That's really not what the statement

10   actually says.  That says nothing about settlement.  It

11   makes the very odd conclusion, which, I don't know whether

12   he's internationally recognized or not, that parties don't

13   want to anger the judge, presumably by taking some position

14   that's stupid -- because you've already said, it's not

15   taking a position that disagrees with what they believe the

16   judge is doing improperly -- not because it's a bad thing in

17   that case, but for some future purpose.

18           It's hard to imagine anything more illogical than

19   that, whether you're internationally recognized or not.

20   Listen.

21           MR. LIPSON:  I think --

22           THE COURT:  I am in Court every day on matters

23   large and small, perhaps, to Professor Levitin and you. They

24   are each equally important to me, whether they're large or

25   small, and I make the decisions based on the evidence before

1     me.  I don't make them on the basis of who is appearing and

2     who isn't appearing.

3            Just in this case alone, Davis Polk, which is the

4     lead counsel, the whole firm has appeared in front of me in

5     two cases in my almost 20 years on the bench.  So, it's not

6     really a repeat player.  Mr. Kaminetzky, who is the only

7     common person in those cases, Delphi and Frontier Airlines,

8     won one and lost one.  He neither angered me nor not angered

9     me.

10           This statement is just simply a load of hooey, and

11    you should know it.  And if you're teaching law students

12    contrary to that, if you're saying to them, judges and

13    lawyers are somehow trying to conspire somehow -- although,

14    this doesn't really say how -- to change the facts or the

15    result and lawyers are hesitant to speak up and tell the

16    judge that the judge is doing something wrong, you're in the

17    wrong profession.  All right?

18           MR. LIPSON:  Your Honor, can I address this?

19           THE COURT:  Yes, you should, because this is just

20    shocking to me.  But I will go one further, because you also

21    have a footnote here.  You say, Mr. Miller, for example,

22    apparently bragged about napping in Judge Drain's chambers,

23    in a book he wrote, right?  Well, if he was napping in my

24    chambers, he was curled up on the floor, because I don't

25    have a couch.

1              I think, if you actually read it and talked to Mr.

2     Miller, you would understand that what he was talking about

3     is that during the Delphi case -- a case which, at that

4     moment, was requiring people to work around the clock, day

5     after day, because of the impending collapse of GM and the

6     auto industry -- he was falling asleep in settlement

7     conferences and at hearings, and he, in this book referenced

8     that and apologized for it.

9              So, you have slandered him in that paragraph.

10    Why?  I have no idea, because it doesn't relate at all to

11    the relief you're seeking, but it does make a nice headline,

12    right, which is what I think you and Mr. Levitin are looking

13    for here, if I can engage in some History pleading.  Now,

14    you can respond.

15             MR. LIPSON:  Are you done?

16             THE COURT:  I am done.

17             MR. LIPSON:  Thank you, Your Honor.  So, the first

18    point is that the question of forum shopping in this case,

19    is a live one, because the Debtors' board, when dominated by

20    the Sacklers, changed their corporate governance documents

21    to make it possible to file, in your Court, at the last

22    possible moment.

23             Now, we don't think that this goes to your

24    integrity at all, and if I offended you in any way, I am

25    deeply sorry.  I have nothing but respect for you and for

1    this Court.  Nor am I accusing any of the lawyers, nor do I

2    believe mister -- Professor Levitin has accused any of the

3    lawyers of corruption.  I don't use that word.  I don't

4    believe he uses that word.

5               THE COURT:  He does, in fact, and you just used

6    the word "questions," which, to me, is just as bad.

7               MR. LIPSON:  What we are concerned about and what

8    we say in our --

9               THE COURT:  Right.  Concerns, questions, issues.

10              MR. LIPSON:  Yes, concerns, questions, and issues

11   that Congress created the position of examiner to address.

12   We're not making this up, Your Honor.  These are in the

13   Debtors' own public statements, after a long, long time of

14   similar concerns, similar questions, involving a family that

15   has been aggressively secret.  So --

16              THE COURT:  You haven't said what the "this" is.

17              MR. LIPSON:  Your Honor --

18              THE COURT:  You just said, it's not manipulation

19   of the Chapter 11 case.  It's not actions of the lawyers or

20   the judge in the Chapter 11 case, so what is the "this" that

21   you're referring to?

22              MR. LIPSON:  The "this" is a strong bias to get a

23   deal done, and the reason that's a problem here, Your Honor,

24   is because I think many people in this case, including Mr.

25   Jackson, believe that the parties have viewed this case as

Page 36

1    choice between the money or the truth.  And you, yourself,

2    have said, well, trials are not truth serums.  We're not

3    going to get the truth here, and that's right.  We know

4    there's going to be a document repository.  We don't know

5    what's going to be in it.

6              But of course, that will come into existence only

7    after the Sacklers have been released, so this is the last

8    best chance this Court has to address concerns about the

9    Sacklers and their capacity to manipulate the legal system

10   that has dogged them for many, many years.

11             THE COURT:  Although, you're not actually seeking

12   that relief.

13             MR. LIPSON:  That's exactly the relief --

14             THE COURT:  What they have done in the past.

15   Because that's going to be covered by the document

16   depository.

17             MR. LIPSON:  One hopes.  We don't know what

18   documents the Sacklers are going to contribute.

19             THE COURT:  So that's not the relief you're

20   seeking.  Now, you also say here --

21             MR. LIPSON:  -- the relief we're seeking --

22             THE COURT:  -- if I can note --

23             MR. LIPSON:  The relief we're seeking, Your Honor,

24   is whether they exercised that power during these cases and

25   shortly before in order to create conditions where --

Page 37

```
1              THE COURT:  I don't --

2              MR. LIPSON:  -- they were --

3              THE COURT:  I guess, what I don't understand is,

4    why you would -- well, I really don't understand the notion

5    as to the shortly before.

6              MR. LIPSON:  Because that's apparently when the

7    deal was negotiated.

8              THE COURT:  But it's -- but that, you keep

9    referring to the deal, right?  And as far as I can tell, you

10   define that about as broadly as one can, which is either, A,

11   an agreement to settle with the Sacklers, or B, an absolute

12   determination not to settle with the Sacklers.  Right?

13   That's your definition of the deal?

14             MR. LIPSON:  No.

15             THE COURT:  Because there was no deal until about

16   half an hour before the final day before the disclosure

17   statement hearing.  That was when there was a deal.

18             MR. LIPSON:  That's clearly inconsistent with the

19   terms sheet that was filed at the outset of this case.

20   There was an agreement in principle before the bankruptcy

21   case --

22             THE COURT:  But it --

23             MR. LIPSON:  -- it had three --

24             THE COURT:  But it wasn't a deal.  Again, I --

25             MR. LIPSON:  It was a deal that was subject to
```

Page 38

1    change, of course, and it did change in some ways.  No

2    question.  The Creditors Committee did an admirable job of

3    increasing the Sacklers' contribution, which is a fine

4    thing.  The problem, Your Honor, is that all of that goes on

5    inside the bubble of a protective order that makes it

6    impossible for creditors outside of the case to understand

7    what is going on and --

8              THE COURT:  Then --

9              MR. LIPSON:  -- whether there's an undue influence

10   --

11             THE COURT:  And you think -- of course, again,

12   this is not what you have the examiner now, as you stated,

13   investigate, but leaving that aside, if the examiner were to

14   investigate the basis for an agreement, right, you believe

15   that all of the information that would be provided to the

16   examiner would be public?

17             MR. LIPSON:  Provided to the examiner?  No --

18             THE COURT:  Yes.

19             MR. LIPSON:  -- clearly not.

20             THE COURT:  Yeah.

21             MR. LIPSON:  But the examiner's report would be.

22             THE COURT:  Right.  And --

23             MR. LIPSON:  That's the whole point, Your Honor.

24   We understand why the parties --

25             THE COURT:  Well, no, because your point is that

Page 39

1    the protective order is shielding transparency.  It's the

2    same constraint that would be imposed on an examiner, as you

3    well know.

4              MR. LIPSON:  Not so, Your Honor.

5              THE COURT:  So, have you ever tried a case, Mr.

6    Lipson?

7              MR. LIPSON:  I have tried --

8              THE COURT:  Have you taken discovery before the

9    case?

10             MR. LIPSON:  I have, Your Honor.

11             THE COURT:  And did you publish all of that

12   discovery?

13             MR. LIPSON:  No, of course, not.

14             THE COURT:  No, of course, not.  Right.

15             MR. LIPSON:  And we're not asking for --

16             THE COURT:  And what happens when you try a case,

17   is that the judge gets the actual evidence that's derived

18   from the discovery.  It's usually in a case that would be of

19   this size, quite voluminous.  It generally takes up, you

20   know, my entire bench and auxiliary trays, but that's not

21   anywhere close to all the discovery, and when you actually

22   conclude and conduct the trial, you learn pretty quickly,

23   don't you, that it's only a miniscule amount of that

24   evidence that actually is relevant.

25             MR. LIPSON:  The fact that you're talking about --

Page 40

1          THE COURT:  So, when you're complaining about

2     transparency, and when this is picked up by people who are

3     not lawyers, I really wonder what on earth you're talking

4     about.

5          MR. LIPSON:  Your Honor, the -- I don't know what

6     trial you are talking about.

7          THE COURT:  I'm talking about the trials I conduct

8     every day.

9          MR. LIPSON:  We're talking about this case, not

10    other cases, Your Honor.

11         THE COURT:  And I guarantee you, if one were to

12    try the issues in this case, there would not be 99 million

13    pages of documents that would be in front of me on my bench.

14         MR. LIPSON:  That may be fine, and it simply not

15    relevant to the reason Congress created the examiner and --

16         THE COURT:  No, but I'm just going to the point

17    that you keep making, which is that there is some veil

18    that's improper as far as the discovery that has been taken

19    in this case, because it's been taken --

20         MR. LIPSON:  Quite the opposite.

21         THE COURT:  -- under protective order.

22         MR. LIPSON:  Quite the opposite.  We are not -- we

23    clearly say we do not believe the protective order or the

24    confidentiality stipulations are, in themselves, improper.

25    We are saying that this is an unusual case, that involves an

Page 41

1   unusual degree of public interest and concern, and we

2   believe that an examiner should go into a bubble, if you

3   will, created by that protective order, evaluate the work

4   that we assume was done on this narrow question, emerge with

5   a report saying, yes, it's okay, here's why.  No, it's not

6   okay, here's what you need to think about.

7           That's what we want and the thing to study, the

8   thing to study is simply the question, did the Sackler

9   families use their governance powers to unduly influence

10  both the board, shortly before the bankruptcy, once the

11  Sacklers decided to give the company up -- not a final deal,

12  but they made the decision -- and then during the case when

13  the Special Committee was appointed.

14          THE COURT:  Okay.

15          MR. LIPSON:  Your Honor, confirmation is coming

16  soon.  We understand that and we very, very narrowly

17  tailored the timing of the examiner not to interfere with

18  that.  But when confirmation comes, the concerns that Mr.

19  Jackson has that the 3,500 people who signed a petition on

20  Change.org asking for an examiner in this case

21  (indiscernible) they have -- they're not going to vanish.

22  They're not going to go away.

23          There will be a public document repository of some

24  sort, and people will go through that.  This is the last

25  best chance this Court has to quell those concerns, to show

1    that they are, in fact, unfounded.  That's what we are

2    asking you to do.

3              THE COURT:  That's what you're asking me now to

4    do.  That's not what was in your pleading.

5              MR. LIPSON:  Well, I apologize, if it was unclear,

6    Your Honor.  Doing the best I can.

7              THE COURT:  All right.

8              MR. LIPSON:  Would you like me to continue with my

9    argument?

10             THE COURT:  Sure.

11             MR. LIPSON:  Or feel like you've exhausted --

12             THE COURT:  No.  I think we've exhausted the key

13   question, which is, what is the relief you're seeking.  Now,

14   are you justified in getting it, is next.

15             MR. LIPSON:  And I think -- correct.  And the

16   answer, I believe, is absolutely yes, Your Honor.  We know

17   that Congress said that Senator DeConcini said that the

18   reason we have examiners is to assure the public of the

19   integrity of the reorganization process in cases -- large

20   cases of great public interest.

21             So, cases like Enron, cases like New Century,

22   cases like Washington Mutual, cases like WorldCom have all

23   involved allegations of serious wrongdoing and have all

24   involved examiners who, in those cases, were doing much more

25   than we're asking for here.  In those cases, they were

Page 43

1    actually figuring out who was the bad guy, but we're not

2    asking for that.

3            All we're asking for is some assurance that the

4    bad guy didn't decide to release (indiscernible).  That's

5    what we're asking for.  Now, it may be the case that the

6    judges in Enron and New Century and WorldCom, maybe they

7    were wrong.  Maybe there was no concern about the integrity

8    of the process.  Maybe Congress was wrong.  And if, Your

9    Honor, you think I'm wrong, you should simply deny the

10   motion and we can move on.

11           I do not want to waste your time.  I do not want

12   to waste the time of the lawyers in this case who've already

13   billed nearly half a billion dollars.  We're not looking to

14   run up anybody's bill.  We're looking for some assurance

15   about the integrity of the decision going forward.  Exactly.

16           THE COURT:  Okay.  As far as the debt threshold of

17   1104(c)(2), what evidence are you relying on?

18           MR. LIPSON:  Well, let's start with the Debtors'

19   own disclosure statement.  Right?  At Page 131, they say --

20   not my words -- their words, that the Department of Justice

21   has "an allowed unsubordinated, undisputed, noncontingent,

22   liquidated, unsecured claim against Purdue Pharma in the

23   amount of $2.8 billion, arising from the Department of

24   Justice's civil investigation."

25           Now, we know that the Creditors Committee and I

Page 44

1    believe the Debtors, it was still contingent, Your Honor,

2    because they don't have to collect.  They can rescind and do

3    something else.  Well, of course, Your Honor, but that

4    proves too much.  Creditors can always forbear.  The fact

5    that they can forbear from collection, the fact that they

6    can forebear from enforcement, doesn't make a claim

7    contingent.

8              THE COURT:  Well, this wouldn't be forbearance.

9    This is a right to rescind.

10             MR. LIPSON:  The right to rescind, Your Honor,

11   then says they have a choice.  They can either pursue

12   everybody or their claims balloon back up to their full

13   amount.  The full amount is not contingent or unliquidated.

14             THE COURT:  I'm sorry, the full amount of their

15   claim?

16             MR. LIPSON:  The full -- I believe, their claim

17   has two components, one of which is clearly stated, two

18   claims at $2.8 million each, one of which is trebled.  There

19   is a portion that is contingent, but that's irrelevant.

20   $2.8 million is clearly more than $5 million.

21             THE COURT:  No, but it -- the order actually says,

22   Paragraph 6, "The United States shall have an allowed

23   unsubordinated, undisputed, noncontingent, liquidated,

24   unsecured claim against PPLP in the amount of $2.8 billion

25   arising from the DOJ's civil investigation provided that, if

Page 45

```
 1    the PPLP defaults on any material obligation, if a plan

 2    materially consistent with the terms of the civil settlement

 3    agreement is not confirmed, in the event of voluntary

 4    dismissal or conversion of the cases, or in the event the

 5    Debtors' obligations under the civil settlement agreement

 6    are voided for any reason, the United States my elect in its

 7    sole discretion to rescind the releases in the civil

 8    settlement agreement or to have -- or, to have an

 9    undisputed, noncontingent, liquidated, allowed unsecured

10    claim against the Debtors for the full amount of that claim"

11    -- of the proof of claim, not the allowed claim, but the

12    proof of claim.

13             MR. LIPSON:  Correct.  I believe you just answered

14    your question.

15             THE COURT:  Right?  So, and I think your reply

16    that came in last night actually contemplates, not only not

17    confirmation of the plan, but also the appointment of a

18    Trustee and/or liquidation of the Debtors, right, so that's

19    a contingency, isn't it?  You refer to those in your reply,

20    those possibilities.

21             MR. LIPSON:  I'm not sure I understand why that's

22    relevant.

23             THE COURT:  Well, because, again --

24             MR. LIPSON:  You planning to appoint a Trustee in

25    this case?
```

Page 46

1           THE COURT:  No, the conversion --

2           MR. LIPSON:  If you think a Trustee should be

3     appointed --

4           THE COURT:  The conversion of the case is a -- one

5     of the outs in this proviso as well as a plan materially

6     consistent with the terms of the civil settlement agreement

7     not being confirmed.  And we don't know whether that's going

8     to happen, yet, right?

9           MR. LIPSON:  There are always provisos in

10    agreements, and creditors always have the right not to --

11          THE COURT:  No, I -- isn't that a contingency?

12          MR. LIPSON:  I don't believe it's a contingency

13    that is relevant to this decision.  And in any case, Your

14    Honor, that is only one of two prongs.  We know that --

15          THE COURT:  I'm just --

16          MR. LIPSON:  -- examiner shall be appointed --

17          THE COURT:  I'm just asking, on this C2 point.

18    I'm just focusing on the C2 point.

19          MR. LIPSON:  I think that when the Debtor enters

20    into a settlement agreement that becomes a (sound drops).

21          THE COURT:  You froze.  Sorry.

22          MR. LIPSON:  Sorry, Your Honor, I didn't hear

23    that.

24          THE COURT:  You unfroze, just now.  So, I think

25    you froze right when you said, when I think -- you said, I

Page 47

1      think when the Debtor enters into a settlement agreement.

2              MR. LIPSON:  And obtains a final order that says

3      the things you just read, that creates an allowed unsecured

4      claim that is not contingent and is fixed.

5              THE COURT:  Okay.

6              MR. LIPSON:  For these purposes.  I think the

7      reality of this case, Your Honor, I think everybody knows,

8      is that a plan will be confirmed, a Trustee will not be

9      appointed, any of the contingencies that you identify are

10     remote.  In fact, the Debtors' own disclosure statement

11     says, oh, the DOJ has said we're getting comfortable with

12     all this stuff.  We feel pretty good.  So, Your Honor, in

13     all due respect, I don't think that's the strong argument

14     that they can make.

15             THE COURT:  So, you're assuming the plan will be

16     confirmed.

17             MR. LIPSON:  I think it is highly likely.  Yes,

18     absolutely.

19             THE COURT:  Okay.

20             MR. LIPSON:  And as I said, Your Honor, we are not

21     here to blow up that deal.  We are not here to reinvent that

22     wheel.  We are here to try to make sure that we have some

23     minimal level of confidence about the integrity of the

24     process that has -- that leads to that final deal.  We,

25     obviously, understand that the agreement that was struck by

Page 48

1    the Sacklers with the plaintiffs' attorneys in 2018 was not

2    the final deal.

3            We realize that it created three pillars of a

4    deal, and those pillars, fundamentally, have not changed.

5    The amounts have changed.  Other details have changed.  The

6    Creditors Committee has done incredible work in this case.

7    The Debtors' counsel has done incredible work in this case

8    to try to manage an extraordinarily difficult situation.

9            We are not attacking that, and I'm sorry if they

10   are attacked.  We are not attacking you, and we're sorry if

11   you feel attacked.  Outside the protective order bubble of

12   this case, there are concerns that will not go away.  You

13   may disagree with those --

14           THE COURT:  You don't think that that might be

15   because --

16           MR. LIPSON:  Inside the bubble --

17           THE COURT:  -- of statements that you, yourself,

18   have made in these pleadings?

19           MR. LIPSON:  I'm sorry, Your Honor.  You're saying

20   that the past 15 years of --

21           THE COURT:  No, no.  I'm talking about statements

22   you have made --

23           MR. LIPSON:  -- the Sacklers being --

24           THE COURT:  -- in these pleadings about the

25   conduct of this case.

1            MR. LIPSON:  Are you suggesting Mr. Jackson does

2    not have the right to ask for an examiner, because --

3            THE COURT:  No.  I am, for example, referring to a

4    statement on Page 23 of your motion where you state -- you

5    clearly imply, quoting me from an opinion, a bench ruling I

6    gave, in September 2020, where I, as part of the factual

7    analysis, said, "It appears to me to have always been the

8    case, and will continue to be the case, that a plan in which

9    the Sackler families do make a material contribution that

10   satisfies the Second Circuit's test in In re:  Metromedia,

11   is not only possible but the most likely outcome in this

12   case."

13           Now, what you neglect to say, and I can understand

14   why someone like Mr. Jackson or the people that read about

15   this in the press might think from that, that that was just

16   a preconceived view of mine, what you failed to state was,

17   that was in the context of a hearing on the preliminary

18   injunction.  Now, we both know, the four prongs that need to

19   be shown to get a preliminary injunction, right, which

20   includes likelihood of success on the merits and irreparable

21   harm or risk of serious harm and a balancing.

22           So, in a reorganization context, that includes a

23   likelihood of a successful reorganization, which includes an

24   analysis of whether the plan contemplated at that time could

25   lead to a successful reorganization.  So, this was not just

Page 50

1    some sort of avuncular remark or preconceived notion of

2    mine, right?  You left that out.  You left that as an

3    implication.  You didn't state that this was as a result of

4    a hearing on notice with over a day's argument as to the

5    facts.

6              MR. LIPSON:  Your Honor, with all due respect, I

7    don't think that that is the only time you have urged the

8    parties to settle.  I don't have the transcript at hand, but

9    the December hearing, at which you approved the DOJ

10   settlement, concludes with you saying something like, you

11   must get this deal done.

12             THE COURT:  I've said --

13             MR. LIPSON:  You can do it; you should do it.

14             THE COURT:  And you think it's improper for a

15   Court --

16             MR. LIPSON:  Absolutely not.

17             THE COURT:  -- have the parties focus on a

18   settlement option?

19             MR. LIPSON:  Absolutely not.

20             THE COURT:  All right, I think that's important

21   for the record, because one can read this pleading as being

22   to the contrary.

23             MR. LIPSON:  Well, if that's --

24             THE COURT:  Including the notion that there's a

25   binary decision, which, I think, this pleading is premised

Page 51

1    upon, that one either decides at the beginning of a case to

2    settle and -- to the exclusion of everything else, or not to

3    settle, to the exclusion of potential settlement.

4          Now, we both know that that's not the case, that

5    that binary decision doesn't exist.  One is always

6    evaluating one as against the other, which is why I don't

7    understand why one would be focusing on a period before the

8    time that there actually was a decision to recommend

9    confirmation of the plan that's currently before me.  I

10   think that's the main point that the Committee is making,

11   which is, if you examine the whole process, you're going too

12   far, because --

13         MR. LIPSON:  Fair enough.

14         THE COURT:  -- people don't settle until they

15   settle.

16         MR. LIPSON:  Fair enough.

17         THE COURT:  Okay.  All right.  Okay, is there

18   anything else?

19         MR. LIPSON:  No, Your Honor, except -- no, except

20   -- I believe that this case will result in a confirmed plan

21   of reorganization and I'm not sure that's a bad result at

22   all, and from inside the case, everything may look, and in

23   fact be, fine.  Contrary to your insinuations, I'm not the

24   one creating concerns about the Sacklers.  They have done it

25   themselves by being secretive.

Page 52

1          There are plenty of far better qualified people

2    asking those questions than myself.  Mr. Jackson, just like

3    any creditor -- just like the single creditor brigade in

4    (indiscernible) is entitled to some assurance about the

5    integrity of the process.  Congress said examiners are

6    required in these cases, not because they're substitutes for

7    litigation, not because they're substitutes for a deal, but

8    because, in these cases, we need to know legitimately that

9    people who are getting the benefit of the deal are entitled

10   to it.

11         I might make one other point.  I'm sorry.  I said

12   I was done.  My -- you said settle or sue.  Well, if you

13   back and look at the cases, where examiners have been

14   involved, there often have been suits against insiders, even

15   in Insys, which is one of the other opioid cases, the

16   Debtors have sued the insider there.  We're not saying the

17   Sacklers should've been sued.

18         THE COURT:  My point is -- my point is a different

19   one.  Your motions focus on the negotiation of the

20   settlement framework, which, throughout, was only a

21   framework, subject to massive due diligence and further

22   negotiation -- which, in fact, I think, has undisputedly

23   occurred since then -- is the starting point for a review

24   of, as you say, "the process."

25         To me, that is misguided, because it assumes,

1    because I think this is -- because it was only the starting

2    point, that if one at least contemplates the prospect of a

3    settlement, that is an irrevocable decision and one cannot

4    turn to litigation.  We both know that that's just absurd,

5    and in fact, is belied by the facts of this case.

6              MR. LIPSON:  What litigation --

7              THE COURT:  One is always evaluating what is

8    possible under a settlement and achievable versus what's

9    possible and achievable in litigation.

10             MR. LIPSON:  So maybe I'm not making my point --

11             THE COURT:  To me, the decision that counts is the

12   decision to actually enter into and be bound by a

13   settlement.

14             MR. LIPSON:  Right.  And what we're saying is that

15   outside of your protective order bubble, many people wonder

16   why the estate hasn't sued the Sacklers.  Well, they're not

17   suing them because they're settling.  Fine.

18             That may be the right thing to do, but given the

19   concerns that have long existed about the Sacklers, we need

20   to know more than what the Debtors have told us in the

21   disclosure statement, which after 40 pages of a litany about

22   the meetings that they've had and the discovery they've

23   taken, and so on and so forth, throws up the hands and says,

24   well, suing the Sacklers would be complicated.  They may be

25   judgment proof.  This is the best deal they can get.

1          THE COURT:  Really?  That's your take on the

2     disclosure statement and the Creditors Committee's letter?

3          MR. LIPSON:  Yes.

4          THE COURT:  In any event, that's not the relief

5     that you're seeking --

6          MR. LIPSON:  (indiscernible).

7          THE COURT:  -- is to look behind that.  You're not

8     looking to look behind that, right?  You're looking as to

9     the issue of independence.

10          MR. LIPSON:  Independence on the decision to grant

11     the releases.  That's correct.

12          THE COURT:  Okay.  All right.  I understand that.

13     that, frankly, could've been made without the -- I mean, I

14     underlined about, I think, 50 times when you made these

15     other allegations, so, that's fine.

16          MR. LIPSON:  Thank you for your guidance, Your

17     Honor.

18          THE COURT:  Okay.

19          MR. HUEBNER:  Your Honor, with respect to the

20     parties responding, I think we have agreed on an order of

21     operations, as we often do, in order to be efficient and not

22     debate who should go next, so I actually think I'm leading

23     off for the people who are objecting to the motion.

24          Good morning, Your Honor.  May it please the

25     Court.  For the record, I am Marshall Huebner of Davis,

Page 55

1    Polk, and Wardwell on behalf of the Debtors.

2          Your Honor, it is difficult to know where to begin

3    in responding to this Kafkaesque view of both the fact and

4    the law.  It actually is quite important, because Professor

5    Lipson's pleadings, I think, as your colloquies have tweaked

6    out, the fundamental attacks on every party to this case

7    and, in fact, themselves calling to question the integrity,

8    not only of a great many people, but frankly, of the

9    bankruptcy system itself.

10          I'm going to apologize in advance.  I will try

11    very hard, but I will -- I may end up slipping into a level

12    of passion and a tone that in the case of one of the most

13    difficult cases I've worked for two years, the Court has

14    never heard from me, but candidly, as I think you will hear,

15    I actually think that Professor Lipson's pleading, in many

16    respects, is outside the bounds of acceptable advocacy to a

17    Court of law.

18          Let me first begin with something on which I want

19    to be very clear.  The Debtors' opposition to this motion

20    should not be perceived in any way, shape, or form to

21    denigrate, minimize, or (indiscernible) the unspeakable and

22    tragic (indiscernible) Mr. Jackson and his family, that

23    fact, that loss, deniable and unfathomable.

24          That said, the terrible and tragic circumstances

25    of the Jackson family cannot change the fact that the motion

Page 56

1    contains no evidence whatsoever of the almost endless litany

2    of nasty, utterly unsupported, and flatly (indiscernible)

3    and unsupportable facts that Mr. Lipson blends into his

4    papers to justify the relief requested.

5             And remarkably, in his reply brief, filed very

6    late last night, he makes no attempt to fill the gaps.  In

7    fact, he doubles down.  I was asked, recently, by someone

8    why, why is Professor Lipson doing this at this stage in the

9    case and why Professor Lipson in particular.

10            So, I'm going to hazard a guess why relief --

11   because it's not supported by a single one of the hundreds

12   of thousands of creditors on the docket of this case, any of

13   the 12 organized groups, many of whom, I think it is fair to

14   say, hate, H-A-T-E, hate either or both of Purdue and the

15   Sacklers and describe them with words like criminal, kill,

16   evil, monster, in describing the opioid epidemic and joining

17   the relief, because candidly, this is about Professor

18   Lipson, in no small degree.

19            On November 10th, 2020, Professor Lipson gave the

20   Friel-Scanlon lecture at Temple University entitled -- I

21   guess, to generate interest -- "Sex, Drugs, and Bankruptcy:

22   Due Process and Social Debt," in which he argued, in

23   essence, the bankruptcy professional, and by extension, the

24   Courts, that work all day every day on these cases, are

25   basically corrupt, that they, in fact, do repeat deals with

Page 57

1   one another, and that they sell out their own clients

2   because of the art of the deal.

3          He specifically actually says that in this case,

4   opioid victims were sold out because the professionals are

5   repeat players and the art of the deal is more important

6   than the epical, sacred obligation to address the dignity

7   and human values and rights of their clients.

8          In particular, he goes on to say that Akin Gump,

9   counsel to the UCC, and Milbank, counsel to Sacklers, are in

10  a huge number of deals together and that, in essence

11  (indiscernible) work stuff out as part of the art of the

12  deal in the relational bankruptcy world.  This ugly, dark

13  vicious view of what we do for a living might explain

14  Professor Lipson's otherwise mindboggling, unsupportable

15  claim that the UCC, Akin Gump, represented UCC, that in the

16  real world, on planet earth, has been battering and slamming

17  and attacking the Sacklers almost every day for two years

18  has somehow taken a dive.

19          I'm not going to let him walk back from what he

20  said in his pleadings.  They could have been a check on the

21  process, but they didn't.  Instead, they wrote the

22  stipulation and gave up their rights and didn't do what they

23  were supposed to do.  We'll talk a little bit later about

24  the ethical canons that govern the practice of law and who

25  might have violated them in this case.

Page 58

1          It also explains why, in the twisted maneuver that

2     is also outside the bounds of acceptable advocacy, Professor

3     Lipson, both in his opening brief and after his

4     extraordinary (indiscernible) statement were pointed out in

5     about a hundred pages of pleadings, totally, completely, and

6     utterly erases the Ad Hoc Committee, the MSGE, the PEC and

7     the MDL, and the mediators from his narrative, because, of

8     course, the country's mass tort lawyers and 48 attorneys

9     general are not "repeat players" in the bankruptcy system in

10    his relational view of what may have happened here.

11         And so, because they don't fit his "relational

12    theory" of Chapter 11, he closes his eyes again and again

13    and again to the actual facts of this case, which I'll

14    describe in a few minutes, clicks his heels together, and

15    tries to enter a world of projected, made up reality.

16         Now, let's talk about the actual facts of this

17    case and how this deal got actually cut.  Because he

18    actually commits a fatal and unforgivable error at the

19    outset.  The original deal was not cut by the board of

20    directors or the Special Committee opposite the Sacklers.

21    That he claims is the original sin that was both massive,

22    (indiscernible) and irredeemable, never happened.  It's a

23    fabrication of his own that is absolutely described in the

24    informational brief and in the disclosure statement and in

25    multiple hearings before this Court.

1          Prior to petition date, it was the AG, attorneys

2    general, the highest legal officers of their states, and the

3    MDL PEC, comprised of most of the most terrifying tort

4    lawyers in America who have filed thousands of lawsuits

5    against Purdue and the Sacklers who were on one side, and

6    Purdue and the Sacklers together were on the other side.

7    That's who cut the framework here.  It was not the board

8    opposite the Sacklers.

9          The plaintiffs were suing Purdue and its owners,

10   in thousands of lawsuits and, as opposed to letting those

11   continue forever, until nothing was left and lawyers made

12   billions of dollars, and the company was destroyed, after

13   mediation ordered and personally overseen by the MDL judge

14   in Cleveland, pre-filing, the original deal was cut.

15         I repeat, it was not cut opposite the Sacklers by

16   the board or the Special Committee.  And if he bothered to

17   read the pleadings or call anyone and ask, it would've been

18   brazenly, totally obvious.  We cite, in our reply papers,

19   exactly where those descriptions are to be found.  The first

20   day transcript is just as clear.

21         He also just makes up -- and I have no better

22   phrase than the colloquial -- makes up what did and did not

23   happen and what was and was not discussed in the mediation

24   ordered by this Court under two of the most respected and

25   august mediators every had worked in this country.  He

Page 60

1    actually had the temerity in a signed pleading to advise us

2    all what happened and did not happen in a confidential

3    mediation he knows nothing about and in which he did not

4    participate, that it was not about the past, but only about

5    the present and the future.

6            And I see he's frowning.  I'm happy to get a pin

7    cite and read his false claim from his initial motion if he

8    doesn't remember it.  In this approach of Professor Lipson,

9    being utterly unburdened by the facts in the quest to

10   vindicate this meta-theory about bankruptcy cases, was

11   equally unburdened much earlier in 2019 when he wrote a

12   letter copying the U.S. Trustee, the Wall Street Journal,

13   this Court, the Debtors, and the UCC requesting an examiner.

14           I'd forgotten until 9:23 p.m. last night, when I

15   read the final exhibit to his untimely declaration, hat he

16   actually, literally looped the Wall Street Journal on an

17   email to the Department of Justice and this Court, a letter

18   that, just like his examiner motion, was fired off with no

19   prior notice to any of the parties actually what he was

20   trying describe, no attempt to reach out and verify basic

21   facts, and utterly replete with flatly false factual claims,

22   including what was and was not being undertaken by the

23   Special Committee and other statutory fiduciary duties about

24   which he knew nothing.  But I guess copying The Wall Street

25   Journal to try to get a story picked up maybe made it okay.

Page 61

1   No lawyer I know would imagine copying the media on a letter

2   to a federal court and the Department of justice.

3           At base, as I noted above, he repeats again and

4   again his motion at Page 2, Paragraph 23 and the reply that

5   notwithstanding the fact that multiple, highly-adversarial

6   plaintiff constituencies, including multiple attorneys

7   general negotiated this, the deal is somehow improper and

8   needs further examination.

9           He goes on to then allege that the UCC, a

10  statutory fiduciary -- oh, here it is, "Could have" but did

11  not "act as a check on questions of independence".  It's at

12  Paragraph 49 of their initial motion if you want to check

13  where he made that accusation.

14          And unless even the Court escaped unaccused of

15  impropriety, he actually did that as well.  On paragraph --

16  motion in Paragraph 55, he said the Court has already made

17  up its mind and will approve the settlement and releases,

18  "with little scrutiny".  So the debtors didn't do their job,

19  the UCC didn't its job, the mediators didn't do their job,

20  attorneys general didn't do their job, and the court didn't

21  do their job.  Because, "people worry that (indiscernible)

22  except for the noble Professor Lipson."

23          Your Honor, we (indiscernible) at great length in

24  our opening paper how Professor's motion distorts terribly

25  beyond the boundary of (indiscernible) advocacy, the actual

Page 62

1   facts of the case, how it's filled with arguendo with no

2   basis in fact.  And I'm going to hit only a few highlights

3   and then turn to the law.

4            So here's his first factual claim.  And he's sure

5   lucky he didn't put that he didn't put that in the

6   declaration, because then we'd be talking about different

7   legal provisions that govern submitting sworn statements to

8   the court that turn out to be unsupportable.

9            "Important decision leading to the settlement

10   agreement may have been made before the PPI Board or a

11   special committee with independence of the Sackler

12   families."  Motion at Paragraph 23.  On his telling all that

13   follows, including the special committee's decision to

14   accept the much-improved, totally different and totally

15   advanced shareholder settlement was taken.  But of course

16   that's just not what happened.

17            As I said a few minutes ago, it was dozens of

18   attorneys general and MDL PEC people representing thousands

19   of governmental entities that negotiated the deal opposite

20   the Sacklers.  And it was those groups who are on the other

21   side of the terms sheet that was filed on October 8th, 2019

22   at Docket Entry 257.

23            Twenty-three AGs and the PEC -- and by the way,

24   just for the record, the PEC represents more than a thousand

25   counties, multiple states and territories, municipalities,

Page 63

1    Native American tribes, individuals, and third-party payors,

2    a group that ultimately merged along with the AGs into the

3    Ad Hoc Committee, who I think it's fair to say are no

4    friends of the Sacklers or Purdue.

5           And, Your Honor, if you want to look at where all

6    these facts were laid out, I'll give you the ping sites for

7    that as well so there can be no possible question of the

8    irresponsibility of the claims that were made.  Pages 3

9    through 4 and 44 through 45 of the Debtor's informational

10   brief, Docket 17, also went on to say the settlement

11   agreement came about as a result of (indiscernible) critical

12   mass of plaintiffs, including many AGs and the PEC.  The

13   Disclosure Statement, Docket Number 2983, would have the

14   same, among many other places, on Pages 3 to 4 and 70 to 71.

15          Despite objecting to the disclosure statement,

16   interestingly enough, Professor Lipson did not object to

17   this part of the disclosure statement.  Nowhere in that

18   objection where he could have said you need to explain more

19   about how the initial deal was cut truly, honestly, and well

20   and by whom.  He didn't do that.  So if he thought that

21   needed more disclosure, maybe he should have done what a

22   regular lawyer would do, which is either call us up and say,

23   you know, I think there are some questions here, I wanted it

24   quite clear enough, or he could have objected if he didn't

25   get accommodation from us, as we accommodated so many other

Page 64

1    people.

2            Moreover, Your Honor, while his examiner motion

3    was actually quite vicious and really nasty in attacking

4    members of the Special Committee -- we mentioned before you,

5    you have Steve Miller dropping, exhausted as he tried to

6    save Delphi, working for a dollar to save a historic

7    American company.  And in fact, the disclosure statement had

8    pages and pages about the formation and independence of the

9    Special Committee.  See AG, Pages 60 to 66.  Did Professor

10   Lipson object to that part of the disclosure statement and

11   say I need more here, I want to know more about how to

12   (indiscernible) who they were?  No, he didn't.  He waited

13   until after the hearing was basically over to drop another

14   totally unexpected, never called, never discussed, you know,

15   thing on the docket that the rest of us have to deal with.

16           So I think that everybody on the planet other than

17   Professor Lipson seems to know this, but let me say it one

18   last time.  The original deal was not negotiated between the

19   Sacklers and the Board of Purdue, nor between the Sacklers

20   and the Special Committee.  It was negotiated in and grew

21   out of the MDL mediation ordered and organized by Judge

22   Polster with many state AGs and the MDL PEC on one side and

23   the Sacklers and Purdue, because we were not in Chapter 11,

24   on the other side.

25           Indeed, Your Honor, another little point of

Page 65

1    bankruptcy law, the Debtors did not even own the fraudulent

2    transfer claims in August of 2019 because they had not yet

3    gone into Chapter 11.  They were not the Plaintiff.  548

4    didn't exist yet, creating a federal action for fraudulent

5    transfer owned by the estate, because there was no Chapter

6    11 proceeding.  And of course 544 didn't exist yet.  So none

7    of the claims that are actually being pursued by state

8    attorneys general and the MDL PEC on fraudulent transfer

9    theory could possibly have been settled by Purdue because

10   they were not Purdue's claims.  They were the claims of the

11   plaintiffs who did settle.

12          Second, Professor Lipson goes on to state again

13   and again with no foundation and directly contrary to every

14   fiber of the record that the shareholder settlement was

15   "foreordained" and "irreversible", see (indiscernible)

16   motion at Paragraph (indiscernible).  It is a thread that

17   again he doubles down on last night, Page 5 of the reply.

18   "While the plan may reflect important developments --"

19   thanks for the shoutout, "-- since the settlement framework

20   was announced, the initial decision to settle appears to

21   have been the first link to a chain of decisions, including

22   the preliminary injunction mediations (indiscernible) the

23   plan."

24          This fact that it was irreversible is totally,

25   outrageously false and ridiculous.  The record in this case,

1    of which lawyers are obligated to take notice and be

2    familiar before filing pleadings as officers of the court,

3    are that the settlement framework was simply the launching

4    off point of further negotiations, and many, many parties

5    were not on board, and many parties didn't even exist.  So

6    it could not possibly have been foreordained.  The UCC

7    wasn't even formed until weeks and weeks after the framework

8    was first agreed to.  And we said this to the world again

9    and again, but I guess not everybody felt that we needed to

10   check it out.

11            In the first three pages of the Debtor's

12   Informational Brief, the first document filed that sets the

13   stage and explains the case, we said there were, "many open

14   points" that had to be resolved before any settlement could

15   be reached.  The Disclosure Statement, on Page 4, more

16   language no one took exception to because it is

17   unquestionably, utterly, totally, and profoundly true, on

18   Page 4 says, and I quote, "The settlement framework,

19   however, was far from a final settlement.  Indeed, the

20   debtors made clear on multiple occasions that the settlement

21   framework left many items to be negotiated and resolved."

22            As the Court may or may not recall, I stood on the

23   podium, the actual podium, in November of '19 at the outset

24   of the cases and emphasized that A critical precondition to

25   any final resolution with the Debtor's shareholders was,

1    "massive amounts of diligence, structuring and negotiation",

2    November 19th, 2019 transcript at 70, Line 8 to 72, Line 3.

3              Although Professor Lipson prefers to either

4    rewrite or invent history.  This is exactly what happened

5    for 22 months as hundreds of people working around the clock

6    every single week of their lives.  Not one, but two estate

7    fiduciaries with duties under federal law completed

8    comprehensive and independent investigations into claims

9    against the Sacklers, not to mention the Department of

10   Justice of the United States of America and the Attorneys

11   General of almost every state in the union and

12   representatives of tens of thousands of municipalities and

13   other representatives of hundreds of thousands of claimants

14   representing the 11 committees that we have in this case.

15             Let's talk just for a minute about the special

16   committee.  Let's actually just for a minute close our eyes

17   and pretend that they cut the initial deal and that

18   therefore this original sin theory actually we should spend

19   a moment on its arguendo.

20             The Debtor's Special Committee, whose precursor

21   was formed in May 2019, conducted an investigation for over

22   22 months that involved an exhaustive review of allegations

23   against the Sacklers, the identification of legal claims,

24   reviewed hundreds of thousands of documents, the commission

25   of forensic analysis, and the publication of all transfers

Page 68

1    to the Sacklers families, totaling over $11 billion, on the

2    docket for the whole world to see.

3            Despite all of this and the description of their

4    independence in the disclosure statement, Professor Lipson's

5    pleading goes on to great lengths to challenge it without

6    any evidence that, independent from the Sacklers, nothing

7    but essentially snide (indiscernible) arguendo.

8            First of all, charters of New York companies are

9    publicly available.  So why don't you stop telling people

10   you couldn't see the charter?  All you do is you go on the

11   certificate -- on the secretary of state's website and you

12   pull up the certificate of incorporation and you can see it.

13   And you can shake your head.  It's just going to be

14   emarassing when you call later and say you're right.  I

15   don't think it is at all untrue.

16           The charter of Purdue Pharma Inc., which is where

17   the (indiscernible) and the special committee said the

18   certificate of incorporation is a public document available

19   on the website of the New York State Secretary of State.

20           Second, Professor Lipson showed fundamentally

21   understanding -- misdescribes how discovery works in every

22   case ever brought in this country (indiscernible), and it's

23   shocking.  Here's how it actually works, for the benefit of

24   everybody.

25           People seek discovery.  All the parties to a

Page 69

1    litigation sign a protective order.  Your Honor, you stole

2    my thunder.  If you get discovery from a counterparty, are

3    you allowed to publish all the documents in the newspaper?

4    Of course you're not.  That's ridiculous.  You are allowed

5    to use them at trial, or at a hearing, or to negotiate, or

6    to threaten.  And you're allowed to use them publicly when

7    the time is right unless the other side says, wait a minute,

8    I have a statutorily legitimate basis to seal a subset of

9    the documents that you want to use in discovery.  And then

10   there is a burden on the producing party to keep the

11   documents confidential.

12           Professor Lipson could have signed the protective

13   order, as so many other parties could have at any time and

14   basically seen everything.  And then if you wanted to

15   litigate -- and we'll talk about that in a few minutes --

16   like every other party in the case, he is absolutely within

17   his rights to use every document, a hundred million pages,

18   probably the most in the history of the world, he is

19   entitled to use all those documents in litigation, to object

20   to confirmation, to object to the disclosure statement, to

21   say that the deal was somehow born in sin.  Right?  And if

22   we thought that something shouldn't be made public of the

23   producing party, we say wait a second, we think this

24   satisfies (indiscernible), and you have a discussion about

25   it.  That's how it works.  There's no secrecy, there's no

Page 70

1    shield from the public.  There's no such thing in the world

2    as the entire public world seeing on a website documents

3    produced by parties in discovery.  Just like prior to the

4    bankruptcy case when there are 2,700 lawsuits by almost

5    every government in the country against Purdue and the

6    Sacklers, those documents weren't public, either.  Because

7    that's not how litigation works, ever.  Ever, in any court

8    in this country.  It's the United States legal system that

9    you produce documents and then when it's time to use them,

10   you can use them in a public forum unless there is a unique

11   justification for sealing.

12          Now let's talk for a minute about his next

13   ridiculous disclosure that because independent directors

14   were not insulated from removal formally until November

15   19th, somehow they were captured or jaded or something until

16   then.

17          Let me be very clear.  I've been doing what I do

18   for a pretty long time and I've seen hundreds of situations

19   where companies needed an independent committee of the board

20   or a special committee of the board to investigate or

21   analyze a transaction or a potential litigation or a

22   potential merger where for a complex reason or other the

23   full board might not be disinterested, or it might just be

24   the better approach.  And so companies all the time -- I

25   don't even know what he meant (indiscernible) when he said

Page 71

1    this is a special committee and not an independent

2    committee.  I don't know what that means, but every one of

3    these directors unquestionably satisfies the independent

4    (indiscernible) in any stock exchange world, which is where

5    they lie.

6            But here's the answer.  I have never in my entire

7    career seen any company do what we did, which is actually

8    formally block the shareholders from touching, removing, or

9    adding to the members of a special committee.  You can read

10   about all the horrible cases out there with the sex scandals

11   and CEO impropriety and fighting with department executives

12   over pay.  You will not find one case where the members of

13   the special committee were barred from being (indiscernible)

14   by a shareholder or (indiscernible) because we were so

15   concerned with being so cleaner than the driven snow and

16   having our process be so utterly above any reproach that we

17   did things nobody even heard of before, like executing a

18   proxy.

19            And, by the way, as this Court knows perfectly

20   well, and probably most of the practitioners because we do

21   this every day know well also had the Sacklers tried to

22   touch a member of the special committee or remove them from

23   office, we would have been before Your Honor in about a New

24   York minute.  And the Second Circuit law is quite clear that

25   attempts by shareholders to interfere with a Chapter 11

Page 72

1   process and interfere with the fiduciary duties of a Chapter

2   11 sworn fiduciary trustee will never be tolerated.  This

3   was belt and suspenders that I believe has truly never been

4   done before, which (indiscernible) criticism that nobody

5   else even has ever thought of before.

6           Every (indiscernible) private equity case where

7   ethe private equity firm is out of the money and their

8   directors all sit on the board, I dare you to show me cases

9   where the firms actually created a proxy that they can never

10   touch or remove or change the board members for the length

11   of the case.  Never happens.

12           Now let's talk about (indiscernible).  There's

13   law, it's called Iridium.  It's the governing Second Circuit

14   Case about one of the ways (indiscernible) the court's

15   approved settlements.  And guess what one of the very first

16   (indiscernible) factors is?  Was the settlement the product

17   of arm's length bargaining?  It's a totally fair question.

18   That's kind of the only thing maybe that Professor Lipson

19   and I agree on.  The world deserves to know and to be

20   comfortable, a hundred percent comfortable, including

21   because of the pre-2018 and pre-2019 domination of the

22   company by its owners, which in a privately-held solvent

23   company is not unusual at all.  In fact, every privately-

24   held solvent company is normally controlled directly by its

25   owners.  The question is did it change, did it change soon

Page 73

1    enough, and was the process by which these settlements were

2    reached appropriate?

3         So how do you do that?  Well, let me for example

4    give you an explanation of how the non-consenting groups

5    (indiscernible) fair to say that even professionals would

6    agree that the non-consenting states group is quite adverse

7    to the Debtors.  I think they're quite adverse to many

8    things in this case, and they have respectfully and strongly

9    and (indiscernible) on many issues.

10        (indiscernible) Professor Lipson, who was trying

11   to evade this Court's order and the confirmation procedures

12   that were entered by this Court a few weeks ago to no

13   objection.  The NCSG is testing and (indiscernible) to

14   litigate if we can't cut a deal, the arm's length nature of

15   Iridium, it is our burden to prove at confirmation

16   (indiscernible) discovery.  Because that's what lawyers do

17   when they want to impose a (indiscernible).  And in fact,

18   the NCSG has sought broad discovery of these points,

19   including a wide array of communication between each of the

20   four special committee members.  All for of them, and the

21   Sacklers.  Because they may be asking or seeking

22   confirmation of a similar question, but they're trying to

23   get an answer the right way, without making up facts and

24   basically accusing everybody in the court of misconduct.

25        But instead of doing that, which is what he should

1    be doing, signing the protective order, paying a small fee

2    to the secretary of state, (indiscernible) corporation,

3    asking questions and seeking discovery, Professor Lipson

4    (indiscernible) people are concerned, we need an

5    examination, a lot of stuff here happened that doesn't feel

6    right.

7              Now let's talk about the UCC (indiscernible).  I

8    already read to the Court Professor Lipson's view

9    (indiscernible) for the Sacklers, just outrageous.  So I

10   want to remind Professor Lipson that the UCC is a statutory

11   fiduciary appointed by the Department of Justice of the

12   United States of America whose members include multiple

13   passionate victims' advocates who have suffered losses no

14   less unfathomable, egregious, and horrible (indiscernible).

15   That committee conducted its own massive, separate, and

16   entirely independent investigation for more than a year-and-

17   a-half, and it cost them tens of millions of dollars that

18   was appropriately spent but (indiscernible).  The record is

19   quite clear, as this Court lived every month for almost two

20   years, that the UCC was incredibly adversarial to the

21   Sacklers.  They pursued discovery from the debtors, from the

22   Sacklers and the like.

23             And by the way, on the relational theory, they

24   weren't much more kind to the Sackler's lawyers.  They

25   actually sought to invade the privilege in an extraordinary

1    motion alleging the crime-fraud exception that the Sackler's

2    lawyers may have helped them commit crimes and that

3    therefore the Sackler's (indiscernible) attorney-client

4    privilege deserved to be invaded.

5              And, by the way, as an aside, to this day, I still

6    can't pronounce Mr. Uzzi's name correctly, so I don't know

7    if there's much coziness over there.

8              So what's the evidence -- what's the evidence that

9    Professor Lipson has of undue holiness -- unholiness and

10   birthed in sin?  No.  He ignores the fact that the Debtors

11   were involved in a discovery program that was unprecedented,

12   with 90 million pages of materials that he could have gotten

13   access to with one flick of a pen.  Millions of additional

14   pages of financial and other materials from the Sackler

15   families, including from banks and institutions all over the

16   world.  And he ignores all of this.

17             He cites the UCC letter and says, you know, there

18   were things helpful, but it doesn't contain the analysis of

19   what they found.  I guess he just didn't read all the way to

20   the end.  Because the UCC explained extremely clearly at

21   Page 23 why it would have been helpful to the Sacklers and

22   totally inappropriate for them -- and by the way for us as

23   well -- to explain in great detail why we did what we did

24   and our strengths and weaknesses.

25             And I quote so the record is clear and Professor

Page 76

1    Lipton can take comfort, and those of us who have worked

2    about 16 hours on this case every day for years actually

3    care deeply in doing our jobs -- and I quote, "This letter

4    is not the appropriate forum to address each of these issues

5    regarding estate and third-party claims.  This is

6    particularly true by the structure of the Sackler's

7    settlement, which provides that in the event the Sacklers

8    breach their payment obligations, the Master Distribution

9    Trust will be responsible for making all payments to other

10   creditor trusts for subsequent distribution, will take

11   ownership of and have the ability to pursue the creditor's

12   (indiscernible) all estate (indiscernible) causes of action

13   against the Sacklers and related parties.  And further, that

14   accounts (indiscernible) all public and private claimants

15   will be free to recommence or commence their direct causes

16   of action.  As such, it would be inappropriate for this

17   debtor to provide the UCC's views on these issues.  It's

18   because we are adverse to the Sacklers, very adverse, that

19   we're not doing this, not because we are somehow

20   (indiscernible).

21         He also explains, as I described before, that the

22   protective order keeps suggesting that it casts an

23   inappropriate shield to keep documents from public view.

24   Your Honor, I have a long quote from you where you actually

25   explained this to parties way back in January.  I'm not

Page 77

1    going to bother rereading it.  I think the rest of us

2    understand quite well how discovery works in every case.

3           Finally on this point, the motion and the reply

4    totally, utterly, and completely, which is outrageous,

5    ignores the multi-month phase two mediation overseen by

6    former federal district judge Layn Phillips and Ken

7    Feinberg, who are indisputably two of the most highly-

8    regarded, experienced mediators in the country.  Contrary to

9    the movant's utterly false and unsupportable claim that the

10   mediation focused on a "present and future" motion

11   (indiscernible) mediation, of which he could not know,  I

12   don't really know where he decided (indiscernible), was in

13   fact focused on the past.  Its principal purpose was to

14   address the strengths, weaknesses, and recoverability on the

15   claims that the debtors and the creditors have against the

16   Sacklers arising from their past conduct to what the right

17   settlement is to address those past claims.

18          He again ignores totally that it was not the

19   debtors and the special committee that ultimately reached

20   agreement with the Sacklers after 11 months of mediation, it

21   was the ad hoc committee with 23 attorneys general, dozens

22   of other state actors, and the MDL PEC.  The UCC, who I

23   already described several times, the MSGE, and the four

24   independent (indiscernible) who negotiated opposite,

25   against, and reached a deal with the Sacklers.  Every one of

1   those three other parties made that point strongly, clearly,

2   unambiguously in their objection.  The response is zero.  He

3   doesn't even bother in his reply brief to acknowledge that

4   he got the facts wrong.  The deal was not cut by the special

5   committee, the deal was cut utterly independently by four

6   antagonistic, motivated -- I think actually all of them were

7   fiduciaries, because two were pretty much all governmental

8   entities and the other two were Chapter 11 fiduciaries.

9        He also totally fails to acknowledge that the

10  $4.275 billion number that he says were birthed in sin was

11  the mediator's number.  It wasn't the debtor's number, it

12  wasn't the special committee's number, it wasn't the UCC's

13  number, it wasn't the AHC's number, it wasn't the

14  (indiscernible) number, it was a joint proposal of two

15  mediators who spent almost a year on this case listening to

16  hundreds and hundreds of hours of presentation about the

17  Sackler's risk and liability and culpability and wealth and

18  everything who then said this is what we think is the right

19  number.  Maybe they are corrupt (indiscernible).

20        Now let's talk about the law.  Because he's pretty

21  much as strong on the law as he is on the facts.  So, Your

22  Honor, I'm going to skip the whole pot on what relief he

23  actually asks for because I think we finally got that

24  clarified.  There's a whole lot of points where the relief

25  he wants is radically different in different places,

Page 79

1    including in Paragraph 17 of his reply, where he appears to

2    radically broaden the requested relief even over what was

3    originally sought in the extraordinary motion.

4          So now let's just go to the law.  Let's start with

5    1104(c)(1), the interests of creditors.  So 1104(c)(1) says

6    that you should appoint an examiner if it's in the interest

7    of creditors.  Well, given that there are 614,000 creditors

8    in this case and there are 12 organized committees of

9    creditors and the fact that not a single other party on the

10   planet, including people who have been passionately adverse

11   to us nonstop for years have joined or supported the relief

12   I think pretty much tells you everything you need to know

13   about what everyone else in the entire case genuinely,

14   truly, and caringly believe is in the interest of creditors.

15         Moreover, Your Honor, the UCC (indiscernible),

16   they have the express support (indiscernible) to Professor

17   Lipson's motion of virtually every organized creditor group

18   in this case on the private side.  And of course the AHC

19   speaks for the people (indiscernible) speaks on the public

20   side and the MSGE basically speaks for the balance.

21         Second, as we already discussed, it's only his

22   gross misunderstanding of how the original deal was cut that

23   we could have justified this motion whatsoever.  And it is

24   false and it is unsupported.

25         Third, he concedes in Paragraph 77 of his original

Page 80

1    motion that (indiscernible) duplicate work done by, dot,

2    dot, dot, key participants in these cases.  That actually

3    was one of the factors for denying (indiscernible) when it

4    duplicates work already done.

5          He then claims, again, that the examiner could

6    deal with the nearly hundred-million page record in this

7    case, wouldn't need his own discovery, could minimize undue

8    delay and duplication.  But that's of course not right,

9    because the nature of the wild accusations (indiscernible)

10   by Professor Lipson and (indiscernible) examiner or anyone

11   of quality would finally, you know, be there through

12   Professor Lipson's world view, finally let the world know

13   whether this all happened properly or not is not doing it in

14   a week or two or four or six.  I wouldn't agree to take the

15   job.  I don't think anybody (indiscernible) would take the

16   job unless they were given a massive period of time and a

17   massive budget.  Because if that's the imprimatur, to use

18   his word, that the world hasn't gotten yet, which he agreed

19   was totally false, that obviously would require anybody

20   (indiscernible) with extraordinary effort.

21          Third, the costs of an examiner, including the

22   delay alone, would be terrible and massive.  So many parties

23   have worked day and night to maintain the current schedule

24   and avoid a delay in confirmation to get the board

25   (indiscernible) the issue out to help (indiscernible) to

Page 81

1    stop the fee burn, to tell the lawyers to go home and to

2    start savings lives.  Delay alone, even a month's delay, is

3    millions and millions of dollars, and maybe more than that.

4            His only answer to the concern that a lot of good,

5    caring fiduciary people have for this is, oh, don't worry --

6    this is in Paragraph 43 of his reply -- it will -- it can

7    conclude, "ten days before the commencement of the

8    confirmation hearing".  This is just poppycock.

9            First of all, ten days before the confirmation

10   hearing is a tiny number of weeks.  Second of all, he

11   cleverly doesn't say when that confirmation hearing would

12   be.  For sure if we adjourn the confirmation hearing a month

13   or two or three or five, maybe it could be done ten days

14   before.  If it's going to happen in August, we'll have used

15   tens of millions of dollars.  For someone who has actually

16   lived (indiscernible) cases Professor Lipson talks about, we

17   lost those examiners, I don't think so.

18           Now let's talk about (indiscernible) and the debt

19   threshold question.  Once again -- and this just really was

20   highlighted by the colloquy of the Court -- I just found it

21   mystifying that when this Court actually read him the

22   provisions of the DOJ settlement, he insisted on trying to

23   maintain that this was a fixed debt.  So let me educate here

24   as well.

25           This is not like any claim settlement.  Claim

Page 82

1    settlements do not give counterparties the right to the sin.

2    They do not contain multiple contingencies.  They do not

3    allow creditors to produce alternative remedies of either

4    springing to a much higher dollar amount or rescinding and

5    suing and doing other things if multiple conditions are not

6    satisfied.  They never (indiscernible).  A typical claim

7    settlement (indiscernible) is very straightforward.  If any

8    (indiscernible) you will have an allowed unsecured or

9    secured claim of X dollars, period.  You have a claim

10   ticket, you have an anticipated distribution, whatever the

11   allow.

12           This claim looks nothing like that.  Because the

13   DOJ settled early in the case -- or earlier in the case, it

14   wasn't actually that early -- when the contours of a plan

15   and its ultimate distribution could not be known.  And even

16   if they didn't have a recission right, which Your Honor

17   called him on correctly which he misdescribed in his

18   pleadings, they only said, no, they just sprang to a

19   different amount.  Wrong.  (indiscernible).  But even once

20   again if I just pretend that his facts are (indiscernible)

21   and they merely (indiscernible) to choose between one of two

22   (indiscernible), it's still not fixed.  The statute says

23   fixed, liquidated, and unsecured.  And so if it's one of two

24   amounts depending on multiple contingencies -- and by the

25   say, it's the only claim in the entire (indiscernible) that

Page 83

1   is even arguably, potentially, hypothetically maybe fixed

2   (indiscernible) the only one (indiscernible).  It's just

3   not.  Because if I either owe you $5 or $20.  We have not

4   fixed the amount that is owed.  It is subject to contingency

5   and therefore to fluctuation.

6         But again, that's the deal that we didn't cut. The

7   deal that we did cut gives them a recission right based on

8   multiple contingences.  And there's no universe in which

9   that extremely atypical claim settlement represents a fixed

10  amount.

11        I'm going to skip citing the legislative history

12  about fixed amount.  There's a lot about balance sheets and

13  (indiscernible) debt (indiscernible) whole section was about

14  (indiscernible) were not unduly heard and the fact that many

15  of the cases that actually say (indiscernible) no

16  exceptions, say it in the public company context because

17  they are there to protect shareholders.  I assume that

18  Professor Lipson and I also agree that the last thing either

19  one of us wants to (indiscernible) is protecting Purdue

20  shareholders.

21        Then, Your Honor, let's talk about the assumption.

22  Because I'm willing to keep giving him the benefit of the

23  doubt again and again and again because he still

24  (indiscernible).  And now let's just pretend for a minute

25  that the DOJ (indiscernible).  We filed a one-page agreement

Page 84

1    with them that says you have a fixed, allowed, unsecured

2    claim of two-point-x billion dollars, period, end of story.

3    Right?  Is it actually mandatory?  I think the answer is no.

4          So let's explain.  First of all, the legislative

5    history he doesn't tell you about is that it says that it

6    shall permit (indiscernible) to a (indiscernible) examiner

7    (indiscernible) where the court believes that it's

8    appropriate.  Permit and where appropriate certainly don't

9    sound like the language of mandatory.  It doesn't say the

10   require.  It actually says permit.

11         Second of all, if you look at Paragraph 62 of his

12   motion, you might not be surprised to see that almost every

13   one of these cases is from the 1980s and 1990s, which ended

14   a very long time ago.  Because what's actually happened in

15   the last twenty-something years is that court after court

16   has held that the as-is-appropriate language in 1104(c) in

17   fact gives the courts discretion to refuse to appoint an

18   examiner when it is inappropriate.

19         And this Court -- this Court (indiscernible)

20   originally (indiscernible) examiner.  We actually think,

21   Your Honor, that you got it right back then, and you were

22   probably ahead of the opponent.  Because what's happened

23   since then is that a great many courts have adopted a

24   similar approach.  And I would note, by the way, that the

25   (indiscernible) actually might well also rule

Page 85

1    (indiscernible) right now, even Judge Patterson.  Because he

2    said, you know, I didn't see enough in there on waiver and

3    laches.  He did not actually rule out the possibility of

4    (indiscernible) and he actually (indiscernible) on the

5    public company context.  So what's happened in the last 20

6    years which we don't (indiscernible) with Professor Lipson's

7    recitation of the law.

8              In re Dewey & LeBeouf, 478 B.R. 627, 639, Judge

9    Glenn declined to appoint an examiner notwithstanding the

10   clear meeting of the debt threshold because, among other

11   things, and I quote, "An appropriate and sufficient

12   investigation has already been conducted supporting approval

13   of the settlement".  Judge Glenn ultimately concluded that

14   the motion was, "filed for improper purpose".

15             In Spansion, a 2012 Delaware case, 426 B.R. 114 at

16   127, Judge Carey declined to appoint an examiner, even

17   though the debt threshold had unquestionably been met,

18   because, quote -- and this is going to sound pretty familiar

19   -- "Creditors' committees and various ad hoc committees

20   vigorously represented unsecured creditors... and all

21   parties had ample opportunity to conduct and have conducted

22   extensive discovery to investigate the debtors".  They

23   didn't spend over a hundred million dollars because they

24   (indiscernible), and that was good enough.  Judge Carey

25   found, and I quote, "No sound purpose in appointing an

Page 86

1    examiner only to significantly limit the examiner's role

2    when there exists insufficient basis for an investigation",

3    426 B.R. 114 at 127.

4            Then there's Innkeepers, where Judge Chapman held

5    that, "A number of course have entirely declined to find it

6    in (indiscernible) is mandatory" and found that, "because

7    the request for the appointment of examiner has increasingly

8    been used as a litigation tactic by parties unhappy with the

9    status or conduct of a case... Courts have quite

10   understandably and properly, I believe, pushed back and

11   declined to appoint an examiner to join in otherwise

12   (indiscernible) in which the many combatants are well-armed

13   and highly motivated". If this is not a case with an

14   unprecedented number of well-armed and highly-motivated

15   combatants, including almost every government in our

16   country, I don't know what case is.

17           And, Your Honor, Judge Glenn summed it up in

18   ResCap. The appointment of -- this is a quote also. And

19   I'll always quote, I won't paraphrase. We don't make up.

20   "The appointment of an examiner would be inappropriate if

21   the motion was filed with improper (indiscernible) such as a

22   litigation (indiscernible) or if there was no factual basis

23   to conclude that an investigation needs to be conducted or

24   if an appropriate and thorough investigation has already

25   been conducted or is nearly complete by a debtor's committee

Page 87

1    or a governmental entity."  ResCap, 474 B.R. 112

2    (indiscernible).  We hit every possible alternative within

3    every possible alternative laid out by Judge Glenn in the

4    ResCap decision.

5             Professor Lipson addresses not one of these cases

6    in his reply, not one.  He talks only about (indiscernible),

7    which, frankly, I could have spent five minutes.  I walked

8    you through why he was totally wrong even on the one case he

9    tried to fend off.  But I'll just give him that

10   (indiscernible) and let's just say that every other case

11   that he failed to deal with is insanely (indiscernible).

12            This is not a case -- and I actually want to be

13   generous to Professor Lipson for a minute.  This is not I

14   think a fact pattern of the type of improper purpose that

15   courts are normally concerned about where parties

16   (indiscernible) and is unhappy with how the whole case is

17   going and maybe trying to sort of, you know, flip the apple

18   cart (indiscernible).  I understand that he is an academic

19   who has a view of the bankruptcy and the Bankruptcy Code and

20   that he actually believes that this case is an example of

21   the way things should not go.  The problem is none of the

22   rest of us who have lived it every day (indiscernible) and

23   the number of people who have acted improperly and

24   (indiscernible) for an examination to be warranted here is

25   (indiscernible) and it really is on some level not the type

Page 88

1   of litigation tactic (indiscernible) I certainly acknowledge

2   that Professor Lipson Mr. Jackson were not the typical

3   litigants.  The reality is it's kind of a litigation tactic.

4   Because as I said before, there are procedures ordered by

5   this court for (indiscernible) like challenge the arm's

6   length nature of the negotiations.  It is one of the prongs

7   we have to satisfy (indiscernible).

8          And I talked before about the fact that someone

9   else who is very adverse to us in this case, the NCSG, is

10  beginning from the same question, but they are doing it

11  properly, not attempting (indiscernible) that all parties

12  agreed to and after extensive negotiation no party

13  (indiscernible) Professor Lipson, objected to.  But

14  Professor Lipson and Mr. Jackson believe that the

15  shareholder settlement and the special committee did not do

16  things (indiscernible) to think they should litigate it at

17  confirmation.  What they can't do is try to force the

18  examiner none of us (indiscernible) to do it

19  (indiscernible).

20          Finally, I need to quickly address (indiscernible)

21  which Professor Lipson perplexingly rests a great deal of

22  his argument (indiscernible).  But let's just say that

23  (indiscernible) actually did.  In Cenevo, this Court

24  acknowledge that there were, "clearly cases" under

25  1104(c)(2) (indiscernible) discussion to refuse to appoint

Page 89

1   an examiner where the motion, "happens towards the end of

2   the case" check, would be a total waste of time, check,

3   (indiscernible).  Again, not intended in the way our

4   litigants might.  I absolutely understand that.  But

5   nonetheless similar outcome.

6           March 6th hearing, transcript at 86

7   (indiscernible) to 87, Line 19.  Well, actually

8   (indiscernible), which we are totally comfortable with.

9   Because I don't think this Court makes too many mistakes

10  that I know of, is that they filed with the (indiscernible)

11  motion ten days after the petition date, not 19 months after

12  the petition date, where all parties agreed there will be

13  some formal investigation by someone was required.  It's the

14  exact, exact, exact other end of the spectrum from this

15  case.

16          Then finally, Your Honor, is the concept of waiver

17  or laches.  Professor Lipson, in his reply, seems to allege

18  that laches only applies sort of within the statute of

19  limitations and it has no applicability as long as the

20  proposal was made (indiscernible) before the

21  (indiscernible).  It's just not what the cases say.  It's

22  interesting, but you can't make up the law.  You need to

23  actually read the cases and accurately represent what they

24  say.  We have the cases on Page 26 of our breach.  And

25  (indiscernible) irrespective of the mandatory nature of

Page 90

1    1104, a party in interest can be deemed and often is deemed

2    to waive its rights to seek an examiner and a delay even if

3    the predicates of 1104(c)(2) were satisfied.  Other than

4    that (indiscernible) he doesn't even touch the caselaw.

5            In (indiscernible), Hearing Transcript 72 filed

6    December 2019, the Court held, quote -- I'm sorry, the

7    movant, "Waived its right to request an examiner by

8    waiving...almost two years after the petition date...and

9    less than two months before the confirmation hearing."  It's

10   like (indiscernible) that case (indiscernible) the motion be

11   excused.

12           Professor Lipson has been very intellectually

13   interested in (indiscernible) since the beginning.  And I

14   don't blame him.  They're actually difficult, challenging,

15   complex cases that raise tremendous issues of social policy

16   in the bankruptcy system.  But that involvement and focus

17   actually proves fatal under the governing cases.

18           In November 2019, Professor Lipson himself, at the

19   time with no client, essentially writing as an

20   (indiscernible) academic who believed that (indiscernible)

21   to the U.S. Trustee and other parties (indiscernible)

22   requesting an examiner.  And that request obviously did not

23   bear proof because the U.S. Trustee and the Department of

24   Justice for the United States of America decided not to

25   accept his invitation and seek an examiner.

Page 91

1            For 19 months he did nothing to follow up or to

2      try to press forward (indiscernible) examiner

3      (indiscernible).  Obviously he lectured and he spoke, but

4      that's not what I mean.  I mean appearing in a court of law

5      seeking relief from (indiscernible).

6            In July of 2020, his now-client submitted a

7      (indiscernible) requesting an examiner.  As we have been

8      with many individual and pro se plaintiffs, I think

9      consistently every time, this Court was responsive and

10     gracious in issuing invitation to treat the letter as a

11     motion.  Mr. Jackson, for reasons that may well be utterly

12     (indiscernible) and completely understandable, chose not to

13     do that.  Perhaps recognizing this -- and this is another

14     just astonishing (indiscernible), and I think he really does

15     not realize how unkind/vicious his (indiscernible) can be.

16     He tries to blame the Court for not (indiscernible).  He

17     basically says the Court warned counsel to stop sending

18     these letters and warning counsel (indiscernible), reply at

19     Paragraph 39.  This is unbelievable.  He's basically saying

20     this Court tried to bully me (indiscernible) the examiner.

21     It's outrageous.  The courts are not supposed to be copied

22     on the letters that people sent to the DOJ or journalists.

23     It's unthinkable.  I know no one would do that.  There are

24     courts that say, and I think (indiscernible) declaration is

25     about seven words long, please stop copying me on these

Page 92

1   emails.  Like, who copies a court on emails like this?

2   Hello?  And read the transcript.  I think a lot of what

3   you're thinking about and asking about has already been put

4   on the record (indiscernible).  To suggest now that the

5   court bullied him in some way out of (indiscernible) and

6   that's excusable neglect is just unbelievable.

7          Then he claims next, and I quote -- I'm sorry, let

8   me (indiscernible), is the (indiscernible) should be deemed

9   excusable by, "hope that the debtor's (indiscernible)

10  statement would provide some answers to the

11  (indiscernible)," Paragraph 31 of the reply.

12         Well, Your Honor, I've already (indiscernible)

13  someone.  We think the disclosure statement advances

14  everything that it needs to.  Obviously every other party in

15  the case does as well since we resolved every single

16  objection, and the Court does as well.  If Professor Lipson

17  (indiscernible) needed to provide more on these topics, he

18  should have called us like everyone else did and said, hey,

19  I think you need more (indiscernible) or you know what, I

20  really care, as an academic who cares about the integrity of

21  the bankruptcy system.  And I think if you don't put in more

22  stuff on the following three topics, questions will remain.

23  And you know what we would have done?  We would have

24  (indiscernible).  Because we added dozens and dozens of

25  pages to the disclosure statement basically requested by

Page 93

1   anybody.  Because Davis Polk has a very specific approach,

2   which is more (indiscernible) is great in the disclosure

3   statement.  Almost anything anybody else put in to say,

4   well, what about this, what about that, we try to

5   accommodate.  But it just didn't happen.  Instead, we got

6   ambushed with an examiner motion, but we have no idea what's

7   coming based on facts they've made up.

8           So with this, let me close.  It is only when you

9   make up facts and ignore the actual facts that are clear on

10  the record of the case and many documents filed in the case

11  that motion papers like this could even be signed.  Facts

12  that he makes up like, one, the initial deal was cut between

13  the Sacklers and the Special Committee, and that needs to be

14  investigated.  False.  Two, there was no MDL mediation

15  (indiscernible).  False.  But the AGs and the PEC are not

16  actually (indiscernible) opposite the Sacklers in the

17  initial framework.  False.  The original framework

18  inexorably foreordained, and I quoted it (indiscernible) to

19  you, the final settlement reached almost two years later by

20  totally different parties, two of whom did not exist when

21  the deal was originally cut.  False.  That the UCC took a

22  (indiscernible) for the Sacklers and didn't do its job, and

23  I quoted his words, and I'm not going to let him

24  (indiscernible) like so many other of these factual

25  assertions in the pleading, totally false, slanderous, and

Page 94

1    outrageous (indiscernible) to the victims on the UCC who

2    have done this as a volunteer for two years.

3            Next, for the almost year-long second mediation

4    before Judge Phillips and Ken Feinberg were, quote, "Not

5    about the past". False. 4275 may not be okay

6    (indiscernible) Ken Feinberg. False.

7            Perhaps Professor Lipson either lost sight of or

8    is not aware of the fact that Rule 9011(b)(3)details

9    representations to the court, provides for the following.

10   By presenting to the court, whether by signing, filing,

11   submitting, or later advocating a petition, pleading,

12   written motion, or other paper, an attorney or unrepresented

13   party is certifying that to the best of the person's

14   knowledge, information, and belief formed after an inquiry

15   reasonable under the circumstances. Three, the allegations

16   and other factual contentions have evidentiary support or

17   are specifically so identified are unlikely to have

18   evidentiary support after a reasonable opportunity for

19   further investigation and discovery.

20           This case has over 600,000 creditors. It is with

21   very good reason not a single one of them, so many of whom

22   have suffered unthinkable, devastating losses, support this

23   motion where virtually every single organized group opposes

24   it. Professor Lipson, with very good reason, stands

25   utterly, completely alone. Because the estate is actually

Page 95

1     paying the fees of the UCC, the MSGE, and the AHC, Professor

2     Lipson has already diverted hundreds of thousands of dollars

3     and probably more from lifesaving, critically-needed

4     abatement to totally waste in legal fees.

5               His latest misguided, ill-informed, and

6     inappropriate foray runs the risk of delaying and diverting

7     millions of dollars and more with terrible, unthinkable

8     (indiscernible) costs to opioid victims and, ironically, to

9     the human and dignity value he purported to champion in his

10    (indiscernible) lecture that the rest of us are desperately

11    trying to uphold and validate.

12              For these reasons, Your Honor, we ask that this

13    motion be denied.

14              THE COURT:  Okay.  Mr. Lipson, I'll give you a

15    chance to reply, but why don't I hear from the other

16    objectors first.  And I have reviewed all the objections, so

17    you should assume that.

18              MR. LIPSON:  I would like to reply when I can,

19    Your Honor.

20              MR. ECKSTEIN:  Your Honor, Good afternoon.  This

21    is Kenneth Eckstein for Kramer Levin.  I hope Your Honor can

22    year me

23              THE COURT:  Yes, and see you.

24              MR. ECKSTEIN:  Thank you.  Your Honor, Kenneth

25    Eckstein for Kramer Levin, co-counsel for the Ad Hoc

Page 96

1    Committee of governmental claimants in the he case.

2            Your Honor, we filed an objection to the motion,

3    which I'm sure, as Your Honor indicted, you have had a

4    chance to review.  And we've all had the benefit of Mr.

5    Huebner's comprehensive and thorough presentation.

6            I'm hesitant to repeat.  And to the extent Your

7    Honor believes that you've already heard particular points,

8    please let me know and I will try to shorten my comments as

9    much as possible because I am mindful of the time.  I would

10   like just to make a handful of points that I think are

11   particularly important in connection with today's motion.

12           First, Your Honor, I also wanted to bring to the

13   Court's attention the quote that Mr. Huebner referred to

14   from the decision by Judge Glenn in the Residential Capital

15   case, which I think in some respects captures the legal

16   standard that the Court abided by in this case.  And that is

17   that the appointment of an examiner would be inappropriate

18   if, among other things, there is no factual basis to

19   conclude that an investigation needs to be conducted or if

20   an appropriate and thorough investigation has already been

21   conducted, or is nearly completed by a creditor's committee

22   or a governmental agency, 474 B.R. 112, 121.  We think those

23   are the appropriate standards that should guide today's

24   consideration and we think it is well-established that both

25   of the standards that have been articulated in the

Page 97

1    Residential Capital case resonate in this case and warrant

2    denying the motion.

3           The movants have effectively conceded and an

4    appropriate and thorough investigation has already been

5    conducted in this case by the Official Creditor's Committee

6    with the active support of the NCSG, the Ad Hoc Committee,

7    and the MSGE, each of whom have been actively involved for

8    the last 18 months in a thorough investigation that has been

9    led most effectively by the Creditor's Committee.

10          Instead, Professor Lipson retreats to arguing that

11   the UCC investigation has not been sufficiently publicized

12   and in order to shoehorn into the argument that there is a

13   factual basis for an examination in this case, he argues

14   that we need to better understand the motivation or

15   influences that the Sacklers may have had over the special

16   committee and the board.

17          I think Your Honor has already heard Mr. Huebner

18   articulate very cogently that there is simply no basis

19   whatsoever for the (indiscernible) and there is clearly no

20   evidence in the record.  And Your Honor has already heard

21   extensive presentations that the evidence is to the

22   contrary.

23          Professor Lipson tries to insinuate that this was

24   a case where pre-petition the Debtor's board and the Sackler

25   family privately and secretly negotiated a settlement that

Page 98

1    was dropped on the parties in interest to the creditors as

2    the predicate for a Chapter 11 case.  I think as Your Honor

3    already has heard, nothing could be further from the truth.

4            As Your Honor knows, and as the pleadings that

5    were submitted at the outset of this case and throughout

6    have reflected, these cases were preceded by extensive,

7    multi-year litigation in federal and state courts throughout

8    the country pursued by the state's attorneys general for

9    nearly every state in the country, plus hundreds of local

10   governments and Indian tribes that were actively involved in

11   a coordinated litigation.  There was a multi-district

12   litigation based in Ohio led by a vigorous plaintiff's

13   executive committee.  These parties coordinated massive pre-

14   bankruptcy discovery and investigates leading up to

15   multiple trials against Purdue and the Sacklers.

16           The governments, consenting and non-consenting

17   states, participated in a year-long intensive negotiation

18   against Purdue and the Sacklers to explore the possibility

19   of settlement.  There was nothing inevitable or pre-ordained

20   about those negotiations.  The debtors participated in those

21   negotiations with the Sacklers, and as Mr. Huebner has

22   explained, they were adverse to the governmental entities

23   and the PEC.

24           The negotiations were supervise by the MDL judge,

25   district Judge Polster, and by a highly-regarded mediator at

1    the time.  These negotiations were intensive and were quite

2    adversarial.  As Your Honor knows, the prepetition

3    negotiations ultimately resulted in a settlement framework.

4    The settlement framework had the support of the members of

5    the Ad Hoc Committee and to this day remains opposed by the

6    non-consenting states.  There was no restructuring support

7    agreement, there was no definitive agreement.

8            But in October of 2019, there was a settlement

9    term sheet.  The settlement term sheet was not binding.  It

10   merely indicated that the parties who supported the

11   settlement term sheet would work to see whether they could

12   arrive at a settlement that would be the basis for a plan of

13   reorganization.

14           At the outset of the case, the settlement term

15   sheet was pursued in conjunction with an undertaking by the

16   Creditor's Committee to pursue an extensive investigation

17   during this Chapter 11 case that had the active support of

18   the non-consenting states, the Ad Hoc Committee, and the

19   MSGE. And as Your Honor knows, there was no steps taken by

20   any parties in this case to commit to a settlement in this

21   case until that investigation was, if not completed, was

22   extensively explored.

23           Your Honor, there is no basis to suggest that the

24   Debtor's board drove the process and that there was no

25   alternative to settlement.  Up until November 2020, the UCC,

Page 100

1    the Ad Hoc Committee, and the non-consenting states, as well

2    as the MSGE, were actively considering a no-settlement plan.

3    And that alternative remains real even today if this deal

4    does not ultimately come together.  That has always been a

5    real alternative.  There was no inevitability of a

6    settlement.  In fact, throughout this process, I believe

7    every party that has been involved in this case has had

8    great concerns about whether or not we ultimately would be

9    able to achieve a settlement that each of us could recommend

10   to our clients.

11          Your Honor, it is the case that the Ad Hoc

12   Committee continues to prefer pursuing a settlement rather

13   than endless, unpredictable litigation that will go on for

14   years and that ultimately at the end will in all likelihood

15   have to return back to a settlement structure.  But that is

16   an issue that ultimately the Court will have to consider in

17   connection with confirmation.

18          The fact that the Sacklers will receive a release

19   in exchange for the settlement, if that settlement is

20   approved, is certainly not remarkable or surprising and is

21   certainly not a (indiscernible) for the examiner.  That is

22   essentially what the Court will have to consider in making a

23   determination of whether or not to approve the settlement

24   and to approve the releases that are embodied in the plan of

25   reorganization.

Page 101

1           The fact that the UCC has conducted a thorough and

2     rigorous investigation -- even the movant acknowledged has

3     been thorough and has been complete.  And the fact that he

4     could like more disclosure belies the fact that we just

5     finished an extensive, multi-day disclosure statement

6     hearing where, as Mr. Huebner indicated, the Debtor was

7     prepared to accept all suggestions for additions, resisted

8     essentially nothing.  And Professor Lipson, frankly, should

9     have, if he wanted to have more disclosure, participated

10    more productively and constructively in the disclosure

11    statement process and would have actually achieved more

12    disclosure if he felt that there was something more to say.

13          As we know, there will be an unprecedented public

14    repository of documents.  And while Professor Lipson is

15    complaining about the fact that that will take place post-

16    confirmation, that also I think has been explained

17    extensively and is completely logical and in fact will be

18    the first time in my experience that something as

19    unprecedented as essentially a public library of the

20    discovery will be created as part of a plan of

21    reorganization.

22          And finally, there will be a confirmation hearing

23    where all parties in interest will have an opportunity to

24    examine and listen to witnesses and where the Court is going

25    to have an opportunity and a responsibility to determine

Page 102

1    whether or not there is a basis to approve a settlement in

2    this case.

3           There is simply no basis whatsoever for the

4    appointment of an examiner to perform any role in this case

5    at what really is the eleventh hour.  This case has been

6    unprecedented in so many respects, but the most important is

7    that there has been a massive 18-month investigation that

8    has been participated in by multiple parties acting on

9    behalf of hundreds and hundreds of thousands of creditors,

10   most of them private.  There is at this point in time a

11   proposed plan that is proceeding to confirmation in a matter

12   of weeks, and we believe that there is no justification

13   under the facts or the law for the appointment of an

14   examiner to do what Mr. Lipson has now tried to explain, but

15   I still am not completely clear makes a lot of sense.  But

16   regardless of the justification that he's trying to

17   articulate in response to the Court's questions, we believe

18   he has failed and we believe that the caselaw and the facts

19   of this case strongly and compellingly support this Court

20   denying the motion.  Thank you, Your Honor.

21           THE COURT:  Okay.  Thank you.

22           MR. CRAWFORD:  Your Honor, Monte Crawford from

23   Caplin & Drysdale on behalf of the MSGE group.

24           THE COURT:  Afternoon.

25           MR. CRAWFORD:  Good afternoon.  We filed an

Page 103

1    opposition, and I will try not to repeat those arguments

2    here or the arguments raised above.  But we would like to

3    highlight a few points specific to the MSGE group.

4            The motion does fail to understand how the parties

5    arrived at the (indiscernible) and ignores the substantial

6    work done by the MSGE group and (indiscernible) parties, and

7    it should be denied.

8            The motion to appoint examiner does not even

9    mention the MSGE group or the Ad Hoc Committee or others.

10   This failure in many ways demonstrates the fundamental flaw

11   of the logic of the motion.  Movants (indiscernible)

12   examiner (indiscernible) committee was in fact independent

13   when we approved the settlement agreement.  But in addition

14   to the points raised by Mr. Huebner, the current settlement

15   is simply different from the original settlement framework.

16           The MSGE group arrived at its decision

17   (indiscernible) and independent deliberation and with the

18   benefit of a massive amount of (indiscernible) and

19   considered (indiscernible) and in the many pre-petition

20   cases (indiscernible) by the MSGE group's members against

21   the debtors and the Sacklers.  Its review and negotiation

22   helped increase the settlement amount from $3 billion to

23   $4.275 billion.  It gave no weight (indiscernible)

24   settlement framework in its decision (indiscernible).

25           It's also important to note that (indiscernible)

Page 104

1    the AHC, the DOJ, and the NCSG, apart and independent from

2    the Debtors and from each other, and each a substantial

3    party in interest in this bankruptcy.  And this undercuts

4    the entire justification of the motion.

5            The motion for appointment of an examiner should

6    be denied, as the appointment of an examiner is simply not

7    appropriate under Section 1104(c), it's not in the best

8    interest of the creditors, the public, or the estates.

9    (indiscernible).  There are over 100,000 personal injury

10   claimants and these are in addition to those severed by

11   (indiscernible).  It is telling none of these groups are

12   seeking an examiner and none of these groups has come

13   forward to support this motion.  There is not fiduciary

14   (indiscernible).

15           And the reason no one has (indiscernible) an

16   examiner is that those investigations (indiscernible)

17   investigations (indiscernible) and would impose substantial

18   (indiscernible) and payments to (indiscernible).

19   (indiscernible).  We join in (indiscernible) that we agree

20   (indiscernible) clearly supports the view that this Court

21   has discretion to whether or not to appoint an examiner.

22   And we also agree that the doctrine of laches provides an

23   independent ground for this Court to deny the request for

24   (indiscernible).

25           In his reply brief, (indiscernible) that an

Page 105

1    examiner is necessary because if the Board was not

2    independent, then it would not be clear creditors have a

3    meaningful choice (indiscernible).  And he argues it would

4    not be clear the UCC or other groups that are litigating

5    (indiscernible).

6            But to echo a point made by Your Honor earlier,

7    throughout the mediation and negotiation, the MSGE group

8    always retained the ability to disagree and alter the

9    settlement.  And the MSGE group always maintained the threat

10   of litigation (indiscernible).  And of course the

11   (indiscernible) did in fact change (indiscernible).

12           And for these reasons, the MSGE respectfully

13   requests this Court deny the motion.

14           THE COURT:  Okay.  Thank you.

15           MR. PREIS:  Your Honor, Arik Preis from Akin Gump

16   Strauss Hauer & Feld on behalf of the Official Creditor's

17   Committee.  May I be heard?

18           THE COURT:  Sure.  Thank you.

19           MR. PREIS:  I know that you've heard now an hour-

20   and-a-half or so of argument, so I'm only going to focus on

21   (indiscernible) Mr. Lipson mentioned about the Creditor's

22   Committee.

23           First, I want to make -- I'm going to make ten

24   points.  The first is the following.  I want to take a

25   moment to talk about Peter Jackson, the moving party.  Mr.

Page 106

1    Jackson lost his daughter, Emily, almost exactly 15 years

2    ago to an overdose from taking one OxyContin prescribed for

3    her uncle.  Putting aside the motion in this case and the

4    opioid epidemic, Mr. Jackson's loss of an 18-year-old

5    daughter three days from the beginning of college should be

6    enough to make everyone stop for a moment and cherish the

7    time we have with our loved ones.

8            Point two, Mr. Jackson now dedicates his life to

9    being an advocate for the reform of prescription opioids.

10   In this way, he is like some of the individual members of

11   the UCC who also dedicate their lives to fighting the opioid

12   epidemic, whether it be through victim advocacy, counseling,

13   or helping the families of those who have lost loved ones.

14           Point three, given our personal views of Mr.

15   Jackson, it's very difficult to take an emotional and

16   passionate and angry stance against him.  And even worse, to

17   be on the same side as Purdue in this proceeding.  And it is

18   a testament to both the seriousness with which the UCC takes

19   its fiduciary duties and the unfortunate and in many ways

20   just plain wrong statements that Mr. Lipson's pleading make,

21   but it's exactly the position we found ourselves in.

22           Point four.  As we noted in our papers, the UCC is

23   supported in its objection by the following four groups.

24   The Ad Hoc Group of Hospitals, the Ad Hoc Group of NAS

25   Children, the TPP mediation participants, and the rate payer

Page 107

1    mediation participants.

2             Point five, as you noted, Mr. Lipson was a bit all

3    over the place in his pleadings about what he wanted.  I

4    know he said earlier the scope of what he wanted as examiner

5    was to seek to examine the independence of the special

6    committee.  And if you think about it in biblical terms, he

7    kind of believes that everything stems from the original

8    decision to enter into the settlement framework by the

9    special committee, which didn't happen.  And so it's kind of

10   like everything that's happened in the case is the fruit of

11   the poisonous tree.

12            He also wants an examiner -- and I don't want to

13   let this go because he says it five times in his reply -- he

14   says he wants the examiner to independently assure the

15   integrity of the reorganization process.  He mentions those

16   words five times in his reply.  He later concedes that the

17   UCC's independence is not in question, in Paragraph 31.  But

18   it's hard to understand a lot of what he says without

19   assuming he's questioning everybody's independence in the

20   case and integrity, including every state, every

21   municipality, tribe, public claimant, private claimant, an

22   of course the Debtors.

23            Third, he wants an examiner -- and I don't want to

24   let this go -- to evaluate the work that has been done by

25   all the other parties in the case and publicly report on the

Page 108

1    analysis.  This kind of has the feel of examining the

2    examiner who examined the examiner.  I'll address each of

3    these in turn.

4         His first point stems from the unholy settlement

5    framework entered into between the Debtors and the Sacklers

6    that didn't happen at a time when the Sacklers controlled

7    the Debtors, which Mr. Huebner explained.  The facts don't

8    bare that out.

9         On the public side, let's look at the original

10   settlement framework.  The states and the PEC entered into

11   that deal, as Mr. Eckstein and Mr. Huebner pointed out.  But

12   furthermore, it's beyond comprehension for anybody who has

13   spent even a moment with any of the AGs in this case to

14   think that 23 sovereigns who like to call themselves

15   sovereigns, or even aware of them for that matter, would

16   agreed to a deal with the Sacklers based on the Special

17   Committee's recommendation.  If anything -- and I mean this

18   in the kindest way possible to everyone involved -- the

19   approval of a special committee of just about anything in

20   this case would have been a reason for people to question

21   it.  Anyone who thinks otherwise has spent zero time with

22   the state AGs.

23         As it relates to the UCC, we weren't involved in

24   the pre-petition investigation.  When we were informed, we

25   never once felt constrained by the settlement agreement.  We

Page 109

1    did our investigation as if it didn't exist.  We don't need

2    to talk about the breadth of our investigation because

3    that's in our letter and people have mentioned it.  When we

4    felt we had reached sufficient diligence -- and this gets to

5    what Mr. Lipson put in his reply papers -- we put together a

6    rather long analysis, something like 200 pages or so, and

7    presented it to the mediation parties and non-consenting

8    states, the Ad Hoc Group, the Debtors, the MSGE, and the

9    mediators.  We fielded questions from all the groups in our

10   analysis.  And after that, we negotiated.  We negotiated

11   unconstrained by settlement framework, by the Debtors, or by

12   Special Committee.  The only thing we were constrained by,

13   and we say it in our letter, was the bankruptcy process in

14   phase one of the mediation.  But that's not a bankruptcy

15   issue.  That's more about the opioid epidemic and the

16   reality of needing to abate the crisis and compensate

17   victims, not about the bankruptcy issues or about the

18   decision not to -- agree not to appoint an examiner or seek

19   a trustee.

20           And to be clear, we absolutely, one thousand

21   percent were ready to file a motion seeking standing to

22   prosecute the estate cause of action against the Sacklers.

23   And we spent hundreds of hours debating with numerous

24   parties whether seeking to lift the injunction and go full-

25   bore against the Sacklers was the right outcome for this

Page 110

1    situation.  Indeed, Mr. Lipson, we filed not one, but two

2    briefs which have been largely unredacted seeking to compel

3    the production of privileged documents.  In those briefs, we

4    laid out some of our analysis that ultimately would have

5    been part of any standing motion.  And we ultimately made

6    the decision that we did based on looking at every facet of

7    this situation.

8           But I can assure you we never once, never, never,

9    never looked at the settlement framework as something we

10   needed to work within, nor did we ever base anything we did

11   on what the Special Committee did.  And so while were not a

12   sovereign like the states, we carried with us a fiduciary

13   duty to every single unsecured creditor in this case, which

14   includes sovereigns just as much as it includes individuals

15   like Peter Jackson.

16          Point seven.  Mr. Lipson states in his reply brief

17   that he wants an examiner to independently assure the

18   integrity of the reorganization process.  We, the UCC, are

19   part of that process.  Indeed, an important part.  We take

20   his statement to mean an examiner would be necessary to

21   assure, among other things, the integrity of the UCC, its

22   members, and its work.  For the life of me, I have no idea

23   what that means or how Mr. Lipson, without ever once calling

24   me or reaching out to talk to the UCC or its members, can

25   come to this conclusion that the UCC's integrity needs to be

Page 111

1    independently assured.  It's instructed to remember that the

2    UCC contains, among other things, four individuals who want

3    nothing more than to take every last dollar, if not more

4    than every last dollar, from the Sacklers and who have

5    fought very hard to make sure the UCC satisfies itself and

6    uncovers every single one.  And to (indiscernible) opioid

7    litigants who, while perhaps less emotional, want nothing

8    less.

9          And also the UCC contains three members who take

10   their fiduciary duties very seriously but who are not opioid

11   litigants.  And we have three ex officio members, a county,

12   a (indiscernible) district, and two Native American tribes,

13   who care deeply about the cases and every single one of the

14   issues associated with them.

15         For Mr. Lipson to question the integrity of that

16   group of people and institutions with whom he never asked to

17   spend a moment with or talk to is not just insulting, it's

18   careless.

19         Point eight.  It seems that Mr. Lipson wants

20   someone to examine the work that was done by the UCC.  He

21   says so in Paragraph 37 of his reply brief.  This feels a

22   little bit academic.  Basically everybody in this case has

23   examined (indiscernible).  The Sacklers -- sorry, the states

24   examined the Sacklers pre-bankruptcy.  We investigated the

25   Debtors and the Sacklers and the estate causes of action

Page 112

1    post-bankruptcy.  The non-consenting states have examined

2    all these things.  So one party examined X, the various

3    parties examined that, and then various parties examined all

4    of that and then some.  Now Mr. Lipson wants someone to come

5    in and examine the examinations?  Will someone then be

6    needed to come in and examine the examination done by the

7    examiner to make sure that it has integrity?  At what point

8    does this end?

9            Point nine.  And this -- and, Judge, you hit on

10   this earlier.  Mr. Lipson seems to think that an examiner is

11   just going to review the work done and then publicly file

12   everything he found, everything that the examiner found.  We

13   are dumbfounded by this.  Would the examiner not be found by

14   the protective order?  Is he going to run roughshod over the

15   protective order in some way that we weren't when we were

16   able to un-redact, along with the (indiscernible), a whole

17   bunch of (indiscernible) privileges motion?

18           My last point.  Mr. Lipson is banking on the fact

19   that this Court will feel compelled to appoint an examiner

20   by virtue of the wording of the statute.

21           Messrs. Huebner, Eckstein, and Crawford have all

22   pointed out to you that many courts have determined that

23   wording of the statute does not make appointment of the

24   examiner mandatory in all circumstances, and that based on

25   the facts in this case, a court can determine not to appoint

Page 113

1    an examiner at all.

2         They've also pointed you to the laches argument.

3    We agree obviously with the points they made and would urge

4    the Court not to spend even a penny of this estate

5    appointing an examiner.

6         Thank you, Your Honor.

7         THE COURT:  Okay, thanks.  Did anyone else want to

8    speak in opposition to the motion or on the motion other

9    than Mr. Lipson in brief response?

10        Okay, why don't you go ahead, Mr. Lipson?

11        MR. LIPSON:  Thank you, Your Honor.  So I want to

12   make four points.  The first is that a great bulk of what we

13   have just heard has nothing to do with our motion.

14   Rejectors attack me, they attack my work as an academic,

15   they focus on their own integrity.  They protest a great

16   deal.  They completely distort the relief that we want and

17   the reasons for seeking it.  But this is not about me, and

18   this is not about them.  This is about the fact that there

19   are problems in the factual record that they have not

20   addressed.  They have not in any way addressed any of the

21   concerns that we have raised.

22        Number one, the Debtors themselves have said in

23   order to justify the preliminary injunction, they were and

24   are inextricably intertwined with the Sacklers.  They and

25   their counsel are parties to or have been parties to joint

Page 114

1    defense of litigants and common interest agreements with the

2    Sacklers.

3              THE COURT:  Can I interrupt you?

4              MR. LIPSON:  And -- and --

5              THE COURT:  Can I -- let me --

6              MR. LIPSON:  And to this day --

7              THE COURT:  I can't let these to points -- no,

8    please.  I cannot let these two points go by.

9              When you say inextricably intertwined, are you

10   actually alleging that that includes management or control

11   of the Debtors post-bankruptcy?  Are you actually alleging

12   that?

13             MR. LIPSON:  No.  Your Honor, I don't know what it

14   means.

15             THE COURT:  Okay.

16             MR. LIPSON:  That's the point.

17             THE COURT:  Yeah, you don't know what it means.

18   But you're not alleging that because you have no evidence of

19   that.  Right?

20             MR. LIPSON:  We have the Debtor's own admissions.

21   So all we have to do --

22             THE COURT:  No, no.  The debtor -- honestly.  You

23   believe that that admission applies to the post-bankruptcy

24   period as far as management or control of the debtors?  Did

25   you read the papers?  Did you see anything about interfering

Page 115

1    with management?  That is a common ground for an injunction

2    to protect third parties, i.e. you can't sue management or

3    the Board because they are active in running the company.

4    Did you see that in the pleadings?

5              MR. LIPSON:  No, but that's not --

6              THE COURT:  No.  So do you think it might be a

7    logical inference that the inextricable nature that they're

8    referring to is with regard to the claims against both of

9    them and the source of recovery and the fact that there

10   would be inevitably the Debtors pulled into the litigation

11   against the Sacklers?  That didn't jump out to you as the

12   logical inference?

13             MR. LIPSON:  That's certainly an inference, Your

14   Honor --

15             THE COURT:  Is there any other -- is there any

16   other, given the fact that they did not allege and

17   everything that you have heard today belies the assertion

18   that the Sacklers have any role in running these debtors

19   post-bankruptcy?

20             MR. LIPSON:  We are not saying that they ran the

21   debtors post-bankruptcy --

22             THE COURT:  Any role whatsoever, whatsoever,

23   including in respect of the most important aspect,

24   controlling in any way the entry into the settlement

25   agreement?

Page 116

1           MR. LIPSON:  Your Honor, we are --

2           THE COURT:  Answer my question.  Yes or no.  Do

3      you have any basis to assert that fact?

4           MR. LIPSON:  Which fact, that they managed the

5      debtors?

6           THE COURT:  That they had any role post-petition

7      in running the debtors, including, without limitation with

8      regard to the debtor's decision to enter into and support

9      the plan?

10          MR. LIPSON:  With respect to running the debtors,

11     no.  But that's not the concern --

12          THE COURT:  And finish the rest.  Do you have any

13     basis to believe that?

14          MR. LIPSON:  Do we have any basis to believe that

15     the Sacklers might have interfered with the Board's decision

16     to --

17          THE COURT:  Yes, the decision to enter into the

18     plan and to support the plan.

19          MR. LIPSON:  Absolutely.

20          THE COURT:  What?  What is it?  What is it?

21          MR. LIPSON:  I'll say it for a fifth time.  We

22     know that the debtors, it appears, had to create a proxy for

23     the Sacklers such that they gave up their right to remove

24     directors on the special committee in November of 2019,

25     number one.

Page 117

1              Number two, we have never seen the governance

2      documents of --

3              THE COURT:  Have you looked?

4              MR. LIPSON:  Obviously ---

5              THE COURT:  Have you looked?

6              MR. LIPSON:  Obviously -- obviously, Your Honor,

7      the charter is publicly available.  And sorry that Mr.

8      Huebner is not so good at quoting after all, but we never

9      say we didn't see the charter, obviously.  We quote from the

10     Charter.  It's the bylaws, it's the shareholder agreements.

11     It's all of the other governance documents that might give

12     the Sacklers the ability to control the board.  If they were

13     not controlling the board or didn't have that power, then

14     why was the proxy necessary?  That's fact number one.

15             Fact number two, the common interest agreements

16     (indiscernible).  I do not understand how the Sacklers and

17     the debtors can have a common interest once they are in

18     bankruptcy.

19             THE COURT:  You don't think that there are the

20     same types of claims asserted against both the company and

21     the Sacklers?

22             MR. LIPSON:  There may be, but the --

23             THE COURT:  There may be.  You just said there's

24     an inextricable link, right?

25             MR. LIPSON:  Right.  And so --

Page 118

1           THE COURT:  Mr. Lipson, at some point you have to

2    actually be realistic.  Right?  I mean, is this what you

3    teach your students, just to assume these sorts of things

4    without actually, you know, doing any real pragmatic

5    analysis?

6           You know, I actually had Michael Avenatti appear

7    in front of me.  He spoke these ways, too.  It might be --

8    it could be the debtors haven't shown, et cetera.  That

9    didn't last very long.  He had no evidence.  He left, and he

10   never came back.  I hope you're not teaching the future

11   Michael Avenattis of this world at Temple.

12          Go on with your argument.

13          MR. LIPSON:  I'm not sure it's appropriate to

14   personalize this sort of an argument, Your Honor.  And I'm

15   not sure why others are doing it and --

16          THE COURT:  I think there is a responsibility to

17   first ask for the relief that you're actually asking for,

18   and second, to back it up with some facts and legal

19   argument.  I'm testing the facts that you are asserting.

20   The first one you asserted is that the Debtors have

21   acknowledged in their preliminary inunction motion that the

22   Sacklers are inextricably intertwined with Purdue without

23   distinguishing between pre and post-bankruptcy.  You haven't

24   given me a credible answer in response to that.

25          If you think that's personal, it is.  Because at

Page 119

1    some point, you do have an obligation to be real.  All

2    right?  To be realistic and to not just throw out statements

3    that people who are not lawyers, people who have suffered a

4    lot and who really don't quite understand the law think, oh

5    my god, are they letting the Sacklers go?  And they read

6    stuff like you are submitting and they see quotes that say,

7    well, academics have said the following, the process may not

8    be conducted with integrity.  What do you think they

9    believe?

10          So, yes, you do have an obligation to support it

11   with facts and not History Channel pleading.

12          MR. LIPSON:  Are the bylaws public?  Are they

13   available?  Do they permit the Sacklers to --

14          THE COURT:  Do you doubt for a minute, Mr. Lipson,

15   that if in fact the Sacklers weren't exercising control over

16   the board in the way that would affect the decision-making

17   in this case, that the creditors' committee and all of the

18   other parties in interest, including all 50 -- well, all 48

19   states because to have settled -- wouldn't be moving

20   immediately for a trustee?  Do you doubt that for a minute?

21   Or that such a motion would be granted if in fact it was the

22   case?

23          MR. LIPSON:  Well, as we pointed out, Your Honor,

24   since the creditors' committee stipulated that it wouldn't

25   do so for the first several months of the case, we don't

Page 120

1    know.

2            THE COURT:  Because they were doing the

3    investigation to see.  And of course the 48 states did not

4    so stipulate.  So you really haven't answered my question.

5            MR. LIPSON:  Your Honor, I might point out since

6    the Debtor's lawyer and Mr. Eckstein both made a point of

7    talking about ResCap, that ResCap does say what it says, but

8    it also resulted in the appointment of an examiner.  I

9    believe Judge Gonzalez was appointed in that case.  And let

10   me read to you, since everybody likes to read from cases --

11           THE COURT:  I've read it.  I understand the case.

12   I've read it.  I understand the case.  You can go on.

13           MR. LIPSON:  So an examiner was appointed there.

14   The other cases that they cite, Spansion, Dewey & LeBoeuf,

15   these are not cases of great public interest.  This is.

16           Mr. Huebner has said over and over about -- over

17   and over again, rather, how significant the public interest

18   in this case is.  If in fact everything is as fine as they

19   claim, the examination into the very limited question we

20   have posed, the very limited concern we have, should be very

21   easy.

22           The creditors' committee could very easily have

23   published their analysis, released their analysis --

24           THE COURT:  No, they couldn't.  Do you -- have you

25   ever moved for approval of a settlement agreement in

Page 121

1    bankruptcy court?

2           MR. LIPSON:  Not in many years.

3           THE COURT:  Yes.  Okay.  And do you think that it

4    really makes sense, particularly where the settlement

5    agreement can be breached in the future and the settling

6    party has the right to proceed against the target on all

7    counts as if the settlement agreement hadn't happened to lay

8    out all of your theories, pro and con?  Do you really think

9    that's advisable, to blow that out, to say that?  Have you

10   ever read a motion for approval of a settlement agreement

11   that actually says that?

12          MR. LIPSON:  Your Honor, that's exactly why we

13   think there is concern about what's happening in these

14   cases.  The settlement agreement -- the settlement is what

15   justifies keeping the analysis of the independence of the

16   special committee and the board from public knowledge, then

17   that means the settlement is the problem.  It's like the

18   protective order.  Right?  Within the protective --

19          THE COURT:  So you wouldn't -- so that basically

20   means you wouldn't have a settlement, right?  You would just

21   have one alternative in a bankruptcy case, which would be to

22   litigate.

23          MR. LIPSON:  No.  It means you have what Congress

24   intended, which is an examiner and a settlement.

25          THE COURT:  Okay.  You can go ahead.

Page 122

1           MR. LIPSON:  And unlike -- contrary to what Mr.

2     Preis said, we are not asking for an examiner to redo

3     anybody's work.

4           THE COURT:  Really?  Well, let's read that, then.

5     Let's read Paragraph 17 of your reply and Paragraph 18.

6     "The motion plainly anticipated that key participants in

7     these cases may have conducted this work" may have, "and

8     thus seeks an examiner not to redo it (unless it was not

9     properly done in the first place)".  Groups, right?

10    Including the Committee.  And then in Paragraph 18 you say

11    that, "It is true that some of these parties are adverse to

12    each other, but their motivation, i.e. their adverse nature

13    and their fiduciary nature, is likely to demaximize --"  I

14    don't know.  This ungrammatical.  It says, "This may be

15    true, but their motivation is likely to be demaximize the

16    settlement amount, not to assess and report on the integrity

17    of the process", whatever that means.  What does that mean?

18    It means to report on their motives, right?  Their

19    integrity.  And you don't think that's embodied in the

20    settlement itself?  You want someone to question their

21    motives?  You want to question the motives of the Unsecured

22    Creditors' Committee, the integrity of the Unsecured

23    Creditors' Committee, the integrity of the group that Mr.

24    Eckstein represents, the integrity of the people who

25    represent the personal injury claimants?  I mean, that seems

Page 123

1   to be what you suggest here.  So that's what you want, an

2   integrity finder?

3            MR. LIPSON:  Are you finished?

4            THE COURT:  But not to analyze what they did, just

5   to decide whether that was done with integrity?  How do you

6   distinguish between those two?  I guess it wouldn't be with

7   a bankruptcy professional who actually knows what they're

8   doing because they are all in small groups to scratch each

9   other's backs, right?  So the people that you asked to

10  review your articles, including judges and bankruptcy

11  professionals, won't be reviewing your articles in the

12  future, right?  You're not going to ask me to do that

13  anymore in the future, right?  Because obviously we can't be

14  relied upon to act with integrity.  So it would have to be

15  someone who doesn't know about the process, won't be

16  reviewing the work that was done, but somehow has to assess

17  and report on the integrity of the people who did it.

18           MR. LIPSON:  Are you done, Your Honor?

19           THE COURT:  I am.  I'm reading your -- I'm reading

20  Paragraph 17 and 18 of your reply, which you submitted, and

21  I'm trying to ask you what on earth that they mean.

22           MR. LIPSON:  What we mean is exactly what we said,

23  which is our concern is that the Sacklers used undisclosed

24  governance powers to influence (indiscernible) --

25           THE COURT:  That's all these pleadings are about?

Page 124

```
 1    That's all these pleadings are about?  So you could tell

 2    your client and anyone else who asks you what all these

 3    questions and concerns were about integrity, and that

 4    included the Committee, the MSGE, and others, that that's

 5    all you were talking about when you raised questions as to

 6    the integrity of the process?

 7              MR. LIPSON:  All of those questions.

 8              THE COURT:  What?

 9              MR. LIPSON:  Correct, because those are evidence,

10    those are facts that have given us concern.  You may not --

11              THE COURT:  So we shouldn't ignore --

12              MR. LIPSON:  You may not agree --

13              THE COURT:  -- the rest of the statements in your

14    pleadings?

15              MR. LIPSON:  Absolutely not.  You may disagree,

16    Your Honor, with my assessment of the facts.  You may

17    disagree with the importance of the facts.  You may

18    mischaracterize the facts (indiscernible) --

19              THE COURT:  So then I have to ask you again the

20    question, what is it that distinguishes the examination that

21    was done, which you don't want to redo, you want to have the

22    same discovery, no additional discovery, or anything

23    pertaining to that examination that's already been done, but

24    just to assess and report on the integrity of it?

25              MR. LIPSON:  Well, Your Honor, that's --
```

Page 125

1                   THE COURT:  And I'm assuming when you talk about

2       the examination, you mean the work done by the Committee and

3       the analysis of it by the 48 states and the governmental

4       entities and all those other parties, right?  So you want to

5       examine their integrity?

6                   MR. LIPSON:  I don't know how many times you need

7       me to say the same thing, Your Honor.  I already said no.

8       What we --

9                   THE COURT:  Well, all right, but then when I asked

10      you, okay, fine, then you said -- and I said, well, so we

11      should ignore those aspects of your pleading, you said no, I

12      shouldn't ignore them.  So that's why I'm coming back.  So I

13      guess I'll take your last word on it, which is, no, that's

14      not the examination you want and therefore I should ignore

15      those aspects of your pleading because they're just hot air.

16      Right?  It's just hot air.  It might get a good quote

17      somewhere, but it's not anything having to do with the

18      relief that you're seeking when you question the integrity

19      of the process.

20                  I think Mr. Preis was right on point when he noted

21      that your pleadings refer, I think, five or six times to

22      questioning "the integrity of the process of the bankruptcy

23      case."  And actually, that's not what you're asking now to

24      have an examination on.

25                  MR. LIPSON:  No.

Page 126

```
 1              THE COURT:  I think that's important to get on the
 2    record.  And that's why I let the other parties because long
 3    as they did, because one's reputation and one's integrity is
 4    important.  And the facts that they laid out on the record
 5    should show that you really aren't, with facts, attacking
 6    that.
 7              MR. LIPSON:  We believe that there are plenty of
 8    facts asserted in our motion, Your Honor, and we've already
 9    said --
10              THE COURT:  Going to the integrity of the
11    Committee's work?
12              MR. LIPSON:  No, Your Honor.  That is not what we
13    want investigated.
14              THE COURT:  Okay.  Good.
15              MR. LIPSON:  The integrity of the process --
16              THE COURT:  All right.  I think we've covered
17    enough of this, then.
18              MR. LIPSON:  The integrity of the process is
19    affected by the power that the shareholders have to
20    influence a board of directors --
21              THE COURT:  Okay.
22              MR. LIPSON:  -- before and during the
23    (indiscernible).
24              THE COURT:  All right.
25              MR. LIPSON:  The parties spend a great deal of
```

Page 127

1    time talking about the deal, about the fact that the deal

2    changed, about the fact that the deal is better.  It hasn't

3    changed that much, but it doesn't make any difference --

4              THE COURT:  (Laughing)

5              MR. LIPSON:  It doesn't --

6              THE COURT:  (Laughing)

7              MR. LIPSON:  The structure of the deal --

8              THE COURT:  Oh, my goodness, Mr. Lipson.  It's

9    just incredible.  Shall we subtract 4. --

10             MR. LIPSON:  It's not relevant, Your Honor.

11             THE COURT:  Shall we subtract the amount from the

12   original amount, and shall we compare the two?  Shall we

13   compare the remedies?  Shall we also reflect on the fact

14   that it still isn't a deal because there is ongoing

15   mediation, which I directed, which we haven't addressed?

16   How do you think your motion would affect those

17   negotiations, which really are important, which really might

18   further improve the deal?

19             How do you -- have you negotiated a deal like this

20   before?  How do you think that the existence of a pending

21   examination would affect those negotiations?  Wouldn't

22   people just wait to see how that happens?

23             MR. LIPSON:  Your Honor, if everything is as fine

24   as the parties all claim, then the examination that we are

25   calling for should have no effect at all.

Page 128

1                    THE COURT:  The negotiation, it was with the

2       parties who are not on board.  How do you think the Sacklers

3       and those parties would engage in those negotiations in the

4       mediation, knowing that there's this other question mark out

5       there?  You didn't give any thought to that, did you?

6                    MR. LIPSON:  Of course, I did.

7                    THE COURT:  Oh, really?

8                    MR. LIPSON:  But the --

9                    THE COURT:  What thought did --

10                   MR. LIPSON:  But the mediation is --

11                   THE COURT:  -- you give to it?  How do you think

12      it would affect it?

13                   MR. LIPSON:  The mediation is not relevant to the

14      question of --

15                   THE COURT:  Of course --

16                   MR. LIPSON:  -- whether an examiner should be

17      appointed.

18                   THE COURT:  Oh, of course not.  Oh, it's not

19      relevant at all, right?  Because you don't know how to

20      negotiate.  Honestly, this is just puerile.  It's really

21      embarrassing, Mr. Lipson, I've got to say.

22                   MR. LIPSON:  Your Honor, I don't think anybody

23      benefits from personal invectives, so let's --

24                   THE COURT:  If people file pleadings like this and

25      argue like this, there are consequences.  This is a public

Page 129

1   forum.  This is a litigation.  This is where the facts come

2   out.  This is where people are judged.

3           MR. LIPSON:  If Your Honor does not agree with our

4   concerns or our assessment of the facts, then you should

5   deny the motion and we will move on.

6           THE COURT:  Okay.  Do you have anything more to

7   add?

8           MR. LIPSON:  No, Your Honor.

9           THE COURT:  Okay.

10          MR. HUEBNER:  Your Honor, I know this is a little

11  bit unusual, but just because of the process questions,

12  could I make four points?  And then I will be done, and I

13  will be very quick?

14          THE COURT:  Okay.

15          MR. HUEBNER:  Number one, it's not really an

16  apology, but it is an explanation.  (indiscernible) the

17  issue is not that it is personal in the personal sense.  The

18  issue is that you originally moved for an examiner in your

19  own name as an academic.  And you had spoken extensively on

20  this case, and I actually took the time to listen to your

21  lectures and take out of it what I believe is motivating

22  your involvement.  And I actually think that it is important

23  for people to understand what brings people to court.  I

24  don't actually think I accused anybody of impropriety or

25  misconduct.

Page 130

```
 1              You have a view of the bankruptcy system and how

 2     it affected this case that you lay out at length in your

 3     lecture and otherwise, and I actually thought it was

 4     important for the parties to understand that.  And there is

 5     a public link to your lecture that anybody is welcome to go

 6     and read.  There is also a synopsis of it on "The Temple 10-

 7     Q", the Temple Business Law magazine, and it's quite sharp

 8     in accusing the professionals in this case and the parties

 9     (indiscernible) leaving moral considerations behind in order

10     to "get the economic (indiscernible) done".

11              And given ironically (indiscernible) this hearing,

12     which is once again spending hours and hours figuring out

13     how to help an incarcerated pro se person file a claim

14     months after the bar date, and following a case where we're

15     talking about tens of millions of dollars in a repository,

16     and pleading guilty to fines after years of denying them,

17     and the exit of every single Sackler from the board, and the

18     appointment of a (indiscernible) Special Committee, the

19     notion that people are being told, especially even more than

20     the Debtor and the Special Committee, the members of the UCC

21     that they threw moral and personal dignity concerns to the

22     wind to get a money deal going.  I just don't think you

23     understand how terribly painful it is for people who devoted

24     years of their lives (indiscernible) as much as possible

25     with this case.
```

Page 131

1           Number two, I ought to say congratulations,

2     because in fact, we prevailed with respect to how the Judge

3     ruled.  Your primary request was to confirm that the deal

4     was not borne in an original sin that irrevocably

5     (indiscernible).  You essentially got representation signed

6     under Rule 9011(b)(3) by the UCC, MSGE and the AHC,

7     answering your question.  All three of them signed pleadings

8     that said in essence, we could not have cared less what the

9     Special Committee thought.  The deal was not foreordained.

10    We made the decision ourselves.  And so I actually think,

11    ironically, you got the answer.

12          And then each of those three parties very strongly

13    validated to you with different levels of passion that the

14    message was equally clear that they reached their decision

15    entirely and utterly independently, that it was never

16    foreordained, and they stood ready and stand ready, even

17    now, to litigate if needed, if we don't get to the goal

18    line.

19          So I would ask you to realize that on some level,

20    what I think earlier today you said was your primary

21    question, in fact you got the answers.  You could have

22    gotten them, ironically, by probably calling any one of us

23    and just asking about it or reading things that I think laid

24    it out.  But if (indiscernible) wasn't clear before, if

25    there's one thing that's imported out of this meeting that I

Page 132

1    think cannot be unclear to anyone on the planet now, is that

2    the UCC, the AHC and the MSGE, after a month of mediation,

3    utterly independently negotiated a deal opposite the

4    Sacklers.

5            The Special Committee was there as well with Mr.

6    Preis -- that I thought it was a little bit unkind actually,

7    but I'll let it go -- that this constituency probably would

8    do the opposite of anything the Special Committee thought or

9    recommended, and if that didn't advance their

10   (indiscernible) structure and actually detracted from it.

11           Three, the bylaws -- and I guess I sort

12   (indiscernible) -- I actually didn't remember that we were

13   talking about ending the bylaws and not (indiscernible)

14   corporation, we could have gotten those in one second flat,

15   like hundreds of other (indiscernible) in the case and their

16   representatives, by signing a protective order and having

17   access to all diligence.  You had chosen not to do that,

18   which is fine, despite being involved in the case since its

19   opening months, which is fine, but please don't pin that on

20   us.

21           Like we prepared (indiscernible) early on.  We

22   (indiscernible).  And since you are not representing a

23   litigant in the case, it's not really fair to say that we

24   didn't do what litigants do when they want to access

25   documents.  You could have read the bylaws.  You could have

Page 133

1    asked us about it.  And you could have raised the issue in

2    the disclosure statement.

3              And finally, to repeat one last time, because it

4    came up in your opening remarks, the UCC explained in its

5    letter -- and I read in almost this full-page paragraph

6    (indiscernible) why they did not, and we also did not, for

7    the same reason, lay out in detail all the considerations,

8    both the weaknesses and the strengths (indiscernible)

9    Sacklers.

10             We may have to sue some or all of them someday.

11   There are 10 pods.  If any pod defaults, we have remedies

12   and rights and snapbacks, and the leases fade away and the

13   foreclosure leases fade away.  And the Judge got it exactly

14   right.  It is precisely to protect the constituencies for

15   who we are fiduciaries that were not ever going to lay out

16   in detail, here are the things that we're afraid of.  Here

17   are the things we might have lost.  Here are the things we

18   were most bullish about.  Here's how we weighted the

19   (indiscernible) and Sackler facts.  Here's how we

20   (indiscernible) Sackler.  Why?  Because that would be

21   suicide and it would be a breach of our fiduciary duties to

22   lay out the weaknesses and the strengths of our case.

23             The issue, at the end of the day, is that unlike

24   the case, which does happen -- and I think we just picked

25   the wrong case -- where only an independent committee of a

Page 134

1    board, only appointed by (indiscernible) a private equity

2    firm, does a deal, and that may or may not be subject to

3    (indiscernible).  Here you have the whole country that was

4    opposite the Sacklers.  Every AG, every municipality, and a

5    fearsome UCC, who hit them harder than any UCC basically

6    ever.

7          But again, I want to end where I began.  We don't

8    treat this count (indiscernible) loss of the Jackson family

9    or any of the other families.  But the process actually

10   work.  And the AHC and the MSGE and the UCC, even if you

11   don't trust the Special Committee, there's no

12   (indiscernible) all (indiscernible) government or victim did

13   not ensure both the moral values and the dignity values, as

14   well as the economic values that need to be indicated, and

15   (indiscernible).

16         You, assuming you actually comply with the

17   procedures that the Court ordered, or anyone else is welcome

18   to challenge at the confirmation hearing whether the

19   Creditors Committee (indiscernible) -- sorry (indiscernible)

20   -- whether the Special Committee or the board operated and

21   made its decisions free of (indiscernible) influence or

22   (indiscernible) Sacklers.  It's a fair question.  And as I

23   said before, the MSGE is exploring it correctly.

24         Let me be very clear, because I didn't say this

25   before.  I am very, very (indiscernible) based on everything

Page 135

1    I know, and I know quite a lot, that the Special Committee

2    has in fact (indiscernible) of inappropriate (indiscernible)

3    influence or connectivity, that each one of them came to the

4    company in a way that was clean and pure and appropriate and

5    free of prior (indiscernible).  That they did their job

6    exactly as one would want them to do.  And that is one of

7    the things we have to prove at confirmation, and we will be

8    doing so.

9         But please don't mistake the fact that we did not

10   want to detail factual defenses of Special Committee

11   (indiscernible) reply, believing that when the time was

12   right and appropriate, we will show all of that and more.

13   The Judge asked us to add dozens of pages to the

14   (indiscernible) parties, which we did.  We literally have

15   (indiscernible).

16        But we, like you, you know, could not possibly

17   feel more strongly about vindicating the propriety of the

18   process that led to the settlement, which is a difficult

19   settlement.  Nobody is unaware of the fact that a whole

20   bunch of money left after they paid this.  No one thinks

21   it's perfect.  No one (indiscernible) side, which is that

22   they didn't have (indiscernible).  But it doesn't mean

23   people didn't do their jobs and didn't act with integrity

24   and traded away things inappropriately for inappropriate

25   reasons.

Page 136

1              (indiscernible) the passion is so strong, I think

2    you genuinely don't realize how brutal your theory is.  And

3    we're here, the fact of unquestionably at the ultimate upper

4    end of the spectrum, seeking relief in front of a Federal

5    Court, based on no facts, and frankly explanations of law

6    that we don't agree with.  It's just something we cannot

7    countenance, you know, this far into it.

8              THE COURT:  Wait --

9              MR. LIPSON:  Your Honor, if I can just respond

10   very briefly?

11             THE COURT:  Yes, that's fine.

12             MR. LIPSON:  If I understand what Mr. Huebner just

13   said, he said something incredibly important, which is that

14   in the entire time the Special Committee has existed,

15   including before November of 2019, it was independent.  And

16   that's very, very helpful.  Now, maybe that's woven into the

17   disclosure statement somewhere else, but I think that's a

18   really important statement.

19             If I can just step back for a second, we

20   understand that everybody would much prefer to get a deal

21   done.  And we understand that this has been disrupted, and I

22   am sorry if that has been disrupted.  We do not intend to

23   cast aspersions on any (indiscernible).  We are concerned

24   that those inside the case simply do not see what it looks

25   like from outside.

1          And as I said before, the questions that we have

2     about the board's governance, the Sacklers' influence over

3     the board, will not go away after confirmation.  But if Mr.

4     Huebner has been able to make that assurance, that is

5     extremely valuable.  Thank you.

6          THE COURT:  Okay.  All right.  I have before me a

7     motion by Mr. Jackson, Peter W. Jackson, for the appointment

8     of an examiner in these cases, under Section 1104(c)(1) or

9     (2) of the Bankruptcy Code.

10          I must say that most of this hearing, I think

11     quite appropriately, has dealt with the motion papers and

12     the statements made in them, as opposed to what the movant's

13     counsel, Professor Lipson, has stated, albeit that that

14     differed from the pleading that was filed at 9:30 last

15     night, is really the relief that's being sought as far as

16     the nature of the examination.

17          I think it's important not only to deal with that

18     request for relief, which was really only clarified this

19     morning after extensive prodding, but also the language in

20     the motion.  I say that because these are very public cases

21     with hundreds of thousands of people, if you count family

22     members, who are not represented by lawyers, who know about

23     the case mostly from what they read or hear about in the

24     media, which, correctly, reads the pleadings and assumes

25     that there is some cogency to what is actually filed.  I

Page 138

1    believe that in respect of this motion, those people have

2    been misled, and in fact, sadly misled.

3           Again, this is a public case where tremendous harm

4    is intended to be addressed.  The victims of that harm

5    certainly no that they have been harmed, and they want to

6    make sure that what comes out of this case is the best

7    result for them.

8           When it is asserted with no evidence that that

9    process lacks integrity, and that the fiduciaries, both

10   under the Bankruptcy Code and their own representatives,

11   somehow have misguided motives, or were misled or confused,

12   or somehow acting without integrity, that's a problem.

13          It's particularly a problem when a law professor,

14   who one would think would understand how courts work, would

15   understand that integrity is the fundamental basis of the

16   legal system, suggesting a series of "questions",

17   "concerns", "issues", without any real support that that's

18   not how it's working here.  That goes so far as to state

19   that the Court and the fiduciaries here have some form of

20   backscratching relationship that prevents them from pursuing

21   the right result, as required by the law, with rationales to

22   suggest, for example, that judges may rule one way because

23   that's not as justice requires, but for some other reason,

24   which is unarticulated, but nevertheless laid out as a

25   concern or at issue.  That the people who practice in the

Page 139

1    court may for some reason not want to pursue their clients'

2    rights to the full, to the best of their ability, because

3    somehow they want to appear again later in the court in some

4    other matter, as Footnote 15 on Page 17 of the motion

5    suggests, as opposed to doing their best job in the court,

6    in the matter in which they are proceeding, is not only

7    bizarre and totally illogical, but again, simply

8    misrepresents to the public, who are employers, what lawyers

9    do.

10          Of course, it's all qualified by, well, we don't

11   mean any disrespect or, you know, of course, judges take

12   seriously their rulings, although it's couched in the draft

13   article that's cited as legal authority by saying, well,

14   judges may do that, but sometimes when it's important, they

15   may not, as the discussion of Judge Isgur in Mr. Levitin's

16   article suggests.  I guess Mr. Levitin left it up to himself

17   to determine what was important and not.  I would tell you

18   that Judge Isgur and every other judge in this country,

19   including me, takes every issue before him with the utmost

20   seriousness, and only looks at those issues and none others,

21   and certainly doesn't look into the future as to what might

22   be filed in front of him or her.  And to suggest otherwise,

23   particularly coming from an academic, is shocking.

24          Now, as I said during oral argument, at least I

25   give Mr. Lipson the credit of taking the heat and appearing

Page 140

1    here today, as opposed to just writing a draft article, as

2    his colleague, Mr. Levitin did.  But I really think it's a

3    sad day when someone who calls themselves an academic, a

4    scholar, engages in that type of ad hoc rationale.

5             This motion began on Page 1 with the wonderfully

6    quotable and totally off point, "These cases have been

7    overshadowed by a single critical question.  Who is

8    responsible for the Debtors' confessed crimes and the harms

9    they caused?"  And that's what's defined as the Sacklers

10   allegations, the crimes.

11            And then that paragraph ends by saying, "While the

12   case has involved massive, perhaps a record amount, of

13   discovery, it has been contained among and analyzed by a

14   small group of case insiders.", who are then discussed at

15   Page 17, as I have already described, as somehow people

16   scratching each other's back, and not actually getting to

17   the truth or to justice.

18            And by the way, Mr. Lipson, when I say justice, I

19   don't distinguish between justice and dignitary justice.  In

20   fact, it's a term I'd never heard before.  And when I looked

21   it up, it comes out of a completely different context than

22   you and your colleague, Mr. Levitin, have used.

23            All justice is dignitary justice.  Justice

24   includes a sense of the dignity of the people who appear

25   before one.  It also includes a responsibility to get the

Page 141

1   facts and the arguments right.  Justice assumes dignity.

2   That's inherent in the oath of office, to do justice to the

3   poor and the rich, the same justice.

4         These cases are not about crimes.  This is not a

5   criminal case.  When I get letters from people who say, how

6   can you "absolve" the Sackler family and let them get away

7   with it, people are thinking of crimes, or they're thinking

8   of something that a ruling in a civil case cannot confer,

9   moral absolution.  That is a different topic, as a law

10  professor should understand.

11        This is a case about who should pay money, based

12  upon claims, and whether that money is best used in a

13  collective settlement, in a collective proceeding, which is

14  the very nature of bankruptcy.  And clearly, there is no

15  more collective proceeding than this one, since it involves

16  48 states, the Federal Governments, hundreds of thousands of

17  individuals and other claimants.  Essentially, it involves

18  the entire country.

19        It is a disservice, not only to the people that I

20  believe you have slandered, but also to the public, to

21  mislead them about what has happened in this case.  Most of

22  these pleadings, including the reply papers, do just that.

23  They talk in vague terms about assessing and reporting on

24  the integrity of the process.

25        And contrary to the remarks at the beginning of

Page 142

1    this hearing, that process, one could clearly infer from

2    reading these pleadings, involves not only the Debtors but

3    also the Official Unsecured Creditors Committee and, I

4    think, 11 or 10 other committees in this case and the Court.

5            Now, what the relief ultimately being sought here

6    is is quite different from all of that.  As I understand it,

7    what Mr. Lipson is now seeking is that an examiner be

8    appointed to investigate whether the Debtors acted

9    independent of the Sacklers in filing and seeking

10   confirmation of the plan before the Court, which includes

11   within it an agreement between the Debtors and the Sackler

12   families, as set forth in the plan and disclosure statement,

13   which was also negotiated with and signed onto by most of

14   the parties in interest in this case, including the Ad Hoc

15   Group of Consenting States and Governmental Entities and the

16   Official Unsecured Creditors Committee, a much more narrow

17   task for an examiner than the various formulations of the

18   proposed examination set forth in the motion and the reply.

19           Section 1104(c) of the Bankruptcy Code says that

20   if the court does not order the appointment of a trustee

21   under Section 1104, then at any time before the confirmation

22   of a plan on a request of a party in interest or the United

23   States Trustee, and after noticing a hearing, the court

24   shall order the appointment of an examiner to conduct such

25   an investigation of the debtor as is appropriate, including

Page 143

1   an investigation of any allegations of fraud, dishonesty,

2   incompetence, misconduct, mismanagement or irregularity in

3   the management of the affairs of the debtor, of or by

4   current or former management of the debtor.

5           Let's just stop there before we get to the two

6   clauses that trigger the foregoing examination.  The named

7   allegations to be investigated, fraud, dishonesty,

8   incompetence, misconduct, mismanagement or irregularity in

9   the management of the affairs of the debtor, of or by

10  current or former management of the debtor, none of those

11  things is within the scope of the examination that is

12  actually being sought by Mr. Lipson.

13          He has not alleged fraud; he has not alleged

14  dishonesty; he has not alleged incompetence, misconduct,

15  mismanagement or irregularity, as far as the decision by the

16  Debtor and the Special Committee to propose the plan.  Of

17  course, those are not the only things that could be

18  investigated, but they give a good indication of what

19  Congress felt should be investigated.

20          Again, what he now says the investigation should

21  entail is a determination or an investigation as to whether

22  the Debtors' Board, and more specifically the Special

23  Committee, on its own, without direction or influence by the

24  Sacklers, determined to propose and seek confirmation of the

25  plan.

1          It is crystal clear, in fact it is beyond doubt,

2     notwithstanding insinuations in both the motion and the

3     reply, that that plan and the pursuit of it was dependent

4     not only on the Debtors signing onto it, but the agreement

5     by the Unsecured Creditors Committee, the Ad Hoc Committee,

6     and others, who separately and independently negotiated,

7     after separately and independently conducting the most

8     massive due diligence that I am aware of in any case under

9     the Bankruptcy Code, of potential causes of action against

10    the Sacklers.

11         Indeed, the motion does not dispute that that

12    happened.  In fact, it states that the examiner would not

13    even attempt to redo that investigation in any way.  One

14    wonders, then, why it is relevant to look at the Debtor

15    alone and the Special Committee.  The objectors say it is

16    not, because they separately made the determinations that

17    they did in support of the settlement.  And it is clear to

18    me from statements made on the record during the course of

19    the disclosure statement hearing that obtaining those

20    parties' agreement was critical to proceeding with the plan

21    by the Debtors.

22         Again, the motion suggests either artfully or

23    inartfully -- it's hard to know -- that those parties also

24    were somehow acting improperly in making those

25    determinations, but the suggestion is not borne out by

1    anything in the record.  And I think -- although it's hard

2    to follow him sometimes -- Mr. Lipson disavowed it during

3    oral argument.

4            Under Section 1104(C), an examiner is not supposed

5    to be appointed in every case to conduct that type of an

6    investigation, as is appropriate under the words of the

7    statute.  An examiner shall only be appointed if, 1, such

8    appointment is in the interests of creditors, any equity

9    security holders, and other interests of the estate; or 2,

10   the debtors fixed liquidated unsecured debts, other than

11   debts for goods, services or taxes, or owing to an insider,

12   exceed $5 million.  As noted, the movant seeks relief under

13   both of those sections.

14           Section 1104(c)(1) clearly provides a judge

15   discretion to appoint an examiner.  The appointment is only

16   appropriate if such appointment is in the interests of

17   creditors, any equity security holders, and other interests

18   of the estate, so that even though the section is introduced

19   by the word "shall", that is the overall section, Section

20   (c), it is clearly discretionary.

21           And in fact, it is highly unusual for a judge's

22   decision on such a discretionary appointment not to be

23   upheld on appeal.  See Clifford J. White III and Walter W.

24   Theus, Jr., Chapter 11 Trustees and Examiners after BAPCPA,

25   80 Am. Bankr. LJ, American Bankruptcy Law Journal 289, 302

Page 146

1   (2006).  "In fact, no District Court or Court of Appeals

2   decision has been reported that reversed a decision by a

3   Bankruptcy Court if appointing or declining to appoint an

4   examiner under (c)(1)."

5           This district has adopted the discussion in 7

6   Collier on Bankruptcy, Paragraph 1104.03, that "Mere

7   allegations of fraud, dishonesty, incompetence, misconduct,

8   mismanagement, or irregularity in the management of the

9   affairs of the debtor of or by former or current management

10  are insufficient to justify the appointment of an examiner

11  under Section 1104(c)."  In Re Dewey & LeBoeuf LLP, 478 B.R.

12  627, 640 (Bankr. S.D.N.Y 2012).

13          The Court needs to focus on whether such

14  appointment is in the interests of creditors and the estate

15  instead.  See In Re JNL Funding Corp., 2010 WL 3448221, *2

16  (Bankr. E.D.N.Y. August 26, 2010).

17          In conducting such an analysis, the court looks at

18  a number of factors, including whether the basis for the

19  examination is warranted in the pleadings by sufficient

20  facts.  Second, whether other parties with a fiduciary

21  interest or fiduciary obligation, or alternatively, a strong

22  practical interest in getting to the bottom of the alleged

23  irregularities, is already conducting such a process in the

24  state in which it is in.  And that is related to the third

25  point, the timing of the request.

Page 147

1            This is in part based upon the undeniable cost of

2       examinations, both in terms of the hard costs of conducting

3       the examination, which includes not only the examiner's

4       costs but the costs of the people that he or she deals with,

5       as well as the time and delay factor with respect to the

6       examination.

7            Mr. Lipson should fully understand this, as laid

8       out in Jonathan C. Lipson, "Understanding Failure: Examiners

9       and the Bankruptcy Reorganization of Large Public

10      Companies", 84 Am. Bankr. LJ 1, 2010, which he summarized

11      the data in 27 cases where examiners reported -- were

12      appointed and noted the high cost of examiners in large

13      cases by and large, the highest being $250 million; the

14      Enron examination being around $100 million.

15           Examiners also, by statute, don't have the power

16      to do any follow-up on their examination.  That is, they

17      can't bring the claims that they find.  Other parties have

18      to bring them.  Other parties may also disagree with the

19      report of the examiner, which is just that, a report by an

20      objective third-party, based on the fact that he or she

21      uncovers.  Other parties may have uncovered their own facts

22      or may disagree with the examiner's conclusion.  So at best,

23      an examiner's report is guidance.  Sometimes it is very

24      clear guidance; sometimes examiners also can act as an

25      objective third-party to try to bring together the parties

Page 148

1    in interest in the case, who may have a different view as to

2    the merits of the claims at issue.

3            That clearly was the situation in In Re Cenveo, my

4    case that Professor Lipson uses as a precedent for the

5    relief that he is requesting here.  Notwithstanding the fact

6    that in that case, the request for an appointment of an

7    examiner was made in the second week of the case, where

8    there was substantial disagreement among the parties as to

9    who should be conducting an investigation, whether it would

10   be a committee, whether it be the debtors, through an

11   independent director.  And I wanted to nip that in the bud

12   by appointing a person who would look over the shoulders of

13   both of them and work with them to get to a fair result,

14   which actually happened.

15           I will note that those parties were all members of

16   the small group of professionals that the motion refers to

17   as often practicing in bankruptcy cases.  They seemed to

18   conduct the process with integrity.  And of course, it was

19   recommended as one by Professor Lipson, who also, I will

20   note, thanked, in his preface to the article that I cited,

21   numerous bankruptcy judges and professionals whose work he

22   is now challenging, as I previously summarized, and as his

23   colleague, Mr. Levitin, is challenging.

24           In this case, we are weeks away from a

25   confirmation hearing on a plan that has been the subject

1    just to extensive mediations, following an unprecedented

2    examination by both the Debtors and by the Official

3    Unsecured Creditors Committee, which gave access to its

4    investigation to the key participants in this case, who were

5    not "a small group of case insiders," but representatives of

6    the 48 states that have asserted claims against the Debtors.

7    Those are clearly independent parties who take their duties

8    extremely seriously.

9           All but one of the groups involved in the two

10   mediations have agreed to the plan.  That one group, I take

11   very seriously, the so-called Nonconsenting States Group.

12   They are very well represented.  They are very

13   sophisticated, being the Attorney Generals of their

14   respective states, and they are now engaged in a third

15   mediation, which I directed to see if the plan, including

16   the settlement with the Sacklers can be improved.

17          That mediation, as is appropriate given the almost

18   two years in these cases, is on a short timetable.  One of

19   my colleagues who, in addition to the two other mediators in

20   this case, I view as one of the best mediators in the

21   country, particular with regard to issues like this.  Judge

22   Chapman is conducting that mediation.  It will be concluded

23   before plan confirmation, although it may not be concluded

24   until shortly before plan confirmation.

25          In that context, the request for an appointment of

Page 150

1    an examiner here, even as limited by Professor Lipson this

2    morning, to the topic of whether the Debtors' board, and

3    more specifically, the special committee was independent of

4    the Sacklers and made its own determination when directing

5    the Debtors to file and seek confirmation of the plan that

6    is now up for confirmation is not in the interest of

7    creditors and other interests of the estate.

8             I'm not even considering here whether it would be

9    in the interest of the equity security holders.  Obviously,

10   that's of minimal importance to me in this context.  Why do

11   I say it's not?  First, it is largely irrelevant, if not

12   entirely irrelevant, given the role of the other fiduciaries

13   in these cases that I've already detailed and it is well

14   laid out in the record and, frankly, simply not addressed in

15   any meaningful way by Professor Lipson, other than to

16   disparage it or question it without evidence and belied by

17   the fact that the very work would be the work that he

18   believes his examiner should investigate to see if, not that

19   the investigation itself was thorough, but whether it had

20   "integrity," whatever that means, and he was not able to

21   define it.

22            Secondly, this request comes very late in the

23   case, as I've noted, and while perhaps the most sensitive

24   negotiation in the case is going on.  It beggars belief that

25   Professor Lipson would not believe that the appointment of

Page 151

1    an examiner might adversely affect this negotiations is, in

2    fact, the case in any negotiation, and certainly in a

3    negotiation over a Chapter 11 plan, that as the closer one

4    gets to court, the more parties get serious about

5    negotiations and actually put their best deal on the table.

6            If they believed they could wait and see how an

7    examiner would come out on "the integrity of the process",

8    it's human nature that people will wait and not use what

9    really is important in this case, that mediation

10   productively.

11           In that context, in addition to the delay and

12   irrelevance of the inquiry, given the roles played by the

13   states, the governmental entities, the Indian tribes, the

14   committee and the subcommittee and the other unofficial

15   committees in this case, the cost simply isn't warranted,

16   nor is the delay warranted.  That is particularly so since

17   it is clearly, I believe, everyone's hope in this case that

18   funds go out promptly to abate the opioid crisis.

19           Professor Lipson also relies on, as I said,

20   Section 1104(c)(2) of the Bankruptcy Code, which again

21   states that, "The Court shall appoint an examiner to conduct

22   an investigation of the Debtor as is appropriate if the

23   Debtors' fixed, liquidated, or unsecured debts, other than

24   debts for goods, services, or taxes, or owing to an insider

25   exceed $5 million."

Page 152

1           There is a dispute in the case law as to whether

2    this provision is mandatory, i.e., that an examiner must be

3    appointed if the fixed, liquidated, or unsecured debts,

4    other than debts for goods, services, or taxes, or owing to

5    an insider exceed $5 million.  The dispute is not a new one.

6    It goes back at least to 1984 where the issue was discussed

7    at length in In re. GHR Companies, 43 B.R. 165 (Bankr. D.

8    Mass. 1984), where that Court that the appointment was not

9    mandatory, in large part, because of the Court's assessment

10   of the legislative history and background to the section and

11   the facts present in that case, as well as the statutes'

12   direction to conduct an investigation as is appropriate.

13           In that case, the Court went through an extensive

14   analysis of the legislative history, which I will not repeat

15   here, which reflects, however, I believe, a couple of

16   important points.

17           First, in enacting the 1978 Bankruptcy Code,

18   Congress was considering prior practice in which for public

19   companies above a certain debt threshold, a trustee was

20   appointed automatically, and the SEC had an important

21   statutory role, to protect the interests of public

22   debtholders and public shareholders.  Congress believed that

23   that level of third-party supervision was actually, as borne

24   out in practice, not a good thing and, therefore, decided to

25   change those provisions of the Chandler Act in the 1978

Page 153

1    Code.

2              There was a considerable back and forth as to

3    whether an examiner would need to be appointed and, if so,

4    under what circumstances in such cases, and there was

5    substantial support for the notion that the Court should

6    discretion to appoint both an examiner and a trustee.

7    Nevertheless, the statute came out as it was drafted, which

8    in one paragraph, (c)(2), appears to make the appointment

9    mandatory, but then in the overall provision pertaining to

10   the investigation makes the nature of the investigation as

11   is appropriate, i.e., in the discretion of the Court.

12             It is clear from the legislative history, and as

13   discussed in the In re. GHR Companies, that Congress was

14   focused largely on public companies with public debt and

15   public equity or public equity, although the statute itself

16   does not limit it to public debt, but rather instead to

17   fixed, liquidated, unsecured debts, other than debts for

18   goods, services, or taxes, or owing to an insider.

19             It's probably safe to say that Congress did not

20   have in mind when it drafted this a case where the claims

21   asserted, other than the claims for goods, services, or

22   taxes, would not be funded debt, but instead would be debt

23   for personal injury and the like.

24             The Court's continued -- well, I would cite

25   Professor Lipson's article, in addition to the legislative

Page 154

1    history discussed in the GHR case, which it goes through

2    this similar analysis and notes, among other things, that

3    the provision as drafted was "ASOP" to the SEC; that quote

4    is from an unnamed party who Professor Lipson said was

5    involved in the negotiations of the language that appears

6    now in the Code.

7              The issue of whether the appointment is mandatory

8    proceeded and still proceeds to this day in the case law and

9    commentary.  Indeed, as originally drafted in prior editions

10   of the leading treatise on bankruptcy, "Collier on

11   Bankruptcy," the section suggested that the Court had

12   discretion under (c)(2).

13             The current discussion in Collier is somewhat

14   schizophrenic.  It now states in, again, paragraph

15   1104.03(2)(b) headed, "The Court's lack of discretion once 5

16   million threshold is met," that "Section 104(c)(2) does not

17   leave any room for the Court to exercise discretion about

18   whether an examiner should be appointed as long as the 5

19   million threshold is met and a motion for an appointment of

20   an examiner is made by a party in interest."

21             It then goes on to state, however:  "Nevertheless,

22   the mandatory nature of this provision was not intended and

23   should not be relied on to permit blatant interference with

24   the Chapter 11 case or the plan confirmation process.

25   Failure to make a timely request for the appointment of an

Page 155

1    examiner may provide the Court with a basis for denying the

2    request on the ground of laches, nor should the mandatory

3    nature of the provision be used to allow one group of

4    creditors or interest holders to obtain a protagonist

5    supporting its litigation position under the guise of an

6    investigation.  In addition, where the parties do not seek

7    mandatory appointment under Section 1104(c)(2), but rather,

8    discretionary appointment, the appointment is not

9    mandatory."

10           The editors then go on to state:  "Alternatively,

11   a Court might grant their request for an examiner, but so

12   limit the role assigned to the examiner that substantial

13   interference will be prevented.  As noted above, Section

14   1104(c) states that the Court shall order the appointment of

15   an examiner to conduct such an investigation of the Debtor

16   as is appropriate."

17           "The limitations and prescriptions regarding the

18   scope of the investigation are subject only to the sound

19   discretion of the bankruptcy judge.  For example, the scope

20   of the examiner's duties is properly limited to an

21   investigation, rather than an evaluation.  In addition, or

22   as an alternative, the Court can limit in advance the

23   compensation to be awarded to the examiner and limit the

24   expenses as well."

25           "Finally, the Court may permit the confirmation

Page 156

1   process to continue and perhaps even conclude prior to

2   receipt of an examiner's report.  Citing the legislative

3   history, 124 Congressional Record H-11103, Daily Edition,

4   September 28, 1978."  "Accordingly," Colliers goes on to

5   state, "In an appropriate case, it is possible both to

6   comply with the clear statutory provisions and also to

7   consider their practical implications.  Again, citing the

8   same legislative history," which to my mind means that the

9   editors say it's mandatory, but not mandatory.  The case law

10  reflects that type of division.

11          Interestingly, Professor Lipson's motion only

12  cites the case law in his favor and ignores cases from this

13  district.  I won't.  There are indeed many cases that

14  construe Section 1104(c)(2) as requiring the appointment of

15  an examiner when the debt limit is met.  They include the

16  only Circuit Court case to have addressed the issue, Morgan

17  Stern v. Revco D.S., Inc. (In re. Revco D.S., Inc.) 898 F.2d

18  (6th Cir. 1990).

19          They include a number of other decisions,

20  including Loral Stockholders Protective Committee v. Loral

21  Space & Communications Ltd. (In re. Loral Space &

22  Communications Ltd), 2004 WL 2979785 (S.D.N.Y. Dec. 23,

23  2004) and In re. Schepps Food Stores, Inc., 148 B.R. 2730

24  (S.D. Tex. 1992), as well as In re. UAL Corp., 307 B.R. 8085

25  (Bankr. N.D. Ill. 2004).

Page 157

1          I will note though that the two District Court

2     cases that I just cited recognize there are exceptions to

3     the mandatory nature that they found, including based on

4     delay, the timing of the motion that is, and the motives or

5     underlying purpose of the request.  In addition, each of

6     those Courts recognize the Court's substantial discretion,

7     as does Colliers, in deciding what is an appropriate

8     examination under the statute.

9          There are many decisions that go the other way,

10    including many more recent ones.  In re. PG&E Corp., 2020 WL

11    9211190 at page 3 (Bankr. N.D. Cal. July 6, 2020), In re.

12    Dewey v. LeBoeuf LLP, 478 B.R. 627, 639 (Bankr. S.D.N.Y.

13    2012), In re. Residential Capital LLC, 474 B.R. 112, 121

14    (Bankr. S.D.N.Y. 2012), U.S. Bank National v. Wilmington

15    Trust Company (In re. Spansion, Inc.) 426 B.R. 114, 128

16    (Bankr. D. Del. 2010), and unreported decisions where there

17    are lengthy bench rulings, which I will go through in a

18    moment.

19          The Spansion case by Judge Carey reflects rulings

20    by some of his colleagues, including Judge Walsh, Judge

21    Walrath, and Judge Sontchi.  I will note that the

22    Residential Capital case also quotes at length an

23    unpublished decision bench ruling by Judge Chapman in the

24    Innkeepers case, all for the proposition that the Court has

25    discretion, albeit not perhaps as extensive discretion as

1    under (c)(1) if the debt limit is, in fact, exceeded under

2    (c)(2).

3            Judge Carey in Spansion actually stated the

4    obvious, "If the Court concludes that there is no basis for

5    an appropriate examination, what is the point of appointing

6    an examiner just to sit there and do thing," highlighting, I

7    think, the compromise that Congress made when it enacted

8    this provision, i.e., 1104(c), and I believe the desire of

9    those parties to just leave it up to the Court as to what is

10   appropriate if there is no basis to not appointment an

11   examiner.

12           In the Residential Capital case, Judge Glenn

13   stated the requirement for the appointment of an examiner

14   under 1104(c)(2) as one requiring, "That a Court order the

15   appointment of an examiner when (1) no plan has been

16   confirmed, (2) no trustee has been appointed, (3) the Debtor

17   has in excess of 5 million in fixed debts, and (4) the facts

18   and circumstances of a case do not render the appointment of

19   an examiner inappropriate," 474 B.R. 121.

20           He then goes on to lay out the circumstances under

21   which such an appointment would not be appropriate.  I might

22   disagree with him as to the burden of proof on that issue.

23   I think probably those opposing the appointment would need

24   to show it.

25           But if they do show it, I agree with him that if,

Page 159

1    in fact, the same investigation or substantially the same

2    investigation is well underway already either by an estate

3    fiduciary or by a third party with clearly a strong interest

4    to pursue that investigation, one should ordinarily believe

5    that the examination would be inappropriate; that is, the

6    appointment of an examiner to conduct a duplicate

7    examination would be inappropriate, which frankly, is common

8    sense.

9         He also notes the timing points that I've already

10   mentioned that were raised in a number of cases, including

11   the Loral opinion that I've cited, the Schepps opinion that

12   I cited, and In re. Bradley Stores, Inc., 209 B.R. 36,

13   (Bankr. S.D.N.Y. 1997).

14        It's also worth quoting from a lengthy transcript

15   by Judge Walrath in the Washington Mutual bankruptcy case,

16   which is also cited in the Residential Capital opinion as

17   Judge Walrath says:

18        "As I recently ruled orally...," so you can't

19   really on it, but I will follow it myself..., "I do believe

20   that 1104(c)(2) gives the Court some discretion, even if the

21   debt level is reached, and the discretion is that the Court

22   has the discretion to determine what appropriate

23   investigation of the Debtor should occur, and that if the

24   Court determines that there's no appropriate investigation

25   that needs to be conducted, the Court has the discretion to

Page 160

1    deny the appointment of an examiner."

2          "The Courts have looked at various factors in

3    determining whether an appropriate investigation is

4    warranted.  They include whether, that same investigation

5    has already been conducted by other parties.  They have

6    looked at whether the appointment of an examiner will

7    increase costs and cause a delay with no corresponding

8    benefit, and they look at the timing of the motion.  They

9    look at whether the motion is a litigation tactic, which

10   includes consideration of the timing, not just how soon it

11   is in a case, but whether it is timed such as to evidence a

12   litigation tactic."

13         In that case, Judge Walrath stated that it was a

14   very close call as to whether to appoint an examiner since

15   she did not find that it was a litigation tactic, but that

16   she concluded that "The appointment of an examiner here

17   really would -- an examiner really would only have the task

18   of reviewing what others have already done.  I don't think

19   there's any original investigation left to be done, so I

20   think that's just a waste of assets."

21         "Secondly, I think the equity committee, which was

22   moving for the appointment of an examiner, is fully able to

23   conduct the investigation that it seeks to have the examiner

24   conduct.  It has the benefit of Rule 2004.  It has the

25   benefit of the discovery rules because there are contested

Page 161

1    matters presently and anticipated in which the equity

2    committee could fully avail itself of that discovery."

3              That's found at In re. Washington Mutual, Inc.,

4    08-1229, Docket No. 3699-mfw, the hearing transcript at page

5    97 through 101.

6              Other courts have actually done what Collier

7    suggests and simply appointed an examiner but then had them

8    do nothing, or in the case of In re. Erickson Retirement

9    Communities, LLC, 425 B.R. 309, 317 (Bankr. N.D. Tex.), the

10   Court appointed an examiner but then gave that person no

11   meaningful duties as there was no sound purpose for it and

12   said, "Perhaps if the Court does not confirm the plan, an

13   examiner could do something."

14             Finally, the objectors properly focus on the Dewey

15   LeBoeuf case, which I previously cited; again, it's at 478

16   B.R. 627 (Bankr. S.D.N.Y. 2012).  There, the Court concluded

17   that it had the discretion under Section 1104(c)(2) not to

18   appoint an examiner under those circumstances present there,

19   given that the investigation that the examiner was sought to

20   be done had already been conducted or was nearly complete,

21   and the appointment of an examiner would upend the

22   settlement process and the consideration of the settlement

23   in connection with the confirmation hearing, in essence,

24   obtain an adjournment of that hearing when, in fact, the

25   Court had set all of those issues up to be determined before

Page 162

1    it.

2            The issue, again, that the motion seeks to have be

3    the subject of the examination is the independence of the

4    Debtor, its board and, more specifically, the special

5    committee of the board in submitting the plan for

6    confirmation.

7            This is, frankly, different than the issues raised

8    in the motion and the reply, which focus on the entire scope

9    of the negotiation of the plan, even before key parties who

10   are supporting the plan were in existence.  The motion is

11   premised upon the theory that the pre-bankruptcy settlement

12   framework embodied in the term sheet negotiated between, on

13   the one hand, the Sacklers and the Debtors -- then not

14   Debtors, just Purdue -- as defendants in multi-district

15   litigation.

16           And the claimants in that litigation, or at least

17   certain of the claimants in that litigation, including the

18   so-called consenting states and the lead personal injury

19   attorneys' committee, was, in fact, a structure that

20   determined the outcome leading to the plan and, therefore,

21   every step from that structure to this moment -- and

22   conceivably, the future -- need to be investigated by the

23   examiner to determine the integrity of the process, using

24   the words of the motion and the reply.

25           This completely ignores that the Debtors are a

Page 163

1    different side of the settlement at this point.  When they

2    become Debtors, they are fiduciaries for their estates and

3    creditors.  They then have claims that otherwise could be

4    asserted only by creditors, namely fraudulent transfer,

5    preference, and veil piercing claims, and they're subject to

6    the supervision of this Court.

7              It also ignores the creation of the official

8    unsecured creditors' committee, which obviously didn't exist

9    before the commencement of these cases, and its fiduciary

10   duties.  It also ignores that the framework settlement was

11   not a settlement, it was merely a framework, subject to

12   definitive documentation and extensive due diligence, as was

13   made clear on the first day of this case and basically in

14   every hearing thereafter by the parties and by me.

15             Given all of that, it appears to me to be

16   completely irrelevant and wasteful to investigate the

17   Debtors' negotiations of the plan.  The motion and Professor

18   Lipson really have no other evidentiary support for the

19   contention that the post-petition Debtor was in any way

20   controlled by the Sacklers, let alone that the special

21   committee was.

22             Again, it's hard for me to see whether the issue

23   itself is particularly relevant, given that there are

24   multiple parties in interest who conducted extensive

25   investigations of claims against the Sacklers besides the

Page 164

1    Debtors, although, of course, the Debtors did too.  Indeed,

2    the announcement by the Attorney General of the State of New

3    York that she had uncovered in excess of $10 billion of

4    claims for potential avoidable transfers by the Sacklers

5    came from uncovering the first page of the Debtors'

6    extensive report detailing those transactions.

7         There is no real suggestion, except wholly

8    inappropriate innuendo, some of which I addressed during

9    oral argument, that the special committee had some sort of

10   proclivity not to act as independent fiduciaries.  But

11   again, even if they did, of which there's no evidence, there

12   were plenty of other fiduciaries adamantly in opposition to

13   the Sacklers, well represented, who actively and, in fact, I

14   think uniquely in bankruptcy practice engaged in I believe

15   the most thorough investigation of those claims one can

16   imagine.

17        Of course, they considered whether the process

18   itself was affected by the Sacklers' role as shareholders of

19   the Debtor and, of course, if they had reached that

20   conclusion, I would have heard it and, of course, if that

21   were true, I would have appointed a trustee or otherwise

22   directed the Sacklers to have no role.  But again, it

23   beggars the mind to believe that Professor Lipson is sincere

24   when he says that you cannot rely upon the creditors'

25   committee to have done that inquiry.

Page 165

```
 1            This was not a point he raised in his objection to

 2     the disclosure statement, yet he relies on the disclosure

 3     statement as not discussing it to his satisfaction.

 4     Frankly, it would have been a five-minute discussion at the

 5     disclosure statement hearing if he had.  I would have asked

 6     the Debtors, I would have asked the committee and I would

 7     have asked other parties in interest, do you have any reason

 8     to believe that the Sacklers are directing or influencing

 9     the special committee or the Debtors in their putting forth

10     this plan.  Although frankly, I believe again the answer to

11     that question is obvious: if the committee did have that

12     belief, it would have raised it, knowing how active,

13     diligent, and committed the members of the committee and its

14     professional are.

15            The Dewey and LeBoeuf case also deals with a

16     second aspect of the issue under Section 1104(c)(2); that

17     is, Judge Glenn in that case analyzes whether the debts in

18     that case as asserted -- and the movant does have the burden

19     of proof on this -- by the movant were, in fact, fixed,

20     liquidated, and unsecured, other than debts for goods,

21     services, or taxes or owing to an insider, in excess of $5

22     million.  Obviously, that's relevant because of the number

23     of cases that state that, at least in most circumstances,

24     the Court must appoint an examiner.

25            As Judge Glenn states in Dewey LeBoeuf, the $5
```

1   million requirement is typically satisfied where there is

2   outstanding unsecured bank debt or outstanding publicly

3   issued debentures in an aggregate sum in excess of $5

4   million.  He goes on to state, "While there is little case

5   law on what constitutes a fixed and liquidated debt for

6   purposes of Section 1104(c)(2), Blacks Law Dictionary

7   defines fixed debt as, "Generally a permanent form of a

8   debt, commonly evidenced by a bond or debenture; long-term

9   debt".

10         Judge Glenn goes on to state, "Conversely, it

11   defines a contingent debt as 'A debt that is not presently

12   fixed but that may become fixed in the future with the

13   occurrence of some event,'".

14         Lastly, it defines a liquidated debt as "A debt

15   whose amount has been determined by agreement of the parties

16   or by operation of law,".

17         Finally, Judge Glenn states "In other bankruptcy

18   contexts, a contingent debt has been defined as one which

19   the Debtor will be called upon to pay only upon the

20   occurrence or a happening of an extrinsic event which will

21   trigger liability.  A debt is liquidated where the claim is

22   determinable by reference to an agreement or by a simple

23   computation", citing Mazzeo v. United States, In re. Mazzeo

24   131 F.3d 295, 303 through 05, (2d Cir. 1997).

25         Generally, these types of issues don't come up in

Page 167

1    the 1104 context, but rather, as to who is an eligible

2    petitioner to commence an involuntary case under Section 303

3    of the Bankruptcy Code.  And certainly, contemplating the

4    legislative history of this section, which was focused on

5    funded debt, as well as the Section 303 case law and the

6    Dewey LeBoeuf case, which addressed contingencies and

7    concluded that the debts that were being asserted did not

8    fall into the category of "fixed, liquidated unsecured

9    debts."

10          There is a substantial question in my mind here as

11   to whether the only debt that is asserted by Professor

12   Lipson as triggering this provision, in fact, falls within

13   the actual language of it.  It is the debt set forth in

14   paragraph 6 of the Court's order pursuant to 11 U.S.C.

15   Section 105 and Federal Rule of Bankruptcy Procedure 9019,

16   authorizing and approving settlements between the Debtors

17   and the United States.

18          That settlement contemplated various judgments and

19   payments to be made to the United States in paragraphs 3

20   through 5, all of which are contingent upon the District

21   Court accepting the plea agreement at the sentencing

22   hearing.

23          And then there is the debt that Mr. Lipson relies

24   on set forth in paragraph 6, which states that "The United

25   States shall have an allowed unsubordinated, undisputed,

Page 168

1    non-contingent, liquidated unsecured claim against PPLP,

2    that is Purdue, in the amount of $2.8 billion arising from

3    the DOJ's civil investigation, defined as the civil claim."

4           If you just stopped there, obviously Professor

5    Lipson would be right.  But the paragraph continues,

6    "Provided that if PPLP..." and then I'll skip the first

7    proviso and go on to, "... provided that if a plan

8    materially consistent with the terms of the civil settlement

9    agreement is not confirmed", and then goes on to say, "In

10   the event of voluntary dismissal or a conversation of the

11   cases, that is the bankruptcy cases, or in the event the

12   Debtors' obligation under the civil settlement agreement are

13   voided for any reason, the United States may elect in its

14   sole discretion to rescind the releases in the civil

15   settlement agreement and bring any civil and/or

16   administrative claim action or proceeding against the

17   Debtors where the claims that would otherwise be covered by

18   the release provided in paragraph III.3 of the civil

19   settlement agreement or to have an undisputed non-contingent

20   and liquidated allowed unsecured claim against Debtors for

21   the full amount of the DOJ's civil proof of claim."

22          To me, that is a material contingency that, quite

23   arguably, takes this without the range of a fixed liquidated

24   unsecured debt.

25          All of these conclusions would lead one in a

Page 169

1    normal situation to deny the motion outright.  I am troubled

2    though, again, by the unsupported and inflammatory

3    allegations in the motion that really have little or nothing

4    to do with the relief that was actually pursued today, i.e.,

5    the relief sought.

6              In particular, I am concerned that based upon

7    those unwarranted and unsupported statements regarding the

8    Debtors' special committee; that the special committee,

9    which as far as I can tell has, in fact, been independent,

10   will somehow always have a taint over it.  We're talking

11   about actual people who I think have already been slandered

12   in this motion, as I've noted during oral argument.

13             It's also clear to me that many provisions of this

14   motion are written in a way to be easily quoted and

15   misconstrued by the media, which again, casts a pall or

16   would cast a pall on these people.  That shouldn't have

17   happened, but it has happened.

18             As everyone agrees, this is a case that elicits

19   properly very emotional reactions.  It is not a case about

20   forgiveness.  It is not even a case about forgetting, and

21   (indiscernible) said, "Many more people just forget or try

22   to forget than forgive."

23             But it is a case where I believe hundreds of

24   people with the best of intentions have worked tirelessly to

25   reach a result that best addresses the claims against Purdue

Page 170

1    and Purdue's rights against the Sacklers and, frankly,

2    third-parties rights against the Sacklers.  Whether that

3    result is enough for me to confirm the plan has not been

4    decided.

5            I will note regarding my concern about how the

6    public views this case that, notwithstanding that obvious

7    fact or the obvious fact that this is not a criminal case, I

8    continue to get correspondence from people who I truly --

9    well, being sorry for them is not enough, I mean, what

10   they've gone through is inexpressible -- but who believe

11   nevertheless because of what they have read that this is a

12   criminal case that will somehow absolve the Sacklers, both

13   criminally and morally.  That is not what this case is

14   about; it never has been about that, nor could it be.

15           On the other hand, as I said, hundreds of people

16   have worked tirelessly to try to maximize the recovery to

17   undo the injuries that have taken place over decades, and

18   how that is perceived is important because most of the money

19   will go to programs to abate the opioid crisis.  If people

20   believe that somehow that process was not conducted with

21   integrity, that effort is somehow tainted.

22           I believe that Professor Lipson could have gotten

23   to this result much more easily than spewing out what he did

24   in his pleadings, but I am concerned that if I do not

25   appointment an examiner, the next press release will be,

Page 171

1    "Court refuses to appoint examiner to determine whether

2    process was fair," and not add, "because there was no

3    evidence submitted to show that it wasn't."

4           So my inclination here is to appoint one person on

5    his or her own, not with a team, to look at one issue, which

6    is whether the board, and more specifically the special

7    committee, in directing that the Chapter 11 plan before me

8    be filed and pursued was acting independently and not under

9    the direction or influence of the Sacklers.

10          That appointment will not -- and I repeat not --

11   involve an assessment of the prior negotiations or of the 99

12   million pages of the investigation conducted by the

13   committee or the other millions of pages of the

14   investigation conducted by the Debtors under the auspices of

15   the special committee.  It will not assess the quality of

16   that work.  It will assess independence.

17          In essence, the Iridium and TMT Trailer factor

18   that I will separately assess if the plan -- when the plan

19   is brought before me to determine whether it should be

20   confirmed.  The Debtors contend that it is enough that I

21   assess that factor based on the evidence, and if this case

22   were not already tainted by this pleading, I think that is

23   the right result, but I believe an examiner should be

24   appointed to do that task.

25          The Debtors stated that the ad hoc committee of

Page 172

1    non-consenting states is taking discovery on that issue,

2    among other issues.  The examiner will have access to that

3    discovery.  He or she can also interview parties in

4    interest, including, of course, the special committee, and I

5    will expect a report on that issue before the commencement

6    of the confirmation hearing.

7            I will also expect a report about the cost of that

8    process and of this motion, so that everyone in this case

9    can know the cost and what was not spent on abating the

10   opioid crisis.  I will set the budget for that process by

11   the examiner, i.e., the examiner's own cost, at $200,000,

12   which is essentially my salary; that should do it.  I don't

13   expect the examiner to need another lawyer, except perhaps

14   to put in his or her fee application and to review the order

15   retaining him or her, although I expect that the U.S.

16   Trustee will appoint a senior person with experience in

17   Chapter 11 cases involving corporate governance or

18   experience with corporate governance in Chapter 11 cases.

19           The concept asserted in these pleadings and in

20   Professor Levitin's article that somehow the people that

21   know best those issues are tainted because they do, leading

22   to the inevitable result that one should appoint a neophyte

23   is, of course, ludicrous.  And, in fact, at least as far as

24   Professor Lipson is concerned, I trust he continues to seek

25   the comments and input from such people when he writes real

Page 173

1    articles, as opposed to press releases to the "Wall Street

2    Journal."

3           I don't expect there to be a lengthy debate or

4    scrutiny before it's submitted to me of the order.  I will

5    ask the Debtors to draft it, since I don't trust Mr.

6    Lipson's drafting since I've read about 20 different

7    versions of the task that he wanted the examiner to

8    undertake.  But, of course, the Debtors should provide him

9    with a copy before it's submitted to the Court so he can

10   make sure it's consistent with my ruling.  Copies should

11   also be circulated to the other parties, but it should not

12   deviate from my ruling.

13          Lastly, I am, as I said, concerned about how this

14   ruling may affect the critical mediation that is ongoing.  I

15   trust, having had Mr. Troop appear before me throughout this

16   entire case -- and by the way, Mr. Lipson, I don't believe

17   Mr. Troop has ever appeared before me in an engagement like

18   this before, unlike the two times that Mr. Kaminetzky has

19   and the one time that Mr. Huebner has -- and I trust that

20   his clients will recognize that this investigation is

21   largely, if not entirely, irrelevant to their negotiations.

22          However, I'm directing the parties to let Judge

23   Chapman know that if they point to it as a reason to delay

24   the mediation or to hold back if she asks them to put their

25   best offer on the table, she should tell me because I

Page 174

1    believe that will be in bad faith.  Now, again, I don't

2    believe that any of the parties to the mediation would do

3    that, but I want to be clear that they shouldn't.

4              So any questions from the parties?

5              MR. HUEBNER:  Yes, Your Honor, just to clarify one

6    this if I may.  It's Marshall Huebner.  So as I think we've

7    made clear in every document ever, it was the special

8    committee that had the authority exclusively vested in it.

9    The other board members did not participate, they were never

10   in the room, and the special committee by and large had, you

11   know, a separate dedicated team and the like.  I'll just

12   give you the one from --

13             THE COURT:  The inquiry should be of the inquiry

14   should be about the special committee, if anyone else had an

15   undue influence them on behalf of the Sacklers, you know, it

16   starts with the special committee.

17             MR. HUEBNER:  I was just confirming that one very

18   small, tangled point, Your Honor.  Obviously, that the

19   reason we had a special committee and, obviously, I wouldn't

20   say we welcome it to approve at a confirmation in any event,

21   but obviously, we certainly understand and are, you know,

22   ready to engage with an examiner appointed to put the

23   special committee through the questions that Professor

24   Lipson has asked, and I hope that there will be quite

25   satisfactory answers for all concerned.

1        THE COURT:  And one other point, although this

2    probably goes without saying also.  I've said that the

3    examiner will have access to the discovery taken by the ad

4    hoc group of non-consenting states; that will be subject to

5    the protective order.  In my experience -- and I don't

6    believe there's ever been a case otherwise, in fact, there

7    are a number of reported opinions where examiners say that

8    the only thing discoverable from them is their report --

9    what the examiner is privy to as far as discovery and the

10   like will be subject to that protective order, and what will

11   be publicly released will be his or her report.

12       So obviously, Mr. Troop, it's the raw discovery;

13   it's not your side's analysis of it.  You can share that if

14   you want, but you don't have to go beyond that obviously.  I

15   see you're nodding there.

16       MR. TROOP:  Sorry, Your Honor.  Understood, Your

17   Honor.

18       THE COURT:  Okay, very well.  So any other

19   questions?  I see the U.S. Trustee, there she is, Miss

20   Riffkin.

21       MR. TROOP:  Your Honor, if I may.

22       THE COURT:  No, I think Miss Riffkin, you're on

23   mute I think still.

24       MS. RIFFKIN:  Yes, I got off of mute.  Thank you,

25   Your Honor.  And we are ready to appoint an examiner once we

Page 176

1    have the order and we'll start the process right away.

2              THE COURT:  Okay, very well.  Thank you.

3              MR. TROOP:  Your Honor, if I may, one quick

4    clarification.  Will the examiner be permitted to meet and

5    confer with counsel to the unsecured creditors' committee

6    and the other major participants in this case?

7              THE COURT:  To get their sense of the

8    independence, not to investigate their integrity.

9              MR. TROOP:  Correct, correct.  Thank you.

10             THE COURT:  All right.

11             MR. TROOP:  Thank you, Your Honor.

12             THE COURT:  All right, very well.  Okay.  Anything

13   else for today?  No?  All right.  Thanks very much.

14             MR. TROOP:  Thank you, Your Honor.

15        (Whereupon these proceedings were concluded at 3:02 PM)

16

17

18

19

20

21

22

23

24

25

1                          I N D E X

2

3                        RULINGS

4                                          Page        Line

5

6    Motion to file late claim granted      12          1

7    Motion to extend preliminary injunction 16         15

8    Extension granted                      17          3

9    Examiner motion granted in part        171         4

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 178

1                  C E R T I F I C A T I O N

2

3        I, Sonya Ledanski Hyde, certified that the foregoing

4   transcript is a true and accurate record of the proceedings.

5
        Sonya Ledanski    Digitally signed by Sonya Ledanski Hyde
6                         DN: cn=Sonya Ledanski Hyde, o, ou,
        Hyde              email=digital@veritext.com, c=US
7                         Date: 2021.06.17 15:43:55 -04'00'

8   Sonya Ledanski Hyde

9

10

11

12

13

14

15

16

17

18

19

20   Veritext Legal Solutions

21   330 Old Country Road

22   Suite 300

23   Mineola, NY 11501

24

25   Date:  June 17, 2021

[& - 2d] Page 1

| & | 172:17,18 | 171 177:9 | 2012 85:15 146:12 |
|---|---|---|---|

**&**

**&** 2:9 6:3,17 7:6
7:24 8:6,23 85:8
102:23 105:16
120:14 146:11
156:21,21

**0**

**05** 166:24
**08-1229** 161:4

**1**

**1** 79:5,5 137:8
140:5 145:7,14
146:4 147:10
158:1,15 177:6
**10** 130:6 133:11
142:4 164:3
**100** 147:14
**100,000** 104:9
**1000** 6:20
**10007** 8:19
**10017** 6:6 7:20
8:10
**10019** 6:13
**10020** 7:10
**10036** 8:2 9:2
**101** 161:5
**104** 154:16
**105** 167:15
**10601** 1:14
**10:00** 2:4
**10:19** 1:17
**10th** 56:19
**11** 3:21 4:19 18:2
25:17,22,25 26:4
30:6 35:19,20
58:12 64:23 65:3
65:6 67:14 68:1
71:25 72:2 77:20
78:8 98:2 99:17
142:4 145:24
151:3 154:24
167:14 171:7

**1104** 4:19 43:17
79:5,5 84:16
88:25 90:1,3
104:7 137:8
142:19,21 145:4
145:14 146:11
151:20 155:7,14
156:14 158:8,14
159:20 161:17
165:16 166:6
167:1
**1104.03** 146:6
154:15
**11103** 156:3
**112** 87:1 96:22
157:13
**114** 85:15 86:3
157:15
**11501** 178:23
**1177** 8:1
**12** 56:13 79:8
177:6
**121** 96:22 157:13
158:19
**1221** 7:9
**124** 156:3
**127** 85:16 86:3
**128** 157:15
**131** 43:19 166:24
**14** 2:9
**148** 156:23
**15** 48:20 106:1
139:4 177:7
**16** 1:16 2:1 76:2
177:7
**165** 152:7
**17** 10:24 29:23
63:10 79:1 122:5
123:20 139:4
140:15 177:8
178:25

**1719** 7:1
**18** 97:8 102:7
106:4 122:5,10
123:20
**19** 11:2 89:7,11
91:1
**19-08289** 2:17
**19-23649** 1:3
**19122** 7:2
**1978** 152:17,25
156:4
**1980s** 84:13
**1984** 152:6,8
**1990** 156:18
**1990s** 84:13
**1992** 156:24
**1997** 159:13
166:24
**19th** 67:2 70:15

**2**

**2** 43:17 61:4 88:25
90:3 137:9 145:9
146:15 151:20
153:8 154:12,15
154:16 155:7
156:14 158:2,14
158:16 159:20
161:17 165:16
166:6
**2,700** 70:4
**2.8** 43:23 44:18,20
44:24 168:2
**20** 33:5 83:3 85:5
173:6
**200** 109:6
**200,000** 172:11
**2004** 26:20 156:22
156:23,25 160:24
**2006** 146:1
**2007** 25:5
**2010** 146:15,16
147:10 157:16

157:13,14 161:16
**2018** 48:1 72:21
**2019** 23:14 26:10
60:11 62:21 65:2
67:2,21 72:21
90:6,18 99:8
116:24 136:15
**2020** 49:6 56:19
91:6 99:25 157:10
157:11
**2021** 1:16 2:1,9
178:25
**2022** 31:3
**209** 159:12
**22** 67:5,22
**23** 49:4 61:4 62:12
75:21 77:21
108:14 156:22
**24** 6:19
**248** 1:13
**250** 147:13
**257** 62:22
**26** 89:24 146:16
**269** 2:20,23 3:8,14
**27** 147:11
**270** 3:4
**272** 3:10
**273** 3:19
**2730** 156:23
**28** 156:4
**2834** 2:6,10,13
**289** 145:25
**2899** 2:10
**28th** 15:10
**295** 166:24
**2963** 3:23 4:2,7,13
4:19 5:1
**2979785** 156:22
**2983** 63:13
**2d** 166:24

[3 - achieved]

**3**

**3** 63:8,14 67:2
94:8 103:22 131:6
157:11 158:16
167:19 177:8
**3,500** 41:19
**300** 1:13 178:22
**3011** 2:15 11:17
**302** 145:25
**3020** 4:4
**3021** 4:9
**3022** 4:15
**3023** 4:22
**303** 166:24 167:2
167:5
**3034** 5:3
**307** 156:24
**309** 161:9
**30th** 7:19 15:6
16:7,11
**31** 6:12 92:11
107:17
**317** 161:9
**330** 178:21
**338** 9:8
**3448221** 146:15
**36** 159:12
**366** 8:9
**3699** 161:4
**37** 30:16 111:21
**39** 91:19
**3:02** 176:15

**4**

**4** 63:9,14 66:15,18
127:9 158:17
177:9
**4.275** 78:10
103:23
**40** 53:21
**425** 161:9
**426** 85:15 86:3
157:15

**4275** 94:5
**43** 81:6 152:7
**44** 63:9
**45** 63:9
**450** 6:5
**474** 87:1 96:22
157:13 158:19
**478** 85:8 146:11
157:12 161:15
**48** 58:8 119:18
120:3 125:3
141:16 149:6
**485** 7:19
**49** 61:12

**5**

**5** 44:20 65:17 83:3
145:12 151:25
152:5 154:15,18
158:17 165:21,25
166:3 167:20
**50** 54:14 119:18
**52nd** 6:12
**544** 65:6
**548** 65:3
**55** 61:16

**6**

**6** 44:22 157:11
167:14,24
**6/16/2021** 2:4
**60** 64:9
**600,000** 94:20
**614,000** 79:7
**62** 84:11
**627** 85:8 146:12
157:12 161:16
**639** 85:8 157:12
**640** 146:12
**66** 64:9
**6th** 89:6 156:18

**7**

**7** 146:5

**70** 63:14 67:2
**70130** 9:9
**71** 63:14
**72** 67:2 90:5
**77** 79:25

**8**

**8** 67:2
**8/30** 15:6
**80** 145:25
**8085** 156:24
**84** 147:10
**86** 8:18 89:6
**87** 89:7
**898** 156:17
**8th** 62:21

**9**

**90** 75:12
**9006** 11:20
**9011** 94:8 131:6
**9019** 167:15
**9211190** 157:11
**97** 161:5
**99** 40:12 171:11
**9:23** 60:14
**9:30** 19:20 137:14
**9th** 15:11

**a**

**aaronson** 7:17
**abate** 109:16
151:18 170:19
**abatement** 95:4
**abating** 172:9
**abided** 96:16
**ability** 11:8 76:11
105:8 117:12
139:2
**able** 21:8 26:14
29:1 100:9 112:16
137:4 150:20
160:22
**absolute** 37:11

**absolutely** 29:22
42:16 47:18 50:16
50:19 58:23 69:16
89:4 109:20
116:19 124:15
**absolution** 141:9
**absolve** 141:6
170:12
**absurd** 53:4
**academic** 87:18
90:20 92:20
111:22 113:14
129:19 139:23
140:3
**academics** 119:7
**accept** 62:14
90:25 101:7
**acceptable** 55:16
58:2
**accepting** 167:21
**access** 10:25
11:25 75:13
132:17,24 149:3
172:2 175:3
**accommodate**
93:5
**accommodated**
63:25
**accommodation**
63:25
**accounts** 76:14
**accurate** 178:4
**accurately** 89:23
**accusation** 61:13
**accusations** 80:9
**accused** 35:2
129:24
**accusing** 35:1
73:24 130:8
**achievable** 53:8,9
**achieve** 100:9
**achieved** 101:11

acknowledge 78:3
  78:9 88:1,24
acknowledged
  101:2 118:21
act 61:11 123:14
  135:23 147:24
  152:25 164:10
acted 87:23 142:8
acting 102:8
  138:12 144:24
  171:8
action 65:4 76:12
  76:16 109:22
  111:25 144:9
  168:16
actions 35:19
active 97:6 99:17
  115:3 165:12
actively 97:7
  98:10 100:2
  164:13
actors 77:22
actual 22:14
  39:17 58:13,16
  61:25 66:23 93:9
  167:13 169:11
ad 3:9 4:11,14
  6:11,18 7:7,25 9:7
  11:13 58:6 63:3
  77:21 85:19 95:25
  97:6 99:5,18
  100:1,11 103:9
  106:24,24 109:8
  140:4 142:14
  144:5 171:25
  175:3
adamantly 164:12
add 129:7 135:13
  171:2
added 92:24
adding 16:14 71:9
addition 14:7
  16:12 103:13

104:10 149:19
  151:11 153:25
  155:6,21 157:5
additional 11:2
  16:24 75:13
  124:22
additions 101:7
address 33:18
  35:11 36:8 57:6
  76:4 77:14,17
  88:20 108:2
addressed 16:21
  113:20,20 127:15
  138:4 150:14
  156:16 164:8
  167:6
addresses 87:5
  169:25
adjourn 81:12
adjournment
  161:24
administrative
  168:16
admirable 38:2
admission 26:8
  114:23
admissions
  114:20
adopted 84:23
  146:5
advance 55:10
  132:9 155:22
advanced 62:15
advances 92:13
adversarial 61:5
  74:20 99:2
adversary 2:17
adverse 73:6,7
  76:18,18 79:10
  88:9 98:22 122:11
  122:12
adversely 151:1

advisable 121:9
advise 60:1
advocacy 55:16
  58:2 61:25 106:12
advocate 106:9
advocates 31:16
  74:13
advocating 94:11
affairs 143:3,9
  146:9
affect 23:17
  119:16 127:16,21
  128:12 151:1
  173:14
affirmed 16:18
afraid 133:16
afternoon 95:20
  102:24,25
ag 59:1 64:9 134:4
agency 96:22
agenda 2:1,1 10:4
  10:5,10,11 12:20
  17:11,11
aggregate 166:3
aggressively
  35:15
ago 17:19 62:17
  73:12 84:14 106:2
agree 13:6 72:19
  73:6 80:14 83:18
  104:19,22 109:18
  113:3 124:12
  129:3 136:6
  158:25
agreed 17:4 54:20
  66:8 80:18 88:12
  89:12 108:16
  149:10
agreement 23:20
  25:16 37:11,20
  38:14 45:3,5,8
  46:6,20 47:1,25
  62:10 63:11 77:20

83:25 99:7,7
  103:13 108:25
  115:25 120:25
  121:5,7,10,14
  142:11 144:4,20
  166:15,22 167:21
  168:9,12,15,19
agreements 46:10
  114:1 117:10,15
agrees 169:18
ags 62:23 63:2,12
  64:22 93:15
  108:13,22
ahc 79:18 95:1
  104:1 131:6 132:2
  134:10
ahc's 78:13
ahead 84:22
  113:10 121:25
air 125:15,16
airlines 33:7
akin 8:23 57:8,15
  105:15
al 2:17,18 4:21 8:8
albeit 137:13
  157:25
allegations 21:12
  21:13,16 28:10
  29:15 42:23 54:15
  67:22 94:15
  140:10 143:1,7
  146:7 169:3
allege 61:9 89:17
  115:16
alleged 143:13,13
  143:14 146:22
allegedly 25:7
alleging 29:1 75:1
  114:10,11,18
allow 82:3,11
  155:3
allowed 11:1
  43:21 44:22 45:9

[allowed - argue]                                                        Page 4

45:11 47:3 69:3,4
69:6 82:8 84:1
167:25 168:20
**alter** 105:8
**alternative** 82:3
87:2,3 99:25
100:3,5 121:21
155:22
**alternatively**
146:21 155:10
**ambushed** 93:6
**amendable** 24:25
**america** 59:4
67:10 74:12 90:24
**american** 63:1
64:7 111:12
145:25
**americas** 7:9 8:1
**amount** 39:23
43:23 44:13,13,14
44:24 45:10 82:4
82:19 83:4,10,12
103:18,22 122:16
127:11,12 140:12
166:15 168:2,21
**amounts** 48:5
67:1 82:24
**ample** 85:21
**analysis** 21:7 28:9
49:7,24 67:25
75:18 108:1 109:6
109:10 110:4
118:5 120:23,23
121:15 125:3
146:17 152:14
154:2 175:13
**analyze** 70:21
123:4
**analyzed** 140:13
**analyzes** 165:17
**andrew** 3:9 6:15
**anger** 31:16 32:13

**angered** 33:8,8
**angry** 106:16
**announced** 65:20
**announcement**
164:2
**answer** 11:15
13:12 24:13 42:16
71:6 73:23 81:4
84:3 116:2 118:24
131:11 165:10
**answered** 45:13
120:4
**answering** 131:7
**answers** 92:10
131:21 174:25
**antagonistic** 78:6
**anticipated** 82:10
122:6 161:1
**anybody** 80:15,19
93:1,3 108:12
128:22 129:24
130:5
**anybody's** 43:14
**anybody's** 122:3
**anymore** 123:13
**apart** 104:1
**apologize** 15:1
42:5 55:10
**apologized** 34:8
**apology** 129:16
**apparently** 23:14
33:22 37:6
**appeal** 145:23
**appeals** 146:1
**appear** 21:14,15
30:14 31:13,18
32:6 118:6 139:3
140:24 173:15
**appeared** 33:4
173:17
**appearing** 33:1,2
91:4 139:25

**appears** 23:18
49:7 65:20 79:1
116:22 153:8
154:5 163:15
**apple** 87:17
**applicability**
89:19
**application** 3:21
172:14
**applies** 89:18
114:23
**appoint** 4:2,7,12
4:18 45:24 79:6
84:17 85:9,16
86:11 88:25 103:8
104:21 109:18
112:19,25 145:15
146:3 151:21
153:6 160:14
161:18 165:24
171:1,4 172:16,22
175:25
**appointed** 24:5
41:13 46:3,16
47:9 74:11 120:9
120:13 128:17
134:1 142:8 145:5
145:7 147:12
152:3,20 153:3
154:18 158:16
161:7,10 164:21
171:24 174:22
**appointing** 85:25
113:5 146:3
148:12 158:5
**appointment** 3:21
45:17 86:7,18,20
96:17 102:4,13
104:5,6 112:23
120:8 130:18
137:7 142:20,24
145:8,15,16,22
146:10,14 148:6

149:25 150:25
152:8 153:8 154:7
154:19,25 155:7,8
155:8,14 156:14
158:10,13,15,18
158:21,23 159:6
160:1,6,16,22
161:21 170:25
171:10
**appreciate** 30:10
**approach** 12:11
60:8 70:24 84:24
93:1
**appropriate**
12:15 24:6,12
73:2 76:4 84:8,8
84:16 85:11 86:24
96:20,23 97:4
104:7 118:13
135:4,12 142:25
145:6,16 149:17
151:22 152:12
153:11 155:16
156:5 157:7 158:5
158:10,21 159:22
159:24 160:3
**appropriately**
74:18 137:11
**approval** 85:12
108:19 120:25
121:10
**approve** 61:17
100:23,24 102:1
174:20
**approved** 31:8
50:9 72:15 100:20
103:13
**approving** 22:6
167:16
**arguably** 83:1
168:23
**argue** 15:21 23:6
128:25

**argued** 56:22
**arguendo** 62:1
67:19 68:7
**argues** 97:13
105:3
**arguing** 97:10
**argument** 42:9
47:13 50:4 88:22
97:12 105:20
113:2 118:12,14
118:19 139:24
145:3 164:9
169:12
**arguments** 103:1
103:2 141:1
**arik** 9:4 105:15
**arising** 43:23
44:25 77:16 168:2
**armed** 86:12,14
**arm's** 72:17 73:14
88:5
**array** 73:19
**arrive** 99:12
**arrived** 103:5,16
**art** 1:25 57:2,5,11
**artfully** 144:22
**article** 139:13,16
140:1 148:20
153:25 172:20
**articles** 123:10,11
173:1
**articulate** 97:18
102:17
**articulated** 96:25
**aside** 38:13 75:5
106:3
**asked** 56:7 111:16
123:9 125:9 133:1
135:13 165:5,6,7
174:24
**asking** 23:7 28:9
28:18,20 39:15
41:20 42:2,3,25

43:2,3,5 46:17
52:2 73:21 74:3
92:3 118:17 122:2
125:23 131:23
**asks** 78:23 124:2
173:24
**asleep** 34:6
**asop** 154:3
**aspect** 31:11
115:23 165:16
**aspects** 125:11,15
**aspersions** 136:23
**assert** 116:3
**asserted** 117:20
118:20 126:8
138:8 149:6
153:21 163:4
165:18 167:7,11
172:19
**asserting** 118:19
**assertion** 115:17
**assertions** 11:3
93:25
**assess** 122:16
123:16 124:24
171:15,16,18,21
**assessing** 141:23
**assessment**
124:16 129:4
152:9 171:11
**assets** 160:20
**assigned** 155:12
**assistant** 8:17
**associated** 111:14
**assume** 21:3 41:4
83:17 95:17 118:3
**assumes** 52:25
137:24 141:1
**assuming** 30:23
47:15 107:19
125:1 134:16
**assumption** 83:21

**assurance** 43:3,14
52:4 137:4
**assure** 42:18
107:14 110:8,17
110:21
**assured** 111:1
**astonishing** 91:14
**attack** 113:14,14
**attacked** 48:10,11
**attacking** 48:9,10
57:17 64:3 126:5
**attacks** 55:6
**attempt** 56:6
60:20 144:13
**attempting** 88:11
**attempts** 71:25
**attention** 96:13
**attorney** 6:25
75:3 94:12 149:13
164:2
**attorneys** 6:4,11
6:18 7:7,18,25 8:7
8:17,24 9:7 31:13
48:1 58:8 59:1
61:6,20 62:18
65:8 67:10 77:21
98:8 162:19
**atypical** 83:9
**august** 15:6 16:10
59:25 65:2 81:14
146:16
**auspices** 171:14
**authority** 12:4
139:13 174:8
**authorize** 24:15
**authorizing**
167:16
**auto** 34:6
**automatically**
152:20
**auxiliary** 39:20
**avail** 161:2

**available** 68:9,18
117:7 119:13
**avenatti** 118:6
**avenattis** 118:11
**avenue** 6:5 7:9,19
8:1,9
**avoid** 11:9 80:24
**avoidable** 164:4
**avrio** 2:24 3:15
**avuncular** 50:1
**awarded** 155:23
**aware** 94:8
108:15 144:8

**b**

**b** 1:21 37:11 94:8
131:6 154:15
**b.r.** 85:8,15 86:3
87:1 96:22 146:11
152:7 156:23,24
157:12,13,15
158:19 159:12
161:9,16
**babies** 9:7
**back** 14:10,14
19:18 44:12 52:13
57:19 76:25 84:21
86:10 100:15
118:10,18 125:12
136:19 140:16
152:6 153:2
173:24
**background**
152:10
**backs** 123:9
**backscratching**
138:20
**bad** 32:16 35:6
43:1,4 51:21
174:1
**balance** 79:20
83:12
**balancing** 16:21
49:21

balloon 44:12
baltimore 8:7
bank 157:14
  166:2
banking 112:18
bankr 145:25
  146:12,16 147:10
  152:7 156:25
  157:11,12,14,16
  159:13 161:9,16
bankruptcy 1:1
  1:12,23 18:12,18
  19:2 21:18 25:14
  32:4 37:20 41:10
  55:9 56:21,23
  57:12 58:9 60:10
  65:1 70:4 87:19
  87:19 90:16 92:21
  98:14 104:3
  109:13,14,17
  111:24 112:1
  114:11,23 115:19
  115:21 117:18
  118:23 121:1,21
  123:7,10 125:22
  130:1 137:9
  138:10 141:14
  142:19 144:9
  145:25 146:3,6
  147:9 148:17,21
  151:20 152:17
  154:10,11 155:19
  159:15 162:11
  164:14 166:17
  167:3,15 168:11
banks 75:15
bapcpa 145:24
bar 2:3,9 130:14
bare 108:8
bargaining 72:17
barred 71:13
base 61:3 110:10

based 11:3,22
  32:25 83:7 93:7
  98:12 108:16
  110:6 112:24
  134:25 136:5
  141:11 147:1,20
  157:3 169:6
  171:21
basic 19:5 60:20
basically 28:4
  56:25 64:13 69:14
  73:24 79:20 91:17
  91:19 92:25
  111:22 121:19
  134:5 163:13
basis 11:4 16:9
  24:17 28:7,14,18
  31:7 33:1 38:14
  62:2 69:8 86:2,22
  96:18 97:13,18
  99:12,23 102:1,3
  116:3,13,14
  138:15 146:18
  155:1 158:4,10
battering 57:16
baum 6:17
bear 31:17 90:23
bearings 16:11
beasley 6:24
began 134:7 140:5
beggars 150:24
  164:23
beginning 19:12
  51:1 88:10 90:13
  106:5 141:25
behalf 2:14,24 3:9
  3:15,22 4:3,8,13
  4:20 5:2 10:20
  55:1 102:9,23
  105:16 174:15
belied 53:5 150:16
belief 94:14
  150:24 165:12

belies 101:4
  115:17
believe 11:4,10
  13:21 15:12 16:18
  24:2 30:25 32:15
  35:2,4,25 38:14
  40:23 41:2 42:16
  44:1,16 45:13
  46:12 51:20 72:3
  79:14 86:10 88:14
  100:6 102:12,17
  102:18 114:23
  116:13,14 119:9
  120:9 126:7
  129:21 138:1
  141:20 150:25
  151:17 152:15
  158:8 159:4,19
  164:14,23 165:8
  165:10 169:23
  170:10,20,22
  171:23 175:6
  174:1,2 175:6
believed 90:20
  151:6 152:22
believes 84:7
  87:20 96:7 107:7
  150:18
believing 135:11
belt 72:3
bench 33:5 39:20
  40:13 49:5 157:17
  157:23
benefit 52:9 68:23
  83:22 96:4 103:18
  160:8,24,25
benefits 128:23
benjamin 2:24
  3:14
best 36:8 41:25
  42:6 53:25 94:13
  104:7 138:6 139:2
  139:5 141:12

147:22 149:20
  151:5 169:24,25
  172:21 173:25
better 10:9 52:1
  59:21 70:24 97:14
  127:2
beyond 28:14
  61:25 108:12
  144:1 175:14
bias 35:22
biased 29:2
biblical 107:6
bickford 9:6,11
bill 43:14
billed 43:13
billion 43:13,23
  44:24 68:1 78:10
  84:2 103:22,23
  164:3 168:2
billions 59:12
binary 50:25 51:5
binder 8:6
binding 18:18
  99:9
birthed 75:10
  78:10
bit 57:23 107:2
  111:22 129:11
  132:6
bizarre 139:7
blacks 166:6
blame 90:14
  91:16
blatant 154:23
blends 56:3
block 71:8
blow 47:21 121:9
board 8:7 18:11
  19:10,14,15,16
  20:7,18 22:5,6,12
  26:3,6 28:1,16
  34:19 41:10 58:19
  59:7,16 62:10

64:19 66:5 70:19
70:20,23 72:8,10
80:24 97:16,24
99:24 105:1 115:3
117:12,13 119:16
121:16 126:20
128:2 130:17
134:1,20 137:3
143:22 150:2
162:4,5 171:6
174:9
**board's** 22:11,19
137:2
**board's** 116:15
**bond** 166:8
**book** 33:23 34:7
**bore** 109:25
**born** 69:21
**borne** 131:4
144:25 152:23
**bother** 77:1 78:3
**bothered** 59:16
**bottom** 28:6
146:22
**bound** 53:12
**boundary** 61:25
**bounds** 55:16
58:2
**bradley** 159:12
**bragged** 33:22
**brazenly** 59:18
**breach** 76:8 89:24
133:21
**breached** 121:5
**breadth** 109:2
**brief** 12:21 13:16
13:17 56:5 58:3
58:24 63:10 66:12
78:3 104:25
110:16 111:21
113:9
**briefly** 136:10

**briefs** 110:2,3
**brigade** 52:3
**bring** 96:12
147:17,18,25
168:15
**brings** 129:23
**broad** 7:1 73:18
**broaden** 79:2
**broadly** 24:21
37:10
**brought** 68:22
171:19
**brutal** 136:2
**bryant** 9:1
**bubble** 38:5 41:2
48:11,16 53:15
**buckfire** 30:8
**bud** 148:11
**budget** 80:17
172:10
**bulk** 113:12
**bullied** 92:5
**bullish** 133:18
**bully** 91:20
**bunch** 12:12
112:17 135:20
**burden** 69:10
73:15 158:22
165:18
**burn** 81:1
**business** 130:7
**bylaws** 26:12
117:10 119:12
132:11,13,25
**byzantine** 18:2
19:8

**c**

**c** 3:22 4:19 6:1 7:4
10:1 43:17 79:5,5
84:16 88:25 90:3
104:7 137:8
142:19 145:4,14
145:20 146:4,11

147:8 151:20
153:8 154:12,16
155:7,14 156:14
158:1,2,8,14
159:20 161:17
165:16 166:6
178:1,1
**c2** 46:17,18
**cal** 157:11
**calendar** 10:5
**call** 59:17 63:22
68:14 108:14
160:14
**called** 64:14 72:13
82:17 92:18
149:11 162:18
166:19
**calling** 55:7
110:23 127:25
131:22
**calls** 11:1 140:3
**candidly** 55:14
56:17
**canons** 57:24
**can't** 73:14 75:6
88:17 89:22 114:7
115:2 123:13
**capacity** 23:17
36:9
**capital** 96:14 97:1
157:13,22 158:12
159:16
**caplin** 102:23
**captured** 70:15
**captures** 96:15
**care** 76:3 92:20
111:13
**cared** 131:8
**career** 71:7
**careless** 111:18
**cares** 92:20
**carey** 85:16,24
157:19 158:3

**caring** 81:5
**caringly** 79:14
**carried** 110:12
**cart** 87:18
**case** 1:3 7:6 13:14
14:8,13 16:4 18:1
18:2 20:8,8 21:4,7
21:18,18 24:3,4
25:10,23,25 26:4
28:5,13 30:18
31:17 32:17 33:3
34:3,3,18 35:19
35:20,24,25 37:19
37:21 38:6 39:5,9
39:16,18 40:9,12
40:19,25 41:12,20
43:5,12 45:25
46:4,13 47:7 48:6
48:7,12,25 49:8,8
49:12 51:1,4,20
51:22 53:5 55:6
55:12 56:9,12
57:3,25 58:13,17
62:1 65:25 66:13
67:14 68:22 69:16
70:4 71:12 72:6
72:11,14 73:8
76:2 77:2 78:15
79:8,13,18 80:7
82:13,13 85:15
86:9,13,16 87:8
87:10,12,16,20
88:9 89:2,15
90:10 92:15 93:10
93:10 94:20 96:1
96:15,16 97:1,1,5
97:13,24 98:2,5
99:14,17,20,21
100:7,11 102:2,4
102:5,19 106:3
107:10,20,25
108:13,20 110:13
111:22 112:25

119:17,22,25
120:9,11,12,18
121:21 125:23
129:20 130:2,8,14
130:25 132:15,18
132:23 133:22,24
133:25 136:24
137:23 138:3,6
140:12,14 141:5,8
141:11,21 142:4
142:14 144:8
145:5 148:1,4,6,7
148:24 149:4,5,20
150:23,24 151:2,9
151:15,17 152:1
152:11,13 153:20
154:1,8,24 156:5
156:9,12,16
157:19,22,24
158:12,18 159:15
160:11,13 161:8
161:15 163:13
165:15,17,18
166:4 167:2,5,6
169:18,19,20,23
170:6,7,12,13
171:21 172:8
173:16 175:6
176:6
**caselaw** 90:4
102:18
**cases** 18:3 23:18
30:15 32:5 33:5,7
36:24 40:10 42:19
42:20,21,21,22,22
42:24,25 45:4
52:6,8,13,15
55:13 56:24 60:10
66:24 71:10 72:8
80:2 81:16 83:15
84:13 87:5 88:24
89:21,23,24 90:15
90:17 98:6 103:20

111:13 120:10,14
120:15 121:14
122:7 137:8,20
140:6 141:4
147:11,13 148:17
149:18 150:13
153:4 156:12,13
157:2 159:10
163:9 165:23
168:11,11 172:17
172:18
**cast** 136:23
169:16
**casts** 76:22 169:15
**category** 167:8
**cause** 109:22
160:7
**caused** 140:9
**causes** 76:12,15
111:25 144:9
**cenevo** 88:23
**centola** 9:6
**century** 42:21
43:6
**cenveo** 148:3
**ceo** 71:11
**ceos** 25:11
**certain** 152:19
162:17
**certainly** 16:2
18:6 84:8 88:1
100:20,21 115:13
138:5 139:21
151:2 167:3
174:21
**certificate** 68:11
68:12,18
**certified** 178:3
**certifying** 94:13
**cetera** 118:8
**chain** 65:21
**challenge** 30:5
68:5 88:5 134:18

**challenged** 29:19
**challenging** 29:20
32:8 90:14 148:22
148:23
**chambers** 8:18
12:7 17:7 33:22
33:24
**champion** 95:9
**chance** 36:8 41:25
95:15 96:4
**chandler** 152:25
**change** 31:4,10
33:14 38:1,1
55:25 72:10,25,25
105:11 152:25
**change.org** 41:20
**changed** 34:20
48:4,5,5 127:2,3
**changes** 14:15
**channel** 27:9,22
29:6 30:11 119:11
**chapman** 86:4
149:22 157:23
173:23
**chapter** 3:21 18:2
25:17,22,24 26:4
30:6 35:19,20
58:12 64:23 65:3
65:5 71:25 72:1
78:8 98:2 99:17
145:24 151:3
154:24 171:7
172:17,18
**charged** 22:6
**charter** 68:10,16
117:7,9,10
**charters** 68:8
**check** 57:20 61:11
61:12 66:10 89:2
89:2
**cherish** 106:6
**chief** 16:18

**children** 106:25
**choice** 36:1 44:11
105:3
**choose** 82:21
**chose** 91:12
**chosen** 132:17
**christopher** 7:12
**cir** 156:18 166:24
**circuit** 71:24
72:13 156:16
**circuit's** 49:10
**circulated** 173:11
**circumstance**
15:21
**circumstances**
12:1,14,16 55:24
94:15 112:24
153:4 158:18,20
161:18 165:23
**cite** 30:22 59:18
60:7 120:14
153:24
**cited** 11:2 139:13
148:20 157:2
159:11,12,16
161:15
**cites** 75:17 156:12
**citing** 25:10 31:22
31:25 32:1,2
83:11 156:2,7
166:23
**city** 8:7
**civil** 21:23 43:24
44:25 45:2,5,7
46:6 141:8 168:3
168:3,8,12,14,15
168:18,21
**claim** 2:3,8,13
11:3,6,9,20,22,25
12:4 43:22 44:6
44:15,16,24 45:10
45:10,11,11,12
47:4 57:15 60:7

62:4 77:9 81:25
81:25 82:6,9,9,12
82:25 83:9 84:2
120:19 127:24
130:13 166:21
168:1,3,16,20,21
177:6
**claimant** 107:21
107:21
**claimants** 4:15
67:13 76:14 96:1
104:10 122:25
141:17 162:16,17
**claims** 2:3 10:12
22:2 23:24 25:9
25:11 44:12,18
58:21 60:21 63:8
65:2,7,10,10 67:8
67:23 76:5 77:15
77:17 80:5 92:7
115:8 117:20
141:12 147:17
148:2 149:6
153:20,21 163:3,5
163:25 164:4,15
168:17 169:25
**clarification**
176:4
**clarified** 78:24
137:18
**clarify** 174:5
**clauses** 143:6
**clean** 135:4
**cleaner** 71:15
**clear** 11:21 12:3
14:22 19:8 55:19
59:20 63:24 66:20
70:17 71:24 74:19
75:25 85:10 93:9
102:15 105:2,4
109:20 131:14,24
134:24 144:1,17
147:24 153:12

156:6 163:13
169:13 174:3,7
**clearly** 10:7,21
13:11 14:4 24:5
37:18 38:19 40:23
44:17,20 49:5
75:20 78:1 88:24
97:19 104:20
141:14 142:1
145:14,20 148:3
149:7 151:17
159:3
**cleveland** 59:14
**cleverly** 81:11
**clicks** 58:14
**client** 75:3 90:19
91:6 124:2
**clients** 31:18 57:1
57:7 100:10 139:1
173:20
**clifford** 145:23
**clock** 34:4 67:5
**close** 39:21 67:16
93:8 160:14
**closer** 151:3
**closes** 58:12
**cobb's** 10:24 11:4
11:9,21
**code** 87:19 137:9
138:10 142:19
144:9 151:20
152:17 153:1
154:6 167:3
**cogency** 137:25
**cogently** 97:18
**collapse** 34:5
**colleague** 10:12
140:2,22 148:23
**colleagues** 149:19
157:20
**collect** 44:2
**collection** 44:5

**collective** 141:13
141:13,15
**college** 106:5
**collier** 146:6
154:10,13 161:6
**colliers** 156:4
157:7
**colloquial** 59:22
**colloquies** 55:5
**colloquy** 81:20
**colorable** 11:4
**combatants** 86:12
86:15
**come** 13:6 36:6
100:4 104:12
110:25 112:4,6
129:1 151:7
166:25
**comes** 41:18
138:6 140:21
150:22
**comfort** 76:1
**comfortable**
21:22 24:24 47:11
72:20,20 89:8
**coming** 14:10
31:2 41:15 93:7
125:12 139:23
**commence** 76:15
167:2
**commencement**
25:22 26:3 81:7
163:9 172:5
**commentary**
154:9
**comments** 96:8
172:25
**commission** 67:24
**commissioners**
8:8
**commit** 75:2
99:20

**commitment** 3:7
**commits** 58:18
**committed** 165:13
**committee** 4:14
4:17,20 6:18 7:25
8:24 9:7 11:13
21:3,22 22:5
23:15,16,16 24:14
28:24 30:3,4,7,18
38:2 41:13 43:25
48:6 51:10 58:6
58:20 59:16 60:23
62:11 63:3 64:4,9
64:20 67:16,20
68:17 70:19,20
71:1,2,9,13,22
73:20 74:15 77:19
77:21 78:5 86:25
88:15 93:13 96:1
96:21 97:5,6,9,16
98:13 99:5,16,18
100:1,12 103:9,12
105:17,22 107:6,9
108:19 109:12
110:11 116:24
119:17,24 120:22
121:16 122:10,22
122:23 124:4
125:2 130:18,20
131:9 132:5,8
133:25 134:11,19
134:20 135:1,10
136:14 142:3,16
143:16,23 144:5,5
144:15 148:10
149:3 150:3
151:14 156:20
160:21 161:2
162:5,19 163:8,21
164:9,25 165:6,9
165:11,13 169:8,8
171:7,13,15,25
172:4 174:8,10,14

174:16,19,23
176:5
**committee's** 4:11
54:2 126:11
**committees** 67:14
79:8 85:19,19
142:4 151:15
**committee's**
62:13 78:12
108:17
**common** 23:20,22
33:7 114:1 115:1
117:15,17 159:7
**commonly** 166:8
**commonwealth**
2:18
**communication**
73:19
**communications**
156:21,22
**communities**
161:9
**companies** 68:8
70:19,24 147:10
152:7,19 153:13
153:14
**company** 25:12
41:11 59:12 64:7
71:7 72:22,23,24
83:16 85:5 115:3
117:20 135:4
157:15
**compare** 127:12
127:13
**compel** 110:2
**compelled** 112:19
**compellingly**
102:19
**compensate**
109:16
**compensation**
155:23

**complaining** 40:1
101:15
**complete** 86:25
101:3 161:20
**completed** 67:7
96:21 99:21
**completely** 58:5
77:4 91:12 94:25
101:17 102:15
113:16 140:21
162:25 163:16
**complex** 30:12
70:22 90:15
**compliance** 13:18
**complicated**
53:24
**comply** 134:16
156:6
**components** 44:17
**comprehension**
108:12
**comprehensive**
67:8 96:5
**comprised** 59:3
**compromise**
158:7
**computation**
166:23
**computer** 10:25
**con** 121:8
**conceded** 97:3
**concedes** 18:11
79:25 107:16
**conceivably**
162:22
**concept** 21:21
89:16 172:19
**concern** 18:10
25:1,2,4 29:6 41:1
43:7 81:4 116:11
120:20 121:13
123:23 124:10
138:25 170:5

**concerned** 20:22
27:3 35:7 71:15
74:4 87:15 136:23
169:6 170:24
172:24 173:13
174:25
**concerns** 35:9,10
35:14 36:8 41:18
41:25 48:12 51:24
53:19 100:8
113:21 124:3
129:4 130:21
138:17
**conclude** 39:22
81:7 86:23 96:19
156:1
**concluded** 16:6
85:13 149:22,23
160:16 161:16
167:7 176:15
**concludes** 50:10
158:4
**conclusion** 28:1
32:11 110:25
147:22 164:20
**conclusions**
168:25
**condensed** 14:18
**conditions** 36:25
82:5
**conduct** 21:16
24:6 28:5,13
39:22 40:7 48:25
77:16 85:21 86:9
142:24 145:5
148:18 151:21
152:12 155:15
159:6 160:23,24
**conducted** 67:21
74:15 85:12,21
86:23,25 96:19,21
97:5 101:1 119:8
122:7 159:25

160:5 161:20
163:24 170:20
171:12,14
**conducting** 144:7
146:17,23 147:2
148:9 149:22
**confer** 141:8
176:5
**conferences** 34:7
**confessed** 140:8
**confidence** 47:23
**confidential** 60:2
69:11
**confidentiality**
21:6 40:24
**confirm** 16:8
131:3 161:12
170:3
**confirmation**
12:24 13:3,4,10
13:11 14:14,24
15:3,19,23 16:7
16:13,23 24:16
28:17 41:15,18
45:17 51:9 69:20
73:11,15,22 80:24
81:8,9,11,12
88:17 90:9 100:17
101:16,22 102:11
134:18 135:7
137:3 142:10,21
143:24 148:25
149:23,24 150:5,6
154:24 155:25
161:23 162:6
172:6 174:20
**confirmed** 15:25
16:1 45:3 46:7
47:8,16 51:20
158:16 168:9
171:20
**confirming**
174:17

confronting 18:1
confused 138:11
congratulations
  131:1
congress 24:5
  35:11 40:15 42:17
  43:8 52:5 121:23
  143:19 152:18,22
  153:13,19 158:7
congressional
  156:3
conjunction 99:15
connecting 2:9
connection 14:9
  25:15 96:11
  100:17 161:23
connectivity
  135:3
conscious 30:20
consented 11:14
consenting 3:10
  6:11 73:4,6 98:16
  98:16 99:6,18
  100:1 109:7 112:1
  142:15 162:18
  172:1 175:4
consequences
  31:17 128:25
consider 100:16
  100:22 156:7
considerable
  153:2
consideration
  96:24 160:10
  161:22
considerations
  130:9 133:7
considered
  103:19 164:17
considering 100:2
  150:8 152:18
consistent 45:2
  46:6 168:8 173:10

consistently 91:9
conspire 33:13
constituencies
  61:6 133:14
constituency
  132:7
constitutes 166:5
constrained
  108:25 109:12
constraint 39:2
construct 13:18
constructively
  101:10
construe 156:14
consulted 11:12
contain 75:18
  82:2
contained 140:13
contains 56:1
  111:2,9
contemplated
  15:24 49:24
  167:18
contemplates
  45:16 53:2
contemplating
  167:3
contend 18:17,20
  21:12 171:20
contending 24:12
contention 163:19
contentions 28:4
  94:16
contested 160:25
context 49:17,22
  83:16 85:5 140:21
  149:25 150:10
  151:11 167:1
contexts 166:18
contingences 83:8
contingencies
  47:9 82:2,24
  167:6

contingency
  45:19 46:11,12
  83:4 168:22
contingent 4:14
  44:1,7,13,19 47:4
  166:11,18 167:20
  168:1,19
continue 42:8
  49:8 59:11 156:1
  170:8
continued 153:24
continues 100:12
  168:5 172:24
continuing 3:6
  13:18
contours 82:14
contrary 25:1
  33:12 50:22 51:23
  65:13 77:8 97:22
  122:1 141:25
contribute 36:18
contribution 38:3
  49:9
control 16:3 18:24
  30:24 114:10,24
  117:12 119:15
controlled 18:7,18
  72:24 108:6
  163:20
controlling 19:1
  115:24 117:13
conversation
  168:10
conversely 166:10
conversion 45:4
  46:1,4
cool 27:13
coordinated
  98:11,13
copied 91:21
copies 92:1
  173:10

copy 173:9
copying 60:12,24
  61:1 91:25
corp 146:15
  156:24 157:10
corporate 22:14
  34:20 172:17,18
corporation 74:2
  132:14
correct 18:19
  20:21 24:18,23
  26:17 42:15 45:13
  54:11 124:9 176:9
  176:9
correctly 75:6
  82:17 134:23
  137:24
correspondence
  170:8
corresponding
  160:7
corrupt 56:25
  78:19
corruption 35:3
cost 11:9 74:17
  147:1,12 151:15
  172:7,9,11
costs 80:21 95:8
  147:2,4,4 160:7
couch 33:25
couched 22:8
  139:12
could've 26:18
  54:13
couldn't 68:10
  120:24
counsel 33:4 48:7
  57:9,9 91:17,18
  95:25 113:25
  137:13 176:5
counseling 106:12
count 134:8
  137:21

countenance
  136:7
counterparties
  82:1
counterparty
  69:2
counties 62:25
country 59:25
  68:22 70:5,8 77:8
  86:16 98:8,9
  134:3 139:18
  141:18 149:21
  178:21
country's 58:8
counts 53:11
  121:7
county 111:11
couple 152:15
courage 31:6
course 16:2 23:17
  27:8 36:6 38:1,11
  39:13,14 44:3
  58:8 62:15 65:6
  69:4 79:18 80:8
  86:5 105:10
  107:22 120:3
  128:6,15,18
  139:10,11 143:17
  144:18 148:18
  164:1,17,19,20
  172:4,23 173:8
court 1:1,12 10:2
  10:8,15,18,22
  11:18 12:6,9,10
  12:22 13:21 14:5
  14:22 15:4,9,13
  15:16 17:9,14,18
  18:14,17,22 19:1
  19:4,12,15 20:1
  20:11,15,19,23
  21:1,10 22:18
  23:7,11 24:8,11
  24:16,20 25:13,20

26:1,7,15,18,20
27:5,9,11,17
28:11,20,23,25
29:2,7,10,13,18
29:21,23 30:1
31:2,25 32:9,22
32:22 33:19 34:16
34:21 35:1,5,9,16
35:18 36:8,11,14
36:19,22 37:1,3,8
37:15,22,24 38:8
38:11,18,20,22,25
39:5,8,11,14,16
40:1,7,11,16,21
41:14,25 42:3,7
42:10,12 43:16
44:8,14,21 45:15
45:23 46:1,4,11
46:15,17,21,24
47:5,15,19 48:14
48:17,21,24 49:3
50:12,14,15,17,20
50:24 51:14,17
52:18 53:7,11
54:1,4,7,12,18,25
55:13,17 58:25
59:24 60:13,17
61:2,14,16,20
62:8 66:2,22 70:7
71:19 73:12,24
74:8,19 81:20,21
84:7,15,15,19,19
88:5,23 89:9 90:6
91:4,9,16,17,20
92:1,5,16 94:9,10
95:14,23 96:16
100:16,22 101:24
102:19,21,24
104:20,23 105:13
105:14,18 112:19
112:25 113:4,7
114:3,5,7,15,17
114:22 115:6,15

115:22 116:2,6,12
116:17,20 117:3,5
117:19,23 118:1
118:16 119:14
120:2,11,24 121:1
121:3,19,25 122:4
123:4,19,25 124:8
124:11,13,19
125:1,9 126:1,10
126:14,16,21,24
127:4,6,8,11
128:1,7,9,11,15
128:18,24 129:6,9
129:14,23 134:17
136:5,8,11 137:6
138:19 139:1,3,5
142:4,10,20,23
146:1,1,3,13,17
151:4,21 152:8,13
153:5,11 154:11
154:17 155:1,11
155:14,22,25
156:16 157:1,24
158:4,9,14 159:20
159:21,24,25
161:10,12,16,25
163:6 165:24
167:21 171:1
173:9 174:13
175:1,18,22 176:2
176:7,10,12
court's 152:9
  153:24 154:15
  157:6 167:14
courts 56:24
  84:17,23 86:9
  87:15 91:21,24
  98:7 112:22
  138:14 157:6
  160:2 161:6
courtsolutions 2:5
court's 72:14
  73:11 96:13

102:17
covered 36:15
  126:16 168:17
covers 24:21
covid 11:2
coziness 75:7
crawford 102:22
  102:22,25 112:21
create 36:25
  116:22
created 35:11
  40:15 41:3 48:3
  72:9 101:20
creates 47:3
creating 25:2
  51:24 65:4
creation 163:7
credible 118:24
credit 139:25
creditor 52:3,3
  76:10 79:17
  110:13
creditors 4:18,21
  8:25 11:13 18:1,3
  21:3,8,25 30:4
  38:2,6 43:25 44:4
  46:10 48:6 54:2
  56:12 77:15 79:5
  79:7,7,9,14 82:3
  85:20 94:20 98:1
  102:9 104:8 105:2
  134:19 142:3,16
  144:5 145:8,17
  146:14 149:3
  150:7 155:4 163:3
  163:4,8 164:24
  176:5
creditors' 85:19
  119:17,24 120:22
  122:22,23
creditor's 76:11
  96:21 97:5,9
  99:16 105:16,21

**crime** 75:1
**crimes** 75:2 140:8
  140:10 141:4,7
**criminal** 21:16,18
  21:24 56:15 141:5
  170:7,12
**criminally** 170:13
**crisis** 109:16
  151:18 170:19
  172:10
**critical** 63:11
  66:24 140:7
  144:20 173:14
**critically** 95:3
**criticism** 72:4
**crystal** 144:1
**culpability** 78:17
**curled** 33:24
**current** 80:23
  103:14 143:4,10
  146:9 154:13
**currently** 51:9
**cut** 58:17,19 59:7
  59:14,15 63:19
  67:17 73:14 78:4
  78:5 79:22 83:6,7
  93:12,21

**d**

**d** 1:22 10:1 152:7
  157:16 177:1
**d.s.** 156:17,17
**daily** 156:3
**dare** 72:8
**dark** 57:12
**data** 147:11
**date** 2:4,9 11:7
  14:23 15:9,18
  16:16 59:1 89:11
  89:12 90:8 130:14
  178:25
**dates** 15:20 16:5
**daughter** 17:20
  106:1,5

**davis** 6:3 10:19
  33:3 54:25 93:1
**day** 15:13,14
  32:22 34:4,5
  37:16 40:8 56:24
  56:24 57:17 59:20
  71:21 75:5 76:2
  80:23 87:22 99:5
  101:5 114:6
  133:23 140:3
  154:8 163:13
**day's** 50:4
**days** 13:10 16:10
  81:7,9,13 89:11
  106:5
**de** 22:14 25:11,21
  25:24 26:1,2
**deadlines** 14:10
**deal** 13:6 28:12
  35:23 37:7,9,13
  37:15,17,24,25
  41:11 47:21,24
  48:2,4 50:11 52:7
  52:9 53:25 57:2,5
  57:12 58:17,19
  59:14 61:7 62:19
  63:19 64:15,18
  67:17 69:21 73:14
  77:25 78:4,5
  79:22 80:6 83:6,7
  87:11 88:21 93:12
  93:21 100:3
  108:11,16 113:16
  126:25 127:1,1,2
  127:7,14,18,19
  130:22 131:3,9
  132:3 134:2
  136:20 137:17
  151:5
**deals** 56:25 57:10
  147:4 165:15
**dealt** 137:11

**debate** 54:22
  173:3
**debating** 109:23
**debenture** 166:8
**debentures** 166:3
**debt** 43:16 56:22
  81:18,23 83:13
  85:10,17 152:19
  153:14,16,22,22
  156:15 158:1
  159:21 166:2,5,7
  166:8,9,11,11,14
  166:14,18,21
  167:5,11,13,23
  168:24
**debtholders**
  152:22
**debtor** 1:9 6:4
  46:19 47:1 76:17
  101:6 114:22
  130:20 142:25
  143:3,4,9,10,16
  144:14 146:9
  151:22 155:15
  158:16 159:23
  162:4 163:19
  164:19 166:19
**debtors** 4:1 10:20
  11:17,19 12:13
  18:4,8,10,13,23
  20:13 21:25 22:6
  22:25 23:19,22
  24:15 25:10,17,22
  26:3,8,11 30:13
  34:19 35:13 43:18
  44:1 45:5,10,18
  47:10 48:7 52:16
  53:20 55:1,19
  60:13 61:18 65:1
  66:20 73:7 74:21
  75:10 77:15,19
  85:22 98:20
  103:21 104:2

107:22 108:5,7
  109:8,11 111:25
  113:22 114:11,24
  115:10,18,21
  116:5,7,10,22
  117:17 118:8,20
  140:8 142:2,8,11
  143:22 144:4,21
  145:10 148:10
  149:2,6 150:2,5
  151:23 162:13,14
  162:25 163:2,17
  164:1,1,5 165:6,9
  167:16 168:12,17
  168:20 169:8
  171:14,20,25
  173:5,8
**debtor's** 63:9
  66:11,25 67:20
  78:11 86:25 92:9
  97:24 99:24
  114:20 116:8
  120:6
**debts** 145:10,11
  151:23,24 152:3,4
  153:17,17 158:17
  165:17,20 167:7,9
**dec** 156:22
**decades** 170:17
**december** 50:9
  90:6
**decide** 43:4 123:5
**decided** 41:11
  77:12 90:24
  152:24 170:4
**decides** 51:1
**deciding** 157:7
**decision** 11:19
  18:11,14,16,17,18
  20:18 23:2 24:15
  28:16 30:20 41:12
  43:15 46:13 50:25
  51:5,8 53:3,11,12

54:10 62:9,13
65:20 87:4 96:14
103:16,24 107:8
109:18 110:6
116:8,15,17
119:16 131:10,14
143:15 145:22
146:2,2 157:23
**decisions**  32:25
65:21 134:21
156:19 157:9,16
**declaration**  60:15
62:6 91:24
**declined**  85:9,16
86:5,11
**declining**  146:3
**deconcini**  42:17
**dedicate**  106:11
**dedicated**  174:11
**dedicates**  106:8
**deemed**  90:1,1
92:8
**deeply**  34:25 76:3
111:13
**defaults**  45:1
133:11
**defendants**
162:14
**defense**  114:1
**defenses**  135:10
**define**  21:14,15
37:10 150:21
**defined**  140:9
166:18 168:3
**defines**  166:7,11
166:14
**definition**  37:13
**definitive**  99:7
163:12
**degree**  41:1 56:18
**del**  157:16
**delaware**  85:15

**delay**  80:8,22,24
81:2,2 90:2 147:5
151:11,16 157:4
160:7 173:23
**delaying**  95:6
**deliberation**
103:17
**delphi**  33:7 34:3
64:6
**demaximize**
122:13,15
**demonstrates**
103:10
**deniable**  55:23
**denied**  95:13
103:7 104:6
**denigrate**  55:21
**deny**  43:9 104:23
105:13 129:5
160:1 169:1
**denying**  80:3 97:2
102:20 130:16
155:1
**department**  43:20
43:23 60:17 61:2
67:9 71:11 74:11
90:23
**dependent**  144:3
**depending**  82:24
**depository**  36:16
**derived**  39:17
**describe**  56:15
58:14 60:20
**described**  58:23
76:21 77:23
140:15
**describing**  56:16
**description**  68:3
**descriptions**
59:19
**deserved**  75:4
**deserves**  72:19

**designed**  15:2
**desire**  158:8
**desperately**  95:10
**despite**  63:15 68:3
132:18
**destroyed**  59:12
**detail**  31:10 75:23
133:7,16 135:10
**detailed**  150:13
**detailing**  164:6
**details**  48:5 94:8
**determinable**
166:22
**determination**
19:22 37:12
100:23 143:21
150:4
**determinations**
144:16,25
**determine**  24:13
24:13 101:25
112:25 139:17
159:22 162:23
171:1,19
**determined**
112:22 143:24
161:25 162:20
166:15
**determines**
159:24
**determining**
160:3
**detracted**  132:10
**devastating**  94:22
**developments**
65:18
**deviate**  173:12
**devoted**  130:23
**dewey**  85:8
120:14 146:11
157:12 161:14
165:15,25 167:6

**dictionary**  166:6
**didn't**  61:18,19
61:19,20,20 62:5
62:5 63:20,24
64:12 65:4,6 66:5
75:19 82:16 83:6
85:2,23 93:5,22
107:9 108:6 109:1
115:11 117:9,13
118:9
**differed**  137:14
**difference**  127:3
**different**  13:9
20:3 52:18 62:6
62:14 78:25,25
82:19 93:20
103:15 131:13
140:21 141:9
142:6 148:1 162:7
163:1 173:6
**difficult**  23:21
30:17 48:8 55:2
55:13 90:14
106:15 135:18
**dignitary**  140:19
140:23
**dignity**  57:6 95:9
130:21 134:13
140:24 141:1
**diligence**  52:21
67:1 109:4 132:17
144:8 163:12
**diligent**  165:13
**diligently**  11:25
**direct**  76:15
**directed**  31:4
127:15 149:15
164:22
**directing**  150:4
165:8 171:7
173:22
**direction**  143:23
152:12 171:9

directly 65:13
72:24
director 148:11
directors 18:11
19:11 20:7 26:10
58:20 70:13 71:3
72:8 116:24
126:20
disagree 48:13
105:8 124:15,17
147:18,22 158:22
disagreement
148:8
disagrees 32:15
disavowed 145:2
disclosure 12:22
20:14 22:24 31:8
37:16 43:19 47:10
53:21 54:2 58:24
63:13,15,17,21
64:7,10 66:15
68:4 69:20 70:13
92:13,25 93:2
101:4,5,9,10,12
133:2 136:17
142:12 144:19
165:2,2,5
discoverable
175:8
discovery 39:8,12
39:18,21 40:18
53:22 68:21,25
69:2,9 70:3 73:16
73:18 74:3,21
75:11 77:2 80:7
85:22 94:19 98:14
101:20 124:22,22
140:13 160:25
161:2 172:1,3
175:3,9,12
discretion 45:7
84:17 104:21
145:15 153:6,11

154:12,15,17
155:19 157:6,25
157:25 159:20,21
159:22,25 161:17
168:14
discretionary
145:20,22 155:8
discuss 31:9
discussed 59:23
64:14 79:21
140:14 152:6
153:13 154:1
discussing 18:14
165:3
discussion 69:24
88:25 139:15
146:5 154:13
165:4
dishonesty 143:1
143:7,14 146:7
disinterested
70:23
dismissal 45:4
168:10
disparage 150:16
dispute 144:11
152:1,5
disrespect 139:11
disrupted 136:21
136:22
disservice 141:19
distinguish 123:6
140:19
distinguishes
124:20
distinguishing
118:23
distort 113:16
distorts 61:24
distribution 76:8
76:10 82:10,15
district 1:2 77:6
98:11,25 111:12

146:1,5 156:13
157:1 162:14
167:20
dive 57:18
diverted 95:2
diverting 95:6
division 156:10
dizengoff 4:20
docket 11:17
56:12 62:22 63:10
63:13 64:15 68:2
161:4
doctrine 104:22
document 2:6,10
2:13,23 3:8,14 4:2
4:7,13,19 5:1 36:4
36:15 41:23 66:12
68:18 69:17 174:7
documentation
163:12
documents 12:24
26:11 34:20 36:18
40:13 67:24 69:3
69:9,11,19 70:2,6
70:9 76:23 93:10
101:14 110:3
117:2,11 132:25
doesn't 74:5
75:18 78:3 81:11
84:5,9 90:4
123:15
dogged 36:10
doing 14:19 15:22
31:21 32:16 33:16
42:6,24 56:8
70:17 73:25 74:1
76:3,19 80:13
82:5 88:10 118:4
118:15 120:2
123:8 135:8 139:5
doj 47:11 50:9
81:22 82:13 83:25
91:22 104:1

doj's 44:25 168:3
168:21
dollar 64:6 82:4
111:3,4
dollars 43:13
59:12 74:17 81:3
81:15 82:9 84:2
85:23 95:2,7
130:15
dominated 30:13
34:19
domination 72:21
don't 68:9,15
70:25 71:2 75:6
77:12 80:15 81:5
81:17 84:8 85:6
86:16,19 89:9
90:14 92:21 95:15
107:12,23 108:7
109:1 113:10
114:13,17 117:19
119:4,25 122:14
122:19 136:6
139:10
dot 80:1,2,2
doubles 56:7
65:17
doubt 83:23
119:14,20 144:1
dozens 62:17
77:21 92:24,24
135:13
draft 139:12
140:1 173:5
drafted 153:7,20
154:3,9
drafting 173:6
drain 1:22 10:3
drain's 33:22
driven 71:15
drives 12:24
drop 64:13

dropped 98:1
dropping 64:5
drops 11:17 12:14
  12:15,16,17,19
  13:2 14:11,12
  17:12 46:20
drove 99:24
drugs 56:21
drysdale 102:23
due 47:13 50:6
  52:21 56:22 144:8
  163:12
dumbfounded
  112:13
duplicate 80:1
  159:6
duplicates 80:4
duplication 80:8
duration 13:24
duties 60:23 67:7
  72:1 106:19
  111:10 133:21
  149:7 155:20
  161:11 163:10
duty 110:13
dynamic 31:14

**e**

e 1:21,21 4:8 6:1,1
  10:1,1 56:14
  177:1 178:1
e.d.n.y. 146:16
earlier 16:6 60:11
  82:13 105:6 107:4
  112:10 131:20
early 82:13,14
  132:21
earth 40:3 57:16
  123:21
easily 120:22
  169:14 170:23
east 6:19
easy 22:9 26:16
  26:22,24 120:21

ecf 2:10,15,20 3:4
  3:10,19,23 4:4,9
  4:15,22 5:3
echo 105:6
eckstein 4:13 8:4
  95:20,21,24,25
  108:11 112:21
  120:6 122:24
economic 130:10
  134:14
ecro 1:25
edition 156:3
editions 154:9
editors 30:23
  31:10 155:10
  156:9
educate 81:23
effect 127:25
effectively 97:3,9
efficient 54:21
effort 11:9 80:20
  170:21
egregious 74:14
eight 111:19
eisenberg 6:17
either 22:13 37:10
  44:11 51:1 56:14
  63:22 67:3 70:6
  82:3 83:3,18 94:7
  144:22 159:2
elect 45:6 168:13
eleventh 102:5
elicits 169:18
eligible 167:1
eliminate 26:9
ellen 17:20
email 12:6 17:6
  60:17
emails 92:1,1
emarassing 68:14
embarrassing
  128:21

embodied 20:18
  100:24 122:19
  162:12
emerge 41:4
emily 17:20 106:1
emotional 106:15
  111:7 169:19
emphasized 66:24
empirically 32:5
employers 139:8
employment
  17:12
enacted 158:7
enacting 152:17
ended 22:20 84:13
endless 56:1
  100:13
ends 13:8 140:11
enforcement 44:6
engage 34:13
  128:3 174:22
engaged 149:14
  164:14
engagement
  173:17
engages 140:4
enron 42:21 43:6
  147:14
ensure 31:15
  134:13
entail 143:21
enter 12:2 53:12
  58:15 107:8 116:8
  116:17
entered 11:17
  23:20 73:12 108:5
  108:10
enters 46:19 47:1
entire 19:12 23:9
  39:20 70:2 71:6
  79:13 82:25 104:4
  136:14 141:18
  162:8 173:16

entirely 22:20
  74:16 86:5 131:15
  150:12 173:21
entities 4:8 62:19
  78:8 98:22 125:4
  142:15 151:13
entitled 52:4,9
  56:20 69:19
entity 87:1
entry 62:22
  115:24
epical 57:6
epidemic 56:16
  106:4,12 109:15
equally 32:24
  60:11 131:14
equity 72:6,7
  134:1 145:8,17
  150:9 153:15,15
  160:21 161:1
erases 58:6
eric 8:12
erickson 161:8
error 58:18
escaped 61:14
eschew 28:4
eschewing 29:2
especially 13:10
  130:19
essence 18:18
  56:23 57:10 131:8
  161:23 171:17
essentially 13:8
  68:7 90:19 100:22
  101:8,19 131:5
  141:17 172:12
established 96:24
estate 53:16 65:5
  67:6 76:5,12
  94:25 109:22
  111:25 113:4
  145:9,18 146:14
  150:7 159:2

estates  21:25
    104:8 163:2
et  2:17,18 4:21 8:8
    118:8
ethe  72:7
ethical  57:24
evade  73:11
evaluate  41:3
    107:24
evaluating  51:6
    53:7
evaluation  155:21
event  31:12 45:3,4
    54:4 76:7 166:13
    166:20 168:10,11
    174:20
events  15:22
everybody  12:12
    44:12 47:7 64:16
    66:9 68:24 73:24
    111:22 120:10
    136:20
everybody's
    107:19
everyone's  151:17
evidence  18:13,22
    18:23 19:4 25:14
    25:20 26:2,7
    27:20,25 32:25
    39:17,24 43:17
    56:1 68:6 75:8,8
    97:20,21 114:18
    118:9 124:9 138:8
    150:16 160:11
    164:11 171:3,21
evidenced  166:8
evidentiary  94:16
    94:18 163:18
evil  56:16
ex  111:11
exact  89:14,14,14
exactly  36:13
    43:15 59:19 67:4

106:1,21 121:12
    123:22 133:13
    135:6
examination  19:6
    19:18 61:8 74:5
    87:24 97:13 112:6
    120:19 124:20,23
    125:2,14,24
    127:21,24 137:16
    142:18 143:6,11
    146:19 147:3,6,14
    147:16 149:2
    157:8 158:5 159:5
    159:7 162:3
examinations
    112:5 147:2
examine  19:9
    51:11 101:24
    107:5 111:20
    112:5,6 125:5
examined  108:2
    111:23,24 112:1,2
    112:3,3
examiner  3:22 4:2
    4:7,12,18 19:6,9
    19:25 23:9 26:21
    28:15 35:11 38:12
    38:13,16,17 39:2
    40:15 41:2,17,20
    46:16 49:2 60:13
    60:18 64:2 79:6
    80:5,10,21 84:6
    84:18,20 85:9,16
    86:1,7,11,20
    88:18 89:1 90:2,7
    90:22,25 91:2,7
    91:20 93:6 96:17
    100:21 102:4,14
    103:8,12 104:5,6
    104:12,16,21
    105:1 107:4,12,14
    107:23 108:2,2
    109:18 110:17,20

112:7,10,12,13,19
    112:24 113:1,5
    120:8,13 121:24
    122:2,8 128:16
    129:18 137:8
    142:7,17,24
    144:12 145:4,7,15
    146:4,10 147:19
    148:7 150:1,18
    151:1,7,21 152:2
    153:3,6 154:18,20
    155:1,11,12,15,23
    156:15 158:6,11
    158:13,15,19
    159:6 160:1,6,14
    160:16,17,22,23
    161:7,10,13,18,19
    161:21 162:23
    165:24 170:25
    171:1,23 172:2,11
    172:13 173:7
    174:22 175:3,9,25
    176:4 177:9
examiner's  38:21
    147:3,22,23
    155:20 156:2
    172:11
examiners  24:5
    42:18,24 52:5,13
    81:17 145:24
    147:8,11,12,15,24
    175:7
examiner's  86:1
examining  108:1
example  16:6
    28:24 33:21 49:3
    73:3 87:20 138:22
    155:19
examples  29:5
exceed  145:12
    151:25 152:5
exceeded  158:1

excellent  10:23
exception  66:16
    75:1
exceptions  83:16
    157:2
excess  158:17
    164:3 165:21
    166:3
exchange  71:4
    100:19
exclusion  51:2,3
exclusively  174:8
excusable  11:22
    92:6,9
excused  90:11
executing  71:17
executive  98:13
executives  71:11
exercise  154:17
exercised  36:24
exercising  119:15
exhausted  42:11
    42:12 64:5
exhaustive  67:22
exhibit  60:15
exist  51:5 65:4,6
    66:5 93:20 109:1
    163:8
existed  53:19
    136:14
existence  36:6
    127:20 162:10
exists  86:2
exit  130:17
expect  172:5,7,13
    172:15 173:3
expenses  155:24
experience  101:18
    172:16,18 175:5
experienced  77:8
explain  57:13
    63:18 75:23 84:4
    102:14

**explained** 18:9
75:20 76:25 98:22
101:16 108:7
133:4
**explains** 58:1
66:13 76:21
**explanation** 73:4
129:16
**explanations**
136:5
**explicitly** 13:15
**explore** 28:21
98:18
**explored** 99:22
**exploring** 134:23
**express** 79:16
**extend** 2:19,19,22
3:8,13 15:19
177:7
**extension** 11:5
13:24 14:23 15:17
17:3,6 56:23
177:8
**extensions** 16:17
**extensive** 23:1
85:22 88:12 97:21
98:6 99:16 101:5
137:19 149:1
152:13 157:25
163:12,24 164:6
**extensively** 99:22
101:17 129:19
**extent** 23:13 96:6
**extra** 15:13,14
**extraordinarily**
12:21 48:8
**extraordinary**
24:3,4 58:4 74:25
79:3 80:20
**extremely** 75:20
83:9 137:5 149:8
**extrinsic** 166:20

**eyes** 58:12 67:16

**f**

**f** 1:21 178:1
**f.2d** 156:17
**f.3d** 166:24
**fabrication** 58:23
**facet** 110:6
**fact** 11:7,23 22:23
26:18,24 31:2
32:5 35:5 39:25
42:1 44:4,5 47:10
51:23 52:22 53:5
55:3,7,23,25 56:7
56:25 61:5 62:2
64:7 65:24 72:23
73:17 75:10 77:13
79:9 83:14 84:17
87:14 88:8 94:8
100:6,18 101:1,3
101:4,15,17
103:12 105:11
112:18 113:18
115:9,16 116:3,4
117:14,15 119:15
119:21 120:18
127:1,2,13 131:2
131:21 135:2,9,19
136:3 138:2
140:20 144:1,12
145:21 146:1
147:20 148:5
150:17 151:2
158:1 159:1
161:24 162:19
164:13 165:19
167:12 169:9
170:7,7 172:23
175:6
**facto** 22:14 25:11
25:21,24 26:3
**factor** 147:5
171:17,21

**factors** 72:16 80:3
146:18 160:2
**facts** 25:10 29:6
33:14 50:5 53:5
56:3 58:13,16
60:9,21 62:1 63:6
73:23 78:4,21
82:20 93:7,9,9,11
102:13,18 108:7
112:25 118:18,19
119:11 124:10,16
124:17,18 126:4,5
126:8 129:1,4
133:19 136:5
141:1 146:20
147:21 152:11
158:17
**factual** 49:6 60:21
62:4 86:22 93:24
94:16 96:18 97:13
113:19 135:10
**fade** 133:12,13
**fail** 103:4
**failed** 49:16 87:11
102:18
**fails** 13:7 78:9
**failure** 11:21
103:10 147:8
154:25
**fair** 51:13,16
56:13 63:3 72:17
73:5 132:23
134:22 148:13
171:2
**fairly** 26:24
**faith** 174:1
**fall** 167:8
**falling** 34:6
**falls** 167:12
**false** 29:14 60:7
60:21 65:25 77:9
79:24 80:19 93:14
93:15,17,21,25

94:5,6
**familiar** 27:15
66:2 85:18
**families** 15:25
18:4 23:13 41:9
49:9 62:12 68:1
75:15 106:13
134:9 142:12
**family** 7:18 18:7
35:14 55:22,25
97:25 134:8
137:21 141:6
**fantasy** 13:5
**far** 21:23 25:13
28:12 37:9 40:18
43:16 51:12 52:1
66:19 114:24
136:7 137:15
138:18 143:15
169:9 172:23
175:9
**fatal** 58:18 90:17
**favor** 156:12
**fearsome** 134:5
**federal** 61:2 65:4
67:7 77:6 98:7
136:4 141:16
167:15
**fee** 74:1 81:1
172:14
**feel** 13:1 42:11
47:12 48:11 74:5
108:1 112:19
135:17
**feels** 111:21
**fees** 95:1,4
**feinberg** 77:7 94:4
94:6
**feld** 8:23 105:16
**felt** 66:9 101:12
108:25 109:4
143:19

fend 87:9
fiber 65:14
fiduciaries 67:7
  78:7,8 133:15
  138:9,19 150:12
  163:2 164:10,12
fiduciary 60:23
  61:10 72:1,2
  74:11 81:5 104:13
  106:19 110:12
  111:10 122:13
  133:21 146:20,21
  159:3 163:9
fielded 109:9
fifteen 17:19
fifth 116:21
fighting 71:11
  106:11
figure 24:11 26:16
  26:22
figuring 43:1
  130:12
file 2:3,8 11:21,25
  12:4 22:23 34:21
  109:21 112:11
  128:24 130:13
  150:5 177:6
filed 2:13,23 3:9
  3:14,22 4:2,7,13
  4:19 5:2 11:7
  17:11 25:17 37:19
  56:5 59:4 62:21
  66:12 83:25 85:14
  86:21 89:10 90:5
  93:10 96:2 102:25
  110:1 137:14,25
  139:22 171:8
filing 2:12 59:14
  66:2 94:10 142:9
fill 56:6
filled 62:1
final 17:11 37:16
  41:11 47:2,24

48:2 60:15 66:19
  66:25 93:19
finally 77:3 78:23
  80:11,12 88:20
  89:16 101:22
  133:3 155:25
  161:14 166:17
financial 75:14
find 17:25 71:12
  86:5 147:17
  160:15
finder 123:2
fine 10:15,22 24:8
  26:15 29:8 38:3
  40:14 51:23 53:17
  54:15 120:18
  125:10 127:23
  132:18,19 136:11
fines 130:16
finish 116:12
finished 101:5
  123:3
fired 60:18
firm 33:4 72:7
  134:2
firms 32:6 72:9
first 10:10,11
  20:23 21:15 34:17
  55:18 59:19 62:4
  65:21 66:8,11,12
  68:8 72:15 81:9
  84:4 95:16 96:12
  101:18 105:23,24
  108:4 113:12
  118:17,20 119:25
  122:9 150:11
  152:17 163:13
  164:5 168:6
fisher 8:12
fit 58:11
five 81:13 87:7
  107:2,13,16
  125:21 165:4

fixed 47:4 81:23
  82:22,23 83:1,4,9
  83:12 84:1 145:10
  151:23 152:3
  153:17 158:17
  165:19 166:5,7,12
  166:12 167:8
  168:23
flags 21:9
flat 132:14
flatly 56:2 60:21
flaw 103:10
flick 75:13
flip 87:17
floor 6:19 7:19
  8:9,18 33:24
fluctuation 83:5
focus 16:12,22,23
  16:24 50:17 52:19
  90:16 105:20
  113:15 146:13
  161:14 162:8
focused 77:10,13
  153:14 167:4
focusing 46:18
  51:7
fogelman 8:21
follow 91:1 145:2
  147:16 159:19
following 27:24
  92:22 94:9 105:24
  106:23 119:7
  130:14 149:1
follows 62:13
food 156:23
footnote 33:21
  139:4
foray 95:6
forbear 44:4,5
forbearance 44:8
force 88:17
forebear 44:6

foreclosure
  133:13
foregoing 11:16
  143:6 178:3
forensic 67:25
foreordained
  65:15 66:6 93:18
  131:9,16
forever 59:11
forget 169:21,22
forgetting 169:20
forgive 169:22
forgiveness
  169:20
forgotten 60:14
form 55:20
  138:19 166:7
formal 89:13
formally 70:14
  71:8
formation 64:8
formed 66:7
  67:21 94:14
former 77:6 143:4
  143:10 146:9
formulations
  142:17
forth 10:23 53:23
  142:12,18 153:2
  165:9 167:13,24
forthcoming
  30:22
forum 34:18
  70:10 76:4 129:1
forward 22:25
  43:15 91:2 104:13
fought 111:5
found 24:10 30:12
  59:19 75:19 81:20
  85:25 86:6 106:21
  112:12,12,13
  157:3 161:3

**foundation** 65:13
**four** 49:18 73:20
77:23 78:5 80:14
106:22,23 111:2
113:12 129:12
**fourth** 6:19
**framework** 30:5
52:20,21 59:7
65:19 66:3,7,18
66:21 93:17,17
99:3,4 103:15,24
107:8 108:5,10
109:11 110:9
162:12 163:10,11
**frankel** 7:24
**frankly** 15:21
54:13 55:8 87:7
101:8 136:5
150:14 159:7
162:7 165:4,10
170:1
**fraud** 75:1 143:1
143:7,13 146:7
**fraudulent** 65:1,4
65:8 163:4
**free** 11:1 20:9,16
26:25 76:15
134:21 135:5
**frequently** 30:14
**friel** 56:20
**friends** 63:4
**front** 15:2 31:13
32:6 33:4 40:13
118:7 136:4
139:22
**frontier** 33:7
**frowning** 60:6
**froze** 46:21,25
**fruit** 107:10
**full** 44:12,13,14
44:16 45:10 70:23
109:24 133:5
139:2 168:21

**fully** 147:7 160:22
161:2
**fundamental** 55:6
103:10 138:15
**fundamentally**
48:4 68:20
**funded** 153:22
167:5
**funding** 146:15
**funds** 151:18
**further** 3:12 14:1
15:19 33:20 52:21
61:8 66:4 76:13
94:19 98:3 127:18
**furthermore**
108:12
**future** 17:24
32:17 60:5 77:10
118:10 121:5
123:12,13 139:21
162:22 166:12

**g**

**g** 10:1
**gaps** 56:6
**gather** 24:14
**general** 28:4 58:9
59:2 61:7,20
62:18 65:8 67:11
77:21 98:8 164:2
**generally** 39:19
166:7,25
**generals** 149:13
**generate** 56:21
**generous** 87:13
**genuinely** 79:13
136:2
**getting** 12:23
42:14 47:11 52:9
140:16 146:22
**ghr** 152:7 153:13
154:1
**give** 41:11 63:6
73:4 82:1 87:9

95:14 117:11
128:5,11 139:25
143:18 174:12
**given** 11:6 14:16
16:3 53:18 79:7
80:16 106:14
115:16 118:24
124:10 130:11
149:17 150:12
151:12 161:19
163:15,23
**gives** 83:7 84:17
159:20
**giving** 83:22
**glad** 12:17
**glenn** 85:9,13
86:17 87:3 96:14
158:12 165:17,25
166:10,17
**gm** 34:5
**go** 10:4 14:23 16:4
19:18 20:2 22:25
27:5,12,19 29:3,7
33:20 41:2,22,24
48:12 54:22 68:10
79:4 81:1 87:21
100:13 107:13,24
109:24 113:10
114:8 118:12
119:5 120:12
121:25 130:5
132:7 137:3
151:18 155:10
157:9,17 168:7
170:19 175:14
**goal** 131:17
**god** 119:5
**goes** 21:10 34:23
38:4 57:8 61:9
65:12 68:5 138:18
152:6 154:1,21
156:4 158:20
166:4,10 168:9

175:2
**going** 19:19 20:2
36:3,4,5,15,18
38:7 40:16 41:21
41:22 43:15 46:7
51:11 55:10 56:10
57:19 62:2 68:13
77:1 78:22 81:14
83:11 85:18 87:17
93:23 101:24
105:20,23 112:11
112:14 123:12
126:10 130:22
133:15 150:24
**gonzalez** 120:9
**good** 10:2,6 14:13
20:1 27:11 31:15
47:12 54:24 81:4
85:24 94:21,24
95:20 102:25
117:8 125:16
126:14 143:18
152:24
**goodness** 127:8
**goods** 145:11
151:24 152:4
153:18,21 165:20
**gotten** 75:12
80:18 131:22
132:14 170:22
**govern** 57:24 62:7
**governance** 22:14
26:11 34:20 41:9
117:1,11 123:24
137:2 172:17,18
**governing** 72:13
90:17
**government** 70:5
86:15 134:12
**governmental** 4:8
4:14 62:19 78:7
87:1 96:1,22
98:22 125:3

[governmental - highlighted] Page 21

142:15 151:13
**governments**
98:10,16 141:16
**graces** 31:15
**gracious** 91:10
**graciously** 13:16
13:17
**grant** 11:19 12:1
16:15 17:3 54:10
155:11
**granted** 16:17
18:6 119:21 177:6
177:8,9
**granting** 2:13
11:4 12:2
**great** 42:20 55:8
61:23 68:5 75:23
84:23 88:21 93:2
100:8 113:12,15
120:15 126:25
**gregory** 7:22
**grew** 64:20
**gross** 79:22
**ground** 104:23
115:1 155:2
**group** 3:9 4:9
6:11 7:7 11:13
13:25 63:2 73:6
79:17 94:23
102:23 103:3,6,9
103:16 105:7,9
106:24,24 109:8
111:16 122:23
140:14 142:15
148:16 149:5,10
149:11 155:3
175:4
**groups** 56:13
62:20 73:4 104:11
104:12 105:4
106:23 109:9
122:9 123:8 149:9

**group's** 103:20
**guarantee** 40:11
**guess** 22:7 31:5
37:3 56:10,21
60:24 66:9 72:15
75:19 123:6
125:13 132:11
139:16
**guidance** 54:16
147:23,24
**guide** 96:23
**guilty** 25:12
130:16
**guise** 155:5
**gump** 8:23 57:8
57:15 105:15
**guy** 43:1,4

**h**

**h** 4:13 8:21 56:14
156:3
**hadn't** 121:7
**hage** 7:17
**half** 37:16 43:13
74:17 105:20
**hand** 15:4 22:16
50:8 162:13
170:15
**handful** 31:13
96:10
**handling** 10:13
**hands** 53:23
**happen** 46:8
59:23 60:2 81:14
93:5 107:9 108:6
133:24
**happened** 17:23
58:10,22 60:2
62:16 67:4 74:5
80:13 84:14,22
85:5 107:10 121:7
141:21 144:12
148:14 169:17,17

**happening** 121:13
166:20
**happens** 39:16
72:11 89:1 127:22
**happy** 10:4 11:15
60:6
**hard** 12:14,17
32:18 55:11
107:18 111:5
144:23 145:1
147:2 163:22
**harder** 134:5
**harm** 49:21,21
138:3,4
**harmed** 138:5
**harms** 16:22
140:8
**hasn't** 80:18
**hat** 60:15
**hate** 56:14,14
**hauer** 8:23 105:16
**haven't** 118:8,23
120:4
**hazard** 56:10
**head** 68:13
**headed** 154:15
**headline** 34:11
**health** 2:24 3:15
**hear** 10:7,9,20
14:3 17:16 46:22
55:14 95:15
137:23
**heard** 55:14 71:17
83:14 96:7 97:17
97:20 98:3 105:17
105:19 113:13
115:17 140:20
164:20
**hearing** 2:1,3,4,8
2:10,12,19,22 3:6
3:12,21 4:1,6,11
4:17 5:1 10:4
12:25 13:10 14:24

15:9,10,11,20,20
15:23 16:7,14,15
16:16 22:24 25:5
37:17 49:17 50:4
50:9 64:13 69:5
81:8,10,11,12
89:6 90:5,9 101:6
101:22 130:11
134:18 137:10
142:1,23 144:19
148:25 161:4,23
161:24 163:14
165:5 167:22
172:6
**hearings** 14:17
34:7 58:25
**heat** 139:25
**heels** 58:14
**held** 2:4 72:22,24
84:16 86:4 90:6
**hello** 92:2
**help** 19:23 80:25
130:13
**helped** 75:2
103:22
**helpful** 75:18,21
136:16
**helping** 106:13
**here's** 62:4 68:23
71:6
**hesitant** 33:15
96:6
**hey** 92:18
**he's** 62:4 78:20
91:19 102:16
107:19
**high** 147:12
**higher** 82:4
**highest** 59:2
147:13
**highlight** 103:3
**highlighted** 81:20

**highlighting**
158:6
**highlights** 62:2
**highly** 30:8 47:17
61:5 77:7 86:13
86:14 98:25
145:21
**hire** 31:19
**historic** 18:24
64:6
**history** 27:9,22
29:6 30:11 34:13
67:4 69:18 83:11
84:5 119:11
152:10,14 153:12
154:1 156:3,8
167:4
**hit** 62:2 87:2
112:9 134:5
**hoc** 3:9 4:11,14
6:11,18 7:7,25 9:7
11:13 58:6 63:3
77:21 85:19 95:25
97:6 99:5,18
100:1,11 103:9
106:24,24 109:8
140:4 142:14
144:5 171:25
175:4
**hold** 173:24
**holders** 145:9,17
150:9 155:4
**holiness** 75:9
**home** 81:1
**hon** 1:22
**honestly** 63:19
114:22 128:20
**honor** 10:6,16
11:16 12:5,8,10
12:20 14:3,6,20
14:25 17:8,10,15
17:17 19:23 20:25
22:17 23:5,16

24:1,19,23 25:1
25:18,25 26:11
27:1,10,16 29:5,8
29:8,11,16,22
30:25 31:24 33:18
34:17 35:12,17,23
36:23 38:4,23
39:4,10 40:5,10
41:15 42:6,16
43:9 44:1,3,10
46:14,22 47:7,12
47:20 48:19 50:6
51:19 54:17,19,24
55:2 61:23 63:5
64:2,25 69:1
71:23 76:24 78:22
79:15 82:16 83:21
84:21 86:17 89:16
92:12 95:12,19,20
95:21,24 96:2,3,7
96:12 97:17,20
98:2,4 99:2,19,23
100:11 102:20,22
105:6,15 113:6,11
114:13 115:14
116:1 117:6
118:14 119:23
120:5 121:12
123:18 124:16,25
125:7 126:8,12
127:10,23 128:22
129:3,8,10 136:9
174:5,18 175:16
175:17,21,25
176:3,11,14
**hooey** 33:10
**hope** 13:5 92:9
95:21 118:10
151:17 174:24
**hopes** 36:17
**horrible** 71:10
74:14

**hospitals** 106:24
**hot** 125:15,16
**hour** 37:16 102:5
105:19
**hours** 76:2 78:16
109:23 130:12,12
**huebner** 4:3 6:8
10:6,9 12:10
14:23,25 15:8,15
17:7,8,10 54:19
54:25 96:13 97:17
98:21 101:6
103:14 108:7,11
112:21 117:8
120:16 129:10,15
136:12 137:4
173:19 174:5,6,17
**huebner's** 96:5
**huge** 57:10
**huh** 29:23
**human** 57:7 95:9
151:8
**hundred** 58:5
69:17 72:20 80:6
85:23
**hundreds** 56:11
67:5,13,24 70:18
78:16,16 95:2
98:9 102:9,9
109:23 132:15
137:21 141:16
169:23 170:15
**hyde** 5:25 178:3,8
**hypothetically**
83:1

**i**

**i.e.** 21:24 115:2
122:12 152:2
153:11 158:8
169:4 172:11
**idea** 20:1 24:1
25:21 26:13 34:10
93:6 110:22

**ideally** 13:5
**identification**
67:23
**identified** 94:17
**identify** 47:9
**ignore** 93:9
124:11 125:11,12
125:14
**ignores** 75:10,16
77:5,18 103:5
156:12 162:25
163:7,10
**ii** 24:18
**iii** 145:23
**iii.3** 168:18
**illogical** 29:15
32:18 139:7
**image** 27:13
**imagine** 30:17
32:18 61:1 164:16
**immediately**
119:20
**impending** 34:5
**imperative** 31:14
**impetus** 32:7
**implication** 50:3
**implications**
156:7
**implicitly** 13:15
29:1
**imply** 49:5
**importance**
124:17 150:10
**important** 19:17
20:12 27:1 32:24
50:20 55:4 57:5
62:9 65:18 96:11
102:6 103:25
110:19 115:23
126:1,4 127:17
129:22 130:4
136:13,18 137:17
139:14,17 151:9

152:16,20 170:18
**importantly**
 26:10
**imported** 131:25
**impose** 73:17
 104:17
**imposed** 39:2
**imposition** 14:19
**impossible** 18:6
 38:6
**imprimatur** 80:17
**improper** 31:21
 40:18,24 50:14
 61:7 85:14 86:21
 87:14
**improperly** 32:16
 87:23 144:24
**impropriety**
 61:15 71:11
 129:24
**improve** 127:18
**improved** 62:14
 149:16
**inadequacy** 23:25
**inadequate** 21:12
 24:2
**inappropriate**
 75:22 76:16,23
 84:18 86:20 95:6
 96:17 135:2,24
 158:19 159:5,7
 164:8
**inappropriately**
 135:24
**inartfully** 144:23
**incarcerated**
 10:24 11:24
 130:13
**incarceration**
 12:16
**inclination** 171:4
**include** 15:24
 74:12 156:15,19

160:4
**included** 124:4
**includes** 49:20,22
 49:23 110:14,14
 114:10 140:24,25
 142:10 147:3
 160:10
**including** 12:16
 35:24 50:24 60:22
 61:6 62:13 63:12
 65:21 72:20 73:19
 75:15 79:1,10
 80:21 86:15
 107:20 115:23
 116:7 119:18
 122:10 123:10
 136:15 139:19
 141:22 142:14,25
 146:18 149:15
 156:20 157:3,10
 157:20 159:10
 162:17 172:4
**incompetence**
 143:2,8,14 146:7
**inconsistent** 37:18
**incorporation**
 68:12,18
**increase** 103:22
 160:7
**increasing** 38:3
**increasingly** 86:7
**incredible** 48:6,7
 127:9
**incredibly** 74:20
 136:13
**independence**
 22:11,13 28:16
 54:9,10 61:11
 62:11 64:8 68:4
 107:5,17,19
 121:15 162:3
 171:16 176:8

**independent**
 18:12 20:19 21:2
 22:5,7 23:15,17
 24:17 67:8 68:6
 70:13,19 71:1,3
 74:16 77:24
 103:12,17 104:1
 104:23 105:2
 133:25 136:15
 142:9 148:11
 149:7 150:3
 164:10 169:9
**independently**
 78:5 107:14
 110:17 111:1
 131:15 132:3
 144:6,7 171:8
**indian** 98:10
 151:13
**indicated** 99:10
 101:6 134:14
**indication** 143:18
**indicted** 96:3
**indiscernible**
 13:11,13 19:8
 41:21 43:4 52:4
 54:6 55:21,22
 56:2 57:11 58:4
 58:22 61:21,23,25
 63:11 64:12 65:15
 65:16,22 68:7,17
 68:22 69:24 70:25
 71:4,13,14 72:4,6
 72:12,14,16 73:5
 73:9,10,13,16,17
 74:2,4,7,9,14,18
 75:3 76:12,12,14
 76:20 77:11,12,24
 78:14,19 79:15,16
 79:19 80:1,3,9,10
 80:15,20,25,25
 81:16,18 82:6,7,8
 82:19,20,21,22,25

83:2,2,13,13,14
83:15,19,24,25
84:6,6,7,19,20,25
85:1,4,4,6,24 86:6
86:12,21,22 87:2
87:6,10,11,16,18
87:22,24,25 88:1
88:5,7,11,13,16
88:18,19,20,22,23
88:25 89:3,7,8,10
89:20,21,25 90:4
90:5,10,10,13,20
90:20,21 91:2,3,5
91:7,12,14,15,16
91:18,20,24 92:4
92:5,8,8,9,11,12
92:17,19,24 93:2
93:15,16,18,22,24
94:1,6 95:8,10
97:19 100:21
103:5,6,11,12,17
103:18,19,20,23
103:24,25 104:9
104:11,14,15,16
104:17,18,18,19
104:19,20,24,25
105:3,5,10,11,11
105:21 111:6,12
111:23 112:16,17
117:16 123:24
124:18 126:23
129:16 130:9,10
130:11,18,24
131:5,24 132:10
132:12,13,15,21
132:22 133:6,8,19
133:20 134:1,3,8
134:12,12,15,19
134:19,21,22,25
135:2,2,5,11,14
135:15,21,22
136:1,23 169:21

indisputably 77:7
individual 7:7
  11:14 91:8 106:10
individuals 63:1
  110:14 111:2
  141:17
industry 34:6
inevitability
  100:5
inevitable 98:19
  172:22
inevitably 115:10
inexorably 93:18
inexpressible
  170:10
inextricable 115:7
  117:24
inextricably
  113:24 114:9
  118:22
infer 142:1
inference 115:7
  115:12,13
inflammatory
  169:2
influence 18:21
  20:9,16 22:15
  26:25 38:9 41:9
  123:24 126:20
  134:21 135:3
  137:2 143:23
  171:9 174:15
influenced 22:16
influences 97:15
influencing 165:8
information 38:15
  94:14
informational
  58:24 63:9 66:12
informed 95:5
  108:24
ingested 17:21

inherent 141:2
initial 20:3 60:7
  61:12 63:19 65:20
  67:17 93:12,17
injunction 2:20
  2:23 3:8,13 13:8
  13:13,19,24 14:16
  14:17 15:17 16:15
  16:19 17:2 49:18
  49:19 65:22
  109:24 113:23
  115:1 177:7
injunctive 16:10
injuries 170:17
injury 104:9
  122:25 153:23
  162:18
innkeepers 86:4
  157:24
innuendo 164:8
input 172:25
inquiry 94:14
  151:12 164:25
  174:13,13
insanely 87:11
inside 38:5 48:16
  51:22 136:24
insider 52:16
  145:11 151:24
  152:5 153:18
  165:21
insiders 52:14
  140:14 149:5
insinuate 97:23
insinuations
  51:23 144:2
insisted 81:22
institutions 75:15
  111:16
instructed 111:1
insufficient 86:2
  146:10

insular 30:5
insulated 70:14
insulting 111:17
insys 52:15
integrity 27:3
  29:18,20 34:24
  42:19 43:7,15
  47:23 52:5 55:7
  92:20 107:15,20
  110:18,21,25
  111:15 112:7
  113:15 119:8
  122:16,19,22,23
  122:24 123:2,5,14
  123:17 124:3,6,24
  125:5,18,22 126:3
  126:10,15,18
  135:23 138:9,12
  138:15 141:24
  148:18 150:20
  151:7 162:23
  170:21 176:8
intellectually
  90:12
intend 12:21
  136:22
intended 89:3
  121:24 138:4
  154:22
intensive 98:17
  99:1
intentions 169:24
interest 23:20,22
  24:4,4 41:1 42:20
  56:21 79:6,14
  90:1 98:1 101:23
  104:3,8 114:1
  117:15,17 119:18
  120:15,17 142:14
  142:22 146:21,22
  148:1 150:6,9
  154:20 155:4
  159:3 163:24

165:7 172:4
interested 90:13
interesting 89:22
interestingly
  63:16 156:11
interests 79:5
  145:8,9,16,17
  146:14 150:7
  152:21
interfere 41:17
  71:25 72:1
interfered 116:15
interference
  154:23 155:13
interfering
  114:25
internationally
  32:4,12,19
internet 11:1
interrupt 114:3
intertwined
  113:24 114:9
  118:22
interview 172:3
introduced
  145:18
inunction 118:21
invade 74:25
invaded 75:4
invectives 128:23
invent 67:4
investigate 20:17
  22:9,19 24:14
  28:15 38:13,14
  70:20 85:22 142:8
  150:18 163:16
  176:8
investigated 22:3
  22:4 93:14 111:24
  126:13 143:7,18
  143:19 162:22
investigation 21:3
  21:4,13 22:21

23:25 24:1,12
43:24 44:25 67:21
74:16 85:12 86:2
86:23,24 89:13
94:19 96:19,20
97:4,8,11 99:16
99:21 101:2 102:7
108:24 109:1,2
120:3 142:25
143:1,20,21
144:13 145:6
148:9 149:4
150:19 151:22
152:12 153:10,10
155:6,15,18,21
159:1,2,4,23,24
160:3,4,19,23
161:19 164:15
168:3 171:12,14
173:20
**investigations**
24:6 67:8 98:14
104:16,17 163:25
**invitation** 90:25
91:10
**involuntary** 167:2
**involve** 171:11
**involved** 42:23,24
52:14 67:22 75:11
97:7 98:10 100:7
108:18,23 132:18
140:12 149:9
154:5
**involvement**
90:16 129:22
**involves** 23:1
40:25 141:15,17
142:2
**involving** 18:24
35:14 172:17
**ira** 4:20
**iridium** 72:13
73:15 171:17

**ironically** 95:8
130:11 131:11,22
**irredeemable**
58:22
**irregularities**
146:23
**irregularity** 143:2
143:8,15 146:8
**irrelevance**
151:12
**irrelevant** 44:19
150:11,12 163:16
173:21
**irreparable** 49:20
**irrespective** 89:25
**irresponsibility**
63:8
**irreversible** 65:15
65:24
**irrevocable** 53:3
**irrevocably** 131:4
**isgur** 139:15,18
**issue** 15:18 16:20
16:20,22 28:1
54:9 80:25 100:16
109:15 129:17,18
133:1,23 138:25
139:19 148:2
152:6 154:7
156:16 158:22
162:2 163:22
165:16 171:5
172:1,5
**issued** 166:3
**issues** 31:9 35:9
35:10 40:12 73:9
76:4,17 90:15
109:17 111:14
138:17 139:20
149:21 161:25
162:7 166:25
172:2,21

**issuing** 91:10
**item** 10:10 12:20
17:10,11
**items** 10:11 66:21
**it's** 61:11 62:1
63:3 68:13,22
70:8,9 72:13,13
72:17 76:17 79:6
79:21 81:14 82:22
82:23,25 83:2
84:7 88:3 89:13
89:21,21 90:9
91:21,23 104:7
106:15,21 107:9
107:18 108:12
111:1,17 117:10
117:10,11 118:13
121:17
**i'll** 63:6 86:19
87:9 95:14 108:2
116:21
**i'm** 62:2 76:25
78:22 83:11,22
90:6 92:7 93:23
96:3,6 105:20,23
118:13,14,19
**i've** 70:17,18
92:12 120:11,12

**j**

**j** 7:12 145:23
**jackson** 3:23 5:2
6:25 17:16,20
21:8 25:4 35:25
41:19 49:1,14
52:2 55:22,25
88:2,14 91:11
105:25 106:1,8,15
110:15 134:8
137:7,7
**jackson's** 4:6 27:2
**jacksons** 17:22
18:3

**jackson's** 106:4
**jacquelyn** 10:12
10:19
**jaded** 70:15
**james** 2:14
**january** 76:25
**jnl** 146:15
**job** 38:2 61:18,19
61:19,20,21 80:15
80:16 93:22 135:5
139:5
**jobs** 76:3 135:23
**join** 31:6 86:11
104:19
**joined** 79:11
**joining** 56:16
**joint** 78:14 113:25
**jonathan** 3:22 7:4
17:15 147:8
**joseph** 7:17,22
**journal** 60:12,16
60:25 145:25
173:2
**journalists** 91:22
**jr** 145:24
**judge** 1:23 10:2
16:18 27:6 31:16
31:18,21 32:13,16
33:16,16,22 35:20
39:17 59:13 64:21
77:6 85:1,8,13,16
85:24 86:4,17
87:3 94:4 96:14
98:24,25 112:9
120:9 131:2
133:13 135:13
139:15,18,18
145:14 149:21
155:19 157:19,20
157:20,21,23
158:3,12 159:15
159:17 160:13
165:17,25 166:10

166:17 173:22
**judge's** 145:21
**judged** 129:2
**judges** 30:14,19
   31:13,15 32:7
   33:12 43:6 123:10
   138:22 139:11,14
   148:21
**judgment** 53:25
**judgments** 167:18
**july** 91:6 157:11
**jump** 115:11
**june** 1:16 2:1
   178:25
**justice** 43:20
   60:17 61:2 67:10
   74:11 90:24
   138:23 140:17,18
   140:19,19,23,23
   140:23 141:1,2,3
**justice's** 43:24
**justification**
   70:11 102:12,16
   104:4
**justified** 42:14
   79:23
**justifies** 121:15
**justify** 56:4
   113:23 146:10

**k**

**kafkaesque** 55:3
**kaminetzky** 2:24
   3:14 33:6 173:18
**keep** 14:9 37:8
   40:17 69:10 76:23
   83:22
**keeping** 121:15
**keeps** 76:22
**ken** 77:6 94:4,6
**kenneth** 4:13 8:4
   95:21,24
**key** 16:23 30:18
   42:12 80:2 122:6

149:4 162:9
**kill** 56:15
**kind** 27:13 72:18
   74:24 88:3 107:7
   107:9 108:1
**kindest** 108:18
**knew** 60:24
**know** 12:12,15,21
   12:22 13:3,8 20:6
   20:10,15,23 22:22
   23:18 25:1,6 31:1
   31:15,20 32:11
   33:11 36:3,4,17
   39:3,20 40:5
   42:16 43:25 46:7
   46:14 49:18 51:4
   52:8 53:4,20 55:2
   61:1 63:23 64:11
   64:14,17 70:25
   71:2,21 72:19
   75:6,17 77:11,12
   79:12 80:11,12
   85:2 86:16 87:17
   89:10 91:23 92:19
   92:23 96:8 101:13
   105:19 107:4
   114:13,17 116:22
   118:4,6 120:1
   122:14 123:15
   125:6 128:19
   129:10 135:1,1,16
   136:7 137:22
   139:11 144:23
   172:9,21 173:23
   174:11,15,21
**knowing** 128:4
   165:12
**knowledge** 94:14
   121:16
**known** 30:8 82:15
**knows** 12:11 47:7
   60:3 71:19 98:4
   99:2,19 123:7

**knudson** 10:13,16
   10:19,19,23 12:5
   12:8
**kramer** 7:24
   95:21,25

**l**

**l.p.** 1:7 2:14,17,24
   2:25 3:1,2,2,3,4
   3:15,16,16,17,18
   3:18,19 4:3,21
**la** 9:9
**laches** 85:3 89:17
   89:18 104:22
   113:2 155:2
**lack** 154:15
**lacks** 138:9
**lafayette** 9:8
**laid** 63:6 87:3
   110:4 126:4
   131:23 138:24
   147:7 150:14
**language** 17:4
   66:16 84:9,16
   137:19 154:5
   167:13
**large** 30:12 32:4
   32:23,24 42:19
   147:9,12,13 152:9
   174:10
**largely** 110:2
   150:11 153:14
   173:21
**lastly** 166:14
   173:13
**late** 2:13 11:6,19
   12:4 56:6 150:22
   177:6
**latest** 95:5
**laughing** 127:4,6
**launching** 66:3
**law** 2:22 5:1 6:24
   19:16 30:23 31:12
   32:5 33:11 55:4

55:17 57:24 62:3
   65:1 67:7 71:24
   72:13 78:20,21
   79:4 85:7 89:22
   91:4 102:13 119:4
   130:7 136:5
   138:13,21 141:9
   145:25 152:1
   154:8 156:9,12
   166:5,6,16 167:5
**lawrence** 8:21
**lawsuits** 59:4,10
   70:4
**lawyer** 61:1 63:22
   120:6 172:13
**lawyers** 19:17
   23:19,19 33:13,15
   35:1,3,19 40:3
   43:12 58:8 59:4
   59:11 66:1 73:16
   74:24 75:2 81:1
   119:3 137:22
   139:8
**lay** 121:7 130:2
   133:7,15,22
   158:20
**layn** 77:6
**lead** 33:4 49:25
   162:18 168:25
**leading** 22:24
   54:22 62:9 98:14
   154:10 162:20
   172:21
**leads** 47:24
**learn** 18:6 25:5
   39:22
**leases** 133:12,13
**leashes** 14:9
**leave** 154:17
   158:9
**leaving** 38:13
   130:9

lebeouf 85:8
leboeuf 120:14
  146:11 157:12
  161:15 165:15,25
  167:6
lecture 56:20
  95:10 130:3,5
lectured 91:3
lectures 129:21
led 97:9 98:12
  135:18
ledanski 5:25
  178:3,8
left 50:2,2 59:11
  66:21 118:9
  135:20 139:16
  160:19
legal 25:7 36:9
  59:2 62:7 67:23
  70:8 95:4 96:15
  118:18 138:16
  139:13 178:20
legislative 83:11
  84:4 152:10,14
  153:12,25 156:2,8
  167:4
legitimate 69:8
legitimately 52:8
length 61:23
  72:10,17 73:14
  88:6 130:2 152:7
  157:22
lengths 68:5
lengthy 157:17
  159:14 173:3
letter 2:8 21:5
  54:2 60:12,17
  61:1 75:17 76:3
  91:10 109:3,13
  133:5
letters 91:18,22
  141:5

letting 59:10
  119:5
let's 67:15,16
  70:12 72:12 74:7
  78:20 79:4,4
  81:18 83:21,24
  84:4 87:10 88:22
  108:9 122:4,5
level 47:23 55:11
  87:25 131:19
  152:23 159:21
levels 131:13
levin 7:24 95:21
  95:25
levitin 32:3,23
  34:12 35:2 139:16
  140:2,22 148:23
levitin's 139:15
  172:20
lexington 6:5 7:19
liability 21:23,24
  78:17 166:21
library 101:19
lie 71:5
life 106:8 110:22
lifesaving 95:3
lift 109:24
light 11:16 30:5
likelihood 49:20
  49:23 100:14
likes 120:10
limit 86:1 153:16
  155:12,22,23
  156:15 158:1
limitation 116:7
limitations 22:13
  89:19 155:17
limited 11:6,24
  13:23 17:5 30:3
  120:19,20 150:1
  155:20
line 2:5 30:11
  67:2,2 89:7

131:18 177:4
lines 27:14
link 27:25 65:21
  117:24 130:5
lipson 3:22 7:4
  17:12,15,16,19
  18:15,16,20,23
  19:3,5,10,14,23
  20:6,13,21,25
  21:2 22:17 23:5
  23:10,12 24:10,18
  24:23 25:18,24
  26:5,8,17,19,23
  27:8,10,15 28:8
  28:18,22 29:5,8
  29:11,16,20,22,25
  30:25 31:24 32:2
  32:21 33:18 34:15
  34:17 35:7,10,17
  35:22 36:13,17,21
  36:23 37:2,6,14
  37:18,23,25 38:9
  38:17,19,21,23
  39:4,6,7,10,13,15
  39:25 40:5,9,14
  40:20,22 41:15
  42:5,8,11,15
  43:18 44:10,16
  45:13,21,24 46:2
  46:9,12,16,19,22
  47:2,6,17,20
  48:16,19,23 49:1
  50:6,13,16,19,23
  51:13,16,19 53:6
  53:10,14 54:3,6
  54:10,16 56:3,8,9
  56:18,19 58:3
  60:8 61:22 63:16
  64:10,17 65:12
  67:3 68:20 69:12
  72:18 73:10 74:3
  74:10 75:9 80:10
  81:16 83:18 87:5

87:13 88:2,13,14
  88:21 89:17 90:12
  90:18 92:16 94:7
  94:24 95:2,14,18
  97:10,23 101:8,14
  102:14 105:21
  107:2 109:5 110:1
  110:16,23 111:15
  111:19 112:4,10
  112:18 113:9,10
  113:11 114:4,6,13
  114:16,20 115:5
  115:13,20 116:1,4
  116:10,14,19,21
  117:4,6,22,25
  118:1,13 119:12
  119:14,23 120:5
  120:13 121:2,12
  121:23 122:1
  123:3,18,22 124:7
  124:9,12,15,25
  125:6,25 126:7,12
  126:15,18,22,25
  127:5,7,8,10,23
  128:6,8,10,13,16
  128:21,22 129:3,8
  136:9,12 137:13
  139:25 140:18
  142:7 143:12
  145:2 147:7,8
  148:4,19 150:1,15
  150:25 151:19
  154:4 163:18
  164:23 167:12,23
  168:5 170:22
  172:24 173:16
  174:24
lipson's 55:5,15
  57:14 153:25
  156:11 173:6
lipson's 68:4 74:8
  79:17 80:12 85:6
  106:20

**lipton** 76:1
**liquidated** 43:22
  44:23 45:9 82:23
  145:10 151:23
  152:3 153:17
  165:20 166:5,14
  166:21 167:8
  168:1,20,23
**liquidation** 45:18
**listen** 19:16 32:20
  101:24 129:20
**listening** 78:15
**litany** 53:21 56:1
**literally** 60:16
  135:14
**litigant** 132:23
**litigants** 88:3 89:4
  111:7,11 114:1
  132:24
**litigate** 69:15
  73:14 88:16
  121:22 131:17
**litigating** 11:10
  105:4
**litigation** 4:15
  16:14,23 17:1
  27:2 52:7 53:4,6,9
  69:1,19 70:7,21
  86:8,22 88:1,3
  98:7,11,12 100:13
  105:10 115:10
  129:1 155:5 160:9
  160:12,15 162:15
  162:16,17
**little** 57:23 61:18
  64:25 111:22
  129:10 132:6
  166:4 169:3
**live** 34:19
**lived** 74:19 81:16
  87:22
**lives** 67:6 81:2
  106:11 130:24

**living** 57:13
**lj** 145:25 147:10
**llc** 157:13 161:9
**llp** 6:3,10,17 7:6
  7:24 8:6,23
  146:11 157:12
**load** 33:10
**local** 98:9
**lockdowns** 11:2
**logic** 28:7 103:11
**logical** 101:17
  115:7,12
**long** 35:13,13
  53:19 70:18 76:24
  84:14 89:19 91:25
  94:3 98:17 109:6
  118:9 126:2
  154:18 166:8
**look** 22:11,11,13
  29:23 51:22 52:13
  54:7,8 63:5 84:11
  108:9 139:21
  144:14 148:12
  160:8,9 171:5
**looked** 110:9
  117:3,5 140:20
  160:2,6
**looking** 20:20
  34:12 43:13,14
  54:8,8 110:6
**looks** 82:12
  136:24 139:20
  146:17
**looped** 60:16
**loral** 156:20,20,21
  159:11
**loss** 55:23 106:4
  134:8
**losses** 74:13 94:22
**lost** 17:20 33:8
  81:17 94:7 106:1
  106:13 133:17

**lot** 27:12 74:5
  78:24 81:4 83:12
  92:2 102:15
  107:18 119:4
  135:1
**loved** 106:7,13
**lp** 7:8 10:3
**lucky** 62:5
**ludicrous** 172:23
**lump** 21:21

## m

**m** 3:9
**madison** 8:9
**magazine** 130:7
**main** 51:10
**maintain** 80:23
  81:23
**maintained** 105:9
**major** 176:6
**making** 26:21
  28:16 29:14 35:12
  40:17 51:10 53:10
  73:23 76:9 100:22
  119:16 144:24
**manage** 48:8
**managed** 116:4
**management**
  14:13 25:21,24
  114:10,24 115:1,2
  143:3,4,9,10
  146:8,9
**mandatory** 13:19
  84:3,9 86:6 89:25
  112:24 152:2,9
  153:9 154:7,22
  155:2,7,9 156:9,9
  157:3
**maneuver** 58:1
**manipulate** 36:9
**manipulated** 18:5
  25:7
**manipulation**
  35:18

**manufacturing**
  3:1,16
**march** 89:6
**marine** 27:14,17
**mark** 128:4
**marshall** 4:3 6:8
  54:25 174:6
**martin** 5:2
**martzell** 9:6
**mass** 58:8 63:12
  152:8
**massachusetts**
  2:18
**massive** 52:21
  58:21 67:1 74:15
  80:16,17,22 98:13
  102:7 103:18
  140:12 144:8
**master** 76:8
**material** 45:1
  49:9 168:22
**materially** 45:2
  46:5 168:8
**materials** 75:12
  75:14
**matter** 1:5 10:12
  102:11 108:15
  139:4,6
**matters** 32:22
  161:1
**maximize** 170:16
**mazzeo** 166:23,23
**mcclammy** 2:14
**mcmahon** 16:18
**mdl** 58:7 59:3,13
  62:18 64:21,22
  65:8 77:22 93:14
  98:24
**mean** 54:13 91:4,4
  108:17 110:20
  118:2 122:17,25
  123:21,22 125:2
  135:22 139:11

170:9
**meaningful**  105:3
150:15 161:11
**means**  11:25
30:19 71:2 110:23
114:14,17 121:17
121:20,23 122:17
122:18 150:20
156:8
**meant**  29:17
70:25
**media**  61:1
137:24 169:15
**mediation**  13:7
15:18 16:13,23,25
16:25 59:13,23
60:3 64:21 77:5
77:10,11,20 93:14
94:3 105:7 106:25
107:1 109:7,14
127:15 128:4,10
128:13 132:2
149:15,17,22
151:9 173:14,24
174:2
**mediations**  14:10
65:22 149:1,10
**mediator**  98:25
**mediators**  58:7
59:25 61:19 77:8
78:15 109:9
149:19,20
**mediator's**  78:11
**meet**  176:4
**meeting**  85:10
131:25
**meetings**  53:22
**member**  71:22
**members**  23:15
30:7,17 64:4 71:9
71:12 72:10 73:20
74:12 99:4 103:20
106:10 110:22,24

111:9,11 130:20
137:22 148:15
165:13 174:9
**memorandum**
2:22 3:12 5:1
**mention**  67:9
103:9
**mentioned**  64:4
105:21 109:3
159:10
**mentions**  107:15
**mere**  146:6
**merely**  13:4 82:21
99:10 163:11
**merged**  63:2
**merger**  70:22
**merits**  11:8 49:20
148:2
**message**  131:14
**messrs**  30:7
112:21
**met**  85:17 154:16
154:19 156:15
**meta**  60:10
**metromedia**
49:10
**mfw**  161:4
**michael**  6:22
118:6,11
**microscopic**  23:2
**milbank**  57:9
**miller**  30:8 33:21
34:2 64:5
**million**  40:12
44:18,20,20 69:17
75:12 80:6 85:23
145:12 147:13,14
151:25 152:5
154:16,19 158:17
165:22 166:1,4
171:12
**millions**  74:17
75:13 81:3,3,15

95:7 130:15
171:13
**mind**  14:15 61:17
153:20 156:8
164:23 167:10
**mindboggling**
57:14
**mindful**  96:9
**mine**  27:17 49:16
50:2
**mineola**  178:23
**minimal**  47:23
150:10
**minimize**  55:21
80:7
**miniscule**  39:23
**minute**  67:15,16
69:7 70:12 71:24
83:24 87:13
119:14,20 165:4
**minutes**  58:14
62:17 69:15 87:7
**mischaracterize**
124:18
**misconduct**  73:24
129:25 143:2,8,14
146:7
**misconstrued**
169:15
**misdescribed**
82:17
**misdescribes**
68:21
**misguided**  52:25
95:5 138:11
**mislead**  141:21
**misled**  21:20
138:2,2,11
**mismanagement**
143:2,8,15 146:8
**misrepresents**
139:8

**mistake**  135:9
**mistakes**  89:9
**mister**  35:2
**misunderstanding**
79:22
**moment**  21:19
34:4,22 67:19
105:25 106:6
108:13 111:17
157:18 162:21
**money**  21:24,25
36:1 72:7 130:22
135:20 141:11,12
170:18
**monster**  56:16
**monte**  102:22
**month**  74:19 77:5
81:12 102:7 132:2
**months**  67:5,22
77:20 89:11 90:9
91:1 97:8 119:25
130:14 132:19
**month's**  81:2
**moral**  130:9,21
134:13 141:9
**morally**  170:13
**morgan**  156:16
**morning**  10:2,6
10:16,18 22:23
54:24 137:19
150:2
**motion**  2:3,8,13
2:19,19,22 3:6,7
3:12,13 4:1,6,11
4:12,18 10:24
11:10,20 12:2
13:22 16:16 17:6
17:11,13 18:9
20:4 23:6,8 26:21
28:8,24 29:24
43:10 49:4 54:23
55:19,25 60:7,18
61:4,12,16,24

62:12 64:2 65:16
75:1 77:3,10 79:3
79:17,23 80:1
84:12 85:14 86:21
89:1,11 90:10
91:11 93:6,11
94:12,23 95:13
96:2,11 97:2
102:20 103:4,8,11
104:4,5,13 105:13
106:3 109:21
110:5 112:17
113:8,8,13 118:21
119:21 121:10
122:6 126:8
127:16 129:5
137:7,11,20 138:1
139:4 140:5
142:18 144:2,11
144:22 148:16
154:19 156:11
157:4 160:8,9
162:2,8,10,24
163:17 169:1,3,12
169:14 172:8
177:6,7,9
**motions** 11:7
52:19
**motivated** 78:6
86:13,14
**motivating** 129:21
**motivation** 27:2
97:14 122:12,15
**motives** 122:18,21
122:21 138:11
157:4
**movant** 90:7
101:2 145:12
165:18,19
**movant's** 137:12
**movants** 97:3
103:11

**movant's** 77:9
**move** 43:10 129:5
**moved** 120:25
129:18
**moving** 105:25
119:19 160:22
**msge** 58:6 77:23
79:20 95:1 97:7
99:19 100:2
102:23 103:3,6,9
103:16,20 105:7,9
105:12 109:8
124:4 131:6 132:2
134:10,23
**multi** 4:8 77:5
98:7,11 101:5
162:14
**multiple** 58:25
61:5,6 62:25
66:20 74:12 82:2
82:5,24 83:8
98:15 102:8
163:24
**municipalities**
62:25 67:12
**municipality**
107:21 134:4
**mute** 175:23,24
**mutual** 42:22
159:15 161:3
**mystifying** 81:21

**n**

**n** 6:1 7:1 10:1
177:1 178:1
**n.d.** 156:25
157:11 161:9
**naftalis** 7:24
**name** 75:6 129:19
**named** 143:6
**napping** 33:22,23
**narrative** 58:7
**narrow** 41:4
142:16

**narrowing** 24:24
**narrowly** 41:16
**nas** 9:7 106:24
**nasty** 56:2 64:3
**national** 32:3
157:14
**native** 63:1
111:12
**nature** 30:6 73:14
80:9 88:6 89:25
115:7 122:12,13
137:16 141:14
151:8 153:10
154:22 155:3
157:3
**nazca** 27:14
**ncsg** 13:15 14:13
73:13,18 88:9
97:6 104:1
**nearly** 43:13 80:6
86:25 96:21 98:9
161:20
**necessary** 105:1
110:20 117:14
**need** 13:2 16:3
28:3 41:6 49:18
52:8 53:19 63:18
64:11 74:4 79:12
80:7 88:20 89:22
92:19 97:14 109:1
125:6 134:14
153:3 158:23
162:22 172:13
**needed** 63:21 66:9
70:19 92:17 95:3
110:10 112:6
131:17
**needing** 109:16
**needs** 61:8 86:23
92:14 93:13 96:19
110:25 146:13
159:25

**neglect** 11:22,23
49:13 92:6
**negotiate** 69:5
128:20
**negotiated** 19:14
37:7 61:7 62:19
64:18,20 66:21
77:24 97:25
109:10,10 127:19
132:3 142:13
144:6 162:12
**negotiating** 22:19
23:3
**negotiation** 52:19
52:22 67:1 88:12
98:17 103:21
105:7 128:1
150:24 151:2,3
162:9
**negotiations** 66:4
88:6 98:20,21,24
99:1,3 127:17,21
128:3 151:1,5
154:5 163:17
171:11 173:21
**neither** 33:8
**neophyte** 172:22
**never** 17:21 26:12
55:14 58:22 64:14
64:14 71:6 72:2,3
72:9,11 82:6
108:25 110:8,8,8
110:9 111:16
117:1,8 118:10
131:15 140:20
170:14 174:9
**nevertheless**
26:21 138:24
153:7 154:21
170:11
**new** 1:2 6:6,13,20
6:20 7:10,20 8:2
8:10,19,19 9:2,9

42:21 43:6 68:8
68:19 71:23 152:5
164:2
**newspaper** 69:3
**nice** 34:11
**night** 19:21 45:16
56:6 60:14 65:17
80:23 137:15
**nine** 112:9
**nip** 148:11
**noble** 61:22
**nodding** 175:15
**non** 3:9 6:11 73:4
73:6 98:16 99:6
99:18 100:1 109:7
112:1 168:1,19
172:1 175:4
**nonconsenting**
13:6,25 17:5
149:11
**noncontingent**
43:21 44:23 45:9
**nonstop** 79:11
**normal** 169:1
**normally** 72:24
87:15
**note** 12:2 13:13
36:22 84:24
103:25 148:15,20
157:1,21 170:5
**noted** 12:3 61:3
106:22 107:2
125:20 145:12
147:12 150:23
155:13 169:12
**notes** 10:25 154:2
159:9
**notice** 2:1,12 50:4
60:19 66:1
**noticing** 142:23
**notion** 37:4 50:1
50:24 130:19
153:5

**notwithstanding**
61:5 85:9 144:2
148:5 170:6
**november** 23:14
26:10 56:19 66:23
67:2 70:14 90:18
99:25 116:24
136:15
**number** 11:6
30:13 32:5,7
57:10 63:13 78:10
78:11,11,12,13,13
78:14,19 81:10
86:5,14 87:23
113:22 116:25
117:1,14,15
129:15 131:1
146:18 156:19
159:10 165:22
175:7
**numerous** 109:23
148:21
**ny** 1:14 6:6,13
7:10,20 8:2,10 9:2
178:23

**o**

**o** 1:21 10:1 178:1
**oath** 141:2
**object** 63:16
64:10 69:19,20
**objected** 15:17
63:24 88:13
**objecting** 12:18
54:23 63:15
**objection** 3:6,6
4:11,12,17,17
13:22,23 14:2
17:6 18:10 63:18
73:13 78:2 92:16
96:2 106:23 165:1
**objections** 95:16
**objective** 147:20
147:25

**objectors** 95:16
144:15 161:14
**obligated** 66:1
**obligation** 45:1
57:6 119:1,10
146:21 168:12
**obligations** 45:5
76:8
**obtain** 18:5 155:4
161:24
**obtaining** 144:19
**obtains** 47:2
**obvious** 59:18
158:4 165:11
170:6,7
**obviously** 12:22
13:2,3,19 15:16
16:12 47:25 80:19
90:22 91:3 92:14
113:3 117:4,6,6,9
123:13 150:9
163:8 165:22
168:4 174:18,19
174:21 175:12,14
**occasions** 66:20
**occur** 159:23
**occurred** 52:23
**occurrence**
166:13,20
**october** 62:21
99:8
**odd** 21:17 32:11
**offended** 29:11
34:24
**offense** 29:14
**offer** 173:25
**office** 71:23 141:2
**officers** 59:2 66:2
**official** 4:17,20
8:24 97:5 105:16
142:3,16 149:2
163:7

**officio** 111:11
**oh** 29:21 47:11
61:10 81:5 119:4
127:8 128:7,18,18
**ohio** 98:12
**okay** 10:2,15 12:6
12:9 13:21 14:22
17:9,14 20:1
23:11 26:15 27:11
30:10 41:5,6,14
43:16 47:5,19
51:17,17 54:12,18
60:25 94:5 95:14
102:21 105:14
113:7,10 114:15
121:3,25 125:10
126:14,21 129:6,9
129:14 137:6
175:18 176:2,12
**old** 106:4 178:21
**once** 18:5 41:10
81:19 82:19
108:25 110:8,23
117:17 130:12
154:15 175:25
**one's** 126:3,3
**ones** 106:7,13
157:10
**ongoing** 14:10
15:18 127:14
173:14
**opaque** 18:2
**open** 22:20 66:13
**opening** 58:3
61:24 132:19
133:4
**operated** 134:20
**operation** 166:16
**operations** 54:21
**opinion** 49:5
159:11,11,16
**opinions** 175:7

opioid 52:15
  56:16 57:4 95:8
  106:4,11 109:15
  111:6,10 151:18
  170:19 172:10
opioids 106:9
opponent 84:22
opportunity
  85:21 94:18
  101:23,25
opposed 13:15,18
  59:10 99:5 137:12
  139:5 140:1 173:1
opposes 94:23
opposing 158:23
opposite 40:20,22
  58:20 59:8,15
  62:19 77:24 93:16
  132:3,8 134:4
opposition 4:1,1,6
  55:19 103:1 113:8
  164:12
option 50:18
oral 139:24 145:3
  164:9 169:12
orally 159:18
ordained 98:19
order 2:12 4:2,6
  10:5 11:7,10 12:2
  12:6 15:1 17:7
  24:19,20 36:25
  38:5 39:1 40:21
  40:23 41:3 44:21
  47:2 48:11 53:15
  54:20,21 69:1,13
  73:11 74:1 76:22
  97:12 112:14,15
  113:23 121:18
  130:9 132:16
  142:20,24 155:14
  158:14 167:14
  172:14 173:4
  175:5,10 176:1

ordered 59:13,24
  64:21 88:4 134:17
orders 21:6
ordinarily 159:4
organized 56:13
  64:21 79:8,17
  94:23
original 31:7,9
  58:19,21 59:14
  64:18 67:18 79:22
  79:25 93:17
  103:15 107:7
  108:9 127:12
  131:4 160:19
originally 79:3
  84:20 93:21
  129:18 154:9
origins 27:19
orleans 9:9
other's 123:9
ought 131:1
outcome 49:11
  89:5 109:25
  162:20
outrageous 74:9
  77:4 91:21 94:1
outrageously
  65:25
outright 169:1
outs 46:5
outset 37:19 58:19
  66:23 98:5 99:14
outside 21:8 38:6
  48:11 53:15 55:16
  58:2 136:25
outstanding 166:2
  166:2
overall 12:4
  145:19 153:9
overdose 106:2
overseen 59:13
  77:5

overshadowed
  140:7
owe 83:3
owed 83:4
owing 145:11
  151:24 152:4
  153:18 165:21
owned 65:5
owners 18:4 59:9
  72:22,25
ownership 76:11
oxycontin 17:21
  106:2

p

p 6:1,1 10:1
p.m. 60:14
pa 7:2
page 21:15 29:23
  43:19 49:4 61:4
  65:17 66:15,18
  75:21 80:6 83:25
  89:24 133:5 139:4
  140:5,15 157:11
  161:4 164:5 177:4
pages 40:13 53:21
  58:5 63:8,14 64:8
  64:8,9 66:11
  69:17 75:12,14
  92:25 109:6
  135:13 171:12,13
paid 135:20
painful 130:23
painless 26:24
pall 169:15,16
paper 30:22 61:24
  94:12
papers 13:20
  14:21 56:4 59:18
  93:11 106:22
  109:5 114:25
  137:11 141:22
paragraph 30:16
  34:9 44:22 61:4

61:12,15,16 62:12
  65:16 79:1,25
  81:6 84:11 91:19
  92:11 107:17
  111:21 122:5,5,10
  123:20 133:5
  140:11 146:6
  153:8 154:14
  167:14,24 168:5
  168:18
paragraphs
  167:19
paraphrase 86:19
park 9:1
part 49:6 57:11
  63:17 64:10
  101:20 110:5,19
  110:19 147:1
  152:9 177:9
participants
  30:18 80:2 106:25
  107:1 122:6 149:4
  176:6
participate 60:4
  174:9
participated
  98:17,20 101:9
  102:8
particular 56:9
  57:8 96:7 149:21
  169:6
particularly 76:6
  96:11 121:4
  138:13 139:23
  151:16 163:23
parties 12:13,18
  13:2 16:12 22:1
  30:2 32:12 35:25
  38:24 50:8,17
  54:20 60:19 66:4
  66:5 68:25 69:13
  70:3 76:13,25
  78:1 80:22 85:21

86:8 87:15 88:11
89:12 90:21 93:20
98:1,13 99:10,20
101:23 102:8
103:4,6 107:25
109:7,24 112:3,3
113:25,25 115:2
119:18 122:11
125:4 126:2,25
127:24 128:2,3
130:4,8 131:12
135:14 142:14
144:20,23 146:20
147:17,18,21,25
148:8,15 149:7
151:4 155:6 158:9
160:5 162:9
163:14,24 165:7
166:15 170:2
172:3 173:11,22
174:2,4
**party** 13:14 55:6
63:1 69:10,16,23
76:5 79:9 88:12
90:1 92:14 94:13
100:7 104:3
105:25 112:2
121:6 142:22
147:20,25 152:23
154:4,20 159:3
**passion** 55:12
131:13 136:1
**passionate** 74:13
106:16
**passionately**
79:10
**pattern** 87:14
**patterson** 85:1
**pause** 16:10
**pay** 71:12 141:11
166:19
**payer** 106:25

**paying** 74:1 95:1
**payment** 15:25
76:8
**payments** 76:9
104:18 167:19
**payors** 63:1
**pec** 58:6 59:3
62:18,23,24 63:12
64:22 65:8 77:22
93:15 98:23
108:10
**pen** 75:13
**pending** 14:11
127:20
**penny** 113:4
**people** 14:9 20:17
22:12 27:18,21,23
27:24 28:5 34:4
35:24 40:2 41:19
41:24 49:14 51:14
52:1,9 53:15
54:23 55:8 61:21
62:18 64:1 67:5
68:9,25 74:4
79:10,19 81:5
87:23 91:22
108:20 109:3
111:16 119:3,3
122:24 123:9,17
127:22 128:24
129:2,23,23
130:19,23 135:23
137:21 138:1,25
140:15,24 141:5,7
141:19 147:4
151:8 169:11,16
169:21,24 170:8
170:15,19 172:20
172:25
**perceived** 55:20
170:18
**percent** 72:20
109:21

**perfect** 135:21
**perfectly** 71:19
**perform** 102:4
**period** 25:14,16
51:7 80:16 82:9
84:2 114:24
**permanent** 166:7
**permit** 84:6,8,10
119:13 154:23
155:25
**permitted** 176:4
**perplexingly**
88:21
**person** 33:7
130:13 148:12
161:10 171:4
172:16
**personal** 104:9
106:14 118:25
122:25 128:23
129:17,17 130:21
153:23 162:18
**personalize**
118:14
**personally** 28:25
29:17 59:13
**person's** 94:13
**perspective** 14:13
**pertain** 25:16
**pertaining** 17:4
124:23 153:9
**peter** 3:22 4:6 5:2
6:25 17:16,19
105:25 110:15
137:7
**petition** 13:7
41:19 59:1 89:11
89:12 90:8 94:11
97:24 103:19
108:24 116:6
163:19
**petitioner** 167:2

**pg&e** 157:10
**pharma** 1:7 2:14
2:17,25,25,25 3:1
3:15,16,16,16 4:3
4:21 7:8 10:3
19:11 20:7 43:22
68:16
**pharmaceutical**
3:2,17
**pharmaceuticals**
3:2,3,18,19
**phase** 77:5 109:14
**philadelphia** 7:2
**phillips** 4:8 77:6
94:4
**phrase** 19:7 59:22
**picked** 40:2 60:25
133:24
**piercing** 163:5
**pill** 17:21
**pillars** 48:3,4
**pillsbury** 6:10
**pin** 60:6 132:19
**ping** 63:6
**pioneer** 11:21
**pittman** 6:10
**place** 16:25
101:15 107:3
122:9 170:17
**places** 63:14
78:25
**plain** 106:20
**plainly** 122:6
**plains** 1:14
**plaintiff** 61:6 65:3
**plaintiffs** 48:1
59:9 63:12 65:11
91:8
**plaintiff's** 98:12
**plan** 15:23 16:1,8
20:18 21:5 22:7
22:24 24:16 28:17
45:1,17 46:5 47:8

47:15 49:8,24
51:9,20 65:18,23
82:14 99:12 100:2
100:24 101:20
102:11 116:9,18
116:18 142:10,12
142:22 143:16,25
144:3,20 148:25
149:10,15,23,24
150:5 151:3
154:24 158:15
161:12 162:5,9,10
162:20 163:17
165:10 168:7
170:3 171:7,18,18
**planet** 57:16
64:16 79:10 132:1
**planning** 45:24
**played** 151:12
**player** 33:6
**players** 31:14
57:5 58:9
**plea** 25:16 167:21
**pleaded** 25:12
**pleading** 21:11,15
31:4,6 34:13 42:4
50:21,25 55:15
60:1 68:5 93:25
94:11 106:20
119:11 125:11,15
130:16 137:14
171:22
**pleadings** 13:16
14:8 27:21,22
48:18,24 55:5
57:20 58:5 59:17
66:2 82:18 98:4
107:3 115:4
123:25 124:1,14
125:21 128:24
131:7 137:24
141:22 142:2
146:19 170:24

172:19
**please** 20:15 29:9
54:24 91:25 96:8
114:8 132:19
135:9
**plenty** 52:1 126:7
164:12
**plus** 98:9
**pm** 176:15
**pod** 133:11
**podium** 10:14
17:13 66:23,23
**pods** 133:11
**point** 19:4,21
21:20 23:3,23,24
23:25 29:3 34:18
38:23,25 40:16
46:17,18 51:10
52:11,18,18,23
53:2,10 64:25
66:4 77:3 78:1
84:2 102:10 105:6
106:8,14,22 107:2
108:4 110:16
111:19 112:7,9,18
114:16 118:1
119:1 120:5,6
125:20 140:6
146:25 158:5
163:1 165:1
173:23 174:18
175:1
**pointed** 58:4
108:11 112:22
113:2 119:23
**points** 20:2 28:2
66:14 73:18 78:24
96:7,10 103:3,14
105:24 113:3,12
114:7,8 129:12
152:16 159:9
**poisonous** 107:11

**police** 29:1
**policy** 90:15
**polk** 6:3 10:19
33:3 55:1 93:1
**polster** 64:22
98:25
**poor** 141:3
**poppycock** 81:8
**portion** 44:19
**posed** 120:20
**position** 27:3
32:13,15 35:11
106:21 155:5
**possibilities** 45:20
**possibility** 85:3
98:18
**possible** 16:2
34:21,22 49:11
53:8,9 63:7 87:2,3
96:9 108:18
130:24 156:5
**possibly** 65:9 66:6
135:16
**post** 101:15 112:1
114:11,23 115:19
115:21 116:6
118:23 163:19
**pot** 78:22
**potential** 16:14
21:23 22:1 51:3
70:21,22 144:9
164:4
**potentially** 24:7
83:1
**power** 23:14 26:6
26:9 36:24 117:13
126:19 147:15
**powers** 26:13 41:9
123:24
**ppi** 62:10
**pplp** 44:24 45:1
168:1,6

**police** 29:1 [duplicate reference omitted]
**practical** 146:22
156:7
**practically** 18:10
**practice** 14:8 30:6
57:24 138:25
152:18,24 164:14
**practicing** 148:17
**practitioners**
71:20
**pragmatic** 118:4
**pre** 59:14 72:21
72:21 97:24 98:13
98:19 103:19
108:24 111:24
118:23 162:11
**preceded** 98:6
**precedent** 148:4
**precisely** 133:14
**preconceived**
49:16 50:1
**precondition**
66:24
**precursor** 67:20
**predicate** 98:2
**predicates** 90:3
**preface** 148:20
**prefer** 100:12
136:20
**preference** 163:5
**prefers** 67:3
**preis** 9:4 105:15
105:15,19 122:2
125:20 132:6
**preliminary** 2:20
2:23 3:8,13 13:24
14:16,17 16:15
17:1 49:17,19
65:22 113:23
118:21 177:7
**premised** 50:25
162:11
**prepared** 22:25
101:7 132:21

**preparing** 16:13
**prepetition** 99:2
**prescribed** 106:2
**prescription**
  106:9
**prescriptions**
  155:17
**present** 60:5
  77:10 152:11
  161:18
**presentation**
  78:16 96:5
**presentations**
  97:21
**presented** 109:7
**presenting** 94:10
**presently** 161:1
  166:11
**preserves** 11:8
**press** 49:15 91:2
  170:25 173:1
**presumably** 32:13
**pretend** 67:17
  82:20 83:24
**pretty** 39:22
  47:12 70:18 78:7
  78:20 79:12 85:18
**prevailed** 131:2
**prevented** 17:24
  155:13
**prevents** 138:20
**previously** 16:17
  148:22 161:15
**primary** 131:3,20
**principal** 77:13
**principle** 37:20
**printed** 12:24
**prior** 59:1 60:19
  70:3 135:5 152:18
  154:9 156:1
  171:11
**prison** 11:2

**private** 72:6,7
  76:14 79:18
  102:10 107:21
  134:1
**privately** 20:10
  72:22,23 97:25
**privilege** 74:25
  75:4
**privileged** 110:3
**privileges** 112:17
**privy** 175:9
**pro** 91:8 121:8
  130:13
**probably** 10:9
  16:9 20:1 69:18
  71:20 84:22 95:3
  131:22 132:7
  153:19 158:23
  175:2
**problem** 13:17
  35:23 38:4 87:21
  121:17 138:12,13
**problems** 2:9
  113:19
**procedure** 167:15
**procedures** 73:11
  88:4 134:17
**proceed** 121:6
**proceeded** 154:8
**proceeding** 2:17
  65:6 102:11
  106:17 139:6
  141:13,15 144:20
  168:16
**proceedings**
  176:15 178:4
**proceeds** 154:8
**process** 12:23
  14:19 18:1,5,19
  19:2,10,12 20:7
  20:16 22:19 23:9
  25:8 26:24,25
  27:4 29:1 42:19

43:8 47:24 51:11
  52:5,24 56:22
  57:21 71:16 72:1
  73:1 99:24 100:6
  101:11 107:15
  109:13 110:18,19
  119:7 122:17
  123:15 124:6
  125:19,22 126:15
  126:18 129:11
  134:9 135:18
  138:9 141:24
  142:1 146:23
  148:18 151:7
  154:24 156:1
  161:22 162:23
  164:17 170:20
  171:2 172:8,10
  176:1
**proclivity** 164:10
**prodding** 137:19
**produce** 70:9 82:3
**produced** 70:3
**producing** 69:10
  69:23
**product** 72:16
**production** 110:3
**productively**
  101:10 151:10
**products** 3:2,17
**profession** 33:17
**professional**
  56:23 123:7
  165:14
**professionals**
  30:14 57:4 73:5
  123:11 130:8
  148:16,21
**professor** 17:12
  19:16 31:5 32:3
  32:23 35:2 55:4
  55:15 56:8,9,17
  56:19 57:14 58:2

60:8 61:22 63:16
  64:9,17 65:12
  67:3 68:4,20
  69:12 72:18 73:10
  74:3,8,10 75:9,25
  79:16 80:10,12
  81:16 83:18 85:6
  87:5,13 88:2,13
  88:14,21 89:17
  90:12,18 92:16
  94:7,24 95:1
  97:10,23 101:8,14
  137:13 138:13
  141:10 148:4,19
  150:1,15,25
  151:19 153:25
  154:4 156:11
  163:17 164:23
  167:11 168:4
  170:22 172:20,24
  174:23
**professor's** 61:24
**profoundly** 66:17
**program** 75:11
**programs** 27:12
  27:12 170:19
**projected** 58:15
**promptly** 151:18
**prongs** 46:14
  49:18 88:6
**pronounce** 75:6
**proof** 2:3,8 11:22
  45:11,12 53:25
  90:23 158:22
  165:19 168:21
**properly** 80:13
  86:10 88:11 122:9
  155:20 161:14
  169:19
**proposal** 78:14
  89:20
**propose** 13:20
  19:6 28:16 143:16

143:24
proposed 2:12
 11:7,10 14:23
 15:1 19:6 102:11
 142:18
proposition 31:23
 32:2 157:24
propriety 135:17
prosecute 109:22
prospect 53:2
protagonist 155:4
protect 83:17
 115:2 133:14
 152:21
protecting 83:19
protective 21:6
 38:5 39:1 40:21
 40:23 41:3 48:11
 53:15 69:1,12
 74:1 76:22 112:14
 112:15 121:18,18
 132:16 156:20
 175:5,10
protest 113:15
prove 73:15 135:7
proves 44:4 90:17
provide 76:17
 92:10,17 155:1
 173:8
provided 38:15,17
 44:25 168:6,7,18
provides 76:7
 94:9 104:22
 145:14
provision 152:2
 153:9 154:3,22
 155:3 158:8
 167:12
provisions 62:7
 81:22 152:25
 156:6 169:13
proviso 46:5
 168:7

provisos 46:9
proxy 71:18 72:9
 116:22 117:14
public 21:21 24:3
 24:4 26:12 35:13
 38:16 41:1,23
 42:18,20 68:18
 69:22 70:1,2,6,10
 76:14,23 79:19
 83:16 85:5 101:13
 101:19 104:8
 107:21 108:9
 119:12 120:15,17
 121:16 128:25
 130:5 137:20
 138:3 139:8
 141:20 147:9
 152:18,21,22
 153:14,14,15,15
 153:16 170:6
publication 67:25
publicized 97:11
publicly 68:9 69:6
 107:25 112:11
 117:7 166:2
 175:11
publish 39:11
 69:3
published 30:23
 120:23
puerile 128:20
puerto 3:1,17
pull 68:12
pulled 115:10
purdue 1:7 2:14
 2:17,25,25,25 3:1
 3:1,2,3,15,15,16
 3:16,17,17,18 4:3
 4:21 7:8 10:3
 19:11,16 20:7
 43:22 56:14 59:5
 59:6,9 63:4 64:19
 64:23 65:9 68:16

70:5 83:19 98:15
 98:18 106:17
 118:22 162:14
 168:2 169:25
purdue's 3:7
 170:1
purdue's 65:10
pure 135:4
purported 95:9
purpose 32:17
 77:13 85:14,25
 87:14 157:5
 161:11
purposes 47:6
 166:6
pursuant 4:18
 167:14
pursue 28:3,6
 44:11 76:11 99:16
 139:1 159:4
pursued 65:7
 74:21 98:8 99:15
 169:4 171:8
pursuing 28:2
 100:12 138:20
pursuit 144:3
pushed 86:10
put 13:9 62:5,5
 92:3,21 93:3
 109:5,5 151:5
 172:14 173:24
 174:22
putting 106:3
 165:9

              q
qualified 52:1
 139:10
quality 80:11
 171:15
quarropas 1:13
quell 41:25
quest 60:9

question 19:5
 22:7 23:7 26:2
 28:11,14 29:13,14
 34:18 38:2 41:4,8
 42:13 45:14 55:7
 63:7 72:17,25
 73:22 81:19 88:10
 107:17 108:20
 111:15 116:2
 120:4,19 122:20
 122:21 124:20
 125:18 128:4,14
 131:7,21 134:22
 140:7 150:16
 165:11 167:10
questioning
 107:19 125:22
questions 11:15
 11:18 27:7,18,20
 27:23 28:5,12
 35:6,9,10,14 52:2
 61:11 63:23 74:3
 92:22 102:17
 109:9 124:3,5,7
 129:11 137:1
 138:16 174:4,23
 175:19
quick 129:13
 176:3
quickly 39:22
 88:20
quinn 6:22
quite 13:1 39:19
 40:20,22 55:4
 63:24 64:3 71:24
 73:6,7 74:19 77:2
 86:9 99:1 119:4
 130:7 135:1
 137:11 142:6
 168:22 174:24
quotable 140:6
quote 30:6 66:18
 75:25 76:3,24

85:11,18,25 86:18
86:19 90:6 92:7
94:4 96:13 117:9
125:16 154:3
**quoted**  93:18,23
169:14
**quotes**  119:6
157:22
**quoting**  49:5
117:8 159:14

**r**

**r**  1:21 6:1 9:11
10:1 178:1
**radically**  13:9
78:25 79:2
**raise**  27:23 90:15
**raised**  16:20
28:13 103:2,14
113:21 124:5
133:1 159:10
162:7 165:1,12
**raising**  15:4
**ran**  115:20
**range**  168:23
**rapaport**  5:2
**rate**  106:25
**rationale**  140:4
**rationales**  138:21
**raw**  175:12
**raymond**  7:18
**rdd**  1:3 2:5,17
**reach**  28:1 60:20
169:25
**reached**  66:15
73:2 77:19,25
93:19 109:4
131:14 159:21
164:19
**reaching**  110:24
**reactions**  169:19
**read**  12:4 13:23
24:21 34:1 47:3
49:14 50:21 59:17

60:7,15 71:9 74:8
75:19 81:21 89:23
92:2 114:25 119:5
120:10,10,11,12
121:10 122:4,5
130:6 132:25
133:5 137:23
170:11 173:6
**reading**  123:19,19
131:23 142:2
**reads**  137:24
**ready**  109:21
131:16,16 174:22
175:25
**real**  57:16 100:3,5
118:4 119:1
138:17 164:7
172:25
**realistic**  118:2
119:2
**reality**  47:7 58:15
88:3 109:16
**realize**  48:3 91:15
131:19 136:2
**really**  11:23 12:11
12:13 14:6 29:21
29:21 32:9 33:6
33:14 37:4 40:3
54:1 64:3 77:12
81:19 87:25 91:14
92:20 102:5 119:4
120:4 121:4,8
122:4 126:5
127:17,17 128:7
128:20 129:15
132:23 136:18
137:15,18 140:2
151:9 159:19
160:17,17 163:18
169:3
**reason**  11:3 18:10
35:23 40:15 42:18
45:6 70:22 94:21

94:24 104:15
108:20 133:7
138:23 139:1
165:7 168:13
173:23 174:19
**reasonable**  11:11
94:15,18
**reasons**  16:17
29:6 91:11 95:12
105:12 113:17
135:25
**recall**  66:22
**receipt**  156:2
**receive**  100:18
**recission**  82:16
83:7
**recitation**  85:7
**recognize**  157:2,6
173:20
**recognized**  32:12
32:19
**recognizing**  91:13
**recommence**
76:15
**recommend**  51:8
100:9
**recommendation**
108:17
**recommended**
132:9 148:19
**record**  10:16
50:21 54:25 62:24
65:14,25 74:18
75:25 80:6 92:4
93:10 97:20
113:19 126:2,4
140:12 144:18
145:1 150:14
156:3 178:4
**recoverability**
77:14
**recovery**  115:9
170:16

**red**  21:9
**redact**  112:16
**redo**  122:2,8
124:21 144:13
**refer**  27:21 30:1,3
30:7 45:19 125:21
**reference**  166:22
**referenced**  34:7
**referred**  96:13
**referring**  35:21
37:9 49:3 115:8
**refers**  31:6 148:16
**reflect**  65:18
127:13
**reflected**  98:6
**reflects**  152:15
156:10 157:19
**reform**  106:9
**refuse**  84:17
88:25
**refuses**  171:1
**regard**  14:15 30:8
115:8 116:8
149:21
**regarded**  77:8
98:25
**regarding**  76:5
155:17 169:7
170:5
**regardless**  102:16
**regular**  63:22
**regulatory**  25:7
**reinvent**  47:21
**reiterated**  17:5
**rejectors**  113:14
**relate**  34:10
**related**  2:5,10,13
2:23 3:8,14 4:2,7
4:12,19 5:1 10:12
76:13 146:24
**relates**  108:23
**relational**  57:12
58:10,11 74:23

**relationship**
138:20
**relationships**
30:17
**relatively** 22:9
26:16,22
**release** 18:16 20:8
43:4 100:18
168:18 170:25
**released** 36:7
120:23 175:11
**releases** 18:5 45:7
54:11 61:17
100:24 168:14
173:1
**relevant** 39:24
40:15 45:22 46:13
127:10 128:13,19
144:14 163:23
165:22
**relied** 123:14
154:23
**relief** 11:15 12:19
19:20 20:3,5,24
20:25 21:11 34:11
36:12,13,19,21,23
42:13 54:4 56:4
56:10,17 78:22,24
79:2,11 91:5
113:16 118:17
125:18 136:4
137:15,18 142:5
145:12 148:5
169:4,5
**relies** 151:19
165:2 167:23
**reluctance** 30:2
**rely** 164:24
**relying** 43:17
**remain** 92:22
**remains** 99:5
100:3

**remark** 50:1
**remarkable**
100:20
**remarkably** 56:5
**remarks** 133:4
141:25
**remedies** 82:3
127:13 133:11
**remember** 60:8
111:1 132:12
**remind** 74:10
**remote** 47:10
**removal** 70:14
**remove** 23:14
26:6,9 71:22
72:10 116:23
**removing** 71:8
**render** 158:18
**renowned** 32:4
**reorganization**
30:9 42:19 49:22
49:23,25 51:21
99:13 100:25
101:21 107:15
110:18 147:9
**reorganizations**
30:12
**repeat** 31:14 33:6
56:25 57:5 58:9
59:15 96:6 103:1
133:3 152:14
171:10
**repeats** 61:3
**replete** 21:11
60:21
**reply** 3:12,12 5:1
13:17 18:9 19:20
20:4 45:15,19
56:5 59:18 61:4
65:17 77:3 78:3
79:1 81:6 87:6
89:17 91:18 92:11
95:15,18 104:25

107:13,16 109:5
110:16 111:21
122:5 123:20
135:11 141:22
142:18 144:3
162:8,24
**report** 38:21 41:5
107:25 122:16,18
123:17 124:24
147:19,19,23
156:2 164:6 172:5
172:7 175:8,11
**reported** 146:2
147:11 175:7
**reporting** 2:9
141:23
**repository** 36:4
41:23 101:14
130:15
**represent** 89:23
122:25
**representation**
131:5
**representations**
94:9
**representatives**
67:12,13 132:16
138:10 149:5
**represented** 57:15
85:20 137:22
149:12 164:13
**representing**
62:18 67:14
132:22
**represents** 62:24
83:9 122:24
**reproach** 71:16
**reputation** 126:3
**request** 15:7
19:19 26:20 28:15
86:7 90:7,22
104:23 131:3
137:18 142:22

146:25 148:6
149:25 150:22
154:25 155:2,11
157:5
**requested** 11:5,15
13:14 17:3 56:4
79:2 92:25
**requesting** 60:13
90:22 91:7 148:5
**requests** 105:13
**require** 80:19
84:10
**required** 52:6
89:13 138:21
**requirement**
158:13 166:1
**requires** 12:12
138:23
**requiring** 34:4
156:14 158:14
**rereading** 77:1
**rescap** 86:18 87:1
87:4 120:7,7
**rescind** 44:2,9,10
45:7 168:14
**rescinding** 82:4
**reserved** 15:13,14
15:20
**residential** 96:14
97:1 157:13,22
158:12 159:16
**residual** 26:13
**resisted** 101:7
**resolution** 11:11
66:25
**resolutions** 12:18
**resolved** 22:23
66:14,21 92:15
**resonate** 97:1
**respect** 21:24 22:1
34:25 47:13 50:6
54:19 115:23
116:10 131:2

138:1 147:5
**respected** 59:24
**respectfully** 73:8
105:12
**respective** 149:14
**respects** 55:16
96:15 102:6
**respond** 34:14
136:9
**responding** 54:20
55:3
**response** 3:7 78:2
102:17 113:9
118:24
**responsibility**
101:25 118:16
140:25
**responsible** 17:23
76:9 140:8
**responsive** 91:9
**rest** 13:20 14:20
64:15 77:1 87:22
95:10 116:12
124:13
**restructuring**
99:6
**rests** 88:21
**result** 14:15 22:15
33:15 50:3 51:20
51:21 63:11 138:7
138:21 148:13
169:25 170:3,23
171:23 172:22
**resulted** 99:3
120:8
**results** 22:21
**retain** 30:24
**retained** 105:8
**retaining** 172:15
**retirement** 161:8
**retreats** 97:10
**return** 100:15

**revco** 156:17,17
**revealed** 21:7
**reversed** 146:2
**review** 11:8 19:19
21:21 23:9 30:24
31:12 52:23 67:22
96:4 103:21
112:11 123:10
172:14
**reviewed** 67:24
95:16
**reviewing** 123:11
123:16 160:18
**rewrite** 67:4
**rhodes** 3:3,4,19
3:19
**rich** 141:3
**rico** 3:1,17
**ridiculous** 65:25
69:4 70:13
**riffkin** 175:20,22
175:24
**right** 11:18 13:11
13:21 14:25 15:10
15:16 19:15,17,17
20:16 22:4,7 24:8
25:14 26:1,16,23
27:5 28:7,23 29:7
29:24 30:1,24
33:17,23 34:12
35:9 36:3 37:9,12
38:14,22 39:14
42:7 43:19 44:9
44:10 45:15,18
46:8,10,25 49:2
49:19 50:2,20
51:17 53:14,18
54:8,12 68:14
69:7,21 73:23
74:6 77:16 78:18
80:8 82:1,16 83:7
84:3,21 85:1 90:7
109:25 114:19

116:23 117:24,25
118:2 119:2 121:6
121:18,20 122:9
122:18 123:9,12
123:13 125:4,9,16
125:20 126:16,24
128:19 133:14
135:12 137:6
138:21 141:1
168:5 171:23
176:1,10,12,13
**rights** 57:7,22
69:17 90:2 133:12
139:2 170:1,2
**rigorous** 101:2
**risk** 49:21 78:17
95:6
**road** 178:21
**robert** 1:22
**role** 86:1 102:4
115:18,22 116:6
150:12 152:21
155:12 164:18,22
**roles** 151:12
**room** 1:13 154:17
174:10
**roughshod** 112:14
**rule** 11:20 84:25
85:3 94:8 131:6
138:22 160:24
167:15
**ruled** 131:3
159:18
**rules** 160:25
**ruling** 49:5 141:8
157:23 173:10,12
173:14
**rulings** 139:12
157:17,19 177:3
**run** 16:7 43:14
112:14
**running** 115:3,18
116:7,10

**runs** 95:6

**s**

**s** 2:6,10,13,23,24
3:8,14,14 4:2,7,13
4:19,20 5:1,2 6:1
6:22 10:1
**s.d.** 156:24
**s.d.n.y** 146:12
**s.d.n.y.** 156:22
157:12,14 159:13
161:16
**sackler** 7:18 15:25
18:4 19:14,15
21:13 23:13 31:9
41:8 49:9 62:11
75:14 97:24
130:17 133:19,20
141:6 142:11
**sacklers** 18:16
20:9,9,16,19
21:16,23 22:2,16
23:19,22 24:17
25:3,3,7,11,21
26:9,13 27:1
28:10 34:20 36:7
36:9,18 37:11,12
38:3 41:11 48:1
48:23 51:24 52:17
53:16,19,24 56:15
57:9,17 58:20
59:5,6,8,15 62:20
63:4 64:19,19,23
67:9,23 68:1,6
70:6 71:21 73:21
74:9,21,22 75:21
76:7,13,18 77:16
77:20,25 93:13,16
93:22 97:15 98:15
98:18,21 100:18
103:21 108:5,6,16
109:22,25 111:4
111:23,24,25
113:24 114:2

115:11,18 116:15
116:23 117:12,16
117:21 118:22
119:5,13,15
123:23 128:2
132:4 133:9 134:4
134:22 137:2
140:9 142:9
143:24 144:10
149:16 150:4
162:13 163:20,25
164:4,13,18,22
165:8 170:1,2,12
171:9 174:15
**sackler's** 74:24
75:1,3 76:6 78:17
**sacred** 57:6
**sad** 140:3
**sadly** 138:2
**safe** 153:19
**salary** 172:12
**satisfaction** 165:3
**satisfactory**
174:25
**satisfied** 82:6 90:3
166:1
**satisfies** 49:10
69:24 71:3 111:5
**satisfy** 88:7
**save** 64:6,6
**savings** 81:2
**saying** 19:1 24:3
27:21 28:12 33:12
40:25 41:5 48:19
50:10 52:16 53:14
91:19 115:20
139:13 140:11
175:2
**says** 32:4,10,10
44:11,21 47:2,11
53:23 57:3 66:18
69:7 75:17 78:10
79:5 82:22 84:1,5

84:10 91:17
107:13,14,18
111:21 120:7
121:11 122:14
142:19 143:20
159:17 164:24
**scandals** 71:10
**scanlon** 56:20
**schedule** 80:23
**scheduled** 14:24
16:5,16
**schepps** 156:23
159:11
**schizophrenic**
154:14
**scholar** 32:4
140:4
**scholars** 27:24
**scholarship** 30:11
**school** 6:24 8:7
**schwartz** 8:6
**scope** 107:4
143:11 155:18,19
162:8
**scott** 4:3 9:11
**scratch** 123:8
**scratching** 140:16
**scrutiny** 25:4
61:18 173:4
**se** 91:8 130:13
**seal** 69:8
**sealing** 70:11
**sec** 152:20 154:3
**second** 12:20
25:12 49:10 65:12
68:20 69:23 71:24
72:13 79:21 81:10
84:11 94:3 118:18
132:14 136:19
146:20 148:7
165:16
**secondary** 28:9

**secondly** 150:22
160:21
**secrecy** 69:25
**secret** 35:15
**secretary** 68:11
68:19 74:2
**secretive** 18:7
51:25
**secretly** 97:25
**section** 83:13
104:7 137:8
142:19,21 145:4
145:14,18,19,19
146:11 151:20
152:10 154:11,16
155:7,13 156:14
161:17 165:16
166:6 167:2,4,5
167:15
**sections** 145:13
**secured** 82:9
**security** 145:9,17
150:9
**see** 10:8 14:5
17:16 60:6 64:9
65:15 68:2,10,12
84:12 85:2 95:23
99:11 114:25
115:4 117:9 119:6
120:3 127:22
136:24 145:23
146:15 149:15
150:18 151:6
163:22 175:15,19
**seeing** 70:2
**seek** 19:21 20:3
24:15 68:25 90:2
90:25 107:5
109:18 143:24
150:5 155:6
172:24
**seeking** 17:12
19:9,18 20:5

21:11 24:22 34:11
36:11,20,21,23
42:13 54:5 73:21
74:3 91:5 104:12
109:21,24 110:2
113:17 125:18
136:4 142:7,9
**seeks** 122:8
145:12 160:23
162:2
**seen** 26:12 69:14
70:18 71:7 117:1
**sell** 57:1
**senator** 42:17
**sending** 91:17
**senior** 172:16
**sense** 102:15
121:4 129:17
140:24 159:8
176:7
**sensitive** 150:23
**sent** 91:22
**sentence** 29:3,4
**sentencing** 25:5
167:21
**separate** 74:15
174:11
**separately** 16:21
22:1 144:6,7,16
171:18
**september** 49:6
156:4
**series** 138:16
**serious** 42:23
49:21 151:4
**seriously** 111:10
139:12 149:8,11
**seriousness**
106:18 139:20
**serums** 36:2
**services** 145:11
151:24 152:4
153:18,21 165:21

set   10:23 142:12
  142:18 161:25
  167:13,24 172:10
sets   66:12
settle   23:20 30:20
  32:7 37:11,12
  50:8 51:2,3,14,15
  52:12 65:11,20
settled   65:9 82:13
  119:19
settlement   15:24
  22:20 30:5 32:10
  34:6 45:2,5,8 46:6
  46:20 47:1 50:10
  50:18 51:3 52:20
  53:3,8,13 61:17
  62:9,15 63:10
  65:14,19 66:3,14
  66:18,19,20 72:16
  76:7 77:17 81:22
  81:25 82:7 83:9
  85:13 88:15 93:19
  97:25 98:19 99:3
  99:4,8,9,11,12,14
  99:20,25 100:2,6
  100:9,12,15,19,19
  100:23 102:1
  103:13,14,15,22
  103:24 105:9
  107:8 108:4,10,25
  109:11 110:9
  115:24 120:25
  121:4,7,10,14,14
  121:17,20,24
  122:16,20 135:18
  135:19 141:13
  144:17 149:16
  161:22,22 162:11
  163:1,10,11
  167:18 168:8,12
  168:15,19
settlements   72:15
  73:1 82:1 167:16

settling   53:17
  121:5
seven   91:25
  110:16
severed   104:10
sex   56:21 71:10
shake   68:13
shape   55:20
share   175:13
shareholder
  62:15 65:14 71:14
  88:15 117:10
shareholders
  66:25 71:8,25
  83:17,20 126:19
  152:22 164:18
sharp   130:7
shaw   6:10
sheet   37:19 62:21
  99:9,9,11,15
  162:12
sheets   83:12
shield   25:8 70:1
  76:23
shielding   39:1
ship   27:17
shocking   33:20
  68:23 139:23
shoehorn   97:12
shopping   34:18
shore   7:12
short   14:9 149:18
shorten   96:8
shortly   18:12 20:8
  36:25 37:5 41:10
  149:24
should've   52:17
shoulders   148:12
shouldn't   69:22
shoutout   65:19
show   27:13 41:25
  72:8 126:5 135:12
  158:24,25 171:3

showed   68:20
shown   49:19
  118:8
side   59:5,6 62:21
  64:22,24 69:7
  79:18,20 106:17
  108:9 135:21
  163:1
side's   175:13
sight   94:7
sign   69:1
signed   41:19 60:1
  69:12 93:11 131:5
  131:7 142:13
significant   18:20
  18:21 120:17
significantly   86:1
signing   74:1 94:10
  132:16 144:4
similar   16:1 35:14
  35:14 73:22 84:24
  89:5 154:2
simple   19:24
  166:22
simply   14:12,13
  20:6 33:10 40:14
  41:8 43:9 66:3
  97:18 102:3
  103:15 104:6
  136:24 139:7
  150:14 151:15
  161:7
sin   58:21 67:18
  69:21 75:10 78:10
  82:1 131:4
sincere   164:23
single   17:21 52:3
  56:11 67:6 79:9
  92:15 94:21,23
  110:13 111:6,13
  130:17 140:7
sir   28:25

sit   72:8 158:6
sites   63:6
situation   48:8
  110:1,7 148:3
  169:1
situations   70:18
six   80:14 125:21
sixth   8:9
size   39:19
skip   21:19 78:22
  83:11 168:6
slamming   57:16
slandered   34:9
  141:20 169:11
slanderous   93:25
sleep   17:21
slipping   55:11
small   30:13 32:5,6
  32:23,25 56:18
  74:1 123:8 140:14
  148:16 149:5
  174:18
snapbacks   133:12
snide   68:7
snow   71:15
social   56:22 90:15
sold   57:4
sole   45:7 168:14
solutions   178:20
solvent   72:22,24
someday   133:10
somewhat   154:13
sontchi   157:21
sonya   5:25 178:3
  178:8
soon   29:10 41:16
  72:25 160:10
sophisticated
  149:13
sorry   27:16 29:16
  34:25 44:14 46:21
  46:22 48:9,10,19
  52:11 90:6 92:7

111:23 117:7
134:19 136:22
170:9 175:16
**sort** 12:4 25:9
41:24 50:1 87:17
89:18 118:14
132:11 164:9
**sorts** 118:3
**sought** 73:18
74:25 79:3 137:15
142:5 143:12
161:19 169:5
**sound** 11:17 12:14
12:15,15,17,19
13:2 14:11,12
17:12 46:20 84:9
85:18,25 155:18
161:11
**source** 115:9
**southern** 1:2
**sovereign** 110:12
**sovereigns** 108:14
108:15 110:14
**space** 156:21,21
**spansion** 85:15
120:14 157:15,19
158:3
**speak** 12:23 31:21
33:15 113:8
**speaks** 79:19,19
79:20
**special** 23:15,16
24:14 30:3,7,18
41:13 58:20 59:16
60:23 62:11,13
64:4,9,20 67:15
67:20 68:17 70:20
71:1,9,13,22
73:20 77:19 78:4
78:12 88:15 93:13
97:15 107:5,9
108:16,19 109:12
110:11 116:24

121:16 130:18,20
131:9 132:5,8
134:11,20 135:1
135:10 136:14
143:16,22 144:15
150:3 162:4
163:20 164:9
165:9 169:8,8
171:6,15 172:4
174:7,10,14,16,19
174:23
**specialists** 30:9
**specific** 93:1
103:3
**specifically** 22:5,8
57:3 94:17 143:22
150:3 162:4 171:6
**spectrum** 89:14
136:4
**spend** 67:18 85:23
111:17 113:4
126:25
**spending** 130:12
**spent** 74:18 78:15
87:7 108:13,21
109:23 172:9
**spewing** 170:23
**spoke** 91:3 118:7
**spoken** 129:19
**sprang** 82:18
**springing** 82:4
**square** 6:19
**stage** 56:8 66:13
**stance** 106:16
**stand** 131:16
**standard** 96:16
**standards** 96:23
96:25
**standing** 109:21
110:5
**stands** 94:24
**start** 19:5 43:18
79:4 81:2 176:1

**starting** 52:23
53:1
**starts** 15:11
174:16
**state** 4:8 19:21
30:16 49:4,16
50:3 64:22 65:7
65:12 67:11 68:19
68:19 74:2 77:22
98:7,9 107:20
108:22 138:18
146:24 154:21
155:10 156:5
164:2 165:23
166:4,10
**stated** 31:3 38:12
44:17 137:13
158:3,13 160:13
171:25
**statement** 2:12
12:22 20:14 22:24
25:15,18 31:8
32:9 33:10 37:17
43:19 47:10 49:4
53:21 54:2 58:4
58:24 63:13,15,17
64:7,10 66:15
68:4 69:20 92:10
92:13,25 93:3
101:5,11 110:20
133:2 136:17,18
142:12 144:19
165:2,3,5
**statements** 18:24
25:15 28:24 31:7
35:13 48:17,21
62:7 106:20 119:2
124:13 137:12
144:18 169:7
**states** 1:1,12 3:10
6:11 8:17 13:6,25
17:5 44:22 45:6
59:2 62:25 67:10

70:8 73:6 74:12
90:24 98:17 99:6
99:18 100:1
108:10 109:8
110:12,16 111:23
112:1 119:19
120:3 125:3
141:16 142:15,23
144:12 149:6,11
149:14 151:13,21
154:14 155:14
162:18 165:25
166:17,23 167:17
167:19,24,25
168:13 172:1
175:4
**state's** 68:11 98:8
**status** 86:9
**statute** 82:22
89:18 112:20,23
145:7 147:15
153:7,15 157:8
**statutes** 152:11
**statutorily** 69:8
**statutory** 60:23
61:10 74:10
152:21 156:6
**stay** 15:7 31:15
**stems** 107:7 108:4
**step** 136:19
162:21
**steps** 99:19
**stern** 156:17
**steve** 64:5
**stipulate** 120:4
**stipulated** 119:24
**stipulation** 57:22
**stipulations** 21:7
40:24
**stock** 71:4
**stockholders**
156:20

stole 69:1
stood 66:22
  131:16
stop 20:11 68:9
  81:1 91:17,25
  106:6 143:5
stopped 168:4
stores 156:23
  159:12
story 60:25 84:2
straightforward
  82:7
strauss 8:23
  105:16
street 1:13 6:12
  7:1 8:18 9:8 60:12
  60:16,24 173:1
strengths 75:24
  77:14 133:8,22
strong 32:7 35:22
  47:13 78:21 136:1
  146:21 159:3
strongly 13:1 73:8
  78:1 102:19
  131:12 135:17
struck 47:25
structure 15:2
  76:6 100:15 127:7
  132:10 162:19,21
structuring 67:1
struggled 17:22
students 33:11
  118:3
study 41:7,8
stuff 47:12 57:11
  74:5 92:22 119:6
stupid 32:14
subcommittee
  151:14
subconscious
  30:21
subject 21:17 25:3
  37:25 52:21 83:4

134:2 148:25
  155:18 162:3
  163:5,11 175:4,10
submitted 91:6
  98:5 123:20 171:3
  173:4,9
submitting 62:7
  94:11 119:6 162:5
subsequent 76:10
subset 13:5 69:8
substantial 15:24
  103:5 104:2,17
  148:8 153:5
  155:12 157:6
  167:10
substantially
  159:1
substantive 14:7
substitutes 52:6,7
subtract 127:9,11
success 49:20
successful 17:1
  49:23,25
sue 30:20 52:12
  115:2 133:10
sued 52:16,17
  53:16
suffered 74:13
  94:22 119:3
sufficient 85:11
  109:4 146:19
sufficiently 97:11
suggest 15:23
  92:4 99:23 123:1
  138:22 139:22
suggested 154:11
suggesting 49:1
  76:22 138:16
suggestion 144:25
  164:7
suggestions 101:7
suggests 31:20
  139:5,16 144:22

161:7
suicide 133:21
suing 53:17,24
  59:9 82:5
suite 178:22
suits 52:14
sum 166:3
summarized
  147:10 148:22
summed 86:17
supervise 98:24
supervision
  152:23 163:6
support 2:22 3:13
  14:1 21:5 25:20
  79:16 94:16,18,22
  97:6 99:4,6,17
  102:19 104:13
  116:8,18 119:10
  138:17 144:17
  153:5 163:18
supported 13:14
  56:11 79:11 99:10
  106:23
supporting 85:12
  155:5 162:10
supports 104:20
supposed 57:23
  91:21 145:4
sure 42:10 45:21
  47:22 51:21 62:4
  81:12 96:3 105:18
  111:5 112:7
  118:13,15 138:6
  173:10
surprised 84:12
surprising 100:20
suspenders 72:3
sworn 62:7 72:2
synopsis 130:6
system 36:9 55:9
  58:9 70:8 90:16
  92:21 130:1

138:16

**t**

t 56:14 178:1,1
table 151:5
  173:25
tactic 86:8 88:1,3
  160:9,12,15
tailored 41:17
taint 169:10
tainted 170:21
  171:22 172:21
take 16:25 28:25
  30:19 54:1 66:1
  76:1,10 80:14,15
  101:15 105:24
  106:15 110:19
  111:3,9 125:13
  129:21 139:11
  149:7,10
taken 12:11 39:8
  40:18,19 53:23
  57:18 62:15 99:19
  170:17 175:3
takes 39:19
  106:18 139:19
  168:23
talk 22:12 57:23
  58:16 67:15 69:15
  70:12 72:12 74:7
  78:20 81:18 83:21
  105:25 109:2
  110:24 111:17
  125:1 141:23
talked 34:1 88:8
talking 34:2 39:25
  40:3,6,7,9 48:21
  62:6 120:7 124:5
  127:1 130:15
  132:13 169:10
talks 81:16 87:6
tangled 174:18
target 121:6

**task** 142:17
160:17 171:24
173:7
**taxes** 145:11
151:24 152:4
153:18,22 165:21
**teach** 118:3
**teaching** 33:11
118:10
**team** 171:5
174:11
**technologies** 3:3,4
3:18,19
**teleconference**
2:5
**telephonically** 6:8
6:15,22 7:4,12,22
8:4,12,21 9:4,11
**tell** 19:24 20:4,22
29:9 31:22 33:15
37:9 81:1 84:5
124:1 139:17
169:9 173:25
**telling** 62:12 68:9
104:11
**tells** 79:12
**temerity** 60:1
**temple** 6:24 56:20
118:11 130:6,7
**ten** 81:7,9,13
89:11 105:23
**tens** 67:12 74:17
81:15 130:15
**term** 99:9,9,11,14
140:20 162:12
166:8
**terms** 16:21 19:24
22:14 37:19 45:2
46:6 62:21 107:6
141:23 147:2
168:8
**terrible** 14:18
55:24 80:22 95:7

**terribly** 14:7
61:24 130:23
**terrific** 10:6
**terrifying** 59:3
**territories** 62:25
**test** 49:10
**testament** 106:18
**testified** 25:4
**testing** 73:13
118:19
**tex** 156:24 161:9
**texas** 30:23
**thank** 10:22 12:5
12:8 14:3,6,21
17:8,15,19 34:17
54:16 95:24
102:20,21 105:14
105:18 113:6,11
137:5 175:24
176:2,9,11,14
**thanked** 148:20
**thanks** 17:18
65:19 113:7
176:13
**that's** 62:16 69:4
69:25 70:7 72:18
73:16 80:8,17
83:6 91:4 92:6
107:10 109:3,14
109:15 114:16
115:5,13 116:11
117:14 118:25
121:9,12 122:19
123:1
**theories** 121:8
**theory** 58:12
60:10 65:9 67:18
74:23 136:2
162:11
**there's** 69:25,25
70:1 72:12 75:7
78:24 83:8,12
86:4 117:23

**theus** 145:24
**they're** 73:7,22
90:14 115:7 123:7
**they've** 93:7
113:2
**thing** 21:17 26:16
26:22 27:22 32:16
38:4 41:7,8 53:18
64:15 70:1 72:18
83:18 109:12
125:7 131:25
152:24 158:6
175:8
**things** 18:24 47:3
71:17 73:8 75:18
82:5 85:11 87:21
88:16 96:18
110:21 111:2
112:2 118:3
131:23 133:16,17
133:17 135:7,24
143:11,17 154:2
**think** 12:10,15,16
14:25 15:2,6,21
16:4,9,11 21:20
24:12,24 26:5
30:2 31:4,10
32:21 34:1,12,23
35:24 38:11 41:6
42:12,15 43:9
45:15 46:2,19,24
46:25 47:1,6,7,13
47:17 48:14 49:15
50:7,14,20,25
51:10 52:22 53:1
54:14,20,22 55:5
55:14,15 56:13
63:3,23 64:16
68:15 69:23 73:7
77:1 78:6,18,23
79:12 80:15 81:17
84:3,20 87:14
88:16 89:9 91:8

91:14,24 92:2,13
92:19,21 96:10,15
96:22,24 97:17
98:2 101:16 107:6
108:14 112:10
115:6 117:19
118:16,25 119:4,8
121:3,8,13 122:19
125:20,21 126:1
126:16 127:16,20
128:2,11,22
129:22,24 130:22
131:10,20,23
132:1 133:24
136:1,17 137:10
137:17 138:14
140:2 142:4 145:1
158:7,23 160:18
160:20,21 164:14
169:11 171:22
174:16 175:22,23
**thinking** 92:3
141:7,7
**thinks** 108:21
135:20
**third** 8:18 17:10
22:1 63:1 76:5
79:25 80:21
107:23 115:2
146:24 147:20,25
149:14 152:23
159:3 170:2
**thorough** 86:24
96:5,20 97:4,8
101:1,3 150:19
164:15
**thought** 29:17
63:20 69:22 72:5
128:5,9 130:3
131:9 132:6,8
**thousand** 62:24
109:20

thousands  17:25
  56:12 59:4,10
  62:18 67:12,13,24
  95:2 102:9 137:21
  141:16
thread  65:16
threat  105:9
threaten  69:6
three  10:10 37:23
  48:3 62:23 66:11
  78:1 81:13 92:22
  94:15 106:5,14
  111:9,11 131:7,12
  132:11
threshold  43:16
  81:19 85:10,17
  152:19 154:16,19
threw  130:21
throw  119:2
throws  53:23
thumb  12:24
thunder  69:2
ticket  82:10
time  2:19 14:18
  16:24 17:22 25:12
  31:17 35:13 43:11
  43:12 49:24 50:7
  51:8 64:18 69:7
  69:13 70:9,18,24
  80:16 84:14 89:2
  90:19 91:9 96:9
  99:1 101:18
  102:10 106:7
  108:6,21 116:21
  127:1 129:20
  133:3 135:11
  136:14 142:21
  147:5 173:19
timed  160:11
timely  11:22
  154:25
times  22:18 54:14
  77:23 107:13,16

125:6,21 173:18
timetable  149:18
timing  16:20,22
  41:17 146:25
  157:4 159:9 160:8
  160:10
tiny  81:10
tirelessly  169:24
  170:16
tmt  171:17
today  10:11 17:25
  28:2 100:3 115:17
  131:20 140:1
  169:4 176:13
today's  10:4
today's  96:11,23
todd  4:7
told  53:20 130:19
tolerated  72:2
toll  11:1
tone  55:12
topic  141:9 150:2
topics  92:17,22
tort  58:8 59:3
total  89:2
totaling  68:1
totally  58:5 59:18
  62:14,14 64:14
  65:24 66:17 72:17
  75:22 77:4,18
  78:9 80:19 87:8
  89:8 93:20,25
  95:4 139:7 140:6
touch  71:22 72:10
  90:4
touching  71:8
tpp  106:25
track  13:9
traded  135:24
tragic  55:22,24
trailer  171:17
transaction  70:21

transactions
  164:6
transcribed  5:25
transcript  50:8
  59:20 67:2 89:6
  90:5 92:2 159:14
  161:4 178:4
transdermal  3:3
transfer  65:2,5,8
  163:4
transfers  67:25
  164:4
transparency
  39:1 40:2
trartsdermal  3:18
trays  39:20
treat  91:10 134:8
treatise  154:10
trebled  44:18
tree  107:11
tremendous  90:15
  138:3
trial  39:22 40:6
  69:5
trials  36:2 40:7
  98:15
tribe  107:21
tribes  63:1 98:10
  111:12 151:13
tried  11:25 39:5,7
  64:5 71:21 87:9
  91:20 102:14
tries  58:15 91:16
  97:23
trigger  143:6
  166:21
triggering  167:12
troop  3:9 6:15
  13:25 14:3,6 15:4
  15:6,11,14 173:15
  173:17 175:12,16
  175:21 176:3,9,11
  176:14

troubled  169:1
true  66:17 76:6
  122:11,15 164:21
  178:4
truly  63:19 72:3
  79:14 170:8
trust  76:9 134:11
  157:15 172:24
  173:5,15,19
trust's  11:8
trustee  23:21
  45:18,24 46:2
  47:8 60:12 72:2
  90:21,23 109:19
  119:20 142:20,23
  152:19 153:6
  158:16 164:21
  172:16 175:19
trustees  145:24
trusts  76:10
truth  36:1,2,3
  98:3 140:17
try  27:25 39:16
  40:12 47:22 48:8
  55:10 60:25 88:17
  91:2 93:4 96:8
  103:1 147:25
  169:21 170:16
trying  12:14
  19:24 24:11 33:13
  60:20 73:10,22
  81:22 87:17 95:11
  102:16 123:21
turn  10:13 15:22
  17:13 53:4 62:3,8
  108:3
turned  25:6
turns  22:22
tweaked  55:5
twenty  62:23
  84:15
twisted  58:1

twists   22:22
two   30:7 33:5
  44:17,17 46:14
  55:13 57:17 59:24
  67:6 74:19 77:5,7
  78:7,8,14 80:14
  81:13 82:21,23
  84:2 90:8,9 93:14
  93:19,20 94:2
  106:8 110:1
  111:12 114:8
  117:1,15 123:6
  127:12 131:1
  143:5 149:9,18,19
  157:1 173:18
type   87:14,25
  140:4 145:5
  156:10
types   117:20
  166:25
typical   82:6 88:2
typically   166:1

**u**

u.s.   1:23 23:21
  60:12 90:21,23
  157:14 172:15
  175:19
u.s.c.   4:19 167:14
ual   156:24
ucc   12:13 57:9,15
  57:15 60:13 61:9
  61:19 66:6 74:7
  74:10,20 75:17,20
  77:22 79:15 93:21
  94:1 95:1 97:11
  99:25 101:1 105:4
  106:11,18,22
  108:23 110:18,21
  110:24 111:2,5,9
  111:20 130:20
  131:6 132:2 133:4
  134:5,5,10

ucc's   76:17 78:12
  107:17 110:25
ugly   57:12
uh   29:23
ultimate   82:15
  136:3
ultimately   63:2
  77:19 85:13 99:3
  100:4,8,14,16
  110:4,5 142:5
un   112:16
unaccused   61:14
unambiguously
  78:2
unarticulated
  138:24
unaware   135:19
unbelievable
  91:19 92:6
unburdened   60:9
  60:11
uncle   106:3
unclear   26:5 42:5
  132:1
unconstrained
  109:11
uncontested
  10:11
uncovered   147:21
  164:3
uncovering   164:5
uncovers   111:6
  147:21
undeniable   147:1
undercuts   104:3
underlined   54:14
underlying   25:1
  28:9 157:5
understand   17:23
  21:9 23:12,21
  24:20 27:1 34:2
  37:3,4 38:6,24
  41:16 45:21 47:25

49:13 51:7 54:12
  77:2 87:18 89:4
  97:14 103:4
  107:18 117:16
  119:4 120:11,12
  129:23 130:4,23
  136:12,20,21
  138:14,15 141:10
  142:6 147:7
  174:21
understandable
  91:12
understandably
  86:10
understanding
  68:21 147:8
understood
  175:16
undertake   173:8
undertaken   60:22
undertaking
  99:15
underway   159:2
undisclosed
  123:23
undisputed   43:21
  44:23 45:9 167:25
  168:19
undisputedly
  52:22
undo   170:17
undue   11:9 18:21
  18:21 26:25 38:9
  75:9 80:7 174:15
unduly   22:15 41:9
  83:14
unexpected   64:14
unfathomable
  55:23 74:14
unforgivable
  58:18
unfortunate
  106:19

unfounded   42:1
unfroze   46:24
ungrammatical
  122:14
unhappy   86:8
  87:16
unholiness   75:9
unholy   108:4
union   6:19 67:11
unique   70:10
uniquely   164:14
united   1:1,12 8:17
  44:22 45:6 67:10
  70:8 74:12 90:24
  142:22 166:23
  167:17,19,24
  168:13
universe   83:8
university   6:24
  56:20
unkind   91:15
  132:6
unliquidated
  44:13
unnamed   154:4
unnecessary   23:2
unofficial   151:14
unopposed   11:19
unprecedented
  75:11 86:14
  101:13,19 102:6
  149:1
unpredictable
  100:13
unpublished
  157:23
unquestionably
  66:17 71:3 85:17
  136:3
unredacted   110:2
unreported
  157:16

**unrepresented**
94:12
**unsecured** 4:18
4:21 8:24 43:22
44:24 45:9 47:3
82:8,23 84:1
85:20 110:13
122:21,22 142:3
142:16 144:5
145:10 149:3
151:23 152:3
153:17 163:8
165:20 166:2
167:8 168:1,20,24
176:5
**unspeakable**
55:21
**unsubordinated**
43:21 44:23
167:25
**unsupportable**
56:3 57:14 62:8
77:9
**unsupported** 56:2
79:24 169:2,7
**unthinkable**
91:23 94:22 95:7
**untimely** 11:3
60:15
**untrue** 68:15
**unusual** 15:21
40:25 41:1 72:23
129:11 145:21
**unwarranted**
169:7
**upend** 161:21
**upheld** 145:23
**uphold** 95:11
**upper** 136:3
**urge** 113:3
**urged** 50:7
**use** 19:7 35:3 41:9
69:5,6,9,17,19

70:9,10 80:17
151:8
**uses** 35:4 148:4
**usually** 39:18
**utmost** 139:19
**utterly** 56:2 58:6
60:9,21 66:17
71:16 77:4,9 78:5
91:11 94:25
131:15 132:3
**uzzi's** 75:6

**v**

**v** 2:18 156:17,20
157:12,14 166:23
**vague** 141:23
**validate** 95:11
**validated** 131:13
**valuable** 137:5
**value** 95:9
**values** 57:7
134:13,13,14
**vanish** 41:21
**various** 20:2
85:19 112:2,3
142:17 160:2
167:18
**veil** 40:17 163:5
**vein** 30:4
**verify** 60:20
**veritext** 178:20
**version** 31:7,9
**versions** 173:7
**versus** 53:8
**vested** 174:8
**vicious** 57:13 64:3
91:15
**victim** 106:12
134:12
**victims** 7:7 11:14
57:4 94:1 95:8
109:17 138:4
**victims'** 74:13

**view** 19:7 23:1,2
49:16 55:3 57:13
58:10 74:8 76:23
80:12 87:19
104:20 130:1
148:1 149:20
**viewed** 35:25
**views** 76:17
106:14 170:6
**vigorous** 98:12
**vigorously** 85:20
**vindicate** 60:10
**vindicating**
135:17
**violated** 57:25
**virtual** 10:13
**virtually** 13:14
79:17 94:23
**virtue** 21:6 112:20
**voided** 45:6
168:13
**voluminous** 39:19
**voluntary** 3:7
13:18 45:3 168:10
**volunteer** 94:2
**vote** 12:23

**w**

**w** 4:6 137:7
145:23
**wait** 69:7,23
127:22 136:8
151:6,8
**waited** 64:12
**waiting** 14:14
**waive** 90:2
**waived** 90:7
**waiver** 85:2 89:16
**waiving** 90:8
**walk** 57:19
**walked** 87:7
**wall** 60:12,16,24
173:1

**walrath** 157:21
159:15,17 160:13
**walsh** 157:20
**walter** 145:23
**want** 20:6,15,17
20:23 22:3,4,19
23:8,8,12 28:12
28:20 31:10,19,21
32:13 41:7 43:11
43:11 55:18 61:12
63:5 64:11 69:9
73:17 74:10 87:12
105:23,24 107:12
107:23 111:2,7
113:7,11,16
122:20,21 123:1
124:21,21 125:4
125:14 126:13
132:24 134:7
135:6,10 138:5
139:1,3 174:3
175:14
**wanted** 63:23
69:14 96:12 101:9
107:3,4 148:11
173:7
**wants** 78:25 83:19
107:12,14,23
110:17 111:19
112:4
**wardwell** 6:3
10:20 55:1
**warned** 91:17
**warning** 91:18
**warrant** 97:1
**warranted** 11:20
16:5,19 87:24
146:19 151:15,16
160:4
**washington** 42:22
159:15 161:3
**wasn't** 66:7 78:11
78:12,12,13,13

82:14
**waste** 43:11,12
89:2 95:4 160:20
**wasteful** 163:16
**watch** 27:9 30:10
**way** 14:17 21:14
22:8,9 23:3 24:24
34:24 55:20 62:23
71:19 73:23 74:23
75:5,19,22 76:25
84:24 87:21 89:3
92:5 106:10
108:18 112:15
113:20 115:24
119:16 135:4
138:22 140:18
144:13 150:15
157:9 163:19
169:14 173:16
**ways** 38:1 72:14
103:10 106:19
118:7
**we've** 11:12 12:11
13:8 42:12 126:8
126:16 174:6
**weaknesses** 75:24
77:14 133:8,22
**wealth** 78:17
**website** 31:3
68:11,19 70:2
**week** 67:6 80:14
148:7
**weeks** 12:25 13:4
66:7,7 73:12
81:10 102:12
148:24
**weight** 103:23
**weighted** 133:18
**welcome** 130:5
134:17 174:20
**went** 17:21 63:10
152:13

**weren't** 70:6
74:24 108:23
112:15 119:15
**west** 6:12
**we'd** 62:6
**we'll** 69:15 81:14
**we're** 76:19
**we've** 96:4
**whatsoever** 56:1
79:23 97:19 102:3
115:22,22
**what's** 75:8,8
84:14,22 85:5
93:6 121:13
**wheel** 47:22
**white** 1:14 7:6
145:23
**who've** 43:12
**wholly** 17:1 164:7
**wide** 73:19
**wield** 26:14
**wild** 80:9
**willing** 83:22
**wilmington**
157:14
**wind** 130:22
**winthrop** 6:10
**witnesses** 101:24
**wl** 146:15 156:22
157:10
**woke** 17:21
**won** 33:8
**wonder** 40:3
53:15
**wonderfully**
140:5
**wonders** 144:14
**won't** 86:19
123:11,15
**word** 35:3,4,6
80:18 125:13
145:19

**wording** 112:20
112:23
**words** 19:17
43:20,20 56:15
91:25 93:23
107:16 145:6
162:24
**work** 12:12 34:4
41:3 48:6,7 56:24
57:11 80:1,4
99:11 103:6
107:24 110:10,22
111:20 112:11
113:14 122:3,7
123:16 125:2
126:11 134:10
138:14 148:13,21
150:17,17 171:16
**worked** 12:17
55:13 59:25 76:1
80:23 169:24
170:16
**working** 13:9 64:6
67:5 138:18
**works** 68:21,23
69:25 70:7 77:2
**world** 13:5 57:12
57:16 58:15 66:8
68:2 69:18 70:1,2
71:4 72:19 75:16
80:12,12,18
118:11
**worldcom** 42:22
43:6
**worry** 18:3 31:18
61:21 81:5
**worse** 106:16
**worth** 159:14
**worthwhile** 16:9
**would've** 59:17
**wouldn't** 80:7,14
119:19,24 121:19
121:20 123:6

**woven** 136:16
**writes** 172:25
**writing** 90:19
140:1
**written** 94:12
169:14
**wrong** 33:16,17
43:7,8,9 78:4
82:19 87:8 106:20
133:25
**wrongdoing** 24:6
42:23
**wrote** 33:23 57:21
60:11

| x |
|---|

**x** 1:4,10 82:9 84:2
112:2 177:1

| y |
|---|

**yeah** 15:8,15
38:20 114:17
**year** 74:16 78:15
94:3 95:22 98:7
98:17 106:4
**years** 10:24 17:19
25:4 33:5 36:10
48:20 55:13 57:17
74:20 76:2 79:11
84:15 85:6 90:8
93:19 94:2 100:14
106:1 121:2
130:16,24 149:18
**york** 1:2 6:6,13,20
6:20 7:10,20 8:2
8:10,19,19 9:2
68:8,19 71:24
164:3
**you're** 68:14 69:4
69:6 92:3 114:18
118:10,17 123:12
**you've** 96:7
105:19

19-23649-shl    Doc 3094    Filed 06/17/21    Entered 06/30/21 15:46:46    Main Document
Pg 227 of 227

**[zealous - '19]**                                   Page 49

| z |
|---|
| **zealous**  31:16 |
| **zero**  78:2 108:21 |
| **'** |
| **'19**  66:23 |

Veritext Legal Solutions
212-267-6868            www.veritext.com            516-608-2400