UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| In re:<br><br>PURDUE PHARMA L.P., *et al.*,<br><br>　　　　　　　　　　　Debtors. | Chapter 11<br><br>Case No. 19-23649 (RDD)<br><br>(Jointly Administered) |

## MEDIATOR'S REPORT

Pursuant to paragraph 1 of the Order Appointing the Honorable Shelley C. Chapman as Mediator, dated May 7, 2021 [ECF No. 2820] (the "Appointment Order"), the Court appointed the Honorable Shelley C. Chapman as mediator (the "Mediator") to conduct a mediation (the "Mediation") between the Non-Consenting States, on the one hand, and the representatives of the Covered Parties[1], on the other hand, with respect to the agreement in principle reached among the Covered Parties, the Debtors, the Creditors' Committee, the Consenting Ad Hoc Committee, and the MSGE Group (each as defined in the Appointment Order). The Mediator respectfully submits this report in accordance with paragraph 14 of the Order Establishing the Terms and Conditions of Mediation Before the Honorable Shelley C. Chapman, dated May 18, 2021 [ECF No. 2879] (the "Mediation Order").

### Statement of Mediator

1. Between May 7, 2021 and June 29, 2021, the Mediator conducted approximately 145 telephonic meetings with the Non-Consenting States and the Covered Parties. On June 28,

---

[1] "Covered Parties" means the Initial Covered Sackler Persons and the Additional Covered Sackler Persons (each as defined in the *Amended and Restated Case Stipulation Among the Debtors, the Official Committee of Unsecured Creditors and Certain Related Parties* [ECF No. 518]).

2021, the Mediator presented a settlement proposal to the Debtors, the Covered Parties, and the Non-Consenting States. The in-person Mediation was conducted on June 30, 2021 (from approximately 8:30 a.m. until approximately 8:00 p.m.) and on July 1, 2021 (from approximately 8:30 a.m. until approximately midnight), with additional discussions between and among the Mediator, the Covered Parties, and certain Non-Consenting States continuing through the night of June 30th and also continuing through the date hereof. At the in-person Mediation on July 1, 2021, the Mediator presented a revised settlement proposal to the Debtors, the Covered Parties, and the Non-Consenting States (the "Mediator's Settlement Proposal").

2. A list of the participants in the Mediation is attached hereto as Exhibit A.

3. All parties participated in the Mediation in good faith. The negotiations were difficult and hard-fought, with the outcome uncertain until well into the night of July 1.

## Summary of Mediation Outcomes

4. The Mediation resulted in an agreement in principle among a majority, but not all, of the participants in the Mediation, subject to documentation and approval of this Court. The following Non-Consenting States accepted the Mediator's Settlement Proposal: Colorado, Hawaii, Idaho, Illinois, Iowa, Maine, Massachusetts, Minnesota, Nevada, New Jersey, New York, North Carolina, Pennsylvania, Virginia, and Wisconsin. The other Non-Consenting States have not yet accepted the Mediator's Settlement Proposal. The Covered Parties accepted the Mediator's Settlement Proposal, as did the Debtors.

5. The parties accepting the Mediator's Settlement Proposal have reached agreement on the following, in each case as set forth in further detail in definitive documentation:

  (i) Enhanced economic consideration to be provided by the Sackler family members in the form of $50 million in incremental cash payments, consisting of $25 million on or about June 30, 2022 and $25 million on or about

June 30, 2023, as well as acceleration of $50 million in previously agreed settlement payments, consisting of $25 million on or about June 30, 2024 and $25 million on or about June 30, 2025;

(ii)    A material expansion of the scope of the public document repository to be established under the Debtors' proposed plan of reorganization to include tens of millions of documents and approximately 13 categories of attorney-client privileged documents (see <u>Exhibit B</u> attached hereto);

(iii)    A prohibition with regard to the Sackler family's naming rights related to charitable contributions until they have fully paid all obligations owed by them under the terms of the contemplated settlement and exited, worldwide, all businesses that engage in the manufacturing or sale of opioids;

(iv)    Timing for disposition of NewCo following the consummation of the Debtors' plan of reorganization; and

(v)    Plan adjustments to permit states or other non-federal governmental entities that do not wish to receive all or a portion of their Abatement Distributions from NOAT[2] in accordance with the NOAT Trust Distribution Procedures to disclaim or transfer such rights, in whole or in part, subject to any consent or other rights of applicable states or local governments under the default allocation mechanism in the NOAT TDP or an applicable Statewide Abatement Agreement.

