DAVIS POLK & WARDWELL LLP
450 Lexington Avenue
New York, New York 10017
Telephone: (212) 450-4000
Facsimile: (212) 701-5800
Marshall S. Huebner
Benjamin S. Kaminetzky
Timothy Graulich
Eli J. Vonnegut
Christopher S. Robertson

*Counsel to the Debtors*
*and Debtors in Possession*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re: | **Chapter 11** |
| **PURDUE PHARMA L.P., et al.,** | **Case No. 19-23649 (RDD)** |
| Debtors.[1] | **(Jointly Administered)** |

**NOTICE OF FILING OF EIGHTH PLAN SUPPLEMENT PURSUANT TO THE FIFTH
AMENDED JOINT CHAPTER 11 PLAN OF REORGANIZATION OF
PURDUE PHARMA L.P. AND ITS AFFILIATED DEBTORS**

**PLEASE TAKE NOTICE** that, on June 3, 2021, the above-captioned debtors and debtors in possession (collectively, the "**Debtors**") filed solicitation versions of (i) the *Fifth Amended Joint Chapter 11 Plan of Reorganization of Purdue Pharma L.P. and Its Affiliated Debtors* [D.I. 2982] (as modified, amended or supplemented from time to time, the "**Plan**") and (ii) the *Disclosure Statement for Fifth Amended Joint Chapter 11 Plan of Reorganization of Purdue Pharma L.P. and Its Affiliated Debtors* [D.I. 2983] (as modified, amended or supplemented from time to time, the "**Disclosure Statement**"). Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to such terms in the Plan.

---

[1] The Debtors in these cases, along with the last four digits of each Debtor's registration number in the applicable jurisdiction, are as follows: Purdue Pharma L.P. (7484), Purdue Pharma Inc. (7486), Purdue Transdermal Technologies L.P. (1868), Purdue Pharma Manufacturing L.P. (3821), Purdue Pharmaceuticals L.P. (0034), Imbrium Therapeutics L.P. (8810), Adlon Therapeutics L.P. (6745), Greenfield BioVentures L.P. (6150), Seven Seas Hill Corp. (4591), Ophir Green Corp. (4594), Purdue Pharma of Puerto Rico (3925), Avrio Health L.P. (4140), Purdue Pharmaceutical Products L.P. (3902), Purdue Neuroscience Company (4712), Nayatt Cove Lifescience Inc. (7805), Button Land L.P. (7502), Rhodes Associates L.P. (N/A), Paul Land Inc. (7425), Quidnick Land L.P. (7584), Rhodes Pharmaceuticals L.P. (6166), Rhodes Technologies (7143), UDF LP (0495), SVC Pharma LP (5717) and SVC Pharma Inc. (4014). The Debtors' corporate headquarters is located at One Stamford Forum, 201 Tresser Boulevard, Stamford, CT 06901.

PLEASE TAKE FURTHER NOTICE that, on April 23, 2021, the Debtors filed the Notice of Filing of Plan Supplement Pursuant to the First Amended Joint Chapter 11 Plan of Reorganization of Purdue Pharma L.P. and Its Affiliated Debtors [D.I. 2732] (the "**First Plan Supplement**") in support of the Plan.

PLEASE TAKE FURTHER NOTICE that, on April 25, 2021, the Debtors filed the *Notice of Filing of Second Plan Supplement Pursuant to the First Amended Joint Chapter 11 Plan of Reorganization of Purdue Pharma L.P. and Its Affiliated Debtors* [D.I. 2737] (the "**Second Plan Supplement**") in support of the Plan.

PLEASE TAKE FURTHER NOTICE that, on May 15, 2021, the Debtors filed the *Notice of Filing of Third Plan Supplement Pursuant to the Second Amended Joint Chapter 11 Plan of Reorganization of Purdue Pharma L.P. and Its Affiliated Debtors* [D.I. 2867] (the "**Third Plan Supplement**") in support of the Plan.

PLEASE TAKE FURTHER NOTICE that, on May 17, 2021, the Debtors filed the *Notice of Filing of Fourth Plan Supplement Pursuant to the Second Amended Joint Chapter 11 Plan of Reorganization of Purdue Pharma L.P. and Its Affiliated Debtors* [D.I. 2868] (the "**Fourth Plan Supplement**") in support of the Plan.

PLEASE TAKE FURTHER NOTICE that, on May 26, 2021, the Debtors filed the *Notice of Filing of Fifth Plan Supplement Pursuant to the Fourth Amended Joint Chapter 11 Plan of Reorganization of Purdue Pharma L.P. and Its Affiliated Debtors* [D.I. 2938] (the "**Fifth Plan Supplement**") in support of the Plan.

PLEASE TAKE FURTHER NOTICE that, on June 2, 2021, the Debtors filed the Notice of Filing of *Sixth Plan Supplement Pursuant to the Fifth Amended Joint Chapter 11 Plan of Reorganization of Purdue Pharma L.P. and Its Affiliated Debtors* [D.I. 2977] (the "**Sixth Plan Supplement**") in support of the Plan.

PLEASE TAKE FURTHER NOTICE that, on June 30, 2021, the Debtors filed the Notice of Filing of *Seventh Plan Supplement Pursuant to the Fifth Amended Joint Chapter 11 Plan of Reorganization of Purdue Pharma L.P. and Its Affiliated Debtors* [D.I. 3098] (the "**Seventh Plan Supplement**") in support of the Plan.

PLEASE TAKE FURTHER NOTICE that the Debtors hereby file this *Eighth Plan Supplement Pursuant to the Fifth Amended Joint Chapter 11 Plan of Reorganization of Purdue Pharma L.P. and Its Affiliated Debtors* (this "**Eighth Plan Supplement**" and, together with the First Plan Supplement, the Second Plan Supplement, the Third Plan Supplement, the Fourth Plan Supplement, the Fifth Plan Supplement, the Sixth Plan Supplement and the Seventh Plan Supplement, each as may be amended, modified or supplemented from time to time, the "**Plan Supplement**") in support of the Plan.

PLEASE TAKE FURTHER NOTICE that this Eighth Plan Supplement contains the following documents, as may be amended, modified or supplemented from time to time by the Debtors in accordance with the Plan:

| | |
|---|---|
| **Exhibit A** | Hospital TDP |
| **Exhibit A-1** | Redline of Hospital TDP against the version filed with the Sixth Plan Supplement |
| **Exhibit E** | TPP TDP |
| **Exhibit E-1** | Redline of TPP TDP |
| **Exhibit G** | NOAT TDP |
| **Exhibit G-1** | Redline of NOAT TDP against the version filed with the Sixth Plan Supplement |
| **Exhibit H** | Tribe TDP |
| **Exhibit H-1** | Redline of Tribe TDP against the version filed with the Sixth Plan Supplement |
| **Exhibit K** | Master TDP |
| **Exhibit K-1** | Redline of Master TDP against the version filed with the Fifth Plan Supplement |
| **Exhibit O** | Hospital Trust Agreement |
| **Exhibit P** | NAS Monitoring Trust Agreement |
| **Exhibit Q** | TPP Trust Agreement |
| **Exhibit R** | NOAT Agreement |
| **Exhibit S** | Tribal Abatement Fund Trust ("TAFT") Agreement |
| **Exhibit T** | Tribal Opioid Abatement Fund LLC ("Tribe Opioid LLC") Operating Agreement |
| **Exhibit U** | MDT Agreement |
| **Exhibit V** | NewCo Transfer Agreement |
| **Exhibit W** | NewCo Operating Agreement |
| **Exhibit X** | TopCo Operating Agreement |
| **Exhibit Y** | NewCo Credit Support Agreement |
| **Exhibit Z** | PAT Agreement |

| | |
|---|---|
| **Exhibit AA** | Shareholder Settlement Agreement |
| **Exhibit BB** | Identity Disclosures |
| **Exhibit CC** | Schedule of Retained Causes of Action |
| **Exhibit DD** | Schedule of Excluded Parties |
| **Exhibit EE** | Restructuring Steps Memorandum |
| **Exhibit FF** | Estimate of Initial NOAT Distribution |
| **Exhibit GG** | Schedule of Rejected Contracts |

Exhibits and schedules to Plan Supplement documents without changes have been omitted from Redlines.

**PLEASE TAKE FURTHER NOTICE** that the forms of documents contained in the Plan Supplement are integral to, and are considered part of, the Plan. If the Plan is confirmed, the documents contained in the Plan Supplement will be approved by the Bankruptcy Court pursuant to the order confirming the Plan.

**PLEASE TAKE FURTHER NOTICE** that, except as otherwise noted, the documents contained herein are in draft form and remain subject to continuing review and negotiation among the Debtors and interested parties with respect thereto and therefore remain subject to material change. The Debtors reserve the right, subject to the terms and conditions set forth in the Plan, to alter, amend, modify or supplement any document in the Plan Supplement at any time before the Effective Date of the Plan, or any such other date as may be provided for by the Plan or by order of the Bankruptcy Court; provided that, if any document in the Plan Supplement is altered, amended, modified, or supplemented in any material respect prior to the hearing to confirm the Plan, the Debtors will file a redline of such document with the Bankruptcy Court. Each Plan Supplement document remains subject to the consent rights of the applicable parties in accordance with the terms of the Plan. For the avoidance of doubt, the inclusion in this Eighth Plan Supplement of any document does not and shall not be construed to mean that any such party has provided such consent.

**PLEASE TAKE FURTHER NOTICE** that copies of the Plan Supplement, the Plan, and the Disclosure Statement may be obtained free of charge by visiting the website of Prime Clerk LLC at https://restructuring.primeclerk.com/purduepharma. You may also obtain copies of any pleadings by visiting the Bankruptcy Court's website at http://www.nysb.uscourts.gov in accordance with the procedures and fees set forth therein.

**PLEASE TAKE FURTHER NOTICE** that the Confirmation Hearing will be commenced on **August 9, 2021, at 10:00 a.m., prevailing Eastern Time**, before the Honorable Robert D. Drain, in the United States Bankruptcy Court for the Southern District of New York, located at 300 Quarropas Street, White Plains, New York 10601-4140; provided that, pursuant to General Order M-543, dated March 20, 2021 (Morris, C.J.) ("**General Order M-543**"), such Hearing shall be conducted telephonically so long as General Order M-543 is in effect or unless

otherwise ordered by the Bankruptcy Court.[2] Please be advised that the Confirmation Hearing may be continued from time to time by the Bankruptcy Court without further notice.

Dated:    July 7, 2021
       New York, New York

                          DAVIS POLK & WARDWELL LLP

                          By:    /s/ Eli J. Vonnegut

                          450 Lexington Avenue
                          New York, New York 10017
                          Telephone: (212) 450-4000
                          Facsimile: (212) 701-5800
                          Marshall S. Huebner
                          Benjamin S. Kaminetzky
                          Timothy Graulich
                          Eli J. Vonnegut
                          Christopher S. Robertson

                          *Counsel to the Debtors*
                          *and Debtors in Possession*

---

[2] A copy of General Order M-543 can be obtained by visiting https://www.nysb.uscourts.gov/news/general-order-m-543-court-operations-under-exigent-circumstances-created-covid-19.

## EXHIBIT A

**Hospital TDP**

## HOSPITAL TRUST
## DISTRIBUTION PROCEDURES[1]

### § 1.    APPLICABILITY.

Pursuant to the plan of reorganization of Purdue Pharma L.P. and its Debtor affiliates (the "Plan")[2] and the Master TDP, the following claims ("Hospital Channeled Claims") shall be channeled to and liability therefor shall be assumed by the Hospital Trust as of the Effective Date: (i) all Hospital Claims,[3] which include all Claims against the Debtors held by providers of healthcare treatment services or any social services, in their capacity as such, that are not Domestic Governmental Entities, and (ii) all Released Claims and Shareholder Released Claims held by providers of healthcare treatment services or any social services, in their capacity as such, that are not Domestic Governmental Entities.    Hospital Channeled Claims shall be administered, liquidated and discharged pursuant to the Hospital Trust Documents, and satisfied solely from funds held by the Hospital Trust as and to the extent provided in these distribution procedures (this "Hospital TDP"). This Hospital TDP sets forth the manner in which the Hospital Trust shall make Abatement Distributions to Holders of Hospital Channeled Claims (such Abatement Distributions, "Hospital Abatement Distributions") that satisfy the eligibility criteria for Authorized Recipients set forth herein.    Hospital Channeled Claims shall be fully discharged pursuant to this Hospital TDP.

Hospital Authorized Recipients (as defined below) are required to use all funds distributed to them from the Hospital Trust solely and exclusively for (i) the Authorized Abatement Purposes set forth in § 7 or (ii) the payment of attorneys' fees and costs of Holders of Hospital Channeled Claims (including counsel to the Ad Hoc Group of Hospitals) (such Authorized Abatement Purposes, collectively, "Hospital Authorized Abatement Purposes").

### § 2.    CLAIMS ADMINISTRATION.

The Plan contemplates that the Hospital Trust will receive a total of $250 million over time, with an initial payment of $25 million to the Hospital Trust on the Effective Date (the "Initial Hospital Trust Distribution") and five subsequent payments to the Hospital Trust from the Master Disbursement Trust in the following amounts: (i) $35 million on July 31, 2022, (ii) $45 million on July 31, 2023, (iii) $45 million on July 31, 2024, (iv) $50 million on July 31, 2025, and (v) $50

---

[1]    These procedures are qualified by the terms of the Plan. Holders of Hospital Channeled Claims are strongly advised to review the Plan as well as all of the Hospital Trust Documents and the Debtors' Disclosure Statement for additional information on the terms of the Plan and the treatment of Hospital Channeled Claims.

[2]    Terms used but not defined herein shall have the meaning ascribed to them in the Plan.

[3]    For the avoidance of doubt, "Hospital Claim" as defined in the Plan includes, without limitation, (i) the Claims set forth in the 1,030 Proofs of Claim filed by hospitals and the 150 Proofs of Claim filed by other treatment providers and (ii) Claims against the Debtors held by non-federal acute care hospitals as defined by the U.S. Centers for Medicare and Medicaid Services ("CMS"), and non-federal hospitals and hospital districts that are required by law to provide inpatient acute care and/or fund the provision of inpatient acute care.

million on July 31, 2026.[4]  So long as he is able to serve as of the Effective Date, the presumptive trustee of the Hospital Trust is Hon. Thomas Hogan (Ret.) (the "Trustee").  If Judge Hogan is not able to serve, then a new Trustee will be selected in accordance with the Plan in advance of the Effective Date by the Ad Hoc Group of Hospitals with the consent of the Debtors (which consent shall not be unreasonably withheld, delayed or denied).[5]  The Ad Hoc Group of Hospitals is a group of certain Holders of Hospital Channeled Claims consisting of the Ad Hoc Group of Hospitals identified in the *Second Amended Verified Statement of the Ad Hoc Group of Hospitals Pursuant to Bankruptcy Rule 2019* [D.I. 1536].

The Trustee shall have the power and authority to perform all functions on behalf of the Hospital Trust, and shall undertake all administrative responsibilities as are provided in the Plan and the Hospital Trust Documents.[6]  The Trustee shall be responsible for all decisions and duties with respect to the Hospital Trust.[7]

The Trustee shall have the authority to determine the eligibility of Hospital Authorized Recipients and the amount of Hospital Abatement Distributions made by the Hospital Trust.  In order to qualify as a Hospital Authorized Recipient and be eligible to receive a Hospital Abatement Distribution, Holders of Hospital Channeled Claims must comply with the terms, provisions and procedures set forth herein, including the Hospital Abatement Distribution Form Deadline and the timely submission of all forms required pursuant hereto.  The Trustee may investigate any Hospital Channeled Claim, and may request information from any Holder of a Hospital Channeled Claim

---

[4]   In the event that any payment date is on a date that is not a Business Day, then the making of such payment may be completed on the next succeeding Business Day, but shall be deemed to have been completed as of the required date.

[5]   The Hospital Trust Agreement shall provide that, in the event of a vacancy in the Trustee position, whether by term expiration, death, retirement, resignation, or removal, the vacancy shall be filled by the unanimous vote of the Hospital Trust Advisory Committee (the "TAC"); in the event that the TAC cannot appoint a successor Trustee, for any reason, the Bankruptcy Court shall select the successor Trustee.

[6]   The Hospital Trust Agreement shall provide that the Trustee shall have the power to appoint such officers, hire such employees, engage such legal, financial, accounting, investment, auditing, forecasting, and other consultants, advisors, and agents as the business of the Hospital Trust requires, and delegate to such persons such powers and authorities as the fiduciary duties of the Trustee permit and as the Trustee, in its discretion, deem advisable or necessary in order to carry out the terms of the Hospital Trust, including without limitation the Delaware Trustee, and any third-party claims or noticing agent deemed necessary or convenient by the Trustee, and pay reasonable compensation to those employees, legal, financial, accounting, investment, auditing, forecasting, and other consultants, advisors, and agents employed by the Trustee after the Effective Date (including those engaged by the Hospital Trust in connection with its alternative dispute resolution activities).

[7]   The Hospital Trust Agreement shall provide that: (i) the Trustee shall receive a retainer from the Hospital Trust for his or her service as a Trustee in the amount of $25,000 per annum, paid annually; (ii) hourly time shall first be billed and applied to the annual retainer; (iii) hourly time in excess of the annual retainer shall be paid by the Hospital Trust; (iv) for all time expended as a Trustee, including attending meetings, preparing for such meetings, and working on authorized special projects, the Trustee shall receive the sum of $525 per hour; (v) for all non-working travel time in connection with Hospital Trust business, the Trustee shall receive the sum of $275 per hour; (vi) all time shall be computed on a decimal (1/10th) hour basis; and (vii) the Trustee shall not be required to post any bond or other form of surety or security unless otherwise ordered by the Bankruptcy Court.

to ensure compliance with the terms set forth in this Hospital TDP, the other Hospital Trust Documents and the Plan.

Pursuant to section 1123(b)(3)(B) of the Bankruptcy Code and applicable state corporate law, the Trustee shall be and is appointed as the successor-in-interest to, and the representative of, the Debtors and their Estates for the retention, enforcement, settlement or adjustment of the Hospital Channeled Claims.

In accordance with Section 5.11(b) and (c) of the Plan, the Trustee shall receive copies of all Proofs of Claims for the Hospital Claims on the Effective Date, and shall be entitled to make reasonable requests to NewCo for additional information and documents reasonably necessary for the administration of the Hospital Trust, which may include those medical, prescription or business records of the Debtors related to the Hospital Channeled Claims, which records shall be transferred to NewCo on the Effective Date.

## § 3.    QUALIFYING CERTIFICATION.

To qualify as a Hospital Authorized Recipient, a Holder of a Hospital Channeled Claim must certify in its Hospital Abatement Distribution Form (as defined below) that:

(a)    It adheres to the standard of care for the emergency department, hospital wards and outpatient clinics at the time of any prospective evaluation, diagnosis, and treatment of OUD, including with respect to the applicable standard of care for the treatment of addiction, acute withdrawal and treatment for OUD with medication assisted treatment; and

(b)    It provides discharge planning and post-discharge care coordination for patients with OUD, including information for appropriate OUD treatment services.

A Holder of a Hospital Channeled Claim must demonstrate through the Requisite Hospital Claims data that it has been damaged in the past and reasonably anticipates incurring additional abatement expenses in the future arising from patients suffering from OUD; if it does not do so, then it will not receive any Hospital Abatement Distribution.

## § 4.    ELIGIBILITY FOR HOSPITAL ABATEMENT DISTRIBUTIONS; NOTICES.

(a)    Eligibility for Hospital Abatement Distributions

To qualify as a Hospital Authorized Recipient eligible to receive Hospital Abatement Distributions from the Hospital Trust, each applicable Holder of a Hospital Channeled Claim must:

(i)    Have timely filed a Proof of Claim in the Debtors' Chapter 11 case (that is, on or before July 30, 2020); provided, that this requirement shall not apply to a Holder of a Hospital Channeled Claim that (a) is listed on the national registry of hospitals maintained by the American Hospital Directory®, as in effect on the Effective Date *and* (b) is (x) a non-federal acute care hospital as defined by CMS or (y) a non-federal hospital or hospital district that is

required by law to provide inpatient acute care and/or fund the provision of inpatient acute care;

(ii)     Timely submit the form attached hereto as Exhibit A (the "Hospital Abatement Distribution Form") containing:

A.     the certification set forth in § 3;

B.     a certification signed by the Holder of a Hospital Channeled Claim or its attorney attesting to the accuracy and truthfulness of the Holder of a Hospital Channeled Claim's submission. Such certification must include an attestation that no data required for claims processing and distribution valuation, and no records or information that would reasonably be relevant to the valuation of the distribution, have been misrepresented or withheld; and

C.     the certification that the Holder of a Hospital Channeled Claim will comply with § 7 in its use of any funds distributed to it; and

(iii)     Provided all of the requisite claims data (as described in § 5 the "Requisite Claims Data") as part of a timely filed Proof of Claim or in connection with submitting a Hospital Abatement Distribution Form.

Any Holder of a Hospital Channeled Claim who meets all of the above criteria (i)-(iii) (each, a "Hospital Authorized Recipient") shall qualify for Hospital Abatement Distributions, subject to the limitations otherwise set forth herein; however, if such Holder does not meet such criteria, then it will not qualify as a Hospital Authorized Recipient and will not receive any Hospital Abatement Distributions. Any discrepancy as to whether a Holder of a Hospital Channeled Claim qualifies as a Hospital Authorized Recipient pursuant to the criteria as set forth in this § 4(a) will be resolved by the Trustee.

Those Hospital Claims that are evidenced by timely filed Proofs of Claim in the Debtors' Chapter 11 Cases (that is, for which Proofs of Claim were filed prior to or on the General Bar Date of July 30, 2020, i.e., D.I. 1536) that contained all of the Requisite Claims Data for such Hospital Claims have satisfied the requirements of §§ 4(a)(i) and 4(a)(iii), and shall be required to submit only a Hospital Abatement Distribution Form that provides the certifications set forth in § 4(a)(ii) to qualify for Hospital Abatement Distributions.[8]

FOR AVOIDANCE OF DOUBT, FOR A HOLDER OF A HOSPITAL CHANNELED CLAIM TO QUALIFY AS A HOSPITAL AUTHORIZED RECIPIENT AND BE ELIGIBLE TO RECEIVE A HOSPITAL ABATEMENT DISTRIBUTION, SUCH HOLDER OF A HOSPITAL

---

[8]     There are approximately 1,180 Hospital Claims believed to satisfy the requirements of §§ 4(a)(i) and 4(a)(iii), comprising approximately 1,030 Proofs of Claim filed by hospitals and 150 Proofs of Claim filed by other treatment providers; this Hospital TDP does not constitute an admission by the Trustee that such Proofs of Claim in fact contained all applicable Requisite Claims Data, and the Trustee reserves the right to request additional information from any Holder of a Hospital Channeled Claim before such Holder of a Hospital Channeled Claim is determined to be a Hospital Authorized Recipient.

CHANNELED CLAIM MUST TIMELY SUBMIT A FULLY COMPLETED HOSPITAL ABATEMENT DISTRIBUTION FORM BY OR BEFORE THE HOSPITAL ABATEMENT DISTRIBUTION FORM DEADLINE (THAT IS, FORTY-FIVE (45) DAYS AFTER THE DATE OF THE APPLICABLE HOSPITAL ABATEMENT DISTRIBUTION DEADLINE NOTICE, AS SET FORTH HEREIN).

(b)    Notices

(i)    As soon as reasonably practicable after the Effective Date of the Plan, the Trustee or the Claims Administrator, as applicable, shall cause a notice to be served on each Holder of a Hospital Channeled Claim that (i) is listed on the national registry of hospitals maintained by the American Hospital Directory ®, as in effect on the Effective Date *and* (ii) is (x) a non-federal acute care hospital as defined by CMS or (y) a non-federal hospital or hospital district that is required by law to provide inpatient acute care and/or fund the provision of inpatient acute care.  Such notice shall contain, among other things that the Trustee deems reasonable and appropriate under the circumstances, (i) this Hospital TDP, including the Hospital Abatement Distribution Form attached hereto, (ii) the URL for the Debtors' claims and noticing website where such Hospitals can locate the Plan (https://restructuring.primeclerk.com/purduepharma), and (iii) clear instructions for submitting a Hospital Abatement Distribution Form to the Trustee, the deadline set forth in each such Hospital Abatement Distribution Form for submitting the Hospital Abatement Distribution Form being 45 days after the date of such notice.

(ii)    Also as soon as reasonably practicable after the Effective Date, the Trustee or the Claims Administrator, as applicable, shall cause a notice (each such notice, and each notice delivered pursuant to § 4(b)(i) above, a "Hospital Abatement Distribution Deadline Notice") to be served on each of the Holders of the approximately 1,180 Hospital Claims for which there are timely filed Proofs of Claim, indicating whether such Proof of Claim contained the Requisite Claims Data for such Hospital Claim, and providing each such Holder of a Hospital Channeled Claim with 45 days from the date of such notice to submit a Hospital Abatement Distribution Form that complies with this § 4.  Such notice shall make clear whether the applicable Proof of Claim (i) contained the Requisite Claims Data (and therefore such Holder of a Hospital Channeled Claim is required to provide only the certifications set forth in § 4(a)(ii)) or (ii) did not contain the Requisite Claims Data in its Proof of Claim (and therefore such Holder of a Hospital Channeled Claim is required to satisfy both §§ 4(a)(ii) and 4(a)(iii) hereof when it submits its Hospital Abatement Distribution Form).

(iii)    For any Holder of a Hospital Channeled Claim that receives a Hospital Abatement Distribution Deadline Notice pursuant to §§ 4(b)(i) or 4(b)(ii) hereof and submits a Hospital Abatement Distribution Form, and all of its parts, by the applicable deadline (with respect to each such notice, the

5

"Hospital Abatement Distribution Form Deadline") and whose Hospital Abatement Distribution Form is substantially complete but otherwise defective in such a manner as to render such Holder of a Hospital Channeled Claim ineligible to receive Hospital Abatement Distributions, and to the extent such defect is determined by the Trustee to be curable, the Trustee, as applicable, shall provide such Holder of a Hospital Channeled Claim with notice of the defect and a reasonable period of time following delivery of such notice for such Holder of a Hospital Channeled Claim to cure such defective Hospital Abatement Distribution Form. The Trustee shall exercise discretion in determining defect, curability and the period of time in which a defect may be cured.  Under no circumstance is the Trustee obligated to send a notice of defect for Hospital Abatement Distribution Forms that do not provide responses to the requirements set forth under §§ 4(a)(ii) and 4(a)(iii).

(iv)     Other than pursuant to the cure procedures set forth herein, any Holder of a Hospital Channeled Claim that does not submit a Hospital Abatement Distribution Form shall not qualify as a Hospital Authorized Recipient, and any Holder of a Hospital Channeled Claim that submits a Hospital Abatement Distribution Form after the Hospital Abatement Distribution Form Deadline shall not qualify as a Hospital Authorized Recipient.  No Hospital Abatement Distribution Form shall be accepted after the Hospital Abatement Distribution Form Deadline.

## § 5.   EVIDENCE FOR DETERMINATION OF HOSPITAL ABATEMENT DISTRIBUTIONS.

(a)     To permit the Trustee to evaluate the amount each Hospital Authorized Recipient is to receive as a Hospital Abatement Distribution, and to the extent not already submitted in connection with its Proof of Claim, a Holder of a Hospital Channeled Claim must submit all of the following, non-exhaustive, data and types of documents, unless otherwise determined in the discretion of the Trustee in consultation with the TAC and consistent with § 4(b)(iii):

(i)     A properly and fully completed Hospital Abatement Distribution Form, with all its parts and requisite submissions, as established by the Trustee, consistent with the requirements set forth in § 4; and

(ii)     copies of all claims, complaints, proofs of claim, notices, settlement documents, releases, recoveries, compensation received, or similar documents that a Holder of a Hospital Channeled Claim submits or entered into in respect of claims asserted against or to be asserted against any other entity or person arising from or related to such Holder of a Hospital Channeled Claim's OUD program or related to any of the injuries that underlie that claim presented to the Trustee.

The Trustee may request additional information as reasonably necessary in the opinion of the Trustee to determine the amount to be distributed to a Hospital Authorized Recipient.  The Trustee shall establish a reasonable timeframe in which a Hospital Authorized Recipient must provide any requested information.

## § 6.    DETERMINATION OF HOSPITAL ABATEMENT DISTRIBUTION AMOUNTS.

(a)    The Trustee (or its agents or representatives) shall review the timely submitted Hospital Abatement Distribution Forms.

(b)    The Trustee shall utilize (but shall have no rights in or to the intellectual property contained in) the proprietary Legier Model and Algorithm (the "Model"), prepared and operated by Legier & Company, apac, for determining the amount of each Hospital Abatement Distribution.   The amount of the Hospital Abatement Distribution to be paid to each Hospital Authorized Recipient shall be determined within 120 days after the applicable Hospital Abatement Distribution Form Deadline or in a period of time determined by the Trustee to be most practicable.

(c)    The Model shall determine the amount distributable to each Hospital Authorized Recipient based on (1) the diagnostic codes associated with operational charges incurred by the Hospital Authorized Recipient in connection with the treatment of Opioid Use Disorder, (2) the portion of such charges that were not reimbursed, and (3) the following distribution determination factors and weights:[9]

(i)    Units of morphine milligram equivalents (MME) dispensed in the Hospital Authorized Recipient's service area ("Service Area") during the period January 1, 2006-December 31, 2014 (the "Measurement Period") (to be weighted at 10%);

(ii)    Opioid use disorder rates at the State level, pro-rated for each Hospital Authorized Recipient (to be weighted at 10%);

(iii)    Opioid overdose deaths in the Hospital Authorized Recipient's Service Area (to be weighted at 8.75%);

(iv)    Operational impact calculated using the Model, to include opioid diagnoses, and charge and reimbursement data (to be weighted at 35%);

(v)    Hospital Authorized Recipient's opioid related patients as a percentage of its total patients (to be weighted at 18.75%);

(vi)    17.5% for either

---

[9]    The Model calculates a Hospital Authorized Recipient's loss resulting from its treatment of patients with OUD and other opioid diagnoses, considering the total charges and collections for each, among other things, including a causation algorithm applied to each patient encounter.

A.      such Hospital Authorized Recipient having filed a timely Proof of Claim in the Purdue Pharma bankruptcy claim filing process, or

B.      such Hospital Authorized Recipient having been designated as a "Safety Net Hospital"[10] on the Effective Date.

## § 7.    HOSPITAL AUTHORIZED ABATEMENT PURPOSES.

(a)     All net funds (after the deduction of all legal fees and litigation expenses, as described herein, and in the Hospital Trust Agreement) distributed to Hospital Authorized Recipients shall be used solely and exclusively for Opioid Use Disorder ("OUD") abatement programs, whether currently existing or newly initiated.  As a condition of receiving a Hospital Abatement Distribution, each Hospital Authorized Recipient must submit to the Trustee on its Hospital Abatement Distribution Form a written statement that all funds will be spent only in the Authorized Recipient's Service Area for one or more of the following Hospital Authorized Abatement Purposes:

(i)      Providing transportation to treatment facilities for patients with OUD.

(ii)     Providing continuing professional education in addiction medicine, including addressing programs addressing stigma.

(iii)    Counteracting diversion of prescribed medication in ED or practice, consistent with the following goal:  reducing opioid misuse, OUD, overdose deaths, and related health consequences throughout the hospital Service Area (county or region).

(iv)    Participating in community efforts to provide OUD treatment to others in the community, such as those in jails, prisons, or other detention facilities.

(v)     Providing community education events on opioids and OUD.

(vi)    Providing Naloxone kits and instruction to patients upon discharge.

(vii)   Implementing needle exchange in hospital or adjacent clinic and providing on-site MAT services if possible.

(viii)  Prospectively providing otherwise unreimbursed or under-reimbursed future medical services for patients with OUD or other opioid related diagnoses.

---

[10]  A "Safety Net Hospital" has (a) a Medicare Disproportionate Patient Percentage (DPP) of 20.2% or greater; (b) annual uncompensated care (UCC) of at least $25,000 per bed; and (c) profit margin of 3.0% or less.

    (ix)     Building or leasing space to add half-way house beds.

    (x)     Participating in research regarding development of innovative OUD treatment practices.

    (xi)     Directing moneys to any other public or private Authorized Recipient of funds concerning the treatment of persons with OUD or other opioid-related diagnoses; provided that such recipient's use of such funds would otherwise constitute an Authorized Abatement Purpose.

    (xii)     Medication-Assisted Treatment ("MAT") Programs: an aggregate of $50 million may be earmarked for Holders of Hospital Channeled Claims to establish and implement a MAT program or to continue, complete and/or implement an existing MAT program already under development.[11]

    (xiii)     Engaging in any other abatement activity with the express permission of the Court, at the request of the Trustee.

(b)    In addition, the Hospital Trust shall, in accordance with the Plan, the Confirmation Order and the Hospital Trust Documents, make Hospital Abatement Distributions to Hospital Authorized Recipients exclusively for Hospital Authorized Abatement Purposes within each Hospital Authorized Recipients' respective Service Area identified in the claim. Decisions concerning Hospital Abatement Distributions made by the Hospital Trust will consider the need to ensure that underserved urban and rural areas, as well as minority communities, receive equitable access to the funds.

(c)    To the extent any Holder of a Hospital Channeled Claim that is otherwise a Hospital Authorized Recipient does not comply with this § 7, such Holder of a Hospital Channeled Claim shall not be a Hospital Authorized Recipient and shall be disqualified from receiving Hospital Abatement Distributions, notwithstanding any other eligibility determination pursuant to other sections or procedures set forth herein or in the other Hospital Trust Documents.

## § 8.  HOSPITAL ABATEMENT DISTRIBUTIONS BY HOSPITAL TRUST.

(a)    Once the Trustee has calculated the amount of the Hospital Abatement Distribution to be paid to each Hospital Authorized Recipient, and also calculated each Hospital Authorized Recipient's *pro rata* share of the total sum of all Hospital Abatement Distributions to be paid to all Hospital Authorized Recipients, then the Trustee shall make interim Hospital Abatement Distributions, from time to time in its judgment, to those Hospital Authorized Recipients that have complied with all of the criteria

---

[11]    The Hospital Abatement Distribution Form will provide an opportunity to indicate the proportion and amount of Hospital Abatement Distributions that the Hospital Authorized Recipient intends to apply to MAT programs.

and procedures described herein.  Unless otherwise determined by the Trustee, such Hospital Authorized Recipients may receive one interim, and one final, distribution.

(b)    All payments made for one or more of said Hospital Authorized Abatement Purposes shall be subject to audit by the Trustee of the Hospital Trust and shall be repaid with a ten percent (10%) penalty added for any funds found by audit to have been spent for an unauthorized purpose.  Such audit may occur any time prior to the wind-down of the Trust.

(c)    Hospital Abatement Distributions will be subject to a common benefit assessment and may be subject to certain additional assessments for payment of attorneys' fees and costs of the Ad Hoc Group of Hospitals in accordance with Section 5.8 of the Plan.

## § 9.    REPORTING BY HOSPITAL AUTHORIZED RECIPIENTS.

(a)    Within ninety (90) days after the end of a distribution period (that being the twelve (12) month period following each annual distribution date), each Hospital Authorized Recipient that received a distribution must submit to the Hospital Trust a certification regarding its satisfaction of the minimum spending requirements on Hospital Authorized Abatement Purposes or that it was unable to meet the minimum spending requirements and must carryover a portion of its distribution.

(b)    If the Hospital Authorized Recipient has not met the requirements during that period, those allocated but unused funds can carry over to the subsequent periods and will continue to carry forward each year until the Hospital Authorized Recipient meets the relevant spending requirements for Hospital Authorized Abatement Purposes.  Additional annual certification(s) must be submitted until the Hospital Authorized Recipient meets the relevant spending requirements.  A Hospital Authorized Recipient shall not be subject to a penalty for failing to meet the minimum spending requirements with respect to its Hospital Abatement Distribution during a given distribution period.

(c)    The Hospital Trust shall have the right to audit a claimant to determine whether the Hospital Authorized Recipient's expenditures for Hospital Authorized Abatement Purposes have met the requirements set forth in the Hospital Trust Documents.

(d)    Each Hospital Authorized Recipient, if and when requested by the Hospital Trustee (or its agents or representatives), shall provide supporting documentation, in a mutually agreed upon format, demonstrating that the Hospital Authorized Recipient's expenditures for Hospital Authorized Abatement Purposes have met the requirements of the Hospital Trust Documents.  All Proofs of Claim, Hospital Abatement Distribution Forms and certifications filed or submitted by Holders of Hospital Channeled Claims are subject to audit by the Hospital Trustee (or its agents or representatives).  If the Hospital Trustee finds a material misstatement in a Holder of a Hospital Channeled Claim's Proof of Claim, Hospital Abatement Distribution Form or certification, the Hospital Trustee may allow that Holder of a

10

Hospital Channeled Claim up to 30 days to resubmit its Proof of Claim, Hospital Abatement Distribution Form or certification with supporting documentation or revisions.  Failure of the Holder of a Hospital Channeled Claim to timely correct its misstatement in a manner acceptable to the Hospital Trustee may result in forfeiture of all or part of the Holder of a Hospital Channeled Claim's qualification as a Hospital Authorized Recipient or right to receive Hospital Abatement Distributions.

(e)    The Trustee shall have the power to take any and all actions that in the judgment of the Trustee are necessary or proper to fulfill the purposes of Hospital Trust. The Hospital Trust retains the right to seek return by legal means of any expenditures which fail to comply with the requirements of this Hospital TDP.

## § 10.   REPORTING BY THE HOSPITAL TRUST.

The Hospital Trust shall file an annual report with the Bankruptcy Court after each year that the Hospital Trust is in existence, summarizing the distributions made from the Hospital Trust and detailing the status of any Hospital Authorized Recipient audits, and any recommendations made by the Trustee relating to such audits.

**EXHIBIT A**
**HOSPITAL ABATEMENT DISTRIBUTION FORM**

# HOSPITAL ABATEMENT DISTRIBUTION FORM

**HOSPITAL ABATEMENT DISTRIBUTION FORM DEADLINE: [_____]**

Please read the instructions carefully before filling out this Hospital Abatement Distribution Form (this "Form").  Capitalized terms used herein and not otherwise defined, shall have the meanings ascribed to them in the *Fifth Amended Joint Plan of Reorganization of Purdue Pharma L.P. and its Affiliated Debtors* (as modified, amended or supplemented from time to time, the "Plan") [Docket No. 2982] or the Hospital Trust Distribution Procedures (as modified, amended or supplemented from time to time, the "Hospital TDP")," dated June 3, 2021 [Docket No. 2977].

Each Holder of a Hospital Channeled Claim, which includes (i) all Hospital Claims,[1] which include all Claims against the Debtors held by providers of healthcare treatment services or any social services, in their capacity as such, that are not Domestic Governmental Entities and (ii) all Released Claims and Shareholder Released Claims held by providers of healthcare treatment services or any social services, in their capacity as such, that are not Domestic Governmental Entities, is required to complete and submit this Form in order to be eligible to receive Hospital Abatement Distributions from the Hospital Trust.

In this proceeding, "Purdue Opioid" means all natural, semi-synthetic or synthetic chemicals that interact with opioid receptors on nerve cells in the body and brain, and that are approved by the U.S. Food & Drug Administration  and listed by the U.S. Drug Enforcement Administration  as Schedule II or III drugs pursuant to the federal Controlled Substances Act, 21 U.S.C. § 801 et seq. produced, marketed, or sold by the Debtors as: (i) the following Brand Name Medications: OxyContin®, Hysingla ER®, Butrans®, Dilaudid®, Ryzolt, MS Contin®, MSIR®, Palladone®, DHC Plus®, OxyIR®, or OxyFast®; and (ii) the following Generic Medications: oxycodone extended-release tablets, buprenorphine transdermal system, hydromorphone immediate-release tablets, hydromorphone oral solution, tramadol extended-release tablets, morphine extended-release tablets, oxycodone immediate-release tablets, oxycodone and acetaminophen tablets (generic to Percocet®), hydrocodone and acetaminophen tablets (generic to Vicodin® or Norco®).

The submission of the completed Form by the Hospital Abatement Distribution Form Deadline set forth above is a prerequisite to eligibility for a Hospital Abatement Distribution, but does not guarantee a Holder of a Hospital Channeled Claim will be deemed eligible for a Hospital Abatement Distribution.  If a Holder of a Hospital Channeled Claim is deemed eligible by the Hospital Trustee pursuant to the Hospital TDP to receive Hospital Abatement Distributions, the information provided in this Form will be used to determine each such Hospital Authorized Recipient's Hospital Abatement Distribution from the Hospital Trust (as defined in the Plan, the "Hospital Trust").  Holders of Hospital Channeled Claims may redact information on this Form or any attached documents, as they deem necessary.  A Holder of a Hospital Channeled Claim shall only attach *copies* of any documents that support a claim, and shall not submit original documents; **documents submitted may be destroyed after scanning and will not be returned to the Holder**

---

[1] For the avoidance of doubt, "Hospital Claim" as defined in the Plan includes, without limitation, the Claims set forth in the 1,030 Proofs of Claim filed by hospitals and the 150 Proofs of Claim filed by other treatment providers.

**of a Hospital Channeled Claim**.  A person who files a fraudulent claim on behalf of a Holder of a Hospital Channeled Claim may, at a minimum, be fined up to $500,000.00, imprisoned for up to 5 years, or both.  18 U.S.C. §§ 152,157.  Holders of Hospital Channeled Claims shall provide the information requested that is, to the best of their knowledge, current and valid as of the date this Form is completed and delivered to the Hospital Trustee by such a Holder of a Hospital Channeled Claim:

---

**Please provide the following information to the Hospital Trustee by delivering this completed Hospital Abatement Distribution Form by email, online or mail at the addresses reflected online at www.purduehospitalsettlement.com prior to the Hospital Abatement Distribution Form Deadline set forth on page 1 of this Form.**

**<u>Failure to submit a completed copy of this Form and requisite claims data</u> (as described in #23 herein) <u>by the Hospital Abatement Distribution Form Deadline set forth on page 1 of this Form may disqualify you from receiving a Hospital Abatement Distribution.</u> Additionally, failure to complete any portion of the Form may result in a reduced Hospital Abatement Distribution or disqualification from receiving a Hospital Abatement Distribution.**

---

The name, address, and the Federal Employer Tax Identification Number ("<u>EIN</u>") of the entity claiming to be a Holder of a Hospital Channeled Claim OR the name, address, and Social Security Number if the Holder of a Hospital Channeled Claim is a natural person:

_____

_____

_____

The contact name, address, phone number *and email address* for where notices and Hospital Abatement Distribution(s) should be sent:

_____

_____

_____

By filling out this Form, you are deemed to consent to receipt of notice by email.  If you do not consent to receipt of notice by email, **please check this box:** ☐

The name, address and duration of your ownership of each facility owned and/or operated by the above referenced entity OR the name and address of the facility at which the Holder of a Hospital

Channeled Claim provides healthcare treatment services or any social services and the duration of that Holder of a Hospital Channeled Claim's provision of such services at such facility for which this claim is filed. (Please list on Exhibit A)

_____

1. Did you file a Proof of Claim in the Debtors' Chapter 11 Cases on or before July 30, 2020 that
   a. Included a dollar amount of financial losses in the Purdue bankruptcy?
      ___ Yes ___ No
   b. As of the date of this Form, provided to the Ad Hoc Group of Hospitals or its agent substantially all of the requisite claims data (as described in #23 herein) for any facility to the best of your knowledge ___ Yes ___ No

   If yes to both (a) and (b) then proceed to final page of Form to complete and sign.

2. Are you listed on the national registry of hospitals maintained by the American Hospital Directory ®, as in effect on the Effective Date and are (x) a non-federal acute care hospital as defined by CMS or (y) a non-federal hospital or hospital district that is required by law to provide inpatient acute care and/or fund the provision of inpatient acute care and did not timely file a Proof of Claim in the Debtors' Chapter 11 Cases on or before July 30, 2020?
   __ Yes __ No

3. Are you a named Plaintiff in any active cause of action against opioids manufacturers, distributors, or pharmacies? ___ Yes ___ No
   a. If yes, please provide whether the active cause of action is filed (check one):
      i. in the MDL: _____
      ii. in state court: _____
   b. Attach a copy of the most recently filed Complaint.

4. Service Area. Please list on Exhibit B the counties that each of the above-described facilities serve, the population of those counties and the percentage of the total population of those counties served by the facility. Attach any supporting documents that you deem to be helpful.

5. For each of the facilities listed on Exhibit A, please provide the payor mix (% of payor payments to total of all payor payments) on Exhibit C:
   a. % Medicare;

   b. % Medicaid;

    c.   % TRICARE;

    d.   % Commercial, e.g., Blue Cross Blue Shield, other non-governmental payors;

    e.   % Self-pay;

    f.   % All Other Payors;

    g.   Describe the name of each payor that comprises "All Other Payors";

6. Please provide on Exhibit D the amounts of funding, if any, received by you and/or for each facility listed on Exhibit A for the period of January 1, 2009 through September 15, 2019 in each of the following:

    a.   Grants;

    b.   Taxing authorities;

    c.   Health-care authorities;

    d.   State funded programs for indigent care;

    e.   "Disproportionate Share"[2];

    f.   Foundations/charities;

    g.   Others;

7. Unless a filed Complaint is attached to the Form, describe on Exhibit E, the opioid problem that has impacted each of the facilities listed on Exhibit A, and include with particularity, data reflecting overdose and deaths from overdoses in your respective service area(s), for the period of time ranging from January 1, 2009 through September 15, 2019.

8. List and describe with particularity on Exhibit F, all Hospital Authorized Abatement Purposes instituted by you at and/or in each facility listed on Exhibit A that are intended to treat, reduce, abate and prevent opioid addiction. Include in your description the year(s) such program(s) began; whether they presently remain operational; and, the prospective end date for the program(s), if any. In addition, please provide the extent that any funding received, as described in No. 6 above, was used to pay for the abatement programs described herein.

9. Prescribing practices:

    a.   For you and/or for each of the facilities listed on Exhibit A, please provide on Exhibit G the national ranking for prescribing the following opioids: (i) Brand Name Medications: OxyContin®, Hysingla ER®, Butrans®, Dilaudid®, Ryzolt, MS Contin®, MSIR®, Palladone®, DHC Plus®, OxyIR®, or OxyFast®; and (ii)

---

[2] Disproportionate Share Hospitals serve a significantly disproportionate number of low-income patients and receive payments from the Centers for Medicaid and Medicare Services to cover the costs of providing care to uninsured patients.

the following Generic Medications: oxycodone extended-release tablets, buprenorphine transdermal system, hydromorphone immediate-release tablets, hydromorphone oral solution, tramadol extended release tablets, morphine extended-release tablets, oxycodone immediate-release tablets, oxycodone and acetaminophen tablets (generic to Percocet®), hydrocodone and acetaminophen tablets (generic to Vicodin® or Norco®);

    b.  Did you and/or any or all of the facilities listed on Exhibit A provide pain management care in a pain management clinic during the period of January 1, 2009 through September 15, 2019? ___ Yes ___No. If yes, please provide the dates for which each of your pain management clinic were in operation on Exhibit G.

10. Are any of the facilities listed on Exhibit A a "safety net" hospital as defined in the CARES ACT?3 ___ Yes ___No.  If yes, please indicate this "safety net" designation next to each applicable facility on Exhibit A and provide proof of each such designation, therein.

11. Are any of the facilities listed on Exhibit A a tertiary referral center?  (A hospital provides tertiary healthcare if it provides "care of a highly technical and specialized nature, in a medical center, usually one affiliated with a university, for patients with unusually severe, complex, or uncommon health problems."  See Flegel, Ken, Tertiary Hospitals Must Provide General Care (March 3, 2015), Nat'l Ctr. for Biotechnology Information, https://www.ncbi.nlm.nih.gov/pmc/articles/PMC4347764).

    ___ Yes ___No. If yes, please provide this designation next to each applicable facility on Exhibit A.

12. Do you and/or any of the facilities listed on Exhibit A perform "Screening Brief Intervention Referral to Treatment" ("SBIRT") in the emergency department? _____ Yes _____ No. If yes, please provide this designation next to each applicable facility on Exhibit A.

13. Do any of the facilities listed on Exhibit A equip emergency departments to treat acute withdrawal and initiate treatment for Opioid Use Disorder ("OUD") with medications, including buprenorphine, suboxone, and subutex, etc.? ___Yes ___ No. If yes, please provide this designation next to each applicable facility on Exhibit A.

14. To qualify for distributions from the Hospital Trust, a Holder of a Hospital Channeled Claim must certify that:

    a.  You and/or it adhere to the standard of care for the emergency department, hospital wards and outpatient clinics at the time of any prospective evaluation, diagnosis,

---

[3] A "safety net" hospital has (a) a Medicare Disproportionate Patient Percentage (DPP) of 20.2% or greater; (b) annual uncompensated care (UCC) of at least $25,000 per bed; and (c) profit margin of 3.0% or less.

and treatment of OUD, including with respect to the applicable standard of care for the treatment of addiction, acute withdrawal and treatment for OUD with medication assisted treatment, AND

b.  You and/or it provide discharge planning and post-discharge care coordination for patients with OUD, including information for appropriate OUD treatment services.

Do you and/or each of the facilities listed on Exhibit A satisfy A? ___ Yes ___No;

Do you and/or each of the facilities listed on Exhibit A satisfy B? ___ Yes ___No.

15. Do you and/or any of the facilities listed on Exhibit A make discharge planning and post-discharge care coordination mandatory for patients with OUD? ___Yes ___No. If yes, please provide this designation next to each applicable facility on Exhibit A.

16. Do you and/or any of the facilities listed on Exhibit A provide bridge programs to encourage access to treatment for patients with OUD? ___ Yes ___ No. If yes, please provide this designation and describe the bridge program next to each applicable facility on Exhibit A.

17. Do you and/or any of the facilities listed on Exhibit A participate in community efforts to provide OUD treatment to others in the community, such as those in jails, or other detention facilities? ___ Yes ___ No. If yes, please provide this designation next to each applicable facility on Exhibit A.

18. Do you and/or any of the facilities listed on Exhibit A provide transportation to OUD treatment facilities? ___Yes ___No. If yes, please provide this designation next to each applicable facility on Exhibit A.

19. Do you and/or any of the facilities listed on Exhibit A implement needle exchange in the hospital or an adjacent clinic and/or provide on-site medication-assisted treatment ("MAT") services? ___Yes ___No. If yes, please provide this designation next to each applicable facility on Exhibit A.

20. Do you and/or any of the facilities listed on Exhibit A use telemedicine, telehealth, and/or teleconsulting to support treatment and to support "spoke" entities? ___Yes ___No. If yes, please provide this designation next to each applicable facility on Exhibit A.

21. Do you and/or any of the facilities listed on Exhibit A perform heart valve replacements?

___ Yes ___ No. If yes, please provide this designation and the percentage of all heart valve replacements performed that are secondary to opioid addiction next to each applicable facility on Exhibit A.

22. Do any of the facilities listed on Exhibit A have a Neonatal Intensive Care Unit ("<u>NICU</u>") that treats babies with Neonatal Abstinence Syndrome ("<u>NAS</u>")?
___ Yes ___ No. If yes, please provide this designation next to each applicable facility on Exhibit A for #22 and 22(a) and 22(b) below:

    a.  Do any of the facilities have a dedicated NAS NICU? ___ Yes ___ No

    b.  Do you and/or any of the facilities provide obstetric and perinatal services to treat mothers with OUD? ____Yes ___ No

23. For all inpatient and outpatient discharges during the period January 1, 2009, to September 15, 2019, from you and/or each qualifying facility operated by you, please provide the following data in CSV (Comma Delimited) Electronic File or Pipe Delimited Electronic Text File to be used in connection with the calculation of each of your financial damages. Eligible qualifying acute care hospitals as defined by the Centers for Medicare and Medicaid Services which are subject to the EMTALA. **An example of the data formatting is set forth in Exhibit H**. **This data should be in a separate CSV (Comma Delimited) Electronic File or Pipe Delimited Electronic Text File for each Holder of a Hospital Channeled Claim**. Physician office visits and non-acute care visits should **NOT** be included in data provided.

For the CSV (Comma Delimited) Electronic File or Pipe Delimited Electronic Text File, please include in the file name the name of the Holder of a Hospital Channeled Claim, City and State where located and Date Range of Data Provided, for example, PhoenixGeneral-Phoenix-AZ-Jan09-Dec12.csv. If more than one file is provided due to size limitation, each file name will be the same with only the date range of the data provided changing e.g. PhoenixGeneral-Phoenix-AZ-Jan13-Dec20.csv

It is important to note, and as further described below, that the following data (except for ICD diagnosis code, ICD diagnosis code description and ICD diagnosis code priority) for each visit/discharge will need to be repeated on each row corresponding to each different ICD diagnosis code.  The data for the ICD diagnosis codes, ICD diagnosis code descriptions and ICD diagnosis code priority for each visit/discharge will therefore be unique to each row.  For example, if a visit has 18 ICD diagnosis codes, there would be 18 rows/lines for that visit/discharge with each line containing a different ICD diagnosis code, ICD diagnosis code description and ICD diagnosis code priority. For all other data fields such as Patient Medical Record Number, Date of Discharge, etc. this data will be the same, and thus repeated, on all 18 rows/lines for that visit/discharge.

Once the CSV (Comma Delimited) or Pipe Delimited Text File is prepared, please review to confirm the data in each column contains the applicable data for that respective columns data field description. **After submission of this completed Form and execution of the Business Associate Agreement (as described in #25 herein), each claimant will be provided a secure portal by the Hospital Trustee to upload this requisite claims data.**

| Column | Data Fields | Definitions and Clarifications |
|---|---|---|
| a. | **Name** | Name of facility for which data is provided. |
| b. | **Address** | Address of facility for which data is provided. |
| c. | **City** | City of facility for which data is provided. |
| d. | **State** | State of facility for which data is provided. |
| e. | **Zip** | Zip of facility for which data is provided. |
| f. | **CMS Certification Number** | Center for Medicare & Medicaid Services – Formerly known as the Medicare Provider Number.  This should be a six-digit Medicare certification number for a facility. |
| g. | **Patient Medical Record #** | |
| h. | **Patient Account #** | |
| i. | **Payor Financial Class Description** | e.g., Blue Cross, Medicaid, Private Pay, etc. |
| j. | **Patient Type** | e.g., Inpatient or Outpatient. Hospital related clinics or physician office visits should NOT be included in data provided. |
| k. | **Custom Patient Type** | e.g., Inpatient Psych, Outpatient Single Visit, Surgery, Lab, etc. Hospital related clinics or physician office visits should NOT be included in data provided. |
| l. | **Date of Admission** | |
| m. | **Date of Discharge** | |

| n. | **Length of Stay (days)** | |
|---|---|---|
| o. | **Admission Type Description** | e.g., Emergency, Reservation, Reference Lab, etc. |
| p. | **Discharge Disposition Description** | e.g., Discharge Home, Nursing Home, Expired, etc. |
| q. | **Patient Date of Birth** | |
| r. | **Patient Age at Discharge** | |
| s. | **Patient Gender** | |
| t. | **Patient Race** | |
| u. | **Patient City** | |
| v. | **Patient State** | |
| w. | **Patient Zip Code** | |
| x. | **Attending Physician Name** | |
| y. | **Total Charges** | |
| z. | **Total Payments** | Total Payments should only contain actual payments received (e.g. insurance/self-pay). It should NOT include adjustments, bad debt, write-offs or contractual adjustments. |
| aa. | **DRG Code** | Provide Diagnosis Related Group (DRG) code for each inpatient visit/discharge. |
| ab. | **DRG Code Description** | Provide DRG description for the above DRG code. |
| ac. | **All ICD Diagnosis Code** | For each visit/discharge, provide all International Classification of Disease (ICD) diagnosis codes (ICD-9 or ICD-10, as applicable) associated with each patient visit/discharge. Each of these ICD Diagnosis Codes related to each patient's visit should NOT be listed in multiple columns but rather each ICD Code |

| | | should be listed in the same single column with each ICD Code shown on separate rows within the same single column. See Exhibit H. |
|---|---|---|
| ad. | **ICD Diagnosis Code Descriptions** | Provide ICD Diagnosis description for the above ICD Diagnosis Code. |
| ae. | **ICD Diagnosis Code Priority** | Provide whether each ICD Diagnosis Code is a Primary, Secondary, Tertiary, etc. diagnosis. These categories must be expressed in terms of a numerical code such as 1=Primary, 2=Secondary, 3=Tertiary, etc. |
| af. | **Mom's MRN - If applicable** | This field pertains only to Holders of Hospital Channeled Claims that deliver newborn babies or have a neonatal unit. If this visit/charge is for a birth mother, then this field should be blank as it would be the same MRN as the patient reported in #g above. However, if this visit/charge pertains to a baby, then this field should contain the mother's MRN so that there can be a mother/baby link associated therewith. |
| ag. | **Baby's MRN - If applicable** | This field pertains only to Holders of Hospital Channeled Claims that deliver newborn babies or have a neonatal unit. If this visit/charge is for a baby, then this field should be blank as it would be the same MRN as the patient reported in #g above. However, if this visit/charge pertains to a birth mother, then this field should contain the Baby's MRN so that there can be a mother/baby link associated therewith. |

24. Please attach your "charge master"[4] for the calendar years 2009 through 2019 for yourself and/or each of the facilities listed on Exhibit A.

---

[4] The "charge master" is a list of all the billable services and items billed to a patient or a patient's health insurance provider. The charge master captures the costs of each procedure, service, supply, prescription drug, and diagnostic test provided at the hospital to a patient, as well as any fees associated with such services, such as equipment fees and room charges.

25. Please execute the Business Associates Agreement attached as Exhibit J and return with the Form for each facility listed on Exhibit A.

26. Funds received from the Hospital Trust may only be used for specific abatement purposes as set forth in Section 7 of the Hospital TDP. If the Holder of a Hospital Channeled Claim on whose behalf this claim has been prepared is allocated a Hospital Abatement Distribution from the Hospital Trust, as a condition of receiving the funds, then it will use the funds for one or more specific uses as listed on Exhibit I.

27. Please complete the W-9 attached hereto for each entity OR the natural person claiming to be a Holder of a Hospital Channeled Claim and return the W-9 with this Form.

> **I certify that I am authorized to sign this Hospital Abatement Distribution Form and I understand that an authorized signature on this Form serves as an acknowledgement that I have a reasonable belief that the information is true and correct.**
>
> **I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.**

Signature: _____

Executed on date: (MM/DD/YYYY) _____

Print the name of the person who is completing and signing this claim.

Name (First, Middle, Last): _____

Title: _____

Hospital: _____

Address: _____

_____

Contact phone: _____

Email: _____

# **EXHIBIT A-1**

## **Redline of Hospital TDP**

# HOSPITAL TRUST
## DISTRIBUTION PROCEDURES[1]

## § 1.    APPLICABILITY.

Pursuant to the plan of reorganization of Purdue Pharma L.P. and its Debtor affiliates (the "Plan")[2] and the Master TDP, the following claims ("Hospital Channeled Claims") shall be channeled to and liability therefor shall be assumed by the Hospital Trust as of the Effective Date: (i) all Hospital Claims,[3] which include all Claims against the Debtors held by providers of healthcare treatment services or any social services, in their capacity as such, that are not Domestic Governmental Entities, and (ii) all Released Claims and Shareholder Released Claims held by providers of healthcare treatment services or any social services, in their capacity as such, that are not Domestic Governmental Entities.    Hospital Channeled Claims shall be administered, liquidated and discharged pursuant to the Hospital Trust Documents, and satisfied solely from funds held by the Hospital Trust as and to the extent provided in these distribution procedures (this "Hospital TDP").    This Hospital TDP sets forth the manner in which the Hospital Trust shall make Abatement Distributions to Holders of Hospital Channeled Claims (such Abatement Distributions, "Hospital Abatement Distributions") that satisfy the eligibility criteria for Authorized Recipients set forth herein.    Hospital Channeled Claims shall be fully discharged pursuant to this Hospital TDP.

Hospital Authorized Recipients (as defined below) are required to use all funds distributed to them from the Hospital Trust solely and exclusively for (i) the Authorized Abatement Purposes set forth in § 7 or (ii) the payment of attorneys' fees and costs of Holders of Hospital Channeled Claims (including counsel to the Ad Hoc Group of Hospitals) (such Authorized Abatement Purposes, collectively, "Hospital Authorized Abatement Purposes").

## § 2.    CLAIMS ADMINISTRATION.

The Plan contemplates that the Hospital Trust will receive a total of $250 million over time, with an initial payment of $25 million to the Hospital Trust on the Effective Date (the "Initial Hospital Trust Distribution") and five subsequent payments to the Hospital Trust from the Master Disbursement Trust in the following amounts: (i) $35 million on July 31, 2022, (ii) $45 million on July 31, 2023, (iii) $45 million on July 31, 2024, (iv) $50 million on July 31, 2025, and (v)

---

[1]    These procedures are qualified by the terms of the Plan. Holders of Hospital Channeled Claims are strongly advised to review the Plan as well as all of the Hospital Trust Documents and the Debtors' Disclosure Statement for additional information on the terms of the Plan and the treatment of Hospital Channeled Claims.

[2]    Terms used but not defined herein shall have the meaning ascribed to them in the Plan.

[3]    For the avoidance of doubt, "Hospital Claim" as defined in the Plan includes, without limitation, (i) the Claims set forth in the 1,030 Proofs of Claim filed by hospitals and the 150 Proofs of Claim filed by other treatment providers and (ii) Claims against the Debtors held by non-federal acute care hospitals as defined by the U.S. Centers for Medicare and Medicaid Services ("CMS"), and non-federal hospitals and hospital districts that are required by law to provide inpatient acute care and/or fund the provision of inpatient acute care.

$50 million on July 31, 2026.[4]  So long as he is able to serve as of the Effective Date, the presumptive trustee of the Hospital Trust is Hon. Thomas Hogan (Ret.) (the "Trustee").  If Judge Hogan is not able to serve, then a new Trustee will be selected in accordance with the Plan in advance of the Effective Date by the Ad Hoc Group of Hospitals with the consent of the Debtors (which consent shall not be unreasonably withheld, delayed or denied).[5]  The Ad Hoc Group of Hospitals is a group of certain Holders of Hospital Channeled Claims consisting of the Ad Hoc Group of Hospitals identified in the *Second Amended Verified Statement of the Ad Hoc Group of Hospitals Pursuant to Bankruptcy Rule 2019* [D.I. 1536].

The Trustee shall have the power and authority to perform all functions on behalf of the Hospital Trust, and shall undertake all administrative responsibilities as are provided in the Plan and the Hospital Trust Documents.[6]  The Trustee shall be responsible for all decisions and duties with respect to the Hospital Trust.[7]

The Trustee shall have the authority to determine the eligibility of Hospital Authorized Recipients and the amount of Hospital Abatement Distributions made by the Hospital Trust.  In order to qualify as a Hospital Authorized Recipient and be eligible to receive a Hospital Abatement Distribution, Holders of Hospital Channeled Claims must comply with the terms, provisions and procedures set forth herein, including the Hospital Abatement Distribution Form Deadline and the timely submission of all forms required pursuant hereto.  The Trustee may

---

[4]    In the event that any payment date is on a date that is not a Business Day, then the making of such payment may be completed on the next succeeding Business Day, but shall be deemed to have been completed as of the required date.

[5]    The Hospital Trust Agreement shall provide that, in the event of a vacancy in the Trustee position, whether by term expiration, death, retirement, resignation, or removal, the vacancy shall be filled by the unanimous vote of the Hospital Trust Advisory Committee (the "TAC"); in the event that the TAC cannot appoint a successor Trustee, for any reason, the Bankruptcy Court shall select the successor Trustee.

[6]    The Hospital Trust Agreement shall provide that the Trustee shall have the power to appoint such officers, hire such employees, engage such legal, financial, accounting, investment, auditing, forecasting, and other consultants, advisors, and agents as the business of the Hospital Trust requires, and delegate to such persons such powers and authorities as the fiduciary duties of the Trustee permit and as the Trustee, in its discretion, deem advisable or necessary in order to carry out the terms of the Hospital Trust, including without limitation the Delaware Trustee, and any third-party claims or noticing agent deemed necessary or convenient by the Trustee, and pay reasonable compensation to those employees, legal, financial, accounting, investment, auditing, forecasting, and other consultants, advisors, and agents employed by the Trustee after the Effective Date (including those engaged by the Hospital Trust in connection with its alternative dispute resolution activities).

[7]    The Hospital Trust Agreement shall provide that: (i) the Trustee shall receive a retainer from the Hospital Trust for his or her service as a Trustee in the amount of $25,000 per annum, paid annually; (ii) hourly time shall first be billed and applied to the annual retainer; (iii) hourly time in excess of the annual retainer shall be paid by the Hospital Trust; (iv) for all time expended as a Trustee, including attending meetings, preparing for such meetings, and working on authorized special projects, the Trustee shall receive the sum of $525 per hour; (v) for all non-working travel time in connection with Hospital Trust business, the Trustee shall receive the sum of $275 per hour; (vi) all time shall be computed on a decimal (1/10th) hour basis; and (vii) the Trustee shall not be required to post any bond or other form of surety or security unless otherwise ordered by the Bankruptcy Court.

investigate any Hospital Channeled Claim, and may request information from any Holder of a Hospital Channeled Claim to ensure compliance with the terms set forth in this Hospital TDP, the other Hospital Trust Documents and the Plan.

Pursuant to section 1123(b)(3)(B) of the Bankruptcy Code and applicable state corporate law, the Trustee shall be and is appointed as the successor-in-interest to, and the representative of, the Debtors and their Estates for the retention, enforcement, settlement or adjustment of the Hospital Channeled Claims.

In accordance with Section 5.11(b) and (c) of the Plan, the Trustee shall receive copies of all Proofs of Claims for the Hospital Claims on the Effective Date, and shall be entitled to make reasonable requests to NewCo for additional information and documents reasonably necessary for the administration of the Hospital Trust, which may include those medical, prescription or business records of the Debtors related to the Hospital Channeled Claims, which records shall be transferred to NewCo on the Effective Date.

## § 3.    QUALIFYING CERTIFICATION.

To qualify as a Hospital Authorized Recipient, a Holder of a Hospital Channeled Claim must certify in its Hospital Abatement Distribution Form (as defined below) that:

(a)    It adheres to the standard of care for the emergency department, hospital wards and outpatient clinics at the time of any prospective evaluation, diagnosis, and treatment of OUD, including with respect to the applicable standard of care for the treatment of addiction, acute withdrawal and treatment for OUD with medication assisted treatment; and

(b)    It provides discharge planning and post-discharge care coordination for patients with OUD, including information for appropriate OUD treatment services.

A Holder of a Hospital Channeled Claim must demonstrate through the Requisite Hospital Claims data that it has been damaged in the past and reasonably anticipates incurring additional abatement expenses in the future arising from patients suffering from OUD; if it does not do so, then it will not receive any Hospital Abatement Distribution.

## § 4.    ELIGIBILITY FOR HOSPITAL ABATEMENT DISTRIBUTIONS; NOTICES.

(a)    Eligibility for Hospital Abatement Distributions

To qualify as a Hospital Authorized Recipient eligible to receive Hospital Abatement Distributions from the Hospital Trust, each applicable Holder of a Hospital Channeled Claim must:

(i)    Have timely filed a Proof of Claim in the Debtors' Chapter 11 case (that is, on or before July 30, 2020); provided, that this requirement shall not apply to a Holder of a Hospital Channeled Claim that (a) is listed on the national registry of hospitals maintained by the American Hospital Directory®, as in effect on the Effective Date *and* (b) is (x) a non-federal

acute care hospital as defined by CMS or (y) a non-federal hospital or
hospital district that is required by law to provide inpatient acute care
and/or fund the provision of inpatient acute care;

(ii)    Timely submit the form attached hereto as Exhibit A (the "Hospital
Abatement Distribution Form") containing:

A.    the certification set forth in § 3;

B.    a certification signed by the Holder of a Hospital Channeled Claim
or its attorney attesting to the accuracy and truthfulness of the
Holder of a Hospital Channeled Claim's submission.   Such
certification must include an attestation that no data required for
claims processing and distribution valuation, and no records or
information that would reasonably be relevant to the valuation of
the distribution, have been misrepresented or withheld; and

C.    the certification that the Holder of a Hospital Channeled Claim
will comply with § 7 in its use of any funds distributed to it; and

(iii)   Provided all of the requisite claims data (as described in § 5 the "Requisite
Claims Data") as part of a timely filed Proof of Claim or in connection
with submitting a Hospital Abatement Distribution Form.

Any Holder of a Hospital Channeled Claim who meets all of the above criteria (i)-(iii) (each, a
"Hospital Authorized Recipient") shall qualify for Hospital Abatement Distributions, subject to
the limitations otherwise set forth herein; however, if such Holder does not meet such criteria,
then it will not qualify as a Hospital Authorized Recipient and will not receive any Hospital
Abatement Distributions.  Any discrepancy as to whether a Holder of a Hospital Channeled
Claim qualifies as a Hospital Authorized Recipient pursuant to the criteria as set forth in this
§ 4(a) will be resolved by the Trustee.

Those Hospital Claims that are evidenced by timely filed Proofs of Claim in the Debtors'
Chapter 11 Cases (that is, for which Proofs of Claim were filed prior to or on the General Bar
Date of July 30, 2020, i.e., D.I. 1536) that contained all of the Requisite Claims Data for such
Hospital Claims have satisfied the requirements of §§ 4(a)(i) and 4(a)(iii), and shall be required
to submit only a Hospital Abatement Distribution Form that provides the certifications set forth
in § 4(a)(ii) to qualify for Hospital Abatement Distributions.[8]

---

[8]    There are approximately 1,180 Hospital Claims believed to satisfy the requirements of §§ 4(a)(i) and 4(a)(iii),
comprising approximately 1,030 Proofs of Claim filed by hospitals and 150 Proofs of Claim filed by other
treatment providers; this Hospital TDP does not constitute an admission by the Trustee that such Proofs of
Claim in fact contained all applicable Requisite Claims Data, and the Trustee reserves the right to request
additional information from any Holder of a Hospital Channeled Claim before such Holder of a Hospital
Channeled Claim is determined to be a Hospital Authorized Recipient.

FOR AVOIDANCE OF DOUBT, FOR A HOLDER OF A HOSPITAL CHANNELED CLAIM TO QUALIFY AS A HOSPITAL AUTHORIZED RECIPIENT AND BE ELIGIBLE TO RECEIVE A HOSPITAL ABATEMENT DISTRIBUTION, SUCH HOLDER OF A HOSPITAL CHANNELED CLAIM MUST TIMELY SUBMIT A FULLY COMPLETED HOSPITAL ABATEMENT DISTRIBUTION FORM BY OR BEFORE THE HOSPITAL ABATEMENT DISTRIBUTION FORM DEADLINE (THAT IS, FORTY-FIVE (45) DAYS AFTER THE DATE OF THE APPLICABLE HOSPITAL ABATEMENT DISTRIBUTION DEADLINE NOTICE, AS SET FORTH HEREIN).

    (b)    Notices

        (i)    As soon as reasonably practicable after the Effective Date of the Plan, the Trustee or the Claims Administrator, as applicable, shall cause a notice to be served on each Holder of a Hospital Channeled Claim that (i) is listed on the national registry of hospitals maintained by the American Hospital Directory ®, as in effect on the Effective Date *and* (ii) is (x) a non-federal acute care hospital as defined by CMS or (y) a non-federal hospital or hospital district that is required by law to provide inpatient acute care and/or fund the provision of inpatient acute care.  Such notice shall contain, among other things that the Trustee deems reasonable and appropriate under the circumstances, (i) this Hospital TDP, including the Hospital Abatement Distribution Form attached hereto, (ii) the URL for the Debtors' claims and noticing website where such Hospitals can locate the Plan (https://restructuring.primeclerk.com/purduepharma), and (iii) clear instructions for submitting a Hospital Abatement Distribution Form to the Trustee, the deadline set forth in each such Hospital Abatement Distribution Form for submitting the Hospital Abatement Distribution Form being 45 days after the date of such notice.

        (ii)    Also as soon as reasonably practicable after the Effective Date, the Trustee or the Claims Administrator, as applicable, shall cause a notice (each such notice, and each notice delivered pursuant to § 4(b)(i) above, a "Hospital Abatement Distribution Deadline Notice") to be served on each of the Holders of the approximately 1,180 Hospital Claims for which there are timely filed Proofs of Claim, indicating whether such Proof of Claim contained the Requisite Claims Data for such Hospital Claim, and providing each such Holder of a Hospital Channeled Claim with 45 days from the date of such notice to submit a Hospital Abatement Distribution Form that complies with this § 4.  Such notice shall make clear whether the applicable Proof of Claim (i) contained the Requisite Claims Data (and therefore such Holder of a Hospital Channeled Claim is required to provide only the certifications set forth in § 4(a)(ii)) or (ii) did not contain the Requisite Claims Data in its Proof of Claim (and therefore such Holder of a Hospital Channeled Claim is required to satisfy both §§ 4(a)(ii) and

4(a)(iii) hereof when it submits its Hospital Abatement Distribution Form).

(iii)    For any Holder of a Hospital Channeled Claim that receives a Hospital Abatement Distribution Deadline Notice pursuant to §§ 4(b)(i) or 4(b)(ii) hereof and submits a Hospital Abatement Distribution Form, and all of its parts, by the applicable deadline (with respect to each such notice, the "Hospital Abatement Distribution Form Deadline") and whose Hospital Abatement Distribution Form is substantially complete but otherwise defective in such a manner as to render such Holder of a Hospital Channeled Claim ineligible to receive Hospital Abatement Distributions, and to the extent such defect is determined by the Trustee to be curable, the Trustee, as applicable, shall provide such Holder of a Hospital Channeled Claim with notice of the defect and a reasonable period of time following delivery of such notice for such Holder of a Hospital Channeled Claim to cure such defective Hospital Abatement Distribution Form. The Trustee shall exercise discretion in determining defect, curability and the period of time in which a defect may be cured.  Under no circumstance is the Trustee obligated to send a notice of defect for Hospital Abatement Distribution Forms that do not provide responses to the requirements set forth under §§ 4(a)(ii) and 4(a)(iii).

(iv)    Other than pursuant to the cure procedures set forth herein, any Holder of a Hospital Channeled Claim that does not submit a Hospital Abatement Distribution Form shall not qualify as a Hospital Authorized Recipient, and any Holder of a Hospital Channeled Claim that submits a Hospital Abatement Distribution Form after the Hospital Abatement Distribution Form Deadline shall not qualify as a Hospital Authorized Recipient.  No Hospital Abatement Distribution Form shall be accepted after the Hospital Abatement Distribution Form Deadline.

## § 5.    EVIDENCE FOR DETERMINATION OF HOSPITAL ABATEMENT DISTRIBUTIONS.

(a)    To permit the Trustee to evaluate the amount each Hospital Authorized Recipient is to receive as a Hospital Abatement Distribution, and to the extent not already submitted in connection with its Proof of Claim, a Holder of a Hospital Channeled Claim must submit all of the following, non-exhaustive, data and types of documents, unless otherwise determined in the discretion of the Trustee in consultation with the TAC and consistent with § 4(b)(iii):

(i)    A properly and fully completed Hospital Abatement Distribution Form, with all its parts and requisite submissions, as established by the Trustee, consistent with the requirements set forth in § 4; and

(ii)    copies of all claims, complaints, proofs of claim, notices, settlement documents, releases, recoveries, compensation received, or similar

documents that a Holder of a Hospital Channeled Claim submits or entered into in respect of claims asserted against or to be asserted against any other entity or person arising from or related to such Holder of a Hospital Channeled Claim's OUD program or related to any of the injuries that underlie that claim presented to the Trustee.

The Trustee may request additional information as reasonably necessary in the opinion of the Trustee to determine the amount to be distributed to a Hospital Authorized Recipient. The Trustee shall establish a reasonable timeframe in which a Hospital Authorized Recipient must provide any requested information.

## § 6.    DETERMINATION OF HOSPITAL ABATEMENT DISTRIBUTION AMOUNTS.

(a)    The Trustee (or its agents or representatives) shall review the timely submitted Hospital Abatement Distribution Forms.

(b)    The Trustee shall utilize (but shall have no rights in or to the intellectual property contained in) the proprietary Legier Model and Algorithm (the "Model"), prepared and operated by Legier & Company, apac, for determining the amount of each Hospital Abatement Distribution. The amount of the Hospital Abatement Distribution to be paid to each Hospital Authorized Recipient shall be determined within 120 days after the applicable Hospital Abatement Distribution Form Deadline or in a period of time determined by the Trustee to be most practicable.

(c)    The Model shall determine the amount distributable to each Hospital Authorized Recipient based on (1) the diagnostic codes associated with operational charges incurred by the Hospital Authorized Recipient in connection with the treatment of Opioid Use Disorder, (2) the portion of such charges that were not reimbursed, and (3) the following distribution determination factors and weights:[9]

(i)    Units of morphine milligram equivalents (MME) dispensed in the Hospital Authorized Recipient's service area ("Service Area") during the period January 1, 2006-December 31, 2014 (the "Measurement Period") (to be weighted at 10%);

(ii)    Opioid use disorder rates at the State level, pro-rated for each Hospital Authorized Recipient (to be weighted at 10%);

(iii)    Opioid overdose deaths in the Hospital Authorized Recipient's Service Area (to be weighted at 8.75%)

---

[9]    The Model calculates a Hospital Authorized Recipient's loss resulting from its treatment of patients with OUD and other opioid diagnoses, considering the total charges and collections for each, among other things, including a causation algorithm applied to each patient encounter.

(iv)     Operational impact calculated using the Model, to include opioid diagnoses, and charge and reimbursement data (to be weighted at 35%);

(v)      Hospital Authorized Recipient's opioid related patients as a percentage of its total patients (to be weighted at 18.75%);

(vi)     17.5% for either

    A.     such Hospital Authorized Recipient having filed a timely Proof of Claim in the Purdue Pharma bankruptcy claim filing process, or

    B.     such Hospital Authorized Recipient having been designated as a "Safety Net Hospital" ~~as defined by the CARES Act as in effect~~ [10] on the Effective Date.

## § 7.  HOSPITAL AUTHORIZED ABATEMENT PURPOSES.

(a)      All net funds (after the deduction of all legal fees and litigation expenses, as described herein, and in the Hospital Trust Agreement) distributed to Hospital Authorized Recipients shall be used solely and exclusively for Opioid Use Disorder ("OUD") abatement programs, whether currently existing or newly initiated.  As a condition of receiving a Hospital Abatement Distribution, each Hospital Authorized Recipient must submit to the Trustee on its Hospital Abatement Distribution Form a written statement that all funds will be spent only in the Authorized Recipient's Service Area for one or more of the following Hospital Authorized Abatement Purposes:

(i)      Providing transportation to treatment facilities for patients with OUD.

(ii)     Providing continuing professional education in addiction medicine, including addressing programs addressing stigma.

(iii)    Counteracting diversion of prescribed medication in ED or practice, consistent with the following goal:  reducing opioid misuse, OUD, overdose deaths, and related health consequences throughout the hospital Service Area (county or region).

(iv)     Participating in community efforts to provide OUD treatment to others in the community, such as those in jails, prisons, or other detention facilities.

(v)      Providing community education events on opioids and OUD.

---

[10]  A "Safety Net Hospital" has (a) a Medicare Disproportionate Patient Percentage (DPP) of 20.2% or greater; (b) annual uncompensated care (UCC) of at least $25,000 per bed; and (c) profit margin of 3.0% or less.

(vi)     Providing Naloxone kits and instruction to patients upon discharge.

(vii)    Implementing needle exchange in hospital or adjacent clinic and providing on-site MAT services if possible.

(viii)   Prospectively providing otherwise unreimbursed or under-reimbursed future medical services for patients with OUD or other opioid related diagnoses.

(ix)     Building or leasing space to add half-way house beds.

(x)      Participating in research regarding development of innovative OUD treatment practices.

(xi)     Directing moneys to any other public or private Authorized Recipient of funds concerning the treatment of persons with OUD or other opioid-related diagnoses; provided that such recipient's use of such funds would otherwise constitute an Authorized Abatement Purpose.

(xii)    Medication-Assisted Treatment ("MAT") Programs: an aggregate of $50 million may be earmarked for Holders of Hospital Channeled Claims to establish and implement a MAT program or to continue, complete and/or implement an existing MAT program already under development.[10][11]

(xiii)   Engaging in any other abatement activity with the express permission of the Court, at the request of the Trustee.

(b)      In addition, the Hospital Trust shall, in accordance with the Plan, the Confirmation Order and the Hospital Trust Documents, make Hospital Abatement Distributions to Hospital Authorized Recipients exclusively for Hospital Authorized Abatement Purposes within each Hospital Authorized Recipients' respective Service Area identified in the claim. Decisions concerning Hospital Abatement Distributions made by the Hospital Trust will consider the need to ensure that underserved urban and rural areas, as well as minority communities, receive equitable access to the funds.

(c)      To the extent any Holder of a Hospital Channeled Claim that is otherwise a Hospital Authorized Recipient does not comply with this § 7, such Holder of a Hospital Channeled Claim shall not be a Hospital Authorized Recipient and shall be disqualified from receiving Hospital Abatement Distributions, notwithstanding any other eligibility determination pursuant to other sections or procedures set forth herein or in the other Hospital Trust Documents.

---

[10][11] The Hospital Abatement Distribution Form will provide an opportunity to indicate the proportion and amount of Hospital Abatement Distributions that the Hospital Authorized Recipient intends to apply to MAT programs.

## § 8.    HOSPITAL ABATEMENT DISTRIBUTIONS BY HOSPITAL TRUST.

(a)    Once the Trustee has calculated the amount of the Hospital Abatement Distribution to be paid to each Hospital Authorized Recipient, and also calculated each Hospital Authorized Recipient's *pro rata* share of the total sum of all Hospital Abatement Distributions to be paid to all Hospital Authorized Recipients, then the Trustee shall make interim Hospital Abatement Distributions, from time to time in its judgment, to those Hospital Authorized Recipients that have complied with all of the criteria and procedures described herein.  Unless otherwise determined by the Trustee, such Hospital Authorized Recipients may receive one interim, and one final, distribution.

(b)    All payments made for one or more of said Hospital Authorized Abatement Purposes shall be subject to audit by the Trustee of the Hospital Trust and shall be repaid with a ten percent (10%) penalty added for any funds found by audit to have been spent for an unauthorized purpose.  Such audit may occur any time prior to the wind-down of the Trust.

(c)    Hospital Abatement Distributions will be subject to a common benefit assessment and may be subject to certain additional assessments for payment of attorneys' fees and costs of the Ad Hoc Group of Hospitals in accordance with Section 5.8 of the Plan.

## § 9.    REPORTING BY HOSPITAL AUTHORIZED RECIPIENTS.

(a)    Within ninety (90) days after the end of a distribution period (that being the twelve (12) month period following each annual distribution date), each Hospital Authorized Recipient that received a distribution must submit to the Hospital Trust a certification regarding its satisfaction of the minimum spending requirements on Hospital Authorized Abatement Purposes or that it was unable to meet the minimum spending requirements and must carryover a portion of its distribution.

(b)    If the Hospital Authorized Recipient has not met the requirements during that period, those allocated but unused funds can carry over to the subsequent periods and will continue to carry forward each year until the Hospital Authorized Recipient meets the relevant spending requirements for Hospital Authorized Abatement Purposes.  Additional annual certification(s) must be submitted until the Hospital Authorized Recipient meets the relevant spending requirements.  A Hospital Authorized Recipient shall not be subject to a penalty for failing to meet the minimum spending requirements with respect to its Hospital Abatement Distribution during a given distribution period.

(c)    The Hospital Trust shall have the right to audit a claimant to determine whether the Hospital Authorized Recipient's expenditures for Hospital Authorized

Abatement Purposes have met the requirements set forth in the Hospital Trust Documents.

(d)     Each Hospital Authorized Recipient, if and when requested by the Hospital Trustee (or its agents or representatives), shall provide supporting documentation, in a mutually agreed upon format, demonstrating that the Hospital Authorized Recipient's expenditures for Hospital Authorized Abatement Purposes have met the requirements of the Hospital Trust Documents.  All Proofs of Claim, Hospital Abatement Distribution Forms and certifications filed or submitted by Holders of Hospital Channeled Claims are subject to audit by the Hospital Trustee (or its agents or representatives).  If the Hospital Trustee finds a material misstatement in a Holder of a Hospital Channeled Claim's Proof of Claim, Hospital Abatement Distribution Form or certification, the Hospital Trustee may allow that Holder of a Hospital Channeled Claim up to 30 days to resubmit its Proof of Claim, Hospital Abatement Distribution Form or certification with supporting documentation or revisions.  Failure of the Holder of a Hospital Channeled Claim to timely correct its misstatement in a manner acceptable to the Hospital Trustee may result in forfeiture of all or part of the Holder of a Hospital Channeled Claim's qualification as a Hospital Authorized Recipient or right to receive Hospital Abatement Distributions.

(e)     The Trustee shall have the power to take any and all actions that in the judgment of the Trustee are necessary or proper to fulfill the purposes of Hospital Trust. The Hospital Trust retains the right to seek return by legal means of any expenditures which fail to comply with the requirements of this Hospital TDP.

## § 10.   REPORTING BY THE HOSPITAL TRUST.

The Hospital Trust shall file an annual report with the Bankruptcy Court after each year that the Hospital Trust is in existence, summarizing the distributions made from the Hospital Trust and detailing the status of any Hospital Authorized Recipient audits, and any recommendations made by the Trustee relating to such audits.

## **EXHIBIT A**
## **HOSPITAL ABATEMENT DISTRIBUTION FORM**

# HOSPITAL ABATEMENT DISTRIBUTION FORM

*See Attached*

**HOSPITAL ABATEMENT DISTRIBUTION FORM DEADLINE: [_____]**

Please read the instructions carefully before filling out this Hospital Abatement Distribution Form (this "Form").  Capitalized terms used herein and not otherwise defined, shall have the meanings ascribed to them in the *Fifth Amended Joint Plan of Reorganization of Purdue Pharma L.P. and its Affiliated Debtors* (as modified, amended or supplemented from time to time, the "Plan") [Docket No. 2982] or the Hospital Trust Distribution Procedures (as modified, amended or supplemented from time to time, the "Hospital TDP")," dated June 3, 2021 [Docket No. 2977].

Each Holder of a Hospital Channeled Claim, which includes (i) all Hospital Claims,[12] which include all Claims against the Debtors held by providers of healthcare treatment services or any social services, in their capacity as such, that are not Domestic Governmental Entities and (ii) all Released Claims and Shareholder Released Claims held by providers of healthcare treatment services or any social services, in their capacity as such, that are not Domestic Governmental Entities, is required to complete and submit this Form in order to be eligible to receive Hospital Abatement Distributions from the Hospital Trust.

In this proceeding, "Purdue Opioid" means all natural, semi-synthetic or synthetic chemicals that interact with opioid receptors on nerve cells in the body and brain, and that are approved by the U.S. Food & Drug Administration  and listed by the U.S. Drug Enforcement Administration  as Schedule II or III drugs pursuant to the federal Controlled Substances Act, 21 U.S.C. § 801 et seq. produced, marketed, or sold by the Debtors as: (i) the following Brand Name Medications: OxyContin®, Hysingla ER®, Butrans®, Dilaudid®, Ryzolt, MS Contin®, MSIR®, Palladone®, DHC Plus®, OxyIR®, or OxyFast®; and (ii) the following Generic Medications: oxycodone extended-release tablets, buprenorphine transdermal system, hydromorphone immediate-release tablets, hydromorphone oral solution, tramadol extended-release tablets, morphine extended-release tablets, oxycodone immediate-release tablets, oxycodone and acetaminophen tablets (generic to Percocet®), hydrocodone and acetaminophen tablets (generic to Vicodin® or Norco®).

The submission of the completed Form by the Hospital Abatement Distribution Form Deadline set forth above is a prerequisite to eligibility for a Hospital Abatement Distribution, but does not guarantee a Holder of a Hospital Channeled Claim will be deemed eligible for a Hospital Abatement Distribution.  If a Holder of a Hospital Channeled Claim is deemed eligible by the Hospital Trustee pursuant to the Hospital TDP to receive Hospital Abatement Distributions, the information provided in this Form will be used to determine each such Hospital Authorized Recipient's Hospital Abatement Distribution from the Hospital Trust (as defined in the Plan, the "Hospital Trust").  Holders of Hospital Channeled Claims may redact information on this Form or any attached documents, as they deem necessary.  A Holder of a Hospital Channeled Claim

---

[12] For the avoidance of doubt, "Hospital Claim" as defined in the Plan includes, without limitation, the Claims set forth in the 1,030 Proofs of Claim filed by hospitals and the 150 Proofs of Claim filed by other treatment providers.

shall only attach *copies* of any documents that support a claim, and shall not submit original documents; **documents submitted may be destroyed after scanning and will not be returned to the Holder of a Hospital Channeled Claim**. A person who files a fraudulent claim on behalf of a Holder of a Hospital Channeled Claim may, at a minimum, be fined up to $500,000.00, imprisoned for up to 5 years, or both. 18 U.S.C. §§ 152,157. Holders of Hospital Channeled Claims shall provide the information requested that is, to the best of their knowledge, current and valid as of the date this Form is completed and delivered to the Hospital Trustee by such a Holder of a Hospital Channeled Claim:

**Please provide the following information to the Hospital Trustee by delivering this completed Hospital Abatement Distribution Form by email, online or mail at the addresses reflected online at www.purduehospitalsettlement.com prior to the Hospital Abatement Distribution Form Deadline set forth on page 1 of this Form.**
**Failure to submit a completed copy of this Form and requisite claims data (as described in #23 herein) by the Hospital Abatement Distribution Form Deadline set forth on page 1 of this Form may disqualify you from receiving a Hospital Abatement Distribution. Additionally, failure to complete any portion of the Form may result in a reduced Hospital Abatement Distribution or disqualification from receiving a Hospital Abatement Distribution.**

The name, address, and the Federal Employer Tax Identification Number ("EIN") of the entity claiming to be a Holder of a Hospital Channeled Claim OR the name, address, and Social Security Number if the Holder of a Hospital Channeled Claim is a natural person:

_____
_____
_____

The contact name, address, phone number *and email address* for where notices and Hospital Abatement Distribution(s) should be sent:

_____
_____
_____

By filling out this Form, you are deemed to consent to receipt of notice by email. If you do not consent to receipt of notice by email, **please check this box:** ☐

The name, address and duration of your ownership of each facility owned and/or operated by the above referenced entity OR the name and address of the facility at which the Holder of a Hospital Channeled Claim provides healthcare treatment services or any social services and the duration of that Holder of a Hospital Channeled Claim's provision of such services at such facility for which this claim is filed. (Please list on Exhibit A)

_____

1. Did you file a Proof of Claim in the Debtors' Chapter 11 Cases on or before July 30, 2020 that
   a. Included a dollar amount of financial losses in the Purdue bankruptcy?
      ___ Yes ___ No

b.  As of the date of this Form, provided to the Ad Hoc Group of Hospitals or its agent substantially all of the requisite claims data (as described in #23 herein) for any facility to the best of your knowledge ____ Yes ____ No

If yes to both (a) and (b) then proceed to final page of Form to complete and sign.

2.  Are you listed on the national registry of hospitals maintained by the American Hospital Directory ®, as in effect on the Effective Date and are (x) a non-federal acute care hospital as defined by CMS or (y) a non-federal hospital or hospital district that is required by law to provide inpatient acute care and/or fund the provision of inpatient acute care and did not timely file a Proof of Claim in the Debtors' Chapter 11 Cases on or before July 30, 2020? ___ Yes ___ No

3.  Are you a named Plaintiff in any active cause of action against opioids manufacturers, distributors, or pharmacies? ____ Yes ____ No
    a.  If yes, please provide whether the active cause of action is filed (check one):
        i.   in the MDL: _____
        ii.  in state court: _____
    b.  Attach a copy of the most recently filed Complaint.

4.  Service Area.  Please list on Exhibit B the counties that each of the above-described facilities serve, the population of those counties and the percentage of the total population of those counties served by the facility.  Attach any supporting documents that you deem to be helpful.

5.  For each of the facilities listed on Exhibit A, please provide the payor mix (% of payor payments to total of all payor payments) on Exhibit C:
    a.  % Medicare;
    b.  % Medicaid;
    c.  % TRICARE;
    d.  % Commercial, e.g., Blue Cross Blue Shield, other non-governmental payors;
    e.  % Self-pay;
    f.  % All Other Payors;
    g.  Describe the name of each payor that comprises "All Other Payors";

6.  Please provide on Exhibit D the amounts of funding, if any, received by you and/or for each facility listed on Exhibit A for the period of January 1, 2009 through September 15, 2019 in each of the following:

      a.  Grants;

      b.  Taxing authorities;

      c.  Health-care authorities;

      d.  State funded programs for indigent care;

      e.  "Disproportionate Share"[13];

      f.  Foundations/charities;

      g.  Others;

7. Unless a filed Complaint is attached to the Form, describe on Exhibit E, the opioid problem that has impacted each of the facilities listed on Exhibit A, and include with particularity, data reflecting overdose and deaths from overdoses in your respective service area(s), for the period of time ranging from January 1, 2009 through September 15, 2019.

8. List and describe with particularity on Exhibit F, all Hospital Authorized Abatement Purposes instituted by you at and/or in each facility listed on Exhibit A that are intended to treat, reduce, abate and prevent opioid addiction. Include in your description the year(s) such program(s) began; whether they presently remain operational; and, the prospective end date for the program(s), if any. In addition, please provide the extent that any funding received, as described in No. 6 above, was used to pay for the abatement programs described herein.

9. Prescribing practices:
      a.  For you and/or for each of the facilities listed on Exhibit A, please provide on Exhibit G the national ranking for prescribing the following opioids: (i) Brand Name Medications: OxyContin®, Hysingla ER®, Butrans®, Dilaudid®, Ryzolt, MS Contin®, MSIR®, Palladone®, DHC Plus®, OxyIR®, or OxyFast®; and (ii) the following Generic Medications: oxycodone extended-release tablets, buprenorphine transdermal system, hydromorphone immediate-release tablets, hydromorphone oral solution, tramadol extended release tablets, morphine extended-release tablets, oxycodone immediate-release tablets, oxycodone and acetaminophen tablets (generic to Percocet®), hydrocodone and acetaminophen tablets (generic to Vicodin® or Norco®);
      b.  Did you and/or any or all of the facilities listed on Exhibit A provide pain management care in a pain management clinic during the period of January 1, 2009 through September 15, 2019? ___ Yes ___ No. If yes, please provide the

---

[13] Disproportionate Share Hospitals serve a significantly disproportionate number of low-income patients and receive payments from the Centers for Medicaid and Medicare Services to cover the costs of providing care to uninsured patients.

dates for which each of your pain management clinic were in operation on Exhibit G.

10. Are any of the facilities listed on Exhibit A a "safety net" hospital as defined in the CARES ACT?14 _____ Yes _____ No. If yes, please indicate this "safety net" designation next to each applicable facility on Exhibit A and provide proof of each such designation, therein.

11. Are any of the facilities listed on Exhibit A a tertiary referral center?  (A hospital provides tertiary healthcare if it provides "care of a highly technical and specialized nature, in a medical center, usually one affiliated with a university, for patients with unusually severe, complex, or uncommon health problems."  See Flegel, Ken, Tertiary Hospitals Must Provide General Care (March 3, 2015), Nat'l Ctr. for Biotechnology Information, https://www.ncbi.nlm.nih.gov/pmc/articles/PMC4347764).
_____ Yes _____ No. If yes, please provide this designation next to each applicable facility on Exhibit A.

12. Do you and/or any of the facilities listed on Exhibit A perform "Screening Brief Intervention Referral to Treatment" ("SBIRT") in the emergency department? _____ Yes _____ No. If yes, please provide this designation next to each applicable facility on Exhibit A.

13. Do any of the facilities listed on Exhibit A equip emergency departments to treat acute withdrawal and initiate treatment for Opioid Use Disorder ("OUD") with medications, including buprenorphine, suboxone, and subutex, etc.? ___ Yes ___ No. If yes, please provide this designation next to each applicable facility on Exhibit A.

14. To qualify for distributions from the Hospital Trust, a Holder of a Hospital Channeled Claim must certify that:
    a. You and/or it adhere to the standard of care for the emergency department, hospital wards and outpatient clinics at the time of any prospective evaluation, diagnosis, and treatment of OUD, including with respect to the applicable standard of care for the treatment of addiction, acute withdrawal and treatment for OUD with medication assisted treatment, AND

---

14 A "safety net" hospital has (a) a Medicare Disproportionate Patient Percentage (DPP) of 20.2% or greater; (b) annual uncompensated care (UCC) of at least $25,000 per bed; and (c) profit margin of 3.0% or less.

    b.   You and/or it provide discharge planning and post-discharge care coordination for patients with OUD, including information for appropriate OUD treatment services.

Do you and/or each of the facilities listed on Exhibit A satisfy A? ____Yes ____No;

Do you and/or each of the facilities listed on Exhibit A satisfy B? ____Yes ____No.

15. Do you and/or any of the facilities listed on Exhibit A make discharge planning and post-discharge care coordination mandatory for patients with OUD? ____Yes ____No. If yes, please provide this designation next to each applicable facility on Exhibit A.

16. Do you and/or any of the facilities listed on Exhibit A provide bridge programs to encourage access to treatment for patients with OUD? ____Yes ____No. If yes, please provide this designation and describe the bridge program next to each applicable facility on Exhibit A.

17. Do you and/or any of the facilities listed on Exhibit A participate in community efforts to provide OUD treatment to others in the community, such as those in jails, or other detention facilities? ____Yes ____No. If yes, please provide this designation next to each applicable facility on Exhibit A.

18. Do you and/or any of the facilities listed on Exhibit A provide transportation to OUD treatment facilities? ____Yes ____No. If yes, please provide this designation next to each applicable facility on Exhibit A.

19. Do you and/or any of the facilities listed on Exhibit A implement needle exchange in the hospital or an adjacent clinic and/or provide on-site medication-assisted treatment ("MAT") services? ____Yes ____No. If yes, please provide this designation next to each applicable facility on Exhibit A.

20. Do you and/or any of the facilities listed on Exhibit A use telemedicine, telehealth, and/or teleconsulting to support treatment and to support "spoke" entities? ____Yes ____No. If yes, please provide this designation next to each applicable facility on Exhibit A.

21. Do you and/or any of the facilities listed on Exhibit A perform heart valve replacements? ____Yes ____No. If yes, please provide this designation and the percentage of all heart valve replacements performed that are secondary to opioid addiction next to each applicable facility on Exhibit A.

22. Do any of the facilities listed on Exhibit A have a Neonatal Intensive Care Unit ("NICU") that treats babies with Neonatal Abstinence Syndrome ("NAS")?
_____ Yes _____ No. If yes, please provide this designation next to each applicable facility on Exhibit A for #22 and 22(a) and 22(b) below:

   a.   Do any of the facilities have a dedicated NAS NICU? ____ Yes ____ No

   b.   Do you and/or any of the facilities provide obstetric and perinatal services to treat mothers with OUD? _____ Yes ____ No

23. For all inpatient and outpatient discharges during the period January 1, 2009, to September 15, 2019, from you and/or each qualifying facility operated by you, please provide the following data in CSV (Comma Delimited) Electronic File or Pipe Delimited Electronic Text File to be used in connection with the calculation of each of your financial damages. Eligible qualifying acute care hospitals as defined by the Centers for Medicare and Medicaid Services which are subject to the EMTALA. **An example of the data formatting is set forth in Exhibit H.  This data should be in a separate CSV (Comma Delimited) Electronic File or Pipe Delimited Electronic Text File for each Holder of a Hospital Channeled Claim**. Physician office visits and non-acute care visits should **NOT** be included in data provided.

For the CSV (Comma Delimited) Electronic File or Pipe Delimited Electronic Text File, please include in the file name the name of the Holder of a Hospital Channeled Claim, City and State where located and Date Range of Data Provided, for example, PhoenixGeneral-Phoenix-AZ-Jan09-Dec12.csv. If more than one file is provided due to size limitation, each file name will be the same with only the date range of the data provided changing e.g. PhoenixGeneral-Phoenix-AZ-Jan13-Dec20.csv

It is important to note, and as further described below, that the following data (except for ICD diagnosis code, ICD diagnosis code description and ICD diagnosis code priority) for each visit/discharge will need to be repeated on each row corresponding to each different ICD diagnosis code.  The data for the ICD diagnosis codes, ICD diagnosis code descriptions and ICD diagnosis code priority for each visit/discharge will therefore be unique to each row.  For example, if a visit has 18 ICD diagnosis codes, there would be 18 rows/lines for that visit/discharge with each line containing a different ICD diagnosis code, ICD diagnosis code description and ICD diagnosis code priority. For all other data fields such as Patient Medical Record Number, Date of Discharge, etc. this data will be the same, and thus repeated, on all 18 rows/lines for that visit/discharge.

Once the CSV (Comma Delimited) or Pipe Delimited Text File is prepared, please review to confirm the data in each column contains the applicable data for that respective columns data field description. **After submission of this completed Form and execution of the Business Associate Agreement (as described in #25 herein), each claimant will be provided a secure portal by the Hospital Trustee to upload this requisite claims data.**

| Data Fields | Definitions and Clarifications |
| --- | --- |

| Column | | |
|---|---|---|
| a. | Name | Name of facility for which data is provided. |
| b. | Address | Address of facility for which data is provided. |
| c. | City | City of facility for which data is provided. |
| d. | State | State of facility for which data is provided. |
| e. | Zip | Zip of facility for which data is provided. |
| f. | CMS Certification Number | Center for Medicare & Medicaid Services – Formerly known as the Medicare Provider Number. This should be a six-digit Medicare certification number for a facility. |
| g. | Patient Medical Record # | |
| h. | Patient Account # | |
| i. | Payor Financial Class Description | e.g., Blue Cross, Medicaid, Private Pay, etc. |
| j. | Patient Type | e.g., Inpatient or Outpatient. Hospital related clinics or physician office visits should NOT be included in data provided. |
| k. | Custom Patient Type | e.g., Inpatient Psych, Outpatient Single Visit, Surgery, Lab, etc. Hospital related clinics or physician office visits should NOT be included in data provided. |
| l. | Date of Admission | |
| m. | Date of Discharge | |
| n. | Length of Stay (days) | |
| o. | Admission Type Description | e.g., Emergency, Reservation, Reference Lab, etc. |
| p. | Discharge Disposition Description | e.g., Discharge Home, Nursing Home, Expired, etc. |
| q. | Patient Date of | |

| | | |
|---|---|---|
| | **Birth** | |
| r. | **Patient Age at Discharge** | |
| s. | **Patient Gender** | |
| t. | **Patient Race** | |
| u. | **Patient City** | |
| v. | **Patient State** | |
| w. | **Patient Zip Code** | |
| x. | **Attending Physician Name** | |
| y. | **Total Charges** | |
| z. | **Total Payments** | Total Payments should only contain actual payments received (e.g. insurance/self-pay).  It should NOT include adjustments, bad debt, write-offs or contractual adjustments. |
| aa. | **DRG Code** | Provide Diagnosis Related Group (DRG) code for each inpatient visit/discharge. |
| ab. | **DRG Code Description** | Provide DRG description for the above DRG code. |
| ac. | **All ICD Diagnosis Code** | For each visit/discharge, provide all International Classification of Disease (ICD) diagnosis codes (ICD-9 or ICD-10, as applicable) associated with each patient visit/discharge.  Each of these ICD Diagnosis Codes related to each patient's visit should NOT be listed in multiple columns but rather each ICD Code should be listed in the same single column with each ICD Code shown on separate rows within the same single column. See Exhibit H. |
| ad. | **ICD Diagnosis Code Descriptions** | Provide ICD Diagnosis description for the above ICD Diagnosis Code. |
| ae. | **ICD Diagnosis** | Provide whether each ICD Diagnosis Code is a |

|   | **Code Priority** | Primary, Secondary, Tertiary, etc. diagnosis.  These categories must be expressed in terms of a numerical code such as 1=Primary, 2=Secondary, 3=Tertiary, etc. |
| af. | **Mom's MRN - If applicable** | This field pertains only to Holders of Hospital Channeled Claims that deliver newborn babies or have a neonatal unit.  If this visit/charge is for a birth mother, then this field should be blank as it would be the same MRN as the patient reported in #g above.  However, if this visit/charge pertains to a baby, then this field should contain the mother's MRN so that there can be a mother/baby link associated therewith. |
| ag. | **Baby's MRN  - If applicable** | This field pertains only to Holders of Hospital Channeled Claims that deliver newborn babies or have a neonatal unit.  If this visit/charge is for a baby, then this field should be blank as it would be the same MRN as the patient reported in #g above.  However, if this visit/charge pertains to a birth mother, then this field should contain the Baby's MRN so that there can be a mother/baby link associated therewith. |

24. Please attach your "charge master"[15] for the calendar years 2009 through 2019 for yourself and/or each of the facilities listed on Exhibit A.

25. Please execute the Business Associates Agreement attached as Exhibit J and return with the Form for each facility listed on Exhibit A.

26. Funds received from the Hospital Trust may only be used for specific abatement purposes as set forth in Section 7 of the Hospital TDP. If the Holder of a Hospital Channeled Claim on whose behalf this claim has been prepared is allocated a Hospital Abatement Distribution from the Hospital Trust, as a condition of receiving the funds, then it will use the funds for one or more specific uses as listed on Exhibit I.

27. Please complete the W-9 attached hereto for each entity OR the natural person claiming to be a Holder of a Hospital Channeled Claim and return the W-9 with this Form.

---

[15] The "charge master" is a list of all the billable services and items billed to a patient or a patient's health insurance provider. The charge master captures the costs of each procedure, service, supply, prescription drug, and diagnostic test provided at the hospital to a patient, as well as any fees associated with such services, such as equipment fees and room charges.

**I certify that I am authorized to sign this Hospital Abatement Distribution Form and I understand that an authorized signature on this Form serves as an acknowledgement that I have a reasonable belief that the information is true and correct.**

**I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.**

Signature: _____

Executed on date: (MM/DD/YYYY) _____

Print the name of the person who is completing and signing this claim.

Name (First, Middle, Last): _____

Title: _____

Hospital: _____

Address: _____

_____

Contact phone: _____

Email: _____

## EXHIBIT E

## TPP TDP

# TPP TRUST DISTRIBUTION PROCEDURES[1]

## § 1.    APPLICABILITY.

Pursuant to the plan of reorganization of Purdue Pharma L.P. and its Debtor affiliates (the "Plan")[2] and the Master TDP, the following claims ("Third-Party Payor Channeled Claims") shall be channeled to and liability therefor shall be assumed by the TPP Trust as of the Effective Date: (i) all Third-Party Payor Claims, which include all Claims against the Debtors held by Third-Party Payors that are not Domestic Governmental Entities ("TPP Claimants"),[3] and (ii) all Released Claims and Shareholder Released Claims held by Third-Party Payors that are not Domestic Governmental Entities. Third-Party Payor Channeled Claims shall be administered, liquidated and discharged pursuant to the TPP Trust Documents, and satisfied solely from funds held by the TPP Trust as and to the extent provided in these trust distribution procedures (this "TPP TDP"). This TPP TDP sets forth the manner in which the TPP Trust shall make Abatement Distributions to TPP Claimants that satisfy the eligibility criteria for TPP Authorized Recipients set forth herein, including the timely filing of a TPP Abatement Claim Form, as defined in Section 4 herein (such Abatement Distributions, "TPP Abatement Distributions"). Third-Party Payor Channeled Claims shall be fully discharged pursuant to this TPP TDP. All Distributions in respect of Third-Party Payor Channeled Claims shall be exclusively in the form of TPP Abatement Distributions, shall be based upon the Purdue-Related Opioid Spend, as defined herein, set forth in the TPP Abatement Claim Form and the TPP Trust's determination with respect to that asserted TPP Abatement Claim, and may be used exclusively for the Authorized Abatement Purposes set forth herein.

## § 2.    RECEIPT AND USE OF FUNDS BY THE TPP TRUST.

The Plan contemplates that the TPP Trust will receive a total of $365 million over time, with an initial payment of $5 million to the TPP Trust on the Effective Date (the "Initial TPP Trust Distribution") and three subsequent payments to the TPP Trust from the Master Disbursement Trust in the following amounts: (i) $120 million on July 31, 2022, (ii) $120 million on July 31,

---

[1]    These procedures are qualified by the terms of the Plan. TPP Claimants are strongly advised to review the Plan as well as all of the TPP Trust Documents and the Debtors' Disclosure Statement for additional information on the terms of the Plan and the treatment of Third-Party Payor Channeled Claims. In addition, you are advised to review the LRP Agreement, which describes lien resolution procedures with respect to claims that Third-Party Payors may have in connection with Distributions to Holders of PI Claims against the Debtors. Although the LRP Agreement is a PI Trust Document, it has been attached to this TPP TDP as Exhibit 1 purely for ease of reference for TPP Claimants and potential TPP Authorized Recipients.

[2]    Terms used but not defined herein shall have the meaning ascribed to them in the Plan.

[3]    For the avoidance of doubt, "Third-Party Payor Claims" include any Claims against any Debtor that are held by Third-Party Payors (including any Claims based on the subrogation rights of the Holder thereof that are not Other Subordinated Claims) that are not Domestic Governmental Entities; provided that Claims in respect of self-funded government plans that were and are asserted through private Third-Party Payors shall be included in this definition of "Third-Party Payor Claims." Claims of Third-Party Payors against Holders of PI Claims or Distributions payable to Holders of PI Claims are not claims against any Debtor and therefore are not included in this definition of "Third-Party Payor Claims." The claims of Third-Party Payors against Holders of PI Claims and Distributions payable to Holders of PI Claims are addressed in the LRP Agreement, as noted in Section 2 hereof and in Exhibit 1. See supra n.1.

2023 and (iii) $120 million on July 31, 2024.[4] The funds paid to the TPP Trust shall be used for the administration (including the payment of expenses) of the TPP Trust, and to make the TPP Abatement Distributions to TPP Claimants that qualify as TPP Authorized Recipients (as defined below), subject to the assessments payable to the Common Benefit Escrow (and, later, the Common Benefit Fund) pursuant to Section 5.8 of the Plan. On the Effective Date, a Common Benefit Escrow shall be established and funded by assessments of 5% of each TPP Abatement Distribution made by the TPP Trust. Such assessments will be paid by the TPP Trust in respect of TPP Abatement Distributions made by the TPP Trust to the Common Benefit Escrow and then, upon its establishment, directly to the Common Benefit Fund established by the MDL Court, on periodic schedules acceptable to the Third-Party Payor Group, The amounts in the Common Benefit Escrow shall be held in escrow until an order is entered by the MDL Court establishing a Common Benefit Fund, at which time the amounts held by the Common Benefit Escrow and all subsequent assessments of 5% of each TPP Abatement Distribution made by the TPP Trust shall be transferred to and distributed in accordance with the order of the MDL Court establishing the Common Benefit Fund.

TPP Authorized Recipients are required to use all funds distributed to them from the TPP Trust solely and exclusively for (i) the Authorized Abatement Purposes set forth herein in Section 8 and Appendices C and D or (ii) the payment of attorneys' fees and costs of TPP Authorized Recipients (including counsel to the Third-Party Payor Group) (collectively, the "TPP Authorized Abatement Purposes"); provided, that a TPP Authorized Recipient that makes the certification required under Sections 8 and 9 regarding minimum spending requirements will be deemed to have used the funds received as a TPP Abatement Distribution for TPP Authorized Abatement Purposes; provided, further that such certification may be subject to audit by the TPP Trust.

CLAIMS THAT THIRD-PARTY PAYORS MAY HAVE AGAINST DISTRIBUTIONS PAYABLE TO HOLDERS OF PI CLAIMS (SUCH AS REIMBURSEMENT AND LIEN CLAIMS) ARE NOT BEING ADMINISTERED BY THE TPP TRUST AND ARE NOT SUBJECT TO THE PROCEDURES SET FORTH HEREIN. THIRD-PARTY PAYORS MAY ELECT TO RESOLVE SUCH CLAIMS THROUGH THE LIEN RESOLUTION PROCEDURES UNDER THE LRP AGREEMENT, WHICH SHALL BE ATTACHED AS EXHIBIT D TO THE PI TRUST AGREEMENT (AND IS ATTACHED HEREIN AS EXHIBIT 1 FOR EASE OF REFERENCE), AND WHICH SHALL BE FILED WITH THE PLAN SUPPLEMENT. THE PLAN SUPPLEMENT (INCLUDING THE LRP AGREEMENT) MAY BE OBTAINED FREE OF CHARGE AT HTTPS://RESTRUCTURING.PRIMECLERK.COM/PURDUEPHARMA.

DISTRIBUTIONS TO PARTICIPATING THIRD-PARTY PAYORS UNDER THE LRP AGREEMENT WILL BE MADE BY THE PI TRUSTEE FROM FUNDS HELD BY THE PI TRUST.

---

[4]    In the event that any payment date is on a date that is not a Business Day, then the making of such payment may be completed on the next succeeding Business Day, but shall be deemed to have been completed as of the required date.

## § 3.    ADMINISTRATION BY TRUSTEE.

The trustee of the TPP Trust (the "Trustee") will be selected in accordance with the Plan in advance of the Effective Date by the Third-Party Payor Group with the consent of the Debtors (which consent shall not be unreasonably withheld, delayed, or denied.).[5] Alan D. Halperin has been selected and approved to serve as the Trustee.

The Trustee shall have the power and authority to perform all functions on behalf of the TPP Trust, and shall undertake all administrative responsibilities of the TPP Trust (whether directly or through professionals and agents engaged by the TPP Trust, including a claims administrator) as are provided in the Plan and the TPP Trust Documents.[6] The Trustee shall be responsible for all decisions and duties with respect to the TPP Trust, as more fully set forth in the TPP Trust Agreement.[7]

The Trustee shall have the exclusive authority to determine the eligibility of TPP Claimants to be TPP Authorized Recipients and the amount of TPP Abatement Distributions to be made by the TPP Trust. In order to qualify as a TPP Authorized Recipient and be eligible to receive a TPP Abatement Distribution, TPP Claimants must comply with the terms, provisions and procedures set forth herein, including the TPP Abatement Claim Deadline (defined below) and the timely submission of all forms required pursuant hereto (which shall be in addition to, and not in substitution of, Proofs of Claim filed in the Chapter 11 Cases). The Trustee may investigate any Third-Party Payor Channeled Claim, may request information from any TPP Claimant to ensure compliance with the terms set forth in this TPP TDP, the other TPP Trust Documents and the Plan, and make determinations about the TPP Abatement Distribution amounts to be made to TPP Authorized Recipients.

Pursuant to section 1123(b)(3)(B) of the Bankruptcy Code and applicable state corporate law, the TPP Trust shall be and is appointed as the successor-in-interest to, and the representative of, the Debtors and their Estates for the retention, enforcement, settlement or adjustment of the Third-Party Payor Channeled Claims.

In accordance with Section 5.11(b) and (c) of the Plan, the Trustee shall receive copies of all Proofs of Claims for the Third-Party Payor Channeled Claims on the Effective Date, and shall be entitled

---

[5]    The TPP Trust Agreement will be filed on or prior to the Plan Supplement Deadline.

[6]    The TPP Trust Agreement shall provide that the Trustee shall have the authority to, in his/her discretion, consult with and retain attorneys, financial advisors, accountants, or other professionals and employees, including any third-party claims administrators or claims and noticing agent, as the Trustee deems appropriate in the reasonable exercise of his/her discretion, and who the Trustee reasonably determines to have qualifications necessary to assist the Trustee in the proper administration of the TPP Trust. The TPP Trust Agreement defines such parties as Trust Professionals. The Trustee may pay the reasonable fees, costs and expenses of such persons (including to him/herself and his/her firm) out of the assets of the TPP Trust in the ordinary course of business, pursuant to the terms of the TPP Trust Agreement. There will also be a Trust Advisory Committee, comprised of representatives of five Third-Party Payors, and the members of that committee will have certain oversight and advisory rights, which are described in the TPP Trust Agreement.

[7]    The TPP Trust Agreement shall provide for the compensation of the Trustee. The Trustee shall not be required to post any bond or other form of surety or security unless otherwise ordered by the Bankruptcy Court.

to reasonably request and receive from NewCo such additional information and documents as reasonably necessary for the administration of the TPP Trust, which may include those medical, prescription or business records of the Debtors related to the Third-Party Payor Channeled Claims, which records shall be transferred from the Debtors to NewCo on the Effective Date.

## § 4.    ELIGIBILITY FOR TPP ABATEMENT DISTRIBUTIONS.

To qualify as a TPP Authorized Recipient and be entitled to receive TPP Abatement Distributions from the TPP Trust, each TPP Claimant must:

a.  Have timely filed a Proof of Claim in the Debtors' Chapter 11 Cases (that is, on or before July 30, 2020) and checked the box identifying itself as a Third-Party Payor, or have timely filed a Proof of Claim and amended that Proof of Claim prior to the Effective Date of the Plan to properly identify itself as a Third-Party Payor;

b.  **Timely submit an additional, completed form (the "<u>TPP Abatement Claim Form,</u>" available at Appendix A) to the TPP Trust by the TPP Abatement Claim Deadline, which shall be no later than sixty (60) days after the Effective Date of the Plan[8] (the "<u>TPP Abatement Claim Deadline</u>") in accordance with the instructions provided with the TPP Abatement Claim Form; and**

c.  Have provided in connection with such TPP Abatement Claim Form, by or before the TPP Abatement Claim Deadline, a calculation of its Purdue-Related Opioid Spend (as defined in Appendix B), utilizing the Maximum Eligible Amount Calculation Methodology (for each TPP Claimant, its "<u>TPP Abatement Claim</u>").[9]

Any TPP Claimant who meets all of the above criteria (a)-(c) (each such TPP Claimant, a "<u>TPP Authorized Recipient</u>") shall qualify for TPP Abatement Distributions, subject to the limitations otherwise set forth herein. **To receive a TPP Abatement Distribution from the TPP Trust, a TPP Authorized Recipient must also complete and return to the TPP Trust an IRS form W-9 or an IRS form W-8, as applicable. Copies of such forms are available at Exhibit 2 to this document.**

FOR AVOIDANCE OF DOUBT, FOR A TPP CLAIMANT TO QUALIFY AS A TPP AUTHORIZED RECIPIENT AND BE ELIGIBLE TO RECEIVE A TPP ABATEMENT DISTRIBUTION, SUCH TPP CLAIMANT MUST HAVE (i) TIMELY FILED A PROOF OF CLAIM IDENTIFYING ITSELF AS A THIRD-PARTY PAYOR BY OR BEFORE THE GENERAL BAR DATE, (ii) MUST TIMELY SUBMIT A TPP ABATEMENT CLAIM FORM BY OR BEFORE THE TPP ABATEMENT CLAIM DEADLINE (THAT IS, SIXTY (60) DAYS AFTER THE EFFECTIVE DATE OF THE PLAN, AS SET FORTH BELOW), USING THE MAXIMUM ELIGIBLE AMOUNT CALCULATION METHODOLOGY, AND (iii) MUST

---

[8]    In the event that the deadline (i.e., the sixtieth day after the Effective Date) falls on a date that is not a Business Day, then the deadline shall be the next succeeding Business Day,

[9]    The Maximum Eligible Amount Calculation Methodology is attached as Appendix B.

PROVIDE A COMPLETED IRS FORM W-9 OR W-8 TO THE TPP TRUST. MORE DETAIL ABOUT EACH OF THESE POINTS IS PROVIDED BELOW.

(a)     **Initial Proof of Claim**

All TPP Claimants were required, in order to preserve their claims against the Debtors, to file Proofs of Claim by the General Bar Date (that is, July 30, 2020) established by the Bankruptcy Court. More than 467,108 such Proofs of Claim were filed (some as part of consolidated Proofs of Claim filed on behalf of numerous TPP Claimants). Many, though not all, were filed using estimated or unliquidated amounts.

Any TPP Claimant that did not timely file a Proof of Claim and check the box on the Proof of Claim form identifying itself as a Third-Party Payor or that did not timely file a Proof of Claim and amend that claim before the Effective Date to properly identify itself as a Third-Party Payor is barred from asserting or seeking to enforce its Third-Party Payor Channeled Claim, pursuant to the Bar Date Order, and shall not be a TPP Authorized Recipient or eligible to receive a TPP Abatement Distribution from the TPP Trust.

(b)     **TPP Abatement Claim Deadline**

All TPP Claimants that timely filed a Proof of Claim on or before July 30, 2020 shall be required to submit a TPP Abatement Claim Form by the TPP Abatement Claim Deadline. Any TPP Claimant that does not submit a TPP Abatement Claim Form shall not qualify as a TPP Authorized Recipient, and any TPP Claimant that submits a TPP Abatement Claim Form after the TPP Abatement Claim Deadline shall not qualify as a TPP Authorized Recipient, and shall have no right to any distribution from the TPP Trust. No TPP Abatement Claim Form shall be accepted after the TPP Abatement Claim Deadline, unless that TPP Claimant has made a written request for an extension to the Trustee prior to the TPP Abatement Claim Deadline, and that request has been granted by the Trustee in writing. Requests for extension must be **actually received** by the Trustee prior to the TPP Abatement Claim Deadline, and the determination as to whether to grant any requested extension is wholly within the discretion of the Trustee.

The TPP Abatement Claim Form requires all TPP Claimants to use the Maximum Eligible Amount Calculation Methodology to determine the amount of their Purdue-Related Opioid Spend, which shall be used to determine the maximum amount they are eligible to receive as a TPP Abatement Distribution. However, the actual amount of the TPP Abatement Distribution to a TPP Authorized Recipient will depend on the total dollar amounts of (i) the TPP Abatement Distribution to all TPP Authorized Recipients and (ii) the Purdue-Related Opioid Spend of all TPP Authorized Recipients.

The TPP Abatement Claim Form (including instructions for the required calculations and the deadlines and instructions for the submission of such TPP Abatement Claim Form on the website to be maintained by the TPP Trust) will be distributed by the Trustee (or an agent thereof) to each TPP Claimant that timely filed a Proof of Claim promptly after the Effective Date and in no event more than three business days after the Effective Date (such notice, the "TPP Abatement Claim Form Notice"). The TPP Abatement Claim Form Notice will make it clear that after the TPP Abatement Claim Forms are reviewed by the Trustee, the TPP website will be the sole form of notice of the TPP Trust's determination of the TPP Abatement Distribution amount each TPP

Authorized Recipient is to receive. The deadline for the posting of such determinations on the website is described in Section 5(a) herein.

As set forth in more detail in the instructions attached to the TPP Abatement Claim Form, for those TPP Abatement Claims that are being submitted on a consolidated basis for multiple TPP Claimants, the filer shall provide aggregate information in Part 3 of the TPP Abatement Claim Form, and attach a chart or spreadsheet containing such aggregate information. For each TPP Claimant included in the consolidated TPP Abatement Claim Form, the chart or spreadsheet shall provide: (i) the name of the TPP Claimant, or if a unique identifier (rather than the TPP Claimant's name) was used in connection with the previously filed Proof of Claim, the unique identifier; (ii)  the last four digits of that TPP Claimant's federal tax identification number (FEIN); (iii) the responses to each of questions 1 through 6 in the instructions accompanying the TPP Abatement Claim Form (described as the Maximum Eligible Amount Calculation Methodology) for that TPP Claimant, (iv) the dollar amount of that TPP Claimant's Purdue-Related Opioid Spend, as calculated pursuant to the instructions set forth in this TDP, and (v) the claim number of the previously filed Proof of Claim.

A TPP Claimant (or its attorney) must deliver, as part of the TPP Abatement Claim Form, a certification signed by the TPP Claimant or its attorney attesting to the accuracy and truthfulness of the TPP Claimant's submission. Such certification must include an attestation that the TPP Claimant utilized the Maximum Eligible Amount Calculation Methodology to determine the Purdue-Related Opioid Spend of its TPP Abatement Claim and that no data required for claims processing and valuation, and no records or information that would reasonably be relevant to the valuation of the TPP Abatement Claim, have been misrepresented or omitted.

A TPP CLAIMANT THAT FILED AN INITIAL PROOF OF CLAIM MUST TIMELY SUBMIT A TPP ABATEMENT CLAIM FORM IN ORDER TO QUALIFY AS A TPP AUTHORIZED RECIPIENT AND TO BE ELIGIBLE FOR TPP ABATEMENT DISTRIBUTIONS FROM THE TPP TRUST. TPP ABATEMENT DISTRIBUTIONS FROM THE TPP TRUST SHALL BE THE SOLE SOURCE OF RECOVERY IN RESPECT OF THIRD-PARTY PAYOR CHANNELED CLAIMS, AND NO TPP CLAIMANT SHALL HAVE ANY OTHER OR FURTHER RECOURSE TO THE DEBTORS OR THEIR ESTATES, THE TPP TRUST OR ANY OTHER RELEASED PARTY OR SHAREHOLDER RELEASED PARTY IN RESPECT OF ITS THIRD-PARTY PAYOR CHANNELED CLAIMS.

      (c)      **Use of Maximum Eligible Amount Calculation Methodology to Determine Purdue-Related Opioid Spend**

In addition to the requirements set forth above, each TPP Claimant must use the Maximum Eligible Amount Calculation Methodology to identify its Purdue-Related Opioid Spend on a TPP Abatement Claim Form in order to qualify as a TPP Authorized Recipient and to be eligible to receive a TPP Abatement Distribution hereunder. On the TPP Abatement Claim Form, each TPP Claimant must set forth, inter alia, the total amount of its Purdue-Related Opioid Spend, certifying that it used the Maximum Eligible Amount Calculation Methodology, as set forth on Appendix B attached hereto, to calculate its Maximum Eligible Amount (as defined below).

TPP Claimants shall not be required to submit the data underlying the amount of their Purdue-Related Opioid Spend with the TPP Abatement Claim Form but shall promptly provide supporting documentation and data, if and when requested by the Trustee, sufficient to enable confirmation of the amounts.

### (d)    The Submission of IRS Form W-9 or IRS Form W-8 to the TPP Trust

Each TPP Claimant must also furnish to the Trustee in writing his, her or its name, address, Employer or Taxpayer Identification Number as assigned by the IRS and a completed IRS Form W-9 or, if applicable, IRS Form W-8. Such form may be submitted with the TPP Abatement Claim Form or may be sent separately via email to [●]. **If such completed form is not received by the Trustee within three hundred sixty-five days (365) days of the TPP Abatement Claim Form Notice, which shall include notice of the deadline for submitting a completed IRS Form W-9 or W-8, each such TPP Claimant shall be deemed to have forfeited his/her/its entire interest in the TPP Trust, any and all claims to the TPP Trust Assets, and all rights to any TPP Abatement Distribution under the TPP TDP, the TPP Trust Agreement, the Plan and Confirmation Order, and such forfeited amounts shall re-vest in the TPP Trust to be distributed to other TPP Authorized Recipients.**

## § 5.    DETERMINATION OF TPP ABATEMENT DISTRIBUTIONS.

### (a)    Claims Review and Reconciliation

The Trustee shall review the timely submitted TPP Abatement Claim Forms.

As part of this review and aggregation process, the Trustee and Trust Professional(s) shall identify and eliminate duplicative TPP Abatement Claims, if any, submitted by more than one TPP Authorized Recipient (e.g., by a Self-Funded Health Plan[10] independently and as an ASO[11] included in a consolidated TPP Abatement Claim Form) to ensure a TPP Authorized Recipient does not receive multiple TPP Abatement Distributions in connection with the same Purdue-Related Opioid Spend. In the event that the Trustee identifies TPP Abatement Claims as duplicative, the Trustee (or Trust Professionals acting on behalf of the Trustee) shall notify the submitting parties via email of the duplication and request joint written instructions or alternatively, instruction from the Self-Funded Health Plan that submitted on its own behalf within thirty (30) days of the date of the email, as to which TPP Abatement Claim should be deemed withdrawn. Absent such timely instructions, the Trustee shall treat the TPP Abatement Claim Form submitted earlier in time as the TPP Abatement Claim Form for notice and distribution purposes, and the other TPP Abatement Claims shall be deemed disqualified.

---

[10]    The term Self-Funded Health Plan ("SFHP") means a health or disability benefits plan provided by an employer, association, union, or other such entity (the "entity") to its employees, members, or other such beneficiaries entitled to receive benefits under the plan, using the entity's own funds, whereby the entity assumes most of the financial risk relating to health insurance. A SFHP may secure stop-loss coverage from an insurer only to cover unexpectedly large or catastrophic claims.

[11]    Self-Funded Health Plans for which a Third-Party Payor performs administrative services only are referred to herein as Administrative Services Only customers or "ASO" or "ASO customers."

No later than 270 days after the TPP Abatement Claim Deadline, the Trustee shall cause the website [www._____.com] to be updated to reflect the TPP Trust's determination of the maximum amounts eligible to be distributed to TPP Authorized Recipients (with respect to each TPP Authorized Recipient, its "Maximum Eligible Amount") and initial percentage of total TPP Abatement Distributions represented by such Maximum Eligible Amount (with respect to each TPP Authorized Recipient, its "Initial Allocation Percentage"). This will require that the TPP Trust match the TPP Abatement Claim Forms to the Proofs of Claim that were timely filed as Third-Party Payor Channeled Claims in connection with the General Bar Date,  review the TPP Abatement Claim Forms and any supporting documentation and data, make determinations about the amount and validity of the TPP Abatement Claims submitted by TPP Authorized Recipients, and eliminate any duplicative TPP Abatement Claims or TPP Abatement Claim Forms that request TPP Abatement Distributions for the same Purdue-Related Opioid Spend. The Maximum Eligible Amount may be shown as zero dollars ($0) and the TPP Abatement Claim disqualified in its entirety, or may be an amount different from that asserted on the TPP Abatement Claim Form, as appropriate, if no Proof of Claim was timely filed in connection with the General Bar Date, if no TPP Abatement Claim Form was timely submitted by the TPP Abatement Claim Deadline, if the TPP Claimant did not fully comply with the requirements of the TPP Abatement Claim Form and instructions, if the TPP Claimant was directed to provide the TPP Trust with documentation or data and did not promptly do so, or on any other basis. The Trustee's determination as to the Maximum Eligible Amount of each TPP Abatement Claim shall be the amount reflected on the updated website.

Each TPP Authorized Recipient's Initial Allocation Percentage will be calculated by dividing (i) the final dollar amount of such TPP Authorized Recipient's Maximum Eligible Amount by (ii) the total dollar amount of all TPP Authorized Recipients' Maximum Eligible Amounts plus the disputed, unresolved TPP Abatement Claims for which funds must be reserved (see below).

Within five business days of updating the website to reflect the TPP Trust's determination of the maximum amounts eligible to be distributed to TPP Authorized Recipients, the Trustee will, via email, notify each TPP Claimant that has submitted or is included in a TPP Abatement Claim Form (via notice to the representative identified as the notice party on the TPP Abatement Claim Form) that the website has been updated. For avoidance of doubt, with respect to consolidated TPP Abatement Claims included in one TPP Abatement Claim Form, email notice will be sent only to the notice party identified on the TPP Abatement Claim Form.

(b)    **Challenges to Determinations by the TPP Trust**

TPP Authorized Recipients will have thirty (30) days from the date that the Trustee emails notice of the updating of the TPP Trust website as set forth in Section 5(a) hereof, to submit a letter or letters to the TPP Trust, by submitting such letter or letters on the TPP Trust website, challenging the TPP Trust's determination regarding its Maximum Eligible Amount or Initial Allocation Percentages and/or the Maximum Eligible Amounts or Initial Allocation Percentages of any other TPP Authorized Recipient (the "Challenge Deadline"). A separate letter must be submitted for each challenged Maximum Eligible Amounts and/or Initial Allocation Percentages.

A TPP Authorized Recipient may challenge the Maximum Eligible Amounts and/or Initial Allocation Percentages of as many other TPP Authorized Recipients as it wishes, though each

challenge must be made separately by one TPP Authorized Recipient against a single other TPP Authorized Recipient, made on a good faith basis, and accompanied by a detailed letter identifying the basis or bases for the challenge. A TPP Claimant that did not timely file a Proof of Claim and does not timely submit a TPP Abatement Claim Form shall not have the right to challenge the amount of any other TPP Authorized Recipient's Maximum Eligible Amounts and/or Initial Allocation Percentages.

The TPP Trust will have up to forty-five (45) days after the Challenge Deadline to resolve challenges (the "Resolution Deadline"). If a TPP Abatement Claim has been timely challenged and no agreement can be reached between the TPP Trust and the TPP Authorized Recipient or TPP Authorized Recipients (i.e., the TPP Authorized Recipient challenging the determination of the TPP Trust, and in the event that the challenge relates to the Maximum Eligible Amount and/or Initial Allocation Percentage of a different TPP Authorized Recipient, that TPP Authorized Recipient), the TPP Authorized Recipient that brought the challenge has the right to file a motion with respect to such challenge with the Bankruptcy Court, within thirty (30) days from the Resolution Deadline (the "Motion Deadline").

**If there is a timely challenge, the amount of the challenged Maximum Eligible Amount and/or Initial Allocation Percentage shall be determined by negotiated resolution if possible, or, in the absence of agreement, the TPP Trust's determination of the Maximum Eligible Amount and/or Initial Allocation Percentage will control, if no motion is filed with the Bankruptcy Court by or before the Motion Deadline. If a motion is timely filed, the amount of the Maximum Eligible Amount and/or Initial Allocation Percentage will be determined by the Bankruptcy Court.**

If appropriate due to a successful challenge, the Trustee shall modify one or more amounts of Maximum Eligible Amounts and/or Initial Allocation Percentages accordingly.

Challenges that do not result in a change to the amount of any Maximum Eligible Amount and/or Initial Allocation Percentages shall be deemed unsuccessful and the challenging TPP Authorized Recipient shall be charged for all fees and expenses associated with adjudicating the failed challenge, including all time spent by the Trustee and associated TPP Trust professionals; such fees and expenses shall be subtracted from the challenging TPP Authorized Recipient's TPP Abatement Distribution payment. To the extent that the challenging TPP Authorized Recipient's TPP Abatement Distribution payment is insufficient to fully reimburse such expenses, the challenging TPP Authorized Recipient and the challenging TPP Authorized Recipient's professionals that filed the unsuccessful challenge shall be liable for payment of all fees and expenses associated with adjudicating the failed challenge, including all time spent by the Trustee and associated Trust Professionals.

If no challenge is timely received, the TPP Trust's determination shall become a final determination as to the amount of that Maximum Eligible Amount and/or Initial Allocation Percentage (with the allocation percentage being subject to adjustment based on the outcome of other challenges).

Promptly following the Motion Deadline, the Trustee shall cause the website [www._____.com] to be updated to reflect the final determination of each TPP Authorized

Recipient's Maximum Eligible Amount and/or Initial Allocation Percentage, which shall become such TPP Authorized Recipient's "Final Allocation Percentage." The website shall also reflect which, if any, TPP Abatement Claims continue to be subject to dispute as a result of timely filed motions.

## § 6.    TPP ABATEMENT DISTRIBUTIONS BY TPP TRUST.

(a)    **Timing and Manner of Distributions**.

There will be three annual distributions by the TPP Trust, and the TPP Trust will provide a distribution report on the TPP Trust website in advance of each of the distributions.

The first distribution report will be due on or before February 15, 2023 (or, if February 15, 2023 is not a Business Day, the next Business Day), provided that February 15, 2023 is at least fifteen (15) months after the Effective Date. If it is not, the first distribution report will be due on the date that is fifteen (15) months after the Effective Date. The second and third distribution reports will be due on or before one year and two years, respectively, after the date of the filing of the first distribution report.

**Distributions to TPP Authorized Recipients will begin thirty (30) days after the filing of each distribution report, with the date on which that distribution begins being a "Distribution Date."**

The maximum amount each TPP Authorized Recipient shall be allowed to receive from a distribution shall be equal to the total gross distributable amount for all TPP Authorized Recipients eligible to receive TPP Abatement Distributions, multiplied by each TPP Authorized Recipient's Final Allocation Percentage, all subject to any amounts reserved on account of disputed Third-Party Payor Channeled Claims, consistent with Section 7. The existence of a Final Allocation Percentage for a particular TPP Authorized Recipient does not entitle that TPP Authorized Recipient to receive any funds, however, unless it has also complied with the terms of the TPP Trust and the funding of delineated opioid abatement initiatives therein.

At the option of the Trustee, any Cash payment may be made by a check or wire transfer or as otherwise required or provided in the TPP Trust Agreement.

(b)    *De Minimis* **Distributions**

The Trustee shall not be required to make any TPP Abatement Distributions of Cash in an amount less than $100, or such lower amount as determined by the Trustee in accordance with the TPP Trust Agreement to any TPP Authorized Recipient; provided, however, that if any TPP Abatement Distribution is not made pursuant to this Section, such TPP Abatement Distribution shall be added to any subsequent TPP Abatement Distribution to be made to such TPP Authorized Recipient. The Trustee shall not be required to make any final distribution of Cash in an amount less than $100 to any TPP Authorized Recipient. If the amount of any final TPP Abatement Distribution to any TPP Authorized Recipient would be $100 or less, then such distribution shall be made available for distribution to all TPP Authorized Recipients receiving final distributions of at least $100.

In the event that following all distributions and upon completion of the TPP Trust's tasks, the TPP Trust is left with *de minimis* funds, the Trustee may donate such *de minimis* funds to an IRS accredited charity.

### (c)    Undeliverable Distributions; Uncashed Checks

In the event that any TPP Abatement Distribution is returned as undeliverable, no TPP Abatement Distribution shall be made to such TPP Authorized Recipient (or its designated agent) unless and until the Trustee is notified in writing of such TPP Authorized Recipient's (or its authorized representative's) then-current address, at which time or as reasonably practicable thereafter, such TPP Abatement Distribution shall be made without interest, subject to the limitations of the following paragraph. The Trustee may, in his or her sole discretion, attempt to determine a TPP Authorized Recipient's current address or otherwise locate a TPP Authorized Recipient but nothing in this TPP TDP, the TPP Trust Agreement or the Plan shall require the Trustee to do so.

In the event that a TPP Abatement Distribution is returned as undeliverable or otherwise unclaimed for a period of six (6) months after the Distribution Date, and no updated address information is provided during that time, such Distribution shall be deemed unclaimed property within the meaning of section 347(b) of the Bankruptcy Code, the TPP Authorized Recipient shall be deemed to have forfeited its/her/his entire interest in the TPP Trust, no further TPP Abatement Distribution shall be made to or for the benefit of such TPP Authorized Recipient, the TPP Abatement Claim(s) of such TPP Authorized Recipient shall be discharged and forever barred from receiving Distributions under this TPP TDP, the TPP Trust Agreement, the Plan and Confirmation Order, and all title to and beneficial interest in the TPP Trust Assets represented by any such undeliverable TPP Abatement Distributions shall be cancelled and revert to and/or remain in the TPP Trust automatically and without need for a further order of the Bankruptcy Court (notwithstanding any applicable federal, provincial or state escheat, abandoned or unclaimed property laws to the contrary), and shall be redistributed in accordance with the Plan, the TPP Trust Agreement, and this TPP TDP.

Likewise, in the event any check in respect of a TPP Abatement Distribution to a TPP Authorized Recipient or its authorized representative has not been cashed or otherwise negotiated within six (6) months of the date of such TPP Abatement Distribution, such check shall be cancelled by stop payment or otherwise and no additional TPP Abatement Distribution(s) shall be made to such TPP Authorized Recipient or representative on account of such TPP Abatement Claim, such TPP Abatement Distribution shall be deemed unclaimed property within the meaning of section 347(b) of the Bankruptcy Code, the TPP Authorized Recipient shall be deemed to have forfeited its/her/his entire interest in the TPP Trust, and the Third-Party Payor Channeled Claims of the TPP Authorized Recipient shall be discharged and forever barred from receiving TPP Abatement Distributions under this TPP TDP, the TPP Trust Agreement, the Plan and Confirmation Order. After such date, all uncashed TPP Abatement Distributions shall become Trust property and revert to the TPP Trust, and shall be redistributed in accordance with the Plan, the TPP Trust Agreement and this TPP TDP.

## § 7.    TREATMENT OF DISPUTED TPP ABATEMENT CLAIMS.

If thirty (30) days prior to the due date of a distribution report, the Maximum Eligible Amount and/or Initial Allocation Percentage of a TPP Abatement Claim remains disputed, funds shall be reserved on account of that Maximum Eligible Amount and/or Initial Allocation Percentage. Once the Trustee or the Bankruptcy Court, as applicable, makes a determination as to the amount of the TPP Authorized Recipient's Maximum Eligible Amount and/or Initial Allocation Percentage, that TPP Authorized Recipient may be entitled to a "catch-up" payment in connection with the next distribution report and Distribution Date, consistent with the determination.

**THE TPP TRUST SHALL NOT BE REQUIRED TO RESERVE FUNDS FOR A DISPUTED TPP ABATEMENT CLAIM UNLESS A TPP CLAIMANT TIMELY SATISFIED THE REQUIREMENTS OF SECTIONS 3 AND 5 HEREIN, INCLUDING BUT NOT LIMITED TO HAVING FILED (I) A PROOF OF CLAIM BY OR BEFORE THE GENERAL BAR DATE AND (II) A TPP ABATEMENT CLAIM FORM BY OR BEFORE THE TPP ABATEMENT CLAIM DEADLINE UTILIZING THE MAXIMUM ELIGIBLE AMOUNT CALCULATION METHODOLOGY. A TPP CLAIMANT THAT FAILED TO TIMELY FILE A PROOF OF CLAIM OR TIMELY SUBMIT A TPP ABATEMENT CLAIM FORM UTILIZING THE MAXIMUM ELIGIBLE AMOUNT CALCULATION METHODOLOGY SHALL HAVE NO CLAIM AGAINST THE TPP TRUST AND NO RIGHT TO ANY TPP ABATEMENT DISTRIBUTION FROM THE TPP TRUST.**

## § 8.    USE OF TPP ABATEMENT DISTRIBUTIONS.

TPP Authorized Recipients are required to use all net funds distributed to them from the TPP Trust solely and exclusively for TPP Authorized Abatement Purposes which consist of (i) Approved MAT Expenses and Approved Uses/Programs[12] and (ii) the payment of attorneys' fees and costs; provided, that a TPP Authorized Recipient that makes the certification required under Sections 8 and 9 regarding minimum spending requirements will be deemed to have used the funds received as a TPP Abatement Distribution for TPP Authorized Abatement Purposes; provided, further that such certification may be subject to audit by the TPP Trust.

A TPP Authorized Recipient that receives a TPP Abatement Distribution from the TPP Trust must certify, pursuant to Section 9, that it has spent on an enterprise-wide basis (including parents, subsidiaries, charitable organizations, and affiliate companies), an aggregate amount equal to or exceeding its share of the annual TPP Abatement Distribution for TPP Authorized Abatement Purposes, and that it has complied with this Section, during the Distribution Period.[13] A TPP Authorized Recipient that submitted an aggregate Proof of Claim on behalf of ASO customers may distribute amounts received to ASO customers; provided that the TPP Authorized Recipient certify, pursuant to Section 9 herein, that it has spent on an enterprise-wide basis (including parents, subsidiaries, charitable organizations, affiliate companies and ASO customers), an aggregate amount equal to or exceeding its TPP Abatement Distribution for TPP Authorized Abatement

---

[12]    See Appendices C and D hereto.

[13]    The Distribution Period is defined as the twelve (12) month period following each annual Distribution Date.

Purposes, and that it has complied with this Section 8, during the Distribution Period. An ASO customer included in an aggregate Proof of Claim will not be subject to independent certification or usage requirements relating to the ASO's share of the TPP Abatement Distribution.

The TPP Trust shall, in accordance with the Plan, the Confirmation Order and the applicable TPP Trust Documents, make TPP Abatement Distributions to TPP Authorized Recipients exclusively for TPP Authorized Abatement Purposes. Decisions made by the TPP Trust concerning Abatement Distributions will consider the need to ensure that underserved urban and rural areas, as well as minority communities, receive equitable access to the funds.

(a)    **Approved MAT Expenses and Approved Uses/Programs**

TPP Authorized Abatement Purposes include Approved MAT Expenses and Approved Uses/Programs.

Approved MAT Expenses shall include all or part of the costs paid by TPP Authorized Recipients for Allowed MAT Therapy as defined in Appendix C attached hereto.

Approved Uses/Programs focus on providing treatment of Opioid Use Disorder ("OUD") and/or any Substance Use Disorder or Mental Health ("SUD/MH") and are defined in Appendix D attached hereto.[14]

(b)    **Requirements for Self-Funded Health Plans**

In each Distribution Period, a TPP Authorized Recipient that qualifies as a Self-Funded Health Plan: i) must have spent an aggregate amount at least equal to, or exceeding, its TPP Abatement Distribution for TPP Authorized Abatement Purposes as described in both Appendices C and D hereto; and ii) must have spent an aggregate amount at least equal to, or exceeding, 50% of the Self-Funded Health Plan's TPP Abatement Distribution on Approved Uses/Programs as described in Appendix D hereto. This provision does not apply to the extent a Self-Funded Health Plan is an ASO included in an aggregate Proof of Claim.

(c)    **Requirements for all TPPs other than Self-Funded Health Plans**

In each Distribution Period, a TPP Authorized Recipient (including a TPP Authorized Recipient that filed an aggregate Proof of Claim on behalf of ASOs), other than a Self-Funded Health Plan that independently filed a Proof of Claim: i) must have spent on an enterprise-wide basis (including parents, subsidiaries, charitable organizations, affiliate companies and ASO customers), an aggregate amount at least equal to, or exceeding, its TPP Abatement Distribution for TPP Authorized Abatement Purposes as described in both Appendices C and D hereto; and ii) must have spent on an enterprise-wide basis (including parents, subsidiaries, charitable organizations, affiliate companies and ASO customers), an aggregate amount at least equal to, or exceeding, 50%

---

[14]    As used herein, words like "expand," "fund," "provide" or the like shall not indicate a preference for new or existing programs.

of the TPP Authorized Recipient's TPP Abatement Distribution on Approved Uses/Programs as described in Appendix D hereto.

## § 9.    REPORTING BY TPP AUTHORIZED RECIPIENTS.

Within ninety (90) days after the end of a Distribution Period, each TPP Authorized Recipient that received a TPP Abatement Distribution, other than an ASO included in an aggregate Proof of Claim, must submit to the TPP Trust a certification regarding its satisfaction of the minimum spending requirements on TPP Authorized Abatement Purposes or that it was unable to meet the minimum spending requirements and must carryover a portion of its TPP Abatement Distribution.

If a TPP Authorized Recipient that received a TPP Abatement Distribution is unable to meet or has not met the minimum spending requirements set forth in Section 8 above during the Distribution Period, those allocated but unused funds can carry over to the subsequent periods and will continue to carry forward each year until the TPP Authorized Recipient meets the relevant spending requirements for TPP Authorized Abatement Purposes. Additional annual certification(s) must be submitted until the TPP Authorized Recipient meets the relevant spending requirements. A TPP Authorized Recipient shall not be subject to a penalty for failing to meet the minimum spending requirements with respect to its TPP Abatement Distribution during a given Distribution Period.

The TPP Trust shall have the right to audit a TPP Authorized Recipient to determine whether the TPP Authorized Recipient's expenditures for TPP Authorized Abatement Purposes have met the requirements set forth in the TPP Trust Documents.

Each TPP Authorized Recipient, other than an ASO included in an aggregate Proof of Claim, if and when requested by the Trustee, shall provide supporting documentation, in a mutually agreed upon format, demonstrating that the TPP Authorized Recipient's expenditures for TPP Authorized Abatement Purposes have met the requirements of the TPP Trust Documents. All Proofs of Claim, TPP Abatement Claim Forms and certifications filed or submitted by TPP Claimants are subject to audit by the Trustee, at the Trustee's discretion. If the Trustee finds a material misstatement in a TPP Claimant's Proof of Claim, TPP Abatement Claim Form or certification, the Trustee may allow that TPP Claimant up to 30 days to resubmit its Proof of Claim, TPP Abatement Claim Form or certification with supporting documentation or revisions. Failure of the TPP Claimant to timely correct its misstatement in a manner acceptable to the Trustee may result in forfeiture of all or part of the TPP Claimant's qualification as a TPP Authorized Recipient or right to receive TPP Abatement Distributions.

The Trustee shall have the power to take any and all actions that in the judgment of the Trustee are necessary or proper to fulfill the purposes of TPP Trust. The TPP Trust retains the right to seek return by legal means of any expenditures that fail to comply with the requirements of this TPP TDP.

## § 10.    ADDITIONAL REPORTING BY THE TPP TRUST.

The TPP Trust shall (i) prepare and deliver to the Master Disbursement Trust for publication annual reports on the disbursement and use of TPP Abatement Distributions from the TPP Trust and the compliance by TPP Authorized Recipients with the TPP Authorized Abatement Purposes

14

set forth in the applicable TPP Trust Documents, and (ii) prepare and file with the Bankruptcy Court and on the TPP website, as soon as available, and in any event within one hundred and twenty (120) days following the end of each fiscal year, an annual report containing financial statements of the TPP Trust after each year that the TPP Trust is in existence. The annual report will contain, among other things, a summary regarding the number of claims resolved during the period covered by the financial statements, the status of any audits of TPP Authorized Recipients and any recommendations made by the Trustee relating to such audits.

*[Remainder of Page Intentionally Left Blank]*

## APPENDICES AND EXHIBITS

**APPENDIX A: TPP Abatement Claim Form**

**APPENDIX B: Maximum Eligible Amount Calculation Methodology**

**APPENDIX C: Approved MAT Expenses**

**APPENDIX D: Approved Uses/Programs**

**EXHIBIT 1:  LRP Agreement**

**EXHIBIT 2:   IRS forms W-9 and W-8**

**APPENDIX A: TPP Abatement Claim Form**

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re:<br><br>**PURDUE PHARMA L.P.,** *et al.,*<br><br>Debtors. | **Chapter 11**<br><br>**Case No. 19-23649 (RDD)**<br><br>**(Jointly Administered)** |

# <u>Third-Party Payor Abatement Claim Form</u>

**This form (this "TPP Abatement Claim Form") is only for Holders of Third-Party Payor Channeled Claims, as defined in the** *[Fifth] Amended Joint Chapter 11 Plan of Reorganization of Purdue Pharma L.P. and Its Affiliated Debtors* **(as modified, amended, or supplemented from time to time, and together with all exhibits and schedules thereto, the "Plan"),[1] that timely filed a Proof of Claim by the General Bar Date (July 30, 2020) established by the Bankruptcy Court (each, a "TPP Claimant").**

**If you are a TPP Claimant and want to have your TPP Abatement Claim reviewed by the TPP Trust that will come into existence upon the Effective Date of the Plan, you or your authorized representative must complete and submit this TPP Abatement Claim Form so that it received on or before [●], 2021 (the "TPP Abatement Claim Deadline"). You may file your TPP Abatement Claim Form using any of the following methods:**

| If by E-Submission: | If by standard or overnight | If by hand delivery: |
|---|---|---|
| Visit https://restructuring.primeclerk.com/purduepharma and click on the "Submit Third-Party Payor Channeled Claim Form" link | Purdue Pharma<br>TPP Supplemental Claims<br>c/o Prime Clerk, LLC<br>One Grand Central Place<br>60 East 42nd Street, Suite 1440<br>New York, NY 10165 | Purdue Pharma<br>TPP Supplemental Claims<br>c/o Prime Clerk, LLC<br>One Grand Central Place<br>60 East 42nd Street, Suite 1440<br>New York, NY 10165<br><br>If you plan to hand deliver your TPP Abatement Claim Form to Prime Clerk's office, please email _____@primeclerk.com at least one business day in advance to arrange delivery. |

**Instructions regarding how to calculate your claim are attached to this TPP Abatement Claim Form.**

**For questions regarding this TPP Abatement Claim Form, please call [_____] or visit [WEBSITE].**

---

[1] Capitalized terms used herein and not otherwise defined shall have the meanings ascribed to them in the Plan or the TPP TDP.

**Third-Party Payor Abatement Claim Form**

*Notwithstanding a previously filed Proof of Claim in In re Purdue Pharma L.P., et al., Case No. 19-23649 (RDD), failure to submit this TPP Abatement Claim Form by the TPP Abatement Claim Deadline ([•], 2021) will result in disqualification of your Proof of Claim and will mean that you are not entitled to any distribution from the TPP Trust.*

**PURSUANT TO THE PLAN, ALL THIRD-PARTY PAYOR CHANNELED CLAIMS AGAINST THE DEBTORS IN THESE CHAPTER 11 CASES WILL BE CHANNELED TO THE TPP TRUST UPON THE EFFECTIVE DATE, AND THE ONLY POTENTIAL SOURCE OF DISTRIBUTIONS TO HOLDERS OF THIRD-PARTY PAYOR CHANNELED CLAIMS WILL BE TPP ABATEMENT DISTRIBUTIONS FROM THE TPP TRUST. AS SET FORTH IN THE PLAN, TPP ABATEMENT DISTRIBUTIONS TO HOLDERS OF THIRD-PARTY PAYOR CHANNELED CLAIMS BY THE TPP TRUST MUST BE USED FOR TPP AUTHORIZED ABATEMENT PURPOSES.**

**IN ORDER TO HAVE THE TPP TRUST REVIEW AND MAKE A DETERMINATION OF YOUR MAXIMUM ELIGIBLE AMOUNT, IF ANY, OF YOUR TPP ABATEMENT CLAIM, YOU MUST HAVE TIMELY FILED A PROOF OF CLAIM BY THE GENERAL BAR DATE IN THESE CHAPTER 11 CASES AND YOU MUST TIMELY FILE THIS TPP ABATEMENT CLAIM FORM BY OR BEFORE THE TPP ABATEMENT CLAIM DEADLINE SET FORTH ABOVE.**

| Part 1: | Identify the Proof of Claim |
|---|---|
| **1. Who is the current creditor?** | _____<br>Name of the entity to be paid for this claim (including other names the creditor used with the debtor, including d/b/a) |
| **2. What is the claim number of your previously filed Proof of Claim?** | Claim Number: _____ |
| **3. Has anyone else filed a claim on behalf of this creditor?** | _____<br><br>If yes, please provide the filer and the claim number<br><br>_____ |
| **4. Last 4 digits of creditor's federal tax identification number (FEIN)?** | FEIN:____ _____ |

| Part 2: | Notices and Distributions |
|---------|---------------------------|

| | |
|---|---|
| **1. Who should receive notice?** | Name: _____<br>First name        Middle name        Last name<br><br>Title: _____<br><br>Company: _____<br>Identify the corporate servicer as the company if the authorized agent is a servicer<br><br>Address: _____<br>Number            Street<br><br>_____<br>City            State            Zip code<br><br>Phone Number: _____<br><br>E-mail Address: _____ (required) |
| **2. Where should TPP Abatement Distributions be sent?** | Name: _____<br>First name        Middle name        Last name<br><br>Title: _____<br><br>Company: _____<br>Identify the corporate servicer as the company if the authorized agent is a servicer<br><br>Address: _____<br>Number            Street<br><br>_____<br>City            State            Zip code |

| Part 3: | Amount of TPP Abatement Claim |
|---------|-------------------------------|

| | |
|---|---|
| **1. Total amount of the TPP Abatement Claim, as calculated by the methodology set forth in the instructions that begin on page 5 herein.** | Claim Amount: $_____ |
| **2. Components of TPP Abatement Claim, per instructions for calculation.** | 1.  Number of creditor's plan members, subscribers, or covered dependents prescribed drugs identified on NDC List on Appendix A between 1/1/2008 and 12/31/2019.(Note: Count each member only once regardless of the number of prescriptions they had): _____ |

2. Number of prescriptions paid by creditor for drugs in item 1: _____

3. Total dollars paid by creditor for such prescriptions:_____

4. Number of plan members in item 1 who were diagnosed with Opioid Use Disorder (Appendix B):_____

5. For members in item 4, dollar amount of medical claims with ICD, CPT or HCPS codes (Appendix C):_____

6. The total number of members, subscribers, and covered dependents covered by your plan or administered by your plan as of January 1, 2020:_____

| Part 4: | Sign Below |
|---------|------------|

**The person completing this TPP Abatement Claim must sign and date it.**

**If you file this claim electronically, FRBP 5005(a)(2) establishes a local rule specifying what a signature is.**

**A person who files a fraudulent claim could be fined up to $500,000, imprisoned for up to 5 years, or both.  18 U.S.C. §§ 152, 157, and 3571.**

*Check the appropriate box:*
☐ I am the creditor
☐ I am the creditor's attorney or authorized agent

I understand that an authorized signature on this *TPP Abatement Claim Form* serves as an acknowledgement and certification that when calculating the amount of the TPP Abatement Claim, the Third-Party Payor on whose behalf the form is submitted has complied with the Maximum Eligible Amount Calculation Methodology set forth in the Instructions.

I have examined the information in this *TPP Abatement Claim Form* and have a reasonable belief that the information is true and correct.

I declare under penalty of perjury that the foregoing is true and correct.

_____
Signature

**Print the name of the person who is completing and signing this form**

Name: _____
            First name            Middle name            Last name

Title: _____

Company: _____
                  Identify the corporate servicer as the company if the authorized agent is a servicer

Address: _____
                  Number                    Street

            _____
            City                        State                    Zip code

## INSTRUCTIONS FOR TPP ABATEMENT CLAIM FORM

### How to Calculate Your TPP Abatement Claim

Each TPP Claimant (also referred to as "You" or "Your" throughout) shall provide information responsive to the questions set forth below, which shall set forth, *inter alia*, the total amount of Your Purdue-Related Opioid Spend, certifying that You used the Maximum Eligible Amount Calculation Methodology, as set forth below, to arrive at the amount. Each TPP Claimant, if and when requested by the TPP Trust Trustee, shall provide supporting documentation and data, in the requested format, underlying the TPP Claimant's calculation of its Purdue-Related Opioid Spend, sufficient to enable confirmation of the amount.

### Consolidated TPP Abatement Claims

For those TPP Abatement Claims that are being submitted on a consolidated basis for multiple TPP Claimants, the filer shall provide aggregate information in Part 3 of the TPP Abatement Claim Form, and attach to the completed TPP Abatement Claim Form a chart identifying the TPP Claimants included in the consolidated TPP Abatement Claim.  For each TPP Claimant included in the consolidated TPP Abatement Claim, the chart shall provide: (i) the name of the TPP Claimant, or if a unique identifier (rather than the TPP Claimant's name) was used in connection with the previously filed Proof of Claim, the unique identifier; (ii) the last four digits of that TPP Claimant's federal tax identification number (FEIN); (iii) responses to each of questions 1 through 6 in these instructions; (iv) the amount of that TPP Claimant's TPP Abatement Claim, as calculated pursuant to the instructions below; and (v) the claim number of the previously filed Proof of Claim.

Filers of consolidated TPP Abatement Claims that provide unique identifiers rather than the names of the TPP Claimants in the charts that accompany their TPP Abatement Claims are required to submit charts with the names of the TPP Claimants that correspond to the unique identifiers directly to the TPP Trust by emailing such charts to [_____].  The names of such TPP Claimants shall not appear on the TPP website.

For avoidance of doubt: Filers of consolidated TPP Abatement Claims that used unique identifiers rather than the names of the TPP Claimants in connection with the Proofs of Claim filed by or before the General Bar Date shall use the same unique identifiers in connection with the filing of this TPP Abatement Claim Form, but are required to concurrently provide the TPP Trust with a chart that provides the unique identifier, the name of the TPP Claimant that corresponds to that identifier, the information required for each claimant under the TPP Claim Calculation Methodology below, the claim number of the previously filed Proof of Claim, and the amount of that TPP Claimant's TPP Abatement Claim.

### Maximum Eligible Amount Calculation Methodology

For the period of January 1, 2008 through December 31, 2019, You must provide the following:

1. The number of unique members who were prescribed one or more of the drugs identified on the NDC List, attached as Appendix A. Count each member only once regardless of the number of prescriptions they had.
2. The number of unique prescriptions paid, all or in part, by Your plan for the drugs identified on the NDC List, attached as Appendix A.
3. The total final dollars paid by Your plan for the prescriptions for the drugs identified in 2 above.
4. The number of unique members identified in 1 above who were diagnosed with an Opioid Use Disorder, using one or more of the codes on the OUD ICD 9 and 10 List, attached as Appendix B.

5. For the members identified in 4 above, the total dollar amount of medical claims with the ICD, CPT, or HCPS codes on the OUD Medical Claims Codes List, attached as Appendix C, paid for those members.

6. The total number of members, subscribers and covered dependents covered by your plan or administered by your plan as of January 1, 2020.

**The amount of Your TPP Abatement Claim (Part 3, question 1 of the TPP Abatement Claim Form) should be calculated by adding the answers to questions 3 and 5 of Part 3 of the TPP Abatement Claim Form.**

You shall provide information reasonably available to You and are not excused from providing the requested information for failure to appropriately investigate Your TPP Abatement Claim. You shall supplement Your responses if You learn that they are incomplete or incorrect in any material respect. You may append one or more pages to provide or supplement your responses hereto.

*You must leave out or redact* information that is entitled to privacy on this form or on any attached documents.

The documents that support your calculations need not be submitted with this TPP Abatement Claim Form. However, the TPP Trustee shall have the right to require that you provide such documentation promptly upon request.

**Confirmation that the TPP Abatement Claim Form has been filed**

To receive confirmation that the TPP Abatement Claim has been filed, enclose a stamped self-addressed envelope and a copy of this completed form. You may also view a list of filed TPP Abatement Claims by visiting the Claims and Noticing Agent's website at [PurduePharmaClaims.com/_____]

*Information that is entitled to privacy.* The TPP Abatement Claim Form and any attached documents must show only the last 4 digits of any social security number, an individual's tax identification number, or a financial account number, only the initials of a minor's name, and only the year of any person's date of birth. If a claim is based on delivering health care goods or services, limit the disclosure of the goods or services to avoid embarrassment or disclosure of confidential health care information. You may later be required to give more information if the TPP Trustee so requests or someone else objects to the TPP Abatement Claim.

*Redaction of information.* Masking, editing out, or deleting certain information to protect privacy. Filers must redact or leave out information entitled to privacy on the TPP Abatement Claim Form and any attached documents.

**APPENDIX A: NDC LIST**

| NDC | DRUG NAME |
| --- | --- |
| 42858000101 | oxyCODONE HCl |
| 42858000110 | oxyCODONE HCl |
| 42858000201 | oxyCODONE HCl |
| 42858000210 | oxyCODONE HCl |
| 42858000301 | oxyCODONE HCl |
| 42858000401 | oxyCODONE HCl |
| 42858000501 | oxyCODONE HCl |
| 42858004001 | HYDROcodone-Acetaminophen |
| 42858010201 | oxyCODONE-Acetaminophen |
| 42858010250 | oxyCODONE-Acetaminophen |
| 42858010301 | oxyCODONE-Acetaminophen |
| 42858010350 | oxyCODONE-Acetaminophen |
| 42858010401 | oxyCODONE-Acetaminophen |
| 42858010450 | oxyCODONE-Acetaminophen |
| 42858012201 | Dilaudid |
| 42858013901 | HYDROcodone-Acetaminophen |
| 42858020101 | HYDROcodone-Acetaminophen |
| 42858020150 | HYDROcodone-Acetaminophen |
| 42858020201 | HYDROcodone-Acetaminophen |
| 42858020301 | HYDROcodone-Acetaminophen |
| 42858020350 | HYDROcodone-Acetaminophen |
| 42858023401 | Dilaudid |
| 42858023450 | Dilaudid |
| 42858023801 | HYDROcodone-Acetaminophen |
| 42858030101 | HYDROmorphone HCl |
| 42858030125 | HYDROmorphone HCl |
| 42858030201 | HYDROmorphone HCl |
| 42858030225 | HYDROmorphone HCl |
| 42858030250 | HYDROmorphone HCl |
| 42858030301 | HYDROmorphone HCl |
| 42858030416 | HYDROmorphone HCl |
| 42858033801 | Dilaudid |
| 42858035340 | Buprenorphine |

| NDC | DRUG NAME |
| --- | --- |
| 42858041616 | Dilaudid |
| 42858049340 | Buprenorphine |
| 42858050103 | Buprenorphine HCl |
| 42858050203 | Buprenorphine HCl |
| 42858051501 | MS Contin |
| 42858058640 | Buprenorphine |
| 42858063101 | MS Contin |
| 42858075040 | Buprenorphine |
| 42858076001 | MS Contin |
| 42858079901 | MS Contin |
| 42858080101 | Morphine Sulfate ER |
| 42858080201 | Morphine Sulfate ER |
| 42858080301 | Morphine Sulfate ER |
| 42858080401 | Morphine Sulfate ER |
| 42858080501 | Morphine Sulfate ER |
| 42858083940 | Buprenorphine |
| 42858090001 | MS Contin |
| 42858090103 | TRAMADOL HCL ER |
| 42858090203 | TRAMADOL HCL ER |
| 42858090303 | TRAMADOL HCL ER |
| 59011010010 | OXYCONTIN |
| 59011010020 | OXYCONTIN |
| 59011010025 | OXYCONTIN |
| 59011010310 | OXYCONTIN |
| 59011010320 | OXYCONTIN |
| 59011010325 | OXYCONTIN |
| 59011010510 | OXYCONTIN |
| 59011010520 | OXYCONTIN |
| 59011010525 | OXYCONTIN |
| 59011010610 | NULL |
| 59011010710 | OXYCONTIN |
| 59011010720 | OXYCONTIN |
| 59011010725 | OXYCONTIN |

| NDC | DRUG NAME |
|-----|-----------|
| 59011010910 | OXYCONTIN |
| 59011010925 | OXYCONTIN |
| 59011020110 | OXYIR |
| 59011022520 | OXYFAST |
| 59011026005 | MS CONTIN |
| 59011026010 | MS Contin |
| 59011026105 | MS CONTIN |
| 59011026125 | MS Contin |
| 59011026205 | MS CONTIN |
| 59011026210 | MS Contin |
| 59011026305 | MS CONTIN |
| 59011026310 | MS Contin |
| 59011026410 | MS Contin |
| 59011027160 | Hysingla ER |
| 59011027260 | Hysingla ER |
| 59011027360 | Hysingla ER |
| 59011027460 | Hysingla ER |
| 59011027560 | Hysingla ER |
| 59011027660 | Hysingla ER |
| 59011027760 | Hysingla ER |
| 59011031220 | PALLADONE |
| 59011031260 | PALLADONE |
| 59011031320 | PALLADONE |
| 59011031360 | PALLADONE |
| 59011031420 | PALLADONE |
| 59011031460 | PALLADONE |
| 59011031520 | PALLADONE |
| 59011031560 | PALLADONE |
| 59011033430 | RYZOLT |
| 59011033530 | RYZOLT |
| 59011033630 | RYZOLT |
| 59011041010 | OxyCONTIN |
| 59011041020 | OxyCONTIN |
| 59011041510 | OxyCONTIN |

| NDC | DRUG NAME |
|-----|-----------|
| 59011041520 | OxyCONTIN |
| 59011042010 | OxyCONTIN |
| 59011042020 | OxyCONTIN |
| 59011043010 | OxyCONTIN |
| 59011043020 | OxyCONTIN |
| 59011044010 | OxyCONTIN |
| 59011044020 | OxyCONTIN |
| 59011044110 | DILAUDID |
| 59011044210 | DILAUDID |
| 59011044225 | Dilaudid |
| 59011044410 | Dilaudid |
| 59011044501 | Dilaudid-HP |
| 59011044505 | Dilaudid-HP |
| 59011044550 | DILAUDID-HP |
| 59011044625 | DILAUDID-HP |
| 59011045101 | Dilaudid |
| 59011045201 | Dilaudid |
| 59011045210 | Dilaudid |
| 59011045401 | Dilaudid |
| 59011045405 | Dilaudid |
| 59011045410 | Dilaudid |
| 59011045810 | Dilaudid |
| 59011046010 | OxyCONTIN |
| 59011046020 | OxyCONTIN |
| 59011048010 | OxyCONTIN |
| 59011048020 | OxyCONTIN |
| 59011075004 | Butrans |
| 59011075104 | Butrans |
| 59011075204 | Butrans |
| 59011075704 | Butrans |
| 59011075804 | Butrans |
| 59011081510 | OXYCONTIN |
| 59011083010 | OXYCONTIN |
| 59011086010 | OXYCONTIN |

# APPENDIX B: OUD ICD 9 AND 10 LIST

**ICD 9 Codes for OUD**:

| | |
|---|---|
| 304.00 | OPIOID DEPENDENCE-UNSPECIFIED |
| 304.01 | OPIOID DEPENDENCE-CONTINUOUS |
| 304.02 | OPIOID DEPENDENCE-EPISODIC |
| 304.03 | OPIOID DEPENDENCE, IN REMISSION |
| 304.70 | OPIOID OTHER DEP-UNSPECIFIED |
| 304.71 | OPIOID OTHER DEP-CONTINUOUS |
| 304.72 | OPIOID OTHER DEP-EPISODIC |
| 304.73 | OPIOID OTHER DEP-IN REMISSION |
| 305.50 | OPIOID ABUSE-UNSPECIFIED |
| 305.51 | OPIOID ABUSE-CONTINUOUS |
| 305.52 | OPIOID ABUSE-EPISODIC |
| 305.53 | OPIOID ABUSE-IN REMISSION |

**ICD 10 Codes for OUD**:

| | |
|---|---|
| F11.1 | Opioid abuse |
| F11.10 | Opioid abuse, uncomplicated |
| F11.11 | Opioid abuse, in remission |
| F11.12 | Opioid abuse with intoxication |
| F11.120 | Opioid abuse with intoxication, uncomplicated |
| F11.121 | Opioid abuse with intoxication delirium |
| F11.122 | Opioid abuse with intoxication with perceptual disturbance |
| F11.129 | Opioid abuse with intoxication, unspecified |
| F11.13 | Opioid abuse with withdrawal |
| F11.14 | Opioid abuse with opioid-induced mood disorder |
| F11.15 | Opioid abuse with opioid-induced psychotic disorder |
| F11.150 | Opioid abuse with opioid-induced psychotic disorder with delusions |
| F11.151 | Opioid abuse with opioid-induced psychotic disorder with hallucinations |
| F11.159 | Opioid abuse with opioid-induced psychotic disorder, unspecified |
| F11.18 | Opioid abuse with other opioid-induced disorder |
| F11.181 | Opioid abuse with opioid-induced sexual dysfunction |
| F11.182 | Opioid abuse with opioid-induced sleep disorder |
| F11.188 | Opioid abuse with other opioid-induced disorder |
| F11.19 | Opioid abuse with unspecified opioid-induced disorder |
| F11.20 | Opioid Dependence uncomplicated |
| F11.21 | Opioid Dependence in remission |
| F11.22 | Opioid dependence with intoxication |
| F11.220 | Opioid Dependence uncomplicated |
| F11.221 | Opioid Dependence delirium |
| F11.222 | Opioid dependence w intoxication with perceptual disturbance |
| F11.229 | Opioid Dependence unspecified |
| F11.23 | Opioid Dependence with withdrawal |
| F11.24 | Opioid Dependence with opioid-induced mood disorder |
| F11.25 | Opioid Dependence with opioid-induced psychotic disorder |
| F11.250 | Opioid Dependence with delusions |
| F11.251 | Opioid Dependence with hallucinations |
| F11.259 | Opioid Dependence unspecified |
| F11.28 | Opioid Dependence with other opioid-induced disorder |
| F11.281 | Opioid Dependence with opioid-induced sexual dysfunction |
| F11.282 | Opioid Dependence with opioid-induced sleep disorder |
| F11.288 | Opioid Dependence with other opioid-induced disorder |

## APPENDIX C: OUD MEDICAL CLAIMS CODES LIST

1. Medication Assisted Treatment (MAT): Assigned ICD-10 code F11.20 (convert to ICD-9 304.00, 304.01, and 304.02) for opioid dependence.

2. Visit type: Adult Wellness Visit (AWV) or acute visit for Opioid Use Disorder/Dependence Comprehensive evaluation of new patient or established patient for suitableness for buprenorphine treatment.

3. New Patient: code 99205, 99201

4. Established Patient: code 9921199215

5. Visit type: MAT medication induction.

6. Established Patient E/M: 99211–99215

7. Patient Consult: 99241-45(*)[2]

8. Telephonic: 99241 can only be used as telephonic prescriber-to-prescriber consultation regarding a patient. Patient cannot be present.

9. Prolonged visits codes (99354, 99355) (*)

10. 30-74 minutes: 99354(*)

11. 75-104 minutes: 99355(*)

12. 105+ minutes: 99354+99355x2(*)

13. Visit type: MAT medication/maintenance. Acute visit for OUD/opioid dependence.

14. Established Patient: 99212-15

15. SBIRT substance abuse and structured screening and brief intervention services: 99408 (can be offered and billed for naloxone education.)

16. CPT/Prof   HCPC/FAC

17. 99214 – E/M office visit/G0480 – UDT definitive

18. 99213 – E/M office visit/H0015 - IOP

19. 99285 – E/M ER visit/H2035 – drug treatment program per hour

20. 99215 – E/M office visit/G0481 – UDT definitive

21. 80307 – UDT presumptive/H0010 – acute/subacute detox

22. 99232 – E/M inpatient visit/H2036 - drug treatment program per diem

23. 99233 – E/M inpatient visit/G0463 – outpatient clinic visit

24. 99223 – E/M inpatient visit/H0011 - acute/subacute detox

25. 99284 – E/M ER visit/H0007 outpatient crisis intervention

26. 99204 – E/M office visit/G0482 – UDT definitive

27. 99231 – E/M inpatient visit/G0483 – UDT definitive

28. 99205 – E/M office visit/H0001 – alcohol and/or drug treatment assessment

29. 99220 – E/M observation/H0020 – alcohol and/or drug treatment – methadone administration

30. 99443 – E/M telephone service/H0050 – alcohol and/or drug treatment, brief intervention

---

[2] Codes followed by an asterisk (*) have been identified as frequently subject to abuse and are being reviewed.

31.     99283 – E/M ER visit/G0396 - alcohol and/or substance abuse structured assessment and brief intervention (15 to 30 mins)

32.     99212 – E/M office visit/G0397 - alcohol and/or substance abuse structured assessment and brief intervention (more than 30 mins)

33.     96372 - Therapeutic, prophylactic, or diagnostic injection (specify material injected); subcutaneous or intramuscular

34.     J2315 - Injection, naltrexone, depot form, 1 mg

35.     3E023GC - Introduction of other therapeutic substance into muscle, percutaneous approach

36.     96372 - Therapeutic, prophylactic, or diagnostic injection (specify material injected); subcutaneous or intramuscular (same as Vivitrol)

37.     Q9991 – Injection, buprenorphine extended-release (Sublocade), less than or equal to 100 mg

38.     Q9992 – Injection, buprenorphine extended-release (Sublocade), greater than 100 mg

39.     G2067 Medication assisted treatment, methadone; weekly bundle including dispensing and/or administration, substance use counseling, individual and group therapy, and toxicology testing, if performed (provision of the services by a Medicare-enrolled Opioid Treatment Program)

40.     G2068 Medication assisted treatment, buprenorphine (oral); weekly bundle including dispensing and/or administration, substance use counseling, individual and group therapy, and toxicology testing if performed (provision of the services by a Medicare-enrolled Opioid Treatment Program)

41.     G2069 – Medication assisted treatment, buprenorphine (injectable); weekly bundle including dispensing and/ or administration, substance use counseling, individual and group therapy, and toxicology testing if performed (provision of the services by a Medicare-enrolled Opioid Treatment Program)

42.     G2070 Medication assisted treatment, buprenorphine (implant insertion); weekly bundle including dispensing and/or administration, substance use counseling, individual and group therapy, and toxicology testing if performed (provision of the services by a Medicare-enrolled Opioid Treatment Program)

43.     G2071 Medication assisted treatment, buprenorphine (implant removal); weekly bundle including dispensing and/or administration, substance use counseling, individual and group therapy, and toxicology testing if performed (provision of the services by a Medicare enrolled Opioid Treatment Program)

44.     G2072 Medication assisted treatment, buprenorphine (implant insertion and removal); weekly bundle including dispensing and/or administration, substance use counseling, individual and group therapy, and toxicology testing if performed (provision of the services by a Medicare enrolled Opioid Treatment Program)

45.     G2073 Medication assisted treatment, naltrexone; weekly bundle including dispensing and/or administration, substance use counseling, individual and group therapy, and toxicology testing if performed (provision of the services by a Medicare-enrolled Opioid Treatment Program)

46.     G2074 – Medication assisted treatment, weekly bundle not including the drug, including substance use counseling, individual and group therapy, and toxicology (provision of the services by a Medicare-enrolled opioid treatment program)

47.     G2075 Medication assisted treatment, medication not otherwise specified; weekly bundle including dispensing and/or administration, substance use counseling, individual and group therapy, and toxicology testing, if performed (provision of the services by a Medicare-enrolled opioid treatment program)

48.     G2076 Intake activities, including initial medical examination that is a complete, fully documented physical evaluation and initial assessment by a program physician or a primary care physician, or an authorized health care professional under the supervision of a program

physician qualified personnel that includes preparation of a treatment plan that includes the patient's short-term goals and the tasks the patient must perform to complete the short-term goals; the patient's requirements for education, vocational rehabilitation, and employment; and the medical, psycho- social, economic, legal, or other supportive services that a patient needs, conducted by qualified personnel (provision of the services by a Medicare-enrolled opioid treatment program)

49. G2077 Periodic assessment; assessing periodically by qualified personnel to determine the most appropriate combination of services and treatment (provision of the services by a Medicare-enrolled opioid treatment program)

50. G2078 Take home supply of methadone; up to 7 additional day supply (provision of the services by a Medicare-enrolled opioid treatment program)

51. G2079 Take home supply of buprenorphine (oral); up to 7 additional day supply (provision of the services by a Medicare-enrolled opioid treatment program)

52. G2080 Each additional 30 minutes of counseling in a week of medication assisted treatment, (provision of the services by a Medicare-enrolled opioid treatment program)

53. G2086 –Office-based treatment for opioid use disorder, including development of the treatment plan, care coordination, individual therapy and group therapy and counseling; at least 70 minutes in the first calendar month

54. G2087 – Office-based treatment for opioid use disorder, including care coordination, individual therapy and group therapy and counseling; at least 60 minutes in a subsequent calendar month

55. G0516 – Insertion of non-biodegradable drug delivery implants, 4 or more (services for subdermal rod implant)

56. G0517 – Removal of non-biodegradable drug delivery implants, 4 or more (services for subdermal implants)

57. G0518 – Removal with reinsertion, non-biodegradable drug delivery implants, 4 or more (services for subdermal implants)

58. G2215 – Take home supply of nasal naxolone (provision of the services by a Medicare enrolled opioid treatment program)

   G2216 – Take home supply of injectable naxolone (provision of the services by a Medicare enrolled opioid treatment program)

59.

60. 11981 – Insertion of single non-biodegradable implant

61. 11982 – Removal of single non-biodegradable implant

62. 11983 – Removal and re-insertion of single nonbiodegradable implant

63. 17999 – unlisted   procedure, skin, mucous mem

64. S9475 –Ambulatory setting substance abuse treatment or detoxification services

65. H0020 ALCOHL &OR RX SRVC; METHADONE ADMIN &OR SERVICE

66. H0033 ORAL MEDICATION ADMIN DIRECT OBSERVATION

67. J3490 - Buprenorphine extended-release injection, for subcutaneous use (Sublocade)

68. J0570 – Buprenorphine implant, 74.2 mg; Physician office and Outpatient

69. J0571 BUPRENORPHINE ORAL 1 MG

70. J0572 BUPRENORPHINE/NALOXONE ORAL </=TO 3 MG BPN

71. J0573 BUPRENORPHNE/NALOXONE ORAL >3 MG BUT </=6 MG BPN

72.  J0574 BUPRENORPHINE/NLX ORAL >6 MG BUT </=TO 10 MG BPN

73.  J0575 BUPRENORPHINE/NALOXONE ORAL >10 MG BUPRENORPHINE

74.  J1230 Methadone

75.  J2315 INJECTION NALTREXONE DEPOT FORM 1 MG

76.  S0109 METHADONE ORAL 5MG

77.  Rev Code 900 + H0020 (methadone)

78.  Rev Code 900 + H0001 or H0004 or H0005 or H0006

79.  Bunavail (buprenorphine with naloxone) Buccal Film; Buprenorphine with naloxone Sublingual Tablet/Film; Cassipa (buprenorphine with naloxone) Sublingual Film; Suboxone (buprenorphine with naloxone) Sublingual Film; Probuphine (buprenorphine); Subutex (buprenorphine); Sublocade (buprenorphine extended-release) injection; Zubsolv (buprenorphine with naloxone) Sublingual Tablet; Vivitrol (naltrexone for extended-release); Methadone]

80.  65200010100760        BUPRENORPHIN SUB 2MG

81.  65200010100760        BUPRENORPHINE 2 MG TABLET SL

82.  65200010100760        SUBUTEX SUB 2MG

83.  65200010100780        BUPRENORPHIN SUB 8MG

84.  65200010100780        BUPRENORPHINE 8 MG TABLET SL

85.  65200010100780        SUBUTEX SUB 8MG

86.  65200010102320        PROBUPHINE IMP KIT 74.2

87.  65200010200710        ZUBSOLV SUB 0.7-0.18

88.  65200010200715        ZUBSOLV SUB 1.4-0.36

89.  65200010200720        BUPREN/NALOX SUB 2-0.5MG

90.  65200010200720        BUPRENORPHN-NALOXN 2-0.5 MG SL

91.  65200010200720        SUBOXONE SUB 2-0.5MG

92.  65200010200720        SUBOXONE SUB 2MG

93.  65200010200725        ZUBSOLV 2.9-0.71 MG TABLET SL

94.  65200010200732        ZUBSOLV SUB 5.7-1.4

95.  65200010200740        BUPREN/NALOX SUB 8-2MG

96.  65200010200740        BUPRENORPHIN-NALOXON 8-2 MG SL

97.  65200010200740        SUBOXONE SUB 8-2MG

98.  65200010200740        SUBOXONE SUB 8MG

99.  65200010200745        ZUBSOLV SUB 8.6-2.1

100.  65200010200760        ZUBSOLV 11.4-2.9 MG TABLET SL

101.  65200010208220        BUPREN/NALOX MIS 2-0.5MG

102.  65200010208220        SUBOXONE MIS 2-0.5MG

103.  65200010208230        BUPREN/NALOX MIS 4-1MG

104.  65200010208230        SUBOXONE MIS 4-1MG

105.  65200010208240        BUPREN/NALOX MIS 8-2MG

| 106. | 65200010208240 | SUBOXONE MIS 8-2MG |
| 107. | 65200010208250 | BUPREN/NALOX MIS 12-3MG |
| 108. | 65200010208250 | SUBOXONE MIS 12-3MG |
| 109. | 65200010208260 | BUNAVAIL MIS 2.1-0.3 |
| 110. | 65200010208270 | BUNAVAIL MIS 4.2-0.7 |
| 111. | 65200010208280 | BUNAVAIL MIS 6.3-1MG |
| 112. | 93400030001920 | VIVITROL INJ 380MG |
| 113. | 93400030100305 | DEPADE TAB 50MG |
| 114. | 93400030100305 | NALTREXONE TAB 50MG |
| 115. | 93400030100305 | REVIA TAB 50MG |
| 116. | 93409902502320 | NALTREXONE IMP |
| 117. | 6520001000E520 | SUBLOCADE INJ 100/0.5 |
| 118. | 6520001000E530 | SUBLOCADE INJ 300/1.5 |
| 119. | F11.1 | Opioid abuse |
| 120. | F11.10 | Opioid abuse, uncomplicated |
| 121. | F11.11 | Opioid abuse, in remission |
| 122. | F11.12 | Opioid abuse with intoxication |
| 123. | F11.120 | Opioid abuse with intoxication, uncomplicated |
| 124. | F11.121 | Opioid abuse with intoxication delirium |
| 125. | F11.122 | Opioid abuse with intoxication with perceptual disturbance |
| 126. | F11.129 | Opioid abuse with intoxication, unspecified |
| 127. | F11.13 | Opioid abuse with withdrawal |
| 128. | F11.14 | Opioid abuse with opioid-induced mood disorder |
| 129. | F11.15 | Opioid abuse with opioid-induced psychotic disorder |
| 130. | F11.150 | Opioid abuse with opioid-induced psychotic disorder with delusions |
| 131. | F11.151 | Opioid abuse with opioid-induced psychotic disorder with hallucinations |
| 132. | F11.159 | Opioid abuse with opioid-induced psychotic disorder, unspecified |
| 133. | F11.18 | Opioid abuse with other opioid-induced disorder |
| 134. | F11.181 | Opioid abuse with opioid-induced sexual dysfunction |
| 135. | F11.182 | Opioid abuse with opioid-induced sleep disorder |
| 136. | F11.188 | Opioid abuse with other opioid-induced disorder |
| 137. | F11.19 | Opioid abuse with unspecified opioid-induced disorder |
| 138. | T40.0X1 | Poisoning by opium, accidental (unintentional) |
| 139. | T40.0X1A | Poisoning by opium, accidental (unintentional), initial encounter |
| 140. | T40.0X1D | Poisoning by opium, accidental (unintentional), subsequent encounter |
| 141. | T40.0X1S | Poisoning by opium, accidental (unintentional), sequela |
| 142. | T40.0X2 | Poisoning by opium, intentional self-harm |

| 143. | T40.0X2A | Poisoning by opium, intentional self-harm, initial encounter |
| 144. | T40.0X2D | Poisoning by opium, intentional self-harm, subsequent encounter |
| 145. | T40.0X2S | Poisoning by opium, intentional self-harm, sequela |
| 146. | T40.0X3 | Poisoning by opium, assault |
| 147. | T40.0X3A | Poisoning by opium, assault, initial encounter |
| 148. | T40.0X3D | Poisoning by opium, assault, subsequent encounter |
| 149. | T40.0X3S | Poisoning by opium, assault, sequela |
| 150. | T40.0X4 | Poisoning by opium, undetermined |
| 151. | T40.0X4A | Poisoning by opium, undetermined, initial encounter |
| 152. | T40.0X4D | Poisoning by opium, undetermined, subsequent encounter |
| 153. | T40.0X4S | Poisoning by opium, undetermined, sequela |
| 154. | T40.1 | Poisoning by and adverse effect of heroin |
| 155. | T40.1X | Poisoning by and adverse effect of heroin |
| 156. | T40.1X1 | Poisoning by heroin, accidental (unintentional) |
| 157. | T40.1X1A | Poisoning by heroin, accidental (unintentional), initial encounter |
| 158. | T40.1X1D | Poisoning by heroin, accidental (unintentional), subsequent encounter |
| 159. | T40.1X1S | Poisoning by heroin, accidental (unintentional), sequela |
| 160. | T40.1X2 | Poisoning by heroin, intentional self-harm |
| 161. | T40.1X2A | Poisoning by heroin, intentional self-harm, initial encounter |
| 162. | T40.1X2D | Poisoning by heroin, intentional self-harm, subsequent encounter |
| 163. | T40.1X2S | Poisoning by heroin, intentional self-harm, sequela |
| 164. | T40.1X3 | Poisoning by heroin, assault |
| 165. | T40.1X3A | Poisoning by heroin, assault, initial encounter |
| 166. | T40.1X3D | Poisoning by heroin, assault, subsequent encounter |
| 167. | T40.1X3S | Poisoning by heroin, assault, sequela |
| 168. | T40.1X4 | Poisoning by heroin, undetermined |
| 169. | T40.1X4A | Poisoning by heroin, undetermined, initial encounter |
| 170. | T40.1X4D | Poisoning by heroin, undetermined, subsequent encounter |
| 171. | T40.1X4S | Poisoning by heroin, undetermined, sequela |
| 172. | T40.1X5 | Adverse effect of heroin |
| 173. | T40.1X5A | Adverse effect of heroin, initial encounter |
| 174. | T40.1X5D | Adverse effect of heroin, subsequent encounter |
| 175. | T40.1X5S | Adverse effect of heroin, sequela |
| 176. | T40.1X6 | Underdosing of heroin |
| 177. | T40.1X6A | Underdosing of heroin, initial encounter |
| 178. | T40.1X6D | Underdosing of heroin, subsequent encounter |
| 179. | T40.1X6S | Underdosing of heroin, sequela |
| 180. | T40.2X1 | Poisoning by other opioids, accidental (unintentional) |

| 181. | T40.2X1A | Poisoning by other opioids, accidental (unintentional), initial encounter |
| 182. | T40.2X1D | Poisoning by other opioids, accidental (unintentional), subsequent encounter |
| 183. | T40.2X1S | Poisoning by other opioids, accidental (unintentional), sequela |
| 184. | T40.2X2 | Poisoning by other opioids, intentional self-harm |
| 185. | T40.2X2A | Poisoning by other opioids, intentional self-harm, initial encounter |
| 186. | T40.2X2D | Poisoning by other opioids, intentional self-harm, subsequent encounter |
| 187. | T40.2X2S | Poisoning by other opioids, intentional self-harm, sequela |
| 188. | T40.2X3 | Poisoning by other opioids, assault |
| 189. | T40.2X3A | Poisoning by other opioids, assault, initial encounter |
| 190. | T40.2X3D | Poisoning by other opioids, assault, subsequent encounter |
| 191. | T40.2X3S | Poisoning by other opioids, assault, sequela |
| 192. | T40.2X4 | Poisoning by other opioids, undetermined |
| 193. | T40.2X4A | Poisoning by other opioids, undetermined, initial encounter |
| 194. | T40.2X4D | Poisoning by other opioids, undetermined, subsequent encounter |
| 195. | T40.2X4S | Poisoning by other opioids, undetermined, sequela |
| 196. | T40.3X1 | Poisoning by methadone, accidental (unintentional) |
| 197. | T40.3X1A | Poisoning by methadone, accidental (unintentional), initial encounter |
| 198. | T40.3X1D | Poisoning by methadone, accidental (unintentional), subsequent encounter |
| 199. | T40.3X1S | Poisoning by methadone, accidental (unintentional), sequela |
| 200. | T40.3X2 | Poisoning by methadone, intentional self-harm |
| 201. | T40.3X2A | Poisoning by methadone, intentional self-harm, initial encounter |
| 202. | T40.3X2D | Poisoning by methadone, intentional self-harm, subsequent encounter |
| 203. | T40.3X2S | Poisoning by methadone, intentional self-harm, sequela |
| 204. | T40.3X3 | Poisoning by methadone, assault |
| 205. | T40.3X3A | Poisoning by methadone, assault, initial encounter |
| 206. | T40.3X3D | Poisoning by methadone, assault, subsequent encounter |
| 207. | T40.3X3S | Poisoning by methadone, assault, sequela |
| 208. | T40.3X4 | Poisoning by methadone, undetermined |
| 209. | T40.3X4A | Poisoning by methadone, undetermined, initial encounter |
| 210. | T40.3X4D | Poisoning by methadone, undetermined, subsequent encounter |
| 211. | T40.3X4S | Poisoning by methadone, undetermined, sequela |
| 212. | T40.4 | Poisoning by, adverse effect of and underdosing of other synthetic narcotics |
| 213. | T40.41 | Poisoning by, adverse effect of and underdosing of fentanylor fentanyl analogs |

| 214. | T40.411 | Poisoning by fentanyl or fentanyl analogs, accidental (unintentional) |
| 215. | T40.411A | Poisoning by fentanyl or fentanyl analogs, accidental (unintentional), initial encounter |
| 216. | T40.411D | Poisoning by fentanyl or fentanyl analogs, accidental (unintentional), subsequent encounter |
| 217. | T40.411S | Poisoning by fentanyl or fentanyl analogs, accidental (unintentional), sequela |
| 218. | T40.412 | Poisoning by fentanyl or fentanyl analogs, intentional self-harm |
| 219. | T40.412A | Poisoning by fentanyl or fentanyl analogs, intentional self-harm, initial encounter |
| 220. | T40.412D | Poisoning by fentanyl or fentanyl analogs, intentional self-harm, subsequent encounter |
| 221. | T40.412S | Poisoning by fentanyl or fentanyl analogs, intentional self-harm, sequela |
| 222. | T40.413 | Poisoning by fentanyl or fentanyl analogs, assault |
| 223. | T40.413A | Poisoning by fentanyl or fentanyl analogs, assault, initial encounter |
| 224. | T40.413D | Poisoning by fentanyl or fentanyl analogs, assault, subsequent encounter |
| 225. | T40.413S | Poisoning by fentanyl or fentanyl analogs, assault, sequela |
| 226. | T40.414 | Poisoning by fentanyl or fentanyl analogs, undetermined |
| 227. | T40.414A | Poisoning by fentanyl or fentanyl analogs, undetermined, initial encounter |
| 228. | T40.414D | Poisoning by fentanyl or fentanyl analogs, undetermined, subsequent encounter |
| 229. | T40.414S | Poisoning by fentanyl or fentanyl analogs, undetermined, sequela |
| 230. | T40.415 | Adverse effect of fentanyl or fentanyl analogs |
| 231. | T40.415A | Adverse effect of fentanyl or fentanyl analogs, initial encounter |
| 232. | T40.415D | Adverse effect of fentanyl or fentanyl analogs, subsequent encounter |
| 233. | T40.415S | Adverse effect of fentanyl or fentanyl analogs, sequela |
| 234. | T40.416 | Underdosing of fentanyl or fentanyl analogs |
| 235. | T40.416A | Underdosing of fentanyl or fentanyl analogs, initial encounter |
| 236. | T40.416D | Underdosing of fentanyl or fentanyl analogs, subsequent encounter |
| 237. | T40.416S | Underdosing of fentanyl or fentanyl analogs, sequela |
| 238. | T40.42 | Poisoning by, adverse effect of and underdosing of tramadol |
| 239. | T40.421 | Poisoning by tramadol, accidental (unintentional) |
| 240. | T40.421A | Poisoning by tramadol, accidental (unintentional), initial encounter |
| 241. | T40.421D | Poisoning by tramadol, accidental (unintentional), subsequent encounter |
| 242. | T40.421S | Poisoning by tramadol, accidental (unintentional), sequela |
| 243. | T40.422 | Poisoning by tramadol, intentional self-harm |
| 244. | T40.422A | Poisoning by tramadol, intentional self-harm, initial encounter |

| 245. | T40.422D | Poisoning by tramadol, intentional self-harm, subsequent encounter |
| 246. | T40.422S | Poisoning by tramadol, intentional self-harm, sequela |
| 247. | T40.423 | Poisoning by tramadol, assault |
| 248. | T40.423A | Poisoning by tramadol, assault, initial encounter |
| 249. | T40.423D | Poisoning by tramadol, assault, subsequent encounter |
| 250. | T40.423S | Poisoning by tramadol, assault, sequela |
| 251. | T40.424 | Poisoning by tramadol, undetermined |
| 252. | T40.424A | Poisoning by tramadol, undetermined, initial encounter |
| 253. | T40.424D | Poisoning by tramadol, undetermined, subsequent encounter |
| 254. | T40.424S | Poisoning by tramadol, undetermined, sequela |
| 255. | T40.425 | Adverse effect of tramadol |
| 256. | T40.425A | Adverse effect of tramadol, initial encounter |
| 257. | T40.425D | Adverse effect of tramadol, subsequent encounter |
| 258. | T40.425S | Adverse effect of tramadol, sequela |
| 259. | T40.426 | Underdosing of tramadol |
| 260. | T40.426A | Underdosing of tramadol, initial encounter |
| 261. | T40.426D | Underdosing of tramadol, subsequent encounter |
| 262. | T40.426S | Underdosing of tramadol, sequela |
| 263. | T40.49 | Poisoning by, adverse effect of and underdosing of other synthetic narcotics |
| 264. | T40.491 | Poisoning by other synthetic narcotics, accidental (unintentional) |
| 265. | T40.491A | Poisoning by other synthetic narcotics, accidental (unintentional), initial encounter |
| 266. | T40.491D | Poisoning by other synthetic narcotics, accidental (unintentional), subsequent encounter |
| 267. | T40.491S | Poisoning by other synthetic narcotics, accidental (unintentional), sequela |
| 268. | T40.492 | Poisoning by other synthetic narcotics, intentional self-harm |
| 269. | T40.492A | Poisoning by other synthetic narcotics, intentional self-harm, initial encounter |
| 270. | T40.492D | Poisoning by other synthetic narcotics, intentional self-harm, subsequent encounter |
| 271. | T40.492S | Poisoning by other synthetic narcotics, intentional self-harm, sequela |
| 272. | T40.493 | Poisoning by other synthetic narcotics, assault |
| 273. | T40.493A | Poisoning by other synthetic narcotics, assault, initial encounter |
| 274. | T40.493D | Poisoning by other synthetic narcotics, assault, subsequent encounter |
| 275. | T40.493S | Poisoning by other synthetic narcotics, assault, sequela |
| 276. | T40.494 | Poisoning by other synthetic narcotics, undetermined |
| 277. | T40.494A | Poisoning by other synthetic narcotics, undetermined, initial encounter |

| 278. | T40.494D | Poisoning by other synthetic narcotics, undetermined, subsequent encounter |
| 279. | T40.494S | Poisoning by other synthetic narcotics, undetermined, sequela |
| 280. | T40.495 | Adverse effect of other synthetic narcotics |
| 281. | T40.495A | Adverse effect of other synthetic narcotics, initial encounter |
| 282. | T40.495D | Adverse effect of other synthetic narcotics, subsequent encounter |
| 283. | T40.495S | Adverse effect of other synthetic narcotics, sequela |
| 284. | T40.496 | Underdosing of other synthetic narcotics |
| 285. | T40.496A | Underdosing of other synthetic narcotics, initial encounter |
| 286. | T40.496D | Underdosing of other synthetic narcotics, subsequent encounter |
| 287. | T40.496S | Underdosing of other synthetic narcotics, sequela |
| 288. | T40.4X | Poisoning by, adverse effect of and underdosing of other synthetic narcotics |
| 289. | T40.4X1 | Poisoning by other synthetic narcotics, accidental (unintentional) |
| 290. | T40.4X1A | Poisoning by other synthetic narcotics, accidental (unintentional), initial encounter |
| 291. | T40.4X1D | Poisoning by other synthetic narcotics, accidental (unintentional), subsequent encounter |
| 292. | T40.4X1S | Poisoning by other synthetic narcotics, accidental (unintentional), sequela |
| 293. | T40.4X2 | Poisoning by other synthetic narcotics, intentional self-harm |
| 294. | T40.4X2A | Poisoning by other synthetic narcotics, intentional self-harm, initial encounter |
| 295. | T40.4X2D | Poisoning by other synthetic narcotics, intentional self-harm, subsequent encounter |
| 296. | T40.4X2S | Poisoning by other synthetic narcotics, intentional self-harm, sequela |
| 297. | T40.4X3 | Poisoning by other synthetic narcotics, assault |
| 298. | T40.4X3A | Poisoning by other synthetic narcotics, assault, initial encounter |
| 299. | T40.4X3D | Poisoning by other synthetic narcotics, assault, subsequent encounter |
| 300. | T40.4X3S | Poisoning by other synthetic narcotics, assault, sequela |
| 301. | T40.4X4 | Poisoning by other synthetic narcotics, undetermined |
| 302. | T40.4X4A | Poisoning by other synthetic narcotics, undetermined, initial encounter |
| 303. | T40.4X4D | Poisoning by other synthetic narcotics, undetermined, subsequent encounter |
| 304. | T40.4X4S | Poisoning by other synthetic narcotics, undetermined, sequela |
| 305. | T40.4X5 | Adverse effect of other synthetic narcotics |
| 306. | T40.4X5A | Adverse effect of other synthetic narcotics, initial encounter |
| 307. | T40.4X5D | Adverse effect of other synthetic narcotics, subsequent encounter |
| 308. | T40.4X5S | Adverse effect of other synthetic narcotics, sequela |
| 309. | T40.4X6 | Underdosing of other synthetic narcotics |

| 310. | T40.4X6A | Underdosing of other synthetic narcotics, initial encounter |
| 311. | T40.4X6D | Underdosing of other synthetic narcotics, subsequent encounter |
| 312. | T40.4X6S | Underdosing of other synthetic narcotics, sequela |
| 313. | T40.601 | Poisoning by unspecified narcotics, accidental (unintentional) |
| 314. | T40.601A | Poisoning by unspecified narcotics, accidental (unintentional), initial encounter |
| 315. | T40.601D | Poisoning by unspecified narcotics, accidental (unintentional), subsequent encounter |
| 316. | T40.601S | Poisoning by unspecified narcotics, accidental (unintentional), sequela |
| 317. | T40.602 | Poisoning by unspecified narcotics, intentional self-harm |
| 318. | T40.602A | Poisoning by unspecified narcotics, intentional self-harm, initial encounter |
| 319. | T40.602D | Poisoning by unspecified narcotics, intentional self-harm, subsequent encounter |
| 320. | T40.602S | Poisoning by unspecified narcotics, intentional self-harm, sequela |
| 321. | T40.603 | Poisoning by unspecified narcotics, assault |
| 322. | T40.603A | Poisoning by unspecified narcotics, assault, initial encounter |
| 323. | T40.603D | Poisoning by unspecified narcotics, assault, subsequent encounter |
| 324. | T40.603S | Poisoning by unspecified narcotics, assault, sequela |
| 325. | T40.604 | Poisoning by unspecified narcotics, undetermined |
| 326. | T40.604A | Poisoning by unspecified narcotics, undetermined, initial encounter |
| 327. | T40.604D | Poisoning by unspecified narcotics, undetermined, subsequent encounter |
| 328. | T40.604S | Poisoning by unspecified narcotics, undetermined, sequela |
| 329. | T40.691 | Poisoning by other narcotics, accidental (unintentional) |
| 330. | T40.691A | Poisoning by other narcotics, accidental (unintentional), initial encounter |
| 331. | T40.691D | Poisoning by other narcotics, accidental (unintentional), subsequent encounter |
| 332. | T40.691S | Poisoning by other narcotics, accidental (unintentional), sequela |
| 333. | T40.692 | Poisoning by other narcotics, intentional self-harm |
| 334. | T40.692A | Poisoning by other narcotics, intentional self-harm, initial encounter |
| 335. | T40.692D | Poisoning by other narcotics, intentional self-harm, subsequent encounter |
| 336. | T40.692S | Poisoning by other narcotics, intentional self-harm, sequela |
| 337. | T40.693 | Poisoning by other narcotics, assault |
| 338. | T40.693A | Poisoning by other narcotics, assault, initial encounter |
| 339. | T40.693D | Poisoning by other narcotics, assault, subsequent encounter |
| 340. | T40.693S | Poisoning by other narcotics, assault, sequela |
| 341. | T40.694 | Poisoning by other narcotics, undetermined |

| 342. | T40.694A | Poisoning by other narcotics, undetermined, initial encounter |
| 343. | T40.694D | Poisoning by other narcotics, undetermined, subsequent encounter |
| 344. | T40.694S | Poisoning by other narcotics, undetermined, sequela |
| 345. | F11.20 | Opioid Dependence uncomplicated |
| 346. | F11.21 | Opioid Dependence in remission |
| 347. | F11.22 | Opioid dependence with intoxication |
| 348. | F11.220 | Opioid Dependence uncomplicated |
| 349. | F11.221 | Opioid Dependence delirium |
| 350. | F11.222 | Opioid dependence w intoxication with perceptual disturbance |
| 351. | F11.229 | Opioid Dependence unspecified |
| 352. | F11.23 | Opioid Dependence with withdrawal |
| 353. | F11.24 | Opioid Dependence with opioid-induced mood disorder |
| 354. | F11.25 | Opioid Dependence with opioid-induced psychotic disorder |
| 355. | F11.250 | Opioid Dependence with delusions |
| 356. | F11.251 | Opioid Dependence with hallucinations |
| 357. | F11.259 | Opioid Dependence unspecified |
| 358. | F11.28 | Opioid Dependence with other opioid-induced disorder |
| 359. | F11.281 | Opioid Dependence with opioid-induced sexual dysfunction |
| 360. | F11.282 | Opioid Dependence with opioid-induced sleep disorder |
| 361. | F11.288 | Opioid Dependence with other opioid-induced disorder |

*[Remainder of Page Intentionally Left Blank]*

*[Page Intentionally Left Blank]*

## APPENDIX B: Maximum Eligible Amount Calculation Methodology

TPP Claimants shall use the following methodology for calculating the Maximum Eligible Amount distributable to them:

For the period of January 1, 2008 through December 31, 2019, provide the following:

1. The number of subscribers or dependents covered under the TPP Claimant's plan during some or all of the period from January 1, 2008 through December 31, 2019 (each, a "Unique Member") who were prescribed one or more of the drugs identified on the NDC List.

2. The number of unique prescriptions paid, all or in part, by your plan for the drugs identified on the NDC List.

3. The total final dollars paid by your plan for the prescriptions for the drugs identified in 2 above.

4. The number of Unique Members identified in 1 above who were diagnosed with an Opioid Use Disorder, using one or more of the codes on the OUD ICD 10 List.

5. For the Unique Members identified in 4 above, the total dollar amount of medical claims with the ICD, CPT, or HCPS codes on the OUD Medical Claims Codes List, paid for those Unique Members.

The NDC List, OUD ICD 10 List, and OUD Medical Claims Codes List will be attached to and included with the TPP Abatement Claim Form.

## APPENDIX C: Approved MAT Expenses

*Approved MAT Expenses.* All or part of the expenses incurred by TPP Authorized Recipients for Allowed MAT Therapy, defined as claims paid for the following therapies or under the following ICD/CPT/HCPS codes:

1.  Medication Assisted Treatment (MAT): Assigned ICD-10 code F11.20 (convert to ICD-9 304.00, 304.01, and 304.02) for opioid dependence.

2.  Visit type: Adult Wellness Visit (AWV) or acute visit for Opioid Use Disorder/Dependence Comprehensive evaluation of new patient or established patient for suitableness for buprenorphine treatment.

3.  New Patient: code 99205, 99201

4.  Established Patient: code 99211-99215

5.  Visit type: MAT medication induction.

6.  Established Patient E/M: 99211–99215

7.  Patient Consult: 99241-45(*)[15]

8.  Telephonic: 99241 can only be used as telephonic prescriber-to-prescriber consultation regarding a patient. Patient cannot be present.

9.  Prolonged visits codes (99354, 99355) (*)

10. 30-74 minutes: 99354(*)

11. 75-104 minutes: 99355(*)

12. 105+ minutes: 99354+99355x2(*)

13. Visit type: MAT medication/maintenance. Acute visit for OUD/opioid dependence.

14. Established Patient: 99212-15

15. SBIRT substance abuse and structured screening and brief intervention services: 99408 (can be offered and billed for naloxone education.)

16. CPT/Prof   HCPC/FAC

17. 99214 – E/M office visit/G0480 – UDT definitive

18. 99213 – E/M office visit/H0015 - IOP

19. 99285 – E/M ER visit/H2035 – drug treatment program per hour

20. 99215 – E/M office visit/G0481 – UDT definitive

21. 80307 – UDT presumptive/H0010 – acute/subacute detox

22. 99232 – E/M inpatient visit/H2036 - drug treatment program per diem

23. 99233 – E/M inpatient visit/G0463 – outpatient clinic visit

---

[15]   Codes followed by an asterisk (*) have been identified as frequently subject to abuse and are being reviewed.

24.    99223 – E/M inpatient visit/H0011 - acute/subacute detox

25.    99284 – E/M ER visit/H0007 outpatient crisis intervention

26.    99204 – E/M office visit/G0482 – UDT definitive

27.    99231 – E/M inpatient visit/G0483 – UDT definitive

28.    99205 – E/M office visit/H0001 – alcohol and/or drug treatment assessment

29.    99220 – E/M observation/H0020 – alcohol and/or drug treatment – methadone administration

30.    99443 – E/M telephone service/H0050 – alcohol and/or drug treatment, brief intervention

31.    99283 – E/M ER visit/G0396 - alcohol and/or substance abuse structured assessment and brief intervention (15 to 30 mins)

32.    99212 – E/M office visit/G0397 - alcohol and/or substance abuse structured assessment and brief intervention (more than 30 mins)

33.    96372 - Therapeutic, prophylactic, or diagnostic injection (specify material injected); subcutaneous or intramuscular

34.    J2315 - Injection, naltrexone, depot form, 1 mg

35.    3E023GC - Introduction of other therapeutic substance into muscle, percutaneous approach

36.    96372 - Therapeutic, prophylactic, or diagnostic injection (specify material injected); subcutaneous or intramuscular (same as Vivitrol)

37.    Q9991 – Injection, buprenorphine extended-release (Sublocade), less than or equal to 100 mg

38.    Q9992 – Injection, buprenorphine extended-release (Sublocade), greater than 100 mg

39.    G2067 Medication assisted treatment, methadone; weekly bundle including dispensing and/or administration, substance use counseling, individual and group therapy, and toxicology testing, if performed (provision of the services by a Medicare-enrolled Opioid Treatment Program)

40.    G2068 Medication assisted treatment, buprenorphine (oral); weekly bundle including dispensing and/or administration, substance use counseling, individual and group therapy, and toxicology testing if performed (provision of the services by a Medicare-enrolled Opioid Treatment Program)

41.    G2069 – Medication assisted treatment, buprenorphine (injectable); weekly bundle including dispensing and/ or administration, substance use counseling, individual and group therapy, and toxicology testing if performed (provision of the services by a Medicare-enrolled Opioid Treatment Program)

42.    G2070 Medication assisted treatment, buprenorphine (implant insertion); weekly bundle including dispensing and/or administration, substance use counseling, individual and

group therapy, and toxicology testing if performed (provision of the services by a Medicare-enrolled Opioid Treatment Program)

43.   G2071 Medication assisted treatment, buprenorphine (implant removal); weekly bundle including dispensing and/or administration, substance use counseling, individual and group therapy, and toxicology testing if performed (provision of the services by a Medicare enrolled Opioid Treatment Program)

44.   G2072 Medication assisted treatment, buprenorphine (implant insertion and removal); weekly bundle including dispensing and/or administration, substance use counseling, individual and group therapy, and toxicology testing if performed (provision of the services by a Medicare enrolled Opioid Treatment Program)

45.   G2073 Medication assisted treatment, naltrexone; weekly bundle including dispensing and/or administration, substance use counseling, individual and group therapy, and toxicology testing if performed (provision of the services by a Medicare-enrolled Opioid Treatment Program)

46.   G2074 – Medication assisted treatment, weekly bundle not including the drug, including substance use counseling, individual and group therapy, and toxicology (provision of the services by a Medicare-enrolled opioid treatment program)

47.   G2075 Medication assisted treatment, medication not otherwise specified; weekly bundle including dispensing and/or administration, substance use counseling, individual and group therapy, and toxicology testing, if performed (provision of the services by a Medicare-enrolled opioid treatment program)

48.   G2076 Intake activities, including initial medical examination that is a complete, fully documented physical evaluation and initial assessment by a program physician or a primary care physician, or an authorized health care professional under the supervision of a program physician qualified personnel that includes preparation of a treatment plan that includes the patient's short-term goals and the tasks the patient must perform to complete the short-term goals; the patient's requirements for education, vocational rehabilitation, and employment; and the medical, psycho- social, economic, legal, or other supportive services that a patient needs, conducted by qualified personnel (provision of the services by a Medicare-enrolled opioid treatment program)

49.   G2077 Periodic assessment; assessing periodically by qualified personnel to determine the most appropriate combination of services and treatment (provision of the services by a Medicare-enrolled opioid treatment program)

50.   G2078 Take home supply of methadone; up to 7 additional day supply (provision of the services by a Medicare-enrolled opioid treatment program)

51.   G2079 Take home supply of buprenorphine (oral); up to 7 additional day supply (provision of the services by a Medicare-enrolled opioid treatment program)

52.   G2080 Each additional 30 minutes of counseling in a week of medication assisted treatment, (provision of the services by a Medicare-enrolled opioid treatment program)

53.   G2086 –Office-based treatment for opioid use disorder, including development of the treatment plan, care coordination, individual therapy and group therapy and counseling; at least 70 minutes in the first calendar month

54.   G2087 – Office-based treatment for opioid use disorder, including care coordination, individual therapy and group therapy and counseling; at least 60 minutes in a subsequent calendar month

55.   G0516 – Insertion of non-biodegradable drug delivery implants, 4 or more (services for subdermal rod implant)

56.   G0517 – Removal of non-biodegradable drug delivery implants, 4 or more (services for subdermal implants)

57.   G0518 – Removal with reinsertion, non-biodegradable drug delivery implants, 4 or more (services for subdermal implants)

58.   G2215 – Take home supply of nasal naxolone (provision of the services by a Medicare enrolled opioid treatment program)

59.   G2216 – Take home supply of injectable naxolone (provision of the services by a Medicare enrolled opioid treatment program)

60.   11981 – Insertion of single non-biodegradable implant

61.   11982 – Removal of single non-biodegradable implant

62.   11983 – Removal and re-insertion of single nonbiodegradable implant

63.   17999 – unlisted   procedure, skin, mucous mem

64.   S9475 –Ambulatory setting substance abuse treatment or detoxification services

65.   H0020 ALCOHL &OR RX SRVC; METHADONE ADMIN &OR SERVICE

66.   H0033 ORAL MEDICATION ADMIN DIRECT OBSERVATION

67.   J3490 - Buprenorphine extended-release injection, for subcutaneous use (Sublocade)

68.   J0570 – Buprenorphine implant, 74.2 mg; Physician office and Outpatient

69.   J0571 BUPRENORPHINE ORAL 1 MG

70.   J0572 BUPRENORPHINE/NALOXONE ORAL </=TO 3 MG BPN

71.   J0573 BUPRENORPHNE/NALOXONE ORAL >3 MG BUT </=6 MG BPN

72.   J0574 BUPRENORPHINE/NLX ORAL >6 MG BUT </=TO 10 MG BPN

73.   J0575 BUPRENORPHINE/NALOXONE ORAL >10 MG BUPRENORPHINE

74.   J1230 Methadone

75.   J2315 INJECTION NALTREXONE DEPOT FORM 1 MG

76.   S0109 METHADONE ORAL 5MG

77.   Rev Code 900 + H0020 (methadone)

78.   Rev Code 900 + H0001 or H0004 or H0005 or H0006

22

79.    Bunavail (buprenorphine with naloxone) Buccal Film; Buprenorphine with naloxone Sublingual Tablet/Film; Cassipa (buprenorphine with naloxone) Sublingual Film; Suboxone (buprenorphine with naloxone) Sublingual Film; Probuphine (buprenorphine); Subutex (buprenorphine); Sublocade (buprenorphine extended-release) injection; Zubsolv (buprenorphine with naloxone) Sublingual Tablet; Vivitrol (naltrexone for extended-release); Methadone

| | | |
|---|---|---|
| 80. | 65200010100760 | BUPRENORPHIN SUB 2MG |
| 81. | 65200010100760 | BUPRENORPHINE 2 MG TABLET SL |
| 82. | 65200010100760 | SUBUTEX SUB 2MG |
| 83. | 65200010100780 | BUPRENORPHIN SUB 8MG |
| 84. | 65200010100780 | BUPRENORPHINE 8 MG TABLET SL |
| 85. | 65200010100780 | SUBUTEX SUB 8MG |
| 86. | 65200010102320 | PROBUPHINE IMP KIT 74.2 |
| 87. | 65200010200710 | ZUBSOLV SUB 0.7-0.18 |
| 88. | 65200010200715 | ZUBSOLV SUB 1.4-0.36 |
| 89. | 65200010200720 | BUPREN/NALOX SUB 2-0.5MG |
| 90. | 65200010200720 | BUPRENORPHN-NALOXN 2-0.5 MG SL |
| 91. | 65200010200720 | SUBOXONE SUB 2-0.5MG |
| 92. | 65200010200720 | SUBOXONE SUB 2MG |
| 93. | 65200010200725 | ZUBSOLV 2.9-0.71 MG TABLET SL |
| 94. | 65200010200732 | ZUBSOLV SUB 5.7-1.4 |
| 95. | 65200010200740 | BUPREN/NALOX SUB 8-2MG |
| 96. | 65200010200740 | BUPRENORPHIN-NALOXON 8-2 MG SL |
| 97. | 65200010200740 | SUBOXONE SUB 8-2MG |
| 98. | 65200010200740 | SUBOXONE SUB 8MG |
| 99. | 65200010200745 | ZUBSOLV SUB 8.6-2.1 |
| 100. | 65200010200760 | ZUBSOLV 11.4-2.9 MG TABLET SL |
| 101. | 65200010208220 | BUPREN/NALOX MIS 2-0.5MG |
| 102. | 65200010208220 | SUBOXONE MIS 2-0.5MG |
| 103. | 65200010208230 | BUPREN/NALOX MIS 4-1MG |
| 104. | 65200010208230 | SUBOXONE MIS 4-1MG |
| 105. | 65200010208240 | BUPREN/NALOX MIS 8-2MG |
| 106. | 65200010208240 | SUBOXONE MIS 8-2MG |
| 107. | 65200010208250 | BUPREN/NALOX MIS 12-3MG |

| 108. | 65200010208250 | SUBOXONE MIS 12-3MG |
| 109. | 65200010208260 | BUNAVAIL MIS 2.1-0.3 |
| 110. | 65200010208270 | BUNAVAIL MIS 4.2-0.7 |
| 111. | 65200010208280 | BUNAVAIL MIS 6.3-1MG |
| 112. | 93400030001920 | VIVITROL INJ 380MG |
| 113. | 93400030100305 | DEPADE TAB 50MG |
| 114. | 93400030100305 | NALTREXONE TAB 50MG |
| 115. | 93400030100305 | REVIA TAB 50MG |
| 116. | 93409902502320 | NALTREXONE IMP |
| 117. | 6520001000E520 | SUBLOCADE INJ 100/0.5 |
| 118. | 6520001000E530 | SUBLOCADE INJ 300/1.5 |
| 119. | F11.1 | Opioid abuse |
| 120. | F11.10 | Opioid abuse, uncomplicated |
| 121. | F11.11 | Opioid abuse, in remission |
| 122. | F11.12 | Opioid abuse with intoxication |
| 123. | F11.120 | Opioid abuse with intoxication, uncomplicated |
| 124. | F11.121 | Opioid abuse with intoxication delirium |
| 125. | F11.122 | Opioid abuse with intoxication with perceptual disturbance |
| 126. | F11.129 | Opioid abuse with intoxication, unspecified |
| 127. | F11.13 | Opioid abuse with withdrawal |
| 128. | F11.14 | Opioid abuse with opioid-induced mood disorder |
| 129. | F11.15 | Opioid abuse with opioid-induced psychotic disorder |
| 130. | F11.150 | Opioid abuse with opioid-induced psychotic disorder with delusions |
| 131. | F11.151 | Opioid abuse with opioid-induced psychotic disorder with hallucinations |
| 132. | F11.159 | Opioid abuse with opioid-induced psychotic disorder, unspecified |
| 133. | F11.18 | Opioid abuse with other opioid-induced disorder |
| 134. | F11.181 | Opioid abuse with opioid-induced sexual dysfunction |
| 135. | F11.182 | Opioid abuse with opioid-induced sleep disorder |
| 136. | F11.188 | Opioid abuse with other opioid-induced disorder |
| 137. | F11.19 | Opioid abuse with unspecified opioid-induced disorder |

| 138. | T40.0X1 | Poisoning by opium, accidental (unintentional) |
| 139. | T40.0X1A | Poisoning by opium, accidental (unintentional), initial encounter |
| 140. | T40.0X1D | Poisoning by opium, accidental (unintentional), subsequent encounter |
| 141. | T40.0X1S | Poisoning by opium, accidental (unintentional), sequela |
| 142. | T40.0X2 | Poisoning by opium, intentional self-harm |
| 143. | T40.0X2A | Poisoning by opium, intentional self-harm, initial encounter |
| 144. | T40.0X2D | Poisoning by opium, intentional self-harm, subsequent encounter |
| 145. | T40.0X2S | Poisoning by opium, intentional self-harm, sequela |
| 146. | T40.0X3 | Poisoning by opium, assault |
| 147. | T40.0X3A | Poisoning by opium, assault, initial encounter |
| 148. | T40.0X3D | Poisoning by opium, assault, subsequent encounter |
| 149. | T40.0X3S | Poisoning by opium, assault, sequela |
| 150. | T40.0X4 | Poisoning by opium, undetermined |
| 151. | T40.0X4A | Poisoning by opium, undetermined, initial encounter |
| 152. | T40.0X4D | Poisoning by opium, undetermined, subsequent encounter |
| 153. | T40.0X4S | Poisoning by opium, undetermined, sequela |
| 154. | T40.1 | Poisoning by and adverse effect of heroin |
| 155. | T40.1X | Poisoning by and adverse effect of heroin |
| 156. | T40.1X1 | Poisoning by heroin, accidental (unintentional) |
| 157. | T40.1X1A | Poisoning by heroin, accidental (unintentional), initial encounter |
| 158. | T40.1X1D | Poisoning by heroin, accidental (unintentional), subsequent encounter |
| 159. | T40.1X1S | Poisoning by heroin, accidental (unintentional), sequela |
| 160. | T40.1X2 | Poisoning by heroin, intentional self-harm |
| 161. | T40.1X2A | Poisoning by heroin, intentional self-harm, initial encounter |
| 162. | T40.1X2D | Poisoning by heroin, intentional self-harm, subsequent encounter |
| 163. | T40.1X2S | Poisoning by heroin, intentional self-harm, sequela |
| 164. | T40.1X3 | Poisoning by heroin, assault |
| 165. | T40.1X3A | Poisoning by heroin, assault, initial encounter |
| 166. | T40.1X3D | Poisoning by heroin, assault, subsequent encounter |

| 167. | T40.1X3S | Poisoning by heroin, assault, sequela |
| 168. | T40.1X4 | Poisoning by heroin, undetermined |
| 169. | T40.1X4A | Poisoning by heroin, undetermined, initial encounter |
| 170. | T40.1X4D | Poisoning by heroin, undetermined, subsequent encounter |
| 171. | T40.1X4S | Poisoning by heroin, undetermined, sequela |
| 172. | T40.1X5 | Adverse effect of heroin |
| 173. | T40.1X5A | Adverse effect of heroin, initial encounter |
| 174. | T40.1X5D | Adverse effect of heroin, subsequent encounter |
| 175. | T40.1X5S | Adverse effect of heroin, sequela |
| 176. | T40.1X6 | Underdosing of heroin |
| 177. | T40.1X6A | Underdosing of heroin, initial encounter |
| 178. | T40.1X6D | Underdosing of heroin, subsequent encounter |
| 179. | T40.1X6S | Underdosing of heroin, sequela |
| 180. | T40.2X1 | Poisoning by other opioids, accidental (unintentional) |
| 181. | T40.2X1A | Poisoning by other opioids, accidental (unintentional), initial encounter |
| 182. | T40.2X1D | Poisoning by other opioids, accidental (unintentional), subsequent encounter |
| 183. | T40.2X1S | Poisoning by other opioids, accidental (unintentional), sequela |
| 184. | T40.2X2 | Poisoning by other opioids, intentional self-harm |
| 185. | T40.2X2A | Poisoning by other opioids, intentional self-harm, initial encounter |
| 186. | T40.2X2D | Poisoning by other opioids, intentional self-harm, subsequent encounter |
| 187. | T40.2X2S | Poisoning by other opioids, intentional self-harm, sequela |
| 188. | T40.2X3 | Poisoning by other opioids, assault |
| 189. | T40.2X3A | Poisoning by other opioids, assault, initial encounter |
| 190. | T40.2X3D | Poisoning by other opioids, assault, subsequent encounter |
| 191. | T40.2X3S | Poisoning by other opioids, assault, sequela |
| 192. | T40.2X4 | Poisoning by other opioids, undetermined |
| 193. | T40.2X4A | Poisoning by other opioids, undetermined, initial encounter |
| 194. | T40.2X4D | Poisoning by other opioids, undetermined, subsequent encounter |
| 195. | T40.2X4S | Poisoning by other opioids, undetermined, sequela |

| 196. | T40.3X1 | Poisoning by methadone, accidental (unintentional) |
| 197. | T40.3X1A | Poisoning by methadone, accidental (unintentional), initial encounter |
| 198. | T40.3X1D | Poisoning by methadone, accidental (unintentional), subsequent encounter |
| 199. | T40.3X1S | Poisoning by methadone, accidental (unintentional), sequela |
| 200. | T40.3X2 | Poisoning by methadone, intentional self-harm |
| 201. | T40.3X2A | Poisoning by methadone, intentional self-harm, initial encounter |
| 202. | T40.3X2D | Poisoning by methadone, intentional self-harm, subsequent encounter |
| 203. | T40.3X2S | Poisoning by methadone, intentional self-harm, sequela |
| 204. | T40.3X3 | Poisoning by methadone, assault |
| 205. | T40.3X3A | Poisoning by methadone, assault, initial encounter |
| 206. | T40.3X3D | Poisoning by methadone, assault, subsequent encounter |
| 207. | T40.3X3S | Poisoning by methadone, assault, sequela |
| 208. | T40.3X4 | Poisoning by methadone, undetermined |
| 209. | T40.3X4A | Poisoning by methadone, undetermined, initial encounter |
| 210. | T40.3X4D | Poisoning by methadone, undetermined, subsequent encounter |
| 211. | T40.3X4S | Poisoning by methadone, undetermined, sequela |
| 212. | T40.4 | Poisoning by, adverse effect of and underdosing of other synthetic narcotics |
| 213. | T40.41 | Poisoning by, adverse effect of and underdosing of fentanylor fentanyl analogs |
| 214. | T40.411 | Poisoning by fentanyl or fentanyl analogs, accidental (unintentional) |
| 215. | T40.411A | Poisoning by fentanyl or fentanyl analogs, accidental (unintentional), initial encounter |
| 216. | T40.411D | Poisoning by fentanyl or fentanyl analogs, accidental (unintentional), subsequent encounter |
| 217. | T40.411S | Poisoning by fentanyl or fentanyl analogs, accidental (unintentional), sequela |
| 218. | T40.412 | Poisoning by fentanyl or fentanyl analogs, intentional self-harm |
| 219. | T40.412A | Poisoning by fentanyl or fentanyl analogs, intentional self-harm, initial encounter |
| 220. | T40.412D | Poisoning by fentanyl or fentanyl analogs, intentional self-harm, subsequent encounter |

| 221. | T40.412S | Poisoning by fentanyl or fentanyl analogs, intentional self-harm, sequela |
| 222. | T40.413 | Poisoning by fentanyl or fentanyl analogs, assault |
| 223. | T40.413A | Poisoning by fentanyl or fentanyl analogs, assault, initial encounter |
| 224. | T40.413D | Poisoning by fentanyl or fentanyl analogs, assault, subsequent encounter |
| 225. | T40.413S | Poisoning by fentanyl or fentanyl analogs, assault, sequela |
| 226. | T40.414 | Poisoning by fentanyl or fentanyl analogs, undetermined |
| 227. | T40.414A | Poisoning by fentanyl or fentanyl analogs, undetermined, initial encounter |
| 228. | T40.414D | Poisoning by fentanyl or fentanyl analogs, undetermined, subsequent encounter |
| 229. | T40.414S | Poisoning by fentanyl or fentanyl analogs, undetermined, sequela |
| 230. | T40.415 | Adverse effect of fentanyl or fentanyl analogs |
| 231. | T40.415A | Adverse effect of fentanyl or fentanyl analogs, initial encounter |
| 232. | T40.415D | Adverse effect of fentanyl or fentanyl analogs, subsequent encounter |
| 233. | T40.415S | Adverse effect of fentanyl or fentanyl analogs, sequela |
| 234. | T40.416 | Underdosing of fentanyl or fentanyl analogs |
| 235. | T40.416A | Underdosing of fentanyl or fentanyl analogs, initial encounter |
| 236. | T40.416D | Underdosing of fentanyl or fentanyl analogs, subsequent encounter |
| 237. | T40.416S | Underdosing of fentanyl or fentanyl analogs, sequela |
| 238. | T40.42 | Poisoning by, adverse effect of and underdosing of tramadol |
| 239. | T40.421 | Poisoning by tramadol, accidental (unintentional) |
| 240. | T40.421A | Poisoning by tramadol, accidental (unintentional), initial encounter |
| 241. | T40.421D | Poisoning by tramadol, accidental (unintentional), subsequent encounter |
| 242. | T40.421S | Poisoning by tramadol, accidental (unintentional), sequela |
| 243. | T40.422 | Poisoning by tramadol, intentional self-harm |
| 244. | T40.422A | Poisoning by tramadol, intentional self-harm, initial encounter |
| 245. | T40.422D | Poisoning by tramadol, intentional self-harm, subsequent encounter |

28

| | | |
|---|---|---|
| 246. | T40.422S | Poisoning by tramadol, intentional self-harm, sequela |
| 247. | T40.423 | Poisoning by tramadol, assault |
| 248. | T40.423A | Poisoning by tramadol, assault, initial encounter |
| 249. | T40.423D | Poisoning by tramadol, assault, subsequent encounter |
| 250. | T40.423S | Poisoning by tramadol, assault, sequela |
| 251. | T40.424 | Poisoning by tramadol, undetermined |
| 252. | T40.424A | Poisoning by tramadol, undetermined, initial encounter |
| 253. | T40.424D | Poisoning by tramadol, undetermined, subsequent encounter |
| 254. | T40.424S | Poisoning by tramadol, undetermined, sequela |
| 255. | T40.425 | Adverse effect of tramadol |
| 256. | T40.425A | Adverse effect of tramadol, initial encounter |
| 257. | T40.425D | Adverse effect of tramadol, subsequent encounter |
| 258. | T40.425S | Adverse effect of tramadol, sequela |
| 259. | T40.426 | Underdosing of tramadol |
| 260. | T40.426A | Underdosing of tramadol, initial encounter |
| 261. | T40.426D | Underdosing of tramadol, subsequent encounter |
| 262. | T40.426S | Underdosing of tramadol, sequela |
| 263. | T40.49 | Poisoning by, adverse effect of and underdosing of other synthetic narcotics |
| 264. | T40.491 | Poisoning by other synthetic narcotics, accidental (unintentional) |
| 265. | T40.491A | Poisoning by other synthetic narcotics, accidental (unintentional), initial encounter |
| 266. | T40.491D | Poisoning by other synthetic narcotics, accidental (unintentional), subsequent encounter |
| 267. | T40.491S | Poisoning by other synthetic narcotics, accidental (unintentional), sequela |
| 268. | T40.492 | Poisoning by other synthetic narcotics, intentional self-harm |
| 269. | T40.492A | Poisoning by other synthetic narcotics, intentional self-harm, initial encounter |
| 270. | T40.492D | Poisoning by other synthetic narcotics, intentional self-harm, subsequent encounter |
| 271. | T40.492S | Poisoning by other synthetic narcotics, intentional self-harm, sequela |
| 272. | T40.493 | Poisoning by other synthetic narcotics, assault |

29

| 273. | T40.493A | Poisoning by other synthetic narcotics, assault, initial encounter |
| 274. | T40.493D | Poisoning by other synthetic narcotics, assault, subsequent encounter |
| 275. | T40.493S | Poisoning by other synthetic narcotics, assault, sequela |
| 276. | T40.494 | Poisoning by other synthetic narcotics, undetermined |
| 277. | T40.494A | Poisoning by other synthetic narcotics, undetermined, initial encounter |
| 278. | T40.494D | Poisoning by other synthetic narcotics, undetermined, subsequent encounter |
| 279. | T40.494S | Poisoning by other synthetic narcotics, undetermined, sequela |
| 280. | T40.495 | Adverse effect of other synthetic narcotics |
| 281. | T40.495A | Adverse effect of other synthetic narcotics, initial encounter |
| 282. | T40.495D | Adverse effect of other synthetic narcotics, subsequent encounter |
| 283. | T40.495S | Adverse effect of other synthetic narcotics, sequela |
| 284. | T40.496 | Underdosing of other synthetic narcotics |
| 285. | T40.496A | Underdosing of other synthetic narcotics, initial encounter |
| 286. | T40.496D | Underdosing of other synthetic narcotics, subsequent encounter |
| 287. | T40.496S | Underdosing of other synthetic narcotics, sequela |
| 288. | T40.4X | Poisoning by, adverse effect of and underdosing of other synthetic narcotics |
| 289. | T40.4X1 | Poisoning by other synthetic narcotics, accidental (unintentional) |
| 290. | T40.4X1A | Poisoning by other synthetic narcotics, accidental (unintentional), initial encounter |
| 291. | T40.4X1D | Poisoning by other synthetic narcotics, accidental (unintentional), subsequent encounter |
| 292. | T40.4X1S | Poisoning by other synthetic narcotics, accidental (unintentional), sequela |
| 293. | T40.4X2 | Poisoning by other synthetic narcotics, intentional self-harm |
| 294. | T40.4X2A | Poisoning by other synthetic narcotics, intentional self-harm, initial encounter |
| 295. | T40.4X2D | Poisoning by other synthetic narcotics, intentional self-harm, subsequent encounter |
| 296. | T40.4X2S | Poisoning by other synthetic narcotics, intentional self-harm, sequela |

30

| 297. | T40.4X3 | Poisoning by other synthetic narcotics, assault |
| 298. | T40.4X3A | Poisoning by other synthetic narcotics, assault, initial encounter |
| 299. | T40.4X3D | Poisoning by other synthetic narcotics, assault, subsequent encounter |
| 300. | T40.4X3S | Poisoning by other synthetic narcotics, assault, sequela |
| 301. | T40.4X4 | Poisoning by other synthetic narcotics, undetermined |
| 302. | T40.4X4A | Poisoning by other synthetic narcotics, undetermined, initial encounter |
| 303. | T40.4X4D | Poisoning by other synthetic narcotics, undetermined, subsequent encounter |
| 304. | T40.4X4S | Poisoning by other synthetic narcotics, undetermined, sequela |
| 305. | T40.4X5 | Adverse effect of other synthetic narcotics |
| 306. | T40.4X5A | Adverse effect of other synthetic narcotics, initial encounter |
| 307. | T40.4X5D | Adverse effect of other synthetic narcotics, subsequent encounter |
| 308. | T40.4X5S | Adverse effect of other synthetic narcotics, sequela |
| 309. | T40.4X6 | Underdosing of other synthetic narcotics |
| 310. | T40.4X6A | Underdosing of other synthetic narcotics, initial encounter |
| 311. | T40.4X6D | Underdosing of other synthetic narcotics, subsequent encounter |
| 312. | T40.4X6S | Underdosing of other synthetic narcotics, sequela |
| 313. | T40.601 | Poisoning by unspecified narcotics, accidental (unintentional) |
| 314. | T40.601A | Poisoning by unspecified narcotics, accidental (unintentional), initial encounter |
| 315. | T40.601D | Poisoning by unspecified narcotics, accidental (unintentional), subsequent encounter |
| 316. | T40.601S | Poisoning by unspecified narcotics, accidental (unintentional), sequela |
| 317. | T40.602 | Poisoning by unspecified narcotics, intentional self-harm |
| 318. | T40.602A | Poisoning by unspecified narcotics, intentional self-harm, initial encounter |
| 319. | T40.602D | Poisoning by unspecified narcotics, intentional self-harm, subsequent encounter |
| 320. | T40.602S | Poisoning by unspecified narcotics, intentional self-harm, sequela |
| 321. | T40.603 | Poisoning by unspecified narcotics, assault |

| 322. | T40.603A | Poisoning by unspecified narcotics, assault, initial encounter |
| 323. | T40.603D | Poisoning by unspecified narcotics, assault, subsequent encounter |
| 324. | T40.603S | Poisoning by unspecified narcotics, assault, sequela |
| 325. | T40.604 | Poisoning by unspecified narcotics, undetermined |
| 326. | T40.604A | Poisoning by unspecified narcotics, undetermined, initial encounter |
| 327. | T40.604D | Poisoning by unspecified narcotics, undetermined, subsequent encounter |
| 328. | T40.604S | Poisoning by unspecified narcotics, undetermined, sequela |
| 329. | T40.691 | Poisoning by other narcotics, accidental (unintentional) |
| 330. | T40.691A | Poisoning by other narcotics, accidental (unintentional), initial encounter |
| 331. | T40.691D | Poisoning by other narcotics, accidental (unintentional), subsequent encounter |
| 332. | T40.691S | Poisoning by other narcotics, accidental (unintentional), sequela |
| 333. | T40.692 | Poisoning by other narcotics, intentional self-harm |
| 334. | T40.692A | Poisoning by other narcotics, intentional self-harm, initial encounter |
| 335. | T40.692D | Poisoning by other narcotics, intentional self-harm, subsequent encounter |
| 336. | T40.692S | Poisoning by other narcotics, intentional self-harm, sequela |
| 337. | T40.693 | Poisoning by other narcotics, assault |
| 338. | T40.693A | Poisoning by other narcotics, assault, initial encounter |
| 339. | T40.693D | Poisoning by other narcotics, assault, subsequent encounter |
| 340. | T40.693S | Poisoning by other narcotics, assault, sequela |
| 341. | T40.694 | Poisoning by other narcotics, undetermined |
| 342. | T40.694A | Poisoning by other narcotics, undetermined, initial encounter |
| 343. | T40.694D | Poisoning by other narcotics, undetermined, subsequent encounter |
| 344. | T40.694S | Poisoning by other narcotics, undetermined, sequela |
| 345. | F11.20 | Opioid Dependence uncomplicated |
| 346. | F11.21 | Opioid Dependence in remission |
| 347. | F11.22 | Opioid dependence with intoxication |
| 348. | F11.220 | Opioid Dependence uncomplicated |

32

| | | |
|---|---|---|
| 349. | F11.221 | Opioid Dependence delirium |
| 350. | F11.222 | Opioid dependence w intoxication with perceptual disturbance |
| 351. | F11.229 | Opioid Dependence unspecified |
| 352. | F11.23 | Opioid Dependence with withdrawal |
| 353. | F11.24 | Opioid Dependence with opioid-induced mood disorder |
| 354. | F11.25 | Opioid Dependence with opioid-induced psychotic disorder |
| 355. | F11.250 | Opioid Dependence with delusions |
| 356. | F11.251 | Opioid Dependence with hallucinations |
| 357. | F11.259 | Opioid Dependence unspecified |
| 358. | F11.28 | Opioid Dependence with other opioid-induced disorder |
| 359. | F11.281 | Opioid Dependence with opioid-induced sexual dysfunction |
| 360. | F11.282 | Opioid Dependence with opioid-induced sleep disorder |
| 361. | F11.288 | Opioid Dependence with other opioid-induced disorder |

## APPENDIX D: Approved Uses/Programs

*Approved Uses/Programs.* Approved Uses/Programs are those that satisfy the following criteria (the "Approved Uses/Programs Criteria"): they (a) focus on providing treatment of Opioid Use Disorder ("OUD") and/or any Substance Use Disorder or Mental Health ("SUD/MH") conditions, and/or grants to organizations focused on providing treatment of OUD and/or any SUD/MH conditions, (b) employ evidence-based or evidence-informed strategies, and (c) do not include reimbursements to health care providers or payments to covered persons under the plan of a TPP Authorized Recipient (or ASO, if applicable). Approved Uses/Programs follow:[16]

1) Support programs that increase the availability or quality of treatment for OUD and/or any SUD/MH conditions or are designed to prevent OUD, including, but not limited to:

   a) Expand telehealth networks and availability to increase access to treatment for OUD and/or any SUD/MH conditions, including MAT, as well as counseling, psychiatric support, and other treatment and recovery support services.

   b) Support mobile, community-based crisis intervention services, including outpatient hospitals, community health centers, mental health centers and other clinics delivering mobile crisis intervention by qualified professionals and service providers, such as peer recovery coaches, for persons with OUD and/or any SUD/MH conditions and for persons who have experienced an opioid overdose. All supported services should make medications for opioid use disorder available through the mobile interventions.

   c) Train health care personnel to identify and treat trauma of individuals with OUD and/or any SUD (e.g., violence, sexual assault, human trafficking, or adverse childhood experiences) and family members (e.g., surviving family members after an overdose or overdose fatality), including training of health care personnel supporting residential treatment, partial hospitalization, and intensive outpatient services.

   d) Provide funding and training for clinicians to obtain a waiver under the federal Drug Addiction Treatment Act of 2000 ("DATA 2000") to prescribe MAT for OUD, and provide technical assistance and professional support to clinicians who have obtained a DATA 2000 waiver.

   e) Support academic-led training on MAT for health care providers, students, or other supporting professionals, such as peer recovery coaches or recovery outreach specialists, including tele-mentoring to assist community-based providers in rural or underserved areas.

   f) Support stigma reduction efforts regarding treatment and support for persons with OUD, including reducing the stigma on effective treatment and peer recovery and support specialists. These efforts should be based on research evidence of what works for stigma reduction and include an evaluation of efforts.

---

[16]  As used herein, words like "expand," "fund," "provide" or the like shall not indicate a preference for new or existing programs.

g)   Support programs offering physical health and behavioral health services for members with OUD and/or any SUD/MH conditions, including but not limited to care management.

h)   Support utilization management programs designed to prevent OUD.

i)   Fund programs providing locations for safe and free disposal of opioids and other controlled substances.

j)   Fund programs tailored to support patient adherence to MAT treatment.

k)   Support educational programs on correct coding for OUD.

l)   Fund programs to develop predictive modeling for earlier identification of OUD and SUD.

m)   Support hospitals to deliver provision of MAT to patients.

2)   Support programs that decrease the cost to the patient of treatment for OUD and/or any SUD/MH conditions.

a)   Waive co-payments and other non-covered (or unreimbursed) patient costs for treatment for opioid use disorder with buprenorphine and methadone.

b)   Provide or support transportation to treatment or recovery programs or services for persons with OUD and/or any SUD/MH conditions.

c)   Provide community support services, including social and legal services, to assist in the living conditions of persons with OUD and/or any SUD/MH conditions.

d)   Provide employment training or educational services for persons in treatment for or recovery from OUD and/or any SUD/MH conditions.

3)   Grants to organizations whose mission is to provide, expand access to and/or improve the delivery of treatment for OUD and/or any SUD/MH conditions through evidence-based or evidence-informed strategies.

Examples include:

Liberation Programs Inc. (CT)

Boston Medical Center (Grayken Center) (MA)

Institutes for Behavioral Resources - Reach Health Services (MD)

Montefiore Medical Center (opioid treatment programs) (NY)

Pennsylvania Psychiatric Institute: Advancement in Recovery (PA)

Evergreen Treatment Services (WA)

Shatterproof

The Alliance for Addiction Payment Reform

National Council for Behavioral Health

Faces and Voices of Recovery

National Alliance for Recovery Residences

Supportive Housing

National Association for Mental Illness

Mental Health of America

The Trustee can add to the list of Approved Uses/Programs in this Appendix D programs that satisfy the Approved Uses/Programs Criteria; provided that the Trustee provides each State Attorney General at least forty-five (45) days advance written notice that both identifies the program or programs to be added to this Appendix D and explains how the program or programs to be added satisfy the Approved Uses/Programs Criteria.

**EXHIBIT 1: LRP Agreement**

## **EXHIBIT E-1**

**Redline of TPP TDP**

## TPP TRUST DISTRIBUTION PROCEDURES[1]

### § 1.    APPLICABILITY.

Pursuant to the plan of reorganization of Purdue Pharma L.P. and its Debtor affiliates (the "Plan")[2] and the Master TDP, the following claims ("Third-Party Payor Channeled Claims") shall be channeled to and liability therefor shall be assumed by the TPP Trust as of the Effective Date: (i) all Third-Party Payor Claims, which include all Claims against the Debtors held by Third-Party Payors that are not Domestic Governmental Entities ("TPP Claimants"),[3] and (ii) all Released Claims and Shareholder Released Claims held by Third-Party Payors that are not Domestic Governmental Entities. Third-Party Payor Channeled Claims shall be administered, liquidated and discharged pursuant to the TPP Trust Documents, and satisfied solely from funds held by the TPP Trust as and to the extent provided in these trust distribution procedures (this "TPP TDP"). This TPP TDP sets forth the manner in which the TPP Trust shall make Abatement Distributions to TPP Claimants that satisfy the eligibility criteria for TPP Authorized Recipients set forth herein, including the timely filing of a TPP Abatement Claim Form, as defined in Section 4 herein (such Abatement Distributions, "TPP Abatement Distributions"). Third-Party Payor Channeled Claims shall be fully discharged pursuant to this TPP TDP. All Distributions in respect of Third-Party Payor Channeled Claims shall be exclusively in the form of TPP Abatement Distributions, shall be based upon the Purdue-Related Opioid Spend, as defined herein, set forth in the TPP Abatement Claim Form and the TPP Trust's determination with respect to that asserted TPP Abatement Claim, and may be used exclusively for the Authorized Abatement Purposes set forth herein.

### § 2.    RECEIPT AND USE OF FUNDS BY THE TPP TRUST.

---

[1]    These procedures are qualified by the terms of the Plan. TPP Claimants are strongly advised to review the Plan as well as all of the TPP Trust Documents, and the Debtors' Disclosure Statement ~~and the LRP Agreement~~ for additional information on the terms of the Plan and the treatment of Third-Party Payor Channeled Claims. In addition, you are advised to review the LRP Agreement, which describes lien resolution procedures with respect to claims that Third-Party Payors may have in connection with Distributions to Holders of PI Claims against the Debtors. Although the LRP Agreement is a PI Trust Document, it has been attached to this TPP TDP as Exhibit 1 purely for ease of reference for TPP Claimants and potential TPP Authorized Recipients.

[2]    Terms used but not defined herein shall have the meaning ascribed to them in the Plan.

[3]    For the avoidance of doubt, "Third-Party Payor Claims" include any Claims against any Debtor that are held by Third-Party Payors (including any Claims based on the subrogation rights of the Holder thereof that are not Other Subordinated Claims) that are not Domestic Governmental Entities; provided that Claims in respect of self-funded government plans that were and are asserted through private Third-Party Payors shall be included in this definition of "Third-Party Payor Claims." ~~For the avoidance of doubt, claims~~Claims of Third-Party Payors against Holders of PI Claims or Distributions payable to Holders of PI Claims are not claims against any Debtor and therefore are not included in this definition of "Third-Party Payor Claims." The claims of Third-Party Payors against Holders of PI Claims and Distributions payable to Holders of PI Claims are addressed in the LRP Agreement, as noted in Section 2 hereof and in Exhibit 1. See supra n.1.

The Plan contemplates that the TPP Trust will receive a total of $365 million over time, with an initial payment of $~~15~~5 million to the TPP Trust on the Effective Date (the "Initial TPP Trust Distribution") and three subsequent payments to the TPP Trust from the Master Disbursement Trust in the following amounts: (i) $~~121~~120 million on July 31, 2022, (ii) $~~121~~120 million on July 31, 2023 and (iii) $~~122~~120 million on July 31, 2024.[4] The funds paid to the TPP Trust shall be used for the administration (including the payment of expenses) of the TPP Trust, and to make the TPP Abatement Distributions to TPP Claimants that qualify as TPP Authorized Recipients (as defined below), subject to the assessments payable to the Common Benefit Escrow (and, later, the Common Benefit Fund) pursuant to Section 5.8 of the Plan. On the Effective Date, a Common Benefit Escrow shall be established and funded by assessments of 5% of each TPP Abatement Distribution ~~pursuant to Section 5.8 of the Plan.~~made by the TPP Trust. Such assessments will be paid by the TPP Trust in respect of TPP Abatement Distributions made by the TPP Trust to the Common Benefit Escrow and then, upon its establishment, directly to the Common Benefit Fund established by the MDL Court, on periodic schedules acceptable to the Third-Party Payor Group, The amounts in the Common Benefit Escrow shall be held in escrow until an order is entered by the MDL Court establishing a Common Benefit Fund, at which time the amounts held by the Common Benefit Escrow and all subsequent assessments of 5% of each TPP Abatement Distribution made by the TPP Trust shall be transferred to and distributed in accordance with the order of the MDL Court establishing the Common Benefit Fund.

TPP Authorized Recipients are required to use all funds distributed to them from the TPP Trust solely and exclusively for (i) the Authorized Abatement Purposes set forth herein in Section 8 and Appendices C and D or (ii) the payment of attorneys' fees and costs of TPP Authorized Recipients (including counsel to the Third-Party Payor Group) (collectively, the "TPP Authorized Abatement Purposes"); provided, that a TPP Authorized Recipient that makes the certification required under Sections 8 and 9 regarding minimum spending requirements will be deemed to have used the funds received as a TPP Abatement Distribution for TPP Authorized Abatement Purposes; provided, further that such certification may be subject to audit by the TPP Trust.

CLAIMS THAT THIRD-PARTY PAYORS MAY HAVE AGAINST DISTRIBUTIONS PAYABLE TO HOLDERS OF PI CLAIMS (SUCH AS REIMBURSEMENT AND LIEN CLAIMS) ARE NOT BEING ADMINISTERED BY THE TPP TRUST AND ARE NOT SUBJECT TO THE PROCEDURES SET FORTH HEREIN. THIRD-PARTY PAYORS MAY ELECT TO RESOLVE SUCH CLAIMS THROUGH THE LIEN RESOLUTION PROCEDURES UNDER THE LRP AGREEMENT, WHICH SHALL BE ATTACHED AS EXHIBIT ~~[•]~~D TO THE PI TRUST AGREEMENT (AND IS ATTACHED HEREIN AS EXHIBIT 1 FOR EASE OF REFERENCE), AND WHICH SHALL BE FILED WITH THE PLAN SUPPLEMENT. THE PLAN SUPPLEMENT (INCLUDING THE LRP AGREEMENT) MAY BE OBTAINED FREE OF CHARGE AT HTTPS://RESTRUCTURING.PRIMECLERK.COM/PURDUEPHARMA.

---

[4]    In the event that any payment date is on a date that is not a Business Day, then the making of such payment may be completed on the next succeeding Business Day, but shall be deemed to have been completed as of the required date.

DISTRIBUTIONS TO PARTICIPATING THIRD-PARTY PAYORS UNDER THE LRP AGREEMENT WILL BE MADE BY THE PI TRUSTEE FROM FUNDS HELD BY THE PI TRUST.

## § 3.    ADMINISTRATION BY TRUSTEE.

The trustee of the TPP Trust (the "Trustee") will be selected in accordance with the Plan in advance of the Effective Date by the Third-Party Payor Group with the consent of the Debtors (which consent shall not be unreasonably withheld, delayed, or denied.).[5] Alan D. Halperin has been selected and approved to serve as the Trustee.

The Trustee shall have the power and authority to perform all functions on behalf of the TPP Trust, and shall undertake all administrative responsibilities of the TPP Trust (whether directly or through professionals and agents engaged by the TPP Trust, including a claims administrator) as are provided in the Plan and the TPP Trust Documents.[6] The Trustee shall be responsible for all decisions and duties with respect to the TPP Trust, as more fully set forth in the TPP Trust Agreement.[7]

The Trustee shall have the exclusive authority to determine the eligibility of TPP Claimants to be TPP Authorized Recipients and the amount of TPP Abatement Distributions to be made by the TPP Trust. In order to qualify as a TPP Authorized Recipient and be eligible to receive a TPP Abatement Distribution, TPP Claimants must comply with the terms, provisions and procedures set forth herein, including the TPP Abatement Claim Deadline (defined below) and the timely submission of all forms required pursuant hereto (which shall be in addition to, and not in substitution of, Proofs of Claim filed in the Chapter 11 Cases). The Trustee may investigate any Third-Party Payor Channeled Claim, and may request information from any TPP Claimant to ensure compliance with the terms set forth in this TPP TDP, the other TPP Trust Documents and the Plan, and make determinations about the TPP Abatement Distribution amounts to be made to TPP Authorized Recipients.

---

[5]    The TPP Trust Agreement will be filed on or prior to the Plan Supplement Deadline.

[6]    The TPP Trust Agreement shall provide that the Trustee shall have the authority to, in his/her discretion, consult with and retain attorneys, financial advisors, accountants, or other professionals and employees, including any third-party claims administrators or claims and noticing agent, as the Trustee deems appropriate in the reasonable exercise of his/her discretion, and who the Trustee reasonably determines to have qualifications necessary to assist the Trustee in the proper administration of the TPP Trust. The TPP Trust Agreement defines such parties as Trust Professionals. The Trustee may pay the reasonable fees, costs and expenses of such persons (including to him/herself and his/her firm) out of the assets of the TPP Trust in the ordinary course of business, pursuant to the terms of the TPP Trust Agreement. There will also be a Trust Advisory Committee, comprised of representatives of five Third-Party Payors, and the members of that committee will have certain oversight and advisory rights, which are described in the TPP Trust Agreement.

[7]    The TPP Trust Agreement shall provide for the compensation of the Trustee. The Trustee shall not be required to post any bond or other form of surety or security unless otherwise ordered by the Bankruptcy Court.

Pursuant to section 1123(b)(3)(B) of the Bankruptcy Code and applicable state corporate law, the TPP Trust shall be and is appointed as the successor-in-interest to, and the representative of, the Debtors and their Estates for the retention, enforcement, settlement or adjustment of the Third-Party Payor Channeled Claims.

In accordance with Section 5.11(b) and (c) of the Plan, the Trustee shall receive copies of all Proofs of Claims for the Third-Party Payor Channeled Claims on the Effective Date, and shall be entitled to reasonably request and receive from NewCo such additional information and documents as reasonably necessary for the administration of the TPP Trust, which may include those medical, prescription or business records of the Debtors related to the Third-Party Payor Channeled Claims, which records shall be transferred from the Debtors to NewCo on the Effective Date.

## § 4.    ELIGIBILITY FOR TPP ABATEMENT DISTRIBUTIONS.

To qualify as a TPP Authorized Recipient and be entitled to receive TPP Abatement Distributions from the TPP Trust, each TPP Claimant must:

a. Have timely filed a Proof of Claim in the Debtors' Chapter 11 Cases (that is, on or before July 30, 2020) and checked the box identifying itself as a Third-Party Payor, or have timely filed a Proof of Claim and amended that Proof of Claim prior to the Effective Date of the Plan to properly identify itself as a Third-Party Payor;

b. **Timely submit an additional, completed form (the "TPP Abatement Claim Form," available at Appendix A) to the TPP Trust by the TPP Abatement Claim Deadline, which shall be no later than sixty (60) days after the Effective Date of the Plan[8] (the "TPP Abatement Claim Deadline") in accordance with the instructions provided with the TPP Abatement Claim Form; and**

c. Have provided in connection with such TPP Abatement Claim Form, by or before the TPP Abatement Claim Deadline, a calculation of its Purdue-Related Opioid Spend (as defined in Appendix B), utilizing the Maximum Eligible Amount Calculation Methodology (for each TPP Claimant, its "TPP Abatement Claim").[9]

Any TPP Claimant who meets all of the above criteria (a)-(c) (each such TPP Claimant, a "TPP Authorized Recipient") shall qualify for TPP Abatement Distributions, subject to the limitations otherwise set forth herein. **To receive a TPP Abatement Distribution from the TPP Trust, a TPP Authorized Recipient must also complete and return to the TPP Trust an IRS form W-9 or an IRS form W-8, as applicable. Copies of such forms are available at Exhibit 2 to this document.**

---

[8]    In the event that the deadline (i.e., the sixtieth day after the Effective Date) falls on a date that is not a Business Day, then the deadline shall be the next succeeding Business Day,

[9]    The Maximum Eligible Amount Calculation Methodology is attached as Appendix B.

FOR AVOIDANCE OF DOUBT, FOR A TPP CLAIMANT TO QUALIFY AS A TPP AUTHORIZED RECIPIENT AND BE ELIGIBLE TO RECEIVE A TPP ABATEMENT DISTRIBUTION, SUCH TPP CLAIMANT MUST HAVE (i) TIMELY FILED A PROOF OF CLAIM IDENTIFYING ITSELF AS A THIRD-PARTY PAYOR BY OR BEFORE THE GENERAL BAR DATE AND, (ii) MUST TIMELY SUBMIT A TPP ABATEMENT CLAIM FORM BY OR BEFORE THE TPP ABATEMENT CLAIM DEADLINE (THAT IS, SIXTY (60) DAYS AFTER THE EFFECTIVE DATE OF THE PLAN, AS SET FORTH BELOW), USING THE MAXIMUM ELIGIBLE AMOUNT CALCULATION METHODOLOGY, AND (iii) MUST PROVIDE A COMPLETED IRS FORM W-9 OR W-8 TO THE TPP TRUST. MORE DETAIL ABOUT EACH OF THESE POINTS IS PROVIDED BELOW.

(a)     **Initial Proof of Claim**

All TPP Claimants were required, in order to preserve their claims against the Debtors, to file Proofs of Claim by the General Bar Date (that is, July 30, 2020) established by the Bankruptcy Court. More than 467,108 such Proofs of Claim were filed (some as part of consolidated Proofs of Claim filed on behalf of numerous TPP Claimants). Many, though not all, were filed using estimated or unliquidated amounts.

Any TPP Claimant that did not timely file a Proof of Claim and check the box on the claimProof of Claim form identifying itself as a Third-Party Payor or that did not timely file a Proof of Claim and amend that claim before the Effective Date to properly identify itself as a Third-Party Payor is barred from asserting or seeking to enforce its Third-Party Payor Channeled Claim, pursuant to the Bar Date Order, and shall not be a TPP Authorized Recipient or eligible to receive a TPP Abatement Distribution from the TPP Trust.

(b)     **TPP Abatement Claim Deadline**

All TPP Claimants that timely filed a Proof of Claim on or before July 30, 2020 shall be required to submit a TPP Abatement Claim Form by the TPP Abatement Claim Deadline. Any TPP Claimant that does not submit a TPP Abatement Claim Form shall not qualify as a TPP Authorized Recipient, and any TPP Claimant that submits a TPP Abatement Claim Form after the TPP Abatement Claim Deadline shall not qualify as a TPP Authorized Recipient, and shall have no right to any distribution from the TPP Trust. No TPP Abatement Claim Form shall be accepted after the TPP Abatement Claim Deadline, unless that TPP Claimant has made a written request for an extension to the Trustee prior to the TPP Abatement Claim Deadline, and that request has been granted by the Trustee in writing. Requests for extension must be **actually received** by the Trustee prior to the TPP Abatement Claim Deadline, and the determination as to whether to grant any requested extension is wholly within the discretion of the Trustee.

The TPP Abatement Claim Form requires all TPP Claimants to use the Maximum Eligible Amount Calculation Methodology to determine the amount of their Purdue-Related Opioid Spend, which shall be used to determine the maximum amount they are eligible to receive as a TPP Abatement Distribution. However, the actual amount of the TPP Abatement Distribution to a TPP Authorized Recipient will depend on the total dollar amounts of (i) the TPP Abatement

Distribution to all TPP Authorized Recipients and (ii) the Purdue-Related Opioid Spend of all TPP Authorized Recipients.

The TPP Abatement Claim Form (including instructions for the required calculations and the deadlines and instructions for the submission of such TPP Abatement Claim Form on the website to be maintained by the TPP Trust) will be distributed by the Trustee (or an agent thereof) to each TPP Claimant that timely filed a Proof of Claim promptly after the Effective Date and in no event more than three business days after the Effective Date (such notice, the "TPP Abatement Distribution Claim Form Notice"). The TPP Abatement Claim Form Notice will make it clear that after the TPP Abatement Claim Forms are reviewed by the Trustee, the TPP website will be the sole form of notice of the TPP Trust's determination of the TPP Abatement Distribution amount each TPP Authorized Recipient is to receive. The deadline for the posting of such determinations on the website is described in Section 5(a) herein.

As set forth in more detail in the instructions attached to the TPP Abatement Claim Form, for those claims TPP Abatement Claims that are being submitted on a consolidated basis for multiple TPP Claimants, the filer shall provide aggregate information in Part 3 of the TPP Abatement Claim Form, and attach a chart identifying the TPP Claimants or spreadsheet containing such aggregate information. For each TPP Claimant included in the consolidated claim, the last five TPP Abatement Claim Form, the chart or spreadsheet shall provide: (i) the name of the TPP Claimant, or if a unique identifier (rather than the TPP Claimant's name) was used in connection with the previously filed Proof of Claim, the unique identifier; (ii) the last four digits of each that TPP Claimant's federal tax identification number ("FEIN") or other unique identifier acceptable to and approved by the Trustee, and; (iii) the responses to each of questions 1 through 6 in the instructions accompanying the TPP Abatement Claim Form (described as the Maximum Eligible Amount Calculation Methodology) for that TPP Claimant, (iv) the dollar amount of that TPP Claimant's claim Purdue-Related Opioid Spend, as calculated pursuant to the instructions set forth in this TDP, and (v) the claim number of the previously filed Proof of Claim.

A TPP Claimant (or its attorney) must deliver, as part of the TPP Abatement Claim Form, a certification signed by the TPP Claimant or its attorney attesting to the accuracy and truthfulness of the TPP Claimant's submission. Such certification must include an attestation that the TPP Claimant utilized the Maximum Eligible Amount Calculation Methodology to determine the Purdue-Related Opioid Spend of its TPP Abatement Claim and that no data required for claims processing and valuation, and no records or information that would reasonably be relevant to the valuation of the claim TPP Abatement Claim, have been misrepresented or omitted.

A TPP CLAIMANT THAT FILED AN INITIAL PROOF OF CLAIM MUST TIMELY SUBMIT A TPP ABATEMENT CLAIM FORM IN ORDER TO QUALIFY AS A TPP AUTHORIZED RECIPIENT AND TO BE ELIGIBLE FOR TPP ABATEMENT DISTRIBUTIONS FROM THE TPP TRUST. TPP ABATEMENT DISTRIBUTIONS FROM THE TPP TRUST SHALL BE THE SOLE SOURCE OF RECOVERY IN RESPECT OF THIRD-PARTY PAYOR CHANNELED CLAIMS, AND NO TPP CLAIMANT SHALL HAVE ANY OTHER OR FURTHER RECOURSE TO THE DEBTORS OR THEIR ESTATES, THE TPP TRUST OR ANY OTHER RELEASED PARTY OR SHAREHOLDER RELEASED PARTY IN RESPECT OF ITS THIRD-PARTY PAYOR CHANNELED CLAIMS.

(c)    **Use of Maximum Eligible Amount Calculation Methodology to Determine Purdue-Related Opioid Spend**

In addition to the requirements set forth above, each TPP Claimant must use the Maximum Eligible Amount Calculation Methodology to identify its Purdue-Related Opioid Spend on a TPP Abatement Claim Form in order to qualify as a TPP Authorized Recipient and to be eligible to receive a TPP Abatement Distribution hereunder. On the TPP Abatement Claim Form, each TPP Claimant must set forth, inter alia, the total amount of its Purdue-Related Opioid Spend, certifying that it used the Maximum Eligible Amount Calculation Methodology, as set forth on Appendix B attached hereto, to calculate its Maximum Eligible Amount (as defined below).

TPP Claimants shall not be required to submit the data underlying the amount of their Purdue-Related Opioid Spend with the TPP Abatement Claim Form but shall promptly provide supporting documentation and data, if and when requested by the Trustee, sufficient to enable confirmation of the amounts.

(d)    **The Submission of IRS Form W-9 or IRS Form W-8 to the TPP Trust**

Each TPP Claimant must also furnish to the Trustee in writing his, her or its name, address, Employer or Taxpayer Identification Number as assigned by the IRS and a completed IRS Form W-9 or, if applicable, IRS Form W-8. Such form may be submitted with the TPP Abatement Claim Form or may be sent separately via email to [●]. **If such completed form is not received by the Trustee within three hundred sixty-five days (365) days of the TPP Abatement Claim Form Notice, which shall include notice of the deadline for submitting a completed IRS Form W-9 or W-8, each such TPP Claimant shall be deemed to have forfeited his/her/its entire interest in the TPP Trust, any and all claims to the TPP Trust Assets, and all rights to any TPP Abatement Distribution under the TPP TDP, the TPP Trust Agreement, the Plan and Confirmation Order, and such forfeited amounts shall re-vest in the TPP Trust to be distributed to other TPP Authorized Recipients.**

## § 5.    DETERMINATION OF TPP ABATEMENT DISTRIBUTIONS.

(a)    **Claims Review and Reconciliation**

The Trustee shall review the timely submitted TPP Abatement Claim Forms.

As part of this review and aggregation process, the Trustee and Trust Professional(s) shall identify and eliminate duplicative ~~claims~~TPP Abatement Claims, if any, submitted by more than one TPP Authorized Recipient (e.g., by a Self-Funded Health Plan[10] independently and as an

---

[10]    The term Self-Funded Health Plan ("SFHP") means a health or disability benefits plan provided by an employer, association, union, or other such entity (the "entity") to its employees, members, or other such beneficiaries entitled to receive benefits under the plan, using the entity's own funds, whereby the entity assumes most of the financial risk relating to health insurance. A SFHP may secure stop-loss coverage from an insurer only to cover unexpectedly large or catastrophic claims.

ASO[11] ~~encompassed by a TPP Authorized Recipient filing an aggregate Proof of~~included in a consolidated TPP Abatement Claim Form) to ensure a TPP Authorized Recipient does not receive multiple TPP Abatement Distributions in connection with the same Purdue-Related Opioid Spend. In the event that the Trustee identifies TPP Abatement Claims as duplicative, the Trustee (or Trust Professionals acting on behalf of the Trustee) shall notify the submitting parties via email of the duplication and request joint written instructions or alternatively, instruction from the Self-Funded Health Plan that submitted on its own behalf within thirty (30) days of the date of the email, as to which TPP Abatement Claim should be deemed withdrawn. Absent such timely instructions, the Trustee shall treat the TPP Abatement Claim Form submitted earlier in time as the TPP Abatement Claim Form for notice and distribution purposes, and the other TPP Abatement Claims shall be deemed disqualified.

No later than 270 days after the TPP Abatement Claim Deadline, the Trustee shall cause the website [www._____.com] to be updated to reflect the TPP Trust's determination of the maximum amounts eligible to be distributed to TPP Authorized Recipients (with respect to each TPP Authorized Recipient, its "Maximum Eligible Amount") and initial percentage of total TPP Abatement Distributions represented by such Maximum Eligible Amount (with respect to each TPP Authorized Recipient, its "Initial Allocation Percentage"). This will require that the TPP Trust match the TPP Abatement Claim Forms to the Proofs of Claim that were timely filed as Third-Party Payor Channeled Claims in connection with the General Bar Date,  review the TPP Abatement Claim Forms and any supporting documentation and data, make determinations about the amount and validity of the ~~Maximum Eligible Amounts~~TPP Abatement Claims submitted by TPP Authorized Recipients, and eliminate any duplicative TPP Abatement Claims or TPP Abatement Claim Forms that request TPP Abatement Distributions for the same Purdue-Related Opioid Spend. The Maximum Eligible Amount may be shown as zero dollars ($0) and the TPP Abatement Claim disqualified in its entirety, or may be an amount different from that asserted on the TPP Abatement Claim Form, as appropriate, if no Proof of Claim was timely filed in connection with the General Bar Date, if no TPP Abatement Claim Form was timely submitted by the TPP Abatement Claim Deadline, if the TPP Claimant did not fully comply with the requirements of the TPP Abatement Claim Form and instructions, if the TPP Claimant was directed to provide the TPP Trust with documentation or data and did not promptly do so, or on any other basis. The Trustee's determination as to the Maximum Eligible Amount of each TPP Abatement Claim shall be the amount reflected on the updated website.

Each TPP Authorized Recipient's Initial Allocation Percentage will be calculated by dividing (i) the final dollar amount of such TPP Authorized Recipient's Maximum Eligible Amount by (ii) the total dollar amount of all TPP Authorized Recipients' Maximum Eligible Amounts plus the disputed, unresolved ~~Third-Party Payor Channeled~~TPP Abatement Claims for which funds must be reserved (see below).

Within five business days of updating the website to reflect the TPP Trust's determination of the maximum amounts eligible to be distributed to TPP Authorized Recipients, the Trustee will, via email, notify each TPP Claimant ~~who~~that has submitted or is included in a TPP Abatement

---

[11]   Self-Funded Health Plans for which a Third-Party Payor performs administrative services only are referred to herein as Administrative Services Only customers or "ASO" or "ASO customers."

Claim Form (via notice to the representative identified as the notice party on the TPP Abatement Claim Form) that the website has been updated. For avoidance of doubt, with respect to consolidated TPP Abatement Claims included in one TPP Abatement Claim Form, email notice will be sent only to the notice party identified on the TPP Abatement Claim Form.

      (b)    **Challenges to Determinations by the TPP Trust**

TPP Authorized Recipients will have thirty (30) days from the date that the Trustee emails notice of the updating of the TPP Trust website as set forth in Section 5(a) hereof, to submit a letter or letters to the TPP Trust, by submitting such letter or letters on the TPP Trust website, challenging the TPP Trust's determination regarding its Maximum Eligible Amount or Initial Allocation Percentages and/or the Maximum Eligible Amounts or Initial Allocation Percentages of any other TPP Authorized Recipient (the "Challenge Deadline"). A separate letter must be submitted for each challenged Maximum Eligible Amounts and/or Initial Allocation Percentages.

A TPP Authorized Recipient may challenge the Maximum Eligible Amounts and/or Initial Allocation Percentages of as many other TPP Authorized Recipients as it wishes, though each challenge must be made separately by one TPP Authorized Recipient against a single other TPP Authorized Recipient, made on a good faith basis, and accompanied by a detailed letter identifying the basis or bases for the challenge. A TPP Claimant that did not timely file a Proof of Claim and does not timely submit a TPP Abatement Claim Form shall not have the right to challenge the amount of any other TPP Authorized Recipient's Maximum Eligible Amounts and/or Initial Allocation Percentages.

The TPP Trust will have up to forty-five (45) days after the Challenge Deadline to resolve challenges (the "Resolution Deadline"). If a TPP Abatement Claim has been timely challenged and no agreement can be reached between the TPP Trust and the TPP Authorized Recipient or TPP Authorized Recipients (i.e., the TPP Authorized Recipient challenging the determination of the TPP Trust, and in the event that the challenge relates to the Maximum Eligible Amount and/or Initial Allocation Percentage of a different TPP Authorized Recipient, that TPP Authorized Recipient), the TPP Authorized Recipient that brought the challenge has the right to file a motion with respect to such challenge with the Bankruptcy Court, within thirty (30) days from the Resolution Deadline (the "Motion Deadline").

**If there is a timely challenge, the amount of the challenged Maximum Eligible Amount and/or Initial Allocation Percentage shall be determined by negotiated resolution if possible, or, in the absence of agreement, (i) the TPP Trust's determination of the Maximum Eligible Amount and/or Initial Allocation Percentage will control, if no motion is timely filed with the Bankruptcy Court, and (ii) by or before the Motion Deadline. If a motion is timely filed, the amount of the Maximum Eligible Amount and/or Initial Allocation Percentage will be determined by the Bankruptcy Court, if a motion is timely filed.**

If appropriate due to a successful challenge, the Trustee shall modify one or more amounts of Maximum Eligible Amounts and/or Initial Allocation Percentages accordingly.

Challenges that do not result in a change to the amount of any Maximum Eligible Amount and/or Initial Allocation Percentages shall be deemed unsuccessful and the challenging TPP Authorized Recipient shall be charged for all fees and expenses associated with adjudicating the failed challenge, including all time spent by the Trustee and associated TPP Trust professionals; such fees and expenses shall be subtracted from the challenging TPP Authorized Recipient's TPP Abatement Distribution payment. To the extent that the challenging TPP Authorized Recipient's TPP Abatement Distribution payment is insufficient to fully reimburse such expenses, the challenging TPP Authorized Recipient and the challenging TPP Authorized Recipient's professionals that filed the unsuccessful challenge shall be liable for payment of all fees and expenses associated with adjudicating the failed challenge, including all time spent by the Trustee and associated Trust Professionals.

If no challenge is timely received, the TPP Trust's determination shall become a final determination as to the amount of that Maximum Eligible Amount and/or Initial Allocation Percentage (with the allocation percentage being subject to adjustment based on the outcome of other challenges).

Promptly following the ~~Challenge~~Motion Deadline, the Trustee shall cause the website [www._____.com] to be updated to reflect the final determination of each TPP Authorized Recipient's Maximum Eligible Amount and/or Initial Allocation Percentage, which shall become such TPP Authorized Recipient's "Final Allocation Percentage." The website shall also reflect which, if any, ~~Third-Party Payor Channeled~~TPP Abatement Claims continue to be subject to dispute as a result of timely filed motions.

## § 6.    TPP ABATEMENT DISTRIBUTIONS BY TPP TRUST.

(a)    **Timing and Manner of Distributions**.

There will be three annual distributions by the TPP Trust, and the TPP Trust will provide a distribution report on the TPP Trust website in advance of each of the distributions.

The first distribution report will be due on ~~the~~or before February 15, 2023 (or, if February 15, 2023 is not a Business Day, the next Business Day), provided that February 15, 2023 is at least fifteen (15) months after the Effective Date. If it is not, the first distribution report will be due on the date that is fifteen (15) months after the Effective Date. The second and third distribution reports will be due on or before one year and two years, respectively, after the date of the filing of the first distribution report.

**Distributions to TPP Authorized Recipients will begin thirty (30) days after the filing of each distribution report, with the date on which that distribution begins being a "~~distribution date~~Distribution Date."**

The maximum amount each TPP Authorized Recipient shall be allowed to receive from a distribution shall be equal to the total gross distributable amount for all TPP Authorized Recipients eligible to receive TPP Abatement Distributions, multiplied by each TPP Authorized Recipient's Final Allocation Percentage, all subject to any amounts reserved on account of disputed Third-Party Payor Channeled Claims, consistent with Section 7. The existence of a

Final Allocation Percentage for a particular TPP Authorized Recipient does not entitle that TPP Authorized Recipient to receive any funds, however, unless it has also complied with the terms of the TPP Trust and the funding of delineated opioid abatement initiatives therein.

At the option of the Trustee, any Cash payment may be made by a check or wire transfer or as otherwise required or provided in the TPP Trust Agreement.

### (b)    *De Minimis* **Distributions**

The Trustee shall not be required to make any TPP Abatement Distributions of Cash in an amount less than $100, or such lower amount as determined by the Trustee in accordance with the TPP Trust Agreement to any TPP Authorized Recipient; provided, however, that if any TPP Abatement Distribution is not made pursuant to this Section, such TPP Abatement Distribution shall be added to any subsequent TPP Abatement Distribution to be made to such TPP Authorized Recipient. The Trustee shall not be required to make any final distribution of Cash in an amount less than $100 to any TPP Authorized Recipient. If the amount of any final TPP Abatement Distribution to any TPP Authorized Recipient would be $100 or less, then such distribution shall be made available for distribution to all TPP Authorized Recipients receiving final distributions of at least $100.

In the event that following all distributions and upon completion of the TPP Trust's tasks, the TPP Trust is left with *de minimis* funds, the Trustee may ~~make a donation of~~donate such *de minimis* funds to an IRS accredited charity.

### (c)    **Undeliverable Distributions; Uncashed Checks**

In the event that any TPP Abatement Distribution is returned as undeliverable, no TPP Abatement Distribution shall be made to such TPP Authorized Recipient (or its designated agent) unless and until the Trustee is notified in writing of such TPP Authorized Recipient's (or its authorized representative's) then-current address, at which time or as reasonably practicable thereafter, such TPP Abatement Distribution shall be made without interest, subject to the limitations of the following paragraph. The Trustee may, in his or her sole discretion, attempt to determine a TPP Authorized Recipient's current address or otherwise locate a TPP Authorized Recipient but nothing in this TPP TDP, the TPP Trust Agreement or the Plan shall require the Trustee to do so.

In the event that a TPP Abatement Distribution is returned as undeliverable or otherwise unclaimed for a period of six (6) months after the Distribution Date, and no updated address information is provided during that time, such Distribution shall be deemed unclaimed property within the meaning of section 347(b) of the Bankruptcy Code, the TPP Authorized Recipient shall be deemed to have forfeited its/her/his entire interest in the TPP Trust, no further TPP Abatement Distribution shall be made to or for the benefit of such TPP Authorized Recipient, the TPP Abatement Claim(s) of such TPP Authorized Recipient shall be discharged and forever barred from receiving Distributions under this TPP TDP, the TPP Trust Agreement, the Plan and Confirmation Order, and all title to and beneficial interest in the TPP Trust Assets represented by any such undeliverable TPP Abatement Distributions shall be cancelled and revert to and/or remain in the TPP Trust automatically and without need for a further order of the Bankruptcy

Court (notwithstanding any applicable federal, provincial or state escheat, abandoned or unclaimed property laws to the contrary), and shall be redistributed in accordance with the Plan, the TPP Trust Agreement, and this TPP TDP. Assessments to the Common Benefit Escrow (and, later, the Common Benefit Fund) of 5% of each TPP Abatement Distribution shall be paid pursuant to Section 5.8 of the Plan.

Likewise, in the event any check in respect of a TPP Abatement Distribution to a TPP Authorized Recipient or its authorized representative has not been cashed or otherwise negotiated within six (6) months of the date of such TPP Abatement Distribution, such check shall be cancelled by stop payment or otherwise and no additional TPP Abatement Distribution(s) shall be made to such TPP Authorized Recipient or representative on account of such TPP Abatement Claim, such TPP Abatement Distribution shall be deemed unclaimed property within the meaning of section 347(b) of the Bankruptcy Code, the TPP Authorized Recipient shall be deemed to have forfeited its/her/his entire interest in the TPP Trust, and the Third-Party Payor Channeled Claims of the TPP Authorized Recipient shall be discharged and forever barred from receiving TPP Abatement Distributions under this TPP TDP, the TPP Trust Agreement, the Plan and Confirmation Order. After such date, all uncashed TPP Abatement Distributions shall become Trust property and revert to the TPP Trust, and shall be redistributed in accordance with the Plan, the TPP Trust Agreement and this TPP TDP.

## § 7.   TREATMENT OF DISPUTED ~~THIRD-PARTY PAYOR CHANNELED~~TPP ABATEMENT CLAIMS.

If thirty (30) days prior to the due date of a distribution report, ~~a~~the Maximum Eligible Amount and/or Initial Allocation Percentage of a TPP Abatement Claim remains disputed, funds shall be reserved on account of that Maximum Eligible Amount and/or Initial Allocation Percentage. Once the Trustee or the Bankruptcy Court, as applicable, makes a determination as to the amount of the TPP Authorized Recipient's Maximum Eligible Amount and/or Initial Allocation Percentage, that TPP Authorized Recipient may be entitled to a "catch-up" payment in connection with the next distribution report and ~~distribution date~~Distribution Date, consistent with the determination.

**THE TPP TRUST SHALL NOT BE REQUIRED TO RESERVE FUNDS FOR A DISPUTED TPP ABATEMENT CLAIM UNLESS A TPP CLAIMANT TIMELY SATISFIED THE REQUIREMENTS OF SECTIONS 3 AND 5 HEREIN, INCLUDING BUT NOT LIMITED TO HAVING FILED (I) A PROOF OF CLAIM BY OR BEFORE THE GENERAL BAR DATE AND (II) A TPP ABATEMENT CLAIM FORM~~, UTILIZING THE MAXIMUM ELIGIBLE AMOUNT CALCULATION METHODOLOGY,~~ BY OR BEFORE THE TPP ABATEMENT CLAIM DEADLINE UTILIZING THE MAXIMUM ELIGIBLE AMOUNT CALCULATION METHODOLOGY. A TPP CLAIMANT THAT FAILED TO TIMELY FILE A PROOF OF CLAIM OR TIMELY SUBMIT A TPP ABATEMENT CLAIM FORM UTILIZING THE MAXIMUM ELIGIBLE AMOUNT CALCULATION METHODOLOGY SHALL HAVE NO CLAIM AGAINST THE TPP TRUST AND NO RIGHT TO ANY TPP ABATEMENT DISTRIBUTION FROM THE TPP TRUST.**

## § 8.   USE OF TPP ABATEMENT DISTRIBUTIONS.

TPP Authorized Recipients are required to use all net funds distributed to them from the TPP Trust solely and exclusively for TPP Authorized Abatement Purposes which consist of (i) Approved MAT Expenses and Approved Uses/Programs[12] and (ii) the payment of attorneys' fees and costs; provided, that a TPP Authorized Recipient that makes the certification required under Sections 8 and 9 regarding minimum spending requirements will be deemed to have used the funds received as a TPP Abatement Distribution for TPP Authorized Abatement Purposes; provided, further that such certification may be subject to audit by the TPP Trust.

A TPP Authorized Recipient that receives a TPP Abatement Distribution from the TPP Trust must certify, pursuant to Section 9, that it has spent on an enterprise-wide basis (including parents, subsidiaries, charitable organizations, and affiliate companies), an aggregate amount equal to or exceeding its share of the annual TPP Abatement Distribution for TPP Authorized Abatement Purposes, and that it has complied with this Section, during the Distribution Period.[13] A TPP Authorized Recipient that submitted an aggregate Proof of Claim on behalf of ASO customers may distribute amounts received to ASO customers; provided that the TPP Authorized Recipient will certify, pursuant to Section 9 herein, that it has spent on an enterprise-wide basis (including parents, subsidiaries, charitable organizations, affiliate companies and ASO customers), an aggregate amount equal to or exceeding its TPP Abatement Distribution for TPP Authorized Abatement Purposes, and that it has complied with this Section 8, during the Distribution Period. An ASO customer included in an aggregate Proof of Claim will not be subject to independent certification or usage requirements relating to the ASO's share of the TPP Abatement Distribution.

The TPP Trust shall, in accordance with the Plan, the Confirmation Order and the applicable AbatementTPP Trust Documents, make TPP Abatement Distributions to TPP Authorized Recipients exclusively for TPP Authorized Abatement Purposes. Decisions made by the TPP Trust concerning Abatement Distributions will consider the need to ensure that underserved urban and rural areas, as well as minority communities, receive equitable access to the funds.

     (a)    **Approved MAT Expenses and Approved Uses/Programs**

TPP Authorized Abatement Purposes include Approved MAT Expenses and Approved Uses/Programs.

Approved MAT Expenses shall include all or part of the costs paid by TPP Authorized Recipients for Allowed MAT Therapy as defined in Appendix C attached hereto.

---

[12]    See Appendices C and D hereto.

[13]    The Distribution Period is defined as the twelve (12) month period following each annual distribution dateDistribution Date.

Approved Uses/Programs focus on providing treatment of Opioid Use Disorder ("OUD") and/or any Substance Use Disorder or Mental Health ("SUD/MH") and are defined in Appendix D attached hereto.[14]

(b)     **Requirements for Self-Funded Health Plans**

In each Distribution Period, a TPP Authorized Recipient that qualifies as a Self-Funded Health Plan: i) must have spent an aggregate amount at least equal to, or exceeding, its TPP Abatement Distribution for TPP Authorized Abatement Purposes as described in both Appendices C and D hereto; and ii) must have spent an aggregate amount at least equal to, or exceeding, 50% of the Self-Funded Health Plan's TPP Abatement Distribution on Approved Uses/Programs as described in Appendix D hereto. This provision does not apply to the extent a Self-Funded Health Plan is an ASO included in an aggregate Proof of Claim.

(c)     **Requirements for all TPPs other than Self-Funded Health Plans**

In each Distribution Period, a TPP Authorized Recipient (including a TPP Authorized Recipient that filed an aggregate Proof of Claim on behalf of ASOs), other than a Self-Funded Health Plan that independently filed a Proof of Claim: i) must have spent on an enterprise-wide basis (including parents, subsidiaries, charitable organizations, affiliate companies and ASO customers), an aggregate amount at least equal to, or exceeding, its TPP Abatement Distribution for TPP Authorized Abatement Purposes as described in both Appendices C and D hereto; and ii) must have spent on an enterprise-wide basis (including parents, subsidiaries, charitable organizations, affiliate companies and ASO customers), an aggregate amount at least equal to, or exceeding, 50% of the TPP Authorized Recipient's TPP Abatement Distribution on Approved Uses/Programs as described in Appendix D hereto.

## § 9.     REPORTING BY TPP AUTHORIZED RECIPIENTS.

Within ninety (90) days after the end of a Distribution Period, each TPP Authorized Recipient that received a TPP Abatement Distribution, other than an ASO included in an aggregate Proof of Claim, must submit to the TPP Trust a certification regarding its satisfaction of the minimum spending requirements on TPP Authorized Abatement Purposes or that it was unable to meet the minimum spending requirements and must carryover a portion of its TPP Abatement Distribution.

If a TPP Authorized Recipient that received a TPP Abatement Distribution is unable to meet or has not met the minimum spending requirements set forth in Section 8 above during the Distribution Period, those allocated but unused funds can carry over to the subsequent periods and will continue to carry forward each year until the TPP Authorized Recipient meets the relevant spending requirements for TPP Authorized Abatement Purposes. Additional annual certification(s) must be submitted until the TPP Authorized Recipient meets the relevant spending requirements. A TPP Authorized Recipient shall not be subject to a penalty for failing

---

[14]   As used herein, words like "expand," "fund," "provide" or the like shall not indicate a preference for new or existing programs.

to meet the minimum spending requirements with respect to its TPP Abatement Distribution during a given Distribution Period.

The TPP Trust shall have the right to audit a ~~claimant~~TPP Authorized Recipient to determine whether the TPP Authorized Recipient's expenditures for TPP Authorized Abatement Purposes have met the requirements set forth in the TPP Trust Documents.

Each TPP Authorized Recipient, other than an ASO included in an aggregate Proof of Claim, if and when requested by the Trustee, shall provide supporting documentation, in a mutually agreed upon format, demonstrating that the TPP Authorized Recipient's expenditures for TPP Authorized Abatement Purposes have met the requirements of the TPP Trust Documents. All Proofs of Claim, TPP Abatement Claim Forms and certifications filed or submitted by TPP Claimants are subject to audit by the Trustee, at the Trustee's discretion. If the Trustee finds a material misstatement in a TPP Claimant's Proof of Claim, TPP Abatement Claim Form or certification, the Trustee may allow that TPP Claimant up to 30 days to resubmit its Proof of Claim, TPP Abatement Claim Form or certification with supporting documentation or revisions. Failure of the TPP Claimant to timely correct its misstatement in a manner acceptable to the Trustee may result in forfeiture of all or part of the TPP Claimant's qualification as a TPP Authorized Recipient or right to receive TPP Abatement Distributions.

The Trustee shall have the power to take any and all actions that in the judgment of the Trustee are necessary or proper to fulfill the purposes of TPP Trust. The TPP Trust retains the right to seek return by legal means of any expenditures ~~which~~that fail to comply with the requirements of this TPP TDP.

## § 10.   ADDITIONAL REPORTING BY THE TPP TRUST.

The TPP Trust shall (i) prepare and deliver to the Master Disbursement Trust for publication annual reports on the disbursement and use of TPP Abatement Distributions from the TPP Trust and the compliance by TPP Authorized Recipients with the TPP Authorized Abatement Purposes set forth in the applicable TPP Trust Documents, and (ii) prepare and file with the Bankruptcy Court and on the TPP website, as soon as available, and in any event within one hundred and twenty (120) days following the end of each fiscal year, an annual report containing financial statements of the TPP Trust after each year that the TPP Trust is in existence. The annual report will contain, among other things, a summary regarding the number of claims resolved during the period covered by the financial statements, the status of any audits of TPP Authorized Recipients and any recommendations made by the Trustee relating to such audits.

~~The TPP Trust shall file an annual report on its website after each year that the TPP Trust is in existence, summarizing the distributions made from the TPP Trust and detailing the status of any TPP Authorized Recipient audits, and any recommendations made by the Trustee relating to such audits.~~

*[Remainder of Page Intentionally Left Blank]*

## APPENDICES AND EXHIBITS

**APPENDIX A: TPP Abatement Claim Form**

**APPENDIX B: Maximum Eligible Amount Calculation Methodology**

**APPENDIX C: Approved MAT Expenses**

**APPENDIX D: Approved Uses/Programs**


**EXHIBIT 1:  LRP Agreement**

**EXHIBIT 2:   IRS forms W-9 and W-8**

**APPENDIX A: TPP Abatement Claim Form**

**[To be filed on or prior to the Plan Supplement deadline]**

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| In re: | Chapter 11 |
| PURDUE PHARMA L.P., *et al.*, | Case No. 19-23649 (RDD) |
| Debtors. | (Jointly Administered) |

# Third-Party Payor Abatement Claim Form

**This form (this "TPP Abatement Claim Form") is only for Holders of Third-Party Payor Channeled Claims, as defined in the *[Fifth] Amended Joint Chapter 11 Plan of Reorganization of Purdue Pharma L.P. and Its Affiliated Debtors* (as modified, amended, or supplemented from time to time, and together with all exhibits and schedules thereto, the "Plan"),[1] that timely filed a Proof of Claim by the General Bar Date (July 30, 2020) established by the Bankruptcy Court (each, a "TPP Claimant").**

**If you are a TPP Claimant and want to have your TPP Abatement Claim reviewed by the TPP Trust that will come into existence upon the Effective Date of the Plan, you or your authorized representative must complete and submit this TPP Abatement Claim Form so that it received on or before [●], 2021 (the "TPP Abatement Claim Deadline"). You may file your TPP Abatement Claim Form using any of the following methods:**

| If by E-Submission: | If by standard or overnight | If by hand delivery: |
|---|---|---|
| Visit https://restructuring.primeclerk.com/purduepharma and click on the "Submit Third-Party Payor Channeled Claim Form" link | Purdue Pharma TPP Supplemental Claims c/o Prime Clerk, LLC One Grand Central Place 60 East 42nd Street, Suite 1440 New York, NY 10165 | Purdue Pharma TPP Supplemental Claims c/o Prime Clerk, LLC One Grand Central Place 60 East 42nd Street, Suite 1440 New York, NY 10165  If you plan to hand deliver your TPP Abatement Claim Form to Prime Clerk's office, please email _____@primeclerk.com at least one business day in advance to arrange delivery. |

**Instructions regarding how to calculate your claim are attached to this TPP Abatement Claim Form.**

**For questions regarding this TPP Abatement Claim Form, please call [_____] or visit [WEBSITE].**

---

[1] Capitalized terms used herein and not otherwise defined shall have the meanings ascribed to them in the Plan or the TPP TDP.

*Notwithstanding a previously filed Proof of Claim in In re Purdue Pharma L.P., et al., Case No. 19-23649 (RDD), failure to submit this TPP Abatement Claim Form by the TPP Abatement Claim Deadline ([●], 2021) will result in disqualification of your Proof of Claim and will mean that you are not entitled to any distribution from the TPP Trust.*

**PURSUANT TO THE PLAN, ALL THIRD-PARTY PAYOR CHANNELED CLAIMS AGAINST THE DEBTORS IN THESE CHAPTER 11 CASES WILL BE CHANNELED TO THE TPP TRUST UPON THE EFFECTIVE DATE, AND THE ONLY POTENTIAL SOURCE OF DISTRIBUTIONS TO HOLDERS OF THIRD-PARTY PAYOR CHANNELED CLAIMS WILL BE TPP ABATEMENT DISTRIBUTIONS FROM THE TPP TRUST. AS SET FORTH IN THE PLAN, TPP ABATEMENT DISTRIBUTIONS TO HOLDERS OF THIRD-PARTY PAYOR CHANNELED CLAIMS BY THE TPP TRUST MUST BE USED FOR TPP AUTHORIZED ABATEMENT PURPOSES.**

**IN ORDER TO HAVE THE TPP TRUST REVIEW AND MAKE A DETERMINATION OF YOUR MAXIMUM ELIGIBLE AMOUNT, IF ANY, OF YOUR TPP ABATEMENT CLAIM, YOU MUST HAVE TIMELY FILED A PROOF OF CLAIM BY THE GENERAL BAR DATE IN THESE CHAPTER 11 CASES AND YOU MUST TIMELY FILE THIS TPP ABATEMENT CLAIM FORM BY OR BEFORE THE TPP ABATEMENT CLAIM DEADLINE SET FORTH ABOVE.**

| Part 1: | Identify the Proof of Claim |
|---|---|
| **1. Who is the current creditor?** | _____<br>Name of the entity to be paid for this claim (including other names the creditor used with the debtor, including d/b/a) |
| **2. What is the claim number of your previously filed Proof of Claim?** | Claim Number: _____ |
| **3. Has anyone else filed a claim on behalf of this creditor?** | _____<br>If yes, please provide the filer and the claim number<br>_____ |
| **4. Last 4 digits of creditor's federal tax identification number (FEIN)?** | FEIN:_____ |

| Part 2: | Notices and Distributions |
|---|---|

| | |
|---|---|
| **1. Who should receive notice?** | Name: _____ _____<br>First name        Middle name        Last name<br><br>Title: _____ _____<br><br>Company: _____ _____<br>Identify the corporate servicer as the company if the authorized agent is a servicer<br><br>Address: _____ _____<br>Number        Street<br><br>_____ _____<br>City        State        Zip code<br><br>Phone Number: _____<br><br>E-mail Address: _____ (required) |
| **2. Where should TPP Abatement Distributions be sent?** | Name: _____ _____<br>First name        Middle name        Last name<br><br>Title: _____ _____<br><br>Company: _____ _____<br>Identify the corporate servicer as the company if the authorized agent is a servicer<br><br>Address: _____ _____<br>Number        Street<br><br>_____ _____<br>City        State        Zip code |

| Part 3: | Amount of TPP Abatement Claim |
|---|---|
| **1. Total amount of the TPP Abatement Claim, as calculated by the methodology set forth in the instructions that begin on page 5 herein.** | Claim Amount: $ _____ |
| **2. Components of TPP Abatement Claim, per instructions for calculation.** | 1.  Number of creditor's plan members, subscribers, or covered dependents prescribed drugs identified on NDC List on Appendix A between 1/1/2008 and 12/31/2019.(Note: Count each member only once regardless of the number of prescriptions they had): _____<br><br>2.  Number of prescriptions paid by creditor for drugs in item 1: _____ |

| | |
|---|---|
| | 3. Total dollars paid by creditor for such prescriptions: _____ |
| | 4. Number of plan members in item 1 who were diagnosed with Opioid Use Disorder (Appendix B): _____ |
| | 5. For members in item 4, dollar amount of medical claims with ICD, CPT or HCPS codes (Appendix C): _____ |
| | 6. The total number of members, subscribers, and covered dependents covered by your plan or administered by your plan as of January 1, 2020:_____ |

| **Part 4:** | **Sign Below** |
|---|---|
| **The person completing this TPP Abatement Claim must sign and date it.**<br><br>**If you file this claim electronically, FRBP 5005(a)(2) establishes a local rule specifying what a signature is.**<br><br>**A person who files a fraudulent claim could be fined up to $500,000, imprisoned for up to 5 years, or both. 18 U.S.C. §§ 152, 157, and 3571.** | *Check the appropriate box:*<br>□ I am the creditor<br>□ I am the creditor's attorney or authorized agent<br><br>I understand that an authorized signature on this *TPP Abatement Claim Form* serves as an acknowledgement and certification that when calculating the amount of the TPP Abatement Claim, the Third-Party Payor on whose behalf the form is submitted has complied with the Maximum Eligible Amount Calculation Methodology set forth in the Instructions.<br><br>I have examined the information in this *TPP Abatement Claim Form* and have a reasonable belief that the information is true and correct.<br><br>I declare under penalty of perjury that the foregoing is true and correct.<br><br>_____<br>Signature<br><br>**Print the name of the person who is completing and signing this form**<br><br>Name: _____<br>     First name    Middle name    Last name<br><br>Title: _____<br><br>Company: _____<br>Identify the corporate servicer as the company if the authorized agent is a servicer<br><br>Address: _____<br>    Number    Street<br><br>_____<br>    City    State    Zip code |

**INSTRUCTIONS FOR TPP ABATEMENT CLAIM FORM**

**How to Calculate Your TPP Abatement Claim**

Each TPP Claimant (also referred to as "You" or "Your" throughout) shall provide information responsive to the questions set forth below, which shall set forth, *inter alia*, the total amount of Your Purdue-Related Opioid Spend, certifying that You used the Maximum Eligible Amount Calculation Methodology, as set forth below, to arrive at the amount. Each TPP Claimant, if and when requested by the TPP Trust Trustee, shall provide supporting documentation and data, in the requested format, underlying the TPP Claimant's calculation of its Purdue-Related Opioid Spend, sufficient to enable confirmation of the amount.

**Consolidated TPP Abatement Claims**

For those TPP Abatement Claims that are being submitted on a consolidated basis for multiple TPP Claimants, the filer shall provide aggregate information in Part 3 of the TPP Abatement Claim Form, and attach to the completed TPP Abatement Claim Form a chart identifying the TPP Claimants included in the consolidated TPP Abatement Claim.  For each TPP Claimant included in the consolidated TPP Abatement Claim, the chart shall provide: (i) the name of the TPP Claimant, or if a unique identifier (rather than the TPP Claimant's name) was used in connection with the previously filed Proof of Claim, the unique identifier; (ii) the last four digits of that TPP Claimant's federal tax identification number (FEIN); (iii) responses to each of questions 1 through 6 in these instructions; (iv) the amount of that TPP Claimant's TPP Abatement Claim, as calculated pursuant to the instructions below; and (v) the claim number of the previously filed Proof of Claim.

Filers of consolidated TPP Abatement Claims that provide unique identifiers rather than the names of the TPP Claimants in the charts that accompany their TPP Abatement Claims are required to submit charts with the names of the TPP Claimants that correspond to the unique identifiers directly to the TPP Trust by emailing such charts to [_____].  The names of such TPP Claimants shall not appear on the TPP website.

For avoidance of doubt: Filers of consolidated TPP Abatement Claims that used unique identifiers rather than the names of the TPP Claimants in connection with the Proofs of Claim filed by or before the General Bar Date shall use the same unique identifiers in connection with the filing of this TPP Abatement Claim Form, but are required to concurrently provide the TPP Trust with a chart that provides the unique identifier, the name of the TPP Claimant that corresponds to that identifier, the information required for each claimant under the TPP Claim Calculation Methodology below, the claim number of the previously filed Proof of Claim, and the amount of that TPP Claimant's TPP Abatement Claim.

**Maximum Eligible Amount Calculation Methodology**

For the period of January 1, 2008 through December 31, 2019, You must provide the following:

1. The number of unique members who were prescribed one or more of the drugs identified on the NDC List, attached as Appendix A. Count each member only once regardless of the number of prescriptions they had.
2. The number of unique prescriptions paid, all or in part, by Your plan for the drugs identified on the NDC List, attached as Appendix A.
3. The total final dollars paid by Your plan for the prescriptions for the drugs identified in 2 above.
4. The number of unique members identified in 1 above who were diagnosed with an Opioid Use Disorder, using one or more of the codes on the OUD ICD 9 and 10 List, attached as Appendix B.
5. For the members identified in 4 above, the total dollar amount of medical claims with the ICD, CPT, or HCPS codes on the OUD Medical Claims Codes List, attached as Appendix C, paid for those members.
6. The total number of members, subscribers and covered dependents covered by your

plan or administered by your plan as of January 1, 2020.

**The amount of Your TPP Abatement Claim (Part 3, question 1 of the TPP Abatement Claim Form) should be calculated by adding the answers to questions 3 and 5 of Part 3 of the TPP Abatement Claim Form.**

You shall provide information reasonably available to You and are not excused from providing the requested information for failure to appropriately investigate Your TPP Abatement Claim. You shall supplement Your responses if You learn that they are incomplete or incorrect in any material respect. You may append one or more pages to provide or supplement your responses hereto.

*You must leave out or redact* information that is entitled to privacy on this form or on any attached documents.

The documents that support your calculations need not be submitted with this TPP Abatement Claim Form. However, the TPP Trustee shall have the right to require that you provide such documentation promptly upon request.

**Confirmation that the TPP Abatement Claim**

**Form has been filed**

To receive confirmation that the TPP Abatement Claim has been filed, enclose a stamped self-addressed envelope and a copy of this completed form. You may also view a list of filed TPP Abatement Claims by visiting the Claims and Noticing Agent's website at [PurduePharmaClaims.com/_____]

*Information that is entitled to privacy.* The TPP Abatement Claim Form and any attached documents must show only the last 4 digits of any social security number, an individual's tax identification number, or a financial account number, only the initials of a minor's name, and only the year of any person's date of birth. If a claim is based on delivering health care goods or services, limit the disclosure of the goods or services to avoid embarrassment or disclosure of confidential health care information. You may later be required to give more information if the TPP Trustee so requests or someone else objects to the TPP Abatement Claim.

*Redaction of information.* Masking, editing out, or deleting certain information to protect privacy. Filers must redact or leave out information entitled to privacy on the TPP Abatement Claim Form and any attached documents.

# APPENDIX A: NDC LIST

| NDC | DRUG NAME |
|---|---|
| 42858000101 | oxyCODONE HCl |
| 42858000110 | oxyCODONE HCl |
| 42858000201 | oxyCODONE HCl |
| 42858000210 | oxyCODONE HCl |
| 42858000301 | oxyCODONE HCl |
| 42858000401 | oxyCODONE HCl |
| 42858000501 | oxyCODONE HCl |
| 42858004001 | HYDROcodone-Acetaminophen |
| 42858010201 | oxyCODONE-Acetaminophen |
| 42858010250 | oxyCODONE-Acetaminophen |
| 42858010301 | oxyCODONE-Acetaminophen |
| 42858010350 | oxyCODONE-Acetaminophen |
| 42858010401 | oxyCODONE-Acetaminophen |
| 42858010450 | oxyCODONE-Acetaminophen |
| 42858012201 | Dilaudid |
| 42858013901 | HYDROcodone-Acetaminophen |
| 42858020101 | HYDROcodone-Acetaminophen |
| 42858020150 | HYDROcodone-Acetaminophen |
| 42858020201 | HYDROcodone-Acetaminophen |
| 42858020301 | HYDROcodone-Acetaminophen |
| 42858020350 | HYDROcodone-Acetaminophen |
| 42858023401 | Dilaudid |
| 42858023450 | Dilaudid |
| 42858023801 | HYDROcodone-Acetaminophen |
| 42858030101 | HYDROmorphone HCl |
| 42858030125 | HYDROmorphone HCl |
| 42858030201 | HYDROmorphone HCl |
| 42858030225 | HYDROmorphone HCl |
| 42858030250 | HYDROmorphone HCl |
| 42858030301 | HYDROmorphone HCl |
| 42858030416 | HYDROmorphone HCl |
| 42858033801 | Dilaudid |
| 42858035340 | Buprenorphine |
| 42858041616 | Dilaudid |
| 42858049340 | Buprenorphine |
| 42858050103 | Buprenorphine HCl |
| 42858050203 | Buprenorphine HCl |
| 42858051501 | MS Contin |
| 42858058640 | Buprenorphine |
| 42858063101 | MS Contin |

| NDC | DRUG NAME |
|-----|-----------|
| 42858075040 | Buprenorphine |
| 42858076001 | MS Contin |
| 42858079901 | MS Contin |
| 42858080101 | Morphine Sulfate ER |
| 42858080201 | Morphine Sulfate ER |
| 42858080301 | Morphine Sulfate ER |
| 42858080401 | Morphine Sulfate ER |
| 42858080501 | Morphine Sulfate ER |
| 42858083940 | Buprenorphine |
| 42858090001 | MS Contin |
| 42858090103 | TRAMADOL HCL ER |
| 42858090203 | TRAMADOL HCL ER |
| 42858090303 | TRAMADOL HCL ER |
| 59011010010 | OXYCONTIN |
| 59011010020 | OXYCONTIN |
| 59011010025 | OXYCONTIN |
| 59011010310 | OXYCONTIN |
| 59011010320 | OXYCONTIN |
| 59011010325 | OXYCONTIN |
| 59011010510 | OXYCONTIN |
| 59011010520 | OXYCONTIN |

| NDC | DRUG NAME |
|-----|-----------|
| 59011010525 | OXYCONTIN |
| 59011010610 | NULL |
| 59011010710 | OXYCONTIN |
| 59011010720 | OXYCONTIN |
| 59011010725 | OXYCONTIN |
| 59011010910 | OXYCONTIN |
| 59011010925 | OXYCONTIN |
| 59011020110 | OXYIR |
| 59011022520 | OXYFAST |
| 59011026005 | MS CONTIN |
| 59011026010 | MS Contin |
| 59011026105 | MS CONTIN |
| 59011026125 | MS Contin |
| 59011026205 | MS CONTIN |
| 59011026210 | MS Contin |
| 59011026305 | MS CONTIN |
| 59011026310 | MS Contin |
| 59011026410 | MS Contin |
| 59011027160 | Hysingla ER |
| 59011027260 | Hysingla ER |
| 59011027360 | Hysingla ER |

| NDC | DRUG NAME |
|---|---|
| 59011027460 | Hysingla ER |
| 59011027560 | Hysingla ER |
| 59011027660 | Hysingla ER |
| 59011027760 | Hysingla ER |
| 59011031220 | PALLADONE |
| 59011031260 | PALLADONE |
| 59011031320 | PALLADONE |
| 59011031360 | PALLADONE |
| 59011031420 | PALLADONE |
| 59011031460 | PALLADONE |
| 59011031520 | PALLADONE |
| 59011031560 | PALLADONE |
| 59011033430 | RYZOLT |
| 59011033530 | RYZOLT |
| 59011033630 | RYZOLT |
| 59011041010 | OxyCONTIN |
| 59011041020 | OxyCONTIN |
| 59011041510 | OxyCONTIN |
| 59011041520 | OxyCONTIN |
| 59011042010 | OxyCONTIN |
| 59011042020 | OxyCONTIN |

| NDC | DRUG NAME |
|---|---|
| 59011043010 | OxyCONTIN |
| 59011043020 | OxyCONTIN |
| 59011044010 | OxyCONTIN |
| 59011044020 | OxyCONTIN |
| 59011044110 | DILAUDID |
| 59011044210 | DILAUDID |
| 59011044225 | Dilaudid |
| 59011044410 | Dilaudid |
| 59011044501 | Dilaudid-HP |
| 59011044505 | Dilaudid-HP |
| 59011044550 | DILAUDID-HP |
| 59011044625 | DILAUDID-HP |
| 59011045101 | Dilaudid |
| 59011045201 | Dilaudid |
| 59011045210 | Dilaudid |
| 59011045401 | Dilaudid |
| 59011045405 | Dilaudid |
| 59011045410 | Dilaudid |
| 59011045810 | Dilaudid |
| 59011046010 | OxyCONTIN |
| 59011046020 | OxyCONTIN |

| NDC | DRUG NAME |
|---|---|
| 59011048010 | OxyCONTIN |
| 59011048020 | OxyCONTIN |
| 59011075004 | Butrans |
| 59011075104 | Butrans |
| 59011075204 | Butrans |

| | |
|---|---|
| 59011075704 | Butrans |
| 59011075804 | Butrans |
| 59011081510 | OXYCONTIN |
| 59011083010 | OXYCONTIN |
| 59011086010 | OXYCONTIN |

## APPENDIX B: OUD ICD 9 AND 10 LIST

**ICD 9 Codes for OUD**:
304.00   OPIOID DEPENDENCE-UNSPECIFIED
304.01   OPIOID DEPENDENCE-CONTINUOUS
304.02   OPIOID DEPENDENCE-EPISODIC
304.03   OPIOID DEPENDENCE, IN REMISSION
304.70   OPIOID OTHER DEP-UNSPECIFIED
304.71   OPIOID OTHER DEP-CONTINUOUS
304.72   OPIOID OTHER DEP-EPISODIC
304.73   OPIOID OTHER DEP-IN REMISSION
305.50   OPIOID ABUSE-UNSPECIFIED
305.51   OPIOID ABUSE-CONTINUOUS
305.52   OPIOID ABUSE-EPISODIC
305.53   OPIOID ABUSE-IN REMISSION

**ICD 10 Codes for OUD**:
F11.1      Opioid abuse
F11.10      Opioid abuse, uncomplicated
F11.11      Opioid abuse, in remission
F11.12      Opioid abuse with intoxication
F11.120      Opioid abuse with intoxication, uncomplicated
F11.121      Opioid abuse with intoxication delirium
F11.122      Opioid abuse with intoxication with perceptual disturbance
F11.129      Opioid abuse with intoxication, unspecified
F11.13      Opioid abuse with withdrawal
F11.14      Opioid abuse with opioid-induced mood disorder
F11.15      Opioid abuse with opioid-induced psychotic disorder
F11.150      Opioid abuse with opioid-induced psychotic disorder with delusions
F11.151      Opioid abuse with opioid-induced psychotic disorder with hallucinations
F11.159      Opioid abuse with opioid-induced psychotic disorder, unspecified
F11.18      Opioid abuse with other opioid-induced disorder
F11.181       Opioid abuse with opioid-induced sexual dysfunction
F11.182      Opioid abuse with opioid-induced sleep disorder
F11.188      Opioid abuse with other opioid-induced disorder
F11.19      Opioid abuse with unspecified opioid-induced disorder
F11.20      Opioid Dependence uncomplicated
F11.21      Opioid Dependence in remission
F11.22      Opioid dependence with intoxication

| | |
|---|---|
| F11.220 | Opioid Dependence uncomplicated |
| F11.221 | Opioid Dependence delirium |
| F11.222 | Opioid dependence w intoxication with perceptual disturbance |
| F11.229 | Opioid Dependence unspecified |
| F11.23 | Opioid Dependence with withdrawal |
| F11.24 | Opioid Dependence with opioid-induced mood disorder |
| F11.25 | Opioid Dependence with opioid-induced psychotic disorder |
| F11.250 | Opioid Dependence with delusions |
| F11.251 | Opioid Dependence with hallucinations |
| F11.259 | Opioid Dependence unspecified |
| F11.28 | Opioid Dependence with other opioid-induced disorder |
| F11.281 | Opioid Dependence with opioid-induced sexual dysfunction |
| F11.282 | Opioid Dependence with opioid-induced sleep disorder |
| F11.288 | Opioid Dependence with other opioid-induced disorder |

## APPENDIX C: OUD MEDICAL CLAIMS CODES LIST

1. Medication Assisted Treatment (MAT): Assigned ICD-10 code F11.20 (convert to ICD-9 304.00, 304.01, and 304.02) for opioid dependence.

2. Visit type: Adult Wellness Visit (AWV) or acute visit for Opioid Use Disorder/Dependence Comprehensive evaluation of new patient or established patient for suitableness for buprenorphine treatment.

3. New Patient: code 99205, 99201

4. Established Patient: code 9921199215

5. Visit type: MAT medication induction.

6. Established Patient E/M: 99211–99215

7. Patient Consult: 99241-45(*)[2]

8. Telephonic: 99241 can only be used as telephonic prescriber-to-prescriber consultation regarding a patient. Patient cannot be present.

9. Prolonged visits codes (99354, 99355) (*)

10. 30-74 minutes: 99354(*)

11. 75-104 minutes: 99355(*)

12. 105+ minutes: 99354+99355x2(*)

13. Visit type: MAT medication/maintenance. Acute visit for OUD/opioid dependence.

14. Established Patient: 99212-15

15. SBIRT substance abuse and structured screening and brief intervention services: 99408 (can be offered and billed for naloxone education.)

16. CPT/Prof   HCPC/FAC

17. 99214 – E/M office visit/G0480 – UDT definitive

18. 99213 – E/M office visit/H0015 - IOP

19. 99285 – E/M ER visit/H2035 – drug treatment program per hour

---

[2] Codes followed by an asterisk (*) have been identified as frequently subject to abuse and are being reviewed.

20. 99215 – E/M office visit/G0481 – UDT definitive

21. 80307 – UDT presumptive/H0010 – acute/subacute detox

22. 99232 – E/M inpatient visit/H2036 - drug treatment program per diem

23. 99233 – E/M inpatient visit/G0463 – outpatient clinic visit

24. 99223 – E/M inpatient visit/H0011 - acute/subacute detox

25. 99284 – E/M ER visit/H0007 outpatient crisis intervention

26. 99204 – E/M office visit/G0482 – UDT definitive

27. 99231 – E/M inpatient visit/G0483 – UDT definitive

28. 99205 – E/M office visit/H0001 – alcohol and/or drug treatment assessment

29. 99220 – E/M observation/H0020 – alcohol and/or drug treatment – methadone administration

30. 99443 – E/M telephone service/H0050 – alcohol and/or drug treatment, brief intervention

31. 99283 – E/M ER visit/G0396 - alcohol and/or substance abuse structured assessment and brief intervention (15 to 30 mins)

32. 99212 – E/M office visit/G0397 - alcohol and/or substance abuse structured assessment and brief intervention (more than 30 mins)

33. 96372 - Therapeutic, prophylactic, or diagnostic injection (specify material injected); subcutaneous or intramuscular

34. J2315 - Injection, naltrexone, depot form, 1 mg

35. 3E023GC - Introduction of other therapeutic substance into muscle, percutaneous approach

36. 96372 - Therapeutic, prophylactic, or diagnostic injection (specify material injected); subcutaneous or intramuscular (same as Vivitrol)

37. Q9991 – Injection, buprenorphine extended-release (Sublocade), less than or equal to 100 mg

38. Q9992 – Injection, buprenorphine extended-release (Sublocade), greater than 100 mg

39. G2067 Medication assisted treatment, methadone; weekly bundle including dispensing and/or administration, substance use counseling, individual and group therapy, and toxicology testing, if performed (provision of the services by a Medicare-enrolled Opioid Treatment Program)

40. G2068 Medication assisted treatment, buprenorphine (oral); weekly bundle including dispensing and/or administration, substance use counseling, individual and group therapy, and toxicology testing if performed (provision of the services by a Medicare-enrolled Opioid Treatment Program)

41. G2069 – Medication assisted treatment, buprenorphine (injectable); weekly bundle including dispensing and/ or administration, substance use counseling, individual and group therapy, and toxicology testing if performed (provision of the services by a Medicare-enrolled Opioid Treatment Program)

42. G2070 Medication assisted treatment, buprenorphine (implant insertion); weekly bundle including dispensing and/or administration, substance use counseling, individual and group therapy, and toxicology testing if performed (provision of the services by a Medicare-enrolled Opioid Treatment Program)

43. G2071 Medication assisted treatment, buprenorphine (implant removal); weekly bundle including dispensing and/or administration, substance use counseling, individual and group therapy, and toxicology testing if performed (provision of the services by a Medicare enrolled Opioid Treatment Program)

44. G2072 Medication assisted treatment, buprenorphine (implant insertion and removal); weekly

bundle including dispensing and/or administration, substance use counseling, individual and group therapy, and toxicology testing if performed (provision of the services by a Medicare enrolled Opioid Treatment Program)

| 45. | G2073 Medication assisted treatment, naltrexone; weekly bundle including dispensing and/or administration, substance use counseling, individual and group therapy, and toxicology testing if performed (provision of the services by a Medicare-enrolled Opioid Treatment Program) |
| 46. | G2074 – Medication assisted treatment, weekly bundle not including the drug, including substance use counseling, individual and group therapy, and toxicology (provision of the services by a Medicare-enrolled opioid treatment program) |
| 47. | G2075 Medication assisted treatment, medication not otherwise specified; weekly bundle including dispensing and/or administration, substance use counseling, individual and group therapy, and toxicology testing, if performed (provision of the services by a Medicare-enrolled opioid treatment program) |
| 48. | G2076 Intake activities, including initial medical examination that is a complete, fully documented physical evaluation and initial assessment by a program physician or a primary care physician, or an authorized health care professional under the supervision of a program physician qualified personnel that includes preparation of a treatment plan that includes the patient's short-term goals and the tasks the patient must perform to complete the short-term goals; the patient's requirements for education, vocational rehabilitation, and employment; and the medical, psycho- social, economic, legal, or other supportive services that a patient needs, conducted by qualified personnel (provision of the services by a Medicare-enrolled opioid treatment program) |
| 49. | G2077 Periodic assessment; assessing periodically by qualified personnel to determine the most appropriate combination of services and treatment (provision of the services by a Medicare-enrolled opioid treatment program) |
| 50. | G2078 Take home supply of methadone; up to 7 additional day supply (provision of the services by a Medicare-enrolled opioid treatment program) |
| 51. | G2079 Take home supply of buprenorphine (oral); up to 7 additional day supply (provision of the services by a Medicare-enrolled opioid treatment program) |
| 52. | G2080 Each additional 30 minutes of counseling in a week of medication assisted treatment, (provision of the services by a Medicare-enrolled opioid treatment program) |
| 53. | G2086 –Office-based treatment for opioid use disorder, including development of the treatment plan, care coordination, individual therapy and group therapy and counseling; at least 70 minutes in the first calendar month |
| 54. | G2087 – Office-based treatment for opioid use disorder, including care coordination, individual therapy and group therapy and counseling; at least 60 minutes in a subsequent calendar month |
| 55. | G0516 – Insertion of non-biodegradable drug delivery implants, 4 or more (services for subdermal rod implant) |
| 56. | G0517 – Removal of non-biodegradable drug delivery implants, 4 or more (services for subdermal implants) |
| 57. | G0518 – Removal with reinsertion, non-biodegradable drug delivery implants, 4 or more (services for subdermal implants) |
| 58. | G2215 – Take home supply of nasal naxolone (provision of the services by a Medicare enrolled opioid treatment program) |
| 59. | G2216 – Take home supply of injectable naxolone (provision of the services by a Medicare enrolled opioid treatment program) |

| 60. | 11981 – Insertion of single non-biodegradable implant |
|---|---|
| 61. | 11982 – Removal of single non-biodegradable implant |
| 62. | 11983 – Removal and re-insertion of single nonbiodegradable implant |
| 63. | 17999 – unlisted   procedure, skin, mucous mem |
| 64. | S9475 –Ambulatory setting substance abuse treatment or detoxification services |
| 65. | H0020 ALCOHL &OR RX SRVC; METHADONE ADMIN &OR SERVICE |
| 66. | H0033 ORAL MEDICATION ADMIN DIRECT OBSERVATION |
| 67. | J3490 - Buprenorphine extended-release injection, for subcutaneous use (Sublocade) |
| 68. | J0570 – Buprenorphine implant, 74.2 mg; Physician office and Outpatient |
| 69. | J0571 BUPRENORPHINE ORAL 1 MG |
| 70. | J0572 BUPRENORPHINE/NALOXONE ORAL </=TO 3 MG BPN |
| 71. | J0573 BUPRENORPHNE/NALOXONE ORAL >3 MG BUT </=6 MG BPN |
| 72. | J0574 BUPRENORPHINE/NLX ORAL >6 MG BUT </=TO 10 MG BPN |
| 73. | J0575 BUPRENORPHINE/NALOXONE ORAL >10 MG BUPRENORPHINE |
| 74. | J1230 Methadone |
| 75. | J2315 INJECTION NALTREXONE DEPOT FORM 1 MG |
| 76. | S0109 METHADONE ORAL 5MG |
| 77. | Rev Code 900 + H0020 (methadone) |
| 78. | Rev Code 900 + H0001 or H0004 or H0005 or H0006 |
| 79. | Bunavail (buprenorphine with naloxone) Buccal Film; Buprenorphine with naloxone Sublingual Tablet/Film; Cassipa (buprenorphine with naloxone) Sublingual Film; Suboxone (buprenorphine with naloxone) Sublingual Film; Probuphine (buprenorphine); Subutex (buprenorphine); Sublocade (buprenorphine extended-release) injection; Zubsolv (buprenorphine with naloxone) Sublingual Tablet; Vivitrol (naltrexone for extended-release); Methadone] |
| 80. | 65200010100760 | BUPRENORPHIN SUB 2MG |
| 81. | 65200010100760 | BUPRENORPHINE 2 MG TABLET SL |
| 82. | 65200010100760 | SUBUTEX SUB 2MG |
| 83. | 65200010100780 | BUPRENORPHIN SUB 8MG |
| 84. | 65200010100780 | BUPRENORPHINE 8 MG TABLET SL |
| 85. | 65200010100780 | SUBUTEX SUB 8MG |
| 86. | 65200010102320 | PROBUPHINE IMP KIT 74.2 |
| 87. | 65200010200710 | ZUBSOLV SUB 0.7-0.18 |
| 88. | 65200010200715 | ZUBSOLV SUB 1.4-0.36 |
| 89. | 65200010200720 | BUPREN/NALOX SUB 2-0.5MG |
| 90. | 65200010200720 | BUPRENORPHN-NALOXN 2-0.5 MG SL |
| 91. | 65200010200720 | SUBOXONE SUB 2-0.5MG |
| 92. | 65200010200720 | SUBOXONE SUB 2MG |
| 93. | 65200010200725 | ZUBSOLV 2.9-0.71 MG TABLET SL |

| 94. | 65200010200732 | ZUBSOLV SUB 5.7-1.4 |
| 95. | 65200010200740 | BUPREN/NALOX SUB 8-2MG |
| 96. | 65200010200740 | BUPRENORPHIN-NALOXON 8-2 MG SL |
| 97. | 65200010200740 | SUBOXONE SUB 8-2MG |
| 98. | 65200010200740 | SUBOXONE SUB 8MG |
| 99. | 65200010200745 | ZUBSOLV SUB 8.6-2.1 |
| 100. | 65200010200760 | ZUBSOLV 11.4-2.9 MG TABLET SL |
| 101. | 65200010208220 | BUPREN/NALOX MIS 2-0.5MG |
| 102. | 65200010208220 | SUBOXONE MIS 2-0.5MG |
| 103. | 65200010208230 | BUPREN/NALOX MIS 4-1MG |
| 104. | 65200010208230 | SUBOXONE MIS 4-1MG |
| 105. | 65200010208240 | BUPREN/NALOX MIS 8-2MG |
| 106. | 65200010208240 | SUBOXONE MIS 8-2MG |
| 107. | 65200010208250 | BUPREN/NALOX MIS 12-3MG |
| 108. | 65200010208250 | SUBOXONE MIS 12-3MG |
| 109. | 65200010208260 | BUNAVAIL MIS 2.1-0.3 |
| 110. | 65200010208270 | BUNAVAIL MIS 4.2-0.7 |
| 111. | 65200010208280 | BUNAVAIL MIS 6.3-1MG |
| 112. | 93400030001920 | VIVITROL INJ 380MG |
| 113. | 93400030100305 | DEPADE TAB 50MG |
| 114. | 93400030100305 | NALTREXONE TAB 50MG |
| 115. | 93400030100305 | REVIA TAB 50MG |
| 116. | 93409902502320 | NALTREXONE IMP |
| 117. | 6520001000E520 | SUBLOCADE INJ 100/0.5 |
| 118. | 6520001000E530 | SUBLOCADE INJ 300/1.5 |
| 119. | F11.1 | Opioid abuse |
| 120. | F11.10 | Opioid abuse, uncomplicated |
| 121. | F11.11 | Opioid abuse, in remission |
| 122. | F11.12 | Opioid abuse with intoxication |
| 123. | F11.120 | Opioid abuse with intoxication, uncomplicated |
| 124. | F11.121 | Opioid abuse with intoxication delirium |
| 125. | F11.122 | Opioid abuse with intoxication with perceptual disturbance |
| 126. | F11.129 | Opioid abuse with intoxication, unspecified |
| 127. | F11.13 | Opioid abuse with withdrawal |
| 128. | F11.14 | Opioid abuse with opioid-induced mood disorder |
| 129. | F11.15 | Opioid abuse with opioid-induced psychotic disorder |
| 130. | F11.150 | Opioid abuse with opioid-induced psychotic disorder with delusions |
| 131. | F11.151 | Opioid abuse with opioid-induced psychotic disorder with |

| | | hallucinations |
|---|---|---|
| 132. | F11.159 | Opioid abuse with opioid-induced psychotic disorder, unspecified |
| 133. | F11.18 | Opioid abuse with other opioid-induced disorder |
| 134. | F11.181 | Opioid abuse with opioid-induced sexual dysfunction |
| 135. | F11.182 | Opioid abuse with opioid-induced sleep disorder |
| 136. | F11.188 | Opioid abuse with other opioid-induced disorder |
| 137. | F11.19 | Opioid abuse with unspecified opioid-induced disorder |
| 138. | T40.0X1 | Poisoning by opium, accidental (unintentional) |
| 139. | T40.0X1A | Poisoning by opium, accidental (unintentional), initial encounter |
| 140. | T40.0X1D | Poisoning by opium, accidental (unintentional), subsequent encounter |
| 141. | T40.0X1S | Poisoning by opium, accidental (unintentional), sequela |
| 142. | T40.0X2 | Poisoning by opium, intentional self-harm |
| 143. | T40.0X2A | Poisoning by opium, intentional self-harm, initial encounter |
| 144. | T40.0X2D | Poisoning by opium, intentional self-harm, subsequent encounter |
| 145. | T40.0X2S | Poisoning by opium, intentional self-harm, sequela |
| 146. | T40.0X3 | Poisoning by opium, assault |
| 147. | T40.0X3A | Poisoning by opium, assault, initial encounter |
| 148. | T40.0X3D | Poisoning by opium, assault, subsequent encounter |
| 149. | T40.0X3S | Poisoning by opium, assault, sequela |
| 150. | T40.0X4 | Poisoning by opium, undetermined |
| 151. | T40.0X4A | Poisoning by opium, undetermined, initial encounter |
| 152. | T40.0X4D | Poisoning by opium, undetermined, subsequent encounter |
| 153. | T40.0X4S | Poisoning by opium, undetermined, sequela |
| 154. | T40.1 | Poisoning by and adverse effect of heroin |
| 155. | T40.1X | Poisoning by and adverse effect of heroin |
| 156. | T40.1X1 | Poisoning by heroin, accidental (unintentional) |
| 157. | T40.1X1A | Poisoning by heroin, accidental (unintentional), initial encounter |
| 158. | T40.1X1D | Poisoning by heroin, accidental (unintentional), subsequent encounter |
| 159. | T40.1X1S | Poisoning by heroin, accidental (unintentional), sequela |
| 160. | T40.1X2 | Poisoning by heroin, intentional self-harm |
| 161. | T40.1X2A | Poisoning by heroin, intentional self-harm, initial encounter |
| 162. | T40.1X2D | Poisoning by heroin, intentional self-harm, subsequent encounter |
| 163. | T40.1X2S | Poisoning by heroin, intentional self-harm, sequela |
| 164. | T40.1X3 | Poisoning by heroin, assault |
| 165. | T40.1X3A | Poisoning by heroin, assault, initial encounter |
| 166. | T40.1X3D | Poisoning by heroin, assault, subsequent encounter |
| 167. | T40.1X3S | Poisoning by heroin, assault, sequela |
| 168. | T40.1X4 | Poisoning by heroin, undetermined |

| 169. | T40.1X4A | Poisoning by heroin, undetermined, initial encounter |
| 170. | T40.1X4D | Poisoning by heroin, undetermined, subsequent encounter |
| 171. | T40.1X4S | Poisoning by heroin, undetermined, sequela |
| 172. | T40.1X5 | Adverse effect of heroin |
| 173. | T40.1X5A | Adverse effect of heroin, initial encounter |
| 174. | T40.1X5D | Adverse effect of heroin, subsequent encounter |
| 175. | T40.1X5S | Adverse effect of heroin, sequela |
| 176. | T40.1X6 | Underdosing of heroin |
| 177. | T40.1X6A | Underdosing of heroin, initial encounter |
| 178. | T40.1X6D | Underdosing of heroin, subsequent encounter |
| 179. | T40.1X6S | Underdosing of heroin, sequela |
| 180. | T40.2X1 | Poisoning by other opioids, accidental (unintentional) |
| 181. | T40.2X1A | Poisoning by other opioids, accidental (unintentional), initial encounter |
| 182. | T40.2X1D | Poisoning by other opioids, accidental (unintentional), subsequent encounter |
| 183. | T40.2X1S | Poisoning by other opioids, accidental (unintentional), sequela |
| 184. | T40.2X2 | Poisoning by other opioids, intentional self-harm |
| 185. | T40.2X2A | Poisoning by other opioids, intentional self-harm, initial encounter |
| 186. | T40.2X2D | Poisoning by other opioids, intentional self-harm, subsequent encounter |
| 187. | T40.2X2S | Poisoning by other opioids, intentional self-harm, sequela |
| 188. | T40.2X3 | Poisoning by other opioids, assault |
| 189. | T40.2X3A | Poisoning by other opioids, assault, initial encounter |
| 190. | T40.2X3D | Poisoning by other opioids, assault, subsequent encounter |
| 191. | T40.2X3S | Poisoning by other opioids, assault, sequela |
| 192. | T40.2X4 | Poisoning by other opioids, undetermined |
| 193. | T40.2X4A | Poisoning by other opioids, undetermined, initial encounter |
| 194. | T40.2X4D | Poisoning by other opioids, undetermined, subsequent encounter |
| 195. | T40.2X4S | Poisoning by other opioids, undetermined, sequela |
| 196. | T40.3X1 | Poisoning by methadone, accidental (unintentional) |
| 197. | T40.3X1A | Poisoning by methadone, accidental (unintentional), initial encounter |
| 198. | T40.3X1D | Poisoning by methadone, accidental (unintentional), subsequent encounter |
| 199. | T40.3X1S | Poisoning by methadone, accidental (unintentional), sequela |
| 200. | T40.3X2 | Poisoning by methadone, intentional self-harm |
| 201. | T40.3X2A | Poisoning by methadone, intentional self-harm, initial encounter |
| 202. | T40.3X2D | Poisoning by methadone, intentional self-harm, subsequent encounter |
| 203. | T40.3X2S | Poisoning by methadone, intentional self-harm, sequela |

| 204. | T40.3X3 | Poisoning by methadone, assault |
| 205. | T40.3X3A | Poisoning by methadone, assault, initial encounter |
| 206. | T40.3X3D | Poisoning by methadone, assault, subsequent encounter |
| 207. | T40.3X3S | Poisoning by methadone, assault, sequela |
| 208. | T40.3X4 | Poisoning by methadone, undetermined |
| 209. | T40.3X4A | Poisoning by methadone, undetermined, initial encounter |
| 210. | T40.3X4D | Poisoning by methadone, undetermined, subsequent encounter |
| 211. | T40.3X4S | Poisoning by methadone, undetermined, sequela |
| 212. | T40.4 | Poisoning by, adverse effect of and underdosing of other synthetic narcotics |
| 213. | T40.41 | Poisoning by, adverse effect of and underdosing of fentanylor fentanyl analogs |
| 214. | T40.411 | Poisoning by fentanyl or fentanyl analogs, accidental (unintentional) |
| 215. | T40.411A | Poisoning by fentanyl or fentanyl analogs, accidental (unintentional), initial encounter |
| 216. | T40.411D | Poisoning by fentanyl or fentanyl analogs, accidental (unintentional), subsequent encounter |
| 217. | T40.411S | Poisoning by fentanyl or fentanyl analogs, accidental (unintentional), sequela |
| 218. | T40.412 | Poisoning by fentanyl or fentanyl analogs, intentional self-harm |
| 219. | T40.412A | Poisoning by fentanyl or fentanyl analogs, intentional self-harm, initial encounter |
| 220. | T40.412D | Poisoning by fentanyl or fentanyl analogs, intentional self-harm, subsequent encounter |
| 221. | T40.412S | Poisoning by fentanyl or fentanyl analogs, intentional self-harm, sequela |
| 222. | T40.413 | Poisoning by fentanyl or fentanyl analogs, assault |
| 223. | T40.413A | Poisoning by fentanyl or fentanyl analogs, assault, initial encounter |
| 224. | T40.413D | Poisoning by fentanyl or fentanyl analogs, assault, subsequent encounter |
| 225. | T40.413S | Poisoning by fentanyl or fentanyl analogs, assault, sequela |
| 226. | T40.414 | Poisoning by fentanyl or fentanyl analogs, undetermined |
| 227. | T40.414A | Poisoning by fentanyl or fentanyl analogs, undetermined, initial encounter |
| 228. | T40.414D | Poisoning by fentanyl or fentanyl analogs, undetermined, subsequent encounter |
| 229. | T40.414S | Poisoning by fentanyl or fentanyl analogs, undetermined, sequela |
| 230. | T40.415 | Adverse effect of fentanyl or fentanyl analogs |
| 231. | T40.415A | Adverse effect of fentanyl or fentanyl analogs, initial encounter |
| 232. | T40.415D | Adverse effect of fentanyl or fentanyl analogs, subsequent encounter |
| 233. | T40.415S | Adverse effect of fentanyl or fentanyl analogs, sequela |

| 234. | T40.416 | Underdosing of fentanyl or fentanyl analogs |
| 235. | T40.416A | Underdosing of fentanyl or fentanyl analogs, initial encounter |
| 236. | T40.416D | Underdosing of fentanyl or fentanyl analogs, subsequent encounter |
| 237. | T40.416S | Underdosing of fentanyl or fentanyl analogs, sequela |
| 238. | T40.42 | Poisoning by, adverse effect of and underdosing of tramadol |
| 239. | T40.421 | Poisoning by tramadol, accidental (unintentional) |
| 240. | T40.421A | Poisoning by tramadol, accidental (unintentional), initial encounter |
| 241. | T40.421D | Poisoning by tramadol, accidental (unintentional), subsequent encounter |
| 242. | T40.421S | Poisoning by tramadol, accidental (unintentional), sequela |
| 243. | T40.422 | Poisoning by tramadol, intentional self-harm |
| 244. | T40.422A | Poisoning by tramadol, intentional self-harm, initial encounter |
| 245. | T40.422D | Poisoning by tramadol, intentional self-harm, subsequent encounter |
| 246. | T40.422S | Poisoning by tramadol, intentional self-harm, sequela |
| 247. | T40.423 | Poisoning by tramadol, assault |
| 248. | T40.423A | Poisoning by tramadol, assault, initial encounter |
| 249. | T40.423D | Poisoning by tramadol, assault, subsequent encounter |
| 250. | T40.423S | Poisoning by tramadol, assault, sequela |
| 251. | T40.424 | Poisoning by tramadol, undetermined |
| 252. | T40.424A | Poisoning by tramadol, undetermined, initial encounter |
| 253. | T40.424D | Poisoning by tramadol, undetermined, subsequent encounter |
| 254. | T40.424S | Poisoning by tramadol, undetermined, sequela |
| 255. | T40.425 | Adverse effect of tramadol |
| 256. | T40.425A | Adverse effect of tramadol, initial encounter |
| 257. | T40.425D | Adverse effect of tramadol, subsequent encounter |
| 258. | T40.425S | Adverse effect of tramadol, sequela |
| 259. | T40.426 | Underdosing of tramadol |
| 260. | T40.426A | Underdosing of tramadol, initial encounter |
| 261. | T40.426D | Underdosing of tramadol, subsequent encounter |
| 262. | T40.426S | Underdosing of tramadol, sequela |
| 263. | T40.49 | Poisoning by, adverse effect of and underdosing of other synthetic narcotics |
| 264. | T40.491 | Poisoning by other synthetic narcotics, accidental (unintentional) |
| 265. | T40.491A | Poisoning by other synthetic narcotics, accidental (unintentional), initial encounter |
| 266. | T40.491D | Poisoning by other synthetic narcotics, accidental (unintentional), subsequent encounter |
| 267. | T40.491S | Poisoning by other synthetic narcotics, accidental (unintentional), sequela |

| 268. | T40.492 | Poisoning by other synthetic narcotics, intentional self-harm |
| 269. | T40.492A | Poisoning by other synthetic narcotics, intentional self-harm, initial encounter |
| 270. | T40.492D | Poisoning by other synthetic narcotics, intentional self-harm, subsequent encounter |
| 271. | T40.492S | Poisoning by other synthetic narcotics, intentional self-harm, sequela |
| 272. | T40.493 | Poisoning by other synthetic narcotics, assault |
| 273. | T40.493A | Poisoning by other synthetic narcotics, assault, initial encounter |
| 274. | T40.493D | Poisoning by other synthetic narcotics, assault, subsequent encounter |
| 275. | T40.493S | Poisoning by other synthetic narcotics, assault, sequela |
| 276. | T40.494 | Poisoning by other synthetic narcotics, undetermined |
| 277. | T40.494A | Poisoning by other synthetic narcotics, undetermined, initial encounter |
| 278. | T40.494D | Poisoning by other synthetic narcotics, undetermined, subsequent encounter |
| 279. | T40.494S | Poisoning by other synthetic narcotics, undetermined, sequela |
| 280. | T40.495 | Adverse effect of other synthetic narcotics |
| 281. | T40.495A | Adverse effect of other synthetic narcotics, initial encounter |
| 282. | T40.495D | Adverse effect of other synthetic narcotics, subsequent encounter |
| 283. | T40.495S | Adverse effect of other synthetic narcotics, sequela |
| 284. | T40.496 | Underdosing of other synthetic narcotics |
| 285. | T40.496A | Underdosing of other synthetic narcotics, initial encounter |
| 286. | T40.496D | Underdosing of other synthetic narcotics, subsequent encounter |
| 287. | T40.496S | Underdosing of other synthetic narcotics, sequela |
| 288. | T40.4X | Poisoning by, adverse effect of and underdosing of other synthetic narcotics |
| 289. | T40.4X1 | Poisoning by other synthetic narcotics, accidental (unintentional) |
| 290. | T40.4X1A | Poisoning by other synthetic narcotics, accidental (unintentional), initial encounter |
| 291. | T40.4X1D | Poisoning by other synthetic narcotics, accidental (unintentional), subsequent encounter |
| 292. | T40.4X1S | Poisoning by other synthetic narcotics, accidental (unintentional), sequela |
| 293. | T40.4X2 | Poisoning by other synthetic narcotics, intentional self-harm |
| 294. | T40.4X2A | Poisoning by other synthetic narcotics, intentional self-harm, initial encounter |
| 295. | T40.4X2D | Poisoning by other synthetic narcotics, intentional self-harm, subsequent encounter |
| 296. | T40.4X2S | Poisoning by other synthetic narcotics, intentional self-harm, sequela |
| 297. | T40.4X3 | Poisoning by other synthetic narcotics, assault |
| 298. | T40.4X3A | Poisoning by other synthetic narcotics, assault, initial encounter |

| 299. | T40.4X3D | Poisoning by other synthetic narcotics, assault, subsequent encounter |
| 300. | T40.4X3S | Poisoning by other synthetic narcotics, assault, sequela |
| 301. | T40.4X4 | Poisoning by other synthetic narcotics, undetermined |
| 302. | T40.4X4A | Poisoning by other synthetic narcotics, undetermined, initial encounter |
| 303. | T40.4X4D | Poisoning by other synthetic narcotics, undetermined, subsequent encounter |
| 304. | T40.4X4S | Poisoning by other synthetic narcotics, undetermined, sequela |
| 305. | T40.4X5 | Adverse effect of other synthetic narcotics |
| 306. | T40.4X5A | Adverse effect of other synthetic narcotics, initial encounter |
| 307. | T40.4X5D | Adverse effect of other synthetic narcotics, subsequent encounter |
| 308. | T40.4X5S | Adverse effect of other synthetic narcotics, sequela |
| 309. | T40.4X6 | Underdosing of other synthetic narcotics |
| 310. | T40.4X6A | Underdosing of other synthetic narcotics, initial encounter |
| 311. | T40.4X6D | Underdosing of other synthetic narcotics, subsequent encounter |
| 312. | T40.4X6S | Underdosing of other synthetic narcotics, sequela |
| 313. | T40.601 | Poisoning by unspecified narcotics, accidental (unintentional) |
| 314. | T40.601A | Poisoning by unspecified narcotics, accidental (unintentional), initial encounter |
| 315. | T40.601D | Poisoning by unspecified narcotics, accidental (unintentional), subsequent encounter |
| 316. | T40.601S | Poisoning by unspecified narcotics, accidental (unintentional), sequela |
| 317. | T40.602 | Poisoning by unspecified narcotics, intentional self-harm |
| 318. | T40.602A | Poisoning by unspecified narcotics, intentional self-harm, initial encounter |
| 319. | T40.602D | Poisoning by unspecified narcotics, intentional self-harm, subsequent encounter |
| 320. | T40.602S | Poisoning by unspecified narcotics, intentional self-harm, sequela |
| 321. | T40.603 | Poisoning by unspecified narcotics, assault |
| 322. | T40.603A | Poisoning by unspecified narcotics, assault, initial encounter |
| 323. | T40.603D | Poisoning by unspecified narcotics, assault, subsequent encounter |
| 324. | T40.603S | Poisoning by unspecified narcotics, assault, sequela |
| 325. | T40.604 | Poisoning by unspecified narcotics, undetermined |
| 326. | T40.604A | Poisoning by unspecified narcotics, undetermined, initial encounter |
| 327. | T40.604D | Poisoning by unspecified narcotics, undetermined, subsequent encounter |
| 328. | T40.604S | Poisoning by unspecified narcotics, undetermined, sequela |
| 329. | T40.691 | Poisoning by other narcotics, accidental (unintentional) |
| 330. | T40.691A | Poisoning by other narcotics, accidental (unintentional), initial encounter |

| 331. | T40.691D | Poisoning by other narcotics, accidental (unintentional), subsequent encounter |
| 332. | T40.691S | Poisoning by other narcotics, accidental (unintentional), sequela |
| 333. | T40.692 | Poisoning by other narcotics, intentional self-harm |
| 334. | T40.692A | Poisoning by other narcotics, intentional self-harm, initial encounter |
| 335. | T40.692D | Poisoning by other narcotics, intentional self-harm, subsequent encounter |
| 336. | T40.692S | Poisoning by other narcotics, intentional self-harm, sequela |
| 337. | T40.693 | Poisoning by other narcotics, assault |
| 338. | T40.693A | Poisoning by other narcotics, assault, initial encounter |
| 339. | T40.693D | Poisoning by other narcotics, assault, subsequent encounter |
| 340. | T40.693S | Poisoning by other narcotics, assault, sequela |
| 341. | T40.694 | Poisoning by other narcotics, undetermined |
| 342. | T40.694A | Poisoning by other narcotics, undetermined, initial encounter |
| 343. | T40.694D | Poisoning by other narcotics, undetermined, subsequent encounter |
| 344. | T40.694S | Poisoning by other narcotics, undetermined, sequela |
| 345. | F11.20 | Opioid Dependence uncomplicated |
| 346. | F11.21 | Opioid Dependence in remission |
| 347. | F11.22 | Opioid dependence with intoxication |
| 348. | F11.220 | Opioid Dependence uncomplicated |
| 349. | F11.221 | Opioid Dependence delirium |
| 350. | F11.222 | Opioid dependence w intoxication with perceptual disturbance |
| 351. | F11.229 | Opioid Dependence unspecified |
| 352. | F11.23 | Opioid Dependence with withdrawal |
| 353. | F11.24 | Opioid Dependence with opioid-induced mood disorder |
| 354. | F11.25 | Opioid Dependence with opioid-induced psychotic disorder |
| 355. | F11.250 | Opioid Dependence with delusions |
| 356. | F11.251 | Opioid Dependence with hallucinations |
| 357. | F11.259 | Opioid Dependence unspecified |
| 358. | F11.28 | Opioid Dependence with other opioid-induced disorder |
| 359. | F11.281 | Opioid Dependence with opioid-induced sexual dysfunction |
| 360. | F11.282 | Opioid Dependence with opioid-induced sleep disorder |
| 361. | F11.288 | Opioid Dependence with other opioid-induced disorder |

*[Remainder of Page Intentionally Left Blank]*

*[Page Intentionally Left Blank]*

**APPENDIX B: Maximum Eligible Amount Calculation Methodology**

TPP Claimants shall use the following methodology for calculating the Maximum Eligible Amount distributable to them:

For the period of January 1, 2008 through December 31, 2019, provide the following:

1. The number of subscribers or dependents covered under the TPP Claimant's plan during some or all of the period from January 1, 2008 through December 31, 2019 (each, a "Unique Member") who were prescribed one or more of the drugs identified on the NDC List.

2. The number of unique prescriptions paid, all or in part, by your plan for the drugs identified on the NDC List.

3. The total final dollars paid by your plan for the prescriptions for the drugs identified in 2 above.

4. The number of Unique Members identified in 1 above who were diagnosed with an Opioid Use Disorder, using one or more of the codes on the OUD ICD 10 List.

5. For the Unique Members identified in 4 above, the total dollar amount of medical claims with the ICD, CPT, or HCPS codes on the OUD Medical Claims Codes List, paid for those Unique Members.

The NDC List, OUD ICD 10 List, and OUD Medical Claims Codes List will be attached to and included with the ~~Third Party Payor~~TPP Abatement Claim Form.

## APPENDIX C: Approved MAT Expenses

*Approved MAT Expenses.* All or part of the expenses incurred by TPP Authorized Recipients for Allowed MAT Therapy, defined as claims paid for the following therapies or under the following ICD/CPT/HCPS codes:

1.  Medication Assisted Treatment (MAT): Assigned ICD-10 code F11.20 (convert to ICD-9 304.00, 304.01, and 304.02) for opioid dependence.

2.  Visit type: Adult Wellness Visit (AWV) or acute visit for Opioid Use Disorder/Dependence Comprehensive evaluation of new patient or established patient for suitableness for buprenorphine treatment.

3.  New Patient: code 99205, 99201

4.  Established Patient: code 99211-99215

5.  Visit type: MAT medication induction.

6.  Established Patient E/M: 99211–99215

7.  Patient Consult: 99241-45(*)[15]

8.  Telephonic: 99241 can only be used as telephonic prescriber-to-prescriber consultation regarding a patient. Patient cannot be present.

9.  Prolonged visits codes (99354, 99355) (*)

10. 30-74 minutes: 99354(*)

11. 75-104 minutes: 99355(*)

12. 105+ minutes: 99354+99355x2(*)

13. Visit type: MAT medication/maintenance. Acute visit for OUD/opioid dependence.

14. Established Patient: 99212-15

15. SBIRT substance abuse and structured screening and brief intervention services: 99408 (can be offered and billed for naloxone education.)

16. CPT/Prof    HCPC/FAC

17. 99214 – E/M office visit/G0480 – UDT definitive

18. 99213 – E/M office visit/H0015 - IOP

19. 99285 – E/M ER visit/H2035 – drug treatment program per hour

20. 99215 – E/M office visit/G0481 – UDT definitive

21. 80307 – UDT presumptive/H0010 – acute/subacute detox

22. 99232 – E/M inpatient visit/H2036 - drug treatment program per diem

---

[15] Codes followed by an asterisk (*) have been identified as frequently subject to abuse and are being reviewed.

23.  99233 – E/M inpatient visit/G0463 – outpatient clinic visit

24.  99223 – E/M inpatient visit/H0011 - acute/subacute detox

25.  99284 – E/M ER visit/H0007 outpatient crisis intervention

26.  99204 – E/M office visit/G0482 – UDT definitive

27.  99231 – E/M inpatient visit/G0483 – UDT definitive

28.  99205 – E/M office visit/H0001 – alcohol and/or drug treatment assessment

29.  99220 – E/M observation/H0020 – alcohol and/or drug treatment – methadone administration

30.  99443 – E/M telephone service/H0050 – alcohol and/or drug treatment, brief intervention

31.  99283 – E/M ER visit/G0396 - alcohol and/or substance abuse structured assessment and brief intervention (15 to 30 mins)

32.  99212 – E/M office visit/G0397 - alcohol and/or substance abuse structured assessment and brief intervention (more than 30 mins)

33.  96372 - Therapeutic, prophylactic, or diagnostic injection (specify material injected); subcutaneous or intramuscular

34.  J2315 - Injection, naltrexone, depot form, 1 mg

35.  3E023GC - Introduction of other therapeutic substance into muscle, percutaneous approach

36.  96372 - Therapeutic, prophylactic, or diagnostic injection (specify material injected); subcutaneous or intramuscular (same as Vivitrol)

37.  Q9991 – Injection, buprenorphine extended-release (Sublocade), less than or equal to 100 mg

38.  Q9992 – Injection, buprenorphine extended-release (Sublocade), greater than 100 mg

39.  G2067 Medication assisted treatment, methadone; weekly bundle including dispensing and/or administration, substance use counseling, individual and group therapy, and toxicology testing, if performed (provision of the services by a Medicare-enrolled Opioid Treatment Program)

40.  G2068 Medication assisted treatment, buprenorphine (oral); weekly bundle including dispensing and/or administration, substance use counseling, individual and group therapy, and toxicology testing if performed (provision of the services by a Medicare-enrolled Opioid Treatment Program)

41.  G2069 – Medication assisted treatment, buprenorphine (injectable); weekly bundle including dispensing and/ or administration, substance use counseling, individual and group therapy, and toxicology testing if performed (provision of the services by a Medicare-enrolled Opioid Treatment Program)

42.  G2070 Medication assisted treatment, buprenorphine (implant insertion); weekly bundle including dispensing and/or administration, substance use counseling,

individual and group therapy, and toxicology testing if performed (provision of the services by a Medicare-enrolled Opioid Treatment Program)

43.   G2071 Medication assisted treatment, buprenorphine (implant removal); weekly bundle including dispensing and/or administration, substance use counseling, individual and group therapy, and toxicology testing if performed (provision of the services by a Medicare enrolled Opioid Treatment Program)

44.   G2072 Medication assisted treatment, buprenorphine (implant insertion and removal); weekly bundle including dispensing and/or administration, substance use counseling, individual and group therapy, and toxicology testing if performed (provision of the services by a Medicare enrolled Opioid Treatment Program)

45.   G2073 Medication assisted treatment, naltrexone; weekly bundle including dispensing and/or administration, substance use counseling, individual and group therapy, and toxicology testing if performed (provision of the services by a Medicare-enrolled Opioid Treatment Program)

46.   G2074 – Medication assisted treatment, weekly bundle not including the drug, including substance use counseling, individual and group therapy, and toxicology (provision of the services by a Medicare-enrolled opioid treatment program)

47.   G2075 Medication assisted treatment, medication not otherwise specified; weekly bundle including dispensing and/or administration, substance use counseling, individual and group therapy, and toxicology testing, if performed (provision of the services by a Medicare-enrolled opioid treatment program)

48.   G2076 Intake activities, including initial medical examination that is a complete, fully documented physical evaluation and initial assessment by a program physician or a primary care physician, or an authorized health care professional under the supervision of a program physician qualified personnel that includes preparation of a treatment plan that includes the patient's short-term goals and the tasks the patient must perform to complete the short-term goals; the patient's requirements for education, vocational rehabilitation, and employment; and the medical, psycho- social, economic, legal, or other supportive services that a patient needs, conducted by qualified personnel (provision of the services by a Medicare-enrolled opioid treatment program)

49.   G2077 Periodic assessment; assessing periodically by qualified personnel to determine the most appropriate combination of services and treatment (provision of the services by a Medicare-enrolled opioid treatment program)

50.   G2078 Take home supply of methadone; up to 7 additional day supply (provision of the services by a Medicare-enrolled opioid treatment program)

51.   G2079 Take home supply of buprenorphine (oral); up to 7 additional day supply (provision of the services by a Medicare-enrolled opioid treatment program)

52.   G2080 Each additional 30 minutes of counseling in a week of medication assisted treatment, (provision of the services by a Medicare-enrolled opioid treatment program)

53.   G2086 –Office-based treatment for opioid use disorder, including development of the treatment plan, care coordination, individual therapy and group therapy and

counseling; at least 70 minutes in the first calendar month

54.  G2087 – Office-based treatment for opioid use disorder, including care coordination, individual therapy and group therapy and counseling; at least 60 minutes in a subsequent calendar month

55.  G0516 – Insertion of non-biodegradable drug delivery implants, 4 or more (services for subdermal rod implant)

56.  G0517 – Removal of non-biodegradable drug delivery implants, 4 or more (services for subdermal implants)

57.  G0518 – Removal with reinsertion, non-biodegradable drug delivery implants, 4 or more (services for subdermal implants)

58.  G2215 – Take home supply of nasal naxolone (provision of the services by a Medicare enrolled opioid treatment program)

59.  G2216 – Take home supply of injectable naxolone (provision of the services by a Medicare enrolled opioid treatment program)

60.  11981 – Insertion of single non-biodegradable implant

61.  11982 – Removal of single non-biodegradable implant

62.  11983 – Removal and re-insertion of single nonbiodegradable implant

63.  17999 – unlisted    procedure, skin, mucous mem

64.  S9475 –Ambulatory setting substance abuse treatment or detoxification services

65.  H0020 ALCOHL &OR RX SRVC; METHADONE ADMIN &OR SERVICE

66.  H0033 ORAL MEDICATION ADMIN DIRECT OBSERVATION

67.  J3490 - Buprenorphine extended-release injection, for subcutaneous use (Sublocade)

68.  J0570 – Buprenorphine implant, 74.2 mg; Physician office and Outpatient

69.  J0571 BUPRENORPHINE ORAL 1 MG

70.  J0572 BUPRENORPHINE/NALOXONE ORAL </=TO 3 MG BPN

71.  J0573 BUPRENORPHNE/NALOXONE ORAL >3 MG BUT </=6 MG BPN

72.  J0574 BUPRENORPHINE/NLX ORAL >6 MG BUT </=TO 10 MG BPN

73.  J0575 BUPRENORPHINE/NALOXONE ORAL >10 MG BUPRENORPHINE

74.  J1230 Methadone

75.  J2315 INJECTION NALTREXONE DEPOT FORM 1 MG

76.  S0109 METHADONE ORAL 5MG

77.  Rev Code 900 + H0020 (methadone)

78.  Rev Code 900 + H0001 or H0004 or H0005 or H0006

79.  Bunavail (buprenorphine with naloxone) Buccal Film; Buprenorphine with naloxone Sublingual Tablet/Film; Cassipa (buprenorphine with naloxone) Sublingual Film;

Suboxone (buprenorphine with naloxone) Sublingual Film; Probuphine (buprenorphine); Subutex (buprenorphine); Sublocade (buprenorphine extended-release) injection; Zubsolv (buprenorphine with naloxone) Sublingual Tablet; Vivitrol (naltrexone for extended-release); Methadone

| | | |
|---|---|---|
| 80. | 65200010100760 | BUPRENORPHIN SUB 2MG |
| 81. | 65200010100760 | BUPRENORPHINE 2 MG TABLET SL |
| 82. | 65200010100760 | SUBUTEX SUB 2MG |
| 83. | 65200010100780 | BUPRENORPHIN SUB 8MG |
| 84. | 65200010100780 | BUPRENORPHINE 8 MG TABLET SL |
| 85. | 65200010100780 | SUBUTEX SUB 8MG |
| 86. | 65200010102320 | PROBUPHINE IMP KIT 74.2 |
| 87. | 65200010200710 | ZUBSOLV SUB 0.7-0.18 |
| 88. | 65200010200715 | ZUBSOLV SUB 1.4-0.36 |
| 89. | 65200010200720 | BUPREN/NALOX SUB 2-0.5MG |
| 90. | 65200010200720 | BUPRENORPHN-NALOXN 2-0.5 MG SL |
| 91. | 65200010200720 | SUBOXONE SUB 2-0.5MG |
| 92. | 65200010200720 | SUBOXONE SUB 2MG |
| 93. | 65200010200725 | ZUBSOLV 2.9-0.71 MG TABLET SL |
| 94. | 65200010200732 | ZUBSOLV SUB 5.7-1.4 |
| 95. | 65200010200740 | BUPREN/NALOX SUB 8-2MG |
| 96. | 65200010200740 | BUPRENORPHIN-NALOXON 8-2 MG SL |
| 97. | 65200010200740 | SUBOXONE SUB 8-2MG |
| 98. | 65200010200740 | SUBOXONE SUB 8MG |
| 99. | 65200010200745 | ZUBSOLV SUB 8.6-2.1 |
| 100. | 65200010200760 | ZUBSOLV 11.4-2.9 MG TABLET SL |
| 101. | 65200010208220 | BUPREN/NALOX MIS 2-0.5MG |
| 102. | 65200010208220 | SUBOXONE MIS 2-0.5MG |
| 103. | 65200010208230 | BUPREN/NALOX MIS 4-1MG |
| 104. | 65200010208230 | SUBOXONE MIS 4-1MG |
| 105. | 65200010208240 | BUPREN/NALOX MIS 8-2MG |
| 106. | 65200010208240 | SUBOXONE MIS 8-2MG |
| 107. | 65200010208250 | BUPREN/NALOX MIS 12-3MG |
| 108. | 65200010208250 | SUBOXONE MIS 12-3MG |

| 109. | 65200010208260 | BUNAVAIL MIS 2.1-0.3 |
| 110. | 65200010208270 | BUNAVAIL MIS 4.2-0.7 |
| 111. | 65200010208280 | BUNAVAIL MIS 6.3-1MG |
| 112. | 93400030001920 | VIVITROL INJ 380MG |
| 113. | 93400030100305 | DEPADE TAB 50MG |
| 114. | 93400030100305 | NALTREXONE TAB 50MG |
| 115. | 93400030100305 | REVIA TAB 50MG |
| 116. | 93409902502320 | NALTREXONE IMP |
| 117. | 6520001000E520 | SUBLOCADE INJ 100/0.5 |
| 118. | 6520001000E530 | SUBLOCADE INJ 300/1.5 |
| 119. | F11.1 | Opioid abuse |
| 120. | F11.10 | Opioid abuse, uncomplicated |
| 121. | F11.11 | Opioid abuse, in remission |
| 122. | F11.12 | Opioid abuse with intoxication |
| 123. | F11.120 | Opioid abuse with intoxication, uncomplicated |
| 124. | F11.121 | Opioid abuse with intoxication delirium |
| 125. | F11.122 | Opioid abuse with intoxication with perceptual disturbance |
| 126. | F11.129 | Opioid abuse with intoxication, unspecified |
| 127. | F11.13 | Opioid abuse with withdrawal |
| 128. | F11.14 | Opioid abuse with opioid-induced mood disorder |
| 129. | F11.15 | Opioid abuse with opioid-induced psychotic disorder |
| 130. | F11.150 | Opioid abuse with opioid-induced psychotic disorder with delusions |
| 131. | F11.151 | Opioid abuse with opioid-induced psychotic disorder with hallucinations |
| 132. | F11.159 | Opioid abuse with opioid-induced psychotic disorder, unspecified |
| 133. | F11.18 | Opioid abuse with other opioid-induced disorder |
| 134. | F11.181 | Opioid abuse with opioid-induced sexual dysfunction |
| 135. | F11.182 | Opioid abuse with opioid-induced sleep disorder |
| 136. | F11.188 | Opioid abuse with other opioid-induced disorder |
| 137. | F11.19 | Opioid abuse with unspecified opioid-induced disorder |
| 138. | T40.0X1 | Poisoning by opium, accidental (unintentional) |

| 139. | T40.0X1A | Poisoning by opium, accidental (unintentional), initial encounter |
| 140. | T40.0X1D | Poisoning by opium, accidental (unintentional), subsequent encounter |
| 141. | T40.0X1S | Poisoning by opium, accidental (unintentional), sequela |
| 142. | T40.0X2 | Poisoning by opium, intentional self-harm |
| 143. | T40.0X2A | Poisoning by opium, intentional self-harm, initial encounter |
| 144. | T40.0X2D | Poisoning by opium, intentional self-harm, subsequent encounter |
| 145. | T40.0X2S | Poisoning by opium, intentional self-harm, sequela |
| 146. | T40.0X3 | Poisoning by opium, assault |
| 147. | T40.0X3A | Poisoning by opium, assault, initial encounter |
| 148. | T40.0X3D | Poisoning by opium, assault, subsequent encounter |
| 149. | T40.0X3S | Poisoning by opium, assault, sequela |
| 150. | T40.0X4 | Poisoning by opium, undetermined |
| 151. | T40.0X4A | Poisoning by opium, undetermined, initial encounter |
| 152. | T40.0X4D | Poisoning by opium, undetermined, subsequent encounter |
| 153. | T40.0X4S | Poisoning by opium, undetermined, sequela |
| 154. | T40.1 | Poisoning by and adverse effect of heroin |
| 155. | T40.1X | Poisoning by and adverse effect of heroin |
| 156. | T40.1X1 | Poisoning by heroin, accidental (unintentional) |
| 157. | T40.1X1A | Poisoning by heroin, accidental (unintentional), initial encounter |
| 158. | T40.1X1D | Poisoning by heroin, accidental (unintentional), subsequent encounter |
| 159. | T40.1X1S | Poisoning by heroin, accidental (unintentional), sequela |
| 160. | T40.1X2 | Poisoning by heroin, intentional self-harm |
| 161. | T40.1X2A | Poisoning by heroin, intentional self-harm, initial encounter |
| 162. | T40.1X2D | Poisoning by heroin, intentional self-harm, subsequent encounter |
| 163. | T40.1X2S | Poisoning by heroin, intentional self-harm, sequela |
| 164. | T40.1X3 | Poisoning by heroin, assault |
| 165. | T40.1X3A | Poisoning by heroin, assault, initial encounter |
| 166. | T40.1X3D | Poisoning by heroin, assault, subsequent encounter |

25

| 167. | T40.1X3S | Poisoning by heroin, assault, sequela |
| 168. | T40.1X4 | Poisoning by heroin, undetermined |
| 169. | T40.1X4A | Poisoning by heroin, undetermined, initial encounter |
| 170. | T40.1X4D | Poisoning by heroin, undetermined, subsequent encounter |
| 171. | T40.1X4S | Poisoning by heroin, undetermined, sequela |
| 172. | T40.1X5 | Adverse effect of heroin |
| 173. | T40.1X5A | Adverse effect of heroin, initial encounter |
| 174. | T40.1X5D | Adverse effect of heroin, subsequent encounter |
| 175. | T40.1X5S | Adverse effect of heroin, sequela |
| 176. | T40.1X6 | Underdosing of heroin |
| 177. | T40.1X6A | Underdosing of heroin, initial encounter |
| 178. | T40.1X6D | Underdosing of heroin, subsequent encounter |
| 179. | T40.1X6S | Underdosing of heroin, sequela |
| 180. | T40.2X1 | Poisoning by other opioids, accidental (unintentional) |
| 181. | T40.2X1A | Poisoning by other opioids, accidental (unintentional), initial encounter |
| 182. | T40.2X1D | Poisoning by other opioids, accidental (unintentional), subsequent encounter |
| 183. | T40.2X1S | Poisoning by other opioids, accidental (unintentional), sequela |
| 184. | T40.2X2 | Poisoning by other opioids, intentional self-harm |
| 185. | T40.2X2A | Poisoning by other opioids, intentional self-harm, initial encounter |
| 186. | T40.2X2D | Poisoning by other opioids, intentional self-harm, subsequent encounter |
| 187. | T40.2X2S | Poisoning by other opioids, intentional self-harm, sequela |
| 188. | T40.2X3 | Poisoning by other opioids, assault |
| 189. | T40.2X3A | Poisoning by other opioids, assault, initial encounter |
| 190. | T40.2X3D | Poisoning by other opioids, assault, subsequent encounter |
| 191. | T40.2X3S | Poisoning by other opioids, assault, sequela |
| 192. | T40.2X4 | Poisoning by other opioids, undetermined |
| 193. | T40.2X4A | Poisoning by other opioids, undetermined, initial encounter |
| 194. | T40.2X4D | Poisoning by other opioids, undetermined, subsequent encounter |
| 195. | T40.2X4S | Poisoning by other opioids, undetermined, sequela |

| 196. | T40.3X1 | Poisoning by methadone, accidental (unintentional) |
| 197. | T40.3X1A | Poisoning by methadone, accidental (unintentional), initial encounter |
| 198. | T40.3X1D | Poisoning by methadone, accidental (unintentional), subsequent encounter |
| 199. | T40.3X1S | Poisoning by methadone, accidental (unintentional), sequela |
| 200. | T40.3X2 | Poisoning by methadone, intentional self-harm |
| 201. | T40.3X2A | Poisoning by methadone, intentional self-harm, initial encounter |
| 202. | T40.3X2D | Poisoning by methadone, intentional self-harm, subsequent encounter |
| 203. | T40.3X2S | Poisoning by methadone, intentional self-harm, sequela |
| 204. | T40.3X3 | Poisoning by methadone, assault |
| 205. | T40.3X3A | Poisoning by methadone, assault, initial encounter |
| 206. | T40.3X3D | Poisoning by methadone, assault, subsequent encounter |
| 207. | T40.3X3S | Poisoning by methadone, assault, sequela |
| 208. | T40.3X4 | Poisoning by methadone, undetermined |
| 209. | T40.3X4A | Poisoning by methadone, undetermined, initial encounter |
| 210. | T40.3X4D | Poisoning by methadone, undetermined, subsequent encounter |
| 211. | T40.3X4S | Poisoning by methadone, undetermined, sequela |
| 212. | T40.4 | Poisoning by, adverse effect of and underdosing of other synthetic narcotics |
| 213. | T40.41 | Poisoning by, adverse effect of and underdosing of fentanylor fentanyl analogs |
| 214. | T40.411 | Poisoning by fentanyl or fentanyl analogs, accidental (unintentional) |
| 215. | T40.411A | Poisoning by fentanyl or fentanyl analogs, accidental (unintentional), initial encounter |
| 216. | T40.411D | Poisoning by fentanyl or fentanyl analogs, accidental (unintentional), subsequent encounter |
| 217. | T40.411S | Poisoning by fentanyl or fentanyl analogs, accidental (unintentional), sequela |
| 218. | T40.412 | Poisoning by fentanyl or fentanyl analogs, intentional self-harm |
| 219. | T40.412A | Poisoning by fentanyl or fentanyl analogs, intentional self-harm, initial encounter |
| 220. | T40.412D | Poisoning by fentanyl or fentanyl analogs, intentional self- |

27

|      |          | harm, subsequent encounter |
|------|----------|----------------------------|
| 221. | T40.412S | Poisoning by fentanyl or fentanyl analogs, intentional self-harm, sequela |
| 222. | T40.413  | Poisoning by fentanyl or fentanyl analogs, assault |
| 223. | T40.413A | Poisoning by fentanyl or fentanyl analogs, assault, initial encounter |
| 224. | T40.413D | Poisoning by fentanyl or fentanyl analogs, assault, subsequent encounter |
| 225. | T40.413S | Poisoning by fentanyl or fentanyl analogs, assault, sequela |
| 226. | T40.414  | Poisoning by fentanyl or fentanyl analogs, undetermined |
| 227. | T40.414A | Poisoning by fentanyl or fentanyl analogs, undetermined, initial encounter |
| 228. | T40.414D | Poisoning by fentanyl or fentanyl analogs, undetermined, subsequent encounter |
| 229. | T40.414S | Poisoning by fentanyl or fentanyl analogs, undetermined, sequela |
| 230. | T40.415  | Adverse effect of fentanyl or fentanyl analogs |
| 231. | T40.415A | Adverse effect of fentanyl or fentanyl analogs, initial encounter |
| 232. | T40.415D | Adverse effect of fentanyl or fentanyl analogs, subsequent encounter |
| 233. | T40.415S | Adverse effect of fentanyl or fentanyl analogs, sequela |
| 234. | T40.416  | Underdosing of fentanyl or fentanyl analogs |
| 235. | T40.416A | Underdosing of fentanyl or fentanyl analogs, initial encounter |
| 236. | T40.416D | Underdosing of fentanyl or fentanyl analogs, subsequent encounter |
| 237. | T40.416S | Underdosing of fentanyl or fentanyl analogs, sequela |
| 238. | T40.42   | Poisoning by, adverse effect of and underdosing of tramadol |
| 239. | T40.421  | Poisoning by tramadol, accidental (unintentional) |
| 240. | T40.421A | Poisoning by tramadol, accidental (unintentional), initial encounter |
| 241. | T40.421D | Poisoning by tramadol, accidental (unintentional), subsequent encounter |
| 242. | T40.421S | Poisoning by tramadol, accidental (unintentional), sequela |
| 243. | T40.422  | Poisoning by tramadol, intentional self-harm |
| 244. | T40.422A | Poisoning by tramadol, intentional self-harm, initial encounter |

28

| 245. | T40.422D | Poisoning by tramadol, intentional self-harm, subsequent encounter |
| 246. | T40.422S | Poisoning by tramadol, intentional self-harm, sequela |
| 247. | T40.423 | Poisoning by tramadol, assault |
| 248. | T40.423A | Poisoning by tramadol, assault, initial encounter |
| 249. | T40.423D | Poisoning by tramadol, assault, subsequent encounter |
| 250. | T40.423S | Poisoning by tramadol, assault, sequela |
| 251. | T40.424 | Poisoning by tramadol, undetermined |
| 252. | T40.424A | Poisoning by tramadol, undetermined, initial encounter |
| 253. | T40.424D | Poisoning by tramadol, undetermined, subsequent encounter |
| 254. | T40.424S | Poisoning by tramadol, undetermined, sequela |
| 255. | T40.425 | Adverse effect of tramadol |
| 256. | T40.425A | Adverse effect of tramadol, initial encounter |
| 257. | T40.425D | Adverse effect of tramadol, subsequent encounter |
| 258. | T40.425S | Adverse effect of tramadol, sequela |
| 259. | T40.426 | Underdosing of tramadol |
| 260. | T40.426A | Underdosing of tramadol, initial encounter |
| 261. | T40.426D | Underdosing of tramadol, subsequent encounter |
| 262. | T40.426S | Underdosing of tramadol, sequela |
| 263. | T40.49 | Poisoning by, adverse effect of and underdosing of other synthetic narcotics |
| 264. | T40.491 | Poisoning by other synthetic narcotics, accidental (unintentional) |
| 265. | T40.491A | Poisoning by other synthetic narcotics, accidental (unintentional), initial encounter |
| 266. | T40.491D | Poisoning by other synthetic narcotics, accidental (unintentional), subsequent encounter |
| 267. | T40.491S | Poisoning by other synthetic narcotics, accidental (unintentional), sequela |
| 268. | T40.492 | Poisoning by other synthetic narcotics, intentional self-harm |
| 269. | T40.492A | Poisoning by other synthetic narcotics, intentional self-harm, initial encounter |
| 270. | T40.492D | Poisoning by other synthetic narcotics, intentional self-harm, subsequent encounter |
| 271. | T40.492S | Poisoning by other synthetic narcotics, intentional self-harm, |

sequela

| 272. | T40.493 | Poisoning by other synthetic narcotics, assault |
| 273. | T40.493A | Poisoning by other synthetic narcotics, assault, initial encounter |
| 274. | T40.493D | Poisoning by other synthetic narcotics, assault, subsequent encounter |
| 275. | T40.493S | Poisoning by other synthetic narcotics, assault, sequela |
| 276. | T40.494 | Poisoning by other synthetic narcotics, undetermined |
| 277. | T40.494A | Poisoning by other synthetic narcotics, undetermined, initial encounter |
| 278. | T40.494D | Poisoning by other synthetic narcotics, undetermined, subsequent encounter |
| 279. | T40.494S | Poisoning by other synthetic narcotics, undetermined, sequela |
| 280. | T40.495 | Adverse effect of other synthetic narcotics |
| 281. | T40.495A | Adverse effect of other synthetic narcotics, initial encounter |
| 282. | T40.495D | Adverse effect of other synthetic narcotics, subsequent encounter |
| 283. | T40.495S | Adverse effect of other synthetic narcotics, sequela |
| 284. | T40.496 | Underdosing of other synthetic narcotics |
| 285. | T40.496A | Underdosing of other synthetic narcotics, initial encounter |
| 286. | T40.496D | Underdosing of other synthetic narcotics, subsequent encounter |
| 287. | T40.496S | Underdosing of other synthetic narcotics, sequela |
| 288. | T40.4X | Poisoning by, adverse effect of and underdosing of other synthetic narcotics |
| 289. | T40.4X1 | Poisoning by other synthetic narcotics, accidental (unintentional) |
| 290. | T40.4X1A | Poisoning by other synthetic narcotics, accidental (unintentional), initial encounter |
| 291. | T40.4X1D | Poisoning by other synthetic narcotics, accidental (unintentional), subsequent encounter |
| 292. | T40.4X1S | Poisoning by other synthetic narcotics, accidental (unintentional), sequela |
| 293. | T40.4X2 | Poisoning by other synthetic narcotics, intentional self-harm |
| 294. | T40.4X2A | Poisoning by other synthetic narcotics, intentional self-harm, initial encounter |
| 295. | T40.4X2D | Poisoning by other synthetic narcotics, intentional self-harm, subsequent encounter |

| 296. | T40.4X2S | Poisoning by other synthetic narcotics, intentional self-harm, sequela |
| 297. | T40.4X3 | Poisoning by other synthetic narcotics, assault |
| 298. | T40.4X3A | Poisoning by other synthetic narcotics, assault, initial encounter |
| 299. | T40.4X3D | Poisoning by other synthetic narcotics, assault, subsequent encounter |
| 300. | T40.4X3S | Poisoning by other synthetic narcotics, assault, sequela |
| 301. | T40.4X4 | Poisoning by other synthetic narcotics, undetermined |
| 302. | T40.4X4A | Poisoning by other synthetic narcotics, undetermined, initial encounter |
| 303. | T40.4X4D | Poisoning by other synthetic narcotics, undetermined, subsequent encounter |
| 304. | T40.4X4S | Poisoning by other synthetic narcotics, undetermined, sequela |
| 305. | T40.4X5 | Adverse effect of other synthetic narcotics |
| 306. | T40.4X5A | Adverse effect of other synthetic narcotics, initial encounter |
| 307. | T40.4X5D | Adverse effect of other synthetic narcotics, subsequent encounter |
| 308. | T40.4X5S | Adverse effect of other synthetic narcotics, sequela |
| 309. | T40.4X6 | Underdosing of other synthetic narcotics |
| 310. | T40.4X6A | Underdosing of other synthetic narcotics, initial encounter |
| 311. | T40.4X6D | Underdosing of other synthetic narcotics, subsequent encounter |
| 312. | T40.4X6S | Underdosing of other synthetic narcotics, sequela |
| 313. | T40.601 | Poisoning by unspecified narcotics, accidental (unintentional) |
| 314. | T40.601A | Poisoning by unspecified narcotics, accidental (unintentional), initial encounter |
| 315. | T40.601D | Poisoning by unspecified narcotics, accidental (unintentional), subsequent encounter |
| 316. | T40.601S | Poisoning by unspecified narcotics, accidental (unintentional), sequela |
| 317. | T40.602 | Poisoning by unspecified narcotics, intentional self-harm |
| 318. | T40.602A | Poisoning by unspecified narcotics, intentional self-harm, initial encounter |
| 319. | T40.602D | Poisoning by unspecified narcotics, intentional self-harm, subsequent encounter |
| 320. | T40.602S | Poisoning by unspecified narcotics, intentional self-harm, sequela |

| 321. | T40.603 | Poisoning by unspecified narcotics, assault |
| 322. | T40.603A | Poisoning by unspecified narcotics, assault, initial encounter |
| 323. | T40.603D | Poisoning by unspecified narcotics, assault, subsequent encounter |
| 324. | T40.603S | Poisoning by unspecified narcotics, assault, sequela |
| 325. | T40.604 | Poisoning by unspecified narcotics, undetermined |
| 326. | T40.604A | Poisoning by unspecified narcotics, undetermined, initial encounter |
| 327. | T40.604D | Poisoning by unspecified narcotics, undetermined, subsequent encounter |
| 328. | T40.604S | Poisoning by unspecified narcotics, undetermined, sequela |
| 329. | T40.691 | Poisoning by other narcotics, accidental (unintentional) |
| 330. | T40.691A | Poisoning by other narcotics, accidental (unintentional), initial encounter |
| 331. | T40.691D | Poisoning by other narcotics, accidental (unintentional), subsequent encounter |
| 332. | T40.691S | Poisoning by other narcotics, accidental (unintentional), sequela |
| 333. | T40.692 | Poisoning by other narcotics, intentional self-harm |
| 334. | T40.692A | Poisoning by other narcotics, intentional self-harm, initial encounter |
| 335. | T40.692D | Poisoning by other narcotics, intentional self-harm, subsequent encounter |
| 336. | T40.692S | Poisoning by other narcotics, intentional self-harm, sequela |
| 337. | T40.693 | Poisoning by other narcotics, assault |
| 338. | T40.693A | Poisoning by other narcotics, assault, initial encounter |
| 339. | T40.693D | Poisoning by other narcotics, assault, subsequent encounter |
| 340. | T40.693S | Poisoning by other narcotics, assault, sequela |
| 341. | T40.694 | Poisoning by other narcotics, undetermined |
| 342. | T40.694A | Poisoning by other narcotics, undetermined, initial encounter |
| 343. | T40.694D | Poisoning by other narcotics, undetermined, subsequent encounter |
| 344. | T40.694S | Poisoning by other narcotics, undetermined, sequela |
| 345. | F11.20 | Opioid Dependence uncomplicated |
| 346. | F11.21 | Opioid Dependence in remission |

| 347. | F11.22 | Opioid dependence with intoxication |
| 348. | F11.220 | Opioid Dependence uncomplicated |
| 349. | F11.221 | Opioid Dependence delirium |
| 350. | F11.222 | Opioid dependence w intoxication with perceptual disturbance |
| 351. | F11.229 | Opioid Dependence unspecified |
| 352. | F11.23 | Opioid Dependence with withdrawal |
| 353. | F11.24 | Opioid Dependence with opioid-induced mood disorder |
| 354. | F11.25 | Opioid Dependence with opioid-induced psychotic disorder |
| 355. | F11.250 | Opioid Dependence with delusions |
| 356. | F11.251 | Opioid Dependence with hallucinations |
| 357. | F11.259 | Opioid Dependence unspecified |
| 358. | F11.28 | Opioid Dependence with other opioid-induced disorder |
| 359. | F11.281 | Opioid Dependence with opioid-induced sexual dysfunction |
| 360. | F11.282 | Opioid Dependence with opioid-induced sleep disorder |
| 361. | F11.288 | Opioid Dependence with other opioid-induced disorder |

## APPENDIX D: Approved Uses/Programs

*Approved Uses/Programs.* Approved Uses/Programs are those that satisfy the following criteria (the "Approved Uses/Programs Criteria"): they (a) focus on providing treatment of Opioid Use Disorder ("OUD") and/or any Substance Use Disorder or Mental Health ("SUD/MH") conditions, and/or grants to organizations focused on providing treatment of OUD and/or any SUD/MH conditions, (b) employ evidence-based or evidence-informed strategies, and (c) do not include reimbursements to health care providers or payments to covered persons under the plan of a TPP Authorized Recipient (or ASO, if applicable). Approved Uses/Programs follow:[16]

1) Support programs that increase the availability or quality of treatment for OUD and/or any SUD/MH conditions or are designed to prevent OUD, including, but not limited to:

   a) Expand telehealth networks and availability to increase access to treatment for OUD and/or any SUD/MH conditions, including MAT, as well as counseling, psychiatric support, and other treatment and recovery support services.

   b) Support mobile, community-based crisis intervention services, including outpatient hospitals, community health centers, mental health centers and other clinics delivering mobile crisis intervention by qualified professionals and service providers, such as peer recovery coaches, for persons with OUD and/or any SUD/MH conditions and for persons who have experienced an opioid overdose. All supported services should make medications for opioid use disorder available through the mobile interventions.

   c) Train health care personnel to identify and treat trauma of individuals with OUD and/or SUD (e.g., violence, sexual assault, human trafficking, or adverse childhood experiences) and family members (e.g., surviving family members after an overdose or overdose fatality), including training of health care personnel supporting residential treatment, partial hospitalization, and intensive outpatient services.

   d) Provide funding and training for clinicians to obtain a waiver under the federal Drug Addiction Treatment Act of 2000 ("DATA 2000") to prescribe MAT for OUD, and provide technical assistance and professional support to clinicians who have obtained a DATA 2000 waiver.

   e) Support academic-led training on MAT for health care providers, students, or other supporting professionals, such as peer recovery coaches or recovery outreach specialists, including tele-mentoring to assist community-based providers in rural or underserved areas.

   f) Support stigma reduction efforts regarding treatment and support for persons with OUD, including reducing the stigma on effective treatment and peer recovery and

---

[16]  As used herein, words like "expand," "fund," "provide" or the like shall not indicate a preference for new or existing programs.

support specialists. These efforts should be based on research evidence of what works for stigma reduction and include an evaluation of efforts.

g) Support programs offering physical health and behavioral health services for members with OUD and/or any SUD/MH conditions, including but not limited to care management.

h) Support utilization management programs designed to prevent OUD.

i) Fund programs providing locations for safe and free disposal of opioids and other controlled substances.

j) Fund programs tailored to support patient adherence to MAT treatment.

k) Support educational programs on correct coding for OUD.

l) Fund programs to develop predictive modeling for earlier identification of OUD and SUD.

m) Support hospitals to deliver provision of MAT to patients.

2) Support programs that decrease the cost to the patient of treatment for OUD and/or any SUD/MH conditions.

a) Waive co-payments and other non-covered (or unreimbursed) patient costs for treatment for opioid use disorder with buprenorphine and methadone.

b) Provide or support transportation to treatment or recovery programs or services for persons with OUD and/or any SUD/MH conditions.

c) Provide community support services, including social and legal services, to assist in the living conditions of persons with OUD and/or any SUD/MH conditions.

d) Provide employment training or educational services for persons in treatment for or recovery from OUD and/or any SUD/MH conditions.

3) Grants to organizations whose mission is to provide, expand access to and/or improve the delivery of treatment for OUD and/or any SUD/MH conditions through evidence-based or evidence-informed strategies.

Examples include:

Liberation Programs Inc. (CT)

Boston Medical Center (Grayken Center) (MA)

Institutes for Behavioral Resources - Reach Health Services (MD)

Montefiore Medical Center (opioid treatment programs) (NY)

Pennsylvania Psychiatric Institute: Advancement in Recovery (PA)

Evergreen Treatment Services (WA)

Shatterproof

The Alliance for Addiction Payment Reform

National Council for Behavioral Health

Faces and Voices of Recovery

National Alliance for Recovery Residences

Supportive Housing

National Association for Mental Illness

Mental Health of America

The Trustee can add to the list of Approved Uses/Programs in this Appendix D programs that satisfy the Approved Uses/Programs Criteria; provided that the Trustee provides each State Attorney General at least forty-five (45) days advance written notice that both identifies the program or programs to be added to this Appendix D and explains how the program or programs to be added satisfy the Approved Uses/Programs Criteria.

**EXHIBIT 1: LRP Agreement**

**<u>EXHIBIT G</u>**

**NOAT TDP**

## NATIONAL OPIOID ABATEMENT TRUST DISTRIBUTION PROCEDURES[1]

| Issue | Description |
|---|---|
| **1. APPLICABILITY OF AGREEMENT** | These terms shall apply to the allocation of value received by NOAT under the plan of reorganization (the "**Chapter 11 Plan**" or the "**Plan**")[2] in the Chapter 11 Cases of Purdue Pharma L.P. and its affiliates (collectively, "**Purdue**") pending in the U.S. Bankruptcy Court for the Southern District of New York (the "**Bankruptcy Court**") in respect of the Public Creditor Trust Distributions (including the Initial Public Creditor Trust Distribution and all amounts distributed in respect of the TopCo Interests and the MDT Interests), which shall be distributed among (i) the states, territories and the District of Columbia (each a "**State**" as defined in the Plan), and (ii) each county, city, town, parish, village, and municipality that is a Domestic Governmental Entity or other holder of a Non-Federal Domestic Governmental Claim that is otherwise not a "State" as defined in the Plan (collectively, the "**Local Governments**"), whose Claims in Class 4 (Non-Federal Domestic Governmental Claims), along with all other Non-Federal Domestic Governmental Channeled Claims, are channeled to the National Opioid Abatement Trust ("**NOAT**") under the Plan and the Master TDP. To the extent not explicitly reflected in the Chapter 11 Plan, the terms set forth herein will be deemed incorporated into the Chapter 11 Plan, the trust |

---

[1] Oklahoma local governments set forth in **Schedule D** (the "**Oklahoma Local Governments**") will receive the equivalent of the Regional Apportionment portion of the allocation for Oklahoma less the $12.5 million designated for the Oklahoma political subdivisions in the State of Oklahoma's pre-petition settlement with the Debtors and the Sacklers (the "**Purdue Oklahoma Political Subdivision Fund**"). The release requirement contained in the State of Oklahoma settlement with the Debtors and the Sacklers for a political subdivision to participate in the Purdue Oklahoma Political Subdivision Fund, as defined in that agreement, shall be waived by the Debtors and any other party to that agreement as part of the documentation related to their Plan of Reorganization such that Oklahoma Local Governments may participate in both the Purdue Oklahoma Political Subdivision Fund and receive distributions from the National Opioid Abatement Trust. Debtors and the Sacklers also waive any requirement in the State of Oklahoma pre-petition settlement that funds not distributed by the Purdue Oklahoma Political Subdivision Fund within a certain amount of time will revert to the Foundation or the National Center for Addiction Studies and Treatment created by the State of Oklahoma's pre-petition settlement, and acknowledges that the entire Purdue Oklahoma Political Subdivision Fund shall be distributed to Oklahoma political subdivisions. Each of the Oklahoma Local Governments will be treated as a Qualifying Block Grantee, as that term is utilized in these National Opioid Abatement Trust Distribution Procedures, regardless of their population or other qualifications. Distributions from NOAT to Oklahoma Local Governments shall be in accordance with the ratios set forth in **Exhibit C** of the allocation to Oklahoma. The Oklahoma Local Governments shall either hire an administrator for the funds from NOAT or receive the funds directly from NOAT. Funds distributed to Oklahoma Local Governments shall only be used for Approved Uses, as that term is defined in these National Opioid Abatement Trust Distribution Procedures, and Oklahoma Local Governments shall be required to publish and submit documentation of the use of funds to an administrator for the purpose of reporting to NOAT as is required for Qualified Block Grantee under these National Opioid Abatement Trust Distribution Procedures. The administrator may be reasonably compensated to perform its administrative function, but not to exceed 5% of the money distributed to Oklahoma Local Governments by NOAT.

[2] Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to them in the Chapter 11 Plan or NOAT Agreement, as applicable.

| Issue | Description |
|---|---|
| | agreement for the National Opioid Abatement Trust (the **"NOAT Agreement"**) and the NOAT Documents, as applicable.<br><br>These terms set forth the manner in which NOAT shall make Abatement Distributions to States and Local Governments (such entities, **"Authorized Recipients"**), which may be used exclusively on the parameters set forth herein.[3] |
| **2.  PURPOSE** | Virtually all creditors and the Court itself in the Purdue Chapter 11 Cases recognize the need for and value in developing a comprehensive abatement strategy to address the opioid crisis as the most effective use of the funds that can be derived from the Purdue estate (including without limitation insurance proceeds and, if included in the Chapter 11 Plan, payments by third parties seeking releases).  Because of the unique impact the crisis has had throughout all regions of the United States, and as repeatedly recognized by the Bankruptcy Court, distribution of a substantial portion of the estates should occur through an established governmental structure, with the use of such funds strictly limited to abatement purposes as provided herein.[4]  This approach recognizes that funding abatement efforts – which would benefit most creditors and the public by reducing future effects of the crisis through treatment and other programs – is a much more efficient use of limited funds than dividing thin slices among all creditors with no obligation to use it to abate the opioid crisis.  Because maximizing abatement of the opioid crisis requires coordination of efforts by all levels of government, particularly when the abatement needs far exceed the |

---

[3] Subject to the approved settlement between the United States Department of Justice and the Debtors, resolution of States' and Local Governments' claims under this model presumes reaching satisfactory agreement regarding all claims asserted by the federal government in the Chapter 11 Cases.

[4] *See, e.g.,* Hrg. Tr at 149:22-150:5 (Oct. 11, 2019) (**"**I would hope that those public health steps, once the difficult allocation issues that the parties have addressed here, can be largely left up to the states and municipalities so that they can use their own unique knowledge about their own citizens and how to address them. It may be that some states think it's more of a law enforcement issue, i.e. interdicting illegal opioids at this point. Others may think education is more important. Others may think treatment is more important."); *id.* At 175:24-176:6 ("I also think, and again, I didn't say this lightly, that my hope in the allocation process is that there would be an understanding between the states and the municipalities and localities throughout the whole process that[,] subject to general guidelines on how the money should be used, specific ways to use it would be left up to the states and the municipalities, with guidance from the states primarily."); Hr'g Tr. At 165:3-165:14 (Nov. 19, 2019) ("I continue to believe that the states play a major role in [the allocation] process. The role I'm envisioning for them is not one where they say we get everything. I think that should be clear and I think it is clear to them. But, rather, where they act – in the best principles of federalism, for their state, the coordinator for the victims in their state."); Hr'g Tr. at 75:19-76:1 (Jan. 24, 2020) ("Even if there ultimately is an allocation here – and there's not a deal now, obviously, at this point on a plan. But if there is an allocation that leaves a substantial amount of the Debtors' value to the states and territories, one of the primary benefits of a bankruptcy case is that the plan can lock in, perhaps only in general ways, but perhaps more in specific ways, how the states use that money . . . .").

| Issue | Description |
|-------|-------------|
|       | available funds, this structure requires a collaborative process between each State and its Local Governments.<br><br>These distribution procedures (these "**National Opioid Abatement Trust Distribution Procedures**") are intended to establish the mechanisms for the distribution and allocation of funds distributed by NOAT to the States and Local Governments.  All funds described in the foregoing sentence are referred to herein as "**NOAT Funds**." 100% of the **NOAT Funds** distributed under the Chapter 11 Plan (and not otherwise dedicated to the attorneys' fee fund set forth in Section 4 herein) shall be used to abate the opioid crisis in accordance with the terms hereof.  Specifically, (i) no less than ninety five percent (95%) of the **NOAT Funds** distributed under the Chapter 11 Plan shall be used for abatement of the opioid crisis by funding opioid or substance use disorder-related projects or programs that fall within the list of uses in <u>**Schedule B**</u> (the "**Approved Opioid Abatement Uses**"); (ii) priority should be given to the core abatement strategies ("**Core Strategies**") as identified on <u>**Schedule A**</u>; and (iii) no more than five percent (5%) of the **NOAT Funds** may be used to fund expenses incurred in administering the distributions for the Approved Opioid Abatement Uses, including the process of selecting programs to receive distributions of **NOAT Funds** for implementing those programs and in connection with the Government Participation Mechanism[5] ("**Approved Administrative Expenses**") and together with the Approved Opioid Abatement Uses and Core Strategies, "**Approved Uses**".[6]<br><br>NOAT shall, in accordance with the Plan, the Confirmation Order and the NOAT Documents, distribute NOAT Funds to States and Local Governments exclusively for Approved Uses. Decisions concerning NOAT Funds made by NOAT will consider the need to ensure that underserved urban and rural areas, as well as minority communities, receive equitable access to the funds.<br><br>Notwithstanding anything in these National Opioid Abatement Trust Distribution Procedures that might imply to the contrary, projects or programs that constitute **Approved Opioid Abatement Uses** may be provided by States, State agencies, Local Governments, Local Government agencies or nongovernmental parties and funded from **NOAT Funds**. |

---

[5] Capitalized terms not defined where first used shall have the meanings later ascribed to them in these National Opioid Abatement Trust Distribution Procedures.

[6] Provisions regarding segregation of funds under consideration.

| Issue | Description |
|---|---|
| **3. DISBURSEMENT OF FUNDS** | The Chapter 11 Plan shall provide for the establishment of NOAT and the appointment of NOAT Trustees.[7] The NOAT Trustees shall distribute the **NOAT Funds** consistent with the allocation attached as **Schedule C** and in accordance with the NOAT Agreement. |
| **4. ATTORNEYS' FEES AND COSTS FUND** | Pursuant to Section 5.8 of the Plan, Public Creditor Trust Distributions will be subject to assessments to fund (i) the Local Government and Tribe Costs and Expenses Fund, which shall be used to pay qualifying costs and expenses (including attorneys' fees) of Holders of Non-Federal Governmental Claims (other than States) and Tribe Claims (including ad hoc groups of any of the foregoing) and (ii) the State Costs and Expenses Fund, which shall be used to pay qualifying costs and expenses (including attorneys' fees) of States (including ad hoc groups thereof). |
| **5. DIVISION OF NOAT FUNDS** | **NOAT Funds** shall be allocated among the States, the District of Columbia, and Territories in the percentages set forth on **Schedule C**.<br><br>A.  Except as set forth below in Section 5(B) for the District of Columbia and Territories, each State's Schedule C share shall then be allocated within the State in accordance with the following:<br><br>   1.  **Default Allocation Mechanism (excluding Territories and DC addressed below).** The **NOAT Funds** allocable to a State that is not party to a **Statewide Abatement Agreement** as defined in Section 5(A)(2) below (each a "**Non-SAA State**") shall be allocated as between the State and its Local Governments to be used only for **Approved Uses**, in accordance with this Section 5(A)(1) (the "**Default Allocation Mechanism**").<br><br>     i.  **Regions.** Except as provided in the final sentence of this paragraph, each **Non-SAA State** shall be divided into |

---

[7] Pursuant to the Plan, the NOAT Trustees shall be selected by the Governmental Consent Parties, in consultation with the Debtors and pursuant to a selection process reasonably acceptable to the Debtors; *provided* that the DOJ shall have the right, in its discretion, to observe such selection process. The NOAT Agreement shall provide that: (i) the Trustees shall receive compensation from NOAT for their services as Trustees; (ii) the amounts paid to the Trustees for compensation and expenses shall be disclosed in the Annual Report; (iii) the Trustees shall not be required to post any bond or other form of surety or security unless otherwise ordered by the Bankruptcy Court; (iv) the Trustees shall have the power to appoint such officers and retain such employees, consultants, advisors, independent contractors, experts, and agents and engage in such legal, financial, accounting, investment, auditing, and alternative dispute resolution services and activities as NOAT requires, and delegate to such persons such powers and authorities as the fiduciary duties of the Trustees permit and as the Trustees, in their discretion, deem advisable or necessary in order to carry out the terms of this Trust Agreement; and (v) the Trustees shall have the power to pay reasonable compensation and expenses to any such employees, consultants, advisors, independent contractors, experts, and agents for legal, financial, accounting, investment, auditing, and alternative dispute resolution services and activities.

| Issue | Description |
|---|---|
| | "**Regions**" as follows:  (a) each **Qualifying Block Grantee** (as defined below) shall constitute a **Region**; and (b) the balance of the State shall be divided into **Regions** (such **Regions** to be designated by the State agency with primary responsibility (referred to herein as a "**lead agency**")[8] for opioid use disorder services employing, to the maximum extent practical, existing regions established in that State for opioid use disorder treatment or similar public health purposes); such non-**Qualifying Block Grantee Regions** are referred to herein as "**Standard Regions**".   The **Non-SAA States** which have populations under four (4) million and do not have existing regions described in the foregoing clause (b) shall not be required to establish **Regions**;[9] such a State that does not establish **Regions** but which does contain one or more **Qualifying Block Grantees** shall be deemed to consist of one **Region** for each **Qualifying Block Grantee** and one **Standard Region** for the balance of the State.<br><br>ii.  **Regional Apportionment.  NOAT Funds** shall be allocated to each **Non-SAA State** as (a) a **Regional Apportionment** or (b) a **Non-Regional Apportionment** based on the amount of **NOAT Funds** dispersed under a confirmed Chapter 11 Plan as follows:<br><br>A.  **First $1 billion** – 70% Regional Apportionment /30% Non-Regional Apportionment<br><br>B.  **$1-$2.5 billion** – 64% Regional Apportionment /36% Non-Regional Apportionment<br><br>C.  **$2.5-$3.5 billion** – 60% Regional Apportionment /40% Non-Regional Apportionment<br><br>D.  **Above $3.5 billion** – 50% Regional Apportionment /50% Non-Regional Apportionment<br><br>iii.  **Qualifying   Block   Grantee.   A** "**Qualifying Local Government**" means a county or parish (or in the cases of States that do not have counties or parishes that function as political subdivisions, a city), that (a) either (i) has a population |

---

[8] A list of lead agencies will be made available on the NOAT website.

[9] To the extent they are not parties to a Statewide Abatement Agreement, the following States will qualify as a Non-SAA State that does not have to establish Regions: Connecticut, Delaware, Hawai'i, Iowa, Maine, Nevada, New Hampshire, New Mexico, Rhode Island, Vermont.

| Issue | Description |
|-------|-------------|
| | of 400,000 or more or (ii) in the case of California has a population of 750,000 or more and (b) has funded or otherwise manages an established, health care and/or treatment infrastructure (e.g., health department or similar agency) to evaluate, award, manage and administer a Local Government Block Grant.[10]    A **Qualifying Local Government** that is eligible and wishes to receive **NOAT Funds** through Local Government Block Grants shall elect to receive funds in such manner no later than (90) ninety days following the Agreement Date.  A **Qualifying Local Government** that elects to receive **NOAT Funds** through Local Government Block Grants is referred to herein as a **Qualifying Block Grantee**. <br><br> iv. **Proportionate Shares of Regional Apportionment.**  As used herein, the "**Proportionate Share**" of each **Region** in each **Non-SAA State** shall be (a) for States in which counties or parishes function as Local Governments, the aggregate shares of the counties or parishes located in such **Region** under the applicable allocation model employed in connection with the Purdue Chapter 11 Cases (the "**Allocation Model**"),[11] divided by the aggregate shares for all counties or parishes in the State under that **Allocation Model**; and (b) for all other States, the aggregate shares of the cities and towns in that **Region** under that **Allocation Model's** intra-county allocation formula, divided by the aggregate shares for all cities and towns in the State under that **Allocation Model**. <br><br> v. **Expenditure or Disbursement of Regional Apportionment.** Subject to Section 6(2)(i) below regarding **Approved Administrative Expenses**, all **Regional Apportionments** shall be disbursed or expended in the form of **Local Government Block Grants** or otherwise for **Approved Opioid Abatement Uses** in the **Standard Regions** of each **Non-SAA State**. |

[10] As noted in footnote 11, the population for each State shall refer to published U. S. Census Bureau population estimates as of [July 1, 2019], released March 2020, and shall remain unchanged during the term of this agreement. These estimates can currently be found at https://www.census.gov/data/datasets/time-series/demo/popest/2010s-counties-total.html.

[11] The Allocation Model shall be the allocation model available at www.opioidnegotiationclass.info implemented in In re: National Prescription Opiates Litigation, MDL No. 2804 (N.D. Ohio) (the "**Negotiation Class Allocation Model**"), provided, however, that notwithstanding the foregoing, a State and its Local Governments may instead agree to utilize the model developed by Christopher J. Ruhm, Professor of Public Policy and Economics at the University of Virginia (the "**Ruhm Allocation Model**"), available at _____.

| Issue | Description |
|---|---|
| | vi. **Qualifying Block Grantees.** Each **Qualifying Block Grantee** shall receive its **Regional Apportionment** as a block grant (a "**Local Government Block Grant**").<br><br>**Local Government Block Grants** shall be used only for **Approved Opioid Abatement Uses** by the **Qualifying Block Grantee** or for grants to organizations within its jurisdiction for **Approved Opioid Abatement Uses** and for **Approved Administrative Expenses** in accordance with Section 5(A)(1)(ix) below. Where a municipality located wholly within a **Qualifying Block Grantee** would independently qualify as a block grant recipient (an "**Independently Qualifying Municipality**"), the **Qualifying Block Grantee** and **Independently Qualifying Municipality** must make a substantial and good faith effort to reach agreement on use of **NOAT Funds** as between the qualifying jurisdictions. If the **Independently Qualifying Municipality** and the **Qualifying Block Grantee** cannot reach such an agreement on or before the Effective Date of the Chapter 11 Plan, the **Qualifying Block Grantee** will receive the **Local Government Block Grant** for its full **Proportionate Share** and commit programming expenditures to the benefit of the **Independently Qualifying Municipality** in general proportion to **Proportionate Shares** (determined as provided in Section 5(A)(2)(iv) above) of the municipalities within the **Qualifying Block Grantee**. Notwithstanding the allocation of the **Proportionate Share** of each **Regional Apportionment** to the **Qualifying Block Grantee**, a **Qualifying Block Grantee** may choose to contribute a portion of its **Proportionate Share** towards a statewide program.<br><br>vii. **Standard Regions.** The portions of each **Regional Apportionment** not disbursed in the form of **Local Government Block Grants** shall be expended throughout the **Standard Regions** of each **Non-SAA State** in accordance with 95%-105% of the respective **Proportionate Shares** of such **Standard Regions**. Such expenditures will be in a manner that will best address opioid abatement within the State as determined by the State with the input, advice and recommendations of the **Government Participation Mechanism** described in Section 6 below. This regional spending requirement may be met by delivering **Approved Opioid Abatement Use** services or programs to a **Standard Region** or its residents. Delivery of such services or programs can be accomplished directly or indirectly through many |

| Issue | Description |
|-------|-------------|
| | different infrastructures and approaches, including without limitation the following:<br><br>A. State agencies, including local offices;<br><br>B. Local governments, including local government health departments;<br><br>C. State public hospital or health systems;<br><br>D. Health care delivery districts;<br><br>E. Contracting with abatement service providers, including nonprofit and commercial entities; or<br><br>F. Awarding grants to local programs.<br><br>viii. **Expenditure or Disbursement of NOAT Funds Other Than Regional Apportionment.** All **NOAT Funds** allocable to a **Non-SAA State** that are not included in the State's **Regional Apportionment** shall be expended only on **Approved Uses**. The expenditure of such funds shall be at the direction of the State's lead agency (or other point of contact designated by the State) and may be expended on a statewide and/or localized manner, including in the manners described herein. **Qualifying Block Grantees** will be eligible to participate in or receive the benefits of any such expenditures on the same basis as other **Regions**.<br><br>ix. **Approved Administrative Expenses.** States may use up to five percent (5%) of their **Non-Regional Apportionments** plus five percent (5%) of the **Regional Apportionment** not used to fund **Local Government Block Grants**, for **Approved Administrative Expenses**. **Qualifying Block Grantees** may use up to five percent (5%) of their **Local Government Block Grants** to fund their **Approved Administrative Expenses**.<br><br>2. **Statewide Abatement Agreement.** Each State and its Local Governments will have until fourteen (14) days after the Effective Date of the Chapter 11 Plan (the "**Agreement Date**") to file with the Bankruptcy Court an agreed-upon allocation or method for allocating the **NOAT Funds** for that State dedicated only to Approved Uses (each a "**Statewide Abatement Agreement**" or "**SAA**"). Any State and its Local Governments that have reached agreement before the Agreement Date of the Chapter 11 Plan that satisfies the metric for approval as described in the immediately following paragraph shall file a notice with the Bankruptcy Court |

| Issue | Description |
|---|---|
| | that it has adopted a binding SAA and either include the SAA with its filing or indicate where the SAA is publicly available; no SAA shall become effective without such filing.  Any dispute regarding allocation within a State that has adopted a **Statewide Abatement Agreement** will be resolved as provided by that **Statewide Abatement Agreement**; *provided* that no **Statewide Abatement Agreement** may remove or otherwise limit the reporting requirements set forth in any of the NOAT Documents, including without limitation in the NOAT Agreement and Sections 5(A)(3) and 7 hereof. <br><br> A **Statewide Abatement Agreement** shall be agreed when it has been approved by the State and either (a) representatives[12] of its Local Governments whose aggregate Population Percentages, determined as set forth below, total more than sixty percent (60%), or (b) representatives of its Local Governments whose aggregate Population Percentages total more than fifty percent (50%) provided that these Local Governments also represent fifteen percent (15%) or more of the State's counties or parishes (or, in the case of States whose counties and parishes that do not function as Local Governments, fifteen percent (15%) of or more of the State's incorporated cities or towns), by number.[13] <br><br> Population Percentages shall be determined as follows: <br><br> For States with counties or parishes that function as Local Governments,[14] the Population Percentage of each county or parish shall be deemed to be equal to (a) (1) 200% of the population of such county or parish, minus (2) the aggregate population of all Primary Incorporated Municipalities located in such county or parish, divided by (b) 200% of the State's population.  A "**Primary Incorporated Municipality**" means a city, town, village or other municipality incorporated under applicable state law with a population of at least 25,000 that is not located within another incorporated municipality.  The Population Percentage of each |

---

[12] An authorized "representative" of local, or even State, government can differ in these National Opioid Abatement Trust Distribution Procedures depending on the context.

[13] All references to population in these National Opioid Abatement Trust Distribution Procedures shall refer to published U. S. Census Bureau population estimates as of [July 1, 2019], released March 2020, and shall remain unchanged during the term of this agreement.  These estimates can currently be found at https://www.census.gov/data/datasets/time-series/demo/popest/2010s-counties-total.html.

[14] Certain states do not have counties or parishes that function as Local Governments, including: Alaska, Connecticut, Massachusetts, Rhode Island, and Vermont.  All other States have counties or parishes that function as Local Governments.

| Issue | Description |
|-------|-------------|
| | primary incorporated municipality shall be equal to its population (including the population of any incorporated or unincorporated municipality located therein) divided by 200% of the State's population; *provided* that the Population Percentage of a primary incorporated municipality that is not located within a county shall be equal to 200% of its population (including the population of any incorporated or unincorporated municipality located therein) divided by 200% of the State's population.  For all States that do not have counties or parishes that function as Local Governments, the Population Percentage of each incorporated municipality (including any incorporated or unincorporated municipality located therein), shall be equal to its population divided by the State's population.<br><br>The **Statewide Abatement Agreement** will become effective within fourteen (14) days of filing, unless otherwise ordered by the Bankruptcy Court.<br><br>A State and its Local Governments may revise, supplement, or refine a **Statewide Abatement Agreement** by filing an amended **Statewide Abatement Agreement** that has been approved by the State and sufficient Local Governments to satisfy the approval standards set forth above with the Bankruptcy Court, which shall become effective within fourteen (14) days of filing, unless otherwise ordered by the Bankruptcy Court.<br><br>3.  **Records.**    The States shall maintain records of abatement expenditures and their required reporting, as set forth in further detail in Section 7, will include data on regional expenditures so it can be verified that the **Regional Distribution** mechanism guarantees are being met.  **Qualifying Block Grantees** shall maintain records of abatement expenditures and shall provide those records periodically to their State for inclusion in their State's required periodic reporting.<br><br>B.  **Allocation for Territories and the District of Columbia Only.** The allocation of **NOAT Funds** within a Territory or the District of Columbia will be determined by its local legislative body within one year of the Effective Date, unless that legislative body is not in session, in which case, the allocation of **NOAT Funds** shall be distributed pursuant to the direction of the Territory's or District of Columbia's executive, in consultation – to the extent applicable – with its Government Participation Mechanism. |

10

| Issue | Description |
|---|---|
| **6. GOVERNMENT PARTICIPATION MECHANISM** | In each **Non-SAA State**, as defined in Section 5(A)(1) above, there shall be a process, preferably pre-existing, whereby the State shall allocate funds under the **Regional Distribution** mechanism only after meaningfully consulting with its respective Local Governments.  Each such State shall identify its mechanism (whether be it a council, board, committee, commission, taskforce, or other efficient and transparent structure) for consulting with its respective Local Governments (the "**Government Participation Mechanism**" or "**GPM**") in a notice filed with the Bankruptcy Court identifying what **GPM** has been formed and describing the participation of its Local Governments in connection therewith.  States may combine these notices into one or more notices for filing with the Bankruptcy Court.  These notices are reviewable by the Bankruptcy Court upon the motion of any Local Government in that State asserting that no **GPM** has been formed. <br><br> **Government Participation Mechanisms** shall conform to the following: <br><br> 1. *Composition*.  For each State, <br><br>    1. the State, on the one hand, and State's Local Governments, on the other hand, shall have equal representation on a **GPM**; <br><br>    2. Local Government representation on a **GPM** shall be weighted in favor of the **Standard Regions** but can include representation from the State's **Qualifying Block Grantees**; <br><br>    3. the **GPM** will be chaired by a non-voting chairperson appointed by the State; <br><br>    4. Groups formed by the States' executive or legislature may be used as a **GPM**, provided that the group has equal representation by the State and the State's Local Governments. <br><br> A **GPM** should have appointees such that as a group they possess experience, expertise and education with respect to one or more of the following: public health, substance abuse, healthcare equity and other related topics as is necessary to assure the effective functioning of the **GPM**. <br><br> 2. *Consensus*.  Members of the **GPMs** should attempt to reach consensus with respect to **GPM Recommendations** and other actions of the **GPM**.  Consensus is defined in this process as a general agreement achieved by the members that reflects, from as many members as possible, their active support, support with reservations, or willingness to abide by the decision of the other members.  Consensus does not require unanimity or other set threshold and may include objectors.  In all events, however, actions of a **GPM** shall be effective if supported |

| Issue | Description |
|-------|-------------|
| | by at least a majority of its members.  **GPM Recommendations** and other actions shall note the existence and summarize the substance of objections where requested by the objector(s). |

3. *Proceedings*.  Each **GPM** shall hold no fewer than four (4) public meetings annually, to be publicized and located in a manner reasonably designed to facilitate attendance by residents throughout the State. Each **GPM** shall function in a manner consistent with its State's open meeting, open government or similar laws, and with the Americans with Disabilities Act.  **GPM** members shall be subject to State conflict of interest and similar ethics in government laws.

4. *Consultation and Discretion*.  The **GPM** shall be a mechanism by which the State consults with community stakeholders, including Local Governments (including those not a part of the **GPM**), state and local public health officials and public health advocates, in connection with opioid abatement priorities and expenditure decisions for the use of **NOAT Funds** on **Approved Opioid Abatement Uses**.

The **GPM** is authorized to identify and recommend that non-**Qualifying Local Government(s)** (individually or in combination) should be considered for a block grant to be funded from an applicable **Regional Apportionment**.  "**Non-Qualifying Local Government(s)**" individually or in combination are Local Governments that are not **Qualifying Local Governments** but they fund or otherwise manage an established, health care and/or treatment infrastructure (*e.g.*, health department or similar agency) to evaluate, award, manage and administer a block grant for programs constituting **Approved Uses**.

5. *Recommendations*.  A **GPM** shall make recommendations regarding specific opioid abatement priorities and expenditures for the use of **NOAT Funds** on **Approved Opioid Abatement Uses** to the State or the agency designated by a State for this purpose (**"GPM Recommendations"**).  In carrying out its obligations to provide **GPM Recommendations,** a **GPM** may consider local, state and federal initiatives and activities related to education, prevention, treatment and services for individuals and families experiencing and affected by opioid use disorder; recommend priorities to address the State's opioid epidemic, which recommendations may be Statewide or specific to **Regions**; recommend Statewide or **Regional** funding with respect to specific programs or initiatives; recommend measurable outcomes to determine the effectiveness of funds expended for **Approved Opioid Abatement Uses**; and monitor the level of **Approved Administrative Expenses** expended from **NOAT Funds**.

The goal is for a process that produces **GPM Recommendations** that are recognized as being an efficient, evidence-based approach to

| Issue | Description |
|---|---|
| | abatement that addresses the State's greatest needs while also including programs reflecting particularized needs in local communities. It is anticipated that such a process, particularly given the active participation of state representatives, will inform and assist the state in making decisions about the spending of the **NOAT Funds**. To the extent a State chooses not to follow a **GPM Recommendation**, it will make publicly available within fourteen (14) days after the decision is made a written explanation of the reasons for its decision, and allow seven (7) days for the **GPM** to respond. |
| | 6. ***Non-SAA States Review***. In Non-SAA States, Local Governments and States may object to any apportionment, allocation, use or expenditure of **NOAT Funds** (an "**Allocation**") solely on the basis that: the Allocation at issue (i) is inconsistent with the provisions of Section 6(1) hereof with respect to the levels of **Regional Apportionments** and **Non-Regional Apportionments**, (ii) is inconsistent with the provisions of Section 6(1) hereof with respect to the amounts of **Local Government Block Grants** or **Regional Apportionment** expenditures, (iii) is not for an **Approved Use** or (iv) violates the limitations set forth herein with respect to **Approved Administrative Expenses**. The objector shall have the right to bring that objection to either (a) a state court with jurisdiction within the applicable State ("**State Court**") or (b) the Bankruptcy Court if the Purdue Chapter 11 Cases have not been closed (each an "**Objection**"). If an **Objection** is filed within fourteen (14) days of approval of an **Allocation**, then no funds shall be distributed on account of the aspect of the **Allocation** that is the subject of the **Objection** until the **Objection** is resolved or decided by the Bankruptcy Court or **State Court**, as applicable. There shall be no other basis for bringing an **Objection** to the approval of an **Allocation**. |
| **7. COMPLIANCE, REPORTING, AUDIT AND ACCOUNTABILITY** | 1. At least annually, each State shall publish on its lead agency's website and/or on its Attorney General's website and deliver to NOAT, a report detailing for the preceding time period, respectively (i) the amount of **NOAT Funds** received, (ii) the allocation awards approved (indicating the recipient, the amount of the allocation, the program to be funded and disbursement terms), and (iii) the amounts disbursed on approved allocations, to **Qualifying Local Governments** for **Local Government Block Grants** and **Approved Administrative Expenses**.<br><br>2. At least annually, each **Qualifying Block Grantee** which has elected to take a **Local Government Block Grant** shall publish on its lead agency's or Local Government's website, and deliver to NOAT, a report detailing for the preceding time period, respectively (i) the amount of **Local Government Block Grants** received, (ii) the |

| Issue | Description |
|-------|-------------|
|  | allocation awards approved (indicating the recipient, the amount of the grant, the program to be funded and disbursement terms), and (iii) the amounts disbursed on approved allocations.<br><br>3.  As applicable, each State or Local Government shall impose reporting requirements on each recipient to ensure that **NOAT Funds** are only being used for **Approved Uses**, in accordance with the terms of the allocation.<br><br>4.  NOAT shall prepare an annual report (an "**Annual Report**") that shall be audited by independent auditors as provided in the NOAT Agreement, which audited **Annual Report** shall be filed annually with the Bankruptcy Court, and the States and **Qualifying Block Grantees** shall provide NOAT with any information reasonably required regarding the expenditure and disbursement of **NOAT Funds** to satisfy the requirements of such an audited **Annual Report** of NOAT.<br><br>5.  (a) A state court with jurisdiction within the applicable State ("**State Court**") or (b) the Bankruptcy Court if the Purdue Chapter 11 Cases have not been closed shall have jurisdiction to enforce the terms of these National Opioid Abatement Trust Distribution Procedures, and as applicable, a **Statewide Abatement Agreement** or default mechanism; *provided* that nothing herein is intended to expand the scope of the Bankruptcy Court's post-confirmation jurisdiction.  For the avoidance of doubt, the Bankruptcy Court shall have continuing jurisdiction over NOAT, *provided*, *however*, the courts of the State of Delaware, including any federal court located therein, shall also have jurisdiction over NOAT, *provided further*, that the foregoing shall not preclude **State Court** jurisdiction in any State with respect to any matter arising under the National Opioid Abatement Trust Distribution Procedures involving that State and one or more of its political subdivisions or agencies.<br><br>6.  The NOAT Trustees shall have the power to take any and all actions that in the judgment of the Trustees are necessary or proper to fulfill the purposes of NOAT, including the requirement that 100% of the NOAT Funds distributed under the Chapter 11 Plan (and not otherwise dedicated to the attorneys' fee fund set forth in Section 4 herein) shall be used to abate the opioid crisis in accordance with the terms hereof. |

## Schedule A
## Core Strategies

States and Qualifying Block Grantees shall choose from among the abatement strategies listed in Schedule B. However, priority shall be given to the following core abatement strategies ("**Core Strategies**").[1]

A.    **NALOXONE OR OTHER FDA-APPROVED DRUG TO REVERSE OPIOID OVERDOSES**

    1.    Expand training for first responders, schools, community support groups and families; and

    2.    Increase distribution to individuals who are uninsured or whose insurance does not cover the needed service.

B.    **MEDICATION-ASSISTED TREATMENT ("MAT") DISTRIBUTION AND OTHER OPIOID-RELATED TREATMENT**

    1.    Increase distribution of MAT to individuals who are uninsured or whose insurance does not cover the needed service;

    2.    Provide education to school-based and youth-focused programs that discourage or prevent misuse;

    3.    Provide MAT education and awareness training to healthcare providers, EMTs, law enforcement, and other first responders; and

    4.    Treatment and Recovery Support Services such as residential and inpatient treatment, intensive outpatient treatment, outpatient therapy or counseling, and recovery housing that allow or integrate medication and with other support services.

C.    **PREGNANT & POSTPARTUM WOMEN**

    1.    Expand Screening, Brief Intervention, and Referral to Treatment ("SBIRT") services to non-Medicaid eligible or uninsured pregnant women;

    2.    Expand comprehensive evidence-based treatment and recovery services, including MAT, for women with co-occurring Opioid Use Disorder ("OUD") and other Substance Use Disorder ("SUD")/Mental Health disorders for uninsured individuals for up to 12 months postpartum; and

---

[1] As used in this Schedule A, words like "expand," "fund," "provide" or the like shall not indicate a preference for new or existing programs.  Priorities will be established through the mechanisms described in the National Opioid Abatement Trust Distribution Procedures.

3.     Provide comprehensive wrap-around services to individuals with Opioid Use Disorder (OUD) including housing, transportation, job placement/training, and childcare.

D.     **EXPANDING TREATMENT FOR NEONATAL ABSTINENCE SYNDROME**

1.     Expand comprehensive evidence-based and recovery support for NAS babies;

2.     Expand services for better continuum of care with infant-need dyad; and

3.     Expand long-term treatment and services for medical monitoring of NAS babies and their families.

E.     **EXPANSION OF WARM HAND-OFF PROGRAMS AND RECOVERY SERVICES**

1.     Expand services such as navigators and on-call teams to begin MAT in hospital emergency departments;

2.     Expand warm hand-off services to transition to recovery services;

3.     Broaden scope of recovery services to include co-occurring SUD or mental health conditions;

4.     Provide comprehensive wrap-around services to individuals in recovery including housing, transportation, job placement/training, and childcare; and

5.     Hire additional social workers or other behavioral health workers to facilitate expansions above.

F.     **TREATMENT FOR INCARCERATED POPULATION**

1.     Provide evidence-based treatment and recovery support including MAT for persons with OUD and co-occurring SUD/MH disorders within and transitioning out of the criminal justice system; and

2.     Increase funding for jails to provide treatment to inmates with OUD.

G.     **PREVENTION PROGRAMS**

1.     Funding for media campaigns to prevent opioid use (similar to the FDA's "Real Cost" campaign to prevent youth from misusing tobacco);

2.     Funding for evidence-based prevention programs in schools.;

3.     Funding for medical provider education and outreach regarding best prescribing practices for opioids consistent with the 2016 CDC guidelines, including providers at hospitals (academic detailing);

4.     Funding for community drug disposal programs; and

5.    Funding and training for first responders to participate in pre-arrest diversion programs, post-overdose response teams, or similar strategies that connect at-risk individuals to behavioral health services and supports.

H.    **EXPANDING SYRINGE SERVICE PROGRAMS**

1.    Provide comprehensive syringe services programs with more wrap-around services including linkage to OUD treatment, access to sterile syringes and linkage to care and treatment of infectious diseases.

I.    **EVIDENCE-BASED DATA COLLECTION AND RESEARCH ANALYZING THE EFFECTIVENESS OF THE ABATEMENT STRATEGIES WITHIN THE STATE.**

## Schedule B
## Approved Uses

Support treatment of Opioid Use Disorder (OUD) and any co-occurring Substance Use Disorder or Mental Health (SUD/MH) conditions through evidence-based or evidence-informed programs or strategies that may include, but are not limited to, the following:

| PART ONE: TREATMENT |
| --- |

### A.    TREAT OPIOID USE DISORDER (OUD)

Support treatment of Opioid Use Disorder (OUD) and any co-occurring Substance Use Disorder or Mental Health (SUD/MH) conditions through evidence-based or evidence-informed programs or strategies that may include, but are not limited to, the following[1]:

1.    Expand availability of treatment for OUD and any co-occurring SUD/MH conditions, including all forms of Medication-Assisted Treatment (MAT) approved by the U.S. Food and Drug Administration.

2.    Support and reimburse evidence-based services that adhere to the American Society of Addiction Medicine (ASAM) continuum of care for OUD and any co-occurring SUD/MH conditions

3.    Expand telehealth to increase access to treatment for OUD and any co-occurring SUD/MH conditions, including MAT, as well as counseling, psychiatric support, and other treatment and recovery support services.

4.    Improve oversight of Opioid Treatment Programs (OTPs) to assure evidence-based or evidence-informed practices such as adequate methadone dosing and low threshold approaches to treatment.

5.    Support mobile intervention, treatment, and recovery services, offered by qualified professionals and service providers, such as peer recovery coaches, for persons with OUD and any co-occurring SUD/MH conditions and for persons who have experienced an opioid overdose.

6.    Treatment of trauma for individuals with OUD (e.g., violence, sexual assault, human trafficking, or adverse childhood experiences) and family members (e.g., surviving family members after an overdose or overdose fatality), and training of health care personnel to identify and address such trauma.

7.    Support evidence-based withdrawal management services for people with OUD and any co-occurring mental health conditions.

---

[1] As used in this Schedule B, words like "expand," "fund," "provide" or the like shall not indicate a preference for new or existing programs.  Priorities will be established through the mechanisms described in the National Opioid Abatement Trust Distribution Procedures.

8.   Training on MAT for health care providers, first responders, students, or other supporting professionals, such as peer recovery coaches or recovery outreach specialists, including telementoring to assist community-based providers in rural or underserved areas.

9.   Support workforce development for addiction professionals who work with persons with OUD and any co-occurring SUD/MH conditions.

10.   Fellowships for addiction medicine specialists for direct patient care, instructors, and clinical research for treatments.

11.   Scholarships and supports for behavioral health practitioners or workers involved in addressing OUD and any co-occurring SUD or mental health conditions, including but not limited to training, scholarships, fellowships, loan repayment programs, or other incentives for providers to work in rural or underserved areas.

12.   Provide funding and training for clinicians to obtain a waiver under the federal Drug Addiction Treatment Act of 2000 (DATA 2000) to prescribe MAT for OUD, and provide technical assistance and professional support to clinicians who have obtained a DATA 2000 waiver.

13.   Dissemination of web-based training curricula, such as the American Academy of Addiction Psychiatry's Provider Clinical Support Service-Opioids web-based training curriculum and motivational interviewing.

14.   Development and dissemination of new curricula, such as the American Academy of Addiction Psychiatry's Provider Clinical Support Service for Medication-Assisted Treatment.

## B.   SUPPORT PEOPLE IN TREATMENT AND RECOVERY

Support people in recovery from OUD and any co-occurring SUD/MH conditions through evidence-based or evidence-informed programs or strategies that may include, but are not limited to, the following:

1.   Provide comprehensive wrap-around services to individuals with OUD and any co-occurring SUD/MH conditions, including housing, transportation, education, job placement, job training, or childcare.

2.   Provide the full continuum of care of treatment and recovery services for OUD and any co-occurring SUD/MH conditions, including supportive housing, peer support services and counseling, community navigators, case management, and connections to community-based services.

3.   Provide counseling, peer-support, recovery case management and residential treatment with access to medications for those who need it to persons with OUD and any co-occurring SUD/MH conditions.

4.   Provide access to housing for people with OUD and any co-occurring SUD/MH conditions, including supportive housing, recovery housing, housing assistance

19

programs, training for housing providers, or recovery housing programs that allow or integrate FDA-approved mediation with other support services.

5. Provide community support services, including social and legal services, to assist in deinstitutionalizing persons with OUD and any co-occurring SUD/MH conditions.

6. Support or expand peer-recovery centers, which may include support groups, social events, computer access, or other services for persons with OUD and any co-occurring SUD/MH conditions.

7. Provide or support transportation to treatment or recovery programs or services for persons with OUD and any co-occurring SUD/MH conditions.

8. Provide employment training or educational services for persons in treatment for or recovery from OUD and any co-occurring SUD/MH conditions.

9. Identify successful recovery programs such as physician, pilot, and college recovery programs, and provide support and technical assistance to increase the number and capacity of high-quality programs to help those in recovery.

10. Engage non-profits, faith-based communities, and community coalitions to support people in treatment and recovery and to support family members in their efforts to support the person with OUD in the family.

11. Training and development of procedures for government staff to appropriately interact and provide social and other services to individuals with or in recovery from OUD, including reducing stigma.

12. Support stigma reduction efforts regarding treatment and support for persons with OUD, including reducing the stigma on effective treatment.

13. Create or support culturally appropriate services and programs for persons with OUD and any co-occurring SUD/MH conditions, including new Americans.

14. Create and/or support recovery high schools.

15. Hire or train behavioral health workers to provide or expand any of the services or supports listed above.

## C. CONNECT PEOPLE WHO NEED HELP TO THE HELP THEY NEED (CONNECTIONS TO CARE)

Provide connections to care for people who have – or at risk of developing – OUD and any co-occurring SUD/MH conditions through evidence-based or evidence-informed programs or strategies that may include, but are not limited to, the following:

1. Ensure that health care providers are screening for OUD and other risk factors and know how to appropriately counsel and treat (or refer if necessary) a patient for OUD treatment.

20

2.    Fund Screening, Brief Intervention and Referral to Treatment (SBIRT) programs to reduce the transition from use to disorders, including SBIRT services to pregnant women who are uninsured or not eligible for Medicaid.

3.    Provide training and long-term implementation of SBIRT in key systems (health, schools, colleges, criminal justice, and probation), with a focus on youth and young adults when transition from misuse to opioid disorder is common.

4.    Purchase automated versions of SBIRT and support ongoing costs of the technology.

5.    Expand services such as navigators and on-call teams to begin MAT in hospital emergency departments.

6.    Training for emergency room personnel treating opioid overdose patients on post-discharge planning, including community referrals for MAT, recovery case management or support services.

7.    Support hospital programs that transition persons with OUD and any co-occurring SUD/MH conditions, or persons who have experienced an opioid overdose, into clinically appropriate follow-up care through a bridge clinic or similar approach.

8.    Support crisis stabilization centers that serve as an alternative to hospital emergency departments for persons with OUD and any co-occurring SUD/MH conditions or persons that have experienced an opioid overdose.

9.    Support the work of Emergency Medical Systems, including peer support specialists, to connect individuals to treatment or other appropriate services following an opioid overdose or other opioid-related adverse event.

10.    Provide funding for peer support specialists or recovery coaches in emergency departments, detox facilities, recovery centers, recovery housing, or similar settings; offer services, supports, or connections to care to persons with OUD and any co-occurring SUD/MH conditions or to persons who have experienced an opioid overdose.

11.    Expand warm hand-off services to transition to recovery services.

12.    Create or support school-based contacts that parents can engage with to seek immediate treatment services for their child; and support prevention, intervention, treatment, and recovery programs focused on young people.

13.    Develop and support best practices on addressing OUD in the workplace.

14.    Support assistance programs for health care providers with OUD.

15.    Engage non-profits and the faith community as a system to support outreach for treatment.

16.    Support centralized call centers that provide information and connections to appropriate services and supports for persons with OUD and any co-occurring SUD/MH conditions.

**D.**    **ADDRESS THE NEEDS OF CRIMINAL-JUSTICE-INVOLVED PERSONS**

Address the needs of persons with OUD and any co-occurring SUD/MH conditions who are involved in, are at risk of becoming involved in, or are transitioning out of the criminal justice system through evidence-based or evidence-informed programs or strategies that may include, but are not limited to, the following:

1.    Support pre-arrest or pre-arraignment diversion and deflection strategies for persons with OUD and any co-occurring SUD/MH conditions, including established strategies such as:

   1.    Self-referral strategies such as the Angel Programs or the Police Assisted Addiction Recovery Initiative (PAARI);

   2.    Active outreach strategies such as the Drug Abuse Response Team (DART) model;

   3.    "Naloxone Plus" strategies, which work to ensure that individuals who have received naloxone to reverse the effects of an overdose are then linked to treatment programs or other appropriate services;

   4.    Officer prevention strategies, such as the Law Enforcement Assisted Diversion (LEAD) model;

   5.    Officer intervention strategies such as the Leon County, Florida Adult Civil Citation Network or the Chicago Westside Narcotics Diversion to Treatment Initiative; or

   6.    Co-responder and/or alternative responder models to address OUD-related 911 calls with greater SUD expertise.

2.    Support pre-trial services that connect individuals with OUD and any co-occurring SUD/MH conditions to evidence-informed treatment, including MAT, and related services.

3.    Support treatment and recovery courts that provide evidence-based options for persons with OUD and any co-occurring SUD/MH conditions.

4.    Provide evidence-informed treatment, including MAT, recovery support, harm reduction, or other appropriate services to individuals with OUD and any co-occurring SUD/MH conditions who are incarcerated in jail or prison.

5.    Provide evidence-informed treatment, including MAT, recovery support, harm reduction, or other appropriate services to individuals with OUD and any co-occurring SUD/MH conditions who are leaving jail or prison have recently left jail

or prison, are on probation or parole, are under community corrections supervision, or are in re-entry programs or facilities.

6.      Support critical time interventions (CTI), particularly for individuals living with dual-diagnosis OUD/serious mental illness, and services for individuals who face immediate risks and service needs and risks upon release from correctional settings.

7.      Provide training on best practices for addressing the needs of criminal-justice-involved persons with OUD and any co-occurring SUD/MH conditions to law enforcement, correctional, or judicial personnel or to providers of treatment, recovery, harm reduction, case management, or other services offered in connection with any of the strategies described in this section.

E.    **ADDRESS THE NEEDS OF PREGNANT OR PARENTING WOMEN AND THEIR FAMILIES, INCLUDING BABIES WITH NEONATAL ABSTINENCE SYNDROME**

Address the needs of pregnant or parenting women with OUD and any co-occurring SUD/MH conditions, and the needs of their families, including babies with neonatal abstinence syndrome (NAS), through evidence-based or evidence-informed programs or strategies that may include, but are not limited to, the following:

1.      Support evidence-based or evidence-informed treatment, including MAT, recovery services and supports, and prevention services for pregnant women – or women who could become pregnant – who have OUD and any co-occurring SUD/MH conditions, and other measures to educate and provide support to families affected by Neonatal Abstinence Syndrome.

2.      Expand comprehensive evidence-based treatment and recovery services, including MAT, for uninsured women with OUD and any co-occurring SUD/MH conditions for up to 12 months postpartum.

3.      Training for obstetricians or other healthcare personnel that work with pregnant women and their families regarding treatment of OUD and any co-occurring SUD/MH conditions.

4.      Expand comprehensive evidence-based treatment and recovery support for NAS babies; expand services for better continuum of care with infant-need dyad; expand long-term treatment and services for medical monitoring of NAS babies and their families.

5.      Provide training to health care providers who work with pregnant or parenting women on best practices for compliance with federal requirements that children born with Neonatal Abstinence Syndrome get referred to appropriate services and receive a plan of safe care.

6.      Child and family supports for parenting women with OUD and any co-occurring SUD/MH conditions.

7.    Enhanced family supports and child care services for parents with OUD and any co-occurring SUD/MH conditions.

8.    Provide enhanced support for children and family members suffering trauma as a result of addiction in the family; and offer trauma-informed behavioral health treatment for adverse childhood events.

9.    Offer home-based wrap-around services to persons with OUD and any co-occurring SUD/MH conditions, including but not limited to parent skills training.

10.   Support for Children's Services – Fund additional positions and services, including supportive housing and other residential services, relating to children being removed from the home and/or placed in foster care due to custodial opioid use.

---

PART TWO: PREVENTION

---

**F.    PREVENT    OVER-PRESCRIBING    AND    ENSURE    APPROPRIATE PRESCRIBING AND DISPENSING OF OPIOIDS**

Support efforts to prevent over-prescribing and ensure appropriate prescribing and dispensing of opioids through evidence-based or evidence-informed programs or strategies that may include, but are not limited to, the following:

1.    Fund medical provider education and outreach regarding best prescribing practices for opioids consistent with the Guidelines for Prescribing Opioids for Chronic Pain from the U.S. Centers for Disease Control and Prevention, including providers at hospitals (academic detailing).

2.    Training for health care providers regarding safe and responsible opioid prescribing, dosing, and tapering patients off opioids.

3.    Continuing Medical Education (CME) on appropriate prescribing of opioids.

4.    Support for non-opioid pain treatment alternatives, including training providers to offer or refer to multi-modal, evidence-informed treatment of pain.

5.    Support enhancements or improvements to Prescription Drug Monitoring Programs (PDMPs), including but not limited to improvements that:

    1.    Increase the number of prescribers using PDMPs;

    2.    Improve point-of-care decision-making by increasing the quantity, quality, or format of data available to prescribers using PDMPs, by improving the interface that prescribers use to access PDMP data, or both; or

    3.    Enable states to use PDMP data in support of surveillance or intervention strategies, including MAT referrals and follow-up for individuals identified within PDMP data as likely to experience OUD in a manner that complies with all relevant privacy and security laws and rules.

24

6.      Ensuring PDMPs incorporate available overdose/naloxone deployment data, including the United States Department of Transportation's Emergency Medical Technician overdose database in a manner that complies with all relevant privacy and security laws and rules.

7.      Increase electronic prescribing to prevent diversion or forgery.

8.      Educate Dispensers on appropriate opioid dispensing.

## G.    **PREVENT MISUSE OF OPIOIDS**

Support efforts to discourage or prevent misuse of opioids through evidence-based or evidence-informed programs or strategies that may include, but are not limited to, the following:

1.      Fund media campaigns to prevent opioid misuse.

2.      Corrective advertising or affirmative public education campaigns based on evidence.

3.      Public education relating to drug disposal.

4.      Drug take-back disposal or destruction programs.

5.      Fund community anti-drug coalitions that engage in drug prevention efforts.

6.      Support community coalitions in implementing evidence-informed prevention, such as reduced social access and physical access, stigma reduction – including staffing, educational campaigns, support for people in treatment or recovery, or training of coalitions in evidence-informed implementation, including the Strategic Prevention Framework developed by the U.S. Substance Abuse and Mental Health Services Administration (SAMHSA).

7.      Engage non-profits and faith-based communities as systems to support prevention.

8.      Fund evidence-based prevention programs in schools or evidence-informed school and community education programs and campaigns for students, families, school employees, school athletic programs, parent-teacher and student associations, and others.

9.      School-based or youth-focused programs or strategies that have demonstrated effectiveness in preventing drug misuse and seem likely to be effective in preventing the uptake and use of opioids.

10.     Create of support community-based education or intervention services for families, youth, and adolescents at risk for OUD and any co-occurring SUD/MH conditions.

11.     Support evidence-informed programs or curricula to address mental health needs of young people who may be at risk of misusing opioids or other drugs, including emotional modulation and resilience skills.

12. Support greater access to mental health services and supports for young people, including services and supports provided by school nurses, behavioral health workers or other school staff, to address mental health needs in young people that (when not properly addressed) increase the risk of opioid or another drug misuse.

## H. <u>PREVENT OVERDOSE DEATHS AND OTHER HARMS (HARM REDUCTION)</u>

Support efforts to prevent or reduce overdose deaths or other opioid-related harms through evidence-based or evidence-informed programs or strategies that may include, but are not limited to, the following:

1. Increase availability and distribution of naloxone and other drugs that treat overdoses for first responders, overdose patients, individuals with OUD and their friends and family members, schools, community navigators and outreach workers, persons being released from jail or prison, or other members of the general public.

2. Public health entities providing free naloxone to anyone in the community.

3. Training and education regarding naloxone and other drugs that treat overdoses for first responders, overdose patients, patients taking opioids, families, schools, community support groups, and other members of the general public.

4. Enable school nurses and other school staff to respond to opioid overdoses, and provide them with naloxone, training, and support.

5. Expand, improve, or develop data tracking software and applications for overdoses/naloxone revivals.

6. Public education relating to emergency responses to overdoses.

7. Public education relating to immunity and Good Samaritan laws.

8. Educate first responders regarding the existence and operation of immunity and Good Samaritan laws.

9. Syringe service programs and other evidence-informed programs to reduce harms associated with intravenous drug use, including supplies, staffing, space, peer support services, referrals to treatment, fentanyl checking, connections to care, and the full range of harm reduction and treatment services provided by these programs.

10. Expand access to testing and treatment for infectious diseases such as HIV and Hepatitis C resulting from intravenous opioid use.

11. Support mobile units that offer or provide referrals to harm reduction services, treatment, recovery supports, health care, or other appropriate services to persons that use opioids or persons with OUD and any co-occurring SUD/MH conditions.

12. Provide training in harm reduction strategies to health care providers, students, peer recovery coaches, recovery outreach specialists, or other professionals that provide

26

care to persons who use opioids or persons with OUD and any co-occurring SUD/MH conditions.

13.     Support screening for fentanyl in routine clinical toxicology testing.

> PART THREE: OTHER STRATEGIES

**I.     I. FIRST RESPONDERS**

In addition to items in section C, D and H relating to first responders, support the following:

1.     Educate law enforcement or other first responders regarding appropriate practices and precautions when dealing with fentanyl or other drugs.

2.     Provision of wellness and support services for first responders and others who experience secondary trauma associated with opioid-related emergency events.

**J.     LEADERSHIP, PLANNING AND COORDINATION**

Support efforts to provide leadership, planning, coordination, facilitations, training and technical assistance to abate the opioid epidemic through activities, programs, or strategies that may include, but are not limited to, the following:

1.     Statewide, regional, local or community regional planning to identify root causes of addiction and overdose, goals for reducing harms related to the opioid epidemic, and areas and populations with the greatest needs for treatment intervention services, and to support training and technical assistance and other strategies to abate the opioid epidemic described in this opioid abatement strategy list.

2.     A dashboard to (a) share reports, recommendations, or plans to spend opioid settlement funds; (b) to show how opioid settlement funds have been spent; (c) to report program or strategy outcomes; or (d) to track, share or visualize key opioid- or health-related indicators and supports as identified through collaborative statewide, regional, local or community processes.

3.     Invest in infrastructure or staffing at government or not-for-profit agencies to support collaborative, cross-system coordination with the purpose of preventing overprescribing, opioid misuse, or opioid overdoses, treating those with OUD and any co-occurring SUD/MH conditions, supporting them in treatment or recovery, connecting them to care, or implementing other strategies to abate the opioid epidemic described in this opioid abatement strategy list.

4.     Provide resources to staff government oversight and management of opioid abatement programs.

**K.     TRAINING**

In addition to the training referred to throughout this document, support training to abate the opioid epidemic through activities, programs, or strategies that may include, but are not limited to, the following:

1.    Provide funding for staff training or networking programs and services to improve the capability of government, community, and not-for-profit entities to abate the opioid crisis.

2.    Support infrastructure and staffing for collaborative cross-system coordination to prevent opioid misuse, prevent overdoses, and treat those with OUD and any co-occurring SUD/MH conditions, or implement other strategies to abate the opioid epidemic described in this opioid abatement strategy list (e.g., health care, primary care, pharmacies, PDMPs, etc.).

## L.    <u>RESEARCH</u>

Support opioid abatement research that may include, but is not limited to, the following:

1.    Monitoring, surveillance, data collection and evaluation of programs and strategies described in this opioid abatement strategy list.

2.    Research non-opioid treatment of chronic pain.

3.    Research on improved service delivery for modalities such as SBIRT that demonstrate promising but mixed results in populations vulnerable to opioid use disorders.

4.    Research on novel harm reduction and prevention efforts such as the provision of fentanyl test strips.

5.    Research on innovative supply-side enforcement efforts such as improved detection of mail-based delivery of synthetic opioids.

6.    Expanded research on swift/certain/fair models to reduce and deter opioid misuse within criminal justice populations that build upon promising approaches used to address other substances (e.g. Hawaii HOPE and Dakota 24/7).

7.    Epidemiological surveillance of OUD-related behaviors in critical populations including individuals entering the criminal justice system, including but not limited to approaches modeled on the Arrestee Drug Abuse Monitoring (ADAM) system.

8.    Qualitative and quantitative research regarding public health risks and harm reduction opportunities within illicit drug markets, including surveys of market participants who sell or distribute illicit opioids.

9.    Geospatial analysis of access barriers to MAT and their association with treatment engagement and treatment outcomes.

## Schedule C
### State Allocation Percentages

| State | Final Percentage Division of Funds |
|---|---|
| Alabama | 1.6579015983% |
| Alaska | 0.2681241169% |
| American Samoa* | 0.0175102976% |
| Arizona | 2.3755949882% |
| Arkansas | 0.9779907816% |
| California | 9.9213830698% |
| Colorado | 1.6616291219% |
| Connecticut | 1.3490069542% |
| Delaware | 0.5061239962% |
| District of Columbia | 0.2129072934% |
| Florida | 7.0259134409% |
| Georgia | 2.7882080114% |
| Guam* | 0.0518835714% |
| Hawaii | 0.3476670198% |
| Idaho | 0.5364838684% |
| Illinois | 3.3263363702% |
| Indiana | 2.2168933059% |
| Iowa | 0.7639415424% |
| Kansas | 0.8114241462% |
| Kentucky | 1.5963344879% |
| Louisiana | 1.5326855153% |
| Maine | 0.5725492304% |
| Maryland | 2.1106090494% |
| Massachusetts | 2.3035761083% |
| Michigan | 3.4020234989% |
| Minnesota | 1.2972597706% |
| Mississippi | 0.8994318052% |
| Missouri | 2.0056475170% |
| Montana | 0.3517745904% |
| N. Mariana Islands* | 0.0191942445% |
| Nebraska | 0.4335719578% |
| Nevada | 1.2651495115% |
| New Hampshire | 0.6419355371% |
| New Jersey | 2.7551354545% |
| New Mexico | 0.8749406830% |
| New York | 5.3903813405% |
| North Carolina | 3.2502525994% |
| North Dakota | 0.1910712849% |
| Ohio | 4.3567051408% |
| Oklahoma | 0.6073894708% |
| Oregon | 1.4405383452% |
| Pennsylvania | 4.5882419559% |

| | |
|---|---|
| Puerto Rico** | 0.7324076274% |
| Rhode Island | 0.5040770915% |
| South Carolina | 1.5989037696% |
| South Dakota | 0.2231552882% |
| Tennessee | 2.6881474977% |
| Texas | 6.2932157196% |
| Utah | 1.2039654451% |
| Vermont | 0.2945952769% |
| Virgin Islands* | 0.0348486384% |
| Virginia | 2.2801150757% |
| Washington | 2.3189040182% |
| West Virginia | 1.1614558107% |
| Wisconsin | 1.7582560561% |
| Wyoming | 0.2046300910% |

\* Allocations for American Samoa, Guam, N. Mariana Islands, and Virgin Islands are 100% based on population because of lack of available information for the other metrics.

\*\* Allocations for Puerto Rico are 25% based on MMEs and 75% based on population because of lack of available information for the other metrics.

The metrics noted above are calculated as follows:

A.      Amount of Prescription Opioids Sold as Measured by MME

The MME metric reflects the intensity of prescription opioid sales by state over a nine-year period from 2006 to 2014. This measure accounts for the flow of prescription opioids from manufacturers to distributors to pharmacies. The MME metric uses sales data for 12 categories of prescription opioids and was collected in a standardized manner by the Drug Enforcement Administration (DEA) in its Automation of Reports and Consolidated Orders System (ARCOS) database. As part of the National Prescription Opiate Litigation Multi-District Litigation, Case No. 1:17-MD-2804 (N.D. Ohio) (Opioid MDL), the DEA agreed to produce the nine years of data from 2006-2014, which encompassed the peak years of opioid sales in most states. The ARCOS data is standardized by converting data from varying products and prescription strengths into uniform MME totals to accurately reflect higher doses and stronger drugs in the data.

B.      Pain Reliever Use Disorder

This metric consists of the number of people in each state with pain reliever use disorder, as identified by the annual National Survey on Drug Use and Health conducted by the federal Substance Abuse and Mental Health Services Administration (SAMHSA). The SAMHSA survey is widely used by federal and other agencies. This metric included all three prior years in which pain reliever use disorder was broken down by state, 2015-2017, and included both people receiving treatment and those who are not.

C.      Overdose Deaths

The overdose death metric includes two measures: (1) overdose deaths caused by opioids and (2) overdose deaths caused by all drugs. The overdose death figures used for the metric are from the years 2007-2017, with data drawn from a database compiled by the Centers for Disease Control and Prevention ("**CDC**"). The CDC database does not adjust for local reporting problems

30

that differ from state to state and over time. To mitigate this data collection issue, figures for all drug overdose deaths, which captures some unidentified opioid overdoses as well as overdoses unrelated to opioids.

### D. Population

Population is measured by the 2018 U.S. Census estimate.

### E. Negotiation Class Metrics

The Opioid MDL Plaintiffs' proposed "negotiation class" metrics weighting factor consists of the Negotiating Class Allocation Model (defined below) applied at the state level.

### ii. Intrastate Allocation of NOAT Abatement Funds

Each State and its Local Governments will have until (14) fourteen days after the Effective Date of the Plan (the "**Agreement Date**") to file with the Bankruptcy Court an agreed-upon allocation or method for allocating the NOAT Funds for that State dedicated only to Approved Uses (each a "**Statewide Abatement Agreement**" or "**SAA**"). Any State and its Local Governments that have reached agreement before the Effective Date of the Plan that satisfies the metric for approval as described in the immediately following paragraph shall file a notice with the Bankruptcy Court that it has adopted a binding SAA and either include the SAA with its filing or indicate where the SAA is publicly available for the SAA to be effective for the Purdue Bankruptcy. Any dispute regarding allocation within a State will be resolved as provided by the Statewide Abatement Agreement; *provided* that no Statewide Abatement Agreement may remove or otherwise limit the reporting requirements set forth in any of the NOAT Documents, including without limitation in the NOAT Agreement.

A Statewide Abatement Agreement shall be agreed when it has been approved by the State and either (a) representatives of its Local Governments whose aggregate Population Percentages, determined as set forth below, total more than sixty percent (60%), or (b) representatives of its Local Governments whose aggregate Population Percentages total more than fifty percent (50%) provided that these Local Governments also represent 15% or more of the State's counties or parishes (or, in the case of States whose counties and parishes that do not function as Local Governments, 15% of or more of the State's incorporated cities or towns), by number.

Population Percentages shall be determined as follows: For States with counties or parishes that function as Local Governments,[1] the Population Percentage of each county or parish shall be deemed to be equal to (a) (1) 200% of the population of such county or parish, minus (2) the aggregate population of all Primary Incorporated Municipalities located in such county or parish, divided by (b) 200% of the State's population. A "**Primary Incorporated Municipality**"

---

[1] Certain states do not have counties or parishes that function as Local Governments, including: Alaska, Connecticut, Massachusetts, Rhode Island, and Vermont. All other States have counties or parishes that function as Local Governments.

means a city, town, village or other municipality incorporated under applicable state law with a population of at least 25,000 that is not located within another incorporated municipality. The Population Percentage of each primary incorporated municipality shall be equal to its population (including the population of any incorporated or unincorporated municipality located therein) divided by 200% of the State's population; *provided* that the Population Percentage of a primary incorporated municipality that is not located within a county shall be equal to 200% of its population (including the population of any incorporated or unincorporated municipality located therein) divided by 200% of the State's population. For all States that do not have counties or parishes that function as Local Governments, the Population Percentage of each incorporated municipality (including any incorporated or unincorporated municipality located therein), shall be equal to its population divided by the State's population.

The Statewide Abatement Agreement will become effective within fourteen (14) days of filing, unless otherwise ordered by the Bankruptcy Court.

A State and its Local Governments may revise, supplement, or refine a Statewide Abatement Agreement by filing an amended Statewide Abatement Agreement that has been approved by the State and sufficient Local Governments to satisfy the approval standards set forth above with the Bankruptcy Court, which shall become effective within fourteen (14) days of filing, unless otherwise ordered by the Bankruptcy Court

Under the Plan, NOAT Funds allocated to each Non-SAA State are allocated between a "**Regional Apportionment**" and a "**Non-Regional Apportionment.**" The Proportionate Share of the Regional Apportionment for each Region in a Non-SAA State is determined by reference to the aggregate shares of counties (as used herein, the term county includes parishes), and cities or towns in the cases of a Non-SAA States in which counties do not function as Local Governments, in the Region either (i) under the allocation model available at www.opioidnegotiationclass.info that was developed as part of the establishment of a negotiation class procedure implemented in *In re: National Prescription Opiates Litigation*, MDL No. 2804 (N.D. Ohio) (the "**Negotiating Class Allocation Model**"), or (ii) the model developed by Christopher J. Ruhm, Professor of Public Policy and Economics at the University of Virginia (the "**Ruhm Allocation Model")**, attached hereto as Exhibit 1, (collectively with the Negotiating Class Allocation Model, the "**Allocation Models**.").

      a.    The Negotiating Class Allocation Model

The Negotiating Class Allocation Model employs a three-factor analysis to allocate potential opioids settlement proceeds among counties. The three factors are:

> A.    Opioid Use Disorder ("**OUD**"). Under this factor, each county is assigned a percentage derived by dividing the number of people in the county with OUD by the total number of people nationwide with OUD. The Model uses data reported in the National Survey on Drug Use and Health ("**NSDUH**") for 2017. The data is accessible at https://bit.ly/2HqF554.

    B.    Overdose Deaths.  This factor assigns to each county a percentage of the nation's opioid overdose deaths.  The percentage is based on Multiple Causes of Death ("**MCOD**") data reported by the National Center for Health Statistics ("**NCHS**"), the Centers for Disease Control ("**CDC**") and the Department of Health and Human Services ("**DHHS**").  The data so reported is adjusted using a standard, accepted method (the "**Ruhm Adjustment**") designed to address the well-established under-reporting of deaths by opioids overdose.

    C.    Amount of Opioids.  This factor assigns to each county a percentage of the national opioids shipments during 2006-2016 (expressed as morphine molecule equivalents, or MMEs) that produced a negative outcome.  This percentage is based on data reported by the U.S. Drug Enforcement Agency ("**DEA**") in its ARCOS (Automation of Reports and Consolidated Orders System) database.  Each county's share of national shipments is multiplied by the higher of two ratios:  (1) the ratio of the percentage of people in the county with OUD to the percentage of people nationwide with OUD; or (2) the ratio of the percentage of people in the county who died of an opioids overdose between 2006-2016 to the national percentages of opioids overdose deaths during that time.

The Negotiating Class Allocation Model gives equal weight to each of these factors. Thus, a hypothetical county with an OUD percentage of .3%, and overdose deaths percentage of .2% and an amounts of opioids percentage of .16% would receive an overall allocation of .22%.

Where a county and its cities and towns are unable to reach agreement regarding the sharing of the county's overall allocation, the Negotiating Class Allocation Model provides for such sharing based on how the county and its cities and towns have historically split funding for opioids abatement.  This historical analysis employs data reported by the U.S. Census Bureau on local government spending by certain functions.  The Negotiating Class Allocation Model assigns to each incorporated city and town a portion of the county's overall allocation based on this historical data.

    b.    The Ruhm Allocation Model

The Ruhm Allocation Model employs a three-factor analysis to allocate potential opioids settlement proceeds among counties.  The three factors are:

    A.    Number of Persons with Opioid Use Disorder ("**OUD**").  **NSDUH** data from 2007-2016 is used to estimate the number of persons in the state with OUD.  The county share of OUD cases was assumed to be the same as its share of opioid-involved overdose deaths, calculated as described in (B) below.

    B.    Opioid-Related Overdose Deaths.  This factor assigns to each county a percentage of the nation's opioid overdose deaths.  The

percentage is based on **MCOD** data reported by the **NCHS**, **CDC** and **DHHS**.  The data so reported is adjusted using the **Ruhm Adjustment** designed to address the well-established under-reporting of deaths by opioids overdose.

C.      Opioid Shipments.  This factor assigns to each county a percentage of the national opioids shipments during 2006-2016 (expressed as morphine molecule equivalents, or MMEs) that produced a negative outcome.  This percentage is based on data reported by the **DEA** in its ARCOS. No additional adjustments are used.

Under the Plan, the Allocation Models' shares of each county in a Region are aggregated. Those aggregate Allocation Model shares are then divided by the total Allocation Model shares for all Regions in the State to determine the subject Region's Proportionate Share.  For Non-SAA States in which counties do not function as Local Governments, the Allocation Model shares for each city and town in a Region are aggregated, and the aggregate is divided by the total Allocation Model shares for all cities and towns in the State to determine the Region's Proportionate Share.

On September 30, 2020, the Bankruptcy Court entered the *Order Expanding Scope of Mediation* [D.I. 1756] (the "**Supplemental Mediation Order**"), which authorized the Mediators to continue the Mediation to resolve certain open issues referenced in the Mediators' Report, as well as to mediate the estate causes of action and any potential claims or causes of action held by any of the Non-Federal Public Claimants against, or that otherwise may become the subject of releases for, members of the Sackler Families in Phase 2 of Mediation.

## EXHIBIT G-1

**Redline of NOAT TDP**

## NATIONAL OPIOID ABATEMENT TRUST DISTRIBUTION PROCEDURES[1]

| Issue | Description |
|---|---|
| **1. APPLICABILITY OF AGREEMENT** | These terms shall apply to the allocation of value received by NOAT under the plan of reorganization (the "**Chapter 11 Plan**" or the "**Plan**")[2] in the Chapter 11 Cases of Purdue Pharma L.P. and its affiliates (collectively, "**Purdue**") pending in the U.S. Bankruptcy Court for the Southern District of New York (the "**Bankruptcy Court**") in respect of the Public Creditor Trust Distributions (including the Initial Public Creditor Trust Distribution and all amounts distributed in respect of the TopCo Interests and the MDT Interests), which shall be distributed among (i) the states, territories and the District of Columbia (each a "**State**" as defined in the Plan), and (ii) each county, city, town, parish, village, and municipality that is a Domestic Governmental Entity or other holder of a Non-Federal Domestic Governmental Claim that is otherwise not a "State" as defined in the Plan (collectively, the "**Local Governments**"), whose Claims in Class 4 (Non-Federal Domestic Governmental Claims), along with all other Non-Federal Domestic Governmental Channeled Claims, are channeled to the National Opioid Abatement Trust ("**NOAT**") under the Plan and the Master TDP. To the extent not explicitly reflected in the Chapter 11 Plan, the terms set forth herein will be deemed incorporated into the Chapter 11 Plan, the trust agreement for the National Opioid Abatement Trust (the "**NOAT** |

---

[1] Oklahoma local governments set forth in **Schedule D** (the "**Oklahoma Local Governments**") will receive the equivalent of the Regional Apportionment portion of the allocation for Oklahoma less the $12.5 million designated for the Oklahoma political subdivisions in the State of Oklahoma's pre-petition settlement with the Debtors and the Sacklers (the "**Purdue Oklahoma Political Subdivision Fund**"). The release requirement contained in the State of Oklahoma settlement with the Debtors and the Sacklers for a political subdivision to participate in the Purdue Oklahoma Political Subdivision Fund, as defined in that agreement, shall be waived by the Debtors and any other party to that agreement as part of the documentation related to their Plan of Reorganization such that Oklahoma Local Governments may participate in both the Purdue Oklahoma Political Subdivision Fund and receive distributions from the National Opioid Abatement Trust. Debtors and the Sacklers also waive any requirement in the State of Oklahoma pre-petition settlement that funds not distributed by the Purdue Oklahoma Political Subdivision Fund within a certain amount of time will revert to the Foundation or the National Center for Addiction Studies and Treatment created by the State of Oklahoma's pre-petition settlement, and acknowledges that the entire Purdue Oklahoma Political Subdivision Fund shall be distributed to Oklahoma political subdivisions. Each of the Oklahoma Local Governments will be treated as a Qualifying Block Grantee, as that term is utilized in these National Opioid Abatement Trust Distribution Procedures, regardless of their population or other qualifications. Distributions from NOAT to Oklahoma Local Governments shall be in accordance with the ratios set forth in **Exhibit C** of the allocation to Oklahoma. The Oklahoma Local Governments shall either hire an administrator for the funds from NOAT or receive the funds directly from NOAT. Funds distributed to Oklahoma Local Governments shall only be used for Approved Uses, as that term is defined in these National Opioid Abatement Trust Distribution Procedures, and Oklahoma Local Governments shall be required to publish and submit documentation of the use of funds to an administrator for the purpose of reporting to NOAT as is required for Qualified Block Grantee under these National Opioid Abatement Trust Distribution Procedures. The administrator may be reasonably compensated to perform its administrative function, but not to exceed 5% of the money distributed to Oklahoma Local Governments by NOAT.

[2] Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to them in the Chapter 11 Plan or NOAT Agreement, as applicable.

| Issue | Description |
|-------|-------------|
|  | **Agreement**") and the NOAT Documents, as applicable. <br><br> These terms set forth the manner in which NOAT shall make Abatement Distributions to States and Local Governments (such entities, "**Authorized Recipients**"), which may be used exclusively on the parameters set forth herein.[3] |
| **2. PURPOSE** | Virtually all creditors and the Court itself in the Purdue Chapter 11 Cases recognize the need for and value in developing a comprehensive abatement strategy to address the opioid crisis as the most effective use of the funds that can be derived from the Purdue estate (including without limitation insurance proceeds and, if included in the Chapter 11 Plan, payments by third parties seeking releases).  Because of the unique impact the crisis has had throughout all regions of the United States, and as repeatedly recognized by the Bankruptcy Court, distribution of a substantial portion of the estates should occur through an established governmental structure, with the use of such funds strictly limited to abatement purposes as provided herein.[4]  This approach recognizes that funding abatement efforts – which would benefit most creditors and the public by reducing future effects of the crisis through treatment and other programs – is a much more efficient use of limited funds than dividing thin slices among all creditors with no obligation to use it to abate the opioid crisis.  Because maximizing abatement of the opioid crisis requires coordination of efforts by all levels of government, particularly when the abatement needs far exceed the available funds, this structure requires a collaborative process between each State and its Local Governments. <br><br> These distribution procedures (these "**National Opioid Abatement** |

---

[3] Subject to the approved settlement between the United States Department of Justice and the Debtors, resolution of States' and Local Governments' claims under this model presumes reaching satisfactory agreement regarding all claims asserted by the federal government in the Chapter 11 Cases.

[4] *See, e.g.,* Hrg. Tr at 149:22-150:5 (Oct. 11, 2019) ("I would hope that those public health steps, once the difficult allocation issues that the parties have addressed here, can be largely left up to the states and municipalities so that they can use their own unique knowledge about their own citizens and how to address them. It may be that some states think it's more of a law enforcement issue, i.e. interdicting illegal opioids at this point. Others may think education is more important. Others may think treatment is more important."); *id.* At 175:24-176:6 ("I also think, and again, I didn't say this lightly, that my hope in the allocation process is that there would be an understanding between the states and the municipalities and localities throughout the whole process that[,] subject to general guidelines on how the money should be used, specific ways to use it would be left up to the states and the municipalities, with guidance from the states primarily."); Hr'g Tr. At 165:3-165:14 (Nov. 19, 2019) ("I continue to believe that the states play a major role in [the allocation] process. The role I'm envisioning for them is not one where they say we get everything. I think that should be clear and I think it is clear to them. But, rather, where they act – in the best principles of federalism, for their state, the coordinator for the victims in their state."); Hr'g Tr. at 75:19-76:1 (Jan. 24, 2020) ("Even if there ultimately is an allocation here – and there's not a deal now, obviously, at this point on a plan. But if there is an allocation that leaves a substantial amount of the Debtors' value to the states and territories, one of the primary benefits of a bankruptcy case is that the plan can lock in, perhaps only in general ways, but perhaps more in specific ways, how the states use that money . . . .").

| Issue | Description |
|-------|-------------|
|  | **Trust Distribution Procedures**”) are intended to establish the mechanisms for the distribution and allocation of funds distributed by NOAT to the States and Local Governments.  All funds described in the foregoing sentence are referred to herein as “**NOAT Funds**.” 100% of the **NOAT Funds** distributed under the Chapter 11 Plan (and not otherwise dedicated to the attorneys’ fee fund set forth in Section 4 herein) shall be used to abate the opioid crisis in accordance with the terms hereof.  Specifically, (i) no less than ninety five percent (95%) of the **NOAT Funds** distributed under the Chapter 11 Plan shall be used for abatement of the opioid crisis by funding opioid or substance use disorder-related projects or programs that fall within the list of uses in **Schedule B** (the “**Approved Opioid Abatement Uses**”); (ii) priority should be given to the core abatement strategies (“**Core Strategies**”) as identified on **Schedule A**; and (iii) no more than five percent (5%) of the **NOAT Funds** may be used to fund expenses incurred in administering the distributions for the Approved Opioid Abatement Uses, including the process of selecting programs to receive distributions of **NOAT Funds** for implementing those programs and in connection with the Government Participation Mechanism[5] (“**Approved Administrative Expenses**”) and together with the Approved Opioid Abatement Uses and Core Strategies, “**Approved Uses**”.[6]<br><br>NOAT shall, in accordance with the Plan, the Confirmation Order and the NOAT Documents, distribute NOAT Funds to States and Local Governments exclusively for Approved Uses.  Decisions concerning NOAT Funds made by NOAT will consider the need to ensure that underserved urban and rural areas, as well as minority communities, receive equitable access to the funds.<br><br>Notwithstanding anything in these National Opioid Abatement Trust Distribution Procedures that might imply to the contrary, projects or programs that constitute **Approved Opioid Abatement Uses** may be provided by States, State agencies, Local Governments, Local Government agencies or nongovernmental parties and funded from **NOAT Funds**. |
| **3.  DISBURSEMENT OF FUNDS** | The Chapter 11 Plan shall provide for the establishment of NOAT and the appointment of NOAT Trustees.[67]  The NOAT Trustees shall distribute |

---

[5] Capitalized terms not defined where first used shall have the meanings later ascribed to them in these National Opioid Abatement Trust Distribution Procedures.

[6] Provisions regarding segregation of funds under consideration.

[67] Pursuant to the Plan, the NOAT Trustees shall be selected by the Governmental Consent Parties, in consultation with the Debtors and pursuant to a selection process reasonably acceptable to the Debtors; *provided* that the DOJ shall have the right, in its discretion, to observe such selection process. The NOAT Agreement shall provide that: (i)

| Issue | Description |
|---|---|
|  | the **NOAT Funds** consistent with the allocation attached as **Schedule C** and in accordance with the NOAT Agreement. |
| **4. ATTORNEYS' FEES AND COSTS FUND** | Pursuant to Section 5.8 of the Plan, Public Creditor Trust Distributions will be subject to assessments to fund (i) the Local Government and Tribe Costs and Expenses Fund, which shall be used to pay qualifying costs and expenses (including attorneys' fees) of Holders of Non-Federal Governmental Claims (other than States) and Tribe Claims (including ad hoc groups of any of the foregoing) and (ii) the State Costs and Expenses Fund, which shall be used to pay qualifying costs and expenses (including attorneys' fees) of States (including ad hoc groups thereof). |
| **5. DIVISION OF NOAT FUNDS** | **NOAT Funds** shall be allocated among the States, the District of Columbia, and Territories in the percentages set forth on **Schedule C**.<br><br>A.  Except as set forth below in Section 5(B) for the District of Columbia and Territories, each State's Schedule C share shall then be allocated within the State in accordance with the following:<br><br>1.  **Default Allocation Mechanism (excluding Territories and DC addressed below).**  The **NOAT Funds** allocable to a State that is not party to a **Statewide Abatement Agreement** as defined in Section 5(A)(2) below (each a "**Non-SAA State**") shall be allocated as between the State and its Local Governments to be used only for **Approved Uses**, in accordance with this Section 5(A)(1) (the "**Default Allocation Mechanism**").<br><br>i.  **Regions.**  Except as provided in the final sentence of this paragraph, each **Non-SAA State** shall be divided into "**Regions**" as follows:  (a) each **Qualifying Block Grantee** (as defined below) shall constitute a **Region**; and (b) the balance of the State shall be divided into **Regions** (such **Regions** to be designated by the State agency with primary |

the Trustees shall receive compensation from NOAT for their services as Trustees; (ii) the amounts paid to the Trustees for compensation and expenses shall be disclosed in the Annual Report; (iii) the Trustees shall not be required to post any bond or other form of surety or security unless otherwise ordered by the Bankruptcy Court; (iv) the Trustees shall have the power to appoint such officers and retain such employees, consultants, advisors, independent contractors, experts, and agents and engage in such legal, financial, accounting, investment, auditing, and alternative dispute resolution services and activities as NOAT requires, and delegate to such persons such powers and authorities as the fiduciary duties of the Trustees permit and as the Trustees, in their discretion, deem advisable or necessary in order to carry out the terms of this Trust Agreement; and (v) the Trustees shall have the power to pay reasonable compensation and expenses to any such employees, consultants, advisors, independent contractors, experts, and agents for legal, financial, accounting, investment, auditing, and alternative dispute resolution services and activities.

| Issue | Description |
|---|---|
|  | responsibility (referred to herein as a "**lead agency**")[78] for opioid use disorder services employing, to the maximum extent practical, existing regions established in that State for opioid use disorder treatment or similar public health purposes); such non-**Qualifying Block Grantee Regions** are referred to herein as "**Standard Regions**". The **Non-SAA States** which have populations under four (4) million and do not have existing regions described in the foregoing clause (b) shall not be required to establish **Regions**;[89] such a State that does not establish **Regions** but which does contain one or more **Qualifying Block Grantees** shall be deemed to consist of one **Region** for each **Qualifying Block Grantee** and one **Standard Region** for the balance of the State. <br><br> ii. **Regional Apportionment. NOAT Funds** shall be allocated to each **Non-SAA State** as (a) a **Regional Apportionment** or (b) a **Non-Regional Apportionment** based on the amount of **NOAT Funds** dispersed under a confirmed Chapter 11 Plan as follows: <br><br> A. **First $1 billion** – 70% Regional Apportionment /30% Non-Regional Apportionment <br><br> B. **$1-$2.5 billion** – 64% Regional Apportionment /36% Non-Regional Apportionment <br><br> C. **$2.5-$3.5 billion** – 60% Regional Apportionment /40% Non-Regional Apportionment <br><br> D. **Above $3.5 billion** – 50% Regional Apportionment /50% Non-Regional Apportionment <br><br> iii. **Qualifying Block Grantee.** A "**Qualifying Local Government**" means a county or parish (or in the cases of States that do not have counties or parishes that function as political subdivisions, a city), that (a) either (i) has a population of 400,000 or more or (ii) in the case of California has a population of 750,000 or more and (b) has funded or otherwise manages an established, health care and/or treatment infrastructure (e.g., health department or similar agency) to evaluate, award, manage and administer a Local |

[78] A list of lead agencies will be made available on the NOAT website.

[89] To the extent they are not parties to a Statewide Abatement Agreement, the following States will qualify as a Non-SAA State that does not have to establish Regions: Connecticut, Delaware, Hawai'i, Iowa, Maine, Nevada, New Hampshire, New Mexico, Rhode Island, Vermont.

| Issue | Description |
|---|---|
| | Government Block Grant.[910] A **Qualifying Local Government** that is NOAT eligible and wishes to receive **NOAT Funds** through Local Government Block Grants shall elect to receive funds in such manner no later than (90) ninety days following the Agreement Date. A **Qualifying Local Government** that elects to receive **NOAT Funds** through Local Government Block Grants is referred to herein as a **Qualifying Block Grantee**. |
| | iv. **Proportionate Shares of Regional Apportionment.** As used herein, the "**Proportionate Share**" of each **Region** in each **Non-SAA State** shall be (a) for States in which counties or parishes function as Local Governments, the aggregate shares of the counties or parishes located in such **Region** under the applicable allocation model employed in connection with the Purdue Chapter 11 Cases (the "**Allocation Model**"),[1011] divided by the aggregate shares for all counties or parishes in the State under that **Allocation Model**; and (b) for all other States, the aggregate shares of the cities and towns in that **Region** under that **Allocation Model's** intra-county allocation formula, divided by the aggregate shares for all cities and towns in the State under that **Allocation Model**. |
| | v. **Expenditure or Disbursement of Regional Apportionment.** Subject to Section 6(2)(i) below regarding **Approved Administrative Expenses**, all **Regional Apportionments** shall be disbursed or expended in the form of **Local Government Block Grants** or otherwise for **Approved Opioid Abatement Uses** in the **Standard Regions** of each **Non-SAA State**. |
| | vi. **Qualifying Block Grantees.** Each **Qualifying Block Grantee** shall receive its **Regional Apportionment** as a block grant (a "**Local Government Block Grant**"). |

[910] As noted in footnote 11, the population for each State shall refer to published U. S. Census Bureau population estimates as of [July 1, 2019], released March 2020, and shall remain unchanged during the term of this agreement. These estimates can currently be found at https://www.census.gov/data/datasets/time-series/demo/popest/2010s-counties-total.html.

[1011] The Allocation Model shall be the allocation model available at www.opioidnegotiationclass.info implemented in In re: National Prescription Opiates Litigation, MDL No. 2804 (N.D. Ohio) (the "**Negotiation Class Allocation Model**"), provided, however, that notwithstanding the foregoing, a State and its Local Governments may instead agree to utilize the model developed by Christopher J. Ruhm, Professor of Public Policy and Economics at the University of Virginia (the "**Ruhm Allocation Model**"), available at _____.

| Issue | Description |
|---|---|
| | **Local Government Block Grants** shall be used only for **Approved Opioid Abatement Uses** by the **Qualifying Block Grantee** or for grants to organizations within its jurisdiction for **Approved Opioid Abatement Uses** and for **Approved Administrative Expenses** in accordance with Section 5(A)(1)(ix) below. Where a municipality located wholly within a **Qualifying Block Grantee** would independently qualify as a block grant recipient (an "**Independently Qualifying Municipality**"), the **Qualifying Block Grantee** and **Independently Qualifying Municipality** must make a substantial and good faith effort to reach agreement on use of **NOAT Funds** as between the qualifying jurisdictions. If the **Independently Qualifying Municipality** and the **Qualifying Block Grantee** cannot reach such an agreement on or before the Effective Date of the Chapter 11 Plan, the **Qualifying Block Grantee** will receive the **Local Government Block Grant** for its full **Proportionate Share** and commit programming expenditures to the benefit of the **Independently Qualifying Municipality** in general proportion to **Proportionate Shares** (determined as provided in Section 5(A)(2)(iv) above) of the municipalities within the **Qualifying Block Grantee**. Notwithstanding the allocation of the **Proportionate Share** of each **Regional Apportionment** to the **Qualifying Block Grantee**, a **Qualifying Block Grantee** may choose to contribute a portion of its **Proportionate Share** towards a statewide program. <br><br> vii. **Standard Regions.** The portions of each **Regional Apportionment** not disbursed in the form of **Local Government Block Grants** shall be expended throughout the **Standard Regions** of each **Non-SAA State** in accordance with 95%-105% of the respective **Proportionate Shares** of such **Standard Regions**. Such expenditures will be in a manner that will best address opioid abatement within the State as determined by the State with the input, advice and recommendations of the **Government Participation Mechanism** described in Section 6 below. This regional spending requirement may be met by delivering **Approved Opioid Abatement Use** services or programs to a **Standard Region** or its residents. Delivery of such services or programs can be accomplished directly or indirectly through many different infrastructures and approaches, including without limitation the following: <br><br> A. State agencies, including local offices; |

| Issue | Description |
|-------|-------------|
|       | B.  Local governments, including local government health departments; |

B.  Local governments, including local government health departments;

C.  State public hospital or health systems;

D.  Health care delivery districts;

E.  Contracting with abatement service providers, including nonprofit and commercial entities; or

F.  Awarding grants to local programs.

viii.   **Expenditure or Disbursement of NOAT Funds Other Than Regional Apportionment.**  All **NOAT Funds** allocable to a **Non-SAA State** that are not included in the State's **Regional Apportionment** shall be expended only on **Approved Uses**.  The expenditure of such funds shall be at the direction of the State's lead agency (or other point of contact designated by the State) and may be expended on a statewide and/or localized manner, including in the manners described herein.  **Qualifying Block Grantees** will be eligible to participate in or receive the benefits of any such expenditures on the same basis as other **Regions**.

ix.  **Approved Administrative Expenses.**  States may use up to five percent (5%) of their **Non-Regional Apportionments** plus five percent (5%) of the **Regional Apportionment** not used to fund **Local Government Block Grants**, for **Approved Administrative Expenses**.   **Qualifying Block Grantees** may use up to five percent (5%) of their **Local Government Block Grants** to fund their **Approved Administrative Expenses**.

2.  **Statewide Abatement Agreement.**   Each State and its Local Governments will have until fourteen (14) days after the Effective Date of the Chapter 11 Plan (the "**Agreement Date**") to file with the Bankruptcy Court an agreed-upon allocation or method for allocating the **NOAT Funds** for that State dedicated only to Approved Uses (each a "**Statewide Abatement Agreement**" or "**SAA**").  Any State and its Local Governments that have reached agreement before the Agreement Date of the Chapter 11 Plan that satisfies the metric for approval as described in the immediately following paragraph shall file a notice with the Bankruptcy Court that it has adopted a binding SAA and either include the SAA with its filing or indicate where the SAA is publicly available; no SAA shall become effective without such filing.  Any dispute regarding allocation within a State that has adopted a **Statewide**

| Issue | Description |
|-------|-------------|
|  | **Abatement Agreement** will be resolved as provided by that **Statewide Abatement Agreement**; *provided* that no **Statewide Abatement Agreement** may remove or otherwise limit the reporting requirements set forth in any of the NOAT Documents, including without limitation in the NOAT Agreement and Sections 5(A)(3) and 7 hereof. |

A **Statewide Abatement Agreement** shall be agreed when it has been approved by the State and either (a) representatives[11][12] of its Local Governments whose aggregate Population Percentages, determined as set forth below, total more than sixty percent (60%), or (b) representatives of its Local Governments whose aggregate Population Percentages total more than fifty percent (50%) provided that these Local Governments also represent fifteen percent (15%) or more of the State's counties or parishes (or, in the case of States whose counties and parishes that do not function as Local Governments, fifteen percent (15%) of or more of the State's incorporated cities or towns), by number.[12][13]

Population Percentages shall be determined as follows:

For States with counties or parishes that function as Local Governments,[13][14] the Population Percentage of each county or parish shall be deemed to be equal to (a) (1) 200% of the population of such county or parish, minus (2) the aggregate population of all Primary Incorporated Municipalities located in such county or parish, divided by (b) 200% of the State's population. A "**Primary Incorporated Municipality**" means a city, town, village or other municipality incorporated under applicable state law with a population of at least 25,000 that is not located within another incorporated municipality. The Population Percentage of each primary incorporated municipality shall be equal to its population (including the population of any incorporated or unincorporated municipality located therein) divided by 200% of the State's population; *provided* that the Population Percentage of a primary incorporated municipality that

---

[11][12] An authorized "representative" of local, or even State, government can differ in these National Opioid Abatement Trust Distribution Procedures depending on the context.

[12][13] All references to population in these National Opioid Abatement Trust Distribution Procedures shall refer to published U. S. Census Bureau population estimates as of [July 1, 2019], released March 2020, and shall remain unchanged during the term of this agreement. These estimates can currently be found at https://www.census.gov/data/datasets/time-series/demo/popest/2010s-counties-total.html.

[13][14] Certain states do not have counties or parishes that function as Local Governments, including: Alaska, Connecticut, Massachusetts, Rhode Island, and Vermont. All other States have counties or parishes that function as Local Governments.

| Issue | Description |
|---|---|
|  | is not located within a county shall be equal to 200% of its population (including the population of any incorporated or unincorporated municipality located therein) divided by 200% of the State's population.  For all States that do not have counties or parishes that function as Local Governments, the Population Percentage of each incorporated municipality (including any incorporated or unincorporated municipality located therein), shall be equal to its population divided by the State's population.<br><br>The **Statewide Abatement Agreement** will become effective within fourteen (14) days of filing, unless otherwise ordered by the Bankruptcy Court.<br><br>A State and its Local Governments may revise, supplement, or refine a **Statewide Abatement Agreement** by filing an amended **Statewide Abatement Agreement** that has been approved by the State and sufficient Local Governments to satisfy the approval standards set forth above with the Bankruptcy Court, which shall become effective within fourteen (14) days of filing, unless otherwise ordered by the Bankruptcy Court.<br><br>3. **Records.**  The States shall maintain records of abatement expenditures and their required reporting, as set forth in further detail in Section 7, will include data on regional expenditures so it can be verified that the **Regional Distribution** mechanism guarantees are being met.  **Qualifying Block Grantees** shall maintain records of abatement expenditures and shall provide those records periodically to their State for inclusion in their State's required periodic reporting.<br><br>B. **Allocation for Territories and the District of Columbia Only.** The allocation of **NOAT Funds** within a Territory or the District of Columbia will be determined by its local legislative body within one year of the Effective Date, unless that legislative body is not in session, in which case, the allocation of **NOAT Funds** shall be distributed pursuant to the direction of the Territory's or District of Columbia's executive, in consultation – to the extent applicable – with its Government Participation Mechanism. |
| 6. **GOVERNMENT PARTICIPATION MECHANISM** | In each **Non-SAA State**, as defined in Section 5(A)(1) above, there shall be a process, preferably pre-existing, whereby the State shall allocate funds under the **Regional Distribution** mechanism only after meaningfully consulting with its respective Local Governments.  Each such State shall identify its mechanism (whether it be a council, board, committee, commission, taskforce, or other efficient and transparent structure) for consulting with its respective Local Governments (the |

| Issue | Description |
|---|---|
| | "**Government Participation Mechanism**" or "**GPM**") in a notice filed with the Bankruptcy Court identifying what **GPM** has been formed and describing the participation of its Local Governments in connection therewith.  States may combine these notices into one or more notices for filing with the Bankruptcy Court.  These notices are reviewable by the Bankruptcy Court upon the motion of any Local Government in that State asserting that no **GPM** has been formed.<br><br>**Government Participation Mechanisms** shall conform to the following:<br><br>1. *Composition*.  For each State,<br><br>   1. the State, on the one hand, and State's Local Governments, on the other hand, shall have equal representation on a **GPM**;<br><br>   2. Local Government representation on a **GPM** shall be weighted in favor of the **Standard Regions** but can include representation from the State's **Qualifying Block Grantees**;<br><br>   3. the **GPM** will be chaired by a non-voting chairperson appointed by the State;<br><br>   4. Groups formed by the States' executive or legislature may be used as a **GPM**, provided that the group has equal representation by the State and the State's Local Governments.<br><br>A **GPM** should have appointees such that as a group they possess experience, expertise and education with respect to one or more of the following: public health, substance abuse, healthcare equity and other related topics as is necessary to assure the effective functioning of the **GPM**.<br><br>2. *Consensus*.   Members of the **GPMs** should attempt to reach consensus with respect to **GPM Recommendations** and other actions of the **GPM**.  Consensus is defined in this process as a general agreement achieved by the members that reflects, from as many members as possible, their active support, support with reservations, or willingness to abide by the decision of the other members.  Consensus does not require unanimity or other set threshold and may include objectors.  In all events, however, actions of a **GPM** shall be effective if supported by at least a majority of its members.  **GPM Recommendations** and other actions shall note the existence and summarize the substance of objections where requested by the objector(s).<br><br>3. *Proceedings*.  Each **GPM** shall hold no fewer than four (4) public meetings annually, to be publicized and located in a manner |

11

| Issue | Description |
|---|---|
| | reasonably designed to facilitate attendance by residents throughout the State. Each **GPM** shall function in a manner consistent with its State's open meeting, open government or similar laws, and with the Americans with Disabilities Act. **GPM** members shall be subject to State conflict of interest and similar ethics in government laws.<br><br>4.  ***Consultation and Discretion***.  The **GPM** shall be a mechanism by which the State consults with community stakeholders, including Local Governments (including those not a part of the **GPM**), state and local public health officials and public health advocates, in connection with opioid abatement priorities and expenditure decisions for the use of **NOAT Funds** on **Approved Opioid Abatement Uses**.<br><br>The **GPM** is authorized to identify and recommend that non-**Qualifying Local Government(s)** (individually or in combination) should be considered for a block grant to be funded from an applicable **Regional Apportionment**. "N**on-Qualifying Local Government(s)**" individually or in combination are Local Governments that are not **Qualifying Local Governments** but they fund or otherwise manage an established, health care and/or treatment infrastructure (*e.g.*, health department or similar agency) to evaluate, award, manage and administer a block grant for programs constituting **Approved Uses**.<br><br>5.  ***Recommendations***.  A **GPM** shall make recommendations regarding specific opioid abatement priorities and expenditures for the use of **NOAT Funds** on **Approved Opioid Abatement Uses** to the State or the agency designated by a State for this purpose ("**GPM Recommendations**").  In carrying out its obligations to provide **GPM Recommendations,** a **GPM** may consider local, state and federal initiatives and activities related to education, prevention, treatment and services for individuals and families experiencing and affected by opioid use disorder; recommend priorities to address the State's opioid epidemic, which recommendations may be Statewide or specific to **Regions**; recommend Statewide or **Regional** funding with respect to specific programs or initiatives; recommend measurable outcomes to determine the effectiveness of funds expended for **Approved Opioid Abatement Uses**; and monitor the level of **Approved Administrative Expenses** expended from **NOAT Funds**.<br><br>The goal is for a process that produces **GPM Recommendations** that are recognized as being an efficient, evidence-based approach to abatement that addresses the State's greatest needs while also including programs reflecting particularized needs in local communities.  It is anticipated that such a process, particularly given the active participation of state representatives, will inform and assist |

| Issue | Description |
|---|---|
|  | the state in making decisions about the spending of the **NOAT Funds**.  To the extent a State chooses not to follow a **GPM Recommendation**, it will make publicly available within fourteen (14) days after the decision is made a written explanation of the reasons for its decision, and allow seven (7) days for the **GPM** to respond. |
|  | 6.  ***Non-SAA States Review***.  In Non-SAA States, Local Governments and States may object to any apportionment, allocation, use or expenditure of **NOAT Funds** (an "**Allocation**") solely on the basis that: the Allocation at issue (i) is inconsistent with the provisions of Section 6(1) hereof with respect to the levels of **Regional Apportionments** and **Non-Regional Apportionments**, (ii) is inconsistent with the provisions of Section 6(1) hereof with respect to the amounts of **Local Government Block Grants** or **Regional Apportionment** expenditures, (iii) is not for an **Approved Use** or (iv) violates the limitations set forth herein with respect to **Approved Administrative Expenses**.  The objector shall have the right to bring that objection to either (a) a state court with jurisdiction within the applicable State ("**State Court**") or (b) the Bankruptcy Court if the Purdue Chapter 11 Cases have not been closed (each an "**Objection**").  If an **Objection** is filed within fourteen (14) days of approval of an **Allocation**, then no funds shall be distributed on account of the aspect of the **Allocation** that is the subject of the **Objection** until the **Objection** is resolved or decided by the Bankruptcy Court or **State Court**, as applicable.  There shall be no other basis for bringing an **Objection** to the approval of an **Allocation**. |
| 7.  **COMPLIANCE, REPORTING, AUDIT AND ACCOUNTABILITY** | 1.  At least annually, each State shall publish on its lead agency's website and/or on its Attorney General's website and deliver to NOAT, a report detailing for the preceding time period, respectively (i) the amount of **NOAT Funds** received, (ii) the allocation awards approved (indicating the recipient, the amount of the allocation, the program to be funded and disbursement terms), and (iii) the amounts disbursed on approved allocations, to **Qualifying Local Governments** for **Local Government Block Grants** and **Approved Administrative Expenses**. |
|  | 2.  At least annually, each **Qualifying Block Grantee** which has elected to take a **Local Government Block Grant** shall publish on its lead agency's or Local Government's website, and deliver to NOAT, a report detailing for the preceding time period, respectively (i) the amount of **Local Government Block Grants** received, (ii) the allocation awards approved (indicating the recipient, the amount of the grant, the program to be funded and disbursement terms), and (iii) |

| Issue | Description |
|-------|-------------|
| | the amounts disbursed on approved allocations.<br><br>3. As applicable, each State or Local Government shall impose reporting requirements on each recipient to ensure that **NOAT Funds** are only being used for **Approved Uses**, in accordance with the terms of the allocation.<br><br>4. NOAT shall prepare an annual report (an "**Annual Report**") that shall be audited by independent auditors as provided in the NOAT Agreement, which audited **Annual Report** shall be filed annually with the Bankruptcy Court, and the States and **Qualifying Block Grantees** shall provide NOAT with any information reasonably required regarding the expenditure and disbursement of **NOAT Funds** to satisfy the requirements of such an audited **Annual Report** of NOAT.<br><br>5. (a) A state court with jurisdiction within the applicable State ("**State Court**") or (b) the Bankruptcy Court if the Purdue Chapter 11 Cases have not been closed shall have jurisdiction to enforce the terms of these National Opioid Abatement Trust Distribution Procedures, and as applicable, a **Statewide Abatement Agreement** or default mechanism; *provided* that nothing herein is intended to expand the scope of the Bankruptcy Court's post-confirmation jurisdiction.  For the avoidance of doubt, the Bankruptcy Court shall have continuing jurisdiction over NOAT, *provided*, *however*, the courts of the State of Delaware, including any federal court located therein, shall also have jurisdiction over NOAT, *provided further*, that the foregoing shall not preclude **State Court** jurisdiction in any State with respect to any matter arising under the National Opioid Abatement Trust Distribution Procedures involving that State and one or more of its political subdivisions or agencies.<br><br>6. The NOAT Trustees shall have the power to take any and all actions that in the judgment of the Trustees are necessary or proper to fulfill the purposes of NOAT, including the requirement that 100% of the NOAT Funds distributed under the Chapter 11 Plan (and not otherwise dedicated to the attorneys' fee fund set forth in Section 4 herein) shall be used to abate the opioid crisis in accordance with the terms hereof. |

**Schedule A**
**Core Strategies**

States and Qualifying Block Grantees shall choose from among the abatement strategies listed in Schedule B. However, priority shall be given to the following core abatement strategies ("**Core Strategies**").[1]

A.   **NALOXONE OR OTHER FDA-APPROVED DRUG TO REVERSE OPIOID OVERDOSES**

    1.   Expand training for first responders, schools, community support groups and families; and

    2.   Increase distribution to individuals who are uninsured or whose insurance does not cover the needed service.

B.   **MEDICATION-ASSISTED TREATMENT ("MAT") DISTRIBUTION AND OTHER OPIOID-RELATED TREATMENT**

    1.   Increase distribution of MAT to individuals who are uninsured or whose insurance does not cover the needed service;

    2.   Provide education to school-based and youth-focused programs that discourage or prevent misuse;

    3.   Provide MAT education and awareness training to healthcare providers, EMTs, law enforcement, and other first responders; and

    4.   Treatment and Recovery Support Services such as residential and inpatient treatment, intensive outpatient treatment, outpatient therapy or counseling, and recovery housing that allow or integrate medication and with other support services.

C.   **PREGNANT & POSTPARTUM WOMEN**

    1.   Expand Screening, Brief Intervention, and Referral to Treatment ("SBIRT") services to non-Medicaid eligible or uninsured pregnant women;

    2.   Expand comprehensive evidence-based treatment and recovery services, including MAT, for women with co-occurring Opioid Use Disorder ("OUD") and other Substance Use Disorder ("SUD")/Mental Health disorders for uninsured individuals for up to 12 months postpartum; and

---

[1] As used in this Schedule A, words like "expand," "fund," "provide" or the like shall not indicate a preference for new or existing programs.  Priorities will be established through the mechanisms described in the National Opioid Abatement Trust Distribution Procedures.

15

3.  Provide comprehensive wrap-around services to individuals with Opioid Use Disorder (OUD) including housing, transportation, job placement/training, and childcare.

D.  **EXPANDING TREATMENT FOR NEONATAL ABSTINENCE SYNDROME**

1.  Expand comprehensive evidence-based and recovery support for NAS babies;

2.  Expand services for better continuum of care with infant-need dyad; and

3.  Expand long-term treatment and services for medical monitoring of NAS babies and their families.

E.  **EXPANSION OF WARM HAND-OFF PROGRAMS AND RECOVERY SERVICES**

1.  Expand services such as navigators and on-call teams to begin MAT in hospital emergency departments;

2.  Expand warm hand-off services to transition to recovery services;

3.  Broaden scope of recovery services to include co-occurring SUD or mental health conditions;

4.  Provide comprehensive wrap-around services to individuals in recovery including housing, transportation, job placement/training, and childcare; and

5.  Hire additional social workers or other behavioral health workers to facilitate expansions above.

F.  **TREATMENT FOR INCARCERATED POPULATION**

1.  Provide evidence-based treatment and recovery support including MAT for persons with OUD and co-occurring SUD/MH disorders within and transitioning out of the criminal justice system; and

2.  Increase funding for jails to provide treatment to inmates with OUD.

G.  **PREVENTION PROGRAMS**

1.  Funding for media campaigns to prevent opioid use (similar to the FDA's "Real Cost" campaign to prevent youth from misusing tobacco);

2.  Funding for evidence-based prevention programs in schools.;

3.  Funding for medical provider education and outreach regarding best prescribing practices for opioids consistent with the 2016 CDC guidelines, including providers at hospitals (academic detailing);

4.  Funding for community drug disposal programs; and

16

5.      Funding and training for first responders to participate in pre-arrest diversion programs, post-overdose response teams, or similar strategies that connect at-risk individuals to behavioral health services and supports.

H.      **EXPANDING SYRINGE SERVICE PROGRAMS**

1.      Provide comprehensive syringe services programs with more wrap-around services including linkage to OUD treatment, access to sterile syringes and linkage to care and treatment of infectious diseases.

I.      **EVIDENCE-BASED DATA COLLECTION AND RESEARCH ANALYZING THE EFFECTIVENESS OF THE ABATEMENT STRATEGIES WITHIN THE STATE.**

## Schedule B
## Approved Uses

Support treatment of Opioid Use Disorder (OUD) and any co-occurring Substance Use Disorder or Mental Health (SUD/MH) conditions through evidence-based or evidence-informed programs or strategies that may include, but are not limited to, the following:

| PART ONE: TREATMENT |
| --- |
|  |

**A.    TREAT OPIOID USE DISORDER (OUD)**

Support treatment of Opioid Use Disorder (OUD) and any co-occurring Substance Use Disorder or Mental Health (SUD/MH) conditions through evidence-based or evidence-informed programs or strategies that may include, but are not limited to, the following[1]:

1. Expand availability of treatment for OUD and any co-occurring SUD/MH conditions, including all forms of Medication-Assisted Treatment (MAT) approved by the U.S. Food and Drug Administration.

2. Support and reimburse evidence-based services that adhere to the American Society of Addiction Medicine (ASAM) continuum of care for OUD and any co-occurring SUD/MH conditions

3. Expand telehealth to increase access to treatment for OUD and any co-occurring SUD/MH conditions, including MAT, as well as counseling, psychiatric support, and other treatment and recovery support services.

4. Improve oversight of Opioid Treatment Programs (OTPs) to assure evidence-based or evidence-informed practices such as adequate methadone dosing and low threshold approaches to treatment.

5. Support mobile intervention, treatment, and recovery services, offered by qualified professionals and service providers, such as peer recovery coaches, for persons with OUD and any co-occurring SUD/MH conditions and for persons who have experienced an opioid overdose.

6. Treatment of trauma for individuals with OUD (e.g., violence, sexual assault, human trafficking, or adverse childhood experiences) and family members (e.g., surviving family members after an overdose or overdose fatality), and training of health care personnel to identify and address such trauma.

7. Support evidence-based withdrawal management services for people with OUD and any co-occurring mental health conditions.

---

[1] As used in this Schedule B, words like "expand," "fund," "provide" or the like shall not indicate a preference for new or existing programs.  Priorities will be established through the mechanisms described in the National Opioid Abatement Trust Distribution Procedures.

8. Training on MAT for health care providers, first responders, students, or other supporting professionals, such as peer recovery coaches or recovery outreach specialists, including telementoring to assist community-based providers in rural or underserved areas.

9. Support workforce development for addiction professionals who work with persons with OUD and any co-occurring SUD/MH conditions.

10. Fellowships for addiction medicine specialists for direct patient care, instructors, and clinical research for treatments.

11. Scholarships and supports for behavioral health practitioners or workers involved in addressing OUD and any co-occurring SUD or mental health conditions, including but not limited to training, scholarships, fellowships, loan repayment programs, or other incentives for providers to work in rural or underserved areas.

12. Provide funding and training for clinicians to obtain a waiver under the federal Drug Addiction Treatment Act of 2000 (DATA 2000) to prescribe MAT for OUD, and provide technical assistance and professional support to clinicians who have obtained a DATA 2000 waiver.

13. Dissemination of web-based training curricula, such as the American Academy of Addiction Psychiatry's Provider Clinical Support Service-Opioids web-based training curriculum and motivational interviewing.

14. Development and dissemination of new curricula, such as the American Academy of Addiction Psychiatry's Provider Clinical Support Service for Medication-Assisted Treatment.

## B.   **SUPPORT PEOPLE IN TREATMENT AND RECOVERY**

Support people in recovery from OUD and any co-occurring SUD/MH conditions through evidence-based or evidence-informed programs or strategies that may include, but are not limited to, the following:

1. Provide comprehensive wrap-around services to individuals with OUD and any co-occurring SUD/MH conditions, including housing, transportation, education, job placement, job training, or childcare.

2. Provide the full continuum of care of treatment and recovery services for OUD and any co-occurring SUD/MH conditions, including supportive housing, peer support services and counseling, community navigators, case management, and connections to community-based services.

3. Provide counseling, peer-support, recovery case management and residential treatment with access to medications for those who need it to persons with OUD and any co-occurring SUD/MH conditions.

4. Provide access to housing for people with OUD and any co-occurring SUD/MH conditions, including supportive housing, recovery housing, housing assistance

programs, training for housing providers, or recovery housing programs that allow or integrate FDA-approved mediation with other support services.

5.  Provide community support services, including social and legal services, to assist in deinstitutionalizing persons with OUD and any co-occurring SUD/MH conditions.

6.  Support or expand peer-recovery centers, which may include support groups, social events, computer access, or other services for persons with OUD and any co-occurring SUD/MH conditions.

7.  Provide or support transportation to treatment or recovery programs or services for persons with OUD and any co-occurring SUD/MH conditions.

8.  Provide employment training or educational services for persons in treatment for or recovery from OUD and any co-occurring SUD/MH conditions.

9.  Identify successful recovery programs such as physician, pilot, and college recovery programs, and provide support and technical assistance to increase the number and capacity of high-quality programs to help those in recovery.

10. Engage non-profits, faith-based communities, and community coalitions to support people in treatment and recovery and to support family members in their efforts to support the person with OUD in the family.

11. Training and development of procedures for government staff to appropriately interact and provide social and other services to individuals with or in recovery from OUD, including reducing stigma.

12. Support stigma reduction efforts regarding treatment and support for persons with OUD, including reducing the stigma on effective treatment.

13. Create or support culturally appropriate services and programs for persons with OUD and any co-occurring SUD/MH conditions, including new Americans.

14. Create and/or support recovery high schools.

15. Hire or train behavioral health workers to provide or expand any of the services or supports listed above.

## C.   CONNECT PEOPLE WHO NEED HELP TO THE HELP THEY NEED (CONNECTIONS TO CARE)

Provide connections to care for people who have – or at risk of developing – OUD and any co-occurring SUD/MH conditions through evidence-based or evidence-informed programs or strategies that may include, but are not limited to, the following:

1.  Ensure that health care providers are screening for OUD and other risk factors and know how to appropriately counsel and treat (or refer if necessary) a patient for OUD                                          treatment.

2.  Fund Screening, Brief Intervention and Referral to Treatment (SBIRT) programs to reduce the transition from use to disorders, including SBIRT services to pregnant women who are uninsured or not eligible for Medicaid.

3.  Provide training and long-term implementation of SBIRT in key systems (health, schools, colleges, criminal justice, and probation), with a focus on youth and young adults when transition from misuse to opioid disorder is common.

4.  Purchase automated versions of SBIRT and support ongoing costs of the technology.

5.  Expand services such as navigators and on-call teams to begin MAT in hospital emergency departments.

6.  Training for emergency room personnel treating opioid overdose patients on post-discharge planning, including community referrals for MAT, recovery case management or support services.

7.  Support hospital programs that transition persons with OUD and any co-occurring SUD/MH conditions, or persons who have experienced an opioid overdose, into clinically appropriate follow-up care through a bridge clinic or similar approach.

8.  Support crisis stabilization centers that serve as an alternative to hospital emergency departments for persons with OUD and any co-occurring SUD/MH conditions or persons that have experienced an opioid overdose.

9.  Support the work of Emergency Medical Systems, including peer support specialists, to connect individuals to treatment or other appropriate services following an opioid overdose or other opioid-related adverse event.

10. Provide funding for peer support specialists or recovery coaches in emergency departments, detox facilities, recovery centers, recovery housing, or similar settings; offer services, supports, or connections to care to persons with OUD and any co-occurring SUD/MH conditions or to persons who have experienced an opioid overdose.

11. Expand warm hand-off services to transition to recovery services.

12. Create or support school-based contacts that parents can engage with to seek immediate treatment services for their child; and support prevention, intervention, treatment, and recovery programs focused on young people.

13. Develop and support best practices on addressing OUD in the workplace.

14. Support assistance programs for health care providers with OUD.

15. Engage non-profits and the faith community as a system to support outreach for treatment.

16.     Support centralized call centers that provide information and connections to appropriate services and supports for persons with OUD and any co-occurring SUD/MH conditions.

## D.     ADDRESS THE NEEDS OF CRIMINAL-JUSTICE-INVOLVED PERSONS

Address the needs of persons with OUD and any co-occurring SUD/MH conditions who are involved in, are at risk of becoming involved in, or are transitioning out of the criminal justice system through evidence-based or evidence-informed programs or strategies that may include, but are not limited to, the following:

1.     Support pre-arrest or pre-arraignment diversion and deflection strategies for persons with OUD and any co-occurring SUD/MH conditions, including established strategies such as:

   1.     Self-referral strategies such as the Angel Programs or the Police Assisted Addiction Recovery Initiative (PAARI);

   2.     Active outreach strategies such as the Drug Abuse Response Team (DART) model;

   3.     "Naloxone Plus" strategies, which work to ensure that individuals who have received naloxone to reverse the effects of an overdose are then linked to treatment programs or other appropriate services;

   4.     Officer prevention strategies, such as the Law Enforcement Assisted Diversion (LEAD) model;

   5.     Officer intervention strategies such as the Leon County, Florida Adult Civil Citation Network or the Chicago Westside Narcotics Diversion to Treatment Initiative; or

   6.     Co-responder and/or alternative responder models to address OUD-related 911 calls with greater SUD expertise.

2.     Support pre-trial services that connect individuals with OUD and any co-occurring SUD/MH conditions to evidence-informed treatment, including MAT, and related services.

3.     Support treatment and recovery courts that provide evidence-based options for persons with OUD and any co-occurring SUD/MH conditions.

4.     Provide evidence-informed treatment, including MAT, recovery support, harm reduction, or other appropriate services to individuals with OUD and any co-occurring SUD/MH conditions who are incarcerated in jail or prison.

5.     Provide evidence-informed treatment, including MAT, recovery support, harm reduction, or other appropriate services to individuals with OUD and any co-occurring SUD/MH conditions who are leaving jail or prison have recently left

jail or prison, are on probation or parole, are under community corrections supervision, or are in re-entry programs or facilities.

6.      Support critical time interventions (CTI), particularly for individuals living with dual-diagnosis OUD/serious mental illness, and services for individuals who face immediate risks and service needs and risks upon release from correctional settings.

7.      Provide training on best practices for addressing the needs of criminal-justice-involved persons with OUD and any co-occurring SUD/MH conditions to law enforcement, correctional, or judicial personnel or to providers of treatment, recovery, harm reduction, case management, or other services offered in connection with any of the strategies described in this section.

## E.      ADDRESS THE NEEDS OF PREGNANT OR PARENTING WOMEN AND THEIR FAMILIES, INCLUDING BABIES WITH NEONATAL ABSTINENCE SYNDROME

Address the needs of pregnant or parenting women with OUD and any co-occurring SUD/MH conditions, and the needs of their families, including babies with neonatal abstinence syndrome (NAS), through evidence-based or evidence-informed programs or strategies that may include, but are not limited to, the following:

1.      Support evidence-based or evidence-informed treatment, including MAT, recovery services and supports, and prevention services for pregnant women – or women who could become pregnant – who have OUD and any co-occurring SUD/MH conditions, and other measures to educate and provide support to families affected by Neonatal Abstinence Syndrome.

2.      Expand comprehensive evidence-based treatment and recovery services, including MAT, for uninsured women with OUD and any co-occurring SUD/MH conditions for up to 12 months postpartum.

3.      Training for obstetricians or other healthcare personnel that work with pregnant women and their families regarding treatment of OUD and any co-occurring SUD/MH conditions.

4.      Expand comprehensive evidence-based treatment and recovery support for NAS babies; expand services for better continuum of care with infant-need dyad; expand long-term treatment and services for medical monitoring of NAS babies and their families.

5.      Provide training to health care providers who work with pregnant or parenting women on best practices for compliance with federal requirements that children born with Neonatal Abstinence Syndrome get referred to appropriate services and receive a plan of safe care.

6.      Child and family supports for parenting women with OUD and any co-occurring SUD/MH conditions.

23

7. Enhanced family supports and child care services for parents with OUD and any co-occurring SUD/MH conditions.

8. Provide enhanced support for children and family members suffering trauma as a result of addiction in the family; and offer trauma-informed behavioral health treatment for adverse childhood events.

9. Offer home-based wrap-around services to persons with OUD and any co-occurring SUD/MH conditions, including but not limited to parent skills training.

10. Support for Children's Services – Fund additional positions and services, including supportive housing and other residential services, relating to children being removed from the home and/or placed in foster care due to custodial opioid use.

---

PART TWO: PREVENTION

---

**F.**  **PREVENT OVER-PRESCRIBING AND ENSURE APPROPRIATE PRESCRIBING AND DISPENSING OF OPIOIDS**

Support efforts to prevent over-prescribing and ensure appropriate prescribing and dispensing of opioids through evidence-based or evidence-informed programs or strategies that may include, but are not limited to, the following:

1. Fund medical provider education and outreach regarding best prescribing practices for opioids consistent with the Guidelines for Prescribing Opioids for Chronic Pain from the U.S. Centers for Disease Control and Prevention, including providers at hospitals (academic detailing).

2. Training for health care providers regarding safe and responsible opioid prescribing, dosing, and tapering patients off opioids.

3. Continuing Medical Education (CME) on appropriate prescribing of opioids.

4. Support for non-opioid pain treatment alternatives, including training providers to offer or refer to multi-modal, evidence-informed treatment of pain.

5. Support enhancements or improvements to Prescription Drug Monitoring Programs (PDMPs), including but not limited to improvements that:

    1. Increase the number of prescribers using PDMPs;

    2. Improve point-of-care decision-making by increasing the quantity, quality, or format of data available to prescribers using PDMPs, by improving the interface that prescribers use to access PDMP data, or both; or

    3. Enable states to use PDMP data in support of surveillance or intervention strategies, including MAT referrals and follow-up for individuals

identified within PDMP data as likely to experience OUD in a manner that complies with all relevant privacy and security laws and rules.

6.    Ensuring PDMPs incorporate available overdose/naloxone deployment data, including the United States Department of Transportation's Emergency Medical Technician overdose database in a manner that complies with all relevant privacy and security laws and rules.

7.    Increase electronic prescribing to prevent diversion or forgery.

8.    Educate Dispensers on appropriate opioid dispensing.

## G.    <u>PREVENT MISUSE OF OPIOIDS</u>

Support efforts to discourage or prevent misuse of opioids through evidence-based or evidence-informed programs or strategies that may include, but are not limited to, the following:

1.    Fund media campaigns to prevent opioid misuse.

2.    Corrective advertising or affirmative public education campaigns based on evidence.

3.    Public education relating to drug disposal.

4.    Drug take-back disposal or destruction programs.

5.    Fund community anti-drug coalitions that engage in drug prevention efforts.

6.    Support community coalitions in implementing evidence-informed prevention, such as reduced social access and physical access, stigma reduction – including staffing, educational campaigns, support for people in treatment or recovery, or training of coalitions in evidence-informed implementation, including the Strategic Prevention Framework developed by the U.S. Substance Abuse and Mental Health Services Administration (SAMHSA).

7.    Engage non-profits and faith-based communities as systems to support prevention.

8.    Fund evidence-based prevention programs in schools or evidence-informed school and community education programs and campaigns for students, families, school employees, school athletic programs, parent-teacher and student associations, and others.

9.    School-based or youth-focused programs or strategies that have demonstrated effectiveness in preventing drug misuse and seem likely to be effective in preventing the uptake and use of opioids.

10. Create of support community-based education or intervention services for families, youth, and adolescents at risk for OUD and any co-occurring SUD/MH conditions.

11. Support evidence-informed programs or curricula to address mental health needs of young people who may be at risk of misusing opioids or other drugs, including emotional modulation and resilience skills.

12. Support greater access to mental health services and supports for young people, including services and supports provided by school nurses, behavioral health workers or other school staff, to address mental health needs in young people that (when not properly addressed) increase the risk of opioid or another drug misuse.

## H. <u>PREVENT OVERDOSE DEATHS AND OTHER HARMS (HARM REDUCTION)</u>

Support efforts to prevent or reduce overdose deaths or other opioid-related harms through evidence-based or evidence-informed programs or strategies that may include, but are not limited to, the following:

1. Increase availability and distribution of naloxone and other drugs that treat overdoses for first responders, overdose patients, individuals with OUD and their friends and family members, schools, community navigators and outreach workers, persons being released from jail or prison, or other members of the general public.

2. Public health entities providing free naloxone to anyone in the community.

3. Training and education regarding naloxone and other drugs that treat overdoses for first responders, overdose patients, patients taking opioids, families, schools, community support groups, and other members of the general public.

4. Enable school nurses and other school staff to respond to opioid overdoses, and provide them with naloxone, training, and support.

5. Expand, improve, or develop data tracking software and applications for overdoses/naloxone revivals.

6. Public education relating to emergency responses to overdoses.

7. Public education relating to immunity and Good Samaritan laws.

8. Educate first responders regarding the existence and operation of immunity and Good Samaritan laws.

9. Syringe service programs and other evidence-informed programs to reduce harms associated with intravenous drug use, including supplies, staffing, space, peer support services, referrals to treatment, fentanyl checking, connections to care, and the full range of harm reduction and treatment services provided by these programs.

10.    Expand access to testing and treatment for infectious diseases such as HIV and Hepatitis C resulting from intravenous opioid use.

11.    Support mobile units that offer or provide referrals to harm reduction services, treatment, recovery supports, health care, or other appropriate services to persons that use opioids or persons with OUD and any co-occurring SUD/MH conditions.

12.    Provide training in harm reduction strategies to health care providers, students, peer recovery coaches, recovery outreach specialists, or other professionals that provide care to persons who use opioids or persons with OUD and any co-occurring SUD/MH conditions.

13.    Support screening for fentanyl in routine clinical toxicology testing.

---

PART THREE: OTHER STRATEGIES

---

## I.   I. FIRST RESPONDERS

In addition to items in section C, D and H relating to first responders, support the following:

1.    Educate law enforcement or other first responders regarding appropriate practices and precautions when dealing with fentanyl or other drugs.

2.    Provision of wellness and support services for first responders and others who experience secondary trauma associated with opioid-related emergency events.

## J.   LEADERSHIP, PLANNING AND COORDINATION

Support efforts to provide leadership, planning, coordination, facilitations, training and technical assistance to abate the opioid epidemic through activities, programs, or strategies that may include, but are not limited to, the following:

1.    Statewide, regional, local or community regional planning to identify root causes of addiction and overdose, goals for reducing harms related to the opioid epidemic, and areas and populations with the greatest needs for treatment intervention services, and to support training and technical assistance and other strategies to abate the opioid epidemic described in this opioid abatement strategy list.

2.    A dashboard to (a) share reports, recommendations, or plans to spend opioid settlement funds; (b) to show how opioid settlement funds have been spent; (c) to report program or strategy outcomes; or (d) to track, share or visualize key opioid- or health-related indicators and supports as identified through collaborative statewide, regional, local or community processes.

3.    Invest in infrastructure or staffing at government or not-for-profit agencies to support collaborative, cross-system coordination with the purpose of preventing overprescribing, opioid misuse, or opioid overdoses, treating those with OUD and any co-occurring SUD/MH conditions, supporting them in treatment or recovery,

19-23649-rdd    Doc 3121    Filed 07/08/21    Entered 07/08/21 00:40:22    Main Document
Pg 241 of 1021

connecting them to care, or implementing other strategies to abate the opioid epidemic described in this opioid abatement strategy list.

4.  Provide resources to staff government oversight and management of opioid abatement programs.

## K.  TRAINING

In addition to the training referred to throughout this document, support training to abate the opioid epidemic through activities, programs, or strategies that may include, but are not limited to, the following:

1.  Provide funding for staff training or networking programs and services to improve the capability of government, community, and not-for-profit entities to abate the opioid crisis.

2.  Support infrastructure and staffing for collaborative cross-system coordination to prevent opioid misuse, prevent overdoses, and treat those with OUD and any co-occurring SUD/MH conditions, or implement other strategies to abate the opioid epidemic described in this opioid abatement strategy list (e.g., health care, primary care, pharmacies, PDMPs, etc.).

## L.  RESEARCH

Support opioid abatement research that may include, but is not limited to, the following:

1.  Monitoring, surveillance, data collection and evaluation of programs and strategies described in this opioid abatement strategy list.

2.  Research non-opioid treatment of chronic pain.

3.  Research on improved service delivery for modalities such as SBIRT that demonstrate promising but mixed results in populations vulnerable to opioid use disorders.

4.  Research on novel harm reduction and prevention efforts such as the provision of fentanyl test strips.

5.  Research on innovative supply-side enforcement efforts such as improved detection of mail-based delivery of synthetic opioids.

6.  Expanded research on swift/certain/fair models to reduce and deter opioid misuse within criminal justice populations that build upon promising approaches used to address other substances (e.g. Hawaii HOPE and Dakota 24/7).

7.  Epidemiological surveillance of OUD-related behaviors in critical populations including individuals entering the criminal justice system, including but not limited to approaches modeled on the Arrestee Drug Abuse Monitoring (ADAM) system.

8.      Qualitative and quantitative research regarding public health risks and harm reduction opportunities within illicit drug markets, including surveys of market participants who sell or distribute illicit opioids.

9.      Geospatial analysis of access barriers to MAT and their association with treatment engagement and treatment outcomes.

## Schedule C
### State Allocation Percentages

| State | Final Percentage Division of Funds |
|---|---|
| Alabama | 1.6579015983% |
| Alaska | 0.2681241169% |
| American Samoa* | 0.0175102976% |
| Arizona | 2.3755949882% |
| Arkansas | 0.9779907816% |
| California | 9.9213830698% |
| Colorado | 1.6616291219% |
| Connecticut | 1.3490069542% |
| Delaware | 0.5061239962% |
| District of Columbia | 0.2129072934% |
| Florida | 7.0259134409% |
| Georgia | 2.7882080114% |
| Guam* | 0.0518835714% |
| Hawaii | 0.3476670198% |
| Idaho | 0.5364838684% |
| Illinois | 3.3263363702% |
| Indiana | 2.2168933059% |
| Iowa | 0.7639415424% |
| Kansas | 0.8114241462% |
| Kentucky | 1.5963344879% |
| Louisiana | 1.5326855153% |
| Maine | 0.5725492304% |
| Maryland | 2.1106090494% |
| Massachusetts | 2.3035761083% |
| Michigan | 3.4020234989% |
| Minnesota | 1.2972597706% |
| Mississippi | 0.8994318052% |
| Missouri | 2.0056475170% |
| Montana | 0.3517745904% |
| N. Mariana Islands* | 0.0191942445% |
| Nebraska | 0.4335719578% |
| Nevada | 1.2651495115% |
| New Hampshire | 0.6419355371% |
| New Jersey | 2.7551354545% |
| New Mexico | 0.8749406830% |
| New York | 5.3903813405% |
| North Carolina | 3.2502525994% |
| North Dakota | 0.1910712849% |
| Ohio | 4.3567051408% |
| Oklahoma | 0.6073894708% |
| Oregon | 1.4405383452% |
| Pennsylvania | 4.5882419559% |

| | |
|---|---|
| Puerto Rico** | 0.7324076274% |
| Rhode Island | 0.5040770915% |
| South Carolina | 1.5989037696% |
| South Dakota | 0.2231552882% |
| Tennessee | 2.6881474977% |
| Texas | 6.2932157196% |
| Utah | 1.2039654451% |
| Vermont | 0.2945952769% |
| Virgin Islands* | 0.0348486384% |
| Virginia | 2.2801150757% |
| Washington | 2.3189040182% |
| West Virginia | 1.1614558107% |
| Wisconsin | 1.7582560561% |
| Wyoming | 0.2046300910% |

\* Allocations for American Samoa, Guam, N. Mariana Islands, and Virgin Islands are 100% based on population because of lack of available information for the other metrics.

\*\* Allocations for Puerto Rico are 25% based on MMEs and 75% based on population because of lack of available information for the other metrics.

The metrics noted above are calculated as follows:

A.      Amount of Prescription Opioids Sold as Measured by MME

The MME metric reflects the intensity of prescription opioid sales by state over a nine-year period from 2006 to 2014.  This measure accounts for the flow of prescription opioids from manufacturers to distributors to pharmacies.  The MME metric uses sales data for 12 categories of prescription opioids and was collected in a standardized manner by the Drug Enforcement Administration (DEA) in its Automation of Reports and Consolidated Orders System (ARCOS) database. As part of the National Prescription Opiate Litigation Multi-District Litigation, Case No. 1:17-MD-2804 (N.D. Ohio) (Opioid MDL), the DEA agreed to produce the nine years of data from 2006-2014, which encompassed the peak years of opioid sales in most states. The ARCOS data is standardized by converting data from varying products and prescription strengths into uniform MME totals to accurately reflect higher doses and stronger drugs in the data.

B.      Pain Reliever Use Disorder

This metric consists of the number of people in each state with pain reliever use disorder, as identified by the annual National Survey on Drug Use and Health conducted by the federal Substance Abuse and Mental Health Services Administration (SAMHSA). The SAMHSA survey is widely used by federal and other agencies. This metric included all three prior years in which pain reliever use disorder was broken down by state, 2015-2017, and included both people receiving treatment and those who are not.

C.      Overdose Deaths

The overdose death metric includes two measures: (1) overdose deaths caused by opioids and (2) overdose deaths caused by all drugs. The overdose death figures used for the metric are from the years 2007-2017, with data drawn from a database compiled by the Centers for Disease Control and Prevention ("**CDC**").  The CDC database does not adjust for local

reporting problems that differ from state to state and over time. To mitigate this data collection issue, figures for all drug overdose deaths, which captures some unidentified opioid overdoses as well as overdoses unrelated to opioids.

<div align="center">D.    Population</div>

Population is measured by the 2018 U.S. Census estimate.

<div align="center">E.    Negotiation Class Metrics</div>

The Opioid MDL Plaintiffs' proposed "negotiation class" metrics weighting factor consists of the Negotiating Class Allocation Model (defined below) applied at the state level.

<div align="center">ii.    Intrastate Allocation of NOAT Abatement Funds</div>

Each State and its Local Governments will have until (14) fourteen days after the Effective Date of the Plan (the "**Agreement Date**") to file with the Bankruptcy Court an agreed-upon allocation or method for allocating the NOAT Funds for that State dedicated only to Approved Uses (each a "**Statewide Abatement Agreement**" or "**SAA**"). Any State and its Local Governments that have reached agreement before the Effective Date of the Plan that satisfies the metric for approval as described in the immediately following paragraph shall file a notice with the Bankruptcy Court that it has adopted a binding SAA and either include the SAA with its filing or indicate where the SAA is publicly available for the SAA to be effective for the Purdue Bankruptcy. Any dispute regarding allocation within a State will be resolved as provided by the Statewide Abatement Agreement; *provided* that no Statewide Abatement Agreement may remove or otherwise limit the reporting requirements set forth in any of the NOAT Documents, including without limitation in the NOAT Agreement.

A Statewide Abatement Agreement shall be agreed when it has been approved by the State and either (a) representatives of its Local Governments whose aggregate Population Percentages, determined as set forth below, total more than sixty percent (60%), or (b) representatives of its Local Governments whose aggregate Population Percentages total more than fifty percent (50%) provided that these Local Governments also represent 15% or more of the State's counties or parishes (or, in the case of States whose counties and parishes that do not function as Local Governments, 15% of or more of the State's incorporated cities or towns), by number.

Population Percentages shall be determined as follows: For States with counties or parishes that function as Local Governments,[1] the Population Percentage of each county or parish shall be deemed to be equal to (a) (1) 200% of the population of such county or parish, minus (2) the aggregate population of all Primary Incorporated Municipalities located in such county or parish, divided by (b) 200% of the State's population. A "**Primary Incorporated Municipality**" means a city, town, village or other municipality incorporated under applicable

---

[1] Certain states do not have counties or parishes that function as Local Governments, including: Alaska, Connecticut, Massachusetts, Rhode Island, and Vermont. All other States have counties or parishes that function as Local Governments.

state law with a population of at least 25,000 that is not located within another incorporated municipality.  The Population Percentage of each primary incorporated municipality shall be equal to its population (including the population of any incorporated or unincorporated municipality located therein) divided by 200% of the State's population; *provided* that the Population Percentage of a primary incorporated municipality that is not located within a county shall be equal to 200% of its population (including the population of any incorporated or unincorporated municipality located therein) divided by 200% of the State's population.  For all States that do not have counties or parishes that function as Local Governments, the Population Percentage of each incorporated municipality (including any incorporated or unincorporated municipality located therein), shall be equal to its population divided by the State's population.

The Statewide Abatement Agreement will become effective within fourteen (14) days of filing, unless otherwise ordered by the Bankruptcy Court.

A State and its Local Governments may revise, supplement, or refine a Statewide Abatement Agreement by filing an amended Statewide Abatement Agreement that has been approved by the State and sufficient Local Governments to satisfy the approval standards set forth above with the Bankruptcy Court, which shall become effective within fourteen (14) days of filing, unless otherwise ordered by the Bankruptcy Court

Under the Plan, NOAT Funds allocated to each Non-SAA State are allocated between a "**Regional Apportionment**" and a "**Non-Regional Apportionment.**"  The Proportionate Share of the Regional Apportionment for each Region in a Non-SAA State is determined by reference to the aggregate shares of counties (as used herein, the term county includes parishes), and cities or towns in the cases of a Non-SAA States in which counties do not function as Local Governments, in the Region either (i) under the allocation model available at www.opioidnegotiationclass.info that was developed as part of the establishment of a negotiation class procedure implemented in *In re: National Prescription Opiates Litigation*, MDL No. 2804 (N.D. Ohio) (the "**Negotiating Class Allocation Model**"), or (ii) the model developed by Christopher J. Ruhm, Professor of Public Policy and Economics at the University of Virginia (the "**Ruhm Allocation Model**"), attached hereto as Exhibit 1, (collectively with the Negotiating Class Allocation Model, the "**Allocation Models**.").

a.    The Negotiating Class Allocation Model

The Negotiating Class Allocation Model employs a three-factor analysis to allocate potential opioids settlement proceeds among counties.  The three factors are:

A.    Opioid Use Disorder ("**OUD**").  Under this factor, each county is assigned a percentage derived by dividing the number of people in the county with OUD by the total number of people nationwide with OUD.  The Model uses data reported in the National Survey on Drug Use and Health ("**NSDUH**") for 2017.  The data is accessible at https://bit.ly/2HqF554.

B.    Overdose Deaths.  This factor assigns to each county a percentage of the nation's opioid overdose deaths.  The percentage is based on

Multiple Causes of Death ("**MCOD**") data reported by the National Center for Health Statistics ("**NCHS**"), the Centers for Disease Control ("**CDC**") and the Department of Health and Human Services ("**DHHS**"). The data so reported is adjusted using a standard, accepted method (the "**Ruhm Adjustment**") designed to address the well-established under-reporting of deaths by opioids overdose.

C.     Amount of Opioids. This factor assigns to each county a percentage of the national opioids shipments during 2006-2016 (expressed as morphine molecule equivalents, or MMEs) that produced a negative outcome. This percentage is based on data reported by the U.S. Drug Enforcement Agency ("**DEA**") in its ARCOS (Automation of Reports and Consolidated Orders System) database. Each county's share of national shipments is multiplied by the higher of two ratios: (1) the ratio of the percentage of people in the county with OUD to the percentage of people nationwide with OUD; or (2) the ratio of the percentage of people in the county who died of an opioids overdose between 2006-2016 to the national percentages of opioids overdose deaths during that time.

The Negotiating Class Allocation Model gives equal weight to each of these factors. Thus, a hypothetical county with an OUD percentage of .3%, and overdose deaths percentage of .2% and an amounts of opioids percentage of .16% would receive an overall allocation of .22%.

Where a county and its cities and towns are unable to reach agreement regarding the sharing of the county's overall allocation, the Negotiating Class Allocation Model provides for such sharing based on how the county and its cities and towns have historically split funding for opioids abatement. This historical analysis employs data reported by the U.S. Census Bureau on local government spending by certain functions. The Negotiating Class Allocation Model assigns to each incorporated city and town a portion of the county's overall allocation based on this historical data.

b.     The Ruhm Allocation Model

The Ruhm Allocation Model employs a three-factor analysis to allocate potential opioids settlement proceeds among counties. The three factors are:

A.     Number of Persons with Opioid Use Disorder ("**OUD**"). **NSDUH** data from 2007-2016 is used to estimate the number of persons in the state with OUD. The county share of OUD cases was assumed to be the same as its share of opioid-involved overdose deaths, calculated as described in (B) below.

B.     Opioid-Related Overdose Deaths. This factor assigns to each county a percentage of the nation's opioid overdose deaths. The percentage is based on **MCOD** data reported by the **NCHS**, **CDC** and **DHHS**. The data so reported is adjusted using the

34

**Adjustment** designed to address the well-established under-reporting of deaths by opioids overdose.

C.    Opioid Shipments.  This factor assigns to each county a percentage of the national opioids shipments during 2006-2016 (expressed as morphine molecule equivalents, or MMEs) that produced a negative outcome.  This percentage is based on data reported by the **DEA** in its ARCOS. No additional adjustments are used.

Under the Plan, the Allocation Models' shares of each county in a Region are aggregated.  Those aggregate Allocation Model shares are then divided by the total Allocation Model shares for all Regions in the State to determine the subject Region's Proportionate Share.  For Non-SAA States in which counties do not function as Local Governments, the Allocation Model shares for each city and town in a Region are aggregated, and the aggregate is divided by the total Allocation Model shares for all cities and towns in the State to determine the Region's Proportionate Share.

On September 30, 2020, the Bankruptcy Court entered the *Order Expanding Scope of Mediation* [D.I. 1756] (the "**Supplemental Mediation Order**"), which authorized the Mediators to continue the Mediation to resolve certain open issues referenced in the Mediators' Report, as well as to mediate the estate causes of action and any potential claims or causes of action held by any of the Non-Federal Public Claimants against, or that otherwise may become the subject of releases for, members of the Sackler Families in Phase 2 of Mediation.

# EXHIBIT H

**Tribe TDP**

### PURDUE PHARMA L.P.

### TRIBE TRUST DISTRIBUTION PROCEDURES[1]

| Issue | Description |
|---|---|
| **1. APPLICABILITY OF AGREEMENT** | These terms shall apply to the allocation of value received by the Tribal Abatement Fund Trust ("**TAFT**") under the plan of reorganization (the "**Chapter 11 Plan**" or the "**Plan**") in the Chapter 11 Cases of Purdue Pharma L.P. and its affiliates (collectively, "**Purdue**") pending in the U.S. Bankruptcy Court for the Southern District of New York (the "**Bankruptcy Court**") with respect to each American Indian or Alaska Native Tribe, band, nation, pueblo, village or community, that the U.S. Secretary of the Interior acknowledges as an Indian Tribe, as provided in the Federally Recognized Tribe List Act of 1994, 25 U.S.C. § 5130 or Tribal Organization, as defined in 25 U.S.C. 5304(l), (each a "**Tribe**"), whose Claims in Class 5 (Tribe Claims) are channeled to TAFT under the Plan. |
| | Pursuant to the Plan and the Master TDP, the following claims (the "**Tribe Channeled Claims**") shall be channeled to and liability shall be assumed by TAFT as of the Effective Date: (i) all Tribe Claims, which include any Claim against any Debtor that is held by a Tribe (including any Claim based on the subrogation rights of a Tribe that is not otherwise an Other Subordinated Claim), and that is not a Priority Tax Claim, and (ii) any Released Claim or Shareholder Released Claim that is held by a Tribe. The distributions made pursuant to these distribution procedures (these "**Tribe Trust Distribution Procedures**") are the exclusive distributions that will be made by TAFT on account of the Tribe Channeled Claims; Holders of Tribe Channeled Claims will have no further or other recourse against TAFT on account of the Tribe Channeled Claims other than what is provided for under these Tribe Trust Distribution Procedures. |
| | To the extent not explicitly reflected in the Chapter 11 Plan, the terms set forth herein will be deemed incorporated into the Chapter 11 Plan, or the trust agreement for TAFT (the "**TAFT Agreement**"), as applicable. |
| | These terms set forth the manner in which TAFT shall make Abatement Distributions to the Tribes, which may be used exclusively on the parameters set forth herein; *provided* that, except as otherwise specified in these Tribe Trust Distribution Procedures, nothing herein shall apply to the Abatement Distributions pursuant to the Restructuring Steps Memorandum. |

---

[1] Terms not otherwise defined herein shall have the meaning ascribed in the Chapter 11 Plan or in the TAFT Agreement.

| Issue | Description |
|-------|-------------|
| **2. PURPOSE** | These Tribe Trust Distribution Procedures are intended to establish the mechanisms for the distribution and allocation of (i) the TopCo Tribe Interest and (ii) funds distributed by TAFT to the Tribes. All such funds described in subclause (ii) of the foregoing sentence are referred to herein as "**Abatement Funds**" and shall be used to abate the opioid crisis in accordance with the terms hereof, with recognition of the culturally appropriate activities, practices, teachings or ceremonies that may, in the judgment of a Tribe or Tribal Organization, be aimed at or supportive of remediation and abatement of the opioid crisis within a tribal community.<br><br>Specifically, (i) no less than ninety five percent (95%) of the Abatement Funds distributed under the TAFT Agreement shall be used for abatement of the opioid crisis by funding opioid or substance use disorder related projects or programs that fall within the scope of **Schedules B** and **D** (the "**Approved Tribal Opioid Abatement Uses**"); and (ii) no more than five percent (5%) of the Abatement Funds may be used to fund expenses incurred in administering the distributions for the Approved Tribal Opioid Abatement Uses, including the process of selecting programs to receive Abatement Funds for implementing those programs ("**Approved Administrative Expenses**," and, together with the Approved Opioid Abatement Uses and Core Strategies, "**Approved Uses**").<br><br>For the avoidance of doubt, **Schedule D** is a non-exhaustive, illustrative list of culturally appropriate activities, practices, teachings or ceremonies that may, in the judgment of a Tribe or Tribal Organization, be aimed at or supportive of remediation and abatement of the opioid crisis within a tribal community.<br><br>TAFT shall, in accordance with the Plan, the Confirmation Order and the TAFT Agreement, distribute Abatement Funds to Tribes for Approved Uses. All distributions of Abatement Funds to Tribes in accordance herewith shall be deemed to satisfy the mandate to ensure that underserved urban and rural areas, as well as minority communities, receive equitable access to the funds.<br><br>Notwithstanding anything in these Tribe Trust Distribution Procedures that might imply to the contrary, projects or programs that constitute Approved Tribal Opioid Abatement Uses may be provided by Tribes, Tribal Organizations, tribal agencies or subdivisions or nongovernmental parties and funded from Abatement Funds. |
| **3. DISBURSEMENT OF TOPCO TRIBE INTEREST** | Pursuant to Section 5.2 of the Plan and the Restructuring Steps Memo, TAFT shall distribute 100% of its TopCo Tribe Interest to Holders of Tribe Channeled Claims, consistent with the Tribal Allocation Percentages set |

| Issue | Description |
|---|---|
| | forth on **Schedule C**, which will immediately contribute such TopCo Tribe Interest to Tribal Opioid Abatement Fund, LLC. |
| 4. **DISBURSEMENT OF ABATEMENT DISTRIBUTIONS** | The Chapter 11 Plan shall provide for the establishment of TAFT and the appointment of Tribe Trustees. The Tribe Trustees shall distribute the Abatement Funds consistent with the Tribal Allocation Percentages set forth on **Schedule C**. The Tribal Allocation Percentages are based on the Tribal Allocation Matrix described on **Schedule E**. |
| 5. **ATTORNEYS' FEES AND COSTS FUND** | Pursuant to Section 5.8 of the Plan, Public Creditor Trust Distributions will be subject to assessments to fund (i) the Local Government and Tribe Costs and Expenses Fund, which shall be used to pay qualifying costs and expenses (including attorneys' fees) of Holders of Non-Federal Governmental Claims (other than States) and Tribe Claims (including ad hoc groups of any of the foregoing) and (ii) the State Costs and Expenses Fund, which shall be used to pay qualifying costs and expenses (including attorneys' fees) of States (including ad hoc groups thereof). |
| 6. **TRIBAL ABATEMENT FUNDING** | 1. The allocation of distributions of Abatement Funds among Tribes will be consistent with the Tribal Allocation Percentages set forth on **Schedule C**, which will be included as part of the Tribe Trust Documents.<br><br>2. The Tribes will use the tribal allocation of Abatement Funds for programs on the approved list of abatement strategies (see **Schedule B**) and also for culturally appropriate activities, practices, teachings or ceremonies that are, in the judgment of a Tribe or Tribal Organization, aimed at or supportive of remediation and abatement of the opioid crisis within a tribal community. A list of representative examples of such culturally appropriate abatement strategies, practices, and programs is attached hereto as **Schedule D** (the "**Tribal Abatement Strategies**"). The separate allocation of abatement funding and illustrative list of Tribal Abatement Strategies recognizes that American Indian and Alaska Native Tribes and the communities they serve possess unique cultural histories, practices, wisdom, and needs that are highly relevant to the health and well-being of American Indian and Alaska Native people and that may play an important role in both individual and public health efforts and responses in Native communities.<br><br>3. The Tribes agree that Abatement Funds distributed under the Chapter 11 Plan shall be used to abate the opioid crisis in accordance with the terms of these Tribe Trust Distribution Procedures. |
| 7. **COMPLIANCE, REPORTING,** | 1. The Tribe Trustees shall impose appropriate reporting requirements on the Tribes to ensure that Abatement Funds are used only for Approved |

| Issue | Description |
|-------|-------------|
| **AUDIT AND ACCOUNTABILITY** | Uses. The Tribe Trustees may authorize modified reporting requirements for Tribes with allocations below a certain level.<br><br>2. TAFT shall prepare an annual report (an "**Annual Report**") that shall be audited by independent auditors as provided in the TAFT Agreement, which audited Annual Report shall be filed annually with the Bankruptcy Court.<br><br>3. The Bankruptcy Court shall have continuing jurisdiction over TAFT, provided however, the courts of the State of Delaware, including any federal court located therein, shall also have jurisdiction over TAFT.<br><br>4. The Tribe Trustees shall have the power to take any and all actions that in the judgment of the Tribe Trustees are necessary or proper to fulfill the purposes of TAFT, including the requirement that 100% of the Abatement Funds distributed under the Plan (and not otherwise dedicated to the attorneys' fee fund set forth in Section 4 herein) shall be used to abate the opioid crisis in accordance with the terms hereof. |

## **Schedule A**

(Reserved)

**Schedule B**
**Approved Uses**

Support treatment of Opioid Use Disorder (OUD) and any co-occurring Substance Use Disorder or Mental Health (SUD/MH) conditions through evidence-based or evidence-informed programs or strategies that may include, but are not limited to, the following:

| PART ONE: TREATMENT |
|---|

**A.    TREAT OPIOID USE DISORDER (OUD)**

Support treatment of Opioid Use Disorder (OUD) and any co-occurring Substance Use Disorder or Mental Health (SUD/MH) conditions through evidence-based or evidence-informed programs or strategies that may include, but are not limited to, the following[1]:

1.    Expand availability of treatment for OUD and any co-occurring SUD/MH conditions, including all forms of Medication-Assisted Treatment (MAT) approved by the U.S. Food and Drug Administration.

2.    Support and reimburse evidence-based services that adhere to the American Society of Addiction Medicine (ASAM) continuum of care for OUD and any co-occurring SUD/MH conditions

3.    Expand telehealth to increase access to treatment for OUD and any co-occurring SUD/MH conditions, including MAT, as well as counseling, psychiatric support, and other treatment and recovery support services.

4.    Improve oversight of Opioid Treatment Programs (OTPs) to assure evidence-based or evidence-informed practices such as adequate methadone dosing and low threshold approaches to treatment.

5.    Support mobile intervention, treatment, and recovery services, offered by qualified professionals and service providers, such as peer recovery coaches, for persons with OUD and any co-occurring SUD/MH conditions and for persons who have experienced an opioid overdose.

6.    Treatment of trauma for individuals with OUD (e.g., violence, sexual assault, human trafficking, or adverse childhood experiences) and family members (e.g., surviving family members after an overdose or overdose fatality), and training of health care personnel to identify and address such trauma.

7.    Support evidence-based withdrawal management services for people with OUD and any co-occurring mental health conditions.

---

[1] As used in this Schedule B, words like "expand," "fund," "provide" or the like shall not indicate a preference for new or existing programs. Priorities will be established through the mechanisms described in the Public Creditor Trust Distribution Procedures.

8.      Training on MAT for health care providers, first responders, students, or other supporting professionals, such as peer recovery coaches or recovery outreach specialists, including telementoring to assist community-based providers in rural or underserved areas.

9.      Support workforce development for addiction professionals who work with persons with OUD and any co-occurring SUD/MH conditions.

10.      Fellowships for addiction medicine specialists for direct patient care, instructors, and clinical research for treatments.

11.      Scholarships and supports for behavioral health practitioners or workers involved in addressing OUD and any co-occurring SUD or mental health conditions, including but not limited to training, scholarships, fellowships, loan repayment programs, or other incentives for providers to work in rural or underserved areas.

12.      Provide funding and training for clinicians to obtain a waiver under the federal Drug Addiction Treatment Act of 2000 (DATA 2000) to prescribe MAT for OUD, and provide technical assistance and professional support to clinicians who have obtained a DATA 2000 waiver.

13.      Dissemination of web-based training curricula, such as the American Academy of Addiction Psychiatry's Provider Clinical Support Service-Opioids web-based training curriculum and motivational interviewing.

14.      Development and dissemination of new curricula, such as the American Academy of Addiction Psychiatry's Provider Clinical Support Service for Medication-Assisted Treatment.

## B.     SUPPORT PEOPLE IN TREATMENT AND RECOVERY

Support people in recovery from OUD and any co-occurring SUD/MH conditions through evidence-based or evidence-informed programs or strategies that may include, but are not limited to, the following:

1.      Provide comprehensive wrap-around services to individuals with OUD and any co-occurring SUD/MH conditions, including housing, transportation, education, job placement, job training, or childcare.

2.      Provide the full continuum of care of treatment and recovery services for OUD and any co-occurring SUD/MH conditions, including supportive housing, peer support services and counseling, community navigators, case management, and connections to community-based services.

3.      Provide counseling, peer-support, recovery case management and residential treatment with access to medications for those who need it to persons with OUD and any co-occurring SUD/MH conditions.

4.      Provide access to housing for people with OUD and any co-occurring SUD/MH conditions, including supportive housing, recovery housing, housing assistance

7

programs, training for housing providers, or recovery housing programs that allow or integrate FDA-approved mediation with other support services.

5.  Provide community support services, including social and legal services, to assist in deinstitutionalizing persons with OUD and any co-occurring SUD/MH conditions.

6.  Support or expand peer-recovery centers, which may include support groups, social events, computer access, or other services for persons with OUD and any co-occurring SUD/MH conditions.

7.  Provide or support transportation to treatment or recovery programs or services for persons with OUD and any co-occurring SUD/MH conditions.

8.  Provide employment training or educational services for persons in treatment for or recovery from OUD and any co-occurring SUD/MH conditions.

9.  Identify successful recovery programs such as physician, pilot, and college recovery programs, and provide support and technical assistance to increase the number and capacity of high-quality programs to help those in recovery.

10. Engage non-profits, faith-based communities, and community coalitions to support people in treatment and recovery and to support family members in their efforts to support the person with OUD in the family.

11. Training and development of procedures for government staff to appropriately interact and provide social and other services to individuals with or in recovery from OUD, including reducing stigma.

12. Support stigma reduction efforts regarding treatment and support for persons with OUD, including reducing the stigma on effective treatment.

13. Create or support culturally appropriate services and programs for persons with OUD and any co-occurring SUD/MH conditions, including new Americans.

14. Create and/or support recovery high schools.

15. Hire or train behavioral health workers to provide or expand any of the services or supports listed above.

## C.   CONNECT PEOPLE WHO NEED HELP TO THE HELP THEY NEED (CONNECTIONS TO CARE)

Provide connections to care for people who have – or at risk of developing – OUD and any co-occurring SUD/MH conditions through evidence-based or evidence-informed programs or strategies that may include, but are not limited to, the following:

1.  Ensure that health care providers are screening for OUD and other risk factors and know how to appropriately counsel and treat (or refer if necessary) a patient for OUD treatment.

8

2.   Fund Screening, Brief Intervention and Referral to Treatment (SBIRT) programs to reduce the transition from use to disorders, including SBIRT services to pregnant women who are uninsured or not eligible for Medicaid.

3.   Provide training and long-term implementation of SBIRT in key systems (health, schools, colleges, criminal justice, and probation), with a focus on youth and young adults when transition from misuse to opioid disorder is common.

4.   Purchase automated versions of SBIRT and support ongoing costs of the technology.

5.   Expand services such as navigators and on-call teams to begin MAT in hospital emergency departments.

6.   Training for emergency room personnel treating opioid overdose patients on post-discharge planning, including community referrals for MAT, recovery case management or support services.

7.   Support hospital programs that transition persons with OUD and any co-occurring SUD/MH conditions, or persons who have experienced an opioid overdose, into clinically appropriate follow-up care through a bridge clinic or similar approach.

8.   Support crisis stabilization centers that serve as an alternative to hospital emergency departments for persons with OUD and any co-occurring SUD/MH conditions or persons that have experienced an opioid overdose.

9.   Support the work of Emergency Medical Systems, including peer support specialists, to connect individuals to treatment or other appropriate services following an opioid overdose or other opioid-related adverse event.

10.  Provide funding for peer support specialists or recovery coaches in emergency departments, detox facilities, recovery centers, recovery housing, or similar settings; offer services, supports, or connections to care to persons with OUD and any co-occurring SUD/MH conditions or to persons who have experienced an opioid overdose.

11.  Expand warm hand-off services to transition to recovery services.

12.  Create or support school-based contacts that parents can engage with to seek immediate treatment services for their child; and support prevention, intervention, treatment, and recovery programs focused on young people.

13.  Develop and support best practices on addressing OUD in the workplace.

14.  Support assistance programs for health care providers with OUD.

15.  Engage non-profits and the faith community as a system to support outreach for treatment.

16.     Support centralized call centers that provide information and connections to appropriate services and supports for persons with OUD and any co-occurring SUD/MH conditions.

**D.     ADDRESS THE NEEDS OF CRIMINAL-JUSTICE-INVOLVED PERSONS**

Address the needs of persons with OUD and any co-occurring SUD/MH conditions who are involved in, are at risk of becoming involved in, or are transitioning out of the criminal justice system through evidence-based or evidence-informed programs or strategies that may include, but are not limited to, the following:

1.     Support pre-arrest or pre-arraignment diversion and deflection strategies for persons with OUD and any co-occurring SUD/MH conditions, including established strategies such as:

　　　　1.     Self-referral strategies such as the Angel Programs or the Police Assisted Addiction Recovery Initiative (PAARI);

　　　　2.     Active outreach strategies such as the Drug Abuse Response Team (DART) model;

　　　　3.     "Naloxone Plus" strategies, which work to ensure that individuals who have received naloxone to reverse the effects of an overdose are then linked to treatment programs or other appropriate services;

　　　　4.     Officer prevention strategies, such as the Law Enforcement Assisted Diversion (LEAD) model;

　　　　5.     Officer intervention strategies such as the Leon County, Florida Adult Civil Citation Network or the Chicago Westside Narcotics Diversion to Treatment Initiative; or

　　　　6.     Co-responder and/or alternative responder models to address OUD-related 911 calls with greater SUD expertise.

2.     Support pre-trial services that connect individuals with OUD and any co-occurring SUD/MH conditions to evidence-informed treatment, including MAT, and related services.

3.     Support treatment and recovery courts that provide evidence-based options for persons with OUD and any co-occurring SUD/MH conditions.

4.     Provide evidence-informed treatment, including MAT, recovery support, harm reduction, or other appropriate services to individuals with OUD and any co-occurring SUD/MH conditions who are incarcerated in jail or prison.

5.     Provide evidence-informed treatment, including MAT, recovery support, harm reduction, or other appropriate services to individuals with OUD and any co-occurring SUD/MH conditions who are leaving jail or prison have recently left jail

or prison, are on probation or parole, are under community corrections supervision, or are in re-entry programs or facilities.

6.  Support critical time interventions (CTI), particularly for individuals living with dual-diagnosis OUD/serious mental illness, and services for individuals who face immediate risks and service needs and risks upon release from correctional settings.

7.  Provide training on best practices for addressing the needs of criminal-justice-involved persons with OUD and any co-occurring SUD/MH conditions to law enforcement, correctional, or judicial personnel or to providers of treatment, recovery, harm reduction, case management, or other services offered in connection with any of the strategies described in this section.

E.  **ADDRESS THE NEEDS OF PREGNANT OR PARENTING WOMEN AND THEIR FAMILIES, INCLUDING BABIES WITH NEONATAL ABSTINENCE SYNDROME**

Address the needs of pregnant or parenting women with OUD and any co-occurring SUD/MH conditions, and the needs of their families, including babies with neonatal abstinence syndrome (NAS), through evidence-based or evidence-informed programs or strategies that may include, but are not limited to, the following:

1.  Support evidence-based or evidence-informed treatment, including MAT, recovery services and supports, and prevention services for pregnant women – or women who could become pregnant – who have OUD and any co-occurring SUD/MH conditions, and other measures to educate and provide support to families affected by Neonatal Abstinence Syndrome.

2.  Expand comprehensive evidence-based treatment and recovery services, including MAT, for uninsured women with OUD and any co-occurring SUD/MH conditions for up to 12 months postpartum.

3.  Training for obstetricians or other healthcare personnel that work with pregnant women and their families regarding treatment of OUD and any co-occurring SUD/MH conditions.

4.  Expand comprehensive evidence-based treatment and recovery support for NAS babies; expand services for better continuum of care with infant-need dyad; expand long-term treatment and services for medical monitoring of NAS babies and their families.

5.  Provide training to health care providers who work with pregnant or parenting women on best practices for compliance with federal requirements that children born with Neonatal Abstinence Syndrome get referred to appropriate services and receive a plan of safe care.

6.  Child and family supports for parenting women with OUD and any co-occurring SUD/MH conditions.

11

7.      Enhanced family supports and child care services for parents with OUD and any co-occurring SUD/MH conditions.

8.      Provide enhanced support for children and family members suffering trauma as a result of addiction in the family; and offer trauma-informed behavioral health treatment for adverse childhood events.

9.      Offer home-based wrap-around services to persons with OUD and any co-occurring SUD/MH conditions, including but not limited to parent skills training.

10.     Support for Children's Services – Fund additional positions and services, including supportive housing and other residential services, relating to children being removed from the home and/or placed in foster care due to custodial opioid use.

<div style="border:1px solid">

PART TWO: PREVENTION

</div>

**F.      PREVENT     OVER-PRESCRIBING     AND     ENSURE     APPROPRIATE PRESCRIBING AND DISPENSING OF OPIOIDS**

Support efforts to prevent over-prescribing and ensure appropriate prescribing and dispensing of opioids through evidence-based or evidence-informed programs or strategies that may include, but are not limited to, the following:

1.      Fund medical provider education and outreach regarding best prescribing practices for opioids consistent with the Guidelines for Prescribing Opioids for Chronic Pain from the U.S. Centers for Disease Control and Prevention, including providers at hospitals (academic detailing).

2.      Training for health care providers regarding safe and responsible opioid prescribing, dosing, and tapering patients off opioids.

3.      Continuing Medical Education (CME) on appropriate prescribing of opioids.

4.      Support for non-opioid pain treatment alternatives, including training providers to offer or refer to multi-modal, evidence-informed treatment of pain.

5.      Support enhancements or improvements to Prescription Drug Monitoring Programs (PDMPs), including but not limited to improvements that:

    1.      Increase the number of prescribers using PDMPs;

    2.      Improve point-of-care decision-making by increasing the quantity, quality, or format of data available to prescribers using PDMPs, by improving the interface that prescribers use to access PDMP data, or both; or

    3.      Enable states to use PDMP data in support of surveillance or intervention strategies, including MAT referrals and follow-up for individuals identified within PDMP data as likely to experience OUD in a manner that complies with all relevant privacy and security laws and rules.

12

6.  Ensuring PDMPs incorporate available overdose/naloxone deployment data, including the United States Department of Transportation's Emergency Medical Technician overdose database in a manner that complies with all relevant privacy and security laws and rules.

7.  Increase electronic prescribing to prevent diversion or forgery.

8.  Educate Dispensers on appropriate opioid dispensing.

## G.  PREVENT MISUSE OF OPIOIDS

Support efforts to discourage or prevent misuse of opioids through evidence-based or evidence-informed programs or strategies that may include, but are not limited to, the following:

1.  Fund media campaigns to prevent opioid misuse.

2.  Corrective advertising or affirmative public education campaigns based on evidence.

3.  Public education relating to drug disposal.

4.  Drug take-back disposal or destruction programs.

5.  Fund community anti-drug coalitions that engage in drug prevention efforts.

6.  Support community coalitions in implementing evidence-informed prevention, such as reduced social access and physical access, stigma reduction – including staffing, educational campaigns, support for people in treatment or recovery, or training of coalitions in evidence-informed implementation, including the Strategic Prevention Framework developed by the U.S. Substance Abuse and Mental Health Services Administration (SAMHSA).

7.  Engage non-profits and faith-based communities as systems to support prevention.

8.  Fund evidence-based prevention programs in schools or evidence-informed school and community education programs and campaigns for students, families, school employees, school athletic programs, parent-teacher and student associations, and others.

9.  School-based or youth-focused programs or strategies that have demonstrated effectiveness in preventing drug misuse and seem likely to be effective in preventing the uptake and use of opioids.

10. Create of support community-based education or intervention services for families, youth, and adolescents at risk for OUD and any co-occurring SUD/MH conditions.

11. Support evidence-informed programs or curricula to address mental health needs of young people who may be at risk of misusing opioids or other drugs, including emotional modulation and resilience skills.

12. Support greater access to mental health services and supports for young people, including services and supports provided by school nurses, behavioral health workers or other school staff, to address mental health needs in young people that (when not properly addressed) increase the risk of opioid or another drug misuse.

## H.   **PREVENT OVERDOSE DEATHS AND OTHER HARMS (HARM REDUCTION)**

Support efforts to prevent or reduce overdose deaths or other opioid-related harms through evidence-based or evidence-informed programs or strategies that may include, but are not limited to, the following:

1. Increase availability and distribution of naloxone and other drugs that treat overdoses for first responders, overdose patients, individuals with OUD and their friends and family members, schools, community navigators and outreach workers, persons being released from jail or prison, or other members of the general public.

2. Public health entities providing free naloxone to anyone in the community.

3. Training and education regarding naloxone and other drugs that treat overdoses for first responders, overdose patients, patients taking opioids, families, schools, community support groups, and other members of the general public.

4. Enable school nurses and other school staff to respond to opioid overdoses, and provide them with naloxone, training, and support.

5. Expand, improve, or develop data tracking software and applications for overdoses/naloxone revivals.

6. Public education relating to emergency responses to overdoses.

7. Public education relating to immunity and Good Samaritan laws.

8. Educate first responders regarding the existence and operation of immunity and Good Samaritan laws.

9. Syringe service programs and other evidence-informed programs to reduce harms associated with intravenous drug use, including supplies, staffing, space, peer support services, referrals to treatment, fentanyl checking, connections to care, and the full range of harm reduction and treatment services provided by these programs.

10. Expand access to testing and treatment for infectious diseases such as HIV and Hepatitis C resulting from intravenous opioid use.

11. Support mobile units that offer or provide referrals to harm reduction services, treatment, recovery supports, health care, or other appropriate services to persons that use opioids or persons with OUD and any co-occurring SUD/MH conditions.

12. Provide training in harm reduction strategies to health care providers, students, peer recovery coaches, recovery outreach specialists, or other professionals that provide

14

care to persons who use opioids or persons with OUD and any co-occurring SUD/MH conditions.

13. Support screening for fentanyl in routine clinical toxicology testing.

---

PART THREE: OTHER STRATEGIES

---

## I. **I. FIRST RESPONDERS**

In addition to items in section C, D and H relating to first responders, support the following:

1. Educate law enforcement or other first responders regarding appropriate practices and precautions when dealing with fentanyl or other drugs.

2. Provision of wellness and support services for first responders and others who experience secondary trauma associated with opioid-related emergency events.

## J. **LEADERSHIP, PLANNING AND COORDINATION**

Support efforts to provide leadership, planning, coordination, facilitations, training and technical assistance to abate the opioid epidemic through activities, programs, or strategies that may include, but are not limited to, the following:

1. Statewide, regional, local or community regional planning to identify root causes of addiction and overdose, goals for reducing harms related to the opioid epidemic, and areas and populations with the greatest needs for treatment intervention services, and to support training and technical assistance and other strategies to abate the opioid epidemic described in this opioid abatement strategy list.

2. A dashboard to (a) share reports, recommendations, or plans to spend opioid settlement funds; (b) to show how opioid settlement funds have been spent; (c) to report program or strategy outcomes; or (d) to track, share or visualize key opioid- or health-related indicators and supports as identified through collaborative statewide, regional, local or community processes.

3. Invest in infrastructure or staffing at government or not-for-profit agencies to support collaborative, cross-system coordination with the purpose of preventing overprescribing, opioid misuse, or opioid overdoses, treating those with OUD and any co-occurring SUD/MH conditions, supporting them in treatment or recovery, connecting them to care, or implementing other strategies to abate the opioid epidemic described in this opioid abatement strategy list.

4. Provide resources to staff government oversight and management of opioid abatement programs.

## K. **TRAINING**

In addition to the training referred to throughout this document, support training to abate the opioid epidemic through activities, programs, or strategies that may include, but are not limited to, the following:

1. Provide funding for staff training or networking programs and services to improve the capability of government, community, and not-for-profit entities to abate the opioid crisis.

2. Support infrastructure and staffing for collaborative cross-system coordination to prevent opioid misuse, prevent overdoses, and treat those with OUD and any co-occurring SUD/MH conditions, or implement other strategies to abate the opioid epidemic described in this opioid abatement strategy list (e.g., health care, primary care, pharmacies, PDMPs, etc.).

## L.    **RESEARCH**

Support opioid abatement research that may include, but is not limited to, the following:

1. Monitoring, surveillance, data collection and evaluation of programs and strategies described in this opioid abatement strategy list.

2. Research non-opioid treatment of chronic pain.

3. Research on improved service delivery for modalities such as SBIRT that demonstrate promising but mixed results in populations vulnerable to opioid use disorders.

4. Research on novel harm reduction and prevention efforts such as the provision of fentanyl test strips.

5. Research on innovative supply-side enforcement efforts such as improved detection of mail-based delivery of synthetic opioids.

6. Expanded research on swift/certain/fair models to reduce and deter opioid misuse within criminal justice populations that build upon promising approaches used to address other substances (e.g. Hawaii HOPE and Dakota 24/7).

7. Epidemiological surveillance of OUD-related behaviors in critical populations including individuals entering the criminal justice system, including but not limited to approaches modeled on the Arrestee Drug Abuse Monitoring (ADAM) system.

8. Qualitative and quantitative research regarding public health risks and harm reduction opportunities within illicit drug markets, including surveys of market participants who sell or distribute illicit opioids.

9. Geospatial analysis of access barriers to MAT and their association with treatment engagement and treatment outcomes.

16

## **Schedule C**
## **Tribe Beneficiaries and Tribal Allocation Percentages**

## RECOMMENDATION OF THE HONORABLE LAYN PHILLIPS REGARDING THE INTERTRIBAL ALLOCATION MATRIX

Native American Tribes participated in the Purdue Mediation process and reached agreement with the other non-Federal Public Claimants on value allocation for the Tribes.

Following the Mediation, the Tribal Leadership Committee ("TLC") contacted me to request an opportunity to present for approval the Intertribal Allocation Matrix. I agreed to hear the presentation and requested materials to review in advance of the presentation. In response to my request, I received the following documents:

1)    PowerPoint summary of the intertribal allocation model

2)    One-page summary of the model titled, "Tribal Allocation Matrix Narrative

3)    Excel spreadsheet with the allocation to the tribes.

In addition, I sent the TLC my preliminary thoughts and inquiries regarding the Intertribal Allocation Matrix for their consideration prior to the presentation that occurred on April 2, 2021.

The TLC presented the Intertribal Allocation Matrix to attorney Clay Cogman and me on April 2, 2021. We had sufficient time to thoroughly discuss the allocation model and the TLC addressed to my satisfaction all questions and issues that were raised.

I note here for context that in a typical mediation setting, I would have had the opportunity to hear from other constituencies for the purpose of assisting me in my analysis by providing me alternative perspectives designed to test the premises and assumptions of the underlying methodology.  That did not occur here, as I have only spoken to the TLC about the Matrix.

That said, based on the foregoing, I find that the Intertribal Allocation Matrix provides a satisfactorily reasonable and transparent methodology for the allocation of Purdue settlement funds among Native American Tribes.

Dated:  May 11, 2011

By:    _____
          Layn R. Phillips

### Allocation of Settlement Among Tribes

6/18/2021

| FederallyRecognizedTribeName | Division of Funds (Allocation %) |
|---|---|
| **Total** | **100.0000%** |
| Absentee-Shawnee Tribe of Indians of Oklahoma | 0.5575% |
| Agua Caliente Band of Cahuilla Indians of the Agua Caliente Indian Reservation, California | 0.0406% |
| Ak-Chin Indian Community | 0.0635% |
| Alabama-Coushatta Tribe of Texas | 0.0293% |
| Alabama-Quassarte Tribal Town | 0.0111% |
| ALL Alaskan Tribes | 9.2643% |
| Alaska Native Tribal Health Consortium | 1.8883% |
| *Aleutian Pribilof Islands Association | 0.0674% |
| *Arctic Slope Native Association | 0.2825% |
| *Bristol Bay Area Health Corporation | 0.4733% |
| Chickaloon Native Village | 0.0105% |
| *Chugachmiut | 0.1055% |
| *Copper River Native Association | 0.0922% |
| *Eastern Aleutian Tribes | 0.1017% |
| Eklutna Native Village | 0.0125% |
| Eyak Native Village | 0.0202% |
| *Kodiak Area Native Association | 0.1817% |
| *Kenaitze Indian Tribe | 0.1544% |
| *Ketchikan Indian Community | 0.1033% |
| Knik Tribe | 0.0118% |
| *Maniilaq Association | 0.4026% |
| Metlakatla Indian Community | 0.0703% |
| *Mt. Sanford Tribal Consortium | 0.0268% |
| *Norton Sound Health Corporation | 0.5929% |
| *Southcentral Foundation | 1.5145% |
| *Southeast Alaska Regional Health Corporation | 0.5865% |
| Seldovia Village Tribe | 0.0322% |
| *Tanana Chiefs Conference (including Council of Athabascan Tribal Governments) | 0.9318% |
| Yakutat Tlingit Tribe | 0.0290% |
| *Yukon Kuskokwim Health Corporation | 1.4987% |
| Native Village of Chitina | 0.0115% |
| Ninilchik Village | 0.0289% |
| Native Village of Tanana | 0.0190% |
| Native Village of Tyonek | 0.0145% |
| Alturas Indian Rancheria, California | 0.0008% |
| Apache Tribe of Oklahoma | 0.1334% |
| Arapaho Tribe of the Wind River Reservation, Wyoming | 0.3444% |
| Aroostook Band of Micmacs | 0.0370% |
| Assiniboine and Sioux Tribes of the Fort Peck Indian Reservation, Montana | 0.3789% |
| Augustine Band of Cahuilla Indians, California | 0.0013% |
| Bad River Band of the Lake Superior Tribe of Chippewa Indians of the Bad River Reservation, Wisconsin | 0.1533% |
| Bay Mills Indian Community, Michigan | 0.0714% |
| Bear River Band of the Rohnerville Rancheria, California | 0.0507% |
| Berry Creek Rancheria of Maidu Indians of California | 0.1121% |
| Big Lagoon Rancheria, California | 0.0027% |
| Big Pine Paiute Tribe of the Owens Valley | 0.0320% |
| Big Sandy Rancheria of Western Mono Indians of California | 0.0328% |
| Big Valley Band of Pomo Indians of the Big Valley Rancheria, California | 0.1214% |
| Bishop Paiute Tribe | 0.1041% |
| Blackfeet Tribe of the Blackfeet Indian Reservation of Montana | 0.5378% |

| FederallyRecognizedTribeName | Division of Funds (Allocation %) |
|---|---|
| Blue Lake Rancheria, California | 0.0038% |
| Bois Forte (Nett Lake) Band of the Minnesota Chippewa Tribe, Minnesota | 0.0820% |
| Bridgeport Indian Colony | 0.0026% |
| Buena Vista Rancheria of Me-Wuk Indians of California | 0.0034% |
| Burns Paiute Tribe | 0.0116% |
| Cabazon Band of Mission Indians, California | 0.0017% |
| Cachil DeHe Band of Wintun Indians of the Colusa Indian Community of the Colusa Rancheria, California | 0.0056% |
| Caddo Nation of Oklahoma | 0.1084% |
| Cahto Tribe of the Laytonville Rancheria | 0.0207% |
| Cahuilla Band of Indians | 0.0368% |
| California Valley Miwok Tribe, California | 0.0044% |
| Campo Band of Diegueno Mission Indians of the Campo Indian Reservation, California | 0.0241% |
| Catawba Indian Nation | 0.0743% |
| Cayuga Nation | 0.0070% |
| Cedarville Rancheria, California | 0.0019% |
| Chemehuevi Indian Tribe of the Chemehuevi Reservation, California | 0.0181% |
| Cher-Ae Heights Indian Community of the Trinidad Rancheria, California | 0.0200% |
| Cherokee Nation | 12.1894% |
| Cheyenne and Arapaho Tribes, Oklahoma | 0.7723% |
| Cheyenne River Sioux Tribe of the Cheyenne River Reservation, South Dakota | 0.2906% |
| Chickahominy Indian Tribe | 0.0315% |
| Chickahominy Indian Tribe—Eastern Division | 0.0085% |
| Chickasaw Nation | 2.1567% |
| Chicken Ranch Rancheria of Me-Wuk Indians of California | 0.0026% |
| Chippewa Cree Indians of the Rocky Boy's Reservation, Montana | 0.2330% |
| Chitimacha Tribe of Louisiana | 0.0347% |
| Choctaw Nation of Oklahoma | 5.4805% |
| Citizen Potawatomi Nation, Oklahoma | 1.4669% |
| Cloverdale Rancheria of Pomo Indians of California | 0.0518% |
| Cocopah Tribe of Arizona | 0.0366% |
| Coeur D'Alene Tribe | 0.2865% |
| Cold Springs Rancheria of Mono Indians of California | 0.0108% |
| Colorado River Indian Tribes of the Colorado River Indian Reservation, Arizona and California | 0.2784% |
| Comanche Nation, Oklahoma | 0.6989% |
| Confederated Salish and Kootenai Tribes of the Flathead Reservation | 0.6040% |
| Confederated Tribes and Bands of the Yakama Nation | 0.6242% |
| Confederated Tribes of Siletz Indians of Oregon | 0.4294% |
| Confederated Tribes of the Chehalis Reservation | 0.0887% |
| Confederated Tribes of the Colville Reservation | 0.4214% |
| Confederated Tribes of the Coos, Lower Umpqua and Siuslaw Indians | 0.0541% |
| Confederated Tribes of the Goshute Reservation, Nevada and Utah | 0.0144% |
| Confederated Tribes of the Grand Ronde Community of Oregon | 0.2456% |
| Confederated Tribes of the Umatilla Indian Reservation | 0.1554% |
| Confederated Tribes of the Warm Springs Reservation of Oregon | 0.3374% |
| Coquille Indian Tribe | 0.0926% |
| Coushatta Tribe of Louisiana | 0.0264% |
| Cow Creek Band of Umpqua Tribe of Indians | 0.1532% |
| Cowlitz Indian Tribe | 0.4024% |
| Coyote Valley Band of Pomo Indians of California | 0.0337% |
| Crow Creek Sioux Tribe of the Crow Creek Reservation, South Dakota | 0.1504% |
| Crow Tribe of Montana | 0.7579% |
| Delaware Nation, Oklahoma | 0.0342% |
| Delaware Tribe of Indians | 0.3134% |

| FederallyRecognizedTribeName | Division of Funds (Allocation %) |
|---|---|
| Dry Creek Rancheria Band of Pomo Indians, California | 0.0709% |
| Duckwater Shoshone Tribe of the Duckwater Reservation, Nevada | 0.0224% |
| Eastern Band of Cherokee Indians | 0.9560% |
| Eastern Shawnee Tribe of Oklahoma | 0.0548% |
| Eastern Shoshone Tribe of the Wind River Reservation, Wyoming | 0.1459% |
| Elem Indian Colony of Pomo Indians of the Sulphur Bank Rancheria, California | 0.0101% |
| Elk Valley Rancheria, California | 0.0063% |
| Ely Shoshone Tribe of Nevada | 0.0550% |
| Enterprise Rancheria of Maidu Indians of California | 0.1825% |
| Ewiiaapaayp Band of Kumeyaay Indians, California | 0.0004% |
| Federated Indians of Graton Rancheria, California | 0.0770% |
| Flandreau Santee Sioux Tribe of South Dakota | 0.0224% |
| Fond du Lac Band of the Minnesota Chippewa Tribe, Minnesota | 0.3382% |
| Forest County Potawatomi Community, Wisconsin | 0.0266% |
| Fort Belknap Indian Community of the Fort Belknap Reservation of Montana | 0.1662% |
| Fort Bidwell Indian Community of the Fort Bidwell Reservation of California | 0.0088% |
| Fort Independence Indian Community of Paiute Indians of the Fort Independence Reservation, California | 0.0104% |
| Fort McDermitt Paiute and Shoshone Tribes of the Fort McDermitt Indian Reservation, Nevada and Oregon | 0.0212% |
| Fort McDowell Yavapai Nation, Arizona | 0.0852% |
| Fort Mojave Indian Tribe of Arizona, California & Nevada | 0.1614% |
| Fort Sill Apache Tribe of Oklahoma | 0.0194% |
| Gila River Indian Community of the Gila River Indian Reservation, Arizona | 2.5642% |
| Grand Portage Band of the Minnesota Chippewa Tribe, Minnesota | 0.0211% |
| Grand Traverse Band of Ottawa and Chippewa Indians, Michigan | 0.1041% |
| Greenville Rancheria | 0.0942% |
| Grindstone Indian Rancheria of Wintun-Wailaki Indians of California | 0.0255% |
| Guidiville Rancheria of California | 0.0137% |
| Habematolel Pomo of Upper Lake, California | 0.0275% |
| Hannahville Indian Community, Michigan | 0.0279% |
| Havasupai Tribe of the Havasupai Reservation, Arizona | 0.0325% |
| Ho-Chunk Nation of Wisconsin | 0.2791% |
| Hoh Indian Tribe | 0.0032% |
| Hoopa Valley Tribe, California | 0.2647% |
| Hopi Tribe of Arizona | 0.4475% |
| Hopland Band of Pomo Indians, California | 0.0723% |
| Houlton Band of Maliseet Indians | 0.0350% |
| Hualapai Indian Tribe of the Hualapai Indian Reservation, Arizona | 0.2240% |
| Iipay Nation of Santa Ysabel, California | 0.0136% |
| Inaja Band of Diegueno Mission Indians of the Inaja and Cosmit Reservation, California | 0.0008% |
| Ione Band of Miwok Indians of California | 0.1215% |
| Iowa Tribe of Kansas and Nebraska | 0.0527% |
| Iowa Tribe of Oklahoma | 0.0959% |
| Jackson Band of Miwuk Indians | 0.0054% |
| Jamestown S'Klallam Tribe | 0.0344% |
| Jamul Indian Village of California | 0.0082% |
| Jena Band of Choctaw Indians | 0.0116% |
| Jicarilla Apache Nation, New Mexico | 0.2812% |
| Kaibab Band of Paiute Indians of the Kaibab Indian Reservation, Arizona | 0.0158% |
| Kalispel Indian Community of the Kalispel Reservation | 0.0374% |
| Karuk Tribe | 0.2540% |
| Kashia Band of Pomo Indians of the Stewarts Point Rancheria, California | 0.0043% |
| Kaw Nation, Oklahoma | 0.1314% |
| Kewa Pueblo, New Mexico | 0.1155% |

| FederallyRecognizedTribeName | Division of Funds (Allocation %) |
|---|---|
| Keweenaw Bay Indian Community, Michigan | 0.1080% |
| Kialegee Tribal Town | 0.0174% |
| Kickapoo Traditional Tribe of Texas | 0.0175% |
| Kickapoo Tribe of Indians of the Kickapoo Reservation in Kansas | 0.0580% |
| Kickapoo Tribe of Oklahoma | 0.5597% |
| Kiowa Indian Tribe of Oklahoma | 0.4367% |
| Klamath Tribes | 0.1776% |
| Kletsel Dehe Band of Wintun Indians | 0.0363% |
| Koi Nation of Northern California | 0.0140% |
| Kootenai Tribe of Idaho | 0.0097% |
| La Jolla Band of Luiseno Indians, California | 0.0372% |
| La Posta Band of Diegueno Mission Indians of the La Posta Indian Reservation, California | 0.0030% |
| Lac Courte Oreilles Band of Lake Superior Chippewa Indians of Wisconsin | 0.1611% |
| Lac du Flambeau Band of Lake Superior Chippewa Indians of the Lac du Flambeau Reservation of Wisconsin | 0.2145% |
| Lac Vieux Desert Band of Lake Superior Chippewa Indians of Michigan | 0.0310% |
| Las Vegas Tribe of Paiute Indians of the Las Vegas Indian Colony, Nevada | 0.3560% |
| Leech Lake Band of the Minnesota Chippewa Tribe, Minnesota | 0.3876% |
| Little River Band of Ottawa Indians, Michigan | 0.0925% |
| Little Shell Tribe of Chippewa Indians of Montana | 0.2023% |
| Little Traverse Bay Bands of Odawa Indians, Michigan | 0.1765% |
| Lone Pine Paiute-Shoshone Tribe | 0.0210% |
| Los Coyotes Band of Cahuilla and Cupeno Indians, California | 0.0157% |
| Lovelock Paiute Tribe of the Lovelock Indian Colony, Nevada | 0.0173% |
| Lower Brule Sioux Tribe of the Lower Brule Reservation, South Dakota | 0.0499% |
| Lower Elwha Tribal Community | 0.0686% |
| Lower Sioux Indian Community in the State of Minnesota | 0.0236% |
| Lummi Tribe of the Lummi Reservation | 0.2100% |
| Lytton Rancheria of California | 0.0238% |
| Makah Indian Tribe of the Makah Indian Reservation | 0.1833% |
| Manchester Band of Pomo Indians of the Manchester Rancheria, California | 0.0819% |
| Manzanita Band of Diegueno Mission Indians of the Manzanita Reservation, California | 0.0046% |
| Mashantucket Pequot Indian Tribe | 0.0369% |
| Mashpee Wampanoag Tribe | 0.0687% |
| Match-e-be-nash-she-wish Band of Pottawatomi Indians of Michigan | 0.0175% |
| Mechoopda Indian Tribe of Chico Rancheria, California | 0.1655% |
| Menominee Indian Tribe of Wisconsin | 0.2586% |
| Mesa Grande Band of Diegueno Mission Indians of the Mesa Grande Reservation, California | 0.0337% |
| Mescalero Apache Tribe of the Mescalero Reservation, New Mexico | 0.2753% |
| Miami Tribe of Oklahoma | 0.0514% |
| Miccosukee Tribe of Indians | 0.0269% |
| Middletown Rancheria of Pomo Indians of California | 0.0260% |
| Mille Lacs Band of the Minnesota Chippewa Tribe, Minnesota | 0.1295% |
| Mississippi Band of Choctaw Indians | 0.4540% |
| Moapa Band of Paiute Indians of the Moapa River Indian Reservation, Nevada | 0.0431% |
| Modoc Nation | 0.0054% |
| Mohegan Tribe of Indians of Connecticut | 0.0666% |
| Monacan Indian Nation | 0.0588% |
| Mooretown Rancheria of Maidu Indians of California | 0.1949% |
| Morongo Band of Mission Indians, California | 0.0795% |
| Muckleshoot Indian Tribe | 0.2826% |
| Muscogee (Creek) Nation | 2.8659% |
| Nansemond Indian Nation | 0.0071% |
| Narragansett Indian Tribe | 0.0435% |

| FederallyRecognizedTribeName | Division of Funds (Allocation %) |
|---|---|
| Navajo Nation, Arizona, New Mexico & Utah | 15.2207% |
| Nez Perce Tribe | 0.2349% |
| Nisqually Indian Tribe | 0.0661% |
| Nooksack Indian Tribe | 0.0494% |
| Northern Cheyenne Tribe of the Northern Cheyenne Indian Reservation, Montana | 0.2535% |
| Northfork Rancheria of Mono Indians of California | 0.1192% |
| Northwestern Band of the Shoshone Nation | 0.0046% |
| Nottawaseppi Huron Band of the Potawatomi, Michigan | 0.0735% |
| Oglala Sioux Tribe | 0.9582% |
| Ohkay Owingeh, New Mexico | 0.2226% |
| Omaha Tribe of Nebraska | 0.1098% |
| Oneida Indian Nation | 0.0792% |
| Oneida Nation | 0.6249% |
| Onondaga Nation | 0.0286% |
| Osage Nation | 0.2998% |
| Otoe-Missouria Tribe of Indians, Oklahoma | 0.1412% |
| Ottawa Tribe of Oklahoma | 0.0294% |
| Paiute Indian Tribe of Utah (Cedar Band of Paiutes, Kanosh Band of Paiutes, Koosharem Band of Paiutes, Indian Peaks Band of Paiutes, and Shivwits Band of Paiutes) | 0.0864% |
| Paiute-Shoshone Tribe of the Fallon Reservation and Colony, Nevada | 0.1593% |
| Pala Band of Mission Indians | 0.0654% |
| Pamunkey Indian Tribe | 0.0149% |
| Pascua Yaqui Tribe of Arizona | 0.6028% |
| Paskenta Band of Nomlaki Indians of California | 0.0061% |
| Passamaquoddy Tribe Indian Township | 0.0601% |
| Passamaquoddy Tribe Pleasant Point | 0.0758% |
| Pauma Band of Luiseno Mission Indians of the Pauma & Yuima Reservation, California | 0.0135% |
| Pawnee Nation of Oklahoma | 0.1674% |
| Pechanga Band of Luiseno Mission Indians of the Pechanga Reservation, California | 0.1620% |
| Penobscot Nation | 0.1004% |
| Peoria Tribe of Indians of Oklahoma | 0.0425% |
| Picayune Rancheria of Chukchansi Indians of California | 0.0820% |
| Pinoleville Pomo Nation, California | 0.0269% |
| Pit River Tribe, California (includes XL Ranch, Big Bend, Likely, Lookout, Montgomery Creek and Roaring Creek Rancherias) | 0.1144% |
| Poarch Band of Creeks | 0.1346% |
| Pokagon Band of Potawatomi Indians, Michigan and Indiana | 0.1197% |
| Ponca Tribe of Indians of Oklahoma | 0.2376% |
| Ponca Tribe of Nebraska | 0.1290% |
| Port Gamble S'Klallam Tribe | 0.0841% |
| Potter Valley Tribe, California | 0.0005% |
| Prairie Band Potawatomi Nation | 0.0680% |
| Prairie Island Indian Community in the State of Minnesota | 0.0030% |
| Pueblo of Acoma, New Mexico | 0.1776% |
| Pueblo of Cochiti, New Mexico | 0.0602% |
| Pueblo of Isleta, New Mexico | 0.9641% |
| Pueblo of Jemez, New Mexico | 0.4715% |
| Pueblo of Laguna, New Mexico | 0.3010% |
| Pueblo of Nambe, New Mexico | 0.0678% |
| Pueblo of Picuris, New Mexico | 0.0148% |
| Pueblo of Pojoaque, New Mexico | 0.0364% |
| Pueblo of San Felipe, New Mexico | 0.1962% |
| Pueblo of San Ildefonso, New Mexico | 0.0515% |
| Pueblo of Sandia, New Mexico | 0.0539% |

| FederallyRecognizedTribeName | Division of Funds (Allocation %) |
|---|---|
| Pueblo of Santa Ana, New Mexico | 0.1216% |
| Pueblo of Santa Clara, New Mexico | 0.0972% |
| Pueblo of Taos, New Mexico | 0.1254% |
| Pueblo of Tesuque, New Mexico | 0.0368% |
| Pueblo of Zia, New Mexico | 0.1135% |
| Puyallup Tribe of the Puyallup Reservation | 0.3461% |
| Pyramid Lake Paiute Tribe of the Pyramid Lake Reservation, Nevada | 0.2112% |
| Quapaw Nation | 0.0677% |
| Quartz Valley Indian Community of the Quartz Valley Reservation of California | 0.0209% |
| Quechan Tribe of the Fort Yuma Indian Reservation, California & Arizona | 0.2304% |
| Quileute Tribe of the Quileute Reservation | 0.0445% |
| Quinault Indian Nation | 0.1554% |
| Ramona Band of Cahuilla, California | 0.0016% |
| Rappahannock Tribe, Inc. | 0.0068% |
| Red Cliff Band of Lake Superior Chippewa Indians of Wisconsin | 0.0680% |
| Red Lake Band of Chippewa Indians, Minnesota | 0.3333% |
| Redding Rancheria, California | 0.3258% |
| Redwood Valley or Little River Band of Pomo Indians of the Redwood Valley Rancheria California | 0.0214% |
| Reno-Sparks Indian Colony, Nevada | 0.4667% |
| Resighini Rancheria, California | 0.0117% |
| Rincon Band of Luiseno Mission Indians of the Rincon Reservation, California | 0.0301% |
| Robinson Rancheria | 0.0577% |
| Rosebud Sioux Tribe of the Rosebud Indian Reservation, South Dakota | 0.3906% |
| Round Valley Indian Tribes, Round Valley Reservation, California | 0.1304% |
| Sac & Fox Nation of Missouri in Kansas and Nebraska | 0.0066% |
| Sac & Fox Nation, Oklahoma | 0.4786% |
| Sac & Fox Tribe of the Mississippi in Iowa | 0.0652% |
| Saginaw Chippewa Indian Tribe of Michigan | 0.1612% |
| Saint Regis Mohawk Tribe | 0.3164% |
| Salt River Pima-Maricopa Indian Community of the Salt River Reservation, Arizona | 0.3690% |
| Samish Indian Nation | 0.0508% |
| San Carlos Apache Tribe of the San Carlos Reservation, Arizona | 0.9842% |
| San Juan Southern Paiute Tribe of Arizona | 0.0052% |
| San Manuel Band of Mission Indians, California | 0.0212% |
| San Pasqual Band of Diegueno Mission Indians of California | 0.0096% |
| Santa Rosa Band of Cahuilla Indians, California | 0.0163% |
| Santa Rosa Indian Community of the Santa Rosa Rancheria, California | 0.0567% |
| Santa Ynez Band of Chumash Mission Indians of the Santa Ynez Reservation, California | 0.0489% |
| Santee Sioux Nation, Nebraska | 0.0407% |
| Sauk-Suiattle Indian Tribe | 0.0041% |
| Sault Ste. Marie Tribe of Chippewa Indians, Michigan | 0.7720% |
| Scotts Valley Band of Pomo Indians of California | 0.0140% |
| The Seminole Nation of Oklahoma | 0.4506% |
| Seminole Tribe of Florida | 0.4524% |
| Seneca Nation of Indians | 0.4387% |
| Seneca-Cayuga Nation | 0.0727% |
| Shakopee Mdewakanton Sioux Community of Minnesota | 0.0040% |
| Shawnee Tribe | 0.0385% |
| Sherwood Valley Rancheria of Pomo Indians of California | 0.0390% |
| Shingle Springs Band of Miwok Indians, Shingle Springs Rancheria (Verona Tract), California | 0.0578% |
| Shinnecock Indian Nation | 0.0136% |
| Shoalwater Bay Indian Tribe of the Shoalwater Bay Indian Reservation | 0.0388% |
| Shoshone-Bannock Tribes of the Fort Hall Reservation | 0.2571% |

| Federally Recognized Tribe Name | Division of Funds (Allocation %) |
|---|---|
| Shoshone-Paiute Tribes of the Duck Valley Reservation, Nevada | 0.1081% |
| Sisseton-Wahpeton Oyate of the Lake Traverse Reservation, South Dakota | 0.2481% |
| Skokomish Indian Tribe | 0.0492% |
| Skull Valley Band of Goshute Indians of Utah | 0.0031% |
| Snoqualmie Indian Tribe | 0.0268% |
| Soboba Band of Luiseno Indians, California | 0.1192% |
| Sokaogon Chippewa Community, Wisconsin | 0.0119% |
| Southern Ute Indian Tribe of the Southern Ute Reservation, Colorado | 0.0816% |
| Spirit Lake Tribe, North Dakota | 0.1358% |
| Spokane Tribe of the Spokane Reservation | 0.1194% |
| Squaxin Island Tribe of the Squaxin Island Reservation | 0.0474% |
| St. Croix Chippewa Indians of Wisconsin | 0.0720% |
| Standing Rock Sioux Tribe of North & South Dakota | 0.2451% |
| Stillaguamish Tribe of Indians of Washington | 0.0069% |
| Stockbridge Munsee Community, Wisconsin | 0.0656% |
| Summit Lake Paiute Tribe of Nevada | 0.0045% |
| Suquamish Indian Tribe of the Port Madison Reservation | 0.0385% |
| Susanville Indian Rancheria, California | 0.0940% |
| Swinomish Indian Tribal Community | 0.0685% |
| Sycuan Band of the Kumeyaay Nation | 0.0050% |
| Table Mountain Rancheria | 0.0008% |
| Tejon Indian Tribe | 0.0230% |
| Te-Moak Tribe of Western Shoshone Indians of Nevada (Four constituent bands: Battle Mountain Band; Elko Band; South Fork Band and Wells Band) | 0.1564% |
| Thlopthlocco Tribal Town | 0.0385% |
| Three Affiliated Tribes of the Fort Berthold Reservation, North Dakota | 0.2170% |
| Timbisha Shoshone Tribe | 0.0061% |
| Tohono O'odham Nation of Arizona | 1.4176% |
| Tolowa Dee-ni' Nation | 0.1350% |
| Tonawanda Band of Seneca | 0.0103% |
| Tonkawa Tribe of Indians of Oklahoma | 0.0387% |
| Tonto Apache Tribe of Arizona | 0.0187% |
| Torres Martinez Desert Cahuilla Indians, California | 0.0496% |
| Tulalip Tribes of Washington | 0.3139% |
| Tule River Indian Tribe of the Tule River Reservation, California | 0.1030% |
| Tunica-Biloxi Indian Tribe | 0.0183% |
| Tuolumne Band of Me-Wuk Indians of the Tuolumne Rancheria of California | 0.0252% |
| Turtle Mountain Band of Chippewa Indians of North Dakota | 0.4382% |
| Tuscarora Nation | 0.0127% |
| Twenty-Nine Palms Band of Mission Indians of California | 0.0023% |
| United Auburn Indian Community of the Auburn Rancheria of California | 0.3284% |
| United Keetoowah Band of Cherokee Indians in Oklahoma | 0.1820% |
| Upper Mattaponi Tribe | 0.0194% |
| Upper Sioux Community, Minnesota | 0.0055% |
| Upper Skagit Indian Tribe | 0.0250% |
| Ute Indian Tribe of the Uintah & Ouray Reservation, Utah | 0.3345% |
| Ute Mountain Ute Tribe | 0.1348% |
| Utu Utu Gwaitu Paiute Tribe of the Benton Paiute Reservation, California | 0.0030% |
| Capitan Grande Band of Diegueno Mission Indians of California (Barona Group of Capitan Grande Band of Mission Indians of the Barona Reservation, California; Viejas (Baron Long) Group of Capitan Grande Band of Mission Indians of the Viejas Reservation, California) | 0.0639% |
| Walker River Paiute Tribe, Nevada | 0.0922% |
| Wampanoag Tribe of Gay Head (Aquinnah) | 0.0216% |
| Washoe Tribe of Nevada & California | 0.2416% |

| Federally Recognized Tribe Name | Division of Funds (Allocation %) |
|---|---|
| White Earth Band of the Minnesota Chippewa Tribe, Minnesota | 0.3129% |
| White Mountain Apache Tribe of the Fort Apache Reservation, Arizona | 1.2832% |
| Wichita and Affiliated Tribes, Oklahoma | 0.1054% |
| Wilton Rancheria, California | 0.0764% |
| Winnebago Tribe of Nebraska | 0.1438% |
| Winnemucca Indian Colony of Nevada | 0.0121% |
| Wiyot Tribe, California | 0.0513% |
| Wyandotte Nation | 0.0858% |
| Yankton Sioux Tribe of South Dakota | 0.1301% |
| Yavapai-Apache Nation of the Camp Verde Indian Reservation, Arizona | 0.1642% |
| Yavapai-Prescott Indian Tribe | 0.0463% |
| Yerington Paiute Tribe of the Yerington Colony & Campbell Ranch, Nevada | 0.0546% |
| Yocha Dehe Wintun Nation, California | 0.0091% |
| Yomba Shoshone Tribe of the Yomba Reservation, Nevada | 0.0162% |
| Ysleta del Sur Pueblo | 0.0531% |
| Yurok Tribe of the Yurok Reservation, California | 0.4941% |
| Zuni Tribe of the Zuni Reservation, New Mexico | 0.4432% |

*\* 50% of the allocation to this entity shall be made available to federally recognized tribes served by the entity.*

**Schedule D**
**Tribal Abatement Strategies**

The following is a non-exhaustive, illustrative list of culturally appropriate activities, practices, teachings or ceremonies that may, in the judgment of the Tribes, be aimed at or supportive of remediation and abatement of the opioid crisis within a tribal community.

Each of the 574 federally recognized Tribes in the United States has its own cultures, histories and traditions. Each Tribe is best suited to determine the most effective abatement strategies for the specific community it serves. The following list provides select examples of tribal abatement strategies and is not intended to limit the remediation and abatement activities for which any Tribe or tribal organization may utilize its share of Abatement Funds.

1.     **Traditional Activities Associated with Cultural Identity and Healing**

Tribal cultural activities can help address historical and intergenerational trauma and feelings of cultural loss that may be underlying root causes and/or contributing factors to addiction. These can include, for example:

- Utilization of traditional healers and spiritual and traditional approaches to healing;
- Sweat lodges, sacred pipe ceremonies, smudging and other ceremonies;
- Talking circles;
- Cultural activities such as basket weaving, pottery making, drum making, canoe building, etc., depending on the Tribe;
- Cultural and linguistic immersion programs.

These traditional activities may be combined with other treatment or included in integrated treatment models, as discussed below.

Example: Drum-Assisted Recovery Therapy for Native Americans (DARTNA) is supported by research. Drums are a sacred instrument in many American Indian and Alaska Native cultures and are often associated with ceremonies and healing. In addition to providing a sense of cultural connection, drumming may have physical and psychological effects that make it a promising focus for treatment.

Example: Some Tribes have utilized seasonal cultural immersion camps in lieu of or in combination with residential treatment for substance use disorder. Participants practice traditional lifeways, including hunting, fishing, living in traditional dwellings and cultural and/or spiritual practices during the course of treatment.

2.     **Culturally Competent Integrated Treatment Models**

Example: The Swinomish Tribe designed and developed a unique treatment program called Didgʷálič that integrates evidence-based chemical dependency treatment with holistic, culturally competent care to successfully deal with the effects of opioid use disorder (OUD). Didgʷálič provides a full array of medical and social services, utilizing a model of care that centers on and incorporates the Tribe's culture and values. The Tribal

18

government and individual Tribal members provide cultural leadership and advice on the use of Native language and practices in the program.

Example: The Tulalip Tribe operates the Healing Lodge, a culturally sensitive transitional home facility for tribal members who are seeking to recover from addiction. In addition to a clean and sober living environment, the facility provides transportation to and from Chemical Dependency/ Mental Wellness groups and individual counseling sessions, sober support groups and cultural activities such as sweats, powwow and family nights. The program also connects residents with educational activities such as life skills trainings, budgeting, post generational trauma and Red Road to Wellbriety, a recovery and wellness program similar in some ways to the 12 Steps of AA but designed especially for Native American and following the teachings of the Medicine Wheel.

3.      **Culturally Grounded Community Prevention**

Culturally competent prevention programs, tailored to each tribal community, can play an important role in stopping and reversing the spread of the opioid epidemic.

Example: The Healing of the Canoe is a collaborative project between the Suquamish Tribe, the Port Gamble S'Klallam Tribe and the University of Washington Alcohol and Drug Abuse Institute (ADAI). It has led to the development and dissemination of the Culturally Grounded Life Skills for Youth curriculum, an evidence-based, strengths-based life skills curriculum for Native youth that uses elements of a Tribe's culture to help prevent substance abuse and connect its youth to their tribal community and culture. It teaches Native youth the skills they need to navigate their life's journey without being pulled off course by alcohol or drugs, using tribal values, traditions and culture both as a compass to guide them and an anchor to ground them. By reversing the historical trauma of forced assimilation, this approach attacks the root cause of so much substance abuse among tribal youth.

Example: The Association of Village Council Presidents has responded to the opioid crisis through the Healthy Families Program, which promotes and supports whole health through the sharing, teaching, and practice of traditional values through Elluarluteng Illakutellriit - a framework illustrating the Yup'ik life cycle of traditional practices, values and beliefs from Yup'ik Elders. This framework functions alongside western and medical practices to help individuals overcome their addictions permanently.

4.      **Peacekeeping and Wellness Courts**

Many Tribes have had success treating opioid offenders using traditional healing practices and alternative institutions, sometimes called wellness courts or peacekeeping courts.

Example: The Yurok Tribal Court, in coordination with the California State courts in Humboldt and Del Norte Counties, operates its Family Wellness Courts (FWC) for Yurok families suffering from opioid abuse problems. The FWC seeks to develop judicial practices that are consistent with Yurok tribal values and needs, combining the resources and expertise of both systems. It focuses on reintegrating tribal members into the culture and life of the Yurok community and helping them establish a drug-free lifestyle.

5.      **Community Workforce Development and Training**

Cultural competency training as well as community workforce development can be a critical tool for addressing gaps in services, especially in rural and remote tribal communities, where it can be extremely difficult to recruit and retain qualified health care professionals.

> Example: In Alaska, the Community Health Aide Program (CHAP) has increased access to medical treatment to more than 170 rural Alaskan villages utilizing a workforce development model geared toward Native people. Under CHAP, individuals selected by their communities are provided with training as community health aides and practitioners to work in rural villages under the supervision of, and in collaboration with, higher level medical professionals, often aided by telemedicine technology. As part of CHAP, behavioral health aides (BHAs) are trained as counselors, educators and advocates to help address mental health and addiction issues.

> Example: Part of the Swinomish Tribe's Didgʷálič treatment model, discussed above, is training for Tribal members with a goal of building a new generation of clinically trained and culturally competent Native counselors and providers, Yup'ik Elders. This framework functions alongside western and medical practices to help individuals overcome their addictions permanently.

## Schedule E
## Tribal Allocation Matrix

The Tribal Nation's allocation matrix is built around six data points: MMEs (morphine milligram equivalents) imputed to each Tribe; drug and prescription opioid overdose rates imputed to each Tribe; Indian Health Service (IHS) user population for each Tribe; citizenship population for each Tribe; relative poverty rates imputed to each Tribe; and relative cost of living imputed to each Tribe. Data are "imputed" to a Tribe by estimation based on population when the data is only available on a county or statewide basis. In the case of MMEs and drug overdose rates, the imputation of the data to a tribal population is multiplied by a "disproportionate impact" adjustment reflecting the higher incidence of opioid use disorder and prescription opioid overdose deaths in tribal communities.

Two computations are undertaken for all Tribes, and then combined together. 85% of a Tribe's matrix share is calculated by considering its imputed MME rate (50%), overdose rates (40%), and poverty rate (10%) as applied to its IHS user population. 15% of a Tribe's matrix share is calculated by considering the same three elements, similarly weighted, as applied to the Tribe's citizenship data. Once these two matrix results are combined, the resulting share is further adjusted by each Tribe's relative cost of living. COLA adjustments are done on a regional basis and are weighted at 10%, resulting in modest adjustments ranging from 1.3% down to 2.4% up.

Data for Alaska Tribes was initially computed on a statewide basis, and the resulting matrix share for Alaska was then subdivided among Alaska Tribes and tribal organizations participating in the Alaska Tribal Health Compact (employing the same methodology historically used to allocate certain other tribal health care funds across Alaska tribal health care providers).

The matrix allocates individual amounts to each California Tribe, although four intertribal health care providers in California have also separately filed litigation. Each such intertribal provider will engage in discussions with its member tribes and agree on an amount that the member tribes will allocate from their funds to the intertribal provider.

Tribal citizenship data used in the matrix was subject to a tribal verification process (except for Alaska, where data was drawn from the U.S. Census). In instances where IHS user population data for multiple Tribes was not allocated by IHS to individual Tribes, user populations were prorated across the Tribes within an IHS service unit based on the Tribes' relative tribal citizenship.

# EXHIBIT H-1

**Redline of Tribe TDP**

## PURDUE PHARMA L.P.

### TRIBE TRUST DISTRIBUTION PROCEDURES[1]

| Issue | Description |
|-------|-------------|
| **1. APPLICABILITY OF AGREEMENT** | These terms shall apply to the allocation of value received by the ~~Tribe Trust (including both the~~ Tribal Abatement Fund Trust ("**TAFT**"~~) and Tribal Abatement Fund II, LLC ("TAF2")~~) under the plan of reorganization (the "**Chapter 11 Plan**" or the "**Plan**") in the Chapter 11 Cases of Purdue Pharma L.P. and its affiliates (collectively, "**Purdue**") pending in the U.S. Bankruptcy Court for the Southern District of New York (the "**Bankruptcy Court**") with respect to each ~~federally recognized Native American, Native Alaskan or American Indian Tribe or other tribal organization~~American Indian or Alaska Native Tribe, band, nation, pueblo, village or community, that the U.S. Secretary of the Interior acknowledges as an Indian Tribe, as provided in the Federally Recognized Tribe List Act of 1994, 25 U.S.C. § 5130 or Tribal Organization, as defined in 25 U.S.C. 5304(l), (each a "**Tribe**"~~ as defined in the Plan~~), whose Claims in Class 5 (Tribe Claims) are channeled to ~~the Tribe Trust~~TAFT under the Plan.<br><br>Pursuant to the Plan and the Master TDP, the following claims (the "**Tribe Channeled Claims**") shall be channeled to and liability shall be assumed by TAFT as of the Effective Date: (i) all Tribe Claims, which include any Claim against any Debtor that is held by a Tribe (including any Claim based on the subrogation rights of a Tribe that is not otherwise an Other Subordinated Claim), and that is not a Priority Tax Claim, and (ii) any Released Claim or Shareholder Released Claim that is held by a Tribe.  The distributions made pursuant to these distribution procedures (these "**Tribe Trust Distribution Procedures**") ~~and the Restructuring Steps Memorandum~~ are the exclusive distributions that will be made by TAFT on account of the Tribe Channeled Claims; Holders of Tribe Channeled Claims will have no further or other recourse against ~~the Tribe Trust~~TAFT on account of the Tribe Channeled Claims other than what is provided for under these Tribe Trust Distribution Procedures.<br><br>To the extent not explicitly reflected in the Chapter 11 Plan, the terms set forth herein will be deemed incorporated into the Chapter 11 Plan, or the trust agreement for ~~the Tribe Trust~~TAFT (the "~~**Tribe Trust**~~**TAFT** Agreement"), as applicable.<br><br>These terms set forth the manner in which ~~the Tribe Trust~~TAFT shall make Abatement Distributions to the Tribes, which may be used exclusively on the parameters set forth herein; *provided* that, except as |

---

[1] Terms not otherwise defined herein shall have the meaning ascribed in the Chapter 11 Plan or in the ~~Tribe Trust~~TAFT Agreement.

1

| Issue | Description |
|---|---|
| | otherwise specified in these Tribe Trust Distribution Procedures, nothing herein shall apply to the Abatement Distributions pursuant to the Restructuring Steps Memorandum. |
| **2.  PURPOSE** | These Tribe Trust Distribution Procedures are intended to establish the mechanisms for the distribution and allocation of (i) the TopCo Tribe Interest and (ii) funds distributed by the Tribe TrustTAFT to the Tribes. All such funds described in subclause (ii) of the foregoing sentence are referred to herein as "**Abatement Funds**" and shall be used to abate the opioid crisis in accordance with the terms hereof, with recognition of the culturally appropriate activities, practices, teachings or ceremonies that may, in the judgment of a Tribe or a tribal health organizationTribal Organization, be aimed at or supportive of remediation and abatement of the opioid crisis within a tribal community.

Specifically, (i) no less than ninety five percent (95%) of the Abatement Funds distributed under the Tribe TrustTAFT Agreement shall be used for abatement of the opioid crisis by funding opioid or substance use disorder related projects or programs that fall within the scope of **Schedules B** and **D** (the "**Approved Tribal Opioid Abatement Uses**"); and (ii) no more than five percent (5%) of the Abatement Funds may be used to fund expenses incurred in administering the distributions for the Approved Tribal Opioid Abatement Uses, including the process of selecting programs to receive Abatement Funds for implementing those programs ("**Approved Administrative Expenses**," and, together with the Approved Opioid Abatement Uses and Core Strategies, "**Approved Uses**").

For the avoidance of doubt, **Schedule D** is a non-exhaustive, illustrative list of culturally appropriate activities, practices, teachings or ceremonies that may, in the judgment of a Tribe or Tribal Organization, be aimed at or supportive of remediation and abatement of the opioid crisis within a tribal community.

The Tribe TrustTAFT shall, in accordance with the Plan, the Confirmation Order and the Tribe Trust DocumentsTAFT Agreement, distribute Abatement Funds to Tribes for Approved Uses. Decisions concerningAll distributions of Abatement Funds made by the Tribe Trust will consider the needto Tribes in accordance herewith shall be deemed to satisfy the mandate to ensure that underserved urban and rural areas, as well as minority communities, receive equitable access to the funds.

Notwithstanding anything in these Tribe Trust Distribution Procedures that might imply to the contrary, projects or programs that constitute Approved Tribal Opioid Abatement Uses may be provided by Tribes, tribal health organizationsTribal Organizations, tribal agencies or |

| Issue | Description |
|---|---|
| | subdivisions or nongovernmental parties and funded from Abatement Funds. |
| **3.** **DISBURSEMENT OF TOPCO TRIBE INTEREST** | Pursuant to Section 5.2 of the Plan and the Restructuring Steps Memo, TAFT shall distribute 100% of its TopCo Tribe Interest to Holders of Tribe Channeled Claims, consistent with the Tribal Allocation Percentages set forth on **Schedule C**, which will immediately contribute such TopCo Tribe Interest to Tribal Opioid Abatement Fund, LLC. |
| **4.** ~~3.~~ DISBURSEMENT OF ABATEMENT DISTRIBUTIONS | The Chapter 11 Plan shall provide for the establishment of ~~the Tribe Trust~~TAFT and the appointment of Tribe Trustees. ²⁻The Tribe Trustees shall distribute the Abatement Funds consistent with the Tribal Allocation Percentages set forth on **Schedule C** ~~and~~. The Tribal Allocation Percentages are based on the Tribal Allocation Matrix ~~set forth~~described on **Schedule E**. |
| **5.** ~~4.~~ ATTORNEYS' FEES AND COSTS FUND | Pursuant to Section 5.8 of the Plan, Public Creditor Trust Distributions will be subject to assessments to fund (i) the Local Government and Tribe Costs and Expenses Fund, which shall be used to pay qualifying costs and expenses (including attorneys' fees) of Holders of Non-Federal Governmental Claims (other than States) and Tribe Claims (including ad hoc groups of any of the foregoing) and (ii) the State Costs and Expenses Fund, which shall be used to pay qualifying costs and expenses (including attorneys' fees) of States (including ad hoc groups thereof). |
| **6.** ~~5.~~ TRIBAL ABATEMENT FUNDING | 1. The allocation of distributions of Abatement Funds among Tribes will be consistent with the Tribal Allocation Percentages set forth on **Schedule C**, which will be included as part of the Tribe Trust Documents.<br><br>2. The Tribes will use the tribal allocation of Abatement Funds for programs on the approved list of abatement strategies (see **Schedule B**) and also for culturally appropriate activities, practices, teachings or |

---

~~² Pursuant to the Plan, the Tribe Trustees shall be selected by the Native American Tribe Group with the consent of the Debtors. The Tribe Trust Agreement shall provide that: (i) the Trustees shall receive compensation from TAFT for their services as Trustees; (ii) the amounts paid to the Trustees for compensation and expenses shall be disclosed in the Annual Report; (iii) The Trustees shall not be required to post any bond or other form of surety or security unless otherwise ordered by the Bankruptcy Court; (iv) the Trustees shall have the power to appoint such officers and retain such employees, consultants, advisors, independent contractors, experts, and agents and engage in such legal, financial, accounting, investment, auditing, and alternative dispute resolution services and activities as TAFT requires, and delegate to such persons such powers and authorities as the fiduciary duties of the Trustees permit and as the Trustees, in their discretion, deem advisable or necessary in order to carry out the terms of this Trust Agreement; and (v) the Trustees shall have the power to pay reasonable compensation and expenses to any such employees, consultants, advisors, independent contractors, experts, and agents for legal, financial, accounting, investment, auditing, and alternative dispute resolution services and activities.~~

| Issue | Description |
|---|---|
| | ceremonies that are, in the judgment of a ~~tribe or tribal health organization~~<u>Tribe or Tribal Organization</u>, aimed at or supportive of remediation and abatement of the opioid crisis within a tribal community. A list of representative examples of such culturally appropriate abatement strategies, practices, and programs is attached hereto as **Schedule D** (the "**Tribal Abatement Strategies**"). The separate allocation of abatement funding and illustrative list of Tribal Abatement Strategies recognizes that American Indian and Alaska Native Tribes and the communities they serve possess unique cultural histories, practices, wisdom, and needs that are highly relevant to the health and well-being of American Indian and Alaska Native people and that may play an important role in both individual and public health efforts and responses in Native communities.<br><br>3. The Tribes agree that Abatement Funds distributed under the Chapter 11 Plan shall be used to abate the opioid crisis in accordance with the terms of these Tribe Trust Distribution Procedures. |
| **7. 6. COMPLIANCE, REPORTING, AUDIT AND ACCOUNTABILITY** | 1. The Tribe Trustees shall impose appropriate reporting requirements on the Tribes ~~(identified on **Schedule C** as "**Reporting Tribes**")~~ to ensure that Abatement Funds are used only for Approved Uses. The Tribe Trustees may authorize modified reporting requirements for Tribes with allocations below a certain level.<br><br>2. ~~The Tribe Trust~~<u>TAFT</u> shall prepare an annual report (an "**Annual Report**") that shall be audited by independent auditors as provided in the ~~Tribe Trust~~<u>TAFT</u> Agreement, which audited Annual Report shall be filed annually with the Bankruptcy Court.<br><br>3. The Bankruptcy Court shall have continuing jurisdiction over ~~the Tribe Trust~~<u>TAFT</u>, provided however, the courts of the State of Delaware, including any federal court located therein, shall also have jurisdiction over ~~the Tribe Trust~~<u>TAFT</u>.<br><br>4. The Tribe Trustees shall have the power to take any and all actions that in the judgment of the Tribe Trustees are necessary or proper to fulfill the purposes of ~~Tribe Trust. The Tribe Trust retains the right to seek return by legal means of any expenditures which fail to comply with the requirements of these Tribe Trust Distribution Procedures~~<u>TAFT, including the requirement that 100% of the Abatement Funds distributed under the Plan (and not otherwise dedicated to the attorneys' fee fund set forth in Section 4 herein) shall be used to abate the opioid crisis in accordance with the terms hereof</u>. |

4

**Schedule A**

(~~Intentionally Omitted~~Reserved)

**Schedule B**
**Approved Uses**

Support treatment of Opioid Use Disorder (OUD) and any co-occurring Substance Use Disorder or Mental Health (SUD/MH) conditions through evidence-based or evidence-informed programs or strategies that may include, but are not limited to, the following:

---

PART ONE: TREATMENT

---

A.    **TREAT OPIOID USE DISORDER (OUD)**

Support treatment of Opioid Use Disorder (OUD) and any co-occurring Substance Use Disorder or Mental Health (SUD/MH) conditions through evidence-based or evidence-informed programs or strategies that may include, but are not limited to, the following[1]:

1.    Expand availability of treatment for OUD and any co-occurring SUD/MH conditions, including all forms of Medication-Assisted Treatment (MAT) approved by the U.S. Food and Drug Administration.

2.    Support and reimburse evidence-based services that adhere to the American Society of Addiction Medicine (ASAM) continuum of care for OUD and any co-occurring SUD/MH conditions

3.    Expand telehealth to increase access to treatment for OUD and any co-occurring SUD/MH conditions, including MAT, as well as counseling, psychiatric support, and other treatment and recovery support services.

4.    Improve oversight of Opioid Treatment Programs (OTPs) to assure evidence-based or evidence-informed practices such as adequate methadone dosing and low threshold approaches to treatment.

5.    Support mobile intervention, treatment, and recovery services, offered by qualified professionals and service providers, such as peer recovery coaches, for persons with OUD and any co-occurring SUD/MH conditions and for persons who have experienced an opioid overdose.

6.    Treatment of trauma for individuals with OUD (e.g., violence, sexual assault, human trafficking, or adverse childhood experiences) and family members (e.g., surviving family members after an overdose or overdose fatality), and training of health care personnel to identify and address such trauma.

7.    Support evidence-based withdrawal management services for people with OUD and any co-occurring mental health conditions.

---

[1] As used in this Schedule B, words like "expand," "fund," "provide" or the like shall not indicate a preference for new or existing programs. Priorities will be established through the mechanisms described in the Public Creditor Trust Distribution Procedures.

6

8.     Training on MAT for health care providers, first responders, students, or other supporting professionals, such as peer recovery coaches or recovery outreach specialists, including telementoring to assist community-based providers in rural or underserved areas.

9.     Support workforce development for addiction professionals who work with persons with OUD and any co-occurring SUD/MH conditions.

10.    Fellowships for addiction medicine specialists for direct patient care, instructors, and clinical research for treatments.

11.    Scholarships and supports for behavioral health practitioners or workers involved in addressing OUD and any co-occurring SUD or mental health conditions, including but not limited to training, scholarships, fellowships, loan repayment programs, or other incentives for providers to work in rural or underserved areas.

12.    Provide funding and training for clinicians to obtain a waiver under the federal Drug Addiction Treatment Act of 2000 (DATA 2000) to prescribe MAT for OUD, and provide technical assistance and professional support to clinicians who have obtained a DATA 2000 waiver.

13.    Dissemination of web-based training curricula, such as the American Academy of Addiction Psychiatry's Provider Clinical Support Service-Opioids web-based training curriculum and motivational interviewing.

14.    Development and dissemination of new curricula, such as the American Academy of Addiction Psychiatry's Provider Clinical Support Service for Medication-Assisted Treatment.

**B.    SUPPORT PEOPLE IN TREATMENT AND RECOVERY**

Support people in recovery from OUD and any co-occurring SUD/MH conditions through evidence-based or evidence-informed programs or strategies that may include, but are not limited to, the following:

1.     Provide comprehensive wrap-around services to individuals with OUD and any co-occurring SUD/MH conditions, including housing, transportation, education, job placement, job training, or childcare.

2.     Provide the full continuum of care of treatment and recovery services for OUD and any co-occurring SUD/MH conditions, including supportive housing, peer support services and counseling, community navigators, case management, and connections to community-based services.

3.     Provide counseling, peer-support, recovery case management and residential treatment with access to medications for those who need it to persons with OUD and any co-occurring SUD/MH conditions.

4.     Provide access to housing for people with OUD and any co-occurring SUD/MH conditions,                              including supportive housing, recovery housing, housing

7

assistance programs, training for housing providers, or recovery housing programs that allow or integrate FDA-approved mediation with other support services.

5. Provide community support services, including social and legal services, to assist in deinstitutionalizing persons with OUD and any co-occurring SUD/MH conditions.

6. Support or expand peer-recovery centers, which may include support groups, social events, computer access, or other services for persons with OUD and any co-occurring SUD/MH conditions.

7. Provide or support transportation to treatment or recovery programs or services for persons with OUD and any co-occurring SUD/MH conditions.

8. Provide employment training or educational services for persons in treatment for or recovery from OUD and any co-occurring SUD/MH conditions.

9. Identify successful recovery programs such as physician, pilot, and college recovery programs, and provide support and technical assistance to increase the number and capacity of high-quality programs to help those in recovery.

10. Engage non-profits, faith-based communities, and community coalitions to support people in treatment and recovery and to support family members in their efforts to support the person with OUD in the family.

11. Training and development of procedures for government staff to appropriately interact and provide social and other services to individuals with or in recovery from OUD, including reducing stigma.

12. Support stigma reduction efforts regarding treatment and support for persons with OUD, including reducing the stigma on effective treatment.

13. Create or support culturally appropriate services and programs for persons with OUD and any co-occurring SUD/MH conditions, including new Americans.

14. Create and/or support recovery high schools.

15. Hire or train behavioral health workers to provide or expand any of the services or supports listed above.

## C.   CONNECT PEOPLE WHO NEED HELP TO THE HELP THEY NEED (CONNECTIONS TO CARE)

Provide connections to care for people who have – or at risk of developing – OUD and any co-occurring SUD/MH conditions through evidence-based or evidence-informed programs or strategies that may include, but are not limited to, the following:

1.    Ensure that health care providers are screening for OUD and other risk factors and know how to appropriately counsel and treat (or refer if necessary) a patient for OUD treatment.

2.    Fund Screening, Brief Intervention and Referral to Treatment (SBIRT) programs to reduce the transition from use to disorders, including SBIRT services to pregnant women who are uninsured or not eligible for Medicaid.

3.    Provide training and long-term implementation of SBIRT in key systems (health, schools, colleges, criminal justice, and probation), with a focus on youth and young adults when transition from misuse to opioid disorder is common.

4.    Purchase automated versions of SBIRT and support ongoing costs of the technology.

5.    Expand services such as navigators and on-call teams to begin MAT in hospital emergency departments.

6.    Training for emergency room personnel treating opioid overdose patients on post-discharge planning, including community referrals for MAT, recovery case management or support services.

7.    Support hospital programs that transition persons with OUD and any co-occurring SUD/MH conditions, or persons who have experienced an opioid overdose, into clinically appropriate follow-up care through a bridge clinic or similar approach.

8.    Support crisis stabilization centers that serve as an alternative to hospital emergency departments for persons with OUD and any co-occurring SUD/MH conditions or persons that have experienced an opioid overdose.

9.    Support the work of Emergency Medical Systems, including peer support specialists, to connect individuals to treatment or other appropriate services following an opioid overdose or other opioid-related adverse event.

10.    Provide funding for peer support specialists or recovery coaches in emergency departments, detox facilities, recovery centers, recovery housing, or similar settings; offer services, supports, or connections to care to persons with OUD and any co-occurring SUD/MH conditions or to persons who have experienced an opioid overdose.

11.    Expand warm hand-off services to transition to recovery services.

12.    Create or support school-based contacts that parents can engage with to seek immediate treatment services for their child; and support prevention, intervention, treatment, and recovery programs focused on young people.

13.    Develop and support best practices on addressing OUD in the workplace.

14.    Support        assistance programs for health care providers with OUD.

15.    Engage non-profits and the faith community as a system to support outreach for treatment.

16.    Support centralized call centers that provide information and connections to appropriate services and supports for persons with OUD and any co-occurring SUD/MH conditions.

**D.    ADDRESS THE NEEDS OF CRIMINAL-JUSTICE-INVOLVED PERSONS**

Address the needs of persons with OUD and any co-occurring SUD/MH conditions who are involved in, are at risk of becoming involved in, or are transitioning out of the criminal justice system through evidence-based or evidence-informed programs or strategies that may include, but are not limited to, the following:

1.    Support pre-arrest or pre-arraignment diversion and deflection strategies for persons with OUD and any co-occurring SUD/MH conditions, including established strategies such as:

　　1.    Self-referral strategies such as the Angel Programs or the Police Assisted Addiction Recovery Initiative (PAARI);

　　2.    Active outreach strategies such as the Drug Abuse Response Team (DART) model;

　　3.    "Naloxone Plus" strategies, which work to ensure that individuals who have received naloxone to reverse the effects of an overdose are then linked to treatment programs or other appropriate services;

　　4.    Officer prevention strategies, such as the Law Enforcement Assisted Diversion (LEAD) model;

　　5.    Officer intervention strategies such as the Leon County, Florida Adult Civil Citation Network or the Chicago Westside Narcotics Diversion to Treatment Initiative; or

　　6.    Co-responder and/or alternative responder models to address OUD-related 911 calls with greater SUD expertise.

2.    Support pre-trial services that connect individuals with OUD and any co-occurring SUD/MH conditions to evidence-informed treatment, including MAT, and related services.

3.    Support treatment and recovery courts that provide evidence-based options for persons with OUD and any co-occurring SUD/MH conditions.

4.    Provide evidence-informed treatment, including MAT, recovery support, harm reduction, or other appropriate services to individuals with OUD and any co-occurring SUD/MH conditions who are incarcerated in jail or prison.

10

5.   Provide evidence-informed treatment, including MAT, recovery support, harm reduction, or other appropriate services to individuals with OUD and any co-occurring SUD/MH conditions who are leaving jail or prison have recently left jail or prison, are on probation or parole, are under community corrections supervision, or are in re-entry programs or facilities.

6.   Support critical time interventions (CTI), particularly for individuals living with dual-diagnosis OUD/serious mental illness, and services for individuals who face immediate risks and service needs and risks upon release from correctional settings.

7.   Provide training on best practices for addressing the needs of criminal-justice-involved persons with OUD and any co-occurring SUD/MH conditions to law enforcement, correctional, or judicial personnel or to providers of treatment, recovery, harm reduction, case management, or other services offered in connection with any of the strategies described in this section.

## E.   ADDRESS THE NEEDS OF PREGNANT OR PARENTING WOMEN AND THEIR FAMILIES, INCLUDING BABIES WITH NEONATAL ABSTINENCE SYNDROME

Address the needs of pregnant or parenting women with OUD and any co-occurring SUD/MH conditions, and the needs of their families, including babies with neonatal abstinence syndrome (NAS), through evidence-based or evidence-informed programs or strategies that may include, but are not limited to, the following:

1.   Support evidence-based or evidence-informed treatment, including MAT, recovery services and supports, and prevention services for pregnant women – or women who could become pregnant – who have OUD and any co-occurring SUD/MH conditions, and other measures to educate and provide support to families affected by Neonatal Abstinence Syndrome.

2.   Expand comprehensive evidence-based treatment and recovery services, including MAT, for uninsured women with OUD and any co-occurring SUD/MH conditions for up to 12 months postpartum.

3.   Training for obstetricians or other healthcare personnel that work with pregnant women and their families regarding treatment of OUD and any co-occurring SUD/MH conditions.

4.   Expand comprehensive evidence-based treatment and recovery support for NAS babies; expand services for better continuum of care with infant-need dyad; expand long-term treatment and services for medical monitoring of NAS babies and their families.

5.   Provide training to health care providers who work with pregnant or parenting women on best practices for compliance with federal requirements that children born with Neonatal Abstinence Syndrome get referred to appropriate services and receive a                          plan of safe care.

11

6.      Child and family supports for parenting women with OUD and any co-occurring SUD/MH conditions.

7.      Enhanced family supports and child care services for parents with OUD and any co-occurring SUD/MH conditions.

8.      Provide enhanced support for children and family members suffering trauma as a result of addiction in the family; and offer trauma-informed behavioral health treatment for adverse childhood events.

9.      Offer home-based wrap-around services to persons with OUD and any co-occurring SUD/MH conditions, including but not limited to parent skills training.

10.     Support for Children's Services – Fund additional positions and services, including supportive housing and other residential services, relating to children being removed from the home and/or placed in foster care due to custodial opioid use.

<div style="border:1px solid">

PART TWO: PREVENTION

</div>

**F.      PREVENT      OVER-PRESCRIBING      AND      ENSURE      APPROPRIATE PRESCRIBING AND DISPENSING OF OPIOIDS**

Support efforts to prevent over-prescribing and ensure appropriate prescribing and dispensing of opioids through evidence-based or evidence-informed programs or strategies that may include, but are not limited to, the following:

1.      Fund medical provider education and outreach regarding best prescribing practices for opioids consistent with the Guidelines for Prescribing Opioids for Chronic Pain from the U.S. Centers for Disease Control and Prevention, including providers at hospitals (academic detailing).

2.      Training for health care providers regarding safe and responsible opioid prescribing, dosing, and tapering patients off opioids.

3.      Continuing Medical Education (CME) on appropriate prescribing of opioids.

4.      Support for non-opioid pain treatment alternatives, including training providers to offer or refer to multi-modal, evidence-informed treatment of pain.

5.      Support enhancements or improvements to Prescription Drug Monitoring Programs (PDMPs), including but not limited to improvements that:

   1.      Increase the number of prescribers using PDMPs;

   2.      Improve point-of-care decision-making by increasing the quantity, quality, or format of data available to prescribers using PDMPs, by improving the interface that prescribers use to access PDMP data, or both; o

12

    3.      Enable states to use PDMP data in support of surveillance or intervention strategies, including MAT referrals and follow-up for individuals identified within PDMP data as likely to experience OUD in a manner that complies with all relevant privacy and security laws and rules.

6.      Ensuring PDMPs incorporate available overdose/naloxone deployment data, including the United States Department of Transportation's Emergency Medical Technician overdose database in a manner that complies with all relevant privacy and security laws and rules.

7.      Increase electronic prescribing to prevent diversion or forgery.

8.      Educate Dispensers on appropriate opioid dispensing.

## G.    PREVENT MISUSE OF OPIOIDS

Support efforts to discourage or prevent misuse of opioids through evidence-based or evidence-informed programs or strategies that may include, but are not limited to, the following:

1.      Fund media campaigns to prevent opioid misuse.

2.      Corrective advertising or affirmative public education campaigns based on evidence.

3.      Public education relating to drug disposal.

4.      Drug take-back disposal or destruction programs.

5.      Fund community anti-drug coalitions that engage in drug prevention efforts.

6.      Support community coalitions in implementing evidence-informed prevention, such as reduced social access and physical access, stigma reduction – including staffing, educational campaigns, support for people in treatment or recovery, or training of coalitions in evidence-informed implementation, including the Strategic Prevention Framework developed by the U.S. Substance Abuse and Mental Health Services Administration (SAMHSA).

7.      Engage non-profits and faith-based communities as systems to support prevention.

8.      Fund evidence-based prevention programs in schools or evidence-informed school and community education programs and campaigns for students, families, school employees, school athletic programs, parent-teacher and student associations, and others.

9.      School-based or youth-focused programs or strategies that have demonstrated effectiveness in preventing drug misuse and seem likely to be effective in preventing the uptake and use of opioids.

13

10. Create of support community-based education or intervention services for families, youth, and adolescents at risk for OUD and any co-occurring SUD/MH conditions.

11. Support evidence-informed programs or curricula to address mental health needs of young people who may be at risk of misusing opioids or other drugs, including emotional modulation and resilience skills.

12. Support greater access to mental health services and supports for young people, including services and supports provided by school nurses, behavioral health workers or other school staff, to address mental health needs in young people that (when not properly addressed) increase the risk of opioid or another drug misuse.

## H.    PREVENT OVERDOSE DEATHS AND OTHER HARMS (HARM REDUCTION)

Support efforts to prevent or reduce overdose deaths or other opioid-related harms through evidence-based or evidence-informed programs or strategies that may include, but are not limited to, the following:

1. Increase availability and distribution of naloxone and other drugs that treat overdoses for first responders, overdose patients, individuals with OUD and their friends and family members, schools, community navigators and outreach workers, persons being released from jail or prison, or other members of the general public.

2. Public health entities providing free naloxone to anyone in the community.

3. Training and education regarding naloxone and other drugs that treat overdoses for first responders, overdose patients, patients taking opioids, families, schools, community support groups, and other members of the general public.

4. Enable school nurses and other school staff to respond to opioid overdoses, and provide them with naloxone, training, and support.

5. Expand, improve, or develop data tracking software and applications for overdoses/naloxone revivals.

6. Public education relating to emergency responses to overdoses.

7. Public education relating to immunity and Good Samaritan laws.

8. Educate first responders regarding the existence and operation of immunity and Good Samaritan laws.

9. Syringe service programs and other evidence-informed programs to reduce harms associated with intravenous drug use, including supplies, staffing, space, peer support services, referrals to treatment, fentanyl checking, connections to care, and the full range of harm reduction and treatment services provided by these programs.

14

10. Expand access to testing and treatment for infectious diseases such as HIV and Hepatitis C resulting from intravenous opioid use.

11. Support mobile units that offer or provide referrals to harm reduction services, treatment, recovery supports, health care, or other appropriate services to persons that use opioids or persons with OUD and any co-occurring SUD/MH conditions.

12. Provide training in harm reduction strategies to health care providers, students, peer recovery coaches, recovery outreach specialists, or other professionals that provide care to persons who use opioids or persons with OUD and any co-occurring SUD/MH conditions.

13. Support screening for fentanyl in routine clinical toxicology testing.

PART THREE: OTHER STRATEGIES

## I. I. FIRST RESPONDERS

In addition to items in section C, D and H relating to first responders, support the following:

1. Educate law enforcement or other first responders regarding appropriate practices and precautions when dealing with fentanyl or other drugs.

2. Provision of wellness and support services for first responders and others who experience secondary trauma associated with opioid-related emergency events.

## J. LEADERSHIP, PLANNING AND COORDINATION

Support efforts to provide leadership, planning, coordination, facilitations, training and technical assistance to abate the opioid epidemic through activities, programs, or strategies that may include, but are not limited to, the following:

1. Statewide, regional, local or community regional planning to identify root causes of addiction and overdose, goals for reducing harms related to the opioid epidemic, and areas and populations with the greatest needs for treatment intervention services, and to support training and technical assistance and other strategies to abate the opioid epidemic described in this opioid abatement strategy list.

2. A dashboard to (a) share reports, recommendations, or plans to spend opioid settlement funds; (b) to show how opioid settlement funds have been spent; (c) to report program or strategy outcomes; or (d) to track, share or visualize key opioid- or health-related indicators and supports as identified through collaborative statewide, regional, local or community processes.

3. Invest in infrastructure or staffing at government or not-for-profit agencies to support collaborative, cross-system coordination with the purpose of preventing overprescribing, opioid misuse, or opioid overdoses, treating those with OUD and any co-                                        occurring SUD/MH conditions, supporting them in treatment

15

recovery, connecting them to care, or implementing other strategies to abate the opioid epidemic described in this opioid abatement strategy list.

4. Provide resources to staff government oversight and management of opioid abatement programs.

## K. TRAINING

In addition to the training referred to throughout this document, support training to abate the opioid epidemic through activities, programs, or strategies that may include, but are not limited to, the following:

1. Provide funding for staff training or networking programs and services to improve the capability of government, community, and not-for-profit entities to abate the opioid crisis.

2. Support infrastructure and staffing for collaborative cross-system coordination to prevent opioid misuse, prevent overdoses, and treat those with OUD and any co-occurring SUD/MH conditions, or implement other strategies to abate the opioid epidemic described in this opioid abatement strategy list (e.g., health care, primary care, pharmacies, PDMPs, etc.).

## L. RESEARCH

Support opioid abatement research that may include, but is not limited to, the following:

1. Monitoring, surveillance, data collection and evaluation of programs and strategies described in this opioid abatement strategy list.

2. Research non-opioid treatment of chronic pain.

3. Research on improved service delivery for modalities such as SBIRT that demonstrate promising but mixed results in populations vulnerable to opioid use disorders.

4. Research on novel harm reduction and prevention efforts such as the provision of fentanyl test strips.

5. Research on innovative supply-side enforcement efforts such as improved detection of mail-based delivery of synthetic opioids.

6. Expanded research on swift/certain/fair models to reduce and deter opioid misuse within criminal justice populations that build upon promising approaches used to address other substances (e.g. Hawaii HOPE and Dakota 24/7).

7. Epidemiological surveillance of OUD-related behaviors in critical populations including individuals entering the criminal justice system,

16

including but not limited to approaches modeled on the Arrestee Drug Abuse Monitoring (ADAM) system.

8.    Qualitative and quantitative research regarding public health risks and harm reduction opportunities within illicit drug markets, including surveys of market participants who sell or distribute illicit opioids.

9.    Geospatial analysis of access barriers to MAT and their association with treatment engagement and treatment outcomes.

## Schedule C
**Tribe Beneficiaries and Tribal Allocation Percentages, Tribe Beneficiaries and Reporting Tribes**

[TBD]

## RECOMMENDATION OF THE HONORABLE LAYN PHILLIPS REGARDING THE INTERTRIBAL ALLOCATION MATRIX

Native American Tribes participated in the Purdue Mediation process and reached agreement with the other non-Federal Public Claimants on value allocation for the Tribes.

Following the Mediation, the Tribal Leadership Committee ("TLC") contacted me to request an opportunity to present for approval the Intertribal Allocation Matrix. I agreed to hear the presentation and requested materials to review in advance of the presentation. In response to my request, I received the following documents:

1) PowerPoint summary of the intertribal allocation model

2) One-page summary of the model titled, "Tribal Allocation Matrix Narrative

3) Excel spreadsheet with the allocation to the tribes.

In addition, I sent the TLC my preliminary thoughts and inquiries regarding the Intertribal Allocation Matrix for their consideration prior to the presentation that occurred on April 2, 2021.

The TLC presented the Intertribal Allocation Matrix to attorney Clay Cogman and me on April 2, 2021. We had sufficient time to thoroughly discuss the allocation model and the TLC addressed to my satisfaction all questions and issues that were raised.

I note here for context that in a typical mediation setting, I would have had the opportunity to hear from other constituencies for the purpose of assisting me in my analysis by providing me alternative perspectives designed to test the premises and assumptions of the underlying methodology. That did not occur here, as I have only spoken to the TLC about the Matrix.

That said, based on the foregoing, I find that the Intertribal Allocation Matrix provides a satisfactorily reasonable and transparent methodology for the allocation of Purdue settlement funds among Native American Tribes.

Dated: May 11, 2011

By:

Layn R. Phillips

**Allocation of Settlement Among Tribes**
6/18/2021

| FederallyRecognizedTribeName | Division of Funds (Allocation %) |
|---|---|
| **Total** | **100.0000%** |
| Absentee-Shawnee Tribe of Indians of Oklahoma | 0.5575% |
| Agua Caliente Band of Cahuilla Indians of the Agua Caliente Indian Reservation, California | 0.0406% |
| Ak-Chin Indian Community | 0.0635% |
| Alabama-Coushatta Tribe of Texas | 0.0293% |
| Alabama-Quassarte Tribal Town | 0.0111% |
| ALL Alaskan Tribes | 9.2643% |
| Alaska Native Tribal Health Consortium | 1.8883% |
| *Aleutian Pribilof Islands Association | 0.0674% |
| *Arctic Slope Native Association | 0.2825% |
| *Bristol Bay Area Health Corporation | 0.4733% |
| Chickaloon Native Village | 0.0105% |
| *Chugachmiut | 0.1055% |
| *Copper River Native Association | 0.0922% |
| *Eastern Aleutian Tribes | 0.1017% |
| Eklutna Native Village | 0.0125% |
| Eyak Native Village | 0.0202% |
| *Kodiak Area Native Association | 0.1817% |
| *Kenaitze Indian Tribe | 0.1544% |
| *Ketchikan Indian Community | 0.1033% |
| Knik Tribe | 0.0118% |
| *Maniilaq Association | 0.4026% |
| Metlakatla Indian Community | 0.0703% |
| *Mt. Sanford Tribal Consortium | 0.0268% |
| *Norton Sound Health Corporation | 0.5929% |
| *Southcentral Foundation | 1.5145% |
| *Southeast Alaska Regional Health Corporation | 0.5865% |
| Seldovia Village Tribe | 0.0322% |
| *Tanana Chiefs Conference (including Council of Athabascan Tribal Governments) | 0.9318% |
| Yakutat Tlingit Tribe | 0.0290% |
| *Yukon Kuskokwim Health Corporation | 1.4987% |
| Native Village of Chitina | 0.0115% |
| Ninilchik Village | 0.0289% |
| Native Village of Tanana | 0.0190% |
| Native Village of Tyonek | 0.0145% |
| Alturas Indian Rancheria, California | 0.0008% |
| Apache Tribe of Oklahoma | 0.1334% |
| Arapaho Tribe of the Wind River Reservation, Wyoming | 0.3444% |
| Aroostook Band of Micmacs | 0.0370% |
| Assiniboine and Sioux Tribes of the Fort Peck Indian Reservation, Montana | 0.3789% |
| Augustine Band of Cahuilla Indians, California | 0.0013% |
| Bad River Band of the Lake Superior Tribe of Chippewa Indians of the Bad River Reservation, Wisconsin | 0.1533% |
| Bay Mills Indian Community, Michigan | 0.0714% |
| Bear River Band of the Rohnerville Rancheria, California | 0.0507% |
| Berry Creek Rancheria of Maidu Indians of California | 0.1121% |
| Big Lagoon Rancheria, California | 0.0027% |
| Big Pine Paiute Tribe of the Owens Valley | 0.0320% |
| Big Sandy Rancheria of Western Mono Indians of California | 0.0328% |
| Big Valley Band of Pomo Indians of the Big Valley Rancheria, California | 0.1214% |
| Bishop Paiute Tribe | 0.1041% |
| Blackfeet Tribe of the Blackfeet Indian Reservation of Montana | 0.5378% |

| FederallyRecognizedTribeName | Division of Funds (Allocation %) |
|---|---|
| Blue Lake Rancheria, California | 0.0038% |
| Bois Forte (Nett Lake) Band of the Minnesota Chippewa Tribe, Minnesota | 0.0820% |
| Bridgeport Indian Colony | 0.0026% |
| Buena Vista Rancheria of Me-Wuk Indians of California | 0.0034% |
| Burns Paiute Tribe | 0.0116% |
| Cabazon Band of Mission Indians, California | 0.0017% |
| Cachil DeHe Band of Wintun Indians of the Colusa Indian Community of the Colusa Rancheria, California | 0.0056% |
| Caddo Nation of Oklahoma | 0.1084% |
| Cahto Tribe of the Laytonville Rancheria | 0.0207% |
| Cahuilla Band of Indians | 0.0368% |
| California Valley Miwok Tribe, California | 0.0044% |
| Campo Band of Diegueno Mission Indians of the Campo Indian Reservation, California | 0.0241% |
| Catawba Indian Nation | 0.0743% |
| Cayuga Nation | 0.0070% |
| Cedarville Rancheria, California | 0.0019% |
| Chemehuevi Indian Tribe of the Chemehuevi Reservation, California | 0.0181% |
| Cher-Ae Heights Indian Community of the Trinidad Rancheria, California | 0.0200% |
| Cherokee Nation | 12.1894% |
| Cheyenne and Arapaho Tribes, Oklahoma | 0.7723% |
| Cheyenne River Sioux Tribe of the Cheyenne River Reservation, South Dakota | 0.2906% |
| Chickahominy Indian Tribe | 0.0315% |
| Chickahominy Indian Tribe—Eastern Division | 0.0085% |
| Chickasaw Nation | 2.1567% |
| Chicken Ranch Rancheria of Me-Wuk Indians of California | 0.0026% |
| Chippewa Cree Indians of the Rocky Boy's Reservation, Montana | 0.2330% |
| Chitimacha Tribe of Louisiana | 0.0347% |
| Choctaw Nation of Oklahoma | 5.4805% |
| Citizen Potawatomi Nation, Oklahoma | 1.4669% |
| Cloverdale Rancheria of Pomo Indians of California | 0.0518% |
| Cocopah Tribe of Arizona | 0.0366% |
| Coeur D'Alene Tribe | 0.2865% |
| Cold Springs Rancheria of Mono Indians of California | 0.0108% |
| Colorado River Indian Tribes of the Colorado River Indian Reservation, Arizona and California | 0.2784% |
| Comanche Nation, Oklahoma | 0.6989% |
| Confederated Salish and Kootenai Tribes of the Flathead Reservation | 0.6040% |
| Confederated Tribes and Bands of the Yakama Nation | 0.6242% |
| Confederated Tribes of Siletz Indians of Oregon | 0.4294% |
| Confederated Tribes of the Chehalis Reservation | 0.0887% |
| Confederated Tribes of the Colville Reservation | 0.4214% |
| Confederated Tribes of the Coos, Lower Umpqua and Siuslaw Indians | 0.0541% |
| Confederated Tribes of the Goshute Reservation, Nevada and Utah | 0.0144% |
| Confederated Tribes of the Grand Ronde Community of Oregon | 0.2456% |
| Confederated Tribes of the Umatilla Indian Reservation | 0.1554% |
| Confederated Tribes of the Warm Springs Reservation of Oregon | 0.3374% |
| Coquille Indian Tribe | 0.0926% |
| Coushatta Tribe of Louisiana | 0.0264% |
| Cow Creek Band of Umpqua Tribe of Indians | 0.1532% |
| Cowlitz Indian Tribe | 0.4024% |
| Coyote Valley Band of Pomo Indians of California | 0.0337% |
| Crow Creek Sioux Tribe of the Crow Creek Reservation, South Dakota | 0.1504% |
| Crow Tribe of Montana | 0.7579% |
| Delaware Nation, Oklahoma | 0.0342% |
| Delaware Tribe of Indians | 0.3134% |

| FederallyRecognizedTribeName | Division of Funds (Allocation %) |
|---|---|
| Dry Creek Rancheria Band of Pomo Indians, California | 0.0709% |
| Duckwater Shoshone Tribe of the Duckwater Reservation, Nevada | 0.0224% |
| Eastern Band of Cherokee Indians | 0.9560% |
| Eastern Shawnee Tribe of Oklahoma | 0.0548% |
| Eastern Shoshone Tribe of the Wind River Reservation, Wyoming | 0.1459% |
| Elem Indian Colony of Pomo Indians of the Sulphur Bank Rancheria, California | 0.0101% |
| Elk Valley Rancheria, California | 0.0063% |
| Ely Shoshone Tribe of Nevada | 0.0550% |
| Enterprise Rancheria of Maidu Indians of California | 0.1825% |
| Ewiiaapaayp Band of Kumeyaay Indians, California | 0.0004% |
| Federated Indians of Graton Rancheria, California | 0.0770% |
| Flandreau Santee Sioux Tribe of South Dakota | 0.0224% |
| Fond du Lac Band of the Minnesota Chippewa Tribe, Minnesota | 0.3382% |
| Forest County Potawatomi Community, Wisconsin | 0.0266% |
| Fort Belknap Indian Community of the Fort Belknap Reservation of Montana | 0.1662% |
| Fort Bidwell Indian Community of the Fort Bidwell Reservation of California | 0.0088% |
| Fort Independence Indian Community of Paiute Indians of the Fort Independence Reservation, California | 0.0104% |
| Fort McDermitt Paiute and Shoshone Tribes of the Fort McDermitt Indian Reservation, Nevada and Oregon | 0.0212% |
| Fort McDowell Yavapai Nation, Arizona | 0.0852% |
| Fort Mojave Indian Tribe of Arizona, California & Nevada | 0.1614% |
| Fort Sill Apache Tribe of Oklahoma | 0.0194% |
| Gila River Indian Community of the Gila River Indian Reservation, Arizona | 2.5642% |
| Grand Portage Band of the Minnesota Chippewa Tribe, Minnesota | 0.0211% |
| Grand Traverse Band of Ottawa and Chippewa Indians, Michigan | 0.1041% |
| Greenville Rancheria | 0.0942% |
| Grindstone Indian Rancheria of Wintun-Wailaki Indians of California | 0.0255% |
| Guidiville Rancheria of California | 0.0137% |
| Habematolel Pomo of Upper Lake, California | 0.0275% |
| Hannahville Indian Community, Michigan | 0.0279% |
| Havasupai Tribe of the Havasupai Reservation, Arizona | 0.0325% |
| Ho-Chunk Nation of Wisconsin | 0.2791% |
| Hoh Indian Tribe | 0.0032% |
| Hoopa Valley Tribe, California | 0.2647% |
| Hopi Tribe of Arizona | 0.4475% |
| Hopland Band of Pomo Indians, California | 0.0723% |
| Houlton Band of Maliseet Indians | 0.0350% |
| Hualapai Indian Tribe of the Hualapai Indian Reservation, Arizona | 0.2240% |
| Iipay Nation of Santa Ysabel, California | 0.0136% |
| Inaja Band of Diegueno Mission Indians of the Inaja and Cosmit Reservation, California | 0.0008% |
| Ione Band of Miwok Indians of California | 0.1215% |
| Iowa Tribe of Kansas and Nebraska | 0.0527% |
| Iowa Tribe of Oklahoma | 0.0959% |
| Jackson Band of Miwuk Indians | 0.0054% |
| Jamestown S'Klallam Tribe | 0.0344% |
| Jamul Indian Village of California | 0.0082% |
| Jena Band of Choctaw Indians | 0.0116% |
| Jicarilla Apache Nation, New Mexico | 0.2812% |
| Kaibab Band of Paiute Indians of the Kaibab Indian Reservation, Arizona | 0.0158% |
| Kalispel Indian Community of the Kalispel Reservation | 0.0374% |
| Karuk Tribe | 0.2540% |
| Kashia Band of Pomo Indians of the Stewarts Point Rancheria, California | 0.0043% |
| Kaw Nation, Oklahoma | 0.1314% |
| Kewa Pueblo, New Mexico | 0.1155% |

| Federally Recognized Tribe Name | Division of Funds (Allocation %) |
|---|---|
| Keweenaw Bay Indian Community, Michigan | 0.1080% |
| Kialegee Tribal Town | 0.0174% |
| Kickapoo Traditional Tribe of Texas | 0.0175% |
| Kickapoo Tribe of Indians of the Kickapoo Reservation in Kansas | 0.0580% |
| Kickapoo Tribe of Oklahoma | 0.5597% |
| Kiowa Indian Tribe of Oklahoma | 0.4367% |
| Klamath Tribes | 0.1776% |
| Kletsel Dehe Band of Wintun Indians | 0.0363% |
| Koi Nation of Northern California | 0.0140% |
| Kootenai Tribe of Idaho | 0.0097% |
| La Jolla Band of Luiseno Indians, California | 0.0372% |
| La Posta Band of Diegueno Mission Indians of the La Posta Indian Reservation, California | 0.0030% |
| Lac Courte Oreilles Band of Lake Superior Chippewa Indians of Wisconsin | 0.1611% |
| Lac du Flambeau Band of Lake Superior Chippewa Indians of the Lac du Flambeau Reservation of Wisconsin | 0.2145% |
| Lac Vieux Desert Band of Lake Superior Chippewa Indians of Michigan | 0.0310% |
| Las Vegas Tribe of Paiute Indians of the Las Vegas Indian Colony, Nevada | 0.0356% |
| Leech Lake Band of the Minnesota Chippewa Tribe, Minnesota | 0.3876% |
| Little River Band of Ottawa Indians, Michigan | 0.0925% |
| Little Shell Tribe of Chippewa Indians of Montana | 0.2023% |
| Little Traverse Bay Bands of Odawa Indians, Michigan | 0.1765% |
| Lone Pine Paiute-Shoshone Tribe | 0.0210% |
| Los Coyotes Band of Cahuilla and Cupeno Indians, California | 0.0157% |
| Lovelock Paiute Tribe of the Lovelock Indian Colony, Nevada | 0.0173% |
| Lower Brule Sioux Tribe of the Lower Brule Reservation, South Dakota | 0.0499% |
| Lower Elwha Tribal Community | 0.0686% |
| Lower Sioux Indian Community in the State of Minnesota | 0.0236% |
| Lummi Tribe of the Lummi Reservation | 0.2100% |
| Lytton Rancheria of California | 0.0238% |
| Makah Indian Tribe of the Makah Indian Reservation | 0.1833% |
| Manchester Band of Pomo Indians of the Manchester Rancheria, California | 0.0819% |
| Manzanita Band of Diegueno Mission Indians of the Manzanita Reservation, California | 0.0046% |
| Mashantucket Pequot Indian Tribe | 0.0369% |
| Mashpee Wampanoag Tribe | 0.0687% |
| Match-e-be-nash-she-wish Band of Pottawatomi Indians of Michigan | 0.0175% |
| Mechoopda Indian Tribe of Chico Rancheria, California | 0.1655% |
| Menominee Indian Tribe of Wisconsin | 0.2586% |
| Mesa Grande Band of Diegueno Mission Indians of the Mesa Grande Reservation, California | 0.0337% |
| Mescalero Apache Tribe of the Mescalero Reservation, New Mexico | 0.2753% |
| Miami Tribe of Oklahoma | 0.0514% |
| Miccosukee Tribe of Indians | 0.0269% |
| Middletown Rancheria of Pomo Indians of California | 0.0260% |
| Mille Lacs Band of the Minnesota Chippewa Tribe, Minnesota | 0.1295% |
| Mississippi Band of Choctaw Indians | 0.4540% |
| Moapa Band of Paiute Indians of the Moapa River Indian Reservation, Nevada | 0.0431% |
| Modoc Nation | 0.0054% |
| Mohegan Tribe of Indians of Connecticut | 0.0666% |
| Monacan Indian Nation | 0.0588% |
| Mooretown Rancheria of Maidu Indians of California | 0.1949% |
| Morongo Band of Mission Indians, California | 0.0795% |
| Muckleshoot Indian Tribe | 0.2826% |
| Muscogee (Creek) Nation | 2.8659% |
| Nansemond Indian Nation | 0.0071% |
| Narragansett Indian Tribe | 0.0435% |

| FederallyRecognizedTribeName | Division of Funds (Allocation %) |
|---|---|
| Navajo Nation, Arizona, New Mexico & Utah | 15.2207% |
| Nez Perce Tribe | 0.2349% |
| Nisqually Indian Tribe | 0.0661% |
| Nooksack Indian Tribe | 0.0494% |
| Northern Cheyenne Tribe of the Northern Cheyenne Indian Reservation, Montana | 0.2535% |
| Northfork Rancheria of Mono Indians of California | 0.1192% |
| Northwestern Band of the Shoshone Nation | 0.0046% |
| Nottawaseppi Huron Band of the Potawatomi, Michigan | 0.0735% |
| Oglala Sioux Tribe | 0.9582% |
| Ohkay Owingeh, New Mexico | 0.2226% |
| Omaha Tribe of Nebraska | 0.1098% |
| Oneida Indian Nation | 0.0792% |
| Oneida Nation | 0.6249% |
| Onondaga Nation | 0.0286% |
| Osage Nation | 0.2998% |
| Otoe-Missouria Tribe of Indians, Oklahoma | 0.1412% |
| Ottawa Tribe of Oklahoma | 0.0294% |
| Paiute Indian Tribe of Utah (Cedar Band of Paiutes, Kanosh Band of Paiutes, Koosharem Band of Paiutes, Indian Peaks Band of Paiutes, and Shivwits Band of Paiutes) | 0.0864% |
| Paiute-Shoshone Tribe of the Fallon Reservation and Colony, Nevada | 0.1593% |
| Pala Band of Mission Indians | 0.0654% |
| Pamunkey Indian Tribe | 0.0149% |
| Pascua Yaqui Tribe of Arizona | 0.6028% |
| Paskenta Band of Nomlaki Indians of California | 0.0061% |
| Passamaquoddy Tribe Indian Township | 0.0601% |
| Passamaquoddy Tribe Pleasant Point | 0.0758% |
| Pauma Band of Luiseno Mission Indians of the Pauma & Yuima Reservation, California | 0.0135% |
| Pawnee Nation of Oklahoma | 0.1674% |
| Pechanga Band of Luiseno Mission Indians of the Pechanga Reservation, California | 0.1620% |
| Penobscot Nation | 0.1004% |
| Peoria Tribe of Indians of Oklahoma | 0.0425% |
| Picayune Rancheria of Chukchansi Indians of California | 0.0820% |
| Pinoleville Pomo Nation, California | 0.0269% |
| Pit River Tribe, California (includes XL Ranch, Big Bend, Likely, Lookout, Montgomery Creek and Roaring Creek Rancherias) | 0.1144% |
| Poarch Band of Creeks | 0.1346% |
| Pokagon Band of Potawatomi Indians, Michigan and Indiana | 0.1197% |
| Ponca Tribe of Indians of Oklahoma | 0.2376% |
| Ponca Tribe of Nebraska | 0.1290% |
| Port Gamble S'Klallam Tribe | 0.0841% |
| Potter Valley Tribe, California | 0.0005% |
| Prairie Band Potawatomi Nation | 0.0680% |
| Prairie Island Indian Community in the State of Minnesota | 0.0030% |
| Pueblo of Acoma, New Mexico | 0.1776% |
| Pueblo of Cochiti, New Mexico | 0.0602% |
| Pueblo of Isleta, New Mexico | 0.9641% |
| Pueblo of Jemez, New Mexico | 0.4715% |
| Pueblo of Laguna, New Mexico | 0.3010% |
| Pueblo of Nambe, New Mexico | 0.0678% |
| Pueblo of Picuris, New Mexico | 0.0148% |
| Pueblo of Pojoaque, New Mexico | 0.0364% |
| Pueblo of San Felipe, New Mexico | 0.1962% |
| Pueblo of San Ildefonso, New Mexico | 0.0515% |
| Pueblo of Sandia, New Mexico | 0.0539% |

| FederallyRecognizedTribeName | Division of Funds (Allocation %) |
|---|---|
| Pueblo of Santa Ana, New Mexico | 0.1216% |
| Pueblo of Santa Clara, New Mexico | 0.0972% |
| Pueblo of Taos, New Mexico | 0.1254% |
| Pueblo of Tesuque, New Mexico | 0.0368% |
| Pueblo of Zia, New Mexico | 0.1135% |
| Puyallup Tribe of the Puyallup Reservation | 0.3461% |
| Pyramid Lake Paiute Tribe of the Pyramid Lake Reservation, Nevada | 0.2112% |
| Quapaw Nation | 0.0677% |
| Quartz Valley Indian Community of the Quartz Valley Reservation of California | 0.0209% |
| Quechan Tribe of the Fort Yuma Indian Reservation, California & Arizona | 0.2304% |
| Quileute Tribe of the Quileute Reservation | 0.0445% |
| Quinault Indian Nation | 0.1554% |
| Ramona Band of Cahuilla, California | 0.0016% |
| Rappahannock Tribe, Inc. | 0.0068% |
| Red Cliff Band of Lake Superior Chippewa Indians of Wisconsin | 0.0680% |
| Red Lake Band of Chippewa Indians, Minnesota | 0.3333% |
| Redding Rancheria, California | 0.3258% |
| Redwood Valley or Little River Band of Pomo Indians of the Redwood Valley Rancheria California | 0.0214% |
| Reno-Sparks Indian Colony, Nevada | 0.4667% |
| Resighini Rancheria, California | 0.0117% |
| Rincon Band of Luiseno Mission Indians of the Rincon Reservation, California | 0.0301% |
| Robinson Rancheria | 0.0577% |
| Rosebud Sioux Tribe of the Rosebud Indian Reservation, South Dakota | 0.3906% |
| Round Valley Indian Tribes, Round Valley Reservation, California | 0.1304% |
| Sac & Fox Nation of Missouri in Kansas and Nebraska | 0.0066% |
| Sac & Fox Nation, Oklahoma | 0.4786% |
| Sac & Fox Tribe of the Mississippi in Iowa | 0.0652% |
| Saginaw Chippewa Indian Tribe of Michigan | 0.1612% |
| Saint Regis Mohawk Tribe | 0.3164% |
| Salt River Pima-Maricopa Indian Community of the Salt River Reservation, Arizona | 0.3690% |
| Samish Indian Nation | 0.0508% |
| San Carlos Apache Tribe of the San Carlos Reservation, Arizona | 0.9842% |
| San Juan Southern Paiute Tribe of Arizona | 0.0052% |
| San Manuel Band of Mission Indians, California | 0.0212% |
| San Pasqual Band of Dieguено Mission Indians of California | 0.0096% |
| Santa Rosa Band of Cahuilla Indians, California | 0.0163% |
| Santa Rosa Indian Community of the Santa Rosa Rancheria, California | 0.0567% |
| Santa Ynez Band of Chumash Mission Indians of the Santa Ynez Reservation, California | 0.0489% |
| Santee Sioux Nation, Nebraska | 0.0407% |
| Sauk-Suiattle Indian Tribe | 0.0041% |
| Sault Ste. Marie Tribe of Chippewa Indians, Michigan | 0.7720% |
| Scotts Valley Band of Pomo Indians of California | 0.0140% |
| The Seminole Nation of Oklahoma | 0.4506% |
| Seminole Tribe of Florida | 0.4524% |
| Seneca Nation of Indians | 0.4387% |
| Seneca-Cayuga Nation | 0.0727% |
| Shakopee Mdewakanton Sioux Community of Minnesota | 0.0040% |
| Shawnee Tribe | 0.0385% |
| Sherwood Valley Rancheria of Pomo Indians of California | 0.0390% |
| Shingle Springs Band of Miwok Indians, Shingle Springs Rancheria (Verona Tract), California | 0.0578% |
| Shinnecock Indian Nation | 0.0136% |
| Shoalwater Bay Indian Tribe of the Shoalwater Bay Indian Reservation | 0.0388% |
| Shoshone-Bannock Tribes of the Fort Hall Reservation | 0.2571% |

| FederallyRecognizedTribeName | Division of Funds (Allocation %) |
|---|---|
| Shoshone-Paiute Tribes of the Duck Valley Reservation, Nevada | 0.1081% |
| Sisseton-Wahpeton Oyate of the Lake Traverse Reservation, South Dakota | 0.2481% |
| Skokomish Indian Tribe | 0.0492% |
| Skull Valley Band of Goshute Indians of Utah | 0.0031% |
| Snoqualmie Indian Tribe | 0.0268% |
| Soboba Band of Luiseno Indians, California | 0.1192% |
| Sokaogon Chippewa Community, Wisconsin | 0.0119% |
| Southern Ute Indian Tribe of the Southern Ute Reservation, Colorado | 0.0816% |
| Spirit Lake Tribe, North Dakota | 0.1358% |
| Spokane Tribe of the Spokane Reservation | 0.1194% |
| Squaxin Island Tribe of the Squaxin Island Reservation | 0.0474% |
| St. Croix Chippewa Indians of Wisconsin | 0.0720% |
| Standing Rock Sioux Tribe of North & South Dakota | 0.2451% |
| Stillaguamish Tribe of Indians of Washington | 0.0069% |
| Stockbridge Munsee Community, Wisconsin | 0.0656% |
| Summit Lake Paiute Tribe of Nevada | 0.0045% |
| Suquamish Indian Tribe of the Port Madison Reservation | 0.0385% |
| Susanville Indian Rancheria, California | 0.0940% |
| Swinomish Indian Tribal Community | 0.0685% |
| Sycuan Band of the Kumeyaay Nation | 0.0050% |
| Table Mountain Rancheria | 0.0008% |
| Tejon Indian Tribe | 0.0230% |
| Te-Moak Tribe of Western Shoshone Indians of Nevada (Four constituent bands: Battle Mountain Band; Elko Band; South Fork Band and Wells Band) | 0.1564% |
| Thlopthlocco Tribal Town | 0.0385% |
| Three Affiliated Tribes of the Fort Berthold Reservation, North Dakota | 0.2170% |
| Timbisha Shoshone Tribe | 0.0061% |
| Tohono O'odham Nation of Arizona | 1.4176% |
| Tolowa Dee-ni' Nation | 0.1350% |
| Tonawanda Band of Seneca | 0.0103% |
| Tonkawa Tribe of Indians of Oklahoma | 0.0387% |
| Tonto Apache Tribe of Arizona | 0.0187% |
| Torres Martinez Desert Cahuilla Indians, California | 0.0496% |
| Tulalip Tribes of Washington | 0.3139% |
| Tule River Indian Tribe of the Tule River Reservation, California | 0.1030% |
| Tunica-Biloxi Indian Tribe | 0.0183% |
| Tuolumne Band of Me-Wuk Indians of the Tuolumne Rancheria of California | 0.0252% |
| Turtle Mountain Band of Chippewa Indians of North Dakota | 0.4382% |
| Tuscarora Nation | 0.0127% |
| Twenty-Nine Palms Band of Mission Indians of California | 0.0023% |
| United Auburn Indian Community of the Auburn Rancheria of California | 0.3284% |
| United Keetoowah Band of Cherokee Indians in Oklahoma | 0.1820% |
| Upper Mattaponi Tribe | 0.0194% |
| Upper Sioux Community, Minnesota | 0.0055% |
| Upper Skagit Indian Tribe | 0.0250% |
| Ute Indian Tribe of the Uintah & Ouray Reservation, Utah | 0.3345% |
| Ute Mountain Ute Tribe | 0.1348% |
| Utu Utu Gwaitu Paiute Tribe of the Benton Paiute Reservation, California | 0.0030% |
| Capitan Grande Band of Diegueno Mission Indians of California (Barona Group of Capitan Grande Band of Mission Indians of the Barona | 0.0639% |
| Walker River Paiute Tribe, Nevada | 0.0922% |
| Wampanoag Tribe of Gay Head (Aquinnah) | 0.0216% |
| Washoe Tribe of Nevada & California | 0.2416% |

| FederallyRecognizedTribeName | Division of Funds (Allocation %) |
|---|---|
| White Earth Band of the Minnesota Chippewa Tribe, Minnesota | 0.3129% |
| White Mountain Apache Tribe of the Fort Apache Reservation, Arizona | 1.2832% |
| Wichita and Affiliated Tribes, Oklahoma | 0.1054% |
| Wilton Rancheria, California | 0.0764% |
| Winnebago Tribe of Nebraska | 0.1438% |
| Winnemucca Indian Colony of Nevada | 0.0121% |
| Wiyot Tribe, California | 0.0513% |
| Wyandotte Nation | 0.0858% |
| Yankton Sioux Tribe of South Dakota | 0.1301% |
| Yavapai-Apache Nation of the Camp Verde Indian Reservation, Arizona | 0.1642% |
| Yavapai-Prescott Indian Tribe | 0.0463% |
| Yerington Paiute Tribe of the Yerington Colony & Campbell Ranch, Nevada | 0.0546% |
| Yocha Dehe Wintun Nation, California | 0.0091% |
| Yomba Shoshone Tribe of the Yomba Reservation, Nevada | 0.0162% |
| Ysleta del Sur Pueblo | 0.0531% |
| Yurok Tribe of the Yurok Reservation, California | 0.4941% |
| Zuni Tribe of the Zuni Reservation, New Mexico | 0.4432% |

* 50% of the allocation to this entity shall be made available to federally recognized tribes served by the entity.

## Schedule D
## Tribal Abatement Strategies

The following is a non-exhaustive, illustrative list of culturally appropriate activities, practices, teachings or ceremonies that may, in the judgment of the Tribes, be aimed at or supportive of remediation and abatement of the opioid crisis within a tribal community.

Each of the 574 federally recognized Tribes in the United States has its own cultures, histories and traditions. Each Tribe is best suited to determine the most effective abatement strategies for the specific community it serves. The following list provides select examples of tribal abatement strategies and is not intended to limit the remediation and abatement activities for which any Tribe or tribal organization may utilize its share of Abatement Funds.

1.     **Traditional Activities Associated with Cultural Identity and Healing**

Tribal cultural activities can help address historical and intergenerational trauma and feelings of cultural loss that may be underlying root causes and/or contributing factors to addiction. These can include, for example:

- Utilization of traditional healers and spiritual and traditional approaches to healing;
- Sweat lodges, sacred pipe ceremonies, smudging and other ceremonies;
- Talking circles;
- Cultural activities such as basket weaving, pottery making, drum making, canoe building, etc., depending on the Tribe;
- Cultural and linguistic immersion programs.

These traditional activities may be combined with other treatment or included in integrated treatment models, as discussed below.

Example: Drum-Assisted Recovery Therapy for Native Americans (DARTNA) is supported by research. Drums are a sacred instrument in many American Indian and Alaska Native cultures and are often associated with ceremonies and healing. In addition to providing a sense of cultural connection, drumming may have physical and psychological effects that make it a promising focus for treatment.

Example: Some Tribes have utilized seasonal cultural immersion camps in lieu of or in combination with residential treatment for substance use disorder. Participants practice traditional lifeways, including hunting, fishing, living in traditional dwellings and cultural and/or spiritual practices during the course of treatment.

2.     **Culturally Competent Integrated Treatment Models**

Example: The Swinomish Tribe designed and developed a unique treatment program called Didgʷálič that integrates evidence-based chemical dependency treatment with holistic, culturally competent care to successfully deal with the effects of opioid use disorder (OUD). Didgʷálič provides a full array of medical and social services, utilizing a

model of care that centers on and incorporates the Tribe's culture and values. The Tribal government and individual Tribal members provide cultural leadership and advice on the use of Native language and practices in the program.

Example: The Tulalip Tribe operates the Healing Lodge, a culturally sensitive transitional home facility for tribal members who are seeking to recover from addiction. In addition to a clean and sober living environment, the facility provides transportation to and from Chemical Dependency/ Mental Wellness groups and individual counseling sessions, sober support groups and cultural activities such as sweats, powwow and family nights. The program also connects residents with educational activities such as life skills trainings, budgeting, post generational trauma and Red Road to Wellbriety, a recovery and wellness program similar in some ways to the 12 Steps of AA but designed especially for Native American and following the teachings of the Medicine Wheel.

3.    **Culturally Grounded Community Prevention**

Culturally competent prevention programs, tailored to each tribal community, can play an important role in stopping and reversing the spread of the opioid epidemic.

Example: The Healing of the Canoe is a collaborative project between the Suquamish Tribe, the Port Gamble S'Klallam Tribe and the University of Washington Alcohol and Drug Abuse Institute (ADAI). It has led to the development and dissemination of the Culturally Grounded Life Skills for Youth curriculum, an evidence-based, strengths-based life skills curriculum for Native youth that uses elements of a Tribe's culture to help prevent substance abuse and connect its youth to their tribal community and culture. It teaches Native youth the skills they need to navigate their life's journey without being pulled off course by alcohol or drugs, using tribal values, traditions and culture both as a compass to guide them and an anchor to ground them. By reversing the historical trauma of forced assimilation, this approach attacks the root cause of so much substance abuse among tribal youth.

Example: The Association of Village Council Presidents has responded to the opioid crisis through the Healthy Families Program, which promotes and supports whole health through the sharing, teaching, and practice of traditional values through Elluarluteng Illakutellriit - a framework illustrating the Yup'ik life cycle of traditional practices, values and beliefs from Yup'ik Elders. This framework functions alongside western and medical practices to help individuals overcome their addictions permanently.

4.    **Peacekeeping and Wellness Courts**

Many Tribes have had success treating opioid offenders using traditional healing practices and alternative institutions, sometimes called wellness courts or peacekeeping courts.

Example: The Yurok Tribal Court, in coordination with the California State courts in Humboldt and Del Norte Counties, operates its Family Wellness Courts (FWC) for Yurok families suffering from opioid abuse problems. The FWC seeks to develop judicial practices that are consistent with Yurok tribal values and needs, combining the resources

20

and expertise of both systems. It focuses on reintegrating tribal members into the culture and life of the Yurok community and helping them establish a drug-free lifestyle.

5. **Community Workforce Development and Training**

Cultural competency training as well as community workforce development can be a critical tool for addressing gaps in services, especially in rural and remote tribal communities, where it can be extremely difficult to recruit and retain qualified health care professionals.

Example: In Alaska, the Community Health Aide Program (CHAP) has increased access to medical treatment to more than 170 rural Alaskan villages utilizing a workforce development model geared toward Native people. Under CHAP, individuals selected by their communities are provided with training as community health aides and practitioners to work in rural villages under the supervision of, and in collaboration with, higher level medical professionals, often aided by telemedicine technology. As part of CHAP, behavioral health aides (BHAs) are trained as counselors, educators and advocates to help address mental health and addiction issues.

Example: Part of the Swinomish Tribe's Didgʷáličˇ treatment model, discussed above, is training for Tribal members with a goal of building a new generation of clinically trained and culturally competent Native counselors and providers, Yup'ik Elders. This framework functions alongside western and medical practices to help individuals overcome their addictions permanently.

**Schedule E**
**Tribal Allocation Matrix**

The Tribal Nation's allocation matrix is built around six data points: MMEs (morphine milligram equivalents) imputed to each Tribe; drug and prescription opioid overdose rates imputed to each Tribe; Indian Health Service (IHS) user population for each Tribe; citizenship population for each Tribe; relative poverty rates imputed to each Tribe; and relative cost of living imputed to each Tribe. Data are "imputed" to a Tribe by estimation based on population when the data is only available on a county or statewide basis. In the case of MMEs and drug overdose rates, the imputation of the data to a tribal population is multiplied by a "disproportionate impact" adjustment reflecting the higher incidence of opioid use disorder and prescription opioid overdose deaths in tribal communities.

Two computations are undertaken for all Tribes, and then combined together. 85% of a Tribe's matrix share is calculated by considering its imputed MME rate (50%), overdose rates (40%), and poverty rate (10%) as applied to its IHS user population. 15% of a Tribe's matrix share is calculated by considering the same three elements, similarly weighted, as applied to the Tribe's citizenship data. Once these two matrix results are combined, the resulting share is further adjusted by each Tribe's relative cost of living. COLA adjustments are done on a regional basis and are weighted at 10%, resulting in modest adjustments ranging from 1.3% down to 2.4% up.

~~The matrix allocates a single amount to all Alaska Tribes and inter-tribal organizations. Alaska Tribes and tribal organization are currently engaged in a process for suballocating the Alaska share of the matrix among the Alaska Tribes and tribal organizations. When this work is complete, the suballocations will replace the "Alaska" allocation in the matrix.~~ Data for Alaska Tribes was initially computed on a statewide basis, and the resulting matrix share for Alaska was then subdivided among Alaska Tribes and tribal organizations participating in the Alaska Tribal Health Compact (employing the same methodology historically used to allocate certain other tribal health care funds across Alaska tribal health care providers).

The matrix allocates individual amounts to each California Tribe, although four intertribal health care providers in California have also separately filed litigation. Each such intertribal provider ~~is currently engaged~~will engage in discussions with its ~~respective Tribes. When those discussions are complete, allocations~~member tribes and agree on an amount that the member tribes will allocate from their funds to the intertribal ~~organizations may be added to the matrix with offsetting reductions to the shares currently assigned to their member Tribes~~provider.

~~All~~Tribal citizenship data used in the matrix ~~are fixed except for tribal citizenship data and certain instances where the IHS user population number is imputed for certain tribes based on tribal citizenship data. For instance, some IHS service units contain multiple tribes. Unless the IHS or Tribes have itemized user counts by Tribe in these cases, the IHS service unit count was prorated among service unit Tribes in proportion to Tribal citizenship counts. Tribal citizenship data is subject to further verification and will be adjusted in the matrix, as necessary, once the~~was subject to a tribal verification process ~~is completed. (This does not apply to total~~(except for Alaska, where data~~, which is~~ was drawn from the U.S. Census~~.~~). In instances

22

where IHS user population data for multiple Tribes was not allocated by IHS to individual Tribes, user populations were prorated across the Tribes within an IHS service unit based on the Tribes' relative tribal citizenship.

## **EXHIBIT K**

**Master TDP**

## MASTER DISBURSEMENT TRUST
## MASTER TRUST DISTRIBUTION PROCEDURES

SECTION 1. APPLICABILITY.

Pursuant to the *Fifth Amended Joint Chapter 11 Plan of Reorganization of Purdue Pharma L.P. and its Affiliated Debtors* (the "Plan"),[1] all Channeled Claims shall be channeled to and liability therefor shall be assumed by the Master Disbursement Trust as of the Effective Date, and each Channeled Claim shall be resolved solely in accordance with the terms, provisions and procedures of these distribution procedures (this "Master TDP"). Holders of Channeled Claims are enjoined from pursuing such Channeled Claims in accordance with Section 10.8 of the Plan other than as expressly permitted pursuant to this Master TDP.

SECTION 2. PROCEDURES GENERALLY.

This Master TDP provides procedures pursuant to which (a) each Channeled Claim shall automatically be further channeled to and assumed exclusively by a Creditor Trust in accordance with Sections 3 through 9 of this Master TDP or shall otherwise be Disallowed and released in full pursuant to Section 12 of this Master TDP and (b) in consideration for the assumption by the Creditor Trusts of Channeled Claims as set forth herein, the Master Disbursement Trust shall (i) issue the MDT Private Claims and make the Initial Private Creditor Trust Distributions to the Private Creditor Trusts, and (ii) issue the MDT Interests, make the Initial Public Creditor Trust Distributions and distribute the TopCo Interests to the National Opioid Abatement Trust ("NOAT") and the Tribal Abatement Fund Trust ("TAFT"). No Channeled Claim shall be channeled to any Creditor Trust except as provided in this Master TDP. Unless Disallowed and released pursuant to this Master TDP, Channeled Claims shall be administered, liquidated and discharged pursuant to, and to the extent provided in, the Creditor Trust Documents for the Creditor Trust to which such Channeled Claims are channeled in accordance with this Master TDP. Distributions from the Creditor Trusts in accordance with the Creditor Trust TDPs shall be the sole source of recovery, if any, in respect of Channeled Claims, and Holders of such Channeled Claims shall have no other or further recourse to any Protected Party, including from the Master Disbursement Trust.

SECTION 3. NON-FEDERAL DOMESTIC GOVERNMENTAL CHANNELED CLAIMS.

3.1     Non-Federal Domestic Governmental Channeled Claims Defined.

A Non-Federal Domestic Governmental Channeled Claim is (a) any Claim against any Debtor that is held by a Domestic Governmental Entity other than the United States or a Tribe (including any Claim based on the subrogation rights of the Holder thereof that is not an Other Subordinated Claim), and that is not a Priority Tax Claim, or (b) any

---

[1] Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to such terms in the Plan.

Released Claim or Shareholder Released Claim that is held by a Domestic Governmental Entity other than the United States or a Tribe.

3.2    Channeling of Non-Federal Domestic Governmental Channeled Claims to NOAT.

On the Effective Date, all Non-Federal Domestic Governmental Channeled Claims shall be further channeled to and exclusively assumed by NOAT. Non-Federal Domestic Governmental Channeled Claims shall be administered, liquidated and discharged solely pursuant to the NOAT Documents, and satisfied solely from funds held by NOAT as and to the extent provided in the NOAT TDP.

3.3    Effective Date Distributions to NOAT.

On the Effective Date or as soon thereafter as reasonably practicable, as consideration for NOAT's assumption of the Non-Federal Domestic Governmental Channeled Claims and in accordance with the Plan, the Master Disbursement Trust will (a) make the Initial NOAT Distribution to NOAT, (b) distribute the TopCo NOAT Interest to NOAT and (c) issue the MDT NOAT Interest to NOAT.

SECTION 4. TRIBE CHANNELED CLAIMS.

4.1    Tribe Channeled Claims Defined.

A Tribe Channeled Claim is (a) any Claim against any Debtor that is held by a Tribe (including any Claim based on the subrogation rights of a Tribe that is not an Other Subordinated Claim), and that is not a Priority Tax Claim, or (b) any Released Claim or Shareholder Released Claim that is held by a Tribe. Claims of Tribes against Holders of PI Claims or Distributions payable to Holders of PI Claims, to the extent such claims exist, are not claims against any Debtor and therefore are not included in the definition of "Tribe Claims."

4.2    Channeling of Tribe Channeled Claims to TAFT.

On the Effective Date, all Tribe Channeled Claims shall be further channeled to and assumed exclusively by TAFT. Tribe Channeled Claims shall be administered, liquidated and discharged solely pursuant to the Tribe Trust Documents, and satisfied solely from funds held by the Tribe Trust as and to the extent provided in the Tribe TDP.

4.3    Effective Date Distributions to TAFT.

On the Effective Date or as soon thereafter as reasonably practicable, as consideration for TAFT's assumption of the Tribe Channeled Claims and in accordance with the Plan, the Master Disbursement Trust will (a) make the Initial Tribe Trust Distribution to TAFT, (b) distribute the TopCo Tribe Interests to TAFT; *provided* that TAFT shall immediately distribute such TopCo Tribe Interest to the TAFT beneficiaries, which shall immediately thereafter contribute such TopCo Tribe Interest to Tribe Opioid Abatement Fund, LLC ("Tribe Opioid LLC") in exchange for interests in Tribe Opioid LLC and (c) issue the MDT Tribe Interest to TAFT.

2

## SECTION 5. HOSPITAL CHANNELED CLAIMS.

5.1    <u>Hospital Channeled Claims Defined</u>.

A Hospital Channeled Claim is (a) any Claim against any Debtor that is held by a provider of healthcare treatment services or any social services, in its capacity as such, that is not a Domestic Governmental Entity, including, based on the Debtors' initial review, the Claims set forth in the 1,030 Proofs of Claims filed by hospitals and the 150 Proofs of Claims filed by other treatment providers, or (b) any Released Claim or Shareholder Released Claim held by a provider of healthcare treatment services or any social services, in its capacity as such, that is not a Domestic Governmental Entity.

5.2    <u>Channeling of Hospital Channeled Claims to the Hospital Trust</u>.

On the Effective Date, all Hospital Channeled Claims shall be further channeled to and assumed exclusively by the Hospital Trust. Hospital Channeled Claims shall be administered, liquidated and discharged solely pursuant to the Hospital Trust Documents, and satisfied solely from funds held by the Hospital Trust as and to the extent provided in the Hospital TDP.

5.3    <u>Effective Date Distributions to the Hospital Trust</u>.

On the Effective Date or as soon thereafter as reasonably practicable, as consideration for the Hospital Trust's assumption of the Hospital Channeled Claims and in accordance with the Plan, the Master Disbursement Trust will (a) make the Initial Hospital Trust Distribution to the Hospital Trust and (b) issue the MDT Hospital Claim to the Hospital Trust.

## SECTION 6. THIRD-PARTY PAYOR CHANNELED CLAIMS.

6.1    <u>Third-Party Payor Channeled Claims Defined</u>.

A Third-Party Payor Channeled Claim is (a) any Claim against any Debtor that is held by a Third-Party Payor (including any Claim based on the subrogation rights of the Holder thereof that is not an Other Subordinated Claim) that is not a Domestic Governmental Entity, or (b) any Released Claim or Shareholder Released Claim that is held by a Third-Party Payor that is not a Domestic Governmental Entity. Third-Party Payor Channeled Claims including Claims in respect of self-funded government plans that were and are asserted through private Third-Party Payors, but do not include claims of Third-Party Payors against Holders of PI Channeled Claims or Distributions payable to Holders of PI Channeled Claims.

6.2    <u>Channeling of Third-Party Payor Channeled Claims to the TPP Trust</u>.

On the Effective Date, all Third-Party Payor Channeled Claims shall be further channeled to and assumed exclusively by the TPP Trust. Third-Party Payor Channeled Claims shall be administered, liquidated and discharged solely pursuant to the TPP Trust Documents,

and satisfied solely from funds held by the TPP Trust as and to the extent provided in the TPP TDP.

6.3    <u>Effective Date Distribution to the TPP Trust</u>.

On the Effective Date or as soon thereafter as reasonably practicable, as consideration for the TPP Trust's assumption of the Third-Party Payor Channeled Claims and in accordance with the Plan, the Master Disbursement Trust will (a) make the Initial TPP Trust Distribution to the TPP Trust and (b) issue the MDT TPP Claim to the TPP Trust.

SECTION 7. NAS MONITORING CHANNELED CLAIMS.

7.1    <u>NAS Monitoring Channeled Claims Defined</u>.

An NAS Monitoring Channeled Claim is (a) any Claim against any Debtor that is held on account of an NAS Child and relates to medical monitoring support, educational support, vocational support, familial support or similar related relief, and is not for an alleged personal injury suffered by an NAS Child, or (b) any Released Claim or Shareholder Released Claim that is held on account of an NAS Child and that relates to medical monitoring support, educational support, vocational support, familial support or similar related relief, and is not for an alleged personal injury suffered by an NAS Child.

7.2    <u>Channeling of NAS Monitoring Claims to the NAS Monitoring Trust</u>.

On the Effective Date, all NAS Monitoring Channeled Claims shall be further channeled to and assumed exclusively by the NAS Monitoring Trust. NAS Monitoring Channeled Claims shall be administered, liquidated and discharged solely pursuant to the NAS Monitoring Trust Documents, and satisfied solely from funds held by the NAS Monitoring Trust as and to the extent provided in the NAS Monitoring TDP.

7.3    <u>Effective Date Distribution to the NAS Monitoring Trust</u>.

On the Effective Date or as soon thereafter as reasonably practicable, as consideration for the NAS Monitoring Trust's assumption of the NAS Monitoring Channeled Claims and in accordance with the Plan, the Master Disbursement Trust will (a) make the Initial NAS Monitoring Trust Distribution to the NAS Monitoring Trust and (b) issue the MDT NAS Monitoring Claim to the NAS Monitoring Trust.

SECTION 8. PI CHANNELED CLAIMS.

8.1    <u>NAS PI Channeled Claims Defined</u>.

An NAS PI Channeled Claim is (a) any Claim against any Debtor that is for alleged opioid-related personal injury to an NAS Child or similar opioid-related claim or Cause of Action against any Debtor asserted by or on behalf of an NAS Child, in each case, that arose prior to the Petition Date, and that is not a Third-Party Payor Claim, an NAS Monitoring Claim or a Hospital Claim, or held by a Domestic Governmental Entity, or (b) any Released Claim or Shareholder Released Claim that is for alleged opioid-related

personal injury to an NAS Child or that is a similar opioid-related claim or Cause of Action asserted by or on behalf of an NAS Child, in each case, that arose prior to the Petition Date, and that is not a Third-Party Payor Channeled Claim, an NAS Monitoring Channeled Claim or a Hospital Channeled Claim, or held by a Domestic Governmental Entity.

8.2    Channeling of NAS PI Channeled Claims to the PI Trust.

On the Effective Date, all NAS PI Channeled Claims shall be further channeled to and assumed exclusively by the PI Trust. NAS PI Channeled Claims shall be administered, liquidated and discharged solely pursuant to the PI Trust Documents, and satisfied solely from the PI Trust NAS Fund held by the PI Trust as and to the extent provided in the NAS PI TDP.

8.3    Non-NAS PI Channeled Claims Defined.

A Non-NAS PI Channeled Claim is (a) any Claim against any Debtor that is for alleged opioid-related personal injury or other similar opioid-related claim or Cause of Action against any Debtor, in each case, that arose prior to the Petition Date, and that is not an NAS PI Claim, a Third-Party Payor Claim, an NAS Monitoring Claim or a Hospital Claim, or held by a Domestic Governmental Entity, or (b) any Released Claim or Shareholder Released Claim that is for alleged opioid-related personal injury or that is a similar opioid-related claim or Cause of Action, in each case, that arose prior to the Petition Date, and that is not an NAS PI Channeled Claim, a Third-Party Payor Channeled Claim, an NAS Monitoring Channeled Claim or a Hospital Channeled Claim, or held by a Domestic Governmental Entity.

8.4    Channeling of Non-NAS PI Channeled Claims to the PI Trust.

On the Effective Date, all Non-NAS PI Channeled Claims shall be further channeled to and assumed exclusively by the PI Trust. Non-NAS PI Channeled Claims shall be administered, liquidated and discharged solely pursuant to the PI Trust Documents, and satisfied solely from the PI Trust Non-NAS Fund held by the PI Trust as and to the extent provided in the Non-NAS PI TDP.

8.5    Effective Date Distribution to the PI Trust.

On the Effective Date or as soon thereafter as reasonably practicable, as consideration for the PI Trust's assumption of the PI Channeled Claims and in accordance with the Plan, the Master Disbursement Trust will (a) make the Initial PI Trust Distribution to the PI Trust and (b) issue the MDT PI Claim to the PI Trust.

SECTION 9. FUTURE PI CHANNELED CLAIMS.

9.1    Future PI Channeled Claims Defined.

A Future PI Channeled Claim is any Released Claim or any Shareholder Released Claim that is for alleged opioid-related personal injury or that is a similar opioid-related claim or

Cause of Action, and that is not (a) a PI Channeled Claim, a Third-Party Payor Channeled Claim, an NAS Monitoring Channeled Claim or a Hospital Channeled Claim, (b) held by a Domestic Governmental Entity or (c) a Released Claim against any Debtor or its Estate, NewCo or any successor owner of NewCo's opioid business, in each case, that arises from or relates to the use of an opioid that is manufactured by or placed in the stream of commerce by NewCo or any successor owner of NewCo's opioid business.

9.2    Channeling of Future PI Channeled Claims to the PI Futures Trust.

On the Effective Date, all Future PI Channeled Claims shall be further channeled to and assumed exclusively by the PI Futures Trust. Future PI Channeled Claims shall be administered, liquidated and discharged solely pursuant to the PI Futures Trust Documents, and satisfied solely from funds held by the PI Futures Trust as and to the extent provided in the PI Futures TDP. For the avoidance of doubt, no Future PI Channeled Claim shall be channeled to, attach to, be payable or otherwise compensable from, be eligible to receive a Distribution from, or have any recourse to, the PI Trust or the assets of the PI Trust, including, but not limited to, the Initial PI Trust Distribution, the MDT PI Claim, any MDT Bermuda-Form Insurance Proceeds, the Creditor Trust Operating Reserve of the PI Trust or any entitlement to or products, proceeds or profits of, any of the foregoing, prior to the establishment of, during the existence of or following the dissolution of, the PI Future Trust or at any other time.

9.3    Effective Date Distribution to the PI Futures Trust.

On the Effective Date or as soon thereafter as reasonably practicable, as consideration for the PI Futures Trust's assumption of the Future PI Channeled Claims and in accordance with the Plan, the Master Disbursement Trust will make the PI Futures Trust Distribution to the PI Futures Trust.

SECTION 10. DEFENSES.

Pursuant to the Plan, the Master Disbursement Trust shall have all defenses, cross-claims, offsets and recoupments regarding the Channeled Claims that the Debtors, the Released Parties and the Shareholder Released Parties, as applicable, have, or would have had, under applicable law; *provided* that, upon the channeling to and assumption by any Creditor Trust of any Channeled Claim, all defenses, cross-claims, offsets and recoupments regarding such Channeled Claim shall vest in such Creditor Trust; *provided*, *further*, that no defenses, cross-claims, offsets or recoupments regarding any Channeled Claim may be asserted against any Protected Party.

SECTION 11. DISALLOWANCE AND RELEASE.

Any Channeled Claim that does not satisfy the requirements under this Master TDP to be channeled to a Creditor Trust is and shall be, without any further action by the MDT Trustees, Disallowed and released in full and the Holder thereof shall have no recourse to, or right of recovery from, the Master Disbursement Trust, any Creditor Trust or any other Protected Party.

SECTION 12. DETERMINATION BY THE BANKRUPTCY COURT.

In accordance with Section 6.21 of the Plan, the Bankruptcy Court shall have exclusive jurisdiction to determine whether a Channeled Claim asserted before or after the Effective Date satisfies the requirements under this Master TDP to be channeled to a Creditor Trust, or is instead released in accordance with this Master TDP. Also pursuant to Section 6.21 of the Plan, only the following parties shall have standing to participate in any such determination before the Bankruptcy Court after the Effective Date: the MDT Trustees, the Creditor Trustees, NewCo, the Person seeking to assert such Channeled Claim, and any Person against which such Channeled Claim is purportedly asserted.

## EXHIBIT K-1

### Redline of Master TDP

**MASTER DISBURSEMENT TRUST**
**MASTER TRUST DISTRIBUTION PROCEDURES**

SECTION 1 APPLICABILITY.

Pursuant to the ~~Fourth~~Fifth *Amended Joint Chapter 11 Plan of Reorganization of Purdue Pharma L.P. and its Affiliated Debtors* (the "Plan"),[1] all Channeled Claims shall be channeled to and liability therefor shall be assumed by the Master Disbursement Trust as of the Effective Date, and each Channeled Claim shall be resolved solely in accordance with the terms, provisions and procedures of these distribution procedures (this "Master TDP"). Holders of Channeled Claims are enjoined from pursuing such Channeled Claims in accordance with Section 10.8 of the Plan other than as expressly permitted pursuant to this Master TDP.

SECTION 2 PROCEDURES GENERALLY.

This Master TDP provides procedures ~~for~~pursuant to which (a) each Channeled ~~Claims to~~Claim shall automatically be further channeled to and assumed exclusively by ~~the respective Creditor Trusts~~a Creditor Trust in accordance with Sections 3 through 9 of this Master TDP or shall otherwise be Disallowed and released in full pursuant to Section 12 of this Master TDP and (b) in consideration for the assumption by the Creditor Trusts of Channeled Claims as set forth herein, the Master Disbursement Trust shall (i) issue the MDT Private Claims and make the Initial Private Creditor Trust Distributions to the Private Creditor Trusts, and (ii) issue the MDT Interests, make the Initial Public Creditor Trust Distributions and distribute the TopCo Interests to the National Opioid Abatement Trust ("NOAT") and the Tribal Abatement Fund Trust ("TAFT"). No Channeled Claim shall be channeled to any Creditor Trust except as provided in this Master TDP. Unless Disallowed and released pursuant to this Master TDP, Channeled Claims shall be administered, liquidated and discharged pursuant to, and to the extent provided in, the Creditor Trust Documents for the Creditor Trust to which such Channeled Claims are channeled in accordance with this Master TDP. Distributions from the Creditor Trusts in accordance with the Creditor Trust TDPs shall be the sole source of recovery, if any, in respect of Channeled Claims, and Holders of such Channeled Claims shall have no other or further recourse to ~~the~~any Protected ~~Parties~~Party, including from the Master Disbursement Trust.

---

[1] Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to such terms in the Plan.

SECTION 3 NON-FEDERAL DOMESTIC GOVERNMENTAL CHANNELED CLAIMS.

3.1    Non-Federal Domestic Governmental Channeled Claims Defined.

A Non-Federal Domestic Governmental Channeled Claim is (A~~a~~) any Claim against any Debtor that is held by a Domestic Governmental Entity other than the United States or a Tribe (including any Claim based on the subrogation rights of the Holder thereof that is not an Other Subordinated Claim), and that is not a Priority Tax Claim, or (B~~b~~) any Released Claim or Shareholder Released Claim that is held by a Domestic Governmental Entity other than the United States or a Tribe.

3.2    Channeling ~~to National Opioid Abatement Fund ("~~of Non-Federal Domestic Governmental Channeled Claims to NOAT~~")~~.

~~All~~On the Effective Date, all Non-Federal Domestic Governmental Channeled Claims shall be further channeled to and exclusively assumed by NOAT. Non-Federal Domestic Governmental Channeled Claims shall be administered, liquidated and discharged solely pursuant to the NOAT Documents, and satisfied solely from funds held by NOAT as and to the extent provided in the NOAT TDP.

3.3    Effective Date Distributions to NOAT.

On the Effective Date or as soon thereafter as reasonably practicable, as consideration for NOAT's assumption of the Non-Federal Domestic Governmental Channeled Claims and in accordance with the Plan, the Master Disbursement Trust will (a) make the Initial NOAT Distribution to NOAT, (b) distribute the TopCo NOAT Interest to NOAT and (c) issue the MDT NOAT Interest to NOAT.

SECTION 4 TRIBE CHANNELED CLAIMS.

4.1    Tribe Channeled Claims Defined.

A Tribe Channeled Claim is (A~~a~~) any Claim against any Debtor that is held by a Tribe (including any Claim based on the subrogation rights of a Tribe that is not an Other Subordinated Claim), and that is not a Priority Tax Claim, or (B~~b~~) any Released Claim or Shareholder Released Claim that is held by a Tribe. Claims of Tribes against Holders of PI Claims or Distributions payable to Holders of PI Claims, to the extent such claims exist, are not claims against any Debtor and therefore are not included in the definition of "Tribe Claims."

4.2    Channeling ~~to Tribal Abatement Fund Trust ("~~of Tribe Channeled Claims to TAFT~~")~~.

~~All~~On the Effective Date, all Tribe Channeled Claims shall be further channeled to and assumed exclusively by TAFT. Tribe Channeled Claims shall be administered, liquidated and discharged solely pursuant to the Tribe Trust Documents, and satisfied solely from funds held by the Tribe Trust as and to the extent provided in the Tribe TDP.

2

4.3    Effective Date Distributions to TAFT.

On the Effective Date or as soon thereafter as reasonably practicable, as consideration for TAFT's assumption of the Tribe Channeled Claims and in accordance with the Plan, the Master Disbursement Trust will (a) make the Initial Tribe Trust Distribution to TAFT, (b) distribute the TopCo Tribe Interests to TAFT; *provided* that TAFT shall immediately distribute such TopCo Tribe Interest to the TAFT beneficiaries, which shall immediately thereafter contribute such TopCo Tribe Interest to Tribe Opioid Abatement Fund, LLC ("Tribe Opioid LLC") in exchange for interests in Tribe Opioid LLC and (c) issue the MDT Tribe Interest to TAFT.

SECTION 5 HOSPITAL CHANNELED CLAIMS.

5.1    Hospital Channeled Claims Defined.

A Hospital Channeled Claim is (Aa) any Claim against any Debtor that is held by a provider of healthcare treatment services or any social services, in its capacity as such, that is not a Domestic Governmental Entity, including, based on the Debtors' initial review, the Claims set forth in the 1,030 Proofs of Claims filed by hospitals and the 150 Proofs of Claims filed by other treatment providers, or (Bb) any Released Claim or Shareholder Released Claim held by a provider of healthcare treatment services or any social services, in its capacity as such, that is not a Domestic Governmental Entity.

5.2    Channeling of Hospital Channeled Claims to the Hospital Trust.

AllOn the Effective Date, all Hospital Channeled Claims shall be further channeled to and assumed exclusively by the Hospital Trust. Hospital Channeled Claims shall be administered, liquidated and discharged solely pursuant to the Hospital Trust Documents, and satisfied solely from funds held by the Hospital Trust as and to the extent provided in the Hospital TDP.

5.3    Effective Date Distributions to the Hospital Trust.

On the Effective Date or as soon thereafter as reasonably practicable, as consideration for the Hospital Trust's assumption of the Hospital Channeled Claims and in accordance with the Plan, the Master Disbursement Trust will (a) make the Initial Hospital Trust Distribution to the Hospital Trust and (b) issue the MDT Hospital Claim to the Hospital Trust.

SECTION 6 THIRD-PARTY PAYOR CHANNELED CLAIMS.

6.1    Third-Party Payor Channeled Claims Defined.

A Third-Party Payor Channeled Claim is (Aa) any Claim against any Debtor that is held by a Third-Party Payor (including any Claim based on the subrogation rights of the Holder thereof that is not an Other Subordinated Claim) that is not a Domestic Governmental Entity, or (Bb) any Released Claim or Shareholder Released Claim that is held by a Third-Party Payor that is not a Domestic Governmental Entity. Third-Party Payor Channeled Claims including Claims in respect of self-funded government plans that were

3

and are asserted through private Third-Party Payors, but do not include claims of Third-Party Payors against Holders of PI Channeled Claims or Distributions payable to Holders of PI Channeled Claims.

6.2     Channeling of Third-Party Payor Channeled Claims to the TPP Trust.

All On the Effective Date, all Third-Party Payor Channeled Claims shall be further channeled to and assumed exclusively by the TPP Trust. Third-Party Payor Channeled Claims shall be administered, liquidated and discharged solely pursuant to the TPP Trust Documents, and satisfied solely from funds held by the TPP Trust as and to the extent provided in the TPP TDP.

6.3     Effective Date Distribution to the TPP Trust.

On the Effective Date or as soon thereafter as reasonably practicable, as consideration for the TPP Trust's assumption of the Third-Party Payor Channeled Claims and in accordance with the Plan, the Master Disbursement Trust will (a) make the Initial TPP Trust Distribution to the TPP Trust and (b) issue the MDT TPP Claim to the TPP Trust.

SECTION 7 NAS MONITORING CHANNELED CLAIMS.

7.1     NAS Monitoring Channeled Claims Defined.

An NAS Monitoring Channeled Claim is (Aa) any Claim against any Debtor that is held on account of an NAS Child and relates to medical monitoring support, educational support, vocational support, familial support or similar related relief, and is not for an alleged personal injury suffered by an NAS Child, or (Bb) any Released Claim or Shareholder Released Claim that is held on account of an NAS Child and that relates to medical monitoring support, educational support, vocational support, familial support or similar related relief, and is not for an alleged personal injury suffered by an NAS Child.

7.2     Channeling of NAS Monitoring Claims to the NAS Monitoring Trust.

All On the Effective Date, all NAS Monitoring Channeled Claims shall be further channeled to and assumed exclusively by the NAS Monitoring Trust. NAS Monitoring Channeled Claims shall be administered, liquidated and discharged solely pursuant to the NAS Monitoring Trust Documents, and satisfied solely from funds held by the NAS Monitoring Trust as and to the extent provided in the NAS Monitoring TDP.

7.3     Effective Date Distribution to the NAS Monitoring Trust.

On the Effective Date or as soon thereafter as reasonably practicable, as consideration for the NAS Monitoring Trust's assumption of the NAS Monitoring Channeled Claims and in accordance with the Plan, the Master Disbursement Trust will (a) make the Initial NAS Monitoring Trust Distribution to the NAS Monitoring Trust and (b) issue the MDT NAS Monitoring Claim to the NAS Monitoring Trust.

SECTION 8. ~~NAS~~ PI CHANNELED CLAIMS.

8.1     NAS PI Channeled Claims Defined.

An NAS PI Channeled Claim is (~~A~~a) any Claim against any Debtor that is for alleged opioid-related personal injury to an NAS Child or similar opioid-related claim or Cause of Action against any Debtor asserted by or on behalf of an NAS Child, in each case, that arose prior to the Petition Date, and that is not a Third-Party Payor Claim, an NAS Monitoring Claim, or a Hospital Claim, or ~~a Claim~~ held by a Domestic Governmental Entity, or (~~B~~b) any Released Claim or Shareholder Released Claim that is for alleged opioid-related personal injury to an NAS Child or that is a similar opioid-related claim or Cause of Action asserted by or on behalf of an NAS Child, in each case, that arose prior to the Petition Date, and that is not a Third-Party Payor Channeled Claim, an NAS Monitoring Channeled Claim or a Hospital Channeled Claim, or held by a Domestic Governmental Entity.

8.2     Channeling of NAS PI Channeled Claims to the PI Trust ~~NAS Fund~~.

~~All~~On the Effective Date, all NAS PI Channeled Claims shall be further channeled to and assumed exclusively by the PI Trust. NAS PI Channeled Claims shall be administered, liquidated and discharged solely pursuant to the PI Trust Documents, and satisfied solely from the PI Trust NAS Fund held by the PI Trust as and to the extent provided in the NAS PI TDP.

~~SECTION 9. NON-NAS PI CHANNELED CLAIMS.~~

8.3     ~~9.1~~ Non-NAS PI Channeled Claims Defined.

A Non-NAS PI Channeled Claim is (~~A~~a) any Claim against any Debtor that is for alleged opioid-related personal injury or other similar opioid-related claim or Cause of Action against any Debtor, in each case, that arose prior to the Petition Date, and that is not an NAS PI Claim, a Third-Party Payor Claim, an NAS Monitoring Claim, or a Hospital Claim, or ~~a Claim~~ held by a Domestic Governmental Entity, or (~~B~~b) any Released Claim or Shareholder Released Claim that is for alleged opioid-related personal injury or that is a similar opioid-related claim or Cause of Action, in each case, that arose prior to the Petition Date, and that is not an NAS PI Channeled Claim, a Third-Party Payor Channeled Claim, an NAS Monitoring Channeled Claim or a Hospital Channeled Claim, or held by a Domestic Governmental Entity.

8.4     ~~9.2~~ Channeling of Non-NAS PI Channeled Claims to the PI Trust ~~Non-NAS Fund~~.

~~All~~On the Effective Date, all Non-NAS PI Channeled Claims shall be further channeled to and assumed exclusively by the PI Trust. Non-NAS PI Channeled Claims shall be administered, liquidated and discharged solely pursuant to the PI Trust Documents, and satisfied solely from the PI Trust Non-NAS Fund held by the PI Trust as and to the extent provided in the Non-NAS PI TDP.

8.5    **Effective Date Distribution to the PI Trust.**

On the Effective Date or as soon thereafter as reasonably practicable, as consideration for the PI Trust's assumption of the PI Channeled Claims and in accordance with the Plan, the Master Disbursement Trust will (a) make the Initial PI Trust Distribution to the PI Trust and (b) issue the MDT PI Claim to the PI Trust.

SECTION 9. FUTURE PI CHANNELED CLAIMS.

9.1    **Future PI Channeled Claims Defined.**

A Future PI Channeled Claim is any Released Claim or any Shareholder Released Claim that is for alleged opioid-related personal injury or that is a similar opioid-related claim or Cause of Action, and that is not (a) a PI Channeled Claim, a Third-Party Payor Channeled Claim, an NAS Monitoring Channeled Claim or a Hospital Channeled Claim, (b) held by a Domestic Governmental Entity or (c) a Released Claim against any Debtor or its Estate, NewCo or any successor owner of NewCo's opioid business, in each case, that arises from or relates to the use of an opioid that is manufactured by or placed in the stream of commerce by NewCo or any successor owner of NewCo's opioid business.

9.2    **Channeling of Future PI Channeled Claims to the PI Futures Trust.**

On the Effective Date, all Future PI Channeled Claims shall be further channeled to and assumed exclusively by the PI Futures Trust. Future PI Channeled Claims shall be administered, liquidated and discharged solely pursuant to the PI Futures Trust Documents, and satisfied solely from funds held by the PI Futures Trust as and to the extent provided in the PI Futures TDP. For the avoidance of doubt, no Future PI Channeled Claim shall be channeled to, attach to, be payable or otherwise compensable from, be eligible to receive a Distribution from, or have any recourse to, the PI Trust or the assets of the PI Trust, including, but not limited to, the Initial PI Trust Distribution, the MDT PI Claim, any MDT Bermuda-Form Insurance Proceeds, the Creditor Trust Operating Reserve of the PI Trust or any entitlement to or products, proceeds or profits of, any of the foregoing, prior to the establishment of, during the existence of or following the dissolution of, the PI Future Trust or at any other time.

9.3    **Effective Date Distribution to the PI Futures Trust.**

On the Effective Date or as soon thereafter as reasonably practicable, as consideration for the PI Futures Trust's assumption of the Future PI Channeled Claims and in accordance with the Plan, the Master Disbursement Trust will make the PI Futures Trust Distribution to the PI Futures Trust.

SECTION 10. DEFENSES.

Pursuant to the Plan, the Master Disbursement Trust shall have all defenses, cross-claims, offsets and recoupments regarding the Channeled Claims that the Debtors, the Released Parties and the Shareholder Released Parties, as applicable, have, or would have had, under applicable law; *provided* that, upon the channeling to and assumption by any Creditor Trust of any Channeled

Claim, all defenses, cross-claims, offsets and recoupments regarding such Channeled Claim shall vest in such Creditor Trust; *provided*, *further*, that no defenses, cross-claims, offsets or recoupments regarding any Channeled Claim may be asserted against any Protected Party.

SECTION D. DISALLOWANCE AND RELEASE.

Any Channeled Claim that does not satisfy the requirements under this Master TDP to be channeled to a Creditor Trust is and shall be, without any further action by the MDT Trustees, Disallowed and released in accordance with the Plan full and the Holder thereof shall have no recourse to, or right of recovery from, the Master Disbursement Trust, any Creditor Trust or any other Protected Party.

SECTION E. DETERMINATION BY ~~MDT TRUSTEES~~ THE BANKRUPTCY COURT.

~~The MDT Trustees, in their sole discretion, shall determine by unanimous vote, whether any Channeled Claim~~ In accordance with Section 6.21 of the Plan, the Bankruptcy Court shall have exclusive jurisdiction to determine whether a Channeled Claim asserted before or after the Effective Date satisfies the requirements under this Master TDP to be channeled to a Creditor Trust, or is instead released in accordance with this Master TDP. Also pursuant to Section 6.21 of the Plan, only the following parties shall have standing to participate in any such determination before the Bankruptcy Court after the Effective Date: the MDT Trustees, the Creditor Trustees, NewCo, the Person seeking to assert such Channeled Claim, and any Person against which such Channeled Claim is purportedly asserted.

# EXHIBIT O

**Hospital Trust Agreement**

**HOSPITAL TRUST AGREEMENT**

**DATED AS OF [●], 2021**

# TABLE OF CONTENTS

<div align="right">PAGE</div>

## SECTION I
## AGREEMENT OF TRUST

1.1  Creation and Name ...........................................................................................4
1.2  Purpose...........................................................................................................4
1.3  Transfer of Assets ...........................................................................................6
1.4  Acceptance of Assets and Assumption of Liabilities .........................................7
1.5  Channeling Injunction......................................................................................9

## SECTION II
## POWERS AND TRUST ADMINISTRATION

2.1  Powers.............................................................................................................9
2.2  General Administration...................................................................................13
2.3  Claims Administration ....................................................................................19

## SECTION III
## ACCOUNTS, INVESTMENTS AND PAYMENTS

3.1  Accounts ........................................................................................................19
3.2  Investments ....................................................................................................20
3.3  Source of Payments.........................................................................................20

## SECTION IV
## TRUSTEE; DELAWARE TRUSTEE

4.1  Number ...........................................................................................................20
4.2  Term of Service...............................................................................................20
4.3  Appointment of Successor Trustee ..................................................................21
4.4  Liability of Trustee and Others........................................................................22
4.5  Compensation and Expenses of Trustee ..........................................................22
4.6  Indemnification of Trustee and Others ............................................................23
4.7  Lien ................................................................................................................24
4.8  Trustee's Employment of Experts ...................................................................24
4.9  Trustee Independence .....................................................................................25
4.10 No Bond .........................................................................................................25
4.11 Delaware Trustee ...........................................................................................25

## SECTION V
## TRUST ADVISORY COMMITTEE

5.1  Members ...........................................................................................................28
5.2  Duties .............................................................................................................28
5.3  Term of Office .................................................................................................29
5.4  Appointment of Successors...............................................................................29
5.5  TAC's Employment of Professionals .................................................................30
5.6  Compensation and Expenses of the TAC ...........................................................32

## SECTION VI
## GENERAL PROVISIONS

6.1  Procedures for Consulting with or Obtaining Consent of the TAC.......................33
6.2  Irrevocability...................................................................................................35
6.3  Term; Termination ...........................................................................................35
6.4  Amendments ....................................................................................................37
6.5  Severability .....................................................................................................38
6.6  Notices ...........................................................................................................38
6.7  Successors and Assigns.....................................................................................39
6.8  Limitation on Claim Interests for Securities Laws Purposes................................40
6.9  Entire Agreement; No Waiver ...........................................................................40
6.10  Headings .......................................................................................................40
6.11  Governing Law ..............................................................................................40
6.12  Settlors' Representative and Cooperation..........................................................41
6.13  Dispute Resolution..........................................................................................41
6.14  Enforcement and Administration ......................................................................42
6.15  Effectiveness .................................................................................................42
6.16  Counterpart Signatures....................................................................................43

## HOSPITAL TRUST AGREEMENT

This Hospital Trust Agreement (this **"Trust Agreement"**), dated the date set forth on the signature page hereof and effective as of the Effective Date,[1] is entered into pursuant to the *[Fifth] Amended Joint Chapter 11 Plan of Reorganization of Purdue Pharma L.P. and Its Affiliated Debtors*, dated [June 3], 2021 (as may be modified, amended or supplemented from time to time, and together with all exhibits and schedules thereto, the **"Plan"**), by Purdue Pharma L.P. and its Debtor affiliates[2] (collectively referred to as the **"Debtors"** or **"Settlors"**),[3] Wilmington Trust Company (the **"Delaware Trustee"**); Thomas L. Hogan (the **"Trustee"**); and the sole member of the Hospital Trust Advisory Committee identified on the signature pages hereof (the **"TAC"** and, together with the Debtors, the Delaware Trustee and the Trustee, the **"Parties"**); and

**WHEREAS,** the Debtors have reorganized under the provisions of Chapter 11 of the Bankruptcy Code;

**WHEREAS,** the Confirmation Order has been entered by the Bankruptcy Court;

**WHEREAS,** the Plan provides, *inter alia,* for the creation of the Hospital Trust (the **"Hospital Trust"**);

**WHEREAS,** pursuant to the Plan, the Hospital Trust shall be established to (i) assume all liability for the Hospital Channeled Claims, (ii) hold the MDT Hospital Claim and collect the

---

[1] All capitalized terms not otherwise defined herein shall have the meanings ascribed to them in the Plan and the Hospital TDP.

[2] The Debtors in these cases are as follows:  Purdue Pharma L.P.; Purdue Pharma Inc.; Purdue Transdermal Technologies L.P.; Purdue Pharma Manufacturing L.P.; Purdue Pharmaceuticals L.P.; Imbrium Therapeutics L.P.; Adlon Therapeutics L.P.; Greenfield BioVentures L.P.; Seven Seas Hill Corp; Ophir Green Corp.; Purdue Pharma of Puerto Rico; Avrio Health L.P.; Purdue Pharmaceutical Products L.P.; Purdue Neuroscience Company; Nayatt Cove Lifescience Inc.; Button Land L.P.; Rhodes Associates L.P.; Paul Land Inc.; Quidnick Land L.P.; Rhodes Pharmaceuticals L.P.; Rhodes Technologies; UDF LP, SVC Pharma LP; and SVC Pharma Inc.

[3] The Chapter 11 Cases of the Debtors and Debtors in Possession are jointly administered under Case No. 19-23649 (RDD) in the United States Bankruptcy Court for the Southern District of New York (the **"Bankruptcy Court"**) and known as *In re Purdue Pharma L.P., et al.*, Case No. 19-23649 (RDD).

Initial Hospital Trust Distribution and additional payments due under the MDT Hospital Claim in accordance with the Private Entity Settlements and the Hospital Trust Documents, (iii) administer Hospital Channeled Claims, (iv) make Hospital Abatement Distributions to Hospital Authorized Recipients for Hospital Authorized Abatement Purposes, in each case in accordance with the Hospital trust distribution procedures (the **"Hospital TDP"**), attached hereto as Exhibit 2 and (v) carry out such other matters as are set forth in the Hospital Trust Documents;

**WHEREAS**, the Plan and the Master TDP provide that on the Effective Date, any and all liability of the Debtors and the other Protected Parties for any and all Hospital Channeled Claims shall automatically, and without further act, deed or court order, be channeled to and assumed by the Master Disbursement Trust solely for the purpose of effectuating the Master TDP, and further provide that immediately thereafter, any and all Hospital Channeled Claims shall automatically, and without further act, deed or court order, be channeled exclusively to and assumed by the Hospital Trust;

**WHEREAS,** pursuant to the Plan and the Confirmation Order, the Hospital Trust shall (i) hold, manage and invest all funds and other Assets received by the Hospital Trust from the Master Disbursement Trust for the benefit of the beneficiaries of the Hospital Trust; (ii) hold and maintain the Hospital Trust Operating Reserve, as defined herein and (iii) administer, process, resolve and liquidate all Hospital Channeled Claims in accordance with the Hospital TDP;

**WHEREAS**, it is the intent of the Debtors, the Trustee and the TAC that the Hospital Trust will evaluate the Hospital Channeled Claims and be in a financial position to make Hospital Abatement Distributions to Hospital Authorized Recipients in accordance with the terms of this Trust Agreement and the Hospital TDP;

2

**WHEREAS,** all rights of the Holders of Hospital Channeled Claims arising under this Trust Agreement and the Hospital TDP shall vest upon the Effective Date;

**WHEREAS,** pursuant to the Plan, the Hospital Trust is intended to qualify as a "qualified settlement fund" (a **"Qualified Settlement Fund"**) within the meaning of section 1.468B-1, et seq. of the Treasury Regulations promulgated under section 468B of the Internal Revenue Code (the **"QSF Regulations"**) and be treated consistently for state and local tax purposes to the extent applicable;

**WHEREAS**, pursuant to the Plan, the Hospital Trust and the Plan satisfy all the prerequisites for issuance of an injunction pursuant to section 105(a) of the Bankruptcy Code with respect to any and all Hospital Channeled Claims, and such injunction has been entered in connection with the Confirmation Order;

**WHEREAS,** the following capitalized terms used in this Trust Agreement and the Hospital TDP shall have the meanings ascribed to them as follows:

"**Ad Hoc Group of Hospitals**" means the Ad Hoc Group of Hospitals identified in the *Second Amended Verified Statement of the Ad Hoc Group of Hospitals Pursuant to Bankruptcy Rule 2019* [D.I. 1536].

"**CARES Act**" means the Coronavirus Aid, Relief, and Economic Security Act passed by Congress and signed into law on March 27, 2020.

"**Hospital Abatement Distribution**" has the meaning ascribed to it in the Hospital TDP.

"**Hospital Abatement Distribution Form**" has the meaning ascribed to it in the Hospital TDP.

"**Hospital Authorized Recipient**" has the meaning ascribed to it in the Hospital TDP.

"**Legier**" means Legier & Company, apac.

"**Legier Model and Algorithm**" means the data driven algorithm used to ascertain operational impact of the opioid crisis on the Holder of a Hospital Channeled Claim and calculate the value of timely and valid Claims, developed and owned by Legier.

"**OUD**" has the meaning ascribed to it in the Hospital TDP.

"**Requisite Claims Data**" has the meaning ascribed to it in the Hospital TDP.

**NOW, THEREFORE,** it is hereby agreed as follows:

<div align="center">

**SECTION I**

**<u>AGREEMENT OF TRUST</u>**

</div>

1.1    **Creation and Name**.  The Parties hereto hereby create a trust known as the "Hospital Trust," which is the Hospital Trust provided for and referred to in Section 5.7 of the Plan. The Trustee of the Hospital Trust may transact the business and affairs of the Hospital Trust in the name of the Hospital Trust, and references herein to the Hospital Trust shall include the Trustee acting on behalf of the Hospital Trust. It is the intention of the Parties that the Hospital Trust constitute a statutory trust under Chapter 38 of title 12 of the Delaware Code, 12 Del. C. § 3801 <u>et seq.</u> (the "**Act**") and that this Trust Agreement shall constitute the governing instrument of the Hospital Trust. The Trustee and the Delaware Trustee are hereby authorized and directed to execute and file a Certificate of Trust with the Delaware Secretary of State in the form attached hereto as Exhibit 1.

1.2    **Purpose**.

(a)    The purpose of the Hospital Trust is to expressly assume sole and exclusive responsibility and liability for the Hospital Channeled Claims channeled to the Hospital Trust in accordance with the Master TDP and the Plan, as well as to, among other things:

(i)    hold the MDT Hospital Claim and collect the Initial Hospital Trust Distribution and additional payments due under the MDT Hospital Claim

<div align="center">4</div>

in accordance with the Private Entity Settlements and the Hospital Trust Documents;

(ii)    administer, process, resolve and liquidate the Hospital Channeled Claims as provided in the Hospital Trust Documents by making Hospital Abatement Distributions to Hospital Authorized Recipients;

(iii)   hold, manage and invest all funds and other Assets received by the Hospital Trust from the Debtors and the Master Disbursement Trust, in each case, for the benefit of the beneficiaries of the Hospital Trust;

(iv)    qualify at all times as a Qualified Settlement Fund within the meaning of the QSF Regulations and be treated consistently for state and local tax purposes to the extent applicable; and

(v)     pay qualifying attorney's fees pursuant to Section 5.8 of the Plan;

(vi)    pay assessments to the extent required by Section 5.8(c) of the Plan to fund the Common Benefit Escrow and then, upon its establishment, the Common Benefit Fund in accordance with the Plan; and

(vii)   otherwise comply in all respects with the Hospital Trust Documents.

(b)    The Hospital Trust is to use the Hospital Trust's Assets and income to:

(i)     make Hospital Abatement Distributions to the Holders of Hospital Channeled Claims in accordance with this Trust Agreement and the Hospital TDP in such a way that such Holders of Hospital Channeled Claims are treated fairly, equitably and reasonably in light of the assets available to resolve such claims;

(ii)     hold and maintain reserves to pay the fees and expenses incurred with respect to administering the Hospital Trust (including the Hospital TDP) and managing the Hospital Trust Assets (together, the **"Hospital Trust Operating Expenses"**) of the Hospital Trust (such reserves, the **"Hospital Trust Operating Reserve"**), which shall be (a) funded with Cash and cash equivalents held by the Hospital Trust in accordance with the Hospital Trust Documents and (b) held by the Hospital Trust in a segregated account and administered by the Trustee;

(iii)    pay the Hospital Trust Operating Expenses from the Hospital Trust Operating Reserve;

(iv)    replenish periodically, until the dissolution of the Hospital Trust, the Hospital Trust Operating Reserve from Cash held or received by the Hospital Trust to the extent deemed necessary by the Trustee to satisfy and pay estimated future Hospital Trust Operating Expenses in accordance with the Hospital Trust Documents; and

(v)     pay all fees and expenses incurred with respect to, among other things, making Hospital Abatement Distributions to Hospital Authorized Recipients, including attorneys' fees and costs (together with the Hospital Trust Operating Expenses, the **"Trust Expenses"**), pursuant to Section 5.8 of the Plan, as applicable.

**1.3     Transfer of Assets**.  Pursuant to Sections 4.6(a) and 5.2(d)(i)(A) of the Plan, the Hospital Trust has received the Initial Hospital Trust Distribution and the MDT Hospital Claim (the

"**Hospital Trust Assets**") to fund the Hospital Trust.[4] In all events, the Hospital Trust Assets or any other assets to be transferred to the Hospital Trust under the Plan will be transferred to the Hospital Trust free and clear of all Claims, Liens or other recourse or encumbrances, and shall not be subject to attachment, disgorgement or recoupment by any Person. The Debtors, among others, shall be authorized pursuant to the Plan to execute and deliver such documents to the Hospital Trust as the Trustee may request to effectuate the transfer and assignment of any Hospital Trust Assets to the Hospital Trust.

**1.4**    **Acceptance of Assets and Assumption of Liabilities**.

(a)    In furtherance of the purposes of the Hospital Trust, the Hospital Trust hereby expressly accepts the transfer to the Hospital Trust of the Hospital Trust Assets or any other transfers contemplated by the Plan and the Master TDP in the time and manner as, and subject to the terms, contemplated in the Plan and the Master TDP.

(b)    In furtherance of the purposes of the Hospital Trust, the Hospital Trust expressly assumes all liabilities and responsibility for all Hospital Channeled Claims (except as set forth in the Plan) subject to the Hospital Trust Documents, and none of the Debtors, the Protected Parties or the Master Disbursement Trust shall have any further financial or other responsibility or liability therefor. Except as otherwise provided in this Trust Agreement, the Hospital TDP, the Plan or the Master TDP, the Hospital Trust shall have and retain any and all defenses, cross-claims, offsets and recoupments regarding the Hospital Channeled Claims, as well as any and all rights of indemnification, contribution, subrogation and similar rights that the Debtors, the Released Parties and the Shareholder Released Parties, as applicable, have or would have had under applicable law;

---

[4] In the event that any payment date is on a date that is not a Business Day, then the making of such payment may be completed on the next succeeding Business Day, but shall be deemed to have been completed as of the required date.

provided that no such claims, defenses or rights may be used to seek any affirmative monetary recovery from any party.

(c)    Notwithstanding anything to the contrary herein, no provision in this Trust Agreement or the Hospital TDP shall be construed or implemented in a manner that would cause the Hospital Trust to fail to qualify as a Qualified Settlement Fund within the meaning of the QSF Regulations.

(d)    In this Trust Agreement and the Hospital TDP, the words "must," "will," and "shall" are intended to have the same mandatory force and effect, while the word "may" is intended to be permissive rather than mandatory.

(e)    To the extent required by the Act, the beneficial owners (within the meaning of the Act) of the Hospital Trust (the **"Beneficial Owners"**) shall be deemed to be the Holders of Hospital Channeled Claims; provided that (i) the Holders of Hospital Channeled Claims, as such Beneficial Owners, shall have only such rights with respect to the Hospital Trust and its assets as are set forth in the Hospital TDP, and (ii) no greater or other rights, including upon dissolution, liquidation or winding up of the Hospital Trust, shall be deemed to apply to the Holders of Hospital Channeled Claims in their capacity as Beneficial Owners. The Beneficial Owners are enjoined from asserting against any Debtor or other Protected Party any Channeled Claim, and may not proceed in any manner against any Debtor or other Protected Party on account of any Channeled Claim in any forum whatsoever, including any state, federal or non-U.S. court or administrative or arbitral forum, and are required to pursue Hospital Channeled Claims exclusively against the Hospital Trust, solely as and to the extent provided in the Hospital TDP.

(f)    The Beneficial Owners shall be subject to the terms of this Trust Agreement, including without limitation, the terms of the Hospital TDP.

8

**1.5**    **Channeling Injunction.**  Nothing in this Trust Agreement shall be construed in any way to limit or expand the scope, enforceability or effectiveness of the Channeling Injunction issues in connection with the Plan or the Hospital Trust's assumption of all liability for Hospital Channeled Claims.

## SECTION II

## POWERS AND TRUST ADMINISTRATION

**2.1**    **Powers**.

(a)    The Trustee is, and shall act as, a fiduciary to the Hospital Trust in accordance with the provisions of this Trust Agreement, the Plan and the Confirmation Order. The Trustee shall, at all times, administer the Hospital Trust and the Hospital Trust Assets in accordance with the purposes set forth in Section 1.2 herein. Subject to the limitations set forth in this Trust Agreement, the Trustee shall have the power to take any and all actions that, in the judgment of the Trustee, are necessary or proper to fulfill the purposes of the Hospital Trust, including, without limitation, each power expressly granted in this Section 2.1, any power reasonably incidental thereto and not inconsistent with the requirements of Section 2.2 and any trust power now or hereafter permitted under the laws of the State of Delaware. The Trustee shall use commercially reasonable efforts to ensure that the costs of administering the Hospital Trust are reasonable in all respects, but the Trustee shall not be bound by any annual or cumulative "caps" on such expenditures.

(b)    Except as required by applicable law or otherwise specified herein or in the Plan or the Confirmation Order, the Trustee need not obtain the order or approval of any court in the exercise of any power or discretion conferred hereunder.

(c)    Without limiting the generality of Section (a) above, and except as limited herein or by the Plan, the Trustee shall have the power to:

(i)      receive and hold the Hospital Trust Assets and exercise all rights with respect thereto, including the right to vote, hold and sell any securities that are included in the Hospital Trust Assets or that may come into possession or ownership of the Trust;

(ii)      invest the monies held from time to time by the Hospital Trust, and/or contract with the Delaware Trustee or any other qualified institution, to hold and invest the Hospital Trust's funds;

(iii)      enter into leasing and financing agreements with third parties, to the extent such agreements are reasonably necessary, to permit the Hospital Trust to operate;

(iv)      pay liabilities and expenses of the Hospital Trust, including the indemnification obligations set forth in the Plan;

(v)      establish such funds, reserves and accounts within the Hospital Trust estate as required by the Plan or this Trust Agreement or as the Trustee deems useful in carrying out the purposes of the Hospital Trust, subject to the limitations set forth in Section 3.1(a) below;

(vi)      initiate, prosecute, defend and resolve all legal actions and other proceedings related to any Asset, liability or responsibility of the Hospital Trust; _provided_ that such legal actions and other proceedings shall be limited solely to those required for purposes of reconciling, administering or defending against the Hospital Channeled Claims channeled to the Hospital Trust and for enforcing the rights of the Hospital Trust under the Plan and the Plan Documents;

(vii)    initiate, prosecute, defend and resolve all such actions in the name of the Debtors or their Estates, in each case if deemed necessary by the Trustee to fulfill the purpose of the Hospital Trust;

(viii)    establish, supervise and administer the Hospital Trust in accordance with this Trust Agreement and the Hospital TDP and the terms thereof;

(ix)    appoint such officers, hire such employees and engage such legal, financial, accounting, investment, auditing, forecasting and other consultants, advisors and agents as the business of the Hospital Trust requires and delegate to such persons such powers and authorities as the fiduciary duties of the Trustee permit and as the Trustee, in its discretion, deems advisable or necessary in order to carry out the terms of the Hospital Trust, including without limitation Legier, the Delaware Trustee and any third-party claims or noticing agent deemed necessary or convenient by the Trustee;

(x)    pay reasonable compensation to those employees, legal, financial, accounting, investment, auditing, forecasting and other consultants, advisors and agents employed by the Trustee after the Effective Date (including those engaged by the Hospital Trust in connection with its alternative dispute resolution activities);

(xi)    as provided herein, (a) compensate the Trustee, the Delaware Trustee, Legier and the TAC, and the employees, legal, financial, accounting, investment, auditing, forecasting and other consultants, advisors and agents of each of them, and (b) reimburse the Trustee, the Delaware Trustee, Legier and the TAC for all reasonable out-of-pocket costs and expenses

11

incurred by such persons in connection with the performance of their duties hereunder;

(xii)    execute and deliver such instruments as the Trustee deems proper in administering the Hospital Trust;

(xiii)   enter into such other arrangements with third parties as the Trustee deems useful in carrying out the purposes of the Hospital Trust; provided that such arrangements do not conflict with any other provision of this Trust Agreement;

(xiv)    in accordance with Section 4.6 herein, defend, indemnify and hold harmless (and purchase insurance indemnifying) (a) the Trustee, (b) the Delaware Trustee, (c) the TAC, (d) Legier and (e) the officers, employees, consultants (including Legier), advisors and agents of each of the Hospital Trust and the TAC, (each of those in (e) herein, the **"Additional Indemnitees"**), to the maximum extent that a statutory trust organized under the laws of the State of Delaware is from time to time entitled to defend, indemnify, hold harmless and/or insure its directors, trustees, officers, employees, consultants, advisors, agents and representatives. No party shall be indemnified in any way for any liability, expense, claim, damage or loss for which he or she is liable under Section 4.6 herein;

(xv)     consult with the TAC at such times and with respect to such issues relating to the purpose, conduct and affairs of the Hospital Trust as the Trustee considers desirable;

12

(xvi) make, pursue (by litigation or otherwise), collect, compromise, settle or otherwise resolve in the name of the Hospital Trust, any claim, right, action or cause of action included in the Hospital Trust Assets or which may otherwise hereafter accrue in favor of the Hospital Trust, including, but not limited to, insurance recoveries, before any court of competent jurisdiction; and

(xvii) exercise any and all other rights, and take any and all other actions as are permitted, of the Trustee in accordance with the terms of this Trust Agreement and the Plan.

(d) The Trustee shall not have the power to guarantee any debt of other persons.

(e) The Trustee agrees to take the actions of the Hospital Trust required hereunder.

(f) The Trustee shall give the TAC prompt notice of any act performed or taken pursuant to Sections (c)(i) or (c)(vi) herein, and any act proposed to be performed or taken pursuant to Section 2.2(f) herein.

**2.2  General Administration.**

(a) The Trustee shall act in accordance with this Trust Agreement, the Plan, the Confirmation Order and the Hospital TDP. In the event of a conflict between the terms or provisions of (i) the Plan or the Confirmation Order, and (ii) this Trust Agreement or the Hospital TDP, the terms or provisions of the Plan or the Confirmation Order shall control. In the event of a conflict between the terms or provisions of this Trust Agreement and the Hospital TDP, the terms or provisions of the Hospital TDP shall control. For the avoidance of doubt, this Trust Agreement shall be construed and implemented in accordance with the Plan, regardless of whether any provision herein explicitly references the Plan.

13

(b)    The Trustee shall be the "administrator" of the Hospital Trust within the meaning of section 1.468B-2(k)(3) of the Treasury Regulations and shall (i) timely file such income tax and other returns and statements required to be filed and shall timely pay, out of the Hospital Trust Operating Reserve, all taxes required to be paid by the Hospital Trust, (ii) comply with all applicable reporting and withholding obligations, (iii) satisfy all requirements necessary to qualify and maintain qualification of the Hospital Trust as a Qualified Settlement Fund within the meaning of the QSF Regulations and (iv) take no action that could cause the Hospital Trust to fail to qualify as a Qualified Settlement Fund within the meaning of the QSF Regulations. Even if permitted by the QSF Regulations, no election shall be filed by or on behalf of the Hospital Trust for the Hospital Trust to be treated as a grantor trust for federal income tax purposes.

(c)    The Trustee shall be responsible for all of the Hospital Trust's tax matters, including, without limitation, tax audits, claims, defenses and proceedings. The Trustee may request an expedited determination under section 505(b) of the Bankruptcy Code for all tax returns filed by or on behalf of the Hospital Trust for all taxable periods through the dissolution of the Hospital Trust. The Trustee shall also file (or cause to be filed) any other statement, return or disclosure relating to the Hospital Trust that is required by any governmental unit and be responsible for payment, out of the Hospital Trust Assets, of any taxes imposed on the Hospital Trust or its assets.

(d)    The Trustee may withhold and pay to the appropriate tax authority all amounts required to be withheld pursuant to the Internal Revenue Code or any provision of any foreign, state or local tax law with respect to any payment or Hospital Abatement Distribution to the Holders of Hospital Channeled Claims. All such amounts withheld and paid to the appropriate tax authority shall be treated as amounts distributed to such Holders of Hospital Channeled Claims for all purposes of this Trust Agreement. The Trustee shall be authorized to collect such tax information

14

from the Holders of Hospital Channeled Claims (including tax identification numbers) as in its sole discretion the Trustee deems necessary to effectuate the Plan, the Confirmation Order and this Trust Agreement. In order to receive Hospital Abatement Distributions, all Holders of Hospital Channeled Claims shall be required to provide tax information to the Trustee to the extent the Trustee deems appropriate in the manner and in accordance with the procedures from time to time established by the Trustee for these purposes. The Trustee may refuse to make a Hospital Abatement Distribution to a Holder of Hospital Channeled Claim that fails to furnish such information in a timely fashion, and until such information is delivered may treat such holder's Hospital Channeled Claims as disputed; provided, however, that, upon the delivery of such information by a Holder of Hospital Channeled Claim, the Trustee shall make such Hospital Abatement Distribution to which such holder is entitled, without additional interest occasioned by such holder's delay in providing tax information. Notwithstanding the foregoing, if a Holder of Hospital Channeled Claim fails to furnish any tax information reasonably requested by the Trustee before the date that is three hundred sixty-five (365) calendar days after the request is made, the amount of such Hospital Abatement Distribution shall irrevocably revert to the Hospital Trust, and any Hospital Channeled Claim with respect to such Hospital Abatement Distribution shall be discharged and forever barred from assertion against the Hospital Trust or its property.

(e)    Pursuant to Section 5.7(g) of the Plan, the Hospital Trust shall (i) monitor the use of funds received by Hospital Authorized Recipients of Hospital Abatement Distributions in accordance with the Hospital Authorized Abatement Purposes, and (ii) prepare and deliver to the Master Disbursement Trust for publication annual reports (each, an "**Annual Report**") on the disbursement and use of Hospital Abatement Distributions from the Hospital Trust and the

15

compliance by Hospital Authorized Recipients with the Hospital Authorized Abatement Purposes set forth in the applicable Hospital Trust Documents.

(f)     The Trustee shall cause to be prepared as soon as practicable prior to the commencement of each fiscal year a budget and cash flow projections covering such fiscal year. The Trustee shall provide a copy of the budget and cash flow projections to the TAC.

(g)     The Trustee shall consult with the TAC on (i) the general implementation and administration of the Hospital Trust; (ii) the general implementation and administration of the Hospital TDP; and (iii) such other matters as may be required under this Trust Agreement or the Hospital TDP.

(h)     The Trustee shall be required to obtain the consent of the TAC pursuant to the consent process set forth in Section  6.1(b) herein, in addition to any other instances elsewhere enumerated, in order:

(i)      to determine, establish or change any aspect of the Hospital TDP;

(ii)      to establish and/or to change the Hospital Abatement Distribution Form to be provided to Holders of Hospital Channeled Claims under the Hospital TDP;

(iii)      to terminate the Hospital Trust pursuant to Section  6.3 herein;

(iv)      to change the compensation of the members of the TAC, the Delaware Trustee or the Trustee, other than to reflect cost-of-living increases or to reflect changes approved by the Bankruptcy Court as otherwise provided herein;

(v)      to take actions to minimize any tax on the Hospital Trust Assets; provided that no such action may be taken if it prevents the Hospital Trust from

16

qualifying as a Qualified Settlement Fund within the meaning of the QSF Regulations; and provided further that even if permitted by the Treasury Regulations governing Qualified Settlement Funds, no election shall be filed by or on behalf of the Hospital Trust for the Hospital Trust to be treated as a grantor trust for federal income tax purposes;

(vi)    to amend any provision of this Trust Agreement or the Hospital TDP in accordance with the terms thereof; provided that no such amendment shall be in contravention of the Plan, including, but not limited to, causing the Hospital Trust to fail to qualify as a Qualified Settlement Fund within the meaning of the QSF Regulations;

(vii)    to acquire an interest in, or to merge any claims resolution organization formed by the Hospital Trust with, another claims resolution organization that is not specifically created by the Plan, this Trust Agreement or the Hospital TDP, or to contract with another claims resolution organization or other entity that is not specifically identified by the Plan, this Trust Agreement or the Hospital TDP, or permit any other party to join in any claims resolution organization that is formed by the Hospital Trust pursuant to this Trust Agreement or the Hospital TDP; provided that such acquisition, merger, contract or joinder shall not (a) subject NewCo, TopCo, PPLP, the Liquidating Debtors, the Transferred PPLP Subsidiaries, the other Debtors, any successors in interest thereto, or the Protected Parties to any risk of having any Hospital Channeled Claim asserted against it or them, (b) otherwise jeopardize the validity or enforceability of any injunction or

17

release issued or granted in connection with the Plan and/or the Confirmation Order, (c) permit the surviving organization to make decisions about the allowability and value of claims that are not in accordance with the Hospital TDP or (d) cause the Hospital Trust to fail to qualify as a Qualified Settlement Fund within the meaning of the QSF Regulations; provided further that the terms of such merger will require the surviving organization to make decisions about the evaluation of Hospital Channeled Claims in accordance with the Hospital TDP;

(viii)    sell, transfer or exchange any or all of the Hospital Trust Assets at such prices and upon such terms as the Trustee may consider proper, consistent with the other terms of this Trust Agreement; or

(ix)    delegate any or all of the authority herein conferred with respect to the investment of all or any portion of the Hospital Trust Assets to any one or more reputable individuals or recognized institutional investment advisors or investment managers without liability for any action taken or omission made because of any such delegation, except as provided in Section 4.4 herein.

(i)    The Trustee shall meet with the TAC no less often than quarterly. The Trustee shall meet in the interim with the TAC when so requested by either. Meetings may be held in person, by telephone conference call or by a combination of the two.

(j)    The Trustee, upon notice from the TAC, if practicable in view of pending business, shall at its next meeting with the TAC consider issues submitted by the TAC for consideration by

the Hospital Trust. The Trustee shall keep the TAC reasonably informed regarding all aspects of the administration of the Hospital Trust.

**2.3**    **Claims Administration.**  The Trustee shall promptly proceed to implement the Hospital TDP.

## SECTION III

## ACCOUNTS, INVESTMENTS AND PAYMENTS

**3.1**    **Accounts**.

(a)    The Trustee may, from time to time, create such accounts and reserves within the Hospital Trust estate as he or she deems necessary, prudent or useful in order to provide for the payment of expenses and making Hospital Abatement Distributions to Hospital Authorized Recipients and may, with respect to any such account or reserve, restrict the use of monies therein, and the earnings or accretions thereto (the **"Trust Subaccounts"**). Any such Trust Subaccounts established by the Trustee shall be held as Trust Assets and are not intended to be subject to separate entity tax treatment as a "disputed claims reserve" within the meaning of the Internal Revenue Code and the Treasury Regulations promulgated thereunder, a "disputed ownership fund" within the meaning of the Treasury Regulations promulgated under the Internal Revenue Code, or otherwise.

(b)    The Trustee shall include a reasonably detailed description of the creation of any account or reserve in accordance with this Section  3.1 and, with respect to any such account, the transfers made to such account, the proceeds of or earnings on the assets held in each such account and the payments from each such account in the reports to be provided to the Master Disbursement Trust pursuant to Section  2.2 above.

**3.2     Investments.**  Though not anticipated, any investment of monies held in the Hospital Trust shall be administered by the Delaware Trustee in a manner consistent with the standards set forth in the Uniform Prudent Investor Act.

**3.3     Source of Payments.**

(a)     All Hospital Trust expenses, payments, distributions and all liabilities with respect to Hospital Channeled Claims shall be payable and made solely by the Hospital Trustee out of the Hospital Trust Assets. Neither the Trustee, the Delaware Trustee, the TAC, nor any of their officers, employees, consultants, advisors and agents, nor the Debtors, nor any other Protected Party, shall be liable for the payment of any Hospital Trust Expense or any other liability of the Hospital Trust, except to the extent explicitly provided for in (i) the Plan or (ii) solely with respect to the Trustee, the Delaware Trustee, the TAC and any of their officers, employees, consultants, advisors and agents, the Plan Documents.

(b)     The Trustee shall include in the Annual Report a reasonably detailed description of any payments made in accordance with this Section  3.3.

(c)     The Trustee, with the consent of the TAC, shall establish and implement billing guidelines applicable to the Trustee and the TAC, as well as their respective professionals who seek compensation from the Hospital Trust.

## SECTION IV

## TRUSTEE; DELAWARE TRUSTEE

**4.1     Number.**  In addition to the Delaware Trustee appointed pursuant to Section  4.11, there shall be one (1) Trustee, the Honorable Thomas L. Hogan (ret.).

**4.2     Term of Service.**

(a)     The Trustee shall serve an initial term of service of five (5) years. Thereafter each term of service shall be one (1) year. The Trustee shall serve from the Effective Date until the

earliest of (i) the end of his or her term, (ii) his or her death, (iii) his or her resignation pursuant to

Section (b) herein, (iv) his or her removal pursuant to Section (c) herein or (v) the termination of

the Hospital Trust pursuant to Section 6.3 herein.

(b)    The Trustee may resign at any time by written notice to the TAC and the trustees of

the Master Disbursement Trust. Such notice shall specify a date on which such resignation shall

take effect, which shall not be less than ninety (90) days after the date such notice is given, where

practicable.

(c)    The Trustee may be removed by the Bankruptcy Court on the motion of the TAC, in

the event that the Trustee becomes unable to discharge his or her duties hereunder due to accident,

physical deterioration, mental incompetence or for other good cause. Good cause shall be deemed

to include, without limitation, any substantial failure to comply with the general administration

provisions of Section 2.2 herein, a consistent pattern of neglect and failure to perform or

participate in performing the duties of a Trustee hereunder or repeated nonattendance at scheduled

meetings. Such removal shall take effect at such time as the Bankruptcy Court shall determine.

**4.3    Appointment of Successor Trustee**.

(a)    In the event of a vacancy in the Trustee position, whether by term expiration, death,

retirement, resignation, removal or because the Trustee is otherwise unable to perform his or her

functions as Trustee, the vacancy shall be filled by the unanimous vote of the TAC. In the event

that the TAC cannot appoint a successor Trustee, for any reason, the Bankruptcy Court shall select

the successor Trustee.

(b)    Immediately upon the appointment of any successor Trustee, all rights, titles, duties,

powers and authority of the predecessor Trustee hereunder shall be vested in, and undertaken by,

the Successor Trustee without any further act. No successor Trustee shall be liable personally for

any act or omission of his or her predecessor Trustee. No successor Trustee shall have any duty to investigate the acts or omissions of his or her predecessor Trustee.

(c)    Each successor Trustee shall serve until the earliest of (i) the expiration of his or her term, (ii) his or her death, (iii) his or her resignation pursuant to Section 4.2(b) herein, (iv) his or her removal pursuant to Section 4.2(c) herein or (v) the termination of the Hospital Trust pursuant to Section 6.3 herein.

(d)    Nothing in this Trust Agreement shall prevent the reappointment of an individual serving as Trustee for one or more additional terms.

**4.4    Liability of Trustee and Others.** [To the maximum extent permitted by applicable law, the Trustee, the members of the TAC, Legier and each of their officers, employees, consultants, advisors and agents shall not have or incur any liability for actions taken or omitted in their respective official capacities, or on behalf of the Hospital Trust, except those acts found by Final Order to be arising out of their willful misconduct, bad faith, gross negligence or fraud, and shall be entitled to indemnification and reimbursement for reasonable fees and expenses in defending any and all of their actions or inactions in their respective official capacities, or on behalf of the Hospital Trust, except for any actions or inactions found by Final Order to be arising out of their willful misconduct, bad faith, gross negligence or fraud.  Any valid indemnification claim of the Trustee, the members of the TAC, Legier and each of their officers, consultants, advisors and agents shall be satisfied from the Hospital Trust.][5]

**4.5    Compensation and Expenses of Trustee**.

(a)    The Trustee shall receive a retainer from the Hospital Trust for his or her service as a Trustee in the amount of $25,000 per annum, paid annually. The initial retainer shall be paid to

---

[5] Subject to ongoing discussion.

the Trustee immediately after the Trust receives the Initial Hospital Trust Distribution, and then every year following on the anniversary of such initial payment. Hourly time, as described herein, shall first be billed and applied to the annual retainer. Hourly time in excess of the annual retainer shall be paid by the Hospital Trust. For all time expended as a Trustee, including attending meetings, preparing for such meetings and working on authorized special projects, the Trustee shall receive the sum of $525 per hour. For all non-working travel time in connection with Hospital Trust business, the Trustee shall receive the sum of $275 per hour. All time shall be computed on a decimal (1/10th) hour basis. The Trustee shall record all hourly time to be charged to the Hospital Trust on a daily basis. The hourly compensation payable to the Trustee hereunder shall be reviewed every year and, after consultation with the members of the TAC, appropriately adjusted for changes in the cost of living.

(b)    The Hospital Trust will promptly reimburse the Trustee for all reasonable out-of-pocket costs and expenses incurred by the Trustee in connection with the performance of their duties hereunder, which costs and expenses shall be paid as Trust Expenses.

(c)    The Hospital Trust shall include in the Annual Report a description of the amounts paid under this Section  4.5.

**4.6    Indemnification of Trustee and Others**.

(a)    [To the maximum extent permitted by applicable law, the Hospital Trust shall indemnify and reimburse the Trustee, members of the TAC, Legier, the Delaware Trustee and the Additional Indemnitees for reasonable fees and expenses (other than taxes in the nature of income taxes imposed on compensation paid to such persons) in defending any and all of their actions or inactions in their respective official capacities, or on behalf of the Hospital Trust, except for any actions or inactions found by Final Order to be arising out of their willful misconduct, bad faith,

gross negligence or fraud.  Any valid indemnification claim of the Trustee, the members of the

TAC, Legier, the Delaware Trustee and each of their officers, consultants, advisors and agents

shall be satisfied from the Hospital Trust.

(b)    Reasonable expenses, costs and fees (including attorneys' fees and costs) incurred by

or on behalf of the Trustee, members of the TAC, the Delaware Trustee or an Additional Indemnitee

in connection with any action, suit or proceeding, whether civil, administrative or arbitrative, from

which they are indemnified by the Hospital Trust pursuant to Section (a) herein, shall be paid by

the Hospital Trust in advance of the final disposition thereof upon receipt of an undertaking, by or

on behalf of the Trustee, the member of the TAC, the Delaware Trustee or the Additional

Indemnitee (as applicable), to repay such amount in the event that it shall be determined ultimately

by Final Order that the Trustee, the member of the TAC, the Delaware Trustee or the Additional

Indemnitee (as applicable) is not entitled to be indemnified by the Hospital Trust.

(c)    The Hospital Trust must purchase and maintain reasonable amounts and types of

insurance on behalf of each individual who is or was a Trustee, a member of the TAC, the Delaware

Trustee or an Additional Indemnitee, including against liability asserted against or incurred by

such individual in that capacity or arising from his or her status as a Trustee, TAC member,

Delaware Trustee or Additional Indemnitee.][6]

**4.7**    **Lien.**  The Trustee, members of the TAC and the Additional Indemnitees shall have a first

priority lien upon the Hospital Trust Assets to secure the payment of any amounts payable to them

pursuant to Section  4.6 herein or any undisputed compensation.

**4.8**    **Trustee's Employment of Experts.**  The Trustee shall retain and/or consult counsel,

accountants, appraisers, auditors, forecasters, experts, financial and investment advisors and such

---

[6] Subject to ongoing discussion.

other parties deemed by the Trustee to be qualified as experts on the matters submitted to them, including without limitation Legier and the Delaware Trustee (the **"Trust Professionals"**), regardless of whether any such party is affiliated with the Hospital Trust or the Trustee in any manner (except as otherwise expressly provided in this Trust Agreement), the cost of which shall be paid as a Trust Expense. In the absence of a bad faith violation of the implied contractual covenant of good faith and fair dealing within the meaning of 12 Del. C. § 3806(e), the written opinion of or information provided by any such party deemed by the Trustee to be an expert on the particular matter submitted to such party shall be full and complete authorization and protection in respect of any action taken or not taken by the Trustee hereunder in good faith and in accordance with the written opinion of or information provided by any such party.

**4.9    Trustee Independence.**    The Trustee shall not, during the term of its service, hold a financial interest in, act as attorney or agent for or serve as an officer or as any other professional for the Debtors. The Trustee shall not act as an attorney, agent or other professional for any Holder of a Hospital Channeled Claim. For the avoidance of doubt, this Section shall not be applicable to the Delaware Trustee.

**4.10    No Bond.**    Neither the Trustee nor the Delaware Trustee shall be required to post any bond or other form of surety or security unless otherwise ordered by the Bankruptcy Court.

**4.11    Delaware Trustee.**

(a)    There shall at all times be a Delaware Trustee to serve in accordance with the requirements of the Act. The Delaware Trustee shall either be (i) a natural person who is at least 21 years of age and a resident of the State of Delaware or (ii) a legal entity that has its principal place of business in the State of Delaware in accordance with section 3807 of the Act, otherwise meets the requirements of applicable Delaware law and shall act through one or more persons

25

authorized to bind such entity. The initial Delaware Trustee shall be Wilmington Trust Company. If at any time the Delaware Trustee shall cease to be eligible in accordance with the provisions of this Section 4.11, it shall resign immediately in the manner and with the effect hereinafter specified in Section (c) herein. For the avoidance of doubt, the Delaware Trustee will only have such rights and obligations as expressly provided by reference to the Delaware Trustee hereunder.

(b)    The Delaware Trustee shall not be entitled to exercise any powers, nor shall the Delaware Trustee have any of the duties and responsibilities, of the Trustee set forth herein. The Delaware Trustee shall be one of the trustees of the Hospital Trust for the sole and limited purpose of fulfilling the requirements of section 3807 of the Act and for taking such actions as are required to be taken by a Delaware Trustee under the Act. The duties (including fiduciary duties), liabilities and obligations of the Delaware Trustee shall be limited to (i) accepting legal process served on the Hospital Trust in the State of Delaware, and (ii) the execution of any certificates required to be filed with the Secretary of State of the State of Delaware that the Delaware Trustee is required to execute under section 3811 of the Act (acting solely at the written direction of the Trustee) and there shall be no other duties (including fiduciary duties) or obligations, express or implied, at law or in equity, of the Delaware Trustee. To the extent that, at law or in equity, the Delaware Trustee has duties (including fiduciary duties) and liabilities relating thereto to the Hospital Trust, the other Parties hereto or any beneficiary of the Hospital Trust, it is hereby understood and agreed by the other Parties hereto that such duties and liabilities are replaced by the duties and liabilities of the Delaware Trustee expressly set forth in this Trust Agreement.

(c)    The Delaware Trustee shall serve until such time as the Trustee removes the Delaware Trustee or the Delaware Trustee resigns, and a successor Delaware Trustee is appointed by the Trustee in accordance with the terms of Section (d) herein. The Delaware Trustee may

resign at any time upon the giving of at least sixty (60) days' advance written notice to the Trustee; provided that such resignation shall not become effective unless and until a successor Delaware Trustee shall have been appointed by the Trustee in accordance with Section (d) herein. If the Trustee does not act within such 60-day period, the Delaware Trustee may apply to the Court of Chancery of the State of Delaware for the appointment of a successor Delaware Trustee.

(d)      Upon the resignation or removal of the Delaware Trustee, the Trustee shall appoint a successor Delaware Trustee by delivering a written instrument to the outgoing Delaware Trustee. Any successor Delaware Trustee must satisfy the requirements of section 3807 of the Act. Any resignation or removal of the Delaware Trustee and appointment of a successor Delaware Trustee shall not become effective until a written acceptance of appointment is delivered by the successor Delaware Trustee to the outgoing Delaware Trustee and the Trustee and any undisputed fees and expenses due to the outgoing Delaware Trustee is paid. Following compliance with the preceding sentence, the successor Delaware Trustee shall become fully vested with all of the rights, powers, duties and obligations of the outgoing Delaware Trustee under this Trust Agreement, with like effect as if originally named as Delaware Trustee, and the outgoing Delaware Trustee shall be discharged of its duties and obligations under this Trust Agreement.

(e)      The Delaware Trustee shall neither be required nor permitted to attend meetings relating to the Hospital Trust.

(f)      The Delaware Trustee shall be paid such compensation as agreed to pursuant to a separate fee agreement.

(g)      The Hospital Trust will promptly reimburse the Delaware Trustee for all reasonable out-of-pocket costs and expenses incurred by the Delaware Trustee in connection with the performance of its duties hereunder.

(h)    The Delaware Trustee shall be permitted to retain counsel only in such circumstances as required in the exercise of its obligations hereunder, and compliance with the advice of such counsel shall be full and complete authorization and protection for actions taken or not taken by the Delaware Trustee in good faith in compliance with such advice.

## SECTION V

## TRUST ADVISORY COMMITTEE

5.1    **Members**.  The initial TAC shall consist of one (1) member. The sole member of the TAC shall be Jeffrey James, CPA. The TAC shall consist of not less than one (1) member, and shall never consist of more than three (3) individuals.

5.2    **Duties.**  A member of the TAC shall serve in a fiduciary capacity, representing the interests of all Holders of Hospital Channeled Claims. The TAC shall have no fiduciary obligations or duties to any party other than the Holders of Hospital Channeled Claims. The Trustee must consult with the TAC on matters identified in Section 2.2(f) herein and in other provisions herein and must obtain the consent of the TAC on matters identified in Section 2.2(g) herein. Where provided in the Hospital TDP, certain other actions by the Trustee may also be subject to the consent of the TAC. Except for the duties and obligations expressed in this Trust Agreement and the documents referenced herein (including the Hospital TDP), there shall be no other duties (including fiduciary duties) or obligations, express or implied, at law or in equity, of the TAC. To the extent that, at law or in equity, the TAC has duties (including fiduciary duties) and liabilities relating thereto to the Hospital Trust, the other Parties hereto or any beneficiary of the Hospital Trust, it is hereby understood and agreed by the other Parties hereto that such duties and liabilities are replaced by the

28

duties and liabilities of the TAC expressly set forth in this Trust Agreement and the documents referenced herein (including the Hospital TDP, the Plan and the Confirmation Order).

**5.3     Term of Office.**

(a)     The initial member of the TAC appointed in accordance with Section 5.1 herein shall serve a five-year term. Any other persons appointed to the TAC shall serve an initial term of three (3) years. Thereafter, each term of office for each member shall be one (1) year. Each member of the TAC shall serve until the earlier of (i) his or her death, (ii) his or her resignation pursuant to Section (b) herein, (iii) his or her removal pursuant to Section (c) herein, (iv) the end of his or her term as provided herein or (v) the termination of the Hospital Trust pursuant to Section 6.3 herein.

(b)     A member of the TAC may resign at any time by written notice to the other members of the TAC, if any, and to the Trustee. Such notice shall specify a date when such resignation shall take effect, which shall not be less than ninety (90) days after the date such notice is given, where practicable.

(c)     A member of the TAC may be removed in the event that he or she becomes unable to discharge his or her duties hereunder due to accident, physical deterioration, mental incompetence or a consistent pattern of neglect and failure to perform or to participate in performing the duties of such member hereunder, such as repeated nonattendance at scheduled meetings, or for other good cause. Such removal may be made by the Bankruptcy Court on the motion of the remaining members of the TAC, or the Hospital Trustee.

**5.4     Appointment of Successors**.

(a)     If, prior to the termination of service of a member of the TAC other than as a result of removal, he or she has designated in writing an individual to succeed him or her as a member of the TAC, such individual shall be his or her successor. If such member of the TAC did not

designate an individual to succeed him or her prior to the termination of his or her service as contemplated above, such member's employer or firm may designate his or her successor. If (i) a member of the TAC did not designate an individual to succeed him or her prior to the termination of his or her service and such member's employer or firm does not designate his or her successor as contemplated herein or (ii) he or she is removed pursuant to Section 5.3(c) herein, his or her successor shall be appointed by the Trustee with the agreement of any TAC members at the time of appointment, or, if such members cannot agree on a successor, the Trustee with approval of the Bankruptcy Court. Nothing in this Trust Agreement shall prevent the reappointment of an individual serving as a member of the TAC for an additional term, and there shall be no limit on the number of terms that a TAC member may serve.

(b)    Each successor TAC member shall serve until the earlier of (i) the end of the full term for which he or she was appointed, (ii) the end of the term of the member of the TAC whom he or she replaced if his or her predecessor member did not complete such term, (iii) his or her death, (iv) his or her resignation pursuant to Section 5.3(b) herein, (v) his or her removal pursuant to Section 5.3(c) herein or (vi) the termination of the Hospital Trust pursuant to Section 6.3 herein. No successor TAC member shall be liable personally for any act or omission of his or her predecessor TAC member. No successor TAC member shall have any duty to investigate the acts or omissions of his or her predecessor TAC member. No TAC member shall be required to post any bond or other form of surety or security unless otherwise ordered by the Bankruptcy Court.

**5.5    TAC's Employment of Professionals**.

(a)    The TAC may, but is not required to, retain and/or consult counsel, accountants, appraisers, auditors, forecasters, experts, financial and investment advisors and such other parties deemed by the TAC to be qualified as experts on the matters submitted to them

(the "**TAC Professionals**"). The TAC and the TAC Professionals shall at all times have complete access to the Hospital Trust's officers, employees and agents, as well as to the Trust Professionals, and shall also have complete access to all non-privileged information generated by them or otherwise available to the Hospital Trust or the Trustee. In the absence of a bad faith violation of the implied contractual covenant of good faith and fair dealing within the meaning of 12 Del. C. § 3806(e), the written opinion of or information provided by any TAC Professional or Trust Professional deemed by the TAC to be an expert on the particular matter submitted to such party shall be full and complete authorization and protection in respect of any action taken or not taken by the TAC in good faith and in accordance with the written opinion of or information provided by the TAC Professional or Trust Professional.

(b)    The Hospital Trust shall promptly reimburse, or pay directly if so instructed, the TAC for all reasonable fees and costs associated with the TAC's employment of legal counsel and forecasters (including estimation consultants and experts) pursuant to this provision in connection with the TAC's performance of its duties hereunder. The Hospital Trust shall also promptly reimburse, or pay directly if so instructed, the TAC for all reasonable fees and costs associated with the TAC's employment of any other TAC Professional pursuant to this provision in connection with the TAC's performance of its duties hereunder; provided, however, that (i) the TAC has first submitted to the Hospital Trust a written request for such reimbursement setting forth (a) the reasons why the TAC desires to employ such TAC Professional, and (b) the basis upon which the TAC seeks advice independent of the Trust Professionals to meet the need of the TAC for such expertise or advice, and (ii) the Hospital Trust has approved the TAC's request for reimbursement in writing, which approval must not be unreasonably withheld, delayed or denied. If the Hospital Trust agrees to pay for the TAC Professional, such reimbursement shall be treated

as a Hospital Trust expense. If the Hospital Trust declines to pay for the TAC Professional, it must set forth its reasons in writing. If the TAC still desires to employ the TAC Professional at the Hospital Trust's expense, the TAC and/or the Trustee shall resolve their dispute pursuant to Section  6.13 herein.

(c)     In the event that the TAC retains counsel in connection with any matter whether or not related to any claim that has been or might be asserted against the TAC and irrespective of whether the Hospital Trust pays such counsel's fees and related expenses, any communications between the TAC and such counsel shall be deemed to be within the attorney-client privilege and protected by section 3333 of Title 12 of the Delaware Code, regardless of whether such communications are related to any claim that has been or might be asserted by or against the TAC and regardless of whether the Hospital Trust pays such counsel's fees and related expenses.

5.6     **Compensation and Expenses of the TAC.**  The member(s) of the TAC shall receive compensation from the Hospital Trust for services on the TAC at the same hourly rate as the Trustee (but with no annual retainer), set forth in Section  4.5 herein. Additionally, the Hospital Trust will promptly reimburse the member(s) of the TAC for all reasonable out-of-pocket costs and expenses incurred in connection with the performance of their duties hereunder. Such reimbursement or direct payment shall be deemed a Hospital Trust expense. The Hospital Trust

shall include a description of the amounts paid under this Section 5.6 in the Annual Report to be

provided to the Master Disbursement Trust pursuant to Section 2.2.

## SECTION VI

## <u>GENERAL PROVISIONS</u>

**6.1**    **Procedures for Consulting with or Obtaining Consent of the TAC**.

    (a)    Consultation Process.

        (i)    In the event the Trustee is required to consult with the TAC pursuant to

Section 2.2(f) herein regarding the Hospital TDP, the Plan or otherwise, the

Trustee shall provide the TAC with written advance notice of the matter

under consideration, and with all relevant information concerning the matter

as is reasonably practicable under the circumstances. The Trustee shall also

provide the TAC with such reasonable access to the Trust Professionals and

other experts retained by the Hospital Trust and its staff (if any) as the TAC

may reasonably request during the time that the Trustee is considering such

matter, and shall also provide the TAC the opportunity, at reasonable times

and for reasonable periods of time, to discuss and comment on such matter

with the Trustee.

        (ii)    In determining when to take definitive action on any matter subject to the

consultation process set forth in this Section 6.1(a), the Trustee shall take

into consideration the time required for the TAC, if they so wish, to engage

and consult with their own independent financial or investment advisors as

to such matter. In any event, the Trustee shall not take definitive action on

any such matter until at least thirty (30) days after providing the TAC with

the initial written notice that such matter is under consideration by the

Trustee, unless such time period is waived by the TAC.

(b)   Consent Process.

   (i)   In the event the Trustee is required to obtain the consent of the TAC

pursuant to Section  2.2(g) herein, the Hospital TDP, the Plan, or otherwise,

the Trustee shall provide the TAC with a written notice stating that its

consent is being sought pursuant to that provision, describing in detail the

nature and scope of the action the Trustee proposes to take, and explaining

in detail the reasons why the Trustee desires to take such action. The Trustee

shall provide the TAC as much relevant additional information concerning

the proposed action as is reasonably practicable under the circumstances.

The Trustee shall also provide the TAC with such reasonable access to the

Trust Professionals and other experts retained by the Hospital Trust and its

staff (if any) as the TAC may reasonably request during the time that the

Trustee is considering such action, and shall also provide the TAC the

opportunity, at reasonable times and for reasonable periods of time, to

discuss and comment on such action with the Trustee.

   (ii)   The TAC must consider in good faith and in a timely fashion any request for

their consent by the Trustee and must in any event advise the Trustee in

writing of its consent or objection to the proposed action within thirty (30)

days of receiving the original request for consent from the Trustee, or within

such additional time as the Trustee and TAC may agree. The TAC may not

withhold its consent unreasonably. If the TAC decides to withhold its

consent, it must explain in detail its objections to the proposed action. If the TAC does not advise the Trustee in writing of its consent or objections to the proposed action within thirty (30) days of receiving notice regarding such request (or any additional time period agreed to by the Trustee), then consent of the TAC to the proposed action shall be deemed to have been affirmatively granted.

(iii)    If, after following the procedures specified in this Section 6.1(b), the TAC continues to object to the proposed action and to withhold its consent to the proposed action, the Trustee and the TAC shall resolve their dispute pursuant to Section 6.13. The TAC shall bear the burden of proving that it reasonably withheld its consent. If the TAC meets that burden, the Hospital Trust shall then bear the burden of showing why it should be permitted to take the proposed action notwithstanding the TAC or Trustee's reasonable objection.

**6.2    Irrevocability.**    To the fullest extent permitted by applicable law, the Hospital Trust is irrevocable.

**6.3    Term; Termination**.

(a)    The term for which the Hospital Trust is to exist shall commence on the date of the filing of the Certificate of Trust and shall terminate pursuant to the provisions of Section 6.3(b) - (d) herein.

(b)    The Hospital Trust shall automatically dissolve on the date (the "**Dissolution Date**") ninety (90) days after the first to occur of the date on which the Trustee decides, with the consent of the TAC, to dissolve the Hospital Trust upon completion of its duties and the satisfaction of the

purposes of the Hospital Trust, wherein (i) the Trustee deems it unlikely that new Authorized Hospital Channeled Claims will be filed against the Hospital Trust, (ii) all Hospital Channeled Claims duly filed with the Hospital Trust have been liquidated and paid or otherwise resolved to the extent provided in this Trust Agreement and the Hospital TDP and (iii) twelve (12) consecutive months have elapsed from the last payment to the Hospital Trust from the Master Disbursement Trust.

(c)    On the Dissolution Date (or as soon thereafter as is reasonably practicable), after the wind-up of the Hospital Trust's affairs by the Trustee and payment of all the Hospital Trust's liabilities have been provided for as required by applicable law including section 3808 of the Act, all monies remaining in the Hospital Trust shall be given to charitable organization(s) exempt from federal income tax under section 501(c)(3) of the Internal Revenue Code, which tax-exempt organization(s) shall be selected by the Trustee using its reasonable discretion; provided, however, that (i) if practicable, the activities of the selected tax-exempt organization(s) shall be related to the treatment of, research on the cure of or other relief for individuals suffering from OUD, and (ii) the tax-exempt organization(s) shall not bear any relationship to the Debtors within the meaning of section 468B(d)(3) of the Internal Revenue Code. Notwithstanding any contrary provision of the Plan and related documents, this Section  6.3(c) cannot be modified or amended.

(d)    Following the dissolution and distribution of the assets of the Hospital Trust, the Hospital Trust shall terminate and the Trustee and the Delaware Trustee (acting solely at the written direction of the Trustee) shall execute and cause a Certificate of Cancellation of the Certificate of Trust of the Hospital Trust to be filed in accordance with the Act. Notwithstanding anything to the contrary contained in this Trust Agreement, the existence of the Hospital Trust as a separate legal entity shall continue until the filing of such Certificate of Cancellation.

**6.4**    **Amendments.** The Trustee, after consultation with the TAC, and subject to the unanimous consent of the TAC, may modify or amend this Trust Agreement (except with respect to Section 6.3(c), which by its own terms is expressly not subject to modification or amendment). The Trustee, after consultation with the TAC, and subject to the consent of the TAC, may modify or amend the Hospital TDP; provided, however, that no amendment to the Hospital TDP shall (i) be inconsistent with the Plan or this Trust Agreement, (ii) have a material and adverse effect on Hospital Authorized Recipients' entitlements to Hospital Abatement Distributions or (iii) be inconsistent with the provisions limiting amendments to that document provided therein. Any modification or amendment made pursuant to this Section must be done in writing. Notwithstanding anything contained in this Trust Agreement or the Hospital TDP to the contrary, neither this Trust Agreement, the Hospital TDP, nor any document annexed to the foregoing shall be modified or amended in any way that could jeopardize, impair or modify (i) the applicability of section 105 of the Bankruptcy Code to the Plan, the Confirmation Order or the Hospital Trust, (ii) the efficacy or enforceability of the Channeling Injunction or any other injunctions or releases issued or granted in connection with the Plan, (iii) the treatment of the Hospital Trust as a Qualified Settlement Fund within the meaning of the QSF Regulations, or (iv) the Plan or the Confirmation

Order. Any amendment affecting the rights, duties, immunities or liabilities of the Delaware Trustee shall require the Delaware Trustee's written consent.

**6.5     Severability.**     Should any provision in this Trust Agreement be determined to be unenforceable, such determination shall in no way limit or affect the enforceability and operative effect of any and all other provisions of this Trust Agreement.

**6.6     Notices**.

(a)     Notices to persons asserting claims shall be given by first class mail, postage prepaid, at the address of such person, or, where applicable, such person's legal representative, in each case as provided on such person's claim form submitted to the Hospital Trust in accordance with the Hospital TDP with respect to his or her Hospital Channeled Claim, or by such other means, including electronic notice, as may be agreed between the Hospital Trust and the TAC.

(b)     Any notices or other communications required or permitted hereunder to the following Parties shall be in writing and delivered to the addresses or e-mail addresses designated herein, or to such other addresses or e-mail addresses as may hereafter be furnished in writing to each of the other Parties listed herein in compliance with the terms hereof.

(c)    To the Hospital Trust through the Trustee:

c/o

[_____]

With a copy to:

[_____]

To the Delaware Trustee:

[_____]

To the TAC:

[_____]

With a copy to:

[_____]

To the Debtors:

[_____]

With a copy to:

[_____]

(d)    All such notices and communications if mailed shall be effective when physically delivered at the designated addresses or, if electronically transmitted, when the communication is received at the designated addresses and confirmed by the recipient by return transmission.

**6.7    Successors and Assigns.**  The provisions of this Trust Agreement shall be binding upon and inure to the benefit of the Hospital Trust, the TAC, the Trustee and the Debtors, NewCo and TopCo, and their respective successors and assigns, except that neither the Trustee nor the TAC members may assign or otherwise transfer any of their rights or obligations, if any, under this Trust

Agreement except in the case of the Trustee in accordance with Section 4.3 herein, the TAC members in accordance with Section 5.4 herein.

**6.8    Limitation on Claim Interests for Securities Laws Purposes**.   Hospital Channeled Claims, and any interests therein, (a) shall not be assigned, conveyed, hypothecated, pledged or otherwise transferred, voluntarily or involuntarily, directly or indirectly, except by will or under the laws of descent and distribution, or by operation of law; (b) shall not be evidenced by a certificate or other instrument; (c) shall not possess any voting rights; and (d) shall not be entitled to receive any dividends or interest.

**6.9    Entire Agreement; No Waiver.**   The entire agreement of the Parties relating to the subject matter of this Trust Agreement is contained herein, and in the documents referred to herein (including the Plan and the Hospital TDP), and this Trust Agreement and such documents supersede any prior oral or written agreements concerning the subject matter hereof. No failure to exercise or delay in exercising any right, power or privilege hereunder shall operate as a waiver thereof, nor shall any single or partial exercise of any right, power or privilege hereunder preclude any further exercise thereof or of any other right, power or privilege. The rights and remedies herein provided are cumulative and are not exclusive of rights under law or in equity.

**6.10   Headings.**   The headings used in this Trust Agreement are inserted for convenience only and do not constitute a portion of this Trust Agreement, nor in any manner affect the construction of the provisions of this Trust Agreement.

**6.11   Governing Law.**   The validity and construction of this Trust Agreement and all amendments hereto and thereto shall be governed by the laws of the State of Delaware, and the rights of all Parties hereto and the effect of every provision hereof shall be subject to and construed according to the laws of the State of Delaware without regard to the conflicts of law provisions

thereof that would purport to apply the law of any other jurisdiction; <u>provided, however,</u> that the Parties hereto intend that the provisions hereof shall control and therefore shall not be applicable to the Hospital Trust, the Trustee, the Delaware Trustee, the TAC or this Trust Agreement, any provision of the laws (statutory or common) of the State of Delaware pertaining to trusts that relate to or regulate in a manner inconsistent with the terms hereof: (a) the filing with any court or governmental body or agency of Trustee accounts or schedules of Trustee fees and charges; (b) affirmative requirements to post bonds for the Trustee, officers, agents or employees of a trust; (c) the necessity for obtaining court or other governmental approval concerning the acquisition, holding or disposition of real or personal property; (d) fees or other sums payable to the Trustee, officers, agents or employees of a trust; (e) the allocation of receipts and expenditures to income or principal; (f) restrictions or limitations on the permissible nature, amount or concentration of trust investments or requirements relating to the titling, storage or other manner of holding of trust assets; (g) the existence of rights or interests (beneficial or otherwise) in trust assets; (h) the ability of beneficial owners or other persons to terminate or dissolve a trust; or (i) the establishment of fiduciary or other standards or responsibilities or limitations on the acts or powers of the Trustee or beneficial owners that are inconsistent with the limitations on liability or authorities and powers of the Trustee, the Delaware Trustee, the TAC or set forth or referenced in this Trust Agreement. Section 3540 of the Act shall not apply to the Hospital Trust.

**6.12  Settlors' Representative and Cooperation.**    The Debtors are hereby irrevocably designated as the Settlors and are hereby authorized to take any action required of the Settlors in connection with the creation of this Trust.

**6.13  Dispute Resolution.**  Any disputes that arise under this Trust Agreement or under the Hospital TDP among the Parties hereto shall be resolved by submission of the matter to an

alternative dispute resolution (**"ADR"**) process with a single mutually agreeable neutral selected amongst Law Offices of Kenneth R. Feinberg, PC (1455 Pennsylvania Avenue, NW, Suite 390, Washington, DC 20004); or ADR Systems (20 North Clark Street, Floor 29, Chicago, IL 60602); or JAMS Chicago (71 S. Wacker Drive, Suite 2400, Chicago, IL 60606). Should any Party to the ADR process be dissatisfied with the decision of the neutral arbitrator, that Party may apply to the Bankruptcy Court for a judicial determination of the matter. Any review conducted by the Bankruptcy Court shall be *de novo*. In either case, if the dispute implicates any consent or approval by the TAC as provided in this Trust Agreement, the burden of proof shall be on the TAC or the members thereof to show that the TAC's consent or approval, or withholding of the same, was valid and consistent with the terms and purposes of this Trust Agreement. Should the dispute not be resolved by the ADR process within sixty (60) days after submission, the Parties are relieved of the requirement to pursue ADR prior to application to the Bankruptcy Court. If the Trustee determines that the matter in dispute is exigent and cannot await the completion of the ADR process, the Trustee shall have the discretion to elect out of the ADR process altogether or at any stage of the process and seek resolution of the dispute in the Bankruptcy Court.

**6.14    Enforcement and Administration.**    The provisions of this Trust Agreement and the Hospital TDP shall be enforced by the Bankruptcy Court pursuant to Section 11.1 of the Plan and the Confirmation Order. The Parties hereby acknowledge and agree that the Bankruptcy Court shall have continuing exclusive jurisdiction over the settlement of the accounts of the Trustee and over any disputes that arise under this Trust Agreement or the Hospital TDP and are not resolved by alternative dispute resolution in accordance with Section 6.13 herein.

**6.15    Effectiveness.**  This Trust Agreement shall not become effective until the Effective Date of the Plan and it has been executed and delivered by all the Parties hereto.

**6.16   Counterpart Signatures.**   This Trust Agreement may be executed in any number of counterparts and by different Parties on separate counterparts (including by PDF transmitted by e-mail), and each such counterpart shall be deemed to be an original, but all such counterparts shall together constitute one and the same instrument.

IN WITNESS WHEREOF, the Parties have executed this Trust Agreement this [_____]

day of [_____], 2021.


**SETTLOR(S):**

**PURDUE PHARMA, LP**

By: _____

**[•]**

By: _____

**TRUSTEE**                                          **DELAWARE TRUSTEE**

_____              Wilmington Trust Co

Name:  Thomas L. Hogan                            By:_____

Dated:  _____                         Name and Title:_____

                                                  Dated:  _____

**Exhibit 1**

**CERTIFICATE OF TRUST**

**(TO FOLLOW)**

**Exhibit 2**

**Hospital TDP**

## EXHIBIT P

**NAS Monitoring Trust Agreement**

**NAS MONITORING TRUST AGREEMENT**

**DATED AS OF [●], 2021**

# TABLE OF CONTENTS

PAGE

SECTION I
AGREEMENT OF TRUST

1.1 Creation and Name ..................................................................................................3
1.2 Purpose....................................................................................................................4
1.3 Transfer of Assets ...................................................................................................6
1.4 Definitions...............................................................................................................7
1.5 Acceptance of Assets and Assumption of Liabilities ............................................9
1.6 Channeling Injunction...........................................................................................11

SECTION II
POWERS AND TRUST ADMINISTRATION

2.1 Powers...................................................................................................................12
2.2 General Administration..........................................................................................17
2.3 Qualified Settlement Fund ....................................................................................21
2.4 Claims Administration ..........................................................................................24

SECTION III
ACCOUNTS, INVESTMENTS, AND PAYMENTS

3.1 Accounts ................................................................................................................24
3.2 Investments ...........................................................................................................26
3.3 Source of Payments...............................................................................................26

SECTION IV
TRUSTEE; DELAWARE TRUSTEE

4.1 Number ..................................................................................................................27
4.2 Term of Service......................................................................................................27
4.3 Appointment of Successor Trustee .......................................................................28
4.4 Liability of Trustee and Others .............................................................................29
4.5 Compensation and Expenses of Trustee ...............................................................29
4.6 Indemnification of Trustee and Others .................................................................30
4.7 Lien .......................................................................................................................31
4.8 Trustee's Employment of Experts .........................................................................31
4.9 Unauthorized Business..........................................................................................32
4.10 Trustee Independence............................................................................................32
4.11 Limitation of Trustee's Authority .........................................................................32
4.12 Confidentiality ......................................................................................................33
4.13 No Bond.................................................................................................................33
4.14 Delaware Trustee...................................................................................................33

SECTION V
TRUST ADVISORY COMMITTEE

5.1 Members ...................................................................................................36
5.2 Duties .....................................................................................................36
5.3 Term of Office ........................................................................................37
5.4 Appointment of Successors.....................................................................38
5.5 TAC's Employment of Professionals ......................................................38
5.6 Compensation and Expenses of the TAC ................................................40

SECTION VI
GENERAL PROVISIONS

6.1 Procedures for Consulting with or Obtaining Consent of the TAC...........41
6.2 Irrevocability...........................................................................................43
6.3 Term; Termination...................................................................................44
6.4 Amendments ...........................................................................................46
6.5 No Association, Partnership or Joint Venture...........................................47
6.6 Severability .............................................................................................47
6.7 Notices ...................................................................................................47
6.8 Successors and Assigns............................................................................49
6.9 Limitation on Claim Interests for Securities Laws Purposes.....................49
6.10 Entire Agreement; No Waiver ................................................................49
6.11 Headings ...............................................................................................50
6.12 Governing Law ......................................................................................50
6.13 Settlors' Representative and Cooperation................................................51
6.14 Dispute Resolution................................................................................51
6.15 Enforcement and Administration ...........................................................51
6.16 Effectiveness .........................................................................................52
6.17 Counterpart Signatures..........................................................................52
6.18 Rights of Holders of NAS Monitoring Channeled Claims ......................52

## NAS MONITORING TRUST AGREEMENT

This NAS Monitoring Trust Agreement (this **"Trust Agreement"**), dated the date set forth on the signature page hereof and effective as of the Effective Date,[1] is entered into pursuant to the *[Fifth] Amended Joint Chapter 11 Plan of Reorganization of Purdue Pharma L.P. and Its Affiliated Debtors*, dated [June 3], 2021 (as it may be modified, amended or supplemented from time to time, and together with all exhibits and schedules thereto, the **"Plan"**), by Purdue Pharma L.P. and its Debtor affiliates[2] (collectively referred to as the **"Debtors"** or **"Settlors"**),[3] Wilmington Trust Company (the **"Delaware Trustee"**); [●] (the **"Trustee"**); and the members of the NAS Monitoring Trust Advisory Committee (the **"TAC"**) identified on the signature pages hereof (together with the Debtors, the Delaware Trustee, and the Trustee, the **"Parties"**); and

**WHEREAS,** the Debtors have reorganized under the provisions of Chapter 11 of the Bankruptcy Code;

**WHEREAS,** the Confirmation Order has been entered by the Bankruptcy Court;

**WHEREAS,** the Plan provides, *inter alia,* for the creation of the NAS Monitoring Trust (the **"NAS Monitoring Trust"**);

**WHEREAS,** pursuant to the Plan, the NAS Monitoring Trust shall be established to (i) assume all liability for the NAS Monitoring Channeled Claims, (ii) hold the MDT NAS

---

[1] All capitalized terms not otherwise defined herein shall have the meanings ascribed to them in the Plan and the NAS Monitoring TDP.

[2] The Debtors in these cases are as follows: Purdue Pharma L.P., Purdue Pharma Inc., Purdue Transdermal Technologies L.P., Purdue Pharma Manufacturing L.P., Purdue Pharmaceuticals L.P., Imbrium Therapeutics L.P., Adlon Therapeutics L.P., Greenfield BioVentures L.P., Seven Seas Hill Corp., Ophir Green Corp., Purdue Pharma of Puerto Rico, Avrio Health L.P., Purdue Pharmaceutical Products L.P., Purdue Neuroscience Company, Nayatt Cove Lifescience Inc., Button Land L.P., Rhodes Associates L.P., Paul Land Inc., Quidnick Land L.P., Rhodes Pharmaceuticals L.P., Rhodes Technologies, UDF LP, SVC Pharma LP and SVC Pharma Inc.

[3] The Chapter 11 Cases of the Debtors and Debtors in Possession are jointly administered under Case No. 19-23649 (RDD) in the United States Bankruptcy Court for the Southern District of New York (the **"Bankruptcy Court"**) and known as *In re Purdue Pharma L.P., et al.*, Case No. 19-23649 (RDD).

Monitoring Claim and collect the Initial NAS Monitoring Trust Distribution and additional payments due under the MDT NAS Monitoring Claim in accordance with the Private Entity Settlements and the NAS Monitoring Trust Documents, (iii) administer NAS Monitoring Channeled Claims, (iv) make NAS Monitoring Grants to Grant Recipients or Grantees for NAS Monitoring Authorized Abatement Purposes, in each case in accordance with the NAS Monitoring trust distribution procedures (the **"NAS Monitoring TDP"**), attached hereto as Exhibit B, and (v) carry out such other matters as are set forth in the NAS Monitoring Trust Documents;

**WHEREAS**, the Plan and the Master TDP provide that on the Effective Date, any and all liability of the Debtors and the other Protected Parties for any and all NAS Monitoring Channeled Claims shall automatically, and without further act, deed or court order, be channeled to and assumed by the Master Disbursement Trust solely for the purpose of effectuating the Mater TDP, and further provide that immediately thereafter, any and all NAS Monitoring Channeled Claims shall automatically, and without further act, deed or court order, be channeled exclusively to and assumed by the NAS Monitoring Trust;

**WHEREAS,** pursuant to the Plan and the Confirmation Order, the NAS Monitoring Trust shall (i) hold, manage and invest all funds and other Assets received by the NAS Monitoring Trust from the Master Disbursement Trust for the benefit of the beneficiaries of the NAS Monitoring Trust; (ii) hold and maintain the NAS Monitoring Trust Operating Reserve, as defined herein; and (iii) administer, process, resolve and liquidate all NAS Monitoring Channeled Claims in accordance with the NAS Monitoring TDP;

**WHEREAS**, it is the intent of the Debtors, the Trustee and the TAC that the NAS Monitoring Trust will evaluate the NAS Monitoring Channeled Claims and be in a financial

position to make NAS Monitoring Grants to Grant Recipients or Grantees in accordance with the terms of this Trust Agreement and the NAS Monitoring TDP;

**WHEREAS,** all rights of the Holders of NAS Monitoring Channeled Claims arising under this Trust Agreement and the NAS Monitoring TDP shall vest upon the Effective Date;

**WHEREAS,** pursuant to the Plan, the NAS Monitoring Trust is intended to qualify as a "qualified settlement fund" (a **"Qualified Settlement Fund"**) within the meaning of section 1.468B-1, et seq. of the Treasury Regulations promulgated under section 468B of the Internal Revenue Code (the **"QSF Regulations"**) and be treated consistently for state and local tax purposes to the extent applicable; and

**WHEREAS**, pursuant to the Plan, the NAS Monitoring Trust and the Plan satisfy all the prerequisites for issuance of an injunction pursuant to section 105(a) of the Bankruptcy Code with respect to any and all NAS Monitoring Channeled Claims, and such injunction has been entered in connection with the Confirmation Order.

**NOW, THEREFORE,** it is hereby agreed as follows:

## SECTION I

## <u>AGREEMENT OF TRUST</u>

**1.1    Creation and Name**. The Parties hereto hereby create a trust known as the "NAS Monitoring Trust," which is the NAS Monitoring Trust provided for and referred to in Section 5.7 of the Plan. The Trustee of the NAS Monitoring Trust shall transact the business and affairs of the NAS Monitoring Trust in the name of the NAS Monitoring Trust, and references herein to the NAS Monitoring Trust shall include the Trustee acting on behalf of the NAS Monitoring Trust. It is the intention of the Parties that the NAS Monitoring Trust constitute a statutory trust under Chapter 38 of title 12 of the Delaware Code, 12 Del. C. § 3801 et seq. (the **"Act"**) and that this Trust Agreement shall constitute the governing instrument of the NAS Monitoring Trust. The

Trustee and the Delaware Trustee are hereby authorized and directed to execute and file a Certificate of Trust with the Delaware Secretary of State in the form attached hereto as Exhibit 1.

**1.2    Purpose**.

(a)    The purpose of the NAS Monitoring Trust is to expressly assume sole and exclusive responsibility and liability for the NAS Monitoring Channeled Claims channeled to the NAS Monitoring Trust in accordance with the Master TDP and the Plan, as well as to, among other things:

> (i)    hold the MDT NAS Monitoring Claim and collect the Initial NAS Monitoring Trust Distribution and additional payments due under the MDT NAS Monitoring Claim in accordance with the Private Entity Settlements and the NAS Monitoring Trust Documents;

> (ii)    administer, process, resolve and liquidate the NAS Monitoring Channeled Claims as provided in the NAS Monitoring Trust Documents by making NAS Monitoring Grants to Grant Recipients or Grantees; *provided, however*, that no Holders of NAS Monitoring Channeled Claims shall receive direct recoveries on account of their NAS Monitoring Channeled Claims; the NAS Monitoring Trust shall make NAS Monitoring Grants to NAS Authorized Recipients in accordance with the NAS Monitoring Trust Distribution Procedures;

> (iii)    hold, manage and invest all funds and other Assets received by the NAS Monitoring Trust from the Debtors and the Master Disbursement Trust, in each case, for the benefit of the beneficiaries of the NAS Monitoring Trust;

(iv) qualify at all times as a Qualified Settlement Fund within the meaning of the QSF Regulations and be treated consistently for state and local tax purposes to the extent applicable;

(v) pay qualifying attorney's fees pursuant to Section 5.8 of the Plan;

(vi) pay assessments to the extent required by Section 5.8(c) of the Plan to fund the Common Benefit Escrow and then, upon its establishment, the Common Benefit Fund in accordance with the Plan; and

(vii) otherwise comply in all respects with the NAS Monitoring Trust Documents.

(b) The NAS Monitoring Trust is to use the NAS Monitoring Trust's Assets and income to:

(i) make NAS Monitoring Grants to the Grant Recipients and Grantees in accordance with this Trust Agreement and the NAS Monitoring TDP in such a way that such Grant Recipients and Grantees are treated fairly, equitably, and reasonably in light of the assets available to resolve such claims;

(ii) hold and maintain reserves to pay the fees and expenses incurred with respect to administering the NAS Monitoring Trust (including the NAS Monitoring TDP) and managing the NAS Monitoring Trust Assets (together, the **"NAS Monitoring Trust Operating Expenses"**) of the NAS Monitoring Trust (such reserves, the **"NAS Monitoring Trust Operating Reserve"**), which shall be (a) funded with Cash and cash equivalents held by the NAS Monitoring Trust in

accordance with the NAS Monitoring Trust Documents and (b) held by the NAS Monitoring Trust in a segregated account and administered by the Trustee;

(iii)    pay the NAS Monitoring Trust Operating Expenses from the NAS Monitoring Trust Operating Reserve;

(iv)    replenish periodically, until the dissolution of the NAS Monitoring Trust, the NAS Monitoring Trust Operating Reserve from Cash held or received by the NAS Monitoring Trust to the extent deemed necessary by the Trustee to satisfy and pay estimated future NAS Monitoring Trust Operating Expenses in accordance with the NAS Monitoring Trust Documents;

(v)    pay all fees and expenses incurred with respect to, among other things, making NAS Monitoring Grants to Grant Recipients or Grantees, including attorneys' fees and costs (together with the NAS Monitoring Trust Operating Expenses, the **"Trust Expenses"**), pursuant to Section 5.8 of the Plan, as applicable;

(vi)    pay qualifying attorney's fees pursuant to Section 5.8 of the Plan; and

(vii)    pay assessments to the extent required by Section 5.8(c) of the Plan to fund the Common Benefit Escrow and then, upon its establishment, the Common Benefit Fund in accordance with the Plan.

**1.3    Transfer of Assets.** Pursuant to Sections 4.9(a) and 5.2(d)(i)(C) of the Plan, the NAS Monitoring Trust has received the NAS Monitoring Trust Assets to fund the NAS Monitoring

Trust.[4] In all events, the NAS Monitoring Trust Assets or any other assets to be transferred to the NAS Monitoring Trust under the Plan will be transferred to the NAS Monitoring Trust free and clear of all Claims, Liens or other recourse or encumbrances, and shall not be subject to attachment, disgorgement or recoupment by any Person. The Debtors shall be authorized pursuant to the Plan to execute and deliver such documents to the NAS Monitoring Trust as the Trustee may request to effectuate the transfer and assignment of any NAS Monitoring Trust Assets to the NAS Monitoring Trust.

**1.4     Definitions.**

(a)     **"Assumed Liability"** means the assumption of liability by the NAS Monitoring Trust for all NAS Monitoring Channeled Claims.

(b)     **"Award"** or **"Awarded"** or **"Awarding"** has the meaning ascribed to such term in the NAS Monitoring TDP.

(c)     **"Birth Mother"** means the female who gave birth to an NAS Child, or who is pregnant and is using, or is suspected to be using, opioids, or who is dependent upon opioids, regardless of whether the Birth Mother is a Guardian of the NAS Child.

(d)     **"Grant Proposal"** has the meaning ascribed to such term in the NAS Monitoring TDP.

(e)     **"Grant Recipient"** or **"Grantee"** have the meanings ascribed to such terms in the NAS Monitoring TDP.

(f)     **"Guardian"** means the individual or individuals who have physical custody of an NAS Child, or who exercise the duties and responsibilities attendant to daily care for an NAS

---

[4] In the event that any payment date is on a date that is not a Business Day, then the making of such payment may be completed on the next succeeding Business Day, but shall be deemed to have been completed as of the required date.

Child. As used in this Trust Agreement, the term "Guardian" may include not only individual(s) who are legal or court-appointed guardians, but also natural parent(s), grandparent(s), relative(s) of an NAS Child, child protective service appointees, and others to the extent such individual(s) have physical custody of an NAS Child or exercise the duties and responsibilities attendant to daily care for an NAS Child.

(g)     **"NAS"** means Neonatal Abstinence Syndrome or opioid dependency at birth.

(h)     **"NAS Abatement Program"** has the meaning ascribed to such term in the NAS Monitoring TDP.

(i)     **"NAS Committee"** means the Ad Hoc Committee of NAS Children in the *First Amended Verified Statement of the Ad Hoc Committee of NAS Children Pursuant to Bankruptcy Rule 2019* [D.I. 1582].

(j)     **"NAS Monitoring Grants"** has the meaning ascribed to such term in the NAS Monitoring TDP.

(k)     **"NAS Monitoring Trust Assets"** mean the gross and aggregate amount of money or the value of any property received by the NAS Monitoring Trust pursuant to the Plan, through payment(s) into the NAS Monitoring Trust through the Master Disbursement Trust, including the Initial NAS Monitoring Trust Distribution and additional payments due under the MDT NAS Monitoring Claim in accordance with the Private Entity Settlements and the NAS Monitoring Trust Document.

(l)     "**NAS Monitoring Trust Operating Expenses**" means, with respect to the NAS Monitoring Trust, any and all costs, expenses, fees, taxes, disbursements, debts or obligations incurred from the operation and administration of the NAS Monitoring Trust, including in connection with the reconciliation and administration of the NAS Monitoring Channeled Claims

channeled to the NAS Monitoring Trust, working capital and all compensation, costs and fees of the Trustee of the NAS Monitoring Trust and any professionals retained by the Trustee. The NAS Monitoring Trust Operating Expenses shall not exceed a value equal to one and one-half percent (1.5%) of the Net Trust Assets not yet Awarded.

(m)    "**NAS Monitoring Trust Operating Reserve**" means the Trust Subaccount to be established to the pay NAS Monitoring Trust Operating Expenses, which shall be (i) funded with Cash and cash equivalents held by the NAS Monitoring Trust in accordance with the NAS Monitoring Trust Documents and (ii) held by the NAS Monitoring Trust in a segregated account and administered by the Trustee. The amounts held in the NAS Monitoring Trust Operating Reserve shall not exceed in the aggregate a value equal to one and one-half percent (1.5%) of the Net Trust Assets not yet Awarded.

(n)    "**Net Trust Assets**" means the aggregate amount of the NAS Monitoring Trust Assets which remain after payment by the NAS Monitoring Trust of the attorneys' fees and expenses to the NAS Committee identified on Schedule A. Net Trust Assets may also include any interest or income, which may accrue from any of the NAS Monitoring Trust Assets.

**1.5**    **Acceptance of Assets and Assumption of Liabilities**.

(a)    In furtherance of the purposes of the NAS Monitoring Trust, the NAS Monitoring Trust hereby expressly accepts the transfer to the NAS Monitoring Trust of the NAS Monitoring Trust Assets or any other transfers contemplated by the Plan and the Master TDP in the time and manner as, and subject to the terms, contemplated in the Plan and the Master TDP.

(b)    In furtherance of the purposes of the NAS Monitoring Trust, the NAS Monitoring Trust expressly assumes all liabilities and responsibility for all NAS Monitoring Channeled Claims (except as set forth in the Plan) subject to the NAS Monitoring Trust Documents, and none of the

9

Debtors, the Protected Parties, or the Master Disbursement Trust shall have any further financial or other responsibility or liability therefor. Except as otherwise provided in this Trust Agreement, the NAS Monitoring TDP, the Plan, or the Master TDP, the NAS Monitoring Trust shall have and retain any and all defenses, cross-claims, offsets, and recoupments regarding the NAS Monitoring Channeled Claims, as well as any and all rights of indemnification, contribution, subrogation, and similar rights, that the Debtors, the Released Parties, and the Shareholder Released Parties, as applicable, have or would have had under applicable law; provided that no such claims, defenses or rights may be used to seek any affirmative monetary recovery from any party.

(c)    Notwithstanding anything to the contrary herein, no provision in this Trust Agreement or the NAS Monitoring TDP shall be construed or implemented in a manner that would cause the NAS Monitoring Trust to fail to qualify as a Qualified Settlement Fund within the meaning of the QSF Regulations.

(d)    In this Trust Agreement and the NAS Monitoring TDP, the words "must," "will," and "shall" are intended to have the same mandatory force and effect, while the word "may" is intended to be permissive rather than mandatory.

(e)    To the extent required by the Act, the beneficial owners (within the meaning of the Act) of the NAS Monitoring Trust (the **"Beneficial Owners"**) shall be deemed to be the Holders of NAS Monitoring Channeled Claims; provided that (i) the Holders of NAS Monitoring Channeled Claims, as such Beneficial Owners, shall have only such rights with respect to the NAS Monitoring Trust and its assets as are set forth in the NAS Monitoring TDP and (ii) no greater or other rights, including upon dissolution, liquidation, or winding up of the NAS Monitoring Trust, shall be deemed to apply to the Holders of NAS Monitoring Channeled Claims in their capacity as Beneficial Owners.

(f)    The sole recourse of any Person on account of any NAS Monitoring Channeled Claim, whether or not the Holder thereof participated in the Chapter 11 Cases and whether or not such Holder filed a Proof of Claim in the Chapter 11 Cases, shall be to the NAS Monitoring Trust as and to the extent provided in the NAS Monitoring TDP. Holders of NAS Monitoring Channeled Claims are enjoined from asserting against any Debtor or other Protected Party any Channeled Claim, and may not proceed in any manner against any Debtor or other Protected Party on account of any Channeled Claim in any forum whatsoever, including any state, federal or non-U.S. court or administrative or arbitral forum, and are required to pursue NAS Monitoring Channeled Claims exclusively against the NAS Monitoring Trust, solely as and to the extent provided in the NAS Monitoring TDP. Notwithstanding the foregoing, no Beneficial Owner shall be entitled to a distribution on account of its NAS Monitoring Channeled Claims but may be considered an indirect beneficiary of the NAS Monitoring Trust through an entity that is Awarded a Grant pursuant to the NAS Monitoring TDP.[5]

(g)    The Beneficial Owners shall be subject to the terms of this Trust Agreement, including without limitation, the terms of the NAS Monitoring TDP.

**1.6    Channeling Injunction.** Nothing in this Trust Agreement shall be construed in any way to limit or expand the scope, enforceability or effectiveness of the Channeling Injunction issues in connection with the Plan or the NAS Monitoring Trust's assumption of all liability for NAS Monitoring Channeled Claims.

---

[5] No natural person that is a Holder of an NAS Monitoring Channeled Claim may be considered a Grantee or Grant Recipient.

# SECTION II

## POWERS AND TRUST ADMINISTRATION

**2.1    Powers**.

(a)    The Trustee is, and shall act as, a fiduciary to the NAS Monitoring Trust in accordance with the provisions of this Trust Agreement, the NAS Monitoring TDP, the Plan and the Confirmation Order. The Trustee shall, at all times, administer the NAS Monitoring Trust and the NAS Monitoring Trust Assets in accordance with the purposes set forth in Section 1.2 herein. Subject to the limitations set forth in this Trust Agreement, the Trustee shall have the power to take any and all actions that, in the judgment of the Trustee, are necessary or proper to fulfill the purposes of the NAS Monitoring Trust, including, without limitation, each power expressly granted in this Section 2.1, any power reasonably incidental thereto and not inconsistent with the requirements of Section 2.2, and any trust power now or hereafter permitted under the laws of the State of Delaware.

(b)    Except as required by applicable law or otherwise specified herein or in the Plan or the Confirmation Order, the Trustee need not obtain the order or approval of any court in the exercise of any power or discretion conferred hereunder.

(c)    Subject to the limitations on the Trustee's powers as set forth herein, the Trustee's powers are exercisable solely in a fiduciary capacity and are to be consistent with and in furtherance of the purposes of this Trust Agreement and the NAS Monitoring TDP, and not otherwise.

(d)    Without limiting the generality of Section 2.1(a) above, and except as limited herein or by the Plan, the Trustee shall have the power to:

(i)    receive and hold the NAS Monitoring Trust Assets and exercise all rights with respect thereto, including the right to vote, hold and sell any securities

12

that are included in the NAS Monitoring Trust Assets or that may come into possession or ownership of the Trust;

(ii)    invest the monies held from time to time by the NAS Monitoring Trust, and/or contract with the Delaware Trustee or any other qualified institution, to hold and invest the NAS Monitoring Trust's funds in federally insured and interest-bearing accounts; provided that any investment of monies held within a separate Trust Subaccount, as defined herein, be held separate and distinct from the investments relating to any other Trust Subaccount;

(iii)    enter into leasing and financing agreements with third parties, to the extent such agreements are reasonably necessary, to permit the NAS Monitoring Trust to operate;

(iv)    pay liabilities and expenses of the NAS Monitoring Trust, including the indemnification obligations set forth in the Plan;

(v)    establish such funds, reserves and accounts within the NAS Monitoring Trust estate as required by the Plan or this Trust Agreement or as the Trustee otherwise deems necessary in carrying out the purposes of the NAS Monitoring Trust, subject to the limitations set forth in Section 3.1(a) below;

(vi)    initiate, prosecute, defend and resolve all such actions in the name of the Debtors or their Estates, in each case if deemed necessary by the Trustee to fulfill the purpose of the NAS Monitoring Trust;

(vii)    initiate, prosecute, defend and resolve all legal actions and other proceedings related to any Asset, liability or responsibility of the NAS

13

Monitoring Trust. Such legal actions and other proceedings shall be limited solely to those required for purposes of reconciling, administering or defending against the NAS Monitoring Channeled Claims channeled to the NAS Monitoring Trust and for enforcing the rights of the NAS Monitoring Trust under the Plan and the Plan Documents;

(viii)    establish, supervise and administer the NAS Monitoring Trust in accordance with this Trust Agreement and the NAS Monitoring TDP and the terms thereof;

(ix)    appoint such officers, hire such employees, and engage such legal, financial, accounting, investment, auditing, forecasting, and other consultants, advisors, and agents as the business of the NAS Monitoring Trust requires, and delegate to such persons such powers and authorities as the fiduciary duties of the Trustee permit and as the Trustee, in its discretion, deems advisable or necessary in order to carry out the terms of the NAS Monitoring Trust;

(x)    pay reasonable compensation to those employees, legal, financial, accounting, investment, auditing, forecasting, and other consultants, advisors, and agents employed by the Trustee after the Effective Date (including those engaged by the NAS Monitoring Trust in connection with its alternative dispute resolution activities);

(xi)    as provided herein, (a) compensate the Trustee, the Delaware Trustee, and the employees, legal, financial, accounting, investment, auditing, forecasting, and other consultants, advisors, and agents of each of them, and

14

(b) reimburse the Trustee, the Delaware Trustee, and the TAC for all reasonable out-of-pocket costs and expenses incurred by such persons in connection with the performance of their duties hereunder;

(xii)   execute and deliver such instruments as the Trustee deems proper in administering the NAS Monitoring Trust;

(xiii)  enter into such other arrangements with third parties as the Trustee deems necessary in carrying out the purposes of the NAS Monitoring Trust; provided that such arrangements do not conflict with any other provision of this Trust Agreement;

(xiv)   in accordance with Section 4.6 herein, defend, indemnify, and hold harmless (and purchase insurance indemnifying) (a) the Trustee, (b) the Delaware Trustee, (c) the TAC, and (d) the officers, employees, consultants, advisors, and agents of each of the NAS Monitoring Trust and the TAC, (each of those in (d) herein, the **"Additional Indemnitees"**), to the maximum extent that a statutory trust organized under the laws of the State of Delaware is from time to time entitled to defend, indemnify, hold harmless, and/or insure its directors, trustees, officers, employees, consultants, advisors, agents, and representatives. No party shall be indemnified in any way for any liability, expense, claim, damage, or loss for which he or she is liable under Section 4.6 herein;

(xv)    consult with the TAC at such times and with respect to such issues relating to the purpose, conduct, and affairs of the NAS Monitoring Trust as the Trustee considers desirable;

(xvi) make, pursue (by litigation or otherwise), collect, compromise, settle, or otherwise resolve in the name of the NAS Monitoring Trust, any claim, right, action, or cause of action included in the NAS Monitoring Trust Assets or which may otherwise hereafter accrue in favor of the NAS Monitoring Trust, including, but not limited to, insurance recoveries, before any court of competent jurisdiction; provided, however, that any settlement of any claims in litigation be approved by the Bankruptcy Court and/or a court of competent jurisdiction;

(xvii) withhold or withdraw yet to be disbursed monies from any Fund established for the purpose of funding of an NAS Abatement Program sponsored by a Grant Recipient or Grantee, in the event of the Grant Recipient or Grantee's noncompliance with the requirements of the NAS Monitoring Trust pertinent to such Awarded Grant, and/or to recover by all legal means the amount of any Disbursements made to a Grant Recipient or Grantee which has violated or failed to comply with the requirements of the NAS Monitoring Trust with respect to such Awarded and Disbursed Grant; and

(xviii) exercise any and all other rights, and take any and all other actions as are permitted, of the Trustee in accordance with the terms of this Trust Agreement and the Plan.

(e)     The Trustee shall not have the power to guarantee any debt of other persons.

(f)     The Trustee agrees to take the actions of the NAS Monitoring Trust required hereunder.

16

(g)    The Trustee shall give the TAC prompt notice of any act performed or taken pursuant to Sections 2.1(d)(i) or (d)(vi) herein, and any act proposed to be performed or taken pursuant to Section  2.2(e) herein.

**2.2    General Administration**.

(a)    The Trustee shall act in accordance with this Trust Agreement, the Plan, the Confirmation Order and the NAS Monitoring TDP. In the event of a conflict between the terms or provisions of (i) the Plan or the Confirmation Order and (ii) this Trust Agreement or the NAS Monitoring TDP, the terms or provisions of the Plan or the Confirmation Order shall control. In the event of a conflict between the terms or provisions of this Trust Agreement and the NAS Monitoring TDP, the terms or provisions of the NAS Monitoring TDP shall control. For the avoidance of doubt, this Trust Agreement shall be construed and implemented in accordance with the Plan, regardless of whether any provision herein explicitly references the Plan.

(b)    Pursuant to Section 5.7(g) of the Plan, the NAS Monitoring Trust shall (i) monitor the use of funds received by Grant Recipients or Grantees of NAS Monitoring Grants in accordance with the NAS Monitoring Authorized Abatement Purposes, and (ii) prepare and deliver to the Master Disbursement Trust for publication annual reports (each, an "**Annual Report**") on the disbursement and use of NAS Monitoring Grants from the NAS Monitoring Trust and the compliance by Grant Recipients or Grantees with the NAS Monitoring Authorized Abatement Purposes set forth in the applicable NAS Monitoring Trust Documents.

(c)    The Trustee shall cause to be prepared as soon as practicable prior to the commencement of each fiscal year a budget and cash flow projections covering such fiscal year. The Trustee shall provide a copy of the budget and cash flow projections to the TAC.

(d)    The Trustee shall consult with the TAC on (i) the general implementation and administration of the NAS Monitoring Trust; (ii) the general implementation and administration of the NAS Monitoring TDP; and (iii) such other matters as may be required under this Trust Agreement or the NAS Monitoring TDP.

(e)    The Trustee shall be required to obtain the consent of the TAC pursuant to the consent process set forth in Section  6.1(b) herein, in addition to any other instances elsewhere enumerated, in order:

(i)    to determine, establish, or change any aspect of the NAS Monitoring TDP;

(ii)    to establish and/or to change the Grant Proposal Form to be provided to be prepared and submitted by potential Grant Recipients or Grantees under the NAS Monitoring TDP;

(iii)    to enter into any agreement with any Grant Recipient or Grantee, including without limitation the Award of a Grant to such Grant Recipient or Grantee for funding of an NAS Abatement Program and the establishment of a Fund for such purpose;

(iv)    to terminate the NAS Monitoring Trust pursuant to Section  6.3 herein;

(v)    to change the compensation of the members of the TAC, the Delaware Trustee, or the Trustee, other than to reflect cost-of-living increases or to reflect changes approved by the Bankruptcy Court as otherwise provided herein; provided that any change to the compensation of the Delaware Trustee shall also require the consent of the Delaware Trustee;

(vi)    to take actions to minimize any tax on the NAS Monitoring Trust Assets; provided that no such action may be taken if it prevents the NAS Monitoring

18

Trust from qualifying as a Qualified Settlement Fund within the meaning of the QSF Regulations; *provided further* that even if permitted by the Treasury Regulations governing Qualified Settlement Funds, no election shall be filed by or on behalf of the NAS Monitoring Trust for the NAS Monitoring Trust to be treated as a grantor trust for federal income tax purposes;

(vii)    to amend any provision of this Trust Agreement or the NAS Monitoring TDP in accordance with the terms thereof; *provided* that no such amendment shall be in contravention of the Plan, including, but not limited to, causing the NAS Monitoring Trust to fail to qualify as a Qualified Settlement Fund within the meaning of the QSF Regulations;

(viii)    to acquire an interest in, or to merge any claims resolution organization formed by the NAS Monitoring Trust with, another claims resolution organization that is not specifically created by the Plan, this Trust Agreement or the NAS Monitoring TDP, or to contract with another claims resolution organization or other entity that is not specifically identified by the Plan, this Trust Agreement or the NAS Monitoring TDP, or permit any other party to join in any claims resolution organization that is formed by the NAS Monitoring Trust pursuant to this Trust Agreement or the NAS Monitoring TDP; *provided* that such acquisition, merger, contract, or joinder shall not (a) subject NewCo, TopCo, PPLP, the Liquidating Debtors, the Transferred PPLP Subsidiaries, the other Debtors, any successors in interest thereto, or the Protected Parties to any risk of having

19

any NAS Monitoring Channeled Claim asserted against it or them, or (b) otherwise jeopardize the validity or enforceability of any injunction or release issued or granted in connection with the Plan and/or the Confirmation Order, (c) permit the surviving organization to make decisions about the allowability and value of claims that are not in accordance with the NAS Monitoring TDP, or (d) cause the NAS Monitoring Trust to fail to qualify as a Qualified Settlement Fund within the meaning of the QSF Regulations; provided further that the terms of such merger will require the surviving organization to make decisions about the evaluation of NAS Monitoring Channeled Claims in accordance with the NAS Monitoring TDP;

    (ix)    delegate any or all of the authority herein conferred with respect to the investment of all or any portion of the NAS Monitoring Trust Assets to any one or more reputable individuals or recognized institutional investment advisors or investment managers without liability for any action taken or omission made because of any such delegation, except as provided in Section 4.4 herein.

    (f)    The Trustee shall meet with the TAC no less often than annually but shall meet with the TAC on the frequency required to obtain the consent and approval of a majority of the members of the TAC as required by this Trust Agreement. Meetings between the Trustee and the TAC may be held in person, telephonically, or by video conferencing. The Delaware Trustee shall not be required, but may be permitted, to attend meetings.

(g)    The Trustee, upon notice from the TAC, if practicable in view of pending business, shall at its next meeting with the TAC consider issues submitted by the TAC for consideration by the NAS Monitoring Trust. The Trustee shall keep the TAC reasonably informed regarding all aspects of the administration of the NAS Monitoring Trust.

(h)    If a special meeting is requested by a majority of the members of the TAC, the Trustee shall notice, hold and attend such meeting. Reasonably prior to such meeting, the TAC shall provide the Trustee with an agenda of the issues for discussion or resolution at such special meeting.

**2.3    Qualified Settlement Fund**.

(a)    The NAS Monitoring Trust is intended to be treated for U.S. federal income tax purposes as a "qualified settlement fund" within the meaning of the QSF Regulations. Accordingly, for all U.S. federal income tax purposes the transfer of assets to the NAS Monitoring Trust or any Trust Subaccount or Series will be treated as a transfer to a trust satisfying the requirements of the QSF Regulations.

(b)    The Trustee shall be the "administrator" of the NAS Monitoring Trust within the meaning of section 1.468B-2(k)(3) of the Treasury Regulations, and shall (i) timely file such income tax and other returns and statements required to be filed and shall timely pay, out of the NAS Monitoring Trust Operating Reserve, all taxes required to be paid by the NAS Monitoring Trust, (ii) comply with all applicable reporting and withholding obligations, (iii) satisfy all requirements necessary to qualify and maintain qualification of the NAS Monitoring Trust as a Qualified Settlement Fund within the meaning of the QSF Regulations, and (iv) take no action that could cause the NAS Monitoring Trust to fail to qualify as a Qualified Settlement Fund within the meaning of the QSF Regulations. Even if permitted by the QSF Regulations, no election shall be

21

filed by or on behalf of the NAS Monitoring Trust for the NAS Monitoring Trust to be treated as a grantor trust for federal income tax purposes.

(c)    The Trustee shall be responsible for all of the NAS Monitoring Trust's tax matters, including, without limitation, tax audits, claims, defenses and proceedings. The Trustee may request an expedited determination under section 505(b) of the Bankruptcy Code for all tax returns filed by or on behalf of the NAS Monitoring Trust for all taxable periods through the dissolution of the NAS Monitoring Trust. The Trustee shall also file (or cause to be filed) any other statement, return or disclosure relating to the NAS Monitoring Trust that is required by any governmental unit and be responsible for payment, out of the NAS Monitoring Trust Assets, of any taxes imposed on the NAS Monitoring Trust or its assets. Taxes shall not be considered expenses for the operation and administration of the NAS Monitoring Trust, which are subject to the limitation set forth in Section  3.3(a).

(d)    No provision in this Trust Agreement shall be construed to mandate any distribution on any claim or other action that would contravene the Trust's compliance with the requirements of a "qualified settlement fund" within the meaning of the QSF Regulations.

(e)    The NAS Monitoring Trust may withhold from any Distribution to a Grant Recipient or Grantee such sum or sums as may be necessary to pay any taxes or other charges which have been or may be imposed on the NAS Monitoring Trust under the income tax laws of the United States or of any state or political subdivision or entity by reason of any Distribution provided for herein or in the Plan or this Agreement, whenever such withholding is required by any law, regulation, rule, ruling, directive or other governmental requirement. All such amounts withheld and paid to the appropriate tax authority shall be treated as amounts distributed to such Grant Recipient or Grantee for all purposes of this Trust Agreement. The Trustee shall be authorized to

collect such tax information from the Grant Recipient or Grantee (including tax identification numbers) as in its sole discretion the Trustee deems necessary to effectuate the Plan, the Confirmation Order, and this Trust Agreement. In order to receive Distributions, all Grant Recipients or Grantees shall be required to provide tax information to the Trustee to the extent the Trustee deem appropriate in the manner and in accordance with the procedures from time to time established by the Trustee for these purposes. The Trustee may refuse to make a Distribution to a Grant Recipient or Grantee that fails to furnish such information in a timely fashion; provided, however, that, upon the delivery of such information by a Grant Recipient or Grantee, the Trustee shall make such Distribution to which such Grant Recipient or Grantee is entitled, without additional interest occasioned by such Grant Recipient's or Grantee's delay in providing tax information. Notwithstanding the foregoing, if a Grant Recipient or Grantee fails to furnish any tax information reasonably requested by the Trustee before the date that is three hundred sixty-five (365) calendar days after the request is made, the amount of such Distribution shall irrevocably revert to the Trust, and any right of the Grant Recipient or Grantee to such Distribution shall be discharged and forever barred from assertion against the NAS Monitoring Trust or its property.

(f)    The Trustee, in the exercise of its discretion and judgment, may enter into agreements with taxing or other authorities for the payment of such amounts as may be withheld in accordance with the provisions of this SectionSECTION II. Notwithstanding the foregoing, but without prejudice to the Trust's rights hereunder, a Grant Recipient or Grantee receiving a NAS Monitoring Grant shall have the right with respect to the United States or any state or political subdivision or entity to contest the imposition of any tax or other charge by reason of any distribution hereunder or under the Plan to the extent permitted by law.

(g)    The Trustee shall file, or cause to be filed, any other statements, returns or disclosures relating to the NAS Monitoring Trust that are required by any governmental unit or applicable law.

**2.4    Claims Administration.** The Trustee shall promptly proceed to implement the NAS Monitoring TDP.

<div align="center">

**SECTION III**

**ACCOUNTS, INVESTMENTS, AND PAYMENTS**

</div>

**3.1    Accounts**.

(a)    The Trustee may, from time to time, create such accounts and reserves within the NAS Monitoring Trust estate as he or she deems necessary, prudent or useful in order to provide for the payment of expenses and the making NAS Monitoring Grants to Grant Recipients and Grantees in accordance with this Trust Agreement and the NAS Monitoring TDP, and may, with respect to any such account or reserve, restrict the use of monies therein, and the earnings or accretions thereto (the **"Trust Subaccounts"**). Any such Trust Subaccounts established by the Trustee shall be held as NAS Monitoring Trust Assets and are not intended to be subject to separate entity tax treatment as a "disputed claims reserve" within the meaning of the Internal Revenue Code and the Treasury Regulations promulgated thereunder, a "disputed ownership fund" within the meaning of the Treasury Regulations promulgated under the Internal Revenue Code, or otherwise.

(b)    The Trustee shall establish a separate Trust Subaccount for each NAS Monitoring Grant Awarded, and the Distribution to a Grant Recipient or Grantee for funding of an NAS Abatement Program shall be paid from such Trust Subaccount established by the Trustee for such Grant Recipient or Grantee. No Distribution payable from a Trust Subaccount for a Grant Recipient or Grantee shall be payable from any other Trust Subaccount established by the Trustee. The sole recourse of any Grant Recipient or Grantee for the amount of a Grant so Awarded shall

<div align="center">24</div>

be against the separate Trust Subaccount established for the funding of the NAS Abatement Program sponsored by such Grant Recipient or Grantee. No Grant Recipient or Grantee shall have the right to make a claim against the NAS Monitoring Trust or any Trust Subaccount established by the Trust for the Award of a Grant until a specific monetary amount is Awarded to such Grant Recipient or Grantee for the funding of an NAS Abatement Program.

(c)    The Trustee shall include a reasonably detailed description of the creation of any account or reserve in accordance with this Section 3.1 and, with respect to any such account, the transfers made to such account, the proceeds of or earnings on the assets held in each such account, and the payments from each such account in the Annual Reports to be provided to the Master Disbursement Trust pursuant to Section 2.2 above.

(d)    With the exception of the NAS Monitoring Trust Operating Reserve, the amounts in which shall not exceed in the aggregate a value equal to one and one-half percent (1.5%) of the Net Trust Assets, the Net Trust Assets of the NAS Monitoring Trust shall be reserved for the payment of amounts which the NAS Monitoring Trust Awards as Grants to fund NAS Abatement Programs. In no event shall any of the Net Trust Assets of the NAS Monitoring Trust be utilized or expended for payments on account of any NAS Monitoring Claims.

(e)    As authorized by Sections 3804 and 3806 of the Act, the Certificate of Trust shall declare that any Fund established by this Trust Agreement shall constitute a separate and distinct Series of the NAS Monitoring Trust, such that the debts, liabilities, obligations and expenses incurred, contracted for or otherwise existing with respect to a particular Fund shall be enforceable against the assets of such Fund only, and not against the assets of the NAS Monitoring Trust generally or any other Fund established by the NAS Monitoring Trust. To effectuate such enhanced liability limitation, the Trustee shall (a) maintain separate and distinct records for each Fund;

25

(b) hold and account for the assets of each Fund by separate and distinct accounts and records which are held and maintained separately from the other assets of the NAS Monitoring Trust and any other Fund thereof; and (c) set forth in the filed Certificate of Trust the terms and provisions of this paragraph so as to give legal notice of this enhanced liability limitation to all non-parties to this Agreement. The terms "Fund," "Trust Subaccount," and "Series," as used in this Agreement, shall be synonymous.

**3.2**     **Investments.** Though not anticipated, any investment of monies held in the NAS Monitoring Trust shall be administered by the Delaware Trustee in a manner consistent with the standards set forth in the Uniform Prudent Investor Act.

**3.3**     **Source of Payments.**

(a)     All NAS Monitoring Trust expenses and payments, Awards of NAS Monitoring Grants and all liabilities with respect to NAS Monitoring Channeled Claims shall be payable solely by the Trustee out of the NAS Monitoring Trust Assets. Neither the Trustee, the Delaware Trustee, the TAC, nor any of their officers, employees, consultants, advisors, and agents, nor the Debtors, nor any other Protected Party, shall be liable for the payment of any NAS Monitoring Trust expense or any other liability of the NAS Monitoring Trust, except to the extent explicitly provided for in (i) the Plan or, (ii) solely with respect to the Trustee, the Delaware Trustee, the TAC, and any of their officers, employees, consultants, advisors, and agents, the Plan Documents.

(b)     The Trustee shall include in the Annual Report a reasonably detailed description of any payments made in accordance with this Section  3.3.

(c)     The Trustee, with the consent of the TAC, shall establish and implement billing guidelines applicable to the Trustee and the TAC, as well as their respective professionals who seek compensation from the NAS Monitoring Trust.

## SECTION IV

### TRUSTEE; DELAWARE TRUSTEE

**4.1    Number.** In addition to the Delaware Trustee appointed pursuant to Section 4.14, there shall be one (1) Trustee, which shall be the Person appearing on the signature page(s) of this Trust Agreement.

**4.2    Term of Service.**

(a)    The Trustee shall serve from the Effective Date until the earliest of (i) the end of his or her term, (ii) his or her death, (iii) his or her resignation pursuant to Section 4.2(b) herein, (iv) his or her removal pursuant to Section 4.2(c) herein, or (v) the termination of the NAS Monitoring Trust pursuant to Section 6.3 herein.

(b)    The Trustee may resign at any time by written notice to the TAC and the trustees of the Master Disbursement Trust. Such notice shall specify a date on which such resignation shall take effect, which shall not be less than ninety (90) days after the date such notice is given, where practicable.

(c)    In the event that the Trustee becomes unable to discharge his or her duties hereunder due to an accident or physical or mental deterioration or for other good cause, the Trustee may be removed and replaced pursuant to an order of the Bankruptcy Court at the recommendation of a majority of the members of the TAC. Good cause shall be deemed to include, without limitation, any substantial failure of the Trustee to comply with the provisions of this Trust Agreement, a consistent pattern of neglect and failure to perform or participate in performing the duties of the Trustee hereunder, or repeated non-attendance at scheduled meetings. Such removal shall require the approval of the Bankruptcy Court and shall require the appointment of a successor Trustee by the Bankruptcy Court.

**4.3**    **Appointment of Successor Trustee**.

(a)    In the event of a vacancy in the Trustee position, whether by term expiration, death, retirement, resignation, removal, or because the Trustee is otherwise unable to perform his or her functions as Trustee, the vacancy shall be filled by the majority vote of the TAC. In the event that the TAC fails to secure a majority vote for the appointment of a Successor Trustee, the Bankruptcy Court shall make the appointment.

(b)    Immediately upon the appointment of any successor Trustee, all rights, titles, duties, powers, and authority of the predecessor Trustee hereunder shall be vested in, and undertaken by, the Successor Trustee without any further act. No successor Trustee shall be liable personally for any act or omission of his or her predecessor Trustee. No successor Trustee shall have any duty to investigate the acts or omissions of his or her predecessor Trustee.

(c)    Each successor Trustee shall serve until the earliest of (i) his or her death, (ii) his or her resignation pursuant to Section 4.2(b) herein, (iii) his or her removal pursuant to Section 4.2(c) herein, or (iv) the termination of the NAS Monitoring Trust pursuant to Section 6.3 herein.

(d)    Nothing in this Trust Agreement shall prevent the reappointment of an individual serving as Trustee for one or more additional terms.

(e)    The resignation or removal of the Trustee shall not operate to terminate the NAS Monitoring Trust or to revoke or invalidate any action taken by the Trust.

(f)    In the event of the resignation or removal of the Trustee, such Trustee shall (a) promptly execute and deliver such documents, instruments and other writings as may be reasonably requested by the successor Trustee to effect the termination of the Trustee's capacity under this Trust Agreement and the conveyance of the assets then held by the Trustee to such

Trustee's successor, (b) deliver to the successor Trustee all documents, instruments, records and other writings related to the NAS Monitoring Trust as may be in the possession of the Trustee, and (c) otherwise assist and cooperate in effecting the assumption of his or her obligations and functions by such successor Trustee.

**4.4     Liability of Trustee and Others.** [To the maximum extent permitted by applicable law, the Trustee, the Delaware Trustee and the members of the TAC shall not have or incur any liability for actions taken or omitted in their respective official capacities, or on behalf of the NAS Monitoring Trust, except those acts found by Final Order to be arising out of their willful misconduct, bad faith, gross negligence or fraud, and shall be entitled to indemnification and reimbursement for reasonable fees and expenses in defending any and all of their actions or inactions in their respective official capacities as Trustee, Delaware Trustee or a member of the TAC, or on behalf of the NAS Monitoring Trust, except for any actions or inactions found by Final Order to be arising out of their willful misconduct, bad faith, gross negligence or fraud. Any valid indemnification claim of the Trustee, the Delaware Trustee or members of the TAC shall be satisfied from the NAS Monitoring Trust.][6]

**4.5     Compensation and Expenses of Trustee**.

(a)     Subject to the limitations set forth in Section  3.1, the Trustee may pay from the NAS Monitoring Trust Operating Reserve reasonable compensation to the Trustee and any employees,

---

[6] Subject to ongoing discussion.

contractors or professionals retained by the Trust. The amounts of such compensation shall be determined by a vote of the majority members of the TAC.

(b)    The NAS Monitoring Trust will promptly reimburse the Trustee for all reasonable out-of-pocket costs and expenses incurred by the Trustee in connection with the performance of their duties hereunder, which costs and expenses shall be paid as Trust Expenses.

(c)    The NAS Monitoring Trust shall include in the Annual Report a description of the amounts paid under this Section  4.5.

**4.6    Indemnification of Trustee and Others**.

(a)    [To the maximum extent permitted by applicable law, the Trustee, members of the TAC and the Delaware Trustee shall be entitled to indemnification and reimbursement for reasonable fees and expenses (other than taxes in the nature of income taxes imposed on compensation paid to such persons) in defending any and all of their actions or inactions in their respective official capacities as Trustee, Delaware Trustee or a member of the TAC, or on behalf of the NAS Monitoring Trust, except for any actions or inactions found by Final Order to be arising out of their willful misconduct, bad faith, gross negligence or fraud. Any valid indemnification claim of the Trustee, the Delaware Trustee or members of the TAC shall be satisfied from the NAS Monitoring Trust. Notwithstanding the foregoing, no individual shall be indemnified or defended in any way for any liability, expense, claim, damage, or loss for which he or she is ultimately liable under Section  4.4 herein.

(b)    Reasonable expenses, costs and fees (including attorneys' fees and costs) incurred by or on behalf of the Trustee, members of the TAC, the Delaware Trustee, or an Additional Indemnitee in connection with any action, suit, or proceeding, whether civil, administrative, or arbitrative, from which they are indemnified by the NAS Monitoring Trust pursuant to Section 4.6(a) herein, shall

be paid by the NAS Monitoring Trust in advance of the final disposition thereof upon receipt of an undertaking, by or on behalf of the Trustee, the member of the TAC, the Delaware Trustee, or the Additional Indemnitees (as applicable), to repay such amount in the event that it shall be determined ultimately by Final Order that the Trustee, the member of the TAC, the Delaware Trustee, or the Additional Indemnitees (as applicable) is not entitled to be indemnified by the NAS Monitoring Trust.

(c)    The NAS Monitoring Trust must purchase and maintain reasonable amounts and types of insurance on behalf of each individual who is or was a Trustee, a member of the TAC, the Delaware Trustee, or an Additional Indemnitee, including against liability asserted against or incurred by such individual in that capacity or arising from his or her status as a Trustee, TAC member, Delaware Trustee, or Additional Indemnitee.][7]

**4.7    Lien.** The Trustee, members of the TAC, and the Additional Indemnitees shall have a first priority lien upon the NAS Monitoring Trust Assets to secure the payment of any amounts payable to them pursuant to Section  4.6 herein or any undisputed compensation.

**4.8    Trustee's Employment of Experts.**

(a)    The Trustee shall retain and/or consult counsel, accountants, appraisers, auditors, forecasters, experts, financial and investment advisors, and such other parties deemed by the Trustee to be qualified as experts on the matters submitted to them, including without limitation the Delaware Trustee (the **"Trust Professionals"**), regardless of whether any such party is affiliated with the NAS Monitoring Trust or the Trustee in any manner (except as otherwise expressly provided in this Trust Agreement), the cost of which shall be paid as a Trust Expense. In the absence of a bad faith violation of the implied contractual covenant of good faith and fair

---

[7] Subject to ongoing discussion.

dealing within the meaning of 12 Del. C. § 3806(e), the written opinion of or information provided by any such party deemed by the Trustee to be an expert on the particular matter submitted to such party shall be full and complete authorization and protection in respect of any action taken or not taken by the Trustee hereunder in good faith and in accordance with the written opinion of or information provided by any such party.

**4.9    Unauthorized Business.** The Trustee shall not at any time on behalf of the NAS Monitoring Trust (a) enter into or engage in any business not authorized by this Trust Agreement, (b) accept an assignment of any right of action from any individual or entity other than the Debtors or their respective insurers, or (c) assume any liabilities of any individual or entity other than the Debtors. Furthermore, no part of the Trust, including its Net Trust Assets or its Trust Subaccounts, or interest or income derived therefrom, shall be used or disposed of by the Trustee in furtherance of any business, enterprise, objective or purpose other than as authorized by the Plan or this Trust Agreement.

**4.10    Trustee Independence.** The Trustee shall not, during the term of its service, hold a financial interest in, act as attorney or agent for, or serve as an officer or as any other professional for the Debtors. The Trustee shall not be a director, officer, employee, agent, or participant in any NAS Abatement Program which may be funded by the NAS Monitoring Trust, and the Trustee shall not receive or derive, directly or indirectly, any money or economic benefit therefrom. This limitation shall apply irrespective of whether the conduct of any such unauthorized business, enterprise, objective or purpose is deemed by the Trustee to be necessary or proper for the operation, administration, conservation or protection of the NAS Monitoring Trust. For the avoidance of doubt, this Section shall not be applicable to the Delaware Trustee.

**4.11   Limitation of Trustee's Authority.** Except as authorized by the Plan, the Confirmation Order, the Final Order, and/or this Trust Agreement, the NAS Monitoring Trust shall have no objective or authority to carry on or conduct any trade or business, or accept an assignment of any claim or right of action from, or assume liabilities of, any individual or entity other than the Debtors, including their predecessors and successors in interest. No part of the Net Trust Assets, or revenue or income derived therefrom, shall be used or disposed of by the NAS Monitoring Trust in furtherance of any unauthorized trade or business.

**4.12   Confidentiality.** The Trustee shall, during the period that it serves in such capacity under this Trust Agreement and following either the termination of this Trust Agreement or such Trustee's removal, incapacity or resignation hereunder, hold strictly confidential and not use for personal gain any material, non-public information of or pertaining to any entity to which any of the NAS Monitoring Trust Assets relate or of which it has become aware in its capacity as Trustee. Subject to requirements for public disclosure of information set forth in this Trust Agreement or under applicable law, the Trustee shall exercise his/her/its discretion in designating information as confidential.

**4.13   No Bond.** Neither the Trustee nor the Delaware Trustee shall be required to post any bond or other form of surety or security unless otherwise ordered by the Bankruptcy Court.

**4.14   Delaware Trustee.**

(a)    There shall at all times be a Delaware Trustee to serve in accordance with the requirements of the Act. The Delaware Trustee shall either be (i) a natural person who is at least 21 years of age and a resident of the State of Delaware or (ii) a legal entity that has its principal place of business in the State of Delaware in accordance with section 3807 of the Act, otherwise meets the requirements of applicable Delaware law and shall act through one or more persons

authorized to bind such entity. The initial Delaware Trustee shall be the individual or entity reflected on the signature pages of this Trust Agreement. If at any time the Delaware Trustee shall cease to be eligible in accordance with the provisions of this Section 4.14, it shall resign immediately in the manner and with the effect hereinafter specified in Section 4.14(c) herein. For the avoidance of doubt, the Delaware Trustee will only have such rights and obligations as expressly provided by reference to the Delaware Trustee hereunder.

(b)    The Delaware Trustee shall not be entitled to exercise any powers, nor shall the Delaware Trustee have any of the duties and responsibilities, of the Trustee set forth herein. The Delaware Trustee shall be one of the trustees of the NAS Monitoring Trust for the sole and limited purpose of fulfilling the requirements of section 3807 of the Act and for taking such actions as are required to be taken by a Delaware Trustee under the Act. The duties (including fiduciary duties), liabilities and obligations of the Delaware Trustee shall be limited to (i) accepting legal process served on the NAS Monitoring Trust in the State of Delaware and (ii) the execution of any certificates required to be filed with the Secretary of State of the State of Delaware that the Delaware Trustee is required to execute under section 3811 of the Act (acting solely at the written direction of the Trustee) and there shall be no other duties (including fiduciary duties) or obligations, express or implied, at law or in equity, of the Delaware Trustee. To the extent that, at law or in equity, the Delaware Trustee has duties (including fiduciary duties) and liabilities relating thereto to the NAS Monitoring Trust, the other Parties hereto or any beneficiary of the NAS Monitoring Trust, it is hereby understood and agreed by the other Parties hereto that such duties and liabilities are replaced by the duties and liabilities of the Delaware Trustee expressly set forth in this Trust Agreement. The Delaware Trustee shall have no liability for acts or omissions of the Trustee.

(c)    The Delaware Trustee shall serve until such time as the Trustee removes the Delaware Trustee or the Delaware Trustee resigns, and a successor Delaware Trustee is appointed by the Trustee in accordance with the terms of Section 4.14(d) herein. The Delaware Trustee may resign at any time upon the giving of at least sixty (60) days advance written notice to the Trustee; provided, that such resignation shall not become effective unless and until a successor Delaware Trustee shall have been appointed by the Trustee in accordance with Section 4.14(d) herein. If the Trustee does not act within such 60-day period, the Delaware Trustee may apply to the Court of Chancery of the State of Delaware for the appointment of a successor Delaware Trustee.

(d)    Upon the resignation or removal of the Delaware Trustee, the Trustee shall appoint a successor Delaware Trustee by delivering a written instrument to the outgoing Delaware Trustee. Any successor Delaware Trustee must satisfy the requirements of section 3807 of the Act. Any resignation or removal of the Delaware Trustee and appointment of a successor Delaware Trustee shall not become effective until a written acceptance of appointment is delivered by the successor Delaware Trustee to the outgoing Delaware Trustee and the Trustee and any undisputed fees and expenses due to the outgoing Delaware Trustee is paid. Following compliance with the preceding sentence, the successor Delaware Trustee shall become fully vested with all of the rights, powers, duties and obligations of the outgoing Delaware Trustee under this Trust Agreement, with like effect as if originally named as Delaware Trustee, and the outgoing Delaware Trustee shall be discharged of its duties and obligations under this Trust Agreement.

(e)    The Delaware Trustee shall neither be required nor permitted to attend meetings relating to the NAS Monitoring Trust.

(f)    The Delaware Trustee shall be paid such compensation as agreed to pursuant to a separate fee agreement.

(g)    The NAS Monitoring Trust will promptly reimburse the Delaware Trustee for all reasonable out-of-pocket costs and expenses incurred by the Delaware Trustee in connection with the performance of its duties hereunder.

(h)    The Delaware Trustee shall be permitted to retain counsel only in such circumstances as required in the exercise of its obligations hereunder, and compliance with the advice of such counsel shall be full and complete authorization and protection for actions taken or not taken by the Delaware Trustee in good faith in compliance with such advice.

## SECTION V

## TRUST ADVISORY COMMITTEE

**5.1    Members**. The TAC shall be formed pursuant to the Plan as of the Effective Date. The TAC shall consist at all times of three (3) members, who shall initially be the individuals identified on the signature pages hereof. The initial members of the TAC, as well as any successor members of the TAC, shall be independent experts in medical, epidemiological, or other scientific fields and knowledgeable with regard to opioids, opioid use disorder, NAS, NAS Children, and/or medical, governmental or societal outreach, counseling, or intervention programs that would serve to abate, mitigate or treat the condition or occurrence of Neonatal Abstinence Syndrome. Of the three (3) members of the TAC, the NAS Committee shall select experts for appointment to and service on the TAC with the consent (not to be unreasonably withheld, conditioned or denied) of the Debtors. The TAC, in its discretion, may appoint ex officio members by the affirmative vote of a majority of the TAC. Ex officio members of the TAC shall not be entitled to vote. Each ex officio member shall be subject to all restrictions contained in this Trust Agreement.

**5.2    Duties.** The members of the TAC shall serve in a fiduciary, scientific, technical, operational and advisory capacity to the NAS Monitoring Trust and shall assist the Trustee in the

36

identification of NAS Abatement Programs for potential funding and in the determination of Awards of Grants to Grant Recipients or Grantees for the funding of NAS Abatement Programs in accordance with the NAS Monitoring TDP. The TAC shall have no fiduciary obligations or duties except as set forth in the preceding sentence. In addition, the members of the TAC will perform those functions which are necessary and which relate to issues or decisions which require the consent and approval of the TAC under the terms of this Trust Agreement. The Trustee must consult with the TAC on matters identified in Section 2.2(e) herein and in other provisions herein and must obtain the consent of the TAC on matters identified in Section 2.2(e) herein. Where provided in the NAS Monitoring TDP, certain other actions by the Trustee may also be subject to the consent of the TAC. Except for the duties and obligations expressed in this Trust Agreement and the documents referenced herein (including the NAS Monitoring TDP), there shall be no other duties (including fiduciary duties) or obligations, express or implied, at law or in equity, of the TAC. To the extent that, at law or in equity, the TAC has duties (including fiduciary duties) and liabilities relating thereto to the NAS Monitoring Trust, the other Parties hereto or any beneficiary of the NAS Monitoring Trust, it is hereby understood and agreed by the other Parties hereto that such duties and liabilities are replaced by the duties and liabilities of the TAC expressly set forth in this Trust Agreement and the documents referenced herein (including the NAS Monitoring TDP, the Plan and the Confirmation Order).

**5.3    Term of Office.**

(a)    Each member of the TAC shall serve until the earlier of (i) his or her death, (ii) his or her resignation pursuant to Section 5.3(b) herein, (iii) his or her removal pursuant to

Section 5.3(c) herein, (iv) the end of his or her term as provided herein, or (v) the termination of the NAS Monitoring Trust pursuant to Section 6.3 herein.

(b)    A member of the TAC may resign at any time by written notice to the other members of the TAC, if any, and to the Trustee. Such notice shall specify a date when such resignation shall take effect, which shall not be less than ninety (90) days after the date such notice is given, where practicable.

(c)    A member of the TAC may be removed in the event that he or she becomes unable to discharge his or her duties hereunder due to accident, physical deterioration, mental incompetence, or a consistent pattern of neglect and failure to perform or to participate in performing the duties of such member hereunder, such as repeated nonattendance at scheduled meetings, or for other good cause. Such removal may be made by the Bankruptcy Court on the motion of the remaining members of the TAC, or the NAS Monitoring Trustee.

**5.4    Appointment of Successors**.

(a)    In the event of death, resignation, or removal of a member of the TAC, a successor member shall be appointed such that the TAC shall continue to consist, at all times, of three (3) members. A successor member of the TAC shall be selected by a majority vote of the remaining members of the TAC and the Trustee.

(b)    Each successor member of the TAC shall serve until the earliest of (i) his or her death, (ii) his or her resignation, (iii) his or her removal, or (iv) the termination of the NAS Monitoring Trust pursuant to Section 6.3, below. No successor TAC member shall be liable personally for any act or omission of his or her predecessor TAC member. No successor TAC member shall have any duty to investigate the acts or omissions of his or her predecessor TAC

member. No TAC member shall be required to post any bond or other form of surety or security unless otherwise ordered by the Bankruptcy Court.

**5.5     TAC's Employment of Professionals**.

(a)     The TAC may, but is not required to, retain and/or consult counsel, accountants, appraisers, auditors, forecasters, experts, financial and investment advisors, and such other parties deemed by the TAC to be qualified as experts on the matters submitted to them (the **"TAC Professionals"**). The TAC and the TAC Professionals shall at all times have complete access to the NAS Monitoring Trust's officers, employees, and agents, as well as to the Trust Professionals, and shall also have complete access to all non-privileged information generated by them or otherwise available to the NAS Monitoring Trust or the Trustee. In the absence of a bad faith violation of the implied contractual covenant of good faith and fair dealing within the meaning of 12 Del. C. § 3806(e), the written opinion of or information provided by any TAC Professional or Trust Professional deemed by the TAC to be an expert on the particular matter submitted to such party shall be full and complete authorization and protection in respect of any action taken or not taken by the TAC in good faith and in accordance with the written opinion of or information provided by the TAC Professional or Trust Professional.

(b)     The NAS Monitoring Trust shall promptly reimburse, or pay directly if so instructed, the TAC for all reasonable fees and costs associated with the TAC's employment of legal counsel and forecasters (including estimation consultants and experts) pursuant to this provision in connection with the TAC's performance of its duties hereunder. The NAS Monitoring Trust shall also promptly reimburse, or pay directly if so instructed, the TAC for all reasonable fees and costs associated with the TAC's employment of any other TAC Professional pursuant to this provision in connection with the TAC's performance of its duties hereunder; provided, however, that (i) the

TAC has first submitted to the NAS Monitoring Trust a written request for such reimbursement setting forth (A) the reasons why the TAC desires to employ such TAC Professional, and (B) the basis upon which the TAC seeks advice independent of the Trust Professionals to meet the need of the TAC for such expertise or advice, and (ii) the NAS Monitoring Trust has approved the TAC's request for reimbursement in writing, which approval must not be unreasonably withheld, delayed, or denied. If the NAS Monitoring Trust agrees to pay for the TAC Professional, such reimbursement shall be treated as an NAS Monitoring Trust expense. If the NAS Monitoring Trust declines to pay for the TAC Professional, it must set forth its reasons in writing. If the TAC still desires to employ the TAC Professional at the NAS Monitoring Trust's expense, the TAC and/or the Trustee shall resolve their dispute pursuant to Section 6.14 herein.

(c)    In the event that the TAC retains counsel in connection with any matter whether or not related to any claim that has been or might be asserted against the TAC and irrespective of whether the NAS Monitoring Trust pays such counsel's fees and related expenses, any communications between the TAC and such counsel shall be deemed to be within the attorney-client privilege and protected by section 3333 of title 12 of the Delaware Code, regardless of whether such communications are related to any claim that has been or might be asserted by or against the TAC and regardless of whether the NAS Monitoring Trust pays such counsel's fees and related expenses.

**5.6    Compensation and Expenses of the TAC.** Subject to the limitations set forth in Section 4.5 above, each member of the TAC shall receive compensation from the NAS Monitoring Trust Operating Reserve for attendance at meetings or the performance of other Trust business at a reasonable hourly rate set and determined by a majority vote of the members of the TAC. The Trustee shall promptly reimburse each member of the TAC from the NAS Monitoring Trust

Operating Reserve for any reasonable out-of-pocket fees and expenses incurred by him or her in connection with the performance of his or her duties as a member of the TAC. The NAS Monitoring Trust shall include a description of the amounts paid under this Section 5.6 in the Annual Report to be provided to the Master Disbursement Trust pursuant to Section 2.2.

<div align="center">

**SECTION VI**

**<u>GENERAL PROVISIONS</u>**

</div>

6.1    **Procedures for Consulting with or Obtaining Consent of the TAC**.

(a)    Consultation Process.

(i)    In the event the Trustee is required to consult with the TAC as provided herein, the Trustee shall provide the TAC with written advance notice of the matter under consideration, and with all relevant information concerning the matter as is reasonably practicable under the circumstances. The Trustee shall also provide the TAC with such reasonable access to Trust Professionals and other experts retained by the NAS Monitoring Trust and its staff (if any) as the TAC may reasonably request during the time that the Trustee is considering such matter, and shall also provide TAC the opportunity, at reasonable times and for reasonable periods of time, to discuss and comment on such matter with the Trustee; provided that in no event shall the TAC or its members (A) have any role, whether by consent, consultation or otherwise, in the NAS Monitoring Trust's selection of counsel, experts or other professionals to defend Trust Claims against the NAS Monitoring Trust, or (B) have any right to consult with or obtain information from the NAS Monitoring Trust or anyone employed by the

<div align="center">41</div>

NAS Monitoring Trust concerning the defense of any such NAS Monitoring Trust Claims.

(ii)     In determining when to take definitive action on any matter subject to the consultation process set forth in this Section 6.1, the Trustee shall take into consideration the time required for the TAC, if its members so wish, to engage and consult with its own independent financial or investment advisors as to such matter. In any event, the Trustee shall not take definitive action on any such matter until at least thirty (30) days after providing the TAC with the initial written notice that such matter is under consideration by the Trustee, unless such time period is waived by the TAC.

(b)     Consent Process.

(i)     In the event the Trustee is required to obtain the consent of the TAC pursuant to Section 2.2(f) herein, the NAS Monitoring TDP, the Plan, or otherwise, the Trustee shall provide the TAC with a written notice stating that its consent is being sought pursuant to that provision, describing in detail the nature and scope of the action the Trustee proposes to take, and explaining in detail the reasons why the Trustee desires to take such action. The Trustee shall provide the TAC as much relevant additional information concerning the proposed action as is reasonably practicable under the circumstances. The Trustee shall also provide the TAC with such reasonable access to the Trust Professionals and other experts retained by the NAS Monitoring Trust and its staff (if any) as the TAC may reasonably request during the time that the Trustee is considering such action, and shall

42

also provide the TAC the opportunity, at reasonable times and for reasonable periods of time, to discuss and comment on such action with the Trustee.

(ii)     The TAC must consider in good faith and in a timely fashion any request for their consent by the Trustee and must in any event advise the Trustee in writing of its consent or objection to the proposed action within thirty (30) days of receiving the original request for consent from the Trustee, or within such additional time as the Trustee and TAC may agree. The TAC may not withhold its consent unreasonably. If the TAC decides to withhold its consent, it must explain in detail its objections to the proposed action. If the TAC does not advise the Trustee in writing of its consent or objections to the proposed action within thirty (30) days of receiving notice regarding such request (or any additional time period agreed to by the Trustee), then consent of the TAC to the proposed action shall be deemed to have been affirmatively granted.

(iii)    If, after following the procedures specified in this Section 6.1(b), the TAC continues to object to the proposed action and to withhold its consent to the proposed action, the Trustee and the TAC shall resolve their dispute pursuant to Section 6.14. The TAC shall bear the burden of proving that it reasonably withheld its consent. If the TAC meets that burden, the NAS Monitoring Trust shall then bear the burden of showing why it should be permitted to take the proposed action notwithstanding the TAC or Trustee's reasonable objection.

**6.2** **Irrevocability.** To the fullest extent permitted by applicable law, the NAS Monitoring Trust is irrevocable.

**6.3** **Term; Termination**.

(a)    The term for which the NAS Monitoring Trust is to exist shall commence on the date of the filing of the Certificate of Trust and shall terminate pursuant to the provisions of Section 6.3(b) - (d) herein.

(b)    The NAS Monitoring Trust shall automatically dissolve on the earlier of date (the **"Dissolution Date"**) (i) that is 24 months after the NAS Monitoring Trust receives its last distribution from the MDT, unless the Trustee determines, after consulting with the TAC, to extend the Dissolution Date for an additional 12 months, or (ii) on which the Trustee determines to dissolve the NAS Monitoring Trust upon completion of its duties and the satisfaction of the purposes of the NAS Monitoring Trust.

(c)    On the Dissolution Date (or as soon thereafter as is reasonably practicable), after the wind-up of the NAS Monitoring Trust's affairs by the Trustee and payment of all the NAS Monitoring Trust's liabilities have been provided for as required by applicable law including section 3808 of the Act, all monies remaining in the NAS Monitoring Trust shall be given to charitable organization(s) exempt from federal income tax under section 501(c)(3) of the Internal Revenue Code, which tax-exempt organization(s) shall be selected by the Trustee using its reasonable discretion; provided, however, that (i) if practicable, the activities of the selected tax-exempt organization(s) shall be related to the treatment of, research on the cure of, or other relief for individuals suffering from OUD, and (ii) the tax-exempt organization(s) shall not bear any relationship to the Debtors within the meaning of section 468B(d)(3) of the Internal Revenue Code.

Notwithstanding any contrary provision of the Plan and related documents, this Section 6.3(c) cannot be modified or amended.

(d)     Following the dissolution and distribution of the NAS Monitoring Trust Assets, the NAS Monitoring Trust shall terminate and the Trustee and the Delaware Trustee (acting solely at the written direction of the Trustee) shall execute and cause a Certificate of Cancellation of the Certificate of Trust of the NAS Monitoring Trust to be filed in accordance with the Act. Notwithstanding anything to the contrary contained in this Trust Agreement, the existence of the NAS Monitoring Trust as a separate legal entity shall continue until the filing of such Certificate of Cancellation.

(e)     After the termination of the NAS Monitoring Trust and for the purpose of liquidating and winding up the affairs of the Trust, the Trustee shall continue to act as such until all duties under the Plan and this Trust Agreement have been fully performed. Upon distribution of all of the assets of the NAS Monitoring Trust, or the proceeds thereof, the Trustee shall hold the books, records and files delivered to or created by the Trustee for a period of four years after the last distribution of assets from the NAS Monitoring Trust is made. All costs and expenses associated with the storage of such documents shall be paid by the Trust. At the Trustee's discretion, all such records and documents may be destroyed at any time after four years from the distribution of all of the assets of the NAS Monitoring Trust. Except as otherwise specifically provided herein, upon the distribution of all of the assets of the NAS Monitoring Trust, the Trustee shall have no further duties or obligations hereunder except to (a) account and report as provided in Section 2.1 above, and (b) perform such other acts as may be required by law.

(f)     Upon termination of the Trust, the Trustee shall file an accounting with the Bankruptcy Court setting forth the amount the Trustee has collected and disbursed, as well as the

fees and expenses incurred in administering the Trust, including the fees and expenses incurred by the Trustee and its professionals. The Trustee shall seek the issuance and entry of any orders necessary to approve such accounting and discharge the Trustee, the Delaware Trustee, and members of the TAC from any and all liability for acts or omissions in administering the NAS Monitoring Trust or for serving in their designated capacities under the Plan and this Trust Agreement. The Trust's professionals shall be required to maintain accurate time and expense records.

**6.4    Amendments.** The Trustee, after consultation with the TAC, and subject to the majority consent of the TAC, may modify or amend this Trust Agreement (except with respect to Section  6.3(c), which by its own terms is expressly not subject to modification or amendment). The Trustee, after consultation with the TAC, and subject to the consent of the TAC, may modify or amend the NAS Monitoring TDP; provided, however, that no amendment to the NAS Monitoring TDP shall (i) be inconsistent with the Plan or this Trust Agreement, (ii) have a material and adverse effect on Grant Recipients or Grantees' entitlements to NAS Monitoring Grants or (iii) be inconsistent with the provisions limiting amendments to that document provided therein. Any modification or amendment made pursuant to this Section must be done in writing. Notwithstanding anything contained in this Trust Agreement or the NAS Monitoring TDP to the contrary, neither this Trust Agreement, the NAS Monitoring TDP, nor any document annexed to the foregoing shall be modified or amended in any way that could jeopardize, impair, or modify (i) the applicability of section 105 of the Bankruptcy Code to the Plan, the Confirmation Order, or the NAS Monitoring Trust, (ii) the efficacy or enforceability of the Channeling Injunction or any other injunctions or releases issued or granted in connection with the Plan, (iii) the treatment of the NAS Monitoring Trust as a Qualified Settlement Fund within the meaning of the QSF

Regulations; or (iv) the Plan or the Confirmation Order. Any amendment affecting the rights, duties, immunities or liabilities of the Delaware Trustee shall require the Delaware Trustee's written consent. Any material change to the NAS Monitoring Trust Agreement or the NAS Monitoring Trust shall be made known to the notice parties in accordance with Section 6.7 below.

**6.5** **No Association, Partnership or Joint Venture.** This Trust Agreement is not intended to create and shall not be interpreted as creating an association, partnership or joint venture of any kind.

**6.6** **Severability.** Should any provision in this Trust Agreement be determined to be unenforceable, such determination shall in no way limit or affect the enforceability and operative effect of any and all other provisions of this Trust Agreement. If any term or provision so severed from this Trust shall be material to the purposes of the NAS Monitoring Trust or the fulfillment or execution thereof, the Trustee shall petition the Bankruptcy Court for amendment or reformation of this Trust Agreement. The remaining terms and provisions of this Trust Agreement shall remain in full force and effect and shall not be affected by the illegal, invalid or unenforceable provision or by its severance from this Trust Agreement. Moreover, this Trust Agreement shall be construed so as to limit any term or provision so as to make it a legal, valid and enforceable provision; provided, however, that such construction, to the maximum extent possible, shall give effect to the purposes of the Plan.

**6.7** **Notices**.

(a)    Notices to persons asserting claims shall be given by first class mail, postage prepaid, at the address of such person, or, where applicable, such person's legal representative, in each case as provided on such person's claim form submitted to the NAS Monitoring Trust in accordance with the NAS Monitoring TDP with respect to his or her NAS Monitoring Channeled Claim, or

by such other means, including electronic notice, as may be agreed between the NAS Monitoring Trust and the TAC.

(b)    Any notices or other communications required or permitted hereunder to the following Parties shall be in writing and delivered to the addresses or e-mail addresses designated herein, or to such other addresses or e-mail addresses as may hereafter be furnished in writing to each of the other Parties listed herein in compliance with the terms hereof.

(c)    To the NAS Monitoring Trust through the Trustee:

> c/o
>
> [_____]

With a copy to:

> [_____]

To the Delaware Trustee:

> [_____]

To the TAC:

> [_____]

With a copy to:

> [_____]

To the Debtors:

> [_____]

With a copy to:

> [_____]

(d)    All such notices and communications if mailed shall be effective when physically delivered at the designated addresses or, if electronically transmitted, when the communication is received at the designated addresses and confirmed by the recipient by return transmission.

**6.8    Successors and Assigns.** The provisions of this Trust Agreement shall be binding upon and inure to the benefit of the NAS Monitoring Trust, the TAC, the Trustee, and the Debtors, NewCo, TopCo, any Grant Recipient or Grantee that is Awarded a Grant or receives a Distribution, and their respective successors and assigns, except that neither the Trustee nor the TAC members may assign or otherwise transfer any of their rights or obligations, if any, under this Trust Agreement except in the case of the Trustee in accordance with Section 4.3 herein, the TAC members in accordance with Section 5.4 herein.

**6.9    Limitation on Claim Interests for Securities Laws Purposes.** NAS Monitoring Channeled Claims, and any interests therein, (a) shall not be assigned, conveyed, hypothecated, pledged, or otherwise transferred, voluntarily or involuntarily, directly or indirectly, except by will or under the laws of descent and distribution, or by operation of law; (b) shall not be evidenced by a certificate or other instrument; (c) shall not possess any voting rights; and (d) shall not be entitled to receive any dividends or interest; provided, however, that clause (a) of this Section 6.9 shall not apply to the holder of a claim that is subrogated to an NAS Monitoring Channeled Claim as a result of its resolution of such NAS Monitoring Channeled Claim.

**6.10    Entire Agreement; No Waiver.** The entire agreement of the Parties relating to the subject matter of this Trust Agreement is contained herein, and in the documents referred to herein (including the Plan and the NAS Monitoring TDP), and this Trust Agreement and such documents supersede any prior oral or written agreements concerning the subject matter hereof. No failure to exercise or delay in exercising any right, power, or privilege hereunder shall operate as a waiver

thereof, nor shall any single or partial exercise of any right, power, or privilege hereunder preclude any further exercise thereof or of any other right, power, or privilege. The rights and remedies herein provided are cumulative and are not exclusive of rights under law or in equity.

**6.11    Headings.** The headings used in this Trust Agreement are inserted for convenience only and do not constitute a portion of this Trust Agreement, nor in any manner affect the construction of the provisions of this Trust Agreement.

**6.12    Governing Law.** The validity and construction of this Trust Agreement and all amendments hereto and thereto shall be governed by the laws of the State of Delaware, and the rights of all Parties hereto and the effect of every provision hereof shall be subject to and construed according to the laws of the State of Delaware without regard to the conflicts of law provisions thereof that would purport to apply the law of any other jurisdiction; provided, however, that the Parties hereto intend that the provisions hereof shall control and therefore shall not be applicable to the NAS Monitoring Trust, the Trustee, the Delaware Trustee, the TAC, or this Trust Agreement, any provision of the laws (statutory or common) of the State of Delaware pertaining to trusts that relate to or regulate in a manner inconsistent with the terms hereof: (a) the filing with any court or governmental body or agency of Trustee accounts or schedules of Trustee fees and charges; (b) affirmative requirements to post bonds for the Trustee, officers, agents, or employees of a trust; (c) the necessity for obtaining court or other governmental approval concerning the acquisition, holding, or disposition of real or personal property; (d) fees or other sums payable to the Trustee, officers, agents, or employees of a trust; (e) the allocation of receipts and expenditures to income or principal; (f) restrictions or limitations on the permissible nature, amount, or concentration of trust investments or requirements relating to the titling, storage, or other manner of holding of assets of the NAS Monitoring Trust; (g) the existence of rights or interests (beneficial

or otherwise), if any, in assets of the NAS Monitoring Trust; (h) the ability of beneficial owners, if any, or other persons to terminate or dissolve a trust; or (i) the establishment of fiduciary or other standards or responsibilities or limitations on the acts or powers of the Trustee or beneficial owners that are inconsistent with the limitations on liability or authorities and powers of the Trustee, the Delaware Trustee, the TAC, or set forth or referenced in this Trust Agreement. Section 3540 of the Act shall not apply to the NAS Monitoring Trust.

**6.13  Settlors' Representative and Cooperation.** The Debtors are hereby irrevocably designated as the Settlors and are hereby authorized to take any action required of the Settlors in connection with the creation of this Trust. The Debtors agree to cooperate in the creation of this Trust.

**6.14  Dispute Resolution.** Any disputes between the Trustee and the TAC that arise under this Trust Agreement or under the NAS Monitoring TDP shall be resolved by submission of the matter to an alternative dispute resolution (**"ADR"**) consisting of arbitration before a single arbitrator to be appointed by the Bankruptcy Court. Should any party to the ADR process be dissatisfied with the decision of the arbitrator, that party may apply to the Bankruptcy Court for a judicial determination of the matter. In either case, if the dispute implicates any consent or approval by the TAC as provided in this Trust Agreement, the burden of proof shall be on the TAC or the members thereof to show that the TAC's consent or approval, or withholding of the same, was valid and consistent with the terms and purposes of this Trust Agreement. Should the dispute not be resolved by the ADR process within thirty (30) days after submission, the parties are relieved of the requirement to pursue ADR prior to application to the Bankruptcy Court.

**6.15  Enforcement and Administration.** The provisions of this Trust Agreement and the NAS Monitoring TDP shall be enforced by the Bankruptcy Court pursuant to Section 11.1 of the Plan

and the Confirmation Order. The Parties hereby acknowledge and agree that the Bankruptcy Court shall have continuing exclusive jurisdiction over the settlement of the accounts of the Trustee and over any disputes that arise under this Trust Agreement or the NAS Monitoring TDP and are not resolved by alternative dispute resolution in accordance with Section 6.14 herein.

6.16    **Effectiveness.** This Trust Agreement shall not become effective until the Effective Date of the Plan and it has been executed and delivered by all the Parties hereto.

6.17    **Counterpart Signatures.** This Trust Agreement may be executed in any number of counterparts and by different Parties on separate counterparts (including by PDF transmitted by e-mail), and each such counterpart shall be deemed to be an original, but all such counterparts shall together constitute one and the same instrument.

6.18    **Rights of Holders of NAS Monitoring Channeled Claims.** Notwithstanding any provision of this Trust Agreement to the contrary, the Holders of NAS Monitoring Channeled claims shall not be deemed to be beneficiaries of the NAS Monitoring Trust except for the sole purpose set forth in Section 1.5(e) herein.

IN WITNESS WHEREOF, the parties have executed this NAS Monitoring Trust

Agreement this the [__] day of [_____], [20__].

PURDUE PHARMA L.P.

By: _____

Title: _____

_____, solely in his/her/its capacity as TRUSTEE

By: _____

Title: _____

_____, solely in his/her/its capacity as DELAWARE TRUSTEE

By: _____

Title: _____

TRUST ADVISORY COMMITTEE:

By: _____

By: _____

By: _____

**Exhibit 1**

**CERTIFICATE OF TRUST**

**(TO FOLLOW)**

**Exhibit 2**

**NAS Monitoring TDP**

## EXHIBIT Q

**TPP Trust Agreement**

**TPP TRUST AGREEMENT**

**DATED AS OF _____, 2021**

# TABLE OF CONTENTS

PAGE

## SECTION I
### DEFINITIONS AND INTERPRETATIONS

**1.1 Definitions**................................................................................6
**1.2 Interpretation**...........................................................................8
**1.3 Particular Words**.......................................................................9

## SECTION II
### AGREEMENT OF TRUST

**2.1 Creation and Name**...................................................................9
**2.2 Purpose**....................................................................................9
**2.3 Transfer of Assets**...................................................................12
**2.4 Acceptance of Assets and Assumption of Liabilities**.............12
**2.5 Channeling Injunction**............................................................14

## SECTION III
### POWERS AND ADMINISTRATION OF THE TRUST

**3.1 Powers and Privileges**............................................................14
**3.2 General Administration**..........................................................20

## SECTION IV
### DISTRIBUTIONS

**4.1 Timing and Amount of Distributions**......................................28
**4.2 Location for Distributions; Notice of Change of Address**.......28
**4.3 Undeliverable Distributions and Unclaimed Property**.............28

## SECTION V
### ACCOUNTS, INVESTMENTS, AND PAYMENTS

**5.1 Accounts**................................................................................29
**5.2 Investments**............................................................................30
**5.3 Source of Payments**................................................................30

## SECTION VI
### TRUSTEE; DELAWARE TRUSTEE

**6.1 Number**...................................................................................31
**6.2 Term of Service**......................................................................31
**6.3 Appointment of Successor Trustee**.........................................32
**6.4 Liability of Trustee and Others**..............................................33

**6.5  Compensation and Expenses of Trustee** .................................................33
**6.6  Indemnification of Trustee and Others** ..................................................34
**6.7  Limited Recourse** .........................................................................35
**6.8  Confirmation of Survival of Provisions** ...............................................35
**6.9  Reliance** .................................................................................35
**6.10  Lien** .....................................................................................35
**6.11  The Trustee's Employment of Experts** ..................................................35
**6.12  Trustee Independence** ....................................................................36
**6.13  No Bond** .................................................................................36
**6.14  Delaware Trustee** ........................................................................36

## SECTION VII
## TRUST ADVISORY COMMITTEE

**7.1  Members** .................................................................................39
**7.2  Duties** ..................................................................................39
**7.3  Term of Office** ..........................................................................40
**7.4  Appointment of Successors** ...............................................................41
**7.5  TAC's Employment of Professionals** .......................................................41
**7.6  Expenses of the TAC** ......................................................................42

## SECTION VIII
## THIRD PARTY RIGHTS; LIMITATION OF LIABILITY

**8.1  Limited Recourse** ........................................................................42
**8.2  Parties Dealing With the Trustee** .........................................................43

## SECTION IX
## GENERAL PROVISIONS

**9.1  Procedures for Consulting with or Obtaining Consent of the TAC** .....................43
**9.2  Irrevocability** ...........................................................................45
**9.3  Term; Termination** ........................................................................45
**9.4  Amendments** ...............................................................................47
**9.5  Severability** .............................................................................48
**9.6  Notices** ..................................................................................48
**9.7  Successors and Assigns** ...................................................................50
**9.8  Limitation on Claim Interests for Securities Laws Purposes** ..........................50
**9.9  Entire Agreement; No Waiver** .............................................................50
**9.10  Headings** ................................................................................51
**9.11  Governing Law** ...........................................................................51
**9.12  Settlors' Representative and Cooperation** ..............................................52
**9.13  Dispute Resolution** ......................................................................52
**9.14  Enforcement and Administration** ..........................................................53
**9.15  Effectiveness** ...........................................................................53
**9.16  Counterpart Signatures** ..................................................................53

**EXHIBITS**

Exhibit A – TPP Abatement Claim Form

Exhibit B – TPP TDP

Exhibit C – Delaware Certificate of Trust

# TPP TRUST AGREEMENT

This TPP Trust Agreement (this "**Trust Agreement**"), dated as of the date set forth on the signature page hereof and effective as of the Effective Date,[1] is entered pursuant to the *[Fifth] Amended Joint Chapter 11 Plan of Reorganization of Purdue Pharma L.P. and Its Affiliated Debtors*, dated [June 3], 2021 (as may be modified, amended or supplemented from time to time, and together with all exhibits and schedules thereto, the **"Plan")**, by Purdue Pharma L.P. and its Debtor affiliates[2] (collectively referred to as the **"Debtors"** or **"Settlors"**),[3] _____ (the **"Delaware Trustee"**); Alan D. Halperin (the **"Trustee"**); and the Members of the TPP Trust Advisory Committee (the "**TAC**") identified on the signature pages hereof (together with the Debtors, the Delaware Trustee, and the Trustee, the **"Parties"**); and

**WHEREAS,** the Debtors have reorganized under the provisions of Chapter 11 of the Bankruptcy Code;

**WHEREAS**, the Confirmation Order has been entered by the Bankruptcy Court and the Effective Date of the Plan has occurred;

**WHEREAS**, the Plan provides, *inter alia*, for the creation of the TPP Trust (the "**TPP Trust**");

---

[1] All capitalized terms not otherwise defined herein shall have the meanings ascribed to them in the Plan and the TPP TDP.

[2] The Debtors in these cases are as follows:  Purdue Pharma L.P.; Purdue Pharma Inc.; Purdue Transdermal Technologies L.P.; Purdue Pharma Manufacturing L.P.; Purdue Pharmaceuticals L.P.; Imbrium Therapeutics L.P.; Adlon Therapeutics L.P.; Greenfield BioVentures L.P.; Seven Seas Hill Corp; Ophir Green Corp.; Purdue Pharma of Puerto Rico; Avrio Health L.P.; Purdue Pharmaceutical Products L.P.; Purdue Neuroscience Company; Nayatt Cove Lifescience Inc.; Button Land L.P.; Rhodes Associates L.P.; Paul Land Inc.; Quidnick Land L.P.; Rhodes Pharmaceuticals L.P.; Rhodes Technologies; UDF L.P.; SVC Pharma L.P.; and SVC Pharma Inc.

[3] The Chapter 11 Cases of the Debtors and Debtors in Possession are jointly administered under Case No. 19-23649 (RDD) in the United States Bankruptcy Court for the Southern District of New York (the **"Bankruptcy Court"**) and known as *In re Purdue Pharma L.P., et al.*, Case No. 19-23649 (RDD).

**WHEREAS** pursuant to the Plan, the TPP Trust shall be established to (i) assume all liability for the Third-Party Payor Channeled Claims, (ii) hold the MDT TPP Claim and collect the Initial TPP Trust Distribution and additional payments due under the MDT TPP Claim in accordance with the Private Entity Settlements and the TPP Trust Documents, (iii) administer Third-Party Payor Channeled Claims, (iv) make Abatement Distributions to Authorized Recipients for Authorized Abatement Purposes, in each case in accordance with the TPP Trust Documents, and (v) carry out such other matters as are set forth in the TPP TDP and the TPP Trust Documents;

**WHEREAS**, the Plan and the Master TDP provide that, on the Effective Date, any and all liability of the Debtors and the other Protected Parties for any and all Third-Party Payor Channeled Claims shall automatically, and without further act, deed or court order, be channeled to and assumed by the Master Disbursement Trust solely for the purpose of effectuating the Master TDP, and further provide that immediately thereafter, any and all TPP Channeled Claims shall automatically, and without further act, deed or court order, be channeled exclusively to and assumed by the TPP Trust;

**WHEREAS,** pursuant to the Plan and the Confirmation Order, the TPP Trust shall (i) hold, manage and invest all funds and other Assets received by the TPP Trust from the Master Disbursement Trust for the benefit of the beneficiaries of the TPP Trust; (ii) hold and maintain the TPP Trust Operating Reserve, as defined herein, and (iii) administer, process, resolve and liquidate all Third-Party Payor Channeled Claims in accordance with the TPP TDP;

**WHEREAS**, it is the intent of the Debtors, the Trustee and the TAC that the TPP Trust will evaluate the Third-Party Payor Channeled Claims and be in a financial position to make TPP

5

Abatement Distributions to TPP Authorized Recipients in accordance with the terms of this Trust Agreement and the TPP TDP;

**WHEREAS**, all rights of the Holders of Third-Party Payor Channeled Claims arising under this Trust Agreement and the TPP TDP shall vest upon the Effective Date;

**WHEREAS,** pursuant to the Plan, the TPP Trust is intended to qualify as a "qualified settlement fund" (a **"Qualified Settlement Fund"**) within the meaning of section 1.468B-1, et seq. of the Treasury Regulations promulgated under section 468B of the Internal Revenue Code (the "**QSF Regulations**") and be treated consistently for state and local tax purposes to the extent applicable;

**WHEREAS,** pursuant to the Plan and Confirmation Order, the TPP Trust and the Plan satisfy all the prerequisites for issuance of an injunction pursuant to section 105(a) of the Bankruptcy Code with respect to any and all of the Third-Party Payor Channeled Claims;

**NOW, THEREFORE,** it is hereby agreed as follows:

## SECTION I

## DEFINITIONS AND INTERPRETATIONS

**1.1     Definitions**.  The following definitions apply to the capitalized terms wherever those terms appear throughout this Trust Agreement. Any capitalized term defined in the prefatory paragraph, the recitals, this Section or any Section below shall have the meaning ascribed to such term therein. Any capitalized term not otherwise defined in this Agreement shall have the meaning set forth in the Plan or the TPP TDP, as applicable.

"**Act**" means Chapter 38 of title 12 of the Delaware Code, 12 Del. C. § 3801 et seq.

"**Member**" and "**Members**" means the member or members of the TAC identified in Section 7.1 hereof, and their successors, if any.

6

"**Permitted Investments**" shall include (a) short-term direct obligations of, or obligations guaranteed by, the United States of America, (b) short-term obligations of any agency or corporation that is or may hereafter be created by or pursuant to an act of the Congress of the United States as an agency or instrumentality thereof, (c) such other investments as the Bankruptcy Court may approve from time to time, (d) demand deposits or certificates of deposit at any nationally recognized bank or trust company that has, at the time of the deposit, a capital stock and surplus aggregating at least $1,000,000,000 and (e) other investments administered in a manner consistent with the standards set forth in the Uniform Prudent Investor Act promulgated by the National Conference of Commissioners on Uniform State Laws in 1994.

"**TPP Abatement Claim Form**" shall mean the document attached hereto as **Exhibit A** and which is also Appendix A to the TPP TDP, and which has the meaning set forth in the TPP TDP.  The TPP Abatement Claim Form may also be referred to as the Third Party Payor Claim Form.

"**TPP Authorized Recipient**" has the meaning ascribed to such term in the TPP TDP.

"**TPP TDP**" means the Third-Party Payor trust distribution procedures, a copy of which is attached hereto as **Exhibit B** and is incorporated herein by reference.

"**TPP Trust Assets**" has the meaning ascribed to it in Section 2.3.

"**TPP Trust Available Cash**" shall mean the aggregate TPP Trust Assets consisting of cash after paying, reserving against, or satisfying (a) allowed expenses of the Members or their professionals, if any, (b) the TPP Trust Operating Expenses, (c) reserves for disputed TPP Claims, and (d) payment assessments pursuant to Section 5.8(c) of the Plan, in favor of the Common Benefit Escrow and the Common Benefit Fund.

"**TPP Trust Operating Expenses**" means, with respect to the TPP Trust, any and all costs, expenses, fees, taxes, disbursements, debts or obligations incurred from the operation and administration of the TPP Trust, including without limitation, in connection with the reconciliation and administration of the Third-Party Payor Channeled Claims channeled to the TPP Trust, the costs of making distributions to holders of Third-Party Payor Channeled Claims, working capital, the costs of obtaining insurance, as referenced in subsection 3.1(c)(xvi) hereof, and all compensation, costs and fees of the Trustee, the Delaware Trustee, the Members of the TAC and any Trust Professionals.

"**TPP Trust Operating Reserve**" means the Trust Subaccount to be established to pay TPP Trust Operating Expenses, which shall be (i) funded with Cash and cash equivalents held by the TPP Trust in accordance with the TPP Trust Documents and (ii) held by the TPP Trust in a segregated account and administered by the Trustee.

"**Trustee**" shall mean the person named in the prefatory paragraph of this Trust Agreement and any successors or replacements duly appointed under the terms of this Trust Agreement.

"**Trust Professionals**" shall mean any consultant or professional retained or employed by the Trustee or the TPP Trust including without limitation, counsel, accountants, auditors, claims and healthcare industry professionals, financial and investment advisors, and such other parties, including the Delaware Trustee, deemed by the Trustee to be qualified and necessary, in his/her sole discretion, to assist the TPP Trust and the Trustee in fulfilling its/his/her responsibilities hereunder.

**1.2**    **Interpretation**.  The headings in this Trust Agreement are for convenience only and shall not affect the meaning or understanding of this Trust Agreement or any provision hereof. Words defined, denoted or stated in the singular form also include the plural form and vice versa, and

words defined, denoted or stated in the masculine, feminine or neuter form include each of the masculine, feminine and neuter forms. The word "including" means "including but not limited to." The word "or" is not exclusive.

**1.3     Particular Words**.  Reference in this Trust Agreement to any Section or Article is, unless otherwise specified, to that such Section or Article under this Trust Agreement. The words "hereof," "herein," "hereto" and similar terms shall refer to this Trust Agreement and not to any particular Section or Article of this Trust Agreement.

<div align="center">

**SECTION II**

**AGREEMENT OF TRUST**

</div>

**2.1     Creation and Name**.  The Debtors as settlors hereby create a trust known as the "TPP Trust," which is the trust contemplated by, provided for and referred to in Section 5.7 of the Plan. The Trustee and the Delaware Trustee (the latter, to the limited extent authorized in this Trust Agreement and consistent with his/her/its role as the Delaware Trustee)  may transact the business and affairs of the TPP Trust in the name of the TPP Trust, and references herein to the TPP Trust shall include the Trustee and the Delaware Trustee acting on behalf of the TPP Trust. It is the intention of the Parties that the TPP Trust constitute a statutory trust under the Act and that this Trust Agreement shall constitute the governing instrument of the TPP Trust. The Trustee and the Delaware Trustee are hereby authorized and directed to execute and file a Certificate of Trust with the Delaware Secretary of State, with such Certificate to be substantially in the form attached hereto as **Exhibit C**.

**2.2     Purpose**.

(a)     The purpose of the TPP Trust is to expressly assume sole and exclusive responsibility and liability for the Third-Party Payor Channeled Claims channeled to the TPP Trust in accordance with the Master TDP and the Plan, as well as to, among other things:

<div align="center">9</div>

(i)        hold the MDT TPP Claim and collect the Initial TPP Trust Distribution and additional payments due under the MDT TPP Claim in accordance with the Private Entity Settlements and the TPP Trust Documents;

(ii)       administer, process, resolve and liquidate the Third-Party Payor Channeled Claims by making TPP Abatement Distribution to TPP Authorized Recipients as provided in the TPP Trust Documents;

(iii)      monitor and enforce certain provisions of the LRP Agreement, which is attached as Exhibit D to the PI Trust Agreement, pursuant to the LRP Agreement and the Plan;

(iv)       hold, manage and invest all funds and other TPP Trust Assets received by the TPP Trust from the Debtors and the Master Disbursement Trust, or such other source as may provide funds to the TPP Trust consistent with the Plan and this Trust Agreement, in each case, for the benefit of the beneficiaries of the TPP Trust;

(v)        qualify at all times as a Qualified Settlement Fund within the meaning of the QSF Regulations and be treated consistently for state and local tax purposes to the extent applicable;

(vi)       pay qualifying attorneys' fees pursuant to Section 5.8 of the Plan;

(vii)      pay assessments to the extent required by Section 5.8(c) of the Plan to fund the Common Benefit Escrow and then, upon its establishment, the Common Benefit Fund in accordance with the Plan; and

(viii)     otherwise comply in all respects with the TPP Trust Documents.

(b)     The TPP Trust is to use the TPP Trust Assets and income to:

10

(i)       make TPP Abatement Distributions to the Holders of Third-Party Payor Channeled Claims in accordance with this Trust Agreement and the TPP TDP in such a way that such Holders of Third-Party Payor Channeled Claims are treated fairly, equitably, and reasonably in light of the assets available to resolve such claims;

(ii)      hold and maintain the TPP Trust Operating Reserve to pay the TPP Trust Operating Expenses and establish such funds, reserves and accounts within the TPP Trust as the Trustee deems useful in carrying out the purposes of the TPP Trust, subject to the limitations set forth in Section 5.1(a) below;

(iii)      pay the TPP Trust Operating Expenses from the TPP Trust Operating Reserve;

(iv)      replenish periodically, until the dissolution of the TPP Trust, the TPP Trust Operating Reserve from Cash held or received by the TPP Trust to the extent deemed necessary by the Trustee to satisfy and pay estimated future TPP Trust Operating Expenses in accordance with the TPP Trust Documents;

(v)      pay, as part of the TPP Trust Operating Expenses, all fees and expenses incurred with respect to, among other things, making TPP Abatement Distributions to TPP Authorized Recipients, as well as attorneys' fees and costs pursuant to Section 5.8 of the Plan, as applicable; and

(vi)      pay all fees and expenses of the Trustee, the Delaware Trustee and the Trust Professionals.

11

**2.3      Transfer of Assets.** Pursuant to Sections 4.7(a) and 5.2(d)(i)(B) of the Plan, the TPP Trust has received the Initial TPP Trust Distribution, the MDT TPP Claim or any other assets to be transferred to the TPP Trust under the Plan (the **"TPP Trust Assets"**) to fund the TPP Trust.[4] In all events, the TPP Trust Assets will be transferred to the TPP Trust free and clear of all Claims, Liens or other recourse or encumbrances, and shall not be subject to attachment, disgorgement or recoupment by any Person. The Debtors, among others, shall be authorized pursuant to the Plan to execute and deliver such documents to the TPP Trust as the Trustee may request to effectuate the transfer and assignment of any TPP Trust Assets to the TPP Trust.

**2.4      Acceptance of Assets and Assumption of Liabilities.**

(a)      In furtherance of the purposes of the TPP Trust, the TPP Trust hereby expressly accepts the transfer to the TPP Trust of the TPP Trust Assets or any other transfers contemplated by the Plan and the Master TDP in the time and manner as, and subject to the terms, contemplated in the Plan and the Master TDP.

(b)      In furtherance of the purposes of the TPP Trust, the TPP Trust expressly assumes all liability and responsibility for all Third-Party Payor Channeled Claims (except as set forth in the Plan) subject to the TPP Trust Documents, and none of the Debtors, the Protected Parties, or the Master Disbursement Trust shall have any further financial or other responsibility or liability therefor; provided, however, that nothing contained herein shall relieve the Master Disbursement Trust of its obligations to the TPP Trust in connection with the MDT TPP Claim or otherwise. Except as otherwise provided in this Trust Agreement, the TPP TDP, the Plan, or the Master TDP, the TPP Trust shall have and retain any and all defenses, cross-claims, offsets, and recoupments

---

[4] In the event that any payment date is on a date that is not a Business Day, then the making of such payment may be completed on the next succeeding Business Day, but shall be deemed to have been completed as of the required date.

regarding the Third-Party Payor Channeled Claims, as well as any and all rights of indemnification, contribution, subrogation, and similar rights that the Debtors, the Released Parties, and the Shareholder Released Parties, as applicable, have or would have had under applicable law; provided that no such claims, defenses or rights may be used to seek any affirmative monetary recovery from any party.

(c)     Notwithstanding anything to the contrary herein, no provision in this Trust Agreement or the TPP TDP shall be construed or implemented in a manner that would cause the TPP Trust to fail to qualify as a Qualified Settlement Fund within the meaning of the QSF Regulations.

(d)     To the extent required by the Act, the beneficial owners (within the meaning of the Act) of the TPP Trust (the **"Beneficial Owners"**) shall be deemed to be the Holders of Third-Party Payor Channeled Claims; provided that (i) the Holders of Third-Party Payor Channeled Claims, as such Beneficial Owners, shall have only such rights with respect to the TPP Trust and its assets as are set forth in this Trust Agreement and the TPP TDP, (ii) the right to TPP Abatement Distributions under the TPP TDP shall be limited to TPP Authorized Recipients, and (iii) no greater or other rights, including upon dissolution, liquidation, or winding up of the TPP Trust, shall be deemed to apply to the Holders of Third-Party Payor Channeled Claims in their capacity as Beneficial Owners.  Holders of Third-Party Payor Channeled Claims are enjoined from asserting against any Debtor, the Trustee, the Delaware Trustee, Member of the TAC, Trust Professional or other Protected Party any Channeled Claim, and may not proceed in any manner against any Debtor or other Protected Party on account of any Channeled Claim in any forum whatsoever, including any state, federal or non-U.S. court or administrative or arbitral forum, and

are required to pursue Third-Party Payor Channeled Claims exclusively against the TPP Trust, solely as and to the extent provided in the TPP TDP.

(e)      The Beneficial Owners shall be subject to the terms of this Trust Agreement, including, without limitation, the terms of the TPP TDP.

2.5      **Channeling Injunction.** Nothing in this Trust Agreement shall be construed in any way to limit or expand the scope, enforceability, or effectiveness of the Channeling Injunction issued in connection with the Plan or the TPP Trust's assumption of all liability for Third-Party Payor Channeled Claims.

## SECTION III

## POWERS AND ADMINISTRATION OF THE TRUST

3.1      **Powers and Privileges.**

(a)      The Trustee is, and shall act as, a fiduciary to the TPP Trust in accordance with the provisions of this Trust Agreement, the Plan, the TPP TDP and the Confirmation Order. The Trustee shall, at all times, administer the TPP Trust and the TPP Trust Assets in accordance with the purposes set forth in Section 2.2 herein. Subject to the limitations set forth in this Trust Agreement, the Trustee shall have the power to take any and all actions that, in the judgment of the Trustee, are necessary or proper to fulfill the purposes of the TPP Trust, including without limitation, each power expressly granted in this Section 3.1, any power reasonably incidental thereto and not inconsistent with the requirements of Section 3.2, and any trust power now or hereafter permitted under the laws of the State of Delaware. The Trustee shall use commercially reasonable efforts to ensure that the costs of administering the TPP Trust are reasonable in all respects, but the Trustee shall not be bound by any annual or cumulative "caps" on such expenditures.

14

(b)    Except as required by applicable law or otherwise specified herein or in the Plan or the Confirmation Order, the Trustee need not obtain the order or approval of any court in the exercise of any power or discretion conferred hereunder.

(c)    Without limiting the generality of Section 3.1(a) above, and except as limited herein or by the Plan, the Trustee shall have the power to:

(i)    receive and hold the TPP Trust Assets and exercise all rights with respect thereto, including the right to vote, hold and sell any securities that are included in the TPP Trust Assets or that may come into possession or ownership of the Trust;

(ii)    invest the monies held from time to time by the TPP Trust, and/or, in the Trustee's discretion, contract with the Delaware Trustee or any other qualified institution to hold and invest the TPP Trust's funds; provided that such investments are Permitted Investments;

(iii)    enter into leasing and financing agreements with third parties, to the extent such agreements are reasonably necessary, to permit the TPP Trust to efficiently operate;

(iv)    pay liabilities and expenses of the TPP Trust including the indemnification obligations set forth in the Plan;

(v)    initiate, prosecute, defend and resolve all legal actions and other proceedings related to any asset, liability or responsibility of the TPP Trust; provided that such legal actions and other proceedings shall be limited solely to those required for purposes of reconciling, administering or defending against the Third-Party Payor Channeled Claims channeled

15

to the TPP Trust and for enforcing the rights of the TPP Trust under the Plan and the Plan Documents;

(vi)     initiate, prosecute, defend and resolve all such actions in the name of the Debtors or their Estates, in each case if deemed necessary by the Trustee to fulfill the purpose of the TPP Trust;

(vii)    establish, supervise, and administer the TPP Trust in accordance with this Trust Agreement and the TPP TDP and the terms thereof;

(viii)   appoint such officers, hire such employees, engage such legal, financial, accounting, investment, auditing, recording and noticing, claims administration and other consultants, advisors and agents as the TPP Trust and/or the Trustee requires, including the Trustee's firms or affiliates, professionals previously employed by the Debtors, and members and representatives of the Third-Party Payor Group, and to delegate to such persons such powers and authorities as the fiduciary duties of the Trustee permit and as the Trustee in his/her discretion, deems advisable or necessary in order to carry out the terms of the TPP Trust, this Trust Agreement and the TPP TDP;

(ix)     pay reasonable compensation to those employees, legal, financial, accounting, investment, auditing, forecasting, and other consultants, advisors, and agents employed by the Trustee after the Effective Date (including those engaged by the TPP Trust in connection with alternative dispute resolution activities);

16

(x)      as and to the extent provided herein, (a) compensate the Trustee, the Delaware Trustee, the TAC, and their respective employees and legal, financial, accounting, and other consultants, advisors, and agents, (b) reimburse the Trustee, the Delaware Trustee, and the Members of the TAC (including counsel to the Members) for all reasonable out-of-pocket costs and expenses incurred by such persons in connection with the performance of their duties hereunder, it being understood that reimbursements payable to the Members and their counsel shall be limited to actual and necessary out-of-pocket phone, facsimile, postage, copying, travel and similar charges incurred in connection with their participation in the TAC;

(xi)     execute and deliver such instruments as the Trustee deems proper in administering the TPP Trust;

(xii)    enter into such other arrangements with third parties as the Trustee deems useful in carrying out the purposes of the TPP Trust, provided such arrangements do not conflict with any other provision of this Trust Agreement;

(xiii)   withhold from the planned TPP Abatement Distribution the maximum amount needed to pay any tax or other charge, if any, that the Trustee has determined, based upon the advice of its agents and/or professionals, may be required to be withheld from such TPP Abatement Distribution under the income tax or other laws of the United States or any state therein;

17

(xiv)   in the event that the Trustee determines that the Beneficial Owners or the TPP Trust may, will or have become subject to different tax consequences than those described in this Trust Agreement, taking such actions that will, or are intended to, address such different tax consequences;

(xv)   in accordance with Section 6.6 herein, defend, indemnify, and hold harmless (A) the Trustee, (B) the Delaware Trustee, (C) the TAC and each of its Members, and (D) the officers, employees, Trust Professionals, representatives, advisors and agents of each of the TPP Trust, the Trustee, the Delaware Trustee and the TAC, in their capacities as the same (each of those in (D) herein, the **"Additional Indemnitees"**), to the maximum extent that a statutory trust organized under the laws of the State of Delaware is from time to time entitled to defend, indemnify, hold harmless, and/or insure its directors, trustees, officers, employees, consultants, advisors, agents, and representatives. No party shall be indemnified in any way for any liability, expense, claim, damage, or loss for which he or she is liable under Section 6.6 herein;

(xvi)   The Trustee shall have the right to seek to purchase insurance relating to the matters and/or any of the parties subject to the foregoing indemnifications and otherwise, in his/her sole discretion;

(xvii)   consult with the TAC at such times and with respect to such issues relating to the purpose, conduct and affairs of the TPP Trust as the Trustee considers advisable;

18

(xviii)  conduct the claims review and reconciliation process, including without limitation, addressing duplicative and late filed claims and compliance with the procedures required under the TPP TDP, make determinations about the validity and amounts of claims, and effect TPP Abatement Distributions with respect to and on account of Third-Party Payor Claims as set forth in the TPP TDP;

(xix)  address the distribution of *de minimis* funds as set forth in the TPP TDP;

(xx)  create sub-trusts or title vehicles; provided that the Trustee shall not create a sub-trust or title vehicle that would cause the TPP Trust to fail to qualify as a Qualified Settlement Fund within the meaning of the QSF Regulations;

(xxi)  create such accounts and reserves as the Trustee deems necessary, prudent or useful in order to provide for the payment of expenses and the effecting of TPP Abatement Distributions, and may, with respect to any such account or reserve, restrict the use of monies therein, and the earnings or accretions thereon, subject to the limitations set forth in Section 5.1(a) below;

(xxii)  review and, in his/her discretion, audit or otherwise investigate certifications provided by TPP Claimants pursuant to the TPP TDP, and to take such action as he/she deems appropriate with respect to TPP Claimants that do not provide the required certifications or otherwise do not cooperate in good faith with the audit/investigation process;

19

(xxiii)  make, pursue (by litigation or otherwise), collect, compromise, settle, or otherwise resolve in the name of the TPP Trust, any claim, right, action or cause of action included in the TPP Trust Assets or which may otherwise hereafter accrue in favor of the TPP Trust, including, but not limited to, insurance recoveries, before any court of competent jurisdiction;

(xxiv)  exercise any and all rights and responsibilities of the TPP Trust or Trustee pursuant to the LRP Agreement;

(xxv)  seek a determination of the Bankruptcy Court with respect to any matter relating to the TPP Trust, the TPP TDP and other Plan Documents as the Trustee deems appropriate; and

(xxvi)  exercise any and all other rights, and take any and all other actions as are permitted, of the Trustee in accordance with the terms of this Trust Agreement and the Plan.

(d)  The Trustee shall not have the power to guarantee on behalf of the TPP Trust any debt of other persons.

(e)  The Trustee agrees to take the actions of the TPP Trust required hereunder.

(f)  The Trustee shall provide reasonable reporting to the TAC of any act performed or taken pursuant to Sections 3.1(c)(i) or 3.1(c)(iv) herein, and shall promptly provide the TAC with copies of any reports or budgets filed with the Bankruptcy Court on behalf of the TPP Trust.

**3.2    General Administration.**

(a)  The Trustee shall act in accordance with this Trust Agreement, the Plan, the Confirmation Order and the TPP TDP. In the event of a conflict between the terms or provisions

20

of the (i) Plan or the Confirmation Order and (ii) this Trust Agreement or the TPP TDP, the terms

or provisions of the Plan or the Confirmation Order shall control. In the event of a conflict between

the terms or provisions of this Trust Agreement and the TPP TDP, the terms or provisions of the

TPP TDP shall control. For the avoidance of doubt, this Trust Agreement shall be construed and

implemented in accordance with the Plan, regardless of whether any provision herein explicitly

references the Plan.

(b)      The Trustee shall be the "administrator" of the TPP Trust within the meaning of

section 1.468B-2(k)(3) of the Treasury Regulations and shall (i) prepare and file any and all

income tax and other returns and statements required to be filed and shall timely pay, out of the

TPP Trust Assets, all taxes required to be paid by the TPP Trust, (ii) comply with all applicable

tax reporting and withholding obligations, (iii) satisfy all requirements necessary to qualify and

maintain qualification of the TPP Trust as a Qualified Settlement Fund within the meaning of the

QSF Regulations, and (iv) take no action that could cause the TPP Trust to fail to qualify as a

Qualified Settlement Fund within the meaning of the QSF Regulations. Even if permitted by the

QSF Regulations, no election shall be filed by or on behalf of the TPP Trust for the TPP Trust to

be treated as a grantor trust for federal income tax purposes.

(c)      The Trustee shall be responsible for all of the TPP Trust's tax matters, including,

without limitation, tax audits, claims, defenses and proceedings. The Trustee may request an

expedited determination under section 505(b) of the Bankruptcy Code for all tax returns filed by

or on behalf of the TPP Trust for all taxable periods through the dissolution of the TPP Trust. The

Trustee shall also file (or cause to be filed) any other statement, return or disclosure relating to the

TPP Trust that is required by any governmental unit and be responsible for payment, out of the

TPP Trust Assets, of any taxes imposed on the TPP Trust or its assets.

(d)    The Trustee may withhold and pay to the appropriate taxing authority all amounts required to be withheld pursuant to the Internal Revenue Code or any provision of any foreign, state, or local tax law with respect to any payment or TPP Abatement Distributions to a TPP Authorized Recipient. All such amounts withheld and paid to the appropriate taxing authority shall be treated as amounts distributed to such TPP Authorized Recipient for all purposes of this Trust Agreement. The Trustee shall be authorized to collect such tax information from the TPP Claimants (including tax identification numbers) as in its sole discretion the Trustee deems necessary to effectuate the Plan, the Confirmation Order, and this Trust Agreement. In order to receive TPP Abatement Distributions, all TPP Claimants shall be required to provide tax information to the Trustee to the extent the Trustee deems appropriate in the manner and in accordance with the procedures from time to time established by the Trustee for these purposes. The Trustee may refuse to make a TPP Abatement Distribution to a TPP Authorized Recipient that fails to furnish such information in a timely fashion, and until such information is delivered may treat such TPP Claimant's Third-Party Payor Channeled Claims as disputed; provided, however, that, upon receipt by the Trustee of such information from a TPP Authorized Recipient, the Trustee shall make such TPP Abatement Distribution to which such TPP Authorized Recipient is entitled, without interest. Notwithstanding the foregoing, if a TPP Authorized Recipient fails to furnish any tax information reasonably requested by the Trustee before the date that is three hundred sixty-five (365) calendar days after the request is made, the amount of such TPP Abatement Distribution shall irrevocably revert to the TPP Trust, and any Third-Party Payor Channeled Claim with respect to such TPP Abatement Distribution shall be discharged and forever barred from assertion against the TPP Trust or its property.

22

(e)        Pursuant to Section 5.7(g) of the Plan, the TPP Trust shall (i) monitor the use of

TPP Abatement Distributions received by TPP Authorized Recipients for compliance with the TPP

Authorized Abatement Purposes, through review of the certifications provided by such TPP

Authorized Recipients, and the Trustee may, in his/her discretion, audit certain of such certified

statements, and (ii) prepare and deliver to the Master Disbursement Trust for publication annual

reports on the disbursement and use of TPP Abatement Distributions from the TPP Trust and the

compliance by TPP Authorized Recipients with the TPP Authorized Abatement Purposes set forth

in the applicable TPP Trust Documents. The Trustee shall timely account to the Bankruptcy Court

as follows:

(i)        The Trustee shall cause to be prepared and filed with the Bankruptcy

Court, as soon as available, and in any event within one hundred and

twenty (120) days following the end of each fiscal year, an annual report

(the **"Annual Report"**) containing financial statements of the TPP Trust

(including, without limitation, a balance sheet of the TPP Trust as of the

end of such fiscal year and a statement of operations for such fiscal year),

and to the extent reasonable and practicable, investments, available for

making TPP Abatement Distributions to TPP Authorized Recipients. The

Trustee shall provide a copy of such Annual Report to the TAC when such

reports are filed with the Bankruptcy Court.

(ii)       Simultaneously with the filing of the Annual Report, the Trustee shall

cause to be prepared and filed with the Bankruptcy Court a report

containing a summary regarding the number and type of claims resolved

23

during the period covered by the financial statements. The Trustee shall provide a copy of such report to the TAC when such report is filed.

(iii)    All materials required to be filed with the Bankruptcy Court by this Section 3.2(d) shall be available for inspection by the public in accordance with procedures established by the Bankruptcy Court.

(f)    The Trustee shall cause to be prepared as soon as practicable prior to the commencement of each fiscal year a budget and cash flow projections covering such fiscal year. The Trustee shall provide a copy of the budget and cash flow projections to the TAC.

(g)    If the Trustee determines, in his/her discretion, that making the final TPP Abatement Distributions immediately prior to the termination and dissolution of the TPP Trust would not be commercially reasonable or the TPP Trust Assets are insufficient to render a further TPP Abatement Distribution practicable, the Trustee shall, as set forth in Section 6 of the TPP TDP, have the right to cause the TPP Trust to abandon or otherwise dispose of such property, including by donation of such remaining funds to a charitable institution qualified as a not-for-profit corporation, under applicable federal and state laws selected by the Trustee.

(h)    The Trustee shall consult with the TAC on (i) the general implementation and administration of the TPP Trust; (ii) the general implementation and administration of the TPP TDP; and (iii) such other matters as may be required under this Trust Agreement or the TPP TDP.

(i)    Any good faith determination by the Trustee as to what actions are in the best interests of the TPP Trust shall be determinative, provided that the Trustee shall be required to obtain the consent of the TAC pursuant to the consent process set forth in Section 9.1(b) herein, in addition to any other instances elsewhere enumerated, in order:

(i)    to determine, establish, or change any material aspect of the TPP TDP;

24

(ii)      to establish and/or to make any material change to the TPP Abatement
Distribution Form to be provided to Holders of Third-Party Payor
Channeled Claims under the TPP TDP;

(iii)     to change the compensation of the Delaware Trustee, or the Trustee, other
than to reflect cost-of-living increases or to reflect changes approved by
the Bankruptcy Court as otherwise provided herein;

(iv)      to take actions to minimize any tax on the TPP Trust Assets, provided that
no such action may be taken if it prevents the TPP Trust from qualifying
as a Qualified Settlement Fund within the meaning of the QSF
Regulations and provided further that even if permitted by the Treasury
Regulations governing Qualified Settlement Funds, no election shall be
filed by or on behalf of the TPP Trust for the TPP Trust to be treated as a
grantor trust for federal income tax purposes;

(v)       to amend any provision of this Trust Agreement or the TPP TDP in
accordance with the terms thereof; provided that no such amendment shall
be in contravention of the Plan, including, but not limited to, causing the
TPP Trust to fail to qualify as a Qualified Settlement Fund within the
meaning of the QSF Regulations;

(vi)      to acquire an interest in, or to merge any claims resolution organization
formed by the TPP Trust with, another claims resolution organization that
is not specifically created by the Plan, this Trust Agreement or the TPP
TDP, or to contract with another claims resolution organization or other
entity that is not specifically identified by the Plan, this Trust Agreement

25

or the TPP TDP, or permit any other party to join in any claims resolution organization that is formed by the TPP Trust pursuant to this Trust Agreement or the TPP TDP; provided that such acquisition, merger, contract, or joinder shall not (a) subject NewCo, TopCo, PPLP, the Liquidating Debtors, the Transferred PPLP Subsidiaries, the Debtors, any successors in interest thereto, or the Protected Parties to any risk of having any Third-Party Payor Channeled Claim asserted against it or them, (b) otherwise jeopardize the validity or enforceability of any injunction or release issued or granted in connection with the Plan and/or the Confirmation Order, (c) permit the surviving organization to make decisions about the value of claims that are not in accordance with the TPP TDP, or (d) cause the TPP Trust to fail to qualify as a Qualified Settlement Fund within the meaning of the QSF Regulations; provided further that the terms of such merger will require the surviving organization to make decisions about the evaluation of Third-Party Payor Channeled Claims in accordance with the TPP TDP;

(vii)  sell, transfer, or exchange any or all of the TPP Trust Assets at such prices and upon such terms as the Trustee may consider proper, consistent with the other terms of this Trust Agreement; or

(viii)  delegate any or all of the authority herein conferred with respect to the investment of all or any portion of the TPP Trust Assets to any one or more reputable individuals or recognized institutional investment advisors or investment managers without liability for any action taken or omission

26

made because of any such delegation, except as provided in Section 6.4 herein.

(j)       The Trustee shall meet with the TAC no less often than quarterly. The Trustee shall meet in the interim with the TAC when so requested by either. Meetings may be held in person, by telephone conference call or online conference, or by a combination of the three.

(k)       The Trustee and the Delaware Trustee shall, during the period that they serve in their respective roles under this Trust Agreement and following the termination of this Trust Agreement or their removal or resignation hereunder, not use for personal gain any material, non-public information of or pertaining to any entity to which any of the TPP Trust Assets relate or which they have become aware of in their capacities as Trustee and Delaware Trustee.

(l)       The Trustee, upon notice from the TAC, if practicable in view of pending business, shall at its next meeting with the TAC consider issues submitted by the TAC for consideration by the TPP Trust. The Trustee shall keep the TAC reasonably informed regarding all aspects of the administration of the TPP Trust.

(m)       Nothing contained in this Trust Agreement shall prevent the TPP Trust or its Trustees, in their discretion, from seeking Bankruptcy Court approval of any action to be undertaken by the TPP Trust or decision made by the TPP Trust, provided, however, that the Trustee and the Delaware Trustee shall not be required to seek such approval unless Bankruptcy Court approval is specifically required pursuant to the Plan, the TPP TDP or this Trust Agreement.

**3.3**       **Claims Administration**. The Trustee shall promptly proceed to implement the TPP TDP, subject to timely receipt of the Initial Distribution and availability of funds.

27

## SECTION IV

## DISTRIBUTIONS

**4.1    Timing and Amount of Distributions**. The Trustee shall make TPP Abatement Distributions of TPP Trust Available Cash consistent with the terms of the Plan, this Agreement and the TPP TDP.

**4.2    Location for Distributions; Notice of Change of Address**. TPP Abatement Distributions shall be made by the Trustee (a) to the addresses set forth on the TPP Abatement Claim Form (which may be the address of the TPP Claimant's counsel), (b) to the addresses set forth in any written notices of address changes delivered to the Trustee by the TPP Claimant after the submission of the TPP Abatement Claim Form, or (c) at the discretion of the Trustee pursuant to explicit and confirmed wire instructions provided to the Trustee by the party identified on the TPP Abatement Claim Form as the party to receive TPP Abatement Distributions.

**4.3    Undeliverable Distributions and Unclaimed Property**.

(a)    In the event that any TPP Abatement Distribution to any Beneficial Owner or its authorized representative is returned as undeliverable or is otherwise unclaimed, unless and until the Trustee is notified in writing of such Beneficial Owner's (or its authorized representative's) then-current address within six months of the date of the respective TPP Abatement Distribution (at which time such distribution shall be made without interest) such TPP Abatement Distribution shall be deemed unclaimed property within the meaning of section 347(b) of the Bankruptcy Code, the Beneficial Owner shall be deemed to have forfeited its/her/his entire interest in the TPP Trust, no further TPP Abatement Distribution shall be made to such Beneficial Owner, the claims of the Beneficial Owner shall be discharged and forever barred from receiving TPP Abatement Distributions under the TPP TDP, this Trust Agreement, the Plan and Confirmation Order, and all title to and beneficial interest in the TPP Trust Assets represented by any such undeliverable TPP

28

Abatement Distributions shall be cancelled and revert to and/or remain in the TPP Trust automatically and without need for a further order by the Court (notwithstanding any applicable federal, provincial or state escheat, abandoned or unclaimed property laws to the contrary).

(b)    In the event any check respecting a TPP Abatement Distribution to a Beneficial Owner or its authorized representative has not been cashed or otherwise negotiated within six months of the date of the respective TPP Abatement Distribution, such check shall be cancelled by stop payment or otherwise and no additional TPP Abatement Distribution shall be made to such Beneficial Owner or representative, such TPP Abatement Distribution shall be deemed unclaimed property within the meaning of section 347(b) of the Bankruptcy Code, the Beneficial Owner shall be deemed to have forfeited its/her/his entire interest in the TPP Trust, the claims of the Beneficial Owner shall be discharged and forever barred from receiving TPP Abatement Distributions under the TPP TDP, this Trust Agreement, the Plan and Confirmation Order. After such date, all uncashed TPP Abatement Distributions shall become Trust property and revert to the Trust, and shall be redistributed in accordance with the Plan, this Trust Agreement and the TPP TDP. The Trustee may, in its sole discretion, attempt to determine a Beneficial Owner's current address or otherwise locate a Beneficial Owner, but nothing in this Trust Agreement or the Plan shall require the Trustee to do so.

## SECTION V

## ACCOUNTS,  INVESTMENTS,  AND PAYMENTS

**5.1    Accounts**

(a)    The Trustee may, from time to time, create such accounts and reserves within the TPP Trust estate as he or she deems necessary, prudent, or useful in order to provide for the payment of expenses and the making of TPP Abatement Distributions to TPP Authorized Recipients and may, with respect to any such account or reserve, restrict the use of monies therein,

29

and the earnings or accretions thereto (the **"Trust Subaccounts"**). Any such Trust Subaccounts established by the Trustee shall be held as Trust Assets and are not intended to be subject to separate entity tax treatment as a "disputed claims reserve" within the meaning of the Internal Revenue Code and the Treasury Regulations promulgated thereunder, a "disputed ownership fund" within the meaning of the Treasury Regulations promulgated under the Internal Revenue Code, or otherwise.

(b)     The Trustee shall include a reasonably detailed description of the creation of any account or reserve in accordance with this Section 5.1 and, with respect to any such account, the transfers made to such account, the proceeds of or earnings on the assets held in each such account, and the payments from each such account in the reports to be filed with the Bankruptcy Court and provided to the TAC pursuant to Section 3.2 above.

**5.2     Investments.** Any investment of monies held in the TPP Trust shall be determined by the Trustee, subject to the requirement that such investments are Permitted Investments.

**5.3     Source of Payments**.

(a)     All TPP Trust expenses, payments, TPP Abatement Distributions and all liabilities with respect to Third-Party Payor Channeled Claims shall be payable and/or made solely by the Trustee out of the TPP Trust Assets. Neither the Trustee, the Delaware Trustee, the TAC, nor any of their officers, employees, consultants, advisors, and agents, nor the Debtors, nor any other Protected Party or Trust Professional, shall be liable for the payment of any TPP Trust expense or any other liability of the TPP Trust, except to the extent explicitly provided for in (i) the Plan or, (ii) solely with respect to the Trustee, the Delaware Trustee, the TAC, and any of their officers, employees, consultants, advisors, and agents, the Plan Documents.

(b)     The Trustee shall include in the Annual Report a reasonably detailed description of any payments made in accordance with this Section 5.3.

(c)     The Trustee, with the consent of the TAC, shall establish and implement billing guidelines applicable to the Trustee and the TAC, as well as their respective professionals who seek compensation from the TPP Trust. In addition, unless another process is established pursuant to the preceding sentence, the Trustee shall submit invoices for his/her services to the TAC on a monthly basis, and the Members shall have ten (10) days from the date of such submission in which to notify the Trustee in writing of any objection to the invoice.  If no written objection is timely received, the invoice shall be deemed approved and may be paid.

## SECTION VI

## TRUSTEE;   DELAWARE TRUSTEE

**6.1     Number.** In addition to the Delaware Trustee appointed pursuant to Section 6.14, there shall be one (1) Trustee, who shall be the person named on the signature page hereof.

**6.2     Term of Service**.

(a)     The Trustee shall serve from the Effective Date until the earliest of (i) his or her death, (ii) his or her resignation pursuant to Section 6.2(b) herein, (iii) his or her removal pursuant to Section 6.2(c) herein, or (iv) the termination of the TPP Trust pursuant to Section 9.3 herein.

(b)     The Trustee may resign at any time by written notice to the TAC and the trustees of the Master Disbursement Trust. Such notice shall specify a date on which such resignation shall take effect, which shall not be less than ninety (90) days after the date such notice is given, where practicable.

(c)     The Trustee may be removed by the Bankruptcy Court on the motion of the TAC, in the event that the Trustee becomes unable to discharge his or her duties hereunder due to accident, physical deterioration, mental incompetence, or for other good cause. Good cause shall

31

be deemed to include, without limitation, any substantial failure to comply with the general administration provisions of Section 3.2 herein, a consistent pattern of neglect and failure to perform or participate in performing the duties of a Trustee hereunder, or repeated nonattendance at scheduled meetings. Such removal shall take effect at such time as the Bankruptcy Court shall determine.

**6.3    Appointment of Successor Trustee.**

(a)    In the event of a vacancy in the Trustee position, whether by death, retirement, resignation, removal, or because the Trustee is otherwise unable to perform his or her functions as a Trustee, the vacancy shall be filled by a majority vote of the TAC. In the event that the TAC cannot appoint a successor Trustee, for any reason, the Bankruptcy Court shall select the successor Trustee on motion of the TAC.

(b)    Immediately upon the appointment of any successor Trustee, all rights, titles, duties, powers, and authority of the predecessor Trustee hereunder shall be vested in, and undertaken by, the successor Trustee without any further act. No successor Trustee shall be liable personally for any act or omission of his or her predecessor Trustee. No successor Trustee shall have any duty to investigate the acts or omissions of his or her predecessor Trustee.

(c)    Each successor Trustee shall serve until the earliest of (i) the expiration of his or her term, (ii) his or her death, (iii) his or her resignation pursuant to Section 6.2(b) herein, (iv) his or her removal pursuant to Section 6.2(c) herein, or (v) the termination of the TPP Trust pursuant to Section 9.3 herein.

(d)    The death, incapacity, resignation or removal of the Trustee shall not terminate the TPP Trust or revoke any existing agency created pursuant to this Trust Agreement or invalidate any action theretofore taken by the Trustee.

32

**6.4**    **Liability of Trustee and Others.** [To the maximum extent permitted by applicable law, the Trustee, the Delaware Trustee, the TAC and its Members and the Additional Indemnitees shall not have or incur any liability for actions taken or omitted in their respective official capacities or on behalf of the TPP Trust, except those acts found by Final Order to be arising out of his/her or its willful misconduct, bad faith, gross negligence or fraud, and shall be entitled to indemnification and reimbursement for reasonable fees and expenses in defending any and all of his/her/its actions or inactions in their respective official capacities, or on behalf of the TPP Trust, except for any actions or inactions found by Final Order to be arising out of his/her/its willful misconduct, bad faith, gross negligence or fraud. Any valid indemnification claim of the Trustee, the TAC and its Members and the Additional Indemnitees shall be satisfied from the TPP Trust.][5]

**6.5**    **Compensation and Expenses of Trustee.**

(a)    The Trustee shall be compensated for all of his/her services hereunder and the other Trust Documents at the rate of $640 per hour, which rate may be increased annually consistent with the Trustee's ordinary hourly rate and increases in the same, upon notice to the TAC. For all non-working travel time in connection with TPP Trust business, the Trustee shall receive the sum of $[●] per hour, which rate may be increased annually commensurate with the Trustee's ordinary hourly rate upon notice to the TAC.

(b)    The TPP Trust will promptly reimburse the Trustee for all reasonable out-of-pocket costs and expenses incurred by the Trustee in connection with the performance of his/her duties hereunder, which costs and expenses shall be paid as TPP Trust Operating Expenses.

(c)    The TPP Trust shall include in the Annual Report a description of the amounts paid under this Section 6.5.

---

[5] Subject to ongoing discussion.

33

(d)    The Trustee shall be entitled to payment by the TPP Trust for time billed and expenses incurred through and including the Trustee's last day of service as Trustee.

**6.6    Indemnification of Trustee and Others.**

(a)    [To the maximum extent permitted by applicable law, the TPP Trust shall indemnify and reimburse the Trustee, the Delaware Trustee, the TAC and its Members and the Additional Indemnitees for reasonable fees and expenses in defending any and all of their actions or inactions in their respective official capacities, or on behalf of the TPP Trust, except for any actions or inactions found by Final Order to be arising out of his or her willful misconduct, bad faith, gross negligence or fraud. Any valid indemnification claim of the Trustee, the Delaware Trustee, the TAC and its Members and the Additional Indemnitees shall be satisfied from the TPP Trust.

(b)    Reasonable expenses, costs and fees (including attorneys' fees and costs) incurred by or on behalf of the Trustee, the TAC and its Members, the Delaware Trustee, or an Additional Indemnitee in connection with any action, suit, or proceeding, whether civil, administrative, or arbitrative, from which they are indemnified by the TPP Trust pursuant to Section 6.6(a) herein, shall be paid by the TPP Trust in advance of the final disposition thereof upon receipt of an undertaking, by or on behalf of the Trustee, the Member of the TAC, the Delaware Trustee, or the Additional Indemnitee (as applicable), to repay such amount in the event that it shall be determined ultimately by Final Order that the Trustee, the Member of the TAC, the Delaware Trustee, or the Additional Indemnitee (as applicable) is not entitled to be indemnified by the TPP Trust.][6]

(c)    The TPP Trust shall seek to purchase and maintain reasonable amounts and types of insurance on behalf of the Trustee and the Members, including against liability asserted against

---

[6] Subject to ongoing discussion.

34

or incurred by such individual in that capacity or arising from his or her status as a Trustee or Member.

**6.7    Limited Recourse**.  All Persons engaged in transactions with the TPP Trust, the Trustee or the Delaware Trustee shall look only to the TPP Trust Assets (or to any insurance that may cover such claim) to satisfy any liability incurred in connection with the carrying out the terms of this Trust Agreement or other Trust Documents.

**6.8    Confirmation of Survival of Provisions.** Without limitation in any way of any provision of this Trust Agreement, the provisions of Sections 6.4, 6.5, 6.6, and 6.7 hereof shall survive the death, dissolution, liquidation, resignation, replacement, or removal, as may be applicable, of any of the Trustee, the Delaware Trustee, the Members of the TAC, any of the Additional Indemnitees, or the termination of the TPP Trust or this Trust Agreement, and shall inure to the benefit of the heirs, successors, and assigns of the Trustee, the Delaware Trustee, the Members of the TAC, and the Additional Indemnitees.

**6.9    Reliance**. The Trustee, the Delaware Trustee, the Members and the Additional Indemnitees may absolutely and unconditionally rely, and shall be protected in acting upon, any resolution, certificate, statement, instrument, opinion, report, notice, request, consent, order, or other paper or document believed by the Trustee in good faith to be genuine and to have been signed or presented by the proper party or parties.

**6.10    Lien.** The Trustee, the Delaware Trustee, the Members of the TAC and the Additional Indemnitees shall have a first priority lien upon the TPP Trust Assets to secure the payment of any amounts payable to them pursuant to this Agreement, including under this Section VI.

**6.11    The Trustee's Employment of Experts**. The Trustee shall retain and/or consult with Trust Professionals deemed by the Trustee to be qualified and necessary, in his/her sole discretion, to

35

assist the TPP Trust and the Trustee in fulfilling its/his/her responsibilities hereunder and may do so regardless of whether such party is affiliated with the TPP Trust or the Trustee in any manner (except as otherwise expressly provided in this Trust Agreement). In the absence of a bad faith violation of the implied contractual covenant of good faith and fair dealing within the meaning of 12 Del. § 3806(e), the information, assessment or written opinion of any Trust Professional deemed by the Trustee to be an expert on the particular matter shall be full and complete authorization and protection in respect of any action taken or not taken by the Trustee hereunder in good faith and in accordance with the information, assessment or written opinion provided by such party.

**6.12    Trustee Independence.** The Trustee and the Delaware Trustee shall not, during the term of their service as such, hold a financial interest in, act as attorney or agent for, or serve as an officer or any other professional for NewCo. In addition, the Trustee and the Delaware Trustee shall not act as attorney, agent or other professional in the Case for any person who holds a Third-Party Payor Channeled Claim, and shall resign any such existing retention on or prior to the Effective Date.

**6.13    No Bond.** Neither the Trustee nor the Delaware Trustee shall be required to post any bond or other form of surety or security unless otherwise ordered by the Bankruptcy Court.

**6.14    Delaware Trustee.**

(a)    There shall at all times be a Delaware Trustee to serve in accordance with the requirements of the Act. The Delaware Trustee shall either be (i) a natural person who is at least 21 years of age and a resident of the State of Delaware or (ii) a legal entity that has its principal place of business in the State of Delaware in accordance with section 3807 of the Act, otherwise meets the requirements of applicable Delaware law and shall act through one or more persons authorized to bind such entity. The initial Delaware Trustee shall be [●]. If at any time the Delaware

36

Trustee shall cease to be eligible in accordance with the provisions of this Section 6.145, he/she/it shall resign immediately in the manner and with the effect hereinafter specified in Section 6.14(c) herein. For the avoidance of doubt, the Delaware Trustee will only have such rights and obligations as expressly provided by reference to the Delaware Trustee hereunder.

(b)     Notwithstanding anything to the contrary contained in this Trust Agreement and the other Plan Documents, the Delaware Trustee shall not be entitled to exercise any powers, nor shall the Delaware Trustee have any of the duties and responsibilities, of the Trustee set forth herein. The Delaware Trustee shall be one of the trustees of the TPP Trust for the sole and limited purpose of fulfilling the requirements of section 3807 of the Act and for taking such actions as are required to be taken by a Delaware Trustee under the Act. The duties (including fiduciary duties), liabilities and obligations of the Delaware Trustee shall be limited to (i) accepting legal process served on the TPP Trust in the State of Delaware and (ii) the execution of any certificates required to be filed with the Secretary of State of the State of Delaware that the Delaware Trustee is required to execute under section 3811 of the Act (acting solely at the written direction of the Trustee), and there shall be no other duties (including fiduciary duties) or obligations, express or implied, at law or in equity, of the Delaware Trustee.

(c)     The Delaware Trustee shall serve until such time as the Trustee removes the Delaware Trustee or the Delaware Trustee resigns, dies, or dissolves, as the case may be, and a successor Delaware Trustee is appointed by the Trustee in accordance with the terms of Section 6.14(d) herein. The Delaware Trustee may resign at any time upon the giving of at least sixty (60) days' advance written notice to the Trustee; provided, that such resignation shall not become effective unless and until a successor Delaware Trustee shall have been appointed by the Trustee in accordance with Section 6.14(d) herein. If the Trustee does not act within such sixty

37

(60) day period, the Delaware Trustee may apply to the Court of Chancery of the State of Delaware for the appointment of a successor Delaware Trustee.

(d)     Upon the resignation or removal of the Delaware Trustee, the Trustee shall appoint a successor Delaware Trustee by delivering a written instrument to the outgoing Delaware Trustee with a copy to the Members. Any successor Delaware Trustee must satisfy the requirements of section 3807 of the Act. Any resignation or removal of the Delaware Trustee and appointment of a successor Delaware Trustee shall not become effective until a written acceptance of appointment is delivered by the successor Delaware Trustee to the outgoing Delaware Trustee and the Trustee, and any undisputed unpaid fees and expenses due and owing to the outgoing Delaware Trustee is paid. Following compliance with the preceding sentence, the successor Delaware Trustee shall become fully vested with all of the rights, powers, duties and obligations of the outgoing Delaware Trustee under this Trust Agreement, with like effect as if originally named as Delaware Trustee, and the outgoing Delaware Trustee shall be discharged of his/her duties and obligations under this Trust Agreement.   The outgoing Delaware Trustee shall take such steps as are reasonably necessary, at the TPP Trust's expense, to insure an orderly transition to the new Delaware Trustee.

(e)     The Delaware Trustee shall neither be required nor permitted to attend meetings relating to the TPP Trust, unless attendance is specifically required by the Trustee.

(f)     The Delaware Trustee shall be paid such compensation as agreed to pursuant to a separate fee agreement.

(g)     The TPP Trust will also promptly reimburse the Delaware Trustee for all reasonable out-of-pocket costs and expenses, to the extent consistent with the fee agreement referenced in Section 6.14(f) above, incurred by the Delaware Trustee in connection with the performance of its duties hereunder, which costs and expenses shall be paid as TPP Trust Operating Expenses.

38

(h)      The Delaware Trustee shall be permitted to retain counsel only in such circumstances as specifically required in the exercise of its obligations hereunder, and compliance with the advice of such counsel shall be full and complete authorization and protection for actions taken or not taken by the Delaware Trustee in good faith and in compliance with such advice.

## SECTION VII

## TRUST ADVISORY COMMITTEE

**7.1      Members.** As of the Effective Date, the TAC shall be comprised of five (5) Members. The initial Members shall be (a) [•], (b) [•], (c) [•], (d) [•] and (e) [•]. During the existence of the TPP Trust, the TAC shall consist of not less than one Member and shall never consist of more than five Members.

**7.2      Duties.** A Member of the TAC shall serve in a fiduciary capacity, representing the interests of all Holders of Third-Party Payor Channeled Claims. The TAC shall have no fiduciary obligations or duties to any party other than the Holders of Third-Party Payor Channeled Claims. The Trustee must consult with the TAC on matters identified in Section 3.2(e) herein and in other provisions herein and must obtain the consent of the TAC on matters identified in Section 3.2(f) herein. Where provided in the TPP TDP, certain other actions by the Trustee may also be subject to the consent of the TAC. Except for the duties and obligations expressed in this Trust Agreement and the documents referenced herein (including the TPP TDP), there shall be no other duties (including fiduciary duties) or obligations, express or implied, at law or in equity, of the TAC. To the extent that, at law or in equity, the TAC has duties (including fiduciary duties) and liabilities relating thereto to the TPP Trust, the other Parties hereto or any beneficiary of the TPP Trust, it is hereby understood and agreed by the other Parties hereto that such duties and liabilities are

39

replaced by the duties and liabilities of the TAC expressly set forth in this Trust Agreement and the documents referenced herein (including the TPP TDP, the Plan and the Confirmation Order).

**7.3    Term of Office.**

(a)    Each Member of the TAC shall serve until the earlier of (i) his or her death, (ii) his or her resignation pursuant to Section 7.3(b) herein, (iii) his or her removal pursuant to Section 7.3(c) herein, or (iv) the termination of the TPP Trust pursuant to Section 9.3 herein.

(b)    A Member of the TAC may resign at any time by written notice to the other Members of the TAC, if any, and to the Trustee. Such notice shall specify a date by which the resignation shall become effective, which shall not be less than sixty (60) days after the date such notice is given. In connection with such resignation, the Member may, by written notice to the other Members, if any, and to the Trustee, (i) designate an individual to succeed him or her, as set forth in Section 7.4, or (ii) state that he or she is not designating a successor.

(c)    A Member may be removed in the event that he or she becomes unable to discharge his or her duties hereunder due to accident, physical deterioration, mental incompetence, or a consistent pattern of neglect and failure to perform or to participate in performing the duties of such Member hereunder, such as repeated non-attendance at scheduled meetings, or for other good cause. Such removal may be made by the Trustee, with the consent of the other Members, if any, or by the Bankruptcy Court upon motion of the Trustee or the other Members, if there is not agreement between the Trustee and the other Members.

**7.4     Appointment of Successors.**

(a)      If, prior to the termination of service of a Member of the TAC other than as a result of removal, he or she has designated in writing an individual to succeed him or her as a Member of the TAC, such individual shall be his or her successor.

(b)      If no successor is appointed pursuant to Section 7.4(a) or if the Member is removed pursuant to Section 7.3(c), the successor will be appointed by the Trustee with the consent of any Members remaining at the time of appointment, or if such Members cannot agree on a successor, the Trustee with the approval of the Bankruptcy Court.

(c)      Each successor Member shall serve until the earlier of (i) his or her death, (ii) his or her resignation pursuant to Section 7.3(b) herein, (iii) his or her removal pursuant to Section 7.3(c) herein, or (iv) the termination of the TPP Trust pursuant to Section 9.3 herein. No successor Member shall be liable personally for any act of omission of his or her predecessor Member. No successor Member shall have any duty to investigate the acts or omissions of his or her predecessor Member. Neither the TAC nor any Member shall be required to post any bond or other form of surety or security unless otherwise ordered by the Bankruptcy Court.

**7.5     TAC's Employment of Professionals.**

(a)      The TAC may retain counsel by unanimous decision of its Members in the event that the TAC determines that it must make a motion to the Bankruptcy Court pursuant to Sections 6.2(c), 6.3(a) or 7.3(c) of this Trust Agreement.

(b)      The TPP Trust will promptly reimburse, or pay directly, if so instructed, the TAC for all reasonable and necessary fees and costs associated with the TAC's employment of counsel pursuant to Section 7.5(a) hereof, subject to the terms set forth in this Section 7.5(b). Prior to engaging such TAC counsel, the TAC must submit to the Trustee a statement setting forth (i) the

41

reasons why the TAC desires to employ such TAC counsel, (ii) the qualifications of the TAC counsel to address the issue or issues, and (iii) the estimated cost (including fees and expenses) of such TAC counsel's services. The Trustee shall have five (5) business days from receipt of such statement to notify the TAC in writing that the TPP Trust agrees to the engagement, and will reimburse or pay directly, the fees and costs up to the estimated amount as a TPP Trust Operating Expense, or that the TPP Trust declines to pay for the TAC counsel. If the TPP Trust declines to pay for the TAC counsel, the Trustee must set forth its reasons in writing. If the TAC still desires to employ the TAC counsel at the TPP Trust's expense, the TAC may seek resolution of the dispute by the Bankruptcy Court, provided that such application by the TAC to the Bankruptcy Court shall not be an expense payable by the TPP Trust.

(c)      In the event that the TAC retains counsel and irrespective of whether the TPP Trust pays such counsel's fees and related expenses, any communications between the TAC and such counsel shall be deemed to be within the attorney-client privilege and protected by section 3333 of Title 12 of the Delaware Code.

**7.6     Expenses of the TAC**.  The TPP Trust will reimburse the Member(s) of the TAC for all reasonable out-of-pocket costs and expenses incurred in connection with the performance of their duties hereunder, consistent with Section 3.1(c)(xi) hereof. Such reimbursement or direct payment shall be deemed a TPP Trust Operating Expense. The TPP Trust shall include a description of the amounts paid under this Section 7.6 in the Annual Report to be filed with the Bankruptcy Court and provided to the TAC pursuant to Section 3.2(e).

<div align="center">

**SECTION VIII**

**THIRD PARTY RIGHTS;   LIMITATION OF LIABILITY**

</div>

**8.1     Limited Recourse**. All persons and entities (including any Trust Professionals) engaged in transactions with the TPP Trust, the Trustee and/or the Delaware Trustee shall look only to the

<div align="center">42</div>

TPP Trust Assets (or to any insurance that may cover such liability) to satisfy any liability of the TPP Trust, Trustee, or Delaware Trustee incurred in connection with this Trust Agreement, the Plan, the Confirmation Order or the TPP TDP.

**8.2**     **Parties Dealing With the Trustee**.  In the absence of actual knowledge to the contrary, any person dealing with the TPP Trust or the Trustee shall be entitled to rely on the authority of the Trustee or any of the Trust Professionals to act in connection with the TPP Trust Assets.

<div align="center">

**SECTION IX**

**GENERAL PROVISIONS**

</div>

**9.1**    **Procedures for Consulting with or Obtaining Consent of the TAC.**

(a)     Consultation Process.

(i)     In the event the Trustee is required to consult with the TAC pursuant to Section 3.2(e), 3.2(h) or 3.2(j) herein regarding the TPP TDP, the Plan, or otherwise, the Trustee shall provide the TAC with written advance notice of the matter under consideration, and with all relevant information concerning the matter as is reasonably practicable under the circumstances. The Trustee shall also provide the TAC with such reasonable access to the Trust Professionals and other experts retained by the TPP Trust and its staff (if any) as the TAC may reasonably request during the time that the Trustee is considering such matter, and shall also provide the TAC the opportunity, at reasonable times and for reasonable periods of time, to discuss and comment on such matter with the Trustee.

(ii)     In determining when to take definitive action on any matter subject to the consultation process set forth in this Section 9.1(a), the Trustee shall provide the TAC with such reasonable prior written notice as is

<div align="center">43</div>

practicable, and shall provide not less than five (5) business days' prior written notice unless exigent circumstances warrant a shorter notice period, but not less than one (1) business day.

(b)     Consent Process.

(i)     In the event the Trustee is required to obtain the consent of the TAC pursuant to Section 3.2(f) or (j) herein, the TPP TDP, the Plan, or otherwise, the Trustee shall provide the TAC with a written notice stating that its consent is being sought pursuant to that provision, describing in detail the nature and scope of the action the Trustee proposes to take, and explaining in detail the reasons why the Trustee desires to take such action. The Trustee shall provide the TAC as much relevant additional information concerning the proposed action as is reasonably practicable under the circumstances. The Trustee shall also provide the TAC with such reasonable access to the Trust Professionals and other experts retained by the TPP Trust and its staff (if any) as the TAC may reasonably request during the time that the Trustee is considering such action, and shall also provide the TAC the opportunity, at reasonable times and for reasonable periods of time, to discuss and comment on such action with the Trustee.

(ii)    The TAC must consider in good faith and in a timely fashion any request for their consent by the Trustee and must in any event advise the Trustee in writing of its consent or objection to the proposed action within the time specified by the Trustee, or within such additional time as the Trustee

44

and TAC may agree. The TAC may not withhold its consent unreasonably. If the TAC decides to withhold its consent, it must explain in detail its objections to the proposed action. If the TAC does not advise the Trustee in writing of its consent or objections to the proposed action within the time specified by the Trustee (or any additional time period agreed to by the Trustee), then consent of the TAC to the proposed action shall be deemed to have been affirmatively granted.

(iii)    If, after following the procedures specified in this Section 9.1(b), the TAC continues to object to the proposed action and to withhold its consent to the proposed action, the Trustee and the TAC shall resolve their dispute pursuant to Section 9.13. The TAC shall bear the burden of proving that it reasonably withheld its consent. If the TAC meets that burden, the TPP Trust shall then bear the burden of showing why it should be permitted to take the proposed action notwithstanding the TAC or Trustee's reasonable objection.

(c)    The Trustee may consult with Trust Professionals and may rely, in good faith, on the advice thereof, and shall not be liable for any action taken or omitted to be taken in good faith and in accordance with the advice thereof.

**9.2    Irrevocability.** To the fullest extent permitted by applicable law, the TPP Trust is irrevocable.

**9.3    Term; Termination.**

(a)    The term for which the TPP Trust is to exist shall commence on the date of the filing of the Certificate of Trust and shall terminate pursuant to the provisions of Section 9.3(b) -

45

(d) herein. In the event that the Certificate of Trust is filed after the Effective Date, the Trustee, on advice of Trust Professionals, may deem the commencement date to be the date of such filing. To the fullest extent permitted by law, the TPP Trust is irrevocable.

(b)    The TPP Trust shall automatically dissolve on the date (the "**Dissolution Date**") ninety (90) days after the first to occur on the date which the Trustee decides, with the consent of the TAC, to dissolve the TPP Trust upon completion of its duties and the satisfaction of the purposes of the TPP Trust, wherein (A) all Third-Party Payor Channeled Claims duly filed with the TPP Trust have been liquidated and paid or otherwise resolved to the extent provided in this Trust Agreement and the TPP TDP, and (B) at least twelve (12) consecutive months have elapsed from the last payment to the TPP Trust from the Master Disbursement Trust.

(c)    On the Dissolution Date (or as soon thereafter as is reasonably practicable), after the wind-up of the TPP Trust's affairs by the Trustee and payment of all the TPP Trust's liabilities have been provided for as required by applicable law including section 3808 of the Act, all monies remaining in the TPP Trust shall be given to charitable organization(s) exempt from federal income tax under section 501(c)(3) of the Internal Revenue Code, which tax-exempt organization(s) shall be selected by the Trustee using its reasonable discretion; provided, however, that (i) if practicable, the activities of the selected tax-exempt organization(s) shall be related to the treatment of, research on the cure of, or other relief for individuals suffering from OUD, and (ii) the tax-exempt organization(s) shall not bear any relationship to the Debtors within the meaning of section 468B(d)(3) of the Internal Revenue Code. Notwithstanding any contrary provision of the Plan and related documents, this Section 9.3(c) cannot be modified or amended.

(d)    Following the dissolution and distribution of the TPP Trust Assets, the TPP Trust shall terminate and the Trustee and the Delaware Trustee (acting solely at the written direction of

46

the Trustee) shall execute and cause a Certificate of Cancellation of the Certificate of Trust of the TPP Trust to be filed in accordance with the Act. Notwithstanding anything to the contrary contained in this Trust Agreement, the existence of the TPP Trust as a separate legal entity shall continue until the filing of such Certificate of Cancellation.

(e)     After the termination of the TPP Trust, the Trustee shall retain for a period of twelve (12) months the books, records, certificates and other documents and files which shall have been delivered to or created by the Trustee. At the Trustee's discretion, all of such records and documents may, but need not, be destroyed at any time after twelve (12) months from the completion and winding up of the affairs of the TPP Trust. For the avoidance of doubt, the limitations on liability contained in Section 6.4 hereof shall apply to actions taken by the Trustee consistent with this Section 9.3.

**9.4**     **Amendments.** The Trustee, after consultation with the TAC, and subject to the majority consent of the TAC, may modify or amend this Trust Agreement (except with respect to Section 9.3(c), which by its own terms is expressly not subject to modification or amendment). The Trustee, after consultation with the TAC, and subject to the consent of the TAC, may modify or amend the TPP TDP; provided, however, that no amendment to the TPP TDP shall (i) be inconsistent with the Plan or this Trust Agreement, (ii) have a material and adverse effect on TPP Authorized Recipients' entitlements to TPP Abatement Distributions or (iii) be inconsistent with the provisions limiting amendments to that document provided therein. Any modification or amendment made pursuant to this Section must be done in writing. Notwithstanding anything contained in this Trust Agreement or the TPP TDP to the contrary, neither this Trust Agreement, the TPP TDP, nor any document annexed to the foregoing shall be modified or amended in any way that could jeopardize, impair, or modify (i) the applicability of section 105 of the Bankruptcy

47

Code to the Plan, the Confirmation Order, or the TPP Trust, (ii) the efficacy or enforceability of the Channeling Injunction or any other injunctions or releases issued or granted in connection with the Plan, (iii) the treatment of the TPP Trust as a Qualified Settlement Fund within the meaning of the QSF Regulations; or (iv) the Plan or the Confirmation Order. Any amendment affecting the rights, duties, immunities or liabilities of the Delaware Trustee shall require the Delaware Trustee's written consent.

**9.5    Severability.** If any term, provision, covenant or restriction contained in this Trust Agreement is held by a court of competent jurisdiction or other authority to be invalid, void, unenforceable or against its regulatory policy, the remainder of the terms, provisions, covenants and restrictions contained in this Trust Agreement shall remain in full force and effect and shall in no way be affected, impaired or invalidated.

**9.6    Notices**.

(a)    Notices to persons asserting claims shall be given by first class mail, first class mail or by e-mail at the address for notice appearing on such claimant's proof of claim or, upon the submission of the TPP Abatement Claim Form, the address for notice on the latter (which may be the address or e-mail address of counsel or other representative), as reflected on the books kept by or on behalf of the Trustee.

(b)    Notice or other communications to the Trustee or the TPP Trust shall be in writing and delivered by hand, by overnight courier (signature required upon receipt) or if authorized by the Trustee, by e-mail, to:

(c)    Notice or other communications to the Trustee or the TPP Trust shall be in writing and delivered by hand, by overnight courier (signature required upon receipt) or if authorized by the Trustee, by e-mail, to:

TPP Trust
c/o

E-mail:

With a copy to:

(d)     Notice or other communications to the Delaware Trustee shall be in writing and delivered by hand, by overnight courier (signature required upon receipt) or if authorized by the Delaware Trustee, by e-mail, to:

TPP Trust, Delaware Trustee
c/o

E-mail:

With a copy to:

(e)     Notice or other communications to the TAC and its Members shall be in writing and delivered by hand, by overnight courier (signature required upon receipt) or, by e-mail, to:


(f)     Notice or other communications to NewCo shall be in writing and delivered by hand, by overnight courier (signature required upon receipt) or by e-mail, to:


c/o

E-mail:

With a copy to:

(g)     All such notices and communications if mailed shall be effective when physically delivered at the designated addresses or, if electronically transmitted, when the communication is received at the designated addresses and confirmed by the recipient by return transmission.

49

9.7     **Successors and Assigns.** The provisions of this Trust Agreement shall be binding upon and inure to the benefit of the TPP Trust, the TAC, the Trustee, and the Debtors, NewCo, and TopCo, and their respective successors and assigns, except that neither the Trustee nor the TAC Members may assign or otherwise transfer any of their rights or obligations, if any, under this Trust Agreement except in the case of the Trustee in accordance with Section 6.3 herein, the TAC Members in accordance with Section 7.4 herein.

9.8     **Limitation on Claim Interests for Securities Laws Purposes.** The interests of the Beneficial Owners shall be uncertificated and reflected only on the records of the TPP Trust. Such interests are not negotiable and not transferable except (a) pursuant to applicable laws of descent and distribution (in the case of a deceased individual Beneficial Owner) or (b) by operation of law. The Trustee shall not be required to record any transfer which, in the Trustee's sole discretion, may be construed to create any uncertainty or ambiguity as to the identity of the holder of the interest in the TPP Trust. Until a transfer is, in fact, recorded on the books and records maintained by the TPP Trust for the purpose of identifying Beneficial Owners, the Trustee, whether or not in receipt of documents of transfer or other documents relating to the transfer, may nevertheless make TPP Abatement Distributions and send communications as though he or she has no notice of any such transfer, and in so doing the Trustee shall be fully protected and incur no liability to any purported transferee or any other person or entity. The Beneficial Owners shall not possess any voting rights and shall not be entitled to receive any dividends or interest with respect to or on account of their interests in the TPP Trust or TPP Trust Assets.

9.9     **Entire Agreement; No Waiver.** The entire agreement of the Parties relating to the subject matter of this Trust Agreement is contained herein, and in the documents referred to herein (including the Plan, the Confirmation Order and the TPP TDP), and this Trust Agreement and such

documents supersede any prior oral or written agreements concerning the subject matter hereof. No failure to exercise or delay in exercising any right, power, or privilege hereunder shall operate as a waiver thereof, nor shall any single or partial exercise of any right, power, or privilege hereunder preclude any further exercise thereof or of any other right, power, or privilege. The rights and remedies herein provided are cumulative and are not exclusive of rights under law or in equity. Except as otherwise provided in this Agreement, the Plan or Confirmation Order, nothing herein is intended or shall be construed to confer upon or give any person other than the parties hereto and the beneficiaries any rights or remedies under or by reason of this Agreement.

**9.10    Headings.** The headings used in this Trust Agreement are inserted for convenience only and do not constitute a portion of this Trust Agreement, nor in any manner affect the construction of the provisions of this Trust Agreement.

**9.11    Governing Law.** The validity and construction of this Trust Agreement and all amendments hereto and thereto shall be governed by the laws of the State of Delaware, and the rights of all Parties hereto and the effect of every provision hereof shall be subject to and construed according to the laws of the State of Delaware without regard to the conflicts of law provisions thereof that would purport to apply the law of any other jurisdiction; provided, however, that the Parties hereto intend that the provisions hereof shall control and therefore shall not be applicable to the TPP Trust, the Trustee, the Delaware Trustee, the TAC and its Members, or this Trust Agreement, any provision of the laws (statutory or common) of the State of Delaware pertaining to trusts that relate to or regulate in a manner inconsistent with the terms hereof: (a) the filing with any court or governmental body or agency of Trustee accounts or schedules of Trustee fees and charges; (b) affirmative requirements to post bonds for the Trustee, officers, agents, or employees of a trust; (c) the necessity for obtaining court or other governmental approval concerning the

51

acquisition, holding, or disposition of real or personal property; (d) fees or other sums payable to the Trustee, officers, agents, or employees of a trust; (e) the allocation of receipts and expenditures to income or principal; (f) restrictions or limitations on the permissible nature, amount, or concentration of trust investments or requirements relating to the titling, storage, or other manner of holding of trust assets; (g) the existence of rights or interests (beneficial or otherwise) in trust assets; (h) the ability of beneficial owners or other persons to terminate or dissolve a trust; or (i) the establishment of fiduciary or other standards or responsibilities or limitations on the acts or powers of the Trustee or beneficial owners that are inconsistent with the limitations on liability or authorities and powers of the Trustee, the Delaware Trustee, the TAC, or set forth or referenced in this Trust Agreement. Section 3540 of the Act shall not apply to the TPP Trust.

**9.12    Settlors' Representative and Cooperation.** The Debtors are hereby irrevocably designated as the Settlors and are hereby authorized to take any action required of the Settlors in connection with the creation of this Trust.

**9.13    Dispute Resolution**.  Any disputes that arise under this Trust Agreement or under the TPP TDP among the Parties may be brought before the Bankruptcy Court, or upon agreement of the Parties to the dispute and subject to Section VI hereof, may be resolved by submission of the matter to an alternative dispute resolution ("**ADR**") process with a single mutually agreed mediator selected among: (i) Law Offices of Kenneth R. Feinberg, PC (1455 Pennsylvania Avenue, NW, Suite 3090, Washington, D.C. 20004); (ii) ADR Systems (20 North Clark Street, floor 29, Chicago, IL 60602); (iii) JAMS (620 Eighth Avenue, New York, NY 10018) or (iv) Phillips ADR (2101 East Coast Highway, Corona Del Mar, CA 92625) (the "**Mediator**"). Should any party to the ADR process be dissatisfied with the decision of the Mediator, that Party may apply to the Bankruptcy Court for judicial determination of the matter. Any review conducted by the Bankruptcy Court

52

shall be de novo. In the event that the dispute is submitted to the ADR process but is not resolved within sixty (60) days of the engagement of the Mediator and the Trustee determines that the matter in dispute is exigent and cannot await the completion of the ADR process, the Trustee shall have the discretion to opt out of the ADR process and seek resolution of the dispute in the Bankruptcy Court. The amounts payable to the mediator or mediation firm shall be shared equally among the Parties to the dispute, unless otherwise agreed by such Parties.  Nothing contained herein shall preclude or prevent the Trustee from bringing any matter relating to the TPP Trust and the rights and obligations of the TPP Trust before the Bankruptcy Court, and the Trustee's authority to seek a determination of the Bankruptcy Court with respect to any such matter is specifically reserved.

**9.14    Enforcement and Administration.** The provisions of this Trust Agreement and the TPP TDP shall be enforced by the Bankruptcy Court pursuant to Section 11.1 of the Plan and the Confirmation Order. The Parties hereby acknowledge and agree that the Bankruptcy Court shall have continuing exclusive jurisdiction over the settlement of the accounts of the Trustee and over any disputes that arise under this Trust Agreement or the TPP TDP and are not resolved by alternative dispute resolution in accordance with Section 9.13 herein.

**9.15    Effectiveness.** This Trust Agreement shall not become effective until the Effective Date of the Plan and this Trust Agreement has been executed and delivered by all the Parties hereto.

**9.16    Counterpart Signatures.** This Trust Agreement may be signed by the Parties in counterparts, and by different Parties on separate counterparts (including by PDF transmitted by e-mail) and each such counterpart shall be deemed to be an original, and all such counterparts, when taken together, shall constitute one and the same document.

*[Remainder of Page Intentionally Left Blank]*

53

IN WITNESS WHEREOF, the Parties have executed this Trust Agreement this_____ day

of _____, 2021.

**SETTLOR(S):**

**PURDUE PHARMA, LP**

By: _____

**[•]**

By: _____

**TRUSTEE**

**DELAWARE TRUSTEE**

_____

[Delaware Trustee]

Name:  Alan D. Halperin

By:_____

Dated:  _____

Name and Title:_____

Dated:  _____

**Exhibit C**

**Certificate of Trust**

**(TO BE INSERTED)**

## EXHIBIT R

**NOAT Agreement**

**NATIONAL OPIOID ABATEMENT**

**TRUST AGREEMENT**

**Dated as of [•], 2021**


***Pursuant to the Debtors' [Fifth] Amended Joint Chapter 11***
***Plan of Reorganization Dated [June 3], 2021***

# NATIONAL OPIOID ABATEMENT TRUST AGREEMENT

## TABLE OF CONTENTS

**Page**

ARTICLE 1 AGREEMENT OF TRUST ...................................................................2

Section 1.1    Creation and Name.................................................................2
Section 1.2    Purposes ................................................................................3
Section 1.3    Transfer of Assets ................................................................4
Section 1.4    Acceptance of Assets. ..........................................................4
Section 1.5    NOAT Beneficiaries..............................................................5
Section 1.6    Jurisdiction ...........................................................................5

ARTICLE 2 POWERS AND TRUST ADMINISTRATION ..........................................6

Section 2.1    Powers. ..................................................................................6
Section 2.2    General Administration..........................................................9
Section 2.3    Accounting .............................................................................9
Section 2.4    Financial Reporting................................................................9
Section 2.5    Opioid Abatement Reporting .................................................9
Section 2.6    Beneficiary Reporting..........................................................10
Section 2.7    Limitation of the Trustees' Authority ..................................10

ARTICLE 3 ACCOUNTS, INVESTMENTS, ADMINISTRATIVE EXPENSES .....................11

Section 3.1    Accounts...............................................................................11
Section 3.2    Investment Guidelines.........................................................11
Section 3.3    Payment of NOAT Operating Expenses ..............................12

ARTICLE 4 ABATEMENT DISTRIBUTIONS.......................................................12

Section 4.1    Abatement Distributions ......................................................12
Section 4.2    Manner of Payment of Abatement Distributions. ................12
Section 4.3    Delivery of Abatement Distributions. ..................................13

ARTICLE 5 TRUSTEES AND DELAWARE TRUSTEE .........................................13

Section 5.1    Number of Trustees; Managing Trustee ..............................13
Section 5.2    Term of Service, Successor Trustees. ..................................14
Section 5.3    Trustee Meetings. ................................................................15
Section 5.4    Compensation and Expenses of Trustees.............................16
Section 5.5    Trustees' Independence........................................................16
Section 5.6    Standard of Care; Exculpation. ...........................................17
Section 5.7    Protective Provisions............................................................18
Section 5.8    Indemnification. ...................................................................18
Section 5.9    Bond .....................................................................................19
Section 5.10   Delaware Trustee. ................................................................19

i

Section 5.11        Meeting Minutes; Rights of Inspection.................................................22

ARTICLE 6 GENERAL PROVISIONS ....................................................................23

Section 6.1        Irrevocability .............................................................................23
Section 6.2        Term; Termination. .....................................................................23
Section 6.3        Taxes. .......................................................................................24
Section 6.4        Modification. .............................................................................24
Section 6.5        Communications ........................................................................25
Section 6.6        Severability ...............................................................................25
Section 6.7        Notices. .....................................................................................26
Section 6.8        Successors and Assigns...............................................................26
Section 6.9        Limitation on Transferability; NOAT Beneficiaries' Interests .............26
Section 6.10       Exemption from Registration .......................................................27
Section 6.11       Entire Agreement; No Waiver ......................................................27
Section 6.12       Headings....................................................................................27
Section 6.13       Governing Law...........................................................................27
Section 6.14       Dispute Resolution ....................................................................28
Section 6.15       Sovereign Immunity...................................................................29
Section 6.16       Waiver of Jury Trial ...................................................................29
Section 6.17       Effectiveness .............................................................................29
Section 6.18       Counterpart Signatures...............................................................29

EXHIBIT 1 AGGREGATE NOAT CONSIDERATION....................................................31

EXHIBIT 2 FORM OF CERTIFICATE OF TRUST OF THE NATIONAL OPIOID
ABATEMENT TRUST ...................................................................32

EXHIBIT 3 INVESTMENT GUIDELINES ..............................................................33

EXHIBIT 4 NATIONAL OPIOID ABATEMENT TRUST DISTRIBUTION
PROCEDURES............................................................................34

# NATIONAL OPIOID ABATEMENT

# TRUST AGREEMENT

This National Opioid Abatement Trust Agreement (together with all Exhibits hereto, this "**Trust Agreement**"), dated as of [    ], 2021 and effective as of the Effective Date, implements certain of the terms of the *Debtors' [Fifth] Amended Joint Chapter 11 Plan of Reorganization of Purdue Pharma L.P. and its Affiliated Debtors*, dated [●], 2021 (as may be further modified, amended, or supplemented from time to time, and together with all exhibits and schedules thereto, the "**Plan**"),[1] confirmed by an order entered on [●], 2021 [Docket No. _____] (the "**Confirmation Order**") by the United States Bankruptcy Court for the Southern District of New York (the "**Bankruptcy Court**") in the Chapter 11 Cases of Purdue Pharma L.P. and its affiliated Debtors[2] (each a "**Debtor**" and collectively, the "**Debtors**," or the "**Settlors**"), jointly administered under Case No. 19-23649 (RDD) and is entered into by the Settlors, the trustees of the National Opioid Abatement Trust who are further identified on the signature pages hereto (together with any successor trustee serving in such capacity, the "**Trustees**"), the Delaware Trustee (together with any successor serving in such capacity, the "**Delaware Trustee**") and the Trust Protector, the individual who is further identified on the signature pages hereto (together with any successor serving in such capacity, the "**Trust Protector**").

## <u>RECITALS</u>

**WHEREAS**, the Debtors have reorganized under the provisions of Chapter 11 of the Bankruptcy Code.

**WHEREAS**, the Plan provides, inter alia, for the establishment of a Creditor Trust with respect to Non-Federal Domestic Governmental Channeled Claims in accordance with Section 5.7 of the Plan ("**NOAT**").

**WHEREAS**, the Confirmation Order has been entered by the Bankruptcy Court and is in full force and effect.

**WHEREAS**, pursuant to the Plan and the Confirmation Order, NOAT shall be established to (i) assume all liability for the Non-Federal Domestic Governmental Channeled Claims, (ii) hold the MDT NOAT Interest and the TopCo NOAT Interest and collect the Initial NOAT Distribution and other Public Creditor Trust Distributions received in accordance with the Public Entity Settlements, (iii) administer Non-Federal Domestic Governmental Channeled Claims, (iv) make

---

[1] Capitalized terms used but not herein defined shall have the meaning ascribed to them in the Plan or the Confirmation Order, as applicable.

[2] The Debtors in these cases are as follows: Purdue Pharma L.P.; Purdue Pharma Inc.; Purdue Transdermal Technologies L.P.; Purdue Pharma Manufacturing L.P.; Purdue Pharmaceuticals L.P.; Imbrium Therapeutics L.P.; Adlon Therapeutics L.P.; Greenfield BioVentures L.P.; Seven Seas Hill Corp; Ophir Green Corp.; Purdue Pharma of Puerto Rico; Avrio Health L.P.; Purdue Pharmaceutical Products L.P.; Purdue Neuroscience Company; Nayatt Cove Lifescience Inc.; Button Land L.P.; Rhodes Associates L.P.; Paul Land Inc.; Quidnick Land L.P.; Rhodes Pharmaceuticals L.P.; Rhodes Technologies; UDF L.P.; SVC Pharma L.P.; and SVC Pharma Inc.

Abatement Distributions to Authorized Recipients for Authorized Abatement Purposes, in each case in accordance with the NOAT trust distributions procedures attached hereto as **Exhibit 4** (the "**NOAT TDP**"), and (v) carry out such other matters as are set forth in the Trust Documents.

**WHEREAS**, the Plan and the Master TDP provide that on the Effective Date, any and all liability of the Debtors and the other Protected Parties for any and all Non-Federal Domestic Governmental Channeled Claims shall automatically, and without further act, deed or court order, be channeled to and assumed by the Master Disbursement Trust solely for the purpose of effectuating the Master TDP, and further provided that immediately thereafter, any and all Non-Federal Domestic Governmental Channeled Claims shall automatically, and without further act, deed or court order, be channeled exclusively to and assumed by NOAT.

**WHEREAS**, pursuant to the Plan and the Confirmation Order, NOAT shall (i) hold, manage and invest all funds and other Assets received by NOAT from the Master Disbursement Trust for the benefit of the beneficiaries of NOAT; (ii) hold and maintain the NOAT Operating Reserve, as defined herein; and (iii) administer, process, resolve and liquidate all Non-Federal Domestic Governmental Channeled Claims in accordance with the NOAT TDP.

**WHEREAS**, the Plan and Confirmation Order provide that, on the Effective Date and continuing thereafter until fully funded by the Debtors in accordance with the Plan, the Aggregate NOAT Consideration (as defined in Section 1.3), as described in **Exhibit 1**, shall be transferred to and vested in NOAT be free and clear of all claims, Liens or other recourse or encumbrances, and shall not be subject to disgorgement or recoupment by any Person.

**WHEREAS**, all rights of the Holders of Non-Federal Domestic Governmental Channeled Claims arising under this Trust Agreement and the NOAT TDP shall vest upon the Effective Date.

**WHEREAS**, the Bankruptcy Court has determined that NOAT and the Plan satisfy all the prerequisites for issuance of an injunction pursuant to section 105(a) of the Bankruptcy Code with respect to any and all Non-Federal Domestic Governmental Channeled Claims, and such injunction (the "**Channeling Injunction**") shall be fully effective and enforceable as provided in the Plan.

**NOW, THEREFORE**, it is hereby agreed as follows:

## ARTICLE 1
## AGREEMENT OF TRUST

**Section 1.1    Creation and Name**. The Debtors as Settlors hereby create a trust known as "National Opioid Abatement Trust" or "NOAT," which is provided for and referred to in Section 5.7 of the Plan. The Trustees may transact the business and affairs of NOAT in the name of NOAT, and references herein to NOAT shall include the Trustees acting on behalf of NOAT. It is the intention of the parties hereto that NOAT constitute a statutory trust under Chapter 38 of title 12 of the Delaware Code, 12 Del. C. Section 3801 *et seq.* (the "**Act**") and that the Confirmation Order, the Plan, this Trust Agreement, and the NOAT TDP (collectively, the "**Trust Documents**"), constitute the governing instruments of NOAT. The Trustees and the Delaware Trustee are hereby authorized and directed to execute and file a Certificate of Trust with the Delaware Secretary of State in the form attached hereto as **Exhibit 2**.

**Section 1.2     Purposes**. The purposes of NOAT are to

(a)     assume all liability for the Non-Federal Domestic Governmental Channeled Claims;

(b)     hold the MDT NOAT Interest and the TopCo NOAT Interest and collect the Initial NOAT Distribution and other Public Creditor Trust Distributions received in accordance with the Public Entity Settlements;

(c)     administer, process, resolve and liquidate Non-Federal Domestic Governmental Channeled Claims. For the avoidance of doubt, each Non-Federal Domestic Governmental Channeled Claim shall be asserted exclusively against NOAT and resolved solely in accordance with the terms, provisions and procedures of the NOAT TDP;

(d)     make Abatement Distributions to States and Local Governments for Approved Uses, as defined in the NOAT TDP, in each case in accordance with the NOAT TDP;

(e)     hold, manage and invest all funds and other Assets received by NOAT from the Debtors, the Master Disbursement Trust and TopCo, including the TopCo NOAT Interest and the MDT NOAT Interest (as defined in Section 1.3 below) in accordance with the terms of the Trust Documents for the benefit of the NOAT Beneficiaries (as defined in Section 1.5(a) below);

(f)     qualify at all times as a qualified settlement fund within the meaning of the QSF Regulations (as defined herein) and be treated consistently for state and local tax purposes to the extent applicable;

(g)     use the Trust Assets, as defined herein, to:

(i)     make Abatement Distributions to States and Local Governments in accordance with this Trust Agreement and the NOAT TDP such that Holders of Non-Federal Domestic Governmental Channeled Claims are treated fairly, equitably, and reasonably in light of the finite assets available to disburse on account of such Non-Federal Domestic Governmental Channeled Claims;

(ii)     hold and maintain reserves to pay the fees and expenses incurred with respect to administering NOAT (including the NOAT TDP) and managing the Assets (together, the "**NOAT Operating Expenses**") of NOAT (such reserves, the "**NOAT Operating Reserve**"), which shall be (a) funded with Cash and cash equivalents held by NOAT in accordance with the Trust Documents and (b) held by NOAT in a segregated account and administered by the Trustees;

(iii)     pay the NOAT Operating Expenses from the NOAT Operating Reserve; and

(iv)     replenish periodically, until the dissolution of NOAT, the NOAT Operating Reserve from Cash held or received by NOAT to the extent

3

deemed necessary by the Trustees to satisfy and pay estimated future NOAT Operating Expenses in accordance with the Trust Documents.

**Section 1.3    Transfer of Assets**. Pursuant to Section 4.4(a) of the Plan, NOAT has received (i) the Initial NOAT Distribution, (ii) the TopCo NOAT Interest and (iii) the MDT NOAT Interest (the "**Aggregate NOAT Consideration**" and, together with any income or gain earned thereon and proceeds derived therefrom, collectively, the "**Trust Assets**"). The Aggregate NOAT Consideration shall be transferred free and clear of all Claims, Liens or other recourse or encumbrances, and shall not be subject to attachment, disgorgement or recoupment by any Person. The Debtors shall be authorized pursuant to the Plan to execute and deliver such documents to NOAT as the Trustees reasonably request to transfer and assign any assets comprising all or a portion of the Aggregate NOAT Consideration to NOAT.

**Section 1.4    Acceptance of Assets.**

(a)    In furtherance of the purposes of NOAT, the Trustees, on behalf of NOAT, hereby expressly accept the transfer to NOAT of the Aggregate NOAT Consideration and any other transfers contemplated by the Plan and the Master TDP and subject to the terms of the Plan and the Master TDP. NOAT shall succeed to all of the Debtors' respective right, title and interest, including all legal privileges, in the Aggregate NOAT Consideration and neither the Debtors nor any other person or entity transferring such Aggregate NOAT Consideration will have any further equitable or legal interest in, or with respect to, the Trust Assets, including the Aggregate NOAT Consideration or NOAT.

(b)    In furtherance of the purposes of NOAT, NOAT expressly assumes all liabilities and responsibility for all Non-Federal Domestic Governmental Channeled Claims (except as set forth in the Plan) subject to the Trust Documents, and none of the Debtors, the Protected Parties, or the Master Disbursement Trust shall have any further financial or other responsibility or liability therefor. Except as otherwise provided in this Trust Agreement, the NOAT TDP, the Plan, or the Master TDP, NOAT shall have and retain any and all defenses, cross-claims, offsets, and recoupments regarding the Non-Federal Domestic Governmental Channeled Claims, as well as any and all rights of indemnification, contribution, subrogation, and similar rights, that the Debtors, the Released Parties, and the Shareholder Released Parties, as applicable, have or would have had under applicable law; *provided* that no such claims, defenses or rights may be used to seek any affirmative monetary recovery from any party.

(c)    Notwithstanding anything to the contrary herein, no provision in this Trust Agreement or the NOAT TDP shall be construed or implemented in a manner that would cause NOAT to fail to qualify as a qualified settlement fund within the meaning of the QSF Regulations.

(d)    Nothing in this Trust Agreement shall be construed in any way to limit (i) the scope, enforceability, or effectiveness of the Channeling Injunction, or (ii) subject to the provisions of Section 1.4(b) herein, NOAT's assumption of all liability for Non-Federal Domestic Governmental Channeled Claims.

(e)    In this Trust Agreement and the NOAT TDP, the words "must," "will," and "shall" are intended to have the same mandatory force and effect, while the word "may" is intended to be permissive rather than mandatory.

**Section 1.5    NOAT Beneficiaries**.

(a)    The beneficial owners (within the meaning of the Act) of NOAT shall be:

    (i)    The States of the United States, the District of Columbia, and those territories of the United States identified on **Schedule C** of the NOAT TDP (each a "**State**" or a "**State Beneficiary**"); and

    (ii)    Each county, city, town, parish, village and municipality that is a Domestic Governmental Entity or other holder of a Non-Federal Domestic Governmental Channeled Claim that is otherwise not a "State" as defined above (each, a "**Local Government**" and, collectively, all such Local Governments together with all State Beneficiaries, the "**NOAT Beneficiaries**").

(b)    Each of the NOAT Beneficiaries is either a state of the United States or a political subdivision thereof, the District of Columbia, or the government of a possession of the United States, or a political subdivision thereof, within the meaning of Section 115 of the IRC.

(c)    The NOAT Beneficiaries shall have only such rights with respect to NOAT and the Trust Assets as are set forth in the NOAT TDP and no greater or other rights, including upon dissolution, liquidation or winding up of NOAT, shall be deemed to apply to such NOAT Beneficiaries. The NOAT Beneficiaries are enjoined from asserting against any Debtor or other Protected Party any Channeled Claim, and may not proceed in any manner against any Debtor or other Protected Party on account of any Channeled Claim in any forum whatsoever, including any state, federal or non-U.S. court or administrative or arbitral forum, and are required to pursue Non-Federal Domestic Governmental Channeled Claims exclusively against NOAT, solely as and to the extent provided in the NOAT TDP.

(d)    The NOAT Beneficiaries shall be subject to the terms of this Trust Agreement, including without limitation, Article 4 and the terms of the NOAT TDP.

**Section 1.6    Jurisdiction**. The Bankruptcy Court shall have continuing jurisdiction over NOAT, <u>provided, however</u>, the courts of the State of Delaware, including any federal court located therein, shall also have jurisdiction over NOAT; <u>provided further</u> (i) only the Bankruptcy Court shall have jurisdiction with respect to Government Participation Mechanism notices (described in Section 6 of the NOAT TDP); (ii) either the Bankruptcy Court or a State court with jurisdiction in the applicable State shall have jurisdiction with respect to an Objection to an Allocation in Non-SAA States (described in NOAT TDP Section 6.6); and (iii) any dispute with respect to a Statewide Abatement Agreement shall be subject exclusively to any jurisdictional provisions set forth in such Statewide Abatement Agreement (described in NOAT TDP Section 5.2). Subject to the foregoing sentence, an applicable State court shall have jurisdiction with respect to any matter arising under the NOAT TDP involving that State and one or more of its counties, cities, towns, parishes, villages, municipalities, regions (or any political subdivisions thereof).

## ARTICLE 2
## POWERS AND TRUST ADMINISTRATION

**Section 2.1    Powers.**

(a)    The Trustees are and shall act as fiduciaries to NOAT in accordance with the provisions of this Trust Agreement. The Trustees shall, at all times, administer NOAT in accordance with the purposes set forth in Section 1.2 above. Subject to the limitations set forth in the Trust Documents, the Trustees shall have the power to take any and all actions that, in the judgment of the Trustees, are necessary or advisable to fulfill the purposes of NOAT, including, without limitation, each power expressly granted in this Section 2.1, any power reasonably incidental thereto and any trust power now or hereafter permitted under the laws of the State of Delaware. In the event of any ambiguity or conflict between the terms of this Trust Agreement or the NOAT TDP, the NOAT TDP shall control. In the event of ambiguity or conflict between the provisions of this Trust Agreement, the provisions of the Plan, or the Confirmation Order, each document shall control in the following order: (1) the Confirmation Order; (2) the Plan; (3) the NOAT TDP, and (4) this Trust Agreement. For the avoidance of doubt, this Trust Agreement shall be construed and implemented in accordance with the Plan, regardless of whether any provision herein explicitly references the Plan.

(b)    Except as required by applicable law or the Trust Documents, the Trustees need not obtain the order or approval of any court in the exercise of any power or discretion conferred hereunder.

(c)    Without limiting the generality of Section 2.1(a) above, and except as limited in the Trust Documents and by applicable law, the Trustees shall have the power to:

(i)    receive and hold the Trust Assets and exercise all rights with respect thereto;

(ii)    invest the monies and other Trust Assets held from time to time by NOAT, subject to the limitations set forth in Section 3.2 below;

(iii)    sell, transfer or exchange any or all of the Trust Assets at such prices and upon such terms as the Trustees may determine proper or consistent with the other terms of this Trust Agreement;

(iv)    enter into leasing, financing or other agreements with third parties as deemed by the Trustees, in their discretion, to be reasonably necessary in carrying out the purposes of NOAT;

(v)    determine and pay liabilities and NOAT Operating Expenses;

(vi)    establish accounts and reasonable reserves within NOAT, as deemed by the Trustees, in their discretion, to be useful in administering NOAT;

(vii)    bring any action in any court of competent jurisdiction including the Bankruptcy Court;

(viii)    initiate, prosecute, defend and resolve all legal actions and other proceedings related to any Asset, liability or responsibility of NOAT. Such legal actions and other proceedings shall be limited solely to those required for purposes of reconciling, administering or defending against the Non-Federal Domestic Governmental Channeled Claims channeled to NOAT and for enforcing the rights of NOAT under the Plan and the Plan Documents;

(ix)    supervise and administer NOAT in accordance with the Trust Documents, including without limitation monitor the Abatement Distribution recipients' compliance with the NOAT TDP requirements for Approved Opioid Abatement Uses and Approved Administrative Expenses;

(x)    appoint such officers and retain such employees, consultants, advisors, independent contractors, experts and agents and engage in such legal, financial, administrative, accounting, investment, auditing and alternative dispute resolution services and activities as NOAT requires, and delegate to such persons such powers and authorities as the fiduciary duties of the Trustees permit and as the Trustees, in their discretion, deem advisable or necessary in order to carry out the terms of this Trust Agreement;

(xi)    pay reasonable compensation and expenses to any of NOAT's employees, consultants, advisors, independent contractors, experts and agents for legal, financial, administrative, accounting, investment, auditing and alternative dispute resolution services and activities as NOAT requires;

(xii)    compensate the Trustees, Delaware Trustee, the Trust Protector, and their employees, consultants, advisors, independent contractors, experts and agents, and reimburse the Trustees, the Delaware Trustee and the Trust Protector for all reasonable out-of-pocket costs and expenses incurred by such persons in connection with the performance of their duties hereunder;

(xiii)    execute and deliver such instruments as the Trustees consider proper in administering NOAT;

(xiv)    enter into such other arrangements with third parties as are deemed by the Trustees to be advisable or necessary in carrying out the purposes of NOAT, provided such arrangements do not conflict with any other provision of this Trust Agreement;

(xv)    in accordance with Section 5.8 below, defend, indemnify and hold harmless (and purchase insurance indemnifying) the Trust Indemnified Parties (as defined in Section 5.6(a) below) to the maximum extent permitted by law;

(xvi)    delegate any or all of the authority herein conferred with respect to the investment of all or any portion of the Trust Assets (other than the TopCo NOAT Interest) to any one or more reputable institutional investment advisors or investment managers without liability for any action taken or

omission made because of any such delegation, except as provided in Section 5.6 below; provided that such investment advisors and investment managers shall be in compliance with the Investment Guidelines (as defined in Section 3.2(a)) at all times;

(xvii)   delegate any or all of the authority herein conferred with respect to the TopCo NOAT Interest to the managers of [TopCo], including the rights, duties and obligations to own, oversee and monetize the TopCo NOAT Interest and/or the assets of [TopCo] for the benefit of NOAT and the NOAT Beneficiaries, in accordance with TopCo Operating Agreement;

(xviii)  take such actions as may be necessary or appropriate in respect of NOAT's rights as owner of the TopCo NOAT Interest in accordance with the TopCo Operating Agreement and applicable laws;

(xix)    make, join, pursue (by litigation or otherwise), collect, compromise, settle, or otherwise resolve, in the name of NOAT, any claim, right, action or cause of action of NOAT, before any court of competent jurisdiction and without approval of the Bankruptcy Court;

(xx)     engage and compensate tax professionals ("**Tax Professionals**") to assist the Trustees (a) with NOAT's tax reporting obligations, audits and all other tax and accounting-related issues, including, in the event that the Trustees determine to request a private letter ruling from the Internal Revenue Service and any necessary or appropriate state governmental agency: (1) that NOAT will be treated as a qualified settlement fund under 26 C.F.R. § 1.468B-1; (2) that the Aggregate NOAT Consideration will be excluded from NOAT's gross income; (3) that all income and gain earned on the Trust Assets will be excludible from NOAT's gross income under Section 115 of the IRC, and corresponding provisions of state law; and (4) on any other matter of federal or state tax law that the Tax Professionals believe is advisable with respect to NOAT ("**Private Letter Ruling(s)**"), and (b) in taking such actions as may be reasonably necessary to secure any such Private Letter Ruling(s) and thereafter ensuring that NOAT complies with the conditions of any such Private Letter Ruling(s);

(xxi)    contract for the establishment and continuing maintenance of (a) a secure method of internet-based communications for NOAT and the NOAT Beneficiaries as described in Section 6.5 (the "**NOAT Portal**") and (b) a public-facing website to publish all information required to be published under the Trust Documents (the "**NOAT Website**");

(xxii)   exercise any and all rights of the Trustees, and take any and all actions as are permitted, in accordance with and subject to the terms of this Trust Agreement and the Plan.

(d)     The Trustees shall not have the power to cause NOAT to guarantee any debt of other Persons.

(e)     Except as otherwise set forth in the Trust Documents, and subject to retention of jurisdiction by the Bankruptcy Court as provided in the Plan, but without prior or further authorization, the Trustees may control and exercise authority over the Trust Assets and over the protection, conservation and disposition thereof. No person dealing with NOAT shall be obligated to inquire into the authority of the Trustees in connection with the protection, conservation or disposition of the Trust Assets.

**Section 2.2     General Administration**. The Trustees shall act in accordance with the Trust Documents. NOAT's principal office is located at [_____]. The Trustees may change the location of the principal office and may establish other offices at other locations. The Trustees shall provide notice to the NOAT Beneficiaries upon establishment of any office by posting such information in the NOAT Portal.

**Section 2.3     Accounting**. The fiscal year of NOAT shall begin on January 1 and shall end on December 31 of each calendar year. The Trustees shall maintain the books and records relating to the Trust Assets and income and the payment of expenses of and liabilities against NOAT. The detail of these books and records and the duration of time during which the Trustees shall keep such books and records shall be such as to allow the Trustees to make a full and accurate accounting of all Trust Assets, as well as to comply with applicable provisions of law and standard accounting practices necessary or appropriate to produce an annual report containing special-purpose financial statements of NOAT, including, without limitation, the assets and liabilities of NOAT as of the end of such fiscal year and the additions, deductions and cash flows for such fiscal year (the "**Annual Report**"); provided, however, that the Trustees shall maintain such books and records until the wind-up of NOAT's affairs and satisfaction of all of NOAT's liabilities.

**Section 2.4     Financial Reporting**.

(a)     The Trustees shall engage a firm of independent certified public accountants (the "**Independent Auditors**") selected by the Trustees, to audit the Annual Report. Within one hundred and twenty (120) days following the end of each calendar year, the Trustees shall file with the Bankruptcy Court the Annual Report audited by the Independent Auditors and accompanied by an opinion of such firm as to the fairness in all material respects of the special-purpose financial statements. The Trustees shall (i) publish a copy of such Annual Report on the NOAT Website and (ii) deliver a copy to the States via the NOAT Portal when such report is filed with the Bankruptcy Court.

(b)     All materials filed with the Bankruptcy Court pursuant to this Section 2.4 need not be served on any parties in the Chapter 11 Cases but shall be available for inspection by the public in accordance with Section 5.7(g) of the Plan.

**Section 2.5     Opioid Abatement Reporting**.

(a)     Within one hundred and twenty (120) days following the end of each calendar year, the Trustees shall cause to be prepared and filed with the Bankruptcy Court an annual report on the Approved Opioid Abatement Uses with respect to such period, together with such additional

information as the Trustees determine necessary or appropriate in their discretion (each, a "**NOAT Opioid Abatement Report**"). The Trustees shall (i) post a copy of the NOAT Opioid Abatement Report on the NOAT Website[3] and (ii) deliver such NOAT Opioid Abatement Report to the Master Disbursement Trust, in each case when such report is filed with the Bankruptcy Court.

(b)      For the avoidance of doubt, the Trustees shall not be required to include in any NOAT Opioid Abatement Report any abatement matters of any Abatement Trust created under the Plan other than NOAT.

(c)      The Trustees shall publish on the NOAT Website each State Beneficiary's "Lead Agency" pursuant to Section 5(A)(1)(i) of the NOAT TDP.

### Section 2.6    Beneficiary Reporting.

(a)      Reporting of Approved Opioid Abatement Uses by NOAT Beneficiaries shall be required to the extent set forth in the Confirmation Order and consistent with the NOAT TDP. The Trustees shall establish the form, content, and due dates of periodic reports with respect to Approved Opioid Abatement Uses to be submitted by the NOAT Beneficiaries (each, a "**Beneficiary Abatement Use Report**") to the Trustees through the NOAT Portal (or delivered by other means approved by the Trustees). Each Beneficiary Abatement Use Report shall contain the information necessary to:

(i)      enable NOAT to satisfy the audited Annual Report requirements described in Section 2.4 above;

(ii)      enable NOAT to satisfy the NOAT Opioid Abatement Report requirements described in Section 2.5(a) above; and

(iii)      enable NOAT Beneficiaries to satisfy their reporting requirements to NOAT under Section 7.1 (annual State reporting) and Section 7.2 (annual Qualifying Block Grantee reporting), respectively, of the NOAT TDP, as applicable.

Section 2.7      **Limitation of the Trustees' Authority**. The Trustees are not authorized to engage in any trade or business with respect to the Trust Assets or proceeds therefrom. The foregoing limitation shall not prevent the Trustees from managing the investment of the Trust

---

[3] For economic efficiency, the NOAT Website and the Tribal Website (and related Portals) may be maintained and administered on a combined basis.

Assets, including management of the TopCo NOAT Interest in accordance with the TopCo Operating Agreement and the Trust Documents.

## ARTICLE 3
## ACCOUNTS, INVESTMENTS, ADMINISTRATIVE EXPENSES

### Section 3.1    Accounts.

(a)    The Trustees shall maintain one or more accounts ("**Trust Accounts**") on behalf of NOAT with one or more financial depository institutions (each a "**Financial Institution**"). Candidates for the positions of Financial Institution shall fully disclose to the Trustees any interest in or relationship with the Debtors, their affiliated persons, any Creditor Trust (other than NOAT or the Tribe Trust), or any Released Parties. Any such interest or relationship shall not be an automatic disqualification for the position, but the Trustees shall take any such interest or relationship into account in selecting a Financial Institution.

(b)    The Trustees may, from time to time, create such accounts and reasonable reserves within the Trust Accounts as authorized in this Section 3.1 and as they may deem necessary, prudent or useful in order to provide for Abatement Distributions to NOAT Beneficiaries and the payment of NOAT Operating Expenses and may, with respect to any such account or reserve, restrict the use of money therein for a specified purpose (the "**Trust Subaccounts**"). Any such Trust Subaccounts established by the Trustees shall be held as Trust Assets and are not intended to be subject to separate entity tax treatment as a "disputed claims reserve" within the meaning of the IRC or the Treasury Regulations, or a "disputed ownership fund" within the meaning of the Treasury Regulations, or otherwise.

(c)    The Trustees may replace any retained Financial Institution with a successor Financial Institution at any time, and such successor shall be subject to the considerations set forth in Section 3.1(a).

### Section 3.2    Investment Guidelines.

(a)    The Trustees may invest the Trust Assets in accordance with the Investment Guidelines, attached hereto as **Exhibit 3**, (the "**Investment Guidelines**"). Notwithstanding any contrary provision of the Trust Documents, this Section 3.2(a) and the Investment Guidelines cannot be modified or amended.

(b)    Pursuant to the Plan, NOAT shall hold the TopCo NOAT Interest. The Trustees may delegate to the managers of TopCo the rights, duties and obligations to own, oversee and monetize the TopCo NOAT Interest and/or the assets of TopCo for the benefit of NOAT and the NOAT Beneficiaries, in accordance with the TopCo Operating Agreement. This Section 3.2(b) is intended to modify the application to NOAT of the "prudent person" rule, "prudent investor" rule and any other rule of law that would require the Trustees to diversify the Trust Assets.

(c)    Cash proceeds received by NOAT in connection with the monetization of the TopCo NOAT Interest shall be invested in accordance with the Investment Guidelines until needed for the purposes of NOAT as set forth in Section 1.2 above.

11

Section 3.3    **Payment of NOAT Operating Expenses**. All NOAT Operating Expenses shall be payable out of the NOAT Operating Reserve. None of the Trustees, Delaware Trustee, the Trust Protector, the NOAT Beneficiaries, nor any of their employees, officers, consultants, advisors, independent contractors, experts or agents shall be personally liable for the payment of any NOAT Operating Expense or any other liability of NOAT.

# ARTICLE 4
## ABATEMENT DISTRIBUTIONS

Section 4.1    **Abatement Distributions**. The Trustees shall make Abatement Distributions only as, and to the extent set forth in this Article 4 and the NOAT TDP. For the avoidance of doubt, Abatement Distributions shall not be made directly to each and every NOAT Beneficiary, but rather certain NOAT Beneficiaries shall, by virtue of being a county, city, town, parish, village, municipality, or Region, as defined in the NOAT TDP, that is a Domestic Governmental Entity within a State, be an indirect beneficiary of certain Abatement Distributions in accordance with the provisions of the NOAT TDP.

Section 4.2    **Manner of Payment of Abatement Distributions.**

(a)    The Trustees shall endeavor to provide ten (10) days' notice to the NOAT Beneficiaries of any upcoming Abatement Distribution, which such notice may be provided through the NOAT Portal; <u>provided, however</u>, that the Trustees may shorten such notice period in their discretion.

(b)    Abatement Distributions shall be made in accordance with one of the following alternative models, as applicable:

(i)    if clause (ii) of this Section 4.2(b) does not apply, either (x) the Default Allocation Mechanism, as set forth in Section 5(A)(1) of the NOAT TDP (with respect to Non-SAA States), provided a Government Participation Mechanism notice has been timely filed with the Bankruptcy Court to the extent required by the NOAT TDP and is then effective, or (y) the provisions of Section 5(B) of the NOAT TDP (with respect to Territories and the District of Columbia); or

(ii)    an applicable Statewide Abatement Agreement, as set forth in Section 5(A)(2) of the NOAT TDP, provided an agreed and binding Statewide Abatement Agreement has been timely filed with the Bankruptcy Court and is then effective.

(c)    Abatement Distributions may be made by the Trustees or by a Disbursement Agent retained by NOAT to make Abatement Distributions on its behalf (the "**Disbursement Agent**"). Abatement Distributions shall be made in accordance with the NOAT TDP on the dates approved for distribution by the Trustees.

(d)    The Trustees may cause Abatement Distributions to be withheld with respect to any NOAT Beneficiary that has failed to deliver timely a completed Beneficiary Abatement Use Report, as described in Section 2.6(a) herein, by the applicable due date. The Trustees shall allow

12

for a reasonable period of time to cure any delinquent Beneficiary Report not to exceed thirty (30) days from the due date thereof, <u>provided further</u>, the Trustees shall cause withheld Abatement Distributions to be made no later than fifteen (15) days after receipt of any delinquent Beneficiary Report.

### Section 4.3    Delivery of Abatement Distributions.

(a)    All Abatement Distributions under this Trust Agreement shall be made in accordance with the electronic transfer information provided by the NOAT Beneficiaries through the NOAT Portal (or by other means approved by the Trustees). Changes to such electronic transfer information must be provided to NOAT or the Disbursement Agent in writing at least five (5) business days prior to any upcoming Abatement Distribution date; <u>provided</u> that the Trustees and Disbursement Agent shall have the authority, in their discretion, to seek further direction from the NOAT Beneficiaries regarding the transfer information of Abatement Distributions under this Trust Agreement.

(b)    In the event that any Abatement Distribution is undeliverable, no further Abatement Distribution shall be made unless and until the Trustees have been notified of the then current wire instructions or address, as applicable, as directed by such NOAT Beneficiary, at which time such distribution shall be made without interest. The Trustees shall take reasonable efforts to obtain a current address or wire instructions, as applicable, for any NOAT Beneficiary with respect to which any distribution is undeliverable, but shall have no obligation to make further inquiry with respect to designated recipients of such NOAT Beneficiaries.

(c)    No Trust Asset or any unclaimed property shall escheat to any federal, state or local government or any other entity.

(d)    [A NOAT Beneficiary may (i) timely disclaim, in accordance with the terms of Delaware law, all or a portion of its rights to Abatement Distributions, or (ii) elect to have all or a portion of its Abatement Distributions directed to the Public Document Repository established as set forth in Section 5.12 of the Plan. For the avoidance of doubt, funding of the Public Document Repository shall constitute an "Approved Opioid Abatement Use" under the NOAT TDP.][4]

## ARTICLE 5
## TRUSTEES AND DELAWARE TRUSTEE

### Section 5.1    Number of Trustees; Managing Trustee.

(a)    **Number**. In addition to the Delaware Trustee appointed pursuant to Section 5.10, there shall be three (3) Trustees. The initial Trustees shall be those persons named on the signature page hereof.

(b)    **Managing Trustee.** At their first meeting, the initial Trustees shall designate one of their number to serve as the Managing Trustee of NOAT, with such administrative duties as the Trustees may determine. The Trustees may change the designation of the individual to serve as

---

[4] Note to Draft: TBD.

Managing Trustee from time to time as circumstances warrant. The Managing Trustee or, in the Managing Trustee's absence, another Trustee selected by the Trustees shall preside at meetings of the Trustees. The Managing Trustee, or the Trustee presiding over such meeting, shall be responsible for taking meeting minutes at each meeting of the Trustees and for performing such other administrative duties and services as shall be assigned to or required of the Managing Trustee by the Trustees. The Managing Trustee shall maintain a list of current Trustees, including their addresses and contact information.

**Section 5.2    Term of Service, Successor Trustees.**

(a)    **Term.** Each Trustee shall serve until the earlier of (i) his or her death, (ii) his or her resignation or removal pursuant to Section 5.2(c) below, or (iii) the termination of NOAT pursuant to the terms of this Trust Agreement. The term of a newly appointed Trustee shall commence upon his or her acceptance of trusteeship.

(b)    **Appointment of Successor Trustees.**

(i)    In the event of a vacancy in the position of one (1) Trustee for any reason, the vacancy shall be filled by the unanimous vote of the remaining Trustees. In the event that the remaining Trustees cannot agree on a successor Trustee within thirty (30) days, each of the remaining Trustees shall propose a Trustee candidate and the Trust Protector (as defined in Section 5.12(a) below) shall select one such candidate as the Successor Trustee.

(ii)    In the event of a vacancy in the position of two (2) Trustees for any reason, the remaining Trustee and the Trust Protector shall, after consultation, jointly appoint two (2) successor Trustees, both of whom shall each be acceptable to both of the remaining Trustee and the Trust Protector. In the event the remaining Trustee and the Trust Protector cannot agree on two (2) successor Trustees, the selection of two (2) successor Trustees shall be resolved in accordance with the dispute resolution provisions of Section 6.14.

(iii)    In the event of a vacancy in the position of three (3) Trustees for any reason, the Trust Protector shall petition the Delaware Court of Chancery to appoint three (3) successor Trustees to serve and any costs relating to the petition shall be borne by NOAT.

(iv)    Notice of the appointment of any successor Trustee(s) shall be filed with the Bankruptcy Court and shall be published on the NOAT Website when it is filed with the Bankruptcy Court.

(v)    In filling any vacancy in the position of one or more Trustees, the remaining Trustee(s) and/or the Trust Protector shall apply the following standard to any successor Trustee: the successor Trustee shall be a disinterested, independent individual with experience in one or more of the following

14

areas: public policy/public health, law enforcement, ethics and compliance, finance, general business and/or corporate governance.

(vi)    Immediately upon the appointment of any successor Trustee(s), all rights, titles, duties, powers and authority of the predecessor Trustee(s) hereunder shall be vested in, and undertaken by, the successor Trustee(s) without any further act. No successor Trustee(s) shall be liable personally for any act or omission of his or her predecessor Trustee. No successor Trustee shall have any duty to investigate the acts or omissions of his or her predecessor Trustee.

(c)    **Resignation or Removal.** A Trustee may resign by giving written notice to either of the other Trustees and the trustees of the Master Disbursement Trust, specifying the effective date of the resignation or, if there are no other Trustees, to the Delaware Trustee. Such notice shall specify a date when such resignation shall take effect, which, except in the case of incapacity or disability, shall not be less than ninety (90) days after the date such notice is given, where practicable. A Trustee may be removed by unanimous vote of the remaining Trustees in the event that he or she becomes unable to discharge his or her duties hereunder due to accident, physical deterioration, mental incompetence or for other good cause, underlined provided such Trustee has received reasonable notice and an opportunity to be heard by the remaining Trustees. Other good cause shall mean fraud, self-dealing, intentional misrepresentation, willful misconduct, indictment for or conviction of a felony in each case whether or not connected to NOAT, any substantial failure to comply with the administration of NOAT or a consistent pattern of neglect and failure to perform or participate in performing the duties of a Trustee hereunder. For the avoidance of doubt, any removal of a Trustee pursuant to this Section 5.2(c) shall require the approval of the Bankruptcy Court and shall take effect at such time as the Bankruptcy Court shall determine.

### Section 5.3    Trustee Meetings.

(a)    **Regular Meetings.** The Trustees shall hold regular meetings not less than quarterly, which may be held without notice at such times and at such places as may be determined from time to time by the Trustees. For the avoidance of doubt, the Delaware Trustee shall not be required or permitted to attend any meetings of the Trustees contemplated by this Section 5.3.

(b)    **Special Meetings.** Special meetings of the Trustees may be called by any Trustee by giving written notice to each other Trustee not less than one (1) business day prior to the date of the meeting. Any such notice shall include the time, place and purpose of the meeting, given to each Trustee by overnight courier, personal delivery, facsimile, electronic mail or other similar means of communication. Notice shall be addressed or delivered to each Trustee at the Trustee's address as shown upon the records of NOAT or as may have been given to Trustees by the Trustee for purposes of notice. If a Trustee's address is not shown on such records or is not readily ascertainable, notice to the Trustee may be given care of the principal office of NOAT. Notice by overnight courier shall be deemed to have been given one (1) business day after the time that written notice is provided to such overnight courier. Any other written notice shall be deemed to have been given at the time it is personally delivered to the recipient or actually transmitted by the person giving the notice by electronic means to the recipient.

(c)    **Action and Quorum.** In all matters pertaining to the affairs of NOAT, the Trustees shall act by a vote of a majority of the number of Trustees then in office, which such majority shall constitute a quorum of the Trustees for the transaction of business, except to adjourn as provided in Section 5.3(f).

(d)    **Participation in Meetings by Telephone Conference.** Trustees may participate in a meeting of the Trustees by conference telephone or similar communications equipment (which shall include virtual meetings via video conferencing software), as long as all Trustees participating in such meeting can hear one another. Participation by a Trustee in a meeting pursuant to this Section 5.3(d) shall constitute presence in person at such meeting.

(e)    **Waiver of Notice.** Notice of a meeting need not be given to any Trustee who signs a waiver of notice, whether before or after the meeting. All such waivers shall be filed with NOAT's records or made a part of the minutes of the meeting. Attendance at a meeting by a Trustee shall constitute a waiver of notice of such meeting except when the Trustee attends a meeting for the express purpose of objecting, at the beginning of the meeting, to the transaction of any business on the ground that the meeting was not lawfully called or convened. Neither the business to be transacted at, nor the purpose of, any Trustee meeting need be specified in any waiver of notice.

(f)    **Adjournment**. A majority of the Trustees present, whether or not a quorum exists, may adjourn any Trustees' meeting to another time and place.

(g)    **Action by Unanimous Written Consent.** Any action required or permitted to be taken at any meeting of the Trustees may be taken without a meeting, if all of the Trustees then in office consent thereto in writing or by Electronic Transmission, which writing may be executed in one or more counterparts, and the writing or Electronic Transmission are filed with the meeting minutes of the Trustees. As used herein, "**Electronic Transmission**" means any form of communication not directly involving the physical transmission of paper that creates a record that may be retained, retrieved and reviewed by a recipient thereof and that may be directly reproduced in paper form by such a recipient through an automated process.

**Section 5.4    Compensation and Expenses of Trustees**. The Trustees shall receive compensation from NOAT for their services as Trustees.[5] NOAT shall also, upon receipt of appropriate documentation, reimburse all reasonable out-of-pocket costs and expenses incurred by each Trustee in the course of carrying out their duties as Trustees in accordance with reasonable policies and procedures as may be adopted from time to time, including in connection with attending meetings of the Trustees. The amounts paid to the Trustees for compensation and expenses shall be disclosed in the Annual Report.

**Section 5.5    Trustees' Independence**.

(a)    The Trustees shall not, during their service, hold a financial interest in, act as attorney or agent for or serve as any other professional for Debtors, their affiliated persons, any Creditor Trust (other than NOAT) or any Released Parties. No Trustee shall act as an attorney for,

---

[5] Note to Draft: Trustee compensation TBD.

or otherwise represent, any Person who holds a claim in the Chapter 11 Cases. For the avoidance of doubt, this provision shall not apply to the Delaware Trustee.

(b)     The Trustees, and the Delaware Trustee, shall be indemnified by NOAT in acting upon any resolution, certificate, statement, instrument, opinion, report, notice, request, consent, order or other paper or document believed by them to be genuine and to have been signed or presented by the proper party or parties.

(c)     Persons dealing with NOAT, the Trustees, and the Delaware Trustee with respect to the affairs of NOAT, shall have recourse only to the Trust Assets to satisfy any liability incurred by NOAT, the Trustees or the Delaware Trustee to such Person in carrying out the terms of this Trust Agreement, and neither the Trustees, the Delaware Trustee, the NOAT Beneficiaries, nor any of their professionals, advisors, officers, agents, consultants or lawyers shall have any personal obligation to satisfy any such liability.

### Section 5.6    Standard of Care; Exculpation.

(a)     As used herein, the term "**Trust Indemnified Party**" shall mean each Trustee, the Delaware Trustee, the Trust Protector, and each of their respective members, officers, employees, agents, consultants, lawyers, advisors or professionals including the Tax Professionals (collectively, the "**Trust Indemnified Parties**").

(b)     [To the maximum extent permitted by applicable law, the Trust Indemnified Parties shall not have or incur any liability for actions taken or omitted in their capacities as Trust Indemnified Parties, or on behalf of NOAT, except those acts found by Final Order to be arising out of their willful misconduct, bad faith, gross negligence or fraud, and shall be entitled to indemnification and reimbursement for reasonable fees and expenses in defending any and all of their actions or inactions in their capacity as Trust Indemnified Parties, or on behalf of NOAT, except for any actions or inactions found by Final Order to be arising out of their willful misconduct, bad faith, gross negligence or fraud. Any valid indemnification claim of any of the Trust Indemnified Parties shall be satisfied from NOAT.

(c)     To the extent that, at law or in equity, the Trust Indemnified Parties have duties (including fiduciary duties) or liability related thereto, to NOAT or the NOAT Beneficiaries, it is hereby understood and agreed by the parties hereto and the NOAT Beneficiaries that such duties and liabilities are eliminated to the fullest extent permitted by applicable law, and replaced by the duties and liabilities expressly set forth in this Trust Agreement with respect to the Trust Indemnified Parties; provided, however, that the duties of care and loyalty are not eliminated but are limited and subject to the terms of this Trust Agreement, including but not limited to this Section 5.4 and its subparts.

(d)     NOAT will maintain appropriate insurance coverage for the protection of the Trust Indemnified Parties, as determined by the Trustees in their discretion.][6]

---

[6] Subject to ongoing discussion.

### Section 5.7    Protective Provisions.

(a)    Every provision of this Trust Agreement relating to the conduct or affecting the liability of or affording protection to Trust Indemnified Parties shall be subject to the provisions of this Section 5.7.

(b)    In the event the Trustees retain counsel (including at the expense of NOAT), the Trustees shall be afforded the benefit of the attorney-client privilege with respect to all communications with such counsel, and in no event shall the Trustees be deemed to have waived any right or privilege including, without limitation, the attorney-client privilege even if the communications with counsel had the effect of guiding the Trustees in the performance of duties hereunder. A successor to any of the Trustees shall succeed to and hold the same respective rights and benefits of the predecessor for purposes of privilege, including the attorney-client privilege. No NOAT Beneficiary or other party may raise any exception to the attorney-client privilege discussed herein as any such exceptions are hereby waived by all parties.

(c)    To the extent that, at law or in equity, the Trustees have duties (including fiduciary duties) and liabilities relating hereto, to NOAT or to the NOAT Beneficiaries, it is hereby understood and agreed by the Parties and the NOAT Beneficiaries that such duties and liabilities are eliminated to the fullest extent permitted by applicable law, including Section 3806 of the Act, and replaced by the duties and liabilities expressly set forth in this Trust Agreement with respect to the Trustees; provided, however, that the duties of care and loyalty are not eliminated but are limited and subject to the terms of this Trust Agreement, including but not limited to Section 5.6 herein.

(d)    No Trust Indemnified Party shall be personally liable under any circumstances, except for their own willful misconduct, bad faith, gross negligence or fraud as finally judicially determined by a court of competent jurisdiction.

(e)    No provision of this Trust Agreement shall require the Trust Indemnified Parties to expend or risk their own personal funds or otherwise incur financial liability in the performance of their rights, duties and powers hereunder.

(f)    In the exercise or administration of NOAT hereunder, the Trust Indemnified Parties (i) may act directly or through their respective agents or attorneys pursuant to agreements entered into with any of them, and the Trust Indemnified Parties shall not be liable for the default or misconduct of such agents or attorneys if such agents or attorneys have been selected by the Trust Indemnified Parties in good faith and with due care, and (ii) may consult with counsel, accountants and other professionals to be selected by them in good faith and with due care and employed by them, and shall not be liable for anything done, suffered or omitted in good faith by them in accordance with the advice or opinion of any such counsel, accountants or other professionals.

### Section 5.8    Indemnification.

(a)    [To the maximum extent permitted by applicable law, the Trust Indemnified Parties shall be entitled to indemnification and reimbursement for reasonable fees and expenses in defending any and all of their actions or inactions in their capacity as Trust Indemnified Parties, or on behalf of NOAT, except for any actions or inactions found by Final Order to be arising out

18

of their willful misconduct, bad faith, gross negligence or fraud. Any valid indemnification claim of any of the Trust Indemnified Parties shall be satisfied from NOAT.

(b)      Reasonable expenses, costs and fees (including attorneys' fees and costs) incurred by or on behalf of the Trust Indemnified Parties in connection with any action, suit or proceeding, whether civil, administrative or arbitrative, from which they are indemnified by NOAT shall be paid by NOAT in advance of the final disposition thereof upon receipt of an undertaking, by or on behalf of the Trust Indemnified Parties, to repay such amount in the event that it shall be determined ultimately by Final Order of the Bankruptcy Court that the Trust Indemnified Parties or any other potential indemnitee are not entitled to be indemnified by NOAT.

(c)      The Trustees shall purchase and maintain appropriate amounts and types of insurance on behalf of the Trust Indemnified Parties, as determined by the Trustees, which may include liability asserted against or incurred by such individual in that capacity or arising from his or her status as a Trust Indemnified Party, and/or as an employee, agent, lawyer, advisor or consultant of any such person.

(d)      The indemnification provisions of this Trust Agreement with respect to any Trust Indemnified Party shall survive the termination of such Trust Indemnified Party from the capacity for which such Trust Indemnified Party is indemnified. Termination or modification of this Trust Agreement shall not affect any indemnification rights or obligations in existence at such time. In making a determination with respect to entitlement to indemnification of any Trust Indemnified Party hereunder, the person, persons or entity making such determination shall presume that such Trust Indemnified Party is entitled to indemnification under this Trust Agreement, and any person seeking to overcome such presumption shall have the burden of proof to overcome the presumption.

(e)      The rights to indemnification hereunder are not exclusive of other rights which any Trust Indemnified Party may otherwise have at law or in equity, including common law rights to indemnification or contribution.][7]

**Section 5.9      Bond**. The Trustees and the Delaware Trustee shall not be required to post any bond or other form of surety or security unless otherwise ordered by the Bankruptcy Court.

**Section 5.10    Delaware Trustee.**

(a)      There shall at all times be a Delaware Trustee. The Delaware Trustee shall either be (i) a natural person who is at least twenty-one (21) years of age and a resident of the State of Delaware or (ii) a legal entity that has its principal place of business in the State of Delaware, otherwise meets the requirements of applicable Delaware law to be eligible to serve as the Delaware Trustee and shall act through one or more persons authorized to bind such entity. If at any time the Delaware Trustee shall cease to be eligible in accordance with the provisions of this Section 5.10, it shall resign immediately in the manner and with the effect hereinafter specified in Section 5.10(c) below. For the avoidance of doubt, the Delaware Trustee will only have such

---

[7] Subject to ongoing discussion.

rights, duties and obligations as expressly provided by reference to the Delaware Trustee hereunder. The Trustees shall have no liability for the acts or omissions of any Delaware Trustee.

(b)      The Delaware Trustee shall not be entitled to exercise any powers, nor shall the Delaware Trustee have any of the duties and responsibilities of the Trustees set forth herein. The Delaware Trustee shall be a trustee of NOAT for the sole and limited purpose of fulfilling the requirements of Section 3807(a) of the Act and for taking such actions as are required to be taken by a Delaware Trustee under the Act. The duties (including fiduciary duties), liabilities and obligations of the Delaware Trustee shall be limited to accepting legal process served on NOAT in the State of Delaware and the execution of any certificates required to be filed with the Secretary of State of the State of Delaware that the Delaware Trustee is required to execute under Section 3811 of the Act. There shall be no other duties (including fiduciary duties) or obligations, express or implied, at law or in equity, of the Delaware Trustee. To the extent that, at law or in equity, the Delaware Trustee has duties (including fiduciary duties) and liabilities relating to NOAT or the NOAT Beneficiaries, such duties and liabilities are replaced by the duties and liabilities of the Delaware Trustee expressly set forth in this Trust Agreement. The Delaware Trustee shall have no liability for the acts or omissions of any Trustee. Any permissive rights of the Delaware Trustee to do things enumerated in this Trust Agreement shall not be construed as a duty and, with respect to any such permissive rights, the Delaware Trustee shall not be answerable for other than its willful misconduct, bad faith or fraud. The Delaware Trustee shall be under no obligation to exercise any of the rights or powers vested in it by this Trust Agreement at the request or direction of the Trustees or any other person pursuant to the provisions of this Trust Agreement unless the Trustees or such other person shall have offered to the Delaware Trustee security or indemnity (satisfactory to the Delaware Trustee in its discretion) against the costs, expenses and liabilities that may be incurred by it in compliance with such request or direction. The Delaware Trustee shall be entitled to request and receive written instructions from the Trustees and shall have no responsibility or liability for any losses or damages of any nature that may arise from any action taken or not taken by the Delaware Trustee in accordance with the written direction of the Trustees. The Delaware Trustee may, at the expense of NOAT, request, rely on and act in accordance with officer's certificates and/or opinions of counsel, and shall incur no liability and shall be fully protected in acting or refraining from acting in accordance with such officer's certificates and opinions of counsel.

(c)      The Delaware Trustee shall serve until such time as the Trustees remove the Delaware Trustee or the Delaware Trustee resigns and a successor Delaware Trustee is appointed by the Trustees in accordance with the terms of Section 5.10(d) below. The Delaware Trustee may resign at any time upon the giving of at least sixty (60) days' advance written notice to the Trustees; provided that such resignation shall not become effective unless and until a successor Delaware Trustee shall have been appointed by the Trustees in accordance with Section 5.10(d) below; [provided further, that if any amounts due and owing to the Delaware Trustee hereunder remain unpaid for more than ninety (90) days, the Delaware Trustee shall be entitled to resign immediately by giving written notice to the Trustees]. If the Trustees do not act within such sixty (60) day period, the Delaware Trustee, at the expense of NOAT, may apply to the Court of Chancery of the State of Delaware or any other court of competent jurisdiction for the appointment of a successor Delaware Trustee.

(d)     Upon the resignation or removal of the Delaware Trustee, the Trustees shall appoint a successor Delaware Trustee by delivering a written instrument to the outgoing Delaware Trustee. Any successor Delaware Trustee must satisfy the requirements of Section 3807 of the Act. Any resignation or removal of the Delaware Trustee and appointment of a successor Delaware Trustee shall not become effective until a written acceptance of appointment is delivered by the successor Delaware Trustee to the outgoing Delaware Trustee and the Trustees, and any fees and expenses due to the outgoing Delaware Trustee are paid. Following compliance with the preceding sentence, the successor Delaware Trustee shall become fully vested with all of the rights, powers, duties and obligations of the outgoing Delaware Trustee under this Trust Agreement, with like effect as if originally named as Delaware Trustee, and the outgoing Delaware Trustee shall be discharged of his or her duties and obligations under this Trust Agreement. The successor Delaware Trustee shall make any related filings required under the Act, including filing a Certificate of Amendment to the Certificate of Trust of NOAT in accordance with Section 3810 of the Act.

(e)     Notwithstanding anything herein to the contrary, any business entity into which the Delaware Trustee may be merged or converted or with which it may be consolidated or any entity resulting from any merger, conversion or consolidation to which the Delaware Trustee shall be a party, or any entity succeeding to all or substantially all of the corporate trust business of the Delaware Trustee, shall be the successor of the Delaware Trustee hereunder, without the execution or filing of any paper or any further act on the part of any of the parties hereto.

(f)     The Delaware Trustee shall be entitled to compensation for its services as agreed pursuant to a separate fee agreement between NOAT and the Delaware Trustee, which compensation shall be paid by NOAT. Such compensation is intended for the Delaware Trustee's services as contemplated by this Trust Agreement. The terms of this paragraph shall survive termination of this Trust Agreement and/or the earlier resignation or removal of the Delaware Trustee.

(g)     The Delaware Trustee shall neither be responsible for, nor chargeable with, knowledge of the terms and conditions of any other agreement, instrument or document, other than this Trust Agreement, whether or not, an original or a copy of such agreement has been provided to the Delaware Trustee. The Delaware Trustee shall have no duty to know or inquire as to the performance or nonperformance of any provision of any other agreement, instrument or document, other than this Trust Agreement. Neither the Delaware Trustee nor any of its directors, officers, employees, agents or affiliates shall be responsible for nor have any duty to monitor the performance or any action of NOAT, the Trustees or any other person, or any of their directors, members, officers, agents, affiliates or employee, nor shall it have any liability in connection with the malfeasance or nonfeasance by such party. The Delaware Trustee may assume performance by all such persons of their respective obligations. The Delaware Trustee shall have no enforcement or notification obligations relating to breaches of representations or warranties of any other person. The Delaware Trustee shall have no responsibilities (except as expressly set forth herein) as to the validity, sufficiency, value, genuineness, ownership or transferability of any Trust Asset, written instructions, or any other documents in connection therewith, and will not, be regarded as making nor be required to make, any representations thereto.

(h)     The Delaware Trustee shall not be responsible or liable for any failure or delay in the performance of its obligations under this Trust Agreement arising out of, or caused, directly or

indirectly, by circumstances beyond its control, including without limitation, any act or provision of any present or future law or regulation or governmental authority; acts of God; earthquakes; fires; floods; wars; terrorism; civil or military disturbances; sabotage; epidemics; riots; interruptions, loss or malfunctions of utilities, computer (hardware or software) or communications service; accidents; labor disputes; acts of civil or military authority or governmental actions; or the unavailability of the Federal Reserve Bank wire or telex or other wire or communication facility.

### Section 5.11    Meeting Minutes; Rights of Inspection.

(a)    The minutes of proceedings of the Trustees shall be kept in written form (which may be electronic) at such place or places designated by the Trustees, or, in the absence of such designation, at the principal office of NOAT.

(b)    Every Trustee shall have the absolute right at any reasonable time to inspect and copy all books, records and documents of every kind and to inspect the physical properties of NOAT.

### Section 5.12    Trust Protector

(a)    Notwithstanding any other provision of this Trust Agreement, there shall at all times be one Trust Protector (the "**Trust Protector**") to serve in accordance with the provisions of this Section 5.12. The Trust Protector shall be a Trust Indemnified Party. The initial Trust Protector shall be [_____].[8]

(b)    Any Trust Protector acting hereunder may resign at any time (i) by delivering written notice thereof to the Trustees then serving; <u>provided</u> that notice to one Trustee shall constitute notice to all Trustees then serving, or (ii) if there are no Trustees then serving, by delivering written notice to the Delaware Trustee.

(c)    A Trust Protector may be removed for good reason upon the unanimous consent of three (3) Trustees then serving; <u>provided, however,</u> if there are less than three (3) Trustees then serving, the Trust Protector shall not be removed except upon order of the Bankruptcy Court. If a vacancy in the position of Trust Protector exists for more than thirty (30) days, then the Trustees, or if there are no Trustees then acting, then the Delaware Trustee may petition the [Delaware Court of Chancery] to appoint a successor Trust Protector to serve and any costs relating to the petition shall be borne by NOAT. At no time may the Settlors or any party related to the Settlors or their affiliates be eligible to serve as Trust Protector. A vacancy in the position of Trust Protector shall not limit the Trustees from exercising any powers afforded them under the Trust Documents.

(d)    The Trust Protector shall have only the authority set forth in Section 5.2(b), which authority may not be expanded by an amendment or modification of this Trust Agreement.

(e)    The Trust Protector shall exercise the Trust Protector's authority in a fiduciary capacity and in a way that the Trust Protector reasonably believes to be in accordance with the purposes of this Trust Agreement. The Trust Protector shall not be under any duty to inquire into

---

[8] TBD

or ensure the performance by the Trustees of their duties and shall not be liable for any loss to such trust (unless such loss results from actions in bad faith or the willful misconduct of the Trust Protector).

(f)    The Trustees shall have no liability for the selection of, or exercise of authority by, the Trust Protector.

(g)    The Trust Protector shall be entitled to:

(i)    receive reasonable compensation and reimbursement for reasonable expenses for serving as Trust Protector;

(ii)    retain advisors to advise and assist in carrying out the duties of the Trust Protector and the costs thereof shall be borne by NOAT; and

(iii)    receive and review minutes of the meetings or other actions of the Trustees, but only at such time as the Trust Protector is required to act pursuant to Section 5.2(b).

## ARTICLE 6
## GENERAL PROVISIONS

**Section 6.1    Irrevocability**. To the fullest extent permitted by applicable law, NOAT is irrevocable. The Settlors shall not (i) retain any ownership or residual interest whatsoever with respect to any Trust Assets, including, but not limited to, the funds transferred to fund NOAT, and (ii) have any rights or role with respect to the management or operation of NOAT, or the Trustees' administration of NOAT.

**Section 6.2    Term; Termination.**

(a)    The term for which NOAT is to exist shall commence on the date of the filing of the Certificate of Trust and shall terminate pursuant to the provisions of this Section 6.2.

(b)    NOAT shall automatically dissolve, as soon as practicable, but no later than ninety (90) days after the date on which the Bankruptcy Court approves the dissolution of NOAT upon the satisfaction of the purposes of NOAT  and the following conditions having been satisfied: (i) all reasonably expected assets have been collected by NOAT, (ii) all Abatement Distributions have been made to the extent set forth in the NOAT TDP, (iii)  necessary arrangements and reserves have been made to discharge all anticipated remaining NOAT obligations and NOAT Operating Expenses in a manner consistent with the Trust Documents, and (iv) a final accounting has been filed and approved by the Bankruptcy Court (the "**Dissolution Date**").

(c)    On the Dissolution Date or as soon as reasonably practicable thereafter, after the wind-up of NOAT's affairs by the Trustees and payment of all of NOAT's liabilities have been provided for as required by applicable law including section 3808 of the Act, all monies remaining in NOAT shall be distributed to the NOAT Beneficiaries in accordance with the NOAT TDP. Notwithstanding any contrary provision of the Plan and related documents, including this Trust Agreement, this Section 6.2(c) cannot be modified or amended.

23

(d)     Following the dissolution and distribution of the assets of NOAT, NOAT shall terminate, and the Trustees, or any one of them, shall execute and cause a Certificate of Cancellation of the Certificate of Trust of NOAT to be filed in accordance with the Act. Notwithstanding anything to the contrary contained in this Trust Agreement, the existence of NOAT as a separate legal entity shall continue until the filing of such Certificate of Cancellation.

### Section 6.3    Taxes.

(a)     NOAT is intended to qualify as a "qualified settlement fund" within the meaning of Section 1.468B-1 *et seq.* of the Treasury Regulations promulgated under Section 468B of the IRC, as amended (the "**QSF Regulations**"), and, to the extent permitted under applicable law, for state and local income tax purposes. Notwithstanding anything to the contrary herein, no provision in this Trust Agreement or the NOAT TDP shall be construed or implemented in a manner that would cause NOAT to fail to qualify as a qualified settlement fund within the meanings of the QSF Regulations.

(b)     The Managing Trustee shall be the "administrator" of NOAT within the meaning of Section 1.468B-2(k)(3) of the Treasury Regulations and, in such capacity, such administrator shall (i) prepare and timely file, or cause to be prepared and timely filed, such income tax and other tax returns and statements required to be filed and shall timely pay all taxes required to be paid by NOAT out of the Trust Assets, which assets may be sold by the Trustees to the extent necessary to satisfy tax liabilities of NOAT and (ii) comply with all applicable tax reporting and withholding obligations.

(c)     Subject to Section 6.3(b) above, following the Effective Date, the Trustees shall be responsible for all of NOAT's tax matters, including, without limitation, tax audits, claims, defenses and proceedings. The Trustees may request an expedited determination under section 505(b) of the Bankruptcy Code for all tax returns filed by or on behalf of NOAT for all taxable periods through the dissolution of NOAT. The Trustees shall be responsible for causing NOAT to satisfy all requirements necessary to qualify and maintain qualification of NOAT as a qualified settlement fund within the meaning of the QSF Regulations and shall take no action that could cause NOAT to fail to qualify as a qualified settlement fund within the meaning of the QSF Regulations.

(d)     The Trustees may authorize the Tax Professionals to submit an application and all necessary supporting materials to obtain the Private Letter Ruling(s) from the Internal Revenue Service or state governmental agencies. Within seven (7) business days after receipt of any Private Letter Ruling(s) from the Internal Revenue Service or state governmental agencies, the Trustees shall advise the NOAT Beneficiaries through the NOAT Portal.

### Section 6.4    Modification.

(a)     Material modifications to this Trust Agreement may be made only pursuant to an order of the Bankruptcy Court; provided, however, that the Trustees may amend this Trust Agreement by unanimous consent of the Trustees from time to time without the consent, approval or other authorization of, but with notice to, the Bankruptcy Court, to make: (i) minor modifications or clarifying amendments necessary to enable the Trustees to effectuate the

provisions of this Trust Agreement; or (ii) modifications to satisfy any requirements, conditions or guidelines contained in any opinion, directive, order, statute, ruling or regulation of any federal, state or foreign governmental entity. Notwithstanding the foregoing, no amendment or waiver of this Trust Agreement shall modify this Trust Agreement in a manner that is inconsistent with the Plan or the Confirmation Order other than to cure any minor ambiguity or inconsistency in the Plan or to correct any clerical errors in this Trust Agreement. The Trustees shall provide to the NOAT Beneficiaries notice of any proposed modification to this Trust Agreement, whether material or minor, through the NOAT Portal not less than ten (10) business days before such modification becomes effective; provided, however, that the Trustees may shorten such notice period in their discretion.

(b)    Notwithstanding the foregoing, in the event guidance from the Internal Revenue Service indicates that the income and gain earned on Trust Assets is taxable, or in the event the Internal Revenue Service has indicated that it will not issue the requested Private Letter Ruling(s) that all income and gain earned on the Trust Assets will be excludible from NOAT's gross income under Section 115 of the IRC, the Trustees shall make such limited modifications to this Trust Agreement as they determine in consultation with the Tax Professionals to be necessary or desirable so as to achieve tax efficiency for NOAT and the NOAT Beneficiaries. Such limited modifications shall be filed with the Bankruptcy Court, communicated to the NOAT Beneficiaries through the NOAT Portal and posted on the NOAT Website. Following receipt of the Private Letter Ruling(s) or other IRS guidance, this Trust Agreement shall not be amended in any manner that would be adverse to the continued application of the Private Letter Ruling(s) or other IRS guidance.

(c)    Notwithstanding anything set forth in this Trust Agreement to the contrary, none of this Trust Agreement, nor any document related thereto shall be modified or amended in any way that could jeopardize, impair or modify (i) the applicability of section 105 of the Bankruptcy Code to the Plan, Confirmation Order, or NOAT, (ii) the efficacy or enforceability of the Channeling Injunction or any other injunction or release issued or granted in connection with the Plan and Confirmation Order, (iii) NOAT's status as a qualified settlement fund within the meaning of the QSF Regulations, (iv) the rights, duties, liabilities and obligations of the Delaware Trustee without the written consent of the Delaware Trustee or (v) the Plan or the Confirmation Order.

**Section 6.5    Communications**. The Trustees shall establish and maintain the NOAT Portal so as to (i) enable each NOAT Beneficiary to deliver the required documentation under the Beneficiary Reports in an electronic format; (ii) enable secure communications between the Trustees and each NOAT Beneficiary; and (iii) provide each NOAT Beneficiary with access to its own secure electronic data folder.

**Section 6.6    Severability**. If any provision of this Trust Agreement or application thereof to any person or circumstance shall be finally determined by a court of competent jurisdiction to be invalid or unenforceable to any extent, the remainder of this Trust Agreement, or the application of such provisions to persons or circumstances other than those as to which it is held invalid or unenforceable, shall not be affected thereby, and such provision of this Trust Agreement shall be valid and enforced to the fullest extent permitted by law.

25

**Section 6.7    Notices.**

(a)    Any notices or other communications required or permitted hereunder to the following parties shall be in writing and delivered at the addresses designated below, or sent by email or facsimile pursuant to the instructions listed below, or mailed by overnight courier, addressed as follows, or to such other address or addresses as may hereafter be furnished in writing to each of the other parties listed below in compliance with the terms hereof.

To the Trustees:

with a copy (which shall not constitute notice) to:

To the Delaware Trustee:

with a copy (which shall not constitute notice) to:

To the Trust Protector:

with a copy (which shall not constitute notice) to:



(b)    All such notices and communications, if mailed, shall be effective when physically delivered at the designated addresses, or if electronically transmitted, shall be effective upon transmission.

**Section 6.8    Successors and Assigns**. The provisions of this Trust Agreement shall be binding upon and inure to the benefit of NOAT, the Trustees, the Delaware Trustee and their respective successors and assigns, except that none of such persons may assign or otherwise transfer any of its, or their, rights or obligations under this Trust Agreement except, in the case of NOAT and the Trustees, as contemplated by Section 2.1 and Section 5.2 above, and in the case of the Delaware Trustee, as contemplated by Section 5.10.

**Section 6.9    Limitation on Transferability; NOAT Beneficiaries' Interests**. NOAT Beneficiaries' interests in NOAT shall not (a) be assigned, conveyed, hypothecated, pledged or otherwise transferred, voluntarily or involuntarily, directly or indirectly and any purported assignment, conveyance, pledge or transfer shall be null and void *ab initio*; (b) be evidenced by a

certificate or other instrument; (c) possess any voting rights; (d) give rise to any right or rights to participate in the management or administration of NOAT or the Trust Assets; (e) entitle the holders thereof to seek the removal or replacement of any Trustee, whether by petition to the Bankruptcy Court or any other court or otherwise; (f) entitle the holders thereof to receive any interest on Abatement Distributions; and (g) give rise to any rights to seek a partition or division of the Trust Assets. In accordance with the Act, NOAT Beneficiaries shall have no interest of any kind in any of the Trust Assets; rather, NOAT Beneficiaries shall have an undivided beneficial interest only in cash assets of NOAT but only to the extent such cash assets are declared by the NOAT Trustees to be distributable as Abatement Distributions in accordance with the Trust Documents. For the avoidance of doubt, NOAT Beneficiaries shall have only such rights as expressly set forth in this Trust Agreement.

**Section 6.10   Exemption from Registration**. The Parties hereto intend that the rights of the NOAT Beneficiaries arising under this Trust Agreement shall not be "securities" under applicable laws, but none of the Parties hereto represent or warrant that such rights shall not be securities or shall be entitled to exemption from registration under applicable securities laws. If it should be determined that any such interests constitute "securities," the Parties hereto intend that the exemption provisions of Section 1145 of the Bankruptcy Code will be satisfied and the offer and sale under the Plan of the beneficial interests in NOAT will be exempt from registration under the Securities Act, all rules and regulations promulgated thereunder, and all applicable state and local securities laws and regulations.

**Section 6.11   Entire Agreement; No Waiver**. The entire agreement of the parties relating to the subject matter of this Trust Agreement is contained herein and in the documents referred to herein, and this Trust Agreement and such documents supersede any prior oral or written agreements concerning the subject matter hereof. No failure to exercise or delay in exercising any right, power or privilege hereunder shall operate as a waiver thereof, nor shall any single or partial exercise of any right, power or privilege hereunder preclude any further exercise thereof or of any other right, power or privilege. The rights and remedies herein provided are cumulative and are not exclusive of rights under law or in equity.

**Section 6.12   Headings**. The headings used in this Trust Agreement are inserted for convenience only and do not constitute a portion of this Trust Agreement, nor in any manner affect the construction of the provisions of this Trust Agreement.

**Section 6.13   Governing Law**. This Trust Agreement shall be governed by, and construed in accordance with, the laws of the State of Delaware, without regard to the conflicts of law provisions thereof which would purport to apply the law of any other jurisdiction. For the avoidance of doubt, none of the following provisions of Delaware law shall apply to the extent inconsistent with the terms of the Trust Documents: (a) the filing with any court or governmental body or agency of trustee accounts or schedules of trustee fees and charges, (b) affirmative requirements to post bonds for trustees, officers, agents or employees of a trust, (c) the necessity for obtaining court or other governmental approval concerning the acquisition, holding or disposition of property, (d) fees or other sums payable to trustees, officers, agents or employees of a trust, (e) the allocation of receipts and expenditures to income or principal, (f) restrictions or limitations on the permissible nature, amount or concentration of trust investments or requirements relating to the titling, storage or other manner of holding of trust

assets, (g) the existence of rights or interests (beneficial or otherwise) in trust assets, (h) the ability of beneficial owners or other persons to terminate or dissolve a trust, and (i) the establishment of fiduciary or other standards or responsibilities or limitations on the acts or powers of trustees or beneficial owners that are inconsistent with the limitations on liability or authorities and powers of the Trustees, set forth or referenced in this Trust Agreement. Section 3540 of Title 12 of the Act shall not apply to NOAT.

### Section 6.14   Dispute Resolution.

(a)    Unless otherwise expressly provided for herein, the dispute resolution procedures of this Section 6.14 shall be the exclusive mechanism to resolve any dispute between or among the parties hereto, and the NOAT Beneficiaries hereof, arising under or with respect to this Trust Agreement.

(b)    **Informal Dispute Resolution**. Any dispute under this Trust Agreement shall first be the subject of informal negotiations. The dispute shall be considered to have arisen when a disputing party sends to the counterparty or counterparties a written notice of dispute ("**Notice of Dispute**"). Such Notice of Dispute shall state clearly the matter in dispute. The period of informal negotiations shall not exceed thirty (30) days from the date the Notice of Dispute is received by the counterparty or counterparties, unless that period is modified by written agreement of the disputing party and counterparty or counterparties. If the disputing party and the counterparty or counterparties cannot resolve the dispute by informal negotiations, then the disputing party may invoke the formal dispute resolution procedures as set forth below.

(c)    **Formal Dispute Resolution**. The disputing party shall invoke formal dispute resolution procedures, within the time period provided in the preceding subparagraph, by serving on the counterparty or counterparties a written statement of position regarding the matter in dispute ("**Statement of Position**"). The Statement of Position shall include, but need not be limited to, any factual data, analysis or opinion supporting the disputing party's position and any supporting documentation and legal authorities relied upon by the disputing party. Each counterparty shall serve its Statement of Position within thirty (30) days of receipt of the disputing party's Statement of Position, which shall also include, but need not be limited to, any factual data, analysis or opinion supporting the counterparty's position and any supporting documentation and legal authorities relied upon by the counterparty. If the disputing party and the counterparty or counterparties are unable to consensually resolve the dispute within thirty (30) days after the last of all counterparties have served its Statement of Position on the disputing party, the disputing party may file with the Bankruptcy Court a motion for judicial review of the dispute in accordance with Section 6.14(d).

(d)    **Judicial Review**. The disputing party may seek judicial review of the dispute by filing with the Bankruptcy Court (or, if the Bankruptcy Court shall not have jurisdiction over any dispute, such court as has jurisdiction under Section 1.6) and serving on the counterparty or counterparties and the Trustees, a motion requesting judicial resolution of the dispute. The motion must be filed within forty-five (45) days of receipt of the last counterparty's Statement of Position pursuant to the preceding subparagraph. The motion shall contain a written statement of the disputing party's position on the matter in dispute, including any supporting factual data, analysis, opinion, documentation and legal authorities, and shall set forth the relief requested and

any schedule within which the dispute must be resolved for orderly administration of NOAT. Each counterparty shall respond to the motion within the time period allowed by the rules the court, and the disputing party may file a reply memorandum, to the extent permitted by the rules of the court.

**Section 6.15   Sovereign Immunity**. Subject to Section 11.1(d) of the Plan, nothing set forth in the Trust Documents shall be construed as a waiver of a claim of sovereign immunity in any action or proceeding, including without limitation, any action or proceeding occurring after the Effective Date.

**Section 6.16   Waiver of Jury Trial**. Each party hereto and each NOAT Beneficiary hereof hereby irrevocably waives, to the fullest extent permitted by applicable law, any and all right to a trial by jury in any legal proceeding arising out of or relating to this Trust Agreement.

**Section 6.17   Effectiveness**. This Trust Agreement shall not become effective until the Effective Date of the Plan and it has been executed and delivered by all the parties hereto.

**Section 6.18   Counterpart Signatures**. This Trust Agreement may be executed in any number of counterparts, each of which shall constitute an original, but such counterparts shall together constitute but one and the same instrument. A signed copy of this Trust Agreement or any amendment hereto delivered by facsimile, email or other means of Electronic Transmission, shall be treated in all manner and respects as an original agreement or instrument and shall be considered to have the same binding legal effect as if it were the original signed version thereof delivered in person.

IN WITNESS WHEREOF, the parties have executed this Trust Agreement as of the date first set forth above to be effective as of the Effective Date.

[SETTLORS]

[TRUSTEE]

[TRUSTEE]

[TRUSTEE]

[DELAWARE TRUSTEE]

[TRUST PROTECTOR]

[Signature Page]

**EXHIBIT 1**

**AGGREGATE NOAT CONSIDERATION**

- Initial NOAT Distribution of $[_____].

- TopCo NOAT Interest.

- MDT NOAT Interest.

**EXHIBIT 2**

**FORM OF CERTIFICATE OF TRUST OF THE
NATIONAL OPIOID ABATEMENT TRUST**

    This Certificate of Trust of the NATIONAL OPIOID ABATEMENT TRUST (the "*Trust*") is being duly executed and filed by the undersigned trustees of the Trust, to form a statutory trust under the Delaware Statutory Trust Act (12 Del. Code § 3801 *et seq.*) (the "*Act*").

1. <u>Name</u>. The name of the statutory trust formed hereby is:

<div align="center">NATIONAL OPIOID ABATEMENT TRUST</div>

2. <u>Delaware Trustee</u>. The name and business address of the Delaware Trustee of the Trust in the State of Delaware is:

3. <u>Effective Date</u>. This Certificate of Trust shall be effective upon filing.

    IN WITNESS WHEREOF, the undersigned, being all of the trustees of the Trust, have duly executed this Certificate of Trust in accordance with Section 3811(a) of the Act.

| TRUSTEES: | DELAWARE TRUSTEE: |
|---|---|
| _____<br>in his/her capacity as Trustee and not individually. | |
| _____<br>in his/her capacity as Trustee and not individually. | By: _____<br>    Name:<br>    Title: |
| _____<br>in his/her capacity as Trustee and not individually. | |

**EXHIBIT 3**
**INVESTMENT GUIDELINES**

**In General**. Only the following investments will be permitted, <u>provided</u> <u>that</u> maturities on the following securities do not exceed twelve (12) months, all investments are U.S. dollar denominated and all requirements are satisfied at the time of purchase:

(i)    marketable securities issued by the U.S. Government and supported by the full faith and credit of the U.S. Treasury; and

(ii)   a U.S. government money market fund required to invest exclusively in cash and U.S. government securities that are supported by the full faith and credit of the U.S. Treasury.

The borrowing of funds or securities for the purpose of purchasing and the lending of any investments held in NOAT is prohibited.

Notwithstanding the foregoing, it is acknowledged and agreed that the Trustees may liquidate investments and deposit and maintain funds in or with banks, trust companies, savings and loan associations, money market organizations and other depositories or issuers of depository-type accounts at such times as the Trustees determine to be necessary or appropriate to have cash available to satisfy distribution and other cash requirements of NOAT.

**TopCo**. The foregoing Investment Guidelines shall not apply to the [TopCo NOAT Interest].

**EXHIBIT 4**
**NATIONAL OPIOID ABATEMENT TRUST DISTRIBUTION PROCEDURES**

## EXHIBIT S

**Tribal Abatement Fund Trust ("TAFT") Agreement**

**TRIBAL ABATEMENT FUND TRUST AGREEMENT**

**Dated as of [●], 2021**

***Pursuant to the Debtors' [Fifth] Amended Joint Chapter 11***
***Plan of Reorganization Dated [●], 2021***

# TRIBAL ABATEMENT FUND TRUST

## TABLE OF CONTENTS

**Page**

**ARTICLE 1 AGREEMENT OF TRUST** ...................................................................2

    Section 1.1       Creation and Name....................................................2
    Section 1.2       Purposes .....................................................................3
    Section 1.3       Transfer of Assets......................................................4
    Section 1.4       Acceptance of Assets. ................................................4
    Section 1.5       Tribe Beneficiaries ....................................................5
    Section 1.6       Jurisdiction.. ...............................................................5

**ARTICLE 2 POWERS AND TRUST ADMINISTRATION**........................................5

    Section 2.1       Powers ........................................................................5
    Section 2.2       General Administration ..............................................8
    Section 2.3       Accounting .................................................................8
    Section 2.4       Financial Reporting ....................................................8
    Section 2.5       Tribal Opioid Abatement Reporting ..........................9
    Section 2.6       Beneficiary Reporting. ...............................................9
    Section 2.7       Limitation of the Trustees' Authority ........................9

**ARTICLE 3 ACCOUNTS, INVESTMENTS, ADMINISTRATIVE EXPENSES** ...............10

    Section 3.1       Accounts.....................................................................10
    Section 3.2       Investment Guidelines................................................10
    Section 3.3       Payment of TAFT Operating Expenses ....................10

**ARTICLE 4 ABATEMENT DISTRIBUTIONS**........................................................10

    Section 4.1       Abatement Distributions ............................................10
    Section 4.2       Manner of Payment of Abatement Distributions. ..................11
    Section 4.3       Delivery of Abatement Distributions. .......................11

**ARTICLE 5 TRUSTEES AND DELAWARE TRUSTEE**........................................12

    Section 5.1       Number of Trustees; Managing Trustee .....................12
    Section 5.2       Term of Service, Successor Trustees. .........................12
    Section 5.3       Trustee Meetings.........................................................13
    Section 5.4       Compensation and Expenses of Trustees....................15
    Section 5.5       Trustees' Independence...............................................15
    Section 5.6       Standard of Care; Exculpation. ..................................15
    Section 5.7       Protective Provisions..................................................16
    Section 5.8       Indemnification. .........................................................17

i

Section 5.9       Bond ......................................................................................18
Section 5.10      Delaware Trustee. ...................................................................18
Section 5.11      Meeting Minutes; Rights of Inspection...................................20
Section 5.12      Trust Protector .......................................................................20

**ARTICLE 6 GENERAL PROVISIONS.................................................................21**

Section 6.1       Irrevocability ..........................................................................21
Section 6.2       Term; Termination. .................................................................22
Section 6.3       Taxes. ......................................................................................22
Section 6.4       Modification. ...........................................................................23
Section 6.5       Communications .....................................................................23
Section 6.6       Severability .............................................................................23
Section 6.7       Notices. ...................................................................................24
Section 6.8       Successors and Assigns...........................................................25
Section 6.9       Limitation on Transferability; Tribe Beneficiaries' Interests .............25
Section 6.10      Exemption from Registration .................................................25
Section 6.11      Entire Agreement; No Waiver .................................................25
Section 6.12      Headings..................................................................................26
Section 6.13      Governing Law........................................................................26
Section 6.14      Dispute Resolution .................................................................26
Section 6.15      Sovereign Immunity................................................................27
Section 6.16      Effectiveness ..........................................................................27
Section 6.17      Counterpart Signatures...........................................................27

**EXHIBIT 1 TAFT ASSETS ...................................................................................2**

**EXHIBIT 2 FORM OF CERTIFICATE OF TRUST OF THE TRIBAL
ABATEMENT FUND TRUST .................................................................................3**

**EXHIBIT 3 INVESTMENT GUIDELINES .............................................................4**

**EXHIBIT 4 TRIBE TRUST DISTRIBUTION PROCEDURES ............................5**

# TRIBAL ABATEMENT FUND
# TRUST AGREEMENT

This Tribal Abatement Fund Trust Agreement (together with all Exhibits hereto, this "**Trust Agreement**"), dated as of [    ], 2021 and effective as of the Effective Date, implements certain of the terms of the *Debtors' [Fifth] Amended Joint Chapter 11 Plan of Reorganization of Purdue Pharma L.P. and its Affiliated Debtors*, dated [●], 2021 (as may be further modified, amended, or supplemented from time to time, and together with all exhibits and schedules thereto, the "**Plan**"),[1] confirmed by an order entered on [●], 2021 [Docket No. ____] (the "**Confirmation Order**") by the United States Bankruptcy Court for the Southern District of New York (the "**Bankruptcy Court**") in the Chapter 11 Cases of Purdue Pharma L.P. and its affiliated Debtors[2] (each a "**Debtor**" and collectively, the "**Debtors,**" or the "**Settlors**"), jointly administered under Case No. 19-23649 (RDD) and is entered into by the Settlors, the trustees of the Tribal Abatement Fund Trust who are further identified on the signature pages hereto (together with any successor trustee serving in such capacity, the "**Trustees**"), the Delaware Trustee (together with any successor serving in such capacity, the "**Delaware Trustee**"), and the Trust Protector, the individual who is further identified on the signature pages hereto (together with any successor serving in such capacity, the "**Trust Protector**").

## RECITALS

**WHEREAS**, the Debtors have reorganized under the provisions of Chapter 11 of the Bankruptcy Code.

**WHEREAS**, the Confirmation Order has been entered by the Bankruptcy Court and is in full force and effect.

**WHEREAS**, the Plan provides, inter alia, for the establishment of the "**Tribe Trust,**" consisting of one or more trusts, limited liability companies, or other Persons to be established in accordance with Section 5.7 of the Plan;

**WHEREAS**, pursuant to the Plan and the Confirmation Order, this Tribal Abatement Fund Trust ("**TAFT**") shall be established as a trust of the Tribe Trust to (i) assume all liability for the Tribe Channeled Claims, (ii) hold the MDT Tribe Interest, (iii) receive and distribute the TopCo Interest to the Holders of Tribe Channeled Claims (and the Holders of Tribe Channeled Claims shall contribute such TopCo Interest to Tribal Opioid Abatement Fund, LLC ("**Tribe Opioid**

---

[1] Capitalized terms used but not herein defined shall have the meaning ascribed to them in the Plan or the Confirmation Order, as applicable.

[2] The Debtors in these cases are as follows: Purdue Pharma L.P.; Purdue Pharma Inc.; Purdue Transdermal Technologies L.P.; Purdue Pharma Manufacturing L.P.; Purdue Pharmaceuticals L.P.; Imbrium Therapeutics L.P.; Adlon Therapeutics L.P.; Greenfield BioVentures L.P.; Seven Seas Hill Corp; Ophir Green Corp.; Purdue Pharma of Puerto Rico; Avrio Health L.P.; Purdue Pharmaceutical Products L.P.; Purdue Neuroscience Company; Nayatt Cove Lifescience Inc.; Button Land L.P.; Rhodes Associates L.P.; Paul Land Inc.; Quidnick Land L.P.; Rhodes Pharmaceuticals L.P.; Rhodes Technologies; UDF L.P.; SVC Pharma L.P.; and SVC Pharma Inc.

LLC")),[3] (iv) collect the Initial Tribe Trust Distribution and the other Public Creditor Trust Distributions received in accordance with the Public Entity Settlements, (v) administer Tribe Channeled Claims and (vi) make Abatement Distributions to Authorized Recipients for Authorized Abatement Purposes, in each case in accordance with the Tribe TDP and (vii) carry out such other matters as are set forth in the Tribe Trust Documents.[4]

**WHEREAS**, the Plan and the Master TDP provide that on the Effective Date, any and all liability of the Debtors and the other Protected Parties for any and all Tribe Channeled Claims shall automatically, and without further act, deed or court order, be channeled to and assumed by the Master Disbursement Trust solely for the purpose of effectuating the Master TDP, and further provided that immediately after, any and all Tribe Channeled Claims shall automatically, and without further act, deed or court order, be channeled exclusively to and assumed by the Tribe Trust.

**WHEREAS**, pursuant to the Plan and the Confirmation Order, TAFT, for the Tribe Trust shall (i) hold, manage and invest all funds and other Assets received by TAFT from the Master Disbursement Trust; (ii) hold and maintain the TAFT Operating Reserve, as defined herein; and (iii) administer, process, resolve and liquidate all Tribe Channeled Claims in accordance with the Tribe TDP.

**WHEREAS**, the Plan and Confirmation Order provide that, on the Effective Date and continuing thereafter until fully funded by the Debtors or otherwise in accordance with the Plan, (i) the TAFT Assets (as defined in Section 1.3), as described in **Exhibit 1**, shall be transferred to and vested in TAFT free and clear of all Claims, Liens or other recourse or encumbrances, and shall not be subject to disgorgement or recoupment by any Person and (ii) TAFT shall distribute its TopCo Interest to the Tribe Beneficiaries and the Tribe Beneficiaries shall contribute such TopCo Interest to Tribe Opioid LLC.

**WHEREAS**, all rights of the Holders of Tribe Channeled Claims arising under this Trust Agreement and the Tribe TDP shall vest upon the Effective Date.

**WHEREAS**, the Bankruptcy Court has determined that TAFT and the Plan satisfy all the prerequisites for issuance of an injunction pursuant to section 105(a) of the Bankruptcy Code with respect to any and all Tribe Channeled Claims, and such injunction (the "**Channeling Injunction**") shall be fully effective and enforceable as provided in the Plan.

**NOW, THEREFORE**, it is hereby agreed as follows:

# ARTICLE 1
## AGREEMENT OF TRUST

**Section 1.1     Creation and Name**. The Debtors as Settlors hereby create a trust known as the "Tribal Abatement Fund Trust" or "TAFT," which is provided for and referred to in the

---

[3] The Authorized Recipients shall mean the Tribe Beneficiaries, as defined herein.

[4] An affiliated entity, Tribal Opioid Abatement Fund, LLC, has been concurrently formed and is governed by the Tribal Opioid Abatement Fund Limited Liability Company Agreement.

Plan. The Trustees may transact the business and affairs of TAFT in the name of TAFT. It is the intention of the parties hereto that TAFT created hereby constitutes a statutory trust under Chapter 38 of title 12 of the Delaware Code, 12 Del. C. Section 3801 *et seq.* (the "**Act**") and that the Confirmation Order, the Plan and this Trust Agreement (collectively, the "**Trust Documents**") constitute the governing instruments of TAFT. The Trustees and the Delaware Trustee are hereby authorized and directed to execute and file a Certificate of Trust with the Delaware Secretary of State in the form attached hereto as **Exhibit 2**.

**Section 1.2    Purposes**. The purposes of TAFT are, among other things, to:

(a)   assume all liability for the Tribe Channeled Claims;

(b)   receive and hold the MDT Tribe Interest;

(c)   receive and distribute the TopCo Tribe Interest to the Tribe Beneficiaries;

(d)   collect the Initial Tribe Trust Distribution and the other Public Creditor Trust Distributions received in accordance with the Public Entity Settlements;

(e)   administer, process, resolve and liquidate Tribe Channeled Claims;

(f)   qualify at all times as a Qualified Settlement Fund within the meaning of the QSF Regulations (as defined herein);

(g)   make Abatement Distributions to Tribe Beneficiaries for Approved Tribal Opioid Abatement Uses, in each case in accordance with the Tribe TDP;

(h)   hold, manage, protect and monetize the Trust Assets in accordance with the terms of the Trust Documents, for the benefit of the Tribe Beneficiaries as defined herein;

(i)   engage in any lawful act or activity, including without limitation, to enter into leasing, financing or other agreements with third parties, that is consistent with, necessary or incidental to the Trust Documents;

(j)   to engage in any lawful activity necessary or incidental to the foregoing in accordance with the Plan and the Confirmation Order; and

(k)   use the TAFT Assets to:

   (i)    make Abatement Distributions to Tribe Beneficiaries in accordance with this Trust Agreement and the Tribe TDP;

   (ii)   hold and maintain reserves to pay the fees and expenses incurred with administering TAFT (including the Tribe TDP) and managing the Assets (together, the "**TAFT Operating Expenses**") of TAFT (such reserves, the "**TAFT Operating Reserve**"), which shall be funded with Cash and cash equivalents held by TAFT in accordance with the Tribe Documents, the Plan and the Confirmation Order and (b) held

3

by the Company in a segregated account and administered by the Board;

(iii)      pay the TAFT Operating Expenses from the TAFT Operating Reserve; and

(iv)      replenish periodically, until the dissolution of TAFT, the TAFT Operating Reserve from Cash held or received by TAFT to the extent deemed necessary by the Trustees to satisfy and pay estimated future TAFT Operating Expenses in accordance with the Governing Documents.

**Section 1.3    Transfer of Assets**. Pursuant to the Plan and the Restructuring Steps Memorandum, TAFT shall receive (i) the Initial Tribe Trust Distribution, (ii) the TopCo Tribe Interest (which shall be distributed to the Tribe Beneficiaries in accordance with the Restructuring Steps Memorandum), and (iii) the MDT Tribe Interest in accordance with Sections 4.5(a) of the Plan (the "**TAFT Assets**" and together with any income or gain earned thereon and proceeds derived therefrom, collectively, the "**Trust Assets**"). The TAFT Assets shall be transferred free and clear of any all Claims, Liens or other recourse or encumbrances, and shall not be subject to attachment, disgorgement or recoupment by any Person. The Debtors shall be authorized pursuant to the Plan to execute and deliver such documents to TAFT as the Trustees reasonably request to transfer and assign any assets comprising all or a portion of the TAFT Assets to TAFT.

**Section 1.4    Acceptance of Assets**.

(a)      In furtherance of the purposes of TAFT, the Trustees, on behalf of TAFT, hereby expressly accept the transfer to TAFT of the TAFT Assets and any other transfers contemplated by the Plan and the Master TDP and subject to the terms of the Trust Documents. TAFT shall succeed to all of the Debtors' respective right, title, and interest, including all legal privileges, in the TAFT Assets and neither the Debtors nor any other person or entity transferring such TAFT Assets will have any further equitable or legal interest in, or with respect to, the Trust Assets, including the TAFT Assets or TAFT.

(b)      In furtherance of the purposes of TAFT, TAFT expressly assumes all liabilities and responsibility for all Tribe Channeled Claims (except as set forth in the Plan) subject to the TAFT Documents, and none of the Debtors, the Protected Parties, or the Master Disbursement Trust shall have any further financial or other responsibility or liability therefor. Except as otherwise provided in this Trust Agreement, the Tribe TDP, the Plan, or the Master TDP, TAFT shall have and retain any and all defenses, cross-claims, offsets, and recoupments regarding the Tribe Channeled Claims, as well as any and all rights of indemnification, contribution, subrogation, and similar rights, that the Debtors, the Released Parties, and the Shareholder Released Parties, as applicable, have or would have had under applicable law; <u>provided</u> that no such claims, defenses or rights may be used to seek any affirmative monetary recovery from any party. For the avoidance of doubt, all Class 5 Tribe Claims asserted against Debtors in the Chapter 11 Cases shall be resolved exclusively in accordance with the Tribe TDP.

(c)    Nothing in this Trust Agreement shall be construed in any way to limit (i) the scope, enforceability, or effectiveness of the Channeling Injunction, or (ii) subject to the provisions of Section 1.4(b) herein, TAFT's assumption of all liability for Tribe Channeled Claims.

(d)    In this Trust Agreement and the Tribe TDP, the words "must," "will," and "shall" are intended to have the same mandatory force and effect, while the word "may" is intended to be permissive rather than mandatory.

### Section 1.5    Tribe Beneficiaries.

(a)    The beneficial owners (within the meaning of the Act) of TAFT are the holders of Tribe Channeled Claims identified on **Schedule C** of **Exhibit 4** hereto (each a "**Tribe Beneficiary**" and collectively, the "**Tribe Beneficiaries**").

(b)    The Tribe Beneficiaries shall have only such rights with respect to TAFT and its assets as are set forth in the Tribe TDP and no greater or other rights, including upon dissolution, liquidation or winding up of TAFT, shall be deemed to apply to such Tribe Beneficiaries. The Tribe Beneficiaries are enjoined from asserting against any Debtor or other Protected Party any Channeled Claim, and may not proceed in any manner against any Debtor or other Protected Party on account of any Channeled Claim in any forum whatsoever, including any state, federal or non-U.S. court or administrative or arbitral forum, and are required to pursue Tribe Channeled Claims exclusively against the Tribe Trust, solely as and to the extent provided in the Tribe TDP.

(c)    The Tribe Beneficiaries shall be subject to the terms of this Trust Agreement, including without limitation, Article 4 and the terms of the Tribe TDP.

### Section 1.6    Jurisdiction. 

The Bankruptcy Court shall have continuing jurisdiction over TAFT; <u>provided, however</u>, the courts of the State of Delaware, including any federal court located therein, shall also have jurisdiction over TAFT; <u>provided further</u>, that notwithstanding the foregoing, the Trustees shall have power and authority to bring any action in any court of competent jurisdiction (including the Bankruptcy Court) to prosecute any Causes of Action held by                                                                                                                        TAFT.

### POWERS AND TRUST ADMINISTRATION

### Section 2.1    Powers.

(a)    The Trustees are and shall act as fiduciaries to TAFT in accordance with the provisions of this Trust Agreement. The Trustees shall, at all times, administer TAFT in accordance with the purposes set forth in Section 1.2 above. Subject to the limitations set forth in the Trust Documents, the Trustees shall have the power to take any and all actions that in the judgment of the Trustees are necessary or proper to fulfill the purposes of TAFT, including, without limitation, each power expressly granted in this Section 2.1, any power reasonably incidental thereto and any trust power now or hereafter permitted under the laws of the State of Delaware. In the event of any ambiguity or conflict between the terms of this Trust Agreement or the Tribe TDP, the Tribe TDP shall control. In the event of a conflict between the terms or provisions of the Plan, this Trust Agreement, or any other Trust Document, the terms of the Plan shall control. For the avoidance of doubt, this Trust Agreement shall be construed and

implemented in accordance with the Plan, regardless of whether any provision herein explicitly references the Plan.

(b)    Except as required by applicable law or the Trust Documents, the Trustees need not obtain the order or approval of any court in the exercise of any power or discretion conferred hereunder.

(c)    Without limiting the generality of Section 2.1(a) above, and except as limited in the Trust Documents and by applicable law, the Trustees shall have the power to:

(i)    receive and hold the Trust Assets and exercise all rights with respect thereto;

(ii)    invest the monies and other Trust Assets held from time to time by TAFT, subject to the limitations set forth in Section 3.2 below;

(iii)    sell, transfer or exchange any or all of the Trust Assets at such prices and upon such terms as the Trustees may determine, consistent with the other terms of the Trust Documents;

(iv)    enter into leasing, financing or other agreements with third parties as deemed by the Trustees in their discretion to be useful in carrying out the purposes of TAFT;

(v)    determine and pay liabilities of TAFT and the TAFT Operating Expenses;

(vi)    establish accounts and reasonable reserves within TAFT, as deemed by the Trustees in their discretion to be necessary, prudent or useful in administering TAFT;

(vii)    bring any action in any court of competent jurisdiction, including the Bankruptcy Court;

(viii)    initiate, prosecute, defend and resolve all legal actions and other proceedings related to any Asset, liability or responsibility of TAFT. Such legal actions and other proceedings shall be limited solely to those required for purposes of reconciling, administering or defending against the Tribe Channeled Claims channeled to TAFT and for enforcing the rights of TAFT under the Plan and the Plan Documents;

(ix)    supervise and administer TAFT in accordance with the Trust Documents, including without limitation monitor the Abatement Distribution recipients' compliance with the Tribe TDP requirements for Approved Tribal Opioid Abatement Uses and Approved Administrative Expenses;

(x)    appoint such officers and retain such employees, consultants, advisors, independent contractors, experts and agents and engage in such legal, financial, administrative, accounting, investment, auditing and alternative

6

dispute resolution services and activities as TAFT requires, and delegate to such persons such powers and authorities as the fiduciary duties of the Trustees permit and as the Trustees, in their discretion, deem advisable or necessary in order to carry out the terms of this Trust Agreement;

(xi)    pay reasonable compensation and expenses to any of TAFT's employees, consultants, advisors, independent contractors, experts and agents for legal, financial, administrative, accounting, investment, auditing and alternative dispute resolution services and activities as TAFT requires;

(xii)   compensate the Trustees, Delaware Trustee, the Trust Protector, and their employees, consultants, advisors, independent contractors, experts and agents, and reimburse the Trustees, the Delaware Trustee and the Trust Protector for all reasonable out-of-pocket costs and expenses incurred by such persons in connection with the performance of their duties hereunder;

(xiii)  execute and deliver such instruments as the Trustees consider advisable or necessary in administering TAFT;

(xiv)   enter into such other arrangements with third parties as are deemed by the Trustees to be advisable or necessary in carrying out the purposes of TAFT; provided that such arrangements do not conflict with any other provision of this Trust Agreement;

(xv)    in accordance with Section 5.8 below, defend, indemnify and hold harmless (and purchase insurance indemnifying) the Trust Indemnified Parties (as defined in Section 5.6(a) below) to the maximum extent permitted by law;

(xvi)   delegate any or all of the authority herein conferred with respect to the investment of all or any portion of the Trust Assets to any one or more reputable institutional investment advisors or investment managers without liability for any action taken or omission made because of any such delegation, except as provided in Section 5.6 below; provided that such investment advisors and investment managers shall be in compliance with the Investment Guidelines (as defined in Section 3.2) at all times;

(xvii)  make, join, pursue (by litigation or otherwise), abandon, collect, compromise or settle, or otherwise resolve, in the name of TAFT or the Tribe Trust any claim, right, action or cause of action of the Tribe Trust, before any court of competent jurisdiction and without approval of the Bankruptcy Court;

(xviii) contract for the establishment and continuing maintenance of (a) a secure method of internet-based communications for TAFT and the Tribe Beneficiaries as described in Section 6.5 herein (the "**Tribal Opioid Abatement Portal**") and (b) a public-facing website to

7

publish all information required to be published under the Trust Documents (the "**Tribal Opioid Abatement Website**"); and

(xix)   exercise any and all rights of the Trustees, and take any and all actions as are permitted, in accordance with and subject to the terms of this Trust Agreement and the Plan.

(d)      The Trustees shall not have the power to cause TAFT to guarantee any debt of other Persons.

(e)      Except as otherwise set forth in the Trust Documents, and subject to retention of jurisdiction by the Bankruptcy Court as provided in the Plan, but without prior or further authorization, the Trustees may control and exercise authority over the Trust Assets and over the protection, conservation and disposition thereof. No person dealing with TAFT shall be obligated to inquire into the authority of the Trustees in connection with the protection, conservation or disposition of the Trust Assets.

**Section 2.2    General Administration**. The Trustees shall act in accordance with the Trust Documents. TAFT's principal office is located at [_____]. The Trustees may change the location of the principal office and may establish other offices at other locations. The Trustees shall provide notice to the Tribe Beneficiaries upon establishment of any office by posting such information in the Tribal Opioid Abatement Portal (or by other means approved by the Trustees).

**Section 2.3    Accounting**. The fiscal year of TAFT shall begin on January 1 and shall end on December 31 of each calendar year. The Trustees shall maintain the books and records relating to the Trust Assets and income and the payment of expenses of and liabilities against TAFT. The detail of these books and records and the duration of time during which the Trustees shall keep such books and records shall be such as to allow the Trustees to make a full and accurate accounting of all Trust Assets, as well as to comply with applicable provisions of law and standard accounting practices necessary or appropriate to produce an annual report containing special-purpose financial statements of TAFT, including, without limitation, the assets and liabilities of TAFT as of the end of such fiscal year and the additions, deductions and cash flows for such fiscal year (the "**Annual Report**"); provided, however, that the Trustees shall maintain such books and records until the wind-up of TAFT's affairs and satisfaction of all of TAFT's liabilities.

**Section 2.4    Financial Reporting**.

(a)      The Trustees shall engage a firm of independent certified public accountants (the "**Independent Auditors**") selected by the Trustees, to audit the Annual Report. Within one hundred twenty (120) days following the end of each calendar year, the Trustees shall file with the Bankruptcy Court the Annual Report audited by the Independent Auditors and accompanied by an opinion of such firm as to the fairness in all material respects of the special-purpose financial statements. The Trustees shall publish a copy of such Annual Report on the Tribal Opioid Abatement Website when such report is filed with the Bankruptcy Court.

8

(b)    All materials filed with the Bankruptcy Court pursuant to this Section 2.4 need not be served on any parties in the Chapter 11 Cases but shall be available for inspection by the public in accordance with Section 5.7(g) of the Plan.

### Section 2.5    Tribal Opioid Abatement Reporting.

(a)    Within one hundred and twenty (120) days following the end of each calendar year, the Trustees shall cause to be prepared and filed with the Bankruptcy Court an annual report on the Approved Tribal Opioid Abatement Uses with respect to such period, together with such additional information as the Trustees determine necessary or appropriate in their discretion (each, a "**Tribal Opioid Abatement Report**").[5] The Trustees shall (i) post a copy of the Tribal Opioid Abatement Report on the Tribal Opioid Abatement Website and (ii) deliver such Tribal Opioid Abatement Report to the Master Disbursement Trust, in each case when such report is filed with the Bankruptcy Court.[6]

(b)    For the avoidance of doubt, the Trustees shall not be required to include in any Tribal Opioid Abatement Report any abatement matters of any Abatement Trust created under the Plan other than TAFT.

### Section 2.6    Beneficiary Reporting.

(a)    Reporting of Approved Tribal Opioid Abatement Uses by the Tribe Beneficiaries shall be required to the extent set forth in the Confirmation Order and consistent with the Tribe TDP. The Trustees shall establish the form, content, and due dates of periodic reports with respect to Approved Tribal Opioid Abatement Uses to be submitted by the Tribe Beneficiaries (each, a "**Beneficiary Abatement Use Report**") to the Trustees through the Tribal Opioid Abatement Portal (or delivered by other means approved by the Trustees). The Trustees may prescribe a modified reporting regime for certain Tribe Beneficiaries based upon appropriate standards to be developed by the Trustees, provided, such modified reporting regime is not inconsistent with TAFT's reporting obligations, as determined by the Trustees in their discretion. Each Beneficiary Abatement Use Report shall contain the information necessary to:

>    (i)    enable TAFT to satisfy the audited Annual Report requirements described in Section 2.4 above; and

>    (ii)    enable TAFT to satisfy the Tribal Opioid Abatement Report requirements described in Section 2.5(a) above.

### Section 2.7    Limitation of the Trustees' Authority. The Trustees are not authorized to engage in any trade or business with respect to the Trust Assets or proceeds therefrom. The foregoing limitation shall not prevent the Trustees from managing the investment of the Trust Assets.

---

[5] The TAFT Tribal Opioid Abatement Report may be coordinated or combined with the Tribe LLC Tribal Opioid Abatement Report in the discretion of the Trustees.

[6] For economic efficiency, the Tribal Opioid Abatement Website and NOAT Website (and related Portals) may be maintained and administered on a combined basis.

## ARTICLE 3
## ACCOUNTS, INVESTMENTS, ADMINISTRATIVE EXPENSES

**Section 3.1    Accounts**.

(a)    The Trustees shall maintain one or more accounts ("**Trust Accounts**") on behalf of TAFT with one or more financial depository institutions (each a "**Financial Institution**"). Candidates for the positions of Financial Institution shall fully disclose to the Trustees any interest in or relationship with the Debtors, their affiliated persons, any Creditor Trust (other than NOAT or TAFT) or any Released Parties. Any such interest or relationship shall not be an automatic disqualification for the position, but the Trustees shall take any such interest or relationship into account in selecting a Financial Institution.

(b)    The Trustees may, from time to time, create such accounts and reasonable reserves within the Trust Accounts as authorized in this Section 3.1 and as they may deem necessary, prudent or useful in order to provide for Abatement Distributions to the Tribe Beneficiaries and the payment of TAFT Operating Expenses and may, with respect to any such account or reserve, restrict the use of money therein for a specified purpose (the "**Trust Subaccounts**"). Any such Trust Subaccounts established by the Trustees shall be held as Trust Assets and are not intended to be subject to separate entity tax treatment as a "disputed claims reserve" within the meaning of the IRC or the Treasury Regulations, or a "disputed ownership fund" within the meaning of the Treasury Regulations, or otherwise.

(c)    The Trustees may replace any retained Financial Institution with a successor Financial Institution at any time and such successor shall be subject to the considerations set forth in Section 3.1(a).

**Section 3.2    Investment Guidelines**. The Trustees may invest the Trust Assets in accordance with the Investment Guidelines, attached hereto as **Exhibit 3**, (the "**Investment Guidelines**"). Notwithstanding any contrary provision of the Trust Documents, this Section 3.2 and the Investment Guidelines cannot be modified or amended.

**Section 3.3    Payment of TAFT Operating Expenses**. All TAFT Operating Expenses shall be payable out of the TAFT Operating Reserve. None of the Trustees, the Delaware Trustee, the Trust Protector, the Tribe Beneficiaries, nor any of their employees, officers, consultants, advisors, independent contractors, experts or agents shall be personally liable for the payment of any TAFT Operating Expense or any other liability of TAFT.

## ARTICLE 4
## ABATEMENT DISTRIBUTIONS

**Section 4.1    Abatement Distributions**. The Trustees shall make Abatement Distributions only as and to the extent set forth in this Article 4 and the Tribe TDP. Abatement Distributions shall be used by the Tribe Beneficiaries as described in Section 2 of the Tribe TDP.

**Section 4.2**    **Manner of Payment of Abatement Distributions**.

(a)    The Trustees shall endeavor to provide ten (10) days' notice to the Tribe Beneficiaries of any upcoming Abatement Distribution through the Tribal Opioid Abatement Portal (or by other means approved by the Trustees); provided, however, that the Trustees may shorten such notice period in their discretion.

(b)    Abatement Distributions shall be made in accordance with the percentage interests set forth on **Schedule C** of **Exhibit 4**.

(c)    Abatement Distributions may be made by the Trustees or by a disbursement agent retained by TAFT to make Abatement Distributions on its behalf (the "**Disbursement Agent**"). Abatement Distributions shall be made in accordance with the Tribe TDP on the dates approved for distribution by the Trustees.

(d)    The Trustees may cause Abatement Distributions to be withheld with respect to any Tribe Beneficiary that has failed to deliver timely a completed Beneficiary Abatement Use Report by the applicable due date. The Trustees shall allow for a reasonable period of time to cure any delinquent Beneficiary Abatement Use Report and may continue to withhold distributions to a Tribe Beneficiary until all such delinquent Beneficiary Abatement Use Reports of such Tribe Beneficiary have been cured.

(e)    If the Trustees determine, in their discretion, that making the final Abatement Distribution immediately prior to the termination and dissolution of TAFT is not cost-effective with respect to the final amounts to be distributed to the Tribe Beneficiaries, the Trustees shall have the authority to direct such final Abatement Distribution, in full, to a tax-exempt organization that has opioid abatement as part of its mission, as selected by the Trustees in their discretion.

**Section 4.3**    **Delivery of Abatement Distributions**.

(a)    All Abatement Distributions under this Trust Agreement shall be made (i) in accordance with the electronic transfer information or (ii) by check at the address provided by the Tribe Beneficiaries in accordance with the Tribe TDP. Changes to such electronic transfer information or address, as applicable, must be provided to TAFT or the Disbursement Agent in writing at least five (5) business days prior to any upcoming Abatement Distribution date; provided, however, that the Trustees and Disbursement Agent shall have the authority, in their discretion, to seek further direction from the Tribe Beneficiaries regarding the transfer information of Abatement Distributions under this Trust Agreement.

(b)    In the event that any Abatement Distribution is undeliverable, no further Abatement Distribution shall be made unless and until the Trustees have been notified of the then current wire instructions or address, as applicable, as directed by such Tribe Beneficiary, at which time such distribution shall be made without interest. The Trustees shall take reasonable efforts to obtain a current address or wire instructions, as applicable, for any Tribe Beneficiary with respect to which any distribution is undeliverable, but shall have no obligation to make further inquiry with respect to designated recipients of such Tribe Beneficiaries.

11

(c)      No Trust Asset or any unclaimed property shall escheat to any federal, state or local government or any other entity.

<div align="center">

**ARTICLE 5**
**TRUSTEES AND DELAWARE TRUSTEE**

</div>

**Section 5.1      Number of Trustees; Managing Trustee**.

(a)      **Number**. In addition to the Delaware Trustee appointed pursuant to Section 5.10, there shall be three (3) Trustees. The initial Trustees shall be those persons named on the signature page hereof.

(b)      **Managing Trustee**. At their first meeting, the initial Trustees shall designate one of their number to serve as the Managing Trustee of TAFT, with such administrative duties as the Trustees may determine. The Trustees may change the designation of the individual to serve as Managing Trustee from time to time as circumstances warrant. The Managing Trustee or, in the Managing Trustee's absence, another Trustee selected by the Trustees shall preside at meetings of the Trustees. The Managing Trustee, or the Trustee presiding over such meeting, shall be responsible for taking meeting minutes at each meeting of the Trustees and for performing such other administrative duties and services as shall be assigned to or required of the Managing Trustee by the Trustees. The Managing Trustee shall maintain a list of current Trustees, including their addresses and contact information.

**Section 5.2      Term of Service, Successor Trustees**.

(a)      **Term**. Each Trustee shall serve until the earlier of (i) his or her death, (ii) his or her resignation or removal pursuant to Section 5.2(c) below, or (iii) the termination of TAFT pursuant to the terms of this Trust Agreement. The term of a newly appointed Trustee shall commence upon his or her acceptance of trusteeship.

(b)      **Appointment of Successor Trustees**.

(i)      In the event of a vacancy in the position of one (1) Trustee for any reason, the vacancy shall be filled by the unanimous vote of the remaining Trustees. In the event that the remaining Trustees cannot agree on a successor Trustee within thirty (30) days, each of the remaining Trustees shall propose a Trustee candidate and the Trust Protector (as defined in Section 5.12(a) below) shall select one such candidate as the Successor Trustee.

(ii)      In the event of a vacancy in the position of two (2) Trustees for any reason, the remaining Trustee and the Trust Protector shall, after consultation, jointly appoint two (2) successor Trustees, both of whom shall each be acceptable to both of the remaining Trustee and the Trust Protector. In the event the remaining Trustee and the Trust Protector cannot agree on two (2) successor Trustees, the selection of two (2) successor Trustees shall be resolved in accordance with the dispute resolution provisions of Section 6.14.

<div align="center">12</div>

(iii)    In the event of a vacancy in the position of three (3) Trustees for any reason, the Trust Protector shall petition the Delaware Court of Chancery to appoint three (3) successor Trustees to serve and any costs relating to the petition shall be borne by TAFT.

(iv)    Notice of the appointment of any successor Trustee(s) shall be filed with the Bankruptcy Court and shall be published on the Tribal Opioid Abatement Website when it is filed with the Bankruptcy Court.

(v)    In filling any vacancy in the position of one or more Trustees, the remaining Trustee(s) and/or the Trust Protector shall apply the following standard to any successor Trustee: the successor Trustee shall be a disinterested, independent individual with experience in one or more of the following areas: public policy/public health, tribal health or welfare, tribal self-determination, administration or self-governance, other tribal affairs, ethics and compliance, finance, general business and/or corporate governance.

(vi)    Immediately upon the appointment of any successor Trustee(s), all rights, titles, duties, powers and authority of the predecessor Trustee(s) hereunder shall be vested in, and undertaken by, the successor Trustee(s) without any further act. No successor Trustee(s) shall be liable personally for any act or omission of his or her predecessor Trustee. No successor Trustee shall have any duty to investigate the acts or omissions of his or her predecessor Trustee.

(c)    **Resignation or Removal**. A Trustee may resign by giving written notice to either of the other Trustees and the trustees of the Master Disbursement Trust. specifying the effective date of the resignation or, if there are no other Trustees, to the Delaware Trustee. Such notice shall specify a date when such resignation shall take effect, which, except in the case of incapacity or disability, shall not be less than ninety (90) days after the date such notice is given, where practicable. A Trustee may be removed by unanimous vote of the remaining Trustees in the event that he or she becomes unable to discharge his or her duties hereunder due to accident, physical deterioration, mental incompetence or for other good cause, provided such Trustee has received reasonable notice and an opportunity to be heard by the remaining Trustees. Other good cause shall mean fraud, self-dealing, intentional misrepresentation, willful misconduct, indictment for or conviction of a felony in each case whether or not connected to TAFT, any substantial failure to comply with the administration of TAFT or a consistent pattern of neglect and failure to perform or participate in performing the duties of a Trustee hereunder. For the avoidance of doubt, any removal of a Trustee pursuant to this Section 5.2(c) shall require the approval of the Bankruptcy Court and shall take effect at such time as the Bankruptcy Court shall determine.

### Section 5.3    Trustee Meetings.

(a)    **Regular Meetings**. The Trustees shall hold regular meetings not less than quarterly, which may be held without notice at such times and at such places as may be determined

from time to time by the Trustees. For the avoidance of doubt, the Delaware Trustee shall not be required or permitted to attend any meetings of the Trustees contemplated by this Section 5.3.

(b)     **Special Meetings**. Special meetings of the Trustees may be called by any Trustee by giving written notice to each other Trustee not less than one (1) business day prior to the date of the meeting. Any such notice shall include the time, place and purpose of the meeting, given to each Trustee by overnight courier, personal delivery, facsimile, electronic mail or other similar means of communication. Notice shall be addressed or delivered to each Trustee at the Trustee's address as shown upon the records of TAFT or as may have been given to Trustees by the Trustee for purposes of notice. If a Trustee's address is not shown on such records or is not readily ascertainable, notice to the Trustee may be given care of the principal office of TAFT. Notice by overnight courier shall be deemed to have been given one (1) business day after the time that written notice is provided to such overnight courier. Any other written notice shall be deemed to have been given at the time it is personally delivered to the recipient or actually transmitted by the person giving the notice by electronic means to the recipient.

(c)     **Action and Quorum**. In all matters pertaining to the affairs of TAFT, the Trustees shall act by a vote of a majority of the number of Trustees then in office, which such majority shall constitute a quorum of the Trustees for the transaction of business, except to adjourn as provided in Section 5.3(f).

(d)     **Participation in Meetings by Telephone Conference**. Trustees may participate in a meeting of the Trustees by conference telephone or similar communications equipment (which shall include virtual meetings via video conferencing software), as long as all Trustees participating in such meeting can hear one another. Participation by a Trustee in a meeting pursuant to this Section 5.3(d) shall constitute presence in person at such meeting.

(e)     **Waiver of Notice**. Notice of a meeting need not be given to any Trustee who signs a waiver of notice, whether before or after the meeting. All such waivers shall be filed with TAFT records or made a part of the minutes of the meeting. Attendance at a meeting by a Trustee shall constitute a waiver of notice of such meeting except when the Trustee attends a meeting for the express purpose of objecting, at the beginning of the meeting, to the transaction of any business on the ground that the meeting was not lawfully called or convened. Neither the business to be transacted at, nor the purpose of, any Trustee meeting need be specified in any waiver of notice.

(f)     **Adjournment**. A majority of the Trustees present, whether or not a quorum exists, may adjourn any Trustees meeting to another time and place.

(g)     **Action by Unanimous Written Consent**. Any action required or permitted to be taken at any meeting of the Trustees may be taken without a meeting, if all of the Trustees then in office consent thereto in writing or by Electronic Transmission, which writing may be executed in one or more counterparts, and the writing or Electronic Transmission are filed with the meeting minutes of the Trustees. As used herein, "**Electronic Transmission**" means any form of communication not directly involving the physical transmission of paper that creates a record that may be retained, retrieved and reviewed by a recipient thereof and that may be directly reproduced in paper form by such a recipient through an automated process.

14

**Section 5.4   Compensation and Expenses of Trustees**. The Trustees shall receive compensation from TAFT for their services as Trustees.[7] TAFT shall also, upon receipt of appropriate documentation, reimburse all reasonable out-of-pocket costs and expenses incurred by each Trustee in the course of carrying out their duties as Trustees in accordance with reasonable policies and procedures as may be adopted from time to time, including in connection with attending meetings of the Trustees. The amounts paid to the Trustees for compensation and expenses shall be disclosed in the Annual Report.

**Section 5.5   Trustees' Independence**.

(a)   The Trustees shall not, during their service, hold a financial interest in, act as attorney or agent for, or serve as any other professional for Debtors, their affiliated persons, any Creditor Trust (other than TAFT) or any Released Parties. Notwithstanding the foregoing, the Trustees shall also serve as the Managers (as defined in the Tribal Opioid Abatement Fund, LLC Operating Agreement, dated as of the date hereof, the "**Tribe Opioid LLC Operating Agreement**") of Tribe Opioid LLC. No Trustee shall act as an attorney for any Tribe in a matter that (i) directly or indirectly relates to claims arising from the use of opioids by any person, or (ii) is directly adverse to the claims of another Tribe.

(b)   The Trustees, and the Delaware Trustee, shall be indemnified by TAFT in acting upon any resolution, certificate, statement, instrument, opinion, report, notice, request, consent, order or other paper or document believed by them to be genuine and to have been signed or presented by the proper party or parties.

(c)   Persons dealing with TAFT, the Trustees, and the Delaware Trustee with respect to the affairs of TAFT, shall have recourse only to the Trust Assets to satisfy any liability incurred by TAFT, the Trustees, or the Delaware Trustee to such Person in carrying out the terms of this Trust Agreement, and neither the Trustees, the Delaware Trustee, the Tribe Beneficiaries, nor any of their professionals, advisors, officers, agents, consultants or lawyers shall have any personal obligation to satisfy any such liability.

**Section 5.6   Standard of Care; Exculpation**.

(a)   As used herein, the term "**Trust Indemnified Party**" shall mean each Trustee, the Delaware Trustee, the Trust Protector, and each of their respective members, officers, employees, agents, consultants, lawyers, advisors or professionals (collectively, the "**Trust Indemnified Parties**").

(b)   [To the maximum extent permitted by applicable law, the Trust Indemnified Parties shall not have or incur any liability for actions taken or omitted in their capacities as Trust Indemnified Parties, or on behalf of TAFT, except those acts found by Final Order to be arising out of their willful misconduct, bad faith, gross negligence or fraud, and shall be entitled to indemnification and reimbursement for reasonable fees and expenses in defending any and all of their actions or inactions in their capacity as Trust Indemnified Parties, or on behalf of TAFT, except for any actions or inactions found by Final Order to be arising out of their willful

---

[7] Trustee compensation TBD.

15

misconduct, bad faith, gross negligence or fraud. Any valid indemnification claim of any of the Trust Indemnified Parties shall be satisfied from TAFT.

(c)     To the extent that, at law or in equity, the Trust Indemnified Parties have duties (including fiduciary duties) or liability related thereto, to TAFT or the Tribe Beneficiaries, it is hereby understood and agreed by the parties hereto and the Tribe Beneficiaries that such duties and liabilities are eliminated to the fullest extent permitted by applicable law, and replaced by the duties and liabilities expressly set forth in this Trust Agreement with respect to the Trust Indemnified Parties; provided, however, that the duties of care and loyalty are not eliminated but are limited and subject to the terms of this Trust Agreement, including but not limited to this Section 5.6 and its subparts.

(d)     TAFT will maintain appropriate insurance coverage for the protection of the Trust Indemnified Parties as determined by the Trustees in their discretion.][8]

### Section 5.7     Protective Provisions.

(a)     Every provision of this Trust Agreement relating to the conduct or affecting the liability of or affording protection to Trust Indemnified Parties shall be subject to the provisions of this Section 5.7.

(b)     In the event the Trustees retain counsel (including, at the expense of TAFT), the Trustees shall be afforded the benefit of the attorney-client privilege with respect to all communications with such counsel, and in no event shall the Trustees be deemed to have waived any right or privilege including, without limitation, the attorney-client privilege even if the communications with counsel had the effect of guiding the Trustees in the performance of duties hereunder. A successor to any of the Trustees shall succeed to and hold the same respective rights and benefits of the predecessor for purposes of privilege, including the attorney-client privilege. No Tribe Beneficiary or other party may raise any exception to the attorney-client privilege discussed herein as any such exceptions are hereby waived by all parties.

(c)     To the extent that, at law or in equity, the Trustees have duties (including fiduciary duties) and liabilities relating hereto, to TAFT or to the Tribe Beneficiaries, it is hereby understood and agreed by the Parties and the Tribe Beneficiaries that such duties and liabilities are eliminated to the fullest extent permitted by applicable law, including Section 3806 of the Act, and replaced by the duties and liabilities expressly set forth in this Trust Agreement with respect to the Trustees; provided, however, that the duties of care and loyalty are not eliminated but are limited and subject to the terms of this Trust Agreement, including but not limited to Section 5.6 herein.

(d)     No Trust Indemnified Party shall be personally liable under any circumstances, except for their own willful misconduct, bad faith, gross negligence or fraud as finally judicially determined by a court of competent jurisdiction.

---

[8] Subject to ongoing discussion.

(e)  No provision of this Trust Agreement shall require the Trust Indemnified Parties to expend or risk their own personal funds or otherwise incur financial liability in the performance of their rights, duties and powers hereunder.

(f)  In the exercise or administration of TAFT hereunder, the Trust Indemnified Parties (i) may act directly or through their respective agents or attorneys pursuant to agreements entered into with any of them, and the Trust Indemnified Parties shall not be liable for the default or misconduct of such agents or attorneys if such agents or attorneys have been selected by the Trust Indemnified Parties in good faith and with due care, and (ii) may consult with counsel, accountants and other professionals to be selected by them in good faith and with due care and employed by them, and shall not be liable for anything done, suffered or omitted in good faith by them in accordance with the advice or opinion of any such counsel, accountants or other professionals.

**Section 5.8    Indemnification**.

(a)  [To the maximum extent permitted by applicable law, the Trust Indemnified Parties shall be entitled to indemnification and reimbursement for reasonable fees and expenses (including attorneys' fees and costs but excluding taxes in the nature of income taxes imposed on compensation paid to the Trust Indemnified Parties) in defending any and all of their actions or inactions in their capacity as Trust Indemnified Parties, or on behalf of TAFT, except for any actions or inactions found by Final Order to be arising out of their willful misconduct, bad faith, gross negligence or fraud. Any valid indemnification claim of any of the Trust Indemnified Parties shall be satisfied from TAFT.

(b)  Reasonable expenses, costs and fees (including attorneys' fees and costs) incurred by or on behalf of the Trust Indemnified Parties in connection with any action, suit or proceeding, whether civil, administrative or arbitrative, from which they are indemnified by TAFT shall be paid by TAFT in advance of the final disposition thereof upon receipt of an undertaking, by or on behalf of the Trust Indemnified Parties, to repay such amount in the event that it shall be determined ultimately by Final Order of the Bankruptcy Court that the Trust Indemnified Parties or any other potential indemnitee are not entitled to be indemnified by TAFT.

(c)  The Trustees shall purchase and maintain appropriate amounts and types of insurance on behalf of the Trust Indemnified Parties, as determined by the Trustees, which may include liability asserted against or incurred by such individual in that capacity or arising from his or her status as a Trust Indemnified Party, and/or as an employee, agent, lawyer, advisor or consultant of any such person.

(d)  The indemnification provisions of this Trust Agreement with respect to any Trust Indemnified Party shall survive the termination of such Trust Indemnified Party from the capacity for which such Trust Indemnified Party is indemnified. Termination or modification of this Trust Agreement shall not affect any indemnification rights or obligations in existence at such time. In making a determination with respect to entitlement to indemnification of any Trust Indemnified Party hereunder, the person, persons or entity making such determination shall presume that such Trust Indemnified Party is entitled to indemnification under this Trust Agreement, and any person seeking to overcome such presumption shall have the burden of proof to overcome the presumption.

17

(e)    The rights to indemnification hereunder are not exclusive of other rights which any Trust Indemnified Party may otherwise have at law or in equity, including common law rights to indemnification or contribution.][9]

Section 5.9    **Bond**. The Trustees and the Delaware Trustee shall not be required to post any bond or other form of surety or security unless otherwise ordered by the Bankruptcy Court.

### Section 5.10   Delaware Trustee.

(a)    There shall at all times be a Delaware Trustee. The Delaware Trustee shall either be (i) a natural person who is at least twenty-one (21) years of age and a resident of the State of Delaware or (ii) a legal entity that has its principal place of business in the State of Delaware, otherwise meets the requirements of applicable Delaware law to be eligible to serve as the Delaware Trustee, and shall act through one or more persons authorized to bind such entity. If at any time the Delaware Trustee shall cease to be eligible in accordance with the provisions of this Section 5.10, it shall resign immediately in the manner and with the effect hereinafter specified in Section 5.10(c) below. For the avoidance of doubt, the Delaware Trustee will only have such rights, duties and obligations as expressly provided by reference to the Delaware Trustee hereunder. The Trustees shall have no liability for the acts or omissions of any Delaware Trustee.

(b)    The Delaware Trustee shall not be entitled to exercise any powers, nor shall the Delaware Trustee have any of the duties and responsibilities of the Trustees set forth herein. The Delaware Trustee shall be a trustee of TAFT for the sole and limited purpose of fulfilling the requirements of Section 3807(a) of the Act and for taking such actions as are required to be taken by a Delaware Trustee under the Act. The duties (including fiduciary duties), liabilities and obligations of the Delaware Trustee shall be limited to accepting legal process served on TAFT in the State of Delaware and the execution of any certificates required to be filed with the Secretary of State of the State of Delaware that the Delaware Trustee is required to execute under Section 3811 of the Act. There shall be no other duties (including fiduciary duties) or obligations, express or implied, at law or in equity, of the Delaware Trustee. To the extent that, at law or in equity, the Delaware Trustee has duties (including fiduciary duties) and liabilities relating to TAFT or the Tribe Beneficiaries, such duties and liabilities are replaced by the duties and liabilities of the Delaware Trustee expressly set forth in this Trust Agreement. The Delaware Trustee shall have no liability for the acts or omissions of any Trustee. Any permissive rights of the Delaware Trustee to do things enumerated in this Trust Agreement shall not be construed as a duty and, with respect to any such permissive rights, the Delaware Trustee shall not be answerable for other than its willful misconduct, bad faith or fraud. The Delaware Trustee shall be under no obligation to exercise any of the rights or powers vested in it by this Trust Agreement at the request or direction of the Trustees or any other person pursuant to the provisions of this Trust Agreement unless the Trustees or such other person shall have offered to the Delaware Trustee security or indemnity (satisfactory to the Delaware Trustee in its discretion) against the costs, expenses and liabilities that may be incurred by it in compliance with such request or direction. The Delaware Trustee shall be entitled to request and receive written instructions from the Trustees and shall have no responsibility or liability for any losses or damages of any nature that may arise from any action taken or not taken by the Delaware Trustee in accordance with the written direction of the Trustees.

---

[9] Subject to ongoing discussion.

The Delaware Trustee may, at the expense of TAFT, request, rely on and act in accordance with officer's certificates and/or opinions of counsel, and shall incur no liability and shall be fully protected in acting or refraining from acting in accordance with such officer's certificates and opinions of counsel.

(c)     The Delaware Trustee shall serve until such time as the Trustees remove the Delaware Trustee or the Delaware Trustee resigns and a successor Delaware Trustee is appointed by the Trustees in accordance with the terms of Section 5.10(d) below. The Delaware Trustee may resign at any time upon the giving of at least sixty (60) days' advance written notice to the Trustees; provided that such resignation shall not become effective unless and until a successor Delaware Trustee shall have been appointed by the Trustees in accordance with Section 5.10(d) below, provided further that if any amounts due and owing to the Delaware Trustee hereunder remain unpaid for more than ninety (90) days, the Delaware Trustee shall be entitled to resign immediately by giving written notice to the Trustees. If the Trustees do not act within such sixty (60) day period, the Delaware Trustee, at the expense of TAFT, may apply to the Court of Chancery of the State of Delaware or any other court of competent jurisdiction for the appointment of a successor Delaware Trustee.

(d)     Upon the resignation or removal of the Delaware Trustee, the Trustees shall appoint a successor Delaware Trustee by delivering a written instrument to the outgoing Delaware Trustee. Any successor Delaware Trustee must satisfy the requirements of Section 3807 of the Act. Any resignation or removal of the Delaware Trustee and appointment of a successor Delaware Trustee shall not become effective until a written acceptance of appointment is delivered by the successor Delaware Trustee to the outgoing Delaware Trustee and the Trustees, and any fees and expenses due to the outgoing Delaware Trustee are paid. Following compliance with the preceding sentence, the successor Delaware Trustee shall become fully vested with all of the rights, powers, duties and obligations of the outgoing Delaware Trustee under this Trust Agreement, with like effect as if originally named as Delaware Trustee, and the outgoing Delaware Trustee shall be discharged of his or her duties and obligations under this Trust Agreement. The successor Delaware Trustee shall make any related filings required under the Act, including filing a Certificate of Amendment to the Certificate of Trust of TAFT in accordance with Section 3810 of the Act.

(e)     Notwithstanding anything herein to the contrary, any business entity into which the Delaware Trustee may be merged or converted or with which it may be consolidated or any entity resulting from any merger, conversion or consolidation to which the Delaware Trustee shall be a party, or any entity succeeding to all or substantially all of the corporate trust business of the Delaware Trustee, shall be the successor of the Delaware Trustee hereunder, without the execution or filing of any paper or any further act on the part of any of the parties hereto.

(f)     The Delaware Trustee shall be entitled to compensation for its services as agreed pursuant to a separate fee agreement between TAFT and the Delaware Trustee, which compensation shall be paid by TAFT. Such compensation is intended for the Delaware Trustee's services as contemplated by this Trust Agreement. The terms of this paragraph shall survive termination of this Trust Agreement and/or the earlier resignation or removal of the Delaware Trustee.

(g)    The Delaware Trustee shall neither be responsible for, nor chargeable with, knowledge of the terms and conditions of any other agreement, instrument, or document, other than this Trust Agreement, whether or not, an original or a copy of such agreement has been provided to the Delaware Trustee. The Delaware Trustee shall have no duty to know or inquire as to the performance or nonperformance of any provision of any other agreement, instrument or document, other than this Trust Agreement. Neither the Delaware Trustee nor any of its directors, officers, employees, agents or affiliates shall be responsible for nor have any duty to monitor the performance or any action of TAFT, the Trustees or any other person, or any of their directors, members, officers, agents, affiliates or employee, nor shall it have any liability in connection with the malfeasance or nonfeasance by such party. The Delaware Trustee may assume performance by all such persons of their respective obligations. The Delaware Trustee shall have no enforcement or notification obligations relating to breaches of representations or warranties of any other person. The Delaware Trustee shall have no responsibilities (except as expressly set forth herein) as to the validity, sufficiency, value, genuineness, ownership or transferability of any Trust Asset, written instructions, or any other documents in connection therewith, and will not be regarded as making, nor be required to make, any representations thereto.

(h)    The Delaware Trustee shall not be responsible or liable for any failure or delay in the performance of its obligations under this Trust Agreement arising out of, or caused, directly or indirectly, by circumstances beyond its control, including without limitation, any act or provision of any present or future law or regulation or governmental authority; acts of God; earthquakes; fires; floods; wars; terrorism; civil or military disturbances; sabotage; epidemics; riots; interruptions, loss or malfunctions of utilities, computer (hardware or software) or communications service; accidents; labor disputes; acts of civil or military authority or governmental actions; or the unavailability of the Federal Reserve Bank wire or telex or other wire or communication facility.

### Section 5.11    Meeting Minutes; Rights of Inspection.

(a)    The minutes of proceedings of the Trustees shall be kept in written form (which may be electronic) at such place or places designated by the Trustees, or, in the absence of such designation, at the principal office of TAFT.

(b)    Every Trustee shall have the absolute right at any reasonable time to inspect and copy all books, records and documents of every kind and to inspect the physical properties of TAFT.

### Section 5.12    Trust Protector

(a)    Notwithstanding any other provision of this Trust Agreement, there shall at all times be one Trust Protector (the "**Trust Protector**") to serve in accordance with the provisions of this Section 5.12. The Trust Protector shall be a Trust Indemnified Party. The initial Trust Protector shall be [_____].[10]

(b)    Any Trust Protector acting hereunder may resign at any time (i) by delivering written notice thereof to the Trustees then serving; provided that notice to one Trustee shall

---

[10] TBD

20

constitute notice to all Trustees then serving, or (ii) if there are no Trustees then serving, by delivering written notice to the Delaware Trustee.

(c)    A Trust Protector may be removed for good reason upon the unanimous consent of three (3) Trustees then serving; provided, however, if there are less than three (3) Trustees then serving, the Trust Protector shall not be removed except upon order of the Bankruptcy Court. If a vacancy in the position of Trust Protector exists for more than thirty (30) days, then the Trustees, or if there are no Trustees then acting, then the Delaware Trustee may petition the Delaware Court of Chancery to appoint a successor Trust Protector to serve and any costs relating to the petition shall be borne by TAFT. At no time may the Settlors or any party related to the Settlors or their affiliates be eligible to serve as Trust Protector. A vacancy in the position of Trust Protector shall not limit the Trustees from exercising any powers afforded them under the Trust Documents.

(d)    The Trust Protector shall have only the authority set forth in Section 5.2(b), which authority may not be expanded by an amendment or modification of this Trust Agreement.

(e)    The Trust Protector shall exercise the Trust Protector's authority in a fiduciary capacity and in a way that the Trust Protector reasonably believes to be in accordance with the purposes of this Trust Agreement. The Trust Protector shall not be under any duty to inquire into or ensure the performance by the Trustees of their duties and shall not be liable for any loss to such trust (unless such loss results from actions in bad faith or the willful misconduct of the Trust Protector).

(f)    The Trustees shall have no liability for the selection of, or exercise of authority by, the Trust Protector.

(g)    The Trust Protector shall be entitled to:

(i)    receive reasonable compensation and reimbursement for reasonable expenses for serving as Trust Protector;

(ii)    retain advisors to advise and assist in carrying out the duties of the Trust Protector and the costs thereof shall be borne by TAFT; and

(iii)    receive and review minutes of the meetings or other actions of the Trustees, but only at such time as the Trust Protector is required to act pursuant to Section 5.2(b).

## ARTICLE 6
## GENERAL PROVISIONS

**Section 6.1    Irrevocability**. To the fullest extent permitted by applicable law, TAFT is irrevocable. The Settlors shall not (i) retain any ownership or residual interest whatsoever with respect to any Trust Assets, including, but not limited to, the funds transferred to fund TAFT, and (ii) have any rights or role with respect to the management or operation of TAFT, or the Trustees' administration of TAFT.

**Section 6.2    Term; Termination**.

(a)    The term for which TAFT is to exist shall commence on the date of the filing of the Certificate of Trust and shall terminate pursuant to the provisions of this Section 6.2.

(b)    TAFT shall automatically dissolve as soon as practicable but no later than ninety (90) days after the date on which the Bankruptcy Court approves the dissolution upon the satisfaction of the purposes of TAFT, wherein (i) all reasonably expected assets have been collected by TAFT, (ii) all Abatement Distributions have been made to the extent set forth in the Tribe TDP, (iii) necessary arrangements and reserves have been made to discharge all anticipated remaining TAFT obligations and TAFT Operating Expenses in a manner consistent with the Trust Documents, and (iv) a final accounting has been filed and approved by the Bankruptcy Court (the "**Dissolution Date**").

(c)    On the Dissolution Date or as soon as reasonably practicable thereafter, after the wind-up of TAFT's affairs by the Trustees and payment of all of TAFT's liabilities have been provided for as required by applicable law including Section 3808 of the Act, all monies remaining in TAFT shall be distributed to the Tribe Beneficiaries in accordance with the Tribe TDP, except as otherwise provided in Section 4.2(e). Notwithstanding any contrary provision of the Plan and related documents, including this Trust Agreement, this Section 6.2(c) cannot be modified or amended.

(d)    Following the dissolution and distribution of the assets of TAFT, TAFT shall terminate, and the Trustees, or any one of them, shall execute and cause a Certificate of Cancellation of the Certificate of Trust of TAFT to be filed in accordance with the Act. Notwithstanding anything to the contrary contained in this Trust Agreement, the existence of TAFT as a separate legal entity shall continue until the filing of such Certificate of Cancellation.

**Section 6.3    Taxes**.

(a)    TAFT is intended to qualify as a "qualified settlement fund" within the meaning of Section 1.468B-1 *et seq.* of the Treasury Regulations promulgated under Section 468B of the IRC (the "**QSF Regulations**"), and, to the extent permitted under applicable law, for state and local income tax purposes. Notwithstanding anything to the contrary herein, no provision in this Trust Agreement or the Tribe TDP shall be construed or implemented in a manner that would cause TAFT to fail to qualify as a Qualified Settlement Fund within the meanings of the QSF Regulations.

(b)    The Managing Trustee shall be the "administrator" of TAFT within the meaning of Treasury Regulation Section 1.468B-2(k)(3) and, in such capacity, such administrator shall (i) prepare and timely file, or cause to be prepared and timely filed, such income tax and other tax returns and statements required to be filed and shall timely pay all taxes required to be paid by TAFT out of the Trust Assets, which assets may be sold by the Trustees to the extent necessary to satisfy tax liabilities of TAFT, and (ii) comply with all applicable tax reporting and withholding obligations.

(c)    Subject to Section 6.3(b) above, following the Effective Date, the Trustees shall be responsible for all of TAFT's tax matters, including, without limitation, tax audits, claims,

defenses and proceedings. The Trustees may request an expedited determination under section 505(b) of the Bankruptcy Code for all tax returns filed by or on behalf of TAFT for all taxable periods through the dissolution of TAFT. The Trustees shall be responsible for causing TAFT to satisfy all requirements necessary to qualify and maintain qualification of TAFT as a qualified settlement fund within the meaning of the QSF Regulations and shall take no action that could cause TAFT to fail to qualify as a qualified settlement fund within the meaning of the QSF Regulations.

**Section 6.4    Modification**.

(a)    Material modifications to this Trust Agreement may be made only pursuant to an order of the Bankruptcy Court; provided, however, that the Trustees may amend this Trust Agreement by unanimous consent of the Trustees from time to time without the consent, approval or other authorization of, but with notice to, the Bankruptcy Court, to make: (i) minor modifications or clarifying amendments necessary to enable the Trustees to effectuate the provisions of this Trust Agreement; or (ii) modifications to satisfy any requirements, conditions or guidelines contained in any opinion, directive, order, statute, ruling or regulation of any federal, state or foreign governmental entity. Notwithstanding the foregoing, no amendment or waiver of this Trust Agreement shall modify this Trust Agreement in a manner that is inconsistent with the Plan or the Confirmation Order other than to cure any minor ambiguity or inconsistency in the Plan or to correct any clerical errors in this Trust Agreement. The Trustees shall provide to the Tribe Beneficiaries notice of any proposed modification to this Trust Agreement, whether material or minor, through the Tribal Opioid Abatement Portal (or by other means approved by the Trustees) not less than ten (10) business days before such modification becomes effective; provided, however, that the Trustees may shorten such notice period in their discretion.

(b)    Notwithstanding anything set forth in this Trust Agreement to the contrary, none of this Trust Agreement, nor any document related thereto shall be modified or amended in any way that could jeopardize, impair or modify (i) the applicability of Section 105 of the Bankruptcy Code to the Plan and the Confirmation Order, (ii) the efficacy or enforceability of the Channeling Injunction or any other injunction or release issued or granted in connection with the Plan and Confirmation Order, (iii) TAFT's status as a qualified settlement fund within the meaning of the QSF Regulations, (iv) the rights, duties, liabilities and obligations of the Delaware Trustee without the written consent of the Delaware Trustee, or (v) the Plan or the Confirmation Order.][11]

**Section 6.5    Communications**. The Trustees shall establish and maintain the Tribal Opioid Abatement Portal (or other means of communication approved by the Trustees) so as to (i) enable each Tribe Beneficiary to deliver the required documentation under the Beneficiary Abatement Use Reports in an electronic format; (ii) enable secure communications between the Trustees and each Tribe Beneficiary; and (iii) provide each Tribe Beneficiary with access to its own secure electronic data folder.

**Section 6.6    Severability**. If any provision of this Trust Agreement or application thereof to any person or circumstance shall be finally determined by a court of competent jurisdiction to be invalid or unenforceable to any extent, the remainder of this Trust Agreement,

---

[11] Note to Draft: Subject to ongoing discussion.

23

or the application of such provisions to persons or circumstances other than those as to which it is held invalid or unenforceable, shall not be affected thereby, and such provision of this Trust Agreement shall be valid and enforced to the fullest extent permitted by law.

**Section 6.7    Notices**.

(a)    Any notices or other communications required or permitted hereunder to the following parties shall be in writing and delivered at the addresses designated below, or sent by email or facsimile pursuant to the instructions listed below, or mailed by overnight courier, addressed as follows, or to such other address or addresses as may hereafter be furnished in writing to each of the other parties listed below in compliance with the terms hereof.

To the Trustees:


with a copy (which shall not constitute notice) to:


To the Delaware Trustee:


with a copy (which shall not constitute notice) to:


To the Trust Protector:


with a copy (which shall not constitute notice) to:


To the Settlors' Representative:


with a copy (which shall not constitute notice) to:


(b)    All such notices and communications, if mailed, shall be effective when physically delivered at the designated addresses, or if electronically transmitted, shall be effective upon transmission.



24

**Section 6.8    Successors and Assigns**. The provisions of this Trust Agreement shall be binding upon and inure to the benefit of TAFT, the Trustees, the Delaware Trustee and their respective successors and assigns, except that none of such persons may assign or otherwise transfer any of its, or their rights or obligations under this Trust Agreement except, in the case of the Trustees, as contemplated by Sections 2.1 and 5.2 above, and in the case of the Delaware Trustee, as contemplated by Section 5.10 above.

**Section 6.9    Limitation on Transferability; Tribe Beneficiaries' Interests**. Tribe Beneficiaries' interests in TAFT shall not (a) be assigned, conveyed, hypothecated, pledged or otherwise transferred, voluntarily or involuntarily, directly or indirectly, and any purported assignment, conveyance, pledge or transfer shall be null and void *ab initio*; provided, however, that nothing set forth in this Trust Agreement shall be deemed to preclude Tribe Beneficiaries from aggregating their Abatement Distributions or otherwise directing their Abatement Distributions for common Approved Tribal Opioid Abatement Uses (as defined in **Exhibit 4**) and/or common Tribal Abatement Strategies (as defined in **Schedule D** of **Exhibit 4**); (b) be evidenced by a certificate or other instrument; (c) possess any voting rights; (d) give rise to any right or rights to participate in the management or administration of TAFT or the Trust Assets; (e) entitle the holders thereof to seek the removal or replacement of a Trustee, whether by petition to the Bankruptcy Court or any other court or otherwise; (f) entitle the holders thereof to receive any interest on Abatement Distributions; nor (g) give rise to any rights to seek a partition or division of the Trust Assets. In accordance with the Act, Tribe Beneficiaries shall have no interest of any kind in any of the Trust Assets; rather, Tribe Beneficiaries shall have an undivided beneficial interest only in cash assets of TAFT but only to the extent such cash assets are declared by the Trustees to be distributable as Abatement Distributions in accordance with the Trust Documents. For the avoidance of doubt, Tribe Beneficiaries shall only have such rights as expressly set forth in this Trust Agreement; provided, however, this sentence shall not to apply to the rights expressly set forth in the Tribe Opioid LLC Operating Agreement.

**Section 6.10    Exemption from Registration**. The Parties hereto intend that the rights of the Tribe Beneficiaries arising under this Trust Agreement shall not be "securities" under applicable laws, but none of the Parties hereto represent or warrant that such rights shall not be securities or shall be entitled to exemption from registration under applicable securities laws. If it should be determined that any such interests constitute "securities," the Parties hereto intend that the exemption provisions of Section 1145 of the Bankruptcy Code will be satisfied and the offer and sale under the Plan of the beneficial interests in TAFT will be exempt from registration under the Securities Act, all rules and regulations promulgated thereunder, and all applicable state and local securities laws and regulations.

**Section 6.11    Entire Agreement; No Waiver**. The entire agreement of the parties relating to the subject matter of this Trust Agreement is contained herein and in the documents referred to herein, and this Trust Agreement and such documents supersede any prior oral or written agreements concerning the subject matter hereof. No failure to exercise or delay in exercising any right, power or privilege hereunder shall operate as a waiver thereof, nor shall any single or partial exercise of any right, power or privilege hereunder preclude any further exercise thereof or of any other right, power or privilege. The rights and remedies herein provided are cumulative and are not exclusive of rights under law or in equity.

**Section 6.12    Headings**. The headings used in this Trust Agreement are inserted for convenience only and do not constitute a portion of this Trust Agreement, nor in any manner affect the construction of the provisions of this Trust Agreement.

**Section 6.13    Governing Law**. This Trust Agreement shall be governed by, and construed in accordance with, the laws of the State of Delaware, without regard to the conflicts of law provisions thereof which would purport to apply the law of any other jurisdiction. For the avoidance of doubt, none of the following provisions of Delaware law shall apply to the extent inconsistent with the terms of the Trust Documents: (a) the filing with any court or governmental body or agency of trustee accounts or schedules of trustee fees and charges, (b) affirmative requirements to post bonds for trustees, officers, agents or employees of a trust, (c) the necessity for obtaining court or other governmental approval concerning the acquisition, holding or disposition of property, (d) fees or other sums payable to trustees, officers, agents or employees of a trust, (e) the allocation of receipts and expenditures to income or principal, (f) restrictions or limitations on the permissible nature, amount or concentration of trust investments or requirements relating to the titling, storage or other manner of holding of trust assets, (g) the existence of rights or interests (beneficial or otherwise) in trust assets, (h) the ability of beneficial owners or other persons to terminate or dissolve a trust, and (i) the establishment of fiduciary or other standards or responsibilities or limitations on the acts or powers of trustees or beneficial owners that are inconsistent with the limitations on liability or authorities and powers of the Trustees, set forth or referenced in this Trust Agreement. Section 3540 of Title 12 the Act shall not apply to the Trust.

**Section 6.14    Dispute Resolution**.

(a)     Unless otherwise expressly provided for herein, the dispute resolution procedures of this Section 6.14 shall be the exclusive mechanism to resolve any dispute between or among the parties hereto, and the Tribe Beneficiaries hereof, arising under or with respect to this Trust Agreement.

(b)     **Informal Dispute Resolution**. Any dispute under this Trust Agreement shall first be the subject of informal negotiations. The dispute shall be considered to have arisen when a disputing party sends to the counterparty or counterparties a written notice of dispute ("**Notice of Dispute**"). Such Notice of Dispute shall state clearly the matter in dispute. The period of informal negotiations shall not exceed thirty (30) days from the date the Notice of Dispute is received by the counterparty or counterparties, unless that period is modified by written agreement of the disputing party and counterparty or counterparties. If the disputing party and the counterparty or counterparties cannot resolve the dispute by informal negotiations, then the disputing party may invoke the formal dispute resolution procedures as set forth below.

(c)     **Formal Dispute Resolution**. The disputing party shall invoke formal dispute resolution procedures, within the time period provided in the preceding subparagraph, by serving on the counterparty or counterparties a written statement of position regarding the matter in dispute ("**Statement of Position**"). The Statement of Position shall include, but need not be limited to, any factual data, analysis or opinion supporting the disputing party's position and any supporting documentation and legal authorities relied upon by the disputing party. Each counterparty shall serve its Statement of Position within thirty (30) days of receipt of the disputing party's Statement of Position, which shall also include, but need not be limited to, any factual data, analysis or

opinion supporting the counterparty's position and any supporting documentation and legal authorities relied upon by the counterparty. If the disputing party and the counterparty or counterparties are unable to consensually resolve the dispute within thirty (30) days after the last of all counterparties have served its Statement of Position on the disputing party, the disputing party may file with the Bankruptcy Court a motion for judicial review of the dispute in accordance with Section 6.14(d).

(d)     **Judicial Review**. The disputing party may seek judicial review of the dispute by filing with the Bankruptcy Court (or, if the Bankruptcy Court shall not have jurisdiction over any dispute, such court as has jurisdiction under Section 1.6) and serving on the counterparty or counterparties and the Trustees, a motion requesting judicial resolution of the dispute. The motion must be filed within forty-five (45) days of receipt of the last counterparty's Statement of Position pursuant to the preceding subparagraph. The motion shall contain a written statement of the disputing party's position on the matter in dispute, including any supporting factual data, analysis, opinion, documentation and legal authorities, and shall set forth the relief requested and any schedule within which the dispute must be resolved for orderly administration of TAFT. Each counterparty shall respond to the motion within the time period allowed by the rules the court, and the disputing party may file a reply memorandum, to the extent permitted by the rules of the court.

**Section 6.15   Sovereign Immunity**. Nothing set forth in the Trust Documents shall be construed as a waiver of a claim of sovereign immunity in any action or proceeding, including without limitation, any action or proceeding occurring after the Effective Date.

**Section 6.16   Effectiveness**. This Trust Agreement shall not become effective until the Effective Date of the Plan and this Trust Agreement has been executed and delivered by all the parties hereto.

**Section 6.17   Counterpart Signatures**. This Trust Agreement may be executed in any number of counterparts, each of which shall constitute an original, but such counterparts shall together constitute but one and the same instrument. A signed copy of this Trust Agreement or any amendment hereto delivered by facsimile, email or other means of Electronic Transmission shall be treated in all manner and respects as an original agreement or instrument and shall be considered to have the same binding legal effect as if it were the original signed version thereof delivered in person.

*[Remainder of Page Intentionally Left Blank]*

IN WITNESS WHEREOF, the parties have executed this Trust Agreement as of the date first set forth above to be effective as of the Effective Date.

[SETTLORS]

[TRUSTEE]

[TRUSTEE]

[TRUSTEE]

[DELAWARE TRUSTEE]

[TRUST PROTECTOR]

*[Signature Page to TAFT Agreement]*

**EXHIBIT 1**

**TAFT ASSETS**

- Initial Tribe Trust Distribution in the amount of $50,000,000.

- TopCo Tribe Interest (which shall be distributed to the Tribe Beneficiaries in accordance with the Restructuring Steps Memorandum).

- MDT Tribe Interest.

**EXHIBIT 2**

**FORM OF CERTIFICATE OF TRUST OF THE TRIBAL ABATEMENT FUND TRUST**

This Certificate of Trust of the TRIBAL ABATEMENT FUND TRUST (the "*Trust*") is being duly executed and filed by the undersigned trustees of the Trust, to form a statutory trust under the Delaware Statutory Trust Act (12 Del. Code § 3801 *et seq.*) (the "*Act*").

1. <u>Name</u>. The name of the statutory trust formed hereby is:

<div align="center">TRIBAL ABATEMENT FUND TRUST</div>

2. <u>Delaware Trustee</u>. The name and business address of the Delaware Trustee of the Trust in the State of Delaware is:

3. <u>Effective Date</u>. This Certificate of Trust shall be effective upon filing.

IN WITNESS WHEREOF, the undersigned, being all of the trustees of the Trust, have duly executed this Certificate of Trust in accordance with Section 3811(a) of the Act.

| TRUSTEES: | DELAWARE TRUSTEE: |
|---|---|
| _____<br>in his/her capacity as Trustee and not individually. | |
| _____<br>in his/her capacity as Trustee and not individually. | By: _____<br>Name:<br>Title: |
| _____<br>in his/her capacity as Trustee and not individually. | |

**EXHIBIT 3**

**INVESTMENT GUIDELINES**

<u>**In General**</u>. Only the following investments will be permitted, provided that maturities on the following securities do not exceed twelve (12) months, all investments are U.S. dollar denominated and all requirements are satisfied at the time of purchase:

(i)     marketable securities issued by the U.S. Government and supported by the full faith and credit of the U.S. Treasury; and

(ii)    a U.S. government money market fund required to invest exclusively in cash and U.S. government securities that are supported by the full faith and credit of the U.S. Treasury. The borrowing of funds or securities for the purpose of purchasing and the lending of any investments held in TAFT is prohibited.

Notwithstanding the foregoing, it is acknowledged and agreed that the Trustees may liquidate investments and deposit and maintain funds in or with banks, trust companies, savings and loan associations, money market organizations and other depositories or issuers of depository-type accounts at such times as the Trustees determine to be necessary or appropriate to have cash available to satisfy distribution and other cash requirements of TAFT.

# EXHIBIT 4

## TRIBE TRUST DISTRIBUTION PROCEDURES

64112075 v1-WorkSiteUS-035843/0014

# EXHIBIT T

**Tribal Opioid Abatement Fund LLC ("Tribe Opioid LLC") Operating Agreement**

**TRIBAL OPIOID ABATEMENT FUND, LLC**

**LIMITED LIABILITY COMPANY OPERATING AGREEMENT**

**Dated as of [●], 2021**

*Pursuant to the Debtors' [Fifth] Amended Joint Chapter 11*
*Plan of Reorganization Dated [June 3], 2021*

# <u>TABLE OF CONTENTS</u>

**Page**

**ARTICLE I**    2

CERTAIN DEFINITIONS ..................................................................................2

    **1.1**    **Definitions** .............................................................................2
    **1.2**    **Interpretation.** .......................................................................5

**ARTICLE II**    5

ORGANIZATIONAL MATTERS .......................................................................5

    **2.1**    **Formation** .............................................................................5
    **2.2**    **The Certificate** .....................................................................5
    **2.3**    **Name** .....................................................................................5
    **2.4**    **Purpose** .................................................................................5
    **2.5**    **Principal Office; Registered Office** .....................................6
    **2.6**    **Term** .....................................................................................7
    **2.7**    **No State-Law Partnership** ...................................................7

**ARTICLE III** BOARD OF MANAGERS; REPORTING ...................................7

    **3.1**    **Management by the Board of Managers** .............................7
    **3.2**    **Composition and Actions of the Board of Managers** ..........8
    **3.3**    **Board Meetings and Actions by Written Consent.** .............8

**ARTICLE IV** LLC INTERESTS; CAPITAL ACCOUNTS ...............................10

    **4.1**    **Interest Holders.** ................................................................10
    **4.2**    **Capital Accounts** ...............................................................10
    **4.3**    **Capital Contributions** .......................................................10
    **4.4**    **Negative Capital Accounts** ................................................10
    **4.5**    **No Withdrawal** ...................................................................10

**ARTICLE V** ALLOCATIONS; DISTRIBUTIONS ..........................................11

    **5.1**    **Allocations of Profits and Losses** .....................................11
    **5.2**    **Tax Elections** .....................................................................11
    **5.3**    **Opioid Abatement Uses** .....................................................11
    **5.4**    **Distributions.** .....................................................................11

**ARTICLE VI** TRANSFER OF LLC INTERESTS ............................................12

    **6.1**    **No Transfers by Interest Holders** ....................................12

**ARTICLE VII** GENERAL RIGHTS AND OBLIGATIONS OF INTEREST HOLDERS ........12

    **7.1**    **Limitation of Liability.** .....................................................12
    **7.2**    **Lack of Authority** ..............................................................13
    **7.3**    **No Right of Partition** ........................................................13

**ARTICLE VIII** EXCULPATION AND INDEMNIFICATION ...................................................13

    **8.1**    **Standard of Care; Exculpation**.........................................................................13
    **8.2**    **Liabilities and Duties of Covered Persons** ....................................................13
    **8.3**    **Indemnification**................................................................................................14

**ARTICLE IX** BOOKS, RECORDS, ACCOUNTING AND REPORTS ...................................15

    **9.1**    **Records and Accounting** ..................................................................................15
    **9.2**    **Fiscal Year** ......................................................................................................15
    **9.3**    **Reports** ............................................................................................................15
    **9.4**    **Financial Reporting.** .......................................................................................16
    **9.5**    **Tribal Opioid Abatement Reporting**..............................................................16
    **9.6**    **Interest Holder Reporting.** ..............................................................................16
    **9.7**    **Portal and Website** ..........................................................................................17

**ARTICLE X** TAXES............................................................................................................17

    **10.1**    **Tax Returns** ....................................................................................................17
    **10.2**    **Partnership Treatment; Tax Elections** ...........................................................17
    **10.3**    **Partnership Representative**..............................................................................17

**ARTICLE XI** DISSOLUTION AND LIQUIDATION............................................................17

    **11.1**    **Dissolution** ......................................................................................................17
    **11.2**    **Liquidation and Termination** .........................................................................18
    **11.3**    **Cancellation of Certificate** .............................................................................18
    **11.4**    **Reasonable Time for Winding Up** ..................................................................18

**ARTICLE XII** GENERAL PROVISIONS ...........................................................................18

    **12.1**    **Amendments.**...................................................................................................18
    **12.2**    **Remedies Cumulative** .....................................................................................19
    **12.3**    **Successors and Assigns** ...................................................................................19
    **12.4**    **Severability** .....................................................................................................19
    **12.5**    **Applicable Law** ...............................................................................................19
    **12.6**    **Consent to Jurisdiction** ...................................................................................19
    **12.7**    **Sovereign Immunity.**.......................................................................................19
    **12.8**    **Communications** .............................................................................................20
    **12.9**    **Addresses and Notices** ....................................................................................20
    **12.10**    **Creditors** .......................................................................................................20
    **12.11**    **Waiver** ..........................................................................................................20
    **12.12**    **Further Action**...............................................................................................20
    **12.13**    **Entire Agreement**..........................................................................................20
    **12.14**    **Delivery by Electronic Transmission** ...........................................................21

## TRIBAL OPIOID ABATEMENT FUND, LLC

## LIMITED LIABILITY COMPANY OPERATING AGREEMENT

THIS LIMITED LIABILITY COMPANY OPERATING AGREEMENT (this "**Agreement**") of Tribal Opioid Abatement Fund, LLC (the "**Company**"), dated as of [●], 2021 and entered into by and among the managers identified on the signature pages hereto (each, a "**Manager**" and, collectively, the "**Managers**" or the "**Board**"), implements certain of the terms of the *Debtors' [Fifth] Amended Joint Chapter 11 Plan of Reorganization of Purdue Pharma L.P. and Its Affiliated Debtors*, dated [June 3], 2021 (as may be further modified, amended, or supplemented from time to time, and together with all exhibits and schedules thereto, the "**Plan**")[1] confirmed by an order entered on [●], 2021 [Docket No. _____] (the "**Confirmation Order**") by the United States Bankruptcy Court for the Southern District of New York (the "**Bankruptcy Court**") in the Chapter 11 Cases of Purdue Pharma L.P. and its affiliated Debtors[2] (each a "**Debtor**" and collectively, the "**Debtors**"). Pursuant to the Confirmation Order, each Tribe and Tribal Organization listed on Schedule C of the LLC Distribution Procedures (as defined herein) is deemed to accept membership in, and is hereby admitted to, the Company as a "member" of the Company within the meaning of the Delaware Act (each Tribe hereafter an "**Interest Holder**" and all Tribes collectively, the "**Interest Holders**"). Terms used in this Agreement and not otherwise defined in the Plan shall have the meanings set forth in <u>Article I</u> of this Agreement.

## RECITALS

**WHEREAS**, the Debtors have reorganized under the provisions of Chapter 11 of the Bankruptcy Code.

**WHEREAS**, the Plan provides, inter alia, for the establishment of the "**Tribe Trust**" consisting of one or more trusts, limited liability companies, or other Persons to be established in accordance with Section 5.7 of the Plan.

**WHEREAS**, the Confirmation Order has been entered by the Bankruptcy Court and is in full force and effect.

**WHEREAS**, pursuant to the Plan and the Confirmation Order, this Company shall be established as a limited liability company to (i) receive and hold the TopCo Tribe Interest contributed by the Interest Holders in accordance with the Restructuring Steps Memorandum and

---

[1] All capitalized terms not otherwise defined herein shall have their respective meanings as set forth in the Plan, and such definitions are incorporated herein by reference.

[2] The Debtors in these cases are as follows: Purdue Pharma L.P.; Purdue Pharma Inc.; Purdue Transdermal Technologies L.P.; Purdue Pharma Manufacturing L.P.; Purdue Pharmaceuticals L.P.; Imbrium Therapeutics L.P.; Adlon Therapeutics L.P.; Greenfield BioVentures L.P.; Seven Seas Hill Corp; Ophir Green Corp.; Purdue Pharma of Puerto Rico; Avrio Health L.P.; Purdue Pharmaceutical Products L.P.; Purdue Neuroscience Company; Nayatt Cove Lifescience Inc.; Button Land L.P.; Rhodes Associates L.P.; Paul Land Inc.; Quidnick Land L.P.; Rhodes Pharmaceuticals L.P.; Rhodes Technologies; UDF L.P.; SVC Pharma L.P.; and SVC Pharma Inc.

collect any Public Creditor Trust Distributions received by the Company in accordance with the Public Entity Settlements and (ii) make Abatement Distributions to Interest Holders for Authorized Abatement Purposes, in each case in accordance with the LLC Distribution Procedures set forth in Exhibit 4 to this Agreement and (iii) carry out such other matters as are set forth in this Agreement.

**WHEREAS**, This Agreement sets forth (a) certain rights and obligations relating to the respective ownership interests of the Interest Holders in the Company and (b) the terms governing the internal affairs of the Company.

**NOW, THEREFORE**, in consideration of the mutual covenants contained herein and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto, intending to be legally bound, hereby agree as follows:

## ARTICLE I

## <u>CERTAIN DEFINITIONS</u>

### 1.1    <u>Definitions</u>

Capitalized terms used but not otherwise defined herein shall have the following meanings, provided that any terms not defined herein or in this <u>Article I</u> shall have the meanings set forth in the Plan:

"**Affiliate**" of any particular Person means (a) any other Person controlling, controlled by, or under common control with such particular Person, where "control" means the possession, directly or indirectly, of the power to direct the management and policies of a Person whether through the ownership of voting securities, by contract or otherwise, (b) if such Person is a partnership, any partner thereof, and (c) if such Person is a trust, the trustee or beneficiary of such trust.

"**Agreement**" has the meaning set forth in the introductory paragraph hereto.

"**Annual Report**" has the meaning set forth in <u>Section 9.1</u>.

"**Approved Tribal Opioid Abatement Uses**" has the meaning set forth in the LLC Distribution Procedures.

"**Bankruptcy Court**" has the meaning set forth in the introductory paragraph hereto.

"**Board**" means the Board of Managers established pursuant to <u>Section 3.2</u>.

"**Capital Account**" means the capital account maintained for an Interest Holder pursuant to <u>Section 4.2</u>.

"**Certificate**" means the Company's Certificate of Formation as filed with the Secretary of State of the State of Delaware and attached hereto as **Exhibit 2**.

- 2 -

"**Chairman**" has the meaning set forth in Section 3.3(h).

"**Chapter 11 Cases**" has the meaning set forth in the recitals hereto.

"**Code**" means the United States Internal Revenue Code of 1986, as amended. Such term shall, at the Board's discretion, be deemed to include any future amendments to the Code and any corresponding provisions of succeeding Code provisions (whether or not such amendments and corresponding provisions are mandatory or discretionary; provided, however, that if they are discretionary, the term "Code" shall not include them if including them would have a material adverse effect on any Interest Holder).

"**Company**" has the meaning set forth in the introductory paragraph hereto.

"**Company Accountants**" has the meaning set forth in Section 9.4(a).

"**Company Assets**" are those assets set forth on **Exhibit 1** hereto.

"**Covered Person**" has the meaning set forth in Section 8.1(a).

"**Damages**" has the meaning set forth in Section 8.3(a).

"**Delaware Act**" means the Delaware Limited Liability Company Act, 6 Del. L. § 18-101, *et seq.*, as it may be amended from time to time, and any successor to the Delaware Act.

"**Disbursement Agent**" has the meaning set forth in Section 5.4(d).

"**LLC Distribution Procedures**" means the procedures to be implemented by the Company for the distribution of Abatement Distributions by the Company to Authorized Recipients and the Authorized Abatement Purposes for Abatement Distributions from the Company, the terms of which shall be consistent with the Plan and are attached as Exhibit 4 to this Agreement.

"**Electronic Transmission**" means any form of communication not directly involving the physical transmission of paper that creates a record that may be retained, retrieved and reviewed by a recipient thereof and that may be directly reproduced in paper form by such a recipient through an automated process.

"**Fiscal Year**" means the Company's annual accounting period established pursuant to Section 9.2.

"**Governing Documents**" has the meaning set forth in Section 2.4.

"**Interest Holder**" has the meaning set forth in the introductory paragraph hereof.

"**Interest Holder Abatement Use Report**" has the meaning set forth in Section 9.6(a).

"**LLC Interest**" means all of the rights and interests of whatsoever nature of the Interest Holders in the Company (including their respective "limited liability company interest" as defined

- 3 -

in the Delaware Act), the right to receive distributions of funds and to receive allocations of income, gain, loss, deduction and credit.

"**Manager**" means a current manager on the Board, who, for purposes of the Delaware Act, will be deemed a "manager" (as defined in the Delaware Act) but will be subject to the rights, obligations, limitations and duties set forth in this Agreement.

"**Officer**" has the meaning set forth in Section 3.1(b).

"**Partnership Representative**" has the meaning set forth in Section 10.3.

"**Percentage Interest**" means, with respect to any Interest Holder as of any particular time, the percentage interest assigned to that Interest Holder on Schedule C of the LLC Distribution Procedures as its interest in Abatement Distributions and any other distribution made by the Company and the Profits and Losses of the Company. The sum of all Percentage Interests shall at all times equal 100%.

"**Profits**" or "**Losses**" for each fiscal year of the Company shall mean the net taxable income or net taxable loss of the Company, as determined in accordance with Section 703(a) of the Code (for this purpose, all items of income, gain, loss or deduction required to be stated separately pursuant to Section 703(a)(1) of the Code shall be included in taxable income or loss), modified to take into account the rules for properly maintaining capital accounts as set forth in Section 1.704-1(b)(2)(iv) of the Treasury Regulations.

"**TAFT**" means the Tribal Abatement Fund Trust.

"**TAFT Agreement**" means the TAFT Trust Agreement, dated as of the date hereof, as amended from time to time.

"**Tax**" or "**Taxes**" means any federal, state, local or foreign income, gross receipts, franchise, estimated, alternative minimum, add-on minimum, sales, use, transfer, registration, value added, excise, natural resources, severance, stamp, occupation, premium, windfall profit, environmental, customs, duties, real property, personal property, capital stock, social security, unemployment, disability, payroll, license, employee, or other withholding or other tax of any kind whatsoever, including any interest, penalties or additions to tax or additional amounts in respect of the foregoing.

"**Treasury Regulations**" means the income tax regulations promulgated under the Code.

"**Tribal Abatement Strategies**" has the meaning set forth in the LLC Distribution Procedures.

"**Tribal Organization**" means Tribal Organization as defined in 25 U.S.C. § 5304(l).

"**Tribal Opioid Abatement Portal**" has the meaning set forth in Section 9.7.

"**Tribal Opioid Abatement Report**" has the meaning set forth in Section 9.5.

- 4 -

"**Tribal Opioid Abatement Website**" has the meaning set forth in <u>Section 9.7</u>.

**1.2** **Interpretation.**

(a) The Exhibits and Schedules attached to this Agreement are incorporated herein by reference and will be considered part of this Agreement, and any references herein to a particular Section, Article, Exhibit or Schedule means a Section or Article of, or Schedule or Exhibit to, this Agreement unless otherwise expressly stated herein.

(b) All definitions set forth herein are deemed applicable whether the words defined are used herein in the singular or in the plural and correlative forms of defined terms have corresponding meanings and any pronoun or pronouns set forth herein will be deemed to cover all genders.

(c) A defined term has its defined meaning throughout this Agreement and each Schedule regardless of whether it appears before or after the place where it is defined.

(d) The word "including" and its derivatives means "including without limitation" and is a term of illustration and not of limitation.

(e) The word "or" shall be disjunctive but not exclusive.

(f) All references to prices, values or monetary amounts refer to United States dollars.

## ARTICLE II

## ORGANIZATIONAL MATTERS

**2.1** **Formation.** The Company has been organized as a Delaware limited liability company by filing the Certificate with the Secretary of State of the State of Delaware under and pursuant to the Delaware Act and shall be continued in accordance with this Agreement.

**2.2** **The Certificate.** The Certificate was filed with the Secretary of State of the State of Delaware on [●], 2021. The Managers hereby agree to execute, file and record all such other certificates and documents, including amendments to the Certificate and to do such other acts as may be appropriate to comply with all requirements for the formation, continuation and operation of a limited liability company, the ownership of property and the conduct of business under the laws of the State of Delaware and any other jurisdiction in which the Company may own property or conduct business.

**2.3** **Name.** The name of the Company shall be "Tribal Opioid Abatement Fund, LLC". The Company's business may be conducted under its name and/or any other name or names deemed advisable by the Board.

**2.4** **Purpose.** The purposes of the Company shall be to:

- 5 -

(a)   receive and hold the TopCo Tribe Interest and collect any distributions received by the Company in accordance with the Public Entity Settlements;

(b)   make Abatement Distributions to Interest Holders for Approved Tribal Opioid Abatement Uses, in each case in accordance with the LLC Distribution Procedures;

(c)   use the Company Assets to:

(i)      make Abatement Distributions to Tribes in accordance with this Agreement and the LLC Distribution Procedures;

(ii)     hold and maintain reserves to pay the fees and expenses incurred with administering the Company (including the LLC Distribution Procedures) and managing the Assets (together, the "**Company Operating Expenses**") of the Company (such reserves, the "**Company Operating Reserve**"), which shall be funded with Cash and cash equivalents held by the Company in accordance with the Governing Documents, as defined herein and (b) held by the Company in a segregated account and administered by the Board;

(iii)    pay the Company Operating Expenses from the Company Operating Reserve; and

(iv)    replenish periodically, until the dissolution of the Company, the Company Operating Reserve from Cash held or received by the Company to the extent deemed necessary by the Managers to satisfy and pay estimated future Company Operating Expenses in accordance with the Governing Documents.

(d)   to engage in any lawful act or activity, including without limitation, to enter into leasing, financing or other agreements with third parties, that is consistent with, necessary or incidental to the Plan, the Confirmation Order and this Agreement (the "**Governing Documents**"); and

(e)   to engage in any lawful activity necessary or incidental to the foregoing in accordance with the Plan and the Confirmation Order. In connection therewith, the Company shall hold, manage, protect and monetize the Company Assets (as set forth on **Exhibit 1** hereto) in accordance with the terms of the Governing Documents, for the benefit of the Interest Holders.

**2.5     Principal Office; Registered Office.** The principal office of the Company shall be located at such place as the Board may from time to time designate, and all business and activities of the Company shall be deemed to have occurred at its principal office. The Company may maintain offices at such other place or places as the Board deems advisable. The registered office of the Company required by the Delaware Act to be maintained in the State of Delaware shall be the office of the initial registered agent named in the Certificate or such other office (which need not be a place of business of the Company) as the Board may designate from time to time in the manner provided by law. The registered agent of the Company in the State of Delaware shall be

the initial registered agent named in the Certificate or such other Person or Persons as the Board may designate from time to time in the manner provided by law.

      **2.6**    **Term.** The term of the Company commenced upon the Effective Date; provided that the Certificate was filed in accordance with the Delaware Act. The Company shall continue in existence until termination and dissolution thereof in accordance with the provisions of Article XI.

      **2.7**    **No State-Law Partnership.** The Interest Holders intend that the Company not be a partnership (including, but not limited to, a limited partnership) or joint venture, and that no Interest Holder be a partner or joint venturer of any other Interest Holder by virtue of this Agreement (except for tax purposes as set forth in the next succeeding sentence of this Section 2.7), and neither this Agreement nor any other document entered into by the Company or any Interest Holder relating to the subject matter hereof shall be construed to suggest otherwise. The Interest Holders intend that the Company shall be treated as a partnership for federal and, if applicable, state or local income tax purposes, and that each Interest Holder and the Company shall file any and all Tax returns as may be required by law and shall otherwise take all tax and financial reporting positions in a manner consistent with such treatment. Without the consent of the Board, the Company shall not make an election to be treated as a corporation for federal income tax purposes pursuant to Section 301.7701-3 of the Treasury Regulations (or any successor regulation or provision) and, if applicable, state and local income tax purposes.

## ARTICLE III

## BOARD OF MANAGERS; REPORTING

### 3.1    Management by the Board of Managers.

      (a)   Authority of Board of Managers. The business and affairs of the Company shall be managed by or under the direction of the Board, subject to the limitations set forth in this Agreement and as otherwise required by the Delaware Act, in which is vested, the full, exclusive and complete power, authority and discretion to manage and control the administration, affairs and operations of the Company. Each Manager shall be a "manager" of the Company as defined in Section 18-101(10) of the Delaware Act. In the event of any ambiguity or conflict between the terms of this Agreement or the LLC Distribution Procedures set forth in Exhibit 4 to this Agreement, the LLC Distribution Procedures shall control. In the event of a conflict between the terms or provisions of the Plan, this Agreement or the Confirmation Order, each document shall control in the following order: (1) the Confirmation Order; (2) the Plan; and (3) this Agreement. For the avoidance of doubt, this Agreement shall be construed and implemented in accordance with the Plan, regardless of whether any provision herein explicitly references the Plan.

      (b)   Officers. Subject to direction of the Managers, the day-to-day administration of the business of the Company may be carried out by employees and agents who may be designated as officers ("**Officers**") by the Managers. The Officers shall have such titles and powers and perform such duties as shall be determined from time to time by the Managers. The Officers shall hold office until their successors are appointed by the Managers, unless the Managers specify otherwise.

Any Officer appointed by the Managers may be removed by the Managers at any time and any vacancy occurring in any office of the Company may be filled by the Managers, in their discretion.

### 3.2    Composition and Actions of the Board of Managers.

(a)    Number. The number of Managers on the Board shall be established at three (3). The initial Managers shall be those persons named on the signature page hereof. The Managers shall, at all times, be the same persons serving as the trustees of the TAFT.

(b)    Term. The Managers shall have the same term as the trustees of the TAFT.

(c)    Resignation or Removal. The resignation or removal of any Manager shall be consistent with the resignation or removal of any trustee of the TAFT, which shall be in accordance with the provisions of the TAFT Agreement.

(d)    Manager Compensation; Reimbursement of Expenses. The Managers shall receive reasonable compensation from the Company for their services as Managers.[3] The Company shall also reimburse all reasonable out-of-pocket costs and expenses incurred by each of the Managers incurred in the course of carrying out their duties as Managers in accordance with reasonable policies and procedures as may be adopted from time to time, including in connection with attending meetings of the Board. The amounts paid to the Managers for compensation and reimbursed to Managers for expenses shall be disclosed in the Annual Report.

(e)    Rights of Inspection. Every Manager shall have the absolute right at any reasonable time to inspect and copy all books, records, reports and documents of every kind of the Company.

### 3.3    Board Meetings and Actions by Written Consent.

(a)    Regular Meetings. The Board shall hold regular meetings not less than quarterly, which may be held without notice at such times and at such places as may be determined from time to time by the Board.

(b)    Special Meetings. Special meetings of the Board may be called by any Manager by giving written notice to each other Managers not less than one (1) business day prior to the date of the meeting. Any such notice shall include the time, place and purpose of the meeting, given to each Manager by overnight courier, personal delivery, facsimile, electronic mail or other similar means of communication. Notice shall be addressed or delivered to each Manager at the Manager's address as shown upon the records of the Company, or as may have been given to the Board by the Manager for purposes of notice. If a Manager's address is not shown on such records or is not readily ascertainable, notice to the Manager may be given care of the principal office of the Company. Notice by overnight courier shall be deemed to have been given one (1) business day after the time that written notice is provided to such overnight courier. Any other written notice

---

[3] Compensation of Managers TBD.

shall be deemed to have been given at the time it is personally delivered to the recipient or actually transmitted by the person giving the notice by electronic means to the recipient.

(c) <u>Action and Quorum</u>. In all matters pertaining to the affairs of the Company, the Board shall act by a vote of a majority of the number of Managers then in office, which such majority shall constitute a quorum of the Board for the transaction of business, except to adjourn as provided in <u>Section 3.3(f)</u>.

(d) <u>Participation in Meetings by Telephone Conference</u>. Managers may participate in a meeting of the Board by conference telephone or similar communications equipment (which shall include virtual meetings via video conferencing software), as long as all Managers participating in such meeting can hear one another. Participation by a Manager in a meeting pursuant to this <u>Section 3.3(d)</u> shall constitute presence in person at such meeting.

(e) <u>Waiver of Notice</u>. Notice of a meeting need not be given to any Manager who signs a waiver of notice, whether before or after the meeting. All such waivers shall be filed with Company records or made a part of the minutes of the meeting. Attendance at a meeting by a Manager shall constitute a waiver of notice of such meeting except when the Manager attends a meeting for the express purpose of objecting, at the beginning of the meeting, to the transaction of any business on the ground that the meeting was not lawfully called or convened. Neither the business to be transacted at, nor the purpose of, any Manager meeting need be specified in any waiver of notice.

(f) <u>Adjournment</u>. A majority of the Managers present, whether or not a quorum exists, may adjourn any Board meeting to another time and place.

(g) <u>Action by Unanimous Written Consent</u>. Any action required or permitted to be taken at any meeting of the Board may be taken without a meeting, if all of the Managers then in office consent thereto in writing or by Electronic Transmission, which may be executed in one or more counterparts, and the writing or Electronic Transmission are filed with the meeting minutes of the Board.

(h) <u>Chairman</u>. At their first meeting, the initial Managers shall designate one of their number to serve as the Chairman of the Board (the "**Chairman**"), with such administrative and other duties as the Managers may determine. The Managers may change the designation of the individual to serve as Chairman from time to time as circumstances warrant. The Chairman or, in the Chairman's absence, another Manager selected by the Managers shall preside at meetings of the Managers. If no person is otherwise designated, the Chairman, or the Manager presiding over such meeting, shall be responsible for taking meeting minutes at each meeting of the Managers.

## ARTICLE IV

## LLC INTERESTS; CAPITAL ACCOUNTS

**4.1**   **Interest Holders.**

(a)   Admission of Interest Holders. The Interest Holders are those Tribes and Tribal Organizations identified on Schedule C of the LLC Distribution Procedures holding a Tribe Channeled Claim.

(b)   Interest Holder Information. The LLC Interests held by each Interest Holder shall represent (i) all of such Interest Holder's rights, title and interest in the Company and (ii) all of such Interest Holder's rights under this Agreement, including their rights to receive Abatement Distributions in accordance with their Percentage Interests. Each Interest Holder's name, [address, LLC Interests held by such Interest Holder] and Percentage Interest is set forth on Schedule C of the LLC Distribution Procedures. Each Interest Holder's interest in the Company, including such Interest Holder's interest in Profits, Losses and Abatement Distributions of the Company, shall be based upon its LLC Interests and Percentage Interests. An Interest Holder's LLC Interest and Percentage Interest shall determine such Interest Holder's allocation of Profits and Losses and Abatement Distributions of cash as set forth in Article V. All LLC Interests shall be uncertificated.

(c)   Limited Voting Rights. The Interest Holders shall have such voting rights with respect to the management of the Company as may be required by non-waivable provisions of applicable law, in which case any such action shall be approved by the (i) the majority of the Percentage Interests plus (ii) the majority of Interest Holders voting upon such action.

**4.2**   **Capital Accounts**. A separate capital account (each, a "**Capital Account**") shall be maintained for each Interest Holder in accordance with the rules of Section 704(b) of the Code and the Treasury Regulations thereunder, and all provisions of this Agreement shall be interpreted and applied in a manner consistent therewith. The provisions of this Agreement may be modified to cause the allocations of Profits, Losses, income, gain and credit pursuant to Article V to have substantial economic effect under the Treasury Regulations.

**4.3**   **Capital Contributions**. Consistent with Sections 4.5(a) and 5.5(a) of the Plan, on the Effective Date, each Interest Holder shall be credited with the capital contribution of a percentage of equity interests in TopCo as set forth on **Exhibit 3** hereto. No Interest Holder shall be required to make any additional capital contribution to the Company.

**4.4**   **Negative Capital Accounts**. No Interest Holder shall be required to pay to any other Interest Holder, the Company or any other Person any deficit or negative balance which may exist from time to time in such Interest Holder's Capital Account (including upon and after dissolution of the Company).

**4.5**   **No Withdrawal**. No Interest Holder shall be entitled to withdraw any part of its Capital Account or to receive any Abatement Distribution from the Company, except as expressly provided herein.

## ARTICLE V

## ALLOCATIONS; DISTRIBUTIONS

**5.1** **Allocations of Profits and Losses**. Profits and Losses for each Fiscal Year or other period shall be allocated among the Interest Holders for such Fiscal Year or other period, in accordance with the Interest Holders' Percentage Interests.

**5.2** **Tax Elections**. Except as otherwise provided in this Agreement, all elections required or permitted to be made by the Company under any applicable tax law shall be made by the Board.

**5.3** **Opioid Abatement Uses**. The Interest Holders hereby acknowledge and agree about the need and value in developing a comprehensive abatement strategy to address the opioid crisis and, to that end, shall apply all Abatement Distributions received from the Company for the Approved Tribal Opioid Abatement Uses.

**5.4** **Distributions**.

(a)    The Managers shall make Abatement Distributions to the Interest Holders only as, and to the extent set forth in this Section 5.4 and the LLC Distribution Procedures. Abatement Distributions shall be used by the Interest Holders as described in Section 2 of the LLC Distribution Procedures.

(b)    The Company shall endeavor to notify the Interest Holders of the intended Abatement Distribution date through the Tribal Opioid Abatement Portal (or by any other means determined appropriate by the Managers) not less than ten (10) business days prior to such date; provided, however, that the Managers may shorten such notice period in their discretion.

(c)    Abatement Distributions shall be made to the Interest Holders in accordance with their Percentage Interests set forth in Schedule C of the LLC Distribution Procedures.

(d)    Abatement Distributions may be made by the Managers or by a Disbursement Agent retained by the Company to make Abatement Distributions on its behalf (the "**Disbursement Agent**"). Abatement Distributions shall be made on the dates approved for distribution by the Managers in accordance with the LLC Distribution Procedures.

(e)    The Board may cause Abatement Distributions to be withheld with respect to any Interest Holder that has failed to deliver timely a completed Interest Holder Abatement Use Report (as defined in Section 9.6(a) below) by the applicable due date. The Board shall cause withheld Abatement Distributions to be made no later than fifteen (15) days after receipt of any delinquent Interest Holder Abatement Use Report.

(f)    All Abatement Distributions under this Agreement shall be made (i) in accordance with the electronic transfer information or (ii) by check at the address provided by the Interest Holders in accordance with the LLC Distribution Procedures. Changes to such electronic transfer information or address, as applicable, must be provided to the Company or the Disbursement Agent in writing at least five (5) business days prior to any upcoming Abatement Distribution date;

- 11 -

provided, however, that the Managers and Disbursement Agent shall have the authority, in their discretion, to seek further direction from the Interest Holders regarding the transfer information of Abatement Distributions under this Agreement.

(g)    In the event that any Abatement Distribution is undeliverable, no further Abatement Distribution shall be made unless and until the Managers have been notified of the then current wire instructions or address, as applicable, as directed by such Interest Holder, at which time such Abatement Distribution shall be made without interest. The Managers shall take reasonable efforts to obtain a current address or wire instructions, as applicable, for any Interest Holders with respect to any undeliverable Abatement Distribution but shall have no obligation to make further inquiry with respect to designated recipients of such Interest Holders.

(h)    No Company Asset or any unclaimed property shall escheat to any federal, state or local government or any other entity.

## ARTICLE VI

## TRANSFER OF LLC INTERESTS

**6.1    No Transfers by Interest Holders**. No Interest Holder shall transfer any of its LLC Interests. Any purported transfer of any LLC Interests shall be null and void, no such transfer shall be recorded on the Company's books and the purported transferee in any such transfer shall not be treated (and the purported transferor shall continue to be treated) as the owner of such LLC Interests for all purposes of this Agreement. Nothing set forth in this Agreement shall be deemed to preclude Interest Holders from aggregating their Abatement Distributions or otherwise directing their Abatement Distributions for common Approved Tribal Opioid Abatement Uses and/or common Tribal Abatement Strategies.

## ARTICLE VII

## GENERAL RIGHTS AND OBLIGATIONS OF INTEREST HOLDERS

**7.1    Limitation of Liability**.

(a)    Except as otherwise required by applicable law, the debts, obligations, commitments and liabilities of the Company, whether arising in contract, tort or otherwise, shall be solely the debts, obligations, commitments and liabilities of the Company, and no Interest Holder shall be obligated personally for any such debt, obligation, commitment or liability of the Company solely by reason of being a member of the Company. Notwithstanding anything contained herein to the contrary, the failure of the Company to observe any formalities or requirements relating to the exercise of its powers or management of its business and affairs under this Agreement or the Delaware Act shall not be grounds for imposing personal liability on the Interest Holders for debts, obligations, commitments or liabilities of the Company. For the avoidance of doubt, the Interest Holders shall have no personal liability hereunder to the fullest extent permitted by law.

- 12 -

(b)  It is the intent of the Interest Holders that no Abatement Distribution to any Interest Holder pursuant to <u>Article V</u> hereof shall be deemed a return of money paid or distributed in violation of the Delaware Act. The payment of any such Abatement Distribution to an Interest Holder shall be deemed to be a compromise within the meaning of the Delaware Act, and the Interest Holder receiving any such Abatement Distribution shall not be required to return it, in whole or in part, to any Person. However, if any court of competent jurisdiction holds that, notwithstanding the provisions of this Agreement, any Interest Holder is obligated to return some or all of such Abatement Distribution to make a payment to any Person, such obligation shall be the obligation of such Interest Holder and not of any other Interest Holder.

**7.2**    <u>**Lack of Authority**</u>. Except as expressly set forth herein, no Interest Holder in its capacity as such has the authority or power to act for or on behalf of the Company in any manner, to do any act that would be (or could be construed as) binding on the Company or to make any expenditures on behalf of the Company, and the Interest Holders hereby consent to the exercise by the Board of the powers conferred on it by law and this Agreement.

**7.3**    <u>**No Right of Partition**</u>. No Interest Holder shall have the right to seek or obtain partition by court decree or operation of law of any Company property, or the right to own or use particular or individual assets of the Company.

<div align="center">

**ARTICLE VIII**

<u>**EXCULPATION AND INDEMNIFICATION**</u>

</div>

**8.1**    <u>**Standard of Care; Exculpation**</u>.

(a)  As used herein, the term "**Covered Person**" shall mean each Manager and Officer and each of their respective members, officers, employees, agents, consultants, lawyers, advisors or professionals.

(b)  [To the maximum extent permitted by applicable law, a Covered Person shall not have or incur any liability for actions taken or omitted in their capacities as a Covered Person, or on behalf of the Company, except those acts found by Final Order to be arising out of their willful misconduct, bad faith, gross negligence or fraud, and shall be entitled to indemnification and reimbursement for reasonable fees and expenses in defending any and all of their actions or inactions in their capacity as Covered Persons, or on behalf of the Company, except for any actions or inactions found by Final Order to be arising out of their willful misconduct, bad faith, gross negligence or fraud.]

**8.2**    <u>**Liabilities and Duties of Covered Persons**</u>. This Agreement is not intended to, and does not, create or impose any fiduciary duty on any Covered Person. Furthermore, each of the Interest Holders and the Company hereby waives any and all fiduciary duties that, absent such waiver, may be implied by applicable law, and in doing so, acknowledges and agrees that the duties and obligation of each Covered Person to each other and to the Company are only as expressly set forth in this Agreement. The provisions of this Agreement, to the extent that they restrict the duties and liabilities of a Covered Person otherwise existing at law or in equity, are agreed by the Interest Holders to replace such other duties and liabilities of such Covered Person.

**8.3**    **Indemnification**.

(a)    [To the maximum extent permitted by applicable law, the Covered Persons shall be entitled to indemnification and reimbursement for reasonable fees and expenses in defending any and all of their actions or inactions in their capacity as Persons, or on behalf of the Company, except for any actions or inactions found by Final Order to be arising out of their willful misconduct, bad faith, gross negligence or fraud. Any valid indemnification claim of any of the Covered Persons shall be satisfied from the Company.

(b)    The Company shall indemnify and reimburse any Covered Person for reasonable fees and expenses incurred in investigating or defending against such losses, claims, damages, judgments, fines or liabilities, and any amounts expended in settlement of any claims (collectively, "**Damages**") that may accrue to or be incurred by any Covered Person, for any actions taken or omitted to be taken by such Covered Person in his, her or its capacity as a Covered Person, except to the extent that it is determined ultimately by a Final Order that such Damages arose primarily from the willful misconduct, bad faith, gross negligence or fraud by or of such Covered Person.

(c)    The Company shall promptly reimburse (and/or advance to the extent reasonably required) each Covered Person for reasonable legal or other expenses (as incurred) of such Covered Person in connection with investigating, preparing to defend or defending any claim, lawsuit or other proceeding relating to any Damages for which such Covered Person may be indemnified pursuant to this Section 8.3; provided, that if it is finally judicially determined that such Covered Person is not entitled to the indemnification provided by this Section 8.3, then such Covered Person shall promptly reimburse the Company for any reimbursed or advanced expenses.

(d)    The indemnification provided by this Section 8.3 shall not be deemed exclusive of any other rights to indemnification to which those seeking indemnification may be entitled under any agreement or otherwise. The provisions of this Section 8.3 shall continue to afford protection to each Covered Person regardless of whether such Covered Person remains in the position or capacity pursuant to which such Covered Person became entitled to indemnification under this Section 8.3 and shall inure to the benefit of the executors, administrators, legatees and distributees of such Covered Person.

(e)    The Company shall purchase and maintain, at its own expense (other than for the upfront premium payment which shall be paid by the Debtors), directors and officers ("**D&O**") insurance to cover Damages covered by the foregoing indemnification provisions and to otherwise cover Damages for any breach or alleged breach by any Covered Person of such Covered Person's duties.

(f)    Notwithstanding anything contained herein to the contrary, any valid indemnification claim of any of the Covered Persons by the Company relating to the matters covered in this Section 8.3 shall be provided out of and to the extent of Company assets only, and no Interest Holder (unless such Interest Holder otherwise agrees in writing) shall have personal liability on account thereof or shall be required to make additional capital contributions to help satisfy such indemnity by the Company.

(g)   If this <u>Section 8.3</u> or any portion hereof shall be invalidated on any ground by any Final Order, then the Company shall nevertheless indemnify and hold harmless each Covered Person pursuant to this <u>Section 8.3</u> to the fullest extent permitted by any applicable portion of this <u>Section 8.3</u> that shall not have been invalidated.

(h)   The provisions of this <u>Section 8.3</u> shall be a contract between the Company, on the one hand, and each Covered Person who served in such capacity at any time while this <u>Section 8.3</u> is in effect, on the other hand, pursuant to which the Company and each such Covered Person intend to be legally bound. No amendment, modification or repeal of this <u>Section 8.3</u> that adversely affects the rights of a Covered Person to indemnification for Damages incurred or relating to a state of facts existing prior to such amendment, modification or repeal shall apply in such a way as to eliminate or reduce such Covered Person's entitlement to indemnification for such Damages without the Covered Person's prior written consent.

(i)   The provisions of this <u>Article VIII</u> shall survive the dissolution, liquidation, winding up and termination of the Company.]

## ARTICLE IX

## BOOKS, RECORDS, ACCOUNTING AND REPORTS

**9.1**   <u>**Records and Accounting**</u>. The Company shall keep, or cause to be kept, appropriate books and records with respect to the Company's business, including all books and records necessary to provide any information, lists and copies of documents required pursuant to applicable laws. The detail of these books and records and the duration the Company shall keep such books and records shall be such as to allow the Managers to make a full and accurate accounting of all Company Assets, as well as to comply with applicable provisions of law and standard accounting practices necessary or appropriate to produce an annual report containing special-purpose financial statements of the Company, including, without limitation, the assets and liabilities of the Company as of the end of such fiscal year and the additions, deductions and cash flows for such fiscal year (the "**Annual Report**"); <u>provided, however</u>, that the Managers shall maintain such books and records until the wind-up of the Company's affairs and satisfaction of all of the Company's liabilities. All matters concerning (i) the determination of the relative amount of allocations and Abatement Distributions among the Interest Holders pursuant to and in accordance with <u>Article V</u> and (ii) accounting procedures and determinations, and other determinations not specifically and expressly provided for by the terms of this Agreement or in the Plan or Confirmation Order, shall be determined by the Board.

**9.2**   <u>**Fiscal Year**</u>. The fiscal year (the "**Fiscal Year**") of the Company shall constitute the twelve (12)-month period ending on December 31 of each calendar year, or such other annual accounting period as may be established by the Board.

**9.3**   <u>**Reports**</u>. The Company shall use its reasonable efforts to deliver or cause to be delivered, within ninety (90) days after the end of each Fiscal Year or as soon as reasonably practicable thereafter, to each Person who was an Interest Holder at any time during such Fiscal Year a Schedule K-1 and any information with respect to the Company reasonably required for the preparation of such Person's United States federal and state income Tax returns. Within

- 15 -

sixty (60) days after the end of each Fiscal Year, the Company shall cause each Interest Holder to be furnished with a copy of the balance sheet of the Company as of the last day of the applicable period, a statement of income or loss of the Company for such period, and a statement of the Company's cash flow for such period. Within forty-five (45) days after the end of each fiscal quarter, the Company shall cause each Interest Holder to be furnished with a copy of a quarterly update in form deemed reasonable by the Board.

### 9.4 Financial Reporting.

(a)    The Managers shall select and engage a firm of independent certified public accountants (the "**Company Accountants**") to audit the Annual Report. Within one hundred and twenty (120) days following the end of each calendar year, the Managers shall file with the Bankruptcy Court the Annual Report audited by the Company Accountants and accompanied by an opinion of such firm as to the fairness in all material respects of the special-purpose financial statements. The Managers shall publish a copy of such Annual Report on the Tribal Opioid Abatement Website when such report is filed with the Bankruptcy Court.

(b)    All Materials with the Bankruptcy Court by this Section 9.4 need not be served on any parties in the Chapter 11 Cases but shall be available for inspection by the public in accordance with procedures established by the Bankruptcy Court.

### 9.5 Tribal Opioid Abatement Reporting.

(a)    Within one hundred and twenty (120) days following the end of each calendar year the Board shall cause to be prepared and filed with the Bankruptcy Court an annual report on the Approved Tribal Opioid Abatement Uses with respect to such period, together with such additional information as the Board determines necessary or appropriate in its discretion (each, a "**Tribal Opioid Abatement Report**"). The Board shall (i) post a copy of the Tribal Opioid Abatement Report on the Tribal Opioid Abatement Website and (ii) delivery such Tribal Opioid Abatement Report to the Master Disbursement Trust, in each case when such report is filed with the Bankruptcy Court.[4]

(b)    For the avoidance of doubt, the Board shall not be required to include in any Tribal Opioid Abatement Report any abatement matters of any entity created under the Chapter 11 Plan other than the Company.

### 9.6 Interest Holder Reporting.[5]

(a)    Reporting of Approved Tribal Opioid Abatement Uses by Interest Holders shall be required to the extent set forth in the Plan and the Confirmation Order and consistent with the LLC Distribution Procedures. The Board shall establish the form, content and due dates of periodic

---

[4] For economic efficiency, the Tribal Opioid Abatement Website and NOAT Website (as defined in the NOAT Trust Agreement) (and related Portals) may be maintained and administered on a combined basis.

[5] The Tribal Opioid Abatement Report may be coordinated or combined with the TAFT Tribal Opioid Abatement Report (as defined in the TAFT Agreement).

reports with respect to Approved Tribal Opioid Abatement Uses to be submitted by the Interest Holders (each, an "**Interest Holder Abatement Use Report**") to the Board through the Tribal Opioid Abatement Portal (or delivered by other means approved by the Board). Each Interest Holder Abatement Use Report shall contain the information necessary to:

       (i)    enable the Company to satisfy the audited Annual Report requirements described in Section 9.4 above; and

       (ii)    enable the Company to satisfy the Tribal Opioid Abatement Report requirements described in Section 9.5(a) above.

    **9.7**    **Portal and Website**. The Company shall contract for the establishment and continuing maintenance of (1) a secure method of internet-based communications for the Company and the Interest Holders (the "**Tribal Opioid Abatement Portal**") and (2) a public-facing website to publish all information required or appropriate to be published (the "**Tribal Opioid Abatement Website**").

## ARTICLE X

## TAXES

    **10.1**    **Tax Returns**. The Company shall prepare and file all necessary federal and state income Tax returns and any other required Tax returns, including making the elections described in Section 10.2.

    **10.2**    **Partnership Treatment; Tax Elections**. It is intended that the Company shall be treated as a partnership for federal and state income tax purposes, and the Board is permitted take any actions reasonably necessary to preserve such treatment. Neither the Company nor the Interest Holders shall take any action or make any election which is inconsistent with the Company's treatment as a partnership. The Company shall make any election the Board may deem appropriate and in the best interests of the Interest Holders.

    **10.3**    **Partnership Representative**. The Chairman shall be the Company's partnership representative, as described in Section 6223 of the Code ("**Partnership Representative**"). The Partnership Representative shall have all powers and responsibilities provided for a "partnership representative" in Section 6221 of the Code *et seq*. The Company shall pay and be responsible for all reasonable third-party costs and expenses incurred by the Partnership Representative in performing its duties as such.

## ARTICLE XI

## DISSOLUTION AND LIQUIDATION

    **11.1**    **Dissolution**. The Company shall not be dissolved by the admission of Interest Holders or by the expulsion, bankruptcy or dissolution of an Interest Holder. The Company shall automatically dissolve and its affairs shall be wound up as soon as practicable but no later than ninety (90) days after the date on which the Bankruptcy Court approves the dissolution of the

Company due to the completion of its duties and the satisfaction of its purposes wherein (i) all reasonably expected assets have been collected by the Company, (ii) all Abatement Distributions have been made to the extent set forth in the LLC Distribution Procedures, (iii) necessary arrangements and reserves have been made to discharge all anticipated remaining Company obligations and administrative and other expenses in a manner consistent with the Governing Documents and (iv) a final accounting has been filed and approved by the Bankruptcy Court.

**11.2    Liquidation and Termination**. On dissolution of the Company, the Board shall act as liquidator or may appoint one or more representatives to act as liquidator. The liquidators shall proceed diligently to wind up the affairs of the Company. The costs of liquidation shall be borne as a Company expense. The liquidators shall pay, satisfy or discharge from Company funds all of the debts, liabilities and obligations of the Company (including all expenses incurred in liquidation) or otherwise make adequate provision for payment and discharge thereof (including the establishment of a cash fund for contingent liabilities in such amount and for such term as the liquidators may reasonably determine) and shall promptly distribute the remaining assets to the Interest Holders in accordance with the Percentage Interests; provided, however, that if the Board determines, in its discretion, that making such Abatement Distributions is not cost-effective with respect to the final amounts to be distributed to the Interest Holders, the Board shall have the authority to direct such final Abatement Distributions, in full, to a tax-exempt organization that has opioid abatement as part of its mission, as selected by the Managers in their discretion.

**11.3    Cancellation of Certificate**. On the completion of the Company's duties and the satisfaction of the Company's purposes as provided in Section 11.1 herein, the Company shall be terminated (and the Company shall not be terminated prior to such time), and the Board (or such other Person or Persons as the Delaware Act may require or permit) shall file a Certificate of Cancellation with the Secretary of State of the State of Delaware, cancel any other filings made pursuant to this Agreement that are or should be cancelled, and take such other actions as may be necessary to terminate the Company. The Company shall be deemed to continue in existence for all purposes of this Agreement until it is terminated pursuant to this Section 11.3.

**11.4    Reasonable Time for Winding Up**. A reasonable time shall be allowed for the orderly winding up of the affairs of the Company pursuant to Section 11.2 in order to minimize any losses otherwise attendant upon such winding up.

## ARTICLE XII

## GENERAL PROVISIONS

**12.1    Amendments**.

(a)    Material modifications to this Agreement may be made only pursuant to an order of the Bankruptcy Court; provided, however, that the Trustees may amend this Agreement by unanimous consent of the Trustees from time to time without the consent, approval or other authorization of, but with notice to, the Bankruptcy Court, to make: (i) minor modifications or clarifying amendments necessary to enable the Trustees to effectuate the provisions of this Agreement; or (ii) modifications to satisfy any requirements, conditions or guidelines contained in any opinion, directive, order, statute, ruling or regulation of any federal, state or foreign

- 18 -

governmental entity. Notwithstanding the foregoing, no amendment or waiver of this Agreement shall modify this Trust Agreement in a manner that is inconsistent with the Plan or the Confirmation Order other than to cure any minor ambiguity or inconsistency in the Plan or to correct any clerical errors in this Agreement. The Trustees shall provide to the Interest Holders notice of any proposed modification to this Agreement, whether material or minor, through the Tribal Opioid Abatement Portal (or by other means approved by the Trustees) not less than ten (10) business days before such modification becomes effective; <u>provided, however</u>, that the Trustees may shorten such notice period in their discretion.

(a)    Notwithstanding anything set forth in this Agreement to the contrary, none of this Agreement, nor any schedule or exhibit hereto shall be modified or amended in any way that could jeopardize or impair the Plan or the Confirmation Order.

**12.2    Remedies Cumulative**. The rights and remedies under this Agreement are cumulative and are in addition to and not in substitution for any other rights and remedies available at law or in equity or otherwise.

**12.3    Successors and Assigns**. All covenants and agreements contained in this Agreement shall bind and inure to the benefit of the parties hereto and their respective heirs, executors, administrators, successors, legal representatives and permitted assigns, whether so expressed or not, except that none of such persons may assign or otherwise transfer any of its, or their, rights or obligations under this Agreement except, in the case of the Company and the Managers, as otherwise contemplated herein or in the Plan or the Confirmation Order.

**12.4    Severability**. Whenever possible, each provision of this Agreement will be interpreted in such manner as to be effective and valid under applicable law, but if any provision of this Agreement or application thereof to any person or circumstance shall be finally determined by a court of competent jurisdiction to be invalid or unenforceable to any extent, the remainder of this Agreement, or the application of such provisions to persons or circumstances other than those as to which it is held invalid or unenforceable, shall not be affected thereby, and such provision of this Agreement shall be valid and enforced to the fullest extent permitted by law.

**12.5    Applicable Law**. This Agreement shall be governed by, and construed in accordance with, the laws of the State of Delaware, without giving effect to any choice of law or conflict of law rules or provisions (whether of the State of Delaware or any other jurisdiction) that would cause the application of the laws of any jurisdiction other than the State of Delaware.

**12.6    Consent to Jurisdiction**. The Bankruptcy Court shall have continuing jurisdiction over the Company pursuant to the Plan; <u>provided, however</u>, the courts of the State of Delaware, including any federal court located therein, shall also have jurisdiction over the Company; provided further, that notwithstanding the foregoing, the Managers shall have the power and authority to bring any action in any court of competent jurisdiction (including the Bankruptcy Court) to prosecute any Causes of Action held by the Company.

**12.7    Sovereign Immunity.** Nothing in the Governing Documents shall be construed as a waiver of a claim of sovereign immunity in any action or proceeding, including without limitation

any action or proceeding occurring after the Effective Date. No Interest Holder shall be deemed or required to waive sovereign immunity by virtue of its membership or interest in the Company.

**12.8**    **Communications**. The Managers shall establish and maintain the Tribal Opioid Abatement Portal (or other means determined appropriate by the Managers) so as to (i) enable each Interest Holder to deliver the required documentation under the Tribal Opioid Abatement Report in an electronic format; (ii) enable secure communications between the Managers and each Interest Holder; and (iii) provide each Interest Holder with access to its own secure electronic data folder; provided, however, that the Managers may modify the foregoing as they determine necessary or advisable in the event such method of communication is unduly burdensome to any Interest Holder.

**12.9**    **Addresses and Notices**. All notices, demands or other communications to be given or delivered under or by reason of the provisions of this Agreement shall be in writing and shall be deemed to have been given or made (a) when delivered personally to the recipient, (b) one (1)business day after delivery to a reputable express courier service (charges prepaid) or (c) on the business day telecopied or electronically transmitted to the recipient (with hard copy sent to the recipient by reputable overnight courier service (charges prepaid) that same day) if by telecopy or electronic transmission before 5:00 p.m. New York time, and otherwise on the next business day. Such notices, demands and other communications shall be sent to the address for such recipient set forth in the Company's books and records, or to such other address or to the attention of such other person as the recipient party has specified by prior written notice to the sending party. Any notice to the Board or the Company shall be deemed given if received by the Board at the principal office of the Company designated pursuant to Section 2.5.

**12.10**    **Creditors**. None of the provisions of this Agreement shall be for the benefit of or enforceable by any creditors of the Company, and no creditor who makes a loan to the Company may have or acquire (except pursuant to the terms of a separate agreement executed by the Company in favor of such creditor) at any time as a result of making the loan any direct or indirect interest in Company Profits, Losses, Abatement Distributions, capital or property other than as a secured creditor.

**12.11**    **Waiver**. No failure by any party to insist upon the strict performance of any covenant, duty, agreement or condition of this Agreement or to exercise any right or remedy consequent upon a breach thereof shall constitute a waiver of any such breach or any other covenant, duty, agreement or condition.

**12.12**    **Further Action**. The parties shall execute and deliver all documents, provide all information, and take or refrain from taking such actions as may be necessary or appropriate to achieve the purposes of this Agreement.

**12.13**    **Entire Agreement**. The Governing Documents, and those documents expressly referred to in this Agreement embody the complete agreement and understanding among the parties and supersede and preempt any prior understandings, agreements or representations by or among the parties, written or oral, which may have related to the subject matter of this Agreement in any way.

**12.14** **Delivery by Electronic Transmission**. This Agreement may be executed in counterparts, each of which shall be deemed an original, but all of which together shall be deemed to be one and the same agreement. A signed copy of this Agreement or any amendment hereto delivered by facsimile, email or other means of Electronic Transmission, shall be treated in all manner and respects as an original agreement or instrument and shall be considered to have the same binding legal effect as if it were the original signed version thereof delivered in person.

*[Page intentionally left blank.]*

*[Signature pages follow.]*

The undersigned Managers have executed or caused to be executed on their behalf this Agreement as of the date first written above.

**MANAGERS:**

[_____]

By: _____
Name: _____
Title: _____


[_____]

By: _____
Name: _____
Title: _____


[_____]

By: _____
Name: _____
Title: _____

## **EXHIBIT 1**

## **COMPANY ASSETS**

## **EXHIBIT 2**

## **CERTIFICATE**

## **EXHIBIT 3**

## **INTEREST HOLDER CAPITAL CONTRIBUTIONS**

## **EXHIBIT 4**

**Tribe Opioid LLC Distribution Procedures**

| Issue | Description |
|---|---|
| **1. <u>APPLICABILITY OF TRIBE OPIOID LLC DISTRIBUTION PROCEDURES</u>** | These terms shall apply to the allocation of value received by the Tribal Opioid Abatement Fund, LLC ("**Tribe Opioid LLC**" or the "**Company**") under the plan of reorganization (the "**Chapter 11 Plan**" or the "**Plan**") in the Chapter 11 Cases of Purdue Pharma L.P. and its affiliates (collectively, "**Purdue**") pending in the U.S. Bankruptcy Court for the Southern District of New York (the "**Bankruptcy Court**") with respect to each American Indian or Alaska Native Tribe, band, nation, pueblo, village or community, that the U.S. Secretary of the Interior acknowledges as an Indian Tribe, as provided in the Federally Recognized Tribe List Act of 1994, 25 U.S.C. § 5130 or Tribal Organization, as defined in 25 U.S.C. 5304(l), (each a "**Tribe**"), whose Claims in Class 5 (Tribe Claims) are channeled to TAFT under the Plan.<br><br>To the extent not explicitly reflected in the Chapter 11 Plan, the terms set forth herein will be deemed incorporated into the Chapter 11 Plan, or this Agreement, as applicable.<br><br>These terms set forth the manner in which the Company shall make Abatement Distributions to the Tribes, which may be used exclusively on the parameters set forth herein. |
| **2. <u>PURPOSE</u>** | These LLC Distribution Procedures are intended to establish the mechanisms for the distribution and allocation of funds distributed by the Company to the Tribes. All such funds described in the foregoing sentence are referred to herein as "**Abatement Funds**" and shall be used to abate the opioid crisis in accordance with the terms hereof, with recognition of the culturally appropriate activities, practices, teachings or ceremonies that may, in the judgment of a Tribe or Tribal Organization, be aimed at or supportive of remediation and abatement of the opioid crisis within a tribal community.<br><br>Specifically, (i) no less than ninety five percent (95%) of the Abatement Funds distributed under this Agreement shall be used for abatement of the opioid crisis by funding opioid or substance use disorder related projects or programs that fall within the scope of **Schedules B** and **D** (the "**Approved Tribal Opioid Abatement Uses**"); and (ii) no more than five percent (5%) of the Abatement Funds may be used to fund expenses incurred in administering the distributions for the Approved Tribal Opioid Abatement Uses, including the process of selecting programs to receive Abatement Funds for implementing those programs ("**Approved Administrative Expenses**," and, together with the Approved Opioid Abatement Uses and Core Strategies, "**Approved Uses**"). |

| Issue | Description |
|---|---|
| | For the avoidance of doubt, **Schedule D** is a non-exhaustive, illustrative list of culturally appropriate activities, practices, teachings or ceremonies that may, in the judgment of a Tribe or Tribal Organization, be aimed at or supportive of remediation and abatement of the opioid crisis within a tribal community.<br><br>The Company shall, in accordance with the Plan, the Confirmation Order and this Agreement, distribute Abatement Funds to Tribes for Approved Uses. All distributions to Tribes in accordance herewith shall be deemed to satisfy the mandate to ensure that underserved urban and rural areas, as well as minority communities, receive equitable access to the funds.<br><br>Notwithstanding anything in these LLC Distribution Procedures that might imply to the contrary, projects or programs that constitute Approved Tribal Opioid Abatement Uses may be provided by Tribes, Tribal Organizations, tribal agencies or subdivisions or nongovernmental parties and funded from Abatement Funds. |
| **3. DISBURSEMENT OF ABATEMENT DISTRIBUTIONS** | The Company shall distribute the Abatement Funds consistent with the Tribal Allocation Percentages set forth on **Schedule C**. The Tribal Allocation Percentages are based on the Tribal Allocation Matrix described on **Schedule E**. |
| **4. ATTORNEYS' FEES AND COSTS FUND** | Pursuant to Section 5.8 of the Plan, Public Creditor Trust Distributions will be subject to assessments to fund (i) the Local Government and Tribe Costs and Expenses Fund, which shall be used to pay qualifying costs and expenses (including attorneys' fees) of Holders of Non-Federal Governmental Claims (other than States) and Tribe Claims (including ad hoc groups of any of the foregoing) and (ii) the State Costs and Expenses Fund, which shall be used to pay qualifying costs and expenses (including attorneys' fees) of States (including ad hoc groups thereof). |
| **5. TRIBAL ABATEMENT FUNDING** | **12.15**  The allocation of distributions among Tribes will be consistent with the Tribal Allocation Percentages set forth on **Schedule C**.<br><br>**12.16**  The Tribes will use the tribal allocation of Abatement Funds for programs on the approved list of abatement strategies (see **Schedule B**) and also for culturally appropriate activities, practices, teachings or ceremonies that are, in the judgment of a Tribe or Tribal Organization, aimed at or supportive of remediation and abatement of the opioid crisis within a tribal community. A list of representative examples of such culturally appropriate abatement strategies, practices, and programs is attached hereto as **Schedule D** (the "**Tribal Abatement Strategies**"). The separate allocation of abatement funding and illustrative list of Tribal Abatement |

| Issue | Description |
|---|---|
| | Strategies recognizes that American Indian and Alaska Native Tribes and the communities they serve possess unique cultural histories, practices, wisdom, and needs that are highly relevant to the health and well-being of American Indian and Alaska Native people and that may play an important role in both individual and public health efforts and responses in Native communities.<br><br>**12.17**  The Tribes agree that Abatement Funds distributed under the Chapter 11 Plan shall be used to abate the opioid crisis in accordance with the terms of these LLC Distribution Procedures. |
| **6. <u>COMPLIANCE, REPORTING, AUDIT AND ACCOUNTABILITY</u>** | 1. The Managers shall impose appropriate reporting requirements on the Tribes to ensure that Abatement Funds are used only for Approved Uses. The Managers may authorize modified reporting requirements for Tribes with allocations below a certain level.<br><br>2. The Company shall prepare an annual report (an "**Annual Report**") that shall be audited by independent auditors as provided in this Agreement, which audited Annual Report shall be filed annually with the Bankruptcy Court.<br><br>3. The Bankruptcy Court shall have continuing jurisdiction over the Company, provided however, the courts of the State of Delaware, including any federal court located therein, shall also have jurisdiction over the Company.<br><br>4. The Managers shall have the power to take any and all actions that in the judgment of the Managers are necessary or proper to fulfill the purposes of the Company, including the requirement that 100% of the Abatement Funds distributed under the Plan (and not otherwise dedicated to the attorneys' fee fund set forth in Section 4 herein) shall be used to abate the opioid crisis in accordance with the terms hereof. |

## **Schedule A**

(Intentionally Omitted)

**Schedule B**
**Approved Uses**

Support treatment of Opioid Use Disorder (OUD) and any co-occurring Substance Use Disorder or Mental Health (SUD/MH) conditions through evidence-based or evidence-informed programs or strategies that may include, but are not limited to, the following:

---

PART ONE: TREATMENT

---

**A.    TREAT OPIOID USE DISORDER (OUD)**

Support treatment of Opioid Use Disorder (OUD) and any co-occurring Substance Use Disorder or Mental Health (SUD/MH) conditions through evidence-based or evidence-informed programs or strategies that may include, but are not limited to, the following[1]:

1.    Expand availability of treatment for OUD and any co-occurring SUD/MH conditions, including all forms of Medication-Assisted Treatment (MAT) approved by the U.S. Food and Drug Administration.

2.    Support and reimburse evidence-based services that adhere to the American Society of Addiction Medicine (ASAM) continuum of care for OUD and any co-occurring SUD/MH conditions

3.    Expand telehealth to increase access to treatment for OUD and any co-occurring SUD/MH conditions, including MAT, as well as counseling, psychiatric support, and other treatment and recovery support services.

4.    Improve oversight of Opioid Treatment Programs (OTPs) to assure evidence-based or evidence-informed practices such as adequate methadone dosing and low threshold approaches to treatment.

5.    Support mobile intervention, treatment, and recovery services, offered by qualified professionals and service providers, such as peer recovery coaches, for persons with OUD and any co-occurring SUD/MH conditions and for persons who have experienced an opioid overdose.

6.    Treatment of trauma for individuals with OUD (e.g., violence, sexual assault, human trafficking, or adverse childhood experiences) and family members (e.g., surviving family members after an overdose or overdose fatality), and training of health care personnel to identify and address such trauma.

7.    Support evidence-based withdrawal management services for people with OUD and any co-occurring mental health conditions.

---

[1] As used in this Schedule B, words like "expand," "fund," "provide" or the like shall not indicate a preference for new or existing programs. Priorities will be established through the mechanisms described in the Public Creditor Trust Distribution Procedures.

- 31 -

8.     Training on MAT for health care providers, first responders, students, or other supporting professionals, such as peer recovery coaches or recovery outreach specialists, including telementoring to assist community-based providers in rural or underserved areas.

9.     Support workforce development for addiction professionals who work with persons with OUD and any co-occurring SUD/MH conditions.

10.    Fellowships for addiction medicine specialists for direct patient care, instructors, and clinical research for treatments.

11.    Scholarships and supports for behavioral health practitioners or workers involved in addressing OUD and any co-occurring SUD or mental health conditions, including but not limited to training, scholarships, fellowships, loan repayment programs, or other incentives for providers to work in rural or underserved areas.

12.    Provide funding and training for clinicians to obtain a waiver under the federal Drug Addiction Treatment Act of 2000 (DATA 2000) to prescribe MAT for OUD, and provide technical assistance and professional support to clinicians who have obtained a DATA 2000 waiver.

13.    Dissemination of web-based training curricula, such as the American Academy of Addiction Psychiatry's Provider Clinical Support Service-Opioids web-based training curriculum and motivational interviewing.

14.    Development and dissemination of new curricula, such as the American Academy of Addiction Psychiatry's Provider Clinical Support Service for Medication-Assisted Treatment.

## B.    <u>SUPPORT PEOPLE IN TREATMENT AND RECOVERY</u>

Support people in recovery from OUD and any co-occurring SUD/MH conditions through evidence-based or evidence-informed programs or strategies that may include, but are not limited to, the following:

1.     Provide comprehensive wrap-around services to individuals with OUD and any co-occurring SUD/MH conditions, including housing, transportation, education, job placement, job training, or childcare.

2.     Provide the full continuum of care of treatment and recovery services for OUD and any co-occurring SUD/MH conditions, including supportive housing, peer support services and counseling, community navigators, case management, and connections to community-based services.

3.     Provide counseling, peer-support, recovery case management and residential treatment with access to medications for those who need it to persons with OUD and any co-occurring SUD/MH conditions.

4.     Provide access to housing for people with OUD and any co-occurring SUD/MH conditions, including supportive housing, recovery housing, housing assistance

- 32 -

programs, training for housing providers, or recovery housing programs that allow or integrate FDA-approved mediation with other support services.

5.      Provide community support services, including social and legal services, to assist in deinstitutionalizing persons with OUD and any co-occurring SUD/MH conditions.

6.      Support or expand peer-recovery centers, which may include support groups, social events, computer access, or other services for persons with OUD and any co-occurring SUD/MH conditions.

7.      Provide or support transportation to treatment or recovery programs or services for persons with OUD and any co-occurring SUD/MH conditions.

8.      Provide employment training or educational services for persons in treatment for or recovery from OUD and any co-occurring SUD/MH conditions.

9.      Identify successful recovery programs such as physician, pilot, and college recovery programs, and provide support and technical assistance to increase the number and capacity of high-quality programs to help those in recovery.

10.     Engage non-profits, faith-based communities, and community coalitions to support people in treatment and recovery and to support family members in their efforts to support the person with OUD in the family.

11.     Training and development of procedures for government staff to appropriately interact and provide social and other services to individuals with or in recovery from OUD, including reducing stigma.

12.     Support stigma reduction efforts regarding treatment and support for persons with OUD, including reducing the stigma on effective treatment.

13.     Create or support culturally appropriate services and programs for persons with OUD and any co-occurring SUD/MH conditions, including new Americans.

14.     Create and/or support recovery high schools.

15.     Hire or train behavioral health workers to provide or expand any of the services or supports listed above.

## C.      **CONNECT PEOPLE WHO NEED HELP TO THE HELP THEY NEED (CONNECTIONS TO CARE)**

Provide connections to care for people who have – or at risk of developing – OUD and any co-occurring SUD/MH conditions through evidence-based or evidence-informed programs or strategies that may include, but are not limited to, the following:

1.      Ensure that health care providers are screening for OUD and other risk factors and know how to appropriately counsel and treat (or refer if necessary) a patient for OUD treatment.

- 33 -

2. Fund Screening, Brief Intervention and Referral to Treatment (SBIRT) programs to reduce the transition from use to disorders, including SBIRT services to pregnant women who are uninsured or not eligible for Medicaid.

3. Provide training and long-term implementation of SBIRT in key systems (health, schools, colleges, criminal justice, and probation), with a focus on youth and young adults when transition from misuse to opioid disorder is common.

4. Purchase automated versions of SBIRT and support ongoing costs of the technology.

5. Expand services such as navigators and on-call teams to begin MAT in hospital emergency departments.

6. Training for emergency room personnel treating opioid overdose patients on post-discharge planning, including community referrals for MAT, recovery case management or support services.

7. Support hospital programs that transition persons with OUD and any co-occurring SUD/MH conditions, or persons who have experienced an opioid overdose, into clinically appropriate follow-up care through a bridge clinic or similar approach.

8. Support crisis stabilization centers that serve as an alternative to hospital emergency departments for persons with OUD and any co-occurring SUD/MH conditions or persons that have experienced an opioid overdose.

9. Support the work of Emergency Medical Systems, including peer support specialists, to connect individuals to treatment or other appropriate services following an opioid overdose or other opioid-related adverse event.

10. Provide funding for peer support specialists or recovery coaches in emergency departments, detox facilities, recovery centers, recovery housing, or similar settings; offer services, supports, or connections to care to persons with OUD and any co-occurring SUD/MH conditions or to persons who have experienced an opioid overdose.

11. Expand warm hand-off services to transition to recovery services.

12. Create or support school-based contacts that parents can engage with to seek immediate treatment services for their child; and support prevention, intervention, treatment, and recovery programs focused on young people.

13. Develop and support best practices on addressing OUD in the workplace.

14. Support assistance programs for health care providers with OUD.

15. Engage non-profits and the faith community as a system to support outreach for treatment.

16.     Support centralized call centers that provide information and connections to appropriate services and supports for persons with OUD and any co-occurring SUD/MH conditions.

## D.     **ADDRESS THE NEEDS OF CRIMINAL-JUSTICE-INVOLVED PERSONS**

Address the needs of persons with OUD and any co-occurring SUD/MH conditions who are involved in, are at risk of becoming involved in, or are transitioning out of the criminal justice system through evidence-based or evidence-informed programs or strategies that may include, but are not limited to, the following:

1.     Support pre-arrest or pre-arraignment diversion and deflection strategies for persons with OUD and any co-occurring SUD/MH conditions, including established strategies such as:

     1.     Self-referral strategies such as the Angel Programs or the Police Assisted Addiction Recovery Initiative (PAARI);

     2.     Active outreach strategies such as the Drug Abuse Response Team (DART) model;

     3.     "Naloxone Plus" strategies, which work to ensure that individuals who have received naloxone to reverse the effects of an overdose are then linked to treatment programs or other appropriate services;

     4.     Officer prevention strategies, such as the Law Enforcement Assisted Diversion (LEAD) model;

     5.     Officer intervention strategies such as the Leon County, Florida Adult Civil Citation Network or the Chicago Westside Narcotics Diversion to Treatment Initiative; or

     6.     Co-responder and/or alternative responder models to address OUD-related 911 calls with greater SUD expertise.

2.     Support pre-trial services that connect individuals with OUD and any co-occurring SUD/MH conditions to evidence-informed treatment, including MAT, and related services.

3.     Support treatment and recovery courts that provide evidence-based options for persons with OUD and any co-occurring SUD/MH conditions.

4.     Provide evidence-informed treatment, including MAT, recovery support, harm reduction, or other appropriate services to individuals with OUD and any co-occurring SUD/MH conditions who are incarcerated in jail or prison.

5.     Provide evidence-informed treatment, including MAT, recovery support, harm reduction, or other appropriate services to individuals with OUD and any co-occurring SUD/MH conditions who are leaving jail or prison have recently left jail

or prison, are on probation or parole, are under community corrections supervision, or are in re-entry programs or facilities.

6.      Support critical time interventions (CTI), particularly for individuals living with dual-diagnosis OUD/serious mental illness, and services for individuals who face immediate risks and service needs and risks upon release from correctional settings.

7.      Provide training on best practices for addressing the needs of criminal-justice-involved persons with OUD and any co-occurring SUD/MH conditions to law enforcement, correctional, or judicial personnel or to providers of treatment, recovery, harm reduction, case management, or other services offered in connection with any of the strategies described in this section.

## E.      ADDRESS THE NEEDS OF PREGNANT OR PARENTING WOMEN AND THEIR FAMILIES, INCLUDING BABIES WITH NEONATAL ABSTINENCE SYNDROME

Address the needs of pregnant or parenting women with OUD and any co-occurring SUD/MH conditions, and the needs of their families, including babies with neonatal abstinence syndrome (NAS), through evidence-based or evidence-informed programs or strategies that may include, but are not limited to, the following:

1.      Support evidence-based or evidence-informed treatment, including MAT, recovery services and supports, and prevention services for pregnant women – or women who could become pregnant – who have OUD and any co-occurring SUD/MH conditions, and other measures to educate and provide support to families affected by Neonatal Abstinence Syndrome.

2.      Expand comprehensive evidence-based treatment and recovery services, including MAT, for uninsured women with OUD and any co-occurring SUD/MH conditions for up to 12 months postpartum.

3.      Training for obstetricians or other healthcare personnel that work with pregnant women and their families regarding treatment of OUD and any co-occurring SUD/MH conditions.

4.      Expand comprehensive evidence-based treatment and recovery support for NAS babies; expand services for better continuum of care with infant-need dyad; expand long-term treatment and services for medical monitoring of NAS babies and their families.

5.      Provide training to health care providers who work with pregnant or parenting women on best practices for compliance with federal requirements that children born with Neonatal Abstinence Syndrome get referred to appropriate services and receive a plan of safe care.

6.      Child and family supports for parenting women with OUD and any co-occurring SUD/MH conditions.

- 36 -

7.     Enhanced family supports and child care services for parents with OUD and any co-occurring SUD/MH conditions.

8.     Provide enhanced support for children and family members suffering trauma as a result of addiction in the family; and offer trauma-informed behavioral health treatment for adverse childhood events.

9.     Offer home-based wrap-around services to persons with OUD and any co-occurring SUD/MH conditions, including but not limited to parent skills training.

10.     Support for Children's Services – Fund additional positions and services, including supportive housing and other residential services, relating to children being removed from the home and/or placed in foster care due to custodial opioid use.

---

PART TWO: PREVENTION

---

**F.**     **PREVENT OVER-PRESCRIBING AND ENSURE APPROPRIATE PRESCRIBING AND DISPENSING OF OPIOIDS**

Support efforts to prevent over-prescribing and ensure appropriate prescribing and dispensing of opioids through evidence-based or evidence-informed programs or strategies that may include, but are not limited to, the following:

1.     Fund medical provider education and outreach regarding best prescribing practices for opioids consistent with the Guidelines for Prescribing Opioids for Chronic Pain from the U.S. Centers for Disease Control and Prevention, including providers at hospitals (academic detailing).

2.     Training for health care providers regarding safe and responsible opioid prescribing, dosing, and tapering patients off opioids.

3.     Continuing Medical Education (CME) on appropriate prescribing of opioids.

4.     Support for non-opioid pain treatment alternatives, including training providers to offer or refer to multi-modal, evidence-informed treatment of pain.

5.     Support enhancements or improvements to Prescription Drug Monitoring Programs (PDMPs), including but not limited to improvements that:

    1.     Increase the number of prescribers using PDMPs;

    2.     Improve point-of-care decision-making by increasing the quantity, quality, or format of data available to prescribers using PDMPs, by improving the interface that prescribers use to access PDMP data, or both; or

    3.     Enable states to use PDMP data in support of surveillance or intervention strategies, including MAT referrals and follow-up for individuals identified within PDMP data as likely to experience OUD in a manner that complies with all relevant privacy and security laws and rules.

- 37 -

6.      Ensuring PDMPs incorporate available overdose/naloxone deployment data, including the United States Department of Transportation's Emergency Medical Technician overdose database in a manner that complies with all relevant privacy and security laws and rules.

7.      Increase electronic prescribing to prevent diversion or forgery.

8.      Educate Dispensers on appropriate opioid dispensing.

## G.      **PREVENT MISUSE OF OPIOIDS**

Support efforts to discourage or prevent misuse of opioids through evidence-based or evidence-informed programs or strategies that may include, but are not limited to, the following:

1.      Fund media campaigns to prevent opioid misuse.

2.      Corrective advertising or affirmative public education campaigns based on evidence.

3.      Public education relating to drug disposal.

4.      Drug take-back disposal or destruction programs.

5.      Fund community anti-drug coalitions that engage in drug prevention efforts.

6.      Support community coalitions in implementing evidence-informed prevention, such as reduced social access and physical access, stigma reduction – including staffing, educational campaigns, support for people in treatment or recovery, or training of coalitions in evidence-informed implementation, including the Strategic Prevention Framework developed by the U.S. Substance Abuse and Mental Health Services Administration (SAMHSA).

7.      Engage non-profits and faith-based communities as systems to support prevention.

8.      Fund evidence-based prevention programs in schools or evidence-informed school and community education programs and campaigns for students, families, school employees, school athletic programs, parent-teacher and student associations, and others.

9.      School-based or youth-focused programs or strategies that have demonstrated effectiveness in preventing drug misuse and seem likely to be effective in preventing the uptake and use of opioids.

10.     Create of support community-based education or intervention services for families, youth, and adolescents at risk for OUD and any co-occurring SUD/MH conditions.

11.     Support evidence-informed programs or curricula to address mental health needs of young people who may be at risk of misusing opioids or other drugs, including emotional modulation and resilience skills.

- 38 -

12.     Support greater access to mental health services and supports for young people, including services and supports provided by school nurses, behavioral health workers or other school staff, to address mental health needs in young people that (when not properly addressed) increase the risk of opioid or another drug misuse.

## H.    <u>PREVENT OVERDOSE DEATHS AND OTHER HARMS (HARM REDUCTION)</u>

Support efforts to prevent or reduce overdose deaths or other opioid-related harms through evidence-based or evidence-informed programs or strategies that may include, but are not limited to, the following:

1.     Increase availability and distribution of naloxone and other drugs that treat overdoses for first responders, overdose patients, individuals with OUD and their friends and family members, schools, community navigators and outreach workers, persons being released from jail or prison, or other members of the general public.

2.     Public health entities providing free naloxone to anyone in the community.

3.     Training and education regarding naloxone and other drugs that treat overdoses for first responders, overdose patients, patients taking opioids, families, schools, community support groups, and other members of the general public.

4.     Enable school nurses and other school staff to respond to opioid overdoses, and provide them with naloxone, training, and support.

5.     Expand, improve, or develop data tracking software and applications for overdoses/naloxone revivals.

6.     Public education relating to emergency responses to overdoses.

7.     Public education relating to immunity and Good Samaritan laws.

8.     Educate first responders regarding the existence and operation of immunity and Good Samaritan laws.

9.     Syringe service programs and other evidence-informed programs to reduce harms associated with intravenous drug use, including supplies, staffing, space, peer support services, referrals to treatment, fentanyl checking, connections to care, and the full range of harm reduction and treatment services provided by these programs.

10.    Expand access to testing and treatment for infectious diseases such as HIV and Hepatitis C resulting from intravenous opioid use.

11.    Support mobile units that offer or provide referrals to harm reduction services, treatment, recovery supports, health care, or other appropriate services to persons that use opioids or persons with OUD and any co-occurring SUD/MH conditions.

12.    Provide training in harm reduction strategies to health care providers, students, peer recovery coaches, recovery outreach specialists, or other professionals that provide

care to persons who use opioids or persons with OUD and any co-occurring SUD/MH conditions.

13.    Support screening for fentanyl in routine clinical toxicology testing.

> PART THREE: OTHER STRATEGIES

## I.    **I. FIRST RESPONDERS**

In addition to items in section C, D and H relating to first responders, support the following:

1.    Educate law enforcement or other first responders regarding appropriate practices and precautions when dealing with fentanyl or other drugs.

2.    Provision of wellness and support services for first responders and others who experience secondary trauma associated with opioid-related emergency events.

## J.    **LEADERSHIP, PLANNING AND COORDINATION**

Support efforts to provide leadership, planning, coordination, facilitations, training and technical assistance to abate the opioid epidemic through activities, programs, or strategies that may include, but are not limited to, the following:

1.    Statewide, regional, local or community regional planning to identify root causes of addiction and overdose, goals for reducing harms related to the opioid epidemic, and areas and populations with the greatest needs for treatment intervention services, and to support training and technical assistance and other strategies to abate the opioid epidemic described in this opioid abatement strategy list.

2.    A dashboard to (a) share reports, recommendations, or plans to spend opioid settlement funds; (b) to show how opioid settlement funds have been spent; (c) to report program or strategy outcomes; or (d) to track, share or visualize key opioid- or health-related indicators and supports as identified through collaborative statewide, regional, local or community processes.

3.    Invest in infrastructure or staffing at government or not-for-profit agencies to support collaborative, cross-system coordination with the purpose of preventing overprescribing, opioid misuse, or opioid overdoses, treating those with OUD and any co-occurring SUD/MH conditions, supporting them in treatment or recovery, connecting them to care, or implementing other strategies to abate the opioid epidemic described in this opioid abatement strategy list.

4.    Provide resources to staff government oversight and management of opioid abatement programs.

## K.    **TRAINING**

In addition to the training referred to throughout this document, support training to abate the opioid epidemic through activities, programs, or strategies that may include, but are not limited to, the following:

1.    Provide funding for staff training or networking programs and services to improve the capability of government, community, and not-for-profit entities to abate the opioid crisis.

2.    Support infrastructure and staffing for collaborative cross-system coordination to prevent opioid misuse, prevent overdoses, and treat those with OUD and any co-occurring SUD/MH conditions, or implement other strategies to abate the opioid epidemic described in this opioid abatement strategy list (e.g., health care, primary care, pharmacies, PDMPs, etc.).

## L.    **RESEARCH**

Support opioid abatement research that may include, but is not limited to, the following:

1.    Monitoring, surveillance, data collection and evaluation of programs and strategies described in this opioid abatement strategy list.

2.    Research non-opioid treatment of chronic pain.

3.    Research on improved service delivery for modalities such as SBIRT that demonstrate promising but mixed results in populations vulnerable to opioid use disorders.

4.    Research on novel harm reduction and prevention efforts such as the provision of fentanyl test strips.

5.    Research on innovative supply-side enforcement efforts such as improved detection of mail-based delivery of synthetic opioids.

6.    Expanded research on swift/certain/fair models to reduce and deter opioid misuse within criminal justice populations that build upon promising approaches used to address other substances (e.g. Hawaii HOPE and Dakota 24/7).

7.    Epidemiological surveillance of OUD-related behaviors in critical populations including individuals entering the criminal justice system, including but not limited to approaches modeled on the Arrestee Drug Abuse Monitoring (ADAM) system.

8.    Qualitative and quantitative research regarding public health risks and harm reduction opportunities within illicit drug markets, including surveys of market participants who sell or distribute illicit opioids.

9.    Geospatial analysis of access barriers to MAT and their association with treatment engagement and treatment outcomes.

- 41 -

**<u>Schedule C</u>**
**<u>Tribe Beneficiaries and Tribal Allocation Percentages</u>**

## Schedule D
## Tribal Abatement Strategies

The following is a non-exhaustive, illustrative list of culturally appropriate activities, practices, teachings or ceremonies that may, in the judgment of the Tribes, be aimed at or supportive of remediation and abatement of the opioid crisis within a tribal community.

Each of the 574 federally recognized Tribes in the United States has its own cultures, histories and traditions. Each Tribe is best suited to determine the most effective abatement strategies for the specific community it serves. The following list provides select examples of tribal abatement strategies and is not intended to limit the remediation and abatement activities for which any Tribe or tribal organization may utilize its share of Abatement Funds.

1.    **Traditional Activities Associated with Cultural Identity and Healing**

Tribal cultural activities can help address historical and intergenerational trauma and feelings of cultural loss that may be underlying root causes and/or contributing factors to addiction. These can include, for example:

- Utilization of traditional healers and spiritual and traditional approaches to healing;
- Sweat lodges, sacred pipe ceremonies, smudging and other ceremonies;
- Talking circles;
- Cultural activities such as basket weaving, pottery making, drum making, canoe building, etc., depending on the Tribe;
- Cultural and linguistic immersion programs.

These traditional activities may be combined with other treatment or included in integrated treatment models, as discussed below.

Example: Drum-Assisted Recovery Therapy for Native Americans (DARTNA) is supported by research. Drums are a sacred instrument in many American Indian and Alaska Native cultures and are often associated with ceremonies and healing. In addition to providing a sense of cultural connection, drumming may have physical and psychological effects that make it a promising focus for treatment.

Example: Some Tribes have utilized seasonal cultural immersion camps in lieu of or in combination with residential treatment for substance use disorder. Participants practice traditional lifeways, including hunting, fishing, living in traditional dwellings and cultural and/or spiritual practices during the course of treatment.

2.    **Culturally Competent Integrated Treatment Models**

Example: The Swinomish Tribe designed and developed a unique treatment program called Didgʷálič that integrates evidence-based chemical dependency treatment with holistic, culturally competent care to successfully deal with the effects of opioid use

disorder (OUD). Didgʷálič provides a full array of medical and social services, utilizing a model of care that centers on and incorporates the Tribe's culture and values. The Tribal government and individual Tribal members provide cultural leadership and advice on the use of Native language and practices in the program.

Example: The Tulalip Tribe operates the Healing Lodge, a culturally sensitive transitional home facility for tribal members who are seeking to recover from addiction. In addition to a clean and sober living environment, the facility provides transportation to and from Chemical Dependency/ Mental Wellness groups and individual counseling sessions, sober support groups and cultural activities such as sweats, powwow and family nights. The program also connects residents with educational activities such as life skills trainings, budgeting, post generational trauma and Red Road to Wellbriety, a recovery and wellness program similar in some ways to the 12 Steps of AA but designed especially for Native American and following the teachings of the Medicine Wheel.

3.      **Culturally Grounded Community Prevention**

Culturally competent prevention programs, tailored to each tribal community, can play an important role in stopping and reversing the spread of the opioid epidemic.

Example: The Healing of the Canoe is a collaborative project between the Suquamish Tribe, the Port Gamble S'Klallam Tribe and the University of Washington Alcohol and Drug Abuse Institute (ADAI). It has led to the development and dissemination of the Culturally Grounded Life Skills for Youth curriculum, an evidence-based, strengths-based life skills curriculum for Native youth that uses elements of a Tribe's culture to help prevent substance abuse and connect its youth to their tribal community and culture. It teaches Native youth the skills they need to navigate their life's journey without being pulled off course by alcohol or drugs, using tribal values, traditions and culture both as a compass to guide them and an anchor to ground them. By reversing the historical trauma of forced assimilation, this approach attacks the root cause of so much substance abuse among tribal youth.

Example: The Association of Village Council Presidents has responded to the opioid crisis through the Healthy Families Program, which promotes and supports whole health through the sharing, teaching, and practice of traditional values through Elluarluteng Illakutellriit - a framework illustrating the Yup'ik life cycle of traditional practices, values and beliefs from Yup'ik Elders. This framework functions alongside western and medical practices to help individuals overcome their addictions permanently.

4.      **Peacekeeping and Wellness Courts**

Many Tribes have had success treating opioid offenders using traditional healing practices and alternative institutions, sometimes called wellness courts or peacekeeping courts.

Example: The Yurok Tribal Court, in coordination with the California State courts in Humboldt and Del Norte Counties, operates its Family Wellness Courts (FWC) for

- 45 -

Yurok families suffering from opioid abuse problems. The FWC seeks to develop judicial practices that are consistent with Yurok tribal values and needs, combining the resources and expertise of both systems. It focuses on reintegrating tribal members into the culture and life of the Yurok community and helping them establish a drug-free lifestyle.

5.    **Community Workforce Development and Training**

Cultural competency training as well as community workforce development can be a critical tool for addressing gaps in services, especially in rural and remote tribal communities, where it can be extremely difficult to recruit and retain qualified health care professionals.

Example: In Alaska, the Community Health Aide Program (CHAP) has increased access to medical treatment to more than 170 rural Alaskan villages utilizing a workforce development model geared toward Native people. Under CHAP, individuals selected by their communities are provided with training as community health aides and practitioners to work in rural villages under the supervision of, and in collaboration with, higher level medical professionals, often aided by telemedicine technology. As part of CHAP, behavioral health aides (BHAs) are trained as counselors, educators and advocates to help address mental health and addiction issues.

Example: Part of the Swinomish Tribe's Didgʷálič treatment model, discussed above, is training for Tribal members with a goal of building a new generation of clinically trained and culturally competent Native counselors and providers, Yup'ik Elders. This framework functions alongside western and medical practices to help individuals overcome their addictions permanently.

## **EXHIBIT U**

**MDT Agreement**

**TRUST AGREEMENT OF**

**MASTER DISBURSEMENT TRUST**

**DATED AS OF [●], 2021**

**BY AND AMONG**

**[●] AS MDT TRUSTEES**

**[●] AS RESIDENT TRUSTEE**

**and**

**THE DEBTOR PARTIES HERETO**

# TABLE OF CONTENTS

**Article I**    **Declaration of Trust**................................................................**3**

Section 1.01.    Creation of Trust ...................................................................3
Section 1.02.    Purpose of Master Disbursement Trust......................................3
Section 1.03.    Vesting of the MDT Transferred Assets and Funding of the Master
                Disbursement Trust ...............................................................4
Section 1.04.    Assumption of Channeled Claims and the Master TDP ...............6
Section 1.05.    Appointment and Acceptance of Initial MDT Trustees.................6
Section 1.06.    No Reversion to Debtors .........................................................7
Section 1.07.    Relationship to Plan ..............................................................7
Section 1.08.    Incidents of Ownership .........................................................7

**Article II**    **MDT Beneficiaries** .................................................................**7**

Section 2.01.    MDT Claims and MDT Interests ..............................................7
Section 2.02.    Disputed or Conflicting Claims or Demands ..............................8
Section 2.03.    Rights of MDT Beneficiaries ..................................................8
Section 2.04.    Nontransferability of MDT Claims and MDT Interests..................8
Section 2.05.    Limited Liability ...................................................................8

**Article III**    **Powers and Trust Administration** ..........................................**9**

Section 3.01.    Powers of the MDT Trustees ..................................................9
Section 3.02.    General Administration ..........................................................11
Section 3.03.    Master TDP .........................................................................12

**Article IV**    **Duration and Termination of the Master Disbursement Trust**.................**12**

Section 4.01.    Duration...............................................................................12
Section 4.02.    Dissolution of the Master Disbursement Trust .............................12
Section 4.03.    Continuance of Master Disbursement Trust for Winding Up ..........13

**Article V**    **Accounts, Investments and Payments** .....................................**13**

Section 5.01.    Accounts...............................................................................13
Section 5.02.    MDT Operating Reserve .........................................................14
Section 5.03.    MDT Claims Reserve .............................................................14
Section 5.04.    Investments ..........................................................................14
Section 5.05.    Source of Payments ...............................................................14

**Article VI**    **Tax Matters**...........................................................................**15**

Section 6.01.    U.S. ....................................................................................15
Section 6.02.    Tax Withholdings...................................................................15

| **Article VII** | **Distributions** .................................................................................**16** |
| --- | --- |
| Section 7.01. | Distributions ................................................................................16 |
| Section 7.02. | Distribution Dates .......................................................................17 |
| Section 7.03. | Escrow Periods and MDT Reserve Periods ..................................17 |
| Section 7.04. | Public Creditor Trust Distributions .............................................18 |
| Section 7.05. | Restriction on Use of Distributions by Creditor Trusts ................19 |

| **Article VIII** | **MDT Trustees, MDT Executive Director and Resident Trustee**.........**19** |
| --- | --- |
| Section 8.01. | The MDT Trustees ......................................................................19 |
| Section 8.02. | Term of Service of the MDT Trustees .........................................19 |
| Section 8.03. | Appointment of Successor MDT Trustees ....................................21 |
| Section 8.04. | MDT Executive Director..............................................................21 |
| Section 8.05. | Independence of the MDT Trustees and MDT Executive Director.................21 |
| Section 8.06. | Obligations of the MDT Fiduciaries ............................................22 |
| Section 8.07. | Compensation and Expenses of the MDT Trustees and the MDT Executive Director and MDT Professionals .......................................22 |
| Section 8.08. | Resident Trustee..........................................................................23 |

| **Article IX** | **Reliance, Liability and Indemnification**.........................................**25** |
| --- | --- |
| Section 9.01. | Reliance by the MDT Trustees and the MDT Executive Director ..................25 |
| Section 9.02. | Nonliability of MDT Trustees and MDT Executive Director...........................25 |
| Section 9.03. | Exculpation .................................................................................25 |
| Section 9.04. | Limitation of Liability..................................................................26 |
| Section 9.05. | Indemnity ....................................................................................26 |

| **Article X** | **Miscellaneous Provisions** ...........................................................**26** |
| --- | --- |
| Section 10.01. | Actions Taken on Other Than a Business Day ..............................26 |
| Section 10.02. | Governing Law.............................................................................27 |
| Section 10.03. | Jurisdiction .................................................................................27 |
| Section 10.04. | Severability..................................................................................27 |
| Section 10.05. | Notices.........................................................................................27 |
| Section 10.06. | Headings......................................................................................28 |
| Section 10.07. | Entire Trust Agreement................................................................29 |
| Section 10.08. | Amendment and Waiver ...............................................................29 |
| Section 10.09. | Confidentiality ............................................................................29 |
| Section 10.10. | Meanings of Other Terms ............................................................29 |
| Section 10.11. | Counterparts ...............................................................................29 |

ii

## MASTER DISBURSEMENT TRUST AGREEMENT

THIS MASTER DISBURSEMENT TRUST AGREEMENT (this "Trust Agreement"), dated as of [●], 2021 (the "Effective Date"), is entered into by and among each of (i) Purdue Pharma L.P., Purdue Pharma Inc., Purdue Transdermal Technologies L.P., Purdue Pharma Manufacturing L.P., Purdue Pharmaceuticals L.P., Imbrium Therapeutics L.P., Adlon Therapeutics L.P., Greenfield BioVentures L.P., Seven Seas Hill Corp., Ophir Green Corp., Purdue Pharma of Puerto Rico, Avrio Health L.P., Purdue Pharmaceutical Products L.P., Purdue Neuroscience Company, Nayatt Cove Lifescience Inc., Button Land L.P., Rhodes Associates L.P., Paul Land Inc., Quidnick Land L.P., Rhodes Pharmaceuticals L.P., Rhodes Technologies, UDF LP, SVC Pharma LP and SVC Pharma Inc. (each, a "Debtor" and, collectively, the "Debtors"), as debtors and debtors-in-possession, (ii) the undersigned MDT Trustees (together with any successor or additional trustee appointed under the terms of this Trust Agreement, the "MDT Trustees"), and (iii) [●], as the Delaware resident trustee (together with any successor Delaware resident trustee appointed under the terms of this Trust Agreement, the "Resident Trustee"), for the purpose of forming a statutory trust under and pursuant to the provisions of the Delaware Statutory Trust Act, 12 Del. C. §§ 3801, et seq. (as the same may from time to time be amended, or any successor statute, the "Trust Act").

## RECITALS

WHEREAS, on September 15, 2019 (the "Petition Date"), each of the Debtors filed a voluntary petition for relief under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code") in the United States Bankruptcy Court for the Southern District of New York (the "Bankruptcy Court"), thereby commencing the chapter 11 cases jointly administered by the Bankruptcy Court under the caption *In re Purdue Pharma L.P., et al.*, Case No. 19-23649 (RDD) (the "Chapter 11 Cases");

WHEREAS, on June 3, 2021, the Debtors filed the *Fifth Amended Joint Chapter 11 Plan of Reorganization of Purdue Pharma L.P. and Its Affiliated Debtors* [D.I. 2982] (including all appendices, exhibits, schedules and supplements thereto, as the same may be altered, amended or modified from time to time in accordance with the Bankruptcy Code, the Bankruptcy Rules and the terms thereof, the "Plan")[1] with the Bankruptcy Court;

WHEREAS, on [●], the Debtors and the Shareholder Payment Parties entered into the Shareholder Settlement Agreement, pursuant to which, among other things, the Shareholder Payment Parties shall be obligated to pay the Shareholder Settlement Amount in accordance with the terms thereof;

WHEREAS, on [●], 2021, the Bankruptcy Court entered the [*Order Confirming the Fifth Amended Joint Chapter 11 Plan of Reorganization of Purdue Pharma L.P. and Its Affiliated Debtors*] [D.I. [●]] confirming the Plan (the "Confirmation Order");

---

[1] Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to such terms in the Plan.

WHEREAS, in accordance with the Plan and the Confirmation Order, PPLP and [NEWCO, LLC], a limited liability company organized under the laws of the State of Delaware ("NewCo"), have entered into the Transfer Agreement, dated as of the Effective Date (the "NewCo Transfer Agreement"), pursuant to which the NewCo Transferred Assets were transferred to NewCo;

WHEREAS, the Plan provides for, among other things, the creation of a Master Disbursement Trust on the Effective Date;

WHEREAS, in accordance with the Plan and the Confirmation Order, the Master Disbursement Trust shall, among other things, (i) receive the MDT Transferred Assets and (ii) assume all liability of the Debtors and the other Protected Parties for any and all Channeled Claims, pursuant to the Channeling Injunction, solely for the purpose of effectuating the Master Trust Distributions Procedures attached as Exhibit A to this Trust Agreement (the "Master TDP"), pursuant to which (A) each Channeled Claim shall either be automatically channeled to and assumed exclusively by a Creditor Trust or otherwise Disallowed and released in full and (B) in exchange for the assumption of the applicable Channeled Claims, the Creditor Trusts shall receive the distributions set forth in the Master TDP;

WHEREAS, in accordance with the Plan, the Confirmation Order and the Master TDP, beneficial interests in the Master Disbursement Trust shall be granted to (i) the United States (such interest, the "MDT Federal Government Claim"), which MDT Federal Government Claim shall entitle the United States to payment of the amounts set forth in Section 4.3(b) of the Plan in accordance with the terms of the Plan and this Trust Agreement, (ii) the Hospital Trust (such interest, the "MDT Hospital Claim"), the NAS Monitoring Trust (such interest, the "MDT NAS Monitoring Claim"), the PI Trust (such interest, the "MDT PI Claim") and the TPP Trust (such interest, the "MDT TPP Claim"), which MDT Hospital Claim, MDT NAS Monitoring Claim, MDT PI Claim and MDT TPP Claim (collectively, the "MDT Private Claims" and, together with the MDT Federal Government Claim, the "MDT Claims") shall entitle such Private Creditor Trusts to payment of the amounts set forth in Section 5.2(d)(i) of the Plan in accordance with the terms of the Plan and this Trust Agreement and (iii) the Tribal Abatement Fund Trust ("TAFT") (such interest, the "MDT Tribe Interest") and NOAT (such interest, the "MDT NOAT Interest"), which MDT Tribe Interest and MDT NOAT Interest (collectively, the "MDT Interests") shall entitle TAFT and NOAT (collectively with the Hospital Trust, the NAS Monitoring Trust, the PI Trust, the TPP Trust, the United States and, solely for purposes of the distributions due to it under the Master TDP, the PI Futures Trust, the "MDT Beneficiaries") to their respective shares of distributions of MDT Excess Cash as set forth in Section 5.2(e)(i) of the Plan and in accordance with the terms of the Plan and this Trust Agreement;

WHEREAS, the purposes of the Master Disbursement Trust are, among other things, to (i) effectuate the Master TDP, (ii) hold and administer the MDT Transferred Assets, (iii) make payments in satisfaction of the MDT Claims in accordance with the Plan and the Private Entity Settlements, (iv) pursue MDT Causes of Action and the MDT Shareholder Rights, including monitoring and enforcing the Shareholder Settlement Agreement, and (v) make Public Creditor Trust Distributions in respect of the MDT Interests from MDT Excess Cash in accordance with the Plan and the Public Entity Settlements;

2

WHEREAS, in accordance with the Plan and the Confirmation Order, as of the Effective Date (i) [TOPCO LLC], a Delaware limited liability company ("TopCo"), shall hold 100% of the NewCo Interests, and (ii) the limited liability company interest in TopCo shall be held by NOAT (such interests, the "TopCo NOAT Interest") and Tribal Opioid Abatement Fund, LLC ("Tribe Opioid LLC" and, such interests, the "TopCo Tribe Interest" and, together with the TopCo NOAT Interest, the "TopCo Interests");

WHEREAS, in accordance with the Plan and the Confirmation Order, the Master Disbursement Trust, NewCo and TopCo shall enter into that certain Credit Support Agreement, dated as of the Effective Date (the "NewCo Credit Support Agreement"), pursuant to which NewCo and TopCo are each obligated to make certain payments to the Master Disbursement Trust, and the Master Disbursement Trust is obligated to repay such amounts to NewCo and TopCo; and

WHEREAS the Master Disbursement Trust was established and is effective for the benefit of the MDT Beneficiaries.

## AGREEMENT

NOW, THEREFORE, pursuant to the Confirmation Order, and in consideration of the foregoing and upon the terms and subject to the mutual covenants and conditions set forth herein, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto agree as follows:

## ARTICLE I
## DECLARATION OF TRUST

Section 1.01.  Creation of Trust. The Debtors and the MDT Trustees, pursuant to the Plan and the Confirmation Order, and in accordance with the applicable provisions of the Bankruptcy Code, hereby create the Master Disbursement Trust, which shall bear the name "Master Disbursement Trust." In connection with the exercise of the MDT Trustees' power hereunder, the MDT Trustees may use this name or such variation thereof as the MDT Trustees reasonably see fit. It is the intention of the parties hereto that the Master Disbursement Trust created hereby constitutes a statutory trust under the Trust Act and that the Confirmation Order, the Plan and this Trust Agreement, constitute the governing instruments of the Master Disbursement Trust.

Section 1.02.  Purpose of Master Disbursement Trust. The purpose of the Master Disbursement Trust is to carry out the duties of the Master Disbursement Trust as set forth in the Plan on behalf, and for the benefit, of the MDT Beneficiaries, including to effectuate the Master TDP and to liquidate, convert to Cash and distribute the MDT Transferred Assets in accordance with the terms of the Plan and this Trust Agreement. The Master Disbursement Trust shall, in each case in accordance with the Plan and this Trust Agreement: (a) hold, manage, sell, invest and distribute the MDT Transferred Assets for the benefit of the MDT Beneficiaries in accordance with the Plan, including the Private Entity Settlements and the Public Entity Settlements as set forth therein and incorporated herein; (b) enforce, pursue, prosecute, compromise and/or settle the MDT Causes of Action, the MDT Insurance Rights and the MDT Shareholder Rights, including monitoring and enforcing the Shareholder Settlement Agreement; (c) make payments in satisfaction of the MDT Claims; (d) make Public Creditor Trust Distributions from MDT Excess

3

Cash; and (e) publish on the MDT Website reports received from the Abatement Trusts regarding the disbursement and use of Abatement Distributions and compliance with Authorized Abatement Purposes. The Master Disbursement Trust shall not be deemed a successor in interest of the Debtors for any purpose other than as specifically set forth in the Plan, this Trust Agreement, or any other agreement entered into between the Master Disbursement Trustee and any of the Debtors.

Section 1.03.   <u>Vesting of the MDT Transferred Assets and Funding of the Master Disbursement Trust.</u>

(a)     On the Effective Date, pursuant to Section 5.6(b) of the Plan and in accordance with this Trust Agreement, the MDT Transferred Assets shall be irrevocably transferred to and vest in the Master Disbursement Trust free and clear of all Claims, Interests, Liens, other encumbrances and liabilities of any kind; *provided* that, to the extent certain Assets comprising the MDT Transferred Assets are not known or identified as of the Effective Date, such Assets shall automatically, and without further act or deed, be transferred to and vest in the Master Disbursement Trust upon the discovery or identification thereof, including, with respect to the Surplus Reserve Cash, in accordance with Section 5.13(c) of the Plan; *provided further* that the transfer of the MDT Insurance Rights and the MDT Shareholder Insurance Rights shall be made in accordance with Section 5.6(i) and (j) of the Plan and the Shareholder Settlement. The Master Disbursement Trust shall have no liability for any prepetition or postpetition Claims, Causes of Action or liabilities of any kind, in each case that have been or could have been asserted against the Debtors, their Estates or their property (including, but not limited to, Claims based on successor liability) based on any acts or omissions prior to the Effective Date, except as expressly set forth in the Plan and this Trust Agreement.

(b)     In accordance with the Plan, the MDT Transferred Assets shall consist of all right, title and interest of the Debtors arising under or attributable to:

(i)     the MDT Operating Reserve;

(ii)    the MDT Causes of Action;

(iii)   the MDT Insurance Rights, consisting of the Purdue Insurance Rights in respect of (A) the MDT Bermuda-Form Insurance Policies, as set forth on <u>Schedule 1</u> hereto, (B) the other MDT Insurance Policies, as defined in the Plan and including without limitation as set forth on <u>Schedule 2</u> hereto, but excluding in each case the Excluded Insurance Policies, as defined in the Plan and as set forth on <u>Schedule 3</u> hereto, and (C) the MDT Insurance Collateral, as set forth on <u>Schedule 4</u> hereto;[2]

---

[2] Notwithstanding anything to the contrary herein, (i) the MDT Insurance Rights with respect to the MDT Insurance Collateral for Isosceles Insurance Ltd. policy number PPLP-01/2019 shall be limited to the right to receive any such MDT Insurance Collateral remaining after the expiration of the policy period and any extension of coverage under such policy, (ii) the MDT Insurance Rights shall not include any right to interfere in any manner with the rights of the insureds under Isosceles Insurance Ltd. policy number PPLP-01/2019 prior to the expiration of the policy period and any extension of coverage under such policy and the resolution of all claims asserted thereunder and (iii) any persons who have unresolved claims under such policy at the expiration of the policy period, including any extension,

4

    (iv)    the MDT Shareholder Rights;

    (v)    Cash in an amount equal to the Initial Private Creditor Trust Distributions and the Initial Public Creditor Trust Distributions;

    (vi)    the TopCo Interests; and

    (vii)    any Surplus Reserve Cash to be distributed to the Master Disbursement Trust, upon the identification thereof by the Plan Administration Trustee or the dissolution of the Plan Administration Trust, in accordance with Section 5.13(c) of the Plan.

(c)    Pursuant to Section 5.11(c) of the Plan, the transfer to the Master Disbursement Trust of information and copies of documents, including books and records, in accordance with Section 5.11(b) of the Plan shall not result in the destruction or waiver of any applicable Privileges. Further, the transfer and/or vesting of any privileges shall occur solely in accordance with, and be subject in all respects to, Section 5.11(c) of the Plan, which is incorporated herein by reference.

(d)    The Debtors shall execute any documents or other instruments and shall take all other steps as the MDT Trustees reasonably request to reflect the transfer and assignment of the MDT Transferred Assets to the Master Disbursement Trust. Upon the transfer of the MDT Transferred Assets to the Master Disbursement Trust, neither the Debtors nor any other Person (other than the MDT Beneficiaries) shall have any interest in or with respect to the MDT Transferred Assets or the Master Disbursement Trust other than as expressly provided for under this Trust Agreement and the Plan. Upon delivery of the MDT Transferred Assets to the Master Disbursement Trust, the Debtors and their predecessors, successors and assigns shall be released from all liability with respect to the delivery thereof and shall have no reversionary or further interest in or with respect to the MDT Transferred Assets or the Master Disbursement Trust.

(e)    The transfer of the MDT Transferred Assets shall be exempt from any stamp, real estate transfer, mortgage reporting, sales, use or other similar tax, pursuant to section 1146(a) of the Bankruptcy Code.

(f)    The Master Disbursement Trust shall be funded with the proceeds of the MDT Transferred Assets and amounts, if applicable, received pursuant to the NewCo Credit Support Agreement.

(g)    The MDT Transferred Assets and all other Assets held from time to time by the Master Disbursement Trust under this Trust Agreement and any earnings, including interest, on

---

shall cooperate with and provide consent to the Master Disbursement Trust to resolve those claims in connection with the MDT Insurance Collateral after the expiration of the policy period, including any extension.

For the avoidance of doubt, pursuant to Section 8.8(c) of the Plan, on and after the Effective Date, all Purdue Insurance Policies that are not MDT Insurance Policies shall be deemed to be, and shall be treated as, executory contracts under the Plan, and shall be assumed by the applicable Debtor, and shall vest in NewCo, the applicable Transferred Debtor or the Plan Administration Trust, as applicable, in accordance with the NewCo Transfer Agreement and the PAT Agreement and continue in full force and effect in accordance with their respective terms.

any of the foregoing shall be held and be applied by the MDT Trustees solely in accordance with the terms of this Trust Agreement, the Plan and the Confirmation Order.

Section 1.04.   <u>Assumption of Channeled Claims and the Master TDP</u>.

(a)      As of the Effective Date, any and all liability of the Debtors and the other Protected Parties for any and all Channeled Claims shall automatically, and without further act, deed or court order, be channeled to and assumed by the Master Disbursement Trust solely for the purpose of effectuating the Master TDP, pursuant to which (i) each Channeled Claim shall either be automatically channeled to and assumed exclusively by a Creditor Trust or otherwise Disallowed and released in full and (ii) in consideration for the assumption by the Creditor Trusts of Channeled Claims in accordance therewith, the Master Disbursement Trust shall make the distributions and [issue] the beneficial interests, as applicable, to the Creditor Trusts as set forth in the Master TDP.

(b)      Distributions, in accordance with the applicable Creditor Trust TDP, from the Creditor Trust to which a Channeled Claim is channeled, in accordance with the Master TDP, shall be the sole source of recovery, if any, in respect of such Channeled Claim, and the Holder of such Channeled Claim shall have no other or further recourse to any Protected Party, including the Master Disbursement Trust. All Channeled Claims channeled to a Creditor Trust in accordance with the Master TDP shall be administered, liquidated and discharged solely pursuant to, and solely to the extent provided in, the applicable Creditor Trust TDP for such Creditor Trust. All Channeled Claims that are Disallowed and released and not channeled to a Creditor Trust in accordance with the Master TDP shall have no recourse to any Protected Party, including the Master Disbursement Trust. For the avoidance of doubt, in no event shall any Channeled Claim have any recourse to the Assets of the Master Disbursement Trust.

(c)      In furtherance of the foregoing, the Master Disbursement Trust, subject to and only to the extent provided in the MDT Documents, shall have all defenses, cross-claims, offsets and recoupments regarding the Channeled Claims that the Debtors, the Released Parties and the Shareholder Released Parties, as applicable, have, or would have had, under applicable law, but solely to the extent consistent with the MDT Documents and the Plan; *provided* that no such Claims, defenses or rights may be asserted against any Protected Party; and *provided further* that all such defenses, cross-claims, offsets and recoupments regarding any Channeled Claim that is channeled to a Creditor Trust in accordance with the Master TDP shall be transferred to such Creditor Trust with such Channeled Claim, at which point, the Master Disbursement Trust shall no longer have such defenses, cross-claims, offsets and recoupments regarding such Channeled Claim.

(d)      For the avoidance of doubt, nothing in this <u>Section 1.04</u> shall limit or affect the transfer of the MDT Insurance Rights to the Master Disbursement Trust.

(e)      Nothing in this Trust Agreement shall be construed in any way to limit the scope, enforceability, or effectiveness of the Channeling Injunction, Releases or Shareholder Releases under the Plan.

Section 1.05.   <u>Appointment and Acceptance of Initial MDT Trustees</u>. Upon the occurrence of the Effective Date, each of the initial MDT Trustees identified in <u>Section 8.01(a)</u> hereof shall

be appointed to serve as the trustees of the Master Disbursement Trust pursuant to sections 1123(a)(5), (a)(7) and (b)(3)(B) of the Bankruptcy Code, subject to the terms of the Plan, the Confirmation Order and this Trust Agreement. The MDT Trustees accept the grant, assignment, transfer, conveyance and delivery to the Master Disbursement Trust, on behalf, and for the benefit, of the MDT Beneficiaries, by the Debtors of all of the MDT Transferred Assets, upon and subject to the terms and conditions set forth herein, in the Plan and in the Confirmation Order. The MDT Trustees shall have and perform all of the duties, responsibilities, rights and obligations of the Master Disbursement Trust set forth in the Plan and this Trust Agreement, as applicable. The MDT Trustees, subject to the terms and conditions of the Plan, the Confirmation Order and this Trust Agreement, shall be authorized to execute, deliver, file or record such documents, contracts, instruments, releases and other agreements, and to take such actions as may be necessary or appropriate, to effectuate and further evidence the terms and conditions of the Plan, any agreement entered into in connection with the Plan, including the Shareholder Settlement Agreement and the NewCo Credit Support Agreement, and this Trust Agreement. The MDT Trustees' powers are exercisable solely in a fiduciary capacity consistent with, and in furtherance of, the purpose of the Master Disbursement Trust and not otherwise. The MDT Trustees shall have the authority to bind the Master Disbursement Trust within the limitations set forth in this Trust Agreement, but shall for all purposes hereunder be acting in their respective capacities as MDT Trustees, and not individually.

Section 1.06.  No Reversion to Debtors. In no event shall any part of the MDT Transferred Assets revert to or be distributed to any Debtor.

Section 1.07.  Relationship to Plan. The principal purpose of this Trust Agreement is to aid in the implementation of the Plan and therefore this Trust Agreement incorporates the provisions of the Plan and the Confirmation Order (which may amend or supplement the Plan). To the extent that there is conflict between the provisions of this Trust Agreement, the provisions of the Plan, or the Confirmation Order, each document shall have controlling effect in the following rank order: (1) the Confirmation Order; (2) the Plan; and (3) this Trust Agreement.

Section 1.08.  Incidents of Ownership. Except as otherwise provided in this Trust Agreement, the MDT Beneficiaries shall be the sole beneficiaries of the Master Disbursement Trust, and the MDT Trustees shall retain only such incidents of ownership as are necessary to undertake the actions and transactions authorized herein, in the Plan and in the Confirmation Order, including those powers set forth in this Trust Agreement.

ARTICLE II
MDT BENEFICIARIES

Section 2.01.  MDT Claims and MDT Interests.

(a)    On the Effective Date, the MDT Federal Government Claim shall be [issued] to the United States in accordance with Section 4.3(b) of the Plan.

(b)    On the Effective Date, upon the assumption by the Creditor Trusts of the applicable Channeled Claims as set forth in the Master TDP, each MDT Private Claim and the MDT Interest shall be [issued] to the applicable Creditor Trust in accordance with the Plan and the Master TDP.

7

(c)      No beneficial interests in the Master Disbursement Trust shall be [issued] other than as provided in the foregoing paragraphs (a) and (b).

Section 2.02.    <u>Disputed or Conflicting Claims or Demands</u>. If any dispute arises with respect to a payment or distribution on account of an MDT Claim or MDT Interest, the MDT Trustees shall be entitled to elect to make no payment or distribution with respect to such MDT Claim or MDT Interest subject to the dispute and the MDT Trustees shall promptly refer such dispute to the Bankruptcy Court, which shall have exclusive jurisdiction over resolution of such disputes; *provided* that any undisputed portion of such payment or distribution shall not be deferred pending such resolution. In so doing, the MDT Trustees shall not be or become liable to any party for its refusal to make such payment or distribution. The MDT Trustees shall be entitled to refuse to act until either (a) the rights of the adverse claimants have been adjudicated by a Final Order of the Bankruptcy Court or such other court of proper jurisdiction or (b) all disputes have been resolved by a written agreement among all such parties and the MDT Trustees, which agreement shall include a complete release of the Master Disbursement Trust, the MDT Trustees and the MDT Executive Director (the occurrence of either (a) or (b) in this <u>Section 2.02</u> of this Trust Agreement being referred to as a "<u>Dispute Resolution</u>"). Promptly after a Dispute Resolution is reached, the MDT Trustees shall transfer the payments and distributions, if any, in accordance with the terms of such Dispute Resolution.

Section 2.03.    <u>Rights of MDT Beneficiaries</u>. Each MDT Beneficiary shall be entitled to participate in the rights and benefits due to an MDT Beneficiary hereunder according to the terms of its MDT Claim or MDT Interest, as applicable. Other than as expressly set forth in this Trust Agreement, the MDT Claims and MDT Interests shall not have consent or voting rights or otherwise confer on the MDT Beneficiaries any rights similar to the rights of a shareholder of a corporation in respect of any actions taken or to be taken by the MDT Trustees in connection with the Master Disbursement Trust. The MDT Claim or MDT Interest, as applicable, of an MDT Beneficiary is hereby declared and shall be in all respects personal property. Except as expressly provided hereunder, an MDT Beneficiary shall have no title to, right to, possession of, management of or control of the Master Disbursement Trust or the MDT Transferred Assets or to any right to call for a partition or division of such assets or to require an accounting. The whole title to the MDT Transferred Assets shall be vested in the Master Disbursement Trust, and the sole interest of each MDT Beneficiary shall be the rights and benefits given to such MDT Beneficiary under this Trust Agreement, the Confirmation Order and the Plan. For the avoidance of doubt, upon the payment in full in Cash of any MDT Claim, the holder of such MDT Claim shall immediately cease to be an MDT Beneficiary for all purposes under this Trust Agreement, and the Master Disbursement Trust shall have no further fiduciary duties thereto.

Section 2.04.    <u>Nontransferability of MDT Claims and MDT Interests</u>. Except in respect of the United States-PI Claimant Medical Expense Claim Settlement as set forth in the Plan, the MDT Claims and MDT Interests shall be nontransferable and nonassignable.

Section 2.05.    <u>Limited Liability</u>. No provision of this Trust Agreement, the Plan or the Confirmation Order, and no mere enumeration herein of the rights or privileges of any MDT Beneficiary, shall give rise to any liability of such MDT Beneficiary solely in its capacity as such, whether such liability is asserted by any Debtor, creditor, successor, representative, employee or equity interest holder of any Debtor, or by any other Person. MDT Beneficiaries shall be deemed

to receive the MDT Claims and MDT Interests, as applicable, in the Master Disbursement Trust in accordance with the provisions of this Trust Agreement, the Plan and the Confirmation Order without further obligation or liability of any kind, but subject to the provisions of this Trust Agreement.

<div align="center">

ARTICLE III
POWERS AND TRUST ADMINISTRATION
</div>

Section 3.01.  Powers of the MDT Trustees.

(a)     Pursuant to the terms of the Plan, the Confirmation Order and this Trust Agreement, the MDT Trustees shall have all powers necessary to accomplish the purposes of the Master Disbursement Trust in accordance with this Trust Agreement, the Plan and the Confirmation Order. The MDT Trustees shall (i) have the power and authority to perform all functions on behalf of the Master Disbursement Trust, (ii) be responsible for all decisions and duties with respect to the Master Disbursement Trust and the MDT Transferred Assets, and (iii) in all circumstances, and at all times, act in a fiduciary capacity for the benefit of and in the best interests of the MDT Beneficiaries, in furtherance of the purposes of the Master Disbursement Trust, and in accordance with the Plan and this Trust Agreement.

(b)     Without limiting, but subject to, the foregoing paragraph (a), and except as limited in the Plan, this Trust Agreement and by applicable law, the MDT Trustees shall be expressly authorized to:

(i)     hold and maintain the MDT Operating Reserve;

(ii)    periodically, until the dissolution of the Master Disbursement Trust, replenish the MDT Operating Reserve from Cash held or received by the Master Disbursement Trust to the extent deemed necessary by the MDT Trustees to satisfy and pay estimated future MDT Operating Expenses;

(iii)   delegate certain duties to the MDT Executive Director;

(iv)    make distributions to MDT Beneficiaries in accordance with the Plan and this Trust Agreement;

(v)     determine MDT Distribution Dates, to the extent permitted by the Plan and this Trust Agreement;

(vi)    prosecute any MDT Causes of Action, including those relating to and necessary to enforce the MDT Insurance Rights and the MDT Shareholder Rights, on behalf of the Master Disbursement Trust, elect not to pursue any MDT Causes of Action, and determine whether and when to compromise, settle, abandon, dismiss or otherwise dispose of any such MDT Causes of Action;

(vii)   retain MDT Professionals to assist in performing their duties under the Plan and hereunder;

<div align="center">9</div>

(viii)    prepare the MDT Operating Budgets;

(ix)    maintain the books, records and accounts of the Master Disbursement Trust;

(x)    invest Cash of the Master Disbursement Trust only to the extent permitted hereunder;

(xi)    incur and pay reasonable and necessary expenses in connection with the performance of duties under the Plan, including the reasonable fees and expenses of the MDT Professionals;

(xii)    administer the Master Disbursement Trust's tax obligations, including, but not limited to, representing the interest and account of the Master Disbursement Trust before any taxing authority in all matters including any claim, defense, action, suit, proceeding or audit;

(xiii)    in the case of the MDT Trustee or MDT Executive Director (if so designated by the MDT Trustees) who is the "administrator" within the meaning of Treasury Regulations section 1.468B-2(k)(3), perform the duties and functions contemplated in Section 6.01(b) of this Trust Agreement;

(xiv)    maintain appropriate liability insurance for the Indemnified Parties;

(xv)    pay statutory fees;

(xvi)    institute procedures, terms and conditions for any actions brought against any MDT Insurer consistent with Section 3.01(e) herein; and

(xvii)    perform such other duties and functions that are consistent with the implementation of the Plan and this Trust Agreement.

(c)    The MDT Trustees shall be empowered to initiate, prosecute, defend and resolve all legal actions and other proceedings related to any Asset, liability or responsibility of the Master Disbursement Trust, including in respect of the MDT Causes of Action, the MDT Insurance Rights and the MDT Shareholder Rights. Such legal actions and other proceedings shall be limited solely to those required for the purposes of satisfying the responsibilities of the Master Disbursement Trust, including in respect of the MDT Causes of Action, the MDT Insurance Rights and the MDT Shareholder Rights. The MDT Trustees shall be empowered to initiate, prosecute, defend and resolve all such actions in the name of the Debtors or their Estates, in each case if deemed necessary or appropriate by the MDT Trustees. The Master Disbursement Trust shall be responsible for the payment of all damages, awards, judgments, settlements, expenses, costs, fees and other charges incurred subsequent to the date upon which the Master Disbursement Trust is established arising from, or associated with, any legal action or other proceeding brought pursuant to the foregoing.

(d)    Except as otherwise provided in this Trust Agreement, the MDT Trustees shall not be required to obtain any order or approval of the Bankruptcy Court or any other court of competent jurisdiction, or account to the Bankruptcy Court or any other court of competent jurisdiction, for the exercise of any right, power or privilege conferred hereunder.

(e)    To the extent the MDT Trustees make a good faith determination that some or all of the MDT Insurance Proceeds are substantially unrecoverable by the Master Disbursement Trust, the MDT Trustees shall have the sole and exclusive authority at any time, upon written notice to any affected MDT Insurer and the MDT Beneficiaries, to terminate, reduce or limit the scope of the MDT Insurer Injunction with respect to any MDT Insurer; *provided* that:

    (i)    any termination, reduction, or limitation of the MDT Insurer Injunction shall apply equally to all Classes of Claims;

    (ii)    the termination, reduction or limitation of the MDT Insurer Injunction as it relates to the MDT Bermuda-Form Insurance Policies shall be subject to the consent (not to be unreasonably withheld, conditioned or delayed) of the Creditor Trustee for the PI Trust;

    (iii)    the MDT Trustees shall implement procedures, terms and conditions with which any actions asserted against MDT Insurers as a result of the termination, reduction or limitation of the MDT Insurer Injunction must comply[; *provided* that any such procedures, terms or conditions shall be subject to the consent (not to be unreasonably withheld, conditioned or delayed) of (i) a majority of the MDT Trustees, (ii) NOAT, (iii) until the payment in full of the MDT Claims, a majority in number of the MDT Beneficiaries other than NOAT and (iv) with respect to any suits seeking recoveries under the MDT Bermuda-Form Insurance Policies, the Creditor Trustee for the PI Trust]; and

    (iv)    except as provided in the procedures, terms and conditions described in the foregoing clause (iii), all proceeds recovered on account of actions asserted against MDT Insurers shall be transferred to the Master Disbursement Trust for distribution in accordance with the Plan, the Master TDP, and this Trust Agreement.

Section 3.02.    General Administration.

(a)    The MDT Trustees shall prepare and file or cause to be prepared and filed with the Bankruptcy Court, within forty-five (45) days after the last day of the fourth month following the Effective Date and after the last day of every fourth month thereafter, a thrice yearly report (the "MDT Report") containing reasonable information regarding the Master Disbursement Trust and the MDT Trustees' activities (on a cumulative basis since the Effective Date and in the four-month period then ended), including with regard to (i) the MDT Shareholder Rights (or any reporting received pursuant to the Shareholder Settlement Agreement), (ii) the MDT Insurance Rights or the MDT Shareholder Insurance Rights (including any proceedings in respect thereof), (iii) the assets of the Master Disbursement Trust (including valuation thereof), (iv) expenditures of the Master Disbursement Trust, (v) distributions made by the Master Disbursement Trust and (vi) forward-looking projections with respect to the foregoing, in each case as the MDT Trustees deem to be reasonable and appropriate under the circumstances, taking into account the best interests of the MDT Beneficiaries and the purposes of the Master Disbursement Trust in accordance with the Plan and this Trust Agreement. The MDT Trustees shall provide a copy of

each MDT Report to each of the Creditor Trustees for the Creditor Trusts and shall publish it on the MDT Website when such MDT Report is filed with the Bankruptcy Court.

(b)      The MDT Trustees shall, in connection with the filing of each MDT Report, host a call for the MDT Beneficiaries to answer questions of the MDT Beneficiaries relating to the MDT Report, and shall otherwise make themselves reasonably available to answer questions of the MDT Beneficiaries relating to the Master Disbursement Trust's activities.

(c)      The MDT Trustees shall prepare and deliver or cause to be prepared and delivered to the MDT Beneficiaries prior to each Scheduled MDT Distribution Date an annual budget of MDT Operating Expenses (the "MDT Operating Budget") for the twelve (12)-month period following such Scheduled MDT Distribution Date, which MDT Operating Budget shall be reviewed by, and reasonably acceptable to, the MDT Beneficiaries. In the event there is a dispute with respect to any MDT Operating Budget, the MDT Trustees shall refer such dispute to the Bankruptcy Court, which shall have exclusive jurisdiction over resolution of such disputes. The MDT Trustees shall undertake to manage the expenses of the Master Disbursement Trust in accordance with the MDT Operating Budget.

(d)      The MDT Trustees shall establish a publicly available website (the "MDT Website") as soon as reasonably practicable after the Effective Date to aid in communicating information to the MDT Beneficiaries and Holders of Channeled Claims and in making the activities of the Master Disbursement Trust as transparent as possible. The MDT Trustees shall publish on the MDT Website (i) all reports received from the Abatement Trusts regarding the disbursement and use of Abatement Distributions and compliance with the Authorized Abatement Purposes, (ii) each MDT Report prepared and filed with the Bankruptcy Court in accordance with Section 3.02(a) hereof and (iii) such other information as the MDT Trustees deem prudent.

Section 3.03.   Master TDP. The Master TDP shall become effective and be automatically implemented according to its terms and the terms of the Plan upon the Effective Date, without any further order of the Bankruptcy Court or action by the MDT Trustees or any other Person. In the event any Person asserts any potential or alleged Channeled Claim against the Master Disbursement Trust, the MDT Trustees shall refer such potential or alleged Channeled Claim to the Bankruptcy Court, which shall determine whether such Person has a Channeled Claim and, if such Person has a Channeled Claim, whether such Channeled Claim is channeled to a Creditor Trust or otherwise released in accordance with the Master TDP.

ARTICLE IV
DURATION AND TERMINATION OF THE MASTER DISBURSEMENT TRUST

Section 4.01.   Duration. The Master Disbursement Trust was formed as of the execution and filing of a Certificate of Trust with the Delaware Secretary of State on [●], 2021 and its existence is intended to continue until such time as its Certificate of Trust has been cancelled by the filing of a certificate of cancellation in accordance with Section 4.03 of this Trust Agreement.

Section 4.02.   Dissolution of the Master Disbursement Trust. The Master Disbursement Trust shall be dissolved and the MDT Trustees and the MDT Executive Director shall be

discharged from their respective duties with respect to the Master Disbursement Trust upon completion of their duties as set forth in the Plan and this Trust Agreement, which, for the avoidance of doubt, shall be no earlier than the date on which (a) all Assets held by the Master Disbursement Trust, including the MDT Transferred Assets, have been liquidated and (b) all payments and other distributions required to be made from the Master Disbursement Trust under the Plan and this Trust Agreement have been made, including payment in full in Cash of all MDT Claims, unless dissolution on an earlier date is authorized pursuant to a Final Order of the Bankruptcy Court. Upon dissolution of the Master Disbursement Trust, any Cash remaining in the MDT Operating Reserve or otherwise held by the Master Disbursement Trust shall be distributed in accordance with the MDT Priority Waterfall and this Trust Agreement; *provided* that, in the event the Master Disbursement Trust is dissolved prior to the payment in full in Cash of all MDT Claims, all outstanding amounts under such MDT Claims shall be deemed due and payable for purposes of the distribution of such remaining Cash pursuant to the MDT Priority Waterfall. Subject to the foregoing sentences, the Master Disbursement Trust shall be dissolved at such time as the MDT Trustees determine that the administration of any remaining assets of the Master Disbursement Trust is not likely to yield sufficient additional proceeds to justify further pursuit.

Section 4.03.    Continuance of Master Disbursement Trust for Winding Up. After the dissolution of the Master Disbursement Trust and solely for the purpose of liquidating and winding up the affairs of the Master Disbursement Trust, the MDT Trustees, or the MDT Executive Director, shall continue to act as such until their duties have been fully performed. As soon as practicable after the MDT Trustees exhaust substantially all of the assets of the Master Disbursement Trust, the MDT Trustees shall, at the expense of the Master Disbursement Trust, (a) provide for the retention and storage of the Master Disbursement Trust's books and records until such time as all such books and records are no longer required to be retained under applicable law, (b) file a certificate with the Bankruptcy Court informing the Bankruptcy Court of the location at which such books and records are being stored and stating that the assets of the Master Disbursement Trust have been exhausted and that final distributions of Cash have been made pursuant to the Plan and this Trust Agreement, (c) notify the MDT Beneficiaries that the MDT Trustees have exhausted substantially all of the assets of the Master Disbursement Trust, and (d) file a certificate of cancellation with the Secretary of State of the State of Delaware to terminate the Master Disbursement Trust. Upon the taking of such actions in the preceding sentence, the Master Disbursement Trust shall be deemed dissolved for all purposes without the necessity for any other or further actions to be taken by or on behalf of the Master Disbursement Trust or payments to be made in connection therewith.

ARTICLE V
ACCOUNTS, INVESTMENTS AND PAYMENTS

Section 5.01.    Accounts. The MDT Trustees may, from time to time, create such accounts and reserves within or in the name of the Master Disbursement Trust as they may deem necessary, prudent or useful in order to discharge their duties hereunder and may, with respect to any such accounts or reserves, restrict the use of monies therein, and the earnings or accretions thereto (the "Trust Subaccounts"). Any such Trust Subaccounts established by the Trustees shall be held as Trust Assets and are not intended to be subject to separate entity tax treatment as "disputed claims reserves" within the meaning of the IRC or Treasury Regulations, "disputed ownership funds" within the meaning of the IRC or Treasury Regulations, or otherwise.

13

Section 5.02.  <u>MDT Operating Reserve</u>. On and after the Effective Date, the MDT Operating Reserve shall be held in a single segregated account administered by the MDT Trustees to pay any and all MDT Operating Expenses. On the Effective Date, the Debtors shall establish and fund the MDT Operating Reserve in accordance with the Plan, which shall vest in the Master Disbursement Trust in accordance with Section 5.6(b) of the Plan and be held and maintained by the MDT Trustees. All MDT Operating Expenses shall be satisfied and paid from the MDT Operating Reserve. Periodically, until the dissolution of the Master Disbursement Trust, the MDT Trustees shall replenish the MDT Operating Reserve from Cash held or received by the Master Disbursement Trust to the extent deemed necessary by the MDT Trustees to satisfy and pay estimated future MDT Operating Expenses.

Section 5.03.  <u>MDT Claims Reserve</u>. Upon the commencement and during the continuation of an MDT Reserve Period, the MDT Trustees shall establish the MDT Claims Reserve in a single segregated account administered by the MDT Trustees in accordance with the Plan and this Trust Agreement. For so long as an MDT Reserve Period is continuing, the MDT Claims Reserve shall remain in place and shall be funded, as of each relevant date of determination, in an amount equal to (a) all outstanding amounts then due on account of the MDT Claims plus (b) all installments of the MDT Claims due on the Scheduled MDT Distribution Date immediately following such date of determination; *provided* that, solely for purposes of any date of determination that is a NewCo Distribution Date on January 30 of any year, if the applicable MDT Reserve Period is continuing solely as a result of a payment default by certain Shareholder Payment Groups, this clause (b) shall be an amount equal to the installments of the MDT Claims due on the Scheduled MDT Distribution Date immediately following such NewCo Distribution Date multiplied by the SSA Percentage of such defaulting Shareholder Payment Groups for the next SSA Payment Date following such NewCo Distribution Date (the sum of the amounts in the foregoing clauses (a) and (b), the "<u>MDT Claims Reserve Funding Amount</u>").

Section 5.04.  <u>Investments</u>.

(a)     Investment of monies held in the Master Disbursement Trust shall comply with the guidelines set forth in <u>Exhibit B</u> to this Trust Agreement.

(b)     The foregoing paragraph (a) shall not apply to securities, instruments or other assets received as, or obtained as proceeds of, the MDT Transferred Assets, the NewCo Credit Support Agreement, or, solely to the extent approved with the unanimous consent of the MDT Trustees, litigation or otherwise to resolve disputes.

Section 5.05.  <u>Source of Payments</u>. All Master Disbursement Trust expenses and payments shall be payable solely out of the assets of the Master Disbursement Trust. None of the MDT Trustees, the MDT Executive Director or any other Protected Party shall be liable for the payment of any Master Disbursement Trust expense or payment or any other liability of the Master Disbursement Trust, except to the extent provided in the Plan or Plan Documents.

ARTICLE VI
TAX MATTERS

Section 6.01.   U.S. Federal Income Tax Treatment.

(a)      The Master Disbursement Trust is intended to be treated, and shall be reported, as a "qualified settlement fund" within the meaning of Section 1.468B-1 et seq. of the Treasury Regulations promulgated under Section 468B of the IRC (the "QSF Regulations") and shall be treated consistently for state and local tax purposes, to the extent applicable. All parties (including the Debtors, the Master Disbursement Trust, the MDT Trustees and the Creditor Trusts) shall report consistently with the foregoing.

(b)      An MDT Trustee or the MDT Executive Director, as determined by a majority vote of the MDT Trustees, shall be the "administrator," within the meaning of Treasury Regulations section 1.468B-2(k)(3), of the Master Disbursement Trust. The administrator of the Master Disbursement Trust shall be responsible for (i) preparing and filing, or causing to be prepared and filed, all tax returns of the Master Disbursement Trust and the payment, out of the Assets of the Master Disbursement Trust, of any taxes due by or imposed on the Master Disbursement Trust and (ii) complying with all applicable tax reporting and withholding obligations. The MDT Trustees shall be responsible for causing the Master Disbursement Trust to satisfy all requirements necessary to qualify and maintain qualification of the Master Disbursement Trust as a qualified settlement fund within the meaning of the QSF Regulations, and shall take no action that could cause the Master Disbursement Trust to fail to qualify as a qualified settlement fund within the meaning of the QSF Regulations. The MDT Trustees may request an expedited determination under section 505(b) of the Bankruptcy Code for all tax returns filed by or on behalf of the Master Disbursement Trust for all taxable periods through the dissolution of the Master Disbursement Trust.

(c)      Subject to Section 6.01(b) of this Trust Agreement, following the Effective Date, the MDT Trustees shall be responsible for all of the Master Disbursement Trust's tax matters, including, without limitation, tax audits, claims, defenses and proceedings. The MDT Trustees shall also file (or cause to be filed) any other statement, return or disclosure relating to the Master Disbursement Trust that is required by any governmental unit and be responsible for payment, out of the MDT Operating Reserve, of any taxes imposed on the Master Disbursement Trust or its assets.

Section 6.02.   Tax Withholdings. The administrator of the Master Disbursement Trust shall withhold and pay to the appropriate tax authority all amounts required to be withheld pursuant to the IRC or any provision of any foreign, state, or local tax law with respect to any payment or distribution to the MDT Beneficiaries. All such amounts withheld and paid to the appropriate tax authority shall be treated as amounts distributed to such MDT Beneficiaries for all purposes of this Trust Agreement. The MDT Trustees shall be authorized to collect such tax information from the MDT Beneficiaries (including tax identification numbers) as in their sole discretion the MDT Trustees deem necessary to effectuate the Plan, the Confirmation Order, and this Trust Agreement. In order to receive distributions, all MDT Beneficiaries shall be required to provide tax information to the MDT Trustees to the extent the MDT Trustees deem appropriate in the manner and in accordance with the procedures from time to time established by the MDT Trustees for these

15

purposes. The MDT Trustees may refuse to make a payment or distribution to an MDT Beneficiary that fails to furnish such information in a timely fashion, and until such information is delivered may treat such MDT Beneficiary's MDT Claim or MDT Interest, as applicable, as disputed; *provided*, *however*, that, upon the delivery of such information by an MDT Beneficiary, the MDT Trustees shall make such payment or distribution to which such MDT Beneficiary is entitled, without additional interest occasioned by such MDT Beneficiary's delay in providing tax information. Notwithstanding the foregoing, if an MDT Beneficiary fails to furnish any tax information reasonably requested by the MDT Trustees before the date that is three hundred sixty-five (365) calendar days after the request is made or, if earlier, the date on which the Master Disbursement Trust is terminated in accordance with Article IV of this Trust Agreement, the amount of such payment or distribution shall irrevocably revert to the Master Disbursement Trust, and any MDT Claim with respect to such distribution shall be discharged and forever barred from assertion against the Master Disbursement Trust Beneficiary or its property.

ARTICLE VII
DISTRIBUTIONS

Section 7.01.   Distributions.

(a)      The MDT Trustees shall distribute all MDT Transferred Assets on behalf of the Master Disbursement Trust in accordance with the Plan and this Trust Agreement.

(b)      In accordance with the Master TDP, on the Effective Date, or as soon thereafter as reasonably practicable, the Master Disbursement Trust shall (i) make the Initial Private Creditor Trust Distributions to the Private Creditor Trusts and (ii) make the Initial Public Creditor Trust Distributions and distribute the TopCo Interests to NOAT and TAFT.

(c)      Subject to Section 7.03 of this Trust Agreement, the MDT Trustees shall make distributions after the Effective Date as follows:

(i)      on each MDT Distribution Date, the MDT Trustees shall apply all Cash and cash equivalents of the Master Disbursement Trust (other than amounts subject to distribution in accordance with Section 5.2(d)(iv)(A) and (B) of the Plan) in accordance with the MDT Priority Waterfall;

(ii)     until the MDT PI Claim has been paid in full in Cash, no later than thirty (30) days after the receipt by the Master Disbursement Trust of any MDT Bermuda-Form Insurance Proceeds, the MDT Trustees shall make the distribution to the PI Trust required pursuant to Section 5.2(d)(iv)(A) of the Plan; and

(iii)    until all MDT Claims have been paid in full in Cash, no later than ten (10) Business Days after the receipt by the Master Disbursement Trust of any MDT Distributable Sale Proceeds, the MDT Trustees shall make the distributions to the MDT Beneficiaries of the MDT Claims required pursuant to Section 5.2(d)(iv)(B) of the Plan.

16

(d)    The MDT Trustees shall not make any distributions, including to MDT Beneficiaries on account of the MDT Claims or MDT Interests or to NewCo or TopCo on account of repayments under the NewCo Credit Support Agreement, other than as provided in the foregoing paragraphs (b) and (c).

(e)    All distributions made by the MDT Trustees to any MDT Beneficiary shall be made on no less than ten (10) Business Days' notice to all MDT Beneficiaries, and thereafter shall become the property of such MDT Beneficiary, free and clear of all Claims, Liens or other recourse or encumbrances, and shall not be subject to attachment, disgorgement or recoupment by any Person, subject to Section 7.05 hereof; *provided* that such ten (10) Business Days' notice period shall not be required for the distributions to be made on the Effective Date in accordance with the Master TDP.

Section 7.02.    Distribution Dates.

(a)    The initial Scheduled MDT Distribution Date shall be [●].[3] Reasonably promptly after the Effective Date, the MDT Trustees shall provide notice to all MDT Beneficiaries of the date of such initial Scheduled MDT Distribution Date.

(b)    Subject to Section 7.03(a) hereof, the second Scheduled MDT Distribution Date shall be July 31, 2023 and each successive Scheduled MDT Distribution Date thereafter shall be on the twelve (12)-month anniversary of the preceding Scheduled MDT Distribution Date;

(c)    Subject to Section 7.03(a) hereof, there shall be an MDT Distribution Date on each date that is ten (10) Business Days after the receipt by the Master Disbursement Trust of a Shareholder Prepayment in accordance with Section 5.2(d)(iv)(C) of the Plan.

(d)    Subject to Section 7.03 of the Plan, the MDT Trustees may, in their discretion, acting in accordance with their fiduciary duties to the MDT Beneficiaries in accordance with Section 5.6(f) of the Plan, declare an MDT Distribution Date on any other date on which the MDT Trustees seek to make a repayment to NewCo or TopCo or a Public Creditor Trust Distribution.

(e)    In the event that an MDT Distribution Date is a date that is not a Business Day, such MDT Distribution Date shall automatically be deemed to occur on the next succeeding Business Day.

Section 7.03.    Escrow Periods and MDT Reserve Periods.

(a)    No distributions shall be made to MDT Beneficiaries during an Escrow Period. If an Escrow Period is in effect on any date that would otherwise be an MDT Distribution Date or on which a distribution would otherwise be required to be paid by the Master Disbursement Trust, such MDT Distribution Date shall be deemed to not occur and such distribution shall be deemed to not be required to be paid, in each case, until the next Business Day following the termination of such Escrow Period. The MDT Trustees shall provide prompt written notice to all MDT

---

[3] Expected to be July 31, 2022.

Beneficiaries upon the commencement and upon the termination of any Escrow Period in accordance with the Shareholder Settlement Agreement.

(b)    An MDT Reserve Period shall commence immediately, and the MDT Trustees shall promptly provide notice thereof to NewCo, TopCo and each MDT Beneficiary, upon the occurrence of any of the following events: (i) any amount is not paid to the Master Disbursement Trust when due under the Shareholder Settlement Agreement, (ii) the MDT Trustees determine, after the receipt of a written acknowledgment by any obligor under the Shareholder Settlement Agreement that any amounts due on the next SSA Payment Date are not expected to be paid and that the Master Disbursement Trust is not likely to be able to fund the payments due on account of the MDT Claims on the next Scheduled MDT Distribution Date after taking into account all sources of liquidity and expected recoveries by the Master Disbursement Trust or (iii) the MDT Trustees determine, on or after the date that is one hundred twenty (120) days prior to July 31, 2024, that the Master Disbursement Trust is not likely to be able to fund the payments due on account of the MDT Claims on July 31, 2024 from the payments due under the Shareholder Settlement Agreement and other sources of liquidity and expected recoveries by the Master Disbursement Trust. Each MDT Reserve Period shall continue until either (x) all currently and past due payments under the Shareholder Settlement Agreement have been paid in full and, with respect to any MDT Reserve Period commencing or continuing based upon a determination by the MDT Trustees under clause (ii) or (iii) of the foregoing sentence, the MDT Trustees determine that the circumstances described in such clauses are no longer reasonably likely to occur or (y) the MDT Trustees determine that the Master Disbursement Trust is not reasonably likely to be unable to make the required payments on account of the MDT Claims on the next Scheduled MDT Distribution Date. The MDT Trustees shall provide prompt written notice to all MDT Beneficiaries upon the commencement and upon the termination of any MDT Reserve Period.

(c)    Upon the commencement of an MDT Reserve Period, the MDT Trustees shall establish and fund the MDT Claims Reserve in an amount equal to the MDT Claims Reserve Funding Amount. For so long as such MDT Reserve Period is continuing, the MDT Claims Reserve shall remain in place and no Public Creditor Trust Distributions, nor any repayments by the Master Disbursement Trust to NewCo or TopCo, shall be made until the MDT Operating Reserve is fully funded in an amount deemed necessary by the MDT Trustees to satisfy and pay estimated future MDT Operating Expenses and the MDT Claims Reserve is fully funded in an amount equal to the MDT Claims Reserve Funding Amount, in each case, determined as of the proposed date of such Public Creditor Trust Distribution or repayment to NewCo or TopCo. For the avoidance of doubt, notwithstanding the occurrence and continuation of an MDT Reserve Period, so long as the MDT Operating Reserve and the MDT Claims Reserve are fully funded, the Master Disbursement Trust shall continue to make Public Creditor Trust Distributions from MDT Excess Cash solely in accordance with Section 5.2(e) of the Plan and this Trust Agreement.

Section 7.04.    Public Creditor Trust Distributions. All Public Creditor Trust Distributions from the Master Disbursement Trust shall be allocated between NOAT, on the one hand, and TAFT, on the other hand, in accordance with the Public Entity Allocation. In order to effectuate the Public Entity Allocation, the MDT Trustees shall maintain written records of each Public Creditor Trust Distribution made to NOAT, TAFT or Tribe Opioid LLC by TopCo or the Master Disbursement Trust. Prior to each NewCo Distribution Date and MDT Distribution Date, the MDT Trustees shall calculate the then-current Public Entity Allocation and provide written notice

thereof to each of TopCo, NOAT, TAFT and Tribe Opioid LLC so that all Public Creditor Trust Distributions, whether from the Master Disbursement Trust or TopCo, to be made on or in connection with such NewCo Distribution Date or MDT Distribution Date can be made in accordance therewith. In furtherance of the foregoing, the TopCo Managers shall provide to the MDT Trustees advance written notice of each Public Creditor Trust Distribution to be made by TopCo and any other information with respect to Public Creditor Trust Distributions reasonably requested by the MDT Trustees. For the avoidance of doubt, none of the MDT Trustees or the Master Disbursement Trust shall have any liability for any Public Creditor Trust Distribution made by TopCo.

Section 7.05.  Restriction on Use of Distributions by Creditor Trusts. Each distribution made by the Master Disbursement Trust to the Creditor Trusts, including all Public Creditor Trust Distributions received on account of the TopCo Interests, shall be used exclusively for the administration (including the payment of Creditor Trust Operating Expenses) of such Creditor Trust, to make Distributions in accordance with the applicable Creditor Trust TDP on account of Channeled Claims channeled to such Creditor Trust pursuant to the Master TDP and for such other purposes as may be specifically set forth in the applicable Creditor Trust Documents and the Plan, including the assessments required pursuant to Section 5.8 of the Plan.

## ARTICLE VIII
### MDT TRUSTEES, MDT EXECUTIVE DIRECTOR AND RESIDENT TRUSTEE

Section 8.01.  The MDT Trustees.

(a)    There shall be three (3) MDT Trustees. The initial MDT Trustees shall be [●], [●] and [●]. References herein to the MDT Trustees shall refer to the individuals serving as the MDT Trustees solely in their respective capacities as trustees hereunder.

(b)    Unless otherwise provided herein, any act of the Master Disbursement Trust shall require the approval of and shall be approved by the affirmative vote of a majority of the MDT Trustees.

(c)    The MDT Trustees shall not be required to post any bond or other form of surety or security unless otherwise ordered by the Bankruptcy Court.

Section 8.02.  Term of Service of the MDT Trustees.

(a)    Each MDT Trustee shall serve until the earliest of (i) his or her death, (ii) his or her resignation pursuant to Section 8.02(b) hereof, (iii) his or her removal pursuant to Section 8.02(c) hereof and (iv) such MDT Trustee complying with his or her obligations pursuant to Section 4.03 following the dissolution of the Master Disbursement Trust pursuant to Section 4.02 hereof.

(b)    An MDT Trustee may resign from the Master Disbursement Trust by giving not less than sixty (60) days' prior written notice thereof to each of the other MDT Trustees. Such resignation shall become effective on the later to occur of (i) the date specified in such written notice, (ii) the effective date of the appointment of a successor MDT Trustee in accordance with Section 8.03(a) of this Trust Agreement and such successor's acceptance of such appointment in accordance with Section 8.03(b) of this Trust Agreement and (iii) if such MDT Trustee is the last

MDT Trustee then in office, the appointment of a successor by the Bankruptcy Court and the acceptance by such successor of such appointment. If a successor MDT Trustee is not appointed or does not accept its appointment within ninety (90) days following delivery of notice of resignation of the last MDT Trustee in office, then such MDT Trustee may petition the Bankruptcy Court for the appointment of a successor MDT Trustee. With respect to any other MDT Trustee's resignation, such resignation shall be effective whether or not a successor has been appointed by the effective date of the resigning MDT Trustee's resignation.

(c)    Upon the payment in full of the MDT Claims, any MDT Trustee may be removed by NOAT in its sole discretion. Prior to the payment in full of the MDT Claims, any MDT Trustee may be removed either (i) at the unanimous recommendation of the other two (2) MDT Trustees in the event that he or she becomes unable to discharge his or her duties hereunder due to accident, physical deterioration, mental incompetence or for other good cause or (ii) in connection with any dispute raised by any MDT Beneficiary in accordance with Section 8.02(d) below. Any removal of any MDT Trustee shall require the approval of the Bankruptcy Court and shall take effect at such time as the Bankruptcy Court shall determine.

(d)    To the extent there are any disputes raised by any MDT Beneficiary regarding the operation of the Master Disbursement Trust or the actions of the MDT Fiduciaries (including, without limitation, any failure to give notice of an MDT Reserve Period and any action related to the MDT Shareholder Rights), (i) any MDT Beneficiary shall have the right to seek resolution by the Bankruptcy Court of such a dispute, including seeking to enjoin any disputed action by the Master Disbursement Trust, and all MDT Fiduciaries and MDT Beneficiaries shall have the right to be heard with regard to any such dispute, including by filing objections, declarations, statements in support or other pleadings (including with supporting evidence) or providing witness testimony at any hearing and (ii) the Bankruptcy Court shall have exclusive jurisdiction to hear and resolve any such disputes, and shall be authorized to order appropriate relief (subject to the provisions of Section 5.6(f) of the Plan and this Trust Agreement and make a determination in an expedited manner, and in all events, shall make such a decision within thirty (30) days from the request for relief).

(e)    The death, resignation or removal of an MDT Trustee shall not operate to terminate the Master Disbursement Trust or to revoke any existing agency created pursuant to the terms of this Trust Agreement, the Plan or the Confirmation Order or invalidate any action theretofore taken by such MDT Trustee. All fees and expenses properly incurred by an MDT Trustee prior to the death, resignation or removal of such MDT Trustee shall be paid from the MDT Operating Reserve, unless such fees and expenses are disputed, in which case the Bankruptcy Court shall resolve the dispute and any disputed fees and expenses of the predecessor MDT Trustee that are subsequently allowed by the Bankruptcy Court shall be paid from the MDT Operating Reserve. In the event of the resignation or removal of an MDT Trustee, such MDT Trustee shall (i) promptly execute and deliver such documents, instruments and other writings as may be reasonably requested by the remaining MDT Trustees or the successor MDT Trustee or directed by the Bankruptcy Court to effect the termination of such MDT Trustee's capacity under this Trust Agreement, (ii) promptly deliver to the remaining MDT Trustees and the successor MDT Trustee all documents, instruments, records and other writings related to the Master Disbursement Trust as may be in the possession of such MDT Trustee, and (iii) otherwise assist and cooperate in effecting the assumption of its obligations and functions by such successor MDT Trustee.

Section 8.03.   Appointment of Successor MDT Trustees.

(a)      In the event of the death, resignation or removal of an MDT Trustee, a vacancy shall be deemed to exist and a successor shall be appointed by the other two (2) MDT Trustees, subject to the approval of the Bankruptcy Court, *provided* that, solely upon the payment in full of all MDT Claims, the MDT Trustees may be replaced by NOAT (including with any of the Creditor Trustees of NOAT) in its sole discretion. Such appointment shall specify the date on which such appointment shall be effective.

(b)      Any successor MDT Trustee appointed in accordance with this Trust Agreement shall execute an instrument accepting its appointment and shall deliver a counterpart thereof to the Bankruptcy Court for filing and, in case of an MDT Trustee's resignation, to the resigning MDT Trustee. Thereupon, such successor MDT Trustee shall, without any further act, become vested with all the liabilities, duties, powers, rights, title, discretion and privileges of its predecessor in the Master Disbursement Trust with like effect as if originally named an initial MDT Trustee and shall be deemed appointed pursuant to section 1123(b)(3)(B) of the Bankruptcy Code. The resigning or removed MDT Trustee shall duly assign, transfer and deliver to such successor MDT Trustee all property and money held by such resigning or removed MDT Trustee hereunder and shall, as directed by the Bankruptcy Court or reasonably requested by such successor MDT Trustee, execute and deliver an instrument or instruments conveying and transferring to such successor MDT Trustee upon the trusts herein expressed, all the liabilities, duties, powers, rights, title, discretion and privileges of such resigning or removed MDT Trustee.

Section 8.04.   MDT Executive Director.

(a)      The MDT Executive Director shall be appointed by the MDT Trustees. The initial MDT Executive Director shall be [●].

(b)      The MDT Executive Director shall (i) carry out the day-to-day operations of the Master Disbursement Trust; (ii) make such enforcement, litigation and liquidation recommendations as are reasonably necessary to the MDT Trustees and such other administrative professionals or entities; and (iii) have such other duties and responsibilities as set forth in this Trust Agreement and as may be delegated to him or her by the MDT Trustees in accordance with this Trust Agreement. The MDT Executive Director shall comply with the terms of the Plan and this Trust Agreement, and shall always act consistently with, and not contrary to, the purpose of the Master Disbursement Trust as set forth in the Plan.

(c)      The MDT Executive shall serve until the earliest of (i) his or her death, (ii) his or her resignation, (iii) his or her removal pursuant to Section 8.04(d) hereof and (iv) the dissolution of the Master Disbursement Trust pursuant to Section 4.02 hereof.

(d)      The MDT Executive Director may be removed by the majority vote of MDT Trustees. Such removal shall become effective on the date action is taken by the MDT Trustees or such other date as the MDT Trustees determine.

Section 8.05.   Independence of the MDT Trustees and MDT Executive Director.

21

(a)     The MDT Trustees and the MDT Executive Director shall be, at the time of appointment and at all times during the term of service, disinterested and independent.

(b)     None of the MDT Trustees or the MDT Executive Director shall, during the term of his or her service, hold a financial interest in, act as a representative, attorney, consultant or agent for or serve as any other professional for any Person with a financial interest in the Master Disbursement Trust or any Creditor Trust, including any Creditor Trustee or any Holder of a Channeled Claim; *provided* that, solely upon the payment in full of all MDT Claims, a Creditor Trustee of NOAT may be appointed as an MDT Trustee by NOAT in accordance with Section 8.03(a) hereof.

Section 8.06.   Obligations of the MDT Fiduciaries. The MDT Trustees and, to the extent he or she is determined by a court of competent jurisdiction to be subject to fiduciary duties, the MDT Executive Director shall take into account the interests of, and owe fiduciary duties to, each of the MDT Beneficiaries in making all decisions on behalf of the Master Disbursement Trust in accordance with Section 5.6(f) of the Plan. In furtherance of the foregoing, (a) in the event of a Specified Default (as defined in the Shareholder Settlement Agreement), the MDT Trustees and, to the extent he or she is determined by a court of competent jurisdiction to be subject to fiduciary duties, the MDT Executive Director, will take into account the remaining rights of the holders of MDT Private Claims as well as the interests of the holders of MDT Interests in formulating and exercising appropriate remedies as they relate to the Shareholder Payment Parties and the Shareholder Release Snapback Parties, but shall in all events, to the extent there are obligations remaining to the Private Creditor Trusts upon such default, seek to utilize all other available sources of assets (including by (i) enforcement of the NewCo Credit Support Agreement in accordance with the terms thereof and (ii) first utilizing commercially reasonable efforts to pursue a Payment Remedy (as defined in the Shareholder Settlement Agreement) before electing to pursue a Shareholder Release Remedy) to pay all outstanding amounts owed to the holders of MDT Claims then-due or to be paid in the future from amounts due from such Breaching Shareholder Family Group until such outstanding amounts have been paid in full, and (b) the Master Disbursement Trust shall provide no less than ten (10) Business Days' advance written notice (unless urgent circumstances require less notice) to each MDT Beneficiary of any material action proposed to be taken in respect of the MDT Shareholder Rights, including any exercise of remedies under the Shareholder Settlement Agreement or the commencement or settlement of any litigation against any Shareholder Payment Party or Shareholder Release Snapback Party.

Section 8.07.   Compensation and Expenses of the MDT Trustees and the MDT Executive Director and MDT Professionals. The MDT Trustees and the MDT Executive Director shall be entitled to reasonable compensation and to retain and reasonably compensate counsel, agents, advisors, consultants and other professionals (the "MDT Professionals") to assist in the duties of the Master Disbursement Trust on such terms as the MDT Trustees and the MDT Executive Director deem appropriate, without Bankruptcy Court approval. The compensation of the initial MDT Trustees shall be $[●]. The compensation of the initial MDT Executive Director shall be $[●]. The compensation of any successor MDT Trustee or MDT Executive Director shall be reasonably acceptable to the MDT Beneficiaries in the same manner as provided for the MDT Operating Budget. The payment of the fees and expenses of the MDT Trustees, the MDT Executive Director and the Master Disbursement Professionals shall be made from the MDT Operating Reserve in the ordinary course of business and shall not be subject to the approval of

22

the Bankruptcy Court; *provided* that any disputes related to such fees and expenses shall be brought before the Bankruptcy Court.

Section 8.08.  Resident Trustee.

(a)    The Resident Trustee has been appointed and hereby agrees to serve as a trustee of the Master Disbursement Trust solely for the purpose of complying with the requirement of Section 3807(a) of the Trust Act that the Master Disbursement Trust have one trustee, which, in the case of a natural person, is a resident of the State of Delaware, or which in all other cases, has its principal place of business in the State of Delaware. The duties and responsibilities of the Resident Trustee shall be limited solely to (i) accepting legal process served on the Master Disbursement Trust in the State of Delaware, (ii) the execution of any certificates required to be filed with the office of the Delaware Secretary of State that the Resident Trustee is required to execute under Section 3811 of the Trust Act, and (iii) any other duties specifically allocated to the Resident Trustee in this Trust Agreement. Except as provided in the foregoing sentence, the Resident Trustee shall have no management responsibilities or owe any fiduciary duties to the Master Disbursement Trust, the MDT Trustees, or the MDT Beneficiaries.

(b)    By execution of this Trust Agreement, the Resident Trustee accepts the Master Disbursement Trust created herein. Except as otherwise expressly required by Section 8.08(a) of this Trust Agreement, the Resident Trustee shall not have any duty or liability with respect to the administration of the Master Disbursement Trust, the investment of the assets of the Master Disbursement Trust or the distribution of the MDT Transferred Assets to the MDT Beneficiaries, and no such duties shall be implied. The Resident Trustee shall not be liable for the acts or omissions of the MDT Trustees, nor shall the Resident Trustee be liable for supervising or monitoring the performance of the duties and obligations of the MDT Trustees or the MDT Executive Director under this Trust Agreement, except as expressly required by Section 8.08(a) of this Trust Agreement. The Resident Trustee shall not be obligated to give any bond or other security for the performance of any of its duties hereunder. The Resident Trustee shall not be personally liable under any circumstances, except for its own willful misconduct, bad faith, or gross negligence. Without limiting the foregoing:

(i)    the Resident Trustee shall not be personally liable for any error of judgment made in good faith, except to the extent such error of judgment constitutes willful misconduct, bad faith or gross negligence;

(ii)    no provision of this Trust Agreement shall require the Resident Trustee to expend or risk its personal funds or otherwise incur any financial liability in the performance of its rights or powers hereunder if the Resident Trustee has reasonable grounds to believe that the payment of such funds or adequate indemnity against such risk or liability is not reasonably assured or provided to it;

(iii)    the Resident Trustee shall not be personally liable for the validity or sufficiency of this Trust Agreement or for the due execution of this Trust Agreement by the other parties to this Trust Agreement;

23

    (iv)    the Resident Trustee may accept a certified copy of a resolution of the board of directors or other governing body of any corporate party as conclusive evidence that such resolution has been duly adopted by such body and that the same is in full force and effect;

    (v)    the Resident Trustee may request the MDT Trustees to provide a certificate with regard to any fact or matter the manner of ascertainment of which is not specifically prescribed herein, and such certificate shall constitute full protection to the Resident Trustee for any action taken or omitted to be taken by it in good faith in reliance thereon;

    (vi)    in the exercise or administration of the Master Disbursement Trust hereunder, the Resident Trustee (A) may act directly or through agents or attorneys pursuant to agreements entered into with any of them and (B) may consult with nationally recognized counsel selected by it in good faith and with due care and employed by it, and it shall not be liable for anything done, suffered or omitted in good faith by it in accordance with the advice or opinion of any such counsel; and

    (vii)    the Resident Trustee acts solely as Resident Trustee hereunder and not in its individual capacity, and all persons having any claim against the Resident Trustee by reason of the transactions contemplated by this Trust Agreement shall look only to the assets of the Master Disbursement Trust for payment or satisfaction thereof.

    (c)    The Resident Trustee shall be entitled to receive compensation out of the assets of the MDT Operating Reserve for the services that the Resident Trustee performs in accordance with this Trust Agreement in accordance with such fee schedules as shall be agreed from time to time by the Resident Trustee and the MDT Trustees. The Resident Trustee may also consult with counsel (who may be counsel for the Master Disbursement Trust or for the Resident Trustee) with respect to those matters that relate to the Resident Trustee's role as the Delaware resident trustee of the Master Disbursement Trust, and the reasonable legal fees incurred in connection with such consultation shall be reimbursed out of the MDT Operating Reserve to the Resident Trustee pursuant to this Section 8.08(c) on terms acceptable to the MDT Trustees; *provided* that no such fees shall be reimbursed to the extent that they are incurred as a result of the Resident Trustee's gross negligence, bad faith or willful misconduct.

    (d)    The Resident Trustee shall serve for the duration of the Master Disbursement Trust or until the earlier of (i) the effective date of the Resident Trustee's resignation, or (ii) the effective date of the removal of the Resident Trustee. The Resident Trustee may resign at any time by giving thirty (30) days' written notice to the MDT Trustees; *provided*, *however*, that such resignation shall not be effective until such time as a successor Resident Trustee has accepted appointment. The Resident Trustee may be removed at any time by the MDT Trustees by providing thirty (30) days' written notice to the Resident Trustee; *provided*, *however*, such removal shall not be effective until such time as a successor Resident Trustee has accepted appointment. Upon the resignation or removal of the Resident Trustee, the MDT Trustees shall appoint a successor Resident Trustee. If no successor Resident Trustee shall have been appointed and shall have

accepted such appointment within forty-five (45) days after the giving of such notice of resignation or removal, the Resident Trustee may petition the Bankruptcy Court for the appointment of a successor Resident Trustee. Any successor Resident Trustee appointed pursuant to this Section 8.08(d) of this Trust Agreement shall be eligible to act in such capacity in accordance with this Trust Agreement and, following compliance with this Section 8.08(d) of this Trust Agreement, shall become fully vested with the rights, powers, duties, and obligations of its predecessor under this Trust Agreement, with like effect as if originally named as Resident Trustee. Any such successor Resident Trustee shall notify the Resident Trustee of its appointment by providing written notice to the Resident Trustee, and upon receipt of such notice, the Resident Trustee shall be discharged of its duties herein.

ARTICLE IX
RELIANCE, LIABILITY AND INDEMNIFICATION

Section 9.01.   Reliance by the MDT Trustees and the MDT Executive Director. Except as otherwise provided in this Trust Agreement, the Plan or the Confirmation Order, each MDT Trustee and the MDT Executive Director may rely and shall be protected in acting upon any resolution, statement, instrument, opinion, report, notice, request, consent, order or other paper or document reasonably believed by such MDT Trustee and/or the MDT Executive Director to be genuine and to have been signed or presented by the proper party or parties having relevant authority or expertise.

Section 9.02.   Nonliability of MDT Trustees and MDT Executive Director. Except as provided herein, nothing contained in this Trust Agreement, the Plan or the Confirmation Order shall be deemed to be an assumption by the MDT Trustees, the MDT Executive Director or the MDT Professionals of any of the liabilities, obligations or duties of the Debtors or shall be deemed to be or contain a covenant or agreement by the MDT Trustees to assume or accept any such liability, obligation or duty. Any successor MDT Trustee or MDT Executive Director may accept and rely upon any accounting made by or on behalf of any predecessor MDT Trustee or MDT Executive Director hereunder, and any statement or representation made as to the assets comprising the MDT Transferred Assets or as to any other fact bearing upon the prior administration of the Master Disbursement Trust, so long as it has a good faith basis to do so. The MDT Trustees and the MDT Executive Director shall not be liable for having accepted and relied in good faith upon any such accounting, statement or representation if it is later proved to be incomplete, inaccurate or untrue. Any successor MDT Trustee and MDT Executive Director shall not be liable for any act or omission of any predecessor MDT Trustee or MDT Executive Director, nor have a duty to enforce any claims against any predecessor MDT Trustee or MDT Executive Director on account of any such act or omission. No provision of this Trust Agreement shall require the MDT Trustees or MDT Executive Director to expend or risk his or her personal funds or otherwise incur any financial liability in the performance of his or her rights or powers hereunder if the MDT Trustee or MDT Executive Director has reasonable grounds to believe that the payment of such funds or adequate indemnity against such risk or liability is not reasonably assured or provided to him or her.

Section 9.03.   Exculpation. To the maximum extent permitted by applicable law, each of the MDT Trustees, the MDT Executive Director, the MDT Professionals and the Resident Trustee shall not have or incur any liability for actions taken or omitted in his or her capacity as an MDT

25

Trustee, the MDT Executive Director, an MDT Professional or the Resident Trustee, or on behalf of the Master Disbursement Trust, except those acts found by Final Order to be arising out of his or her willful misconduct, bad faith, gross negligence or fraud, and shall be entitled to indemnification and reimbursement for reasonable fees and expenses in defending any and all of his or her actions or inactions in his or her capacity as an MDT Trustee, the MDT Executive Director, an MDT Professional or the Resident Trustee, or on behalf of the Master Disbursement Trust, except for any actions or inactions found by Final Order to be arising out of his or her willful misconduct, bad faith, gross negligence or fraud. Any valid indemnification claim of the MDT Trustees, the MDT Executive Director, the MDT Professionals or the Resident Trustee shall be satisfied from the MDT Operating Reserve.

Section 9.04. <u>Limitation of Liability</u>. The MDT Trustees, the Resident Trustee, the MDT Executive Director, and the Master Disbursement Professionals will not be liable for punitive, exemplary, consequential, special or other damages for a breach of this Trust Agreement under any circumstances.

Section 9.05. <u>Indemnity</u>. The Master Disbursement Trust shall indemnify and hold harmless each of the MDT Trustee, MDT Executive Director, MDT Professional and Resident Trustee, in each case solely in such Person's capacity as such (each, an "<u>Indemnified Party</u>"), from and against and with respect to any and all liabilities, losses, damages, claims, costs and expenses (other than taxes in the nature of income taxes imposed on compensation paid to the Indemnified Parties), including, but not limited to, attorneys' fees, arising out of or due to the implementation or administration of the Plan or this Trust Agreement, other than such Indemnified Party's willful misconduct, bad faith, gross negligence or fraud, with respect to the implementation or administration of the Plan or this Trust Agreement. To the extent that an Indemnified Party asserts a claim for indemnification as provided above, (a) any payment on account of such claim shall be paid solely from the MDT Operating Reserve and (b) the legal fees and related costs incurred by counsel to such Indemnified Party in monitoring and participating in the defense of such claims giving rise to the asserted right of indemnification shall be advanced to such Indemnified Party (provided that such Indemnified Party undertakes to repay such amounts if it ultimately shall be determined that such Indemnified Party is not entitled to be indemnified therefore) out of the MDT Operating Reserve or any insurance purchased using the MDT Operating Reserve. This indemnification provision shall remain available to, and the repayment obligation and be binding upon, any former MDT Trustee, MDT Executive Director, MDT Professional or Resident Trustee or the estate of any deceased MDT Trustee, MDT Executive Director, MDT Professional or Resident Trustee, as the case may be, and shall survive the termination of the Master Disbursement Trust.

ARTICLE X
MISCELLANEOUS PROVISIONS

Section 10.01. <u>Actions Taken on Other Than a Business Day</u>. In the event that any payment or act under the Plan or this Trust Agreement is required to be made or performed on a date that is not a Business Day, then the making of such payment or the performance of such act may be completed on the next succeeding Business Day, but shall be deemed to have been completed as of the required date.

Section 10.02. <u>Governing Law</u>. Except to the extent that the Bankruptcy Code or other federal law is applicable, or to the extent that any document to be entered into in connection herewith provides otherwise, the rights, duties, and obligations arising under this Trust Agreement shall be governed by, and construed and enforced in accordance with, the laws of the State of Delaware, without giving effect to principles of conflicts of laws.

Section 10.03. <u>Jurisdiction</u>. Subject to the proviso below, the Bankruptcy Court shall have exclusive jurisdiction over the Master Disbursement Trust, the MDT Trustees and the MDT Executive Director, including the administration and activities of the Master Disbursement Trust, the MDT Trustees and the MDT Executive Director, and, pursuant to the Plan, the Bankruptcy Court has retained such jurisdiction; *provided*, *however*, that, notwithstanding the foregoing, the MDT Trustees shall have power and authority to bring any action in any court of competent jurisdiction (including the Bankruptcy Court) to prosecute any MDT Causes of Action or any other Causes of Action held by the Master Disbursement Trust.

Section 10.04. <u>Severability</u>. In the event any provision of this Trust Agreement or the application thereof to any person or circumstances shall be determined by a final, non-appealable judgment or order to be invalid or unenforceable to any extent, the remainder of this Trust Agreement or the application of such provision to persons or circumstances or in jurisdictions other than those as to or in which it is held invalid or unenforceable, shall not be affected thereby, and each provision of this Trust Agreement shall be valid and enforceable to the full extent permitted by law.

Section 10.05. <u>Notices</u>. Any notice or other communication required or permitted to be made under this Trust Agreement shall be in writing and shall be deemed to have been sufficiently given, for all purposes, if delivered personally, by email, sent by nationally recognized overnight delivery service or mailed by first-class mail:

(a)     if to the Master Disbursement Trust, to:

[●]
Email: [●]

with a copy to:

[●]
Email: [●]

(b)     if to the MDT Trustees, to:

[●]
Email: [●]

(c)     if to the MDT Executive Director, then to each of:

[●]
Email: [●]

[●]
Email: [●]

[●]
Email: [●]

(d) if to the MDT Beneficiaries, then to each of or as applicable:

 (i) with respect to the Private Creditor Trusts:

  PI Trust
  Edgar C. Gentle III
  c/o Gentle Turner Sexton & Harbison, LLC
  Hoover, Alabama 35244
  Email: egentle@gtandslaw.com

  Hospital Trust
  [●]
  Email: [●]

  TPP Trust
  [●]
  Email: [●]

  NAS Monitoring Trust
  [●]
  Email: [●]

 (ii) with respect to the Public Creditor Trusts:

  NOAT
  [●]
  Email: [●]

  TAFT or Tribe Opioid LLC
  [●]
  Email: [●]

 (iii) with respect to the United States:

  [●]
  Email: [●]

Section 10.06. <u>Headings</u>. The headings contained in this Trust Agreement are solely for convenience of reference and shall not affect the meaning or interpretation of this Trust Agreement or of any term or provision of this Trust Agreement.

Section 10.07. <u>Entire Trust Agreement</u>. This Trust Agreement (including the recitals and annex hereto), the Plan, and the Confirmation Order constitute the entire agreement by and among the parties and supersede all prior and contemporaneous agreements or understandings by and among the parties with respect to the subject matter of this Trust Agreement.

Section 10.08. <u>Amendment and Waiver</u>. Any provision of this Trust Agreement may be amended or waived only with the consent of (x) a majority of the MDT Trustees, (y) NOAT and (z) until the payment in full of the MDT Claims, a majority in number of the other MDT Beneficiaries (excluding NOAT); provided, however, that the MDT Trustees may amend this Trust Agreement by unanimous consent of the MDT Trustees from time to time, without the consent, approval or other authorization of any other Person, to make minor modifications or clarifying amendments as necessary to enable the MDT Trustees to effectuate the provisions of this Trust Agreement. Notwithstanding the foregoing, no amendment or waiver of any provision of this Trust Agreement shall modify this Trust Agreement in a manner that (a) is inconsistent with the Plan or the Confirmation Order without an order of the Bankruptcy Court (after notice and a hearing) approving such modification, other than to make minor modifications or clarifying amendments by unanimous consent of the MDT Trustees as necessary to enable the MDT Trustees to effectuate the provisions of this Trust Agreement, (b) would adversely impact the distributions to, or confer additional obligations or liabilities upon, any MDT Beneficiary without the consent of such MDT Beneficiary; (c) would alter the duties or liabilities of the Resident Trustee without the consent of the Resident Trustee or (d) would amend or waive this Section 10.08. The MDT Trustees shall provide notice to the MDT Beneficiaries of any proposed amendment or wavier of any provision of this Trust Agreement including, for the avoidance of doubt, any proposed amendment or waiver that does not require the consent of the MDT Beneficiaries hereunder, not less than ten (10) Business Days before such amendment or waiver becomes effective.

Section 10.09. <u>Confidentiality</u>. The MDT Trustees, the Resident Trustee, the MDT Executive Director and the MDT Professionals (each, a "<u>Confidential Party</u>" and, collectively, the "<u>Confidential Parties</u>") shall hold strictly confidential and not use for personal gain any material, non-public information of which they have become aware in their capacity as a Confidential Party, of or pertaining to any Debtor to which any of the MDT Transferred Assets relates; <i>provided</i>, <i>however</i>, that such information may be disclosed if (a) it is now or in the future becomes generally available to the public other than as a result of a disclosure by the Confidential Parties or (b) such disclosure is required of the Confidential Parties pursuant to legal process including subpoena or other court order or other applicable laws or regulations. For the avoidance of doubt and notwithstanding anything to the contrary herein, each Confidential Party shall comply with Section 5.11(c) of the Plan.

Section 10.10. <u>Meanings of Other Terms</u>. Except where the context otherwise requires, (a) words importing the masculine, feminine or neuter gender include the masculine, feminine and neuter gender, (b) words importing the singular or plural number shall include the singular and plural number, (c) the words "herein," "hereof," or "hereunder" and other words of similar import refer to this Trust Agreement as a whole and not to any particular Article, Section or subdivision of this Trust Agreement and (d) the words "includes" and "including" are not limiting.

Section 10.11. <u>Counterparts</u>. This Trust Agreement may be executed in any number of counterparts, each of which shall be deemed an original, but such counterparts shall together

constitute but one and the same instrument. A portable document file (PDF) signature of any party shall be considered to have the same binding legal effect as an original signature.

[*Signature Pages Follow*]

IN WITNESS WHEREOF, the parties hereto have executed this Trust Agreement or caused this Trust Agreement to be duly executed by their respective officers, representatives or agents, effective as of the Effective Date.

**[DEBTORS]**

By: _____
    Name:
    Title:

**[MDT TRUSTEE]**, as MDT Trustee

By: _____
    Name:

**[MDT TRUSTEE]**, as MDT Trustee

By: _____
    Name:

**[MDT TRUSTEE]**, as MDT Trustee

By: _____
    Name:

**[RESIDENT TRUSTEE]**, as Resident Trustee

By: _____
    Name:
    Title:

[Signature Page to Master Disbursement Trust Agreement]

## Schedule 1

### Schedule of MDT Bermuda-Form Insurance Policies

| Insurer | Policy Period Start | Policy Period End | Policy Number |
|---|---|---|---|
| Steadfast Insurance Company | 10/1/1999 | 10/1/2005 | GL02729885-03 |
| National Union Fire Insurance Company of Pittsburgh, PA | 10/1/2000 | 10/1/2005 | BE 357 40 57 |
| American International Specialty Lines Insurance Company | 10/1/2000 | 10/1/2005 | 267-47-08 |
| Gulf Underwriters Insurance Company | 10/1/1997 | 10/1/2005 | GU6078280 |
| Zurich Reinsurance (London) Limited | 10/1/1998 | 10/1/2005 | 823/KE9801815 |
| Gerling-Konzern General Insurance Company | 10/1/1998 | 10/1/2005 | 823/KE9801816 |
| Zurich Reinsurance (London) Limited | 10/1/1998 | 10/1/2005 | 823/KE9801817 |
| Winterthur Swiss Insurance Company | 10/1/1998 | 10/1/2005 | 823/KE9801818 |
| Gerling-Konzern General Insurance Company | 10/1/1998 | 10/1/2005 | 823/KE9801818 |
| XL Insurance Company, Ltd. | 10/1/1988 | 10/1/2003 | XLUMB-00342 |
| Starr Excess Liability Insurance International Limited | 10/1/1998 | 10/1/2003 | 201012 |
| Winterthur Swiss Insurance Company | 7/1/2000 | 10/1/2003 | 823/KE0002108 |
| Ace Insurance S.A. N.V. (Chubb Europe) | 7/1/2000 | 10/1/2003 | 823/KE0002108 |
| New Hampshire Insurance Company (per AIG Europe (UK) Ltd.) | 7/1/2000 | 10/1/2003 | 823/KE0002108 |
| Underwriter Insurance Company Limited | 7/1/2000 | 10/1/2003 | 823/KE0002108 |
| QBE International Insurance Limited | 7/1/2000 | 10/1/2003 | 823/KE0002108 |
| SR International Business Insurance Company Ltd. | 7/1/2000 | 10/1/2003 | 823/KE0002108 |
| Gerling-Konzern General Insurance Company | 10/1/1999 | 10/1/2003 | 823/KE9901926 |
| Liberty International Insurance Company | 10/1/1999 | 10/1/2003 | 823/KE9901928 |
| SR International Business Insurance Company | 10/1/1999 | 10/1/2003 | 823/KE9901927 |
| Zurich Reinsurance (London) Limited | 10/1/1999 | 10/1/2003 | 823/KE9901925 |
| ACE Bermuda Insurance Ltd. | 7/1/2000 | 10/1/2002 | PRA-1031/5 |
| TIG Specialty Insurance Company | 7/1/2000 | 10/1/2002 | XEX 37690728/ XLX38822826 |
| Kemper Indemnity Insurance Company | 7/1/2000 | 10/1/2002 | 9YR001019-00 |
| Evanston Insurance Company | 7/1/2000 | 10/1/2002 | XO-GA-1138-00 |

## Schedule 2

## Schedule of MDT Insurance Policies

| Insurer | Policy Period Start | Policy Period End | Policy Number |
|---|---|---|---|
| Gulf Underwriters Insurance Company | 10/1/1997 | 10/1/2005 | GU6078280 |
| Zurich Reinsurance (London) Limited | 10/1/1998 | 10/1/2005 | 823/KE9801815 |
| Gerling-Konzern General Insurance Company | 10/1/1998 | 10/1/2005 | 823/KE9801816 |
| Starr Excess Liability Insurance International Limited | 10/1/1998 | 10/1/2003 | 201012 |
| XL Insurance Company, Ltd. Sedgwick Management Services (Bermuda), Limited | 10/1/1997 | 10/1/2003 | XLUMB-00342 |
| Zurich Reinsurance (London) Limited | 10/1/1998 | 10/1/2005 | 823/KE9801817 |
| Gerling-Konzern General Insurance Company UK Branch | 10/1/1998 | 10/1/2005 | 823/KE9801818 |
| Winterthur Swiss Insurance Company | 10/1/1998 | 10/1/2005 | 823/KE9801818 |
| Zurich Reinsurance (London) Limited | 10/1/1999 | 10/1/2003 | 823/KE9901925 |
| Gerling Konzern Allgemeine Versicherungs – AG | 10/1/1999 | 10/1/2003 | 823/KE9901926 |
| Liberty International Insurance Company | 10/1/1999 | 10/1/2003 | 823/KE9901928 |
| SR International Business Insurance Company | 10/1/1999 | 10/1/2003 | 823/KE9901927 |
| ACE Bermuda Insurance Ltd. [now Chubb] | 7/1/2000 | 10/1/2002 | PRA-1031/5 |
| Certain Member Companies of the International Underwriting Association of London (subscribing companies include: Winterthur Swiss Insurance Company, ACE Insurance S.A. N.V., New Hampshire Insurance Company (per AIG Europe (UK) Ltd.), the Underwriter Insurance Company Limited, SR International Business Insurance Company Ltd., and QBE International Insurance Limited) | 7/1/2000 | 10/1/2003 | 823/KE0002108 |
| Evanston Insurance Company (Markel) | 7/1/2000 | 10/1/2002 | XO-GA-1138-00 |
| Kemper Indemnity Insurance Company | 7/1/2000 | 10/1/2002 | 9YR001019-00 |
| TIG Specialty Insurance Company | 7/1/2000 | 10/1/2002 | XEX 37690728/ XLX38822826 |
| American International Specialty Lines Insurance Company | 10/1/2000 | 10/1/2005 | 267-47-08 |
| National Union Fire Insurance Company of Pittsburgh, PA | 10/1/2000 | 10/1/2005 | BE 357 40 57 |
| Steadfast Insurance Company | 10/1/2000 | 10/1/2005 | GL02729885-03 |
| Allied World Assurance Company | 10/1/2003 | 10/1/2004 | C001210/002 |
| American Guarantee & Liability Insurance Company | 10/1/2003 | 10/1/2004 | AEC 9376768 00 |
| Arch Reinsurance Ltd. | 10/1/2003 | 10/1/2004 | B4-UFP-03233-01 |
| Liberty Mutual Fire Insurance Company | 10/1/2003 | 10/1/2004 | TH2-611-004531-063 |

| Liberty Mutual Fire Insurance Company | 7/1/2003 | 10/1/2004 | RG2-611-004531-023 |
| Federal Insurance Company | 11/15/2003 | 12/5/2004 | 8160-3480 |
| St. Paul Mercury Insurance Company | 11/15/2003 | 11/15/2004 | 564CM0215 |
| Allied World Assurance Company | 10/1/2004 | 10/1/2005 | C001210/003 |
| American Guarantee and Liability Insurance Company | 10/1/2004 | 10/1/2005 | AEC 9376768 01 |
| Arch Reinsurance Ltd. | 10/1/2004 | 10/1/2005 | B4-UFP-03233-02 |
| Liberty Mutual Fire Insurance Company | 10/1/2004 | 10/1/2005 | TH2-611-004531-064 |
| Liberty Mutual Insurance Company | 10/1/2004 | 10/1/2005 | EN1-611-0045310024 |
| Allied World Assurance Company | 10/1/2005 | 10/1/2006 | C001210/004 |
| American Guarantee and Liability Insurance Company | 10/1/2005 | 10/1/2006 | AEC 9376768 02 |
| Arch Reinsurance Ltd. | 10/1/2005 | 10/1/2006 | B4-UFP-03233-03 |
| Liberty Mutual Fire Insurance Company | 10/1/2005 | 10/1/2006 | TH2-611-004531-065 |
| Liberty Mutual Insurance Company | 10/1/2005 | 10/1/2006 | EN1-611-004531025 |
| Allied World Assurance Company | 10/1/2006 | 10/1/2007 | C001210/005 |
| American Guarantee and Liability Insurance Company | 10/1/2006 | 10/1/2007 | AEC 9376768 03 |
| Arch Reinsurance Ltd. | 10/1/2006 | 10/1/2007 | UFP001824000 |
| Liberty Mutual Fire Insurance Company | 10/1/2006 | 10/1/2007 | TH2-611-004531-066 |
| Liberty Mutual Insurance Company | 10/1/2006 | 10/1/2007 | EN1-611-0045310026 |
| American Guarantee and Liability Insurance Company | 10/1/2007 | 10/1/2008 | AEC 9376768 04 |
| Liberty Mutual Insurance Company | 10/1/2007 | 10/1/2008 | EN1-611-0045310027 |
| National Union Fire Insurance Company of Pittsburgh, Pa. | 10/1/2007 | 10/1/2008 | 9835266 |
| St. Paul Fire and Marine Insurance Company | 10/1/2007 | 10/1/2008 | QI05700185 |
| American Guarantee and Liability Insurance Company | 10/1/2008 | 10/1/2009 | AEC 9376768 05 |
| Liberty Mutual Fire Insurance Company | 10/1/2008 | 10/1/2009 | TH2-611-004531-148 |
| Liberty Mutual Insurance Company | 10/1/2008 | 10/1/2009 | EN1-611-0045310028 |
| XL Insurance America, Inc. | 10/1/2008 | 10/1/2009 | US00011152LI08A |
| Liberty Mutual Fire Insurance Company | 10/1/2009 | 10/1/2010 | TH2-611-004531-149 |
| Liberty Mutual Insurance Company | 10/1/2009 | 10/1/2010 | EN1-611-004531-029 |
| American Guarantee and Liability Insurance Company | 10/1/2009 | 10/1/2010 | AEC 9376768 06 |
| XL Insurance America, Inc. | 10/1/2009 | 10/1/2010 | US00011152LI09A |

| | | | |
|---|---|---|---|
| American Guarantee and Liability Insurance Company | 10/1/2010 | 10/1/2011 | AEC 9376768 07 |
| Liberty Mutual Fire Insurance Company | 10/1/2010 | 10/1/2011 | TH2-611-004531-140 |
| Liberty Mutual Insurance Company | 10/1/2010 | 10/1/2011 | EN1-611-004531-020 |
| XL Insurance America, Inc. | 10/1/2010 | 10/1/2011 | US00011152LI10A |
| American Guarantee and Liability Insurance Company | 10/1/2011 | 10/1/2012 | AEC 9376768 08 |
| Liberty Mutual Insurance Company | 10/1/2011 | 10/1/2012 | EN1-611-004531-021 |
| Liberty Mutual Insurance Company | 10/1/2011 | 10/1/2012 | TH2-611-004531-141 |
| Liberty Insurance Corporation | 10/1/2011 | 10/1/2012 | TH7-611-004531-141 |
| XL Insurance America, Inc. | 10/1/2011 | 10/1/2012 | US00011152LI11A |
| American Guarantee and Liability Insurance Company | 10/1/2012 | 10/1/2013 | AEC 9376768 09 |
| Liberty Mutual Insurance Company | 10/1/2012 | 10/1/2013 | EN1-611-004531-022 |
| North American Elite Insurance Company | 10/1/2012 | 10/1/2013 | H2U0000619-00 |
| XL Insurance America, Inc. | 10/1/2012 | 10/1/2013 | US00011152LI12A |
| American Guarantee and Liability Insurance Company | 10/1/2013 | 10/1/2014 | AEC 9376768 10 |
| Liberty Mutual Fire Insurance Company | 10/1/2013 | 10/1/2014 | EN2-611-004531-023 |
| North American Elite Insurance Company | 10/1/2013 | 10/1/2014 | UMB 000802001 |
| XL Insurance America, Inc. | 10/1/2013 | 10/1/2014 | US00011152LI13A |
| American Guarantee and Liability Insurance Company | 10/1/2014 | 10/1/2015 | AEC 9376768-11 |
| Liberty Mutual Fire Insurance Company | 10/1/2014 | 10/1/2015 | EN2-611-004531-024 |
| North American Elite Insurance Company | 10/1/2014 | 10/1/2015 | UMB000802002 |
| XL Insurance America, Inc. | 10/1/2014 | 10/1/2015 | US00011152LI14A |
| American Guarantee and Liability Insurance Company | 10/1/2015 | 10/1/2016 | AEC 9376768-12 |
| Columbia Casualty Company | 10/1/2015 | 10/1/2016 | HAZ 4032268671-0 |
| Liberty Mutual Fire Insurance Company | 10/1/2015 | 10/1/2016 | EN2-611-004531-025 |
| North American Elite Insurance Company | 10/1/2015 | 10/1/2016 | UMB000802003 |
| XL Insurance America, Inc. | 10/1/2015 | 10/1/2016 | US00011152LI15A |
| Aspen American Insurance Company | 10/1/2016 | 10/1/2017 | CX004QT16 |
| Columbia Casualty Company | 10/1/2016 | 10/1/2017 | HAZ 4032268671-1 |
| Liberty Mutual Fire Insurance Company | 10/1/2016 | 10/1/2017 | EN2-611-004531-026 |
| Navigators Specialty Insurance Company | 10/1/2016 | 10/1/2017 | SM16FXR884487IC |
| North American Elite Insurance Company | 10/1/2016 | 10/1/2017 | UMB000802004 |
| Swiss Re International SE | 10/1/2016 | 10/1/2017 | MH 145892.1 |
| XL Insurance America, Inc. | 10/1/2016 | 10/1/2017 | US00011152LI16A |

| | | | |
|---|---|---|---|
| Allied World Assurance Company (Europe) Ltd. | 12/12/2016 | 1/11/2018 | B0509FINMR 1600558 |
| Arch Insurance Company (Europe) Ltd | 12/12/2016 | 1/11/2018 | B0509FINMR 1600559 |
| Beazley Insurance Company, Inc. | 12/12/2016 | 1/11/2018 | V1A42D160201 |
| National Union Fire Insurance Company of Pittsburgh, PA | 12/12/2016 | 1/11/2018 | 03-329-88-41 |
| QBE Insurance Company | 12/12/2015 | 1/11/2018 | QPL0172784 |
| U.S. Specialty Insurance Company | 12/12/2016 | 1/11/2018 | 12-MGU-16-A39466 |
| U.S. Specialty Insurance Company | 12/12/2016 | 1/11/2018 | 14-MGU-16-A39466 |
| XL Specialty Insurance Company | 12/12/2016 | 1/11/2018 | ELU147833-16 |
| ACE Property and Casualty Insurance Company | 10/1/2017 | 10/1/2019 | G46815634 001 |
| Aspen American Insurance Company | 10/1/2017 | 10/1/2019 | CX004QT17 |
| Columbia Casualty Company | 10/1/2017 | 10/1/2018 | HAZ 4032268671-2 |
| Liberty Mutual Fire Insurance Company | 10/1/2017 | 10/1/2019 | EN2-611-0045310027 |
| Navigators Specialty Insurance Company | 10/1/2017 | 10/1/2018 | NY17LGL786201NC |
| Navigators Specialty Insurance Company | 10/1/2017 | 10/1/2019 | SM16FXR884487IV |
| XL Insurance America, Inc. | 10/1/2017 | 10/1/2019 | US00011152LI17 |
| ACE Property and Casualty Insurance Company | 10/1/2018 | 10/1/2019 | G46815634 002 |
| ACE Property and Casualty Insurance Company | 10/1/2018 | 10/1/2019 | G71187263 001 |
| Liberty Mutual Fire Insurance Company | 10/1/2018 | 10/1/2019 | EN2-611-004531-028 |
| Liberty Mutual Fire Insurance Company | 10/1/2018 | 10/1/2019 | EB2-611-0045310178 |
| Liberty Surplus Insurance Corporation | 10/1/2018 | 10/1/2019 | 1000318031-01 |
| Old Republic Insurance Company | 10/1/2018 | 10/1/2020 | MWZZ 314344 |
| Isosceles Insurance Limited | 10/1/2019 | 10/1/2021 | PPLP-02/2019 |

iv

## Schedule 3

**Schedule of Excluded Insurance Policies**

1.     Isosceles Insurance Ltd. policy number PPLP-01/2019

2.     The following Purdue Insurance Policies subject to clause (ii) of the definition of Excluded Insurance Policies:

       a.   automobile liability;

       b.   workers' compensation or employers' liability;

       c.   international products liability;

       d.   international completed operations liability;

       e.   foreign voluntary workers' compensation and employers' liability;

       f.   international general liability;

       g.   international premises liability;

       h.   international automobile liability;

       i.   first party property damage;

       j.   marine cargo;

       k.   clinical trials;

       l.   domestic credit insurance;

       m.   employment practices liability;

       n.   fiduciary liability;

       o.   crime and blanket crime;

       p.   employed lawyers;

       q.   special contingency, special risk, corporate protection and kidnapping and ransom;

       r.   marine and war risk; and

       s.   cyber, security and privacy liability.

## **Schedule 4**

Schedule of MDT Insurance Collateral

| Insurer | Policy Period Start | Policy Period End | Policy Number |
|---|---|---|---|
| Columbia Casualty Company | 10/1/2015 | 10/1/2016 | HAZ 4032268671-0 |
| Columbia Casualty Company | 10/1/2016 | 10/1/2017 | HAZ 4032268671-1 |
| Columbia Casualty Company | 10/1/2017 | 10/1/2018 | HAZ 4032268671-2 |
| Isosceles Ins. Ltd | 211/2019 | 2/11/2022 | PPLP-01/2019 |
| Isosceles Ins. Ltd | 10/1/2019 | 10/1/2021 | PPLP-02/2019 |
| Old Republic Ins. Co. | 10/1/2018 | 10/1/2020 | MWZZ 314344 |

## Exhibit A

**Master TDP**

[Filed Separately]

## Exhibit B

**Investment Guidelines**

Only the following investments will be permitted, provided that maturities on the following securities do not exceed twelve (12) months, all investments are U.S. dollar denominated and all requirements are satisfied at the time of purchase:

1.      marketable securities issued by the U.S. Government and supported by the full faith and credit of the U.S. Treasury; and

2.      a U.S. government money market fund required to invest exclusively in cash and U.S. government securities that are supported by the full faith and credit of the U.S. Treasury.

The borrowing of funds or securities for the purpose of purchasing and the lending of any investments is prohibited.

Notwithstanding the foregoing, it is acknowledged and agreed that the MDT Trustees may liquidate investments and deposit and maintain funds in or with banks, trust companies, savings and loan associations, money market organizations and other depositories or issuers of depository-type accounts at such times as the MDT Trustees determine to be necessary or appropriate to have cash available to satisfy distribution and other cash requirements of the Master Disbursement Trust.

# **EXHIBIT V**

**NewCo Transfer Agreement**

## TRANSFER AGREEMENT

THIS TRANSFER AGREEMENT (this "Agreement") is made effective as of [●], 2021 (the "Effective Date"), by and between Purdue Pharma L.P., a Delaware limited partnership ("PPLP"), and [NewCo], a Delaware limited liability company ("NewCo" and, together with PPLP, the "Parties" and, each, a "Party").[1]

## RECITALS

WHEREAS, on September 15, 2019 (the "Petition Date"), each of Purdue Pharma, Inc., PPLP and PPLP's wholly (or substantially wholly) owned direct and indirect subsidiaries (collectively, the "Debtors") filed a voluntary petition for relief under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code") in the United States Bankruptcy Court for the Southern District of New York (the "Bankruptcy Court"), thereby commencing the chapter 11 cases jointly administered by the Bankruptcy Court under the caption *In re Purdue Pharma L.P., et al.*, Case No. 19-23649 (RDD) (the "Chapter 11 Cases");

WHEREAS, on June 3, 2021, the Debtors filed the *Fifth Amended Joint Chapter 11 Plan of Reorganization of Purdue Pharma L.P. and Its Affiliated Debtors* [D.I. 2982] (including all appendices, exhibits, schedules and supplements thereto, as the same may be altered, amended or modified from time to time in accordance with the Bankruptcy Code, the Bankruptcy Rules and the terms thereof, the "Plan")[2] with the Bankruptcy Court;

WHEREAS, on [●], 2021, the Bankruptcy Court entered the [*Order Confirming the Fifth Amended Joint Chapter 11 Plan of Reorganization of Purdue Pharma L.P. and Its Affiliated Debtors*] [D.I. [●]] confirming the Plan (the "Confirmation Order");

WHEREAS, the Plan provides for, among other things, the transfer of substantially all assets from PPLP to NewCo on the Effective Date;

WHEREAS, pursuant to the Plan, the Confirmation Order and this Agreement, and in accordance with the steps in the restructuring steps memorandum attached as Exhibit I hereto (the "Restructuring Steps"), PPLP shall convey to NewCo, and NewCo shall accept, all of PPLP's right, title, and interest, in, to and under the following assets, in each case, Free and Clear (as defined below): (i) cash in an amount equal to the Initial NewCo Cash and (ii) all non-cash assets of PPLP as of the date hereof (prior to giving effect to the Restructuring Transactions) other than the Excluded Assets (as defined below), including (except in the case of Excluded Assets) (A) all contracts, agreements, purchase orders, transactions under master agreements, licenses, sublicenses, leases, subleases, sale and purchase orders, easements, mortgages, security agreements, insurance policies, Benefit Plans, instruments, guaranties, commitments, understandings, undertakings or other similar arrangements, whether express or implied, written,

---

[1] If some or all of the assets (and/or liabilities) of certain Non-Transferred Debtors will need to be transferred to (and/or assumed by) NewCo, a Transferred Debtor or a newly-created sub of NewCo, such Non-Transferred Debtor will need to execute a separate transfer agreement transferring such assets to the applicable transferee (and/or providing for the applicable assuming party to assume such liabilities).

[2] Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to such terms in the Plan.

electronic or oral (each, a "Contract") and any permits, registrations, licenses, franchises, certificates and consents of any governmental authority ("Governmental Licenses"), including, in each case, any of the foregoing that have previously been assumed pursuant to a Final Order of the Bankruptcy Court, (B) any raw materials (including all bulk active pharmaceutical ingredients), work-in-progress, parts, equipment, supplies, and other items of inventory (including items in transit, on consignment, or covered by open purchase orders or in the possession of any third party), (C) all furniture, fixtures, furnishings, equipment, vehicles, leasehold improvements, and other tangible personal property, including all artwork, desks, chairs, tables, copiers, telephone lines and numbers, telecopy machines and other telecommunication equipment, cubicles and miscellaneous office furnishings and supplies and all computer and computer-related hardware, including, but not limited to, computers, file servers, facsimile servers, scanners, color printers, laser printers and networks, (D) any books, records, documents, drawing, reports, operating data, manuals, plans, blueprints, specifications and procedures, (E) all Retained Causes of Action against Co-Defendants or ongoing commercial counterparties of NewCo, (F) all patents, trademarks, copyrights, domain names, social media handles, know-how, trade secrets, software, data and all other intellectual property or proprietary rights in any and all jurisdictions, including all registrations and applications for registration of any of the foregoing, all rights to sue or recover or retain damages and costs and attorneys' fees for any past, present or future infringement, misappropriation or other violation of any of the foregoing, and all rights to claim priority with respect to any of the foregoing, (G) all Purdue Insurance Rights (other than the MDT Insurance Rights and the PAT Insurance Rights) and (H) all other non-cash assets except for the equity interests of those entities (the "Non-Transferred Debtors", which such entities, for the avoidance of doubt, do not individually or in the aggregate hold assets that are material to the business of PPLP as conducted prior to the Effective Date[3]) set forth on Annex A (collectively, the items listed in clauses (i) and (ii), but excluding, for the avoidance of doubt, the Transferred Equity Interests (as defined below), the "Transferred Non-Equity Assets") to have and to hold with all appurtenances thereto as the sole owner (such conveyance of the Transferred Non-Equity Assets, the "Non-Equity Asset Transfer") (as used herein, "Free and Clear" means free and clear of all Claims, Interests, Liens, other encumbrances and liabilities of any kind, it being understood, however, that NewCo is assuming those liabilities set forth in Section 1(c) below);

WHEREAS, all executory Contracts that are Transferred Non-Equity Assets have been assumed pursuant to an order of the Bankruptcy Court, with the exception of those set forth on Annex B attached hereto, which Contracts on Annex B are Contracts in respect of which the counterparty has previously formally objected to assumption and such objection has not been resolved as of the Effective Date; whether by obtaining the counterparty's consent, by a Final Order of the Bankruptcy Court, by withdrawal of the objection, by rejection of the Contract or otherwise;

WHEREAS, "Excluded Assets" means those assets of PPLP that will not be transferred to NewCo pursuant to this Agreement, as set forth on Annex C attached hereto;

---

[3] Assets held by Non-Transferred Debtors to be confirmed.

WHEREAS, PPLP owns the equity interests in the Debtors as set forth on <u>Annex D</u> attached hereto (each entity, a "<u>Transferred Debtor</u>", and such equity interests, collectively, the "<u>Transferred Equity Interests</u>");[4]

WHEREAS, pursuant to the Plan, the Confirmation Order and this Agreement, and in accordance with the Restructuring Steps, PPLP shall convey to NewCo, and NewCo shall accept, the Transferred Equity Interests, in each case Free and Clear, resulting in NewCo being the sole owner of such Transferred Equity Interests (the "<u>Equity Transfer</u>" and, together with the Non-Equity Asset Transfer, the "<u>NewCo Asset Transfer</u>"); and

WHEREAS, pursuant to the Plan, the Confirmation Order and this Agreement, and in accordance with the Restructuring Steps, NewCo shall (i) assume and accept from PPLP, and PPLP shall assign to NewCo, solely those liabilities of PPLP set forth on <u>Annex E</u> attached hereto (the "<u>Assumed Liabilities</u>") and (ii) agree to carry out its obligations as set forth in the Plan, including its obligations to (A) enter into the NewCo Credit Support Agreement in the form set forth on <u>Annex F</u> attached hereto on the Effective Date, (B) satisfy any deficiency of funding in the Wind-Up Reserve and (C) satisfy any deficiency of funding in the Director and Employee Escrow Account (as defined in the PAT Agreement).

## AGREEMENT

NOW, THEREFORE, pursuant to the Confirmation Order, and in consideration of the foregoing and upon the terms and subject to the mutual covenants and conditions set forth herein, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties agree as follows:

Section 1.        <u>NewCo Asset Transfer; Assumed Liabilities; NewCo Obligations</u>.

(a)        The recitals above are incorporated herein by reference.

(b)        PPLP hereby contributes, transfers, assigns, conveys and delivers to NewCo, and NewCo hereby acquires and accepts from PPLP, all of PPLP's right, title, and interest in and to the Transferred Non-Equity Assets and the Transferred Equity Interests, in each case, Free and Clear; *provided* that, notwithstanding the foregoing, this Agreement shall not be treated as effecting the legal transfer of any asset that would otherwise be transferred hereunder but is instead being transferred [concurrently] pursuant to a separate instrument (such assets being set forth on <u>Annex G</u> attached hereto). Concurrently herewith, PPLP and/or NewCo, as applicable, shall execute and deliver such stock powers, certificates and amendments to limited liability company

---

[4] To the extent any Transferred Debtors will be converted into LLCs, amended LLCs will need to be executed concurrently with this Agreement to reflect NewCo as the sole member of the LLC. To the extent any Transferred Debtors remain as LPs or GPs, amended partnership agreements will need to be executed concurrently with this Agreement to reflect the new GP of each entity as well as any name changes. In addition, for Transferred Debtors that currently have PPI as its GP, if they remain as a GP or LP, either (i) a new GP will be needed (e.g., PPI would need to transfer the GP interest to NewCo or one of its subsidiaries, and in that event, NewCo will need to transfer some or all of its LP interests to one of its subsidiaries), or (ii) PPI needs to be a Transferred Debtor and remain the GP of those entities. Further, if PPI is to be transferred to NewCo, a separate transfer instrument will be needed for PPI to transfer its GP interest.

agreements and/or limited partnership agreement or partnership or other agreements and documents, as the case may be, to effectuate the Equity Transfer.

(c)     NewCo hereby (i) assumes and accepts the Assumed Liabilities and (ii) agrees to carry out its obligations as set forth in the Plan, including its obligations to (x) enter into the NewCo Credit Support Agreement on the Effective Date, (y) satisfy any deficiency of funding in the Wind-Up Reserve and (z) satisfy any deficiency of funding in the Director and Employee Escrow Account (as defined in the PAT Agreement).

(d)     From and after the Effective Date, NewCo shall be substituted for PPLP as the limited partner, member or sole stockholder, as the case may be, of each Transferred Debtor and the sole record and beneficial owner of all Transferred Non-Equity Assets and Transferred Equity Interests. From and after the Effective Date, PPLP shall and does hereby withdraw from each Transferred Debtor as a [limited partner, member or stockholder (as applicable)] of each Transferred Debtor, ceases to be a [limited partner, member or stockholder (as applicable)] of each Transferred Debtor, and ceases to have or exercise any right or power as a [limited partner, member or stockholder (as applicable)] of each Transferred Debtor. The Parties hereto agree that the transfer of the Transferred Non-Equity Assets and the Transferred Equity Interests, the admission of NewCo as a substitute [limited partner, member or stockholder (as applicable)] of each Transferred Debtor, and the withdrawal of PPLP as a [limited partner, member or stockholder (as applicable)] of each Transferred Debtor, shall not dissolve any Transferred Debtor and the business of each Transferred Debtor shall continue unaffected by such transfers and other such actions. PPLP hereby consents to the admittance of NewCo as a substitute [limited partner, member or stockholder (as applicable)] of each Transferred Debtor. PPLP hereby waives all provisions, if any, in the limited partnership agreement, limited liability company agreement, organizational document or other applicable agreement of each Transferred Debtor, or provided under the Delaware law or any other applicable law, that would prohibit, delay, require notice of, grant rights in connection with, or require compliance with any other requirements in connection with, such transfer and admission.

Section 2.     Delayed Transferred Assets.

(a)     Notwithstanding any provision contained in Section 1, if the contribution, transfer, assignment, conveyance or delivery of any Transferred Non-Equity Asset (any assets described in this clause, the "Delayed Transferred Assets"[, which Delayed Transferred Assets, to the extent known as such by PPLP as of the Effective Date and not set forth on Annex B are set forth on Annex H attached hereto; *provided* that this Annex will not be treated as a representation or warranty by PPLP]) intended to occur hereunder is not consummated on or by the Effective Date because (i) such transfer, assignment, conveyance or delivery is prohibited because of an applicable law, regulation, judgment, injunction, order or decree or because a consent, approval or authorization required by law to be obtained with or from any governmental authority with respect to such Transferred Asset has not been obtained or (ii) such transfer, assignment, conveyance or delivery would constitute a breach or other contravention of a contract with a third party with respect to such Transferred Asset (in each case unless the Bankruptcy Code permits and/or the Plan, the Confirmation Order or any Plan Document authorizes such transfer, assignment, conveyance or delivery), then the NewCo Asset Transfer shall nevertheless be consummated with respect to the other Transferred Non-Equity Assets and, with respect to each Delayed Transfer

Asset, the transfer or assignment to NewCo of such Delayed Transferred Asset shall be deferred until such time as all legal or contractual impediments with respect to the transfer or assignment thereof are removed or as otherwise agreed by the Parties.

(b)     The Parties shall use commercially reasonable efforts to resolve any legal or contractual impediments that caused the delay in the transfer of any asset pursuant to Section 2(a)(i) or (ii). Pending the resolution of such impediment, PPLP and NewCo shall, to the fullest extent permitted, cooperate in a mutually agreeable arrangement under which NewCo would obtain the benefits and assume the obligations thereunder in accordance with this Agreement, including sub-contracting, sub-licensing, or sub-leasing to NewCo, or PPLP enforcing for the benefit of NewCo all of its rights thereunder, with NewCo assuming PPLP's obligations thereunder. If and when the legal and contractual impediments that caused the delay in the transfer of any asset pursuant to Section 2(a)(i) or (ii) are resolved, the transfer of the applicable Delayed Transferred Asset shall automatically be effected in accordance with the terms of this Agreement.

(c)     Any Delayed Transferred Assets transferred, assigned, conveyed or delivered to NewCo as provided in this Section 2 shall be deemed (i) for purposes of this Agreement to be "Transferred Non-Equity Assets" of the party directly or indirectly transferring or assigning such assets and (ii) for U.S. federal income tax purposes, to have been transferred on the Effective Date.

Section 3.     Push-Out Election. The Parties agree that if any Transferred Debtor characterized as a partnership for U.S. tax purposes with respect to tax periods beginning prior to the Equity Transfer receives from the IRS a notice of final partnership adjustment as defined in IRC section 6231(b)(2) with respect to taxes relating to such periods, a "push-out election" under IRC section 6226 shall be timely made and all actions necessary to effect such election shall be timely taken to the extent permitted by applicable law.

Section 4.     Tax Items Attributable to Effective Date. The Parties agree that for all income tax purposes, all items of income, gain, deduction, loss or credit attributable to the Effective Date in respect of NewCo and its subsidiary entities that are treated as disregarded entities or partnerships for tax purposes is attributable to PPLP's ownership of NewCo on the Effective Date and shall be reported accordingly for tax purposes.

Section 5.     Further Assurances. In addition to the actions provided for in this Agreement, and except as otherwise provided herein and subject to the terms and conditions of this Agreement, the Bankruptcy Code and any orders of the Bankruptcy Court, from and after the Effective Date, PPLP and NewCo shall use their respective reasonable best efforts to take, or cause to be taken, all reasonable actions and to do, or cause to be done, all things necessary or desirable under applicable law or contractual provisions or otherwise to consummate the transactions contemplated hereby, and by the Plan and the Confirmation Order, including (i) preparing and filing as promptly as practicable with any governmental authority or other third party all documentation reasonably required to effect all necessary filings, notices, petitions, statements, registrations, submissions of information, applications and other documents and (ii) using commercially reasonable efforts to obtain and maintain all approvals, consents, registrations, permits, authorizations and other confirmations required to be obtained from any governmental authority or other third party that are necessary, proper or advisable to consummate the transactions contemplated hereby, in each case, after giving effect to the Confirmation Order.

(b)    At and after the Effective Date, and without further consideration therefor, PPLP shall execute and deliver to NewCo such further instruments and certificates as reasonably requested by NewCo, (i) to vest, perfect or confirm ownership (of record or otherwise) in NewCo and/or one or more of its subsidiaries, PPLP's right, title or interest in, to or under any or all of the Transferred Non-Equity Assets, in each case Free and Clear, or (ii) to otherwise effectuate the purposes and intent of this Agreement, the Confirmation Order and the Plan or for aiding, assisting, collecting and reducing to possession any of the Transferred Assets and exercising rights with respect thereto. From and after the Effective Date, each Party shall take, or cause to be taken, and cooperate with the other Party to take, or cause to be taken, all reasonable actions and do, or cause to be done, all reasonable things, as may be requested by NewCo in order to vest, perfect or confirm any and all right, title and interest in, to and under such rights, properties or assets in NewCo or otherwise to carry out this Agreement, and shall execute and deliver all deeds, bills of sale, instruments of conveyance, powers of attorney, assignments, assumptions and assurances, and as may be reasonably required to consummate the transactions contemplated hereby.

(c)    PPLP does hereby grant to NewCo a power-of-attorney for the express purpose of executing and delivering the Transferred Non-Equity Assets and the Transferred Equity Interests and to take, or cause to be taken, all such further action as NewCo may deem reasonably necessary, in order to evidence or effectuate the transfer of the Transferred Non-Equity Assets and the Transferred Equity Interests contemplated hereby; *provided* that such power-of-attorney will not be used to reduce PPLP's rights or increase its obligations.

Section 6.    <u>Disclaimers; Warranties</u>. IT IS THE EXPLICIT INTENT OF EACH PARTY HERETO THAT THE TRANSFERRED NON-EQUITY ASSETS AND TRANSFERRED EQUITY INTERESTS BEING ASSIGNED, TRANSFERRED, DELIVERED, CONTRIBUTED AND CONVEYED BY PPLP PURSUANT TO THIS AGREEMENT ARE BEING SO ASSIGNED, TRANSFERRED, DELIVERED, CONTRIBUTED AND CONVEYED FREE AND CLEAR BUT OTHERWISE "AS IS, WHERE IS," WITH ALL FAULTS, AND THAT PPLP IS MAKING NO REPRESENTATION, WARRANTY OR COVENANT WHATSOEVER, EXPRESS OR IMPLIED (INCLUDING, WITHOUT LIMITATION: (A) ANY IMPLIED OR EXPRESS WARRANTY OF FITNESS FOR A PARTICULAR PURPOSE; (B) ANY IMPLIED OR EXPRESS WARRANTY OF MERCHANTABILITY; OR (C) ANY OTHER IMPLIED WARRANTY OR REPRESENTATION OF ANY NATURE) REGARDING, RELATING TO OTHERWISE WITH RESPECT TO, THE TRANSFERRED EQUITY INTERESTS OR THE ASSETS, AND HEREBY EXPRESSLY DISCLAIMS AND NEGATES ANY SUCH REPRESENTATION, WARRANTY OR COVENANT. THE PARTIES HERETO AGREE THAT, TO THE EXTENT REQUIRED BY APPLICABLE LAW TO BE EFFECTIVE, THE DISCLAIMERS OF REPRESENTATIONS, WARRANTIES AND COVENANTS CONTAINED IN THIS SECTION ARE "CONSPICUOUS" DISCLAIMERS FOR THE PURPOSES OF ANY APPLICABLE LAW, RULE OR ORDER.

Section 7.    <u>Counterparts</u>. The Parties agree to execute any and all documents and instruments of transfer, assignment, assumption or novation and to perform such other acts as may be reasonably necessary or expedient to further the purposes of this Agreement and the transactions contemplated by this Agreement.

Section 8.    <u>Entire Agreement</u>. This Agreement, the Confirmation Order and the Plan constitute the sole and entire agreement of the Parties with respect to the subject matter contained herein, and supersedes all prior and contemporaneous understandings, representations and warranties and agreements, both written and oral, with respect to such subject matter.

Section 9.    <u>Successors and Assigns</u>. This Agreement shall be binding upon and shall inure to the benefit of the Parties hereto and their respective successors and permitted assigns.

Section 10.    <u>Severability</u>. If any provision of this Agreement is held or declared to be void, illegal, or unenforceable for any reason by a court of competent jurisdiction, the offending provision shall, if possible, be reformed by such court in such manner as will implement, to the fullest extent legally permissible, valid and enforceable, the expressed intentions of the undersigned without illegality, invalidity or unenforceability. If such reformation is not possible, the offending provision shall be stricken and all other provisions of this Agreement shall nevertheless remain in full force and effect.

Section 11.    <u>Headings; Certain Definitional and Interpretative Provisions</u>. The words "hereof," "herein" and "hereunder" and words of like import used in this Agreement shall refer to this Agreement as a whole and not to any particular provision of this Agreement. The captions in this Agreement are included for convenience of reference only and shall be ignored in the construction or interpretation hereof. References to Sections and Annexes are to Sections and Annexes of this Agreement unless otherwise specified. All annexes attached hereto or referred to herein are hereby incorporated in and made a part of this Agreement as if set forth in full herein. Any singular term in this Agreement shall be deemed to include the plural, and any plural term the singular. Whenever the words "include," "includes" or "including" are used in this Agreement, they shall be deemed to be followed by the words "without limitation," whether or not they are in fact followed by those words or words of like import. The word "will" shall be construed to have the same meaning and effect as the word "shall." The word "or" when used in this Agreement is not exclusive. References to any agreement or contract are to that agreement or contract as amended, modified or supplemented from time to time in accordance with the terms hereof and thereof; *provided* that with respect to any agreement or contract listed on any annex hereto, all such amendments, modifications or supplements must also be listed in the appropriate annex. In the event an ambiguity or question of intent or interpretation arises, this Agreement shall be construed as jointly drafted by the Parties and no presumption or burden of proof shall arise favoring or disfavoring any Party by virtue of the authorship of any provision of this Agreement.

Section 12.    <u>Notices</u>. All notices, requests and other communications to any party hereunder shall be in writing and shall be deemed given if delivered personally or sent by overnight courier (providing proof of delivery) or by electronic mail to the parties.  All notices to PPLP shall be delivered to [__] and all notices to NewCo shall be delivered to [__]. All such notices, requests and other communications shall be deemed received on the date of receipt by the recipient thereof if received prior to 5 p.m. as of the local time of the recipient's address above and such day is a business day in the place of receipt; provided, that notices, requests or other communications provided by electronic mail shall be deemed received upon delivery. Otherwise, any such notice, request or communication shall be deemed not to have been received until the next succeeding business day in the place of receipt.

Section 13.    <u>Third Party Rights</u>. Except as expressly set forth herein, no provision of this Agreement is intended to confer any rights, benefits, remedies, obligations, or liabilities hereunder upon any person, other than the Parties and their respective successors and permitted assigns.

Section 14.    <u>Amendments and Waivers</u>. Any provision of this Agreement may be amended or waived, but only if, such amendment or waiver is in writing and is signed, in the case of an amendment, by each Party, or in the case of a waiver, by the Party against whom the waiver is to be effective.

Section 15.    <u>Electronic Transmission</u>. A signed copy of this Agreement or any amendment hereto delivered by facsimile or any form of communication not directly involving the physical transmission of paper that creates a record that may be retained, retrieved, and reviewed by a recipient thereof and that may be directly reproduced in paper form by such a recipient through an automated process (including e-mail of a "pdf" signature), shall be treated in all manner and respects as an original agreement or instrument and shall be considered to have the same binding legal effect as if it were the original signed version thereof delivered in person.

Section 16.    <u>Governing Law</u>. This Agreement and the rights and obligations hereunder shall in all respects be governed by and construed under the laws of the State of Delaware without regard to any conflict of laws principles that would require the application of any other law; provided, for the avoidance of doubt, New York law shall govern the interpretation and enforcement of the Plan and the Confirmation Order.

Section 17.    <u>Relationship to Plan</u>. The principal purpose of this Agreement is to aid in the implementation of the Plan and therefore this Agreement incorporates the provisions of the Plan and the Confirmation Order (which may amend or supplement the Plan). To the extent that there is conflict between the provisions of this Agreement, the provisions of the Plan, or the Confirmation Order, each document shall have controlling effect in the following rank order: (1) the Confirmation Order; (2) the Plan; and (3) this Agreement.

*[Signature page follows]*

IN WITNESS WHEREOF, the parties hereto have executed this Agreement effective as of the Effective Date.

**PURDUE PHARMA L.P.**

By:  Purdue Pharma Inc., *its general partner*

By:_____
Name:
Title:

**[NEWCO]**

By:_____
Name:
Title:

EXHIBIT I

<u>Restructuring Steps Memorandum</u>

[To Come]

ANNEX A

Non-Transferred Debtors

[To come]

ANNEX B

Required Consents

[To come]

ANNEX C

Excluded Assets

[To come]

ANNEX D

<u>Transferred Debtors</u>

[To come]

ANNEX E

<u>Assumed Liabilities</u>

[To come]

ANNEX F

Form of NewCo Credit Support Agreement

[To come]

ANNEX G

Assets Subject to Transfer Pursuant to [Concurrent] Instruments

[To come]

# EXHIBIT W

**NewCo Operating Agreement**

**LIMITED LIABILITY COMPANY OPERATING AGREEMENT**

**of**

**[NewCo LLC][1]**
**a Delaware limited liability company**

**Dated as of [    ], 20__**

---

[1] NTD: Company name to be determined and reserved for use with the Delaware Secretary of State.

## Table of Contents

**Page**

**ARTICLE I** CERTAIN DEFINITIONS.................................................................................2

    **1.1**    Defined Terms .................................................................. 2
    **1.2**    Terms Defined in the Plan ............................................... 8
    **1.3**    Interpretation................................................................. 8

**ARTICLE II** ORGANIZATIONAL MATTERS .................................................................9

    **2.1**    Formation ...................................................................... 9
    **2.2**    Name ............................................................................. 9
    **2.3**    Purpose and Governance Covenants ............................... 9
    **2.4**    Principal Office; Registered Office ................................. 10
    **2.5**    Powers .......................................................................... 10
    **2.6**    Term ............................................................................. 10

**ARTICLE III** BOARD OF MANAGERS; OFFICERS .....................................................10

    **3.1**    Composition and Actions of the Board of Managers ......... 10
    **3.2**    Board Meetings and Actions by Written Consent .............. 11
    **3.3**    Management by the Board of Managers ........................... 13
    **3.4**    Officers ......................................................................... 14

**ARTICLE IV** THE MEMBER ..........................................................................................16

    **4.1**    The Member ................................................................... 16

**ARTICLE V** DISPOSITION EVENT; ASSET SALES .....................................................17

    **5.1**    Overview ....................................................................... 17
    **5.2**    Engagement of Disposition Advisor and other Company Advisors..................... 18
    **5.3**    Disposition Status Reports ............................................. 18
    **5.4**    Disposition Deadline...................................................... 19
    **5.5**    Other Required Asset Disposition; Limitations ................. 19

**ARTICLE VI** CERTAIN RIGHTS AND OBLIGATIONS OF THE COMPANY AND THE
MEMBER ....................................................................................19

    **6.1**    Monitor ......................................................................... 19
    **6.2**    Public Health Initiatives................................................. 19
    **6.3**    Annual Budget ............................................................... 20
    **6.4**    Operating Expenses ....................................................... 21
    **6.5**    Distributions.................................................................. 21
    **6.6**    Company Investments..................................................... 22
    **6.7**    Compliance Program ...................................................... 22
    **6.8**    Document Retention Policy ............................................. 23
    **6.9**    Preservation of Causes of Action and Reservation of Rights ............... 23

**ARTICLE VII** EXCULPATION AND INDEMNIFICATION..............................................23

    **7.1**    Indemnification; Advancement........................................ 23

**ARTICLE VIII** BOOKS, RECORDS, ACCOUNTING AND REPORTS ................................25

    **8.1**    Records and Accounting ............................................................ 25
    **8.2**    Fiscal Year ................................................................................ 25
    **8.3**    Financial and Other Reporting.................................................. 26

**ARTICLE IX** TAXES ..............................................................................................27

    **9.1**    Tax Returns ............................................................................... 27
    **9.2**    Tax Elections ............................................................................ 27

**ARTICLE X** DISSOLUTION AND LIQUIDATION ................................................27

    **10.1**    Dissolution ................................................................................ 27
    **10.2**    Liquidation and Termination ..................................................... 27
    **10.3**    Cancellation of Certificate ........................................................ 28

**ARTICLE XI** GENERAL PROVISIONS.................................................................28

    **11.1**    Amendments .............................................................................. 28
    **11.2**    No Return of Distributions........................................................ 29
    **11.3**    Remedies Cumulative ............................................................... 29
    **11.4**    Successors and Assigns ............................................................ 29
    **11.5**    Severability ............................................................................... 29
    **11.6**    Applicable Law; Jurisdiction .................................................... 29
    **11.7**    Addresses and Notices .............................................................. 29
    **11.8**    No Reliance by Third Parties .................................................... 30
    **11.9**    No Implied Waivers .................................................................. 30
    **11.10**    Entire Agreement ...................................................................... 30
    **11.11**    Delivery by Electronic Transmission........................................ 30
    **11.12**    Relationship to Plan .................................................................. 30

Schedules

| Schedule 1.1(a) | Operating Injunction |
|---|---|
| Schedule 1.1(b) | Company Initiatives |
| Schedule 1.1(c) | PHI Products |
| Schedule 1.1(d) | Pipeline Assets |
| Schedule 3.1 | Initial Managers |
| Schedule 5.5 | Other Required Asset Dispositions; Limitations |

## [NEWCO LLC][2]

## LIMITED LIABILITY COMPANY OPERATING AGREEMENT

THIS LIMITED LIABILITY COMPANY OPERATING AGREEMENT (the "**Agreement**") of [NewCo LLC], a Delaware limited liability company (the "**Company**"), dated as of [    ], 20[  ] is entered into by and among the Company [and] [TopCo LLC] ("**TopCo**" or the "**Member**"), a Delaware limited liability company and the sole owner of the LLC Interest (as defined below), to implement certain of the terms of the Debtors' [Fifth] Amended Joint Chapter 11 Plan of Reorganization Dated [June 3, 2021] (as may be further modified, amended or supplemented from time to time, and together with all exhibits and schedules thereto, the "**Plan**") confirmed by an order entered on [    ], 20[  ] [Docket No. _____] (the "**Confirmation Order**") by the United States Bankruptcy Court for the Southern District of New York (the "**Bankruptcy Court**") in the Chapter 11 cases of Purdue Pharma L.P. and its affiliated debtors (each a "**Debtor**" and collectively, the "**Debtors**") known as *In re Purdue Pharma L.P., et al.*, Case No. 19-23649 (collectively, the "**Chapter 11 Cases**").

## RECITALS

(A)    The Debtors have, or contemporaneously with the execution of this Agreement will have, reorganized under the provisions of Chapter 11 of the Bankruptcy Code in the Chapter 11 Cases.

(B)    The Confirmation Order has been entered by the Bankruptcy Court and is in full force and effect.

(C)    This Agreement constitutes the "NewCo Operating Agreement".

(D)    The Plan and Confirmation Order provide for, among other things, the creation of the Company, the rights and obligations of the Board and the Member, the Governance Covenants and the appointment of the Monitor, and the issuance of the Operating Injunction pursuant to which the Company, and any successor owner of the Opioid Business, are and will be bound, each as set forth herein and in the Plan and Confirmation Order.

(E)    In accordance with the Plan, the Company has entered into that certain [credit support agreement] dated [as of the date hereof] by and among the Company, the Member and the Master Disbursement Trust (the "**Credit Support Agreement**"), pursuant to which, among other things, the Company is obligated under certain circumstances set forth therein to make Cash payments and pay over certain MDT Distributable Sale Proceeds to the Master Disbursement Trust, and the Master Disbursement Trust is obligated to repay certain amounts

---

[2] NTD: This draft Agreement assumes execution and effectiveness at emergence. As NewCo may need to be formed beforehand (including for regulatory approval purposes) NewCo would be formed with a short-form operating agreement and this Agreement would be approved under the Confirmation Order as an Amended and Restated LLC Agreement.

received from the Company and the Member as contemplated by the Plan and in accordance with the Credit Support Agreement.

(F)    Pursuant to the Plan and in accordance with the NewCo Transfer Documents, the NewCo Transferred Assets, including the Initial NewCo Cash and certain Retained Causes of Action, were transferred to and vested in the Company or one or more Subsidiaries of the Company (other than any NewCo Transferred Assets previously held by a Transferred Debtor, which re-vested in such Transferred Debtor), in each case free and clear of Claims, Interests and liabilities in accordance with the NewCo Transfer Documents.

(G)    The Member desires to enter into this Agreement in order to set forth, among other things, the rights and obligations relating to the LLC Interest and the relationship of the parties hereto.

NOW, THEREFORE, in consideration of the mutual covenants contained herein and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto, intending to be legally bound, hereby agree as follows:

## ARTICLE I

## CERTAIN DEFINITIONS

1.1    **Defined Terms**. Capitalized terms used but not otherwise defined herein shall have the following meanings:

"**Agreement**" has the meaning set forth in the introductory paragraph hereto.

"**Annual Financial Statements**" has the meaning set forth in Section 8.3(b)(ii).

"**Asset**" means property of whatever type or nature, including real, personal, mixed, intellectual, tangible and intangible property.

"**Bankruptcy Code**" means title 11 of the United States Code, as applicable to the Chapter 11 Cases.

"**Bankruptcy Court**" has the meaning set forth in the introductory paragraph hereto.

"**Board**" means the Board of Managers established hereunder in accordance with Section 3.1(a).

"**Business Day**" means any day other than a Saturday, a Sunday or any other day on which banking institutions in New York, New York are authorized or required by law or executive order to close.

"**Cash**" means all legal tender of the United States of America.

"**Certificate**" means the Company's Certificate of Formation as filed with the Secretary of State of the State of Delaware.

- 2 -

"**Chair**" has the meaning set forth in Section 3.2(h).

"**Chapter 11 Cases**" has the meaning set forth in the recitals hereto.

"**Claim**" has the meaning set forth in section 101(5) of the Bankruptcy Code.

"**Committee**" has the meaning set forth in Section 3.3(d).

"**Company**" has the meaning set forth in the introductory paragraph hereto.

"**Company Accountants**" has the meaning set forth in Section 8.3(a).

"**Company Initiatives**" means the initiatives described on Schedule 1.1(b).

"**Company's Purpose**" has the meaning set forth in Section 2.3(a).

"**Compliance Program**" has the meaning set forth in Section 6.7(a).

"**Confirmation Order**" has the meaning set forth in the introductory paragraph hereto.

"**Covered Person**" means (i) the Member, (ii) each current or former officer or director of the Member, (iii) each current or former Manager or officer of the Company or any of its Subsidiaries, (iv) each person who is or was serving at the request of the Company or any of its Subsidiaries or the Member as a member, director, manager, officer, employee or agent of another Person and (v) each Designated Indemnitee; provided, however, that a Person shall not be deemed to be a "Covered Person" with respect to such Person's service in any role prior to the Effective Date, including as a member, director, manager, officer, employee or agent of any Debtor or any Subsidiary of the Company.

"**Credit Support Agreement**" has the meaning set forth in the Recitals.

"**Damages**" has the meaning set forth in Section 7.1(b).

"**Debtor**" has the meaning set forth in the introductory paragraph hereto.

"**Designated Indemnitee**" means any current or former employee, agent or representative of the Company, any of its Subsidiaries, the Member or any other Person who, in any such case, (x) is not a Covered Person under any of clauses (i)-(iv) of the definition of "Covered Person" and (y) is designated by action of the Board as a Designated Indemnitee. The Board may delegate to any officer or officers its authority to designate individuals as Designated Indemnitees subject to any such limitations as the Board may specify in such delegation; provided, however that no Person shall be a "Designated Indemnitee" with respect to such Person's service in any role prior to the Effective Date, including as an employee, agent or representative of any Debtor or any Subsidiary of the Company.

"**Delaware Act**" means the Delaware Limited Liability Company Act, 6 Del. L. § 18-101, *et seq.*, as it may be amended from time to time, and any successor to the Delaware Act.

- 3 -

"**Disposition Advisor**" means a nationally recognized, independent investment banker, financial advisor or similar financial professional, it being understood and agreed that (i) any Person that has a material relationship with any other Person directly or indirectly owning an equity interest in any Debtor on the date on which such Debtor commenced its Chapter 11 Case shall not be deemed independent for purposes of this Agreement, (ii) any Person that is or was an advisor to the Debtors prior to the Effective Date shall not be deemed independent for purposes of this definition and (iii) the fact that such Person provided investment banking, financial advisory or similar financial professional services to the Ad Hoc Committee or the Supporting Claimants or is related to any post-Effective Date Manager, shall not affect such Person's independence for purposes hereof.

"**Disposition Deadline**" has the meaning set forth in Section 5.4.

"**Disposition Event**" has the meaning set forth in Section 5.1(a).

"**Disposition Status Report**" has the meaning set forth in Section 5.3.

"**Distribution Date**" means (i) [June 30, 2022] and (ii) January 30, 2023 and each six (6) month anniversary thereof; provided that, if an Escrow Period is then in effect on any such date, such Distribution Date shall be the next Business Day following the termination of such Escrow Period.

"**Eastern Time**" means Eastern Daylight Time or Eastern Standard Time, whichever is in effect on the relevant date.

"**Effective Date**" means [●].

"**Electronic Transmission**" means any form of communication not directly involving the physical transmission of paper that creates a record that may be retained, retrieved, and reviewed by a recipient thereof and that may be directly reproduced in paper form by such a recipient through an automated process.

"**Excess Cash**" means, as of any date of measurement, all unrestricted Cash and cash equivalents held by the Company and the Company's Subsidiaries (other than MDT Distributable Sale Proceeds), as reflected on the consolidated balance sheet of the Company and the Company's Subsidiaries as of such date, in excess of (i) two hundred million dollars ($200,000,000), provided that such amount may be (x) decreased to an amount that is less than two hundred million dollars ($200,000,000) upon the determination of the Board that the retention of such lesser amount by the Company is appropriate, taking into consideration the Company's obligation to fund Operating Expenses and the Company's Purpose and (y) increased to an amount that is greater than two hundred million dollars ($200,000,000) upon the determination of the Board that the retention of such greater amount by the Company is reasonably necessary, after taking into consideration the Company's obligation to fund Operating Expenses and the Company's Purpose and (ii) amounts required to be paid at that time on account of the Company's obligations under the Credit Support Agreement in accordance with Section 5.2(d)(iii)(A) of the Plan, if any, including any amounts required to satisfy any shortfall of funding of the MDT Operating Reserve and the MDT Claims Reserve.

"**Final Order**" means an order or judgment of the Bankruptcy Court, or court of competent jurisdiction with respect to the subject matter of the applicable case or controversy, as entered on the docket in any Chapter 11 Case or the docket of any court of competent jurisdiction (i) that has not been reversed, stayed, modified or amended, and (ii) (A) as to which the time to appeal, seek certiorari or move for a new trial, re-argument or rehearing has expired according to applicable law and no appeal or petition for certiorari or other proceedings for a new trial, re-argument or rehearing has been timely taken or (B) as to which any appeal that has been taken or any petition for certiorari that has been or may be timely filed has been withdrawn or resolved by the highest court to which the order or judgment was appealed or from which certiorari was sought or the new trial, re-argument or rehearing shall have been denied, resulted in no modification of such order or has otherwise been dismissed with prejudice.

"**Fiscal Year**" means the Company's annual accounting period established pursuant to Section 8.2.

"**Governance Covenants**" means the provisions set forth in Appendix [●] to the Confirmation Order, which are binding on the Company and the Company's Subsidiaries, and which shall bind any successor owner of the Opioid Business.

"**Governing Documents**" has the meaning set forth in Section 3.3(a)(i).

"**Increased PHI Development Budget Amount**" has the meaning set forth in Section 6.2(a).

"**Indebtedness**" means, as to any Person at a particular time, without duplication, all of the following, whether or not included as indebtedness or liabilities in accordance with GAAP: (a) all obligations for borrowed money, whether current or long-term, and all obligations evidenced by bonds, debentures, notes, loan agreements or other similar instruments but specifically excluding trade payables incurred in the ordinary course of business; (b) to the extent unreimbursed by the Company, all obligations under letters of credit (including standby and commercial), bankers' acceptances and similar instruments (including bank guaranties); (c) the implied principal component of capital leases, synthetic leases and securitization transactions; and (d) all guarantees in respect of any debt of another Person [other than the debt of any member of the NewCo Control Group].

"**Initial NewCo Cash**" means two hundred million dollars ($200,000,000) that was transferred to the Company on the Effective Date.

"**Initial PHI Development Budget Amount**" has the meaning set forth in Section 6.2(a).

"**Interest**" means any equity security (as defined in section 101(16) of the Bankruptcy Code) in a Person, including any shares, common stock or units, preferred stock or units, or other instrument evidencing any fixed or contingent equity or ownership interest in a Person, including any option, warrant or other right, contractual or otherwise, to acquire any such interest in such Person, whether or not transferable and whether fully vested or vesting in the future.

"**IRC**" means the Internal Revenue Code of 1986, as amended.

"**IRS**" means the Internal Revenue Service.

"**LLC Interest**" means the limited liability company interest in the Company representing one hundred percent (100%) of the economic and voting interest in the Company.

"**Manager**" means each manager appointed to the Board of the Company.

"**Minimum TopCo Distribution**"[3] means TopCo Distributions from Excess Cash in an aggregate amount equal to (i) $820 million (*less* amounts distributed by the Debtors on the Effective Date pursuant to the Initial NOAT Distribution and the Initial Tribe Trust Distribution), consisting of an aggregate amount of $50 million through January 30, 2023, an incremental aggregate amount of $200 million through January 30, 2024 and an incremental aggregate amount of $300 million through January 30, 2025, *plus* (ii) any Excess Cash from Net Sale Proceeds or from Company Initiatives, *minus* (iii) all NewCo Available Cash and MDT Distributable Sale Proceeds paid to the Master Disbursement Trust under the Credit Support Agreement.

"**Monitor**" means the monitor appointed in accordance with Section 5.4(i) of the Plan to ensure the Company's compliance with the Operating Injunction and the Governance Covenants. The initial Monitor shall be the "NewCo Monitor" appointed pursuant to the Confirmation Order.

["**NewCo Control Group**" means NewCo and its Subsidiaries.]

"**NewCo Transfer Agreement**" means that certain Transfer Agreement entered into on the Effective Date by and between Purdue Pharma L.P. and the Company, as such agreement may be amended, modified, supplemented or waived in accordance with the terms thereof and the Plan.

"**NewCo Transfer Documents**" means the agreements transferring assets from Purdue Pharma L.P. to the Company, including the NewCo Transfer Agreement, and all documents and information of the Debtors related thereto, from the Debtors to the Company or one of the Company's Subsidiaries (or the transfer of the Transferred Debtors to the Company or one of the Company's Subsidiaries and the re-vesting of the NewCo Transferred Assets held by such Transferred Debtors in such Transferred Debtors).

"**NewCo Transferred Assets**" means the "Transferred Assets" as defined in the NewCo Transfer Agreement and any other assets transferred to the Company or any Transferred Debtor pursuant to any other NewCo Transfer Document.

"**NOAT**" means the National Opioid Abatement Trust, a Delaware statutory trust established on [●], 20[ ] in accordance the Plan.

"**Officers**" has the meaning set forth in <u>Section 3.4</u>.

---

[3] NTD: Payment timing subject to adjustment 15 days prior to the Effective Date. Any adjustments made to the Minimum TopCo Distribution shall be subject to the consent of the Governmental Consent Parties.

"**Operating Expenses**" has the meaning ascribed to the term "NewCo Operating Expenses" in the Plan.

"**Operating Injunction**" means the voluntary injunction set forth in Appendix [●] to the Confirmation Order, which is binding on the Company, the Company's Subsidiaries and any successor owner(s) of the Opioid Business, as such voluntary injunction may be amended or substituted from time to time in accordance with the Confirmation Order.

"**Opioid Assets**" means the assets of the Company and the Company's Subsidiaries used in the Opioid Business.

"**Opioid Business**" means the business of the Company and the Company's Subsidiaries related to the manufacturing and sale of opioids.

"**Opioid Proceeds**" means any profits or proceeds derived from the development, production, manufacture, licensing, labeling, marketing, distribution or sale of opioid products by the Company or the Company's Subsidiaries or the disposition of all or part of the Opioid Business.

"**Permitted Investment**" means each investment described in Schedule 5.5(b)-(c), in each case subject to the respective limitations set forth therein.

"**Person**" means an individual (including in his or her capacity as a trustee, protector or executor), corporation, partnership, joint venture, association, joint stock company, limited liability company, limited liability partnership, trust or trustee, protector, executor, estate, unincorporated organization, Governmental Unit (as defined in Section 101(27) of the Bankruptcy Code), Tribe or other Entity (as defined in Section 101(15) of the Bankruptcy Code).

"**PHI Budget Amount**" has the meaning set forth in Section 6.2(a).

"**PHI Product Cost**" means, with respect to any PHI Product, the total cost of manufacturing and distributing such PHI product *plus* any other direct and quantifiable cost of producing such PHI Product, as determined by the Board.

"**PHI Products**" means (x) the products listed on Schedule 1.1(c) and (y) any other medicines to treat opioid addiction and reverse opioid overdoses as determined by the Board.

"**Pipeline Assets**" means (x) the products listed on Schedule 1.1(d) and (y) such other assets that have been approved by the Board, after taking into account the extent to which such assets are value accretive to the direct and indirect holders of interests in the Company and consistent with the Company's Purpose, and can be developed within the [Pipeline Investment] budget.

"**Plan**" has the meaning set forth in the introductory paragraph hereto.

"**Public Health Initiatives**" means the development and distribution of PHI Products.

- 7 -

"**Public Website**" has the meaning set forth in Section 3.3(c). "**State**" means any U.S. state, any U.S. territory or the District of Columbia.

"**Subsidiaries**" means, with respect to a Person, all direct and indirect subsidiaries of such Person.

"**TopCo**" has the meaning set forth in the introductory paragraph hereto.

"**TopCo Distributable Sale Proceeds**" means, with respect to any transaction described in the definition of "MDT Distributable Sale Proceeds" the Net Sale Proceeds of such transaction *minus* the amount, if any, of the applicable MDT Distributable Sale Proceeds of such transaction.

"**TopCo Distributions**" means any and all distributions from the Company to TopCo in respect of the LLC Interest.

"**Transferred Debtor**" has the meaning ascribed to such term in the NewCo Transfer Agreement.

"**Tribe**" means any American Indian or Alaska Native Tribe, band, nation, pueblo, village or community, that the U.S. Secretary of the Interior acknowledges as an Indian Tribe, as provided in the Federally Recognized Tribe List Act of 1994, 25 U.S.C. § 5130, and as periodically listed by the U.S. Secretary of the Interior in the Federal Register pursuant to 25 U.S.C. § 5131; and any "Tribal Organization" as provided in the Indian Self-Determination and Education Assistance Act of 1975, as amended, 25 U.S.C. § 5304(l).

"**Tribe Opioid LLC**" means Tribal Opioid Abatement Fund LLC, a Delaware limited liability company established on [ ], 20[ ] in accordance with the Plan.

1.2    **Terms Defined in the Plan**. Capitalized terms used in this Agreement but not defined in Section 1.1 or otherwise herein shall have the meanings ascribed to such terms in the Plan; provided that any reference to "NewCo" in the definitions of such terms in the Plan shall mean "the Company" for purposes of this Agreement.

1.3    **Interpretation**.

(a)    The words "this Agreement," "herein," "hereby," "hereunder," "hereof," and other equivalent words refer to this Agreement as an entirety and not solely to the particular portion, article, section, subsection or other subdivision of this Agreement in which any such word is used.

(b)    The Schedules attached to this Agreement are incorporated herein by reference and will be considered part of this Agreement, and any references herein to a particular Section, Article or Schedule means a Section or Article of, or Schedule to, this Agreement unless otherwise expressly stated herein.

(c)    All definitions set forth herein are deemed applicable whether the words defined are used herein in the singular or in the plural and correlative forms of defined terms

- 8 -

have corresponding meanings, and any pronoun or pronouns set forth herein will be deemed to cover all genders.

(d)     A defined term has its defined meaning throughout this Agreement and each Schedule regardless of whether it appears before or after the place where it is defined.

(e)     The word "including" and its derivatives means "including without limitation" and is a term of illustration and not of limitation.

(f)     The word "or" shall be disjunctive but not exclusive.

(g)     All references to prices, values or monetary amounts refer to United States dollars.

<div align="center">

**ARTICLE II**

**ORGANIZATIONAL MATTERS**

</div>

**2.1    Formation**. The Company was organized as a Delaware limited liability company by filing the Certificate with the Secretary of State of the State of Delaware on [____], 20[ ] under and pursuant to the Delaware Act and shall be continued in accordance with this Agreement. The Managers are authorized to execute, file and record all such other certificates and documents, including amendments to the Certificate, and to do such other acts as may be appropriate to comply with all requirements for the formation, continuation and operation of a limited liability company, the ownership of property, and the conduct of business under the laws of the State of Delaware and any other jurisdiction in which the Company may own property or conduct business.

**2.2    Name**. The name of the Company shall be "[NewCo] LLC". The Company's business may be conducted under its name and/or any other name or names deemed advisable by the Board.

**2.3    Purpose and Governance Covenants**.

(a)     The purpose of the Company shall be to, directly and/or through the Company's Subsidiaries, operate the NewCo Transferred Assets and any other business or assets of the Company (i) in accordance with the terms of this Agreement, the Plan and the Confirmation Order, (ii) subject to the Operating Injunction and the Governance Covenants, and (iii) in a responsible, transparent and sustainable manner, taking into account the public interest in transparency regarding the Company and balancing: (x) the interests of its stakeholders (including the direct and indirect holders of Interests in the Member) to fund and provide abatement of the opioid crisis, (y) effective deployment of the Company's and the Company's Subsidiaries' Assets to address the opioid crisis, and (z) the interests of third parties materially affected by the Company's and the Company's Subsidiaries' conduct (collectively, the "**Company's Purpose**").

(b)     The Company shall not be required (and the Board shall not be required to cause the Company) to maximize the Company's or the Company's Subsidiaries' sales or profits, but

<div align="center">- 9 -</div>

rather shall take all elements of the Company's Purpose into account. In balancing the interests of the Member prior to implementation of a Disposition Event, the Board shall give priority to the Company's obligation to use best efforts to fund the Minimum TopCo Distribution for the purpose of devoting funds to opioid abatement programs.

(c)    The Company shall, and shall cause the Company's Subsidiaries to, conduct their respective business in a manner that complies with the Governance Covenants in order to ensure that each of the Company, the Company's Subsidiaries and any successor to the Opioid Business, (i) develops, manufactures, distributes and sells all of its products, including all opioid products, in a safe and secure manner that limits the risk of diversion, (ii) complies with its obligations under the Public Entity Settlements and the Private Entity Settlements, (iii) pursues and implements Public Health Initiatives, and (iv) otherwise takes into account long-term public health interests relating to the national opioid crisis and best environmental, social and governance practices in management of a pharmaceutical business.

2.4    **Principal Office; Registered Office**. The principal office of the Company shall be located at such place as the Board may from time to time designate, and all business and activities of the Company shall be deemed to have occurred at its principal office. The Company may maintain offices at such other place or places as the Board deems advisable. The registered office of the Company required by the Delaware Act to be maintained in the State of Delaware shall be the office of the initial registered agent named in the Certificate or such other office (which need not be a place of business of the Company) as the Board may designate from time to time in any manner provided by law. The registered agent of the Company in the State of Delaware shall be the initial registered agent named in the Certificate or such other Person or Persons as the Board may designate from time to time in the manner provided by law.

2.5    **Powers**. The Company shall, subject to Operating Injunction, the Governance Covenants, the Plan and the Confirmation Order, have the all the powers that a limited liability company may have under the Delaware Act, including the power to do any and all acts and things necessary, appropriate, proper, advisable, convenient or incidental (or determined in good faith by the Board to be so necessary, appropriate, proper, advisable, convenient or incidental) for or to Company's Purpose and for the protection of the Company.

2.6    **Term**. The term of the Company commenced upon the filing of the Certificate in accordance with the Delaware Act and shall continue in existence until termination and dissolution thereof in accordance with the terms of this Agreement.

## ARTICLE III

## BOARD OF MANAGERS; OFFICERS

### 3.1    Composition and Actions of the Board of Managers.

(a) <u>Number</u>. The number of Managers on the Board shall be [  ][4] The persons named on <u>Schedule 3.1(a)</u>, as approved in the Confirmation Order, are hereby appointed as the initial Managers, effective as of the Effective Date.

(b) <u>Term</u>. Each initial Manager shall hold office until the earlier of (i) his or her death, resignation, disqualification or removal by the Member pursuant to <u>Section 3.1(d)</u>, or (ii) the termination and dissolution of the Company in accordance with the provisions of this Agreement.

(c) <u>Appointment of Successor Managers; Qualifications</u>. In the event of a vacancy in the position of one or more Managers for any reason, the Member shall appoint a disinterested and independent successor Manager who has experience in one or more of the areas of experience described in the last sentence of this <u>Section 3.1(c)</u>. Each initial Manager has experience in one or more of the following areas: (i) the domestic and international pharmaceutical industry, (ii) public policy (including public health policy), (iii) law enforcement, (iv) ethics and compliance, (v) finance, (vi) audit, (vii) general business and/or (viii) corporate governance.

(d) <u>Resignation; Removal</u>. A Manager may resign by giving written notice to the Chair (or, if the Manager resigning is the Chair, to the board of managers of the Member). Such notice shall specify a date when such resignation shall take effect, which, except in the case of incapacity or disability, shall not be less than ninety (90) days after the date such notice is given, where practicable. A Manager may be removed by the Member at any time, with or without cause.

(e) <u>Manager Compensation; Reimbursement of Expenses</u>. The Managers shall receive compensation from the Company for their services as Managers.[5] The Company shall also reimburse all reasonable out-of-pocket costs and expenses incurred by the Managers in the course of carrying out their duties as Managers in accordance with reasonable policies and procedures as may be adopted from time to time, including in connection with attending regular and special meetings of the Board.

(f) <u>Rights of Inspection</u>. The Member and each Manager shall have the absolute right at any reasonable time to inspect and copy all books, records and documents of every kind of the Company and the Company's Subsidiaries.

**3.2    <u>Board Meetings and Actions by Written Consent</u>**.

(a) <u>Quarterly Meeting</u>. The Board shall hold a meeting at least once per calendar quarter.

(b) <u>Meetings; Notice</u>. All meetings of the Board (i) may be called by the Chair, the Chief Executive Officer or two or more Managers and (ii) shall be held upon at least twenty-four (24) hours' written notice, in each case including time, place and purpose of the meeting, given

---

[4] NTD: Number of Managers to be between five and seven based on ongoing selection process.
[5] NTD: Additional compensation details under continued review.

to each Manager by overnight courier, personal delivery, facsimile, electronic mail, or other similar means of communication. Notice shall be addressed or delivered to each Manager at the Manager's address as shown upon the records of the Company, or as may have been given to the Board by the Manager for purposes of notice. Notice by overnight courier shall be deemed to have been given one Business Day after the time that written notice is provided to such overnight courier. Email or any other written notice shall be deemed to have been given at the time it is personally delivered to the recipient or actually transmitted by the person giving the notice by electronic means to the recipient.

(c)    Waiver of Notice. Notice of a meeting need not be given to any Manager who waives such notice, whether before or after the meeting. All such waivers shall be made a part of the minutes of the meeting. Attendance at a meeting by a Manager shall constitute a waiver of notice of such meeting except when the Manager attends a meeting for the express purpose of objecting, at the beginning of the meeting, to the transaction of any business on the ground that the meeting was not lawfully called or convened. Neither the business to be transacted at, nor the purpose of, any Manager meeting need be specified in any waiver of notice.

(d)    Place of Meeting; Participation in Meetings. Meetings of the Board shall be held at any place designated by the Board, or by means of remote communication, as shall be stated in the notice of meeting. Managers may participate in a meeting of the Board or of a Committee by conference telephone, video conferencing or similar communications equipment, as long as all Managers participating in such meeting can hear one another. Participation by a Manager in a meeting pursuant to this Section 3.2(d) shall constitute presence in person at such meeting.

(e)    Action and Quorum. Except as otherwise provided herein, in all matters pertaining to the affairs of the Company, the Board shall act by a vote of a majority of the number of Managers then in office, which such majority shall constitute a quorum of the Board for the transaction of business, except to adjourn as provided in Section 3.2(f).

(f)    Adjournment. A majority of the Managers present, whether or not a quorum exists, may adjourn any Board or Committee meeting to another time and place.

(g)    Action by Unanimous Written Consent. Any action required or permitted to be taken at any meeting of the Board or a Committee may be taken without a meeting, if all of the Managers then in office consent thereto in writing or by Electronic Transmission, which writing or Electronic Transmission may be executed in one or more counterparts, and the writing or Electronic Transmission is filed with the minutes of proceedings of the Board or a Committee.

(h)    Chair. The Chair of the Board (the "**Chair**") shall initially be [ ][6]. Thereafter, the Managers shall designate one of their number to serve as the Chair, with such administrative duties as the Managers may determine. The Chair or, in the Chair's absence, another Manager selected by the Managers present shall preside at meetings of the Board. The Chair, or the Manager presiding over such meeting, shall be responsible for performing such duties and services as shall be assigned to or required of the Chair by the Managers.

---

[6] NTD: Initial Chair to be selected by the Governmental Consent Parties.

### 3.3    Management by the Board of Managers.

(a)    Duties and Authority of Board of Managers.

(i)    Except for situations in which the approval of the Member is expressly required hereby or otherwise required by non-waivable provisions of applicable law and subject to the provisions of Section 3.3(a)(ii), the Plan and the Confirmation Order, including the Governance Covenants and the Operating Injunction, (A) the powers of the Company shall be exercised by or under the authority of, and the business and affairs of the Company shall be managed under the direction of, the Board in accordance with this Agreement, the Plan and the Confirmation Order (collectively, the "**Governing Documents**") and (B) the Board may make all decisions and take all actions for the Company not otherwise provided for in this Agreement.

(ii)    The Board shall manage or direct the business and affairs of the Company in accordance with the Company's Purpose.

(iii)    Notwithstanding anything to the contrary herein, the Board shall not have the power to (A) cause the Company or the Company's Subsidiaries to incur any Indebtedness without the prior written consent of TopCo[; *provided* that such consent shall not be required for the Company or any of its Subsidiaries to, in the ordinary course of business (including, for this purpose, the ordinary course of business of any predecessor owner of the business of the Company and its Subsidiaries) and subject to Board approval, (x) have one or more letters of credit issued in connection with any insurance policy of the Company or any of its Subsidiaries or (y) issue or have issued one or more surety or performance bonds in connection with the operation of its business,] (B) expel or remove TopCo as a Member of the Company, (C) authorize the Company, the Company's Subsidiaries or any Person acting on their behalf to take any action inconsistent with the Company's Purpose, the Operating Injunction or the Governance Covenants or (D) issue or sell interests in the Company; provided that, the foregoing shall not apply to the Company's obligations under the Credit Support Agreement.

(b)    Board Evaluation. The Company and the Board shall regularly evaluate whether the Company's and the Company's Subsidiaries' conduct of their business constitutes the optimal method or methods of fulfilling the Company's Purpose, including the Public Health Initiatives. The Board shall periodically, and no less than semi-annually, evaluate the efficacy of the Public Health Initiatives. The Board shall consult with the Member, who shall determine if the Public Health Initiatives are value accretive to the interests of the Company's stakeholders (including the direct and indirect holders of Interests in the Member); provided that no determination with respect to value accretion shall affect the obligation of the Company with respect to the Public Health Initiatives set forth in the Governance Covenants.

(c)    Public Website.  The Board shall cause the Company to establish (or cause to be established) and maintain (or cause to be maintained) a public facing website (the "**Public Website**") on which the Company shall make available the reports described in Sections 8.3(c), 8.3(d) and 8.3(e) and such other information as the Board deems appropriate.

(d)    Committees. The Board may designate one or more committees of the Board (each, a "**Committee**"), which such Committees shall initially include an Audit Committee and a

Compensation Committee.  Each Committee shall have such authority and duties with respect to the management of the Company as designated by the Board, consistent with the Governance Covenants, except as prohibited by law, and will act pursuant to a charter adopted by the Board. Each Committee shall regularly make reports to the Board and as the Board from time to time may request. Notwithstanding the foregoing, and except as expressly provided herein, the Board shall not delegate to any Committee the authority to take any action, the taking of which is expressly contemplated to be authorized by the Board hereunder, including, for the avoidance of doubt, the authorization of the Board set forth in Section 6.5(a) as it relates to distributions hereunder.  The Board may designate one or more Managers as alternate members of any Committee, who may replace any absent or disqualified member at any meeting of the Committee. In the absence or disqualification of a member of a Committee, the member or members of the Committee present at any meeting and not disqualified from voting, whether or not he, she or they constitute a quorum, may unanimously appoint another member of the Board to act at the meeting in the place of any such absent or disqualified member.

3.4    **Officers**. Subject to direction by the Board, the day-to-day administration of the business of the Company and the Company's Subsidiaries may be carried out by employees and agents who may be designated as officers ("**Officers**") by the Board; provided that the Board may delegate to one or more Officers the authority to designate Officers and any such delegation shall be subject to any such limitations as the Board may specify in such delegation. The Officers shall have such titles and powers and perform such duties as shall be determined from time to time by the Board (and in determining such duties the Board may alter the specific duties set forth below with respect to any given Officer to increase, decrease or otherwise change such duties), and may include the following:

(a)    Chief Executive Officer. The Chief Executive Officer of the Company shall, subject to the direction of the Board, have responsibility for the general management and control of the business and affairs of the Company and shall perform all duties and have all powers which are commonly incident to the office of Chief Executive Officer or which the Board may from time to time prescribe. The Chief Executive Officer shall have power to sign contracts and other instruments of the Company which are authorized and shall have general supervision and direction of all of the other officers, employees and agents of the Company, other than Board.

(b)    President. The President shall perform such duties and possess such powers as the Board or the Chief Executive Officer may from time to time prescribe. In the event of the absence, inability or refusal to act of the Chief Executive Officer, the President (if not the Chief Executive Officer) or any other person as determined by the Board, shall perform the duties of the Chief Executive Officer and when so performing shall have all the powers of, and be subject to all the restrictions upon, the Chief Executive Officer.

(c)    Vice Presidents. Any Vice President shall perform such duties and possess such powers as the Board or the Chief Executive Officer may from time to time prescribe. In the event of the absence, inability or refusal to act of the President, the Vice President (or if there shall be more than one, the Vice Presidents in the order determined by the Board) shall perform the duties of the President and when so performing shall have all the powers of and be subject to all the restrictions upon the President. The Board may assign to any Vice President the title of Executive Vice President, Senior Vice President or any other title selected by the Board.

- 14 -

(d)  Secretary and Assistant Secretaries. The Secretary shall perform such duties and shall have such powers as the Board or the Chief Executive Officer may from time to time prescribe. In addition, the Secretary shall perform such duties and have such powers as are incident to the office of the Secretary, including the duty and power to give notices of all meetings of the Board and any Committee, to keep the minutes and records of the proceedings of all meetings of the Board and to be custodian of Company records. Any Assistant Secretary shall perform such duties and possess such powers as the Board, the Chief Executive Officer, the President or the Secretary may from time to time prescribe. In the event of the absence, inability or refusal to act of the Secretary, the Assistant Secretary (or if there shall be more than one, the Assistant Secretaries in the order determined by the Board) shall perform the duties and exercise the powers of the Secretary. In the absence of the Secretary or any Assistant Secretary at any meeting of the Board, the person presiding at the meeting shall designate a temporary secretary to keep a record of the meeting.

(e)  Treasurer and Assistant Treasurers. The Treasurer shall have the care and custody of all moneys, funds, and securities of the Company and shall deposit or cause to be deposited all funds of the Company in accordance with directions or authorizations of the Board or the Chief Executive Officer. The Treasurer shall have power to indorse for deposit or collection, or otherwise, all checks, drafts, notes, bills of exchange or other commercial paper payable to the Company, and to give proper receipts or discharges therefor. In the event of the absence, inability or refusal to act of the Treasurer, the Assistant Treasurer (or if there shall be more than one, the Assistant Treasurers in the order determined by the Board) shall perform the duties and exercise the powers of the Treasurer.

(f)  Chief Compliance Officer. The Chief Compliance Officer shall oversee the Company's compliance with the Operating Injunction, the Governance Covenants and the Compliance Program. The Chief Compliance Officer shall have the power to take all actions necessary to implement the Compliance Program as authorized by the Board. The Chief Compliance Officer shall be responsible for reviewing the Compliance Program, identifying potential areas of compliance vulnerability and reporting to the Board no less frequently than quarterly the results of such review. Notwithstanding the foregoing, if the Chief Compliance Officer is not also the chief legal officer of the Company, the Board may determine to have the Chief Compliance Officer report to the chief legal officer of the Company and in such event the Board may determine that the chief legal officer of the Company shall have ultimate oversight with respect to one or more of the matters set forth above as being overseen by the Chief Compliance Officer.

(g)  Term. The Officers shall be appointed by the Board and shall hold office until their successors are appointed by the Board, unless the Board specifies otherwise. Any Officer may be removed by the Board at any time and any vacancy occurring in any office of the Company may be filled by the Board, in its discretion.

(h)  General. Any given individual may hold more than one Officer position, as determined by the Board.

# ARTICLE IV

# THE MEMBER

**4.1**    **The Member**.

(a)    <u>Admission of Member</u>. The Member is hereby admitted to the Company as the sole member of the Company.

(b)    <u>LLC Interest</u>. The LLC Interest held by the Member shall represent (i) all of the Member's rights, title and interest in the Company and (ii) all of the Member's rights under this Agreement, including its rights to receive TopCo Distributions in accordance with <u>Section 6.5</u>. The LLC Interest shall be uncertificated.

(c)    <u>Voting Rights</u>. The Member shall have no rights with respect to the management of the Company, except as otherwise set forth in the Plan, or the Confirmation Order or expressly set forth in this Agreement or as may be required by non-waivable provisions of applicable law.

(d)    <u>Lack of Authority</u>. Except as set forth in the Plan, the Confirmation Order or expressly set forth in this Agreement, TopCo, in its capacity as a Member, shall have no authority or power to (i) act for or on behalf of the Company or the Company's Subsidiaries in any manner, (ii) enter into any agreements on behalf of the Company or the Company's Subsidiaries or (iii) do any act that would be (or could be construed as) binding on the Company or the Company's Subsidiaries or make any expenditures on behalf of the Company or the Company's Subsidiaries.

(e)    <u>Limited Liability</u>. Without limitation of any limitations on liability provided under Section 18-303 of the Delaware Act, except as otherwise provided by the Delaware Act, or applicable law, the debts, obligations, commitments and liabilities of the Company, whether arising in contract, tort or otherwise, shall be solely the debts, obligations, commitments and liabilities of the Company, and neither the Member nor any Manager, employee or agent of the Company shall be obligated personally for any debt, obligation or liability of the Company, or for any debt, obligation or liability of any other Member, Manager, employee or agent of the Company, by reason of being a Member, Manager, employee or agent of the Company. Notwithstanding anything contained herein to the contrary, the failure of the Company to observe any formalities or requirements relating to the exercise of its powers or management of its business and affairs under this Agreement or the Delaware Act shall not be grounds for imposing personal liability on the Member or any Manager, employee or agent of the Company for debts, obligations, commitments or liabilities of the Company.

(f)    <u>Consents</u>. Whenever the vote of the Member is required or permitted to be taken in connection with any action of the Company by any provision of the Delaware Act, applicable law and this Agreement, such action may be taken without a meeting by written consent, setting forth the action so taken, signed by the Member.

## ARTICLE V

## DISPOSITION EVENT; ASSET SALES

**5.1**    <u>Overview</u>.

(a)    <u>Disposition Event</u>.  Commencing with the first meeting of the Board following the Effective Date, the Board shall cause the Company and the Company's Subsidiaries to take such actions as are reasonably necessary to identify a transaction or series of transactions that will enable the Company to satisfy its Minimum TopCo Distribution and ultimately sell all or substantially all of the Company's and the Company's Subsidiaries' Assets and/or the sale, transfer or contribution (including by way of merger, consolidation, combination or other reorganization) of one hundred percent (100%) of the Member's LLC Interest (collectively, such transaction or series of transactions, a "**Disposition Event**") in accordance with this Article V. The Board shall have the ability to determine the structure of the Disposition Event(s), which may be implemented, among other methods, by way of (i) the sale or other transfer or disposition of any products, product line, manufacturing business, or assets of the Company to third parties, (ii) a sale of the Company's and the Company's Subsidiaries' Assets or the equity Interests in the Company or the Company's Subsidiaries (including by way of merger, consolidation, combination or other reorganization) to one or more publicly held or private buyers which such buyer(s) may be for-profit or not-for profit entities, (iii) a sale of equity Interests in the Company in a public offering, (iv) alternative transactions, including contributing any assets of the Company's or of the Company's Subsidiaries' or the Company's or any of the Company's Subsidiaries' equity Interests to a joint venture or a not-for-profit entity, or a conversion of the Company or the Company's Subsidiaries to a not-for-profit entity, (v) if the Company's financial circumstances so requires, winding up the Company in accordance with <u>Article X</u>, or (vi) any combination of the transactions described in clauses (i)-(v) of this <u>Section 5.1(a)</u> or any other method; *provided*, that in all events the method(s) of implementation of the Disposition Event shall be subject to the consent of the Member.

(b)    <u>Determination Factors</u>. In determining whether to pursue and consummate a proposed Disposition Event, the Board and the Member shall evaluate, among other things, whether such proposed Disposition Event best achieves the Company's Purpose, taking into account (i) the Company's obligation to use best efforts to make the Minimum TopCo Distribution, (ii) the proposed application of proceeds of such Disposition Event, and (iii) whether the proposed buyer(s) will be able to and will agree to continue to deploy the purchased Assets or Interests in furtherance of the Company's Purpose and the Governance Covenants after giving effect to the consummation of the Disposition Event.

(c)    <u>Agreements</u>. The Company may enter into any agreements to effect a Disposition Event and consummate the transactions contemplated by such agreements only upon the authorization of the Board and the Member.

(d)    <u>Transferees Bound</u>. Notwithstanding anything else to the contrary herein, the Board and the Member shall not authorize or approve any transaction (whether constituting a Disposition Event or otherwise) involving the direct or indirect sale or disposition of all or any portion of the Opioid Assets or the Opioid Business unless the Person(s) acquiring such Opioid

- 17 -

Assets or all or such portion of the Opioid Business agree(s), pursuant to an agreement in form and substance satisfactory to both the Board and the Member, to be bound by (and to not transfer all or any portion of such Opioid Assets or the Opioid Business to any subsequent transferee unless such transferee agrees to be bound by and to similarly bind its transferees to) the applicable terms of the Operating Injunction and Governance Covenants upon the consummation of such transaction, *provided* that nothing in this Section 5.1(d) shall prohibit or otherwise restrict the Company and the Company's Subsidiaries from selling any products pursuant to the Company's or the Company's Subsidiaries' commercial arrangements in the ordinary course of the Company's and the Company's Subsidiaries' business.

(e)    <u>Cooperation</u>. The Company shall, and shall cause the Company's Subsidiaries to, provide to the Member such cooperation as is reasonably requested by the Member in connection with a Disposition Event.

**5.2    <u>Engagement of Disposition Advisor and other Company Advisors</u>**. Within one hundred twenty (120) days of the Effective Date, the Board shall retain one or more Disposition Advisors, legal advisors and accounting professionals to advise the Company and the Member regarding the merits, process, and timing of potential transactions that will enable the Company to make the Minimum TopCo Distribution as well as to assess and advise concerning any Disposition Event. The Board and the Member may retain any additional advisors (which may include a Disposition Advisor) on behalf of the Company and the Company's Subsidiaries to assess, analyze and effectuate a Disposition Event. No Disposition Advisor shall be retained as an advisor on a "success fee" or similar basis under which all or a portion of such Disposition Advisor's fees in respect of such engagement is conditioned or contingent upon the successful consummation of a Disposition Event or any transaction in furtherance thereof.

**5.3    <u>Disposition Status Reports</u>**. No later than [●][7], and semi-annually thereafter, the Board, in consultation with the Disposition Advisors, shall provide to the Member and the Master Disbursement Trust a report (a "**Disposition Status Report**") identifying potential purchasers and other counterparties to a Disposition Event, analyzing and assessing potential Disposition Events and recommending strategic options that will enable the Company to make the Minimum TopCo Distribution and effectuate a Disposition Event in accordance with <u>Section 5.4</u>, including, among other things as reasonably determined by the Board, an analysis of opportunities with respect to: (x) potential financing opportunities, (y) sales of the Company (including a sale of the LLC Interest) or all or a portion of the Company's Assets to a commercial entity or a non-profit organization, and (z) public offerings of all or a portion of the Company's equity. Each Disposition Status Report shall also address, with respect to each potential Disposition Event the (i) market conditions for such opportunities and likely valuations of the Company, (ii) potential to maximize near-term proceeds and long-term value, (iii) tax implications of any potential transactions, (iv) effect of a potential transaction on the continuation of the Company's Purpose and the Governance Covenants, including the likelihood of the continuation of the Public Health Initiatives and (v) means for implementing a potential Disposition Event in coordination with the funding of the Minimum TopCo Distribution.

---

[7] NTD: To be six-month anniversary of the Effective Date.

**5.4**    **Disposition Deadline**. The Board and the Member shall use best efforts to cause the Company to consummate the transaction or series of transactions constituting a Disposition Event no later than December 31, 2024 (as may be extended as set forth herein, the "**Disposition Deadline**"); *provided* that the Disposition Deadline may be extended on not more than two (2) occasions, in each case for not more than one (1) year and only by the Member (acting upon the vote of no less than two-thirds (2/3) of the managers of the Member), taking into account the Company's Purpose, after providing thirty (30) days' written notice to TopCo. Such notice shall set forth in reasonable detail the reasons that such an extension is considered appropriate and advances the public interest.  At the conclusion of each successive three (3) month period after the Member has approved an extension of the Disposition Deadline, the Board shall deliver in writing a report to the Member describing in reasonable detail the status of the Company's continuing efforts to distribute to the Member the Minimum TopCo Distribution and effectuate a Disposition Event and whether the Board believes that an additional extension is appropriate to protect or advance the public interest asserted in the initial extension.

**5.5**    **Other Required Asset Disposition; Limitations**. The Company shall consummate the disposition and comply with the limitations on expenditures set forth in Schedule 5.5.

## ARTICLE VI

## CERTAIN RIGHTS AND OBLIGATIONS OF THE COMPANY AND THE MEMBER

**6.1**    **Monitor**. The Board shall cause the Company to, and the Company and the Managers shall, and shall cause the Company's professionals and representatives to, cooperate with, and reasonably respond to requests for assistance by, the Monitor in the performance of the Monitor's duties and responsibilities as provided for in the Plan and the Confirmation Order, including the Operating Injunction and the Governance Covenants, including by responding to reasonable requests for access to relevant books and records of the Company and the Company's Subsidiaries. The compensation of, and costs and expenses incurred by, the Monitor in connection with its duties and responsibilities, including the fees and expenses of professionals retained by the Monitor, shall constitute Operating Expenses hereunder and be paid by the Company. Upon the resignation of the Monitor, or upon the removal of the Monitor in accordance with the Confirmation Order, TopCo shall select a replacement Monitor.

**6.2**    **Public Health Initiatives**.

(a)    Development of Public Health Initiatives; Budget. The Company shall continue to support the development of PHI Products on the terms set forth on Exhibit [_]. From the date hereof until such time as the Company has distributed to the Member the Minimum TopCo Distribution, the Company and the Company's Subsidiaries shall not expend, in the aggregate

- 19 -

and subject to Section 6.2(b), more than $[●][8] on the direct research and development in support of PHI Products (the "**Initial PHI Development Budget Amount**"). From and after the date that the Company has distributed to the Member the Minimum TopCo Distribution, the Board may elect, upon the Member's prior written consent, to increase the Initial PHI Development Budget Amount in an amount not to exceed an additional thirty-five million dollars ($35,000,000.00) (the "**Increased PHI Development Budget Amount**" and together with the Initial PHI Development Budget Amount, the "**PHI Budget Amount**") for the period of time from the date of such increase until the occurrence of a Disposition Event.

(b)    Adjustments to PHI Budget. Any costs and expenses incurred by the Company and the Company's Subsidiaries in respect of any Public Health Initiatives other than direct research and development of PHI Products, including overhead allocations and medical affairs expenses, shall not reduce or be limited by the PHI Budget Amount. Notwithstanding anything to the contrary in this Section 6.2, to the extent the Company or any of the Company's Subsidiaries sells any PHI Products for a purchase price that is less than the PHI Product Cost any then-remaining PHI Budget Amount shall be reduced by an amount equal to the difference between (i) the PHI Product Cost of such PHI Product *minus* (ii) the actual amount received by the Company or the Company's Subsidiaries in connection with such sale.

(c)    Board Evaluation. The Board shall (i) periodically evaluate the efficacy of the Public Health Initiatives and (ii) consistent with the Company's Purpose, determine the most effective means by which to utilize any available PHI Budget Amounts and to otherwise comply with the Governance Covenants.

(d)    Transferees Not Bound. There shall be no limitation on, or other requirements with respect to, the amounts that any purchaser of the Company's or the Company's Subsidiaries' interests or Assets, as the case may be, may expend in connection with PHI Products.

**6.3    Annual Budget**. [The budget of the Company and the Company's Subsidiaries in effect for the period commencing on the Effective Date and ending on December 31, [20__] and the business plan of the Company and the Company's Subsidiaries for [20__] have been (i) prepared consistent with the financial projections set forth in Appendix C to the Disclosure Statement and (ii) approved by the Board.[9] Commencing with the budget for the [20__] calendar year, the Officers shall prepare and submit to the Board for its approval, in its sole reasonable discretion, no later than November 20 of the prior calendar year (i.e., in the case of the 2022 calendar year, by November 20, 2021)][10] a budget of the Company's and the Company's Subsidiaries' anticipated revenue, Operating Expenses and cash flow projections in reasonable detail for the next calendar year, in a format previously approved by the Board.  The Officers

---

[8] NTD: To be an amount equal to $50 million *minus* the Debtors' PHI expenditures from 6/30/2021 through the date of this Agreement.

[9] NTD: Budget to include, among other things, line items in reasonable detail with respect to funding insurance "required and appropriate for the business needs of NewCo" as set forth in Section 5.4(g) of the Plan.

[10] NTD: If Effective Date will be later than December [ ], 2021, the 2022 budget can be substituted for the 2022 business plan in the prior sentence and the dates in this parenthetical can be changed to 2023 and 2022, respectively. Any such budget shall be subject to approval of the Governmental Consent Parties.

- 20 -

shall thereafter make any required changes requested by the Board to such draft budget, and no budget shall be deemed to be approved for purposes of this Agreement until it is approved by the Board. No budget shall be approved for any period after the Disposition Deadline unless such budget allocates sufficient resources to fund the minimum projected cash requirements of the Company and any negative working capital balance.

6.4     **Operating Expenses**. From and after the Effective Date, all Operating Expenses shall be paid by the Company or the Company's Subsidiaries. No provision contained herein shall limit or restrict the ability of the Company or the Company's Subsidiaries to pay any of its then due and payable Operating Expenses between each Distribution Date from funds generated by the Company and the Company's Subsidiaries or otherwise available to the Company and the Company's Subsidiaries.

6.5     **Distributions**.

(a)   TopCo Distributions. The Board shall authorize the Company to, and the Company shall, make TopCo Distributions as follows:

(i)     on each Distribution Date, the Company shall distribute to the Member all Excess Cash held by the Company on such Distribution Date, as a TopCo Distribution, in accordance with Section 5.2(e)(ii)(A)(I) of the Plan, which such Excess Cash shall be distributed, for the avoidance of doubt, whether or not the Company has made the Minimum TopCo Distribution;

(ii)    upon the receipt by the Company of any repayments from the Master Disbursement Trust of amounts received by the Master Disbursement Trust from the Company pursuant to its obligations under the Credit Support Agreement, the Company shall promptly, but in any event not later than two (2) Business Days after receipt of such repayment amount, distribute to the Member all such repayments as a TopCo Distribution in accordance with Section 5.2(e)(ii)(B)(I) of the Plan; and

(iii)   (x) on each date that the Company makes a payment under Section 5.2(d)(iii)(B) of the Plan to the Master Disbursement Trust in respect of any transaction that generates MDT Distributable Sale Proceeds, and (y) with respect to any transaction referenced under clause (ii) of the definition of that term that occurs after the third anniversary of the Effective Date, within five (5) Business Days after the receipt by the Company of Net Sale Proceeds in respect of such transaction, the Company shall distribute to the Member all TopCo Distributable Sale Proceeds in respect of such transaction;

*provided* that, until the payment in full in cash of all MDT Claims, the Company shall provide written notice to each Private Creditor Trust and the Master Disbursement Trust of any proposed distribution to the Member under Section 6.5(a)(i) no less than ten (10) Business Days prior to such distribution.

(b)   Limitation on TopCo Distributions.

- 21 -

(i)    Until the payment in full in cash of all MDT Claims, all Distributions shall be made (A) only on the dates set forth in Section 6.5(a)(i) - (iii) and, (B) with respect to a Distribution pursuant to Section 6.5(a)(i), solely with Excess Cash.

(ii)    Notwithstanding anything to the contrary herein, no distribution to the Member shall be made (A) if an MDT Reserve Period has commenced and is continuing, unless the MDT Operating Reserve and the MDT Claims Reserve have been fully funded, (B) if an Escrow Period has commenced and is continuing or (C) if and to the extent that such TopCo Distribution would render the Company insolvent or would violate the Delaware Act or applicable law; *provided* that in the event the Company is prohibited from making all or a portion of any distribution under Section 6.5(a) as a result of the application of this Section 6.5(b)(ii), the Company shall promptly notify the Member in writing of the facts and circumstances which the Board believes prohibit the Company from making all or a portion of such distribution; *provided further* that such notice shall not relieve the Company from any of its obligations hereunder (other than any obligation to make such distribution or portion thereof).

(c)    Minimum TopCo Distribution. The Company shall use best efforts to make the Minimum TopCo Distribution from NewCo Excess Cash by January 30, 2025; *provided, however*, that, in seeking to fund the Minimum TopCo Distribution, the Board shall consider the Company's obligation to fund Operating Expenses and the Company's Purpose.

**6.6    Company Investments**. Neither the Company nor any of the Company's Subsidiaries shall expend any funds for the development of any product unless (i) the investment in such product is a Permitted Investment, (ii) such products are (A) generic pipeline assets of the Rhodes Debtors (as such term "Rhodes Debtors" is defined in the Confirmation Order), (B) such expenditures are included in an annual budget approved by the Board pursuant to Section 6.3 or are subsequently approved by the Board and (C) in the case of the Company's initial budget, such budget is consistent with the financial projections set forth in Appendix C to the Disclosure Statement, (iii) such expenditure is made in accordance with Section 6.2, (iv) such product is available for sale to the public by the Company or the Company's Subsidiaries on the date hereof and is, at the time such funds are to be expended, continuing to generate profit to the Company and the Company's Subsidiaries, taken as a whole, as determined by the Board in its sole discretion or (v) the expenditure of such funds is approved by not less than two-thirds (2/3) of the Managers after taking into account the extent to which such expenditure is value accretive to the direct and indirect holders of interests in the Company and consistent with the Company's Purpose.

**6.7    Compliance Program**.

(a)    The Company shall implement a comprehensive internal compliance program (the "**Compliance Program**") that ensures adherence to the Operating Injunction and Governance Covenants. Such program may include the following features: (i) a system that accurately and effectively identifies suspicious orders of controlled substances, (ii) a prohibition of incentives to employees based on the sales of controlled substances, (iii) investments in technology to ensure that the Company has appropriate protocols and infrastructure to combat diversion of highly regulated products, (iv) conducting due diligence of customers and ongoing and regular training

- 22 -

of Company employees and (v) otherwise identifies innovative ideas to combat misuse and diversion of highly regulated products.

(b)   To the extent the Board determines it beneficial, the Board may also (i) request regular reports from senior executives of the Company about the risks related to such executives' areas of responsibility and the effectiveness of the Compliance Program in addressing such risks and (ii) include in the agenda at Board meetings appropriate topics related to the risks associated with the Company's Opioid Business and non-compliance with the Operating Injunction or the Governance Covenants, and (iii) take such steps as are necessary in the Board's reasonable discretion to ensure the Board monitors the Compliance Program.

6.8   **Document Retention Policy**. The Company shall at all times have a policy with respect to the retention, preservation and destruction of the Company's books, records and documents, including in electronic format (the "**Document Retention Policy**"). The Document Retention Policy shall provide for customary retention periods for various categories of the Company's and its Subsidiaries documents and business records in the ordinary course and for the retention of such documents and records for no less than one year after the consummation of a Disposition Event. The Document Retention Policy shall be administered by the Chief Compliance Officer or the chief legal officer of the Company, as determined by the Board.

6.9   **Preservation of Causes of Action and Reservation of Rights**. The Company shall have the right to prosecute any and all Retained Causes of Action constituting NewCo Transferred Assets; *provided* that the prosecution of any such Retained Causes of Action and any release by the Company of such Retained Causes of Action in connection with a settlement or otherwise shall be subject to the consent of the Member.  In the event the Company fails to prosecute any Retained Causes of Action constituting a NewCo Transferred Asset, the Member may direct the Company to prosecute such Retained Causes of Action in accordance with this Agreement.

## ARTICLE VII

## EXCULPATION AND INDEMNIFICATION

7.1   **Indemnification; Advancement**.

(a)   No Covered Person shall be liable to the Company or any other Covered Person for any loss, damage, or claim incurred for any actions taken or omitted to be taken by such Covered Person in his, her, or its capacity as a Covered Person, or by reason of the fact that such Covered Person is a Covered Person, except to the extent that it is determined ultimately by a Final Order that such Damages arose primarily from the fraud, bad faith or willful misconduct of such Covered Person. Without limiting the foregoing in this Section 7.1, each Manager shall, in the performance of his or her duties, be fully protected in relying in good faith upon the books of account or reports made to the Company or the Board by any of the Company's officers, managers, employees, agents, consultants, advisors or other representatives, or in relying in good faith upon other records of the Company. Furthermore, each Manager (in such Person's capacity as a Manager) may rely, and shall incur no liability in acting or refraining from acting, upon any resolution, certificate, statement, instrument, opinion, report, notice, request, consent, order,

- 23 -

bond, debenture, paper, document, signature or writing believed by it to be genuine, and may rely on a certificate signed by an officer, director, manager, employee, agent, consultant, advisor or other representatives, of any person in order to ascertain any fact with respect to such person or within such person's knowledge, in each case except to the extent that it is determined ultimately by a Final Order that such Damages arose primarily from the fraud, bad faith or willful misconduct of such Manager.

(b)    To the fullest extent permitted by the Delaware Act, as the same now exists or may hereafter be amended, substituted or replaced (but, in the case of any such amendment, substitution or replacement only to the extent that such amendment, substitution or replacement permits the Company to provide broader indemnification rights than the Delaware Act permitted the Company to provide prior to such amendment, substitution or replacement), the Company shall indemnify, hold harmless, defend, pay and reimburse any Covered Person against any and all losses, claims, damages, judgments, fines or liabilities, including reasonable legal fees or other expenses incurred in investigating or defending against such losses, claims, damages, judgments, fines or liabilities, and any amounts expended in settlement of any claims (collectively, "**Damages**") that may accrue to or be incurred by any Covered Person, for any actions taken or omitted to be taken by such Covered Person in his, her, or its capacity as a Covered Person, or by reason of the fact that such Covered Person is a Covered Person, except to the extent that it is determined ultimately by a Final Order that such Damages arose primarily from the fraud, bad faith or willful misconduct by or of such Covered Person.

(c)    The Company shall promptly reimburse (and/or advance to the extent requested by the Covered Person) each Covered Person for reasonable legal or other expenses of such Covered Person in connection with investigating, preparing to defend or defending any claim, lawsuit, or other proceeding relating to any Damages for which such Covered Person may be indemnified pursuant to this Section 7.1; *provided* that if it is finally judicially determined that such Covered Person is not entitled to the indemnification provided by this Section 7.1, then such Covered Person shall promptly reimburse the Company for any reimbursed or advanced expenses.

(d)    The indemnification provided by this Section 7.1 shall not be deemed exclusive of any other rights to indemnification to which those seeking indemnification may be entitled under any agreement or otherwise. The provisions of this Section 7.1 shall continue to afford protection to each Covered Person regardless of whether such Covered Person remains in the position or capacity pursuant to which such Covered Person became entitled to indemnification under this Section 7.1 and shall inure to the benefit of the executors, administrators, legatees and distributees of such Covered Person.

(e)    The Company shall maintain, at its own expense (other than for the initial premium payment which shall be paid by the Debtors), directors and officers (D&O) insurance with customary coverages and other customary terms to cover Damages covered by the foregoing indemnification provisions and to otherwise cover Damages for any breach or alleged breach by any Covered Person of such Covered Person's duties.

(f)    Notwithstanding anything contained herein to the contrary, any indemnity by the Company relating to the matters covered in this Section 7.1 shall be provided out of and to the

- 24 -

extent of the Assets of the Company only, and no Person (other than the Company) shall have personal liability on account thereof or shall be required to make additional capital contributions to help satisfy such indemnity by the Company.

(g)   If this Section 7.1 or any portion hereof shall be invalidated on any ground by any Final Order, then the Company shall nevertheless indemnify and hold harmless each Covered Person pursuant to this Section 7.1 to the fullest extent permitted by any applicable portion of this Section 7.1 that shall not have been invalidated and to the fullest extent permitted by applicable law.

(h)   The provisions of this Section 7.1 shall be a contract between the Company, on the one hand, and each Covered Person who served in such capacity at any time while this Section 7.1 is in effect, on the other hand, pursuant to which the Company and each such Covered Person intend to be legally bound. No amendment, modification or repeal of this Section 7.1 that adversely affects the rights of a Covered Person to the extent relating to a state of facts existing prior to such amendment, modification or repeal shall apply in such a way as to eliminate or reduce such Covered Person's rights under this Section 7.1 without the Covered Person's prior written consent.

(i)   The provisions of this Article VII shall survive the dissolution, liquidation, winding up and termination of the Company.  If the Company or any of its successors or assignees consolidates with or merges into any other entity and is not the continuing or surviving entity, or sells all or substantially all of its assets, then to the extent necessary, proper provision shall be made so that the continuing or surviving entity or the acquirer of the Company's assets, as applicable, assumes the obligations of the Company pursuant to this Section 7.1.

## ARTICLE VIII

## BOOKS, RECORDS, ACCOUNTING AND REPORTS

**8.1    Records and Accounting**. The Company shall keep, or cause to be kept, appropriate books and records with respect to the Company's business, including all books and records necessary to provide any information, lists, and copies of documents required pursuant to applicable laws. The detail of these books and records shall be such as to allow the Board to make a full and accurate accounting of all of the Company's Assets, as well as to comply with applicable provisions of law and standard accounting practices necessary or appropriate to produce the items set forth in Section 8.3(b) - (e). The Board shall maintain such books and records until the wind-up of the Company's affairs and satisfaction of all of the Company's liabilities. All matters concerning accounting procedures and determinations, and other determinations not specifically and expressly provided for by the terms of this Agreement, shall be determined by the Board.

**8.2    Fiscal Year**. The fiscal year (the "**Fiscal Year**") of the Company shall constitute the twelve (12)-month period ending on December 31 of each calendar year, or such other annual accounting period as may be established by the Board.

**8.3**     **Financial and Other Reporting**.

(a)    The Board shall select and engage a nationally recognized firm of independent certified public accountants (the "**Company Accountants**") selected by the Board, to audit the Annual Financial Statements; *provided* that the Board may delegate the foregoing authority to the Audit Committee. By May 30 of the year following the end of each calendar year, the Company shall deliver to the Member the Annual Financial Statements audited by the Company Accountants and accompanied by an opinion of such firm as to the fairness in all material respects of the financial statements.

(b)    The Board shall cause the Company to prepare and deliver to the Member:

(i)      No later than [twenty (20)] Business Days after June 30 of each year, for the immediately preceding semi-annual period: (i) an unaudited consolidated balance sheet of the Company and the Company's Subsidiaries, dated as of the end of such semi-annual period, (ii) an unaudited consolidated statement of income and expense of the Company and the Company's Subsidiaries for such semi-annual period and (iii) an unaudited consolidated statement of cash flows of the Company and the Company's Subsidiaries for such semi-annual period; *provided* that the materials deliverable after [June 30, 2022] shall cover the period beginning [on the Effective Date and ending on [June 30, 2022]].

(ii)      No later than [thirty (30)] Business Days after December 31 of each year, for the immediately preceding Fiscal Year: (x) (i) an unaudited consolidated balance sheet of the Company and the Company's Subsidiaries, dated as of the end of such Fiscal Year, (ii) an unaudited consolidated statement of income and expense of the Company and the Company's Subsidiaries for such Fiscal Year and (iii) an unaudited consolidated statement of cash flows of the Company and the Company's Subsidiaries for such Fiscal Year, in each case including explanatory footnotes, in each case for the full Fiscal Year (collectively (i)-(iii) the "**Annual Financial Statements**"), and (y) a narrative explanation containing the Company's management's discussion and analysis of the Annual Financial Statements.[11]

(c)    Following the end of (x) the first period for which a report is required by clause (i) or (ii) above and (y) each six (6) month period thereafter, the Board shall cause the Company to prepare a report, which, among other things, shall describe the Company's effectuation of the Company's Purpose, the short-term and long-term value being created by the Company and the public benefits being achieved consistent with the Company's Purpose during the applicable period. The Company shall make such reports available on the Public Website no later than 60 days following the end of each applicable period.

(d)    Subject to Section 6.1, the Company shall cooperate with the Monitor to enable the Monitor to prepare and publish quarterly reports regarding the matters for which the Monitor is responsible, including in respect of the Company's compliance with the Operating Injunction and the Governance Covenants.

---

[11] NTD: Scope/detail of management's narrative to be discussed.

(e)   The Company shall identify and report on the Public Website the portion of TopCo Distributions that are derived from Opioid Proceeds.

# ARTICLE IX

## TAXES

**9.1**    **Tax Returns**. The Company shall prepare and file, or cause to be prepared and filed, all required tax returns and timely pay all taxes for which it is liable.

**9.2**    **Tax Elections**. The Company shall make a timely election to be treated as a corporation for U.S. federal and applicable state income tax purposes effective as of the date immediately following the Effective Date no later than the deadline for making such election (or such later date as to which the IRS has granted an extension for such election); *provided* that the Company need not make such election if the IRS has provided guidance which may be relied upon to the effect that not making such election would not have a material adverse tax effect on NOAT, including by reason of the application of IRC section 115. For any taxable periods for which such election is not in effect and in which there is only one owner of the LLC Interest, it is the intention of the Company and the Member that the Company be treated as a disregarded entity for U.S. federal and applicable state and local tax purposes. For any taxable periods for which such election is not in effect and in which there is more than one owner of the LLC Interest, it is the intention of the Company and the Member that the Company shall be treated as a partnership for such purposes unless otherwise required by applicable law, and this Agreement shall be amended appropriately to reflect such tax status.

# ARTICLE X

## DISSOLUTION AND LIQUIDATION

**10.1**    **Dissolution**. Subject to the Company's Purpose, the Company shall dissolve, and its affairs shall be wound up on the soonest practicable date but no later than ninety (90) days after the first to occur of the following events:

(a)   the date on which the Member decides to dissolve the Company, which such date shall be after the later of (i) the date on which the Minimum TopCo Distribution has been effected and (ii) the date on which a Disposition Event has occurred; or

(b)   the date on which the Bankruptcy Court enters an order approving such dissolution and such order becomes a Final Order.

**10.2**    **Liquidation and Termination**. On dissolution of the Company, the Board shall act as liquidator or may appoint one or more representatives to act as liquidator. The liquidators shall prepare or cause to be prepared a statement setting forth the Assets and liabilities of the Company as of the date of dissolution, a copy of which statement shall be furnished to the Member. The liquidators shall proceed diligently to wind up the affairs of the Company as promptly as possible, but in an orderly and businesslike and commercially reasonable manner. The costs of liquidation shall be borne as a Company expense. The liquidators shall pay, satisfy

- 27 -

or discharge from Company funds all of the debts, liabilities and obligations of the Company (including all expenses incurred in liquidation) or otherwise make adequate provision for payment and discharge thereof (including the establishment of a cash fund for contingent or unmatured liabilities or obligations of the Company or the Company's Subsidiaries arising out of or in connection with the Company or the Company's Subsidiaries in such amount and for such term as the liquidators may reasonably determine) and shall promptly distribute the remaining Assets to the Member. Such cash fund may, in the discretion of the liquidator, be paid over to a national title company or bank or other financial institution selected by them and authorized to conduct business as an escrowee to be held by such national title company or bank or financial institution as escrowee for the purposes of disbursing such cash fund to satisfy the liabilities and obligations described above, and at the expiration of such period as the liquidator may reasonably deem advisable, distributing any remaining balance to the Member. The liquidators may distribute Assets of the Company in kind only with the consent of the Member. A reasonable time shall be allowed for the orderly winding up of the affairs of the Company pursuant to this Section 10.2 in order to minimize any losses otherwise attendant upon such winding up.

10.3    **Cancellation of Certificate**. On completion of the winding up of the Company as described in Section 10.2 and the distribution of the Company's Assets as provided herein, the Company shall be terminated (and the Company shall not be terminated prior to such time), and the Board (or such other Person or Persons as the Delaware Act may require or permit) shall file a certificate of cancellation with the Secretary of State of the State of Delaware, cancel any other filings made pursuant to this Agreement that are or should be canceled, and take such other actions as may be necessary to terminate the Company. The Company shall be deemed to continue in existence for all purposes of this Agreement until it is terminated pursuant to this Section 10.3.

## ARTICLE XI

## GENERAL PROVISIONS

11.1    **Amendments**.

(a)    Except as otherwise provided herein, this Agreement may be amended only with the consent of (x) not less than a majority of the Managers and (y) the Member. The Board may amend this Agreement from time to time without the consent, approval or other authorization of any other Person, to: (i) make a change that is necessary to cure any ambiguity, to correct or supplement any provision in this Agreement that would be inconsistent with any other provision in this Agreement, or to make any other provision with respect to matters or questions arising under this Agreement that will not be inconsistent with the provisions of this Agreement; (ii) make a change that is necessary to satisfy any requirements, conditions or guidelines contained in any opinion, directive, order, statute, ruling or regulation of any federal, state or foreign governmental entity; (iii) make a change that is required or contemplated by this Agreement; or (iv) make a change in any provision of this Agreement that requires any action to be taken by or on behalf of the Board or the Company pursuant to applicable Delaware law if the provisions of applicable Delaware law are amended, modified or revoked so that the taking of such action is no longer required. Notwithstanding the foregoing, this Agreement may not be modified in a

- 28 -

manner that is inconsistent with the Plan or the Confirmation Order absent an order of the Bankruptcy Court, entered after proper notice (including to holders of TopCo Interests, the MDT Trustees and the MDT Beneficiaries) and a hearing, approving such modification. The Board shall provide notice to the Member of any proposed modification, to this Agreement including, for the avoidance of doubt, any proposed modification that does not require the consent of the Member hereunder, not less than ten (10) Business Days before such modification becomes effective, if practicable.

   **11.2    No Return of Distributions**. It is the intent of the Member that no TopCo Distribution pursuant to Section 6.5 hereof shall be deemed a return of money paid or distributed in violation of the Delaware Act. The payment of any such TopCo Distribution shall be deemed to be a compromise within the meaning of the Delaware Act, and TopCo shall not be required to return it, in whole or in part, to any Person.

   **11.3    Remedies Cumulative**. The rights and remedies under this Agreement are cumulative and are in addition to and not in substitution for any other rights and remedies available at law or in equity or otherwise.

   **11.4    Successors and Assigns**. All covenants and agreements contained in this Agreement shall bind and inure to the benefit of the parties hereto and their respective heirs, executors, administrators, successors, legal representatives and permitted assigns, whether so expressed or not.

   **11.5    Severability**. Whenever possible, each provision of this Agreement will be interpreted in such manner as to be effective and valid under applicable law, but if any provision of this Agreement is held to be invalid, illegal, or unenforceable in any respect under any applicable law or rule in any jurisdiction, such invalidity, illegality or unenforceability will not affect any other provision or the effectiveness or validity of any provision in any other jurisdiction, and this Agreement will be reformed, construed, and enforced in such jurisdiction as if such invalid, illegal, or unenforceable provision had never been contained herein.

   **11.6    Applicable Law; Jurisdiction**. This Agreement shall be governed by, and construed in accordance with, the laws of the State of Delaware, without giving effect to any choice of law or conflict of law rules or provisions (whether of the State of Delaware or any other jurisdiction) that would cause the application of the laws of any jurisdiction other than the State of Delaware.  The Bankruptcy Court shall have continuing jurisdiction over the Company, *provided* that, the courts of the State of Delaware, including any federal court located therein, shall also have jurisdiction over the Company; *provided further*, that notwithstanding the foregoing, the Board shall have power and authority to bring any action in any court of competent jurisdiction (including the Bankruptcy Court) to prosecute any Causes of Action held by the Company.

   **11.7    Addresses and Notices**. All notices, demands or other communications to be given or delivered under or by reason of the provisions of this Agreement shall be in writing and shall be deemed to have been given or made (a) when delivered personally to the recipient, (b) one (1) Business Day after delivery to a reputable express courier service (charges prepaid), or (c) on the Business Day telecopied or electronically transmitted to the recipient if by telecopy

or Electronic Transmission before 5:00 p.m. Eastern Time, and otherwise on the next Business Day. Such notices, demands and other communications shall be sent to the address for such recipient set forth in the Company's books and records, or to such other address or to the attention of such other person as the recipient party has specified by prior written notice to the sending party. Any notice to the Board or the Company shall be deemed given if received by the Board at the principal office of the Company designated pursuant to Section 2.4.

**11.8    No Reliance by Third Parties**. Except as otherwise set forth herein, none of the provisions of this Agreement shall be for the benefit of, or enforceable by, any Person other than the Company and the Member, including any creditor who makes a loan to the Company (except, and only to the extent, pursuant to the terms of a separate agreement executed by the Company in favor of such creditor) and no creditor or other Person (other than the Member and the Company) shall obtain any rights under this Agreement or by reason of this Agreement, or shall be able to make any claim under this Agreement in respect of any debts, liabilities, commitments or obligations against the Company or the Member, it being understood that the Covered Persons shall be intended third-party beneficiaries of Article VII.

**11.9    No Implied Waivers**. No failure by any party to insist upon the strict performance of any covenant, duty, agreement or condition of this Agreement or to exercise any right or remedy consequent upon a breach thereof shall constitute a waiver of any such breach or any other covenant, duty, agreement, or condition.

**11.10    Entire Agreement**. The Governing Documents and the other documents expressly referred to in this Agreement embody the complete agreement and understanding among the parties and supersede and preempt any prior understandings, agreements, or representations by or among the parties, written or oral, which may have related to the subject matter of this Agreement in any way.

**11.11    Delivery by Electronic Transmission**. This Agreement may be executed in counterparts, each of which shall be deemed an original, but all of which together shall be deemed to be one and the same agreement. A signed copy of this Agreement or any amendment hereto delivered by facsimile or other Electronic Transmission (including e-mail of a "pdf" signature), shall be treated in all manner and respects as an original agreement or instrument and shall be considered to have the same binding legal effect as if it were the original signed version thereof delivered in person.

**11.12    Relationship to Plan**. This Agreement is being executed pursuant to and in accordance with the Plan to aid in the implementation of the Plan.  To the extent that there is conflict between the provisions of this Agreement, the provisions of the Plan, or the Confirmation Order, each document shall have controlling effect in the following rank order: (1) the Confirmation Order; (2) the Plan; and (3) this Agreement.

**[Remainder of page intentionally left blank.**

**Signature pages follow.]**

- 30 -

The undersigned have executed or caused to be executed on their behalf this Limited Liability Agreement as of the date first written above.

COMPANY:

By: _____
Name:
Title:

MEMBER:

By: _____
Name:
Title:

**Schedule 1.1(a)**

**Operating Injunction**


**[To Come]**

**Schedule 1.1(b)**

**Company Initiatives**

**[To Come]**,

**<u>Schedule 1.1(c)</u>**

**<u>PHI Products</u>**

**<u>[To Come]</u>**

**Schedule 1.1(d)**

**Pipeline Assets**

**[To Come]**

**Schedule 3.1**

**Initial Managers**

**[To Come]**

**Schedule 5.5**

**Other Required Asset Disposition; Limitations**

**[To Come]**

## EXHIBIT X

**TopCo Operating Agreement**

# LIMITED LIABILITY COMPANY OPERATING AGREEMENT

## of

## [TopCo LLC][1]
## a Delaware limited liability company

## Dated as of [    ], 2021

---

[1] NTD: Company name to be determined and reserved for use with the Delaware Secretary of State.

# TABLE OF CONTENTS

**Page**

ARTICLE I CERTAIN DEFINITIONS ................................................................2

    1.1    Defined Terms ................................................................2
    1.2    Terms Defined in the Plan ................................................6
    1.3    Interpretation ................................................................6

ARTICLE II ORGANIZATIONAL MATTERS ................................................7

    2.1    Formation ................................................................7
    2.2    Name ................................................................7
    2.3    Purpose ................................................................7
    2.4    Principal Office; Registered Office ................................8
    2.5    Powers ................................................................8
    2.6    Term ................................................................8
    2.7    No State-Law Partnership ................................................8

ARTICLE III BOARD OF MANAGERS; OFFICERS ....................................8

    3.1    Composition and Actions of the Board of Managers ..............8
    3.2    Board Meetings and Actions by Written Consent ................9
    3.3    Management by the Board of Managers ............................10

ARTICLE IV LLC INTERESTS; CAPITAL ACCOUNTS; TRANSFERS ..............12

    4.1    Members ................................................................12
    4.2    Member Meetings; Voting ..............................................13
    4.3    Capital Accounts ........................................................13
    4.4    Negative Capital Accounts ..............................................14
    4.5    No Withdrawal ..........................................................14
    4.6    No Transfer of LLC Interests ..........................................14

ARTICLE V ALLOCATIONS; DISTRIBUTIONS ..........................................14

    5.1    Allocations of Profits and Losses ......................................14
    5.2    Distributions ............................................................14

ARTICLE VI CERTAIN RIGHTS AND OBLIGATIONS OF THE COMPANY AND THE
MEMBERS    ................................................................16

    6.1    Disposition Event ........................................................16
    6.2    Operating Expenses ....................................................17

ARTICLE VII EXCULPATION AND INDEMNIFICATION ..............................17

    7.1    Indemnification; Advancement ........................................17

ARTICLE VIII BOOKS, RECORDS, ACCOUNTING AND REPORTS ..............19

    8.1    Records and Accounting ................................................19
    8.2    Fiscal Year ..............................................................20
    8.3    Reports ................................................................20
    8.4    Financial Reporting ....................................................20

8.5     NewCo Reports ................................................................................................20
8.6     Board Availability ...........................................................................................20

ARTICLE IX TAXES ....................................................................................................20

9.1     Tax Returns .....................................................................................................20
9.2     Tax Elections ...................................................................................................20
9.3     Partnership Representative ..............................................................................20

ARTICLE X DISSOLUTION AND LIQUIDATION ...................................................21

10.1    Dissolution ......................................................................................................21
10.2    Liquidation and Termination ..........................................................................21
10.3    Cancellation of Certificate ..............................................................................22

ARTICLE XI GENERAL PROVISIONS ......................................................................22

11.1    Amendments ....................................................................................................22
11.2    No Return of Distributions ..............................................................................22
11.3    Remedies Cumulative ......................................................................................23
11.4    Successors and Assigns ...................................................................................23
11.5    Severability ......................................................................................................23
11.6    Applicable Law; Jurisdiction ..........................................................................23
11.7    Addresses and Notices .....................................................................................23
11.8    No Reliance by Third Parties ..........................................................................23
11.9    No Implied Waivers .........................................................................................24
11.10   Entire Agreement .............................................................................................24
11.11   Delivery by Electronic Transmission ..............................................................24
11.12   Relationship to Plan .........................................................................................24

Exhibits and Schedules

Exhibit A            Members
Exhibit B            Waterfall
Schedule 3.1(a)      Initial Managers

## [TOPCO], LLC

## LIMITED LIABILITY COMPANY OPERATING AGREEMENT

THIS LIMITED LIABILITY COMPANY OPERATING AGREEMENT (this "**Agreement**") of [TopCo], LLC (the "**Company**"), dated as of [_____], 20[ ], is entered into by and among the National Opioid Abatement Trust ("**NOAT**") [and] Tribal Opioid Abatement Fund, LLC, a Delaware limited liability company ("**Tribe Opioid LLC**") (NOAT and Tribe Opioid LLC each, a "**Member**" and, collectively, the "**Members**"), and implements certain of the terms of the Debtors' [Fifth] Amended Joint Chapter 11 Plan of Reorganization Dated [June 3, 2021] (as may be further modified, amended or supplemented from time to time, and together with all exhibits and schedules thereto, the "**Plan**"), confirmed by an order entered on [ ], 20[ ] [Docket No. ____] (the "**Confirmation Order**") by the United States Bankruptcy Court for the Southern District of New York (the "**Bankruptcy Court**") in the Chapter 11 cases of Purdue Pharma L.P. and its affiliated debtors (each a "**Debtor**" and collectively, the "**Debtors**") known as *In re Purdue Pharma L.P. et al.*, Case No. 19-23649 (collectively, the "**Chapter 11 Cases**").

### RECITALS

(A)    The Debtors have, or contemporaneously with the execution of this Agreement will have, reorganized under the provisions of Chapter 11 of the Bankruptcy Code in the Chapter 11 Cases.

(B)    The Confirmation Order has been entered by the Bankruptcy Court and is in full force and effect.

(C)    This Agreement constitutes the "TopCo Operating Agreement" (as defined in the Plan).

(D)    The Plan and Confirmation Order provide for, among other things, the creation of the Company and the rights and obligations of the Board and the Members each as set forth herein and in the Plan and Confirmation Order.

(E)    On the Effective Date, (i) Purdue Pharma L.P. transferred the NewCo Interest to the Company, (ii) transferred the TopCo Interests to the Master Disbursement Trust, (iii) immediately thereafter, the Master Disbursement Trust transferred the TopCo Interests to NOAT and TAFT, and (iv) immediately upon receipt thereof, TAFT transferred its portion of the TopCo Interest to Authorized Recipients under the Tribe TDP, who immediately thereafter contributed such interests to Tribal Opioid LLC.

(F)    In accordance with the Plan, the Company has entered into that certain [credit support agreement] dated [as of the date hereof] by and among the Company, [NewCo], LLC, a Delaware limited liability company (such company, [and, as the context requires,] together with its subsidiary companies, "**NewCo**"), and the Master Disbursement Trust (the "**Credit Support Agreement**"), pursuant to which, among other things, the Company is obligated under certain circumstances set forth therein to make Cash payments and pay over certain MDT Distributable

Sale Proceeds to the Master Disbursement Trust, and the Master Disbursement Trust is obligated to repay certain amounts received from the Company and NewCo, as contemplated by the Plan and in accordance with the Credit Support Agreement.

(G)    The Members desire to enter into this Agreement in order to set forth, among other things, the rights and obligations relating to the LLC Interests and the relationship of the parties hereto.

NOW, THEREFORE, in consideration of the mutual covenants contained herein and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto, intending to be legally bound, hereby agree as follows:

# ARTICLE I

# CERTAIN DEFINITIONS

**1.1    Defined Terms.** Capitalized terms used but not otherwise defined herein shall have the following meanings:

"**Agreement**" has the meaning set forth in the introductory paragraph hereto.

"**Annual Report**" has the meaning set forth in Section 8.1.

"**Asset**" means property of whatever type or nature, including real, personal, mixed, intellectual, tangible and intangible property.

"**Bankruptcy Code**" means title 11 of the United States Code, as applicable to the Chapter 11 Cases.

"**Bankruptcy Court**" has the meaning set forth in the introductory paragraph hereto.

"**Board**" means the Board of Managers established hereunder in accordance with Section 3.1(a).

"**Business Day**" means any day except any Saturday, any Sunday, any day which is a federal holiday in the United States of America or any day on which banking institutions in the State of New York are authorized or required by law or other governmental action to close.

"**Capital Account**" means the capital account maintained for a Member pursuant to Section 4.3.

"**Cash**" means all legal tender of the United States of America.

"**Certificate**" means the Company's Certificate of Formation as filed with the Secretary of State of the State of Delaware.

"**Chair**" has the meaning set forth in Section 3.2(h).

"**Class A Interest**" means an LLC Interest, representing the interest of a Member entitled to vote on matters pertaining to the Company pursuant to and in accordance with this Agreement, in Profits, Losses and Distributions and having the rights and obligations specified with respect to the Class A Interests in this Agreement.

"**Class A Member**" has the meaning set forth in Section 4.2(a).

"**Class B Interest**" means an LLC Interest, representing the interest of a Member not entitled to vote on any matters pertaining to the Company pursuant to and in accordance with this Agreement, in Profits, Losses and Distributions and having the rights and obligations specified with respect to the Class B Interests in this Agreement.

"**Code**" means the United States Internal Revenue Code of 1986, as amended.

"**Company**" has the meaning set forth in the introductory paragraph hereto.

"**Company Accountants**" has the meaning set forth in Section 8.4(a).

"**Company Minimum Gain**" has the same meaning as "partnership minimum gain" set forth in Treasury Regulations Section 1.704-2(b)(2).

"**Company's Purpose**" has the meaning set forth in Section 2.3.

"**Confirmation Order**" has the meaning set forth in the introductory paragraph hereto.

"**Covered Person**" means (i) the Members, (ii) each current or former trustee, officer or director of each Member, (iii) any current or former Manager or officer of the Company, (iv) each person who is or was serving at the request of the Company, as a member, director, officer, employee or agent of another Person and (v) each Designated Indemnitee; provided, however, that a Person shall not be deemed to be a "Covered Person" with respect to such Person's service in any role prior to the Effective Date, including as a member, director, manager, officer, employee or agent of any Debtor or any Subsidiary of the Company.

"**Credit Support Agreement**" has the meaning set forth in the Recitals.

"**Damages**" has the meaning set forth in Section 7.1(c).

"**Delaware Act**" means the Delaware Limited Liability Company Act, 6 Del. L. § 18-101, *et seq.*, as it may be amended from time to time, and any successor to the Delaware Act.

"**Designated Indemnitee**" means any current or former employee, agent or representative of the Company, a Member or any other Person who, in any such case, (x) is not a Covered Person under any of clauses (i)-(iv) of the definition of "Covered Person" and (y) is designated by action of the Board as a Designated Indemnitee. The Board may delegate to any officer or officers its authority to designate individuals as Designated Indemnitees subject to any such limitations as the Board may specify in such delegation; provided, however that no Person shall be a "Designated Indemnitee" with respect to such Person's service in any role prior to the

Effective Date, including as an employee, agent or representative of any Debtor or any Subsidiary of the Company.

"**Disbursing Agent**" has the meaning set forth in <u>Section 5.3(a)</u>.

"**Disposition Advisor**" has the meaning set forth in <u>Section 1.1</u> of the NewCo Operating Agreement

"**Disposition Deadline**" has the meaning set forth in <u>Section 5.4</u> of the NewCo Operating Agreement.

"**Disposition Event**" has the meaning set forth in <u>Section 5.1(a)</u> of the NewCo Operating Agreement.

"**Distribution**" means each distribution made by the Company to a Member.

"**Distribution Date**" has the meaning ascribed to such term in the NewCo Operating Agreement.

"**Electronic Transmission**" means any form of communication not directly involving the physical transmission of paper that creates a record that may be retained, retrieved, and reviewed by a recipient thereof and that may be directly reproduced in paper form by such a recipient through an automated process.

"**Excess Cash**" has the meaning ascribed to the term "TopCo Excess Cash" in the Plan.

"**Escrow Period**" has the meaning set forth in the Plan.

"**Final Order**" means an order or judgment of the Bankruptcy Court, as entered on the docket in any Chapter 11 case, or of any other court of competent jurisdiction (i) that has not been reversed, stayed, modified or amended, and (ii) (A) as to which the time to appeal, seek certiorari or move for a new trial, re-argument or rehearing has expired according to applicable law and no appeal or petition for certiorari or other proceedings for a new trial, re-argument or rehearing has been timely taken, or (B) as to which any appeal that has been taken or any petition for certiorari that has been or may be timely filed has been withdrawn or resolved by the highest court to which the order or judgment was appealed or from which certiorari was sought or the new trial, re-argument or rehearing shall have been denied, resulted in no modification of such order or has otherwise been dismissed with prejudice.

"**Fiscal Year**" means the Company's annual accounting period established pursuant to <u>Section 8.2</u>.

"**Governance Covenants**" has the meaning set forth in Section 1.1 of the NewCo Operating Agreement.

"**Governing Documents**" has the meaning set forth in <u>Section 3.3(a)(i)</u>.

"**Gross Asset Value**" means, with respect to any Company property, the Company's adjusted basis for federal income tax purposes, adjusted from time to time to reflect the adjustments required or permitted by Treasury Regulations Section 1.704-1(b)(2)(iv)(d)-(g), except that in the case of any property contributed to the Company, the Gross Asset Value of such property shall initially equal the fair market value of such property.

"**LLC Interests**" means the limited liability company interests in the Company, including the right to receive distributions of funds, and to receive allocations of income, gain, loss, deduction, and credit, and shall include the Class A Interests and Class B Interests; provided that any class or group of LLC Interests issued shall have the relative rights, powers, and duties set forth in this Agreement and the LLC Interest represented by such class or group shall be determined in accordance with such relative rights, powers, and duties set forth in this Agreement.

"**Manager**" means each manager appointed to the Board of the Company.

"**Member**" has the meaning set forth in the introductory paragraph hereto.

"**Member Nonrecourse Debt Minimum Gain**" has the same meaning as "partner nonrecourse debt minimum gain" set forth in Treasury Regulations Section 1.704-2(i) and shall be determined in accordance with the principles of that Section.

"**NewCo Board**" means the Board of Managers of NewCo established pursuant to the NewCo Operating Agreement.

"**NewCo Manager**" means each manager appointed to the NewCo Board pursuant to the NewCo Operating Agreement.

"**NewCo Operating Agreement**" means the limited liability company agreement of NewCo, as may be amended from time to time.

"**NewCo's Purpose**" means the "Company's Purpose" as such term is defined in the NewCo Operating Agreement.

"**Operating Expenses**" has the meaning ascribed to the term "TopCo Operating Expenses" in the Plan.

"**Operating Injunction**" has the meaning set forth in Section 1.1 of the NewCo Operating Agreement.

"**Opioid Business**" has the meaning set forth in Section 1.1 of the NewCo Operating Agreement.

"**Partnership Audit Rules**" means Chapter 63 of the Code (and any Treasury Regulations or other guidance promulgated, or that may be promulgated in the future, relating thereto) and any similar or analogous provision of state, local or non-U.S. tax laws.

"**Partnership Representative**" has the meaning set forth in Section 9.3.

"**Person**" has the meaning set forth in Section 1.1 of the NewCo Operating Agreement.

"**Profits**" or "**Losses**" for each fiscal year of the Company means the net taxable income or net taxable loss of the Company, as determined in accordance with Code Section 703(a) (for this purpose, all items of income, gain, loss, or deduction required to be stated separately pursuant to Code Section 703(a)(1) shall be included in taxable income or loss), modified to take into account the rules for properly maintaining capital accounts as set forth in Treasury Regulations Section 1.704-1(b)(2)(iv).

"Public Creditor Trusts" means NOAT, TAFT and TAF LLC.

"**Public Health Initiatives**" has the meaning set forth in Section 1.1 of the NewCo Operating Agreement.

"**Regulatory Allocations**" means those certain allocations required by Treasury Regulations Sections 1.704-1(b) and 1.704-2, including Treasury Regulations Sections 1.704-1(b)(2)(ii)(d) (qualified income offset), 1.704-2(i)(4) and -2(f) (minimum gain chargeback), 1.704-2(e) (nonrecourse deductions), and 1.704-2(i) (member nonrecourse deductions).

"**Subsidiaries**" means, with respect to a Person, all direct and indirect subsidiaries of such Person.

"TAFT" means the Tribal Abatement Fund Trust, a Delaware statutory trust established on [●], 20[ ] in accordance the Plan.

"**Tax**" or "**Taxes**" means any federal, state, local, or foreign income, gross receipts, franchise, estimated, alternative minimum, add-on minimum, sales, use, transfer, registration, value added, excise, natural resources, severance, stamp, occupation, premium, windfall profit, environmental, customs, duties, real property, personal property, capital stock, social security, unemployment, disability, payroll, license, employee, or other withholding, or other tax, of any kind whatsoever, including any interest, penalties, or additions to tax or additional amounts in respect of the foregoing.

"**Taxable Year**" means the Company's Fiscal Year unless the Board determines otherwise in compliance with applicable laws.

"**Treasury Regulations**" means the final or temporary regulations that have been issued by the U.S. Department of Treasury pursuant to its authority under the Code, and any successor regulations.

"**Tribe Opioid LLC**" has the meaning set forth in the introductory paragraph.

**1.2**     **Terms Defined in the Plan**. Capitalized terms used in this Agreement but not defined in Section 1.1 or otherwise herein shall have the meanings ascribed to such terms in the Plan; provided that any reference to "TopCo" in the definitions of such terms in the Plan shall mean "the Company" for purposes of this Agreement.

**1.3**     **Interpretation**.

- 6 -

(a)      The words "this Agreement," "herein," "hereby," "hereunder," "hereof," and other equivalent words refer to this Agreement as an entirety and not solely to the particular portion, article, section, subsection or other subdivision of this Agreement in which any such word is used.

(b)      The Exhibits and Schedules attached to this Agreement are incorporated herein by reference and will be considered part of this Agreement, and any references herein to a particular Section, Article, Exhibit or Schedule means a Section or Article of, or Schedule or Exhibit to, this Agreement unless otherwise expressly stated herein.

(c)      All definitions set forth herein are deemed applicable whether the words defined are used herein in the singular or in the plural and correlative forms of defined terms have corresponding meanings, and any pronoun or pronouns set forth herein will be deemed to cover all genders.

(d)      A defined term has its defined meaning throughout this Agreement and each Schedule regardless of whether it appears before or after the place where it is defined.

(e)      The word "including" and its derivatives means "including without limitation" and is a term of illustration and not of limitation.

(f)      The word "or" shall be disjunctive but not exclusive.

(g)      All references to prices, values or monetary amounts refer to United States dollars.

## ARTICLE II

## ORGANIZATIONAL MATTERS

**2.1**      **Formation.** The Company was organized as a Delaware limited liability company by filing the Certificate with the Secretary of State of the State of Delaware on ___, 20[ ] under and pursuant to the Delaware Act and shall be continued in accordance with this Agreement. The Managers are authorized to execute, file and record all such other certificates and documents, including amendments to the Certificate, and to do such other acts as may be appropriate to comply with all requirements for the formation, continuation and operation of a limited liability company, the ownership of property, and the conduct of business under the laws of the State of Delaware and any other jurisdiction in which the Company may own property or conduct business.

**2.2**      **Name.** The name of the Company shall be "[TopCo, LLC]". The Company's business may be conducted under its name and/or any other name or names deemed advisable by the Board.

**2.3**      **Purpose.** The purposes of the Company shall be to (i) receive, hold and vote the sole limited liability company interest (the "**NewCo Interest**") in NewCo, (ii) make certain payments, and receive repayment therefor, pursuant to the Credit Support Agreement and (iii) receive distributions and exercise rights in respect thereof from NewCo and distribute Excess

Cash to the Members, in each case in accordance with this Agreement, NewCo's Purpose, the Governance Covenants and the Plan (collectively, the "**Company's Purpose**").

**2.4**    **Principal Office; Registered Office.** The principal office of the Company shall be located at such place as the Board may from time to time designate, and all business and activities of the Company shall be deemed to have occurred at its principal office. The Company may maintain offices at such other place or places as the Board deems advisable. The registered office of the Company required by the Delaware Act to be maintained in the State of Delaware shall be the office of the initial registered agent named in the Certificate or such other office (which need not be a place of business of the Company) as the Board may designate from time to time in any manner provided by law. The registered agent of the Company in the State of Delaware shall be the initial registered agent named in the Certificate or such other Person or Persons as the Board may designate from time to time in the manner provided by law.

**2.5**    **Powers**. The Company shall, subject to Operating Injunction, the Governance Covenants, the Plan and the Confirmation Order, have the all the powers that a limited liability company may have under the Delaware Act, including the power to do any and all acts and things necessary, appropriate, proper, advisable, convenient or incidental (or determined in good faith by the Board to be so necessary, appropriate, proper, advisable, convenient or incidental) for or to Company's Purpose and for the protection of the Company.

**2.6**    **Term.** The term of the Company commenced upon the filing of the Certificate in accordance with the Delaware Act and shall continue in existence until termination and dissolution thereof in accordance with the provisions of Article XI.

**2.7**    **No State-Law Partnership.** The Members intend that the Company not be a partnership (including, a limited partnership) or joint venture, and that no Member be a partner or joint venturer of any other Member by virtue of this Agreement (except for tax purposes as set forth in the next succeeding sentence of this Section 2.7), and neither this Agreement nor any other document entered into by the Company or any Member relating to the subject matter hereof shall be construed to suggest otherwise. The Members intend that the Company shall be treated as a partnership for federal and, if applicable, state and local income tax purposes, and each Member and the Company shall file any and all tax returns as may be required by law and shall otherwise take all tax and financial reporting positions in a manner consistent with such treatment. Without the consent of the Board, the Company shall not make an election to be treated as a corporation for federal income tax purposes pursuant to Treasury Regulations Section 301.7701-3 (or any successor regulation or provision) and, if applicable, state and local income tax purposes.

## ARTICLE III

## BOARD OF MANAGERS; OFFICERS

### 3.1    Composition and Actions of the Board of Managers.

(a)    Number; Qualifications. The number of Managers on the Board shall be three (3). No Member may be a Manager and, except as provided in the first proviso in this

Section 3.1(a), all Managers shall be disinterested and independent; provided that one (but not more than one) trustee of NOAT may serve as a Manager; provided further that, for the avoidance of doubt, any action taken by such individual in his or her capacity as a Manager, shall be solely in such capacity, and shall not otherwise be subject to the fiduciary duties of such individual in his or her capacity as a trustee of NOAT. The persons named on Schedule 3.1(a), as approved in the Confirmation Order, are hereby appointed as the initial Managers, effective as of the Effective Date.

(b)    Term. Each initial Manager shall hold office until the earlier of (i) his or her death, resignation, disqualification or removal by NOAT pursuant to Section 3.1(d), or (ii) the termination and dissolution of the Company in accordance with the provisions of this Agreement.

(c)    Appointment of Successor Managers. In the event of a vacancy in the position of one or more Managers for any reason, NOAT shall appoint a successor that satisfies the requirements of Section 3.1(a).

(d)    Resignation; Removal. A Manager may resign by giving written notice to the Chair and any trustee of NOAT. Such notice shall specify a date when such resignation shall take effect, which, except in the case of incapacity or disability, shall not be less than ninety (90) days after the date such notice is given, where practicable. A Manager may be removed by NOAT at any time with or without cause.

(e)    Manager Compensation; Reimbursement of Expenses. The Managers shall receive compensation from the Company for their services as Managers.[2] The Company shall also reimburse all reasonable out-of-pocket costs and expenses incurred by the Managers in the course of carrying out their duties as Managers in accordance with reasonable policies and procedures as may be adopted from time to time, including in connection with attending regular and special meetings of the Board.

(f)    Rights of Inspection. The Members and each Manager shall have the absolute right at any reasonable time to inspect and copy all books, records, reports, and documents of every kind of the Company, and to the extent determined by the Board to be in furtherance of the Company's purposes, to inspect all material books, records, reports, and documents of every kind of NewCo.

**3.2    Board Meetings and Actions by Written Consent.**

(a)    Quarterly Meeting. The Board shall hold a meeting at least once per calendar quarter.

(b)    Meetings; Notice. All meetings of the Board (i) may be called by any Manager and (ii) shall be held upon at least twenty-four (24) hours' written notice, in each case including time, place and purpose of the meeting, given to each Manager by overnight courier, personal delivery, facsimile, electronic mail, or other similar means of communication. Notice shall be addressed or delivered to each Manager at the Manager's address as shown upon the

---

[2] NTD: Additional compensation details under continued review.

- 9 -

records of the Company, or as may have been given to the Board by the Manager for purposes of notice. Notice by overnight courier shall be deemed to have been given one Business Day after the time that written notice is provided to such overnight courier. Email or any other written notice shall be deemed to have been given at the time it is personally delivered to the recipient or actually transmitted by the person giving the notice by electronic means to the recipient.

(c)    Waiver of Notice. Notice of a meeting need not be given to any Manager who waives such notice, whether before or after the meeting. All such waivers shall be made a part of the minutes of the meeting. Attendance at a meeting by a Manager shall constitute a waiver of notice of such meeting except when the Manager attends a meeting for the express purpose of objecting, at the beginning of the meeting, to the transaction of any business on the ground that the meeting was not lawfully called or convened. Neither the business to be transacted at, nor the purpose of, any Manager meeting need be specified in any waiver of notice.

(d)    Place of Meeting; Participation in Meetings. Meetings of the Board shall be held at any place designated by the Board, or by means of remote communication, as shall be stated in the notice of meeting. Managers may participate in a meeting of the Board by conference telephone, video conferencing or similar communications equipment, as long as all Managers participating in such meeting can hear one another. Participation by a Manager in a meeting pursuant to this Section 3.2(d) shall constitute presence in person at such meeting.

(e)    Action and Quorum. The Board shall act by a vote of a majority of the number of Managers then in office, which such majority shall constitute a quorum of the Board for the transaction of business, except to adjourn as provided in Section 3.2(f).

(f)    Adjournment. A majority of the Managers present, whether or not a quorum exists, may adjourn any Board meeting to another time and place.

(g)    Action by Unanimous Written Consent. Any action required or permitted to be taken at any meeting of the Board may be taken without a meeting, if all of the Managers then in office consent thereto in writing or by Electronic Transmission, which writing or Electronic Transmission may be executed in one or more counterparts, and the writing or Electronic Transmission is filed with the minutes of proceedings of the Board.

(h)    Chair. The Managers shall designate one of their number to serve as the Chair of the Board (the "**Chair**"), with such administrative duties as the Managers may determine. The Chair or, in the Chair's absence, another Manager selected by the Managers present shall preside at meetings of the Board. The Chair, or the Manager presiding over such meeting, shall be responsible for performing such duties and services as shall be assigned to or required of the Chair by the Managers.

### 3.3    **Management by the Board of Managers**.

(a)    Authority of Board of Managers.

(i)    Except for situations in which the approval of the Members is expressly required hereby or otherwise required by non-waivable provisions of applicable law and subject to the provisions of Section 3.3(a)(ii), the Plan and the Confirmation Order,

including the Governance Covenants and the Operating Injunction, (A) the powers of the Company shall be exercised by or under the authority of, and the business and affairs of the Company shall be managed under the direction of, the Board in accordance with this Agreement, the Plan and the Confirmation Order (collectively, the "**Governing Documents**") and (B) the Board may make all decisions and take all actions for the Company not otherwise provided for in this Agreement or otherwise consistent with the Governing Documents.

(ii)    The Board shall manage or direct the business and affairs of the Company in accordance with the Company's Purpose.

(iii)    Notwithstanding anything to the contrary herein, the Board shall not have the power to (A) except as set forth in the Credit Support Agreement, cause the Company or the Company's Subsidiaries to guarantee any debt of other persons, (B) expel or remove NOAT or Tribe Opioid LLC as a Member of the Company, (C) authorize the Company or any Person acting on its behalf to take any action inconsistent with the Company's Purpose, (D) except for the LLC Interests held by NOAT and Tribe Opioid LLC as of the date hereof, issue or sell LLC Interests in the Company or, (E) without the consent of NOAT, make an election for the Company to be treated as a corporation for federal income tax purposes pursuant to Treasury Regulations Section 301.7701-3 (or any successor regulation or provision) and, if applicable, state and local income tax purposes.

(iv)    Notwithstanding anything to the contrary herein or in the NewCo Operating Agreement and without limiting the power of the Board set forth in Section 3.3(a)(i), the Board shall have the power to take action in respect of the following rights of the Company set forth in the NewCo Operating Agreement, provided such actions are taken consistent with the Company's Purpose:

(A)    removing any NewCo Manager, with or without cause, and appointing a successor NewCo Manager as set forth in Sections 3.1(c)-(d) of the NewCo Operating Agreement;

(B)    inspecting the books, records, and documents of every kind of NewCo as set forth in Section 3.1(f) of the NewCo Operating Agreement;

(C)    taking such actions with respect to a Disposition Event, as set forth in Sections 5.1(a)-(c) of the NewCo Operating Agreement;

(D)    taking such actions with respect to which the Company has rights under Section 5.1(d) of the NewCo Operating Agreement;

(E)    taking such actions with respect to the Minimum TopCo Distribution and the Disposition Event in accordance with Section 5.4 of the NewCo Operating Agreement;

(F)    taking such actions with respect to the amendment of the NewCo Operating Agreement in accordance with Section 11.1(a) of the NewCo Operating Agreement; and

- 11 -

(G)    consenting to such other actions as provided in the NewCo Operating Agreement.

(b)    <u>Public Health Initiatives</u>.    The Board shall periodically evaluate the efficacy of the Public Health Initiatives, which such evaluation shall consider, among other factors, the extent to which the Public Health Initiatives are value accretive to the direct and indirect holders of interests in the Company.

(c)    <u>Officers</u>. Subject to direction by the Board, the day-to-day administration of the business of the Company may be carried out by employees and agents who may be designated as officers ("**Officers**") by the Board. The Board may delegate to such Officers such power and authority as the Board deems necessary or advisable. The Officers shall have such titles and powers and perform such duties as shall be determined from time to time by the Board. The Officers shall hold office until their successors are appointed by the Board, unless the Board specifies otherwise. Any Officer may be removed by the Board at any time and any vacancy occurring in any office of the Company may be filled by the Board, in its discretion.

## ARTICLE IV

## LLC INTERESTS; CAPITAL ACCOUNTS; TRANSFERS

### 4.1    **Members**.

(a)    <u>Admission of Members</u>. Each Member listed on <u>Exhibit A</u> is hereby admitted to the Company as a member of the Company.

(b)    <u>Classes of LLC Interests.</u> There shall be two Classes of LLC Interests. Class A Interests shall be held by NOAT; Class B Interests shall be held by Tribe Opioid LLC. Any holder of Class A Interests shall be entitled to vote on any matter for which the Members are entitled to vote hereunder or pursuant to the Delaware Act. Any holder of Class B Interests shall not be entitled to vote on any matter.

(c)    <u>Lack of Authority</u>. Except as expressly set forth in this Agreement, none of the Members shall have authority or power to (i) act for or on behalf of the Company in any manner, (ii) enter into any agreements on behalf of the Company or (iii) do any act that would be (or could be construed as) binding on the Company or make any expenditures on behalf of the Company.

(d)    <u>No Right of Partition</u>. No Member shall have the right to seek or obtain partition by court decree or operation of law of any Company property, or the right to own or use particular or individual assets of the Company.

(e)    <u>Capital Contributions</u>. No Member shall be required to make any additional capital contribution to the Company.

(f)    <u>Member Information</u>. The LLC Interests held by each Member shall represent (i) all of such Member's rights, title and interest in the Company and (ii) all of such Member's rights under this Agreement, including such Member's rights to receive Distributions

- 12 -

in accordance with <u>Section 5.3</u> and Exhibit B. Each Member's name, and address, and the LLC Interests held by such Member, are identified on <u>Exhibit A</u>. Each Member's interest in the Company, including such Member's interest in Profits, Losses and Distributions of the Company and the right to vote on certain matters as provided in this Agreement, shall be based upon its LLC Interests as set forth on <u>Exhibit A</u>, other than Members owning Class B Interests (which are not entitled to vote under this Agreement). A Member's LLC Interests shall determine such Member's allocation of Profits and Losses and Distributions as set forth in <u>Article IV</u>. All LLC Interests shall be uncertificated.

(g)    <u>Limited Liability</u>. Without limitation of any limitations on liability provided under Section 18-303 of the Delaware Act, except as otherwise provided by the Delaware Act, or applicable law, the debts, obligations, commitments and liabilities of the Company, whether arising in contract, tort or otherwise, shall be solely the debts, obligations, commitments and liabilities of the Company, and no Member, Manager, employee or agent of the Company shall be obligated personally for any debt, obligation or liability of the Company, or for any debt, obligation or liability of any other Member, Manager, employee or agent of the Company, by reason of being a Member, Manager, employee or agent of the Company. Notwithstanding anything contained herein to the contrary, the failure of the Company to observe any formalities or requirements relating to the exercise of its powers or management of its business and affairs under this Agreement or the Delaware Act shall not be grounds for imposing personal liability on any Member, Manager, employee or agent of the Company for debts, obligations, commitments or liabilities of the Company.

4.2    <u>**Member Meetings; Voting.**</u>

(a)    Any Member(s) holding Class A Interests (each, a "**Class A Member**") may call a meeting of the Class A Members by giving written notice to all Class A Members not less than one (1) Business Day prior to the date of the meeting. The notice must specify the date of the meeting and the nature of any business to be transacted. A Class A Member may waive notice of a meeting of Class A Members orally, in writing or by attendance at the meeting. Members holding solely a Class B Interest shall not be entitled to attend meetings of the Class A Members.

(b)    A Class A Member may act at a meeting of Class A Members through any Person authorized by signed proxy, and such proxy may be granted in writing, by means of Electronic Transmission, or as otherwise permitted by the Delaware Act.

(c)    Whenever the vote of the Class A Members is required or permitted to be taken in connection with any action of the Company by any provision of the Delaware Act, applicable law and this Agreement, such action may be taken without a meeting by written consent, setting forth the action so taken, signed by all of the Class A Members.

4.3    <u>**Capital Accounts**</u>. A separate capital account (each, a "**Capital Account**") shall be maintained for each Member in accordance with the rules of Section 704(b) of the Code and the Treasury Regulations thereunder, and all provisions of this Agreement shall be interpreted and applied in a manner consistent therewith. The provisions of this Agreement may be modified

- 13 -

to cause the allocations of profits, losses, income, gain and credit pursuant to <u>Article V</u> to have substantial economic effect under the Treasury Regulations.

**4.4** <u>**Negative Capital Accounts**</u>. No Member shall be required to pay to any other Member, the Company or any other Person any deficit or negative balance which may exist from time to time in such Member's Capital Account (including upon and after dissolution of the Company).

**4.5** <u>**No Withdrawal**</u>. No Member shall be entitled to withdraw any part of its Capital Account or to receive any Distribution from the Company, except as expressly provided herein.

**4.6** <u>**No Transfer of LLC Interests**</u>.  No Member shall transfer all or any portion of its LLC Interest.  Any purported transfer of all or any portion of the LLC Interest shall be null and void, no such transfer shall be recorded on the Company's books, and the purported transferee in any such transfer shall not be treated (and NOAT or Tribe Opioid LLC, as applicable, shall continue to be treated) as the owner of the applicable LLC Interest for all purposes of this Agreement.

<div align="center">

**ARTICLE V**

<u>**ALLOCATIONS; DISTRIBUTIONS**</u>

</div>

**5.1** <u>**Allocations of Profits and Losses**</u>. After giving effect to the Regulatory Allocations, Profits and Losses for any taxable year will be allocated among the Members in a manner that will result in the Capital Account balance for each Member (which balance may be positive or negative), after adjusting the Capital Account for all capital contributions and distributions and any special allocations required pursuant to this Agreement for the current and all prior taxable years, being (as nearly as possible) equal to (x) the amount that would be distributed to the Member if the Company were to sell all of its assets at their current Gross Asset Value, pay all liabilities of the Company (limited, with respect any nonrecourse liabilities, to the value reflected in the Members' Capital Accounts for the assets securing such nonrecourse liabilities), and distribute the proceeds thereof in accordance with <u>Section 5.3</u>, minus (y) the Member's share of Company Minimum Gain and Member Nonrecourse Debt Minimum Gain, computed immediately before the hypothetical sale of assets.

**5.2** <u>**Distributions.**</u>

(a) <u>Distributions to the Members</u>. Subject to <u>Section 5.3(b)</u> of this Agreement, the Board shall authorize the Company to, and the Company shall, make Distributions as follows:

(i) on each Distribution Date, the Company shall distribute to the Members all Excess Cash held by the Company on such Distribution Date, as a Distribution, in accordance with Section 5.2(e)(ii)(A)(II) of the Plan and the applicable proportions set forth on <u>Exhibit B</u>;

(ii) upon receipt by the Company of any TopCo Distribution from NewCo pursuant to Section 6.5(a)(ii) of the NewCo Operating Agreement or any repayments

<div align="center">- 14 -</div>

from the Master Disbursement Trust pursuant to the Master Disbursement Trust's obligations under the Credit Support Agreement, the Company shall promptly, but in any case no later than the Business Day after receipt of such TopCo Distribution or repayment from NewCo, as the case may be, distribute to the Members all such amounts received as a Distribution, in accordance with Section 5.2(e)(ii) and the applicable proportions set forth on Exhibit B; and

(iii)    upon receipt by the Company from NewCo of any TopCo Distributions pursuant to Section 6.5(a)(iii) of the NewCo Operating Agreement, the Company shall promptly distribute to the Members all such amounts received as a Distribution, in accordance with Section 5.2(e)(ii)(C) of the Plan and the applicable proportions set forth on Exhibit B;

*provided* that, until the payment in full in cash of all MDT Claims, the Company shall provide written notice to each Private Creditor Trust and the Master Disbursement Trust of any proposed distribution to the Members (other than a Distribution pursuant to Section 5.3(a)(ii)) no less than ten (10) Business Days prior to such distribution.

(b)    Limitations on Distributions.

(i)    The Company shall not make any distribution to the Members other than as provided in Section 5.3(a)

(ii)    Notwithstanding anything to the contrary herein, no distribution to the Members shall be made (A) if an MDT Reserve Period has commenced and is continuing, unless the Master Disbursement Trust has provided notice to the Company that the MDT Operating Reserve and the MDT Claims Reserve have been fully funded, (B) if an Escrow Period has commenced and is continuing or (C) if and to the extent that such Distribution would render the Company insolvent or would violate the Delaware Act or applicable law, *provided* that in the event the Company is prohibited from making all or a portion of any distribution required to be made pursuant to Section 5.2(a) as a result of the application of this Section 5.2(b)(i), the Company shall promptly notify the Members in writing of the facts and circumstances which the Board believes prohibit the Company from making all or a portion of such distribution; *provided further* that such notice shall not relieve the Company from any of its obligations hereunder (other than any obligation to make such distribution or portion thereof.

(c)    Public Entity Allocation. All Distributions by the Company shall constitute Public Creditor Trust Distributions under the Plan and shall be allocated between NOAT, on the one hand, and Tribe Opioid LLC, on the other hand, in accordance with Exhibit B. The allocation of any Distribution hereunder shall be the Public Entity Allocation set forth in the then-most recent notice provided to the Managers by the MDT Trustees prior to each Distribution Date and MDT Distribution Date in accordance with Section [7.04] of the MDT Agreement. In furtherance of the foregoing, the TopCo Managers shall provide to the MDT Trustees advance written notice of each Distribution to be made by the Company and any other information with respect to Public Creditor Trust Distributions reasonably requested by the MDT Trustees. For the avoidance of doubt, none of the MDT Trustees or the Master Disbursement Trust shall have any liability for any Distribution made by the Company.

- 15 -

(d)     All Distributions under this Agreement shall be made in accordance with the electronic transfer information provided by the Members; changes to such electronic transfer information must be provided to the Disbursing Agent or Board, as applicable, in writing at least five (5) Business Days prior to any upcoming Distribution Date; *provided* that the Board and Disbursing Agent shall have the authority, in their discretion, to seek further direction and information from Members regarding the direction of Distributions under this Agreement.

(e)     Distributions from the Company to the Members may be made by the Company or by a disbursing agent retained by the Company to make Distributions on its behalf (the "**Disbursing Agent**").

(f)     No Asset of the Company or any unclaimed property shall escheat to any federal, state, or local government or any other entity.

(g)     The Company shall withhold all amounts required by any provision of federal, state, local, or foreign tax law with respect to any payment, Distribution, or allocation to the Members, and any amounts withheld and properly remitted to the applicable taxing authority shall be treated as amounts paid or distributed to the Member with respect to which such withholding was made for all purposes of this Agreement, and the Company shall not be required to increase the amount of any payment or distribution as a result of any such withholding.

<div align="center">

**ARTICLE VI**

**CERTAIN RIGHTS AND OBLIGATIONS OF THE COMPANY AND THE MEMBERS**

</div>

**6.1**     **Disposition Event.**

(a)     The Board shall cause the Company and NewCo to pursue a Disposition Event in accordance with, and as contemplated by, the NewCo Operating Agreement by the Disposition Deadline. In determining whether to pursue and consummate a proposed Disposition Event, the Board shall evaluate, among other things, which transactions best achieve NewCo's Purpose, taking into account (i) NewCo's obligation to use best efforts to make the Minimum TopCo Distribution, (ii) the proposed application of proceeds of such Disposition Event, and (iii) whether the proposed buyer(s) will be able to and will agree to continue to deploy the purchased assets or Interests in furtherance of NewCo's Purpose and the Governance Covenants after giving effect to the consummation of the Disposition Event.

(b)     The Company may enter into any agreements to effect a Disposition Event and consummate the transactions contemplated by such agreements upon the authorization of the Board.

(c)     Notwithstanding anything to the contrary herein, the Board may cause the Company to engage (or to cause NewCo to engage pursuant to Section 5.2 of the NewCo Operating Agreement) such advisors as the Board deems appropriate to assess, analyze and effectuate a Disposition Event. In order to avoid a potential conflict of interest in any Disposition Advisor's analysis of the merits of any transaction(s), such advisors shall not be retained to effectuate any such transaction on a "success fee" or similar basis under which all or a portion of

the Disposition Advisors' fees in respect of such engagement is conditioned or contingent upon the successful consummation of a Disposition Event.

(d)    Upon the receipt by the Company of (i) any Disposition Status Report (as defined in the NewCo Operating Agreement) pursuant to Section 5.3 of the NewCo Operating Agreement or (ii) any report from the NewCo Board pursuant to Section 5.3 of the NewCo Operating Agreement, the Company shall promptly deliver a copy thereof to the Members.

(e)    Notwithstanding anything else to the contrary herein, the Board shall not authorize or approve any transaction (whether constituting a Disposition Event or otherwise) involving the direct or indirect sale or disposition of all or any substantial portion of the Opioid Assets (as defined in the NewCo Operating Agreement) or the Opioid Business unless the Person(s) acquiring such Opioid Assets or all or such portion of the Opioid Business agree(s), pursuant to an agreement in form and substance satisfactory to the Board, to be bound by (and to not transfer all or any substantial portion of such Opioid Assets or such portion of the Opioid Business to any subsequent transferee unless such transferee agrees to be bound by and to similarly bind its transferees to) the applicable terms of the Operating Injunction and Governance Covenants upon the consummation of such transaction, *provided* that nothing in this Section 6.1(e) shall prohibit or otherwise restrict NewCo and NewCo's Subsidiaries from selling any products pursuant to NewCo's or NewCo's Subsidiaries' commercial arrangements in the ordinary course of NewCo's and NewCo's Subsidiaries' business.

**6.2    Operating Expenses**. From and after the Effective Date, all Operating Expenses of the Company shall be paid by the Company. No provision contained herein shall limit or restrict the ability of the Company to pay any of its Operating Expenses between each Distribution Date from funds generated by the Company or otherwise available to the Company.

## ARTICLE VII

## EXCULPATION AND INDEMNIFICATION

**7.1    Indemnification; Advancement.**

(a)    No Covered Person shall be liable to the Company or any other Covered Person for any loss, damage, or claim incurred for any actions taken or omitted to be taken by such Covered Person in his, her, or its capacity as a Covered Person, or by reason of the fact that such Covered Person is a Covered Person, except to the extent that it is determined ultimately by a Final Order that such Damages arose primarily from the fraud, bad faith or willful misconduct of such Covered Person.

(b)    Without limiting the foregoing in this Section 7.1, each Manager shall, in the performance of his or her duties, be fully protected in relying in good faith upon the books of account or reports made to the Company or the Board by any of the Company's or NewCo's officers, managers, employees, agents, consultants, advisors or other representatives, or in relying in good faith upon other records of the Company or NewCo. Furthermore, each Manager (in such Person's capacity as a Manager) may rely, and shall incur no liability in acting or refraining from acting, upon any resolution, certificate, statement, instrument, opinion, report,

- 17 -

notice, request, consent, order, bond, debenture, paper, document, signature or writing believed by it to be genuine, and may rely on a certificate signed by an officer, director, manager, employee, agent, consultant, advisor or other representatives, of any person in order to ascertain any fact with respect to such person or within such person's knowledge, in each case except to the extent that it is determined ultimately by a Final Order that such Damages arose primarily from the fraud, bad faith or willful misconduct of such Manager.

(c)      To the fullest extent permitted by the Delaware Act, as the same now exists or may hereafter be amended, substituted or replaced (but, in the case of any such amendment, substitution or replacement only to the extent that such amendment, substitution or replacement permits the Company to provide broader indemnification rights than the Delaware Act permitted the Company to provide prior to such amendment, substitution or replacement), the Company shall indemnify, hold harmless, defend, pay and reimburse any Covered Person against any and all losses, claims, damages, judgments, fines or liabilities, including reasonable legal fees or other expenses incurred in investigating or defending against such losses, claims, damages, judgments, fines or liabilities, and any amounts expended in settlement of any claims (collectively, "**Damages**") that may accrue to or be incurred by any Covered Person, for any actions taken or omitted to be taken by such Covered Person in his, her, or its capacity as a Covered Person, or by reason of the fact that such Covered Person is a Covered Person except to the extent that it is determined ultimately by a Final Order that such Damages arose primarily from the fraud, bad faith or willful misconduct by or of such Covered Person.

(d)      The Company shall promptly reimburse (and/or advance to the extent requested by the Covered Person) each Covered Person for reasonable legal or other expenses of such Covered Person in connection with investigating, preparing to defend or defending any claim, lawsuit, or other proceeding relating to any Damages for which such Covered Person may be indemnified pursuant to this Section 7.1; *provided*, that if it is finally judicially determined that such Covered Person is not entitled to the indemnification provided by this Section 7.1, then such Covered Person shall promptly reimburse the Company for any reimbursed or advanced expenses.

(e)      The indemnification provided by this Section 7.1 shall not be deemed exclusive of any other rights to indemnification to which those seeking indemnification may be entitled under any agreement or otherwise. The provisions of this Section 7.1 shall continue to afford protection to each Covered Person regardless of whether such Covered Person remains in the position or capacity pursuant to which such Covered Person became entitled to indemnification under this Section 7.1 and shall inure to the benefit of the executors, administrators, legatees and distributees of such Covered Person.

(f)      The Company shall purchase and maintain, at its own expense (other than for the initial premium payment which shall be paid by the Debtors) directors and officers (D&O) insurance with customary coverages and other customary terms to cover Damages covered by the foregoing indemnification provisions and to otherwise cover Damages for any breach or alleged breach by any Covered Person of such Covered Person's duties.

(g)      Notwithstanding anything contained herein to the contrary, any indemnity by the Company relating to the matters covered in this Section 7.1 shall be provided out of and to

- 18 -

the extent of the Assets of the Company only, and no Person (other than the Company) shall have personal liability on account thereof or shall be required to make additional capital contributions to help satisfy such indemnity by the Company.

(h)    If this Section 7.1 or any portion hereof shall be invalidated on any ground by any Final Order, then the Company shall nevertheless indemnify and hold harmless each Covered Person pursuant to this Section 7.1 to the fullest extent permitted by any applicable portion of this Section 7.1 that shall not have been invalidated and to the fullest extent permitted by applicable law.

(i)    The provisions of this Section 7.1 shall be a contract between the Company, on the one hand, and each Covered Person who served in such capacity at any time while this Section 7.1 is in effect, on the other hand, pursuant to which the Company and each such Covered Person intend to be legally bound. No amendment, modification or repeal of this Section 7.1 that adversely affects the rights of a Covered Person the extent relating to a state of facts existing prior to such amendment, modification, or repeal shall apply in such a way as to eliminate or reduce such Covered Person's rights under this Section 7.1 without the Covered Person's prior written consent.

(j)    The provisions of this Article VII shall survive the dissolution, liquidation, winding up and termination of the Company. If the Company or any of its successors or assignees consolidates with or merges into any other entity and is not the continuing or surviving entity, or sells all or substantially all of its assets, then to the extent necessary, proper provision shall be made so that the continuing or surviving entity of the Company or the acquirer of the Company's assets, as applicable, assumes the obligations of the Company pursuant to this Section 7.1.

## ARTICLE VIII

## BOOKS, RECORDS, ACCOUNTING AND REPORTS

**8.1**    **Records and Accounting**. The Company shall keep, or cause to be kept, appropriate books and records with respect to the Company's business, including all books and records necessary to provide any information, lists, and copies of documents required pursuant to applicable laws. The detail of these books and records shall be such as to allow the Board to make a full and accurate accounting of all of the Company's Assets, as well as to comply with applicable provisions of law and standard accounting practices necessary or appropriate to produce an annual report containing financial statements of the Company on an unconsolidated basis, including the assets and liabilities of the Company as of the end of such fiscal year and the additions, deductions and cash flows for such fiscal year (the "**Annual Report**").  The Board shall maintain such books and records until the wind-up of the Company's affairs and satisfaction of all of the Company's liabilities. All matters concerning (i) the determination of the relative amount of allocations and distributions among the Members pursuant to and in accordance with Article IV and (ii) accounting procedures and determinations, and other determinations not specifically and expressly provided for by the terms of this Agreement, shall be determined by the Board.

**8.2**    **Fiscal Year**. The fiscal year (the "**Fiscal Year**") of the Company shall constitute the twelve (12)-month period ending on December 31 of each calendar year, or such other annual accounting period as may be established by the Board.

**8.3**    **Reports**. The Company shall deliver or cause to be delivered, within ninety (90) days after the end of each Fiscal Year or as soon as reasonably practicable thereafter, to each Person who was a Member at any time during such Fiscal Year a Schedule K-1 and any information with respect to the Company reasonably required for the preparation of such Person's United States federal and state income tax returns.

**8.4**    **Financial Reporting**.[3] The Board shall engage a firm of independent certified public accountants (the "**Company Accountants**") to audit the Annual Report. Within ninety (90) days following the end of each calendar year, the Company shall deliver to NOAT, the Annual Report audited by the Company Accountants and accompanied by an opinion of such firm as to the fairness in all material respects of the special-purpose financial statements.

**8.5**    **NewCo Reports**. The Company shall promptly provide NOAT copies of all material reports received from NewCo including any reports delivered to the Company pursuant to Article VIII of the NewCo Operating Agreement.

**8.6**    **Board Availability**. The Board shall, in connection with the delivery of each report under Section 8.5, host a call for the recipients of such report, to answer questions of the recipients relating to such report, and shall otherwise make themselves reasonably available to answer questions of the Members relating to the Company's activities.

## ARTICLE IX

## TAXES

**9.1**    **Tax Returns**. The Company shall prepare and file all necessary federal and state income tax returns.

**9.2**    **Tax Elections**. The Company shall make any election the Board deems appropriate and in the best interests of the Members.

**9.3**    **Partnership Representative**. The Chair shall be the Company's partnership representative, as described in Section 6223 of the Code (the "**Partnership Representative**"). The Partnership Representative shall have all powers and responsibilities provided for a "partnership representative" in Section 6221 of the Code *et seq.*. The Company shall pay and be responsible for all reasonable third-party costs and expenses incurred by the Partnership Representative in performing its duties as such. [If requested by the Partnership Representative, each Member shall provide the Partnership Representative with any information, representations, certifications, forms, or documentation, and take such action, that, as determined by the Partnership Representative in its sole discretion, is necessary for the Company subject to the Partnership Audit Rules to make any election or to modify an imputed underpayment under

---

[3] NTD: To be confirmed with Company Accountants that TopCo will not be consolidated with NewCo and NewCo subsidiaries for financial accounting purposes.

- 20 -

Section 6225(c) of the Code (or any related or analogous provision or guidance of the Partnership Audit Rules) or otherwise adopt any course under the Partnership Audit Rules. Notwithstanding anything to the contrary in this Agreement, any information, representations, certifications, forms or documentation so provided may be disclosed to any applicable taxing authority. Any action taken by the Partnership Representative in connection with audits of the Company under the applicable law will, to the extent permitted by law, be binding on the Members.]

## ARTICLE X

## DISSOLUTION AND LIQUIDATION

**10.1    Dissolution**. Subject to the Company's Purpose, the Company shall dissolve, and its affairs shall be wound up on the soonest practicable date but no later than ninety (90) days after the first to occur of the following events:

      (a)    the date on which the Class A Member decides to dissolve the Company, which such date shall be after the later of (i) the date on which the Minimum TopCo Distribution has been effected and (ii) the date on which a Disposition Event has occurred, and in any case not before the dissolution and winding up of NewCo; or

      (b)    the date on which the Bankruptcy Court enters an order approving such dissolution and such order becomes a Final Order.

**10.2    Liquidation and Termination**. On dissolution of the Company, the Board shall act as liquidator or may appoint one or more representatives to act as liquidator. The liquidators shall prepare or cause to be prepared a statement setting forth the Assets and liabilities of the Company as of the date of dissolution, a copy of which statement shall be furnished to the Members. The liquidators shall proceed diligently to wind up the affairs of the Company as promptly as possible, but in an orderly and businesslike and commercially reasonable manner. The costs of liquidation shall be borne as a Company expense. The liquidators shall pay, satisfy or discharge from Company funds all of the debts, liabilities and obligations of the Company (including all expenses incurred in liquidation) or otherwise make adequate provision for payment and discharge thereof (including the establishment of a cash fund for contingent or unmatured liabilities or obligations of the Company or the Company's Subsidiaries arising out of or in connection with the Company or the Company's Subsidiaries in such amount and for such term as the liquidators may reasonably determine) and shall promptly distribute the remaining Assets to the Members in the applicable proportions set forth on Exhibit B. Such cash fund may, in the discretion of the liquidator, be paid over to a national title company or bank or other financial institution selected by them and authorized to conduct business as an escrowee to be held by such national title company or bank or financial institution as escrowee for the purposes of disbursing such cash fund to satisfy the liabilities and obligations described above, and at the expiration of such period as the liquidator may reasonably deem advisable, distributing any remaining balance to the Members in the applicable proportions set forth on Exhibit B. The liquidators may distribute Assets of the Company in kind only with the consent of the Class A Members. A reasonable time shall be allowed for the orderly winding up of the affairs of the

- 21 -

Company pursuant to this <u>Section 10.2</u> in order to minimize any losses otherwise attendant upon such winding up.

**10.3** **Cancellation of Certificate**. On completion of the winding up of the Company as described in <u>Section 10.2</u> and the distribution of the Company's Assets as provided herein, the Company shall be terminated (and the Company shall not be terminated prior to such time), and the Board (or such other Person or Persons as the Delaware Act may require or permit) shall file a certificate of cancellation with the Secretary of State of the State of Delaware, cancel any other filings made pursuant to this Agreement that are or should be canceled, and take such other actions as may be necessary to terminate the Company. The Company shall be deemed to continue in existence for all purposes of this Agreement until it is terminated pursuant to this <u>Section 10.3</u>.

## ARTICLE XI

## GENERAL PROVISIONS

**11.1** **Amendments**. Except as otherwise provided in this Section 11.1, this Agreement may be amended or modified only by NOAT; provided, however, that Tribe Opioid LLC's consent shall be required for any amendment or modification which would purport to adversely impact the Distributions to, or confer additional obligations or liabilities upon, Tribe Opioid LLC. Notwithstanding the foregoing, the Board may amend this Agreement from time to time without the consent, approval or other authorization of any other Person, to: (i) make a change that is necessary to cure any ambiguity, to correct or supplement any provision in this Agreement that would be inconsistent with any other provision in this Agreement, or to make any other provision with respect to matters or questions arising under this Agreement that will not be inconsistent with the provisions of this Agreement; (ii) make a change that is necessary to satisfy any requirements, conditions or guidelines contained in any opinion, directive, order, statute, ruling or regulation of any federal, state or foreign governmental entity; (iii) make a change that is required or contemplated by this Agreement; or (iv) make a change in any provision of this Agreement that requires any action to be taken by or on behalf of the Board or the Company pursuant to applicable Delaware law if the provisions of applicable Delaware law are amended, modified or revoked so that the taking of such action is no longer required. Notwithstanding the foregoing, this Agreement may not be modified in a manner that is inconsistent with the Plan or the Confirmation Order absent an order of the Bankruptcy Court approving such modification. The Board shall provide notice to the Members of any proposed modification, to this Agreement including, for the avoidance of doubt, any proposed modification that does not require the consent of the Members hereunder, not less than ten (10) Business Days before such modification becomes effective, if practicable. For the avoidance of doubt, any of amendment of this Agreement shall be subject to the limitations set forth in the Governance Covenants.

**11.2** **No Return of Distributions.** It is the intent of the Members that no Distribution to any Member pursuant to <u>Article V</u> hereof shall be deemed a return of money paid or distributed in violation of the Delaware Act. The payment of any such Distribution to a Member shall be deemed to be a compromise within the meaning of the Delaware Act, and the Member receiving any such Distribution shall not be required to return it, in whole or in part, to any Person.

- 22 -

**11.3    Remedies Cumulative**. The rights and remedies under this Agreement are cumulative and are in addition to and not in substitution for any other rights and remedies available at law or in equity or otherwise.

**11.4    Successors and Assigns**. All covenants and agreements contained in this Agreement shall bind and inure to the benefit of the parties hereto and their respective heirs, executors, administrators, successors, legal representatives, and permitted assigns, whether so expressed or not.

**11.5    Severability**. Whenever possible, each provision of this Agreement will be interpreted in such manner as to be effective and valid under applicable law, but if any provision of this Agreement is held to be invalid, illegal, or unenforceable in any respect under any applicable law or rule in any jurisdiction, such invalidity, illegality, or unenforceability will not affect any other provision or the effectiveness or validity of any provision in any other jurisdiction, and this Agreement will be reformed, construed, and enforced in such jurisdiction as if such invalid, illegal, or unenforceable provision had never been contained herein.

**11.6    Applicable Law; Jurisdiction**. This Agreement shall be governed by, and construed in accordance with, the laws of the State of Delaware, without giving effect to any choice of law or conflict of law rules or provisions (whether of the State of Delaware or any other jurisdiction) that would cause the application of the laws of any jurisdiction other than the State of Delaware. The Bankruptcy Court shall have continuing jurisdiction over the Company, *provided* that, the courts of the State of Delaware, including any federal court located therein, shall also have jurisdiction over the Company; *provided further*, that notwithstanding the foregoing, the Board shall have power and authority to bring any action in any court of competent jurisdiction (including the Bankruptcy Court) to prosecute any Causes of Action held by the Company.

**11.7    Addresses and Notices**. All notices, demands, or other communications to be given or delivered under or by reason of the provisions of this Agreement shall be in writing and shall be deemed to have been given or made (a) when delivered personally to the recipient, (b) one (1) Business Day after delivery to a reputable express courier service (charges prepaid), or (c) on the Business Day telecopied or electronically transmitted to the recipient if by telecopy or Electronic Transmission before 5:00 p.m. Eastern Time, and otherwise on the next Business Day. Such notices, demands, and other communications shall be sent to the address for such recipient set forth in the Company's books and records, or to such other address or to the attention of such other person as the recipient party has specified by prior written notice to the sending party. Any notice to the Board or the Company shall be deemed given if received by the Board at the principal office of the Company designated pursuant to Section 2.4.

**11.8    No Reliance by Third Parties**. Except as otherwise set forth herein, none of the provisions of this Agreement shall be for the benefit of, or enforceable by, any Person other than the Company and the Members, including any creditor who makes a loan to the Company (except, and only to the extent, pursuant to the terms of a separate agreement executed by the Company in favor of such creditor) and no creditor or other Person (other than the Members and the Company) shall obtain any rights under this Agreement or by reason of this Agreement, or shall be able to make any claim under this Agreement in respect of any debts, liabilities,

- 23 -

commitments or obligations against the Company or the Members, it being understood that the Covered Persons shall be intended third-party beneficiaries of <u>Article VII</u>.

**11.9    <u>No Implied Waivers</u>**. No failure by any party to insist upon the strict performance of any covenant, duty, agreement, or condition of this Agreement or to exercise any right or remedy consequent upon a breach thereof shall constitute a waiver of any such breach or any other covenant, duty, agreement, or condition.

**11.10    <u>Entire Agreement</u>**. The Governing Documents and the other documents expressly referred to in this Agreement embody the complete agreement and understanding among the parties and supersede and preempt any prior understandings, agreements, or representations by or among the parties, written or oral, which may have related to the subject matter of this Agreement in any way.

**11.11    <u>Delivery by Electronic Transmission</u>**. This Agreement may be executed in counterparts, each of which shall be deemed an original, but all of which together shall be deemed to be one and the same agreement. A signed copy of this Agreement or any amendment hereto delivered by facsimile or other Electronic Transmission (including e-mail of a "pdf" signature), shall be treated in all manner and respects as an original agreement or instrument and shall be considered to have the same binding legal effect as if it were the original signed version thereof delivered in person.

**11.12    <u>Relationship to Plan</u>**. This Agreement is being executed pursuant to and in accordance with the Plan to aid in the implementation of the Plan. To the extent that there is conflict between the provisions of this Agreement, the provisions of the Plan, or the Confirmation Order, each document shall have controlling effect in the following rank order: (1) the Confirmation Order; (2) the Plan; and (3) this Agreement.

**[Remainder of page intentionally left blank**

**Signature pages follow.]**

The undersigned have executed or caused to be executed on their behalf this Limited Liability Agreement as of the date first written above.

**MEMBERS:**

**National Opioid Abatement Trust**

By: _____
Name: _____
Title: _____

**Tribal Opioid Abatement Fund, LLC**

By: _____
Name: _____
Title: _____

# EXHIBIT A

## MEMBERS

| Name | Address | Class A Interests | Class B Interests |
|------|---------|-------------------|-------------------|
| National Opioid Abatement Trust | | [97] | 0 |
| Tribal Opioid Abatement Fund, LLC | | 0 | [3] |
| **Total:** | **--** | **[97]** | **[3]** |

## EXHIBIT B

## WATERFALL

*first*, 100% to NOAT until the aggregate cumulative amount of Public Creditor Trust Distributions hereunder and distributions to TAFT and NOAT under the MDT Trust Agreement equals $1 billion;

*second*, 2.935% to Tribe Opioid LLC and 97.065% to NOAT until the aggregate cumulative amount of Public Creditor Trust Distributions equals $3 billion;

*third*, 2.8125% to Tribe Opioid LLC and 97.1875% to NOAT until the aggregate cumulative Public Creditor Trust Distributions equals $5 billion; and

*thereafter*, 3% to Tribe Opioid LLC and 97% to NOAT.

**For the avoidance of doubt, all amounts and computations set forth in this Exhibit B shall be determined by taking into account all Public Creditor Trust Distributions made to TAFT, Tribe Opioid LLC or NOAT from the Debtors, TopCo or the Master Distribution Trust, including without limitation the Initial Public Creditor Trust Distributions.**

# EXHIBIT Y

**NewCo Credit Support Agreement**

## CREDIT SUPPORT AGREEMENT

THIS CREDIT SUPPORT AGREEMENT (this "Agreement"), dated as of [____], 2021 (the "Effective Date"), is entered into by and among each of (i) [NewCo], a Delaware limited liability company formed in accordance with Section 5.4 of the Plan (as defined herein) and the NewCo Operating Agreement ("NewCo"), (ii) [TopCo], a Delaware limited liability company formed in accordance with Section 5.5 of the Plan and the TopCo Operating Agreement ("TopCo" and, together with NewCo, the "Credit Support Obligors"), and (iii) the Master Disbursement Trust, a Delaware statutory trust established in accordance with Section 5.6 of the Plan and the MDT Agreement (the "Master Disbursement Trust" and, collectively with the Credit Support Obligors, the "Parties" and, each, a "Party").

## RECITALS

WHEREAS, on September 15, 2019 (the "Petition Date"), each of Purdue Pharma Inc., Purdue Pharma, L.P. ("PPLP") and PPLP's wholly owned direct and indirect subsidiaries (collectively, the "Debtors") filed a voluntary petition for relief under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code") in the United States Bankruptcy Court for the Southern District of New York (the "Bankruptcy Court"), thereby commencing the chapter 11 cases jointly administered by the Bankruptcy Court under the caption *In re Purdue Pharma L.P., et al.*, Case No. 19-23649 (RDD) (the "Chapter 11 Cases");

WHEREAS, on June 3, 2021, the Debtors filed the *Fifth Amended Joint Chapter 11 Plan of Reorganization of Purdue Pharma L.P. and Its Affiliated Debtors* [D.I. 2982] (including all appendices, exhibits, schedules and supplements thereto, as the same may be altered, amended or modified from time to time in accordance with the Bankruptcy Code, the Bankruptcy Rules and the terms thereof, the "Plan")[1] with the Bankruptcy Court;

WHEREAS, on [●], the Debtors and the Shareholder Payment Parties entered into the Shareholder Settlement Agreement, pursuant to which, among other things, the Shareholder Payment Parties shall be obligated to pay the Shareholder Settlement Amount in accordance with the terms thereof;

WHEREAS, on [●], 2021, the Bankruptcy Court entered the [*Order Confirming the Fifth Amended Joint Chapter 11 Plan of Reorganization of Purdue Pharma L.P. and Its Affiliated Debtors*] [D.I. [●]] confirming the Plan (the "Confirmation Order");

WHEREAS, in accordance with the Plan and the Confirmation Order, PPLP and NewCo have entered into the Transfer Agreement, dated as of the Effective Date (the "NewCo Transfer Agreement"), pursuant to which the NewCo Transferred Assets were transferred to NewCo;

WHEREAS, in accordance with the Plan and the Confirmation Order, (i) the Debtors and the MDT Trustees have entered into the Master Disbursement Trust Agreement, dated as of the

---

[1] Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to such terms in the Plan.

Effective Date (the "MDT Agreement"), pursuant to which the MDT Transferred Assets were transferred to the Master Disbursement Trust, and (ii) all liability of the Debtors and the other Protected Parties for any and all Channeled Claims was channeled to the Master Disbursement Trust, pursuant to the Channeling Injunction, solely for the purpose of effectuating the Master TDP, pursuant to which (A) each Channeled Claim shall either be automatically channeled to and assumed exclusively by a Creditor Trust or otherwise Disallowed and released in full and (B) in exchange for the assumption of the applicable Channeled Claims, the Creditor Trusts shall receive the distributions set forth in the Master TDP;

WHEREAS, in accordance with the Plan and the Confirmation Order, (i) TopCo holds 100% of the NewCo Interests, and (ii) 100% of the limited liability company interest in TopCo are held by NOAT and Tribal Opioid Abatement Fund, LLC ("Tribe Opioid LLC");

WHEREAS, in accordance with the Plan, (i) NewCo is obligated under certain circumstances set forth therein to make Cash payments to the Master Disbursement Trust in accordance with Section 5.2(d)(iii)(A) and (f)(ii) of the Plan and (ii) NewCo and TopCo are each obligated to pay over MDT Distributable Sale Proceeds to the Master Disbursement Trust in accordance with Section 5.2(d)(iii)(B) of the Plan; and

WHEREAS, in accordance with the Plan and as more fully set forth in this Agreement, the Master Disbursement Trust is required to repay amounts received from the Credit Support Obligors under this Agreement to the extent set forth in Section 5.2(f)(i)(D) of the Plan.

## AGREEMENT

NOW, THEREFORE, pursuant to the Confirmation Order, and in consideration of the foregoing and upon the terms and subject to the mutual covenants and conditions set forth herein, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties agree as follows:

ARTICLE I
INTERPRETIVE PROVISIONS

Section 1.01.  Capitalized Terms. Capitalized terms used herein and not defined have the meanings ascribed to such terms in the Plan.

Section 1.02.  Interpretation. Unless otherwise specified, all section references in this Agreement are to the respective section in this Agreement, as the same may be amended, waived, or modified from time to time in accordance with the terms hereof. The words "herein," "hereof," or "hereunder," and other words of similar import refer to this Agreement as a whole and not to any particular section, subsection, or clause contained therein and have the same meaning as "in the Agreement," "of the Agreement," and "under the Agreement," respectively. The words "includes" and "including" are not limiting. The headings in this Agreement are for convenience of reference only and shall not limit or otherwise affect the provisions hereof. For purposes herein: (a) in the appropriate context, each term, whether stated in the singular or plural, shall include both the singular and the plural, and pronouns stated in the masculine, feminine, or neuter gender shall include the masculine, feminine, and the neuter gender; (b) any reference herein to a contract, lease, instrument, release, indenture, or other agreement or

2

document being in a particular form or on particular terms and conditions means that the reference document shall be substantially in that form or substantially on those terms and conditions; (c) any reference herein to a contract, lease, instrument, release, indenture, or other agreement or document shall be construed as referring to such contract, lease, instrument, release, indenture, or other agreement or document as from time to time amended, restated, amended and restated, refinanced, extended, supplemented or otherwise modified (subject to any restrictions on such amendments, restatements, amendments and restatements, refinancing, extensions, supplements or modifications set forth in this Agreement); (d) the rules of construction set forth in section 102 of the Bankruptcy Code shall apply; (e) all references to "$" and dollars shall be deemed to refer to United States currency unless otherwise specifically provided; and (f) any rule of construction to the effect that ambiguities are to be resolved against the drafting party shall not be applied in the construction or interpretation of this Agreement. No prior draft of this Agreement nor any course of performance or course of dealing shall be used in the interpretation or construction of this Agreement. No parol evidence shall be introduced in the construction or interpretation of this Agreement unless the ambiguity or uncertainty in issue is plainly discernable from a reading of this Agreement without consideration of any extrinsic evidence.

## ARTICLE II
## GUARANTEE OF OBLIGATIONS OF THE MASTER DISBURSEMENT TRUST

Section 2.01.   NewCo Available Cash Payment.

(a)     In accordance with Section 5.2(d)(iii)(A) of the Plan, within five (5) Business Days following the receipt by NewCo from the MDT Trustees of notice of the commencement of an MDT Reserve Period and, in accordance with Sections 5.2(d)(iii)(A) and 5.2(f)(ii) of the Plan, on each NewCo Distribution Date thereafter, for so long as such MDT Reserve Period is continuing, NewCo shall pay to the Master Disbursement Trust all NewCo Available Cash up to an aggregate amount necessary to ensure that the MDT Operating Reserve and the MDT Claims Reserve are fully funded at the amounts required as of that date as set forth in the Plan and the MDT Agreement.

(b)     The amounts required to be paid by NewCo to the Master Disbursement Trust under this Section 2.01 shall be limited to the extent of NewCo Available Cash; *provided* that in the event there is a deficiency of funding in the MDT Claims Reserve for a period of eighteen (18) months during the continuation of an MDT Reserve Period, the Master Disbursement Trust shall be entitled to accelerate its claims under this Agreement and exercise remedies in accordance with Section 3.15 of this Agreement.

Section 2.02.   MDT Distributable Sale Proceeds.

(a)     In accordance with Section 5.2(d)(iii)(B) of the Plan, regardless of whether there is an MDT Reserve Period in effect, until the payment in full in Cash of the MDT Claims, TopCo and NewCo shall pay to the Master Disbursement Trust an amount equal to one hundred percent (100%) of the MDT Distributable Sale Proceeds within five (5) Business Days after the receipt thereof; *provided* that (i) MDT Distributable Sale Proceeds of less than ten million dollars ($10,000,000) (in the aggregate for TopCo and NewCo) shall be carried forward and

accumulated and no distributions to the Master Disbursement Trust on account thereof shall be required until the aggregate amount of the accumulated MDT Distributable Sale Proceeds so received following the Effective Date equals or exceeds such amount and (ii) the amounts payable to the Master Disbursement Trust under this Section 2.02(a) shall not exceed the aggregate outstanding amount owed on account of the MDT Claims (regardless of whether some amounts are not yet due and owing).

(b)     In accordance with Section 5.2(d)(iii)(B) of the Plan, any non-Cash proceeds in respect of the sale of any Asset of TopCo or any of its Subsidiaries shall be held and not distributed by TopCo or such Subsidiary, as applicable, until the payment in full of the MDT Claims or the disposition of such non-Cash proceeds for Cash; *provided* that, upon such disposition of such non-Cash proceeds for Cash, such Cash shall be deemed MDT Distributable Sale Proceeds and such Cash shall be subject to and applied in accordance with this Section 2.02.

(c)     The Master Disbursement Trust shall apply all amounts received under this Section 2.02 in accordance with Section 5.2(d)(iv)(B) of the Plan and the MDT Agreement.

Section 2.03.   MDT Repayment Obligation.

(a)     Subject to Section 2.03(b) of this Agreement, on each MDT Distribution Date, in accordance with and subject to the MDT Priority Waterfall specified in Section 5.2(f)(i) of the Plan, the Master Disbursement Trust shall repay to NewCo or TopCo, as applicable, amounts received by the Master Disbursement Trust from NewCo or TopCo, as applicable, pursuant to Section 2.01 or 2.02 of this Agreement; *provided* that NewCo shall promptly make a TopCo Distribution from all such repayments and TopCo shall promptly make Public Creditor Trust Distributions from all such repayments and such TopCo Distributions.

(b)     In accordance with Section 5.2(e)(iv) of the Plan, no repayments under this Agreement shall be due or made by the Master Disbursement Trust (i) if an MDT Reserve Period has commenced and is continuing, unless the Master Disbursement Trust has provided notice to NewCo and TopCo that the MDT Operating Reserve and the MDT Claims Reserve have been fully funded or (ii) if an Escrow Period has commenced and is continuing.

ARTICLE III
MISCELLANEOUS

Section 3.01.   Controlling Document. In the event of any conflict or inconsistency between the terms and provisions of this Agreement and the terms and provisions of the Plan, the terms and provisions of the Plan shall govern and control.

Section 3.02.   Notice. All notices, requests and other communications required or permitted under, or otherwise made in connection with, this Agreement, shall be in writing and shall be deemed to have been duly given (a) when delivered in person, (b) upon confirmation of receipt when transmitted by facsimile transmission, (c) upon receipt after dispatch by registered or certified mail, postage prepaid, (d) on the next Business Day if transmitted by national overnight courier (with confirmation of delivery) or (e) on the date delivered if sent by email (with confirmation of delivery), in each case, addressed as follows:

4

if to TopCo, to:

[          ]

with a copy to (which shall not constitute notice):

[          ]

if to NewCo, to:

[          ]

with a copy to (which shall not constitute notice):

[          ]

if to the Master Disbursement Trust, to:

[          ]

with a copy to (which shall not constitute notice):

[          ]

or to such other address or facsimile number as such party may hereafter specify for the purpose by notice to the other parties hereto. Notices and other communications sent shall be deemed to have been given when received; *provided* that if such notice or other communication is not received during the normal business hours of the recipient, such notice or communication shall be deemed to have been received at the opening of the business on the next Business Day for the recipient. Each of the Parties may change its notice address provided for in this Section 3.02 by notice to the other Parties hereto.

Section 3.03.  Payments Received. All payments made by or on behalf of any of the Parties under this Agreement shall be made without condition or deduction for any counterclaim, defense, recoupment or setoff and shall be made (a) in the case of payments pursuant to Section 2.01 and Section 2.02 to the Master Disbursement Trust, to an account as the Master Disbursement Trust may designate from time to time and (b) in the case of payments pursuant to Section 2.03 to the applicable Credit Support Obligor, to an account as such Credit Support Obligor may designate from time to time, in each case, in U.S. dollars, and in immediately

5

available funds by 11:59 p.m. (New York City time) on the date specified herein. Except as otherwise set forth herein, if any payment to be made by any Party would have come due on a day other than a Business Day, payment shall be due on the next following Business Day.

Section 3.04.  <u>Amendment and Waiver</u>. Any provision of this Agreement may be amended or waived only with the consent of (w) a majority of the MDT Trustees, (x) the Credit Support Obligors, (y) NOAT and (z) until the payment in full of the MDT Claims, a majority in number of the other MDT Beneficiaries (excluding NOAT); provided, however, that the MDT Trustees and the Credit Support Obligors may amend this Agreement by unanimous consent of the MDT Trustees and the Credit Support Obligors from time to time, without the consent, approval or other authorization of any other Person, to make minor modifications or clarifying amendments as necessary to enable the MDT Trustees and the Credit Support Obligors to effectuate the provisions of this Agreement. Notwithstanding the foregoing, no amendment or waiver of any provision of this Agreement shall modify this Agreement in a manner that (a) is inconsistent with the Plan or the Confirmation Order without an order of the Bankruptcy Court (after notice and a hearing) approving such modification, other than to make minor modifications or clarifying amendments by unanimous consent of the MDT Trustees and the Credit Support Obligors as necessary to enable the MDT Trustees and the Credit Support Obligors to effectuate the provisions of this Agreement, (b) would adversely impact the distributions to, or confer additional obligations or liabilities upon, any MDT Beneficiary without the consent of such MDT Beneficiary or (c) would amend or waive this Section 3.04. The MDT Trustees shall provide notice to the MDT Beneficiaries of any proposed amendment or wavier of any provision of this Agreement including, for the avoidance of doubt, any proposed amendment or waiver that does not require the consent of the MDT Beneficiaries hereunder, not less than ten (10) Business Days before such amendment or waiver becomes effective.

Section 3.05.  <u>Assignment</u>. This Agreement and all of the provisions of this Agreement shall be binding upon and inure to the benefit of the Parties and their respective heirs, successors and permitted assigns. Notwithstanding the foregoing, neither this Agreement nor any of the rights, interests or obligations under this Agreement shall be assigned (including by operation of Law) by any Party without the prior written consent of the other Parties. Any attempted assignment or delegation in contravention of this Agreement shall be null and void.

Section 3.06.  <u>Severability</u>. Each provision of this Agreement shall be interpreted in such manner as to be effective and valid under applicable Law. If any provision of this Agreement is held to be invalid, illegal or unenforceable in any respect under any applicable Law in any jurisdiction, such invalidity, illegality or unenforceability will not affect any other provision or the effectiveness or validity of any provision in any other jurisdiction. Should any ruling or illegality, invalidity or unenforceability be obtained, this Agreement will be reformed, construed and enforced in such jurisdiction as if such invalid, illegal or unenforceable provision had never been contained in this Agreement. In addition, if such term or provision could be drawn more narrowly so as not to be illegal, invalid, prohibited or unenforceable in such jurisdiction, it shall be so narrowly drawn, as to such jurisdiction, without invaliding the remaining terms and provisions of this Agreement or affecting the legality, validity or enforceability of such term or provision in any other jurisdiction.

Section 3.07.  Entire Agreement. This Agreement, the Plan and the Confirmation Order constitute the entire agreement between the Parties with respect to the subject matter of this Agreement and supersedes all prior agreements and understandings, both oral and written, between the Parties with respect to the subject matter of this Agreement.

Section 3.08.  Relationship to Plan. This Agreement is being executed pursuant to and in accordance with the Plan to aid in the implementation of the Plan. To the extent that there is conflict between the provisions of this Agreement, the provisions of the Plan, or the Confirmation Order, each document shall have controlling effect in the following rank order: (1) the Confirmation Order; (2) the Plan; and (3) this Agreement.

Section 3.09.  Counterparts. This Agreement may be executed in multiple counterparts and delivered by facsimile or portable document format (.pdf), each of which, when executed, shall be deemed an original, and all of which shall constitute but one and the same instrument binding on all the Parties.

Section 3.10.  No Strict Construction. Notwithstanding the fact that this Agreement has been drafted or prepared by one of the Parties, each Party confirms that they and their respective counsel have reviewed, negotiated and adopted this Agreement as a joint agreement. As a result, the understanding of the Parties and the language used in this Agreement shall be deemed to be the language chosen by the Parties to express their mutual intent, and no rule of strict construction shall be applied against any Person.

Section 3.11.  Captions. The captions used in this Agreement are for convenience of reference only and do not constitute a part of this Agreement. Consequently, the captions shall not be deemed to limit, characterize or in any way affect any provision of this Agreement, and all provisions of this Agreement shall be enforced and construed as if no such caption or description had been used in this Agreement.

Section 3.12.  Governing Law. This Agreement has been executed and delivered and shall be construed, interpreted and governed pursuant to and in accordance with the laws of the State of New York, without regard to any conflict of laws principles which, if applied, might permit or require the application of the laws of another jurisdiction.

Section 3.13.  Consent to Jurisdiction; Service of Process.

(a)      The Parties hereto agree that any action, litigation or proceeding (each, a "Proceeding") seeking to enforce any provision of, or based on a matter arising out of or in connection with, this Agreement shall be brought in the Bankruptcy Court, and each of the parties hereby irrevocably consents for such purpose to the jurisdiction of the Bankruptcy Court (and of the appropriate appellate courts therefrom) or, in the event Bankruptcy Court does not have or accept such jurisdiction, in any federal court sitting in the Southern District of New York and any appellate court therefrom or, in the event such federal court does not have or accept jurisdiction, a New York State court and any appellate court therefrom in any such Proceeding. Each of the Parties hereto irrevocably waives, to the fullest extent permitted by law, any objection that it may now or hereafter have to the laying of the venue of any such Proceeding in any such court or that any such Proceeding brought in any such court has been brought in an

inconvenient forum. Process in any such Proceeding may be served on any party anywhere in the world, whether within or without the jurisdiction of any such court. Without limiting the foregoing, each Party agrees that service of process on such party as provided in Section 3.02(a), (c) or (d) shall be deemed effective service of process on such party.

(b)     Notwithstanding anything herein to the contrary, the Parties agree that any Proceeding arising under, related to, or in connection with this Agreement, including any action seeking specific performance of any provision of this Agreement or declaratory judgment concerning this Agreement, shall be heard and determined by the Bankruptcy Court as a contested matter under Rule 9014 of the Federal Rules of Bankruptcy Procedure. With respect to such Proceeding, each Party agrees to (i) submit to the jurisdiction of the Bankruptcy Court, (ii) consent to the authority of the Bankruptcy Court to enter final orders or judgments, and (iii) waive and not advance any argument that such dispute is or must be adjudicated as an adversary proceeding governed by Part VII of the Federal Rules of Bankruptcy Procedure or that the Bankruptcy Court is an improper or inconvenient forum or venue. Any party to such Proceeding shall be permitted to request that the Bankruptcy Court adjudicate such dispute on an expedited basis, and all other parties shall consent to such expedited adjudication.

Section 3.14.   WAIVER OF JURY TRIAL. EACH PARTY HERETO HEREBY IRREVOCABLY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY IN ANY LEGAL PROCEEDING DIRECTLY OR INDIRECTLY ARISING OUT OF OR RELATING TO THIS AGREEMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY (WHETHER BASED ON CONTRACT, TORT OR ANY OTHER THEORY). EACH PARTY HERETO (A) CERTIFIES THAT NO REPRESENTATIVE, AGENT OR ATTORNEY OF ANY OTHER PERSON HAS REPRESENTED, EXPRESSLY OR OTHERWISE, THAT SUCH OTHER PERSON WOULD NOT, IN THE EVENT OF LITIGATION, SEEK TO ENFORCE THE FOREGOING WAIVER AND (B) ACKNOWLEDGES THAT IT AND THE OTHER PARTIES HERETO HAVE BEEN INDUCED TO ENTER INTO THIS AGREEMENT BY, AMONG OTHER THINGS, THE MUTUAL WAIVERS AND CERTIFICATIONS IN THIS SECTION.

Section 3.15.   Remedies; Specific Enforcement. The rights and remedies of the Parties shall be cumulative (and not alternative) and not exclusive of any rights, remedies, powers and privileges provided by Law. The Parties agree that irreparable damage would occur if any provision of this Agreement were not performed in accordance with the terms hereof and that the Parties shall be entitled to an injunction or injunctions to prevent breaches of this Agreement or to enforce specifically the performance of the terms and provisions of this Agreement in addition to any other remedy to which they are entitled at law or in equity, under the Plan and under any other documentation entered into in connection with the Plan, in each case without the requirement of posting any bond or other type of security.

[*Remainder of page left intentionally blank*]

IN WITNESS WHEREOF, the Parties have caused this Agreement to be duly executed by their respective authorized officers, representatives or agents, effective as of the Effective Date.

**[NEWCO LLC]**

By: _____
Name:
Title:

**[TOPCO LLC]**

By: _____
Name:
Title:

**MASTER DISBURSEMENT TRUST**

By: _____
Name:
Title:

## EXHIBIT Z

**PAT Agreement**

**TRUST AGREEMENT OF**

**PLAN ADMINISTRATION TRUST**

**DATED AS OF [●], 2021**

**BY AND AMONG**

**[●] AS PLAN ADMINISTRATION TRUSTEE,**

**[●] AS RESIDENT TRUSTEE,**

**and**

**THE DEBTOR PARTIES HERETO**

# TABLE OF CONTENTS

**Article I**       **Declaration of Trust** .......................................................................................**3**

Section 1.01     Creation of Trust ...............................................................................3
Section 1.02     Purpose of Plan Administration Trust...............................................3
Section 1.03     Vesting of PAT Assets .......................................................................3
Section 1.04     Appointment and Acceptance of Plan Administration Trustee..........5
Section 1.05     No Reversion to Debtors ....................................................................5
Section 1.06     Relationship to Plan ...........................................................................5
Section 1.07     Incidents of Ownership ......................................................................5

**Article II**      **Trust Beneficiaries** ...............................................................................**6**

Section 2.01     Transferability of Distribution Rights.................................................6
Section 2.02     Limited Liability .................................................................................6

**Article III**     **Powers and Trust Administration** .......................................................**6**

Section 3.01     Powers of the Plan Administration Trustee .........................................6
Section 3.02     Books and Records..............................................................................8
Section 3.03     Cooperation with the Master Disbursement Trust and the Creditor Trusts ........8

**Article IV**      **Duration and Termination of the Plan Administration Trust**......................**9**

Section 4.01     Duration .............................................................................................9
Section 4.02     Dissolution of the Plan Administration Trust ....................................9
Section 4.03     Continuance of the Plan Administration Trust for Winding Up ..........9

**Article V**       **Accounts, Investments and Payments** ................................................**9**

Section 5.01     Accounts.............................................................................................9
Section 5.02     Wind-Up Reserve..............................................................................10
Section 5.03     PAT Distribution Accounts...............................................................10
Section 5.04     Priority Claims Reserve ....................................................................10
Section 5.05     Disputed Claims Reserve ..................................................................10
Section 5.06     Disputed Cure Claims Reserve .........................................................11
Section 5.07     Surplus Reserved Cash .....................................................................11
Section 5.08     Investment of Plan Administration Trust Monies.............................11

**Article VI**      **Tax Matters** ........................................................................................**11**

Section 6.01     U.S......................................................................................................11
Section 6.02     Tax Returns and Payments................................................................12

**Article VII**     **Distributions** ......................................................................................**13**

Section 7.01     Distributions Generally ....................................................................13

Section 7.02    Disputed Payments ..........................................................................13
Section 7.03    Disbursing Agent ............................................................................13
Section 7.04    Records...........................................................................................13
Section 7.05    Attorneys' Fees and Expenses of Directors, Officers, Employees and Agents 13

**Article VIII    Plan Administration Trustee and Resident Trustee ....................................14**

Section 8.01    Plan Administration Trustee ...........................................................14
Section 8.02    Term of Service of the Plan Administration Trustee .....................14
Section 8.03    Appointment of Successor Plan Administration Trustee ................15
Section 8.04    Compensation and Expenses of the Plan Administration Trustee and Plan Administration Professionals ..................................................15
Section 8.05    Duties of the Plan Administration Trustee.....................................16
Section 8.06    Resident Trustee..............................................................................16

**Article IX    Reliance, Liability and Indemnification.................................................18**

Section 9.01    Reliance by the Plan Administration Trustee .................................18
Section 9.02    Nonliability of Plan Administration Trustee...................................18
Section 9.03    Exculpation .....................................................................................19
Section 9.04    Limitation of Liability.....................................................................19
Section 9.05    Indemnity ........................................................................................19

**Article X    Miscellaneous Provisions .......................................................................20**

Section 10.01    Actions Taken on Other Than a Business Day ...............................20
Section 10.02    Governing Law................................................................................20
Section 10.03    Jurisdiction.....................................................................................20
Section 10.04    Severability.....................................................................................20
Section 10.05    Notices............................................................................................20
Section 10.06    Headings..........................................................................................21
Section 10.07    Entire Trust Agreement...................................................................21
Section 10.08    Amendment and Waiver .................................................................21
Section 10.09    Confidentiality ...............................................................................21
Section 10.10    Meanings of Other Terms ...............................................................22
Section 10.11    Counterparts ...................................................................................22

ii

## PLAN ADMINISTRATION TRUST AGREEMENT

THIS PLAN ADMINISTRATION TRUST AGREEMENT (this "Trust Agreement"), dated as of [●], 2021 (the "Effective Date"), is entered into by and among each of (i) Purdue Pharma L.P., Purdue Pharma Inc., Purdue Transdermal Technologies L.P., Purdue Pharma Manufacturing L.P., Purdue Pharmaceuticals L.P., Imbrium Therapeutics L.P., Adlon Therapeutics L.P., Greenfield BioVentures L.P., Seven Seas Hill Corp., Ophir Green Corp., Purdue Pharma of Puerto Rico, Avrio Health L.P., Purdue Pharmaceutical Products L.P., Purdue Neuroscience Company, Nayatt Cove Lifescience Inc., Button Land L.P., Rhodes Associates L.P., Paul Land Inc., Quidnick Land L.P., Rhodes Pharmaceuticals L.P., Rhodes Technologies, UDF LP, SVC Pharma LP and SVC Pharma Inc. (each, a "Debtor" and, collectively, the "Debtors"), as debtors and debtors-in-possession, (ii) [●], as Plan Administration Trustee (together with any successor or additional trustee appointed under the terms of this Trust Agreement, the "Plan Administration Trustee") and (iii) [●], as the Delaware resident trustee (together with any successor Delaware resident trustee appointed under the terms of this Trust Agreement, the "Resident Trustee"), for the purpose of forming a statutory trust under and pursuant to the provisions of the Delaware Statutory Trust Act, 12 Del. C. §§ 3801, et seq. (as the same may from time to time be amended, or any successor statute, the "Trust Act") as contemplated by the Plan (the "Plan Administration Trust").

## RECITALS

WHEREAS, on September 15, 2019 (the "Petition Date"), each of the Debtors filed a voluntary petition for relief under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code") in the United States Bankruptcy Court for the Southern District of New York (the "Bankruptcy Court"), thereby commencing the chapter 11 cases jointly administered by the Bankruptcy Court under the caption *In re Purdue Pharma L.P., et al.*, Case No. 19-23649 (RDD) (the "Chapter 11 Cases");

WHEREAS, on June 3, 2021, the Debtors filed the *Fifth Amended Joint Chapter 11 Plan of Reorganization of Purdue Pharma L.P. and Its Affiliated Debtors* [D.I. 2982] (including all appendices, exhibits, schedules and supplements thereto, as the same may be altered, amended or modified from time to time in accordance with the Bankruptcy Code, the Bankruptcy Rules and the terms thereof, the "Plan")[1] with the Bankruptcy Court;

WHEREAS, on [●], the Debtors and the Shareholder Payment Parties entered into the Shareholder Settlement Agreement, pursuant to which, among other things, the Shareholder Payment Parties shall be obligated to pay the Shareholder Settlement Amount in accordance with the terms thereof;

WHEREAS, on [●], 2021, the Bankruptcy Court entered the [*Order Confirming the Fifth Amended Joint Chapter 11 Plan of Reorganization of Purdue Pharma L.P. and Its Affiliated Debtors*] [D.I. [●]] confirming the Plan (the "Confirmation Order");

---

[1] Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to such terms in the Plan.

WHEREAS, in accordance with the Plan and the Confirmation Order, PPLP and [NEWCO, LLC], a limited liability company organized under the laws of the State of Delaware ("NewCo"), have entered into the Transfer Agreement, dated as of the Effective Date (the "NewCo Transfer Agreement"), pursuant to which the NewCo Transferred Assets were transferred to NewCo;

WHEREAS, in accordance with the Plan and the Confirmation Order, (i) the Debtors and the MDT Trustees have entered into the Master Disbursement Trust Agreement, dated as of the Effective Date (the "MDT Agreement"), pursuant to which the MDT Transferred Assets were transferred to the Master Disbursement Trust, and (ii) all liability of the Debtors and the other Protected Parties for any and all Channeled Claims was channeled to the Master Disbursement Trust, pursuant to the Channeling Injunction, solely for the purpose of effectuating the Master TDP, pursuant to which (A) each Channeled Claim shall either be automatically channeled to and assumed exclusively by a Creditor Trust or otherwise Disallowed and released in full and (B) in exchange for the assumption of the applicable Channeled Claims, the Creditor Trusts shall receive the distributions set forth in the Master TDP;

WHEREAS, the Plan provides for, among other things, the creation of a Plan Administration Trust on or prior to the Effective Date;

WHEREAS, the purposes of the Plan Administration Trust are, among other things, to (i) administer Claims against the Debtors (other than Channeled Claims) and make Distributions to Holders of Allowed Claims (other than Channeled Claims) against the Debtors that are entitled to a Distribution from the Plan Administration Trust in accordance with the Plan and this Trust Agreement (Holders of such Allowed Claims, the "Trust Beneficiaries") and (ii) administer the Plan;

WHEREAS, the Plan provides for NewCo (and any purchaser of, or successor to, NewCo) to satisfy any deficiency of funding in the Wind-Up Reserve held by the Plan Administration Trust;

WHEREAS, the Plan provides for the Plan Administration Trust to reimburse certain fees and expenses incurred by current and former directors, officers, employees and authorized agents of the Debtors (other than Sackler Family Members) (collectively, the "Reimbursement Parties") from a reserve (the "Director and Employee Escrow Account") established by the Debtors, and for NewCo (and, at any time after a sale of all or substantially all Assets of or Interests in NewCo, the Master Disbursement Trust) to fund certain additional amounts into such Director and Employee Escrow Account from time to time in accordance with the Plan; and

WHEREAS, the Plan Administration Trust was established and is effective for the benefit of the Trust Beneficiaries.

## AGREEMENT

NOW, THEREFORE, pursuant to the Confirmation Order, and in consideration of the mutual covenants and agreements hereinafter set forth and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto agree as follows:

## ARTICLE I
## DECLARATION OF TRUST

Section 1.01   <u>Creation of Trust</u>. The Debtors and the Plan Administration Trustee, pursuant to the Plan and the Confirmation Order, and in accordance with the applicable provisions of the Bankruptcy Code, hereby create the Plan Administration Trust, which shall bear the name "Plan Administration Trust." In connection with the exercise of the Plan Administration Trustee's power hereunder, the Plan Administration Trustee may use this name or such variation thereof as the Plan Administration Trustee reasonably sees fit. It is the intention of the parties hereto that the Plan Administration Trust created hereby constitutes a statutory trust under the Trust Act and that the Confirmation Order, the Plan and this Trust Agreement, constitute the governing instruments of the Plan Administration Trust.

Section 1.02   <u>Purpose of Plan Administration Trust</u>. The purpose of the Plan Administration Trust is to carry out the duties of the Plan Administration Trust as set forth in the Plan and this Trust Agreement on behalf, and for the benefit, of the Trust Beneficiaries, including to liquidate, convert to Cash and distribute the PAT Assets, with no objective to continue or engage in the conduct of a trade or business, except to the extent reasonably necessary to, and consistent with, the liquidating purpose of the Plan Administration Trust. The Plan Administration Trust shall, in each case in accordance with the Plan and this Trust Agreement, (a) hold, manage, sell and invest the PAT Assets for the benefit of Holders of Allowed Claims (other than Channeled Claims); (b) administer, process, resolve and liquidate Claims (other than Channeled Claims), including through the prosecution and resolution of objections to Disputed Claims (other than Channeled Claims); (c) hold and maintain the PAT Reserves and the PAT Distribution Account and maintain the Professional Fee Escrow Account and the Director and Employee Escrow Account; and (d) make Distributions to Holders of Allowed Claims (other than Channeled Claims) and other payments from the Plan Administration Trust, the Professional Fee Escrow Account and the Director and Employee Escrow Account in accordance with the Plan.

Section 1.03   <u>Vesting of PAT Assets.</u>

(a)   On the Effective Date, pursuant to Section 5.3(b) of the Plan and in accordance with this Trust Agreement, the PAT Assets shall be irrevocably transferred to and vest in the Plan Administration Trust free and clear of all Claims, Interests, Liens, other encumbrances and liabilities of any kind.

(b)   In accordance with the Plan, the PAT Assets shall consist of:

(i)   the Wind-Up Reserve, the Disputed Claims Reserves, the Disputed Cure Claims Reserve and the Priority Claims Reserve (collectively, the "<u>PAT Reserves</u>"), in each case in the amounts set forth on <u>Schedule A</u> to this Trust Agreement;

(ii)   the PAT Distribution Accounts;

(iii)   the Retained Causes of Action relating solely to, and only to the extent necessary for, the administration of Claims against the Debtors (other than Channeled Claims), the enforcement of the Plan Administration Trust's

3

rights and other responsibilities of the Plan Administration Trust; *provided* that no Retained Causes of Action against Excluded Parties shall constitute PAT Assets, except as necessary to object to and resolve any Disputed Claims held by an Excluded Party;

(iv)    all Excluded Privileged Materials and all other documents, books and records of the Debtors that are Excluded Assets; *provided* that any such documents that were produced to the Debtors by Shareholder Released Parties in connection with Purdue Legal Matters shall continue to remain subject to the terms of the Protective Order and any order of the Bankruptcy Court or provision of this Plan affording confidentiality protections to such documents, unless such documents are included in the Public Document Repository in accordance with the Plan and the Shareholder Settlement Agreement; and

(v)    all Purdue Insurance Rights in respect of any Purdue Insurance Policy (other than an MDT Insurance Policy) to the extent such Purdue Insurance Policy provides coverage for any Claim for which the holder thereof is entitled to payment from the Plan Administration Trust (the "PAT Insurance Rights").

(c)    Pursuant to Section 5.11(a) of the Plan, the Plan Administration Trustee shall have the right to retain copies of all documents, books and records transferred to NewCo and NewCo shall permit the Plan Administration Trustee and its counsel and representatives to have full access to such transferred documents, books and records.

(d)    Pursuant to Section 5.11(c) of the Plan, the transfer to the Plan Administration Trust of information and documents, including books and records, in accordance with Section 5.11(a) of the Plan shall not result in the destruction or waiver of any applicable Privileges. Further, the transfer and/or vesting of any privileges shall occur solely in accordance with, and be subject in all respects to, Section 5.11(c) of the Plan, which is incorporated herein by reference.

(e)    The Debtors shall execute any documents or other instruments and shall take all other steps as the Plan Administration Trustee reasonably requests to reflect the transfer and assignment of the PAT Assets to the Plan Administration Trust in accordance with the Plan, the Confirmation Order and this Trust Agreement. Upon the transfer of the PAT Assets to the Plan Administration Trust, the Debtors shall have no interest in or with respect to the PAT Assets or the Plan Administration Trust. Upon delivery of the PAT Assets to the Plan Administration Trust, the Debtors and their predecessors, successors and assigns shall be released from all liability with respect to the delivery thereof and shall have no reversionary or further interest in or with respect to the PAT Assets or the Plan Administration Trust.

(f)    The transfer of the PAT Assets shall be exempt from any stamp, real estate transfer, mortgage reporting, sales, use or other similar tax, pursuant to section 1146(a) of the Bankruptcy Code.

(g)    The Plan Administration Trust shall be funded with (i) the PAT Assets, including any proceeds thereof and (ii) any amounts, if applicable, received from NewCo to the extent of any deficiency of funding in the Wind-Up Reserve after the Effective Date.

(h)    The PAT Assets and all other Assets held from time to time by the Plan Administration Trust under this Trust Agreement and any earnings, including interest, on any of the foregoing shall be held and be applied by the Plan Administration Trustee solely in accordance with the terms of this Trust Agreement, the Plan and the Confirmation Order for the benefit of the Trust Beneficiaries, subject to the covenants, conditions and terms set forth in this Trust Agreement.

Section 1.04    Appointment and Acceptance of Plan Administration Trustee. Upon the occurrence of the Effective Date, the initial Plan Administration Trustee identified in Section 8.01 hereof shall be appointed to serve as trustee of the Plan Administration Trust pursuant to sections 1123(a)(5), (a)(7) and (b)(3)(B) of the Bankruptcy Code, subject to the terms of the Plan, the Confirmation Order and this Trust Agreement. The Plan Administration Trustee accepts the grant, assignment, transfer, conveyance and delivery to the Plan Administration Trust, on behalf, and for the benefit, of the Holders of Allowed Claims (other than Channeled Claims), by the Debtors of all of their respective right, title and interest in the PAT Assets, upon and subject to the terms and conditions set forth herein, in the Plan and in the Confirmation Order. The Plan Administration Trustee shall have and perform all of the duties, responsibilities, rights and obligations of the Plan Administration Trust set forth in the Plan and this Trust Agreement, as applicable. The Plan Administration Trustee, subject to the terms and conditions of the Plan, the Confirmation Order and this Trust Agreement, shall be authorized to execute, deliver, file or record such documents, contracts, instruments, releases and other agreements, and to take such actions as may be necessary or appropriate, to effectuate and further evidence the terms and conditions of the Plan, any agreement entered into in connection with the Plan and this Trust Agreement. The Plan Administration Trustee's powers are exercisable solely in a manner consistent with, and in furtherance of, the purpose of the Plan Administration Trust and not otherwise. The Plan Administration Trustee shall have the authority to bind the Plan Administration Trust within the limitations set forth in this Trust Agreement, but shall for all purposes hereunder be acting in the capacity as Plan Administration Trustee, and not individually.

Section 1.05    No Reversion to Debtors. In no event shall any part of the PAT Assets revert to or be distributed to any Debtor.

Section 1.06    Relationship to Plan. The principal purpose of this Trust Agreement is to aid in the implementation of the Plan and therefore this Trust Agreement incorporates the provisions of the Plan and the Confirmation Order (which may amend or supplement the Plan). To the extent that there is conflict between the provisions of this Trust Agreement, the provisions of the Plan, or the Confirmation Order, each document shall have controlling effect in the following rank order: (1) the Confirmation Order; (2) the Plan; and (3) this Trust Agreement.

Section 1.07    Incidents of Ownership. Except as otherwise provided in this Trust Agreement, the Trust Beneficiaries shall be the sole beneficiaries of the Plan Administration Trust, and the Plan Administration Trustee shall retain only such incidents of ownership as are necessary

to undertake the actions and transactions authorized herein, in the Plan and in the Confirmation Order, including those powers set forth in this Trust Agreement.

## ARTICLE II
## TRUST BENEFICIARIES

Section 2.01  <u>Transferability of Distribution Rights</u>. Any right to receive a Distribution or other payment from the Plan Administration Trust shall be nontransferable and nonassignable except by will, intestate, succession or operation of law.

Section 2.02  <u>Limited Liability</u>. No provision of this Trust Agreement, the Plan or the Confirmation Order, and no mere enumeration herein of the rights or privileges of any Trust Beneficiary, shall give rise to any liability of such Trust Beneficiary, solely in its capacity as such, whether such liability is asserted by any Debtor, creditor, successor, representative, employee or equity interest holder of any Debtor, or by any other Person. Trust Beneficiaries shall be deemed to receive a Distribution in accordance with the provisions of this Trust Agreement, the Plan and the Confirmation Order, without further obligations or liability of any kind, but subject to the provisions of this Trust Agreement.

## ARTICLE III
## POWERS AND TRUST ADMINISTRATION

Section 3.01  <u>Powers of the Plan Administration Trustee</u>.

(a)  The Plan Administration Trustee shall have all powers necessary to accomplish the purposes of the Plan Administration Trust in accordance with this Trust Agreement, the Plan and the Confirmation Order. The Plan Administration Trustee shall (i) have the power and authority to perform all functions on behalf of the Plan Administration Trust; (ii) undertake all administrative responsibilities as are provided in the Plan and this Trust Agreement, including filing the final monthly operating report (for the month in which the Effective Date occurs) and all subsequent quarterly operating reports and administering the closure of the Chapter 11 Cases, which reports shall be delivered to the Master Disbursement Trust; (iii) be responsible for all decisions and duties with respect to the Plan Administration Trust and the PAT Assets; and (iv) take such other actions as the Plan Administration Trust determines to be necessary or desirable to carry out the purposes of the Plan.

(b)  Without limiting, but subject to, the foregoing paragraph (a), and except as limited in the Plan, this Trust Agreement and by applicable law, the Plan Administration Trustee shall be expressly authorized to:

> (i)  hold and maintain the PAT Reserves and the PAT Distribution Account and maintain the Professional Fee Escrow Account and the Director and Employee Escrow Account;

> (ii)  periodically, until the dissolution of the Plan Administration Trust, replenish the Wind-Up Reserve from Surplus Reserve Cash in other PAT Reserves to the extent deemed necessary by the Plan Administration Trustee

6

to satisfy and pay estimated future expenses of the Debtors' Estates and the Plan Administration Trust;

(iii)    make Distributions to Holders of Allowed Claims against the Debtors (other than Channeled Claims) in accordance with the Plan and this Trust Agreement;

(iv)    determine Distribution Dates, to the extent permitted by the Plan and this Trust Agreement;

(v)    prosecute any Retained Causes of Actions relating to and to the extent necessary for the administration of Claims against the Debtors (other than Channeled Claims) or the other responsibilities of the Plan Administration Trustee in accordance with this Trust Agreement;

(vi)    retain Plan Administration Professionals to assist in performing his or her duties under the Plan;

(vii)    maintain the books, records and account of the Plan Administration Trust;

(viii)    invest Cash of the Plan Administration Trust only to the extent permitted hereunder;

(ix)    incur and pay reasonable and necessary expenses in connection with the performance of duties under the Plan, including the reasonable fees and expenses of the Disbursing Agent, the PPLP Liquidator and the Plan Administration Professionals;

(x)    perform the duties and functions contemplated in Section 6.02 of this Trust Agreement;

(xi)    maintain appropriate liability insurance for the Plan Administration Trustee;

(xii)    after a Debtor's Estate has been fully administered, seek authority from the Bankruptcy Court to close the applicable Chapter 11 Case in accordance with the Bankruptcy Code and Bankruptcy Rules;

(xiii)    pay statutory fees; and

(xiv)    perform such other duties and functions that are consistent with the implementation of the Plan and this Trust Agreement.

(c)    The Plan Administration Trust shall be empowered to initiate, prosecute, defend and resolve all legal actions and other proceedings related to any Asset, liability or responsibility of the Plan Administration Trust. Such legal actions and other proceedings shall be limited solely to those required for the purposes of reconciling, administering and defending against Claims (other than Channeled Claims) and the other responsibilities of the Plan Administration Trust. The Plan Administration Trust shall be empowered to initiate, prosecute, defend and resolve all such

actions in the name of the Debtors or their Estates, in each case if deemed necessary or appropriate by the Plan Administration Trustee. The Plan Administration Trust shall be responsible for the payment of all damages, awards, judgments, settlements, expenses, costs, fees and other charges incurred subsequent to the date upon which the Plan Administration Trust is established arising from, or associated with, any legal action or other proceeding brought pursuant to the foregoing. For the avoidance of doubt, the Plan Administration Trust, pursuant to section 1123(b)(3)(B) of the Bankruptcy Code and applicable state corporate law, is appointed as the successor-in-interest to, and representative of, the Debtors and their Estates for the retention, enforcement, settlement or adjustment of Claims against the Debtors (other than the Channeled Claims). For the further avoidance of doubt, neither the Plan Administration Trust nor the Plan Administration Trustee shall be vested with the rights to pursue any MDT Insurance Rights or MDT Insurance Collateral.

(d)     Except as otherwise provided in this Trust Agreement, the Plan Administration Trustee shall not be required to obtain any order or approval of the Bankruptcy Court or any other court of competent jurisdiction, or account to the Bankruptcy Court or any other court of competent jurisdiction, for the exercise of any right, power or privilege conferred hereunder. Pursuant to the Plan, the Bankruptcy Court has retained jurisdiction for such purposes and may approve or disapprove any such proposed action upon motion by the Plan Administration Trustee.

Section 3.02   Books and Records. The Plan Administration Trustee shall maintain in respect of the Plan Administration Trust and the Trust Beneficiaries books and records reflecting PAT Assets in its possession and income of the Plan Administration Trust and the payment of expenses, liabilities, and claims against or assumed by the Plan Administration Trust in such detail and for such period of time as may be necessary to enable it to make full and proper accounting in respect thereof in accordance with the provisions of the Plan, this Trust Agreement and applicable law, including applicable tax reporting requirements. Nothing in this Trust Agreement requires the Plan Administration Trustee to file any accounting or seek approval of any court with respect to the administration of the Plan Administration Trust, or as a condition for making any payment or Distribution out of the PAT Assets. At the Plan Administration Trustee's discretion, all books and records held by the Plan Administration Trust, including those that have been delivered to the Plan Administration Trust and those that have been created by the Plan Administration Trustee, may, but need not, be destroyed at any time after six (6) years from the Effective Date; *provided*, *however*, that the Plan Administration Trust shall preserve any books or records that are required to be retained under applicable law or regulation.

Section 3.03   Cooperation with the Master Disbursement Trust and the Creditor Trusts. On and after the Effective Date, the Plan Administration Trustee may maintain its documents, books and records in accordance with its document retention policies set forth in this Trust Agreement. The Plan Administration Trustee shall respond to reasonable requests of (a) the MDT Trustees for information and documents related to the MDT Insurance Rights, the MDT Causes of Action or otherwise, in each case to the extent reasonably necessary for the administration of the Master Disbursement Trust, and (b) each Creditor Trustee for information and documents relating to the applicable Channeled Claims or otherwise, in each case to the extent reasonably necessary for the administration of the applicable Creditor Trust.

ARTICLE IV
DURATION AND TERMINATION OF THE PLAN ADMINISTRATION TRUST

Section 4.01   Duration. The Plan Administration Trust was formed as of the execution and filing of a Certificate of Trust with the Delaware Secretary of State on [●], 2021 and its existence is intended to continue until such time as its Certificate of Trust has been cancelled by the filing of a certificate of cancellation in accordance with Section 4.03 of this Trust Agreement.

Section 4.02   Dissolution of the Plan Administration Trust. The Plan Administration Trust shall be dissolved and the Plan Administration Trustee shall be discharged from its duties with respect to the Plan Administration Trust upon completion of his or her duties as set forth in the Plan and satisfaction of the purposes of the Plan Administration Trust as set forth in Section 1.02 of this Trust Agreement, which, for the avoidance of doubt, shall be no earlier than the later of (a) the PPLP Dissolution Date and (b) the date on which (i) all Disputed Claims (other than Channeled Claims) have been resolved, (ii) all PAT Assets have been liquidated and (iii) all Distributions and other payments required to be made by the Plan Administration Trustee under the Plan and this Trust Agreement have been made, unless dissolution on an earlier date is authorized pursuant to a Final Order of the Bankruptcy Court. Any Cash or cash equivalents in the Plan Administration Trust remaining upon dissolution of the Plan Administration Trust, including any Surplus Reserve Cash remaining in the PAT Reserves, shall be distributed in accordance with Section 5.13(c) of the Plan.

Section 4.03   Continuance of the Plan Administration Trust for Winding Up. After the dissolution of the Plan Administration Trust and solely for the purpose of liquidating and winding up the affairs of the Plan Administration Trust, the Plan Administration Trustee shall continue to act as such until his or her duties have been fully performed. As soon as practicable after the Plan Administration Trustee exhausts substantially all of the assets of the Plan Administration Trust, the Plan Administration Trustee shall, at the expense of the Plan Administration Trust, (a) provide for the retention and storage of the Plan Administration Trust's books and records until such time as all such books and records are no longer required to be retained under applicable law, (b) file a certificate with the Bankruptcy Court informing the Bankruptcy Court of the location at which such books and records are being stored and stating that the assets of the Plan Administration Trust have been exhausted and that final distributions of Cash have been made pursuant to the Plan and this Trust Agreement, and (c) file a certificate of cancellation with the Secretary of State of the State of Delaware to terminate the Plan Administration Trust. Upon the taking of such actions in the preceding sentence, the Plan Administration Trust shall be deemed dissolved for all purposes without the necessity for any other or further actions to be taken by or on behalf of the Plan Administration Trust or payments to be made in connection therewith.

ARTICLE V
ACCOUNTS, INVESTMENTS AND PAYMENTS

Section 5.01   Accounts. The Plan Administration Trustee may, from time to time, create such accounts and reserves within or in the name of the Plan Administration Trust as he or she may deem necessary, prudent or useful in order to discharge their duties hereunder and may, with respect to any such accounts or reserves, restrict the use of monies therein, and the earnings or accretions thereto (the "Trust Subaccounts"). Any such Trust Subaccounts established by the

9

Trustees shall be held as PAT Assets and are not intended to be subject to separate entity tax treatment as "disputed claims reserves" within the meaning of the IRC or Treasury Regulations, "disputed ownership funds" within the meaning of the IRC or Treasury Regulations, or otherwise.

Section 5.02   Wind-Up Reserve. On the Effective Date, the Debtors shall establish and fund the Wind-Up Reserve, which shall vest in the Plan Administration Trust and be held and maintained by the Plan Administration Trustee. In the event of any shortfall of funding in the Wind-Up Reserve, after taking into account Surplus Reserve Cash used to satisfy any such shortfall in accordance with Section 5.13(c) of the Plan, NewCo shall be obligated to satisfy any such deficiency (which obligation shall be assumed by NewCo and any successor to NewCo's business). The costs and expenses of the Plan Administration Trust, including the compensation, fees and expenses of the Plan Administration Trustee and its retained professionals, shall be paid out of the Wind-Up Reserve. Any fees and expenses, including any valid indemnification claim, incurred by the PPLP Liquidator shall be paid by the Plan Administration Trustee from the Wind-Up Reserve.

Section 5.03   PAT Distribution Accounts. The Debtors shall establish the PAT Distribution Account to make Distributions in respect of Allowed Avrio General Unsecured Claims, Allowed Adlon General Unsecured Claims and Allowed Other General Unsecured Claims (which may be a single or collective account for one or more Classes of Claims). The PAT Distribution Account shall be (a) funded on the Effective Date in accordance with Section 5.13(a)(viii) of the Plan in an amount necessary to make Distributions in respect of such Claims to the extent Allowed as of the Effective Date and periodically funded thereafter in accordance with Section 7.6 of the Plan and (b) held by the Plan Administration Trust and administered by the Plan Administration Trustee.

Section 5.04   Priority Claims Reserve. The Debtors shall establish the Priority Claims Reserve to pay Allowed Administrative Claims (other than Professional Fee Claims, which shall be paid from the Professional Fee Escrow Account in accordance with Section 2.1(b) of the Plan, and the DOJ Forfeiture Judgment Claim, which shall be paid in accordance with Section 2.3 of the Plan), Allowed Secured Claims and Allowed Priority Claims. The Priority Claims Reserve shall be (a) funded on the Effective Date with Cash and cash equivalents of the Debtors in an amount determined by the Debtors and reasonably acceptable to the Governmental Consent Parties, in consultation with the Creditors' Committee, and (b) held by the Plan Administration Trust in a segregated account and administered by the Plan Administration Trustee on and after the Effective Date.

Section 5.05   Disputed Claims Reserve. The Debtors shall establish a reserve on account of Disputed Avrio General Unsecured Claims, Disputed Adlon General Unsecured Claims and Disputed Other General Unsecured Claims (which may be a single or collective reserve for one or more Classes of Claims). The Disputed Claims Reserves shall be (a) funded on the Effective Date with Effective Date Cash in an amount determined by the Debtors and reasonably acceptable to the Creditors' Committee and the Governmental Consent Parties and (b) held by the Plan Administration Trust and administered by the Plan Administration Trustee on and after the Effective Date. For the avoidance of doubt, the Disputed Claims Reserve for Other General Unsecured Claims shall be funded with the Other General Unsecured Claim Cash on the Effective Date.

Section 5.06    <u>Disputed Cure Claims Reserve</u>. The Debtors shall establish a reserve to pay the aggregate amount of Disputed Cure Claims or such lower amount as ordered by the Bankruptcy Court or agreed to by the parties to the applicable executory contract or unexpired lease. The Disputed Cure Claims Reserve shall be (a) funded on the Effective Date with Effective Date Cash in an amount determined by the Debtors and reasonably acceptable to the Creditors' Committee and the Governmental Consent Parties and (b) held by the Plan Administration Trust in a segregated account and administered by the Plan Administration Trustee on and after the Effective Date.

Section 5.07    <u>Surplus Reserved Cash</u>. Prior to the dissolution of the Plan Administration Trust, the Plan Administration Trustee shall determine, on each six (6)-month anniversary of the Effective Date, whether the amounts available in any PAT Reserve exceed the amounts necessary to satisfy the purpose for which such reserves were established. If the Plan Administration Trustee determines that a surplus exists in any PAT Reserve as of the date of such determination, such Surplus Reserve Cash shall be (a) *first*, used to satisfy any funding deficiency in any other PAT Reserve and (b) *second*, with respect to any amounts not used to satisfy any such funding deficiency in another PAT Reserve, transferred to the Master Disbursement Trust in accordance with the MDT Agreement. All Cash and cash equivalents of the Plan Administration Trust remaining upon the dissolution of Plan Administration Trust, including any remaining Surplus Reserve Cash in the PAT Reserves, shall be transferred to the Master Disbursement Trust in accordance with the MDT Agreement.

Section 5.08    <u>Investment of Plan Administration Trust Monies</u>. The Plan Administration Trustee may, invest Cash (including any earnings thereon or proceeds therefrom) in a non-interest bearing account, in short term certificates of deposits, in banks or other saving institutions, or other temporary, liquid investments, such as Treasury bills. All monies and other assets received by the Plan Administration Trustee as PAT Assets (including the proceeds thereof as a result of investment in accordance with this <u>Section 5.08</u>) shall, until distributed or paid over as herein provided, be held in trust for the benefit of the Trust Beneficiaries or transferred to the Master Distribution Trust in accordance with <u>Section 5.07</u> hereof, and shall not be segregated from other PAT Assets, unless and to the extent required by the Plan.

<div align="center">ARTICLE VI<br>TAX MATTERS</div>

Section 6.01    <u>U.S. Federal Income Tax Treatment</u>.

(a)    The Plan Administration Trust is intended to be treated, and shall be reported, as a trust described in IRC sections 661 through 664 and the regulations promulgated thereunder (a "<u>complex trust</u>") for U.S. federal income tax purposes and shall be reported consistently for state and local tax purposes, to the extent applicable. All parties to this Trust Agreement will be required to treat the Plan Administration Trust as a complex trust for all applicable tax reporting purposes. The Plan Administration Trust shall be governed and construed in all respect as a complex trust and any ambiguity herein shall be construed consistent herewith and, if necessary, this Trust Agreement may be amended to comply with such United States federal income tax laws, which amendment may apply retroactively to the extent permissible under applicable law.

(b)      The Plan Administration Trustee shall be responsible for (i) preparing and filing (or cause to be prepared and filed) such statements, returns, or disclosures relating to the Plan Administration Trust as are required by any Governmental Unit, including IRS Form 1041, IRS Form 1041-ES, and IRS Schedule K-1 (ii) complying with all applicable tax reporting and withholding obligations, (iii) payment, out of the PAT Assets, of any taxes imposed on the Plan Administration Trust or the PAT Assets, including estimated and annual U.S. federal income taxes and (iv) causing the Plan Administration Trust to satisfy all requirements necessary to qualify and maintain the qualification of the Plan Administration Trust as a complex trust. Any taxes paid hereunder shall be considered a cost and expense of the operation of the Plan Administration Trustee.

(c)      The Plan Administration Trustee may request an expedited determination of taxes of the Plan Administration Trust under section 505(b) of the Bankruptcy Code for all returns filed for, or on behalf of, the Plan Administration Trust for all taxable periods through the dissolution of the Plan Administration Trust. Nothing in this Section 6.01 shall be deemed to determine, expand or contract the jurisdiction of the Bankruptcy Court under section 505 of the Bankruptcy Code.

Section 6.02      Tax Returns and Payments. The Plan Administration Trust shall comply with all withholding and reporting requirements imposed by any federal, state, local or foreign taxing authority, and all Distributions made by the Plan Administration Trust to Trust Beneficiaries shall be subject to any such withholding and reporting requirements.  All such amounts withheld and paid to the appropriate tax authority shall be treated as amounts distributed to such Trust Beneficiaries for all purposes of this Trust Agreement.  The Plan Administration Trustee shall be authorized to collect such tax information from the Trust Beneficiary (including tax identification number) as in its sole discretion the Plan Administration Trustee deem necessary to effectuate the Plan, the Confirmation Order, and this Trust Agreement. In order to receive distributions, all Trust Beneficiaries shall be required to provide tax information to the Plan Administration Trustee to the extent the Plan Administration Trustee deems appropriate in the manner and in accordance with the procedures from time to time established by the Plan Administration Trustee for these purposes. The Plan Administration Trustee may refuse to make a payment or distribution to a Trust Beneficiary that fails to furnish such information in a timely fashion, and until such information is delivered may treat such Trust Beneficiary's Claim or Interest, as applicable, as disputed; *provided*, *however*, that, upon the delivery of such information by a Trust Beneficiary, the Plan Administration Trustees shall make such payment or distribution to which such Trust Beneficiary is entitled, without additional interest occasioned by such Trust Beneficiary's delay in providing tax information. Notwithstanding the foregoing, if a Trust Beneficiary fails to furnish any tax information reasonably requested by the Plan Administration Trustees before the date that is three hundred sixty-five (365) calendar days after the request is made, the amount of such payment or distribution shall irrevocably revert to the Plan Administration Trust, and any Claim with respect to such payment or distribution shall be discharged and forever barred from assertion against the Plan Administration Trust or its property.

ARTICLE VII
DISTRIBUTIONS

Section 7.01   Distributions Generally. On or after the Effective Date, the Plan Administration Trust, with the assistance of the Disbursing Agent(s), shall make Distributions only in accordance with the terms of the Plan, the Confirmation Order and this Trust Agreement to Holders of Allowed Claims against the Debtors (other than Channeled Claims) and only to the extent that the Plan Administration Trust has sufficient PAT Assets to make such payments in accordance with and to the extent provided for in the Plan, the Confirmation Order and this Trust Agreement. Each date on which a Distribution is made from the Plan Administration Trust shall be referred to as a "Distribution Date."

Section 7.02   Disputed Payments. If any dispute arises as to the identity of a Holder of an Allowed Claim against the Debtors who is to receive a Distribution from the Plan Administration Trust, the Plan Administration Trustee and the Disbursing Agent may, in lieu of making such Distribution, establish a reserve for such Distribution. Such Distribution shall be held in reserve until the disposition thereof shall be determined by order of the Bankruptcy Court or other court of competent jurisdiction or by written agreement among the interested parties to such dispute.

Section 7.03   Disbursing Agent. The Plan Administration Trustee shall act in the capacity of a Disbursing Agent or may retain and direct a Disbursing Agent to make Distributions to Holders of Allowed Claims (other than Channeled Claims) contemplated under the Plan and this Trust Agreement.

Section 7.04   Records. The Plan Administration Trustee shall, or shall cause any third-party Disbursing Agent to, maintain records relating to all disbursements made to any Holder of an Allowed Claim and all reserve made in accordance with the Plan and this Trust Agreement.

Section 7.05   Attorneys' Fees and Expenses of Directors, Officers, Employees and Agents. The Plan Administration Trust will promptly reimburse as and when incurred the reasonable actual attorneys' fees and related expenses incurred by any of the Reimbursement Parties from the Director and Employee Escrow Account after the Effective Date and before the sixth (6th) anniversary of the Effective Date in connection with such individual's cooperation with, or in connection with the defense of such individual with respect to, any investigation, prosecution and/or litigation involving conduct relating to the Debtors or the Debtors' business or property or any defense of the Releases or the Channeling Injunction. On or before the Effective Date, the Debtors will establish and fund the Director and Employee Escrow Account in the amount of $10 million, which shall be held and maintained by the Plan Administration Trustee in a segregated account to fund the foregoing reimbursement obligations. If, at any time, the balance of the Director and Employee Escrow Account is less than $5 million, NewCo (or, at any time after a sale of all or substantially all Assets of or Interests in NewCo, the Master Disbursement Trust) shall replenish the Director and Employee Escrow Account so that amounts in the Director and Employee Escrow Account are not less than $10 million, *provided* that (x) the aggregate amount deposited into the Director and Employee Escrow Account may not exceed $30 million, and (y) on the sixth (6th) anniversary of the Effective Date, any funds remaining in the Director and Employee Escrow Account will be released to the Master Disbursement Trust and NewCo's and the Master Disbursement Trust's funding obligations with respect to Director and Employee

13

Escrow Account will cease. Notwithstanding the foregoing, the Plan Administration Trust will not reimburse any such amounts incurred by any individual who (a) does not provide an appropriate undertaking consistent with the undertakings required for indemnification during the pendency of the Chapter 11 Cases, (b) has at any time prior to the Effective Date refused or does at any time after the Effective Date refuse to testify based on a claim of privilege against self-incrimination in any proceeding relating to the Debtors or the Debtors' business or property, or (c) is at any time indicted for a felony relating to the Debtors or the Debtors' business or property (*provided*, *however*, that if such individual is found to be not guilty of such felony, then expenses shall be promptly reimbursed).

ARTICLE VIII
PLAN ADMINISTRATION TRUSTEE AND RESIDENT TRUSTEE

Section 8.01    <u>Plan Administration Trustee</u>. The initial Plan Administration Trustee shall be [●]. References herein to the Plan Administration Trustee shall refer to the individual serving as the Plan Administration Trustee solely in its capacity as trustee hereunder. The Plan Administration Trustee shall not be required to post any bond or other form of surety or security in any jurisdiction.

Section 8.02    <u>Term of Service of the Plan Administration Trustee</u>.

(a)    The Plan Administration Trustee shall serve in such capacity through the earlier of (i) his or her resignation pursuant to <u>Section 8.02(b)</u> hereof, (ii) his or her removal pursuant to <u>Section 8.02(c)</u> hereof and (iii) subject to <u>Section 4.03</u> hereof, the dissolution of the Plan Administration Trust pursuant to <u>Section 4.02</u> hereof.

(b)    The Plan Administration Trustee may resign from the Plan Administration Trust by giving at least sixty (60) days' prior written notice thereof to the Bankruptcy Court. Such resignation shall become effective on the later to occur of (i) the date specified in such written notice and (ii) the effective date of the appointment of a successor Plan Administration Trustee in accordance with <u>Section 8.03(a)</u> of this Trust Agreement and such successor's acceptance of such appointment in accordance with <u>Section 8.03(b)</u> of this Trust Agreement.

(c)    The Plan Administration Trustee may be removed by the Bankruptcy Court after written notice to the Plan Administration Trustee and a hearing at which it is determined that the Plan Administration Trustee is unable to discharge his or her duties hereunder due to accident, physical deterioration, mental incompetence or has acted in bad faith. Any such removal of the Plan Administration Trustee shall take effect at such time as the Bankruptcy Court shall determine.

(d)    The death, resignation or removal of the Plan Administration shall not operate to terminate the Plan Administration Trust or to revoke any existing agency created pursuant to the terms of this Trust Agreement, the Plan, or the Confirmation Order or invalidate any action theretofore taken by the Plan Administration Trustee. All fees and expenses properly incurred by the Plan Administration Trustee prior to the death, resignation or removal of the Plan Administration Trustee shall be paid from the Wind-Up Reserve, unless such fees and expenses are disputed, in which case the Bankruptcy Court shall resolve the dispute and any disputed fees and expenses of the predecessor Plan Administration Trustee that are subsequently allowed by the

Bankruptcy Court shall be paid from the Wind-Up Reserve. In the event of the resignation or removal of the Plan Administration Trustee, such Plan Administration Trustee shall (i) promptly execute and deliver such documents, instruments and other writings as may be reasonably requested by the successor Plan Administration Trustee or directed by the Bankruptcy Court to effect the termination of such Plan Administration Trustee's capacity under this Trust Agreement, (ii) promptly deliver to the successor Plan Administration Trustee all documents, instruments, records and other writings related to the Plan Administration Trust as may be in the possession of such Plan Administration Trustee, and (iii) otherwise assist and cooperate in effecting the assumption of its obligations and functions by such successor Plan Administration Trustee.

Section 8.03    Appointment of Successor Plan Administration Trustee.

(a)    In the event of the death, resignation or removal of the Plan Administration Trustee, a vacancy shall be deemed to exist and a successor shall be appointed by the Bankruptcy Court. Such appointment shall specify the date on which such appointment shall be effective.

(b)    Any successor Plan Administration Trustee appointed in accordance with this Trust Agreement shall execute an instrument accepting its appointment and shall deliver a counterpart thereof to the Bankruptcy Court for filing and, in the case of a resigning Plan Administration Trustee, to the resigning Plan Administration Trustee. Thereupon, such successor Plan Administration Trustee shall, without any further act, become vested with all the liabilities, duties, powers, rights, title, discretion and privileges of its predecessor in the Plan Administration Trust with like effect as if originally named Plan Administration Trustee and shall be deemed appointed pursuant to section 1123(b)(3)(B) of the Bankruptcy Code. The resigning or removed Plan Administration Trustee shall duly assign, transfer and deliver to such successor Plan Administration Trustee all property and money held by such resigning or removed Plan Administration Trustee hereunder and shall, as directed by the Bankruptcy Court or reasonably requested by such successor Plan Administration Trustee, execute and deliver an instrument or instruments conveying and transferring to such successor Plan Administration Trustee upon the trusts herein expressed, all the liabilities, duties, powers, rights, title, discretion and privileges of such resigning or removed Plan Administration Trustee.

Section 8.04    Compensation and Expenses of the Plan Administration Trustee and Plan Administration Professionals. [The Plan Administration Trustee shall be entitled to reasonable compensation, in an amount to be determined by the Debtors, subject to the consent (not to be unreasonably withheld, conditioned or delayed) of the Creditors' Committee and the Governmental Consent Parties.] The Plan Administration Trustee shall also be entitled to retain and reasonably compensate counsel and other professionals, including any professionals who represented parties in interest in the Chapter 11 Cases (the "Plan Administration Professionals") to assist in the duties of the Plan Administration Trust on such terms as the Plan Administration Trustee deems appropriate, without Bankruptcy Court approval. The payment of the fees and expenses of the Plan Administration Trustee and the Plan Administration Professionals shall be made from the Wind-Up Reserve in the ordinary course of business and shall not be subject to the approval of the Bankruptcy Court; *provided* that any disputes related to such fees and expenses shall be brought before the Bankruptcy Court.

Section 8.05    <u>Duties of the Plan Administration Trustee</u>. Except for obligations expressly imposed on the Plan Administration Trustee by the Plan or this Trust Agreement, to the extent that, at law or in equity, the Plan Administration Trustee has duties (including fiduciary duties) to the Trust Beneficiaries or to any other person that is a party to or is otherwise bound by this Trust Agreement, such duties are hereby eliminated by this Trust Agreement to the fullest extent permitted by applicable law; *provided, however*, that this Trust Agreement does not eliminate the implied contractual covenant of good faith and fair dealing.

Section 8.06    <u>Resident Trustee</u>.

(a)    The Resident Trustee has been appointed and hereby agrees to serve as the trustee of the Plan Administration Trust solely for the purpose of complying with the requirement of Section 3807(a) of the Trust Act that the Plan Administration Trust have one trustee, which, in the case of a natural person, is a resident of the State of Delaware, or which in all other cases, has its principal place of business in the State of Delaware. The duties and responsibilities of the Resident Trustee shall be limited solely to (i) accepting legal process served on the Plan Administration Trust in the State of Delaware, (ii) the execution of any certificates required to be filed with the office of the Delaware Secretary of State that the Resident Trustee is required to execute under Section 3811 of the Trust Act, and (iii) any other duties specifically allocated to the Resident Trustee in this Trust Agreement. Except as provided in the foregoing sentence, the Resident Trustee shall have no management responsibilities or owe any fiduciary duties to the Plan Administration Trust, the Plan Administration Trustee or the Holders of Allowed Claims (other than Channeled Claims).

(b)    By execution of this Trust Agreement, the Resident Trustee accepts the Plan Administration Trust created herein. Except as otherwise expressly required by <u>Section 8.06(a)</u> of this Trust Agreement, the Resident Trustee shall not have any duty or liability with respect to the administration of the Plan Administration Trust, the investment of the PAT Assets or the Distribution of the PAT Assets to the Holders of Allowed Claims (other than Channeled Claims), and no such duties shall be implied. The Resident Trustee shall not be liable for the acts or omissions of the Plan Administration Trustee, nor shall the Resident Trustee be liable for supervising or monitoring the performance of the duties and obligations of the Plan Administration Trustee under this Trust Agreement, except as expressly required by <u>Section 8.06(a)</u> of this Trust Agreement. The Resident Trustee shall not be obligated to give any bond or other security for the performance of any of its duties hereunder. The Resident Trustee shall not be personally liable under any circumstances, except for its own willful misconduct, bad faith, or gross negligence. Without limiting the foregoing:

(i)    the Resident Trustee shall not be personally liable for any error of judgment made in good faith, except to the extent such error of judgment constitutes willful misconduct, bad faith or gross negligence;

(ii)    no provision of this Trust Agreement shall require the Resident Trustee to expend or risk its personal funds or otherwise incur any financial liability in the performance of its rights or powers hereunder if the Resident Trustee has

16

reasonable grounds to believe that the payment of such funds or adequate indemnity against such risk or liability is not reasonably assured or provided to it;

(iii)    the Resident Trustee shall not be personally liable for the validity or sufficiency of this Trust Agreement or for the due execution of this Trust Agreement by the other parties to this Trust Agreement;

(iv)    the Resident Trustee may accept a certified copy of a resolution of the board of directors or other governing body of any corporate party as conclusive evidence that such resolution has been duly adopted by such body and that the same is in full force and effect;

(v)    the Resident Trustee may request the Plan Administration Trustee to provide a certificate with regard to any fact or matter the manner of ascertainment of which is not specifically prescribed herein, and such certificate shall constitute full protection to the Resident Trustee for any action taken or omitted to be taken by it in good faith in reliance thereon;

(vi)    in the exercise or administration of the Plan Administration Trust hereunder, the Resident Trustee (A) may act directly or through agents or attorneys pursuant to agreements entered into with any of them and (B) may consult with nationally recognized counsel selected by it in good faith and with due care and employed by it, and it shall not be liable for anything done, suffered or omitted in good faith by it in accordance with the advice or opinion of any such counsel; and

(vii)    the Resident Trustee acts solely as Resident Trustee hereunder and not in its individual capacity, and all persons having any claim against the Resident Trustee by reason of the transactions contemplated by this Trust Agreement shall look only to the PAT Assets for payment or satisfaction thereof.

(c)    The Resident Trustee shall be entitled to receive compensation out of the Wind-Up Reserve for the services that the Resident Trustee performs in accordance with this Trust Agreement in accordance with such fee schedules as shall be agreed from time to time by the Resident Trustee and the Plan Administration Trustee. The Resident Trustee may also consult with counsel (who may be counsel for the Plan Administration Trust or for the Resident Trustee) with respect to those matters that relate to the Resident Trustee's role as the Delaware resident trustee of the Plan Administration Trust, and the reasonable legal fees incurred in connection with such

consultation shall be reimbursed out of the Wind-Up Reserve to the Resident Trustee pursuant to this Section 8.06(c) on terms acceptable to the Plan Administration Trustee; *provided* that no such fees shall be reimbursed to the extent that they are incurred as a result of the Resident Trustee's gross negligence, bad faith or willful misconduct.

(d)    The Resident Trustee shall serve for the duration of the Plan Administration Trust or until the earlier of (i) the effective date of the Resident Trustee's resignation, or (ii) the effective date of the removal of the Resident Trustee. The Resident Trustee may resign at any time by giving thirty (30) days' written notice to the Plan Administration Trustee; *provided*, *however*, that such resignation shall not be effective until such time as a successor Resident Trustee has accepted appointment. The Resident Trustee may be removed at any time by the Plan Administration Trustee, by providing thirty (30) days' written notice to the Resident Trustee; *provided*, *however*, such removal shall not be effective until such time as a successor Resident Trustee has accepted appointment. Upon the resignation or removal of the Resident Trustee, the Plan Administration Trustee, shall appoint a successor Resident Trustee. If no successor Resident Trustee shall have been appointed and shall have accepted such appointment within forty-five (45) days after the giving of such notice of resignation or removal, the Resident Trustee may petition the Bankruptcy Court for the appointment of a successor Resident Trustee. Any successor Resident Trustee appointed pursuant to this Section 8.06(d) shall be eligible to act in such capacity in accordance with this Trust Agreement and, following compliance with this Section 8.06(d), shall become fully vested with the rights, powers, duties, and obligations of its predecessor under this Trust Agreement, with like effect as if originally named as Resident Trustee. Any such successor Resident Trustee shall notify the Resident Trustee of its appointment by providing written notice to the Resident Trustee, and upon receipt of such notice, the Resident Trustee shall be discharged of its duties herein.

ARTICLE IX
RELIANCE, LIABILITY AND INDEMNIFICATION

Section 9.01    Reliance by the Plan Administration Trustee. Except as otherwise provided in this Trust Agreement, the Plan or the Confirmation Order, the Plan Administration Trustee may rely and shall be protected in acting upon any resolution, statement, instrument, opinion, report, notice, request, consent, order or other paper or document reasonably believed by the Plan Administration Trustee to be genuine and to have been signed or presented by the proper party or parties having relevant authority or expertise.

Section 9.02    Nonliability of Plan Administration Trustee. Except as provided herein, nothing contained in this Trust Agreement, the Plan or the Confirmation Order shall be deemed to be an assumption by the Plan Administration Trustee or the Plan Administration Professionals of any of the liabilities, obligations or duties of the Debtors or shall be deemed to be or contain a covenant or agreement by the Plan Administration Trustee to assume or accept any such liability, obligation or duty. Any successor Plan Administration Trustee may accept and rely upon any accounting made by or on behalf of any predecessor Plan Administration Trustee hereunder, and any statement or representation made as to the assets comprising the PAT Assets or as to any other fact bearing upon the prior administration of the Plan Administration Trust, so long as it has a good faith basis to do so. The Plan Administration Trustee shall not be liable for having accepted and relied in good faith upon any such accounting, statement or representation if it is later proved to

18

be incomplete, inaccurate or untrue. Any successor Plan Administration Trustee shall not be liable for any act or omission of any predecessor Plan Administration Trustee, nor have a duty to enforce any claims against any predecessor Plan Administration Trustee on account of any such act or omission. No provision of this Trust Agreement shall require Plan Administration Trustee to expend or risk his or her personal funds or otherwise incur any financial liability in the performance of his or her rights or powers hereunder if the Plan Administration Trustee has reasonable grounds to believe that the payment of such funds or adequate indemnity against such risk or liability is not reasonably assured or provided to him or her.

Section 9.03    Exculpation. To the maximum extent permitted by applicable law, each of the Plan Administration Trustee, the Resident Trustee and the Plan Administrator Professionals shall not have or incur any liability for actions taken or omitted in his or her capacity as the Plan Administration Trustee, the Resident Trustee or a Plan Administrator Professional, or on behalf of the Plan Administration Trust, except those acts found by Final Order to be arising out of his or her willful misconduct, bad faith, gross negligence or fraud, and shall be entitled to indemnification and reimbursement for reasonable fees and expenses in defending any and all of his or her actions or inactions in his or her capacity as the Plan Administration Trustee, the Resident Trustee or a Plan Administration Professional, or on behalf of the Plan Administration Trust, except for any actions or inactions found by Final Order to be arising out of his or her willful misconduct, bad faith, gross negligence or fraud. Any valid indemnification claim of the Plan Administration Trustee, the Resident Trustee or a Plan Administration Professional shall be satisfied from the Wind-Up Reserve.

Section 9.04    Limitation of Liability. The Plan Administration Trustee, the Resident Trustee and the Plan Administrator Professionals will not be liable for punitive, exemplary, consequential, special or other damages for a breach of this Trust Agreement under any circumstances.

Section 9.05    Indemnity. The Plan Administration Trust shall indemnify and hold harmless each of the Plan Administration Trustee, the Resident Trustee and the Plan Administrator Professionals (each, an "Indemnified Party"), from and against and with respect to any and all liabilities, losses, damages, claims, costs and expenses (other than taxes in the nature of income taxes imposed on compensation paid to the Indemnified Parties), including, but not limited to, attorneys' fees, arising out of or due to the implementation or administration of the Plan or this Trust Agreement, other than such Indemnified Party's willful misconduct, bad faith, gross negligence or fraud, with respect to the implementation or administration of the Plan or this Trust Agreement. To the extent that an Indemnified Party asserts a claim for indemnification as provided above, (a) any payment on account of such claim shall be paid solely from the Wind-Up Reserve and (b) the legal fees and related costs incurred by counsel to such Indemnified Party in monitoring and participating in the defense of such claims giving rise to the asserted right of indemnification shall be advanced to such Indemnified Party (provided that such Indemnified Party undertakes to repay such amounts if it ultimately shall be determined that such Indemnified Party is not entitled to be indemnified therefore) out of the Wind-Up Reserve or any insurance purchased using the Wind-Up Reserve. This indemnification provision shall remain available to, and the repayment obligation be binding upon, any former Plan Administration Trustee, Resident Trustee or Plan Administrator Professional and the estate of any deceased Plan Administration Trustee, Resident

Trustee or Plan Administrator Professional, as the case may be, and shall survive the termination of the Plan Administration Trust.

ARTICLE X
MISCELLANEOUS PROVISIONS

Section 10.01 <u>Actions Taken on Other Than a Business Day</u>. In the event that any payment or act under the Plan or this Trust Agreement is required to be made or performed on a date that is not a Business Day, then the making of such payment or the performance of such act may be completed on the next succeeding Business Day, but shall be deemed to have been completed as of the required date.

Section 10.02 <u>Governing Law</u>. Except to the extent that the Bankruptcy Code or other federal law is applicable, or to the extent that any document to be entered into in connection herewith provides otherwise, the rights, duties, and obligations arising under this Trust Agreement shall be governed by, and construed and enforced in accordance with the laws of the State of Delaware, without giving effect to principles of conflicts of laws.

Section 10.03 <u>Jurisdiction</u>. The Bankruptcy Court shall have exclusive jurisdiction over the Plan Administration Trust and the Plan Administration Trustee, including the administration and activities of the Plan Administration Trust and the Plan Administration Trustee, and, pursuant to the Plan, the Bankruptcy Court has retained such jurisdiction.

Section 10.04 <u>Severability</u>. In the event any provision of this Trust Agreement or the application thereof to any person or circumstances shall be determined by a final, non-appealable judgment or order to be invalid or unenforceable to any extent, the remainder of this Trust Agreement or the application of such provision to persons or circumstances or in jurisdictions other than those as to or in which it is held invalid or unenforceable, shall not be affected thereby, and each provision of this Trust Agreement shall be valid and enforceable to the full extent permitted by law.

Section 10.05 <u>Notices</u>. Any notice or other communication required or permitted to be made under this Trust Agreement shall be in writing and shall be deemed to have been sufficiently given, for all purposes, if delivered personally, by email, sent by nationally recognized overnight delivery service or mailed by first-class mail:

(a)     if to the Debtors:

[●]
Email: [●]

(b)     if to the Plan Administration Trust, to:

[●]
Email: [●]

with a copy to:

20

[●]
Email: [●]

(c)    if to the Plan Administration Trustee, to:

[●]
Email: [●]

with a copy to:

[●]
Email: [●]

(d)    if to the Resident Trustee, to:

[●]
Email: [●]

Section 10.06  Headings. The headings contained in this Trust Agreement are solely for convenience of reference and shall not affect the meaning or interpretation of this Trust Agreement or of any term or provision of this Trust Agreement.

Section 10.07  Entire Trust Agreement. This Trust Agreement (including the recitals and annex hereto), the Plan, and the Confirmation Order constitute the entire agreement by and among the parties and supersede all prior and contemporaneous agreements or understandings by and among the parties with respect to the subject matter of this Trust Agreement.

Section 10.08  Amendment and Waiver. Any provision of this Trust Agreement may be amended or waived only with the consent of the Plan Administration Trustee and the Master Disbursement Trust (taken following the unanimous approval by the MDT Trustees), upon notice to the Holders of the Allowed Claims; *provided* that any such amendment which alters the duties or liabilities of the Resident Trustee shall also require the consent of the Resident Trustee. Notwithstanding this Section 10.08, any amendment to this Trust Agreement shall not (a) be inconsistent with the purpose and intention of the Plan Administration Trust, (b) be inconsistent with the purposes of the Plan and the Confirmation Order, or (c) permit any amendment or waiver of this Section 10.08. Additionally, no change may be made to this Trust Agreement that would adversely affect the Distributions to be made under this Trust Agreement.

Section 10.09  Confidentiality. The Plan Administration Trustee, the Resident Trustee and the Plan Administration Professionals (each, a "Confidential Party" and, collectively, the "Confidential Parties") shall hold strictly confidential and not use for personal gain any material, non-public information of which they have become aware in their capacity as a Confidential Party, of or pertaining to any Debtor to which any of the PAT Assets relates; *provided*, *however*, that such information may be disclosed if (a) it is now or in the future becomes generally available to the public other than as a result of a disclosure by the Confidential Parties or (b) such disclosure is required of the Confidential Parties pursuant to legal process including subpoena or other court order or other applicable laws or regulations. For the avoidance of doubt and

21

notwithstanding anything to the contrary herein, each Confidential Party shall comply with Section 5.11(c) of the Plan.

Section 10.10  Meanings of Other Terms. Except where the context otherwise requires, (a) words importing the masculine, feminine or neuter gender include the masculine, feminine and neuter gender, (b) words importing the singular or plural number shall include the singular and plural number, (c) the words "herein," "hereof," or "hereunder" and other words of similar import refer to this Trust Agreement as a whole and not to any particular Article, Section or subdivision of this Trust Agreement and (d) the words "includes" and "including" are not limiting.

Section 10.11  Counterparts. This Trust Agreement may be executed in any number of counterparts, each of which shall be deemed an original, but such counterparts shall together constitute but one and the same instrument. A portable document file (PDF) signature of any party shall be considered to have the same binding legal effect as an original signature.

[*Signature Pages Follow*]

IN WITNESS WHEREOF, the parties hereto have executed this Trust Agreement or caused this Trust Agreement to be duly executed by their respective officers, representatives or agents, effective as of the Effective Date.

[DEBTORS]

By: _____
Name:
Title:

[PLAN ADMINISTRATION TRUSTEE], as Plan Administration Trustee

By: _____
Name:

[RESIDENT TRUSTEE], as Resident Trustee

By: _____
Name:
Title:

**SCHEDULE [A]**

PAT Reserves

| PAT Reserve | Balance (as of the Effective Date) |
|---|---|
| Wind-Up Reserve | |
| Disputed Claims Reserve | |
| Disputed Cure Claims Reserve | |
| Priority Claims Reserve | |

## EXHIBIT AA

### Shareholder Settlement Agreement

Except as otherwise noted, the Shareholder Settlement Agreement is in draft form and remains subject to continuing review and negotiation among the Debtors and interested parties with respect thereto, has not yet been agreed to by any party including and remains subject to material change.  The Debtors reserve the right, subject to the terms and conditions set forth in the Plan, to alter, amend, modify or supplement the Settlement Agreement at any time before the Effective Date of the Plan, or any such other date as may be provided for by the Plan or by order of the Bankruptcy Court; *provided* that, if the Settlement Agreement is altered, amended, modified, or supplemented in any material respect prior to the hearing to confirm the Plan, the Debtors will file a redline of such document with the Bankruptcy Court. [A revised draft of the Shareholder Settlement Agreement shall be filed no later than July [•], 2021.]

**DRAFT**

**FORM OF SETTLEMENT AGREEMENT**

**BY AND AMONG**

**[THE MASTER DISBURSEMENT TRUST],**

**EACH OF THE PARTIES LISTED ON EXHIBIT A HERETO,**

**AND**

**EACH OF THE PARTIES LISTED ON EXHIBIT B HERETO**

**[_____], 2021**

# TABLE OF CONTENTS

PAGE

ARTICLE 1. DEFINITIONS ................................................................................................... 2

    Section 1.01    Definitions ........................................................................ 2
    Section 1.02    Interpretative Provisions ................................................. 18

ARTICLE 2. SETTLEMENT PAYMENTS ......................................................................... 20

    Section 2.01    Required Settlement Payment ......................................... 20
    Section 2.02    Payment of Net Proceeds ............................................... 25
    Section 2.03    Collar ................................................................................ 26
    Section 2.04    Guarantee of Certain Obligations of A-Side Capped Payment Parties ................ 27
    Section 2.05    Reserved ........................................................................... 29
    Section 2.06    No Change to Aggregate Settlement Amount ................. 29
    Section 2.07    Illustrative Examples ...................................................... 30
    Section 2.08    Payments Pending Appeals ............................................ 30
    Section 2.09    Reserved ........................................................................... 32

ARTICLE 3. SALE OF IACS ............................................................................................. 32

    Section 3.01    Covenant to Sell .............................................................. 32
    Section 3.02    IAC Information Rights; Access; Waiver ....................... 33
    Section 3.03    Other IAC-Related Covenants ........................................ 34
    Section 3.04    Indemnification ............................................................... 36
    Section 3.05    Implementation Limitations ............................................ 36
    Section 3.06    Termination of Sale Obligations ..................................... 36
    Section 3.07    Pledge of Shares; Net Proceeds Collateral Account ...... 37
    Section 3.08    Exercise of Remedies ..................................................... 38
    Section 3.09    Reserved ........................................................................... 39

ARTICLE 4. TAX MATTERS ........................................................................................... 39

    Section 4.01    Restitution Payments ...................................................... 39
    Section 4.02    Reserved ........................................................................... 40
    Section 4.03    Reserved ........................................................................... 40
    Section 4.04    Reserved ........................................................................... 40
    Section 4.05    Reserved ........................................................................... 40
    Section 4.06    Reserved ........................................................................... 40

ARTICLE 5. RESERVED. ................................................................................................. 40

ARTICLE 6. TERMINATION. .......................................................................................... 40

    Section 6.01    Termination of Agreement .............................................. 40

ARTICLE 7. REPRESENTATIONS AND WARRANTIES OF THE SACKLER PARTIES ................. 40

    Section 7.01    Formation and Power ...................................................... 41
    Section 7.02    Authority; Enforceability ................................................ 42

Section 7.03    No Contravention......................................................................................... 42
Section 7.04    Reserved. .................................................................................................... 43
Section 7.05    List of IACs ................................................................................................ 43

ARTICLE 8. COVENANTS ................................................................................................... 43

Section 8.01    Certain Information Rights ........................................................................ 43
Section 8.02    Non-Circumvention ................................................................................... 43
Section 8.03    No Interference. ......................................................................................... 43
Section 8.04    Consent to Cancellation of PPLP Interests and De Minimis PRALP
                Interests...................................................................................................... 44
Section 8.05    Insurance Policies ...................................................................................... 44
Section 8.06    Reserved ..................................................................................................... 44
Section 8.07    Notification of Breach ............................................................................... 44
Section 8.08    Opioid Business ......................................................................................... 44
Section 8.09    Other Covenants and Agreements ............................................................. 44

ARTICLE 9. BREACH AND REMEDIES ............................................................................. 44

Section 9.01    Breach ........................................................................................................ 44
Section 9.02    Remedies. ................................................................................................... 46
Section 9.03    Trustee Liability ........................................................................................ 51
Section 9.04    Breach Fee ................................................................................................. 51
Section 9.05    Reinstatement ............................................................................................ 51

ARTICLE 10. CONDITIONS PRECEDENT ......................................................................... 52

Section 10.01   Settlement Effective Date .......................................................................... 52

ARTICLE 11. MISCELLANEOUS ....................................................................................... 53

Section 11.01   Notices ....................................................................................................... 53
Section 11.02   Payments Received .................................................................................... 54
Section 11.03   Survival of Representations and Warranties.............................................. 54
Section 11.04   Remedies Cumulative; Specific Performance ........................................... 54
Section 11.05   Confession of Judgment............................................................................ 54
Section 11.06   Entire Agreement; Severability; Amendments and Waivers ..................... 55
Section 11.07   Reserved .................................................................................................... 56
Section 11.08   Sackler Parties' Representative. ................................................................ 56
Section 11.09   Binding Effect; Benefit; Assignment......................................................... 56
Section 11.10   Governing Law .......................................................................................... 56
Section 11.11   Jurisdiction; Contested Matter .................................................................. 57
Section 11.12   Waiver of Jury Trial................................................................................... 57
Section 11.13   Counterparts; Trustee of Multiple Trusts; Effectiveness .......................... 57
Section 11.14   Document Repository ................................................................................ 58
Section 11.15   Reserved .................................................................................................... 58

Exhibits[1]

| | |
|---|---|
| Exhibit A | Payment Groups and IAC Payment Parties |
| Exhibit B | Debtors |
| Exhibit C | Family Groups and Corresponding Payment Groups |
| Exhibit D | Collar Recipients |
| Exhibit E | IACs |
| Exhibit F | IAC Pledged Entities |
| Exhibit G | Bank Account Information |
| Exhibit H | Restricted Parties |
| Exhibit I | Termination Events |
| Exhibit J | IAC Pledge and Security Agreements |
| Exhibit K | Assuring Parties |
| Exhibit L | List of Approved Third Party Accountants |
| Exhibit M | List of Approved Financial Advisors |

Annexes

| | |
|---|---|
| Annex A | A-Side Credit Support Terms for Groups 1, 3, 5, 6, 7 and 8 |
| Annex B | A-Side Credit Support Terms for Group 2 |
| Annex C | A-Side Credit Support Terms for Group 4 |
| Annex D | B-Side Credit Support Terms for B-Side Payment Group 1 |
| Annex E | B-Side Credit Support Terms for B-Side Payment Group 2 |

---

[1] Note to Draft: Exhibits and annexes are under discussion.

3

## SETTLEMENT AGREEMENT

THIS SETTLEMENT AGREEMENT (this "Agreement"), dated as of [____], 2021 (the "Agreement Effective Date"), is entered into by and among [the MDT] (as defined below), the Sackler Parties (as defined below), and each of the parties listed on Exhibit B hereto (collectively, the "Debtors", and together with the MDT and the Sackler Parties, the "Parties" and each, a "Party").

RECITALS

WHEREAS, on September 15, 2019, the Debtors each filed voluntary petitions for relief under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code") in the United States Bankruptcy Court for the Southern District of New York (the "Bankruptcy Court"), thereby commencing the chapter 11 cases that are currently pending and jointly administered by the Bankruptcy Court under the caption *In re Purdue Pharma L.P., et al.*, Case No. 19-23649 (RDD) (the "Bankruptcy Cases");

WHEREAS, for the purposes of this Agreement, certain Sackler Parties are included in distinct Payment Groups as set forth in Exhibit A;

WHEREAS, for the purposes of this Agreement, [certain of] the Shareholder Released Parties are included in distinct Family Groups as set forth in Exhibit C, each of which corresponds to a specific Payment Group as set forth on Exhibit C;

WHEREAS, in furtherance of the settlement of the Shareholder Released Claims against the Shareholder Released Parties (each as defined below) as contemplated and effectuated pursuant to the Plan (the "Settlement"), the B-Side Payment Groups and the A-Side Payment Groups have agreed to pay the Aggregate Settlement Amount (as defined below) to MDT, subject to the terms of this Agreement;

WHEREAS, in furtherance of the Settlement, the B-Side Payment Parties agree to pay, or cause to be paid, on a joint and several basis among the B-Side Payment Parties within a B-Side Payment Group, but on a several and not joint basis as among B-Side Payment Groups, their respective B-Side Payment Group's Initial Settlement Amount, subject to the terms of this Agreement;

WHEREAS, in furtherance of the Settlement, the A-Side Payment Parties agree to pay, or cause to be paid, on a joint and several basis among the A-Side Payment Parties within an A-Side Payment Group, but on a several and not joint basis as among A-Side Payment Groups, their respective A-Side Payment Group's Initial Settlement Amount, subject to the terms of this Agreement;

WHEREAS, certain Sackler Parties that are IAC Payment Parties (as defined below) hold interests, directly or indirectly, in the IACs set forth on Exhibit E;

WHEREAS, in furtherance of the Settlement, each of the IAC Payment Parties agrees to sell, in one or more transactions, all of the issued and outstanding equity interests in each IAC and/or the assets of each IAC;

WHEREAS, in furtherance of the Settlement, each IAC Payment Party agrees to pay, or cause to be paid, the Net Proceeds resulting from Sales of IACs and IAC Distributions (each as defined below) to the MDT as and when required by this Agreement;

WHEREAS, certain Sackler Parties hold interests, directly or indirectly, in Purdue Pharma L.P. ("PPLP Interests") and Purdue Pharma Inc. ("PPI Interests"), and Purdue Pharma Inc. holds certain de minimis interests in Pharmaceutical Research Associates L.P. ("De Minimis PRALP Interests");

WHEREAS, in furtherance of the Settlement, the Sackler Parties agree, subject to the terms and conditions of this Agreement, to the deemed surrender, cancellation, and/or redemption of the PPLP Interests pursuant to the Plan and that the direct and indirect holders thereof shall not receive or retain any property under the Plan on account of the PPLP Interests;

WHEREAS, in furtherance of the Settlement, the Sackler Parties agree, subject to the terms and conditions of this Agreement, to the deemed surrender, cancellation, and/or redemption of the PPI Interests and De Minimis PRALP Interests pursuant to the Plan and that (i) Purdue Pharma Inc. shall not receive or retain any property under the Plan on account of the De Minimis PRALP Interests and (ii) the direct and indirect holders of Purdue Pharma Inc. shall not receive or retain any property under the Plan on account of the PPI Interests;

WHEREAS, in furtherance of the Settlement, certain of the Sackler Parties have agreed to grant a security interest in and Lien on certain of their assets to secure the obligations of certain Payment Parties under this Agreement as more fully set forth below in this Agreement (including each of Annex A, Annex B, Annex C, Annex D and Annex E attached hereto (individually, a "Credit Support Annex" and, collectively, the "Credit Support Annexes")) and the Collateral Documents (as defined below);

[Additional recitals to come].

NOW, THEREFORE, in consideration of the mutual covenants and agreements hereinafter set forth and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties hereto agree as follows:

## ARTICLE 1.
## DEFINITIONS

**Section 1.01    Definitions**.

(a)    As used in this Agreement, the following terms have the following meanings:

["2.01(i) Top-Off Payment" has the meaning set forth in Section 2.01(i).]

"2.04 Top-Off Payment" has the meaning set forth in Section 2.04(b).

"74A Trust" has the meaning set forth in Section 2.01(k).

["Actual Taxes" means, with respect to an IAC Payment Party, an amount equal to the actual cash Tax liability of such IAC Payment Party, its direct or indirect subsidiaries, or its direct or indirect equityholders or beneficiaries payable with respect to income and gain recognized by or allocated to such Person from an IAC or the Sale of an IAC, taking into account any tax benefits arising under this Agreement and the Plan calculated on a with-and-without basis, including, for the avoidance of doubt, any deduction that may be available to such Payment Party under Section 162(f) of the Code and the deductibility or creditability, as applicable, of local, state and non-U.S. income Taxes.]

["A-Side Allocable Portion" means, fifty percent (50%) of the difference between (x) the aggregate Advanced Contributions of all B-Side Payment Groups and (y) the aggregate Advanced Contributions of all A-Side Payment Groups; *provided* that if such amount is less than zero, then the A-Side Allocable Portion shall equal zero.

"A-Side Capped Payment Parties" means the Payment Parties in Payment Group 8 that are not A-Side General Obligors.

"A-Side Capped Payment Party Payment Shortfall" has the meaning set forth in Section 2.04(a).

"A-Side Funding Deadline Obligation" means, in respect of each A-Side Payment Group as of any given Funding Deadline, an amount equal to such A-Side Payment Group's A-Side Payment Group Adjusted 2.01 Amount, as adjusted pursuant to Sections 2.03 and 2.01(e) in that order.

"A-Side General Obligors" means each A-Side Payment Party designated as such on Exhibit A.

"A-Side IAC Payment Party" means each Party designated as an "A-Side IAC Payment Party" on Exhibit A.

"A-Side Payment Group" means each of the eight (8) Payment Groups, each of which is comprised of A-Side Payment Parties, designated as such on Exhibit A.

"A-Side Payment Group 2.01 Amount" means:

(i)     With respect to each Non-Collar Recipient as of any given Funding Deadline, 6.25% of the Required Settlement Payment, as adjusted pursuant to Section 2.01(f); and

(ii)    With respect to each Collar Recipient as of any given Funding Deadline, (x) 6.25% of the Required Settlement Payment, as adjusted pursuant to Section 2.01(f) *plus* (y) an amount equal to the Non-Collar Recipient 2.01 Adjustment.

"A-Side Payment Group 8" means the A-Side Payment Group indicated as such on Exhibit A.

"A-Side Payment Group Adjusted 2.01 Amount" means in respect of each A-Side Payment Group as of any given Funding Deadline, such A-Side Payment Group's A-Side Payment Group 2.01 Amount, as adjusted pursuant to Section 2.01(h).

"A-Side Payment Group Portion" means, in respect of each A-Side Payment Group, six and one quarter percent (6.25%).

"A-Side Payment Party" means a Party designated as an "A-Side Payment Party" on Exhibit A.

"A-Side Reallocation Payment" has the meaning set forth in Section 2.01(h).

"Advanced Contribution" means, as of the date of determination, with respect to any Payment Group, an amount equal to (a) the Aggregate Payments of such Payment Group prior to such date of determination, *less* (b) the aggregate amount of any payments made, or deemed to have been made, by such Payment Group to the MDT pursuant to Section 2.02(b) prior to such date of determination, less (c) the aggregate amount of Net Proceeds paid, or deemed to have been paid, to the MDT by such Payment Group prior to such date of determination (with Net Proceeds calculated without giving effect to the deduction of Unapplied Advanced Contributions); *provided* that if such amount is less than zero, then the Advanced Contribution shall equal zero.

"Advisors" means Deutsche Bank AG and/or one or more other nationally recognized investment banking firms and/or such other financial advisors, reasonably acceptable to the MDT, as may be engaged

3

by a Sackler Party, an Affiliate thereof or an IAC to advise such Sackler Party, such Affiliate thereof or IAC and/or other Sackler Parties, their Affiliates or IACs in connection with the Sales.]

"Affiliate" means, with respect to any Person, any other Person directly or indirectly Controlling, Controlled by, or under common Control with such Person.

["Affiliate Transaction" has the meaning set forth in Section 3.03(a).]

"Aggregate Settlement Amount" means $4,275,000,000.

["Aggregate Payments" means, as of the date of determination, with respect to any Payment Group, all cash amounts actually paid to MDT by such Payment Group (or, in the case of a payment by an A-Side General Obligor, Common B-Side Payment Party or IAC Payment Party, all cash amounts actually paid to MDT that are deemed to be paid by such Payment Group) pursuant to Sections 2.01 and 2.02 but excluding the amount of any prepayments made by such Payment Group pursuant to Section 2.01(e) unless and until such prepayments been applied to satisfy and reduce a Payment Group's A-Side Funding Deadline Obligation or B-Side Funding Deadline Obligation, as applicable.  For the avoidance of doubt, (i) Aggregate Payments shall not include the payment of any Breach Fees and (ii) amounts paid to the Appeals Escrow Account will be deemed to be amounts actually paid to MDT.]

"Agreement" has the meaning set forth in the preamble.

"Agreement Effective Date" has the meaning set forth in the preamble.

["Appeals Escrow Account" means an escrow account subject to an escrow agreement mutually acceptable to the MDT and the Sackler Parties located in the U.S. in which payments owed to the MDT are deposited and maintained.]

"Authorized Action" has the meaning set forth in Section 11.08(c).

"B-Side Excess Amount" has the meaning set forth in Section 2.01(g).

"B-Side Funding Deadline Obligation" means, in respect of each B-Side Payment Group as of any given Funding Deadline, an amount equal to such B-Side Payment Group's B-Side Payment Group Adjusted 2.01 Amount, as adjusted pursuant to Sections 2.03 and 2.01(e) in that order.

"B-Side IAC Payment Party" means a Party designated as a "B-Side IAC Payment Party" on Exhibit A.

"B-Side Payment Group" means any of the two (2) groups, each of which is comprised of B-Side Payment Parties, as set forth in Exhibit A.

["B-Side Payment Group 2.01 Amount" means, in respect of each B-Side Payment Group as of any Funding Deadline,  25% of the Required Settlement Payment as adjusted pursuant to Sections 2.01(f) and 2.01(g) in that order.]

"B-Side Payment Group Adjusted 2.01 Amount" means in respect of each B-Side Payment Group as of any given Funding Deadline, such B-Side Payment Group's B-Side Payment Group 2.01 Amount, as adjusted pursuant to Section 2.01(h).

"B-Side Payment Group Portion" means, in respect of each B-Side Payment Group, twenty-five percent (25%).

"B-Side Payment Party" means a Party designated as a "B-Side Payment Party" on Exhibit A.

"Bankruptcy Cases" has the meaning set forth in the recitals.

"Bankruptcy Code" has the meaning set forth in the recitals.

"Bankruptcy Court" has the meaning set forth in the recitals.

"Beacon Trust" [has the meaning set forth in the Plan].

"Breach" has the meaning set forth in Section 9.01.

"Breach Fee" has the meaning set forth in Section 9.04.

"Breach Notice" has the meaning set forth in Section 9.02(a)(i).

"Breach Trigger" has the meaning set forth in Section 9.01.

"Business Day" means a day, other than Saturday, Sunday or other day on which commercial banks in New York, New York are authorized or required by applicable Law to close.

"Case Stipulation" means the *Amended and Restated Case Stipulation Among the Debtors, the Official Committee of Unsecured Creditors and Certain Related Parties* [Docket No. 518] filed in the Bankruptcy Cases.

["Cash and Cash Equivalents" means cash and cash equivalents such as U.S. government treasury bills and any other financial instruments properly classified as cash equivalents under GAAP.]

"Channeling Injunction" has the meaning set forth in the Plan.

"Code" means the Internal Revenue Code of 1986, as amended.

["Collar Amount" means the sum of (a) the lesser of (w) one-sixteenth of the excess of the Collar Computation Proceeds over $1.5 billion and (x) $62.5 million, *plus* (b) in the event that Collar Computation Proceeds are greater than $3.3 billion, the lesser of (y) one-sixteenth of the excess of such Collar Computation Proceeds over $3.3 billion and (z) $62.5 million.  For the avoidance of doubt, the Collar Amount shall be: (i) zero in the event that Collar Computation Proceeds are less than or equal to $1.5 billion; (ii) ratably increased (i.e., by one-sixteenth of the corresponding increase in Collar Computation Proceeds above $1.5 billion) from zero to $62.5 million in the event that Collar Computation Proceeds are greater than $1.5 billion but less than $2.5 billion; (iii) $62.5 million in the event that Collar Computation Proceeds are greater than or equal to $2.5 billion but less than $3.3 billion; (iv) ratably increased (i.e., by one-sixteenth of the corresponding increase in Collar Computation Proceeds above $3.3 billion) from $62.5 million to $125 million in the event that Collar Computation Proceeds are greater than or equal to $3.3 billion but less than $4.3 billion; and (v) $125 million in the event that Collar Computation Proceeds are greater than or equal to $4.3 billion.

"Collar B-Side Amount" has the meaning set forth in Section 2.03(d).

"Collar Computation Proceeds" means the aggregate Net Proceeds with respect to all IAC Payment Parties, but without giving effect to any reduction for Unapplied Advanced Contributions and substituting "sixty percent (60%)" for "fifty-five percent (55%)" in the definition of "Net Proceeds".

"Collar Determination Date" has the meaning set forth in Section 2.03(a).]

"Collar Recipient" means each A-Side Payment Group identified as a "Collar Recipient" on Exhibit D.

"Collar Top-Up Amount" has the meaning set forth in Section 2.03(a).

["Collateral" means the IAC Collateral and all other "Collateral" (or similar or equivalent term) as defined in any Credit Support Annex or in any Collateral Document (including any IAC Collateral Document) and shall include all assets and property, whether real, personal or mixed, whether now or hereafter acquired and wherever located, with respect to which a Lien is granted (or required, intended or purported to be granted) as security for any Obligation pursuant to this Agreement (including the Credit Support Annexes) or any Collateral Document, including all proceeds and products thereof.

"Collateral Documents" means, collectively, the IAC Collateral Documents, the Security Documents as defined under each of the Credit Support Annexes, this Agreement (to the extent it provides or purports to provide the grant of a security interest in and Lien on the Collateral) and all other security agreements, pledge agreements and other instruments and documents, and each of the supplements thereto, executed and delivered pursuant to this Agreement (including the Credit Support Annexes) or otherwise in order to grant or purport to grant a Lien on any assets to secure the Obligations or under which rights or remedies with respect to such Liens are governed.]

"Common B-Side Payment Party" has the meaning set forth in Section 2.01(l).

"Confirmation Order" means an order entered by the Bankruptcy Court confirming the Plan and providing related relief, in form and substance acceptable to the Sackler Parties (a) in their sole and absolute discretion solely with respect to the matters related to (i) the Shareholder Releases provided by the Debtors, their Estates (as defined in the Plan) and the Releasing Parties, (ii) the Channeling Injunction (as defined in the Plan), (iii) this Agreement and (iv) the Collateral Documents and (b) in their reasonable discretion with respect to all other matters outside the scope of the foregoing clause (a) relating to the Shareholder Released Parties.  For the avoidance of doubt, the Sackler Parties agree that the proposed order filed at Docket No. [●] on the docket of the Bankruptcy Cases is in form and substance acceptable to the Sackler Parties.

"Consent" means any approval, consent, ratification, permission, waiver or authorization (including any permit).

"Consent Person" has the meaning set forth in Section 7.01(d).

"Contract" means any contract, agreement, indenture, note, bond, loan, license, instrument, lease, commitment, plan or other arrangement, whether oral or written.

"Control" means, with respect to any Person, the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of a Person, whether through ownership of voting securities, by contract or otherwise, and the terms "Controlling" and "Controlled by" have correlative meanings to the foregoing.

"Credit Support Annex" has the meaning set forth in the recitals.

"Creditor Trust" has the meaning set forth in the Plan.

"Crossover Member" has the meaning set forth in **Error! Reference source not found.**.

"Cumulative Minimum Required Settlement Payments" means, as of any Funding Deadline, the cumulative Minimum Required Settlement Payments due on and prior to such Funding Deadline.  For purposes of illustration, the Cumulative Minimum Required Settlement Payments is (a) $300 million as of the first Funding Deadline, (b) $650 million as of the second Funding Deadline, (c) $1 billion as of the third Funding Deadline, and (d) $1.35 billion as of the fourth Funding Deadline.

 "Debtors" has the meaning set forth in the preamble.

["Definitive Documents" means this Agreement, the Collateral Documents, the Further Assurances Agreements, the Separation Agreements and any and all other documentation required to implement the Settlement.]

"De Minimis PRALP Interests" has the meaning set forth in the recitals.

"Designated Shareholder Released Parties" means [●].

"Disclosure Statement" means the disclosure statement and other solicitation materials in respect of the Plan, each in form and substance reasonably acceptable to the Sackler Parties solely with respect to the matters related to the Settlement, the Shareholder Releases and this Agreement.  For the avoidance of doubt, the Sackler Parties agree that the approved disclosure statement filed at Docket No. 2988 on the docket of the Bankruptcy Cases is in form and substance acceptable to the Sackler Parties.

"Disclosure Statement Order" means the order entered by the Bankruptcy Court, in form and substance reasonably acceptable to the Sackler Parties solely with respect to the matters related to the Settlement, the Shareholder Releases and this Agreement (a) approving the Disclosure Statement, (b) approving notice and other procedures for soliciting the Plan, and (c) authorizing solicitation of the Plan.  For the avoidance of doubt, the Sackler Parties agree that the order entered at Docket No. 2988 on the docket of the Bankruptcy Cases is in form and substance acceptable to the Sackler Parties.

"Dispute Proceeding" has the meaning set forth in Section 9.02(a)(i).

"District Court" means the United States District Court for the Southern District of New York.

"Equity Interest" means, with respect to any Person, any and all stock, shares, interests, rights to purchase or acquire, warrants, options, participation interests or other equivalents (however designated, whether voting or nonvoting), of equity of such Person, including, if such Person is a partnership, partnership interests (whether general or limited), or if such Person is a limited liability company, membership interests, and any other interest or participation that confers on a person the right to receive a share of the profits and losses of, or distributions of property or assets of, such issuing Person and whether or not such stock, shares, interests, rights to purchase or acquire, warrants, options, participations or other equivalents are outstanding on any date of determination.

"Estates" has the meaning set forth in the Plan.

["Excess Cash" of an IAC means any cash that (A) may be distributed without violating applicable Law and (B) in the good faith judgment of management of such IAC is not needed in the business of such IAC (whether for current or future operations, to be held in reserve for contingencies or otherwise).]

"Excess IAC Proceeds" has the meaning set forth in Section 2.01(i).

"Excess Group 8 Payment Obligation" has the meaning set forth in Section 2.01(i).

"Family Group" means a group comprised of Payment Parties and certain Shareholder Released Parties as set forth in Exhibit C.

"Family Member" means any Payment Party or Shareholder Released Party in a Family Group as set forth in Exhibit A.

"Final Second Circuit Decision" means a ruling by the Second Circuit that is not subject to any petitions for rehearing by the Second Circuit.

"Fourth Tier Obligor" has the meaning set forth in Section 9.02(a)(iv).

"Funding Deadline" has the meaning set forth in Section 2.01(b).

"Further Assurances Agreements" means [●].

"GAAP" means generally accepted accounting principles in the United States applied on a consistent basis.

"Governmental Authority" means any: (a) nation, state, commonwealth, province, territory, county, municipality, district or other jurisdiction of any nature; (b) federal, state, local, municipal, foreign or other government; or (c) governmental or quasi-governmental authority of any nature (including any governmental division, department, agency, commission, instrumentality, official, organization, unit, body or Person and any court or other tribunal and including any arbitrator and arbitration panel).

"Governmental Authorization" means any permit, license, certificate, approval, consent, grant, franchise, permission, clearance, registration, qualification or authorization issued, granted, given or otherwise made available by or under the authority of any Governmental Authority or pursuant to any Law.

"IAC" means an entity or Person set forth on Exhibit [E].

["IAC Account" means, in each case, (i) a deposit account subject to a Control Agreement or (ii) if elected by the applicable IAC Payment Party, an escrow account subject to an Escrow Agreement, in each case located in the U.S. or such other jurisdiction as acceptable to the MDT, and in which the proceeds of any Sale or any IAC Distribution is deposited and maintained.]

"IAC Account Bank" means a financial institution in the U.S. or such other jurisdiction as acceptable to the MDT acting as a deposit bank or securities intermediary, as applicable, in respect of the IAC Account, which financial institution is reasonably acceptable to the MDT.

"IAC Collateral" means all "Collateral" (or similar or equivalent term) as defined in any IAC Collateral Document and shall include all assets and property, whether real, personal or mixed, whether now or hereafter acquired and wherever located, with respect to which a Lien is granted (or required, intended or purported to be granted), as security for any Obligation of the Payment Groups that any IAC Payment Party is a member of, pursuant to any IAC Collateral Document, including all proceeds and products thereof.

["IAC Collateral Documents" means, collectively, the IAC Pledge and Security Agreements, the IAC Control Agreements, the IAC Escrow Agreements and all other agreements, instruments and documents that create, perfect or evidence, or are intended to create, perfect or evidence, Liens to secure the Obligations of the Payment Group(s) of which the IAC Payment Parties are members of, including any and all other security agreements, pledge agreements, loan agreements, notes, guarantees, pledges, powers of attorney, consents, assignments, contracts, fee letters, notices, financing statements and all other written matter whether heretofore, now, or hereafter executed by any IAC Payment Party or any other Person and delivered to the MDT or any other Secured Party for their benefit, in each case, as amended, extended, renewed, restated, refunded, replaced, refinanced, supplemented, modified or otherwise changed from time to time.

"IAC Control Agreement" means a control agreement in a form reasonably acceptable to the MDT executed by the applicable IAC Payment Party, the applicable Secured Parties and the account bank in respect of an IAC Account and pursuant to which the Secured Parties are granted control (as such term is described in Section 9-104 of the UCC or any similar concept under the laws of any jurisdiction outside the United States governing perfection) of such IAC Account and their first-priority Lien on such IAC Account to secure the Outstanding Settlement Amount of the applicable Payment Group and other Obligations of such Payment Group is perfected.

"IAC Distribution" means any distribution of cash or other property or other Restricted Payments made by an IAC directly or indirectly to an IAC Payment Party on a pro rata basis based on relative ownership interests, including, but not limited to, any distribution of Sale Proceeds, any IAC Tax Distribution and any IAC Non-Tax Distribution.

"IAC Distribution Deductions" means, with respect to IAC Non-Tax Distributions actually received by an IAC Payment Party, the sum of:

(i) such IAC Payment Party's Unapplied Advanced Contributions; *plus*

(ii) without duplication and to the extent not previously applied in determining a Permitted Deduction, the following documented, out-of-pocket fees, costs and expenses of each member of such IAC Payment Party's Payment Group (allocated to such IAC Payment Party pro rata on the basis of the respective cash proceeds received by each IAC Payment Party within such Payment Group): (A) legal and other fees and expenses incurred in connection with a Sale or prospective Sale of any IAC, (B) any Settlement and Restructuring Expenses, and (C) amounts specified in Section 3.04, in each case borne, directly or indirectly, by such IAC Payment Party or any of its IAC Holding Companies or IACs (provided, for purposes of this clause (ii), such IAC Payment Party's pro rata share of any such fees, costs and expenses incurred by (x) such IAC Payment Party shall equal 100%, and (y) any of such IAC Payment Party's IAC Holding Companies or IACs shall equal the amount of such fees, costs and expenses multiplied by a fraction, the numerator of which is the amount actually received by such IAC Payment Party in connection with such IAC Non-Tax Distribution and the denominator of which is the total amount paid by such IAC Holding Company or IAC, as applicable, to its equityholders in connection with such IAC Non-Tax Distribution); *plus*

(iii) without duplication and to the extent not previously applied in determining a Permitted Deduction, all amounts funded, directly or indirectly, to any IAC by such IAC Payment Party's Payment Group (including its IAC Holding Companies) on or after the Agreement Effective Date (other than contributions that reduce the amount of IAC Non-Tax Distributions, as contemplated by the definition of "IAC Non-Tax Distribution")

Notwithstanding the foregoing, IAC Distribution Deductions shall not include income Taxes or withholding Taxes. IAC Distribution Deductions shall include repayment of indebtedness payable to Sackler Parties, provided that the full amount of any such repayment is included as a IAC Distribution to the payee.

"IAC Escrow Agreement" means an escrow agreement executed by the applicable IAC Payment Party, the applicable Secured Parties and the escrow agent in respect of an IAC Account, in customary form, but providing that amounts may be withdrawn by notice from the applicable IAC Payment Party (and not requiring notice or other approval of the applicable Secured Parties), *provided* that the applicable IAC Payment Party provides written notice to the MDT of such withdrawal, which notice shall include a certification from such IAC Payment Party that such withdrawal satisfies the conditions hereunder for a Permitted Withdrawal.

"IAC Holding Company" means any Person of which an IAC is a Subsidiary and which is jointly owned, directly or indirectly, by (i) one or more A-Side IAC Payment Parties and (ii) one or more B-Side IAC Payment Parties.

"IAC Non-Tax Distributions" means any cash distributions received by an IAC Payment Party in respect of its interest in any IAC other than distributions of Sale Proceeds, IAC Tax Distributions or amounts owing to the Sackler Parties pursuant to Section 3.04[; *provided* that no such distribution shall be considered a IAC Non-Tax Distribution unless and until the sixtieth (60th) day following the receipt by such IAC Payment Party of such distribution; *provided*, *further*, that the amount of any IAC Non-Tax Distribution shall be reduced by the amount of any cash contributions made by a Sackler Party to any IAC during such sixty (60) day period].]

"IAC Payment Party" means an A-Side IAC Payment Party or B-Side IAC Payment Party.

"IAC Pledge and Security Agreements" means the pledge and security agreements in respect of the IAC Pledged Shares set forth on Exhibit J.

"IAC Pledged Entities" means, collectively, the entities designated as "IAC Pledged Entities" on Exhibit F.

"IAC Pledged Shares" means, collectively, all Equity Interests of the IAC Pledged Entities now or hereafter owned by any IAC Pledgor, together in each case with (a) all certificates representing the same, (b) all Equity Interests representing a dividend on or a distribution or return of capital on or in respect of the IAC Pledged Shares, or resulting from a split-up, revision, reclassification or other like change of the IAC Pledged Shares or otherwise received in exchange therefor or in substitution thereof, and any warrants, rights or options issued to the holders of, or otherwise in respect of, the IAC Pledged Shares, and (c) all Equity Interests of any successor entity in connection with merger, consolidation, amalgamation or similar transaction.

"IAC Pledgor" means each entity designated as an "IAC Pledgor" on Exhibit F.

["IACPP Efforts" means, with respect to an IAC Payment Party in reference to any covenant in Section 3.03(a) or 3.03(b), that such IAC Payment Party shall, and shall cause each Subsidiary that it controls to, as necessary, (a) deliver written notice to the board of directors, board of managers or similar group, and to the chief executive officer (or person holding a similar position), in each case, of each IAC informing such Persons of such covenants and instructing such Persons to cause such IAC to comply, (b) with respect to any officer, director or other manager whose actions or failure to act has resulted in a violation of such covenant of which such IAC has actual knowledge, which failure cannot be cured or has

not been cured following reasonable notice and opportunity to cure, exercise such voting, approval, consent or similar rights of such IAC Payment Party or such controlled Subsidiary pursuant to the governing documents of such IAC in favor of the removal of such officer, director or other manager and (c) to the extent such IAC Payment Party or controlled Subsidiary has the right to call a meeting or solicit the consent of the equityholders of such IAC for the purpose of removing any officer, director or other manager described in the immediately preceding clause (b), exercise such right.  For purposes of the foregoing, an IAC Payment Party "controls" a Subsidiary with respect to a specified action if, acting by itself (or indirectly through other Subsidiaries that it controls), such IAC Payment Party has the authority under applicable law and the governing documents of such Subsidiary, to cause such Subsidiary to take the relevant action.]

["IAC Tax Distributions" means cash distributions received by an IAC Payment Party in respect of its interest in an IAC equal to (x) such IAC Payment Party's allocable share of the taxable income (as determined for U.S. income tax purposes as though such person were a U.S. citizen who is a resident of the State of Connecticut) for any taxable period arising from such direct or indirect ownership of the IAC and its Subsidiaries *multiplied by* (y) [the highest marginal U.S. federal, state, local and foreign income and withholding tax rates for such taxable period applicable to a U.S. citizen who is a resident of the State of Connecticut, taking into account the character of the income and the deductibility of state, local taxes and foreign income taxes for U.S. federal income tax purposes]; *provided*, that (i) IAC Tax Distributions may be calculated using a good faith estimate of the taxable income of any IAC; (ii) IAC Tax Distributions may be paid in installments during or after the relevant taxable period; (iii) IAC Tax Distributions may be paid in respect of a prior taxable period to the extent insufficient IAC Tax Distributions were made by an IAC in such prior taxable period in respect of its taxable income.  To the extent that a IAC Tax Distribution is based on a good faith estimate of the taxable income of an IAC, if, once the actual taxable income of such IAC in known, it is determined that the good faith estimate of the taxable income of such IAC exceeded the actual taxable income of such IAC, the IAC Tax Distribution to the extent of such excess shall be deemed a IAC Non-Tax Distribution made at the time of such determination.]

"IFRS" means the International Financial Reporting Standards.

"Implementation Limitations" has the meaning set forth in Section 3.05.

["Initial Settlement Amount" means (a) for each A-Side Payment Group that is a Non-Collar Recipient, $267,187,500, (b) for each Collar Recipient, $204,687,500, (c) for each B-Side Payment Group, 1,287,500,000.  The sum of the Initial Settlement Amounts of all Payment Groups shall be equal to the Aggregate Settlement Amount (i.e., $4.275 billion).]

"Indebtedness" of any Person means, as of any date of determination, all indebtedness of such Person as of such date, and shall include the following: (i) all indebtedness of such Person for borrowed money, (ii) all obligations of such Person evidenced by bonds, debentures, notes or other similar instruments, (iii) all obligations of such Person to pay the deferred purchase price of property or services other than trade payables in the ordinary course of business that are not overdue by more than sixty (60) days, (iv) all obligations of such Person under finance or capital leases which would be shown as an obligation in a balance sheet prepared in accordance with GAAP or IFRS, (v) all obligations under hedging agreements, (vi) all indebtedness of others with respect to obligations referred to in (i) to (v) above, guaranteed in any manner, directly or indirectly, by such Person, (vii) to all indebtedness of others with respect to obligations referred to in (i) to (v) above secured by a Lien on any asset owned by such Person (whether or not such indebtedness is assumed by such Person); *provided* that the amount of such indebtedness will be the lesser of: (a) the fair market value of such asset at such date of determination, and (b) the amount of such indebtedness of such other Person; and (viii) all net reimbursement obligations of such Person with respect to letters of credit, foreign currency sale agreements and bankers' acceptances, except such as are obtained by such Person to secure performance of obligations (other than for borrowed

money or similar obligations). Notwithstanding the foregoing, trade payables and accounts receivable (including intercompany payables and receivables, but excluding trade payables that are overdue by more than ninety (90) days) incurred in the ordinary course of business shall not constitute "Indebtedness".

"Law" means any federal, state, local, or foreign law, international or multinational ordinance, rule, statute or other requirement or provision having the force of law of any Governmental Authority.

"Lien" means, with respect to any property or asset (and/or any interest therein), any mortgage, lien, deed of trust, pledge, charge, security interest, collateral assignment, hypothecation, encumbrance or other adverse claim or interest of any kind in respect of such property or asset (or interest therein).

["MDT" shall mean (i) prior to the Plan Effective Date, the Debtors and (ii) beginning on and following the Plan Effective Date, the Master Disbursement Trust, as such term is defined in the Plan]

"MDT Shareholder Insurance Rights" means [●].[1]

"Minimum Required Settlement Payment" has the meaning set forth in Section 2.01(b).

["Net Proceeds" means, with respect to each IAC Payment Party:

(x) with respect to any Sale in respect of an IAC, (a) fifty-five percent (55%) of (i) the Sale Proceeds actually received by such IAC Payment Party from such Sale including, for the avoidance of doubt, (A) any cash payments received by way of deferred payment pursuant to a note or installment receivable or purchase price adjustment receivable or otherwise, in each case only as and when received, (B) any cash proceeds received from the conversion of non-cash consideration received from any Sale, and (C) any fees or other amounts payable to any Sackler Party in connection with any Sale; *provided* that in determining the amount of Sale Proceeds actually received by such IAC Payment Party for purposes of this clause (x), the amount treated as actually received by an IAC Payment Party shall be calculated  without duplication as though any income or withholding Taxes imposed in respect of such Sale Proceeds on an IAC, IAC Holding Company, or IAC Payment Party or any direct or indirect subsidiary of the foregoing shall be treated as actually received by such IAC Payment Party, *less* (b) Sale Proceeds Deductions of such IAC Payment Party; and

(y) with respect to any IAC Non-Tax Distribution, (a) fifty-five percent (55%) (with respect to any IAC Non-Tax Distribution ultimately received by an IAC Payment Party from an IAC to the extent there has been no IAC Tax Distribution with respect to such IAC Non-Tax Distribution), or (b) 100% (with respect to any other IAC Non-Tax Distribution), of (i) the aggregate amount of such IAC Non-Tax Distribution actually received by such IAC Payment Party; *provided* that in determining the amount of IAC Non-Tax Distributions actually received by such IAC Payment Party for purposes of this clause (y), the amount treated as actually received by an IAC Payment Party shall be calculated without duplication as though any income or withholding Taxes imposed in respect of such IAC Non-Tax Distribution on an IAC, IAC Holding Company, or IAC Payment Party or any direct or indirect subsidiary of the foregoing shall be treated as actually received by such IAC Payment Party, *less* (b) IAC Distribution Deductions of such IAC Payment Party.]

"Net Proceeds Payment" has the meaning set forth in Section 2.02(a).

---

[1] Note to Draft: Under discussion.

"Non-Collar Recipient" means any A-Side Payment Group that is not a Collar Recipient.

["Non-Collar Recipient 2.01 Adjustment" means, for a given Funding Deadline, one-seventh (1/7) of the amount, if any, by which the Non-Collar Recipient's A-Side Payment Group Portion of the Required Settlement Payment after giving effect to Section 2.01(f) exceeds such Non-Collar Recipient's Settlement Amount Balance.]

["Non-Specified Breach" shall mean each occurrence set forth in Section 9.01 that is not a Specified Breach.][2]

"Obligations" means obligations, covenants, liabilities and duties of the Sackler Parties (or any applicable Sackler Parties, as applicable) arising under this Agreement or the Definitive Documents, whether direct or indirect, absolute or contingent, due or to become due, now existing or hereafter arising, including, but not limited to, the applicable Outstanding Settlement Amount(s) of such Sackler Party or Sackler Parties, Breach Fee owed by such Sackler Party or Sackler Parties and any reimbursement obligations of such Sackler Party or Sackler Parties for costs and expenses pursuant to Section 9.02.

"Other Parties" has the meaning set forth in Section 4.01(d).

["Outstanding Settlement Amount" means, at any time of determination, with respect to any Payment Group, (a) such Payment Group's Settlement Amount Balance, *less* (b) the amount of any prepayments made by such Payment Group pursuant to Section 2.01(e) that have not yet been applied to satisfy and reduce such Payment Group's A-Side Funding Deadline Obligation or B-Side Funding Deadline Obligation, as applicable.]

"Party" has the meaning set forth in the preamble.

"Payment Group" means each set of Payment Parties identified as a "payment group" on Exhibit A.

"Payment Group Portion" means, (i) with respect to an A-Side Payment Group, its A-Side Payment Group Portion and (ii) with respect to a B-Side Payment Group, its B-Side Payment Group Portion.

"Payment Party" means an A-Side Payment Party or a B-Side Payment Party.

"Payment Remedy" has the meaning set forth in Section 9.02(a)(ii)(A).

"Payors" has the meaning set forth in Section 4.01(a).

"Permitted Deductions" means IAC Distribution Deductions and Sale Proceeds Deductions.

["Permitted Withdrawals" means (i) in the case of an A-Side IAC Payment Party, (x) any amounts used to pay Actual Taxes of such IAC Payment Party or of any of its direct or indirect Subsidiaries or its direct or indirect equity holders or beneficiaries in respect of any Sale of any IAC directly or indirectly held by such IAC Payment Party (y) any IAC Distribution Deductions described in clauses (ii) and (iii) of the definition thereof or (z) any Sale Proceeds Deductions described in clauses (ii) or (iii) of the definition thereof, (ii) with respect to a B-Side IAC Payment Party, the portion of any Sale Proceeds or IAC Distribution that do not constitute Net Proceeds and (iii) in the case of any IAC Payment Party, the

---

[2] Note to Draft: Under discussion.

repayment of amounts paid to the MDT by Persons other than such IAC Payment Party (or any Subsidiary thereof) in respect of such IAC Payment Party's Obligations under Section 2.02.]

"Person" means an individual, corporation, partnership, limited liability company, association, trust or other entity or organization, including a Governmental Authority.

"Plan" means the chapter 11 plan to be filed by the Debtors, including any schedules, annexes, exhibits and supplements thereto, as amended from time to time, each in form and substance acceptable to the Sackler Parties (a) in their sole and absolute discretion solely with respect to the matters related to the (i) Shareholder Releases provided by the Debtors, their Estates and the Releasing Parties, (ii) Channeling Injunction (as defined in the Plan), (iii) this Agreement and (iv) Collateral Documents and (b) in their reasonable discretion with respect to all other matters outside the scope of the foregoing clause (a) relating to the Shareholder Released Parties.  For the avoidance of doubt, the Sackler Parties agree that the chapter 11 plan filed at Docket No. 2982 on the docket of the Bankruptcy Cases is in form and substance acceptable to the Sackler Parties.

["Plan Administration Trust" has the meaning set forth in the Plan].

["Plan Administration Trustee" has the meaning set forth in the Plan].

["Plan Distributions" shall mean all Distributions (as defined in the Plan) to be made by the MDT or NewCo in accordance with the Plan.]

"Plan Documents" has the meaning set forth in the Plan.

"Plan Effective Date" means the effective date of the Plan.

"PPI Interests" has the meaning set forth in the recitals.

"PPLP Interests" has the meaning set forth in the recitals.

"PPLP Liquidator" [has the meaning set forth in the Plan].

"PRA L.P." has the meaning set forth in Section 2.01(j).

"Prejudicial Impact" has the meaning set forth in Section 8.02.

"Proceeding" means any action, suit, litigation, arbitration, proceeding (including any civil, criminal, administrative, investigative or appellate proceeding), hearing, inquiry, audit, examination or investigation commenced, brought, conducted or heard by or before, or otherwise involving, any court or other Governmental Authority.

["Protective Order" has the meaning set forth in Section 11.14.]

"Purchaser" has the meaning set forth in Section 3.01(a).

"Purdue" means Purdue Pharma L.P.

["Purdue Canada" means Bard Pharmaceuticals (1990) Inc., Elvium Life Sciences GP Inc., Elvium Life Sciences Limited Partnership, Elvium ULC, Purdue Frederick Inc. (Canada), Purdue Pharma (Canada), Purdue Pharma Inc. (Canada), and Purdue Pharma ULC.]

"<u>Quarterly Sweep Date</u>" has the meaning set forth in <u>Section 3.07(e)</u>.

"<u>Recovery</u>" has the meaning set forth in <u>Section 9.05</u>.

"<u>Related Parties</u>" means [●].[3]

"<u>Release Remedy</u>" has the meaning set forth in <u>Section 9.02(a)(ii)(B)</u>.

"<u>Releasing Parties</u>" shall have the meaning ascribed to such term in the Fifth Amended Plan filed at Docket No. 2982 on the docket of the Bankruptcy Cases, but shall not include <u>clause (vi)</u> in the definition thereto.

"<u>Relevant Parties</u>" has the meaning set forth in <u>Section 4.01(d)</u>.

"<u>Remedies Forbearance Period</u>" has the meaning set forth in <u>Section 9.02(a)(i)</u>.

"<u>Representation</u>" means [●].

"<u>Representatives</u>" means a Person's officers, directors, employees, agents, attorneys, accountants, advisors and other authorized representatives.

["<u>Required Settlement Payment</u>" means, as of any Funding Deadline, an amount equal to (x) the Cumulative Minimum Required Settlement Payments due on or prior to such Funding Deadline *less* (y) the Aggregate Payments made, or required to have been made (whether or not actually made) prior to such Funding Deadline (and, for the avoidance of doubt, not including any payment required to be made on such Funding Deadline), *plus* (z) the B-Side Excess Amount as of immediately prior to such Funding Deadline; *provided* that if such calculation results in an amount that is less than zero, the Required Settlement Payment shall be equal to zero.]

"<u>Restitution</u>" has the meaning set forth in <u>Section 4.01(a)</u>.

"<u>Restricted Payment</u>" means any dividend or other distribution (whether in cash, securities or other property) with respect to any Equity Interest of any Person, or any payment (whether in cash, securities or other property) including any sinking fund or similar deposit, on account of the purchase, redemption, retirement, acquisition, cancellation or termination of any such Equity Interest (including, but not limited to, the IAC Pledged Shares), or on account of any return of capital to such Person's shareholders, partners or members (or the equivalent Persons thereof).

"<u>Retained Interest</u>" has the meaning set forth in <u>Section 3.01(b)</u>.

"<u>Sackler Party</u>" means a Payment Party or an IAC Payment Party.

"<u>Sackler Parties' Representative</u>" means [●], a [●] organized under the laws of [●].

"<u>Sale</u>" has the meaning set forth in <u>Section 3.01(a)</u>.

"<u>Sale Obligations</u>" has the meaning set forth in <u>Section 3.06</u>.

---

[3] <u>Note to Draft</u>: Under discussion

"Sale Period" has the meaning set forth in Section 3.01(a).

["Sale Proceeds" means the gross cash proceeds of a Sale, including in the event the assets of any IAC Payment Party, IAC Holding Company, IAC, or any other direct or indirect Subsidiary of an IAC Payment Party are sold as part of the same transaction or series of related transactions as a Sale, the proceeds from the sale of such assets.]

["Sale Proceeds Deductions" means, with respect to Sale Proceeds actually received by an IAC Payment Party in respect of a Sale, the sum of:

(i) such IAC Payment Party's Unapplied Advanced Contributions; *plus*

(ii) without duplication and to the extent not previously applied in determining a Permitted Deduction, the following documented, out-of-pocket fees, costs and expenses of each member of such IAC Payment Party's Payment Group (allocated to such IAC Payment Party pro rata on the basis of the respective cash proceeds received by each IAC Payment Party within such Payment Group):  (A) transfer Taxes, legal and other fees and expenses incurred in connection with a Sale or prospective Sale of any IAC, (B) any Settlement and Restructuring Expenses, and (C) amounts specified in Section 3.04, in each case borne, directly or indirectly, by such IAC Payment Party or any of its IAC Holding Companies or IACs (provided, for purposes of this clause (ii), such IAC Payment Party's pro rata share of any such fees, costs and expenses incurred by (x) such IAC Payment Party shall equal 100%, and (y) any of such IAC Payment Party's IAC Holding Companies or IACs shall equal the amount of such fees, costs and expenses multiplied by a fraction, the numerator of which is the amount of Sale Proceeds actually received by such IAC Payment Party in connection with such Sale and the denominator of which is the total amount paid by such IAC Holding Company or IAC, as applicable, to its equityholders in connection with such Sale ); *plus*

(iii) without duplication and to the extent not previously applied in determining a Permitted Deduction, all amounts funded, directly or indirectly, to any IAC by such IAC Payment Party's Payment Group (including its IAC Holding Companies) on or after the Agreement Effective Date (other than contributions that reduce the amount of IAC Non-Tax Distributions, as contemplated by the definition of "IAC Non-Tax Distribution")

Notwithstanding the foregoing, Sale Proceeds Deductions shall not include repayment of indebtedness payable to Sackler Parties, income Taxes or withholding Taxes. Sale Proceeds Deductions shall include repayment of indebtedness payable to Sackler Parties, *provided* that the full amount of any such repayment is included as Sale Proceeds to the payee]

"Second Circuit" means the United States Court of Appeals for the Second Circuit.

"Secured Party" means each of (i) the MDT and each of its successors and permitted assigns and (ii) any agent, trustee or other representative or designee (including one or more Subsidiaries or other entities of the MDT formed to carry out its duties and obligations under the Definitive Documents) authorized or appointed to hold any security interest in or Lien on, or take possession or control of, any Collateral on behalf of and for the benefit of itself and any person described in clause (i) above.

["Separation Agreements" means the agreements entered into in accordance with this Agreement to govern continuing business relationships and claims among the Debtors, NewCo and any entities owned directly or indirectly by the Sackler Parties.]

"Settlement" has the meaning set forth in the recitals.

["Settlement Amount Balance" means, at any time of determination, with respect to any Payment Group, (a) such Payment Group's Initial Settlement Amount, *less* (b) the Aggregate Payments of such Payment Group and *adjusted for* (c) any reallocation of the Settlement Amount Balance required by Section 2.03.]

"Settlement and Restructuring Expenses" means [●].[4]

"Settlement Effective Date" [means the first date on which each of the conditions precedent set forth in Article 10 have been satisfied, or, to the extent permitted therein, waived]

["Shareholder Insurance Rights" has the meaning set forth in the Plan.]

"Shareholder Released Claims" has the meaning set forth in the Plan.

"Shareholder Released Parties" has the meaning set forth in the Plan.

"Shareholder Releasing Parties" has the meaning set forth in the Plan.

"Shareholder Releases" has the meaning set forth in the Plan.

"Specified Breach" means [●].[5]

"Subsidiary" means, with respect to any Person, a corporation, partnership, joint venture, limited liability company or other entity (i) of which a majority of the shares or securities or other equity or ownership interests having ordinary voting power for the election of directors, managers, or other governing body (other than securities or interests having such power only by reason of the happening of a contingency) are at the time directly or indirectly beneficially owned by such Person, or (ii) the management of which is otherwise controlled, directly or indirectly through one or more intermediaries, or both, by such Person.

["Tax" or "Taxes" means all taxes, customs, duties, governmental fees or other like assessment or charge of any kind whatsoever, including all federal, state, local or foreign income, gross receipts, windfall profits, severance, property (real or personal), production, sales, use, value-added, ad valorem, license, excise, franchise, transfer, gains, escheat, mortgage recording, transportation, gross operating, capital, employment, unemployment, occupation, social security, pension plan, withholding or similar taxes, customs, duties, governmental or other like assessments or charges, together with any interest, repayment supplement, additions or penalties with respect thereto and any interest in respect of such additions or penalties.]

["Tax Advisor" means an accounting firm of international renown with expertise in the relevant jurisdiction engaged by a Sackler Party or an IAC to provide advice regarding the tax consequences of a Sale.]

"Tax Treatment" has the meaning set forth in Section 4.01(d).

["Third Party Payee" means, with respect to any Sale or IAC Distribution, (a) any Tax authority or other regulatory authority to whom payments are required in connection with such transaction, (b) any

[4] Note to Draft: Under discussion.

[5] Note to Draft: Under discussion.

contract counterparty whose consent is required to complete such Sale or IAC Distribution, or who is entitled to a payment as a result of such Sale or IAC Distribution, (c) any legal, accounting, financial or other advisor that provides services in connection with such Sale or IAC Distribution or (d) any Person (including any Sackler Party or any of their Affiliates) that advances payments to any Person described in clauses (a) through (c).]

"Trusts" means [the trusts subject to the terms hereof being Sackler Parties as set forth on Exhibit A, on account of their respective trustees entering into this Agreement, in their capacity as such.]

["Unapplied Advanced Contributions" of an IAC Payment Party means, with respect to a Sale or IAC Non-Tax Distribution, an amount equal to the greater of zero or:

(i) the Aggregate Payments prior to (and without giving effect to) such Sale or IAC Non-Tax Distribution of all Payment Groups in which such IAC Payment Party is a member, *less*

(ii) the aggregate amount of any payments made, or deemed to have been made, to the MDT prior to (and without giving effect to) such Sale or IAC Non-Tax Distribution pursuant to Section 2.02(b) of all Payment Groups in which such IAC Payment Party is a member, *less*

(iii) the aggregate amount of Net Proceeds of all Payment Groups in which such IAC Payment Party is a member prior to (and without giving effect to) such Sale or IAC Non-Tax Distribution (with Net Proceeds calculated without giving effect to the deduction of Unapplied Advanced Contributions).

If proceeds from such Sale or IAC Non-Tax Distribution are received by more than one IAC Payment Party that share membership in a common set of Payment Groups (e.g., the A-Side General Obligors, with respect to the A-Side Payment Groups), then such Unapplied Advanced Contributions shall be allocated between such IAC Payment Parties pro rata on a basis of the respective cash proceeds received by such IAC Payment Parties.]

"Unapplied Net Proceeds" has the meaning set forth in Section 2.02(b).

**Section 1.02    Interpretative Provisions**.

(a)    The words "hereof," "herein" and "hereunder" and words of like import used in this Agreement shall refer to this Agreement as a whole and not to any particular provision of this Agreement.

(b)    The captions herein are included for convenience of reference only and shall be ignored in the construction or interpretation hereof.  References to Articles, Sections, and Exhibits are to the Articles, Sections, and Exhibits of this Agreement unless otherwise specified.

(c)    All Exhibits and Schedules annexed hereto or referred to herein are hereby incorporated in and made a part of this Agreement as if set forth in full herein.  Any capitalized terms used in any Exhibit or Schedule but not otherwise defined therein shall have the meaning as defined in this Agreement.

(d)    Any singular term in this Agreement shall be deemed to include the plural, and any plural term the singular, and words denoting either gender shall include both genders as the context requires. Where a word or phrase is defined herein, each of its other grammatical forms shall have a corresponding meaning.

(e)     Whenever the words "include," "includes" or "including" are used in this Agreement, they shall be deemed to be followed by the words "without limitation," whether or not they are in fact followed by those words or words of like import.

(f)     The use of the word "or" shall not be exclusive.

(g)     The word "will" shall be construed to have the same meaning and effect as the word "shall."

(h)     The word "party" shall, unless the context otherwise requires, be construed to mean a party to this Agreement.   Any reference to a party to this Agreement or any other agreement or document contemplated hereby shall include such party's successors and permitted assigns.

(i)     Any reference in this Agreement to a trust as a person or party shall, unless the context otherwise requires, be construed to include the trustees thereof acting in their capacity as such trustees.

(j)     Any reference in this Agreement to a "natural person" shall not, unless the context otherwise requires, be construed to include a trustee that is a natural person acting in such person's capacity as trustee.

(k)     Any reference in this Agreement to the rights and obligations of a trust (including a Trust) that does not have a separate legal personality under applicable Law shall be construed as a reference to the rights and obligations of the trustees of those trusts (including the Trusts) in their capacity as such.

(l)     All references to "$" and dollars shall be deemed to refer to United States currency unless otherwise specifically provided.

(m)     All references to a day or days shall be deemed to refer to a calendar day or calendar days, as applicable, unless otherwise specifically provided.

(n)     Any reference to any Contract shall be a reference to such agreement or contract, as amended, amended and restated, modified, supplemented or waived.

(o)     A reference to any legislation or to any provision of any legislation shall include any modification, amendment, re-enactment thereof, any legislative provision substituted therefore and all rules, regulations and statutory instruments issued or related to such legislation.

(p)     Any rule of construction to the effect that ambiguities are to be resolved against the drafting party shall not be applied in the construction or interpretation of this Agreement.   No prior draft of this Agreement nor any course of performance or course of dealing shall be used in the interpretation or construction of this Agreement.   No parol evidence shall be introduced in the construction or interpretation of this Agreement unless the ambiguity or uncertainty in issue is plainly discernable from a reading of this Agreement without consideration of any extrinsic evidence.   Although the same or similar subject matters may be addressed in different provisions of this Agreement, the Parties intend that, except as reasonably apparent on the face of the Agreement or as expressly provided in this Agreement, each such provision shall be read separately, be given independent significance and not be construed as limiting any other provision of this Agreement (whether or not more general or more specific in scope, substance or content).

(q)     [Any reference to any obligation of any Sackler Party to "cause" an IAC to take (or refrain from taking) any action shall be a reference to such Sackler Party taking all necessary action to cooperate

19

with any other relevant Sackler Party or Subsidiary of Sackler Party, to ensure that Persons with Control over such IAC act together to cause such IAC to take (or refrain from taking) the relevant action.]

## ARTICLE 2.
## SETTLEMENT PAYMENTS

### Section 2.01    Required Settlement Payment.

(a)    Payment of the Outstanding Settlement Amount.  Each Payment Party agrees, on a joint and several basis with the other Payment Parties within its Payment Group, but on a several and not joint basis as among Payment Groups, to pay or cause to be paid, in the manner and at the times set forth in this Agreement (whether out of Net Proceeds pursuant to Section 2.02, by the applicable Funding Deadlines pursuant to this Section 2.01, as a result of a Payment Remedy, or otherwise) the Outstanding Settlement Amount of its Payment Group.  Except as provided in Section 2.05, the Payment Parties within a Payment Group shall have no further payment obligation under this Section 2.01 once (and for so long as) the Outstanding Settlement Amount of such Payment Group has been reduced to zero.  For the avoidance of doubt, if the Outstanding Settlement Amount of any Payment Group is reduced to zero and then subsequently becomes an amount greater than zero, from and after the date on which the Outstanding Settlement Amount becomes an amount greater than zero, such Payment Group shall comply with the obligations of this Section 2.01 until its Outstanding Settlement Amount is again reduced to zero.

(b)    Minimum Required Settlement Payment.  Subject to the terms and conditions set forth herein, the Aggregate Settlement Amount shall be paid by the Payment Parties in the amounts and on or before the deadlines set forth in the schedule below.  Each such payment deadline set forth in the schedule below shall be referred to herein as a "Funding Deadline" and each amount set forth in the schedule below on each Funding Deadline shall be referred to herein as a "Minimum Required Settlement Payment".

| #   | Funding Deadline    | Minimum Required Settlement Payment                                                             |
| --- | ------------------- | ---------------------------------------------------------------------------------------------- |
| 1.  | Plan Effective Date | $300 million                                                                                   |
| 2.  | June 30, 2022       | $350 million                                                                                   |
| 3.  | June 30, 2023       | $350 million                                                                                   |
| 4.  | June 30, 2024       | $350 million                                                                                   |
| 5.  | June 30, 2025       | $350 million                                                                                   |
| 6.  | June 30, 2026       | $300 million                                                                                   |
| 7.  | June 30, 2027       | $1,000 million                                                                                 |
| 8.  | June 30, 2028       | $475 million                                                                                   |
| 9.  | June 30, 2029       | $425 million, subject to adjustment as set forth in the proviso immediately below this schedule |
| 10. | June 30, 2030       | $375 million, subject to adjustment as set forth in the proviso immediately below this schedule |
| 11. | June 30, 2031       | Up to $200 million, as set forth in the proviso immediately below this schedule                 |

provided that (x) each dollar in excess of $2.5 billion up to and including $2.675 billion in the aggregate that the MDT actually receives pursuant to this Agreement on or prior to June 30, 2026 shall defer one dollar, up to a maximum aggregate amount of $175 million, of the Minimum Required Settlement Payment otherwise payable on June 30, 2030 to instead become payable on June 30, 2031 and (y) each dollar in excess of $2.675 billion that the MDT actually receives pursuant to this Agreement on or prior to June 30, 2026 shall defer one dollar, up to a maximum aggregate amount of $25 million, of the Minimum Required Settlement Payment otherwise payable on June 30, 2029 to instead become payable on June 30, 2031; provided, however, that deferrals shall only be made pursuant to the foregoing proviso if the aggregate

amount available for deferral pursuant thereto exceeds $25 million; *provided*, *further* that for each month that the Plan Effective Date is delayed past February 28, 2022, the second Funding Deadline of June 30, 2022 shall be extended in increments of one calendar month (and due at such month end) such that there are no fewer than four calendar months between the Plan Effective Date and the second Funding Deadline, with all other Funding Deadlines remaining as set forth above, *however*, in the event any Funding Deadline is otherwise extended pursuant to the terms of this Agreement such that fewer than five calendar months remain until the next Funding Deadline, such next Funding Deadline shall be automatically extended by one calendar month.

(c)   Payment of A-Side Funding Deadline Obligations.  With respect to each Payment Group, on each Funding Deadline,

(i)   The A-Side General Obligors within each A-Side Payment Group shall pay, or cause to be paid (on a joint and several basis with the other A-Side General Obligors) to the MDT, such A-Side Payment Group's A-Side Funding Deadline Obligation by the applicable Funding Deadline;

(ii)   the A-Side Payment Parties that are trusts (other than A-Side General Obligors and "Bare Trusts") or other entities within each A-Side Payment Group shall pay, or cause to be paid (on a joint and several basis with the other remaining A-Side Payment Parties that are trusts or other entities within such A-Side Payment Group), to the MDT such A-Side Payment Group's A-Side Funding Deadline Obligation by the applicable Funding Deadline solely to the extent such A-Side Funding Deadline Obligation is not paid pursuant to clause (i); and

(iii)   the A-Side Payment Parties that are natural persons or "Bare Trusts" within each A-Side Payment Group shall pay, or cause to be paid (on a joint and several basis with the other A-Side Payment Parties that are natural persons or "Bare Trusts" within such A-Side Payment Group), to the MDT such A-Side Payment Group's A-Side Funding Deadline Obligation by the applicable Funding Deadline solely to the extent such A-Side Funding Deadline Obligation is not paid pursuant to clause (i) or (ii);

*provided* that (1) if, on any Funding Deadline, the payment of any A-Side Funding Deadline Obligation would cause the Outstanding Settlement Amount of an A-Side Payment Party's Payment Group to be less than zero, such A-Side Payment Party shall pay, or cause to be paid, to MDT on such Funding Deadline an amount equal to the Outstanding Settlement Amount of its A-Side Payment Group; (2) no A-Side Payment Party shall be required to pay any portion of any Required Settlement Payment so long as the Outstanding Settlement Amount of its A-Side Payment Group is zero (or less than zero); [(3) no A-Side General Obligor shall have any obligation to make any payment pursuant to this Section 2.01 (and shall not be in Breach or otherwise have any liability to the MDT for the failure to make any payment) if and to the extent it does not have sufficient liquid assets (not including, in respect of any A-Side IAC Payment Party, any amounts reserved in good faith for the payment of (x) Taxes or any IAC Distribution Deductions described in clause (ii) of the definition thereof or Sale Proceeds Deductions described in clause (ii) of the definition thereof) to do so;] and (4) nothing in this Section 2.01(c) [(other than the preceding clause (3), solely with respect to such A-Side General Obligor)] shall limit the MDT's right to seek payment in full from any A-Side Payment Party of its A-Side Funding Deadline Obligation without any requirement to seek collection first from any A-Side General Obligor or any other A-Side Payment Party.

(d)   Payment of B-Side Funding Deadline Obligations.  With respect to each Funding Deadline, each B-Side Payment Group shall pay, or cause to be paid, to the MDT its B-Side Funding Deadline Obligation by the applicable Funding Deadline; *provided* that (x) if, on any Funding Deadline, the payment by any B-Side Payment Group of its B-Side Funding Deadline Obligation would cause its Outstanding

Settlement Amount to be less than zero, then such B-Side Payment Group shall pay, or cause to be paid, to MDT an amount equal to its Outstanding Settlement Amount on such Funding Deadline and (y) such B-Side Payment Group shall not be required to pay any portion of any Required Settlement Payment so long as its Outstanding Settlement Amount is zero (or less than zero).

(e)    Prepayment of Outstanding Settlement Amount.  Any Payment Group shall have the right to prepay its Outstanding Settlement Amount at any time, in whole or in part, without premium or penalty. Any such prepayment by a Payment Group shall satisfy and reduce, dollar-for-dollar, such Payment Group's next due A-Side Funding Deadline Obligation(s) or B-Side Funding Deadline Obligation(s), as the case may be. For the avoidance of doubt, no such prepayment by a Payment Group (or subsequent reduction of the next due A-Side Funding Deadline Obligation(s) or B-Side Funding Deadline Obligation(s) of such Payment Group) shall affect any payment obligation under this Agreement of any other Payment Group.

(f)    Adjustment of Required Settlement Payments on First Three Funding Deadlines.  If the Required Settlement Payment on any of the first, second, or third Funding Deadline is greater than zero, then (i) each B-Side Payment Group shall pay, or cause to be paid, to the MDT on such Funding Deadline, an amount equal to fifty percent (50%) of such Required Settlement Payment and (ii) no A-Side Payment Party shall be required to pay any portion of such Required Settlement Payment.  For the avoidance of doubt, (x) any payment by a B-Side Payment Group pursuant to this Section 2.01(f) shall be credited in full to such B-Side Payment Group (and not to any A-Side Payment Group) for purposes of calculating the Aggregate Payments of such Payment Group and (y) each B-Side Payment Party shall be jointly and severally liable with the other B-Side Payment Parties within its B-Side Payment Group for the amount payable under this Section 2.01(f) by its B-Side Payment Group.

(g)    B-Side Excess Amount Adjustment.  If, as of any Funding Deadline, (x) the Aggregate Payments of all Payment Groups exceeds (y) an amount equal to the greater of (i) the Cumulative Minimum Required Settlement Payments as of the immediately prior Funding Deadline and (ii) the aggregate amount of Net Proceeds with respect to all Payment Parties calculated without giving effect to the deduction of Unapplied Advanced Contributions  (the amount of the excess between clauses (x) and (y), the "B-Side Excess Amount"), then the portion of the Required Settlement Payment payable by each B-Side Payment Group on such Funding Deadline shall be reduced by the lesser of fifty percent (50%) of the B-Side Excess Amount or one hundred percent (100%) of such B-Side Payment Group's B-Side Payment Group Portion of the Required Settlement Payment after giving effect to Section 2.01(f).

(h)    A-Side Allocable Portion Adjustment.  If, immediately prior to the eighth Funding Deadline, the A-Side Allocable Portion is greater than zero, then:

(i)    on each of the eighth, ninth and tenth Funding Deadlines, each A-Side Payment Group shall pay, or cause to be paid, to MDT an amount equal to the lesser of (x) one-twenty-fourth (1/24) of the A-Side Allocable Portion calculated as of immediately prior to the eighth Funding Deadline; (y) such A-Side Payment Group's Settlement Amount Balance less its A-Side Payment Group 2.01 Amount as of such eighth, ninth, or tenth Funding Deadline; and (z) one eighth (1/8) of the B-Side Payment Groups' aggregate B-Side Payment Group 2.01 Amounts as of such eighth, ninth, or tenth Funding Deadline (each such payment pursuant to this subparagraph (i), an "A-Side Reallocation Payment"); and

(ii)    each B-Side Payment Group's B-Side Payment Group 2.01 Amount for the eighth, ninth or tenth Funding Deadlines shall be reduced by an amount equal to fifty percent (50%) of the aggregate A-Side Reallocation Payments made on such Funding Deadline.

For the avoidance of doubt, (w) any A-Side Reallocation Payment made by a A-Side Payment Group shall be credited in full to such A-Side Payment Group (and not to any B-Side Payment Group) for purposes of calculating the Aggregate Payments, (x) the obligation of each A-Side Payment Group to pay its A-Side Reallocation Payment is in addition to its obligation to pay its A-Side Funding Deadline Obligation due on such Funding Deadline pursuant to Section 2.01(c), (y) each A-Side Payment Party shall be jointly and severally liable with the other A-Side Payment Parties within its A-Side Payment Group for the A-Side Reallocation Payment of such Payment Group, and (z) an A-Side Payment Group shall have no further obligation to pay its A-Side Reallocation Payment once (and for so long as) the Settlement Amount Balance of such Payment Group has been reduced to zero.

(i)    Family Group 8 Cap.  Notwithstanding anything in this Section 2.01 or Section 2.03 to the contrary  if, at any time, the A-Side Capped Payment Parties have actually paid an aggregate of $84,500,000 to the MDT pursuant to Sections 2.01(c)(ii), (e) and (h) (not including any payments deemed to have been made by A-Side Payment Group 8 pursuant to Section 2.01(l)), then, with respect to any other payment obligations of the A-Side Capped Payment Parties arising from time to time thereafter pursuant to Sections 2.01(c)(ii) and 2.01(h) (any such amount, an "Excess Group 8 Payment Obligation"):

(i)    the A-Side Payment Parties within each A-Side Payment Group (other than A-Side Payment Group 8) shall pay, or cause to be paid, on a joint and several basis with the other A-Side Payment Parties within their respective A-Side Payment Groups, to the MDT when such Excess Group 8 Payment Obligation is due an amount equal to one fourteenth (1/14) of any such Excess Group 8 Payment Obligation; and

(ii)    the B-Side Payment Parties within each B-Side Payment Group shall pay, or cause to be paid, on a joint and several basis with the other B-Side Payment Parties within their respective B-Side Payment Groups, to the MDT when such Excess Group 8 Payment Obligation is due an amount equal to one quarter (1/4) of any such Excess Group 8 Payment; and

(iii)    the A-Side Capped Payment Parties shall have no obligation to pay any portion of the Excess Group 8 Payment Obligation.  For the avoidance of doubt, nothing in this Section 2.01(i) shall relieve the A-Side General Obligors or the A-Side IAC Payment Parties in A-Side Family Group 8 of their obligations under Sections 2.01, 2.02, and 2.03.

For the avoidance of doubt, the payment of any such Excess Group 8 Payment Obligation will be considered Aggregate Payments by the A-Side Payment Group 8 and not by the Payment Group actually making such payment.

Notwithstanding the foregoing, if (i) any B-Side Payment Group pays any portion of an Excess Group 8 Payment Obligation and (ii) following the date upon which A-Side Payment Group 8's Outstanding Settlement Amount (inclusive of the Excess Group 8 Payment Obligation) has been reduced to zero, any A-Side General Obligor receives or retains proceeds resulting, directly or indirectly, from a Sale or IAC Non-Tax Distribution (other than any such proceeds used to pay Taxes, reserved in good faith for the payment of Taxes, or that constitute IAC Distribution Deductions described in clause (ii) of the definition thereof or Sale Proceeds Deductions described in clause (ii) of the definition thereof) (any such proceeds, "Excess IAC Proceeds"), such A-Side General Obligor shall be obligated to pay to each such B-Side Payment Group an amount (such amount, a "2.01(i) Top-Off Payment") equal to the lesser of (x) one thirty-second (1/32) of the amount of proceeds received by such A-Side General Obligor, and (y) the amount paid by such B-Side Payment Group in respect of the Excess Group 8 Payment Obligation (less amounts previously paid to such B-Side Payment Group pursuant to this paragraph).  Until such time as the B-Side Payment Groups have received 2.01(i) Top-Off Payments equal to the amount paid by all B-Side Payment Groups in respect of the Excess Group 8 Payment Obligation, no A-Side General Obligor shall make any

distribution to any A-Side Capped Payment Party of Excess IAC Proceeds.  If, notwithstanding the foregoing, any A-Side Capped Payment Party receives any Excess IAC Proceeds, such A-Side Capped Payment party will be obligated to make a 2.01(i) Top-Off Payment to each B-Side Payment Group in an amount equal to the lesser of (1) one fourth (1/4) of the Excess IAC Proceeds received by such A-Side Capped Payment Party and (2) the amount paid by such B-Side Payment Group in respect of the Excess Group 8 Payment Obligation (less amounts previously paid to such B-Side Payment Group by the A-Side General Obligors or the A-Side Capped Payment Parties pursuant to this paragraph).

Any 2.01(i) Top-Off Payment required to be made pursuant to the preceding paragraph will be paid within the later of (x) thirty (30) days after the date on which all Outstanding Settlement Amounts of the A-Side Payment Groups have been reduced to zero and (y) thirty (30) days after the date on which such Excess IAC Proceeds have been received by the relevant A-Side General Obligor or A-Side Capped Payment Party, as the case may be.  Any 2.01(i) Top-Off Payment by an A-Side Capped Payment Party or A-Side General Obligor to a B-Side Payment Group pursuant to the immediately preceding sentence shall be made by wire transfer of immediately available funds to such account(s) as may be designated by such B-Side Payment Group to such A-Side Capped Payment Party or such A-Side General Obligor in accordance with Section 11.01.  For the avoidance of doubt, the payment of any 2.01(i) Top-Off Payment will not be considered a payment made by any Payment Group for purposes of calculating the Aggregate Payments of any such Payment Group.

(j)    Payments by Beacon Trust.  All payments by any A-Side Payment Group, except as otherwise designated, shall be made directly or indirectly to Beacon Trust (which received substantial distributions indirectly from Purdue) and contributed by Beacon Trust through intervening entities to Pharmaceutical Research Associates L.P. ("PRA L.P."), which shall make the required payments under this Section 2.01 to the MDT in accordance with Section 2.01(l) below.  All such payments made directly or indirectly to Beacon Trust by any A-Side Payment Group shall be paid, dollar for dollar, to the MDT by PRA L.P.

(k)    Payments by 74A Trust.  All payments by any B-Side Payment Group, except as otherwise designated, shall be made directly or indirectly to the Trust formed under agreement of trust dated November 5, 1974 for the benefit of Beverly Sackler (the "74A Trust") (which received substantial distributions indirectly from Purdue) and contributed by the 74A Trust through intervening entities to PRA L.P., which shall make the required payments under this Section 2.01 to the MDT in accordance with Section 2.01(l) below.  All such payments made directly or indirectly to the 74A Trust by any B-Side Payment Group shall be paid, dollar for dollar, to the MDT by PRA L.P.

(l)    Allocation of Payments.

(i)    For all purposes of this Agreement (including the definitions of Aggregate Payments), any payment by an A-Side General Obligor shall be deemed to have been made by each A-Side Payment Group, in an amount equal to the lesser of (A) one-eighth (1/8) of such payment and (B) such A-Side Payment Group's Settlement Amount Balance, *provided* that if the Settlement Amount Balance of any A-Side Payment Group is zero or is reduced to zero by such allocation, then any unallocated portion of such payment by an A-Side General Obligor shall be deemed to have been made on a *pro rata* basis among the A-Side Payment Group(s) whose Settlement Amount Balances are greater than zero.

(ii)    If a B-Side Payment Party is a member of more than one B-Side Payment Group (such B-Side Payment Party, a "Common B-Side Payment Party"), then for all purposes of this Agreement (including the definitions of Aggregate Payments and Outstanding Settlement Amount), any payment by such Common B-Side Payment Party shall be deemed to have been made

24

by each B-Side Payment Group in an amount equal to one-half (1/2) of such payment; *provided*, if such payment is made by the 74A Trust as a result of a B-Side Payment Party's payment to the 74A Trust pursuant to Section 2.01(k) or Section 2.02(d), then, for so long as the 74A Trust is a Common B-Side Payment Party, such payment by the 74A Trust shall be deemed to have been made by the B-Side Payment Group in the amount such Payment Group paid to 74A Trust for such payment.

(m)     Notwithstanding anything in this Agreement to the contrary, each Payment Party agrees that such Payment Party's obligations with respect to the Outstanding Settlement Amount owed by such Payment Party, and such Payment Party's obligations arising as a result of the joint and several liability of such Payment Party with each other Payment Party within the same Payment Group hereunder, shall be separate and distinct obligations, but all such obligations shall be primary obligations of each Payment Party.  Subject to Section 9.02(a)(i), if a Breach of this Section 2.01 has occurred and is continuing with respect to any Payment Group, the MDT may proceed directly and at once, against any Payment Party within such Payment Group to collect and recover the full amount, or any portion of, such Payment Group's Outstanding Settlement Amount, without first proceeding against any other Payment Party or any other Person, or against any Collateral securing the Outstanding Settlement Amount of within such Payment Group.  Each Payment Party waives all suretyship defenses and consents and agrees that the MDT shall be under no obligation to marshal any assets in favor of any Payment Group or against or in payment of any or all of the Outstanding Settlement Amount.

(n)     All payments made to the MDT pursuant to this Section 2.01 shall be made by wire transfer of immediately available funds to the account set forth on Exhibit G (or such other account(s) of the MDT as may be designated by the MDT to the Sackler Parties' Representative in accordance with Section 11.02 at least ten (10) Business Days prior to the applicable Funding Deadline set forth in Section 2.01(b)).

**Section 2.02     Payment of Net Proceeds**.

(a)     Each IAC Payment Party hereby covenants and agrees to pay, or cause to be paid, [within forty-five (45)] calendar days following the receipt thereof (or as soon thereafter as legally permissible), an amount equal to 100% of any Net Proceeds received by such IAC Payment Party, to the MDT in the manner set forth in Section 2.02(c) or (d) below, as applicable, and Section 2.08 (each such payment, a "Net Proceeds Payment"), *provided* that no IAC Payment Party shall be required to pay to the MDT any amounts referred to in the proviso to the first sentence of Section 5.01(d).  The A-Side IAC Payment Parties shall have no further payment obligation under this Section 2.02 once (and for so long as) the Outstanding Settlement Amount of all A-Side Payment Groups has been reduced to zero and the B-Side IAC Payment Parties within a Payment Group shall have no further payment obligation under this Section 2.02 once (and for so long as) the Outstanding Settlement Amount of such Payment Group has been reduced to zero.  For the avoidance of doubt, if the Outstanding Settlement Amount of any Payment Group is reduced to zero and then subsequently becomes an amount greater than zero, from and after the date on which the Outstanding Settlement Amount becomes an amount greater than zero, the IAC Payment Parties in such Payment Group shall comply with the obligations of this Section 2.02 until its Outstanding Settlement Amount is again reduced to zero.

(b)     In the event that a B-Side IAC Payment Party receives Net Proceeds that it is not obligated to pay to the MDT as a result of the second sentence of Section 2.02(a) (any such amount, "Unapplied Net Proceeds"), the A-Side IAC Payment Parties (or, if the A-Side IAC Payment Parties have insufficient funds, the other A-Side Payment Parties within each A-Side Payment Group, in a proportion equal to the proportion in which payments by A-Side General Obligors are allocated and deemed to be made by each A-Side Payment Group at such time pursuant to Section 2.01(l)) shall be obligated to pay, concurrently with the payment of such Net Proceeds, to the MDT an additional amount equal to the lesser of (x) the

Unapplied Net Proceeds of each such B-Side IAC Payment Party and (y) the aggregate remaining Outstanding Settlement Amount of all A-Side Payment Groups.

(c)    All payments by any A-Side IAC Payment Party, except as otherwise designated, shall be made directly or indirectly to Beacon Trust (which received substantial distributions indirectly from Purdue) and contributed by Beacon Trust through intervening entities to PRA L.P., which shall make the required payments to the MDT under this Section 2.02 to the account set forth on Exhibit G (or such other account(s) of the MDT that previously have been designated by the MDT to each of the Sackler Parties in accordance with Section 11.02) by wire transfer of immediately available funds. All such payments made directly or indirectly to Beacon Trust by any A-Side IAC Payment Party shall be paid, dollar for dollar, to the MDT by PRA L.P.

(d)    All payments by any B-Side IAC Payment Party, except as otherwise designated, shall be made directly or indirectly to the 74A Trust (which received substantial distributions indirectly from Purdue) and contributed by the 74A Trust through intervening entities to PRA L.P., which shall make the required payments to the MDT under this Section 2.02 to the account set forth on Exhibit G (or such other account(s) of the MDT that previously have been designated by the MDT to each of the Sackler Parties in accordance with Section 11.02) by wire transfer of immediately available funds.  All such payments made directly or indirectly to the 74A Trust by any B-Side IAC Payment Party shall be paid, dollar for dollar, to the MDT by PRA L.P.

(e)    For all purposes of this Agreement (including the definitions of Aggregate Payments):

(i)    each Net Proceeds Payment made by an A-Side IAC Payment Party shall be deemed to have been made by each A-Side Payment Group in accordance with Section 2.01(l); and

(ii)    any amounts paid by PRA L.P. to the MDT in respect of amounts received by PRA L.P. as a result of its direct or indirect interest in any IAC (and not, for the avoidance of doubt, as a result of the payment by an A-Side IAC Payment Party or the Beacon Trust pursuant to Section 2.02(c) or a B-Side IAC Payment Party or the 74A Trust pursuant to Section 2.02(d)), shall be deemed to have been paid by each Payment Group, pro rata in accordance with their respective Payment Group Portions.

**Section 2.03    Collar.**

(a)    Immediately prior to each Sale or IAC Non-Tax Distribution, (i) the Collar Amount after giving effect to such Sale or IAC Non-Tax Distribution shall be calculated by the Sackler Parties' Representative and (ii) if such calculation results in an increase in the Collar Amount (the amount of such increase resulting from each such event, a "Collar Top-Up Amount"), then (x) the Settlement Amount Balance of each Collar Recipient shall be automatically (i) increased by the Collar Top-Up Amount and (y) the Settlement Amount Balance of each B-Side Payment Group shall be automatically decreased by fifty percent (50%) of the Collar Top-Up Amount multiplied by [7].

(b)    If on any Funding Deadline:

(i)    (A) a Collar Recipient's Settlement Amount Balance is greater than zero and (B) its A-Side Payment Group Adjusted 2.01 Amount is greater than its Settlement Amount Balance, then (x) such Collar Recipient's A-Side Funding Deadline Obligation on such Funding Deadline shall  be adjusted to an amount equal to its Settlement Amount Balance on such Funding Deadline, and (y) each B-Side Payment Group's B-Side Funding Deadline Obligation on such Funding Deadline shall be increased by an amount equal to fifty percent (50%) of the difference between

26

such Collar Recipient's A-Side Payment Group Adjusted 2.01 Amount and such Collar Recipient's Settlement Amount Balance; and

(ii)    a Collar Recipient's Settlement Amount Balance is zero (excluding the impact of any payment made by the Collar Recipient on such Funding Deadline), then (x) each B-Side Payment Group's B-Side Funding Deadline Obligation shall be increased by an amount equal to fifty percent (50%) of the A-Side Payment Group Adjusted 2.01 Amount that would have been payable on such Funding Deadline by such Collar Recipient had its Settlement Amount Balance not been reduced to zero and (y) such Collar Recipient's A-Side Funding Deadline Obligation shall be equal to zero.

(c)    If on any Funding Deadline:

(i)    (A) a B-Side Payment Group's Settlement Amount Balance is greater than zero and (B) its B-Side Payment Group Adjusted 2.01 Amount is greater than its Settlement Amount Balance, then (x) such B-Side Payment Group's B-Side Funding Deadline Obligation shall be adjusted to an amount equal to its Settlement Amount Balance on such Funding Deadline and (y) each Collar Recipient's A-Side Funding Deadline Obligation shall be increased by an amount equal to one-seventh (1/7) of the difference between such B-Side Payment Group's B-Side Payment Group Adjusted 2.01 Amount and such B-Side Payment Group's Settlement Amount Balance; and

(ii)    a B-Side Payment Group's Settlement Amount Balance is zero or less than zero (excluding the impact of any payment made by such B-Side Payment Group on such Funding Deadline), then (x) each Collar Recipient's A-Side Funding Deadline Obligation shall be increased by an amount equal to one-seventh (1/7) of the B-Side Payment Group Adjusted 2.01 Amount that would have been payable on such Funding Deadline by such B-Side Payment Group had its Settlement Amount Balance not been reduced to zero and (y) such B-Side Payment Group's B-Side Funding Deadline Obligation shall be equal to zero.

(d)    If any reduction of the Settlement Amount Balance of any B-Side Payment Group as a result of the re-adjustment provided for in Section 2.03(a), or any other event, would reduce the Settlement Amount Balance of such B-Side Payment Group to an amount less than zero after giving effect to all payments required to be made by the A-Side IAC Payment Parties and the A-Side Payment Parties pursuant to Section 2.02(b) (such negative number, in absolute terms, the "Collar B-Side Amount"), each Collar Recipient will pay to each such B-Side Payment Group an amount equal to one-seventh (1/7) *multiplied by* the Collar B-Side Amount of such B-Side Payment Group. Such payment will occur within thirty (30) days of the date on which such Collar Recipient has satisfied, or was required to satisfy, its payment obligations pursuant to Section 2.01 and Section 2.02 and (x) such Collar Recipient's Settlement Amount Balance will be decreased by the amount so paid to any one or more B-Side Payment Groups by such Collar Recipient and (y) such B-Side Payment Group's Settlement Amount Balance will be increased by the amount so paid to such B-Side Payment Group by one or more Collar Recipients. Any payment by a Collar Recipient to a B-Side Payment Group pursuant to the immediately preceding sentence shall be made by wire transfer of immediately available funds to such account(s) as may be designated by such B-Side Payment Group to such Collar Recipient in accordance with Section 11.01.

**Section 2.04    Guarantee of Certain Obligations of A-Side Capped Payment Parties**.

(a)    If at any time any A-Side Capped Payment Party fails to make any payment to the MDT required to be made by it pursuant to Sections 2.01(c)(ii) or (h) when due and payable, then, within ten (10) Business Days after delivery to the Sackler Parties' Representative of evidence reasonably satisfactory to the Sackler Parties' Representative that the MDT has diligently pursued all remedies available to it

hereunder against such A-Side Capped Payment Party, and that despite such efforts an amount required to be paid by such A-Side Capped Payment Party remains unpaid (any such remaining unpaid amount, an "A-Side Capped Payment Party Payment Shortfall"):

       (i)      the A-Side Payment Parties within each A-Side Payment Group (other than A-Side Payment Group 8) shall pay, or cause to be paid, on a joint and several basis with the other A-Side Payment Parties within their respective A-Side Payment Groups, to the MDT amount equal to one fourteenth (1/14) of any such A-Side Capped Payment Party Payment Shortfall; and

       (ii)     the B-Side Payment Parties within each B-Side Payment Group shall pay, or cause to be paid, on a joint and several basis with the other B-Side Payment Parties within their respective B-Side Payment Groups, to the MDT an amount equal to one quarter (1/4) of any such A-Side Capped Payment Party Payment Shortfall;

*provided*, that the obligations of (x) the A-Side Payment Parties within each A-Side Payment Group (other than A-Side Payment Group 8) pursuant to this Section 2.04 shall not exceed $3,017,857.14, and (y) the B-Side Payment Parties within each B-Side Payment Group pursuant to this Section 2.04 shall not exceed $10,562,500. Each Payment Party making a payment pursuant to this Section 2.04 shall be subrogated to the rights of the MDT as against such A-Side Capped Payment Party with respect to such payment. For the avoidance of doubt, the payment of any such A-Side Capped Payment Shortfall will (1) reduce the Outstanding Settlement Amount of A-Side Payment Group 8 (and not the Outstanding Settlement Amount of the Payment Group actually making such payment) and (2) be considered Aggregate Payments by the A-Side Payment Group 8.

(b)      Notwithstanding the foregoing, if (i) any B-Side Payment Group pays any portion of an A-Side Capped Payment Party Payment Shortfall and (ii) following the date upon which A-Side Payment Group 8's Outstanding Settlement Amount (inclusive of the Excess Group 8 Payment Obligation) has been reduced to zero, any A-Side General Obligor receives or retains Excess IAC Proceeds, such A-Side General Obligor shall be obligated to pay to each such B-Side Payment Group an amount (such amount, a "2.04 Top-Off Payment") equal to the lesser of (x) one thirty-second (1/32) of the amount of proceeds received by such A-Side General Obligor, and (y) the amount paid by such B-Side Payment Group in respect of the A-Side Capped Payment Party Payment Shortfall (less amounts previously paid to such B-Side Payment Group pursuant to this paragraph). Until such time as the B-Side Payment Groups have received 2.04 Top-Off Payments equal to the amount paid by all B-Side Payment Groups in respect of the A-Side Capped Payment Party Payment Shortfall, no A-Side General Obligor shall make any distribution to any A-Side Capped Payment Party of Excess IAC Proceeds. If, notwithstanding the foregoing, any A-Side Capped Payment Party receives any Excess IAC Proceeds, such A-Side Capped Payment party will be obligated to make a 2.04 Top-Off Payment to each B-Side Payment Group in an amount equal to the lesser of (1) one fourth (1/4) of the Excess IAC Proceeds received by such A-Side Capped Payment Party and (2) the amount paid by such B-Side Payment Group in respect of the A-Side Capped Payment Party Payment Shortfall (less amounts previously paid to such B-Side Payment Group by the A-Side General Obligors or the A-Side Capped Payment Parties pursuant to this paragraph).

(c)      Any 2.04 Top-Off Payment required to be made pursuant to the preceding paragraph will be paid within the later of (x) thirty (30) days after the date on which all Outstanding Settlement Amounts of the A-Side Payment Groups have been reduced to zero and (y) thirty (30) days after the date on which such Excess IAC Proceeds have been received by the relevant A-Side General Obligor or A-Side Capped Payment Party, as the case may be. Any 2.04 Top-Off Payment by an A-Side Capped Payment Party or A-Side General Obligor to a B-Side Payment Group pursuant to the immediately preceding sentence shall be made by wire transfer of immediately available funds to such account(s) as may be designated by such B-Side Payment Group to such A-Side Capped Payment Party or such A-Side General Obligor in accordance

28

with Section 11.01.  For the avoidance of doubt, the payment of any 2.04 Top-Off Payment will not be considered a payment made by any Payment Group for purposes of calculating the Aggregate Payments of any such Payment Group.

**Section 2.05    Reserved**.

**Section 2.06    No Change to Aggregate Settlement Amount**.

(a)    Notwithstanding anything to the contrary herein, in no event shall the application of any provision or provisions of this Article 2 result in (i) as of any date of determination, the Aggregate Payments as of such date, *plus* the aggregate Settlement Amount Balances of all Payment Parties as of such date, being less than the Aggregate Settlement Amount or (ii) the Aggregate Payments as of a Funding Deadline being less than the greater of (x) the Cumulative Minimum Required Settlement Payments as of such Funding Deadline and (y) the aggregate amount of Net Proceeds calculated without giving effect to the deduction of Unapplied Advanced Contributions as of such Funding Deadline.  If the application of any provision or provisions of Article 2 has such result, each A-Side Payment Group shall be liable for one sixteenth (1/16), and each B-Side Payment Group shall be liable for one quarter (1/4), of any resulting shortfall.

(b)    Notwithstanding anything to the contrary herein:

(i)    In no event shall the Aggregate Payments made by all Payment Groups hereunder exceed $4.275 billion, and (without affecting any other limitation on the obligations of a Payment Party hereunder) all payment obligations of the Payment Parties to MDT hereunder (other than payments pursuant to Section [8.02] and except as provided in Section 2.05) shall terminate when the Aggregate Payments of all Payment Groups equal $4.275 billion.  [In addition, all payment obligations of non-breaching Payment Groups to MDT hereunder shall terminate at such time when $4.275 billion would have been paid to MDT pursuant to this Agreement but for the breaching Payment Group's or Payment Groups' failure to make any payment(s) required under this Agreement.][6]  For the avoidance of doubt, (i) any payment obligation of one or more Payment Groups to one or more other Payment Groups pursuant to this Agreement shall survive and (ii) any breaching Payment Group shall remain obligated to pay its unfulfilled payment obligations under this Agreement, including any Breach Fee or other amounts that accrue under this Agreement to such Payment Group.

(ii)    [A breach of this Agreement by a Payment Party or Payment Group shall not, by itself, cause any provision of Article 2 to be disregarded, or affect the payment obligation of any member of any other Payment Group.  Without limiting the foregoing, a Payment Group's payment obligations under this Agreement shall not be increased, accelerated or otherwise impacted as a result of any breach of this Agreement by any other Payment Group (i.e., each non-breaching Payment Group's payment obligations shall be determined as if each other Payment Group and Payment Parties had not breached its and their respective obligations under this Agreement, with the intent being that each non-breaching Payment Group shall not be adversely affected by any other Payment Group's breach).][7]

---

[6] Note to Draft: Under discussion.

[7] Note to Draft: Under discussion.

**Section 2.07    Illustrative Examples**.  Illustrative examples of the calculation of payment obligations at various intervals pursuant to Sections 2.01, 2.02, and 2.03 (and related definitions) based on various enumerated assumptions are included in Annex [●].

**Section 2.08    Payments Pending Appeals**.

(a)    [Notwithstanding anything in Section 2.01 or 2.02 to the contrary, all amounts payable by the Payment Parties and IAC Payment Parties to the MDT under Sections 2.01 and 2.02 shall be deposited into the Appeals Escrow Account to secure the Obligations under this Agreement, *provided* that:

(i)    on the Funding Deadline that is the Plan Effective Date, the amount required to be paid to the MDT pursuant to Section 2.01(f) shall be paid directly to the MDT in accordance with Sections 2.01(j) and (k);

(ii)    on the date of the second Funding Deadline (as it may be adjusted pursuant to the last proviso of Section 2.01(b)), (A) the lesser of (1) the amount of the Minimum Required Settlement Payment corresponding to such Funding Deadline and (2) the total amount of Net Proceeds in the Appeals Escrow Account on such date, shall be released from escrow, and (B) the amount, if any, by which the Minimum Required Settlement Payment corresponding to such Funding Deadline exceeds the total amount of Net Proceeds in the Appeals Escrow Account on such date shall be paid pursuant to Section 2.01(f), in each case, to the MDT in accordance with Sections 2.01(j) and (k); and

(iii)    on the date of the third Funding Deadline (as it may be adjusted pursuant to the last proviso of Section 2.01(b)), (A) the lesser of (1) the amount of the Minimum Required Settlement Payment corresponding to such Funding Deadline and (2) the total amount of Net Proceeds in the Appeals Escrow Account on such date, shall be released from escrow, and (B) the amount, if any, by which the Minimum Required Settlement Payment corresponding to such Funding Deadline exceeds the total amount of Net Proceeds in the Appeals Escrow Account on such date shall be paid pursuant to Section 2.01(f), in each case, to the MDT in accordance with Sections 2.01(j) and (k); *provided* that on such Funding Deadline:

(A)    no appeal from the Confirmation Order has been taken that could result in vacatur, modification or reversal of the Confirmation Order with respect to the Shareholder Releases by the Debtors, their Estates and the Releasing Parties;

(B)    if an appeal from the Confirmation Order has been taken that could result in vacatur, modification or reversal of the Confirmation Order with respect to the Shareholder Releases by the Debtors, their Estates and the Releasing Parties and a Final Second Circuit Decision has not yet been issued in such appeal, (1) the Second Circuit has accepted a direct appeal from the Bankruptcy Court in accordance with 28 U.S.C. § 158(d)(2) or will hear such appeal directly because the District Court entered the Confirmation Order in the first instance, (2) the Second Circuit has granted a motion to expedite such appeal and (3) if a stay pending appeal has been requested, such request has been denied; or

(C)    if a Final Second Circuit Decision has been issued that affirms the Confirmation Order with respect to the Shareholder Releases by the Debtors, their Estates and the Releasing Parties, the Supreme Court of the United States has not granted a writ of certiorari that could result in the vacatur, modification or reversal of such Final Second Circuit Decision in relation to such releases.

*provided*, *further*, that if all conditions in the foregoing <u>clauses (B)</u> or <u>(C)</u> are satisfied at any time after the date of the third Funding Deadline (as it may be adjusted pursuant to the last proviso of <u>Section 2.01(b))</u>, (A) the lesser of (1) the amount of the Minimum Required Settlement Payment corresponding to such Funding Deadline and (2) the total amount of Net Proceeds in the Appeals Escrow Account on such date, shall be released from escrow, and (B) the amount, if any, by which the Minimum Required Settlement Payment corresponding to such Funding Deadline exceeds the total amount of Net Proceeds in the Appeals Escrow Account on such date shall be paid pursuant to <u>Section 2.01(f)</u>, in each case,, to the MDT in accordance with <u>Sections 2.01(j)</u> and <u>(k)</u>.

(b)        On the date of the fourth Funding Deadline (as it may be adjusted pursuant to the last proviso of <u>Section 2.01(b)</u>), the MDT and NewCo shall pause all Plan Distributions if (i) an appeal has been taken from the Confirmation Order that could result in vacatur, modification or reversal of the Confirmation Order with respect to the Shareholder Releases by the Debtors, their Estates and the Releasing Parties and (ii) no Final Second Circuit Decision has been issued as of the date of the fourth Funding Deadline that affirms the Confirmation Order with respect to such releases. If such a Final Second Circuit Decision affirming the Shareholder Releases by the Debtors, their Estates and the Releasing Parties is issued, the MDT and NewCo shall thereafter release all Plan Distributions that had been previously paused and all further Plan Distributions shall result on a normal schedule. If, at any time, the Supreme Court of the United States grants a writ of certiorari that could result in the vacatur, modification or reversal of the Shareholder Releases by the Debtors, their Estates and the Releasing Parties in respect of a Final Second Circuit Decision that affirmed the Confirmation Order, the MDT and NewCo shall pause all Plan Distributions from the date the Supreme Court of the United States grants a writ of certiorari until the date the Supreme Court of the United States renders a decision or dismisses the appeal or writ of certiorari.

(c)        Notwithstanding the foregoing, all amounts held in the Appeals Escrow Account (including earnings thereon) shall be released to the MDT, and <u>Sections 2.08(a)</u> and <u>2.08(b)</u> shall no longer apply and shall not be in effect if (A) all applicable time periods for commencing an appeal from the Confirmation Order (including filing a petition for writ of certiorari) have expired, (B) any and all appeals (including to the Supreme Court of the United States) from the Confirmation Order that could result in vacatur, modification or reversal of the Confirmation Order with respect to the Shareholder Releases by the Debtors, their Estates and the Releasing Parties have concluded, (C) no court has issued a decision that does not affirm the Confirmation Order with respect to the Shareholder Releases by the Debtors, their Estates and the Releasing Parties and (D) this Agreement has not been rescinded or terminated in accordance with the terms herein.

(d)        If a Final Second Circuit Decision not subject to further appeal or a decision of the Supreme Court of the United States is issued that does not affirm the Confirmation Order with respect to the Shareholder Releases by the Debtors, their Estates and the Releasing Parties, then: (i) this Agreement shall be rescinded; (ii) the Parties' rights arising from such recission (including any entitlement by the Sackler Parties to restitution of amounts paid to MDT) shall be preserved; (iii) the Sackler Parties shall be entitled to credit (without duplication) any payments of the Outstanding Settlement Amount or other Obligations that were actually received by the MDT against future judgments related to litigation that would otherwise be subject to the Shareholder Releases; and (iv) all amounts remaining in the Appeals Escrow Account (and earnings thereon) shall be released to the Sackler Parties, pro rata in proportion to the amounts such parties paid to the Appeals Escrow Account.

(e)        For the avoidance of doubt, a ruling dismissing an appeal from the Confirmation Order as "equitably moot" shall constitute an affirmance of the Confirmation Order for purposes of this Agreement.

(f)      If this Agreement is rescinded as provided in <u>Section 2.08(d)</u>, then the A-Side Payment Parties within each A-Side Payment Group shall pay, or cause to be paid, on a joint and several basis with the other A-Side Payment Parties within their respective A-Side Payment Groups, to each B-Side Payment Group amount equal to one sixteenth (1/16) of the amount of all payments made to the MDT by such B-Side Payment Group pursuant to <u>Section 2.01(f)</u>.][8]

**Section 2.09      Reserved**.

<div align="center">

**ARTICLE 3.**
**SALE OF IACS**

</div>

**Section 3.01      Covenant to Sell**.

(a)      Subject to <u>Section 3.01(b)</u> and <u>(c)</u>, during the seven (7)-year period commencing on the Plan Effective Date (the "<u>Sale Period</u>"), which period may be extended by a written instrument duly executed by the MDT and the Sackler Parties' Representative, the IAC Payment Parties shall use their best efforts (i) to sell or cause to be sold to one or more unaffiliated third parties (each, a "<u>Purchaser</u>"), through any transaction, series of related transactions or separate transactions, all or substantially all of (A) such IAC Payment Parties' direct and/or indirect interests in the IACs and/or (B) the assets of such IACs (each, a "<u>Sale</u>"); (ii) to take, or cause to be taken, all actions and do, or cause to be done, all things necessary, proper or advisable under Law to consummate each such Sale, including, without limitation, (A) proposing, negotiating, agreeing to, committing to and effecting the sale, divestiture, transfer, license or disposition of any businesses, product lines or assets of the IACs and (B) executing (or causing to be executed) purchase agreements or other certificates, instruments and other agreements required to consummate the proposed Sale; and (iii) to cause all Sale Proceeds that are received by an IAC, an IAC Holding Company, IAC Payment Party or any other direct or indirect Subsidiary of an IAC Payment Party, to be either paid directly to a Tax authority to the extent used to satisfy a liability for any Tax imposed with respect to such Sales or the distribution of proceeds therefrom, or to another Third Party Payee in respect of legal and other fees and expenses, or distributed or otherwise paid, directly or indirectly, to one or more IAC Payment Parties (which may include a Person who agrees in writing to become bound by the obligations of an IAC Payment Party hereunder) or directly to the MDT in respect of the payment obligation under <u>Section 2.02</u> and upon the receipt by the final recipient that is an IAC Payment Party of all such Sale Proceeds that are not paid directly to a Tax authority or other Third Party Payee, or to the MDT, to cause such net Sale Proceeds to be deposited into an IAC Account in accordance with <u>Section 3.07(c)</u> of this Agreement; *provided*, that all such payments to Persons other than Third Party Payees shall be made either pro rata to the Payment Groups based on the equity ownership in the payor held, directly or indirectly, by the members of each Payment Group, or in the case of a payment by a Person that is wholly-owned, directly or indirectly, by a single IAC Payment Party, solely to members of the same Payment Group as such IAC Payment Party; and *provided further*, that, in connection with any Sale, no such IAC, IAC Holding Company, IAC Payment Party, or any other direct or indirect Subsidiary of an IAC Payment Party shall be obligated to provide any indemnification other than (x) in respect of its representations and warranties relating to ownership and authority and (y) indemnification obligations that are limited by the amount of any escrows established for such purpose, which escrows shall be commercially reasonable in amount and duration; *provided further* that, notwithstanding the foregoing and solely with respect to Purdue Canada, the Sale Period shall expire on the later of (x) the date that is seven (7) years after the Plan Effective Date and (y) the date that is two (2) years after the date on which a full and final resolution of the claims asserted in *British Columbia v. Apotex Inc. et al, Registry No. S189395 (B.C.S.C. 2018)* is consummated.

---

[8] <u>Note to Draft</u>: Section under discussion.

(b)      If and to the extent necessary to facilitate a Sale, an IAC Payment Party, IAC Holding Company, IAC, or any other direct or indirect Subsidiary of an IAC Payment Party shall be permitted to retain (i) in the case of an asset sale, non-operating, administrative or otherwise *de minimis* assets that a buyer is unwilling to acquire and that the IAC Payment Parties have been unable to liquidate or transfer to another unaffiliated third party after the use of commercially reasonable efforts, (ii) interests in assets subject to Implementation Limitations, the retention of which would not (x) materially adversely affect such IAC or (y) violate Section 8.10 of this Agreement and (iii) the equity interests of any IAC that has sold all of its assets (other than the assets referred to in the preceding clauses (i) and (ii)) (any assets or interests described in the preceding clauses (i) through (iii), a "Retained Interest").  For the avoidance of doubt, notwithstanding the retention of any Retained Interest, a Sale of the relevant IAC shall be deemed to have occurred for all purposes of this Agreement.

(c)      The Sackler Parties' Representative shall be responsible for (i) the structuring of the Sales, including the tax structuring of any Sale, distribution of proceeds therefrom and the type of consideration to be received (which shall be limited to (x) Cash and Cash Equivalents or (y) with the written consent of the MDT, which it may grant or withhold in its sole discretion, any other form of consideration), taking into account tax efficiency considerations, (ii) the design and execution of one or more marketing processes to make or solicit offers to or from prospective Purchasers in respect of the IACs and their businesses, (iii) the preparation, negotiation and execution of the definitive documentation for the Sales and (iv) the consummation of the Sales; *provided*, *however*, that the Sackler Parties' Representative shall use commercially reasonable efforts to consult with the Advisors and the Tax Advisor and take into account in good faith advice received in connection with such consultation prior to making any material decision in respect of the foregoing.

### Section 3.02     IAC Information Rights; Access; Waiver.

(a)      The IAC Payment Parties shall provide, or shall cause to be provided (except, in the case of clause (iv) below, only the A-Side IAC Payment Parties shall be required to provide, or cause to be provided), the following to the MDT:

(i)      as soon as reasonably practicable, but in any event within thirty (30) days from their receipt thereof, copies of all annual financial statements and any quarterly financial statements delivered to the boards of directors or equivalent governing bodies of the IACs;

(ii)      as soon as reasonably practicable, but in any event no later than thirty (30) days after any IAC Tax Distribution, a report indicating the amount of such IAC Tax Distribution;

(iii)      as soon as reasonably practicable, but in any event no later than thirty (30) days after the receipt of any Sale Proceeds or IAC Non-Tax Distribution, a report setting forth in reasonable detail a good faith calculation of the Net Proceeds relating to such Sale Proceeds or Non-Tax IAC Distribution, which calculation shall be prepared by an independent third party accountant selected by the Sackler Parties' Representative from the list of approved third party accountants set forth on Exhibit [L][9]; and

(iv)      as soon as reasonably practicable, but in any event no later than fifteen (15) days prior to any Permitted Withdrawal of Actual Taxes, a report indicating the amount and calculation in reasonable detail of such Actual Taxes.

---

[9] Note to Draft: Documentation related to Net Proceeds under discussion.

(b)    Notwithstanding anything herein to the contrary, information shall only be provided pursuant to this Section 3.02 to the extent that the provision of such information is (i) subject to confidentiality obligations pursuant to a mutually acceptable confidentiality agreement and (ii) in compliance with applicable Law and not in contravention of any confidentiality or similar obligations that the IACs or IAC Payment Parties are subject to; *provided* that, with respect to clause (ii), (x) a general description of the information not provided on such basis (and the nature of such basis) shall be provided, and (y) no such confidentiality or similar obligations with respect to the information described in this Section 3.02 shall be entered into after the Agreement Effective Date outside the ordinary course without prior approval of the MDT (which shall not be unreasonably withheld).

**Section 3.03    Other IAC-Related Covenants**.

(a)    [Each IAC Payment Party covenants and agrees that, with respect to each IAC directly or indirectly owned by it in whole or in part, from the Agreement Effective Date until the consummation of the Sale of such IAC, except as expressly provided for herein or with the consent of the MDT (which shall not be unreasonably withheld), such IAC Payment Party will use IACPP Efforts to cause such IAC not to:]

(i)    enter into any material transaction or series of related transactions that would materially restrict the ability of such IAC to participate in a Sale (other than the renewal, amendment or modification of agreements in effect as of the Agreement Effective Date; *provided* that such renewal, amendment or modification is not more restrictive, taken as a whole, compared to the applicable agreement prior to such renewal, amendment or modification);

(ii)    [enter into any material transaction or series of related transactions between such IAC or any of its Subsidiaries on the one hand, and any Sackler Party or any of its Affiliates (other than any IACs or their respective Subsidiaries), on the other hand (each, an "Affiliate Transaction"), except for an Affiliate Transaction on terms no less favorable to such IAC than those that would reasonably have been obtained in a comparable transaction on an arm's-length basis with an unrelated Person; *provided* that (A) with respect to any Affiliate Transaction or series of related Affiliate Transactions involving aggregate consideration in excess of $[__], such IAC has delivered to the MDT an officers' certificate or a written opinion by an independent financial advisor from the list of approved financial advisors set forth on Exhibit [M] certifying that such Affiliate Transaction or series of related Affiliate Transactions complies with this covenant and (B) with respect to any Affiliate Transaction or series of related Affiliate Transactions involving aggregate consideration in excess of $[__], such IAC has delivered a written opinion by an independent financial advisor from the list of approved financial advisors set forth on Exhibit [M] certifying that such Affiliate Transaction or series of related Affiliate Transactions complies with this covenant and has been approved by a majority of the disinterested members of the board of directors or equivalent governing body of such IAC, if any, and if such governing body does not exist, such IAC shall have obtained the written consent of the MDT with respect to such Affiliate Transaction; *provided*, *further* that this subparagraph (ii) shall not restrict any IAC Distribution permitted hereunder, the renewal or extension of any financing arrangements on terms no less favorable in the aggregate to the borrower than those currently in place (except as required by applicable law, such as with respect to minimum interest rate requirements to be treated as indebtedness for Tax purposes), or any other transaction permitted hereunder or in any of the IAC Collateral Documents;]

(iii)    take any action in violation of (A) any applicable Law or any material order, writ, injunction and decree of any Governmental Authority applicable to such IAC or to its business or property, to the extent such violation would be materially adverse to such IAC, or (B) the Confirmation Order;

(iv)    declare or make, directly or indirectly, any Restricted Payment, or incur any obligation (contingent or otherwise) to do so, other than a Restricted Payment that constitutes a IAC Distribution with respect to the IAC Payment Parties and IAC Holding Companies that receive such Restricted Payment; or

(v)    transfer, or grant a Lien in respect of, any direct or indirect equity interests in any IAC, IAC Holding Company, or any other direct or indirect Subsidiary of an IAC or IAC Holding Company other than (i) to another IAC Payment Party or wholly owned direct or indirect Subsidiary thereof within the same Payment Group or (ii) in connection with a Sale, or (iii) to the MDT pursuant to the Collateral Documents; or

(vi)    amend, restate, supplement or otherwise modify or waive any of its organizational documents, in each case, to the extent the same would reasonably be expected to be material and adverse to the MDT or the ability of the IAC to be sold.

Without limiting the foregoing, any transaction between an IAC and any Sackler Party that is prohibited by Section 3.03(a) shall be a breach of Section 3.03(a) by such Sackler Party.

(b)    Notwithstanding anything in this Section 3.03 to the contrary, any IAC, IAC Holding Company, IAC Payment Party or any entity Controlled (whether individually or as a group) by one or more IAC Payment Parties may (x) take commercially reasonable steps to reorganize the business and/or ownership structure of such IAC to the extent desirable to facilitate a Sale, including engaging in any internal corporate restructuring, reorganization or similar transaction of the applicable IACs or IAC Holding Companies (whether by way of conversion, recapitalization, reorganization or exchange of equity interests of one or more IACs or into one or more corporations, limited liability companies, limited partnerships or other business entities); *provided* that the Sackler Parties' Representative shall use commercially reasonable efforts to consult with the Advisors and the Tax Advisor and take into account in good faith advice, including advice on tax efficiency considerations, received in connection with such consultation, prior to any material decisions being made in respect of the actions in the foregoing clause (x); *provided further* that the resulting, surviving, or transferee Person is an IAC, IAC Holding Company or an entity Controlled (whether individually or as a group) by one or more IAC Payment Parties and subject to the Sale Obligations hereunder and (y) make payments to, or receive payments from, any other IAC, any IAC Holding Company or any Subsidiary of an IAC Holding Company (whether in the form of indebtedness or otherwise), and the IAC Payment Parties may cause any IAC under their Control to take such actions as they deem appropriate, including incurring indebtedness, or providing funds in the form of dividends, intercompany loans or otherwise to another IAC, an IAC Holding Company or an IAC Payment Party, in each case, in order to satisfy the Outstanding Settlement Amounts or any other Obligations pursuant to this Agreement; *provided* that, with respect to the foregoing clauses (x) and (y), such actions shall only be permitted if (A) such reorganized, newly-formed or transferee IAC is an entity wholly-owned (whether individually or as a group), directly or indirectly by one or more IAC Payment Parties, (B) such actions do not result in a disproportionate change to a Payment Group's aggregate level of direct or indirect ownership interests in an IAC, relative to any other Payment Group and (C) such actions do not adversely affect the perfection or priority of the Secured Parties' security interest in the IAC Pledged Shares.

(c)    Each IAC Payment Party shall (i) use IACPP Efforts to cause each IAC owned directly or indirectly by such IAC Payment Party to make an IAC Distribution, by not later than the end of each of the first and third quarters of each fiscal year ending after the Effective Date, of any Excess Cash held by such IAC as of the end of such fiscal year and subsequent second fiscal quarter, respectively, and (ii) cause all proceeds from such IAC Distribution that are received by an IAC, an IAC Holding Company, IAC Payment Party or any other direct or indirect Subsidiary of an IAC Payment Party, to be either paid directly to a Tax authority, or to another Third Party Payee in respect of legal and other fees and expenses, or distributed or

otherwise paid, directly or indirectly, to one or more IAC Payment Parties (which may include a Person who agrees in writing to become bound by the obligations of an IAC Payment Party hereunder) and, upon the receipt by the final recipient that is an IAC Payment Party of all such Sale Proceeds that are not paid directly to a Tax authority or other Third Party Payee, to cause such net IAC Distribution proceeds to be deposited into an IAC Account in accordance with Section 3.07(c) of this Agreement; *provided*, that all such payments to Persons other than Third Party Payees shall be made either pro rata to the Payment Groups based on the equity ownership in the payor held, directly or indirectly, by the members of each Payment Group, or in the case of a payment by a Person that is wholly-owned, directly or indirectly, by a single IAC Payment Party, solely to members of the same Payment Group as such IAC Payment Party.

Section 3.04    **Indemnification**.  [Notwithstanding anything in this Agreement to the contrary with respect to the calculation and payment of Net Proceeds, to the extent that any seller in such Sale (or its successors) incurs any liability in respect of a Purchaser, prospective Purchaser or other third party in connection with a Sale or prospective Sale (including as a result of the exercise of indemnification rights by any Purchaser in connection therewith, or any breach of any representation or warranty by such seller in connection with the Sale, but excluding any liability for Taxes resulting from such Sale), any Net Proceeds that become available for payment by or on behalf of such seller shall be first used to indemnify and hold harmless such seller for such liability net of any Tax benefits received in cash (including any reductions in withholding Taxes that would result from such indemnification payment) up to an aggregate amount not to exceed [●]% of the Sale Proceeds actually received by such seller from the applicable Sale.][10]

Section 3.05    **Implementation Limitations**.  The obligations of the IAC Payment Parties set forth in [Article 3] of this Agreement shall be subject to compliance with and may be limited by any applicable Laws (including the applicable Laws of any jurisdiction outside of the U.S. where any IAC Payment Parties, entities Controlled (whether individually or as a group) by one or more IAC Payment Parties, IACs or IAC Holding Companies are located and any fiduciary or other duties applicable under such Laws) (collectively, "Implementation Limitations").  In the event any Implementation Limitation prohibits, restricts, limits or conflicts with any of the obligations of the IAC Payment Parties to comply with the terms and conditions of Article 3, the IAC Payment Parties shall (and shall cause the IACs and their Subsidiaries to) use their commercially reasonable efforts to seek any Consent from any applicable Governmental Authority or other Person required to eliminate any such prohibition, restriction, limitation or conflict, with any expenses related thereto deemed to be expenses incurred in connection with the Sale or prospective Sale of IACs for purposes of computing Net Proceeds; *provided* that no such Person shall be required to compensate any Governmental Authority or other Person, commence or participate in any suit, claim, complaint, arbitration or other legal proceeding by or before any government authority or offer or grant any accommodation (financial or otherwise) to any Governmental Authority or other Person to obtain any such Consent, but if any such compensation is made, any such action commenced or any such accommodation is granted, expenses in connection therewith shall be deemed to be expenses incurred in connection with the Sale or prospective Sale of IACs for purposes of computing Net Proceeds.

Section 3.06    **Termination of Sale Obligations**.  All obligations of the IAC Payment Parties set forth in [Article 3] (the "Sale Obligations") shall terminate when all interests of the Sackler Parties in the IACs other than the Retained Interests have been disposed of and all proceeds therefrom applied in the manner contemplated by Section 2.02.  For the avoidance of doubt, the obligations set forth in the other [Articles] of this Agreement shall not be affected by the termination of the Sale Obligations.

---

[10] Note to Draft: Under discussion.

**Section 3.07    Pledge of Shares; Net Proceeds Collateral Account**.

(a)    Each IAC Payment Party, as collateral security for the payment in full when due of all Obligations of such IAC Payment Party, (i) shall grant a security interest in and Lien on the IAC Pledged Shares (and the proceeds thereof) held by such IAC Payment Party, and shall cause each direct or indirect Subsidiary of such IAC Payment Party to grant a security interest in and Lien on the Pledged Shares (and the proceeds thereof) held by each such Subsidiary, and (ii) shall grant a security interest in and Lien on each IAC Account of such IAC Payment Party (and the proceeds thereof), in each case in favor of and for the benefit of the Secured Party pursuant to the terms and conditions of the IAC Collateral Documents.

(b)    Each IAC Payment Party hereby agrees (i) to be bound by the terms of the IAC Collateral Documents applicable to it as the same may be in effect from time to time and (ii) to perform, or cause to be performed, its obligations thereunder in accordance therewith.

(c)    Each IAC Payment Party shall promptly deposit and maintain at all times (subject to the provisions of this Section 3.07), all Sale Proceeds or IAC Distributions received by such IAC Payment Party in an IAC Account; *provided*, that (i) Permitted Withdrawals may be made by such IAC Payment Party pursuant to this Agreement and (ii) such IAC Payment Party may pay all or a portion of Sale Proceeds or IAC Distributions to another IAC Payment Party for deposit in its IAC Account pursuant to this Section 3.07 (e.g., to repay outstanding indebtedness among such IAC Payment Parties, and to effectuate payments of Net Proceeds to MDT in the manner contemplated by Section 2.02(c) or Section 2.02(d)).

(d)    Until the date on which the MDT has been paid all Obligations of the Payment Group(s) of which such IAC Payment Party is a member, (i) such IAC Payment Party shall have no right of withdrawal from an IAC Account other than (A) Permitted Withdrawals and payments to another IAC Payment Party for deposit in its IAC Account pursuant to Section 3.07(c) and (B) to make payments of Net Proceeds to the MDT in the manner provided in Article 2; *provided* that, notwithstanding the provisions of this subparagraph (d), if the Outstanding Settlement Amount of any Payment Group of which such IAC Payment Party is a member is $0, then such IAC Payment Party shall have the right to withdraw from its IAC Account an amount equal to the product of (1) the total amount then held in such IAC Account *multiplied by* (2) a fraction, the numerator of which is the number of Payment Groups of which such IAC Payment Party is a member whose Outstanding Settlement Amount is $0 and the denominator of which is the total number of Payment Groups of which such IAC Payment Party is a member, and (ii) the funds on deposit in IAC Accounts shall be collateral security for the Obligations of the Payment Group(s) of which such IAC Payment Party is a member. In the event that, notwithstanding the provisions of this subparagraph (d), any IAC Payment Party receives any Sale Proceeds or IAC Distribution that are not otherwise permitted to be withdrawn from an IAC Account or are required to be deposited into an IAC Account, in each case pursuant to this Agreement, such Sale Proceeds or IAC Distribution shall be held in trust by such IAC Payment Party or such Subsidiary for the MDT, shall not be commingled with any of such Person's other funds or deposited in any account of such Person other than an IAC Account.

(e)    By no later than the tenth (10th) Business Day following each March 31, June 30, September 30 and December 31 (each such date, a "Quarterly Sweep Date"), each A-Side IAC Payment Party shall cause the lesser of (1) all proceeds in any IAC Account of such A-Side IAC Payment Party as of such Quarterly Sweep Date (other than amounts reserved in good faith for the payment of (x) Taxes or (y) any IAC Distribution Deductions described in clause (ii) of the definition thereof or Sale Proceeds Deductions described in clause (ii) of the definition thereof) and (2) the Outstanding Settlement Amount of the Payment Group of which such A-Side IAC Payment Party is a member, to be paid to the MDT as a prepayment pursuant to Section 2.01(e) (or, in the case of any payment made on June 30, as a Required Settlement Payment pursuant to Section 2.01(c)(i)). No fewer than fifteen (15) Business Days prior to each

37

Quarterly Sweep Date, each A-Side IAC Payment Party shall provide the MDT with a report indicating the amount and calculation in reasonable detail.

(f)    Each IAC Payment Party shall promptly and duly take, execute, acknowledge and deliver, and shall cause each of its Subsidiaries that is an IAC Pledged Entity to promptly and duly take, execute, acknowledge and deliver, all such further acts, documents and assurances as may from time to time be necessary or as the Secured Party may from time to time reasonably request in order to carry out the intent and purposes of this Article 3 in accordance with the IAC Collateral Documents, including all such actions to establish, create, preserve, protect, perfect, and maintain perfection of a first priority Lien on the IAC Collateral in favor of and for the benefit of the Secured Party (including IAC Collateral acquired after the date hereof) and to exercise any and all remedies in respect thereof.

(g)    [The IAC Collateral Documents shall provide that if an IAC Payment Party or any of its Subsidiaries becomes the owner of all or a portion of the Equity Interests of any IAC Pledged Entity that has not previously been pledged pursuant to the IAC Collateral Documents, such IAC Payment Party shall promptly give notice of such acquisition to the Secured Party, and within sixty (60) days (or such longer period as may be necessary for such IAC Payment Party to take such actions, using commercially reasonable efforts) after the acquisition thereof (i) deliver or cause to be delivered to the Secured Party any certificates in respect of the Equity Interests of such IAC Pledged Entity, together with related transfer powers duly executed in blank, (ii) execute and/or deliver (or cause to be executed and delivered) such other IAC Collateral Documents or amendments, modifications or supplements thereto, in form and substance reasonably acceptable to the Secured Party, as may be reasonably requested by the Secured Party in order to maintain the validity and perfection of the security interests in such additional Pledged Interests and (iii) deliver proof of corporate (or comparable) action or incumbency of officers as any of the Secured Party shall reasonably request.  If any IAC Payment Party or any of its Subsidiaries that is an IAC Pledged Entity (x) changes its legal name or (y) converts to a different form or to a different jurisdiction of organization, such IAC Payment Party (A) shall promptly give notice to the Secured Party of such change describing such change, and (B) within sixty (60) days (or such longer period as may be necessary for such IAC Payment Party to take such actions, using commercially reasonable efforts) of such change shall execute and/or deliver (or cause to be executed and delivered) such amendments, modifications or supplements to the IAC Collateral Documents, in form and substance reasonably acceptable to the Secured Party, as may be reasonably requested by the Secured Party in order to maintain the validity and perfection of the security interests in the relevant Pledged Interests without lapse or change in priority.]

(h)    For the avoidance of doubt, the terms and conditions of this [Article 3] and the IAC Collateral Documents shall not apply to assets other than the IACs and the IAC Pledged Shares (and proceeds therefrom), and nothing in this Agreement or any IAC Collateral Document shall restrict the rights of any IAC Payment Party, IAC, IAC Holding Company or other Subsidiary of an IAC Payment Party [(other than an IAC)] from transferring assets other than the IACs and the IAC Pledged Shares (and proceeds therefrom) to any one or Persons (including Sackler Parties).

Section 3.08    Exercise of Remedies.  If, at the end of the Sale Period with respect to any IAC, a Sale has not been effectuated with respect to such IAC, the MDT will be permitted to exercise all remedies in respect of the IAC Pledged Shares with respect to such unsold IAC as set forth in the IAC Collateral Documents. The IAC Collateral Documents will provide in relevant part that the MDT will be obligated to sell the unsold IAC (and any other assets held, directly or indirectly, by any IAC Pledged Entity), with proceeds being applied to satisfy all Outstanding Settlement Amounts and other Obligations (including costs to enforce the Settlement Agreement or the Collateral Documents and to exercise remedies, Breach Fees and other expenses of MDT owed hereunder) and any excess proceeds shall be repaid to the IAC Payment Parties in accordance with a distribution waterfall set forth in the IAC Collateral Documents. Such

remedies shall be in addition to, and shall not limit in any way, the remedies set forth in <u>Article 9</u> of this Agreement.[11]

Section 3.09    **Reserved**.

# ARTICLE 4.
# TAX MATTERS

Section 4.01    **Restitution Payments**.

(a)    [The Restitution Amounts (as defined in the following paragraph) paid in Cash, Cash Equivalents, in kind (by transfers of property) or otherwise, directly or indirectly, by, on behalf of, or at the direction of the Debtors, the Payment Parties, or PRA LP or any of its direct or indirect interest holders (the "<u>Payors</u>") pursuant to the Plan and/or this Agreement are hereby, in each case, based on the origin of the liability and the nature and purpose of the payments (as more fully described in the Disclosure Statement, the Plan, the NOAT TDP and the Tribe TDP), identified as amounts paid for restitution, remediation or that are paid to come into compliance with any law which was violated, in accordance with 26 U.S.C. § 162(f)(2)(A)(ii) (and the applicable Treasury Regulations promulgated thereunder) (collectively, "<u>Restitution</u>"), in each case in relation to the damage done and harm suffered in connection with or arising out of Opioid-Related Activities with respect to the Products (as more fully described in the Disclosure Statement, the Plan, the NOAT TDP and the Tribe TDP). Nothing in this document, the Plan, Confirmation Order or any documents submitted in connection with the Plan is a binding determination on the Internal Revenue Service regarding whether the amounts paid described herein satisfy the requirements of 26 U.S.C. § 162(f)(2) or any other requirements of 26 U.S.C. § 162(f) and applicable Treasury Regulations.

(b)    To the extent relevant for purposes of 26 U.S.C. § 162(f)(2)(A)(ii), the term "Restitution Amounts" shall comprise (i) the payment or transfer pursuant to the Plan of the Initial Public Creditor Trust Distributions; the NewCo Transferred Assets; and the Effective Date Cash transferred to fund the MDT Operating Reserve, (ii) the payments to be made to the Master Disbursement Trust pursuant to this Agreement in the aggregate amount of $4.275 billion and (iii) any other amounts paid or properties transferred to, or at the direction of, any government or governmental entity, pursuant to the Plan and/or this Agreement in relation to Opioid Related Activities with respect to the Products and within the scope of 26 U.S.C. § 162(f). However, no amounts described in Section 5.8 of the Plan paid in connection with the Plan and/or this Agreement as reimbursement for costs of any government investigation or litigation concerning the violation or potential violation of any law, including attorney's fees, shall be treated as Restitution Amounts. Neither the DOJ Forfeiture Payment, nor any amount paid to the United States pursuant to Section 4.3(b) of the Plan for Federal Government Unsecured Claims (Class 3), shall be treated as Restitution Amounts.  All Restitution Amounts shall be used in accordance with the terms of the Plan, this Agreement and the Creditor Trust Documents, including for Approved Uses (as defined in the NOAT TDP and  the Tribe TDP, as applicable), as more fully set forth in such documents.

(c)    For purposes of this <u>Section 4.01</u>, (x) the amount of any payment made in Cash or Cash Equivalents shall be equal to the face amount of such Cash or Cash Equivalents, and the amount of any payment made through a transfer of other property shall be equal to the fair market value of such property

---

[11] <u>Note to Draft</u>: If the MDT forecloses on any Pledged Shares, it will be obligated to sell the unsold IAC, with proceeds being applied to satisfy all Outstanding Settlement Amounts and other Obligations (including costs to enforce the Settlement Agreement or the Collateral Documents and to exercise remedies, Breach Fees and other expenses of MDT owed hereunder) and any excess repaid to the IAC Payment Parties in accordance with a distribution waterfall set forth in the Collateral Documents.

as of the time of each such transfer; (y) the terms used in this Section [4.01] shall be interpreted in conformity with the meaning of such terms as used in 26 U.S.C. § 162(f) and the Treasury Regulations promulgated thereunder; and (z) the term "Plan" shall include the Plan, any other documents and agreements contemplated by the Plan, any other documents and agreements which are supplemental or ancillary to the Plan and any court order or judgment relating to the foregoing.

(d)     For the avoidance of doubt, nothing in Section 4.01 shall bind the IRS with respect to tax treatment, tax reporting or information reporting, and (i) no party other than PRA LP, the Payment Parties, the Shareholder Released Parties and their non-Debtor Affiliates and Related Parties (collectively, the "Relevant Parties") shall be responsible for obtaining any Tax deductions or other Tax treatment claimed by any Relevant Party in connection any payments or transfers under this Agreement or the Plan, including all amounts intended to constitute Restitution (collectively the "Tax Treatment"), (ii) nothing in this Agreement shall impose on the Debtors, any Holder of an Allowed Claim, the Master Disbursement Trust, any Creditor Trust, the Plan Administration Trust or any other entity created pursuant to the Plan (including without limitation TopCo, NewCo and their Subsidiaries), or any Affiliate or Related Party of any of the foregoing (collectively, the "Other Parties") any liability with respect to the Tax Treatment (including without limitation the failure of any Relevant Party to obtain such Tax Treatment) and (iii) none of the Other Parties shall have any obligation to indemnify, defend, or otherwise hold harmless any party with respect to any loss, denial, deferral, curtailment or impairment of such Tax Treatment or any related costs, interest or penalties, nor shall the failure of any party to obtain such Tax Treatment give rise to any right of any Relevant Party to any deduction, counterclaim, defense, recoupment or setoff with respect to any payments they are required to make pursuant to this Agreement or the Plan.]¹²

Section 4.02     **Reserved**.

Section 4.03     **Reserved**.

Section 4.04     **Reserved**.

Section 4.05     **Reserved**.

Section 4.06     **Reserved**.

## ARTICLE 5.
## RESERVED.

## ARTICLE 6.
## TERMINATION.

Section 6.01     **Termination of Agreement**.    This Agreement shall terminate under the circumstances set forth on Exhibit I.

## ARTICLE 7.
## REPRESENTATIONS AND WARRANTIES OF THE SACKLER PARTIES

Each Sackler Party represents and warrants (as to itself only) to the MDT that, as of the Agreement Effective Date, the Settlement Effective Date, and each anniversary of the Settlement Effective Date (in

---

¹² Note to Draft: Under discussion.

each case, except to the extent a representation or warranty is made as of a specific date, in which case such representation or warranty is made only as of such date):

**Section 7.01    Formation and Power**.

(a)    Each such Sackler Party that is not a Trust or natural person, including without limitation a corporation, limited liability company or limited partnership, (i) is duly formed, validly existing and in good standing (to the extent such concepts are recognized under applicable Law) under the Laws of its jurisdiction of formation, with full power and authority to enter into this Agreement and the Collateral Documents to which it is a party and perform all of its obligations hereunder and thereunder, (ii) is duly qualified and authorized to do business and in good standing (to the extent such concepts are recognized under applicable Law) under the Laws of each jurisdiction where its ownership, lease or operation of properties or the conduct of its business requires such qualification and (iii) has all requisite governmental licenses, authorizations, consents and approvals to operate its business as currently conducted; in the case of clauses (ii) and (iii), except as would not materially adversely affect the ability of such Sackler Party to enter into this Agreement or the Collateral Documents to which it is a party and perform its obligations hereunder or thereunder.

(b)    [Each such Sackler Party that is a Trust (i) was duly created under the laws of its "Original Jurisdiction of Creation" as set forth on Exhibit [●], (ii) has as its situs and principal place of administration, and validly exists under the laws of, its "Jurisdiction of Administration" as set forth on Exhibit [●], and (iii) is governed (taking into account any express provisions in its organizational documents) by the laws of its "Governing Law Jurisdiction" as set forth on Exhibit [●].  With respect to such Trust, Exhibit [●] sets forth a true and complete list of (A) its trustees, (B) as of the Plan Effective Date, the Persons (other than trustees) possessing powers, whether held in a fiduciary or non-fiduciary capacity, with respect to the administration of such Trust, including, without limitation, with respect to the removal, replacement and appointment of additional trustees and to direct the trustees to take (or otherwise cause to be taken or take on their own behalf) any action that, if under the control of the trustees of such Trust, would violate such Trust's covenants and agreements in Section 8.02 hereof, and [(C) as of the Plan Effective Date, the Persons who would be necessary parties to the settlement of an account of proceedings of the relevant trustees in its jurisdiction of administration named as such on Exhibit [●] (taking into account the terms of its governing instrument and encompassing the period of the negotiation, execution and delivery to MDT of this Agreement and the Collateral Documents).]  Exhibit [●] may be amended by the Sackler Parties' Representative at any time and from time to time to reflect changes occurring after the date hereof, *provided*, that notice and a copy of such amendment shall be provided promptly to the MDT.]

(c)    The trustees of each such Sackler Party that is a Trust (i) have been duly appointed and are validly acting as the trustees of such Trust, (ii) are resident and/or have their respective principal place of business as set forth on Exhibit [●], (iii) in the case of trustees that are not individuals (x) are duly formed, validly existing and in good standing (to the extent such concepts are recognized under applicable Law) under the Laws of their jurisdiction of formation, with full power and authority to act and exercise their powers and authorities as a trustee of such Sackler Party, (y) are duly qualified and authorized to do business and in good standing (to the extent such concepts are recognized under applicable Law) under the Laws of their jurisdiction of formation and each other jurisdiction where their acting as trustees of such Sackler Party requires such qualification, authorization and good standing (with respect to the administration of the Trust as currently conducted) and (z) have all requisite governmental licenses, authorizations, consents and approvals to operate its businesses (to the extent relevant to acting as a trustee, or otherwise join in the administration, of the Trust) as currently conducted; in the case of clauses (y) and (z), except as would not materially adversely affect the ability of such Sackler Party to enter into this Agreement or the Collateral Documents to which it is a party and perform its obligations hereunder, (iv) have all requisite power and authority in their own capacities acting on their own behalf to serve as trustees of such Sackler Party, and

(v) have all requisite power and authority in their capacities as trustees of such Sackler Party to execute and deliver on behalf of such Sackler Party this Agreement and the Collateral Documents to which such Sackler Party is a party, and to cause such Sackler Party to perform its obligations hereunder and thereunder.

(d)    Except (a) to the extent investment discretion has been delegated to investment managers, and (b) for contractual restrictions related to specific investments, each trustee of such Sackler Party that is a Trust (or, for the avoidance of doubt but subject to the proviso of this Section 7.01(d), in the case of a Trust with more than one trustee, the trustees of such Trust collectively) has sole discretion, power and authority to manage and control the assets of the Trust for both investments and determinations of distributions, to sell, exchange, invest, reinvest, dispose of, or pledge the assets of the Trust, including the IAC Pledged Shares and the other Collateral, and to incur debt and enter into agreements to pay or make binding guarantees, subject to the restrictions and qualifications set forth in the trust instruments of such Trust requiring the trustee to obtain the consent of  a protector or other Person (a "Consent Person") as listed on Exhibit A in order to take certain actions; *provided* that, for the avoidance of doubt, in the case of a Trust with more than one trustee whose Trust instrument confers any such discretion, power or authority on one or more but less than all of the trustees, the representation made in this Section 7.01(d) shall, insofar as such discretion, power or authority is concerned, be read to apply only to the trustee or trustees having such discretion, power or authority.

### Section 7.02    Authority; Enforceability

(a)    The execution, delivery and performance of this Agreement and the Collateral Documents to which it is a party by each Sackler Party that is not a Trust or a natural person, including, without limitation, a corporation, limited liability company or limited partnership, and the consummation by such Sackler Party of the transactions contemplated hereby have been duly and validly authorized by all requisite corporate, limited liability company, partnership or other entity action by such Sackler Party, and no other proceedings on the part of such Sackler Party are necessary to authorize the execution, delivery or performance of this Agreement or the Collateral Documents to which it is a party by such Sackler Party. This Agreement and the Collateral Documents to which it is a party have been duly and validly executed and delivered by such Sackler Party, and this Agreement and the Collateral Documents to which it is a party constitute a valid and binding obligation of such Sackler Party, enforceable against such Sackler Party in accordance with their terms, except as such enforceability may be limited by general equitable principles.

(b)    The execution, delivery and performance of this Agreement and the Collateral Documents to which the relevant Sackler Party is a party by the trustees of each Sackler Party that is a Trust, and the consummation by such trustees of the transactions contemplated hereby and thereby have been duly and validly authorized by all requisite trustee action, and any requisite action by any applicable Consent Person, and no other proceedings relating to such Sackler Party (or any Person interested therein) are necessary to authorize the execution, delivery or performance of this Agreement or the Collateral Documents to which the relevant Sackler Party is a party by them in their capacities as such trustees.  This Agreement and the Collateral Documents to which the relevant Sackler Party is a party have been duly and validly executed and delivered by such trustees in their capacities as such trustees, and this Agreement and the Collateral Documents to which the relevant Sackler Party is a party constitute a valid and binding obligation of such trustees and their successors as such trustees, enforceable against the property of each Sackler Party that is a Trust in accordance with their terms, except as such enforceability may be limited by general equitable principles.

### Section 7.03    No Contravention. Subject to the Implementation Limitations, the execution, delivery and performance of this Agreement and the Collateral Documents to which it is a party by each Sackler Party (including for the avoidance of doubt by the trustees of a Sackler Party that is a Trust) does not (a) contravene the terms of any such Sackler Party's organization documents (including trust

documentation), (b) violate any Law, (c) violate any fiduciary duty owed to any Person, or (d) violate any other agreement, instrument or trust or other restrictions to which the Sackler Parties (or the trustees thereof in their capacities as such trustees) are subject; in the case of clauses (b) and (c), except as would not materially adversely affect the ability of such Sackler Party to enter into this Agreement or the Collateral Documents to which it is a party and perform its obligations hereunder and thereunder.

Section 7.04    **Reserved.**

Section 7.05    **List of IACs**.  Exhibit E-1 sets forth (a) a true and complete list of all non-U.S. (and certain U.S.) pharmaceutical companies that are operating companies owned and controlled, indirectly through one or more Pledged Entities or IAC Holding Companies, each of which is referred to herein as an "IAC," other than those entities set forth on Exhibit E-2 (which for the avoidance of doubt, are not IACs for purposes of this Agreement), (b) the IAC Payment Parties within the A-Side Family Group and the B-Side Family Group that directly or indirectly own each such IAC and (c) all Subsidiaries of each such IAC Payment Party that directly or indirectly hold any common and preferred equity interests in any IAC.

## ARTICLE 8.
## COVENANTS

Section 8.01    **Certain Information Rights**.  The Sackler Party Representative  shall provide, or cause to be provided, to the MDT, as soon as reasonably practicable after each event resulting in Net Proceeds, a report setting forth in reasonable detail a good faith calculation of the Collar Computation Proceeds, the Collar Amount and the Outstanding Settlement Amount of each Payment Group.

Section 8.02    **Non-Circumvention.**  [Each Sackler Party covenants and agrees that it shall not, and shall cause all Persons under its Control not to, intentionally take or fail to take any action a purpose or material effect of which is to avoid, circumvent, frustrate or impair the ability of any Sackler Party to satisfy its Obligations under this Agreement or the Collateral Documents to which it is a party, the enforcement thereof or the ability of the MDT to recover any unpaid Obligations (a "Prejudicial Impact"); *provided* that, notwithstanding the foregoing, any Sackler Party may (i) for the avoidance of doubt, take any action expressly permitted by this Agreement or the Collateral Documents to which it is a party and (ii) undergo a conversion, recapitalization, reorganization, division, appointment in further trust, appointment of new trustees or exchange of securities into one or more corporations, limited liability companies, limited partnerships, trusts or other entities, and such action shall not constitute a Prejudicial Impact, but only, in each case, to the extent that (A) the resulting entity or Trust assumes the obligations of such Sackler Party in this Agreement and (B) to the extent such Sackler Party has provided Collateral to the MDT or any other Secured Party pursuant to any Collateral Document, such conversion, recapitalization, reorganization, division, appointment, exchange or other transaction shall not have the effect of rendering any liens in favor of the MDT or any other Secured Party granted by such Sackler Party pursuant to any Collateral Document invalid, unenforceable or unperfected and any surviving or resulting trust or entity shall take any and all steps as are necessary to maintain the MDT's or such other Secured Party's perfected security interest (without change in priority) in such Collateral.][13]

Section 8.03    **No Interference.**

(a)        Each Sackler Party, and the trustees of each of the Sackler Parties that is a Trust solely in their capacities as such trustees, hereby covenants and agrees that it will not, and shall cause all Persons under its Control not to, intentionally take any action that would in any material respect interfere with, delay, impede, postpone or frustrate the  confirmation or consummation of the Plan and implementation of

---

[13] Note to Draft: Under discussion.

the transactions contemplated in this Agreement and under the Collateral Documents to which such Sackler Party is a party.

Section 8.04    **Consent to Cancellation of PPLP Interests and De Minimis PRALP Interests**.

(a)    Effective as of the Agreement Effective Date, [certain Sackler Parties] hereby agree, [subject to the terms and conditions of this Agreement and contingent upon the continuing effectiveness of the Plan and the Shareholder Releases,] to the deemed surrender, cancellation, and/or redemption of the PPLP Interests pursuant to the Plan and that the direct and indirect holders thereof shall not receive or retain any property under the Plan on account of the PPLP Interests.

(b)    Effective as of the Agreement Effective Date, the Parties agree, [subject to the terms and conditions of this Agreement and contingent upon the continuing effectiveness of the Plan and the Shareholder Releases,] to the deemed surrender, cancellation and/or redemption of the PPI Interests and the De Minimis PRALP Interests pursuant to the Plan and that (i) Purdue Pharma Inc. shall not receive or retain any property under the Plan on account of the De Minimis PRALP Interests and (ii) the direct and indirect holders of Purdue Pharma Inc. shall not receive or retain any property under the Plan on account of the PPI Interests.

Section 8.05    **Insurance Policies**.  [●][14]

Section 8.06    **Reserved**.

Section 8.07    **Notification of Breach**. If any Party becomes aware that a Breach Trigger or Breach has occurred, such Party shall provide notice in accordance with Section 11.01 of this Agreement to all other Parties of the occurrence of such Breach Trigger or Breach within five (5) Business Days (for the avoidance of doubt, any such notice provided by the Sackler Party Representative shall constitute notice provided on behalf of all applicable Sackler Parties).  The Parties shall keep any occurrence or notice of Breach Trigger or Breach confidential until the earlier of (i) the commencement of a Dispute Proceeding or (ii) the time at which the MDT is permitted to exercise remedies pursuant to Section 9.02(a)(ii) of this Agreement.

Section 8.08    **Opioid Business**.  [●][15]

Section 8.09    **Other Covenants and Agreements**.  Each of the A-Side Payment Groups and the B-Side Payment Groups agree to provide credit support in respect of the obligations of their respective Payment Groups on the terms set forth in the Credit Support Annexes attached hereto.

**ARTICLE 9.**
**BREACH AND REMEDIES** [16]

Section 9.01    **Breach**.  Any of the following shall, as specified therein, constitute a "Breach Trigger" or "Breach":

(a)    Non-Payment.  (1) The Payment Parties in a Payment Group fail to pay when due all or any portion of (x) the Outstanding Settlement Amount pursuant to Section 2.01 or (y) any Breach Fee

---

[14] Note to Draft: Under discussion.

[15] Note to Draft: Under discussion.

[16] Note to Draft: Article 9 under discussion.

pursuant to Section 9.04, each of which shall constitute a Breach with respect to all the Payment Parties in such Payment Group (except otherwise provided herein, including in Section 9.02(a)(iv)), or (2) any IAC Payment Party fails to (i) pay when due all or any portion of any Net Proceeds pursuant to Section 2.02 or (ii) deposit Sale Proceeds or IAC Distributions in an IAC account pursuant to Section 3.07(c), each of which shall constitute a Breach with respect to such IAC Payment Party. For the avoidance of doubt, no Breach by any Payment Group under this Section 9.01(a) shall be deemed a Breach by any other Payment Group and no obligations of any Payment Group shall be affected by the payment default of any Payment Party, other than a Payment Party in such Payment Group.

(b)      Clawback of Payment. The MDT or any other Creditor Trust is required in any insolvency or liquidation proceeding or otherwise to disgorge, turn over or otherwise pay any amount to the estate of any Sackler Party (or any trustee, receiver or similar Person therefor), because the payment of such amount was declared to be fraudulent or preferential in any respect or for any other reason, whether received as proceeds of security, enforcement of any right of setoff or otherwise, which shall constitute a Breach Trigger, and if such Breach Trigger continues for sixty (60) or more days following notice by the MDT to the Sackler Parties' Representative, shall constitute a Breach with respect to the Payment Group that includes such Sackler Party.

(c)      Sale of IACs. Any IAC Payment Party fails to perform or observe, in any material respect, any term, covenant or agreement contained in Article 3, which shall constitute a Breach Trigger, and if such failure continues for 60 or more days, which shall constitute a Breach with respect to the Payment Group that includes such Sackler Party.

(d)      Opioid Business. Any Sackler Party fails to perform or observe any term, covenant or agreement contained in Section 8.08, which shall constitute a Breach Trigger, and if such failure continues for 60 or more days, which shall constitute a Breach with respect to the Payment Group that includes such Sackler Party.

(e)      Other Breaches. Any Sackler Party fails to perform or observe any term, covenant or agreement contained in this Agreement or any other Definitive Document on its part to be performed or observed, which shall constitute a Breach Trigger, and if such failure continues for 60 or more days, which shall constitute a Breach with respect to the Payment Group that includes such Sackler Party.

(f)      Representations and Warranties. Any representation, warranty, certification or statement of fact made or deemed made by or on behalf of any Sackler Party in this Agreement, the Collateral Documents, or any other Definitive Document shall be incorrect or misleading in any material respect (or in any respect if any such representation or warranty is already qualified by materiality) when made or deemed made, which shall constitute a Breach with respect to the Payment Group that includes such Sackler Party.

(g)      Contest of Validity of Agreement. Any Sackler Party (i) contests in writing the validity or enforceability of any provision of the Agreement or any Definitive Document, (ii) denies in writing that it has any or further liability or obligation under the Agreement (other than as a result of payment in full of its Payment Group's Settlement Amount) or any other Definitive Document, or (iii) purports in writing to revoke, rescind or challenge the Agreement or the Collateral Documents or the validity, enforceability or perfected nature of the liens created thereby, which in each case shall constitute a Breach with respect to the Payment Group that includes such Sackler Party.

(h)      Insolvency Proceedings, Etc. (i) Any Sackler Party institutes or consents to the institution of any insolvency, bankruptcy, reorganization, winding-up, administration, dissolution, composition or similar proceeding, or makes an assignment for the benefit of creditors, (ii) any Sackler Party appoints,

45

applies for or consents to the appointment of any receiver, administrator, administrative receiver, trustee, custodian, conservator, liquidator, rehabilitator, judicial manager, provisional liquidator, administrator, receiver and manager, controller, monitor or similar officer for it or for all or any material part of its property, (iii) any receiver, trustee, custodian, conservator, liquidator, rehabilitator, judicial manager, provision liquidator, administrator, administrative receiver, receiver and manager, controller, monitor or similar officer is appointed without the application or consent of such Sackler Party and the appointment continues undischarged or unstayed for 60 days, or (iv) any proceeding or any bankruptcy, reorganization, winding-up, administration, dissolution, composition or similar proceeding relating to any such Sackler Party or to all or a material part of its property is instituted without the consent of such Sackler Party and continues undismissed or unstayed for [60] days, which in each case shall constitute a Breach only with respect to such Sackler Party.

(i)    Collateral.  Any security interest and Lien purported to be created by any Collateral Document shall cease to be in full force and effect (except as the result of an action or a failure to act of the Secured Party) in favor of the Secured Party, or shall be asserted by or on behalf of any Sackler Party not to be, a valid, enforceable, perfected, first priority (except as otherwise expressly provided in this Agreement or such Collateral Document) security interest in or Lien on the Collateral covered thereby, which in each case shall constitute a Breach with respect to the Sackler Party whose obligations are secured by such Collateral.

**Section 9.02    Remedies**.

(a)    Payment Group Breaches.

(i)    Upon notice from the MDT of either a Breach Trigger or a Breach with respect to a Payment Group (such notice, a "Breach Notice") to the members of such Payment Group, the MDT shall forbear from exercising any and all remedies (including the Payment Remedy or the Release Remedy) with respect to such Payment Group on account of such Breach Trigger or Breach for a period of ten (10) Business Days following such Breach Notice, during which period such Payment Group shall have the opportunity to contest in good faith that such Breach Trigger or Breach, as applicable, has occurred pursuant to an expedited hearing in the Bankruptcy Court pursuant to Section 11.11(b) of this Agreement or otherwise (such proceeding, a "Dispute Proceeding"); *provided* that (A) the motion, application or other pleading filed with the Bankruptcy Court commencing such Dispute Proceeding includes a statement in writing that the Payment Group believes in good faith that such Breach Trigger or Breach has not occurred and the basis therefor, (B) the foregoing provision shall not require MDT to forbear from exercising any and all remedies with respect to such Payment Group, if such Dispute Proceedings are not brought within ten (10) Business Days following the Breach Notice, (C) the sole issue that such Payment Group may bring before the Bankruptcy Court in any such Dispute Proceeding is whether or not such Breach Trigger or Breach has occurred and/or is continuing, (D) the MDT shall be entitled to contest before the Bankruptcy Court in any such Dispute Proceeding whether or not the Remedies Forbearance Period is applicable to the MDT due to the lack of a good faith dispute and (E) the Payment Group shall seek to have the matters giving rise to the Dispute Proceeding heard on an emergency or expedited basis by the Bankruptcy Court (and the Payment Group and all Sackler Parties party to the Dispute Proceeding hereby consent that the MDT shall also be entitled to seek such emergency or expedited hearing without further notice of any kind). If a Dispute Proceeding has been brought before the Bankruptcy Court in accordance with the foregoing, the MDT shall further forbear from exercising any and all remedies (including the Payment Remedy or the Release Remedy) with respect to such Payment Group on account of such Breach Trigger or Breach until the later of (I) the end of the period specified by this Agreement during which the relevant Breach Trigger may be cured in accordance herewith before the occurrence of a Breach, if applicable and

(II) in the event the Bankruptcy Court determines in such Dispute Proceeding, after a good faith dispute, that a Breach Trigger or Breach has occurred, ten (10) Business Days after the Bankruptcy Court has made its determination as to whether such Breach Trigger or Breach has occurred.  The forbearance periods described in this Section 9.02(a) shall be referred to herein as the "Remedies Forbearance Period." Notwithstanding anything to the contrary in this Section 9.02(a), the right to seek a Dispute Proceeding hereunder and the Remedies Forbearance Period (x) shall not apply to the Breaches referenced in Section 9.01(a) (Non-Payment), except in the case of a good faith disagreement in respect of the amount due, it being agreed that in the event of any such good faith disagreement no Breach will occur until ten (10) Business Days following the date on which such disagreement has been resolved (whether pursuant to a Dispute Proceeding or otherwise) and (y) shall not apply to the Breaches referenced in Section 9.01(h) (Insolvency Proceedings, etc.). For the avoidance of doubt, a Payment Group shall not be permitted to bring a Dispute Proceeding with respect to a Breach if a Dispute Proceeding has previously been brought with respect to a Breach Trigger that matured into such Breach, except to the extent that the facts underlying such Breach differ from those underlying the Breach Trigger.  For the avoidance of doubt, the MDT may exercise its rights and remedies under Article 9 through a Secured Party or a designee (as appropriate), in its sole discretion.

(ii)     If a Specified Breach has occurred and is continuing, then, to the extent applicable, following the expiration of the Remedies Forbearance Period and subject to the limitations set forth in Section 9.02(a)(iv) and (v), with respect to each applicable Payment Group in Breach, the MDT may:

(A)     Option 1:

(i)     Declare the Outstanding Settlement Amount of the Payment Group in Breach and all other Obligations owed by such Payment Group to be immediately due and payable in whole by the Payment Parties in the Payment Group in Breach, and thereupon the Outstanding Settlement Amount and other Obligations so declared to be due and payable shall become due and payable immediately by the Payment Parties in the Payment Group in Breach (the "Payment Remedy"), without presentment, demand, protest, or other notice of any kind, all of which are hereby waived by each Sackler Party; *provided*, that (x) the MDT may, in its sole discretion, rescind any such declaration and its consequences if the rescission would not conflict with any judgment or decree (it being understood that no such rescission shall affect any subsequent Breach or impair any right or consequence thereto) and (y) in the case of a Breach specified in Section 9.01(b) or 9.01(h), the Payment Remedy shall [(1) only apply to the Sackler Party that is the subject of the proceedings and/or actions set forth in such Section 9.01(b) or 9.01(h) and not to any other Party within the same Payment Group as such Sackler Party and (2)] be deemed exercised automatically by the occurrence of any event triggering such Breach without presentment, demand, protest, or other notice of any kind, all of which are hereby waived by each Sackler Party;

(ii)     The Secured Party shall have the right to foreclose on the Collateral securing the Obligations of the Payment Group in Breach or liquidate or direct the liquidation of such Collateral in accordance with the applicable Collateral Documents and otherwise exercise remedies against such Collateral as provided in (and subject to) this Agreement (including

47

the Credit Support Annexes) and the applicable Collateral Documents, and the MDT may pursue any other available remedy at law or in equity to collect the payment of the Outstanding Settlement Amount of the Payment Group in Breach and the other Obligations of the Payment Group in Breach or to enforce the performance by the members of the Payment Group in Breach of any provision of this Agreement and the Collateral Documents, *provided* that in the case of a Breach specified in Section 9.01(b) or 9.01(k), the Secured Party shall only have such foreclosure and related rights with respect to the Collateral provided by the Sackler Party in Breach and not to any other Party within the same Payment Group as such Sackler Party; and

(iii)     The Payment Group in Breach (or in in the case of a Breach specified in Section 9.01(b) or 9.01(k), the Sackler Party in Breach and not to any other Party within the same Payment Group as such Sackler Party) shall reimburse the Secured Party for all costs and out-of-pocket expenses incurred or made by it while such Breach Trigger or Breach is continuing, including (i) all costs and expenses incurred by the Secured Party related to any contest of such Breach Trigger or Breach and (ii) costs of collection and expenses, disbursements and advances of the Secured Party's agents, counsel, accountants and experts and all amounts due to the Secured Party under the Collateral Documents; or

(B)     Option 2:  (i) Declare the Shareholder Releases to be immediately void *ab initio* and of no further force or effect with respect to the members of the Family Group of which the members of such Payment Group in Breach are members [and the Designated Shareholder Released Parties][17]; whereupon (ii) the members of such Family Group [and the Designated Shareholder Released Parties] shall be deemed to not be Shareholder Released Parties under the Plan *nunc pro tunc* to the Plan Effective Date, (iii) the *status quo ante* shall be restored with respect to the Shareholder Releases for the members of such Family Group[, such Designated Shareholder Released Parties], the Debtors, the MDT, and each of the Shareholder Releasing Parties with respect to the members of such Family Group[ and the Designated Shareholder Released Parties]; (iv) the Settlement Agreement and all related documents, including the Collateral Documents, shall be of no further force and effect with respect to such Family Group [and the Designated Shareholder Released Parties], except for any provisions thereof regarding reinstatement which shall survive indefinitely, *provided* that the Settlement Agreement and all related documents, including the Collateral Documents, and the Obligations thereunder (including the security interests under the Collateral Documents), shall be automatically reinstated in the event the Release Remedy or the related provisions of this Agreement are declared invalid, void or unenforceable and (v) for the avoidance of doubt, the MDT shall be entitled to bring any claim or cause of action against such members of such Family Group [and the Designated Shareholder Released Parties] as if the Shareholder Releases had never been granted; *provided* that, for the avoidance of doubt, the Shareholder Releases shall continue in effect

---

[17] Note to Draft: Designated Shareholder Released Parties provisions under discussion.

for, and shall be fully enforceable by, all other Shareholder Released Parties (collectively, the "Release Remedy").

(iii)    The MDT shall be entitled to elect to exercise the Payment Remedy and all other remedies set forth in Section 9.02(a)(ii)(A) or the Release Remedy, but in no event shall the MDT be entitled to elect or exercise the Payment Remedy or any other remedy set forth in Section 9.02(a)(ii)(A) simultaneously with the Release Remedy.  If the MDT elects the Payment Remedy (or other remedies set forth in Section 9.02(a)(ii)(A)), it shall not be prohibited from electing the Release Remedy (subject to Section 9.02(a)(iii)(A) below), but if the MDT elects the Release Remedy, it shall be prohibited from electing the Payment Remedy (or other remedies set forth in Section 9.02(a)(ii)(A)). The MDT's exercise of remedies shall also be subject to the following:

(A)    Following the election of the Payment Remedy with respect to a Payment Group in Breach, the MDT may, at any time, but only upon thirty (30) days' prior written notice to the Sackler Parties' Representative, elect to forgo any and all rights to exercise or continue to exercise the Payment Remedy with respect to such Payment Group in Breach and to instead exercise the Release Remedy with respect to the members of the Family Group of which the members of such Payment Group in Breach are members [and the Designated Shareholder Released Parties].  For the avoidance of doubt, if the MDT exercises the Release Remedy in respect of a Family Group, any payments of the Outstanding Settlement Amount, Breach Fee or any other Obligations made by or on behalf of a Family Group (including, without limitation, in connection with the exercise of a Payment Remedy) prior to the exercise of the Release Remedy shall not be returned to the Payment Group in Breach, but such Payment Group shall be entitled to credit (without duplication) any such amounts that were actually received by the MDT against future judgments related to litigation brought by the MDT[18] in connection with the exercise of the Release Remedy.  For the avoidance of doubt, the MDT shall be permitted to elect the Release Remedy at the outset (without first electing the Payment Remedy), in which case, the thirty (30) day notice period above shall not apply.

(B)    If, following the election of the Release Remedy with respect to a Family Group, any court of competent jurisdiction enters an order declaring the Release Remedy or the related provisions of this Agreement invalid, void or unenforceable with respect to such Family Group, the MDT's rights to exercise the Payment Remedy with respect to the Payment Group in Breach related to such Family Group pursuant to the Settlement Agreement and all related documents, including the Collateral Documents (and the liens granted therein), shall be automatically reinstated, and the MDT may exercise such Payment Remedy with respect to such Payment Group.

(iv)    [Notwithstanding anything contained in Section 9.01, with respect to any Payment Party that is a member of more than one Payment Group (any such Payment Party, a "Crossover Member"), other than with respect to the Payment Party identified as a "Fourth Tier Obligor" in the Credit Support Annexes (the "Fourth Tier Obligor"), and any Payment Group that contains a Crossover Member:

---

[18] Note to Draft: Under discussion.

(A)      a Breach by such Crossover Member shall not constitute a Breach by, or give rise to any remedies in respect of, any Payment Party other than such Crossover Member, and the MDT shall be entitled to exercise any and all remedies (including the Payment Remedy or the Release Remedy) pursuant to this Section 9.02 solely with respect to such Crossover Member and not any other Payment Party or Family Group member as a result of such Breach by such Crossover Member; and

(B)      a Breach by a Payment Party that is not a Crossover Member shall not constitute a Breach by, or give rise to remedies in respect of, any Crossover Member.  For the avoidance of doubt, upon any such Breach, the MDT shall be entitled to exercise any and all remedies (including the Payment Remedy or the Release Remedy) pursuant to this Section 9.02 with respect to each Payment Party that is not a Crossover Member within the breaching Payment Party's Payment Group [and, as applicable, the Designated Shareholder Released Parties].][19]

(v)      Notwithstanding anything contained in Section 9.01 and Section 9.02(a)(iv), with respect to A-Side Payment Group 5, A-Side Payment Group 6 and A-Side Payment Group 7 (each of which the Fourth Tier Obligor is a member), a Breach by any such Payment Group shall constitute a Breach by, and give rise to remedies in respect of, the A-Side Payment Group 1, and the MDT shall be entitled to exercise the Payment Remedy or the Release Remedy pursuant to this Section 9.02 with respect to both (x) the members of the relevant Payment Group or Family Group in Breach and (y) the members of the A-Side Payment Group 1 or the A-Side Family Group 1; *provided* that the exercise of remedies with respect to any members in the foregoing clauses (x) and (y) that are A-Side General Obligors shall be subject to Section 9.02(a)(iv); *provided further* that, in the event of any exercise of remedies against the Crossover Members that are the Millenium Trust or the Perelle Bay Trust, the proceeds resulting from such exercise of remedies shall be allocated for the benefit of the MDT in accordance with the relevant Collateral Documents and applied on a pro rata basis (i.e., 50% each) to satisfy the Obligations of A-Side Payment Group 1 and A-Side Payment Group 7; *provided further* that, in the event of any exercise of remedies against the Fourth Tier Obligor, the proceeds resulting from such exercise of remedies shall be allocated in accordance with Section 9.02(d).

(vi)      If a Non-Specified Breach has occurred and is continuing, the MDT shall have the right to seek any additional remedy available at law or equity, including specific performance, damages and/or default interest, and if appropriate, subject to the discretion of the Bankruptcy Court, sanctions.

(vii)      The Confirmation Order shall provide that each Party is required to comply in good faith with the terms of this Agreement and applicable Collateral Documents to which it is party.

(b)      Delay or Omission.  A delay or omission by the MDT in exercising any right or remedy accruing upon a Breach shall not impair the right or remedy or constitute a waiver of or acquiescence in such Breach or any other Breach. Except as set forth in Section 9.02(a)(iii) above, no remedy is exclusive of any other remedy, and all remedies are cumulative

(c)      Waiver of Past Breaches.  The MDT may waive an existing Breach and its consequences. When a Breach is waived, it is deemed cured and the MDT and the Sackler Party or Payment Group in

---

[19] Note to Draft: Crossover Member issues under discussion.

Breach will be restored to its former positions and rights under this Agreement, but no such waiver shall extend to any subsequent or other Breach or impair any consequent right.

(d)    <u>Priorities</u>.  If a Breach has occurred, and the Secured Party collects any cash or property pursuant to this <u>Article 9</u> from the Payment Group in Breach (including any Crossover Member that is a part of such Payment Group, but subject to any requirement herein to hold all or any portion of such proceeds in escrow or apply such proceeds to satisfy the Obligations of other Payment Groups), it shall apply the cash or property (upon conversion of the property to cash) in the following order:  *first*, to the Secured Party for all costs out-of-pocket expenses incurred or made by it, including costs of collection and expenses, disbursements and advances of the Secured Party's agents, counsel, accountants and experts and all amounts due to the Secured Party under the relevant Collateral Documents and hereunder; *second*, to pay Breach Fees due hereunder; *third*, to pay the Outstanding Settlement Amounts of the Payment Group in Breach; *fourth* to pay any other outstanding payment Obligations of the Payment Group in Breach; and *fifth*, with respect any remaining cash or property collected from A-Side Payment Group 1 (including the Fourth Tier Obligor), to be deposited by the Secured Party into an escrow account to secure, on a pro rata basis, the Obligations of A-Side Payment Group 5, A-Side Payment Group 6 and A-Side Payment Group 7; *provided*, that with respect to any cash or property collected pursuant to this <u>Article 9</u> from any A-Side General Obligor, such cash or property shall be segregated and 12.5% of such cash or property shall be allocated to each A-Side Payment Group that is not in Breach and held in escrow by the Secured Party for the benefit of each A-Side Payment Group that is not in Breach until the next Funding Deadline (or until the exercise of rights and remedies against such A-Side Payment Group if it subsequently is in Breach), at which time such amounts shall be applied against such A-Side Payment Group's obligations.

Section 9.03    **Trustee Liability**.  [The MDT agrees and acknowledges that certain of the Sackler Parties are trustees for the Trusts; that the trustees of such Trusts are entering into this Agreement solely in their capacities as trustees and not individually; that any remedy, recourse or right of recovery against a Trust is limited to the assets of such Trust; and that the trustees of such Trusts shall have no personal liability hereunder.][20]

Section 9.04    **Breach Fee**.  [●][21]

Section 9.05    **Reinstatement**.  If the MDT or any Creditor Trust is required in any insolvency or liquidation proceeding or otherwise to disgorge, turn over or otherwise pay any amount to the estate of any Payment Party (or any trustee, receiver or similar Person therefor), because the payment of such amount was declared to be fraudulent or preferential in any respect or for any other reason, any amount (a "<u>Recovery</u>"), whether received as proceeds of security, enforcement of any right of setoff or otherwise, then the Outstanding Settlement Amounts shall be reinstated to the extent of such Recovery and deemed to be outstanding.  The Payment Group of which such Payment Party is a member shall be obligated to pay to the MDT the amount of such Recovery within 60 days of the date that such Recovery has been disgorged or otherwise paid to such Payment Party estate.  If this Agreement and/or the Collateral Documents shall have been terminated prior to such Recovery, this Agreement and/or the Collateral Documents shall be reinstated in full force and effect until such time as such Recovery has been so paid.

---

[20] <u>Note to Draft</u>: Section under discussion.

[21] <u>Note to Draft</u>: Under discussion.

## ARTICLE 10.
## CONDITIONS PRECEDENT

**Section 10.01    Settlement Effective Date**.

(a)    [The "Settlement Effective Date" shall be the first date on which each of the following conditions has been satisfied or waived by the Parties:

(i)    the Disclosure Statement Order (i) shall be in full force and effect and (ii) shall not have been reversed, modified or stayed, or be subject to a motion to stay;

(ii)    the Confirmation Order (i) shall be in full force and effect and (ii) shall not have been reversed, modified or stayed, or be subject to a motion to stay;

(iii)    the Definitive Documents shall have been executed and delivered by each of the parties thereto;

(iv)    the approval of the terms of this Agreement [and the Definitive Documents] and the confirmation of the authority of the trustees of the Sackler Parties that are Trusts to enter into and perform all obligations thereunder (including, but not limited to, all payment obligations, provision of security and disclosure of documents) by the Royal Court of Jersey (Channel Islands) in connection with a Representation to be brought before that court by [A-Side IAC Payment Party], and to which all relevant beneficiaries (including any minor or unborn beneficiaries, if any) of [each A-Side IAC Payment Party] are to be convened;

(v)    the MDT shall have received a copy of the Act of Court issued by the Royal Court of Jersey (Channel Islands) or an extract thereof verifying the approval and confirmation set out in Section 10.01(iv) above;

(vi)    [Reserved];

(vii)    [Reserved];

(viii)    the Persons listed on Exhibit K shall have executed the Further Assurances Agreement;

(ix)    the Plan Effective Date shall have occurred;

(x)    the MDT shall have received the payment of the first Required Settlement Payment from each Payment Group; and

(xi)    the conditions precedent set forth in each of the Credit Support Annexes shall have been satisfied (or waived) in accordance therewith.

(b)    The obligations of each Party under this Agreement are subject to, and shall become effective upon, the occurrence of the Settlement Effective Date.  Notwithstanding the foregoing sentence, the following obligations shall become effective upon the Agreement Effective Date:

(i)    the obligations set forth in Sections [●];

52

(ii)      each obligation expressly provided to be effective upon the Agreement Effective Date herein;

(iii)     the obligation of the Payment Parties to pay the first Required Settlement Payment on the Plan Effective Date.][22]

# ARTICLE 11.
## MISCELLANEOUS

**Section 11.01   Notices**.  All notices, requests and other communications required or permitted under, or otherwise made in connection with, this Agreement, shall be in writing and shall be deemed to have been duly given (a) when delivered in person, (b) upon confirmation of receipt when transmitted by facsimile transmission, (c) upon receipt after dispatch by registered or certified mail, postage prepaid, (d) on the next Business Day if transmitted by national overnight courier (with confirmation of delivery) or (e) on the date delivered if sent by email (with confirmation of delivery), in each case, addressed as follows:

if to the MDT, to:

[_____]

with a copy to (which shall not constitute notice):

[_____]

if to any Sackler Party within A-Side Payment Group [__], to:

[_____]

with a copy to (which shall not constitute notice):

[_____]

if to any Sackler Party within B-Side Payment Group 1, to:

[_____]

with a copy to (which shall not constitute notice):

[_____]

if to any Sackler Party within B-Side Payment Group 2, to:

[_____]

with a copy to (which shall not constitute notice):

[_____]

---

[22] Note to Draft: Section under discussion.

if to any Debtor, to:

[_____]

with a copy to (which shall not constitute notice):

[_____]

or to such other address or facsimile number as such party may hereafter specify for the purpose by notice to the other parties hereto. Notices and other communications sent shall be deemed to have been given when received unless otherwise provided in this Section 11.01; *provided* that if such notice or other communication is not received during the normal business hours of the recipient, such notice or communication shall be deemed to have been received at the opening of the business on the next Business Day for the recipient. Each of the Parties may change its notice address provided for in this Section 11.01 by notice to the other Parties hereto.

**Section 11.02    Payments Received**.  [Each payment made by or on behalf of the Payment Groups under this Agreement shall be made without condition or deduction for any counterclaim, defense, recoupment or setoff and shall be made to the MDT to an account as the MDT may designate from time to time in U.S. dollars, and in immediately available funds by 11:59 p.m. (New York City time) on the date specified herein. Except as otherwise set forth herein, if any payment to be made by the Payment Groups would have come due on a day other than a Business Day, payment shall be due on the next following Business Day.]²³

**Section 11.03    Survival of Representations and Warranties**.  All representations and warranties made hereunder and in any other document delivered pursuant hereto or in connection herewith or therewith shall survive the execution and delivery hereof and thereof. Such representations and warranties have been or will be relied upon by each Party, regardless of any investigation made by any Party or on their behalf, and shall continue in full force and effect as long as any Outstanding Settlement Amount and any other amounts hereunder remains outstanding.

**Section 11.04    Remedies Cumulative; Specific Performance**.  The rights and remedies of the Parties shall be cumulative (and not alternative) and not exclusive of any rights, remedies, powers and privileges provided by Law. The Parties agree that irreparable damage would occur if any provision of this Agreement were not performed in accordance with the terms hereof and that the Parties shall be entitled to an injunction or injunctions to prevent breaches of this Agreement or to enforce specifically the performance of the terms and provisions of this Agreement in addition to any other remedy to which they are entitled at law or in equity, in each case without the requirement of posting any bond or other type of security.

**Section 11.05    Confession of Judgment**.

(a)    [On or before the Settlement Effective Date, each Sackler Party shall execute and deliver a confession of judgment, in form and substance satisfactory to the MDT, with respect to the obligations of such Sacker Party under the Settlement Agreement (assuming the maximum amount that may be owed by such Sackler Party under the Settlement Agreement and Collateral Documents after giving effect to the terms of Article 2 of this Settlement Agreement), and agrees, prior to expiration or invalidity of any such

---

²³ Note to Draft: Section under discussion.

confession of judgment, from time to time to deliver all supplements (or if so required, new confessions of judgment) that are necessary to maintain the effectiveness and validity of any such confession of judgment.

(b)    Each Sackler Party hereby irrevocably authorizes [any attorney-at-law] to, upon the occurrence of any Breach, appear for such Sackler Party in the Bankruptcy Court or other court of competent jurisdiction, admit the obligations of the Sackler Party that have come due and are in breach under this Agreement, and waive the issuing and service of process and confess judgment against such Sackler Party for the amount then due, together with costs of suit, and thereupon to waive all errors and all rights of appeal and stay of execution.][24]

**Section 11.06    Entire Agreement; Severability; Amendments and Waivers**.

(a)    [This Agreement constitutes the entire agreement between the Parties with respect to the subject matter of this Agreement and supersedes all prior agreements and understandings, both oral and written, between the Parties with respect to the subject matter of this Agreement (including, for the avoidance of doubt, the Sackler Settlement Agreement Term Sheet, filed as Appendix G to the approved disclosure statement filed at Docket No. 2988 on the docket of the Bankruptcy Cases).

(b)    Except as provided in Section 11.06(c), if any term, provision, covenant or restriction of this Agreement is held by a court of competent jurisdiction or other Governmental Authority to be invalid, void or unenforceable, the remainder of the terms, provisions, covenants and restrictions of this Agreement shall remain in full force and effect and shall in no way be affected, impaired or invalidated so long as the economic or legal substance of the transactions contemplated hereby is not affected in any manner materially adverse to any party.  Upon such a determination, the Parties shall negotiate in good faith to modify this Agreement so as to effect the original intent of the Parties as closely as possible in an acceptable manner in order that the transactions contemplated hereby be consummated as originally contemplated to the fullest extent possible.

(c)    [Reserved.]

(d)    No failure or delay by any Party in exercising any right, remedy, power or privilege hereunder shall operate as a waiver thereof nor shall any single or partial exercise thereof preclude any other or further exercise thereof or the exercise of any other right, remedy, power or privilege.

(e)    Any provision of this Agreement or the exhibits hereto may be (a) amended only in a writing signed by the MDT and the Sackler Parties' Representative or (b) waived only in a writing executed by the Person against which enforcement of such waiver is sought; *provided*, that the Sackler Parties' Representative shall act on behalf of the Sackler Parties in respect of any waiver under this clause (e); and *provided*, *further*, that the Sackler Parties' Representative shall be permitted to, solely with the prior consent of the MDT (which may be given or denied in its sole and absolute discretion), amend Exhibit A hereto at any time and from time to time, to add or remove Sackler Parties, including as a result of any Sackler Party that is a Trust splitting into separate trusts or combining with one or more other trusts or being distributed or appointed (in whole or in part) to another trust (subject to compliance with Section 8.02 and Section 11.09).  No waiver of any provision hereunder or any breach thereof shall extend to or affect in any way any other provision or prior or subsequent breach.][25]

---

[24] Note to Draft: Section under discussion.

[25] Note to Draft: Section under discussion.

**Section 11.07    Reserved**.

**Section 11.08    Sackler Parties' Representative.**

(a)    <u>Designation</u>.  Subject to the terms and conditions of this <u>Section 11.08</u>, the Sackler Parties' Representative is hereby designated as the representative of the Sackler Parties with respect to the matters set forth in this Agreement, and solely to the extent set forth therein, the Collateral Documents and the other documents or agreements contemplated hereby or thereby to be performed by the Sackler Parties.

(b)    <u>Authority</u>.  By the approval of this Agreement, each of the Sackler Parties hereby irrevocably constitutes and appoints the Sackler Parties' Representative as the representative, agent, proxy and attorney-in-fact for each of the Sackler Parties for all purposes authorized under this Agreement, including the full power and authority on behalf of the Sackler Parties to (i) take all other actions to be taken by or on behalf of each Sackler Party (or the Sackler Parties collectively) in connection herewith and (ii) do each and every act and exercise any and all rights which each Sackler Party (or the Sackler Parties collectively) is permitted or required to do or exercise under this Agreement or any other agreement contemplated hereby.  Each of the Sackler Parties agrees that such agency and proxy are coupled with an interest, are therefore irrevocable without the written consent of the Sackler Parties' Representative and shall survive the bankruptcy, dissolution, liquidation, death or incapacity of any Sackler Party.  All decisions and actions by the Sackler Parties' Representative (to the extent authorized by this Agreement) shall be binding upon each of the Sackler Parties, and no Sackler Party shall have the right to object, dissent, protest or otherwise contest the same.

(c)    <u>Reliance</u>.  Each Sackler Party agrees that the other Parties shall be entitled to rely on any action taken by the Sackler Parties' Representative on behalf of such Sackler Party (an "<u>Authorized Action</u>"), and that each Authorized Action shall be binding on each Sackler Party as fully as if such Sackler Party had taken such Authorized Action.

(d)    [Reserved.]

**Section 11.09    Binding Effect; Benefit; Assignment**.

(a)    The provisions of this Agreement shall be binding upon and shall inure to the benefit of the Parties hereto and their respective successors and assigns.  No provision of this Agreement is intended to confer any rights, benefits, remedies, obligations or liabilities hereunder upon any Person other than the Parties hereto and their respective successors and assigns.

(b)    No Sackler Party may assign, delegate or otherwise transfer any of its rights or obligations under this Agreement, whether by operation of law or otherwise, without the prior written consent of the MDT (*provided*, for the avoidance of doubt, any amendment to any other provision of this Agreement, including without limitation amendments to <u>Exhibit F</u> hereto to reflect changes not expressly contemplated by this <u>Section 11.09</u>, shall require the consent of the MDT).

**Section 11.10    Governing Law**.    This Agreement shall be governed by and construed in accordance with the Laws of the State of New York (including in respect of the statute of limitations or other limitations period applicable to any claim, controversy or dispute hereunder), without giving effect to principles of conflicts of laws that would require the application of the laws of any other jurisdiction. [For the avoidance of doubt, each of the MDT and the Debtors shall have the benefit in connection with any matter with respect to a Sackler Party that is a Trust arising from or related to this Agreement and the Collateral Documents of the most protective protections afforded third-parties dealing in good faith with trustees in their capacities as such in good faith reliance on representations made by them in their capacities

as trustees under the internal laws of such Trust's Jurisdiction of Administration as set forth on Exhibit [●], but giving effect to the extent they are even more protective, to the terms of such Trust's governing instrument and the effect of any choice of law provisions contained therein.]

**Section 11.11   Jurisdiction; Contested Matter**.

(a)      [The parties hereto agree that any Proceeding seeking to enforce any provision of, or based on a matter arising out of or in connection with, this Agreement shall be brought in the Bankruptcy Court, and each of the parties hereby irrevocably consents for such purpose to the jurisdiction of the Bankruptcy Court (and of the appropriate appellate courts therefrom) or, in the event Bankruptcy Court does not have or accept such jurisdiction, in any federal court sitting in the Southern District of New York and any appellate court therefrom or, in the event such federal court does not have or accept jurisdiction, a New York State court and any appellate court therefrom in any such Proceeding. Each of the parties hereto irrevocably waives, to the fullest extent permitted by law, any objection that it may now or hereafter have to the laying of the venue of any such Proceeding in any such court or that any such Proceeding brought in any such court has been brought in an inconvenient forum.  Process in any such Proceeding may be served on any party anywhere in the world, whether within or without the jurisdiction of any such court.  Without limiting the foregoing, each party agrees that service of process on such party as provided in Section 11.01 shall be deemed effective service of process on such party. For the avoidance of doubt, nothing in this Section 11.01(a) shall prevent any Party from initiating a Proceeding in any relevant jurisdiction to enforce any order, ruling or judgment of any of the courts above.]

(b)      [Notwithstanding anything herein to the contrary, the Parties agree that any Proceeding arising under, related to, or in connection with this Agreement, including any action seeking specific performance of any provision of this Agreement or declaratory judgment concerning this Agreement, shall be heard and determined by the Bankruptcy Court as a contested matter under Rule 9014 of the Federal Rules of Bankruptcy Procedure. With respect to such Proceeding, each Party agrees to (i) submit to the jurisdiction of the bankruptcy court, (ii) consent to the authority of the bankruptcy to enter Final Orders or judgments, and (iii) waive and not advance any argument that such dispute is or must be adjudicated as an adversary proceeding governed by Part VII of the Federal Rules of Bankruptcy Procedure or that the Bankruptcy Court is an improper or inconvenient forum or venue. Any party to such Proceeding shall be permitted to request that the Bankruptcy Court adjudicate such dispute on an expedited basis, and all other parties shall consent to such expedited adjudication. This Section 11.11(b) shall not apply to actions brought in connection with the exercise of the Release Remedy.]

**Section 11.12   Waiver of Jury Trial**.   EACH OF THE PARTIES HERETO HEREBY IRREVOCABLY WAIVES ANY AND ALL RIGHT TO TRIAL BY JURY IN ANY LEGAL PROCEEDING ARISING OUT OF OR RELATED TO THIS AGREEMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY.

**Section 11.13   Counterparts; Trustee of Multiple Trusts; Effectiveness**.   This Agreement may be signed in any number of counterparts, each of which shall be an original (subject to the last sentence in this Section 11.13), with the same effect as if the signatures thereto and hereto were upon the same instrument.  To the extent any Sackler Party signs this agreement in his, her or its capacity as trustee of a Trust, such signature shall be deemed to be in respect of all Trusts of which such Person is trustee. This Agreement shall become effective on the Agreement Effective Date.  For the avoidance of doubt, until and unless each party has received a counterpart hereof signed by the other parties hereto, this Agreement shall have no effect and no party shall have any right or obligation hereunder (whether by virtue of any other oral or written agreement or other communication).  The exchange of a fully executed Agreement (in counterparts or otherwise) by electronic transmission in .PDF format or by facsimile shall be sufficient to bind the parties to the terms and conditions of this Agreement, subject to the provisions of Article 10.

**Section 11.14**   **Document Repository**.  [●][26]

**Section 11.15**   **Reserved**.

[*Signature Page Follows*]

---

[26] Note to Draft: Under discussion.

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be duly executed by their respective authorized officers as of the date first written above.

[MDT]

By: _____
    Name:
    Title:

[Sackler Party 1]

By: _____
    Name:
    Title:

[Sackler Party 2]

By: _____
    Name:
    Title:

[Sackler Party 3]

By: _____
    Name:
    Title:

[Debtor 1]

By: _____
    Name:
    Title:

[Signature Page to Settlement Agreement]

[Debtor 2]


By: _____
    Name:
    Title:



[Debtor 3]


By: _____
    Name:
    Title:

[Signature Page to Settlement Agreement]

**<u>Exhibit A</u>**
**Payment Groups and IAC Payment Parties[1]**

---

[1] <u>Note to Draft</u>: Exhibit A under discussion.

**A-Side Payment Parties and A-Side Payment Groups**

| A-Side Payment Group 1 | A-Side Payment Group 2 |
|---|---|
| *Second Tier Obligors*<br>Theresa E. Sackler 1988 Trust<br>Theresa E. Sackler 2008 Trust<br>Millennium Trust<br>Perelle Bay Trust<br><br>*Third Tier Obligor*<br>Theresa Sackler<br><br>*Fourth Tier Obligor*<br>None | *Second Tier Obligor*<br>[Trust to be named that will hold collateral account]<br><br>*Third Tier Obligor*<br>Kathe Sackler<br><br>*Fourth Tier Obligor*<br>None |

| A-Side Payment Group 3 | A-Side Payment Group 4 |
|---|---|
| *Second Tier Obligors*<br>Ilene S. Lefcourt Trust 88<br>Ilene S. Lefcourt Trust 96<br>ISL 2010 Family Trust<br>ISL 2011 Family Trust<br><br>*Third Tier Obligor*<br>Ilene Sackler Lefcourt<br><br>*Fourth Tier Obligor*<br>None | *Second Tier Obligors*<br>MDAS Investment Trust<br>Mortimer DA Sackler Trust 1996<br>Mortimer DA Sackler Trust 2002<br>MDAS 2010 Family Trust<br>MDAS 2011 Family Trust<br>Trust under Agreement dated the 11th day of May 2005<br>MDAS Children's Trust 2012<br>Nixie Trust<br>Indian Wells Trust<br><br>*Third Tier Obligor*<br>Mortimer D.A. Sackler<br><br>*Fourth Tier Obligor*<br>None |

| A-Side Payment Group 5 | A-Side Payment Group 6 |
|---|---|
| *Second Tier Obligors*<br>MDS 2006 Trust<br>MDS 1992 Trust<br>MDS Beacon 2010 Trust<br>MDS Beacon 2011 Trust<br>MDS Family Trust 2010<br><br>*Third Tier Obligor*<br>None<br><br>*Fourth Tier Obligor*<br>Theresa Sackler | *Second Tier Obligors*<br>MTS 2013 Family Trust<br>MTS 2016 Trust<br>MTS Beacon 2013 Trust<br>MTS Beacon 2014 Trust<br>MTS Beacon 2015 Trust<br>MTS Beacon Trust 2010<br>MTS Beacon Trust 2011<br>MTS Beacon Trust 2012<br>MTS Family Trust 2010<br><br>*Third Tier Obligor*<br>None |

|  | *Fourth Tier Obligor* |
|---|---|
|  | Theresa Sackler |

| A-Side Payment Group 7 | A-Side Payment Group 8 |
|---|---|
| *Second Tier Obligors* | *Second Tier Obligors* |
| SDS 1992 Trust | Romas Trust |
| SDS Beacon 2011 Trust | Sheffield Trust |
| SDS Family Trust 2010 | SSSH 2013 Family Trust |
| Millennium Trust | SSSH Beacon 2013 Trust |
| Perelle Bay Trust | Samantha Hunt 1996 Trust |
|  | Samantha S Hunt 2002 Trust |
| *Third Tier Obligor* |  |
| None | *Third Tier Obligor* |
|  | None |
| *Fourth Tier Obligor* |  |
| Theresa Sackler | *Fourth Tier Obligor* |
|  | None |

**B-Side Payment Parties and B-Side Payment Groups**

| B-Side Payment Group 1 | B-Side Payment Group 2 |
| --- | --- |
| AR Irrevocable Trust | AJ Irrevocable Trust |
| David A. Sackler | [New AJ Holding Company LLC][4] |
| [New AR Holding Company LLC][2] | [New 2A Trust Holding Company LLC][5] |
| [New 1A Trust Holding Company LLC][3] | 1JM LLC |
| China Sea Company, Inc. | 2JM LLC |
| G3A LLC | 3JM LLC |
| G3D LLC | China Sea Company, Inc. |
| G3R LLC | Estate of Jonathan D. Sackler |
| Hudson River Partners | Hudson River Partners |
| Meridian International, Ltd. | Hudson Trust |
| Raymond R. Sackler Trust 1 dtd 12/23/89 | Irrevocable Trust under Declaration dated as of December 29, 1992 |
| Raymond R. Sackler Trust 1B dtd 12/23/89 | JDS Revocable Pourover Trust |
| RGT One LLC | JGT One LLC |
| RGT Three LLC | JGT Three LLC |
| RGT Two LLC | JGT Two LLC |
| Dr. Richard S. Sackler | Meridian International, Ltd. |
| Rosebay Medical Company, Inc. | Raymond R. Sackler Trust 2 dtd 12/23/89 |
| Trust U/A 11/5/74 fbo Beverly Sackler | Raymond R. Sackler Trust 2B dtd 12/23/89 |
| Trust under agreement dated December 23, 1980 f/b/o Richard S. Sackler | Rosebay Medical Company, Inc. |
| Trust under agreement dated December 3, 1979 f/b/o Richard S. Sackler | Temagami LLC |
| Trust under agreement dated June 16, 1980 f/b/o Richard S. Sackler | Trust U/A 11/5/74 fbo Beverly Sackler |
| | Trust under agreement dated December 23, 1980 f/b/o Jonathan D. Sackler |
| | Trust under agreement dated December 3, 1979 f/b/o Jonathan D. Sackler |
| | Trust under agreement dated June 16, 1980 f/b/o Jonathan D. Sackler |

---

[2] To become party to the Agreement when formed.

[3] To become party to the Agreement when formed.

[4] To become party to the Agreement when formed.

[5] To become party to the Agreement when formed.

**IAC Payment Parties**

| A-Side IAC Payment Parties | B-Side IAC Payment Parties |
| --- | --- |
| Beacon Trust | 1JM LLC |
| Canadian Partnership Trust | 2JM LLC |
| Clover Trust | 3JM LLC |
| Fidinc Trust | China Sea Company, Inc. |
| Halm Trust | Estate of Jonathan D. Sackler |
| Hercules Trust | G3A LLC |
| Medichem Trust | G3D LLC |
| Memphis Pharma Trust | G3R LLC |
| MIL Trust | Hudson River Partners |
| Milton Trust | Hudson Trust |
| Mundi Lab Trust | Irrevocable Trust under Declaration dated as of December 29, 1992 |
| Pickering Trust | JDS Revocable Pourover Trust |
| Tom & Kelly Trust | JGT One LLC |
| Varus Trust | JGT Three LLC |
| | JGT Two LLC |
| | Meridian International, Ltd. |
| | Raymond R. Sackler Trust 1 dtd 12/23/89 |
| | Raymond R. Sackler Trust 1B dtd 12/23/89 |
| | Raymond R. Sackler Trust 2 dtd 12/23/89 |
| | Raymond R. Sackler Trust 2B dtd 12/23/89 |
| | RGT One LLC |
| | RGT Three LLC |
| | RGT Two LLC |
| | Dr. Richard S. Sackler |
| | Rosebay Medical Company, Inc. |
| | Temagami LLC |
| | Trust U/A 11/5/74 fbo Beverly Sackler |
| | Trust under agreement dated December 23, 1980 f/b/o Richard S. Sackler |
| | Trust under agreement dated December 3, 1979 f/b/o Richard S. Sackler |

| | |
|---|---|
| | Trust under agreement dated June 16, 1980 f/b/o Richard S. Sackler |
| | Trust under agreement dated December 23, 1980 f/b/o Jonathan D. Sackler |
| | Trust under agreement dated December 3, 1979 f/b/o Jonathan D. Sackler |
| | Trust under agreement dated June 16, 1980 f/b/o Jonathan D. Sackler |

**A-Side General Obligors**

| A-Side General Obligors |
|---|
| A-Side IAC Payment Parties |

**<u>Exhibit B</u>**
**Debtors**

| |
|---|
| Purdue Pharma L.P. |
| Purdue Pharma Inc. |
| Purdue Transdermal Technologies L.P. |
| Purdue Pharma Manufacturing L.P. |
| Purdue Pharmaceuticals L.P. |
| Imbrium Therapeutics L.P. |
| Adlon Therapeutics L.P. |
| Greenfield BioVentures L.P. |
| Seven Seas Hill Corp. |
| Ophir Green Corp. |
| Purdue Pharma of Puerto Rico |
| Avrio Health L.P. |
| Purdue Pharmaceutical Products L.P. |
| Purdue Neuroscience Company |
| Nayatt Cove Lifescience Inc. |
| Button Land L.P. |
| Rhodes Associates L.P. |
| Paul Land Inc. |
| Quidnick Land L.P. |
| Rhodes Pharmaceuticals L.P. |
| Rhodes Technologies |
| UDF LP |
| SVC Pharma LP |
| SVC Pharma Inc. |

**Exhibit C**
**Family Groups and Corresponding Payment Groups[1]**

**A-Side Family Groups[2]**

| A-Side Family Group 1<br>*Corresponds to A-Side Payment Group 1* | A-Side Family Group 2<br>*Corresponds to A-Side Payment Group 2* |
|---|---|
| Theresa Sackler | Kathe Sackler |
| TES Bare Trust | Benjamin Shack Sackler Trust 98 |
| Theresa E. Sackler 1988 Trust | BJSS 2010 Trust |
| Theresa E. Sackler 2008 Trust | BJSS 2013 Trust |
| TES Beacon 2012 Trust | BJSS and JHSS 2012 K Trust |
| TES Beacon 2013 Trust | JHSS 2010 Trust |
| TES Beacon 2014 Trust | JHSS 2013 Trust |
| The business entities owned and controlled by each individual within this Family Group, excluding any publicly-traded entity | Julia Shack Sackler Trust 98 |
| For each trust within this Family Group, the trustees thereof, solely in their respective capacities as such and not in their individual capacities. | KAS 2010 Family Trust |
| | KAS 2011 Family Trust |
| | Kathe A. Sackler 2001 Trust |
| | Kathe A. Sackler Trust 88 |
| | Kathe A. Sackler Trust 96 |
| | SASS 2010 Trust |
| | SASS 2013 Trust |
| | SS Tanager Trust |
| | Trust under Agreement dated the 13th day of March 2009 |
| | [Trust to be identified that will create the collateral account, if not already listed above] |
| | The spouses, and adult children [and grandchildren] of each individual within this Family Group |
| | The business entities owned and controlled by each individual within this Family Group, excluding any publicly-traded entity |
| | For each trust within this Family Group, the trustees thereof, solely in their respective |

---

[1] Note to Draft: Exhibit C under discussion.

[2] A Person shall only be a member of a Family Group to the extent it continues to be the case that such Person is neither deceased nor the estate of a natural person (provided that nothing shall prohibit any such estate from cooperating with the MDT with respect to any litigation or similar proceeding related to the Debtors' Opioid-Related Activities (as defined in the Plan) , including by participating in discovery).

|  | capacities as such and not in their individual capacities. |
|---|---|

| A-Side Family Group 3<br>*Corresponds to A-Side Payment Group 3* | A-Side Family Group 4<br>*Corresponds to A-Side Payment Group 4* |
|---|---|
| Ilene Sackler Lefcourt | Mortimer D.A. Sackler |
| Jeffrey Lefcourt | Indian Wells Trust |
| Karen Lefcourt | MDAS 2010 Family Trust |
| 533 Canal Trust | MDAS 2011 Family Trust |
| Ilene S. Lefcourt Trust 88 | MDAS Children's Trust 2012 |
| Ilene S. Lefcourt Trust 96 | MDAS Investment Trust |
| Ilene Sackler Lefcourt Revocable Trust | Mortimer DA Sackler Trust 1996 |
| ISL 2010 Family Trust | Mortimer DA Sackler Trust 2002 |
| ISL 2011 Family Trust | Nixie Trust |
| ISL JML OSHA Trust | Trust under Agreement dated the 11th day of May 2005 |
| ISL LT Children's Trust | Trust Under Declaration of Trust No. 2 dated November 25, 1996 |
| JML 2010 Family Trust | Trust Under Declaration of Trust No. 1 dated November 25, 1996 |
| JML 2011 Family Trust | |
| JML Investment Trust | The spouses, and adult children [and grandchildren] of each individual within this Family Group |
| JML OSHA Trust | |
| JML Pour-Over Trust | The business entities owned and controlled by each individual within this Family Group, excluding any publicly-traded entity |
| Karen Lefcourt Trust | |
| KLT 2010 Family Trust | For each trust within this Family Group, the trustees thereof, solely in their respective capacities as such and not in their individual capacities. |
| KLT 2011 Family Trust | |
| KLT Pour-Over Trust | |
| LSRR Family Trust | |
| The spouses, and adult children [and grandchildren] of each individual within this Family Group | |
| The business entities owned and controlled by each individual within this Family Group, excluding any publicly-traded entity | |
| For each trust within this Family Group, the trustees thereof, solely in their respective capacities as such and not in their individual capacities. | |

| A-Side Family Group 5 *Corresponds to A-Side Payment Group 5* | A-Side Family Group 6 *Corresponds to A-Side Payment Group 6* |
|---|---|
| Michael D. Sackler | Marissa T. Sackler |
| MDS 1992 Trust | Glebe II Trust |
| MDS 2002 Trust | MTS 2002 Trust |
| MDS 2006 Trust | MTS 2006 Trust |
| MDS Beacon 2010 Trust | MTS 2013 Family Trust |
| MDS Beacon 2011 Trust | MTS 2016 Trust |
| MDS Beacon 2012 Trust | MTS Bare Trust |
| MDS Beacon 2013 Trust | MTS Beacon 2013 Trust |
| MDS Family Trust 2010 | MTS Beacon 2014 Trust |
| The spouses, and adult children [and grandchildren] of each individual within this Family Group | MTS Beacon 2015 Trust |
| | MTS Beacon Trust 2010 |
| The business entities owned and controlled by each individual within this Family Group, excluding any publicly-traded entity | MTS Beacon Trust 2011 |
| | MTS Beacon Trust 2012 |
| | MTS Family Trust 2010 |
| For each trust within this Family Group, the trustees thereof, solely in their respective capacities as such and not in their individual capacities. | The spouses, and adult children [and grandchildren] of each individual within this Family Group |
| | The business entities owned and controlled by each individual within this Family Group, excluding any publicly-traded entity |
| | For each trust within this Family Group, the trustees thereof, solely in their respective capacities as such and not in their individual capacities. |

| A-Side Family Group 7 *Corresponds to A-Side Payment Group 7* | A-Side Family Group 8 *Corresponds to A-Side Payment Group 8* |
|---|---|
| Sophia Dalrymple | Samantha Hunt |
| SDS 1992 Trust | Romas Trust |
| SDS 2002 Trust | Sheffield Trust |
| SDS 2006 Trust | SSSH 2013 Family Trust |
| SDS Bare Trust | SSSH Beacon 2013 Trust |
| SDS Beacon 2011 Trust | Samantha Hunt 1996 Trust |
| SDS Beacon 2012 Trust | Samantha S. Hunt 2002 Trust] |
| SDS Beacon 2014 Trust | The spouses, and adult children [and grandchildren] of each individual within this Family Group |
| SDS Family Trust 2010 | |

| | |
|---|---|
| The spouses, and adult children [and grandchildren] of each individual within this Family Group<br><br>The business entities owned and controlled by each individual within this Family Group, excluding any publicly-traded entity<br><br>For each trust within this Family Group, the trustees thereof, solely in their respective capacities as such and not in their individual capacities. | The business entities owned and controlled by each individual within this Family Group, excluding any publicly-traded entity<br><br>For each trust within this Family Group, the trustees thereof, solely in their respective capacities as such and not in their individual capacities. |

**B-Side Family Groups**

| B-Side Family Group 1[3]<br>*Corresponds to B-Side Payment Group 1*<br>(Richard Sackler Family) |
| --- |
| Dr. Richard S. Sackler[4] |
| David A. Sackler |
| The former spouse of Dr. Richard S. Sackler |
| The children [and grandchildren] of Dr. Richard S. Sackler |
| 1974 Irrevocable Trust fbo BS and RSS |
| AR Irrevocable Trust |
| Raymond R. Sackler Trust 1 dtd 12/23/89 |
| Raymond R. Sackler Trust 1B dtd 12/23/89 |
| Irrevocable Trust under Declaration dated as of September 19, 1995 f/b/o Issue of Richard S. Sackler |
| Beverly Sackler Trust 1 f/b/o David Alex Sackler 12/20/1989 |
| Beverly Sackler Trust 1 f/b/o MRS 12/21/1989 |
| Beverly Sackler Trust 1 f/b/o RKS 12/22/1989 |
| Beverly Sackler Trust 2 f/b/o David Alex Sackler 12/20/1989 |
| Beverly Sackler Trust 2 f/b/o MRS 12/21/1989 |
| Beverly Sackler Trust 2 f/b/o RKS 12/22/1989 |
| Beverly Sackler Trust 3 f/b/o David Alex Sackler 12/20/1989 |
| Beverly Sackler Trust 3 f/b/o MRS 12/21/1989 |
| Beverly Sackler Trust 3 f/b/o RKS 12/22/1989 |
| David A. Sackler 2012 Trust |
| MRS 2012 Trust |
| RKS 2012 Trust |
| Trust under Declaration of Trust dated August 23, 1988 f/b/o Richard S. Sackler and Issue of Richard S. Sackler |
| Trust under Declaration of Trust dated December 17, 1991 f/b/o Richard S. Sackler and Issue of Richard S. Sackler |
| Trust under agreement dated December 3, 1979 f/b/o Richard S. Sackler |

---

[3] The trustees of each trust in a Family Group are included in such Family Group, solely in their respective capacities as such, and not in their individual capacities.

[4] A Person shall only be a member of a Family Group to the extent it continues to be the case that such Person is neither deceased nor the estate of a natural person (provided that nothing shall prohibit any such estate from cooperating with the MDT with respect to any litigation or similar proceeding related to the Debtors' Opioid-Related Activities (as defined in the Plan) , including by participating in discovery).

Trust under agreement dated June 16, 1980 f/b/o Richard S. Sackler

Trust under agreement dated December 23, 1980 f/b/o Richard S. Sackler

BBS Trust

BBS 2013 Trust

Trust Agreement dated August 29, 2003 f/b/o Issue of Richard S. Sackler

Irrevocable Trust under Declaration dated as of August 25, 1992

Richard S. Sackler Trust U/A 9/30/04

Richard S. Sackler Trust f/b/o David A. Sackler 3/8/90

Richard S. Sackler Trust f/b/o MRS 3/8/90

Richard S. Sackler Trust f/b/o RKS 3/8/90

The RSS 2012 Family Trust

MRS Captain Trust

RKS Captain Trust

RSS Fiduciary Management Trust

Crystal Trust

Data Trust

DABB Trust

RSS Revocable Pourover Trust

Sel. Fam. Investment Trust

Trust U/A 11/5/74 fbo Beverly Sackler

Trust B U/A 11/5/74 fbo Beverly Sackler

The 1974 Irrevocable Investment Trust

Irrevocable Trust under Declaration dated as of April 25, 1991

Richard S. Sackler Life Insurance Trust

Jonathan D. Sackler Life Insurance Trust

Raymond R. Sackler Credit Shelter Trust u/a 3/29/2012

Raymond R. Sackler GST Exempt Marital Trust u/a 3/29/2012

New AR Holding Company LLC[5]

New 1A Trust Holding Company LLC[6]

The business entities in which any Person within this Family Group has a controlling ownership interest (either individually or alongside one or more Person(s) identified on this Exhibit C), excluding (i) any entity identified on Exhibit E, (ii) any entity with an ownership interest in any

---

[5] Entity to be included once formed.

[6] Entity to be included once formed.

entity listed on Exhibit E that is not otherwise identified on this Exhibit C, and (iii) any publicly-traded entity.

| B-Side Family Group 2[7] |
| :---: |
| *Corresponds to B-Side Payment Group 2* |
| (Jonathan Sackler Family) |
| The surviving spouse of Jonathan D. Sackler |
| The children [and grandchildren] of Jonathan D. Sackler |
| 1974 Irrevocable Trust fbo BS and JDS |
| AJ Irrevocable Trust |
| Raymond R. Sackler Trust 2 dtd 12/23/89 |
| Raymond R. Sackler Trust 2B dtd 12/23/89 |
| Irrevocable Trust under Declaration dated as of September 19, 1995 f/b/o Issue of Jonathan D. Sackler |
| Beverly Sackler Trust 1 f/b/o MS 12/26/1989 |
| Beverly Sackler Trust 1 f/b/o CES 12/27/1989 |
| Beverly Sackler Trust 1 f/b/o MRCS 12/29/1989 |
| Beverly Sackler Trust 2 f/b/o MS 12/26/1989 |
| Beverly Sackler Trust 2 f/b/o CES 12/27/1989 |
| Beverly Sackler Trust 2 f/b/o MRCS 12/30/1989 |
| Beverly Sackler Trust 3 f/b/o MS 12/26/1989 |
| Beverly Sackler Trust 3 f/b/o CES 12/27/1989 |
| Beverly Sackler Trust 3 f/b/o MRCS 12/28/1989 |
| MS 2012 Trust |
| CES 2012 Trust |
| MRCS 2012 Trust |
| Trust under Declaration of Trust dated August 23, 1988 f/b/o Jonathan D. Sackler and Issue of Jonathan D. Sackler |
| Trust under Declaration of Trust dated December 17, 1991 f/b/o Jonathan D. Sackler and Issue of Jonathan D. Sackler |
| Trust under agreement dated December 3, 1979 f/b/o Jonathan D. Sackler |
| Trust under agreement dated June 16, 1980 f/b/o Jonathan D. Sackler |
| Trust under agreement dated December 23, 1980 f/b/o Jonathan D. Sackler |
| MC Trust |

---

[7] The trustees and/or protectors of each trust in a Family Group are included in such Family Group, solely in their respective capacities as such.

Trust Agreement dated August 29, 2003 f/b/o MC and Issue of Jonathan D. Sackler

Irrevocable Trust under Declaration dated as of December 29, 1992

Jonathan D. Sackler Trust U/A 9/30/04

Hudson Trust

Jonathan D. Sackler Trust f/b/o CES 4/11/90

Jonathan D. Sackler Trust f/b/o MS 4/11/90

Jonathan D. Sackler Trust f/b/o MRCS, 4/11/90

JDS Fiduciary Management Trust

MCM Fiduciary Management Trust

Cornice Trust

JDS Revocable Pourover Trust

Cedar Cliff Trust

Trust U/A 11/5/74 fbo Beverly Sackler

Trust B U/A 11/5/74 fbo Beverly Sackler

The 1974 Irrevocable Investment Trust

Irrevocable Trust under Declaration dated as of April 25, 1991

Richard S. Sackler Life Insurance Trust

Jonathan D. Sackler Life Insurance Trust

Raymond R. Sackler Credit Shelter Trust u/a 3/29/2012

Raymond R. Sackler GST Exempt Marital Trust u/a 3/29/2012

New AJ Holding Company LLC[8]

New 2A Trust Holding Company LLC[9]

The business entities in which any Person within this Family Group has a controlling ownership interest (either individually or alongside one or more Person(s) identified on this Exhibit C), excluding (i) any entity identified on Exhibit E, (ii) any entity with an ownership interest in any entity listed on Exhibit E that is not otherwise identified on this Exhibit C, and (iii) any publicly-traded entity.

---

[8] Entity to be included once formed.

[9] Entity to be included once formed.

**<u>Exhibit D</u>**
**Collar Recipients**

A-Side Payment Group 1
A-Side Payment Group 2
A-Side Payment Group 3
A-Side Payment Group 5
A-Side Payment Group 6
A-Side Payment Group 7
A-Side Payment Group 8

**Exhibit E**
**IACs[1]**

| |
|---|
| Mundipharma Pharmaceuticals Argentina S.r.l. |
| Mundipharma Healthcare Pty. Limited |
| Mundipharma Oncology Pty. Limited |
| Mundipharma Pty Limited |
| Mundipharma GesmbH |
| Mundipharma Medical CEE GmbH |
| Mundipharma BV |
| Mundipharma Pharmaceuticals (Belgium) BV |
| Bermag Limited |
| L.P. Clover Limited |
| Mundipharma International Corporation Limited |
| Mundipharma International Holdings Limited |
| Mundipharma International Limited |
| Mundipharma Laboratories Limited |
| Mundipharma Limited |
| Mundipharma Medical Company |
| Mundipharma Ophthalmology Corporation Limited |
| Mundipharma Ophthalmology Products Limited |
| Mundipharma Brasil Productos Médicos e Farmacêuticos Ltda. |
| IAF Limited |
| Mundipharma Medical S.ar.l. (Bulgaria Branch of Swiss company) |
| Elvium Life Sciences GP Inc. |
| Elvium Life Sciences Limited Partnership |
| Elvium ULC |
| Purdue Frederick Inc. |
| Purdue Pharma |
| Purdue Pharma Inc. |
| Mundipharma (China) Pharmaceutical Company Limited |
| Mundipharma (Shanghai) International Trade Company Limited |
| Wuhu Haitong Kanghong Pharmaceutical Trading Co. Ltd. |
| Mundipharma (Colombia) S.A.S. |
| Mundipharma Pharmaceuticals Limited |
| Mundipharma GesmbH (Czech Republic Branch of Austrian company) |
| Mundipharma A/S |
| Mundipharma Middle East FZ-LLC |
| Mundipharma Egypt LLC |
| Scientific Office of Mundipharma MEA GmbH |
| Mundipharma Oy |
| Mundipharma SAS |
| Krugmann GmbH |
| Mundichemie GmbH |
| Mundipharma Biologics GmbH |
| Mundipharma Deutschland GmbH & Co. KG |

---

[1] Note to Draft: Exhibit E under discussion.

| |
|---|
| Mundipharma GmbH |
| Mundipharma Medical GmbH |
| Mundipharma Research GmbH & Co. KG |
| Mundipharma Research Verwaltungs GmbH |
| Mundipharma Verwaltungsgesellschaft mbH |
| Mundipharma (Hong Kong) Limited |
| Mundipharma Medical GmbH (Hungary Branch of Swiss Company) |
| Mundipharma Laboratories GmbH (Indonesian Branch of Swiss Company) |
| PT. Mundipharma Healthcare Indonesia |
| Mundipharma Corporation (Ireland) Limited |
| Mundipharma Pharmaceuticals Limited |
| Mundipharma Pharmaceuticals S.r.l. |
| Mundipharma Kabushiki Kaishe |
| Mundipharma TK |
| Mundipharma Distribution Limited |
| Mundipharma Korea Limited |
| Euro-Celtique S.A. |
| Mundipharma International Services S.ar.l. |
| Mundipharma Pharmaceuticals Sdn. Bhd. |
| Mundipharma de Mexico, S. de R.L. de C.V. |
| Mundipharma Maroc |
| Mundipharma (Myanmar) Co., Limited |
| Alfa Generics B.V. |
| Bradenton Products B.V. |
| Ladenburg B.V. |
| Mundipharma B.V. |
| Mundipharma Bradenton B.V. |
| Mundipharma DC B.V. |
| Mundipharma Pharmaceuticals B.V. |
| Mundipharma New Zealand Limited |
| Mundipharma A.S. |
| Mundipharma Distribution GmbH (Philippine Branch of Swiss Company) |
| Mundipharma Polska SP. Z.O.O. |
| Mundipharma Farmaceutica LDA. |
| Mundipharma GesmbH (Russian Branch of Austrian company) |
| Technical Scientific Office of Mundipharma Near East GmbH |
| Mundipharma Healthcare Pte. Limited |
| Mundipharma IT Services Pte. Limited |
| Mundipharma Manufacturing Pte. Limited |
| Mundipharma Pharmaceuticals Private Limited |
| Mundipharma Pte Limited |
| Mundipharma Singapore Holding Pte. Limited |
| Mundipharma GesmbH (Slovak Republic Branch of Austrian company) |
| Mundipharma (Proprietary) Limited |
| Mundipharma Biologics S.L. |
| Mundipharma Pharmaceuticals S.L. |
| Mundipharma AB |
| Mundipharma AG |
| Mundipharma Distribution GmbH |

| |
|---|
| Mundipharma EDO GmbH |
| Mundipharma Holding AG |
| Mundipharma International Services GmbH |
| Mundipharma IT GmbH |
| Mundipharma IT Services GmbH |
| Mundipharma Laboratories GmbH |
| Mundipharma LATAM GmbH |
| Mundipharma MEA GmbH |
| Mundipharma Medical Company |
| Mundipharma Medical GmbH |
| Mundipharma Near East GmbH |
| Taiwan Mundipharma Pharmaceuticals Limited |
| Mundipharma (Thailand) Limited |
| Mundipharma Pharmaceuticals Industry and Trade Limited |
| Bard Pharmaceuticals Limited |
| Clinical Designs Limited |
| Mundibiopharma Limited |
| Mundipharma Corporation Limited |
| Mundipharma International Limited |
| Mundipharma International Services Limited |
| Mundipharma International Technical Operations Limited |
| Mundipharma IT Services Limited |
| Mundipharma Medical Company Limited |
| Mundipharma Research Limited |
| Napp Laboratories Limited |
| Napp Pharmaceutical Group Limited |
| Napp Pharmaceutical Holdings Limited |
| Napp Pharmaceuticals Limited |
| Napp Research Centre Limited |
| Qdem Pharmaceuticals Limited |
| Mundipharma Healthcare Corporation |
| Mundipharma Healthcare LLC |
| Mundipharma International Limited |
| Mundipharma International Technical Operations Limited |
| Mundipharma IT Services Inc. |
| Mundipharma Pharmaceuticals Inc. |
| The Representative Office of Mundipharma Pharmaceuticals Pte Limited in Ho Chi Minh City |

**Exhibit F**
**IAC Pledged Entities[1]**

| IAC Pledged Entity | Jurisdcition | IAC Pledgor(s)[2] |
|---|---|---|
| *IAC Pledged Entities and IAC Pledgors applicable to Side A* | | |
| Beacon Company | Delaware | Beacon Trust |
| [Beacon Company | Delaware | Stanhope Gate Corp.] |
| Purdue Pharma (Canada) | Canada | Canadian Partnership Trust |
| Clover Company Limited | Bermuda | Clover Trust |
| Diagonal Blue Corp. | BVI | Diagonal Blue Trust |
| Fideurop Inc. | Panama | Fidinc Trust |
| Cedar Rock Investment Corporation | BVI | Halm Trust |
| [Cedar Rock Investment Corporation | BVI | Bengal Moon (Delaware) LLC] |
| Banela Corporation | BVI | Hercules Trust |
| Betal Limited | Bermuda | Hercules Trust |
| [Betal Limited | Bermuda | Lemures LLC] |
| Medichem Consultants (Intercontinental) Limited | Jersey | Medichem Trust |
| Mundipharma International Holdings Limited | Bermuda | MIL Trust |
| Pacific Moon Corp. | BVI | Milton Trust |
| Mundilab Company Limited | Bermuda | Mundilab Trust |
| Pickering Pharmaceuticals Corporation | BVI | Pickering Trust |
| Taddeo LLC | Delaware | Taddeo Trust |
| Kelly Pharmaceuticals Limited | Bermuda | Tom & Kelly Trust |
| TK International Limited | Bermuda | Tom & Kelly Trust |
| Hazell Holdings Limited | Jersey | Varus Trust |
| Rushleigh Limited | Jersey | Varus Trust |
| *IAC Pledged Entities and IAC Pledgors applicable to Side B* | | |
| Rosebay Medical Company L.P. | Delaware | Trust U/A 11/5/74 fbo Beverly Sackler; Rosebay Medical Company, Inc. |
| Linarite Holdings LLC | Delaware | Raymond R. Sackler Trust 1B dtd 12/23/89 |
| Perthlite Holdings LLC | Delaware | Raymond R. Sackler Trust 2B dtd 12/23/89 |
| East Hudson Inc. | BVI | Dr. Richard S. Sackler; Raymond R. Sackler Trust 1 dtd 12/23/89; Hudson Trust; Raymond R. Sackler Trust 2 dtd 12/23/89; Meridian International, Ltd. |
| Meridian International, Ltd. | Delaware | Dr. Richard S. Sackler; JDS Revocable Pourover Trust; Raymond R. Sackler Trust 1 dtd 12/23/89; Raymond R. Sackler Trust 2 dtd 12/23/89 |
| St. Lawrence Associates | New York | Dr. Richard S. Sackler; JDS Revocable Pourover Trust; Raymond R. Sackler Trust 1 dtd 12/23/89; |

---

[1] Note to Draft: Exhibit F under discussion.

[2] Each IAC Pledgor pledges 100% of its equity interests in each respective IAC Pledged Entity.

| | | Raymond R. Sackler Trust 2 dtd 12/23/89 |
|---|---|---|
| Hudson River (Delaware) Inc. | Delaware | Dr. Richard S. Sackler; JDS Revocable Pourover Trust; Raymond R. Sackler Trust 1 dtd 12/23/89; Raymond R. Sackler Trust 2 dtd 12/23/89 |
| Hudson River Partners | New York | Dr. Richard S. Sackler; JDS Revocable Pourover Trust; Raymond R. Sackler Trust 1 dtd 12/23/89; Raymond R. Sackler Trust 2 dtd 12/23/89 |
| Pacific Partners Company | New York | Dr. Richard S. Sackler; JDS Revocable Pourover Trust; Raymond R. Sackler Trust 1 dtd 12/23/89; Raymond R. Sackler Trust 2 dtd 12/23/89 |
| Tradewind Company | New York | Dr. Richard S. Sackler; JDS Revocable Pourover Trust |
| Laysan Limited | Bermuda | Raymond R. Sackler Trust 1 dtd 12/23/89; Raymond R. Sackler Trust 2 dtd 12/23/89 |
| W.A. Canada L.P. | Delaware | Dr. Richard S. Sackler; Temagami LLC; G3D LLC; 1JM LLC; G3A LLC; 2JM LLC; G3R LLC; 3JM LLC |
| China Sea Company L.P. | Delaware | China Sea Company, Inc.; Hudson River Partners |
| Crissaire Corporation | Delaware | Dr. Richard S. Sackler; JDS Revocable Pourover Trust |
| Standard Pharmaceuticals Corporation | Delaware | Dr. Richard S. Sackler; JDS Revocable Pourover Trust |
| Ankersea Limited Liability Company | Delaware | Dr. Richard S. Sackler; Raymond R. Sackler Trust 1 dtd 12/23/89; Trust under agreement dated December 3, 1979 f/b/o Richard S. Sackler |
| Lodestone Limited Liability Company | Delaware | JDS Revocable Pourover Trust; Raymond R. Sackler Trust 2 dtd 12/23/89; Trust under agreement dated December 3, 1979 f/b/o Jonathan D. Sackler |
| RWA Holdings LLC | Delaware | RGT One LLC; RGT Two LLC; RGT Three LLC |
| JWA Holdings LLC | Delaware | JGT One LLC; JGT Two LLC; JGT Three LLC |
| Nerula S.ar.l. | Luxembourg | Raymond R. Sackler Trust 1 dtd 12/23/89 |
| Neji S.ar.l. | Luxembourg | Raymond R. Sackler Trust 2 dtd 12/23/89 |
| R Napp Holdings LLC | Delaware | Trust under agreement dated June 16, 1980 f/b/o Richard S. Sackler |

| | | |
|---|---|---|
| Menlo Park Investors Inc. | BVI | Irrevocable Trust under Declaration dated as of December 29, 1992 |
| Mundipharma International Limited | UK | Raymond R. Sackler Trust 1 dtd 12/23/89; Raymond R. Sackler Trust 2 dtd 12/23/89 |
| Mundipharma International Technical Operations Limited | UK | Raymond R. Sackler Trust 1 dtd 12/23/89; Raymond R. Sackler Trust 2 dtd 12/23/89 |
| Purdue Pharma Inc. | Canada | Raymond R. Sackler Trust 1 dtd 12/23/89; Raymond R. Sackler Trust 2 dtd 12/23/89 |
| Elvium Life Sciences GP Inc. | Canada | Raymond R. Sackler Trust 1 dtd 12/23/89; Raymond R. Sackler Trust 2 dtd 12/23/89 |
| Mundipharma Pharmaceuticals Limited | Cyprus | Raymond R. Sackler Trust 1 dtd 12/23/89; Raymond R. Sackler Trust 2 dtd 12/23/89 |
| Mundipharma A/S | Denmark | Raymond R. Sackler Trust 1 dtd 12/23/89; Raymond R. Sackler Trust 2 dtd 12/23/89 |
| Mundipharma Oy | Finland | Raymond R. Sackler Trust 1 dtd 12/23/89; Raymond R. Sackler Trust 2 dtd 12/23/89 |
| Ladenburg B.V. | Netherlands | Raymond R. Sackler Trust 1 dtd 12/23/89; Raymond R. Sackler Trust 2 dtd 12/23/89 |
| Mundipharma IT Services Limited | UK | Raymond R. Sackler Trust 1 dtd 12/23/89; Raymond R. Sackler Trust 2 dtd 12/23/89 |
| Mundipharma Medical GmbH | Switzerland | Raymond R. Sackler Trust 1 dtd 12/23/89; Raymond R. Sackler Trust 2 dtd 12/23/89 |
| Purdue Frederick Inc. | Canada | Dr. Richard S. Sackler; JDS Revocable Pourover Trust |
| Mundipharma GmbH | Germany | Dr. Richard S. Sackler; Estate of Jonathan Sackler |
| Mundipharma Holding AG | Switzerland | Trust under agreement dated December 23, 1980 f/b/o Richard S. Sackler; Trust under agreement dated December 23, 1980 f/b/o Jonathan D. Sackler |
| Mundipharma Research Limited | UK | Trust under agreement dated June 16, 1980 f/b/o Richard S. Sackler; Trust under agreement dated June 16, 1980 f/b/o Jonathan D. Sackler |
| Moonstone Holdings LLC | Delaware | Raymond R. Sackler Trust 1B dtd 12/23/89 |
| Roselite Holdings LLC | Delaware | Raymond R. Sackler Trust 2B dtd 12/23/89 |

**<u>Exhibit G</u>**
**Bank Account Information**

**<u>Exhibit H</u>**
**Restricted Parties**

**<u>Exhibit I</u>**
**Termination Events**

**Exhibit J**
**IAC Pledge and Security Agreement**

**Exhibit K**
**Assuring Parties**

**Exhibit L**
**List of Approved Third Party Accountants**

**Exhibit M**
**List of Approved Financial Advisors**

**<u>Annex A</u>**
**Credit Support Annex for A-Side Payment Groups 1, 3, 5, 6, 7 and 8**

Draft 7/7/2021 – FILING VERSION

## ANNEX A[1]
### A-SIDE PAYMENT GROUPS 1, 3, 5, 6, 7, 8

### ARTICLE I.
### DEFINITIONS

**Section 1.01**    **Settlement Agreement**.  Capitalized terms used herein and not defined herein have the meanings ascribed to such terms in the Settlement Agreement to which this Annex A is attached.

**Section 1.02**    **Defined Terms**.  As used in this Agreement, the following terms shall have the meanings specified below:

"**Account Bank**" means a financial institution in the United States acting as a deposit bank or securities intermediary, as applicable, in respect of the Cash Collateral Account, which financial institution is reasonably satisfactory to the MDT.

"**Asset HoldCos**" means the wholly-owned intermediate holding companies [set forth on Schedule I attached hereto] and each other wholly-owned Person hereafter formed or acquired by a Second Tier Obligor to make and hold investments in third parties on behalf of and for the benefit of such Second Tier Obligor, in each case together with their successors and assigns.[2]

"**Bermuda Pledge Agreements**" means the Bermuda law-governed Pledge Agreements, each dated as of the Settlement Effective Date or thereafter, entered into by each Asset HoldCo organized under the laws of Bermuda, each Second Tier Obligor that is the direct parent thereof and the MDT as the Secured Party thereunder, as the same may be amended, restated, supplemented or otherwise modified from time to time.

"**Cash Collateral Account**" means one or more deposit or securities accounts, which shall be (i) maintained in the United States with the Account Bank, (ii) funded on or before the Settlement Effective Date with the Initial Cash Collateral Amount and (iii) subject to a Control Agreement.

["**Cash Equivalents**" means (a) money, (b) securities issued or fully guaranteed or insured by the United States of America, the United Kingdom, Canada or a member state of the European Union or any agency or instrumentality of any thereof, (c) time deposits, certificates of deposit or bankers' acceptances of (i) any commercial bank having capital and surplus in excess of $500,000,000 (or the foreign currency equivalent thereof as of the date of such investment) and the commercial paper of the holding company of which is rated at least F2 or the equivalent thereof by Fitch, at least P-2 or the equivalent thereof by

---

[1] This Annex A to the Shareholder Settlement Agreement is in draft form and remains subject to continuing review and negotiation among the Debtors and interested parties with respect thereto, has not yet been agreed to by any party and remains subject to material change.  The Debtors reserve the right, subject to the terms and conditions set forth in the Plan, to alter, amend, modify or supplement the Shareholder Settlement Agreement at any time before the Effective Date of the Plan, or any such other date as may be provided for by the Plan or by order of the Bankruptcy Court; *provided* that, if the Shareholder Settlement Agreement is altered, amended, modified, or supplemented in any material respect prior to the hearing to confirm the Plan, the Debtors will file a redline of such document with the Bankruptcy Court.

[2] NTD:  TBD whether the Asset HoldCos will be scheduled here or set forth elsewhere.

Moody's or at least A-2 or the equivalent thereof by S&P (or, if at such time none is issuing ratings, a comparable rating of another nationally recognized rating agency) and (d) money market instruments, commercial paper or other short-term obligations rated at least F2 or the equivalent thereof by Fitch, at least P-2 or the equivalent thereof by Moody's or at least A-2 or the equivalent thereof by S&P (or, if at such time none is issuing ratings, a comparable rating of another nationally recognized rating agency).][3]

"**Collateral**" means all "Collateral" (or similar or equivalent term) as defined in any Security Document and shall include all assets and property, whether real, personal or mixed, whether now owned or hereafter acquired and wherever located, with respect to which a Lien is granted (or required, intended or purported to be granted) as security for any Obligation pursuant to any Security Document, including all proceeds and products thereof. It is understood and agreed that the Collateral shall consist of substantially all of the assets of the Second Tier Obligors, whether now owned or hereafter acquired, and all proceeds and products of the foregoing, other than Excluded Property.

"**Confession of Judgment**" has the meaning set forth in Section 3.06.

"**Control Agreement**" means a blocked account control agreement or a securities account control agreement (as applicable) in the form required by the applicable Account Bank and otherwise in form and substance reasonably acceptable to the MDT and the Secured Party executed by the applicable Second Tier Obligor, the Secured Party and the applicable Account Bank in respect of the Collateral or the Cash Collateral Account, as applicable, and pursuant to which the Secured Party is granted "control" (as such term is described in Section 9-104 of the UCC) of such Collateral or Cash Collateral Account, as applicable, and its first-priority security interest in and Lien on such Collateral or Cash Collateral Account to secure the Outstanding Settlement Amounts and other Obligations is perfected, in accordance with this Annex A or the Security Documents, as the same may be amended, restated, supplemented or otherwise modified from time to time.

"**Disposition**" [shall mean, with respect to any property or asset, any conveyance, sale, lease, sublease, assignment, transfer or other disposition (including by way of merger or consolidation and including any sale and leaseback transaction) of such property or asset, including by means of a merger, consolidation, division or similar transaction, and the terms "**Dispose**," "**Disposed**" and "**Disposing**" shall have meanings correlative thereto.

"**Distribution**" means (a) with respect to any Second Tier Obligor that is a trust, , any Disposition to, or for the use or benefit of, any beneficiary of such Second Tier Obligor (including to or for the use or benefit of such Second Tier Obligor but excluding any direct payment made by a Second Tier Obligor for its own benefit such as a payment for services rendered to it by an unrelated third-party), whether in cash, securities or other property and including any appointment of property in further trust for the benefit of any one or more of them and (b) with respect to any Second Tier Obligor that is a corporation, limited liability company, partnership or any other similar type of entity, any dividend or other distribution (whether in cash, securities or other property) with respect to any Equity Interest of such Second Tier Obligor, or any payment (whether in cash, securities or other property), including any sinking fund or similar deposit, on account of the purchase, redemption, retirement, acquisition, cancellation or

---

[3] NTD:  Definition subject to further review and negotiation.

termination of any such Equity Interest, or on account of any return of capital to such Second Tier Obligor's shareholders, partners or members.][4]

"**Distribution Condition**" means, as to any relevant transaction (or series of related transactions) by a Second Tier Obligor, Third Tier Obligor or Fourth Tier Obligor in a Group, the aggregate value of the Collateral of all Second Tier Obligors in such Group on a pro forma basis after giving effect to such transaction or series of transactions (and after giving effect to any Liens with respect to such Collateral and any indebtedness of the Second Tier Obligors)[5] is not less than an amount equal to [____]% of the Remaining Amount.  Prior to entering into any transaction in reliance on the Distribution Condition, the applicable obligor shall deliver to the MDT (i) a certification as to pro forma compliance with the Distribution Condition and (ii) a written opinion by an Independent Financial Advisor stating the aggregate value of the Collateral of all Second Tier Obligors in such Group on a pro forma basis after giving effect to such transaction or series of related transactions (and after giving effect to any Liens with respect to such Collateral and any indebtedness of the Second Tier Obligors).

"**Domestic Asset HoldCos**" means the Asset HoldCos organized under the Laws of the United States, any State thereof, any territory thereof or the District of Columbia.

"**Enforcement Event**" means the [____]. [6]

["**Excluded Asset HoldCos**" means the Asset HoldCos indicated on Schedule I attached hereto as an "Excluded Asset HoldCo."]

"**Excluded Property**" means:

(a)      Equity Interests in the Excluded Asset HoldCos;

(b)      Any property the pledge of which or security interest therein is prohibited by applicable Law and any governmental licenses or state or local franchises, charters or authorizations, to the extent a security interest therein would be prohibited or restricted thereby, in each case except to the extent such prohibition or restriction is unenforceable after giving effect to applicable anti-assignment provisions under the UCC or any other applicable Law (and excluding any proceeds or products thereof);

(b)      Any lease, license or other agreements (other than organizational documents of the Second Tier Obligors or Asset HoldCos) to the extent that a security interest therein would violate or invalidate such lease, license or agreement or create a right of termination in favor of any other party thereto or a default thereunder, in each case except to the extent such violation, invalidation or termination right is unenforceable after giving effect to applicable anti-assignment provisions under the UCC or any other applicable Law (and excluding any proceeds or products thereof); provided that any such provision in any lease, license or other agreement was not entered into after the Settlement Effective Date with the purpose of excluding such asset from the Collateral;

---

[4] NTD:  Definitions subject to further review and negotiation.

[5] NTD:  Subject to further review and negotiation.

[6] NTD:  Definition subject to further review and negotiation.

3

Annex A

(c)        Any property the pledge of which or security interest in which would reasonably be expected to give rise to a material tax liability, as reasonably determined by the applicable Second Tier Obligor in consultation with its tax advisors; and

(d)        In the case of any Security Document governed by non-U.S. Law, customary exclusions in such jurisdiction (that are set forth in the applicable Security Document).

provided that, notwithstanding the foregoing, (x) in no event shall the Equity Interests of any Asset HoldCo (other than an Excluded Asset HoldCo), the Cash Collateral Account or any proceeds or products of each of the foregoing constitute "Excluded Property" and (y) at such time as the prohibitions or restrictions in clause (b) or (c) shall be remedied, whether by contract, change of Law or otherwise (as applicable), such property shall immediately cease to be Excluded Property, and any security interest that would otherwise be granted herein or under the Security Documents shall attach immediately to such property, or to the extent severable, to any portion thereof that does not result in the prohibitions or restrictions in clause (b) or (c) above

"**Existing Related Party Loans**" means loans in existence on the Financial Information Record Date and disclosed in [the summary previously delivered by Huron Consulting Services, LLC on [____], 2021],[7] and any extensions of the maturity date thereof; provided that (i) the terms of such extended loans are on substantially the same terms (which, in the case of economic terms, shall be no less favorable to the Second Tier Obligor, Third Tier Obligor or Fourth Tier Obligor (as applicable) party thereto) as in effect on the Financial Information Record Date and (ii) the outstanding principal amount of such loans shall not exceed the aggregate principal amount of the such loans outstanding on the Financial Information Record Date plus any accrued and unpaid interest outstanding on such extension date.

"**Financial Information Record Date**" means [_____].[8]

"**Fourth Tier Obligor**" means Theresa Sackler.

"**Group**" means, individually or collectively, as the context may require, Group 1, Group 3, Group 5, Group 6, Group 7 and Group 8.

"**Group 1**" means the Payment Group identified as A-Side Payment Group 1 (excluding the A-Side General Obligors) on Exhibit A to the Settlement Agreement.[9]

"**Group 3**" means the Payment Group identified as A-Side Payment Group 3 (excluding the A-Side General Obligors) on Exhibit A to the Settlement Agreement.

"**Group 5**" means the Payment Group identified as A-Side Payment Group 5 (excluding the A-Side General Obligors) on Exhibit A to the Settlement Agreement.

---

[7] NDT: Loan information to be provided by Huron.

[8] NTD: This would refer to the date as of which the MDT will have updated financial information for each of the Groups, which is expected to be as of December 31, 2020.

[9] NTD: Inclusion of A-Side General Obligors/A-Side IAC Payment Parties subject to further review and negotiation.

4
Annex A

"**Group 6**" means the Payment Group identified as A-Side Payment Group 6 (excluding the A-Side General Obligors) on Exhibit A to the Settlement Agreement.

"**Group 7**" means the Payment Group identified as A-Side Payment Group 7 (excluding the A-Side General Obligors) on Exhibit A to the Settlement Agreement.

"**Group 8**" means the Payment Group identified as A-Side Payment Group 8 (excluding the A-Side General Obligors) on Exhibit A to the Settlement Agreement.

"**Indebtedness for Borrowed Money**" of any Person means, as of any date of determination, all of the following: (i) all indebtedness of such Person for borrowed money, (ii) all obligations of such Person evidenced by bonds, debentures, notes or other similar instruments, (iii) all obligations of such Person under finance or capital leases, (iv) all indebtedness of others with respect to obligations referred to in (i) to (iii) above, guaranteed in any manner, directly or indirectly, by such Person, (v) all indebtedness of others with respect to obligations referred to in (i) to (iv) above secured by a Lien on any asset owned by such Person (whether or not such indebtedness is assumed by, or is a personal obligation of, such Person); <u>provided</u> that the amount of such indebtedness will be the lesser of: (a) the fair market value of such asset at such date of determination, and (b) the amount of such indebtedness of such other Person; and (vi) all net reimbursement obligations of such Person with respect to letters of credit, foreign currency sale agreements and bankers' acceptances, except such as are obtained by such Person to secure performance of obligations (other than for borrowed money or similar obligations).

"**Independent Financial Advisor**" means (i) a financial advisor selected by a Second Tier Obligor or Asset HoldCo from the financial advisors listed on Schedule III attached hereto or (ii) solely to the extent the applicable Second Tier Obligor or Asset HoldCo is unable to engage any such independent financial advisor set forth in clause (i) of this definition, any other independent financial advisor reasonably acceptable to the MDT.

"**Initial Cash Collateral Amount**" means cash or Cash Equivalents with a fair market value of not less than $44,000,000 as of the Settlement Effective Date.

"**IRS**" means the United States Internal Revenue Service.

"**Jersey Security Agreements**" means the Jersey law-governed Security Agreements, each dated as of the Settlement Effective Date or thereafter, entered into by each Second Tier Obligor and the MDT as the Secured Party thereunder (and acknowledged by any Asset HoldCo organized under the Laws of [Jersey or] the British Virgin Islands, as applicable), as the same may be amended, restated, supplemented or otherwise modified from time to time.

"**Listed Transaction**" means (x) a "listed transaction" identified as such by the Internal Revenue Service under Section 6707A(c)(2) of the Internal Revenue Code and Treasury Regulation Section 1.6011-4(b)(2) as of the date of this Agreement or (y) a "listed transaction" identified as such by the Internal Revenue Service under such provisions after the date of this Agreement substantially comparable to the type of promotor-marketed abusive tax shelter transactions that the IRS has been identifying as "listed transactions" as of the date of this Agreement, in each case unless the IRS has delisted the transaction.

"**Material Adverse Effect**" means, with respect to a Group, a material adverse effect on (a) the business, assets or financial condition, in each case, of such Group, (b) the rights and remedies (taken as a

5
Annex A

whole) of the Secured Parties under the Settlement Agreement and the Security Documents (taken as a whole) relating to such Group or (c) the ability of such Group under the Settlement Agreement to satisfy its payment obligations under the Settlement Agreement and the Security Documents.

"**Minimum Cash Collateral Amount**" means $44,000,000, reduced by any withdrawals permitted pursuant to Section 2.03.

"**Net Investment Returns**" means investment returns, if any, on assets of the Second Tier Obligors within a Group representing a net realized dollar for dollar increase in the aggregate value thereof since the Settlement Effective Date which has not been distributed by such Second Tier Obligors or reduced by any withdrawals with respect to Taxes pursuant to Section 2.02.

"**Perfection Certificate**" means, as to each Second Tier Obligor pledging Collateral, a certificate in the form attached hereto as Exhibit A, as supplemented pursuant to Section 3.01(b) and as otherwise amended or modified from time to time at the request of the Secured Party to require the provision of additional information reasonably necessary to ensure due perfection under the laws of additional jurisdictions.

"**Protected Information**" means (a) any document, information or other matter (i) that constitutes non-financial trade secrets or non-financial proprietary information, (ii) in respect of which disclosure is prohibited by Law or binding agreement, (iii) that is subject to attorney-client or similar privilege or constitutes attorney work product or (iv) in respect of which any Pledgor owes confidentiality obligations to any third party, (b) any counterparty information, including the names of counterparties and (c) any personal identifying information (including addresses, telephone numbers, government identification numbers or tax identification numbers) and any information protected by General Data Protection Regulation 2016/679 or comparable laws in the European Union, the United Kingdom or the United States.[10]

"**Related Parties**" means [_____].[11]

"**Remaining Amount**" means, with respect to a Group, as of any date of determination, the remaining amount potentially owed under the Settlement Agreement (assuming the maximum amount that may be owed by such Group under the Settlement Agreement and Security Documents).

"**Second Tier Obligors**" means the members of each Group identified as Second Tier Obligors on Schedule II attached to this Annex A (each of which is a Jersey law governed trust).

"**Secured Party**" means each of (i) the MDT and each of its successors and permitted assigns and (ii) any agent, trustee or other representative or designee (including one or more Subsidiaries or other entities of the MDT formed to carry out its duties and obligations under the Definitive Documents) authorized or appointed to hold any security interest in or Lien on, or take possession or control of, any Collateral on behalf of and for the benefit of itself and any person described in clause (i) above.

"**Security Documents**" means, as to each Group and in each case as applicable, the Jersey Security Agreements, the Bermuda Pledge Agreements, the U.S. Pledge Agreements, any Control

---

[10] NTD:  Definition subject to further review and negotiation.

[11] NTD:  Definition subject to further review and negotiation.

Agreement, any uncertificated securities control agreements and each of the other security agreements, pledge agreements and other instruments and documents, and each of the supplements thereto, executed and delivered pursuant to this Annex A or otherwise in order to grant or purport to grant a Lien on any assets to secure the Obligations of such Group under the Settlement Agreement or under which rights or remedies with respect to such Liens are governed.

"**Third Tier Obligors**" means the members of each Group identified as Third Tier Obligors on Schedule II attached to this Annex A.

"**UCC**" shall mean the Uniform Commercial Code or any successor provision thereof (or similar code or statute) as in effect from time to time in any applicable state or jurisdiction, to the extent it may be required to apply to any item or items of Collateral.

"**U.S. Pledge Agreements**" means the New York law-governed Pledge Agreements, each dated as of the Settlement Effective Date or thereafter, entered into by each Domestic Asset HoldCo, each Second Tier Obligor that is the direct parent thereof and the MDT as the Secured Party thereunder, as the same may be amended, restated, supplemented or otherwise modified from time to time.

**Section 1.03    Interpretative Provisions**.  For the avoidance of doubt, the rules of construction set forth in Section 1.02 of the Settlement Agreement shall apply *mutatis mutandis* to this Annex A.

**Section 1.04    Division.**  For all purposes under this Annex, in connection with any division or plan of division under Delaware Law or any comparable event under a different jurisdiction's Laws or, in the case of a trust, any division, appointment or other event under the terms of its governing instrument or otherwise causing property of a trust to be held in one or more trusts separate from the original trust, as applicable: (a) if any asset, right, obligation or liability of any Person becomes the asset, right, obligation or liability of a different Person, then it shall be deemed to have been transferred from the original Person to the subsequent Person, and (b) if any new Person comes into existence, such new Person shall be deemed to have been organized on the first date of its existence by the holders of its Equity Interests or, in the case of a new trust, to have been formed on the first date of the acceptance in trust of any property thereof by any trustee thereof.

**Section 1.05    Valuation Methodology**.  It is understood and agreed that for purposes of preparing the quarterly and annual financial statements described in this Annex and calculating compliance with any covenant contained in this Annex (including with respect to the value of the initial Collateral as of the Settlement Effective Date and the Distribution Condition), asset valuations shall be determined in all material respects in a manner that is reasonably consistent with the valuation methodologies used by Huron Consulting Services LLC to prepare the previous net asset reports delivered in the Chapter 11 Cases pursuant to the Amended and Restated Stipulation and in accordance with this Section 1.05.  Notwithstanding the foregoing, (i) all asset valuations (including with respect to the initial Collateral as of the Settlement Effective Date and the Distribution Condition) shall exclude any contingent liabilities [(including tax liabilities and inchoate claims but, for the avoidance of doubt, guarantees of Indebtedness for Borrowed Money shall be counted in the determination of asset values) and, for the avoidance of doubt, any tax refunds of estimated taxes [arising as a result of a distribution from the Second Tier Obligor] that might be payable [to the Second Tier Obligor] but for an election under section 643(g) to treat such payment of estimated taxes as a payment of estimated taxes made by its beneficiary or beneficiaries], (ii) the Obligors may exclude any asset in their sole discretion when calculating compliance with the Distribution Condition, (iii) with respect to the valuation of assets consisting of equity interests that are listed or quoted for trading on the New York Stock Exchange, the

7
Annex A

NYSE MKT, the NASDAQ Global Select Market, the NASDAQ Global Market, the NASDAQ Capital Market, OTC Bulletin Board or any other national securities exchange, the "Value" thereof shall be based on the arithmetic average of the closing price of a share of such equity interests for the ten (10) consecutive trading days on which shares of such equity interests traded immediately preceding the date of determination and (iv) all asset valuations shall exclude any Obligations under the Settlement Agreement.  In determining asset valuation as of any date of determination, other than in the case of cash, cash equivalents or other assets for which market quotations are readily available and may be determined on such date of determination, the Obligors shall use the asset valuation for the applicable assets as of the end of the most recently ended fiscal quarter for which financial statement are available as of such date of determination or, if no such quarterly valuation exists, then the most recent valuation used by the trustees of the Second Tier Obligors to maintain the Second Tier Obligor's books and records.[12]

<div align="center">

**ARTICLE II.**
**COLLATERAL MATTERS**

</div>

**Section 2.01    Security; Security Documents**.

(a)    As credit support for, and to secure the prompt payment and performance of, the Obligations of each Group under the Settlement Agreement, each Second Tier Obligor in each Group shall, on or before the Settlement Effective Date, grant a perfected first priority security interest in and Lien on all of its right, title and interest in the Collateral of such Second Tier Obligor in favor of and for the benefit of the Secured Party (including, without limitation, where applicable, 100% of the Equity Interests of each Asset HoldCo and the Cash Collateral Account).

(b)    Without limiting the generality of clause (a) of this Section 2.01, on the Settlement Effective Date, the Secured Party shall have a perfected first priority security interest in and Lien on the Equity Interests of each Asset HoldCo, which Asset HoldCo shall have and own assets with a fair market value, when taken together with the assets of all other Asset HoldCos owned by members of the same Group, equal to or greater than the amount set forth on Schedule IV hereto with respect to each Group.[13]

(c)    Subject to the rights of the Secured Party under Sections 4.01 and 4.02, the security interests and Liens created in respect of the Collateral shall be created and perfected, in the case of each such Second Tier Obligor: (i) under the laws of Jersey by the execution by the applicable trustees of the Jersey Security Agreements, (ii) by the filing of a UCC financing statement in Washington, D.C. (in the case of trustees located in Jersey) or the State of Wyoming (in the case of trustees located in Wyoming), (iii) in the case of the security interest in the Equity Interests of a Domestic Asset HoldCo (or any Asset HoldCo organized under the Laws of a jurisdiction in which the perfection of a first priority security interest in such Equity Interests may be obtained by the possession or control of certificated securities or other instruments) represented by certificated securities or other instruments, by the delivery to the Secured Party of such certificates or other instruments representing the Equity Interests of such Asset HoldCo, together with stock transfer powers or other instruments of transfer (if any) with respect thereto endorsed in blank, (iv) in the case of the security interest in the Equity Interests of a Domestic Asset HoldCo in the form of uncertificated securities under Article 8 of the UCC, by the execution of an uncertificated securities account control agreement, (v) in the case the security interest in the Equity Interests of an Asset HoldCo (other than a Domestic Asset HoldCo), also under the Laws of the

---

[12] NTD:  Subject to further review and negotiation.
[13] NTD:  Closing date value for assets in Asset HoldCos to be agreed.

<div align="center">

8
Annex A

</div>

jurisdiction of organization of such Asset HoldCo by execution of a security agreement governed by the Laws of such jurisdiction (or, in the case of an Asset HoldCo organized under the Laws of Jersey or the British Virgin Islands, the related Jersey Security Agreement) or (if applicable) a supplement to any existing security agreement and, where applicable, by registration or other filings or recordings required by applicable Law, and (vi) the case of the security interest in the Equity Interests of a Domestic Asset HoldCo, by execution of a U.S. Pledge Agreement (or supplement thereto), in each case, in such form and such manner as shall be agreed by the applicable Second Tier Obligor and the Secured Party and their legal counsel in the relevant jurisdictions.

(d)      Each Second Tier Obligor shall promptly and duly take, execute, acknowledge and deliver (and shall cause each of the Asset HoldCos owned by such Second Tier Obligor to cause to be promptly and duly taken, executed, acknowledged and delivered) such further acts, documents and assurances as may from time to time be necessary or as the Secured Party may from time to time reasonably request in order to carry out the intent and purposes of the Security Documents and this Annex A (including, but not limited to, if applicable, making non-U.S. filings and entry into non-U.S. security agreements, pledge agreements or other documents or instruments), including such actions necessary to establish, create, preserve, protect, perfect, and maintain perfection and priority of a first priority security interest in and Lien on the Collateral in favor of and for the benefit of the Secured Party (including after-acquired Collateral), in each case in a manner consistent with this Annex A (including Section 2.01(c) hereof), and to enable the Secured Party to exercise any and all remedies in respect thereof.

Section 2.02    **Cash Collateral Account**. As additional credit support for, and to secure the prompt payment and performance of, the Obligations of Group 3, on or before the Settlement Effective Date, [____][14] shall establish and fund from their assets the Cash Collateral Account. In furtherance of the foregoing, [____][15] hereby grants to the Secured Party, as collateral security for the prompt and complete payment or performance in full when due (whether by required payment, prepayment, declaration, acceleration, demand or otherwise (including the payment of amounts that would become due but for the operation of the automatic stay under Section 362(a) of the Bankruptcy Code or any similar provision of any other bankruptcy, insolvency, receivership or other similar law) of all Obligations of Group 3 under the Settlement Agreement, a first priority security interest in, and Lien on, all of [____]'s[16] right, title and interest in, to and under, the Cash Collateral Account, and all assets or amounts held therein or credited thereto, in each case, whether now owned or hereafter acquired, and all products and proceeds thereof. Such security interest and Lien of the Secured Party shall be perfected by means of entry into, and the Cash Collateral Account shall at all times be subject to, a Control Agreement with the Account Bank in favor of the Secured Party, which Control Agreement shall (i) give sole dominion and control over the Cash Collateral Account and all assets or amounts held therein or credited thereto to the Secured Party, (ii) provide that the applicable Second Tier Obligor shall not be entitled to make withdrawals or otherwise provide direction or instructions to the Account Bank or otherwise with respect to the Cash Collateral Account or the assets or amounts held therein or credited thereto and (iii) be in the form required by the Account Bank and in form and substance reasonably acceptable to the MDT and the Secured Party. Notwithstanding any other provisions set forth herein, the applicable Second Tier Obligor shall not be permitted to (a) transfer (or direct the transfer of) the Cash Collateral Account or the assets or amounts held therein or credited thereto except withdrawals permitted hereunder (and for account bank

---

[14] To include all Second Tier Obligors that will maintain Cash Collateral Accounts.

[15] To include all Second Tier Obligors that will maintain Cash Collateral Accounts.

[16] To include all Second Tier Obligors that will maintain Cash Collateral Accounts.

fees and other reasonable and customary expenses of maintaining the Cash Collateral Account, in excluding income Taxes other than Taxes on income from and gains on investments held therein to the extent such income or gains accrued after the later of (x) the date that is [thirty (30) days][17] prior to the Settlement Effective Date and (y) the date such assets were deposited therein)or (b) maintain any assets in the Cash Collateral Account other than cash or Cash Equivalents.

Section 2.03    **Withdrawals**. Withdrawals from the Cash Collateral Account shall be permitted (and effected by written instruction of the Secured Party to the Account Bank in accordance with the Control Agreement) at the direction of the Second Tier Obligors for Group 3, if and only to the extent (x) the fair market value of the assets remaining in the Cash Collateral Account (after giving effect to such withdrawal) is not less than the Remaining Amount on such date of determination after giving effect to any withdrawn amount from the Cash Collateral Account on the date of determination, (y) no [Specified Breach] has occurred and is continuing, and (z) as otherwise provided in the last sentence of Section 2.02. After an Enforcement Event, notwithstanding anything to the contrary in this Section 2.03, the Secured Party may make withdrawals from the Cash Collateral Account and/or direct dispositions of the Cash Collateral Account and the assets or amounts held therein or credited thereto in accordance with the terms of the Control Agreement, the applicable Security Documents, the Settlement Agreement and applicable Law and apply such amounts as set forth in Section 7.01 below.

Section 2.04    **Advanced Contribution Amounts**. If the fair market value of the assets in the Cash Collateral Account is less than $44,000,000, any Advance Contribution amount returned to any member of Group 3 under the Settlement Agreement shall be deposited in the Cash Collateral Account if and only to the extent necessary to cause the fair market value of the assets in the Cash Collateral Account to be not less than the lesser of (i) the Remaining Amount on such date of determination and (ii) $44,000,000.

Section 2.05    **Tax Matters**.

(a)    The Parties agree that, to the extent permitted by law, (i) the Second Tier Obligors for Group 3 shall be treated as the owners of the Cash Collateral Account for U.S. federal income and other applicable income tax purposes and (ii) the Parties shall report consistently with such treatment on any applicable tax returns or information reports.

(b)    Before the Settlement Effective Date, each Second Tier Obligor shall provide (and shall cause each Asset HoldCo owned by such Second Tier Obligor to provide) a duly completed and executed IRS Form W-9 or Form W-8 (or any successor forms), as applicable, to the Secured Party and shall provide an updated IRS Form W-9 or Form W-8 within thirty (30) days if any certification on a previously-provided IRS Form W-9 or Form W-8 becomes incorrect or as otherwise required under applicable Law, and from time to time upon the reasonable request of the Secured Party. Each Second Tier Obligor shall provide (and shall cause each Asset HoldCo owned by such Second Tier Obligor to provide) any other tax forms or certifications that the Secured Party may reasonably request and which it is lawfully able to provide to permit the Secured Party to comply with any tax withholding or reporting requirements prescribed by applicable Law.

Section 2.06    **New Pledgor; Additional Collateral**.

---

[17] NTD: Expected time period between funding and closing to be confirmed.

10
Annex A

(a)      Upon the acquisition or creation of any Person that is required to grant a security interest and Lien on its assets pursuant to this Annex A or any Security Document or upon the occurrence of any other event that requires any Person to grant a security interest in and Lien on its assets pursuant this Annex A or any Security Document, (x) the applicable Second Tier Obligor party to such transaction shall deliver notice to the MDT and (y) within thirty (30) days of such acquisition, creation or event (or such longer period as may be agreed to in writing by the MDT), such Second Tier Obligor shall (and shall cause the new pledgor to) (I) execute and deliver to the MDT such amendments or supplements to the relevant Security Documents as required thereby or such other documents or agreements required by this Annex A or any Security Document to grant to the Secured Party a security interest in and a Lien on the assets of such new pledgor that constitute or are intended to constitute Collateral and (II) take all actions to cause such security interest and Lien to be duly perfected as required by and in accordance with the Security Documents and this Annex A.

(b)      Upon the acquisition of additional Equity Interests of an Asset HoldCo and/or any other assets by a Second Tier Obligor that constitute or are intended to constitute Collateral (other than an Excluded Asset HoldCo), in each case, that are not automatically secured and perfected pursuant to the Security Documents (including filed UCC financing statements), (x) the applicable Second Tier Obligor shall deliver notice to the MDT and (y) within thirty (30) days of such acquisition, the applicable Second Tier Obligor shall (I) execute and deliver to the MDT such amendments or supplements to the relevant Security Documents as required thereby or such other documents or agreements required by this Annex A to grant to the Secured Party a security interest in and a Lien on such Equity Interests and (III) take such other actions to cause such security interest and Lien to be duly perfected as required by and in accordance with the Security Documents and this Annex A (including, for the avoidance of doubt, delivery of any certificated securities or uncertificated securities control agreements, if applicable, as described in Section 2.01(c)).

## ARTICLE III.
## SECOND TIER OBLIGOR AFFIRMATIVE COVENANTS

Each Second Tier Obligor warrants, covenants and agrees with the MDT (subject to the last paragraph of Article IV) that such Second Tier Obligor shall, and shall cause each of the Asset HoldCos owned by such Second Tier Obligor, to:

### Section 3.01      **Financial Statements, Reports**.

(a)      Furnish to the MDT, within [●] days following the end of each six-month period, commencing with the sixth-month period ending [____], (i) unaudited balance sheets of such Second Tier Obligor in a form consistent with reporting prepared in the ordinary course of trust administration by or on behalf of the trustees for such Group (with omission and/or redaction of any Protected Information); (ii) a compliance certificate stating that such Second Tier Obligor is in compliance with the covenants applicable to such Second Tier Obligor; (iii) statements and other reporting with respect to the fair market value of the Collateral that was received from third parties by such Second Tier Obligor and/or its Asset HoldCos during such period, as applicable, and consistent with past practice (with omission and/or redaction of any confidential information) and (iv) in the case of Group 3, reporting of the balance of funds held in the Cash Collateral Account in form reasonably satisfactory to the MDT;

(b)      Furnish to the MDT, together with the compliance certificate delivered under Section 3.01(a)(ii) above relating to the period including December 31 of any calendar year, a certification that the Secured Party's security interests in and Liens on the Collateral remain perfected in accordance with

11
Annex A

the Security Documents as of a date not more than 31 days prior to the date of such certificate and a supplement to the Perfection Certificate (if applicable) setting forth any change or update to the information set forth therein since the Settlement Effective Date (or the date of the last such supplement, if applicable);

(c)     Furnish to the MDT prompt written notice of any change, event, effect or occurrence that would reasonably be expected to have a material adverse effect on the creation, preservation, perfection, priority or maintenance of the perfection (or validity) of the security interest granted over the Collateral, the financial condition of any Second Tier Obligor within such Group or the ability of the MDT or any other Secured Party to exercise and enforce its rights under the Security Documents with respect to such obligor, but in any event within thirty (30) days thereof (and within twenty (20) days before perfection lapses), which notice shall describe such change, event, effect or occurrence and reasonably detail the expected material adverse effect; and

(d)     Furnish to the MDT, in the event of any change in any Second Tier Obligor's or any Asset HoldCo's (in each case, within the Group of such Second Tier Obligor) (A) trustee(s) or the legal or organization name, (B) location of its chief executive office or principal place of business or administration [(or, if applicable to perfection by filing, in the location of the chief executive office, principal place of business or residence of any trustee of a Second Tier Obligor)], (C) organizational type, (D) federal taxpayer identification number or organizational identification number, if any, or (E) jurisdiction of organization (or in the case of a trust, administration or governing law) (in each case, including by merging with or into any other entity, reorganizing, dissolving, dividing into two or more trusts, "decanting" in further trust by reason of the exercise of any power of appointment (held in a fiduciary capacity or otherwise), liquidating, reorganizing or organizing in any other jurisdiction), the applicable Second Tier Obligor shall (x) deliver prompt written notice of such change (and in any event, at least ten (10) days prior to the occurrence) and (y) take all actions necessary to maintain (without lapse or change in priority) the validity, perfection and priority of the security interests provided for in the Security Documents and reimburse the Secured Party for any reasonable, documented, out-of-pocket costs and expenses incurred by it in connection therewith.

(e)     Make the appropriate subject matter experts available for consultation in connection with information provided under the above information covenants; provided that the MDT will not request consultation more than one (1) time within any 12-month period.

**Section 3.02    Preservation of Existence.** (i) Preserve, renew and maintain its jurisdiction of administration and governing law jurisdiction as set forth on Exhibit [A] to the Settlement Agreement (as updated from time to time subject to Section 3.01(d) and the other provisions of this Annex A) and (ii) in the case of Asset HoldCos and trustees that are not natural persons of each Second Tier Obligor, preserve, renew and maintain in full force and effect its legal existence and good standing under the laws of the jurisdiction of its organization.

**Section 3.03    Compliance with Laws**.  Comply with the requirements of all applicable Laws and all orders, writs, injunctions and decrees of any Governmental Authority applicable to it or the trust property and administration thereof (or, to the extent applicable, the business of the trust company) except to the extent non-compliance could not reasonably be expected to have a Material Adverse Effect.

**Section 3.04    Books and Records**. Maintain proper books of record and account in a manner consistent with past practice in all material respects.

<div align="center">12<br>Annex A</div>

Section 3.05    **Tax Payments**. Pay and discharge promptly all Taxes before the same shall become delinquent or in default, provided that such payment and discharge shall not be required with respect to (a) Taxes being contested in good faith by appropriate proceedings as long as any such contested Taxes determined to be due shall be paid no later than 60 days following the date on which such determination (within the meaning of Section 1313(a) of the Internal Revenue Code for US federal income taxes and by analogy for other Taxes) becomes final and non-appealable or (b) Taxes the non-payment of which, individually or in the aggregate, could not reasonably be expected to have a Material Adverse Effect.

Section 3.06    **Tax Returns.** Timely (after taking into account any applicable extensions) file all material IRS Forms 8886 (or any successor forms) and any analogous tax forms for U.S. state income tax purposes, in each case that are required by Law to be filed with respect to any transaction to which it is a party that it knew, or reasonably should have known, is a "listed transaction" identified as such by the Internal Revenue Service under Section 6707A(c)(2) of the Internal Revenue Code and Treasury Regulation Section 1.6011-4(b)(2) (other than any such transaction described in Section 4.07(ii)) in a manner that is true, accurate and complete in all material respects.[18]

Section 3.07    **Confession of Judgment**. In respect of each Second Tier Obligor, execute a confession of judgment in form and substance reasonably satisfactory to the MDT (the "**Confession of Judgment**") with respect to the Obligations of such Second Tier Obligor under the Settlement Agreement (assuming the maximum amount that may be owed by the Group under the Settlement Agreement and Security Documents), together with all supplements (or, if so required, new confessions of judgment consistent in scope to the original Confessions of Judgment) that are necessary to maintain the effectiveness and validity of any such Confession of Judgment.

## ARTICLE IV.
## SECOND TIER OBLIGOR NEGATIVE COVENANTS

Each Second Tier Obligor warrants, covenants and agrees with the MDT (subject to the last paragraph of this Article IV) that no such Second Tier Obligor shall, nor shall it cause or permit any Asset HoldCo owned by such Second Tier Obligor, to:

Section 4.01    **Limitations on Transfers.** Dispose of any assets or properties to any Person unless such Disposition (a) is to a Second Tier Obligor in the same Group, (b) is for reasonably equivalent value (taking into account any differences in the built-in gain (as determined for U.S. federal income tax purposes) associated with the assets or properties disposed of, as of immediately prior to such Disposition, and any assets or properties received in such Disposition) or (c) is a Distribution permitted by Section 4.02; provided that (i) with respect to any transaction or series of related transactions relying on clause (b) above involving aggregate consideration in excess of $[___], such Second Tier Obligor delivers to the MDT a written opinion by an Independent Financial Advisor stating that such transaction or series of related transactions complies with this Section 4.01 and (ii) any Disposition of the Equity Interests of an Asset HoldCo shall require entry into equivalent security and perfection arrangements reasonably acceptable to the Secured Party (and, in the case of proceeds consisting of Equity Interests. consistent with Section 2.01) to continue the first priority perfected security interest in and Lien on (x) the proceeds thereof or any Equity Interests of an Asset HoldCo acquired in connection therewith (without lapse or change in priority) or (y) the Equity Interest of such Asset HoldCo (other than an Excluded Asset

---

[18] NTD: Subject to further review and negotiation.

13
Annex A

HoldCo) in the case of a Disposition to another Second Tier Obligor within the same Group to the extent such Disposition was not for reasonably equivalent value; provided, further, that in the case of Group 3, the foregoing shall not apply to Dispositions of the Cash Collateral Account and the assets and amounts held therein or credited thereto, which restrictions shall be subject to the restrictions on withdrawals described in Section 2.03 of this Annex A. [19]

Section 4.02    **Limitations on Distributions.** In the case of the Second Tier Obligors, make any Distribution; provided that (i) the Second Tier Obligors and any beneficiaries of such Second Tier Obligors shall (other than, with respect to Group 3, the Cash Collateral Account and the assets and amounts held therein or credited thereto) be permitted to use (other than for Dispositions) residential real estate, art and collectibles and other property in each case, in the ordinary course and solely to the extent such use does not deplete the value of such property (ordinary course wear and tear excepted) (but, for the avoidance of doubt, excluding cash, cash equivalents, securities or other financial assets) and (ii) at any time that the Remaining Amount of such Group in which such Second Tier Obligor is a member is less than $[___] (and subject in the case of Group 3 to Sections 2.03 and 2.04), the Second Tier Obligors in such Group shall be permitted to (A) make Distributions in an aggregate amount (among all such Second Tier Obligors in such Group) not to exceed the Net Investment Returns of all such Second Tier Obligors in such Group or (B) make Distributions if (and to the extent that) the Distribution Condition is satisfied (with respect to the Group to which such Second Tier Obligor is a member) after giving pro forma effect thereto. Any Distribution of the Equity Interests of an Asset HoldCo to another Person within the same Group permitted under this Section 4.02 shall require entry into equivalent security and perfection arrangements reasonably acceptable to the Secured Party to continue the first priority perfected security interest in and Lien on (A) the proceeds thereof (including any Equity Interests acquired in connection therewith) (in each case without lapse or change in priority) and (B) the Equity Interests of the Asset HoldCo (other than an Excluded Asset HoldCo) in the case of a Distribution of such Equity Interests to another Second Tier Obligor within the same Group to the extent such Distribution was not for reasonably equivalent value.[20]

Section 4.03    **Related Party Transactions.** Enter into any transaction or series of related transactions with any [Related Party] (other than transactions with other Second Tier Obligors or Asset HoldCos within the same Group), except for (a) Existing Related Party Loans, (b) Dispositions permitted by Section 4.01, (c) Distributions permitted by Section 4.02, (d) the Settlement Agreement (including this Annex A) or the Security Documents and the transactions required or permitted thereunder and (e) any transaction or series of related transactions on terms no less favorable to such Second Tier Obligor or Asset HoldCo than those that would have been obtained in a comparable transaction on an arm's-length basis with a Person other than a Related Party; provided that with respect to any transaction or series of related transactions involving aggregate consideration in excess of $[___], such Second Tier Obligor or Asset HoldCo shall deliver to the MDT a written opinion by an Independent Financial Advisor stating that such transaction or series of related transactions complies with this Section 4.03; provided, further, that the Second Tier Obligors and any beneficiaries shall (other than, with respect to Group 3, the Cash Collateral Account and the assets and amounts held therein or credited thereto) be permitted to use (other than for Dispositions) residential real estate, art and collectibles and other property, in each case, in the ordinary course and solely to the extent such use does not deplete the value of such property (ordinary course wear and tear excepted) (but, for the avoidance of doubt, excluding cash, cash equivalents, securities or other financial assets).

---

[19] NTD:  All proposed figures subject to further review and negotiation.

[20] NTD:  Subject to further review and negotiation.

14
Annex A

**Section 4.04    Indebtedness and Liens.**  Other than Indebtedness for Borrowed Money or Liens, in each case, in existence on the Financial Information Record Date and disclosed in [the summary previously delivered by Huron Consulting Services, LLC on [____], 2021] (or extensions, renewals or refinancings thereof, in each case to the extent that the aggregate principal amount of such Indebtedness for Borrowed Money or other amount secured does not increase to an amount in excess of the amount disclosed or outstanding as of such date plus any accrued interest, premium or fees), incur, create, assume or permit or cause to exist, directly or indirectly, any Indebtedness for Borrowed Money, or incur, create, assume or grant or cause or (in the case of any consolidations, mergers or divisions otherwise permitted hereunder) suffer to exist, any Lien on any of its property or assets, except for:

(a)    Liens created by the Security Documents (it being understood that (x) the payment Obligations arising out of the Settlement Agreement and Security Documents do not constitute Indebtedness for Borrowed Money for purposes of this covenant and (y) the Security Documents shall not permit any Liens to secure Indebtedness for Borrowed Money);

(b)    Indebtedness for Borrowed Money and Liens incurred for the purpose of investments of such party to the extent incurred in the ordinary course of business and consistent with past practices;

(c)    Indebtedness for Borrowed Money that constitutes purchase money indebtedness (and Liens securing such purchase money indebtedness) incurred in connection with the acquisition of assets (including real estate) so long as (x) any such Liens are limited solely to the assets being acquired and the proceeds thereof and (y) such assets being acquired are acquired and remain owned by the Second Tier Obligor or Asset HoldCo incurring such purchase money indebtedness;

(d)    Indebtedness for Borrowed Money consisting of Existing Related Party Loans;

(e)    Liens for Taxes that are not yet delinquent, that are being contested in accordance with **Error! Reference source not found.**(a) or the non-payment of which, individually or in the aggregate, could not reasonably be expected to have a Material Adverse Effect;

(f)    Carrier's, warehousemen's, mechanics', landlords', materialmen's, repairmen's or other Liens arising by operation of law in the ordinary course of business;

(g)    Easements, rights-of-way, building, zoning and similar restrictions, utility agreements, covenants, reservations, restrictions, encroachments, charges, and other similar encumbrances or title defects incurred, or leases or subleases granted by or to others, in the ordinary course of business, which do not in the aggregate materially interfere with the ordinary use of property; and

(h)    Liens over deposit, securities, brokerage or similar accounts securing obligations (other than Indebtedness for Borrowed Money) to the relevant bank or intermediary incurred in the ordinary course of business; and

(i)    Other Indebtedness for Borrowed Money in an amount not exceeding $[____] outstanding in the aggregate at any time; and

(j)    Liens securing obligations not exceeding $[____] outstanding in the aggregate at any one time.

15
Annex A

**Section 4.05    Other Transactions.** Enter into any transaction or series of related transactions or agreement that would materially restrict or impair its ability to Dispose of or otherwise liquidate a material portion of its assets and properties (excluding (a) as required under the Settlement Agreement and the Security Documents and (b) transfer or assignment restrictions under or in respect of investments or contracts in each case entered into in the ordinary course of business).

**Section 4.06    Mergers and Consolidations.** Consolidate, merge, amalgamate or divide, or Dispose of all or substantially all of its assets, taken as a whole, in any one transaction or series of transactions, to any other Person unless (i) the resulting, surviving or transferee Person (the "**successor**") is either the applicable Payment Party or a expressly assumes by separate agreement satisfactory to the MDT all of such Payment Party's Obligations under the Settlement Agreement and the Security Documents, (ii) such consolidation, merger, amalgamation, division or Disposition shall not have the effect of rendering any Liens of the Secured Party on the Collateral invalid, unenforceable or unperfected; (iii) the successor takes any and all steps as are necessary to maintain the Secured Party's perfected first priority security interest in the Collateral (without lapse or change in priority); and (iv) the applicable trust/trustee or entity delivers to the MDT opinions of counsel, in form and substance reasonably acceptable to the MDT, stating that any consolidation, merger, amalgamation, division or Disposition referred to in this covenant complies with the provisions of this covenant and that all conditions precedent provided herein relating to such transactions have been complied with.

**Section 4.07    Listed Transactions.** Be a party to any transaction that it knew, or reasonably should have known, is a Listed Transaction as of the time it entered into a binding commitment to enter into the transaction; provided that, for purposes of this covenant, (i) the Plan and Settlement Agreement and the payments and transactions contemplated thereby shall not be taken into account and (ii) no Payment Party shall be treated as a party to a Listed Transaction that is entered into by any collective investment vehicle or other entity if (A) such entity is managed by a professional investment advisor that is unaffiliated with the Payment Party (or any of its Related Parties) and (B) the Payment Party (together with any of its Related Parties) does not have dominion and control over the entity's investment decisions..

**Section 4.08    Amendments or Waivers of Organizational Documents.**    Agree to or otherwise give effect to any amendment, restatement, supplement or other modification to, or waiver of, any Second Tier Obligor or Asset HoldCo's organizational documents (including trust documentation) after the Settlement Effective Date, in each case, to the extent the same would reasonably be expected to be adverse in any manner to the MDT (including without limitation, with respect to the perfection and/or priority of any Secured Party's security interest in the Collateral) or the ability of such Second Tier Obligor or Asset HoldCo to perform its Obligations under the Settlement Agreement and Security Documents and otherwise pay the applicable Outstanding Settlement Amount, in each case, without obtaining the prior consent of the MDT to such amendment, restatement, supplement or other modification or waiver; provided that any such amendment, restatement, supplement or modification shall maintain the Secured Party's perfected first priority security interest in the Collateral (without lapse or change in priority).

**Section 4.09    Business Activities.** In the case of each Asset HoldCo, engage in any business activities other than holding and dealing in its assets and investments consistent with past practice.

**Section 4.10    Change in Trustees.** In the case of Second Tier Obligors that are Trusts:

(a)        Cause or suffer to exist any change in the trusteeship without the prior written consent of MDT; and

(b)        Recognize the appointment of (including without limitation by granting control over any trust asset to) any additional or replacement trustee, unless and until such additional or replacement trustee (x) becomes a party to the Settlement Agreement and the Security Documents in its capacity as such trustee and thereby confirms and agrees that such trustee is bound by the terms and provisions of the Settlement Agreement and the Security Documents (as applicable), (y) such additional or replacement trustee is approved by the Jersey Court and (z) all steps that are necessary to maintain the perfected first priority security interest of the Secured Party in the Collateral (without lapse or change in priority) shall have been taken.

Notwithstanding anything to the contrary in this Annex A, (x) the Second Tier Obligors and Asset HoldCos shall be permitted to pay reasonable expenses (including Taxes on income from and gains on investments) in connection with their operation and their compliance with the Settlement Agreement and Security Documents and related matters; provided that in the case of Group 3 such amounts are not paid from the Cash Collateral Account (other than amounts permitted to be paid therefrom pursuant to clause (a) of the second parenthetical set forth in the last sentence of Section 2.02); and (y) each Second Tier Obligor and Asset HoldCo shall be permitted to continue to pursue investment strategies and use investment techniques generally consistent with past practice (or industry standard practice) to the extent such strategies and investment techniques are not inconsistent with the limitations set forth in Sections 4.01, 4.02, 4.03, 4.04 and 4.06 above.

## ARTICLE V.
## THIRD AND FOURTH TIER OBLIGOR COVENANTS

**Section 5.01        Confession of Judgment.** Each Third Tier Obligor and Fourth Tier Obligor shall execute a Confession of Judgment with respect to the Obligations of such obligor under the Settlement Agreement (assuming the maximum amount that may be owed by the Group under the Settlement Agreement and Security Documents), together with all supplements (or, if so required, new confessions of judgment consistent in scope to the Confessions of Judgment) that are necessary to maintain the effectiveness and validity of any such Confession of Judgment.

**Section 5.02        Third and Fourth Tier Obligor Negative Covenants.** Each Third Tier Obligor and the Fourth Tier Obligor warrants, covenants and agrees with the MDT that so long as the Settlement Agreement shall remain in effect, such Third Tier Obligor or Fourth Tier Obligor shall not:

(a)        Other Transactions. Enter into any transaction or series of related transactions or agreement that would materially restrict or impair its ability to Dispose of or otherwise liquidate a material portion of its assets and properties (excluding (a) as required under the Settlement Agreement and the Security Documents and (b) transfer or assignment restrictions under or in respect of investments or contracts entered into in the ordinary course of business).

(b)        Limitations on Transfers. Dispose of assets to any other Person unless such Disposition is for reasonably equivalent value, as applicable; provided that that with respect to any transaction or series of related transaction involving aggregate consideration in excess of $[_____], such Third or Fourth Tier Obligor delivers to the MDT a written opinion by an Independent Financial Advisor stating that such transaction or series of related transactions complies with this covenant; provided, further, that this clause (b) shall not apply to (x) transfers of assets, in an amount not exceeding $[_____] per calendar year or (y)

17
Annex A

Dispositions of assets in an aggregate amount during the term of the Settlement Agreement not exceeding, in the aggregate, $[___].

**Section 5.03    Third Tier Obligor and Fourth Tier Obligor Reporting.** Within thirty (30) days after the end of each fiscal year, each Third Tier Obligor and Fourth Tier Obligor shall provide to the MDT an annual compliance certificate stating that such party is in compliance with the covenants applicable to such obligor.

## ARTICLE VI.
## ADDITIONAL CONDITIONS PRECEDENT

**Section 6.01    Additional Conditions Precedent to Settlement Effective Date**.  In addition to the conditions set forth in Section 10.01 of the Settlement Agreement, the occurrence of the Settlement Effective Date shall be subject to the satisfaction (or waiver by the Parties) of the following conditions:

(a)    The MDT (or its counsel) shall have received duly executed copies of (i) the Jersey Security Agreements, (ii) the Bermuda Pledge Agreements, (iii) the U.S. Pledge Agreements and (iv) Control Agreements in respect of each Cash Collateral Account in existence as of the Settlement Effective Date.

(b)    In respect of the Second Tier Obligors that have trustees located in Jersey, the MDT (or its counsel) shall have received UCC-1 financing statements in a form prepared for filing in Washington D.C. and otherwise in form and substance reasonably satisfactory to the MDT (or its counsel);

(c)    In respect of the Second Tier Obligors that have trustees located in Wyoming, the MDT (or its counsel) shall have received UCC-1 financing statements in a form prepared for filing in Wyoming and otherwise in form and substance reasonably satisfactory to the MDT (or its counsel);

(d)    All Equity Interests of the Asset HoldCos (other than Excluded Asset HoldCos) shall have been pledged pursuant to the Security Documents (including uncertificated securities control agreements, as applicable) and, in the case of the Domestic Asset HoldCos or any other Asset HoldCo organized under the Laws of a jurisdiction in which the perfection of a first priority security interest in such Equity Interests may be obtained by the possession or control of certificated securities or other instruments, the MDT (or its counsel) shall have received all certificates or instruments, if any, representing the Equity Interests of such Asset HoldCos, accompanied by stock transfer powers or other instruments of transfer (if any) with respect thereto endorsed in blank;

(f)    The MDT (or its counsel) shall have received evidence that its security interest in and Lien on the Equity Interests of the Asset HoldCos organized under the laws of Bermuda have been registered in the Registrar of Companies in Bermuda;

(e)    The MDT (or its counsel) shall have received a duly executed copy of a Perfection Certificate with respect to each Second Tier Obligor pledging Collateral hereunder; and

(f)    The MDT (or its counsel) shall have received the Confessions of Judgment.

18
Annex A

## ARTICLE VII.
## ENFORCEMENT EVENTS; REMEDIES

**Section 7.01    Occurrence of an Enforcement Event. Priority of Payments**.[21] Upon the occurrence, and during the continuance of, an Enforcement Event with respect to a Group, the Secured Party shall have the right to foreclose on the Collateral, liquidate, or direct the liquidation of the Collateral in accordance with the Security Documents and otherwise exercise all rights and remedies against the Collateral of such Group as provided in (and subject to) the Settlement Agreement and the Security Documents or under applicable Law, and in each case shall apply the proceeds thereof (including amounts in the Cash Collateral Account in the case of Group 3) to pay (a) first, any costs or expenses incurred by the MDT or any other Secured Party to enforce the Settlement Agreement, the Security Documents or otherwise incurred in connection with the exercise of remedies, in each case, solely with respect to such Group, (B) second, any accrued and unpaid interest, late payment fees, or other fees or payment Obligations (other than the Outstanding Settlement Amount) due to the MDT under the Settlement Agreement and the Security Documents solely on account of the obligations of such Group and (C) third, the Outstanding Settlement Amount of such Group then outstanding under the Settlement Agreement, with any excess proceeds being retained by the relevant obligor.

**Section 7.02    Death of a Third Tier Obligor or Fourth Tier Obligor.** In the event of the death of a Third Tier Obligor or Fourth Tier Obligor while the Obligations of its applicable Group to the MDT under the Settlement Agreement are greater than zero (assuming, for such purposes, the maximum amount that may be owed by such Group under the Settlement Agreement and Security Documents), the payment Obligations of such obligor under the Settlement Agreement and the Security Documents shall remain obligations of the estate of such obligor, and transfers of assets from the estate of such obligor shall be restricted unless and until the Outstanding Settlement Amount and all other payment Obligations of such applicable Group (or, in the case of the Fourth Tier Obligor, Groups) are reduced to zero (assuming, for such purposes, the maximum amount that may be owed by the Group under the Settlement Agreement and Security Documents); provided that any such transfer or transfers shall be permitted if the Distribution Condition is satisfied at the time of such transfer or transfers (with respect to each Group to which the applicable Third Tier Obligor or Fourth Tier Obligor is a member (as applicable) in their capacity as Third Tier Obligor or Fourth Tier Obligor).

**Section 7.03    Collateral Allocation for Groups 1 and 7.** Solely with respect to Groups 1 and 7, upon any exercise of remedies against the assets of Millennium Trust or Perelle Bay Trust following an Enforcement Event with respect to Group 1 or Group 7, (i) fifty (50%) of the proceeds resulting from such exercise of remedies shall be applied in accordance with the waterfall set forth in Section 7.01 and (ii) fifty (50%) of the proceeds resulting from such exercise of remedies shall be deposited by the Secured Party into an escrow account on terms and conditions reasonably satisfactory to the MDT to secure the Obligations of the non-defaulting Group.

**Section 7.04    Supported Group Defaults.** In the event that the Second Tier Obligors[22] for Group 5, 6 or 7 (each a "**Supported Group**") fail to make any payment or payments required to be made by such Group under the Settlement Agreement (a "**Defaulting Supported Group**"), the Fourth Tier Obligor shall also be fully liable for all such amounts. Any failure to pay such amounts when due by the Fourth Tier Obligor shall allow the Secured Party to exercise all available remedies under the Settlement

---

[21] NTD:  Subject to further review and negotiation.

[22] NTD: Inclusion of First Tier Obligors subject to further review and negotiation.

#94743877v4

Agreement against Group 1 (in addition to exercising remedies against the Defaulting Supported Group). For the avoidance of doubt, any other Enforcement Event as to the Fourth Tier Obligor shall allow the Secured Party the rights to exercise remedies under the Settlement Agreement and the Security Documents with respect to the Fourth Tier Obligor as described in <u>Section 7.01</u>.

     **Section 7.05**    <u>**Remedies Against Group 1.**</u> Upon any exercise of remedies against Group 1 following an Enforcement Event with respect to Group 1, any proceeds resulting from such exercise of remedies remaining after satisfaction of the Obligations of Group 1 shall be deposited by the Secured Party into an escrow account on terms and conditions reasonably satisfactory to the MDT to support the then-outstanding Obligations of the Fourth Tier Obligor with respect to the Supported Groups.

<center>

**ARTICLE VIII.**
**MISCELLANEOUS**

</center>

     **Section 8.01**    <u>**Termination.**</u>  The Obligations described in this Annex A shall terminate, and all security interests granted under the Security Documents shall be automatically released and all other requirements described in this Annex A shall be extinguished, with respect to each Group on the date on which the Outstanding Settlement Amount and all other payment Obligations of such Group under the Settlement Agreement are paid in full in cash and reduced to $0 (assuming, for such purposes, the maximum amount that may be owed by the Group under the Settlement Agreement and Security Documents); <u>provided</u> that such Obligations, and all security interests in connection therewith, shall be automatically reinstated if and to the extent that, for any reason, the MDT is required to disgorge, turn over, or otherwise pay any amount paid to the MDT by or on behalf of such Group, whether as a result of any proceeding in bankruptcy or reorganization or otherwise.

<center>

20
Annex A

</center>

**<u>Schedule I</u>**

**Asset HoldCos**

| Asset HoldCos | Jurisdiction | Excluded Asset HoldCo |
|---|---|---|
|  |  | **[Y/N]** |

1
Schedule I

## Schedule II

**Obligors**

1
Schedule II

#94623369v17
1006852714v10
#94743877v4

## <u>Schedule III</u>

**Independent Financial Advisors**

1
Schedule III

#94623369v17
1006852714v10
#94743877v4

**<u>Schedule IV</u>**

**Asset Values**

1
Schedule V

#94623369v17
1006852714v10
#94743877v4

**<u>Annex B</u>**
**Credit Support Annex for A-Side Payment Group 2**

Draft 7/7/2021 – FILING VERSION

## ANNEX B[1]
## A-SIDE PAYMENT GROUP 2

## ARTICLE I.
## DEFINITIONS

**Section 1.01**    **Settlement Agreement**.  Capitalized terms used herein and not defined herein have the meanings ascribed to such terms in the Settlement Agreement to which this Annex [__] is attached.

**Section 1.02**    **Defined Terms**.  As used in this Agreement, the following terms shall have the meanings specified below:

"**Account Bank**" means a financial institution in the United States acting as a deposit bank or securities intermediary, as applicable, in respect of the Collateral Account, which financial institution is reasonably satisfactory to the MDT.

"**Cash Equivalents**" means (<u>a</u>) money, (<u>b</u>) securities issued or fully guaranteed or insured by the United States of America, the United Kingdom, Canada or a member state of the European Union or any agency or instrumentality of any thereof, (<u>c</u>) time deposits, certificates of deposit or bankers' acceptances of (<u>i</u>) any commercial bank having capital and surplus in excess of $500,000,000 (or the foreign currency equivalent thereof as of the date of such investment) and the commercial paper of the holding company of which is rated at least F2 or the equivalent thereof by Fitch, at least P-2 or the equivalent thereof by Moody's or at least A-2 or the equivalent thereof by S&P (or, if at such time none is issuing ratings, a comparable rating of another nationally recognized rating agency) and (<u>d</u>) money market instruments, commercial paper or other short-term obligations rated at least F2 or the equivalent thereof by Fitch, at least P-2 or the equivalent thereof by Moody's or at least A-2 or the equivalent thereof by S&P (or, if at such time none is issuing ratings, a comparable rating of another nationally recognized rating agency).[2]

"**Collateral**" means the Collateral Account, all cash, Cash Equivalents and other property or assets deposited therein as of the Settlement Effective Date and at all times thereafter, and all products and proceeds thereof.

"**Collateral Account**" means one or more deposit or securities accounts, which shall be (i) maintained in the United States with the Account Bank, (ii) funded on or before the Settlement Effective Date with the Initial Collateral Account Amount and (iii) subject to a Control Agreement.

"**Confession of Judgment**" has the meaning set forth in <u>Section 3.07</u>.

---

[1] This <u>Annex B</u> to the Shareholder Settlement Agreement is in draft form and remains subject to continuing review and negotiation among the Debtors and interested parties with respect thereto, has not yet been agreed to by any party and remains subject to material change.  The Debtors reserve the right, subject to the terms and conditions set forth in the Plan, to alter, amend, modify or supplement the Shareholder Settlement Agreement at any time before the Effective Date of the Plan, or any such other date as may be provided for by the Plan or by order of the Bankruptcy Court; *provided* that, if the Shareholder Settlement Agreement is altered, amended, modified, or supplemented in any material respect prior to the hearing to confirm the Plan, the Debtors will file a redline of such document with the Bankruptcy Court.

[2] NTD:  Subject to further review and negotiation.

"**Control Agreement**" means a blocked account control agreement or a securities account control agreement (as applicable) in the form required by the applicable account bank and otherwise in form and substance reasonably acceptable to the MDT and the Secured Party executed by the Second Tier Obligor, the Secured Party and the applicable Account Bank in respect of the Collateral or the Collateral Account, as applicable, and pursuant to which the Secured Party is granted "control" (as such term is described in Section 9-104 of the UCC) of such Collateral or Collateral Account, as applicable, and its first-priority security interest in and Lien on such Collateral or Collateral Account to secure the Outstanding Settlement Amounts and other Obligations is perfected, in accordance with this Annex [__] or the Security Documents, as the same may be amended, restated, supplemented or otherwise modified from time to time.

"**Disposition**" shall mean, with respect to any property or asset, any conveyance, sale, lease, sublease, assignment, transfer or other disposition (including by way of merger or consolidation and including any sale and leaseback transaction) of such property or asset, including by means of a merger, consolidation, division or similar transaction, and the terms "**Dispose**," "**Disposed**" and "**Disposing**" shall have meanings correlative thereto.

"**Eligible Assets**" means cash, Cash Equivalents and [_____].

"**Enforcement Event**" means [_____].[3]

"**Group 2**" means the Payment Group identified as A-Side Payment Group 2 (excluding the A-Side General Obligors) on Exhibit A to the Settlement Agreement.

"**Independent Financial Advisor**" means (i) a financial advisor selected by the Second Tier Obligor from the financial advisors listed on Schedule I attached hereto or (ii) solely to the extent the Second Tier Obligor is unable to engage any such independent financial advisor set forth in clause (i) of this definition, any other independent financial advisor reasonably acceptable to the MDT.

"**Initial Collateral Account Amount**" means Eligible Assets with a fair market value of not less than $98,000,000 as of the Settlement Effective Date.

"**Material Adverse Effect**" means (a) a material adverse effect on (i) the Second Tier Obligor's ownership and interest in the Collateral Account, (ii) the existence of the Collateral Account and the Security Party's first priority perfected security interest in and Lien on the Collateral Account, (iii) the rights and remedies of the Security Party under the Settlement Agreement and the Security Documents relating to Group 2, including the right of the Security Party to effect withdrawals from the Collateral Account in accordance with <u>Section 2.03,</u> or (iv) the ability of the Second Tier Obligor to perform its payment obligations under the Settlement Agreement and the Security Documents, or (b) the termination of the Collateral Account or the Control Agreement or the failure of the Control Agreement to be a valid, binding and enforceable agreement against the Second Tier Obligor or the relevant Account Bank.

"**Remaining Amount**" means the remaining amount potentially owed under the Settlement Agreement (assuming the maximum amount that may be owed by Group 2 under the Settlement Agreement and Security Documents after giving effect to the terms of Article II of the Settlement Agreement) after giving effect to any withdrawn amount from the Collateral Account on the date of determination, in accordance with <u>Section 2.03</u> hereof.

---

[3] NTD: Subject to further review and negotiation.

"**Second Tier Obligor**" means [____].

"**Secured Party**" means each of (i) the MDT and each of its successors and permitted assigns and (ii) any agent, trustee or other representative or designee (including one or more Subsidiaries or other entities of the MDT formed to carry out its duties and obligations under the Definitive Documents) authorized or appointed to hold any security interest in or Lien on, or take possession or control of, any Collateral on behalf of and for the benefit of itself and any person described in clause (i) above.

"**Security Documents**" means the Control Agreement and each of the other security agreements, pledge agreements and other instruments and documents, and each of the supplements thereto, executed and delivered pursuant to this Annex [__] or otherwise in order to grant or purport to grant a Lien on any assets to secure the Obligations of Group 2 under the Settlement Agreement or pursuant to which the rights or remedies with respect to such Liens are governed.[4]

"**Third Tier Obligor**" means Kathe A. Sackler.

"**UCC**" shall mean the Uniform Commercial Code or any successor provision thereof (or similar code or statute) as in effect from time to time in any applicable state or jurisdiction to the extent it may be required to apply to any item or items of Collateral.

Section 1.03    **Interpretative Provisions**.  For the avoidance of doubt, the rules of construction set forth in Section 1.02 of the Settlement Agreement shall apply *mutatis mutandis* to this Annex [____].

Section 1.04    **Division**.  For all purposes under this Annex, in connection with any division or plan of division under Delaware Law or any comparable event under a different jurisdiction's Laws or, in the case of a trust, any division, appointment or other event under the terms of its governing instrument or otherwise causing property of a trust to be held in one or more trusts separate from the original trust, as applicable: (a) if any asset, right, obligation or liability of any Person becomes the asset, right, obligation or liability of a different Person, then it shall be deemed to have been transferred from the original Person to the subsequent Person, and (b) if any new Person comes into existence, such new person shall be deemed to have been organized on the first date of its existence by the holders of its Equity Interests or, in the case of a new trust, to have been formed on the first date of the acceptance in trust of any property thereof by any trustee thereof.

## ARTICLE II.
## COLLATERAL MATTERS

Section 2.01    **Collateral Account**.  As additional credit support for, and to secure the prompt payment and performance of, the Obligations of Group 2, on or before the Settlement Effective Date, the Second Tier Obligor shall (i) establish the Collateral Account and (ii) fund the Collateral Account with the Initial Collateral Account Amount.  In furtherance of the foregoing, the Second Tier Obligor hereby grants to the Secured Party, as collateral security for the prompt and complete payment or performance in full when due (whether by required payment, prepayment, declaration, acceleration, demand or otherwise (including the payment of amounts that would become due but for the operation of the automatic stay under Section 362(a) of the Bankruptcy Code or any similar provision of any other bankruptcy, insolvency, receivership or other similar law) of all Obligations of Group 2 under the Settlement Agreement, a first priority security interest in, and Lien on, all of the Second Tier Obligor's right, title and interest in to and under the Collateral Account, all assets or amounts held therein or credited thereto, and

---

[4] NTD: Separate security agreement TBD depending on jurisdiction of trust.

all other Collateral, in each case, whether now owned or hereafter acquired, and all products and proceeds thereof.  Such security interest and Lien of the Secured Party shall be perfected by means of entry into, and the Collateral Account shall at all times be subject to, a Control Agreement with the Account Bank in favor of the Secured Party, which Control Agreement shall (A) give sole dominion and control over the Collateral Account and all assets or amounts held therein or credited thereto to the Secured Party, (B) provide that the Second Tier Obligor shall not be entitled to make withdrawals or otherwise provide direction or instructions to the Account Bank or otherwise with respect to the Collateral Account or the assets or amounts held therein or credited thereto and (C) be in the form required by the Account Bank and in form and substance reasonably acceptable to the MDT and the Secured Party.  Notwithstanding any other provisions set forth herein, the Second Tier Obligor shall not be permitted to (a) transfer (or direct the transfer of) the Collateral Account or the assets or amounts held therein or credited thereto except withdrawals permitted hereunder (and for account bank fees and other reasonable and customary expenses of maintaining the Collateral Account, in excluding income Taxes other than Taxes on income from and gains on investments held therein to the extent such income or gains accrued after the later of (x) the date that is [____ days][5] prior to the Settlement Effective Date and (y) the date such assets were deposited therein)or (b) maintain any assets in the Cash Account other than Eligible Assets.

Section 2.02    **Limited Recourse Obligations**.  The payment obligations of the Second Tier Obligor shall be limited recourse obligations payable solely from the assets in the Collateral Account.

Section 2.03    **Withdrawals**.  Withdrawals from the Collateral Account shall be permitted (and effected by written instruction of the Secured Party to the Account Bank in accordance with the Control Agreement) at the direction of the Second Tier Obligor, if and only to the extent (x) the fair market value of the assets remaining in the Collateral Account (after giving effect to such withdrawal) is not less than the Remaining Amount on such date of determination after giving effect to any withdrawn amount from the Collateral Account on the date of determination, (y) no [Specified Breach] has occurred and is continuing and (z) as otherwise provided in the last sentence of <u>Section 2.06</u>.  After an Enforcement Event, notwithstanding anything to the contrary in this Section 2.03, the Secured Party may make withdrawals from the Collateral Account and/or direct dispositions of the Collateral Account and the assets or amounts held therein or credited thereto in accordance with the terms of the Control Agreement, the applicable Security Documents and/or applicable Law and apply such amounts as set forth in Section 7.01 below.

Section 2.04    **Advanced Contribution Amounts**.  If the fair market value of the assets in the Collateral Account is less than $98,000,000, any Advance Contribution amount returned to any member of Group 2 under the Settlement Agreement shall be deposited in the Collateral Account if and only to the extent necessary to cause the fair market value of the assets in the Collateral Account to be not less than the lesser of (i) the Remaining Amount on such date of determination and (ii) $98,000,000.

---

[5] NTD:  Subject to further review and negotiation.

**Section 2.05    Tax Matters.**[6]

(a)    The parties agree that, to the extent permitted by law, (i) the Second Tier Obligor shall be treated as the owner of the Collateral Account for U.S. federal income and other applicable income tax purposes and (ii) the parties shall report consistently with such treatment on any applicable tax returns or information reports.

(b)    Before the Settlement Effective Date, the Second Tier Obligor shall provide a duly completed and executed IRS Form W-9 or Form W-8 (or any successor forms), as applicable, to the Secured Party and shall provide an updated IRS Form W-9 or Form W-8 within thirty (30) days if any certification on a previously-provided IRS Form W-9 or Form W-8 becomes incorrect or as otherwise required under applicable Law, and from time to time upon the reasonable request of the Secured Party. The Second Tier Obligor shall provide any other tax forms or certifications that the Secured Party may reasonably request and which it is lawfully able to provide to permit the Secured Party to comply with any tax withholding or reporting requirements prescribed by applicable Law.

**ARTICLE III.w**
**SECOND TIER OBLIGOR AFFIRMATIVE COVENANTS**

The Second Tier Obligor warrants, covenants and agrees with the MDT that it shall:

**Section 3.01    Financial Statements, Reports.**  Furnish to the MDT:

(a)    Within [__] days following the end of each six-month period, commencing with the sixth-month period ending [__], a compliance certificate stating that the Second Tier Obligor is in compliance with the covenants applicable to it (including that the security interest in all of the Collateral of the Secured Party remains perfected as of December 31 of the immediately preceding year);

(b)    Within ten (10) days following the end of each fiscal quarter, as requested by the MDT if the Secured Party does not have the right to request such information from the Account Bank under the Control Agreement, reporting of the balance of funds held in the Collateral Account in the form provided by the Account bank or such other form reasonably satisfactory to the MDT;

(c)    Prompt written notice of any change, event, effect or occurrence that would reasonably be expected to have a material adverse effect on the creation, preservation, priority, perfection, or maintenance of the perfection (or validity) of the security interest granted over the Collateral, or the ability of the MDT or any other Secured Party to exercise and enforce its rights under the Security Documents with respect to the Second Tier Obligor or the Collateral Account, but in any event within thirty (30) days thereof (and within twenty (20) days before perfection lapses), which notice shall describe such change, event, effect or occurrence and reasonably detail the expected material adverse effect; and

(d)    In the event of any change in the Second Tier Obligor's (A) trustee(s) or the legal or organization name, (B) location of its chief executive office or principal place of business or administration, (C) organizational type, (D) federal taxpayer identification number or organizational identification number, if any, or (E) jurisdiction of organization (or in the case of a trust, administration or governing law) (in each case, including by merging with or into any other entity, reorganizing, dissolving, dividing into two or more trusts, "decanting" in further trust by reason of the exercise of any power of appointment (held in a fiduciary capacity or otherwise), liquidating, reorganizing or organizing in any

---

[6] NTD:  Subject to further review and negotiation.

other jurisdiction), the Second Tier Obligor shall (x) deliver prompt written notice of such change (and in any event, at least ten (10) days prior to the occurrence) and (y) take all actions necessary to maintain (without lapse or change in priority) the validity, perfection and priority of the security interests provided for in the Security Documents and reimburse the Secured Party for any reasonable, documented, out-of-pocket costs and expenses incurred by it in connection therewith.

Section 3.02    **Preservation of Existence**.  (a) Preserve, renew and maintain its jurisdiction of administration and governing law jurisdiction as set forth on Exhibit [A] to the Settlement Agreement (as may be updated from time to time subject to Section 3.01(d) above and the other provisions of this Annex), and (b) in the case of trustees that are not natural persons of the Second Tier Obligor and (x) preserve, renew and maintain in full force and effect its legal existence and good standing under the laws of the jurisdiction of its organization.

Section 3.03    **Compliance with Laws**.  Comply with the requirements of all applicable Laws and all orders, writs, injunctions and decrees of any Governmental Authority applicable to it or the trust property and administration thereof (or, to the extent applicable, the business of the trust company) except to the extent non-compliance could not reasonably be expected to have a Material Adverse Effect.

Section 3.04    **Confession of Judgment**.  Execute a confession of judgment, in form and substance reasonably satisfactory to the MDT (the "**Confession of Judgment**") with respect to the Obligations of the Second Tier Obligor under the Settlement Agreement (assuming the maximum amount that may be owed by Group 2 under the Settlement Agreement and Security Documents after giving effect to the terms of Article II of the Settlement Agreement), together with all supplements (or, if so required, new confessions of judgment consistent in scope to the original Confessions of Judgment) that are necessary to maintain the effectiveness and validity of any such Confession of Judgment.

## ARTICLE IV.
## SECOND TIER OBLIGOR NEGATIVE COVENANTS

The Second Tier Obligor warrants, covenants and agrees with the MDT that it shall not:

Section 4.01    **Limitation on Liens**.  Incur, create, assume or grant or cause or suffer to exist, any Lien on the Collateral Account other than Liens created by the Security Documents and Liens of the Account Bank.

Section 4.02    **Other Transactions**.  Enter into any transaction or series of related transactions or agreement that would materially restrict or impair its ability to Dispose of or otherwise liquidate any of its assets and properties deposited in or credited to the Collateral Account (other than, for the avoidance of doubt, as required under the Settlement Agreement and the Security Documents).

Section 4.03    **Mergers and Consolidations**.  Consolidate, merge, amalgamate or divide , or Dispose of all or substantially all of its assets, taken as a whole, in any one transaction or series of transactions, to any other Person unless (i) the resulting, surviving or transferee Person (the "**successor**") is either the applicable Payment Party or expressly assumes by separate agreement satisfactory to the MDT all of such Payment Party's Obligations under the Settlement Agreement and the Security Documents, (ii) such consolidation, merger, amalgamation, division or Disposition shall not have the effect of rendering any Liens of the Secured Party on the Collateral invalid, unenforceable or unperfected; (iii) the successor takes any and all steps as are necessary to maintain the Secured Party's perfected first priority security interest in the Collateral (without lapse or change in priority); and (iv) the applicable trust/trustee or entity delivers to the MDT opinions of counsel, in form and substance reasonably acceptable to the MDT, stating that any consolidation, merger, amalgamation, division or Disposition

6
Annex [___]

referred to in this covenant complies with the provisions of this covenant and that all conditions precedent provided herein relating to such transactions have been complied with.

**Section 4.04**    **Amendments or Waivers of Organizational Documents**.    Agree to or otherwise give effect to any amendment, restatement, supplement or other modification to, or waiver of, the Second Tier Obligor's organizational documents (including trust documentation) after the Settlement Effective Date, in each case, to the extent the same would reasonably be expected to be adverse in any manner to the MDT (including, without limitation, with respect to the perfection and/or priority of any Secured Party's security interest in the Collateral) or the ability of the Second Tier Obligor to perform its Obligations under the Settlement Agreement and Security Documents and otherwise pay the applicable Outstanding Settlement Amount, in each case, without obtaining the prior consent of the MDT to such amendment, restatement, supplement or other modification or waiver; provided that any such amendment, restatement, supplement or modification shall maintain the Secured Party's perfected first priority security interest in the Collateral (without lapse or change in priority).

**Section 4.05**    **Change in Trustees**.

(a)    Cause or suffer to exist any change in the trusteeship without the prior written consent of MDT;

(b)    Recognize the appointment of (including without limitation by granting control over any trust asset to) any additional or replacement trustee, unless and until such additional or replacement trustee (x) becomes a party to the Settlement Agreement and the Security Documents in its capacity as such trustee and thereby confirms and agrees that such trustee is bound by the terms and provisions of the Settlement Agreement and the Security Documents, (y) such additional or replacement trustee is approved by the Jersey Court and (z) all steps that are necessary to maintain the perfected first priority security interest of the Secured Party in the Collateral (without lapse or change in priority) shall have been taken.

## ARTICLE V.
## THIRD TIER OBLIGOR COVENANTS

**Section 5.01**    **Confession of Judgment**.  The Third Tier Obligor shall execute a Confession of Judgment with respect to its Obligations under the Settlement Agreement (assuming the maximum amount that may be owed by Group 2 under the Settlement Agreement and Security Documents after giving effect to the terms of Article II of the Settlement Agreement), together with all supplements (or, if so required, new confessions of judgment consistent in scope to the Confessions of Judgment) that are necessary to maintain the effectiveness and validity of any such Confession of Judgment.

**Section 5.02**    **Third Tier Obligor Negative Covenants**.  The Third Tier Obligor warrants, covenants and agrees with the MDT that it shall not:

(a)    Other Transactions.    Enter into any transaction or series of related transactions or agreement that would materially restrict or impair its ability to Dispose of or otherwise liquidate a material portion of its assets and properties (excluding (a) as required under the Settlement Agreement and the Security Documents and (b) transfer or assignment restrictions under or in respect of investments or contracts in each case entered into in the ordinary course of business).

(b)    Limitations on Transfers.  Dispose of assets to any other Person unless such Disposition is for reasonably equivalent value, as applicable; provided that that with respect to any transaction or series of related transaction involving aggregate consideration in excess of $[____], the Third Tier Obligor delivers to the MDT a written opinion by an Independent Financial Advisor stating that such transaction

7
Annex [____]

or series of related transactions complies with this covenant; provided, further, that this clause (b) shall not apply to (x) transfers of assets, in an amount not exceeding $[___] per calendar year or (y) Dispositions of assets in an aggregate amount during the term of the Settlement Agreement not exceeding, in the aggregate, $[__].

**Section 5.03    Third Tier Obligor Reporting**.  Within thirty (30) days after the end of each fiscal year, the Third Tier Obligor shall provide to the MDT an annual compliance certificate stating that the Third Tier Obligor is in compliance with the covenants applicable to it.

## ARTICLE VI.
## ADDITIONAL CONDITIONS PRECEDENT

**Section 6.01    Additional Conditions Precedent to Settlement Effective Date**.  In addition to the conditions set forth in Section 10.01 of the Settlement Agreement, the occurrence of the Settlement Effective Date shall be subject to the satisfaction (or waiver by the Parties) of the following conditions:

(a)    The MDT (or its counsel) shall have received a duly executed copy of the Control Agreement in respect of the Initial Collateral Account Amount; and[7]

(b)    The MDT (or its counsel) shall have received the Confession of Judgment.

## ARTICLE VII.
## ENFORCEMENT EVENTS; REMEDIES

**Section 7.01    Occurrence of an Enforcement Event**.  Upon the occurrence, and during the continuance of, an Enforcement Event with respect to Group 2, the Secured Party shall have the right to foreclose on the Collateral, liquidate or direct the liquidation of the Collateral in accordance with the Security Documents and otherwise exercise all rights and remedies against the Collateral of Group 2 as provided in (and subject to) the Settlement Agreement and the Security Documents or under applicable Law , and shall apply the amounts in the Collateral Account to pay (a) first, any costs or expenses incurred by the MDT or any other Secured Party to enforce the Settlement Agreement, Security Documents or otherwise incurred in connection with the exercise of remedies, in each case, solely with respect to Group 2, (B) second, any accrued and unpaid interest, late payment fees, or other fees or payment Obligations (other than the Outstanding Settlement Amount) due to the MDT under the Settlement Agreement and the Security Documents solely on account of the Obligations of Group 2 and (C) third, the Outstanding Settlement Amount of Group 2 then outstanding under the Settlement Agreement, with any excess proceeds being retained by the relevant obligor.

**Section 7.02    Death of a Third Tier Obligor**.  In the event of the death of the Third Tier Obligor while the obligations of Group 2 to the MDT under the Settlement Agreement are greater than zero (assuming, for such purposes, the maximum amount that may be owed by Group 2 under the Settlement Agreement and Security Documents after giving effect to the terms of Article II of the Settlement Agreement), the payment obligations of the Third Tier Obligor under the Settlement Agreement and the Security Documents shall remain obligations of the estate of the Third Tier Obligor, and transfers of assets from the estate of such obligor shall be restricted unless and until the Outstanding Settlement Amount and all other payment obligations of Group 2 are reduced to zero (assuming, for such purposes, the maximum amount that may be owed by Group 2 under the Settlement Agreement and Security Documents after giving effect to the terms of Article II of the Settlement Agreement), provided

---

[7] NTD:  Subject to further review and negotiation.

that any such transfer or transfers shall be permitted if at the time thereof the fair market value of the assets remaining in the Collateral Account is not less than the Remaining Amount on such date of determination.

<div align="center">

**ARTICLE VIII.**
**MISCELLANEOUS**

</div>

**Section 8.01**    <u>**Termination**</u>.  The Obligations described in this Annex [___] shall terminate, and all security interests granted under the Security Documents shall be automatically released and all other requirements described in this Annex [___] shall be extinguished, with respect to Group 2 on the date on which the Outstanding Settlement Amount and all other payment Obligations of Group 2 under the Settlement Agreement are paid in full in cash and reduced to $0 (assuming, for such purposes, the maximum amount that may be owed by Group 2 under the Settlement Agreement and Security Documents); <u>provided</u> that such Obligations, and all security interests in connection therewith, shall be automatically reinstated if and to the extent that, for any reason, the MDT is required to disgorge, turn over, or otherwise pay any amount paid to the MDT by or on behalf of Group 2, whether as a result of any proceeding in bankruptcy or reorganization or otherwise.

#94744098v4

## Schedule I

**Independent Financial Advisors**

**<u>Annex C</u>**
**Credit Support Annex for A-Side Payment Group 4**

Draft 7/7/2021 – FILING VERSION

## ANNEX C[1]
## A-SIDE PAYMENT GROUP 4

### ARTICLE I.
### DEFINITIONS

**Section 1.01**   **Settlement Agreement**.  Capitalized terms used herein and not defined herein have the meanings ascribed to such terms in the Settlement Agreement to which this Annex is attached.

**Section 1.02**   **Defined Terms**.  As used in this Agreement, the following terms shall have the meanings specified below:

"**Asset HoldCo**" **[**means [_____], a Delaware limited liability company, together with its successors and assigns.]**[2]

"**Collateral**" means all "Collateral" (or similar equivalent term) as defined in any Security Document and shall include all assets and property, whether real, personal or mixed, whether now owned or hereafter acquired and whenever located, in each case, with respect to which a Lien is granted (or required, intended or purposed to be granted) as security for any Obligations pursuant to any Security Document, including all proceeds and products thereof.  [For the avoidance of doubt, as of the Settlement Effective Date, the Collateral shall be comprised of all of the Equity Interests of the Asset HoldCo and all proceeds and products thereof.][3]

"**Confession of Judgment**" has the meaning set forth in <u>Section 3.07</u>.

"**Disposition**" [shall mean, with respect to any property or asset, any conveyance, sale, lease, sublease, assignment, transfer, payment or other disposition (including by way of merger or consolidation and including any sale and leaseback transaction) of such property or asset, including by means of a merger, consolidation, division or similar transaction, and the terms "**Dispose**," "**Disposed**" and "**Disposing**" shall have meanings correlative thereto.

"**Distribution**" means (a) with respect to any Second Tier Obligor that is a trust, any Disposition to, or for the use or benefit of, any beneficiary of such Second Tier Obligor (including to or for the use or benefit of such Second Tier Obligor but excluding any direct payment made by a Second Tier Obligor for its own benefit such as a payment for services rendered to it by an unrelated third-party), whether in cash, securities or other property and including any appointment of property in further trust for the benefit of any one or more of them and (b) with respect to the Asset HoldCo and any Second Tier Obligor that is a corporation, limited liability company, partnership or any other similar type of entity, any dividend or

---

[1] This <u>Annex C</u> to the Shareholder Settlement Agreement is in draft form and remains subject to continuing review and negotiation among the Debtors and interested parties with respect thereto, has not yet been agreed to by any party and remains subject to material change.  The Debtors reserve the right, subject to the terms and conditions set forth in the Plan, to alter, amend, modify or supplement the Shareholder Settlement Agreement at any time before the Effective Date of the Plan, or any such other date as may be provided for by the Plan or by order of the Bankruptcy Court; *provided* that, if the Shareholder Settlement Agreement is altered, amended, modified, or supplemented in any material respect prior to the hearing to confirm the Plan, the Debtors will file a redline of such document with the Bankruptcy Court.

[2] NTD:  Subject to further review and negotiation.

[3] NTD:  Subject to further review and negotiation.

1
Annex [__]

other distribution (whether in cash, securities or other property) with respect to any Equity Interest of such Second Tier Obligor, or any payment (whether in cash, securities or other property), including any sinking fund or similar deposit, on account of the purchase, redemption, retirement, acquisition, cancellation or termination of any such Equity Interest, or on account of any return of capital to such Second Tier Obligor's shareholders, partners or members.][4]

"**Enforcement Event**" means [\_\_\_\_\_]. [5]

"**Existing Related Party Loans**" means loans in existence on the Financial Information Record Date and disclosed in [the summary previously delivered by Huron Consulting Services, LLC on [\_\_\_], 2021], and any extensions of the maturity date thereof; <u>provided</u> that (i) the terms of such extended loans are on substantially the same terms (which, in the case of economic terms, shall be no less favorable to the Second Tier Obligor or Third Tier Obligor (as applicable) party thereto) as in effect on the Financial Information Record Date and (ii) the outstanding principal amount of such loans shall not exceed the aggregate principal amount of the such loans outstanding on the Financial Information Record Date plus any accrued and unpaid interest outstanding on such extension date plus any accrued and unpaid interest outstanding on such extension date.

"**Financial Information Record Date**" means [_____]. [6]

"**Group 4**" means the Payment Group identified as A-Side Payment Group 4 (excluding the A-Side General Obligors) on Exhibit A to the Settlement Agreement.

"**HoldCo Distribution Condition**" means a condition that is satisfied with respect to any transaction (including any Disposition) if, after giving effect to such transaction, the aggregate value of the assets of the Asset HoldCo on a pro forma basis after giving effect to such transaction (and after giving effect to any Liens with respect to such assets and any indebtedness of the Asset HoldCo) is not less than the lesser of (a) $[\_\_] and (b) the Remaining Amount.   Prior to entering into any transaction (including making any distribution) in reliance on the HoldCo Distribution Condition, the applicable Second Tier Obligor shall deliver to the Secured Party (i) a certification as to compliance with the HoldCo Distribution Condition and (ii) a written opinion by an Independent Financial Advisor stating the aggregate value of the assets of the Asset HoldCo on a pro forma basis after giving effect to such transaction or series of related transactions (and after giving effect to any Liens with respect to such assets and any indebtedness of the Asset HoldCo).

"**Indebtedness for Borrowed Money**" of any Person means, as of any date of determination, all of the following: (i) all indebtedness of such Person for borrowed money, (ii) all obligations of such Person evidenced by bonds, debentures, notes or other similar instruments, (iii) all obligations of such Person under finance or capital leases, (iv) all indebtedness of others with respect to obligations referred to in (i) to (iii) above, guaranteed in any manner, directly or indirectly, by such Person, (v) all indebtedness of others with respect to obligations referred to in (i) to (iv) above secured by a Lien on any asset owned by such Person (whether or not such indebtedness is assumed by, or is a personal obligation of, such Person); <u>provided</u> that the amount of such indebtedness will be the lesser of: (a) the fair market value of such asset at such date of determination, and (b) the amount of such indebtedness of such other Person; and (vi) all net reimbursement obligations of such Person with respect to letters of credit, foreign

---

[4] NTD:  Definition subject to further review and negotiation.

[5] NTD:  Subject to further review and negotiation.

[6] NTD:  To be the date as of which the MDT will have updated financial information for each of the Groups.

2
Annex [\_\_]

currency sale agreements and bankers' acceptances, except such as are obtained by such Person to secure performance of obligations (other than for borrowed money or similar obligations).

"**Independent Financial Advisor**" means (i) a financial advisor selected by a Second Tier Obligor or Asset HoldCo from the financial advisors listed on Schedule I attached hereto or (ii) solely to the extent the applicable Second Tier Obligor or Asset HoldCo is unable to engage any such independent financial advisor set forth in clause (i) of this definition, any other independent financial advisor reasonably acceptable to the MDT.

"**IRS**" means the United States Internal Revenue Service.

"**Listed Transaction**" means (x) a "listed transaction" identified as such by the Internal Revenue Service under Section 6707A(c)(2) of the Internal Revenue Code and Treasury Regulation Section 1.6011-4(b)(2) as of the date of this Agreement or (y) a "listed transaction" identified as such by the Internal Revenue Service under such provisions after the date of this Agreement substantially comparable to the type of promotor-marketed abusive tax shelter transactions that the IRS has been identifying as "listed transactions" as of the date of this Agreement, in each case unless the IRS has delisted the transaction.

"**Material Adverse Effect**" means, with respect to Group 4, a material adverse effect on (a) the business, assets or financial condition, in each case, of such Group under the Settlement Agreement, (b) the rights and remedies (taken as a whole) of the Secured Parties under the Settlement Agreement and the Security Documents (taken as a whole) relating to such Group, (c) the ability of such Group under the Settlement Agreement to satisfy its Obligations under the Settlement Agreement and the Security Documents or (d) the Collateral (taken as a whole).

"**Pledge Agreement**" means that certain New York law governed Pledge Agreement, dated as of [___], between the Pledgor and the MDT, as the Security Party thereunder in form and substance satisfactory to the parties thereto.

"**Pledgor**" means [the Second Tier Obligor (which shall be organized and/or administered in the United States) that holds 100% of the equity of Asset HoldCo.

"**Protected Information**" means (a) any document, information or other matter (i) that constitutes non-financial trade secrets or non-financial proprietary information, (ii) in respect of which disclosure is prohibited by Law or binding agreement, (iii) that is subject to attorney-client or similar privilege or constitutes attorney work product or (iv) in respect of which any Pledgor owes confidentiality obligations to any third party, (b) any counterparty information, including the names of counterparties and (c) any personal identifying information (including addresses, telephone numbers, government identification numbers or tax identification numbers) and any information protected by General Data Protection Regulation 2016/679 or comparable laws in the European Union, the United Kingdom or the United States.[7]

"**Related Parties**" [___][8]

---

[7] NTD:  Subject to further review and negotiation.

[8] NTD:  Subject to further review and negotiation.

#94743967v3

"**Remaining Amount**" means, with respect to Group 4, as of any date of determination, the remaining amount potentially owed under the Settlement Agreement (assuming the maximum amount that may be owed by such Group under the Settlement Agreement and Security Documents).

"**Restricted Payment**" [means any dividend or other distribution (whether in cash, securities or other property) with respect to any Equity Interest of any Person, or any payment (whether in cash, securities or other property), including any sinking fund or similar deposit, on account of the purchase, redemption, retirement, acquisition, cancellation or termination of any such Equity Interest, or on account of any return of capital to such Person's shareholders, partners or members (or the equivalent Persons thereof).][9]

"**Second Tier Obligors**" means the members of Group 4 identified as Second Tier Obligors on Schedule II attached to this Annex.

"**Secured Party**" means each of (i) the MDT and each of its successors and permitted assigns and (ii) any agent, trustee or other representative or designee (including one or more Subsidiaries or other entities of the MDT formed to carry out its duties and obligations under the Definitive Documents) authorized or appointed to hold any security interest in or Lien on, or take possession or control of, any Collateral on behalf of and for the benefit of itself and any person described in clause (i) above.

"**Security Documents**" means the Pledge Agreement and each of the other security agreements, pledge agreements and other instruments and documents (including any uncertificated securities account control agreement) and each of the supplements thereto, executed and delivered pursuant to this Annex or otherwise, in order to grant or purport to grant a Lien on any assets to secure the Obligations of Group 4 under the Settlement Agreement or under which rights or remedies with respect to such Lien are governed.

"**Third Tier Obligor**" means Mortimer D.A. Sackler.

"**UCC**" shall mean the Uniform Commercial Code or any successor provision thereof (or similar code or statute) as in effect from time to time in any applicable state or jurisdiction, to the extent it may be required to apply to any item or items of Collateral.

Section 1.03    **Interpretative Provisions**.  For the avoidance of doubt, the rules of construction set forth in Section 1.02 of the Settlement Agreement shall apply *mutatis mutandis* to this Annex.

Section 1.04    **Division**.  For all purposes under this Annex, in connection with any division or plan of division under Delaware Law or any comparable event under a different jurisdiction's Laws or, in the case of a trust, any division, appointment or other event under the terms of its governing instrument or otherwise causing property of a trust to be held in one or more trusts separate from the original trust, as applicable: (a) if any asset, right, obligation or liability of any Person becomes the asset, right, obligation or liability of a different Person, then it shall be deemed to have been transferred from the original Person to the subsequent Person, and (b) if any new Person comes into existence, such new person shall be deemed to have been organized on the first date of its existence by the holders of its Equity Interests or, in the case of a new trust, to have been formed on the first date of the acceptance in trust of any property thereof by any trustee thereof.

---

[9] NTD:  Subject to further review and negotiation.

4
Annex [___]

**Section 1.05    Valuation Methodology**.    It is understood and agreed that for purposes of preparing the quarterly and annual financial statements described in this Annex and calculating compliance with any covenant contained in this Annex (including with respect to the value of the initial Collateral as of the Settlement Effective Date and the HoldCo Distribution Condition), asset valuations shall be determined in all material respects in a manner that is reasonably consistent with the valuation methodologies used by Huron Consulting Services LLC to prepare the previous net asset reports delivered in the Chapter 11 Cases pursuant to the Amended and Restated Stipulation and in accordance with this Section 1.05.    Notwithstanding the foregoing, (i) all asset valuations (including with respect to the initial Collateral as of the Settlement Effective Date and the HoldCo Distribution Condition) shall exclude any contingent liabilities [(including tax liabilities and inchoate claims but, for the avoidance of doubt, guarantees of Indebtedness for Borrowed Money shall be counted in the determination of asset values) and, for the avoidance of doubt, any tax refunds of estimated taxes [arising as a result of a distribution from the Second Tier Obligor] that might be payable [to the Second Tier Obligor] but for an election under section 643(g) to treat such payment of estimated taxes as a payment of estimated taxes made by its beneficiary or beneficiaries], (ii) the Obligors may exclude any asset in their sole discretion when calculating compliance with the HoldCo Distribution Condition, (iii) with respect to the valuation of assets consisting of equity interests that are listed or quoted for trading on the New York Stock Exchange, the NYSE MKT, the NASDAQ Global Select Market, the NASDAQ Global Market, the NASDAQ Capital Market, OTC Bulletin Board or any other national securities exchange, the "Value" thereof shall be based on the arithmetic average of the closing price of a share of such equity interests for the ten (10) consecutive trading days on which shares of such equity interests traded immediately preceding the date of determination and (iv) all asset valuations shall exclude any Obligations under the Settlement Agreement.    In determining asset valuation as of any date of determination, other than in the case of cash, cash equivalents or other assets for which market quotations are readily available and may be determined on such date of determination, the Obligors shall use the asset valuation for the applicable assets as of the end of the most recently ended fiscal quarter for which financial statement are available as of such date of determination or, if no such quarterly valuation exists, then the most recent valuation used by the trustees of the Second Tier Obligors to maintain the Second Tier Obligor's books and records.[10]

## ARTICLE II.
## COLLATERAL MATTERS

**Section 2.01    Security; Security Documents**.

(a)    As credit support for, and to secure the prompt payment and performance of, the Obligations of Group 4 under the Settlement Agreement, the Pledgor shall, on or before the Settlement Effective Date, grant a perfected first priority security interest in and Lien on all of its right, title and interest in the Collateral in favor of and for the benefit of the Secured Party.

(b)    Without limiting the generality of clause (a) of this Section 2.01, on the Settlement Effective Date, the Secured Party shall have a perfected first priority security interest and Lien on 100% of the Equity Interests of the Asset HoldCo, which Asset HoldCo shall have and own assets with a fair market value equal to or greater than $[_____].[11]

(c)    Subject to the rights of the Secured Party under Sections 4.01 and 4.02, the security interests and Liens created in respect of the Collateral shall be created under the laws of the State of New York by execution by the Pledgor of the Pledge Agreement and shall be perfected (i) by the filing of a

---

[10] NTD:  Subject to further review and negotiation.

[11] NTD:  Subject to further review and negotiation.

#94743967v3

UCC financing statement in [the jurisdiction of organization of the Pledgor] and (ii) by the delivery to the Secured Party of certificates or other instruments (if any) representing the Equity Interests of the Asset HoldCo), together with stock transfer powers or other instruments of transfer (if any) with respect thereto endorsed in blank and (iii) in the case Equity Interests in the form of uncertificated securities under Article 8 of the UCC, by the execution of an uncertificated securities account control agreement.

(d)     The Pledgor shall promptly and duly take, execute, acknowledge and deliver (and shall cause the Asset HoldCo to cause to be promptly and duly taken, executed, acknowledged and delivered) such further acts, documents and assurances as may from time to time be necessary or as the Secured Party may from time to time reasonably request in order to carry out the intent and purposes of the Security Documents and this Annex, including, without limitation, such actions necessary to establish, create, preserve, protect, perfect, and maintain perfection and priority of a first priority security interest in and Lien on the Collateral in favor of and for the benefit of the Secured Party (including after-acquired Collateral), in each case in a manner consistent with this Annex (including Section 2.01(c) hereof) and to enable the Secured Party to exercise any and all remedies in respect thereof.

**Section 2.02    Tax Matters**.  Before the Settlement Effective Date, each Second Tier Obligor shall provide (and shall cause each Asset HoldCo owned by such Second Tier Obligor to provide) a duly completed and executed IRS Form W-9 or Form W-8 (or any successor forms), as applicable, to the Secured Party and shall provide an updated IRS Form W-9 or Form W-8 within thirty (30) days if any certification on a previously-provided IRS Form W-9 or Form W-8 becomes incorrect or as otherwise required under applicable Law, and from time to time upon the reasonable request of the Secured Party. Each Second Tier Obligor shall provide (and shall cause each Asset HoldCo owned by such Second Tier Obligor to provide) any other tax forms or certifications that the Secured Party may reasonably request and which it is lawfully able to provide to permit the Secured Party to comply with any tax withholding or reporting requirements prescribed by applicable Law.[12]

**Section 2.03    New Pledgor; Additional Collateral**.[13]

(a)     Upon the acquisition of any Equity Interests of the Asset HoldCo by any Person or upon the occurrence of any other event that requires any Person to grant a security interest in and Lien on such Equity Interests pursuant to this Annex or any Security Document, (x) the applicable Second Tier Obligor party to such transaction shall deliver notice to the MDT and (y) within thirty (30) days of such acquisition, creation or event (or such longer period as may be agreed to in writing by the MDT), such Second Tier Obligor shall (and shall cause the new pledgor to) (I) execute and deliver to the MDT such amendments or supplements to the relevant Security Documents as required thereby or such other documents or agreements required by this Annex or any Security Agreement to grant to the Secured Party a security interest in and a Lien on such Equity Interests and (II) take all actions to cause such security interest and Lien to be duly perfected as required by and in accordance with the Security Documents and this Annex.

(b)     Upon the acquisition of additional Equity Interests of the Asset HoldCo by the Pledgor that are not automatically secured and perfected pursuant to the Security Documents (including filed UCC financing statements), (x) the applicable Second Tier Obligor shall deliver notice to the MDT and (y) within thirty (30) days of such acquisition, the applicable Second Tier Obligor shall (I) execute and deliver to the MDT such amendments or supplements to the relevant Security Documents as required thereby or such other documents or agreements required by this Annex to grant to the Secured Party a

---

[12] NTD:  Section subject to further review and negotiation.

[13] NTD:  Subject to further review and negotiation.

#94743967v3

security interest in and a Lien on such Equity Interests and (II) take such other actions to cause such security interest and Lien to be duly perfected as required by and in accordance with the Security Documents and this Annex (including, for the avoidance of doubt, delivery of any certificated securities or uncertificated securities control agreements, if applicable, as described in Section 2.01(c)).

## ARTICLE III.
## SECOND TIER OBLIGOR AFFIRMATIVE COVENANTS

Each Second Tier Obligor warrants, covenants and agrees with the MDT (subject to the last paragraph of Article IV) that such Second Tier Obligor shall, and shall cause the Asset HoldCo to:

**Section 3.01**    **Financial Statements, Reports**.

(a)    Furnish to the MDT, within [___] days following the end of each six-month period, commencing with the sixth-month period ending [___], (i) unaudited balance sheets of such Second Tier Obligor in a form consistent with reporting prepared in the ordinary course of trust administration by or on behalf of the trustees for such Group (with omission and/or redaction of any Protected Information; (ii) a compliance certificate stating that such Second Tier Obligor is in compliance with the covenants applicable to such Second Tier Obligor and (iii) statements and other reporting with respect to the fair market value of the Collateral that was received from third parties by such Second Tier Obligor and/or the Asset HoldCo during such period, as applicable, and consistent with past practice (with omission and/or redaction of any confidential information);

(b)    Furnish to the MDT, together with the compliance certificate delivered under Section 3.01(a)(ii) above relating to the period including December 31 of any calendar year, a certification that the Secured Party's security interests in and Liens on the Collateral remain perfected in accordance with the Security Documents as of a date not more than thirty one (31) days prior to the date of such certificate;

(c)    Furnish to the MDT prompt written notice of any change, event, effect or occurrence that would reasonably be expected to have a material adverse effect on the creation, preservation, perfection, priority or maintenance of the perfection (or validity) of the security interest granted over the Collateral, the financial condition of any Second Tier Obligor within Group 4 or the ability of the MDT or any other Secured Party to exercise and enforce its rights under the Security Documents with respect to such obligor, but in any event within thirty (30) days thereof (and within twenty (20) days before perfection lapses), which notice shall describe such change, event, effect or occurrence and reasonably detail the expected material adverse effect; and

(d)    Furnish to the MDT, in the event of any change in the Pledgor's or the Asset HoldCo's (A) trustee(s) or the legal or organization name, (B) location of its chief executive office or principal place of business or administration [(or, if applicable to perfection by filing, in the location of the chief executive office, principal place of business or residence of any trustee of the Pledgor)], (C) organizational type, (D) federal taxpayer identification number or organizational identification number, if any, or (E) jurisdiction of organization (or in the case of a trust, administration or governing law) (in each case, including by merging with or into any other entity, reorganizing, dissolving, dividing into two or more trusts, "decanting" in further trust by reason of the exercise of any power of appointment (held in a fiduciary capacity or otherwise), liquidating, reorganizing or organizing in any other jurisdiction), the applicable Second Tier Obligor shall (x) deliver prompt written notice of such change (and in any event, at least ten (10) days prior to the occurrence) and (y) take all actions necessary to maintain (without lapse or change in priority) the validity, perfection and priority of the security interests provided for in the

7
Annex [___]

Security Documents and reimburse the Secured Party for any reasonable, documented, out-of-pocket costs and expenses incurred by it in connection therewith.

(e)     Make the appropriate subject matter experts available for consultation in connection with information provided under the above information covenants; provided that the MDT will not request consultation more than one (1) time within any 12-month period.

**Section 3.02    Preservation of Existence.**  (a) Preserve, renew and maintain its jurisdiction of administration and governing law jurisdiction as set forth on [Exhibit [●] to the Settlement Agreement] (as updated from time to time subject to Section 3.01(d) above and the other provisions of this Annex A) and (b) in the case of the Asset HoldCo and trustees that are not natural persons of each Second Tier Obligor, preserve, renew and maintain in full force and effect its legal existence and good standing under the laws of the jurisdiction of its organization.

**Section 3.03    Compliance with Laws**.  Comply with the requirements of all applicable Laws and all orders, writs, injunctions and decrees of any Governmental Authority applicable to it or the trust property and administration thereof (or, to the extent applicable, the business of the trust company) except to the extent non-compliance could not reasonably be expected to have a Material Adverse Effect.

**Section 3.04    Books and Records**.  Maintain proper books of record and account in a manner consistent with past practice in all material respects.

**Section 3.05    Tax Payments**. [ Pay and discharge promptly all Taxes before the same shall become delinquent or in default, provided that such payment and discharge shall not be required with respect to (a) Taxes being contested in good faith by appropriate proceedings as long as any such contested Taxes determined to be due shall be paid no later than 60 days following the date on which such determination (within the meaning of Section 1313(a) of the Internal Revenue Code for US federal income taxes and by analogy for other Taxes) becomes final and non-appealable or (b) Taxes the non-payment of which, individually or in the aggregate, could not reasonably be expected to have a Material Adverse Effect.

**Section 3.06    Tax Returns.**  Timely (after taking into account any applicable extensions) file all material IRS Forms 8886 (or any successor forms) and any analogous tax forms for U.S. state income tax purposes, in each case that are required by Law to be filed with respect to any transaction to which it is a party that it knew, or reasonably should have known, is a "listed transaction" identified as such by the Internal Revenue Service under Section 6707A(c)(2) of the Internal Revenue Code and Treasury Regulation Section 1.6011-4(b)(2) (other than any such transaction described in Section 4.07(ii)) in a manner that is true, accurate and complete in all material respects.][14]

**Section 3.07    Confession of Judgment**.  In respect of each Second Tier Obligor, execute a confession of judgment in form and substance reasonably satisfactory to the MDT (the "**Confession of Judgment**") with respect to the Obligations of such Second Tier Obligor under the Settlement Agreement (assuming the maximum amount that may be owed by the Group under the Settlement Agreement and Security Documents), together with all supplements (or, if so required, new confessions of judgment consistent in scope to the original Confessions of Judgment) that are necessary to maintain the effectiveness and validity of any such Confession of Judgment.

---

[14] NTD: Sections subject to further review and negotiation.

#94743967v3

## ARTICLE IV.
## SECOND TIER OBLIGOR NEGATIVE COVENANTS

Each Second Tier Obligor warrants, covenants and agrees with the MDT (subject to the last paragraph of Article IV) that no such Second Tier Obligor shall, nor shall it cause or permit the Asset HoldCo owned by the applicable Second Tier Obligor to:

**Section 4.01**    **Limitations on Transfers**.

(a)    In the case of each Second Tier Obligor, Dispose of assets or properties to any Person unless such Disposition (i) is to another member of Group 4, (ii) is for reasonably equivalent value [(taking into account any differences in the built-in gain (as determined for U.S. federal income tax purposes) associated with the assets or properties disposed of, and any assets or properties received in such Disposition)] or (iii) is a Distribution permitted by Section 4.02; provided that (A) with respect to any transaction or series of related transactions relying on clause (ii) above and involving aggregate consideration in excess of $[___], such Second Tier Obligor delivers to the MDT a written opinion by an Independent Financial Advisor stating that such transaction or series of related transactions complies with this Section 4.01(a) and (B) any Disposition of the Equity Interests of the Asset HoldCo permitted under this Section 4.01(a) shall require entry into security and perfection arrangements reasonably acceptable to the Secured Party (and, in the case of proceeds consisting of Equity Interests, consistent with Section 2.01) to continue the first priority perfected security interest in and Lien on (x) the proceeds thereof (including any Equity Interests acquired in connection therewith) (in each case without lapse or change in priority) or (y) the Equity Interest of the Asset HoldCo in the case of a Disposition to another member of Group 4 to the extent such Disposition was not for reasonably equivalent value.

(b)    In the case of the Asset HoldCo, Dispose of or make payment or distribution of assets to any Person (whether to a member of Group 4 or otherwise) unless (i) such transaction or series of related transactions is for reasonably equivalent value (which, for the avoidance of doubt, shall not include payments under the Settlement Agreement) [(taking into account any differences in the built-in gain (as determined for U.S. federal income tax purposes) associated with the assets or properties disposed of, as of immediately prior to such Disposition, and any assets or properties received in such Disposition)]; provided that with respect to any transaction or series of related transactions involving aggregate consideration in excess of $[_____], the applicable Second Tier Obligor delivers to the MDT a written opinion, in form and substance reasonably satisfactory to the MDT, by an Independent Financial Advisor stating that such transaction or series of related transactions complies with this Section 4.01(b); provided, further, that with respect to any exchange of assets among the Asset HoldCo and a Second Tier Obligor or the Third Tier Obligor (or any [Related Party]), the assets received by the Asset HoldCo must be of at least substantially equivalent liquidity to the assets exchanged by the Asset HoldCo; (ii) the HoldCo Distribution Condition shall be satisfied after giving pro forma effect to such transaction or series of related transactions; [(iii) cash distributions by the Asset HoldCo to the Pledgor (A) to pay Taxes attributable to the income or assets of the Asset HoldCo and (B) to pay expenses of (or attributable to the ownership of ) the Asset HoldCo and its operations] or (iv) such transaction or series of related transactions does not involve consideration in excess of $[___].

**Section 4.02**    **Limitations on Distributions**.  In the case of each Second Tier Obligor, make any Distributions or other payments to, or for the use of, any Person (including any beneficiaries of Second Tier Obligors that are Trusts) that are not members of Group 4; provided that (i) the Second Tier Obligors and any beneficiaries shall be permitted to use (other than for Dispositions) residential real estate, art and collectibles and other property, in each case, in the ordinary course and solely to the extent such use does not deplete the value of such property (ordinary wear and tear excepted) (but, for the

#94743967v3

avoidance of doubt, excluding cash, cash equivalents, securities and other financial assets) and (ii) any Distribution or other payment of the Equity Interests of the Asset HoldCo to another Person within Group 4 permitted under this Section 4.02 shall require entry into security and perfection arrangements reasonably acceptable to the Secured Party (and, in the case of proceeds consisting of Equity Interests, consistent with Section 2.01 to continue the first priority perfected security interest in and Lien on (A) the proceeds thereof (including any Equity Interests acquired in connection therewith) (in each case without lapse or change in priority) and (B) the Equity Interest of the Asset HoldCo in the case of a Restricted Payment or other payment of such Equity Interests to another Person within Group 4 to the extent such Distribution was not for reasonably equivalent value.

Section 4.03    **Related Party Transactions**.    Enter into any transaction or series of related transactions with any [Related Party], except for (a) in the case of Second Tier Obligors, transactions with other members of Group 4, (b) Existing Related Party Loans, (c) Dispositions permitted by Section 4.01, (d) Distributions permitted by Section 4.02, (e) the Settlement Agreement (including this Annex) or the Security Documents and the transactions required [or permitted] thereunder, (f) any transaction or series of related transactions on terms no less favorable to such Second Tier Obligor or the Asset HoldCo than those that would have been obtained in a comparable transaction on an arm's-length basis with a Person other than a Related Party and (f) solely in the case of the Asset HoldCo, any transaction or series of related transactions if, after giving pro forma effect thereto, the HoldCo Distribution Condition shall be satisfied; provided that with respect to any transaction or series of related transactions entered into in reliance on clause (e) of this Section 4.03 involving aggregate consideration in excess of $[___], such Second Tier Obligor or the Asset HoldCo shall deliver to the MDT a written opinion by an Independent Financial Advisor stating that such transaction or series of related transactions complies with this Section 4.03; provided, further, that any beneficiaries shall be permitted to use (other than for Dispositions) residential real estate, art and collectibles and other property, in each case, in the ordinary course and solely to the extent such use does not deplete the value of such property (ordinary wear and tear excepted (but, for the avoidance of doubt, excluding cash, cash equivalents, securities and other financial assets).

Section 4.04    **Indebtedness and Liens**.    Other than Indebtedness for Borrowed Money or Liens, in each case, in existence on the Financial Information Record Date and disclosed in [the summary previously delivered by Huron Consulting Services, LLC on [___], 2021) (or extensions, renewals or refinancings thereof, in each case to the extent that the aggregate principal amount of such Indebtedness for Borrowed Money or other amount secured does not increase to an amount in excess of the amount disclosed or outstanding as of such date plus any accrued interest, premium or fees), incur, create, assume or permit or cause to exist, directly or indirectly, any Indebtedness for Borrowed Money, or incur, create, assume or grant or cause or (in the case of any consolidations, mergers or divisions otherwise permitted hereunder) suffer to exist, any Lien on any of its property or assets, except for:

(a)    Liens created by the Security Documents (it being understood that (x) the payment Obligations arising out of the Settlement Agreement and Security Documents do not constitute Indebtedness for Borrowed Money  for purposes of this covenant and (y) the Security Documents shall not permit any Liens to secure Indebtedness for Borrowed Money);

(b)    Indebtedness for Borrowed Money and Liens incurred for the purpose of investments of such party to the extent incurred in the ordinary course of business and consistent with past practices;

(c)    Indebtedness for Borrowed Money that constitutes purchase money indebtedness (and Liens securing such purchase money indebtedness) incurred in connection with the acquisition of assets (including real estate) so long as (x) any such Liens are limited solely to the assets being acquired and proceeds thereof and (y) such assets being acquired are acquired and remain owned by the Second Tier Obligor or Asset HoldCo incurring such purchase money indebtedness;

(d)        In the case of the Asset HoldCo, any Indebtedness for Borrowed Money or Liens if, after giving pro forma effect to the incurrence of such Indebtedness for Borrowed Money or Liens, the HoldCo Distribution Condition shall be satisfied;

(e)        Indebtedness for Borrowed Money consisting of Existing Related Party Loans;

(f)        Liens for Taxes that are not yet delinquent or that are being contested in good faith in accordance with Section 3.05(a) or the non-payment of which, individually or in the aggregate, could not reasonably be expected to have a Material Adverse Effect;

(g)        Carrier's, warehousemen's, mechanics', landlords', materialmen's, repairmen's or other Liens arising by operation of law in the ordinary course of business;

(h)        Easements, rights-of-way, building, zoning and similar restrictions, utility agreements, covenants, reservations, restrictions, encroachments, charges, and other similar encumbrances or title defects incurred, or leases or subleases granted by or to others, in the ordinary course of business, which do not in the aggregate materially interfere with the ordinary use of property;

(i)        Liens over deposit, securities, brokerage or similar accounts securing obligations (other than Indebtedness for Borrowed Money) to the relevant bank or intermediary incurred in the ordinary course of business;

(j)        Other Indebtedness for Borrowed Money in an amount not exceeding $[___] outstanding in the aggregate at any time; and

(k)        Liens securing obligations not exceeding $[___] outstanding in the aggregate at any one time.

**Section 4.05    Other Transactions**.  Enter into any transaction or series of related transactions or agreement that would materially restrict or impair its ability to Dispose of or otherwise liquidate a material portion of its assets and properties (except (a) as required under the Settlement Agreement and the Security Documents and (b) transfer or assignment restrictions under or in respect of investments or contracts [(including for indebtedness permitted by Section 4.04)]) in each case entered into in the ordinary course of business).

**Section 4.06    Mergers and Consolidations**.  Consolidate, merge, amalgamate or divid, or Dispose of all or substantially all of its assets, taken as a whole, in any one transaction or series of transactions, to any other Person unless (i) the resulting, surviving or transferee Person (the "**successor**") of any Second Tier Obligor is either a Second Tier Obligor or expressly assumes by separate agreement satisfactory to the MDT all of such Second Tier Obligor's Obligations as a Second Tier Obligor under the Settlement Agreement and the Security Documents, (ii) such consolidation, merger, amalgamation, division or Disposition shall not have the effect of rendering any Liens of the Secured Party on the Collateral invalid, unenforceable or unperfected; (iii) the successor takes any and all steps as are necessary to maintain the Secured Party's perfected first priority security interest in the Collateral (without lapse or change in priority); and (iv) the applicable trust/trustee or entity delivers to the MDT opinions of counsel, in form and substance reasonably acceptable to the MDT, stating that any consolidation, merger, amalgamation, division or Disposition referred to in this covenant complies with the provisions of this covenant and that all conditions precedent provided herein relating to such transactions have been complied with.

11
Annex [___]

**Section 4.07**    **Listed Transactions**.  Be a party to any transaction that it knew, or reasonably should have known, is a Listed Transaction as of the time it entered into a binding commitment to enter into the transaction; provided that, for purposes of this covenant, (i) the Plan and Settlement Agreement and the payments and transactions contemplated thereby shall not be taken into account and (ii) no Payment Party shall be treated as a party to a Listed Transaction that is entered into by any collective investment vehicle or other entity if (A) such entity is managed by a professional investment advisor that is unaffiliated with the Payment Party (or any of its Related Parties) and (B) the Payment Party (together with any of its Related Parties) does not have dominion and control over the entity's investment decisions. [15]

**Section 4.08**    **Amendments or Waivers of Organizational Documents**.    Agree to or otherwise give effect to any amendment, restatement, supplement or other modification to, or waiver of, any Second Tier Obligor's or the Asset HoldCo's organizational documents (including trust documentation) after the Settlement Effective Date, in each case, to the extent the same would reasonably be expected to be adverse in any manner to the MDT (including, without limitation, with respect to the perfection and/or priority of any Secured Party's security interest in the Collateral) or the ability of such Second Tier Obligor or the Asset HoldCo to perform its Obligations under the Settlement Agreement and Security Documents and otherwise pay the applicable Outstanding Settlement Amount, in each case without obtaining the prior consent of the MDT to such amendment, restatement, supplement or other modification or waiver; provided that any such amendment, restatement, supplement or modification shall maintain the Secured Party's perfected first priority security interest  in the Collateral (without lapse or change in priority).

**Section 4.09**    **Business Activities**.  In the case of the Asset HoldCo, engage in any business activities other than holding and dealing in its assets and investments consistent with past practice.

**Section 4.10**    **Change in Trustees**.  In the case of Second Tier Obligors that are Trusts:

(a)    Cause or suffer to exist any change in the trusteeship without the prior written consent of MDT; and

(b)    Recognize the appointment of (including without limitation by granting control over any trust asset to) any additional or replacement trustee, unless and until such additional or replacement trustee (x) becomes a party to the Settlement Agreement and the Security Documents (as applicable) in its capacity as such trustee and thereby confirms and agrees that such trustee is bound by the terms and provisions of the Settlement Agreement and the Security Documents (as applicable) and (y) such additional or replacement trustee is approved by the Jersey Court and (z) all steps that are necessary to maintain the perfected first priority security interest of the Secured Party in the Collateral (without lapse or change in priority) shall have been taken.

Notwithstanding anything to the contrary in this Annex, (x) the Second Tier Obligors and the Asset HoldCo shall be permitted to pay the reasonable expenses (including Taxes on income from and gains on assets) in connection with their operation and their compliance with the Settlement Agreement and Security Documents and related matters (and the Asset HoldCo may make distributions to the Pledgor to pay such amounts) and (y) each Second Tier Obligor and the Asset HoldCo shall be permitted to continue to pursue investment strategies and use investment techniques generally consistent with past practice (or industry standard practice) to the extent such strategies and investment techniques are not inconsistent with the limitations set forth in Sections 4.01, 4.03, 4.04, and 4.06 above.

---

[15] NTD:  Subject to further review and negotiation.

#94743967v3

## ARTICLE V.
## THIRD TIER OBLIGOR COVENANTS

**Section 5.01    Confession of Judgment**.  The Third Tier Obligor shall execute a confession of judgment with respect to its Obligations under the Settlement Agreement (assuming the maximum amount that may be owed by Group 4 under the Settlement Agreement and Security Documents), together with all supplements (or, if so required, new confessions of judgment consistent in scope to the Confessions of Judgment) that are necessary to maintain the effectiveness and validity of any such Confession of Judgment.

**Section 5.02    Third Tier Obligor Negative Covenants**.  The Third Tier Obligor warrants, covenants and agrees with the MDT that, so long as the Settlement Agreement remains in effect, it shall not:

(a)    Other Transactions. Enter into any transaction or series of related transactions or agreement that would materially restrict or impair its ability to Dispose of or otherwise liquidate a material portion of its assets and properties (except (a) as required under the Settlement Agreement and the Security Documents and (b) transfer or assignment restrictions under or in respect of investments or contracts entered into in the ordinary course of business).

(b)    Limitations on Transfers. Dispose of any assets to any other Person unless such Disposition is for reasonably equivalent value, as applicable; provided that that with respect to any transaction or series of related transaction involving aggregate consideration in excess of $5,000,000, the Third Tier Obligor delivers to the MDT a written opinion by an Independent Financial Advisor stating that such transaction or series of related transactions complies with this covenant; provided, further, that this clause (b) shall not apply to (x) transfers of assets, in an amount not exceeding $[____] per calendar year or (y) Dispositions of assets in an aggregate amount during the term of the Settlement Agreement not exceeding, in the aggregate, $[____].

**Section 5.03    Third Tier Obligor Reporting**.  Within thirty (30) days after the end of each fiscal year, the Third Tier Obligor shall provide to the MDT an annual compliance certificate stating that the Third Tier Obligor is in compliance with the covenants applicable to it.

## ARTICLE VI.
## ADDITIONAL CONDITIONS PRECEDENT

**Section 6.01    Additional Conditions Precedent to Settlement Effective Date**.  In addition to the conditions set forth in Section 10.01 of the Settlement Agreement, the occurrence of the Settlement Effective Date shall be subject to the satisfaction (or waiver by the Parties) of the following conditions:

(a)    The MDT (or its counsel) shall have received a duly executed copy of the Pledge Agreement;

(b)    The MDT (or its counsel) shall have received a UCC-1 financing statement in a form prepared for filing in the jurisdiction of organization of the Pledgor and otherwise in form and substance reasonably satisfactory to the MDT (or its counsel);

(c)    [All Equity Interests of the Asset HoldCo shall have been pledged pursuant to the Security Documents and the MDT (or its counsel) shall have received all certificates or instruments, if

any, representing such Equity Interests pledged under the Security Documents, accompanied stock transfer powers or other instruments of transfer (if any) with respect thereto endorsed in blank;][16]

     (d)     The MDT (or its counsel) shall have received the Confession of Judgment.

## ARTICLE VII.
## ENFORCEMENT EVENTS; REMEDIES

**Section 7.01    Occurrence of an Enforcement Event; Priority of Payments**.  Upon the occurrence, and during the continuance of, an Enforcement Event with respect to Group 4, the Secured Party shall have the right to foreclose on the Collateral, liquidate, or direct the liquidation of the Collateral in accordance with the Security Documents and otherwise exercise all rights and remedies against the Collateral as provided in (and subject to) the Settlement Agreement and the Security Documents or under applicable Law, and in each case shall apply the proceeds thereof to pay (a) first, any costs or expenses incurred by the MDT or any other Secured Party to enforce the Settlement Agreement, the Security Documents or otherwise incurred in connection with the exercise of remedies, in each case, solely with respect to Group 4, (B) second, any accrued and unpaid interest, late payment fees, other fees and all other payment Obligations (other than the Outstanding Settlement Amount) due to the MDT under the Settlement Agreement and the Security Documents solely on account of the Obligations of Group 4 and (C) third, the Outstanding Settlement Amount of Group 4 then outstanding under the Settlement Agreement, with any excess proceeds being retained by the relevant obligor.

**Section 7.02    Death of a Third Tier Obligor**.  In the event of the death of the Third Tier Obligor while the Obligations of Group 4 to the MDT under the Settlement Agreement are greater than zero (assuming, for such purposes, the maximum amount that may be owed by the Group under the Settlement Agreement and Security Documents), the payment Obligations of such obligor under the Settlement Agreement and the Security Documents shall remain obligations of the estate of the Third Tier Obligor, and transfers of assets from the estate of such obligor shall be restricted unless and until the Outstanding Settlement Amount and all other payment Obligations of Group 4 are reduced to zero (assuming, for such purposes, the maximum amount that may be owed by the Group under the Settlement Agreement and Security Documents after giving effect to the terms of Article II of the Settlement Agreement); underlined provided that any such transfer or transfers shall be permitted if the Holdco Distribution Condition is satisfied at the time of such transfer or transfers.

## ARTICLE VIII.
## MISCELLANEOUS

**Section 8.01    Termination**.  The Obligations described in this Annex shall terminate, and all security interests granted under the Security Documents shall be automatically released and all other requirements described in this Annex shall be extinguished, with respect to Group 4 on the date on which the Outstanding Settlement Amount and all other payment Obligations of Group 4 under the Settlement Agreement are paid in full in cash and reduced to $0 (assuming, for such purposes, the maximum amount that may be owed by Group 4 under the Agreement and Security Documents); provided that such Obligations, and all security interests in connection therewith, shall be automatically reinstated if and to the extent that, for any reason, the MDT is required to disgorge, turn over, or otherwise pay any amount

---

[16] NTD:  Subject to further review and negotiation.

paid to the MDT by or on behalf of Group 4, whether as a result of any proceeding in bankruptcy or reorganization or otherwise.

**<u>Schedule I</u>**

**Independent Financial Advisors**

Draft 7/7/2021 – FILING VERSION

**<u>Schedule II</u>**

**Second Tier Obligors**

1
Schedule [___]

**<u>Annex D</u>**
**Credit Support Annex for B-Side Payment Group 1**

**Draft 7/7/2021 – Filing Version**

## ANNEX D[1]
## B-SIDE PAYMENT GROUP 1

### ARTICLE I.
### DEFINITIONS

**Section 1.01    Settlement Agreement**.  Capitalized terms used herein and not defined herein have the meanings ascribed to such terms in the Settlement Agreement to which this Annex [___] is attached.

**Section 1.02    Defined Terms**.  As used in this Credit Support Annex, the following terms shall have the meanings specified below:

"**Advanced Contribution Top-Off**" means, as of any date of determination, an amount equal to the lesser of:

(i)       an amount equal to (A) the aggregate amount distributed or paid pursuant to Section 4.01(a)(iv)(A) and Section 4.01(b) prior to such date minus (B) the aggregate amount of Advanced Contribution Top-Offs made prior to such date pursuant to Section 2.02 (in each case, without duplication); and

(ii)      the amount required to increase the Value of the Collateral to an amount equal to the lesser of (x) $500,000,000 and (y) the Outstanding Settlement Amount of the Applicable Payment Group as of such date.

"**Applicable Federal Rate**" means, with respect to any month, the applicable federal rate published by the IRS for such month.

"**Applicable Payment Group**" means [*the Jonathan Sackler family Payment Group under the Settlement Agreement*]/[*the Richard Sackler family Payment Group under the Settlement Agreement*].

"**Asset Coverage Ratio**" means, as of any date of determination, the ratio of (A) the Value of the assets of the Trust Pledgors (excluding the value of any Equity Interests in IACs owned directly or indirectly by the Trust Pledgors) as of such date of determination to (B) the Outstanding Settlement Amount of the Applicable Payment Group as of such date of determination.

"**Asset Management Agreement**" means any asset management agreement entered into from time to time between or among the Holding Company Pledgors, on the one hand, and the Asset Manager, on the other hand, with respect to the management of the assets and investments of the Holding Company Pledgors, including the agreements existing as of the Settlement Effective Date specified in Exhibit G.

---

[1] This Annex D to the Shareholder Settlement Agreement is in draft form and remains subject to continuing review and negotiation among the Debtors and interested parties with respect thereto, has not yet been agreed to by any party and remains subject to material change.  The Debtors reserve the right, subject to the terms and conditions set forth in the Plan, to alter, amend, modify or supplement the Shareholder Settlement Agreement at any time before the Effective Date of the Plan, or any such other date as may be provided for by the Plan or by order of the Bankruptcy Court; *provided* that, if the Shareholder Settlement Agreement is altered, amended, modified, or supplemented in any material respect prior to the hearing to confirm the Plan, the Debtors will file a redline of such document with the Bankruptcy Court.

"**Asset Manager**" means [*Kokino*]/[*Summer Road*] and any replacement asset manager.

"**Business Day**" means any day excluding Saturday, Sunday and any day which is a legal holiday under the laws of the State of New York or the State of Wyoming or is a day on which banking institutions located in any such state are authorized or required by law or other governmental action to close.

"**Collateral**" means the "Collateral" as defined in Section 2.01(a).  In no event shall the Collateral include Excluded Property.

"**Collateral Coverage Ratio**" means, as of any date of determination, the ratio of (A) the Value of the Collateral as of such date of determination to (B) the Outstanding Settlement Amount of the Applicable Payment Group as of such date of determination.

"**Credit Support Annex**" means this Annex [__] to the Settlement Agreement.

"**Disposition**" shall mean, with respect to any property or asset, any conveyance, sale, lease, sublease, license, assignment, transfer or other disposition (including by way of merger or consolidation and including any sale and leaseback transaction) of such property or asset, including by means of a merger, consolidation, division  or similar transaction, and the terms "**Dispose**," "**Disposed**" and "**Disposing**" shall have meanings correlative thereto.

"**Enforcement Event**" means the occurrence of a Specified Breach by the Applicable Payment Group permitting the Secured Party to exercise the Payment Remedy under the Settlement Agreement with respect to such Applicable Payment Group.

"**First Priority**" means, with respect to any Lien purported to be created in any Collateral pursuant to any Security Document, that such Lien is prior in lien priority to any other Lien thereon other than Permitted Encumbrances applicable to such Collateral which as a matter of law have priority over the respective Liens on such Collateral created pursuant to the relevant Security Document.

"**Hedging Agreement**" means (i) any and all rate swap transactions, basis swaps, credit derivative transactions, forward rate transactions, commodity swaps, commodity options, forward commodity contracts, equity or equity index swaps or options, bond or bond price or bond index swaps or options or forward bond or forward bond price or forward bond index transactions, interest rate options, forward foreign exchange transactions, currency swap transactions, cross-currency rate swap transactions, currency options, cap transactions, floor transactions, collar transactions, spot contracts, or any other similar transactions or any combination of any of the foregoing (including any options or warrants to enter into any of the foregoing), whether or not any such transaction is governed by, or otherwise subject to, any master agreement or any netting agreement, and (ii) any and all transactions or arrangements of any kind, and the related confirmations, which are subject to the terms and conditions of, or governed by, any form of master agreement (or similar documentation) published from time to time by the International Swaps and Derivatives Association, Inc., any International Foreign Exchange Master Agreement, or any other master agreement (any such agreement or documentation, together with any related schedules, a "**Master Agreement**"), including any such obligations or liabilities under any Master Agreement

"**Holding Company Pledgors**" means, collectively, [(i) [*2A Trust Holding Company LLC*] and (ii) [*AJ Holding Company LLC*]][2] / [(i) [*1A Trust Holding Company LLC*] and (ii) [*AR Holding Company LLC*]][3].

"**Increased Built-in Gain**" means, with respect to any Permitted Exchange, an amount equal to the sum of the positive difference, if any, between (i) the Value of an asset received in such Permitted Exchange minus the Investment Holding Vehicle's basis in such asset for U.S. federal income tax purposes and (ii) the Value of the original asset minus the Investment Holding Vehicle's basis in the original asset for U.S. federal income tax purposes.

"**Incurrence Tests**" means, collectively, the Lock Box Distribution Incurrence Test and the Trust Distribution Incurrence Test.

"**Indebtedness for Borrowed Money**" of any Person means, as of any date of determination, all of the following: (i) all indebtedness of such Person for borrowed money, (ii) all obligations of such Person evidenced by bonds, debentures, notes or other similar instruments, (iii) all obligations of such Person under finance or capital leases, (iv) all net reimbursement obligations of such Person with respect to letters of credit, foreign currency sale agreements and bankers' acceptances, except such as are obtained by such Person to secure performance of obligations (other than for borrowed money or similar obligations), (v) all indebtedness of others with respect to obligations referred to in (i) to (iv) above, guaranteed in any manner, directly or indirectly, by such Person, and (vi) all indebtedness of others with respect to obligations referred to in (i) to (v) above are secured by a Lien on any asset owned by such Person (whether or not such indebtedness is assumed by, or is a personal obligation of, such Person); provided that the amount of such indebtedness will be the lesser of: (a) the fair market value of such asset at such date of determination, and (b) the amount of such indebtedness of such other Person.  It is understood and agreed that payment Obligations of any Person under the Settlement Agreement shall not constitute Indebtedness for Borrowed Money.

"**Independent Financial Advisor**" means (i) a financial advisor selected by the Pledgors from the financial advisors listed on Exhibit B attached hereto or (ii) solely to the extent the applicable Pledgor is unable to engage any such independent financial advisor set forth in clause (i) of this definition, any other independent financial advisor reasonably acceptable to the MDT.

"**Investment Holding Vehicles**" means each direct, wholly-owned, holding company Subsidiary of each Holding Company Pledgor as of the Settlement Effective Date and identified as such in the Pledge Agreement and each other direct, wholly-owned Subsidiary formed or acquired by a Holding Company Pledgor after the Settlement Effective Date to make and hold investments but excluding, in all cases, any underlying investment vehicle owned by an Investment Holding Vehicle.

"**IRC**" means the Internal Revenue Code of 1986, as amended.

"**IRS**" means the United States Internal Revenue Service.

"**Kokino**" means Kokino LLC, a Delaware limited liability company (together with its successors and permitted assigns).

---

[2] NTD: Jon Sackler family.

[3] NTD: Richard Sackler family.

["**Listed Transaction**" means (x) a "listed transaction" identified as such by the Internal Revenue Service under Section 6707A(c)(2) of the Internal Revenue Code and Treasury Regulation Section 1.6011-4(b)(2)(i) as of the date of this Agreement or (y) a "listed transaction" identified as such by the Internal Revenue Service under such provisions after the date of this Agreement substantially comparable to the type of promotor-marketed abusive tax shelter transaction that the Internal Revenue Service has been identifying as "listed transactions" as of the date of this Agreement, in each case unless the Internal Revenue has delisted the transaction.[4]]

"**Lock Box Distribution Incurrence Test**" as defined in Section 4.01(a)(i)(B).

"**Material Adverse Effect**" means a material adverse effect on (a) the business, assets or financial condition, in each case, of the Pledgors, taken as a whole, (b) the rights and remedies (taken as a whole) of the Secured Party under the Settlement Agreement or the Security Documents or (c) the ability of the Pledgors (taken as a whole) to perform their payment Obligations under the Settlement Agreement or the Security Documents.

"**North Bay**" means North Bay Associates, a Delaware general partnership (together with its successors and assigns).

"**Permitted Encumbrances**" [means (a) Liens for Taxes (i) that are not yet delinquent or that are being contested in accordance with Section 3.05 or (ii) with respect to which the failure to make payment would not reasonably be expected to have a Material Adverse Effect; (b) statutory Liens of landlords and carriers', warehousemen's, mechanics', materialmen's, repairmen's, storage or other similar like Liens arising in the ordinary course of business and securing obligations that are not yet due or which do not in the aggregate have a material adverse effect on the value or use of property encumbered thereby; (c) Liens incurred or pledges and deposits made in the ordinary course of business in compliance with workers' compensation, unemployment insurance and other social security laws or regulations; (d) deposits Liens to secure the performance, or payment in respect of, bids, insurance premiums, deductibles or co-insured amounts, tenders, government or utility contracts (other than for the repayment of borrowed money) trade contracts (other than for obligations for the payment of borrowed money), leases, statutory obligations, surety, stay, customs and appeal bonds, performance bonds and other obligations of a like similar nature incurred in the ordinary course of business; (e) zoning restrictions, easements, rights-of-way, encroachments, protrusions, licenses or other restrictions on, and other minor defects or irregularities affecting, the use of any real property estate (including leasehold title) and other similar encumbrances incurred in the ordinary course of business which, in the aggregate, do not materially interfere with the ordinary conduct of the business of the Pledgors, and ground leases in respect of real property on which facilities owned or leased by the Pledgors are located; (f) Liens (i) of a collection bank arising under Section 4-210 of the Uniform Commercial Code on the items in the course of collection, (ii) attaching to trading accounts or other brokerage accounts incurred in the ordinary course of business, (iii) in favor of a banking or other financial institution arising as a matter of law encumbering deposits or other funds maintained with a financial institution (including the right of set-off) and which are within the general parameters customary in the banking industry and (iv) for the fees and expenses of a bank or securities intermediary in maintaining deposit accounts or securities accounts; (g) any Lien on any property or asset of the Trust Pledgors existing on the Settlement Effective Date; provided that (i) all of the Indebtedness for Borrowed Money secured by such Liens are listed on Schedule I attached hereto and (ii) any such Lien shall secure only those obligations which it secures on the Settlement Effective Date and extensions, refinancings, renewals and replacements thereof that do not increase the outstanding principal amount thereof other than for accrued interest, fees and premiums (if any) thereon and reasonable fees and expenses associated with the extension, refinancing,

---

[4] NTD:  Subject to further review and negotiation.

4
Annex [__]

renewal or replacement, and such Lien shall not extend to any other property or asset other than the property or assets securing such obligations on the Settlement Effective Date and the proceeds or products thereof; (h) Liens on property of Trust Pledgors in favor of clearing agencies, broker-dealers and similar Liens incurred in the ordinary course of business; (i) Liens arising solely from precautionary filings of financing statements under the Uniform Commercial Code of the applicable jurisdictions; (j) [reserved]; (k) Liens consisting of any (i) interest or title of a lessor or sub-lessor under any lease of real estate not prohibited hereunder, (ii) landlord lien permitted by the terms of any lease, (iii) restriction or encumbrance to which the interest or title of such lessor or sub-lessor may be subject or (iv) subordination of the interest of the lessee or sub-lessee under such lease to any restriction or encumbrance referred to in the preceding clause (iii); (l) Liens (i) on any cash earnest money deposits made by the Pledgors in connection with any letter of intent or purchase agreement with respect to any investment permitted hereunder or (ii) consisting of an agreement to dispose of any property; (m) Liens securing obligations under operating, reciprocal easement or similar agreements entered into in the ordinary course of business of the Pledgors; (n) leases, licenses, subleases or sublicenses granted to others in the ordinary course of business which do not (i) interfere in any material respect with the business of the Pledgors or (ii) secure any Indebtedness for Borrowed Money; (o) Liens arising (i) out of conditional sale, title retention, consignment or similar arrangements for the sale of any assets or property in the ordinary course of business or (ii) by operation of law under Article 2 of the UCC (or similar law of any jurisdiction); (p) Liens in favor of any Pledgor; (q) Liens on assets and property of the Trust Pledgors (other than Equity Interests in the Holding Company Pledgors) securing obligations under Hedging Agreements entered in the ordinary course; (r) (i) Liens on equity interests of joint ventures or non-Pledgors securing capital contributions to, or obligations of, such Persons and (ii) customary rights of first refusal and tag, drag and similar rights in joint venture agreements and agreements with respect to non-Pledgors; and (t) any encumbrance or restriction assumed in connection with an acquisition of the property or equity interests of any Person, so long as such encumbrance or restriction relates solely to the property so acquired (or to the Person or Persons (and its or their subsidiaries) bound thereby) and was not created in connection with or in anticipation of such acquisition.][5]

"**Permitted Exchange**" as defined in clause (C) of the last paragraph of Section 4.01(a).

"**Pledge Agreement**" means the Pledge and Security Agreement entered into on the Settlement Effective Date among the Pledgors, the Asset Manager and the Secured Party, as the same may be amended, restated, supplemented or otherwise modified from time to time.

"**Pledgors**" means, collectively, the Trust Pledgors and the Holding Company Pledgors.

"**Related Parties**" [_____][6]

"**Related Party Transaction**" as defined in Section 4.02.

"**Restricted Payment**" [means any (i) dividend or other distribution (whether in cash, securities or other property) with respect to any Equity Interest of any Person, or any payment (whether in cash, securities or other property), including any sinking fund or similar deposit, on account of the purchase, redemption, retirement, acquisition, cancellation or termination of any such Equity Interest (including, but not limited to, the Collateral), or on account of any return of capital to such Person's shareholders, partners or members (or the equivalent Persons thereof), (ii) with respect to any Trust Pledgor, any distribution (whether in cash, securities or other property) to any beneficiary of such Trust Pledgor or a direct payment by such Trust Pledgor to any beneficiary of such Trust Pledgor or (iii) in the case of a Holding Company

---

[5] NTD:  Definition subject to review and negotiation.

[6] NTD:  Definition subject to review and negotiation.

Pledgor, any payment or distribution of the types described in Section 4.01(a) or (b) to any Trust Pledgor or any beneficiary thereof.][7]

"**Secured Party**" means each of (i) the MDT and each of its successors and permitted assigns and (ii) any agent, trustee or other representative or designee (including one or more Subsidiaries or other entities of the MDT formed to carry out its duties and obligations under the Definitive Documents) authorized or appointed to hold any security interest in or Lien on, or take possession or control of, any Collateral on behalf of and for the benefit of itself and any person described in clause (i) above.

"**Secured Obligations**" as defined in Section 2.01(a).

"**Security Documents**" means the Pledge Agreement, each uncertificated securities control agreement and each of the other security agreements, pledge agreements and other instruments and documents, and each of the supplements thereto, executed and/or delivered pursuant to this Credit Support Annex or the Security Documents in order to grant or purport to grant a Lien on any assets to secure the Secured Obligations and/or under which rights or remedies with respect to such Liens are governed.

"**Specified Assets**" means cash, cash equivalents, marketable securities or investments in private equity funds or hedge funds.

"**Trust Distribution Incurrence Test**" as defined in Section 4.01(c)(i)(B).

"**Trust Pledgors**" means, collectively, [(i) AJ Irrevocable Trust and (ii) 2A Trust][8][ AR Irrevocable Trust and the 1A Trust][9].

"**UCC**" shall mean the Uniform Commercial Code or any successor provision thereof (or similar code or statute) as in effect from time to time in any applicable state or jurisdiction, to the extent it may be required to apply to any item or items of Collateral.

"**Value**" means, with respect to the Collateral or assets of the Pledgors, the value thereof determined in accordance with Section 1.04.

**Section 1.03    Interpretative Provisions**.  The rules of construction set forth in Section 1.02 of the Settlement Agreement shall apply *mutatis mutandis* to this Credit Support Annex.  The use herein of the word "include" or "including", when following any general statement, term or matter, shall not be construed to limit such statement, term or matter to the specific items or matters set forth immediately following such word or to similar items or matters, whether or not non-limiting language (such as "without limitation" or "but not limited to" or words of similar import) is used with reference thereto, but rather shall be deemed to refer to all other items or matters that fall within the broadest possible scope of such general statement, term or matter.  References herein to any Section, Schedule or Exhibit shall be to a Section, an Appendix or an Exhibit, as the case may be, of this Credit Support Annex unless otherwise specifically provided.  In addition, (i) the term "descendants" shall include all issue, including grandchildren, stepchildren and adoptive relationships, and current and former spouses and (ii) the term "spouse" shall include qualified domestic partners.

---

[7] NTD:  Definition subject to review and negotiation.

[8] NTD: Jon Sackler family annex.

[9] NTD: Richard Sackler family annex.

**Section 1.04    Valuation Methodology**.    It is understood and agreed that for purposes of preparing the quarterly and annual financial statements described in this Credit Support Annex and calculating compliance with any covenant contained in this Credit Support Annex (including with respect to the Value of the initial Collateral as of the Settlement Effective Date and the Incurrence Tests), asset valuations shall be determined in all material respects in a manner that is reasonably consistent with the valuation methodologies used by Huron Consulting Services LLC to prepare the previous net asset reports delivered in the Chapter 11 Cases pursuant to the Amended and Restated Stipulation and in accordance with this Section 1.04.  Notwithstanding the foregoing, (i) all asset valuations (including with respect to the initial Collateral as of the Settlement Effective Date and the Incurrence Tests) shall exclude any contingent liabilities (including tax liabilities and inchoate claims but, for the avoidance of doubt, guarantees of Indebtedness for Borrowed Money shall be counted in the determination of asset values) and, for the avoidance of doubt, any tax refunds that might be payable but for an election under section 643(g) as a result of a trust distribution, (ii) the Pledgors may exclude any asset in their sole discretion when calculating compliance with the Incurrence Tests, (iii) with respect to the valuation of assets consisting of Equity Interests that are listed or quoted for trading on the New York Stock Exchange, the NYSE MKT, the NASDAQ Global Select Market, the NASDAQ Global Market, the NASDAQ Capital Market, OTC Bulletin Board or any other national securities exchange, the "Value" thereof shall be based on the arithmetic average of the closing price of a share of such Equity Interests for the ten (10) consecutive trading days on which shares of such Equity Interests traded immediately preceding the date of determination and (iv) all asset valuations shall exclude any Obligations under the Settlement Agreement.  In determining asset valuation as of any date of determination, other than in the case of cash, cash equivalents or other assets for which market quotations are readily available and may be determined on such date of determination, the Pledgors and any Independent Financial Advisor shall use the asset valuation for the applicable assets as of the end of the most recently ended fiscal quarter for which financial statement are available as of such date of determination or, if no such quarterly valuation exists, then the most recent valuation used by North Bay and/or the Asset Manager to maintain the Pledgors' books and records.

**Section 1.05    Division**.  For all purposes under this Credit Support Annex, in connection with any division or plan of division under Delaware Law or any comparable event under a different jurisdiction's Laws, as applicable: (a) if any asset, right, obligation or liability of any Person becomes the asset, right, obligation or liability of a different Person, then it shall be deemed to have been transferred from the original Person to the subsequent Person, and (b) if any new Person comes into existence, such new person shall be deemed to have been organized on the first date of its existence by the holders of its Equity Interests.

<div align="center">

**ARTICLE II.**
**COLLATERAL MATTERS**

</div>

**Section 2.01    Security; Security Documents**.

(a)    As credit support for, and to secure the prompt payment and performance of the payment Obligations of the Applicable Payment Group under the Settlement Agreement to the MDT (the "**Secured Obligations**"),

(i)    each Trust Pledgor shall, on or before the Settlement Effective Date, grant a perfected first priority security interest in and Lien on all of its right, title and interest in the following property, wherever located, and whether now owned or hereafter acquired (the "**Trust Pledgor Collateral**"):

<div align="center">

7
Annex [___]

</div>

(A)    in the case of the AJ Irrevocable Trust, 100% of the Equity Interests held by the AJ Irrevocable Trust in AJ Holding Company LLC;

(B)    in the case of the 2A Trust, 100% of the Equity Interests held by the 2A Trust in 2A Trust Holding Company LLC; and

(C)    all proceeds and products of the foregoing;

(ii)    each Holding Company Pledgor shall, on or before the Settlement Effective Date, grant a perfected first priority security interest in and Lien on all of its right, title and interest in the following property, wherever located, and whether now owned or hereafter acquired (the "**Holding Company Pledgor Collateral**"):

(A)    substantially all assets of such Holding Company Pledgor (including 100% of the Equity Interests in all underlying Investment Holding Vehicles owned by such Holding Company Pledgor and its rights under Asset Management Agreements between such Holding Company Pledgor and the Asset Manager with respect to voting rights to liquidate assets) as described in the Pledge Agreement; and

(B)    all proceeds and products of the foregoing; and

(iii)    The Asset Manager shall, on or before the Settlement Effective Date, grant a perfected first priority security interest in and Lien on all of its right, title and interest in the Asset Management Agreements between any Holding Company Pledgor and the Asset Manager with respect to voting rights to liquidate assets and any proceeds thereof (the "**Kokino Asset Management Agreement Collateral**" and, together with the Trust Pledgor Collateral and the Holding Company Pledgor Collateral, collectively, the "**Collateral**").

Notwithstanding the foregoing, in no event shall the Collateral include (I) investments held by an Investment Holding Vehicle that are distributed to a Holding Company Pledgor for the sole purpose of transferring such investment to another Investment Holding Vehicle, (II) any assets being contributed to any Holding Company Pledgor on a "post-closing" basis, so long as, in each case, such assets are contributed to an Investment Holding Vehicle within five (5) Business Days of their receipt by, or contribution to, a Holding Company Pledgor, (III) any property the pledge of which or security interest therein is prohibited by applicable Law (including, without limitation, any legally effective requirement to obtain the consent of any Governmental Authority) and any governmental licenses or state or local franchises, charters or authorizations, to the extent a security interest therein would be prohibited or restricted thereby (including, without limitation, any legally effective prohibition or restriction), in each case except to the extent such prohibition or restriction is unenforceable after giving effect to applicable anti-assignment provisions of the UCC or any other applicable Law (other than proceeds thereof, the assignment of which is expressly deemed effective under the UCC notwithstanding such prohibition or restriction), (IV) any lease, license or other agreements (other than organizational documents of the Pledgors or any Investment Company Vehicle) to the extent that a security interest therein would violate or invalidate such lease, license or agreement or create a right of termination in favor of any other party thereto or a default thereunder, in each case except to the extent such violation, invalidation or termination right is unenforceable after giving effect to applicable anti-assignment provisions of the UCC or any other applicable Law, and provided that any such provision in any lease, license or other agreement was not entered into after the date hereof with the purpose of excluding such asset from the Collateral and (V) ownership interests in any non-wholly-owned Subsidiaries but only to the extent the organizational documents or other agreements with non-Related Party equity holders of such non-wholly-owned Subsidiaries do not permit the pledge of such ownership interests for so long as such prohibition exists, in

each case after giving effect to the anti-assignment provisions in the UCC or applicable Law (the assets and property referred to in the foregoing clauses (I) through (V) are collectively referred to herein as the "**Excluded Property**"); <u>provided</u> that, in the case of clauses (III) through (V), (i) the Collateral shall include the replacements, substitutions and proceeds of any of the foregoing property in clauses (III) through (V) unless such replacements, substitutions or proceeds also constitute Excluded Property in accordance with clauses (III) through (V) above and (ii) clauses (III) through (V) above shall not apply to property or assets (that would otherwise constitute Collateral but for the above exclusions) valued at more than $25,000 in the aggregate.

(b)     Without limiting the generality of clause (a) of this Section 2.01, on the Settlement Effective Date, (i) the Secured Party shall have a perfected first priority security interest in and Lien on (A) 100% of the Equity Interests of the Holding Company Pledgors and (B) substantially all assets of the Holding Company Pledgors pursuant to Section 2.01(a)(ii), and (ii) the collective Value of the Equity Interests held by Holding Company Pledgors in the Investment Holding Vehicles and pledged to the Secured Party to secure the Secured Obligations of the Applicable Payment Group shall not be less than $500,000,000 (which, for the avoidance of doubt, shall not include any Excluded Property).

(c)     The Pledgors shall not be required, nor shall the Secured Party be authorized, to perfect any pledge or security interest hereunder by any means other than by (i) filing financing statements (including continuation statements) pursuant to the UCC in the office of the secretary of state (or similar central filing office) of the relevant state or jurisdiction for each Pledgor, (ii) in the case of Collateral consisting of Equity Interests in any Holding Company Pledgor or Investment Holding Vehicle organized in jurisdictions outside the U.S., the entry into non-US law share pledge agreements and the filing of financing statements or local law equivalents and other perfection actions in relevant non-US jurisdictions, (iii) the delivery to the Secured Party of certificates or other instruments (if any) representing pledged Equity Interests, together with stock transfer powers or other instruments of transfer (if any) with respect thereto endorsed in blank and (iv) in the case of the pledge of Equity Interests in any Holding Company Pledgor or Investment Holding Vehicle in the form of uncertificated securities, the execution of uncertificated securities control agreements.

(d)     Each Pledgor shall promptly and duly take, execute, acknowledge and deliver such further acts, documents and assurances as may from time to time be necessary or as the Secured Party may from time to time reasonably request in order to carry out the intent and purposes of the Security Documents and consistent with this Credit Support Annex (including, but not limited to, making non-U.S. filings, the entry into non-U.S. security agreements and the entry, by the applicable Pledgor and any Holding Company Pledgor or Investment Holding Vehicle that is the issuer of pledged equity interests that are uncertificated securities, into an uncertificated securities control agreement) to establish, create, preserve, protect, perfect, and maintain perfection of a first priority lien on the Collateral in favor of and for the benefit of the Secured Party (including Collateral acquired after the date hereof) and to exercise any and all remedies in respect thereof.

(e)     The Security Documents shall contain customary release provisions providing for the release the security interests in the Collateral upon a Disposition of Collateral not prohibited by this Credit Support Annex.

**Section 2.02     Advanced Contribution Top-Off**. If any distribution or payment made pursuant to Section 4.01(a)(iv)(A) or any payment made under Section 4.01(b) is thereafter returned, in whole or in part, to the Applicable Payment Group in the form of a Permitted Withdrawal of the Applicable Payment Group's Unapplied Advanced Contributions (i.e., a Permitted Withdrawal on account of Sale Proceeds Deductions or Distribution Deductions with respect to the Applicable Payment Group's Unapplied Advanced Contributions (the amount of such Permitted Withdrawal, the "**Recouped Advanced**

9

Annex [___]

Contribution")), the Trust Pledgors shall, within forty-five (45) days of such receipt, contribute assets to the applicable Holding Company Pledgor (which assets the Holding Company Pledgor shall, in turn, contribute to an Investment Holding Vehicle) in an amount equal to the lesser of (i) the Advanced Contribution Top-Off and (ii) the Recouped Advanced Contribution. [For the avoidance of doubt, the limitation in the preceding sentence to the Recouped Advanced Contribution shall not preclude further contributions in accordance with this Section 2.02 in the event additional amounts are returned to the relevant Applicable Payment Group.][10]

Section 2.03   **Tax Forms**.  Each Pledgor shall provide to the Secured Party and keep up to date a duly completed and executed IRS Form W-9 (or any successor forms) and shall provide any other tax forms or certifications that the Secured Party may reasonably request to permit the Secured Party, any transferee or their payment agents to comply with any applicable tax withholding or reporting requirements.

Section 2.04   **Opinions of Counsel**.  On the Settlement Effective Date, each Pledgor shall deliver to the MDT a customary opinion of its counsel (the "**Settlement Effective Date Opinion**") regarding, among other things, the enforceability and perfection of the relevant security interest with respect to the Collateral.

Section 2.05   **New Pledgor; Additional Collateral.**

(a)      In the event a Trust Pledgor is subject to a consolidation, merger, division, dissolution or liquidation or similar reorganization (or any other event contemplated by Section 4.10), the resulting, surviving or transferee trust(s) (a "**New Trust Pledgor**") (x) the applicable Trust Pledgor party to such transaction shall deliver notice to the MDT and (y) within sixty (60) days of such event (or such longer period as may be agreed to in writing by the MDT (acting reasonably)), such Trust Pledgor shall (and shall cause the New Trust Pledgor to) (I) execute and deliver to the MDT such amendments or supplements to the Security Documents as required thereby or such other documents, instruments or agreements required by this Credit Support Annex to grant to the Secured Party a perfected First Priority security interest in and a Lien on the Equity Interests in any Holding Company Pledgor owned by such New Trust Pledgor in accordance with Section 2.01(a)(i) and (II) take all actions to cause such security interest and Lien to be duly perfected as required by Section 2.01(c).

(b)      In the event a Holding Company Pledgor is subject to a consolidation, merger, division, dissolution or liquidation or similar reorganization, the resulting, surviving or transferee entit(ies) (a "**New Holding Company Pledgor**") (x) the applicable Holding Company Pledgor party to such transaction shall deliver notice to the MDT and (y) within sixty (60) days of such event (or such longer period as may be agreed to in writing by the MDT (acting reasonably)), such Holding Company Pledgor shall (and shall cause the New Holding Company Pledgor to) (I) execute and deliver to the MDT such amendments or supplements to the Security Documents as required thereby or such other documents, instruments or agreements required by this Credit Support Annex to grant to the Secured Party a perfected First Priority security interest in and a Lien on those assets of such New Holding Company Pledgor that constitute or are intended to constitute Holding Company Pledgor Collateral and (II) take all actions to cause such security interest and Lien to be duly perfected as required by Section 2.01(c).

(c)      Following the acquisition of additional Equity Interests that (or any assets from the proceeds from the sale of Collateral) that constitute Collateral and that are not automatically secured and perfected pursuant to the Security Documents (including filed UCC financing statements), (x) the applicable Pledgor shall deliver notice to the MDT and (y) within sixty (60) days of such acquisition, the

---

[10] NTD: Language subject to review and negotiation.

applicable Pledgor shall (I) execute and deliver to the MDT such amendments or supplements to the relevant Security Documents as required thereby or such other documents or agreements required by this Credit Support Annex to grant to the Secured Party a perfected First Priority security interest in and a Lien on such Equity Interests and (II) take such other actions to cause such security interest and Lien to be duly perfected as required by Section 2.01(c).

(d)        Following the joinder of a new Pledgor, or with respect to the acquisition of additional Equity Interests that constitute Collateral and that are not automatically secured and perfected pursuant to the Pledge Agreement or other collateral documents (including filed UCC financing statements), at the reasonable request of the Secured Party, the applicable Pledgor shall deliver a customary opinion of counsel with respect thereto.


# ARTICLE III.
# AFFIRMATIVE COVENANTS

**Section 3.01    Financial Statements, Reports**.

(a)        The Pledgors shall deliver to the Secured Party (i) within sixty (60) days following the end of each fiscal quarter period, copies of the Pledgors' quarterly financial statements and (ii) within one-hundred twenty (120) days following the end of each fiscal year, annual financial statements of each Pledgor [and omitting (or redacting) counterparty or confidential information[11]], in each case, setting forth the categories of investments held by such Pledgor, in each case, in a form substantially similar to the form attached hereto as Exhibit A;

(b)    (i)        Together with the financial statements required to be delivered pursuant to Section 3.01(a), the Pledgors shall deliver a compliance certificate, in a form substantially similar to the form attached hereto as Exhibit C, certifying that to their knowledge no Breach Trigger or Breach with respect to the Applicable Payment Group has occurred under the Settlement Agreement or the Security Documents during the period covered by the certificate;

(ii)        on or prior to the making of any Restricted Payment or series of related Restricted Payments in excess of $10,000,000, and in $10,000,000 increments thereof, by a Holding Company Pledgor pursuant to Section 4.01(a) (other than pursuant to Section 4.01(a)(iv)(A)), such Holding Company Pledgor shall deliver a compliance certificate, in a form substantially similar to the form attached hereto as Exhibit C, certifying that to their knowledge no Breach Trigger or Breach with respect to the Applicable Payment Group has occurred under the Settlement Agreement or the Security Documents and, if applicable, in the case of any such certificate being delivered with respect to a Restricted Payment by a Holding Company Pledgor pursuant to Section 4.01(a)(iv)(B), such certificate shall include a confirmation that such Restricted Payment is being made pursuant to such clause (it being understood and agreed that once a certificate has been delivered pursuant to this clause (b)(ii) with respect to any Restricted Payment or series of related Restricted Payments in an aggregate amount greater than $10,000,000, there shall be no requirement to deliver an additional certificate under this clause (b)(ii) until the applicable Holding Company Pledgor has made additional Restricted Payments in an aggregate amount greater than $10,000,000); and

---

[11] NTD:  Form of Exhibit A subject to review and negotiation.

(iii)   on or prior to the making of any Restricted Payment or series of related Restricted Payments in excess of $10,000,000, and in $10,000,000 increments thereof, by a Trust Pledgor pursuant to Section 4.01(c), such Trust Pledgor shall deliver a compliance certificate, in a form substantially similar to the form attached hereto as Exhibit C, certifying that to their knowledge no Breach Trigger or Breach with respect to the Applicable Payment Group has occurred under the Settlement Agreement or the Security Documents and, if applicable, in the case of any such certificate being delivered with respect to a distribution by a Trust Pledgor pursuant to Sections 4.01(c)(i) or 4.01(c)(iv), such certificate shall include a confirmation that such Restricted Payment is being made pursuant to such clauses (it being understood and agreed that once a certificate has been delivered pursuant to this clause (b)(iii) with respect to any Restricted Payment or series of related Restricted Payments in an aggregate amount greater than $10,000,000, there shall be no requirement to deliver an additional certificate under this clause (b)(iii) until the applicable Holding Company Pledgor has made additional Restricted Payments in an aggregate amount greater than $10,000,000);

(c)    The Pledgors shall deliver prompt written notice to the MDT (but in any event within thirty (30) days) of any change, event, effect or occurrence that is known to them and that would reasonably be expected to have a material adverse effect on ability of the Secured Party to exercise and enforce its rights under the Settlement Agreement or the Pledge Agreement with respect to the Applicable Payment Group or any material portion of the Collateral;

(d)    In the event of any change (A) in any legal or organization name of any Pledgor or any Investment Holding Vehicle or, if applicable, any trustee of a Trust Pledgor, (B) in the location of any Pledgor's chief executive office or principal place of business (or, if applicable, in the location of the chief executive office, principal place of business or residence of any trustee of a Trust Pledgor), (C) in any Pledgor's organizational type, (D) in any Pledgor's federal taxpayer identification number or organizational identification number, if any, or (E) in any Pledgor's or Investment Holding Vehicle's jurisdiction of organization (in each case, including by merging with or into any other entity, reorganizing, dissolving, liquidating, reorganizing or organizing in any other jurisdiction), the applicable Pledgor shall (1) deliver prompt written notice of such change (and in any event, no later than thirty (30) days after such change) and (2) deliver to the Secured Party all additional financing statements and other documents that are necessary to maintain the validity, perfection and priority of the security interests provided for in the Security Documents;

(e)    Within twenty-five (25) Business Days after the end of each fiscal quarter period, a schedule in form substantially similar to the form attached hereto as Exhibit D indicating the amount and type of any Restricted Payments (or loans in lieu of distributions) made by or between (i) each Holding Company Pledgor to the applicable Trust Pledgor and (ii) each Trust Pledgor to its beneficiaries, in each case, during the preceding fiscal quarter;

(f)    Within thirty (30) days after each calendar year, the Pledgors shall deliver to the Secured Party a supplement to the Pledge Agreement schedules to reflect any changes to the information set forth thereon consistent with Section 2.05 and a certification that the Secured Party's liens in the Collateral remain perfected in accordance with the Pledge Agreement as of the date of such certificate, all of which will be in a form substantially similar to the form attached hereto as Exhibit E; and

(g)    To the extent Restricted Payments are made pursuant to Incurrence Tests, at the request of the MDT, and subject to confidentiality arrangements reasonably satisfactory to the Pledgors, the Pledgors shall use commercially reasonable efforts to cause the Independent Financial Advisor that delivered the applicable compliance certificate to attend an annual telephonic conference call with advisors of the MDT at a reasonable time to be mutually agreed, which conference call shall be limited to questions relating to the matters covered by the applicable compliance certificates delivered during the

12
Annex [___]

prior twelve (12) month period; <u>provided</u> that the MDT shall not request more than one conference call in any twelve (12) month period.

**Section 3.02    Preservation of Existence.** Each Pledgor shall, except as permitted under Section 4.06, (a) preserve, renew and maintain in full force and effect its legal existence under the laws of the jurisdiction of its organization; and (b) take all reasonable action to maintain all material rights and privileges (including its good standing, if such concept is applicable in its jurisdiction of organization) necessary or desirable in the normal conduct of its business, in each case to the extent that the failure to do so could reasonably be expected to result in a Material Adverse Effect.

**Section 3.03    Compliance with Laws**. Each Pledgor shall comply with the requirements of all applicable Laws and all material orders, writs, injunctions and decrees of any Governmental Authority applicable to it or its business or property in each case to the extent that the failure to do so could reasonably be expected to result in a Material Adverse Effect.

**Section 3.04    Books and Records**. Each Pledgor shall maintain proper books of record and account in a manner consistent with past practice.

**Section 3.05    Tax Matters**. Except as would not reasonably be expected to result in a Material Adverse Effect, each Trust Pledgor shall pay and discharge promptly all Taxes before the same shall become delinquent or in default, <u>provided</u> that such payment and discharge shall not be required with respect to (a) Taxes being contested in good faith by appropriate proceedings as long as any such contested Taxes determined to be due shall be paid no later than 60 days following the date on which such determination (within the meaning of Section 1313(a) of the Internal Revenue Code for US federal income taxes and by analogy for other Taxes) becomes final and non-appealable or (b) Taxes the non-payment of which, individually or in the aggregate, could not reasonably be expected to have a Material Adverse Effect. No Trust Pledgor or Holding Company Pledgor shall take or cause to be taken any action that would result in a Trust Pledgor, Holding Company Pledgor or Investment Holding Vehicle being treated as a corporation or an association taxable as a corporation for U.S. federal income tax purposes.[12]

**Section 3.06    Tax Reports**. Except as would not reasonably be expected to result in a Material Adverse Effect, each Trust Pledgor shall timely (after taking into account any applicable extensions) file all [material] federal, state, foreign and other tax returns and reports required to be filed. Each Trust Pledgor shall timely (after taking into account any applicable extensions) file all material IRS Forms 8886 (or any successor forms) and any analogous tax forms for U.S. state income tax purposes, in each case that are required by Law to be filed with respect to any transaction to which it is a party that it knew, or reasonably should have known, is a "listed transaction" identified as such by the Internal Revenue Service under Section 6707A(c)(2) of the Internal Revenue Code and Treasury Regulation Section 1.6011-4(b)(2) (other than any such transaction described in Section 4.07(ii)) in a manner that is true, accurate and complete in all material respects.

**Section 3.07    Reinvestment**. The Holding Company Pledgors shall reinvest returns on, and returns of, and any other proceeds of, investments in additional investments made by them and/or their respective Investment Holding Vehicles, and cash proceeds received by the Holding Company Pledgors shall be promptly contributed to their respective Investment Holding Vehicles, or to make payments or to make distributions to the applicable Trust Pledgor in each case, to the extent not prohibited by this Credit Support Annex and the Pledge Agreement.

---

[12] NTD: Subject to further review and negotiation.

13
Annex [___]

## ARTICLE IV.
## NEGATIVE COVENANTS

**Section 4.01**     **Restricted Payments**.

(a)     Limitations on Holding Company Pledgor Restricted Payments to Trust Pledgors: The Holding Company Pledgors shall not, directly or indirectly (including through any Investment Holding Vehicle or any Subsidiary thereof) make any Restricted Payments to the Trust Pledgors, except:

(i)     Restricted Payments in an unlimited amount so long as (A) no Enforcement Event has occurred and is continuing (and provided no such Restricted Payment shall be permissible during any Remedies Forbearance Period), (B) after giving effect to such Restricted Payment on a pro forma basis, the Collateral Coverage Ratio with respect to the Pledgors in the Applicable Payment Group shall not be less than 1.00 to 1.00 (such condition in this clause (B), the "**Lock Box Distribution Incurrence Test**"), and (C) prior to making any Restricted Payment pursuant to this clause (i), the Secured Party shall receive a certification as to compliance with the Lock Box Distribution Test, and as to the accuracy of the calculation, after giving effect to such Restricted Payment from an Independent Financial Advisor, in a form substantially similar to the form attached hereto as Exhibit F;

(ii)     Restricted Payments by a Holding Company Pledgor that is treated as a pass-through entity for U.S. federal income tax purposes to the applicable Trust Pledgor to pay when due (including estimated income tax) the income taxes imposed on such Trust Pledgor resulting from allocations of income, gain, losses, deductions and credits recognized in the current taxable year attributable to its ownership interest in such Holding Company Pledgor, determined as if such allocated items were the only items recognized by the Trust Pledgor for the applicable tax period; provided that (A) no distribution has previously been made in respect of the tax imposed on such allocated items, provided that, for this purpose, any Restricted Payment made pursuant to Section 4.01(a)(i) shall be treated as a distribution in respect of tax;  (B) such distributions shall not exceed the income taxes imposed on such Trust Pledgor resulting from allocations of income, gain, losses, deductions and credits recognized in the current taxable year attributable to its ownership interest in such Holding Company Pledgor (including by giving effect to any deductions available for the tax period under IRC section 642(c) and excluding the effect of any deductions available for the tax period under IRC section 661), determined as if such allocated items were the only items recognized by the Trust Pledgor for the applicable tax period and using the tax rate specified in the definition of "Tax Distributions" in the Settlement Agreement; (C) to the extent any distribution in respect of estimated income taxes exceeds the tax payable for the applicable tax period, as determined pursuant to the immediately preceding subclause (B), the amount of subsequent permitted distributions shall be reduced by the amount of such excess;  (D) no distributions shall be made pursuant to this clause (ii) with respect to the first cumulative Tax distributions due to the Trust Pledgors in the amount of $[____] resulting from allocations of income and gain (net of allocations of losses, deductions and credits) attributable to their ownership interest in the Holding Company Pledgors (including by giving effect to any available deductions in the tax period under IRC section 642(c) and excluding the effect of any deductions available for the tax period under IRC section 661) to the Trust Pledgors and (E) solely with respect to Permitted Exchanges, no distributions shall be made pursuant to this clause (ii) with respect to the cumulative income and gain of the Trust Pledgors resulting from allocations of income and gain (net of allocations of losses, deductions and credits) to the Trust Pledgors attributable to their ownership interest in the Holding Company Pledgors (including by giving effect to any available deductions in the tax period under IRC section 642(c) and excluding the effect of any deductions available for the tax period

14
Annex [____]

under IRC section 661) except to the extent such cumulative income and gain exceeds the total amount of all Increased Built-in Gain not previously taken into account in limiting distributions pursuant to this subclause (E);

(iii)    Restricted Payments to pay reasonable costs and expenses (other than income taxes) of maintaining the operations and investments of each Holding Company Pledgor and its share of its underlying investments, including brokerage expenses, overhead and accounting expenses, along with professional fees (including payments to the Asset Manager and North Bay, other management fees, tax preparation costs and legal fees of such Holding Company Pledgor or relating to its underlying investments); provided that the aggregate amount of Restricted Payments made pursuant to this clause (iii) to pay management fees to the Asset Manager and North Bay and any other "family offices" in any calendar quarter shall not exceed 0.3125% (i.e. 1.25% per annum) of the Value of the Collateral at the start of such calendar quarter and shall be paid quarterly in advance for each calendar quarter (and prorated for any partial calendar quarter based on the number of days remaining in such calendar quarter) once such Value of the Collateral has been determined for such calendar quarter;

(iv)    (A) with respect to any Required Settlement Payment, Restricted Payments to pay an amount not to exceed 43% of the Applicable Payment Group's B-Side Funding Deadline Obligation (minus any amounts paid directly by the Holding Company Pledgor within such Applicable Payment Group, any Investment Holding Vehicle within such Applicable Payment Group, or any Subsidiary thereof directly to MDT in respect of such B-Side Funding Deadline Obligation pursuant to Section 4.01(b)), so long as such Restricted Payments are applied to pay such portion of the Applicable Payment Group's B-Side Funding Deadline Obligation within thirty (30) days after the receipt thereof by the applicable Trust Pledgor, and

(B)    so long as no Enforcement Event has occurred and is continuing, Restricted Payments to pay up to 43% of all other reasonable costs and expenses (other than income taxes) of the Applicable Payment Group arising after the Settlement Effective Date under or related to the Settlement Agreement (along with all ancillary documents and agreements thereto) including legal and other professional fees arising in connection with the Chapter 11 Cases and the Settlement Agreement (e.g., legal and professional fees to enforce the rights of the Applicable Payment Group under the Settlement Agreement but excluding (I) the costs of any judgment against any Trust Pledgor and (II) costs related solely to the operations of the IACs).

In addition, it is understood and agreed that:

(A)    Section 4.01(a)(iv) shall not permit the payment of any portion of the Applicable Payment Group's B-Side Funding Deadline Obligation that is due and payable on the Settlement Effective Date.

(B)    Transactions permitted under this Section 4.01(a) may also be effected by way of a loan to the applicable Trust Pledgor in lieu of a Restricted Payment.

(C)    Notwithstanding anything in this Credit Support Annex to the contrary, the Pledgors may exchange assets owned and held by Investment Holding Vehicles of the type constituting Specified Assets for other assets constituting Specified Assets of a substantially equivalent value (including with respect to liquidity) (a "**Permitted Exchange**"), so long as, in the case of Specified Assets consisting of investments in private equity funds or hedge funds, the applicable Pledgor delivers a certificate to the Secured Party certifying the exchanged asset is of

substantially equivalent value (including with respect to liquidity) to the original asset. In furtherance of the foregoing, no Permitted Exchange shall be consummated unless the applicable Holding Company Pledgor receives the new Specified Asset from the Trust Pledgors and then contributes the same to the applicable Investment Holding Vehicle substantially concurrently with the distribution of the original Specified Asset to the Trust Pledgors.

(b)    Limitations on Payments of Required Settlement Payments. With respect to any Required Settlement Payment, the Holding Company Pledgors shall not, and the Holding Company Pledgors shall cause the Investment Holding Vehicles and/or their respective Subsidiaries not to, pay such Required Settlement Payment except for payments in an aggregate amount not exceeding 43% of the Applicable Payment Group's B-Side Funding Deadline Obligation (minus any amounts paid to MDT by means of a Restricted Payment to a Trust Pledgor in respect of such B-Side Funding Deadline Obligation pursuant to Section 4.01(a)(iv)). It is understood and agreed that this Section 4.01(b) shall not permit the payment of any portion of the Applicable Payment Group's B-Side Funding Deadline Obligation that is due and payable on the Settlement Effective Date.

(c)    Limitations on Trust Pledgor Distributions to Beneficiaries: The Trust Pledgors shall not make any Restricted Payments to their respective beneficiaries, directly or indirectly (including through any Investment Company Vehicle and any Subsidiary thereof) except:

(i)    so long as no Enforcement Event has occurred and is continuing (and provided no such Restricted Payment shall be permissible during any Remedies Forbearance Period), Restricted Payments in the aggregate amount under this clause (i) not to exceed $150,000,000;

(ii)    additional Restricted Payments in an unlimited amount so long as (A) no Enforcement Event has occurred and is continuing (and provided no such Restricted Payment shall be permissible during any Remedies Forbearance Period), (B) after giving effect to such Restricted Payment on a pro forma basis, the Trust Pledgors' Asset Coverage Ratio shall not be less than 1.50 to 1.00 (such condition in this clause (B), the "**Trust Distribution Incurrence Test**"), and (C) prior to making any Restricted Payment pursuant to this clause (ii), the Secured Party shall receive a certification as to compliance with the Trust Distribution Incurrence Test, and as to the accuracy of the calculation, after giving effect to such Restricted Payment from an Independent Financial Advisor, in a form substantially similar to the form attached hereto as Exhibit F;

(iii)    Restricted Payments for the payment of reasonable costs and expenses (other than income taxes) of maintaining the operations and investments of each Trust Pledgor and its share of its underlying investments, including acquiring, maintaining, financing, hedging, and disposing of investments, along with professional fees (including payments to the Asset Manager and North Bay, other management fees, tax preparation costs and legal fees); provided that, in the case of any payments to the Asset Manager and North Bay or any other "family office" under this clause (iii), the Asset Manager, North Bay and such other "family office" shall be run as break-even enterprises consistent with past practice;

(iv)    so long as no Enforcement Event has occurred and is continuing, Restricted Payments to pay any and all legal fees and related expenses (other than income taxes) of any Trust Pledgor or any one or more beneficiaries of any Trust Pledgor (but not, for the avoidance of doubt, the costs of any judgment against any one or more beneficiaries of such Trust Pledgor); and

(v)    to the extent constituting a Restricted Payment, transactions permitted under Section 4.02 (other than under clauses (b)(ii), (iii), (iv), (vi), (viii), (xi) and (xii) of Section 4.02).

In addition, it is understood and agreed that:

(A)    This Section 4.01(c) shall not permit any distribution of (1) any Equity Interests held by a Trust Pledgor in any Holding Company Pledgors or (2) any Equity Interests held by a Holding Company Pledgor in any Investment Holding Vehicle, in each case, to the beneficiaries of the applicable Trust Pledgor; and

(B)    Transactions permitted under this Section 4.01(c) may also be effected by way of a loan to the applicable beneficiary in lieu of a Restricted Payment; provided that any such loan will be made at a rate of interest no less than the Applicable Federal Rate.

**Section 4.02    Related Party Transactions**.

(a)    The Pledgors shall not, and the Holding Company Pledgors shall cause the Investment Holding Vehicles to not, enter into any transaction with any Related Party (a "**Related Party Transaction**") unless such transactions are on terms no less favorable than would reasonably have been obtained in a comparable, arm's length transaction with a Person who is not a Related Party; provided that, for any Related Party Transaction or series of Related Party Transactions with an aggregate value in excess of $[____], the relevant Pledgors shall deliver to the Secured Party a written opinion by any Independent Financial Advisor stating that such transaction or series of related transactions complies with this Section 4.02.

(b)    The foregoing restrictions in this Section shall not apply to the following:

(i)    (A) any beneficiaries or other Related Party shall be permitted to use residential real estate, art and collectibles and other tangible personal property (but, for the avoidance of doubt, excluding cash, cash equivalents, securities and other financial assets), in each case, in the ordinary course and to the extent such use does not result in a Material Adverse Effect and the primary purpose of which is not to circumvent the provisions of this Credit Support Annex, (B) retaining family offices, including the Asset Manager and North Bay, for services and (C) sharing professional expenses by the Trust Pledgors with other Payment Parties under the Settlement Agreement (including by transferring funds to one or more Payment Parties who are designated payors under the Settlement Agreement, along with similar "funds flow" transactions to enhance administrative and tax efficiencies);

(ii)    (A) the hiring and retention of family offices for investment management and related (e.g., book keeping, tax preparation) services and the payment, subject to Section 4.01(a)(iii), of management fees and budgeted expenses in the ordinary course, (B) Kokino's (or any successor or replacement family office) management of the assets and investment activities of the Trust Pledgors and the Holding Company Pledgors (e.g., Kokino may move assets within the Holding Company Pledgors structure and make investment decisions in its discretion) in the ordinary course of business, and (C) in the case of the foregoing, activities incidental thereto (e.g., setting the budget for Kokino) other than activities that have a material adverse impact on the Secured Party's security interest in the Collateral;

(iii)    (A) transactions that result in the transfer of assets from a Holding Company Pledgor, Investment Holding Vehicle or any Subsidiary thereof to a trust or Person that is a Holding Company Pledgor, Investment Holding Vehicle or any Subsidiary thereof, (B) transactions between and among the Trust Pledgors, (C) transaction between and among the Holding Company Pledgors and the Investment Holding Vehicles, (D) transfers from any Trust Pledgor to any Holding Company Pledgor or Investment Holding Vehicle and (E) transfers from any Subsidiary of a

Holding Company Pledgor or an Investment Holding Vehicle to any Holding Company Pledgor or Investment Holding Vehicle, in each case, solely to the extent among Persons that are within the same Applicable Payment Group;

(iv)    [transactions required or permitted by the Settlement Agreement, this Credit Support Annex or any other Security Document, including][13] (A) transfers of Sale Proceeds and Non-Tax Distributions to IAC Accounts, (B) Permitted Withdrawals from IAC Accounts, (C) transactions the purpose of which is to facilitate the transfer of assets to make payments under the Settlement Agreement, and to pay any taxes imposed on the transferee as a result of such transfer as well as any taxes imposed on the transferee (or its direct or indirect subsidiary) on Sales Proceeds taxable to the transferee to the extent Sales Proceeds actually received by the transferee are insufficient to pay such taxes, and the remittance of cash and "funds flow" to effect the same (e.g., pursuant to Sections 2.01(k) and 2.02(d) of the Settlement Agreement), and (D) Tax Distributions, so long as, in each case, the intent, purpose and primary effect of such transaction shall not be to circumvent the provisions of this Credit Support Annex[14];

(v)    unsecured loans using the Applicable Federal Rate as the interest rate; _provided_ that any such loans to beneficiaries of the Trust Pledgors are permitted under Section 4.01(c) (other under than clause (v) thereof) (to the extent such Restricted Payments are otherwise permitted under the terms and provisions hereof, and counting such loan as a distribution to such beneficiary);

(vi)    transactions permitted under clauses (a), (b) or (c) of Section 4.01;

(vii)    the appointment of bona fide third party professionals as trustees and the retention of such professionals respective firms; _provided_ that the payment of professional fees to such professionals by any Pledgor shall be otherwise permitted under this Credit Support Annex, pursuant to a term hereof other than Section 4.01(c)(v);

(viii)    transactions certified as complying with Section 4.02(a) in an opinion by an Independent Financial Advisor;

(ix)    subject to Section 4.01(a)(iv)(A), any other transactions required by the Settlement Agreement, including the transfer of any other amounts contemplated by the Settlement Agreement, including the [Collar B-Side Amounts];

(x)    indemnification arrangements that are consistent with past practice, entered into by the Pledgors or any of Investment Holding Vehicle with the former, current and future trustees, managers, officers, employees, agents, and consultants and professional advisors of any Pledgor, any Investment Holding Vehicle, any family office (e.g., Kokino and North Bay), the Sackler Parties' Representative, and any other entity owned in whole or in part by any member of the Applicable Payment Group;

(xi)    the repayment (including prepayment) of loans made prior to the Settlement Effective Date;

---

[13] NTD: Language subject to further review and negotiation.

[14] NTD: Subject to further review and negotiation.

18
Annex [___]

(xii)    the Asset Management Agreements (and transactions arising pursuant to the terms thereof) as in effect on the Settlement Effective Date, and as may be amended, modified, supplemented or replaced thereafter; provided that any such amendment, modification, supplement or replacement, taken as a whole, is not materially less favorable to the MDT and the Secured Parties; and

(xiii)    each Pledgor, or an Investment Holding Vehicle, may form, and capitalize, a new investment vehicle with a Related Party so long as (A) such capitalization and the distributions by such investment vehicle to its equityholders are made on a ratable basis, (B) such investment vehicles makes investments other than in Related Parties, (C) any Disposition (or obligation to Dispose) of the Equity Interests of such investment vehicle to any Related Party shall be made pursuant to customary buy/sell arrangements and for reasonably equivalent value and (D) if Equity Interests of the investment vehicle are directly owned by a Holding Company Pledgor, then such Equity Interests directly owned by such Holding Company Pledgor are pledged in accordance with Section 2.05; provided that (1) such new investment vehicle may be managed by a family office consistent with the other provisions of this Credit Support Annex, which family office shall not be subject to such ratable requirements to make capitalizations or receive distributions in its capacity as a manager or equivalent controlling person (e.g., general partner or managing member) of such investment vehicle and may receive customary indemnification and expense reimbursement and (2) such new investment vehicle shall not be capitalized with Collateral unless the Equity Interests of the Investment Holding Vehicle holding such investment vehicle are pledged as Collateral in accordance with Section 2.05(c).

**Section 4.03    Indebtedness.** The Pledgors shall not incur, create, assume, guaranty or permit to exist, directly or indirectly, any Indebtedness for Borrowed Money, except:

(a)    Indebtedness for Borrowed Money of the Trust Pledgors incurred to finance payments under the Settlement Agreement; provided that the net proceeds of such Indebtedness for Borrowed Money are promptly applied to fund such Settlement Agreement payments;

(b)    Indebtedness for Borrowed Money of the Trust Pledgors incurred for the purpose of financing investments that are incurred in the ordinary course of business and consistent with past practices or standard industry practices;

(c)    Indebtedness for Borrowed Money of the Trust Pledgors that constitutes purchase money indebtedness incurred in connection with the acquisition of assets (including real estate) so long as (x) any Liens securing such Indebtedness for Borrowed Money are limited solely to the assets being acquired, (y) so long as such assets being acquired are acquired and remain owned by the Pledgor incurring such purchase money indebtedness and (z) such assets are acquired within ninety (90) days of the incurrence of such indebtedness;

(d)    any Indebtedness for Borrowed Money of the Trust Pledgors if, after giving pro forma effect to the incurrence of such Indebtedness for Borrowed Money (as a reduction to the Value of the assets of the Trust Pledgors in the principal amount of such Indebtedness for Borrowed Money), the Trust Distribution Incurrence Test shall be satisfied;

(e)    Indebtedness for Borrowed Money of the Trust Pledgors (i) pursuant to tenders, statutory obligations, bids, leases, governmental contracts, trade contracts, surety, stay, customs, appeal, performance and/or return of money bonds or other similar obligations incurred in the ordinary course of business,

consistent with past practice or consistent with industry norm and (ii) in respect of letters of credit, bank guaranties, surety bonds, performance bonds or similar instruments to support any of the foregoing items;

(f)      (i) Indebtedness for Borrowed Money incurred in the ordinary course of business, consistent with past practice or consistent with industry norm in respect of obligations of the Pledgors to pay the deferred purchase price of goods or services or progress payments in connection with such goods and services, in each case, for the benefit of the applicable Pledgor and its Subsidiaries and (ii) Indebtedness for Borrowed Money in respect of letters of credit, bankers' acceptances, bank guaranties, surety bonds, performance bonds or similar instruments with respect to such Indebtedness for Borrowed Money entered into in the ordinary course of business, consistent with past practice or consistent with industry norm;

(h)      Indebtedness for Borrowed Money of the Trust Pledgors existing, or pursuant to commitments existing, on the Settlement Effective Date and any extensions, refinancings, renewals and replacements thereof, so long as such extension, refinancing, renewal or replacement does not exceed in a principal amount the Indebtedness for Borrowed Money being renewed, extended or refinanced plus accrued interest, fees and premiums (if any) thereon and reasonable fees and expenses associated with the extension, refinancing, renewal or replacement;

(i)      Indebtedness for Borrowed Money consisting of the financing of insurance premiums;

(j)      Indebtedness for Borrowed Money representing deferred compensation to current or former directors, trustees, beneficiaries, officers, employees, members of management, managers, members, partners, independent contractors and consultants in the ordinary course of business, consistent with past practice or consistent with industry norm; and

(k)      Indebtedness for Borrowed Money of the Trust Pledgors in an aggregate principal amount not to exceed $[____] at any time outstanding.

**Section 4.04      Liens.** The Pledgors shall not incur, create, assume or grant or (in the case of any consolidations, mergers or divisions otherwise permitted hereunder) cause or suffer to exist, any Lien on any of its property or assets, except:

(a)      Liens created by the Security Documents;

(b)      Permitted Encumbrances;

(c)      Liens on assets and property of the Trust Pledgors (other than Equity Interests in the Holding Company Pledgors) securing Indebtedness for Borrowed Money permitted under Sections 4.03(a), (b) and (c); and

(d)      Liens on assets and property of the Trust Pledgors (other than Equity Interests in the Holding Company Pledgors) securing obligations or Indebtedness for Borrowed Money permitted hereunder in an aggregate principal amount not to exceed $[____] at any time outstanding.

**Section 4.05      Passive Holding Company Activity.** The Holding Company Pledgors shall not engage in any material operating or business activities; provided that the following and any activities incidental thereto shall be permitted in any event:

(i)      ownership of the Equity Interests in Investment Holding Vehicles and the receipt and payment of Restricted Payments and other amounts in respect of Equity Interests and making contributions to the capital of the Investment Holding Vehicles;

(ii)    the maintenance of its legal existence and privilege of doing business (including the ability to incur and pay, as applicable, fees, costs and expenses and taxes relating to such maintenance and the payment of any tax distributions pursuant to Section 4.01(a));

(iii)    the performance of its Obligations with respect to the Settlement Agreement and the Security Documents and, in each case, any related documents and agreements;

(iv)    if applicable, participating in Tax, accounting and other administrative matters, including as a member of any consolidated, combined, unitary or similar tax group and the provision of administrative and advisory services (including treasury and insurance services) to its Subsidiaries of a type customarily provided by a holding company to its Subsidiaries;

(v)    holding any cash in an aggregate amount not to exceed $[___] for not longer than five (5) Business Days;

(vi)    providing indemnification to its officers and directors (or other equivalent Persons), and

(vii)    any transaction with any Pledgor, any Investment Holding Vehicle or any of its Subsidiaries, and/or any other Person to the extent permitted under this Credit Support Annex and the Security Documents.

**Section 4.06    Fundamental Changes**. The Pledgors shall not consolidate, merge, divide, dissolve or liquidate unless (i) either (A) the applicable Pledgor is the surviving entity or (B) the resulting, surviving or transferee Person is a U.S. trust or Person (solely in the case of a Holding Company Pledgor) organized or existing under the laws of the United States that assumes the Obligations of the applicable Pledgor under the Security Documents pursuant to Section 2.05 (and, if applicable, the Obligations of the Pledgor under the Settlement Agreement), (ii) such consolidation, merger, division, consolidation or liquidation, after giving effect to clause (i) above, shall not have a material adverse impact on the value of, and the Secured Party's interest in, and/or the rights and remedies of the MDT with respect to the Collateral (after giving effect to any liabilities with respect thereto), (iii) the Secured Party's security interest in the Collateral shall remain perfected (without lapse or change in priority) and (iv) in the case of clause (i)(B) above, if reasonably requested by the Secured Party, the applicable Trust Pledgor or Holding Company Pledgor shall deliver to the Secured Party a customary opinion of counsel, regarding the enforceability and perfection of the relevant security interest with respect to the Collateral and other customary matters. Notwithstanding the foregoing, (A) any Trust Pledgor may undergo a division or similar reorganization into one or more other trusts and (B) the AJ Irrevocable Trust may split into separate trusts as a result of the death of Jonathan Sackler to the extent that, in either case, the (i) trustee(s) of the resulting trust(s) (in their capacities as trust trustees and not in their own individual or personal capacities) assume the Obligations of such Trust Pledgor as described in this Credit Support Annex (and, if applicable, under the Settlement Agreement) and takes any and all steps that are necessary to maintain the perfection of the Secured Party's Lien on the Collateral (without change in priority), [(ii) Exhibit [      ] of the Settlement Agreement is updated as may be needed to include the Assuring Parties with respect to the resulting trust(s) (to the extent not already listed) and (iii) each Assuring Party with respect to the resulting trust(s) has delivered an Assurance Undertaking to MDT to the extent they have not already provided such Assurance Undertaking][15].

---

[15] NTD:  Subject to further review and negotiation.

21

Annex [___]

**Section 4.07    Listed Transactions.**  [The Trust Pledgors shall not (and shall not cause or permit any Holding Company Pledgor to) be a party to any transaction that it knew, or reasonably should have known, is a Listed Transaction at the time it entered into a binding commitment to enter into the transaction, provided that, for purposes of this covenant, (i) the Plan and Settlement Agreement and the payments and transactions contemplated thereby shall not be taken into account and (ii) no Trust Pledgor shall be treated as a party to a Listed Transaction that is entered into by any collective investment vehicle or other entity if (A) such entity is managed by a professional investment advisor that is unaffiliated with the Trust Pledgor (or any of its Related Parties); provided that, for purposes of this subclause (A), the Asset Manager and any other "family office" described in Section 4.01(c)(iii) shall not be considered unaffiliated with the Trust Pledgor; and (B) the Trust Pledgor (together with any of its Related Parties) does not have dominion and control over the entity's investment decisions.[16]]

**Section 4.08    Amendments or Waivers of Organizational Documents.**  The Pledgors shall not make any amendment, restatement, supplement or other modification to, or waiver of, any of any such Person's organizational documents (including trust documentation) after the Settlement Effective Date, in each case, to the extent the same (a) would adversely affect the perfection or priority of the Secured Parties' Lien on the Collateral or (b) would reasonably be expected to be otherwise materially adverse to the interests of the MDT (or any other Secured Party) or the ability of the Payment Parties under the Settlement Agreement relating the Applicable Payment Group, taken as a whole, to perform their Obligations and otherwise pay the applicable Outstanding Settlement Amount under the Settlement Agreement, other than as permitted under the Settlement Agreement, without obtaining the prior consent of MDT to such amendment, restatement, supplement or other modification or waiver (such consent not to be unreasonably withheld or delayed) or thereafter taking such steps as are necessary to maintain the perfection and priority of the Secured Party's Lien on the Collateral; provided that, for purposes of clarity, it is understood and agreed that the Trust Pledgors and the Holding Company Pledgors may effect a change to its organizational form and/or consummate any other transaction that is not prohibited under this Credit Support Annex.

**Section 4.09    Restrictive Agreements.**  The Pledgors shall not enter into any transaction or series of related transactions that would restrict or impair in any material respect the ability of the Pledgors to sell, Dispose of or otherwise liquidate all or substantially all of the assets and properties of the Pledgors, except

(a)    as required under the Settlement Agreement and the Security Documents;

(b)     transfer restrictions contained in documentation governing individual investments which have been entered into in the ordinary course of business or pursuant to standard industry practices;

(c)    restrictions with respect to the assets and properties of the Trust Pledgors in effect on the Settlement Effective Date (and any replacements thereof);

(d)    customary provisions restricting assignment contained in agreements entered into in the ordinary course of business or pursuant to standard industry practices so long as such restrictions relate to such agreement which do not restrict the sale, Disposition or liquidation of all or substantially all of the assets and properties of the Pledgors; and

(e)    restrictions with respect to property of the Trust Pledgors in agreements governing Indebtedness for Borrowed Money permitted under Section 4.03; provided that such restrictions do not

---

[16] NTD:  Subject to further review and negotiation.

materially interfere with or otherwise prohibit such Trust Pledgors from performing and satisfying its Obligations under the Settlement Agreement.

Section 4.10    **Change in Trustees.** The Trust Pledgors shall not permit or otherwise recognize the appointment of (including by granting control over any trust asset to) any additional or replacement trustee of such Trust Pledgor, unless and until such additional or replacement trustee (A) becomes a party to the Settlement Agreement, the Pledge Agreement, and any other applicable Security Documents in its capacity as such trustee of the applicable Trust Pledgor, (B) takes any and all steps that are necessary to maintain the perfection (without change in priority) of the Secured Party's lien on the Collateral, (C) confirms and agrees at the time of its appointment that such trustee, solely in its capacity as a trustee, is bound by the terms and provisions of the Settlement Agreement, the Pledge Agreement, and the other Security Documents and that the Obligations of the Trust Pledgors constitute valid and binding obligations (including under the applicable trust agreement) enforceable against the applicable Trust Pledgor's property in accordance with their terms and [(D) delivers a [Successor Trustee] Further Assurances Undertaking executed in its own individual or personal capacity][17].

## ARTICLE V.

## ADDITIONAL CONDITIONS PRECEDENT

Section 5.01    **Additional Conditions Precedent to Settlement Effective Date**.  In addition to the conditions set forth in Section 10.01 of the Settlement Agreement, the occurrence of the Settlement Effective Date shall be subject to the satisfaction (or waiver by the Parties) of the following conditions:

(a)    The MDT (or its counsel) shall have received a duly executed copy of the Pledge Agreement;

(b)    The MDT (or its counsel) shall have received a UCC-1 financing statement in a form prepared for filing in the jurisdiction of organization of each Pledgor and otherwise in form and substance reasonably satisfactory to the MDT (or its counsel);

(c)    All Equity Interests of the Holding Company Pledgors and the Investment Holding Vehicles shall have been pledged pursuant to the Security Documents and/or the provisions hereof and the MDT (or its counsel) shall have received all (i) certificates or instruments, if any, representing such Equity Interests pledged under the Security Documents, accompanied stock transfer powers or other instruments of transfer (if any) with respect thereto endorsed in blank and (ii) uncertificated securities control agreements, substantially in the form exhibited to the Pledge Agreement, with respect to any uncertificated securities of the Holding Company Pledgors and/or the Investment Holding Vehicles; and

(d)    The MDT (or its counsel) shall have received the Settlement Effective Date Opinion.

## ARTICLE VI.

## ENFORCEMENT EVENT; REMEDIES

Section 6.01    **Occurrence of an Enforcement Event; Priority of Payments**.  Upon the occurrence and during the continuance of an Enforcement Event, the Secured Party shall have the right to exercise all rights and remedies against the Collateral as provided in the Security Documents, which shall

---

[17] NTD:  Subject to further review and negotiation.

include all rights and remedies under the UCC (and any similar local laws) and the right to (i) foreclose on the Collateral, and/or (ii) direct the liquidation of investments of the Investment Holding Vehicles and apply the proceeds thereof to pay (A) first, any costs or expenses incurred by the Secured Party to enforce the Settlement Agreement, the Security Documents or otherwise incurred in connection with the exercise of remedies, in each case, solely with respect to the Applicable Payment Group, (B) second, any accrued and unpaid interest, late payment fees, other fees and all other payment Obligations (other than the Outstanding Settlement Amount and any contingent indemnification obligations for which no claim or demand for payment, whether oral or written, has been made at such time) due to the Secured Party under the Settlement Agreement solely on account of the Obligations of the Applicable Payment Group, and (C) third, the Outstanding Settlement Amount of the Applicable Payment Group then outstanding under the Settlement Agreement, with any excess proceeds being retained by the Pledgors.  For the avoidance of doubt, the Secured Party shall have the right to exercise remedies against the Collateral during the Sale Period.

## ARTICLE VII.
## MISCELLANEOUS

**Section 7.01    Termination.**  The obligations described in this Credit Support Annex shall terminate, and all security interests granted under the Security Documents shall be automatically released and all other requirements described in this Credit Support Annex shall be extinguished, on the date on which the Outstanding Settlement Amount and all other payment Obligations (other than any contingent indemnification obligations for which no claim or demand for payment, whether oral or written, has been made at such time) under the Settlement Agreement of the Applicable Payment Group to the MDT are paid in full in cash and reduced to $0 (or less than $0); provided that the obligations of the Pledgors under the Pledge Agreement, and all security interests thereunder, shall be automatically reinstated if and to the extent that, for any reason, the Secured Party is required to disgorge, turn over, or otherwise pay any amount paid to the Secured Party by or on behalf of the Applicable Payment Group, whether as a result of any proceeding in bankruptcy or reorganization or otherwise.

EXHIBIT A to ANNEX [__][1]

**FINANCIAL STATEMENT TEMPLATE**

**Name of Entity**
**Balance Sheet**

_____ XX/XX/20XX

**Assets**

| | | |
|---|---|---|
| Cash and Cash Equivalents | $ | - |
| Accounts Receivable and Prepaid Expenses | | - |
| Marketable Securities and Hedge Funds | | - |
| Notes Receivable | | - |
| Other Investments | | - |
| Private Equity Investments | | - |
| Real Estate Investments | | - |
| Residential Real Estate | | - |
| Life Insurance – Surrender Value | | - |
| Retirement Accounts | | - |
| Artwork (including Jewelry) | | - |

**Total Assets**            $ _____ -

**Liabilities**

| | | |
|---|---|---|
| Accounts Payable | $ | - |
| Long-Term Debt | $ | - |
| Mortgage Debt | $ | - |
| Short-Term Debt | $ | - |

**Total Liabilities**         $ _____ -

**Net Assets**: $ _____

---

[1] NTD:  Exhibits subject to further review and negotiation.

A-1

**EXHIBIT B to ANNEX [___]**

## APPROVED FINANCIAL ADVISORS

Accenture

AlixPartners

Alvarez and Marsal

Analysis Group

AT Kearney

Bain & Company

BDO USA

Booz Allen Hamilton

Boston Consulting Group
Centerview Partners LLC
Deloitte
Ducera Partners LLC
Ernst & Young
Evercore
FTI Consulting

Grant Thornton
Greenhill
HL Consulting
Huron Consulting Group

KPMG

L.E.K Consulting
Lazard
Mercer

Oliver Wyman

Parthenon
PJT Partners
PricewaterhouseCoopers
Raymond James
Strategy
TRS Advisors
Any other independent financial advisor reasonably acceptable to
the Secured Party

**EXHIBIT C to ANNEX [__]**

## FORM OF COMPLIANCE CERTIFICATE

**[_____ __], 20[__]**

Reference is made to Annex [__] (the "**[JS/RS] Family B-Side Credit Support Annex**") to the Settlement Agreement dated as of [_____ __], 2021 among the Pledgors referred to in the [JS/RS] Family B-Side Credit Support Annex, the other Payment Parties party thereto and The Master Disbursement Trust (as amended, restated, supplemented or otherwise modified from time to time). Capitalized terms used herein and not otherwise defined herein shall have the meanings assigned to such terms in the [JS/RS] Family B-Side Credit Support Annex.

[*Certificate to consist of one the following certifications*][1]:

### Section 3.01(b)(i) Certification

[Reference is made to the [quarterly/annual] financial statements for the [fiscal quarter/fiscal year] period ending [_____ __], 20[__]. Pursuant to Section 3.01(b)(i) of the [JS/RS] Family B-Side Credit Support Annex, the undersigned, in his/her capacity as an authorized officer of the Pledgors (or, in the case of a Trust Pledgor, an authorized officer of its trustee), and not in any individual capacity, certifies as follows, for such fiscal period ending [_____ __], 20[__]:

To my knowledge, no Breach Trigger or Breach with respect to the Applicable Payment Group has occurred under the Settlement Agreement or the Pledge Agreement during such [fiscal quarter/fiscal year] period.]

### Section 3.01(b)(ii) Certification

[Reference is made to the Restricted Payment or series of related Restricted Payments made or to be made pursuant to Section 4.01(a) of the [JS/RS] Family B-Side Credit Support Annex (other than pursuant to Section 4.01(a)(iv)(A)) on or about [_____ __], 20[__] in an aggregate amount exceeding $10,000,000 (such Restricted Payment or series of related Restricted Payments, the "**Applicable Restricted Payment**"). Pursuant to Section 3.01(b)(ii) of the [JS/RS] Family B-Side Credit Support Annex, the undersigned, in his/her capacity as an authorized officer of the Pledgors (or, in the case of a Trust Pledgor, an authorized officer of its trustee), and not in any individual capacity, certifies as follows:

[1.] To my knowledge, as of the date hereof, no Breach Trigger or Breach with respect to the Applicable Payment Group has occurred under the Settlement Agreement or the Pledge Agreement.

[2. The Applicable Restricted Payment is being made pursuant to Section 4.01(a)(iv)(B) of the [JS/RS] Family B-Side Credit Support Annex.][2]

### Section 3.01(b)(iii) Certification

---

[1] NTD: Include applicable certification.

[2] NTD: Include if applicable.

C-1

[Reference is made to the Restricted Payment or series of related Restricted Payments made or to be made pursuant to Section 4.01(c) on or about [_____ __], 20[__] in an aggregate amount exceeding $10,000,000 (such Restricted Payment or series of related Restricted Payments, the "**Applicable Restricted Payment**").  Pursuant to Section 3.01(b)(iii) of the [JS/RS] Family B-Side Credit Support Annex, the undersigned, in his/her capacity as an authorized officer of the Pledgors (or, in the case of a Trust Pledgor, an authorized officer of its trustee), and not in any individual capacity, certifies as follows:

[1.] To my knowledge, as of the date hereof, no Breach Trigger or Breach with respect to the Applicable Payment Group has occurred under the Settlement Agreement or the Pledge Agreement.

[2. The Applicable Restricted Payment is being made pursuant to [Section 4.01(c)(i)]/ [Section 4.01(c)(iv)] of the [JS/RS] Family B-Side Credit Support Annex.][3]

By: _____
Name:
Title:

---

[3] NTD: Include if applicable.

C-2

**EXHIBIT D to ANNEX [__]**

## SCHEDULE OF DISTRIBUTIONS

**[_____ __], 20[__]**[1]

Reference is made to Annex [___] (the "**[JS/RS] Family B-Side Credit Support Annex**") to the Settlement Agreement dated as of [_____ __], 2021 among the Pledgors referred to in the [JS/RS] Family B-Side Credit Support Annex, the other Payment Parties party thereto and The Master Disbursement Trust (as amended, restated, supplemented or otherwise modified from time to time).  Capitalized terms used herein and not otherwise defined herein shall have the meanings assigned to such terms in the [JS/RS] Family B-Side Credit Support Annex.

Reference is made to the fiscal quarter ending [_____ __], 20[__].  In accordance with Section 3.1(e) of the [JS/RS] Family B-Side Credit Support Annex, set forth below are the distributions (or loans in lieu thereof) made by or between (i) any Holding Company Pledgor to the applicable Trust Pledgor and (ii) each Trust Pledgor to its beneficiaries, in each case, during such fiscal quarter.

| | |
|---|---|
| 1. | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |

For and behalf of the Pledgors:

By:  _____
Name:
Title:

---

[1] Schedule to be delivered within 25 Business Days after the end of each fiscal quarter.

D-1

**EXHIBIT E to ANNEX [__]**

## FORM OF COLLATERAL CERTIFICATE

**[_____ __], 20[__]**[1]

Reference is made to (i) Annex [__] (the "**[JS/RS] Family B-Side Credit Support Annex**") to the Settlement Agreement dated as of [_____ __], 2021 among the Pledgors referred to in the [JS/RS] Family B-Side Credit Support Annex, the other Payment Parties party thereto and The Master Disbursement Trust (the "**MDT**") (as amended, restated, supplemented or otherwise modified from time to time) and (ii) the Pledge Agreement dated as of [_____ __], 2021 (the "**Pledge Agreement**") among the Pledgors referred to in the [JS/RS] Family B-Side Credit Support Annex, Kokino LLC and the MDT (as amended, restated, supplemented or otherwise modified from time to time).  Capitalized terms used herein and not otherwise defined herein shall have the meanings assigned to such terms in the [JS/RS] Family B-Side Credit Support Annex.

Reference is made to the calendar year ending [_____ __], 20[__].  Pursuant to Section 3.01(f) of the [JS/RS] Family B-Side Credit Support Annex, the undersigned, in his/her capacity as an authorized officer of the Pledgors (or, in the case of a Trust Pledgor, an authorized officer of its trustee), and not in any individual capacity, certifies as follows:

1.      All liens granted to the Secured Party pursuant to the Pledge Agreement remain effective and are perfected as of the date hereof, [except with respect to the assets described below].

2.      There have been no changes to the information required to be included in the Annexes 1, 2 and 3 to the Pledge Agreement [, except for the following items:]

[APPLICABLE PLEDGOR]

By:     _____
        Name:
        Title:

_____

[1] Certificate to be delivered within 30 days after calendar year end.

E-1

**EXHIBIT F to ANNEX [__]**

**FORM OF INCURRENCE TEST COMPLIANCE CERTIFICATE**

**[_____ __], 20[__]**

Reference is made to Annex [__] (the "**[JS/RS] Family B-Side Credit Support Annex**") to the Settlement Agreement dated as of [_____ __], 2021 among the Pledgors referred to in the [JS/RS] Family B-Side Credit Support Annex, the other Payment Parties party thereto and The Master Disbursement Trust (as amended, restated, supplemented or otherwise modified from time to time).  Capitalized terms used herein and not otherwise defined herein shall have the meanings assigned to such terms in the [JS/RS] Family B-Side Credit Support Annex.

[*Certificate to consist of one the following certifications*][24]:

[This certificate is being delivered pursuant to Section 4.01(a)(i) of the [JS/RS] Family B-Side Credit Support Annex in connection with a proposed Restricted Payment to be made by a Holding Company Pledgor pursuant to such provision.

I, on behalf of an Independent Financial Advisor, and not in any individual capacity, hereby certify that in reliance on calculations provided to me by the Pledgors the Lock Box Distribution Incurrence Test shall be satisfied on a pro forma basis after giving effect to such Restricted Payment.  Attached as Schedule 1 hereto is a calculation of the Collateral Coverage Ratio on pro forma basis after giving effect to the applicable Restricted Payment.]

[This certificate is being delivered pursuant to Section 4.01(c)(ii) of the [JS/RS] Family B-Side Credit Support Annex in connection with a proposed Restricted Payment to be made by a Trust Pledgor pursuant to such provision.

I, on behalf of an Independent Financial Advisor, and not in any individual capacity, hereby certify that in reliance on calculations provided to me by the Pledgors the Trust Distribution Incurrence Test shall be satisfied on a pro forma basis after giving effect to such Restricted Payment.  Attached as Schedule 1 hereto is a calculation of the Asset Coverage Ratio on pro forma basis after giving effect to the applicable Restricted Payment.]

[          ], an Independent Financial Advisor and not in any individual capacity.

By: _____
Name:
Title:

---

[24] NTD: Include applicable certification.

<u>**SCHEDULE 1 to EXHIBIT F TO ANNEX [    ]**</u>[25]

**[Calculation of Collateral Coverage Ratio]**

A. Value of Collateral:                                    $[_____]

B.  Outstanding Settlement Amount of the Applicable Payment Group      $[_____]

Collateral Coverage Ratio (A/B):                    [____]:1.00

Minimum Amount Permitted                        1.00:1.00

In Compliance?                                [Yes/No]

**[Calculation of Asset Coverage Ratio]**

A. Value of Assets of Trust Pledgors:                  $[_____]

B.  Outstanding Settlement Amount of the Applicable Payment Group      $[_____]

Asset Coverage Ratio (A/B):                      [____]:1.00

Minimum Amount Permitted                        1.50:1.00

In Compliance?                                [Yes/No]

---

[25] Insert calculation as applicable

4

**<u>Annex E</u>**
**Credit Support Annex for B-Side Payment Group 2**

**Draft 7/7/2021 – Filing Version**

## ANNEX E[1]
## B-SIDE PAYMENT GROUP 2

### ARTICLE I.
### DEFINITIONS

**Section 1.01**     **Settlement Agreement**.  Capitalized terms used herein and not defined herein have the meanings ascribed to such terms in the Settlement Agreement to which this Annex [___] is attached.

**Section 1.02**     **Defined Terms**.  As used in this Credit Support Annex, the following terms shall have the meanings specified below:

"**Advanced Contribution Top-Off**" means, as of any date of determination, an amount equal to the lesser of:

(i)     an amount equal to (A) the aggregate amount distributed or paid pursuant to Section 4.01(a)(iv)(A) and Section 4.01(b) prior to such date minus (B) the aggregate amount of Advanced Contribution Top-Offs made prior to such date pursuant to Section 2.02 (in each case, without duplication); and

(ii)     the amount required to increase the Value of the Collateral to an amount equal to the lesser of (x) $500,000,000 and (y) the Outstanding Settlement Amount of the Applicable Payment Group as of such date.

"**Applicable Federal Rate**" means, with respect to any month, the applicable federal rate published by the IRS for such month.

"**Applicable Payment Group**" means [*the Jonathan Sackler family Payment Group under the Settlement Agreement*]/[*the Richard Sackler family Payment Group under the Settlement Agreement*].

"**Asset Coverage Ratio**" means, as of any date of determination, the ratio of (A) the Value of the assets of the Trust Pledgors (excluding the value of any Equity Interests in IACs owned directly or indirectly by the Trust Pledgors) as of such date of determination to (B) the Outstanding Settlement Amount of the Applicable Payment Group as of such date of determination.

"**Asset Management Agreement**" means any asset management agreement entered into from time to time between or among the Holding Company Pledgors, on the one hand, and the Asset Manager, on the other hand, with respect to the management of the assets and investments of the Holding Company Pledgors, including the agreements existing as of the Settlement Effective Date specified in Exhibit G.

---

[1] This Annex E to the Shareholder Settlement Agreement is in draft form and remains subject to continuing review and negotiation among the Debtors and interested parties with respect thereto, has not yet been agreed to by any party and remains subject to material change.  The Debtors reserve the right, subject to the terms and conditions set forth in the Plan, to alter, amend, modify or supplement the Shareholder Settlement Agreement at any time before the Effective Date of the Plan, or any such other date as may be provided for by the Plan or by order of the Bankruptcy Court; *provided* that, if the Shareholder Settlement Agreement is altered, amended, modified, or supplemented in any material respect prior to the hearing to confirm the Plan, the Debtors will file a redline of such document with the Bankruptcy Court.

"**Asset Manager**" means [*Kokino*]/[*Summer Road*] and any replacement asset manager.

"**Business Day**" means any day excluding Saturday, Sunday and any day which is a legal holiday under the laws of the State of New York or the State of Wyoming or is a day on which banking institutions located in any such state are authorized or required by law or other governmental action to close.

"**Collateral**" means the "Collateral" as defined in Section 2.01(a).  In no event shall the Collateral include Excluded Property.

"**Collateral Coverage Ratio**" means, as of any date of determination, the ratio of (A) the Value of the Collateral as of such date of determination to (B) the Outstanding Settlement Amount of the Applicable Payment Group as of such date of determination.

"**Credit Support Annex**" means this Annex [__] to the Settlement Agreement.

"**Disposition**" shall mean, with respect to any property or asset, any conveyance, sale, lease, sublease, license, assignment, transfer or other disposition (including by way of merger or consolidation and including any sale and leaseback transaction) of such property or asset, including by means of a merger, consolidation, division or similar transaction, and the terms "**Dispose**," "**Disposed**" and "**Disposing**" shall have meanings correlative thereto.

"**Enforcement Event**" means the occurrence of a Specified Breach by the Applicable Payment Group permitting the Secured Party to exercise the Payment Remedy under the Settlement Agreement with respect to such Applicable Payment Group.

"**First Priority**" means, with respect to any Lien purported to be created in any Collateral pursuant to any Security Document, that such Lien is prior in lien priority to any other Lien thereon other than Permitted Encumbrances applicable to such Collateral which as a matter of law have priority over the respective Liens on such Collateral created pursuant to the relevant Security Document.

"**Hedging Agreement**" means (i) any and all rate swap transactions, basis swaps, credit derivative transactions, forward rate transactions, commodity swaps, commodity options, forward commodity contracts, equity or equity index swaps or options, bond or bond price or bond index swaps or options or forward bond or forward bond price or forward bond index transactions, interest rate options, forward foreign exchange transactions, currency swap transactions, cross-currency rate swap transactions, currency options, cap transactions, floor transactions, collar transactions, spot contracts, or any other similar transactions or any combination of any of the foregoing (including any options or warrants to enter into any of the foregoing), whether or not any such transaction is governed by, or otherwise subject to, any master agreement or any netting agreement, and (ii) any and all transactions or arrangements of any kind, and the related confirmations, which are subject to the terms and conditions of, or governed by, any form of master agreement (or similar documentation) published from time to time by the International Swaps and Derivatives Association, Inc., any International Foreign Exchange Master Agreement, or any other master agreement (any such agreement or documentation, together with any related schedules, a "**Master Agreement**"), including any such obligations or liabilities under any Master Agreement

"**Holding Company Pledgors**" means, collectively, [(i) [*2A Trust Holding Company LLC*] and (ii) [*AJ Holding Company LLC*]][2] / [(i) [*1A Trust Holding Company LLC*] and (ii) [*AR Holding Company LLC*]][3].

"**Increased Built-in Gain**" means, with respect to any Permitted Exchange, an amount equal to the sum of the positive difference, if any, between (i) the Value of an asset received in such Permitted Exchange minus the Investment Holding Vehicle's basis in such asset for U.S. federal income tax purposes and (ii) the Value of the original asset minus the Investment Holding Vehicle's basis in the original asset for U.S. federal income tax purposes.

"**Incurrence Tests**" means, collectively, the Lock Box Distribution Incurrence Test and the Trust Distribution Incurrence Test.

"**Indebtedness for Borrowed Money**" of any Person means, as of any date of determination, all of the following: (i) all indebtedness of such Person for borrowed money, (ii) all obligations of such Person evidenced by bonds, debentures, notes or other similar instruments, (iii) all obligations of such Person under finance or capital leases, (iv) all net reimbursement obligations of such Person with respect to letters of credit, foreign currency sale agreements and bankers' acceptances, except such as are obtained by such Person to secure performance of obligations (other than for borrowed money or similar obligations), (v) all indebtedness of others with respect to obligations referred to in (i) to (iv) above, guaranteed in any manner, directly or indirectly, by such Person, and (vi) all indebtedness of others with respect to obligations referred to in (i) to (v) above are secured by a Lien on any asset owned by such Person (whether or not such indebtedness is assumed by, or is a personal obligation of, such Person); provided that the amount of such indebtedness will be the lesser of: (a) the fair market value of such asset at such date of determination, and (b) the amount of such indebtedness of such other Person.  It is understood and agreed that payment Obligations of any Person under the Settlement Agreement shall not constitute Indebtedness for Borrowed Money.

"**Independent Financial Advisor**" means (i) a financial advisor selected by the Pledgors from the financial advisors listed on Exhibit B attached hereto or (ii) solely to the extent the applicable Pledgor is unable to engage any such independent financial advisor set forth in clause (i) of this definition, any other independent financial advisor reasonably acceptable to the MDT.

"**Investment Holding Vehicles**" means each direct, wholly-owned, holding company Subsidiary of each Holding Company Pledgor as of the Settlement Effective Date and identified as such in the Pledge Agreement and each other direct, wholly-owned Subsidiary formed or acquired by a Holding Company Pledgor after the Settlement Effective Date to make and hold investments but excluding, in all cases, any underlying investment vehicle owned by an Investment Holding Vehicle.

"**IRC**" means the Internal Revenue Code of 1986, as amended.

"**IRS**" means the United States Internal Revenue Service.

"**Kokino**" means Kokino LLC, a Delaware limited liability company (together with its successors and permitted assigns).

---

[2] NTD: Jon Sackler family.

[3] NTD: Richard Sackler family.

3
Annex [___]

["**Listed Transaction**" means (x) a "listed transaction" identified as such by the Internal Revenue Service under Section 6707A(c)(2) of the Internal Revenue Code and Treasury Regulation Section 1.6011-4(b)(2)(i) as of the date of this Agreement or (y) a "listed transaction" identified as such by the Internal Revenue Service under such provisions after the date of this Agreement substantially comparable to the type of promotor-marketed abusive tax shelter transaction that the Internal Revenue Service has been identifying as "listed transactions" as of the date of this Agreement, in each case unless the Internal Revenue has delisted the transaction.[4]]

"**Lock Box Distribution Incurrence Test**" as defined in Section 4.01(a)(i)(B).

"**Material Adverse Effect**" means a material adverse effect on (a) the business, assets or financial condition, in each case, of the Pledgors, taken as a whole, (b) the rights and remedies (taken as a whole) of the Secured Party under the Settlement Agreement or the Security Documents or (c) the ability of the Pledgors (taken as a whole) to perform their payment Obligations under the Settlement Agreement or the Security Documents.

"**North Bay**" means North Bay Associates, a Delaware general partnership (together with its successors and assigns).

"**Permitted Encumbrances**" [means (a) Liens for Taxes (i) that are not yet delinquent or that are being contested in accordance with Section 3.05 or (ii) with respect to which the failure to make payment would not reasonably be expected to have a Material Adverse Effect; (b) statutory Liens of landlords and carriers', warehousemen's, mechanics', materialmen's, repairmen's, storage or other similar like Liens arising in the ordinary course of business and securing obligations that are not yet due or which do not in the aggregate have a material adverse effect on the value or use of property encumbered thereby; (c) Liens incurred or pledges and deposits made in the ordinary course of business in compliance with workers' compensation, unemployment insurance and other social security laws or regulations; (d) deposits Liens to secure the performance, or payment in respect of, bids, insurance premiums, deductibles or co-insured amounts, tenders, government or utility contracts (other than for the repayment of borrowed money) trade contracts (other than for obligations for the payment of borrowed money), leases, statutory obligations, surety, stay, customs and appeal bonds, performance bonds and other obligations of a like similar nature incurred in the ordinary course of business; (e) zoning restrictions, easements, rights-of-way, encroachments, protrusions, licenses or other restrictions on, and other minor defects or irregularities affecting, the use of any real property estate (including leasehold title) and other similar encumbrances incurred in the ordinary course of business which, in the aggregate, do not materially interfere with the ordinary conduct of the business of the Pledgors, and ground leases in respect of real property on which facilities owned or leased by the Pledgors are located; (f) Liens (i) of a collection bank arising under Section 4-210 of the Uniform Commercial Code on the items in the course of collection, (ii) attaching to trading accounts or other brokerage accounts incurred in the ordinary course of business, (iii) in favor of a banking or other financial institution arising as a matter of law encumbering deposits or other funds maintained with a financial institution (including the right of set-off) and which are within the general parameters customary in the banking industry and (iv) for the fees and expenses of a bank or securities intermediary in maintaining deposit accounts or securities accounts; (g) any Lien on any property or asset of the Trust Pledgors existing on the Settlement Effective Date; provided that (i) all of the Indebtedness for Borrowed Money secured by such Liens are listed on Schedule I attached hereto and (ii) any such Lien shall secure only those obligations which it secures on the Settlement Effective Date and extensions, refinancings, renewals and replacements thereof that do not increase the outstanding principal amount thereof other than for accrued interest, fees and premiums (if any) thereon and reasonable fees and expenses associated with the extension, refinancing,

---

[4] NTD:  Subject to further review and negotiation.

4

renewal or replacement, and such Lien shall not extend to any other property or asset other than the property or assets securing such obligations on the Settlement Effective Date and the proceeds or products thereof; (h) Liens on property of Trust Pledgors in favor of clearing agencies, broker-dealers and similar Liens incurred in the ordinary course of business; (i) Liens arising solely from precautionary filings of financing statements under the Uniform Commercial Code of the applicable jurisdictions; (j) [reserved]; (k) Liens consisting of any (i) interest or title of a lessor or sub-lessor under any lease of real estate not prohibited hereunder, (ii) landlord lien permitted by the terms of any lease, (iii) restriction or encumbrance to which the interest or title of such lessor or sub-lessor may be subject or (iv) subordination of the interest of the lessee or sub-lessee under such lease to any restriction or encumbrance referred to in the preceding clause (iii); (l) Liens (i) on any cash earnest money deposits made by the Pledgors in connection with any letter of intent or purchase agreement with respect to any investment permitted hereunder or (ii) consisting of an agreement to dispose of any property; (m) Liens securing obligations under operating, reciprocal easement or similar agreements entered into in the ordinary course of business of the Pledgors; (n) leases, licenses, subleases or sublicenses granted to others in the ordinary course of business which do not (i) interfere in any material respect with the business of the Pledgors or (ii) secure any Indebtedness for Borrowed Money; (o) Liens arising (i) out of conditional sale, title retention, consignment or similar arrangements for the sale of any assets or property in the ordinary course of business or (ii) by operation of law under Article 2 of the UCC (or similar law of any jurisdiction); (p) Liens in favor of any Pledgor; (q) Liens on assets and property of the Trust Pledgors (other than Equity Interests in the Holding Company Pledgors) securing obligations under Hedging Agreements entered in the ordinary course; (r) (i) Liens on equity interests of joint ventures or non-Pledgors securing capital contributions to, or obligations of, such Persons and (ii) customary rights of first refusal and tag, drag and similar rights in joint venture agreements and agreements with respect to non-Pledgors; and (t) any encumbrance or restriction assumed in connection with an acquisition of the property or equity interests of any Person, so long as such encumbrance or restriction relates solely to the property so acquired (or to the Person or Persons (and its or their subsidiaries) bound thereby) and was not created in connection with or in anticipation of such acquisition.][5]

"**Permitted Exchange**" as defined in clause (C) of the last paragraph of Section 4.01(a).

"**Pledge Agreement**" means the Pledge and Security Agreement entered into on the Settlement Effective Date among the Pledgors, the Asset Manager and the Secured Party, as the same may be amended, restated, supplemented or otherwise modified from time to time.

"**Pledgors**" means, collectively, the Trust Pledgors and the Holding Company Pledgors.

"**Related Parties**" [_____][6]

"**Related Party Transaction**" as defined in Section 4.02.

"**Restricted Payment**" [means any (i) dividend or other distribution (whether in cash, securities or other property) with respect to any Equity Interest of any Person, or any payment (whether in cash, securities or other property), including any sinking fund or similar deposit, on account of the purchase, redemption, retirement, acquisition, cancellation or termination of any such Equity Interest (including, but not limited to, the Collateral), or on account of any return of capital to such Person's shareholders, partners or members (or the equivalent Persons thereof), (ii) with respect to any Trust Pledgor, any distribution (whether in cash, securities or other property) to any beneficiary of such Trust Pledgor or a direct payment by such Trust Pledgor to any beneficiary of such Trust Pledgor or (iii) in the case of a Holding Company

---

[5] NTD:  Definition subject to review and negotiation.

[6] NTD:  Definition subject to review and negotiation.

Pledgor, any payment or distribution of the types described in Section 4.01(a) or (b) to any Trust Pledgor or any beneficiary thereof.][7]

"**Secured Party**" means each of (i) the MDT and each of its successors and permitted assigns and (ii) any agent, trustee or other representative or designee (including one or more Subsidiaries or other entities of the MDT formed to carry out its duties and obligations under the Definitive Documents) authorized or appointed to hold any security interest in or Lien on, or take possession or control of, any Collateral on behalf of and for the benefit of itself and any person described in clause (i) above.

"**Secured Obligations**" as defined in Section 2.01(a).

"**Security Documents**" means the Pledge Agreement, each uncertificated securities control agreement and each of the other security agreements, pledge agreements and other instruments and documents, and each of the supplements thereto, executed and/or delivered pursuant to this Credit Support Annex or the Security Documents in order to grant or purport to grant a Lien on any assets to secure the Secured Obligations and/or under which rights or remedies with respect to such Liens are governed.

"**Specified Assets**" means cash, cash equivalents, marketable securities or investments in private equity funds or hedge funds.

"**Trust Distribution Incurrence Test**" as defined in Section 4.01(c)(i)(B).

"**Trust Pledgors**" means, collectively, [(i) AJ Irrevocable Trust and (ii) 2A Trust][8][ AR Irrevocable Trust and the 1A Trust][9].

"**UCC**" shall mean the Uniform Commercial Code or any successor provision thereof (or similar code or statute) as in effect from time to time in any applicable state or jurisdiction, to the extent it may be required to apply to any item or items of Collateral.

"**Value**" means, with respect to the Collateral or assets of the Pledgors, the value thereof determined in accordance with Section 1.04.

**Section 1.03    Interpretative Provisions.**  The rules of construction set forth in Section 1.02 of the Settlement Agreement shall apply *mutatis mutandis* to this Credit Support Annex.  The use herein of the word "include" or "including", when following any general statement, term or matter, shall not be construed to limit such statement, term or matter to the specific items or matters set forth immediately following such word or to similar items or matters, whether or not non-limiting language (such as "without limitation" or "but not limited to" or words of similar import) is used with reference thereto, but rather shall be deemed to refer to all other items or matters that fall within the broadest possible scope of such general statement, term or matter.  References herein to any Section, Schedule or Exhibit shall be to a Section, an Appendix or an Exhibit, as the case may be, of this Credit Support Annex unless otherwise specifically provided.  In addition, (i) the term "descendants" shall include all issue, including grandchildren, stepchildren and adoptive relationships, and current and former spouses and (ii) the term "spouse" shall include qualified domestic partners.

---

[7] NTD:  Definition subject to review and negotiation.

[8] NTD: Jon Sackler family annex.

[9] NTD: Richard Sackler family annex.

**Section 1.04    Valuation Methodology**.    It is understood and agreed that for purposes of preparing the quarterly and annual financial statements described in this Credit Support Annex and calculating compliance with any covenant contained in this Credit Support Annex (including with respect to the Value of the initial Collateral as of the Settlement Effective Date and the Incurrence Tests), asset valuations shall be determined in all material respects in a manner that is reasonably consistent with the valuation methodologies used by Huron Consulting Services LLC to prepare the previous net asset reports delivered in the Chapter 11 Cases pursuant to the Amended and Restated Stipulation and in accordance with this Section 1.04.  Notwithstanding the foregoing, (i) all asset valuations (including with respect to the initial Collateral as of the Settlement Effective Date and the Incurrence Tests) shall exclude any contingent liabilities (including tax liabilities and inchoate claims but, for the avoidance of doubt, guarantees of Indebtedness for Borrowed Money shall be counted in the determination of asset values) and, for the avoidance of doubt, any tax refunds that might be payable but for an election under section 643(g) as a result of a trust distribution, (ii) the Pledgors may exclude any asset in their sole discretion when calculating compliance with the Incurrence Tests, (iii) with respect to the valuation of assets consisting of Equity Interests that are listed or quoted for trading on the New York Stock Exchange, the NYSE MKT, the NASDAQ Global Select Market, the NASDAQ Global Market, the NASDAQ Capital Market, OTC Bulletin Board or any other national securities exchange, the "Value" thereof shall be based on the arithmetic average of the closing price of a share of such Equity Interests for the ten (10) consecutive trading days on which shares of such Equity Interests traded immediately preceding the date of determination and (iv) all asset valuations shall exclude any Obligations under the Settlement Agreement.  In determining asset valuation as of any date of determination, other than in the case of cash, cash equivalents or other assets for which market quotations are readily available and may be determined on such date of determination, the Pledgors and any Independent Financial Advisor shall use the asset valuation for the applicable assets as of the end of the most recently ended fiscal quarter for which financial statement are available as of such date of determination or, if no such quarterly valuation exists, then the most recent valuation used by North Bay and/or the Asset Manager to maintain the Pledgors' books and records.

**Section 1.05    Division**.  For all purposes under this Credit Support Annex, in connection with any division or plan of division under Delaware Law or any comparable event under a different jurisdiction's Laws, as applicable: (a) if any asset, right, obligation or liability of any Person becomes the asset, right, obligation or liability of a different Person, then it shall be deemed to have been transferred from the original Person to the subsequent Person, and (b) if any new Person comes into existence, such new person shall be deemed to have been organized on the first date of its existence by the holders of its Equity Interests.

## ARTICLE II.
## COLLATERAL MATTERS

**Section 2.01    Security; Security Documents**.

(a)    As credit support for, and to secure the prompt payment and performance of the payment Obligations of the Applicable Payment Group under the Settlement Agreement to the MDT (the "**Secured Obligations**"),

(i)    each Trust Pledgor shall, on or before the Settlement Effective Date, grant a perfected first priority security interest in and Lien on all of its right, title and interest in the following property, wherever located, and whether now owned or hereafter acquired (the "**Trust Pledgor Collateral**"):

> (A)    in the case of the AJ Irrevocable Trust, 100% of the Equity Interests held by the AJ Irrevocable Trust in AJ Holding Company LLC;

> (B)    in the case of the 2A Trust, 100% of the Equity Interests held by the 2A Trust in 2A Trust Holding Company LLC; and

> (C)    all proceeds and products of the foregoing;

(ii)    each Holding Company Pledgor shall, on or before the Settlement Effective Date, grant a perfected first priority security interest in and Lien on all of its right, title and interest in the following property, wherever located, and whether now owned or hereafter acquired (the "**Holding Company Pledgor Collateral**"):

> (A)    substantially all assets of such Holding Company Pledgor (including 100% of the Equity Interests in all underlying Investment Holding Vehicles owned by such Holding Company Pledgor and its rights under Asset Management Agreements between such Holding Company Pledgor and the Asset Manager with respect to voting rights to liquidate assets) as described in the Pledge Agreement; and

> (B)    all proceeds and products of the foregoing; and

(iii)    The Asset Manager shall, on or before the Settlement Effective Date, grant a perfected first priority security interest in and Lien on all of its right, title and interest in the Asset Management Agreements between any Holding Company Pledgor and the Asset Manager with respect to voting rights to liquidate assets and any proceeds thereof (the "**Kokino Asset Management Agreement Collateral**" and, together with the Trust Pledgor Collateral and the Holding Company Pledgor Collateral, collectively, the "**Collateral**").

Notwithstanding the foregoing, in no event shall the Collateral include (I) investments held by an Investment Holding Vehicle that are distributed to a Holding Company Pledgor for the sole purpose of transferring such investment to another Investment Holding Vehicle, (II) any assets being contributed to any Holding Company Pledgor on a "post-closing" basis, so long as, in each case, such assets are contributed to an Investment Holding Vehicle within five (5) Business Days of their receipt by, or contribution to, a Holding Company Pledgor, (III) any property the pledge of which or security interest therein is prohibited by applicable Law (including, without limitation, any legally effective requirement to obtain the consent of any Governmental Authority) and any governmental licenses or state or local franchises, charters or authorizations, to the extent a security interest therein would be prohibited or restricted thereby (including, without limitation, any legally effective prohibition or restriction), in each case except to the extent such prohibition or restriction is unenforceable after giving effect to applicable anti-assignment provisions of the UCC or any other applicable Law (other than proceeds thereof, the assignment of which is expressly deemed effective under the UCC notwithstanding such prohibition or restriction), (IV) any lease, license or other agreements (other than organizational documents of the Pledgors or any Investment Company Vehicle) to the extent that a security interest therein would violate or invalidate such lease, license or agreement or create a right of termination in favor of any other party thereto or a default thereunder, in each case except to the extent such violation, invalidation or termination right is unenforceable after giving effect to applicable anti-assignment provisions of the UCC or any other applicable Law, and provided that any such provision in any lease, license or other agreement was not entered into after the date hereof with the purpose of excluding such asset from the Collateral and (V) ownership interests in any non-wholly-owned Subsidiaries but only to the extent the organizational documents or other agreements with non-Related Party equity holders of such non-wholly-owned Subsidiaries do not permit the pledge of such ownership interests for so long as such prohibition exists, in

each case after giving effect to the anti-assignment provisions in the UCC or applicable Law (the assets and property referred to in the foregoing clauses (I) through (V) are collectively referred to herein as the "**Excluded Property**"); <u>provided</u> that, in the case of clauses (III) through (V), (i) the Collateral shall include the replacements, substitutions and proceeds of any of the foregoing property in clauses (III) through (V) unless such replacements, substitutions or proceeds also constitute Excluded Property in accordance with clauses (III) through (V) above and (ii) clauses (III) through (V) above shall not apply to property or assets (that would otherwise constitute Collateral but for the above exclusions) valued at more than $25,000 in the aggregate.

(b)    Without limiting the generality of clause (a) of this Section 2.01, on the Settlement Effective Date, (i) the Secured Party shall have a perfected first priority security interest in and Lien on (A) 100% of the Equity Interests of the Holding Company Pledgors and (B) substantially all assets of the Holding Company Pledgors pursuant to Section 2.01(a)(ii), and (ii) the collective Value of the Equity Interests held by Holding Company Pledgors in the Investment Holding Vehicles and pledged to the Secured Party to secure the Secured Obligations of the Applicable Payment Group shall not be less than $500,000,000 (which, for the avoidance of doubt, shall not include any Excluded Property).

(c)    The Pledgors shall not be required, nor shall the Secured Party be authorized, to perfect any pledge or security interest hereunder by any means other than by (i) filing financing statements (including continuation statements) pursuant to the UCC in the office of the secretary of state (or similar central filing office) of the relevant state or jurisdiction for each Pledgor, (ii) in the case of Collateral consisting of Equity Interests in any Holding Company Pledgor or Investment Holding Vehicle organized in jurisdictions outside the U.S., the entry into non-US law share pledge agreements and the filing of financing statements or local law equivalents and other perfection actions in relevant non-US jurisdictions, (iii) the delivery to the Secured Party of certificates or other instruments (if any) representing pledged Equity Interests, together with stock transfer powers or other instruments of transfer (if any) with respect thereto endorsed in blank and (iv) in the case of the pledge of Equity Interests in any Holding Company Pledgor or Investment Holding Vehicle in the form of uncertificated securities, the execution of uncertificated securities control agreements.

(d)    Each Pledgor shall promptly and duly take, execute, acknowledge and deliver such further acts, documents and assurances as may from time to time be necessary or as the Secured Party may from time to time reasonably request in order to carry out the intent and purposes of the Security Documents and consistent with this Credit Support Annex (including, but not limited to, making non-U.S. filings, the entry into non-U.S. security agreements and the entry, by the applicable Pledgor and any Holding Company Pledgor or Investment Holding Vehicle that is the issuer of pledged equity interests that are uncertificated securities, into an uncertificated securities control agreement) to establish, create, preserve, protect, perfect, and maintain perfection of a first priority lien on the Collateral in favor of and for the benefit of the Secured Party (including Collateral acquired after the date hereof) and to exercise any and all remedies in respect thereof.

(e)    The Security Documents shall contain customary release provisions providing for the release the security interests in the Collateral upon a Disposition of Collateral not prohibited by this Credit Support Annex.

**Section 2.02    Advanced Contribution Top-Off**. If any distribution or payment made pursuant to Section 4.01(a)(iv)(A) or any payment made under Section 4.01(b) is thereafter returned, in whole or in part, to the Applicable Payment Group in the form of a Permitted Withdrawal of the Applicable Payment Group's Unapplied Advanced Contributions (i.e., a Permitted Withdrawal on account of Sale Proceeds Deductions or Distribution Deductions with respect to the Applicable Payment Group's Unapplied Advanced Contributions (the amount of such Permitted Withdrawal, the "**Recouped Advanced**

9

Contribution")), the Trust Pledgors shall, within forty-five (45) days of such receipt, contribute assets to the applicable Holding Company Pledgor (which assets the Holding Company Pledgor shall, in turn, contribute to an Investment Holding Vehicle) in an amount equal to the lesser of (i) the Advanced Contribution Top-Off and (ii) the Recouped Advanced Contribution. [For the avoidance of doubt, the limitation in the preceding sentence to the Recouped Advanced Contribution shall not preclude further contributions in accordance with this Section 2.02 in the event additional amounts are returned to the relevant Applicable Payment Group.][10]

Section 2.03    **Tax Forms**.  Each Pledgor shall provide to the Secured Party and keep up to date a duly completed and executed IRS Form W-9 (or any successor forms) and shall provide any other tax forms or certifications that the Secured Party may reasonably request to permit the Secured Party, any transferee or their payment agents to comply with any applicable tax withholding or reporting requirements.

Section 2.04    **Opinions of Counsel**.  On the Settlement Effective Date, each Pledgor shall deliver to the MDT a customary opinion of its counsel (the "**Settlement Effective Date Opinion**") regarding, among other things, the enforceability and perfection of the relevant security interest with respect to the Collateral.

Section 2.05    **New Pledgor; Additional Collateral.**

(a)    In the event a Trust Pledgor is subject to a consolidation, merger, division, dissolution or liquidation or similar reorganization (or any other event contemplated by Section 4.10), the resulting, surviving or transferee trust(s) (a "**New Trust Pledgor**") (x) the applicable Trust Pledgor party to such transaction shall deliver notice to the MDT and (y) within sixty (60) days of such event (or such longer period as may be agreed to in writing by the MDT (acting reasonably)), such Trust Pledgor shall (and shall cause the New Trust Pledgor to) (I) execute and deliver to the MDT such amendments or supplements to the Security Documents as required thereby or such other documents, instruments or agreements required by this Credit Support Annex to grant to the Secured Party a perfected First Priority security interest in and a Lien on the Equity Interests in any Holding Company Pledgor owned by such New Trust Pledgor in accordance with Section 2.01(a)(i) and (II) take all actions to cause such security interest and Lien to be duly perfected as required by Section 2.01(c).

(b)    In the event a Holding Company Pledgor is subject to a consolidation, merger, division, dissolution or liquidation or similar reorganization, the resulting, surviving or transferee entit(ies) (a "**New Holding Company Pledgor**") (x) the applicable Holding Company Pledgor party to such transaction shall deliver notice to the MDT and (y) within sixty (60) days of such event (or such longer period as may be agreed to in writing by the MDT (acting reasonably)), such Holding Company Pledgor shall (and shall cause the New Holding Company Pledgor to) (I) execute and deliver to the MDT such amendments or supplements to the Security Documents as required thereby or such other documents, instruments or agreements required by this Credit Support Annex to grant to the Secured Party a perfected First Priority security interest in and a Lien on those assets of such New Holding Company Pledgor that constitute or are intended to constitute Holding Company Pledgor Collateral and (II) take all actions to cause such security interest and Lien to be duly perfected as required by Section 2.01(c).

(c)    Following the acquisition of additional Equity Interests that (or any assets from the proceeds from the sale of Collateral) that constitute Collateral and that are not automatically secured and perfected pursuant to the Security Documents (including filed UCC financing statements), (x) the applicable Pledgor shall deliver notice to the MDT and (y) within sixty (60) days of such acquisition, the

---

[10] NTD: Language subject to review and negotiation.

applicable Pledgor shall (I) execute and deliver to the MDT such amendments or supplements to the relevant Security Documents as required thereby or such other documents or agreements required by this Credit Support Annex to grant to the Secured Party a perfected First Priority security interest in and a Lien on such Equity Interests and (II) take such other actions to cause such security interest and Lien to be duly perfected as required by Section 2.01(c).

(d)    Following the joinder of a new Pledgor, or with respect to the acquisition of additional Equity Interests that constitute Collateral and that are not automatically secured and perfected pursuant to the Pledge Agreement or other collateral documents (including filed UCC financing statements), at the reasonable request of the Secured Party, the applicable Pledgor shall deliver a customary opinion of counsel with respect thereto.

## ARTICLE III.
## AFFIRMATIVE COVENANTS

**Section 3.01    Financial Statements, Reports**.

(a)    The Pledgors shall deliver to the Secured Party (i) within sixty (60) days following the end of each fiscal quarter period, copies of the Pledgors' quarterly financial statements and (ii) within one-hundred twenty (120) days following the end of each fiscal year, annual financial statements of each Pledgor [and omitting (or redacting) counterparty or confidential information[11]], in each case, setting forth the categories of investments held by such Pledgor, in each case, in a form substantially similar to the form attached hereto as Exhibit A;

(b)    (i)    Together with the financial statements required to be delivered pursuant to Section 3.01(a), the Pledgors shall deliver a compliance certificate, in a form substantially similar to the form attached hereto as Exhibit C, certifying that to their knowledge no Breach Trigger or Breach with respect to the Applicable Payment Group has occurred under the Settlement Agreement or the Security Documents during the period covered by the certificate;

(ii)    on or prior to the making of any Restricted Payment or series of related Restricted Payments in excess of $10,000,000, and in $10,000,000 increments thereof, by a Holding Company Pledgor pursuant to Section 4.01(a) (other than pursuant to Section 4.01(a)(iv)(A)), such Holding Company Pledgor shall deliver a compliance certificate, in a form substantially similar to the form attached hereto as Exhibit C, certifying that to their knowledge no Breach Trigger or Breach with respect to the Applicable Payment Group has occurred under the Settlement Agreement or the Security Documents and, if applicable, in the case of any such certificate being delivered with respect to a Restricted Payment by a Holding Company Pledgor pursuant to Section 4.01(a)(iv)(B), such certificate shall include a confirmation that such Restricted Payment is being made pursuant to such clause (it being understood and agreed that once a certificate has been delivered pursuant to this clause (b)(ii) with respect to any Restricted Payment or series of related Restricted Payments in an aggregate amount greater than $10,000,000, there shall be no requirement to deliver an additional certificate under this clause (b)(ii) until the applicable Holding Company Pledgor has made additional Restricted Payments in an aggregate amount greater than $10,000,000); and

---

[11] NTD:  Form of Exhibit A subject to review and negotiation.

(iii)   on or prior to the making of any Restricted Payment or series of related Restricted Payments in excess of $10,000,000, and in $10,000,000 increments thereof, by a Trust Pledgor pursuant to Section 4.01(c), such Trust Pledgor shall deliver a compliance certificate, in a form substantially similar to the form attached hereto as Exhibit C, certifying that to their knowledge no Breach Trigger or Breach with respect to the Applicable Payment Group has occurred under the Settlement Agreement or the Security Documents and, if applicable, in the case of any such certificate being delivered with respect to a distribution by a Trust Pledgor pursuant to Sections 4.01(c)(i) or 4.01(c)(iv), such certificate shall include a confirmation that such Restricted Payment is being made pursuant to such clauses (it being understood and agreed that once a certificate has been delivered pursuant to this clause (b)(iii) with respect to any Restricted Payment or series of related Restricted Payments in an aggregate amount greater than $10,000,000, there shall be no requirement to deliver an additional certificate under this clause (b)(iii) until the applicable Holding Company Pledgor has made additional Restricted Payments in an aggregate amount greater than $10,000,000);

(c)      The Pledgors shall deliver prompt written notice to the MDT (but in any event within thirty (30) days) of any change, event, effect or occurrence that is known to them and that would reasonably be expected to have a material adverse effect on ability of the Secured Party to exercise and enforce its rights under the Settlement Agreement or the Pledge Agreement with respect to the Applicable Payment Group or any material portion of the Collateral;

(d)      In the event of any change (A) in any legal or organization name of any Pledgor or any Investment Holding Vehicle or, if applicable, any trustee of a Trust Pledgor, (B) in the location of any Pledgor's chief executive office or principal place of business (or, if applicable, in the location of the chief executive office, principal place of business or residence of any trustee of a Trust Pledgor), (C) in any Pledgor's organizational type, (D) in any Pledgor's federal taxpayer identification number or organizational identification number, if any, or (E) in any Pledgor's or Investment Holding Vehicle's jurisdiction of organization (in each case, including by merging with or into any other entity, reorganizing, dissolving, liquidating, reorganizing or organizing in any other jurisdiction), the applicable Pledgor shall (1) deliver prompt written notice of such change (and in any event, no later than thirty (30) days after such change) and (2) deliver to the Secured Party all additional financing statements and other documents that are necessary to maintain the validity, perfection and priority of the security interests provided for in the Security Documents;

(e)      Within twenty-five (25) Business Days after the end of each fiscal quarter period, a schedule in form substantially similar to the form attached hereto as Exhibit D indicating the amount and type of any Restricted Payments (or loans in lieu of distributions) made by or between (i) each Holding Company Pledgor to the applicable Trust Pledgor and (ii) each Trust Pledgor to its beneficiaries, in each case, during the preceding fiscal quarter;

(f)      Within thirty (30) days after each calendar year, the Pledgors shall deliver to the Secured Party a supplement to the Pledge Agreement schedules to reflect any changes to the information set forth thereon consistent with Section 2.05 and a certification that the Secured Party's liens in the Collateral remain perfected in accordance with the Pledge Agreement as of the date of such certificate, all of which will be in a form substantially similar to the form attached hereto as Exhibit E; and

(g)      To the extent Restricted Payments are made pursuant to Incurrence Tests, at the request of the MDT, and subject to confidentiality arrangements reasonably satisfactory to the Pledgors, the Pledgors shall use commercially reasonable efforts to cause the Independent Financial Advisor that delivered the applicable compliance certificate to attend an annual telephonic conference call with advisors of the MDT at a reasonable time to be mutually agreed, which conference call shall be limited to questions relating to the matters covered by the applicable compliance certificates delivered during the

prior twelve (12) month period; <u>provided</u> that the MDT shall not request more than one conference call in any twelve (12) month period.

**Section 3.02**    **Preservation of Existence.**  Each Pledgor shall, except as permitted under Section 4.06, (a) preserve, renew and maintain in full force and effect its legal existence under the laws of the jurisdiction of its organization; and (b) take all reasonable action to maintain all material rights and privileges (including its good standing, if such concept is applicable in its jurisdiction of organization) necessary or desirable in the normal conduct of its business, in each case to the extent that the failure to do so could reasonably be expected to result in a Material Adverse Effect.

**Section 3.03**    **Compliance with Laws**.  Each Pledgor shall comply with the requirements of all applicable Laws and all material orders, writs, injunctions and decrees of any Governmental Authority applicable to it or its business or property in each case to the extent that the failure to do so could reasonably be expected to result in a Material Adverse Effect.

**Section 3.04**    **Books and Records**.  Each Pledgor shall maintain proper books of record and account in a manner consistent with past practice.

**Section 3.05**    **Tax Matters**.  Except as would not reasonably be expected to result in a Material Adverse Effect, each Trust Pledgor shall pay and discharge promptly all Taxes before the same shall become delinquent or in default, <u>provided</u> that such payment and discharge shall not be required with respect to (a) Taxes being contested in good faith by appropriate proceedings as long as  any such contested Taxes determined to be due shall be paid no later than 60 days following the date on which such determination (within the meaning of  Section 1313(a) of the Internal Revenue Code for US federal income taxes and by analogy for other Taxes)  becomes final and non-appealable or (b) Taxes the non-payment of which, individually or in the aggregate, could not reasonably be expected to have a Material Adverse Effect. No Trust Pledgor or Holding Company Pledgor shall take or cause to be taken any action that would result in a Trust Pledgor, Holding Company Pledgor or Investment Holding Vehicle being treated as a corporation or an association taxable as a corporation for U.S. federal income tax purposes.[12]

**Section 3.06**    **Tax Reports**.  Except as would not reasonably be expected to result in a Material Adverse Effect, each Trust Pledgor shall timely (after taking into account any applicable extensions) file all [material] federal, state, foreign and other tax returns and reports required to be filed. Each Trust Pledgor shall timely (after taking into account any applicable extensions) file all material IRS Forms 8886 (or any successor forms) and any analogous tax forms for U.S. state income tax purposes, in each case that are required by Law to be filed with respect to any transaction to which it is a party that it knew, or reasonably should have known, is a "listed transaction" identified as such by the Internal Revenue Service under Section 6707A(c)(2) of the Internal Revenue Code and Treasury Regulation Section 1.6011-4(b)(2) (other than any such transaction described in Section 4.07(ii)) in a manner that is true, accurate and complete in all material respects.

**Section 3.07**    **Reinvestment**.  The Holding Company Pledgors shall reinvest returns on, and returns of, and any other proceeds of, investments in additional investments made by them and/or their respective Investment Holding Vehicles, and cash proceeds received by the Holding Company Pledgors shall be promptly contributed to their respective Investment Holding Vehicles, or to make payments or to make distributions to the applicable Trust Pledgor in each case, to the extent not prohibited by this Credit Support Annex and the Pledge Agreement.

---

[12] NTD: Subject to further review and negotiation.

## ARTICLE IV.
## NEGATIVE COVENANTS

**Section 4.01**      **Restricted Payments**.

(a)      <u>Limitations on Holding Company Pledgor Restricted Payments to Trust Pledgors</u>: The Holding Company Pledgors shall not, directly or indirectly (including through any Investment Holding Vehicle or any Subsidiary thereof) make any Restricted Payments to the Trust Pledgors, except:

(i)      Restricted Payments in an unlimited amount so long as (A) no Enforcement Event has occurred and is continuing (and provided no such Restricted Payment shall be permissible during any Remedies Forbearance Period), (B) after giving effect to such Restricted Payment on a pro forma basis, the Collateral Coverage Ratio with respect to the Pledgors in the Applicable Payment Group shall not be less than 1.00 to 1.00 (such condition in this clause (B), the "**Lock Box Distribution Incurrence Test**"), and (C) prior to making any Restricted Payment pursuant to this clause (i), the Secured Party shall receive a certification as to compliance with the Lock Box Distribution Test, and as to the accuracy of the calculation, after giving effect to such Restricted Payment from an Independent Financial Advisor, in a form substantially similar to the form attached hereto as Exhibit F;

(ii)      Restricted Payments by a Holding Company Pledgor that is treated as a pass-through entity for U.S. federal income tax purposes to the applicable Trust Pledgor to pay when due (including estimated income tax) the income taxes imposed on such Trust Pledgor resulting from allocations of income, gain, losses, deductions and credits recognized in the current taxable year attributable to its ownership interest in such Holding Company Pledgor, determined as if such allocated items were the only items recognized by the Trust Pledgor for the applicable tax period; <u>provided</u> that (A) no distribution has previously been made in respect of the tax imposed on such allocated items, <u>provided</u> that, for this purpose, any Restricted Payment made pursuant to Section 4.01(a)(i) shall be treated as a distribution in respect of tax;  (B) such distributions shall not exceed the income taxes imposed on such Trust Pledgor resulting from allocations of income, gain, deductions and credits recognized in the current taxable year attributable to its ownership interest in such Holding Company Pledgor (including by giving effect to any deductions available for the tax period under IRC section 642(c) and excluding the effect of any deductions available for the tax period under IRC section 661), determined as if such allocated items were the only items recognized by the Trust Pledgor for the applicable tax period and using the tax rate specified in the definition of "Tax Distributions" in the Settlement Agreement; (C) to the extent any distribution in respect of estimated income taxes exceeds the tax payable for the applicable tax period, as determined pursuant to the immediately preceding subclause (B), the amount of subsequent permitted distributions shall be reduced by the amount of such excess;  (D) no distributions shall be made pursuant to this clause (ii) with respect to the first cumulative Tax distributions due to the Trust Pledgors in the amount of $[_____] resulting from allocations of income and gain (net of allocations of losses, deductions and credits) attributable to their ownership interest in the Holding Company Pledgors (including by giving effect to any available deductions in the tax period under IRC section 642(c) and excluding the effect of any deductions available for the tax period under IRC section 661) to the Trust Pledgors and (E) solely with respect to Permitted Exchanges, no distributions shall be made pursuant to this clause (ii) with respect to the cumulative income and gain of the Trust Pledgors resulting from allocations of income and gain (net of allocations of losses, deductions and credits) to the Trust Pledgors attributable to their ownership interest in the Holding Company Pledgors (including by giving effect to any available deductions in the tax period under IRC section 642(c) and excluding the effect of any deductions available for the tax period

14
Annex [___]

under IRC section 661) except to the extent such cumulative income and gain exceeds the total amount of all Increased Built-in Gain not previously taken into account in limiting distributions pursuant to this subclause (E);

(iii)    Restricted Payments to pay reasonable costs and expenses (other than income taxes) of maintaining the operations and investments of each Holding Company Pledgor and its share of its underlying investments, including brokerage expenses, overhead and accounting expenses, along with professional fees (including payments to the Asset Manager and North Bay, other management fees, tax preparation costs and legal fees of such Holding Company Pledgor or relating to its underlying investments); provided that the aggregate amount of Restricted Payments made pursuant to this clause (iii) to pay management fees to the Asset Manager and North Bay and any other "family offices" in any calendar quarter shall not exceed 0.3125% (i.e. 1.25% per annum) of the Value of the Collateral at the start of such calendar quarter and shall be paid quarterly in advance for each calendar quarter (and prorated for any partial calendar quarter based on the number of days remaining in such calendar quarter) once such Value of the Collateral has been determined for such calendar quarter;

(iv)    (A) with respect to any Required Settlement Payment, Restricted Payments to pay an amount not to exceed 43% of the Applicable Payment Group's B-Side Funding Deadline Obligation (minus any amounts paid directly by the Holding Company Pledgor within such Applicable Payment Group, any Investment Holding Vehicle within such Applicable Payment Group, or any Subsidiary thereof directly to MDT in respect of such B-Side Funding Deadline Obligation pursuant to Section 4.01(b)), so long as such Restricted Payments are applied to pay such portion of the Applicable Payment Group's B-Side Funding Deadline Obligation within thirty (30) days after the receipt thereof by the applicable Trust Pledgor, and

(B)    so long as no Enforcement Event has occurred and is continuing, Restricted Payments to pay up to 43% of all other reasonable costs and expenses (other than income taxes) of the Applicable Payment Group arising after the Settlement Effective Date under or related to the Settlement Agreement (along with all ancillary documents and agreements thereto) including legal and other professional fees arising in connection with the Chapter 11 Cases and the Settlement Agreement (e.g., legal and professional fees to enforce the rights of the Applicable Payment Group under the Settlement Agreement but excluding (I) the costs of any judgment against any Trust Pledgor and (II) costs related solely to the operations of the IACs).

In addition, it is understood and agreed that:

(A)    Section 4.01(a)(iv) shall not permit the payment of any portion of the Applicable Payment Group's B-Side Funding Deadline Obligation that is due and payable on the Settlement Effective Date.

(B)    Transactions permitted under this Section 4.01(a) may also be effected by way of a loan to the applicable Trust Pledgor in lieu of a Restricted Payment.

(C)    Notwithstanding anything in this Credit Support Annex to the contrary, the Pledgors may exchange assets owned and held by Investment Holding Vehicles of the type constituting Specified Assets for other assets constituting Specified Assets of a substantially equivalent value (including with respect to liquidity) (a "**Permitted Exchange**"), so long as, in the case of Specified Assets consisting of investments in private equity funds or hedge funds, the applicable Pledgor delivers a certificate to the Secured Party certifying the exchanged asset is of

substantially equivalent value (including with respect to liquidity) to the original asset.  In furtherance of the foregoing, no Permitted Exchange shall be consummated unless the applicable Holding Company Pledgor receives the new Specified Asset from the Trust Pledgors and then contributes the same to the applicable Investment Holding Vehicle substantially concurrently with the distribution of the original Specified Asset to the Trust Pledgors.

(b)      Limitations on Payments of Required Settlement Payments.  With respect to any Required Settlement Payment, the Holding Company Pledgors shall not, and the Holding Company Pledgors shall cause the Investment Holding Vehicles and/or their respective Subsidiaries not to, pay such Required Settlement Payment except for payments in an aggregate amount not exceeding 43% of the Applicable Payment Group's B-Side Funding Deadline Obligation (minus any amounts paid to MDT by means of a Restricted Payment to a Trust Pledgor in respect of such B-Side Funding Deadline Obligation pursuant to Section 4.01(a)(iv)).  It is understood and agreed that this Section 4.01(b) shall not permit the payment of any portion of the Applicable Payment Group's B-Side Funding Deadline Obligation that is due and payable on the Settlement Effective Date.

(c)      Limitations on Trust Pledgor Distributions to Beneficiaries:  The Trust Pledgors shall not make any Restricted Payments to their respective beneficiaries, directly or indirectly (including through any Investment Company Vehicle and any Subsidiary thereof) except:

(i)      so long as no Enforcement Event has occurred and is continuing (and provided no such Restricted Payment shall be permissible during any Remedies Forbearance Period), Restricted Payments in the aggregate amount under this clause (i) not to exceed $150,000,000;

(ii)      additional Restricted Payments in an unlimited amount so long as (A) no Enforcement Event has occurred and is continuing (and provided no such Restricted Payment shall be permissible during any Remedies Forbearance Period), (B) after giving effect to such Restricted Payment on a pro forma basis, the Trust Pledgors' Asset Coverage Ratio shall not be less than 1.50 to 1.00 (such condition in this clause (B), the "**Trust Distribution Incurrence Test**"), and (C) prior to making any Restricted Payment pursuant to this clause (ii), the Secured Party shall receive a certification as to compliance with the Trust Distribution Incurrence Test, and as to the accuracy of the calculation, after giving effect to such Restricted Payment from an Independent Financial Advisor, in a form substantially similar to the form attached hereto as Exhibit F;

(iii)      Restricted Payments for the payment of reasonable costs and expenses (other than income taxes) of maintaining the operations and investments of each Trust Pledgor and its share of its underlying investments, including acquiring, maintaining, financing, hedging, and disposing of investments, along with professional fees (including payments to the Asset Manager and North Bay, other management fees, tax preparation costs and legal fees); provided that, in the case of any payments to the Asset Manager and North Bay or any other "family office" under this clause (iii), the Asset Manager, North Bay and such other "family office" shall be run as break-even enterprises consistent with past practice;

(iv)      so long as no Enforcement Event has occurred and is continuing, Restricted Payments to pay any and all legal fees and related expenses (other than income taxes) of any Trust Pledgor or any one or more beneficiaries of any Trust Pledgor (but not, for the avoidance of doubt, the costs of any judgment against any one or more beneficiaries of such Trust Pledgor); and

(v)      to the extent constituting a Restricted Payment, transactions permitted under Section 4.02 (other than under clauses (b)(ii), (iii), (iv), (vi), (viii), (xi) and (xii) of Section 4.02).

In addition, it is understood and agreed that:

(A)    This Section 4.01(c) shall not permit any distribution of (1) any Equity Interests held by a Trust Pledgor in any Holding Company Pledgors or (2) any Equity Interests held by a Holding Company Pledgor in any Investment Holding Vehicle, in each case, to the beneficiaries of the applicable Trust Pledgor; and

(B)    Transactions permitted under this Section 4.01(c) may also be effected by way of a loan to the applicable beneficiary in lieu of a Restricted Payment; provided that any such loan will be made at a rate of interest no less than the Applicable Federal Rate.

**Section 4.02    Related Party Transactions**.

(a)    The Pledgors shall not, and the Holding Company Pledgors shall cause the Investment Holding Vehicles to not, enter into any transaction with any Related Party (a "**Related Party Transaction**") unless such transactions are on terms no less favorable than would reasonably have been obtained in a comparable, arm's length transaction with a Person who is not a Related Party; provided that, for any Related Party Transaction or series of Related Party Transactions with an aggregate value in excess of $[____], the relevant Pledgors shall deliver to the Secured Party a written opinion by any Independent Financial Advisor stating that such transaction or series of related transactions complies with this Section 4.02.

(b)    The foregoing restrictions in this Section shall not apply to the following:

(i)    (A) any beneficiaries or other Related Party shall be permitted to use residential real estate, art and collectibles and other tangible personal property (but, for the avoidance of doubt, excluding cash, cash equivalents, securities and other financial assets), in each case, in the ordinary course and to the extent such use does not result in a Material Adverse Effect and the primary purpose of which is not to circumvent the provisions of this Credit Support Annex, (B) retaining family offices, including the Asset Manager and North Bay, for services and (C) sharing professional expenses by the Trust Pledgors with other Payment Parties under the Settlement Agreement (including by transferring funds to one or more Payment Parties who are designated payors under the Settlement Agreement, along with similar "funds flow" transactions to enhance administrative and tax efficiencies);

(ii)    (A) the hiring and retention of family offices for investment management and related (e.g., book keeping, tax preparation) services and the payment, subject to Section 4.01(a)(iii), of management fees and budgeted expenses in the ordinary course, (B) Kokino's (or any successor or replacement family office) management of the assets and investment activities of the Trust Pledgors and the Holding Company Pledgors (e.g., Kokino may move assets within the Holding Company Pledgors structure and make investment decisions in its discretion) in the ordinary course of business, and (C) in the case of the foregoing, activities incidental thereto (e.g., setting the budget for Kokino) other than activities that have a material adverse impact on the Secured Party's security interest in the Collateral;

(iii)    (A) transactions that result in the transfer of assets from a Holding Company Pledgor, Investment Holding Vehicle or any Subsidiary thereof to a trust or Person that is a Holding Company Pledgor, Investment Holding Vehicle or any Subsidiary thereof, (B) transactions between and among the Trust Pledgors, (C) transaction between and among the Holding Company Pledgors and the Investment Holding Vehicles, (D) transfers from any Trust Pledgor to any Holding Company Pledgor or Investment Holding Vehicle and (E) transfers from any Subsidiary of a

17

Holding Company Pledgor or an Investment Holding Vehicle to any Holding Company Pledgor or Investment Holding Vehicle, in each case, solely to the extent among Persons that are within the same Applicable Payment Group;

(iv)    [transactions required or permitted by the Settlement Agreement, this Credit Support Annex or any other Security Document, including][13] (A) transfers of Sale Proceeds and Non-Tax Distributions to IAC Accounts, (B) Permitted Withdrawals from IAC Accounts, (C) transactions the purpose of which is to facilitate the transfer of assets to make payments under the Settlement Agreement, and to pay any taxes imposed on the transferee as a result of such transfer as well as any taxes imposed on the transferee (or its direct or indirect subsidiary) on Sales Proceeds taxable to the transferee to the extent Sales Proceeds actually received by the transferee are insufficient to pay such taxes, and the remittance of cash and "funds flow" to effect the same (e.g., pursuant to Sections 2.01(k) and 2.02(d) of the Settlement Agreement), and (D) Tax Distributions, so long as, in each case, the intent, purpose and primary effect of such transaction shall not be to circumvent the provisions of this Credit Support Annex[14];

(v)    unsecured loans using the Applicable Federal Rate as the interest rate; provided that any such loans to beneficiaries of the Trust Pledgors are permitted under Section 4.01(c) (other under than clause (v) thereof) (to the extent such Restricted Payments are otherwise permitted under the terms and provisions hereof, and counting such loan as a distribution to such beneficiary);

(vi)    transactions permitted under clauses (a), (b) or (c) of Section 4.01;

(vii)    the appointment of bona fide third party professionals as trustees and the retention of such professionals respective firms; provided that the payment of professional fees to such professionals by any Pledgor shall be otherwise permitted under this Credit Support Annex, pursuant to a term hereof other than Section 4.01(c)(v);

(viii)    transactions certified as complying with Section 4.02(a) in an opinion by an Independent Financial Advisor;

(ix)    subject to Section 4.01(a)(iv)(A), any other transactions required by the Settlement Agreement, including the transfer of any other amounts contemplated by the Settlement Agreement, including the [Collar B-Side Amounts];

(x)    indemnification arrangements that are consistent with past practice, entered into by the Pledgors or any of Investment Holding Vehicle with the former, current and future trustees, managers, officers, employees, agents, and consultants and professional advisors of any Pledgor, any Investment Holding Vehicle, any family office (e.g., Kokino and North Bay), the Sackler Parties' Representative, and any other entity owned in whole or in part by any member of the Applicable Payment Group;

(xi)    the repayment (including prepayment) of loans made prior to the Settlement Effective Date;

---

[13] NTD: Language subject to further review and negotiation.

[14] NTD: Subject to further review and negotiation.

(xii)     the Asset Management Agreements (and transactions arising pursuant to the terms thereof) as in effect on the Settlement Effective Date, and as may be amended, modified, supplemented or replaced thereafter; <u>provided</u> that any such amendment, modification, supplement or replacement, taken as a whole, is not materially less favorable to the MDT and the Secured Parties; and

(xiii)     each Pledgor, or an Investment Holding Vehicle, may form, and capitalize, a new investment vehicle with a Related Party so long as (A) such capitalization and the distributions by such investment vehicle to its equityholders are made on a ratable basis, (B) such investment vehicles makes investments other than in Related Parties, (C) any Disposition (or obligation to Dispose) of the Equity Interests of such investment vehicle to any Related Party shall be made pursuant to customary buy/sell arrangements and for reasonably equivalent value and (D) if Equity Interests of the investment vehicle are directly owned by a Holding Company Pledgor, then such Equity Interests directly owned by such Holding Company Pledgor are pledged in accordance with Section 2.05; <u>provided</u> that (1) such new investment vehicle may be managed by a family office consistent with the other provisions of this Credit Support Annex, which family office shall not be subject to such ratable requirements to make capitalizations or receive distributions in its capacity as a manager or equivalent controlling person (e.g., general partner or managing member) of such investment vehicle and may receive customary indemnification and expense reimbursement and (2) such new investment vehicle shall not be capitalized with Collateral unless the Equity Interests of the Investment Holding Vehicle holding such investment vehicle are pledged as Collateral in accordance with Section 2.05(c).

**Section 4.03     Indebtedness.** The Pledgors shall not incur, create, assume, guaranty or permit to exist, directly or indirectly, any Indebtedness for Borrowed Money, except:

(a)     Indebtedness for Borrowed Money of the Trust Pledgors incurred to finance payments under the Settlement Agreement; <u>provided</u> that the net proceeds of such Indebtedness for Borrowed Money are promptly applied to fund such Settlement Agreement payments;

(b)     Indebtedness for Borrowed Money of the Trust Pledgors incurred for the purpose of financing investments that are incurred in the ordinary course of business and consistent with past practices or standard industry practices;

(c)     Indebtedness for Borrowed Money of the Trust Pledgors that constitutes purchase money indebtedness incurred in connection with the acquisition of assets (including real estate) so long as (x) any Liens securing such Indebtedness for Borrowed Money are limited solely to the assets being acquired, (y) so long as such assets being acquired are acquired and remain owned by the Pledgor incurring such purchase money indebtedness and (z) such assets are acquired within ninety (90) days of the incurrence of such indebtedness;

(d)     any Indebtedness for Borrowed Money of the Trust Pledgors if, after giving pro forma effect to the incurrence of such Indebtedness for Borrowed Money (as a reduction to the Value of the assets of the Trust Pledgors in the principal amount of such Indebtedness for Borrowed Money), the Trust Distribution Incurrence Test shall be satisfied;

(e)     Indebtedness for Borrowed Money of the Trust Pledgors (i) pursuant to tenders, statutory obligations, bids, leases, governmental contracts, trade contracts, surety, stay, customs, appeal, performance and/or return of money bonds or other similar obligations incurred in the ordinary course of business,

consistent with past practice or consistent with industry norm and (ii) in respect of letters of credit, bank guaranties, surety bonds, performance bonds or similar instruments to support any of the foregoing items;

(f)    (i) Indebtedness for Borrowed Money incurred in the ordinary course of business, consistent with past practice or consistent with industry norm in respect of obligations of the Pledgors to pay the deferred purchase price of goods or services or progress payments in connection with such goods and services, in each case, for the benefit of the applicable Pledgor and its Subsidiaries and (ii) Indebtedness for Borrowed Money in respect of letters of credit, bankers' acceptances, bank guaranties, surety bonds, performance bonds or similar instruments with respect to such Indebtedness for Borrowed Money entered into in the ordinary course of business, consistent with past practice or consistent with industry norm;

(h)    Indebtedness for Borrowed Money of the Trust Pledgors existing, or pursuant to commitments existing, on the Settlement Effective Date and any extensions, refinancings, renewals and replacements thereof, so long as such extension, refinancing, renewal or replacement does not exceed in a principal amount the Indebtedness for Borrowed Money being renewed, extended or refinanced plus accrued interest, fees and premiums (if any) thereon and reasonable fees and expenses associated with the extension, refinancing, renewal or replacement;

(i)    Indebtedness for Borrowed Money consisting of the financing of insurance premiums;

(j)    Indebtedness for Borrowed Money representing deferred compensation to current or former directors, trustees, beneficiaries, officers, employees, members of management, managers, members, partners, independent contractors and consultants in the ordinary course of business, consistent with past practice or consistent with industry norm; and

(k)    Indebtedness for Borrowed Money of the Trust Pledgors in an aggregate principal amount not to exceed $[____] at any time outstanding.

**Section 4.04    Liens.** The Pledgors shall not incur, create, assume or grant or (in the case of any consolidations, mergers or divisions otherwise permitted hereunder) cause or suffer to exist, any Lien on any of its property or assets, except:

(a)    Liens created by the Security Documents;

(b)    Permitted Encumbrances;

(c)    Liens on assets and property of the Trust Pledgors (other than Equity Interests in the Holding Company Pledgors) securing Indebtedness for Borrowed Money permitted under Sections 4.03(a), (b) and (c); and

(d)    Liens on assets and property of the Trust Pledgors (other than Equity Interests in the Holding Company Pledgors) securing obligations or Indebtedness for Borrowed Money permitted hereunder in an aggregate principal amount not to exceed $[____] at any time outstanding.

**Section 4.05    Passive Holding Company Activity.** The Holding Company Pledgors shall not engage in any material operating or business activities; provided that the following and any activities incidental thereto shall be permitted in any event:

(i)    ownership of the Equity Interests in Investment Holding Vehicles and the receipt and payment of Restricted Payments and other amounts in respect of Equity Interests and making contributions to the capital of the Investment Holding Vehicles;

20
Annex [___]

(ii)    the maintenance of its legal existence and privilege of doing business (including the ability to incur and pay, as applicable, fees, costs and expenses and taxes relating to such maintenance and the payment of any tax distributions pursuant to Section 4.01(a));

(iii)    the performance of its Obligations with respect to the Settlement Agreement and the Security Documents and, in each case, any related documents and agreements;

(iv)    if applicable, participating in Tax, accounting and other administrative matters, including as a member of any consolidated, combined, unitary or similar tax group and the provision of administrative and advisory services (including treasury and insurance services) to its Subsidiaries of a type customarily provided by a holding company to its Subsidiaries;

(v)    holding any cash in an aggregate amount not to exceed $[____] for not longer than five (5) Business Days;

(vi)    providing indemnification to its officers and directors (or other equivalent Persons), and

(vii)    any transaction with any Pledgor, any Investment Holding Vehicle or any of its Subsidiaries, and/or any other Person to the extent permitted under this Credit Support Annex and the Security Documents.

**Section 4.06    Fundamental Changes**. The Pledgors shall not consolidate, merge, divide, dissolve or liquidate unless (i) either (A) the applicable Pledgor is the surviving entity or (B) the resulting, surviving or transferee Person is a U.S. trust or Person (solely in the case of a Holding Company Pledgor) organized or existing under the laws of the United States that assumes the Obligations of the applicable Pledgor under the Security Documents pursuant to Section 2.05 (and, if applicable, the Obligations of the Pledgor under the Settlement Agreement), (ii) such consolidation, merger, division, consolidation or liquidation, after giving effect to clause (i) above, shall not have a material adverse impact on the value of, and the Secured Party's interest in, and/or the rights and remedies of the MDT with respect to the Collateral (after giving effect to any liabilities with respect thereto), (iii) the Secured Party's security interest in the Collateral shall remain perfected (without lapse or change in priority) and (iv) in the case of clause (i)(B) above, if reasonably requested by the Secured Party, the applicable Trust Pledgor or Holding Company Pledgor shall deliver to the Secured Party a customary opinion of counsel, regarding the enforceability and perfection of the relevant security interest with respect to the Collateral and other customary matters. Notwithstanding the foregoing, (A) any Trust Pledgor may undergo a division or similar reorganization into one or more other trusts and (B) the AJ Irrevocable Trust may split into separate trusts as a result of the death of Jonathan Sackler to the extent that, in either case, the (i) trustee(s) of the resulting trust(s) (in their capacities as trust trustees and not in their own individual or personal capacities) assume the Obligations of such Trust Pledgor as described in this Credit Support Annex (and, if applicable, under the Settlement Agreement) and takes any and all steps that are necessary to maintain the perfection of the Secured Party's Lien on the Collateral (without change in priority), [(ii) Exhibit [       ] of the Settlement Agreement is updated as may be needed to include the Assuring Parties with respect to the resulting trust(s) (to the extent not already listed) and (iii) each Assuring Party with respect to the resulting trust(s) has delivered an Assurance Undertaking to MDT to the extent they have not already provided such Assurance Undertaking][15].

---

[15] NTD:  Subject to further review and negotiation.

21

Annex [___]

**Section 4.07    Listed Transactions.**  [The Trust Pledgors shall not (and shall not cause or permit any Holding Company Pledgor to) be a party to any transaction that it knew, or reasonably should have known, is a Listed Transaction at the time it entered into a binding commitment to enter into the transaction, provided that, for purposes of this covenant, (i) the Plan and Settlement Agreement and the payments and transactions contemplated thereby shall not be taken into account and (ii) no Trust Pledgor shall be treated as a party to a Listed Transaction that is entered into by any collective investment vehicle or other entity if (A) such entity is managed by a professional investment advisor that is unaffiliated with the Trust Pledgor (or any of its Related Parties); provided that, for purposes of this subclause (A), the Asset Manager and any other "family office" described in Section 4.01(c)(iii) shall not be considered unaffiliated with the Trust Pledgor; and (B) the Trust Pledgor (together with any of its Related Parties) does not have dominion and control over the entity's investment decisions.[16]]

**Section 4.08    Amendments or Waivers of Organizational Documents.**  The Pledgors shall not make any amendment, restatement, supplement or other modification to, or waiver of, any of any such Person's organizational documents (including trust documentation) after the Settlement Effective Date, in each case, to the extent the same (a) would adversely affect the perfection or priority of the Secured Parties' Lien on the Collateral or (b) would reasonably be expected to be otherwise materially adverse to the interests of the MDT (or any other Secured Party) or the ability of the Payment Parties under the Settlement Agreement relating the Applicable Payment Group, taken as a whole, to perform their Obligations and otherwise pay the applicable Outstanding Settlement Amount under the Settlement Agreement, other than as permitted under the Settlement Agreement, without obtaining the prior consent of MDT to such amendment, restatement, supplement or other modification or waiver (such consent not to be unreasonably withheld or delayed) or thereafter taking such steps as are necessary to maintain the perfection and priority of the Secured Party's Lien on the Collateral; provided that, for purposes of clarity, it is understood and agreed that the Trust Pledgors and the Holding Company Pledgors may effect a change to its organizational form and/or consummate any other transaction that is not prohibited under this Credit Support Annex.

**Section 4.09    Restrictive Agreements.**  The Pledgors shall not enter into any transaction or series of related transactions that would restrict or impair in any material respect the ability of the Pledgors to sell, Dispose of or otherwise liquidate all or substantially all of the assets and properties of the Pledgors, except

(a)    as required under the Settlement Agreement and the Security Documents;

(b)    transfer restrictions contained in documentation governing individual investments which have been entered into in the ordinary course of business or pursuant to standard industry practices;

(c)    restrictions with respect to the assets and properties of the Trust Pledgors in effect on the Settlement Effective Date (and any replacements thereof);

(d)    customary provisions restricting assignment contained in agreements entered into in the ordinary course of business or pursuant to standard industry practices so long as such restrictions relate to such agreement which do not restrict the sale, Disposition or liquidation of all or substantially all of the assets and properties of the Pledgors; and

(e)    restrictions with respect to property of the Trust Pledgors in agreements governing Indebtedness for Borrowed Money permitted under Section 4.03; provided that such restrictions do not

---

[16] NTD:  Subject to further review and negotiation.

materially interfere with or otherwise prohibit such Trust Pledgors from performing and satisfying its Obligations under the Settlement Agreement.

**Section 4.10    Change in Trustees.** The Trust Pledgors shall not permit or otherwise recognize the appointment of (including by granting control over any trust asset to) any additional or replacement trustee of such Trust Pledgor, unless and until such additional or replacement trustee (A) becomes a party to the Settlement Agreement, the Pledge Agreement, and any other applicable Security Documents in its capacity as such trustee of the applicable Trust Pledgor, (B) takes any and all steps that are necessary to maintain the perfection (without change in priority) of the Secured Party's lien on the Collateral, (C) confirms and agrees at the time of its appointment that such trustee, solely in its capacity as a trustee, is bound by the terms and provisions of the Settlement Agreement, the Pledge Agreement, and the other Security Documents and that the Obligations of the Trust Pledgors constitute valid and binding obligations (including under the applicable trust agreement) enforceable against the applicable Trust Pledgor's property in accordance with their terms and [(D) delivers a [Successor Trustee] Further Assurances Undertaking executed in its own individual or personal capacity][17].

## ARTICLE V.

## ADDITIONAL CONDITIONS PRECEDENT

**Section 5.01    Additional Conditions Precedent to Settlement Effective Date**. In addition to the conditions set forth in Section 10.01 of the Settlement Agreement, the occurrence of the Settlement Effective Date shall be subject to the satisfaction (or waiver by the Parties) of the following conditions:

(a)    The MDT (or its counsel) shall have received a duly executed copy of the Pledge Agreement;

(b)    The MDT (or its counsel) shall have received a UCC-1 financing statement in a form prepared for filing in the jurisdiction of organization of each Pledgor and otherwise in form and substance reasonably satisfactory to the MDT (or its counsel);

(c)    All Equity Interests of the Holding Company Pledgors and the Investment Holding Vehicles shall have been pledged pursuant to the Security Documents and/or the provisions hereof and the MDT (or its counsel) shall have received all (i) certificates or instruments, if any, representing such Equity Interests pledged under the Security Documents, accompanied stock transfer powers or other instruments of transfer (if any) with respect thereto endorsed in blank and (ii) uncertificated securities control agreements, substantially in the form exhibited to the Pledge Agreement, with respect to any uncertificated securities of the Holding Company Pledgors and/or the Investment Holding Vehicles; and

(d)    The MDT (or its counsel) shall have received the Settlement Effective Date Opinion.

## ARTICLE VI.

## ENFORCEMENT EVENT; REMEDIES

**Section 6.01    Occurrence of an Enforcement Event; Priority of Payments**. Upon the occurrence and during the continuance of an Enforcement Event, the Secured Party shall have the right to exercise all rights and remedies against the Collateral as provided in the Security Documents, which shall

---

[17] NTD:  Subject to further review and negotiation.

include all rights and remedies under the UCC (and any similar local laws) and the right to (i) foreclose on the Collateral, and/or (ii) direct the liquidation of investments of the Investment Holding Vehicles and apply the proceeds thereof to pay (A) first, any costs or expenses incurred by the Secured Party to enforce the Settlement Agreement, the Security Documents or otherwise incurred in connection with the exercise of remedies, in each case, solely with respect to the Applicable Payment Group, (B) second, any accrued and unpaid interest, late payment fees, other fees and all other payment Obligations (other than the Outstanding Settlement Amount and any contingent indemnification obligations for which no claim or demand for payment, whether oral or written, has been made at such time) due to the Secured Party under the Settlement Agreement solely on account of the Obligations of the Applicable Payment Group, and (C) third, the Outstanding Settlement Amount of the Applicable Payment Group then outstanding under the Settlement Agreement, with any excess proceeds being retained by the Pledgors.  For the avoidance of doubt, the Secured Party shall have the right to exercise remedies against the Collateral during the Sale Period.

## ARTICLE VII.
## MISCELLANEOUS

**Section 7.01**     **Termination.**   The obligations described in this Credit Support Annex shall terminate, and all security interests granted under the Security Documents shall be automatically released and all other requirements described in this Credit Support Annex shall be extinguished, on the date on which the Outstanding Settlement Amount and all other payment Obligations (other than any contingent indemnification obligations for which no claim or demand for payment, whether oral or written, has been made at such time) under the Settlement Agreement of the Applicable Payment Group to the MDT are paid in full in cash and reduced to $0 (or less than $0); provided that the obligations of the Pledgors under the Pledge Agreement, and all security interests thereunder, shall be automatically reinstated if and to the extent that, for any reason, the Secured Party is required to disgorge, turn over, or otherwise pay any amount paid to the Secured Party by or on behalf of the Applicable Payment Group, whether as a result of any proceeding in bankruptcy or reorganization or otherwise.

EXHIBIT A to ANNEX [__][1]

**FINANCIAL STATEMENT TEMPLATE**

**Name of Entity**
**Balance Sheet**

_____ XX/XX/20XX_____

**Assets**

| | | |
|---|---|---|
| Cash and Cash Equivalents | $ | - |
| Accounts Receivable and Prepaid Expenses | | - |
| Marketable Securities and Hedge Funds | | - |
| Notes Receivable | | - |
| Other Investments | | - |
| Private Equity Investments | | - |
| Real Estate Investments | | - |
| Residential Real Estate | | - |
| Life Insurance – Surrender Value | | - |
| Retirement Accounts | | - |
| Artwork (including Jewelry) | | - |

**Total Assets**              $_____ -

**Liabilities**

| | | |
|---|---|---|
| Accounts Payable | $ | - |
| Long-Term Debt | $ | - |
| Mortgage Debt | $ | - |
| Short-Term Debt | $ | - |

**Total Liabilities**              $_____ -

**Net Assets**: $_____

_____

[1] NTD:  Exhibits subject to further review and negotiation.

A-1

EXHIBIT B to ANNEX [___]

## APPROVED FINANCIAL ADVISORS

Accenture

AlixPartners

Alvarez and Marsal

Analysis Group

AT Kearney

Bain & Company

BDO USA

Booz Allen Hamilton

Boston Consulting Group
Centerview Partners LLC
Deloitte
Ducera Partners LLC
Ernst & Young
Evercore
FTI Consulting

Grant Thornton
Greenhill
HL Consulting
Huron Consulting Group

KPMG

L.E.K Consulting
Lazard
Mercer

Oliver Wyman

Parthenon
PJT Partners
PricewaterhouseCoopers
Raymond James
Strategy
TRS Advisors
Any other independent financial advisor reasonably acceptable to
the Secured Party

**EXHIBIT C to ANNEX [__]**

## FORM OF COMPLIANCE CERTIFICATE

**[_____ __], 20[__]**

Reference is made to Annex [__] (the "**[JS/RS] Family B-Side Credit Support Annex**") to the Settlement Agreement dated as of [_____ __], 2021 among the Pledgors referred to in the [JS/RS] Family B-Side Credit Support Annex, the other Payment Parties party thereto and The Master Disbursement Trust (as amended, restated, supplemented or otherwise modified from time to time). Capitalized terms used herein and not otherwise defined herein shall have the meanings assigned to such terms in the [JS/RS] Family B-Side Credit Support Annex.

[*Certificate to consist of one the following certifications*][1]:

### Section 3.01(b)(i) Certification

[Reference is made to the [quarterly/annual] financial statements for the [fiscal quarter/fiscal year] period ending [_____ __], 20[__]. Pursuant to Section 3.01(b)(i) of the [JS/RS] Family B-Side Credit Support Annex, the undersigned, in his/her capacity as an authorized officer of the Pledgors (or, in the case of a Trust Pledgor, an authorized officer of its trustee), and not in any individual capacity, certifies as follows, for such fiscal period ending [_____ __], 20[__]:

To my knowledge, no Breach Trigger or Breach with respect to the Applicable Payment Group has occurred under the Settlement Agreement or the Pledge Agreement during such [fiscal quarter/fiscal year] period.]

### Section 3.01(b)(ii) Certification

[Reference is made to the Restricted Payment or series of related Restricted Payments made or to be made pursuant to Section 4.01(a) of the [JS/RS] Family B-Side Credit Support Annex (other than pursuant to Section 4.01(a)(iv)(A)) on or about [_____ __], 20[__] in an aggregate amount exceeding $10,000,000 (such Restricted Payment or series of related Restricted Payments, the "**Applicable Restricted Payment**"). Pursuant to Section 3.01(b)(ii) of the [JS/RS] Family B-Side Credit Support Annex, the undersigned, in his/her capacity as an authorized officer of the Pledgors (or, in the case of a Trust Pledgor, an authorized officer of its trustee), and not in any individual capacity, certifies as follows:

[1.] To my knowledge, as of the date hereof, no Breach Trigger or Breach with respect to the Applicable Payment Group has occurred under the Settlement Agreement or the Pledge Agreement.

[2. The Applicable Restricted Payment is being made pursuant to Section 4.01(a)(iv)(B) of the [JS/RS] Family B-Side Credit Support Annex.][2]

### Section 3.01(b)(iii) Certification

---

[1] NTD: Include applicable certification.

[2] NTD: Include if applicable.

C-1

[Reference is made to the Restricted Payment or series of related Restricted Payments made or to be made pursuant to Section 4.01(c) on or about [_____  __], 20[__] in an aggregate amount exceeding $10,000,000 (such Restricted Payment or series of related Restricted Payments, the "**Applicable Restricted Payment**").  Pursuant to Section 3.01(b)(iii) of the [JS/RS] Family B-Side Credit Support Annex, the undersigned, in his/her capacity as an authorized officer of the Pledgors (or, in the case of a Trust Pledgor, an authorized officer of its trustee), and not in any individual capacity, certifies as follows:

[1.] To my knowledge, as of the date hereof, no Breach Trigger or Breach with respect to the Applicable Payment Group has occurred under the Settlement Agreement or the Pledge Agreement.

[2. The Applicable Restricted Payment is being made pursuant to [Section 4.01(c)(i)]/ [Section 4.01(c)(iv)] of the [JS/RS] Family B-Side Credit Support Annex].][3]

By: _____

Name:

Title:

---

[3] NTD: Include if applicable.

C-2

**EXHIBIT D to ANNEX [__]**

## SCHEDULE OF DISTRIBUTIONS

**[_____ __], 20[__]**[1]

Reference is made to Annex [__] (the "**[JS/RS] Family B-Side Credit Support Annex**") to the Settlement Agreement dated as of [_____ __], 2021 among the Pledgors referred to in the [JS/RS] Family B-Side Credit Support Annex, the other Payment Parties party thereto and The Master Disbursement Trust (as amended, restated, supplemented or otherwise modified from time to time).  Capitalized terms used herein and not otherwise defined herein shall have the meanings assigned to such terms in the [JS/RS] Family B-Side Credit Support Annex.

Reference is made to the fiscal quarter ending [_____ __], 20[__].  In accordance with Section 3.1(e) of the [JS/RS] Family B-Side Credit Support Annex, set forth below are the distributions (or loans in lieu thereof) made by or between (i) any Holding Company Pledgor to the applicable Trust Pledgor and (ii) each Trust Pledgor to its beneficiaries, in each case, during such fiscal quarter.

| | |
|---|---|
| 1. | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |

For and behalf of the Pledgors:

By: _____
Name:
Title:

---

[1] Schedule to be delivered within 25 Business Days after the end of each fiscal quarter.

D-1

**EXHIBIT E to ANNEX [__]**

## FORM OF COLLATERAL CERTIFICATE

**[_____ __], 20[__]**[1]

Reference is made to (i) Annex [__] (the "**[JS/RS] Family B-Side Credit Support Annex**") to the Settlement Agreement dated as of [_____ __], 2021 among the Pledgors referred to in the [JS/RS] Family B-Side Credit Support Annex, the other Payment Parties party thereto and The Master Disbursement Trust (the "**MDT**") (as amended, restated, supplemented or otherwise modified from time to time) and (ii) the Pledge Agreement dated as of [_____ __], 2021 (the "**Pledge Agreement**") among the Pledgors referred to in the [JS/RS] Family B-Side Credit Support Annex, Kokino LLC and the MDT (as amended, restated, supplemented or otherwise modified from time to time).  Capitalized terms used herein and not otherwise defined herein shall have the meanings assigned to such terms in the [JS/RS] Family B-Side Credit Support Annex.

Reference is made to the calendar year ending [_____ __], 20[__].  Pursuant to Section 3.01(f) of the [JS/RS] Family B-Side Credit Support Annex, the undersigned, in his/her capacity as an authorized officer of the Pledgors (or, in the case of a Trust Pledgor, an authorized officer of its trustee), and not in any individual capacity, certifies as follows:

1.      All liens granted to the Secured Party pursuant to the Pledge Agreement remain effective and are perfected as of the date hereof, [except with respect to the assets described below].

2.      There have been no changes to the information required to be included in the Annexes 1, 2 and 3 to the Pledge Agreement [, except for the following items:]

[APPLICABLE PLEDGOR]

By: _____
      Name:
      Title:

---

[1] Certificate to be delivered within 30 days after calendar year end.

E-1

**EXHIBIT F to ANNEX [___]**

## FORM OF INCURRENCE TEST COMPLIANCE CERTIFICATE

**[_____ __], 20[__]**

Reference is made to Annex [___] (the "**[JS/RS] Family B-Side Credit Support Annex**") to the Settlement Agreement dated as of [_____ __], 2021 among the Pledgors referred to in the [JS/RS] Family B-Side Credit Support Annex, the other Payment Parties party thereto and The Master Disbursement Trust (as amended, restated, supplemented or otherwise modified from time to time). Capitalized terms used herein and not otherwise defined herein shall have the meanings assigned to such terms in the [JS/RS] Family B-Side Credit Support Annex.

[*Certificate to consist of one the following certifications*][24]:

[This certificate is being delivered pursuant to Section 4.01(a)(i) of the [JS/RS] Family B-Side Credit Support Annex in connection with a proposed Restricted Payment to be made by a Holding Company Pledgor pursuant to such provision.

I, on behalf of an Independent Financial Advisor, and not in any individual capacity, hereby certify that in reliance on calculations provided to me by the Pledgors the Lock Box Distribution Incurrence Test shall be satisfied on a pro forma basis after giving effect to such Restricted Payment. Attached as Schedule 1 hereto is a calculation of the Collateral Coverage Ratio on pro forma basis after giving effect to the applicable Restricted Payment.]

[This certificate is being delivered pursuant to Section 4.01(c)(ii) of the [JS/RS] Family B-Side Credit Support Annex in connection with a proposed Restricted Payment to be made by a Trust Pledgor pursuant to such provision.

I, on behalf of an Independent Financial Advisor, and not in any individual capacity, hereby certify that in reliance on calculations provided to me by the Pledgors the Trust Distribution Incurrence Test shall be satisfied on a pro forma basis after giving effect to such Restricted Payment. Attached as Schedule 1 hereto is a calculation of the Asset Coverage Ratio on pro forma basis after giving effect to the applicable Restricted Payment.]

[          ], an Independent Financial Advisor and not in any individual capacity.

By: _____
Name:
Title:

---

[24] NTD: Include applicable certification.

**SCHEDULE 1 to EXHIBIT F TO ANNEX [    ][25]**

**[Calculation of Collateral Coverage Ratio]**

A. Value of Collateral:                                  $[_____]

B.  Outstanding Settlement Amount of the Applicable Payment Group      $[_____]

Collateral Coverage Ratio (A/B):              [____]:1.00

Minimum Amount Permitted                    1.00:1.00

In Compliance?                              [Yes/No]


**[Calculation of Asset Coverage Ratio]**

A. Value of Assets of Trust Pledgors:          $[_____]

B.  Outstanding Settlement Amount of the Applicable Payment Group      $[_____]

Asset Coverage Ratio (A/B):                  [____]:1.00

Minimum Amount Permitted                    1.50:1.00

In Compliance?                              [Yes/No]

---

[25] Insert calculation as applicable

## EXHIBIT BB

### Identity Disclosures

**PLAN ADMINISTRATION TRUSTEE AND PPLP LIQUIDATOR**

Pursuant to Section 5.3(c) of the Plan, the Plan Administration Trustee will be an existing employee of the Debtors selected by the Debtors in their sole discretion or another individual selected by the Debtors with the consent of the Creditors' Committee and the Governmental Consent Parties (which consent shall not be unreasonably withheld, conditioned or delayed). The PPLP Liquidator will be the same individual appointed as the Plan Administration Trustee.

To the extent known, the identity of the Plan Administration Trustee and PPLP Liquidator will be disclosed in a Plan Supplement prior to the commencement of the Confirmation Hearing.

**NEWCO MANAGERS**

Pursuant to Section 5.4(d) of the Plan, the board of managers of NewCo will consist of five (5) to seven (7) NewCo Managers, each with experience in one or more of the following areas: pharmaceuticals, public policy (including public health policy), law enforcement, ethics and compliance, finance, audit, general business and/or corporate governance issues. The initial NewCo Managers shall be disinterested and independent, and shall be selected by the Governmental Consent Parties, in consultation with the Debtors and the Creditors' Committee, and pursuant to a selection process that is reasonably acceptable to the Debtors; *provided* that the DOJ shall have the right, in its discretion, to observe such selection process.[1]

To the extent known, the identity of the initial NOAT Managers will be disclosed in a Plan Supplement prior to the commencement of the Confirmation Hearing.

**TOPCO MANAGERS**

Pursuant to Section 5.5(b) of the Plan, the board of managers of TopCo will consist of three (3) TopCo Managers, each of whom shall be disinterested and independent; *provided* that one (1) (but no more than one (1)) Creditor Trustee of NOAT may serve as a TopCo Manager. The initial TopCo Managers shall be selected by the Governmental Consent Parties, in consultation with the Debtors and the Creditors' Committee, and pursuant to a selection process that is reasonably acceptable to the Debtors; *provided* that the DOJ shall have the right, in its discretion, to observe such selection process.

To the extent known, the identity of the initial TopCo Managers will be disclosed in a Plan Supplement prior to the commencement of the Confirmation Hearing.

---

[1] If determined to be necessary by the Governmental Consent Parties, NewCo may retain one or more of the four independent directors on PPLP's Special Committee for a period of time to serve as interim directors of NewCo to allow for a period of transition and onboarding of NewCo Managers.

**MDT TRUSTEES**

Pursuant to Section 5.6(d) of the Plan, the board of trustees of the Master Disbursement Trust will consist of three (3) MDT Trustees, each with relevant experience, including in financial reorganizations, and each of whom shall be disinterested and independent. One (1) initial MDT Trustee shall be selected by the Creditors' Committee and two (2) additional initial MDT Trustees shall be selected by the Governmental Consent Parties, in each case, in consultation with the Debtors and pursuant to a selection process reasonably acceptable to the Debtors; *provided* that, in each case, the DOJ shall have the right, in its discretion, to observe such selection process.

To the extent known, the identity of the initial MDT Trustees will be disclosed in a Plan Supplement prior to the commencement of the Confirmation Hearing.

**MDT EXECUTIVE DIRECTOR**

Pursuant to Section 5.6(e) of the Plan, the MDT Executive Director will be an individual with experience in financial reorganizations. The initial MDT Executive Director shall be selected by the MDT Trustees; *provided* that the DOJ shall have the right, in its discretion, to observe such selection process.

To the extent known, the identity of the initial MDT Executive Director will be disclosed in a Plan Supplement prior to the commencement of the Confirmation Hearing.

**CREDITOR TRUSTEES FOR NOAT**

There will be three (3) Creditor Trustees for NOAT. Pursuant to Section 5.7(b)(i) of the Plan, the initial Creditor Trustees for NOAT shall be selected by the Governmental Consent Parties, in consultation with the Debtors and pursuant to a selection process reasonably acceptable to the Debtors; *provided* that the DOJ shall have the right, in its discretion, to observe such selection process.

To the extent known, the identity of the initial Creditor Trustees for NOAT will be disclosed in a Plan Supplement prior to the commencement of the Confirmation Hearing.

**TRUST PROTECTOR FOR NOAT**

The initial Trust Protector for NOAT shall be selected by the Governmental Consent Parties, in consultation with the Debtors and pursuant to a selection process reasonably acceptable to the Debtors; *provided* that the DOJ shall have the right, in its discretion, to observe such selection process.

To the extent known, the identity of the initial Trust Protector for NOAT will be disclosed in a Plan Supplement prior to the commencement of the Confirmation Hearing.

**CREDITOR TRUSTEES FOR THE TRIBAL ABATEMENT FUND TRUST ("TAFT")**

1.    Kevin K. Washburn

2.      Mary L. Smith

3.      Kathy Hopinkah Hannan

**TRUST PROTECTOR FOR TAFT**

The initial Trust Protector for TAFT shall be selected by the Native American Tribe Group, with the consent (not to be unreasonably withheld, conditioned or denied) of the Debtors.

To the extent known, the identity of the initial Trust Protector for TAFT will be disclosed in a Plan Supplement prior to the commencement of the Confirmation Hearing.

**MANAGERS FOR THE TRIBAL OPIOID ABATEMENT FUND LLC ("TRIBE OPIOID LLC")**

1.      Kevin K. Washburn

2.      Mary L. Smith

3.      Kathy Hopinkah Hannan

**CREDITOR TRUSTEE FOR THE HOSPITAL TRUST**

1.      Hon. Thomas L. Hogan (Ret.)

**MEMBER OF THE HOSPITAL TRUST ADVISORY COMMITTEE**

1.      Jeffrey James

**CREDITOR TRUSTEE FOR THE TPP TRUST**

1.      Alan D. Halperin

**MEMBERS OF THE TPP TRUST ADVISORY COMMITTEE**

The Advisory Committee for the TPP Trust will consist of five (5) members. The initial members of the Advisory Committee for the TPP Trust shall be selected by the Third-Party Payor Group, with the consent (not to be unreasonably withheld, conditioned or denied) of the Debtors.

To the extent known, the identity of the initial members of the Advisory Committee for the TPP Trust will be disclosed in a Plan Supplement prior to the commencement of the Confirmation Hearing.

**CREDITOR TRUSTEE FOR THE NAS MONITORING TRUST**

1.      Donald R. Cravens, Jr.

**MEMBERS OF THE NAS MONITORING TRUST ADVISORY COMMITTEE**

1.    Dr. Reed V. Tuckson

The Advisory Committee for the NAS Monitoring Trust will consist of three (3) members with expertise in medical, epidemiological or other scientific fields and knowledgeable with regard to opioids, opioid use disorder, Neonatal Abstinence Syndrome ("NAS"), NAS Children and/or medical, governmental or societal outreach, counseling or intervention programs that would serve to abate, mitigate or treat the condition or occurrence of NAS. The initial members of the Advisory Committee for the NAS Monitoring Trust shall be selected by the NAS Committee with the consent (not to be unreasonably withheld, conditioned or denied) of the Debtors.

To the extent known, the identity of the two (2) additional initial members of the Advisory Committee for the NAS Monitoring Trust will be disclosed in a Plan Supplement prior to the commencement of the Confirmation Hearing.

**CREDITOR TRUSTEE FOR THE PI TRUST**

1.    Edgar C. Gentle III

**MEMBERS OF THE PI TRUST OVERSIGHT COMMITTEE**

1.    Sean Higgins

2.    Troy Tatting

The Oversight Committee for the PI Trust will consist of three (3) members. The initial members of the Oversight Committee for the PI Trust shall be the two (2) individuals identified above and a third (3rd) initial member selected by the other initial members.

To the extent known, the identity of the third (3rd) initial member of the Oversight Committee for the PI Trust will be disclosed in a Plan Supplement prior to the commencement of the Confirmation Hearing.

**CREDITOR TRUSTEE FOR THE PI FUTURES TRUST**

1.    Edgar C. Gentle III

## EXHIBIT CC

### Schedule of Retained Causes of Action

In accordance with section 1123(b) of the Bankruptcy Code and section 10.15 of the *Fifth Amended Joint Chapter 11 Plan of Reorganization of Purdue Pharma L.P. and Its Affiliated Debtors* [D.I. 2982] (as may be amended, modified and/or supplemented, the "**Plan**")[1] and except as expressly provided in the Plan, including, without limitation, Sections 10.5 through 10.13 thereof, all of the Debtors' Causes of Action that are not expressly released under the Plan or otherwise expressly released prior to the Effective Date shall be preserved, and such Causes of Action shall be transferred to the Master Disbursement Trust, the Plan Administration Trust, the applicable Creditor Trust or NewCo, as applicable, which shall have, retain, reserve and be entitled to commence, pursue, and settle, as appropriate, any and all such Causes of Action, whether arising before or after the Petition Date, including, without limitation, the Causes of Action identified herein, notwithstanding the entry of the Confirmation Order or the occurrence of the Effective Date.

No Person or Entity may rely on the absence of a specific reference in the Plan or the Plan Supplement to any Cause of Action against such Person or Entity as any indication that such Cause of Action will be released or that the Master Disbursement Trust, the Plan Administration Trust, the applicable Creditor Trust or NewCo, as applicable, will not receive and pursue any and all Causes of Action against such Person or Entity. The Debtors, the Master Disbursement Trust, the Plan Administration Trust, the applicable Creditor Trust and/or NewCo, expressly reserve all rights to prosecute any and all Causes of Action, including any Causes of Action the Debtors could assert under Bankruptcy Code sections 506(d), 522, 541, 542, 543, 544, 545, 547, 548, 549, 550 and/or 553 or otherwise under the Bankruptcy Code or under similar or related state or federal statutes and common law (including, without limitation, all preference, fraudulent conveyance, fraudulent transfer, and/or other similar avoidance claims, rights, and causes of action), any defenses, cross-claims, and counter-claims related to any Causes of Action, and any Causes of Action for failure to fully perform or to condition performance on additional requirements under contracts with any one or more of the Debtors before the assumption or rejection, if applicable, of such contracts, in each case, against any Person or Entity, except as otherwise expressly provided in the Plan. Unless any Causes of Action against a Person or Entity are expressly waived, relinquished, exculpated, released, compromised, or settled in the Plan or a Final Order, the Debtors, the Master Disbursement Trust, the Plan Administration Trust, the applicable Creditor Trust and/or NewCo expressly reserve all Causes of Action, for later adjudication and, therefore, no preclusion doctrine, including the doctrines of *res judicata*, collateral estoppel, issue preclusion, claim preclusion, estoppel (judicial, equitable, or otherwise), and laches, shall apply to any reserved Causes of Action upon, after, or as a consequence of entry of the Confirmation Order or the occurrence of the Effective Date.

Notwithstanding and without limiting the generality of the foregoing, unless otherwise expressly waived, relinquished, exculpated, released, compromised, or settled in the Plan or pursuant to a

---

[1] Capitalized terms used but not defined herein shall have the meaning ascribed to such terms in the Plan.

Final Order, the following Causes of Action are further expressly reserved and preserved by the Debtors, the Master Disbursement Trust, the Plan Administration Trust, the applicable Creditor Trust and/or NewCo.

| Debtor(s) | Counterparty(ies) | Case Number and Jurisdiction | Nature of Dispute |
|---|---|---|---|
| Purdue Pharma L.P., et al. | AIG Specialty Insurance Co. (f/k/a American International Specialty Lines Insurance Company), et al. | Bankruptcy Case No. 19-23649 (RDD), Adv. Pro. No. 21-07005 (RDD) (Bankr. S.D.N.Y) | Insurance adversary proceeding |
| Purdue Pharma L.P. and Purdue Pharma Inc. | TIG Specialty Insurance Company (now known as Ironshore Specialty Insurance Company) | Sited in London under the English Arbitration Act 1996 | Claims related to insurance policies |
| Purdue Pharma L.P., Purdue Pharmaceuticals L.P. and Rhodes Technologies | Collegium Pharmaceutical, Inc. | C.A. No. 1:15-cv-13099-FDS (D. Mass.) | Lead Case Xtampza patent litigation |
| Purdue Pharma L.P. and Purdue Pharmaceuticals L.P. | Collegium Pharmaceutical, Inc. | C.A. No. 1:17-cv-11814-FDS (D. Mass.) | Xtampza patent litigation |
| Purdue Pharma L.P., Purdue Pharmaceuticals L.P. and Rhodes Technologies | Collegium Pharmaceutical, Inc. | C.A. No. 1:21-cv-10598-FDS (D. Mass.) | Xtampza patent litigation |
| Purdue Pharma L.P. and Purdue Pharmaceuticals L.P. | Collegium LLC and Collegium Pharmaceutical, Inc. | C.A. No. 1:18-cv-00226-CFC (D. Del.) | Nucynta ER and Nucynta IR patent litigation |
| Purdue Pharma L.P., Purdue Pharmaceuticals L.P. and Rhodes Technologies | Accord Healthcare Inc. | C.A. No. 1:20-cv-01362 (D. Del.) | OxyContin ANDA litigation |

## **EXHIBIT DD**

### **Schedule of Excluded Parties**[1]

1.    McKinsey & Company, Inc. United States and all its Related Parties, in their respective capacities as such.

2.    Practice Fusion, Inc.

3.    Publicis Health Media, an affiliate of Razorfish Health LLC

4.    ZS Associates, Inc.

6.    Mark Timney

7.    John Stewart

---

[1] The inclusion of any party on this Schedule of Excluded Parties is not an indication that any such party has been, or will be, accused of, or has committed any, wrongful conduct.

## <u>EXHIBIT EE</u>

### Restructuring Steps Memorandum

This Restructuring Steps Memorandum reflects the Debtors' current intentions with respect to the Restructuring Transactions. However, for the avoidance of doubt, nothing in this Restructuring Steps Memorandum shall limit or modify in any way any section of the Plan or any related provisions in the Confirmation Order or any authority or discretion granted to the Debtors, the Plan Administration Trust, the Master Disbursement Trust, the Creditor Trusts, NewCo or TopCo, as applicable. The Debtors reserve all rights to amend, revise or supplement the Plan Supplement, including this Restructuring Steps Memorandum, subject to the applicable consent rights under the Plan, at any time prior to the Effective Date, or on any such other date as may be provided for by the Plan or by order of the Bankruptcy Court.

In accordance with Sections 5.1 and 5.14 of the Plan, in furtherance of implementing the Restructuring Transactions, prior to, on and following the Effective Date, the Debtors, the Plan Administration Trust, the Master Disbursement Trust, the Creditor Trusts, NewCo, TopCo and the other entities referenced below, as applicable, will effect the following steps in the following order unless otherwise indicated below:

1.   Prior to the Effective Date, the Debtors and the Shareholder Payment Parties will enter into the Shareholder Settlement Agreement.

2.   Prior to the Effective Date, Purdue Pharma L.P. ("**PPLP**") will form [NewCo], LLC ("**NewCo**") and [TopCo], LLC ("**TopCo**") as Delaware limited liability companies.

3.   As of the Effective Date, (a) the Master Disbursement Trust will have been formed as a Delaware statutory trust by the Debtors [and the MDT Trustees] as a Delaware statutory trust, (b) the Plan Administration Trust will have been formed as a Delaware statutory trust by the Debtors [and the Plan Administration Trustee], (c) NOAT, the Tribal Abatement Fund Trust ("**TAFT**"), the Hospital Trust, the TPP Trust, the NAS Monitoring Trust, the PI Trust and the PI Futures Trust will have been formed as Delaware statutory trusts by their respective settlors and Creditor Trustees, and (d) Tribal Opioid Abatement Fund, LLC ("**Tribe Opioid LLC**") will have been formed as  a Delaware limited liability company by [●].

4.   On or before the Effective Date, the Debtors will establish and fund (a) the Professional Fee Escrow Account, (b) the Director and Employee Escrow Account, (c) the Priority Claims Reserve, (d) the Disputed Claims Reserves, (e) the Disputed Cure Claims Reserve, (f) the Wind-Up Reserve, (g) the PAT Distribution Accounts in the amounts necessary to make Distributions required under the Plan in respect of Allowed Adlon General Unsecured Claims and Allowed Avrio General Unsecured Claims, each to the extent Allowed as of the Effective Date, and (h) the MDT Operating Reserve.

5.   On or before the Effective Date, the Debtors will establish and fund the Public Document Repository.

6.     On the Effective Date, the Debtors will make (a) the Truth Initiative Contribution, subject to Section 5.8(f) of the Plan and (b) the Initial Federal Government Distribution.

7.     On the Effective Date and before 11:59:56 p.m. prevailing Eastern Time, the Debtors and the Plan Administration Trustee will enter into the PAT Agreement, pursuant to which (a) the PAT Assets will vest in the Plan Administration Trust and (b) control of the Professional Fee Escrow Account and Director and Employee Escrow Account will vest in the Plan Administration Trust.

8.     After Step 7, on the Effective Date or as soon thereafter as reasonably practicable, the Disbursing Agent, acting at the direction of the Plan Administration Trustee, shall make Distributions (a) from the Priority Claims Reserve in respect of Allowed Administrative Claims, Allowed Secured Claims and Allowed Priority Claims, each in an amount and to the extent Allowed as of the Effective Date and (b) from the PAT Distribution Accounts in respect of Allowed Avrio General Unsecured Claims and Allowed Adlon General Unsecured Claims, each in an amount required in accordance with Article VI of the Plan and solely to the extent Allowed as of the Effective Date.

9.     On the Effective Date and before 11:59:56 p.m. prevailing Eastern Time, (a) PPLP and certain of its Subsidiaries will enter into the Separation Agreement [with Purdue Research Associates, L.P. and certain independent associated companies relating to intellectual property, regulatory and other commercial matters]; and (b) PPLP and its Subsidiaries will complete certain internal restructuring transactions pursuant to which certain Debtors will transfer assets to other Debtors [and certain Transferred Debtors will be converted from limited partnerships to limited liability companies] in preparation for the transfer of the Transferred Debtors to NewCo.

10.    After Step 9 and before 11:59:56 p.m. prevailing Eastern Time on the Effective Date, PPLP, and NewCo will enter into the NewCo Transfer Agreement, pursuant to which, (a) PPLP will transfer the NewCo Transferred Assets, including the Initial NewCo Cash, to NewCo and (b) –NewCo will (i) assume the Assumed Liabilities (as defined in the NewCo Transfer Agreement) pursuant to the NewCo Transfer Agreement and (ii) agree to perform its obligations under the Plan, including the obligations to (A) enter into the NewCo Credit Support Agreement, (B) satisfy any deficiency of funding in the Wind-Up Reserve and (C) satisfy any deficiency of funding in the Director and Employee Escrow Account in accordance with Section 5.3(e) of the Plan.

11.    On the Effective Date and before 11:59:56 p.m. prevailing Eastern Time, (a) PPLP will contribute 100% of its NewCo Interest to TopCo and (b) TopCo will agree to perform its obligations under the Plan, including its obligation to enter into the NewCo Credit Support Agreement.

12.    At 11:59:56 p.m. prevailing Eastern Time on the Effective Date, (a) pursuant to the Channeling Injunction, all Channeled Claims shall be channeled to the Master Disbursement Trust solely for the purpose of effectuating the Master TDP and (b) the Debtors and the MDT Trustees will enter into the MDT Agreement, pursuant to which (i) the Debtors will transfer the MDT Transferred Assets (including the MDT Operating Reserve), the TopCo Interests and Cash in an amount equal to the Initial Private Creditor

Trust Distributions and the Initial Public Creditor Trust Distributions to the Master Disbursement Trust, (ii) the Master Disbursement Trust will issue the MDT Federal Government Claim to the United States in accordance with the Plan and (iii) the Master Disbursement Trust will agree to issue the MDT Private Claims and MDT Interests and make the other distributions to the Creditor Trusts upon the assumption by such Creditor Trusts of Channeled Claims under the Master TDP as more fully described below.

13.     At 11:59:57 p.m. prevailing Eastern Time on the Effective Date, pursuant to the Channeling Injunction and the Master TDP:

    a.     all Hospital Channeled Claims will be channeled to the Hospital Trust, in exchange for which the Master Disbursement Trust will (i) make the Initial Hospital Trust Distribution to the Hospital Trust and (ii) issue the MDT Hospital Claim to the Hospital Trust;

    b.     all Third-Party Payor Channeled Claims will be channeled to the TPP Trust, in exchange for which the Master Disbursement Trust will (i) make the Initial TPP Trust Distribution to the TPP Trust and (ii) issue the MDT TPP Claim to the TPP Trust;

    c.     all NAS Monitoring Channeled Claims will be channeled to the NAS Monitoring Trust, in exchange for which the Master Disbursement Trust will (i) make the Initial NAS Monitoring Trust Distribution to the NAS Monitoring Trust and (ii) issue the MDT NAS Monitoring Claim to the NAS Monitoring Trust;

    d.     all PI Channeled Claims will be channeled to the PI Trust, in exchange for which the Master Disbursement Trust will (i) make the Initial PI Trust Distribution to the PI Trust and (ii) issue the MDT PI Claim to the PI Trust;

    e.     all Future PI Channeled Claims will be channeled to the PI Futures Trust, in exchange for which the Master Disbursement Trust will make the PI Futures Trust Distribution to the PI Futures Trust;

    f.     all Non-Federal Domestic Governmental Channeled Claims will be channeled to NOAT, in exchange for which the Master Disbursement Trust will (i) make the Initial NOAT Distribution to NOAT, (ii) distribute the TopCo NOAT Interests to NOAT and (iii) issue the MDT NOAT Interest to NOAT.

    g.     all Tribe Channeled Claims will be channeled to TAFT, in exchange for which the Master Disbursement Trust will (i) make the Initial Tribe Trust Distribution to TAFT, (ii) distribute the TopCo Tribe Interest to TAFT and (iii) issue the MDT Tribe Interest to TAFT.

14.     At 11:59:58 p.m. prevailing Eastern Time on the Effective Date, TAFT will distribute 100% of the TopCo Tribe Interest to Holders of Tribe Channeled Claims, which will

immediately contribute the TopCo Tribe Interest to Tribe Opioid LLC in exchange for membership interests in Tribe Opioid LLC in accordance with the Tribe Opioid LLC Operating Agreement.

15.     At 11:59:59 p.m. prevailing Eastern Time on the Effective Date, TopCo and NewCo will enter into the NewCo Credit Support Agreement with the Master Disbursement Trust.

16.     Unless NewCo or NOAT receives favorable guidance from the IRS by a specified date, NewCo will elect to be treated as a corporation for tax purposes, effective the day after the Effective Date.

## EXHIBIT FF

### Estimate of Initial NOAT Distribution

$220,000,000[1]

---

[1] The final amount of the Initial NOAT Distribution on the Effective Date is subject to adjustment for (i) proposed accelerated payments, payable on the Effective Date under the Debtors' 2021 key employee incentive plan and 2021 key employee retention plan if approved as proposed, (ii) year-to-date budget to actual adjustments for both operating and non-operating results, (iii) items outside of the Debtors' control, including but not limited to, potential variability in investment monetization proceeds, higher than forecasted restructuring-related professional fees and potential cash collateral necessary to secure insurance coverage for NewCo and TopCo, and (iv) other adjustments.

## <u>EXHIBIT GG</u>

### Schedule of Rejected Contracts

The Debtors reserve the right to modify the treatment of any particular executory contract or unexpired lease pursuant to Section 8.1 of the Plan. Furthermore, notwithstanding anything to the contrary in the Plan, the Debtors may alter, amend, modify or supplement the Schedule of Rejected Contracts and assume, assume and assign or reject executory contracts and unexpired leases at any time prior to the Effective Date or, with respect to any executory contract or unexpired lease subject to a Contract Dispute that is resolved after the Effective Date, within thirty (30) days following entry of a Final Order of the Bankruptcy Court resolving such Contract Dispute.

1. Exclusive Licensing and Product Development Agreement, effective June 3, 2014, by and between Rhodes Pharmaceuticals L.P. and Altus Formulation, Inc.