UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

**Hearing Date: July 19, 2021**
**Hearing Time: 10:00 am**

------------------------------------------------------- x
                                    :

In re                               :          Chapter 11

                                      :

PURDUE PHARMA L.P., *et al.*,         :          Case No. 19-23649 (RDD)

                                      :

                       Debtors.   :          Jointly Administered

                                      :

------------------------------------------------------- x

## OBJECTION OF THE UNITED STATES TRUSTEE TO MOTION OF DEBTORS FOR ORDER AUTHORIZING IMPLEMENTATION OF 2021 KEY EMPLOYEE INCENTIVE PLAN AND 2021 KEY EMPLOYEE RETENTION PLAN

TO:     **THE HONORABLE ROBERT D. DRAIN,**
         **UNITED STATES BANKRUPTCY JUDGE:**

William K. Harrington, the United States Trustee for Region 2 (the "United States Trustee"), hereby submits this Objection in response to the Debtors' Motion for Entry of an Order Authorizing Implementation of 2021 Key Employee Incentive Plan and 2021 Key Employee Retention Plan (the "2021 Compensation Motion").  ECF Doc. No. 3077.  In support thereof, the United States Trustee respectfully states as follows:

### PRELIMINARY STATEMENT

Debtors propose to pay $23 million in incentive and retention payments, including over $7 million for five executives and insiders.  The 2021 Compensation Motion does not satisfy the standards for a KEIP and, in any event, should not be approved because it will deprive a new post-confirmation board from making the determination as to the appropriateness of employee compensation.

This is the third motion by which the Debtors seek authority to pay compensation above base salary.  The Debtors first sought authority to pay bonuses less than two years ago, on the day they commenced these cases, September 15, 2019.  The Debtors again sought authority to

pay bonuses on September 9, 2020.  On June 28, 2021, the Debtors filed their current request to

seek permission to pay bonuses.  Five of the proposed recipients also received bonuses under the

Debtors' second motion filed 10 months ago; the other three prior recipients under that motion

have since left the Debtors.

It is unclear why the Debtors seek approval for the payment of bonuses well over two

months earlier than they have done in the past.  No explanation is given.  The United States

Trustee submits, however, that because a confirmation hearing is scheduled to commence in

these cases on August 9, 2021 (only three weeks after this motion is scheduled to be heard), it is

appropriate for any compensation above base salary to be reviewed by the Debtors' post-

confirmation board in September 2021—the time the Debtors historically have sought authority

to pay bonuses.

Aside from whether it is reasonable to pay yet more bonuses to insiders and senior

executives, the payment of the bonuses under the Debtors' 2021 key employee incentive plans

are based upon metrics that may not represent difficult targets—they may have actually become

easier to attain than under prior plans—and are so vaguely described that it is impossible to

determine their terms or to verify whether the insiders have actually met their targets.

Accordingly, absent more information, it appears that the "incentive" awards are nothing more

than retention payments rewarding insiders for merely staying with the Debtors.[1]

With respect to the Debtors' 2021 retention plans, the costs are above the market 90th

percentile.  And when base salaries as well as KERP payments are considered, total direct

---

[1] In fact the Debtors appear to admit their retentive motive for the 2021 Compensation Motion when they state that "[t]he Debtors believe that it is important to continue to incentivize the 2021 KEIP Participants, as their institutional knowledge and skills remain essential to guiding the Debtors through their novel restructuring and maximizing the value of the Debtors' estates *through the conclusion of the Chapter 11 Cases*."  Id. at ¶ 26 (emphasis added).

compensation remains above-market and is competitive with the 75th percentile, which was the

standard set by the Court earlier in this case. The United States Trustee continues to oppose that

standard as a matter of law because Congress did not adopt market rates when restricting

executive and insider compensation in Section 503(c) of the Bankruptcy Code. Nevertheless,

even under the Court's prior ruling, the 2021 Compensation Motion is unacceptable because it

allows for the payment of large bonuses with costs well in excess of market averages. And the

proposed bonus structure is not justified by the facts and circumstances of this case, including the

projected small distribution creditors may receive under the Debtors' proposed plan of

reorganization.

