# EXHIBIT 2

## UNITED STATES BANKRUPTCY COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| In re: | Chapter 11 |
| PURDUE PHARMA L.P., et al., | Case No. 19-23649-rdd |
| Debtors. | (Jointly Administered) |
| CREIGHTON BLOYD, and CHARLES FITCH on behalf of themselves and others similarly situated to them, | Adversary Proceeding |
| Plaintiffs, | Case No. 20-07027-rdd |
| v. | Class Action |
| PURDUE PHARMA L.P., WALMART, INC., and McKINSEY & CO., | |
| Defendants. | |

## <u>AMENDED ADVERSARY PROCEEDING COMPLAINT</u>

On behalf of themselves and those similarly situated to them, Creighton

Bloyd and Charles Fitch bring this amended adversary proceeding complaint

against the Debtor, as herein defined.[1]  In support of their requests for relief, Bloyd

and Fitch state:

---

[1] This amendment substitutes Fitch as a class representative, omits Bridges as a class representative (named as such in the original adversary proceeding complaint), and clarifies claims.

1

1.    Bloyd and Fitch's claims against Debtor constitute a core proceeding in this case.  Bloyd and Fitch's claims against Wal-Mart and McKinsey are related to this case, insofar as each dollar paid by Wal-Mart or McKinsey may reduce the Debtor's liability for the restitution demanded herein. Especially insofar as equitable relief is concerned, Debtor may also have claims of contribution and indemnity against Wal-Mart and McKinsey.  The claims are all related to the Debtor's misconduct leading to the opioid crisis.  Debtor made, promoted, distributed and dispensed OxyContin, MS Contin and other opioids, but McKinsey advised Debtor how to overcome regulatory and legal constraints and, as those restraints were overwhelmed, Wal-Mart dispensed the opioids without abiding by regulatory constraints, according to the United States Department of Justice. Bloyd, Fitch, and the class of persons they represent were the victims of these failures.

2.    Bloyd is a resident of Alabama and is over 21 years of age.

3.    Fitch is a resident of Alabama and is over 21 years of age.

4.    Debtor is defined as that group of companies described in footnote 1 of Exhibit A in Appendix 1 appended to this amended adversary proceeding complaint.

5.    Debtor manufactured, sold, and distributed opioid products, including but not limited to oxycodone.

2

6.     Debtor's opioid products included those marketed under the brand names OxyContin and MS Contin.

7.     Debtor aggressively marketed its opioid products to physicians and others.

8.     Debtor's aggressive marketing caused physicians and others to write medically unnecessary prescriptions, thousands of which were for no legitimate medical purpose whatsoever.

9.     The market was so flooded with medically unnecessary prescriptions that not even Wal-Mart kept pace with ordinary compliance oversight.  See Appendix 2 appended to this amended adversary proceeding complaint (Civil Complaint by United States against Wal-Mart).

10.     The flood of opioid prescriptions in Walker County, Alabama, where Bloyd now works, was so great that all the pharmacies in the entire county would often run out of opioids.  As a result, patients with legitimate medical needs had to travel to other counties just to fill prescriptions for pain medication.

11.     When Debtor's owners had exhausted their own imaginations about how to flood the market with opioids, Debtor enlisted the aid of McKinsey & Co. for additional ideas. McKinsey supplied Debtor with schemes to maintain opioid sales despite regulatory constraints.

12.    Once these medical unnecessary prescriptions were filled, Debtor's products were sold to innocent third parties, many of whom were minors, who thought the products were safe to consume and who had no idea how extraordinarily addictive the products were.

13.    Bloyd was a student when he became addicted to OxyContin, a product manufactured by the Debtor.

14.    The OxyContin that Bloyd consumed came from Florida via a pipeline that was the subject of a feature length story in Rolling Stone magazine.[2]

15.    Bloyd became addicted to opioids by reason of his consumption of Debtor's products.

16.    By reason of his addiction, Bloyd's life was very nearly destroyed.

17.    Bloyd attempted to stop consuming opioids, but could not, even with professional help.

18.    Eventually, after years of addiction and unsuccessful attempts to stop using opioids, Bloyd became a patient for medicine assisted therapy (MAT).