---

[2] "NOAT" means the National Opioid Abatement Trust to be established under the Debtors' proposed plan of reorganization.

6.      In addition, the individual trustees of NOAT, or such other qualified party or parties as shall be selected by the Bankruptcy Court, will, subject to receipt of necessary approvals, become the controlling members of the Raymond and Beverly Sackler Foundation and the Raymond and Beverly Sackler Fund for the Arts and Sciences, which shall have an aggregate value of at least $175 million, and will be required to limit the purposes of the Foundations to purposes consistent with philanthropic and charitable efforts to ameliorate the opioid crisis.

7.      The Mediator remains available to assist the parties with respect to the resolution of outstanding unresolved issues.


Dated:   New York, New York
         July 7, 2021

                                        /s/Shelley C. Chapman
                                        HONORABLE SHELLEY C. CHAPMAN

**Exhibit A**
Purdue Pharma Mediator's Report
List of Mediation Participants[1]

| State / Firm | Party |
|---|---|
| **Ad Hoc Group of Non-Consenting States** | |
| State of California | Rob Bonta (Attorney General) |
|  | Michelle Burkart |
| State of Colorado | Phil Weiser (Attorney General) |
|  | Megan Rundlet |
| State of Connecticut | William Tong (Attorney General) |
|  | Matthew Fitzsimmons |
| State of Delaware | Kathy Jennings (Attorney General) |
|  | Owen Lefkon |
| District of Columbia | Karl A. Racine (Attorney General) |
|  | Wendy Weinberg |
| State of Hawaii | Clare E. Connors (Attorney General) |
|  | Bryan Yee |
| State of Idaho | Lawrence Wasden (Attorney General) |
|  | Brett Delange |
| State of Illinois | Kwame Raoul (Attorney General) |
|  | Adam Braun |
|  | Susan Ellis |
| State of Iowa | Tom Miller (Attorney General) |
|  | Nathan Blake |
| State of Maine | Aaron Frey (Attorney General) |
|  | Linda Conti |
| State of Maryland | Brian E. Frosh (Attorney General) |
|  | Brian Edmunds |
| Commonwealth of Massachusetts | Maura Healey (Attorney General) |
|  | Gillian Feiner |
| State of Minnesota | Keith Ellison (Attorney General) |
|  | John Keller |
| State of Nevada | Aaron D. Ford (Attorney General) |
|  | Mark Krueger |
|  | Laura Tucker |
| State of New Hampshire | John Formella (Attorney General) |
|  | James Boffetti |

---

[1] Attorneys General did not attend the Mediation in person but were all available telephonically.

| | | |
|---|---|---|
| State of New Jersey | Gurbir S. Grewal (Attorney General) | |
| | Lara Fogel | |
| State of New York | Letitia James (Attorney General) | |
| | Jennifer Levy | |
| State of North Carolina | Josh Stein (Attorney General) | |
| | Wesley Swain Wood | |
| | Daniel Mosteller | |
| State of Oregon | Ellen F. Rosenblum (Attorney General) | |
| | David Hart | |
| Commonwealth of Pennsylvania | Josh Shapiro (Attorney General) | |
| | James Donahue | |
| State of Rhode Island | Peter F. Neronha (Attorney General) | |
| | Neil Kelly | |
| State of Vermont | T.J. Donovan Jr. (Attorney General) | |
| | Jill Abrams | |
| Commonwealth of Virginia | Mark Herring (Attorney General) | |
| | Thomas Beshere | |
| State of Washington | Bob Ferguson (Attorney General) | |
| | Tad O'Neill | |
| State of Wisconsin | Josh Kaul (Attorney General) | |
| | R. Duane Harlow | |
| Pillsbury Winthrop Shaw Pittman LLP | Andrew Troop | |
| | Hugh McDonald | |
| | Andrew Alfano | |
| **Sackler Side B** | | |
| Milbank LLP | Gerard Uzzi | |
| | Nicholas Prey | |
| Paul, Weiss, Rifkind, Wharton & Garrison LLP | Theodore Wells Jr. | |
| | Michele Hirshman | |
| **Sackler Side A** | | |
| Debevoise & Plimpton LLP | Jeffrey Rosen | |
| | Mary Jo White | |
| | Maura Kathleen Monaghan | |
| **Debtors** | | |
| Purdue Pharma | Marc Kesselman | |
| Davis Polk & Wardwell LLP | Marshall Huebner | |
| | Jacob Weiner | |
| | Max Linder | |
| Dechert LLP | Sheila Birnbaum | |

|  | Hayden Coleman |
| --- | --- |
| **Mediator** | |
| N/A | Hon. Shelley C. Chapman |
| | Jamie Eisen |
| | Leslie Kan |

**Exhibit B**
Purdue Pharma Mediator's Report
Public Document Repository
Terms to be Added to Plan of Reorganization[1]

*Public Document Repository*.