Finally, the United States Trustee is cognizant the Court overruled similar objections

regarding the difficulty of the Debtors' proposed metrics as well as the cost of the Debtors'

incentive and retention compensation plans. The Court, however, should review the 2021

Compensation Motion with skepticism because of the timing of its filing, as noted above.

Assuming the Debtors confirm their plan and emerge from bankruptcy, any compensation above

base salary should be subject to review and approval by the Debtors' post-confirmation board.

## BACKGROUND

A.    General Background

1.    The Debtors commenced voluntary cases under chapter 11 of the Bankruptcy

Code on September 15, 2019 (the "Petition Date").

2.    The Debtors are authorized to continue to operate their businesses and manage

their properties as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy

Code.

3.    The Debtors' chapter 11 cases are being jointly administered for procedural

purposes only pursuant to Rule 1015(b) of the Federal Rules of Bankruptcy Procedure.  ECF

Doc. No. 59.

4.       The Debtors are pharmaceutical companies that manufacture, sell or distribute,

among other products, extended-release, long-acting opioid pain medications.  See Debtors'

Information Brief ECF Doc. No. 17 at 1.

5.       On September 27, 2019, the United States Trustee appointed an official

committee of unsecured creditors.  ECF Doc. No. 131.

6.       On June 3, 2021, this Court approved the Debtors' Disclosure Statement for its

Fifth Amended Chapter 11 Plan.  ECF Doc. No. 2988.  A confirmation hearing for the Debtors'

Chapter 11 Plan is scheduled to commence on August 9, 2021.

B.       The 2019 Benefits Motion

7.       On the Petition Date, the Debtors filed a Motion for Entry of an Order

Authorizing (I) Debtors to (A) Pay Pre-Petition Wages, Salaries, Employee Benefits and Other

Compensation, and (B) Maintain Employee Benefits Programs and Pay Related Administrative

Obligations (II) Employees and Retirees to Proceed with Outstanding Workers' Compensation

Claims, and (III) Financial Institutions to Honor and Process Related Checks and Transfers (the

"2019 Benefits Motion").  ECF Doc. No. 6.

8.       Pursuant to the 2019 Benefits Motion, the Debtors sought approval of, among

other things, their: (i) 2019 Annual Incentive Plan; (ii) Long-Term Results Plan; and (iii) Non-

Executive Retention Plan.  2021 Compensation Motion at ¶¶ 13 & 14.

9.       The United States Trustee objected to the 2019 Benefits Motion.  See ECF Doc.

No. 134.

10.     At three separate hearings the United States Trustee asserted, among other things,

because the metrics for the payment of bonuses were not difficult to reach, purported incentive

payments were primarily for retentive purposes and violated Bankruptcy Code Section 503(c)(1).

11.     Additionally, the United States Trustee asserted that because retention bonuses

were to be paid to officers who were "insiders" (as that term is defined in the Bankruptcy Code),

retention payments to those individuals violated Section 503(c)(1).

12.     The Court overruled the objections of the United States Trustee and granted the

Debtors' requests.

C.      The 2020 Compensation Plan

13.     On September 9, 2020, the Debtors filed a motion seeking approval of a key

employee incentive plan and a key employee retention plan (the "2020 Compensation Motion").

ECF Doc. No. 1674.  The plans set forth in the 2020 Compensation Motion were modeled on the

plans set forth in the 2019 Benefits Motion.  2021 Compensation Motion at ¶ 16.

14.     Pursuant to the 2020 Compensation Motion, eight insiders would be eligible to

receive: (i) an award contingent upon performance metrics with a target value; (ii) partial

payment of prepetition Long-Term Results Plan grants that are payable in 2022; and (iii) a long-

term incentive compensation grant payable in 2023.  2020 Compensation Plan at ¶ 21.

15.     The Debtors also sought authorization to implement a Key Employee Retention

Plan for approximately 614 employees.  Id. at ¶ 39.