19.    MAT is an addiction treatment that uses medicine, as opposed to therapy alone, to help patients overcome addiction.  In treating opioid addiction,

---

[2] https://www.rollingstone.com/culture/culture-news/the-dukes-of-oxy-how-a-band-of-teen-wrestlers-built-a-smuggling-empire-226940/.

4

the medicine used in MAT can include opioid agonists (such as buprenorphine,

another product made by Debtor, and commonly known as Suboxone).

20.    With MAT, persons such as Bloyd stand a dramatically better chance

at overcoming their addictions.

21.    Today, with MAT, Bloyd lives a successful life. He has married and

his career as a consumer finance executive is going well.

22.    Bloyd works in Jasper, Alabama, the county seat of Walker County,

Alabama, which has one of the highest per capita opioid prescription rates in the

United States, if not the world.  He can see first hand the ravages that addiction has

wrought in that community.

23.    Bloyd has medical insurance, but his insurance does not cover his

MAT.  Thus, he has to pay for his MAT out of his own pocket.

24.    Fitch has been an opioid addict for much of his adult life.

25.    Debtor's products were a mainstay of Fitch's addiction.

26.    As a result of his addiction, Fitch has spent most of his adult life in the

custody of the Alabama Department of Corrections, the notorious agency in charge

of prisons in Alabama.

27.    The prisons in Alabama are among the worst in the Nation. Indeed,

those prisons are so bad that, even during the tenure of the Attorney General Jeff

Sessions, a man whose political career was built on a reputation for being "tough"

5

on crime, the United States Department of Justice investigated and found that conditions fell short of even the minimal constitutional standards necessary to avoid violating the Eighth Amendment of the United States Constitution.

28.    As a result of those findings and the open refusal of the State of Alabama to address prison conditions, the United States Department of Justice commenced an action pursuant to the Civil Rights of Institutionalized Persons Act. At paragraph 57 of its complaint, USDOJ specifically calls out the danger to inmates caused by the drug use in Alabama prisons.[3]

29.    As an opioid addict, Fitch is particularly vulnerable in custody.

30.    If Fitch were in custody in the Jefferson County, Alabama jail, he would be eligible for MAT. Likewise, if he was a prisoner in another State (for example, Rhode Island), he might be eligible for MAT.

31.    Because Fitch is in the custody of ADOC, he cannot have MAT.

32.    However, Fitch can have counseling.[4]

33.    Indeed, the Alabama Board of Pardons and Paroles often insists that an inmate with a history of drug addiction *must* have drug counseling before he is

---

[3] A copy of the complaint is available at Justice Department Files Lawsuit Against the State of Alabama for Unconstitutional Conditions in State's Prisons for Men | OPA | Department of Justice.

[4] Moreover, prisoners in custody are in the process of obtaining access to lawful video conferencing.

eligible for parole, regardless whether, in fact, the required counseling was available to the prisoner.

34.    Thus, prisoners are denied parole when they cannot have drug counseling.

35.    While Fitch is in custody, he can endure the unconstitutional conditions of his confinement, provided he has access to counseling, even without succumbing to his addiction.

36.    However, as a practical matter, Fitch often cannot obtain counseling because he cannot pay for it out of his own pocket and because the classes that would make the counseling available to him are generally full.  While ADOC offers third party counseling, that counseling is available only after inmates have acquired drugs in prison and have been placed on suicide watch and in administrative segregation (solitary).

37.    Various States have urged this Court to award them money to compensate the States for the damages they allegedly incurred as a result of "the opioid crisis."