(a) **Summary**. The document disclosure program provided in this Plan will lead to the public disclosure of the most significant documents about Purdue, the Sackler family, and the opioid crisis, including video depositions and millions of documents that Purdue produced in investigations and litigation over the past two decades. In addition, it will lead to the public disclosure of millions of documents not previously available to the public, including documents not previously produced in any investigation or litigation and certain privileged documents from the years when Purdue developed and promoted OxyContin, as identified below.

The document disclosure program and Public Document Repository ("**PDR**") will be conducted in a way to maximize public confidence and public access and will set a new standard for transparency.

(b) **DOJ Repository Obligation**. The Debtors bear sole responsibility for complying with the DOJ document repository obligation set forth in the Debtors' Plea Agreement in *United States v. Purdue Pharma L.P.*, No. 2:20-cr-01028-MCA (D.N.J.) ("**DOJ Repository Obligation**"), and the DOJ Repository Obligation is not modified by this Plan. Similarly, the Debtors' satisfaction of the DOJ Repository Obligation shall not diminish the additional commitment to disclosure provided by this Plan. Instead, the public shall receive the full benefit of both, and the PDR shall contain the full set of documents that the Debtors have agreed to host under the DOJ Repository Obligation.

(c) **Disclosure Oversight Board**. As described further below, the disclosure program provided in this Plan shall be overseen by a volunteer Disclosure Oversight Board ("**DOB**"), consisting of two representatives from each of the AHC, NCSG, and the Creditors' Committee and one representative from each of the Tribes and MSGE. No current or former director, officer, employee, or attorney of the Debtors shall serve on the DOB or oversee the disclosure program.

(d) **Purdue Legal Matters**. As described further below, important material for the disclosure program is contained in documents that the Debtors preserved, collected, logged, and produced in connection with investigations and litigation about Purdue's opioid business. Many non-privileged documents were produced in those matters; and many privileged documents were identified and logged. This Section 5.12 provides for the disclosure of many documents from the Purdue Legal Matters, which is a broad set of investigations and litigation defined in the Plan.

---

[1] Certain capitalized terms used but not defined herein shall have the meanings ascribed to such terms in the *Fifth Amended Joint Chapter 11 Plan of Reorganization of Purdue Pharma L.P. and its Affiliated Debtors* [ECF No. 2982].

(e) **Disclosure Program Budget**. As described further below, the disclosure program is designed to avoid unnecessary expense, including by employing an unpaid volunteer oversight board and by using negotiated agreements to avoid the need for litigation. To ensure the funding necessary for the disclosure program, Purdue, the Shareholders, the Creditors' Committee, and the Government Consent Parties negotiated funding provisions designed to preserve the value provided to claimants and dedicated to abatement. Initial funding shall be from the additional Sackler payments. Timing and quantum of other funding shall be agreed upon among the parties, this shall constitute the Disclosure Program Budget ("**Disclosure Program Budget**"), which shall be spent at the direction of the DOB.

In addition, as already provided in the Plan, Domestic Governmental Entities may elect (but are not required) to direct portions of their distributions to the PDR under terms provided in the Plan. Moreover, the DOB shall be permitted, but not required, to coordinate its work on this disclosure program with the work of state Attorneys General on related disclosures in the opioid industry, in a manner that reduces the costs and increases the benefits of this disclosure program. Finally, to make efficient use of the knowledge and expertise of the Debtors and their professionals, the Plan provides for significant materials to be collected by the Effective Date, as described further below.

For the avoidance of doubt, the PDR shall not be owned, held, administered or operated by the DOB, the Master Disbursement Trust, or any Creditor Trust; the role of the DOB and the Master Disbursement Trust is to develop and oversee a temporary program to set up the appropriate PDR and achieve the goals of the disclosure program

(f) **Access Materials**. On the Effective Date, or as soon as reasonably practicable thereafter, the DOB shall be provided access to a set of non-privileged materials for the purpose of accomplishing the PDR (collectively, the "**Access Materials**"). These Access Materials shall include:

(i) all transcripts and audio or video recordings of depositions taken in the Purdue Legal Matters, together with the exhibits to those depositions;

(ii) all documents produced by the Debtors in the Purdue Legal Matters (which comprise more than 13 million documents and more than 100 million pages);

(iii) the non-privileged documents from the Debtors' Relativity database described below (which are estimated to comprise more than 20 million additional documents beyond those produced in the Purdue Legal Matters);

(iv) all privilege logs regarding documents withheld by the Debtors in the Purdue Legal Matters; and

(v) documents obtained during the bankruptcy by the NAS Children Ad Hoc Committee regarding clinical and pre-

clinical studies conducted by the Debtors or other companies associated with the Sackler families.