16.     The United States Trustee objected to the 2020 Compensation Motion because the

Debtors did not demonstrate that the metrics for the bonuses associated with the incentive awards

presented difficult targets and the retention awards were in excess of market averages.  ECF Doc.

No. 1708.

17.     The Court overruled the objections of the United States Trustee and granted the

Debtors' requests.  ECF Doc. No. 1762.

D.     The 2021 Compensation Plan

18.     On June 28, 2021, the Debtors filed the 2021 Compensation Motion.  Pursuant to

the 2021 Compensation Motion the Debtors seek to renew the programs set forth in the 2020

Compensation Motion.  Id. at ¶ 20.

        a.     The KEIP

19.     According to the 2021 Compensation Motion, the Debtors seek approval of a Key

Employee Incentive Plan (the "KEIP") for five current insider employees (the "KEIP

Participants"), consisting of the: (i) President & Chief Executive Officer; (ii) Executive Vice

President, Chief Financial Officer; (iii) Executive Vice President, General Counsel and

Corporate Secretary; (iv) Chief Technical Operations Officer; and (v) President, Rhodes

Pharmaceuticals.  Id. at ¶ 26.

20.     Each KEIP Participant will receive an award comprised of: (i) an annual award

(the "2021 KEIP Annual Award") with a target value, which is also the award's maximum value;

and (ii) a long-term incentive compensation grant payable in 2024 (the "2021 KEIP Long-Term

Award").  Id. at ¶ 28.

21.     2021 KEIP Annual Award payments will be contingent upon the Debtors'

achievement of certain 2021 performance metrics (the "2021 Performance Metrics"), at the

threshold or target performance levels, as applicable.  Id. at ¶ 29.  2021 KEIP Annual Awards

aggregate between $4,044,525 and $5,392,700.  Id.

22.     2021 KEIP Annual Awards will be paid as follows: (i) 50% on the regular payroll

date closest to October 1, 2021; and (ii) 50% on the regular payroll date closest to March 15,

2022.  Id. at ¶ 32.  If the Debtors emerge at any time prior to any outstanding payment date, the

remaining full 2021 KEIP Annual Award payment would be paid on the emergence date at the

target 2021 KEIP Annual Award value, subject to a claw back.  Id.

23.    Each 2021 KEIP Participant will also receive a 2021 KEIP Long-Term Award,

which is designed to mimic the economic structure of the Long-Term Results Plan (the "LTRP")

grant that the participant otherwise would have received in 2021, payable in 2024.  Id. at ¶ 33.

Payments under the 2021 KEIP Long Term Award will accelerate at target value upon

emergence, subject to a claw back.  Id. at ¶ 34.   Payouts will be based on the same 2021

Performance Metrics that apply to the 2021 KEIP Annual Award.  Id. at ¶ 33.  The maximum

aggregate amount of such payments is approximately $1,710,000.  Id. at ¶ 34.

24.    The 2021 Performance Metrics are based on the same metrics as listed in the 2020

Compensation Motion: (i) value creation (representing 40% of the 2021 Performance Metrics);

(ii) innovation and efficiency (50% of the 2021 Performance Metrics); and (iii) people and

culture (10% of the 2021 Performance Metrics).  Id. at ¶ 36.

b.    *The KERP*

25.    The Debtors also seek authorization to implement a Key Employee Retention

Plan (the "KERP") for approximately 506 employees (the "KERP Participants"), of which 19

will be Vice President or higher and 487 will be middle management, professional employees

and support and technical staff, which include scientific researchers as well as regulatory,

compliance, quality and manufacturing personnel.  Id. at ¶ 46.

26.    The KERP Participants will receive an award comprised of: (i) an amount equal

to the 2021 KERP Participant's target AIP (the "2021 KERP Annual Award"); (ii) a long-term

incentive compensation grant payable in 2024 (the "2021 KERP Long-Term Award"); and (iii),

with respect to certain 2021 KERP Participants, additional targeted retention payments (the

"2021 Targeted Retention Awards").  Id. at ¶ 48.