38.    Many, if not all, of these States actually caused the crisis by loose regulation or effective regulations that were not enforced.

39.    Indeed, in Alabama, the State did not merely fail to prevent or to diminish the opioid crisis. The State of Alabama actively aggravated the crisis by

7

criminalizing opioid addiction without offering meaningful treatment for it and then confining victims in prisons where drugs were easily available and essentially forced on inmates through racketeering.

40.    The States have no legal damages and most cannot prove any right to restitution.

41.    In instances where the States have proved a right of restitution, they have wildly overstated their demands.

42.    Even if States could prove damages or quantify a right to restitution, they have no right to the restitution properly belonging to the Debtor's victims. If the States ever had such a right, they forfeited that right by aggravating the misery of those victims instead of treating their diseases.[5]

43.    The United States Department of Justice has attempted to use this bankruptcy case to require victims to seek from the States and local governments that restitution that the victims would otherwise receive under the Mandatory Victims Restitution Act.  USDOJ attempts to grab Debtor's assets (despite the MVRA) by allowing Debtor to plead guilty to a violation of 18 U.S.C. 371, a violation of which does not *per se* trigger statutorily mandated restitution. See

---

[5] The State of Alabama has not managed even to vaccinate seniors and first responders against COVID-19. Alabama vaccine distribution worst in the nation - al.com. It is unreasonable to require Debtor's victims to rely on the State to manage the long term treatment, given that the State has historically preferred to incarcerate, rather than treat those victims. The situation is not much better even in other jurisdictions that have historically had a better reputation for respecting the rule of law.

8

Appendix 1 (Criminal Plea Agreement with Debtor).   While the Plea Agreement between USDOJ and Debtor does not expressly deny that Debtor's victims are not otherwise entitled to restitution, that Agreement justifies completely foregoing restitution for anyone at all by proclaiming that calculating restitution would result in unnecessary "prolongation."

44.    If McKinsey and Co. could calculate how much Debtor should pay pharmacies when their customers overdosed, it should not lie beyond human understanding to calculate the costs of restitution to Debtor's victims who have filed claims in this case and those who would have filed claims, but for their incarceration in facilities that made filing impracticable.[6]  The average cost of two years of MAT in an outpatient setting and competent therapy delivered via telemedicine is about $33,000 in a typical State.

45.    With its vast network of pharmacies and stores, Wal-Mart reaches into practically every corner of the United States and is especially strong in rural and suburban areas, where the opioid crisis was and is particularly acute.

46.    In its civil action against Wal-Mart, the complaint which is appended hereto as Appendix 2, the United States describes how Wal-Mart made the opioid crisis possible by requiring pharmacists to fill prescriptions despite red flags (*e.g.,*

---

[6] See https://www.nytimes.com/2020/11/27/business/mckinsey-purdue-oxycontin-opioids.html

when the prescriptions were written by physicians whose orders no other pharmacies would fill or when the patients presenting the prescriptions were visibly intoxicated).

47.    While Wal-Mart may not have been the only pharmacy to ignore the perils of improper prescription practices, its market presence, nationwide reach, and overall influence (much of which has worked for good in the late pandemic) made possible the pipeline that poured opioids into addicted Americans year after year.  Wal-Mart could have and should have stopped dispensing opioids pursuant to prescriptions that were bogus.[7]

48.    Debtor's management undoubtedly included many gifted chemists and skilled managers, but Debtor could never have overcome the increasing resistance to improper prescription practices without the aid of McKinsey.

49.    McKinsey literally empowered Debtor in its reckless practices, which would have failed but for McKinsey.

---

[7] Today, Wal-Mart has taken a sharply different attitude at the corporate level. See Our Commitment Starts Here (walmart.com).   While Wal-Mart's website describes some laudable steps toward keeping the opioid crisis from spreading, the efforts described there omit anything to overcome the past effects of the crisis.  With the company's resources and goodwill (particularly the trust that the company has built among moderate and lower income Americans), in kind restitution payments from Wal-Mart could mean health to thousands of Americans battling opioid addiction.