(g) **Debtors' Relativity Database.** In the course of the Purdue Legal Matters, the Debtors collected a significant set of documents that are stored in a Relativity database. This collection includes files from more than two hundred custodians who played important roles at Purdue, including every member of the Sackler family who sat on the board or worked at the company. It also includes non-custodial documents, such as collections from electronic drives and paper archives. The custodial and non-custodial documents collected for the Relativity database are from files that Purdue has preserved pursuant to broad document preservation policies in place for over twenty years, including from an email archive containing emails dating to the 1990s. Pursuant to the terms provided in this Section 5.12, materials from the Relativity database will be available for the disclosure program as described above.

(h) **Additional Collections.** On the Effective Date, or as soon as reasonably practicable thereafter, the DOB will identify to Debtors the additional custodians whose documents should be collected, to the extent possible, from the email archive and other preserved files and the Debtors will load those files into the Relativity database for inclusion as Access Materials or Sequestered Materials as applicable.

(i) **Sequestered Materials.** On the Effective Date, or as soon as reasonably practicable thereafter, the Debtors shall provide the Plan Administration Trust ("**PAT**") with certain Privileged documents, described below, collected by Debtors during the course of the Purdue Legal Matters and stored in the Debtors' Relativity database, ("**Sequestered Materials**") to be preserved for access by the DOB. The provision of the Sequestered Materials to the PAT shall not constitute a waiver of any applicable privileges and, for clarity, no waiver of any applicable privilege shall occur prior to the Sequestration Date described below. The Sequestered Materials are estimated to include hundreds of thousands of documents.

To leverage efficiencies, the Debtors' current document review teams with experience reviewing Purdue's documents for privilege will screen and review, as necessary, all documents currently in the Relativity database for Privilege, Attorney Work Product, confidentiality, HIPAA, and critical business information before turning over documents as Access Materials or for sequestration. The DOB will aid the Debtors' document review team in setting parameters and search terms to effectuate accurate screening and review. The DOB may, confidentially and subject to privilege, request and be provided with information, and as necessary, an appropriate, expert-aided statistically valid sampling of the relevant documents or other methodologies to aid in the foregoing review under an appropriate protective order and non-waiver agreement.

Subject to the Sequestration Date, below, the Debtors agree to waive attorney client and work product privilege over documents created before May 1, 2014 ("**Cutoff Date**") that fall within the following categories:

(i) Marketing materials, promotional materials, and sales strategies. This will include, for example, legal advice on: marketing and promotional materials as part of the Medical,

Regulatory, Legal ("**MRL**") review process, and other reviews of statements in promotional and marketing materials to ensure consistency with a product's labeling and legal requirements; sales training materials (such as how to instruct the sales team on what they can and cannot say about the products); review of all call notes and whether statements on sales calls were appropriate; call planning; and sales bulletins. For the avoidance of doubt, "sales strategies" in this paragraph includes documents related to (1) medical liaisons, (2) continuing medical education, (3) the Evolve to Excellence program, (4) Purdue's interactions with medical advocacy groups, and (5) legal advice regarding the performance, selection, retention, management, and compensation of personnel in sales and marketing;

(ii) Materials reflecting legal advice on submissions to the FDA and compliance with FDA regulations. This will include, for example, advice on the decision to reformulate OxyContin, advice on interactions and communications with FDA, and advice on FDA requirements;

(iii) Legal advice regarding distributions to the Sacklers;

(iv) Legal advice regarding the organization or function of the board of directors;

(v) Legal advice regarding grants, gifts, and other payments with respect to naming rights of Purdue and its shareholders;

(vi) Legal advice regarding the performance, selection, retention, management, and compensation of the CEO of Purdue Pharma;

(vii) Legal advice regarding Purdue's interactions with state licensing boards and the Federation of State Medical Boards;

(viii) Legal advice regarding Purdue's interactions with Key Opinion Leaders, advisory boards and treatment guidance;

(ix) Legal advice regarding advocacy before the United States Congress or a state legislative branch with respect to OxyContin;

(x) Employment records and files created before the Cutoff Date pertaining to employment terminations or disciplinary actions related to opioid sales and marketing, including documents created before the Cutoff Date pertaining to internal investigations of personnel related to marketing of

        opioids, in all cases subject to applicable federal and state privacy and similar laws with respect to employees and with any redactions necessary to comply therewith; and

(xi) To the extent provided during the time period while the Corporate Integrity Agreement was in effect, legal advice regarding compliance with the Corporate Integrity Agreement entered into between Purdue and the DOJ.