27.    The 2021 KERP Annual Award will be paid as follows: (i) 50% paid on the

Company regular payroll date closest to October 1, 2021; and (ii) the remaining 50% paid on the

Company regular payroll date closest to March 15, 2022.  Id. at ¶ 50.  In the event the Debtors

emerge from bankruptcy any time prior to a payment date, the remaining full amount of the 2021

KERP Annual Award would accelerate and be payable, subject to claw back.  Id.

28.    The total aggregate target (and maximum) payment under the 2021 KERP Annual

Award is approximately $16,100,000.  Id. at 50.

29.    2021 KERP Participants will also receive a 2021 KERP Long-Term Award that is

essentially the same as the 2020 KERP Long-Term Award and is designed to mimic the

economic structure of the LTRP grant that otherwise would have been granted to the 2021 KERP

Participant in 2021 under Purdue's longstanding compensation practices.  The aggregate total

cost of these 2021 KERP Long-Term Awards for all 2021 KERP Participants is approximately

$6,000,000.  Id. at ¶ 52.

30.     In addition, the Debtors seek approval of the 2021 Targeted Retention Awards in

an aggregate amount of up to $7,200,000.  Id. at ¶ 53.  The 2021 Targeted Retention Awards will

be payable in the fourth quarter of 2021 and the first quarter of 2022.  Id. at ¶ 54.

31.    The aggregate cost of the 2021 KERP Annual Awards plus the 2021 KERP Long-

Term Awards is approximately $22.1 million, which represents 3.14% of the Debtors' revenue

and is above the market 90th percentile.  Id. at ¶ 75, Table 7.  Similarly, the cost of the 2021

Targeted Retention Awards is up to $7,200,000, which represents 1.02% of the Debtors' revenue

and is above the market 90th percentile.  Id. at ¶ 75, Table 8.

32.      Even when sized to consider base salaries as well as KERP payments, total direct

compensation remains above-market and competitive with the 75th percentile.  Id. at Table 6.

## ARGUMENT

**A.      The Governing Law: Section 503(c)**

Section 503(c) of the Bankruptcy Code provides, in relevant part, that:

Notwithstanding subsection (b), there shall neither be allowed, nor paid –

(1)      a transfer made to, or an obligation incurred for the benefit of, an insider of the debtor for the purpose of inducing such person to remain with the debtors' business, absent a finding by the court based on evidence in the record that

    (A)      the transfer or obligation is essential to retention of the person because the individual has a bona fide job offer from another business at the same or greater rate of compensation;

    (B)      the services provided by the person are essential to the survival of the business; and

    (C)      either –

        (i)      the amount of the transfer made to, or obligation incurred for the benefit of, the person is not greater than an amount equal to 10 times the amount of the mean transfer or obligation of a similar kind given to nonmanagement employees for any purpose during the calendar year in which the transfer is made or the obligation is incurred; or

        (ii)      if no such similar transfers were made to, or obligations were incurred for the benefit of, such nonmanagement employees during such calendar year, the amount of the transfer or obligation is not greater than an amount equal to 25 percent of the amount of any similar transfer or obligation made to or incurred for the benefit of such insider for any purpose during the calendar year before the year in which such transfer is made or obligation is incurred;

11 U.S.C. § 503(c).

As an initial matter, Section 503(c) must be applied to any contemplated transfer that is being made for the benefit of an insider of a debtor. Once it is determined that the individual who will receive the transfer is an insider, no transfer can be made where the transfer is being made for the purpose of inducing the person to remain with the debtor's business, unless the factors set forth in Sections 503(c)(1)(A) and (B) are met and either one of the mathematical formulas set forth in (C)(i) or (C)(ii) has been satisfied.