10

50.    Bloyd and Fitch realize that it may be impracticable and, in any event, imprudent, to award money damages to Debtor's victims, especially where such victims remain in active addiction.

51.    Bloyd and Fitch respectfully submit they and the class and subclasses that they respectively represent should not be required to rely upon the States for restitution, given the open antagonism that their State and other States have shown toward their conditions.  In particular, if Alabama gets the money that should be spent on healing Debtor's victims, the payments will likely go to build more prisons to incarcerate the victims, not to heal them.[8]

52.    Even if they could be trusted to look after the interests of Debtor's victims, Alabama and other States should not receive restitution necessary to restore the health of Debtor's victims, if for no other reason than Alabama and other States generally lack the legal ability to earmark such money to pay for the victims' recoveries, as opposed (for example) to pay for public recreational projects.  Even if they could earmark the money, most would likely go to law enforcement, rather than treatment.

53.    Bloyd timely filed a claim in bankruptcy and on that claim declared his desire to represent a class of all persons similarly situated to him.  That class of

---

[8] Ivey signs leases for 2 new prisons; costs not released - al.com

11

persons would consist of all persons who a) became addicted to opioids by using Debtor's products and b) who require MAT.

54.    Fitch timely filed a claim in bankruptcy court and on that claim declared his desire to represent a class of all persons similarly situated to him. That class of persons consists of opioid use disorder patients who are incarcerated and who, by reason of their incarceration, are denied MAT, but who can receive counseling.

55.    The statutes of limitations for Bloyd and Fitch have been tolled due to the affects of addiction on their abilities to manage their affairs.

56.    The statute of limitations for Bloyd was tolled due to the fact that he was a minor when he became addicted to the Debtor's products.

57.    The statute of limitations for Fitch was tolled due to his continual incarceration in unconstitutional conditions that kept him from pursuing his own interests.

58.    Bloyd will adequately represent the interests of all Debtor's victims who became addicted to opioids.

59.    Fitch will adequately represent the interests of all Debtor's victims who, by reason of their incarceration, cannot have access to MAT, but who can have access to counseling.

12

60.     The claims in this matter are numerous. By one estimate, there were more than 17,000 claims for personal injury in this action.

61.     The claims of the class representatives are typical of those of the absent class members.

62.     There are questions of law and fact common among the class representatives and the absent class members.

63.     A class proceeding is a superior means of adjudicating the controversy between Debtor, on the one hand, and Debtor's victims, on the other hand.

## Count One

64.     Bloyd and Fitch incorporate by reference paragraphs 1 through 63 of this Amended Adversary Proceeding Complaint.

65.     Every State in the Nation allows victims of a criminal's conduct to recover damages for the injuries that the criminal caused.  *See*, e.g. *Hardie-Tynes Manufacturing Co. v. Cruse*, 189 Ala. 66, 78, 66 So. 657, 661 (1914).

66.     The criminal activity in which the Debtor engaged is too widespread to catalogue here and too well known to require recitation.  At a minimum, the Debtor repeatedly violated the Controlled Substances Act, 21 U.S.C. 856(a), by fraud and deceit and committed other frauds and deceits.

13

67.     The nature of the Debtor's crimes was such that it rendered Debtor's victims incapable of pressing their claims until now, such that any limitations of actions should be tolled.

## Count Two

68.     Bloyd and Fitch incorporate by reference paragraphs 1 through 63 of this Amended Adversary Proceeding Complaint.

69.      Wal-Mart enabled Debtor to dispense medications in violation of 18 U.S.C. 371, the Controlled Substances Act, and various other State and Federal laws regarding the manufacture, sale, and distribution of Debtor's products.

70.     In addition, Wal-Mart itself violated 18 U.S.C. 371, the Controlled Substances Act, and various other State and Federal laws regarding the manufacture, sale, and distribution of Debtor's products.