Subject to the Sequestration Date, below, the Debtors agree to waive attorney client and work product privilege over the following categories of documents:

(xii) Documents reflecting Law Department reviews of, and decisions regarding, health care providers and pharmacies pursuant to Purdue's Abuse and Diversion Detection (ADD), Order Monitoring System (OMS), and Suspicious Order Monitoring (SOM) programs prior to mid-2018, which will have been or will be provided to the Department of Justice under a June 2019 non-waiver agreement; and

(xiii) Documents created before February 2018 reflecting legal review, analysis and advice with respect to advice received from McKinsey related to the sale and marketing of opioids; and

(xiv) Documents created before June 30, 2017 reflecting legal review, analysis and advice with respect to Practice Fusion.

To the extent documents subject to any of these waivers was previously logged on a privilege log in a Purdue Legal Matter, the Debtors shall provide the DOB with amended privilege logs that indicate the entries being produced pursuant to these waivers. For the avoidance of doubt, Privileged communications about interactions with the media with respect to subject matters that are otherwise waived herein are included in such waivers.

The Governmental Consent Parties and other parties hereto acknowledge that certain documents described in paragraphs (i) through (xiv) are subject to joint defense agreements, common interest privileges and other rights of third parties, which the Debtors do not have authority to waive. The Debtors will provide the DOB with privilege logs reflecting documents subject to such third-party privileges and rights that are identified in the course of identifying and compiling the Sequestration Materials. No documents subject to such third-party privileges and rights shall be included in the PDR, absent appropriate resolution of such third parties' rights and privileges. Further, the Debtors, the Governmental Consent Parties, and the other parties hereto acknowledge that no waiver of Privilege described herein shall be construed as subject matter waiver.

Subject to these acknowledgements, the Debtors, the Governmental Consent Parties, and the other parties hereto further agree to work together in good faith to

ensure that all documents consistent with the foregoing Sequestration Materials categories shall be available to the DOB for potential inclusion in the Public Document Repository.

To the extent that a document within the Access Materials also falls within a category of Sequestered Materials (for example, a document that was produced in a Purdue Legal Matter under Section 5.12(f)(ii) and is in the Debtors' Relativity database under Section 5.12(i)(i)), the document is eligible for access and disclosure as an Access Material regardless of the fact that it also appears in the set of data being preserved as Sequestered Materials.

(j) **Protection of the Privilege.** For the avoidance of doubt, Debtors do not waive and do not agree to provide as Sequestered Materials for the PDR any Privileged documents and communications not otherwise identified in Sections 5.12(i)(i) through (xiv). Such Privileged documents and communications not otherwise identified in Sections 5.12(i)(i) through (xiv) shall be removed from the Relativity database and separately preserved, and shall not be eligible for the PDR at any time. All Privileged documents removed from the Debtors' Relativity database, and not included in the Sequestered Materials described above, will be provided to the PAT, separately from the Sequestered Materials. The PAT will retain these materials for the period described in Section 5.12(v) below. For clarity, except for the Sequestered Documents identified in Sections 5.12(i)(i) through (xiv) above, the Debtors shall not intentionally provide the Master Distribution Trust or DOB with access to any documents or content of documents that are Privileged. Privileged documents subject to a clawback by Debtors in the Purdue Legal Matters. In the event that the Debtors inadvertently provide the Master Distribution Trust or DOB with access to Privileged documents except for those documents identified in Sections 5.12(i) through (xiv) above, that inadvertent provision does not operate as a waiver of the Privilege and, upon discovery, the DOB and/or Master Distribution Trust must promptly take steps to return the documents to the PAT or destroy such documents.

(k) **Sequestration Date**. On January 1, 2025, NewCo or the Master Disbursement Trust ("**MDT**") shall deliver the Sequestered Materials to the Host Institution. Those materials shall be made available for assessment by the DOB and disclosure in the PDR subject to the other provisions of this Section. The Host Institution may add Sequestered Materials to the PDR on the earlier of June 30, 2025 or the date after January 1, 2025 on which the MDT Claims are paid in full under the Plan.