Congress added Section 503(c) in 2005 to curtail payments of retention incentives to insiders to "'eradicate the notion that executives were entitled to bonuses simply for staying with the Company through the bankruptcy process.'" In re Residential Capital LLC, 478 B.R. 154, 169 (Bankr. S.D.N.Y. 2012) ("Rescap") (quoting In re Global Home Prods., LLC, 369 B.R. 778, 784 (Bankr. D. Del. 2007); accord In re Hawker Beechcraft, Inc., 479 B.R. 308, 312-13 (Bankr. S.D.N.Y. 2012); In re Velo Holdings, Inc., 472 B.R. 201, 209 (Bankr. S.D.N.Y. 2012). In addition, Congress intended to limit the scope of key employee retention plans and other programs providing incentives to management of the debtor as a means of inducing management to remain employed by the debtor. Rescap, 478 B.R. at 169. Congress intended to put into place "a set of challenging standards" for debtors to overcome before retention bonuses could be paid. Global Home Prods., 369 B.R. at 784. The proponent of a bonus plan has the burden of showing that the plan is not a retention plan governed by Section 503(c)(1). Hawker Beechcraft, 479 B.R. at 313; Rescap, 478 B.R. at 170.

Where Section 503(c) applies, the transfer cannot be justified solely on the debtor's business judgment. See In re Borders Group., Inc., 453 B.R. 459, 470-71 (Bankr. S.D.N.Y. 2011). If a proposed transfer falls within Section 503(c)(1), then the business judgment rule does

not apply, regardless of whether a sound business purpose may actually exist.  In re Dana Corp.,

351 B.R. 96, 101 (Bankr. S.D.N.Y. 2006) ("Dana I").

Further, a debtor's label of a plan as incentivizing to avoid the strictures of Section

503(c)(1) must be viewed with skepticism; rather, the circumstances under which the proposal is

made and the structure of the compensation package control.  Velo Holdings, 472 B.R. at 209

("Attempts to characterize what are essentially prohibited retention programs as 'incentive'

programs in order to bypass the requirements of section 503(c)(1) are looked upon with disfavor,

as the courts consider the circumstances under which particular proposals are made, along with

the structure of the compensation packages"); see also Hawker Beechcraft, 479 B.R. at 313

("The concern ... is that the debtor has dressed up a KERP to look like a KEIP in the hope that it

will pass muster under the less demanding 'facts and circumstances' standard in ... §503(c)(3).");

Dana I, 351 B.R. at 102 n.3 ("If it walks like a duck (KERP) and quacks like a duck (KERP), it's

a duck (KERP).").

Finally, not only must bonus plans comply with Section 503(c), but as administrative

expenses they must also be "actual, necessary costs and expenses of preserving the estate," as

required by Section 503(b).  11 U.S.C. § 503(b); In re Unidigital, Inc., 262 B.R. 283, 288 (Bankr.

D. Del. 2001) (administrative expenses may not be allowed unless they are actual and necessary

to preserve the estate); In re Regensteiner Printing Co., 122 B.R. 323 (N.D. Ill. 1990) (reversing

approval of severance agreements for key employees, because debtors presented no evidence that

severance payments were necessary to preserve bankruptcy estate).

**B.** **The Debtors Have Failed to Satisfy Their Evidentiary
Burden to Demonstrate the KEIP is an Incentive Plan**

The law is clear that the burden is on the Debtors to either show that the proposed bonus

plan complies with the requirements of section 503(c)(1) or that it is not a disguised retention

plan.  See Dana I, 351 B.R. at 100; In re Mesa Air Group, Inc., No. 10-10018 (MG), 2010 WL

3810899 (Bankr. S.D.N.Y. Sept. 24, 2010), at *2 (citing Global Home Prods., 369 B.R. at 785).

Retention plans usually are intended "to encourage certain crucial employees to remain

with the company through a critical, transitional time period when the exact future of the

company is unclear and when those employees would be most likely to search for other

employment."  In re The Brooklyn Hosp. Ctr. and Caledonian Health Ctr., Inc., 341 B.R. 405,

413 (Bankr. E.D.N.Y. 2006).  Although the Debtors style the KEIP as incentive plans, they fail

to satisfy the stringent criteria that it is not merely retentive.  It is the substance of how and why

the proposed payments are made, not the label put on the plan, that is determinative.  Mesa Air

Group, Inc., 2010 WL 3810899, at *4 (incentive plans are designed to motivate employees to

achieve performance goals).