71.     As a consequence of these violations, Bloyd, Fitch, and the class of persons similarly situated to them were harmed in the manner described herein.

## Count Three

72.     Bloyd and Fitch incorporate by reference paragraphs 1 through 63 of this Amended Adversary Proceeding Complaint.

73.     As devoted as it was to pursuing profit and disregarding sound pharmaceutical practices, Debtor could never have accomplished all of the wrongdoing that it managed to achieve without McKinsey.

74.    McKinsey materially contributed to and proximately caused the harms endured by Debtor's victims by coaching Debtor to achieve its unlawful goals.

75.    While McKinsey has apologized to the public, and while McKinsey is negotiating with the States to forestall any monetary demands those governments may have, McKinsey has not diminished the harm that the company caused Debtor's victims to suffer.

WHEREFORE, on behalf of themselves and others similarly situated to them, Bloyd and Fitch respectfully request this Court to enter an order as follows:

A.    To require Debtor to establish a directed trust (the Trust),  1) the primary beneficiaries of which are those natural persons a) who have filed claims in this case,  b) who are opioid use disorder victims, and c) who consumed Debtor's opioid products, and the secondary beneficiaries of which are persons who satisfy conditions b) and c), and 2)  the powers of which Trust shall be those necessary to accomplish the purpose of providing MAT, including counseling, to primary and secondary beneficiaries.

B.    To require Debtor to appoint Truist Bank, or, in the event Truist Bank is unwilling or unable to accept the appointment, another similarly sized depositary institution with trust powers as the trustee for the Trust.

C.     To require Debtor to designate an acceptable money manager for the
Trust from a slate of managers presented by the Unsecured Creditor's Committee
to the Court.

D.      To take evidence and, if necessary, to have a hearing (whether
virtually or otherwise) on the amount necessary to cover the MAT, including
counseling as appropriate.

E.     To impose a lien (the Lien) against the Debtor's assets in an amount
that the Court determines as an appropriate amount to pay as restitution for Bloyd,
Fitch, and the class of persons they represent, which amount shall be the amount
described above.

F.     To require Debtor to deposit into the Trust cash or cash equivalents in
an amount necessary to satisfy the Lien.

G.     From a list that Bloyd and Fitch present and after hearing objections,
if any, from creditors, to appoint administrative, medical, and psychological
experts to advise the Trust from time to time on methods for reimbursing service
providers (including pharmacies) who provide MAT, including therapy, to
beneficiaries of the Trust.[9]

---

[9] The New York Times reports that McKinsey & Co. regrets its role in the opioid crisis.
McKinsey Issues a Rare Apology for Its Role in OxyContin Sales - The New York Times
(nytimes.com). If McKinsey really wanted to help, rather than merely regret, the company could
provide the administrative support necessary to manage the trust.

16

H.      After the funds of the Trust are such that efficient administration is

not practical, or after the beneficiaries have completed MAT and counseling, or

upon other good cause shown by any beneficiary, trustee of the Trust, or advisor of

the Trust, to disburse the corpus of the trust to such persons whose usage of the

funds would be consistent with the purpose of the Trust.

I.      To the extent the Court deems such just and proper, to award a

reasonable fee to Plaintiffs' attorneys and to tax costs to the Debtor as an

administrative expense.

Respectfully submitted,


s/ Frank Ozment
Frank Ozment (ASB-7203-N73J)
Frank Ozment Attorney at Law, LLC
217 Country Club Park, Box 501
Birmingham, AL 35213
Phone: (205) 847-5401
***Attorney for Plaintiffs***


**OF COUNSEL:**
Roderick Graham (ASB-3237-R74R)
Graham and Associates, P.C.
P.O. Box 43334
Birmingham, Alabama 35243
Phone: (205) 427-9494
***Attorney for Plaintiffs***

17