(l) **Responsibilities of the DOB**. The DOB shall be responsible for:

(i) accomplishing prompt, broad, permanent, public disclosure of millions of the Debtors' documents via the PDR to allow the public to examine the Debtors' role in the opioid crisis;

(ii) engaging with survivors, advocates, journalists, scholars, policymakers, and others to ensure that the disclosure program serves the public;

(iii) directing the use of the Disclosure Program Budget;

(iv) establishing protections for Protected Information, as described below;

    (v) establishing procedures for resolution of Challenges to the redaction or disclosure of information, as described below;

    (vi) overseeing the Host Institution's implementation of the disclosure program;

    (vii) coordinating, as appropriate, the disclosure of documents from other producing parties or non-parties in opioid cases whose confidential information is included in the Access Materials including by discussing inclusion of Access Materials containing such third-party confidential information;

    (viii) ensuring the long-term sustainability and success of the disclosure program; and

    (ix) retaining and overseeing staff, counsel, or such other resources as are necessary and appropriate to accomplish he DOB's responsibilities under this Section 5.12.

  (m) **Host Institution**. The Host Institution(s) shall be selected by the governmental entities that support the Plan. The Host Institution will be responsible for hosting and maintaining the PDR in perpetuity, including but not limited to: maintaining control and security over documents in the PDR; providing an accessible user interface; and providing clear and transparent explanations of its procedures to the public. Subject to restrictions and oversight imposed by the DOB, the Host Institution may employ appropriate resources to accomplish its responsibilities, including but not limited to the use of permanent university employees, temporary employees, contractors, and vendor services. Commensurate with the large responsibilities assigned to the Host Institution, and subject to the decisions and oversight of the DOB and the requirements of this Plan, much of the Disclosure Program Budget may be directed to the Host Institution to fund the accomplishment of its responsibilities.

  (n) **Prompt Disclosure**. In keeping with the importance of the matter, the DOB shall dedicate its best efforts to ensure prompt disclosure and shall seek to ensure that the public receives substantial disclosure at least every quarter. The DOB shall prioritize prompt disclosure of the transcripts and audio and video recordings of depositions taken in the Purdue Legal Matters, together with the exhibits to those depositions. The Debtors will prioritize prompt production of the documents that Debtors have agreed to host pursuant to the DOJ Repository Obligation for immediate inclusion in the PDR for the sake of efficiency and cost savings.

  (o) **Redaction of Protected Information**. The DOB shall implement appropriate procedures to protect the following information ("**Protected Information**") by redacting Protected Information in documents before they are disclosed to the public in the PDR and by promptly catching and correcting errors if Protected Information is disclosed. Protected Information is: (i) any information protected from disclosure by the Health Insurance Portability and Accountability Act or similar state or federal statute; (ii) personal email addresses or personal phone numbers; (iii) information subject to confidentiality rights of third parties; (iv) information

subject to current trade secrets protection; (v) information regarding individuals that is of a purely personal nature and does not pertain to the Debtors' opioid business or related practices; and (vi) information otherwise protected by law. For the avoidance of doubt, Protected Information that should be redacted in a written document shall also be redacted in audio or video, such as deposition recordings.

(p)     **Limits on Redaction**. There shall be no redaction of: (i) names of the Debtors' directors, officers, employees, agents, attorneys, or consultants or of prescribers or of officials or employees of a government agency; (ii) email addresses at the "pharma.com" or "purduepharma.com" domain; or (iii) trade secrets in documents dated more than 5 years before the disclosure.

(q)     **Inadvertent Release of Privileged or Protected Information.** Notwithstanding anything else in the Plan, the PDR shall not contain or disclose any documents or content of documents that are Privileged, except for those documents identified in Sections 5.12(i) through (xiv) above that are eligible for the PDR after January 1, 2025, or any Protected Information. Inadvertent disclosure of Privileged documents in the PDR does not operate as a waiver of Privilege and, upon discovery, any Privileged documents must be promptly removed from the Document Repository.

The DOB will have sole liability for reviewing, evaluating, processing, and redacting all Protected Information before any document is placed in the PDR, but may permit any individual or entity to review, evaluate, process, or redact Protected Information. The DOB will establish a procedure that permits any party or member of the public to identify or challenge the disclosure of any potentially Protected Information placed in the PDR. The DOB will cause any document identified through this process to be immediately removed from the PDR pending review. Any disagreements regarding whether such material is Protected Information shall be resolved by the Special Master. The DOB will bear full legal responsibility arising out of or related to any improper disclosure of Protected Information.