*1.*        *The Debtors Do Not Demonstrate that the Metrics are Difficult*

The Debtors do not demonstrate that the 2021 Performance Metrics for the bonuses

associated with the KEIP awards present difficult targets that will incentivize future

performance.  The innovation and efficiency performance metrics, representing 50% of the

performance metrics, are as follows:

| 2021 Innovation and Efficiency Performance Metric[8] | 2021 Performance Target | % of Innovation and Efficiency | % of 2021 Performance Metrics |
|---|---|---|---|
| Consolidated total business Operating Profit | $69 million | 40% | 20.0% |
| Adhansia XR Net Sales | $14 million | 20% | 10.0% |
| Avrio Net Sales | $97.7 million | 20% | 10.0% |

| | | | |
|---|---|---|---|
| Reduce Rhodes (RALP) 2021 Funding Requirement by $45 million from 2020 amount | ($45 million) | 20% | 10% |
| **Total** | | **100%** | **50%** |

2021 Compensation Motion at ¶ 38.

No information, including historical financial information, regarding these metrics is provided to allow creditors, the Court and the United States Trustee to compare the current targets with past results. Without such information it is impossible to determine if these are truly difficult targets or rather "lay-ups" rewarding participants for merely staying with the Debtors.

As demonstrated in the chart below, it appears that three of the four 2021 Performance Targets are now lower than the Performance Targets set for 2020. The Debtors must justify these reduced metrics. The Debtors should also explain why the 2021 Compensation Plan only contains four Innovation and Efficiency Performance metrics while the 2020 Compensation Plan had six.

| 2020 Innovation and Efficiency Performance Metric[11] | 2020 Performance Target | % of Innovation and Efficiency | % of Target KEIP Award |
|---|---|---|---|
| Purdue Branded Business Operating Profit | $115M | 20% | 10% |
| Adhansia XR Net Sales | $18M | 10% | 5% |
| Adhansia XR Operating Loss[12] | ($44M) | 15% | 7.5% |
| Avrio Net Sales | $85M | 10% | 5% |
| Avrio Operating Profit | $8.6M | 15% | 7.5% |
| Rhodes (RALP) Operating Loss | ($35M) | 30% | 15% |
| **Total** | | **100%** | **50%** |

2020 Compensation Motion at ¶ 29.

In addition, the Debtors describe the people and culture metric, representing 10% of the

performance metrics, is as follows:

> (i) conducting readiness activities to prepare for emergence from bankruptcy and (ii) establishing and supporting implementation of a diversity, equity and inclusion ("**DE&I**") roadmap through the end of 2021 to ensure a sustainable and accountable DE&I profile for the organization.

Id. at ¶ 39.

This description is at best vague and it is difficult to objectively determine if it has been

achieved.  Therefore, it is impossible to ascertain if this metric represents a difficult target or is

merely retentive in nature.  Absent further explanation, the KEIP awards that are tied to the

foregoing metrics do not represent difficult targets to reach.  See Hawker Beechcraft, 479 B.R. at

314 (denying bonus motion where (i) sale price target was not "much of a challenge" and (ii)

cash flow targets would be met if debtors do not encounter any "whoopsies").

        2.        *The Debtors Do Not Adequately Address Section 503(c)(1)(C)*

The Debtors fail to establish that, among other things, any of the insiders have a bona fide

job offer with other companies at the same or greater rates or that either: (i) the new proposed

payments are less than ten times the mean of similar payments made to non-management

employees during the calendar year; or (ii) the proposed payments are less than 25 percent of the

amount of any similar payments made to the Senior Managers in the prior year.  11 U.S.C.

§ 503(c)(1).  Accordingly, the Court should conclude that the Debtors have failed to satisfy their

burden under section 503(c)(1) and the "incentive" awards should not be approved at this time.