(r)     **Special Master**. Immediately after the Effective Date, or as soon as reasonably practicable thereafter, the Bankruptcy Court shall appoint a Disclosure Oversight Special Master (the "**Special Master**"). The Special Master's qualifications shall include former service as a judicial officer, whether as a state or federal judge. The Special Master will adjudicate all privilege and related disputes. No current or former director, officer, employee, or attorney of the Debtors, the Creditors' Committee, or Governmental Consent Party shall be eligible to be appointed as the Special Master, counsel or staff working under the Special Master, provided that prior work for a Governmental Consent Party that was completed prior to 2015 shall not preclude the appointment of a Special Master. The Special Master's reasonable hourly fees and expenses shall be paid out of the Disclosure Program Budget.

To the extent that the DOB seeks to (a) challenge Debtors' assertion of Privilege with respect to any documents withheld or redacted from production in the Purdue Legal Matters, or excluded by Debtors from the Access Materials or (b) disclose any Protected Information in the PDR, such efforts shall be subject to review by the Special Master, who shall have final say regarding whether (1) the Master Distribution Trust and/or DOB should be provided with such materials, and (2) such materials shall be protected from public disclosure.

All challenges to documents over which Debtors assert Privilege or documents with Protected Information in the PDR, including challenges brought by either the DOB or members of the public, shall be brought within (i) one year of the Effective Date or (ii) within one year from, when the document or information at issue is first withheld from the PDR by redaction or logging, whichever of (i) or (ii) is earliest, but in no event after two years from the Effective Date. On or shortly after the Effective Date, the Court shall appoint a law firm to defend against challenges to whether documents or information withheld from the PDR are Privileged or Protected Information ("**Privilege Defense Counsel**"). Privilege Defense Counsel shall have the duty to represent the interests of the holder of Privilege or beneficiary of Protected Information in responding to disputes before the Special Master.

Any party seeking to initiate a challenge to the Privilege or Protected Information designation of a document or information in a document or any other challenge to the inclusion or exclusion of documents in the PDR (the "**Petitioner**") must first, as a condition precedent to any such challenge, meet and confer with Privilege Defense Counsel by serving a written statement of the specific material being disputed and the reasons for disputing each such material. If the meet and confer does not resolve the dispute, then the Petitioner shall submit a brief to the Special Master arguing why each individual document at issue should not be considered Privileged or subject to protection or should otherwise be included or excluded. Once a challenge has been submitted, the Special Master shall set a briefing schedule, permitting Privilege Defense Counsel no fewer 21 days to respond to the challenge, which may include *in camera* submissions in response. At the discretion of the Special Master, the briefing schedule may also include supplemental submissions, oral argument, or other procedures the Special Master deems necessary to reach a determination. The Special Master shall then evaluate and decide the challenge based upon existing legal precedent of federal law within the U.S. Court of Appeals for the Second Circuit, and shall be empowered to determine whether such materials are subject to a valid claim of Privilege or otherwise constitute Protected Information or should have otherwise been included or excluded, but shall not be empowered to waive any Privilege ever asserted by Debtors with respect to the Purdue Legal Matters or with respect to the Access Materials. If the Petitioner does not prevail, then the Special Master has the discretion to shift to the Petitioner some or all of the reasonable legal expense of Privilege Defense Counsel, whose reasonable fees and expenses shall otherwise be paid for by the Disclosure Program Budget. If the Special Master determines that the challenge was frivolous, harassing, needlessly increasing costs or expenses, or otherwise brought for an improper purpose, then the Special Master shall shift to the Petitioner some or all of the reasonable legal expense of Privilege Defense Counsel. For avoidance of doubt, any materials determined by the Special Master to be Privileged or to contain Protected Information shall not be included in the PDR.

Pending resolution of a challenge asserting a document was improperly disclosed, the Host Institution shall remove or redact each identified, challenged document.

(s) **Materials Produced by Shareholder Released Parties**. With respect to the Sackler family members' documents, the document repository shall include all documents that were produced in the bankruptcy cases and that relate to the manufacturing, sale, or marketing of opioids in the United States, the Debtors' alleged role or liability in connection with the opioid crisis, or the regulatory approval of any opioid product sold in the United States by the Debtors, but subject to appropriate exclusions for documents covered by the attorney-client

and work product privileges and certain confidential information (including exclusions for information and documents related to the finances, financing activities, taxes and tax filings, investments, and third party business and advisory relationships of the Shareholder Released Parties).