 C.    **The KERP Must Be Rejected Because the Awards are too Costly**

In order for the KERP payments to pass muster under Section 503(c)(3) of the

Bankruptcy Code, the movant must show that it is warranted by "the facts and circumstances of

the case." 11 U.S.C. § 503(c)(3); In re Dana Corp., 358 B.R. 567, 576 (Bankr. S.D.N.Y. 2006)

("Dana II"). To meet their burden under Section 503(c)(3), the Debtors must show that there is

"sound business judgment" for the compensation plan in question. See id. at 576-77.

As noted above, the cost of the 2021 KERP Annual Award plus the 2021 KERP Long-

Term Award is approximately $22.1 million, which represents 3.14% of the Debtors' revenue

and is above the market 90th percentile. Id. at ¶ 75, Table 7. Similarly, the cost of the 2021

Targeted Retention Awards is up to $7,200,000, which represents 1.02% of the Debtors' revenue

and is above the market 90th percentile. Id. at ¶ 75, Table 8. Even when sized to consider base

salaries as well as KERP payments, total direct compensation remains above-market and

competitive with the 75th percentile. Id. at Table 6. The payment of large bonuses in excess of

market average is not justified by the facts and circumstances of this case, including the small

distribution certain creditors are proposed to receive under the Debtors' plan of reorganization.

**D.    The KEIP and KERP Are Not Justified By the Facts and Circumstances of This Case**

If the Court finds that Section 503(c)(1) does not apply, the Court may also consider

whether the payments are permissible under section 503(c)(3). Dana II, 358 B.R. at 576.

Section 503(c)(3) authorizes judicial discretion with respect to bonus plans motivated primarily

by reasons other than retention. Id. Should the Court find that Section 503(c)(1) does not apply,

to grant the awards the Court must find that it passes the test of Section 503(c)(3)—that it is

necessary to preserve the value of the Debtors' estate and is "justified by the facts and

circumstances of the case." 11 U.S.C. § 503(c)(3); In re Unidigital, Inc., 262 B.R. 283, 288

(Bankr. D. Del. 2001) (administrative expenses may not be allowed unless they are actual and

necessary to preserve the estate); see also In re Regensteiner Printing Co., 122 B.R. 323 (N.D. Ill.

15

1990) (reversing approval of severance agreements for key employees, because debtors

presented no evidence that severance payments were necessary to preserve bankruptcy estate).[2]

The Debtors have not established that the requested bonuses are justified by the facts and

circumstances of this case. As set forth above, the Debtors were twice previously awarded

authority to pay employees bonuses. In fact, the 2019 Benefits Motion and the 2020

Compensation Motion were filed in September 2019 and September 2020, respectively. It is

unclear why the Debtors are seeking approval of the 2021 Compensation Motion well over two

months earlier than they have done in the past. Because a confirmation hearing is scheduled to

commence on August 9, 2021, assuming the Debtors confirm their plan and emerge from

bankruptcy, compensation above base salary should be reviewed by the Debtors' post-

confirmation board. In light of the foregoing, the facts and circumstances do not justify the

payment of additional bonuses to the Debtors' employees at this time.

---

[2] Although some courts in this district have determined that the standard under Section 503(c)(3) is not different from the business judgment test under Section 363(b), see In re Residential Capital, LLC, 491 B.R. 73, 84 (Bankr. S.D.N.Y. 2013) (additional citations omitted), these courts and others continue to apply the factors listed by Judge Lifland in Dana II, when determining if the structure of a compensation proposal and the process for its development meet with the standard under Section 503(c)(3).

WHEREFORE, the United States Trustee respectfully requests that the Court deny the

approval of the 2021 Compensation Motion as set forth herein and grant such other relief as the

Court deems fair and just.

Dated:  New York, New York
          July 12, 2021

                                              Respectfully submitted,

                                              WILLIAM K. HARRINGTON
                                              UNITED STATES TRUSTEE, Region 2

                                              By: */s/ Paul K. Schwartzberg*
                                              Paul K. Schwartzberg
                                              Trial Attorneys
                                              201 Varick Street, Room 1006
                                              New York, New York 10014
                                              Tel. (212) 510-0500