The Sackler family members and the Governmental Consent Parties shall agree to the appointment of a special master to resolve disputes regarding whether certain documents or information is required to be included in the document repository by the Sackler family members. If such parties cannot agree on a special master, the parties shall request that Judge Drain appoint the special master.

The Sackler family members shall have the right to claw back documents that they were entitled to exclude in accordance with this provision but inadvertently produced to the Public Document Repository, and such inadvertent production shall not operate as a waiver of rights. The special master shall resolve any disputes between Sackler family members and the Governmental Consent Parties concerning the exercise of clawback rights.

For the avoidance of doubt, "Sackler family members' documents" refer only to documents in the Sackler family members' possession, custody or control. Section 5.12(s) does not refer to documents including or involving Sackler family members that are in the Debtors' possession, custody or control.

(t) **Release of Confidentiality Rights by Parties Receiving Releases.** With regard to the disclosure of information in the PDR as authorized by this Section, the protections provided to Released Parties and Shareholder Released Parties shall be limited to the protections provided by this Plan. To the extent that Released Parties and Shareholder Released Parties possess rights to confidentiality beyond those provided this Plan (for example, a contractual confidentiality provision), those rights are waived to facilitate this disclosure program in exchange for the benefit of the releases provided to the Released Parties and Shareholder Released Parties by the Plan.

(u) **DOJ Settlement Communications**. Communications between the Debtors and DOJ regarding settlement or cooperation between 2015 and the final, non-appealable conclusion of *U.S. v. Purdue Pharma L.P.*, Case 2:20-cr-01028-MCA (D.N.J.) shall be protected from disclosure to the Master Distribution Trust and the DOB and shall not be included in the PDR, nor shall any internal Debtor documents reflecting such communications or the strategy for such communications. The Debtors shall implement this exclusion when creating the set of Sequestered Materials.

(v) **Documents Produced By Certain Financial Institutions**. The disclosure program shall not include the documents produced by financial institutions pursuant to the examination authorized by the Court at ECF No. 1143. For the avoidance of doubt, if the same information also appears in a second source that is subject to disclosure (*e.g.*, a deposition exhibit), then the information in that second source is subject to disclosure.

(w)     **Active Vendor Contracts**. The PDR shall not disclose the NewCo's active vendor contracts or expired contracts that would reveal the sum and substance of active contracts.  The DOB shall take appropriate steps to implement this exclusion.

(x)     **Exculpation and Indemnification of DOB members and Host Institution**.  To the maximum extent permitted by applicable law, the DOB members, whenever appointed, and the Host Institution shall not have or incur any liability for actions taken or omitted in his or her capacity as a DOB member, or on behalf of the DOB, except those acts found to be arising out of his or her willful misconduct, bad faith, gross negligence or fraud, and shall be entitled to indemnification and reimbursement for reasonable fees and expenses in defending any and all of his or her actions or inactions in his or her capacity as a DOB member, except for any actions or inactions found to be arising out of his or her willful misconduct, bad faith, gross negligence or fraud.  Any valid indemnification claim of any of the DOB members shall be satisfied from the Disclosure Program Budget.

(y)     **Reports**. On each of the first five anniversaries of the Effective Date, the DOB shall publish a public report describing the activities of the disclosure program, the use of any funds expended, and any funds committed for future use.

(z)     **Wind Down**. In or after January 2026, the DOB shall wind itself down.  If appropriate to facilitate the long-term success of the PDR, the DOB may arrange for another long-lived institution, such as one or more Attorneys General Offices, to interact with the Host Institution after the DOB is wound down (*e.g.*, by receiving reports). Upon the wind down of the DOB, the Host Institution shall be responsible for the permanent maintenance of the PDR.  For avoidance of doubt, however, the access to the Access Materials granted to the DOB herein shall not be transferred to any successor institution other than the Host Institution.  Upon the wind down of the DOB, the Access Materials shall, at NewCo's election, be returned to NewCo or destroyed or if NewCo no longer exists, the documents shall be destroyed or transferred to Privilege Defense Counsel.

Within 90 days of the announcement of the dissolution of the Plan Administration Trust, the Plan Administration Trust shall use commercially reasonable efforts to return to Privileged materials to Privilege Defense Counsel who shall retain the materials in a segregated client file.